IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | CASE NO. 1:15-CR-0088-CG |
| XIULU RUAN, M.D., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT XIULU RUAN, M.D.'S MOTION TO DISMISS THE SECOND
SUPERSEDING INDICTMENT, IN PART**

Xiulu Ruan, M.D. moves to dismiss, in part, the Second Superseding Indictment

("Indictment").  Specifically, Dr. Ruan asks the Court to dismiss all counts in the Indictment

related to alleged violations of the Controlled Substances Act ("the Act" or "CSA"), Title 21

United States Code, Section 801, et seq. The provisions of the CSA at issue here, 21 U.S.C. §§

841 and 846, violate the Due Process clauses of the Fifth and Fourteenth Amendments of the

United States Constitution, because those provisions are unconstitutionally vague as applied to

physicians authorized to prescribe controlled substances.  Sections 841 and 846 of the Act are

vague and constitutionally infirm, because the statutory framework, controlling regulatory

authority, and case law fail to define the conduct proscribed by the Act with sufficient

definiteness that a physician would know what conduct is prohibited and, therefore, encourages

arbitrary and discriminatory enforcement.  Furthermore, because the CSA offenses are one of the

two necessary predicates to the Racketeering Influenced and Corrupt Organizations

("RICO") conspiracy charged in Count 1 of the Indictment, the dismissal of the those offenses is

fatal to the RICO count and requires its dismissal as well.

I.      THE INDICTMENT

The Indictment in this case is sprawling.  It alleges that Dr. Ruan, along with his co-accused, Dr. John Patrick Couch, operated their pain clinic, Physician's Pain Specialist of Alabama, P.C. ("PPSA"), and a co-located pharmacy, as a "criminal enterprise."  *See* Doc. 269, p. 13.  The Indictment concedes that the clinic had "some aspects of legitimate medical practice," but implies these were anomalous exceptions to its true "essence" as a "pill mill."  *Id.* at 8. Therefore, the government has accused doctors Ruan and Couch of being racketeers and conspiring with each other and their business entities to engage in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).  *Id.* at 13-20.  The pattern of racketeering activity alleged is two-fold:  first, a conspiracy to illegally dispense, and in-fact illegally dispensing, controlled substances in violation of 21 U.S.C. §§ 841 and 846; second, the commission of multiple acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.  *Id.* at 20.

As to Dr. Ruan, the violations of the CSA are alleged in Counts 2,3,4,8,9,10,11 and 12 the gravamen of those allegations is that he prescribed to his pain clinic patients various controlled substances—all medications invented for the treatment of pain—"outside the usual course of medical practice and not for a legitimate medical purpose."  *Id.* at 20-23, 25-26.   The alleged substantive violations of the mail and wire fraud statutes as to both doctors are found in Count 19, which alleges that they billed at a higher doctor rate when patients were seen by nurses and then manipulated prescriptions by selecting drugs with the highest reimbursement rates.  *Id.* at 37-39.  The Indictment also alleges violations of the statute proscribing healthcare kickbacks, 42 U.S.C. § 1320-7b(b), and a conspiracy to commit healthcare fraud in violation of 18 U.S.C. § 1349.  *Id.* at 27-39.

## II.       THE CSA AND ITS REGULATORY FRAMEWORK

### a.  THE CSA AS APPLIED TO PHYSICIANS

The CSA, in pertinent part, makes it unlawful for any person to knowingly and intentionally "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute or dispense, a controlled substance," absent a specific authorization contained elsewhere within Title 21.  *See* 21 U.S.C. § 841(a)(1).  Section 846 of Title 21 makes it a crime to conspire to violate § 841(a)(1).  One of the specific exceptions to  § 841's prohibitions is a prescription for a controlled substance issued by a physician, *i.e.,* a licensed "practitioner," so long as the prescription is "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."  *See* 21 C.F.R. § 1306.04(a); *see also* 21 U.S.C. § 802(21) ("practitioner means a physician . . .") and § 822(b) ("Persons registered by the Attorney General . . . are authorized to . . . dispense [controlled] substances [.]).  In sum, although a physician such as Dr. Ruan may legally "dispense" controlled substances, if he does so without a legitimate medical purpose and not in the usual course of his professional practice, he may be criminally prosecuted under the CSA.  *See* 21 C.F.R. § 1306.04(a).

It is absolutely critical then that a physician such as Dr. Ruan have a proper understanding of the talismanic clause "legitimate medical purpose . . . in the usual course of his professional practice," because the physician's failure to adhere to it can trigger criminal culpability and a life in federal prison.  However, the definition of these terms exists nowhere in the CSA or the applicable Code of Federal Regulations.  Section 802 is the "Definitions" section of the CSA and defines 55 terms found in the statute, often through multiple expounding subparagraphs, yet it does not contain a definition of "legitimate medical purpose" or "usual course of professional practice."  *See* 21 U.S.C. § 802.  Title 21 of the C.F.R. has five "Definitions" sections containing hundreds of definitions of key terms that amplify the prohibitions of the CSA.  *See* 21 C.F.R. § 1300.01 – 1300.05.  These definitions do tell a doctor

3

that a "*Valid Prescription* means a prescription . . . issued for a legitimate medical purpose . . . in the usual course of a practitioner's professional practice," but in no way explicate those critical phrases.  *See* 21 C.F.R. § 1300.02(b) (emphasis in original).

### b.  GUIDANCE FROM STATE MEDICAL BOARDS

There is a dual regulatory scheme for physicians prescribing controlled substances, shared by the DEA and individual state medical boards, both of which publish some guidance. A pain management physician such as Dr. Ruan can also look outside of government regulatory bodies and consult associations dedicated to their practice area.  Unfortunately, the guidance provided by both regulators and ancillary medical resources is only slightly less vague than the broad dictates of the statutory scheme itself, particularly as it relates to guidance on the threshold legal requirements of "legitimate medical purpose" and "usual course of practice."

### 1.  The Alabama Board of Medical Examiners

As a beginning effort, it would be reasonable for Dr. Ruan to consult the standards promulgated by the Alabama State Board of Medical Examiners ("the Board"), the entity responsible for regulating Dr. Ruan's practice.   In fact, the Board has adopted such standards. *See* Ala. Board of Med. Examiners Admin. Code, Chapter 540-x-4-.08, *RequirementsFor The Use Of Controlled Substances For The Treatment Of Pain*.

The Chapter is divided into two sections, denominated (1) Preamble and (2) Requirements. The Preamble outlines the purpose of the Chapter and expresses the desire to strike a balance between the goal of effective pain management and concerns for public health and safety.  In it, the Board recognizes, "principles of quality medical practice dictate that the people of the State of Alabama have access to appropriate and effective pain relief."  *See* 540-x-4-.08(1)(a).  The Board also acknowledges the concern that "[f]ears of investigation or sanction

by federal, state or local regulatory agencies may also result in inappropriate or inadequate treatment of chronic pain patients" and states the Chapter was drafted "to alleviate physician uncertainty and to encourage better pain management." *See* 540-x-4-.08(1)(b). As part of the latter endeavor the Board pronounces a broad spectrum for the acceptable use of controlled substances, stating such substances "may be essential in the treatment of acute pain due to trauma or surgery and chronic pain, whether due to cancer or non-cancer origins." *See* 540-x-4-.08(1)(c). Furthermore, the Board's guidance seeks to properly frame the issue of physical dependence as "a normal consequence of sustained use of opioid analgesics and . . . not synonymous with addiction." *Id.* The Preamble speaks to the issues of public health and safety by directing physicians to be "diligent in preventing . . . diversion . . . for illegitimate purposes." *See* 540-x-4-.08(1)(D).

Although the Board did seek in the Preamble to provide some guidance on the statutory principles of "legitimate medical purpose" and "usual course of practice," its effort does little more than to restate those notions in different terms that add no amplifying guidance. On these issues, the Board stated the following:

> PHYSICIANS SHOULD NOT FEAR DISCIPLINARY ACTION . . . FOR PRESCRIBING . . . CONTROLLED SUBSTANCES, INCLUDING OPIOID ANALGESICS, FOR A LEGITMATE MEDICAL PURPOSE AND IN THE USUAL COURSE OF PROFESSIONAL PRACTICE. THE BOARD WILL CONSIDER PRESCRIBING, ORDERING, ADMINISTERING OR DISPENSING CONTROLLED SUBSTANCES FOR PAIN TO BE FOR A LEGITIMATE MEDICAL PURPOSE IF BASED ON ***ACCEPTED MEDICAL KNOWLEDGE OF THE TREATMENT OF PAIN.***

*See* 540-x-4-.08(1)(d) (capitalized emphasis in original; bold, italicized emphasis added). The last phrase is the key addition the Board makes to the elusive definition, but it goes no further to state what is "accepted knowledge of the treatment pain," nor does it refer a physician to a

5

comprehensive treatise that will do so.  As such, the addition of this language provides very little

to a doctor seeking clear guidance on what prescribing practices fall within the ambit of

"legitimate medical purpose" or "usual course of practice."

The "Requirements" section of the Chapter provides a similar dearth of direction.  The

Requirements set out seven things that a physician must do in the course of treating a patient

with controlled substances—Evaluation, Treatment Plan, Informed Consent and Agreement for

Treatment, Periodic Review, Consultation, Medical Records, and Compliance With Controlled

Substances Laws and Regulations.  *See* 540-x-4-.08(2)(a)-(g).  However, the term

"Requirements"is somewhat misleading, as they provide little in the way of specific direction

and read more like general guidelines.[1]  As an example, they require a "physical examination"

prior to a prescription for a controlled substance, but there is no further definition or guidance of

what such an examination should include.  *See* 540-x-4-.08(2)(a). The same is true for the

principal of Periodic Review, which is required at "reasonable intervals," but without any inner

or outer limit of time by which a physician could gauge "reasonableness."  *See* 540-x-4-
.08(2)(d).

Most importantly, the Requirements mandate compliance with controlled substance laws,

both federal and state, but do not state what those laws are or define their applicability to

physicians.  *See* 540-x-4-.08(2)(f).  This disconnect is a consistent theme throughout the Chapter,

which, in the Preamble, advises physicians to "become knowledgeable about . . . statutory

requirements for prescribing controlled substances," but does not even cite the applicable

statutes.  *See* 540-x-4-.08(1)(a).  Instead, the Chapter refers physicians seeking further guidance

---

[1] In fact, the heading of the web page where this Chapter is found online reads, "*Guidelines* for the use of controlled substances for the treatment of Pain [sic]."  It should also be noted that the online version cites the Chapter as 540-x-4-.*09* rather than .08.  *See* http://www.albme.org/paincontrol.html (emphasis added).

6

to two outside sources, the *Federation of State Medical Boards' Model Policy on the Use of Opioid Analgesics in the Treatment of Chronic Pain, July 2013*, and *the Drug Enforcement Administration ("DEA") Office of Diversion Control Manual, Narcotic Treatment Programs Best Practice Guidelines*.  However, as demonstrated below, these regulatory sources do little to unmuddle the definition of "legitimate medical purpose" or "usual course of practice," and they provide a physician with insufficient notice of what conduct is proscribed by the CSA.

    2.   The Federation of State Medical Boards' Model Policy

The *Federation of State Medical Boards' Model Policy on the Use of Opioid Analgesics in the Treatment of Chronic Pain, July 2013* (*"Model Policy"*), as its name suggests, was adopted to serve as a guide to states for the adoption of their own rules and regulations.  This purpose is further evidenced by the fact that the Alabama policy specifically references it.  The *Model Policy* is similar to Alabama's in that it is divided into a Preamble, stating general principles, and a Guidelines section with more specific direction to practitioners.  *See Model Policy,* pp. 7-14.  The *Model Policy* similarly seeks to strike a balance between public health and safety and the availability of controlled substances for the treatment of pain. "By promulgating its Model Policies, the FSMB has sought to provide a framework for the legitimate medical use of opioid analgesics for the treatment of pain while emphasizing the need to safeguard against their misuse and diversion."  *See, Id.* at 3.  The *Model Policy* specifically expressed the concern that fear of "regulatory scrutiny" for prescribing controlled substances was a significant contributing factor to the "inadequate treatment of pain."  *Id.* at 4.

Like the Alabama Board, the Federation sought to assure physicians that they would not face regulatory consequences for "prescribing opioid analgesics . . . for legitimate medical purposes."  *Id.* at 6.  The *Model Policy* does go somewhat further in defining the phrase:

> The Board will consider the use of opioids for pain management to
> be for a legitimate medical purpose if it is based on sound clinical
> judgment and current best clinical practices, is appropriately
> documented, and is of demonstrable benefit to the patient. To be
> within the usual course of professional practice, a legitimate
> physician patient relationship must exist and the prescribing or
> administration of medications should be appropriate to the
> identified diagnosis, should be accompanied by careful follow-up
> monitoring of the patient's response to treatment as well as his or
> her safe use of the prescribed medication, and should demonstrate
> that the therapy has been adjusted as needed.  There should be
> documentation of appropriate referrals as necessary.

*Id.* at 7.  However, the *Model Policy's* use of more words and space to define the phrase

dictating a physician's criminal liability does little to notify a physician of the type of practice

activities that trigger that liability.  The *Model Policy* adds terms such as "sound clinical

judgment" and "best clinical practices," but, like all other guidance on the issue, leaves the key

terms mostly undefined and unspecified.

The "Guidelines" section of the *Model Policy* speaks to many of the same areas found in

the Alabama Board's "Requirements," but focuses more on the initial assessment of patients and

the initiation of opioid therapy.  *Id.* at 8-10.  It recommends the assessment of things such as

"social supports, housing, and meaningful work," and that opioid therapy should not begin

unless alternative treatments are "considered."  *Id.* at 9.  However, the *Model Policy* provides

broad guidance on initiating opioid therapy as a trial.  *Id.* at 11.  As for physical exams of a

patient, the *Model Policy* dictates it must be "relevant," but offers nothing more.   *Id.* at 9.  The

same is true with other areas of the *Model Policy* regarding initiation, monitoring and adaptation

of treatment with controlled substances.  All of these direct a physician to balance the patient's

progress with any signs of prescription abuse or aberrant behavior.  *Id.* at 11-13.  Yet, at no point

does the *Model Policy* set a bright line rule that a specific characteristic or behavior of a patient

in pain, either at initial presentment or during the course of trial, requires a physician to refuse to

8

begin or terminate opioid therapy.  Rather, it leaves such decisions to a physician's broad

discretion, allowing adjustment of opioid therapy to meet a patient's risk factors.  *Id.* at 13.

      As for the dictates of the CSA, the *Model Policy* refers physicians back to any guidance

issued by their state medical boards and the DEA's *Office of Diversion Control Manual.  Id.* at

14.

### 3.   The DEA Manual

      In 2006, the DEA published *The Drug Enforcement Administration Practitioner's*

*Manual* ("the *Manual*" or "the *DEA Manual*").  The *DEA Manual* sought to provide guidance on

CSA-related matters within its area of regulatory responsibility.  The DEA described those

responsibilities as "two-fold: to prevent the diversion and abuse of these drugs while ensuring an

adequate and uninterrupted supply is available to meet the country's legitimate medical,

scientific, and research needs."  *See DEA Practitioner's Manual,* p. 4.  The *Manual* provides

guidance on subjects covering, *inter alia*, Registration Requirements, Security and

Recordkeeping, and Valid Prescriptions. *Id.*    For validity, the *Manual* dictates a two-pronged

assessment.  First, the form of the prescription must meet certain administrative requirements.  It

must be signed and dated on the date when issued and must include certain descriptive

information such as drug name, strength, dosage, quantity, directions for use, and number of

refills.  *Id.* at 18.  Second, the prescription must meet the statutory requirement of being "issued

for a legitimate medical purpose by a practitioner acting in the usual course of medical practice."

*Id.* at 19.  On certain subjects, the *Manual* provides very specific guidance, e.g. no federal time

limit for filling a Schedule II prescription; oral orders only permitted in emergencies; multiple

prescriptions are limited to 90-day periods upon satisfaction of specific criteria.  *Id.* at 19-20.

This specificity disappears when the *Manual* answers the question: "What is meant by 'acceptable medical practice?'" *Id.* at 30.

The *DEA Manual* begins its answer to the question by stating the phrase "has been construed to mean" a prescription written "in accordance with a standard of medical practice generally recognized and accepted in the United States." *Id.* As will be demonstrated below, the "construed" definition provided in the *Manual* is merely a restatement of the general consensus arising from the case law. This answer, of course, provides zero clarity of what specific prescribing activities trigger criminal liability. In fact, the *DEA Manual* perfectly frames the degree of uncertainty wrought by the CSA, noting, "it is not possible to expand on the phrase 'legitimate medical purpose in the usual course of professional practice' in a way that will provide definitive guidelines to address all of the varied situations physicians may encounter." *Id.* The *Manual* does identify eight specific patterns of activity that "may be" indicative of inappropriate prescribing as follows:

- An inordinately large quantity of controlled substances prescribed or large numbers of prescriptions issued compared to other physicians in an area;
- No physical examination was given;
- Warnings to the patient to fill prescriptions at different drug stores;
- Issuing prescriptions knowing that the patient was delivering the drugs to others;
- Issuing prescriptions in exchange for sexual favors or for money;
- Prescribing of controlled drugs at intervals inconsistent with legitimate medical treatment;
- The use of street slang rather than medical terminology for the drugs prescribed; or
- No logical relationship between the drugs prescribed and treatment of the condition allegedly existing.

*Id.*

The *Manual* specifically caveats that none of these criteria is dispositive and must be viewed in the "totality of the circumstances." *Id.* A review of these non-dispositive and non-exhaustive factors further demonstrates the difficulty in assessing criminality for physicians. Some of them, issuing drugs for sex as an example, are clearly criminal. Others, such as volume of prescriptions and the "logical relationship" between medication and treatment are not clear. The allegations in the current Indictment provide a stark example of the problems presented by the "logical relationship" factor in particular. One would think that a physician who reviewed the factors could safely presume that prescribing pain medication to patients in pain would be logically related and legal. But we now know that is not the case, at least according to the DEA and the U.S. Attorney's Office. Because the DEA has refused to promulgate "definitive guidance," the Special Agents, in consult with prosecuting attorneys, are free to second guess the soundness of a physician's determination of "logical relationship" and charge the physician criminally. Furthermore, the lack of specific guidance allows them to do so without saying precisely why.

## 1. Ancillary Guidance for Physicians

In 2009, the American Pain Society and the American Academy of Pain Medicine published an article in the *Journal of Pain* entitled "Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Noncancer Pain" ("Clinical Guidelines"). *See Journal of Pain,* Vol. 10, Issue 2, pp. 113-30. The stated purpose of the article was to assess the available evidence for the use of opioids to treat non-cancer pain. *Id.* at 113. The abstract of the article states the group's conclusion that "chronic opioid therapy can be an effective therapy for carefully selected and monitored patients with chronic noncancer pain." *Id.* at 113-14. The recommendations in the article plow much of the same ground covered by the Alabama Board of Medical Examiners,

the Federation of State Medical Boards, and the DEA Manual cited above.  However, the article's guidance is focused specifically on treating non-cancer conditions such as "back pain, osteoarthritis, fibromyalgia, and headache." *Id.* at 114.  The article notes the significant costs associated with these pain conditions—$85 to $100 billion in expenditures in 2004 and 2005 for back pain alone. *Id.*

The article's focus on the initiation of opioid therapy for patients suffering from "moderate" chronic pain does provide some additional guidance.  Specifically, under the heading "Patient selection and risk stratification," they recommend opioid therapy for such pain if the pain is having "an adverse impact on function or quality of life and potential therapeutic benefits." *Id.* at 115.  As this guidance is fleshed out, however, it creates a vastly arrayed patient profile that would allow for the prescription of opioids. *See Id.* at 116 (contrasting a 30-year-old patient with fibromyalgia and a history of drug abuse with a 60-year-old patient with osteoarthritis, no drug abuse, and failed attempts at other treatments).  The article does not define exactly where within this spectrum opioids should not be prescribed, but leaves the ultimate determination to the professional discretion of the treating physician through the employment of proper monitoring, titration and dose rotation. *Id.* at 116-20.

As for guidance on the type of physician practices that might trigger criminal liability, the "Clinical Guidelines" offer essentially none.  For example, the article requires a "history, physical examination and appropriate testing," but does not define those routine practices in any detail, nor does it direct that they be done by a physician rather than a physician's assistant or nurse practitioner. *See Id.* at 115.  Nowhere do the "Clinical Guidelines" instruct that the failure to employ any one of its recommendations invalidates a prescription or renders the opioid therapy illegitimate, and the article does not even mention the terms "legitimate medical

purpose" or "usual course of professional practice" at all.  The article warns that physicians are "vulnerable to regulatory investigation or discipline if they fail to comply with practice standards or regulations," but there is no guidance on the interplay of "practice standards" and federal criminal law.  *Id.* at 123.

### 5.  Federal Case Law Defining "Legitimate Medical Purpose" and "Usual Course of Practice"

The United States Supreme Court first recognized the principal of criminal liability for physicians for violations of the CSA in *United States v. Moore,* 423 U.S. 122 (1975).  In *Moore*, the Court rejected the novel argument by the defendant that physicians registered under the Act are *per se* exempt from criminal liability.  *See United States v. Moore,* 423 U.S. at 131. The Court noted that its existing precedent, which predated Congress's adoption of the CSA, had established that physicians could be held criminally liable for dispensing controlled substances in instances where their dispensing activities were consistent with that of a "street pusher" rather than a physician practicing medicine.  *See Moore* at 132, 143 (internal citations omitted).  The Court held that facts presented in *Moore* fit the "street pusher" model.  *Id.*  The Court pointed out that the physician in that case "conceded that he did not observe generally accepted medical practices" in prescribing methadone.  *Id.* at 126.  He had instead argued that his voluminous prescribing activities were part of an idiosyncratic approach to addiction treatment borrowed from a British practitioner.  *Id.*  The Court noted that minimal or no physical exams were performed at his clinic and that the results of all tests done were ignored.  *Id.* at 126, 143.The Court found it particularly compelling that the physician did not bill for medical services he provided at the clinic at all and only charged for the pills he dispensed, the prices of which were determined on a sliding scale contingent on the volume of a particular prescription.  *Id.*

The key phrase for criminal liability the Court considered in *Moore* was not the precise language at issue in the current Indictment, but the analogous language, "lawful course of . . . professional practice."*Id.* 142.  The Court spent little time trying to properly define or frame this language, given its ultimate holding that the physician's conduct at issue was so far outside of that framework that he operated essentially as a drug dealer.*Id.*at 126, 143.  Nevertheless, *Moore* is an important case for demonstrating the original paradigm of criminal liability for physicians under the CSA, which was that physicians would be culpable in cases where their conduct was so egregious it demonstrated them to be indistinguishable from any other drug dealer prosecuted under the statute.  *See, e.g. Id.*at 135 ("'severe criminal penalties' were imposed on those, like respondent, who sold drugs, not for legitimate purposes"); at 139 ("Under the Harrison Act physicians who departed from the usual course of medical practice were subject to the same penalties as street pushers with no claim to legitimacy.")

As criminal liability for physicians under the CSA has evolved after *Moore*, it has become decidedly less bright-lined.  The Eleventh Circuit has repeatedly reaffirmed the principle that physicians can be criminally culpable under the CSA and sent to jail for their prescribing practices.  *See*United States v. Azmat*, 805 F.3d 1019 (11th Cir. 2015) (physician convicted of CSA offenses and money laundering); *United States v. Joseph*, 709 F.3d 1082 (11th Cir. 2013) (physician, assistant and pharmacist convicted for violations of CSA); *United States v. Williams*, 445 F.3d 1302 (11th Cir. 2006); *United States v. Collier,* 478 F.2d 268 (5th Cir. 1973)[2].  Through this line of cases, certain prescribing patterns have emerged to inform that at least certain prescribing habits can implicate the Act.  These include prescribing controlled substances without an adequate physical examination and refusing to accept patients with health insurance.

---

[2]Pursuant to *Bonnard v. City of Prichard,* 661 F.2d 1206 (11th Cir. 1981), all decisions of the United States Court of Appeals for the Fifth Circuit as of September 30, 1981, are binding as precedent in the Eleventh Circuit.

*See, e.g., Azmat* at 1025, 1030; *Joseph* at 1089, 1102 ("physician's delivery of a prescription without conducting any physical examination of the patient provides strong evidence to support a conviction").  However, the Eleventh Circuit has been unable through its precedent to provide clear guidance on the standard for judging a physician's criminality.  The court seems to have settled on the following as the proper jury instruction to define the CSA's key phrase:

> A controlled substance is prescribed by a physician in the usual course of professional [practice] and, therefore, lawfully, if the substance is prescribed by him in good faith as part of his medical treatment for the patient in accordance with the standards of medical practice generally recognized and accepted in the United States.

*See United States v. Merrill,* 513 F.3d 1293, 1306 (11th Cir. 2008).  Yet as the Court has fleshed out this definition the results have been often inconsistent and in some cases wholly contradictory.

The first inconsistency includes the *mens rea* required for a violation of § 841.  The court has held that to establish a physician's guilt, the Government must prove that he "dispensed controlled substances for other than legitimate medically purposes" and "that he did so knowingly and intentionally."  *See United States v. Ignasiak,* 667 F.3d 1217, 1227 (11th Cir. 2012).  However, the court has also held that "knowingly" and "intentionally" do not mean that a physician's subjective intent should be taken into account, and the court has specifically rejected the argument that the Government must prove the defendant knew and intended to act outside the course of professional practice to support a conviction in violation of the CSA. *Merrill* at 1305-06.  Rather, "knowingly and intentionally" are to be judged as compared to "a standard of medical practice generally recognized and accepted in the United States."  *Id.* at 1306.  The court in *Merrill* based its rationale, in part, on guidance from the Supreme Court's decision in *Moore.  Id.*  However, *Moore* specifically noted that the trial jury in that case had been instructed

15

that "'an honest effort' to prescribe for detoxification in compliance with an accepted standard of medical practice could not support a conviction." *Moore* 123 U.S. at 123, n. 20. To further contradict the notion that a doctor's subjective intent is irrelevant, the Eleventh Circuit has repeatedly recognized the appropriateness of a good faith instruction in CSA prosecutions of defendants. *See, e.g., Merrill*, at 1306; *Joseph* at 1096-97; *United States v. Williams,* 445 F.3d at 1309.

In *United States v.Tobin,* 676 F.3d 1264 (11th Cir. 2012) (abrogated on other grounds), the court characterized its body of precedent on the *mens rea* issue as "muddying," and went so far as to state that the case law and the statutory language itself call for a dual analysis: "1) whether the doctor *subjectively* believed that the prescription was for a 'legitimate medical purpose' and 2) whether, from an *objective* standpoint, the controlled substances were dispensed in the 'usual course of professional practice.'" *Tobin*, at 1282 (emphasis in original). It was the conclusion of the *Tobin* court that this dual inquiry guidance resolved the previously incomprehensible framework into "a coherent whole." *Id.* However, the conflict apparently remains unresolved in the Eleventh Circuit, as defendant Ruan has yet to find any other case that applies *Tobin's* dual analysis.

The Eleventh Circuit and its sister circuits have also been less than clear in specifying the appropriate standard to be used to establish "legitimate medical purpose" and "usual course of practice." The Eleventh Circuit has noted that it is most appropriate to view a defendant's conduct as defined by the physician's relevant state medical board rather than a "single national standard," but has also held—quite puzzlingly—that instructing a jury to determine guilt or innocence by "a standard of medical practice generally accepted and recognized in the United States" does not impose such a national standard. *See, generally, Joseph* 709 F.3d at 1093-96;

16

*Tobin,* at 1281, n 8.  Similarly, appellate courts have both condemned and approved jury instructions that conflate the civil and criminal standards of care to determine criminal liability under the CSA.  Multiple circuits have cautioned that crafting instructions that would allow a jury to convict on a civil negligence standard is to be strictly avoided.  *See United States v. McIver*, 470 F.3d 550, 558-61 (4th Cir. 2006) (holding jury instructions adequate because they "precluded conviction on a lesser civil standard"); *United States v. Smith*, 573 F.3d 639, 649 (8th Cir. 2009) (holding that jury instructions as a whole avoided the "danger" that "improper" civil standard would be used as basis for conviction). On the other hand, the Eleventh Circuit has stated that the civil standard of care may be an appropriate consideration, and at least circumstantial evidence that a given physician defendant's prescribing practices were not for a "legitimate medical purpose" and outside the "usual course of practice."   As demonstrated below, it is these inconsistencies in defining the statute's terms and standards for criminal liability that render it unconstitutionally vague.

## III.   THE CSA IS OVERLY BROAD AND VIOLATES THE RIGHT TO DUE PROCESS

### a. Controlling Law and Analysis

The Fifth and Fourteenth Amendments to the United States Constitution guarantee to all citizens the fundamental right to due process.  A criminal statute comports with due process if it "define[s] the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement."  *See Skilling v. United States*, 130 S.Ct. 2896, 2927-28 (2010). Impermissibly vague statutes are those that are so broadly written that they provide inadequate notice of the type of conduct that they proscribe, and sweep within their ambit conduct that an individual could not reasonably expect to violate the criminal law.  *See Johnson v. United States,*

135 S.Ct. 2551, 2556-57 (2015) ("[T]he indeterminacy of the wide-ranging inquiry required by the [statute] both denies fair notice to defendants and invites arbitrary enforcement by judges.") The fact that a statute has existed for a long period of time and has been repeatedly applied to individual defendants does not save it from a claim of unconstitutional vagueness. *See Johnson,* at 2259-60.Indeed, it may be a statute's repeated prosecution that reveals an inability to define consistent standards for its application and demonstrates it to be constitutionally infirm. *See Johnson,* at 2258 (holding that the Court's "repeated attempts and repeated failures to craft a principled and objective standard . . . confirm [a statute's] hopeless indeterminacy.") This is true even in circumstances where Congress has intervened to narrow the scope of a particular statute. *SeeSkilling* at 2932-33.

Where a statute is determined to be overly vague, either on its face or as applied in a particular case, the Supreme Court has held that courts should first seek to interpret the statute in a way that limits its scope before rendering it void. *Id.* at 2929. Nevertheless, the fact that a court may point to some conduct that always and neatly fits a statute's prohibitions does not automatically cure its constitutional defect. *Johnson* at 2560 – 61. In *Johnson*, Justice Scalia, writing for the majority, provided the following illustrations of this point:

> For instance, we have deemed a law prohibiting grocers from charging an "unjust or unreasonable rate" void for vagueness—even though charging someone a thousand dollars for a pound of sugar would surely be unjust and unreasonable. L. Cohen Grocery Co., 255 U.S., at 89, 41 S.Ct. 298. We have similarly deemed void for vagueness a law prohibiting people on sidewalks from "conduct[ing] themselves in a manner annoying to persons passing by"— even though spitting in someone's face would surely be annoying. Coates v. Cincinnati, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971). These decisions refute any suggestion that the existence of some obviously risky crimes establishes the residual clause's constitutionality.

*Id.* at 2561.

*Johnson* demonstrates the problems with the charges against the physicians in this case. As pointed out above, the Eleventh Circuit has crafted through its decisions a range of conduct that it presumes to always violate the CSA.  However, the critical vulnerability in applying the CSA to physicians "is not division about whether the [statute] covers this or that crime . . . ; it is, rather, pervasive disagreement about the nature of the inquiry one is supposed to conduct and the kinds of factors one is supposed to consider."*Johnson* at 2560.  For example, the Supreme Court and the Eleventh Circuit have well established that "inadequate physical examinations" are a key indicator that a controlled substance prescription violates the CSA, but that formulation creates more questions than answers.

What does an "adequate physical examination" mean? Who determines adequacy? Is the physical examination to be conducted by the physician himself, or can it be delegated to the physician's staff who then report to the physician?  Again, the statute does not say and neither does the Alabama Board of Medical Examiners, nor any of the other cited professional guidance.

The Government seeks to prove that these prescriptions were not "for a legitimate medical purpose" and not "in the usual course of medical practice" through the say-so of their experts.  This method of proof highlights the statute's ambiguity, particularly as applied in this case.  In each instance of an alleged violation of the CSA charged in the Indictment, the Government seeks to hold the doctors criminally liable for prescribing pain medicine to patients who presented themselves to the clinic as patients in pain.  The gravamen of the charges is not that the doctors did not do the things recommended to pain clinics—conduct physical examinations, obtain patient histories, present multiple treatment options, adjust dosage to

symptoms and risk.  It is instead that they did not do those things well enough, or at least well enough to satisfy the standards of Government agents and attorneys.

This type of enforcement regime for the CSA cannot meaningfully provide notice to a physician practicing pain medicine what type of prescribing habits run afoul of the CSA and subject him to criminal liability.  In Alabama, a physician such as Dr. Ruan would be referred by the Medical Board's guidance to the literature of other medical boards and the *DEA Manual*. The former would provide him with certain parameters, but would leave the distinct impression that he is afforded wide latitude to use opioids to treat his patients in pain, so long as he tailors those prescriptions to the risks presented.  The latter would notify him that he should not trade pills for sex with his patients, among other things, but would also emphasize that the phrase 'legitimate medical purpose in the usual course of professional practice' cannot be clearly defined.  Thus, physicians dispensing controlled substances for the treatment of pain are left to stake their livelihood and liberty on the whims of Government regulators, for as the Indictment in this case indicates, they only provide notice that they deem your medical practice criminal after they have decided to charge you.  As occurred in this case, that notice often arrives contemporaneously with the Government's deprivation of substantial portions of your personal wealth.

### b.  Requested Relief

First, the defendant acknowledges there is binding precedent in the Eleventh Circuit rejecting arguments that the CSA is unconstitutionally vague as applied to physicians.  *See, United States v. Collier,* 478 F.2d 268 (5th Cir. 1973)[3]; *Tobin,* 676 F.3d at 1278.  However, this

---

[3] In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

20

precedent is distinguishable from the arguments being made here.  First, *Collier* was decided well before the legal framework for the CSA's application to physicians evolved into its current state of enigmatic morass.  Second, the issue before the court in *Tobin* was quite narrow and dealt solely with the provisions of the CSA applicable to the distribution of controlled substances via the Internet.  *Tobin,* at 1274, 1278.  In the instant case, Ruan is contending that the legal standard pronounced by the CSA—"legitimate medical purpose" and "usual course of medical practice"—is not well defined, and it has been so inconsistently applied by the courts that the statute does not provide sufficient notice that the type of conduct alleged in the Indictment is criminal.  As a result, the statute's opaque standards, coupled with its grant of sole authority to a single federal agency to determine its bounds, encourage discriminatory and arbitrary enforcement, a clear violation of due process.  As such, the CSA counts charged in the Indictment are due to be dismissed.

The dismissal of those counts also necessitates the dismissal of the RICO conspiracy, for without the alleged violations of the CSA the Indictment only alleges a single RICO predicate—the money laundering conspiracy charged in Count 19.  Doc. 269*,* pp. 37-39.  A single RICO predicate is insufficient to establish "a pattern" of racketeering activity, and the absence of such a pattern is fatal to a RICO charge.  *See* 18 U.S.C. 1961(5), which "requires at least two acts of racketeering activity."

It is, of course, true that the court may follow the Supreme Court's instruction in *Skilling* that it should, if possible, interpret and limit the statute in a way that protects against its lack of notice and the potential for arbitrary enforcement.  If the court chooses this remedy, it is defendant Ruan's position that the varied and conflicting guidance from the Eleventh Circuit and other circuits' precedent above highlight the areas where this would be most appropriate.  To

begin with, to the extent that the evidence at trial alludes to the civil standard of care or suggests

that Dr. Ruan was negligent, the Court should provide a specific instruction that negligence, or a

violation of the civil standard of care, is insufficient and cannot serve as the basis to convict Dr.

Ruan of a crime.  Second, the Court should specifically instruct the jury that there is not "a

single national standard" for the prescription of controlled substances, but a multi-faceted

framework that includes the DEA, the Alabama Board of Medical Examiners, and variety of

guidance from various professional boards related to the discipline of pain management.  Third,

the Court should provide a meaningful good faith instruction that makes clear that Dr. Ruan's

subjective belief about his prescribing habits is a relevant factor in their analysis of whether he

intended to dispense controlled substances in violation of the CSA.  *See Tobin*, at 1282.

## IV.   <u>CONCLUSION</u>

Based on the foregoing Dr. Ruan's Motion to Dismiss, in part, is due to be granted, and

all counts in the Indictment related to the CSA are due to be dismissed.  The dismissal of those

counts will mandate the dismissal of the RICO allegations as well.  If the court decides not to

dismiss the counts, it should cure the CSA's constitutional defects by giving jury instructions

consistent with those outlined by defendant Ruan above.

Respectfully submitted this the 2nd  day of December, 2016.

WHEREFORE, premises considered, the Defendant respectfully moves this Honorable
Court to dismiss the second superseding indictment, in part and for such other, different and
further relief, premises considered.

<div style="margin-left:40%;">

Respectfully submitted,
<u>/s/ Dennis J. Knizley</u>
Dennis J. Knizley
Attorney for the Defendant
7 N. Lawrence Street
Mobile, Alabama 36602
Phone:  (251) 432-3799
Fax:     (251) 432-4539

</div>

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 2nd day of December, 2016, served a true and correct copy of the foregoing pleading by electronically filing same with the Clerk of the Court using the CM/ECF system which will send notification of such filing to Assistant U.S. Attorney Deborah A. Griffin.


/s/ Dennis J. Knizley
Dennis J. Knizley