<pre>
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF ALABAMA
 2

 3   UNITED STATES OF AMERICA
                                      CASE NO. CR15-00088
 4   v.
                                      COURTROOM 2B
 5   JOHN PATRICK COUCH, M.D.,
     and XIULU RUAN, M.D.,
 6                                    MOBILE, ALABAMA
               Defendants.
 7   * * * * * * * * * * * * * *      THURSDAY, JANUARY 5, 2017

 8   REDACTED

 9                         DAY 1 OF TRIAL
             BEFORE THE HONORABLE CALLIE V. S. GRANADE,
10              UNITED STATES DISTRICT JUDGE, AND JURY

11

12   APPEARANCES:

13   FOR THE GOVERNMENT:
         DEBORAH A. GRIFFIN
14       CHRISTOPHER BODNAR
         United States Attorney's Office
15       63 S. Royal Street, Suite 600
         Mobile, AL  36602
16       (251) 441-5845

17

     FOR THE DEFENDANT COUCH:
18       ARTHUR T. POWELL, III
         P.O. Box 40456
19       Mobile, AL 36640-0456
         (251) 433-8310
20
         JACKSON R. SHARMAN, III
21       ROBERT JACKSON SEWELL
         JEFFREY PAUL DOSS
22       BENJAMIN SANDERS WILLSON
         Lightfoot, Franklin & White
23       400 North 20th Street
         Birmingham, AL  35203
24       (205) 581-0700

25
</pre>

```
 1   (Continued)

 2       BRANDON KEITH ESSIG
         800 Shades Creek Parkway, Suite 600D
 3       Birmingham, AL  35209
         (251) 879-1981
 4
     FOR THE DEFENDANT RUAN:
 5       DENNIS J. KNIZLEY
         7 N. Lawrence
 6       Mobile, AL 36602
         (251) 432-3799
 7
         JASON BRADLEY DARLEY
 8       Darley & McGough, LLC
         1751 Dauphin Street
 9       Mobile, AL 36604
         (251) 441-7772
10
         GORDON G. ARMSTRONG, III
11       P.O. Box 1464
         Mobile, AL  36633
12       (251) 434-6428

13       STEVEN D. MARTINIE
         4955 North Lake Drive
14       Whitefish Bay, WI  53217
         (414) 332-9683
15
     THE CLERK:  MARY ANN BOYLES
16   THE LAW CLERK:  LYNN DEKLE
     COURT REPORTER:  ROY ISBELL, CCR, RDR, CRR
17
             Proceedings recorded by OFFICIAL COURT REPORTER
18          Qualified pursuant to 28 U.S.C. 753(a) & Guide to
       Judiciary Policies and Procedures Vol. VI, Chapter III, D.2.
19            Transcript produced by computerized stenotype.

20

21

22

23

24

25
```

1                            INDEX

2    OPENING STATEMENT OF MR. BODNAR . . . . . . . . . . . .  26

3    OPENING STATEMENT OF MR. SHARMAN  . . . . . . . . . . .  48

4    OPENING STATEMENT OF MR. KNIZLEY  . . . . . . . . . . .  66

5

6    WITNESS:

7    DEA DI SUSANNAH HERKERT
            DIRECT BY MR. BODNAR  . . . . . . . . . . . . . . .  92

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Jury selection began Wednesday, January 4, and was

2    completed Thursday, January 5, at 12:30 p.m.)

3                              * * *

4    (Afternoon session, 1:45 p.m., in chambers, jury not

5    present.)

6        MS. GRIFFIN:  Your Honor, Mr. Sharman provided us a

7    copy of what he intends to use during his opening.  And the

8    off-label use of medication has a reference to Viagra and to

9    aspirin, neither of which have anything to do with this case,

10   neither of which will be mentioned in this case.  And we object

11   to talking about Viagra and aspirin unless that's something he

12   intends to offer as having any relevance in the case.

13       MR. SHARMAN:  Your Honor, the government makes a huge

14   deal out of the off-label use of medication and that it's

15   supposed to be actually illegal and criminal.  We are going to

16   offer evidence through experts and otherwise about the

17   off-label use of medications, including maybe even these very

18   ones.  But I think that the idea that somehow off-label use of

19   medication or examples of them are not relevant is just not so.

20       MS. GRIFFIN:  Your Honor, we don't intend to claim

21   that you can't prescribe off label.  We intend to claim that

22   you can't prescribe off label if it's not for a legitimate

23   medical purpose.  So I see how aspirin and Viagra have

24   absolutely nothing to do --

25       THE COURT:  Can you remove the slide?  Is it a slide

```
 1   or a video.
 2              MR. SHARMAN:  It's a slide.  It's pictures.
 3              THE COURT:  Can you remove the slide that has to do --
 4   has the pictures of Viagra on it?
 5              MR. SHARMAN:  Well, if I'm required to do so, yes,
 6   ma'am, I can.  Is it just the Viagra?  Can I keep the other
 7   ones in?
 8              THE COURT:  Are there others that are not mentioned in
 9   the indictment that are in there?
10              MR. SHARMAN:  I'm sure -- all three of those.  It's
11   Viagra, trazodone and aspirin.  And I don't think there are any
12   claims that Dr. Couch --
13              THE COURT:  Well, they're all on the same slide;
14   right?
15              MR. SHARMAN:  Yes, ma'am.
16              THE COURT:  It's just that slide?
17              MR. SHARMAN:  But it's our theory of defense that
18   there is nothing wrong with off-label use of prescription
19   medication.  And that's what I'm talking about in part of my
20   opening.
21              THE COURT:  Well --
22              MS. GRIFFIN:  But, Your Honor, that's not -- they're
23   not charged with that.  They are charged with -- they are
24   prescribing off label for which there is no legitimate medical
25   purpose.
```

1          THE COURT:  I don't understand the indictment to

2    charge strictly that off-label use for prescriptions are

3    illegal.  And as a matter of fact, you know, I know that they

4    are not.

5          MR. SHARMAN:  Yes, ma'am.

6          THE COURT:  But having pictures of medications that

7    are not -- don't have anything to do with the charges in this

8    case I think is inappropriate for an opening for sure.  And so

9    if you can just remove that slide.

10          MR. SHARMAN:  Thank you.  I will do it.

11          THE COURT:  Talk about it without using the slide.

12          MR. SHARMAN:  I can do that.

13          MS. GRIFFIN:  We have an agreement -- he has a Centers

14    for Disease Control slide that talks about something that's in

15    the Centers for Disease Control in 2016.  The agreement is if

16    he talks about this, then it will be fair for us to offer the

17    entire publication during the trial, and Mr. Sharman has

18    agreed.

19          MR. SHARMAN:  I have.  I'm not saying it's relevant to

20    the Court, but I agree that you can offer it.

21          THE COURT:  Anything else?

22          MS. GRIFFIN:  That's all we have.

23          THE COURT:  Okay.

24          THE CLERK:  Mr. Knizley and Mr. Sharman, are you

25    halfing your time 37 and a half apiece.

1          MR. SHARMAN:  I can do that.

2          MS. GRIFFIN:  One other quick matter.  We would invoke

3    the Rule, Your Honor, and ask to keep the two case agents at

4    counsel table.

5          THE COURT:  All right.  Do y'all need anybody other

6    than your clients and your legal assistants at counsel table?

7          MR. SHARMAN:  No, ma'am.  I mean my tech guy is right

8    behind me.

9          MR. KNIZLEY:  They're right behind me, Judge.  The

10   tech guy is right behind me as well and the assistant.  I only

11   have two people, tech man and the legal assistant.

12         MS. GRIFFIN:  And Your Honor, there is a third --

13         MR. KNIZLEY:  And one more lawyer.  Excuse me.

14         MS. GRIFFIN:  There is a third DEA diversion

15   investigator that was a case agent.  But the defense called him

16   as a witness.  They cannot tell me if they are going to call

17   him or not.  And I fail to see why he should be excluded if

18   they are not sure whether they're going to call him.  We are

19   not going to call him.  But he was the diversion part of the

20   case.

21         THE COURT:  All right.  Well, I will excuse him even

22   if he is a witness because he's one of the case agents in the

23   case.

24         MS. GRIFFIN:  Thank you, Your Honor.

25         THE COURT:  Did you have any --

```
1            MR. KNIZLEY:  No, I have no problem at all, Judge.
2    Either way is fine.
3            THE COURT:  All right.  That's fine.
4            Mary Ann is this your pen?  Somebody left it.
5            THE CLERK:  Yes, ma'am, I guess so.
6            THE COURT:  That's all right.  I just wanted to find
7    the owner.
8        (A recess was taken at 1:48 p.m.)
9        (1:57 p.m., in open court, defendants and jury present.)
10           THE CLERK:  Case set for trial in United States of
11   America versus John Patrick Couch, MD, and Xiulu Ruan, MD,
12   criminal case number 15-88.
13           Is the government ready to proceed?
14           MR. BODNAR:  United States is ready, Your Honor.
15           THE CLERK:  Is counsel for Dr. Couch ready to proceed?
16           MR. SHARMAN:  Ready to proceed, Your Honor.
17           THE CLERK:  Is counsel for Dr. Ruan ready to proceed?
18           MR. KNIZLEY:  Ready, Your Honor.
19           THE COURT:  All right.  Ladies and gentlemen, now that
20   you've been selected as jurors, I'm going to ask you to please
21   rise and take this oath as jurors.
22           THE CLERK:  Let me get you to raise your right hands.
23       (The jury was sworn.)
24           THE CLERK:  Thank you.  Please be seated.
25           THE COURT:  All right.  Now that you've been sworn,
```

1    I'm going to give you some preliminary instructions to guide
2    your participation in this trial.  It will be your duty to find
3    from the evidence what the facts are in this case.  You and you
4    alone will be the judges of the facts.  You will then have to
5    apply to those facts the law as the Court will give it to you,
6    and you must follow that law whether you agree with it or not.
7            Nothing that I may say or do during the course of this
8    trial is intended to indicate or should be taken by you as
9    indicating what your verdict should be.
10           The evidence from which you will find the facts will
11   consist of the testimony of witnesses, documents, and other
12   items received into the record as exhibits and any facts that
13   the lawyers agree or stipulate to or that I may instruct you to
14   find.
15           Certain things are not evidence and must not be
16   considered by you, and I will list some of that for you now.
17           First, the statements, the arguments, and the
18   questions by the lawyers are not evidence.  It is the answers,
19   it is the testimony that is the evidence, not the questions.
20           Second, objections to questions are not
21   evidence.  Lawyers have an obligation to their clients to make
22   objections when they believe that evidence being offered is
23   improper under the rules of evidence.  You should not be
24   influenced by the objection or by my ruling on it.  If the
25   objection is sustained, simply ignore the question.  If the

1   objection is overruled, treat the answer as any other

2   answer.  If you are instructed that some item of evidence is

3   received for a limited purpose only, you must follow that

4   instruction.

5          Testimony that the Court has excluded or told you to

6   disregard is not evidence and must not be considered by

7   you.  And as I have said during jury selection, anything that

8   you may have seen or heard outside the courtroom is not

9   evidence and must be disregarded.  You are to decide this case

10  solely on the evidence presented here in the courtroom.

11         Now, there are two kinds of evidence -- direct and

12  circumstantial.  Direct evidence is direct proof of a fact such

13  as the testimony of an eyewitness.

14         Circumstantial evidence is proof of facts from which

15  you may infer or conclude that other facts exist.  Now, I will

16  give you further instructions on these as well as other matters

17  at the end of the case.  But keep in mind that you may consider

18  both kinds of evidence.  The law makes no distinction between

19  the two kinds of evidence.

20         It will be up to you to decide which witnesses to

21  believe, which witnesses not to believe, if any, and how much

22  of any witness' testimony to accept or reject.    I will give

23  you some guidelines at the end of the case to help you

24  determine the credibility of the witnesses.

25         Now, as you know, this is a criminal case.  And there

1    are certain rules about a criminal case that you must keep in

2    mind.

3            First, the defendants are presumed innocent until

4    proven guilty.  The indictment brought by the government

5    against these defendants is only an accusation, nothing

6    more.  It is not proof of guilt or of anything else.  Therefore

7    the defendants start out with a clean slate.

8            Second, the burden of proof is on the government until

9    the very end of the case.  The defendants have no burden to

10   prove their innocence or to present any evidence or to

11   testify.  And since a defendant has a right not to testify, if

12   either or both of these defendants decide not to testify and to

13   remain silent, the law prohibits you from arriving at your

14   verdict by considering that the defendant may not have

15   testified.

16           Third, the government must prove each defendant's

17   guilt beyond a reasonable doubt.  I will give you further

18   instructions on this point later, but bear in mind that in this

19   respect a criminal case is different from a civil case.

20           Now, in this case I told you at the beginning of the

21   jury selection just a basic outline of what the charges are,

22   the offenses are in this case.  I'm going to give you a few

23   preliminary instructions about those charges in order that you

24   will know basically what the government has to prove in order

25   to make its case beyond a reasonable doubt.  But the detailed

1    instructions on the law will come at the end of the case.  This

2    is only to give you kind of a thumbprint to go by.

3          As I said, there are 22 separate counts in this

4    indictment.  There are 22 charges.  And there are a number of

5    these charges that are what we call conspiracy charges.  And

6    that is not what we call a substantive offense but a conspiracy

7    offense.

8          In count one both defendants are charged with

9    committing -- or not charged with committing a substantive

10   offense; rather, they are charged with committing a conspiracy

11   offense.  The first count alleges that both defendants Couch

12   and Ruan were associated with two entities, Physicians Pain

13   Specialists of Alabama, known as PPSA, and C&R Pharmacy.  Count

14   one charges that beginning at least in about 2011 and

15   continuing through on or about May 20th, 2015, both defendants

16   together with these two entities and with other individuals

17   constituted an enterprise through which the defendants

18   knowingly conspired to engage in a pattern of racketeering

19   activity.  This is called a conspiracy to commit racketeering

20   activity.  That is what is alleged.

21         I'm not going to give you detailed instructions on

22   what is -- what the racketeering activity is.  But you need to

23   understand that each of the defendants can be found guilty of

24   violating this conspiracy statute only if all of the following

25   facts are proved beyond a reasonable doubt.

13

1          First that two or more people agreed to try to

2    accomplish the unlawful plan to engage in a pattern of

3    racketeering activity as described in the indictment;

4    second, that the defendant under consideration knowingly and

5    willfully joined a conspiracy; and that when the defendant

6    joined in the agreement, the defendant had the specific intent

7    either to personally participate in committing at least two of

8    the other racketeering acts or else to participate in the

9    enterprise's affairs knowing that other members of the

10   conspiracy would commit at least two of the charged acts of

11   racketeering and intending to help them as part of a pattern of

12   racketeering activity.

13          Now, counts two, three, and four of the indictment

14   each charge the defendants with another type of conspiracy

15   offense.  Title 21, United States Code Section 846 makes it a

16   separate federal crime or offense for anyone to conspire or

17   agree with someone else to do something which if actually

18   carried out would be a violation of Title 18, United States

19   Code -- excuse me -- Section 841(a)(1) of Title 21, United

20   States Code.  Now, that statute makes it a crime for anyone to

21   knowingly and unlawfully distribute or dispense or possess with

22   intent to unlawfully distribute or dispense a controlled

23   substance.

24          Count two -- counts two, three, and four charge the

25   same type of crime.  Count two charges that from 2011 through

1    May 2015 both defendants conspired to unlawfully and knowingly

2    distribute and dispense or possess with intent to distribute

3    and dispense oxycodone, oxymorphone, hydromorphone, and

4    morphine by means of prescriptions and other methods outside

5    the usual course of professional medical practice and not for

6    legitimate medical purpose.

7         Count three charges the same defendants during the

8    same time period with unlawfully dispensing fentanyl, another

9    controlled substance.

10         Count four, again, charges the same time period and

11   the same defendants with unlawfully possessing and distributing

12   a schedule III controlled substance, including hydrocodone,

13   again outside the usual course of professional medical practice

14   and not for a legitimate medical purpose.

15         These three counts, the drug dispensing counts,

16   conspiracy counts, can be substantiated only if the government

17   proves beyond a reasonable doubt that two or more persons in

18   some way or manner agreed to try and accomplish a shared and

19   unlawful plan of possessing with intent to distribute or

20   dispense unlawfully the named controlled substances, that the

21   defendant knew the unlawful purpose of the plan and willfully

22   joined in it, and that the object of the plan was to distribute

23   or dispense or possess with intent to unlawfully distribute or

24   dispense the subject controlled substances.

25         Counts five through 14 each charge Defendants Couch

1    and Ruan with violating Title 21, United States Code Section

2    841(a)(1).  These are the substantive dispensing or

3    distributing counts of the drugs involved in the case.

4           Count five charges that on or about August 5th, 2014,

5    Defendant Couch unlawfully dispensed a mixture and substance

6    containing a detectable amount of oxycodone -- that is, 90

7    pills of Roxicodone 15 milligrams -- to an undercover DEA task

8    force officer for no legitimate medical purpose and outside the

9    usual course of professional practice.

10          Count six charges that on September 8th Defendant

11   Couch distributed oxycodone -- again, 90 pills of Roxicodone 15

12   milligrams -- to a DEA task force officer undercover, again,

13   for no legitimate medical purpose and outside the usual course

14   of professional practice.

15          Count seven, the date is November 5th, 2014, the

16   Defendant Couch is charged with dispensing unlawfully 110 pills

17   of Roxicodone again to the undercover task force officer.

18          Count eight charges that on February 26, 2015,

19   Defendant Ruan knowingly and unlawfully distributed or

20   dispensed a mixture and substance containing a detectable

21   amount of controlled substance, to wit specified amounts of

22   Abstral, Subsys, OxyContin and Norco to a patient for no

23   legitimate medical purpose and outside the usual course of

24   professional practice.

25          Count nine charges that on April 27, 2015, Defendant

```
 1    Ruan again dispensed -- unlawfully dispensed specified amounts
 2    of Fentora, OxyContin, and oxycodone to a patient for no
 3    legitimate medical purpose and outside the usual course of
 4    professional practice.
 5            Count 10 charges that on or about July 15th, 2014,
 6    Defendant Ruan again unlawfully dispensed specified amounts of
 7    Fentora and Zohydro ER to a patient for no legitimate medical
 8    purpose and outside the usual course of professional practice.
 9            Count 11 charges that on November 25th, 2014,
10    Defendant Ruan unlawfully dispensed a detectable amount of
11    oxymorphone under the brand name Opana for no legitimate
12    medical purpose and outside the usual course of professional
13    practice.
14            Count 12, the date is October 12th -- excuse me --
15    10th, 2012, Defendant Ruan unlawfully dispensed a mixture and
16    substance containing a detectable amount of morphine sulfate
17    under the brand name MS Contin for no legitimate medical
18    purpose and outside the usual course of professional practice.
19            Count 13, the dates are March 5th and 11th, 2015.  The
20    defendant is Dr. Couch.  He's charged with unlawfully
21    dispensing oxycodone hydrochloride under the brand name of
22    Roxicodone and -- oxycodone under the brand name of OxyContin
23    both for no legitimate medical purpose and outside the usual
24    course of professional practice.
25            Count 14 charges that on or about March 18th and 31st,
```

1   2014, Defendant Couch unlawfully dispensed oxymorphone and a
2   mixture and substance containing morphine sulfate instant
3   release for no legitimate medical purpose and outside the usual
4   course of professional practice.
5          For each of those substantive counts of distribution
6   or dispensing, unlawfully dispensing controlled substances, the
7   defendant in question can be found guilty only if all of the
8   following facts are proved beyond a reasonable doubt:  First,
9   that that defendant distributed or dispensed or possessed with
10  intent to distribute or dispense the named controlled
11  substance; second, that the defendant did so knowingly and
12  intentionally; and, third, that the defendant did not have a
13  legitimate medical purpose in the usual course of professional
14  practice for doing so.
15         In count 15 both defendants are charged with violating
16  Title 18, United States Code Section 1349, which makes it a
17  federal crime to knowingly and willfully conspire or agree to
18  do something that, if actually carried out, would result in the
19  crime of mail fraud or wire fraud.  Specifically, count 15
20  charges that beginning in 2011 and continuing through May 20,
21  2015, both defendants knowingly conspired to violate what is
22  known as the anti-kickback statute.  You will get the details
23  of what is required to prove the anti-kickback statute when I
24  give you the final instruction, but you need to understand that
25  this is a conspiracy to violate that statute.  Each defendant

1    can be found guilty of this conspiracy only if all of the

2    following facts are proved beyond a reasonable doubt:  First,

3    that two or more persons in some way or manner agreed to try

4    and accomplish a common and unlawful plan to commit the charge

5    in the indictment, which is mail fraud and wire fraud.  Well,

6    this is the anti-kickback statute, though; right?  The mail

7    fraud and wire fraud is in connection with violating the anti-

8    kickback statute.  Second, that the defendant knew the unlawful

9    purpose of the plan and willfully joined in it.

10          Counts 16 through 18 charge separate conspiracies of

11   violating Title 18, United States Code Section 371, which makes

12   it a federal crime for anyone to conspire to defraud the United

13   States or any of its agencies or to commit an offense against

14   the United States.

15          Count 16 charges that from 2011 through May of 2015

16   both defendants knowingly conspired with each other and with a

17   coconspirator identified by the initials M.D. and with a

18   coconspirator by the name of Christopher Manfuso and with

19   others to commit, again, violations of the anti-kickback

20   statute.

21          Count 17 charges that from August 2012 continuing

22   through May of 2015 both defendants conspired with each other

23   and with a coconspirator named Natalie Perhacs and with others

24   to again commit offenses against the United States that is in

25   violation of the anti-kickback statute.

1     Count 18 charges that from September 2014 through
2  February 2015 both defendants knowingly conspired to again
3  commit offenses against the United States that is in violation
4  of the anti-kickback statute.
5     These defendants can be found guilty of these crimes
6  only if all of the following facts are proved beyond a
7  reasonable doubt:  First, that two or more people in some way
8  tried to agree and tried to accomplish a shared and unlawful
9  plan as described in each of those counts; second, that the
10  defendant knew the unlawful purpose of the plan and willfully
11  joined in it; third, that during the conspiracy one of the
12  conspirators knowingly engaged in at least one of the overt
13  acts described in the indictment; and finally, that the overt
14  act was knowingly committed on or about the time alleged and
15  with the purpose of carrying out the object of the conspiracy.
16     In count 19 the defendants are charged with another
17  violation of a conspiracy to violate the mail or wire fraud
18  laws.  Specifically, count 19 charges that from January 2011
19  through May 2015 both defendants knowingly conspired with each
20  other and with others -- including Natalie Perhacs, Justin
21  Thomas Palmer, and Bridgette Parker -- to execute and attempt
22  to execute a scheme to defraud for obtaining money and property
23  by means of false and fraudulent pretenses and representations
24  in violation of the mail and wire fraud statutes.
25     Each defendant can be found guilty of those offenses

1    only if all of the following facts are proved beyond a

2    reasonable doubt:  First, that two or more persons in some way

3    or manner agreed to try and accomplish a common and unlawful

4    plan to commit mail and/or wire fraud as charged in the

5    indictment; second, that the defendant knew the unlawful

6    purpose of the plan and willfully joined in it.

7              Count 20 is another conspiracy charge.  It charges

8    Defendant Ruan with violating Title 18, United States Code

9    Section 1956(h), which makes it a federal crime to conspire to

10   engage in money laundering or transactions involving the

11   proceeds of specified unlawful activity that violates Title 18,

12   Section 1957.

13             Specifically, count 20 charges that on or about March

14   5th, 2011, through May 20th, 2015, Defendant Ruan, aided and

15   abetted by Christopher Manfuso and others, knowingly conspired

16   to violate the money laundering statute; that is, to knowingly

17   engage and attempt to engage in monetary transactions by and

18   through a financial institution affecting interstate or foreign

19   commerce in criminally derived property of a value greater than

20   $10,000; that is, among other means and methods, by

21   transferring funds from bank accounts to other individuals by

22   wire transfers, such property having been derived from

23   specified unlawful activity.  The specified unlawful activity

24   is the conspiracy to commit healthcare fraud, conspiracy to

25   violate the anti-kickback statute, and the conspiracy to

1  distribute controlled substances.

2       Dr. Ruan can be found guilty of this crime only if all

3  of the following facts are proved beyond a reasonable doubt:

4  First, that two or more persons tried to accomplish a common

5  and unlawful plan to violate the money laundering statute;

6  second, that the defendant knew the plans were for an unlawful

7  purpose and voluntarily joined in it.

8       Finally, counts 21 and 22 charge Defendant Ruan with

9  violating these substantive money fraud -- money laundering

10 statutes that make it a federal crime for anyone to engage in

11 certain kinds of financial transactions commonly known as money

12 laundering.

13      Specifically, count 21 charges that on August 14th,

14 2014, Dr. Ruan knowingly engaged in a wire transfer in the

15 amount of $124,355 from a State Bank & Trust account in the

16 name of XLR Exotic Autos to a JPMorgan Chase Bank account in

17 Dallas, Texas, such funds having been derived from violations

18 of and conspiracy to violate the healthcare fraud statute, the

19 conspiracy to violate the anti-kickback statutes, and the

20 conspiracy to distribute controlled substance statutes.

21      Count 22 charges a financial transaction on August 26,

22 2014, in saying that Defendant Ruan knowingly engaged in a wire

23 transfer in the amount of $110,000 from a State Bank & Trust

24 account in the name of XLR Exotic Autos to a Comerica Bank

25 account in San Diego, California, such funds having been

1  derived from violations of and conspiracies as described in the

2  previous count.

3          The defendant can be found guilty of either of these

4  two substantive money laundering offenses only if all of the

5  following facts are proved beyond a reasonable doubt:  First,

6  the defendant knowingly engaged or attempted to engage in a

7  monetary transaction; second, the defendant knew that the

8  transaction involved property or funds that were proceeds of

9  some criminal activities; third, that the property had a value

10 of more than $10,000; fourth, that the property was in fact

11 proceeds of the alleged unlawful activity; and, fifth that the

12 transaction took place in the United States.

13         Now, as I said earlier, the instructions that I give

14 you on the law will be more detailed at the end of the

15 case.  But that is a thumbnail to let you know what the

16 government must prove to make its case on each of those counts.

17         Now a few words about your conduct as jurors.  You as

18 jurors, as I said before, must decide this case solely on the

19 evidence presented here in the four walls of this

20 courtroom.  This means that during this trial you must not

21 read, watch, or listen to any accounts or discussions related

22 to the case that may be represented in the media.  Also, you

23 must not conduct any independent research in this case about

24 the matters in this case, the individuals or companies involved

25 in this case.  In other words, you should not consult

1  dictionaries or reference materials, search the internet, do

2  not Google anything about this case, don't search websites or

3  blogs or use any other electronic tools to obtain information

4  about the case or to help you decide the case.  Please do not

5  try to find out any information at all about the case or the

6  persons involved in the case from any source outside the

7  confines of this courtroom.

8         Until you retire to deliberate you may not discuss

9  this case with anyone, even with each other.  After you retire

10  to deliberate, you may begin your deliberations with your

11  fellow jurors.  But you cannot discuss the case with anyone

12  else until you return a verdict in this case.

13         Now, I know that many of you use smart phones, the

14  internet, and other tools of technology.  You must not talk to

15  anyone or communicate with anyone using these tools of

16  technology to communicate electronically about the case.  This

17  includes your family and your friends.  You may not communicate

18  with anyone about the case on your cell phone, through email,

19  through iPhone, text messaging, on Twitter, through any blog or

20  website, including Facebook, LinkedIn, YouTube, Instagram, et

21  cetera, et cetera.  You may not use any similar technology or

22  social media even if I have not specifically mentioned it here.

23         Now, I expect that you would inform me if you become

24  aware of another juror's violation of these instructions.  A

25  juror who violates these restrictions jeopardizes the fairness

1    of these proceedings, and a mistrial could result which would

2    cause us to have to begin all over again.

3            Finally, do not form any opinion concerning this case

4    until all of the evidence is in.  Keep an open mind until you

5    start your deliberations at the end of the case.

6            Now, if you want, we have provided pads for you to use

7    to take notes for your own use.  However, you need to

8    understand that it is difficult to take notes and pay careful

9    attention to what the witnesses are saying at the same

10   time.  If you do take notes, make sure that your note taking

11   does not interfere with your ability to listen and consider all

12   of the evidence.  Also if you take notes, do not discuss them

13   with anyone before you begin your deliberations and do not take

14   your notes with you when you leave this room.  Whenever you

15   leave this room on break or to go home at the end of the day,

16   until you start your deliberations, leave your notes on your

17   assigned chair, and the Court will keep them safe for you.

18   Nobody else will be looking at them.  The Court will not be

19   looking at them either.  We'll keep them safe for you.

20           If you choose not to take notes, remember that it is

21   your own individual responsibility to listen carefully to the

22   evidence.  You cannot give this responsibility to someone else

23   who is taking detailed notes.  We depend on the judgment of all

24   members of the jury, and you all must remember what the

25   evidence is in this case.

1          Now, although the defendants, these two defendants,

2    are being tried together, you must give separate consideration

3    to each defendant.  In doing so you must determine which

4    evidence in the case applies to a particular defendant and

5    disregard any evidence admitted solely against the other

6    defendant.  The fact that you may find one of the defendants

7    guilty or not guilty should not control your verdict as to the

8    other defendant in the case.  So in other words, you've got to

9    consider them separately.

10          In just a minute the trial will begin.  First the

11   government will make an opening statement, which is simply an

12   outline to help you understand the evidence as it comes in.

13   Then the defendants' attorneys may make opening

14   statements.  Opening statements are not evidence nor should

15   they be arguments.  The government will then present its

16   witnesses, and counsel for the defendants may cross-examine

17   them.  Following the government's case, the defendant may

18   present witnesses whom the government may cross-examine.  After

19   all the evidence is in, the attorneys will present their

20   closing arguments to summarize and interpret the evidence for

21   you, and the Court will instruct you on the law.  After all of

22   that, you will then retire to deliberate on your verdict.

23          Now, as I told you before, we will begin every morning

24   at 9 o'clock.  We will take a break mid-morning, we will break

25   for lunch for either an hour and 15 minutes or an hour and a

OPENING STATEMENT OF MR. BODNAR
26

 1   half, depending on what the Court has to do during the lunch

 2   hour.  In the afternoon we will take a break at

 3   mid-afternoon.  We will try to recess every day by at least 5

 4   o'clock.

 5          So with that in mind, I'll now ask the government are

 6   you ready to make your opening statement?

 7          MR. BODNAR:  United States is ready, Your Honor.

 8          THE COURT:  All right.  You may make it.

 9          MR. BODNAR:  What did they do and why did they do it?

10   What did they do and why did they do it?  Ladies and gentlemen,

11   that's why you're going to be here for the next several weeks,

12   to sift through a lot of evidence to decide what did Defendant

13   John Patrick Couch do and why did he do it; what did Defendant

14   Xiulu Ruan do and why did he do it?

15          We're going to talk more about the evidence in detail

16   in a moment.  But at the end of this case what we expect that

17   you will find is what did they do?  They prescribed controlled

18   substances outside the usual course of professional practice.

19   Why did they do that?  For money.

20          We expect that you're going to find that they

21   committed mail fraud, wire fraud, healthcare fraud.  And why

22   did they do that?  For money.

23          We expect that you're going to find from the evidence

24   that they accepted illegal kickbacks from pharmaceutical

25   companies.  Why did they do that?  For the money.

1          And pertaining only to Dr. Ruan, we expect that you're

2    going to find that he committed money laundering.  And again

3    why did he do that?  To hide the money.

4          Ladies and gentlemen, as a way of introduction again,

5    my name is Chris Bodnar.  I represent the United States.  Along

6    with me in this trial you will see Assistant United States

7    Attorney Deborah Griffin and the three case agents FBI Special

8    Agent Amy White, DEA Special Agent Mike Burt, and DEA Diversion

9    Agent Kevin Downey.

10          So as we start here let's talk first about what this

11    trial is not about.  This is not about the United States

12    telling doctors how to practice medicine.  Doctors have a wide

13    range of deciding how to prescribe, who to prescribe to, and

14    what's appropriate for a patient.  If a doctor has a legitimate

15    patient relationship and they decide I think in the best

16    interest of my patient for the disease or the symptom of that

17    patient that this particular drug is the proper drug for them,

18    that is per se within the law.  You have that right as a

19    doctor.  You could be absolutely wrong, you could have messed

20    up completely, and it could turn out that, you know what, that

21    drug that I thought really was good for that patient wasn't

22    good and maybe you have malpractice there.  But you certainly

23    don't have a crime.

24          We're not talking about regulating how doctors

25    practice medicine properly.  What we're talking about here is

 1    the illegal prescribing of controlled substances.

 2            Now, what makes prescribing illegal?  You heard the

 3    judge say before that dispensing a controlled substance -- and

 4    we're going to have a witness on in a few minutes that's going

 5    to help explain what all the controlled substances are for

 6    you -- that prescribing a controlled substance is illegal

 7    unless there's two things that happen:  It's prescribed in the

 8    usual course of professional practice and it's prescribed for a

 9    legitimate medical purpose.  So both things have to be

10    there.  You can have somebody that has a legitimate medical

11    purpose for a medication -- and you're going to see that a lot

12    in this case.  A lot of the patients that went to PPSA, the

13    clinic there, had legitimate medical problems where pain

14    medicine may have been appropriate.  But just because there is

15    a legitimate medical need for controlled substances does not

16    make the prescription legal if it's prescribed outside the

17    usual course of professional practice.

18            Now, I know a lot of you talked about in jury

19    selection -- there's been a lot of talk about pill mills.  And

20    when at least I think of pill mills, the classic thing that

21    comes to mind is people driving in from, say, Kentucky or

22    Tennessee or Ohio or south Florida paying cash, getting

23    prescriptions for OxyContin, Roxicodone.  That's not what this

24    clinic was about.  That's very, very, very different from how

25    this clinic operated.

```
 1              PPSA was not cash only.  In fact, they wouldn't accept
 2     that.  PPSA required patients to be referred by another
 3     doctor.  They required patients to have insurance.  And the
 4     insurance is the big key here.  Because this wasn't a pill mill
 5     in your traditional sense.  What this was was a money mill.
 6     And to have a money mill you needed two things, and they had it
 7     at PPSA.  You needed patients with good insurance that would
 8     pay for these drugs and the doctors needed their own pharmacy
 9     so there was no checks and balances on what was dispensed based
10     on what those doctors prescribed.
11              You heard the judge speak about it earlier, C&R
12     Pharmacy.  C&R Pharmacy stands for Couch and Ruan.  It was
13     attached to one of the two clinic locations.  Now, you'll hear
14     that roughly 27 percent of all prescriptions written by Couch
15     and Ruan were filled at C&R Pharmacy.  So a good chunk of them
16     were filled at Walgreens, Rite Aid, normal pharmacies.  But
17     nearly 90 percent of the high-dollar prescriptions were filled
18     at their own pharmacy.  And those are some of the ones that
19     we're going to be focusing on in this trial.
20              And two drugs that you're going to hear a lot about
21     are both what's called instant release fentanyl.  One of the
22     brand names is Subsys.  It's a spray that goes under the
23     tongue.  And another one is a similar product, an instant
24     release fentanyl tablet that's placed under the tongue.  This
25     isn't the kind of drug that you can go for if you are in a
```

 1   standard pill mill where people are coming in for

 2   cash.  Prescriptions for Subsys and for Abstral range from

 3   5,000 to over $24,000 every month.

 4          Now, as we said, what is Subsys and Abstral?  These

 5   drugs have one FBI indication.  That means they are only

 6   approved by the FDA for one purpose, and that is the treatment

 7   of breakthrough cancer pain in cancer patients over the age of

 8   18 who are already on around-the-clock opioids and it's not

 9   controlling their pain.  You're going to hear that they did

10   have some patients like that.  But of over the just close to

11   1,000 patients that they prescribed Subsys and Abstral to, very

12   few have cancer.

13          And that brings up a topic that's also going to be

14   talked a lot about here, and that's off-label

15   prescribing.  What we talked about is the one indication for

16   Subsys and Abstral for cancer patients.  And the evidence is

17   going to show overwhelmingly that the patients that received

18   the 5,000 to $24,000 a month drug that their insurance paid

19   for, very, very, very few of these patients had cancer.  So

20   they received the drug off label.

21          Now, there is nothing inherently wrong and there is

22   nothing illegal about prescribing off-label drugs if you do it

23   for a legitimate medical purpose and within the usual course of

24   professional practice.  But here at PPSA they were not

25   prescribing Subsys for a legitimate medical purpose or within

1  the usual course of professional practice, and they weren't

2  doing that for Abstral either.

3        With regard to Subsys, you are going to hear that

4  these doctors were some of the largest prescribers of Subsys in

5  the entire United States.  They were also receiving over

6  $100,000 in kickback payments from the manufacturer of Subsys,

7  Insys Therapeutics.  The drug rep that represented these two

8  doctors, Natalie Perhacs, she will be here.  She has already

9  pled guilty to paying these doctors close to $100,000 in

10  kickbacks to prescribe those drugs.

11        And again, no checks and balances here.  Because they

12  own the pharmacy.  Doctor writes the prescription, gets it

13  filled at their own pharmacy; you have good insurance, your

14  insurance just paid close to $20,000 that you were getting the

15  upper doses of Subsys.

16        So fentanyl as you're going to hear, is a very, very,

17  very potent opioid.  A lot of these patients that got Subsys

18  did have legitimate pain.  They had some knee pain, some back

19  pain, some neck pain.  And sure enough, fentanyl is going to

20  take care of that pain.  In the same way that if you go

21  hunting, you can use a rifle and you can use a missile.  Now

22  it's going to result in the same thing, same result.  But

23  there's an appropriate way to do it and a not appropriate way

24  to do it.  And in this case these doctors prescribed extremely

25  potent opioids off label because they were getting paid by the

1    pharmaceutical company and they were doing it not in the

2    patient's best interest.

3         Abstral, the competitor to Subsys, now, Abstral wasn't

4    paying kickbacks -- the manufacturer of Abstral, Galena

5    Biopharm, was not paying kickbacks to Dr. Ruan and Dr. Couch.

6    They had a fix in a different way, as you're going to

7    see.  Wait till you see the graphs that show how and when

8    Dr. Ruan and Dr. Couch started prescribing Abstral off label to

9    hundreds of patients in their clinic.  You're going to be able

10   to see from those graphs very quickly when it was that Dr. Ruan

11   and Dr. Couch and their pharmacists that ran the pharmacy and

12   one of their head nurse practitioners purchased close to $2

13   million in stock in Galena Biopharma that makes one product.

14        You're going to see the emails where Dr. Ruan is

15   talking about with Dr. Couch how Galena Biopharma is the

16   company to buy.  They've got one product.  We can prescribe the

17   heck out of it.  The stock price will move up; we make money.

18        They were the number one and number two prescribers of

19   Abstral in the entire United States.  You're going to see

20   evidence that roughly one-third of every Abstral prescription

21   ever written anywhere in the U.S. during this time period was

22   written by one of these two doctors.

23        And again, if there is a legitimate doctor-patient

24   relationship and Dr. Ruan or Dr. Couch says you know what, I

25   know it's for cancer pain, but you've got neck pain and nothing

1    else is working for you, and I really think that Abstral since

2    it's so strong or Subsys is so strong it will benefit you,

3    there's nothing wrong with that.  That's not illegal.  That's

4    exactly within the purview of the doctor relationship.

5           But that's not what happened here.  These doctors were

6    not making decisions based on the patient's best interest.  It

7    was what was in the best interest to their financial

8    labor.  And you will see that because when drugs are not in the

9    doctors' financial best interests, they stopped prescribing

10   it.  It's going to fall off the table.

11          Now, these were very important doctors to both Insys

12   Therapeutic, the maker of Subsys, and Galena Biopharma, the

13   manufacturer of Abstral.  They represented significant portions

14   of their business.  You're going to see evidence that the

15   founder and the CEO and some of the top executives of Insys

16   flew from Phoenix, Arizona -- this billion-dollar company was

17   based in Phoenix, Arizona, and the heads of the whole company

18   fly to Mobile, Alabama, to meet with Dr. Couch, Dr. Ruan and

19   their pharmacists.  They knew what they had here in

20   Mobile.  When you have doctors that own a clinic and own the

21   pharmacy, you've got a money mill.

22          You're going to hear about Galena Biopharma, another

23   major pharmaceutical company based in Portland, Oregon.  The

24   CEO and top executives flew down to Mobile, Alabama, and stayed

25   right over there at the Battle House on multiple occasions to

 1   meet with the number one subscribers of this drug in the entire

 2   United States.

 3           A lot of other drugs are going to be talked about in

 4   this case.  But those are going to be two of the big ones that

 5   we'll be focusing on.

 6           As we said, there was also fraud involved here.  And

 7   there were a lot of ways that fraud was permeating this

 8   clinic.  One of the things you're going to hear about -- and

 9   this also touches on prescribing outside the usual course of

10   professional practice -- is you're going to hear from Justin

11   Palmer.  Justin Palmer was a nurse practitioner that worked

12   first for Dr. Ruan and then exclusively for Dr. Couch.  He has

13   already pled guilty to conspiring with these two doctors to

14   prescribe drugs outside the usual course of professional

15   practice.

16           Now, these two doctors right here wrote just under

17   300,000 prescriptions from January 1st, 2011, to May 20th,

18   2015, the day they were arrested.  Justin Palmer's going to

19   come in here and tell you that he wrote about 15 to 20,000 of

20   those prescriptions.  Now, Justin Palmer does not have a DEA

21   number.  He's a nurse practitioner.  He could have had a DEA

22   number, and that was done at the very end of the conspiracy.

23   But for a vast majority of time he did not have a DEA

24   number.  Nor was he signing prescriptions for Subsys, Abstral,

25   OxyContin, Roxicodone, signing it at the bottom Justin

1   Palmer.  He was signing John Patrick Couch.  15 to 20,000

2   times.  He's already pled guilty to that, and he's going to

3   come in and explain why he did that.

4           Dr. Couch rarely came into work early in the morning.

5   Patients were being seen as early as 7 a.m.  Dr. Couch

6   frequently would not come in until 10 a.m.  Dr. Couch

7   frequently would be out of the state or out of the country on

8   vacation.  You can't have your patients not being

9   seen.  Patients not being seen, less money for the clinic.  It

10  was about the money.

11          Dr. Couch knew that Justin Palmer was doing this;

12  Dr. Ruan knew that Justin Palmer was doing this, forging these

13  prescriptions.  And no one stopped him.  No one stopped him

14  because he was making everybody money.

15          And it's not just Dr. Ruan and Dr. Couch that knew

16  that Justin Palmer was doing this.  I don't believe there was a

17  single employee that we're going to bring in here that was not

18  aware of that.  You're going to hear from multiple patients who

19  knew that Justin Palmer was forging Dr. Couch's signature.  In

20  fact, you're going to hear many patients thought that Justin

21  Palmer was the doctor.

22          Now, Justin Palmer has got a lot of problems.  He's

23  going to be the first one to admit that.  He's had twice a

24  relapse of drug problems.  He would regularly use drugs

25  intravenously in the office at work while he was seeing

```
 1   patients.  In fact, he was temporarily suspended by Dr. Couch
 2   and then brought back after that.  Why?  Because he can't fire
 3   nurse practitioners because they see the patients for you, they
 4   are making you money.  So they allowed somebody who was
 5   knowingly forging the doctor's signature on prescriptions many
 6   times every single day, who they also knew was abusing
 7   intravenous Dilaudid, in the office and allowed him to see
 8           You're going to hear from Bridgette Parker, another
 9   nurse practitioner who originally worked for Dr. Ruan.
10   Dr. Ruan fired her, then she was hired by Dr. Couch.  She has
11   also pled guilty to prescribing drugs outside the usual course
12   of professional practice with the two defendants.
13           You're going to hear how she was high at work
14   virtually every day, how she was stealing from patients, how
15   she was stealing from the office, and how this was known.  And
16   again, you don't let people go; they're your worker bees.  You
17   let them go, you make less money.  And this is a money mill, so
18   you need the money to be flowing in.
19           They both have plea agreements.  They're going to be
20   the first ones to tell you that.  And, of course, just like any
21   defendant that's pleading and cooperating, they hope for a
22   lesser sentence.  That's every single defendant that ever comes
23   in and testifies.
24           You'll see their plea agreement.  Nothing in their
25   plea agreement has any basis on whether or not you convict
```

1  Dr. Couch or Dr. Ruan.  The only thing that they have to do is

2  come in here and tell the truth.

3          So you've got the forged prescriptions.  I don't think

4  there's going to be much debate that that is outside the usual

5  course of professional practice.  I intend to ask every single

6  expert that comes in here, whether it's an expert paid for by

7  the United States -- and yes, the United States has paid for

8  experts to come in and help you understand this.  And the

9  defendants have as well.  And I intend to ask every one of them

10 do they allow this to happen in their clinic?  Is there any

11 possible way that this is within the usual course of

12 professional practice to allow your nurse practitioner who

13 doesn't have a license to forge your name tens of thousands of

14 times to make you money?

15          And again, we're not talking about prescriptions for

16 cold medicine.  We're not talking about Advil.  We're not

17 talking about amoxicillin.  We're talking about OxyContin.

18 We're talking about Zohydro.  We're talking about Xanax and, of

19 course, Subsys and Abstral.

20          Now, there's some other things that you're going to

21 hear about on the fraud end.  One of them is something called

22 upcoding.  That's essentially padding the bill.  You will hear

23 that nurse practitioners for certain insurance companies when

24 doctors sign up, in particular Blue Cross and Blue Shield --

25 doctors don't have to accept Blue Cross and Blue Shield

1    insurance.  But if you do, you have to bill under the person

2    who's actually rendering treatment.  And there's a different

3    price being paid for who renders the treatment.  If the doctor

4    does the treatment, it's paid at a higher rate, which, as the

5    witnesses will explain to you, makes sense because the doctor

6    should have more knowledge and more experience plus doctors

7    have spent more time and money going to medical school, so they

8    should be paid at a higher rate.  And if a nurse practitioner

9    sees a patient, there's nothing wrong with that so long as it's

10   billed under the nurse practitioner's rate.

11          You're going to hear from Blue Cross and Blue Shield

12   that they never got billed under the nurse practitioner's rate.

13   It was billed under John Patrick Couch and under Xiulu Ruan

14   despite the fact you're going to hear from the nurse

15   practitioners as well as many, many, many patients that it was

16   the nurse practitioners that were running the show there.

17          So again, it's not wrong at all for nurse

18   practitioners to see the patients and to treat the patients as

19   long as it's billed under that.  But what a nurse practitioner

20   cannot do unless they have a DEA license is prescribe

21   controlled substances.

22          Some of the other things that you're going to hear

23   about in this case are a little more tricky to figure out what

24   did they do and why did they do it and what makes it illegal.

25   And one of the examples is urine drug tests.  Urine drug tests

1    were utilized at PPSA, and that's a really good thing.  All of

2    the experts -- I know the United States experts and I'm sure

3    the defense experts will all agree that a properly run pain

4    clinic should be doing urine drug testing.  And as you will

5    hear, there's a good reason for that.  You want to find out two

6    different things from urine drug tests when you're in a pain

7    clinic.  You want to find out, one, does the patient have in

8    their system the drug they're supposed to have, which is

9    important to know, because if they don't, possibly they're

10   selling it on the side or they're abusing their drug.  So you

11   want them to have the drug that you're prescribing them in

12   their system.  And you don't want them to have other drugs,

13   either illicit drugs like marijuana or cocaine or just other

14   prescription drugs that you didn't prescribe to them.  You

15   don't want to see that there.  So these urine drug tests are

16   really important.

17          But in this case you have to ask why did they do it?

18   What is the evidence going to show about why the doctors were

19   using this particular drug test, which is called the GC-MS

20   test?  And you're going to see Dr. Ruan in his own words in

21   emails explains that these tests are important because

22   insurance paid roughly $1,000 per test.  Once they paid the

23   $250 to the lab, that means $750 profit to PPSA.

24          Now, you can say, well, maybe that's just a great

25   benefit.  That's a tremendous benefit.  We need to do this

40

1   anyway.  That's awesome.  We get paid a lot of money, and

2   there's nothing wrong with making a lot of money.

3        But you're going to see through the emails too and

4   through the medical records that frequently the results of the

5   urine drug tests were not followed through.  There are patients

6   you will see who tested negative for the drugs they were

7   supposed to take.  And they weren't fired -- or they weren't

8   always fired.  You will see ones that tested positive for drugs

9   they shouldn't be taking, and they weren't always fired.

10       Now, of course, doctors can have the discretion to

11  say, okay, in my best medical judgment, I think even though

12  Chris Bodnar had an inconsistent test this time, I'm going to

13  keep him on as a patient at my practice and maybe I'll monitor

14  him more closely.

15       But Dr. Ruan in the email tells you exactly why it's

16  not a good idea to fire patients.  He spells it out.  It's not

17  a good idea to fire patients when you're in private practice

18  because you'll lose revenue.  Plus as you're going to see and

19  he explains, if there's an inconsistent test, that pretty much

20  authorizes you to do more tests.  And those tests pay a lot

21  more than office visits.

22       So while the urine drug tests were sometimes used and

23  they did sometimes fire patients that were testing negative for

24  things that they should have and positive for things that they

25  weren't, that wasn't across the board and that's not why they

1    were doing GC-MS testing.

2          Other things you're going to see, this was more than

3    just what they got in their pharmacy.  You'll hear about the

4    kickbacks for Subsys from Insys.  You'll hear about the stock

5    manipulation from Galena Biopharma.  Dr. Ruan and Dr. Couch

6    also had what's called a workers' comp dispensary in one of

7    their two clinic locations.  A workers' comp dispensary in

8    states like Alabama does not require somebody to get a

9    prescription and go to either C&R Pharmacy or another pharmacy

10   to fill that prescription.  The doctors can actually dispense

11   those drugs directly out of the dispensary.  And that's totally

12   legitimate.

13          What you're going to see in this case, though, is

14   Dr. Ruan and Dr. Couch contracted with a company called IPM,

15   which later became CRS, to have the exclusive rights to manage

16   Dr. Ruan and Dr. Couch's workers' comp dispensary.  And what

17   does IPM/CRS get out of it?  Dr. Ruan and Dr. Couch are only

18   going to dispense these particular high-dollar drugs that are

19   on the formulary that they give to Dr. Ruan and

20   Dr. Couch.  Now, what did Dr. Ruan and Dr. Couch get for just

21   dispensing these high-dollar drugs?  Dr. Couch got about

22   $18,000 every single month.  Dr. Ruan got up to $80,000 every

23   single month.  And this money doesn't go to the pharmacy, this

24   money doesn't go to PPSA, it doesn't go to the dispensary.

25   This money goes to the doctors in their personal capacity.  And

 1   you'll see the email about how upset Dr. Ruan got when a check

 2   accidentally went to the clinic and someone opened it and saw

 3   how much money he was getting each month.

 4          And you're going to hear about this from a defendant

 5   named Christopher Manfuso who's already pled guilty to paying

 6   kickbacks to IPM/CRS and these doctors, over a million

 7   dollars -- actually over $2 million over the course of this

 8   time period for them just to prescribe the drugs that were on

 9   there.

10          Other things that you're going to hear in this case,

11   it's going to be broken down into several different counts, as

12   the judge said.  The first one is what's called a RICO

13   conspiracy.  Now, at least for me when I think of RICO, the

14   first thing that pops in my mind is organized crime.  Because

15   that's where I hear RICO or I think of RICO is Mafia cases and

16   gang cases.  But that does not mean that RICO is exclusively a

17   gang charge or a Mafia charge.  As the judge is going to

18   instruct you, RICO is a conspiracy to use an enterprise, some

19   sort of entity -- in this case it's PPSA and C&R Pharmacy -- to

20   commit two or more racketeering acts.  So again, racketeering,

21   wow, that sounds like Mafia, organized crime.  But as the judge

22   is going to explain, Congress said two or more racketeering

23   crimes -- and by the way, here are all the crimes that count as

24   racketeering crimes.  The two crimes that are alleged here that

25   count as racketeering crimes are prescribing drugs outside the

 1   usual course of professional practice and mail and wire

 2   fraud.  So no, they are not charged with being mobsters,

 3   they're not gangsters.  That charge encompasses using their

 4   facility to engage in two or more racketeering acts.

 5            You'll hear that it's conspiracy to prescribe drugs

 6   outside the usual course of professional practice.  Count two

 7   is all about schedule II drugs.  And Susannah Herkert, who will

 8   be the first witness up here in a little while, she's going to

 9   explain to you what is a schedule II drug and which drugs count

10   in that.  Count three is going to be prescribing fentanyl

11   outside the usual course of professional practice.  And that's

12   going to be Subsys and that's going to be the Abstral.

13            And one of the things you may ask yourself is, well,

14   while they've got this together and they're business partners

15   together, they're in two separate companies.  Dr. Ruan and

16   Dr. Couch were very rarely at the same office, which one was at

17   the Springhill Avenue and one was at the Airport Avenue [sic].

18   So were they really conspiring to prescribe these drugs

19   together?  Well, when you see the graphs showing how long and

20   how much of these drugs they were prescribing, you're going to

21   notice something pretty peculiar.  Their lines are almost in

22   lock step.  Two doctors practicing at different clinics with

23   different patients who presumably have different needs and

24   ailments if it's being prescribed for a legitimate purpose, for

25   something that the doctor actually has a patient relationship

1  for, you would expect that they wouldn't necessarily line up

2  because Dr. Couch may have more patients, Dr. Ruan may have

3  less at a given time for those drugs.  But what you're going to

4  see is those lines match up quite a bit.

5        Count four is going to be the schedule III drugs

6  which, as Susannah Herkert is going to explain to you, is

7  hydrocodone for a portion of this indictment period.

8  Hydrocodone was a schedule III drug; it's now a schedule II

9  drug.

10        Five through 15, those are substantive drug counts,

11  and those allege just one of the two doctors.  And instead of a

12  conspiracy saying over this period of time they agreed to

13  prescribe outside the usual course of professional practice,

14  it's going to be very specific and it's going to say on this

15  date, January 1st, Dr. Ruan prescribed XYZ drug to this

16  particular patient.

17        And you'll hear from Dr. Couch that that patient

18  that's charged in I believe it's counts five, six, and seven of

19  the indictment was an undercover DEA agent.  You're going to

20  hear that the undercover DEA agent was given a fake referral

21  into the clinic, he got in, and he received Roxicodone.  You'll

22  see video of that.

23        After that you'll have the kickback conspiracies which

24  we talked about, and that is the IPM/CRS.  That's the

25  dispensary.  That's the payments from Subsys, and there's one

1    for Galena Biopharma.  And I want you to know that Galena

2    Biopharma did not pay any fees to the doctors.  They didn't pay

3    kickbacks straight out to the doctors.  But what they did was

4    different.  They said we are going to set up a rebate agreement

5    with the pharmacy, which is legal for pharmaceutical companies

6    to do.  They can say okay, CVS, you buy a lot of Abstral, so

7    we're going to give you a discount on purchasing Abstral from

8    us.  And then on the doctor's -- or on the pharmacy's end, so

9    long as they pass on that discount to federally insured

10   healthcare programs like Medicare, Tri-Care which is military,

11   there's nothing wrong with that.

12           However, this is not your typical pharmacy.  This is

13   not CVS, this is not Rite Aid or Walgreens.  C&R Pharmacy was

14   attached to the doctors' clinic on Airport Boulevard.  C&R

15   Pharmacy only filled prescriptions for doctors at PPSA and only

16   for PPSA patients, and it was owned by the two doctors there.

17   So in this case the rebate agreement is essentially putting

18   more money in Dr. Couch's and Dr. Ruan's pockets.  And that was

19   $97,000.  And you're going to see from the graph exactly when

20   that rebate started because you're going to see it spike up.

21   And as soon as that rebate agreement ends and they stop paying,

22   you will see it drop back down again.  It's not what you would

23   expect to see if the reason they were prescribing the drug was

24   truly because they thought it was in the best interest of

25   patients.

 1           Now there's going to be a lot of evidence throughout
 2    this trial.  And sometimes it will be complicated, and there
 3    are going to be reasons that sometimes the United States will
 4    have to put witnesses out of order.  Some witnesses are coming
 5    from far away.  But we promise it's all going to tie up.  And
 6    when I come back at closing or when Ms. Griffin comes back at
 7    closing, we're going to help summarize all of this for you so
 8    you understand and you can find beyond a reasonable doubt what
 9    the defendants did and why the defendants did it.  And you're
10    going to find that they committed RICO conspiracy, that they
11    prescribed drugs outside the usual course of professional
12    practice, that they committed money laundering -- or that
13    Dr. Ruan committed money laundering, and that they were engaged
14    in fraud.
15           Now, I'll say one last thing about PPSA before we end.
16    Again, I said this is not a traditional pill mill.  This is a
17    money mill.  This was not about patients coming in off the
18    streets with cash and getting OxyContin or Roxicodone or
19    Opana prescriptions.  A lot of the patients that came in there
20    were legitimate patients with legitimate pain.  The patients
21    also signed forms that the doctor gave them saying you waive
22    liability for off-label prescribing.  They're not given any
23    instructions that what they're prescribing are extremely
24    dangerous cancer drugs for them.  So while you have patients
25    that have legitimate pain and legitimate need -- and there were

47

1    definitely some that were treated very appropriately in this

2    office.  There is no question about that, that there were

3    certainly instances where Dr. Ruan and Dr. Couch did a really

4    good job for their patients.  We're not here because of

5    that.  We're here for the times that they were prescribing

6    these drugs outside the usual course of professional practice.

7          So keep that in mind when you hear these patients and

8    you see them come in.  Most will have legitimate pain.  And

9    opioids and other pain killers for people with legitimate pain

10   is in most cases for a legitimate medical purpose.  But there

11   has to be that second prong, was it also in the usual course of

12   professional practice.  And when you see from the overwhelming

13   evidence that the reason they were prescribing certain drugs to

14   certain patients would be because they had insurance that was

15   going to pay for it, that is why they made their decision, not

16   based upon patient need.

17         Ladies and gentlemen, when we come back in several

18   weeks from now and summarize this all for you, we believe the

19   evidence will overwhelmingly show beyond a reasonable doubt

20   that the defendants are guilty of each and every crime they are

21   charged with.  Thank you.

22         THE COURT:  All right.  Before the defense counsel

23   makes their opening statements to you, I'm going to give you

24   your afternoon break.  So leave your pads on your

25   chairs.  Remember my instructions to you not to discuss the

 1   case or allow anyone to discuss it with you.  Take your break

 2   downstairs in the jury assembly room, and we will call you back

 3   up in about 15 minutes.

 4          We're in recess.

 5      (A recess was taken at 3:02 p.m.)

 6      (In open court, defendants and jury present.)

 7          THE COURT:  All right.  Mr. Sharman?

 8          MR. SHARMAN:  Thank you, Your Honor.

 9          You know that television news show called 60 Minutes?

10   They just gave you about 20 minutes worth of a 60-minute

11   show.  There is news here.  Dr. Couch is not a drug pusher.  He

12   didn't mistreat his patients, he didn't cheat big insurance

13   companies, and he didn't steal the government's money.

14          You're going to hear a lot of evidence about pain

15   management.  Well, what is that?  First you'll see the evidence

16   that pain management is a legitimate, important and necessary

17   medical specialty.  Secondly you'll see the evidence -- and

18   maybe more importantly you'll see that it means that Dr. Couch

19   is the doctor of last resort.  If you have an injury, an

20   accident, or chronic pain from a medical procedure and your

21   general practitioner or your orthopedic surgeon has done all he

22   or she can do for you, that doctor will refer you to a

23   specialist like Dr. Couch because he's the only one that can

24   hold out some hope for you, and he'll deliver that hope, you'll

25   see in the evidence, through a combination of counseling and

1    medication.

2          Now, the evidence in this case is going to be about

3    medicine.  Medicine, you'll see, is about judgment and

4    decision, a physician's judgment and a patient's

5    decision.  It's a two-way street.  And as the evidence unfolds,

6    what you'll see is that in fact the government wants to turn

7    that street, your physician's judgment and your decision as a

8    patient, into a crime.

9          As the evidence unfolds, one crime you'll see is that

10   some of the people that the government is going to put on that

11   witness stand are going to lie.  Well, why are they going to

12   lie?  Well, the evidence will show that they'll lie for a

13   couple of reasons.  The first is that they've done deals with

14   the government and they're trying to cut their time in prison.

15   The other reason you'll see in the evidence is that they lie

16   and have to because Dr. Couch is not a drug pusher.  And how

17   are you going to see that in the evidence?  Well, one way

18   you're going to see it is by the events that in part got us

19   here this afternoon.

20          Think back in time for a minute.  Think back to August

21   of 2014.  What were you doing?  Where were you living?  Think

22   about August 5th of 2014.  You probably can't remember that

23   with any great specificity, but it's an important day for the

24   evidence in this case.  On August 5th, 2014, it was hot in

25   Mobile.  It had already hit 90 before noon.  About 10:40 a.m. a

1   man drives a car into the parking lot of PPSA Clinic on

2   Springhill.  He gets out, he walks into the clinic, signs in as

3   a patient, and sits down to wait.  He signs in as Sean Kelly --

4   I'm sorry -- as Sean Brennan.  But that's not his real name.

5   His real name is Sean Kelly.  Sean Kelly is a DEA undercover

6   agent.  He's wearing a body camera.  He's got a wad of cash in

7   his pocket the government has given him, and he's about to lie

8   his way into Dr. Couch's practice.

9          After about 10 minutes of sitting there, the

10   receptionist calls up Kelly -- or let's call him Brennan

11   because that's what everybody at PPSA knew him as.  The

12   receptionist calls up Brennan and asks for his insurance

13   card.  And he says:  I don't have insurance but I've got

14   cash.  And now, of course, we know he was a fake patient so he

15   didn't have insurance.

16          Now, at that point what would you expect the evidence

17   to show you?  What would you expect the evidence to be with

18   regard to this supposed drug pusher and this supposed pill mill

19   that makes so much money?  One thing you might expect to see in

20   that evidence is that supposed drug pusher and that supposed

21   pill mill gobbled up that cash and it's burning a hole in that

22   agent's pocket.  But that's not what the evidence will show

23   you.  Here's what it will show you.

24          The receptionist calls Brennan up to the front and

25   asks for his insurance card.  He says:  I don't have insurance.

 1    I have cash.

 2          The receptionist says:  I'm sorry.  We don't accept

 3    cash.

 4          PPSA didn't accept cash because it was an upfront,

 5    up-and-up legitimate business.  It was happy to have its bills

 6    seen by insurance companies and other payors.

 7          Now, that policy was a real problem for the DEA; a

 8    supposed pill mill wouldn't let him in to get any pills.  So

 9    what happens next?  He turns around, walks out of the clinic,

10    walks out in that hot parking lot, and he calls back to the

11    office to speak with another DEA agent.  In fact, he speaks

12    with Mr. Burt, Mike Burt sitting right there, and they have a

13    conversation.  (Indicating.)

14          And Brennan explains the problem, that the pill mill

15    won't let him in to get any pills.  And he hangs up.

16          A little bit later his cell phone rings and he answers

17    it.  And it's a call from a man named JW..........  JW.........

18    is a chiropractor who works in Mount Vernon, Alabama.  But

19    more importantly the evidence will show you JW.........,

20    chiropractor, is about to tell another lie for the

21    government.  And you'll see Brennan answer his phone and say:

22    How are we going to play this, Doc?

23          They end the call.  W..... calls into the clinic and

24    you'll see from the evidence starts raising Cain:  What kind of

25    people are you to not take my patient just because he has cash?

1    And you'll see that he's so insistent, the staff relents.  They

2    find a nurse practitioner to help him, a lady named Stacy.

3            Brennan then goes through most of the normal things

4    you would see in a doctor's office, in the course of which

5    Stacy says to Brennan that he is going to have a procedure,

6    probably a nerve block.  In other words, this wasn't going to

7    be just about pills.

8            Now, a real procedure for a fake patient is a

9    problem.  Brennan keeps his cool, and he convinces Stacy that

10   he's afraid of needles.  So she allows him to put it off.  She

11   takes his history, goes to consult with Dr. Couch.  Dr. Couch

12   comes in briefly with Brennan, provides Brennan two

13   prescriptions that Stacy had already gone over with Brennan,

14   one for a muscle relaxer and one for Roxicodone.  Dr. Couch

15   leaves and Brennan leaves with an appointment to come back in

16   four weeks.

17           So a fake patient got real medicine from a real

18   doctor.

19           The evidence will show you the only way that happened

20   was because a real doctor, W....., lying for the government,

21   was able to force that patient into that clinic.  Once he got

22   inside, he lied to every single person up to and including

23   Dr. Couch.

24           Now, let's talk about opioid addiction for a

25   minute.  As with any other substance, the evidence will show

OPENING STATEMENT OF MR. SHARMAN                    53

 1    you -- any other controlled substance, the evidence will show

 2    you that addiction is one possible outcome.  But what are some

 3    of the facts about opioid addiction?  You've probably heard of

 4    the Centers for Disease Control, the federal agency.  And that

 5    agency -- and you'll see this in the evidence, a lot of

 6    material from them -- has written a lot about opioids.  And one

 7    thing they pointed out is that about 20 percent of every person

 8    who shows up to their doctor's office with chronic pain or

 9    noncancer pain receives an opioid prescription.  There's

10    nothing weird or unusual about it you will see, although we can

11    have policy debates about it.  Second, the CDC says -- and you

12    will hear this in the expert testimony -- that there's a lack

13    of consensus, meaning there's no agreement among clinicians,

14    among practitioners, about how to treat chronic pain.  And then

15    third, the CDC says no matter what guidelines we want to apply

16    to this medicine, at the end of the day it comes down to that

17    relationship between the doctor and the patient.

18              Now, there is no doubt -- and you'll see this in the

19    evidence -- that treatment with opioid pain relievers is a

20    serious business for both doctor and patient.  And to that end

21    PPSA and Dr. Couch had an opioid agreement, sort of like a

22    contract almost, between patient and doctor setting out each

23    side's, so to speak, expectation.  And if you look in greater

24    detail, you'll see what are some of the conditions of being a

25    patient?  A patient is supposed to receive his or her opioid

1    medication from one pharmacy and shouldn't receive opioid

2    medication from other doctors without prior approval from

3    Dr. Couch or PPSA.  You've got to maintain your dosing schedule

4    as prescribed; in other words, you've got to do what's on the

5    label and other therapies that may be prescribed.  And also

6    there's other things that the patient undertakes to do and

7    knows to do.  And in particular, he or she has to be ready to

8    be accountable for the proper use of the medication, including

9    the number of pills.  In other words, you may be required to

10   actually bring in your bottle and do a pill count.  The

11   evidence will show that all of that is the kind of thing that

12   you're supposed to do with regard to opioid medication.

13          Now, you'll hear a lot of evidence and you'll hear the

14   government's lawyers and the other experts talk a lot about the

15   dangers and the hardships of opioid addiction.  And they should

16   because its's a serious matter.  What you will not hear

17   evidence from them about is the hardships caused people by

18   chronic pain.  And the CDC has taught us a little bit about

19   that.  What happens?  The evidence will show.  And what do we

20   lose with chronic pain?

21          Chronic pain limits what you can do, fairly simple

22   things.  We lose productivity, assuming we have a job, if we

23   have chronic pain.  It reduces our simple quality of life, and

24   you'll see it stigmatizes us with our friends, family,

25   coworkers, and neighbors.  The evidence is going to show that

1    those hardships are exactly the hardships that Dr. Couch tried

2    to alleviate.

3           PPSA wasn't a pill mill, traditional or

4    otherwise.  That's a lazy term that the media likes to use

5    because it rhymes and it makes headlines.  The government knows

6    that.  That's why they're now trying to call it a money mill.

7    But the thrust of the indictment and the thrust of the evidence

8    from the government is going to be the same.

9           So what are some of the characteristics of a pill mill

10   that you might hear about in this case?  Well, a pill mill

11   takes cash.  In fact, a pill mill demands cash.  You walk in

12   with cash; you walk out with drugs.  Insurance is not only not

13   required, it's not available.  No appointments or referrals are

14   needed.  Walk-ins are welcome.  It's like a mail shop for

15   drugs.  There are little or no medical records, little or no

16   medical equipment.  The physical exams are grossly

17   inadequate.  There are large doses of medication prescribed way

18   outside the bounds of anything acceptable.  Patients are told

19   to get their prescriptions filled at different pharmacies,

20   pharmacy shopping.  And we'll see that here.  And the

21   prescriber, the doctor, knows that drugs are being diverted,

22   they're being sold or given to somebody else.  And the

23   prescriber and his or her staff use street slang for medication

24   instead of the proper names.

25          So how does that compare to Dr. Couch's practice and

1    to PPSA generally?  Some of this you'll remember from that fake

2    patient visit, from the undercover visit.

3          There's not going to be any evidence indicating street

4    slang was used.

5          There's not going to be any evidence that Dr. Couch

6    knew or believed patients were selling or giving away drugs.

7          Nobody told Dr. Couch's patients to go pharmacy

8    shopping.

9          The experts will testify that Dr. Couch's prescribing

10   practices and exams were appropriate and legitimate.  PPSA had

11   medical equipment -- medical equipment -- MRIs and so forth.

12   PPSA and Dr. Couch had ample medical records.  You had to have

13   a referral from another doctor.  You had to have an

14   appointment.  As we saw, cash was almost never accepted.

15          So what have we got left?  Yes, PPSA had

16   security.  They had security, and you'll hear the evidence that

17   that was primarily to help patients in and out of their cars.

18          Racketeering and mobsters.  Let us speak

19   English.  Dr. Couch is being charged with being a racketeer.

20   He is absolutely being charged with being a mobster.  PPSA,

21   everybody from that receptionist on up to Dr. Couch, is being

22   charged with being part of a racketeering operation.  Couch,

23   the evidence will show, is not a racketeer, he is not a

24   mobster.

25          Patients, what about the patients at PPSA?  What will

 1   the evidence show about that?  In 2015 PPSA had about 8,000

 2   active patients.

 3           In this trial, as long as it is, you're probably going

 4   to hear reference to only a few dozen.  You will not hear a

 5   word from the government about the thousands of other

 6   patients.  The evidence that they offer is cherrypicked, and

 7   they want you to look at this over here and not these over

 8   there.  (Indicating.)

 9           Prescriptions.  You're going to hear Justin Palmer,

10   perhaps others, say that they forged Dr. Couch's signature on

11   prescriptions and did so with his knowledge and approval.  The

12   evidence will show that is a lie.  And why would the evidence

13   show Mr. Palmer's going to get on that stand and lie?

14   Mr. Palmer forged Dr. Couch's signature on scripts in large

15   part so that he could get drugs for himself.  Because the

16   government already mentioned he used drugs, and in fact he was

17   fired for shooting up Dilaudid in the office.  That is the man

18   upon which the government builds its case.

19           For billing, Dr. Couch had a professional staff who

20   were trained to bill in whom he had confidence and on whom he

21   relied.  And you will see that in the evidence.  The billing

22   side of healthcare, including the care that Dr. Couch provided,

23   took place in a large public and kind of complicated arena.

24   The billing and payment and reimbursement involved a number of

25   people.  Who were all these people involved in healthcare and

OPENING STATEMENT OF MR. SHARMAN                                            58

```
 1   payment?  The Veterans Administration, which referred patients

 2   to Dr. Couch, Medicare, Blue Cross and Blue Shield of Alabama

 3   on whose Pain Management Advisory Board, you will hear,

 4   Dr. Couch sat and who had the ability, you will hear, to audit

 5   Dr. Couch's bills and prescriptions whenever it wanted just

 6   like a good insurance company would.  All of these insurance

 7   companies, Medicare, Preferred Physicians, pharmacists had

 8   access to and saw exactly what Dr. Couch was doing and

 9   prescribing.

10        You're going to hear evidence and testimony about

11   so-called off-label use, off-label prescriptions or

12   medication.  Let's be clear what the evidence is going to be on

13   that.  There is nothing illegal or inappropriate about a

14   physician prescribing any medication for off-label use, strong

15   or weak, known or unknown, common or uncommon.

16        The federal Food and Drug Administration, the FDA, may

17   approve a medication for a particular use.  What's the evidence

18   going to show that means?  What that means is that the

19   pharmaceutical company can then market that medication and then

20   sell it for that purpose.  That has no effect on a medical

21   professional and his or her judgment about the appropriate use

22   of off-label medication.

23        And there was no secret about this use of off-label

24   medications at PPSA and in Dr. Couch's practice.  PPSA had an

25   off-label agreement, a form that talked with the patient about
```

 1    off-label pain treatment.  And it was real clear and in

 2    particular went through detailed applications of off-label

 3    uses, including for some very powerful drugs.

 4            You're also going to hear some evidence about what are

 5    called pain pumps.  The government is going to only put on

 6    evidence about drugs because the government's theory is that

 7    this is a pill mill or a pill mill that makes money and

 8    therefore a money mill.  Dr. Couch performed procedures, and

 9    one of those procedures was a pain pump in which he surgically

10    implanted a little device in a patient's body which would then

11    distribute, deliver pain medication as needed to that patient.

12    There's no evidence in this case that there was anything

13    unlawful about, for example, his staff at their two facilities

14    refilling those pain pumps.

15            And on the subject of procedures, that's something

16    else you will see in the evidence, because Dr. Couch's practice

17    at PPSA is not just about medication.  He performed procedures

18    on patients to help them with their pain.  And forgive me, I've

19    got to read this because I didn't go to medical school.  But he

20    performed cervical MYOBLOC injections, greater occipital nerve

21    blocks, bilateral occipital nerve blocks, and lumbar epidural

22    steroid injections.  The evidence will show that those are

23    things that do not happen at a pill mill.

24            Now, did Dr. Couch hire some people that he probably

25    in hindsight should not have?  Yes.  But -- and there will be

 1   no evidence that Dr. Couch is perfect in that regard.  Just
 2   look at Justin Palmer and Bridgette Parker and listen to them
 3   when they testify.  But evidence of Dr. Couch's hires, you will
 4   see, is not evidence of criminality.
 5          In a particular patient situation, could Dr. Couch
 6   have made a different particular judgment?  That's
 7   possible.  But this isn't a medical malpractice case.  It's a
 8   criminal case.
 9          From time to time will you see in the evidence
10   situations where paperwork could be better?  Absolutely.  But
11   the evidence is going to show you Dr. Couch went to medical
12   school to doctor people in pain, not because of paperwork.
13          For that matter, could Dr. Couch, Dr. Ruan and their
14   colleagues, could they have run PPSA better as a business?
15   Probably.  Most businesses could be run better.  But in none of
16   that will you see evidence of a crime.
17          Volume.  Just in the government's opening statement
18   you heard lots of statements about volume, the ranking of
19   Dr. Couch and his business partner, Dr. Ruan.  That's why
20   you're going to see from the Government lots of pie charts,
21   graphs, and spreadsheets.  But when you look at the evidence as
22   it unfolds in this case about volume, you'll see that the
23   government's basic complaint is that Dr. Couch tried too much
24   to treat too much pain.
25          And let's put a little bit of that evidence into

1    context.  For example, you may hear from the government in this

2    case that Dr. Couch prescribed or Dr. Couch and Dr. Ruan

3    prescribed more medication than doctors in New York and

4    Boston.  Well, the evidence will show you that there's a reason

5    for that; that there are far more doctors in New York and

6    Boston per capita than there are in Alabama or in our

7    neighboring state of Mississippi.  The same is true you'll find

8    with regard to the number of prescriptions.  You heard earlier

9    the number 300,000 prescriptions over the course of the time

10   frame in this indictment.  If you do the math -- and I'm not

11   very good at math, but I did it twice -- that averages out to

12   less than one prescription per patient per month, one

13   prescription per patient per month.

14           Now we haven't really talked about who Pat Couch

15   is.  Pat Couch was very young when he decided he wanted to help

16   people in pain.  So he went to medical school, the Medical

17   College of Georgia, and you will hear he got an MD.  He then

18   did an internship at the University of South Florida in

19   anesthesiology, operations and so forth.  Then he went to

20   California and did a one-year fellowship at UCLA in pain

21   management.  He took a bunch of hard tests, got board certified

22   in anesthesiology, pain medicine, and in addiction.  He is a

23   highly qualified, you will see in the evidence, physician to

24   whom other physicians refer their patients with real problems

25   and to whom he gave real treatment.

 1              Now, because this case is about medicine, you're going
 2    to hear experts both from the government and Dr. Couch, from
 3    Dr. Ruan.  Some of them are real interesting and some of them
 4    may be less so, but you need to listen to them.  Why is that?
 5    It's because the evidence in this case is going to show that
 6    this is about medical judgment, about what a doctor believes is
 7    good for his or her patients and then what that patient does
 8    with that judgment.  It's that two-way street again.
 9              Now, despite the fact that this is about medical
10    judgment, you will hear that the government's experts didn't
11    talk to any of Dr. Couch's patients.  They didn't talk to any
12    of the family members of Dr. Couch's patients.  In fact, they
13    didn't talk to any of the doctors who referred their patients
14    to Dr. Couch.
15              And when you listen to that evidence, you will see
16    that all these doctors that you're going to hear, many of whom
17    are distinguished, cannot agree on what Dr. Couch should have
18    done with regard to a particular patient in a particular
19    situation.  They can't agree about the practice of pain
20    medicine.  Sometimes it's good, sometimes it's bad.  Even
21    Mr. Bodnar presenting the government's case said sometimes it's
22    good, sometimes it's bad.  It's about medical judgment and the
23    patient's decision about what to do with it.
24              The government promises that the evidence will show
25    that Justin Palmer, perhaps others, decided to bill office

1  visits under Dr. Couch's name when he was absent.  What's the

2  rest of the news story on that?  The evidence will show that

3  Dr. Couch -- Dr. Couch never had any intent to defraud anyone

4  or anything and that he relied on Palmer and then his billing

5  staff to do his billing correctly.

6       You're going to hear a lot in this case about a

7  pharmaceutical company called Insys.  Insys made a medicine

8  called Subsys, which was a spray, a pain killer spray you put

9  under your tongue and spray it.  It's very powerful and very

10  effective.

11       It is entirely possible that Insys and its

12  employees -- like, for example, one of the sales reps, Natalie

13  Perhacs -- it's entirely possible that they did things they

14  shouldn't have.  It's entirely possible they broke the

15  law.  The evidence will show you that Dr. Couch was not a

16  participant in those corporate shenanigans and that he did not

17  intend anything other than to give speeches and talks about a

18  medication, Subsys, that he believed in and, more importantly,

19  believed in for his patients.

20       The government also is going to put on evidence or try

21  to put on evidence that Dr. Couch was prescribing another

22  medication, Abstral, in order to somehow pump up the stock

23  price of Abstral's manufacturer, a company in which Dr. Couch

24  bought some stock.  The evidence will show that when Dr. Couch

25  bought stock in Galena, he thought it was a good company.  And

1    the evidence will show that his stock purchases and sales

2    actually don't match up well with what you would expect someone

3    would be trying to do if they were actually hatching that plan.

4            Now, let me talk to you about two principles, and then

5    I'm going to sit down and be quiet.  The first principle is

6    that, as Judge Granade has already told you, Pat Couch right

7    now is presumed innocent.  Presumed innocent means actually

8    innocent.  It doesn't mean kind of innocent, it doesn't mean

9    hypothetically innocent, it doesn't mean maybe innocent.  It

10   means innocent unless you find that the government has carried

11   its burden of proof, has proven its case beyond a reasonable

12   doubt.

13           And the second thing Judge Granade spoke with you

14   about or will speak with you again in greater detail, that the

15   government has a burden of proof to prove the elements of the

16   offenses beyond a reasonable doubt.  Well, what does that mean?

17   Again, forgive me, I've got to read it so I get it

18   right.  "Proof beyond a reasonable doubt means a real doubt

19   based on your reason and your common sense after you have

20   carefully and impartially considered all the evidence in this

21   case.  So proof beyond a reasonable doubt is proof so

22   convincing that you would be willing to rely and act on it

23   without hesitation in the most important of your own affairs."

24           It's easiest sometimes to understand reasonable doubt,

25   like a lot of other things, in terms of football.  This

1   afternoon the government's got the ball.  They are on their own

2   goal line.  Now this is a criminal case, not a civil case.  If

3   it were a civil case, like if the government were suing the

4   contractor for not making the air-conditioning work in here,

5   that would be a civil lawsuit for damages.  If that were this

6   kind of lawsuit, the government would only have to get the ball

7   across the 50 because the government would only have to satisfy

8   what lawyers and judges call a preponderance of the evidence

9   standard.  Is it more than 50 percent?  And if it were a civil

10  lawsuit for money damages and maybe that contractor had done

11  something real bad and the government was seeking punitive

12  damages to punish the defendant, the government might have to

13  get the ball into the red zone.  But this is not a civil

14  case.  It's a criminal case.

15          So this afternoon and throughout the whole trial the

16  government will start with its own goal line.  To convict

17  Dr. Couch it's not enough that they get the ball across the 50.

18  To convict Dr. Couch it's not enough they get the ball in the

19  red zone.  They don't have to get the ball out of the stadium,

20  but they do have to get it into the end zone.

21          My name is Jack Sharman.  And I'm confident after

22  you've considered all of the evidence, after you've listened to

23  all of the news, you're going to return a verdict of not guilty

24  for Dr. Pat Couch.

25          Thank you.

```
 1              THE COURT:  Mr. Knizley?

 2              MR. KNIZLEY:  May it please the Court, counsel, and

 3    ladies and gentlemen of the jury, on May 20th, 2015, armed

 4    federal agents entered into two medical offices here in Mobile,

 5    one on Springhill Avenue and one on Airport Boulevard.  These

 6    armed agents seized the patient files, seized computer data,

 7    seized other things, took the medicines that were there for

 8    these people to be treated.  The employees of these two

 9    places -- they interrogated the employees.  As a result of this

10    raid on the doctors' offices, those two doctors' offices were

11    shut down.  The people lost their jobs.  The patients that were

12    there to receive medical care didn't receive it.  The doctors

13    they had relied upon for 12 years were out of business, and

14    they had no way to have their care tended to.

15              On that day Xiulu Ruan was arrested.  Xiulu Ruan was

16    an outstanding pain management doctor.  His story is one of an

17    American dream.  He was born in China, poor, went to medical

18    school there, was fortunate enough to come to the United States

19    and go to LSU for further medical training, on to the

20    University of Wisconsin or the Medical School of Wisconsin, and

21    then on to the University of Michigan where he received further

22    medical training, fellowships.  Xiulu Ron has eight board

23    certifications.  That is probably more board certifications

24    than any physician in the United States.  He is eminently

25    qualified in the field of pain medication.
```

1      As Mr. Sharman told you, pain medication is sort of
2  the end of the road.  People have car wrecks and have to go to
3  the doctors, people have -- get their bones crushed in
4  industrial accidents, people have cancer or other diseases and
5  are in excruciating pain, and either their orthopedic surgeon
6  from the car wreck or neurosurgeon or their primary care
7  physician have tried to treat their pain and give them
8  medications, and they just cannot put these people back into a
9  functional way of life.  And they say:  Okay, I can't do this
10  anymore or I can't help you anymore, patient; I'm going to have
11  to send you to the specialist, to the person that has the
12  expertise, the knowledge, and the board certifications to know
13  how to make you be functional in this society.
14      And that's what Xiulu Raun did.  And he had doctors
15  from all over this city and from all over the region send
16  patients to him because of his expertise.
17      What happened after these years of treating patients,
18  after these years of establishing this business and making this
19  a place where people work and earn a living, what happened that
20  this -- why did they raid -- why did the law people come to his
21  business?
22      Well, the government decided that he was not
23  practicing medicine in an appropriate fashion.  And not only
24  that, that he was conducting a criminal enterprise; that's what
25  he was doing.  And they said he was conducting a pill mill.

1    And you've heard all the talk about that.  And I was quite

2    surprised a moment ago because since way back then in 2015, for

3    18 months these people have been operating a pill mill.  That's

4    all we've heard about.  Now today for the first time we hear

5    maybe they're not operating a pill mill.  Well, wait a minute.

6         When the government went to the grand jury and

7    returned the indictment, it wasn't a nontraditional pill

8    mill.  It was PPSA, Ruan and Couch ran what was in essence a

9    pill mill.  Their primary method of pain management was writing

10   multiple prescriptions for high doses of controlled substances.

11        Then they said later on in the indictment when they

12   talked about the RICO enterprise, members and associates of the

13   PPSA enterprise primarily operated the enterprise as a pill

14   mill where members of prescriptions -- where numbers of

15   prescriptions for controlled substances were written for no

16   legitimate medical purpose or outside the usual course of

17   professional practice.  In addition, members and associates of

18   the PPSA enterprise engaged in fraudulent billing.

19        Well, it doesn't say that's not -- the allegation in

20   the indictment that they've been talking about for 18 months

21   doesn't say this wasn't an official pill mill.  It doesn't say

22   it was a money mill.  That's what they accused these people of.

23   After 18 months maybe they decided that wasn't quite what was

24   going on, and when they come here today to prove the case, they

25   decide to change it.

```
 1            They also said in there that this is -- you know, they
 2    said, well, this was for no legitimate medical purpose and
 3    outside the normal course of medical practice.  But today they
 4    tell us, well, maybe it was for a legitimate medical purpose,
 5    but it was outside the normal course of medical practice.
 6            MR. BODNAR:  Your Honor, we're going to object to
 7    that.  He just read it as "or" and not "and" right from the
 8    statement itself.
 9            THE COURT:  Mr. Knizley, if you will make your opening
10    statement and not so much of an argument in this case.
11            MR. KNIZLEY:  Yes, ma'am.
12            Mr. Sharman spoke to you about characteristics of a
13    pill mill, and the prosecution has told you that possibly
14    that's not the characteristic they're looking for here.  But
15    I'll revisit it in just a bit.
16            This was an entity that purportedly was a criminal
17    enterprise, but it did not take the cash.  It is not someplace
18    where it's off to the side and nobody knows where it is and
19    only people that come around looking for medication without a
20    legitimate medical practice would come and pay cash for a
21    doctor that doesn't examine them.
22            No.  This was a place where you were referred by the
23    doctors well respected in our community when they could no
24    longer treat you for the care -- for the injury that you had
25    and the pain that you were suffering from this injury, and they
```

1    sent them to these people.  They were doctor referrals.

2          And when the prosecution began to talk like that, I

3    thought, well, he's pretty well giving part of my opening

4    statement.  And I said, yes, we take insurance, we don't take

5    cash; we take referrals, we don't take walk-ins.  And there's a

6    lot of truth to that as well.

7          Not only that, when you come to Dr. Ruan's office, you

8    are greeted in a highly professional manner.  You will see a

9    receptionist, you will see a medical assistant that will help

10   you.  After that you'll be referred to a nurse practitioner

11   that will help you.  And then after that the doctor will come

12   see you.  And what we will do is, unlike a pill mill, we will

13   give you an examination and won't be worried about what you do

14   or why you want the drugs.  We want to do a thorough medical

15   examination.  And we have highly expensive and state-of-the-art

16   MRI equipment, X-ray equipment, and other diagnostic equipment

17   you go to.  And then we don't start you off with

18   medications.  You don't just get -- we're going to start off --

19   many people come there that are already on serious medications,

20   even opioids and stuff like that.  We don't always continue

21   that.  Sometimes we change that.  As for other things we're

22   going to do, intervention.  We're going to give spinal blocks,

23   we're going to give epidurals, we're going to give nerve blocks

24   and that sort of thing before or in addition to any medication

25   treatment.  It's not just a mill putting out pills.  That's not

 1   all we do.

 2          When you come there, you're expected to -- if you are

 3   a patient that at some point is going to get opioids, which is

 4   a powerful medication, you're going to, as Mr. Sharman said,

 5   you're going to sign an opioid management agreement.  And

 6   you're going to say that you're going to take the opioids

 7   consistent with this agreement.  And if you don't do that,

 8   you're going to have to leave this practice.

 9          And the records from just simply 2013 when they again

10   the electronic records show you 238 of Dr. Ruan's patients only

11   got kicked out of the practice for not following that

12   agreement.

13          And one way they monitored that agreement is they had

14   urinalysis.  When you come in and you're a patient there, just

15   about every time you come in you have to give urinalysis in a

16   cup.  And that is a primary indicator of whether or not you're

17   taking the drugs or whether you've taking street drugs or

18   something like that.  And if you're taking street drugs -- you

19   can't take any street drugs.  And if you're not taking the

20   drugs we give you, it sort of indicates that.  But that's not a

21   good test, and everybody is going to tell you that's a starter

22   test to give you some indication.

23          But if you're really going to practice real pain

24   medicine, if you're going to be a specialist in this, you've

25   got to have more sophisticated testing to show exactly what is

1    in that patient's system because there's a lot of false

2    positives and false negatives with respect to this.  So they

3    send this off for yet another testing to make a determination

4    whether or not this person is, one, not taking the medication

5    that they give them.  Because if they're not taking the

6    medication, that means they may be selling it on the street and

7    you have to be kicked out because you didn't follow the

8    agreement, and they kick them out like they did the ones I told

9    you.  Secondly, whether you are taking any street drugs or some

10   other drugs.  And if you're doing that, you're either going to

11   be warned.  And if you're warned and you still do it, then

12   you're going to be kicked out.  And you say it's easy to kick

13   people out.  But what they will probably do is give you a

14   dosage to be weaned off, and then you're terminated.

15          And the government seems to have a problem with them

16   sending off for the -- yes, it's a more expensive urinalysis.

17   But I can assume that if you didn't send it off for the

18   analysis, they would say, well, you're back to being a pill

19   mill, that you don't check up like you're supposed to check up,

20   and they would be complaining about that.  And I suggest to

21   you, ladies and gentlemen, the evidence is going to show that

22   the characteristics of this operation were anything but a pill

23   mill.

24          Now, what does it really come down to?  What it really

25   comes down to is -- you've heard all kinds of things.  It's

73

1   been very complicated.  We're going to try to get into

2   specifics a little bit.  But it's sort of complicated.  And

3   maybe if we can get it down to what we're really here about,

4   and what we're really here about, is this a criminal enterprise

5   or is this the practice of medicine?  And what do we do -- how

6   do we -- what is my job to do?  What is the jury's job to do?

7   Criminal enterprise or the practice of medicine?  Well, how am

8   I supposed to determine that?

9           These people here, the prosecution, have to not only

10  determine that for you, they have the burden of proof beyond a

11  reasonable doubt to convince you of that.  And if you leave

12  with some state of confusion, you're not real sure, you know, I

13  can't understand all this, then they haven't done their job.

14  Their job is to prove to you beyond a reasonable doubt that

15  there was criminal activity involved with these two people.

16          Simplistically, is it a criminal activity, is this a

17  criminal activity, or is this real doctors practicing real

18  medicine treating real patients?  I suggest to you, ladies and

19  gentlemen, that's what we're going to find in this case.

20          Now, I want to go into a little bit of the details

21  about some of the stuff the prosecution talked about.  But

22  before we do that, please understand there is two people

23  charged in the case, and I represent only one of them.  That's

24  Xiulu Raun.  When you take the evidence and you hear the

25  evidence in the next few weeks, please think about it and say,

 1   okay, how did that evidence affect Dr. Couch?  How did that

 2   evidence affect Dr. Ruan?  And just because you hear evidence,

 3   you need to sort it out between the two of them and don't --

 4   just because it came in about this case, does that prove

 5   anything to me about Dr. Ruan?  Did that prove anything to me

 6   about Dr. Couch?  Because the judge has told you already today

 7   you're going to have to go through -- at the end of this case

 8   go through and say has anything been proven against Dr. Ruan;

 9   has anything been proven against Dr. Couch or both of them.  So

10   please when you receive the evidence keep that in mind.

11           And with that, let's look at what we've been charged

12   with.  Starting with -- can you see that?  (Indicating.)

13           A JUROR:  I can see it.

14           MR. KNIZLEY:  Count one of the indictment is RICO.

15   We've heard a little about it.  That racketeer influenced and

16   corrupt organizations.  And yes, that is the Mafia statute.

17   That's what it was about.  It can equally apply to this type of

18   situation, but that's what it's all about.  And they allege a

19   conspiracy to engage in a pattern of racketeering activities

20   specifically.  And these are the things they have to prove in

21   order to prove the RICO.  It's got a number of things in here.

22   But it's illegally distribute drugs, commit wire fraud, and

23   commit mail fraud.

24           Now, these three things also come in later counts in

25   the indictment.  But the RICO count says there's a pattern of

 1  racketeering, a pattern of racketeering activity to do these

 2  three things.  Okay.  Actually you have to prove two of the

 3  three things, but that's what they've got to prove there.

 4          Now, the second count and probably the gist of the

 5  case is this:  drugs distribution counts.  It's counts two

 6  three and four and as to Dr. Ruan, eight, nine, 10, 11, 12.

 7  What's this about?  Drugs distribution counts.  Is that like a

 8  drug deal?  Exactly.  Same statute.  It's the same identical

 9  statute that says you've got to prove this Dr. Ruan is a drug

10  dealer, that he has drugs that cannot be distributed in his

11  possession and he did distribute them without -- illegally.

12          Counts two, three and four say a conspiracy to

13  unlawfully distribute controlled substances, these drugs -- and

14  you'll see this term a lot -- and eight, nine, 10, 11, 12 is to

15  unlawfully distribute, just like this up here, unlawfully

16  distribute a controlled substance.  But they talk about five

17  particular people.  The first three counts talk about three

18  different classes of drugs and conspiracy; the other five

19  counts that apply talk about whether he gave them on this

20  particular day and this particular individual.

21          Okay.  Well how is that a crime for a doctor to give

22  out drugs?  I mean, well, what are you talking about?  How do

23  you make that a drug deal?  Well, the only way you can make

24  that is if these drugs are given for no legitimate medical

25  purpose and/or are outside the usual course of professional

```
 1    practice.  That's what the statute says and that's what the

 2    indictment says as well.

 3              So what does that mean?  Well, how do we get to this?

 4    Well, I believe the prosecution told us that, look, for this no

 5    legitimate medical purpose part, uh, I think there's a lot of

 6    legitimate medical purpose there.  So what about this part?

 7    Outside the usual course of medical professional practice.

 8    Okay?  I don't know what's outside the usual course of medical

 9    practice.  I don't know how you determine what's a legitimate

10    medical -- what's for a legitimate purpose or not for a

11    legitimate purpose.  How are we as a jury going to figure this

12    out?  What do we mean by this?  Who can let us know what's

13    legitimate or not legitimate?

14              Well, if we're not studying qualified medicine, then

15    we have to go find doctors that are and say, okay, y'all come

16    in here, doctors, and y'all explain to us what is a legitimate

17    medical purpose?  When these drugs were distributed -- they

18    talk about what these drugs will do.  When these drugs were

19    distributed, what is this legitimate medical purpose and what

20    is outside the usual practice?  What doctors are we going to

21    get to come tell you that?

22              Well, we need to -- if we want to really know, we want

23    to get to those expert pain doctors that know what they're

24    talking about, because this is real complicated stuff and it

25    changes over time and that sort of thing.  And so we're going
```

OPENING STATEMENT OF MR. KNIZLEY

1   to get these doctors that know what they're talking about.

2          And the government has went out and found some doctors

3   they told you, and they're good doctors, I'm sure.  But they

4   work for the government over and over and over again.  Okay.

5   And they get paid an awful lot of money working for the

6   government over and over and over again to testify for the

7   government.

8          And there's three doctors who are going to testify.

9   And one way that people evaluate doctors is, you know, well,

10  how much education have you had and are you board certified?

11         You know, that's one thing they say, and you've heard

12  that term a lot.  I told you that Dr. Ruan had board

13  certifications.  Well, their doctors, I believe, each of them

14  have a board certification, but one of them is in internal

15  medicine.  I'd rather have a doctor board certified in a

16  specialty.

17         And then another way we look at determining doctors

18  and their qualifications is whether they are published is a

19  term that is used a lot.  And what that means is in medicine

20  there are journals and magazines and stuff like that that are

21  what are called peer reviewed.  They have peers and boards and

22  doctors on those boards like the Journal of Pain Medicine or

23  something like that.  And they've got a lot of journals in

24  particular fields like pain.

25         And then you want to say:  Well, how published is that

1    doctor?  In other words, how much does his peers -- how much

2    has he sent to his peers that is published and say:  I'm real

3    knowledgeable about this subject?

4           And you'll find of the doctors, of the three of them,

5    there's only two publications period from any of them.

6           Now, who is Dr. Ruan bringing to you to talk about

7    this very important part and whether this is or is not true?

8           He's going to bring you two doctors, Jeff Gudin and

9    Chris Gharibo.  And I may mispronounce his name

10   sometimes.  They are eminently qualified.  Dr. Gudin has board

11   certifications, they both have fellowship training.  A

12   fellowship-trained MD means they have yet another year beyond

13   all of the medical stuff to get a fellowship.  Dr. Gharibo, he

14   has three board certifications, all in -- not all of them, but

15   they all -- or both of them are certified in pain management.

16   They are seen as two eminent doctors that are respected

17   throughout the United States and probably two of the most

18   eminent pain doctors in the United States.  If you want to know

19   what's going on with pain medicine, these are the type people

20   you go to.  Published.  They have dozens and dozens of

21   publications each of them in these pain management journals and

22   that sort of thing.

23          They are the type people that understand pain

24   medication, that understand the intricacies of it, that

25   understand how difficult it is to have that delicate balance

1    between putting a person back to work, having a person have a

2    quality of life, and keeping them from getting addicted and

3    that sort of thing.  And it's very difficult.  It's not easy.

4         But those people, those doctors are going to come tell

5    you that every single one of the times they claim that Xiulu

6    Raun had prescribed something outside the normal course of

7    medical practice, they said:  No.  I'm the expert.  Both of

8    them said:  Nope, that didn't happen.  Everything he did in

9    their opinion was within -- was for a legitimate medical

10   purpose and outside the normal -- inside normal professional

11   medical practice without question, without qualification.

12        And I suggest to you, ladies and gentlemen, when you

13   hear from someone who knows how to answer this question --

14   because I certainly don't without that kind of testimony --

15   you're going to say, well, look, if these people with these

16   qualifications say -- they may have a difference of opinion.

17   I'm not saying they're bad people for having a difference of

18   opinion.  But you'll find in the medical world there's an awful

19   lot of differences of opinion.  And if they had two differences

20   of opinion and one says this is right and one says it's wrong,

21   that still puts it into the normal course of medical practice.

22   And I suggest that's what you're going to see and you're going

23   to hear that.  And you're going to say:  Now, if they're going

24   to come in here and say that, therefore these charges are just,

25   you know, really, really out of place.

1        And I suggest to you when you hear that, you're going

2    to return a verdict of not guilty as to these counts.  And if

3    you do that, then you need to look at what else they're

4    alleging here.

5        We heard the word "kickback."  Counts 16, 17 and 18 of

6    the indictment -- again, this is conspiracy to kickback -- they

7    say -- these three things, these three counts, allege three

8    different areas of kickback.  You've heard Manfuso's name,

9    you've heard Ms. Perhacs' name, you've heard Galena's name.

10   I'm going to try to put it to you so you'll see what they're

11   all about.

12       Okay.  Mr. Manfuso.  Dr. Ruan and Dr. Couch owned two

13   pharmacies.  One was this C&R Pharmacy.  Okay?  And then

14   another one was what they call a workmen's compensation

15   dispensary or a pharmacy for workmen's compensation patients

16   only.  They all had one day when they saw only workmen's

17   compensation patients.  So they had a bunch of workmen's

18   compensation patients that they treated for pain, somebody

19   that's been injured on the job, industrial accidents, been hurt

20   read bad.  But they were referred by their doctors.  Their

21   doctors, primary doctors, said:  Look, we can't help you

22   anymore.  Go to these pain specialists, go to the pain

23   specialists, and workmen's compensation will pay for it.  All

24   right?

25       So they had a workmen's compensation dispensary.  All

OPENING STATEMENT OF MR. KNIZLEY

81

1  right.  Well, they got this guy here, IPM did and then later

2  CRS or something.  They said:  Look here.  We've got this

3  workmen's compensation dispensary and we need to hire somebody

4  to manage it.  They could have went out and hired anybody they

5  wanted to.  But they said:  Okay.  You've got a company and you

6  claim that your company's specialty is managing these type of

7  workmen's compensation dispensaries.  I'm going to hire you to

8  do that.  Okay?  And they entered into a contract.  Okay?  And

9  the contract says you or your company IPM, or later it was CRS

10  or whatever it was, I want you to manage my workmen's

11  compensation for me.  That's all I want you to do.  And I want

12  you to treat -- I want you to treat Alabama workmen's

13  compensation patients, not the other patients.  Alabama.

14  That's the wording there.

15      So we get this guy to do the workmen's compensation.

16  And he says:  Okay.  Look, I'll pay you -- if you'll do this,

17  I'll keep 30 percent and I will give you back 70 percent of

18  your own money.  He doesn't have any money.  This isn't his

19  money.  There is no money for him to kick back.  This is Ruan

20  and Couch's money.  There can't be any kickback.  It's their

21  own money anyway.  So it's just foolishness.

22      And further, this only applies -- and he mentioned

23  it -- to federally insured fraud.

24      MR. BODNAR:  Your Honor, before we go on, I want to

25  object based on your rulings on this before on this issue.

1          THE COURT:  All right.  Let's move on.

2          MR. KNIZLEY:  This has nothing to do with the ruling

3    on the issue, Judge.

4          THE COURT:  Well, come to side bar.

5      (At the side bar, jury not present.)

6          THE COURT:  What is the basis of your objection?

7          MR. BODNAR:  Your Honor, it sounds like the next thing

8    that is going to come out is there's only a few federally

9    insured people and that there's $2.4 million paid to them; it's

10   irrelevant because there were only a few federally insured

11   people.  The Court's already ruled the entire amount -- they

12   purchased the entire amount, all the patients, federal and

13   nonfederal.  So by law -- there is no relevance to the fact of

14   arguing, well, there are just a few federal and therefore it's

15   not relevant.

16          MR. KNIZLEY:  The relevance is, Judge -- yes, there

17   are a few people federally affected.  There's a contract

18   between these two people.  They had the contract, and that is

19   for you to treat Alabama workmen's compensation patients.  That

20   he went outside of that, of the 95 percent of the people he did

21   and treated them -- but we had no knowledge of it.  We expect

22   that's what the evidence would show.  We had no knowledge.  The

23   contract --

24          THE COURT:  All of this is completely going over the

25   heads of everybody until the evidence comes in.  This is more

1   in the nature of argument as to what the evidence means.  So I

2   mean you can go down this road with it, but --

3           MR. KNIZLEY:  I think it's a little bit over their

4   heads, too.  I agree with that.

5           THE COURT:  I think you need to wait and address these

6   issues when the actual evidence comes in.  But if you want to

7   go through that now, you can.  But I don't think it -- it goes

8   to knowledge that your client had, not to the issue of whether

9   or not that is legally chargeable.

10          MR. KNIZLEY:  Absolutely.  It goes to whether he's

11  guilty or not.

12          THE COURT:  Okay.

13       (In open court, defendants and jury present.)

14          MR. KNIZLEY:  95 percent of these people are Alabama

15  workmen's compensation patients.  The statutes don't apply to

16  that.  But 5 percent, may have been, may not have been.  But if

17  there is 5 percent, it does apply.  But the contract between my

18  client and this guy is if you do Alabama workmen's compensation

19  patients.  I expect the evidence to show if he did something

20  otherwise than that, it was without any of my client's

21  knowledge.  And the client in this particular setting, you have

22  to have knowledge somebody's done something wrong.

23          Perhacs, she worked for that substance company you

24  heard somebody talk about.  She supposedly was -- what she did

25  with her company Insys is something different from what we know

1    that she did when she came to our company.  She was a

2    pharmaceutical salesman that would come by and would go in the

3    clinic and talk to people.  And they said:  Okay.  We've got

4    particular programs.  Doctor, if you will come speak to these

5    people, go out to lunch together, we will pay you 25-$3,500 is

6    what we will do.  Okay?  And that's perfectly legal; nothing

7    wrong with that whatsoever.

8            She did that.  And I think her testimony is going to

9    be that she came in and made every effort to make people come

10   to these things, other doctors, other doctors' personnel staff.

11   And he would speak to them about, you know, the benefits and

12   negatives and whatever it might be or whatever this pain

13   medication is, and he got paid for it.  And there's nothing

14   wrong with that unless it's some kind of kickback

15   situation.  We suggest there's going to be no evidence

16   whatsoever, whatsoever, to indicate that for any speaking fee

17   he got, that he did something in connection with his medical

18   practice that would have been different otherwise.  We think

19   just the opposite.  She's going to encourage him to up dosages,

20   and you're going to see emails where he says, no, I'm not doing

21   that.  I'm prescribing the medicine I think is best for my

22   clients.

23           As far as any motive to do that, the money they paid

24   him to go and speak, he could have made a lot more money, the

25   evidence will show, sitting in his office and

OPENING STATEMENT OF MR. KNIZLEY

1   working.  Okay.  And what did he do with the money?  The vast

2   majority of this money he sent to the University of South

3   Alabama -- paid directly to the University of South Alabama, to

4   LSU where he went to school, and to the colleges where he went

5   to school.  Most of the money he got from this he just gave to

6   educational institutions, didn't even keep it.

7           Galena, kickbacks in the form of a rebate.  And you

8   heard the prosecutor tell us there's nothing wrong with rebates

9   whatsoever.  It's when the rebate doesn't pass through to the,

10  again, federally insured person, then that could be some

11  kickback.  Okay.  Well, first off, Galena signs the kickback

12  agreement not with Dr. Ruan and not with Dr. Couch but with

13  this C&R Pharmacy.  C&R Pharmacy that's owned by them is

14  managed by Dan McConaghy of McConaghy Drugs from up there in

15  the Satsuma-Saraland area.  And Caye McConaghy Renegard, who is

16  his niece, operated that.  And they signed that agreement and

17  they entered into that agreement.  We didn't even have any idea

18  that they were negotiating for some kickback -- for some

19  rebate.  We had no idea about that.  And it wasn't the rebate

20  to begin with; it was a rebate that had been passed through --

21  which I don't know whether it was or not, they may know -- to

22  the federal healthcare program.  There's nothing wrong with it

23  anyway.  But we knew nothing about it.

24          We paid -- we paid McConaghy and his company to run

25  the pharmacy.  Galena talked to them and they signed the

1    agreement.  We never negotiated with Galena and we didn't know

2    anything about it.  Now, they want to talk about some other

3    part about Galena, but they don't want to say it's a kickback;

4    they want to say they got these stock -- they got stock, so

5    they then must have prescribed medicine to help the stock.

6           Well, I submit to you that it would have been

7    impossible for simply prescribing more medications to increase

8    the value of the stock.  And it's sort of like buying Krispy

9    Kreme stock and then go buy a bunch of donuts and maybe my

10   stock will go up.  I don't think -- I think the evidence will

11   show that the benefit of the Galena stock at that time, the

12   driving force, what made it appear to be valuable to anyone,

13   was a breast cancer medication.  And every investor in that

14   thought that was something that was going to be very important

15   and maybe would make that stock very valuable in the future --

16   not Abstral, not what we would be prescribing.  That was not

17   it.

18          You're also going to see when he talks about these

19   spikes and stuff, when the stuff goes up, well, Galena just had

20   bought the Abstral.  The Abstral is one of those four forms of

21   fentanyl:  the Subsys, Abstral, Fentora and one more.  But they

22   had just bought that, and they were giving out coupons -- which

23   is totally fine.  When you go to a doctor and he gives you a

24   free sample or a coupon for medication, that's to promote that

25   particular medication.  That's what that's all about.

1        Well, they were giving out coupons of this to go from

2   one form of fentanyl to another.  And the Galena form of

3   fentanyl was Abstral.  And at that time Ruan -- some of his

4   patients could not even qualify for these drugs.  He would give

5   them the coupon so they wouldn't have to pay for it out of

6   their pocket so the insurance company wouldn't get it.  And

7   when it just came out, well, there it goes.  There goes the

8   spiking he's talking about.

9        Now, if you want to drive your stock price up, don't

10  be giving away coupons.  Make the insurance company pay for it.

11        And I suggest to you, ladies and gentlemen, that's

12  what you're going to see in this theory of some kickback from

13  Galena, just like the other kickbacks; it's something they were

14  trying to enforce and it's something that did not happen.

15        Count 15 is healthcare fraud, conspiracy to commit

16  fraud by billing insurance companies for drugs that were not

17  for a legitimate medical purpose and outside the normal course

18  of medical practice.  We see this a whole bunch.  Okay.  Who is

19  going to talk to us about this?  Our experts.  We think our

20  experts are qualified.  We think when our experts will tell you

21  that none of this is outside the normal course of medical

22  practice, that won't matter anymore.

23        They also say on healthcare fraud submitting false

24  medical information to the insurer -- I'll shorten this up.

25  It's a bunch of particulars, but I'll just talk about one of

1    the particulars they talk about.  They say we sent some false

2    information, but one of the basic ones they talk about is that

3    upcoding.  They talk about how, well, the nurse practitioner

4    saw the doctor -- excuse me -- saw the patient and the doctor

5    never came and saw the patient, and they billed Blue Cross/Blue

6    Shield, and therefore that was fraudulent.

7           Well, first off, Blue Cross/Blue Shield is about the

8    only one that requires the doctor to actually come in the

9    examining room before they can bill under their provider

10   number.  And that is a contract between Blue Cross and Blue

11   Shield.  That's not the law.  It's an agreement.  But, now, if

12   you intentionally do that, the doctor intentionally violates

13   that agreement, you know, that might be fraud.  But if you

14   don't know that's the contract -- so what do you mean you

15   didn't know it was the contract?  Well, he's the doctor, it's

16   his office.

17          Well, you'll find that during the time frame of what

18   they're talking about, first Dr. Ruan saw nearly every one of

19   his patients anyway.  But if there was a question whether that

20   ever happened -- they had issues with their billing in

21   2013.  They weren't billing appropriately.  They hired a lady

22   who you will hear from named Debi Phillips as an office

23   manager.  The gentleman that was their office manager named Ken

24   Cross was not doing a very good job.  They hired an office

25   accountant named Boe Strange to come in along with Ms. Phillips

1  to clean up this.  Ms. Phillips saw where they had failed to

2  bill for over a million dollars, several million dollars worth.

3  They didn't bill it, just didn't bill it.  It was messed up.

4          So then they said, okay, let's go get this

5  sophisticated billing program from a business named Greenway so

6  we will bill properly.  They paid about $120,000, and then

7  every month they had to pay thousands of dollars to maintain

8  it.  They had Ms. Phillips and Greenway and said, look, let's

9  get this straightened out.  Okay.  And Dr. Ruan is practicing

10  medicine.  He is hiring Mr. Strange, the accountant; he was

11  hiring Mr. Cross he had to fire; he had hired Ms. Phillips to

12  go figure out and make sure the billings were right.  He paid a

13  $120,000 for a billing program, and you would think they know

14  how to bill -- they would know how the software should work

15  when you mash the button to send it to Blue Cross/Blue Shield

16  and that's all that happens, that it's billed properly.

17          Ms. Phillips, the testimony will show, came in and

18  said:  Doctor, this is very confusing.  This Blue Cross/Blue

19  Shield thing is very confusing.  First she went to Dr. Couch

20  and said:  We need to go have some seminars, go to some classes

21  and figure out how to do this.

22          Dr. Couch says:  You're going to have to ask Dr. Ruan.

23          Dr. Ruan says:  Yes.  If you don't know how to bill

24  that, we'll send you to some seminars to figure out how all

25  this is done.  And that's what they did.

1    There was absolutely zero intent to defraud anyone.

2    The evidence will say just the opposite.  They did everything

3    they could to, one, buy the equipment, two, hire the employees,

4    three, to manage -- and three, to get them educated to know how

5    to do this billing.  Yes, they may have made mistakes in

6    billing, but it's not some criminal enterprise.  It's a

7    mistake.  And if they owe some money back, they owe them.  I

8    don't know if they do or don't.  But it's not because they went

9    out to try to defraud somebody.  It's just the opposite.  They

10   did everything at the expense of money to do it right.

11        The wire fraud and mail fraud, this is count

12   19.  Again, it's a conspiracy to commit wire fraud and mail

13   fraud.  And basically that upcoding that I just told you about,

14   about billing wrong to Blue Cross/Blue Shield, the upcoding is

15   using the mail to get paid and emailing using the wire, okay,

16   to get higher workmen's compensation medicines reimbursed.

17   Well, all that wire fraud and mail fraud is is the United

18   States mail and other forms of mail and the federal

19   government -- regulated Federal Communications Commission, the

20   telephone -- the telephone.  Okay.  So that's where we get the

21   term "wire fraud" and "mail fraud."  And if you use the mail or

22   you use the telephone -- nowadays the computer and nowadays

23   Fed Ex and stuff like that -- that gives the federal government

24   jurisdiction to claim you did something fraudulent.  And so

25   it's not really anything new they're talking about here.

OPENING STATEMENT OF MR. KNIZLEY

1    They're just claiming that you used the telephone or computer

2    nowadays, used the mail or Fed Ex and other things nowadays to

3    do something that's wrong.

4            Well, if you didn't do the other things wrong, then

5    you can't commit wire fraud and mail fraud if all these other

6    things weren't illegal.  So don't let that confuse you.  If

7    there's no other legal conduct, just because you use the wire

8    and mail doesn't make it any more illegal.  Okay?  That's a

9    federal jurisdictional provision for them to come in here and

10   charge people with fraudulent conduct by using that wire and

11   using that mail.

12           The last one they talk about is money laundering,

13   counts 21, 22, and 23.  And that's engaging in monetary

14   transactions involving a bank with illegally derived

15   funds.  Now, that's real simplistic.  But it basically means if

16   you got the money that you got from an illegal purpose and you

17   put it in the banking system and it's derived from an illegal

18   purpose, then you can be charged with money laundering.  And so

19   you've got to have first the illegal conduct, whatever it was

20   they were talking about, the drug distribution and the

21   kickbacks.  If you don't have that, wherever the money came

22   from, it doesn't matter, it's not money laundering anymore,

23   just like it's not wire fraud and mail fraud.

24           I went over that to try to help all of us understand

25   what this case is going to be about for the next several weeks.

```
 1              THE CLERK:  Mr. Knizley, time.
 2              MR. KNIZLEY:  Yes, ma'am.
 3              And my time is up.  But hopefully that has been
 4    somewhat helpful to you to understand what we're looking at
 5    and, what we need to evaluate for these next few weeks.
 6              But I think we can go through all this terminology and
 7    all these expert opinions and all this stuff, and I think it
 8    gets right down to this:  Do you really think and is there
 9    proof beyond a reasonable doubt that this was a criminal
10    enterprise?  Or do you think these were real doctors practicing
11    real medicine, treating real patients?  I believe when this
12    case is over, that's what you will conclude.  Thank you.
13              THE COURT:  All right.  Do you have your first witness
14    available this afternoon?
15              MR. BODNAR:  Yes, Your Honor, we do.
16              THE COURT:  We're going to break at 5 o'clock, but
17    we're going to work till 5 o'clock.  So they can start with
18    their first witness.
19              THE CLERK:  Step forward toward the witness stand and
20    I'll swear you in.  Let me get you to raise your right around.
21                        DEA DI SUSANNAH HERKERT
22              was sworn and testified as follows:
23              THE WITNESS:  I do.
24              THE CLERK:  Thank you, ma'am.  Please be seated.
25                        DIRECT EXAMINATION
```

```
 1   BY MR. BODNAR:

 2   Q   Good afternoon.

 3   A   Good afternoon.

 4           MR. BODNAR:  I don't know if my mic's on actually.

 5           THE COURT:  Is the green light on?

 6           MR. BODNAR:  It's on.  There it is.

 7   Q   Would you please state your name for the jury?

 8   A   Susannah Herkert.

 9   Q   And, Ms. Herkert, where do you work?

10   A   I work for the Drug Enforcement Administration.

11   Q   Is that more commonly known as the DEA?

12   A   Yes, it is.

13   Q   Would you please explain to the jury what you do for the

14   DEA?

15   A   For the DEA I'm a diversion investigator.

16   Q   And what is a diversion investigator compared to a DEA

17   special agent?

18   A   A diversion investigator is a specialist position with DEA

19   that entails the prevention and investigation of diversion of

20   pharmaceutical controlled substances as opposed to the straight

21   elicit controlled substances.

22   Q   So in simplistic terms, special agents generally deal with

23   meth or heroin, whereas diversion agents deal with

24   pharmaceuticals?

25   A   That is correct.
```

```
 1  Q   Can you please explain to the jury what your background is
 2  before you became a DEA diversion agent?
 3  A   Prior to becoming a DEA diversion investigator, I was an
 4  adjunct professor in aviation and space science.
 5  Q   And what kind of degree did you have before you were an
 6  adjunct professor?
 7  A   I had a master of science in natural and applied sciences
 8  and aviation and space science.
 9  Q   And how long have you been a DEA DI?
10  A   Approximately 11 years.
11  Q   And what kind of specialized training in pharmaceutical
12  cases have you had through the DEA or through the rest of your
13  education?
14  A   As part of my basic drug diversion investigator training
15  with DEA, I received approximately three months of specialized
16  training at Quantico, Virginia, that involved the pharmacology
17  of drugs, investigations of illicit distribution of controlled
18  substances, the manufacturing, audits as they entail
19  pharmaceutical companies, physicians, and pharmacies.
20  Q   And in that training experience did you learn what
21  constitutes a legitimate prescription?
22  A   Yes, I did.
23  Q   And what are the elements of a prescription, if it is a
24  legitimate prescription?
25          MR. KNIZLEY:  Your Honor, I object.  I don't think
```

1   there's a proper predicate or foundation to give that type of

2   opinion.

3          THE COURT:  Sustained.

4   BY MR. BODNAR:

5   Q   What training and experience have you had in terms of

6   learning what might make something a legitimate prescription?

7   A   I've been trained in the Controlled Substances Act,

8   specifically within the Code of Federal Regulations and what

9   DEA requires for a prescription to be issued for controlled

10  substance for it to be effective or legitimate.

11  Q   And what does the DEA federal regulations require for a

12  prescription to be a legitimate prescription?

13         MR. KNIZLEY:  Object.  Same objection.

14         THE COURT:  Overruled.

15  BY MR. BODNAR:

16  Q   You can answer.

17  A   DEA requires, for a controlled substance to be effective,

18  it must be issued within the usual course of a professional

19  practice by an individual practitioner and for legitimate

20  medical purpose.

21  Q   And you said an individual practitioner.  Can any

22  practitioner prescribe a controlled substance?

23  A   Not without a DEA registration.

24  Q   So explain to the jury, please, what is a DEA registration

25  and how is it different than just having a normal medical

1   degree or nursing degree?

2   A    A DEA registration is a specific application process that a

3   physician, a pharmacy, or anyone who handles controlled

4   substances must go through.  This registration process involves

5   a mid-level practitioner practicing requirement, the researcher

6   to apply for the ability to legally manufacture, distribute,

7   dispense, prescribe, or administer a controlled substance and

8   that authority is designated by DEA.

9   Q    And if you are approved for a DEA license, are you given

10  something as either a physician or a practitioner that

11  signifies you have the ability to handle, dispense, prescribe a

12  controlled substance?

13  A    Yes, you're given a DEA registration number.

14  Q    And is that -- I know it's letters and numbers; correct?

15  A    That is correct.

16  Q    Is it somewhat akin to a Social Security number, that each

17  one is individual for a particular doctor or nurse

18  practitioner?

19  A    Yes, it is individualized for the specific pharmacy,

20  practitioner, manufacturer, distributor that has applied for

21  the DEA registration number.

22  Q    In preparation for your testimony today, did you help

23  prepare a series of visual aids to help the jury understand the

24  drug scheduling and some various types of drugs that they may

25  hear about in this trial?

 1   A   Yes, I did.

 2          MR. BODNAR:  Your Honor, may I approach the witness

 3   with what's been marked as Government's Exhibit 1-2 through

 4   1-13?

 5          THE COURT:  All right.

 6   BY MR. BODNAR:

 7   Q   Would you please look through 1-2 through 1-13 and identify

 8   what these are to the jury?

 9   A   These are various demonstrative aids that demonstrate drug

10   schedules and different drugs and their brand names.

11          MR. BODNAR:  And, Your Honor, while these are marked,

12   the United States is just going to use them as a visual aid

13   with this witness and not intending to admit them.

14          THE COURT:  Not offering them; is that correct?  All

15   right.

16          MR. BODNAR:  Not offering them.  May we show them to

17   the jury?

18          THE COURT:  Yes.

19   BY MR. BODNAR:

20   Q   Agent Herkert, I'm going to show you first what's marked as

21   Government's Exhibit 1-2, entitled Drug Schedules.  Can you

22   help the jury first understand what are the drug schedules?

23   What does that mean, a scheduled drug?

24   A   A drug schedule, there are five drug schedules within DEA

25   where the drugs are classified based off their current

1   medicinal value, the potential for abuse, and whether or not

2   there's a physical/psychological dependence of the drug.  So

3   DEA has five classifications of these drugs.

4   Q   And if something is scheduled, is that what is referred to

5   as a controlled substance?

6   A   That is correct.

7   Q   But are all prescriptions that are written controlled

8   substances?

9   A   No, they are not.

10   Q   So a prescription for, say, cold medicine or, well,

11   penicillin -- or is it?  That would not be a controlled

12   substance; correct?

13   A   That is correct.  Penicillin is not a controlled substance.

14   Q   Well, let's start at the top.  What does it mean if

15   something is schedule I?

16   A   Schedule I means that there's no current accepted medical

17   use for that drug, there's a high potential for abuse and it

18   cannot be prescribed.

19   Q   What about schedule II, the schedule right below it?

20   A   Schedule II, for this there's a high potential for abuse in

21   this category.  There's also a physical/psychological

22   dependence and there's severe restrictions on the prescriptions

23   within this category.

24   Q   And in this column here, examples in this trial, what are

25   those drugs?  It looks like fentanyl down to hydrocodone.

DEA DI SUSANNAH BERKERT - DIRECT BY MR. BODNAR

1    A    Yes, an example of schedule II drugs would be cocaine.

2    Other examples are fentanyl, oxymorphone, hydromorphone,

3    methadone, oxycodone, morphine, and hydrocodone, other examples

4    of schedule II.

5    Q    Now, can you help the jury understand, why does that

6    hydrocodone have a little asterisk next to it right there?

7    A    Hydrocodone has an asterisk by it because prior to October

8    the 6th of 2014 hydrocodone was a schedule III controlled

9    substance and it was moved to schedule II with a combination of

10   products as of October 6, 2014.

11   Q    So during the course of the time period in the indictment

12   did hydrocodone switch from a schedule III to a schedule II?

13   A    That is correct.

14   Q    Is there a general name for these example drugs right

15   there, fentanyl, oxymorphone, hydromorphone, and so on?

16   A    Yes.  These are all considered opioids.

17   Q    And just in general can you explain to the jury what is an

18   opioid?

19   A    An opioid is an opium-like substance and its synthetic or

20   semi-synthetic derivatives.  Of that several opioids also can

21   be considered narcotics or called narcotics.

22   Q    And can opioids be used to treat pain?

23   A    Yes.

24   Q    But are all pain medicines opioids?

25   A    No, they are not.

1   Q   So, for example, Tylenol, or what's commonly known as

2   acetaminophen, is that an opioid?

3   A   No, that is not.

4   Q   How about Ibuprofen?

5   A   No, it is not an opioid.

6   Q   So there are pain management drugs that are not controlled

7   substances -- that are not opioids?

8   A   That is correct.

9   Q   Looking down at schedule III, what's the difference between

10  a schedule II and a schedule III drug?

11  A   As you move down from schedule II to schedule III, there's

12  still a potential for abuse, but it's lower than the drugs in

13  schedule II.  There's still physical and psychological

14  dependency potential, and there are restrictions on

15  prescriptions that are listed in schedule III.

16  Q   And does it follow the same way that schedule IV is

17  slightly less regulated than schedule III or schedule II?

18  A   That is correct.

19  Q   And these two examples here, benzodiazepines and

20  carisoprodol, can you explain first what is a benzodiazepine?

21  A   Benzodiazepine is a class of psychoactive drugs that treat

22  a wide range of conditions, to include insomnia or

23  anxiety.  Examples of the benzodiazepine could be alprazolam,

24  more commonly known as Xanax.

25  Q   So are benzodiazepines, or benzos, are they opioids as

1   well?

2   A   No, they are not.

3   Q   So it's just a separate class of drugs?

4   A   That is correct.

5   Q   Now, what is carisoprodol that is down there?

6   (Indicating.)

7   A   Carisoprodol is a muscle relaxant commonly used to treat

8   muscle spasm pain, or pain.

9   Q   And is that, again, a separate class of drugs from benzos

10  and from opioids?

11  A   Yes.

12  Q   And I see listed under examples it starts here at the top,

13  fentanyl, and goes down to hydrocodone.  Is that generally

14  ranked from strongest to least strong within the opioids?

15  A   Yes, it is.

16  Q   And did you prepare or help prepare slides for the jury to

17  explain these different types of drugs under the opioids?

18  A   Yes.

19  Q   I'm going to show you now what's been marked as

20  Government's Exhibit 1-3, labeled at the top Hydrocodone.  And

21  I'll zoom out for a second.  Does this have a footnote down at

22  the bottom explaining what you talked about about the

23  hydrocodone switching schedules?

24  A   That is correct.

25  Q   So let's walk the jury through right here.  What are they

DEA DI SUSANNAH HERKERT - DIRECT BY MR. BODNAR

1    seeing on this hydrocodone slide?

2    A   On this hydrocodone chart there's various brand names, to

3    include Lortab, Norco, Vicodin, and Zohydro.  And these are

4    various formulations of hydrocodone and the brand name of that

5    tablet.

6    Q   This is not necessarily all the brands of hydrocodone;

7    correct?

8    A   No, it is not.

9    Q   These are some of the more commonly known ones?

10   A   Yes, it is.

11   Q   Now, I see here -- so this is Lortab in a tablet.  And I'm

12   presuming that's a picture of what Lortab looks like?

13   A   Yes, that's a picture of one of the tablets.

14   Q   And it says common strength, I see 5.0-325 mg.  Can you

15   help explain to the jury what it is that they're looking at

16   right there?

17   A   The strength, the first number, the smaller number, the

18   5.0, is going to be the amount of opioid or the amount of

19   hydrocodone within the tablet.  And the second number is the

20   nonopioid or the acetaminophen, more commonly known as Tylenol,

21   amount in that tablet.  So they're combination tablets, that

22   you're seeing the two numbers.

23   Q   So just so I understand, does that mean that there's five

24   milligrams of hydrocodone and 325 milligrams of essentially

25   Tylenol in that lowest strength of Lortab?

DEA DI SUSANNAH HERKERT - DIRECT BY MR. BODNAR

```
1   A   That is correct.

2   Q   And is that the same you see for Norco and Vicodin?

3   A   Yes.

4   Q   What about Zohydro in the bottom capsules?  Why don't I see

5   a second number after them?

6   A   Zohydro is not a combination acetaminophen tablet.  So that

7   is the amount of hydrocodone within that tablet.

8   Q   So that means it's a pure hydrocodone tablet?

9   A   Yes, that is the amount of hydrocodone in that tablet.

10  Q   And is the next step up in opioids morphine?

11  A   Yes.

12  Q   I'm going to show you now what's been marked as

13  Government's Exhibit 1-4.  Can you briefly explain what we're

14  looking at on this morphine slide?

15  A   Yes.  This is another chart that shows various brand names

16  of morphine tablets, including MS Contin, Kadian, Embeda,

17  Avinza, in different formulations and an image of some of

18  those.

19  Q   And since I only see one number here, does that mean that

20  MS Contin, Kadian, Embeda, and Avinza, these are pure morphine

21  products?

22  A   The number listed is the amount of morphine within that

23  tablet.

24  Q   After morphine, is the next step up oxycodone?

25          THE COURT:  All right.  Mr. Bodnar, we're going to
```

1    stop for today.

2          MR. BODNAR:  Yes, Your Honor.

3          THE COURT:  Thank you.  You may step down.

4          All right, ladies and gentlemen.  You've put in a long

5    first day.  So I'm going to instruct you again, do not forget,

6    you are not to discuss this case at all with whoever you may

7    live with or whomever you may see between now and the time you

8    are back here tomorrow.  Just go home, if you can, and relax,

9    put it out of your mind and be back downstairs in the jury

10   assembly room ready to start, to be called back up at 9 o'clock

11   tomorrow morning.

12          Thank you very much and I hope you have a good

13   evening.

14        (In open court, defendants present, jury not present.)

15          THE COURT:  All right.  Counsel, I understand that one

16   of the jurors inquired of court security as to what they are

17   supposed to do if they don't understand either the question or

18   the answer.  It's the lawyers' job to make sure the jury does

19   understand the questions or the answers.  I don't know whether

20   this was during opening statements.  I know it would be,

21   because it had to be before the first witness.  So I just want

22   you to keep in mind that most of these jurors don't know

23   anything about the practice of medicine or controlled

24   substances.  So don't go too fast so that you run away with the

25   information that they need to know in terms of what you're

1    going to be presenting.

2              So thank you.  And we will -- yes?  I'm sorry?

3              MS. GRIFFIN:  Your Honor, might we just approach

4    briefly?

5              THE COURT:  Sure.  Do you need the court reporter?

6              MS. GRIFFIN:  I don't think so.

7              THE COURT:  Okay.

8         (A discussion was held off the record at side bar between

9    the Court and counsel.)

10        (Court adjourned at approximately 5 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25