

```
1                UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF ALABAMA
2


3   UNITED STATES OF AMERICA
                                    CASE NO. CR15-00088
4   v.
                                    COURTROOM 2B
5   JOHN PATRICK COUCH, M.D.,
    and XIULU RUAN, M.D.,
6                                   MOBILE, ALABAMA
             Defendants.
7                                   FRIDAY, JANUARY 6, 2017
    * * * * * * * * * * * * * * *
8


9                         DAY 2 OF TRIAL
10        BEFORE THE HONORABLE CALLIE V. S. GRANADE,
             UNITED STATES DISTRICT JUDGE, AND JURY
11


12

13  APPEARANCES:

14  FOR THE GOVERNMENT:
        DEBORAH A. GRIFFIN
15      CHRISTOPHER BODNAR
        United States Attorney's Office
16      63 S. Royal Street, Suite 600
        Mobile, AL  36602
17      (251) 441-5845

18
    FOR THE DEFENDANT COUCH:
19      ARTHUR T. POWELL, III
        P.O. Box 40456
20      Mobile, AL 36640-0456
        (251) 433-8310
21
        JACKSON R. SHARMAN, III
22      ROBERT JACKSON SEWELL
        JEFFREY PAUL DOSS
23      BENJAMIN SANDERS WILLSON
        Lightfoot, Franklin & White
24      400 North 20th Street
        Birmingham, AL  35203
25      (205) 581-0700
```

1    (Continued)

2        BRANDON KEITH ESSIG
         800 Shades Creek Parkway, Suite 600D
3        Birmingham, AL  35209
         (251) 879-1981

4

    FOR THE DEFENDANT RUAN:
5        DENNIS J. KNIZLEY
         7 N. Lawrence
6        Mobile, AL 36602
         (251) 432-3799

7

         JASON BRADLEY DARLEY
8        Darley & McGough, LLC
         1751 Dauphin Street
9        Mobile, AL 36604
         (251) 441-7772

10

         GORDON G. ARMSTRONG, III
11       P.O. Box 1464
         Mobile, AL  36633
12       (251) 434-6428

13       STEVEN D. MARTINIE
         4955 North Lake Drive
14       Whitefish Bay, WI  53217
         (414) 332-9683

15

    THE CLERK:  MARY ANN BOYLES
16  THE LAW CLERK:  LYNN DEKLE
    U.S. ATTORNEY IT: BRIAN COCHRAN
17  COURT SECURTY:  WILLIAM NOEL
    COURT REPORTER:  ROY ISBELL, CCR, RDR, CRR

18

            Proceedings recorded by OFFICIAL COURT REPORTER
19       Qualified pursuant to 28 U.S.C. 753(a) & Guide to
    Judiciary Policies and Procedures Vol. VI, Chapter III, D.2.
20         Transcript produced by computerized stenotype.

21

22

23

24

25

1                          EXAMINATION INDEX

2

  DEA DI SUSANNAH HERKERT
3        DIRECT BY MR. BODNAR . . . . . . . . . . . . . . 111
         CROSS BY MR. ESSIG . . . . . . . . . . . . . . . 131
4        CROSS BY MR. KNIZLEY . . . . . . . . . . . . . . 150
         REDIRECT BY MR. BODNAR . . . . . . . . . . . . . 164

5

  NANCY BISHOP, R.Ph.
6        DIRECT BY MS. GRIFFIN . . . . . . . . . . . . . 178
         CROSS BY MR. SEWELL . . . . . . . . . . . . . . 200
7        CROSS BY MR. KNIZLEY . . . . . . . . . . . . . . 207
         REDIRECT BY MS. GRIFFIN . . . . . . . . . . . . 216

8

  FBI SA ERIC LAWSON
9        DIRECT BY MS. GRIFFIN . . . . . . . . . . . . . 220
         DIRECT BY MS. GRIFFIN . . . . . . . . . . . . . 231
10       CROSS BY MR. ESSIG . . . . . . . . . . . . . . . 263
         CROSS BY MR. KNIZLEY . . . . . . . . . . . . . . 286
11       REDIRECT BY MS. GRIFFIN . . . . . . . . . . . . 299

12 FBI SA STEVEN SORRELLS
         DIRECT BY MS. GRIFFIN . . . . . . . . . . . . . 302
13       CROSS BY MR. KNIZLEY . . . . . . . . . . . . . . 316

14 FBI SA CAROLYN MIDDLETON
         DIRECT BY MS. GRIFFIN . . . . . . . . . . . . . 328

15

16

17

18

19

20

21

22

23

24

25

```
 1                        EXHIBIT INDEX

 2                                                   MAR ADM
       GOVERNMENT'S
 3     1-1    TIRF Enrollment Form                      126

 4     1-2    Chart - Drug Schedules B2                 164

 5     2-1    Search Book - PPSA Springhill -           223
              Administrative folder
 6
       2-2    Photos (37 paper copies)                  225
 7
       2-3    Ruan signed blank scripts (18373) - room G. 245
 8            east

 9     2-4    Layout of Springhill office               228

10     2-5    Ruan signed blank script (split from 18197, 247
              now 18381)
11
       2-6    American Society of Interventional Pain    248
12            Physicians lobbying contribution form

13     2-7    Documents from file cabinets - Castle      249
              Medical, WKRG, and Lamar Advertising
14
       2-9    Contents of file drawer (1B128) folders #1 239
15            Subsys, #2 Abstral

16     2-10   Miscellaneous financial records (1B213) from 252
              B. east
17
       2-11   Documents seized from PPSA, CO 170 BCBS    256
18            payment denied when billed by this type
              provider (1B378, split from 1B173)
19
       2-12   Presigned scripts (18199) drug logbooks &  241
20            prescriptions

21     2-13   Items seized from Springhill (B.B. west),  251
              drug logbooks and prescriptions
22
       2-14   Business records - Insys bills to C&R      256
23
       3-1    Administrative worksheet and evidence      303
24            recovery log and photograph log

25     3-2    Photographs                                306
```

| 1 | 3-3 | Signed blank prescriptions | 311 |
| 2 | 3-4 | Blowup of sketch | 309 |
| 3 | 3-5 | C&R Abstral prior authorizations 2014 (1B83) | 314 |
| 4 | 3-6 | Medical records, presigned forms | 315 |
| 5 | 4-1 | Search Book - C&R Pharmacy | 329 |
| 6 | 4-2 | Photos | 332 |
| 7 | 4-11 | Unsigned filled scripts  (1B28) (folder - green tray) | 336 |
| 8 | | | |
| | 4-12 | C&R calendar (1B274) | 342 |
| 9 | | | |
| | 4-13 | Couch & Ruan Abstral | 340 |
| 10 | | | |
| | 24-1 | Alabama PDMP data - Ruan & Couch 2011 | 199 |
| 11 | | | |
| | 24-2 | Alabama PDMP data disk (stipulation) | 326 |
| 12 | | | |
| | 24-3 | Subsys peer-to-peer comparison 1/11/11 - 5/31/15 | 196 |
| 13 | | | |
| 14 | 24-4 | Abstral peer-to-peer comparison 1/11/11 - 5/31/15 | 197 |
| 15 | | | |
| | 24-5 | Mississippi PDMP data - Couch | 328 |
| 16 | | | |
| | 24-6 | Mississippi PDMP data - Ruan | 328 |
| 17 | | | |
| | 24-7 | Florida PDMP data - Couch | 327 |
| 18 | | | |
| | 24-8 | Florida PDMP data - Ruan | 327 |
| 19 | | | |
| | 24-9 | Florida PDMP data - CD | 327 |
| 20 | | | |
| | 24-10 | Mississippi PDMP data - CD | 328 |
| 21 | | | |
| 22 | | | |

DEFENDANT COUCH
| 23 | 202 | Drug Abuse Manual 2015, page nine only | 161 |

1

2      (Morning session, 9 a.m., in open court, defendants and

3   jury present.)

4           THE COURT:  Good morning, ladies and gentlemen.

5           I meant to tell you yesterday that during the course

6   of this trial, because it is going to be a long trial and just

7   in general, if you between our breaks, either lunch or

8   mid-morning or mid-afternoon, if you feel the need to stand up

9   and stretch or stand up and move around, feel free to do so.  I

10  know that sometimes it's hard not to get drowsy and hard to

11  make yourself pay attention at times, so feel free to stand up

12  in place if you want to.  If you absolutely have to have a

13  break at a time other than when we're going to break, just

14  raise your hand and let me know.  We can accommodate any

15  special needs that you may have.

16          All right, Counsel.

17          MR. BODNAR:  The United States recalls Diversion

18  Investigator Herkert to the stand.

19                  DEA DI SUSANNAH HERKERT,

20      previously sworn, testified further, as follows:

21              DIRECT EXAMINATION CONTINUED

22  BY MR. BODNAR:

23  Q   Good morning, Investigator Herkert.

24  A   Good morning, sir.

25  Q   I believe where we left off yesterday was on Government's

1   Exhibit 1-4.  Morphine; correct?

2   A   Yes, sir.

3   Q   And you had mentioned before, what schedule is morphine?

4   A   Morphine is a schedule II controlled substance.

5   Q   And you had explained to the jury, I believe -- I think we

6   had gone through it that these are the common brands or some

7   brand names of morphine and this is what the pills looked like?

8   (Indicating.)

9   A   That is correct.

10  Q   I move on now to Government's Exhibit 1-5.  And what does

11  this slide show?

12  A   This slide is showing oxycodone, which is another

13  semisynthetic opioid.  It's derived from or synthesized from

14  thebaine, one of the opioid alkaloids in the poppy.  It's a

15  schedule II controlled substance.  And this lists several brand

16  names of it.

17  Q   And is this essentially the next step higher in potency

18  above morphine?

19  A   Correct.

20  Q   And I see the brand names here.  These are ones that some

21  people may have heard them before.  Can you read those to the

22  jury, please?

23  A   Yes.  The brand names listed here are OxyContin,

24  Roxicodone, Percocet, and Endocet.

25  Q   And I see down here for Percocet and Endocet kind of what

1    we saw before with the hydrocodone pills, where there's a

2    number, dash, and another number.  What does that mean again?

3    A    These are combination tablets.  The first number is the

4    amount of the opioid within the tablet, the 2.5 milligrams of

5    oxicodone, for example, and the 325 milligrams is the amount of

6    acetaminophen, or more commonly known as Tylenol, in the

7    tablet.

8    Q    And since we don't see those with OxyContin and Roxicodone,

9    does that mean that those are pure oxycodone pills?

10   A    Those tablets, that number is the amount of the opioid or

11   oxycodone within that tablet.

12   Q    And while OxyContin and Roxicodone are both pure oxycodone

13   pills, what is the difference between OxyContin and Roxicodone?

14   A    OxyContin is a brand name of oxycodone tablets, with common

15   strengths and size up to 80 milligrams.  That tablet is an

16   extended release version of oxycodone.  And the Roxicodone, the

17   main difference is it's an immediate-release oxicodone tablet.

18   Q    Well, those terms, let's explain for the jury.  What is an

19   extended-release drug like OxyContin?  What does that mean?

20   A    An extended-release drug means the drug will get into your

21   system over a longer period of time, allowing for taking a

22   fewer number of pills, where a Roxicodone is more of an

23   immediate-release drug that gets into your system faster than

24   an extended release.

25   Q    I now move on to Government's Exhibit 1-6.  And what is it

DEA DI SUSANNAH HERKERT - DIRECT BY MR. BODNAR

1    that we see here, Investigator Herkert?

2    A   This is showing methadone.  Methadone is a schedule II

3    synthetic opioid used to treat pain, also used in

4    detoxification or maintenance therapy for individuals addicted

5    to opioids.  It can be used to detox them from the opioid

6    addiction.

7    Q   And I think the common thing, at least when I think of

8    methadone, is the last thing you said, that it's for

9    detoxification or rehab.  But you said in the beginning too it

10   can be used for pain management as well?

11   A   That is correct.

12   Q   And since it's just one number, does that mean that that is

13   a pure methadone -- methadone is a pure pill, not a combination

14   pill?

15   A   That is the amount of methadone that's in the tablet, yes.

16   Q   I move on to Government's Exhibit 1-7, now.  Is this the

17   next step up in potency here?

18   A   Yes, this is a hydromorphone, a schedule II semisynthetic

19   opioid.  The brand names listed here are Exalgo and Dilaudid,

20   and the various strengths for those brand names of

21   hydromorphone.

22   Q   And I see it seems to be a combination of hydrocodone and

23   morphine.  Is that what this is or is this something different?

24   What's with the name here?

25   A   Yes.  Hydromorphone is another semisynthetic opioid.  It's

1   synthesized from another one of the opioid alkaloids within the

2   poppy morphine.

3   Q   And I see Exalgo and Dilaudid.  There's pictures of tablets

4   here.  Does Dilaudid also come in any other form?

5   A   It also comes in a liquid pump form.

6   Q   And again, is this a schedule II?

7   A   Yes, it is.

8   Q   Move on to Government's Exhibit 1-8.  And this is the next

9   step up higher in potency?

10  A   Yes.  This is oxymorphone.  It's another semisynthetic

11  opioid.  It's synthesized from the opioid alkaloid within the

12  poppy thebaine, and the brand name listed here is Opana, tablet

13  form, and the various strengths of the Opana drug.

14  Q   And for Opana, is this what you talked about before; is it

15  an extended-release drug or an instant-release drug?

16  A   It's an immediate release or extended-release drug.

17  Q   So it can be either?

18  A   Correct.

19  Q   And although we kind of talked about other than the

20  oxycodone -- I'm sorry -- the Roxicodone and Roxicontin, but

21  are a lot of these products in various forms of either instant

22  release or extended release?

23  A   Yes.

24  Q   Move on now to Government's Exhibit 1-9.  What drug are we

25  talking about here?

DEA DI SUSANNAH HERKERT - DIRECT BY MR. BODNAR

116

1    A    This is fentanyl, a schedule II controlled substance.  The

2    subcutaneous, or the fentanyl that's given under the skin, is

3    considered to be 50 to 100 times as potent as morphine.

4    Q    And is that why, instead of milligrams, now we're looking

5    at here in micrograms?

6    A    That is correct.  It's in microgram formulation as opposed

7    to milligrams.

8    Q    Now, I want to start at the bottom here of the list.  What

9    is this bottom one right here?  (Indicating.)

10   A    The bottom one is a Duragesic patch.  The best explanation

11   would be similar to a nicotine patch that has the drug on the

12   patch that, when applied to the body, the drug is released

13   through the skin over a period of time.

14   Q    And so is that considered an extended release as well?

15   A    Yes, it is.

16   Q    And is that what, kind of, we see here, the strength, where

17   it says 12.5 micrograms all the way to a hundred micrograms an

18   hour?

19   A    That is correct.

20   Q    Now, looking at these top four ones, would you please read

21   those for the jury?

22   A    Yes, Subsys, Abstral, Fentora, and Lazanda.

23   Q    And how is Subsys delivered to the patient?  It doesn't

24   look like it's a pill.  What is Subsys?

25   A    Subsys is an under-the-tongue oral spray.

1    Q    And you spray it in your mouth, but is it something you

2    swallow or how does Subsys work?

3    A    No.  Subsys, Abstral, Fentora, and Lazanda, they're all

4    considered transmucosal immediate-release fentanyl and those

5    are all absorbed through the mucous membrane of the body.

6    Q    So does that mean it absorbs underneath your tongue?  You

7    don't swallow the spray?

8    A    That is correct.

9    Q    And Abstral, the next one down, what kind of delivery

10   mechanism is Abstral?

11   A    That is an under-the-tongue dissolving tablet that's placed

12   under the tongue and then it's dissolved.

13   Q    And how about Fentora?  What is Fentora?

14   A    Fentora is in the gums, and it's in between the cheek and

15   the gum.

16   Q    And lastly, Lazanda?

17   A    And Lazanda is the nasal spray version.

18   Q    And you briefly mentioned a moment ago that there's a

19   category for these four drugs -- not Duragesic -- but the

20   Subsys, Abstral, Fentora, and Lazanda.  What is that category

21   called?

22   A    It's abbreviated as the TIRF drugs or the transmucosal

23   immediate-release fentanyl drugs.

24   Q    And when you're saying TIRF, is that T-I-R-F?

25   A    That's correct.

DEA DI SUSANNAH HERKERT - DIRECT BY MR. BODNAR

1  Q   Now we move on to Government's Exhibit 1-10.  Now, we've

2  been talking about opioids before all the previous slides;

3  correct?

4  A   Correct.

5  Q   What is this slide showing?

6  A   This slide is showing various brand names for

7  benzodiazepines, which is just a class of psychoactive drugs,

8  or drugs used to treat a range of conditions including anxiety

9  and insomnia.

10  Q   And benzodiazepines, are they opioids?

11  A   No, they are not.

12  Q   And what schedule are benzodiazepines?

13  A   Benzodiazepines are schedule IV controlled substances

14  Listed here.

15  Q   So can you read for the jury, what is the brand names and

16  the generic names that are shown here?

17  A   So the ones listed here, we have Xanax; the generic name is

18  alprazolam.  We have Valium as another brand name, with the

19  generic being diazepam.  Klonopin, with the generic being

20  clonazepam.  Brand name Ativan and generic lorazepam.  And

21  Versed is another brand name, with midazolam as the generic

22  name.

23  Q   And under common strengths it looks like there's just one

24  number.  So do I assume, then, that that's just a pure diazepam

25  or Alprazolam pill?

DEA DI SUSANNAH HERKERT - DIRECT BY MR. BODNAR

1  A   Those tablets, that is the amount of alprazolam within the

2  substances, the .5 milligram, the one milligram, or the two

3  milligram.

4  Q   I'm going to show you now what's been marked as

5  Government's Exhibit 1-11.  Now, what does the jury see here?

6  A   This is carisoprodol.  It's a schedule IV controlled

7  substance.  The brand name is Soma.

8  Q   Now, we've talked about opioids and benzodiazepines.  Is

9  carisoprodol a benzo or an opioid?

10  A   No, it's a muscle relaxant.

11  Q   So this is a third category now?

12  A   Yes.

13  Q   It's a muscle relaxant, schedule IV, and I see just one

14  number.  So does that mean it's a pure, not combination, drug?

15  A   It is not a combination drug.  It's the amount of

16  carisoprodol there.

17  Q   And yesterday I believe you talked about you had how many

18  years of experience as a diversion agent?

19  A   Approximately 11 years.

20  Q   And where have you worked as a diversion agent?

21  A   For my first five years, I was assigned to the Los Angeles

22  field division tactical diversion squad.  In 2010 I was

23  reassigned to Dallas field division, tactical diversion squad.

24  I've also worked TDY in Florida, Washington, and several states

25  throughout the United States on diversion cases.

1    Q    And what does TDY mean when you say TDY down in Florida?

2    A    Temporary duty.

3    Q    Does that mean you're assigned basically to a case or to

4    work a series of cases for a short period of time?

5    A    That is correct.

6    Q    And you talked about being on a -- I don't remember if you

7    said strike force or task force.  Would you please explain that

8    to the jury?

9    A    Yes.  A tactical diversion squad within DEA is a special

10   squad that's comprised of diversion investigators, special

11   agents, intel analysts, and tactical or task force

12   officers.  And the primary focus of these tactical diversion

13   squads is to investigate, disrupt, and dismantle those involved

14   in the unlawful distribution of controlled substances and to

15   ensure adequate supply for those who need it.  So there are

16   diversion investigators who are assigned to regular groups that

17   do the regulatory compliance, to make sure that manufacturers,

18   distributors, pharmacies, and physicians are in compliance with

19   recordkeeping.  And then there's the criminal element, which is

20   the tactical diversion squad, that focuses primarily on the

21   criminal investigations.

22   Q    And approximately how many criminal investigations

23   involving pharmaceutical drugs have you been involved in?

24   A    Over 100.

25   Q    And in your experience on those investigations, have you

DEA DI SUSANNAH HERKERT - DIRECT BY MR. BODNAR

1   seen or noticed or learned about various combinations of drugs

2   that are typically sought out?

3   A   Yes, I have.

4   Q   And what is one of the -- what is some of those

5   combinations of drugs?

6   A   There are various combinations.  Depending on what part of

7   the country you're in, there will be a different opioid that is

8   the biggest street seller in that area.  But universally or

9   throughout the United States we commonly see drug seekers

10  wanting an opioid or a narcotic, a benzodiazepine, and often a

11  codeine-based cough syrup or a muscle relaxant similar to

12  carisoprodol.

13  Q   And is there a term for that type of -- cocktail?

14  A   Yes, it's considered a drug cocktail, or the Holy Trinity.

15          MR. ESSIG:  Your Honor, I'm going to object to that

16  testimony.

17          THE COURT:  On what ground?

18          MR. ESSIG:  There's no relevance shown to this case

19  whatsoever.

20          THE COURT:  Overruled.

21  BY MR. BODNAR:

22  Q   Investigator Herkert, I'm going to show you now what's been

23  marked as Government's Exhibit 1-12.  And you just mentioned

24  the Holy Trinity cocktail.  Would you please explain to the

25  jury what they are seeing and how that all fits together?

DEA DI SUSANNAH HERKERT - DIRECT BY MR. BODNAR

1  A   Yes.  The Holy Trinity cocktail is comprised of three

2  different categories:  the opioids, which we've discussed,

3  being hydrocodone, morphine, oxycodone, hydromorphone,

4  oxymorphone, or fentanyl.  And this is one of the class of

5  drugs that we see drug seekers often pursue on the streets.

6        The benzodiazepine is the second category, where they

7  are wanting the alprazolam, diazepam, clonazepam, lorazepam,

8  midazolam.

9        And then, depending on the area of the country you're

10 in, the third is often carisoprodol, muscle relaxant, or a

11 codeine-based cough syrup, one that has to do with codeine.

12       And it's the combination of these three drugs that

13 enhance the euphoric effect and why they call it the Holy

14 Trinity.

15 Q   And by euphoric effect, you mean the high?

16 A   The high of the drugs.

17 Q   I'm going to show you now what's been marked as

18 Government's Exhibit 1-13.  And can you please explain to the

19 jury what we see here?

20 A   Yes.  This is TIRF drugs, transmucosal instant-release

21 fentanyl drugs.  The brand names listed are Subsys, Fentora,

22 Abstral, and Lazanda.

23 Q   And based on your experience and work in this area, do you

24 know if there's an FDA indication for T-I-R-F or TIRF drugs?

25 A   Yes.

123

1    Q    And what is that FDA indication?

2    A    The FDA indication is for the management of breakthrough

3    pain in adult cancer patients who are already receiving and who

4    are tolerant to around-the-clock opioid therapy for their

5    underlying persistent cancer pain.

6    Q    Now, can you explain to the jury what is an FDA indication

7    and what does that really mean?

8    A    An FDA indication is a guideline for what a drug's intended

9    use is for.

10   Q    So if a drug is prescribed for its intended use, is there a

11   term for that?

12   A    That is considered prescribing how it's FDA indicated.

13   Q    Is that also sometimes called prescribed on label?

14   A    Yes.

15   Q    And can you explain, then, to the jury what does it mean if

16   something is prescribed off label.

17   A    If something's prescribed off label, it's simply prescribed

18   other than what the FDA indication for the drug is.

19   Q    And is it inherently illegal to prescribe something off

20   label?

21   A    No, it is not.

22   Q    What is -- what does or does not make a prescription legal

23   or illegal for the DEA?

24   A    For DEA, for a prescription to be effective, it must be

25   issued for a legitimate medical purpose by a practitioner

1    acting in the usual course of professional practice.

2    Q    And with the TIRF drugs, did the FDA set up any sort of

3    program to regulate the prescribing or dispensing of the TIRF

4    drugs?

5    A    Yes, it did.

6    Q    And what is that called?

7    A    The TIRF REMS program or the Transmucosal Immediate-Release

8    Fentanyl Risk Evaluation Mitigation Strategy Program was set up

9    by FDA for these specific drugs.

10   Q    And for specific drugs, you mean Subsys, Abstral, Fentora,

11   and Lazanda?

12   A    That is correct.

13   Q    Is there a similar REMS program for, say, OxyContin?

14   A    There are various REMS programs set up through FDA for

15   the -- for manufacturers when drugs are first put on the

16   market, but it's not a similar shared system like the TIRF

17   program.

18   Q    Why is the TIRF program different from the rest?

19   A    The TIRF program has the patients enroll -- the pharmacies

20   that are dispensing the drug enroll and the physicians

21   dispensing the drug -- or prescribing the drug enroll in it.

22   Q    And why is that with these specific fentanyl drugs?

23   A    Because of the potencies of the drugs.

24   Q    And how potent did you say they were again?

25   A    Approximately -- the subcutaneous fentanyl, approximately

125

1  50 to 100 times as potent as morphine.

2  Q   And so what did the TIRF REMS Access Program require?

3  A   That the individual sign up on an enrollment form so they

4  can monitor dosage/interactions and that everyone who has

5  access to the drugs -- whether it's prescribing, dispensing, or

6  the end user, the patient -- is part of this shared system.

7  Q   Prior to the doctor being able to prescribe a TIRF drug

8  such as Subsys, or Abstral, Fentora, Lazanda, do they have to

9  sign up with the FDA with some sort of form?

10 A   Yes, they fill out an enrollment form.

11 Q   And is that enrollment form found online through the FDA?

12 A   Yes, it is.

13         MR. BODNAR:  Your Honor, may I approach with what's

14 been marked as Government's Exhibit 1-1?

15         THE COURT:  Yes.

16 MR. BODNAR:

17 Q   Investigator Herkert, could you please identify what

18 Government's Exhibit 1-1 is?

19 A   Yes.  This is the TIRF REMS Access Prescriber Enrollment

20 Form.

21         MR. BODNAR:  Your Honor, the United States moves to

22 admit Government's Exhibit 1-1.

23         THE COURT:  All right.

24         MR. ESSIG:  Your Honor, we object.  We don't object to

25 any REMS forms coming in in this case, but this one's not

1   relevant.  It's not one that was used by these doctors, it's

2   not one kept at the clinic.  So it's just not relevant in this

3   case.  At some point in time they're going to have experts to

4   testify and lay a foundation to introduce those documents.  But

5   we're going to object to this particular one because it's not

6   relevant to these particular doctors and their medical

7   practice.

8            MR. BODNAR:  Your Honor, these doctors signed up and

9   enrolled with a form just like this that was printed offline.

10  It's a public document.  They prescribed these drugs all the

11  time and were enrolled.

12           THE COURT:  All right.  I overrule the objection.

13       (Government's Exhibit 1-1 was entered into evidence.)

14  BY MR. BODNAR:

15  Q   Investigator Herkert, I'm now showing you and the jury can

16  see Government's Exhibit 1-1.  Can you please explain what they

17  are seeing here or at least on this first page?

18  A   Yes, this is the explanation of what it is to be involved

19  in the TIRF REMS enrollment program, and it discusses those

20  requirements.

21  Q   And before we go through what some of these requirements

22  are, is there a second and third page for the doctor or the

23  prescriber to fill out their information and then ultimately

24  sign?

25  A   Yes; that is correct.

DEA DI SUSANNAH HERKERT - DIRECT BY MR. BODNAR

1  Q   So let's start right here with the bold writing, where

2  it's:  I understand.  What is it that the doctor is saying

3  there that they understand?

4  A   It says:  I understand that TIRF medicines are only

5  available through the TIRF REMS Risk Evaluation and Mitigation

6  Strategy Access Program and I must comply with the program

7  requirements.  In addition, I acknowledge that -- and it lists

8  them out.

9  Q   And it lists several things that they acknowledge; correct?

10 A   Yes.

11 Q   Let's look at number three.  What are they agreeing, that

12 in addition I acknowledge that -- what?

13 A   Number three, they are acknowledging that:  I understand

14 that TIRF medicines are indicated only for the management of

15 breakthrough pain in patients with cancer who are already

16 receiving, and who already are tolerant to, around-the-clock

17 opioid therapy for their underlying persistent pain.

18 Q   And what are they acknowledging that they agree to with

19 four and five there?

20 A   I understand that TIRF medicines are contraindicated for

21 use in opioid nontolerant patients and know that fatal overdose

22 can occur at any dose.

23 Q   And number five?  I'll center it.

24 A   I understand that TIRF medicines must not be used to treat

25 any contraindicated conditions described in the full

1   prescribing information, such as acute or postoperative pain,

2   including headache and migraine.

3   Q   And now let's look at number nine right here.  What does

4   number nine say that they acknowledge?

5   A   Number nine says:  I will complete and sign a TIRF REMS

6   Access Patient Prescriber Agreement with each new patient

7   before writing the patient's first prescription for a TIRF

8   medicine and renew the agreement every two years.

9   Q   And for number 11, would you please read that to the jury?

10  A   At any followup visit I agree to assess the patient for

11  appropriateness of the dose of the TIRF medicines and for signs

12  of misuse and abuse.

13  Q   And again, you explained that this form has to be filled

14  out before a doctor can prescribe?

15  A   Yes.

16  Q   And are there similar forms that patients need to fill out

17  before they receive a TIRF drug?

18  A   That is correct.

19  Q   And there are similar forms that a pharmacy would need to

20  fill out before they can dispense a TIRF drug?

21  A   That is correct.

22  Q   Investigator Herkert, you discussed a couple of times that

23  off-label prescribing is not illegal; correct?

24  A   No, it is not.

25  Q   And you said what does constitute an illegal prescription

DEA DI SUSANNAH HERKERT - DIRECT BY MR. BODNAR

1   under the DEA.  How about signatures on a prescription; what is

2   or is not a valid signature on a prescription?

3   A   On --

4           MR. KNIZLEY:  Your Honor, object.  No proper

5   predicate.

6           THE COURT:  Overruled.

7   BY MR. BODNAR:

8   Q   What constitutes a valid signature on a prescription?

9   A   For a prescription to be effective, it must be signed by

10  the practitioner issuing the prescription.

11  Q   And by the practitioner issuing the prescription, does that

12  practitioner have to have a DEA number like you explained

13  yesterday?

14  A   Yes.  To issue a controlled substance prescription, they

15  must have a DEA registration for that controlled substance's

16  schedule.

17  Q   If a doctor has a DEA number, can a nurse practitioner

18  working under him sign a prescription for that doctor?

19  A   A nurse practitioner cannot issue a prescription under

20  another doctor's DEA number.

21  Q   Unless the nurse practitioner has their own DEA number;

22  correct?

23  A   Yes.  A nurse practitioner would have their own DEA

24  registration number to issue a prescription.

25  Q   In terms of time of signing and prescribing, is there any

DEA DI SUSANNAH HERKERT - DIRECT BY MR. BODNAR

1  requirement for the signature to be on the date a prescription

2  is issued?

3  A   Yes, the Code of Federal Regulations requires that a

4  controlled substance prescription be dated and signed the day

5  it is prescribed.

6  Q   So if a bunch of prescriptions are signed ahead of time, is

7  that a valid prescription?

8  A   No, it is not.

9  Q   What about a bunch of blank prescription pads signed at a

10  time?

11  A   No, it is not.

12  Q   What about if somebody is forging the doctor's name; is

13  that a valid prescription?

14  A   No, it is not.

15       MR. BODNAR:  One moment, Your Honor.

16       THE COURT:  All right.

17  BY MR. BODNAR:

18  Q   Investigator Herkert, we talked about the FDA and we didn't

19  actually say what the FDA stands for.  Can you please explain

20  to the jury what is the FDA?

21  A   The FDA is the Food and Drug Administration.

22  Q   And how -- what does the FDA do, for those who may not

23  know?

24  A   The Food and Drug Administration assists DEA in

25  investigations, but they also have their own regulations for

1   compliance investigation for drugs and food safety.

2   Q   And because these are visual aids, I forgot to ask you what

3   schedule is hydromorphone on, so that we can have it on the

4   record?

5   A   Hydromorphone is a schedule II controlled substance.

6   Q   And the same with oxymorphone?

7   A   It's a schedule II controlled substance.

8   Q   And we talked about fentanyl being in micrograms and the

9   other drugs we saw all being in milligrams.  How many

10  micrograms are there in one milligram?

11  A   There are 1,000 micrograms in one milligram.

12  Q   So essentially a microgram is a thousandth of one

13  milligram?

14  A   That is correct.

15          MR. BODNAR:  Pass the witness, Your Honor.

16          THE COURT:  Mr. Essig?

17          MR. ESSIG:  Thank you, Your Honor.

18                          CROSS EXAMINATION

19  BY MR. ESSIG:

20  Q   Morning, ma'am.

21  A   Good morning, sir.

22  Q   My name is Brandon Essig, and I represent Dr. Couch.  What

23  I want to do, Ms. Herkert, is I'd like to -- let's start kind

24  of towards the end of your testimony there.  And one of the

25  things you talked about, Mr. Bodnar asked you about, is a

DEA DI SUSANNAH HERKERT - CROSS BY MR. ESSIG

1    prescription and what is required for a prescription to be

2    valid; is that right?

3    A   Yes.

4    Q   And isn't it true that you testified, which is consistent

5    with the Code of Federal Regulations and consistent with the

6    Controlled Substances Act, that a prescription in order to be

7    valid has to be signed, dated, issued on the date the doctor

8    sees the person?  Isn't that correct?

9    A   Yes, they date the prescription the day they see the

10   patient.

11   Q   Okay.  All right.  And if it's not dated and signed that

12   day, it's an invalid prescription?

13   A   Well, but they can do -- depending on which drug

14   schedule -- if you're talking about the 90-day prescriptions,

15   they can date prescriptions to be filled within the 90 days.

16   But they date the prescription that day for the day they write

17   it, yes.

18   Q   That's right.  The DEA has a regulation or there's a Code

19   of Federal Regulations -- there's an administrative regulation

20   by the DEA that says that a doctor can write a schedule II

21   controlled substance, can write three prescriptions, for a

22   period of 90 days the first time they see the patient; isn't

23   that right?

24   A   They can do the 90 days, yes.

25   Q   That's correct.  So they can come in, they can see them the

1   first week of August and they can write them a 30-day

2   prescription to be filled -- to be refilled for a new

3   prescription to get the first week of September; isn't that

4   right?

5   A    Yes, they can do the 90-day prescriptions on a schedule II.

6   Q    Okay.  And then I want to break this down so the jury

7   understands this.  Then they can give them another prescription

8   at that first visit signed by them, dated by them, to then be

9   filled the first week of October; isn't that right?

10  A    Right; as long as it's not to be filled before that date.

11  Q    That's exactly right.  So as long as it's not to give

12  them -- in the office they can see them one time and that

13  patient can walk out of that clinic with 90 days' worth of

14  schedule II controlled substances; isn't that correct?

15  A    That's correct.

16  Q    And in that 90 days there is absolutely no requirement that

17  that doctor or a nurse practitioner working for that doctor do

18  any assessment of that patient whatsoever; isn't that correct?

19  A    The only requirement is that it's issued within the usual

20  course of professional practice and for a legit medical

21  purpose.

22  Q    Right.  Let's operate on that assumption.  Let's operate on

23  the assumption that the first day the doctor sees that patient,

24  that patient presents to them with chronic pain, the doctor

25  makes the decision that there's a legit medical purpose and

 1   within the usual course.  If they make that decision, they can

 2   send that patient out the door with 90 days' worth of

 3   prescriptions to be filled at 30-day intervals, and they never

 4   have to see that patient again, do they?  Ever?

 5   A   Never?  Are you talking about just filling the three months

 6   or --

 7   Q   That's correct.  Once they see them, once they send them

 8   out the door with that 90-day prescription, there is no DEA

 9   requirement that they ever see that patient again; isn't that

10   correct?

11   A   The DEA requirement is that it be issued within the

12   legitimate course.

13   Q   We've already established that.  That's not my question.

14   A   Okay.

15   Q   My question is per the DEA regulations for the 90-day rule,

16   they can see that patient the first time, determine they need a

17   prescription, send them out the door with 90 days' worth of

18   prescriptions for pills, they never have to see that patient

19   again, pursuant to the DEA regulations; isn't that correct?

20   A   If it's within the usual course of professional practice,

21   that is correct.

22   Q   It's a yes-or-no question.  Please answer the question.

23          THE COURT:  Well, she has.  So let's move on.

24   BY MR. ESSIG:

25   Q   Now, Ms. Herkert, as a part of that process, if the doctor

1    hands the patient three prescriptions, they hand them a patient

2    -- they hand them a prescription for the first week of August

3    signed by the doctor, they hand them a second prescription for

4    the first week of September signed by the doctor dated for

5    September, they hand them a third prescription dated the first

6    week of October signed by the doctor, isn't it true that the

7    September and October prescriptions have been presigned by the

8    doctor?

9    A    They are -- they are signed on the date that the doctor

10   issued the prescription.  They are not considered refilled

11   prescriptions.  They are original prescriptions.

12   Q    But they are presigned prescriptions.  The September and

13   October prescriptions haven't been signed the first week of

14   September and haven't been signed in the first week of October.

15   They were presigned and predated by the doctor back in August;

16   isn't that correct?

17   A    The doctor is signing them in front -- signing them when he

18   is present with the patient and handing him three

19   prescriptions.  They are not signed prior to the meeting or

20   being presigned.

21   Q    Okay.  Now, isn't it true if a doctor sees that patient

22   that first time and for that 90 days, instead of just sending

23   him out the door with 90 days' worth of pills to fill every 30

24   days with no oversight whatsoever, isn't it true if a doctor

25   requires them to come back every 30 days that they've actually

136

1   added an extra layer of protection against diversion in that

2   case?

3   A   Are you asking if they've added an extra layer of

4   protection?

5   Q   They've gone beyond the DEA requirements?  If they require

6   that patient to come in every 30 days to see a nurse

7   practitioner before they fill that next 30-day interval,

8   they've added an extra requirement to what the DEA requires;

9   isn't that true?

10   A   DEA does not specify how many times you have to see a

11   doctor or the time frame.  DEA requires that it be issued for

12   legitimate medical purpose within the usual course of

13   professional practice.

14   Q   Right.  The DEA doesn't require you -- after they get out

15   the door with that 90-day prescription, DEA doesn't require the

16   doctor or a nurse practitioner to ever see that patient again?

17   A   No, as long as it's in the usual course.

18   Q   Okay.  As long as it's in the usual course.  So if a doctor

19   brings that patient back every 30 days to have a nurse

20   practitioner see them before they get that next prescription,

21   they've done something more than what the DEA requires, haven't

22   they?

23   A   No.  The doctor is making the judgment call of what's

24   considered within the usual course of professional practice.

25   Q   Okay.  Now I want to go back and let's talk a little bit

 1   about fentanyl.  And let's go to --

 2          MR. ESSIG:  Chris where's your slide?  Chris?

 3   Q   Now, if we go back --

 4          THE COURT:  Mary Ann?

 5          THE CLERK:  Yes, ma'am.  I've got it back on the

 6   document camera.  I'm trying to get it back.

 7   BY MR. ESSIG:

 8   Q   Now, if we go back to Government's -- this is 1.2, which is

 9   not admitted, but is a government demonstrative exhibit.  Now,

10   we've talked about DEA schedules.  And this document here, this

11   demonstrative exhibit, lays out the DEA schedules, schedule I

12   through V; isn't that correct?

13   A   That is correct.

14   Q   And basically, as you testified and as I understand the way

15   the schedules work, essentially sort of the layman's way of

16   thinking about it is schedule I drugs are essentially the most

17   serious and the most dangerous drugs, schedule V drugs require

18   a little less oversight?  Is that a basic framework?

19   A   Well, schedule I is no current medical use.  And then from

20   II down to V it titrates on the dangers.

21   Q   Right.  But so my point is schedule I cannot be prescribed

22   legally, according to the DEA, at all?

23   A   Correct.

24   Q   All right.  And schedules II through V have lower risk of

25   addiction, have lower risk of abuse?  That's why those drugs

```
 1   are scheduled as schedule V rather than schedule I?

 2   A   That is correct.

 3   Q   And in this case you talked about the fact that fentanyl,

 4   as you say, is how many more times potent than morphine?

 5   A   Approximately 50 to 100 times.

 6   Q   But they're in the same schedule?

 7   A   Fentanyl and morphine, yes.

 8   Q   That's right.

 9   A   They are both schedule II.

10   Q   That's exactly right.  There's no legally -- per the DEA's

11   administrative determination, there's no additional scheduling

12   requirement, no more serious schedule for fentanyl and

13   morphine; is that right?

14   A   Correct; it's in schedule II.

15   Q   And you talked about some examples of DEA schedule drugs.

16   You mentioned that cocaine is a schedule II drug; is that

17   right?

18   A   That is correct.

19   Q   Crack cocaine is a schedule II drug; is that right?

20   A   Cocaine has a medical necessity, so it is a schedule II

21   controlled --

22   Q   Crack cocaine is a schedule II drug?

23   A   I'm not sure what you're distinguishing.  But cocaine --

24   the pharmaceutical grade cocaine that's used in eye drops, I

25   know, is a schedule II controlled substance.
```

DEA DI SUSANNAH HERKERT - CROSS BY MR. ESSIG

```
 1   Q   Crack cocaine is a schedule II drug?

 2           MR. BODNAR:  Your Honor, asked and answered.  She's

 3   talking about the drug that is in crack cocaine and said that

 4   there is a pharmaceutical schedule II.

 5           THE COURT:  If you want to ask her about the

 6   difference between the two, you can.  But you haven't asked

 7   that.

 8   BY MR. ESSIG:

 9   Q   All types of cocaine are schedule II drugs, no matter what

10   type they are?

11   A   Yes, the active ingredient in cocaine is schedule II.

12   Q   Whether it's an eye drop or it's a crack rock sold by a

13   street corner drug dealer, it's a schedule II controlled

14   substance?

15   A   Yes.

16   Q   And that's an important point in this case, is that all of

17   these drugs --

18           MR. BODNAR:  Objection, Your Honor, that it's an

19   important point.  Cocaine is not involved in this case at all.

20           THE COURT:  Well, let him finish the question, because

21   I don't know what it is.

22           MR. ESSIG:  Your Honor, I will note she used cocaine

23   specifically as one of the examples of a schedule II controlled

24   drugs during her testimony.  I just want to --

25           THE COURT:  Well, you're the one that introduced it.
```

1   She didn't testify about it on direct.  So let's limit our
2   questioning somewhat, because it is not relevant to this case.
3           MR. ESSIG:  Yes, ma'am.
4   Q   The only point I want to make, Ms. Herkert, is that the
5   statutes at issue, Title 21 of the United States Code, Section
6   841, and Title 21, United States Code, Section 846, those are
7   the statutes being prosecuted in this case; is that correct?
8   A   The statutes?  Title 21, yes.
9   Q   Yes.  Those are the federal drug distribution statutes?
10  A   Yes, they are.
11  Q   And it's the same statute that will be used to prosecute
12  street corner drug dealers; isn't that correct?
13  A   That is correct.
14  Q   Okay.  But in this case there's a requirement in order for
15  a prescription to be illegal, it has to be outside of the
16  legitimate -- or not for a legitimate purpose, or outside the
17  usual course of medical practice; is that correct?
18  A   That is correct.
19  Q   That if we go to Title 21, United States Code -- and you've
20  talked about the C.F.R., title 21 of the C.F.R. -- those terms
21  aren't defined, are they?
22  A   No, they are not.
23  Q   Okay.  The terms are mentioned in the C.F.R., but there's
24  no definition given by the DEA; is that right?
25  A   The definition is not listed in the C.F.R.; correct.

141

1   Q   Correct.  There is no definition of those terms by DEA

2   because doctors have a wide range of practice that they can use

3   in the course of their medical practice and in prescribing

4   those drugs; isn't that right?

5   A   That is correct.

6   Q   There's a broad range of things they can do that do not run

7   afoul of the law; isn't that right?

8   A   That is correct.

9   Q   A broad range of things they can do that don't make them a

10  drug dealer; isn't that true?

11  A   That is correct.

12  Q   As a matter of fact, one of the things they can do that is

13  perfectly legal and does not violate the code is to prescribe

14  TIRF drugs off label?  That's perfectly legal, isn't it?

15  A   It is perfectly legal to prescribe them as long as it's for

16  a legitimate medical purpose within the scope.

17  Q   Right.  And it can be for a legit medical purpose and in

18  the usual scope if it is prescribed off label?

19  A   That is correct.

20  Q   Are you aware that fentanyl and Subsys in particular are

21  sometimes prescribed and given by doctors in emergency rooms in

22  emergency situations?

23          MR. BODNAR:  Again, objection, Your Honor.  Relevance.

24  This has nothing to do with emergency rooms or anything like

25  that.  This is pain management.

DEA DI SUSANNAH HERKERT - CROSS BY MR. ESSIG

142

```
 1              THE COURT:  Sustained.
 2   BY MR. ESSIG:
 3   Q   Now, Ms. Herkert, as we go through and we talk about the
 4   prescriber enrollment form that you testified to on direct and
 5   we look at some of the points that you talked about here --
 6   again, number three -- all of these requirements on the REMS
 7   form are talking about on-label uses of TIRF medication; isn't
 8   that right?
 9   A   Yes.
10   Q   And when it says in number three that TIRF medications are
11   indicated only for the management of breakthrough pain -- okay
12   -- if we stop there, indicated, indicated means FDA indicated;
13   isn't that right?
14   A   That is correct.
15   Q   It doesn't mean DEA indicated; isn't that correct?
16   A   Correct.
17   Q   Because it's not illegal -- again, this document does not
18   make it illegal for a doctor to prescribe off label, as long as
19   it's in the usual course?
20   A   Yeah, as long as it's for legitimate medical purpose and in
21   the usual course of professional practice.
22   Q   Right.  And it's not illegal to prescribe other than
23   indicated as long as it's in the usual course and for a
24   legitimate medical purpose; isn't that correct?
25   A   I'm not sure I understand your question.
```

143

DEA DI SUSANNAH HERKERT - CROSS BY MR. ESSIG

1    Q    Now, Ms. Herkert, we talked about a lot of your past
2    history and your past training.  But in your history and in
3    your training, you've never been to medical school?
4    A    No, I have not.
5    Q    And you've never received any training on how to operate as
6    a pain management practitioner, have you?
7    A    No, I have not.
8    Q    You have no experience and you have no training on how to
9    assess and diagnose a patient in pain when they go in to see a
10   doctor or a caregiver for pain management?
11   A    No, I have no medical school training.
12   Q    Okay.  And as a matter of fact, you have no training and
13   you do not know in a particular situation what type of
14   medications are appropriate for a doctor assessing a pain
15   management patient, you don't know how to make that
16   determination, how a doctor makes that determination?
17   A    No, I do not.
18   Q    Okay.  And you don't know how a doctor makes a
19   determination of the quantity of medication they are going to
20   give an individual?
21   A    No, I do not.
22   Q    And you don't have any education, you have no knowledge, of
23   how they make a decision about the number of pills to give to
24   an individual?
25   A    No, I do not.

```
 1   Q   And, Ms. Herkert, too you talked about the term and you
 2   used the term "Holy Trinity"; is that correct?
 3   A   Yes.
 4   Q   And you said Holy Trinity -- and I think the phrase that
 5   was on the slide is the "Holy Trinity cocktail"; isn't that
 6   right?
 7   A   Yes.
 8   Q   Okay.  Holy Trinity cocktail, that's not -- that's not a
 9   medical term?
10   A   No, it is not.
11   Q   Okay.  I mean, that's a term used by drug seekers and law
12   enforcement; isn't that right?
13   A   No.  I've had doctors and pharmacists use the terms also.
14   Q   Okay.  And you've had doctors and pharmacists use the term
15   in what context?
16   A   During a post-arrest interview of a doctor, he explained
17   that he prescribed the cocktail of drugs and I've had
18   pharmacists say they were reluctant to fill for the Holy
19   Trinity prescriptions that patients bring in.
20   Q   A doctor in a post-arrest interview.  Got it.
21           But Holy Trinity, I mean, that's not something that
22   you see -- it's not a term a doctor's supposed to be using?
23           MR. BODNAR:  Object to that, Your Honor.  How would
24   she know what term doctors are or are not supposed to use?
25           THE COURT:  Sustained.
```

145

1  BY MR. ESSIG:

2  Q   My point is, Ms. Herkert, for the term "Holy Trinity," if

3  we again look in Title 21 of the United States Code, there's no

4  mention of the Holy Trinity, is there?

5  A   No, that term is not mentioned.

6  Q   Right.  And if we look at C.F.R., there's no mention of the

7  Holy Trinity?

8  A   No, there is not.

9  Q   And as a matter of fact, the cocktail of drugs that you

10  talked about and that were referenced on the slide, it's not

11  illegal to prescribe that combination of drugs to a patient?

12  A   It is not illegal unless it is not issued for a legitimate

13  medical purpose in the usual course of professional practice.

14  Q   So we'll operate on that assumption.  Just if it's for a

15  legitimate medical purpose and in the usual course, it is not

16  illegal to prescribe that combination of drugs?

17  A   Correct.

18  Q   Now, Agent Herkert, you mentioned before that the purpose

19  of a tactical diversion squad -- is that what you talked about?

20  A   Yes.

21  Q   You talked about that you've been TDY and you've traveled

22  around the country conducting investigations, diversion

23  investigations?

24  A   Yes.

25  Q   And diversion investigations are typically -- I mean, based

146

1    on my understanding of your description -- diversion means

2    simply that the drug is moving from the legal course of

3    distribution from the pharmaceutical company to the doctor's

4    office, the doctor's office prescribes it, but then at some

5    point in time that medicine gets to the street so to speak.  Is

6    that essentially what diversion is?

7    A   Yes, that is a diversion investigation.

8    Q   Okay.  And part of the diversion investigation and one of

9    the things you've investigated in your career are things that

10   are referred to as pill mills?

11   A   That is correct.

12   Q   And some common characteristics of a pill mill,

13   Ms. Herkert, I mean, it includes things like medical clinics

14   that are handing out drugs and they won't take anything but

15   cash?

16   A   I've seen some that are like that, yes.

17   Q   And you've seen pill mills in fact in your experience who

18   not only that they only take cash, but the cash directly

19   changed hands between the patient and the doctor; isn't that

20   correct?

21   A   I've seen examples of that.

22   Q   Yeah.  I mean, that's a common characteristic; right?  A

23   patient walks in, they go see the doctor, they give the doctor

24   some cash, and the doctor gives them some pills?

25   A   I would say it's common for them to pay up front or pay the

1    doctor.

2    Q   Isn't it also common too in a pill mill investigation that

3    the cash prices of the drugs increase based on what you're

4    buying?

5    A   They can vary depending on the controlled substance.

6    Q   Right.  And if we talk about the Holy Trinity, I mean,

7    isn't it common in pill mill investigations to see that the

8    patient pays a cash premium for the Holy Trinity combination

9    because it's such a popular cocktail of drugs?

10   A   I've seen standard fees of you pay 200 or $600 regardless

11   of what you get, and I've seen some pill mills where you pay

12   per drug.  So I've seen both.

13   Q   Okay.  And on the street it's certainly more expensive to

14   purchase the Holy Trinity; isn't that right?

15   A   It depends, because you're purchasing benzodiazepine or

16   something that has a lower street value than a schedule II

17   drug.  Purchasing fentanyl, oxymorphone, hydromorphone, or

18   oxycodone are going to be more expensive than purchasing the

19   Holy Trinity.

20   Q   And in your pill mill investigation it's very common or

21   typically in the typical pill mill patients get into the clinic

22   by walking in off the street with no referrals from a medical

23   doctor?

24   A   Not necessarily.

25   Q   Isn't that a common -- or something that you frequently

148

1  see, that you often see?

2  A   It varies from state to state.  I know in recent pill mill

3  investigations you have to have a referral.  Pill mills have

4  evolved throughout the years and now you cannot simply walk in

5  off the street, and you must have a referral or some way into

6  the clinic.

7  Q   Okay.  And isn't it also common too in pill mill

8  investigations, traditional pill mill investigations, when a

9  patient goes in that the only thing they offer them is pills?

10  A   No, I would not say that's common.  A lot of the pill mills

11  tend to write an antibiotic or another NSAID or acetaminophen

12  or lisinopril or something else with the controlled substance

13  to make the prescription look more legitimate by not only

14  prescribing controlled substances.

15  Q   It's not typical for a pill mill to do steroid injections?

16  A   I've seen pill mills do them, yes.

17  Q   It's not common for a pill mill to do nerve blocks?

18  A   I have not seen a lot of nerve blocks in pill mills.

19  Q   And it's not common for a pill mill to refuse to give a

20  patient the drugs that they ask for?

21  A   I -- I have seen a lot of pill mills refuse for various

22  reasons.

23  Q   And it's -- again, it's not common in a pill mill for them

24  to turn away patients that come with the ability to spend their

25  money, is it?

DEA DI SUSANNAH HERKERT - CROSS BY MR. ESSIG

1  A   I have seen pill mills turn away a lot of patients for a
2  multitude of reasons.
3  Q   Okay.  But you've also seen pill mills and you've also
4  investigated pill mills -- because most of those cases began in
5  Florida; isn't that right?
6  A   I started out in Los Angeles, where I did a lot of my pill
7  mill investigations and I also did Florida pill mills too.
8  Q   Right.  But the cases -- most of the cases you've been
9  involved in involved cash transactions; is that correct?
10  A   Some of them have, yes.
11  Q   I'm talking about the cases you've testified in.
12  A   Yes.
13  Q   The cases that you specifically worked to investigate,
14  that's what I'm talking about, your personal experience.
15  A   Yes, in my personal experience, there's been cash or
16  insurance payments for these pill mills.
17  Q   Right.  And you've investigated a lot of cases, a lot of
18  cases in your personal experience, cases you previously
19  testified in --
20  A   Yes, I have.
21  Q   -- a lot of cases where there's cash being handed over from
22  the patient to the doctor in the examining room; correct?
23  A   I can think of one, one trial where it was directly in the
24  exam room.  And another one was at the -- that I've testified
25  in was at the front desk.  It was handed over as cash at the

DEA DI SUSANNAH HERKERT - CROSS BY MR. KNIZLEY

```
 1   front desk.
 2           MR. ESSIG:  Just a moment.  No further questions.
 3           THE COURT:  Mr. Knizley?
 4                       CROSS EXAMINATION
 5   BY MR. KNIZLEY:
 6   Q   Good morning, Ms. Herkert.  Herkert; is that right?
 7   A   Yes, sir.
 8   Q   Are you from Dallas?
 9   A   That's where I'm assigned, yes, sir.
10   Q   And you came here from Dallas?
11   A   Yes, sir.
12   Q   Welcome to Mobile.
13   A   Thank you, sir.
14   Q   Now, were you with the other DEA -- or the DEA agents on
15   May the 20th that came into my client's medical clinic?
16   A   No, sir.
17   Q   Okay.  Did you talk to any of the 60 or so employees he had
18   there?
19   A   No, sir.
20   Q   And did you talk to any of the patients that lost their
21   medical care that day?
22   A   No, sir.
23   Q   Now, you've told us some things about medicines and that
24   sort of thing.  And Mr. Essig has touched upon it, but could
25   you tell us what your major in college was?
```

151

1   A   I have a bachelor of arts degree in English and I have a

2   master of science in natural and applied science in aviation

3   and space science.

4   Q   So your major in college was English, you said?

5   A   Yes.

6   Q   Okay.  And then you went and got a master's degree?

7   A   Yes, sir.

8   Q   And what was that master's degree in?

9   A   Natural and applied sciences in aviation and space

10  sciences.

11  Q   Does that have anything to do with medicine?

12  A   No, sir.

13  Q   So your formal college education was not based in medicine;

14  is that right?

15  A   Yes, sir.

16  Q   Mr. Essig asked you was you a doctor and you told us of

17  course not; right?

18  A   Correct.

19  Q   Do you know what a toxicologist is?

20  A   Yes, sir.

21  Q   Are you a toxicologist?

22  A   No, sir, I'm not.

23  Q   Could you tell the ladies and gentlemen of the jury what

24  you understand a toxicologist would be?

25  A   A toxicologist understands metabolization of drugs in the

152

```
 1   system and the breakdown of drugs.

 2   Q   Okay.  And do you know what a pharmacist is?

 3   A   Yes, sir.

 4   Q   Are you a pharmacist?

 5   A   No, sir.

 6   Q   What would be a pharmacist's expertise?

 7   A   A pharmacist is pharmacology.

 8   Q   And what's that?

 9   A   Study of drugs, interactions, doses, strengths.

10   Q   A lot of stuff you were talking about here today?

11   A   Yes, sir.

12   Q   Okay.  And you said you had some training, though, I think?

13   At Quantico, Virginia, I think; is that correct?

14   A   Yes, sir.

15   Q   All right.  Well, and that Quantico, Virginia, you said you

16   had three months' training there; is that correct?

17   A   Approximately three months, yes.

18   Q   And was all of that training associated with the type

19   testimony you gave here today, identification of medicines and

20   that sort of thing?

21   A   I've received additional training since Quantico.  That was

22   back in 2005, but we had the basics.

23   Q   What was -- what other training have you had?

24   A   I've had advanced diversion investigator school, through

25   the California Bureau of Narcotics Investigators, I've attended
```

DEA DI SUSANNAH HERKERT - CROSS BY MR. KNIZLEY

1    pharmacology and drug identification, drug investigations.

2    Q    And could you -- I saw that.  Could you tell us a little

3    bit more about that California thing you said you had?

4    A    That's --

5    Q    How long did it last?

6    A    Those are a couple of day courses.

7    Q    Two days?  Both of them were two days?

8    A    I went to one every year for several years, and they were

9    multiple-day trainings.

10   Q    What was the type of stuff you studied in those two-day

11   courses?

12   A    It varies from drug identification to pharmacology, to

13   search warrant execution, interviewing, investigation

14   techniques.

15   Q    So some of it's about what you testified today, but some of

16   it's not; is that correct?

17   A    That is correct.

18   Q    So how much of it was about what you testified today,

19   about?

20   A    Various classes every year.  I mean, they were two- to

21   four-hour blocks daily.  So --

22   Q    Be a little more specific.  Two- to four-hour blocks daily.

23   How much more education or training have you gotten since you

24   went to Quantico about what you testified to today

25   specifically, please?

1    A    So I went to advanced diversion training several years ago

2    and that was an additional two days.

3    Q    Excuse me.  All two days about pills and medicine?

4    A    Two days was about pill mill investigations, pharmacology,

5    drugs, current trends.

6    Q    Well, investigations and current trends?  You know,

7    investigations, that may mean something different.  I'm asking

8    you just tell the jury, if you would, please, what your other

9    training has been about what you testified here today

10    specifically.

11    A    Okay.  Well, I've been testifying about pill mills

12    specifically today and about those drugs and the trends and the

13    Holy Trinity and I've received additional training at least

14    once a year since 2005 regarding that.

15    Q    Okay.  Did your training at Quantico have -- was it

16    involved in general medicine in any way?

17    A    We had a medical expert that discussed with us various

18    drugs and prescriptions.

19    Q    Was part of your training at FBI Quantico, did you have any

20    medical training in general medicine?

21    A    In general medicine, no.

22    Q    Okay.  Did you have any training in the form of

23    biochemistry?

24    A    No.

25    Q    Did you have any training in physiology?

DEA DI SUSANNAH HERKERT - CROSS BY MR. KNIZLEY

1   A   At Quantico, no.

2   Q   Did you have any training as to how the body metabolizes

3   chemicals?

4   A   We did have a pharmacologist suggest some of that with us.

5   Q   Do you recall testifying under oath on April 22nd, 2009, in

6   the Central District of California?

7   A   Yes, I do.

8   Q   And do you recall being asked the question:  How does the

9   body metabolize?  Did you have any training in any form on how

10  a body metabolizes chemicals?  Do you remember being asked that

11  question?

12  A   Not specifically, no.

13        MR. KNIZLEY:  May I approach the witness, Your Honor?

14  Or may I use the --

15        THE COURT:  Well, she's not denying that she was

16  testifying about that.  So why don't you just ask her what

17  you're going to ask her about it.

18        MR. KNIZLEY:  Okay.

19  Q   I'm going to ask you again, did at Quantico you have any

20  training about how a body metabolizes chemicals?

21  A   Well, if you're referring to 2009, I received advanced

22  diversion training from Quantico after 2009.

23  Q   No, ma'am.  I'm asking you a question.  First I'm going to

24  ask you the question:  Did you testify?

25  A   Yes, I did testify to it, yes.

1  Q   When asked that question did you have any training on how a

2  body metabolizes chemicals, do you recall what your answer was?

3  A   I believe my answer was no, because at that time I had not

4  had that training.

5  Q   Okay.  All right.  Now, how about -- did you receive any

6  training about how -- DEA training about how to diagnose

7  illnesses?

8  A   At that time, no, I had not had that training.

9  Q   What about medications that should be prescribed for

10  ailments?

11        MR. BODNAR:  Your Honor, we're going to object.  We're

12  so far off of what she says she can do.  He's asking her a

13  million questions about --

14        THE COURT:  I don't recall her testifying anything

15  about what you can prescribe for illness.  So let's move on.

16        MR. KNIZLEY:  Well, Judge, my recollection of her

17  testimony is she was saying, you know, what things are

18  frequently prescribed or not prescribed.  I may have been

19  wrong.

20        THE COURT:  She was talking about the FDA indications

21  of what they were for.

22  BY MR. KNIZLEY:

23  Q   Now, you talked about the term "Holy Trinity."  Do you

24  understand that term to be something that originated in a

25  prison setting?

1   A   No, I do not know its origin.

2   Q   Have you ever heard about its origin?

3   A   I've heard multiple theories.

4   Q   Is one of them being in a prison setting?

5   A   That, I haven't heard that one personally, but --

6   Q   Now, you're not saying that these three types of

7   medications can't be legitimately prescribed for legitimate

8   medical use, are you?

9   A   No, I'm not.

10  Q   They certainly can be, can't they?

11  A   If it's prescribed within the course of professional

12  practice and for legitimate medical purpose.

13  Q   And all three at the same time; right?

14  A   If it's within the usual course of professional practice.

15  Q   The simple fact that those three are prescribed together in

16  and of itself does not indicate some inappropriate conduct,

17  does it?

18  A   That in and of itself is not illegal.

19  Q   All right.  And you've told us -- I want to go back to your

20  drug schedules.

21        And you prepared this; is that right?  (Indicating.)

22  A   I assisted.

23  Q   Okay.  And do you agree with it, though?

24  A   Yes, I do.

25  Q   Okay.  And what that purports to be is sort of an excerpt

1    from the Controlled Substances Act, isn't it?  These little

2    things you have right here?  (Indicating.)

3    A    Controlled substance in the DEA website.

4    Q    Okay.  I want to show you what's marked as Defendant's

5    Exhibit 202.  And could you -- if you recognize that, could you

6    tell us if you recognize that?

7    A    That's the drugs that are abused published by the U.S.

8    Department of Justice.

9    Q    Are you familiar with it?

10   A    Yes, I am.

11          A JUROR:  Our screens aren't on.

12          THE COURT:  That's because it hasn't been introduced

13   yet.  That's all right.  We normally will not show it to you

14   unless it's just a demonstrative exhibit that is not to be

15   introduced or after it is actually admitted into evidence.

16   Then you'll be able to see it.

17          A JUROR:  Thank you.

18          THE COURT:  But thanks for bringing that to my

19   attention, because I hadn't told you that yet.  Thanks.  Okay.

20   Go ahead, Mr. Knizley.

21   BY MR. KNIZLEY:

22   Q    Now, I want to show you page nine of that manual and tell

23   me if you recognize that.

24          MR. BODNAR:  Your Honor, before we go further on this,

25   can we identify what year this is we're talking about?

```
 1            THE COURT:  Do you have a year on this one?

 2            MR. KNIZLEY:  Yes, ma'am, I do.

 3    Q   Will you tell me what year we're talking about down here,

 4    right here at the bottom?  (Indicating.)

 5    A   It says the 2015 edition.

 6    Q   Okay.  And is that fairly current?  Do you know if there's

 7    a '16 edition on that?

 8    A   I know there's another, there's a '16 edition for drug

 9    trends, but I'm not sure if that includes this or not.

10    Q   Okay.  And I will show you this is schedule I and schedule

11    II controlled substances; is that right?

12    A   Yes.

13    Q   Okay.  Do you agree that is the appropriate definition or

14    the proper definition from the Controlled Substances Act?

15    A   You're asking me what's under schedule I or --

16    Q   Let's go back.

17            MR. KNIZLEY:  Judge, we'd offer Defendant's Exhibit

18    202.

19            MR. BODNAR:  Your Honor, at this point I don't know if

20    he's laid any relevance or foundation on this.

21            THE COURT:  Yeah, I don't have enough information to

22    know whether or not it's admissible at this time.

23            MR. KNIZLEY:  Okay.

24            THE COURT:  If you're simply trying to refresh her

25    recollection of something, why don't you bring it up and show
```

1    it to her and point out what you want her to read and then ask

2    whether or not she agrees with it, because it's difficult to

3    see.

4          MR. KNIZLEY: Judge, ultimately, I'd like to compare

5    her visual aid with what she recognizes as an authoritative

6    document from DEA.  That's what I'm looking for.  But I'll be

7    happy to approach and ask her about it in a little more detail.

8          THE COURT: All right.  Okay.

9    BY MR. KNIZLEY:

10   Q   I'm going to ask you again.  I show you what's marked as

11   Defendant's Exhibit 202.  It purports to be a copy of a

12   publication by the DEA.  And you said you recognize that; is

13   that right?

14   A   Yes, sir, I recognize this.

15   Q   Okay.  I'm going to flip you to page nine.  Okay?  And that

16   was the one I showed you a moment ago.  And, again, what year

17   was this one from?

18   A   It says 2015 edition, DEA Resource Guide.

19   Q   And you're familiar with this document?

20   A   Yes.

21   Q   Okay.  And you told us a little bit earlier about the

22   schedule I, schedule II, and schedule III controlled substances

23   and their propensity for abuse and that sort of thing; is that

24   right?

25   A   Yes.

DEA DI SUSANNAH HERKERT - CROSS BY MR. KNIZLEY

1   Q   And on this page of your DEA manual it outlines in a little

2   more specificity what those indications are for each one of

3   those drugs or what the descriptions are for each one of those

4   categories of drugs?

5   A   It has a description, yes, for each one.

6   Q   And you would agree with that, would you not?

7   A   Yes.

8          MR. KNIZLEY:  Judge, I'd offer Defendant's Exhibit

9   202.

10         THE COURT:  Well, it's got more than just that page in

11  it.

12         MR. KNIZLEY:  I'd offer page nine of Defendant's

13  Exhibit 202.

14         THE COURT:  Any objection?

15         MR. BODNAR:  Could we look at it real quick?  We have

16  not seen this yet, Your Honor.

17         THE COURT:  All right.

18         MR. BODNAR:  No objection to page nine coming in, Your

19  Honor.

20         THE COURT:  All right.

21      (Defendant Couch's Exhibit 202 was entered into evidence.)

22         MR. KNIZLEY:  Judge, can we have the screen -- is it

23  on?

24         THE CLERK:  Yes, sir.

25  BY MR. KNIZLEY:

DEA DI SUSANNAH HERKERT - CROSS BY MR. KNIZLEY

 1   Q   All right.  Now, what you showed the jury earlier, when you

 2   said drugs in this class, you said that it had a high potential

 3   for abuse and psychological or physiological dependency.  Is

 4   that right?

 5   A   Physical/psychological dependency.

 6   Q   Actually what the whole thing says, if you look at it, is

 7   abuse of the drug or other substance may lead to severe

 8   psychological dependence; is that right?

 9   A   That's correct.

10   Q   That's a little clearer than what you have here, is it not?

11   It's a little more comprehensive?

12   A   There's additional words on there.

13   Q   Makes it a little more understandable, doesn't it?  The

14   true meaning of it, doesn't it?  Not to you?  Not to you?

15   A   I thought it was explanatory.

16   Q   Okay.  Let's look at the other one here.  Schedule III

17   drugs, and they are a little less addictive; right?  And you

18   just used the words physiological and psychological dependency;

19   right?

20   A   Uh-huh (positive response).

21   Q   Is that what you put on there?

22   A   Yes.

23   Q   In your exhibit?

24   A   That's what's on the exhibit, yes.

25   Q   Okay.  But the whole thing really says -- the Controlled

1   Substances Act says abuse of the drugs may lead to moderate or

2   low physical dependence; is that right?

3   A   This resource guide says it may lead to moderate or low

4   physical dependence.

5   Q   That resource guide's right, isn't it?

6   A   Yes.  I mean, that's what DEA published, yes.

7   Q   Okay.  That sort of better explains what you have on here;

8   right?

9   A   You can -- yeah, we can say that.

10          MR. KNIZLEY:  Thank you.

11          That's all, Judge.

12          THE COURT:  Any redirect?

13          MR. BODNAR:  Yes, Your Honor.

14          Your Honor, now that these Exhibits 1-2 through --

15   these demonstrative aids have been used by all parties, the

16   United States moves to admit these as exhibits as well.

17          THE COURT:  Is there any objection?

18      (No audible response.)

19          THE COURT:  All right.

20          MR. KNIZLEY:  Excuse me.  Which ones?

21          MR. BODNAR:  At this point they've all been discussed.

22   We're going to admit them all.

23          MR. KNIZLEY:  All?

24          THE COURT:  Is there any objection to any --

25          MR. KNIZLEY:  Yes, we object, Your Honor.

 1          THE COURT:  To which?  On what basis?

 2          MR. KNIZLEY:  I object to -- the front page, I haven't

 3    used any of the other -- I don't object to the front page I

 4    compared to Defendant's Exhibit 202.

 5          THE COURT:  When you say the front page, it has a

 6    number.  What do you not object to?

 7          MR. KNIZLEY:  Government's Exhibit -- it appears on

 8    this 1-2.

 9          THE COURT:  All right.  1-2 is admitted.  Mr. Essig,

10    do you have an objection to 1-2?

11          MR. ESSIG:  No, Your Honor.

12          THE COURT:  All right.

13       (Government's Exhibit 1-2 was entered into evidence.)

14          THE COURT:  What about the others?

15          MR. KNIZLEY:  Yes.

16          THE COURT:  You do?  All right.  On what basis?

17          MR. KNIZLEY:  One's hearsay.  Secondly, as to the

18    basis he offered it for, I made no reference to that

19    whatsoever.

20          THE COURT:  All right.  Then I'll admit 1-2 and

21    withhold admitting on the others at this point.

22                      REDIRECT EXAMINATION

23    BY MR. BODNAR:

24    Q   Ms. Herkert, I just want to clarify something, several

25    points that were made here.  Do you remember when Mr. Essig

1   came up and talked to you about dating for 90 straight days?

2   A   Yes.

3   Q   And you were talking about a don't-fill-by date?

4   A   Yes.

5   Q   So I know I'm ripping out something -- so that's the first

6   date, Rx January 1st, 2017?

7   A   Yes.

8           MR. ESSIG:  Your Honor, I'm going to object to this.

9   It's not in evidence.  We have no context of what this piece of

10  paper is or handwriting.

11          MR. BODNAR:  Your Honor, explaining what it looks

12  like, what he was saying and asking about the 90 days and how

13  it's dated, and that was very confusing.  So we're going to

14  visually show the jury how that should look.

15          THE COURT:  Is this something you wrote?

16          MR. BODNAR:  Yes, I hand wrote it just as we were

17  sitting here.

18          THE COURT:  It's just a demonstrative exhibit?

19          MR. BODNAR:  It is a demonstrative exhibit we are not

20  admitting.

21          THE COURT:  All right.  Go ahead.  Overruled.

22  BY MR. BODNAR:

23  Q   Do you remember when they're talking about getting three

24  prescriptions at the same time?

25  A   Yes.

1   Q   And do you remember you mentioning that they have to be

2   signed on the date written?

3   A   Yes.

4   Q   So would the second one, if you got two that day -- the

5   first one is right there?

6   A   Yes.

7   Q   Would the second one look like that?  Again, January 1st,

8   but then written under it:  Do not fill before February 1st,

9   2017?

10   A   That is correct.

11   Q   And the third one would look something like that?

12   (Indicating.)

13   A   That is correct.

14   Q   So that's what Mr. Essig was talking about is lawful;

15   correct?

16   A   Yes.

17   Q   But if you on January 1st had one that instead of saying

18   January 1st, do not fill before, it just said February 1 and

19   that one just said March 1st and they were all given on that

20   first day, would that be a legitimate prescription?

21   A   No, it would not.

22   Q   Next, do you remember Mr. Essig was talking to you about

23   fentanyl being -- I'm showing you what's been admitted as

24   Government's Exhibit 1-2 right now.

25   A   That is correct.

1    Q   Remember when he asked you about fentanyl being in the same

2    schedule as hydrocodone?

3    A   Yes.

4    Q   Fentanyl does have a legitimate medical purpose, doesn't

5    it?

6    A   Yes.

7              MR. KNIZLEY:  Objection.  Leading.

8              THE COURT:  Overruled.

9    BY MR. BODNAR:

10   Q   And schedule I, you told us, has no current medically

11   acceptable purpose; correct?

12   A   That is correct.

13   Q   So could fentanyl be ranked higher than schedule II?

14   A   No, it could not.

15   Q   And, as you were listing potency, is there a stratifying

16   within schedule II?

17   A   Yes.

18   Q   And where does fentanyl sit amongst the other opioids in

19   this list?

20   A   It's at the top.

21   Q   Now, do you remember when Mr. Essig was talking to you

22   about common characteristics of pill mills that you've been

23   involved in?

24   A   That is correct.

25   Q   And he asked you about cash transactions?

1   A   Yes.

2   Q   That's not the only way prescriptions are done, are they?

3   A   No, it's not.

4   Q   In your experience have you seen any pill mills with cash

5   transactions for $20,000 worth of fentanyl?

6           MR. KNIZLEY:  Objection.  Leading.

7           THE COURT:  Overruled.

8   BY MR. BODNAR:

9   Q   In your experience working pill mills, have you ever seen

10  cash transactions for $20,000 worth of fentanyl?

11  A   No, I have not.

12  Q   You talked about common characteristics, or he walked you

13  through various common characteristics of pill mills.  Are

14  there other common characteristics of pill mills that were not

15  discussed with Mr. Essig?

16  A   Yes, there are.

17  Q   And does some of that include some of the type of drugs

18  that are frequently seen in your experience working pill mill

19  cases?

20  A   Yes.

21  Q   Let's talk about those.  Look at Exhibit 1-3.  Hydrocodone.

22  Are any of these pills frequently seen in pill mill cases?

23  A   Yes, they are.

24  Q   And which ones in particular?

25  A   We see frequently the higher milligram strengths of the

1   opioids, then we see a lot of the 7.5 and the 10 milligram

2   formulations.

3   Q    That would be 10 milligram Lortab or Vicodin?

4   A    That is correct.

5   Q    7.5 -- they all have the same?

6   A    Yes.

7   Q    So, how about with oxycodone, is that something you

8   frequently see in pill mill cases?

9   A    Yes.  Throughout the years we've seen OxyContin, a lot of

10  the 80-milligram OxyContin.  When OxyContin was reformulated,

11  we started seeing a lot of the Roxicodone immediate release

12  tablets, the 30 milligrams specifically, and we also started

13  seeing a lot of those on the street.

14  Q    Is it common in the cases that you've done -- we've talked

15  about common characteristics of pill mill investigations -- to

16  see very large volumes of OxyContin or oxycodone?

17  A    Yes.

18  Q    How about very large volumes of the 60 and the 80

19  OxyContin?

20  A    Yes.

21          MR. KNIZLEY:  Objection.  Leading.

22          THE COURT:  Overruled.

23  BY MR. BODNAR:

24  Q    Now, you're not saying that 60 and 80 milligram couldn't be

25  used for a medical purpose; correct?  Are you saying that?

```
1   A   No, no, I'm not.

2   Q   But you're saying in your experience you see those at

3   higher levels?

4   A   Yes, we see those a lot through our pill mill

5   investigations.

6   Q   How about Roxicodone?  What do you typically see in pill

7   mill investigations involving Roxicodone?

8   A   We see 30-milligram Roxicodone tablets a lot in the pill

9   mill investigations.

10  Q   In small volumes or in very large volumes?

11  A   In large volumes.

12  Q   Now look at Government's Exhibit 1-8, oxymorphone.  How

13  about in pill mill investigations you've been involved in have

14  you seen Opana?

15  A   Yes, I have.

16  q   And explain to the jury how you see Opana in your

17  investigations you've been involved in.

18  A   We've seen a lot of Opana 40 milligrams in our

19  investigations.

20  Q   Are we talking about large volumes of Opana 40?

21  A   Yes, large volumes.

22  Q   And was there a period of time where Opana 40 suddenly

23  became a more prolific drug at the pill mill cases you've seen?

24  A   Yes.

25  Q   Why did Opana 40 suddenly become a much larger volume drug
```

1    at pill mills?

2    A    Because in my experience, specifically within California

3    and Texas, with Opana -- after OxyContin was reformulated

4    around 2010, the Opana 40 milligrams spiked among the pill

5    mills as the drug that drug seekers and abusers were pursuing.

6    Q    And you said OxyContin was reformulated.  Help me

7    understand.  What does it mean that OxyContin was reformulated?

8    A    Yes, around 2010 the makers of OxyContin, Purdue Pharma,

9    reformulated the tablet because people were abusing it and

10   getting rid of the time release within the caplet or within the

11   tablet so that they could break it down quicker and abuse

12   it.  So Purdue Pharma reformulated it to alleviate some of that

13   ability to break down the time release on the tablet.  So then

14   our drug seekers and drug abusers went for a different drug of

15   choice with the Opana and the Roxicodone.

16   Q    So to simplify it, did Purdue Pharma then make it harder to

17   abuse OxyContin after 2010?

18         MR. ESSIG:  Objection, Your Honor.

19   A    That is correct.

20         MR. ESSIG:  I'm going to object to that.  This is

21   beyond the scope of both direct and cross at this point.

22         THE COURT:  Well, the testimony is already in

23   unobjected to about that, so let's move on at this point.

24         MR. BODNAR:  Yes, Your Honor.

25   Q    You mentioned frequently you see cash transactions in pill

172

1    mill investigations.  Is that what you said to Mr. Essig?

2    A   Yes, we see cash.

3    Q   But is that exclusively how you work pill mills?

4    A   No.  We've seen cash, we've seen insurance payments.

5    Q   And have you ever seen cash payments for Subsys or Abstral?

6    A   No, I have not.

7    Q   And why is that?

8    A   It's not something we see frequently.  Even our pill mill

9    doctors, the ones I've investigated, we rarely see the

10   prescriptions for fentanyl.

11   Q   You were asked about the Holy Trinity and whether or not

12   that name was in the DEA regulations or the federal statutes.

13   Do you remember that question being asked?

14   A   Yes, I do.

15   Q   Is "Holy Trinity" a sign name?

16   A   Yes, it is.

17   Q   Similar to "ice" or "crystal" or something like that?

18   A   That is correct.

19   Q   Which refer to other drugs; correct?

20   A   That is correct.

21   Q   And does "ice" or "crystal" or "angle dust," terms like

22   that, appear in the statute, to your knowledge?

23   A   Not to my knowledge, no.

24   Q   You talked about being trained on current trends within

25   pill mill investigations.  Do you remember when Mr. Knizley was

1  asking you about that?

2  A   Yes.

3  Q   Have you had training or discussions of trends of the Holy

4  Trinity?

5  A   Yes.

6  Q   Is this something that is well known throughout the United

7  States or something that just someone that has the diversion

8  experience would know about?

9  A   It appears to be well known to me.

10  Q   Based on your experience working with pharmacies, is this

11  something well known to pharmacists?

12  A   Yes.

13  Q   Do pharmacists, in your experience, have any sort of duty

14  when they get a prescription in that they may not believe is

15  within the usual course of professional practice?

16        MR. ESSIG:  Objection, Your Honor, relevance.  Beyond

17  her expertise as well.

18        MR. KNIZLEY:  Outside the scope.

19        THE COURT:  I do believe it's outside the

20  scope.  So --

21        MR. BODNAR:  Yes, Your Honor.

22        THE COURT:  The objection is sustained.

23  BY MR. BODNAR:

24  Q   In your training have you learned about the dangers of the

25  Holy Trinity?

1  A   Yes, I have.

2  Q   Can you please explain to the jury what the dangers of the

3  Holy Trinity are?

4          MR. KNIZLEY:  Your Honor, I object to foundation.

5          THE COURT:  Overruled.

6  BY MR. BODNAR:

7  Q   Would you please explain the dangers of the Holy Trinity as

8  you've learned them through your training?

9  A   As I've learned through my training, that the combined

10 effects of these drugs, that's why drug seekers typically go

11 after them.  For non-opioid tolerant individuals who take the

12 opioids in combination with the benzodiazepine and the Soma,

13 we've had individuals who the toxicology screening has revealed

14 that their death was as a result of the oxycodone or the opioid

15 and the benzodiazepine in their system that's been ruled as a

16 drug overdose.

17         MR. BODNAR:  One moment, Your Honor.

18         THE COURT:  All right.

19         MR. BODNAR:  Nothing further from this witness, Your

20 Honor.

21         THE COURT:  You may step down.  Thank you.

22         THE WITNESS:  Thank you.

23         THE COURT:  All right.  Ladies and gentlemen, we're

24 going to take our morning break at this time.  Remember my

25 instructions to you not to discuss the case or allow anyone to

175

 1    discuss it with you.  Take your break downstairs in the jury

 2    assembly room and leave your pads and anything else you want on

 3    your chairs here.  We'll keep them safe for you and we will

 4    call you back up in about 15 minutes.

 5         (A recess was taken at 10:26 a.m.)

 6         (In chambers, 10:42 a.m., jury not present.)

 7              MR. SHARMAN:  Morning, Judge.

 8              MR. ESSIG:  Morning, Judge.

 9              THE COURT:  Good morning.  Whose party is this?

10              MR. ESSIG:  I guess it's mine, Judge.  What I wanted

11    to bring up is the last witness that testified, at the very end

12    of her direct examination, where she was asked about the

13    effects of the Holy Trinity, she mentioned that one of the

14    effects is death.  And we were concerned about that because we

15    had actually filed a motion, as you know, to keep out any

16    references to death other than the charged death counts.  The

17    government responded they didn't intend to get into that.

18              Our concern is we didn't object to it at this point in

19    time.  If it comes out again, we're going to have to object to

20    it and probably have to move for a mistrial because of the

21    danger of prejudicing the jury when there's going to be no

22    evidence of death in this case.

23              THE COURT:  Well, I understand your concern.  But I

24    didn't understand it to be any reference to any activities in

25    this case.  I understood it to be why it's such a serious and

1   heavy drug.  So even if you had objected to it, I would have

2   overruled the objection based upon the context in which it came

3   in.  But the government needs to be aware that we need to stay

4   away from that subject.

5          MR. BODNAR:  Yes, Your Honor.  And just to put on the

6   record that when I met with her on Wednesday night to prep her,

7   we specifically reminded her we're not talking about deaths,

8   period.  And then when I talked to her yesterday before she

9   went on, I said:  We're not talking about deaths.

10          I did not remind her again this morning because I

11  didn't talk to her at all while she was on the stand.

12          THE COURT:  I understand.  All right.  Well, y'all

13  have your --

14          MR. SHARMAN:  We're not blaming the lawyers.

15          MR. ESSIG:  We're not.  We're just expressing --

16          THE COURT:  You're blaming her.

17          MR. ESSIG:  We just don't want to see an argument:

18  Hey, you heard there's a risk of death and it result in a

19  mistrial.

20          THE COURT:  All right.  Anything else?

21          MR. SHARMAN:  No, ma'am.

22          MS. GRIFFIN:  No, Your Honor.

23          MR. SHARMAN:  Thank you.

24          MS. GRIFFIN:  Do y'all want to talk about next week?

25  Or later?  Talk about next week at this time or talk to you

 1   later, Judge?

 2        THE COURT:  If we've got time right now, you can do

 3   it.

 4        MS. GRIFFIN:  We have tried to move some people and

 5   they had other obligations, and we are not able to do so.

 6        THE COURT:  Okay.  So you need both days off?

 7        MS. GRIFFIN:  We do need both days.  It would disrupt

 8   how we're trying to put it together and throw off the experts.

 9   And the defense had checked with us -- if y'all want to

10   confirm -- about even moving some of their witnesses because of

11   it.  So we are sort of hamstrung trying to get them back when

12   we've told them they are free.

13        THE COURT:  I understand.  Okay.  Well, if that

14   changes, let ne know, because I'm not going to say anything to

15   the jury until the end of Monday.

16        MR. SHARMAN:  Yes, ma'am.

17        THE COURT:  The guy that needs his license renewed

18   will be happy.

19        MS. GRIFFIN:  If anything changes, we certainly will

20   let the Court know immediately.

21        THE COURT:  Thank you.

22        MS. GRIFFIN:  Thank you.

23        MR. SHARMAN:  Thank you.

24      (A recess was taken at approximately 10:44 a.m.)

25      (In open court, 10:50 a.m., defendants and jury present.)

```
 1              THE COURT:  All right.  Call your next witness.

 2              MS. GRIFFIN:  Your Honor, the  United States would

 3  call Nancy Bishop.

 4                      NANCY BISHOP, R.Ph.,

 5              was sworn and testified as follows:

 6     THE WITNESS:  I do.

 7     THE CLERK:  Thank you, ma'am.  Please be seated.

 8              MR. SEWELL:  Your Honor, before the witness begins

 9  testifying, Dr. Couch would like to renew his objection to the

10  testimony we anticipate Ms. Bishop would present with reference

11  to our briefing on the PDMP.  And we further object to the

12  extent that she may address any patients not encompassed in the

13  indictment or reviewed by the experts.

14              THE COURT:  Well, you need to address your objections

15  to individual comments concerning the patient issue.  But I

16  deny your motion that I've already ruled on.

17              MR. SEWELL:  Yes, ma'am.

18                      DIRECT EXAMINATION

19  BY MS. GRIFFIN:

20  Q   Tell us your name, please.

21  A   Nancy Bishop.

22  Q   How are you employed?

23  A   I'm employed with the Alabama Department of Public Health

24  as the state pharmacy director.

25  Q   In that capacity what are your duties?
```

179

1   A   I have three major duties.  One is consultant for the

2   county health departments as far as medicines that they

3   dispense, the other is emergency preparedness, and the third is

4   the Prescription Drug Monitoring Program.

5   Q   What is the Prescription Drug Monitoring Program?

6   A   It's a database of all controlled substances dispensed in

7   Alabama.  And for our purposes, dispense means walking out the

8   door with a patient.

9   Q   Who does it apply to?

10   A   The prescriptions that are gathered, the prescription

11   records that are gathered into the database, are all anyone in

12   Alabama that had a controlled substance filled.  The user

13   groups are people who can go into the database and look up a

14   patient.  And then the uploaders are those who dispense the

15   medicines and add that or upload that information to the

16   database.

17   Q   And before I go any further with the PDMP, tell us about

18   your background.

19   A   I began practicing pharmacy in 1981.  I have experience in

20   hospital, home infusion, specialty, and retail.  And I came to

21   the Department of Public Health in August of 2012.

22   Q   In what capacity?

23   A   I was the assistant state pharmacy director.

24   Q   Have you subsequently become the state pharmacy director?

25   A   Yes, in July of last year I was promoted.

NANCY BISHOP - DIRECT BY MS. GRIFFIN

1  Q   And you serve in that capacity now; is that right?

2  A   That's right.

3  Q   As such you oversee the PDMP?

4  A   Yes.

5  Q   And you've told us briefly what the PDMP is and said it

6  could be accessed by certain people.  What types of individuals

7  can access the PDMP?

8  A   That is defined in our law.  It's physicians, dentists,

9  podiatrists, optometrists, and pharmacists.

10 Q   And what type information can they access?

11 A   They can access -- I'm sorry.  If I could go back?  Nurse

12 practitioners/nurse midwifes also do have controlled substance

13 certificates and can access it as well as physician delegates.

14 But when they search a patient, they are able to see the

15 prescription history of that patient.

16 Q   So what you're telling us is an individual could not access

17 it to see what type prescription someone else had received?

18 A   No.  It's very defined in the law.  And when they apply for

19 access, we credential them to make sure they are qualified for

20 access.

21       MS. GRIFFIN:  Your Honor, Ms. Bishop mentioned the

22 PDMP law.  We would ask the Court to instruct the jury pursuant

23 to our earlier request about the Alabama law about the PDMP.

24       THE COURT:  All right.  May I see that?

25       THE CLERK:  Oh, I apologize.

1        THE COURT:  I left my copy in the other room.

2            Ladies and gentlemen, I have taken judicial notice of

3    these laws of Alabama.  Alabama Code section 20-2-213 requires

4    the following entities to report dispensed controlled

5    substances information to the PDMP database.  First, licensed

6    pharmacies, not including pharmacies of general and specialized

7    hospitals, nursing homes, and any other healthcare facilities

8    which provide in-patient care so long as the controlled

9    substance is administered and used by a patient on the premises

10   of the facility; second, mail order pharmacies or pharmacy

11   benefit programs filling prescriptions for or dispensing

12   controlled substances to residents of this state; third is

13   licensed physicians, dentists, podiatrists, optometrists, or

14   veternarians who dispense class II, class III, class IV, and

15   class V controlled substances directly to patients or, in the

16   case of veterinarians, for administration to animals, but

17   excluding sample medications.  For purposes of this article,

18   sample medications are defined as those drugs labeled as a

19   sample, not for resale under the laws and regulations of the

20   Federal Food and Drug Administration.  Controlled substances

21   administered to patients by injection, topical application,

22   suppository administration, or oral administration during the

23   course of treatment are excluded from the reporting

24   requirement.

25            Alabama Code section 20-2-214 limits access to the

```
 1    PDMP database to the following:  First, authorized
 2    representatives of the certifying boards; provided, however,
 3    that access shall be limited to information concerning the
 4    licensees of the certifying board.  However, authorized
 5    representatives from the board of medical examiners may access
 6    the database to inquire about certified registered nurse
 7    practitioners or certified nurse midwives that hold a qualified
 8    Alabama controlled substances registration certificate.
 9            Second, a licensed practitioner approved by the
10    department who has authority to prescribe, dispense, or
11    administer controlled substances.
12            The licensed practitioner's access shall be limited to
13    information concerning himself or herself, registrants who
14    possess a qualified Alabama controlled registration certificate
15    over whom the practitioner exercises physician supervision or
16    with whom they have a joint practice agreement, a certified
17    registered nurse practitioner and a certified nurse midwife
18    with a qualified Alabama controlled substances registration
19    certificate over whom the practitioner exercises professional
20    oversight and direction pursuant to an approved collaborative
21    practice agreement, a current patient of the practitioner, and
22    individuals seeking treatment from the practitioner.
23            Practitioners shall have no requirement or obligation
24    under this article to access the check -- or check the
25    information in the controlled substances database prior to
```

1  prescribing, dispensing, or administering medications, or as
2  part of their professional practice.
3         However, the applicable licensing boards in their
4  discretion may impose such a requirement or obligation by
5  regulations.
6         Third, a licensed physician approved by the department
7  who has authority to prescribe, dispense, or administer
8  controlled substances may designate up to two employees who may
9  access the database on the physician's behalf.
10         Fourth, a licensed certified registered nurse
11  practitioner or a licensed certified nurse midwife approved by
12  the department who is authorized to prescribe, administer, or
13  dispense pursuant to a qualified Alabama controlled substances
14  registration certificate; provided, however, that such access
15  shall be limited to information concerning a current or
16  prospective patient of the certified registered nurse
17  practitioner or certified nurse midwife.
18         Fifth, a licensed assistant to physician approved by
19  the department who is authorized to prescribe, administer, or
20  dispense pursuant to a qualified Alabama controlled substances
21  registration certificate; provided, however, that such access
22  shall be limited to information concerning a current patient of
23  the assistant to the physician or an individual seeking
24  treatment from the assistant to the physician.
25         Sixth, a licensed pharmacist approved by the

1   department; provided, however, that such access is limited to

2   information related to the patient or prescribing practitioner

3   designated on a controlled substance prescription that a

4   pharmacist has been asked to fill.

5        Pharmacists shall have no requirement or obligation to

6   access or check the information in the controlled substances

7   database prior to dispensing or administering medication or as

8   part of their professional practices.

9        Seventh, state and local law enforcement authorities

10  as authorized under section 20-2-91, and federal law

11  enforcement authorities authorized to access prescription

12  information upon application to the department accompanied by a

13  declaration that probable cause exists for the use of the

14  requested information.

15       Eight, employees of the department and consultants

16  engaged by the department for operational and review purposes.

17       Nine, the Prescription Drug Monitoring Program of any

18  of the other states or territories of the United States, if

19  recognized by the alliance for Prescription Drug Monitoring

20  Programs under procedures developed, certified, or approved by

21  the United States Department of Justice or the integrated

22  justice information system's institute or successor entity,

23  subject to or consistent with limitations for access prescribed

24  by this chapter for the Alabama Prescription Drug Monitoring

25  Program.

185

1             And 10, authorized representatives of the Alabama

2    Medicaid Agency; provided, however, that access shall be

3    limited to inquiries concerning possible misuse or abuse of

4    controlled substances by Medicaid recipients.

5    BY MS. GRIFFIN:

6    Q   Ms. Bishop, pursuant to that law, is the PDMP maintained by

7    your office?

8    A   It is.

9    Q   And could you tell us how that information comes to your

10   office?

11   A   We use a vendor, software vendor.  And the dispenser

12   uploads the information either directly from their dispensing

13   software or through an online system.

14   Q   Could you give us an example of a dispenser?

15   A   Yes, a pharmacy.

16   Q   A pharmacy?

17   A   Right.  And there are physicians who also dispense.

18   Q   So if a prescription is not filled, would it be reported to

19   the PDMP?

20   A   If a prescription is not filled, it would not.  It only is

21   reported when it is actually inputted into the dispensing

22   software and dispensed to the patient.

23   Q   Are those records reported electronically?

24   A   Yes, they are.

25   Q   Is there one exception in the whole state?

1    A    There is.  We do allow a waiver if a pharmacy or any

2    dispenser does not have internet capability, and there is one

3    pharmacy in our state that does not.

4    Q    That is not C&R Pharmacy, is it?

5    A    No, it's not.

6    Q    Could you tell us if you looked to determine if there were

7    reports of drugs prescribed by Dr. Patrick Couch and Dr. Xiulu

8    Ron?

9    A    I'm sorry.  Can you repeat that, please?

10    Q    Did you look to see if there were PDMP reports about drugs

11    prescribed by Dr. Couch and Dr. Ruan?

12    A    I did not look at specific reports to show their

13    prescribing.  No, I did not.

14    Q    You looked to determine that they had some, without looking

15    at the patient name?

16    A    That's correct.

17    Q    And why is that prohibited, for looking at the patient

18    name?

19    A    Because I don't really have a legal obligation -- I don't

20    really have a legal authority to pull any data in the PDMP

21    without a subpoena.

22    Q    Now, did you determine whether or not Dr. Ruan and

23    Dr. Couch had delegates and could you tell us what are

24    delegates?

25    A    Delegates are people who the physician has requested to

1   search the database on their behalf.  The delegate sets up

2   their own account, they have a unique user name and password,

3   and the physician goes into the system and links their account

4   to the delegate.

5   Q   And typically what type of employment would the delegates

6   have?

7   A   Typically it's someone employed by the practice.

8   Q   For example, an MP or PA?

9   A   It could be an MP or PA, it could be an office manager.  A

10  license is not required for it.

11  Q   Now, you said the user had a name and an account.  Did you

12  determine that there were any delegates for Dr. Ruan or for

13  Dr. Couch in the Alabama PDMP system?

14  A   I could not find any delegates for them.

15  Q   Do the doctors themselves have to use a name and an account

16  number to access the PDMP?

17  A   Yes.  Each user has their own unique user ID and password.

18  Q   So, for example, Dr. Couch would have had a user ID?

19  A   That's correct.

20  Q   Dr. Ruan would have had a user ID; is that right?

21  A   That's correct.

22  Q   With those, what type information may they access with that

23  user ID?

24  A   They can search one of their patients.  As the law states,

25  it has to be a patient or prospective patient.  And they go in

1    and they can search the data or put in the patient's first

2    name, last name, and date of birth and a report comes up and it

3    lists the -- we call them recipients rather than patients --

4    recipient's name, the prescription number, the prescription

5    drug, quantity, date supplied, prescription number, the

6    dispenser, and the prescriber.

7    Q   I show you what's marked as Government's Exhibit 24-4A, as

8    a demonstrative exhibit, and ask if this information is

9    provided on a PDMP about each drug filled in the state of

10   Alabama -- that is a scheduled drug?  Excuse me.

11   A   Yes.  It is controlled drugs and, yes, this is the

12   information that's provided.

13   Q   So that would be the date dispensed, the drug name, the

14   quantity of the drug dispensed; is that right?

15   A   That's correct.

16   Q   The days of supply, the prescriber identification number,

17   prescriber name?

18   A   Right.

19   Q   Date prescribed, prescription number, whether it's a new

20   prescription or a refill?

21   A   That is correct.

22   Q   The dispenser ID would be the pharmacy or, if there were a

23   dispensary in the doctor's office, would that be the dispenser

24   ID?

25   A   It is the -- it's whoever dispensed the medicine, whether

NANCY FISHOP - DIRECT BY MS. GRIFFIN

```
 1   it be a pharmacy or a physician.
 2   Q   And it would give their identifying information, of course?
 3   A   That's correct.
 4   Q   The method of payment?
 5   A   That's right.
 6   Q   The identification of the recipient, and you said the
 7   recipient would be the patient; is that right?
 8   A   That's correct.
 9   Q   Now, how is it that doctors are able to access this with
10   their number?  Can they do that from their offices?
11   A   Yes, they can do it from any computer.
12   Q   So it's electronic access?
13   A   Right.
14   Q   Are the records maintained electronically?
15   A   They are.
16   Q   And they are business records of your organization; is that
17   correct?
18   A   They are within the database, yes.
19   Q   Could you tell us if you were asked to provide a listing of
20   the prescriptions that Dr. Couch wrote and that Dr. Ruan wrote
21   from January of 2011 through the end of May 2015?
22   A   I was.
23   Q   And pursuant to that, were those sent to DEA
24   electronically?
25   A   They were.
```

```
 1   Q   I'll show you what you've previously had the opportunity to
 2   review as Government's Exhibit 24-1.  And I realize that this
 3   is very small type, but could you identify what this exhibit
 4   shows?
 5         THE COURT:  Can you blow it up some so she can see at
 6   least what the first few entries are?
 7         MS. GRIFFIN:  (Complying.)
 8         THE CLERK:  The little green button on the top, just
 9   to the right.
10   BY MS. GRIFFIN:
11   Q   I show you the first one that says Ruan Alabama 2011.  Does
12   it in fact show the date dispensed, January the 3rd, 2011?
13   A   It does.
14   Q   The drug alprazolam?
15   A   It does.
16   Q   The quantity?
17   A   It does.
18   Q   The days of supply?
19   A   Yes.
20   Q   The identifying number for the prescriber, in this case the
21   doctor?
22   A   Right.  That's his DEA number.
23   Q   And is that for Dr. Ruan?
24   A   Yes.
25   Q   Does it show the date filled?
```

1   A   This -- the second date is the date prescribed.

2   Q   The first date is the date filled; is that right?

3   A   That's correct.

4   Q   And it provides the information you've identified, as

5   showing you who prescribed it and who it was prescribed for; is

6   that correct?

7   A   That's correct.

8   Q   Did you provide those as part of Exhibit 24-1 for Dr. Ruan

9   for 2011, 2012, 2013, 2014, and 2015, until May of 2015?

10  A   Right.  It was through May.

11  Q   Did you also provide those for Dr. Couch for that same

12  period of time?

13  A   I did.

14  Q   And I show you Dr. Couch Alabama 2011.  That shows the date

15  dispensed?

16  A   Right.

17  Q   The drug Opana?

18  A   That's correct.

19  Q   The quantity?

20  A   That's correct.

21  Q   Days of supply?

22  A   Yes.

23  Q   Dr. Couch's name?

24  A   Yes.

25  Q   The date the prescription was written?

```
 1   A    Right.

 2   Q    The pharmacy?

 3   A    That's correct.

 4   Q    And then later the patient's name; is that right?

 5   A    That's correct.

 6   Q    Now, these have the first pages printed from each year that

 7   y'all provided because the pages number over 7,000 pages.  Have

 8   they been placed on a disk electronically so they can be seen?

 9   A    We did not put them on the disk.

10   Q    All right.  Do you realize the DEA, rather than print them

11   out on paper, what you sent electronically they just

12   transferred to a disk?

13           MR. SEWELL:  Objection, Your Honor.  Lack of personal

14   knowledge.

15           THE COURT:  Do you know that that occurred?

16           THE WITNESS:  No, I don't.

17           THE COURT:  Okay.  Go ahead.

18   BY MS. GRIFFIN:

19   Q    And those were the records you had provided pursuant to

20   their request; is that right?

21   A    That's correct.

22           MR. SEWELL:  Objection, Your Honor.  She's still

23   talking about a disk that this witness has no personal

24   knowledge of the creation of.

25           THE COURT:  I don't think she's talking about the
```

1    disk.  So she was just asking about the records provided.

2            MR. SEWELL:  Yes, Your Honor.

3    BY MS. GRIFFIN:

4    Q    Then why, what is the purpose, what's the purpose of the

5    PDMP?

6    A    It is a tool for the prescribers and the dispensers to use

7    to make the best clinical decision for their patient.

8    Q    And I believe I asked you it only requires reporting

9    scheduled drugs?

10   A    That's right.

11   Q    So, for example, arthritis medicine or heart medicine or

12   thyroid medicine wouldn't be reported?

13   A    We collect schedules II through V only.

14   Q    What about prescriptions written in Alabama and filled in

15   another state?

16   A    Those would not be in our system.

17   Q    So it's only filled in this state?

18   A    In Alabama.

19   Q    When the information is provided to the doctors by their

20   access, do they physically sign on and put the information

21   you've identified -- patient's name and date of birth?

22   A    Yes, yes.

23   Q    How long does that machine stay connected or signed on, if

24   you know?

25   A    With no activity on the website, it will automatically log

1    off in 15 minutes.

2    Q   So is there a limit on how many PDMPs a doctor can look at

3    in that 15-minute period of time?

4    A   Theoretically there might be.  Each -- there is a limit to

5    the number of accesses, but it is extremely high for every

6    prescriber.

7    Q   So if a doctor wanted to keep it active all day to look at,

8    what would they have to do?

9    A   They would have to be using it at least -- or have some

10   activity in the website at least once every 15 minutes.

11   Q   Now, were you subpoenaed to provide information from the

12   Alabama PDMP for the number of prescriptions written by

13   Dr. Ruan and the number written by Dr. Couch for the drug

14   Subsys for the period of time of January the 1st of 2011 to May

15   the 31st of 2015?

16   A   I was.

17   Q   Those numbers you have would be just the number of Subsys

18   prescriptions filled in the state of Alabama?

19   A   That is correct.

20   Q   So if there were scripts they wrote that were filled in

21   Mississippi or Kentucky or anywhere else, they would not show

22   up in your data?

23   A   That is correct.

24   Q   I show you what's marked as a government's exhibit.  Were

25   you asked to give the rank within the state of those two

 1    doctors --

 2    A    I was.

 3    Q    -- as to how many Subsys they wrote during that period of

 4    time?

 5    A    I was.

 6    Q    I show you what's been marked as Government's Exhibit 24-3

 7    and ask if you have previously seen this Exhibit 24-3.

 8    A    I have.

 9    Q    Did you in fact prepare this exhibit based on the PDMP

10    records that are stored within your system?

11    A    I did.

12    Q    And can you tell us what this actually shows?

13            MR. KNIZLEY:  Your Honor, again, I object to her

14    referencing the document she prepared.  The best evidence is

15    the records themselves.  She can certainly testify to what the

16    records may say.  But this is a hearsay statement that she has

17    now created, that has a great deal more information on it than

18    simply what may be reflected in the records.  And we would

19    object to her making a reference to that.  She can certainly

20    testify to what the records say, but not what this document,

21    hearsay document, says.

22            MS. GRIFFIN:  Your Honor, she's testified she prepared

23    it from the records.

24            THE COURT:  Yeah, I'm not sure I understand the

25    distinction.

1           MR. KNIZLEY:  Judge, the government is showing an

2    out-of-the-court document to the witness for the purpose --

3           THE COURT:  Which she prepared from the records.  So I

4    overrule your objection.

5           MS. GRIFFIN:  Move to admit Government's Exhibit 24-3

6    Your Honor.

7           MR. KNIZLEY:  Objection.  Hearsay.

8           THE COURT:  Overruled.

9       (Government's Exhibit 24-3 was entered into evidence.)

10   BY MS. GRIFFIN:

11   Q   You've prepared this from your records; is that correct?

12   A   I did.

13   Q   What does it show, please, across the top of the

14   spreadsheet?

15          MR. KNIZLEY:  Your Honor, We object.  The records are

16   not in evidence.

17          THE COURT:  Well, I thought she admitted the fact that

18   she had downloaded all of those records, that she doesn't have

19   the actual papers here, but they are --

20          MS. GRIFFIN:  The papers are not here, Your Honor,

21   because they are voluminous documents.

22          THE COURT:  And I'm assuming you can connect them up

23   that the CD was in fact prepared from that?

24          MS. GRIFFIN:  That's correct.

25          THE COURT:  I'll let her proceed as if it had already

NANCY BISHOP - DIRECT BY MS. GRIFFIN

1  been admitted.  So go ahead.

2  A   The first column is rank, second column prescriber name,

3  third column is number of prescriptions written, and the fourth

4  column is the number of units prescribed, which is the

5  quantity.

6  BY MS. GRIFFIN:

7  Q   And that's just within the state of Alabama; is that right?

8  A   That's correct.

9  Q   Did you also prepare a similar chart for Abstral?

10  A   I did.

11  Q   I show you what you've previously been shown as

12  Government's Exhibit 24-4 and ask if this is a document you

13  made from the records subpoenaed.

14  A   It is.

15  Q   And from this did you also do the rank, prescriber name,

16  number of prescriptions written, the number of units prescribed

17  from January the 1st of '15 -- excuse me -- January 1st of '11

18  through May 31st of 2015?

19  A   That's correct.

20        MS. GRIFFIN:  Move to admit Government 24-4.

21        MR. KNIZLEY:  Objection.  Hearsay, no foundation.

22        THE COURT:  Overruled.  Mark it in.

23     (Government's Exhibit 24-4 was entered into evidence.)

24  BY MS. GRIFFIN:

25  Q   And again, with this number, it shows 68,116 units

1  prescribed by Dr. Ruan in that period of time and 45,208 units

2  prescribed by Dr. Couch during that time; is that correct?

3  A   That is correct.

4  Q   It does not list any prescriptions they may have written

5  for Abstral that were filled in other states?

6  A   Only those filled in Alabama.

7          MS. GRIFFIN:  One moment, Your Honor.

8  Q   Ms. Bishop, are you aware that Mississippi and Florida have

9  similar programs to the Alabama PDMP program?

10  A   I am.

11  Q   How are you aware of that?

12  A   The states periodically get together for national meetings

13  and then various organizations -- we communicate on a regular

14  basis.

15  Q   Are you aware also or do you know whether other states call

16  it something different than PDMP?

17  A   Yes.

18  Q   Could they have just a different name?

19  A   Right.  Like in Kentucky it's called KASPER, and it's an

20  acronym for whatever.  And then in Florida, I believe it's

21  called E-FORCSE.

22  Q   So are you aware whether or not they collect the same type

23  data that Alabama collects?

24  A   I -- I can't speak to the specifics of what they collect.

25  Q   But it's controlled substance information, to your

1   knowledge?

2   A   It is.

3   Q   And do you know whether or not it's just information filled

4   in those specific states?

5   A   Every state operates within that state and I -- I don't

6   know their law or how their system operates.  So I can't real

7   definitively say that.

8   Q   Now, you've testified you provided the documents, you've

9   identified the first page of each document in Government's

10  Exhibit 24-1.  I'd move to admit Government's Exhibit 24-1.

11          THE COURT:  All right.

12          MR. KNIZLEY:  Excuse me.  I don't have any objection.

13          MS. GRIFFIN:  First page.  (Indicating.)

14          MR. SEWELL:  And, Your Honor, we have the same

15  objection that we mentioned in our briefing.  We also object on

16  the grounds of relevance and 403.

17          THE COURT:  All right.  Overruled.  You can mark it

18  in.

19      (Government's Exhibit 24-1 was entered into evidence.)

20          MR. SEWELL:  Also, Your Honor, we also object to the

21  extent these records cover any patient that's not referenced in

22  the indictment or reviewed by a scripts order, in accordance

23  with the Court's ruling.

24          THE COURT:  All right.  Overruled.

25  BY MS. GRIFFIN:

1    Q   Ms. Bishop, those were provided electronically through the

2    Drug Enforcement Administration; right?

3    A   That's right.

4    Q   And they are business records of your agency?

5    A   Yes.

6            MS. GRIFFIN:  That's all I have of the witness at this

7    time, Your Honor.

8            THE COURT:  All right.  Mr. Sewell?

9                         CROSS EXAMINATION

10   BY MR. SEWELL:

11   Q   Good morning, Ms. Bishop.

12   A   Morning.

13   Q   My name is Jay Sewell.  I'm one of the attorneys for

14   Dr. Couch.  And I just have a few questions about the PDMP so

15   that I and the jury and everyone here can kind of understand

16   what it is and how it works.  The PDMP is kind of -- I thought

17   you said it's useful as a tool; right?

18   A   That's correct.

19   Q   For doctors and pharmacists; is that right?

20   A   That's correct.

21   Q   It's also an investigative tool for law enforcement;

22   correct?

23   A   Law enforcement has what we call indirect access.

24   Q   And I believe, from what the judge read, and the statute,

25   your understanding is that law enforcement can request access

1  to this database?

2  A  Again, that's indirect access.

3  Q  Indirect access.  But they -- presumably they would use

4  that as part of preparing for an investigation?

5  A  Right.

6  Q  And that -- and that includes law enforcement, whether it's

7  sheriff's office or local police department; right?

8  A  It can be state or federal.

9  Q  And federal, like the DEA or the FBI?

10  A  That's correct.

11  Q  Okay.  And going back to just kind of the PDMP -- and

12  you're here just to kind of -- you're here to kind of speak for

13  the Department of Public Health, I guess, as it relates to

14  PDMP; right?

15  A  That's correct.

16  Q  You don't personally enter records into the PDMP?

17  A  I do not.

18  Q  And the PDMP -- or other people working with your

19  organization, they don't personally enter information?

20  A  They do not.

21  Q  All the information from the PDMP comes from dispensers?

22  A  Right.  The prescription records all come from dispensers.

23  Q  From dispensers.  So CVS on the corner, when they fill a

24  controlled substance, they are supposed to fill that in?

25  A  That's correct.

NANCY BISHOP - CROSS BY MR. SEWELL

1    Q    And you said that is done with software?

2    A    Right.  Their dispensing software communicates with the

3    server at our software vendor and uploads.

4    Q    Okay.  So -- I'm sorry to interrupt you.  So as I

5    understand it, the pharmacist that takes in the prescription

6    and fills it -- as you said, it walks out the door?

7    A    That's correct.

8    Q    The only person, they type it into their computer that puts

9    it into this server; is that right?

10   A    I'm not an IT expert.

11   Q    Okay.  I understand.   Your understanding?

12   A    Right.  The pharmacies have software, dispensing software.

13   So it goes into their system.  And then they are required now

14   daily to upload that information into our system.  So it's

15   either generated onsite or by like a chain would be a corporate

16   office.  It's uploaded through technology --

17   Q    Technology?

18   A    -- into our database.

19   Q    Right.  And so this, this, what they are doing, their

20   records are basically saying to PDMP:  Refill this prescription

21   today?

22   A    That's correct.

23   Q    All right.  And so PDMP isn't the one actually looking at

24   the prescription, the written prescription, to say?

25   A    No, we do not.

1  Q   And you are a registered pharmacist; is that correct?

2  A   I am.

3  Q   So you're also familiar with the DEA regulations as they

4  relate to filling the prescriptions?

5  A   I am.

6  Q   And you know that pharmacists have an obligation to make

7  the independent determination of whether to fill a prescription

8  if it's in the usual course of medical practice and for a

9  legitimate purpose?

10  A   That's correct.

11  Q   So when -- so, and they can't fill a prescription until

12  they make that determination; is that correct?

13  A   That's kind of out of my specialty.  But that is what we're

14  taught, yes.

15  Q   Okay.  And so when a pharmacist fills a prescription,

16  presumably they've made that determination, and then they've

17  input that into the PDMP and that's basically them saying:

18  This is a good prescription and I filled it?

19  A   They input it into their dispensing software and then it's

20  uploaded daily into our system.

21  Q   Yes.  And so PDMP really only knows what the pharmacist has

22  put into the system?

23  A   That is correct.

24  Q   And you said it's going back to its usefulness as a tool

25  and it's used for prescribers to make judgments on, you know,

1  what they should prescribe their patients; is that correct?

2  Or -- I'm sorry -- to look and see what other medications they

3  may have been prescribed?

4  A   Can you repeat that question?

5  Q   Yeah.  I'm sorry.  That was not a good question.

6         When a doctor or practitioner would look at the PDMP

7  records, do their search for a patient, kind of the purpose

8  behind that is to see what other medications they are on and

9  how that may affect their current -- or the script that they

10  may prescribe?

11  A   Yes.  The PDMP allows them to see what other controlled

12  substances that patient has received.

13  Q   Okay.  So it's a tool for doctors and it's a tool for law

14  enforcement, like we talked about?

15  A   Right.  Law enforcement has indirect access.

16  Q   And I think you also said, as far as going to the use of

17  it, state law does not require a doctor or a pharmacist to

18  check the PDMP?

19  A   That's correct.

20  Q   I'd like -- I'm going to direct you to the screen for just

21  an example for right now -- not to admit it.

22         THE COURT:  Is this demonstrative evidence or is this

23  something you're going to be admitting later?

24         MR. SEWELL:  We may admit it later, Your Honor.

25         THE COURT:  All right.

```
 1          MS. GRIFFIN:  Your Honor, we don't object to it if
 2   they are going to admit it later.  But I think it needs to come
 3   in through somebody else.
 4          THE COURT:  Yeah, I'm not sure.
 5          MS. GRIFFIN:  We don't object to the form.
 6          THE COURT:  We are not showing it to the jury right
 7   now.  But I'm not --
 8          MR. SEWELL:  That's all I'm asking you, not to show it
 9   to the jury but to give reference to the witness.
10          THE COURT:  Yeah.  But maybe you should just bring it
11   to her and show it to her.
12          MR. SEWELL:  Yes, Your Honor.  May I approach?
13          THE COURT:  Yeah.
14   BY MR. SEWELL:
15   Q   Okay.  Ms. Bishop, I'm showing you what we have marked as
16   Couch Exhibit 44R.  And I'll take you -- have you take a look
17   at it.  We have redacted out some information on that.  But
18   that's basically what a PDMP report looks like after somebody
19   has printed it out?
20   A   That is correct.
21   Q   Okay.  And at the bottom, if you will read along with me,
22   at the bottom it says:  The Alabama Prescription Drug
23   Monitoring Program does not warrant the above information to be
24   accurate or complete?
25   A   That is correct.
```

NANCY BISHOP - CROSS BY MR. SEWELL

1   Q   Did I read that correctly?

2           Okay.  It's based on search criteria and data provided

3   by dispensing entities?

4   A   That's correct.

5   Q   And for more information about any prescription, please

6   contact the dispenser or the prescriber?

7   A   That is correct.

8   Q   So basically that's the PDMP saying:  We only know as much

9   as the pharmacy that put it in tells us?

10  A   That is correct.

11  Q   And you can't guarantee that what's in that is accurate?

12  A   I cannot.

13  Q   And you can't say that, you know, if a record says that on

14  May 25th a prescription for tramadol of 90 tablets was filled

15  at CVS Pharmacy down the road, you can't say that's actually

16  what happened?

17  A   Can you rephrase that?  I can't --

18  Q   Right.  So if you were to look at an entry for a specific

19  date, the PDMP can't say that on that date that medication was

20  actually dispensed?  They can only say if the pharmacist had

21  said that's what happened?

22  A   Well, it can't be in the system unless it was dispensed.

23  So --

24  Q   Well, it can't be in the system unless somebody put it

25  actually in the system?

```
 1    A    Right.
 2    Q    And, you know, you're operating under maybe the assumption
 3    that or you're hoping that they put it in correctly?
 4    A    Yes.
 5    Q    But you can't guarantee that it was put in correctly?
 6    A    That is correct.
 7            MR. SEWELL:  No further questions, Your Honor.
 8            THE COURT:  Mr. Knizley?  Are you going to question
 9    the witness?
10            MR. KNIZLEY:  Yes, ma'am.
11            THE COURT:  Okay.
12                          CROSS EXAMINATION
13    BY MR. KNIZLEY:
14    Q    Good morning, Ms. Bishop.
15    A    Good morning.
16    Q    I'm going to draw your attention to the Government's
17    Exhibit 24-3.  And the prosecutor asked you about this; is that
18    right?
19    A    That is right.
20    Q    And she asked you did you -- well, first, did you actually
21    do this yourself or get somebody to do it for you?
22    A    I did it myself.
23    Q    Okay.  And so you are familiar enough with the software and
24    stuff to pull the numbers up?
25    A    I am.
```

NANCY BISHOP - CROSS BY MR. KNIZLEY

1    Q   Were you asked by someone else to do this?

2    A   It was subpoenaed, it was per subpoena.

3    Q   A subpoena from the United States, from the government

4    here?

5    A   Yes.

6    Q   And were you asked only to pull up the rank, prescriber

7    number and number of prescriptions written and number of units

8    prescribed or were you asked to do anything else?

9    A   Specific to this report?

10   Q   Specific to this exhibit, Government's Exhibit 24-3.  You

11   said you prepared this pursuant to a subpoena; is that correct?

12   A   That is correct.

13   Q   All right.  Did the subpoena ask you to do anything other

14   than rank these people --

15           MS. GRIFFIN:  Objection as to relevance, Your Honor.

16           THE COURT:  Sustained.

17   BY MR. KNIZLEY:

18   Q   Okay.  Were you requested by subpoena or otherwise to

19   retrieve the number of patients?

20   A   No.

21   Q   Okay.  And so you didn't do that; right?  Ma'am?

22   A   I did not.

23   Q   Okay.  So what this tells us is that Dr. Ruan had this many

24   prescriptions, but we don't know how many patients he had?

25   From these records anyway?

NANCY BISHOP - CROSS BY MR. KNIZLEY

```
 1   A   I did not research that, no.

 2   Q   Okay.  You weren't asked?

 3   A   I was not asked.

 4   Q   And you could have, though; right?

 5   A   Uh, I would have to -- let me think about that.  I could

 6   get that information, yes.

 7   Q   Right.  And you were asked to do this for a specific

 8   medication; right?

 9   A   That's correct.

10   Q   Okay.  So did you have a computer program you used to

11   determine what the medication was and then the number of

12   prescriptions or you just had to do it manually or how did you

13   do it?

14   A   The system allows me to put in the drug name.

15   Q   Uh-huh?

16   A   And a date.  I couldn't do that whole time period.  It's

17   done by month.

18   Q   Uh-huh?

19   A   So I had to take each month during that time frame and pull

20   it out and I put the -- it does a ranking for those with this

21   information, and so I had to put each of those months on a

22   spreadsheet.

23   Q   Okay.

24   A   And from that I got the totals.

25   Q   Okay.  And again, you don't know how many patients this
```

NANCY BISHOP - CROSS BY MR. KNIZLEY

1  doctor had to get that many prescriptions, do you?

2  A   I do not.

3  Q   You could find out, but you weren't asked to do that?

4  A   I don't -- I'm trying to think how I could do that.  And it

5  would be a tedious process, but I could get it out of the

6  system.

7  Q   Okay.  And the dosages are in there as well, not just

8  prescriptions, but how much the dosages of each prescription

9  was?

10  A   Right.  That's what we put for the quantity.

11  Q   Number of units?

12  A   Right.

13  Q   Excuse me.  This number of units indicated, it doesn't mean

14  the number of -- this is the number of prescriptions

15  (indicating) and this is the number of units (indicating), and

16  what is the unit we're talking about?

17  A   For Subsys it is the dose that was -- the quantity

18  dispensed.

19  Q   Okay.  And this is the number of prescriptions that were

20  written for Subsys?  Okay?

21  A   Right.

22  Q   And the number of units, that doesn't mean -- and I'm just

23  wondering what units means.

24  A   It's the quantity.  Like if you have 60 tablets, then the

25  quantity would be 60.

NANCY BISHOP- CROSS BY MR. KNIZLEY

```
 1  Q   And so we don't know what the dosage is, though; right?
 2  A   No.  It's -- it could -- this covers all dosage of Subsys.
 3  Q   So it could be -- if it's Subsys, it could be a hundred
 4  micrograms, 200, 400, 600, 800, up to 1,600?  Are you familiar
 5  with the quantities they come in?
 6  A   I am.  And I did not break it down as to quantity per
 7  strength dispensed.
 8  Q   Sure.
 9  A   I did not.
10  Q   So when we're looking at this, it could be all 100, it
11  could be all 1,600 it could be 800?  We don't know what the
12  strengths are, do we?
13  A   That's correct.
14  Q   So this just tells us it's that many pills were dispensed
15  or whatever it might be?
16  A   Yes, sir.
17  Q   And Subsys comes a lot of different ways; right?
18  A   It does.
19  Q   How many different ways does it come in?
20  A   I can't tell you offhand.
21  Q   Four maybe?  Does that sound about right?
22  A   Yes.
23  Q   One you put underneath your tongue, one you put in your
24  cheek, and one that you spray in?  If you know?
25          MS. GRIFFIN:  Your Honor, objection.
```

```
 1              THE COURT:  She said she didn't know.

 2              MS. GRIFFIN:  She doesn't know.

 3              THE COURT:  So let's move on.

 4   BY MR. KNIZLEY:

 5   Q   Okay.  So you don't -- you don't know how?

 6   A   I haven't practiced pharmacy.

 7   Q   When you see these units, you don't know how it may have

 8   been dispensed within the unit?

 9   A   This is the total quantity for that drug.  This is the -- I

10   can't break down those numbers by the strength.

11   Q   Okay, okay.  And I would assume that this applies to

12   Dr. Couch as well, what I just asked you about?

13   A   It does.

14   Q   When I say this applies, what I mean is, you know, whether

15   it's 100 or 1,600 or 800, it all applies to Dr. Couch, what I

16   was asking you about, as well?

17   A   That's true.

18   Q   Okay.  Now, you put a rank here.  Now, do you know if

19   number three was a pain doctor?  Do you have any idea?

20   A   We do not keep the specialty in our system.  So I do not

21   know.

22   Q   So this could be any kind of physician; is that right?

23   A   That's right.

24   Q   An OB-GYN?  Anything; is that right?

25   A   Yes.  Our system does not retain or does not capture the
```

NANCY BISHOP - CROSS BY MR. KNIZLEY

```
 1   specialty.
 2   Q   Okay.  I think I did ask you.  You don't know how many
 3   patients each of these doctors may have; is that right?
 4   A   That's correct.
 5   Q   And I've asked you those questions about 24-3.  And 24-4
 6   talks about a different kind of fentanyl; is that right?
 7   A   That's correct.
 8   Q   Okay.  And Subsys, the other one, was fentanyl too; is that
 9   right?
10   A   That's correct.
11   Q   I misspoke.  It's four kinds of fentanyl, not four kinds of
12   Subsys, if you know.  You may not know.  Do you know?
13   A   Fentanyl comes in a variety of different formulations.
14   Q   And this is one of them, Abstral?
15   A   That's one of them.
16   Q   And the Subsys is one of them?
17   A   That's correct.
18   Q   Okay.  Again, your 24-4 didn't list the patients; is that
19   right?
20   A   That's correct.
21   Q   And the same question about the number of units; we just
22   know that's the number of however it's packaged, be it pill, be
23   it spray -- however it's packaged, that's the number of those
24   things that got dispensed?
25   A   That's correct.
```

NANCY BISHOP - CROSS BY MR. KNIZLEY

1    Q   And again, the same thing with Abstral, we don't know the
2    strength of the dosage?
3    A   That's correct.
4    Q   I failed to ask on Abstral -- and we don't know the
5    specialty or anything else of any of these other lesser
6    prescribers; is that right?
7    A   That's correct.
8    Q   Are you familiar with whether pain doctors are more likely
9    to prescribe fentanyl products than nonpain doctors, or are
10   you?
11   A   I'm not -- I have no knowledge of that.
12   Q   Okay.  Now, you told us about doctors and pharmacists being
13   able to access your system to get information?
14   A   Yes.
15   Q   And I believe you said a doctor from his own office can get
16   on his computer and access your PDMP and, if a patient comes
17   in, he can see what that patient has gotten from the pharmacy
18   either in the recent past or for a long period; right?
19   A   That's right.
20   Q   And how does that help the doctor, if you know?
21   A   It's a tool.  And we don't dictate how the physician uses
22   it.
23   Q   Do you have an understanding of how it may help the doctor?
24   A   It allows them to see the prescriptions that -- controlled
25   substance prescriptions that the patient has had filled.

NANCY BISHOP - CROSS BY MR. KNIZLEY

1   Q   So if the patient's in there and he's about to prescribe a

2   controlled substance, if that patient has already gotten

3   something similar that he thinks he'll prescribe, he would know

4   then; right?

5   A   Right.

6   Q   The day before if he had been to the pharmacy and tried to

7   get something, the doctor would know; right?

8   A   Yes.

9   Q   And he would also know what the person may have been doing

10  over the last six months or a year; right?

11  A   That is -- right now the data in the system goes back to

12  2006.

13  Q   Okay.  And you said that is a tool for the doctors; is that

14  right?

15  A   That's correct.

16  Q   To help them decide what they should be giving patients

17  when they come in there?

18  A   That's correct.

19  Q   All right.  And do you know if all doctors routinely use

20  the PDMP or do you have --

21  A   I would have no knowledge of that.

22  Q   Okay.  Do you know -- you said there's a limit to the

23  access that a doctor can have on a daily basis; is that right?

24  A   As far as the number of searches that can be done?

25  Q   Right.

NANCY BISHOP - CROSS BY MR. KNIZLEY

 1   A   Yes.  And it's quite high.  It's set for different amounts.

 2   And if they want more, we -- they call us and we can up that.

 3   Q   Okay.

 4   A   But it's like 500 to a thousand.

 5   Q   Okay.  And do you know on an average about how much the

 6   doctors in our state access your system a day?

 7   A   No, sir.  I'm not allowed to pull data from the system.

 8   Q   Okay.  Now, but you can tell us, and I think I've requested

 9   from the government, how many times Dr. Ruan has attempted on a

10   daily basis to access your -- or has not attempted -- has in

11   fact accessed your system on a daily basis; is that right?

12   A   Yes, I was asked to pull those records.

13   Q   I didn't ask you to bring them -- you weren't asked by the

14   government to bring them today, though; right?

15   A   No.

16   Q   You did that, did you not?

17   A   I did.

18   Q   So you have records available -- not today, but in the

19   future -- that can tell us how many times per day Dr. Ruan

20   would have accessed your system?

21   A   Yes.  Upon a subpoena, I can run those records.

22          MR. KNIZLEY:  Thank you.

23          THE COURT:  Any redirect?

24          MS. GRIFFIN:  Yes, Your Honor.

25                    REDIRECT EXAMINATION

BY MS. GRIFFIN:

Q   Ms. Bishop, you were asked as to whether your chart showed the dosage or the strength.  Do the PDMP records that you provided for each of these doctors show the dosage and the strength?

A   It does.

Q   And when a doctor would access the PDMP, they would see the dosage and the strength the person may have been taking; is that right?

A   That's correct.

Q   Are you aware that doctors throughout this state rely on the PDMP as a tool?

A   I am --

        MR. KNIZLEY:  Objection.  Leading, Your Honor.

        MS. GRIFFIN:  Your Honor, they were asked as to what the purpose was on it and they implied that it was incorrect and that it was not accurate.

        THE COURT:  Well, I think --

        MR. KNIZLEY:  Objection.  Leading.

        THE COURT:  -- I think you can get that information from her without a leading question.

BY MS. GRIFFIN:

Q   Can you tell us if you are aware on how frequently the information is accessed throughout the state?

A   I cannot give you data on that because I'm not allowed to

1  access the system.  But we get calls daily regarding physicians

2  and pharmacists who are accessing the system.

3  Q   Now, you indicated to Mr. Knizley that this Abstral did not

4  give you the dosage, but you also indicated -- does this cover

5  every doctor who wrote a script for Abstral in the state of

6  Alabama?

7  A   It covers the top 10.

8  Q   Top 10.  Excuse me.

9  A   Yes.

10  Q   So these are the top -- so number three wrote 10

11  prescriptions, according to your PDMP records; is that correct?

12  A   That is correct.

13  Q   And does it include all doctors in the state?  Did you

14  compare it to all doctors in the state, not the chart?

15  A   Can you rephrase that question?

16  Q   Yes.  Did you run that to get all the doctors in the state?

17  A   Right.  When I put in the information, it gives me all the

18  doctors, all the prescribers.

19  Q   And that would include -- or would that include pain

20  doctors as well?

21  A   Again, we don't keep up with the specialties.  So I

22  wouldn't know if they were a pain doctor or not.

23  Q   So number three could be a pain doctor, number two could be

24  a pain doctor, you don't know the specialty?

25  A   That is -- I do not know.

1  Q    Were the pain doctors excluded from these numbers?

2  A    No.

3  Q    Same thing with Subsys.  The third-highest prescriber in

4  the state, you don't know if that's a pain doctor or what type

5  doctor?

6  A    I do not.

7  Q    But pain doctors were not excluded from Government's

8  Exhibit 24-3?

9  A    No.

10  Q    And that shows the next-highest number under the 992

11  scripts as how many?

12  A    Number three?

13  Q    Yes.

14  A    372.

15  Q    You were also asked if pharmacies filled a prescription,

16  they believed that it was a valid script; is that correct?

17  A    That's correct.

18  Q    If a pharmacist does not believe it is a valid script, what

19  is their responsibility?

20  A    What I was taught in school is that if it's not a valid

21  prescription and there's knowledge that it would not be of

22  benefit to the patient, the obligation is to not fill the

23  prescription.

24  Q    Now, prescriptions that are written by a doctor and refused

25  to be filled by a pharmacy, are those reported to the PDMP?

220

1   A   No.  It's only reported when the prescription is filled.

2   Q   And a pharmacist has a obligation to refuse to fill scripts

3   for what reason?

4   A   If they feel that it's a fraudulent prescription, if it's

5   been tampered with, or it would cause harm to the patient.

6   Q   And those aren't contained in the numbers you provided?

7   A   The numbers I provided are only those that were dispensed.

8        MS. GRIFFIN:  That's all I have of the witness, Your

9   Honor.

10       THE COURT:  All right.  Thank you.  You may step down.

11       Call your next witness.

12       MS. GRIFFIN:  We call Eric Lawson.

13       THE CLERK:  Sir, let me get you to step forward toward

14  the witness stand and I'll swear you in.  Raise your right

15  hand.

16                    FBI SA ERIC LAWSON

17              was sworn and testified as follows:

18       THE WITNESS:  I do.

19       THE CLERK:  Thank you, sir.  Please be seated.

20                    DIRECT EXAMINATION

21  BY MS. GRIFFIN:

22  Q   Tell us your name, please sir.

23  A   Eric Lawson.

24  Q   How are you employed?

25  A   Special agent with the FBI.

FBI SA ERIC LAWSON - DIRECT BY MS. GRIFFIN

1  Q   How many years of law enforcement experience do you have?

2  A   Just over 11.

3  Q   I want to direct your attention to May the 20th,

4  2015.  Were you so employed on that date here in Mobile?

5  A   I was.

6  Q   And did you have occasion to participate in the execution

7  of a federal search warrant at the Springhill Avenue PPSA

8  office in Mobile, Alabama?

9  A   Yes, ma'am.

10  Q   Is that Dr. Couch and Dr. Ruan's office?

11  A   Yes, ma'am.

12  Q   What was your responsibility that day?

13  A   I was the evidence response team team leader that day.

14  Q   What does that mean?

15  A   Well, the evidence response team for the FBI is kind of

16  like a crime screen unit responsible for forensic cases mostly,

17  but in addition we usually help out other squads or any squad

18  with bigger cases or multi-location cases, to assist there.

19  Q   You were not the only person that went to the search of

20  that Springhill office, were you?

21  A   No, ma'am.

22  Q   You had a number of other agents and officers?

23  A   Yes, ma'am.

24  Q   Did you prepare a document log and a photo log and an

25  administrative log?

222

1   A   Yes, ma'am.

2   Q   Could you tell us what those are?

3   A   Those are the ERT -- the ERT documents that we use for any

4   search.

5   Q   For example, what would be contained in your package for a

6   search?

7   A   You have an admin log, sketch, photo log, evidence recovery

8   log, summary sheet, entry/exit logs, just kind of a regular

9   packet that you do on any search to keep your administrative

10  work kept together.

11  Q   Does that assist in knowing which photograph goes with

12  which number or which exhibit came from which room?

13  A   Yes, ma'am.

14  Q   I show you what you've previously provided as Government's

15  Exhibit 1 [sic], and which you previously reviewed.  Have you

16  seen this exhibit before?

17  A   Yes.

18  Q   And what's contained in Exhibit 2-1?

19          THE COURT:  You said Government's Exhibit 1.

20          MS. GRIFFIN:  I'm sorry.

21          THE COURT:  You meant 2-1?

22          MS. GRIFFIN:  It's 2-1.

23          THE COURT:  Okay.

24  A   I believe that's my entire packet that I put together that

25  day.  All the ERT documents.

1  Q  I show you the inside of 2.1.  Have you previously seen it?

2  A  Yes, that's the sketch.

3  Q  Have you previously seen the photographs?

4  A  Yes, ma'am.

5  Q  Have you previously seen the photographic log?

6  A  Yes, ma'am.

7  Q  Have you previously seen your administrative worksheet?

8  A  Yes, ma'am.

9  Q  And have you previously seen the evidence recovery log?

10 A  Yes, ma'am.

11 Q  Did you assist in preparing all these and retain these

12 records throughout that search?

13 A  I did.

14      MS. GRIFFIN:  Your Honor, we'd move to admit

15 Government's Exhibit 2-1 and publish it to the jury.

16      MR. ESSIG:  No objection, Your Honor.

17      THE COURT:  All right.  Mark it in.

18     (Government's Exhibit 2-1 was entered into evidence.)

19 BY MS. GRIFFIN:

20 Q  Now, I also want to show you Government's Exhibit 2.2 and

21 ask if you've previously seen -- excuse me, 2-2 -- seen the

22 photographs that were taken that day at the Springhill location

23 for Physicians Pain Specialists of Alabama?

24 A  Yes, ma'am.

25 Q  Were these photographs actual replicas of the items that

FBI SA ERIC LAWSON - DIRECT BY MS. GRIFFIN

```
 1  they depict that were in that building?

 2  A   Yes.

 3          MS. GRIFFIN:  Your Honor, I move to admit Government's

 4  Exhibit 2-2.

 5          MR. KNIZLEY:  Your Honor?  Is that the photographs

 6  themselves you're admitting?

 7          MS. GRIFFIN:  Yes.

 8          MR. KNIZLEY:  Judge, we object.  No foundation as to

 9  relevance to the issues here in this case.

10          THE COURT:  All right.  You're going to have to go

11  through each one then.

12  BY MS. GRIFFIN:

13  Q   Mr. Lawson, approximately what time did you and the other

14  agents get to PPSA on May the 20th, 2015, if you recall?

15  A   Sometime after 6 o'clock, right around.

16  Q   In the morning?

17  A   Yes, ma'am.

18  Q   And I show you what's marked as a portion of Government's

19  Exhibit 2-2, jpeg number two, ask if you can identify the

20  photograph?

21  A   That's the front door of the Physicians Pain Specialists of

22  Alabama at the Springhill location.

23  Q   And would you like to have access to your log as we

24  proceed?

25  A   Yes, ma'am.  Yes, ma'am.  Thanks.
```

FBI SA ERIC LAWSON - DIRECT BY MS. GRIFFIN

1  Q  That's the outside view?

2  A  Yes, this is one of our entry photographs.

3        MS. GRIFFIN:  Move to admit that photograph as a

4  portion of Exhibit 2-2.

5        MR. ESSIG:  No objection.

6        THE COURT:  Are you going to mark these individually?

7        MS. GRIFFIN:  We weren't going to, Your Honor, because

8  they are all of the inside except this one of the

9  pharmacy.  But we can do so.

10        THE COURT:  Mr. Knizley, why don't you take a look

11  through that --

12        MR. KNIZLEY:  I will.

13        THE COURT:  -- and see which ones you specifically

14  object to.

15        MR. KNIZLEY:  I will.

16        THE COURT:  All right.

17        MS. GRIFFIN:  These have previously been provided, but

18  we certainly don't object to them seeing them again.

19      (A discussion was held off the record between counsel.)

20        MS. GRIFFIN:  Your Honor, I've been advised that they

21  have no objection to all the photographs, Government's Exhibit

22  2-2.  We would move to admit that.

23        THE COURT:  All right.  Mark them in.

24      (Government's Exhibit 2-2 was entered into evidence.)

25        MS. GRIFFIN:  Actually, I have them up with the

 1  computer, Your Honor.  We would ask that this be turned on.

 2        THE COURT:  All right.  We'll switch to the

 3  computer.  It will take a minute.

 4        MS. GRIFFIN:  It's jpeg two.

 5  Q   You've identified this as the front of the office; is that

 6  right?

 7  A   Yes, ma'am.

 8  Q   Whose names are on the front?  You may need to enlarge it.

 9  A   Patrick Couch and -- forgive me for not being able to

10  pronounce the second name -- Ruan.

11  Q   And also Chen?

12  A   Yes, ma'am.

13  Q   Now, is there a pharmacy located adjacent to this picture

14  -- to this location?

15  A   Meaning next door?

16  Q   Yes, C&R Pharmacy?

17  A   I don't recall.

18  Q   When you went in to search the building, what was the first

19  thing you and the other agents did?

20  A   The very first thing we do is secure the location.  Once

21  it's secured, we start TRT-wise with entry photos.

22  Q   What do you mean by securing it, in simplest terms?

23  A   We make sure there's nobody inside and make sure that

24  there's no -- it wasn't an issue at this location; it was a

25  business and we got there before it was opened.  But if you do

 1    a search, you have to secure it and make sure that there are no

 2    threats.

 3    Q    Is that for safety purposes?

 4    A    Safety purposes.  That's pretty standard.

 5    Q    Then I show you the inside, jpeg five, and ask if you can

 6    identify the photograph.

 7    A    Yes.  Number five is entry room A. north.

 8    Q    Now, how did you know that that's entry room A. north?

 9    A    Because the number on this photo corresponds with our

10    photographic log in the entry photo section.

11    Q    Could you open the front of your administrative folder

12    that's been admitted as Exhibit 2-1?

13    A    Yes, ma'am.

14    Q    And show us if there's a sketch in the front of that?

15    A    Yes.

16    Q    Who prepared that sketch of the location?

17    A    Sarah Urbin.

18    Q    How is it that she prepared that?

19    A    Every ERT team has some specific duties and one person is

20    assigned to be the sketcher.  In this case it was Sarah that

21    day.  And what she does is gets graph paper.  And I don't know

22    if it is up yet, but it's a top-down sky view sketch of the

23    building where all the names -- where the location, the

24    preparer, every room is sketched and given either a letter

25    designator or a number designator.  In this case it was letter

FBI SA ERIC LAWSON - DIRECT BY MS. GRIFFIN

1    designator.

2    Q   So every room has an identifying number or letter,

3    depending on how many rooms are in the building?

4    A   Yes, ma'am.

5    Q   That was prepared and that's contained in Exhibit 2-1?

6    A   Yes, ma'am.

7    Q   Was that blown up for you to reference, a duplicate of

8    what's contained in your exhibit?

9    A   Yes, ma'am.

10   Q   And I show you what's marked as Government's Exhibit 2-4,

11   ask if it is a blowup of the sketch that the FBI used that day

12   in searching the rooms?

13   A   This is it.

14           MS. GRIFFIN:  Your Honor, we'd move to admit

15   Government's Exhibit 2-4.

16           THE COURT:  All right.

17           MR. ESSIG:  No objection by Dr. Couch.

18           THE COURT:  All right.  Mark it in.

19       (Government's Exhibit 2-4 was entered into evidence.)

20   BY MS. GRIFFIN:

21   Q   Why are the rooms given letters or numbers?

22   A   Because we during the search have to account for the entire

23   building and account from where each evidence item which is

24   seized, where it came from.

25   Q   Which room it came from?

FBI SA ERIC LAWSON - DIRECT BY MS. GRIFFIN

1   A   Yes, ma'am.

2   Q   So that's why you referenced this jpeg picture five by a

3   letter?

4   A   Yes.

5   Q   I show you the next photograph within the building and ask

6   if you can identify jpeg 49.

7   A   49 is entry room F. west.

8   Q   And could you hold up and just show what type of room that

9   is and where it's located on your chart 2-4?  I don't know if

10  we can put them by there at the same time.

11  A   It is east office number two.

12  Q   And you will have to just point.  It's somewhat toward the

13  entry?  (Indicating.)

14  A   Yeah, relatively.

15  Q   That appears to be what type room, jpeg 49?

16  A   An examination room, the best I can say.

17  Q   And then I show you jpeg 54 and ask if you can identify it.

18  A   54 is listed as entry room G. west.  It appears to be kind

19  of the same type of room.  And if you reference this, G. west

20  says exam room.

21  Q   Then I'll show you jpeg 59, the next photograph, and ask if

22  you can identify the picture.

23  A   Entry room H. west.

24  Q   What does this appear to be?

25  A   The same type of exam room, or similar.

FBI SA ERIC LAWSON - DIRECT BY MS. GRIFFIN

1           MS. GRIFFIN:  Excuse me.

2       (A discussion was held off the record between government

3   counsel.)

4   BY MS. GRIFFIN:

5   Q   You've been referencing these past three photographs which

6   you say appear to be exam rooms as the entry to the room.

7   Could you clarify if that's the entry within the building or

8   it's not an entry from without the building?

9   A   No, ma'am.  What we mean by entry is this initial section

10  of photographs are our entry photographs.  So when we first get

11  there and we secure the location, any location, the very first

12  thing that happens is our ERT photographer takes a photograph

13  of the entire outside of the building, any adjacent buildings,

14  and every single room in the building from a few different

15  angles, most of the time, but not if it's a smaller room.  So

16  the title of these initial photographs are entry photographs.

17  Q   Meaning before the search has begun?

18  A   Yes, ma'am.

19  Q   So you are having a picture of what it looks like before

20  you do anything?

21  A   Yes, ma'am.  We want to take a photo of exactly what the

22  place looks like before we actually start searching for

23  evidence items.  So it kind of freezes in a place right when we

24  get there so we can say this is what it looked like right when

25  we showed up.

FBI SA ERIC LAWSON - DIRECT BY MS. GRIFFIN

1   Q   You're not identifying those, then, as having entrances
2   from the outside?
3   A   No, ma'am.
4           THE COURT:  Ms. Griffin, can we break for lunch at
5   this point?
6           All right.  Ladies and gentlemen, we are going to
7   break for lunch for an hour and a half today.  I do have other
8   matters I need to take up before we begin again in the
9   afternoon.  So remember my instructions to you not to talk to
10  each other or anybody else about the case.  Leave your pads on
11  your chairs and be back downstairs in the jury assembly room
12  ready to come back up at 1:30.
13          Thank you.  We're in recess.
14      (A recess was taken at 12:02 p.m.)
15      (Afternoon session, 1:35 p.m., in open court, defendants
16  and jury present.)
17          THE COURT:  All right, Ms. Griffin.
18                  DIRECT EXAMINATION CONTINUED
19  BY MS. GRIFFIN:
20  Q   Mr. Lawson, since you were on the stand, I have put next to
21  jpeg 59, the photograph you identified, Government's Exhibit
22  2-4, the chart of the location.  Can you see that?
23  A   Yes, ma'am.
24  Q   Okay.  And we've already talked about 59.  Let's turn to
25  jpeg 90 and ask you to identify it.

FBI SA ERIC LAWSON - DIRECT BY MS. GRIFFIN

```
 1   A   That's 90?

 2   Q   Yes.

 3   A   That's the entry photo for room N. west.

 4   Q   And can you show us where that room is?

 5   A   (Indicating.)  Titled dispensary.

 6   Q   Titled dispensary?  And is it here on the screen?

 7   A   Yes, ma'am.

 8   Q   Where the arrow's pointing?  And I show you a blowup of

 9   that same photograph, N, jpeg 92, and ask if that is a larger

10   picture of one portion of that dispensary room?

11   A   It is.

12   Q   And we'll turn to Exhibit 128 -- jpeg 128 -- and ask if you

13   can identify the photograph.

14   A   That's an entry photo for room V. as in Victor west.

15   Q   And can you show us where that is located?

16            THE COURT:  He can annotate directly on the screen.

17   BY MS. GRIFFIN:

18   Q   On the screen --

19   A   The screen's a little blurry to me.  Let me have a minute.

20   Okay.  V. west (indicating), it says X-ray.

21   Q   Then I'll show you Exhibit jpeg 173.

22            THE COURT:  Ms. Griffin, can you clear those arrows?

23   BY MS. GRIFFIN:

24   Q   Can you clear 128?

25            THE COURT:  You can do that on the lower left.
```

FBI SA ERIC LAWSON - DIRECT BY MS. GRIFFIN

```
 1  A   This says safe room Q. north.
 2          THE COURT:  You've got one more arrow on there.
 3          MS. GRIFFIN:  Can you take us to 173?
 4  Q   Can you identify the room that this photograph was taken
 5  in, jpeg 173?
 6  A   Q. says reception office.
 7  Q   And what does that appear to be or as you see there?
 8  A   That's a little cabinet sized Sentry safe.
 9  Q   If you'll turn to the next photograph, 175 jpeg, and ask
10  you to identify that.
11  A   175 is the open safe, room Q. north.
12  Q   The open safe that you had just seen a picture of?
13  A   Yes, ma'am.
14  Q   And we'll turn to jpeg 176, ask if you can identify the
15  exhibit.
16  A   76 is the safe in room --
17  Q   176?
18  A   Correct.  176 is the safe in room B.B. west.
19  Q   Could you show us where that room is located?
20  A   Let me find it.  B.B. west is billing (indicating).
21  Q   And the next picture, 177 jpeg?
22  A   It's that same room with the safe opened.
23  Q   The safe we just saw?
24  A   Yes, ma'am.
25  Q   Now open?
```

234

```
 1    A    Open safe, room B.B. west.
 2    Q    And I show you jpeg 179, ask if you can identify the
 3    photograph of the safe in that room.
 4    A    That is the safe in room V. west.
 5    Q    I show you picture jpeg 180, ask if you can identify the
 6    location of the photograph.
 7    A    That is the safe log, room V. west.
 8    Q    And I show you jpeg 181 and ask if you can identify the
 9    photograph.
10    A    That's the safe opened, room V. west.
11    Q    And does that box appear to have a label on it, a drug
12    label?  Is it too small for you to see?
13    A    That's too small.
14         (Ms. Griffin enlarged the image.)
15    A    Yes, ma'am.
16    BY MS. GRIFFIN:
17    Q    What is that?
18    A    Dilaudid.
19    Q    Dilaudid?  And then I show you jpeg 182 and ask if you can
20    identify the room where this photograph was taken.
21    A    That is the safe, room D. west.
22    Q    And then the next jpeg, 187, if you can identify the
23    photograph?
24    A    It's the open safe, room D. east.  You say 187?  Yeah, room
25    D. east.
```

FBI SA ERIC LAWSON - DIRECT BY MS. GRIFFIN

235

1   Q   187, is that a photograph of the inside of 182?

2   A   Yes, ma'am.

3   Q   I show you jpeg 188 and ask if you can identify it.

4   A   188 is contents of locked cabinet, room N. west.

5   Q   Have you previously had an arrow at N. west in the

6   dispensary?

7   A   N. west, yes.

8   Q   And I'll show you jpeg 189 and ask if that's the same

9   location in the dispensary.

10  A   189 is contents of locked cabinet, room N. west.

11  Q   Is that the dispensary?

12  A   N. west is the dispensary.

13  Q   And then jpeg 192, is there another photograph of the

14  dispensary?

15  A   Yes, it's the dispensary.

16  Q   Jpeg 193, is that an additional photograph of the

17  dispensary drugs?

18  A   Yes, ma'am.

19  Q   I'll skip to jpeg 215 and ask if you can identify the

20  location of this particular drug.

21  A   It's items from room D. east.

22  Q   And then we'll go to -- where is D. east?

23  A   D. east is --

24          THE COURT:  Can you clear the arrows that are already

25  on the screen, please?

```
1           THE CLERK:  Hit the Clear.

2           THE WITNESS:  Where is the Clear button?

3           THE CLERK:  (Indicating.)

4   A   D. east is titled pump nurse.

5   BY MS. GRIFFIN:

6   Q   I show you what's marked as jpeg 217, ask if you can

7   identify it.

8   A   It says items from room D. east.

9   Q   Is that the pump nurse room?

10  A   Yes, D. east is the pump nurse room.

11  Q   And further, is photograph jpeg 218 from the pump nurse

12  room?

13  A   It is.

14  Q   And photograph 219 jpeg, is it from the pump nurse room?

15  A   Yes, ma'am.

16  Q   And ask if you can tell what name is written on the bottle

17  that's on the table?

18  A   Morphine.

19  Q   Then we'll go to jpeg picture 220, ask if you can identify

20  where these objects were photographed.

21  A   220 are items from room D. east.

22  Q   And photograph 221 jpeg?

23  A   It's the same, items from room D. east.

24  Q   Then if you will turn to jpeg 243 and ask if you can

25  identify the location of that photograph.
```

1    A    243 are items from room O. west.

2    Q    Can you show us where O. west is?

3    A    Let me find it.  O. west is right there (indicating).

4    Nurse office.

5              MS. GRIFFIN:  If I may approach, Your Honor?

6              THE COURT:  All right.

7    BY MS. GRIFFIN:

8    Q    I'll show you what's been marked as Government's Exhibit

9    2-9, box one of two, and ask if you have previously seen the

10   exhibits.

11   A    Yes, ma'am.

12   Q    Can you tell from the identification label that the FBI

13   placed on these exhibits where these exhibits were seized from?

14   A    I will be, yes.

15             THE COURT:  Are you talking about all of them or are

16   you going to go through them --

17             MS. GRIFFIN:  Collectively, all of them.  If you can

18   keep jpeg 243 up, please.

19   A    This whole container, 2-9.  This is 2-9.  Box one of two.

20             This, this starts out description, item 44, which is

21   the item number that ERT gives to it.  It was labeled patient

22   files.

23             Discovery location, room O. west.

24   BY MS. GRIFFIN:

25   Q    You don't have the picture of the Subsys and the Abstral in

FBI SA ERIC LAWSON - DIRECT BY MS. GRIFFIN

1    front of you?

2    A   I have the picture of these items in the filing cabinet.

3    Q   So what's been handed to you as Government's Exhibit 2-9?

4        THE COURT:  2 dash 9?

5        MS. GRIFFIN:  2-9, excuse me.

6    Q   Do you see the items labeled the same as are labeled on the

7    photograph?

8        THE CLERK:  2-9 is not in, Your Honor.

9    BY MS. GRIFFIN:

10   Q   Will you compare 2-9 to the photograph jpeg 243?  Do you

11   have that?

12   A   Yes, these are the -- these are the same.

13   Q   Submitted Abstral, submitted LMN, Abstral approvals,

14   Abstral denials, Abstral --

15   A   Submitted -- yes, ma'am.

16   Q   Then you have several that are Subsys files.  Were they

17   taken from the location where jpeg photograph 243 was?

18   A   243?  Yes, according to that sheet that you walked off

19   with, it said room O. west.  Yes.

20       MS. GRIFFIN:  I'd move to admit Government's Exhibit

21   2-9, box one and two, Your Honor.

22       MR. ESSIG:  No objection, Your Honor.

23       THE COURT:  Mark them in.

24       When you describe these exhibits, if you will use the

25   dash so we're not -- the record doesn't show that it's 29 as

```
 1   opposed to 2-9.
 2            MS. GRIFFIN:  Thank you.  Will do, Your Honor.
 3        (Government's Exhibit 2-9 was entered into evidence.)
 4   BY MS. GRIFFIN:
 5   Q   And if you will, transfer to the next photograph, please,
 6   jpeg 255.
 7            THE COURT:  2-55?
 8            MS. GRIFFIN:  This is a jpeg photograph, 255.
 9            THE COURT:  Okay.  It's number 255.
10            MS. GRIFFIN:  That's contained in Government's Exhibit
11   2-2.
12   Q   And can you tell us where this photograph was taken?
13   A   255, item from room B.B. west.
14   Q   And can you show us where that is on your map?
15   A   B.B. west is again billing.  (Indicating.)
16   Q   Can you briefly make out what is at the top right-hand
17   corner, the words?
18   A   It says "Sam's next week."
19   Q   And I show you what's marked as Government's Exhibit 2-12
20   and ask if you've previously seen this exhibit.
21   A   I have.
22   Q   Can you tell us where those items were taken from?
23   A   Item 115, drug logbooks and prescriptions, room B.B. west.
24   Q   And that was from your FBI --
25   A   That was my ERT paperwork.
```

FBI SA ERIC LAWSON - DIRECT BY MS. GRIFFIN

1  Q   ERT paperwork?  Does that appear to be the same listing of

2  names that's shown on Exhibit 2-12?

3  A   Yes, ma'am.

4  Q   Is that a blowup to the left-hand side?

5       MS. GRIFFIN:  And if you can focus in, Mr. Cochran, so

6  we can see the top?

7  A   Yes, ma'am.

8  BY MS. GRIFFIN:

9  Q   Is there a first patient name on the exhibit I gave you,

10  2-12, the first name that appears on the screen in jpeg picture

11  255 as contained in Government's Exhibit 2-2?

12  A   It's the same.

13  Q   Were the --

14       MR. ESSIG:  May I ask counsel a question?

15       (A discussion was held off the record between counsel.)

16  BY MS. GRIFFIN:

17  Q   And you are actually looking at 2-12; is that correct?

18  A   Yes, ma'am.  Right here.  (Indicating.)

19  Q   Did you also seize what appear to be the blue pages

20  underneath that exhibit as shown on the photograph?

21  A   Yes.

22  Q   Okay.  And are those contained in Exhibit 2-12?

23  A   Yes, ma'am.  They're right here.  (indicating.)

24  Q   The physical exhibits that were seized?

25  A   Right here.

FBI SA ERIC LAWSON - DIRECT BY MS. GRIFFIN

241

1      MS. GRIFFIN:  I move to admit Government's Exhibit

2  2-12?

3      MR. ESSIG:  No objection.

4      THE COURT:  All right.  Mark them in.

5    (Government's Exhibit 2-12 was entered into evidence.)

6      MS. GRIFFIN:  If you will, Mr. Cochran, show the top

7  of this for us?

8      Thank you.

9  Q   What is the date that's shown at the top right-hand corner

10  of the beginning of this exhibit?

11  A   Top right-hand corner is 5/18/2015.

12  Q   Now, if you will, turn to the very first script that's

13  right behind that page that was seized at the same time.

14  A   Okay.

15  Q   And tell us what you see.

16  A   Effective date, 5/26/15.

17  Q   And what do those appear to be?

18  A   Prescriptions.

19  Q   Okay.  Could you hold that up so the jury could see what

20  you're referring to?

21  A   (Indicating.)

22      MS. GRIFFIN:  Madam Clerk, could you switch over so

23  we're on the ELMO?

24      THE CLERK:  I switched it.  It just takes a few

25  minutes.

242

```
 1              THE COURT:  You may have to clear your screen.
 2    BY MS. GRIFFIN:
 3    Q   I show you the second page of Exhibit 12 -- excuse me --
 4    2-12.  And this was the script you were referring to, what
 5    appeared to be a script?
 6    A   Is that the first page?
 7    Q   Yes.
 8    A   Yeah, that was the one I was looking at.
 9    Q   Does it show an effective date for the script being
10    written?
11    A   Yes, ma'am.
12    Q   What date is that?
13    A   5/26/15.
14    Q   And does that script appear to be signed?
15    A   Yes, ma'am, in the doctor's file.
16    Q   What date were these items seized?
17    A   These were seized on the 20th.
18    Q   Of May of 2015?
19    A   Yes, ma'am.
20    Q   So they were seized before May the 26th of 2015?
21    (Indicating.)
22    A   Yes, ma'am.
23    Q   And throughout this notebook, which you've previously seen,
24    are there numbers of scripts with that same effective date
25    where it appears to be signed over the name John P. Couch,
```

FBI SA ERIC LAWSON - DIRECT BY MS. GRIFFIN

1   MD?

2   A   Yes, ma'am.

3         MS. GRIFFIN:  I'd move to admit Government's Exhibit

4   12-2, Your Honor -- 2-12.

5         MR. ESSIG:  No objection.

6         THE COURT:  All right.  I thought it was already in.

7         MS. GRIFFIN:  I'll get it straight.

8         THE COURT:  It's already in.

9         MS. GRIFFIN:  And if we can go back to the jpeg

10  photographs, there are only a few more.

11        THE COURT:  They need you to switch the screen back.

12  BY MS. GRIFFIN:

13  Q   To picture jpeg 273, which is part of Government's Exhibit

14  2-2, can you identify the location where this photograph was

15  made, please?

16  A   273 is items from room B.B. west.

17  Q   And do those appear to be packages of drugs, as you can

18  tell?

19  A   They appear to be.

20        MS. GRIFFIN:  Okay.  Can we blow that up any,

21  Mr. Cochran?

22  Q   Can you tell us what types of drugs that you can read from

23  your screen?

24  A   Fentanyl.  That one there, I can't really make out the

25  names on those.

FBI SA ERIC LAWSON - DIRECT BY MS. GRIFFIN

1    Q   Okay.  And then I show you jpeg 274, ask if you can

2    identify the location of that photograph.

3    A   Same room, B.B. west.

4    Q   And if you will turn to jpeg 280, one more, and tell us if

5    you can identify the location of this photograph?

6    A   This is, again, from room B.B. west.

7    Q   And what does the orange folder state?

8    A   The orange says:  Dr. Couch scripts that need your

9    signature.

10   Q   And then last I take you to photograph 308, jpeg 308, which

11   is contained in Government's Exhibit 2-2, and ask if you can

12   identify the photograph.

13   A   308, items from room G. east.

14   Q   Could you show us where G. east is located?

15   A   That's the correct one.  (Indicating.)  Yes, ma'am, G. east

16   is Dr. Ruan's office.

17   Q   Were these items seized?

18   A   Yes, I believe so.

19   Q   And what do they appear to be?

20   A   I can't make it out that small.

21        MS. GRIFFIN:  Okay.  Could you expand it for us?

22   Q   What do those appear to be?  You don't have to read what's

23   on them.  Do you know what they appear to be?

24   A   Prescriptions?

25   Q   Yes.  I show you what's marked as Government's Exhibit 2-3

FBI SA ERIC LAWSON - DIRECT BY MS. GRIFFIN

1    and ask if you can identify the exhibit.

2    A    Okay.  Yeah, this is the prescriptions that match what's in

3    the photograph.

4    Q    The prescriptions numbered Government's Exhibit 2-3 are the

5    same as the photographs shown on the screen?

6    A    They appear to be, yes, ma'am.

7    Q    Those were seized at the time of the search?

8    A    Yes, ma'am.

9            MS. GRIFFIN:  May we switch back to the ELMO, Madam

10   Clerk?

11           Move to admit Government's Exhibit 2-3, Your Honor.

12           THE COURT:  All right.  Mark them in.

13       (Government's Exhibit 2-3 was entered into evidence.)

14   BY MS. GRIFFIN:

15   Q    I show you what was shown in the photograph and then what

16   you've identified as actually coming from the location in the

17   Springhill office as prescriptions and ask if you can identify

18   if these appear to be signed blank prescriptions?

19   A    They do.

20   Q    And does it have a dispense as written under what appears

21   to be a signature?

22   A    Yes.

23   Q    Is there a doctor's name circled at the top to show which

24   doctor's signature this is?

25   A    No, ma'am.

FBI SA ERIC LAWSON - DIRECT BY MS. GRIFFIN

246

1   Q   And then I show you throughout the book were there numbers

2   of scripts presigned that were blank with that name initialed?

3   A   That's right.

4   Q   Were there also some in that same stack that had product

5   selection permitted and dispense as written, both signed on a

6   blank script?

7   A   Yes.

8   Q   Did that appear on more than one of the signed blank

9   scripts in that exhibit?

10  A   Yes.

11  Q   And throughout the book were there some where product

12  selection was permitted and some that said dispense as written?

13  A   Yes, ma'am.

14  Q   As to the exhibit, the script at the bottom of the page on

15  this side, do you see a name circled?

16  A   Yes, that is Ruan.

17  Q   And then do you see a signature down at the bottom on

18  dispense as written?

19  A   Yes, ma'am.

20          MS. GRIFFIN:  Those are all the photographs and these,

21  Chris, can go too.

22          And I'll still be using the ELMO.  Government's

23  Exhibit 2-5, may I show it just to the witness first?

24          THE COURT:  Hold on.

25          THE CLERK:  Yes, ma'am.

FBI SA ERIC LAWSON - DIRECT BY MS. GRIFFIN

```
 1            THE COURT:  Okay.  Go ahead.
 2   BY MS. GRIFFIN:
 3   Q   Have you previously seen Government's Exhibit 2-5?
 4   A   Yes, ma'am.
 5   Q   And can you tell us where that came from at the Springhill
 6   location?  Would you like to see it?  Actually see it?
 7   A   No, ma'am.  This will do.  Item 113, billing and info and
 8   assorted docs, was discovery location room G.
 9   Q   And this was still at the Springhill location; right?
10   A   Yes, ma'am.
11   Q   Is this the script that was seized from that location?
12   A   Yes.
13   Q   Is it a blank presigned script?
14   A   Yes.
15   Q   Is there a doctor's name circled at the top of the
16   prescription?
17   A   Yes, ma'am, Ruan.
18   Q   And then is there a signature down at the bottom right-hand
19   side?  Is that right?
20   A   That's right.
21            MS. GRIFFIN:  Move to admit Government's Exhibit 2-5.
22            THE COURT:  Mark it in.
23        (Government's Exhibit 2-5 was entered into evidence.)
24   BY MS. GRIFFIN:
25   Q   I'll also show you Government's Exhibit 2-6 -- without the
```

FBI SA ERIC LAWSON - DIRECT BY MS. GRIFFIN                    248

1   jury seeing it first, please -- and ask if you can identify the

2   application for the American Society of Interventional Pain

3   Physicians, document Exhibit 2-6, as coming from 1B89.

4   A    You need to -- yes -- go back.  There you go.  Yes, this is

5   ERT item number two, document patient billing pain

6   authorization form, Dr. Ruan, and it became item 1B89.

7   Q    And that, again, is from the Springhill location?

8   A    Yes, ma'am, room B.

9   Q    And what is this, please, sir?

10  A    It's the American Society of Interventional Pain Physicians

11  lobbying contribution form.

12          MS. GRIFFIN:  Move to admit Government's Exhibit 2-6.

13          THE COURT:  All right.  Mark it in.

14      (Government's Exhibit 2-6 was entered into evidence.)

15  BY MS. GRIFFIN:

16  Q    Whose name does it appear to be in?

17  A    Dr. Ruan's.

18  Q    And is there a signature at the bottom left-hand side of

19  the membership application with the initials -- what appears to

20  be a signature?

21  A    Yes, ma'am.

22          MS. GRIFFIN:  Your Honor, may we turn the jury's

23  screen on?

24          THE COURT:  It's on, but there's always a delay.  So

25  after you introduce something and when you want it exhibited to

FBI SA ERIC LAWSON - DIRECT BY MS. GRIFFIN

1   the jury, you'll have to wait till it pops up where you can see

2   that front screen.  If you can see the front screen, the jury

3   is seeing it.  Okay?  If it's black, the jury is not seeing it.

4           MR. BODNAR:  So they can see now.

5           MS. GRIFFIN:  They can see it.

6   Q   Again, would you identify whose name this application is

7   in?

8   A   This application is in the name of Dr. Ruan.

9   Q   And is there a signature that purports to be Dr. Ruan's

10  signature?

11  A   Yes, ma'am.

12  Q   Also from the Springhill location did you seize exhibits

13  from Castle Medical, bills, and from Lamar Advertising, and

14  bills from WKRG?

15  A   In the -- yes, ma'am.

16  Q   Government's Exhibit 2-7, can you tell us where bills from

17  Castle Medical, WKRG, and Lamar Advertising were located?

18  A   Sure.  This was item 195, documents from the filing cabinet

19  seized.  Discovery location, area room L.  It became 1B252.

20  Q   Is this 1B252?

21  A   It is.

22  Q   And that came from that location of the filing cabinet at

23  the Springhill location?

24  A   That's right.

25          MS. GRIFFIN:  Move to admit Government's Exhibit 2-7.

```
 1              THE COURT:  Mark it in.
 2          (Government's Exhibit 2-7 was entered into evidence.)
 3  BY MS. GRIFFIN:
 4  Q   Government's Exhibit 2-8, I will show to you on the ELMO.
 5              THE COURT:  Has this been admitted?
 6              THE CLERK:  No, ma'am.
 7              MS. GRIFFIN:  It has not.  I would like to just show
 8  it to him.
 9  Q   2-8?
10  A   Yes, ma'am.
11              MS. GRIFFIN:  It has been admitted as a different
12  number, Your Honor.  Let me make this 213 -- 2-13.
13  Q   And ask if you can tell us where the items in 1B199 came
14  from at the Springhill location.
15  A   Discovery location, room bravo bravo, which is B.B. west.
16  Q   And what type items were discovered there?
17  A   This was item 115, drug logbooks and prescriptions.
18  Q   And have you previously examined certain select items
19  pulled from that location?
20  A   Yes, ma'am.
21  Q   That are contained in this Exhibit, 2-13?
22  A   I believe so.
23  Q   Did those items come from the Springhill location?
24  A   Yes, ma'am.
25              MS. GRIFFIN:  We move to admit Government's Exhibit
```

1    2-13, Your Honor.

2           THE COURT:  All right.  Mark them in.

3        (Government's Exhibits 2-13 was entered into evidence.)

4    BY MS. GRIFFIN:

5    Q   And did this also contain scripts signed -- appeared to be

6    signed by John Couch?

7    A   Yes, ma'am.

8    Q   And there were numbers of those prescriptions contained

9    here in; is that correct?

10   A   Yes, ma'am.

11          MS. GRIFFIN:  Is it published to the jury?

12          THE COURT:  We've switched it, but it hasn't come on

13   yet.  So you have to wait till you see it.

14          THE WITNESS:  There it is.

15          THE COURT:  There you go.

16   BY MS. GRIFFIN:

17   Q   Did this contain several scripts signed by John P. Couch or

18   appearing to be signed by John P. Couch?

19   A   It did.

20   Q   I show you Government's Exhibit 2-10.  1B213 is your FBI

21   identification number.

22          MS. GRIFFIN:  And if I might, Madam Clerk, show this

23   to the witness first?

24   Q   And ask if you have examined these items taken from the

25   Springhill location, miscellaneous financial records from

FBI SA ERIC LAWSON - DIRECT BY MS. GRIFFIN

1    1B213.

2    A    Yes.

3    Q    Where were these items taken from, please?

4    A    Area, room B. east.

5    Q    There in the Springhill location?

6    A    Yes, ma'am.

7    Q    Have you previously examined the exhibits?

8    A    Yes, ma'am.

9    Q    And do they contain what appear to be check stubs --

10   A    Yes.

11   Q    -- for Dr. Couch?

12   A    Yes.

13   Q    A letter to Dr. Couch?

14   A    Yes.

15   Q    A bill from a CPA?

16   A    Yes.

17   Q    And a letter from the Physicians Pain Specialists of

18   Alabama, appears to be signed by Dr. Couch?

19   A    Yes.

20          MS. GRIFFIN:  Move to admit Government's Exhibit 2-10.

21          THE COURT:  All right.  Mark it in.

22     (Government's Exhibit 2-10 was entered into evidence.)

23          THE COURT:  All right.  Are you going to show that to

24   the jury?

25          MS. GRIFFIN:  Yes, Your Honor, if I might publish it

FBI SA ERIC LAWSON - DIRECT BY MS. GRIFFIN

1    to the jury.

2    Q    Government's Exhibit 2-10, could you tell us what the first

3    page appears to be?

4    A    That's a check.

5    Q    Is it a check or a check stub?

6    A    Stub to Dr. Couch.

7    Q    And what does it say under the comment?

8    A    Live speaker training D.C.

9    Q    And what is the amount of payment?

10   A    Check total says $3,750.

11   Q    And that check stub is attached to a letter from whom?

12   A    Insys Therapeutics.

13   Q    Insys Therapeutics?

14   A    Insys, yes.

15   Q    Then I show you a bill from a CPA?

16   A    Yes, ma'am.

17   Q    Is that correct?

18   A    That's right.

19   Q    Who is that bill to?

20   A    It's to Physicians Compounding Solutions, Inc.

21   Q    And I show you last a letter that appears to be dated what

22   date?

23   A    November 27th, 2013.

24   Q    And who does it appear to be signed by?

25   A    Dr. Couch.

1   Q   And this pertains to E*Trade?  Does that appear?

2   A   That's at the top, yes.

3           MS. GRIFFIN:  Your Honor, might I have one moment with

4   defense counsel?

5           THE COURT:  Yes.

6       (A discussion was held off the record between counsel.)

7   BY MS. GRIFFIN:

8   Q   I show you Government's Exhibit 2-12 and ask if you can

9   identify these as Blue Cross/Blue Shield records that were

10  seized from the Springhill location.

11          THE CLERK:  Your Honor, something --

12          THE COURT:  Yeah, hold on.  There's no description on

13  your exhibit list of what 2-12 is.  Is that different than

14  2-11 -- 2-11?

15          MS. GRIFFIN:  It is.  I'm sorry, Your Honor.  It's

16  2-11 -- 2-11.  I said 2-12.

17          THE COURT:  Right.  It's 2-11.

18          MS. GRIFFIN:  2-11.

19          THE COURT:  All right.

20  BY MS. GRIFFIN:

21  Q   Now, can you tell us?

22  A   That's 2-11, that is -- do you want the description of it?

23  Q   Please.  Did you seize it from Springhill?

24  A   We did.

25  Q   And where was it from?

FBI SA ERIC LAWSON - DIRECT BY MS. GRIFFIN

1  A   Originally, it says discovery location, room E. east.  The

2  description is from a folder titled documents 003-Blue

3  Cross/Blue Shield correspondence, split from -- that's an echo

4  number, so that would be a bar code number E59208301.

5  Q   And these items from Blue Cross/Blue Shield were seized at

6  PPSA on Springhill?

7  A   Yes, ma'am.

8       MS. GRIFFIN:  Move to admit Government's Exhibit 2-11,

9  Your Honor.

10       MR. ESSIG:  Your Honor, may I have a moment to take a

11  look at the document?

12       THE COURT:  Yes.

13       MR. ESSIG:  Your Honor, I object to the admission of

14  these documents with this witness.  My understanding, there are

15  going to be people from Blue Cross/Blue Shield here that can

16  lay the foundation for these documents.  But they haven't yet.

17  We object.

18       MS. GRIFFIN:  Your Honor, they were seized from the

19  Springhill pharmacy, they are documents sent to PPSA from Blue

20  Cross/Blue Shield.

21       THE COURT:  Since they were seized from the

22  defendant's place of business, I think they are admissible.

23       MS. GRIFFIN:  We would move to admit and publish them

24  to the jury, Your Honor.

25       MR. ESSIG:  Your Honor, I still think they are hearsay

1    until somebody vouches that they were kept in the regular

2    course.

3           THE COURT:  They were seized from the defendant's

4    place of business, so I think they are admissible.

5           MR. ESSIG:  We -- we maintain our objection, Your

6    Honor.  But I understand.

7           THE COURT:  All right.  Go ahead.  They are admitted.

8           MS. GRIFFIN:  And may we show these to the jury,

9    please?

10          THE COURT:  Yes.

11      (Government's Exhibit 2-11 was entered into evidence.)

12   BY MS. GRIFFIN:

13   Q  Government's Exhibit 2-11, in addition to some various

14   paperwork, does it contain some documents from Blue Shield --

15   that purport to be from Blue Shield -- Blue Cross/Blue Shield?

16   A  Yes, ma'am.

17   Q  And are those patient accounts, denial amounts and paid

18   amounts?  Let me turn it so we can all see.

19   A     Patient -- yes, ma'am.

20          MS. GRIFFIN:  And one more.  Madam Clerk, what is the

21   next number, 2-14?

22          THE CLERK:  Yes, ma'am.

23      (Government's Exhibit 2-14 was entered into evidence.)

24   BY MS. GRIFFIN:

25   Q  Government's Exhibit 2-14, I show you what you've

1  previously been -- been shown, business records seized from the

2  Springhill pharmacy, and ask if you can tell us the location of

3  these documents from item number 171, 1B171.

4  A   1B171 came from --

5  Q   Hold on just one second.  This is the FBI's identification

6  number, 1B171?

7  A   Yes.

8  Q   It's Government's Exhibit Number 2-14.

9  A   2-14; correct.  It is from discovery location, room Q.

10 west.

11 Q   In PPSA on Springhill Avenue?

12 A   Yes, ma'am.

13 Q   And --

14       THE COURT:  Ms. Griffin, you have several times

15 referred to it as Springhill Pharmacy.  Is this different from

16 the doctor's office location?

17 MS. GRIFFIN:

18 Q   This is all from the Springhill clinic; is that correct?

19 A   Yes.

20       THE COURT:  You've called it pharmacy, so I was

21 confused.

22       MS. GRIFFIN:  Let me clarify that.

23       THE COURT:  All right.

24 BY MS. GRIFFIN:

25 Q   Mr. Lawson, is everything I have shown you from the

FBI SA ERIC LAWSON - DIRECT BY MS. GRIFFIN

1   Springhill PPSA clinic?

2   A   Yes, that was my -- the clinic was my search location.

3   Q   You did not search the Airport location of PPSA?

4   A   No, ma'am.  Everything that I've done, this whole packet,

5   all my evidence was from Springhill.

6   Q   And you did not participate in the search of C&R Pharmacy

7   that is located next door to the PPSA clinic on Airport; is

8   that right?

9   A   Correct.  Everything was in the clinic building.

10  Q   So everything you've testified to that begins with the

11  number two, 2-1 through 2-14, came from the Springhill clinic;

12  is that right?

13  A   Yes, ma'am.

14  Q   I show you Government's Exhibit 2-14, and if you would

15  identify the room these came from and ask if you can identify

16  the exhibit?

17          MR. KNIZLEY:  Your Honor, I also object to the hearsay

18  and relevance.

19          THE COURT:  Well, I can't tell yet whether or not they

20  are relevant.  But since I'm assuming that -- why don't you

21  step forward, Ms. Griffin, tell me what they are.

22      (At the side bar, jury not present.)

23          MR. KNIZLEY:  Your Honor, if I may, I appreciate --

24          MS. GRIFFIN:  May I tell her?

25          MR. KNIZLEY:  Go ahead.

259

1          MS. GRIFFIN:  These are payment records where Insys

2    Therapeutics has paid C&R Pharmacy but they are seized from the

3    clinic on Springhill Avenue, not from C&R Pharmacy.  But they

4    were located within that and they are within their billing

5    department records.

6          MR. KNIZLEY:  Judge, I appreciate what they purport to

7    be.  But no one has said that's what they are.

8          THE COURT:  Well --

9          MR. KNIZLEY:  And secondly, Judge, the simple fact of

10   seizure means they got them.  We still have the other issues of

11   whether it is a hearsay document, whether it is relevant to the

12   issues in the case, whether it is an authentic document.  The

13   mere fact it came from a locality in and of itself does not

14   give rise to admissibility.

15         MS. GRIFFIN:  Your Honor, these were in their records

16   where they had received monies.  It goes to the motive that we

17   are attempting to show.

18         THE COURT:  I think it's admissible.  So --

19         MR. KNIZLEY:  That's my objection.

20         THE COURT:  Okay.

21      (Counsel left and returned to side bar, jury not present.)

22         MR. KNIZLEY:  Your Honor, also I'll object as each

23   document comes in, if you would prefer I do it that way.  Or if

24   you -- this line of questioning, seized documents from this

25   locality, my objection is to the hearsay, relevance and --

FBI SA ERIC LAWSON - DIRECT BY MS. GRIFFIN

1           THE COURT:  Well, I think you'd better object

2    individually.

3           MR. KNIZLEY:  I will.

4           THE COURT:  But you can say -- I mean, if she attempts

5    to introduce, you know, one of the clerical employees'

6    daughter's birthday card or something, I would say that's not

7    relevant.

8           MR. KNIZLEY:  I understand, Judge.  But what it

9    purports to be, we've had nobody say that's what it is.  And it

10   comes from --

11          THE COURT:  Well, I understand that.  But it's in

12   their records that they maintain at their business and it goes

13   to the weight.  If they don't show what it is eventually, then

14   it doesn't mean much.  But the fact that it was seized from

15   their place of business and pertains to the business that they

16   are running, I think it's admissible.

17          MR. KNIZLEY:  And I think it's a little cloudy, if it

18   was seized from their records.  It was at a locality that was

19   searched and picked up and no one said this is where the

20   billing records were kept, this is where these records were

21   kept, and these were kept in the normal course of the business.

22          THE COURT:  That goes to the weight of it, not

23   admissibility.

24          MR. KNIZLEY:  That's it.  And you would like me to

25   object one by one?

FBI SA ERIK LAWSON - DIRECT BY MS. GRIFFIN

1          THE COURT:  Well, group by group.

2          MR. KNIZLEY:  Yes.

3          MS. GRIFFIN:  This is the last group.

4          MR. KNIZLEY:  Okay.

5      (In open court, defendants and jury present.)

6   BY MS. GRIFFIN:

7   Q   Mr. Lawson, can you see the exhibit?

8   A   I do.

9   Q   And you've identified where it came from.  Can you tell us

10  what the first page of Exhibit 2-14 appears to be?

11  A   It's a payment record, C&R Pharmacy, LLC.  Payment amount

12  total, $121,361.47.

13  Q   And who does it appear to be paid to, please, sir?

14  A   Paid to Insys Therapeutics.

15  Q   And I show you the second page of that same exhibit.

16          MS. GRIFFIN:  Oh, may we publish it to the jury now,

17  Your Honor, that it's admitted?

18          THE COURT:  Yes.  It will take it a minute.

19          MS. GRIFFIN:  Let me go back to the first page.

20  Q   You testified that it appears to be a C&R check to Insys

21  Therapeutics in the amount of $121,361?

22  A   Yes, ma'am.

23  Q   And does its show a date on that payment?

24  A   Payment date, 12/3/2014.

25  Q   And I show you the second page and ask if this is an

FBI SA ERIC LAWSON - DIRECT BY MS. GRIFFIN

1  invoice?

2  A   Yes, ma'am.

3  Q   From?

4  A   Insys Therapeutics.

5  Q   And billed to?

6  A   C&R Pharmacy.

7  Q   And is this in -- what amount is the bill?

8  A   That amount, 130,496.20.

9  Q   And what date does this appear to have been ordered and

10 shipped?

11 A   Date shipped is 12/3/2014.

12 Q   And this was -- this was seized from the Springhill clinic;

13 is that right?

14 A   Yes.

15 Q   Not the pharmacy?

16 A   Not the pharmacy.

17         MS. GRIFFIN:  That's all I have of this witness at

18 this time, Your Honor.

19         THE COURT:  All right.  Mr. Essig?

20         MR. ESSIG:  Yes, Your Honor.  It's going to take me a

21 minute to sort of gather the -- we don't have copies of all

22 these exhibits.  It will take me a minute to gather them all.

23 So if I could just have a moment?

24         MS. GRIFFIN:  Your Honor, they do have copies.  They

25 weren't provided a duplicate set today.

FBI SA ERIC LAWSON - CROSS BY MR. ESSIG

1        THE COURT:  They may not have immediate access to them

2    in front of them, though.  So you're welcome to use the

3    originals.

4        MR. ESSIG:  Yes, Your Honor.  May I approach?

5        THE COURT:  Sure.

6        MR. ESSIG:  I think I'm ready, Your Honor.

7        THE COURT:  All right.  Whenever you're ready.

8                     CROSS EXAMINATION

9    BY MR. ESSIG:

10   Q   All right.  Agent Lawson, good afternoon.  How are you

11   today?

12   A   Good.  How are you?

13   Q   Good.  My name is Brandon Essig.  I represent Dr. Couch.  I

14   don't think we've ever met before.

15   A   Afraid not.

16   Q   Now, Agent Lawson, on this date -- I just want to just for

17   clarification's sake -- there was a search warrant being

18   executed at the Springhill location of PPSA; is that right?

19   A   That's correct.

20   Q   And how many search warrants have you done in your career?

21   A   A lot.  I haven't kept track.

22   Q   I mean, more than a dozen?

23   A   Well more than a dozen.

24   Q   Maybe even more than a hundred?

25   A   That's close.

264

1  Q   And the FBI, you've got standard SOPs, standard operating

2  procedures, that you follow when you conduct a search warrant;

3  is that right?

4  A   They are not SOPs like you use in the military, but you

5  have -- you have a standardized packet of information that you

6  use and fill out for a search.

7  Q   Sure.  And that, that standard operating procedure so to

8  speak, it's going to vary a little bit -- you know, if you're

9  going to do a raid on, you know, a violent drug dealer's house,

10  that's going to vary a little bit from when you're doing a

11  search warrant with businesses; is that right?

12  A   That's right.  We have authority to adapt to whatever

13  circumstances we're dealing with.

14  Q   Sure.  I mean, the FBI, you investigate everything from

15  violent street gangs to fraud and that sort of thing?  Isn't

16  that right?

17  A   That's right.

18  Q   And on this particular occasion -- but there are certain

19  things you always do.  You mentioned that you established

20  security when you got in the facility; is that right?

21  A   That's right.

22  Q   And that's something you're going to do and it doesn't

23  matter where you're searching?  That's going to be every single

24  time?

25  A   That's right.

1    Q    I mean, every single search warrant you do, you're going to

2    secure the perimeter, once you go into the facility, whether

3    it's a forced entry or whether you just knock on the door and

4    walk through -- you're going to go through that facility again,

5    no matter where it is, to make sure there are no threats to the

6    other agents that are going to be following...(inaudible)?

7              THE REPORTER:   Following alone?

8    BY MR. ESSIG:

9    Q    Following behind.  Is that correct?

10   A    We do that -- one caveat to that is we don't do security if

11   we -- if we come to do a search warrant on a site that has

12   already been secured --

13   Q    Sure.

14   A    -- by other law enforcement.  But yes, law enforcement,

15   FBI, we do do that.

16   Q    Some of it you do.  If four agents go into that building,

17   four people participating in the search warrant go into that

18   building to search, you always take those security steps for

19   protection?

20   A    Yes.

21   Q    And early on in your examination you referred to the PPSA

22   clinic as a crime scene; is that right?

23   A    I don't think I did.

24   Q    I wrote it in my notes.

25   A    No.  I think what you're referring to, when I was asked

```
 1   what is the ERT.
 2   Q   Right?
 3   A   ERT can be -- another way to put it, we're the FBI's crime
 4   scene unit.
 5   Q   Okay.
 6   A   But it's going to be called crime scene or evidence
 7   response team.
 8   Q   Okay.
 9   A   So we -- our primary task is to do evidence recovery for
10   anything that has forensic material, whether it be a like a
11   whodunnit type case, kidnapping, or way more complex scenes
12   like if you remember a few years ago over in Dothan that man
13   who snatched the kid and went down into the bunker.
14   Q   Uh-huh?
15   A   That type of scene, we did that scene.
16   Q   Sure.
17   A   That's our main task.  But because we have more training,
18   we have -- we assist other squads and handle the more complex
19   or multi-location big searches for a fraud case or any other
20   one.
21   Q   And if I understand, it sounded to me like during the
22   course of this search warrant for your unit what you're doing
23   there that particular day is that you guys weren't necessarily
24   participating in the investigation or the analysis of the
25   evidence.  I mean, you're going there to the scene, you're
```

1    responsible for collecting the evidence, making sure you get a

2    good record like you've gone through on direct examination of

3    where you find the evidence, you're getting good photographs of

4    the scene; is that right?

5    A    That's right.

6    Q    I mean, and you're -- it's really sort of scene integrity;

7    right?  Protection, the integrity of all the evidence that's

8    going to be seized; is that correct?

9    A    That's correct.

10   Q    So, I mean, you're essentially -- I mean, you're just kind

11   of finding stuff where it is; is that right?

12   A    That's accurate.

13   Q    Okay.  Now, one of the things I want to talk about -- and

14   again, please understand, I'm not -- this is not -- when you

15   take these photographs that we've seen, that the jury's been

16   shown in this case, sometimes, you know, if you need to take a

17   photograph, you either move stuff around so you can see where

18   it is; is that right?  Would that be fair to say?

19   A    Yes.

20   Q    Again, I'm not trying to imply that there's anything like

21   improper manipulation of the evidence.  Just common sense.

22   Like for some of these prescription boxes, if it's laying face

23   down, you've got to stand it up to be able to take that

24   photograph; isn't that right?

25   A    Yes.

1    Q   Because in this case we saw -- like going through for all
2    of the safes, you mentioned a number of safes and a number of
3    locked closets; is that right?  You found a number of those in
4    this case?
5    A   Right.
6    Q   And in those photographs -- I mean typically, from my
7    perspective, it looked as if you took one photograph when you
8    go in the room of the closed locked-up safe; is that right?
9    A   We'll take an overall picture of the room, then it's
10   like far, medium, close --
11   Q   Sure.
12   A   -- is the way to describe it.  Picture of the room, you see
13   the safe, take a picture of the safe.  You get the safe open,
14   you take a picture of the contents of the safe.  If you need a
15   closeup of the contents of the safe, then you go that much
16   further.
17   Q   And that was sort of my point.  I'm just trying to make
18   sure you do that for days like today; right?  So everybody can
19   sort of understand what you did, the integrity of what you did,
20   and what you found or where you found it?
21   A   Right.
22   Q   And so because the point I want to make is on direct
23   examination there were several references to opening a safe,
24   pictures of an open safe and pictures and references to -- your
25   testimony was in this room we found an open safe; isn't that

1  right?

2  A   I was simply reading the photo log description for that

3  specific photo she was showing me.  But yes, it was an open

4  safe.

5  Q   Okay.  And that testimony in reference to an open safe,

6  that's not a safe -- those weren't safes you found open or

7  cabinets you found open, those were ones that were locked?  I

8  mean, that you guys unlocked them so you could take the

9  photograph?

10  A   I believe that's right.

11       MR. ESSIG:  And in some of these photographs -- as a

12  matter of fact, if we could go to -- Deborah, can y'all pull up

13  273 and 74, please?  Start with 273.

14       THE COURT:  It will take a minute for the --

15       MR. ESSIG:  Yes, ma'am.

16  Q   Like that photograph there -- again, not trying -- I'm not

17  trying to imply anything improper -- but that looks like the

18  prescriptions were arranged so that you could adequately see

19  what you were getting a picture of?

20  A   That's what it appears.

21       MR. ESSIG:  The same thing for 274?  Please show

22  us that picture.

23  Q   The same thing there?  Those look like they've been

24  arranged in some way so that you can get an accurate picture of

25  what you're finding?

1  A   It could be.

2  Q   Okay.  So, I mean, I guess my point is for 273 and 274,

3  it's not your testimony here today that that's the condition

4  you found those prescription bottles?  I mean, you don't know,

5  do you?

6  A   I don't.  I didn't take these photos.  I'm going off of the

7  log and the photos themselves.

8  Q   Right.  Okay.  And again, that's --

9  A   If necessary, you can arrange an item -- once you take it

10 in place, you can then arrange it to fill the screen or get

11 them all together.

12 Q   Right.  And I understand.  Please, I understand.  I am not

13 -- I'm not saying you guys manipulated anything.  I'm not

14 saying you did anything improper.  I just want the jury to

15 understand these two photographs don't necessarily represent

16 where these items were specifically when they were found?  It

17 could have been arranged differently?

18 A   Perhaps.

19 Q   Yeah, it could have been found in another part of the room

20 and they just put them in one spot so you could get a good

21 photo?

22 A   Yes.  I don't have every photo in its --

23 Q   You just don't know one way or the other?

24 A   Yes.

25       MR. ESSIG:  That's all I'm trying to say.

FBI SA ERIC LAWSON - CROSS BY MR. ESSIG

1           Just a minute, Your Honor.

2           Deborah, can y'all bring up your photograph of 2-12,

3    please?

4           MS. GRIFFIN:  2-12 was shown on the --

5           MR. ESSIG:  That one there.  (Indicating.)  Your

6    Honor, may I approach?

7           THE COURT:  Yes.

8    BY MR. ESSIG:

9    Q   Agent Lawson, I just want to -- the jury's got a picture

10   there.  This is -- this is 2-12; is that correct?

11   A   Yes, this is item -- yes, 2-12.

12   Q   Okay.  I think, as you testified on direct, 2-12, the first

13   couple of pages here, just says Sam's -- we don't know what

14   that means yet, do we?

15   A   I'm just reading what it says.

16   Q   Sure.  Sam's next week.  Then we've got two pages -- well,

17   we have about a page and a third of names, patient names, looks

18   like patient names listed; is that right?

19   A   That's right.

20   Q   And for each one of these patient names, if you go to the

21   second column there, it says appointment type.  Do you see that

22   column?

23   A   Yes.

24   Q   And if you review that, it looks like there's just two

25   types of appointments; there's an established patient and a

FBI SA ERIC LAWSON - CROSS BY MR. ESSIG

1    worker's compensation patient; isn't that correct?

2    A    That's right.

3    Q    Okay.  And then you've got -- it's not the way they were

4    found.  This photograph shows the way they were found

5    (indicating).  They obviously weren't in these plastic cases.

6    A    That's right.

7    Q    Okay.  But attached to that page and a third sheet of list

8    of patients and the appointment type were these prescriptions

9    that Ms. Griffin referred to; is that correct?

10   A    All I can tell you, it appears that that highlighted sheet

11   was on top of them.

12   Q    Okay.  Yeah.  And if we look there on 2-12, the photograph

13   on the right, you can see at the top right-hand corner there

14   looks like there's a binder clip.  It's clipping this paper to

15   these prescriptions; correct?

16   A    That's correct; right.

17   Q    And if we look at these again, if we look on there for

18   almost every single one of these patients and the appointment

19   type, it says that they are an established patient; isn't that

20   what it says?

21   A    Correct.

22   Q    Meaning you're just reading the document?

23   A    Correct.

24   Q    None of these say new patient, do they?

25   A    No.

FBI SA ERIC LAWSON - CROSS BY MR. ESSIG

1  Q   None of these say new patient appointment, do they?

2  A   No.

3  Q   None of these patients say that they are a new referral, do

4  they?

5  A   No.

6       MR. ESSIG:  Now, if we go to -- let's take the -- can

7  I have the ELMO, please, Mary Ann?

8  Q   If we go to -- I'm just going to pull out what is the first

9  prescription of 2-12.  And there at the top we see a patient

10 name; is that correct?

11 A   That's right.

12 Q   We see his address?

13 A   Correct.

14 Q   We see his date of birth?

15 A   Correct.

16 Q   And we see, of course, there at the top that the business

17 that is issuing this prescription is PPSA Springhill; is that

18 correct?

19 A   Correct.

20 Q   And then there at the very bottom we see a -- we see a

21 signature?

22 A   Correct.

23 Q   At the bottom of each of those?

24 A   Correct.

25 Q   And again, it's above the name John P. Couch?

FBI SA ERIC LAWSON - CROSS BY MR. ESSIG

1   A   That's right.

2   Q   Now, do you see there under the Rx symbol for prescription?

3   A   Yes.  The little description?

4   Q   Yes.

5   A   Yes.

6   Q   And on the first one -- or the one on the left there,

7   methadone oral tablet of 10 milligrams.  And it gives some

8   directions on how to take it.  Now, the prescription, the

9   effective date of this prescription, is May 26 of 2015; is that

10  correct?

11  A   That's what it says.

12  Q   But the instruction on the prescription is that this

13  prescription cannot be filled until June 25th of 2015; isn't

14  that correct?

15  A   Tablet, do not fill before 6/25/15; correct.

16  Q   Okay.  And if we look over to the one on the right, it's

17  for a different medication, but the dispensary -- I don't even

18  know the right word -- but the instructions on when this

19  prescription can be filled is the same; isn't that right?

20  A   Same date.

21  Q   Yeah.  Same date.  Can't be filled before June 25th of

22  2016; is that correct?

23  A   Yes.

24  Q   Now, if we go back to -- if we go back to this document

25  that appeared to have been binder clipped to those

1   prescriptions in 2-12, if we look at it again, going left to

2   right, we've got appointment time, we've got patient name,

3   we've got appointment type, and then we've got a resource.  And

4   in the column of resource there's a name, Ben Clark, and then

5   an acronym, CRNP; isn't that correct?

6   A   Yes.

7   Q   And if we read all the way down that sheet, the resource

8   for that prescription or -- excuse me -- for that appointment

9   is Ben Clark, CRNP?

10   A   That's right.

11   Q   And if we go to the next page, again, this is that what we

12   mentioned that's like a page and a third?

13   A   I understand.

14   Q   This is the other piece of that page; is that right?

15   A   That's right.

16   Q   And the same thing there:  The resource for all of the

17   appointments listed here is Ben Clark, CRNP?

18   A   Correct.

19   Q   And you don't know the significance of the resource for --

20   A   I have no idea.

21   Q   Now, I don't know, Agent Lawson.  Have you done -- again,

22   we talked about I know your job is not analysis of the

23   evidence.  It's really just collection integrity.  But have you

24   looked to see whether the prescriptions that are signed here in

25   this binder match the patient list --

276

 1  A   I have not.

 2  Q   -- by flipping through it?

 3         MR. ESSIG:  Deborah, do y'all have a photograph just

 4  of this?  (Indicating.)

 5         MS. GRIFFIN:  It is in the front of 2-1.

 6         THE WITNESS:  I've got that.

 7         MS. GRIFFIN:  It's up with the witness.

 8         MR. ESSIG:  Let's trade.

 9         THE WITNESS:  Okay.

10  BY MR. ESSIG:

11  Q   As Ms. Griffin said, that diagram that you have there,

12  you've got a blowup of the diagram; is that right?

13  A   Yes.

14  Q   Okay.  And what's the exhibit number of the document you're

15  looking at?

16  A   2-4.

17  Q   This what I'm going to show you looks like the original.

18  A   It should be.

19  Q   2-1.  And what you've got -- what you've got up there is a

20  single sheet; is that right?

21  A   I've got -- yeah, I've got a copy of both pieces in a

22  single sheet.

23  Q   This one is on two sheets; is that right?

24  A   The original?

25  Q   Yeah.

1   A   That you have.

2   Q   Two sheets.  Okay.  It's just going to make this a little

3   bit more difficult.  Our copies aren't exactly the same.  What

4   was the reason for having to put this sketch or this building

5   on two separate sheets?  Why did you have to do that?

6   A   It was a long building that -- to do a -- I mean, really

7   it's just -- it was a long building and the sketcher, to get it

8   somewhat dimensional -- remember, none of these are to scale.

9   Q   Sure.

10  A   But to get it well done and to fill it all in correctly,

11  she needed two sheets.

12  Q   Got you.  So you want the integrity of what you guys are

13  doing there that day with the evidence, to get good solid --

14  it's a big place -- you needed two sheets?

15  A   You need it to be legible.

16  Q   Right.

17  A   If you crammed this long building on one sheet, it would be

18  too small and not useful.

19  Q   Yeah.  And I'm not questioning your decision to put it on

20  that.  But the point is it's a pretty large medical office that

21  you guys went through that day?

22  A   That's right.

23  Q   Now, if we look at what I'm going to call the first page of

24  2-12, of the original drawing -- and we'll kind of start with

25  the entrance here.  If you go there, at the very bottom of the

278

1    first page of the original drawing, it's labeled north lobby;

2    is that right?

3    A    Yes.

4    Q    Okay.  And then as you walk into the building, there's a

5    reception area; correct?  (Indicating.)

6    A    Yeah, uh-huh (nodding head affirmatively).

7    Q    I'm sorry, you've got to give a yes or no.

8    A    I'm sorry, yes.

9    Q    And then past the reception office there's a billing area?

10   A    That's correct.

11   Q    Then there's a lab area?

12   A    Yes.

13   Q    Okay.  And then as we keep going back, there is an X-ray

14   room right there; is that correct?

15   A    That's right.

16   Q    And actually it looks like we would go to sheet two.  So

17   it's sort of the -- the last room we can see on the first sheet

18   is the last two rooms, I guess, or last three rooms, the west

19   X-ray room, there's a west private room, and then there's a P.

20   east exam room; is that correct?

21   A    That's right.

22   Q    So if we go to the second sheet, it's where the bottom

23   portion of the second page shows those rooms again; is that

24   correct?

25            THE COURT:  You need to be looking at what's on the

1  screen.

2  A   This is the top of the second one, G. east?

3  BY MR. ESSIG:

4  Q   Well, it's --

5  A   Yes.

6  Q   Okay.  All right.  That's why I'm trying to make sure.  We

7  don't have two of those.  That's just relabeling, so we've got

8  the right perspective.

9  A   Yeah, that overlaps.

10  Q   So at that point in time, as we go through the front door,

11  we see the lobby, we see the receptionist area, we see the

12  reception offices, we've seen the billing area, we've seen a

13  lab.  And now we've seen -- again, if we go here, we've seen an

14  X-ray room, we've got this private room, and then as we go down

15  and up here again we've got an MRI changing room right there;

16  is that correct?  (Indicating.)

17  A   Yes.

18  Q   Then we've got another MRI changing room; is that correct?

19          MS. GRIFFIN:  Your Honor?  If we might, these

20  obviously speak for themselves and the jury will have those

21  with them and it is truly beyond the scope to identify every

22  room.

23          MR. ESSIG:  Your Honor, I agree the documents speak

24  for themselves.  The government spent a tremendous amount of

25  time on direct examination having the agent get into the

1  content of the documents.  We just want to be able to do the

2  same.

3          THE COURT:  I agree.  But there are plenty of those

4  rooms that he didn't say one thing about that is really beyond

5  the scope of his direct examination.

6          MR. ESSIG:  Your Honor, a couple of more questions and

7  then I'll finish.

8          THE COURT:  All right.

9  BY MR. ESSIG:

10  Q  All right.  So if we go beyond the MRI changing room, we've

11  got an east MRI control room above that?

12  A  Correct.

13  Q  And then above that we've got a fairly large northeast MRI

14  room?

15  A  Right.

16  Q  And then surrounding, sort of on the -- I guess those are

17  the east and west wings of the building, surrounding the

18  hallways there -- there's a series of multiple exam rooms and

19  offices?

20  A  Correct.

21  Q  Did you see the MRI machine that day when you were in

22  there?

23          MS. GRIFFIN:  Objection as to relevance, Your Honor.

24  He's identified the room.

25          THE COURT:  Is there any relevance to this case,

FBI SA ERIC LAWSON - CROSS BY MR. ESSIG

1  whether or not this witness saw the MRI machine?

2         MR. ESSIG:  Your Honor, I mean, I don't know that

3  there's any relevance to the fact this witness saw the stuff

4  that was in the photographs either.  But it's the same type

5  thing.  I just want to know --

6         THE COURT:  Well, there's been no testimony about it.

7  So let's stick to whatever he testified to on direct

8  examination for your cross-examination.

9         MR. ESSIG:  Yes, ma'am.

10 Q   Now, Agent Lawson, one of the things you did testify to on

11 direct is a reference to some medications that were found in a

12 pump room.  Do you remember that, talking about the pump room?

13 A   Refresh me.  Which exhibit was it?

14        MR. ESSIG:  Let's see.  If you could bring up, please,

15 photograph 218?

16 Q   Do you remember that?  You have on your diagram.  I don't

17 know you -- you identified it as the pump room on direct?

18 A   You had -- you have the packet that I would be able to

19 identify that from.

20        MR. ESSIG:  Your Honor, may I approach?

21        THE COURT:  Yes.

22        THE WITNESS:  Is that 2-1?

23        MR. ESSIG:  Yes.

24 A   What are you asking me?

25 BY MR. ESSIG:

FBI SA ERIC LAWSON - CROSS BY MR. ESSIG

282

1  Q   I was asking you about your direct examination testimony

2  that you found items in a pump room.  I just want to know how

3  you identified them.

4  A   Hold on a second.

5        This was photo 218, which is labeled items from room

6  D. east.  D. east on the sketch was labeled pump nurse.

7  Q   Okay.  All right.  Again, with this photograph, kind of the

8  same thing as the other ones -- I mean, your testimony here

9  today is the photograph accurately depicts what it depicts?

10 A   Yes.

11 Q   Right.  But, I mean, in terms of where these items were

12 located when agents entered the room and decided to take

13 photographs, they could have been moved to where they are?

14 A   I can't tell you from this picture, this alone.

15 Q   Right.  You don't know where these items in the photograph

16 were when they were found?

17 A   Right.

18 Q   Okay.  Now, Agent Lawson, also -- again, pump room, in

19 addition to X-ray room, in addition to the other examination

20 rooms, you testified there was a pump room in the clinic; is

21 that right?

22 A   I don't remember saying pump room.  I read D. east pump

23 nurse -- wait a minute.  Right below it it says C. east pump

24 room, B. east pump room.

25 Q   Yeah, I think there was a reference to that photograph 219

 1    came from the pump room.

 2           MS. GRIFFIN:  Your Honor, I'm going to object to him

 3    testifying what there was a reference to.

 4           THE COURT:  Well, he can't tell without his chart that

 5    you took away from him again.  So if you want to ask him where

 6    things were, you need to give him that folder back.

 7           MR. ESSIG:  Yes, ma'am.

 8           I'll leave it.

 9    Q   Again, photograph 219, you testified on direct examination,

10    I think, that that was a pump room?

11    A   219 you say?  219, items from room D. east.  D. east is

12    labeled pump nurse.

13    Q   Okay.  All right.  Do you know what a pump nurse is?

14    A   No, I do not.

15    Q   I mean, do you have any idea what the significance of a

16    pump nurse in a health office may be?

17    A   I do not.

18           MR. ESSIG:  May I have one moment Your Honor?

19           THE COURT:  Yes.

20       (A discussion was held off the record between defense

21    counsel.)

22    BY MR. ESSIG:

23    Q   Agent Lawson, I want to show you -- this is a photograph

24    that looks like this is -- now, this is a photograph -- I think

25    the way they were identified was by their jpeg number?

1    A    Yes.

2    Q    Jpeg 54?

3    A    Okay.

4    Q    And this is in Exhibit 2 dash -- and this is one of the

5    exam room photographs that you authenticated on direct

6    examination.  As you look at that exam room, do you see a blood

7    pressure machine there?

8    A    I do.

9    Q    Do you see the spinal column model there?

10   A    I do.

11          MS. GRIFFIN:  Your Honor, we object to the relevance.

12   He was testifying on direct about the items he seized from that

13   building, not a blow-by-blow description of everything

14   contained in that building.

15          THE COURT:  Yes.  I know what you're doing, but I

16   think that another witness would be a better person to do this

17   through.  He's simply identified the things that were seized

18   and where they were.  So unless you want to question about

19   that, that's really beyond the scope of his direct examination.

20          MR. ESSIG:  Yes, ma'am.  Just one moment.

21   Q    Agent Lawson, again, I'll ask you one more question here.

22   This is specific to the actions of your team when you were out

23   there.  Do you know if anything was moved in this photograph?

24   (Indicating.)

25   A    It's highly doubtful.  This is an entry photo.

1  Q   And when you take -- as you described it before, the first

2  thing you do when you go in the room, before you search, is you

3  take an entry photo to show that nothing's been manipulated

4  before you go on; is that right?

5  A   Right.

6  Q   The way the room exists.  So is that a yes?  I'm sorry.

7  A   Yes.

8  Q   So this photograph here, jpeg 54 in Government's Exhibit

9  2-2, it's pretty safe to say that's the state of the room as

10  the agents found it; is that right?

11  A   More than likely the only thing that occurred in that room

12  before the photo was the light was turned on and we labeled it.

13  That's it.

14  Q   And you would have secured it; is that right?

15  A       If there is another door or bathroom in there, we

16  would have gone in there and looked to see if there was anybody

17  in there.  But just that right here, this have would have been

18  as is.  (Indicating.)

19         MR. ESSIG:  Okay.  No further questions.

20         THE COURT:  All right.  Before Mr. Knizley questions

21  -- is it Mr. Knizley or Mr. Armstrong that is going to do the

22  questions?

23         MR. KNIZLEY:  (Indicating.)

24         THE COURT:  All right.  We're going to take our

25  afternoon break at this time.  Leave your pads on your chairs.

286

 1    No discussion about the case.  Take your break downstairs.  We

 2    will call you back up in about 15 minutes.

 3              We're in recess.

 4         (A recess was taken at approximately 2:57 p.m.)

 5         (In open court, 3:20 p.m., defendants and jury present.)

 6              THE COURT:  Mr. Knizley, ready?

 7              MR. KNIZLEY:  Yes, ma'am.

 8                         CROSS EXAMINATION

 9    BY MR. KNIZLEY:

10    Q    Good afternoon, Agent.

11    A    Good afternoon.

12    Q    What time did you arrive at Springhill Avenue that day?

13    A    Stand by.  (Reading.)

14    Q    Tell us the time you got there.

15    A    About 6:45.

16    Q    Okay.  And --

17    A    A.m.

18    Q    -- were there already other people there?

19    A    There were.

20    Q    And was it just the FBI or were there other law enforcement

21    agencies there?

22    A    Others.

23    Q    Who else was there?

24    A    There were -- I know there was DEA.  I'm not sure if I have

25    the entire sign-in log.  FBI agents from Atlanta to assist.

FBI SA ERIC LAWSON - CROSS BY MR. KNIZLEY

1    Q    Okay.

2    A    I couldn't tell you if there were any others off the top of

3    my head.

4    Q    Mobile Police Department?

5    A    That might have been who was doing the physical security

6    outside.

7    Q    About how many agents, FBI and DEA, if you recall, were

8    there?

9              MS. GRIFFIN:  Your Honor, I object to the relevance.

10             THE COURT:  Sustained.

11   BY MR. KNIZLEY:

12   Q    Well, what was your job there?

13   A    I was the ERT team leader.

14   Q    And tell us again what that -- your job as that leader,

15   what do you do?

16   A    It was the evidence response team which, as I explained it

17   earlier, the primary function, we can be considered the FBI's

18   crime screen unit.  Our primary task is scenes where forensic

19   evidence of some sort has to be collected.  We get special

20   training, we get some equipment, but we're the more trained

21   evidence-collection team.  However, our most often occurrence

22   is helping with larger or complex or multi-location regular

23   search warrants.

24   Q    And was this a multi-location search?

25   A    Yes, sir.

288

```
 1   Q   What was the other location?

 2   A   There were two.  I couldn't tell you where they were.

 3   Q   Okay.  Was the other one -- are you familiar with the

 4   Airport Boulevard office of this business?

 5   A   No, I'm only familiar with my location.

 6            MS. GRIFFIN:  Your Honor, I object, as he said he

 7   didn't know where the other two were.

 8            THE COURT:  Let's try and keep it a real cross-

 9   examination and not redoing everything that's been done.  Okay.

10            MR. KNIZLEY:  Yes, ma'am.

11            THE COURT:  All right.

12   BY MR. KNIZLEY:

13   Q   Okay.  How many people were on your team?

14            MS. GRIFFIN:  Objection as to relevance.

15            THE COURT:  What does it matter how many people are on

16   the team?

17            MR. KNIZLEY:  It doesn't really matter how many,

18   Judge.  He's told us he's got photographs and he told us about

19   them.  He said he didn't take them, I'm just wondering how he

20   got them and how they get here.

21            THE COURT:  Well, it's not relevant, so let's move on.

22   BY MR. KNIZLEY:

23   Q   Okay.  These photographs that we see, you didn't take any

24   of them?

25   A   No, sir.
```

FBI SA ERIC LAWSON - CROSS BY MR. KNIZLEY

1   Q   And somebody else took them and gave them to you?

2   A   That's correct.

3   Q   Okay.  Now, I want to ask you first about Government's

4   Exhibit 214.

5           THE COURT:  2-14?

6   BY MR. KNIZLEY:

7   Q   2-14.  Do you remember that one?

8   A   I do.

9   Q   Okay.  And the prosecutor asked you about what it appeared

10  to be; right?  And then she asked you to read this up here;

11  right?  She asked you to read that?  (Indicating.)

12  A   That's correct.

13  Q   C&R Pharmacy, do you know where C&R Pharmacy is?

14  A   I do not.

15  Q   Do you know where its offices are?

16  A   I do not.

17  Q   Okay.  And Insys Therapeutics, do you have any idea what

18  that is?

19  A   No, sir.

20  Q   And do you know anything about this, what it is, what --

21  (indicating).  She asked you, I think, something about a check.

22  Do you know that?

23  A   No, I do not.

24  Q   Do you know anything about any of this stuff?

25  A   Other than --

FBI SA ERIC LAWSON - CROSS BY MR. KNIZLEY

1    Q    Except you took a picture of it -- somebody took a picture

2    of it?

3    A    What I'm telling you is I'm looking at this and it is

4    something that we seized from the Springhill location.

5    Q    And that's all you know about it?

6    A    That's correct.

7    Q    All right.  Now, you showed us Government's Exhibit 2-3.

8    Remember that?

9    A    I remember it.  What is it -- I remember 2-3.  What's it

10   for?

11   Q    Let's see.  It's --

12   A    Blank signed prescriptions?   Yes, I remember that.

13   Q    All right.  And these are the actual pieces of paper;

14   right?

15   A    That's correct.

16   Q    That somebody seized?

17   A    That's correct.

18   Q    And we don't -- and do you know where they seized it from,

19   the documents?

20   A    I can tell you who seized it, where they seized it, and

21   what happened to it after that.

22   Q    Okay.  Could you, please?

23   A    I need the actual packet.

24   Q    Yeah, sure.

25   A    Well, that was the -- the picture that I was looking for

 1  was the picture of the box.  But this is --

 2  Q   I can get you the other one.

 3  A   I can still -- I can still do it from this.  This was

 4  seized from PPSA, 2001 Springhill Avenue, collected evidence,

 5  room G. east.  The individual who was the -- who found the item

 6  was T. Loftin from FBI Mobile.  I was the seizing agent.  And

 7  it was blank signed prescriptions -- the description is blank

 8  signed prescriptions from Ruan, split from bar code number

 9  E5920962, which became 1B164.

10  Q   Okay.

11  A   Collected on 5/20/2015.

12  Q   You asked about the box a second ago.  Is this the picture

13  of the box you're talking about?

14  A   1B -- this is a picture for this item, not for this one

15  (indicating).

16  Q   Do you have a picture of the box?  If you look at it, is

17  that split out somehow maybe?

18  A   Yes, it is.  This is split from box -- split from echo --

19  let me just find it.  1B1 -- looks like -- 1B197.

20  Q   Is that 1B197 the box over there in the other picture?

21  A   This is the split (indicating).

22          Let me see what -- stand by.  This is item 113.

23  That's the ERT number, billing info and associated docs, split

24  to bar code E5329711, which may not be listed on here.

25          That's the correct number.  All right.  What is it

1  you're specifically asking from me now?  It's the correct box.

2  Q   Okay.  The box in the picture in --

3  A   That's telling me that that item is split off of the box

4  that's pictured a page or two back.

5  Q   So it meant it came out of the box?

6  A   A split is if you -- we take a big box of evidence from a

7  room.  Later on, when the case agent and investigative team

8  goes through all those documents, if there's something

9  particularly useful in that box as evidence, they can take that

10  out, split it from the original box, and give it its own number

11  so you don't have to hunt through that big box every time you

12  want to find that evidence on it.

13  Q   And we'll display it so you can explain it to the jury in

14  just a second.  Now, that stuff in 2-4, was it split from a box

15  or can you tell?

16  A   This says blank signed prescriptions from Ruan split from a

17  car code number, which is-or another item number, 1B164.

18  There's just no photo in here that I can show you that, show

19  you the box.

20  Q   Okay.  But it was a box, you think?

21  A   Probably.

22  Q   Okay.  Thank you.

23       Now, back to 2-3, which you just told us was split

24  from something else -- a box you think; right?

25  A   Yeah.  Go to the left where it says description.

1  Q   All right.

2  A   All right.  Now read that and it tells you blank signed

3  prescriptions from Ruan, split from that number there.

4  Q   All right.

5  A   There's a bar code on the box.

6  Q   Okay.

7  A   It also shows you that other -- that computer-generated

8  item number, which is that number -- the thing is on this

9  packet that you just showed me there's not a picture of a box

10 for me to show you where that is.

11 Q   Okay.  But you have one probably somewhere; right?

12 A   Correct.

13 Q   Okay.  And we can identify that box by looking at these

14 numbers?

15 A   Yes, sir.  This is a computer-generated sheet that traces

16 what happens to each evidence item.

17 Q   Okay.  And do you know how -- your best understanding is

18 these pieces of paper we're looking at were in a box somewhere?

19 Is that your best understanding?

20 A   That's probably right.

21 Q   Okay.  And that box was in an office; is that right?  In a

22 locality that someone took a picture that you gathered from?

23 A   Yes.  There was a photo of it earlier.  You could see where

24 it was.

25 Q   Okay.  And it was an office, I think, wasn't it?

 1  A   Everything in that building was pretty much in an office.

 2  Q   All right.  And looking at this --

 3          THE COURT:  You can clear those arrows by touching the

 4  screen just above it.

 5          THE WITNESS:  I just did and it didn't.

 6          THE COURT:  Touch the actual screen.

 7          THE WITNESS:  (Complying.)

 8          THE COURT:  There you go.

 9          THE WITNESS:  Okay.

10  BY MR. KNIZLEY.

11  Q   Now, we'll take first that 2-5.  On 2-5, Government's

12  Exhibit 2-5, that's the one we have a picture of the box;

13  right?

14  A   The original box.  That's -- that would be an original box

15  that we seized from that location because that's the evidence

16  label on there that you can read.

17  Q   And we know that that script came out of that box?

18  A   Scroll it, scroll it down.  Okay.  Go back to the photo.

19  Q   (Complying.)

20  A   The other one, so I can see the --

21  Q   Closer?

22  A   Well, now, this photo doesn't have the bar code sticker.  I

23  was going to reference that as well.  You can go back to the

24  other page.

25  Q   Okay.  Back to the other page.  Do we or do we not know

295

1  whether this came out of the box?

2  A   Yes.  It says it right up there.

3  Q   Okay.  All right.  And so looking at this, what is -- it

4  has Dr. Ruan's name on there; right?

5  A   Yes, sir.

6  Q   You were asked about that earlier.

7  A   Yes.

8  Q   What is the address it has there?

9  A   2001 Springhill Avenue, Mobile, Alabama.

10  Q   And the date of the arrest, do you know where his primary

11  address was?

12  A   No.

13  Q   Okay.  Do you know about Ms. Parker, whether she was

14  employed there at that time?

15  A   I do not.

16  Q   How about Ms. Bishop, do you know whether she was employed

17  there at that time?

18  A   I do not.

19  Q   Okay.  Now, similarly, on 2.3, do remember these a little

20  bit?

21  A   I do.

22  Q   All right.  And we believe they came out of a box, but --

23  pretty certain.

24  A   They were packaged somehow to go from his office to the

25  FBI.

FBI SA ERIC LAWSON - CROSS BY MR. KNIZLEY

1   Q   And let me ask you that.  Do you know where they were in

2   that office, where the box or these things themselves actually

3   were?

4   A   If I had a picture of that item number, yes.  There it is,

5   room G. east.

6   Q   Okay.  And do we know like was it in a drawer?  Was it in a

7   box?

8   A   I can't tell you from this information.

9   Q   Do you have a recollection from the day you were there?

10  A   I did not seize that item.

11  Q   Do you know who the gentlemen was that did?

12  A   T. Loftin.

13  Q   Okay.  He would probably know; right?

14  A   If he remembered that, yes.  But his name's right on it.

15  His name's right there.

16  Q   All right.  And looking again at these, on that address it

17  has Dr. Ruan's name on there.  Okay.  And it has an address; is

18  that right?

19  A   Yes.

20  Q   And that address is Springhill Avenue; right?

21  A   Yes.

22  Q   And it has one of the CRNP's name, Ms. Holder; right?

23  A   Yes.

24  Q   Do you know if she was employed there at that time?

25  A   I do not know.

```
 1   Q   And looking through these, that looks like all these are --
 2   the identical printed pad, that being with the Springhill
 3   Avenue address and Ms. Holder?  Is that what it looks like?
 4   A   You're asking me if it what?
 5   Q   Look at the top.
 6          MS. GRIFFIN:  Your Honor?
 7   A   Yes, it's the same.  It's the same original script
 8   background, yes.
 9          MS. GRIFFIN:  We object.  He's just identifying where
10   these came from, what building.  There will be someone later
11   that we intend to call --
12          THE COURT:  I think y'all are spending time on this
13   witness that is unnecessary for cross-examining this witness
14   about what he testified.  What he knows about who worked there,
15   all of that is not appropriate cross-examination on this.
16          MR. KNIZLEY:  Judge, I'm asking what the content of
17   the prescription pad is, not necessarily asking if he --
18          THE COURT:  Well, I still think --
19          MR. KNIZLEY:  The government took some time going
20   through these.
21          THE COURT:  Well, I understand.  But the purpose of
22   this witness' testimony is not substantive.  It's simply to
23   identify what was in the office and what was seized.  There
24   will be plenty of other witnesses that you can get the
25   information from that you want to produce on that.
```

FBI SA ERIC LAWSON - CROSS BY MR. KNIZLEY

1          MR. KNIZLEY:  Yes, Your Honor.  I realize that.  But
2     the government did take some time --
3          THE COURT:  Well, it doesn't mean you have to take
4     some time.  You need to tailor your questions to what is
5     relevant in this case.
6          MR. KNIZLEY:  Forgive me for not objecting, Judge.  I
7     understand.
8     Q   And that's Government's Exhibit 2-2?
9     A   It is.
10    Q   What is that?
11    A   That's the cover sheet for the photographer.
12    Q   And one of the photographs we talked about, remember?
13    A   Yes.
14    Q   Are you familiar with it?
15    A   Yes, I have it right here.
16    Q   Okay.  The last thing I want to show you, do you know where
17    this photograph was taken?  (Indicating.)
18    A   Scroll down so I can see the jpeg number.  308?  Stand
19    by.  Room G. east.
20    Q   And what room was that?  Is that the same room you found
21    the other scripts in?
22    A   Room G. east is Dr. Ruan's office.
23    Q   Is that the same room you found the other ones in?
24    A   The others?  What?
25    Q   The other -- what appeared to be prescription pads.

1          MS. GRIFFIN:  Your Honor, I object.  He can't possibly

2    answer without knowing an exhibit number.  Just referring to

3    scripts --

4          THE COURT:  If you show him that, can you read off of

5    that what you need to?

6    A   2-3 says room G. east, which is, again, Dr. Ruan's office.

7    BY MR. KNIZLEY:

8    Q   Can you tell me the date of that prescription right there?

9    A   10/4/06.

10         MR. KNIZLEY:  Thank you.  That's all I have, Judge.

11         THE COURT:  All right, Ms. Griffin.

12         MS. GRIFFIN:  Three quick questions, Your Honor.

13         Can you pull up for me jpeg 308?

14                        REDIRECT EXAMINATION

15   BY MS. GRIFFIN:

16   Q   Mr. Lawson, you've testified that these came out of a

17   certain room which you've identified as Dr. Ruan's office.

18   A   Yes, ma'am.

19   Q   Now, when you were talking about that they were put in a

20   box, tell us what you mean.

21   A   I'm simply explaining that whatever evidence we find in any

22   room, we have to package it someway so we can label it and

23   transport it back to the FBI office so we can enter it into our

24   evidence system.  So it was -- all of the items there that day

25   were, you know, paper documents, were paper bags or cardboard

1   boxes.  That's -- that's 99 percent of the packaging we use.

2   Q   So I understand, you're not claiming that these were found

3   in a box?

4   A   Correct.  I'm not -- correct.  I'm talking about us putting

5   it into a box.

6   Q   And that's how they were transported from the location?  Is

7   that what you did?

8   A   Right.  Once we had all of the evidence collected, we

9   transported it back to the FBI office.

10  Q   Now I want to direct your attention to --

11          THE COURT:  Ms. Griffin, will you push the button on

12  your microphone?  It's gotten turned off.

13          MS. GRIFFIN:  Sorry, Your Honor.

14          THE COURT:  That's all right.

15          MS. GRIFFIN:  Photograph 279, if you can pull that up

16  for me?

17  Q   You have previously identified Government's Exhibit 2-12 as

18  being that picture that has Sam's and next week on it.  Is that

19  correct?

20  A   Yes, ma'am.

21  Q   And you've actually identified the scripts that were

22  attached to that exhibit; is that right?

23  A   Correct.

24  Q   You indicated that you had not taken the time to match

25  those up to see if the scripts match the people's names?  Is

301

 1    that right?

 2    A   Correct, correct.

 3          MS. GRIFFIN:  Could you blow up the first name for us,

 4    Mr. Cochran, first group of names?

 5    Q   And you see that's a last name that starts with an S-C-H;

 6    is that right?

 7    A   Yes, ma'am.

 8    Q   I show you the last page on Government's Exhibit 12-2

 9    [sic].  It's a signed script by Couch -- purporting to be

10    Couch.  It's dated May the 26th of 2015?

11    A   Yes, ma'am.

12    Q   Is that the same name as the first name on the --

13    photograph?

14    A   Yes, ma'am, Kurt Schmucker.

15    Q   Thank you.  And the date on that is May 20?

16    A   The effective date is May 26, 2015.

17    Q   What day was the search?

18    A   20th, May 20th.

19    Q   So did that have to be signed prior to May 20th?

20    A   Yes, ma'am.

21          MS. GRIFFIN:  That's all I have of this witness, Your

22    Honor.

23          THE COURT:  All right.  You may step down.  Thank you.

24          MS. GRIFFIN:  Call Steve Sorrells.

25                    FBI SA STEVEN SORRELLS

302

1          was sworn and testified as follows:

2          THE WITNESS:  I do.

3          THE CLERK:  Thank you.  Please be seated.

4                         DIRECT EXAMINATION

5    BY MS. GRIFFIN:

6    Q   Tell us your name, please, sir.

7    A   It's Steven Sorrells.

8    Q   Would you spell your last name?

9    A   Last name is spelled S-O-R-R-E-L-L-S.

10   Q   How are you employed?

11   A   I'm a special agent with the FBI.

12   Q   How many years of law enforcement experience do you have?

13   A   18 years.

14   Q   You're currently assigned to the Mobile FBI office?

15   A   That's correct.

16   Q   Did you have occasion to be the lead of the search on May

17   the 20th, 2015, of the Airport -- excuse me -- yes, the Airport

18   location of PPSA?

19   A   Yes, I was the team leader for the evidence response team.

20   Q   And tell us what that means.

21   A   The evidence response team is the FBI's crime scene team,

22   the analysts, of FBI searches -- both forensic searches and

23   regular searches, such as in this case.

24   Q   As such did you maintain a notebook of the photographs that

25   were taken of the location and evidence seized from the

1  location at Airport?

2  A  Yes, we had a photo log that was made while the

3  photographer was making photos during the search.

4  Q  I show you what's marked as Government's Exhibit 3-1, ask

5  if you have previously seen the exhibit.

6       MS. GRIFFIN:  I'll need to switch it to the ELMO,

7  please, ma'am -- wait a minute.  Mr. Cochran, is this on?

8       My mistake.  It's on the computer.

9  Q  Ask if you've seen this exhibit before.

10  A  Yes, I have.

11  Q  Does that contain the contents of your administrative

12  worksheet and your evidence recovery log and your photograph

13  log?

14  A  Yes, it does.

15  Q  That was from the search on Airport on May the 20th of '15?

16  A  That's correct.

17       MS. GRIFFIN:  Move to admit Government's Exhibit 3-1,

18  Your Honor, and publish it to the jury.

19       THE COURT:  Any objection?

20       MR. ESSIG:  No, Your Honor.

21       THE COURT:  All right.  Mark it in.

22     (Government's Exhibit 3-1 was entered into evidence.)

23  BY MS. GRIFFIN:

24  Q  Contained therein is just what we've described; is that

25  correct?  Your inventory, the evidence seized --

1   A   Yes.

2   Q   -- and the photographs; is that right?

3   A   Yes.  They were things such as an evidence log, a photo

4   log, DVDs with photos, and an administrative log that I kept,

5   and a sketch that someone on the team kept that I reviewed.

6   Q   And I'd move to Exhibit 3-2, please, and I ask if you've

7   previously seen this exhibit and what it consists of.

8   A   Yes, this is the title page or the first page.  When we

9   take photos at a site, we include a title page.  In this

10  instance it shows that the photographer on that day was Janet

11  White, who is one of my associates on the evidence response

12  team.

13  Q   That was at the Airport location of PPSA?

14  A   That's correct.

15  Q   And it contains a number of photographs that were taken of

16  the location before the search; is that correct?

17  A   That's correct.  This is the title page and then the

18  regular photographs follow that.

19          MS. GRIFFIN:  I'd move to admit Government's Exhibit

20  3-2, Your Honor.

21          MR. KNIZLEY:  Your Honor, I would like to take a quick

22  moment to look through it.

23          THE COURT:  All right.

24          MR. KNIZLEY:  Judge, we only have objection to jpeg

25  number 63 and 70.  The rest of them we don't have objections

```
 1   to.
 2           THE COURT:  What is the basis for your objection to 63
 3   and 70?
 4           MR. KNIZLEY:  Hearsay, predicate, and relevance.
 5           MS. GRIFFIN:  Your Honor, I don't believe there is a
 6   63 and a 70.
 7           MR. KNIZLEY:  363 and 370.
 8           MS. GRIFFIN:  May we approach or could we give the
 9   exhibit to the Court?
10           THE COURT:  Approach, please.
11      (At the side bar, jury not present.)
12           MS. GRIFFIN:  363 and what?
13           MR. KNIZLEY:  370.
14           MS. GRIFFIN:  363 and 370 are back to back, Your
15   Honor.
16           THE COURT:  And you say the relevance -- it's on
17   relevance grounds?
18           MR. KNIZLEY:  Hearsay, relevance, and authenticity.
19   We didn't know -- we have a photograph taken of a document that
20   has hearsay material in it, I would suggest, and we don't know
21   the author of it and don't now how it's relevant to any issue
22   in the case at this time.
23           THE COURT:  I can look at it and tell it is relevant
24   to an issue in this case.  So I overrule the objection.
25      (In open court, defendants and jury present.)
```

1       MS. GRIFFIN:  Your Honor, I move to admit Government's

2  Exhibit 3-2, the photographs taken.

3       THE COURT:  All right.  Mark them in.

4     (Government's Exhibit 3-2 was entered into evidence.)

5  BY MS. GRIFFIN:

6  Q   Now, Mr. Sorrells, these are not all the photographs, these

7  are selected ones; is that correct?

8  A   That's correct.

9       MS. GRIFFIN:  And if you would, Mr. Cochran, please

10  show us jpeg four from Government's Exhibit 3-2.

11  Q   Can you tell us what that is, please, sir?

12  A   Yeah, this is an outside photograph.  When we get to a

13  scene, we take entry photographs both on the outside and the

14  inside.  This is an entry photograph of the site which is at

15  the corner of General Bullard Avenue and Airport Boulevard.  So

16  this is on the General Bullard Avenue site looking at the PPSA

17  building.

18  Q   This is the area -- this is the building that was searched

19  that day where you were the lead, May 20 of 2015?

20  A   That's correct.

21  Q   And if you will turn it to jpeg five, please, the picture

22  in Government's Exhibit 3-2, is that a side view of the same

23  building?

24  A   It is.  This is on the west side, looking to the east.

25  Kind of southeast you can see Airport Boulevard kind of in the

1  background beside the building to the right.

2  Q   And you see a billboard that appears to be in the top

3  right-hand corner?

4        MS. GRIFFIN:  And could you make that larger for us,

5  Mr. Cochran?

6  Q   Was there a billboard there for Physicians Pain Specialists

7  of Alabama in that photograph?

8  A   Yes, there is.

9        MS. GRIFFIN:  And, Mr. Cochran, if you could go to

10  picture -- jpeg picture nine?

11  Q   Could you tell us what this was?

12  A   Yeah, this is an entry-level outside photograph.  I'm now

13  on the south side of the PPSA building, with Airport Boulevard

14  behind me, looking to the north.  And this is the C&R Pharmacy

15  location from the outside.

16  Q   Is C&R Pharmacy located next to the Airport PPSA clinic?

17  A   Yes, it's actually -- the buildings are hooked together.

18  There's actually an entrance from the inside, which is how we

19  entered the C&R Pharmacy.  And from this picture on the left-

20  hand side, you can see an overhang that goes out to the west

21  side of the building.  That's actually the entry point where we

22  made entry and exited throughout the day in the building.

23  Q   So they have separate entrances, but they can get from one

24  to the other from inside each of the buildings?

25  A   That's correct.  The only outside door that we made entry

1    through that day was the main entrance that you see out to the

2    west side, where the arrow is.  And we did not go in and out

3    the C&R Pharmacy door because we had entry from the inside of

4    the building.

5    Q   Now, you were not in charge of the C&R Pharmacy search,

6    were you?

7    A   No, I was not.

8    Q   And I want to direct you to -- excuse me -- to photograph

9    jpeg 134, which is part of Government's Exhibit 3-2.

10              THE COURT:  All right.  Mr. Sorrells, you can clear

11   that arrow by touching the screen in the lower left-hand

12   corner.  Thanks.

13   BY MS. GRIFFIN:

14   Q   Jpeg 132, could you tell us where this photograph was taken

15   within the Airport office?

16              THE COURT:  This is 134.

17              MS. GRIFFIN:  I'm sorry.  134 jpeg.

18   A   134, the photo that I'm looking at, this is in a medium

19   shot of, I believe, Dr. Ruan's office.  In our sketch we listed

20   that as, I believe, Q.  When we do a search, we label each room

21   A, B, C, D and so on to make it easier and consistent with

22   those searching and for the case agents later to determine

23   where everything was located.

24   BY MS. GRIFFIN:

25   Q   Contained in your Exhibit 3.1 is there a sketch of that

FBI SA STEVEN SORRELLS - DIRECT BY MS. GRIFFIN

309

1    location, hand-drawn sketch?

2    A   Yes, there is.

3    Q   And was that blown up for purposes of this trial,

4    Government's Exhibit 3-4?  May I show you 3-4 and ask if it is

5    a copy of the sketch that's contained in Exhibit 3-1?

6    A   Yes, it is.

7              MS. GRIFFIN:  Move to admit Government's Exhibit 3-4.

8              THE COURT:  Mark it in.

9         (Government's Exhibit 3-4 was entered into evidence.)

10   BY MS. GRIFFIN:

11   Q   How is it that you had a sketch of that location?

12   A   We had a person who was -- an evidence response team person

13   was there and they made the sketch at the time while we were

14   conducting the search.

15   Q   And can you tell us, using that search, the location that

16   you've described that the photograph jpeg 134 came from?

17   A   Yes, 134 came from room Q.

18   Q   And can you locate that for us on this sketch, Government's

19   Exhibit 34?

20   A   Yes.  It's in the -- the way the office sat, this is the

21   north side, this is General Bullard Avenue, this is Airport

22   Boulevard, and the office Q. is right here in the lower

23   southeast side of the building.  (Indicating.)

24   Q   And you can actually touch the screen and put an arrow

25   toward that right there.  (Indicating.)

FBI SA STEVEN SORRELLS - DIRECT BY MS. GRIFFIN

1   A   That's correct.

2   Q   Do you know whose office that was?

3   A   I believe that was Dr. Ruan's office.

4   Q   And I will ask you to go to jpeg 347 and 349 and ask if you

5   can identify the photographs 349 and 347.

6   A   Yes.  347 was the photograph that was made during the

7   search that's in room -- I believe that was in room S.

8   Q   And can you point out where room S. is on the exhibit?

9   A   (Indicating.)

10  Q   You're showing that with a green arrow on Exhibit 3-4; is

11  that correct?

12  A   That's correct.

13  Q   I show you what has been marked as Government's Exhibit

14  3-3 -- well, first of all, were the scripts that are shown in

15  these two photographs seized, the signed blank prescriptions?

16  A   Yes.  Those shown in the picture?

17  Q   Yes.

18  A   Yes, they were.

19  Q   And we would go to picture 349 and blow that up some for us

20  and you can take them off, please, sir.  So you're looking at

21  jpeg picture 349 from Government's Exhibit 3-2, the

22  photographs.  Those were actually seized?

23  A   Yes, they were.

24  Q   I show you Government's Exhibit 3-3 and ask if you can

25  identify the signed blank prescriptions.

1   A   Yes, these look like some prescriptions that were taken

2   from that site in room S.

3   Q   And can you look, please, at the indexing paperwork on the

4   exhibit and tell us what room those scripts came from?

5   A   Yes, they are listed as from room S.

6   Q   And that's the same room you've identified the photograph

7   from?

8   A   That's correct.

9          MS. GRIFFIN:  I'd move to admit the scripts

10  Government's Exhibit 3-3, Your Honor.

11         THE COURT:  All right.  Mark them in.

12    (Government's Exhibit 3-3 was entered into evidence.)

13         MS. GRIFFIN: And if you could, Mr. Cochran, turn to

14  the photographs in Exhibit 3-3 of the scripts?  And if you'll

15  just blow -- pull one up so we can see it?

16  Q   Were these some of the scripts that were taken from that

17  room that you've identified in Government's Exhibit 3-3?

18  A   Yes, they were.

19  Q   Do they appear to be signed in the bottom right-hand

20  corner?

21  A   Yes, they do.

22  Q   Have someone's handwriting, signature?  And does it appear

23  to be a prescription that is blank?

24  A   Yes, it does.

25  Q   But signed?

FBI SA STEVEN SORRELLS - DIRECT BY MS. GRIFFIN

1    A    Yes.

2    Q    Were there a number of those seized at that location and

3    are they contained within Government's Exhibit 3-3?

4    A    Yes.

5    Q    And this is Airport; is that right?

6    A    That is correct.

7              MS. GRIFFIN:  if you can go back to the photograph,

8    Mr. Cochran?

9              349.  And if you can blow it up?

10   Q    Now, do you see some yellow appearing?  It says:  Copy, not

11   a prescription, there underneath the signed blank scripts?

12   A    I do.

13   Q    And were those also seized?

14   A    Yes, I believe they were.

15   Q    Are they also contained in Government's Exhibit 3-3?

16   A    I think they were.  I may have to look at the exhibit

17   again.

18              Yes.

19   Q    Now I want to show you those on the ELMO.  Do those scripts

20   appear to be voided in any manner, the scripts in the front of

21   the book that are blank?

22   A    No, they do not.

23   Q    They are signed and they don't have a name or a drug on

24   them, do they?

25   A    No, I don't see anything.

FBI SA STEVEN SORRELLS - DIRECT BY MS. GRIFFIN

313

```
1        MS. GRIFFIN:  I'll take those from you.  I believe
2   I've admitted 3-3.
3        THE CLERK:  Yes, ma'am.
4        THE COURT:  They are already in.
5        MS. GRIFFIN:  And I'd like to show these on the ELMO,
6   please.
7   Q   Would you identify anything on the scripts that appear to
8   be white that are signed and blank that they are voided in any
9   manner?
10  A   No, I didn't see anything showing anything voided on those.
11  Q   And then the ones you identified that were shown in the
12  photograph and were actually seized that were yellow, what do
13  they say at the very top in the black box, please, sir?  Black
14  box across the top?
15  A   Oh, duplicate copy -- not a prescription.
16  Q   And there was just one page connected with those; is that
17  right?
18  A   That's correct.
19  Q   And on the white ones in the front of the book that were
20  signed and are blank, they are two pages, the white page and
21  the yellow page underneath it; is that right?
22  A   That's correct.
23  Q   And if you would turn to jpeg picture 377?  And tell us
24  where that photograph was taken?
25       THE COURT:  Do you need to go to the computer?
```

FBI SA STEVEN SORRELLS - DIRECT BY MS. GRIFFIN                                314

```
 1            MS. GRIFFIN:  I'm so sorry.  Going back to the
 2   computer.
 3   Q   It says C&R Abstral, says PAs 2014, and it's jpeg 377?
 4   A   Yes.
 5            MS. GRIFFIN:  I'll approach, Your Honor, and show him
 6   Government's Exhibit 3-5.
 7   Q   C&R Abstral PAs 2014, and ask if this is the same as the
 8   photograph that you took?
 9   A   Yes, it is.
10   Q   Did you seize Exhibit 3-5?
11   A   Yes, we did.
12   Q   And the contents are still inside that were seized; is that
13   correct?
14   A   Yes, I believe they are.
15            MS. GRIFFIN:  I move to admit Government's Exhibit
16   3-5.
17            MR. KNIZLEY:  Your Honor, if I could take a real quick
18   look at that?
19            THE COURT:  All right.
20            MR. KNIZLEY:  I don't have any objection, Your Honor.
21            THE COURT:  Mr. Essig?
22            MR. ESSIG:  No objection.
23            THE COURT:  Mark it in, 3-5.
24       (Government's Exhibit 3-5 was entered into evidence.)
25   BY MS. GRIFFIN:
```

315

1   Q   And your last exhibit, Government's Exhibit 3-6, I'd like

2   to show you what is taken from item 161 and ask if you can

3   identify where this item was seized from.

4   A   Yes, this was seized from room K. at the PPSA building on

5   Airport.

6   Q   And what are those, please, sir, according to your log?

7   A   Oh, the log -- this was item 15 on my evidence log, medical

8   records, presigned forms.

9           MS. GRIFFIN:  Move to admit Government's Exhibit 3-6.

10          MR. KNIZLEY:  Take just a minute.

11      (A discussion was held off the record between counsel.)

12          MS. GRIFFIN:  Your Honor, we've removed one item from

13  the exhibit based on the representations that at a later time

14  the defense will not claim these did not come from Exhibit

15  3-6.  Other than that, we would move to admit the exhibit.

16          THE COURT:  All right.  Mark it in.

17      (Government's Exhibit 3-6 was entered into evidence.)

18          THE COURT:  The things that you removed, do you intend

19  to introduce them later?

20          MS. GRIFFIN:  We do intend to offer them later, Your

21  Honor.

22          THE COURT:  And make them once again a part of 3-6?

23          MS. GRIFFIN:  No.  We will number them 3-6A so that

24  they can be distinguished.

25          THE COURT:  All right.  Okay.

1    MS. GRIFFIN:  And we'll just have them for

2 identification at this time, not for admission.

3    That's all we have of this witness, Your Honor.

4    THE COURT:  Mr. Essig, do you intend to cross-examine

5 this witness?

6    MR. ESSIG:  Your Honor, I'm going to allow Mr. Knizley

7 to go first.  I may not have any questions of this witness.

8    THE COURT:  All right.

9    MR. KNIZLEY:  With the Court's permission.

10    MR. ESSIG:  With the Court's permission; that's

11 correct.  This evidence was primarily Dr. Ruan's.

12    THE COURT:  Okay.  Go ahead.

13    MR. KNIZLEY:  I'm going to ask you some location

14 questions.  Would it be of assistance for you to have 3-1 when

15 I ask you the locations of some of the items you testified

16 about?

17    THE WITNESS:  It would, yes.

18    CROSS EXAMINATION

19 BY MR. KNIZLEY:

20 Q   Now, Agent, you were the lead of this search; is that

21 correct?

22 A   Yes, I was the evidence response team leader.  We also had

23 a case agent or squad agents there.  Carolyn Middleton was at

24 the site, but she was the team leader for the C&R Pharmacy

25 search and we had others.  So Carolyn Middleton was the overall

1  leader, but I was the evidence team leader for the PPSA

2  building.

3  Q   Okay.  And what I want to ask you is questions about what

4  your duties and responsibilities were.  So could you tell me

5  what your duties and responsibilities were then?

6  A   Yes, my job was basically to be the team leader for the

7  evidence team, which was basically to run the search.  So if we

8  had questions related to the actual content of documents, we

9  would refer that to the case squad.  But I would run the search

10 to make sure we followed protocol, doing the photographs

11 properly, doing the sketches properly, and collecting the

12 evidence properly.

13 Q   Now, I'm going to show you what's marked as Government

14 Exhibit 3-3.

15         MR. KNIZLEY:  Is that the ELMO, please?

16 Q   And I'm showing you what's been marked as Government's

17 Exhibit 3-3.  And this indication of presigned scripts is on

18 the front.  Who gave it that indication, if you know?

19 A   I think on -- let me check my evidence log.

20         Yeah, I think we described that as pertinent records

21 and in parentheses on my evidence log I listed presigned

22 scripts.

23 Q   Is that your designation of this?

24 A   It was, to show that that was -- they are pertinent records

25 but they include presigned scripts as part of those.

318

1   Q   And did you actually -- when you look at these

2   prescriptions or these pads that were used typically for

3   business from time to time -- did you actually recover these

4   items?

5   A   Those items, I saw them in place.  But I was not the first

6   person to lay hands upon them.

7   Q   Okay.  And back to our room where these were --

8   A   Yes, that was room S.

9   Q   And on our chart, S. -- let's see -- is right here?

10  (Indicating.)

11  A   Yes, it was the south -- the actual building was facing to

12  the north.  This was on the southeastern area of the building.

13  Q   By the Airport Boulevard part?

14  A   Yes.

15  Q   All right.  And the C&R Pharmacy, is it on this diagram

16  here?

17  A   Yes, it is.  If you move it back to the very southern

18  portion, as it's sitting there you see it listed as pharmacy.

19  That was the entryway from the inside going to the south, to

20  enter into a door that was then the pharmacy.

21  Q   All right.  This room here, that's not Dr. Ruan's office,

22  is it?  (Indicating.)

23  A   No, I don't believe so.

24  Q   Do you remember seeing a big office there that had his

25  diplomas and board certifications and that sort of thing on the

319

1    wall?

2    A    Yes, I did.

3    Q    And it was over in this area; is that correct?

4    (Indicating.)  It's designated as Dr. Ruan's office somewhere?

5    A    Yes, it was room Q.

6    Q    All right.  And that's room Q. there; right?  (Indicating.)

7    A    Yes.

8    Q    These items that we're talking about here were taken from

9    room -- a different room?  (Indicating.)

10   A    Yes, they were taken from room S.

11   Q    You don't have a photograph of room S. with you, do you?

12   A    There are -- were photographs in my packet from --

13   Q    Sure, sure.  I'm just asking for today.  Do you happen to

14   have one in the courtroom?

15   A    No, I don't.

16   Q    Do you remember what it looked like?

17   A    I do.

18   Q    Could you tell the ladies and gentlemen of the jury what S.

19   looked like?

20   A    Yeah.  Generally, when you went in the door there were

21   either three or four desks around the room.

22   Q    Okay.  None of the diplomas and other stuff you saw in

23   other places?  None of the diplomas and stuff you saw on the

24   walls at other places?

25           MS. GRIFFIN:  Your Honor, I object to the relevance.

1        THE COURT:  Overruled.  Do you remember if there were
2   diplomas on the wall in S.?
3        THE WITNESS:  I don't remember if there were other
4   diplomas other than room Q. on the walls.
5   BY MR. KNIZLEY:
6   Q   Okay.  Now, do you recall how these -- these items in 3-3
7   were organized or disorganized or how they were when you saw
8   them?  In a drawer?  A box?  On top of the desk?  Underneath
9   the desk?  Do you have any recollection where they were?
10  A   I know the -- I saw the photograph that was shown of a
11  portion of the pertinent records from room S., item 26.  I saw
12  those from the same perspective that the photos showed.  The
13  other items in that room that make up item 26 were just in a
14  package.  I went to that room, and the agent who searched that
15  room showed me what they found and I made sure that they were
16  boxed properly and sent to the location to be able to process
17  the package.
18  Q   So the jury can understand, on 3-3 --
19       THE COURT:  Agent, could you clear the arrows off the
20  screen?  Touch it above -- on the screen, above that.
21       THE WITNESS:  Okay.
22       THE COURT:  Yeah, there you go.
23  BY MR. KNIZLEY:
24  Q   What you found in 3-3, which you indicated that someone --
25  that you said you designated as presigned scripts, these

1   documents, do you know where they came from?

2   A   Yes.  Those, those documents, or at least documents that

3   look exactly like them, came from a drawer in one of the desks

4   in room S.

5   Q   Okay.

6   A   It was pulled out that we showed a photograph of.

7   Q   And I'm now going to take you to 3-2 and show you jpeg

8   347.  Is this the drawer you're talking about?

9   A   Yes, that looks like it to me.  I did observe that that

10  day.

11  Q   Well, what's on jpeg 347 on Government's Exhibit 3-2 and

12  what's in 3-3 were all in the same place, to the best of your

13  recollection?

14  A   Yes, they were all in room S.

15  Q   Okay.  Now, you chose to say these are presigned

16  scripts.  Now, do you know what -- now, these were logs --

17  these yellow things, these copies, were there too; right?

18  A   The yellow part is a copy that is attached.  Compared to

19  the others, the yellow part is the bottom copy; correct.

20  Q   When you say script, you don't necessarily mean a

21  prescription for a controlled substance, do you?

22  A   No.  That -- when I say script, I mean they look like a

23  prescription-type item.  So that's how we listed it.  And for

24  the particular item, that's not to say that there were only

25  scripts or presigned scripts in that item.  That's why there

322

```
 1    was a broader category for --
 2    Q   Right.  These yellow copies that you have included in 3-3,
 3    which have this presigned script, include receipts of things
 4    for what looks like or appears to be an ointment, Gralise, do
 5    you know that's controlled?
 6    A   No, I'm not an expert on that.
 7    Q   You're not telling us -- you're not telling us these are
 8    necessarily prescriptions for a controlled substances, you're
 9    just saying it's pictures of pads that routinely may be used
10    for that?
11    A   Yeah.  What I meant by that is I wrote that we have
12    pertinent records in there and the other scripts that I
13    observed, the particular -- the white ones that had what looked
14    like an initial or something written on it, that those were
15    presigned scripts with blank copies.  The other, yellow, looked
16    like they were the scripts that might have been the back to
17    some type of prescription written, but those were included in
18    the pertinent record description.
19              MR. KNIZLEY:  Will you bring up that jpeg 347 on 3-2?
20              347.  Thank you.  Blow it up a little bit bigger,
21    please.
22    Q   See, that says the word "ointment" on it there?  It's
23    upside-down for us.  Do you see that?
24    A   I'm sorry.  I don't.  Where the arrow is?
25    Q   The yellow, the yellow one.  See?  If I can -- maybe I can
```

 1   do it.  There you go.  Right there (indicating).

 2   A   I don't see it.  I'm sorry.

 3   Q   Do you see the yellow piece of paper?

 4   A   Yes, I do.  Oh, yes, I see where it says ointment.

 5   Q   Okay.  And do you believe that's the same one that says

 6   ointment as the other --

 7   A   I think it was.  They were similar types of documents, yes.

 8          MR. KNIZLEY:  Okay.  And if you could now do the same

 9   thing for 349, please?

10   Q   And is that just another photograph of the same thing?

11   A   Yes, I believe so.

12   Q   So what you showed -- what we showed to the jury in 3-3 --

13          THE COURT:  Do you want to switch to the --

14          MR. KNIZLEY:  Bring up the ELMO.

15   Q   What we saw in 3-3 were the same documents we saw in that

16   drawer, you believe; is that right?

17   A   Yes.

18   Q   And somebody else's office other than Dr. Ruan's?

19   A   In room S.

20   Q   I'm sorry.

21   A   I don't know if it was in an office.

22   Q   In an office that didn't have his diplomas and stuff in

23   there?

24   A   It's a room that we described this room S. and it -- there

25   were three, three or four desks in that room.

1   Q   And did you see some of those prescriptions earlier that

2   they flashed up here that had the word "invalid" on it?  Did

3   you see that?

4   A   On the yellow portion?

5   Q   No, on the real portion.  Did you see it earlier when it

6   came up on the screen?

7   A   Are you talking about on the yellow portion that you just

8   showed?

9   Q   And it seemed to be if it got turned at one angle, it said

10  invalid, but from the other angle it went away.  You didn't see

11  that a little earlier?

12  A   No, I did not.

13          MS. GRIFFIN:  Your Honor, I object.  It's a photograph

14  and he has the originals and we object to him in this manner

15  attempting to confuse the issues.

16          MR. KNIZLEY:  I'm certainly not trying to confuse

17  it.  If I could see the photograph they are speaking of?

18          THE COURT:  I'm sorry?

19          MS. GRIFFIN:  It's a photograph behind what

20  Mr. Cochran took the picture of that's coming through on the

21  screen, and I ask Mr. Knizley to ask him about the original

22  documents that were seized.

23          MR. KNIZLEY:  I don't know.  I'm just asking.  I saw

24  it on the screen and asking him --

25          THE COURT:  Well, let's look at the original and see

FBI SA STEVEN SORRELLS - CROSS BY MR. KNIZLEY

1    what --

2           MR. KNIZLEY:  Sure.

3           MR. BODNAR:  When we took a photograph of it, that's

4    what caused it, just like when you photocopy a prescription.

5           MR. KNIZLEY:  Judge, let's not testify about it.

6    Let's just ask the witness and let him explain it, if he has an

7    explanation.

8           THE COURT:  Well, that's what I'm asking you to do.

9           MR. KNIZLEY:  Yes, ma'am.

10   Q   Do you have the original?

11   A   No, I don't.

12   Q   I'll just ask you, Agent, do you recall seeing that

13   displayed to the jury earlier, a prescription that had the word

14   "invalid" behind it?  Do you recall seeing that?

15   A   No, I don't.

16          MR. KNIZLEY:  Okay.  Thank you.

17          That's all I have, Judge.

18          THE COURT:  All right.  Ms. Griffin?  Mr. Essig?

19          MR. ESSIG:  No questions, Your Honor.

20          THE COURT:  Okay.  Ms. Griffin?

21          MS. GRIFFIN:  Nothing further, Your Honor.

22          THE COURT:  All right.  You may step down.  Thank you.

23          MS. GRIFFIN:  Your Honor, I have if I might, three

24   stipulations I'd like to move to admit.

25          THE COURT:  All right.

326

```
1          MS. GRIFFIN:  First is Government's Exhibit 24-2.
2    It's a disk that the Alabama PDMP -- all of Dr. Ruan and
3    Dr. Couch's scripts that were filled in the state of Alabama
4    from 2011 through May of 2015 that were transferred to the DEA
5    and copied on this disk for purposes of this court.  They came
6    electronically and they were copied.
7          MR. ESSIG:  Your Honor, yeah, subject to our
8    objections that we want to maintain regarding hearsay and the
9    other issues that we raised in our motion in limine, but we --
10   I think there was an earlier objection that kept it from being
11   admitted regarding which agent had knowledge of it.  We
12   withdraw that portion of the objection.  We stipulate to the --
13         THE COURT:  All right.  You say you stipulate that
14   they are what she said?
15         MR. ESSIG:  Yes, ma'am.
16         THE COURT:  What they purport to be?
17         MR. ESSIG:  Yes, ma'am.
18         THE COURT:  All right.  We'll mark that in.
19      (Government's Exhibit 24-2 was entered into evidence.)
20         MS. GRIFFIN:  Government's Exhibit 24-7.  24-7, 24-8,
21   and 24-9 are the Florida PDMP first page of the scripts for
22   Dr. Ruan.  And Dr. Ruan is 24-8, Dr. Couch is 24-7, to show
23   what the PDMP scripts from Florida look like.  And the
24   electronic information that was forwarded to DEA is contained
25   in the disk, Government's Exhibit 29 -- excuse me -- 24-9.
```

1   They were sent to DEA electronically and copied on a disk and

2   the parties have stipulated that if a PDMP representative from

3   the state of Florida came, they would identify these as their

4   PDMP records for these two doctors during that period of time,

5   subject to the defense's continuing objection.  But they do

6   admit, they do agree, that we may introduce these.

7          MR. ESSIG:  That's correct, Judge, subject to the

8   objection.

9          THE COURT:  So those are numbers 24 --

10         MS. GRIFFIN:  24-7.  24-7, 24-8, 24-9.

11         THE COURT:  All right.  Mark them in.

12      (Government's Exhibits 24-7, 24-8, and 24-9 were entered

13   into evidence.)

14         MS. GRIFFIN:  And then another stipulation, Your

15   Honor, as to the Mississippi PDMPs, and that is Government's

16   Exhibit 24-5 for Dr. Couch; 24-7 for Dr. Ruan; and 24-10,

17   that's the PDMP for scripts written by these doctors that were

18   filled in Mississippi.  These records were provided by the

19   Mississippi PDMP electronically to DEA, they were placed at DEA

20   on a disk for purposes of introduction in the courtroom.  And I

21   understand they have a continuing objection, but that they

22   don't object to the admission of these records.

23         MR. ESSIG:  That's correct, Judge.

24         MS. GRIFFIN:  I'm sorry, Your Honor.  Mr. Bodnar's

25   just advised me it's 24-5, 24-6, and 24-10.  24-5 is Couch

1  records, 24-6 is Ruan records, and 24-10 is the

2  compilation.  The 24-5 and 24-6 are just the first pages to

3  show what type of records they are connected with the PDMP.

4  And I understand the defense still has a continuing objection.

5        THE COURT:  All right.  Mark them in.

6     (Government's Exhibit 24-5, 24-6, and 24-10 were entered

7  into evidence.)

8        MS. GRIFFIN:  We call Carolyn Middleton.

9              FBI SA CAROLYN MIDDLETON

10           was sworn and testified as follows:

11       THE WITNESS:  I do.

12       THE CLERK:  Thank you, ma'am.  Please be seated.

13              DIRECT EXAMINATION

14  BY MS. GRIFFIN:

15  Q   Tell us your name, please, ma'am.

16  A   Carolyn Middleton.

17  Q   How are you employed?

18  A   I'm with the FBI as a special agent.

19  Q   How many years of law enforcement experience do you have?

20  A   14.

21  Q   You are assigned to the Mobile office; is that correct?

22  A   That's correct.

23  Q   I want to direct your attention to May the 20th of

24  2015.  Did you participate in the execution of a federal search

25  warrant at C&R Pharmacy on Airport Boulevard in Mobile?

1  A   Yes, I did.

2  Q   Were you assigned a special duty as to C&R Airport?

3  A   I was.  I was with the evidence response team.

4  Q   And we've heard that that is the person who calendars

5  everything that is collected in the search; is that right?

6  A   That's correct.

7  Q   Have you previously been shown Government's Exhibit 4-1?

8          MS. GRIFFIN:  Could you put it on the screen for us,

9  please?

10  A   Excuse me?

11  BY MS. GRIFFIN:

12  Q   Have you previously been shown this booklet --

13  A   I have.

14  Q   -- that I have?  That you're seeing a photo of?

15  A   Yes.

16  Q   Government's Exhibit 4-1, does this contain the documents

17  pertaining to the C&R Pharmacy, that being your administrative

18  worksheet for the search, your evidence log, your photography

19  log, and the listing of drugs, controlled substances, seized

20  from the location?

21  A   It does.

22  Q   Does it also contain a photograph or a sketch of the

23  location?

24  A   Yes, it does.

25          MS. GRIFFIN:  Move to admit Government's Exhibit 4-1

FBI SA CAROLYN MIDDLETON - DIRECT BY MS. GRIFFIN

 1  and to show it quickly to the jury.

 2          THE COURT:  All right.

 3          MR. ESSIG:  No objection.

 4          THE COURT:  Mark it in.

 5      (Government's Exhibit 4-1 was entered into evidence.)

 6          MS. GRIFFIN:  Does it just show that there's an

 7  administrative worksheet?  Mr. Cochran?

 8          THE COURT:  All right.  It's up.

 9          THE WITNESS:  There it is.

10          MS. GRIFFIN:  And then, of course, it goes through and

11  shows the evidence record.  And if you will, go to the

12  photograph of the layout.

13  Q   Now, Ms. Middleton, is this a sketch of the C&R Pharmacy?

14  A   Yes, it is.

15  Q   And could you generally give us an idea of how big this is,

16  this location?

17  A   It's a relatively small location.  I would say, rough

18  estimate, maybe half of this courtroom.

19  Q   And how do you enter C&R Pharmacy?

20  A   There are two ways to enter C&R Pharmacy.  One is you can

21  see that there is an A on the sketch.  That's an entry door

22  from the outside, the outside of the structure that exists.  Or

23  there is an interior door that comes in from a medical

24  practice.

25  Q   And that medical practice would be what business?

FBI SA CAROLYN MIDDLETON - DIRECT BY MS. GRIFFIN

1   A    That was PPSA.

2   Q    So they are connected, although C&R Pharmacy has an entry

3   or exit to the outside?

4   A    That's correct.

5   Q    Were photographs taken in C&R Pharmacy?

6   A    Yes, they were.

7   Q    And I show you what's been marked as Government's Exhibit

8   4-2 and ask if you can identify that these were the photographs

9   taken within C&R Pharmacy on that date?

10  A    Yes, they were.

11  Q    Have you previously been shown these photographs?

12  A    I have.

13          MS. GRIFFIN:  And, Your Honor, we would move to admit

14  Government's Exhibit 4-2, photographs from within C&R Pharmacy.

15          THE COURT:  Do you need to look at them?

16          MR. KNIZLEY:  Yes, ma'am, please.

17  BY MS. GRIFFIN:

18  Q    Now, Ms. Middleton, these are not all the photographs; is

19  that right?

20  A    That's correct.

21  Q    These are just ones selected to present in court?

22  A    That's right.

23          MS. GRIFFIN:  Your Honor, might we roll this to the

24  front of the lectern?

25          THE COURT:  Sure.  Yes.

FBI SA CAROLYN MIDDLETON - DIRECT BY MS. GRIFFIN

1          Any objection?

2          MR. KNIZLEY:  No, ma'am.

3          THE COURT:  Mr. Essig?

4          MR. ESSIG:  No, ma'am.

5          THE COURT:  All right.  Mark 4-2 in, then, 4-2.

6          THE CLERK:  Yes, ma'am.

7       (Government's Exhibit 4-2 was entered into evidence.)

8          MS. GRIFFIN:  Your Honor, we will not be admitting

9   4-3.  We already have the layout of the pharmacy, so we'll

10  strike Exhibit 4-3.

11          THE COURT:  All right.

12          MS. GRIFFIN:  And if you would, turn to the first

13  picture in the C&R Pharmacy pictures, please?

14  Q   Could you tell us what this jpeg picture number two is,

15  please, ma'am.

16  A   Sure.  This is a photograph of the entrance to C&R Pharmacy

17  from the medical practice, PPSA's medical practice.  That would

18  be the interior entrance.

19  Q   So as you are looking at this door, are you in PPSA or C&R

20  Pharmacy?

21  A   You're in PPSA.

22  Q   And if you go through the door?

23  A   You're in C&R Pharmacy.

24  Q   I show you jpeg picture number five and ask if you can

25  identify.

FBI SA CAROLYN MIDDLETON - DIRECT BY MS. GRIFFIN

333

1   A   This is one of the rooms within the C&R Pharmacy and it's

2   got a label on there that tells me it's room B.

3   Q   And you have a room B identified on the sketch you've

4   previously identified; is that correct?

5   A   That's correct.

6   Q   I show you jpeg number six and ask if you can identify it.

7   A   This is another shot within the same room.

8   Q   Jpeg number seven?

9   A   This is another shot within that same room that's room B.

10  Q   And we'll go to room C, jpeg eight.

11  A   This is a shot looking into room C.

12  Q   And were there actually drugs contained within this room

13  that you can see in the photograph?

14  A   There are.

15  Q   I show you Government's Exhibit -- excuse me -- jpeg nine,

16  photograph nine, which is part of Exhibit 4-2.

17  A   This is another view of room C.

18  Q   Containing drugs?

19  A   Yes.

20  Q   And I will skip photograph jpeg 10 and go to jpeg 12,

21  please, and ask if you can identify room D.

22  A   This is room D, I know that from the label up on the

23  window.

24  Q   And did you determine -- what did you determine this to be?

25  A   This is the office, so the administrative area.

FBI SA CAROLYN MIDDLETON - DIRECT BY MS. GRIFFIN

1  Q   And I show you jpeg 13, still all part of Government's
2  Exhibit 4-2, and ask if you can identify the photograph.
3  A   I can.  This is also room D.
4  Q   Which is still part of the --
5  A   The office for C&R Pharmacy.
6  Q   I show you Government's Exhibit -- jpeg 14, part of Exhibit
7  4-2.
8  A   This is room E, and so this would be -- this would be
9  between the office and there's a hallway between this and a
10  waiting area for customers, patients.
11  Q   As you look straight at the picture, is the waiting room
12  shown in the photograph?
13  A   It is.
14  Q   Can you tell us where that is on the photograph?
15  A   On the photograph the waiting room is -- from where the
16  photographer is standing, the waiting room is directly in front
17  of him.  You can see the three black chairs against the wall.
18  That would be the waiting room.
19  Q   And what is behind the letter E that's shown in this
20  photograph?
21  A   That's a counter where customers could go to the counter
22  and conduct business with the pharmacy staff.
23  Q   Does it appear that there may be something behind the E?
24  Is there glass that can be closed there?
25  A   There is.

1  Q   If we would go to jpeg 21, please.

2         And ask if you can identify the location of that

3  photograph.

4  A   I can.  This is in room D.  So that's the office.  And this

5  was above what appeared to be the main desk (indicating).

6  Q   Then photograph jpeg 36, and ask if you can identify.

7  A   This was in room D also.

8  Q   What do those appear to be there where I have pointed an

9  arrow?

10  A   Those are bundles of prescriptions.

11  Q   And there in the green box?

12  A   Also prescriptions.

13  Q   Did you find any unsigned prescriptions there that appeared

14  to have been filled at that pharmacy?

15  A   We did.

16  Q   I show you what's marked as Government's Exhibit 4-11 and

17  ask if you can identify the contents of 4-11 and where they

18  came from.

19  A   These are -- this is a green container much like the one

20  you see in the photograph here.  These came from room D and

21  within these are small bundles of prescriptions.

22  Q   Do they appear, from the back of the prescriptions, to have

23  been filled?

24  A   Most if not all of them do appear -- they have a pharmacy

25  sticker on them which it shows -- it indicated to us that the

FBI SA CAROLYN MIDDLETON - DIRECT BY MS. GRIFFIN

336

 1  pharmacy at least addressed them in some fashion.

 2  Q   Did those on the back contain a number that appears to be a

 3  prescription number?

 4  A   Yes.

 5  Q   And are those scripts signed or unsigned?

 6  A   They are unsigned, they do not have a physician's signature

 7  on them.

 8  Q   Are they C&R scripts?

 9  A   They are C&R prescriptions, yes.

10       MS. GRIFFIN:  I'd move to admit Government's Exhibit

11  4-11 at this time.

12       MR. KNIZLEY:  May I look at it?

13       MS. GRIFFIN:  Mr. Cochran, while we're waiting, would

14  you move to jpeg 71 so we'll be ready?  Thank you.

15       THE COURT:  Any objection?

16       MR. KNIZLEY:  No objection.

17       THE COURT:  All right.  Mark them in.

18       MS. GRIFFIN:  Any objection to 4-11?

19       THE COURT:  No, there wasn't.

20       MR. ESSIG:  Your Honor, no objection to the exhibit,

21  but we would ask the witness not testify any further regarding

22  whether the unsigned prescriptions were actually filled.  She

23  doesn't have any experience in that area and she has no

24  expertise.  I understand it's already come out.  We would ask

25  for no other testimony on that.

FBI SA CAROLYN MIDDLETON - DIRECT BY MS. GRIFFIN

```
 1              THE COURT:  Well, I would simply say if there's a
 2    question asked that you object to it at that time.  I don't do
 3    anticipatory rulings.
 4              Mark it in.
 5         (Government's Exhibit 4-11 was entered into evidence.)
 6    BY MS. GRIFFIN:
 7    Q   I'd show you jpeg picture 71 which is contained in
 8    Government's Exhibit 4-2 and ask if you can identify the
 9    photograph.
10    A   This is a photograph of what appeared to be storage of
11    bundles of prescriptions.
12    Q   And does there appear to be numbers on each of these little
13    parcels?
14              MS. GRIFFIN:  Can you blow up one to show us,
15    Mr. Cochran?
16    A   Yes, there are numbers and they appear to correspond to
17    these prescription numbers within the bundles.
18    BY MS. GRIFFIN:
19    Q   Within the little packages?
20    A   Yeah.
21    Q   Then if we could see jpeg 72 and then jpeg 73, these also
22    appear to be what?
23    A   These are also bundles of prescriptions.
24    Q   Same with jpeg 74?
25    A   That's correct.
```

FBI SA CAROLYN MIDDLETON - DIRECT BY MS. GRIFFIN

1   Q   Were they all contained within C&R Pharmacy?

2   A   They were.

3   Q   Were those all seized?

4   A   These were all seized, yes.

5   Q   How were they seized?  What were they transferred into?

6   A   Boxes.  In this photograph here you can see in the lower

7   left-hand corner that there's a banker's box and they were

8   shifted over into boxes.

9   Q   Did they appear to be or were they in drawers?

10  A   They were.

11  Q   And then when you seized them you placed them in boxes?

12  A   Correct.

13  Q   What happened to the controlled substances that were

14  contained within C&R Pharmacy?

15  A   DEA managed all of those and seized those.

16  Q   They did not seize the noncontrolled; is that correct?

17  A   That is my understanding.

18  Q   In that pharmacy was there anything for sale that you would

19  normally associate with a pharmacy like Band-Aids or --

20          MR. KNIZLEY:  Objection.  No predicate for this

21  witness.

22  BY MS. GRIFFIN:

23  Q   Did you see anything like that?

24          MR. KNIZLEY:  Well --

25          THE COURT:  Just ask her about specific things so that

339

1   she doesn't --

2   BY MS. GRIFFIN:

3   Q   Did you see any Band-Aids in the pharmacy for sale?

4   A   I didn't see any.

5   Q   Did you see any rubbing alcohol for sale?

6   A   I did not.

7          MR. ESSIG:  Your Honor, I object to that line of

8   questioning, whether there are Band-Aids or rubbing alcohol at

9   the pharmacy.  It has no relevance to the charges in this

10  indictment.

11         THE COURT:  Overruled.

12  BY MS. GRIFFIN:

13  Q   Did you see any aspirin for sale?

14  A   I did not.

15  Q   Did you see any Ace bandages for sale?

16  A   I did not.

17  Q   Did you see any Kleenex for sale?

18  A   No.

19  Q   Did you see any splints for sale?

20  A   No, I did not.

21  Q   You just saw controlled substances, other drugs and

22  prescriptions basically?

23  A   Yes; that's correct.

24  Q   Some records?

25  A   Yes.

1  Q   I show you what's marked as Government's Exhibit 4-13 --

2  4-13, I'm sorry -- and ask if you can identify the exhibit.

3  A   This is FBI item number 1B44.  That means it's an evidence

4  number that's assigned to it.  At the search this was the

5  item -- item 25.  We assigned that at the search time.  And

6  it's a box of documents and scripts.  And this was -- these are

7  items that were taken out of that box of documents and scripts.

8          MS. GRIFFIN:  We'd move to admit Government's Exhibit

9  4-13, 4-13.

10          THE COURT:  Any objection?

11          MR. ESSIG:  No objection.

12          THE COURT:  All right.  Mark them in.

13      (Government's Exhibit 4-13 was entered into evidence.)

14  BY MS. GRIFFIN:

15  Q   And if you will, tell us the names of the folders that were

16  seized from within the pharmacy that have just been admitted as

17  Exhibit 4-13?

18  A   I will.  It's Couch-Abstral, Fill Out and Fax to Angela.

19  And the other one is Ruan-Abstral, Fill Out and Fax to Angela.

20          MS. GRIFFIN:  May we publish these to the jury, Your

21  Honor?

22          THE COURT:  Yes.

23          MS. GRIFFIN:  From the ELMO, please, ma'am.

24  Q   4-13.  You've identified the folders that were marked Ruan

25  Abstral and Couch Abstral contained within Exhibit 4-13; is

FBI SA CAROLYN MIDDLETON - DIRECT BY MS. GRIFFIN

 1   that correct?

 2   A   That's correct.

 3   Q   And I'll show you within the folder marked Couch does there

 4   appear to be a patient name at the top of the document, the

 5   Abstral enrollment form?

 6   A   I did not see a patient name on these documents.

 7   Q   And are the documents signed at the bottom by someone?

 8   A   They are signed by somebody, yes.  That's correct.

 9   Q   And there were several of those in that folder; is that

10   right?

11   A   That's right.

12   Q   And I show you also contained therein are there additional

13   Abstral enrollment forms?

14   A   That's correct.

15   Q   Do they appear to contain a patient name?

16   A   They do not.

17   Q   And further, have you determined whether they appear to be

18   signed at the bottom under the sign here?

19   A   Yes; that's correct.  They were signed by somebody.

20   Q   Does each page contain in the bottom right-hand corner the

21   FBI serial 1B44 for where the items were seized?

22   A   Yes, they do.

23           THE COURT:  Ms. Griffin, is this a good stopping point

24   for us or do you have a very short --

25           MS. GRIFFIN:  I have a very short exhibit.

342

```
 1              THE COURT:  Let's go with that one.
 2    BY MS. GRIFFIN:
 3    Q   I show you Government's Exhibit 4-12 and ask if you have
 4    previously seen this exhibit 1B274?
 5    A   Yes, I have.
 6    Q   And what was seized in connection with this exhibit number?
 7    A   This was a pharmacy calendar in a binder of loose pharmacy
 8    documents.  This was removed from item 10 from the search.
 9    Q   But it's contained in Government's Exhibit 4-12?
10    A   I can't -- can I see down at the bottom?  I'm sorry about
11    that.
12    Q   Yes.
13    A   Yes, 4-12, yes, ma'am.
14    Q   And these were actually seized from within C&R Pharmacy?
15    A   Yes, they were.
16              MS. GRIFFIN:  We'd move to admit Government's Exhibit
17    4-12.
18              THE COURT:  Any objection?
19              MR. KNIZLEY:  No, Your Honor.
20              THE COURT:  All right.  Mark them in.
21       (Government's Exhibit 4-12 was entered into evidence.)
22              MS. GRIFFIN:  And this contains a calendar.  May we
23    publish it to the jury, Your Honor?
24              THE COURT:  Yes.
25    BY MS. GRIFFIN:
```

1   Q   A calendar seized there at C&R Pharmacy; is that right?

2   A   That's correct.

3   Q   I'll show you on the ELMO what appears to be the date for

4   July 2014.

5   A   Yes; that's correct.

6   Q   That's part of the calendar; is that right?

7   A   That's right.

8   Q   And does it appear to have handwriting under different

9   dates?

10  A   It does.

11  Q   For different drugs?

12  A   Yes.

13          MS. GRIFFIN:  That's all I have of this witness at

14  this time, Your Honor.  I have some additional exhibits, this

15  whole dolly in front, to go through.  But I don't believe I can

16  get through it in the next few --

17          THE COURT:  I don't think you can do it in two

18  minutes.

19          All right.  Ladies and gentlemen, I'm going to put you

20  in recess for the weekend.  Now, every time you've left this

21  courtroom I've instructed you not to talk about this case with

22  anybody, including each other.  But it's especially important

23  now that you're going home for a weekend break to remember that

24  you can't talk about this with anybody you may see between now

25  and when you come back.

1            And the reason for that is if you say what you've been

2    listening to or hearing or seeing in this courtroom, whoever

3    you're talking to is going to want to put their two cents'

4    worth in and they haven't seen the evidence, they don't know

5    what you know about this case, and you don't need any outside

6    influence.  So just keep it to yourselves.  Relax this weekend,

7    if you can, and we will see you back Monday morning downstairs

8    in the jury assembly room, ready to be called back up at 9 a.m.

9    Thank you and have a good weekend.

10           (In open court, defendants present, jury not present.)

11                THE COURT:  Do you have something you want to take up?

12                MS. GRIFFIN:  Your Honor, I do.  We have taken two

13   witnesses off the witness list with the Alabama -- excuse me --

14   with the Mississippi and Florida stipulations.  And then we

15   have one more stipulation for Monday that will take another

16   witness off the list.

17                MR. BODNAR:  And one suggestion, Your Honor, that may

18   help alleviate things for next week and the week after.  For

19   Special Agent Mike Burt, Special Agent Coy Davis, Natalie

20   Perhacs, and Chris Manfuso, there's going to be -- and David

21   Corin -- there's going to be a series of emails that came in

22   through the search warrant.  If I can get copies to the Court

23   and to defense counsel the night before, it may be advantageous

24   for us to take it up either in the morning or at a lunch break,

25   if there's any objections to hearsay or other issues.  That way

```
 1    we can move through the emails faster as opposed to possible
 2    objections for every several ones.
 3            THE COURT:  All right.
 4        (A discussion was held off the record between counsel.)
 5            MR. BODNAR:  I will get it to everybody as quickly as
 6    we can get them in final format, Your Honor.
 7            THE COURT:  All right.  Y'all get a good weekend.
 8        (Court adjourned at approximately 5 p.m.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```