1               UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF ALABAMA
2

3  UNITED STATES OF AMERICA
                                    CASE NO. CR15-00088
4  V.
                                    COURTROOM 2B
5  JOHN PATRICK COUCH, M.D.,
   and XIULU RUAN, M.D.,
6                                   MOBILE, ALABAMA
            Defendants.
7                                   MONDAY, JANUARY 9, 2017
   * * * * * * * * * * * * * *
8  REDACTED

9
                        DAY 3 OF TRIAL
10        BEFORE THE HONORABLE CALLIE V. S. GRANADE,
             UNITED STATES DISTRICT JUDGE, AND JURY
11

12

13 APPEARANCES:

14 FOR THE GOVERNMENT:
        DEBORAH A. GRIFFIN
15      CHRISTOPHER BODNAR
        United States Attorney's Office
16      63 S. Royal Street, Suite 600
        Mobile, AL  36602
17      (251) 441-5845

18
   FOR THE DEFENDANT COUCH:
19      ARTHUR T. POWELL, III
        P.O. Box 40456
20      Mobile, AL 36640-0456
        (251) 433-8310
21
        JACKSON R. SHARMAN, III
22      ROBERT JACKSON SEWELL
        JEFFREY PAUL DOSS
23      BENJAMIN SANDERS WILLSON
        Lightfoot, Franklin & White
24      400 North 20th Street
        Birmingham, AL  35203
25      (205) 581-0700

1    (Continued)

2        BRANDON KEITH ESSIG
         800 Shades Creek Parkway, Suite 600D
3        Birmingham, AL  35209
         (251) 879-1981

4
    FOR THE DEFENDANT RUAN:
5        DENNIS J. KNIZLEY
         7 N. Lawrence
6        Mobile, AL 36602
         (251) 432-3799

7
         JASON BRADLEY DARLEY
8        Darley & McGough, LLC
         1751 Dauphin Street
9        Mobile, AL 36604
         (251) 441-7772

10
         GORDON G. ARMSTRONG, III
11       P.O. Box 1464
         Mobile, AL  36633
12       (251) 434-6428

13       STEVEN D. MARTINIE
         4955 North Lake Drive
14       Whitefish Bay, WI  53217
         (414) 332-9683

15
    THE CLERK:  MARY ANN BOYLES
16  THE LAW CLERK:  LYNN DEKLE
    COURT REPORTER:  ROY ISBELL, CCR, RDR, CRR
17
             Proceedings recorded by OFFICIAL COURT REPORTER
18         Qualified pursuant to 28 U.S.C. 753(a) & Guide to
      Judiciary Policies and Procedures Vol. VI, Chapter III, D.2.
19           Transcript produced by computerized stenotype.

20

21

22

23

24

25

1                          EXAMINATION INDEX

2

FBI SA CAROLYN MIDDLETON
3        DIRECT BY MS. GRIFFIN . . . . . . . . . . . . . . . . .370
         CROSS BY MR. ESSIG . . . . . . . . . . . . . . . . . .398
4        CROSS BY MR. KNIZLEY . . . . . . . . . . . . . . . .405
         REDIRECT BY MS. GRIFFIN . . . . . . . . . . . . . .415
5
DEA ANALYST PAUL SHORT
6        DIRECT BY MR. BODNAR . . . . . . . . . . . . . . . .419
         CROSS BY MR. WILLSON . . . . . . . . . . . . . . . .483
7        CROSS BY MR. ARMSTRONG . . . . . . . . . . . . . . 551
         REDIRECT BY MR. BODNAR . . . . . . . . . . . . . . 512
8
DEA DI MICHELLE PENFOLD
9        DIRECT BY MS. GRIFFIN . . . . . . . . . . . . . . . 518
         CROSS BY MR. ESSIG . . . . . . . . . . . . . . . . . 537
10       CROSS BY MR. KNIZLEY . . . . . . . . . . . . . . . .543
         REDIRECT BY MS. GRIFFIN . . . . . . . . . . . . . .547
11
FBI SA COY DAVIS
12       DIRECT BY MR. BODNAR . . . . . . . . . . . . . . . .548
         CROSS BY MR. DOSS . . . . . . . . . . . . . . . . . .594

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         EXHIBIT INDEX

2                                                      MAR ADM
     GOVERNMENT'S
3    4-7A        Hydrocodone Rxs                           378

4    4-7B        Hydrocodone Rxs                           378

5    4-7C        Hydrocodone Rxs                           378

6    4-7D        Hydrocodone Rxs                           378

7    4-8A        Couch fentanyl Rxs                        380

8    4-8B        Couch fentanyl Rxs                        380

9    4-9A        Ruan fentanyl Rxs                         382

10   4-9B        Ruan fentanyl Rxs                         382

11   4-10A       Couch out-of-country Rxs                  385

12   4-10B       Couch out-of-country Rxs                  385

13   4-11A       Unsigned filled scripts (folder - green   386
                 tray)
14
     4-14A       miscellaneous scripts                     395
15
     4-14B       miscellaneous scripts                     395
16
     4-14C       miscellaneous scripts                     395
17
     4-14D       miscellaneous scripts                     395
18
     4-14E       miscellaneous scripts                     395
19
     4-14F       miscellaneous scripts                     395
20
     4-15A       Zohydro                                   389
21
     4-15B       Zohydro                                   389
22
     4-16        IOU log                                   393
23
     4-17        Select patient Rxs                        394
24
     4-18        2015 C&R Audit Logs                       372
25

| | | |
|---|---|---|
| 4-19 | 2011 C&R Daily Audit Logs | 372 |
| 4-20 | 2012-2013 C&R Daily Audit Logs | 375 |
| 4-21 | 2014 C&R Daily Audit Logs | 375 |
| 5-1A | Joyce Barber scripts (N303) (Three Notch Pharmacy) | 520 |
| 5-1B | Joyce Barber scripts (N262) | 520 |
| 5-2 | Lauren Blouin scripts (284, 268) (Daphne Pharmacy) | 521 |
| 5-3 | CC..... scripts (N301 & N302) (Daphne Publix Pharmacy) | 522 |
| 5-4 | J. Driver script (N273) (Loxley Discount Pharmacy) | 522 |
| 5-5 | S. McDonald script (N276) (Kmart Pharmacy, Mobile) | 523 |
| 5-6 | K. Daves scripts (N282) (CVS Mobile) | 524 |
| 5-7 | C. Sanford scripts (N278 & 270) (Walgreens & Daw Pharmacy) | 524 |
| 5-8 | M. Sansing scripts (N264, 265 & 266) Mississippi | 523 |
| 5-9 | G. Douthitt scripts (N293 & 294) | 524 |
| 10-0 | Charts (gray binder) | 422 |
| 10-01 | Couch & Ruan select drugs | 422 |
| 10-02 | Ruan select drugs | 422 |
| 10-03 | Couch select drugs | 422 |
| 10-04 | Couch select drugs out of town graph | 422 |
| 10-05 | Ruan schedule II breakdown graph Mcg TIRF | 422 |
| 10-05(a) | Couch & Ruan recipients receiving TIRF prescriptions | 422 |

| | | | |
|---|---|---|---|
| 1 | 10-06 | Ruan schedule II breakdown top 10 | 422 |
| 2 | 10-07 | Couch chart top 10 schedule II drugs prescribed | 422 |
| 4 | 10-08 | Ruan pie chart prescriptions by drug group | 422 |
| 5 | 10-09 | Couch pie chart prescriptions by drug group | 422 |
| 7 | 10-10 | Ruan pie chart prescriptions by schedule | 422 |
| 8 | 10-11 | Couch pie chart prescriptions by schedule | 422 |
| 9 | 10-12 | Couch chart selected drug totals | 422 |
| 10 | 10-13 | Couch chart prescriptions on specified days | 422 |
| 12 | 10-14 | Couch pie chart prescriptions by schedule | 422 |
| 13 | 10-15 | Ruan chart drug combinations | 422 |
| 14 | 10-16 | Couch chart drug combinations | 422 |
| 15 | 10-17 | Couch & Ruan Exalgo prescriptions by month mg | 422 |
| 17 | 10-17(a) | Couch & Ruan prescribed by month mcg - graph | 422 |
| 18 | 10-18 | Couch & Ruan prescribed by month mcg - graph | 422 |
| 20 | 10-18(a) | Chart Ruan & Couch Subsys mcg prescribed per month | 422 |
| 21 | 10-19 | Couch & Ruan Abstral prescribed per month mcg - graph | 422 |
| 23 | 10-19(a) | Chart Ruan & Couch Abstral mcg prescribed per month | 422 |
| 24 | 10-20 | qd | 422 |

10-23        Ruan Abstral & Subsys top 25 - totals        422
             in grams

10-25        Couch Abstral & Subsys top 25 - totals       422
             in grams

10-26        Ruan & Couch C&R Pharmacy & Others, AL,      478
             MS, FL

10-27        Ruan & Couch TIRF Scripts C&R Pharmacy       478
             & Others, AL, MS, FL

10-28        Ruan & Couch Subsys & Abstral scripts        478
             AL, MS, FL

11-1         Investment records - Capital One (Ruan)      551

11-2         Investment records - Charles Schwab          551
             OptionsXpress (Ruan)

11-3         Investment records - E*Trade (Couch)         552

11-4         Summary of stock purchases of Galena         554
             Biopharma

11-5(1)-(17) Emails                                       559

13-2A        John Bosarge Rxs (N-287)                     525

13-3A        D. Walker Rxs (N279 & 272)                   525

13-11A       M. Weaver Rxs (N273 & 277)                   526

13-12A       DL..... Rx (N269)                            526

13-18A       B. Wells Rxs (N271, 273, and 275)            527

13-19A       K. Engles Rxs (N280, 281, 283)               527


DEFENDANT COUCH'S
62           Chart of Couch stock transactions -          596
             E*Trade

1    (Morning session, 8:30 a.m., in chambers, jury not

2    present.)

3         THE COURT:  Good morning.

4         MR. SHARMAN:  Good morning, Judge.

5         MR. BODNAR:  Good morning, Your Honor.

6         MS. GRIFFIN:  Good morning, Your Honor.

7         THE COURT:  Good morning.

8         MR. WILLSON:  Good morning, Your Honor.

9         THE COURT:  Have a seat.  Pull a chair up.

10        All right.  Whose party is this?

11        MR. BODNAR:  I set out everything ahead of time in

12   case they had any objections, Your Honor.  I believe they do.

13        THE COURT:  Okay.

14        MR. SHARMAN:  Do we need Dennis?

15        MR. WILLSON:  We do.

16     (Mr. Knizley entered chambers.)

17        MR. KNIZLEY:  Morning, Your Honor.

18        THE COURT:  Good morning, good morning.

19        MR. KNIZLEY:  Mr. Armstrong, I think, is right behind

20   me.

21        THE COURT:  The door is open.

22        MR. WILLSON:  Age before --

23        MR. KNIZLEY:  We've got plenty of that here.

24        MS. GRIFFIN:  Excuse me.

25        MR. KNIZLEY:  Plenty of the age here, if that's what

 1    he's asking about.

 2            MR. ARMSTRONG:  Good morning.  I apologize.

 3            THE COURT:  All right.  The objections to which

 4    exhibits?  Who's the spokesperson for the objectors?

 5            MR. KNIZLEY:  Judge, Mr. Armstrong is going to take

 6    the witness, Mr. Short, so I think he will address the

 7    objections as to Mr. Short's exhibits.

 8            MR. ARMSTRONG:  Judge, if you'll give me a moment,

 9    I've got then written down.  Judge, the government has a number

10    of exhibits that they have proposed to offer through Agent

11    Short.  We've been shown those exhibits.  They start with

12    Exhibit Numbers 10-1 and go through as of yesterday 10.28 and

13    they include a lot of -- for instance, the 10 point series of

14    exhibits.  And there's approximately -- Chris, amongst those,

15    there are some -- some of them have subparts.  I guess you're

16    looking at them now.  Some of them have, for instance, subparen

17    (a), subparen (b), subparen (c), and those also include

18    voluminous supporting data to those subparts.

19            What our objection is, these are all the PDMP data

20    that has already been introduced, that disk of the PDMP data.

21    And so we have that running line of objections to the

22    introduction of that.  So that's the first one, that we think

23    that that is irrelevant because it includes all patients, all

24    prescriptions for controlled substances during the period of

25    the indictment.  And we think that includes not only the

1    patients that they're alleging did not get proper care and were

2    part of this indictment, but also patients outside of that.

3    And so we think that that is in violation of that prior

4    objection we had.

5            Secondly, Judge, we think that many of those, if not

6    most of this information and data, is irrelevant to the

7    allegations in the indictment because they address not just the

8    claims of the specific patient care that's alleged but also the

9    conspiracy charges.  It includes patients -- and, of course,

10   this data refers to recipients that are not included within

11   those.  Specifically, a lot of these exhibits point to names,

12   specific patients, that there will not be testimony or evidence

13   introduced that there was improper care or outside the scope of

14   professional medical practice about those patients.

15           So we think it is irrelevant.  There will not be a

16   proper foundation for the introduction of those exhibits

17   because they will not tie it together later.

18           Also Judge -- and we think that that violates the

19   Court's pretrial ruling regarding evidence being limited on

20   patients not contemplated by the indictment.

21           Also we think under ground 403, we think that it will

22   be confusing to the jury.  I don't know if you've scanned

23   through all these, but they come from different directions,

24   they break down certain medications, they exclude other

25   medications, they do certain time periods for one medication,

356

1    certain time periods for combinations of medications.  And we

2    think it's going to be extremely confusing to the jury and we

3    don't think it's going to assist them because these are going

4    to be trial exhibits, these are not going to be the evidence

5    itself.  These are going to be exhibits that the government has

6    put together onto these charts by gleaning data from the actual

7    evidence, which is the entire PDMP file.  And we think it's

8    going to be confusing under rule 403.  I don't know if --

9             MR. KNIZLEY:  Cocktail.

10            MR. ARMSTRONG:  Oh, and there's a specific one, Judge,

11   which I think is in 10-15.  If you can look at 10-15, there's a

12   reference on one of the categories to the words "cocktail

13   combination."  Or maybe it's 15(a).  I'll get the specific one.

14            Yeah, if you look at it, there's a category at the top

15   that they refer to as Cocktail.  Well, that's purely argument,

16   Judge, Cocktail Component.  We think that's inappropriate.  We

17   think that's extremely prejudicial, it's argument.  It is not

18   in the data as Cocktail.  That's the government's assertion as

19   to that and we would ask that "cocktail," the word "cocktail"

20   -- I mean, they can put in there "component," if they want or

21   "medication," but not "cocktail."  That's not a medical term

22   and that's not in the data.  That's argument by the

23   government.  So we would object to that.

24            THE COURT:  Anything else?

25            MR. ARMSTRONG:  And that's all for Dr. Ruan.

357

1              MR. WILLSON:  Your Honor, in addition to Dr. Couch,

2     you know, we join Dr. Ruan's objection, but specifically if you

3     will look at 10-25, which is in the exhibits, kind of a

4     distillation of the larger list of top 25 recipients of Abstral

5     and Subsys for Dr. Couch in this case, and it specifically

6     lists 25 names, many of which are outside, again, of Your

7     Honor's pretrial order regarding, you know, these patients

8     being part of the substantive or conspiracy counts, and so we

9     would only add, Your Honor, that if this is relevant, that we

10    would certainly be entitled to bring one or more of these

11    patients to provide more evidence concerning the actual care

12    that they received.

13             MR. ARMSTRONG:  We would join that as well, Judge.

14             THE COURT:  You're joining each others, unless you opt

15    out.  So you don't have to keep saying you're joining it.

16             All right.  Any response?

17             MR. BODNAR:  Your Honor, I'll try to make sure I hit

18    all the different points.  One for foundation, all the

19    underlying data is already in evidence.  It is voluminous, it

20    encompasses 294,183 different prescriptions written by these

21    doctors filled in Mississippi, Alabama, and Florida.  He is

22    testifying and we do intend to admit them as evidence

23    themselves under 1006 as charts of voluminous data.

24             With regard to 10-25 -- and I believe the equivalent

25    one would be 10-23 for Dr. Ruan in terms of the top 25

1    patients -- those top 25 patients' names have been given to the

2    defendants a long time ago as patients that we are going -- as

3    some of the patients that we are going to allege received

4    Subsys and Abstral outside the usual course of professional

5    practice.

6            THE COURT:  So you're saying that none of these

7    patients listed on either of these exhibits are patients that

8    did not receive proper care or some of these patients did

9    receive proper care?

10           MR. BODNAR:  What we're doing, Your Honor, is there's

11   a subsequent witness that's going to come later this week, Jeff

12   Young with the FBI, and he's going to take those top 25 lists

13   and he is going to mark down which ones.  He has reviewed the

14   medical records for each one of these individuals.  And I

15   believe it's seven for Dr. Ruan and maybe nine -- I may have it

16   backwards -- for Couch that did have cancer.  So we are

17   pointing out that those individuals did receive it for what

18   Subsys and Abstral are intended for, but the vast majority of

19   these just on the top 25 did not.

20           THE COURT:  Why are you including the ones that you

21   say did receive proper care in your charts?

22           MR. BODNAR:  Because what Paul Short is going to

23   testify today is that he does not change data or take things

24   out or add anything to it.  He's not a statistician.  What he

25   does is he simply takes the data from the PDMP reports and puts

1  it in a format that is easy for the jury to understand.  So

2  what he doesn't want to do is say:  Okay.  Here's the top 25

3  recipients of people that didn't have cancer.

4          Because he has no knowledge and he won't testify to

5  that as who did or who did not have cancer on this list.  And

6  we've alleged as an enhancement that there was more than 40

7  grams of fentanyl prescribed outside the usual course of

8  professional practice, which is the sentencing -- a mandatory

9  minimum sentencing enhancement, Your Honor.  So he is simply

10  going to say -- he's not going to say one way or the other if

11  these people were or were not treated in the usual course of

12  professional practice.  He will say these are the top 25

13  recipients.

14          Jeff Young is going to testify which ones did or

15  didn't have cancer.  Dr. Greenberg or Aultman will be speaking

16  about other individuals as having received care outside the

17  usual course.  And then a number of these patients, the ones

18  that are still living, will actually come in and testify about

19  their treatment as well.  So that's why the top 25 are like

20  that, Your Honor.

21          THE COURT:  Okay.  Go ahead.

22          MR. BODNAR:  Next, in terms of the word "cocktail,"

23  the charts 10-15 and 10-16 do have the backup components, which

24  are the actual documents.  Frankly, Your Honor, I think just

25  10-15 and 10-16 are enough.  They summarize exactly how many

1    people got the different cocktails.  There's about 700 pages

2    behind them for each one where it shows each patient on each

3    date.  That is basically just him showing his work.

4           We included it in case defense counsel wanted to claim

5    that individuals did not receive the cocktail or they did

6    not -- or he viewed it the wrong way.

7           THE COURT:  I understood he objected to the word

8    "cocktail."

9           MR. BODNAR:  Well, that word's already come in through

10   Susannah Herkert, who's explained that that combination -- the

11   opioids, benzos, and carisoprodol -- are known as the Holy

12   Trinity cocktail.  She talked about it.  Paul Short has

13   knowledge about it from just his work in the DEA.  Numerous

14   other witnesses can talk -- including all of our experts and

15   some of Dr. Ruan's experts.

16          THE COURT:  The ones that are labeled Cocktail

17   Component --

18          MR. BODNAR:  Those are in subparts, Your Honor.  Those

19   really don't even need to come in unless they are going to

20   challenge whether or not the numbers are correct on 10-15 and

21   10-16.  We can simply do 10-15 and 10-16, which are the summary

22   charts that show for each of those combinations, and he used

23   the word "combinations" instead of "cocktail" on those two.

24          THE COURT:  All right.

25          MR. BODNAR:  In terms of relevance, Your Honor, this

1   is highly relevant of what's going on here.

2          THE COURT:  I don't question the relevance.

3          MR. BODNAR:  And in terms of confusion for the jury,

4   Mr. Short has testified in many, many other cases for over 17

5   years of doing this.  I've walked through it with him a number

6   of times already.  He will be able to explain this in a clear

7   way to the jury.

8          THE COURT:  Well, I think what would be more confusing

9   is just to give them all the PDMP numbers without any

10  explanation.  So I agree that these summary charts are

11  appropriate, and it's up to you to determine which are

12  necessary.  So --

13         MR. BODNAR:  And lastly, Your Honor, in terms of using

14  them later, there are going to be a number that don't

15  necessarily make sense right at the moment.  For instance,

16  Dr. Couch's select dates, 10-3, which are just certain select

17  dates that we gave him to look at what drugs were prescribed on

18  those dates, that will become -- that will become clear when

19  Amy White testifies later that these are the days that through

20  various flight records she can show Dr. Couch was either out of

21  the state or out of the country.  So we need to get in those

22  documents now so they tie in with Special Agent White's

23  testimony later that the dates match up with the dates that we

24  can show he was out, not treating patients, and these are the

25  drugs prescribed those days.

1        THE COURT:  Okay.

2        MR. ARMSTRONG:  Judge, if I could just respond to that

3   very briefly?  Chris mentioned -- I guess, for Dr. Ruan it

4   would be Exhibit 10-23, which is the, quote, "top 25

5   recipients" and that those names have been provided and some of

6   those are going to be ones that they allege received improper

7   care, but not all.  That does not take into account on 10-15 he

8   was just talking about the number of recipients that received

9   this, quote, "cocktail" were 255 patients, different

10  patients.  And they are summarized, those patients are

11  summarized, their names and everything, in the summary exhibits

12  10-15(a), (b), (c), or (d).  And that's just that received

13  that, quote, what they call the "Holy Trinity cocktail" that

14  they referred to, which has a legitimate medical use.  So the

15  fact that they got those does not per se mean that they were

16  improper.  They would have to have followup testimony that each

17  of those patients -- otherwise there's no relevance to admit

18  those patient names or numbers.

19        Secondly, Exhibit 10-22, there's 637 patient names

20  that the government wants to introduce on Exhibit 10-22, which

21  is recipients over that four-year period of the indictment,

22  four and a half years, that received Abstral and Subsys.  637

23  patient names, different names.  And if they bring all those

24  patient names into the case as being relevant, if they say they

25  are relevant, then we have a right to talk about those

```
 1   patients, not just the ones that they want to cherrypick from

 2   that exhibit.

 3            THE COURT:  This is not an objection to the

 4   exhibit.  This is you're asking for permission to put on

 5   additional evidence about names in the exhibit; is that

 6   correct?

 7            MR. ARMSTRONG:  Well, if the Court's going to deem

 8   that those exhibits are relevant, which we still think that

 9   they are not relevant because of the numbers --

10            THE COURT:  They are definitely relevant.  I don't

11   think relevance is a question.  Based on allegations in the

12   indictment, any patients or the number of patients that were

13   prescribed Abstral and Subsys --

14            MR. BODNAR:  Subsys.

15            THE COURT:  -- are relevant to the charges in this

16   indictment.  You're raising the question of whether you can put

17   on evidence about some of the patients that they don't claim

18   were treated outside the usual scope of medical practice.

19            MR. ARMSTRONG:  If they are going to put their names

20   in as an exhibit, then that opens the door for us and we just

21   want to make sure we're clear on that.

22            THE COURT:  That's a different question, that's a

23   different question.  So we'll have to face that, I suppose,

24   when they attempt to offer evidence about those patients.

25            MR. BODNAR:  Yes, Your Honor.  The one thing I say
```

```
 1    going forward towards that is this list is not a list of people
 2    that did or did not receive it in the usual course of
 3    professional practice.  There are going to be other witnesses
 4    later that are going to talk about who did and didn't get
 5    Subsys in the usual course.  This is simply the list from --
 6            THE COURT:  Well, I know, but there are plenty of
 7    people who did and who didn't; correct?
 8            MR. BODNAR:  Yes.  For the reasons we've already
 9    stated, he'll state on the stand he does not take in or out
10    evidence.  It's just:  Here's what the data says.
11            THE COURT:  Okay.  Anything else?
12            MR. ARMSTRONG:  I don't think so.
13            THE COURT:  Okay.
14            MR. ARMSTRONG:  Oh, Judge, instead of interrupting
15    every time they go into an exhibit, if we can just have a
16    running objection?  Instead of having to stand up each time, if
17    the Court will allow us to, in the series of exhibits?
18            THE COURT:  You haven't objected to all of them.  So I
19    don't --
20            MR. ARMSTRONG:  Well, we didn't object to all of them,
21    based on the prior motion.
22            THE COURT:  I know, but I've already ruled on that.
23            MR. ARMSTRONG:  Right.  Well, then, I would -- since
24    it hasn't been specific, I would object -- I thought I did --
25    to each and every exhibit they are offering in this line
```

```
 1    through Agent Short.  I mean, or I can do it --
 2            THE COURT:  Based on the same objection you had to the
 3    -- the PDMP?
 4            MR. KNIZLEY:  PDMP.
 5            THE COURT:  I can't get the initials right.
 6            MR. ARMSTRONG:  All of mine I previously asserted,
 7    Judge, including they will be confusing to the jury.  I
 8    think -- I know you haven't really had a chance to look through
 9    all of them.  But there's graphs, there's charts, there's
10    lists, they include some dates, not all dates.
11            THE COURT:  What rule of evidence is the fact that
12    they may be confusing to the jury, what makes it inadmissible?
13            MR. ARMSTRONG:  That's rule 403, Judge, I believe.
14            THE COURT:  Well --
15            MR. ARMSTRONG:  If it's misleading or confusing.
16            THE COURT:  Well, it's not misleading.  I hate to say
17    that you can have a continuing objection to things that I'm not
18    sure that you've objected to, because I haven't -- haven't
19    looked at --
20            MR. ARMSTRONG:  We'll just object each time it's
21    introduced.  That's fine.
22            THE COURT:  All right.
23            MR. SHARMAN:  Just so the record is clear, Your Honor,
24    I understand the Court to be overruling the objection as
25    Mr. Armstrong stated it in here at least?
```

```
 1                THE COURT:  Yes.
 2                MR. KNIZLEY:  Your Honor, I don't know if the Court
 3     wants to now or later, as it comes up, but there's a Coy Davis.
 4     And I don't know if you're going to get to Coy today or not.
 5                MR. BODNAR:  Yes, we are definitely going to get to
 6     him today.  We think.
 7                MR. KNIZLEY:  You may not have looked at those
 8     exhibits.  We'll just bring it up at the time.
 9                THE COURT:  I looked at the emails.  Is that what
10     you're talking about?
11                MR. KNIZLEY:  The emails and there was a summary chart
12     which has some similar objections.  I can just make that at
13     that time.  It's one piece of paper.  The emails, I don't
14     really have an objection to them except maybe the redaction
15     aspect of it.  But I don't even know if that will be an issue
16     as well.
17                Lastly, though, on the witness that's now on the
18     witness stand, Agent Middleton, they brought some documents or
19     identified some documents that they intend to introduce through
20     her that wasn't previously identified as doing so.  Do y'all
21     still intend to try to introduce those through her today?
22                MS. GRIFFIN:  They are not new exhibits to the
23     defense.
24                MR. KNIZLEY:  Well, not new exhibits.
25                MS. GRIFFIN:  They are new to come in through this
```

```
 1    witness.
 2              MR. KNIZLEY:  Right.  IB120, pages 36 through 570,
 3    from the doc -- or alternatively C&R 134543 through 135544.  Do
 4    you still want to try to get them in through that particular
 5    witness?
 6              MS. GRIFFIN:  Yes, we intend to.
 7              MR. KNIZLEY:  Judge, if you want to hear the objection
 8    to that now, we can, or just as they introduce it.
 9              THE COURT:  Well, I have no idea what it is.
10              MR. KNIZLEY:  It's 575 pages.  But we'll just bring it
11    up when --
12              THE COURT:  Of --
13              MS. GRIFFIN:  Records seized, Your Honor, from the
14    searches.
15              THE COURT:  Okay.  All right.  You can object to it
16    whenever she attempts to introduce it.
17              MR. KNIZLEY:  Sure.
18              THE COURT:  Now let me ask you this:  Since you say
19    one of these agents is going to be put on this afternoon, is it
20    going to go over till tomorrow?  Do we have no witnesses for
21    tomorrow?  How is that going to work?
22              MR. BODNAR:  What we have, Your Honor, is we have
23    Special Agent Middleton, who's on right now.  Paul Short --
24    and, Gordon, for housekeeping purposes, he's not an agent.
25    he's just -- I think you would call him an analyst, Mr. Short.
```

1          MR. ARMSTRONG:  DEA?

2          MR. BODNAR:  DEA.  We have Coy Davis that's going to

3 follow him.  I don't think Coy will take -- either Coy will

4 take us right to the end of the afternoon or we've got Michelle

5 Penfold standing by who is a DEA diversion agent here who went

6 and obtained certain prescriptions from non-C&R Pharmacies on

7 certain select patients.  She would be the one introducing

8 those and then also explaining what the prescription looks

9 like:  Here's a sticker on the back.

10         THE COURT:  My question is:  Is any of this going to

11 go until tomorrow?

12         MR. BODNAR:  I thought we were off tomorrow, Your

13 Honor.

14         THE COURT:  Only if you didn't have any witnesses.

15         MR. BODNAR:  Yes.  We had been planning it, Your

16 Honor, to be able to end it at the end of the day today because

17 we need to start with Dr. Greenberg on Thursday morning.  And I

18 think that's still our position, isn't it?

19         MS. GRIFFIN:  He's not here yet.

20         MR. BODNAR:  He's not here yet.  He comes in either

21 tonight or tomorrow.

22         MS. GRIFFIN:  Tomorrow.

23         MR. BODNAR:  So -- and he is really the next best

24 person.

25         THE COURT:  Can he start Wednesday, if he comes in

1  tomorrow?

2          MS. GRIFFIN:  Judge, he had asked to come in a day

3  earlier because he's coming from the west coast, the time

4  frame.

5          THE COURT:  Well, I understand.  But --

6          MS. GRIFFIN:  I know.

7          THE COURT:  If he's here on Wednesday, anytime on

8  Wednesday, should he not be able to testify on Thursday?  I

9  mean if he's here tomorrow, Tuesday, should he not be able to

10 testify on Wednesday?

11         MR. KNIZLEY:  If you need to talk about it, we'll --

12         THE COURT:  Just let me know.

13         MS. GRIFFIN:  Can we --

14         MR. KNIZLEY:  I think what you're not saying is you

15 expected some preparation time for this witness, and you may --

16         MS. GRIFFIN:  We had intended initially to have him

17 here for the weekend if we were going all week.  And he

18 rearranged his schedule so we could cover what he intended to

19 cover later in the week and we've not had the chance to talk to

20 him.  We have, of course, prepped him.  But we would like to

21 see him before he takes the stand.  So --

22         THE COURT:  Well, you may be able to do that tomorrow

23 afternoon.  But we'll see.  Let me know at the end of the

24 afternoon.

25         MS. GRIFFIN:  We will, Your Honor.

FBI SA CAROLYN MIDDLETON - DIRECT BY MS. GRIFFIN

1    THE COURT:  You know.

2    MS. GRIFFIN:  Or we'll try to discuss it at lunch.

3    THE COURT:  Okay.  All right.  Thank you.

4    MR. BODNAR:  Thank you, Your Honor.

5    (A recess was taken at approximately 8:52 a.m.)

6    (9:06 a.m., in open court, defendants and jury present.)

7    THE COURT:  Good morning, ladies and gentlemen.  I

8    Hope y'all stayed warm this weekend.

9    All right, you may continue.

10                   FBI SA CAROLYN MIDDLETON,

11        previously sworn, testified further, as follows:

12                   DIRECT EXAMINATION CONTINUED

13    BY MS. GRIFFIN:

14    Q    Good morning, Ms. Middleton.  How are you today?

15    A    Good morning.  I'm well.  How about you?

16    MS. GRIFFIN:  May I approach, Your Honor?

17    THE COURT:  Yes.

18    BY MS. GRIFFIN:

19    Q    I show you what's marked as Government's Exhibit 4-19 and

20    ask if you can identify the exhibit and where it was seized

21    where from, please.

22    A    Sure.  This is 4-19.  This was seized from C&R Pharmacy on

23    May 20th, 2015, and it is a book of documents and scripts -- or

24    it came from a box.

25    Q    And if you would open that exhibit to see if you can

FBI SA CAROLYN MIDDLETON - DIRECT BY MS. GRIFFIN

1   identify the audit logs?

2   A   Okay.  Yes.  These are many, many, many printed pages of

3   what are entitled at the top as Daily Audit Logs.

4   Q   And does that have a year on it?

5   A   This top page has a year of 12 -- or a date of 12/1/2011.

6        MS. GRIFFIN:  Your Honor, we'd move to admit the daily

7   audit logs, Government's Exhibit 4-19, from the C&R Pharmacy.

8        MR. ESSIG:  Your Honor, we have an objection to this

9   exhibit on multiple bases.  One is that the documents are not

10  authenticated.  There's an attestation by an individual at the

11  end of the documents when the documents were printed out.  In

12  addition to that, Your Honor, is that the documents are

13  hearsay.  This witness cannot lay any sort of foundation or

14  exception for these documents being hearsay.

15       In addition to that, Your Honor, as she stated, the

16  daily audit logs the government is seeking to introduce into

17  evidence contain information about every single prescription

18  filled by the pharmacy for every single patient.  So they're

19  not limited in any way to patients that the government is

20  alleging are part of the indictment in this case and they are

21  not tailored in any way to the charges in the indictment.  So

22  we would object as hearsay, not properly authenticated, and

23  they are irrelevant to the charges.

24       MS. GRIFFIN:  Your Honor, they were seized from C&R

25  Pharmacy.

```
 1              THE COURT:  Yes, I overrule the objections.  Mark them
 2   in.
 3       (Government's Exhibit 4-19 was entered into evidence.)
 4              THE CLERK:  Yes, ma'am.
 5   BY MS. GRIFFIN:
 6   Q   I show you Government's Exhibit 4-18 and ask if you can
 7   identify it.
 8   A   Sure.  This is 4-18, and I see that this was seized from
 9   C&R Pharmacy.  It is FBI item 1B25 and it was item two of our
10   search.  It's documents, invoices, audit logs, and IOUs.
11   Q   And that was seized just like that; is that correct?
12   A   That's correct.
13   Q   How was it labeled when you received it -- when you seized
14   it?  Excuse me.
15   A   It says on the top here -- there's a label that says 2015
16   Daily Audit Logs.
17              MS. GRIFFIN:  We move to admit, Your Honor, the daily
18   audit logs for 2015, Government's Exhibit 4-18.
19              MR. ESSIG:  Same objection, Your Honor.
20              THE COURT:  Overruled.  Mark it in.
21       (Government's Exhibit 4-18 was entered into evidence.)
22              MS. GRIFFIN:  If I could get you to step down?
23   Q   I show you what's marked as Government's Exhibit 4-20 --
24   4-20 -- and ask if you can identify the exhibit.
25   A   Okay.  I see this is Government Exhibit 4-20 and it was
```

```
 1   seized from --

 2       (A discussion was held off the record between Ms. Griffin

 3   and the witness.)

 4           MS. GRIFFIN:  Your Honor, we will introduce this

 5   through another agent.

 6           THE COURT:  All right.

 7           THE WITNESS:  Sit back down?

 8           MS. GRIFFIN:  Please.  One moment, Your Honor.

 9           THE COURT:  Okay.

10       (A discussion was held off the record between counsel.)

11           MS. GRIFFIN:  Your Honor, the defense has agreed that

12   we do not need to call the other agent from the other location.

13   They maintain their same objection.  But Government's Exhibit

14   4-20 and Government's Exhibit 4-21, if we could have

15   Ms. Middleton identify those items that were seized and

16   identify what they are according to the C&R label that was on

17   the box?

18           THE COURT:  All right.

19           THE WITNESS:  Okay.

20   BY MS. GRIFFIN:

21   Q   So this is Exhibit 4-20?

22   A   4-20.  This was seized from PPSA on May 20th, 2015, and

23   that would be the Airport location, and I see here this is

24   search item number 37, which translated to FBI 1B number 1B79,

25   and this is 2012 to 2013 Daily Audit Logs.
```

FBI SA CAROLYN MIDDLETON - DIRECT BY MS. GRIFFIN

1  Q   This is the actual box that was seized bearing the C&R

2  Pharmacy notation?

3  A   Yes.

4          MS. GRIFFIN:  We move to admit Government's Exhibit

5  4-20, Your Honor.

6          THE COURT:  And although they were seized from PPSA,

7  they are daily logs for C&R Pharmacy; is that correct?

8          MS. GRIFFIN:  That's correct, Your Honor.

9  Q   And would you read the label that was on this same box when

10 it was seized?

11 A   I will.  It's a C&R Pharmacy label, a printed label with

12 C&R Pharmacy and their address and phone number, and it says

13 2012 to 2013 Daily Audit Logs.

14 Q   And these were the boxes they were seized in; is that

15 right?

16 A   I believe so.  We don't have boxes like this that we

17 collect items in.

18 Q   And I show you Government's Exhibit 4-21, and it too was

19 from the Airport PPSA office, and if you will look inside and I

20 ask if you can identify the exhibit?

21 A   Sure.  This is Government Exhibit 4-21.  Inside this box of

22 documents here I can see on our item that this was seized from

23 PPSA at the Airport location on May 20th, 2015.  It's search

24 item number 36, translates into FBI 1B78, and this is entitled

25 2014 Daily Audit Logs.  I see on the box here, a similar box to

1   this other one, just a plain brown box, it has a C&R Pharmacy

2   sticker.  It's a preprinted C&R Pharmacy sticker with their

3   address and phone number and it says 2014 Daily Audit Logs.

4           MS. GRIFFIN:  I would move to admit both exhibits,

5   Your Honor.

6           MR. ESSIG:  Same objection, Your Honor.  And also for

7   all of the daily audit logs, we would assert a confrontation

8   objection as well consistent with our motion in limine.

9           THE COURT:  All right.

10          MS. GRIFFIN:  That would be 4-20 and 4-21.

11          THE COURT:  Overrule the objections.  Mark them in.

12      (Government's Exhibit 4-20 and 4-21 were entered into

13   evidence.)

14          MS. GRIFFIN:  And if I could publish Exhibit 4-18 that

15   was seized from C&R Pharmacy?

16          THE COURT:  All right.

17   BY MS. GRIFFIN:

18   Q   I'm showing you an example of what was seized from

19   Government's Exhibit 4-18 labeled 2015 Daily Audit Logs for C&R

20   Pharmacy and ask if you can identify or tell us what's

21   contained at the top of the audit log.

22   A   At the top of the audit log it gives -- it says C&R

23   Pharmacy and it says Daily Audit Log.  It gives the date off to

24   the upper right-hand corner, and then there are some numbers

25   that I don't know what they are in the upper left-hand corner.

FBI SA CAROLYN MIDDLETON - DIRECT BY MS. GRIFFIN

376

1   Q   Does it appear to show prescription numbers?

2   A   There is a column that says Rx and below that are a series

3   of numbers.  It could be prescription numbers.

4   Q   Is there a column for patient name?

5   A   There is.  Directly under that are what appear to be

6   patient names.

7   Q   Is there a column for prescribers?

8   A   There is.

9   Q   Is there a column for the drug?

10  A   There is, yes.

11  Q   And what other columns does it appear to show?

12  A   It shows dispensing unit, and then it says -- it looks like

13  ORG and then a DC, RF, RPh, ORG-DT, Refill, N, Prescription,

14  Price, and then something IFCO.

15  Q   Now, Ms. Middleton, you advised us that a number of scripts

16  were seized also from the pharmacy?

17  A   That's correct.

18  Q   And at the U.S. Attorney's Office's request did an analyst

19  pull certain of those scripts?

20  A   Yes.

21  Q   You did not actually pull them, but you can identify that

22  they were the ones seized during the search of C&R?

23  A   That's correct.

24  Q   I show you what's marked as Government's Exhibit 4-7A and

25  4-7B, if you will look through those while I pull the next two?

1    A    Sure.

2    Q    I show you what's marked as 4-7C and 4-7D, if you will look

3    through those?

4    A    Absolutely.

5        (A discussion was held off the record between Mr. Knizley

6    and the witness.)

7            THE WITNESS:  I'll give it right to you.

8        (A discussion was held off the record between counsel.)

9    BY MS. GRIFFIN:

10   Q    Are you ready, Ms. Middleton?

11   A    I am.

12   Q    Could you tell us if those exhibits 4-7A through D are

13   marked hydrocodone?

14   A    They are marked Hydro Drugs.

15   Q    And are they marked with a date range?

16   A    They are, each book has a date range.

17   Q    Give us the date range for each book along with the number,

18   please.

19   A    4-7A, it is marked Hydro Drugs 2/12 through 2/14 -- excuse

20   me -- 12/14.  I apologize.

21           THE COURT:  Wait.  Can you say that again?  What is

22   the range on there?

23           THE WITNESS:  Sure.  It's Hydro Drugs 2/12 through

24   12/14.

25   BY MS. GRIFFIN:

1  Q   So that would be February of 2012 through December of 2014?

2  A   That's my understanding.  That's how I read that.

3        4-7B is marked Hydro Drugs 12/14 through 3/15, so I'd

4  translate that to December 2014 through March 2015.

5        4-7C is marked Hydro Drugs 3/15 through 4/15, so I'm

6  going to translate that to March '15, 2015, through April 2015.

7        4-7D is Hydro Drugs 5/15, and so May 2015.

8  Q   Now, these were seized from C&R Pharmacy and then pulled by

9  an analyst, the hydro drugs pulled and put in a notebook?

10 A   That's correct.

11        MS. GRIFFIN:  I'd move to admit, Your Honor,

12 Government's Exhibit 4-7A through D.

13        MR. ESSIG:  Your Honor, we object to the relevance of

14 these.  They are not hearsay because they are statements of the

15 defendants.  But, again, they cover patients other than those

16 referenced and covered by the indictment.

17        THE COURT:  All right.  Overruled.  Mark them in.

18     (Government's Exhibits 4-7A through 4-7D were entered into

19 evidence.)

20        MS. GRIFFIN:  And may we publish Exhibit 4-7D so the

21 jury can see what we have admitted?

22        THE COURT:  Yes.

23 BY MS. GRIFFIN:

24 Q   I show you Government's Exhibit 4-7D and ask if you can

25 just describe what's contained within the exhibit.

FBI SA CAROLYN MIDDLETON - DIRECT BY MS. GRIFFIN

1   A   This is a prescription written by a physician.  It looks

2   like it's Dr. Ruan.  It's from PPSA West Mobile, gives the

3   address on Airport Boulevard, phone number.  It's for a

4   particular patient and it gives her date of birth, her patient

5   information, the drug, looks like the dose, how frequently she

6   should take it, and how many pills are to be dispensed.  And

7   then there is a signature on there.

8   Q   And I show you on the second page of that exhibit similar

9   information on each script?

10  A   Similar information, different patient.

11  Q   Are the scripts contained front and back throughout the

12  exhibits numbered 4-7?

13  A   Yes.

14  Q   Also, Ms. Middleton, I direct your attention to 4-8A and

15  4-8B and ask if these are scripts pulled from scripts seized

16  from C&R by an analyst who was pulling just the script TIRF

17  drugs for Dr. Couch?

18  A   Yes.  Let me take a look here.  Okay.

19  Q   Again, those were not seized by you -- excuse me -- those

20  were not pulled by you, but they were seized from C&R Pharmacy?

21  A   That's correct.

22          MS. GRIFFIN:  I move to admit Government's Exhibits

23  4-8A and 4-8B.

24          THE COURT:  All right.

25          MR. ESSIG:  Same relevance objection.

```
 1                THE COURT:  Overruled.  Mark them in.
 2          (Government's Exhibit 4-8A and 4-8B were entered into
 3   evidence.)
 4   BY MS. GRIFFIN:
 5   Q   I will show you -- if I might publish some to the jury,
 6   Your Honor --
 7                THE COURT:  Sure.
 8   BY MS. GRIFFIN:
 9   Q   -- Government's Exhibit 4-8A marked Couch TIRF A. through
10   S.  What does the A. through S. signify?
11   A   Patient name.
12   Q   And could you identify on the first page what is contained
13   therein?
14   A   This is a prescription.  It's a little hard to read.
15   There's a little bit of -- there you go.  That's better.  This
16   is a prescription.  Dr. Couch's name is circled on there.  It's
17   for a particular patient, does not give her address.  It gives
18   the date of the prescription, when it can be filled, looks like
19   there's the name of the drug, the dose on it, how frequently it
20   can be given, the number the patient can be given, and there's
21   a signature on there.
22   Q   And I'm going to show you the back of that same script and
23   ask what appears to be on the back of the script.
24   A   This appears to be a sticker that is a printed version of
25   the front of it.  It gives information about the patient, where
```

FBI SA CAROLYN MIDDLETON - DIRECT BY MS. GRIFFIN

1    that patient lives, prescription number is on there, Rx number

2    in the upper right-hand corner, the quantity that the patient

3    got, what the drug is, what the dose on that is, how it's

4    given, and instructions for the patient, and then the

5    physician's name, office, phone number, contact information.

6    Q    Does it appear to have the milligrams or micrograms

7    circled?

8    A    It does.

9    Q    Does it appear to have the quantity circled?

10   A    Yes, it does.

11   Q    And then does it appear to have some initials or some

12   writing in pen at the top of the back of the prescription?

13   A    It does up at the top.  It looks like those could be

14   initials at the very top.

15   Q    And this is similar to what is contained for Dr. Couch in

16   both of the TIRF exhibits that you've identified?

17   A    Yes, it is.

18   Q    As you said, 4-8A, Couch TIRF A. through S.  The 4-8B, what

19   letters of the alphabet does that go through?

20   A    This is entitled Couch TIRF S. through W.  I'd assume that

21   that means patient last name beginning in S. through W.

22   Q    I show you what's been marked Government's Exhibit 4-9A and

23   4-9B -- 4-9A appears to be the letters A. through L. and 4-9B

24   appears to be the remaining letters of the alphabet -- and ask

25   if you can identify these as scripts pulled for Dr. Ruan,

FBI SA CAROLYN MIDDLETON - DIRECT BY MS. GRIFFIN

1  fentanyl scripts.

2  A   All right.  4-9A, it's entitled Ruan TIRF A. through L.  I

3  assume that means patient last name beginning in A. through

4  last names beginning in L.  4-9B is also prescriptions, Ruan,

5  Dr. Ruan TIRF M. through W.  I assume that means patient last

6  names beginning in M. through patient last names beginning in

7  W.

8  Q   And these are actually fentanyl drugs; is that correct?

9  A   These are fentanyl drugs.

10  Q   The same for both exhibits?

11  A   The same for both exhibits, fentanyl drugs.

12          MS. GRIFFIN:  Your Honor, I'd move to admit the

13  fentanyl drug prescriptions contained in Exhibit 4-9A and 4-9B

14  for Dr. Ruan, alphabet A. through W.

15          THE COURT:  All right.  Mark them in.

16          MR. ESSIG:  Same objection.

17      (Government's Exhibits 4-9A and 4-9B were entered into

18  evidence.)

19          MS. GRIFFIN:  And, Your Honor, those should be listed

20  Ruan fentanyl drugs 4-9A and 4-9B.

21          THE COURT:  Not --

22          MS. GRIFFIN:  Not TIRF.  They are Ruan fentanyl drugs.

23  And may I publish a portion of 4-9A?

24          THE COURT:  Yes, ma'am.

25  BY MS. GRIFFIN:

FBI SA CAROLYN MIDDLETON - DIRECT BY MS. GRIFFIN

1  Q   And as to Dr. Couch, 4-8A and 4-8B, the label should have

2  fentanyl drugs rather than TIRF drugs.

3       THE COURT:  All right.  Will you have those changed at

4  some point so that it won't be confusing?

5       MS. GRIFFIN:  Yes, yes.  We will be glad to.

6  Q   I'll show you what is part of Exhibit 4-9A, Ruan

7  Fentanyl.  And similar to what you've done previously, could

8  you just tell us what this contains?

9  A   Sure.  This is a prescription.  Dr. Ruan's name has been

10 circled in the upper right-hand corner.  It's for -- it gives a

11 patient name, it gives the practice, PPSA, the address, phone

12 number, the date that this prescription was written, it's for

13 Abstral, it gives the micrograms and how often it should be

14 given, and the number of dosage units that will be dispensed,

15 no refills, and there's a signature down in the lower left-hand

16 corner.

17 Q   And you, prior to becoming an FBI agent, you were actually

18 employed in what manner?

19 A   I was a registered nurse.

20 Q   Are you familiar with the difference between dispense as

21 written and product selection permitted?

22 A   I am.

23 Q   Would you explain that to us?

24 A   Sure.  Dispense as written means that you are prescribing a

25 particular drug and that no substitutions are allowed.

1   Q    And product selection permitted?

2   A    If the physician signs there, that means that they could

3   use another, another -- the same drug but maybe a generic

4   version of it.

5   Q    As opposed to a brand name?

6   A    Correct.

7   Q    I'll show you the back of that A..... prescription that

8   you've just described and ask if you could tell us what it

9   appears to show on the back.

10  A    On the back it's very similar information to the front of

11  the prescription.  However, it does give you the prescription

12  number in the upper right-hand corner.  It gives you the

13  patient's name, contact information, it tells you the drug

14  name, the dosage unit, how frequently it should be given and

15  how it should be given, the quantity to be dispensed, and down

16  at the bottom it gives information about Dr. Ruan, gives the

17  price of the drug, and I think that's about it.

18  Q    Does it show that there are no refills authorized?

19  A    It does show no refills authorized.

20  Q    And what price does it show for the drug?

21  A    I see $530.85.  It's right above Dr. Ruan's name.

22  Q    Right there?  (Indicating.)

23  A    Yes.

24  Q    I'll turn back to the front of that and ask if it shows

25  whether there are refills?

1  A   No refills.

2  Q   In connection with -- and that the drug is Fentora?

3  A   Fentora.

4  Q   Now, these were seized from C&R Pharmacy; is that correct?

5  A   That's correct.

6  Q   Excuse me.  Also seized from C&R Pharmacy were there select

7  dates that the analyst was asked to pull scripts for Dr. Couch

8  and for Dr. Ruan?

9  A   Yes; that's correct.

10 Q   These scripts came from C&R Pharmacy?

11 A   Yes.

12        MS. GRIFFIN:  And if there's no objection to the Ruan

13 select dates and the Couch select dates other than their

14 standing objection, we would move to admit Government's Exhibit

15 4-10A and 4-10B after showing them to the agent.

16        MR. ESSIG:  Same relevance objection, Your Honor.

17        THE COURT:  All right.  Overruled.  Mark them in.

18    (Government's Exhibits 4-10A and 4-10B were entered into

19 evidence.)

20 BY MS. GRIFFIN:

21 Q   Could you just tell us, please, if the exhibits as admitted

22 just contain prescriptions from selected dates?

23 A   Absolutely.  4-10A is -- the book is entitled Couch

24 Selected Dates.

25 Q   Does it contain scripts from a variety of dates?

386

1   A   Yes, it does.

2   Q   And those are dates within the time frame of the

3   indictment?

4   A   They are.  4-10B is entitled Ruan Selected Dates, and it is

5   a book of prescriptions on various dates.

6   Q   And I show you Government's Exhibit 4-11, which is named

7   Unsigned Scripts.  Are these scripts that were pulled from the

8   prescriptions seized from C&R Pharmacy by an analyst?

9   A   Yes, they were.

10   Q   And do these contain unsigned scripts?

11   A   Yes, they do.

12          MS. GRIFFIN:  Move to admit Government's Exhibit 4-11.

13          MR. ESSIG:  Same objection, Your Honor.

14          THE COURT:  All right.  Overruled.  Mark them in.

15      (Government's Exhibit 4-11A was entered into evidence.)

16   BY MS. GRIFFIN:

17   Q   And if you could look through these, which you've

18   previously looked through, and tell us that they contain the

19   unsigned scripts?

20   A   4-11, entitled Unsigned Scripts, is a book of prescriptions

21   that do not have physician signatures on them.

22   Q   Would you look at the back of the prescriptions and see if

23   many of them contain indications that they've been filled?

24          MR. ESSIG:  Objection, Your Honor.  She can't give

25   that testimony.  She's not qualified to state that.  She can

FBI SA CAROLYN MIDDLETON - DIRECT BY MS. GRIFFIN

 1   state what is on the back of the prescriptions, but she can't

 2   give the opinion of whether or not they've been filled.

 3            THE COURT:  All right.  Sustained.

 4   BY MS. GRIFFIN:

 5   Q   Have you had a chance to flip through the book previously?

 6   A   Yes, I have.

 7            MS. GRIFFIN:  May we publish this to the jury, Your

 8   Honor?

 9            THE COURT:  Yes.

10   BY MS. GRIFFIN:

11   Q   I show you a page from the book and ask as to Timothy, last

12   name beginning with M. -- excuse me -- is there a signature for

13   Dr. Couch above his name?

14   A   There is not.

15   Q   Is there a signature for the script at all?

16   A   It doesn't appear to be a prescription -- or a prescription

17   with a signature on it.

18   Q   It has typing on it but no signature, no handwriting?

19   A   That's correct.

20   Q   I show you the back of that same script and ask if you can

21   tell us what's on the back of the script.

22   A   The back of the prescription, it gives the patient's name,

23   their contact information, upper right-hand corner has a

24   prescription number, the date of the prescription, it shows

25   what the drug is, the Lazanda, 100 milligrams nasal spray, it

1   shows -- it gives instructions on how frequently the patient

2   should take it, how many should be dispensed, no refills, it

3   gives the price of the drug, it gives Dr. Couch's name and

4   information, and there are some circles around different things

5   on there that appear to be handwritten circles around the dose

6   of the drug and some of the patient instructions as well as the

7   number dispensed, and it looks like that could be -- it's a

8   similar squiggly line -- that could be initials at the top.

9   Q   And the red pen writing or what appears to be red pen

10   writing was on these scripts when they were seized; is that

11   correct?

12   A   That's right.

13   Q   As was the black or dark blue handwriting on others?

14   A   That's right; yes.

15   Q   I show you Government's Exhibit 4-15A and 4-15B -- this is

16   your exhibit number -- and ask if these purport to be Zohydro

17   scripts pulled through what date?

18   A   It would be March 2014 through April 2015.

19   Q   Again, did an analyst pull the scripts that were seized

20   from C&R Pharmacy?

21   A   Yes.

22   Q   I show you Government's Exhibit 4-15B -- there's your

23   exhibit number -- and ask if this purports to be Zohydro

24   scripts from 4/15 through 5/15?

25   A   Yes; that's correct.

1  Q   Do these contain scripts seized from C&R Pharmacy that have

2  been pulled by the name Zohydro?

3  A   Yes.

4        MS. GRIFFIN:  We move to admit Government's Exhibits

5  4-15A, 4-15B.

6        THE COURT:  All right.  Mark them in.

7        MR. ESSIG:  Same objection.

8     (Government's Exhibits 4-15A and 4-15B were entered into

9  evidence.)

10       MS. GRIFFIN:  And may we publish one of the scripts to

11 the jury, Your Honor?

12       THE COURT:  Yes.

13 BY MS. GRIFFIN:

14 Q   Ruan Exhibit 4-15A, I show you the first prescription for

15 an individual whose last name begins with an H.  Let me get

16 that closer for you and ask if you can just tell us the nature

17 of what's on the front.

18 A   Sure.  This is a prescription from PPSA.  It gives the west

19 Mobile Airport location, phone number, patient name, contact

20 information, date of birth, the date of the prescription, it

21 gives the information about the prescription, what the drug is,

22 what the dose is, instructions for how they take it and how

23 often they take it, and the number that should be dispensed.

24 There is what appears to be a signature above Dr. Couch's name,

25 Dr. Couch and his information is below that.

FBI SA CAROLYN MIDDLETON - DIRECT BY MS. GRIFFIN

390

1  Q   Does there appear to be a prescription number on the front

2  of this prescription?

3  A   There does not appear to be a prescription number on the

4  front of this.

5  Q   I'll show you the back of this prescription, the same

6  individual.  Is that clear enough?  Do you need it larger?

7  A   No.  That's perfect.

8  Q   And ask if you can tell us what's on the back of the

9  script?

10  A   It's very much the same information.  We see in the upper

11  right-hand corner there's a prescription number here, it's for

12  the same patient, contact information, it gives the drug name,

13  the dose, instructions on how to take it and how often, it

14  gives a price information above Dr. Couch's name, number of

15  refills, and then something about Dr. Couch's information

16  regarding his licensure.

17  Q   Does it show the price for this script?

18  A   It does show a price for this.  It's 439 -- I think it says

19  56.

20  Q   Again, can you tell us if there appears to be something

21  other than typed information on this particular script?

22  A   Yes.  It looks like somebody with a pen has gone back and

23  circled the specific pieces of information such as the dose,

24  the quantity to be dispensed, and some of the information on

25  how to give the drug, and then at the top is a kind of a

FBI SA CAROLYN MIDDLETON - DIRECT BY MS. GRIFFIN

391

1    squiggly line that's familiar to me.  It could be potentially

2    somebody's initials.

3    Q    And again, this handwriting was on these scripts when they

4    were seized?

5    A    Yes, it was.

6    Q    I'll show you the back of the script right behind that

7    prescription for an individual whose last name begins with an

8    H. and there's an individual whose last name begins with an M.,

9    and it has a prescription number?

10   A    Yes, in the upper right-hand corner there's a prescription

11   number.

12   Q    And does it also have what appears to be pen writing?

13   A    Yes, very similar to the other ones that we saw just

14   previously, where you've got the specific information that

15   looks like the dose, maybe the quantity to be dispensed, some

16   of the information about how to take the drug and how often,

17   and then refills.

18   Q    And it appears to have similar writing on the back in pen

19   as the prescription for the individual whose last name starts

20   with an H.?

21   A    That's right.

22   Q    I show you Government's Exhibit 4-16 and ask if you have

23   previously seen scripts pulled by certain information

24   identified as IOU log?

25   A    Yes, I have.

1   Q   Again, were these scripts pulled by analysts from scripts

2   seized from C&R Pharmacy?

3   A   Yes, they were.

4           MS. GRIFFIN:  Move to admit Government's Exhibit 4-16,

5   Your Honor.

6           MR. ESSIG:  Your Honor, we object to relevance.

7   There's no context here of what the IOU log is, how that came

8   to be, how these exhibits came to be named the IOU log, or

9   contents whatsoever.

10          THE COURT:  Yeah, I don't know what they are.  So it's

11  hard to know the relevance.

12          MS. GRIFFIN:  Your Honor, she's not going to explain

13  them or look through them or describe them.  She's just

14  identifying that they came from C&R Pharmacy.

15          THE COURT:  Are they prescriptions?

16          MS. GRIFFIN:  They are prescriptions.

17          THE COURT:  Overruled.

18          MS. GRIFFIN:  I will show her they are prescriptions.

19  They are selected prescriptions pulled from the seized

20  prescriptions.

21          MR. ESSIG:  Your Honor, I think without any context of

22  what the term "IOU Log" means or how that label got on the

23  exhibit, we would ask that that label be removed and they just

24  be admitted as documents that came from C&R.

25          THE COURT:  Well, we'll just admit it as something

 1   called the IOU Log.  We don't know what it means right now, but
 2   maybe we'll find out later.
 3            MR. ESSIG:  Same relevance objection.
 4            THE COURT:  All right.  Overruled mark it in.
 5       (Government's Exhibit 4-16 was entered into evidence.)
 6            MS. GRIFFIN:  And I will just show her the contents,
 7   Your Honor, so she can tell us what's contained.
 8   Q   Without describing the information on the documents, tell
 9   us what the exhibits consist of.
10   A   All right.  I can see that these are prescriptions.  They
11   appear to be prescriptions.
12   Q   And were those from -- were they in this binder, the ones
13   that were seized from C&R Pharmacy?
14   A   Yes.
15            MS. GRIFFIN:  Move to admit 4-16.  I believe it's
16   actually admitted.
17            THE COURT:  It is.
18   BY MS. GRIFFIN:
19   Q   I show you what's marked as Government's Exhibit 4-17 and
20   ask you if the analyst was asked to pull scripts for various
21   individuals connected with this case?
22   A   Yes.
23   Q   4-17, and it has 10 names on the front; is that correct?
24   A   Can you go down?  There we go.  One, two, three, four,
25   five, six, seven, eight, nine -- can you go down a little bit?

FBI SA CAROLYN MIDDLETON - DIRECT BY MS. GRIFFIN

1  No, the other way.  10, yes, I see 10 names.

2  Q   Last name Dominguez, last name Gist, last name Goellner,

3  G-O-E-L-L-N-E-R, last name Greathouse, last name Lapeyrouse,

4  L-A-P-E-Y-R-O-U-S-E, another last name Lapeyrouse, last name

5  Lowe, last name McCollum, M-C-C-O-L-L-U-M, last name Plant, and

6  last name Thompson?

7  A   That's what I see, yes.

8  Q   And were the scripts seized from C&R Pharmacy?

9  A   Yes, they were.

10  Q   And these names placed in this notebook?

11  A   That's correct.

12       MS. GRIFFIN:  Move to admit Government's Exhibit 4-17.

13       THE COURT:  All right.  Mark them in.

14       MR. ESSIG:  Same relevance objection.

15       THE COURT:  Mark them in.

16     (Government's Exhibit 4-17 was entered into evidence.)

17  BY MS. GRIFFIN:

18  Q   And I will collectively show you Government's Exhibits

19  4-14A, B, C, D, E, and F and ask if these exhibits -- let me

20  bring them up there to you -- were pulled again by just various

21  patient names as to each -- 4-14A pulled for the person's last

22  name L...?

23  A   4-14A, these are prescriptions for the last name L....

24  Q   4-14B?

25  A   4-14B, these are prescriptions for last name Sanford.

1   Q    4-14C?

2   A    4-14C, these are prescriptions for patient last name

3   Greathouse.

4   Q    4-14D?

5   A    4-14D these are prescriptions for last name Driver.

6   Q    4-14E?

7   A    4-14E, these are prescriptions for someone with the last

8   name Daves, D-A-V-E-S.

9   Q    And 4-14F?

10  A    4-14F, these are prescriptions for the last name Chausse,

11  C-H-A-U-S-S-E.

12  Q    And that's pronounced Chausse, but how is it spelled?

13  A    C-H-A-U-S-S-E.

14          MS. GRIFFIN:  Move to admit Exhibit 4-14A through F,

15  Your Honor.

16          MR. ESSIG:  No objection.

17          THE COURT:  All right.  Mark them in.

18      (Government's Exhibits 4-14A through 4-14F were entered

19  into evidence.)

20          MS. GRIFFIN:  And I would move to publish just one out

21  of the selected ones, Your Honor.

22          THE COURT:  All right.

23  BY MS. GRIFFIN:

24  Q    I'll show you what's marked as 4-14A and ask, again, if you

25  can tell us if these prescriptions were some of the ones seized

FBI SA CAROLYN MIDDLETON - DIRECT BY MS. GRIFFIN

396

1  at PPSA?

2  A   Yes, this is a prescription.  It says PPSA on it.  It's the

3  Springhill location.  It's got a patient name and contact

4  information, it's got the patient's date of birth, the date of

5  the prescription, what the drug is, the dose, instructions to

6  the patient on how to take it and how often, the number that

7  will be dispensed, it has a physician signature, and then it

8  has Dr. Ruan's name and information below that.

9  Q   It does not have a prescription number on it, does it?

10  A   I don't see a prescription number on the front.

11  Q   I'll show you the back of this prescription and ask if you

12  can describe what's contained on the back of this

13  prescription --

14  A   Sure.

15  Q   -- for the individual with the last name L...?

16  A   This is a sticker.  In the upper right-hand corner we've

17  got a prescription number, Rx number, with a number after it.

18  It gives a patient name, contact information, date of birth,

19  gives the drug name and the dose.  Below that we've got

20  information about how to take the drug and how often.  There's

21  a price right above Dr. Ruan's name and his information, and

22  the number of refills is on there.  I see that there are

23  handwritten circles on there as well.  Looks like they have

24  circled the dose, the number to be dispensed, and then some

25  information within the patient instructions, and the number of

1   refills.  And up at the top it looks like there's what could be

2   some initials.

3   Q   Does it appear to be similar writing as has been on the

4   other scripts you have identified backs of?

5   A   It appears to be.

6   Q   In connection with this prescription, the front of the

7   prescription says Percocet?

8   A   Yes.

9   Q   Is that correct?

10   A   Yes.

11   Q   And the back of the prescription says oxycodone-ACETA?

12   A   Yes.

13   Q   Based on what you know as a nurse, are those the same

14   thing?

15   A   They are -- they can be.

16   Q   Explain that to us.

17   A   I'm not sure -- well, I mean --

18          MR. KNIZLEY:  Your Honor, at this point I object.  I

19   think it's a little bit outside the scope of her --

20          THE COURT:  All right.  Sustained.

21          MS. GRIFFIN:  One moment, Your Honor.

22          THE COURT:  All right.

23          MS. GRIFFIN:  Your Honor, may I just check my numbers?

24   And I believe we're ready to turn our witness over.

25          That's all we have for this witness at this time, Your

 1    Honor.

 2              THE COURT:  All right.  Mr. Essig?

 3              MR. ESSIG:  Yes, Your Honor.  Your Honor, may I have

 4    just a moment to gather some documents for cross-examination?

 5              THE COURT:  Yes.

 6                        CROSS EXAMINATION

 7    BY MR. ESSIG:

 8    Q    Good afternoon -- or good morning.  How are you?

 9    A    Good morning.

10    Q    My name is Brandon Essig, and I represent Dr. Couch in this

11    case.  I want to follow up on Ms. Griffin's questions.  Now,

12    first thing, to be clear, you were the ERT at the pharmacy; is

13    that correct?

14    A    That's correct, sir.

15    Q    And that's at the Airport location; is that right?

16    A    Yes, sir.

17    Q    Now, just so I understand, as we went through your direct

18    examination we saw a number of photos; is that right?

19    A    That's right.

20    Q    And we saw a number of the pictures of the items you

21    seized?

22    A    Yes.

23    Q    And obviously we've been through quite a bit of time going

24    through some of the documents that you saw; is that correct?

25    A    Yes, sir.

1  Q    Okay.  Now, when you got to the pharmacy that day, for the

2  photographs and some of the documents that the jury's seen in

3  the courtroom here today, does that pretty fairly represent

4  what it was you saw there that day when you went in and you

5  seized evidence?

6  A    Yes.

7  Q    Okay.  And so when you went into the pharmacy, what you

8  found were prescriptions for medications; is that right?

9  A    Yes, sir.

10 Q    And you found a lot of medications?

11 A    There were, there was a lot of medication, yes, sir.

12 Q    Okay.  And I think you mentioned on direct that there were

13 schedule II medications that you found there; is that right?

14 A    There were -- the FBI did not handle the medications --

15 Q    Sure.

16 A    -- necessarily.  I'm aware that there were schedule II

17 drugs there.

18 Q    Okay.  And there were other schedules of medications that

19 you found at the pharmacy that day; is that right?

20 A    I'd assume so.  But again, I did not do the audit of the

21 drugs, so I can't give you specifics.

22 Q    But you know there was some group of medications that were

23 taken by the DEA and they were taken away from the premises;

24 that is correct?

25 A    That's correct; yes.

FBI SA CAROLYN MIDDLETON - CROSS BY MR. ESSIG

```
 1   Q   And there were other medications that were left there; is
 2   that right?
 3   A   There were some drugs that were left behind; that's
 4   correct.
 5   Q   Okay.  So we can presume, I think, because I think you
 6   testified on direct, that the medications that were taken away
 7   would have been the controlled substances; is that right?
 8   A   DEA --
 9   Q   The DEA schedule II controlled substance?
10   A   Yes.  The DEA told me that those were controlled
11   substances.
12   Q   But we had both there at the pharmacy?
13   A   That's my understanding.
14   Q   And we had prescriptions for both of the medications?
15   A   That's also my understanding.
16   Q   Now, what I want to do is I want to go back to -- and,
17   Agent Middleton, if I'm correct, you have a nurse background;
18   is that right?
19   A   I do.
20   Q   But you're not a pharmacist?
21   A   I'm not a pharmacist, no, sir.
22   Q   Okay.  And so, I mean, you don't have any training in how
23   pharmacies dispense medications?
24   A   Not specifically.
25   Q   Okay.  And no specific training as to documentations or
```

1    administrative recordkeeping for pharmacies?

2    A    No.

3    Q    Okay.  So in this case what I want to do is I want to show

4    you a couple of prescriptions from some of the patients that

5    were shown you on direct examination.  And if we look here,

6    these are prescriptions, again --

7            MS. GRIFFIN:  Counsel, can we have the number?

8            MR. ESSIG:  This is Exhibit 4-9A, which I think is the

9    Ruan TIRF binder and the patient here is A......

10           THE COURT:  That's actually not a TIRF binder anymore.

11   It's a fentanyl binder.

12           MR. ESSIG:  I apologize, Your Honor.

13           THE COURT:  That's okay.

14   BY MR. ESSIG:

15   Q    And again, these are Ms. A......  You were shown her

16   prescriptions on direct examination; is that correct?

17   A    Yes, sir.

18   Q    And then you testified as to writing on the back of the

19   prescriptions; is that right?

20   A    That's right.

21   Q    All right.  And if we look at these prescriptions for

22   Ms. A....., if we look at the front, on the left you've got a

23   prescription that's dated January 30th of 2014 and then we've

24   got on the right there one that's dated February the 25th of

25   2014; is that correct?

402

1   A   There's a little bit of glare on the one on the right --

2   there you go.  Yeah.  That's correct.

3   Q   And if we look again on the front there, the one on the

4   left, Abstral is the brand of the medication; is that right?

5   A   That's what's written, yes.

6   Q   And we know by the way these were marked they are all

7   fentanyl; isn't that correct?

8   A   Yes, that's my understanding.

9   Q   And then the one there on the right, what's that?  Can you

10  tell?  What's the name brand there?

11  A   Fentora.

12  Q   So one month she was prescribed Abstral, the next month she

13  was prescribed Fentora; is that right?

14  A   It would appear by the prescriptions.

15  Q   And then if we look there on the back -- and again, it's

16  going to flip; right?  I mean the prescription now that we see

17  on the screen on the right, the CA........... prescription,

18  that's going to be on the January 30th, 2014, prescription; is

19  that correct?

20  A   That's correct; yes.

21  Q   And if we go back over again, that's the Abstral

22  prescription; right?

23  A   Yes.

24  Q   And then for the Fentora prescription on the left, the

25  Fentora prescription has handwriting on the back, the Abstral

1   prescription does not; is that correct?

2   A   That's what I see, yes.

3   Q   And we don't know, as we sit here today without further

4   testimony, we don't know what that means, do we?

5   A   Absolutely not.

6   Q   I mean, clearly we see this pretty consistently on the

7   prescriptions; most of them have writing, some of them don't;

8   is that correct?

9            MS. GRIFFIN:  Your Honor, objection as to foundation,

10   as to what the others have on the back.

11            THE COURT:  Well, overruled.  The two we're looking

12   at, it's clear that one does and one doesn't.

13   BY MR. ESSIG:

14   Q   But we don't know, we don't know what that means?

15   A   No, sir.

16   Q   We can assume maybe the pharmacy is putting handwriting on

17   the back of these prescriptions, but we have no idea what

18   purpose that serves, do we?

19   A   As an FBI agent searching that facility, no, I don't know

20   what that means.

21   Q   All right.  Now, it's sort of common sense; right; then --

22   you know, I think we know this, that when a prescription goes

23   into a pharmacy -- and I assume you've found or you saw that

24   day some prescription bottles that had medication in them?

25   A   Again, I didn't handle any prescriptions.  I did not handle

1  the bottles.  They were there, I was aware of them, they're in

2  the pictures.  They were in the pharmacy, but we weren't

3  handling them.

4  Q   We would know, though, when patients walk out of a

5  pharmacy, they're going to have a bottle that's got pills in

6  it?  I mean, common sense would tell us that; right?

7  A   Or some other form of drug.

8  Q   Right.

9  A   Presumably they will walk out with that.

10  Q   Right.  Not everybody gets the same quantity; isn't that

11  right?

12  A   The prescriptions -- they're going to get presumably

13  whatever is on the prescription, at least that's what they

14  should get.

15  Q   Right.  So the pharmacist has got to go through a two-step

16  process?

17          MS. GRIFFIN:  Objection, Your Honor, as to foundation.

18          THE COURT:  Sustained.

19  BY MR. ESSIG:

20  Q   And again, as we go through -- for a lot of these documents

21  there was an exhibit admitted that had -- an "IOU log" I think

22  was the term on there, the term "IOU" was on there?

23  A   Yes, sir.

24  Q   You don't have any training on what that term means?

25  A   I don't know what that -- what that means.

FBI SA CAROLYN MIDDLETON - CROSS BY MR. KNIZLEY
405

1  Q   Okay.  Do you know how that label got on that group of

2  prescriptions?

3  A   I believe there were documents that were labeled IOU Logs

4  or IOUs or something to that effect.

5  Q   But you're not certain about that?

6  A   I -- offhand I'm not certain about that.  But I'm

7  remembering something that said IOU.

8          MR. ESSIG:  Just a moment.  No further questions, Your

9  Honor.

10          THE CLERK:  Mr. Essig, please be sure to put the item

11  back in the book.

12          MR. ESSIG:  Yes, ma'am.

13          THE CLERK:  Okay.

14          THE COURT:  All right.  Mr. Knizley?

15          MR. KNIZLEY:  Yes, ma'am.

16                        CROSS EXAMINATION

17  BY MR. KNIZLEY:

18  Q   Good morning, Agent Middleton.

19  A   Good morning.  How are you?

20  Q   Good.

21          MR. KNIZLEY:  Judge, may I approach the witness with

22  this?

23          THE COURT:  Sure.

24  BY MR. KNIZLEY:

25  Q   Agent, I believe you told Mr. Essig a moment ago that your

 1  expertise is not in the administrative or organization of

 2  pharmaceutical records or something of that nature?

 3  A   That's correct.

 4  Q   So you're not here to tell us about that type of thing?

 5  A   No, sir, I am not.

 6  Q   Okay.  Now, you showed us, I believe it was Friday, this

 7  green box here.

 8          MS. GRIFFIN:  Your Honor, could we have an exhibit

 9  number?

10  BY MR. KNIZLEY:

11  Q   Agent, could you tell us what that exact number is there?

12  A   Sure.  It's 4-11.

13  Q   Okay.  And in 4-11 was this green box of stuff; right?

14  A   Yes, sir.

15  Q   And we looked at it Friday.  And I think you told us -- if

16  you would look at them again, please?

17  A   Sure.  Absolutely.

18  Q   And that top one appears to be what looks like we were

19  talking about prescription pads here; right?

20  A   Yes, sir.

21  Q   And that one didn't have a signature on it?

22  A   There's no signature on the front of it; that's correct.

23  Q   On the back of that what do we see?

24  A   There is a -- it's a sticker and it's very much like the

25  other stickers we've seen.  It's got a prescription number in

1   the upper right-hand corner, patient name, contact information,

2   the name of the drug, the dose, how many are going to be

3   dispensed, instructions to the patient.  It's got the price,

4   the number of refills, and the physician's name and

5   information.

6   Q   And in the rest of that box are a number of other

7   prescriptions and they do have signatures as well on the

8   bottom; right?

9   A   Yes, it sure looks that way.

10  Q   Can you flip on to back of them, please, the first one at

11  the top?

12  A   Sure.

13  Q   It's got that squiggly writing we've been talking about;

14  right?

15  A   Squiggly writing, yes.

16  Q   The first one didn't have a signature, didn't have the

17  squiggly writing?

18  A   The first one did not.

19          MS. GRIFFIN:  Your Honor, if we might have the last

20  name of the person on the front of the document he's referring

21  to so we know which ones are being referenced?

22          THE COURT:  All right.

23          MR. KNIZLEY:  I'll be happy to, Judge.

24  Q   Agent Middleton, that person we were talking about, I

25  believe, is Denise P. that we can identify; is that right?

FBI SA CAROLYN MIDDLETON - CROSS BY MR. KNIZLEY

1   A   Yes, sir, Denise P.

2   Q   And on the back of that one we don't have the squiggly

3   writing, as we said; right?

4   A   That's correct.

5   Q   And then of all the rest of them at least in the green box,

6   there are signatures and squiggly writing; is that correct?

7   A   Yes, sir.

8   Q   You don't have any idea why that was sitting on top without

9   the squiggly writing, do you?

10   A   I have no idea, sir.

11          THE COURT:  For the record, we have two exhibit 4-11s

12   that have been entered.  One was entered this morning, and the

13   one that Mr. Knizley just used was admitted on Friday.

14          THE CLERK:  Yeah, the other was in a binder.

15          THE COURT:  We need to straighten out this numbering.

16          MS. GRIFFIN:  Your Honor, the one Mr. Knizley has in

17   his hand will be 4-11 and the one introduced this morning will

18   be 4-11A.

19          THE COURT:  All right.

20          MS. GRIFFIN:  And I will come add the A to the one

21   this morning.

22          THE CLERK:  Mr. Knizley has that one.

23   BY MR. KNIZLEY:

24   Q   Ma'am, you were asked Friday about whether or not when you

25   went into the area called C&R Pharmacy what you saw, if you

1  remember?

2  A   Yes, sir.

3  Q   And if you can tell us a little bit more about C&R

4  Pharmacy, it is an area that is attached to the medical clinic;

5  is that correct?

6  A   It is an area that is -- it is, it is -- it shares a common

7  door, there's a door that you can pass from C&R Pharmacy to the

8  medical practice.

9  Q   Did you note that door to be locked?

10 A   It was locked when we got there.

11 Q   And did it appear that it was the other side, or the

12 outdoor entrance, where the patients would probably come in,

13 where the glass was that we saw?

14 A   I actually had no way of knowing that.  But it appeared to

15 be there was a waiting area.  If you came in that outside door,

16 there was a waiting area that would be appropriate for patients

17 and there was a window that would be appropriate for patients

18 to interact with the staff.

19 Q   It was all under the same roof as the medical clinic and

20 the pharmacy; right?

21 A   They shared a roofline.

22 Q   Now, you were asked about what you saw and you were asked

23 about seeing Band-Aids, I think, and you were asked about

24 seeing alcohol and Ace bandages; right?

25 A   I was asked that, yes.

1    Q    And this is not a retail store, is it?

2    A    I don't know what their business model is.

3    Q    It doesn't look like CVS, does it?

4    A    It didn't look like CVS.

5    Q    It looked like a place where medications only are

6    dispensed?

7    A    I -- I had -- there were a lot of medications.  I assume

8    they are being dispensed there.

9    Q    All right.  You were shown Government's Exhibit 4-14, if

10   you recall?

11   A    Yes.

12   Q    About Mr. L...?

13   A    Yes, sir.

14   Q    DEL......?  We talked a little bit earlier about when you

15   have the physician's signature on this spot that says "product

16   selection permitted," what does that mean?

17   A    I read that that you could potentially do a substitution of

18   some kind.  That drug, you could substitute it for a generic

19   drug.

20   Q    You were asked about this drug here, Percocet?

21   A    Yes, sir.

22   Q    And you looked on the back and you were asked about -- I

23   think that would be over here, then; right?

24   A    That's correct.

25   Q    And you told us that it could be the same or essentially

FBI SA CAROLYN MIDDLETON - CROSS BY MR. KNIZLEY

 1   the same?

 2   A   I'm not a pharmacist.  It wasn't -- the reason that I was

 3   there was to ascertain drugs and equivalents and so forth.

 4   Q   And I'm asking you about the response you gave the

 5   government a moment ago, when they showed you this.  Did you

 6   tell the government it looked like it could be the same?

 7   A   It could be the same.

 8   Q   And that was based on your nursing experience?

 9   A   Yes, sir.

10   Q   Okay.  And do you still agree it could be the same?

11   A   Absolutely.

12   Q   It really doesn't matter, does it, because if it's the

13   same, relatively the same, I mean, the physician signed it so

14   you could substitute some similar, equivalent product; right?

15   A   I -- again, I'm not a pharmacist.  I wouldn't make that

16   determination.

17   Q   And not being a pharmacist, you just really don't know the

18   ins and outs of how a pharmacy, as you said earlier, is

19   maintained and operated and the administrative aspect of the

20   pharmacy; is that right?

21   A   No, sir.  While I've interacted intimately with pharmacies,

22   I've never worked in one.

23   Q   Okay.  On Government Exhibit 4-16, which has been

24   designated IOU Log --

25   A   Yes.

FBI SA CAROLYN MIDDLETON - CROSS BY MR. KNIZLEY

412

1  Q   -- right?  And within that there's a lot of prescriptions,

2  I think we saw; right?

3  A   There are prescriptions in there, yes, sir.

4  Q   And a lot of them, aren't there?

5  A   I believe so.

6  Q   Whatever fills up this, ever how many this is -- right?

7  And then you see this, indications here in the binder that says

8  IOU Log, and it'll have a name and it will say, oh, five boxes

9  and it'll have a date expected, and when it comes and quantity

10  owed; right?

11  A   It is what it says.

12  Q   And you don't have any idea what that's supposed to mean,

13  do you?

14  A   No, sir.

15  Q   Okay.  And these folders we have, these three-ring binders

16  we have these in, that's not how you found it, is it?

17  A   That is not how we found it.

18  Q   And someone has gone through all the things y'all seized

19  and organized them in the way you see them here today?

20  A   Yes, sir.

21  Q   They could have been in a pile, they could have been neatly

22  stacked?  Do you have any idea how they were?

23  A   I know where these items came from.  I can tell you that

24  based on the documentation that goes with them.  And I can tell

25  you where I seized them from at the pharmacy.

FBI SA CAROLYN MIDDLETON - CROSS BY MR. KNIZLEY

1    Q    You can tell us the room; right?

2    A    I can tell you the room and the general location where they

3    came from.

4    Q    General location?

5    A    Yes, sir.

6    Q    Wouldn't it be that a lot of times once you got to them,

7    you know, the agent tells you:  I got this out of this room,

8    and it's been stacked up or put here in this location, and then

9    you say:  Okay.  I know this came from this room.  If you've

10   indicated it came from the desk, I know it came from the desk;

11   right?

12   A    That's accurate, yes.

13   Q    And sometimes they don't say it came from the desk, you

14   just know it came from the room?

15   A    Correct.

16   Q    And as far as your testimony, you don't know how these were

17   arranged unless you were actually there watching them; right?

18   Whether it was in the desk, whether it was underneath the desk,

19   whether it was on top of the desk?

20   A    Some of the items, there was very specific information

21   about where it came from, and others there weren't.

22   Q    We know it wasn't like it looks in here today?

23   A    That's correct.

24   Q    Okay.  And some -- and these are not all the items y'all

25   seized?

1    A    By no means, no.  No, sir.

2    Q    Just would it be fair to say thousands and thousands of

3    prescriptions you got?

4    A    That would be fair.

5    Q    Okay.  And we've just selected a few here for us; right?

6    A    Yes, sir.

7    Q    Okay.  And those boxes, now, that had the daily logs in

8    them, they were pretty well like that, were they not?  The

9    cardboard boxes?

10   A    I'm sorry.  Could you repeat the question, sir?

11   Q    On the cardboard boxes that had the daily audit logs --

12   A    Yes, sir?  The two brown boxes?

13   Q    Yes.

14   A    Yes, sir.

15   Q    Now, they were pretty well like that, weren't they?

16   A    That is my understanding.  However, those were taken from a

17   location that I was not searching.

18   Q    Okay.  But from the location you searched and the other

19   location, there was, again, thousands of entries on each of

20   those boxes that appeared to be some recordation of the

21   activity of the pharmacy?

22   A    Yes.

23            MR. KNIZLEY:  Thank you.

24            MS. GRIFFIN:  Briefly, Your Honor.

25            THE COURT:  All right.

1    MS. GRIFFIN:  Could I have Exhibit Number 4-2?

2                    REDIRECT EXAMINATION

3    BY MS. GRIFFIN:

4    Q   Agent Middleton, you testified that the door shown in

5    Government's Exhibit 4-2 into the pharmacy from PPSA Clinic

6    appeared to be locked when you got there in the morning of May

7    20th, 2015?

8    A   That's correct, it was locked.

9    Q   What time were you there that morning?

10   A   We got to the practice -- I would have to check my log for

11   an exact.  However, we got to the practice, the medical

12   practice, PPSA, it was -- it was sometime around 7 a.m., 6:30,

13   7 a.m.

14   Q   Pretty early; is that right?

15   A   It was early in the morning.  That's correct.  And it was

16   sometime later when we got into C&R Pharmacy.

17   Q   Was the door to the pharmacy from the outside locked as

18   well at that time?

19   A   Yes, it was.

20   Q   Now, you indicated that you did not have anything to do

21   with the audit or the seizure of the controlled substances; is

22   that right?

23   A   That's right.

24   Q   You were aware that it was going on around you as you were

25   participating in the search?

416

1   A   That's right.

2   Q   And who is it that did the audit and took the controlled

3   substances?  What agency?

4   A   DEA did that.

5   Q   And Mr. Knizley asked you how the items were contained, how

6   the scripts were contained in the pharmacy?

7   A   Yes.

8   Q   I show you jpeg picture 71 from Government's Exhibit 4-2

9   that you've previously identified and ask if this is how -- or

10   what does this depict, please?

11   A   These were drawers within the pharmacy and appeared to be a

12   filing system for bundles of prescriptions.  And each of the

13   bundles had numbers that appeared to be a range on it and we

14   assumed that those were prescription numbers.

15   Q   Was that how the majority of the scripts were seized?

16   A   The vast majority, yes.

17   Q   And then you identified room D, photograph jpeg 12, as

18   being what you determined to be the pharmacist's office; is

19   that correct?

20   A   That's right.

21   Q   Do there also appear to be scripts in this area?

22   A   Yes, we found those prescriptions and, you know, bundles,

23   little small bundles of prescriptions around this area as well.

24   Q   So they were not all contained in drawers, but some were

25   throughout the inside of the pharmacy?

417

1   A   Yes; that's correct.

2   Q   What would you categorize in the pharmacy as outside, or

3   the common area for the patients to come into?

4   A   If you were to look at the -- do you have the sketch by any

5   chance?

6   Q   Yes.  Or I can show you a photograph.

7   A   Or a photograph will be fine.

8   Q   It's jpeg number 14.

9   A   This is a photograph looking from that room D, that office,

10  straight to the patient -- what appeared to be a waiting area

11  for patients or customers.  Right around you'll see that

12  there's a lab coat hanging on the right-hand side here.

13  Immediately around this, the wall that that is hanging on, is

14  that door to the outside of the building that we've spoken of

15  that was locked.

16  Q   If you will use your finger, it will draw an arrow to the

17  area you're discussing.

18  A   Okay.  (Complying.)  So if you -- that goes to the door

19  where the patients would come in from the outside, if they are

20  accessing the building from the parking lot, the outside area.

21  So that would be -- Airport Boulevard would be out in that

22  direction.  And then straight in here, as you can see, that's a

23  different room and it looks like it's a patient waiting area.

24  There's no drugs in there, it doesn't appear to be a place

25  where an employee would work in there.  And so -- and then this

1    is a counter where patients might interact through that glass

2    with pharmacy staff (indicating).

3    Q    So the areas -- the first two areas you would classify as

4    the common area or the public area of the pharmacy?

5    A    Most probably.

6    Q    And as you're pointing to behind E, you would characterize

7    that as the pharmacist part of the pharmacy?

8    A    Yes, as well as D, where this photograph is taken from,

9    would have been in room D.  And I wouldn't expect patients to

10   be in there.

11          MS. GRIFFIN:  That's all I have of this witness at

12   this time, Your Honor.

13          THE COURT:  All right.  You may step down.  Thank you.

14          All right.  Ladies and gentlemen, we're going to take

15   our morning break at this time.  Leave your pads on your

16   chairs.  Take your break downstairs in the jury assembly room

17   and remember, no discussion about the case.  Thank you.  We're

18   in recess.

19      (A recess was taken at approximately 10:22 a.m.)

20      (In open court, 10:45 a.m., defendants and jury present.)

21          THE COURT:  All right.  Call your next witness.

22          MR. BODNAR:  The United States calls Paul Short.

23          THE CLERK:  Mr. Short, please step forward toward the

24   witness stand and I'll swear you in.  Let me get you to raise

25   your right hand.

```
 1                    DEA ANALYST PAUL SHORT
 2               was sworn and testified as follows:
 3          THE WITNESS:  I do.
 4          THE CLERK:  Thank you, sir.  Please be seated.
 5                    DIRECT EXAMINATION
 6  BY MR. BODNAR:
 7  Q   Good morning, Mr. Short.
 8  A   Good morning.
 9  Q   Could you please introduce yourself to the jury?
10  A   I'm Paul Short.  I'm a DEA analyst currently assigned to
11  the document/media exploitation section.
12  Q   And, Mr. Short, the jury's already heard from DEA special
13  agents and a diversion agent, but you're neither a special
14  agent or a diversion agent, are you?
15  A   No, sir, I'm an analyst.
16  Q   And what's the difference between an agent and an analyst?
17  A   Agents are law enforcement officers, carry weapons, that
18  sort of thing.  Analysts review information.  I have no arrest
19  powers or anything of that sort.
20  Q   And how long have you worked for the DEA?
21  A   Approximately five years.
22  Q   And prior to working for the DEA, what did you do?
23  A   I had the same position with the National Drug Intelligence
24  Center.
25  Q   And what is the work that you do with the DEA and
```

1    previously with the National Drug Intelligence Center?

2    A    I'm in what's called the document/media exploitation

3    section.  We specialize in assisting investigations with

4    voluminous or bulk information.  So cases that have large

5    volumes of either computer records or hard copy documents, we

6    assist the investigation with those records.

7    Q    And in particular do you work on investigations or have you

8    worked on investigations involving prescriptions?

9    A    Yes, sir.

10   Q    Approximately how many prescription-related investigations

11   have you worked on?

12   A    Probably a couple of hundred.

13   Q    And is it fair to say that you help take voluminous data

14   and put it into a chart or an exhibit that helps the jury

15   understand what it is they are looking at?

16   A    Yes, sir.

17   Q    And were you involved in that aspect of this investigation

18   for a Dr. Xiulu Ruan and Dr. John Patrick Couch?

19   A    Yes, sir.

20   Q    Were you provided PDMP data from DEA Mobile related to

21   these two doctors?

22   A    Yes, sir.

23   Q    And which three states were you provided PDMP data?

24   A    I was provided the PDMP from Alabama, Mississippi, and

25   Florida.

DEA ANALYST PAUL SHORT - DIRECT BY MR. BODNAR

1  Q   And from those PDMP -- well, first of all, were those PDMP

2  records voluminous?

3  A   Yes, sir.

4  Q   And did you then take those records and create a series of

5  charts and graphs and other exhibits from them?

6  A   Yes, I did.

7       MR. BODNAR:  Your Honor, may I approach and show the

8  witness what's been marked as Government's Exhibit 10-0 through

9  10-20, 10-23, 10-25, 10-28, also including 10-5A, 10-17A,

10 10-18A, and 10-19A.

11      THE COURT:  Yes.

12 BY MR. BODNAR:

13 Q   Mr. Short, could you look through this binder and see if

14 you can identify if these are the charts that you created for

15 this case?

16 A   Yes, sir.  They are.

17 Q   And just to clarify, these are charts that were created

18 solely from the PDMP records for John Patrick Couch and Xiulu

19 Ruan from Alabama, Mississippi, and Florida?

20 A   That's correct.

21      MR. BODNAR:  Your Honor, the United States moves to

22 admit and publish the government's exhibits as named a few

23 moments ago.

24      MR. ARMSTRONG:  Judge, we would reassert the motions,

25 the objections we had previously stated, to all of the exhibits

1    that he just named.

2          THE COURT:  All right.  Overruled.  Mark them in.

3          (Government's Exhibits 10-0 through 10-20, 10-23, 10-25,

4    and 10-28 were entered into evidence.)

5    BY MR. BODNAR:

6    Q    Mr. Short, did you create an exhibit to help the jury

7    understand how many prescriptions were filled written by these

8    doctors in states of Alabama, Mississippi, and Florida?

9    A    Yes, I did.

10   Q    And is that what's identified here and has been marked here

11   as Government's Exhibit 10-0?

12   A    Yes, it is.

13   Q    Can you walk the jury through this and what is it that they

14   are seeing here?

15   A    These are the PDMP -- a summary of the PDMP records for

16   Alabama, Mississippi, and Florida.  It's broken down first by

17   the doctor.  So Dr. Couch is the first gray line and Dr. Ruan

18   would be the second gray line.  And this chart shows that

19   Dr. Couch had a total of 143,140 prescriptions.

20   Q    And that's what's written right here?  (Indicating.)

21   A    Yes, sir.  And that is broken down as 129,659 records from

22   Alabama, 12,196 records from Mississippi, 1,285 prescriptions

23   from Florida.

24   Q    When you say records and prescriptions, do you mean that

25   there is PDMP data for 129,659 prescriptions filled in the

DEA ANALYST PAUL SHORT - DIRECT BY MR. BODNAR

1   state of Alabama?

2   A   That's correct.

3   Q   And does that work the same way for Dr. Ruan right here,

4   151,043 prescriptions?

5   A   Yes, sir.

6   Q   And that's the breakdown of how many were filled in those

7   three states?

8   A   Yes.

9   Q   And during what time period was this we're looking at?

10   A   January 1st, 2011, through May 19th of 2015.

11   Q   And so is this the total for both doctors?  (Indicating.)

12   A   Yes.

13   Q   In that time period, 294,183 prescriptions?

14   A   Yes, sir.

15   Q   Now, I see the percentages over here.  What does it mean in

16   the gray bar that Dr. Couch's 143,000 is 48.66 percent?

17   A   Of the combined total between the two doctors, Dr. Couch

18   had 48.66 percent of the total and, likewise, Dr. Ruan had

19   51.34 percent of the prescriptions from both doctors from all

20   three states.

21   Q   And just to clarify for the jury, when we say

22   prescriptions, we mean controlled substance prescriptions;

23   correct?

24   A   That is correct.

25   Q   Mr. Short, did you then examine how many different patients

1   received particular drugs as prescribed by Dr. Ruan and

2   Dr. Couch?

3   A   Yes, I did.

4   Q   Is that what's marked here as Government's Exhibit 10-1?

5   A   Yes, it is.

6   Q   And can you walk us through at least what's going on --

7   well, here's the date range you just gave; is that correct?

8   A   Correct.

9   Q   So looking at this first part up top here, can you walk us

10  through what we have here so the jury understands what they are

11  looking at?

12  A   That first section is the totals for TIRF drugs, for

13  transmucosal immediate-release fentanyl products.

14  Q   Is that -- I see the little one out there.  If I zoomed

15  out, is that the footnote one you've got right there at the

16  bottom?

17  A   Yes, sir.

18  Q   Okay.  So looking at that top part again --

19  A   So that section of the chart shows the total number of

20  patients that received each of those drugs all strengths by

21  Dr. Ruan and Dr. Couch.

22  Q   And I see at the top you have 688 and it's got an asterisk

23  next to it.  Why is that?

24  A   The totals for each drug are the number of patients that

25  received each of those drugs.  However, some of the patients

DEA ANALYST PAUL SHORT - DIRECT BY MR. BODNAR

425

1    received multiple drugs, and so that top line is just the

2    unique -- all the TIRF drugs, whereas individual lines for the

3    drugs counts each individual patient.

4    Q    So --

5    A    So the top line is not double counted.

6    Q    You say it doesn't double count?

7    A    The 688 does not double count.

8    Q    So, for example, if Dr. Ruan prescribed a patient Subsys

9    and Abstral, they would be marked here and here, but only

10   counted one time as the total patients who received TIRF drugs?

11   (Indicating.)

12   A    That's correct.

13   Q    And what was the total number of different patients that

14   received TIRF drugs from Dr. Ruan?

15   A    688.

16   Q    And how about for Dr. Couch?

17   A    351.

18   Q    And what were the two largest number of TIRF drugs per

19   recipient received?

20   A    For Subsys, for Dr. Ruan was 484 patients.  And for

21   Dr. Couch it would be -- Subsys, 208 recipients.

22   Q    And Abstral would be the second-most prescribed, based on

23   the number of different recipients?

24   A    Yes.

25   Q    Now let's look at the bottom part of this chart here,

426

1   select schedule II drugs.  And, now, were these drugs selected

2   by the prosecution and/or DEA to ask you to look for these

3   particular drugs?

4   A    Yes, sir.

5   Q    Okay.  And which particular schedule II drugs are we

6   talking about here?

7   A    Oxycodone 30 milligrams, also brand name Roxicodone;

8   oxymorphone 40 milligrams, which also the brand name would be

9   Opana; oxycodone 80 milligrams, also OxyContin; hydromorphone

10  32 milligrams, which brand would be Exalgo; morphine sulfate

11  100 milligrams, which goes by MS Contin; and hydrocodone 50

12  milligrams, which also goes by Zohydro.

13  Q    And before we get to the numbers, do these select drugs and

14  the numbers we're going to see here on the right refer only to

15  that particular strength?

16  A    Yes.

17  Q    So whereas at the top you are counting people that receive

18  Subsys of any strength or Abstral of any strength; correct?

19  A    Correct.

20  Q    Here at the bottom you're just looking at the number of

21  patients that, for instance, received OxyContin 80 or

22  Roxicodone 30?

23  A    Just patients who received that strength of that drug.

24  Q    And I see a number two next to Zohydro 50 milligrams.  What

25  does that two refer to?

1   A   Hydrocodone products were previously scheduled as a

2   schedule III and they were moved up to a schedule II.  For

3   Zohydro, that total counts both time periods.

4   Q   And does this work the same way as you explained it before,

5   where for oxycodone 30 does it show the number of unique

6   patients for Dr. Ruan and Dr. Couch?

7   A   That's correct.

8   Q   How many was that for oxycodone 30?

9   A   167 for Dr. Ruan and 980 for Dr. Couch.

10   Q   How about for Opana 40 milligrams?

11   A   134 for Dr. Ruan, 167 for Dr. Couch.

12   Q   And OxyContin 80?

13   A   30 recipients for Dr. Ruan and 83 recipients for Dr. Couch.

14   Q   I'm not going to read them all.  I'm just going to ask the

15   last one, Exalgo 32?

16   A   100 recipients for Dr. Ruan and 11 for Dr. Couch.

17   Q   And does it work the same way as you explained above with

18   this total line up here?  (Indicating.)

19   A   Yes.

20   Q   That you didn't double count?

21   A   Each individual patient would be counted individually for

22   the bottom -- for the individual drug totals.  But for the

23   overall total for that whole gray section for the overall, they

24   were only counted once.

25   Q   So if Chris Bodnar received a prescription for Roxicodone

DEA ANALYST PAUL SHORT - DIRECT BY MR. BODNAR          428

1   30, I'm counted there; and OxyContin 80, I'm counted in that

2   line; correct?  (Indicating.)

3   A    Correct.

4   Q    But only counted one time here because I'm only one unique

5   patient?  (Indicating.)

6   A    That's correct.

7   Q    For these particular drugs were you then asked to look at

8   how much each doctor distributed in terms of how many

9   prescriptions and then how many units were distributed for each

10  drug?

11  A    Yes.

12  Q    Mr. Short, just so the jury understands how you came up

13  with this analysis, can you explain to the jury how it was that

14  you were able to take the PDMP data, 294,000 -some-odd

15  prescription data, and come up with a chart that looks like

16  this?  How do you do something like that?

17          THE COURT:  When you say looks like this, what exhibit

18  number are you showing him?

19          MR. BODNAR:  I'm looking at Government's Exhibit 10-1

20  as an example.

21  Q    How did you do this analysis to figure out this is the

22  number of patients, Mr. Short?

23  A    The PDMP records have common fields.  So we looked at the

24  recipient names, the drug names, the dispense dates, the fill

25  dates, and combined those records by common fields and then

1  organized them according to recipients.

2  Q   And did you have to use any special proprietary DEA

3  software to do something like this?

4  A   Microsoft Excel.

5  Q   Just a regular Excel spreadsheet is how you -- where you

6  put all the numbers into and were able to come up with analysis

7  like this?

8  A   That's correct.

9  Q   And you had mentioned that you've worked on hundreds of

10  pill cases before; correct?

11  A   That is correct.

12  Q   Is this how you've done it in other cases as well?

13  A   Yes.

14  Q   And have you been able to create charts such as this in

15  other cases as well?

16  A   Yes.

17  Q   As I asked before, we've been taking the particular drugs

18  here and asked to look at how many prescriptions and how many

19  units were dispensed by each doctor?

20  A   Yes.

21  Q   I'm showing you what's been marked and admitted as

22  Government's Exhibit 10-2.  Is this that chart for Dr. Xiulu

23  Ruan?

24  A   Yes, it is.

25  Q   So walk me through the top part first.  Can you explain to

1   the jury what it is they are seeing?

2   A   Again, those are the TIRF drugs:  Subsys, Abstral, Fentora,

3   Lazanda, all strengths.

4   Q   And let's walk through Subsys, just walking across so that

5   they understand what it is we have here.

6   A   Right.  For Subsys the first column -- actually the second

7   column, the number of recipients, that is the same as in the

8   previous chart.  So those are -- for each individual drug,

9   those are unique recipients for each of those drugs.

10  Q   484 different patients during this time period received at

11  least one prescription for Subsys from Dr. Ruan?

12  A   That's correct.

13  Q   Okay.  And how many different prescriptions did he write

14  for Subsys during that time?

15  A   2,044.

16  Q   And then I see the final column says pills/units dispensed.

17  What does that mean?

18  A   Pills or units, the drugs come in different types.  So the

19  pills/units are the quantity that was written by the doctor.

20  Q   And are you familiar with what Subsys looks like?

21  A   Yes.

22  Q   I'm going to show you what's been not admitted but numbered

23  as Government's Exhibit 1-9.  It is a visual aid that was used

24  with a defendant witness.

25       (A discussion was held off the record between counsel.)

DEA ANALYST PAUL SHORT - DIRECT BY MR. BODNAR

431

1   BY MR. BODNAR:

2   Q   This is 1-9.  Up here is this a picture of what Subsys

3   looks like?  (Indicating.)

4   A   Yes.

5   Q   So in this column where you're referring to 131,130 units,

6   does that mean 131,000 sprays?

7   A   Yes.

8   Q   And does that work the same way down the list for Abstral,

9   Fentora, and Lazanda?

10  A   Yes.

11  Q   And again, this is just for Dr. Ruan; correct?

12  A   That's correct.

13  Q   At the bottom of the chart can you walk us through just one

14  line so we make sure we understand what's going on here?

15  A   As we went through the previous section, the second column,

16  number of recipients for oxycodone or Roxicodone 30, there was

17  167 unique recipients for oxycodone or Roxicodone 30.  They

18  were issued to 669 prescriptions totaling 58,534 pills.

19  Q   And just so we're clear, that's 58,534 are just pills that

20  were dispensed in the states of Alabama, Florida, and

21  Mississippi?

22  A   That is correct.

23  Q   And just for prescriptions written by Dr. Ruan?

24  A   Correct.

25  Q   Does that work the same way down here with all the rest,

DEA ANALYST PAUL SHORT - DIRECT BY MR. BODNAR

432

1    such as Opana 40, the 95,000 pills?

2    A   Yes, sir.

3    Q   And we're not saying that that's all the Opana that was

4    dispensed in those states, are we?

5    A   That's what's in the PDMP records.

6    Q   But there were other strengths of Opana?  This is strictly

7    Opana 40?

8    A   Yes, that's all the prescriptions for Opana 40.

9    Q   Did you make a similar chart for Dr. Couch?

10   A   Yes, I did.

11   Q   I'm going to show you what's been marked and admitted as

12   Government's Exhibit 10-3.  Is this the chart you made for

13   Dr. Couch?

14   A   Yes, it is.

15   Q   And does it work the same way as the chart we just saw for

16   Dr. Ruan?

17   A   Yes.

18   Q   So does that mean -- how many recipients received Subsys?

19   A   208 received Subsys from Dr. Couch.

20   Q   Again, in the states of Florida, Mississippi, or Alabama?

21   A   Correct.

22   Q   And how many prescriptions?

23   A   1,001.

24   Q   And for how many -- in this case would be sprays of Subsys;

25   correct?

1   A   Yes.  111,370.

2   Q   Looking down at the bottom part, we'll just use Roxicodone

3   30 as the example.  How many different patients received

4   Roxicodone 30 in the states of Alabama, Florida, and

5   Mississippi from Dr. Couch?

6   A   980 different recipients.

7   Q   How many prescriptions did he write that were filled in

8   those states?

9   A   11,874.

10   Q   And how many different or how many pills of Roxicodone did

11   that amount to?

12   A   1,145,867.

13   Q   And, Mr. Short, you have no way of knowing from the PDMP

14   records if these were legitimate or illegitimate prescriptions,

15   do you?

16   A   No, sir.

17   Q   And you didn't do any sort of projections or statistics

18   about what they might have done in the future on these charts,

19   did you?

20   A   Strictly what was within those PDMP records.

21   Q   So these numbers come from the records you created?

22   A   That's correct.

23   Q   From the PDMP records?

24   A   Yes.

25   Q   Were you then asked to create graphs to show the number of

1   prescriptions of the TIRF drugs by year?

2   A   Yes.

3   Q   And just showing on Exhibit 10-3, those TIRF drugs, is that

4   Subsys, Abstral, Lazanda, and Fentora?

5   A   Yes.

6   Q   I'm going to show you what's been marked as Government's

7   Exhibit and admitted as Government's Exhibit 10-4.  Is this the

8   graph you created?

9   A   Yes, it is.

10  Q   So walking us through the top, we've got the two doctors.

11  And is that the same date range we've used before or a

12  different date range?

13  A   It's a different date range.

14  Q   Why is it that you went January 1st, 2011, through December

15  31st, 2014, instead of going all the way to May 20th of '15?

16  A   The 2015 only went through May, so that would not be a

17  complete year.  So it wouldn't be an accurate reflection of

18  what was done in the year.

19  Q   And why didn't you just do a projection of how many

20  prescriptions they would have done had they finished out the

21  year 2015 before they were arrested?

22  A   That's not how my analysis works.  I strictly report what

23  was done.  There's no type of projection or forecasting.

24  Q   No statistical analysis or projections?

25  A   No projections or forecasting.

DEA ANALYST PAUL SHORT - DIRECT BY MR. BODNAR

435

1  Q   Okay.  So walking through with us here, which line is

2  Dr. Couch?

3  A   Dr. Couch is the red line -- no, I'm sorry -- Dr. Couch is

4  the blue line.

5  Q   Does that mean Dr. Ruan is the red line?

6  A   That's correct.

7  Q   So starting down here in 2011, how many prescriptions for

8  TIRF drugs were written by Dr. Couch?

9  A   80.

10  Q   And how many by Dr. Ruan?

11  A   394.

12  Q   And by the time you got to 2014, how many prescriptions for

13  TIRF drugs were written by Dr. Couch?

14  A   1,166.

15  Q   Now how about for Dr. Ruan?

16  A   2,184.

17  Q   Now, this graph is measuring the number of prescriptions;

18  correct?

19  A   That is correct.

20  Q   And that could be a prescription for Subsys 100 or Subsys

21  1600; correct?

22  A   That's correct.

23  Q   But there are different strengths of the drug?

24  A   Yes.

25  Q   Were you then asked to look at the number of micrograms per

1  year?

2  A   Yes.

3  Q   Of Subsys and Abstral -- for TIRFs?

4  A   Yes, sir.

5  Q   And did you create a graph about that?

6  A   Yes, I did.

7  Q   I'm going to show you what's been admitted as Government's

8  Exhibit 10-5.  Is this the graph you were just mentioning?

9  A   Yes, it is.

10  Q   So on the last graph we saw the number of

11  prescriptions.  In this graph we're looking at the number of

12  micrograms of TIRF?

13  A   Yes, sir.

14          THE COURT:  Mr. Bodnar, let me just ask you.

15          MR. BODNAR:  Yes, ma'am?

16          THE COURT:  Sometimes you call it TIRF and sometimes

17  you call it "TRIF."  Is that the same thing?

18          MR. BODNAR:  I'm sorry, Your Honor.  It is the same

19  thing.  I should say TIRF, the transmucosal release fentanyl

20  drugs.

21          THE COURT:  Okay.  Just so we understand you're

22  talking about the same things.

23          MR. BODNAR:  We are.  I will try to make sure I use

24  the same thing TIRF, T-I-R-F.

25          THE COURT:  Okay.

DEA ANALYST PAUL SHORT - DIRECT BY MR. BODNAR

1   BY MR. BODNAR:

2   Q   And is this the graph micrograms of TIRF drugs?

3   A   Yes, it is.

4   Q   Now, did you choose to put this in micrograms or is the

5   drug dispensed in micrograms?

6   A   It's dispensed in micrograms.

7   Q   And how did you determine how many micrograms per year were

8   dispensed -- were written and then dispensed in those three

9   states by Dr. Ruan and Dr. Couch?

10  A   Calculated the individual prescriptions, multiplying the

11  quantity times the micrograms to get a total micrograms per

12  patient and then added those up for all patients for every

13  given year.

14  Q   So, for example, if there's a patient that gets a

15  prescription for 90 sprays of Subsys 800, did you multiply 90

16  times 800?

17  A   Yes.

18  Q   And that gave you the number of micrograms for that one

19  particular script?

20  A   Yes.

21  Q   And then you did it for each Subsys script, Abstral,

22  Lazanda, and Fentora for the year?

23  A   Yes.

24  Q   Is that how you came up with those numbers?

25  A   It is.

DEA ANALYST RALL SHORT - DIRECT BY MR. BODNAR                438

1    Q   So looking, then, do we have the blue line as Dr. Couch

2    again and the red line is Dr. Ruan?

3    A   Yes.

4    Q   How many micrograms of TIRF, T-I-R-F, fentanyl were

5    prescribed by Dr. Couch in 2011?

6    A   In 2011 it was 3,548,800 micrograms.

7    Q   And how many micrograms of the TIRF fentanyl was prescribed

8    by Dr. Ruan that same year?

9    A   In 2011 Dr. Ruan prescribed 9,304,400 micrograms.

10   Q   Now, jumping forward to 2014, by 2014 how many micrograms

11   of TIRF fentanyl was prescribed by Dr. Ruan?

12   A   Dr. Ruan had 55,457,100 micrograms in 2014.

13   Q   And how about for Dr. Couch?

14   A   In 2014 Dr. Couch had 82,292,500 micrograms.

15   Q   Now, obviously -- or is the 82 million substantially more,

16   magnitude more, than the 3 million?

17   A   Yes, sir.

18   Q   Did you then look to see how many more patients per year

19   for these TIRF fentanyl drugs?

20   A   Yes, I did.

21   Q   I'm going to show you what's been marked as Government's

22   Exhibit 10-5A.  10-5A, is that the chart that you did by

23   patients?

24   A   Yes, it is.

25   Q   So looking at it this way, in 2011 how many patients were

DEA ANALYST PAUL SHORT - DIRECT BY MR. BODNAR

439

1   receiving TIRF -- different patients received at least one TIRF

2   fentanyl prescription from Dr. Couch?

3   A   Dr. Couch had 22 patients receiving TIRF drugs in 2011.

4   Q   So if we look back at 10-5 then, 10-5, there were 22

5   patients receiving the combined 3.548 -- there are 3,548,000

6   micrograms?

7   A   That is correct.

8   Q   How many did Dr. Ruan have in 2011?

9   A   There were 82 recipients in 2011 for Dr. Ruan.

10  Q   And by 2014 how many did each doctor have?

11  A   In 2014, Dr. Couch had 233 -- 233 recipients and Dr. Ruan

12  had 440 recipients.

13  Q   Now, I see -- we'll just use this as an example --  in 2013

14  there were 116 patients; correct?

15  A   Correct.

16  Q   And 233 for March of 2014?

17  A   Correct.

18  Q   Does that mean that there were 233 more patients different

19  from that 116, or does that mean there were just -- within this

20  year were there some included in 116 or not, in 2014 there were

21  233 different patients?

22  A   Yes, in 2013 there was 116 unique individuals receiving

23  TIRF drugs.  And in 2014 there was 233.  There were different

24  names in there; it's not -- they are not unique, they are not

25  new people.

440

1    Q   Okay.  So you're not saying that 233 more unique patients

2    are coming, it's just within that year of 2014, 233 people

3    received TIRF fentanyl prescriptions?

4    A   Yes, there was 233 recipients in that year.

5    Q   So looking from, with Dr. Couch, from 2013 to 2014, does it

6    roughly double the number of patients in 2014 that he

7    prescribed to in 2013?

8    A   Yes.

9    Q   Looking at the micrograms for 2013 to 2014, do the

10   micrograms also double or is it more than double?

11   A   I believe it's in excess of tripling.

12   Q   And looking for Dr. Ruan, we'll use from 2012 to 2014.

13   Does his number of patients roughly double --

14   A   Yes.

15   Q   -- from 2012 to 2014?

16   A   Roughly.

17   Q   Looking at the number of micrograms, though, in 2012 to

18   2014 for Dr. Ruan, does it double or does it more than double?

19   A   It more than doubles.

20   Q   Mr. Short, were you asked to look and see amongst the

21   schedule II drugs which were the top prescribed drugs for each

22   doctor?

23   A   Yes, I was.

24   Q   And again, when we say top prescribed, we're talking about

25   top prescribed and filled in pharmacies in Mississippi,

DEA ANALYST PAUL SHORT - DIRECT BY MR. BODNAR

441

 1   Alabama, and Florida?

 2   A   Based on prescriptions filled in those three states, yes.

 3   Q   I'm going to show you what's been admitted as Government's

 4   Exhibit 10-6.  Is this the chart you created for Dr. Ruan?

 5   A   Yes, it is.

 6   Q   So again, we're back to the full time period now; correct?

 7   A   That's correct.

 8   Q   So what was the number one Schedule II drug prescribed by

 9   Dr. Ruan during that period?

10   A   Oxycodone had the most prescriptions.

11   Q   And before when we looked at oxycodone, we were talking

12   about specific strength, and Roxicodone 30, OxyContin 80, do

13   you recall that?

14   A   Yes.

15   Q   Here we're talking about any product that has oxycodone in

16   it?

17   A   That is correct.

18   Q   How many prescriptions for an oxycodone drug were

19   prescribed by Dr. Ruan during this time period?

20   A   Dr. Ruan had 27,414 prescriptions for oxycodone products

21   between January 1st, 2011, and May 20th, 2015.

22   Q   And what -- I'm sorry.

23   A   I'm sorry.

24   Q   What percentage of all the schedule II drugs written by

25   Dr. Ruan were oxycodone?

 1    A    Roughly 35 percent.

 2    Q    And that's the number we see right here?

 3    A    That's correct.

 4    Q    So that's not 35 percent of all his controlled substances

 5    prescribed, is it?

 6    A    No, sir.

 7    Q    Just amongst his schedule IIs?

 8    A    Correct.

 9    Q    And for the oxycodone pills, how many pills did he dispense

10    during that time period?  Or how many pills were dispensed at

11    pharmacies in those three states as prescribed by Dr. Ruan?

12    A    2,584,692.

13    Q    And does this top 10 list go in order, so oxycodone number

14    one, morphine two, fentanyl three?

15    A    Yes, it's in order by number of prescriptions.

16    Q    And so on.  And I see here at the bottom the total number

17    of prescriptions.  Is that the total number of prescriptions

18    for these top 10 drugs in schedule II?

19    A    That's correct.

20    Q    Now, I notice it does not equal 100 percent here.  Why is

21    that?

22    A    There were a few other schedule II drugs beyond the top 10

23    and those accounted for the remaining roughly one and a half

24    percent, or half a percent.

25    Q    So essentially over 99 percent of prescriptions for

1   schedule II drugs were amongst these top 10 dispensed from

2   Dr. Ruan's prescriptions?

3   A   That is correct.

4   Q   And what's the total number for these top 10 dispensed from

5   Dr. Ruan's prescriptions?

6   A   There was 5,986,602 pills or units dispensed in that time

7   frame.

8   Q   Now, I see that asterisk again next to hydrocodone as

9   well.  What does that asterisk signify?

10  A   The hydrocodone switched from a schedule III to a schedule

11  II, and that asterisk shows that these only count the

12  hydrocodone pills that were prescribed after it became a

13  schedule II, not -- does not include the ones while hydrocodone

14  was a schedule III.

15  Q   So if Chris Bodnar received a oxycodone prescription before

16  it was -- a hydrocodone prescription before this date and I

17  filled it in Alabama, Mississippi, or Florida, it would not be

18  reflected on here?

19  A   It would not be on this chart.

20  Q   Because this is only schedule II?

21  A   This is only schedule II.

22  Q   Did you create a similar chart for Dr. Couch?

23  A   Yes, I did.

24  Q   And is that what's been admitted as Government's Exhibit

25  10-7?

DEA ANALYST PAUL SHORT - DIRECT BY MR. BODNAR

1  A   Yes, it is.

2  Q   Just using the top as the example, again, this is all

3  strengths, all types of oxycodone?

4  A   Yes, sir.

5  Q   How many prescriptions of Roxicodone?

6  A   36,584.

7  Q   And those were filled in those three dates we've been

8  talking about?

9  A   Yes, sir.

10  Q   What percentage of all of Dr. Couch's schedule II

11  prescriptions were oxycodone?

12  A   44.6 percent.

13  Q   And how many oxycodone pills were dispensed based on

14  Dr. Couch's prescriptions in these three states?

15  A   3,331,463.

16  Q   And, again, does it go down the list in order?

17  A   Yes, sir.

18  Q   And is it -- do you recall, is this the same top three as

19  Dr. Ruan:  oxycodone, morphine, fentanyl?

20  A   I don't recall.

21  Q   I'm going to show you again what's been marked as

22  Government's Exhibit 10-6.  What are the top three for

23  Dr. Ruan?

24  A   Yes, oxycodone, morphine, and fentanyl.

25  Q   And for Dr. Couch?

DEA ANALYST BALL SHORT - DIRECT BY MR. BODNAR

445

1    A    Oxycodone, morphine, and fentanyl.

2    Q    And again, I'm assuming the same explanation you gave;

3    hydrocodone applies here for Dr. Couch?

4    A    Yes, it does.

5    Q    And does the same explanation explain why this number does

6    not come to 100 percent?

7    A    Yes.

8    Q    So there were a few drugs outside the top 10 that were

9    still schedule II prescribed by Dr. Couch?

10   A    Yes.

11   Q    Mr. Short, were you then asked to create a chart to show

12   the jury based on class of drugs prescribed by Dr. Ruan and

13   Dr. Couch during this time period?

14   A    Yes.

15   Q    I'm going to show you what's been marked as Government's

16   Exhibit Number 10-8.  Can you walk the jury through what they

17   are seeing here?

18   A    This is a pie chart of Dr. Ruan's prescriptions by DEA

19   schedule covering the time -- I'm sorry.

20   Q    Was that by the schedule or drug?

21   A    I'm sorry.  Drug group.

22   Q    And what is this red, this largest section here?

23   (Indicating.)

24   A    Those are opioids.

25   Q    So those are all the drugs that -- all the prescriptions

1   for drugs that are classified as opioids?

2   A   Yes.

3   Q   And how many prescriptions were there?

4   A   107,942.

5   Q   And what's this next one right here in blue?

6   A   Those are benzodiazepines.

7   Q   And green is what?

8   A   Carisoprodol, or Soma.

9   Q   And what does other drugs mean?

10  A   Everything else that didn't fall in one of those

11  categories.

12  Q   Everything that was not an opioid, a benzo, or Soma is 12

13  percent?

14  A   Yes, sir.

15  Q   Did you create a similar chart for Dr. Couch?

16  A   Yes, I did.

17  Q   Is that what's been admitted as Government's Exhibit 10-9?

18  A   Yes, it is.

19  Q   Does it work the same way, where the red is the opioids,

20  blue is the benzodiazepines, green Soma, and yellow other

21  drugs.

22  A   Yes, it does.

23  Q   And Dr. Couch's pie chart and percentages, were they

24  roughly similar or the same as Dr. Ruan's?

25  A   Roughly similar.

1    Q    Here again is Dr. Ruan's; correct?  (Indicating.)

2    A    Yes.

3    Q    And is there Dr. Couch's?  (Indicating.)

4    A    Correct.

5    Q    We just looked at drug class, which you mentioned before

6    prescriptions schedule as well.  Did you also do a pie chart

7    for the jury from these three states about the scheduling of

8    the drugs broken down for Dr. Ruan and Dr. Couch?

9    A    Yes, I did.

10   Q    I'm going to show you what's been marked as Government's

11   Exhibit 10-10.  Is this the pie chart you created for Dr. Ruan?

12   A    Yes, it is.

13   Q    And could you walk us through what we see here?

14   A    The red section has the 52 percent, the schedule II

15   drugs.  The blue section are the schedule III drugs, roughly 21

16   percent.  The green section is schedule IV, has 25 percent.

17   And the schedule V have two percent.

18   Q    And again, in these charts we're looking at the number of

19   prescriptions written; correct?

20   A    That's correct.

21   Q    So it could be a prescription for a different strength,

22   different types of drugs, we're just looking at the actual

23   number, one piece of paper and one prescription?

24   A    That is correct.

25   Q    And so for schedule II, Dr. Ruan wrote 77,494 schedule II

DEA ANALYST BALL SHORT - DIRECT BY MR. BODNAR

1  prescriptions?

2  A   That is correct.

3  Q   That were filled in Alabama, Florida, and Mississippi?

4  A   That's correct.

5  Q   Did you create a similar chart for Dr. Couch?

6  A   Yes, I did.

7  Q   Is that what's been -- it is Government's Exhibit 10-11?

8  A   Yes, it is.

9  Q   And does it work the same way, red being schedule II, blue

10 being schedule III, green schedule IV, and yellow schedule V?

11 A   Yes, it does.

12 Q   And did the percentages of each schedule for the two

13 doctors roughly equate to one another?

14 A   Roughly.

15 Q   This being Dr. Ruan's (indicating) and this being

16 Dr. Couch's (indicating)?

17 A   Yes.

18 Q   Now, Dr. Ruan is slightly lower in schedule II, isn't he?

19 He's 52 percent to Couch's 58 percent?

20 A   Yes.

21 Q   Moving away from Dr. Ruan for the moment, were you asked to

22 look for specific dates for prescriptions written by Dr. Couch

23 and filled in pharmacies in Alabama, Florida, and Mississippi?

24 A   Yes, sir.

25 Q   And were you asked to break that down by certain drug type?

DEA ANALYST PAUL SHORT - DIRECT BY MR. BODNAR

```
 1   A    Yes.
 2   Q    Is that what has been admitted as Government's Exhibit
 3   10-12 here?
 4   A    Yes, it is.
 5   Q    And flipping first to the second page, are these the
 6   particular dates on which you were asked to look at what
 7   prescriptions were written?
 8   A    Yes, sir.
 9   Q    Or written and then later filled?
10   A    These are the prescribed dates I was asked to look for.
11   Q    And you have no outside knowledge of why these particular
12   dates may have been requested, do you?
13   A    That's correct.
14   Q    And you just looked at the PDMP data for these three states
15   for those particular dates?
16   A    Yes, sir.
17   Q    Is that how you created this chart right here?
18   A    It is.
19   Q    And does this work similarly to the charts we saw in the
20   beginning, with the TIRF fentanyl drugs up top and the same
21   select schedule II drugs down below?
22   A    It's the same format.
23   Q    And so on the dates selected, those particular dates, how
24   many different recipients received Subsys prescriptions?
25   A    There was 53 different recipients for Subsys on those
```

DEA ANALYST BALL SHORT - DIRECT BY MR. BODNAR

450

1    dates.

2    Q    And how many prescriptions were written on those particular

3    dates for Subsys?

4    A    72.

5    Q    And how many Subsys sprays were dispensed for prescriptions

6    written on those dates?

7    A    7,140.

8    Q    Now, we're talking about written on and dispensed on.  Does

9    the PDMPs show a difference between sometimes the date it was

10   prescribed and the date it was actually dispensed?

11   A    Yes, they do differentiate.

12   Q    Which date did you look for for the dates on those charts

13   right there?

14   A    These were the dates prescribed.

15   Q    So even if they were dispensed on a different date, Chris

16   Bodnar gets a prescription on one of these dates here, I fill

17   it a different day, it would be counted on here because this

18   was the date prescribed?  (Indicating.)

19   A    That is correct.

20   Q    And on the bottom, we'll just use one as an example.  The

21   Roxicodone 30, how many different individuals received

22   prescriptions for Roxicodone 30 on those particular dates?

23   A    439 different recipients received Roxicodone 30

24   prescriptions.

25   Q    How many prescriptions were written for Roxicodone 30 on

1  those dates?

2  A    839.

3  Q    And how many Roxicodone 30 pills were dispensed on

4  prescriptions written on those dates?

5  A    81,659.

6  Q    And I assume these markings down at the bottom about

7  hydrocodone and TIRF and the dates are all the same markings as

8  you showed that we've talked about before?

9  A    That's correct.

10  Q    Did you then make a chart breaking down the particular

11  dates that we saw on the second page here and the number of

12  recipients, prescriptions, and units dispensed of any drug on

13  those days?

14  A    Yes.

15  Q    I'm going to show you what's been marked as Government's

16  Exhibit 10-13.  Is this that chart?

17  A    It is.

18  Q    Just reading it across, does this mean -- we'll zoom in so

19  we can get -- just focus on one example.  So here on March 7th,

20  2011, how many recipients -- on that particular day -- how many

21  recipients received a prescription for a controlled substance

22  from Dr. Couch?

23  A    42.

24  Q    It doesn't mean they all filled their prescription that

25  day, does it?

1  A   That's correct.

2  Q   How many prescriptions for those 42 people were written?

3  A   84.

4  Q   And how many pills were dispensed or units of Subsys such

5  as a spray were dispensed that day?

6  A   6,143.

7  Q   And does it work the same way going down this list for all

8  those dates?

9  A   Yes.

10  Q   And is it several pages?

11  A   Yes.

12  Q   Looks like four pages.  And what's this total on this

13  bottom?

14  A   It says 4,654 recipients.

15  Q   So on the dates, on those specific dates identified for

16  you, 4,654 people received controlled substance prescriptions

17  written by Dr. Couch?

18  A   That's correct.

19  Q   And how many prescriptions were written on those dates?

20  A   10,401.

21  Q   And how many pills or units were dispensed for

22  prescriptions written on those dates?

23  A   1,297,764.

24       MR. BODNAR:  One moment, Your Honor.

25  Q   Now, Mr. Short, all the data for these dates, that came

 1   from the PDMP reports that you've been analyzing; correct?

 2   A   Correct.

 3   Q   So all those are for controlled substances?

 4   A   Yes.

 5        MR. BODNAR:  Your Honor, among the exhibits shown to

 6   Mr. Short was Exhibit 10-13A.  That exhibit is not going to be

 7   offered and it's not going to be shown to the jury.  I've just

 8   informed defense counsel on that.  That was meant to be taken

 9   out earlier.

10        THE COURT:  So 10-13A was removed?

11        MR. BODNAR:  Correct.  I'm removing it out.

12   Q   Mr. Short, for those particular days that we just

13   discussed, did you then do a chart to break down what

14   percentage was schedule II, III, and so on?

15   A   Yes, I did.

16   Q   Again, we're just talking about Dr. Couch at this point;

17   correct?

18   A   That's correct.

19   Q   Is that what's been admitted as Government's Exhibit 10-14?

20   A   Yes, it is.

21   Q   And walk us around.  What do we see here?

22   A   The red section were the schedule IIs, roughly 56 percent.

23   The blue section is schedule IIIs, 20 percent.  The green

24   section is schedule IVs, 21 percent.  And the yellow section is

25   schedule Vs, three percent.

DEA ANALYST PAUL SHORT - DIRECT BY MR. BODNAR

454

1    Q   And these 5,793 prescriptions for schedule II drugs on that

2    date, that could be anything; it could be Norco to Subsys?

3    A   That is correct.

4    Q   And that could be any strength?

5    A   Any strength.

6    Q   It is simply a single -- you're counting single pieces of

7    paper, single images?

8    A   Correct.

9    Q   Mr. Short, were you also asked to look for certain

10   combinations of drugs prescribed and then dispensed --

11   prescribed and/or dispensed in a short period of time of one

12   another?

13   A   Yes.

14   Q   And particularly did you look for -- well, I'll show you

15   what's been marked as Government's Exhibit 10-15.  Is this the

16   chart that you created for certain combinations of drugs?

17   A   Yes, it is.

18   Q   Now, it says dispensed in the same calendar month on it.

19   Can you explain to the jury what does that mean and how did you

20   create this particular exhibit?

21   A   We went with dispensed month because some of the drugs,

22   particularly your schedule IIIs and schedule IVs, can have

23   refills.  So we went with the drugs that were dispensed in the

24   same calendar months.  So a prescription may have been written

25   in January with three refills.  We counted the dispensed months

1   to make sure those were accounted for.

2   Q   So accounted for a single patient receiving from a pharmacy

3   in Alabama, Mississippi, or Florida three different types of

4   drugs or whatever combination we're looking at here in the same

5   month?

6   A   Yes.

7   Q   Now, what's the first combination we have here that we

8   looked at?

9   A   The first combination was a combination of opioids,

10  benzodiazepines, and carisoprodol.

11  Q   And based on your experience working with DEA, are you

12  familiar with a name for that combination of drugs?

13  A   It's often referred to as the Holy Trinity.

14  Q   So looking first at this Holy Trinity, how many recipients

15  received the Holy Trinity drugs in the same month from

16  Dr. Ruan?

17  A   From Dr. Ruan there was 255 recipients that received that

18  drug combination.

19  Q   And how many times did that occur?

20  A   3,513.

21  Q   And I see an asterisk next to that.  What does that

22  asterisk mean?

23  A   The number of occurrences is like I previously mentioned,

24  that is dispensed in the same calendar month.  Someone could

25  have had a prescription filled on the 1st and the 3rd or the

1   15th; they were counted as an occurrence where they received it

2   the same calendar month.

3   Q   And did you do that because most prescriptions appeared to

4   be for a 30-day supply?

5   A   Yes, sir.

6   Q   So there were 3,513 times that a patient received a Holy

7   Trinity prescription in the same month?

8   A   That's correct.

9   Q   And what does it mean by the number of prescriptions for

10  these combined drugs only for these occurrences?

11  A   That kind of suggests the opioids, the benzodiazepines, and

12  the carisoprodol prescriptions.  These individuals may have

13  received additional drugs.  Those are not accounted for in that

14  figure.  That's strictly for the opioids, benzodiazepines, and

15  carisoprodol products.

16  Q   So if I received prescriptions for the Holy Trinity and a

17  fourth drug, that fourth drug is not accounted for in this

18  number?

19  A   That is correct.

20  Q   Did you then look at individuals that received the Holy

21  Trinity as well as Abstral or Subsys in the same month?

22  A   Yes, I did.

23  Q   And how many recipients for Dr. Ruan receive the Holy

24  Trinity and Subsys or Abstral?

25  A   53 recipients.

457

1    Q    And how many times did that occur?

2    A    181.

3    Q    And the number of prescriptions in this combination, that

4    would be the three Trinity drugs plus Subsys or Abstral?

5    A    The Abstral or Subsys could count as the opioid as well.

6    So it would be one of those three -- or all three of those, one

7    prescription for all three of those combinations.

8    Q    Got you.

9    A    1,045 was the number.

10   Q    Did you then look at combinations where individuals

11   received an opioid and a benzo during the same month?

12   A    Yes, I did.

13   Q    How many patients received opioids and benzos the same

14   month from Dr. Ruan and filled it in Alabama, Florida, or

15   Mississippi?

16   A    793 recipients.

17   Q    How many times did that occur?

18   A    10,393.

19   Q    You've already explained how that final figure works.  And

20   was the last combination you looked at the opioid, benzo, plus

21   Abstral and/or Subsys?

22   A    Yes.  Again, the Abstral or Subsys could count as the

23   opioid in that.

24   Q    Okay.  And how many times -- how many recipients was that?

25   A    161.

DEA ANALYST PAUL SHORT - DIRECT BY MR. BODNAR

1  Q  And that was 615 different times?

2  A  That's correct.

3  Q  Did you create a similar chart for Dr. Couch?

4  A  Yes, I did.

5  Q  Is that what's marked in and admitted here as Government's

6  Exhibit 10-16?

7  A  Yes, it is.

8  Q  Does that work the same way as this Trinity combination up

9  here on top?

10  A  Correct.

11  Q  How many times did Dr. Couch during this time period

12  dispense Holy Trinity -- or write prescriptions that were

13  dispensed in those three states for the Holy Trinity in this

14  time period?

15  A  There was 1,771 occurrences.

16  Q  And how many different patients?

17  A  228.

18  Q  How many times did Dr. -- how many different patients did

19  Dr. Couch prescribe the Trinity plus Abstral or Subsys?

20  A  It was prescribed to nine different recipients for a total

21  of 49 occurrences.

22  Q  And for opioid and benzos?  I'll try to keep the glare off

23  of it.

24  A  For the opioid and benzodiazepines there was 964 recipients

25  and 9,760 occurrences, for a total of 30,097 pills or units

DEA ANALYST PAUL SHORT - DIRECT BY MR. BODNAR

459

 1  within those combinations.

 2  Q   And for opioids and benzos as well as an Abstral or Subsys

 3  prescription?

 4  A   There were 79 recipients, with 285 occurrences, involving

 5  1,207 pills or units.

 6  Q   And this is accounting for any opiate, any benzo, any

 7  strength; correct?

 8  A   Correct.

 9  Q   And any strength of Subsys or Abstral in any quantity?

10  A   Correct.

11  Q   Similarly, did you get an opioid prescription, a benzo

12  prescription, and a carisoprodol prescription?

13  A   Correct.

14  Q   And some occasions a Subsys or Abstral?

15  A   Yes.

16  Q   Mr. Short, were you also asked to look at three particular

17  drugs and graph out the number of milligrams in one case and

18  micrograms in another over a period of time that these doctors

19  prescribed that were dispensed in Florida, Alabama, and

20  Mississippi?

21  A   Yes, I was.

22  Q   Was one of those drugs Exalgo?

23  A   Yes, it was.

24  Q   I'm going to show you what's previously been used as visual

25  exhibit Government's Exhibit 1-7 -- first, are you familiar

 1   with what Exalgo looks like?

 2   A   Roughly.

 3   Q   I'm going to show you what's been marked as Government's

 4   Exhibit 1-7.  Is this what Exalgo is right here?  (Indicating.)

 5   A   Yes, sir.

 6   Q   Small white pill?

 7   A   Yes, sir.

 8   Q   And what kind of drug is Exalgo?

 9   A   It's a hydromorphone product.

10   Q   Were you asked to look and compare Dr. Ruan and Dr. Couch

11   by the milligrams of Exalgo prescribed for a month?

12   A   Yes, sir.

13   Q   And did you come up with this chart that is marked as

14   Government's Exhibit 10-17?

15   A   Yes.

16   Q   I'll zoom out so we can see the whole chart.  Okay.  The

17   blue line represents which doctor?

18   A   Dr. Couch.

19   Q   And the red line?

20   A   Dr. Ruan.

21   Q   Which doctor?

22   A   I'm sorry.  Dr. Ruan.

23   Q   And where does this start on the line, what time period?

24   A   January 2011.

25   Q   And it goes all the way through --

1  A    May of 2015.

2  Q    So where I see May '15 here, that's not saying May 15th,

3  that's May 2015?

4  A    May 2015.

5  Q    And what is this day 1-18 there, why is that represented

6  there?

7  A    It covers the 1st through the 18th of May.

8  Q    And is that because there were no prescriptions written

9  after the 18th of May for Exalgo?

10  A    That's correct.

11  Q    Looking at this right here, what are we measuring, or what

12  is being measured here?

13  A    The milligrams of Exalgo.

14  Q    How did you come up with a chart like this?  How did you

15  figure out how many milligrams of Exalgo were prescribed by

16  either Dr. Ruan or Dr. Couch on each of these months?

17  A    Multiplying the quantity times the strength of the drug.

18  Q    So if I received a prescription for 100 Exalgo 32-milligram

19  pills, would you multiply 100 times 32?

20  A    That is correct.

21  Q    And do that for every prescription in a given month?

22  A    That's correct.

23  Q    Is that something you were able to do with the Excel

24  spreadsheet we talked about putting the PDMP data on?

25  A    Yes.

1    Q    And then did you come up with a prescription for each month

2    or the milligrams for each month?

3    A    Yes.

4    Q    And how were you able to graph that?  What did you -- did

5    you have to use any sort of fancy DEA software to graph that?

6    A    Microsoft Excel.

7    Q    Again Microsoft Excel.

8             Do you have any way of knowing why Dr. Ruan's line was

9    roughly like that?  (Indicating.)

10   A    No, sir.

11   Q    Do you have any way of knowing why Dr. Couch's line stays

12   right here on the bottom?

13   A    No, sir.

14   Q    You're just telling the jury that is the number of

15   milligrams dispensed based on the prescriptions written in

16   those months?

17   A    Yes, that's what the data shows.

18   Q    And as a backup to this graph, did you also mark down the

19   number of milligrams per month for Exalgo per doctor?

20   A    Yes.

21   Q    Is that what is marked as Government's Exhibit 10-17A?

22   A    Yes, it is.

23   Q    So does this show, for example -- let's just use July

24   2nd -- sorry -- July 2012 as an example right here.  Does that

25   mean Dr. Couch prescribed 112 milligrams of Exalgo?

1    A    That's correct.

2    Q    And Dr. Ruan 1,084 milligrams?

3    A    That's correct.

4    Q    And did you choose to do this in milligrams or is that how

5    Exalgo is broken down?

6    A    That's how the product is broken down.

7    Q    Did you create a similar chart for Subsys?

8    A    Yes, I did.

9    Q    And, now, Subsys is broken down in what unit?  Is it in

10   milligrams or micrograms?

11   A    Micrograms.

12   Q    So did you create your chart in micrograms?

13   A    Yes, I did.

14   Q    I'm going to show you what's been admitted as Government's

15   Exhibit 10-18.  Is this the chart you created for Subsys?

16   A    Yes, it is.

17   Q    So going along the bottom from -- it says April '12.  Does

18   that mean April 2012?

19   A    That is correct.

20   Q    It says May 2015?

21   A    Yes.

22   Q    So those are the months that Subsys was prescribed and then

23   filled in pharmacies in Alabama, Florida, and Mississippi for

24   prescriptions from these doctors?

25   A    Yes, it is.

DEA ANALYST PAUL SHORT - DIRECT BY MR. BODNAR

464

1   Q   And what's the unit over here on this side?

2   A   Those are micrograms.

3   Q   And are these in millions?  Is that one million, two

4   million, up to seven million?

5   A   That is correct.

6   Q   How much smaller is a microgram than a milligram?

7   A   Up -- it's one millionth of a gram.

8   Q   So does that make 1,000 micrograms into one milligram?

9   A   I believe so.  I'd have to multiply that out.

10  Q   And did you create this chart the same way you just said

11  you created the Exalgo chart?

12  A   I did.

13  Q   Was that by multiplying if I had a Subsys -- Subsys 600

14  prescription and 90 sprays, multiply 90 times 600 micrograms?

15  A   Yes.

16  Q   You did that for every prescription in a month?

17  A   Yes.

18  Q   And then graph that out on Excel?

19  A   Yes.

20  Q   Do you have any -- and which line represents which doctor?

21  A   Dr. Couch is the blue line, Dr. Ruan is the red line.

22  Q   And do you have any way of knowing why Dr. Couch's line is

23  flat and then spikes up here and then goes around?

24  (Indicating.)

25  A   No, sir.

DEA ANALYST BALL SHORT - DIRECT BY MR. BODNAR

1  Q   Do you have any basis of knowledge of why Dr. Couch's line
2  proceeds like it does?  (Indicating.)
3  A   No, sir.
4  Q   You're just telling the jury that that's what the PDMP data
5  shows was filled for those months in Florida, Mississippi, and
6  Alabama?
7  A   Yes, sir.
8  Q   And similar to Exalgo, did you create a chart that shows by
9  month the number of micrograms prescribed?
10  A   Yes.
11  Q   Is that what's been marked as Exhibit 10-18A?
12  A   Yes.
13  Q   Just using as an example January 2014, how many micrograms
14  were prescribed by Dr. Couch that month?
15  A   5,016,000.
16  Q   Micrograms of Subsys?
17  A   Micrograms of Subsys.
18  Q   And how many micrograms for Dr. Ruan of Subsys during that
19  month?
20  A   Dr. Ruan had 3,186,000 micrograms of Subsys that month.
21  Q   Did you create a similar chart for Abstral?
22  A   Yes, I did.
23  Q   And similar to Subsys, is Abstral represented in
24  micrograms?
25  A   Yes, it is.

466

1    Q    Is that because the product is divided into micrograms?

2    A    That's how the product is delivered, yes.

3    Q    I show you what's been admitted as Government's Exhibit

4    10-19.  Is this the Abstral chart?

5    A    Yes, it is.

6    Q    I'm looking at the bottom.  What line is for what doctor?

7    A    Dr. Couch is the blue line, Dr. Ruan is the red line.

8    Q    And are these the dates along the bottom from May of 2011

9    through May of 2015?

10   A    Yes, the month and the year.

11   Q    What is right there -- it says 26-31 for May '11?

12   A    Those are the time frame when it started.

13   Q    Does that mean nobody prescribed before May 26th, 2011?

14   A    That's correct.

15   Q    That's not a full month?

16   A    Yes.

17   Q    Is that similar to here at the end, May the 15th says 1-18?

18   A    That would be May of 2015, the 1st through the 18th.

19   Q    And what unit of measurement and numbers do we have over

20   here?  (Indicating.)

21   A    Abstral is measured in micrograms.

22   Q    Does this start from 500,000 and go up to 3 million right

23   here?

24   A    Yes, in increments of 500,000.

25   Q    You said the red line is Dr. Ruan; correct?

DEA ANALYST BALL SHORT - DIRECT BY MR. BODNAR

1    A    The red line is Dr. Ruan.

2    Q    And the blue line is Dr. Couch?

3    A    That is correct.

4    Q    Do you have any independent knowledge of why it's a flat

5    line to roughly October of 2013?

6    A    No, sir.

7    Q    Do you know why Dr. Couch -- I'm sorry -- Dr. Ruan went up

8    at this time period?  (Indicating.)

9    A    No, sir.

10   Q    Or down at this time period?  (Indicating.)

11   A    No, sir.

12   Q    Up at this time period?  (Indicating.)

13   A    No, sir.

14   Q    Or down here?  (Indicating.)

15   A    No.

16   Q    You're simply saying that that is what the PDMP data shows

17   was dispensed in Florida, Mississippi, and Alabama?

18   A    That's correct.

19   Q    The same thing for Dr. Couch, do you have any knowledge of

20   why his chart goes like this?  (Indicating.)

21   A    No, sir.  And one point I should make, my unit is involved

22   in just certain aspects of an investigation.  We don't

23   participate in the day-to-day operations of an

24   investigation.  So my involvement on this case was limited

25   strictly to the PDMP records.  So anything else that was

468

 1   involved, I was not involved in that.

 2   Q   And that's a good clarifying point.  You're not a case

 3   agent on this case?

 4   A   That's correct.

 5   Q   You were brought in for a specific task?

 6   A   That is correct.

 7   Q   So it's not that you just didn't learn what this might

 8   mean, you were simply looking at the PDMP data?

 9   A   Strictly at the PDMP data.

10   Q   Similar to the last two charts we just saw for Exalgo and

11   for Subsys, did you create a month-by-month chart for Abstral

12   to show the amount of micrograms prescribed by each doctor per

13   month?

14   A   Yes, I did.

15   Q   Just as an example, December 13, 2013 -- make sure I get my

16   doctors right up at the top -- Couch prescribed how many

17   micrograms of Abstral?

18   A   752,000.

19   Q   And Ruan prescribed how many?

20   A   1,587,200 micrograms.

21   Q   And the following month, in January, what were those

22   numbers?

23   A   Dr. Couch had 1,340,800 micrograms, Dr. Ruan had 1,452,800

24   micrograms.

25   Q   Now, going back briefly to Exhibit 10-19, this is the

469

1    Abstral graph; correct?

2    A   Correct.

3    Q   Were you asked to look at the patients who received their

4    first Abstral prescription between November of '13 -- let me

5    zoom out to get this better.  Were you asked to look at

6    patients that received their first prescription for Abstral

7    from November '13 through April of '14?

8    A   Yes.

9    Q   So patients with their first Abstral prescription during

10   that time period?

11   A   That's correct.

12   Q   Did you create a chart about that?

13   A   Yes, I did.

14   Q   I'm going to show you what's been admitted as Government's

15   Exhibit 10-20.  Is this the chart that you were just talking

16   about?

17   A   Yes, it is.

18   Q   So let's walk through what we see here.  What is this red,

19   this 78.8 percent recipients, 328 first-time Abstral

20   recipients, what does the red mean?

21   A   The red indicates that 328 recipients or roughly 78.8

22   percent of the recipients were not on Subsys or another TIRF

23   drug within 45 days of starting the Abstral.

24   Q   So for these patients that got it during that big spike

25   time period, 78 percent of them hadn't been just switched over

1   from Subsys?

2   A   They did not have Subsys within 45 days of starting that.

3   Q   And this blue, the 17 percent, 74 recipients, what is that?

4   A   Those are 74 recipients, those received Subsys within 45

5   days prior to starting Abstral.

6   Q   So those would be individuals that presumably may have been

7   switched from Subsys to Abstral?

8   A   That's correct.

9   Q   How about the green, these 13 recipients?  (Indicating.)

10   A   Those received another TIRF drug within 45 days prior to

11   starting Abstral.

12   Q   And would that be Lazanda and Fentora?

13   A   That's correct.

14   Q   And finally I see one recipient.  Did that one recipient

15   receive Subsys and another TIRF drug, T-I-R-F drug?

16   A   That's correct.

17   Q   Just prior to receiving Abstral?

18   A   Within 45 days.

19           MR. BODNAR:  One second, Your Honor.

20           THE COURT:  All right.

21   BY MR. BODNAR:

22   Q   Can you explain to the jury how did you know, based on the

23   PDMP records, that, for instance, these 74 recipients, when

24   they received Abstral, had already received Subsys within 45

25   days?

471

1    A    I went through and examined the other records within the

2    PDMP records.

3    Q    And is that something you were able to do and filter

4    through with just normal Microsoft Excel?

5    A    Yes.

6    Q    Mr. Short, were you asked to look at and break down the

7    number of patients that received Abstral and Subsys?

8    A    Yes.

9    Q    Just those two TIRF fentanyl drugs?

10   A    Correct.

11   Q    And did you create a chart showing the patients that were

12   the top 25 recipients of Subsys and Abstral?

13   A    Yes.

14   Q    And for Dr. Ruan I'm going to show you what's been marked

15   as Government's Exhibit 23 and admitted as such.  Is this the

16   chart you created for Dr. Ruan?

17   A    Yes, it is.

18   Q    Now, I see it starts from Mr. Robert H. at the top?

19   A    Yes.

20   Q    And goes down to a Ms. Lisa Clark?

21        THE COURT:  What is the number of that exhibit?

22        MR. BODNAR:  This is Government's Exhibit 10-23, Your

23   Honor.

24        THE COURT:  All right.

25   BY MR. BODNAR:

DEA ANALYST PAUL SHORT - DIRECT BY MR. BODNAR

472

1  Q    This is not all the individuals that received Subsys or
2  Abstral, is it?
3  A    No, sir.
4  Q    This is just the top 25 recipients based on what?  How did
5  you figure out that these were the top 25 recipients?
6  A    These are the top 25 recipients based on combined
7  micrograms or grams.
8  Q    You said combined micrograms and then said grams.  The
9  chart says grams; correct?
10  A    Correct.  First I calculated the micrograms and then
11  converted it to grams.
12  Q    So we talked about micrograms being in millions because
13  it's a million micrograms per gram; correct?
14  A    Correct.
15  Q    So to make this easier, did you mark this down in terms of
16  grams, for instance, this first patient?
17  A    Yes.
18  Q    So he received 6.17 grams and you can see here -- how did
19  you figure that out between those two?  (Indicating.)
20  A    I calculated the quantities times the micrograms for each
21  prescription and for each drug and totaled them up.
22  Q    So for Mr. R. Holder, you looked at all his Abstral
23  prescriptions?
24  A    Yes.
25  Q    Added up all the micrograms?

DEA ANALYST DALE SHORT - DIRECT BY MR. BODNAR

1   A   Correct.

2   Q   Did the same for Subsys, added up all the micrograms for

3   all those prescriptions?

4   A   Yes.

5   Q   Converted that to grams?

6   A   Correct.

7   Q   So essentially divided by a million?

8   A   Yes.

9   Q   And then came up with a total number of grams?

10   A   Yes.

11   Q   Now, you're not saying whether or not any of these patients

12   received this on or off label, are you?

13   A   No, sir.

14   Q   Do you have any knowledge from the PDMP records of why

15   anyone on this list received Subsys or Abstral?

16   A   No, sir.

17   Q   Are you simply telling the jury that these are people that

18   had the largest amounts of Abstral and Subsys that were filled

19   in Mississippi, Florida, and Alabama?

20   A   Yes.

21   Q   Now, I see some names -- for instance, Ms. JL......... --

22   and she's got an asterisk next to her name.  And I see several

23   names, BW......, BS..........  What does it mean if the

24   individuals have asterisks next to their names?

25   A   Anytime records are obtained from multiple sources, such at

1   multiple pharmacies, there are name variations within the

2   records, such as William and Bill or William H. and William

3   Harold.  So for this chart I went through and looked at those

4   names based on dates of birth and addresses to make sure that

5   we had an accurate figure.  The asterisk indicates names that

6   were standardized.

7   Q   So for instance, we'll just use number seven as an example.

8   If this individual, CS........., had been listed as C....... --

9   we'll give her a middle initial D. --

10  A   Correct.

11  Q   -- S. for C.......'s last name, how would you figure out if

12  that CS......... was the same person as CDS...........?

13  A   Looking at the dates of birth and the addresses.

14  Q   And so in instances where you combined records because they

15  had slight variations of names, that's why you put asterisks

16  next to the names?

17  A   Yes.

18  Q   Did you also look to see what was the total number of grams

19  of Abstral prescribed to all of Dr. Ruan's patients who

20  received Abstral prescriptions?

21  A   Yes, I did.

22  Q   And what was that total number of grams?

23  A   Total grams of Abstral was 27.1 grams.

24  Q   27.1 grams.  And that is not reflected on this chart,

25  though; is that correct?

DEA ANALYST BALL SHORT - DIRECT BY MR. BODNAR

475

```
 1   A   That's correct.

 2   Q   All total, not just here on the top 25, but every patient?

 3   A   Every patient.

 4   Q   27.1 grams of Abstral?

 5   A   That's correct.

 6   Q   And how many grams of Subsys for Dr. Ruan?

 7   A   69.1 grams.

 8   Q   69.1 grams, again, reflects the top 25 plus everybody else

 9   that received it?

10   A   Every recipient.

11   Q   What was the total number of Subsys and Abstral grams

12   prescribed by Dr. Ruan to all of his different patients?

13   A   96.2 grams.

14   Q   96.2 grams.  And again, the same thing, this total plus the

15   total for every other patient?  (Indicating.)

16   A   That's correct.

17   Q   Did you create a similar chart for Dr. Couch?

18   A   Yes, I did.

19   Q   I'm going to show you what's been admitted as Government's

20   Exhibit 10-25.  Is this the exhibit that you created for

21   Dr. Couch?

22   A   Yes, it is.

23   Q   And again, I should have mentioned before, is this the same

24   time period that we looked at for Dr. Ruan?

25   A   Yes.
```

DEA ANALYST PAUL SHORT - DIRECT BY MR. BODNAR                    476

1    Q    And this is similar patients that received Subsys and

2    Abstral?

3    A    Yes.

4    Q    And did you rank them based on the total number of grams

5    that they received?

6    A    Yes, I did.

7    Q    So you took the micrograms and then divided by a million?

8    A    That's correct.

9    Q    Did you do it in the same fashion you explained as you did

10   for Dr. Ruan?

11   A    Yes.

12   Q    Now, for just this first person here, I see Eugenia C., the

13   number-one person on the list --

14   A    Okay.

15   Q    -- I don't see anything under Abstral but I see 11.688

16   grams for Subsys.  What does that mean?

17   A    That means that individual had 11.6 grams of Subsys

18   dispensed and no Abstral prescriptions.

19   Q    Does that work the same with Matthew S. below, it signifies

20   he didn't receive any Abstral?

21   A    That's correct.

22   Q    So all of his grams for Subsys/Abstral in this case for

23   these two people came from Subsys?

24   A    That is correct.

25   Q    And would it work the same with number 17, all of his grams

1    came from Abstral?

2    A    That's correct.

3            THE COURT:  All right.  Mr. Bodnar, let me interrupt

4    you, because we're going to break for lunch right now.

5            MR. BODNAR:  Yes, Your Honor.

6            THE COURT:  Ladies and gentlemen, leave your pads on

7    your chairs.  Remember my instructions to you not to discuss

8    the case or allow anyone to discuss it with you.  I do have

9    another matter to take up.  So we will break for an hour and a

10   half today.  Be back downstairs in the jury assembly room at

11   1:30, ready to be called back up.

12           We're in recess.

13       (A recess was taken at 11:58 a.m.)

14       (Afternoon session, 1:30 p.m., in open court, defendants

15   and jury present.)

16           THE COURT:  All right, Mr. Bodnar.

17           MR. BODNAR:  Your Honor, may I approach the witness

18   with what has been marked as Government's Exhibit 10-26 and

19   10-27?  I had neglected to offer these initially.  So I want to

20   make sure he can identify them and offer them for admission.

21           THE COURT:  All right.

22   BY MR. BODNAR:

23   Q    Mr. Short, I'm now showing you what's been marked as

24   Government's Exhibit 10-26 and 10-27.  Are those also exhibits

25   that you produced or created in connection with this

1  investigation?

2  A   Yes, they are.

3       MR. BODNAR:  Your Honor, the United States moves to

4  admit Government's Exhibit 10-26 and 10-27.

5       MR. ARMSTRONG:  Judge, same objection as previously

6  made.

7       THE COURT:  All right.  Mark them in.  Overruled.

8     (Government's Exhibits 10-26 and 10-27 were entered into

9  evidence.)

10 BY MR. BODNAR:

11 Q   Mr. Short, I believe we left off on what has been admitted

12 as Government's Exhibit 10-25, this being the top 25 recipients

13 of Abstral and Subsys by Dr. Couch.  Do you recall that?

14 A   Yes, sir.

15 Q   And I believe we did talk already about certain things

16 about Terry Simmons and Bruce D. would have blank spots there;

17 correct?  (Indicating.)

18 A   Correct.

19 Q   Did you also look at beyond just the top 25, at the total

20 patients who received Abstral from Dr. Couch?

21 A   Yes.

22 Q   And filled their prescriptions in Mississippi, Florida, or

23 Alabama?

24 A   Yes, I did.

25 Q   What was the total number in grams of Abstral prescribed

DEA ANALYST PAUL SHORT - DIRECT BY MR. BODNAR

1  and filled in those states?

2  A   25.6 grams.

3  Q   25.6 grams?

4  A   Correct.

5  Q   Of Abstral?

6  A   Of Abstral.

7  Q   Did you make a similar calculation for Subsys, the total

8  for all patients beyond just the top 25 who received

9  prescriptions from Dr. Couch, filled in those three states?

10 A   Yes, I did.

11 Q   And what was the total number for Subsys?

12 A   102.0 grams.

13 Q   102.0 grams of fentanyl from TIRF Subsys, fentanyl?

14 A   Correct.

15 Q   And did you also then do a total of everybody, not just the

16 top 25, so all grams of Abstral and Subsys prescribed by

17 Dr. Couch and filled in these three states?

18 A   Yes, I did.

19 Q   And what was the total number of grams for Subsys and

20 Abstral combined?

21 A   127.6 grams.

22 Q   And that was 127.6 grams?

23 A   127.6 grams.

24 Q   Mr. Short, in connection with this investigation, did you

25 look to see how many prescriptions were filled at C&R Pharmacy

480

 1   versus other pharmacies and percentages?

 2   A   Yes, I did.

 3   Q   I'm going to show you now what's been marked as

 4   Government's Exhibit 10-26 and has now been admitted as

 5   10-26.  Walk us through this first chart right here.

 6   A   This chart represents all the prescriptions for Dr. Ruan

 7   and Dr. Couch filled in Alabama, Mississippi, and Florida and

 8   it breaks out C&R Pharmacy versus all other dispensers.

 9   Q   When you say all prescriptions, again, we are talking about

10   all controlled substance prescriptions; correct?

11   A   That's correct.

12   Q   So, and that was the number you told us before, there were

13   294,183 controlled substance prescriptions for these two

14   doctors filled in these three states?

15   A   Yes.

16   Q   How many were filled at C&R Pharmacy?

17   A   70,897.

18   Q   So of the total prescriptions of controlled substances

19   prescribed by the two doctors, what percentage were filled at

20   C&R Pharmacy?

21   A   24.1 percent of all the prescriptions were filled at C&R

22   Pharmacy.

23   Q   So slightly less than one quarter, when you look at all

24   prescriptions for controlled substances, were filled at C&R?

25   A   That's correct.

DEA ANALYST PAUL SHORT - DIRECT BY MR. BODNAR

481

1    Q   Did you also look at what percentage of the TIRF fentanyl

2    prescriptions were filled at C&R Pharmacy versus other

3    pharmacies?

4    A   Yes, I did.

5    Q   Did you create a chart about that?

6    A   Yes, I did.

7    Q   I'm going to show you what has been now admitted as

8    Government's Exhibit 10-27.  Is this that chart?

9    A   Yes, it is.

10   Q   Explain.  What are we seeing here?

11   A   Similar to the previous chart, these are all the TIRF

12   prescriptions for Dr. Ruan and Dr. Couch filled in Alabama,

13   Mississippi, and Florida, breaking out what was filled at C&R

14   Pharmacy compared with all other dispensers.

15   Q   And again, did you use an Excel spreadsheet for, instead of

16   looking at all controlled substances filled, just the TIRF

17   prescriptions that were filled?

18   A   Yes.

19   Q   The prescriptions for Subsys, Abstral, Lazanda and Fentora?

20   A   Yes.

21   Q   And how many prescriptions were filled at C&R Pharmacy for

22   those four TIRF fentanyl drugs?

23   A   6,018.

24   Q   What percentage of all the TIRF fentanyl drugs were filled

25   at C&R Pharmacy?

DEA ANALYST RAUL SHORT - DIRECT BY MR. BODNAR

1  A   82.64 percent of all TIRF drugs were filled at C&R

2  Pharmacy.

3  Q   So looking back at what has been admitted as Government's

4  Exhibit 10-26, will you tell us amongst all the controlled

5  substances only roughly a quarter were filled at C&R?

6  A   Yes.

7  Q   Whereas when we look at the TIRF, approximately 82 percent

8  were filled at C&R Pharmacy?

9  A   That is correct.

10 Q   And finally, did you break down the TIRF fentanyl to see

11 just for Subsys and Abstral -- so excluding Lazanda and

12 Fentora -- what percentage of Subsys and Abstral prescriptions

13 were filled at C&R Pharmacy?

14 A   Yes, I did.

15 Q   And is that what has been admitted here as Government's

16 Exhibit 10-28?

17 A   Yes, it is.

18 Q   And let's walk through this final slide here.

19 A   Similar to the previous two charts, this is all Dr. Ruan's

20 and Dr. Couch's Subsys and Abstral prescriptions filled in

21 Alabama, Mississippi, and Florida comparing what was filled at

22 C&R Pharmacy with all other dispensers.

23 Q   And now, it says filled in Alabama, Mississippi, and

24 Florida.  But if it was filled in C&R Pharmacy, it was filled

25 in Alabama; correct?

1   A   Correct.

2   Q   But you're comparing it versus any Subsys or Abstral script

3   filled in any of the three PDMP reports that you have?

4   A   That's correct.

5   Q   So how many prescriptions for Subsys and Abstral were

6   filled at C&R Pharmacy?

7   A   4,893.

8   Q   Versus how many were filled at all other pharmacies in the

9   state of Alabama, Florida, and Mississippi?

10  A   473.

11  Q   So what percentage of the Subsys and Abstral prescriptions

12  written by Dr. Ruan and Dr. Couch were filled at their C&R

13  Pharmacy?

14  A   91 percent.

15  Q   And that's what's reflected right here?

16  A   Yes, sir.

17         MR. BODNAR:  One moment, Your Honor.

18         THE COURT:  All right.

19         MR. BODNAR:  United States passes the witness, Your

20  Honor.

21         THE COURT:  All right.  Mr. Willson?

22                        CROSS EXAMINATION

23  BY MR. WILLSON:

24  Q   Good afternoon, Mr. Short.

25  A   Afternoon, sir.

1    Q   I'm Ben Willson, and I represent Dr. Patrick

2    Couch.  Mr. Short, there is not, is there, in this entire stack

3    of charts and graphs that you made for the prosecutors, any

4    number that tells us the total number of recipients of

5    Dr. Couch's prescriptions during the period of time that you

6    analyzed; isn't that right?

7    A   Not on there, no, sir.

8    Q   You could have done that; right?

9    A   Yes, sir.

10   Q   You had full access to the PDMP database, didn't you?

11   A   Yes, sir.

12   Q   You could easily have found how many patients Dr. Couch

13   had; in other words, how many recipients of these prescriptions

14   there were during that period of time?

15   A   Yes, sir.

16   Q   But you didn't do that because you weren't asked; is that

17   right?

18   A   That's correct.

19   Q   So the prosecutors asked you to go into the PDMP database

20   and pull specific information and to make specific kinds of

21   charts; is that fair?

22   A   Yes, sir.

23   Q   All right.  For example, look at what's been admitted by

24   the government as 10-1.  The prosecutor told you to look for

25   these six select drugs; is that right?

DEA ANALYST PAUL SHORT - CROSS BY MR. WILLSON

1  A   Yes, sir.

2  Q   They gave those to you specifically and asked you to go

3  find those and represent those on a chart?

4  A   Yes, sir.

5  Q   And the same with these TIRF drugs, and they asked you, it

6  appears, specifically to determine how many of Dr. Couch's

7  patients during this period of time were prescribed TIRF drugs;

8  is that right?

9  A   Yes, sir.

10 Q   And you found it to be 351 patients; is that right?

11 A   Yes, sir.

12 Q   Okay.  And again, we don't know what percentage of

13 Dr. Couch's total population that is, because you didn't report

14 that number?

15 A   Correct.

16 Q   Okay.  But you did say -- and I'd like to go to another

17 slide -- you did make a chart of the top 10 schedule II drugs

18 prescribed during the same period of time for Dr. Couch and, as

19 you told Mr. Bodnar, fentanyl was number three; is that right?

20 A   Yes, sir.

21 Q   There's no TIRF medications on this list that I see.  Is

22 TIRF included in that fentanyl number?

23 A   Yes, sir, it is.

24 Q   Okay.  So, for example, if we look at 10-2 -- I'm sorry --

25 10-3 here, where you said that the total number of

1    prescriptions of TIRF medications during the same period of

2    time -- and that's broken out, you know, one by one, Subsys,

3    Abstral, Fentora, and Lazanda -- is 2,109?

4    A    Right.

5    Q    And those, again, it says right there TIRF drugs are

6    transmucosal immediate-release fentanyl products.  So TIRF

7    medications are fentanyl medications; right?

8    A    Yes, sir.

9    Q    And here, fentanyl, 9,221, do you have any idea what those

10   other seven-some thousand medications are?

11   A    Fentanyl?

12   Q    Yes, sir.

13   A    I can't name them all specifically, but a lot of them was

14   patches, the fentanyl patches, and things of that sort.

15   Q    Okay.  So other fentanyl drugs that we really haven't heard

16   about, the government didn't ask you to go look for them?

17   A    Yes, sir.

18   Q    But the ones they did ask you to go look for were those

19   TIRF medications, and those were 2,109, I believe?

20   A    Correct.

21   Q    And they are included in this 9,221.

22        Let me ask you, Mr. Short.  And math in public is my

23   recurring nightmare.  So I apologize.  But if we were to take

24   that 2,109 and we were to put it on this top 10 schedule II

25   list, am I right that it would sort of slide in right here

1    beneath oxymorphone and above hydromorphone?

2    A    If you cut out the TIRF drugs from the fentanyl.

3    Q    Because, you know, here on the top of the first page, 10-1

4    TIRF drugs, that's the headliner, that's the top of that page

5    broken out, so if we break it out similarly here and include it

6    in this top 10 list, could we put it right there between

7    oxymorphone and hydromorphone?  Is that where that would go?

8    A    If it was broken out, yes, sir.

9    Q    Okay.  And if I'm reading this right, oxymorphone was

10   4.3 -- I'm sorry -- 4.36 percent of the total percentage of

11   Dr. Couch's schedule II prescriptions, hydromorphone was 1.77

12   percent.  So it would be somewhere between those two numbers in

13   terms of the percentage of the schedule II prescriptions of

14   Dr. Couch that were TIRF medications; is that right?

15   A    Yes, sir.

16   Q    Okay.  Let me ask you this:  If we were to take 2,109 and

17   we were to -- this is, again, math in public -- if we were to

18   divide it by this total number, 81,857, and multiply by a

19   hundred, would that be a pretty good approximation of the

20   actual percentage of Dr. Couch's schedule II drugs?  And I

21   recognize that it won't be exact because down here at the

22   bottom that's not 100 percent.  That's 99 percent.  But if we

23   were to do that math, would that be a pretty good

24   approximation?

25   A    If you would break out the TIRF drugs and divided by the

488

 1   81,000, you're correct in what you're asking.

 2   Q   Would you check my math?  I'm going to --

 3           THE WITNESS:  Your Honor, might I --

 4   BY MR. WILLSON:

 5   Q   Or if you would like to do it yourself, that might be

 6   easier.

 7           THE COURT:  All right.

 8   BY MR. WILLSON:

 9   Q   And we'll do it together.  I'll do it at the same time here

10   and we'll see if we come up with the same thing.

11   A   What was the TIRF number?

12   Q   I believe -- I'll show it to you here.  The total number of

13   prescriptions for the TIRF medications was 2,109.  I'm sorry.

14   What did you come up with?

15   A   Roughly 2.6 percent.

16   Q   Okay.  I got 2.58 percent.  Is that fair?

17   A   Yes.

18   Q   Is that what you got?  So of all of Dr. Couch's

19   prescriptions, all of Dr. Couch's schedule II prescriptions

20   during this period of time, 2.58 percent of them were for these

21   TIRF or T-I-R-F medications; is that right?

22   A   Yes, sir.

23   Q   Okay.  Now, taking a little closer look at this, at this

24   top 10 chart, Mr. Short, you've got oxycodone and morphone as

25   numbers one and two, and it looks like these are categories of

1   medications; is that right?

2   A   Like the base ingredient.

3   Q   Okay.  So in other words, again, back to 10-1, you've

4   got -- you know, you've got, you know, your select six drugs.

5   There are multiple kinds of oxycodone on that short list;

6   right?

7   A   Number one and number three on the bottom half.

8   Q   Right.  Okay.  And there are multiple kinds of morphine;

9   right?

10   A   That's correct.

11   Q   Okay.  And even if we look -- did the prosecutors ask you

12   to rank these in terms of the percentages as you did?

13   A   I ranked them by percentages.

14   Q   Okay.  But if you would rank them by pills or units

15   dispensed, it would be a little different, wouldn't it?

16   A   Yes, sir.

17   Q   Okay.  So, for example, again, fentanyl, treating it as a

18   big category without breaking out these special kinds of TIRF

19   medications, if we just take that big fentanyl category and

20   sort of put it where it belongs on that list -- and I know I'm

21   doing some reorganization here -- it wouldn't be third, would

22   it?  It would be down here, I guess, underneath hydrocodone?

23   What is that, sixth?  Is that -- is that fair?

24   A   Number five, I believe.

25   Q   Number five?  Okay.  I'm sorry.  I think you're right.  All

490

1  right.  Doctor -- I'm sorry -- Mr. Short, while we're on the

2  subject of prescription numbers, the prosecutor didn't ask

3  you -- or did they -- to include in your charts and graphs the

4  frequency of Dr. Couch's prescriptions, did they?  In other

5  words, some prescriptions are written for 30 days, some for 60

6  days, some for 90 days.  Does that make an appearance in your

7  analysis?

8  A   No, it doesn't.

9  Q   Okay.  But, again, you could have found that information,

10  couldn't you have?

11  A   Roughly.

12  Q   Okay.  Isn't there basically a data set in the PDMP that is

13  called days?

14  A   Day supply.

15  Q   Day supply.  And that comes right off the prescription;

16  right?

17  A   I believe so, sir.

18  Q   30, 60, 90, something like that?

19  A   Correct.

20  Q   And that's not in here?

21  A   No, sir.

22  Q   Would you agree with me -- and let's go back.  I'm sorry I

23  took it down.  But let's go back here to 10.7 just to look at

24  it.  Would you agree with me that if a doctor like Dr. Couch

25  requires his patients to come back more frequently than, say,

 1   the 90 days that are required --

 2          MR. WILLSON:  Mr. Bodnar?

 3          MR. BODNAR:  I'm going to let you finish, then object.

 4   BY MR. WILLSON:

 5   Q   -- then this number, this percentage, or this number of

 6   prescriptions would be higher?

 7          MR. BODNAR:  Objection, Your Honor.  This is way

 8   outside of his testimony of using data from the PDMP to come up

 9   with these charts.

10          MR. WILLSON:  Your Honor, these are the witness'

11   charts and include --

12          THE COURT:  I overrule the objection.

13   BY MR. WILLSON:

14   Q   So would you like me to restate that, Mr. Short?

15   A   Yes, sir.

16   Q   So if a doctor like Mr. Couch sees his patients more

17   frequently than is required, more frequently than 90 days --

18   sees them every 30 days, for example -- wouldn't that number of

19   prescriptions be higher than it would be if he just saw them as

20   often as required, 90 days?

21   A   Yes, sir.

22   Q   Okay.  But that's not part of your analysis, that doesn't

23   make any change to the charts?

24   A   Yes.  I'm not sure if -- the other part of that is I'm not

25   a medical expert, so I'm not sure as far as schedule II drugs

492

1    if you can do 60-90 day supplies.  So I'm not aware of the

2    regulations relating to those.

3    Q    That's just mathematically speaking?

4    A    Mathematically, yes, sir.

5    Q    Okay.  Let's look at Exhibit 10-9.  I'm going to ask about

6    this.  This is the prescriptions by drug group for Dr. Couch.

7    And I believe there was another slide where you said -- and

8    pardon me for flipping around, but this is 10-0 -- and you

9    found that there was a total of 143,140 prescriptions written

10   by Dr. Couch in your search during this period of time?

11   A    Yes, sir.

12   Q    And you break those 143,000 prescriptions down into these

13   groups of medications; right?

14   A    Yes, sir.

15   Q    And you got 74 percent of the prescriptions of Dr. Couch

16   were for opioids.  Does that include both schedule II and

17   schedule III opioids?

18   A    Yes, sir.

19   Q    Okay.  So it includes everything from, you know, from

20   oxycodone to fentanyl medicines to Tylenol 3, all the whole

21   range of opioid medicines; right?

22   A    Yes, sir.

23   Q    Okay.  And I believe you spoke with Mr. Bodnar in some

24   detail in comparing the charts -- and this is Exhibit 10-8 of

25   Dr. Ruan and Dr. Couch -- and I believe you made the

1  observation that they were somewhat similar?

2  A   Roughly similar, yes, sir.

3  Q   Okay.  And this opioid piece of the pie, that includes a

4  lot of medicines, doesn't it?

5  A   Yes, sir.

6  Q   All right.  Well, let's look, just as an example, back at a

7  couple of other exhibits on this point.  I'd like to look at

8  Exhibit 10-2, which is Dr. Ruan's selected drug totals.  And

9  we'll try to do this as -- and 10-3, which is the same for

10  Dr. Couch.  And I guess I'll zoom out a bit.  And would you

11  agree with me, Mr. Short, that, for example, it would take

12  oxycodone, HCL, or oxycodone -- and you look at the number of

13  prescriptions, 669 for one doctor and 11,000 for the other; on

14  the other hand, you look down here at OxyContin, 170 for one

15  doctor and you've got 1,079 for the other -- would you agree

16  that just this select six medicines alone shows some

17  considerable variation in prescribing patterns between these

18  two doctors?

19  A   Yes, sir.  The shape of the pies -- the shape of the pie is

20  similar, just the size of the pie is different.  The pie

21  charts -- the shape of the pie charts are similar, but the size

22  of them may be different.

23  Q   Okay.  But if you were to make a pie chart out of these

24  lists, for example, the sizes would be very different?

25  (Indicating.)

494

1   A   Yes, sir.

2   Q   Okay.  So I guess my question to you is doesn't this show

3   that, in fact more sort of looking a little deeper into the

4   numbers, there's actually quite a bit of variation between

5   these two doctors' prescribing patterns with respect to these

6   medicines?

7   A   Yes, sir.

8   Q   And marching right through, Mr. Short, to the next exhibit

9   for Dr. Couch, which is Government's Exhibit 10-11, in fact,

10  you've got the schedule II piece of the pie here is not 74 like

11  opioids, but it's 58 percent of Dr. Couch's prescriptions

12  during this period of time that are schedule II; is that right?

13  A   Yes, sir.

14  Q   You're familiar with the scheduling of controlled

15  substances and what that means?

16  A   Yes, sir.

17  Q   So you know that schedule III drugs, schedule III

18  medicines, have a lesser potential for abuse and a lesser

19  chance of leading to physical/psychological dependence?

20  A   Yes, sir.

21  Q   Schedule IV, even less than schedule III, and the

22  regulations are different for each schedule; is that right?

23  A   Yes, sir.

24  Q   And in here you've got, you know, 18 percent of Dr. Couch's

25  medicines are schedule III and 21 percent are schedule IV.  Is

1   that accurate?

2   A   Yes, sir.

3   Q   Okay.  I'd like to talk with you, Mr. Short, about your

4   charts related to this, what you call a Holy Trinity.  You

5   didn't find that term in the PDMP, did you?

6   A   No, sir.

7   Q   You didn't find it in any of the records or other data that

8   you reviewed about Dr. Couch's prescribing medicines to his

9   patients, did you?

10  A   That's correct, sir.

11  Q   All right.  That's a slang term, isn't it, that you use to

12  basically refer to someone who abuses certain types of drugs

13  that were prescribed; is that fair?

14  A   Yes, sir.

15  Q   So it's not a medical term at all, and in fact -- right?

16  A   Correct.

17  Q   Okay.  And in fact, do you know of any reason why there's

18  anything medically inappropriate about a prescription of these

19  three drugs to an individual patient within a calendar month?

20         MR. BODNAR:  Objection, Your Honor.  It's outside the

21  course of what this witness knows.

22         THE COURT:  Sustained.

23         MR. BODNAR:  Whether it's medically appropriate.

24         THE COURT:  Sustained.

25         MR. WILLSON:  I withdraw the question, Your Honor.

1   Q   Mr. Short, you said there were 228 recipients of this

2   combination, as you call it, of these three drugs within the

3   same calendar month.  Again, we don't know, do we, what

4   percentage of Dr. Couch's patients that represents at all

5   because that number's not in your work; is that right?

6   A   That's correct.

7   Q   Because you weren't asked to find that number; right?

8   A   Correct.

9   Q   So let's see if we can work with what we've got,

10   Mr. Short.  What you do have here is you've got this column out

11   to the right, combination drugs only for these occurrences

12   only, and did I hear you correctly that that basically is the

13   number of individual prescriptions that were involved in some

14   way with these occurrences of this combination?

15   A   Those were drugs that were classified either as an opioid,

16   a benzodiazepine, or as carisopzodol, yes.

17   Q   Yes.  But it refers to specific numbers of prescriptions;

18   is that right?

19   A   Yes.

20   Q   So 7,529 of Dr. Couch's prescriptions became this many

21   occurrences of this combination?

22   A   Yes, sir.

23   Q   Okay.  And you said earlier, I believe, that 143,140

24   prescriptions for Dr. Couch was what you got from PDMP in

25   total?

497

1   A   For those three states, yes, sir.

2   Q   So we have that.  Would it be fair Mr. Short, to break out

3   our calculators again and to divide 7,529 by the total number

4   to come to -- admittedly not as good a number as the

5   percentages of the patients -- but a number of percentage of

6   prescriptions that were involved in some way with this

7   so-called combination, would that be fair?

8   A   Yes, sir.

9   Q   Well, if you would, Mr. Short, and I'll do the same and

10  we'll compare notes.

11  A   Sir, if I could get that first number that you have?

12  Q   Yes, sir.  I see 143,140 prescriptions and 7,529

13  prescriptions involved in combinations.  And you can call it

14  out when you've got it, Mr. Short.

15  A   Again, that first sheet -- 140,000 in my calculation --

16  Q   I'll keep it up together.  I'm sorry.  So again, we're

17  dividing this, which is the number of prescriptions that were

18  involved in these combinations you found, by the total number

19  of prescriptions that you found by Dr. Couch.

20  A   Yes, sir.  It would be 5.26 percent.

21  Q   Okay.  That's what I got.  So 5.26 percent of Dr. Couch's

22  total prescriptions were involved in some way with these

23  so-called combinations, which you don't have an opinion about

24  one way or the other; is that right?

25  A   Well, that is that many, just those out of these.  That

1    same number would have additional prescriptions that were

2    filled on those days.  So these are the correct numbers for

3    just the combination drugs.  However, there was additional

4    prescriptions on those days that are included in that number.

5    Q    Additional prescriptions?  By that you mean something other

6    than an opioid or benzodiazepine or carisoprodol?

7    A    That's correct.

8    Q    But in terms of this so-called Holy Trinity, the number of

9    prescriptions -- the percentage of prescriptions that has any

10   play in this combination is at most 5.26 percent?

11   A    Yes.

12   Q    Okay.  Is there a slang term in the DEA for opioids and

13   benzodiazepines, this second category?

14   A    I'm not aware.

15   Q    Is that no?

16   A    Not that I'm aware of.

17   Q    Okay.  Mr. Short, let me show you this chart which you

18   discussed with Mr. Bodnar.  This is 10-18.  This shows the

19   prescribing in micrograms of both doctors during the time

20   period you indicated.  Do you know, Mr. Short, when Subsys was

21   first made available for use?

22   A    No, sir.

23   Q    Your note down at the bottom says Dr. Couch's first Subsys

24   prescription was on April 25th, 2015.  Do you know if it was

25   about that time?

DEA ANALYST PAUL SHORT - CROSS BY MR. WILLSON

1   A   I have no idea.

2   Q   10-18 is -- I believe this was the actual breakdown of

3   numbers that you used to create that last graph; is that right?

4   A   Yes, sir.

5   Q   And it shows that Dr. Couch's total micrograms of Subsys

6   prescribed during the entire period looked at was 102 million

7   micrograms; is that right?

8   A   Yes, sir.

9   Q   A microgram's a unit of measurement basically?

10  A   Yes, sir.

11  Q   It's 1,000th of a milligram?

12  A   Yes, sir.

13  Q   Millionth of a gram?

14  A   Millionth of a gram.

15  Q   Does a paperclip weigh about a gram?

16  A   I don't know, sir.

17  Q   Let's say it does.

18  A   Okay.

19  Q   If there were 102 million micrograms of medicine, would

20  that be about basically -- if a paperclip is a gram, would that

21  be about 102 paperclips over the course of four years in terms

22  of weight?

23  A   If you're correct in your math, yes, sir.

24  Q   So over four years that comes to a little over 25

25  paperclips a year --

1    A   Yes, sir.

2    Q   -- in terms of weight?

3         Mr. Short, I'm getting close to the end here.  But

4    this is Government's Exhibit 10-19 and this is the same sort of

5    a graph with respect to Abstral.  And as you told Mr. Bodnar,

6    you have no idea what this chart indicates; right; in terms of

7    why the Abstral was prescribed in the manner that it was over

8    the period of time?

9    A   I'm not aware of why it was prescribed.

10   Q   This data comes from information from individual patients;

11   right?

12   A   It comes from the PDMP.

13   Q   PDMP which has prescriptions that a doctor gives to his

14   patients; right?

15   A   Yes, sir.

16   Q   And these, this data, records the complex decisions of that

17   doctor in prescribing that medication; right?

18        MR. BODNAR:  Objection, Your Honor.  This is outside

19   of what his knowledge is of what the PDMP numbers are.

20        THE COURT:  Sustained.

21   BY MR. WILLSON:

22   Q   Mr. Short, Government's Exhibit 10-26, you told us less

23   than a quarter of all of Dr. Couch's prescriptions are filled

24   at C&R Pharmacy; right?

25   A   Yes, sir.

1   Q   And further, that 82 or 83 percent of TIRF medications are

2   filled at C&R Pharmacy?

3          MR. BODNAR:  Your Honor, we object.  This isn't just

4   Dr. Couch.  This is Dr. Couch and Dr. Ruan's numbers combined.

5   There's not a breakout for Dr. Couch.

6          MR. WILLSON:  Apologies, Your Honor.  I'll correct

7   myself.

8   Q   This is for both doctors; right?

9   A   That's correct.

10  Q   And finally, that 91 percent of Subsys and Abstral that

11  they were prescribed was filled at C&R Pharmacy; right?

12  A   Yes, sir.

13  Q   You don't know anything, do you, about the relative

14  availability of Subsys and Abstral in these other pharmacies,

15  do you?

16  A   No, sir.

17  Q   You don't know anything about the relative availability of

18  these specialized TIRF medications in other pharmacies, do you?

19  A   No, sir.

20  Q   But you do know that less than a quarter of Drs. Ruan and

21  Couch's prescriptions were filled at C&R Pharmacy?

22  A   Yes, sir.

23          MR. WILLSON:  I don't have any further questions.

24          THE COURT:  Mr. Armstrong?

25                      CROSS EXAMINATION

1    BY MR. ARMSTRONG:

2    Q   Mr. Short, I am going to be very brief because Mr. Willson

3    took a lot of my questions that I was going to ask.  I'm not

4    going to repeat them.  But one thing he asked you that I

5    thought was very important that I was going to ask you is the

6    same questions about comparing those same percentages for TIRF

7    medications versus total prescriptions.  Do you remember that?

8    A   Yes, sir.

9    Q   And you sat down and you did a little calculation with

10   him.  If you could look at that?  And those were the TIRF

11   breakout on 10-1, if you will remember.  Do you remember that

12   right here, the TIRF broken down?

13   A   Yes, sir.

14   Q   And then for Dr. Ruan it was 688 --

15   A   Yes, sir.

16   Q   -- total prescriptions?

17   A   688 is recipients.

18   Q   I'm sorry.  688 recipients.  And then if you compare that

19   with the number on chart 10-6 just like you did with

20   Mr. Willson -- if I can find it here -- do you have your

21   calculator up there still?

22   A   Yes, sir.

23   Q   Okay.

24           MR. BODNAR:  Your Honor, before we -- I object to

25   comparing number of recipients, number of prescriptions.  I

503

1    think he needs to be shown the one that shows Dr. Ruan's number

2    of prescriptions, which should be 10-3.

3          MR. ARMSTRONG:   10-2.  I'm sorry.  Okay.

4    Q    Have you got the number there?

5    A    Yes, sir.

6    Q    Which is the number of prescriptions, 5,173?  Is that it?

7    There are so many charts.  I showed you the wrong one.  I

8    apologize.  Is that right here?  77,000; right?

9    A    The first number again -- turn my calculator on.

10   Q    I'll leave that up there so you can see it.

11   A    Looking for percentage of those for all schedule IIs; is

12   that correct?

13   Q    Correct.  That's on your chart, based on your chart.

14   A    So there's TIRF -- those TIRF prescriptions account for 6.7

15   percent of all the schedule IIs.

16   Q    So 6.7 percent of Dr. Ruan's prescriptions were  what --

17   A    Of the schedule IIs.

18   Q    -- of the schedule IIs were what they call or refer to as

19   TIRF?

20   A    That's correct.

21   Q    All right.  But against all prescriptions, that number is

22   very much more reduced; correct?

23   A    Based on the math, approximately half.

24   Q    Right.  So it would cut that down in half?

25   A    Just about.

1  Q   Okay.  And so if we're looking at 6.7, we're talking

2  somewhere around less than 4, around 3.3 or 3.4 percent of all

3  prescriptions that Dr. Ruan wrote were for TIRF?

4  A   Roughly, yes, sir.

5  Q   That's a very small percentage, isn't it?

6  A   Relatively.

7  Q   Relatively small; right?

8  A   Uh-huh (nodding head affirmatively).

9  Q   That kind of puts into perspective all these numbers the

10  jury's been hearing; right?

11  A   Yes, sir.

12  Q   Now, similarly, I'm going to ask you to look at Exhibit

13  10-15, if I can find it.  Okay.  Now, this was the chart that

14  breaks out the three in combination; correct?  And you said you

15  found the number of prescriptions for this one was 14,881 based

16  on these occurrences within the same month; correct?

17  A   Yes, sir.

18  Q   Now, if you compare that with this chart -- which was the

19  10-0; right?  If you take the total number of prescriptions in

20  the PDMP that you searched of 151,043 and you run that same

21  comparison, what do you get?

22  A   9.85 percent.

23  Q   9.85.  And again, that's based on schedule II; correct?

24  A   That was -- that was of all drugs.

25  Q   Oh, that's all.  Okay.  Over that period of time?

DEA ANALYST PAUL SHORT - CROSS BY MR. ARMSTRONG

 1  A   Yes, sir.

 2  Q   Okay.  That four-year period.  Okay.  Now, some of these

 3  other charts that were pie graphs -- and, believe me, I'm not

 4  going to belabor the point -- where you put this together

 5  talking about percentage of opioids and then you have this one

 6  -- that's Dr. Couch -- then you have -- that's 10-8.  And then

 7  you've got 10-10 that talks about prescriptions by schedule.

 8          Dr. Ruan is a pain management specialist; isn't that

 9  correct?

10  A   Yes, sir.

11  Q   Okay.  So you would expect to see opioids and schedule

12  II -- excuse me -- opioids and schedule II and such

13  prescriptions, that's what you expect to see; right?

14          MR. BODNAR:  Objection, Your Honor, to relevance to

15  this witness.

16          THE COURT:  Sustained.

17  BY MR. ARMSTRONG:

18  Q   Well, and I think you testified on direct that either the

19  prosecution or the DEA gave you instructions on what

20  medications to look for; right?

21  A   Yes, sir.

22  Q   And based on the medications they asked you to look for,

23  you prepared these charts and these numbers; right?

24  A   Yes, sir.

25  Q   Okay.  And they didn't ask you to look for diabetes

506

1  medications; right?

2  A   That's correct.

3  Q   They didn't ask you to look for heart medicines, did they?

4  A   No, sir.

5  Q   Or blood thinners or any kind of statins or anything like

6  that?

7  A   That's correct.

8  Q   These are the only things they asked you to look for?

9  A   Yes, sir.

10 Q   So all your numbers and your comparisons and your charts

11 and the percentages are based against the numbers they asked

12 you to look for; correct?

13     MR. BODNAR:  Objection, Your Honor.  He's asking this

14 in an exhibit that includes every single prescription right

15 there.

16     THE COURT:  Were you?

17     MR. BODNAR:  That chart is every single prescription.

18 So it's not based on any numbers given to him.  That's this

19 PDMP numbers.

20     MR. ARMSTRONG:  I didn't suggest these were numbers --

21     THE COURT:  But the PDMP numbers were schedule II

22 prescriptions; right?

23     MR. BODNAR:  It is all schedule drugs.

24     THE COURT:  He's asking about other prescriptions.

25 BY MR. ARMSTRONG:

1  Q   There are prescription medications -- there are medications

2  that are issued by a physician -- that are not in the schedule

3  that are controlled; correct?

4  A   Yes, sir.

5  Q   So those medications are not factored into this; right?

6  A   No, sir.

7  Q   I'm sorry if my question was confusing.  That's what I was

8  asking.

9          Now, again -- this is the last line of questions I'm

10  going to ask you.  Several of these charts were asking you to

11  look at microgram numbers.  For instance, this one, this is in

12  micrograms per month.  That's 10-18.  And then we've got 10-5,

13  micrograms again.  And then we've got -- anyway, several of

14  these, without having to go hunt them down one at a time, you

15  were looking at micrograms; right?

16  A   Yes, sir.

17  Q   And because the medication, usually when it's dispensed,

18  comes in microgram measurements?

19  A   Yes, sir.

20  Q   That's a term of weight; correct?

21  A   Yes, sir.

22  Q   And a microgram is one millionth of a gram?

23  A   That's correct.

24  Q   Okay.  And that's the point I think that Mr. Willson was

25  asking you, how much does the gram weigh or how much does a

DEA ANALYST PAUL SHORT - CROSS BY MR. ARMSTRONG
508

 1   microgram weigh.  If you put a microgram in your hand, you

 2   wouldn't know it was there, would you?

 3   A   I don't know.  Well, it depends on what it was, sir.

 4   Q   You think that --

 5   A   A few micrograms of some of these drugs you would, you may

 6   know.  I mean, it's --

 7   Q   Based on weight.

 8   A   Based only --

 9   Q   If you had your eyes closed and somebody put a microgram in

10   your hand, would you know it was there?

11   A   No, sir.

12   Q   One millionth of a gram, you would know it was there?

13   A   No, sir.

14   Q   So we're talking very small finite weight limits, aren't

15   we?

16   A   Yes, sir.

17   Q   So the charts that have these calculations into the

18   millions, we're still talking about weight-wise very small,

19   very small numbers; right?

20   A   Relative to other drugs, yes, sir.

21   Q   And that's because that's the way these particular

22   substances are dispensed, that's the way they are done; right?

23   A   Yes, they are very powerful, so they are in very small

24   measurements.

25   Q   Now, do you know how many patients Dr. Ruan -- based on

1  reviewing the PDMP, do you know how many patients Dr. Ruan saw
2  over that period of time?
3  A   No, sir.
4  Q   You didn't -- that's in the PDMP, the number of patients;
5  right?  Or they are not known as recipients; right?
6  A   Yes, sir.
7  q   But that's not broken down on these charts?
8  A   No, sir.
9  Q   Do you also understand the PDMP -- you received this, what,
10  electronically?  Some kind of electronic file was sent to you
11  of all this?
12  A   Yes.
13  Q   It's a very large amount of data; right?
14  A   Yes, sir.
15  Q   And there's a lot more data in that PDMP file than what you
16  script out and put in this charts; right?
17  A   I'm not sure I understand your question, sir.
18  Q   Well, you were asked to look at very specific things about
19  that data; right?
20  A   Yes, sir.
21  Q   There's a lot more data in there than what you actually
22  pulled out and put into a chart; right?
23  A   Yes, sir.
24  Q   Okay.  And in fact, one of the things that you could look
25  for that's in that data is the number of times Dr. Ruan looked

1  at the PDMP; right?

2          MR. BODNAR:  Objection, Your Honor.  That is something

3  that would have been for asking Ms. Bishop, not for someone

4  that had the raw data of what the prescriptions were.

5          THE COURT:  Sustained.

6  BY MR. ARMSTRONG:

7  Q   Let me ask this question:  Did you see that in there when

8  you were looking?

9  A   What's that, sir?

10 Q   Did you see the data in the PDMP about the number of times

11 a physician can actually look at it?

12 A   No, sir.

13 Q   Do you understand that that is in there?

14          MR. BODNAR:  Objection, Your Honor.  Again, that is

15 not what was provided for him.  That was a question for

16 Ms. Bishop.

17          THE COURT:  Sustained.

18 BY MR. ARMSTRONG:

19 Q   You were not asked to look for that; right?

20          MR. BODNAR:  Objection, Your Honor.  He was not asked

21 to look for something that was not in there.

22          THE COURT:  He said he wasn't provided with that

23 information.

24          MR. ARMSTRONG:  Well --

25          THE COURT:  So I sustain the objection.

1  BY MR. ARMSTRONG:

2  Q   Were you provided that information?  It was in the PDMP;

3  right?  You got the whole -- you got all the data; right?

4          MR. BODNAR:  Objection, Your Honor.  We're talking

5  about the information in the PDMP versus a separate thing that

6  the check that Ms. Bishop said about how many times they

7  accessed it.  What he had was the raw data about the pharmacies

8  from each prescription, not how often it was accessed.

9          THE COURT:  I sustain the objection.

10          MR. ARMSTRONG:  I think that's all, Judge.

11          THE COURT:  Any redirect?

12          MR. BODNAR:  Yes, Your Honor.  May we approach side

13  bar real quick before we redirect, please?

14          THE COURT:  Yes.

15      (At the side bar, jury not present.)

16          MR. BODNAR:  Your Honor, it was brought up per counsel

17  for both defendants about the relative weight.  This is --

18  fentanyl is in micrograms.  And that it is only 102 grams,

19  essentially 102 paperclips.  Since that door has been opened, I

20  feel like I should be able to ask him, because I know he has

21  the knowledge because he has mentioned it before, that 102

22  grams of fentanyl put in perspective is essentially the amount

23  used in biological weapons.  So we're not talking about --

24  while it's 102 paperclips, Your Honor --

25          THE COURT:  You're not going there.

1          MR. BODNAR:  Your Honor, can I ask certain amounts,

2    about 102 paperclips' worth of fentanyl is not the same as 102

3    paperclips of any other drug.  This is a drug that's potency is

4    so strong, it's measured in micrograms.  It's 102 paperclips of

5    fentanyl, which is extremely --

6          THE COURT:  Well, I know.  But you have to be

7    extremely careful.  This witness is simply describing stuff

8    that was given to him in the documents.  I'm sure you have

9    other witnesses who can testify to that.  So I don't think we

10   need to go into that.

11         MR. BODNAR:  Okay.  We will bring it up with other

12   witnesses, then, Your Honor, and I'll approach at side bar

13   beforehand.  Because that is the biological weapon level of

14   fentanyl used in Russia in 2003.  That's all.

15         THE COURT:  Anything else?

16         MR. BODNAR:  No.  That's all I have on that.

17      (In open court, defendants and jury present.)

18         MR. BODNAR:  Your Honor, give us one moment just to

19   get them back in order, please.

20         THE COURT:  All right.

21                    REDIRECT EXAMINATION

22   BY MR. BODNAR:

23   Q   Good afternoon, Mr. Short.

24   A   Yes, sir.

25   Q   Do you recall when Mr. Willson was asking you about whether

1   or not the numbers would be reflected the same way if a patient

2   came once a month or received a 60- or 90-day supply of a drug?

3   A   Yes, sir.

4   Q   Do you remember him specifically using the term

5   "mathematically speaking" they would be different?

6   A   Yes.

7   Q   Do you remember him asking you that?

8   A   Yes, sir.

9   Q   I want to show as an example for you and the jury, if a

10  patient came and received a prescription on January 1st then

11  came back on February 1st and then came back on March 1st, in

12  the PDMP would that count as three separate records for each

13  time that was filled?

14  A   Yes, sir.

15  Q   Now, if they came only on January 1st and at the time on

16  January 1st they received all three prescriptions, but the

17  February 1st one said don't fill until February 1st and the

18  March 1st one said don't fill until March 1st, would those

19  still show up as three records in the PDMP report?

20  A   Yes, sir.

21  Q   So mathematically speaking, it's exactly the same, isn't

22  it?

23  A   If three prescriptions were issued, yes, sir.

24  Q   Three prescriptions issued, one every month, or three

25  prescriptions issued at the same time, it's going to show up as

1    three prescriptions; correct?

2    A   Yes, sir.

3    Q   So your numbers would be identical with these three whether

4    they were given all at once or at different times?

5    A   Yes, sir.

6    Q   Mr. Short, do you remember both attorneys asking you about

7    what was 10-2 and 10-3?  I'm just going to use the Dr. Couch

8    one as an example.  But do you remember both attorneys speaking

9    about their clients' drug lists like this and having you use

10   the math on that?

11   A   Yes, sir.

12   Q   Now, on this chart weren't you looking at various specific

13   drugs?

14   A   Yes, sir.

15   Q   So specifically at TIRF and Subsys, Abstral, Fentora,

16   Lazanda?

17   A   Yes.

18   Q   Specifically these group of drugs were here?  (Indicating.)

19   A   Yes, sir.

20   Q   That's a very small look at what they are prescribing,

21   isn't it?

22   A   Yes, sir.

23   Q   And do you remember them showing you and asking you to

24   compare with the top 10 list?  And I'm going to show you

25   Dr. Couch's just as example.  Both look substantially similar;

1   correct?

2   A   Yes, sir.

3   Q   Do you remember them having you do the math about that?

4   A   Yes, sir.

5   Q   We're not comparing apples to apples on these two charts,

6   are we?  We're comparing a close-in view of very specific drugs

7   and now a further-out view of just types of drugs, aren't we?

8   A   Yes.  The first chart's more specific products and the

9   second one is the generic or base of the drug.

10  Q   And do you remember when both counsel made a big deal about

11  these TIRF fentanyl drugs versus the fentanyl total here?

12  (Indicating.)

13  A   Yes, sir.

14  Q   You're not trying to hide the ball in any way, are you?

15  A   No, sir.

16  Q   These are all the fentanyl drugs, aren't they?

17  A   Yes, sir.

18  Q   And you talked about, I think with Mr. Willson, that

19  fentanyl patches made up a large portion of other fentanyl if

20  not TIRF fentanyl?

21  A   Yes, sir.

22  Q   You didn't break down oxycodone into long-acting OxyContin

23  or fast-acting Roxicodone, did you?

24  A   No, sir.

25  Q   And that's because you were taking a larger look at what

1   was here?

2   A   Yes, sir.

3   Q   And in effect did you take a furthest outlook -- so from

4   small, looking at specific drugs, to a little bit bigger,

5   looking at the type of drugs, not specific brands any more, or

6   strengths -- and then did you look at the farthest-out view of

7   classes of drugs?  (Indicating.)

8   A   Yes, sir.

9   Q   And actually even one more further out, a schedule of

10  drugs?

11  A   Yes, sir.

12  Q   So you're not hiding the ball with any of this, or trying

13  to manipulate the data, are you?

14  A   No, sir.

15  Q   You're just showing the jury different things at different

16  views, aren't you?

17  A   Correct.

18  Q   So the largest view of the different schedules of the

19  drugs; slightly more in, about what those drug classes are; a

20  little further look at what type of drugs it is;

21  and then the closest-in window on what the actual brand or a

22  particular strength of the brand is; is that correct?

23  (Indicating.)

24  A   Yes, sir.

25          MR. BODNAR:  Nothing further, Your Honor.  Actually,

 1    one moment Your Honor.

 2            THE COURT:  All right.

 3    BY MR. BODNAR:

 4    Q   Mr. Short, I just showed you -- we talked about farthest

 5    out to the narrowest view.  I just want to identify the exhibit

 6    numbers on those.  When we talked about the furthest-out

 7    view -- let me grab one of those -- this schedule of drugs, is

 8    that 10-10, 10-10 for Dr. Ruan?

 9    A   Yes, sir.

10    Q   And what's admitted as 10-11 for Dr. Couch?

11    A   Correct.

12    Q   So that's the broadest view; right?

13    A   Yes, sir.

14    Q   And a slightly more narrow view for Dr. Ruan being 10-8; is

15    that correct?

16    A   Slide it up a little bit.

17    Q   I'm sorry?

18    A   Yes, sir.

19    Q   And a slightly closer-in view for Dr. Couch was 10-9?

20    A   Yes, sir.

21    Q   And then when we looked at the even narrower view of the

22    drug by type, for Dr. Couch was that 10-7?

23    A   10-7, yes, sir.

24    Q   And for Dr. Ruan was that 10-6?

25    A   10-6, yes, sir.

DEA DI MICHELLE PENFOLD - DIRECT BY MS. GRIFFIN

1   Q   And finally, for the narrowest view, we talked about

2   particular drugs and strengths, was that 10-3 for Dr. Couch?

3   A   Yes, sir.

4   Q   And was that 10-2 for Dr. Ruan?

5   A   Yes, it is.

6         MR. BODNAR:  Thank you.  Nothing further from this

7   witness, Your Honor.

8         THE COURT:  All right.  You may step down.  Thank you.

9         Call your next witness.

10        MS. GRIFFIN:  Michelle Penfold.

11                  DEA DI MICHELLE PENFOLD

12              was sworn and testified as follows:

13        THE WITNESS:  Yes.

14        THE CLERK:  Thank you.  Please be seated.

15                    DIRECT EXAMINATION

16  BY MS. GRIFFIN:

17  Q   Ms. Penfold, I believe I just mispronounced your name.

18  Will you tell us how to pronounce your name?

19  A   Mitchell Penfold.

20  Q   And how do you spell your last name?

21  A   P-E-N-F-O-L-D.

22  Q   How are you employed?

23  A   I'm a diversion investigator with the DEA in Mobile.

24  Q   How long have you been so employed?

25  A   Approximately six years.

DEA DI MICHELLE RENFOLD - DIRECT BY MS. GRIFFIN

1   Q   I want to direct your attention to scripts written by

2   Dr. Couch and Dr. Ruan that were not filled at C&R

3   Pharmacy.  Did you and other diversion investigators have

4   occasion to pull some of those scripts from the pharmacies?

5   A   Yes.

6   Q   And could you tell us what we mean by pulling a script from

7   a pharmacy?

8   A   We would go into a pharmacy where a prescription had been

9   filled and request the original document from the pharmacy.

10  Q   Why would those pharmacies have the original prescription?

11  A   They are required to maintain prescriptions that are filled

12  for controlled substances for two years.

13  Q   Now, you, as a diversion investigator with DEA, are you

14  authorized to pull those scripts in connection with

15  investigations?

16  A   I am.

17  Q   What is left there with the pharmacy to show that the

18  pharmacy has had that script pulled?

19  A   It's a DEA form 12 receipt for cash or other items.

20  Q   Now, in connection with that, did you cause to be pulled

21  and pull a number of patient scripts not only in the Mobile

22  area but in Mississippi as well?

23  A   Correct.

24  Q   I show you what's marked as Government's Exhibit 5-1A and

25  5-1B.  Now, you previously have seen these; is that correct?

```
 1   A   Yes.
 2   Q   5-1A.  And tell us, if you will, where these prescriptions
 3   for an individual whose first name begins with a J., last name
 4   is Barber, B-A-R-B-E-R, were from?
 5   A   I believe those were from Three Notch Pharmacy.
 6   Q   And that is in the Mobile area?
 7   A   Yes, ma'am.
 8   Q   Would you like me to bring these up to you as you examine
 9   them?
10   A   Yes, please.
11   Q   I'll also show you what's marked as Government's Exhibit
12   5-1B and ask if you can identify where these prescriptions were
13   picked up from.
14   A   Three Notch Pharmacy.
15           MS. GRIFFIN:  Your Honor, we move to admit
16   Government's Exhibit 5-1A and 5-1B.
17           THE COURT:  All right.  Mark them in.
18           MR. ESSIG:  No objection, Your Honor.
19       (Government's Exhibit 5-1A and 5-1B were entered into
20   evidence.)
21           MS. GRIFFIN:  Your Honor, may I approach the witness?
22           THE COURT:  Yes.
23   BY MS. GRIFFIN:
24   Q   I also show you what's marked as Government's Exhibit 5-2
25   and ask if you can identify the exhibit by giving the patient's
```

1  first initial and last name?

2  A   L. Blouin.

3  Q   Can you spell the last name?

4  A   B-L-O-U-I-N.

5  Q   And where were those prescriptions picked up from by DEA?

6  A   Daphne Pharmacy.

7          MS. GRIFFIN:  And we'd move to admit Government's

8  Exhibit 5-2, Your Honor.

9          MR. ESSIG:  No objection.

10         THE COURT:  All right.  Mark them in.

11    (Government's Exhibit 5-2 was entered into evidence.)

12  BY MS. GRIFFIN:

13  Q   Government's Exhibit 5-3, patient C. -- first initial --

14  and last name C..., if you can identify those and tell us where

15  they were picked up from?

16  A   Okay.  Exhibit 302 was picked up from Publix Pharmacy in

17  Daphne.

18  Q   And Exhibit 301?

19  A   Was picked up from Daphne Pharmacy in Daphne.

20  Q   Now, you were actually referencing the DEA N number when

21  you gave those numbers?

22  A   Yes, ma'am.

23  Q   So the actual exhibit number is Exhibit 5-3?

24  A   Correct.  Would you like me to say which ones were filled

25  at Publix?

1   Q   No, ma'am.  Just when you referenced a number 302, and 301,

2   those are the internal numbers provided by DEA, not the exhibit

3   number for the court; is that correct?

4   A   Correct.

5   Q   So the prescriptions for C. -- initial C. -- C... are

6   contained in Government's Exhibit 2-3 [sic]; is that correct?

7   A   Correct.

8          MS. GRIFFIN:  The ones that were picked up.  We'd move

9   to admit that exhibit, Your Honor.

10         THE COURT:  You mean 5-3?

11         MS. GRIFFIN:  I'm sorry.  5-3.

12         THE COURT:  Yeah.

13      (Government's Exhibit 5-3 was entered into evidence.)

14         MS. GRIFFIN:  And actually, with defense approval,

15  I'll just let her identify the scripts rather than say the

16  pharmacies they were taken from.  Is there a problem with that?

17         MR. KNIZLEY:  No, ma'am.

18  BY MS. GRIFFIN:

19  Q   I show you Government's Exhibit 5-4 and ask if these are

20  the scripts that were picked up pertaining to Jeanette Driver?

21  A   Correct.

22         MS. GRIFFIN:  Move to admit 5-4, Your Honor.

23         THE COURT:  All right.  Mark it in.

24      (Government's Exhibit 5-4 was entered into evidence.)

25  BY MS. GRIFFIN:

1   Q   I show you Government's Exhibit 5-5 and ask if that was a

2   script that was picked up for a male, first initial S., last

3   name McDonald?

4   A   Correct.

5           MS. GRIFFIN:  Move to admit Government's Exhibit 5-5.

6           THE COURT:  Mark it in.

7       (Government's Exhibit 5-5 was entered into evidence.)

8   BY MS. GRIFFIN:

9   Q   And I show you a number of prescriptions, Government's

10  Exhibit 5-8, for an individual known as Matthew Sansing and ask

11  if you can identify those scripts as being picked up by the

12  DEA?

13  A   Yes; correct.

14          MS. GRIFFIN:  Move to admit multiple prescriptions for

15  Matthew Sansing, Government's Exhibit 5-8.

16          THE COURT:  All right.  Mark them in.

17      (Government's Exhibit 5-8 was entered into evidence.)

18  BY MS. GRIFFIN:

19  Q   Also ask you to identify a number of prescriptions picked

20  up for Kenneth Daves, D-A-V-E-S, as Government's Exhibit 5-6?

21  A   Correct.  For Roxicodone.

22  Q   Pardon?

23  A   For Roxicodone.

24          MS. GRIFFIN:  For Roxicodone.  Move to admit

25  Government's Exhibit 5-8 [sic].

1      THE COURT:  5-6.

2      (Government's Exhibit 5-6 was entered into evidence.)

3  BY MS. GRIFFIN:

4  Q   I show you 5-7 and ask if you can identify these exhibits

5  and whose prescriptions those were.

6  A   C. Sanford for Lyrica, Norco, and morphine.

7  Q   And is that actually Carrie Sanford?

8  A   Correct.

9      MS. GRIFFIN:  Move to admit Government's Exhibit 5-7.

10      THE COURT:  Mark it in.

11      (Government's Exhibit 5-7 was entered into evidence.)

12  BY MS. GRIFFIN:

13  Q   And then I have Government's Exhibit 5-9 and ask if can you

14  identify the prescriptions that were picked up for Gary

15  Douthitt,

16  A   Correct.  M.S.I.R., MS Contin Immediate Release, Soma.  MS

17  Contin Immediate Release, with Soma.

18  Q   And can you spell his last name?

19  A   D-O-U-T-H-E-T-T.

20  Q   And does it appear which doctor wrote the scripts for

21  Mr. Douthitt?

22  A   They were issued by Dr. Ruan.

23      MS. GRIFFIN:  Move to admit Government's Exhibit 5-9.

24      THE COURT:  All right.  Mark them in.

25      (Government's Exhibit 5-9 was entered into evidence.)

DEA DI MICHELE PENFOLD - DIRECT BY MS. GRIFFIN

1  BY MS. GRIFFIN:

2  Q   Now, I'd show you some prescriptions that were picked up.

3  Government's Exhibit 13-2A for John Bosarge, see if you can

4  identify those.

5  A   Percocet issued by Dr. Ruan, Klonopin issued by Dr. Ruan,

6  MS Contin issued by Dr. Ruan.

7          MS. GRIFFIN:  We'd move to admit Government's Exhibit

8  13-2A.

9          THE COURT:  Mark them in.

10     (Government's Exhibit 13-2A was entered into evidence.)

11  MS. GRIFFIN:

12  Q   I show you Government's Exhibit 13-3A, purporting to be

13  prescriptions picked up for Deborah Walker and ask if you can

14  identify the prescriptions.

15  A   Soma issued by Dr. Ruan, Opana issued by Dr. Ruan, Opana

16  issued by Dr. Ruan, another Opana issued by Dr. Ruan.

17          MS. GRIFFIN:  Move to admit Government's Exhibit

18  13-3A, Your Honor.

19          THE COURT:  All right.  Mark them in.

20     (Government's Exhibit 13-3A was entered into evidence.)

21  BY MS. GRIFFIN:

22  Q   I'll show you prescriptions purporting to be for Mark

23  Weaver, Government's Exhibit 13-11A, and ask if you can

24  identify the scripts that were picked up.

25  A   MS Contin by Dr. Ruan, Soma issued by Dr. Ruan, Lortab

1   issued by Dr. Ruan, Lortab issued by Dr. Ruan, another Soma

2   issued by Dr. Ruan, MS Contin issued by Dr. Ruan, and a call-in

3   for Xanax called in by Angela for Dr. Ruan.

4           MS. GRIFFIN:  Move to admit that exhibit, Your Honor.

5           THE COURT:  Mark it in.

6       (Government's Exhibit 13-11A was entered into evidence.)

7   BY MS. GRIFFIN:

8   Q   I show you what's been marked as Government's Exhibit

9   13-12A and ask if you can identify a script for DL........,

10  L...?

11  A   Roxicodone issued by Dr. Ruan.

12          MS. GRIFFIN:  And move to admit that exhibit, Your

13  Honor.

14          THE COURT:  Mark it in.

15      (Government's Exhibit 13-12A was entered into evidence.)

16  BY MS. GRIFFIN:

17  Q   Next I will show you Government's Exhibit 13-18A for Brian

18  T. Wells and ask if you can identify the scripts.

19  A   Norgesic issued by Dr. Couch, Norgesic issued by Dr. Couch,

20  Ambien issued by Dr. Couch, and Duragesic issued by Dr. Couch,

21  Roxicodone issued by Dr. Couch, oxycodone issued by Dr. Couch,

22  and a final Roxicodone issued by Dr. Couch.

23          MS. GRIFFIN:  And we move to have that exhibit

24  admitted, Your Honor.

25          THE COURT:  All right.  Mark it in.

 1         (Government's Exhibit 13-18A was entered into evidence.)

 2    BY MS. GRIFFIN:

 3    Q    And the last grouping of scripts, Government's Exhibit

 4    13-19A, that purport to be in the name of Katheryn Engles, and

 5    ask if you can identify the scripts.

 6    A    A methadone issued by Dr. Couch on April 8, '13, Xanax

 7    issued by Dr. Couch, Dolophine issued by Dr. Couch, Lortab

 8    issued by Dr. Couch, Dolophine issued by Dr. Couch, Lortab

 9    issued by Dr. Couch, Xanax issued by Dr. Couch, and Phenergan

10    with codeine, it was a call-in issued per Dr. Couch.

11    Q    And we move to admit that exhibit, Your Honor.

12         THE COURT:  All right.  Mark it in.

13         (Government's Exhibit 13-19A was entered into evidence.)

14    BY MS. GRIFFIN:

15    Q    Ms. Penfold, have you had the opportunity to look at the

16    back of those prescriptions that were picked up and that you

17    have just identified and were admitted?

18    A    Correct.

19    Q    You've looked at those?

20    A    Yes, ma'am.

21    Q    Based on your training and experience, is there a way for

22    you to tell if the scripts -- grouping of scripts you just

23    admitted -- have been filled?

24    A    Correct.  When a prescription is presented to the pharmacy,

25    a pharmacy tech enters the information from the prescription

1   into a computer and generates a label that is placed on the

2   back of that prescription before it is filled.  And that gives

3   the pharmacist information on what to fill.

4   Q   Typically in your experience do the labels contain what is

5   known as a prescription number?

6   A   Correct.  They are assigned a prescription number, it has

7   the patient's name and address, the doctor's name, address, DEA

8   number, has the drug, the quantity of the drug, the strength of

9   the drug, the form, and the actual prescription will contain

10  the doctor's signature.

11  Q   Is there a requirement that that label that's generated in

12  the pharmacy be signed by the pharmacist?

13  A   They initial off.  It can either be printed on there or

14  initialed.

15  Q   And printed with what?

16  A   With the pharmacist's initials.

17  Q   So that you know who actually filled the prescription?

18  A   Correct.

19  Q   Now, have you also had the opportunity to see prescriptions

20  that were filled at C&R Pharmacy?

21  A   Yes.

22  Q   What you've just been describing are prescriptions filled

23  at other pharmacies; is that right?

24  A   Correct.

25  Q   I'm pulling Government's Exhibit 4-9A, which has been

1    pulled and identified as fentanyl scripts written by

2    Dr. Ruan.  And I'll show you the second page and ask if you can

3    identify what's contained on the front of the prescription,

4    what type information.

5         MR. KNIZLEY:  Your Honor, we object.  This is not an

6    expert witness.  This is redundant.  We've been over this with

7    other witnesses.  She has no particular knowledge or

8    information about these particular prescriptions and she's not

9    testifying as an expert.  So any opinions or ideas or thoughts,

10   it's just inappropriate from this witness.

11        THE COURT:  Overruled.

12   BY MS. GRIFFIN:

13   Q   Just the type of information that's required to be on the

14   front of the prescription?

15   A   The patient's name and address, the date the prescription

16   was issued, the drug name, the strength, the quantity, the

17   directions for use, the doctor's DEA registration, the doctor's

18   name and address and the doctor's signature.

19   Q   And where it says effective date, when you said the date,

20   was that the date written?

21   A   That should be the date written; correct.

22   Q   That doesn't mean it has to be filled on that day, does it?

23   A   No.

24   Q   I'm going to show you the back of this script and ask if

25   these white stickers on the back are what you have referred to

 1    earlier as the printed portion that the pharmacy adds to a

 2    script?

 3    A    Correct.

 4    Q    And could you just explain to us or point out what you're

 5    referring to as contained on the back?

 6    A    On the back it lists the Rx number which is assigned when

 7    the prescription is presented at the pharmacy for

 8    filling.  That's the internal document number so that the

 9    pharmacy can track that prescription.  It has the patient's

10    name, the patient's address, it has the drug name, strength,

11    quantity, has directions for use, it has the doctor's name, the

12    doctor's address, the doctor's DEA number.

13    Q    Now, is that all that's required on the back to show that

14    the prescription has been filled?

15    A    Correct.

16    Q    Do you see what appears to be some writing with a pen on

17    the back of this particular prescription, first name C., the

18    letter C., last name A..........?

19    A    Can you slide that a little bit?  I can't see one of

20    them.  The other way.

21    Q    I'm just showing you one of them.

22    A    Oh, okay.  Okay.  Yes, I see it.

23    Q    Is the pen writing or what appears to be writing in ink or

24    pen required on the back of a prescription that's been filled?

25    A    I believe the state requires the pharmacist's initials.  I

531

1   do not know if it has to be pen or if it can be printed.

2   Q   Okay.  But the circling or the writing of the milligrams

3   and the number of tablets does not have to be written?

4   A   No.

5   Q   Now, based on your experience and training, what happens if

6   a prescription is filled, a number is given to it, and somebody

7   does not pick it up for a patient?

8   A   It can be returned to stock.

9   Q   Have you had opportunities to see scripts that have been

10  returned to stock?

11  A   Yes.

12  Q   And how have you been able to identify that that's what

13  happened?

14  A   It is usually notated on the back of the original

15  prescription that it was not filled and then is entered into

16  the computer system to adjust the inventory.

17  Q   And when you indicate that the label that goes on the back

18  of the script is usually a typed or a printed label -- is that

19  right?

20  A   Correct.

21  Q   That's done electronically typically?

22  A   Correct.

23  Q   Are there any pharmacies that still do that by hand that

24  you're aware of?

25  A   I have not seen any that are done by hand.

DEA DI MICHELLE PENFOLD - DIRECT BY MS. GRIFFIN

1  Q   Now, I want to direct your attention to 5-1A, 5-1A that you

2  identified for Joyce Barber.  Have you previously had the

3  opportunity to look at these scripts for Ms. Barber?

4  A   Correct.

5  Q   And on the first two at the top of the page, what drugs are

6  those for, please?

7  A   Lyrica 150 milligram and Lortab 10 milligram.

8  Q   And do you see anything written on the front of these

9  scripts that indicate any medical condition that it's alleged

10 Ms. Barber has?

11 A   No.

12 Q   And then I'll show you the third one in this exhibit and

13 ask if it indicates any --

14 A   It's for Lyrica and it does not indicate a medical

15 condition.

16 Q   Now, I see at the top of this prescription there is a

17 prescription number.  Rx stands for prescription?

18 A   Correct.

19 Q   Is that required to be placed on the front of a

20 prescription?

21 A   It is not a requirement to be placed on the front of a

22 prescription.  It's usually contained on the back on the label.

23 Q   Some pharmacies just do that front and back?

24 A   I believe this pharmacy did it because the label was hard

25 to read.

533

1   Q   I also direct your attention to Government's Exhibit 5-1B,

2   still Ms. Barber.  And you've identified these as being picked

3   up for Ms. Barber.  On the first prescription can we tell if

4   there is a prescription for Subsys Sublingual Spray?

5   A   Correct.

6   Q   And the effective date, the date that should have been

7   signed?

8   A   Correct.  October 22nd, 2013.

9   Q   Straight across is there another prescription, November

10  26th of '13, for Subsys Sublingual?

11  A   Correct.

12  Q   Do both of those appear to be Dr. Couch's signatures?

13  A   Correct.

14  Q   Signed over his name, in other words?

15  A   Correct.

16  Q   Then down at the bottom of the page do you have two

17  prescriptions for Ms. Barber for Subsys and then for a

18  Duragesic?

19  A   Correct.

20  Q   Do you know that Duragesic is a form of Subsys?

21  A   Correct.

22  Q   Do you see anything on either of these four indicating a

23  medical condition for Ms. Barber?

24  A   I do not.

25  Q   The second page of Government's Exhibit 5-1B, I show you

DEA DI MICHELLE PINFOLD - DIRECT BY MS. GRIFFIN

1    the top, and does it indicate the prescription on May the 28th

2    of '13 for Subsys?

3    A    Correct.

4    Q    To the right of the Rx, where it says please print, is

5    there -- does there appear to be a diagnosis listed?

6    A    Uterine cancer.

7    Q    And that's a Subsys prescription purporting to be from

8    Dr. Couch?

9    A    Correct.

10   Q    To the right of that prescription is there another Subsys

11   prescription for July the 30th of '13 for Joyce Barber?

12   A    Correct, for Subsys 400 milligram.

13   Q    And that's a higher milligram than was in the May

14   prescription right next to it?

15   A    Correct.

16   Q    Does there appear to be under her name and address a type

17   of diagnosis written?

18   A    Uterine cancer.

19   Q    Is that required on a script, to list the diagnosis?

20   A    No.

21   Q    And then I show you the bottom of the second page and ask

22   if this is also a Subsys prescription for Ms. Barber dated June

23   the 25th of 2013.

24   A    Correct.  For Subsys 200 milligram.

25   Q    Does that indicate something that says a Dx instead of Rx?

 1   A    Correct.

 2   Q    What is Dx?

 3   A    Diagnosis.

 4   Q    And then what does it indicate is the diagnosis?

 5   A    Uterine cancer.

 6   Q    Again, this is not required to be on the script, is it?

 7   A    No.

 8   Q    And you don't have any independent knowledge of what

 9   condition this particular patient has, do you?

10   A    I do not.

11          THE COURT:  Ms. Griffin, is now a good time for us to

12   take our break?

13          MS. GRIFFIN:  It is, Your Honor.

14          THE COURT:  All right.  Ladies and gentlemen, we are

15   going to take our afternoon break.  Leave your pads on your

16   chairs.  No discussion about the case.  Take your break

17   downstairs.  We will call you back up in about 15 minutes.

18       (A recess was taken at 3:02 p.m.)

19       (In open court, 3:24 p.m., defendants and jury present.)

20   BY MS. GRIFFIN:

21   Q    Ms. Penfold, I show you first from Exhibit 5-1B

22   prescriptions for Joyce Barber that you had indicated had

23   uterine cancer written on them?

24   A    Correct.

25   Q    And as the date, what I'm pointing to, can you see that

DEA DI MICHELLE BENFOLD - DIRECT BY MS. GRIFFIN

```
 1   date?
 2   A   5/28 of '13.  And I apologize, but I think I may have said
 3   milligrams.  Those are microgram.
 4   Q   Okay.  Thank you.
 5           And the date on the one on the right-hand side?
 6   A   July 30th, 2013.
 7   Q   Then I'm going to show you two scripts from the same days
 8   on Exhibit 5-1A.  I'll try to put them up here at the same
 9   time.  Is there one on 7/30/13 for Lortab?
10   A   Correct.
11   Q   Does that say anything about her diagnosis or her
12   condition?
13   A   No, it does not.
14   Q   But the one written the same day for Subsys says uterine
15   cancer?
16   A   That's correct.
17   Q   And I show you the Subsys written May the 28th of '13.  It
18   says Subsys and uterine cancer; is that right?
19   A   Correct.
20   Q   And the one written or purporting to be written the same
21   day, 5/28/13, for Lyrica, does it appear to list a diagnosis?
22   A   It does not.
23   Q   So only the Subsys ones list the uterine cancer; is that
24   right?
25   A   That is correct.
```

1  Q   Now, I believe I asked you if Duragesic was a form of

2  Subsys and I misspoke.  Is Duragesic actually a form of

3  Fentanyl?

4  A   Fentanyl; correct.

5  Q   It is not a form of Subsys; is that right?

6  A   Correct.  Subsys is a form of fentanyl, as well as Norgesic

7  is a form of fentanyl.

8         MS. GRIFFIN:  That's all I have of this witness, Your

9  Honor.

10         THE COURT:  All right.

11                      CROSS EXAMINATION

12  BY MR. ESSIG:

13  Q   Good afternoon, Ms. Penfold.  My name is Brandon Essig, and

14  I'm an attorney representing Dr. Couch.

15         What I want to do is just kind of go back through some

16  of the information that you just went through.  Now, just to

17  begin with, and just make sure the jury understands,

18  Ms. Penfold, all of the prescriptions that you have talked

19  about in this case, your role here today is to talk about

20  prescriptions that you got from pharmacies that were not owned

21  by the doctors; is that correct?

22  A   Yes.  DEA obtained the prescriptions from other pharmacies.

23  Q   Okay.  You are aware; right; that Dr. Couch and Dr. Ruan

24  owned a pharmacy that was attached to one of their clinics?

25  A   I'm aware of that.

1   Q   Okay.  And so the pharmacies -- the prescriptions you're

2   talking about here today are not prescriptions that came from

3   there?

4   A   Correct.

5   Q   Okay.  Now, you talked a little bit about as a diversion

6   investigator that you've got some training and some knowledge

7   of how pharmacies go about filling prescriptions; is that

8   correct?

9   A   Correct.

10  Q   Now, you would agree with me, wouldn't you, that for a

11  prescription to end up in the hands of a patient that has a

12  prescription -- for the medicine to end up in their hands --

13  there's a two-step process; isn't that correct?

14  A   I don't know if I understand what you're trying to say.

15          MS. GRIFFIN:  Your Honor, object.  She doesn't have a

16  foundation for what's required for a prescription to end up in

17  the patient's hand.

18          THE COURT:  You need to establish that, if you think

19  she does.

20          MR. ESSIG:  That's what I'm trying to do, Your

21  Honor.  And I probably asked a bad question.  I'll rephrase it.

22          THE COURT:  All right.

23  BY MR. ESSIG:

24  Q   Ms. Penfold, here's what I mean by that, is that inside the

25  pharmacy, when the prescription comes in, somebody's got to

539

1    take those pills and somebody's got to fill the bottle up with

2    the pills; isn't that right?

3    A    Correct.

4    Q    And that's what we mean when we talk about filling a

5    prescription; isn't that right?

6    A    Correct.  Well, the dispenser does, yes; correct.  They

7    fill it and then dispense it to the patient.

8    Q    That's right.  And that was my point.  The second step in

9    the process is to dispense it to the patient; isn't that right?

10   A    Correct.

11   Q    And when the patient walks in the door, they get the bottle

12   of pills that's been filled; isn't that right?

13   A    Correct.

14   Q    Now, you testified on direct, in talking about the stickers

15   that are on the back of the prescriptions, I think what I

16   understood your testimony to be was that what is required is

17   that that label goes on the back of the prescription; is that

18   right?

19   A    I don't believe there's anything that specifies it has to

20   be on the back of the prescription -- at least not with DEA.

21   Q    Somewhere on the prescription there's got to be that label?

22   A    There has to be required information.

23   Q    Okay.  But does it have to be on a label or can it be

24   handwritten?

25   A    DEA has no requirement that has to be on the label --

1    Q    Okay.

2    A    -- on a label.

3    Q    And as you sit here today, you can't testify as to how all

4    pharmacies designate how that prescription is filled, can you?

5    A    No.

6    Q    I mean, you can't sit here and say that all pharmacies put

7    a label and then write on it to signify that it's been filled

8    in this case, you can't give this testimony today, can you?

9    A    I can't testify for all pharmacies.

10   Q    There's a lot of discretion for a particular pharmacy as to

11   how they notate that a prescription has been filled?

12   A    I don't understand -- I don't necessarily know that I can

13   answer that.  I know that there is required information that

14   DEA requires, there is required information that individual

15   states and pharmacy boards require.  In my professional

16   experience, I've always seen it on a label on the back of a

17   prescription.

18   Q    But you haven't always seen it with the label and

19   handwriting, have you?  You haven't always seen both of those?

20   A    Not that I can recall, maybe not.

21   Q    So in terms of the prescriptions that Ms. Griffin showed

22   you, when we look at those, you don't know what the specific

23   handwriting might mean to a specific pharmacy for their

24   recordkeeping purposes, do you?

25   A    In my professional experience, usually it's the

1  verification where the pharmacist is verifying the drug, the

2  quantity, the amount dispensed, and then they initial off of

3  it.

4  Q   But that wasn't my question.  My question was for each

5  pharmacy, you can't testify as to what that handwriting might

6  mean for that particular pharmacy's recordkeeping purposes?

7  A   I cannot.

8  Q   Now, if we look here at the Joyce Barber prescriptions --

9  if we go back to these?

10         THE COURT:  Which exhibit number are you using?

11         MR. ESSIG:  Your Honor, this is 5-1B.

12  Q   Now, if we look here, again, I want to go back to the first

13  page there.  Now, all of these prescriptions contained here on

14  the first page of 5-1B, am I wrong that all of these are for

15  some form of fentanyl?

16  A   That is correct.

17  Q   And none of the prescriptions on this page, if I'm looking

18  at them correctly, have any sort of cancer diagnosis at all, do

19  they?

20  A   Not that I can see.

21  Q   Okay.  If we go to the second page, though, for the Joyce

22  Barber prescriptions, there are three prescriptions here and,

23  again, admittedly, all of which contain a diagnosis of uterine

24  cancer; is that correct?

25  A   Correct.

542

```
 1   Q   Now, do you see, particularly on the prescription on the
 2   top left-hand corner and the prescription on the bottom right-
 3   hand corner, there look to be multiple different people who
 4   have their handwriting on that prescription; is that right?
 5   A   Correct.
 6   Q   I mean, there's blue handwriting, there's black
 7   handwriting; isn't that correct?
 8   A   Correct.
 9   Q   And the point is you can't testify and you don't know at
10   what point in time the words "uterine cancer" were written on
11   any of these prescriptions, can you?
12   A   I cannot.
13   Q   And you can't testify and you have no knowledge as to who
14   wrote the words "uterine cancer" on these prescriptions, do
15   you?
16   A   No.
17   Q   And again, as you testified as you began -- as I began my
18   questioning of you -- every single one of these prescriptions
19   concerning Ms. Barber came from a pharmacy not owned by these
20   two doctors; isn't that right?
21   A   Correct.
22   Q   Now, Ms. Penfold, you testified on direct examination that
23   you have some training and knowledge based on the DEA
24   requirements for a valid prescription; is that correct?
25   A   Correct.
```

543

1   Q   And you're aware that a pharmacist, when they fill a

2   prescription, that prior to filling that prescription they have

3   to make a determination that that prescription is for a

4   legitimate medical purpose and in the usual course of practice?

5   A   Correct.

6         MR. ESSIG:  No further questions, Your Honor.

7         THE COURT:  Mr. Knizley?

8                    CROSS EXAMINATION

9   BY MR. KNIZLEY:

10  Q   Good afternoon, Ms. Penfold.  Ms. Penfold, I'm going to

11  show you what's marked as Government's Exhibit 5-9.  And do you

12  recall testifying about that particular exhibit?

13  A   Yes.

14  Q   And was that a prescription, you said, from a local

15  pharmacy that you had picked up?

16  A   Let me pull it up.

17        MS. GRIFFIN:  Mr. Knizley, would you turn it over to

18  give her the N number, please?

19  BY MR. KNIZLEY:

20  Q   Would that be helpful to you?

21  A   Yes.  Okay.  N294.  Would you like me to tell you where it

22  was obtained at?

23  Q   Yes, ma'am.

24  A   Rite Aid Pharmacy, Springhill Avenue in Mobile.

25  Q   Now, you had told us that when the prosecutor asked you

1    questions about on the back part of that prescription you had

2    the front, then you have a sticker on the back; right?

3    A   Right.

4    Q   And the pharmacy itself, be it Rite Aid or whoever, creates

5    that sticker; right?

6    A   Correct.

7    Q   It's the same thing we see on the pill bottles when we take

8    them home?

9    A   Correct.

10   Q   And she asked you about whether that should be signed by

11   the pharmacist or signed by someone; is that right?  Or

12   initialed?

13   A   It must have the pharmacist's initials.

14   Q   And that's the way pharmacies are supposed to do it; right?

15   A   Correct.

16   Q   All right.  Now, I'm going to show you on Exhibit 5-4, Rite

17   Aid at Springhill, do you see any such signing, let's say, on

18   this one on the left?

19   A   I cannot read that.

20   Q   Okay.  Can I bring it to you?

21          THE COURT:  Can you blow it up, Mr. Knizley?

22          MR. ESSIG:  Turn this.  (Indicating.)

23          MR. KNIZLEY:  Let me zoom it up some.

24          THE COURT:  Well, that's a little too much.

25   BY MR. KNIZLEY:

DEA DI MICHELLE RINFOLD - CROSS BY MR. KNIZLEY

1   Q   Let's see here.  Can you see it now?

2   A   I do.

3   Q   And can you tell us if there's any signatures or initials

4   on that?

5   A   It says RPh, SO5.  There was not a handwritten signature.

6   Q   There are no signature or initials on it?

7   A   I don't know if that has -- it says RPh.  Usually that has

8   the initials of the pharmacist after that.

9   Q   Yes, ma'am.  Are there any initials or signatures on it?

10  A   There is no signature on that.

11  Q   Or initials?

12  A   I don't know if that SO -- I really can't see it --

13  Q   Okay.

14  A   -- if it is an initial.

15  Q   You think it might be an initial?

16  A   Usually there are three initials when I see them on the

17  back of the script.

18  Q   I'm talking about handwritten initials.

19  A   No, there are no handwritten initials.

20  Q   That's what you were talking about earlier, handwritten

21  initials.

22  A   No, it has to have one -- when a prescription is filled,

23  the pharmacist is identified by initials.

24  Q   Okay.

25  A   I have no knowledge of whether it has to be handwritten or

DEA DI MICHELLE BENFOLD - CROSS BY MR. KNIZLEY

```
 1  just recorded with the initials.
 2  Q   Okay.  It could just be typed on there like this label?
 3  A   Correct.
 4  Q   And where is the pharmacy information you think may be
 5  attributable to who the physician is?
 6  A   The physician is Dr. Xiulu Ruan.
 7  Q   Excuse me.  Pharmacist, pharmacist.
 8  A   Under the address of the patient, RPh, usually there is
 9  initials after that.
10  Q   And you think that SO5 may be someone's initials?
11  A   I don't know.
12  Q   Okay.  Let's look at maybe -- I'm going to ask you about
13  Government's Exhibit 5-1.  Let me go back out, please.  5-1A,
14  and the N number looks like 303.  Could you tell me what
15  pharmacy that came from, please, ma'am?
16  A   That was Three Notch Pharmacy in Mobile.
17  Q   And was it a Rite Aid or CVS or do you know?
18  A   It was Three Notch Pharmacy.
19  Q   And on the back of those do you, again, see any signatures,
20  written initials, or anything else that you think may be
21  somebody's initials?
22  A   Yes, RPh:JK.
23  Q   What do you think that is?
24  A   The pharmacist's initials.
25  Q   That is sufficient for what you're talking about?  You
```

 1   don't have to have any writing on the back?

 2   A   I have no knowledge of any requirement that it has to be

 3   written.

 4   Q   Do you know of any requirement that it has to be even on

 5   there?

 6   A   The pharmacist's initials -- DEA does not require any of

 7   those labels on the back.

 8   Q   Okay.  Is there any requirement that a pharmacist's

 9   initials appear on the back or front of the prescription?

10   A   I believe there is.

11   Q   Do you know?

12   A   I do not.

13   Q   Thank you.  So whether initials are on the front or back,

14   you don't know whether that's a requirement for a valid

15   prescription or not?

16   A   DEA does not have a requirement that the pharmacist's

17   initials be on the prescription.  The pharmacy board of the

18   state may.  I see them in my professional practice on every

19   prescription that I can recall seeing.

20           MR. KNIZLEY:  Thank you.  That's all the questions we

21   have.

22           THE COURT:  Do you have any redirect?

23           MS. GRIFFIN:  Just one, Your Honor.

24           THE COURT:  All right.

25                    REDIRECT EXAMINATION

 1   BY MS. GRIFFIN:

 2   Q   Ms. Penfold, what do you understand RPh to stand for?

 3   A   Registered pharmacist.

 4   Q   And that's the initials by what purports to be someone's

 5   initials on these exhibits?

 6   A   Correct.

 7           MS. GRIFFIN:  That's all I have of the witness, Your

 8   Honor.

 9           THE COURT:  All right.  You may step down.  Thank you,

10   ma'am.

11           MR. BODNAR:  United States calls FBI Special Agent Coy

12   Davis.

13           THE CLERK:  Let me get you to raise your right hand.

14                       FBI SA COY DAVIS

15               was sworn and testified as follows:

16           THE WITNESS:  I do.

17           THE CLERK:  Thank you, sir.  Please be seated.

18                       DIRECT EXAMINATION

19   BY MR. BODNAR:

20   Q   Good afternoon, Mr. Davis.

21   A   Good afternoon.

22   Q   Would you please introduce yourself to the jury?

23   A   My name is Coy Davis.

24   Q   And, Mr. Davis, where do you work?

25   A   I work for the FBI.

1  Q   And what do you do currently for the FBI?

2  A   I'm a special agent.

3  Q   And is that special agent for the FBI here in Mobile?

4  A   That's correct.

5  Q   How long have you been a special agent with the FBI?

6  A   Approximately two years.

7  Q   Prior to becoming a special agent with the FBI, did you

8  have another job with the FBI?

9  A   That's correct.  As a forensic accountant with the FBI here

10  in Mobile.

11  Q   And can you explain to the jury what is the difference

12  between a forensic accountant, the job you used to have, and a

13  special agent, the job you have now?

14  A   Sure.  So a forensic accountant, the main duties include

15  reviewing financial transactions in connection with criminal

16  investigations, whereas a special agent does all sorts of

17  activities -- interviews, analyses, reviews.  But the key

18  difference is forensic accountants mostly just review financial

19  transactions.

20  Q   And, Special Agent Davis, can you just talk a little bit

21  slower?  I know I've been warned about talking too fast --

22  A   Okay.

23  Q   -- for typing.

24          Prior to become becoming a forensic accountant with

25  the FBI, what was your experience in terms of education and the

550

1   work force that led to you being a forensic accountant?

2   A   Sure.  I graduated with a bachelor's and master's degree in

3   accounting.  And then I worked for three years in Houston,

4   Texas, for an accounting firm, where I performed external

5   audits for public and private companies.  I'd been doing that

6   for three years.  That's when I came to Mobile and took a job

7   at the FBI as a forensic accountant.

8   Q   And prior to joining the FBI, did you have your CPA

9   license?

10  A   That's correct.

11  Q   Were you involved in an investigation into Dr. Xiulu Ruan

12  and Dr. John Patrick Couch?

13  A   I was.

14  Q   Were you the lead investigator for the FBI in this case?

15  A   I was not.

16  Q   And was that person Special Agent Amy White that's sitting

17  right there?

18  A   Correct.

19  Q   Were you brought in to handle a particular aspect of this

20  case?

21  A   I was.

22  Q   And just generally what was that aspect of this case that

23  you were brought in to handle?

24  A   I reviewed investment accounts for Dr. Couch and Dr. Ruan.

25  Q   And did you also review certain emails for Dr. Couch and

1  Dr. Ruan?

2  A   That's correct.  I did.

3  Q   I want to show you now what's been marked as Government's

4  Exhibit 11-1 and 11-2.  Could you please identify what 11-1 and

5  11-2 are for the Court?

6  A   11-1 is an investment account for Dr. Ruan from Capital

7  One.  11-2 is also an investment account for Dr. Ruan from

8  Capital One -- I'm sorry -- from optionsXpress.

9  Q   And is optionsXpress a division or a part of Charles

10 Schwab?

11 A   That's correct.

12 Q   And were these records obtained via subpoena?

13 A   That's correct.

14         MR. BODNAR:  Your Honor, the United States moves to

15 admit Government's Exhibit 11-1 and 11-2.

16         THE COURT:  All right.  Mark them in.

17     (Government's Exhibit 11-1 and 11-2 were entered into

18 evidence.)

19 BY MR. BODNAR:

20 Q   Special Agent Davis, you just identified two investment

21 accounts for Dr. Ruan.  Did you also look at business records

22 for investment accounts related to Dr. Couch?

23 A   I did.

24 Q   Were those also obtained via subpoena?

25 A   That's correct.

1          MR. BODNAR:  May I approach, Your Honor, with what's

2     been marked as Government's Exhibit 11-3?

3          THE COURT:  Yes.

4     BY MR. BODNAR:

5     Q    Special Agent Davis, could you please identify what 11-3 is

6     for the Court?

7     A    These are the E*Trade investment accounts for Dr. Couch.

8     Q    And is there multiple accounts there?

9     A    There are.

10    Q    And how many accounts?

11    A    There are two accounts, I believe.

12    Q    Both with E*Trade, both for Dr. Couch?

13    A    That's correct.

14    Q    And again, these were obtained via subpoena?

15    A    That's correct.

16         MR.  BODNAR:  United States moves to admit

17    Government's Exhibit 11-3, Your Honor.

18         MR. DOSS:  No objection.

19         THE COURT:  All right.  Mark them in.

20        (Government's Exhibit 11-3 was entered into evidence.)

21    BY MR. BODNAR:

22    Q    Special Agent Davis, were the business records obtained

23    from Charles Schwab and E*Trade -- and I apologize.  What was

24    the third one for Dr. -- the second one for Dr. Ruan?

25    A    Capital One.

1    Q   Capital One?  Were those voluminous records?

2    A   They were.

3    Q   Did you create a summary chart from those voluminous

4    records to help the jury understand something about those

5    records?

6    A   I did.

7    Q   And was that about the purchase dates for a particular

8    stock?

9    A   That's correct.

10   Q   And which stock are we talking about?

11   A   Galena Biopharma.

12   Q   And what is the ticker symbol for Galena Biopharma?

13   A   It's identified as GALE.

14           MR. BODNAR:  Your Honor, may I approach with what has

15   been previously marked as Government's Exhibit 10-4?

16           THE COURT:  Yes.

17           MR. BODNAR:  I'm sorry.  That should be 11-4.

18   Q   Can you identify what has been marked as 11-4?

19   A   Yes.  This is a summary schedule I prepared which shows

20   stock purchases of Galena Biopharma made by Dr. Couch and

21   Dr. Ruan.  It includes the date, the purchaser, the cost of the

22   purchase, and the shares purchased.

23           MR. BODNAR:  Your Honor, United States moves to admit

24   Government's Exhibit 11-4.

25           THE COURT:  All right.  Mark it in.

FBI SA COY DAVIS - DIRECT BY MR. BODNAR

1           (Government's Exhibit 11-4 was entered into evidence.)

2                MR. BODNAR:  May we publish it to the jury?

3                THE COURT:  Yes.

4    BY MR. BODNAR:

5    Q    Special Agent Davis, I'm now going to show you what's been

6    admitted as 11-4.  Starting at this heading up top, can you

7    please explain what it is that the jury's looking at?

8    A    Sure.  So the heading is identified as what it is, stock

9    purchases of Galena Biopharma, identified with ticker GALE.

10   Q    And you explained that before, a ticker symbol.  What does

11   a ticker symbol mean with regard to a particular stock?

12   A    It's what's used to identify it.

13   Q    So, for instance, a stock typically has a two- or a three-

14   or a four-letter identifier for the company?

15   A    I don't know how many digits it can be limited to.  But

16   yes, it usually is something shorter to identify the full name

17   of the company.

18   Q    And GALE is for Galena Biopharma?

19   A    That's correct.

20   Q    And during the course of your investigation through this

21   aspect of the case, did you learn who Galena Biopharma is?

22   A    I did.

23   Q    What is Galena -- who is -- or what is Galena Biopharma?

24   A    They are a pharmaceutical company.

25   Q    And what if any product did Galena Biopharma make during

1    the time period of the superseding indictment?

2    A   They -- Abstral was the name of the product.

3    Q   And do you know what Abstral looks like?

4    A   I do.

5    Q   I'm going to show you what has previously been identified

6    as Government's Exhibit 1-9.  Special Agent Davis, this is

7    Exhibit 1-9.  Is this Abstral here?  (Indicating.)

8    A   Correct.

9    Q   Is that the product you were saying was made by Galena

10   Biopharma?

11   A   Correct.

12   Q   And what is Abstral?

13   A   It's a fentanyl-based product used for breakthrough cancer

14   pain.

15   Q   And how is it used?  Is it a pill or what is it?

16   A   It's a pill you administer under the tongue.

17   Q   Does it dissolve under the tongue?

18   A   Correct.

19   Q   Now, in creating this chart, Special Agent Davis, did you

20   include all information that was in those stock records?

21   A   I did not.

22   Q   Was this -- does this chart only purport to show the

23   purchases of stock for Galena Biopharma?

24   A   That's correct.

25   Q   So if either defendant purchased a different stock other

FBI SA COY DAVIS - DIRECT BY MR. BODNAR

1   than Galena with those accounts, that's not going to be

2   reflected here?

3   A   That's correct.

4   Q   And the sale of particular stocks is also not reflected in

5   here?

6   A   It's not included.

7   Q   If there were multiple purchases on a single day -- and

8   we'll just -- and I don't know if this is -- but as an example,

9   if Dr. Couch made multiple purchases on November 27th of Galena

10  Biopharma, how did you account for that in this chart?

11  A   It would be summarized in one day.  So, for instance, if

12  these 12,000 shares here, if it's two separate transactions

13  that day for 6,000 shares a piece, I just summarized them into

14  one line to show 12,000 shares for that date.

15  Q   So what it's showing -- there may have been on November

16  27th multiple purchases of Galena stock, but you're just saying

17  on this date Dr. Couch purchased that amount?

18  A   In total; correct.

19  Q   And just using the first line as an example, too, walk us

20  through what exactly is this chart saying on November 27th

21  happened?

22  A   Sure.  So it's saying on November 27, 2013, Dr. Couch

23  purchased 12,000 shares and the total cost of that purchase was

24  $45,000, $45,808.38.

25  Q   So 12,000 shares were purchased for that amount?

1  A    Correct.

2  Q    Well, help me understand something.  I see 12,000 shares

3  also purchased down here on a different date, December 13th,

4  but the price is different.  Why, why is the price different?

5  A    It's two different days, like the stock price changes over

6  time.  It's a fluctuating amount.  So even though you buy the

7  same number of shares, it costs -- it could cost more or less,

8  depending on the day you purchase that number of shares.

9  Q    So whatever the share price is that day times 12,000 is

10 going to be what the cost of the purchase is?

11 A    Correct.  If there's any fees included, that may be in

12 there as well.

13 Q    And were there certain dates, such as January 17th, where

14 both doctors purchased Galena Biopharma stock?

15 A    That's correct.

16 Q    And did you break it out then, the purchases for Dr. Ruan

17 versus purchases for Dr. Couch?

18 A    I did.

19 Q    Is that what we see here, Dr. Ruan purchased how much?

20 A    $197,930.90.

21 Q    And Dr. Couch purchased how much on that same date?

22 A    134,154.97.

23 Q    And the stock purchases, what was the first date of

24 purchase for Dr. Couch?

25 A    November 27th, 2013.

558

```
 1   Q   What was the first date of purchase for Dr. Ruan?

 2   A   January 9th, 2014.

 3   Q   What was the last date of purchase for Dr. Couch?

 4   A   April 24th, 2014.

 5   Q   And the last date of purchase for Dr. Ruan?

 6   A   July 9th, 2014.

 7   Q   I'm going to show you now what's previously been marked as

 8   Government's Exhibit 11-5 -- 11-5(1) through 11-5(17).  Can you

 9   identify what 11-5(1) through 11-5(17) are for the Court,

10   please?

11   A   These are emails involving Dr. Couch and Dr. Ruan.

12   Q   And could you please explain to the jury how were emails

13   obtained in this case?

14   A   They were obtained via search warrant.

15   Q   So was there a search warrant for emails for

16   xiuluruan@yahoo.com?

17   A   That's correct.

18   Q   And for jpcmd@hotmail.com?

19   A   Correct.

20   Q   And were these emails obtained from Hotmail and Yahoo

21   pursuant to search warrants?

22   A   That's correct.

23   Q   And reviewed by you?

24   A   Correct.

25           MR. BODNAR:  Your Honor, the United States moves to
```

FBI SA COY DAVIS - DIRECT BY MR. BODNAR

 1  admit Government's Exhibit 11-5, which has the subparts (1)

 2  through (17).

 3          THE COURT:  Any objection?

 4          MR. KNIZLEY:  No objection.

 5          THE COURT:  All right.

 6          MR. DOSS:  No objection.

 7          THE COURT:  All right.  Mark them in.

 8      (Government's Exhibits 11-5(1) through 11-5(17) were

 9  entered into evidence.)

10  BY MR. BODNAR:

11  Q   And, Special Agent Davis, you have previously reviewed

12  these emails prior to taking the stand today; correct?

13  A   That's correct.

14  Q   I want to show you what's been marked as Government's

15  Exhibit 11-5, subsection (1).  Can you please explain what's in

16  that -- I'm going to take it right out of the sleeve so it's

17  not -- can you please explain what we have in this very first

18  email?

19  A   Sure.  It's an email from Dr. Ruan to NV..... with the

20  subject line Galena, dated November 21st, 2013, and it reads:

21  Baby, I found this link.  Do you think we should wait or not

22  for purchase?

23          And it looks like there's a link included below.

24  Q   And what's the date of this purchase?

25  A   The date of this email?

FBI SA COY DAVIS - DIRECT BY MR. BODNAR

1  Q   I'm sorry.  The date of this email; correct.

2  A   November 21st, 2013.

3  Q   And through the course of your investigation have you

4  learned who NV..... is?

5  A   A friend of Dr. Ruan's.

6  Q   And to put in perspective this date, you said this is what,

7  November 21st?

8  A   November 21st, 2013.

9  Q   Was this email sent -- looking at Exhibit 11-4 again -- was

10  that email sent before or after the doctors began purchasing

11  the Galena stock?

12  A   Before.

13  Q   And is that the first page of Dr. Couch on the 27th?

14  A   Correct.

15  Q   On that same date, November 21st, was there a followup

16  email from NV..... to Dr. Ruan?

17  A   I'm not sure of the date, but I know there was a followup

18  email.

19  Q   I'm going to show you what's been marked as Exhibit

20  11-5(2).  Is this the followup email?

21  A   Correct.

22  Q   Is that the same date?

23  A   It is.

24  Q   And what is NV..... responding to Dr. Ruan?

25  A   She says:  Honey, that is a good article.  Here is some

561

1  analysis about Galena in the past two weeks.

2          It looks likes there's a link included here.  It says:

3  The advice is not to buy now, wait for the dip.  N....

4  Q   Again, this is in late November 2013?

5  A   Correct.

6  Q   I'm going to show you what's previously been admitted as

7  Government's Exhibit 10-19, a chart showing Abstral

8  prescriptions in micrograms per month.  And did you previously

9  tell us that Galena Biopharma makes Abstral?

10 A   Correct.

11 Q   Can you draw a line on this chart -- you can write right on

12 your screen -- of where November 2013 is compared on this

13 chart?

14 A   (Indicating.)

15 Q   Thank you.  Were there additional emails between NV.....

16 and Dr. Ruan -- actually I want to show you now what's been

17 marked as Government's Exhibit 11-5(3).  And is this an email

18 from Dr. Ruan to an individual named Chris Lento?

19 A   That's correct, with other people included.

20 Q   And did Dr. Ruan include a forwarded email Chris Lento had

21 sent to him?

22 A   That's correct.

23 Q   Let's start first with the email from April 22nd to Chris

24 Lento to Dr. Ruan.  And do you know who Chris Lento is?

25 A   Yes.  He's one of the VPs for Galena Biopharma.

1   Q   And can you tell me or read that email to Dr. Ruan, please?

2   A   Sure.  Subject is Galena Biopharma/Abstral Relaunch.

3        Dr. Ruan:  I hope all is well.  I am writing to

4   introduce myself and Galena Biopharma to you and your

5   practice.  I recently joined Galena to head up their commercial

6   operations team.  As you may be aware, Galena recently acquired

7   (press release below) the U.S. promotional rights to Abstral

8   (sublingual fentanyl) from Prostrakan.  We will begin marketing

9   and promoting the product to healthcare professionals in the

10  very near future.  I understand that you have prescribed

11  Abstral for your patients in the past and appreciate your

12  support of the brand.  I will be attending the American Pain

13  Society meeting in New Orleans in early May.  Will you be

14  attending the conference?  If so, I would welcome the chance to

15  meet in person.  Galena will be sponsoring a breakfast on

16  the a.m. of the 9th.  If you are available, I can share the

17  details with you.  Please let me know if you will be there and

18  we can coordinate a time to speak.

19  Q   And what is the date on this email from Chris Lento to

20  Dr. Ruan, please?

21  A   April 22nd, 2013.

22  Q   And did he mention there that Dr. Raun has prescribed

23  Abstral to his patients in the past?  (Indicating.)

24  A   He does.

25  Q   And again looking at what's been admitted as Government's

FBI SA COX-DAVIS - DIRECT BY MR. BODNAR

1  Exhibit 10-19, for April of 2013, when that email from Chris

2  Lento was, can you show us where April 2013 is?

3  A    (Indicating.)

4  Q    And you mentioned before that Dr. Ruan responded to this

5  email to Chris Lento.  And what does he say?  Well, first, how

6  much later?  This email is when?

7  A    April 22nd, 2013.

8  Q    And when does Dr. Ruan respond to that?

9  A    December 5th, 2013.

10 Q    And what does Dr. Ruan state to Chris Lento?

11 A    Hi, Chris, this is the initial email you sent me back in

12 April, before Galena started promoting Abstral.  In a little

13 over six months, Abstral has begun to take a significant role

14 as one of the unique transmucosal fentanyl formulations in

15 offering patients with severe breakthrough pain.  I am very

16 excited about the opportunity to be involved with Galena at the

17 highest advisory/consultatory level, as we discussed in our

18 previous conversations.  Have a great rest of the week.  Xiulu

19 Ruan, MD.

20 Q    I'm going to show you now what's been marked as Government

21 Exhibit 11-5(4).  Can you please identify who this email is to

22 and from?

23 A    It's from NV..... to Dr. Ruan, with the subject:  Threshold

24 Insider Trading Policy.

25 Q    And what is NV..... telling Dr. Ruan?

FBI SA COY DAVIS - DIRECT BY MR. BODNAR

1   A   It says:  Honey, I could not find Galena insider trading

2   policy.  However, I found the insider trading policy for

3   Threshold Pharma.  I think these policies should bear

4   similarity.  Advisory board members are considered insiders and

5   are not allowed to short sale.

6            There's a link included.

7   Q   And what is the date on here?

8   A   January 17th, 2014.

9   Q   Was there another email on January 17th, 2014, which has

10   previously been admitted as Government's Exhibit 11-5(5)?  Is

11   that that same date?

12   A   Correct.

13   Q   And this time is this email from Dr. Ruan?

14   A   It's from Dr. Ruan to Dr. Couch.

15   Q   And what is the subject line?

16   A   Avoid to be Considered Inside Trader.

17   Q   And what is Dr. Ruan telling Dr. Couch?

18   A   It says:  Hi, Pat.  We have to be careful with our way of

19   buy/sell Galena stock.  We both use the drug in the clinic.  We

20   should be more careful with buying/selling them as others may

21   perceive us inside trader.  Do you --

22   Q   Is there a glare?

23   A   Do you think there are any issues?  Xiulu.

24            Looks like there's a link in there as well.

25   Q   And you said what date are these two emails about insider

1  trading on?

2  A   January 17th, 2014.

3  Q   I'm going to show you what has been admitted as

4  Government's Exhibit 11-4.  Can you see if there were any

5  purchases made by the doctors on January 17th, 2014?

6  A   There were purchases made by both doctors.

7  Q   Is that right here?  (Indicating.)

8  A   Correct.

9  Q   And how much was purchased by Dr. Ruan?

10 A   $197,930.90.

11 Q   For how many shares?

12 A   28,500.

13 Q   And for Dr. Couch, how much did he purchase on that date?

14 A   $134,154.97.

15 Q   And for how many shares?

16 A   18,500.

17 Q   He also notes in here:  We both use drugs in the clinic; is

18 that correct?

19 A   Correct.

20 Q   I'm going to show you again what's been admitted as

21 Government's Exhibit 10-19.  Can you show the jury where

22 January of 2014 is on this chart?

23 A   (Indicating.)

24 Q   I'm now showing you what's been marked as Government's

25 Exhibit 10-5(6), and is this an email from the following day,

FBI SA COY DAVIS - DIRECT BY MR. BODNAR

1   January 18th?

2   A    Correct.

3   Q    And does it start first with an email from Dr. Ruan to

4   Dr. Couch?

5   A    Correct.

6   Q    And then a response from Dr. Couch to Dr. Ruan?

7   A    Right.

8   Q    Looks likes Dr. Ruan included some hyperlinks?

9   A    Correct.

10  Q    What does Dr. Ruan first say to Dr. Couch?

11  A    Pat, I am reconsidering whether I should go to the next

12  weekend's Galena advisory board meeting.  I am concerned that

13  once I am involved with them at that level, then I am

14  considered insider and subjecting myself to more restrictions

15  and regulations, et cetera.  What do you think?  Remember

16  Martha Stewart went to jail for six months after avoiding

17  $46,000 loss in stock, as we both have purchased a good number

18  of stocks and plan to sell quick on the side.  It will save me

19  a lot of worries if I am not involved with the company as their

20  advisory board member so that I know no more than the general

21  public.  I will check with my attorney Tom Galloway for his

22  advice.  You may ask Boe's opinion on this, too.  I just want

23  to make sure neither us or PPSA gets involved in a bad way.

24  Maybe I am paranoid.  But since we have both purchased some

25  stocks and we use their products more than others -- so I am

1    waiting for Tom to give me his opinion on this before I made my

2    final decision whether I will go or not.  Just a few links

3    below regarding this issue.  Have a great weekend.  Xiulu.

4    Q    Is that at 12:57 on the 18th?

5    A    Right.

6    Q    And is Dr. Couch's response above that?

7    A    It says:  Xiulu, I don't think it will be an issue, because

8    we are not on business board or in executive positions.  We

9    don't have any access to insider information more than anyone

10   else does in the public.  Also, we purchased our stock before

11   we became involved with the advisory board.

12   Q    I'm now showing you what's been marked as Government's

13   Exhibit -- admitted as Government's Exhibit 11-5(7).  Is this

14   an email two days later from Dr. Ruan to Chris Lento?

15   A    Correct.

16   Q    I want to take it out of the sleeve so we don't have a

17   glare.  Please tell us what Dr. Ruan's telling Chris Lento?

18   A    The Subject is Advisory Board Meeting.  Hi, Chris, it seems

19   that I will not be able to make this weekend's advisory board

20   meeting.  The reason is:  I recently purchased some stocks from

21   Galena online.  Now if I get involved with the company at

22   advisory board level, then I will be considered insider; right?

23   If so there will be a lot of restrictions and regulations on

24   how these stocks can be traded.  Also, there may be some legal

25   trouble once I know more about the company and who owns

568

```
 1    stocks.  At the current level I know no more than the general
 2    public, therefore there is no risk for me to trade the stocks I
 3    purchased.  I have sent some information to my lawyer to find
 4    out the legality of this while owning stocks and participating
 5    -- the board meeting.  He has not emailed me yet.  So I figured
 6    I just want to let you know.  Hope everything is well and hope
 7    you all have a successful meeting this weekend.  I have not
 8    signed the agreement yet with Galena, so I am not an
 9    insider.  Have a great weekend.  Xiulu Ruan, MD.
10    Q    That's on the 20th?
11    A    Correct.
12    Q    Later that same date does Dr. Ruan receive an email from
13    NV..... which is marked as Government's Exhibit 11-5(8)?
14    A    Scroll up to the top to see the date.
15    Q    (Complying.)
16    A    Right.  NV..... sent Dr. Ruan and Tom Galloway an email on
17    Monday, January 20th, 2014.
18    Q    Same date as the previous exhibit --
19    A    Correct.
20    Q    -- that I showed you?
21    A    Right.
22    Q    And what is NV..... writing to Tom Galloway and Dr. Ruan?
23    A    The subject summarizes it pretty well actually:  My
24    concerns about trading as advisory board member.
25    Q    And just so there's not a glare on it, what does she say?
```

1   A   It says:  Dear Tom, thank you for helping Xiulu.  I have a

2   few concerns about him being an advisory board member and does

3   swing trade.  I read a document on Insider Trading Under

4   Security Law.  Find some information.

5   Q   And does that appear to be information that's included down

6   here?

7   A   Right.  It looks like she made a comment there:  By this

8   definition, an advisory board member is an outsider

9   professional advisor.  Thus, Xiulu could be considered an

10  insider.

11  Q   Does she go on to appear to list more things from what she

12  said?

13  A   Correct.

14  Q   Now I'm going to show you what has been admitted as

15  Government's Exhibit 11-5 -- 11-5(9).  And this email appears

16  to look a little bit different than the previous ones that we

17  have looked at.  In fact, it's got a line along the bottom,

18  doesn't it?

19  A   Correct.

20  Q   The previous emails that we've looked at, 11-5(1) through

21  (8), whose search warrant did those come from?

22  A   Dr. Ruan's.

23  Q   Whose search warrant did this particular document come

24  from?

25  A   Dr. Couch's.

FBI SA COY DAVIS - DIRECT BY MR. BODNAR
570

1   Q    In fact, for the rest of the exhibits 11-5(10) through

2   11-5(17), did all the rest also come from Dr. Ruan's search

3   warrant?

4   A    Correct.

5   Q    This is the only one that came from Dr. Couch's?

6   A    Correct.

7   Q    Okay.  Do we have here first an email from Dr. Ruan to

8   Dr. Couch?

9   A    Right.  It's dated February 2nd, 2014.  It says:  Pat,

10  these are the link [sic] to the comments to the article of "red

11  flags."  When I read about the history of Insys, considering

12  their initial IPO on May 7, 2013, at $8, and within seven

13  months it hit $60, despite the subpoena by inspector general, I

14  believe Galena has much better chance of hitting much higher.

15  So I will hold mine for at least a year, giving it three-

16  quarters to grow.  It certainly has a chance to be close to

17  Insys in terms of market share.

18  Q    I want to stop you there for a second.  Based on your

19  involvement in this case, do you know who Insys is that he is

20  referring to?

21  A    I do.

22  Q    And what is Insys?

23  A    They are also a pharmaceutical company.

24  Q    And are they more properly known as Insys Therapeutics?

25  A    Correct.

1  Q   Do you know what products Insys Therapeutics was making at
2  this time?
3  A   They're making two products at this time; one was a nausea
4  vomiting medicine and the other was a fentanyl-based product
5  used for cancer breakthrough pain as well.
6  Q   And do you know the name of that fentanyl cancer
7  breakthrough pain medicine that Insys was making?
8  a   It was called Subsys.
9  Q   And do you know if Subsys and Abstral are competitor
10 products?
11 A   Well, they are both fentanyl based products used for
12 breakthrough cancer pain, so I would -- I would say yes.
13 Q   And going on further, then, the second paragraph down, what
14 does Dr. Ruan say?
15 A   Also considering I have lost millions on real estate, I
16 could afford to lose all mine in this, but there is a good
17 chance that it will bring the most.  I like the chances.  I
18 will wait till I see at least three-quarters.  This is the
19 product we can play a big role.  I am sure we can with Zogenix,
20 but not in this dominant fashion as many other providers can do
21 the same, but with Abstral.
22 Q   I'm going to stop you there.  During the course of your
23 investigation, have you learned what Zogenix is?
24 A   They're also a pharmaceutical company.
25 Q   Do you know what if any products Zogenix was making at that

1    time?

2    A    I know they were making Zohydro, which is a pure

3    hydrocodone pill.

4    Q    Do you see where he says:  I'm sure we can with Zogenix,

5    but not in this dominant fashion -- discussing Abstral?

6    A    Correct.

7    Q    What is the date of that email?

8    A    February 2nd, 2014.

9    Q    And again, on what's previously been admitted as

10   Government's Exhibit 10-19, can you show the jury on this

11   Abstral chart where February 2014 is?

12   A    (Indicating.)

13   Q    Does Dr. Couch then respond to Dr. Ruan?

14   A    I believe so.  It's a response, he says:  Yes, I agree, and

15   also I read the comments yesterday.  Interesting.

16   Q    And although it doesn't have a header on top, you said this

17   did come from Dr. Ruan's -- I'm sorry -- Dr. Couch's search

18   warrant?

19   A    Correct.

20   Q    Four days later, on February 6th, 2014, does Dr. Ruan send

21   an email to an individual named Dr. LM..., which is marked as

22   Government's Exhibit 11-5(10)?

23   A    Correct.

24   Q    Do we have first an email from Dr. Ruan to LM... at the

25   bottom and then Dr. LM...'s response up top?

1  A   That's right.

2  Q   Looking first at the email that Dr. Ruan sent -- I may have

3  to zoom out a little bit to get it all on there -- can you

4  please tell us what Dr. Ruan said to Dr. LM... on February 6th?

5  A   It says:  Hi, Dr. M., thanks for the concern!  It has been

6  a while since the last email.  I has [sic] wanted to contact

7  you a while ago, but a little bit of unsure.  The only thing

8  new is that I have, for the first time in life, am a real stock

9  owner.  I used to be very proud of myself, a gambler by nature,

10 had never purchased a single share of stock after living in

11 U.S. for over two decades, talking about the determination to

12 resist any distraction.  But that record was gone.  Let me

13 explain to you why.  Last year when Insys offered their IPO, it

14 was around $8.  I was hoping --

15 Q   Let me stop you right there for a second.  Can you identify

16 what is an IPO, if you know, for the jury?

17 A   It's the first time a company offers stock to the public.

18 Q   And what does IPO stand for?

19 A   Initial public offering.

20 Q   That's the very first time an individual has an opportunity

21 to buy stock in a company, is the IPO?

22 A   Public stock.

23 Q   Public stock.  So -- sorry.  Last year when Insys offered

24 their IPO --

25 A   It was around $8.  I was hoping the company could offer me

574

1    some stock to compensate my time and idea.  [Sic.]  I was at

2    their very first advisory board meeting back in December 2012

3    before they got the FDA approval in spring 2013.  And I have

4    been their national speaker since.  But I did not ask them for

5    any stock (as I did not feel appropriate) and they did not

6    offer to give me either.  So I also felt that may be it was not

7    ethical to own its stock and meanwhile be its speaker and user.

8    Anyway, in less than seven months their stock price climbed

9    from $8 to $60, despite some whistle blower reported the

10   company promoted Subsys off label, and inspector general had

11   subpoenaed them in January.  Their stock is still around $50.

12   Q    Now I want to stop you for a second there.  What is

13   Dr. Ruan telling Dr. M. happened to Insys recently in time to

14   this email?

15   A    They got investigated by the inspector general.

16   Q    For what?

17   A    Promoting Subsys off label.

18   Q    And does Dr. Ruan's email to Dr. M. continue on the second

19   page?

20   A    It does.  It says:  I see Galena as the next Insys as it

21   has better pipeline product, as it seems.  I see Galena a

22   serious competitor in stealing the transmucosal fentanyl

23   product very soon, let alone its other pipeline products.

24   After careful consideration, I decided to invest into this

25   single stock, hopefully will help me generate enough profit to

1  pay for my divorce settlement.  So far I've invested into this

2  stock as much as I have invested into -- redacted -- in less

3  than a month.  All I can do now is hoping I am correct and that

4  it is going to skyrocket like Insys in a few months.  Wish me

5  luck!  I will be at Orlando for a speaker training tomorrow

6  evening and return on Saturday evening.  How far are you from

7  Orlando?  Any chance we could meet there?  Thanks again for

8  your concern.

9  Q   Now I want to focus you up here to this part here.  I see

10 Galena a serious competitor in stealing the transmucosal

11 fentanyl product very soon.

12         You said that Insys had a couple of products.  Did

13 they have one that was a transmucosal fentanyl product?

14 A   I knew it was a fentanyl-based product called Subsys.

15 Q   And what is the fentanyl-based product, that Abstral he's

16 talking about, possibly stealing from the competitor?

17 A   Well, Galena has Abstral.

18 Q   Galena has Abstral.

19 A   Yeah.

20 Q   That's what I meant.  And then does Dr. LM... respond to

21 Dr. Ruan?

22 A   Correct.

23 Q   Up here?  (Indicating.)

24 A   Right.  Dr. Ruan, good to hear from you.  I do hope the

25 stock will fly and, will include that in my prayer!  [Sic.]

576

1   Q   Now, this was on February 6, 2014?

2   A   Right.

3   Q   On February 7th, 2014 -- 17th, 2014, was there another

4   series of email between Dr. Ruan and Dr. LM... which had

5   previously been admitted as Government's Exhibit 11-5(11)?

6   A   Correct.

7   Q   I'll take it out so it doesn't have the glare.  And is this

8   Dr. M.'s response here, and the initial email down here from

9   Dr. Ruan?

10  A   Right.  I believe there was one below that as well.

11  Q   Is this the first one in the chain, then?  (Indicating.)

12  A   I believe so.

13  Q   Could you please -- and this is from Xiulu Ruan?

14  A   Correct.

15  Q   Could you please read what Dr. Ruan wrote to Dr. M. in this

16  first email?

17  A   Dr. M., when Insys stock came on the market some eight

18  months ago I was told to buy them.  But I never felt it could

19  go up, as I think their way of selling is too aggressive.  But

20  in less than eight months they jumped to $60 despite there is

21  litigation and mass lawsuit, et cetera.  I think Galena should

22  do at least the same, if not better.  As I see no issue with

23  product of Abstral being number one branded transmucosal

24  fentanyl in Europe, plus the upcoming cancer vaccine, et

25  cetera, I think Abstral has much more potential and it is

1    really cheap now.

2    Q    And I want to stop you there for one second.  Does he raise

3    concern about Insys, the way that Insys goes about selling

4    their product?

5    A    Right.  It says they are too aggressive.

6    Q    And do you recall in a previous email where Dr. Ruan is

7    explaining that he is a national speaker for Insys?

8    A    Right.

9    Q    Please go forward.  I think you left off:  I saw.

10   A    I saw all the negative reports, et cetera.  But with such a

11   good example like Insys, realizing there is no issue with the

12   product Abstral, plus there is good potential down the road, I

13   think it is worth the risk.  If I fail with this one, then

14   there is no stock I should do.  So I want to give it a try.  I

15   am holding them for 1 and a half years, give Galena enough time

16   to eat the market share from Insys, as I believe it will.  Then

17   I will decide whether I will hold till the result of cancer

18   vaccine, et cetera.

19   Q    Now I want to stop you right there.  What is he saying he

20   wants to do here in this next 1.5 years with his Galena stock?

21   A    He says:  I want to hold it for one and a half years to

22   give Galena enough time to eat the market share from Insys.  So

23   to give Galena's product, Abstral, time to eat the market share

24   from Insys.

25   Q    Again, is this still in February of 2014?

1    A    Correct.

2    Q    And showing you again what's been admitted as Government's

3    Exhibit 10-19, the Abstral chart --

4    A    Right.

5    Q    -- are we still in this time period right here, February of

6    '14?

7    A    Correct.

8    Q    Does he talk about after the year and a half deciding

9    whether to hold till the result of the cancer vaccine?

10    A    Right.  It says:  Then I will decide whether I will hold

11    till the result of cancer vaccine, et cetera.

12    Q    Continue on.

13    A    Considering I have lost lots of money on real estate, I

14    will give it a try on stock and, whether winning or losing, I

15    have given it a try.  I do believe this one has the best chance

16    of success based on what I see from Insys -- especially Insys

17    is under investigation.

18    Q    I stop you there again.  Does he seem to know as of

19    February 17th of 2014 that Insys is under investigation?

20    A    Sure.

21    Q    Could you finish that all, please?

22    A    I refused to speak for them and I refused to be on their

23    advisory board, so that I will not be scrutinized.  They

24    invited me for that.  I told them, I don't want to know more

25    than the general public does as I don't want to get in trouble

1  down the road.  I have a speaker event this evening.  Take

2  care.  SC.

3  Q   You had mentioned that there is another email in this chain

4  from Dr. Ruan to Dr. M. also on the 17th?

5  A   Right.

6  Q   Is that what we see right here?  (Indicating.)

7  A   Right.  It says:  Dr. M., I believe it is a good time to

8  get in as now the price is really low.  Based on the report of

9  -- from its parent company till December 2013 (report was

10 published in Yahoo News online, nothing internal, see link

11 below), they have already taken more than five percent market

12 share in a very short time, which I do not doubt as they have

13 good promotional program and it is easy to use and store and

14 plus Insys has been under federal investigation.  Considering

15 they just started to see the product in October, my

16 prescriptions from my clinic started in mid-November.  I had

17 previously used it about two years ago and my patients gave

18 some positive feedback.  My guess is --

19 Q   I'll stop you there for a second.

20         Is what Dr. Ruan is saying there, that they previous

21 used it in the clinic starting in mid-November, does that

22 appear to be what's reflected on this chart?  That it had been

23 used prior to November and then they use it in November

24 forward?

25 A   They did start using around October-November.  What was the

1    other question?

2    Q    And does this chart appear to show that there were minor

3    usages of it before November of '13?

4    A    Sure.  Just minor.

5    Q    Continue on, please, after mid-November.

6    A    I had previously used it about two years ago and my

7    patients gave some positive feedback.  My guess is they will

8    have a substantial market share growth at the end of March, and

9    I also expect to see a substantial market share drop from

10   Insys, not only because of ongoing federal investigation, but

11   also because Galena started their sale campaign.  Their first

12   advisory board meeting was at the end of January (which I

13   refused to attend), but they have connected other physicians

14   who have experience using transmucosal fentanyl like my

15   partner.  My personal belief is that there will be a major

16   market share taking over which may drive the stock up as well

17   as generating enough cash to support their R&D on the cancer

18   vaccine.

19   Q    I want to stop you there for a second.  What is Dr. Raun

20   telling Dr. M. might be something that drives the price of the

21   stock up?

22   A    That Galena will be taking over market share from Insys.

23   Q    And could you help explain to the jury what does it means,

24   taking over a market share?

25   A    If two -- like if two products are competing, like Gatorade

FBI SA COY DAVIS - DIRECT BY MR. BODNAR

1   and Powerade and they compete in the same market.  If Gatorade

2   starts to having more sales, I guess you would assume that

3   Powerade would start having less sales.

4   Q   And did you previously tell us that Subsys and Abstral are

5   in the same market?

6   A   They offer a similar product for the same purpose.

7   Q   Okay.  Continue on, please.  I do believe you left off at:

8   However.

9   A   However, this is just my guessing/hypothesis based on my

10  own experience (which is sparse).  I am hopeful for it because

11  I have seen what Insys has done.  However, you know I am always

12  overoptimistic.

13          And there's a link included.

14  Q   Now I'm going to show you what has been marked and admitted

15  as Government's Exhibit 11-5(12).  Is this an email from

16  Dr. Ruan to a grouping of other people on March 7th, 2014?

17  A   Correct.

18  Q   And did he attach an article below his email?

19  A   Correct.

20  Q   What is the name of that article?

21  A   Is Galena Following in the Footsteps of Insys with Abstral?

22  Q   And who did Dr. Ruan send this email to?

23  A   LM..., SW....., last name G..., Joan Ruan, Justin Palmer.

24  Q   And what is the subject line here?

25  A   Interesting Paper on Comparing Galena with Insys.

582

1  Q   And what is it that Dr. Ruan says to those individuals on

2  this email?

3  A   Hi, guys, this is a very interesting paper and quite

4  accurate one except for one thing, the Insys CEO/chairman of

5  the board is a wise businessman while the CEO of Galena is like

6  a despicable thief.  Yesterday, I decided to contact the board

7  of directors of Galena and ask them to fire their CEO, the guy

8  who did so much damage to this company and threw the company

9  into toilet with what he did.  They will get back to me next

10  week.  I believe once the CEO is replaced with a businessman

11  with insight and team morale and ethic, the confidence of

12  shareholders will build up again and the stock will follow the

13  course of Insys.  I have zero confidence in this guy (CEO) and

14  I wonder how can he still lead this company after he single

15  handedly trashed the confidence of all others with his

16  conduct.  Hope you all have a great weekend.  Xiulu.

17  Q   So what does Dr. Ruan appear to be upset about here?

18  A   He's upset about the executives of Galena.

19  Q   And specifically what is he claiming the executives of

20  Galena did or didn't do?

21  A   (No response.)

22  Q   Does he appear to be upset about what happened with the CEO

23  related to the stock price of Galena?

24  A   Yeah.  He says:  I believe once the CEO is replaced with a

25  businessman of insight and team morale and ethic, the

1    confidence of shareholders will build up again and the stock

2    will follow the course of Insys.

3    Q   And Dr. Ruan's saying that he called the board of directors

4    to have the CEO fired?

5    A   Correct.

6    Q   And that's on March 7th?

7    A   Right.

8    Q   Now, I'm going to show you what has been admitted as

9    Government's Exhibit 11-5(13) and ask you is this an email from

10   Dr. Raun.  I'll show you the number, 11-5(13).  Is this an

11   email from Dr. Ruan to Dr. R..?

12   A   Correct.  It reads:  Hi, Dr. R.., it was very nice talking

13   to you.  I am forwarding the email exchanges from me and Remy

14   (VP Marketing and Communications of Galena).

15   Q   Now I'll stop you there for a second.  Does it appear that

16   the Remy, then, he's talking about is the the VP at Galena?

17   A   Correct.

18   Q   And VP stands for what?

19   A   Vice president.

20   Q   Go on, please.

21   A   The discussion is scheduled to take place next Thursday at

22   5 p.m. Central time, there is a dial-in number you can call

23   in.  My partner Dr. Couch and I will be calling them together

24   in my office.  We will speak to the board of director who has

25   not sold his share, a few other board of directors also sold

1  theirs too.  The purpose of this talk is to express our opinion

2  to push them to replace their CEO (they don't have to let him

3  go, he can still stay within the company as some kind of

4  speaker, but not as CEO, they may need his knowledge and

5  experience in the cancer vaccine, et cetera, the least is they

6  should replace him temporarily, say for a year or so, then if

7  the stock recovers, they may use him later on) and they should

8  make some needed policy changes for -- restrict insider trader.

9  Q   Stop you there again.  Does he appear to be angry about the

10  stock price of Galena?

11  A   Yeah, and that the executives are doing insider trading.

12  Q   And can you continue on, then, from since you?

13  A   Since you, Dr. Couch, and I are all shareholders of the --

14  and together we represent a very significant portion of their

15  business, we have a much better chance of making it if -- team

16  up together in getting this done.

17  Q   And just to be clear, when he says "since you," that's from

18  Dr. Ruan; correct?

19  A   Correct.

20  Q   To Dr. Couch?

21  A   Right.

22  Q   And "I," referring to Dr. Ruan?

23  A   Right.

24  Q   Are all shareholders and we know, at least -- you know that

25  at least Dr. Couch and Dr. Ruan are in fact shareholders;

1    correct?

2    A    Right.

3    Q    And then he says:  Together we represent a very significant

4    portion of their business.  Is that what he says?

5    A    That's what he says.

6    Q    Why does he say it's important that we're all shareholders

7    and represent a very significant portion of Galena's business?

8         MR. KNIZLEY:  Your Honor, I object as to what his

9    mental operation was.  What the document says is certainly

10   admissible.

11        THE COURT:  Sustained.

12   BY MR. BODNAR:

13   Q    We'll move on to the further part down here, starting with:

14   Performance.

15   A    The performance the first quarter of 2014 is critical and

16   we have two weeks to go!  However, the Galena stock will still

17   be bumpy even if the last quarter 2013 may turn out to be a

18   positive one, but it will have only a transient stimulating

19   effect -- because it will quickly be buried by the

20   doubt/fear/frustration caused by their CEO and some of the

21   board or directors inside selling, and dozens of self-inflicted

22   lawsuits.  Changing their CEO will play a big role in restoring

23   the trust and confidence of the public to this company, to show

24   the public they have -- they have placed an individual who

25   knows about business and how it is done as a publicly traded

1  company and those who messed up should be held accountable.  I

2  will email Remy to tell her that we have been in contact and

3  spent a lot of time discussing this, and that you may join us

4  at the conference.  If you cannot make it, I will tell them it

5  is our team decision from us, although many other of our

6  colleagues feel the same way, we want to contain the

7  information of the meeting to the three of us.  As you know

8  very well they know who we are.  We also need to give them the

9  impression that if we do not -- if they do not do it, we will

10  switch to other companies and its products altogether (I will

11  use -- express this in an indirect way, but enough for them to

12  understand what we will do if they don't do it).

13  Q   So what is he talking about here?  What is Dr. Ruan saying

14  that they are going to suggest to Galena on this conference

15  call?

16       MR. KNIZLEY:  Your Honor, again I object.  Whatever

17  Dr. Ruan says is in the document.

18       THE COURT:  Sustained.

19  BY MR. BODNAR:

20  Q   And does he finish up with a final greeting?

21  A   Right.  I hope you have a great weekend, Xiulu.

22  Q   I now show you -- and that was March 16th, 2014?

23  A   Right.

24  Q   Now I'm going to show you what has been marked as

25  Government's Exhibit 11-5(14).  And is this an email from the

1   following day, March 17th?  There's the number (indicating).

2   And is this an email from the following day, March 17th?

3   A   Yeah, March 17th from Xiulu Ruan to Remy,

4   rBernarda@galenabiopharma.com.

5   Q   And from the previous email, who did you tell us that Remy

6   appears to be?

7   A   Well, Dr. Ruan in his email said that Remy was a VP in

8   marketing and communications of Galena.

9   Q   So is this an email now to Remy?

10  A   Correct.

11  Q   And who is cc'd on this email from Dr. Ruan to Remy?

12  A   Dr. Couch, jjrho4666@gmail.com.

13  Q   Does it have an email for Dr. R..?  Is that Dr. R..'s

14  email?

15  A   Right, right.  Dr. R.. and Chris Lento.

16  Q   And you previously told us, who is Chris Lento?

17  A   Vice president of commercial -- at Galena Biopharma.

18  Q   Okay.  And what is Dr. Ruan telling to Remy here?

19  A   Remy, hope you have had a good weekend.  I have had quite a

20  few conversations with a few physicians who have all invested

21  in your company.  Dr. JR......., a good friend of mine who is

22  an interventional pain specialist in California and also a

23  strong believer in Abstral and an expert in TIRF, is interested

24  in joining the conference on Thursday with you and your board

25  of directors.  I believe he should be of [sic] no stranger to

 1   your Abstral sales team, even if you may not know him.  As a

 2   matter of fact, he has shared with me many positive feedbacks

 3   from using Abstral since last fall.  Just like Dr. Couch and I,

 4   Dr. R.. also believes in Galena's product and its pipeline, and

 5   therefore a shareholder as well.  I had lengthy discussion with

 6   Dr. R.. and Dr. Couch this weekend.  We feel that if -- we feel

 7   that it will be very beneficial if we could attend this

 8   conference together, have an honest discussion with the board

 9   of directors of Galena, to express our feeling, concerns,

10   opinions/recommendations, as we are not only shareholders, but

11   also your clients, and customers to some extent.  I hope that

12   is okay with you and your board of directors.  Thank you very

13   much for your kind help!  Xiulu Ruan, MD.

14   Q    Now I'm going to show you what has been marked as

15   Government's Exhibit 11-5(15).  And is this an email from the

16   following day, March 18th, 2014?

17   A    Correct.

18   Q    I'll take it out to take off the glare.

19            What does it say up top?

20   A    It's an email from Xiulu Ruan and it's to a number of

21   people -- LM..., last name G..., NV....., Joan Ruan, SW.....,

22   SR........., TC......, Bryan Crawford, mcconaghy.dan@gmail.com,

23   Justin Palmer, and Sunilpan --

24   Q    Sunilpan2000?

25   A    @Yahoo.com.

1    Q    Read this email, what it says.

2    A    Sure.  The subject is a forward:  GALE:  Galena:  A Good

3    Investment Gone Bad.  Hi, guys, it is so painful to see how --

4    Galena becoming such a mess in such a short time!  We have all

5    become victims of Galena's massive, horrendous inside trading.

6    I feel so sorry as some of you first heard about Galena from

7    me.  I agree to the author of the article.  I made the same

8    mistake as the author.  Dr. Couch, Dr. R.., and I have

9    scheduled open dialogue this Thursday afternoon with Galena

10   board of directors.  Our initial plan was to ask for Galena's

11   board of directors to replace its CEO or ask him to step down,

12   plus to ask them to change the board of directors as

13   well.  However, some of you have concern that the instability

14   of the executive team could hurt its stock even worse.  Plus,

15   they announced SEC investigation yesterday.  Some of you feel

16   that if SEC finds them guilty, they will be down automatically.

17   So there is no need to put more pressure on them.  But I

18   believe we need to put pressure on them asking for the change

19   of executives of board of directors.  I believe the author of

20   the article feels the same way.  So I would like to hear your

21   input before Thursday afternoon when the talk is scheduled to

22   take place.  Once again, I am very sorry for involving you in

23   such a mess.  I am 100 percent confident in its product and its

24   pipeline potential, but have zero confidence in its executive

25   team and board of directors!  Please read the following article

1    and share your thoughts!

2    Q    And the date of this email is?

3    A    March 18th, 2014.

4    Q    And look down here at the bottom.  It says he's a hundred

5    percent confident in its product; correct?

6    A    Right.

7    Q    As well as its pipeline; correct?

8    A    Right.

9    Q    But has zero confidence in the executive team?

10   A    Correct.

11   Q    I show you again what's been admitted as Government's

12   Exhibit 10-19.  This is the Abstral chart.  Do you see March

13   here, 2014?

14   A    Right.

15   Q    Can you see what happens following March of 2014, according

16   to this chart?

17   A    The Abstral prescribed by month in micrograms goes down.

18   Q    And does it appear to go down fairly significantly from

19   over 2.5 million down to under a million micrograms per month?

20   A    Correct.

21   Q    And yet Dr. Couch -- Dr. Ruan says he's a hundred percent

22   confident in the product, is that what he says?

23   A    That's what the email says.

24   Q    This same day is the second email sent out to a number of

25   individuals and that's marked as Government's Exhibit 11-5(16)

1    and it's the second email sent on the 18th?

2    A    It's from Dr. Ruan to a number of individuals.

3    Q    A number of individuals?  And what does Dr. Ruan say in

4    this email?  I'll zoom in so it's --

5    A    The subject is Criminals.  Guys, look at the inside selling

6    from Galena.  These guys are criminals!  We are not talking

7    about CEO, CFO, we are talking about everyone else on the board

8    of directors, from board chairman (SH..............) to the

9    rest of the directors.  It is like they were conducting some

10   type of trading competition or something!  This is insanity,

11   stupidity, greed by definition!  And believe it or not, this

12   SH.............. guy is a Harvard Law School graduate!  How

13   can fools like these be on the board of directors and authorize

14   its executive team to do this in cahoots with the board of

15   directors, which completely ruined the Galena stock, and expect

16   all other shareholders to swallow this?  They did this after

17   they paid $50,000 to an online company to write about Galena,

18   then sold their shares right at the end of the online article

19   promotion/propaganda when the stock of the price rose from

20   $2.70 to $7.70.  Xiulu.

21          And there's a link included.

22   Q    So again, does he appear to be angry about the stock price

23   here?

24   A    Right.  And the executives conducting insider trading.

25   Q    Finally, I'm going to show you what's been marked as

1  Government's Exhibit 11-5(17).  And is this a chain of emails

2  that appears first to be a response to an email we looked at

3  earlier from March 16th?

4  A   That's right.

5  Q   And March 17th is there a followup by Remy Bernarda to that

6  original March 16th email?

7  A   That's right.  It says:  Hi, Dr. Ruan, that sounds great

8  and we appreciate your support.  From Galena, you will be

9  speaking with our board member Bill Ashton, and his bio is

10  below.  I am traveling, but will try to join the call as well.

11  Dr. R.., here are the conference call details.

12  Q   And the received conference call details and a bio below

13  that?

14  A   That's right.

15  Q   This email from Dr. Ruan, was this on Monday, April 14th?

16  A   April 14th, 2014.

17  Q   To whom?

18  A   To Remy at Galena, and also copied on the email is

19  Dr. Couch.

20  Q   Does there appear two different email addresses for

21  Dr. Couch?

22  A   Two for Dr. Couch, Dr. R.., and Chris Lento.

23  Q   And what does this email say?

24  A   It says:  Hi, Remy, how are you?  It has been a while since

25  we last communicated.  I hope this email could you -- assuming

1  you have not left yet.  I don't even know where to start!  In

2  my life I have never seen something like this, when a truly

3  healthy, promising company (Galena), with unique pipeline and

4  solid FDA approved product, employees of good morale and

5  working ethics, has been totally ruined, not by natural

6  disaster, politicians, or competition, but by its own executive

7  officers and its board of directors, because of their blatant,

8  insatiable greed and selfishness!  To them, everything can be

9  sacrificed, as long as their pockets are filled up!  They don't

10  give a damn about other shareholders' interest, the market, the

11  public trust, the reputation of the company, their employees,

12  and their customers, and the patients!  What bothers everyone

13  is the fact that the supervising board of directors and its

14  executive officers created this mess in cahoots!  I agree with

15  many of the other shareholders that the executive team and

16  board of directors need to be replaced ASAP, as no one would

17  like to see Galena end up filing bankruptcy!  No one will

18  believe whatever your CEO or board of directors say or do!

19  Their presence with Galena will be enough to wipe out any

20  confidence/trust/hope from the public which is what's needed to

21  save Galena!  The only thing that may save the company is the

22  change in executive team and its board of directors!  This

23  needs to happen and nothing can replace!  No one can/will

24  develop any trust in them.

25  Q  Again, when is this email sent?

1  A  April 14th, 2014.

2  Q  And at this time, looking back at Government's Exhibit

3  10-19, April of 2014, is this red line, being that of

4  Dr. Ruan's -- let me redraw that -- does it appear to be

5  significantly lower than where his prescribing was several

6  months earlier?

7  A  In January, February, March and back to 2013, end of 2013.

8  Q  And does he here, April 14th, in this email appear to be

9  angry about the stocks and the decisions made at the company of

10  Galena Biopharma?

11  A  Correct.

12  Q  Does he say anything about angry or not liking the product,

13  Abstral?

14  A  No.

15      MR. BODNAR:  One moment, Your Honor.

16    (A discussion was held off the record between government's

17  counsel.)

18      MR. BODNAR:  Pass the witness.

19      THE COURT:  Mr. Doss?

20              CROSS EXAMINATION

21  BY MR. DOSS:

22  Q  Good afternoon, Agent Davis.

23  A  Good afternoon.

24  Q  My name is Jeff Doss.  I'm one of the attorneys

25  representing Dr. Couch in this case.  Now, on direct

595

1   examination you were shown what has been marked and admitted

2   Government's Exhibit 11-4.

3   A   Correct.

4   Q   And that's not the only chart that you prepared in

5   preparation for that chart; correct?  Do you recall preparing

6   another chart based on your review of Dr. Couch's E*Trade

7   account?

8   A   Correct.  There's charts that go underneath this that make

9   up these subtotals.

10          MR. DOSS:  May I approach the witness, Your Honor?

11          THE COURT:  Yes.

12  BY MR. DOSS:

13  Q   Agent Davis, I'm going to show you what we've marked for

14  identification purposes as Couch Exhibit 62.  If you wouldn't

15  mind taking a look at that and tell me if you recognize it?

16  A   I do.

17  Q   What is that, Agent Davis?

18  A   It's a schedule of -- it looks like all or at least more

19  stock transactions made by Dr. Couch.

20  Q   Was that chart prepared by you, Agent Davis?

21  A   Correct.

22  Q   And that was based on your review of what has been marked

23  as Government's Exhibit 11-3, which would include the

24  underlying statements for Dr. Couch's E*Trade account; is that

25  correct?

```
 1   A   Yes, sir; that's correct.
 2           MR. DOSS:  Your Honor, we move to admit Couch Exhibit
 3   62.  There is a portion of it of which Mr. Bodnar and I
 4   discussed that pertains to some stock unrelated to this case.
 5   We left it unredacted so that the witness can identify it.  But
 6   we would offer Couch Exhibit 62 with the last nine or so lines
 7   redacted on it.
 8           MR. BODNAR:  No objection, Your Honor.
 9           THE COURT:  All right.  Mark in the redacted copy.
10       (Defendant Couch Exhibit 62 was entered into evidence.)
11           MR. DOSS:  Thank you.
12   Q   Agent Davis, I'm going to show what we've now admitted as
13   Couch Exhibit 62.  All right.  Now, with Government's Exhibit
14   11-4 we have a purchase of November 27th, 2013, cost of
15   purchase $45,808.38, and shares purchased, 12,000 shares.  But
16   on November 27th, 2013, as I believe you testified on direct,
17   there was actually five separate purchases by Dr. Couch at five
18   separate prices and it totaled up to 12,000 shares; is that
19   correct?
20   A   Correct.
21   Q   And so on November 27th, 2013, Dr. Couch invested
22   $45,808.38 for 12,000 shares.  Now I want to focus your
23   attention to the account ending in 8497.  Do you see that there
24   are two separate accounts that he was buying and selling stock
25   out of?
```

1    A    I do.

2    Q    If you look down and focus just on the account ending in

3    8497, what is the next activity that you see in that account?

4    A    December 13th, 2013.

5    Q    What happened on December 13th?

6    A    12,000 shares were purchased.

7    Q    I think we may have skipped one.  Do you see one on

8    December 3rd, 2013, for that account 8497?

9    A    Oh, yes.  I apologize.  I do.

10   Q    What happened on December 3rd, 2013, Agent Davis?

11   A    Mr. Couch -- Dr. Couch sold 12,000 shares.

12   Q    Okay.  So on November 27th he bought 12,000 shares and on

13   December 3rd he sold 12,000 shares?

14   A    Correct.

15   Q    Okay.  Now, I believe you've already done the math on that

16   one.  On November 27th he purchased those shares for

17   $45,808.38; correct?

18   A    Yes, sir.

19   Q    How much did he sell those shares for?

20   A    47,989.17.

21   Q    All right.  Do you have a calculator in front of you?

22   A    I don't.

23        THE CLERK:  (Indicating.)

24   BY MR. DOSS:

25   Q    Okay.  Would you tell us if he made money or lost money on

1    that sale?

2    A    Do you mind putting the other one back up?

3    Q    Not at all.

4    A    He made money.

5    Q    And how much did he make?

6    A    2,180.79.

7    Q    Okay.  Now, if we look back at Couch Exhibit 62 and we

8    again focus on the account ending in 8497, what is the next

9    activity you see in that account?

10   A    That's December 13th, 2013.

11   Q    And what happened on December 13th, 2013?

12   A    Dr. Couch bought 12,000 shares of Galena stock for a total

13   of 47,769.99.

14   Q    Okay.  And would you agree with me, Agent Davis, that he

15   bought those 12,000 shares on December 13th, 2013, for about

16   the same amount of money that he received on December 3rd,

17   2013, when he sold 12,000 shares?

18   A    It's close, yes.

19   Q    Then $200?

20   A    Yes.

21   Q    Okay.  What is the next activity that you see in the

22   account ending 8497?

23   A    Dr. Couch sold 12,000 shares for $50,399.13.

24   Q    Okay.  When he sold those 12,000 shares did he make money

25   or lose money?

1   A   He made money.

2   Q   Would you mind doing the calculation for us?

3   A   Yes, sir.

4           $2,619.14.

5   Q   Okay.  Agent Davis, what's the next activity that you see

6   in the account ending 8497?

7   A   Dr. Couch bought 12,000 shares on December 19th, 2013.

8   Q   All right.  How much did he pay for those shares?

9   A   47,649.99 cents.

10  Q   And is that pretty close to the amount of money he received

11  on December 17th, 2013, when he sold 12,000 shares?

12  A   Yeah, about -- within $3,000 or so.

13  Q   Okay.  What's the next activity you see in the account

14  ending 8497?

15  A   December 26th, 2013, Dr. Couch sold 12,000 shares for

16  proceeds of $49,789.14.

17  Q   Did he make money or lose money on that?

18  A   He made about $2,000.

19  Q   And I'll represent to you that I've done the math and it

20  ends up being $2,139.15 that he made.  Do you agree with that

21  figure?

22  A   I trust your math.

23  Q   Thank you.  So from November 27th, 2013, through December

24  26, 2013, if I understand your testimony, Dr. Couch made

25  approximately $6,939.08; correct?

600

1   A   It sounds about right.  But again, I'd have to trust your

2   math.

3   Q   Sure.  So when we look back at Government's Exhibit 11-4,

4   which you prepared, that same time frame, November 27th --

5   admittedly, there is another account we haven't talked about

6   yet -- but from November 27th, through December 23rd, Dr. Couch

7   was not only buying stock, he was also selling it?

8   A   That's correct.

9   Q   And he was making a little bit of money off of the buys and

10  sells?

11  A   For that account.

12  Q   Sure.  Based on Couch Exhibit 62, we have a lot of detail

13  here.  And this was, if I understand correctly, was drawn

14  straight from the account statements?

15  A   Correct.

16  Q   We have a price listed in that column; correct?

17  A   Correct.

18  Q   Is that the price that the stock on that day at that

19  particular time was available for purchase on the open market?

20  A   It was the price of the buy or sell by Dr. Couch.

21  Q   Okay.  So if the activity is bought on 11/27/2013 and the

22  price is $3.8199 -- about 82 cents?

23  A   Sure.

24  Q   Does that mean that if Dr. Couch purchased it on the stock

25  market, that's how much it was per share?

1    A    Correct.  Yeah.

2    Q    Now, the activity date on Couch Exhibit 62 begins on 11/27

3    of 2013 and ends on April 24th, 2014; correct?

4    A    Correct.

5    Q    And is that the last account activity that you observed for

6    Dr. Couch's E*Trade account associated with his Galena

7    purchases and sales?

8    A    Correct.  Through the time period that I reviewed

9    statements.

10   Q    Okay.  On April 24th, 2014, do you see what the stock price

11   was?

12   A    I do.

13   Q    What was that?

14   A    1.77.

15   Q    That's quite a bit less than where it started; correct?

16   A    That's correct.

17   Q    And we see it rise around January of 2014 to over $7 at

18   some points; correct?

19   A    That's correct.

20   Q    Is it fair to say that stock prices evidenced were going up

21   and down throughout this period?

22   A    That's right.

23   Q    We also -- and to be fair, this includes both accounts;

24   right?

25   A    Right.

602

1   Q   Now, we have the quantity column and we've got positive

2   numbers and negative numbers; correct?

3   A   Correct.

4   Q   And if it's a positive number, that indicates Dr. Couch was

5   buying stock?

6   A   Correct.

7   Q   And when it's a negative number, that indicates Dr. Couch

8   was selling it?

9   A   Correct.

10  Q   Now, you are welcome to double-check my math on this one.

11  But if I'm correct, it looks like by April 24th, 2014,

12  Dr. Couch owned 100,300 shares of Galena?

13  A   That sounds right, yeah.

14  Q   Now, if Dr. Couch had sold 100,300 shares of Galena stock

15  April 24th, 2014, at a price $1.77 a share, how much money

16  would he have received?

17  A   $177,000 -- 177,531.

18  Q   Okay.  Over time Dr. Couch, according to my calculations --

19  and again, you're welcome to double-check it -- Dr. Couch

20  invested a total of $810,697.65.  Does that sound about right?

21  A   It does.

22  Q   Okay.  And over the same period of time Dr. Couch sold

23  stock and received $323,229.30.  Does that sound about right?

24  A   It does.

25          MR. DOSS:  And, Your Honor, I would like to place the

```
 1   piece of paper on the ELMO purely for demonstrative purposes.
 2           THE COURT:  That's what you just wrote the figures on?
 3           MR. DOSS:  Yes, ma'am.
 4           THE COURT:  Sure.
 5           MR. DOSS:  Thank you.
 6   Q   So that's the amount that Dr. Couch paid out; right?
 7   (Indicating.)
 8   A   Right.  That's the amount, the cost of the purchases.
 9   Q   Okay.  And that's the amount that he received?
10   (Indicating.)
11   A   Correct.
12   Q   Okay.  (Writing.)  So is it fair to say that if you
13   subtract the money he got in, the $323,000, from the amount
14   that he paid out, $810,000, it means that he was able to recoup
15   323,000 but he was still out somewhere in the ballpark of
16   487,000?
17   A   Well, the stock price is constantly changing.  So it's
18   tough to know when --
19   Q   Sure.  And we'll get to that.
20   A   Okay.
21   Q   We'll get to that.  But just taking these numbers as they
22   are --
23   A   Okay.
24   Q   -- if you subtract the bottom number from the top number --
25   and you're welcome to check my math on that one -- what is that
```

1  number?

2  A   487,468.35.

3       MR. BODNAR:  Your Honor, I'm going to object.  Perhaps

4  I missed something here.  Has there been evidence that he

5  actually sold it on this date or is this speculating if he did

6  sell it on that date?

7       THE COURT:  What date are you talking about?

8       MR. DOSS:  Pardon?

9       THE COURT:  What date are we talking about?

10      MR. DOSS:  I want to focus on April 24th of 2014,

11  whether he had -- whether he lost money or gained money at the

12  end of this time period.

13      MR. BODNAR:  And that's what I'm going to object to,

14  Your Honor.  At this point there isn't showing any sale here.

15  So he didn't lose or gain any money.

16      THE COURT:  Well, you can go into that on redirect.

17      MR. BODNAR:  Will do, Your Honor.  Thank you.

18  BY MR. DOSS:

19  Q   487,468.  And is there some change on that one?

20  A   35 cents.

21  Q   Okay.  All right.  So that 487,468.35.  That's how much --

22  let's just take April 24th of 2014.  That's how much Dr. Couch

23  is out at that point; correct?

24  A   No.  He still has his investments.

25  Q   But if he -- okay.  Well, that's a fair point.  Let's say

FBI SA ROY DAVIS - CROSS BY MR. DOSS

1   he sells it.  I think we talked earlier, if he were to sell it

2   all that day --

3   A   Yeah.

4   Q   -- if a hundred thousand shares, 100,300 shares, sells it

5   all for $1.77, he's going to get $177,531 back; correct?

6   A   That's correct.

7   Q   That's an important point.  Okay.  As of April 24th, 2014,

8   based on these figures, is Dr. Couch's investment upside-down?

9   A   It is.

10  Q   Okay.  And could we figure out how much it was upside-down?

11  A   Could.

12  Q   What could we do?

13  A   Subtract the bottom number from the top number.

14  Q   Okay.  What does that come up to?

15  A   309,937.35.

16  Q   390,000 --

17  A   309,000.

18  Q   309,000 --

19  A   937 and 35 cents.

20  Q   Okay.

21          THE COURT:  Let me see counsel at side bar.

22      (At the side bar, jury not present.)

23          THE COURT:  We're at the end of the day.  And I just

24  wanted to check on where we are, number one, with this witness

25  and then with the remaining government witnesses.

```
 1              MR. BODNAR:  I don't know how much cross-examination
 2    there is.  I've just got very minor points, at least with
 3    respect now on redirect.
 4              MR. KNIZLEY:  I have a lot.
 5              THE COURT:  He has a lot, he says.
 6              MR. KNIZLEY:  I do.  I have, Judge.  He spent a long
 7    time with the emails.
 8              THE COURT:  Well, do you have any other witnesses you
 9    could put on if we brought this witness back tomorrow?
10              MS. GRIFFIN:  No, sir -- I mean no, Judge.  Excuse
11    me.  I do not.
12              MR. BODNAR:  Our biggest issue right now, Your Honor,
13    is when we moved Dr. Greenberg, he was going to testify --
14              THE COURT:  I understand.  I understand the problem
15    with the experts.  But are the experts the only witnesses you
16    have left?
17              MR. BODNAR:  No.  They are the best ones to call next
18    in order.  And the other problem is that we had designated
19    tomorrow as being our big day to go through Dr. Greenberg with
20    all this stuff because we expect him to be on pretty much a
21    full day on Thursday.  So we anticipate him being lengthy and
22    need this time over the next day or two.  We were going to
23    bring him in on Friday --
24              THE COURT:  I'm going to let the jury go.  We're going
25    to pick back up with this man on Thursday morning and finish
```

```
 1          his examination.
 2                    MR. BODNAR:  Yes, Your Honor.
 3                    THE COURT:  And, of course, we're not going to be
 4          trying the case the following Monday, on the 12th, because
 5          that's a federal holiday.
 6                    MS. GRIFFIN:  The 16th?
 7                    MR. ARMSTRONG:  16th.
 8                    THE COURT:  You're right.  16th.  So I'm just going to
 9          tell them that.  Anything else we need to discuss before we
10          recess for the day?
11                    MS. GRIFFIN:  Just briefly, Your Honor.  We have
12          discussed and we have been able to eliminate four witnesses.
13          We're going to continue to see if there are some ways that we
14          can streamline the proceedings.
15                    THE COURT:  All right.  Great.
16            (In open court, defendants and jury present.)
17                    THE COURT:  All right, ladies and gentlemen.  We're
18          going to recess for the day.
19                    Now, we have had some scheduling difficulties not due
20          to the parties at all, but entirely to the Court.  We are not
21          going to be trying this case tomorrow or Wednesday.  So you've
22          got another weekend right here.  You need to be back here on
23          Thursday morning at 9 o'clock, ready to be called back up.
24                    Also, for your information, next Monday, the 16th, is
25          a federal holiday.  It's Martin Luther King Holiday.  So we
```

1    will not be trying the case then, simply for your planning

2    purposes.  Hopefully there won't be any other hiccups in our

3    scheduling for the rest of the trial except for if we run into

4    any other holidays.  Hopefully, we won't be.  So we won't be

5    trying the case tomorrow or Wednesday.  We'll be back here

6    Thursday morning.

7              Remember my instructions just like I gave you for the

8    weekend.  No discussion about the case with each other -- with

9    anybody.  So we will see you Thursday morning, 9 o'clock in the

10   jury assembly room, ready to be called back up.

11             Thank you and have a good couple of days.

12        (In open court, defendants present, jury not present.)

13             THE COURT:  We're in recess.  So you are free to go.

14        (Court adjourned at approximately 5:02 p.m.)

15

16

17

18

19

20

21

22

23

24

25