1      UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF ALABAMA
2

3  UNITED STATES OF AMERICA
                                    CASE NO. CR15-00088
4  v.
                                    COURTROOM 2B
5  JOHN PATRICK COUCH, M.D.,
   and XIULU RUAN, M.D.,
6                                   MOBILE, ALABAMA
           Defendants.
7                                   THURSDAY, JANUARY 12, 2017
   * * * * * * * * * * * * * *
8  REDACTED

9
                       DAY 4 OF TRIAL
10       BEFORE THE HONORABLE CALLIE V. S. GRANADE,
           UNITED STATES DISTRICT JUDGE, AND JURY
11

12

13  APPEARANCES:

14  FOR THE GOVERNMENT:
        DEBORAH A. GRIFFIN
15      CHRISTOPHER BODNAR
        United States Attorney's Office
16      63 S. Royal Street, Suite 600
        Mobile, AL  36602
17      (251) 441-5845

18
    FOR THE DEFENDANT COUCH:
19      ARTHUR T. POWELL, III
        P.O. Box 40456
20      Mobile, AL 36640-0456
        (251) 433-8310
21
        JACKSON R. SHARMAN, III
22      ROBERT JACKSON SEWELL
        JEFFREY PAUL DOSS
23      BENJAMIN SANDERS WILLSON
        Lightfoot, Franklin & White
24      400 North 20th Street
        Birmingham, AL  35203
25      (205) 581-0700

1    (Continued)

2        BRANDON KEITH ESSIG
         800 Shades Creek Parkway, Suite 600D
3        Birmingham, AL  35209
         (251) 879-1981

4

     FOR THE DEFENDANT RUAN:
5        DENNIS J. KNIZLEY
         7 N. Lawrence
6        Mobile, AL 36602
         (251) 432-3799

7

         JASON BRADLEY DARLEY
8        Darley & McGough, LLC
         1751 Dauphin Street
9        Mobile, AL 36604
         (251) 441-7772

10

         GORDON G. ARMSTRONG, III
11       P.O. Box 1464
         Mobile, AL  36633
12       (251) 434-6428

13       STEVEN D. MARTINIE
         4955 North Lake Drive
14       Whitefish Bay, WI  53217
         (414) 332-9683

15

     THE CLERK:  MARY ANN BOYLES
16   THE LAW CLERK:  LYNN DEKLE
     COURT SECURITY OFFICER:  WILLIAM NOEL
17   COURT REPORTER:  ROY ISBELL, CCR, RDR, CRR

18          Proceedings recorded by OFFICIAL COURT REPORTER
            Qualified pursuant to 28 U.S.C. 753(a) & Guide to
19   Judiciary Policies and Procedures Vol. VI, Chapter III, D.2.
            Transcript produced by computerized stenotype.

20

21

22

23

24

25

1                    EXAMINATION INDEX

2

   FBI SA COY DAVIS
3        CROSS BY MR. DOSS . . . . . . . . . . . . . . . .614
         CROSS BY MR. KNIZLEY  . . . . . . . . . . . . . .618
4        REDIRECT BY MR. BODNAR . . . . . . . . . . . . . 649

5  DAVID GORDON GREENBERG, MD
         DIRECT BY MS. GRIFFIN . . . . . . . . . . . . . .661
6        CROSS BY MR. SHARMAN  . . . . . . . . . . . . . .804

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         EXHIBIT INDEX

2                                                    MAR ADM

   GOVERNMENT'S
3  9-10    Subsys box with black-box warning insert      759
           prescribed by Couch for S. Byrd
4
   13-1    Patrick Chausse medical file (Couch)          697
5
   13-2    JB.......... medical file (Ruan)              697
6
   13-3    Deborah Walker medical file                   697
7
   13-4    Erick Gist medical file (Ruan)                698
8
   13-5    KL........... medical file (Ruan)             698
9
   13-6    DG.............. medical file (Ruan)          698
10
   13-7    Medical file of BH............ (Couch)        762
11
   13-8    Medical file of JL................            762
12
   13-9    Medical file of RB..........                  762
13
   13-10   Medical file of Karen Daw (Ruan)             762
14
   13-11   Medical file of Mark Weaver - withdrawn       762
15
   13-12   Medical file of David Lott (Couch)           762
16
   13-13   Medical file of Matthew Sansing (Couch)      762
17
   13-14   Medical file of AP......... (Ruan)           762
18
   13-15   Medical file of Terry Simmons (Couch)        762
19
   13-16   Medical file of Tamison Blanks (Couch)       762
20
   13-17   Medical file of Desiree Beasley (Couch)      762
21
   13-18   Medical file of Brian Wells (Couch)          762
22
   13-19   Medical file of Katheryn Engles (Couch)      762
23
   13-20   Medical file of Matthew Watts (Couch)        762
24
   18-5    American Airlines flight schedule - Ruan     650
25

| | | | |
|---|---|---|---|
| 1 | **DEFENDANT COUCH'S** | | |
| | 101 | 2009 Clinical Guidelines of the American Pain Society | 820 |
| 2 | | | |
| 3 | 107 | 2016 CDC guidelines | 806 |
| 4 | 118 | Portion of the Alabama Regulatory Code by the Alabama Medical Board | 830 |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | **DEFENDANT RUAN'S** | | |
| | 16-3 | Purporting to be a combination of Government's Exhibit 10-18A and 10-19A, Ruan & Couch charts of Subsys and Abstral mcg prescribed by month | 631 |
| 9 | | | |
| 10 | | | |
| | 52 | Emails between Ruan & Ma (unredacted) same as GX 11-5(11) | 639 |
| 11 | | | |
| 12 | 53 | Emails between Ruan & Ma (unredacted) same as GX 11-5(10) | 639 |
| 13 | | | |
| | 54 | Emails between Ruan & Ma (unredacted) same as GX 11-5(8) | 639 |
| 14 | | | |
| 15 | 61 | Abstral prescribed/month mcg (same as GX 10-19) Ruan only | 624 |
| 16 | | | |
| | 62 | Abstral prescribed/month mcg (same as GX 10-19) Ruan only - begins 10/13 | 624 |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

614

```
 1         (Morning session, 9 a.m., in open court, defendants and
 2   jury present.)
 3            THE COURT:  Good morning, ladies and gentlemen.
 4            All right.  Counsel, are you ready to proceed?
 5            MR. DOSS:  Yes, Your Honor.
 6            THE COURT:  All right.
 7                     FBI SA COY DAVIS,
 8        previously sworn, testified further, as follows:
 9                  CROSS EXAMINATION CONTINUED
10   BY MR. DOSS:
11   Q   Good morning, Agent Davis.
12   A   Good morning.
13   Q   I believe where we left off on Tuesday or Monday, we were
14   looking through what's been marked Couch Exhibit 62.  And this
15   was the chart that you prepared based on your review of
16   Government's Exhibit 11-3, with the underlying E*Trade report;
17   correct?
18   A   Correct.
19   Q   Before we broke last time, we were also looking through
20   some totals of this account.  I show you again, just to
21   refresh, the $810,000 at the top, that's the total amount of
22   money Dr. Couch invested in Galena during the time period from
23   November 2013 to April 2014; correct?
24   A   Correct.
25   Q   The received is the amount of money Dr. Couch received from
```

1    the sale of Galena stock; correct?

2    A    Correct.

3    Q    Which then gives us this net amount.  (Indicating.)  This

4    $177,000 number, that would be if as of April 24th, 2014,

5    Dr. Couch sold off all of the stock, how much he could get;

6    correct?

7    A    Correct.

8    Q    And then what is this bottom number, if you recall?

9    A    That would be the amount of loss essentially.

10   Q    Okay.  And I think you agreed with me last time we spoke

11   that as of April 24th, 2014, Dr. Couch was upside-down in terms

12   of his investment in Galena; correct?

13   A    Correct.

14   Q    And by upside-down, would that be the same as, for example,

15   if he purchased a house for $50,000 and a couple of years later

16   the market price for the home went down to, say, $25,000?

17   A    Correct.

18   Q    Okay.  Based on your review of the E*Trade account for

19   Dr. Couch, Agent Davis, overall does it appear that Dr. Couch

20   profited from his investment in Galena?

21   A    As of what date?

22   Q    Between November 2013 and April 2014.

23   A    No.

24   Q    On direct, Agent Davis, you testified that you did some

25   research into what Galena Biopharma is; correct?

1  A   Correct.

2  Q   And you learned that Galena Biopharma sold a product called

3  Abstral?

4  A   Correct.

5  Q   And did you also learn that Galena did not start selling

6  Abstral until October of 2013?

7  A   That's correct.

8  Q   And in fact, before October 2013 did you learn that a

9  company in Sweden was selling Abstral until Galena purchased

10 the rights to sell it in this country?

11 A   Yeah.  I don't recall where the company is from, but I do

12 recall it purchased the product essentially from another

13 company.

14 Q   And in fact it was earlier in 2013, say around April 2013,

15 when Galena purchased those sales; right?

16 A   That sounds right.

17 Q   While researching Galena, did you also learn that as part

18 of its effort to introduce itself to the market Galena

19 implemented a voucher program whereby patients could obtain

20 Abstral for free during the fall of 2013 and spring of 2014?

21         MR. BODNAR:  Your Honor, I object.  This is way

22 outside his direct examination about the stock of Galena.

23         THE COURT:  Sustained.  And, Mr. Doss, if you don't

24 mind taking the exhibit off the presenter unless you're using

25 it to question a witness?

```
 1              MR. DOSS:  Yes, Your Honor.
 2              THE COURT:  Thanks.
 3    BY MR. DOSS:
 4    Q   And, Agent Davis, did you learn that Galena had other
 5    business activities other than selling Abstral?
 6    A   No.
 7    Q   I want to show you, Agent Davis, what's been admitted as
 8    Government's Exhibit 11-5, and in particular 11-5(11).  And
 9    this was the email you identified as being sent from Li Ma to
10    Dr. Ruan on or about February 17, 2014.  And do you see where
11    it makes reference to a cancer vaccine?
12    A   Correct.
13    Q   Based on your research into Galena Biopharma, are you aware
14    that Galena was also developing a cancer vaccine?
15    A   Yes, I am.
16    Q   And was the name of that cancer vaccine NeuVax?
17    A   That sounds correct; yes.
18    Q   And, Agent Davis, are you familiar generally with what
19    NeuVax was intended to do?
20    A   No, sir.
21    Q   Likewise, I want to show you what's been admitted as
22    Government's Exhibit 11-5(13).  And this is another email
23    identified by you as being from Dr. Ruan.  And do you see here
24    where it makes reference to a cancer vaccine?
25    A   I do.
```

1   Q   And there were several emails that you identified during

2   direct examination, Agent Davis, that make reference to the

3   term "insider trading."  As far as you know, Dr. Couch isn't

4   charged with insider trading, is he?

5   A   I don't know, sir.

6   Q   In this case do you know if Dr. Couch is charged with

7   insider trading?

8   A   I don't believe so, no.

9        MR. DOSS:  One moment, Your Honor.

10       THE COURT:  All right.

11       MR. DOSS:  Thank you, Agent Davis.  No further

12   questions, Your Honor.

13       THE COURT:  All right.  Mr. Knizley?

14       MR. KNIZLEY:  Thank Your Honor.

15   (A discussion was held off the record between counsel.)

16                   CROSS EXAMINATION

17   BY MR. KNIZLEY:

18   Q   Morning, Agent.

19   A   Good morning, sir.

20   Q   On Monday we had discussed Government's Exhibit 11-4, which

21   is a chart of the Galena stock purchases for both Dr. Couch and

22   Dr. Ruan that, I believe, you prepared; is that right?

23   A   Yes; that's correct.

24   Q   And in looking through that, you have the purchases on

25   there, but as Mr. Doss had said as to Dr. Couch, as to Dr. Ruan

FBI SA COY DAVIS - CROSS BY MR. KNIZLEY

1   there was also some sales as well?

2   A   Yes, sir; that's correct.

3   Q   And do you have the information with regards to those sales

4   or do you have to refer to Government's Exhibit 11-1?

5   A   I'd have to refer to the actual exhibits.

6   Q   I'm going to hand you what's marked as Government's Exhibit

7   11-1 and 11-2.  And could you tell the ladies and gentlemen of

8   the jury what that is?

9   A   11-1 is the Capital One investment account for Dr. Ruan and

10  11-2 is the investment account for Dr. Ruan for optionsXpress

11  or Charles Schwab.

12  Q   And those are the two accounts he used for those investment

13  firms in order to buy the Galena stock; is that right?

14  A   Yes, sir.

15  Q   And if you look on the 11/13/14 transaction, is there a

16  sale of stock there?  That would be in the -- that would be in

17  the Capital One, I believe.

18  A   Capital One?

19  Q   1/13/2014?

20  A   Yes, sir; that's correct.

21  Q   So, and that's going to be right after this purchase;

22  right?  Right here?  (Indicating.)

23  A   Yeah, January 13th.

24  Q   And what does it say?

25  A   Excuse me?

1   Q   What does it say?  January 13th?

2   A   Yes, sir, it was on the 13th.

3   Q   And if we look at this purchase, on January 9th he made a

4   purchase; right?

5   A   Yes, sir.

6   Q   And sold the exact number of shares five days later -- four

7   days later; right?

8   A   That's correct.

9   Q   He was down to zero at that time; right?

10  A   For that account, oh, yes, sir.

11  Q   For all accounts?

12  A   Yes; that's right.

13  Q   So then on June 12th, 2014, something else happened?

14  A   June 12th?

15  Q   I believe that's the date.

16          THE COURT:  Tell him which exhibit you're looking at.

17  BY MR. KNIZLEY:

18  Q   This is going to be the Charles Schwab exhibit, I believe.

19  A   Oh, let me switch over.

20  Q   Again, June 12th, I believe it's $5,000 -- 5,000 shares.

21  A   Yes, sir, I'm there.

22  Q   So what happened on June 12th?

23  A   Dr. Ruan sold 15,000 shares of Galena.

24  Q   Was it 15 or 10?

25  A   15.

621

1    Q    Okay.  So right in here he had a sale; right?

2    (Indicating.)

3    A    Yes, sir.

4    Q    All right.  So if you add up these figures on here, that's

5    going to be two million, because we've got those two sales in

6    there; right?  If you add up these, you've got to subtract out

7    the sales; is that right?

8    A    There were sales, yes, sir.

9    Q    To get a total of what he owned?

10   A    Yes, sir; that's correct.

11   Q    You would have to subtract out the sales?

12   A    Exactly.

13   Q    So when we get right here, 15,000 shares that he had sold,

14   then he bought 15 more back; is that right?

15   A    That's right.

16   Q    And then from June 17th, right here, till July 9th, he

17   bought 35,000 shares; is that right?  (Indicating.)

18   A    Correct; yes, sir.

19   Q    Okay.  And from your analysis of these documents, did that

20   put him at the highest amount of shares he ever owned in Galena

21   from the time frame coming up to May the 15th?

22   A    I don't know that off the top of my head.  I'd have to look

23   at each transaction to see if that was in fact the highest

24   total shares at one point.

25   Q    Okay.  Let's just take a look, then.

FBI SA COY DAVIS - CROSS BY MR. KNIZLEY

```
 1    A    Okay.

 2    Q    Okay.  We've got here he bought 11,9; right?

 3    A    Yes.

 4    Q    Purchased?

 5    A    Yes.

 6    Q    And he sold that a few days later; right?

 7    A    That's correct.

 8    Q    Then he bought 25,3; right?

 9    A    Correct.

10    Q    Then he bought 28?

11    A    Correct.

12    Q    Right?  Then he bought 28 again; is that correct?

13    A    Yes, sir; that's correct.

14    Q    And then a two and an eight and a six and five, and then we

15    know he sold off 15; right?

16    A    Yes, sir.

17    Q    So would that then appear down here, on June 9th he would

18    have had the highest number of shares he ever owned in Galena?

19    A    Yes, sir; that's correct.

20    Q    Okay.  And that's July 9; is that correct?

21    A    Correct.  Yes, sir.

22    Q    Is that correct?

23    A    That's correct.

24    Q    Now, you looked at a chart yesterday -- or Monday -- I

25    think it was Government's Exhibit 10-19.  Okay?  Do you
```

1   remember that chart?

2   A   I do.

3   Q   And that was the chart of both Dr. Ruan and Dr. Couch of

4   Abstral prescribed by month in micrograms; is that right?

5   A   Yes, sir.

6   Q   Okay.  I'm going to show you what's marked as Ruan's

7   Exhibit 10-61.  Okay?

8   A   Okay.

9        MR. KNIZLEY:  And if I can, may I approach the

10  witness, Your Honor?

11       THE COURT:  Yes.

12     (A discussion was held off the record between counsel.)

13  BY MR. KNIZLEY:

14  Q   Agent, I want to show you Government's Exhibit  10-19.  And

15  then I will show you Ruan's Exhibit 10-61, which I said

16  purports to be the same exhibit without the Couch blue line.

17  A   Okay.

18  Q   Take a look at it and tell me if it looks like that to you.

19  A   Yes, sir, it does.

20  Q   Now, I'm going to show you Ruan's Exhibit 62, which

21  purports to be starting in the October -- see that long flat

22  line?

23  A   Right.

24  Q   Then we've got this, of course, spread out a bit because

25  it's longer.

```
 1   A   Sure.

 2   Q   Could you take a look at that and make sure I've got the

 3   right points throughout there?

 4   A   Sure.

 5           THE COURT:  Mr. Knizley, what is the number of the

 6   second one?

 7           MR. KNIZLEY:  10-62, Ruan's Exhibit -- I mean 62.

 8    Excuse me.  Just 62.

 9           THE COURT:  No 10 in front of it?

10           MR. KNIZLEY:  I'm sorry.

11   A   Yes, sir; that appears correct.

12           MR. KNIZLEY:  Judge, we'd offer Ruan 61 and 62.

13           THE COURT:  Is it 61 or 10-61?

14           MR. KNIZLEY:  I apologize, Judge, because the other

15   ones are 10.  Mine are simply 61 and 62.

16           THE COURT:  All right.  Mark them in.

17       (Defendant Ruan's Exhibits 61 and 62 were entered into

18   evidence.)

19   BY MR. KNIZLEY:

20   Q   Agent, going back to what we looked at Monday, 10-19 was

21   both Ruan -- Dr. Ruan and Dr. Couch's Abstral by month; is that

22   right?

23   A   Yes, sir.

24   Q   And what I just showed you was Dr. Ruan's only, Exhibit 61,

25   which would be the same as that other chart with Dr. Couch's
```

FBI SA COY BAHS - CROSS BY MR. KNIZLEY

1   removed; is that correct?

2   A   It appears so, yes.

3   Q   And 62, which would be yet the same chart, but just only

4   starting in October?

5   A   Correct.

6   Q   Okay.  Now, you've told us that it appeared from your

7   calculations that Dr. Ruan had his maximum amount of Galena

8   stock after his 35,000-share purchase from June -- June 23 --

9   June 17th to July 9, he purchased 35,000 shares on Government's

10  Exhibit 11-4; right?

11  A   Correct.

12  Q   And that says -- your calculation that we looked at a

13  moment ago, you said, brought him up to his highest amount of

14  shares he owned?

15  A   Correct.

16  Q   Throughout the time frame from October until May 15th,

17  2015?

18  A   Yes, sir.

19  Q   Okay.  Now, that was July.  Now, in August of '14 -- which

20  would be that point right there, would it not?  (Indicating.)

21  A   Right.

22  Q   And for this time period, October to March, would that be -

23  - what would that rank?  What would that rank in his Abstral

24  prescriptions?  Would it be the highest, lowest, or in between?

25  A   One of the lower points.

1    Q   Well, it would be the absolute lowest point, would it not,

2    if we look here and here?  (Indicating.)  If we go back to

3    the --

4    A   I'm looking at October 2013.

5    Q   All right.  After it starts up?

6    A   Correct.  After.

7    Q   October?

8    A   Correct.

9    Q   This would be the lowest point?  (Indicating.)

10   A   Right.

11   Q   So at the time he owned the most stock, the next month --

12   except for October, the lowest point?

13   A   Correct.

14   Q   Now, you told us you weren't -- or you see in the emails,

15   do you not, particularly at Exhibit 11-5(3), when there's a

16   correspondence back and forth between Dr. Ruan and Mr. Lento --

17   I'm looking at Government's Exhibit 11-5(3).  Do you recall

18   this email?

19   A   Yes, sir, I do.

20   Q   And in that email, you told Mr. Doss that you were aware

21   that the promotion rights or the sales rights to Abstral was

22   purchased by Galena from another company and they were going to

23   promote it here in the United States?

24   A   Correct.

25   Q   And this is what this is here, that Mr. Lento from Abstral

FBI SA COY DAVIS - CROSS BY MR. KNIZLEY                627

1    is telling Dr. Ruan:  We will begin marketing and promoting the

2    product to healthcare professionals in the very near future; is

3    that correct?

4    A    That's what it says.

5    Q    Okay.  Right here, Ruan's 61, do you know when that

6    promotion started, by any chance?

7    A    I believe it was October 2013.

8    Q    So this right here; right?  (Indicating.)

9    A    Right.

10   Q    There had been some prescriptions along the way and here,

11   right here, this is when this product was beginning to be

12   promoted?

13   A    Whenever Galena started to promote it, yes, sir.

14   Q    When Galena started promoting the Abstral product?

15   A    It was around -- I believe it was October 2013.

16   Q    And I think you said you were unaware of coupons and stuff

17   like that?

18   A    That's right.

19   Q    Okay.  So we don't know why, but this stock goes up --

20   excuse me -- the prescriptions go up; right?

21   A    Correct.

22   Q    All right.  Now, we know Dr. Ruan didn't buy any stock,

23   from your records, until January; is that right?  We can go

24   back and look at that.

25   A    Right.

FBI SA COX DAVIS - CROSS BY MR. KNIZLEY

```
1   Q    Government's Exhibit 11-4, our first stock purchase is --
2   A    January 9th.
3   Q    Okay.  So what we have here -- I'm trying to get it on
4   January -- is for some reason there's an increase in
5   prescriptions when he doesn't own the stock?
6   A    Prior to January his prescriptions did increase, yes.
7   Q    Okay.  And January is our stock purchase date?
8   A    First, yes, sir.
9   Q    Okay.  You told us on Monday -- you told us on Monday that
10  you had a familiarity with the business known as Insys?
11  A    Yes, sir, a general familiarity.
12  Q    And I think it was Insys Therapeutics?
13  A    Yes, sir.
14  Q    And you told us about the products they made, did you not?
15  A    Correct.
16  Q    And what do you recall those products being, if you recall?
17  A    So during that time period we're talking about one product
18  was Subsys and the other product was -- I don't recall the
19  name, but it was a product used for nausea, vomiting, and
20  anorexia.
21  Q    You told us, did you not, that Insys was a competitor of
22  Galena?
23  A    Correct.
24  Q    And you told us that the Subsys was a fentanyl-based
25  transmucosal drug, medicine, that was for cancer treatment; is
```

629

```
 1  that right?

 2  A   Correct.

 3  Q   And that it's a similar or the same purpose and use as the

 4  Abstral that is marketed by Galena?

 5  A   They are both used for breakthrough cancer pain.

 6  Q   And in your words on Monday, you said they were

 7  competitors?

 8  A   Yes, sir.

 9  Q   Okay.  Now, I'm going to show you what's been previously

10  introduced as Dr. Ruan and Dr. Couch's Abstral micrograms

11  prescription by month.  Do you remember seeing that in

12  Government's Exhibit 10-19A?

13  A   I've never seen this before.

14  Q   Okay.  Did you know whether or not -- you've seen this

15  chart, then; right?

16  A   Right; yes, sir.

17  Q   Okay.  And this chart has various numbers on it; right?

18  A   Right.

19  Q   Okay.  And, for instance, this two five, you're going to

20  see on 10-19 the same month it looks like that's where these

21  numbers may have come from?

22  A   What are the two columns there, sir?

23  Q   Dr. Ruan's --

24  A   Okay.

25  Q   Okay?
```

```
 1   A   Okay.

 2   Q   By month, Abstral, micrograms?

 3   A   Is this the underlying data for that chart, sir?

 4   Q   Yes.  I suggest to you it is.

 5   A   Okay.

 6   Q   Okay.  And I don't -- can you agree by looking at it, it

 7   appears to be the underlying data and I gave you that of this

 8   stock here?

 9   A   Right.  That one point matches up to this.

10   Q   Okay.  Now, so I'm also going to show you what's marked as

11   Government's Exhibit 18-A that has been admitted in evidence,

12   which purports to be the Subsys micrograms prescribed by month.

13   A   Right.

14   Q   Now, when we looked at it, it was the basis of the chart,

15   was it Abstral micrograms prescribed by month?  Right?

16   A   Right.

17   Q   All right.  And you told us that Insys, who makes this, is

18   the competitor?

19   A   Correct.

20   Q   With Galena that makes this?  (Indicating.)

21   A   Correct.

22   Q   And this being Abstral in 10-19A.

23        Now, Agent, I have put together for visual

24   illustration purposes only Ruan Exhibit 63, which purports to

25   line up with this Government's Exhibit 10-18A and number
```

 1  10-19A, which were Abstral and Subsys prescriptions.

 2        THE COURT:  Let me ask is there any objection to this

 3  exhibit?  Because it's not in evidence yet.

 4        MR. KNIZLEY:  Judge, these are two exhibits that are

 5  in evidence.  I have stuck them together like this.

 6        THE COURT:  I know.  What I'm saying is the jury is

 7  not seeing it because it hasn't been offered.  Do you offer it?

 8        MR. KNIZLEY:  Judge, yes, I'd like to offer Ruan's

 9  Exhibit 16-3, which purports to be a combination of

10  Government's Exhibit 10-19A and 10-18A.

11        THE COURT:  Any objection?

12        MR. BODNAR:  No objection.

13        THE COURT:  All right.  You can mark it in and we will

14  turn on the exhibit.

15      (Defendant Ruan's Exhibit 16-3 was entered into evidence.)

16  BY MR. KNIZLEY:

17  Q   All right.  Back to Ruan's Exhibit 63.  See at the top it's

18  supposed to be Ruan and Couch's Abstral micrograms per month

19  and Subsys micrograms per month; right?

20  A   Right.

21  Q   And I've put these together to try to draw these highlights

22  and follow them across.  And you see it gets a little further

23  wider as it goes down?

24  A   Yes.

25  Q   We'll do the best we can.  All right.  Remember we started

1  in October with more prescribing of Abstral?

2  A   Right.

3  Q   Starting in October -- and I'm concerned with Dr. Ruan

4  only; okay?

5  A   Okay.

6  Q   So I'll try to slide up and down.  This is Dr. Ruan's

7  column and this is Dr. Ruan's column.  (Indicating.)

8  A   Okay.

9  Q   Okay?  So -- and remember, this is the Abstral, this is the

10  Galena, this is the one we own stock in, this is the

11  competitor.  (Indicating.)

12  A   Correct.

13  Q   Okay.  So if we look at November -- let's start in October.

14  We see how much Abstral?

15  A   192,000 micrograms.

16  Q   And October, how much --

17  A   3.371 million micrograms.

18  Q   And November, which is really that month they started

19  highlighting -- and if you don't mind for the rest of this,

20  let's just forget about October, because it's so low here, it

21  wouldn't really start.  So I'm going to start my analysis, if

22  you will, in November?  Okay?

23  A   Okay.

24  Q   I'm trying to be fair.  This is a low number here.  So

25  we're going to start with the more significant number.

```
 1   A   Okay.

 2   Q   All right.  November, 790,400?

 3   A   Correct.

 4   Q   November over here for the competitor?

 5   A   Right, 3.396 million.

 6   Q   December for Abstral?

 7   A   1.5 million.

 8   Q   And for the competitor?

 9   A   2.7 million.

10   Q   January?

11   A   1.4 million.

12   Q   Competitor?

13   A   3.1 million.

14   Q   February?

15   A   2.3 million.

16   Q   (Indicating.)

17   A   3.8 million.

18   Q   March?

19   A   2.6 million.

20   Q   (Indicating.)

21   A   2.8 million.

22   Q   Now, March was that month that we had those emails where he

23   was mad or seemed to be angry in the emails with the Galena

24   leadership?

25   A   Right.
```

634

```
 1   Q   So in that month of March we have 2,6 on the Abstral, but
 2   2,8 -- he's still prescribing for the competitor?
 3   A   Can you ask the question, sir?
 4   Q   All right.  On March we're prescribing 2,6?
 5   A   Right.
 6   Q   But we're prescribing more of the competitor; is that
 7   right?
 8   A   That's right.
 9   Q   April?
10   A   2 million.
11   Q   Competitor?
12   A   2.9 million.
13   Q   May?
14   A   771,000.
15   Q   Competitor?
16   A   Could you slide it up a little bit?
17   Q   I'm sorry.  (Indicating.)  Competitor?
18   A   3 million.
19   Q   June?
20   A   886,000.
21   Q   (Indicating.)
22   A   3 million.
23   Q   Of course, the numbers speak for themselves as we go down
24   here.  And, though, if you look at almost every month you just
25   described that covered the emails, it appeared that the
```

635

1  competitor number was higher?

2  A   Correct.

3  Q   Now, if you go on down, you might find a couple of months

4  that flip.  But the document will speak for itself, whatever

5  those numbers are.

6        MR. KNIZLEY:  Okay.  If you trust my math for the

7  moment, I'm going to show you a visual aid only, Your Honor, if

8  I could show it to the jury?

9        THE COURT:  All right.

10  BY MR. KNIZLEY:

11  Q   For Ruan, from that time period I just talked about, okay,

12  if you trust my math, for the Galena product and the Subsys

13  product, if I've added these numbers up correctly I've

14  highlighted -- okay?

15  A   Okay.

16  Q   If you're trusting my math -- and I'm asking you just to

17  tolerate for a moment that it's correct.  That would be the

18  Abstral in milligrams and that would be the Subsys in

19  milligrams prescribed from November '13 to May 2015, if my

20  numbers are correct?

21  A   If your numbers are correct; yes.

22  Q   And if you're looking at it, it looks like certainly the

23  Subsys were higher numbers than the Abstral we looked at?

24  A   Right.  By month, yes.

25  Q   Okay.  So if my numbers are correct, I add these two

1  together, and if my addition is correct, that would be how you

2  get a percentage; right?  You take the total number together

3  and divide the total number by whatever you prescribed?

4  A   Right.

5  Q   So if that's correct, then during this time frame Abstral

6  was prescribed -- the amount of Abstral prescribed was 35.1

7  percent and the amount of Subsys prescribed was 64.8?

8  A   Correct.  If those numbers are correct.

9  Q   If the numbers are correct, he prescribed the competitor 64

10  percent of the time, if the numbers are correct?

11  A   For total micrograms.

12  Q   For total micrograms of volume of prescription, not

13  necessarily time frame?

14  A   Right.

15  Q   For volume of prescriptions?

16  A   Right.

17  Q   Okay.  64 percent of the time he prescribed the competitor?

18         MR. BODNAR:  Your Honor, we object.  It's not volume

19  of prescriptions.  What he's showing here is micrograms.  So

20  it's not number of prescriptions.  It is strength.

21         MR. KNIZLEY:  And he is correct.  I misspoke.

22         THE COURT:  All right.

23  BY MR. KNIZLEY:

24  Q   This is not volume of prescriptions.  And let's go back

25  over that.  I misspoke.  This is volumes of micrograms; right?

1   A   Right.  As it charts here.

2   Q   We talked about here the micrograms?

3   A   Right.

4   Q   So as far -- micrograms are the actual substance, the

5   medicine that's being prescribed?

6   A   Right.

7   Q   The prescription is just one time.  It could be a hundred

8   or 1,600?

9   A   Right.

10   Q   So as much as the medicine's prescribed, it's 64 percent of

11   the time, if the numbers are correct?

12   A   Right.

13   Q   Now, you told us that Insys, the particular Subsys

14   competitor -- was there two other competitors in that field, if

15   you know, the producers of fentanyl and the producers of

16   Lazanda?

17   A   I'm not familiar, sir.

18   Q   Okay.  And you don't know whether Dr. Ruan during that time

19   frame may have prescribed any other competitors, if there were

20   any?

21   A   I'm not aware.

22   Q   Agent Davis, I'm going to change subject matters to the

23   email we looked at the other day.  I show you what's marked as

24   Government's Exhibit 11-5, and it's a binder that has an email

25   at the top dated Thursday, November 21st, 2013, from Dr. Ruan

1    to Ms. Vo; is that right?

2    A   Yes, sir.

3    Q   And that was what you referred to the other day?

4    A   Correct.

5           MR. KNIZLEY:  May I approach the witness, Your Honor?

6           THE COURT:  Yes.

7    (A discussion was held off the record between counsel.)

8    BY MR. KNIZLEY:

9    Q   Agent, if you would take a moment and look at Government's

10   Exhibit 11-5, and I'll show you a Ruan exhibit to compare to

11   it.

12   A   You have another exhibit in here.

13   Q   I'm going to give you Ruan Exhibit 52, 53, 54, and 55,

14   which purports to be the same thing just, as you know, it's in

15   redacted form, some of that.

16   A   Right.

17   Q   And if you would, look through it and take a moment and

18   look at the dates and see if that appears to be the unredacted

19   versions of those emails.

20      (A discussion was held off the record between Mr. Knizley

21   and the witness.)

22   BY MR. KNIZLEY:

23   Q   As to Ruan Exhibit 52, does that appear to be the redacted

24   version of the email from Dr. Ruan to Dr. Ma?

25   A   Correct; yes.  The same with 53.

FBI SA COY DAVIS - CROSS BY MR. KNIZLEY

639

1    Q   53 appears to be the unredacted version of another Ruan to
2    Ma email?
3    A   Correct.
4            Same with 54.
5            Okay.  You gave me the redacted on this email.
6    (Indicating.)
7        (A discussion was held off the record between Mr. Knizley
8    and the witness.)
9            THE WITNESS:  Well, this is the original email, which
10   is that right there, and that is redacted.
11       (A discussion was held off the record between Mr. Knizley
12   and the witness.)
13           THE WITNESS:  Okay.
14           MR. KNIZLEY:  Judge, we would offer Ruan's Exhibit 52,
15   53, and 54.
16           MR. BODNAR:  No objection, Your Honor.
17           THE COURT:  All right.  Mark them in.
18       (Defendant Ruan's Exhibits 52, 53, and 54 were entered into
19   evidence.)
20   BY MR. KNIZLEY:
21   Q   Agent, I'm going to show you what's marked as Government's
22   Exhibit 11-5(4).  And, as of Monday, we have these plastic
23   covers.  If there is such a glare, you can ask me to take it
24   out.
25   A   Yes, sir.

1  Q   And on 11-5(4), that is from Ms. Vo?

2  A   Right.

3  Q   And January of 2014; right?

4  A   Correct.

5  Q   And that would have been right after a stock purchase?

6  A   Right.

7  Q   And it is to Dr. Ruan?

8  A   Right.

9  Q   And she is writing him.  If you could, tell us what she

10 says to him in this email.

11 A   Honey, I could not find Galena insider trading

12 policy.  However, I found the insider trading policy for

13 Threshold Pharma.  I think these policies should bear

14 similarity.  Advisory board members are considered insiders and

15 are not allowed to short sell.  There's a link included.

16 Q   It  appears to be an email inquiring as to the propriety of

17 insider trading?

18 A   Correct.

19 Q   I want to show you what's marked as Government's Exhibit

20 11-5(7).  And this is Monday, January 20th; is that correct?

21 A   That's correct.

22 Q   It's from the doctor?

23 A   Right.

24 Q   To Mr. Lento?

25 A   Correct.

641

1   Q   And we understood him to be a vice president, I think, or

2   an office holder in Galena?

3   A   That's right; vice president.

4   Q   And could you tell me what Dr. Ruan says in that first

5   line, please?

6   A   Hi, Chris.  It seems that I will not be able to make this

7   weekend's advisory board meeting.

8   Q   And then he has some other information that he shares with

9   Mr. Lento.  Starting right there what does he say?

10   (Indicating.)

11   A   I have sent some information to my lawyer to find out the

12   legality of this, while owning stocks and participating in the

13   board meeting.

14   Q   Go ahead.

15   A   He has not emailed me yet.  So I figured I just want to let

16   you know.  Hope everything is well and hope you all have a

17   successful meeting this weekend.  I have not signed the

18   agreement yet with Galena, so I am not yet an insider.  Have a

19   great weekend.

20   Q   And that is him explaining his current posture regarding

21   the stock or his involvement with the company with Mr. Lento?

22   A   Yeah, that he won't be at the meeting.

23   Q   He won't be able to make the meeting?

24   A   Correct.

25   Q   He references he's waiting on lawyer response?

1   A    Exactly.

2   Q    And as to the lawyer response, did you see the name Tom

3   Galloway earlier in some of this?

4   A    I did.

5   Q    And do you know Mr. Galloway?

6   A    I don't know him, sir.

7   Q    Do you know him to be a lawyer here in Mobile?

8   A    I do.

9   Q    And the next one, in fact, it's the same day; is that

10  correct?

11  A    Right.

12  Q    Ms. Vo, the friend; is that correct?

13  A    Yes, sir.

14  Q    On Monday the 20th is writing to Dr. Ruan -- excuse me --

15  writing to Dr. Ruan and to Mr. Galloway?

16  A    Right.

17  Q    And she's really addressing it to Mr. Galloway; is that

18  right?

19  A    That's right.

20  Q    And could you read that first line for me, please?

21  A    Thank you for helping Xiulu.  I have a few concerns about

22  him being an advisory board member and does swing trade.

23  Q    And the next line?

24  A    I read a document on insider trading under securities law,

25  found some information.

FBI SA COY DAVIS - CROSS BY MR. KNIZLEY

1  Q   And then the next part, does that appear to be the

2  information she may have found?

3  A   That's right.

4  Q   And again, that was Government's Exhibit 11-5(8)?

5  A   Right.

6  Q   I'm next going to show you Government's Exhibit 11-5(10).

7  And this is an email from a person named Li Ma; is that

8  correct?

9  A   Correct.

10 Q   And it is to Dr. Ruan; is that right?

11 A   Correct; yes, sir.

12 Q   And this is Thursday, February 6th, some two weeks or so

13 after our last email we looked at?

14 A   Right.

15 Q   Now, if you could read from starting right here, I used to,

16 in that first paragraph?

17 A   Okay.  I used to be very proud of myself, a gambler by

18 nature and never purchased a single share of shock after living

19 in the U.S. for over two decades.  Talking about the

20 determination to resist any distraction.

21 Q   At least by his representation, that was his first venture

22 into purchasing stock?

23 A   That's what the email says.

24 Q   Now, if you could read that paragraph for us, please, sir,

25 starting with but?

1    A    But that record was gone.  Let me explain to you why.  Last

2    year when Insys offered their IPO, it was around $8, I was

3    hoping the company could offer me have some stock to compensate

4    my time and idea.  I was at their very first advisory board

5    meeting back in December 2012, before they got the FDA approval

6    in spring 2013.  And I have been their national speaker

7    since.  But I did not ask them for any stock as I did not feel

8    appropriate, and they did not offer to give me either.  So I

9    also felt that maybe it was not ethical to own its stock and

10   meanwhile be its speaker and user.

11   Q    He expresses his opinion as to the ethics of owning stock

12   in the other company?

13   A    Right.

14   Q    And, Agent, did you tell us you were or were not familiar

15   with any other products of Abstral that may have been under

16   research?

17   A    Abstral or Galena?

18   Q    Galena.  Not the --

19   A    I knew they -- I knew they sold Abstral and I knew they had

20   other products in the pipeline but not yet being sold, during

21   this time period.

22   Q    Okay.  And I want to show you what's marked as Government's

23   Exhibit 11-5(11) and ask you if you could start at the word --

24   this is an email from Ma, is it not, and that's on February 17

25   to Dr. Ruan; is that right?

1    A    Right.

2    Q    And in that email what does Ma say, starting with the word

3    "as"?

4    A    I believe this is Dr. Ruan.

5    Q    I'm sorry.  Ending with the word "et cetera."  Okay?

6    A    I believe this email is from Dr. Ruan to Dr. ma.

7    Q    Okay.  I see.  I'm sorry.  Excuse me.  This is from Ruan,

8    this is Ruan's words, Dr. Ruan's words.

9    A    Correct.

10   Q    Starting with as?

11   A    Okay.  As I see no issue with the product of Abstral being

12   number one branded transmucosal fentanyl in Europe plus the

13   upcoming cancer vaccine, et cetera.

14   Q    At least Dr. Ruan thinks it's an upcoming cancer vaccine?

15   A    Right.

16   Q    And the same email, 11-5(11), at the end of it what does

17   Dr. Ruan say starting with the words "I refused"?

18   A    I refused to speak for them and I refused to be on their

19   advisory board, so that I will not be scrutinized.  They

20   invited me for that.  I told them I don't want to know more

21   than the general public does as I don't want to get in trouble

22   down the road.  I have a speaker event this evening.  Take

23   care.

24   Q    And he says he doesn't want to get in trouble down the

25   road?

1    A    Right.

2    Q    And then do you recall on Monday we talked about some

3    exchange he had in connection with what was going on with the

4    leadership of Abstral -- of Galena?  Do you remember that?

5    A    Right.  Yes, sir.

6    Q    I'll show you what's marked as Government's Exhibit

7    11-5(12), and is this the email -- at least one of the emails

8    -- that discussed his thoughts about the CEO and chairman of

9    Galena?

10   A    Correct.

11   Q    And this is from Dr. Ruan on March 7, 2014, to Ma and

12   others; is that right?

13   A    That's right.

14   Q    All right.  How does he, starting with the word "while,"

15   describe the CEO?

16   A    While the CEO of Galena is like a despicable thief.

17   Q    All right.  And what does he say beginning with the words

18   "I believe"?  What does that sentence say?

19   A    I believe once the CEO is replaced with a businessman with

20   insight and team morale and ethics, the confidence of

21   shareholders will build up again and the stock will follow the

22   course of Insys.

23   Q    Is there a second reference in these emails to ethics that

24   we've looked at today?

25   A    That we looked at today; right.

FBI SA COY DAVIS - CROSS BY MR. KNIZLEY

1  Q   I show you what's marked as Government's Exhibit 11-5(16),
2  which is another email from Dr. Ruan to some other people,
3  including Dr. Ma again?
4  A   Right.
5  Q   And could you, starting with the word "guys," could you
6  read down to the word "definition"?
7  A   Guys, look at the inside selling from Galena.  These guys
8  are criminals.  We are not talking about CEO/CFO, we are
9  talking about everyone else on the board of directors from
10  board chairman Sanford Hillsberg to rest of the directors.
11  It's like they are conducting some type of trading competition
12  or something.  This is insanity, stupidity, greed by the
13  definition.
14  Q   Does, at least in his opinion, he seem to be upset with the
15  criminal conduct of others?
16  A   Correct.
17  Q   And, Agent, I show you Government's Exhibit 11-5(6).  I'd
18  like you to read, if you will, please, starting with the
19  word -- first off, this is -- first, Dr. Couch sent something
20  January 18th to Dr. Ruan and he made some remarks and then in
21  response to that, on January 18th, Dr. Ruan writes back; am I
22  correct about that?
23  A   Yeah, based on the timestamp, although based on the time of
24  the email it looks like it's actually the opposite.
25  Q   It went the other way?

648

1   A   Right; yes, sir.  Looks like --

2   Q   I see what you're saying.  The time stamps sort of indicate

3   one thing, but the response sort of goes the other way.

4   A   Right.

5   Q   But in any event, we do know that at least this email says

6   January 18th at 12:57 p.m. Dr. Ruan wrote something?

7   A   Correct.

8   Q   And let's look.  And that is shortly after he bought this

9   stock; right?

10  A   That's right.

11  Q   And if you would, please, read for the ladies and gentlemen

12  of the jury starting at the word -- do you know who -- go

13  ahead, starting at the word "it," will you read that, please?

14  A   It will save me a lot of worries if I am not involved with

15  the company as their advisory board member so that I know no

16  more than the general public.  I will check with my attorney,

17  Tom Galloway, for his advice.  You may ask Boe's opinion on

18  this too.  I just want to make sure neither us or PPSA gets

19  involved in a bad way.  Maybe I am paranoid.  But since we both

20  have purchased some stock and we use their products more than

21  others, so I am waiting for Tom to give me his opinion on this

22  before I made my final decision whether I will go or not.  Just

23  a few links below regarding this issue.

24  Q   And if you recall, is that his decision to go to this

25  advisory board meeting?

1    A    That -- that seems right.

2    Q    So he's calling, he wants to hear from his lawyer whether

3    it's appropriate?

4    A    Right.

5    Q    Now, who is Boe, if you know?

6    A    I don't know who Boe is.

7    Q    Okay.  Do you know who Boe Strange is in the course of this

8    investigation?

9    A    I don't.

10   Q    But if you tell me, again, starting at I, that sentence?

11   A    I just want to make sure neither us or PPSA gets involved

12   in a bad way.

13              MR. KNIZLEY:  Thank you.  Pass the witness.

14              MR. BODNAR:  Just one moment to gather the stuff, Your

15   Honor.

16              THE COURT:  All right.

17                        REDIRECT EXAMINATION

18   BY MR. BODNAR:

19   Q    Good morning, Mr. Davis.

20   A    Good morning.

21   Q    I want to start out first, do you remember when Mr. Knizley

22   was up there and he was asking you and he had his own chart --

23   I don't see it up here -- but he pointed out you guys talked

24   about in July, right here, he had bought the most amount of

25   stock he ever had?  Do you recall that conversation?

1    A    That he owned the most amount of stock at that time.

2    Q    That he owned the most?

3    A    Right.

4    Q    And then Mr. Knizley pointed out, though, in August was the

5    lowest amount he prescribed going all the way back to the

6    October time frame, do you remember that?

7    A    I do.

8    Q    Now, do you have any idea of why he may have prescribed

9    less Abstral during that month?

10   A    I don't know.

11   Q    Do you know if Dr. Ruan was in the country?

12   A    I don't.

13   Q    For a chunk of that month?

14   A    I don't know.

15        MR. BODNAR:  Your Honor, the United States moves to

16   admit per a business record and for stipulation Government's

17   Exhibit 18-5.  I'm going to show it to defense counsel.

18        (A discussion was held off the record between counsel.)

19        MR. BODNAR:  Your Honor, the United States moves to

20   admit Government's Exhibit 18-5.

21        MR. KNIZLEY:  No objection, Your Honor.

22        THE COURT:  All right.  Mark it in.

23        (Government's Exhibit 18-5 was entered into evidence.)

24   BY MR. BODNAR:

25   Q    Mr. Davis, I'm going to show you what's been marked and is

 1  now admitted as Government's Exhibit 18-5.  Can you tell me at

 2  the top what does it say right at the top banner?

 3  A   It says American Airlines.

 4  Q   And American Airlines, does it appear to be for which

 5  passenger, records for which passenger?

 6  A   Dr. Ruan.

 7  Q   Now, do you see a string of dates here for August of 2014?

 8  A   I do.

 9  Q   And what is that first date right there?  (Indicating.)

10  A   August 14th, 2014.

11  Q   And I see a departure and arrival.  Are you familiar with

12  MOB and DFW in terms of airport codes?

13  A   MOB is Mobile and DFW is Dallas-Fort Worth.

14  Q   So, according to the American Airlines billing, where did

15  Dr. Ruan go on August 14th, 2014?

16  A   Went from Mobile to Dallas, then Dallas to -- I'm not

17  exactly sure what PVG is.

18  Q   If I propose to you PVG is Shanghai, Pudong International

19  Airport --

20  A   Okay.

21  Q   So what time does he leave Mobile?

22  A   Left Mobile at 6 o'clock, arriving at Dallas 7:45, left

23  Dallas at 10:55 and arrived Shanghai at 2:55 -- 14:55.

24  Q   And then does it show his return to the United States from

25  Shanghai, China?

652

1    A    Right.  August 25th, 2014, went from Shanghai to Dallas,

2    and the same date from Dallas back to Mobile.

3    Q    So again, that's approximately what, a 10- or 11-day trip?

4    A    Right.

5    Q    During the month of August 2014?

6    A    That's correct.

7    Q    Again, I'm showing you what has been admitted as

8    Government's Exhibit 10-19.  Is that that same month that

9    defense counsel was asking you about?

10   A    It's the same month.

11   Q    Special Agent Davis, do you recall the questions from

12   Dr. Ruan when he was showing you --

13          MR. BODNAR:  Dennis, where is that slide?

14       (A discussion was held off the record between counsel.)

15          MR. BODNAR:  One moment, Your Honor.  We're looking

16   for 11-4.

17          THE COURT:  All right.

18   BY MR. BODNAR:

19   Q    While we're looking for that chart, do you recall the chart

20   that you produced that defense counsel just showed you, 11-4?

21   It was the listing of all the stock purchased by Dr. Couch and

22   Dr. Ruan.

23   A    I do.

24   Q    And do you recall Mr. Knizley just showing you that?

25   A    Correct.

1    Q   Do you remember him asking you about the fact that the

2    first stock purchase, if you recall what I recall, was it being

3    in January of 2000 --

4          MR. KNIZLEY:  (Indicating.)

5    BY MR. BODNAR:

6    Q   Now, we don't need to recall.  11-4, do you recall

7    discussing this chart with Mr. Knizley?

8    A   I do.

9    Q   And do you recall him talking about the first purchase was

10   January 9th for Dr. Ruan?

11   A   That's right.

12   Q   And do you recall him on chart 10-19 showing you that

13   January was here, but Dr. Ruan had already been prescribing?

14   A   We discussed that, yes.

15   Q   But in the emails 11-5(1) when was it that Dr. Ruan and

16   Ngoc Vo began talking about stock purchases?

17   A   November 21st, 2013.

18   Q   And in fact, in the next email, 11-5(2), what advice does

19   Ngoc give?

20   A   The advice is not to buy now, wait for the dip.

21   Q   So at what point were they talking about purchasing stock,

22   at least contemplating purchasing stock in Abstral -- in

23   Galena?

24   A   At least November 21st, 2013.

25   Q   And looking back at Abstral chart 10-19, is that actually

1   right here, then?  (Indicating.)

2   A   Yeah, even to then.

3   Q   Special Agent Davis, do you recall going through the math

4   problem with Mr. Doss?

5   A   I do.

6   Q   And do you recall him asking you:  Well, what would have

7   happened if Dr. Ruan or if Dr. Couch sold his shares on April

8   24th?

9   A   I do.

10  Q   However, did Dr. Couch sell his stock on April 24th?

11  A   He didn't.

12  Q   That didn't actually then happen, did it?

13  A   It did not happen.

14  Q   Well, let's talk about something that did happen.  I'm

15  going to show you a copy of what has been admitted as Couch

16  Exhibit 62.  We'll use the original version.  It's right here.

17  What has been admitted as Couch Exhibit 62, what is this column

18  right here, Special Agent?

19  A   That's the price which Dr. Couch purchased the shares

20  identified, through the same row.

21  Q   So does that mean the price that the stock is trading for

22  on any particular day?

23  A   At that time it was purchased or sold; correct.

24  Q   So looking at the beginning dates -- and I'll blow it up a

25  little, then we'll move down -- in November roughly what was

1    the stock trading for?

2    A    $3.80.

3    Q    And by the time it got to January, what was it trading for?

4    Let's look at the January 17th date because we know he talked

5    about that date being purchased.  What's it trading for then?

6    A    $7.45.

7    Q    And again looking back at Government's Exhibit 10-19, in

8    January is that what their prescribing levels are at?

9    A    That's right.

10   Q    Has the stock price gone up or down?

11   A    It's gone up.

12   Q    Now let's look towards April, at the bottom here.  And

13   April 24th, on those days what is the Galena stock price valued

14   at?

15   A    $1.77.

16   Q    And is that a significant dropoff from what it was?

17   A    Very significant, yes.

18   Q    Let's look again at 10-19.  And is this April?

19   A    Right.

20   Q    So we talked about being here in January; correct?

21   (Indicating.)

22   A    Right.

23   Q    That's January?

24   A    That's right.

25   Q    When the stock was up at $7 a share?

1    A    Correct.

2    Q    And they were prescribing at over 2.5, Dr. Ruan at least,

3    over 2.5 million micrograms a month?

4    A    That's right.

5    Q    And then we just saw the stock price in April; correct?

6    A    Right.

7    Q    And this is April.  (Indicating.)  And what -- is Dr. Ruan

8    now under a million micrograms a month?

9    A    He is.

10   Q    I want to go back to what's been admitted as Government's

11   Exhibit 11-4.  Do you recall being asked questions about the

12   sales of the stock during this time period?

13   A    I do.

14   Q    What is this chart titled right at the top?

15   A    Stock Purchases, Galena Biopharma.

16   Q    It doesn't say all stock activity, does it?

17   A    No, it does not.

18   Q    Is this all the purchases for Galena Biopharma for these

19   doctors?

20   A    That's correct.  For the time period I reviewed.

21   Q    And do you remember or do you recall Mr. Knizley saying:

22   Well, the totals of this would be not accurate because there

23   were sales; correct?

24   A    Correct.

25   Q    But you didn't put totals on this chart, did you?

1  A   I did not.

2  Q   So this chart is what it purports to be, is it not?

3  A   It's stock purchases of Galena Biopharma made by Dr. Couch

4  and Dr. Ruan.

5  Q   And both Dr. Ruan and Dr. Couch's counsel brought up the

6  fact that they sold stock during this time period, the Galena

7  stock; is that correct?

8  A   That's right.

9  Q   When you sell stock, you get back what?

10  A   Money.

11  Q   And do you automatically have to reinvest that money into

12  that same stock?

13  A   No.

14  Q   You can choose -- can't you choose to do whatever you want

15  with that money?

16  A   You can.

17  Q   So the fact that they sold it, does that mean anything?

18  A   It means they have money.

19  Q   And in which they then -- as both their counsel showed

20  you -- What did they do with that money?

21  A   They reinvested back into Galena Biopharma.

22  Q   Do you recall both counsel for Dr. Couch and Dr. Ruan

23  asking you about the cancer vaccine that Galena had in the

24  pipeline?

25  A   I do.

1  Q   Can you explain to the jury what does it mean if a drug is

2  in the pipeline?

3  A   It means the FDA has not yet approved it to be actually put

4  out on the market for us to take.

5  Q   So at the time period when Dr. Ruan and Dr. Couch were

6  buying and selling the Galena stock, was this cancer drug being

7  sold at that time?

8  A   It was not.

9  Q   And they showed you emails where they referenced the cancer

10 drug, do you recall that?

11 A   I do.

12 Q   And one of them was 11-5(11); correct?

13 A   Right.

14 Q   And Dr. Ruan's attorney had you read from this second

15 paragraph?

16 A   That's correct.

17 Q   Starting from right there, my personal belief, can you just

18 read to the end of that paragraph?  And just so we show, is

19 this Dr. Ruan's email to Li Ma?

20 A   That's right.

21 Q   And starting from my personal belief, I'll blow it up a

22 little bit for you.

23 A   My personal belief is that there will be a major market

24 share taking over, which may drive the stock up as well as

25 generating enough cash to support their R&D on the cancer

 1  vaccine.

 2  Q   And again, major market takeover, they are not selling the

 3  cancer drug yet.  Is he talking about the cancer drug here?

 4  A   No.  The cancer's -- the cancer product wasn't being sold

 5  yet.

 6  Q   What is Dr. Ruan's personal belief that he's stating here?

 7  What is going to have a major market share takeover?

 8  A   There's going to be a major market share taking over

 9  Abstral into Subsys.

10  Q   And lastly, do you recall going through the charts with

11  Dr. Ruan's attorney about the amount of Subsys versus the

12  amount of Abstral prescribed each month?

13  A   I do.

14  Q   And do you recall the email where Dr. Ruan mentioned being

15  a national speaker for Subsys?

16  A   Yes.

17  Q   But you were not the case agent on this case, were you?

18  A   I was not.

19  Q   So you don't have any knowledge as you sit here today as to

20  why or why not Dr. Ruan or Dr. Couch may have been prescribing

21  Subsys?

22  A   No.

23          MR. BODNAR:  One moment, Your Honor.

24          Nothing further.

25          MR. KNIZLEY:  Permission to recross on the limited

 1   issue for the flight that was not part of the direct

 2   examination?

 3           THE COURT:  Overruled.

 4           All right.  You may step down, Agent.  Thank you.

 5           Call your next witness.

 6           MS. GRIFFIN:  Call Dr. Greenberg, Your Honor.

 7           THE COURT:  All right.

 8           MR. ARMSTRONG:  Judge, while we're waiting on this

 9   witness, may we approach side bar real quick?

10           THE COURT:  All right.

11       (At the side bar, jury not present.)

12           MR. SHARMAN:  Your Honor, we have to approach.  We

13   didn't want to interrupt counsel's rhythm.  Dr. Couch and

14   Dr. Ruan wish to make a limited objection to Dr. Greenberg's

15   qualification as an expert.  We wanted to raise that now before

16   he got on the stand and before the jury.  Basically the

17   argument is that he is certainly qualified to be an expert in

18   general medicine and addiction medicine, probably in

19   occupational medicine, but he's not qualified to be an expert

20   in what he's being offered, as we understand it in this case,

21   which is an expert in pain Management.  He's not board

22   certified.  He is not an anesthesiologist, not board certified

23   anesthesiologist.  He has a practice in anesthesiology.  He's

24   not published.

25           So particularly on the issue of his qualifications, we

661

```
 1   object to Dr. Greenberg's being offered as an expert in pain

 2   management as opposed to any of those other topics.

 3           MS. GRIFFIN:  If I might, Your Honor, he's practiced

 4   pain management for 30 years.  He has also been retained by the

 5   Arizona Board of Medicine, a medical board, to oversee

 6   investigations into doctors, pill mills, abuse of drugs

 7   themselves and any other issues about doctors.  He's done that

 8   for 30 years.  He's been qualified in federal court before in

 9   pain management and he has been qualified in state court.  He's

10   actually qualified in pain and addiction medication.  And I

11   think if they had this issue, it should have been raised in a

12   Daubert motion.

13           THE COURT:  All right.  I overrule the

14   objection.  Thank you.

15       (In open court, defendants and jury present.)

16           THE CLERK:  Dr. Greenberg, if you will step toward the

17   witness stand, I'll swear you in.  Let me get you to raise your

18   right hand.

19               DAVID GORDON GREENBERG, MD,

20           was sworn and testified as follows:

21       THE WITNESS:  Yes, I do.

22       THE CLERK:  Thank you, sir.  Please be seated.

23                   DIRECT EXAMINATION

24   BY MS. GRIFFIN:

25   Q   Good morning.
```

1   A   Morning.

2   Q   Tell us your name, please, sir.

3   A   David Gordon Greenberg.

4   Q   Are you a physician licensed to practice in Arizona and

5   California, Dr. Greenberg?

6   A   Yes, I am.

7   Q   What type medicine do you currently practice?

8   A   I practice addiction medicine and also chronic pain

9   medicine.

10   Q   Let's discuss your education, Dr. Greenberg.  Where did you

11   go to college?

12   A   I went to college at the University of California at

13   Berkeley Campus and I graduated with a degree in agricultural

14   sciences.

15   Q   Then did you go on to medical school?

16   A   Yes, I did.  I went to medical school at UC Davis, which is

17   another campus of the California system, and they have a

18   medical school there.

19   Q   When did you graduate from medical school?

20   A   I graduated from medical school in 1979.

21   Q   Did you join the Army thereafter?

22   A   Yes, ma'am.  The first thing I did when I graduated was

23   join the Army.

24   Q   Now, what generally follows a doctor immediately after

25   medical school, would that be an internship?

663

1    A    Yes.  Specially back in the 1970s that would be -- that

2    would be an internship.

3    Q    What is an internship?

4    A    An internship is the first time that a newly-minted

5    graduate in the field of medicine will get a chance to

6    autonomously or to basically take care of patients on their own

7    without supervision from an attending physician.

8    Q    Now, did you have occasion to rotate during your

9    internship?

10   A    Yes, I did.  I chose to do a rotating internship.

11   Q    What does that mean?

12   A    It means that I rotated on different services such as the

13   surgical services, such as the internal medicine services,

14   pediatric services, et cetera.

15   Q    Did you also rotate in pain management and ER management?

16   A    Yes, definitely.  We did emergency room rotations and I had

17   pain management training at the University of Arizona, both at

18   the University of Arizona main campus and then also at the

19   Tucson Veterans Hospital.

20   Q    When you said you were doing this internship, was that in

21   the state of Arizona?

22   A    Yes.

23   Q    And you were in the military at that time; is that right?

24   A    Yes.  I was on active duty assigned to the University of

25   Arizona system.

DAVID GORDON GREENBERG, MD - DIRECT BY MS. GRIFFIN

664

1  Q   In connection with your internship, did there come a time
2  when a patient actually bit you?
3  A   Yes, there was a time.
4  Q   Could you tell us about that?
5  A   Well, this was about 40 years ago.  And it was during
6  monsoon season.
7  Q   What does that mean?
8  A   Monsoon season is what in Arizona they call the wet
9  season.  I think you guys might disagree as far as whether it's
10  really a wet season in Arizona, because it's pretty dry.  But
11  at any rate, it was the time that we have a lot of
12  thunderstorms and a lot of power failures.
13  Q   And what happened on that particular day when you were
14  bitten by a patient?
15  A   We -- actually it was at nighttime and got a call from the
16  emergency room that a patient needed to be intubated, which
17  means that the patient was having respiratory failure and was
18  getting ready to die.  And I was called down to the emergency
19  room to go ahead and place a tube in the patient's throat so
20  that she could breathe.
21  Q   Initially were you able to do so?
22  A   No, I wasn't able to do it initially.
23  Q   So what did you do?
24  A   What I did is I tried to open the patient's mouth gingerly
25  with my fingers and prying them open so as not to hurt her

1    teeth.  And I attempted at that point in time to go ahead and

2    try to open up her airway through that method.

3    Q    Were you able to do so?

4    A    I was able to almost do so, but then unfortunately this

5    patient started to have seizures at the same -- at the same

6    time that I was trying to work on her airway.  And so her

7    condition then got to be quite a bit more critical.  And while

8    I was trying to manipulate her airway, she bit me on my left

9    index finger and middle finger.

10   Q    Were you able ultimately to fix it so the patient could

11   breathe?

12   A    I was able to, to place a surgical incision that was --

13   allowed her to breathe through a tube after that.

14   Q    Can you tell us what happened connected with the bite?

15   A    Yes.  Shortly after I got bitten, I realized that I was

16   having what looked like infection in the two fingers that

17   received the bite.  And the chief of surgery there, Dr. Hugo

18   Villar, looked at it.  And he felt it was infected also at that

19   time and he felt the wound needed to be debrided, which is

20   just -- really just cleaning up the dead tissue that was around

21   the site of the bite.

22   Q    And that's very painful because it involves scraping the

23   skin off?

24   A    Correct.  Yes.

25   Q    Were you prescribed something during that procedure or

DAVID GORDON GREENBERG, MD - DIRECT BY MS. GRIFFIN

666

```
 1   after that procedure?
 2   A   My department chairman, Dr. Burnell Brown, who is no longer
 3   with us, he prescribed the Percocet five milligram tablets to
 4   take.
 5   Q   What is Percocet?  Does it have another name?
 6   A   Yeah.  Well, Percocet would be -- the generic name would be
 7   oxycodone.
 8   Q   And can you tell us what dosages?  You said five milligram?
 9   A   Five milligrams.  It also had some acetaminophen in it too.
10   Q   Is that a low dosage?
11   A   Yeah, that's a low dosage.
12   Q   Approximately how many weeks did you take that medication?
13   A   I took that medication for about five weeks tops.
14   Q   During the time you were taking the medication did the bite
15   become more serious in connection with pain going up your arm?
16   A   It did.  And I was given --
17   Q   Briefly tell us about that.
18   A   Yeah, it did.  And I was given nerve blocks.  I was given
19   stellate ganglion blocks and other nerve blocks to try and
20   quell the pain.
21   Q   Did there come a time -- during that time you were still
22   working as an intern?
23   A   80 hours a week.
24   Q   Did -- was fentanyl, liquid fentanyl, being used in the
25   emergency room during that time?
```

1    A    Some liquid Fentanyl was being used in the emergency rooms
2    at that time but also there was a lot of Fentanyl being used on
3    the open heart surgery surface too.  And so there were multiple
4    areas within the hospital that the fentanyl was used.
5    Q    There wasn't a spray Fentanyl at that time; is that
6    correct?
7    A    No.
8    Q    Just liquid.  And were there patches at that time?
9    A    There were no patches at that time.  It was just liquid
10   fentanyl.
11   Q    What happened to the left-over fentanyl that was wasted
12   from those major heart surgeries or emergencies?
13   A    It would -- back in those days once a week a person would
14   come around and collect all the waste fentanyl and then pour it
15   down the drain and have it witnessed by the nurses.
16   Q    And is that referred to as wasting?
17   A    Yes.
18   Q    The remainder?  Were there times when you used some of that
19   wasted fentanyl along with your Percocet which was prescribed?
20   A    Not so much along with Percocet.  But when I ran out of
21   Percocet on the next 80-hour shift I had I started to realize
22   at that point in time that I was having a reaction to the
23   narcotic medication, that disturbed me.
24   Q    In fact, you said that was about five weeks after initially
25   being bitten?

1    A    Approximately, yes.

2    Q    What did you do as a result of that concern?

3    A    I called the Surgeon General's office in Washington, D.C.

4    and I reported to Colonel Harlan Bridenbaugh -- he then became

5    a general later -- I reported to him that I felt that I was

6    becoming possibly dependent on the Percocet medication.

7    Q    Did you request help?

8    A    Yes, I did.

9    Q    Did you receive help?

10   A    Yes, I did.  I got transferred to William Beaumont Army

11   Medical Center where they have a treatment program for

12   different types of chemical dependency.

13   Q    Did you undergo a six-week treatment program?

14   A    Yes, ma'am, I did.

15   Q    Have you had any problems thereafter?

16   A    No.  Thank God, no.

17   Q    Now, once you completed the treatment, did you then go into

18   a residency?

19   A    Once I completed the treatment, I did not go into a

20   residency.  I volunteered to go to the Ninth Infantry Division

21   in Fort Lewis Washington.

22   Q    That's the Army; is that right?

23   A    Yes, that was the Army.  Uh-huh.

24   Q    Did that consist of your being a battalion surgeon?

25   A    Yes, ma'am.  That was my duty station as a battalion

669

1    surgeon.

2    Q    Then did there come a time -- what type medicine did you do

3    there as battalion surgeon?

4    A    We would do preventive medicine and we also did a lot of

5    medicine at that time to try to counteract the effects of

6    poison gases and other types of things that would be used in

7    combat against us.

8    Q    In connection with that, did you have a residency

9    thereafter?

10   A    No, I did not.

11   Q    Did you go into practicing medicine thereafter?

12   A    Yes, I did.

13   Q    And could you tell us what type work and where?

14   A    Yes.  It was in Phoenix, Arizona.  And the name of the

15   health plan was the Cigna Health Plan.  It was what they called

16   an HMO, but that's a type of health insurance plan that was

17   common back then.  And --

18   Q    What type work were you doing?

19   A    I was doing work in chronic pain medicine and also

20   addiction medicine.

21   Q    Approximately how long did that last?

22   A    That lasted about six, seven -- about six years.  About six

23   years.

24   Q    Now, during this time did you also have any duties with the

25   Arizona Medical Board?

```
 1   A   Yes, ma'am.  I was hired by the Arizona Medical Board and
 2   trained by them to be an investigator.
 3   Q   At the same time you were working in pain management?
 4   A   Yes.
 5   Q   What did you do as an investigator with the Arizona Medical
 6   Board?
 7   A   We did everything from counter diversion-type activities,
 8   which would mean trying to disrupt criminal -- criminal
 9   organizations that were figuring out how to siphon off
10   narcotics and other controlled substances into the black
11   market.
12   Q   How long did that continue that you assisted with the
13   Arizona Medical Board in connection with investigating doctors?
14   A   Well, I still do some work for the Arizona Medical Board in
15   that -- not in the counter diversion capacity but in assisting
16   them with doctors that are having problems either
17   psychiatrically or problems related to substance abuse.
18   Q   Did you continue for more than a short period of time
19   investigating, though, for the Arizona Medical Board?
20   A   I did.  I wound up being the chief investigator.  And I was
21   chief investigator for about -- for about, I would say, 12 --
22   12 months.
23           THE COURT:  Ms. Griffin, is now a good time for us to
24   break for the morning break?
25           All right.  Ladies and gentlemen, leave your pads on
```

```
 1    your chairs, no discussion about the case.  Take your break

 2    downstairs in the jury assembly room.  We will call you back up

 3    in about 15 minutes.  We're in recess.

 4         (A recess was taken at approximately 10:30 a.m.)

 5         (In open court, defendants and jury present.)

 6              THE COURT:  All right, Ms. Griffin.

 7    BY MS. GRIFFIN:

 8    Q   We're going to go through your qualifications, additional

 9    qualifications rather quickly.  Were you -- did you work with a

10    pain clinic there in Arizona approximately five years before

11    volunteering for Desert Storm?

12    A   Yes, I did.

13    Q   What did you do during your volunteer time in the Army for

14    Desert Storm?

15    A   Well, I volunteered to go overseas but the Army was having

16    some shortages at that point in time with reference to bringing

17    huge numbers of reservists back down onto active duty.  And one

18    of the things that they noticed was that a lot of the -- a lot

19    of reservists had lost their skills, and so I was put in charge

20    of a program that was kind of an ad hoc program to test the

21    medics as they came back in to report to duty.

22              And to make sure that their skills were good.  If

23    their skills were good, then we put them out into infantry in

24    armored battalions to take part in Desert Storm.  If their

25    skills were not so good, we sent them to be orderlies in the
```

 1    hospitals in Germany.

 2    Q    Dr. Greenberg, thereafter did you go back to the practice

 3    of pain management?

 4    A    Yes.

 5    Q    Did you also practice addiction management?

 6    A    Yes.

 7    Q    Now, you have previously been admitted in federal court as

 8    an expert witness in pain and addiction medicine?

 9    A    That's correct.

10    Q    You've also been admitted in state court as an expert in

11    addiction medicine; is that correct?

12    A    Correct.

13    Q    So you have approximately 35 to 40 years of experience in

14    pain management?

15    A    Yes.

16    Q    Now, have you also consulted with Medicaid on commercial

17    drug diversions?

18    A    Yes, I have.

19    Q    Have you consulted the Department of Justice on dangerous

20    opioid prescribing cases?

21    A    Yes.

22    Q    Have you been a consultant to Tricare on drug abuse and

23    drug diversion?

24    A    Yes, I have.

25    Q    Have you been the attending physician for the Maricopa

1  County Indigent Inpatient and Outpatient Detoxification

2  Services?

3  A   Yes.

4  Q   That Maricopa County is in Arizona?

5  A   Correct.

6  Q   Have you been a consultant in pain management at White

7  Mountain Regional Medical Center in Arizona?

8  A   Yes.

9  Q   Have you also, and I think you've already told us that,

10  contracted with the State of Alabama as the director of their

11  program for doctors?

12  A   State of Arizona.

13  Q   State of Arizona, I'm sorry.  Is that right?

14  A   Yes.

15  Q   And you have done some overseas healthcare work as well; is

16  that right?

17  A   Yes.  I used to work for a mining company for a number of

18  years in Arizona.  Actually it was in Arizona and in New

19  Mexico.  And they needed to go overseas into the -- into the

20  Democratic Republic of Congo to do exploration work, and I

21  served as the company medic for the mercenaries that we had

22  under our control and also for our expatriates that were also

23  working on the project from Germany and the Netherlands and

24  other places in Europe.

25  Q   In connection with that you also did pain management and

1  addiction management?

2  A  Yes, I did.  Although when I was overseas, I was not doing

3  addiction or pain medicine.  I was doing tropical medicine and

4  trauma medicine.

5  Q  And thereafter when you came back to the states you picked

6  up doing pain management medicine?

7  A  Yes.

8  Q  Have you also assisted the Cigna Health Plan of Arizona in

9  connection with diversion cases?

10  A  Yes.

11  Q  And, sir, are you also published?

12  A  Yes.

13  Q  What does that mean first of all?

14  A  Published means that I had an article that went into a peer

15  review journal and in fact I did.  The title of the article was

16  Investigative Guidelines for Distressed Chronic Pain Practices,

17  and it won the Lasker Award, L-A-S-K-E-R.

18  Q  Can you tell us what that is?

19  A  That's the award given each year by the American -- by the

20  state medical societies all across the United States.  They

21  give an award for writing and for contribution to improving

22  patient safety.

23  Q  Now, throughout this time you've also continued to practice

24  medicine; is that right?

25  A  Correct.

1          MS. GRIFFIN:  Your Honor, at this time we would

2     qualify Dr. Greenberg, move to qualify him as an expert in pain

3     and addiction medicine.

4          THE COURT:  All right.

5          MR. ARMSTRONG:  Same objection.

6          THE COURT:  All right.  Objection's overruled.  So

7     qualified.

8     BY MS. GRIFFIN:

9     Q    Dr. Greenberg, is there any way to estimate how many

10    individuals you've dealt with in your career in connection with

11    pain management?

12    A    The busiest clinic that I was ever at was the Cigna Health

13    Plan Clinic.  And we served an HMO population, which is a

14    prepaid healthcare population of about 250,000 people but

15    obviously not all of them are winding up in the pain

16    clinic.  But we would see those people when they had pain-type

17    problems.  And I was the medical director of that pain clinic

18    for approximately six years.

19    Q    Now, sir, what does standard of care mean in connection

20    with a physician?

21    A    Standard of care would be the standards of conduct, the

22    standards of honesty, the standards of proficiency within --

23    within the field of medicine.

24    Q    And in connection with pain management and pain medicine,

25    would you please give us a brief overview of a doctor-patient

676

1    relationship that is within the standard of care?

2    A    Something would be within the standard of care so long as

3    the doctors are doing everything they can to communicate well

4    with that patient and to be honest with that patient about

5    what's going on so the things that really need to happen are

6    the -- it's necessary that doctors tell patients the

7    truth.  That's an important thing.  And that sometimes doesn't

8    happen and that's a real tragedy sometimes.

9            So the other thing that's important with reference to

10   that is that doctors not only tell the truth, but they also

11   spend time with the patients and they explain what's going on

12   with them in their -- in their treatment plans.

13   Q    And is that something that should be done by the doctor him

14   or herself?

15   A    Yes, I believe that should be done by the doctor him or

16   herself.

17   Q    And that would be within the standard of care?

18   A    Yes, that would be within the general standard of care.

19   Q    In connection with the doctor-patient relationship for pain

20   clinics is there a different type of relationship in terms of

21   deciding to accept a patient as opposed to a general

22   practitioner?

23   A    Yeah, there is.  It's not a formal standard but it's a

24   common standard.  And basically a simple example of that would

25   be a patient comes into a pain clinic and they request services

677

1   in pain medicine.  And the things that -- that are done a

2   little bit differently in ethical pain medicine practices is

3   that we vet the patients.  And when I say vet them, that means

4   we actually check them out and make sure that they seem to be

5   legitimate.  And the other thing that we do which is of

6   tremendous importance is that we contact the referring

7   physicians.  And that can be done either by phone or it can be

8   done -- it can be done through an email or whatever you have.

9          But the critical thing is that when someone's coming

10  in and wanting to join a pain medicine practice as a patient,

11  it's very important that we get information from the referring

12  physician as to why that patient wants to come to our practice

13  and also to get information from that referring doctor or the

14  previous prescribing doctor as to what was that patient's

15  compliance like in the practice of medicine that they are

16  leaving.  And that's critical information.

17  Q   What do you mean by compliance?

18  A   Compliance would be following the rules for the practice.

19  Rules could be something like if the practice uses an opioid

20  treatment agreement, then it would be -- it would be so that

21  the patients would understand what the rules are, the new

22  patient would understand what the rules are, and that they

23  would sign a document that stated that they would follow the

24  rules of the practice.

25  Q   And who in connection with pain management should be the

678

 1   person that goes over that with the patient?

 2   A   The physician.

 3   Q   Now, when you talk to or speak to a doctor that has

 4   referred a patient, what else would you want to know in

 5   connection with taking a new pain management patient?

 6   A   Well, first of all, after talking with the doctor, we would

 7   definitely check the controlled substances database.  That's a

 8   critical piece of information.  That's actually life-saving

 9   information in many situations.

10   Q   Is that commonly known here in Alabama as the PDMP?

11   A   Yeah, and it has similar but not the same initials in

12   Arizona.

13   Q   And most states have some type of similar program?

14   A   Yes.

15   Q   Even though they may call it something differently; is that

16   right?

17   A   Slight variations.

18   Q   And you said that's life-saving before you see a

19   patient.  Why is that?

20   A   Well, because of the problem that we have, both within pain

21   medicine and addiction medicine.  There are people who try to

22   scam the system, have tried to game the system.  And it's

23   critically important that we identify those people.  And not

24   because we think they are evil or bad people or anything like

25   that.  Many of them are actually addicted to these drugs and

679

1  they are desperate and they are looking for a way to get -- to

2  get medications that they believe will make them feel

3  better.  And so that's -- it's a very important part of the

4  process.

5  Q   Do you also look or discuss with the referring doctor for

6  any previous signs of abuse or diversion or any red flags

7  before you accept a patient?

8  A   Yes, absolutely.  If we had a patient that had been caught

9  diverting and they wanted to join our practice, we would tell

10 them we're sorry, but they are going to have to go somewhere

11 else because we do not tolerate drug diversion.  Drug diversion

12 is what goes to the middle schools.  That's where kids in

13 middle schools get their drugs.

14 Q   Drug diversion means selling or giving away the drugs

15 someone is prescribed?

16 A   Correct.

17 Q   Then once you have determined that the individual might be

18 compliant and you decide to take the individual, what is the

19 standard of care for your first meeting with the client -- I

20 mean with the patient?

21 A   The first meeting would be to get to know the -- to get to

22 know the patient.  And whenever possible, I like to meet with

23 the patient and their spouse along too.  That's a better way to

24 do it.  And to make sure that the communication is going well

25 between the spouse and the patient.  Because sometimes that

1   communication doesn't go so well and the patient may be -- may

2   be willing to try to tell the spouse things that aren't true

3   with reference to the type of treatment they are getting.  So

4   I'd like to see whenever possible the patient and the spouse or

5   the patient and an adult child.

6   Q    And that is the patient's ultimate choice, though; is that

7   correct, as to whether that person comes in?

8   A    Absolutely.  Oh, yeah, totally.  If the patient says they

9   don't want that person in, that person will not come in.  But

10  it also decreases the chances that we'll accept that patient.

11  Q    Do you attempt to determine if there are any signs of

12  addiction to opioids with the patient on the first visit?

13  A    Sure.  I mean, in addition to checking the PDMP and getting

14  the old records from the previous prescribing physicians, we,

15  you know, we take a history of the patient.  And that history

16  that we take is a history of their pain problems.  We also ask

17  questions about do they have any substance abuse problems

18  themselves, or do they have substance abuse as a problem within

19  their blood relatives.  Because those are important pieces of

20  information that we need for improving safety as much as

21  possible for that prospective patient.

22  Q    Do you inquire both as to prescribed medications and

23  illicit street medications?

24  A    Say that again, please.

25  Q    Do you inquire of the new patient about any use of

681

1    prescription medications and of street medications?

2    A   Yes, absolutely.  We look at illicit and licit drugs.

3    Q   Does there come a time after making this inquiry that you

4    do an examination of the patient?

5    A   Yeah, we do a physical examination of the patient that

6    focuses on the areas of complaint that they may have the

7    most.  So with the part of the body that's hurting them the

8    most, we start the physical examination on that part of the

9    body.  But we also check other parts and other systems too.

10   Q   Do you, the doctor, personally do that or is that within

11   the usual course of professional practice for pain management?

12   A   Yeah, I normally do that.  I normally do that by myself.

13   Q   Now, this would be different from maybe a physical

14   examination your first time with a general practitioner?

15   A   It's quite different than that.  When we're evaluating a

16   patient to come on board with our practice, we very much -- we

17   very much want that patient to be happy with our service and we

18   also want that patient to be compliant with our rules.  And

19   when we do the physical examination, we do a substance abuse

20   examination in addition to just listening to the patient's

21   heart or something like that.  And that's a very important

22   thing to do, especially in addiction medicine and pain medicine

23   because there's so much abuse that does go on in those

24   particular disciplines.

25   Q   And give us an example of what you mean by abuse

682

1    examination.

2    A    Sure.  We examine the patient's body for fresh I.V. tracks

3    to see if they have been injecting -- injecting narcotics or

4    other medications, methamphetamine, through that method.  And

5    that's an important thing to do.  Unfortunately there are a lot

6    of practices in the United States of America that don't do a

7    proper substance abuse examination and the patients and their

8    families do not benefit from that kind of abdication of that

9    important role.

10   Q    Do you look for sores or gums or teeth problems in

11   connection with addictions?

12   A    We can certainly look at that.  And those types of problems

13   would be more common with people who are also heavily using

14   methamphetamine.  But we certainly look for those types of

15   problems too, as a lot of patients that we see in addiction

16   medicine have problems with more than one class of addicting

17   drugs; it's not just opioids or it's not just marijuana or it's

18   not just methamphetamine.  So we check, we check as thoroughly

19   as we can within reason.

20   Q    And you said you also check the area of the body where the

21   patient has indicated they have a problem, be it the knee or

22   elbow or shoulder; is that right?

23   A    Yeah, we examine the painful region.  Yes.

24   Q    You, the doctor, actually does that?

25   A    Yes, ma'am.

1  Q   And is that within the usual course of professional

2  practice in pain management?

3  A   It certainly is within the state of Arizona.

4  Q   In connection with examining the particular area the

5  patient claims is hurtful, why does that help you?

6  A   That gives us an idea of where the problem may lie.  It

7  could be a person may be suffering from severe arthritis in

8  their knee and have pain there and not really know what to do

9  sometimes and not really know where to go with it.  So we also

10  do a lot of referring for diagnoses so we utilize specialists

11  who are trained in orthopedics, neurology.  For example,

12  neurologists would be someone -- we would refer to a

13  neurologist when the patient had problems with severe headaches

14  and none of the normal medications were helping them, we would

15  refer them to a neurologist.

16  Q   And if you couldn't see any reason for the pain the patient

17  complains of, MRI is relatively fine, you know of nothing else

18  particularly wrong with the patient and they still complain of

19  pain, what type of examination do you do?

20  A   You would do the same type of examination but we would tell

21  the patient that if we couldn't find something wrong, that we

22  would do our best to refer them to a specialist that would --

23  for example, if it was painful knee, that would be expert in

24  taking care of that type of condition.

25  Q   On this first visit do you typically give a patient an

684

1   opioid?

2   A   No.

3   Q   Why is that?

4   A   Because we want to have the time to properly evaluate the

5   patient and make sure that the previous prescribing doctors

6   were vouching for them for being a compliant patient and also

7   we want to make sure that we have time to get back an initial

8   confirmed urine drug screen on them before we give them any

9   types of opioid medication.  So what we tell the patients in

10   that setting is you're going to have to continue to get your

11   medications from your previous doctor for the next week or two

12   until we get all the data we need to make sure that we want to

13   go ahead with our relationship.

14   Q   Do you also talk to the patient about informed consent --

15   A   Absolutely.

16   Q   -- during this initial meeting?

17   A   Yes.

18   Q   And could you explain that to us?

19   A   Informed consent is a critical piece of ethical medical

20   practice.

21   Q   And is it also within the usual course of professional

22   practice in a pain practice?

23   A   Yes, it is.

24   Q   Could you explain what it is?

25   A   Well, at the present time it's more important than ever to

1   properly utilize informed consent with patients.  And the

2   reason for that is -- everyone here I'm sure knows is that

3   we're in the middle of an opioid emergency in the United States

4   of America, and it's a true emergency.  I'm not one of these

5   ones that gets built up --

6   Q   If you will, just tell us why you give the informed

7   consent -- the purpose of the informed consent?

8   A   The purpose of the informed consent is that we're honest

9   with our patients and we tell them -- for example, we tell them

10   that there are certain things that we don't want them to do and

11   the reasons why we don't want them to do it.  Okay?  And that

12   could be -- that could be mixing alcohol or mixing other

13   prescription drugs with the medications that we're going to be

14   giving them, things like that.  And that's very, very

15   important.

16          The most important thing, though, for informed consent

17   is this:  We also tell our patients their diagnosis as best we

18   can derive it and what the treatment alternatives are, what the

19   treatment options are for what they have.  And that's an

20   important thing for them to know.  And then in addition to that

21   we also tell them what the risks are of these medications.  And

22   chronic pain medications unfortunately are not benign.  There's

23   a tremendous amount of abuse and there's a tremendous amount of

24   addiction that can be caused sometimes.  And when we say

25   medical, it's iatrogenic, which means doctor-caused addiction.

DAVID GORDON GREENBERG, MD - DIRECT BY MS. GRIFFIN

1    Q    And that would be by form of prescription?

2    A    Yes, that would be through injudicious use of

3    overprescribing.

4    Q    When you do informed consent, is it within the usual course

5    of professional practice for that to be by the doctor, him or

6    herself?

7    A    Yes, ma'am.

8    Q    And you've stated that also on the first visit you will

9    take a urine sample for a urine drug test; is that right?

10   A    Yes, and I'd like to just add to that; that that's a urine

11   drug test that is sent out to a licensed drug testing

12   laboratory for a confirmed result.

13   Q    With that, the patient comes back for the second time.

14   They've had an informed consent, they've had results of the

15   urine drug test come back, and what happens at the second

16   meeting with the doctor?

17   A    Well, by that time we will have made contact with the

18   referring doctor or the previous doctor that was providing pain

19   services.  And that's at a time when we really have a better

20   idea of what is going on with that particular individual.  For

21   example, it may be that the reason that the new patient wants

22   to come to the clinic where I work at because they might have

23   just moved and the office that I'm at is actually closer to

24   them than what the previous office was.  That would be a very

25   benign type of a setting in which the person actually was

687

1  moving and they wanted to just be able to be closer to a pain

2  doctor that they could get services from.

3  Q   Now, on the second visit do you discuss with the patient

4  what the alternatives are and what you think might assist their

5  situation?

6  A   Yeah, we discuss that actually on the first and second

7  visit.

8  Q   And are there times when you make decisions about what to

9  prescribe and what to recommend for the patient on this second

10  visit?

11  A   Yes.

12  Q   Could you give us examples of the types of things you've

13  offered patients after you've done your initial determinations?

14  A   Sure.  One of the things that we really try to do is to

15  make our practices -- our practice as safe as is

16  possible.  Okay.  And one of the medications that we use now

17  more for chronic pain as opposed to -- as opposed to in the

18  past is a medication called buprenorphine.  We use

19  buprenorphine because of the fact it has a lower chance of

20  killing patients.  The chances of the patient accidentally

21  having an overdose death are significantly less with the drug

22  buprenorphine.

23       Now, buprenorphine is not nearly as popular as some of

24  the drugs that produce more of a high.  But we tell our

25  patients that we want them to be alive and we want them to be

688

1  healthy and that we believe that buprenorphine compounds for

2  many chronic pain patients are the safest way to go.

3  Q   Is that drug commonly known or is that a brand name called

4  Suboxone?

5  A   Suboxone is the brand name.

6  Q   Now, in connection with this second visit where you may be

7  making a decision with the patient about the treatment plan, is

8  it the doctor in the medical practice that should meet with the

9  patient in the usual course of professional practice?

10 A   Yeah.  The physician meets with the patient and explains

11 the treatment plan.  And again, we still invite the spouse or

12 adult child to come if they are willing to.

13 Q   It's not the physician assistant or the nurse practitioner

14 who makes the plan or meets with the patient on the second

15 time, is it?

16 A   No, ma'am; not in our practice, no.

17 Q   Is it outside the usual course of professional practice to

18 have the nurse assistant or the assistant to the doctor make

19 the decision on what medications the individual would receive?

20 A   Well, it would definitely be outside the usual practice of

21 practicing medicine in the state of Arizona, that's for sure.

22 Q   And if you were advised that no one in the practice, in the

23 PPSA practice except Dr. Ruan, Dr. Couch, and one other doctor

24 who's not named here, were the only ones who had the authority

25 to write schedule drugs, would it have to be the doctor that

1   actually wrote the schedule drugs?

2   A   So you're saying if the doctor who wrote the scheduled

3   drugs for the patient would be the only person who would -- who

4   would see that patient and follow that patient?

5   Q   No.

6   A   Okay.

7   Q   If the doctors such as Dr. Ruan and Dr. Couch were the only

8   physicians and the only people authorized under DEA or the

9   state of Alabama law to write controlled substances, then the

10  doctor with that licensing would have to be the one writing the

11  controlled substance?

12  A   Yes.

13          MR. SHARMAN:  Objection, Your Honor.  Nothing in

14  evidence that can be asked as a hypothetical.

15          MS. GRIFFIN:  Your Honor, I believe I said for

16  example.

17          THE COURT:  Yeah.  It's a hypothetical.  Overruled.

18  BY MS. GRIFFIN:

19  Q   Now, different states may have different requirements.  But

20  if we assume in Alabama that a nurse practitioner or a

21  registered nurse or a nurse anesthetist cannot write

22  prescription drugs -- cannot write controlled substances

23  without a DEA license, then the doctor would have to write the

24  scripts in those situations?

25  A   Yes.

1   Q   And are you aware also that no one is authorized to write

2   schedule IIs, but those under the DEA license in Alabama?

3   A   I -- I've picked that up indirectly through my reading of

4   charts.

5   Q   On the second visit where you are a pain doctor seeing the

6   patient, what would happen if you decide that some medication

7   needs to be prescribed or changed, how would that be handled?

8   A   Well, it depends upon what type of medication we're talking

9   about.  If the medication is a powerful schedule II narcotic

10  that has a reputation of being a drug that causes overdose

11  deaths, then certainly that would affect the recommendations

12  that we're going to utilize.  Because in our practice we really

13  put patient safety as the number one -- the number one

14  important thing that we have to accomplish.

15  Q   So in the usual course of professional practice, would it

16  be the physician's duty to warn the patient whenever the

17  physician decides to prescribe the narcotic or the opioid?

18  A   Yes, in our practice we -- the physicians do that.  We

19  don't delegate that to nurse helpers or anyone else.  The

20  physicians do.

21  Q   Is that within the usual course of professional practice?

22  A   It certainly is again, within the state of Arizona, yes.

23  Q   Now, do you also when you're going to give an opioid,

24  explain to the patient the dangers that can be associated with

25  the opioid as part of this informed consent?

DAVID GORDON GREENBERG, MD - DIRECT BY MS. GRIFFIN

691

1    A    Yes.

2    Q    Specifically, as for the powerful drugs, what type of

3    information -- powerful opioids would you advise the patient?

4    A    What we would tell the patient is this:  Is that these

5    medications are also poisonous and they've been known to be

6    poisonous ever since ancient time, ancient Thebes rode down the

7    Nile River.  And the fact of the matter is we tell the patients

8    flat out that even if they take these medications exactly as

9    the way we tell them to take them they could still suffer a

10   fatal respiratory arrest with some of these medications.  And

11   that's more so in patients that have certain pathologies such

12   as heavy smokers or something related to that that would cause

13   them to have respiratory systems that are not tip-top shape.

14   Q    Should that informed consent be documented in the medical

15   record under the usual course of professional practice?

16   A    We always document that in the medical record.

17   Q    Should patients also be offered safer therapies if they

18   have any problem with taking the strong medications that you

19   have discussed with them?

20   A    Oh, we encourage safer therapies to all our

21   patients.  Again, that's the type of clinic that we have.

22   Q    And are there occasions when patients say:  I don't want to

23   take a certain type of drug?  And if so, what do you do?

24   A    If patients say they don't want to take a certain type of

25   drug because they've heard the informed consent information

1  that it could be lethal even if they take it correctly, then we

2  work with them to use alternative treatments to deal with their

3  chronic pain.

4  Q   Now, also are patients warned as part of the usual course

5  of professional practice about compliant behavior before they

6  are given opioid prescriptions?

7  A   Yes.  The warning is essentially this:  We tell them that

8  they cannot give, sell, or otherwise transmit any of the

9  medications that we give them regardless if they're controlled

10  substances or noncontrolled substances.  That is -- that is

11  taboo.  We don't allow that.  And if any of our patients are

12  caught diverting, we eliminate them from our clinic.

13  Q   Is it within the usual course of professional practice for

14  the doctor to warn the patient about these behaviors that will

15  result in them being terminated from the clinic?

16  A   We choose to use the physician to do that type of informed

17  consent education because of the fact that we believe that it

18  has more impact on the patient if they are getting it directly

19  from the physician and not from a nurse helper or other type of

20  mid-level provider.

21  Q   Do you also continue to check and confront a patient if you

22  determine they are noncompliant?

23  A   Absolutely.  And again, this is where the controlled

24  substances PDMP and urine testing when used together really

25  help us out in ways that back in the old days before urine

 1   testing was as accurate and precise as it is right now, could

 2   help.  So what we'll do while we're monitoring these patients

 3   is first of all we decide whether or not the patient is a

 4   high-risk patient or a lower medium-risk-type patient.

 5   Q   What do you mean by that as it pertains to pain management?

 6   A   A high-risk patient would be a patient who has risk factors

 7   that increase the chances of them having a catastrophic

 8   outcome.

 9   Q   And a low-risk patient?

10   A   A low-risk patient would be a patient that didn't have

11   those types of factors.  I mean, a simple thing might be -- a

12   way of thinking might be like this:  A 65-year-old man who's

13   been a laborer all his life now has a very, very painful left

14   hip and is in distress because of that particular problem.  And

15   what we do is when we're vetting these patients is we make sure

16   the patient is telling us what appears to be a coherent story

17   and a coherent history of their present illness.  Then the next

18   thing that's really important to do is that we get on with the

19   analysis of the prescription database, which we call the CSPMP.

20         You guys have different initials, but it's the

21   prescription database as far as controlled substances.  That's

22   a really important thing for us to do.  And when I say checking

23   that database is lifesaving, I mean that literally.  That's not

24   a, you know, slang term I'm using or anything like that.  When

25   we pick up patients who say they are in compliance and then we

694

1  check on the controlled substances database and find out that,

2  oh, no, they've been getting controlled substances from maybe

3  five, 10, 15, 20, you know, different providers of controlled

4  substances, that's an emergency.  Those patients are the ones

5  that have catastrophic overdoses.  And so we confront them

6  straightforwardly and respectfully but we let them know that

7  this is unacceptable for being in our clinic.

8  Q   If they continue in that behavior, what happens?

9  A   They are disenrolled from our clinic.  We give them 30 days

10  in which we will cover them and then after that 30 days, it's

11  up to them to have gotten a new provider.

12  Q   And so if you're not an addiction specialist in terms of

13  getting someone off drugs, as a pain specialist you would refer

14  that individual out to someone who can help you with their

15  addiction?

16  A   Yeah, you can -- that would be -- that would be what a lot

17  of pain specialists do.  And we get a lot of referrals from

18  pain specialists who have had pain patients going back and they

19  want to help them but they don't have the experience or the

20  hospital privileges necessary to do detoxification in the local

21  hospitals, and we take care of that.

22  Q   You also, you've talked about monitoring and looking for

23  the physical signs of problems with a patient.  Do you monitor

24  mental/emotional status for opioid-induced depression?

25  A   Yeah, we do.  And opioids do cause depression.  The

695

1    stereotype is you take opioids and they make you feel wonderful

2    and euphoric and all that.  And that does happen.  And that's a

3    common effect.  It's a common effect of the opioid drugs.  But

4    opioids have a tremendous number of complications, especially

5    when they are used chronically.

6    Q   Other than giving these medications or opioids, prior to

7    giving it have you considered other modalities before

8    prescribing an opioid?

9    A   Oh, yeah, absolutely.  A patient who is not on any -- any

10   type of controlled substance, we make a lot of referrals to

11   what we call PM&R physicians which are physical medicine and

12   rehabilitation physicians.  And they are really unsung heroes

13   when it comes in the -- with the whole pain problem that we're

14   dealing with.  The PM&R doctors can often work wonders as far

15   as getting patients back to have full mobility and to decrease

16   their pain and to not be complicated by side effects from

17   powerful opioid or sedative-hypnotic drugs.

18   Q   So before prescribing an opioid is it within the usual

19   course of professional practice to consider noncontrolled

20   substances?

21   A   Certainly, especially in a patient who's on no medication.

22   Q   Is it also within the usual course of professional practice

23   to consider and recommend physical therapy for those patients

24   who are able to do so before prescribing opioids?

25   A   We recommend physical therapy.  But to be honest with you,

696

1    we have the best luck with the PM&R therapists, the physical

2    medicine and rehabilitation doctors.  But the physical therapy

3    can be very helpful in certain patients too.

4    Q   Now, Dr. Greenberg, in connection with your testimony here

5    today, have you been asked to review 20 patient files of

6    patients from PPSA?

7    A   Yes.  I believe it's approximately 20 files, yes.

8    Q   You had no prior knowledge of these patients?

9    A   No.

10   Q   You had not met nor did you know Dr. Ruan or Dr. Couch?

11   A   No.

12   Q   And you've not had any connection with their business,

13   PPSA?

14   A   No connection.

15   Q   I'm going to show you six at a time and ask you to identify

16   if you have reviewed the particular patient file.  The first

17   one is Government's Exhibit 13-1, and it is Patrick Chausse,

18   spelled C-H-A-U-S-S-E.  Have you had occasion to review and

19   form an opinion as to Mr. Chausse's treatment.

20   A   Yes.

21         MS. GRIFFIN:  Move to admit Government's Exhibit 13-1,

22   Your Honor.

23         THE COURT:  All right.  Any objection?

24         MR. SHARMAN:  No objection, Your Honor.

25         THE COURT:  All right.  Mark it in.

DAVID GORDON GREENBERG, MD - DIRECT BY MS. GRIFFIN

697

1          (Government's Exhibit 13-1 was entered into evidence.)

2    BY MS. GRIFFIN:

3    Q   I'll show you what's marked as Government's Exhibit 13-2,

4    JB.........., patient file from PPSA.  And ask if you have had

5    the opportunity to review that patient file and form an

6    opinion.

7    A   Yes.

8          MS. GRIFFIN:  I move to admit Government's Exhibit

9    13-2, the JB.......... patient file, Your Honor.

10          THE COURT:  All right.  Mark it in.

11          (Government's Exhibit 13-2 was entered into evidence.)

12    BY MS. GRIFFIN:

13    Q   And I ask if you've had the opportunity to review and form

14    an opinion on the Deborah Walker patient file from PPSA,

15    Government's Exhibit 13-3?

16    A   Yes.

17          THE COURT:  Are you offering that one?

18          MS. GRIFFIN:  I offer Government's Exhibit 13-3, Your

19    Honor.

20          THE COURT:  All right.  Mark it in.

21          (Government's Exhibit 13-3 was entered into evidence.)

22    BY MS. GRIFFIN:

23    Q   I'll show you patient file Erick, E-R-I-C-K, Gist, G-I-S-T,

24    Government's Exhibit 13-4.  Have you previously been provided

25    this patient file and had the opportunity to review it and form

1    an opinion?

2    A    Yes.

3            MS. GRIFFIN:  Move to admit Exhibit 13-4.

4            THE COURT:  Mark it in.

5        (Government's Exhibit 13-4 was entered into evidence.)

6    BY MS. GRIFFIN:

7    Q    I show you Government's Exhibit 13-5, KL..........,

8    ........, patient file and ask if you've had the opportunity to

9    review this file and form an opinion?

10   A    Yes.

11           MS. GRIFFIN:  Move to admit Exhibit 13-5.

12           THE COURT:  Mark it in.

13       (Government's Exhibit 13-5 was entered into evidence.)

14   BY MS. GRIFFIN:

15   Q    And Government's Exhibit 13-6, I'll show you the patient

16   file for DG............. and ask if you have previously had

17   the opportunity to review this file and form an opinion?

18   A    Yes.

19           MS. GRIFFIN:  Move to admit Government's Exhibit 13-6.

20           THE COURT:  All right.  Mark it in.

21       (Government's Exhibit 13-6 was entered into evidence.)

22   BY MS. GRIFFIN:

23   Q    I will hand you Government's Exhibit 13-1, the Chausse,

24   Patrick Chausse, C-H-A-U-S-S-E, file.

25           In addition to the file from PPSA as to Mr. Chausse,

699

1   were you also provided his Alabama PDMP record?

2   A   Yes.

3   Q   And that's what you've previously referenced as being the

4   documents maintained by the state about prescription controlled

5   substances that patients have received; is that right?

6   A   Correct.

7   Q   I show you what's marked as Government's Exhibit 13-1B and

8   ask if this is Mr. Chausse's PDMP from the state of Alabama?

9   A   Yes.  It appears to be, yes.

10  Q   So in addition to reviewing the patient file you also

11  reviewed PDMP; is that correct?

12  A   Yes.

13  Q   Could you tell us how you reviewed Mr. Chausse's file?  And

14  I'm assuming the way you're going to describe it will be the

15  way you reviewed each of the files?

16  A   Yeah.  The way that I reviewed the file is to first try not

17  to get a hernia picking up the files and then opening them up

18  and trying to see if I can follow what the physicians who were

19  taking care of Mr. Chausse in this case were trying to do as

20  part of their management of this particular patient.

21  Q   As to Mr. Chausse, did you determine who his physician was

22  at PPSA?

23  A   Yeah.  This was one of Dr. John Couch's cases.

24  Q   What could you tell us about Mr. Chausse?

25  A   Mr. Chausse was an Army veteran and he had had some very

1    serious problems which put him into an extremely high risk

2    category of chronic pain patient.  Mr. Chausse had had the

3    inability to safely use opioid medications.  And because of

4    that the patient -- I shouldn't say because of that -- in

5    addition to that the patient also had a history of psychiatric

6    problems to include PTSD.

7    Q   Which is?

8    A   Post-traumatic stress disorder.

9    Q   And had he previously had a history of opioid addiction

10   while in the United States Army?

11   A   Yes, he did.  Yes, he did.  And he also had a history of a

12   near-fatal respiratory arrest that required him to be in the

13   intensive care unit, I believe in Germany but it might have

14   been here in the United States.  And that fatal, near-fatal

15   respiratory arrest in his situation was due to his

16   overconsumption of fentanyl patches and Percocet.

17   Q   In connection with his referral to Dr. Couch, you said he

18   would be considered a high-risk patient?

19   A   Absolutely.  And that would be according to the 2009

20   American Academy of Pain Medicine and the American Pain Society

21   criterion for staging high-risk patients.

22   Q   As such, what care should have been taken with this

23   particular high-risk patient?

24   A   Oh, well, the care should have been -- should have been

25   completely different than what it was.

DAVID GORDON GREENBERG, MD - DIRECT BY MS. GRIFFIN                                       701

1              This was a human -- this person's a human being who

2     almost died because of an opioid overdose.

3     Q    And that was before he came to the pain clinic to see

4     Dr. Couch?

5     A    Right.  Right.  Exactly.

6     Q    How should his treatment have been handled by Dr. Couch and

7     how was it handled by Dr. Couch?

8     A    This patient at the time that he saw Dr. Couch had become

9     opioid free.

10    Q    What does that mean?

11    A    That means that he was no longer using opioids.  Okay?  And

12    he had expressed that he did not want to go back on opioids,

13    that he was scared of going back on opioids.  And for good

14    reason, for very good reason.  The patient Chausse also had a

15    history of psychiatric problems that went back for quite some

16    time and he was on psychiatric medications.  Abilify is one of

17    them, Wellbutrin is another one, and Valium was another one of

18    the medications that he was on for psychiatric issues.

19              The 2009 American Pain Society and American Academy of

20    Pain Medicine recommendations for dealing with high-risk

21    patients require special intensive management schemes to

22    protect these patients.  And unfortunately that did not happen

23    and that increases the chance of someone like Mr. Chausse

24    having a catastrophic outcome.

25    Q    Did you determine that Mr. Chausse first appeared at PPSA

702

1    in January of 2013?

2    A    Yes, January 10th, 2013.

3    Q    And was there any interdisciplinary team recommended by

4    Dr. Couch for this patient?

5    A    No, none that I ever saw or read, no.

6    Q    And despite Mr. Chausse saying he did not want to be on

7    addictive medication what was he treated with?

8    A    He was treated with powerful opioid drugs which was a

9    mistake, I believe, a major mistake in his management.

10   Q    And was one of these oxymorphone?

11   A    One of them was oxymorphone.

12   Q    And could you tell us how the treatment continued of

13   Mr. Chausse?

14   A    The treatment for Mr. Chausse just continued to him getting

15   more and more schedule II narcotics.

16   Q    Did you determine whether Dr. Couch himself conducted or

17   performed a comprehensive informed consent process to warn

18   Mr. Chausse about the significant dangers by the use of the

19   oxymorphone?

20   A    I've never seen in my review of PPSA records any proper

21   informed consent with reference to the dangers -- potential

22   lethal, fatal dangers -- of powerful opioid drugs.

23   Q    Did you determine that Dr. Couch prescribed in addition to

24   oxymorphone, methadone, and sedative-hypnotic drugs such as the

25   Zolpidem sleeping pills?

1  A   Yes.  And again, that compounds the tragedy of the

2  mismanagement of this case.  This patient --

3  Q   Why is there a problem with mixing sedative-hypnotic drugs

4  with powerful opioids?

5  A   The problem is that there's a synergistic interaction.

6  Synergistic meaning that there's an adverse, a combination of

7  the opioid drugs, the powerful schedule II opioid drugs, along

8  with the sedative-hypnotic drugs which are the benzodiazepines

9  in many cases and that this interaction makes it even more

10  likely that a high-risk patient such as Mr. Chausse would have

11  a catastrophic result as he did the first time that he wound up

12  on the drugs.

13  Q   As well as depression?

14  A   Yes.  And sure, his depression was not well addressed at

15  all.

16         MR. SHARMAN:  Your Honor, may we approach briefly?

17         THE COURT:  Is there an objection?

18         MR. SHARMAN:  Yes, ma'am, but I'd like to state it at

19  side bar if I may.

20         THE COURT:  All right.

21     (At the side bar, jury not present.)

22         MR. SHARMAN:  Your Honor, I'm not blaming the lawyers

23  for this.  But since 11:17 he has mentioned death one, two,

24  three, four, actually more than that, five times.  He keeps

25  talking about a catastrophic event with a patient who has

1  died.  Now, I don't know if he's trying to get in death even

2  though death has been withdrawn.  We've talked to the

3  government about this.  It is out of the case.  And I'm not

4  going to move for a mistrial now.  But he is clearly trying to

5  get that death in front of this jury and I object to it.

6         MS. GRIFFIN:  Your Honor, he has been instructed

7  yesterday and again this morning, and I have so advised

8  Mr. Sharman prior to court this morning, that he is not to make

9  any reference to the death of any of these patients.  He is

10 talking about his opinion that these high-power drugs, that

11 could be a potential result for them.  And I will lead him more

12 carefully.  But he has been instructed twice not to mention the

13 patients that have died such as Mr. Chausse and that he is not

14 to talk about their deaths.

15        THE COURT:  All right.  I have not to this point

16 understood his testimony to have been relating to what actually

17 happened to the patient.  I had understood his testimony to be

18 referencing what the potential outcomes are based upon the

19 practices as he is reviewing the charts.  So I overrule your

20 objection and I agree that Ms. Griffin should probably lead him

21 a little more carefully.

22        MR. SHARMAN:  Yes, ma'am.

23    (In open court, defendants and jury present.)

24 BY MS. GRIFFIN:

25 Q   You said you did not see a proper informed consent in

1    connection with the drugs that were being prescribed by

2    Dr. Couch to Mr. Chausse?

3    A    Correct.

4    Q    Did you find however that there were -- there was a

5    informed consent for an invasive procedure with Mr. Chausse?

6    A    Yes, I did.  And this is one of the things that's so

7    baffling about Dr. Couch and Dr. Ruan's practice of chronic

8    pain medicine, is that they know darn well how to do an

9    informed consent when they are going to be putting a needle

10   into a patient and giving a nerve block, or something like

11   that.  But you know, we don't have an emergency in the United

12   States of America of people dying from nerve blocks.

13              MR. SHARMAN:  Objection, Your Honor.

14   BY MS. GRIFFIN:

15   Q    Let's talk about what is an invasive procedure?

16   A    Invasive procedure is when you're actually putting a needle

17   into a patient and injecting medications into the

18   patient.  That would be an example of an invasive procedure

19   where you're actually going through the patient's skin and then

20   depositing a medication.

21   Q    Now, did you determine that on or about January of 2013

22   Mr. Chausse had a urine drug screening which was positive for

23   benzo?

24   A    Yes.

25   Q    And had those been prescribed by Dr. Couch?

1    A    I don't believe so.

2    Q    What happened after it was determined that Mr. Chausse

3    tested positive for benzos?

4    A    Well, what should have happened is that the physician in

5    charge, the attending physician, should have had the decency to

6    sit down with this young man and explain to him that his

7    behavior with reference to taking unauthorized medications was

8    unacceptable and could not be repeated.

9            And unfortunately this did not happen, and that is a

10   great disservice to a patient.  Because when a patient has

11   illicit drugs in their urine, it means that they are -- they're

12   in trouble.  Okay.  They're in trouble.  And they may have

13   catastrophic outcome.  And to not -- to not aggressively attack

14   that situation and talk with the patient and explain to them

15   how dire the situation could be -- nothing mattered.

16   Q    Is oxymorphone, does it have a street name -- excuse me, a

17   brand name of Opana?

18   A    Yes, it does.  That's the brand name for it, Opana.

19   Q    Did you see any indication where Dr. Couch followed through

20   with any attempts to get this veteran to a type of drug rehab

21   program?

22   A    No.  And this veteran could have used -- could have used

23   some type of a drug program especially -- especially because of

24   the fact that he was clean.  He had gotten to the point where

25   he was off the narcotics and it was tremendously bad judgment,

1   in my opinion, for Dr. Couch to go ahead and put him back on

2   these extremely powerful pain narcotics.  It was unnecessary.

3   Q   Was that outside the usual course of professional practice

4   for pain medication?

5   A   Absolutely.

6   Q   In connection, did you determine if the file contained any

7   evidence of random pill counts on this high-risk patient?

8   A   No.  I would have to say that Dr. Couch and Dr. Ruan's

9   practice of medicine did not involve that type of important

10  scrutiny with reference to doing random pill counts and other

11  types of safety-based actions that could benefit their

12  patients, especially their high-risk patients.  I've never seen

13  evidence of that.

14  Q   You've examined files from both Dr. Ruan and Dr. Couch, is

15  that correct, within your 20 files you examined?

16  A   Yes.

17  Q   And you had for your review their medical file and the

18  PDMP; is that correct?

19  A   Correct.

20  Q   Now, did you determine that Dr. Couch sent Mr. Chausse to

21  any other specialists?

22  A   No.  I did not -- I did not note that.  And at the very

23  least he should have been recommended to a psychiatric

24  specialist.

25  Q   Was the patient also placed on an anabolic steroid known as

1   testosterone?

2   A   Yes, he was placed on an anabolic steroid known as

3   testosterone, and that also was problematic.

4   Q   Was there an informed consent detailing the risks involved

5   in taking this anabolic steroid with his other medications?

6   A   No, there was no documentation of an informed consent

7   procedure that informed patient Chausse of the serious

8   consequences of being placed on the anabolic steroids.

9   Q   What are some of these risks?

10  A   Cancer is a risk.

11  Q   Heart disease?

12  A   Heart disease is a risk.

13  Q   Depression?

14  A   Depression is a risk.

15  Q   Exacerbation of his PTSD?

16  A   Absolutely it's a risk.

17  Q   Anxiety?

18  A   Yes, a risk.

19  Q   Now, was it also in the file that Mr. Chausse was noted to

20  be lethargic on the medications Dr. Couch was providing?

21  A   Yes, I believe both the patient Chausse noted that and also

22  his wife noted that too.

23          MS. GRIFFIN:  If I may have doctor -- excuse me.  If I

24  may have patient Chausse's file?

25          I'll show you what's Bates stamped number 207148.

```
 1              THE COURT:  Are you pulling that out of that file?
 2              MS. GRIFFIN:  I'm going to pull it out and put it
 3    right back in, your Honor.
 4              THE COURT:  That's fine.  I just want the record to
 5    reflect what you're doing.
 6              MS. GRIFFIN:  The record will reflect I pulled page
 7    207148 out of the Chausse file, Government's Exhibit 13-1.  And
 8    may we publish it to the jury, Your Honor?
 9              THE COURT:  Yes.
10    BY MS. GRIFFIN:
11    Q   I show you up at the top where it's January 26th, 2013,
12    Patrick Chausse.  And does it list his chief complaint?
13    A   His chief complaints were shoulder pain and he also had
14    some knee and low-back pain.
15    Q   Now, in the history of the present illness, does it say
16    that he's concerned about becoming addicted to pain medication
17    because he became addicted to pain medication while he was in
18    the military?
19    A   Yes, it does.
20    Q   Does it say that he's -- in the military, it says he took
21    too much pain medication and ended up on a ventilator in ICU
22    while in the military?
23    A   Yes.
24    Q   I'm placing that back in his file.  And I'm taking out
25    Bates stamp number 207185, which I will return after we look at
```

DAVID GORDON GREENBERG, MD - DIRECT BY MS. GRIFFIN

1   this.  Does this show a physician note or a notation of

2   treatment on April the 4th of 2013 for Mr. Chausse?

3   A   Yes.

4   Q   And in that does it indicate that he would like to come off

5   the pain medicine and he would like to try Suboxone?

6   (Indicating.)

7   A   Yes.

8   Q   Did you notice where Suboxone was ever written for him?

9   A   No.

10  Q   And was he -- did he continue to be prescribed opioids?

11  A   Yes, he continued to be prescribed powerful opioids, the

12  ones that are far more associated with catastrophic outcomes of

13  overdose.

14  Q   And you had referenced that he stated that he was

15  lethargic?  I show you what's Bates stamp number C&R 207233 for

16  August the 1st of '13 and ask you if this is part of

17  Mr. Chausse's file?

18  A   It appears to be.

19  Q   And does he state that after the increase of meds he is

20  lethargic and he feels he is on too much meds?  (Indicating.)

21  A   Yes, that's exactly what I read too.

22  Q   Does he also state that the meds were sedating him too

23  much?

24  A   Yes.

25  Q   Was anything changed on his medications?

711

1    A    Tragically, no.

2    Q    Now, as the usual course of professional practice for pain

3    management, is it just to stop pain or are there some other

4    objectives for the patient?

5    A    Well, there are other objectives as far as improving both

6    physical and mental health.  So those are -- those are other

7    objectives of treating pain patients, yes.

8    Q    Is there an objective of them being able to do more than

9    just sit?

10   A    Yes, absolutely.  To restore normal functioning both

11   intellectually and also through their physical abilities.

12   Q    I show you Bates stamp number 207253, which I will remove

13   and then place back into the file, to the exhibit, which

14   appears to be a September 20th, 2013 note about Mr. Chausse's

15   visit; is that correct?

16   A    Correct.

17   Q    Does he indicate in there that he requests occupational

18   nerve block and he said his meds are working well but he would

19   like to switch them up so he doesn't get used to it?

20   A    Yes.

21   Q    Was he switched up in medications?

22   A    His medications did appear to go up, yes.

23   Q    Went up?

24   A    Pardon me?

25   Q    Went up?

712

1  A   Yes.

2  Q   What is your professional opinion about the treatment

3  Patrick Chausse received from Dr. Couch?

4  A   I believe the treatment was grossly substandard and

5  dangerous.

6  Q   Did you believe it was outside the usual course of

7  professional practice?

8  A   Absolutely.

9        THE COURT:  All right.  Ms. Griffin, is now a good

10 time for us to break for lunch?

11       MS. GRIFFIN:  Yes, Your Honor.

12       THE COURT:  All right.  Ladies and gentlemen, leave

13 your pads on your chairs.  We're going to take a one-hour and

14 15-minute lunch break.  Be back downstairs in the jury assembly

15 room ready to be called back up at 1:15.  No discussion about

16 the case.  We're in recess.

17       MS. GRIFFIN:  Your Honor, may we approach briefly

18 after the jury leaves.

19       THE COURT:  Yes, the jury can go ahead.

20    (In open court, defendants presents, jury not present.)

21       MS. GRIFFIN:  Your Honor, can Mr. Knizley,

22 Mr. Sharman, and I approach briefly?

23       THE COURT:  Do you want the witness?

24       MS. GRIFFIN:  No, Your Honor, we don't need the

25 witness.

1    (At the side bar, jury not present.)

2         MS. GRIFFIN:  Normally, of course, we're prohibited

3    from speaking to the witness while they are on the stand at a

4    break.  I would like to have Mr. Bodnar remind him not to use

5    the word "death" or "die," just -- again just to refresh him to

6    just say something other than the word "death," if that's

7    appropriate with counsel and the Court.

8         MR. SHARMAN:  It is, Your Honor.  Because now we are

9    on a specific person and he is peppering his whole testimony

10   with "tragically, no," "catastrophic results."  It compounds

11   the tragedy.  He is trying as best he can to get this man's

12   death in front of that jury and I again object.  I do

13   appreciate the offer, but I again object.

14        MS. GRIFFIN:  Your Honor, I do not believe he was

15   trying to do that.  I believe he was trying to explain the

16   danger, which was in fact a danger for anybody taking those

17   kind of medications.  But I would like Mr. Bodnar just to be

18   able to tell him:  Remember that we have talked about not using

19   the word "death."

20        THE COURT:  All right.  And, yeah, you might discuss

21   with him, Mr. Bodnar, the legal implications and the problems

22   it could cause in the case.

23        MR. BODNAR:  We already have, and I will remind him

24   again there will be no other discussion between him and myself.

25        MR. ARMSTRONG:  And his review is not just for this

714

```
 1   one patient, but for all the rest of them.
 2          THE COURT:  I don't know how many of them died.
 3          MR. BODNAR:  Just two of them.
 4          THE COURT:  I'm not going to prohibit him from
 5   testifying about what the consequences have been to what's
 6   prescribed in these files, but any suggestion that the patient
 7   died is prohibited.  Okay.
 8          MR. BODNAR:  Yes.  Absolutely, Your Honor.
 9      (A recess was taken at 12:01 p.m.)
10      (Afternoon session, 1:19 p.m., in open court, defendants
11   and jury present.)
12          MS. GRIFFIN:  May we proceed, Your Honor?
13          THE COURT:  All right, Ms. Griffin.
14   BY MS. GRIFFIN:
15   Q   I had shown you the history and physical of the January 26,
16   2013 form for Patrick Chausse.  I now show you the third page
17   of that report, Bates number 207150, and ask at the bottom if
18   it shows it to be electronically signed by anyone?
19   A   It appears to be electronically signed by Stacy Madison.
20   Q   And what date was that?
21   A   January 27, 2013.
22   Q   You don't see that it was electronically signed by
23   Dr. Couch, do you?
24   A   No, I do not.
25   Q   Do you have any way to know if Dr. Couch even saw the
```

1   patient on this first visit?

2   A   No.

3   Q   I'll show you the next two pages of the Chausse

4   chart.  That's Bates number 207151 and 152, and ask you if this

5   appears to be an opioid agreement for pain management?

6   A   Yes, it does appear to be that.

7   Q   Does it bear Mr. Chausse's name on the first page?

8   A   Yes, it does.

9   Q   And on the second page does it contain the patient's

10   signature?

11   A   Yes, it does appear to be the patient's signature.

12   Q   Is there a witness signature or a doctor's signature?

13   A   There is no witness signature and I do not see a doctor

14   signature.

15   Q   Do you have any way to know if anyone talked to Mr. Chausse

16   about this, with this document?

17   A   I have no idea based on this document.

18   Q   And then I show you a January 13th, very next page, a

19   patient consent and agreement for off-label pain treatment from

20   PPSA, Bates number 207153.  And ask if you have previously had

21   the opportunity to review this patient consent and agreement

22   for off-label pain treatment?

23   A   Yes, I've seen it before.

24   Q   Does it show down at the bottom where Mr. Chausse agrees to

25   the above and releases the physicians and the clinic for all

716

1   liability of off-label use of drugs?

2   A   Yes.

3   Q   And it doesn't have a place for a nurse or a witness or the

4   doctor to sign, does it?

5   A   Correct.

6   Q   Now, on this, do you know whether on this first visit there

7   were off-label drugs prescribed to Mr. Chausse?

8   A   I cannot be sure what he was prescribed.

9   Q   Why is that?

10   A   Because it's not -- it's not listed and therefore I

11   can't -- I can't really see what exactly he got.

12   Q   It doesn't tell you the drug or any specific drug, does it?

13   A   No.

14   Q   Is this what you mean by a consent -- appropriate consent

15   agreement for the use of off-label pain treatment?

16   A   This is not -- this is not a very useful agreement.  And

17   furthermore, it is not serving any real form of protecting the

18   patient.

19   Q   Does it even identify the particular off-label drug that

20   may be prescribed?

21   A   The way I read this is that any off-label drug in the

22   universe could fit this.

23   Q   In connection with that, I don't believe we've talked about

24   off label.  What is off-label prescribing?

25   A   Off-label prescribing is a right that the American

1   physicians have to use drugs in unusual and novel

2   circumstances.

3   Q   And does off label mean it has not been approved for that

4   use by the FDA?

5   A   Yes, generally it means it has not been formally approved.

6   Yes.

7   Q   Further, in Mr. Chausse's file you were shown his

8   appointment in September of 2013 where he stated that he would

9   like to switch his drugs up so he doesn't get used to it, do

10  you recall that?

11  A   Yes.

12  Q   Do you see down at the bottom of the page a signature by a

13  CRNP?

14  A   Yes, I do.

15  Q   And do you know what that stands for?

16  A   A certified nurse practitioner.

17  Q   Do you see what appears to be a signature above that, under

18  the -- above the line that says physician's signature?

19  A   Yes, I do.  I see a -- it's not a very legible signature

20  but there is some ink and some wavy lines there.

21  Q   And you don't know whose signature that is there, do you?

22  A   No, I do not.

23  Q   Now, you also reviewed the drugs that Mr. Chausse was given

24  in the consent form that he had for some type of procedure; is

25  that right?

1   A   Yes.

2   Q   And you said that the doctors knew how to give a consent

3   because they had a procedure form; is that correct?

4   A   Correct.  They were using an adequate procedure type of

5   consent for when they were doing invasive procedures such as

6   nerve blocks.

7   Q   But you did not see such an informed consent for the drugs

8   that Mr. Chausse was going to be prescribed?

9   A   Correct.

10  Q   I'll direct your attention to March the 18th and March the

11  31st, 2014.  Are you aware from a review of the file that

12  Mr. Chausse was prescribed a mixture and substance containing a

13  detectable amount of oxymorphone which is a schedule II

14  controlled substance, and a mixture and substance containing a

15  detectable amount of morphine sulfate instant release, also a

16  schedule II controlled substance?

17  A   Yes.

18  Q   Based on your review of this entire file were those two

19  prescriptions in late March of 2014 outside the usual course of

20  professional practice?

21  A   Yes.  In my opinion they are outside the course of usual

22  practice.  The information that I've been able to review does

23  not protect the patient adequately.

24  Q   Does it support the prescribing of those drugs?

25  A   No, it does not make a rational case for the prescribing of

1   those drugs.

2   Q   Now, if we will go to Government's Exhibit 13-2, the

3   B...... medical file.  And I believe you have that in front of

4   you; is that right?

5   A   Yes.

6   Q   Did you also examine Mr. B.'s..... PDMP record?

7   A   Yes, I did.

8   Q   That was for the State of Alabama, Alabama PDMP?

9   A   Yes.

10  Q   And in connection with your review of the B...... case -- I

11  failed to ask you one thing about Mr. Chausse.  Was he 27 years

12  old?

13  A   Are you talking about the --

14  Q   Mr. Chausse.

15  A   Mr. Chausse?  He was a young man, and I don't have his

16  birth date here in front of me.

17  Q   I show you the --

18  A   I take that back.  His date of birth, I see it here, is

19  2/17/59.

20  Q   1959.  That was B.......  Mr. Chausse, I'm sorry.  Going

21  back to him.

22  A   Okay.  I have Patrick Chausse in my hand and then there's a

23  B...... case.

24  Q   No, I want Mr. Chausse's date.  Was he 27?  It says on his

25  first report.  On January 26, 2014 does it indicate his age?

1   A    26 years old.

2   Q    Now, on Mr. B.'s.... first page of treatment does it

3   indicate his age?

4   A    I believe it does but I'd have to read it.

5   Q    Under his history?

6   A    50 years old.

7   Q    Have you had the opportunity to review this file as well?

8   A    Yes.

9   Q    And my apologies for jumping back to the Chausse file.

10        Now on the B...... file, which is Government's Exhibit

11   13-2, what was Mr. B...... there for, what was his complaint?

12   A    His immediate complaint appeared to be pain secondary to

13   gout.

14   Q    Did he also complain of some low-back pain?

15   A    Yes.

16   Q    And some knee pain?

17   A    Yes, uh-huh.

18   Q    What was going on with Mr. B...... in terms of medication

19   at the time he first presented to PPSA?

20   A    I believe that he was on some chronic pain medications that

21   were controlled substances.  I don't have it right here in

22   front of me other than the fact that he was also using a

23   agonist-antagonist drug known as Stadol, otherwise known as

24   butorphanol.

25   Q    Did he report for treatment to Dr. Ruan?  Was Dr. Ruan the

1    physician?

2    A    This page, I cannot tell you which --

3    Q    Do you have that from your review?

4    A    Pardon me?

5    Q    The opinion you drafted?

6    A    Yes.

7    Q    That it's Dr. Ruan or do you know?

8    A    I believe it was Dr. Ruan.

9    Q    Okay.  And did you determine that he also was taking some

10   type of psychiatric medication?

11   A    Yes, he was.

12   Q    What was that?

13   A    He was on antidepressant medication and on another

14   medication that was for a mood stabilization, I believe.

15   Q    And do you have your opinion before you, the draft summary

16   and your concerns for the B...... treatment that you wrote?

17   A    I'll have to dig for it but I've got it, yes.

18   Q    Was Mr. B...... having some functioning problems also?

19   A    Yes, he was.

20   Q    And would you like to pull your report?

21   A    Yeah, let me -- okay.  I have my report now.

22   Q    Did you determine who the provider or who the physician was

23   treating Mr. B......?

24   A    Dr. Ruan.

25   Q    And you've told us a little bit of why he was there.  Could

1  you tell us if Mr. B...... would be considered a high-risk

2  patient?

3  A   Yes, he would be considered a high-risk patient.

4  Q   Why is that?

5  A   Due to psychiatric issues and also due to the fact that he

6  had a significant amount of serious hypertension problems and

7  also cardiac problems.

8  Q   Was there -- when you say hypertension, are you talking

9  about blood pressure?

10  A   Blood pressure.  High blood pressure yes.

11  Q   In fact, at one patient visit his blood pressure was 199

12  over 101?

13  A   Yes.  That was an extremely high blood pressure and it went

14  unaddressed at that visit.

15  Q   By Dr. Ruan?

16  A   Yes, by Dr. Ruan.

17  Q   He was not referred to someone because of blood pressure in

18  his treatment?

19  A   Yeah, he should have probably gone to the emergency room.

20  Q   Now, was there any effort to refer Mr. B...... for

21  detoxification?

22  A   None that I saw.

23  Q   And can you tell us what treatment was provided by Dr. Ruan

24  for this patient?

25  A   Dr. Ruan chose to utilize a very unorthodox treatment for

723

```
 1   this patient.  This patient was suffering from various
 2   different types of problems to include chronic headaches, along
 3   with nausea, and along with -- with anxiety.  And the problem
 4   in this particular case was this:  Mr. B...... was for some
 5   reason given a special type of narcotic that can cause human
 6   beings to go into drug withdrawal.
 7   Q   What is that commonly referred to in the medical field,
 8   something that would cause you to go into withdrawal?
 9   A   Well, something that would cause you to go into withdrawal,
10   it could be more than one type of thing that causes it.  But in
11   this particular case Dr. Ruan -- pardon me, Dr. Ruan gave the
12   patient a medication that on the package insert had a warning
13   not to use this medication on people who were on regular
14   narcotic drugs.
15   Q   Would that be an opioid user?
16   A   Yes, that would be an opioid user.
17   Q   And when you say it was on the package insert, what do you
18   mean?
19   A   Inside the package in which medications are packed there's
20   a piece of paper called a package insert and that package
21   insert had specific warnings on it that stated that human
22   beings who were to be given this medication needed to be
23   completely detoxed off of the traditional opioid medication
24   prior to being put on the medication that Dr. Ruan used in this
25   particular case, which was a type of drug called an
```

1    agonist-antagonist drug.

2    Q   What does that mean?

3    A   It means that the drug has the potential to cause harm to

4    the person who's taking it by putting them into severe opioid

5    withdrawal.  It's called precipitous withdrawal, and it's

6    warned against in the package inserts that patients who are

7    going to be put on this type of an antagonist drug, that they

8    need to be fully detoxed.

9    Q   Prior to taking it?

10   A   Prior to taking the medication.  Otherwise, they will go

11   into precipitous withdrawal, which is -- which is very, very

12   painful and excruciating.

13   Q   Is that drug spelled B-U-T-O-R-P-H-A-N-O-L?

14   A   Yes, butorphanol.

15   Q   Does it also have any impact on the heart?

16   A   Yes, it does.  That particular medication increases the

17   amount of work that the heart has to perform in order to pump

18   blood.  So it's a drug that is definitely not indicated in

19   someone who has severe hypertension because hypertension, part

20   of the problem is pumping that blood against a pressure

21   gradient that's very high.

22   Q   So that would be outside the usual course of professional

23   practice?

24   A   Yes, outside the usual course of professional practice and

25   outside the usual course of prescribing of a controlled

725

```
 1   substance.

 2   Q   Was the patient B...... opioid dependent at the time he

 3   came to Dr. Ruan?

 4   A   It --

 5   Q   Does it appear?

 6   A   Pardon me?

 7   Q   Does it appear from the file that he was?

 8   A   It appears that he might have been, yes.  And I take that

 9   back, it appears that he was.

10   Q   Was there any indication that there was any reference for a

11   treatment program to treat the opioid dependency or to treat

12   his condition --

13   A   No.

14   Q   -- by Dr. Ruan?  And what if anything was given to him in

15   connection with sleeping?

16   A   He was given sedative-hypnotic drugs.  And those are types

17   of drugs like benzodiazepines like Valium, phenobarbital would

18   be an old-fashioned example of a sedative-hypnotic drug.  And

19   the problem with the prescribing, as I see it in this case, is

20   that this patient should have been given the absolute minimum

21   use of powerful sedative-hypnotic drugs and instead he got

22   powerful sedative-hypnotic drugs which was --

23   Q   In combination with opioids?

24   A   In combination with opioids which increases the types of

25   complications that can happen and other problems associated
```

1    with mixing drugs.

2    Q    Now, is Xanax also one of these types of drugs?

3    A    Yes.

4    Q    A benzoid, benzo?

5    A    Benzodiazepine.

6    Q    We've not talked about benzos.  Can you tell us the dangers

7    of benzos in combination with controlled substances,

8    particularly opioids?

9    A    Yeah.  Well, benzos are controlled substances.  Okay.  And

10   there is a danger in mixing them with opioids.  The danger is

11   fairly straightforward, and that is that when patients are

12   prescribed powerful opioids and large doses of benzodiazepines

13   that it increases the chances of them to have an accidental

14   respiratory arrest.

15   Q    And in connection with Mr. B......, he was given opioids,

16   he was given the B-U-T-O-R-P-H-A-N-O-L?

17   A    Butorphanol.

18   Q    Butorphanol?

19   A    Yeah.

20   Q    And the controlled substance opioid; is that right?

21   A    Yes; that's correct.  And that was without the recommended

22   detoxification period where the patient should have been

23   withdrawn from the traditional narcotics prior to being put on

24   the butorphanol agonist-antagonist drug.

25   Q    In connection with Mr. B.'s..... review of his file have

727

1   you determined if his treatment by Dr. Ruan was outside the

2   usual course of professional practice?

3   A   Most definitely it was outside the usual course of

4   professional practice.  The package insert is full of all types

5   of warnings not to do what Dr. Ruan chose to do with this

6   patient.

7   Q   Now, I bring your attention to prescriptions written on or

8   about October the 10th, 2012, by Dr. Ruan for morphine sulfate,

9   a schedule II controlled substance, under the brand name MS

10  Contin?

11  A   Yes.

12  Q   Was that prescription prescribed by Dr. Ruan for patient

13  B...... outside the usual course of professional practice?

14  A   Yes, I believe so.

15  Q   And now if you will pull your report for Deborah Walker and

16  I will bring you her file.  The file is Government's Exhibit

17  13-3.  Here you are.

18        Did you also have the opportunity to review Deborah

19  Walker's file?

20  A   Yes, I did.

21  Q   If you will look at the beginning of your report and tell

22  us what age was Deborah Walker when she came to see Dr. Ruan?

23  Does it appear she was a 48-year-old female?

24  A   Yes, she was a 48-year-old female.  I was just looking for

25  the exact birth date.  I can't find it here.

728

1   Q   We're not trying to find the exact birth date.  But she was

2   a Dr. Ruan patient?

3   A   Yes.

4   Q   And can you tell us, had she previously been a patient in

5   that practice some years earlier?

6   A   Yes, she had previously been a patient of Dr. Ruan and it

7   appears also Dr. Couch.

8   Q   Was she not a patient for a period of 19 months when she

9   was incarcerated?

10  A   Yes, it appears that she was not a patient while she was

11  incarcerated.

12  Q   So this first visit on January 14th of 2014 was her first

13  visit back after 19 months; is that correct?

14  A   Correct.

15  Q   According to the records?

16  A   Yes.

17  Q   Was there any inquiry about why she had been to prison by

18  the doctors?

19  A   No.  And I think that's a big deficiency in this particular

20  case.

21  Q   Why is that?

22  A   Well, because of the fact that unfortunately there are

23  people who go to pain clinics and are drug seeking and also

24  unfortunately there are people who do that and also commit

25  other related criminal behaviors, and to have a patient in your

1  pain practice that you know has just done 20 months in prison

2  is a red flag.  It's a giant red flag.

3  Q   We don't know why, but if we assume or if we -- give you a

4  hypothetical that a particular patient had been in for drug

5  diversion or for selling prescription drugs, would that be

6  something the prescribing doctor would want to know?

7  A   Absolutely.

8  Q   Now, would that -- if it were a conviction for prescribing

9  or -- excuse me -- for selling diversion drugs would that alter

10  the treatment of the patient by the doctor?

11  A   Yes, it would.

12  Q   Why is that?

13  A   Well, because of the fact the doctor would be warned, put

14  on notice at that point that he had a patient who was going to

15  be most likely to be involved in various illicit activities

16  that involved drugs, either drugs that are illicit drugs or

17  drugs that are diverted from a legitimate pain practitioner.

18  Q   Now, we're not suggesting that that's the case of this

19  individual that you reviewed.  We do not know.

20  A   Right.

21  Q   Is that correct?

22  A   Correct, yeah.

23  Q   You were just giving a hypothetical about someone; is that

24  right?

25  A   It's a hypothetical but also Dr. Ruan should have asked

730

1  some questions of the patient.  It's normal for doctors to ask

2  their patients after they've gotten out of prison:  Hey, how

3  was prison; you know, what was it like?  Did you have any

4  illnesses or anything like that, were you there, et cetera, et

5  cetera.  And Dr. Ruan didn't get any information whatsoever

6  from her, that I can glean.

7  Q   Did you determine from the file that patient Walker

8  reported her pain was alleviated by Lortab with some Neurontin

9  and also by bending over?

10  A   Yes, I did see that.  And that was an interesting

11  finding.  Sometimes patients can relieve their own pain by

12  stretching and by doing other types of exercises, and that

13  includes positional movement and positional changes in their

14  posture, they can actually make the pain get better sometimes.

15  Q   Was there any documentation in the file as to which

16  direction the patient had been to relieve the pain?

17  A   No, that was not -- that was important information that

18  should have been in the chart and it wasn't there.

19  Q   Further, did the patient Walker report her pain interfered

20  with her general activity, her walking ability and her normal

21  routine?

22  A   Yes.  She basically complained that it interfered with most

23  everything in her life.

24  Q   Was she sent for any type of physical activity or physical

25  treatment that you can find?

1  A   None that I could find, no.  It would have been perfect for

2  her.

3  Q   Did you also determine from the file that the patient

4  suffered from a bipolar disorder?

5  A   Yes, she had a bipolar disorder and she also was diagnosed

6  as having, in addition, the bipolar with some schizophrenic

7  features.

8  Q   Would this be a red flag as to whether a consultation

9  should be appropriate with another physician?

10  A   Oh, absolutely.  She should have been referred to a

11  psychiatrist and Dr. Ruan did not refer her to a psychiatrist.

12  Q   Did Dr. Ruan note that she suffered from opioid dependence?

13  A   Yes, he did.

14  Q   And she had complained that bending helped.  Was she -- did

15  she have an MRI of her spine?

16  A   I believe she had an MRI and I believe that her MRI was

17  close to normal.

18  Q   Now, tell us, if you will, based on your experience and

19  training, an MRI of someone in their 50th year of life, would

20  that always be a perfect MRI?

21  A   Absolutely not.  Once people -- actually past about age 40

22  there gets to be degenerative changes within the spine and

23  pelvis, and it's not -- the person is no longer going to make a

24  virgin MRI.

25  Q   So some things, minor things would be expected on an MRI of

1  someone in their 50s?

2  A   Absolutely.

3  Q   Does that cause everyone pain?

4  A   No, it doesn't cause everyone pain.

5  Q   And would you expect to treat everyone over 50 with some

6  things on their MRI with an opioid?

7  A   No, absolutely not.

8  Q   Why is that?

9  A   Because -- because if the patient is not having serious

10  pain, then there's no reason for them to be given a powerful

11  opioid.

12  Q   Did you note that the patient Walker was started on Opana

13  10 milligrams immediate release by Dr. Ruan?

14  A   Yes, I am aware of that.

15  Q   And that is an oxymorphone, Opana?

16  A   Oxymorphone is the chemical name of the drug and it is a

17  very powerful opioid.  As a matter of fact when I was in my

18  training at the University of Arizona, the drug oxymorphone was

19  taken off the market, I believe for about seven or eight years,

20  because the authorities felt it was too addicting to be out and

21  used by the general population.

22  Q   Does Opana have a longer half-life than many other opioids

23  used for chronic pain?

24  A   It has a longer half-life than many of the opioids that are

25  used for chronic pain difficulty.

DAVID GORDON GREENBERG, MD - DIRECT BY MS. GRIFFIN

1   Q   What does half-life mean?

2   A   It means basically how much time it takes for half of that

3   dose to be metabolized.

4   Q   Into the body?

5   A   Yes, into the body and out through the urinary system or

6   through the feces.

7   Q   And then, yes or no, does Opana have a more euphoric high

8   than certain other opioids?

9   A   Yeah, Opana, in my clinical practice, is the most sought

10  after prescription drug by people who are heroin addicts or

11  other I.V.-type abusers of I.V. opioid drugs.  The -- the

12  euphoria that Opana produces is not only longer acting than

13  some of the other drugs like heroin but also is more intense

14  and it is sold at a great premium on the black market.

15          MR. SHARMAN:  Objection, Your Honor.  Nonresponsive.

16          THE COURT:  Overruled.

17  BY MS. GRIFFIN:

18  Q   Dr. Greenberg, would Opana be a good choice by a pain

19  management doctor for a person that had some psychiatric issues

20  and opioid dependency?

21  A   No.  It would be a very poor choice.

22  Q   And then did you determine that later the patient was

23  prescribed carisoprodol?

24  A   Yes.

25  Q   And hydrocodone?

734

1  A   Yes.

2  Q   What is carisoprodol?

3         THE COURT:  Can you spell that for me?

4         MS. GRIFFIN:  C-A-R-I-S-O-P-R-O-D-O-L.

5         THE COURT:  Thank you.

6  BY MS. GRIFFIN:

7  Q   What is carisoprodol?

8  A   Carisoprodol is a sedative-hypnotic drug that is approved

9  by the FDA for the short-term use -- it's an important

10 distinction -- for the short-term use of acute

11 spasm.  Unfortunately carisoprodol also increases the euphoria

12 that comes when people have used narcotic drugs and so it's a

13 very popular drug that's used as an adjunct to give a person a

14 more desirable high from their narcotic experience.

15 Q   In fact, does carisoprodol have a brand name of Soma,

16 S-O-M-A?

17 A   Yes.  Soma is the brand name.

18 Q   Now, on January 14th of 2014, patient Walker was given a

19 urine drug screen; is that correct?

20 A   Yes.

21 Q   At that time was Dr. Ruan prescribing the Soma and

22 hydrocodone to the patient?

23 A   Yes, I believe so.

24 Q   Did she test positive for using those prescriptions?

25 A   I believe not, no.

735

1  Q  Was there any counseling or any notation about her being

2  warned that she was not testing positive for the drug she was

3  being prescribed?

4  A  No.  And again, this patient was a high-risk patient

5  because of -- because of her psychiatric issues and also

6  because of her incarceration issues.  And it was a -- it was a

7  major -- a major mistake for the doctor not to sit down with

8  this patient and just simply say:  This is not acceptable.  And

9  not only that, but it could be quite dangerous.

10  Q  You didn't notice any initialing on the lab report to show

11  that Dr. Ruan had reviewed that lab report showing the

12  inconsistencies?

13  A  No, I didn't see that.

14  Q  And would that be outside the usual course of professional

15  practice, rather than just a mistake to inquire about the

16  inconsistent drug test?

17  A  Yes.  To confront the patient in a humane, nonshameful way

18  but let them know that you're very concerned about the fact

19  that they didn't have the drugs that should have been in their

20  system is an act of compassion and concern by a practitioner

21  who cares about their patient.  And when it doesn't happen, it

22  really leaves a therapeutic hole.

23  Q  Is it also a way to check for red flags what is signified

24  when a patient is being prescribed a controlled substance and

25  not testing positive for it?

736

1  A   Yeah, that's a red flag absolutely.

2  Q   Why is that?  What's it indicative of?

3  A   It's indicative of the fact that they may be diverting the

4  drug that they are being prescribed and then using that

5  medication, using the drug in an illicit fashion or selling it.

6  Q   On that same day did the patient test positive for

7  P-R-E-G-A-B-A-L-I-N?  And you'll have to pronounce that for us.

8  A   Pregabalin.

9  Q   What is that?

10  A   That is a medication that's used along with opiates

11  sometimes in order to try to control pain.

12  Q   Had that been prescribed by Dr. Ruan?

13  A   Pardon me?

14  Q   Had that been prescribed by Dr. Ruan?

15  A   Yes, I believe so.

16  Q   Did you determine that it wasn't prescribed by him in your

17  report?

18  A   Hang on just one second.  Let me look at my report.

19  Q   Your report of page four.

20  A   Yes, page four.  I see it.  Was not prescribed by Dr. Ruan.

21  Q   That would be significant of what?

22  A   That would be significant of the fact that the patient was

23  noncompliant.

24  Q   And that was receiving medication either off the street or

25  from another doctor?

1    A   Yes, absolutely.

2    Q   How would one have been able to tell that?  What would

3    you -- what would Dr. Ruan have been able to check to determine

4    if it was being prescribed by someone else?

5    A   Well, the thing that should have been done on a regular

6    basis, especially with high-risk patients such as Ms. Walker is

7    that -- well, for example, in our practice --

8    Q   No, just as to her.

9    A   Just as to her?

10   Q   Right.  How could Dr. Ruan have determined if she had

11   received that drug --

12   A   Right.  Okay.

13   Q   -- from another doctor?

14   A   By querying the PMP.

15   Q   PHMP?

16   A   Prescription monitoring program.

17   Q   And would that be something Dr. Ruan should have discussed

18   with patient Walker as well?

19   A   Absolutely.

20   Q   Further, were there any monitors for alcohol or alcohol

21   metabolites of this patient?

22   A   No, there weren't.  And I believe I can safely say that

23   both for Dr. Ruan and his partner, that they virtually never

24   did any type of monitoring for alcohol or alcohol metabolites.

25   Q   Why is that significant in pain management, why is that in

1    the usual course of professional practice?

2    A    It's -- the reason that that is significant is that a lot

3    of -- a lot of overdoses involve both alcohol and prescription

4    drugs, or street drugs and so --

5    Q    It's dangerous to combine those, is that what you're

6    saying?

7    A    It's very dangerous to combine those.

8    Q    Did you also find thereafter on April 10th of 2014 another

9    urine screen on patient Walker?

10   A    Yes.

11   Q    And again, was that urine screen, did it have inconsistent

12   positives for unprescribed hydrocodone, hydromorphone, drugs

13   not prescribed at that time by Dr. Ruan?

14   A    Yes, it did.  Again.

15   Q    Was there any indication that anybody at that clinic sat

16   down with her and told her she was violating any agreements and

17   that they would not continue to treat her if she used drugs

18   that they were not prescribing her?

19   A    There's nothing to indicate that anybody took any type of

20   corrective action to help this woman.

21   Q    Is there anything that showed they had determined whether

22   these were drugs she had gotten off the street or whether they

23   were being prescribed by another doctor?

24   A    I do not believe that any other further PMP check was done

25   at this time that should have been done.

739

1  Q   Did you determine from her PDMP which you reviewed that in

2  fact there were some other doctors prescribing her medication

3  at the same time?

4  A   Yes.  There was approximately 12 or 13 other doctors

5  prescribing for her.  This is one of the reasons why, again in

6  a state of the art and more ethical practice of chronic pain

7  medicine, it is -- it is customary to go ahead and query the

8  PDMP for every visit.

9  Q   Is it inside the usual course of professional practice to

10  check the PDMP of a noncompliant patient?

11  A   Yes, absolutely.

12  Q   Is it inside the usual course of professional practice to

13  check the PDMP as to all patients in a pain management clinic?

14  A   Yes, PDMP should be checked routinely and regularly.  The

15  PDMP is a -- is a life-saving intervention.

16  Q   I'll direct your attention to the prescriptions written for

17  patient Walker on November the 25th, 2014, by Dr. Ruan for

18  oxymorphone which is under the brand name Opana, O-P-A-N-A.

19  Was that script written on that date, based on your review of

20  this file and her conditions, outside the usual course of

21  professional practice?

22  A   Yes, I believe so.  They were outside the usual course of

23  professional practice.

24  Q   Did you conclude further that her treatment was outside the

25  usual course of professional practice?

 1   A   Very much so outside the course of usual practice.

 2   Q   I'll next show you the file for patient Gist, G-I-S-T, a

 3   male, Government's Exhibit 13-4?

 4   A   I have it.

 5   Q   And ask if you had the opportunity to review this file?

 6   A   Yes, I did.

 7   Q   Before we talk about Mr. Gist, I'll show you what's been

 8   admitted as Government's Exhibit 13-3A, prescriptions for

 9   Deborah Walker, that were previously admitted and ask if this

10   is the Opana prescription you have referenced in November of

11   '14 by Dr. Ruan for Ms. Walker?

12   A   Yes, it appears to be.

13   Q   And that's the one you have stated that was outside the

14   usual course of professional practice?

15   A   Yes.

16   Q   And that would be along with all of her treatment?

17   A   Yes.

18   Q   Now, I'll go to patient Gist.  You reviewed his file; is

19   that correct?

20   A   Yes, I did.

21   Q   Could you tell us what Mr. Gist suffered from?

22   A   Yes.  Mr. Gist had a long-standing serious disorder with

23   depression.

24   Q   And why did he report to Dr. Ruan to be treated?

25   A   I'm not sure why he chose to go to Dr. -- with Dr. Ruan.

1  Q   Was it determined early on that this patient was opioid

2  dependent?

3  A   Yes, this patient was opioid dependent.

4  Q   Is there any concern by a pain management doctor about

5  opioid drugs to individuals who also have some type of

6  depressive disorder?

7  A   Yes.  It's a dangerous practice to prescribe powerful

8  opioid drugs and/or sedative-hypnotic drugs to people who are

9  suffering from serious, long-standing psychiatric disease such

10  as this patient, Mr. Gist.

11  Q   Early on was there a determination that this patient had

12  inconsistent positives for nonprescribed fentanyl and

13  clonazepam?

14  A   Yes.  On September 9th, 2014 the patient had multiple

15  inconsistent positives for nonprescribed gabapentin,

16  nonprescribed clonazepam -- that's a benzodiazepine sedative,

17  it's not a drug -- nonprescribed fentanyl and nonprescribed

18  norfentanyl.  The other important --

19  Q   Wait.  Is one of those Xanax?

20  A   Clonazepam is not Xanax, but it is close to Xanax.  It's a

21  benzodiazepine like Xanax is.

22  Q   It's a benzo?

23  A   Yes, it is.

24  Q   And the fentanyl, of course, is a schedule II controlled

25  substance?

1   A   Correct.

2   Q   What is norfentanyl?

3   A   Norfentanyl is a metabolite of fentanyl and it can be used

4   to track whether or not a person has been using fentanyl

5   because it's a metabolite that is part of the degradation of

6   fentanyl itself.

7   Q   It would mean in a urine test that one had been using

8   fentanyl?

9   A   Yes, it would mean that someone had been using fentanyl.

10  Q   Now, was there also, in this particular test, a finding of

11  alcohol in the urine in a reported level of 2.85 milligrams?

12  A   Yes.  And that's quite disturbing in this particular case

13  because it went unaddressed by the doctors who were taking care

14  of this patient.

15  Q   That's a significant amount of alcohol; is that right?

16  A   That's a very high level of alcohol and it could be

17  extremely dangerous to a human being to have the combination of

18  alcohol in their system and also opiates.

19  Q   Was it outside the usual course of professional practice

20  not to refer this patient to detox or to treatment?

21  A   Yes, I believe it would have been outside of the usual

22  course.

23  Q   You've said he had inconsistent positives in September of

24  '14.  Did he also have inconsistent medications in December of

25  '14, some three months later?

743

1    A    Yes.  He did on the 21st of December he had inconsistent

2    positives.

3    Q    And was there any abdication of duty in connection with

4    that second round of inconsistent positives?

5    A    Yes.  The doctor taking care of this patient had a duty to

6    sit down with this patient and explain to him that his

7    noncompliance was threatening his health in a very severe

8    fashion and also he should have reinstated -- reiterated to the

9    patient that the patient could no longer get any further -- he

10   could no longer get any controlled substances at this point.

11            The ideal thing for the doctor to have done would have

12   been to transfer the patient for detoxification at a licensed

13   detoxification facility where he could be safely separated from

14   the alcohol and drugs that he was abusing.

15   Q    Was Mr. Gist ever tested again for alcohol?

16   A    I don't believe so.  And that was another huge mistake made

17   in the management of this patient.

18   Q    Did Dr. Ruan place Mr. Gist on high-dose fentanyl?

19   A    I believe he did, yes.

20   Q    Along with Opana?

21   A    Yes.

22   Q    And you've told us Opana is oxymorphone?

23   A    Yes.

24   Q    Did you find any documented valid informed consent with

25   Mr. Gist as to either of those drugs, the fentanyl or the

744

1    Opana?

2    A    I did not.

3    Q    Did you draw a conclusion as to Mr. Gist's treatment by

4    Dr. Ruan as to whether it was within the usual course of

5    professional practice?

6    A    My opinion is this is well below the usual course of

7    professional practice in legitimate pain medicine.

8    Q    Based on that conclusion, in connection with Mr. Gist did

9    you determine that Dr. Ruan wrote him a prescription on July

10   the 15th of 2014 for 112 tablets of Fentora, the 600

11   micrograms, and for Zohydro extended release 60 in number, 50

12   milligram?

13   A    Yes.  I felt that in my opinion was absolutely reckless

14   prescribing and that those prescriptions were not legitimate.

15   Q    They are outside the usual course of professional practice?

16   A    Outside the usual course of professional practice and that

17   the prescriptions themselves for those controlled substances

18   were not legitimate, in my opinion.

19   Q    Fentora is actually a fentanyl?

20   A    Yes, it is; a fentanyl lozenge type of medication.

21   Q    And next we will go to patient KL........... I'll show

22   you Government's Exhibit 13-5, her patient file, and ask is

23   that the file that you have previously reviewed?

24   A    Yes, I have.  I'm trying to unstick the pages here.

25           THE COURT:  Give us the exhibit number again for that

 1  patient file.

 2          MS. GRIFFIN:  KL........... is 13-5.

 3          THE COURT:  Thank you.

 4  A   I have the file.

 5  Q   Did you determine that KL's........... initial visit with

 6  Dr. Ruan was January the 13th of 2009?

 7  A   Yes, I did.

 8  Q   And did she continue to see him through much of the time

 9  period alleged in these charts?

10  A   Yes.

11  Q   What was her initial complaint?

12  A   Her initial complaint was severe pain over her entire body.

13  Q   For how many years?

14  A   20 years.

15  Q   What should this tell you as a pain physician?

16  A   Cases such as this with total body pain for long-standing

17  periods of time often indicate that the individual who's

18  complaining about the total body pain for 20 years has

19  unresolved psychiatric diagnoses and needs psychiatric help.

20  Q   Now, you're not aware exactly what issues there might have

21  been for this patient, but that would be the first thing you

22  would question if someone advised you of that?

23  A   Correct.

24  Q   Did you determine that there was any appropriate

25  functional-based chronic pain history from the patient or any

746

1  examination of the patient?

2  A    No.

3  Q    Or any questioning about what she had attempted to do to

4  help the pain for the past 20 years?

5  A    No.  There was really no history of present illness taken

6  or recorded, that I can see, regarding this patient.

7  Q    Did you determine there were any referrals to a

8  psychiatrist or any kind of physical therapy?

9  A    No.  I did not see any referrals to a psychiatrist or

10  physical therapy.  And I would say the Couch practice rarely

11  referred people out for outside care.

12  Q    Is that outside the usual course of professional practice

13  for a pain clinic?

14  A    Yes, I would say so.  Absolutely.

15  Q    Why is that?

16  A    Because no one physician or no one group of physicians are

17  masters at everything.  And the fact of the matter is that when

18  people present with complex long-standing problems that are not

19  easily solved, that referral to the appropriate specialists,

20  whether it's a psychiatrist or neurologist, or whatever, is an

21  appropriate thing to do and a good thing to do.

22  Q    Did you find any indication in the file that this patient

23  L... had cancer?

24  A    I believe -- I believe she had no cancer but despite the

25  fact that she had no cancer whatsoever, at least nothing that I

1  saw, that she was given an end-of-life drug that is only

2  approved by the FDA for people who are in the last stages of

3  their lives with cancer.

4  Q   Would that be the fentanyl lozenges that she was

5  prescribed?

6  A   Right.

7  Q   Was she also prescribed Opana, OxyContin, Xanax, Percocet,

8  Lunesta sleeping pills and Soma?

9  A   Yes.

10 Q   By Dr. Ruan?

11 A   Yes, she was.

12 Q   Those are all schedule II narcotics in addition to the

13 fentanyl being a schedule II?

14 A   I believe the benzo set of hypnotic drugs were not schedule

15 II.  They were probably schedule III or IV.

16 Q   And that would be the Xanax?

17 A   Right.  The benzodiazepine, yes.

18 Q   It's a schedule drug, not a schedule II?

19 A   Right.

20 Q   Now schedule II is the highest schedule a physician can

21 write; is that correct?

22 A   It's the highest legal schedule the physician can write

23 without special permission for scientific purposes that are to

24 be granted by the federal government.

25 Q   Did you see any reporting of a appropriate comprehensive

1    informed consent for this combination of serious drugs?

2    A    No appropriate informed consent for this combination of

3    drugs.  It's a major criticism of the care for this patient.

4    Q    Was there any warning that there were dangers with mixing

5    the powerful opioids with her prescribed sleeping pills and

6    other sedative medications?

7    A    Not that I saw on the chart.

8    Q    Is that outside the usual course of professional practice?

9    A    Yes, it was outside the course of usual professional

10   practice.

11   Q    Did you determine that this patient was noncompliant when

12   she claimed to have run out of medications prematurely on

13   multiple occasions?

14   A    Yes, she -- she definitely was noncompliant.  She

15   definitely ran out of her medications prematurely on multiple

16   occasions and unfortunately neither Dr. Ruan or Dr. Couch took

17   her to task and gave her the counseling that she needed to let

18   her know what kind of danger that she could be getting into.

19   Q    Is that a red flag for pain doctors if a patient

20   continually claims to run out of medications prematurely?

21   A    Yeah, that's a giant red flag.

22   Q    What does that signal?

23   A    It signals -- first of all, it means that the patient is

24   probably either taking too much of the medication that's been

25   prescribed for her at a time or that she may be diverting those

749

1   medications.  And we can't tell which.

2   Q   Either way, would it be inside the usual course of

3   professional practice to have counseled her and to determine

4   what the issue was?

5   A   Yeah.

6   Q   And that wasn't done, was it?

7   A   Was not done.  No history was taken, no intervention

8   happened, and the patient was not put on what should have been

9   a more stringent regimen of urine testing, and certainly she

10  should have been getting the PDMP every time she came in to see

11  the doctors.

12  Q   They should be checking to see if she was receiving

13  medication from anyone else?

14  A   Right, exactly; to make sure that she wasn't adding other

15  illicit medications into her regimen.

16  Q   On October of 2014 did this patient have some illicit

17  inconsistent positives in her urine drug test for hydrocodone

18  and fentanyl?

19  A   Yes.

20  Q   And at that time she was not receiving either of those from

21  Dr. Ruan; is that correct?

22  A   That is correct.

23  Q   Was there any indication that this red flag was discussed

24  with her or there was a determination as to how she had

25  received these other drugs?

750

1    A    No.  It appears just that Dr. Ruan and Dr. Couch ignored

2    this red flag.

3    Q    Now, this was Dr. Ruan's patient; right?

4    A    Right.  Correct.

5    Q    In reviewing this file is it your professional opinion that

6    prescribing and treatment of this patient was outside the usual

7    course of professional practice?

8    A    Yes, I believe that prescribing and the treatment was

9    outside the course of usual professional practice.

10   Q    I direct your attention to a script written by Dr. Ruan for

11   this patient on April the 27th of 2015 for Fentora 600

12   micrograms, for OxyContin 80 milligrams, for oxycodone 15

13   milligrams.  Those being 56 Fentora, 60 OxyContin and 120

14   oxycodone.  Is it your position, from reviewing this file, that

15   those prescriptions were outside the usual course of

16   professional practice?

17   A    Absolutely.  In my opinion they were outside the usual

18   course of professional practice.

19   Q    We will now go to the G......... file -- that is

20   Government's Exhibit 13-6 -- and ask if you have had occasion

21   to review this file and form an opinion.

22   A    Yes, I have.

23   Q    What is your opinion after reviewing this file as to

24   whether the treatment of this patient by Dr. Ruan was outside

25   the usual course of professional practice?

1   A   After reviewing this file carefully, I most definitely

2   believe that the care given to patient G......... and the

3   prescriptions given to her were outside the usual course of --

4   chronic pain medication and chronic pain practice.

5   Q   Now, this was a Dr. Ruan patient?

6   A   Yes.

7   Q   Dr. Ruan prescribed her a Narcan injector for PRN use in

8   overdose situations.  First of all, what does PRN mean?

9   A   PRN stands for as the occasion arises.  That's a Latin

10  abbreviation.  So it means that as needed the patient should

11  use this medication.

12  Q   What is a Narcan injector?

13  A   A Narcan injector has an antidote for opioid narcotics in

14  it that will -- that will block the effect temporarily for a

15  very short term of time as far as -- as far as trying to

16  prevent an overdose.  But this is --

17  Q   Wait just a minute.  Narcan is N-A-R-C-A-N?

18  A   Yes, N-A-R-C-A-N.

19  Q   And you said it's used to stop an overdose; is that

20  correct?

21  A   That's the -- that's the purported idea for some chronic

22  pain physicians to do.  But it doesn't make sense and here's

23  why.  Okay.  First of all, these patients have usually multiple

24  drugs in their system, not just narcotics in their

25  system.  Okay.  And the Narcan injectors, they may blunt the

 1   effect of the narcotics that are in that person's system, but

 2   they in no way take care of the sedative-hypnotic effects and

 3   respiratory depression effects of the benzodiazepines and other

 4   types of medications that they are taking.  So it gives

 5   individuals -- certain practitioners, it gives them a false

 6   degree of confidence.

 7          But in reality these injectors, at least by the

 8   national studies that I've looked at and also international

 9   studies that I've looked at, don't really cause that much

10   protection.  One of the huge problems with this is that patient

11   G......... is walking around in a stuporous state, and even if

12   she were to be conscious enough to know that there was a

13   problem, there's been no one trained by Dr. Ruan or by

14   Dr. Couch to go ahead and teach this person, at least no

15   documentation, to teach this person or the people who are

16   around them how to use this type of an injector as an antidote.

17          So because of that, it's a bad idea.  It's something

18   that doesn't make sense from a rational standpoint.  And the

19   other question that -- the other issue that comes up with this

20   is who's going to be watching the patient?  Patient G.........

21   is in a stupor and ready to fall into a coma.  Who's watching

22   her?

23   Q   So is what you're saying that she may not realize at the

24   point that she needs to give herself that injection?

25   A   That's right.  She may not realize it because of the fact

1   that the patient has already, what they call obtunded.

2   Obtunded means they are under heavy influence of the drugs that

3   she's taking.

4   Q   And you used the word "narcotics," that it could help

5   reverse the overdose narcotics.  Are you referring to opioids?

6   A   Yes, referring to opioids.

7   Q   Is narcotics an older term used?

8   A   Yes.

9   Q   For opioids?

10  A   An older term, yes.

11  Q   And do you believe that that was outside the usual course

12  of professional practice to prescribe her a Narcan injector?

13  A   Especially when she did not -- she and her family members

14  did not get any type of training on how to do CPR and on how to

15  clear an airway and how to do all the emergency maneuvers that

16  need to be done when somebody has a respiratory arrest.

17  Q   And there was no detailed comprehensive informed consent

18  which you located in the file about these issues?

19  A   And there was no -- there was no detailed information that

20  I saw in the chart on how the patient was supposed to use this

21  Narcan.

22  Q   Rather than giving a patient Narcan that they might not

23  realize when they need to use it, should a doctor advise them

24  of the dangers of using their scripts or their medications

25  inappropriately?

1    A    Yeah, absolutely.  Absolutely.  The patient in this type of

2    a situation, the only safe way to deal with a patient who's

3    walking around in this state of being -- being, you know, under

4    the influence of narcotics and benzodiazepines is to tell the

5    patient that they can no longer be trusted to medicate

6    themselves with these powerful drugs and that the time has come

7    for humane, gentle detoxification so that we can lower the

8    doses of medication that this patient is getting.

9    Q    Did Dr. Ruan prescribe Provigil for her?  P-R-O-V-I-G-I-L.

10   A    Provigil is the drug of the amphetamine class.  It's

11   related to methamphetamine and other drugs that are in the

12   amphetamine class.  And to prescribe Provigil because of the

13   fact that the patient is being overdosed on opioids and

14   overdosed on benzodiazepines is simply way below the rational

15   standard of care for dealing with people who are in a near

16   overdose state.

17   Q    Did you see any indication that Ms. G......... was referred

18   for any type of treatment?

19   A    No.

20   Q    And did Dr. Ruan also prescribe her controlled substance

21   sleeping pills known as Zolpidem, Z-O-L-P-I-D-E-M?

22   A    Yes, Zolpidem was also prescribed.  And Zolpidem was also a

23   problematic drug because of the fact that it is associated with

24   a strong possibility of patient suicide.

25   Q    In connection with the prescribing for this patient, did

1   you determine that she was prescribed fentanyl, that is Subsys,

2   and then Abstral at the same time?

3   A   Yes.  And that also makes no sense.  All those drugs use

4   fentanyl as the main active ingredient that is in those

5   preparations.  And it just makes no sense to prescribe

6   poly-opioid prescriptions.

7   Q   Did you find any indication that she had cancer?

8   A   No.

9   Q   And would Subsys and Abstral both be being used off-label

10  since she did not have cancer?

11  A   Yeah, that would be an off-label use.

12  Q   Would that be an extraordinary high amount of controlled

13  substances of opioids?

14  A   I believe it was a very high amount of controlled

15  substances and that the patient being under the influence as

16  she was at home and stuporous, that it was -- it was extremely

17  bad medical judgment and it was below the standards of

18  legitimate chronic pain treatment.

19  Q   Was there also some inconsistent urine tests for the

20  narcotic or the opioid drug dihydrocodeine?

21  A   Yes.

22  Q   D-I-H-Y-D-R-O-C-O-D-E-I-N-E.

23  A   Yes, there were inconsistent results for that particular

24  substance.

25  Q   Now, I direct your attention to February the 26th of

756

1   2015.  Did you determine that Ms. G......... received Abstral

2   400 micrograms, Subsys 400 micrograms, Abstral 400 micrograms,

3   Subsys 400 micrograms, OxyContin 40 milligrams, and Norco 10

4   milligrams on the same date?

5   A   Yes.

6   Q   Those were prescribed by Dr. Ruan?

7   A   Yes, and it was done without appropriate informed consent,

8   in my opinion.

9   Q   And was that prescribing outside the usual course of

10  professional practice?

11  A   Yes, absolutely.

12  Q   Now, you also reviewed 14 other files; is that correct?

13  A   Yes.

14  Q   We're going to briefly hit on some of those and then I'm

15  going to ask you your conclusions about the remainder of those

16  files.  But you've talked about Subsys and you've talked about

17  Abstral, and are they commonly provided with what's known as a

18  black-box warning?

19  A   They have to have black-box warnings, and those black-box

20  warnings have been relatively recent maneuvers of the federal

21  government, specifically the FDA, to try to prevent unnecessary

22  overdose problems.

23  Q   What -- what does a black-box warning mean?

24  A   What it means is that the combination of those drugs is

25  extremely dangerous.  And that the FDA sends out the black-box

1    warnings in multiple different ways to notify doctors.  You can

2    get black-box warnings, FDA alerts, from the email.  You can

3    get them -- I believe still get them by a phone recording.  And

4    the purpose of that is for the FDA to be able to notify

5    physicians when there are dangerous drug-drug interactions that

6    could cause bad things to happen to patients.

7    Q    How do physicians learn about new black-box warnings?

8    A    Well, there's a couple of ways.  One way is that if they

9    are ordering a drug that has a black-box warning, then when you

10   open up the packaging for that drug, the new black-box warning

11   will actually be there with the literature and whatever else is

12   in the parcel that came with the drugs.  So that's one way the

13   doctors will find out.

14          The other way that they find out again is through

15   email alerts from the FDA and also there still are I believe --

16   I still believe that doctors can get phone alerts from the FDA

17   too.  That may have been stopped.  But I believe that that's

18   still true.

19   Q    When we say a black-box warning, is it really just a box

20   warning with an absolute black box drawn around it?

21   A    Yes.  It actually has a black box drawn around -- around

22   the name of the drug.

23   Q    I'll show you what's been marked as Government's Exhibit

24   9-10, which purports to be a Subsys 600 microgram box

25   prescribed by Dr. Ruan to an individual last named Byrd,

1  B-Y-R-D, on October the 31st of '13 and ask if you've

2  previously seen the box?

3  A   Yes, I have seen the box.

4  Q   And it no longer contains any of the Subsys, does it?

5  A   No.

6  Q   Have you found a black-box warning in the paperwork having

7  to do with Government's Exhibit 9-10?

8  A   I believe there was a black-box warning in this.  Okay.  So

9  there we are.

10  Q   Could you speak up so they can hear you?

11  A   I'm sorry.  Yeah.  There is a black-box warning that's in

12  the upper left-hand corner of the package insert.  This is the

13  package insert that comes with the drug as it's ordered from

14  the factory.  Would you like me to read it?

15          MS. GRIFFIN:  Your Honor, may we publish it to the

16  jury?  We're going to admit it through a different witness.

17          THE COURT:  Is that the same exhibit number of the box

18  you --

19          MS. GRIFFIN:  It is, Your Honor.

20          THE COURT:  All right.

21          MS. GRIFFIN:  It's Exhibit Number 9-10.

22  Q   So this black-box warning on Subsys was in 2013 already?

23  A   Right.

24          THE COURT:  Have you offered it yet?

25          MS. GRIFFIN:  I have not, Your Honor.

```
 1              THE COURT:  All right.  Any objection?

 2              MR. SHARMAN:  (Shaking head negatively.)

 3              MR. KNIZLEY:  No objection.

 4              MS. GRIFFIN:  We'll offer it, Your Honor.

 5              THE COURT:  Mark it in.

 6         (Government's Exhibit 9-10 was entered into evidence.)

 7    BY MS. GRIFFIN:

 8    Q    When you say black-box warning, is this what you're

 9    referring to, this black box that goes around the warning?

10    A    Correct.

11    Q    Could you tell us what it says for Subsys please, sir?

12    A    It says:  Do not use Subsys unless you are regularly using

13    another opioid pain medicine around the clock for your cancer

14    pain and your body is used to these medicines.  (This means

15    that you are opioid tolerant.)  You can ask your healthcare

16    provider if you are opioid tolerant.  Keep Subsys in a safe

17    place away from children.  Get emergency help right away if a

18    child uses Subsys --

19    Q    And then they further talk about some dangers; correct?

20    A    Right.

21    Q    That's what you mean by a black-box warning?

22    A    Yes.

23    Q    Should a prescribing pain physician be familiar with black-

24    box warnings before prescribing medications that contain

25    warnings?
```

760

1   A   Yes, absolutely.

2   Q   Does it appear that there was any informed consent as to

3   Subsys or to Abstral to --

4   A   No.

5   Q   -- to Ms. G.........?

6   A   I saw no appropriate informed consent that would have

7   warned patient G..........

8   Q   Then I'm going to show you in rapid succession Government's

9   Exhibit 13-7, BH's........... medical file, 13-8, JL's.......,

10   L................., medical file; Government's

11   Exhibit 13-9, Ms. B's................, medical file; number

12   13-10, Ms. Daw's, D-A-W, medical file; 13-11, Mr. Weaver's

13   medical file; 13-12, Mr. Lott's PPSA medical file; 13-14,

14   Ms. P.'s..., ........., file; 13-15 Mr. Simmons',

15   S-I-M-M-O-N-S, medical file; 13-16 Ms. Blanks', B-L-A-N-K-S,

16   medical file; 13-7, Desiree Beasley's medical file; 13-8, Brian

17   Wells' medical file; 13-9, Ms. Engles', E-N-G-L-E-S, medical

18   file; and 13-20, Mr. Watts', W-A-T-T-S, medical file.

19           THE COURT:  Ms. Griffin, some of those numbers you

20   read out, you read out the same number twice for different

21   patient names.

22           MS. GRIFFIN:  Let me go back then.

23           13-7 should be H.......

24           13-8 should be L..........

25           13-9 should be B...., ..........

761

```
 1              13-10 should be Daw, D-A-W.

 2              13-11 should be Weaver.

 3              13-12 should be Lott, L-O-T-T.

 4              13-13 should be Sansing, S-A-N-S-I-N-G,

 5              13-14 should be P...., P.........

 6              13-15 should be Mr. Simmons, S-I-M-M-O-N-S.

 7              13-16 should be Ms. Blanks, B-L-A-N-K-S.

 8              13-17 would be Beasley.

 9              13-8 would be Wells.

10              THE COURT:  13 --

11              MS. GRIFFIN:  13-18 would be Wells.

12              THE COURT:  Okay.

13              MS. GRIFFIN:  13-19 would be Engles and 13-20 would be

14      Mr. Lott's.

15              THE COURT:  Okay.

16              MS. GRIFFIN:  Does that correct the numbers?

17              THE COURT:  Yes.

18      BY MS. GRIFFIN:

19      Q   Have you --

20      A   I believe the one file that I did not review was Weaver.

21      Q   Which one?

22      A   Weaver.

23              THE COURT:  Weaver?

24              MS. GRIFFIN:  Weaver?

25              THE WITNESS:  Weaver.  I'm sorry.
```

1            MS. GRIFFIN:  Okay.  Well, we will withdraw the Weaver
2    file.
3            THE COURT:  That's 13-11?
4            MS. GRIFFIN:  13-11.
5    Q   Did you review all of the others?
6    A   Yes.
7            MS. GRIFFIN:  And I'd move to admit all of the others
8    with the exception of the Weaver file.
9            THE COURT:  All right.  Mark them in.
10       (Government's Exhibit 13-7, 13-8, 13-9, 13-10, 13-12,
11   13-13, 13-14, 13-15, 13-16, 13-17, 13-18, 13-19, 13-20 were
12   entered into evidence.)
13           MS. GRIFFIN:  Here is 13-11, and I will take it back,
14   Your Honor.
15   Q   Did you also review the PDMP reports for each of these
16   files?
17   A   Yes, I did.
18   Q   Now, we're going to discuss quickly the H......, the B....
19   and the Blanks files.  But H...... is 13-7.  Do you have your
20   report as to Ms. H......?
21   A   Yeah, I have it here.  It will just take me a minute to
22   find it.  I have H.......
23   Q   Could you tell us, please, if she had a diagnosis of
24   chronic pancreatitis?
25   A   Yes.  Actually the diagnosis she had was chronic

 1   pancreatitis.

 2   Q   What's the difference?

 3   A   That is a chronic inflammation of the pancreas gland, which

 4   is the gland that makes insulin and other hormones for the

 5   body.

 6   Q   And can that be occasionally alcohol related?

 7   A   More than occasionally.  It is alcohol related.  There's a

 8   strong association between pancreatitis and alcohol abuse.

 9   Q   But it's not always alcohol related, is it?

10   A   No, not always.  There are people that get -- get

11   pancreatitis that have never had a drop of alcohol in their

12   life.

13   Q   And on this Exhibit 13-7, her patient file, did you

14   determine that there was any rudimentary or just basic alcohol

15   history from this patient?

16   A   No, there was no alcohol history whatsoever, and that's a

17   critical piece of taking care of these types of patients.

18   Q   Was this a Dr. Couch patient?

19   A   Yes, it was.

20   Q   Did this patient have a history of anxiety, depression?

21   A   Yes.

22   Q   And pancreatitis?

23   A   Yes.  This patient had psychiatric problems with anxiety

24   and depression and they went basically unaddressed.

25   Q   Did that make her a high-risk category patient pursuant to

DAVID GORDON GREENBERG, MD - DIRECT BY MS. GRIFFIN

1   the 2009 joint guidelines of the American Pain Society and the

2   American Academy of Pain Medicine?

3   A   Yes.  That would have definitely put her into the high-risk

4   group.

5   Q   Did you determine that this patient had inconsistent urine

6   drug testing throughout her entire course of treatment?

7   A   I don't believe she had any.

8   Q   Did she have any counseling about inconsistent drug

9   testing?

10  A   Not that I remember, no.

11  Q   Is there any thorough examination that you can determine by

12  Dr. Couch of her abdomen?

13  A   No.

14  Q   It was not recorded in your patient file, was it?

15  A   No.

16  Q   Was she prescribed Xanax tablets by Dr. Couch?

17  A   Yes.

18  Q   Did you find any type of meaningful informed consent that

19  would have provided her with information about the risk of this

20  medication along with her other medication?

21  A   No.

22  Q   Was she sent to any other outside physicians such as a

23  gastro doctor or a psychiatrist?

24  A   No, but she should have been referred to both of those

25  specialties.

1  Q   And was she placed on fentanyl?

2  A   Yes, she was, I believe.  Uh-huh.

3  Q   Was she a cancer patient?

4  A   Not that I saw any documentation of.

5  Q   And was that outside the usual course of professional

6  practice?

7  A   Very much so outside the usual course of professional

8  practice.

9  Q   Why was that?

10  A   Well, because this patient could have benefited from

11  psychiatric treatment and also could have benefited from seeing

12  the gastroenterologist as you mentioned.  That would have been

13  the appropriate thing to do for a patient suffering from this

14  malady.

15  Q   Is the pancreas issue a very painful issue?

16  A   Yes, it can be painful.

17  Q   And is it also treatable?

18  A   It can be treatable, but -- but there are cases of

19  pancreatitis that are what they call fulminant and people do

20  die of this disease.

21  Q   Was there any warning that this medication that she was

22  prescribed, the fentanyl, was for cancer patients --

23  breakthrough pain in cancer patients?

24  A   No.

25  Q   Was there any warning that she should only use it if she

766

1   had a severe pancreas attack that could not be controlled by

2   anything else?

3   A    No.

4   Q    And was there abdication of Dr. Couch in the treating of

5   this patient?

6   A    Yes, I believe that he abdicated his role of being the

7   patient protector.

8   Q    And was that specifically Subsys fentanyl that she was

9   provided?

10  A    I would have to look and see if it was specifically Subsys

11  or not.  She was definitely given fentanyl.

12         Here it looks like on page one of my report she was

13  also getting -- she was getting fentanyl products to include

14  Fentora lozenges which were only approved by the FDA for

15  breakthrough pain in end-stage cancer patients.

16  Q    Dr. Greenberg, would you repeat that?  We have some trouble

17  hearing you when you're looking down, or pull that microphone

18  up toward your mouth.

19  A    Okay.

20  Q    Thank you.

21  A    Is that better?

22  Q    Yes.  Thank you.

23  A    Okay.   It appears to me that she was taking Fentora

24  lozenges which is a form of fentanyl that is approved by the

25  FDA only for end-of-life cancer care.

1          And it does not appear that she got any meaningful

2    informed consent as far as warning her about the fentanyl

3    lozenges.  And also prescribed were Opana 40 milligram tablets.

4    Q   And I show you from her patient file what's Bates stamped

5    209390.

6          MS. GRIFFIN:  Your Honor, for the record, I'm taking

7    it out of the patient file to show it to the jury.  I will

8    replace it in the patient file.

9          THE COURT:  All right.

10   Q   And ask if this appears to be her prescription on August

11   the 9th of 2013, Dr. Greenberg?

12   A   Yes.

13   Q   Does that have Dr. Couch's name circled at the top?

14   A   Yes, it does.

15   Q   Is that for Subsys 800 micrograms Spray for Ms. H......?

16   A   Yes.

17   Q   Through reviewing her file did you come to a conclusion

18   about her treatment by Dr. Couch, whether it was inside or

19   outside the usual course of professional practice?

20   A   I believe that the care rendered to KL.......... was

21   outside the course of the usual professional practices.

22   Q   And I show you the electronic -- you said for

23   KL............  We were talking about Ms. H.......  Would you

24   look back at --

25   A   I'm sorry.  I'm sorry.

768

1  Q   Do you have Ms. H......?

2  A   Yes, Ms. H.......

3  Q   And did you review her file?  Have we been discussing her

4  file?

5  A   Yes, I did review her file.

6  Q   What was your opinion as to whether her treatment was

7  inside or outside the usual course of professional practice?

8  A   I believe that it was outside the usual course of

9  professional practice.

10  Q   I show you what is Bates stamped 209345 through 209347.

11  I'm removing it from her file to show you and then I'll place

12  it back in the exhibit, and ask if it appears that Ms. H......

13  first saw Dr. Couch's office around February the 5th of 2013?

14  A   Yes.

15  Q   Does it indicate that she was in her early 50s?

16  A   Yes, 53 years old, white female.

17  Q   I'll show you the last page of that report and ask if it

18  appears if it was electronically signed by Stacy Madison on

19  that same day, February 5th?

20  A   Yes, there is an electronic signature from Stacy

21  Madison.  There are no credentials that accompany the name

22  Stacy Madison, so I don't know whether she's a nurse helper or

23  whether she's a nurse practitioner or whether -- or whether

24  she's employed in some other fashion.

25  Q   You don't see a doctor's signature by Dr. Couch, electronic

769

```
 1   signature on that first visit, do you?

 2   A   I do not.

 3   Q   Now, what do we mean by electronic signature on a medical

 4   record?

 5   A   What we mean is that the electronic signatures are usually

 6   used on what are called EMRs which are a modern form of

 7   replacing the old medical records and old charts that used to

 8   be used by physicians in hospitals and in their clinics and in

 9   their practices.  And the electronic signature is supposed to

10   have key identifiers within it so that individuals who are not

11   supposed to have access to printing that signature cannot print

12   it.  There's supposed to be a security system in that.  That's

13   how they are designed, so that people can't just go signing

14   medical records willy-nilly.

15   Q   And what you reference is older medical records are usually

16   paper records?

17   A   Correct.

18   Q   Is that right?

19   A   Yes.

20   Q   And the newer medical records are usually contained in a

21   computer, thus called electronic?

22   A   EMR, yes, electronic medical record.

23   Q   In those does each person who signs their name typically

24   have an identifying number that they -- only the person

25   purporting to sign can be the person that goes into that?
```

1    A    Yeah.  Ideally that's the case but it doesn't always

2    happen.  But ideally that's the case.

3    Q    Does the electronic record also show the date and time that

4    someone signs the medical record?

5    A    Yes, it should have that information as far as date and

6    time.

7    Q    In your opinion on Ms. H...... was her treatment outside

8    the usual course of professional practice?

9    A    Yes.

10   Q    Now, I want to show you if we can the 13-16, Tamison

11   Blanks' medical file.  If you can turn to that one,

12   please.  Tell us when you have it.

13           THE COURT:  Ms. Griffin, do you have the same report?

14           MS. GRIFFIN:  I do, Your Honor.

15           THE COURT:  Can you refer him to a page number?  Or

16   does it have page numbers?

17           MS. GRIFFIN:  It's Bates number 224495 but I will be

18   glad to provide him mine.

19           THE WITNESS:  Thank you.  I don't have a Bates number

20   on mine.

21   BY MS. GRIFFIN:

22   Q    Would you look at that and see what I've just handed you,

23   your expert opinion on the Blanks case?

24   A    Yes, it is.

25   Q    And actually that's a copy of what you provided to the U.S.

1  Attorney's Office; is that right?

2  A   Yes, uh-huh.

3  Q   Now, can you tell us why Ms. Blanks was first seen by these

4  doctors and who she was seen by?

5  A   Yeah.

6          MR. SHARMAN:  Your Honor, I object to him just reading

7  what he's previously typed up.  If he has a genuine failure of

8  recollection, he can be refreshed but he can't just read a

9  hearsay document.

10         MS. GRIFFIN:  Your Honor, he's not going to read a

11  hearsay document.  I'm asking him did he have information as to

12  that file.

13         THE COURT:  Do you need to refer to your --

14  BY MS. GRIFFIN:

15  Q   Do you need to refresh your recollection?

16  A   No.  I have my report here.

17         THE COURT:  Well, the question is:  Do you need to

18  refer to your report in order to testify concerning individual

19  patients?

20         THE WITNESS:  Oh, I understand.  No, I don't believe I

21  need it for this patient.

22         THE COURT:  All right.

23         THE WITNESS:  Thank you.

24  BY MS. GRIFFIN:

25  Q   Could you tell us, please, who Ms. Blanks went to see at

1    the clinic?

2    A    Ms. Blanks was referred to see Dr. Couch by an

3    anesthesiologist whose name was Aimee Walsh.

4    Q    Did she go see Dr. Couch?

5    A    Did she -- did she go see Dr.  --

6    Q    Couch?

7    A    -- Couch?

8    Q    Yes.  Was that the physician she saw at the clinic?

9    A    Yes, she did.

10   Q    According to the records; is that right?

11   A    Yes, uh-huh.

12   Q    Could you just tell us if it appeared -- what her condition

13   appeared to be?

14   A    She had abdominal pain and she was referred for -- by the

15   anesthesiologist Aimee Walsh, for pain control.  There was no

16   other information on the referral form that was sent to

17   Dr. Couch other than that information.

18   Q    And what type of treatment did she receive?

19   A    She received -- first of all I think it's important that I

20   note that these medical records here had --

21   Q    No, sir.  I don't want to talk about that part of it.

22   A    All right.  She was --

23   Q    You were asked what type treatment did she receive.

24   A    She received medication for pain.

25   Q    And did it come to pass that she had a hernia?

1    A    Yes.

2    Q    How was that determined?

3    A    That was determined through physical examination.

4    Q    What is a hernia?

5    A    A hernia -- there's all different kinds of hernias.  The

6    most common ones are the ones that go through the inguinal

7    canal.

8    Q    We don't know what that is.

9    A    It's a canal near where your -- where your belly joins the

10   lower belly.  And what happens with that is that with pressure

11   and time there can be a defect that's caused a hole, allows --

12   a hole forms and it allows part of the guts literally -- part

13   of the guts from inside the abdomen to move into that canal.

14   Q    Is it fair to say that it can be a bulge inside the stomach

15   tissue?

16   A    Yes.

17   Q    Or gut tissue?

18   A    Yes, be a bulge too.

19   Q    What was she prescribed for a hernia?

20   A    She was prescribed something quite unusual for hernia pain.

21   Hernia pain is usually not very severe and not very long

22   lasting.  And she was prescribed the Subsys type of fentanyl

23   preparations which are approved by the FDA only for end-of-life

24   cancer pain.

25   Q    Was there any indication that she had cancer?

1   A   None whatsoever, that I could tell.

2   Q   How are hernias typically taken care of?

3   A   Simple surgery.  Normally that's sufficient.

4   Q   Was she referred for a simple surgery for her hernia?

5   A   I don't believe so.  No.  Huh-uh.

6   Q   And would that be outside the usual course of professional

7   practice?

8   A   Yes, it would have been -- she should have at the very

9   least been examined by a general surgeon.

10  Q   In connection with her treatment is it your opinion that

11  she should not have been prescribed Subsys?

12  A   Yes, I believe that the Subsys end-of-cancer -- end-of-life

13  cancer medications for hernia pain were totally without merit

14  and were definitely below the normal standard of treatment for

15  hernia pain.

16  Q   Would that be outside the usual course of professional

17  practice?

18  A   Quite outside the usual course, yes.

19  Q   That Subsys would not be prescribed for hernia pain?

20  A   No.  Subsys should never be prescribed for hernia pain.

21  Q   Is that a high-level opioid?

22  A   It is a very high level, very potent opioid.

23  Q   And can you tell us anything else about Tamison Blanks'

24  medical treatment?

25  A   I can tell you that she didn't receive, in my opinion at

775

1   all, an appropriate warning with reference to the use of the

2   powerful narcotic agent Subsys, did not -- she did not get a

3   proper informed consent.

4   Q   She was not told that it could be very dangerous and that

5   it was an off-label drug, is that what you're saying?

6   A   She was certainly not told that it was -- that it was very

7   dangerous, at least not what I can see from my record.  And I

8   don't remember anyone telling her that it was dangerous.  But

9   in fact, it is a dangerous drug.

10  Q   Would that be outside the usual course of professional

11  practice not to have been given that warning by Dr. Couch?

12  A   Yes.

13          THE COURT:  All right.  Ms. Griffin, is now a good

14  time for us to break?

15          MS. GRIFFIN:  Yes, Your Honor.

16          All right.  We're going to take our afternoon break at

17  this time.  Leave your pads on your chairs.  No discussion

18  about the case.  Go downstairs to the jury assembly room.  We

19  will call you back up in about 15 minutes.

20          We're in recess.

21      (A recess was taken at approximately 3 p.m.)

22      (In open court, defendants and jury present.)

23          THE COURT:  All right, Ms. Griffin.

24  BY MS. GRIFFIN:

25  Q   Dr. Greenberg, do you have the Tamison Blanks medical file

 1   in front of you?

 2   A   I have the Bates stamp number.

 3   Q   The patient file?

 4   A   512757.

 5   Q   Look on the front page.  It's Exhibit 13-16, Tamison

 6   Blanks?

 7   A   Yes, 13-16.  It doesn't say Tamison Blanks on it, though.

 8   Q   Does it say Tamison Blanks Witherspoon?

 9   A   Pardon me.  Tamison Blanks what?

10   Q   Does it say another last name?

11   A   No.  It just says:  Admitted 12/17.

12        THE COURT:  I think she's talking about the cover of

13   the binder.

14        MS. GRIFFIN:  The cover.

15        THE WITNESS:  Oh, the cover here?

16        THE COURT:  Yes.

17        THE WITNESS:  Yeah, 2104.

18   BY MS. GRIFFIN:

19   Q   Is that her file?

20   A   Yes.

21   Q   Tamison Blanks?

22   A   Yes.

23   Q   Okay.  And I had opened it to a certain page.  Bates

24   stamped 201114, dated December the 10th, 2013.  I think I made

25   a mistake in telling you she had not had a hernia -- that she

777

```
 1    had yet to have -- she had had the hernia surgery by the time
 2    she got there; is that right?
 3    A    I believe so, yeah.
 4    Q    Okay.  So my mistake.  What was she prescribed by
 5    Dr. Couch?
 6    A    She was prescribed powerful narcotic pain killers.
 7    Q    Opioids?
 8    A    Yes.
 9    Q    Okay.  And what did your review show about her treatment by
10    Dr. Couch, her medical treatment?
11    A    Pretty minimal treatment.
12    Q    What do you mean by that?
13    A    Well, I don't believe that she had an appropriate
14    examination performed on her for a person who was, you know,
15    presenting as she presented.
16    Q    And from your recall, what else did you determine about
17    Ms. Blanks?
18    A    She had a history of failing previous medications --
19    Q    Doctor, pull that towards you as you speak.
20          THE COURT:  The microphone.
21    Q    In front of you so we can hear you.
22    A    Good?
23          THE COURT:  Repeat the question.
24          MS. GRIFFIN:  Would you read the last question to me
25    please, sir?
```

778

1        (Requested portion of record read.)

2    Q    What did you determine about her treatment?

3    A    Well, her treatment as far as treatment that would be

4    legitimate was minimal.  The most important part about her

5    treatment is that it appears that the patient was given

6    significant amounts -- large amounts of the Subsys sublingual

7    Spray.

8    Q    And is that the same drug you've identified at box four in

9    Government's Exhibit --

10   A    Yes.  It's the end-of-life cancer drug.

11   Q    Did you find any indication that she had cancer?

12   A    None whatsoever.

13   Q    Did you find an informed consent that detailed the dangers

14   of doing an off-label drug approved for cancer?

15   A    No, no details and no informed consent.

16   Q    In connection with that, with Ms. Blanks, was she -- was

17   the Subsys combined with any other opioids?

18   A    I believe it was combined with other opioids and one of

19   them was a sublingual form of fentanyl that she was given to be

20   taken four times per day for severe breakthrough pain.

21   Q    Does the record document that she had severe breakthrough

22   pain four times a day?

23   A    No.  The only real documentation that is on the record is

24   opioid dependence, continuous, which is code 304.01, shoulder

25   pain, abdominal pain, multiple sites, and a hiatal hernia.

1  Q   Now, when you gave that code number that is a medical

2  coding number; is that correct?

3  A   That's right, that's used for coding in billing.

4  Q   And did you determine whether she was given anything

5  besides just opioids?  Was she given any other type of

6  treatment?

7  A   Not that I can see, no.

8  Q   Did you conclude that Ms. Blanks' treatment by Dr. Couch

9  was outside the usual course of professional practice?

10  A   Yes.  Hernia pain is almost always quite self-limited and

11  it is certainly outside the normal practice of medicine to be

12  medicating hernia pain with end-of-life cancer drugs.

13  Q   I'll take that file from you.  Do you have any way of

14  knowing from this file whether Dr. Couch ever saw this patient

15  despite it saying that she was Dr. Couch's patient?

16  A   No.

17  Q   Now, I'll direct your attention to the Sansing file,

18  Government's Exhibit 13-13.  Do you have that report that you

19  wrote on Sansing?

20  A   I should have it here.  It will just take me a minute to

21  find it.  I have the Sansing report in my hand now.

22  Q   And have you reviewed the Sansing medical file?

23  A   Yes, I have.

24  Q   Do you need the medical report, the patient file in front

25  of you?

1   A   No.

2   Q   Did you also review Mr. Sansing's PDMP?

3   A   I'm sorry?

4   Q   Did you also review Mr. Sansing's PDMP?

5   A   Yes.

6   Q   Now, Dr. Greenberg, did Mr. Sansing have Crohn's disease

7   and ulcerated --

8           MR. SHARMAN:  Objection, Your Honor, same thing.

9   She's asking a question and he's just reading his report.  If

10  she asks a question and he can't remember, he can look at it

11  and then put it aside and answer.  But he's just reading the

12  report.  He's not even looking at the medical record.

13          MS. GRIFFIN:  Your Honor, he didn't answer.  He was

14  given a chance.

15          MR. SHARMAN:  I was trying to get in an objection

16  before he did.

17          THE COURT:  He said he didn't need to look at the

18  medical record.  Do you need your report to refresh your

19  recollection?

20          THE WITNESS:  I can do Sansing based upon my report

21  that I have in my hand right now.

22          THE COURT:  Well, that's the question.  Can you

23  testify about Mr. Sansing without reference to your report,

24  from memory alone?

25          THE WITNESS:  I think I can.

781

```
 1              THE COURT:  All right.
 2   BY MS. GRIFFIN:
 3   Q   Do you need to review it for a second before you testify
 4   about it or can you recall it?
 5   A   (Reading.)
 6              THE COURT:  I mean you're welcome to use your report
 7   if you cannot recall without looking at it.  But simply using
 8   it without saying that you can't recall is not
 9   appropriate.  So --
10              THE WITNESS:  Okay.
11              THE COURT:  So do you need to look at your report in
12   order to testify about your review?
13              THE WITNESS:  Uh, I would like to read my report for
14   just maybe 30 to 60 seconds.  Is that okay?
15              THE COURT:  All right.
16              THE WITNESS:  Okay.  I think I can go ahead.
17              THE COURT:  Ms. Griffin.
18   BY MS. GRIFFIN:
19   Q   Are you ready?
20   A   Yes.
21   Q   Could you tell us, please, sir, on Mr. Sansing what you
22   determined after your review.
23   A   After my review?
24   Q   Yes, sir.
25   A   Well, first of all, the diagnoses of Crohn's disease and
```

782

1    ulcerated --

2    Q   You will have to -- instead of reading it, you will have to

3    tell us.  Just talk to us.

4    A   Okay.  Well, the diagnoses of ulcerative colitis and also

5    the Crohn's disease were not very well documented in this

6    case.  And unfortunately, Dr. Couch really didn't document much

7    in the medical record as far as taking care of this patient so

8    there's not a lot of information here.  There was also no

9    attempt that I could see in the chart as far as Dr. Couch

10   trying to get in touch with Mr. Sansing's gastroenterologist,

11   which is a GI specialist, to coordinate care.

12          And that's an important thing for these inflammatory

13   bowel diseases because these diseases often require a lot of

14   coordination between the gastroenterology specialist and/or the

15   general surgeon when a patient has serious inflammatory bowel

16   conditions.  Their course can be rocky and it can -- they can

17   benefit greatly from a rapid referral to a GI specialist for

18   further management and/or a general surgeon should they need to

19   have any of their bowel resected.

20          The other thing interesting about this case is that

21   this patient appears at the time that he came to Dr. Couch was

22   on the drug called Marinol.  And Marinol is the legal form,

23   liquid form of marijuana extract that can be used with -- in

24   special circumstances with reference to treating people with

25   bowel diseases who may be losing weight.

DAVID GORDON GREENBERG, MD - DIRECT BY MS. GRIFFIN

783

1  Q   And what did you determine about Mr. Sansing's treatment or

2  lack thereof?

3  A   Mr. Sansing got very little treatment as far as I'm

4  concerned.  Dr. Couch did not pursue and document a working

5  relationship with a gastroenterologist or a surgeon.  And the

6  fact of the matter is that Mr. Sansing was placed on a

7  sedative-hypnotic medication called alprazolam, and he was

8  also --

9  Q   Let me stop you just a second.  What's a brand name for

10  alprazolam?

11  A   Xanax.  Xanax is the trade name.

12  Q   And is that a benzo?

13  A   That's a benzodiazepine, sedative-hypnotic drug.

14  Q   And that was prescribed along with an opioid?

15  A   That was prescribed along with fentanyl patches.

16  Q   Which is an opioid; right?

17  A   Yes, absolutely.

18  Q   Now, I show you from his file, Government's Exhibit 13-13.

19  I'm going to remove a page and then put it back in, Bates

20  number 209619.  Do you show -- do you see that it appears that

21  Dr. Couch wrote Mr. Sansing on December the 13th of 2012,

22  Subsys?

23  A   Correct.

24  Q   And what microgram?

25  A   It's a little bit unclear but it looks like 400 micrograms.

 1    Q   And I will return that copy -- that page to the file.  And

 2    show you some five months later Bates number 209654.  This

 3    being May the 31st, '13.  Does it show Dr. -- Mr. -- Dr. Couch

 4    prescribing 600 micrograms?

 5    A   Yes, it shows that Dr. Couch prescribed 600 micrograms of

 6    Subsys, which is again, approved only by the FDA for end-of-

 7    life cancer pain and there's nothing in the chart that states

 8    in any way, shape, or form that Mr. Sansing had end-of-life

 9    cancer pain.

10    Q   So was the micrograms -- were the micrograms increased by

11    half?

12    A   Yeah, the micrograms were significantly increased.

13    Q   And I'll show you what's marked as page -- Bates number

14    209667, which was less than two months later, to Mr. Sansing.

15    And this is a copy of a prescription; is that right?

16    A   Yes.

17    Q   Does it appear to show where Dr. Couch has prescribed in

18    less than two months 1200 micrograms of Subsys?

19    A   Yes, this is a dramatic escalation in the amount of

20    fentanyl -- spray fentanyl that this patient is getting without

21    any justification whatsoever regarding end-of-life pain.

22    Q   Does that show a doubling in less than two months of the

23    micrograms?

24    A   Close to that.

25    Q   From 600 to 1200?

785

1    A    Yes.  Close to doubling, yes.

2    Q    And what is the danger of titrating or going up so quickly

3    with micrograms?

4    A    First of all, there's no reason to have to use an

5    ultra-short acting formula of fentanyl for managing ulcerative

6    colitis.  The type of pain people have when they have

7    ulcerative colitis is constant pain with cramping and sometimes

8    some bleeding through their rectum and it's not the type of

9    pain that would be excruciating in the sense of someone who was

10   facing the end of their life and in complete agony.  So it's a

11   very, very unusual prescription to be writing.

12   Q    Did you also determine he had obtunded in the waiting room?

13   A    Had obtunded?

14   Q    Obtunded in the waiting room?

15   A    Yes.

16   Q    PPSA?  And obtund means pass out?

17   A    Means passing out, means losing consciousness.

18   Q    And what happened?  What did Dr. Couch do when the patient

19   Matthew Sansing obtunded or passed out in the office?

20   A    I don't remember exactly what Dr. Couch did.  But I don't

21   believe that he performed any type of maneuver that would have

22   improved the situation.

23   Q    You don't know if he gave him -- you don't recall if he

24   gave him Narcan to bring him back?

25   A    He -- to give Narcan for someone who has obtunded in the

786

1   waiting room would be a normal thing to do.

2   Q   Now, did you determine that with the Marinol, with the

3   Subsys being drastically increased, that the treatment of this

4   patient was outside the usual course of professional practice?

5   A   Yes, I would say it was well outside the usual course of

6   professional practice.

7   Q   Now, I want to ask you, you also reviewed some files that

8   you're not going to go into detail about, those being the

9   L......... file, the Daw file, the Lott file, the P.... file,

10  Simmons, Beasley, Wells, Engles and Watts; is that right?

11  A   Correct.

12  Q   Could you tell us from your review of those files what

13  opinion you formed about the course of treatment specifically

14  by Dr. Couch as to Mr. Watts, by Dr. Ruan as to Mr. Lott, by

15  Dr. Couch as to Mr. Wells, by Dr. Couch as to Ms. Beasley,

16  Dr. Couch as to Terry Simmons, Dr. Couch and Dr. Ruan as to

17  Ms. P...., Dr. Ruan as to Ms. Daw, D-A-W, Dr. Couch as to

18  Katheryn Engles, in general?

19  A   I can tell you --

20          MR. SHARMAN:  Objection, Your Honor.  There's

21  absolutely no foundation laid for the opinion at all, factual

22  or otherwise.  She's asking for a raw opinion with nothing

23  else.  There's no basis in foundation.

24          MS. GRIFFIN:  Your Honor, he's testified that he had

25  reviewed all of the files and he is entitled to give an opinion

 1    as to the files.

 2         THE COURT:  I think so.  Overrule the objection.

 3    BY MS. GRIFFIN:

 4    Q   Go ahead, Dr. Greenberg.

 5    A   Okay.

 6    Q   If you want to point out one specific or two specific

 7    things about each, you may do so or if you want to talk about

 8    them collectively, you may do so.

 9    A   Well, I would say that collectively Dr. Couch really

10    doesn't do much of anything to address the diagnostic dilemma

11    of the patients that we're talking about.  He doesn't do

12    anything with reference to hooking up and making contact with a

13    GI specialist, and that's what this patient needs.  Talking

14    about Mr. Sansing.  He needs a GI specialist to take care of

15    his inflammatory bowel disease and very likely he probably, in

16    this situation, needs to -- needs the services -- at least

17    possibly the services of a general surgeon.  And that just

18    doesn't happen.  That just doesn't happen.

19    Q   Okay.  Now, if you will turn to Mr. Watts, your review of

20    Mr. Watts?

21    A   I believe that Mr. Watts was the one that I said I didn't

22    do.

23    Q   No, you told us that you did not do --

24         THE COURT:  Mr. Weaver.

25    Q   -- number 11, which was Weaver.

788

1  A   Weaver.  I'm sorry.  I'm getting my Ws mixed up.

2  Q   Do you have your Watts report?

3  A   I don't have it in front of me right now.

4  Q   Would you like to review it for a second?  Do you need to

5  refresh and then testify about it?

6  A   Yeah.

7  Q   (Indicating.)

8  A   Okay.  Mr. Watts --

9          THE COURT:  Wait until she asks you a question.

10          THE WITNESS:  Sorry.

11          THE COURT:  Go ahead and review the report and then

12  wait until she asks you a question.

13  BY MS. GRIFFIN:

14  Q   Have you had a chance to review?

15  A   Yeah.

16  Q   And could you tell us what you determined about Mr. Watts?

17  A   Mr. Watts was a patient who was obtaining methadone

18  without -- without letting his doctor, Dr. Couch, know that he

19  was getting methadone.

20  Q   Is methadone a controlled substance?

21  A   Yes, it is.

22  Q   And what is the purpose of methadone?

23  A   Well, methadone can be a useful drug that is used to help

24  people who are opioid addicts and it can help them suppress

25  their signs and symptoms of withdrawal.  It's also sometimes

DAVID GORDON GREENBERG, MD - DIRECT BY MS. GRIFFIN

1    used as a pain medication by itself, although it's a risky drug

2    to use for pain medication in a lot of situations.

3    Q    Did Dr. Couch then prescribe him morphine sulfate?

4    A    Yes, he did.

5    Q    And what would be the dangers of morphine sulfate along

6    with methadone?

7    A    It's again combining two powerful narcotics in the logical

8    manner without any real justification for doing so.  And it is

9    a practice that doesn't make sense from a treatment standpoint.

10   Q    Did Mr. Watts continue to receive large quantities of

11   Opana, morphine, and Percocet from Dr. Couch?

12   A    Yes, he did.

13   Q    Did you determine that that was outside of the usual course

14   of professional practice?

15   A    Yes.

16   Q    Did you review the remaining files that we -- that I've

17   just mentioned, those being the L........., Daw, Lott, P....,

18   Simmons, Beasley, Wells, Engles files?

19   A    Yes.

20   Q    You previously reviewed them?

21   A    Uh-huh (positive response).

22   Q    And did you come to a conclusion about the treatment,

23   whether it was inside the usual course of professional practice

24   or outside the usual course of professional practice for those

25   remaining patients whose files you reviewed?

1  A   Yeah, the -- it was -- it was all outside of the usual

2  course of treatment that would be given for patients that had

3  the complaints that were mentioned in the charts.

4  Q   In those remaining charts was there much documentation or

5  interdisciplinary care?

6  A   None whatsoever.

7  Q   Was there much evidence of comprehensive physical

8  examinations?

9  A   No.

10 Q   Was there any indication that there were physical exams to

11 specific parts of the body?

12 A   Not that I saw.

13 Q   Did you determine that regardless of the diagnosis or the

14 findings the patients received massive amounts of controlled

15 substances?

16 A   Yes, that's a constant in these cases.

17 Q   In your professional opinion, were those justified?

18 A   No, I don't believe that those prescriptions were justified

19 at all.

20 Q   And there's a saying in medicine start low and go slow.

21 Could you explain that to us?

22 A   Sure.  When the time comes in the physicians' management of

23 a patient they believe that that patient needs to go on

24 powerful opioid medications to control their pain, then the old

25 adage of start low and go slow is very good advice, especially

1    in the case of a couple of these patients that were getting

2    methadone.  And the reason for that is that methadone can

3    slowly build up in the system and then all of a sudden hit

4    toxic levels and therefore it requires extra expertise as far

5    as the safe use.

6         So the issue -- the issue here was that there was

7    really no indication from any rational standpoint for these

8    patients to be getting all of the sleeping pills and sedative-

9    hypnotics and methadone tablets and other opioids that they

10   were getting.  And that's kind of a constant in looking at

11   these cases.  There is just -- it's just abysmal patient care

12   management without much in the way of any kind of coordination,

13   without much in the way of -- in any way properly using

14   consultants and without really monitoring these patients

15   scrupulously for illicit -- for illicit use of both

16   pharmaceutical preparations and also illicit use of

17   nonpharmaceutical illicit -- of nonpharmaceutical illicit

18   preparations.  And it just -- it just doesn't hold up to the

19   standards of treating -- of treating these patients with the

20   pain that they say they have.

21   Q    Did you find much evidence of comprehensive physical exams

22   that could lead to a diagnosis?

23   A    Virtually never.

24   Q    And is there much documentation or response to more

25   conservative care?

1    A    No.  Conservative care isn't -- isn't on the menu.

2    Q    Now, Dr. Greenberg, in connection with your testimony you

3    had the patient files and the PDMPs; is that right?

4    A    Yes.

5    Q    You didn't interview any patients?

6    A    No.

7    Q    You didn't interview anyone that worked there at the pain

8    clinic?

9    A    No.

10   Q    And you did not interview anyone else connected with the

11   activity there?

12   A    Correct.

13   Q    Did you -- if I told you that Dr. Couch hypothetically did

14   not see the majority of these patients after the first visit,

15   would that change your opinion as to the standard of care that

16   you have said is outside the usual course of professional

17   practice?

18   A    Yeah, it would make the -- it would make the care rendered

19   to those patients even more of even greater concern.

20   Q    And if I told you -- and, of course, you don't have

21   anything in the records to show this -- that Dr. Couch and

22   Dr. Ruan hypothetically owned the pharmacy attached to one of

23   their offices and patients were going there to fill their

24   scripts, would there be any responsibility on the doctors' part

25   to disclose their financial interest in that pharmacy?

1    A    Well, I think there would be both with Medicaid statutes

2    and also Medicare statutes.  The doctors would have a financial

3    interest in a pharmacy or an X-ray facility or anything like

4    that, as I understand the law, that the doctor has to declare

5    that they have a financial interest in that.  And I know that

6    because when I sign -- when I have to sign up for my Medicaid

7    and Medicare patients, every year they make us sign a -- an

8    agreement that if we have an X-ray facility or a lab or

9    anything else related to making money off the practice of

10   medicine, that we have to declare that to Medicare or Medicaid.

11   Q    So in other words, if we told you that PPSA had their own

12   MRI machine and patients were referred for that, would that be

13   an example of where a disclosure would be required of

14   self-interest?

15   A    As I understand -- as I understand the law as a nonlawyer,

16   that would be a situation where they would have to disclose

17   that.

18   Q    Also, if I told you that there was no one, hypothetically

19   -- patients that saw Dr. Couch -- that nurse practitioners or

20   physician assistants were seeing the patients when he was

21   outside of the office, would that be outside the scope of

22   professional practice, outside the usual course of professional

23   practice?

24   A    First of all, I find that hard to believe that that would

25   happen.  But I'm going to take it on face value that that did

```
 1   happen.  And that would make it way, way out of the normal
 2   professional practice of legitimate medicine in the United
 3   States.  I mean, it's hard for me to fathom that.
 4   Q   And if I told you hypothetically that Dr. Ruan would change
 5   patients from fentanyl to Subsys in the middle of their
 6   treatment without explaining to them why, with just sending a
 7   nurse or a physician assistant, a nurse assistant in with a
 8   prescription, would that be outside the usual course of
 9   professional care?
10   A   It would be completely outside the usual course of
11   professional care.
12   Q   Would a patient be entitled to know why their drugs were
13   being changed?
14   A   Absolutely a patient has a right to know why their drugs
15   are being changed.
16   Q   And the same goes for Dr. Ruan as I previously asked you
17   for Dr. Couch; if the physician assistant or the nurse
18   assistant was seeing the patients rather than Dr. Ruan after
19   the initial visit, would that be outside the usual course of
20   professional care?
21   A   Absolutely.
22           MR. ARMSTRONG:  Object to the form of the question.  I
23   think she's getting the names confused based on where she
24   started and where she finished.  Object to the form of the
25   question.
```

 1          THE COURT:  Just ask it again.

 2   BY MS. GRIFFIN:

 3   Q    Hypothetically, if I told you that Dr. Ruan might see a

 4   patient on the first visit and thereafter would have a

 5   physician extender such as a nurse practitioner see the patient

 6   and that medicines were being changed, is that outside the

 7   usual course of professional practice?

 8   A    Yes, that would be my opinion.

 9   Q    Is it also your opinion that billing for a doctor visit

10   when no doctor has seen the patient is outside the usual course

11   of professional practice?

12   A    Yeah.  This was fraud and that's problematic.  That's a

13   huge problem if that was happening.

14   Q    In your experience, are doctor visits paid at a higher rate

15   than a physician assistant visit with a patient?

16   A    Yeah.  In most states that's true, yes.

17   Q    Because of the amount of expertise and training and the

18   licensing of a doctor; is that correct?

19   A    Correct, yes.

20   Q    Now, did you also find or let me ask you hypothetically.

21   Would it be appropriate for a nurse to give the informed

22   consent rather than a medical doctor on these substantially

23   high-level opioids, Subsys and Abstral?

24   A    No.  It would be completely inappropriate for the nurse to

25   give the informed consent to someone going on high-dose

1  fentanyl.  That would be again well outside the legitimate

2  practice of nursing and it would probably be well outside the

3  legitimate authority for a physician to think they could

4  delegate that to a nurse.

5  Q   Is it outside the usual course of legitimate practice to

6  prescribe Adderall to opioid patients simply because their

7  opioids are making them overly lethargic?

8  A   No.  That practice is to be condemned and dangerous and,

9  again, it makes no sense.  If a person has become obtunded from

10  opiates, the solution to that is to sit down with a patient,

11  explain to them:  Mr. Smith, sorry; you've been falling asleep

12  in the waiting room or falling asleep in the pharmacy or

13  wherever, wherever inappropriate place they've been falling

14  asleep and basically say what we need to do now is not to give

15  you stimulant drugs.  What we need to do now is start to slowly

16  and humanely taper you off of the powerful narcotic drugs that

17  we have you on so that your function can be restored.

18  Q   Is it outside the usual course of professional practice for

19  a physician to see a new pain management patient for only 45

20  seconds, not even a full minute, and thereafter prescribe a

21  schedule II controlled substance?

22  A   45 seconds?

23  Q   45 seconds.

24  A   Yes, I would say that's way off the normal legitimate

25  practice of pain medicine.

DAVID GORDON GREENBERG, MD - DIRECT BY MS. GRIFFIN

1   Q   Now, Dr. Greenberg, is it also outside of the usual

2   professional practice for an NP or an RN who does not have a

3   DEA license to prescribe controlled substances to sign a

4   doctor's name?

5   A   I think it's only a felony but I don't know what else it

6   is.  I mean that's -- that's -- that's outrageous.

7   Q   Do you have to have a DEA license to prescribe schedule II

8   controlled substances?

9   A   Yes, you have to have a DEA certificate that allows you

10  to -- on your DEA form that they send you from the DEA, what

11  they do is they put which of the controlled substances that

12  particular licentiate has the ability to legally prescribe.  So

13  it could be someone would only be allowed to prescribe schedule

14  IV drugs, but most physicians have the ability to schedule, to

15  order and to dispense any of the legal classifications which

16  means everything other than a schedule I.

17  Q   But a nurse practitioner or a registered nurse, absent a

18  DEA license, would not have authority to sign a doctor's name

19  at all?

20  A   Not in any situation that I'm aware of, no.

21  Q   Would they have authority to sign it even if they did have

22  a DEA license, to sign a doctor's name?

23  A   It would depend upon the state that a person is in.  There

24  are some states that allow nurse practitioners to obtain DEA

25  registrations, so there is some variability from state to

DAVID GORDON GREENBERG, MD - DIRECT BY MS. GRIFFIN

798

1    state.  And there are a few states that do allow nurse

2    practitioners to prescribe that way.

3    Q    But they would sign their own name if they had such a

4    license rather than a doctor's name?

5    A    Absolutely, they have to sign their own name.  They can't

6    use a fake name.

7    Q    They can't sign the doctor's name?

8    A    No, they cannot use a fictitious name, they cannot use

9    someone else's name.  They put their name on it and that's how

10   it's done.

11   Q    Would it also be outside the usual course of professional

12   practice to tell a nurse that you can up this patient's

13   medication by 10 percent or lower it by 10 percent, just a

14   blanket direction by a doctor to a nurse?

15   A    That would be highly unusual.

16   Q    Would that be outside the usual course of professional

17   practice?

18   A    I can't think of a situation where it wouldn't be.

19   Q    Now, Dr. Greenberg, you have been paid by the United States

20   for your review of these 20 files?

21   A    Yes.

22   Q    Did that take you a considerable length of time over the

23   past year?

24   A    Yeah.  I've been working on them for the past -- almost 55

25   months -- 55 weeks.  Sorry.

799

```
 1   Q   Excuse me.  And do you like other medical experts charge an
 2   hourly rate for reviews?
 3   A   Yes.
 4   Q   Do you charge an hourly rate for court testimony?
 5   A   Yes.
 6   Q   And do you charge an hourly rate for consultation with the
 7   attorneys, be they defense or prosecution attorneys?
 8   A   Yes.
 9   Q   Have you in fact done work for the prosecutors before?  Not
10   in this case but in other cases?
11   A   Yes, I have.
12   Q   Have you done defense work for the defense side of a case
13   before?
14   A   Yeah.  The -- my office manager, I asked her to pull my
15   cases for the past -- since 2007 up until the present time, and
16   the overwhelming number of my cases are defense cases.
17   Q   Where you've consulted and were paid by the defense for
18   your reviews, your consultations and your court testimony; is
19   that right?
20   A   Yes.  That's correct, yeah.
21   Q   And in connection with this 55 weeks worth of work, have
22   you been paid thus far by the United States?
23   A   I would have to -- I would have to talk to my business
24   manager as far as what the status of the account is.  But I
25   have faith that the people in the government of the United
```

1  States will make good on their promise.

2  Q   Have you been paid thus far right at $58,000?

3  A   Right.

4  Q   And you charge $395 an hour for your reviewing and pretrial

5  work?

6  A   Right.

7  Q   And you charge $800 an hour for your in-court work; is that

8  correct?

9  A   Correct.

10  Q   And then you are entitled to your travel, just like any

11  witness the United States subpoenas; is that correct?

12  A   Correct.

13  Q   Now, that includes all of your time going through the

14  files, providing your report, consulting with the prosecutors

15  and preparing for your trial testimony; is that correct?

16  A   It's all inclusive, yes.

17  Q   And is that your same fee that you charge for defense

18  attorneys and prosecutors in any other cases?

19  A   Yeah, it's the same.  I use the same fee schedule whether

20  it's defense or prosecution.

21  Q   I want to show you what's been introduced as Government's

22  Exhibit 4-13.

23          THE COURT:  This is already in evidence; right?

24          MS. GRIFFIN:  It is, Your Honor.

25      (A discussion was held off the record between counsel.)

801

```
 1   BY MS. GRIFFIN:

 2   Q   Show you part of Government's Exhibit 4-13 from Doc Lab 1

 3   B44 which does not mean anything to you, but that's an

 4   identification way for the attorneys.  Just this first page was

 5   contained in the Exhibit 4-13 as coming from C&R Pharmacy which

 6   is the pharmacy the doctors owned.  Could you read that,

 7   please, sir?

 8   A   Yes.

 9           THE COURT:  Out loud or to himself?

10           MS. GRIFFIN:  No, to yourself first.

11   A   Sure.

12   Q   And tell us when you've finished.  It's just one page?

13   A   Uh-huh (positive response).

14   Q   Have you had a chance to read it?

15   A   Yeah.

16           MS. GRIFFIN:  I'm going to publish it, please.  It's

17   been admitted as part of Government's Exhibit 4-13 prior to

18   your coming in the courtroom.

19           May I publish it to the jury, Your Honor?

20   Q   And it appears to be a letter from Physicians Pain

21   Specialists of Alabama under the name Dr. Ruan; is that

22   correct?

23   A   Yes.

24   Q   Could you read it for us?  I'll make it larger.

25   A   Okay.  When severe breakthrough pain not fully covered by
```

802

1   regular short-acting opioids -- we use transmucosal fentanyl,

2   an analgesic, to provide rapid onset pain relief in properly

3   selected patients.

4         In general, as fellowship-trained multi-boarded

5   specialists with added qualification in addiction medicine, I

6   set my dosage limit not to exceed the following:  99 percent of

7   our patients use significantly less than the following dose

8   limit.  We have many other patients not on any opioid.

9         And then there's a list of different drugs.  I suppose

10  these are the drugs that are offered through the doctors'

11  pharmacy.

12  Q   Is that methadone?

13  A   Yeah.  Number one:  Methadone, no more than 40 milligrams

14  b.i.d.

15        MS Contin, 100 milligrams t.i.d.

16        Opana ER, 80 milligrams b.i.d.

17        Fentanyl patch, 200 micrograms per hour.

18        Exalgo, 32 milligrams b.i.d.

19        OxyContin, 80 milligrams b.i.d.

20        Lortab, no more than four to five per day.

21        Percocet, no more than six per day.

22        Opana, 10 milligrams no more than six per day.

23        And then the last drug that they have here is

24  Fentora/Actiq/Abstral/Subsys, all up to four per day.  It

25  doesn't say what unit of four, it just says up to four per day.

DAVID GORDON GREENBERG, MD - DIRECT BY MS. GRIFFIN                    803

1   Q   Let me stop you there.  What does b.i.d. mean?

2   A   B.i.d. means twice per day.

3   Q   What does TID mean?

4   A   Three times per day.

5   Q   And then to summarize in this letter it says:  Keys are

6   what, please, sir?

7   A   To summarize, keys are, number one, a thorough history

8   (special attention to social history, psyche history, drug

9   abuse history, physical exam, psychological eval, and

10  treatment).

11          And then the next line says:  Number two, only use in

12  properly selected patients.

13          Number three, start low and go slow.

14          Number four, closely monitoring through urine screen,

15  lab confirmation, pill count.

16          Number five, watch for pain behavior, watch for

17  misuse, abuse, diversion, and other street drug use.

18          Number six -- and this is the last of the numbers that

19  are in a row -- terminate opioid therapy when evidence of

20  abnormal usage identified.

21  Q   And is this under the signature line for Dr. Ruan?

22  A   Yes, it appears to be.

23  Q   Now, in your review of the 20 patient files you saw in this

24  case, were these keys followed?

25  A   Not even close.

804

1    Q    In your review were these dosage limits set forth by

2    Dr. Ruan followed?

3    A    No.

4            MS. GRIFFIN:  That's all I have of this witness, Your

5    Honor.

6            THE COURT:  All right.  Who's cross-examining for

7    Mr. Couch?

8            MR. SHARMAN:  I am.  Court's indulgence, just a couple

9    of minutes to move paperwork around.

10           THE COURT:  All right.

11                         CROSS EXAMINATION

12   BY MR. SHARMAN:

13   Q    May I please the Court.

14           Good afternoon, Dr. Greenberg.

15   A    Good afternoon.

16   Q    My name is Jack Sharman, I represent Dr. Couch.  I'd like

17   to see first if we can agree on some basic terms that can help

18   the jury understand what we've been talking about this

19   afternoon.  Okay?

20           All right.  You know what the federal Centers for

21   Disease Control is; right?

22   A    Yes.

23   Q    And that's a federal agency, or entity?

24   A    Right.

25   Q    And they do a lot of research about disease and about

1   medicine; right?

2   A   Correct.

3   Q   And they publish papers, guidance documents and alerts on

4   those subjects; right?

5   A   Correct.

6   Q   And do you find them to be diligent and authoritative in

7   what they do and what they write on and pronounce; right?

8   A   By and large, yes.

9   Q   And they also from time to time review and publish papers

10  or guidance documents about opioids; right?

11  A   They do.

12          MR. SHARMAN:  May I approach, Your Honor?

13          THE COURT:  Yes.

14  BY MR. SHARMAN:

15  Q   I'm going to show you, Dr. Greenberg, what's been marked

16  for identification as Couch 107 and ask you to take a look at

17  that, please, sir.  And what does that appear to you to be?

18  A   This is a copy of the most recent CDC guidelines for

19  prescribing opioids for chronic pain, and it is effective 2016.

20  Q   And it's -- as you say it's the most recent one so it's

21  pretty new; right?

22  A   I believe there may be one more recent one since this

23  that's been put out, but it might just be one of the warning

24  ones.

25  Q   And these guidelines as you say do change from time to time

1   as thinking changes or new evidence is received or there are

2   other developments; right?

3   A   Yes.

4          MR. SHARMAN:  Your Honor, Dr. Couch moves into

5   evidence Exhibit 107.

6          MS. GRIFFIN:  No objection, Your Honor.

7          THE COURT:  All right.  Mark it in.

8      (Defendant Couch's Exhibit 107 was entered into evidence.)

9   BY MR. SHARMAN:

10  Q   Dr. Greenberg, if you would, if you would turn please, sir,

11  to the very first page, the one --

12         THE COURT:  Hold on just a minute.

13         THE CLERK:  Your Honor, I can't switch over to the --

14         THE COURT:  The system is rebooting itself.  She can't

15  switch from computer to presenter right now.

16         MR. SHARMAN:  Well, actually I need the computer, not

17  the ELMO.

18         THE COURT:  Well, that's --

19         THE CLERK:  I can't switch.

20         THE COURT:  She can't switch right now.

21         THE CLERK:  They are trying to bring it up now, Your

22  Honor.

23         THE COURT:  All right.  We'll just have to wait.

24         MR. SHARMAN:  We'll wait a moment and then I will do

25  something.

1          THE COURT:  Are you trying to exhibit one of the pages

2    from it?

3          MR. SHARMAN:  Yes, ma'am.  I thought it would be

4    helpful by showing what we're talking about.

5          THE COURT:  Do you have a hard copy that you can put

6    on the presenter?

7          MR. SHARMAN:  Yes, ma'am.  Bear with me a moment here.

8    Q   It has highlighting on it, Dr. Greenberg, that was not on

9    the original document.

10         All right.  If you would look on the left-hand column,

11   Dr. Greenberg, the CDC says that opioids are commonly

12   prescribed for pain.  An estimated 20 percent of patients

13   presenting to physician offices with noncancer pain symptoms or

14   pain-related diagnoses, including acute and chronic pain,

15   receive an opioid prescription.  Would you agree with that?

16   A   I would say that that's probably pretty close, yes.

17   Q   And so an opioid prescription by itself is not anything

18   peculiar or sinister or unusual?

19   A   Yeah, by itself, I agree.

20   Q   And if you will go to the bottom of that paragraph, the

21   last sentence in this CDC guidance document notes that rates of

22   opioid prescribing vary greatly across states in ways that

23   cannot be explained by the underlying health status of the

24   population, highlighting the lack of consensus among clinicians

25   on how to use opioid pain medication.  Do you agree with that?

808

1  A   I agree that there is some variation from provider to

2  provider on how they do prescribe opioid drugs.  I agree with

3  that.

4  Q   And you agree that there's a lack of consensus about how to

5  do it?

6  A   Actually I think that there is a good consensus on how to

7  do it and that the best reference for that are the 2009

8  American Pain Society, American Academy of Pain Medicine

9  guidelines that were published for exactly the purpose that

10 you're talking about, to standardize opioid treatment and to

11 make it safer.

12 Q   So the federal Centers for Disease Control is wrong on that

13 point?

14 A   I'm not saying they're wrong.

15 Q   Are you saying they're right?

16 A   What I'm saying is that there are a lot of guidelines that

17 have come out for how to use opioids and not all of them are

18 useful.

19 Q   And I'm just trying to get through this.  So do you agree

20 with that statement or do you disagree with it?

21         MS. GRIFFIN:  Your Honor, he's already answered and he

22 doesn't have to just answer agree or disagree.  He's entitled

23 to explain his answer, so we would object.

24         MR. SHARMAN:  That's fine, Your Honor.  We can't get

25 an answer, we'll go on.

```
1            THE COURT:  All right.
2    BY MR. SHARMAN:
3    Q   If you will look on the right-hand column.
4            THE COURT:  Are the slides up now?
5            THE CLERK:  Yes, ma'am.
6            THE COURT:  The slides are up now.
7            MR. SHARMAN:  I'm sorry.
8            MS. GRIFFIN:  Your Honor, we would ask that he be able
9    to explain his answer.
10           THE COURT:  Well, I think he did more or less.
11   BY MR. SHARMAN:
12   Q   And if you could look at the right-hand column of the first
13   page, the CDC also says there are clinical, psychological and
14   social consequences associated with chronic pain, including
15   limitations in complex activities, lost work productivity,
16   reduced quality of life and stigma emphasizing the importance
17   of appropriate and compassionate patient care.  Do you agree
18   with that?
19   A   I'm all for compassionate patient care.  But I believe that
20   the opioid emergency that the United States of America is in
21   right now takes precedence over compassionate care at this
22   point in time.
23   Q   I'm sorry.  My question wasn't very clear.  I
24   apologize.  Do you agree with that statement by the CDC or not?
25   A   I believe that this rendition of the CDC, because there's
```

 1   been others before it.  Okay?  I believe that it has some

 2   useful components.  I don't believe it's anywhere near as good

 3   as the American Academy of Pain Medicine or the American Pain

 4   Society's guidelines on the safe use of opioid pain killers.

 5   Q   All right.  We talked a lot about chronic pain.  We're

 6   probably going to talk a little bit more about it.  The CDC

 7   defines chronic pain generally as in this guideline as pain

 8   that typically lasts greater than three months or past the time

 9   of normal tissue healing.  Do you agree with that?

10   A   Yeah, that's a pretty standard and well-recognized

11   definition.

12   Q   Okay.  So chronic pain is not -- for example, if you have a

13   dental procedure and your jaw hurts for a day or two, that's

14   not chronic pain?

15   A   Correct.

16         MR. SHARMAN:  May I approach, Your Honor?

17         THE COURT:  Yes.

18   BY MR. SHARMAN:

19   Q   I show you what's been marked as Couch Exhibit 115.  Will

20   you take a look at that, please, sir, and tell us what that is?

21   A   This is the May 2010 Management of Opioid Therapy for

22   Chronic Pain produced by the Department of Defense and the VA

23   System.  And again, it's dated 2010.

24   Q   And you're familiar with the Veterans Administration?

25   A   Yes.

DAVID GORDON GREENBERG, MD - CROSS BY MR. SHARMAN

```
1   Q   You're a veteran yourself?

2   A   I've trained in a veterans hospital too.

3   Q   And the VA, among other things, provides healthcare to

4   veterans?

5   A   Yes.

6   Q   And they discharge that mission honorably, do they not?

7   A   I think they do the best they can with what they've got.

8   Q   Yes, sir.  And in fact, Mr. Chausse, one of the patients

9   you testified about, he was a veteran, was he not?

10  A   Correct.

11  Q   And he was referred to Dr. Couch from the VA.

12  A   Yes.

13  Q   If you would, please, sir, take a look --

14          MS. GRIFFIN:  Your Honor, we're going to object to it

15  being outside the time frame charged in any of the counts.  And

16  it's no establishment that it's any type of learned treatise.

17          MR. SHARMAN:  Well, I'll back up and see if I can lay

18  a foundation, Your Honor.

19          THE COURT:  All right.

20  BY MR. SHARMAN:

21  Q   You are familiar, having trained in the VA facility, that

22  the VA has obligations to healthcare of veterans; right?

23  A   Yes.

24  Q   In discharging that obligation they do research, publish

25  guidelines and adopt proposed best practices for various
```

1  medical specialties in order to advance that mission; right?

2  A   Yes, they -- as I said, they do -- they do the best they

3  can with what they have.  It has -- as you probably know, the

4  VA is an extremely stressed bureaucracy at this point in time

5  and they are having trouble accomplishing their missions.

6  Q   And as part of that comission they do things like create

7  working groups or commissions or blue ribbon committees to

8  investigate a topic and then report out on it from time to

9  time; right?

10  A   Yeah, they do that.

11  Q   Okay.  And the document you have before you which is Couch

12  115, that is such a document; right?

13  A   Yes, it is.

14        MR. SHARMAN:  Your Honor, I move admission of this in

15  addition to being, I believe, a learned treatise.  It's also

16  authentic under 9025 and it's admissible under 8038 as a public

17  record.

18        MS. GRIFFIN:  Your Honor, we object.  We do not

19  believe it's a learned treatise.  It is outside the date range

20  of the charges that are charged in this case and we'd like to

21  approach for the further objections.

22        THE COURT:  All right.

23      (At the side bar, jury not present.)

24      (A discussion was held off the record between government

25  counsel.)

 1            MS. GRIFFIN:  Judge, there's no showing that this is -

 2    - is everybody here?  A learned treatise.  There's no showing

 3    that he recognizes it being authoritative.  Further, these are

 4    produced all the time and the first charge is January of 2011.

 5    And I don't think just because a committee put this together

 6    that it makes it a learned treatise or something that we're

 7    going to have the jury see because this changes all the time,

 8    it changed in 2009, changed again each year almost, and we

 9    object to its admission.

10            He can say he's familiar with it or he knows they

11    produced such type things and be shown pages.  But we object to

12    the actual --

13            THE COURT:  Admission of the document?

14            MS. GRIFFIN:  -- guideline being admitted.  We might

15    as well admit all the Medicare and Medicaid guidelines if we're

16    going to do that.  And that would be hundreds of thousands of

17    pages.

18            MR. SHARMAN:  Your Honor --

19            THE COURT:  What is the purpose of offering it?

20            MR. SHARMAN:  Well, one thing, Your Honor, we are

21    going to talk about guidelines and how they change in terms and

22    what they actually mean.  He has said that he recognizes it as

23    authoritative and that this is -- this is what they do and that

24    he recognizes that.  Also, clearly it's separate from that.

25    It's admissible as a public record.  The one we just got

 1    through talking about admitting was 2016.  That was outside the

 2    time frame of the indictment as well.  That's not -- that's not

 3    what governs admissibility here.

 4            THE COURT:  Well, it appears that this --

 5            MR. SHARMAN:  And also the 2009 guidelines are outside

 6    as well.  So --

 7            MS. GRIFFIN:  Your Honor, we would be glad to research

 8    it and have a --

 9            THE COURT:  Well, I just want to know.  This appears

10    to be hundreds of pages.  What in it do you intend to use?

11            MR. SHARMAN:  Several pages about definitions, several

12    pages about guidelines, several pages about their research.

13    I'm not going to use all 180 for sure.

14            MS. GRIFFIN:  Judge, I fail to see how the VA's

15    research has any bearing on his testimony.

16            MR. SHARMAN:  I'm trying to see if he will agree, Your

17    Honor, to established definitions of these things.  Because he

18    hasn't used any thus far.  And I'm entitled, as part of our

19    theory of defense, that he is using terminology loosely and

20    incompletely.

21            MR. SEWELL:  And, if I may, it's also relevant to one

22    of the patients who was referred by the VA.  So it will be

23    relevant to his treatment.

24            THE COURT:  I don't know that this is relevant to that

25    particular patient.  I hesitate to admit it as an authoritative

```
1    document because it hasn't been established as being an
2    authoritative document.  I mean, he's testified that he knows
3    the VA produces these.
4             MR. SHARMAN:  And that they have people who -- this is
5    part of the admission -- they gather people who are qualified
6    in committees, commissions, to create things like this.
7             THE COURT:  He says he knows that they do that, but
8    you haven't established that it is authoritative.
9             MR. BODNAR:  Your Honor?
10            MR. SHARMAN:  I can -- if I may, may I ask him if he
11   considers it authoritative even if he doesn't agree with all of
12   it?  He doesn't have to agree with all of it.
13            THE COURT:  He doesn't know what he's agreeing with
14   until you show him specific parts of it, unless you can say
15   that he's read through it and understands and agrees to it.
16            MR. SHARMAN:  I don't think -- if we're talking about
17   a learned treatise, I don't believe that's the standard for
18   admission.
19            THE COURT:  You haven't established it is a learned
20   treatise, is what I'm saying.  If you're trying to show he
21   agrees with certain definitions, I think you can certainly ask
22   him about that.  But that doesn't make the entire document
23   admissible.
24            MR. SHARMAN:  And independently of that, Your Honor,
25   it's clearly admissible as a public record.  It's
```

 1   self-authenticating and it's a public record and it's relevant.

 2   We can argue about the time periods, the definitions, but

 3   that's the point I'm trying to make.

 4        THE COURT:  I don't -- you haven't established it as a

 5   public record, the keeping of public document or record,

 6   keeping a public document.  You haven't really established what

 7   this thing is.

 8        MR. BODNAR:  And, Your Honor, for a learned treatise,

 9   it's my understanding -- I've got the research, I'll be happy

10   to send it this afternoon or tonight.  It's that if they

11   establish that the witness -- through a witness, this witness

12   or one of their own witnesses, that this is a relied-upon

13   document in the usual course of the field, and then that the

14   witness has seen it and knows what it is, then they can read

15   from it but not admit it; if they read through parts and have

16   him agree to it but not admit the entire treatise.  If it were

17   even a learned treatise foundation.

18        THE COURT:  I don't think you can wholeheartedly -- I

19   mean, wholesale admit this document at this point.

20        MR. SHARMAN:  What if I -- I will go over it with him.

21   I will see if he will agree that it's relied upon, then.

22        THE COURT:  When you say you will go over it, it's

23   hundreds of pages.  So I don't know how you can go over it with

24   him unless he recognizes it, has read it before, and

25   understands what it is.

1          MR. SHARMAN:  I understand, Your Honor.  I will ask my

2    questions without the benefit of having published it to the

3    jury, then I will ask to have those sections moved in.

4          THE COURT:  All right.  Let's see what you can do with

5    it.  But at this point I'm not admitting it.

6          (In open court, defendants and jury present.)

7    BY MR. SHARMAN:

8    Q    All right.  May I have 115 back up on the screen, except

9    for everybody -- except for the jury?

10          All right.  Before that interruption, Dr. Greenberg,

11    we were talking about Couch 115 which is the guidance document

12    from the VA.  And in general, do people in your field rely upon

13    and use in their professional practice documents such as this.

14    A    In the private practice world I don't think a lot of pain

15    and/or pain addiction physicians are using the VA guidelines

16    because it is for such a special selection -- group of the

17    population.  So -- but I do believe that there is more as time

18    is going on, people who are willing to embrace specific

19    guidelines to make prescribing better and safer.

20    Q    And do you have any doubt that this document is produced by

21    the VA?

22    A    No, I don't have any doubt of that at all.  It's an old

23    document but it doesn't mean that it's going to be useless.

24    Q    All right.  If you will, turn over with me to page four,

25    please, sir.  And as you said, this document particularly it

1   speaks to opioid therapy in a veterans population.  And in fact

2   there's a subheading there called OT in VA Population.  Do you

3   see where I am?

4   A   Yes, I see it.

5   Q   And there's a paragraph that starts:  More than 50 percent

6   of male VA patients in primary care report chronic pain.

7          Do you see where I am?

8   A   Yes, I see it.

9   Q   Based on your experience, would that likely to be true?

10  A   Yeah.  I would say that it depends what kind of treating

11  physicians the soldiers have, but certainly infantry soldiers

12  that are out in the hinterlands of Iraq and Afghanistan, et

13  cetera, do suffer injuries that definitely become chronic.

14  Q   And based on your review, for example, of Mr. Chausse's

15  file, that description would fit him?

16  A   Yeah, that would fit him pretty well.

17  Q   And then the last sentence of that paragraph says that:  In

18  some studies, the prevalence of comorbid post-traumatic stress

19  disorder (PTSD), traumatic brain injury and pain exceeds 40

20  percent.

21          Based on your review of Mr. Chausse's file that

22  description actually fits him; right?

23  A   I would say that it would fit him and it would fit a lot of

24  other individuals in his age cohorts too.

25  Q   Then with regard to chronic pain, Dr. Greenberg, in general

1   we're talking about a condition where the underlying cause is

2   not going away.  In other words, that's why the pain is

3   chronic, not temporary; right?

4   A   Yeah.  I mean that's a -- that's a decent way to explain

5   it.

6            MR. SHARMAN:  May I approach, Your Honor?

7            THE COURT:  Yes.

8   BY MR. SHARMAN:

9   Q   I'm showing you, Dr. Greenberg, what's been marked as Couch

10  Exhibit 101 and ask you to take a look at it.

11  A   Uh-huh (positive response).

12  Q   Do you recognize Couch 101?

13  A   Yeah, I do recognize it.

14  Q   What is it please, sir?

15  A   Pardon?

16  Q   What is it?

17  A   It's the 2009 Clinical Guidelines that were promulgated by

18  the American Pain Society and also the American Academy of Pain

19  Medicine, and they are often referred to as the Joint

20  Guidelines.

21  Q   And you -- this was published in the Journal of Pain; is

22  that right?

23  A   Absolutely it was.  And the primary author was Roger Chou.

24  Q   And is that -- is that a journal that you and others in the

25  field find authoritative?

DAVID GORDON GREENBERG, MD - CROSS BY MR. SHARMAN

1   A   Yes, that's a respected journal.

2   Q   And you've relied on this article in your own practice?

3   A   Yes, I have.  I use this article in my own practice and I

4   actually think that this article, even though it's older than

5   some of them, actually has better safety guidelines in it.

6          MR. SHARMAN:  Your Honor, we move in evidence Couch

7   101.

8          MS. GRIFFIN:  Your Honor, the objection is that this

9   is the February 2009 and he indicated that this is older than

10  some of the guidelines, those would be guidelines during the

11  period of time charged, January of 2011 through December the

12  15th.  So I think that goes to the weight it's to be accorded

13  rather than the admissibility, that it is old and out of date.

14         THE COURT:  So you're not objecting to the

15  admissibility?

16         MS. GRIFFIN:  No, just to the fact and to the weight

17  that it is outside.

18         THE COURT:  All right.  Mark it in.

19      (Defendant Couch's Exhibit 101 was entered into evidence.)

20  BY MR. SHARMAN:

21  Q   All right.  And Dr. Greenberg, if you would, if you could

22  turn to the page that is numbered 114.  Obviously there's not

23  114 pages before you.  I'm sorry.

24  A   113?

25  Q   I'm sorry.  114.  If I said 113, I misspoke.

821

1   A   Okay.  Yeah.

2   Q   All right.  So if you will look please, sir at the bottom

3   of the opening paragraph, paragraph -- the last sentence there.

4   It's CNCP, which is the shorthand there for chronic noncancer

5   pain.

6   A   Right, chronic noncancer pain, CNCP.

7   Q   Is a leading cause of disability and can have deleterious

8   effects on ability to work, functional status and other quality

9   of life domains.  Do you see where I read that?

10  A   Yes.

11  Q   Do you agree with that?

12  A   Yeah, I agree with that.

13  Q   Deleterious just means real bad?

14  A   Yeah.

15  Q   And quality of life -- domains just means parts of your

16  life; right?

17  A   Right.

18  Q   Now, sometimes in the records, Dr. Greenberg, we see, and

19  you have spoken about the term dependence.  Is that a common

20  term in pain management?

21  A   Yeah.  Opioid -- opioid dependence is a common term in pain

22  management.  Unfortunately it's misunderstood and a lot of

23  people are confused about it.  But it's actually quite

24  simple.  The DSM-IV-TR which is the statistical manual known as

25  the number one entity that comes up with diagnoses both for

822

 1   classifications of diseases and disorders and also for billing

 2   purposes.  The DSM-IV-TR is a book that explains quite well and

 3   clearly what opioid dependency means and what the criteria are

 4   for developing opioid dependency as a diagnosis.

 5   Q   And I appreciate that.  But I need to ask you a question.

 6   A   Sure.

 7   Q   If you will turn -- have you still got the VA document up

 8   there with you?

 9   A   Yeah.

10   Q   Couch 115?  If you'll turn please, sir, to page 14.

11   A   Okay.

12   Q   And at the top you will see a definitions page, page 14.

13   Are you with me?

14   A   Yeah, I'm getting there.  So it's the page that says

15   101-014; correct?

16   Q   It should be page 14 at the bottom.

17        MR. SHARMAN:  May I approach Your Honor?

18        THE COURT:  Yes.

19   A   Yeah.  This one here?

20   Q   No, sir.  I'm sorry.

21   A   Oh, the DOD one.  Okay.

22   Q   I may have misspoken.  I apologize.

23   A   Let me turn to that one.

24   Q   Back at the VA and what they're saying with opioids and

25   it's page 14?

 1  A   Right.

 2  Q   And this is a glossary, a definitions page; right?

 3  A   What I see -- hang on just a second.  What I see is --

 4          MS. GRIFFIN:  Your Honor, we object.  He was talking

 5  about opioid dependence, not physical dependence.

 6          MR. SHARMAN:  Your Honor, I'm just trying to ask the

 7  question, see if he agrees with the definitions.  That's all

 8  I'm doing.

 9  BY MR. SHARMAN:

10  Q   So can we get to page 14, Doctor?

11          THE COURT:  You can go ahead.

12  A   I'm on page 14.  But I don't see the --

13          THE COURT:  Why don't you just read from the screen?

14  Because they've got it up on the screen.

15  Q   If that's acceptable, that might be -- there's a definition

16  there by the VA of physical dependence.  Do you see that?

17  A   Uh-huh (positive response), I see that.

18  Q   And since the jury can't see it, and I'll read it.

19  Physical dependence on an opioid is a physiologic state in

20  which abrupt cessation of the opioid, rapid tapering, for

21  example, when a patient forgets to take the medication, or

22  administration of an opioid antagonist results in a withdrawal

23  syndrome.

24          Now, do you think that's a good definition of physical

25  dependence?

824

1    A    That's an acceptable definition of physical dependence.

2    Q    All right.  And the VA goes to on to say:  Physical

3    dependency on opioids is an expected occurrence in all

4    individuals using long-term use of opioids for therapeutic or

5    for non-therapeutic purposes.  Do you agree with the VA on that

6    or not?

7    A    I agree with it partially.  But the bigger problem is the

8    problem of opioid dependency.  And that is not covered so well

9    by the VA.

10   Q    We'll get to that.  Just bear with me.

11   A    Okay.

12   Q    So you'll agree that physical dependency on opioids is

13   something that we expect in patients who use opioids for a long

14   time.  That's likely to happen?

15   A    Yeah, it's definitely known to happen.  Yes.

16   Q    And then the VA goes on:  It, meaning physical dependency,

17   does not in and of itself imply addiction.  That is correct, is

18   it not, physical dependency by itself doesn't mean addiction?

19   A    That is true.  That is true.  But the big problem with

20   opioids and dependence is what we call opioid dependency which

21   is a different animal completely and is addiction.

22   Q    And if you will just let me finish this out.  So the VA

23   says:  Use of the word "dependence" by itself is often used

24   synonymously with addiction and should not be used to describe

25   physical addiction.  That's correct, is it not?

825

1    A    I would say that that is -- that's close to correct; yes.

2    Q    So physical dependence is not the same as being addicted to

3    opioids; right?

4    A    Yes, that's true.  Because the true diagnosis of opioid

5    dependency has aberrant behaviors and maladaptive situations

6    that complicate the course of the disease of opioid dependency.

7    Q    And in fact, if you look at the screen at page -- at page

8    14, a little further down, it does give a definition of

9    addiction; right, which I believe references some of the things

10   that we talked about?  Addiction, it's got to be talking about

11   physical dependence; right?

12   A    Right.

13   Q    Which we expect will happen if somebody uses opioids for a

14   long time.  That doesn't necessarily mean addiction; right?

15   Correct?

16   A    Right.

17   Q    Now we're moving to addiction.  The VA says:  Addiction in

18   the context of pain treatment with opioids is characterized by

19   a persistent pattern of dysfunctional opioid use that may

20   involve any or all of the following.  And then it gives a list

21   of a few things; right?

22   A    Right.

23   Q    One is loss of control over the use of opioids.

24   A    Right.

25   Q    One is preoccupation with obtaining opioids, preoccupation

1   with getting them despite the presence of adequate analgesia.

2   Do you see that?

3   A   Yes.

4   Q   And analgesia -- adequate analgesia just means there's

5   enough to treat your pain?

6   A   Correct.

7   Q   And then the third one is:  Continued use of the opioids

8   despite physical, psychological, or social adverse

9   consequences; right?

10  A   Correct.

11  Q   So in other words, an addictive person will continue even

12  though bad things may be happening in their life; right?

13  A   Correct.

14  Q   Okay.  So those are the things that characterize addiction

15  as opposed to physical dependance.  We've established those two

16  things; right?

17  A   It's true.  But one of the problems that we have is that

18  there's multiple sources of definitions of addiction.  And the

19  gold standard is not the old VA standard.  The gold standard is

20  the DSM-IV-TR which was in effect when the misprescribing was

21  performed that we talked about in this case.  And so I think

22  that to do justice to it that we should look at the DSM-IV-TR

23  because that's the one that's used for billing, one that's used

24  for coding, and that's the one used by almost all physicians in

25  the United States of America.  Very few people use the VA

827

```
 1   criteria, unless they're in the VA system.
 2   Q   Just to kind of keep it in plain English, it's possible to
 3   be physically dependant and not addicted; right?
 4   A   Possible, that's right.  It's not common, but it's
 5   definitely possible.
 6   Q   If I drink a lot of coffee --
 7   A   Okay.
 8   Q   -- and then I stop drinking coffee suddenly --
 9   A   Yeah.
10   Q   -- I start to get headaches?
11   A   Right.
12   Q   I might be dependent -- I might be physically dependent on
13   coffee; right?
14   A   Right.
15   Q   I'm not addicted to coffee; right?  I'm not going to
16   continue using it despite all social adverse consequences.
17   There's a difference between physical dependence and addiction?
18   A   You're not robbing Starbucks.
19   Q   Exactly.  All right.  So that is addiction and
20   dependence.  All right.  Now, we talked a little bit and you
21   mentioned it a little bit in your direct about standards of
22   practice and the rules and regulations that go along with
23   those.  And in that regard every state, like Arizona, has a
24   medical board; right?  Is that right?
25   A   Yes.
```

828

1   Q   All right.  And basically the medical board governs the

2   doctors and their practice or practices in that state; right?

3   A   By and large, yes.

4   Q   So the medical board is the one that grants licenses or

5   takes them away; right?

6   A   Right.

7   Q   And they make up the rules and the regulations and they

8   might publish guidance documents about them; right?

9   A   Correct.

10  Q   And if you -- now, you practice in Arizona, don't you?

11  A   Yes, I do.

12  Q   So you look to the rules and regulations and guidance

13  documents of the Arizona Medical Board, or at least you look

14  there first, to give you guidance about what you're supposed to

15  do, what you can do, what you can't do; right?

16  A   They do.  But to tell the truth, in a lot of the medical

17  boards they stopped giving those types of guidelines out as

18  much as they used to.  But I know what you're talking about.

19  And Arizona did used to publish guidelines on a regular basis

20  but that hasn't happened for a number of years now, I don't

21  think.

22  Q   Well, if you practice in Arizona you're going to be

23  governed by whatever the Arizona Medical Board says, probably

24  not what the Alabama Medical Board says; right?

25  A   Correct.

829

1    Q    And the Alabama Medical Board and the regulations that it

2    promulgates would be a good place for a doctor in Alabama to

3    look, at least first, to decide how to comport himself or

4    herself in their practice; right?

5              MS. GRIFFIN:  Your Honor, we would object to that line

6    of questioning, because it is the federal rules that they are

7    operating under for the DEA license and the DEA prescribing of

8    controlled substances.

9              MR. SHARMAN:  The Alabama Medical Board speaks

10   specifically to what an Alabama physician is or is not supposed

11   to do in promulgating the guidelines.  It's certainly relevant.

12             THE COURT:  You can continue.

13             MR. SHARMAN:  May I approach, Your Honor?

14             THE COURT:  Yes.

15   BY MR. SHARMAN:

16   Q    I'm going to show you, Dr. Greenberg, what's been marked as

17   Couch Exhibit 118, which purports to be a portion of the

18   Alabama Regulatory Code promulgated by the Alabama Medical

19   Board concerning controlled substances.

20             MS. GRIFFIN:  Your Honor, again we object.  They are

21   not charged with violating any of the rules of the Alabama

22   Board.  They are charged with violating criminal violations of

23   the United States.  And these are administrative and that's an

24   administrative board, not a board that determines guilt or

25   innocence.

```
 1            THE COURT:  Let me see you at side bar for just a
 2  minute.
 3       (At the side bar, jury not present.)
 4            THE COURT:  What is the purpose for offering this
 5  exhibit?
 6            MR. SHARMAN:  We are charged, Your Honor, with
 7  violating a certain standard which is not defined.  And one way
 8  of getting at that, which it goes to our --
 9            THE COURT:  So you think it's relative to outside the
10  course of usual practice?
11            MR. SHARMAN:  Exactly.
12            THE COURT:  I overrule the objection.
13            MR. SHARMAN:  Thank you for articulating that.
14       (In open court, defendants and jury present.)
15            MR. SHARMAN:  Your Honor, we move the admission of
16  118.  It's a public document and it's published regulations.
17            THE COURT:  All right.
18            MS. GRIFFIN:  We have the same objection, Your Honor.
19            THE COURT:  You have the same objection?
20            MS. GRIFFIN:  Same objection.
21            THE COURT:  All right.  Overruled.  Mark it in.
22       (Defendant Couch's Exhibit 118 was entered into evidence.)
23  BY MR. SHARMAN:
24  Q   All right.  Dr. Greenberg, as you can tell from the front
25  page of 118, this -- may it be published to the jury, Your
```

 1    Honor?

 2             THE COURT:  Yes.

 3    BY MR. SHARMAN:

 4    Q   This is the Alabama Administrative Code that governs

 5    doctors and controlled substances registration, controlled

 6    substances and a host of other duties that Alabama doctors have

 7    in this area.  Do you see where I am?

 8    A   Yeah.

 9    Q   All right.  If you would, please, sir, if you could turn to

10    page 4-26.  The page numbers are there at the bottom,

11    4-26.  And I'm going to direct your attention to subparagraph

12    (b) down there towards the bottom of the paragraph beginning

13    inadequate pain control.  And it's also on the screen if that's

14    helpful to you.  Do you see where I am?

15    A   Yeah.  Small letter B?

16    Q   Yes, sir.  And this comes under the heading of Requirements

17    for the Use of Controlled Substances in the Treatment of

18    Pain.  And the Alabama Medical Board says that inadequate pain

19    control may result from physicians' lack of knowledge about

20    pain management or an inadequate understanding of tolerance,

21    dependence or addiction.  Now, do you agree with the Alabama

22    Medical Board on that?

23    A   Yeah, I agree with it may result.

24    Q   The Alabama Medical Board also tells Alabama doctors that

25    fears of investigation or sanction by federal, state, and local

832

1    regulatory agencies may also result in inappropriate or

2    inadequate treatment of chronic pain patients.  Do you agree

3    with the Alabama Medical Board on that?

4    A    I don't think that's as big of a problem as it used to be.

5    Q    And then if you will look just at the next paragraph along

6    with the LC in front of it, the one that says the board

7    recognizes, the Alabama Medical Board there says:  The board

8    recognizes that controlled substances, including opioid

9    analgesics -- and again, analgesics is just a fancy name saying

10   something that helps with pain; right?  Is that right?

11   A    Right.

12   Q    All right.  So the Alabama Medical Board says:  The board

13   recognizes that controlled substances, including opioid

14   analgesics, may be essential to the treatment of acute pain due

15   to trauma or surgery and chronic pain, whether due to cancer or

16   noncancer origins.  The medical management of pain should be

17   based on current knowledge and research and should include the

18   use of both pharmacologic and nonpharmacologic modalities.  And

19   pharmacologic and nonpharmacologic meaning drugs and other

20   things; right?  Drugs or not drugs?

21   A    Correct.

22   Q    Physicians, the board goes on to say, should recognize that

23   tolerance and physical dependence are normal consequences of

24   sustained use of opioid analgesics and are not synonymous with

25   addiction.  The same point the VA made; right?

1  A   Correct.

2  Q   And you agree with that; right?  They are not the same

3  thing.  They're not synonymous.

4  A   Right.  Tolerance and physical dependence are not the same

5  thing as addiction.

6  Q   And then if you will turn over, Dr. Greenberg, and I won't

7  march us through it at the end of the day here, but you'll see

8  where on page 4-27, beginning at number two, there's a phrase

9  called "Requirements" down there.  Do you see that?  The board

10 requires the following when a physician evaluates the use of

11 controlled substances for pain control.  Do you see where that

12 starts down there towards the bottom?

13 A   It's 4-27 at the bottom?

14 Q   Yes, sir.

15 A   Yes.

16 Q   And then you can either look on the screen or your hard

17 copy, but there are a number of requirements, some of which

18 we've touched on today that the board sets out:  Evaluate the

19 patient, treatment plan, informed consent, review,

20 consultation, and so forth.

21       I won't march us through those today.  But are those

22 consistent with what you understand good practice would be?

23 That is what the Alabama Medical Board is saying here.

24 A   I think that the Alabama Medical Board is making a

25 good-faith attempt to deal with the problem.  And I'd like to

1  read it more carefully before I say anything more than that.

2  But I think it's a good-faith attempt.

3  Q   And it's a good-faith attempt that it's reasonable for a

4  doctor in Alabama -- not in Arizona -- but in Alabama would be;

5  right?

6  A   Right, because of the local laws.

7       THE COURT:  All right.

8  BY MR. SHARMAN:

9  Q   And the standard of practice in the area and that sort of

10  thing; right?

11  A   Correct (nodding head affirmatively).

12       THE COURT:  Is now a good time for us to break?

13       MR. SHARMAN:  Yes, ma'am.

14       THE COURT:  All right.  Ladies and gentlemen, we are

15  going to break for the evening.  Leave your pads on your

16  chairs.  Remember no discussion about the case with anyone.  Be

17  back downstairs in the -- sorry.  Be back downstairs in the

18  jury assembly room at 9 o'clock tomorrow morning ready to be

19  called back up.

20       Have a good evening.  We'll see you tomorrow.

21     (In open court, defendants present, jury not present.)

22       THE COURT:  All right.  Counsel, is there anything we

23  need to discuss before we recess?

24       MR. BODNAR:  Not from the United States, Your Honor.

25       MR. SHARMAN:  No, Your Honor.

835

1        THE COURT:  You have a good evening too.

2        MR. BODNAR:  Thank you, Your Honor.

3     (Court adjourned at approximately 4:59 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25