UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ALABAMA

UNITED STATES OF AMERICA

CASE NO. CR15-00088

v.

COURTROOM 2B

JOHN PATRICK COUCH, M.D.,
and XIULU RUAN, M.D.,

MOBILE, ALABAMA

            Defendants.

FRIDAY, JANUARY 13, 2017

* * * * * * * * * * * * * * *

REDACTED

DAY 5 OF TRIAL
BEFORE THE HONORABLE CALLIE V. S. GRANADE,
UNITED STATES DISTRICT JUDGE, AND JURY

APPEARANCES:

FOR THE GOVERNMENT:
     DEBORAH A. GRIFFIN
     CHRISTOPHER BODNAR
     United States Attorney's Office
     63 S. Royal Street, Suite 600
     Mobile, AL  36602
     (251) 441-5845

FOR THE DEFENDANT COUCH:
     ARTHUR T. POWELL, III
     P.O. Box 40456
     Mobile, AL 36640-0456
     (251) 433-8310

     JACKSON R. SHARMAN, III
     ROBERT JACKSON SEWELL
     JEFFREY PAUL DOSS
     BENJAMIN SANDERS WILLSON
     Lightfoot, Franklin & White
     400 North 20th Street
     Birmingham, AL  35203
     (205) 581-0700

1   (Continued)

2       BRANDON KEITH ESSIG
        800 Shades Creek Parkway, Suite 600D
3       Birmingham, AL  35209
        (251) 879-1981

4

FOR THE DEFENDANT RUAN:
5       DENNIS J. KNIZLEY
        7 N. Lawrence
6       Mobile, AL 36602
        (251) 432-3799

7

        JASON BRADLEY DARLEY
8       Darley & McGough, LLC
        1751 Dauphin Street
9       Mobile, AL 36604
        (251) 441-7772

10

        GORDON G. ARMSTRONG, III
11      P.O. Box 1464
        Mobile, AL  36633
12      (251) 434-6428

13      STEVEN D. MARTINIE
        4955 North Lake Drive
14      Whitefish Bay, WI  53217
        (414) 332-9683

15

THE CLERK:  MARY ANN BOYLES
16  THE LAW CLERK:  LYNN DEKLE
U.S. ATTORNEY IT:  BRIAN COCHRAN
17  DEFENSE IT:  SAM McALLISTER
COURT REPORTER:  ROY ISBELL, CCR, RDR, CRR

18

            Proceedings recorded by OFFICIAL COURT REPORTER
19       Qualified pursuant to 28 U.S.C. 753(a) & Guide to
   Judiciary Policies and Procedures Vol. VI, Chapter III, D.2.
20           Transcript produced by computerized stenotype.

21

22

23

24

25

1                    EXAMINATION INDEX

2

DAVID GORDON GREENBERG, MD
3        CROSS BY MR. SHARMAN                           839
         CROSS BY MR. ARMSTRONG                         964
4        REDIRECT BY MS. GRIFFIN                       1050

5

6

7

8

9

10

11                    EXHIBIT INDEX

                                                 MAR ADM
12  GOVERNMENT'S
     13-21  CDC pamphlet for prescribing opioids      1058
13

14  DEFENDANT COUCH'S
     110    2006 U.S. Dept of Justice DEA Office of     883
15          Diversion Control Practitioner's Manual &
            Informational Outline of the Controlled
16          Substances Act

17

18

19

20

21

22

23

24

25

```
 1        (Morning session, 9 a.m., in open court, defendants and
 2   jury present.)
 3             THE COURT:  Good morning, ladies and gentlemen.
 4             All right.  Mr. Sharman, you may continue.
 5             MR. SHARMAN:  Thank you, Your Honor.
 6                     DAVID GORDON GREENBERG, MD,
 7          previously sworn, testified further, as follows:
 8                     CROSS EXAMINATION CONTINUED
 9   BY MR. SHARMAN:
10   Q    Good morning, Dr. Greenberg.
11   A    Good morning.
12   Q    When we left off yesterday afternoon we were talking about
13   regulations that have been set out by the Alabama State Medical
14   Board regarding opioid prescribing.  Do you remember that
15   discussion?
16   A    Yes.
17   Q    And that was in Exhibit 118, which I believe you have
18   before you?
19   A    Yeah, I'm certain I have it here somewhere, absolutely.
20   And I've seen it.
21   Q    If you could pull that out for me, please, sir.  If it's
22   easier, sir, you can also refer to the screen.
23   A    Yeah, I'll look at the screen but I've got the document
24   here too.
25   Q    Based on your testimony yesterday it's correct that in
```

840

```
 1    coming to your opinions in this case about Dr. Couch and

 2    Dr. Ruan, you did not consider any of the rules and regulations

 3    of the Alabama State Medical Board.  That's correct, right?

 4    A    I did look at the rules and regulations for the Alabama

 5    State Medical Board, and actually they have -- they have what I

 6    consider to be a fairly good set of recommendations with

 7    reference for how doctors are supposed to document their

 8    interactions with chronic-pain patients.  I think actually the

 9    Alabama Board has a pretty good setup.

10    Q    And I appreciate that.  But my question was a little

11    different.

12    A    Yeah.

13    Q    Before yesterday, in coming to your opinions about

14    Dr. Couch and Dr. Ruan, you didn't look to the Alabama

15    regulations, you looked to other things; right?

16    A    I saw the -- I looked at the Alabama regulations prior

17    to -- prior to yesterday.

18    Q    So you're saying that you in fact did base your opinion on

19    them, at least in part?

20    A    Yeah, at least in part.  It was mostly the documentation

21    that they required that I reviewed for having the chronic pain

22    patient.  And I thought that that documentation that the

23    Alabama Board was using looked good.

24    Q    And was there any part of that Alabama set of rules and

25    regulations that you thought was bad?
```

841

1    A    That I thought what?

2    Q    Was bad, was wrong.

3    A    No.

4    Q    All right.  If you will look, please, on page 4-26 of

5    Exhibit 118, which would be on the screen, the subparagraph

6    (g).  We'll go ahead and focus on subparagraph (g).

7    A    Yes, I see G.

8    Q    Here the Alabama State Medical Board for purposes of opioid

9    prescribing guidance refers Alabama physicians to the

10   Federation of State Medical Boards policy -- excuse me -- model

11   policy on the use of opioid analgesics in the treatment of

12   chronic pain.  Do you see where I read that?

13   A    Yes, I see that.

14   Q    And you're generally familiar with the Federation of State

15   Medical Boards; right?

16   A    Yes, I am.  I've been to many of their meetings and I

17   received an award from them a few years ago.

18   Q    Great.  Now, they are a national nonprofit that represents

19   medical boards all over the country; right?

20   A    Correct.

21   Q    And they put on conferences and give awards like you said;

22   right?

23   A    Yes, they do.

24   Q    And they provide assessment tools and policy documents and

25   credentialing services and other services to their members;

```
 1   right?

 2   A   Yes, they do.

 3   Q   So it's an organization that you would look to and rely

 4   upon in your work, as would others in your field; right?

 5   A   Yes, especially people that work in medical regulation.

 6            MR. SHARMAN:  May I approach, Your Honor?

 7            THE COURT:  Yes.

 8   BY MR. SHARMAN:

 9   Q   Dr. Greenberg, I show you what I've already provided to the

10   government which is Couch 119, which purports to be a model

11   policy of the Federation of State Medical Boards on the use of

12   opioid analgesics and the treatment of chronic pain.

13            MS. GRIFFIN:  Your Honor, we would object to the use

14   of this.  It is not a law.  It is not binding on these

15   doctors.  It is merely a model policy, no different than other

16   model policies produced.  It is thus hearsay and nonbinding.

17            THE COURT:  Well, I don't know what he's doing with it

18   yet, so --

19            MR. SHARMAN:  Well, Your Honor it's incorporated by

20   the Alabama regulations and goes directly to the intent and

21   standard that governs these physicians and --

22            THE COURT:  Are you intending to offer it?

23            MR. SHARMAN:  I may, yes, ma'am.

24            MS. GRIFFIN:  Your Honor --

25            MR. SHARMAN:  Not yet.
```

 1          MS. GRIFFIN:  It's not incorporated.  It is referred

 2     to.  So that it's not part and parcel of the Alabama Medical

 3     Board rules.

 4          THE COURT:  Well, let me hear what the question is

 5     about it first.

 6     BY MR. SHARMAN:

 7     Q    All right.  Dr. Greenberg, if you would go to the second

 8     page, please, sir, of Couch 119, which is the Federation of

 9     State Medical Boards model policy about prescribing opioids.

10     And in particular, if you will look at the middle of the page

11     where the Federation of State Medical Boards says -- or

12     discusses the undertreatment of pain is recognized.  Do you see

13     that paragraph?  It's the second full paragraph underneath the

14     heading called Issues Addressed in the article?

15     A    Yes, and I disagree with that.  There was a time in the

16     United State of America where pain was undertreated but that is

17     no longer a problem in the United States.

18          MR. SHARMAN:  Dr. Greenberg, I appreciate that.

19     But --

20          MS. GRIFFIN:  Judge?

21          THE COURT:  Hold on just a minute.  There's an

22     objection.

23          MS. GRIFFIN:  We object to him thanking or commenting

24     on the witness' answers.  He cuts the witness off and it's

25     inappropriate, we contend, for him to comment on he appreciates

844

1   it.  But he didn't answer the question.

2           THE COURT:  Well, I will caution the lawyers on both

3   sides not to comment on the answers of the witnesses.  However,

4   he was nonresponsive to the question at this point.  So just

5   ask a question and we'll see what the response is.

6   BY MR. SHARMAN:

7   Q   Dr. Greenberg, do you see where the paragraph is that I

8   pointed you to?

9           THE COURT:  That's either a yes or a no.

10  A   Please redesignate that paragraph so I can find it.

11  Q   Yes, sir.  It's on page two.

12  A   Okay.

13  Q   It is the second full paragraph, under that big heading

14  that says:  Issues Addressed in the New Model Policy.

15  A   Yes.

16  Q   It's the paragraph that begins:  Under Treatment of Pain.

17  A   Yes.

18  Q   Do you see that?

19  A   Yes.  And this is an old policy.  This policy is outdated.

20          THE COURT:  There's no a question before you.

21          THE WITNESS:  Okay.  I'm sorry.

22          THE COURT:  The question is simply:  Do you see it?

23          THE WITNESS:  Yes, I do.  Sorry.

24          THE COURT:  All right.

25          MR. SHARMAN:  And, Sam, can you put up that paragraph;

DAVID GORDON GREENBERG, MD - CROSS BY MR. SHARMAN

1  not for the jury, but just for these screens, please?

2  Q   The Federation of State Medical Boards in their model

3  policy says:  Undertreatment of pain is recognized as a serious

4  public health problem that compromises patients' functional

5  status and quality of life.

6         Do you see where I read that?

7  A   Yes.

8  Q   Do you agree with the Federation of State Medical Boards on

9  that point?

10  A   Again, this is an old policy and unfortunately the winds

11  have shifted in the United States of America, and

12  undertreatment of pain is nowhere near the problem that it was

13  years ago.  The problem right now is that we're involved in a

14  situation in which we have an emergency in the United States

15  that regards opiate overdose drugs that are provided by pain

16  doctors.  And that's the real emergency and you're asking me to

17  read something that's years out of date.

18  Q   Dr. Greenberg, my question is:  Do you or do you not agree

19  with that statement of the Federation of State Medical Boards?

20         MS. GRIFFIN:  Your Honor, it's asked and answered.

21         THE COURT:  I sustain the objection.

22         THE WITNESS:  I disagree.

23         THE COURT:  That means you don't have to answer.

24         THE WITNESS:  Oh, okay.

25  BY MR. SHARMAN:

1  Q   All right.  We go on with the Federation of State Medical

2  Boards and they say in the same paragraph:  A myriad of

3  psychological, social, economic, political, legal, and

4  educational factors, including inconsistencies and restrictions

5  in state pain policies can either facilitate or impede the

6  ability and the willingness of physicians to manage patients

7  with pain.

8       Do you see where I read that?

9  A   Yes.

10      MS. GRIFFIN:  Your Honor, we object to this line of

11  questioning as irrelevant.  There are numerous portions of this

12  in connection with prior rulings by the Court and in connection

13  with talking about policies, problems throughout the

14  country.  We think it is irrelevant.  We were, according to

15  rulings, not to be discussing policies around the country.

16      MR. SHARMAN:  Your Honor, this is not a discussion of

17  policies, it's a discussion of what a standard is and what in

18  the area of expertise --

19      THE COURT:  Well, it is titled:  Model Policy for the

20  use of Opioid Analgesics.  So I sustain the objection on that

21  point.  I think he's fully answered the question anyway.  So

22  let's move on.

23      MR. SHARMAN:  Yes, ma'am.

24  Q   If you look in the next paragraph, Dr. Greenberg, the one

25  that begins:  While acknowledging the undertreatment of pain;

1  do you see where that is?

2  A   Yes.

3  Q   That statement --

4      MS. GRIFFIN:  And, Your Honor, again this is not

5  relevant.  This does not establish the standard.  It is merely

6  a policy.

7      MR. SHARMAN:  Your Honor, it goes --

8      MS. GRIFFIN:  It is hearsay.

9      MR. SHARMAN:  Your Honor, it goes directly along with

10  the other guidelines, including the Alabama regulations that

11  govern the Alabama doctors about standards.  That's what he

12  testified extensively about yesterday.  And we're entitled to

13  inquire whether he agrees or disagrees with the various

14  guidance documents and definitions in this area of medical

15  specialty.

16      THE COURT:  Let's address this at side bar.

17    (At the side bar, jury not present.)

18      MS. GRIFFIN:  May I?

19      THE COURT:  Yeah.

20      MS. GRIFFIN:  First of all, this is a 2013, July of

21  '13, model policy.  It has all type of information about the

22  increase of opioid morbidity, mortality, serious health

23  problems.  We were prohibited from talking about some of the

24  various things in here.  And it means that he can cherry-pick

25  from here.  And then we are prohibited to cross on the things

 1   that talk about what a serious problem it is and that this

 2   serious increase is in morbidity and mortality.  So it in

 3   essence is trying to put up something that he needs a witness

 4   to testify to.  There is no model policy or there is no rule

 5   for outside the usual course of professional practice.

 6           THE COURT:  Show me, show me where it's referenced in

 7   the Alabama Medical --

 8           MR. SHARMAN:  It's in subparagraph (g).

 9           THE COURT:  Show me the document, if you will.

10           MR. SHARMAN:  I think it may be up here.

11           MR. ARMSTRONG:  There it is.  (Indicating.)

12           MR. SHARMAN:  Here it is.  And I may be able to find

13   it for Your Honor, if you will permit me.  4-26, I think it's

14   on page 4-26.

15           THE COURT:  It's probably --

16           MR. SHARMAN:  Subparagraph (v).  This may have

17   gotten -- I don't know how -- it's short.  May I go back to

18   my --

19           THE COURT:  Sure.

20       (Mr. Sharman left and returned to side bar.)

21           MR. SHARMAN:  Here we go.  All right.  Let's

22   see.  Okay.  There's -- this is the policy.  And then in

23   relation -- here it is, 4-27 sub (g).

24           THE COURT:  So what are you showing me there?

25           MR. SHARMAN:  This is the Alabama regulations, which

849

```
 1   is Exhibit 118, on how to prescribe opioids for physicians in
 2   Alabama.  Among other things what it does is it refers to
 3   substantive --
 4           THE COURT:  This one?  (Indicating.)
 5           MR. SHARMAN:  Yes, ma'am, substantively to this.
 6           THE COURT:  Where does this one refer to --
 7           MR. SHARMAN:  Back to it?
 8           THE COURT:  This is not the same thing as your -- is
 9   this what you're questioning him from?
10           MR. SHARMAN:  Yes, ma'am, this is what I'm questioning
11   him from exactly.  So the regs say look at this.  So now I'm
12   looking at this.
13           THE COURT:  If you're going into this (indicating),
14   she's going to be allowed on redirect to go into anything else
15   in this.
16           MR. SHARMAN:  In the document.
17           THE COURT:  But the document itself is not admissible,
18   based upon what I've learned so far.
19           MR. SHARMAN:  Okay.
20           MS. GRIFFIN:  Just, Your Honor, for the record, they
21   are not regulations.  They are really proposals or suggestions
22   because they are suggested model policy, no different than the
23   model bar rules.
24           But particularly, this has been changed somewhat each
25   year, this medical examiners and medical board requirements.
```

850

 1   And there are more current changes that cover the remaining

 2   period of this indictment.

 3            MR. SHARMAN:  Not in these regs, there's not.  Maybe

 4   that --

 5            MS. GRIFFIN:  I believe there is.  And I believe we

 6   can confirm that and see.  Because they've sent us some

 7   amendments.  So --

 8            THE COURT:  All right.

 9            MS. GRIFFIN:  -- we'll check and see.

10            THE COURT:  Continue, but --

11            MR. SHARMAN:  I'll tell you what I'll do.  Maybe I'll

12   just ask him questions.  Maybe he can answer the questions.

13   These aren't complicated.

14            THE COURT:  Without the documents.

15            MR. SHARMAN:  These aren't complicated.  I just want

16   to know if he agrees with the documents.  That's all I'm trying

17   to do.

18            THE COURT:  All right.

19        (In open court, defendants and jury present.)

20   BY MR. SHARMAN:

21   Q   All right.  Dr. Greenberg, let me ask you this:  Do you

22   agree that chronic pain is often intractable?  That is, it

23   really can't be cured but only managed well?

24   A   Certainly there are situations in which human beings suffer

25   chronic pain that can be intractable.  They are normally

1    treated at a university center when they have fully intractable

2    pain.

3    Q    And intractable is just another way of saying you can't

4    readily resolve it, can't readily cure it; right?

5    A    Yeah, that it's a complex case.

6    Q    All right.  Do you believe that patients share with their

7    doctors a responsibility for the appropriate use of opioids?

8    A    I believe that if patients have received adequate

9    instruction and adequate informed consent that they do share

10   that responsibility.

11   Q    So if in your opinion informed consent is lacking or

12   there's some other failing on the doctor's part, the patient

13   doesn't have to do anything with regard to his or her

14   responsibility to the opioid medications; that it's okay?

15   A    I'm not saying that.  I'm saying that in situations where

16   the doctors failed to give potentially lifesaving informed

17   consent to their patients when they're prescribing toxic

18   substances to their patients, that those patients deserve the

19   dignity of being warned about the true and most dangerous

20   consequences of utilizing those medications.  And

21   unfortunately, quite unfortunately, patients sometimes do not

22   get that important counsel from their physicians.

23   Q    At a minimum, you'd agree doctors have a responsibility

24   with regard to opioids; right?

25   A    Doctors do and patients do.

 1  Q   And patients also have a responsibility, do you agree with

 2  that; right?

 3  A   If they've received proper informed consent, yes.

 4  Q   But if they don't, all bets are off, they have no

 5  responsibility; right?

 6  A   They have reduced responsibility because their doctor has

 7  failed them.

 8  Q   And on that point, I think you mentioned, Doctor, in your

 9  direct testimony that it was very important for doctors to be

10  honest with their patients; right?

11  A   Especially honest about life-threatening complications.

12  Q   It's also important for patients to be honest with their

13  doctors; right?

14  A   That's important, but that's not -- that's not part of

15  the -- it's not part of the patient's total

16  responsibility.  The patient is really putting himself in care

17  of the doctor and it's really up to the doctor to ethically and

18  honestly inform that patient about what's going on.  So the

19  burden is definitely on the physician.

20  Q   Well, if a patient lies to you, it's hard to be sure you're

21  giving them good care; right?

22  A   If a patient lies to you, there are excellent ways that we

23  can find out whether or not they're lying.  Unfortunately not

24  all physicians that take care of chronic-pain patients do that

25  type of homework and really look at the records so that they

1  can pick up easily when they see their patients are lying to

2  them.  And this was a problem in the cases that I

3  reviewed.  They were -- they were not using the basic tools to

4  protect the public and they were not using the basic tools to

5  protect public safety.

6  Q   I'm sorry, and I apologize.  And just answer the question.

7  When a patient lies to you, it's more difficult to treat them;

8  right?

9  A   When a patient lies what?

10  Q   When a patient lies to you, Doctor --

11  A   Yes.

12  Q   -- it's more difficult to treat them?

13  A   It's more difficult to treat them but we have really good

14  tools nowadays to pick up patient dishonesty if only doctors

15  would use them.

16  Q   Do you think trust is an important part of a doctor-patient

17  relationship?

18  A   I'm an old fan of Ronald Reagan, and I believe trust but

19  verify it.  And we have the tools to verify it.

20  Q   I'm sorry?

21  A   And we have the tools to verify it.

22  Q   You do believe trust is important between a doctor and

23  patient?

24          MS. GRIFFIN:  Your Honor, it's been asked and

25  answered.

DAVID GORDON GREENBERG, MD - CROSS BY MR. SHARMAN

854

1    A    Sure.

2           THE COURT:  I sustain.

3    BY MR. SHARMAN:

4    Q    And it's a two-way street between a doctor and a patient;

5    right?  It's not a one-way highway; right?

6    A    It's a two-way street with the burden on that professional

7    who's charging that patient money to take care of them and put

8    them in trust of protecting them.

9    Q    You spoke early in your direct testimony with Ms. Griffin

10   about your addictions.  Do you remember that?

11   A    Sure.

12   Q    And would I be correct that it's your view that having gone

13   through that experience, that experience made you more

14   sensitive than it would have otherwise to issues about drug

15   addiction and treatment, is that fair?

16   A    It's made me a far better physician, yes.

17   Q    And you would probably say that having gone through that

18   experience, you would be the last person in this room to try to

19   get somebody addicted; right?

20   A    I would never try to get somebody addicted.

21   Q    And you're especially sensitive to it having gone through

22   those issues and the treatment effort; right?

23          MS. GRIFFIN:  Your Honor, it's asked and answered and

24   we object.

25          MR. SHARMAN:  I'll go on.

```
 1            THE COURT:  Yeah.  Sustained.
 2   BY MR. SHARMAN:
 3   Q   All right.  Dr. Greenberg, I'll ask you to take a look at
 4   Exhibit 101 which is in evidence, which is the February 2009
 5   Journal of Pain article that we saw yesterday?
 6   A   Yes.
 7   Q   And I think we established yesterday that you believe that
 8   this is a appropriate learned and useful set of guidelines;
 9   right?
10   A   Yes, I do.
11   Q   All right.  If you would, please, sir, in Exhibit 101, turn
12   to --
13            MR. SHARMAN:  May this be published to the jury since
14   it's in evidence?
15            THE CLERK:  It's on its way.
16            THE COURT:  It's on.
17   BY MR. SHARMAN:
18   Q   If you would, please, sir, turn to page 116 of Exhibit 101.
19   And if you will look, please, sir, at the second full
20   paragraph, the one starting:  Reliable Evidence.
21   A   Yes, uh-huh.
22   Q   Do you see that?
23   A   Right.
24   Q   All right.  And then the second sentence of that paragraph
25   says:  However, randomized trial demonstrates the benefits of
```

856

1    COT.  That's chronic opioid therapy; right?

2    A    Right.

3    Q    Randomized trials that demonstrate the benefits of chronic

4    opioid therapy are most applicable to patients with moderate or

5    more severe pain who have not responded to nonopioid therapies.

6    Do you see where I read that?

7    A    Yes, I see that.

8    Q    Do you agree with that, is that true?

9    A    I think in general that's true.

10   Q    So what they are talking about is a patient who has had the

11   benefit of or been subjected to other treatments and just

12   hasn't really responded to it; right?

13   A    Correct.

14   Q    So for example, physical therapy may have been provided to

15   them but it doesn't seem to have helped; right?

16   A    Right.

17   Q    Or counseling or exercise or yoga may have been provided

18   them and that hasn't helped; right?

19   A    Correct.

20   Q    And that happens even when the primary care physician or

21   some other specialist is doing everything he or she can and

22   knows to to help that patient?

23   A    Yes, that can happen.

24   Q    I'm sorry?

25   A    Yes, that can happen.

857

1  Q   And that's why treating doctors end up referring their

2  patients to a specialist in the first place; right?  In other

3  words, this set of treatment options has not worked so I'm

4  going to send my patient to somebody else; right?

5  A   Sending patients to specialty care is an important part of

6  medicine and the decision when to make that is important.

7  Q   But that's what they do, they've done what they think they

8  can do and they are going to try to send them to somebody else

9  to see if somebody else can do something?

10  A   Correct.

11  Q   Then if you will look, please, sir, at the next page, page

12  117 of Exhibit 101 to the American Pain Society Guideline, and

13  on 117 on the right-hand side, the paragraph numbered 3.2, the

14  kind of indented paragraph.  Do you see that paragraph 3.2 at

15  the right up at the top?

16  A   Yeah, I see it.

17  Q   And paragraph 3.2 says at the end:  There is insufficient

18  evidence to recommend short-acting versus long-acting opioids,

19  or as needed versus around-the-clock dozing of opioids.  Do you

20  see where I read that?

21  A   Yes, I see that.

22  Q   Do you agree with the American Pain Society on that?

23  A   Things have changed again.  This is an older document.  And

24  things have changed with reference to this.  The

25  recommendations now are to use short-acting opioids and to stay

858

1  away from, from long-term opioids.  And that's a strong

2  recommendation put out by the Center for Disease Control and

3  FDA.

4  Q   The Centers for Disease Control, that's the group we were

5  talking about yesterday; right?  Those guidelines we talked

6  about; right?

7  A   CD -- we talked about the CDC Guidelines yesterday, yes.

8  Q   And the decision, Dr. Greenberg, with regard to these

9  matters, short-acting versus long-acting opioids or as-needed

10  medicine versus around-the-clock, ultimately those are going to

11  be decisions based on that particular physician's judgment

12  about that particular patient; right?

13  A   Correct.

14  Q   Guidelines are helpful, useful, but at the end of the day

15  we're still talking about doctor and about patient; right?

16  A   Correct.

17  Q   And then also, Dr. Greenberg, still on 117, if you will

18  look at the next full paragraph, the one beginning

19  Interventional Course of Treatment, and then down in the middle

20  of that where the American Pain Society says:  In most cases

21  the therapeutic trial -- now, when they say trial they don't

22  mean like this, do they?  That's not that kind of trial?

23  A   No, no.

24  Q   They mean an attempt at a course of treatment?

25  A   What they're referring to is the recommended practice, and

859

1    it's still a recommended practice to this day, of when a

2    decision is made to start a patient on a powerful opioid drug

3    is that the doctor tell the patient that this is just a trial

4    of the medication.  We're going to see how much your function

5    improves over time and that you're -- during the period of time

6    that you're on the medicines that the doctor's

7    prescribing.  And then if your function improves and there's no

8    bad side-effects, then you may be a candidate to stay on the

9    drug long term.

10   Q   I just want to be clear about the word "trial."  It's

11   something we're going to try.

12   A   Right, right.  Not -- not a trial like we have here.

13   Q   All right.  So let me start over.  The American Pain

14   Society says:  In most cases the therapeutic trial includes

15   individualization of the dose through incremental dose

16   escalations, as long as no serious harms are present.

17         And you agree with the American Pain Society on that.

18   A   Yes, I agree with that advice.

19   Q   And that means that the dose has to be individualized to

20   that patient; right?

21   A   It needs to be rationally individualized to the patient,

22   yes.

23   Q   But there's no hard and fast rule, there's no -- there's no

24   law, there's no table that you can go to and say that patient

25   Smith or patient Jones, this or that's the appropriate

1    treatment.  But rather it has to be individual and tailored to

2    that individual patient; right?

3          MS. GRIFFIN:  Your Honor, we object to him asking this

4    witness about the law.

5          THE COURT:  Yes.

6          MR. SHARMAN:  I'll remove -- I'll re-ask the question

7    without the word law.

8          THE COURT:  All right.

9    BY MR. SHARMAN:

10   Q    There is no hard and fast principle, guideline, statement,

11   checklist or other mandatory over-arching principle that

12   dictates dose.  Rather, the dose is a matter for the

13   physician's judgment about that particular patient; right?

14   A    In general, that's true.  But there are exceptions to

15   that.  One of the exceptions is the use of methadone.  And

16   methadone is often dosed by both the weight of the patient and

17   it's also dosed with reference to how much of the medication

18   that the -- that the doctor feels is safe to give during that

19   therapeutic trial.  So methadone would be one exception to the

20   general rule that you're saying.

21   Q    Fair enough.  But even though methadone, your example you

22   used, it still depends to some degree on doctor judgment how

23   much he or she feels is safe?

24   A    Yes, it would.  But there are guidelines for methadone,

25   that's different than what you were proposing before.

1  Q   All right.  Then if you will turn, please, sir, to page

2  119, where you look at the beginning where the American Pain

3  Society document, Exhibit 101, and there is a very long

4  paragraph on the left that begins:  Periodic urine drug

5  screening.  And then in the middle of that there is a sentence

6  that begins:  Although evidence on accuracy of urine drug

7  screen.

8        MR. SHARMAN:  Sam, if you can bring that up?

9  Q   The American Pain Society says:  Although evidence on

10 accuracy of urine drug screening to identify aberrant

11 drug-related behaviors or diversion is lacking, no evidence

12 exists that demonstrates that screening improves clinical

13 outcomes.

14 A   Yeah.  Actually this is quite out of date and there are

15 studies and I can get you copies of them that show that urine

16 drug screenings are highly effective now with the more modern

17 techniques of gas chromatography and mass spectroscopy.  So

18 this is a portion of this 2009 document that is clearly out of

19 date.

20 Q   Let me just ask you the question.

21 A   Okay.

22 Q   And you tell me if you agree or disagree.  First, evidence

23 on accuracy of urine drug screenings to identify aberrant

24 drug-related behaviors or diversion is lacking.  Do you agree

25 with that?

DAVID GORDON GREENBERG, MD - CROSS BY MR. SHARMAN

1   A   I believe that urine drug screening technology has come a

2   long way since 2009 and that it is now highly reliable but it

3   depends upon whether or not the doctors even want to look at

4   the urine drug screen and analyze that.  And that's true for a

5   lot of things in chronic pain.  It's very true for the

6   controlled substances PDMP which doctors have to look at in

7   order to get and glean life-saving information from.  So

8   there's a burden on this as far as whether the physicians are

9   going to use these modern techniques.  And urine screening has

10  gone up tremendously as far as accuracy and reliability since

11  this article was published.

12  Q   Doctor, do you agree or disagree?

13          MS. GRIFFIN:  Your Honor, it's asked and answered.

14          MR. SHARMAN:  No, that has not.

15          MS. GRIFFIN:  The witness does not have to be limited

16  to a yes or no answer.  He's entitled --

17          THE COURT:  I think he's explained his view on it so

18  let's move on.

19  BY MR. SHARMAN:

20  Q   The American Pain Society says:  No evidence exists to

21  demonstrate screening improves clinical outcomes.  Do you agree

22  or disagree with that?

23  A   No, I disagree with that.  There are articles that have

24  shown now with the better improvements in urine screening that

25  in fact it's far more reliable than it was many years ago when

863

```
 1   this article was published.
 2   Q   Okay.  The American Pain Society also says that in fact
 3   urine drug screening results usually do not suggest a
 4   definitive course of action but rather should be interpreted in
 5   the context of individual patient circumstances.  Do you agree
 6   or do you disagree with that?
 7   A   I disagree with that.  And the reason I disagree with that
 8   is the fact that we're not talking about the most important
 9   thing, and that is the doctor looking at that urine screening
10   report and then reading it carefully and then choosing to
11   either perform or not perform potentially life-saving changes
12   in that patient's management.
13   Q   Right.
14   A   So it's very much dependent upon the doctor.  And I can
15   tell you that that's a real problem.  A lot of the doctors
16   don't use the life-saving tools, whether it's the PSP -- PDMP,
17   whether it's the urine screening.  They go through the motions,
18   but they're not really analyzing them and using them in a way
19   to improve patient safety.
20   Q   It depends on what the doctor's judgment tells him or her
21   to do; right?
22   A   And unfortunately the doctor's judgment in a lot of these
23   cases is highly flawed.
24   Q   I think I got an answer but I just want to be sure.  It
25   depends on the doctor's judgment, Dr. Greenberg?
```

 1          MS. GRIFFIN:  Your Honor, it's asked and answered and

 2    it's argumentative at this point with the witness.

 3          THE COURT:  Overruled.

 4    BY MR. SHARMAN:

 5    Q   It depends on the doctor's judgment, Dr. Greenberg;

 6    correct?

 7    A   The doctors who are practicing chronic-pain medicine should

 8    be looking at those urine screenings, the modern urine screens.

 9    Now we're not talking about the out-of-date urine technology

10    that was used, and they should be looking at that and reading

11    that carefully, commenting on it, and also using it to address

12    the patient when inconsistencies are found.  And unfortunately,

13    unfortunately, that does not happen frequently enough.  And

14    certainly not enough in the cases that we're -- that I was

15    asked to review.

16    Q   The interpretation of urine drug screening results does or

17    does not depend on the physician's judgment?

18          MS. GRIFFIN:  Your Honor, this is the third time.

19          THE COURT:  Well, I'll overrule.

20    BY MR. SHARMAN:

21    Q   Do you need me to repeat it again?

22    A   Yes.

23    Q   The interpretation of a urine drug screen, Dr. Greenberg,

24    does or does not depend on the individual physician's judgment?

25    A   It depends partially on the individual physician's

865

 1    judgment.  Okay.  But it also depends upon the integrity of

 2    that physician as to how hard they're looking and scrutinizing

 3    a patient who may be lying to them or who may be diverting

 4    drugs or who may be doing other -- engaged in other illicit

 5    type of activities.  So in order for the -- for the system to

 6    work, the doctors have to properly use the urine drug screening

 7    results.  And unfortunately that does not happen in certain

 8    practices of medicine where that's not a priority.

 9    Q   Dr. Greenberg, Dr. Couch did not just prescribe

10    medications; right?  He did other things in the practice.

11    A   Right.

12    Q   Files that you reviewed; right?

13    A   Correct.

14    Q   For example, he performed procedures of various --

15    A   Yes.

16    Q   Some of them were injections of different kinds; right?

17    A   Correct.

18    Q   And I may get these wrong but Myobloc cervical injections

19    were one kind?

20    A   Yes.

21    Q   And epidural steroid injections was another kind?

22    A   Correct.

23    Q   He also performed various nerve block procedures; is that

24    right?

25    A   Correct.

866

1    Q    And also facet joint blocks; is that right?

2    A    Correct.

3    Q    He also performed a pain pump procedure; is that right?

4    A    Correct.

5    Q    And a pain pump is a little device that's surgically

6    implanted in a patient's body so that it can distribute

7    whatever medicine is to be distributed?

8    A    Correct.

9    Q    Do you perform any such procedures?

10    A    I was trained in doing multiple different types of nerve

11    blocks during my time at the University of Arizona.  And so we

12    did -- we did everything from epidural blocks to pregnant women

13    who were going to deliver babies to pain blocks that were used

14    for people who had chronic pain and reflex sympathetic

15    dystrophy and other types of problems in which those pain

16    blocks could be useful to them.  And we also did celiac plexus

17    blocks back in the day when we didn't have imaging, where we

18    actually had to palpate the area that we wanted to go into with

19    the block.  And so I was -- I was trained in those types of

20    blocks.

21    Q    When was the last time you did a invasive procedure?

22    A    The last time I did any invasive procedure as far as a

23    block would have been minor procedures that involved trigger

24    point injections.

25    Q    When was that?

1  A   That's where you inject a local anesthetic into a painful

2  point on the patient's body.

3  Q   I'm sorry.  I misspoke.  When did that happen?  When was

4  the last time you did a procedure of trigger points?

5  A   Oh, the last time I did trigger points was probably three

6  weeks ago.

7  Q   What about nerve blocks?  When was the last time you did a

8  nerve block?

9  A   I haven't done any nerve blocks for, I would say, probably

10  several years.

11  Q   All right.  Yesterday you and Ms. Griffin had some

12  discussion about what's called off-label prescribing of

13  medication.  Do you remember some of that discussion?

14  A   Yes.

15  Q   There's nothing illegal, there's nothing wrong, per se, by

16  itself about off-label prescriptions; right?

17          MS. GRIFFIN:  Your Honor, we would object to him being

18  asked about the legality.

19          MR. SHARMAN:  Your Honor, he testified at length about

20  off-label prescriptions.

21          THE COURT:  Well, yeah, but the legality is a question

22  that I don't know that he's qualified to answer.  You can

23  certainly question him about the usual course of practice.

24  BY MR. SHARMAN:

25  Q   All right.  All right.  There is nothing, Dr. Greenberg,

868

1    that is wrong by itself with a doctor prescribing a medication

2    off label; right?

3    A    Doctors can make mistakes prescribing medications off

4    label.  But there's -- as far as I know, in the United States

5    of America it is legal for physicians to use off-label

6    prescriptions.

7    Q    Well, and it's more than legal, it happens frequently, does

8    it not?

9    A    It does happen frequently and it would depend from practice

10   to practice.

11   Q    And the federal Food and Drug Administration, that's the

12   FDA; right?

13   A    Correct.

14   Q    Now, the FDA from time to time, after there's been a lot of

15   work and a lot of effort, will approve a specific drug for a

16   specific purpose; right?

17   A    Correct.

18   Q    A lot of times that's what's meant when we say a drug is

19   indicated for something; right?

20   A    Correct.

21   Q    And what that means, or the effect of that is that the

22   manufacturer, or the pharmaceutical company can then market,

23   can then sell that drug for that purpose; right?

24   A    Yes, that's --

25   Q    They can say it's FDA approved?

1  A   If it's FDA approved, yes.  It can be sold across state
2  lines.
3  Q   But the manufacturer -- and the manufacturers can't go
4  around trying to market it and sell it for some other purpose;
5  right?
6         MS. GRIFFIN:  Your Honor, our objection as to
7  foundation, for the manufacturer.
8         MR. SHARMAN:  Your Honor, he talked about off-label
9  prescriptions at length yesterday.  If he doesn't know, he
10  doesn't know.
11         THE COURT:  All right.  Sustained.  I mean
12  overruled.  You can answer, if you can.
13  BY MR. SHARMAN:
14  Q   Do you need me to go back?
15  A   Just repeat the question and I'll answer.
16  Q   All right.  So a -- when the FDA approves a -- medications
17  for a specific purpose that means that the drug company can
18  market it for that specific purpose; right?  That's what
19  happens.
20  A   Yes, for that specific purpose.  Yes.
21  Q   And conversely, it also means that the drug company cannot
22  market it for other purposes?
23  A   Correct.
24  Q   Doctors, though, are in a little bit different situation;
25  right?

1  A   Different than drug companies.

2  Q   Right.  In other words, a doctor may prescribe that

3  medication for a condition or ailment that is different from or

4  in addition to the one that the FDA approved; right?

5  A   Yeah, that's correct.

6  Q   And the FDA's decision doesn't expand or limit how you as a

7  physician might prescribe a medication off label?

8  A   I would say that that's true the majority of the

9  time.  There would be situations which the FDA sends out alerts

10  that there's been a problem with a certain drug that's being

11  used for -- sometimes for off-label use.  But in general,

12  that -- what you're saying holds up.

13  Q   Now, in the files that you reviewed from Dr. Couch -- and I

14  would expect also from Dr. Ruan -- you found paperwork that was

15  an agreement for off-label pain treatment; right?

16  A   Yes, I did see that.

17  Q   All right.  I'm just going to point you to one and we're

18  going to walk through it, if that's okay.  And this is already

19  in evidence on Mr. Chausse' file.

20         MR. SHARMAN:  Sam, it's Couch 128-003.

21         And, Counsel, it's C&R 207153.

22  Q   All right.  Dr. Greenberg, is this one of the documents

23  that you reviewed from Mr. Chausse's file?

24  A   Yes, it appears to be.

25  Q   And does it appear to you to be consistent with the same

871

```
 1   type of documents, same form as other off-label agreements that
 2   you saw in other patient's files?
 3   A    No.  There was some significant variations.  Some of the
 4   releases that the PPSA patients were told that they had to sign
 5   had different wording than this.  And the wording was, I
 6   believe, quite inappropriate.  It stated that it was a known
 7   fact that chronic pain could not be properly treated without
 8   the use of off-label drugs.  And that is strictly not
 9   true.  Normal drugs are used to treat chronic pain successfully
10   all the time, and so I think that was something which was --
11   which was -- which was false, a false statement.  And I believe
12   that it was not fair to the patients because that also meant
13   with that false statement they did not get proper informed
14   consent.
15   Q    My question, Dr. Greenberg, was this form consistent with
16   other such forms that you saw in other patients' files?
17   A    No.  There was variation between the forms, significant
18   variation between the forms.  And the one that I brought up was
19   the one that stated that you could not treat chronic pain
20   without the use of off-label drugs.  And that is a falsehood.
21   Q    Well, let's take a look at that.  If we could look at the
22   first paragraph, the one beginning:  All prescription drugs.
23   All right.  This is from the off-label page agreement in
24   Mr. Chausse's file, and it says:  All prescription drugs in the
25   United States have a label approved by the United States Food
```

1  and Drug Administration.  This label provides an indication and

2  dosage for the drug, but neither physician nor patient is

3  legally bound to follow them.

4          Now, I think we just established you agree with that,

5  that's --

6  A   I agree with that.

7  Q   That's an accurate -- then it goes on to say:  The pain

8  treatment is virtually impossible unless the physician

9  prescribes one or more medications that are for an indication

10  or dosage not listed on the drug label.  You disagree with

11  that?

12  A   Completely.  I believe it's extremely misleading.

13  Q   And if another physician testifies or just believes that

14  that is true factually, they are just wrong; right?

15  A   I would -- I would believe that any physician that states

16  that the only way that chronic pain can be successfully treated

17  is to use off-label drugs that are not fully approved by the

18  FDA; that anyone who endorses that statement, okay, is wrong.

19  Because chronic pain is being treated probably by thousands of

20  people today, okay, successfully, successfully, without any use

21  of off-label drugs.  So I believe it's a misleading statement.

22          And furthermore, the informed consent piece of this

23  was completely lacking as far as telling the patients what the

24  risks were, the real risks were of taking these drugs.

25  Q   You and Ms. Griffin also talked about the uses to which

1   off-label prescriptions can be -- can be put, so let's look at

2   that.  If we would go down a little bit further to the section

3   called:  Specific Off-Label Uses.  So here in this off-label

4   agreement there are five categories or five examples of the

5   kinds of medications that the patient might reasonably be

6   expected to get; right?

7           MS. GRIFFIN:  Your Honor, we would object to him not

8   seeing the middle paragraph and the jury not seeing the middle

9   paragraph with this particular paragraph, because it explains

10  what are --

11          THE COURT:  Well, you can go into that on redirect.

12          Go ahead.

13  BY MR. SHARMAN:

14  Q   Is that correct?  It sets out five different categories or

15  types of medications that might be the subject of off-label

16  prescriptions; right?

17  A   Correct.

18  Q   And so, for example, the first one is that there may be

19  antidepressants, antiepileptics, muscle relaxants,

20  tranquilizers and nutraceuticals for pain relief?

21  A   Along with methadone and other drugs too.  Yes.

22  Q   And from time to time antidepressants are in fact used in

23  chronic-pain management; right?

24  A   Yes.

25  Q   And antiepileptics, I suppose those are medicines that are

1    normally indicated or directly prescribed to persons suffering

2    from epilepsy; right?

3    A    Correct.

4    Q    Okay.  They also, from time to time, can be used in

5    chronic-pain management; right?

6    A    Yes, they can be.

7    Q    And then again just as an example of category number five,

8    topical use of morphine, methadone, naloxone, carisoprodol -- I

9    never can pronounce that either.  Help me out -- carisoprodol?

10   A    Carisoprodol.

11   Q    And ketamine.  And when we say topical use we're talking

12   about usually creams or some sort of application?

13   A    It's something that would be applied to the skin as opposed

14   to injecting.

15   Q    And then on this off-label pain agreement, we see a

16   signature above the patient's signature line.  Now, you don't

17   know the signature, nor do I, but there is a signature there?

18   A    I see a signature, yes.

19   Q    In addition to the off-label agreement, you saw opioid

20   agreements, agreement of pain management in Mr. Chausse's file

21   and in other files; right?

22   A    There were some.  There were some pain agreements for some

23   patients.  But not all patients.

24   Q    Not in every file?

25   A    Right.

DAVID GORDON GREENBERG, MD - CROSS BY MR. SHARMAN

875

```
 1  Q   All right.  If you will turn -- and this is already in
 2  evidence also -- and just from Mr. Chausse's file since we're
 3  on it.
 4          MR. SHARMAN:  Sam, it's Couch 128-1.
 5          And Counsel, it's C&R 207151.
 6  Q   All right.  Take a look at that and do you recognize that
 7  as the opioid agreement that you saw in Mr. Chausse's file?
 8  A   Yeah, this is -- this is one of the agreements that the
 9  PPSA practice did use.
10  Q   And there were, in fact, different -- there were, in fact,
11  different forms of that agreement; right?
12  A   Correct.
13  Q   All right.  If we could take a look --
14          MR. SHARMAN:  And, Sam, if you could go down to the
15  itemized portions?
16  Q   And the agreement sets out on this patient and in the
17  following several undertakings that the patient has -- or
18  understandings -- that the patient is saying he or she gets;
19  right?
20  A   Correct.
21  Q   One of them is that the patient is to receive his or her
22  opioid medication from one pharmacy; right?
23  A   Yes.
24  Q   And that's generally a good thing because it discourages or
25  what we want to try to avoid is pharmacy shopping basically;
```

876

```
 1   right?
 2   A   Correct.  And that problem has largely been eliminated when
 3   providers/physicians use the PSP, the prescribe -- the
 4   prescribing lists that come out from the State of Alabama
 5   regarding controlled substances.  So the need to have a single
 6   pharmacy designated is nowhere near as important as it was
 7   years ago.
 8   Q   Still a good idea, though; right?
 9   A   Still a good idea.  Sure.
10   Q   And number two, that the patient shouldn't receive opioid
11   medication from other doctors, at least without prior approval
12   from our office; right?
13   A   Right.  That's an important -- that's an important thing.
14   Q   That's a good thing?
15   A   Yes.
16   Q   And then three, the patient is to maintain dosing schedule
17   as was prescribed.  Basically that means take the medicine the
18   way it says on the prescription label?
19   A   Correct.
20   Q   And then four and five talk about -- talk about other
21   therapies, psychological therapy, physical therapy, even
22   massage therapy; right?
23   A   I see that there.  But in my review of the charts I saw
24   virtually no referrals for psychological therapy and virtually
25   no referrals for physical therapy from this practice in
```

877

1   medicine.

2   Q   You did, though, see referrals into the practice from

3   physicians; right?  In other words, physicians referring their

4   patients to Dr. Couch or Dr. Ruan; right?

5   A   Yes.

6   Q   And in those referrals, or at least some of them, you saw

7   the efforts that had been made and treatment given to those

8   patients that were now being referred to Dr. Couch; right?

9   A   Some of those referrals did have information such as what

10   you're saying, yes.

11   Q   Okay.  And some of them, for example, had a psychiatrist;

12   right?

13   A   Pardon me?

14   Q   Some of them had a psychiatrist?

15   A   Yes, some of them -- a minority of patients had a

16   psychiatrist, yes.

17   Q   And some of them had tried -- many of them had tried a

18   variety of different modalities to use the term, different

19   kinds of treatment including things like physical therapy,

20   nonsteroidal medications, and so forth; right?

21   A   Yes.

22   Q   Some of the patients?

23   A   Some of the patients had definitely tried alternate

24   therapies.

25   Q   And then if we could just turn to the next page.

DAVID GORDON GREENBERG, MD - CROSS BY MR.SHARMAN

878

1           MR. SHARMAN:  Sam, number 8.

2  Q   The opioid agreement also lets the patient know that urine

3  tests, as well as blood tests, may be required on an

4  unscheduled basis to verify your compliance.  And in general,

5  that's a good thing, urine test, blood test, so forth; right?

6  A   Yeah.  I mean the urine testing is superior to blood

7  testing because the drugs concentrate in the urine.  But a

8  blood test is okay.  It's a more expensive way to do it but

9  it's not as cost effective.

10 Q   And there is also, Dr. Greenberg, is there not, an

11 incentivizing effect on the patient when he or she knows that

12 urine tests or blood tests may be required; right?  There's a

13 compliance and incentivizing effect on the patient; right?

14 A   Right.  It's a statement to the patient that -- so that the

15 patient understands that they will have to undergo this

16 testing.

17 Q   And so they are hopefully more likely to conform their

18 behavior accordingly; right?

19 A   It increases the chance, yes.

20 Q   And that's a good thing?

21 A   Pardon me?

22 Q   And that's a good thing?

23 A   Yes.

24 Q   And then if the -- number 10 says:  If the opioids are not

25 taken as prescribed, they can cause side-effects as mentioned

879

 1   previously on this agreement.  Do you see that?  I read that,

 2   number 10?

 3   A   Yeah, it's a little -- 10 is a little blurry, but yes.

 4   Q   So basically the agreement is telling the patient if you

 5   don't take them as prescribed, if you do something different,

 6   you might get some of the side-effects that we talked about in

 7   the very beginning; right?

 8   A   Yes.

 9   Q   And actually let's go back and look at those.

10        MR. SHARMAN:  Sam, can you go back to the first page

11   and highlight the first paragraph, especially the sentence

12   beginning:  There are potential limitations?

13   Q   The first paragraph of the pain -- I'm sorry -- the opioid

14   agreement says that there are limitations to this mode of

15   therapy.  Talking about opioid therapy; right?

16   A   Correct.

17   Q   And the patient is told here some of these limitations are

18   sedation, constipation, nausea, vomiting, itching, swelling of

19   extremities, and respiratory depression are some of the common

20   side-effects.  And that is true depending on the medication,

21   but those are some of the common -- potential common side-

22   effects of opioids; right?

23   A   It's a list of some of the potential common side-effects of

24   opiates but unfortunately it doesn't address the most serious

25   side-effect.

880

1    Q    Okay.  And other additional concerns, it says, include

2    addiction tolerance and physical dependence.  And those are all

3    true, those are all potential outcomes or effects with opioid

4    treatment; right?

5    A    Yes, they are.

6    Q    And then again, just staying with this example, there's a

7    line for a patient signature on the second page and -- again,

8    there is a signature there where there is a space for it.  We

9    don't know -- we don't know the handwriting but there is a

10    signature there; right?

11    A    It's signed and dated.

12    Q    All right.  Now Dr. Greenberg, in your work, you are

13    familiar with the DEA, the Drug Enforcement Administration;

14    right?

15    A    Yes.

16    Q    And among other things they are very important and, in

17    fact, charged by mission with dealing with controlled

18    substances and problems that arise from controlled substances

19    and trying to minimize diversion of controlled substances and

20    so forth; right?

21    A    Correct.

22    Q    And from time to time they put out various guidance

23    documents, pronouncements, guidelines about how they are doing

24    that and what they think doctors and other healthcare providers

25    ought to do; right?

1   A   They do.

2   Q   And you see that from time to time; right?

3   A   Right, they send email memos around and -- or if it's an

4   alert, there can occasionally be even a telephonic alert if

5   there's a particular problem that appears to be overwhelming a

6   certain community.

7            MR. SHARMAN:  All right.  May I approach, Your Honor?

8            THE COURT:  Yes.

9   BY MR. SHARMAN:

10  Q   Dr. Greenberg, I want to show, and I've already provided

11  the government a copy of what has been marked as Couch Exhibit

12  10 which has on the front cover United States Department of

13  Justice Drug Enforcement Administration Office of Diversion

14  Control Practitioner's Manual:  An Informational Outline of the

15  Controlled Substances Act.  Have you ever seen that before or a

16  version of it?

17  A   Yeah.  Again, this is a 2006 edition of it and I think

18  there were -- I think I've seen earlier -- earlier editions of

19  this particular one.

20  Q   And I may have misspoke.  I may have said Exhibit 10.  It's

21  been marked as 110?

22  A   110 is what I have.  But I understand we're on the same --

23  same sheet.

24  Q   All right.  If you would turn, please, sir, to page 30.

25  The page numbers are down there at the bottom.

DAVID GORDON GREENBERG, MD - CROSS BY MR. SHARMAN

```
1              MR. SHARMAN:  And, Sam, this is -- it's Couch 110-034.
2    Q   And Dr. Greenberg, if you would look at the document where
3    it's on the screen for you.
4    A   Okay.  I'll look on the screen because I've got Bates
5    stamping and then date stamping, so it would be better for me
6    to look at the screen.
7    Q   All right.  If you look, please, in the top third of page
8    30, and there's a big question up at the top that says:  What
9    is meant by acceptable medical practice?  Do you see where that
10   is?
11   A   Right.
12   Q   Okay.  So this is the DEA sort of answering questions or
13   giving a view about acceptable medical practice?
14   A   Yeah.  This would be their opinion or their definition of
15   that, yes.
16   Q   And then if you will look at the -- we won't go through the
17   whole thing, but if you will look at the second full paragraph,
18   the DEA says:  Federal courts have long recognized that it is
19   not possible to expand on the phrase legitimate medical purpose
20   in the usual course of professional practice in a way that will
21   provide definitive guidelines to address all the varied
22   situations physicians may encounter.
23              Do you see where I read that?
24   A   Yes.
25   Q   Did I read that right?
```

883

 1    A   Yes, I believe so.

 2    Q   Do you agree with that?

 3    A   I would say that it's not -- it may not be possible to

 4    expand the definition to cover every possible thing that could

 5    happen within the practice of medicine or chronic-pain

 6    medicine.  I would agree with that part of it.

 7    Q   All right.  And then below that, the DEA gives some

 8    examples.

 9         MR. SHARMAN:  And actually Dr. Couch moves Exhibit 110

10    in evidence.  It would be easier.

11         MS. GRIFFIN:  Your Honor, no objection except the

12    acknowledgment that it is a 2006 edition and that these charges

13    are 2011 through 2015.  So it may go to the weight of the

14    admissibility.

15         THE COURT:  All right.  Mark it in.

16       (Defendant Couch's Exhibit 110 was entered into evidence.)

17         MR. SHARMAN:  All right.  And may that be published

18    for the jury, please?

19         THE COURT:  Yes.

20    BY MR. SHARMAN:

21    Q   All right.  And then immediately below that, Dr. Greenberg,

22    the DEA lists some recurring patterns that may indicate

23    inappropriate prescribing.  Do you see where that is?

24    A   Yeah, now it's coming up.  I can see.  They have the bullet

25    points on it.

1  Q   Yes, sir.  We'll get a little bit better image here in a

2  minute.

3         And we won't spend a lot of time, but I want to go

4  through them briefly.  One is an inordinately large quantity of

5  controlled substances prescribed compared to others in the

6  area; right?  That's one thing to look for; right?

7  A   Correct.

8  Q   No physical exam was given; right?

9  A   No physical examination is listed, yes.

10 Q   Warnings to the patient to fill prescriptions at different

11 drugstores; right?

12 A   Correct.

13 Q   That's the kind of thing we just talked about kind of

14 pharmacy shopping?

15 A   Right.

16 Q   The healthcare provider issuing scripts knowing that the

17 patient was delivering drugs to others; right?

18 A   Correct.

19 Q   That's kind of knowledge diversion.  I know that my

20 medicine's going somewhere else; right?

21 A   Right.

22 Q   Issuing scripts in exchange for sexual favors or money;

23 right?

24 A   Right.

25 Q   The intervals of prescriptions are inconsistent with, you

885

1    know, legitimate medical treatment.  The timing of them, I

2    guess; right?

3    A    Yes.

4    Q    The use of street slang instead of actual medical

5    terminology.  That's something to look out for; right?

6    A    Yeah.  I would say yes.

7    Q    And lack of logical relationship between the medication and

8    the condition; right?

9    A    Correct.

10   Q    And then below that the DEA says:  Each case must be

11   evaluated based on its own merits in view of the totality of

12   circumstances particular to the physician and the patient.

13          You agree with that, don't you?

14   A    I agree that cases should be evaluated on the merits of

15   their own case and the totality of the circumstances.  I do

16   agree with that.

17   Q    And it's particular to that physician and that patient;

18   right?

19   A    Correct.

20   Q    And on that topic, Dr. Greenberg, you would agree, wouldn't

21   you, that medicine -- and not even just chronic-pain

22   management, but medicine in general, is both an art and a

23   science; right?  It partakes of both; right?

24   A    Yeah.  Over time that's evolving into more of a science

25   than an art.  But I agree with you that there are parts of

886

1    medicine that still depend upon the art of medicine rather than

2    science, yes.

3    Q    And we've talked a lot and will again about medicine.  But

4    let's talk a moment about pain.  In many instances a patient

5    might present to a physician with some obvious and objective

6    and manifest condition.  Your leg is broken, something like

7    that; right?

8    A    Right.

9    Q    And another situation it may not be that obvious or

10    manifest but there is a checklist, for lack of a better term,

11    that a physician may use to identify what's going on.  For

12    example, when a patient presents with chest pain, is this a

13    heart attack or is it something else going on?  And there's

14    going to be a standard and objective course that a physician

15    tries to use to figure out what's going on with that patient's

16    chest pain; right?

17    A    Yes.

18    Q    Now, pain is subjective; right?

19    A    It's certainly more subjective than most areas in medicine.

20    Q    And in general, pain can only be measured -- I'm talking

21    about measurement now -- by what the patient tells you; right?

22    A    It can be measured by what the patient tells you and it can

23    also be measured by observations of that patient over time.

24    Q    Or perhaps like, for example, the patient's gait, the way

25    they walk when they come in the exam room?

DAVID GORDON GREENBERG, MD - CROSS BY MR. SHARMAN

1  A   Right.  And speaking of walking, that's one of the things
2  that's useful to look at.  And in a lot of ethical pain
3  practices, the parking lot survey is something that's used.  In
4  other words, the people who work in the pain clinic will
5  actually watch and see how the patients are locomoting and
6  walking in the parking lot.  And you can pick up some very
7  interesting data that way.
8  Q   But in general, you have to depend on what the patient
9  tells you.  For example, in response to those little strips
10  that's got like a smiley face at one end and a frowney face at
11  the other and you're supposed to identify where your pain is?
12  A   Yeah.
13  Q   It's things like that that are subjective for pain that
14  you've got to rely on for instance?
15  A   Yeah, and those, those are pretty much -- the kind of
16  numerical scale you're seeing, the one that's in there, is
17  pretty much out of favor.  I know in Arizona that's not used.
18  Those types of scales aren't really used much anymore.  The
19  function now in modern pain medicine is to look at the
20  functioning of the patient and take a functional history to do
21  a functional-based physical examination and to really give
22  the -- the process has gotten far more scientific than what it
23  was back when these things were written in 2006.
24  Q   Okay.  Plenty of doctors still ask you:  Sir, on a scale of
25  one to 10 where is the pain; right?  That happens all the time;

1   right?

2   A   It does.  And like I said, that's falling out of disfavor.

3   But you're absolutely right, doctors still do that.

4   Q   And there is no objective way to measure pain; right?  I

5   understand you review the patient's report, you can watch them

6   walk but there is no objective measurement of pain, there's no

7   pain meter; right?

8   A   In research facilities there are objective ways to measure

9   pain but in the typical clinician's practice there are -- there

10  are not that many objective criterion that can be measured

11  scientifically.

12          MR. SHARMAN:  Your Honor, I'm about to move to another

13  subject.  I don't know if this is an appropriate time.  I'll

14  defer to whatever the court wishes.

15          THE COURT:  I want to wait another 10 or 15 minutes to

16  break.

17  BY MR. SHARMAN:

18  Q   All right.  Dr. Greenberg, you are board certified in

19  addiction medicine; correct?

20  A   Correct.

21  Q   And board certified means you take some hard tests that are

22  given by the appropriate credentialing agencies and pass the

23  test, get the right grade, and then you get basically their

24  certification; right?

25  A   Right.

889

1  Q   That's what board certification means?

2  A   Yes.

3  Q   And you got board certified in addiction medicine in 1987;

4  is that right?

5  A   '87 it wasn't board certified yet.  There was a -- it was a

6  certification by the American Society of Addiction Medicine but

7  they hadn't reached board status at that point in time so it

8  was more of -- it was an official certification but it didn't

9  have the weight of board certification until years later.

10  Q   All right.  You are -- you are not board certified in pain

11  management or pain medicine; right?

12  A   Correct.

13  Q   You are not board certified in anesthesiology; right?

14  A   Correct.

15  Q   In fact, you are not an anesthesiologist?

16  A   I am not an anesthesiologist.

17  Q   Now, you are a member of the American Academy of Pain

18  Management; right?

19  A   Of the -- the American Academy of Pain Medicine.

20  Q   I'm sorry.  The American Academy of Pain Medicine, you're a

21  member of that; right?

22  A   Yes.

23  Q   You haven't passed any particular credentialing or

24  endorsing program that they have; right?

25  A   No, I have not.

1  Q   Now, as we discussed and as you discussed with Ms. Griffin

2  early on, you hold yourself out to be an expert in pain

3  medicine; right?  That's what we've been talking about.

4  A   I have expertise in pain medicine but I also make full use

5  of referring patients when necessary to pain experts who have

6  board certification and who I know are reliable, competent and

7  safe anesthesiologists and other practitioners in the field of

8  pain.

9  Q   But for our purposes here you're holding yourself out as a

10  expert in pain medicine; right?

11  A   Yes.  I have many, many years experience working with pain

12  medicine and also working with practitioners who fail to meet

13  the standards in the state of Arizona with reference to

14  practicing pain medicine.

15  Q   I just want to be clear.  That's what you're telling

16  everybody in this court that you're an expert in pain medicine;

17  right?

18          MS. GRIFFIN:  Your Honor, objection.  It's asked and

19  answered.  And the Court has already ruled that he may testify

20  as an expert in pain management.

21          THE COURT:  Sustained.

22  BY MR. SHARMAN:

23  Q   Now, that's what you tell people in courtrooms but that's

24  not really what you tell the public, is it?

25  A   How do you mean that?

 1   Q   Well, you -- your firm has a website, does it not?

 2   A   Yes, it does.

 3   Q   Okay.  And you hired somebody to create that website?

 4   A   Yes.

 5   Q   All right.  And you or somebody on your behalf told them

 6   what to put on the website?

 7   A   Correct.

 8   Q   So that the firm, your company, your practice could be

 9   represented accurately; right?

10   A   Correct.

11        MR. SHARMAN:  Sam, could you bring up the first page?

12        THE COURT:  Is this an exhibit number?

13        MR. SHARMAN:  It's not, Your Honor.  I'm just using it

14   for impeachment, so I would like it to be published to the

15   jury.  But I can put an exhibit number on it if you would like.

16        THE COURT:  Well, if you're going to be using it, it

17   needs an exhibit number.

18        MR. SHARMAN:  What have we got?

19        I apologize for not following instructions.  It's --

20   this is what's been marked for identification as Couch 137.

21        THE COURT:  All right, sir.

22        MR. SHARMAN:  And --

23        THE COURT:  Can you tell us what it's purported to be?

24        MR. SHARMAN:  This is --

25   Q   If you take a look at it, Dr. Greenberg, this is the home

1  page of your website, is it not?

2  A   Yes, it is.

3  Q   Do you have any doubt that it's the home page of your

4  website?

5  A   No, I do not.

6  Q   And what's your firm called?

7  A   Greenberg & Sucher.

8  Q   Sucher?

9  A   S-U-C-H-E-R.  Greenberg and Sucher.

10 Q   And it's part of your -- it's part of your business to

11 create and maintain this; right?

12 A   Yes.

13      MR. SHARMAN:  We move Exhibit 137 into evidence, Your

14 Honor.

15      MS. GRIFFIN:  Your Honor, there is no foundation that

16 this is exactly what it is, it still exists or currently

17 exists, and it is hearsay.  We don't object to him asking him

18 specific questions about the exhibit or using it as a

19 demonstrative aid but we do object to it being admitted.

20      MR. SHARMAN:  It's a business record.

21      THE COURT:  Is this more than one page?

22      MR. SHARMAN:  Yes, ma'am.  We're going to go through

23 them and I can -- I can offer a printed-out version with all

24 the pages but he is just authenticating it as a business

25 record.

893

1          MS. GRIFFIN:  Your Honor, it was just pulled up as

2    Google so I'm not sure that getting into what's on Google has

3    any --

4          MR. SHARMAN:  He just said this is his website.

5          THE COURT:  Come to side bar, please.  I don't know

6    that he's looked at every page of it, for one thing.

7       (At the side bar, jury not present.)

8          THE COURT:  Have you shown him the entire exhibit?

9          MR. SHARMAN:  I can.

10         THE COURT:  In order for him to say it's his website,

11   I think that needs to be shown.

12         MR. SHARMAN:  I can do that, yes, ma'am.

13         MS. GRIFFIN:  Let me see.

14         MR. SHARMAN:  Sure.

15         MS. GRIFFIN:  Your Honor, it was just pulled up on the

16   screen under Google.  And as are common with many Google

17   things, there are comments by other people that come out when

18   you print a Google article.

19         THE COURT:  Take a look and see what's in that.

20         MS. GRIFFIN:  It's got --

21         THE COURT:  I mean, have you seen this before?

22         MS. GRIFFIN:  No.

23         MR. SHARMAN:  There's no comments.  It's a website.

24         MS. GRIFFIN:  Well, it may be, but that doesn't mean

25   I've seen it.

894

 1          MR. SHARMAN:  Websites come into evidence all the
 2  time.
 3          THE COURT:  Well, why don't you take -- I'll go ahead
 4  and recess and we'll ask Ms. Griffin to go through it and ask
 5  him to make sure it's his current website.  And I don't know
 6  that all of it is relevant to what you want to impeach him with
 7  or what you want to point out about it, so I don't think that
 8  part needs to come in that aren't relevant to what the issues
 9  are in this case.
10          MR. SHARMAN:  Okay.
11          THE COURT:  Let's see if you can limit it to that.
12          MR. SHARMAN:  I'm sorry.  What -- do you want me to
13  show it to him at the break?
14          THE COURT:  Well, first of all, are you planning on
15  examining him on every page of this?
16          MR. SHARMAN:  Not every page.
17          THE COURT:  Well, then I don't think it needs to come
18  in as to every page, because --
19          MR. SHARMAN:  Most pages, but not every one, yes.
20          MS. GRIFFIN:  Your Honor, there's no relevance as to
21  his partner and the background, personal background, of his
22  partner.
23          MR. SHARMAN:  It's relevant because he's represented
24  he is in pain management and there is nothing in there about
25  pain management.  It goes to his credibility and believability.

DAVID GORDON GREENBERG, MD - CROSS BY MR. SHARMAN

1          THE COURT:  His partner?

2          MS. GRIFFIN:  His partner's?

3          MR. SHARMAN:  In him.

4          MS. GRIFFIN:  I was discussing his partner.

5          THE COURT:  She objected to his partner's history.  So

6    I'm saying see if you can limit it to what you intend to

7    question him on on those pages and see if he will say that

8    that's his website.

9          MR. SHARMAN:  Okay.

10          THE COURT:  I don't know anything about that

11   gentleman.  Okay.

12          I'm going to go ahead and recess.

13          MR. SHARMAN:  And I'll give this to him.

14      (In open court, defendants and jury present.)

15          THE COURT:  All right.  Ladies and gentlemen, we're

16   going to go ahead and take our morning break at this

17   time.  Leave your pads on your chairs.  Take your break

18   downstairs.  No discussion about the case.  We will call you up

19   in about 15 minutes.

20          We're in recess.

21      (A recess was taken at approximately 10:26 a.m.)

22      (In open court, defendants and jury present.)

23          THE COURT:  All right, Mr. Sharman.

24          MR. SHARMAN:  Thank you, Your Honor.  And we will

25   proceed with Exhibit 137, not ask for it to be admitted, but

1    just for demonstrative and impeachment purposes.

2           And with that understanding may I have it published to

3    the jury, please?

4           THE COURT:  I'm sorry.  I couldn't hear you.

5           MR. SHARMAN:  I'm sorry.  May I have it published to

6    the jury, please?

7           THE COURT:  You're just going to cross-examine him

8    with it and not admit it; is that correct?

9           MR. SHARMAN:  Yes, ma'am.

10          THE COURT:  All right.  Go ahead.

11          It will take a minute to come up.

12   BY MR. SHARMAN:

13   Q   Now, Dr. Greenberg, is this the "About Us" page on your

14   website?

15   A   Yes, it is.

16   Q   And the first paragraph describes your firm, your practice

17   and your partner's practice; right?

18   A   Yes, it does.

19   Q   And it says:  With over 50 years of combined experience in

20   the field of addiction and professional well-being, Greenberg

21   and Sucher help professionals such as CEOs, administrators,

22   physicians, physician's assistants, dentists, nurses, dental

23   hygienists, attorneys, pilots, and individuals in many other

24   fields with substance use, boundary issues, psychiatric

25   problems, age-related issues, and medical problems.

DAVID GORDON GREENBERG, MD - CROSS BY MR. SHARMAN

```
 1              That's what y'all do; right?
 2    A    Yes, that's -- we have a contract with the state of Arizona
 3    Medical Board and we perform those services for the doctors and
 4    PAs who are under the jurisdiction of that medical board.
 5    Q    Okay.  And you practice, or you focus on those areas that
 6    you just described there about substance use and so forth;
 7    right?
 8    A    Absolutely.  The vast majority of the patients that we see
 9    are patients who became addicted to their use and
10    inappropriate -- inappropriate prescribing of controlled
11    substances by pain doctors.
12    Q    Okay.  And your patients or clients are in large part
13    professionals; right?
14    A    For the part that deals with the Arizona Medical Board they
15    are large -- they are in large part professionals.
16    Q    A lot of them are in the medical professions but that's the
17    characteristic of your client base; right?
18    A    Yes.
19    Q    And nowhere on that "About Us" description does it say we
20    treat pain patients or we are a pain clinic or we are pain
21    experts; right?
22    A    We treat pain patients with great regularity.  As I said,
23    the majority of people who get addicted to opioids in the
24    United States of America get addicted, iatrogenically.
25    Iatrogenically means they get addicted by physicians who
```

DAVID GORDON GREENBERG, MD - CROSS BY MR. SHARMAN

```
 1   over-prescribed opioids to them and then they became addicted.
 2   And that is a large part of our clientele.
 3   Q   Is pain management or pain medicine anywhere on the "About
 4   Us" page of your website?
 5   A   Pain management and addiction medicine are so closely
 6   intertwined nowadays.  But there's talk about making them, at
 7   some point in time, into one specialty.  That's just the
 8   unfortunate situation that we have right now.
 9            THE COURT:  Dr. Greenberg, if you will listen to his
10   question.  His question was simply:  Does it say it on the
11   "About" page?
12            THE WITNESS:  No.  It does not say it on the website.
13            THE COURT:  Okay.
14   BY MR. SHARMAN:
15   Q   And let's turn to the programs your firm offers.   And it
16   offers what you call post-treatment supervision; right?
17   A   Correct.
18   Q   And just to try to summarize, that's a program that helps
19   people who have substance abuse, addiction problems, other
20   kinds of issues after they've had their treatment to get better
21   and to reintegrate into what they were doing before?
22   A   Yes, after they've had their detoxification and other
23   treatments necessary due to most likely and most commonly
24   over-prescribing the pain medicines.  The post-treatment
25   supervision helps to carefully monitor these patients and make
```

899

```
 1    sure that they are staying adherent to their treatment
 2    programs.
 3    Q    And in the post-treatment supervision program that
 4    Greenberg and Sucher offer, you're not treating lower back
 5    pain?
 6    A    No, we're not treating lower back pain, huh-uh.
 7    Q    You're not treating pain resulting from Crohn's disease;
 8    right?
 9    A    No.
10    Q    You're not treating an amputee's phantom pain in this
11    program; right?
12    A    Not in the Greenberg-Sucher program.
13    Q    And that's your firm, Greenberg-Sucher; right?
14    A    That's true, but I also work in the Medicaid Indigent Care
15    System of the state of Arizona, and in that capacity I do see
16    patients who have been addicted to their pain medicines and
17    have suffered tremendous consequences thereof.  I also, in
18    those situations, do what I would call primary care pain
19    management and do refer patients to specialists in pain
20    medicine on a regular basis.
21    Q    Right.  When you get -- if the need arises, you actually
22    send somebody to a pain management specialist; correct?  You
23    refer it out?
24    A    Yes.  If it's a complex case, we refer it out.  Within the
25    Medicaid System if they're more on the primary care level, then
```

900

1   we would be less likely to refer out.

2   Q   And then scroll -- in scrolling down you also have a

3   section called Areas of Expert Testimony that the firm

4   provides?

5   A   Correct.

6   Q   Do you see that there?

7   A   Yeah.

8   Q   And there's a number of areas of expert testimony that you

9   tell people on your website that you or the firm, you and the

10  firm can offer; right?

11  A   That's true.  But Dr. Sucher and I have different areas of

12  emphasis on expert testimony.  He is also expert -- in addition

13  to addiction medicine, he's also expert in behavior health-type

14  system issues.  He was the person who was in charge of the

15  Behavior Health System for the state of Arizona for a number of

16  years so he has expertise in that area that I do not have.

17  Q   Okay.  Where, Dr. Greenberg, in the listed areas of

18  expertise of your firm does it say pain management?

19  A   We don't advertise for pain management.  We take referrals

20  from medical boards, osteopathic boards, et cetera, when

21  there's a doctor of osteopathic medicine or a doctor of

22  allopathic medicine that needs treatment and needs triage with

23  reference to a problem with chronic-pain medicine.  And the

24  medical boards have respected us for years because we do not

25  send people to practitioners that over-prescribe medications,

 1   and we monitor our patients extremely well.

 2   Q   Dr. Greenberg, you get those calls because those physicians

 3   or other healthcare providers you're talking about is because

 4   they are having addiction or substance abuse problems; right?

 5   That's why you're getting a call?

 6   A   Yeah.  We also get them for chronic pain calls too.

 7   Chronic pain is a major source of why physicians in my age

 8   group are retiring, especially surgeons.  Surgeons are retiring

 9   now at an ever-increasing rate.  And chronic pain is one of the

10   reasons for that.  So when we get a surgeon, say, who's been a

11   very productive cardiothoracic surgeon, saved many, many, many

12   thousands of patients' lives in their career and they have

13   to -- they have to retire because they have chronic-pain issues

14   that just have not been easy to solve, we work with those

15   doctors and find reputable chronic-pain doctors that will

16   safely prescribe them and these doctors are able to prolong

17   their careers to society and to their own benefit.

18   Q   Do you plan to add to your website what you tell the public

19   that you're an expert in pain management or are you going to

20   leave it like it is?

21   A   I practice pain management medicine and that is my right in

22   the state of Arizona, being certified by them.  I'm also an

23   inventor in the field of pain medicine and have just received a

24   very, very important patent from the United States patent

25   office which is going to tremendously increase the amount of

902

1   safety for pain management patients and decrease the amount of

2   overdose deaths that we see in the state -- in the United

3   States of America.

4           And like I said, that patent was just awarded.  We're

5   very proud of it and we're going into production sometime

6   within the next six months.  And I think I really honestly

7   believe that we're going to have major impact on decreasing the

8   accidental overdose problem in the United States of America,

9   and that will be a good thing.

10  Q   I probably misspoke.  After this trial, are you going to

11  add pain management to your list of expertise on your website

12  as you tell the public or are you going to leave it as is?

13  A   I'm probably going to leave it as is because we get so much

14  business from the medical boards and dental boards and other --

15  the airline pilots, et cetera, that we can't handle much more

16  business along those lines.  We would have to hire new docs and

17  expand and we're not sure, Dr. Sucher and I, if we want to go

18  ahead and expand at this point in time.

19  Q   Speaking of Arizona, you just mentioned you'd testified in

20  Arizona.  In Arizona, you can testify in Arizona courts as a

21  expert in pain -- in addiction medicine; right?

22  A   Correct.  In Arizona, I've been admitted to, in Superior

23  Court of Arizona, to testify in -- in addiction medicine.  And

24  then on the federal level I've been admitted to be able to be

25  an expert in addiction and pain medicine.

1    Q    But actually in Arizona State Court, state in which you

2    practice, you cannot at least currently, be qualified as an

3    expert in pain management; right?  You testified to pain

4    addiction, but not -- I mean addiction medicine but not pain

5    management; right?

6    A    Yeah.  I've never tried to get the pain medicine -- the

7    pain medicine certification to be in superior court.

8    Q    And that's because in Arizona to be able to testify as an

9    expert in a medical malpractice case, for example, you have to

10   be board certified; right?

11   A    No, that's not true.  I've testified in cases in Arizona

12   where board certification wasn't necessary.

13   Q    All right.  Let's move to testimony.  You have, and

14   continue to do so, testified in court and other proceedings;

15   right?

16   A    Yes.

17   Q    You've testified in court and other proceedings,

18   administrative and otherwise, a good bit, have you not?

19   A    Yes, I have.

20   Q    Okay.  Some of those have been medical malpractice cases;

21   right?

22   A    Correct.

23   Q    And just so we're on the same page, a medical malpractice

24   case, that's when a patient sues a doctor or some other

25   healthcare provider because the patient claims that the doctor

904

1  or the healthcare provider has been negligent in their care of

2  the patient and have hurt them; right?

3  A   Correct.

4  Q   And from your work, testifying in medical malpractice

5  cases, you understand that negligence is a claim that the

6  doctor or the healthcare provider didn't meet the standard of

7  care; right?

8  A   By and large yes, I agree with you.

9  Q   Is that right?

10  A   Yeah, I agree with you.  That's the most common reason.

11  Q   And in this case that we're here about today, this isn't a

12  medical malpractice case; right?

13  A   As far as I know, this is not a medical malpractice case.

14  Q   Because a medical malpractice case, that's a civil lawsuit,

15  not a criminal one; right?

16  A   Yes, absolutely.  That's true.

17  Q   And today we're here about a criminal case; right?

18  A   Correct.

19  Q   And as far as you know, the patients whose files you've

20  reviewed have not sued Dr. Couch for medical malpractice;

21  right?

22          MS. GRIFFIN:  Objection as to relevance, Your Honor.

23          THE COURT:  Sustained.

24  BY MR. SHARMAN:

25  Q   Well, do you know if anybody besides you have made a formal

905

```
 1   claim that Dr. Couch failed to meet some standard of care?
 2           MS. GRIFFIN:  Objection as to relevance.  May we
 3   approach, Your Honor?
 4           THE COURT:  I sustain the objection.
 5   BY MR. SHARMAN:
 6   Q   You haven't talked to any actual patient; right?
 7   A   That's absolutely true.
 8   Q   You haven't talked with any family members of any patients;
 9   right?
10   A   I have not talked with any family members.
11   Q   You haven't spoken with any of the doctors who referred
12   their patients to Dr. Couch; right?
13   A   That's true too.
14   Q   So you don't know whether any of those folks are happy,
15   unhappy or otherwise with Dr. Couch; right?
16   A   Correct.  I've spoken to none of the family members at all.
17   Q   Well, or their referring physicians?
18   A   Correct.
19   Q   Or any patients?
20   A   Correct.
21   Q   All right.  Now, you have testified in criminal cases, have
22   you not?
23   A   I have.
24   Q   You've testified in criminal or consulted perhaps is a
25   better word and provided services in criminal cases; right?
```

906

```
 1   A    Correct.

 2   Q    And most of those criminal testimony engagements and

 3   consultation services have been for the prosecution; right?

 4   For the government?

 5   A    In -- yeah.  If you look at the cases I've had over the

 6   years, the majority of cases have been defense cases,

 7   malpractice defense cases.  But I've also testified in a couple

 8   or three of criminal cases too, yes.

 9   Q    All right.  Now, you've had contracts with the federal

10   government to be an expert witness, have you not, either as a

11   testifying witness or as a consultant?

12   A    Yes.

13   Q    Have you not?

14   A    Yes.

15   Q    And by my count, it's 17 since 2007.  Does that sound about

16   right?

17   A    Yeah, but not all of those were cases that went to

18   court.  Some of those are just cases for consulting.

19   Q    Fair enough.  I'm not saying those were all trials?

20   A    Okay, yeah.

21   Q    But they were all criminal investigations for the United

22   States Department of Justice or the DEA, those 17?

23   A    Yeah.  I would say that many of them were, yes.

24   Q    And in those 17 instances where you've testified for or

25   you've been a consultant for the government or the DEA, you
```

DAVID GORDON GREENBERG, MD - CROSS BY MR. SHARMAN

 1    earned about $320,000 from those contracts.  Does that sound
 2    about right?
 3    A   That would be close, over the years, yes.
 4    Q   Okay.  And even in the last five years working for the DEA
 5    and working for the government, you've made about $250,000 in
 6    about the last five years.  Does that sound right?
 7    A   I would say it's pretty close, yeah.
 8    Q   How many times have you testified for a criminal defendant?
 9    A   For a criminal defendant?
10    Q   Yes, sir.
11    A   I don't believe that I have testified for a criminal
12    defendant.  I believe I've consulted but not testified.
13    Q   All right.  You have written, have you not, Dr. Greenberg,
14    on the subject of the distressed chronic-pain practitioner?
15    A   Yes.
16    Q   And that's something you believe that you know a good bit
17    about; right?
18    A   Yes, I think I'm pretty well acquainted with the subject.
19    Q   That's something you hold yourself out as an expert in;
20    right?
21    A   It was the topic of the award that I got from the American
22    Federation of State Medical Boards was that guide to
23    investigators so that they could more efficiently and more
24    productively deal with the problem of chronic-pain
25    practitioners who were in practices that were extremely

908

1   distressed.  And by distressed I mean dysfunctional and

2   dangerous.

3   Q   And you've criticized what you call, I think, self-declared

4   experts in chronic-pain medicine; right?

5   A   Yeah.  There are people who are self-declared experts in

6   chronic-pain medicine that have never opened up a book on

7   chronic-pain medicine, that have never had a CME course on

8   chronic-pain medicine, and they just open up shop.  In the

9   American system that is a legal thing to do and most other

10  states of the -- most other parts of the world physicians

11  cannot declare themselves to be a specialist without having

12  other types of qualifications.

13          But in the United States anyone can -- any doctor, at

14  least other than the state of Massachusetts, I think, can say:

15  Hey, I'm a specialty -- I'm a specialist in neurosurgery.  And

16  put that -- hang up a shingle and go for it.  So we really have

17  a unique situation in the United States.

18  Q   Okay.  And you've said that these self-declared experts in

19  chronic-pain medicine that these folks you criticize, there's

20  some common characteristics you've identified; right?

21  A   Yes.

22  Q   One of them is that they don't have any formal training in

23  chronic-pain medicine.  That's one characteristic; right?

24  A   Even worse than that is they have no formal training and

25  they have no history of going to CME programs on chronic-pain

1  medicine or reading the literature of chronic-pain medicine or

2  subscribing to the magazines or the journals or anything like

3  that.  They're just people who decided they want to make a

4  quick buck and opened up a pain clinic.

5  Q   They don't have any history of studying under a qualified

6  mentor, somebody who's in the field a long time and can learn

7  from; right?

8  A   Correct.

9  Q   They -- I think you mentioned that they don't, they don't

10 participate in recognized CME.  And that stands for continuing

11 medical education; right?

12 A   Yes, sir.

13 Q   And in particular, they don't have anything to do with

14 presentations and courses and accreditations about pain, pain

15 management, pain medicine; right?

16 A   Right.

17 Q   And they don't belong to professional pain treatment

18 organizations, the right ones, they don't do that; right?

19 A   Correct.

20 Q   And I think you mentioned they don't keep up, they don't

21 read the right journals, they don't publish in or read the

22 right textbooks, and so forth; right?

23 A   Correct.

24 Q   And a lot of times they actually failed the original

25 specialty medicine that they were in and then declared

1    themselves to be pain management doctors; right?

2    A    Yes.

3    Q    All right.  Let me walk through, Dr. Greenberg, just

4    briefly, a few characteristics.  And after each characteristic

5    I want you to tell me whether you think that is or is not

6    likely to be a characteristic of an expert in pain management

7    or pain medicine.  Okay?

8    A    I will try.

9            MS. GRIFFIN:  Your Honor, we object to the relevance

10   of what he thinks is an expert in pain management.

11           MR. SHARMAN:  That's all he's been testifying about,

12   Your Honor, what is -- and that's what he's claimed is his

13   expertise.

14           THE COURT:  He's not been testifying about other

15   experts in pain management.  He's been testifying about his

16   opinion as an expert in pain management.  So I think you're

17   going off on a tangent here.  And I sustain the objection.

18   BY MR. SHARMAN:

19   Q    Well, Dr. Greenberg, I would like to ask -- I would like to

20   offer you some characteristics of a pain management physician.

21   And in comparison with your published description of a

22   self-declared expert in pain management I would like you to

23   tell me if that is or is not an actual characteristic of a pain

24   management physician; not an expert but a physician.

25           MS. GRIFFIN:  And, Your Honor, we object to the

911

 1    relevance.

 2              MR. SHARMAN:  Your Honor, it is -- that's what the

 3    case is about.  It is well --

 4              THE COURT:  Come to side bar, if you will.

 5         (At the side bar, jury not present.)

 6              THE COURT:  It seems like you're missing the -- the

 7    connection.  I'm not understanding what you're trying to do.

 8              MR. SHARMAN:  He's claiming this is a bogus practice,

 9    this is -- they're doing all this horrible stuff.  And he

10    described the aspects of such a practice.  Okay.  I want to

11    give him characteristics, a set of characteristics.

12              THE COURT:  Yeah.  But the characteristics you're

13    talking about are ones he's identified of pain expert

14    witnesses.

15              MR. SHARMAN:  No, ma'am, of physicians.  I can go back

16    and clear that up.

17              THE COURT:  That's not what I had understood at all.

18              MR. SHARMAN:  I can go back and clear that up.  He's

19    criticizing doctors who fail in some other practice; you

20    know, there are OB-GYNs, the example he used in his article,

21    OB-GYN --

22              THE COURT:  Maybe you should be talking about pain

23    management specialists as opposed to experts.

24              MR. SHARMAN:  Fair enough.

25              THE COURT:  This whole questioning, I thought he was

912

1  talking about other expert witnesses.

2          MR. SHARMAN:  Okay.  And that was probably my fault.

3          MS. GRIFFIN:  As we did.

4          MR. SHARMAN:  And I can clarify he's talking about

5  doctors.  That's my fault.  Thank you.

6          THE COURT:  All right.

7      (In open court, defendants and jury present.)

8          THE COURT:  Go ahead.

9  BY MR. SHARMAN:

10  Q   Dr. Greenberg, just to be clear.  When we were going over

11  your criticisms of self-declared experts in chronic-pain

12  medicine, you were -- you and I were talking about, and you

13  were criticizing physicians, doctors who were setting

14  themselves up as pain management doctors; right?

15  A   Yes.  And not just setting themselves up but doing it

16  without even taking, as we talked about, a CME course or

17  training of any kind.  And that's -- it's an exploitative

18  feature of our system.

19  Q   Right.  But your criticisms were directed to -- and you and

20  I were talking about physicians that were the subject of that

21  criticism; right?

22  A   Right.

23  Q   Okay.  And then the list I went through was your view of

24  such physicians; right?

25  A   The common problems with those types of physicians, yeah.

DAVID GORDON GREENBERG, MD - CROSS BY MR.SHARMAN

913

1   Q   All right, sir.  So now I'd like to move slightly and I'd

2   like to give you some characteristics of other physicians.

3   A   Okay.

4          MS. GRIFFIN:  And, Your Honor, I still object.  We're

5   not here about other physicians.  The relevance and --

6          THE COURT:  You mean other pain management physicians?

7          MR. SHARMAN:  Other pain management physicians.

8          THE COURT:  You can proceed with that.

9   BY MR. SHARMAN:

10  Q   All right.  Now, Dr. Greenberg, if a physician has a

11  residency, does a residency and completes a residency in

12  anesthesiology with clinical rotations in a pain clinic, is

13  that a likely sign that that physician is not one of these

14  self-declared experts but may be a genuine, qualified

15  pain-management physician?

16  A   Yes.

17  Q   I'm not saying that's the whole thing, but that's one

18  characteristic?

19  A   Yes, that would be far more likely that that person would

20  be a legitimate practitioner of anesthesiology and then also

21  chronic-pain medicine if they got chronic-pain medicine as part

22  of their anesthesiology residency or fellowship.

23  Q   Tell us what a fellowship is, please.

24  A   Fellowship is additional training that physicians get or

25  can get after they've gone through residency training.  So it's

914

```
 1   usually about an extra year, sometimes it's an extra 18 months,
 2   but it is some additional training after they've gotten their
 3   initial residency done.  So, for example, they would get a
 4   residency in anesthesiology and then maybe a year or two later
 5   they would go into a fellowship program and complete a
 6   fellowship in chronic pain-related type of program.
 7   Q   Okay.  So if a physician had a one-year fellowship in pain
 8   management, that would be another factor that would tend to
 9   lead you to conclude that that physician did not fall within
10   your category of self-declared expert.  Not the only
11   characteristic, but that would be another characteristic you
12   would take into consideration; right?
13   A   Yeah, I agree with you.
14   Q   If the physician were certified or had a certification from
15   the American Board of Anesthesiology in the subspecialty of
16   pain management, would that be a characteristic that would make
17   you less inclined to view that practitioner as one of these,
18   you know, experts that set themselves up on their own?
19          MS. GRIFFIN:  Your Honor, there is no allegation in
20   the charges that these are self-declared experts.  And I
21   question the continuing relevance of this line of
22   questioning.  It doesn't matter what other self-declared expert
23   pain doctors may claim.
24          MR. SHARMAN:  It matters, Your Honor, to the extent
25   we're talking about the standard of care and who meets it and
```

1  who doesn't.

2          MS. GRIFFIN:  Those are completely different issues,

3  Your Honor.

4          THE COURT:  I sustain the objection.

5  BY MR. SHARMAN:

6  Q  Well, what about -- do you have any familiarity,

7  Dr. Greenberg, with Dr. Couch's background, profession?

8  A  No, I have not read his formal background.  I've not been

9  given materials, I don't believe, on his formal training.

10 Q  Okay.  So you don't know, for example, whether he is a

11 member of the American Society of Interventional Pain

12 Physicians or not, do you?

13          MS. GRIFFIN:  Your Honor, he can't possibly know.  He

14 said that he's read or seen nothing about it and we would

15 object to that line of questioning.

16          THE COURT:  Sustained.

17 BY MR. SHARMAN:

18 Q  Well, you'd agree with me, Dr. Greenberg, that there are

19 objective characteristics of qualified legitimate chronic pain

20 physicians; right?  You would agree with that?

21 A  Yes, I would.

22 Q  At the time PPSA was shut down, Dr. Greenberg, about how

23 many active patients did the whole practice have?

24          MS. GRIFFIN:  Objection as to foundation.

25          THE COURT:  Sustained.

1          MR. SHARMAN:  I'm sorry, Your Honor, I don't --

2          THE COURT:  There's been no testimony that he has any

3    knowledge about PPSA other than what he's read in the files

4    that he's testified about.

5    BY MR. SHARMAN:

6    Q   I just want to be clear.  You don't have any knowledge

7    about this practice as a whole or Dr. Couch's practice in

8    particular, other than what you read in those files; right?

9    A   That is correct.

10   Q   And those files were -- well -- you didn't select those

11   files out of the whole possible universe of patients, however

12   many there are; right?

13   A   That is correct.

14   Q   Somebody from the prosecution picked those files for you;

15   right?

16   A   That is correct.

17   Q   And are any of the people working for the prosecution that

18   picked those files, were they doctors?

19   A   I don't know if they retained any physicians prior to

20   myself, so I don't know.

21   Q   As far as you know, you're the only doctor for the

22   government that's looked at those files; right?

23   A   As far as I know.

24          MS. GRIFFIN:  Your Honor, may we approach?

25          THE COURT:  All right.

1      (At the side bar, jury not present.)

2           MS. GRIFFIN:  Your Honor, the majority of these

3   patients were picked because they are dead.  They died shortly

4   after receiving prescriptions from these doctors.  And we're

5   going to get awfully close to that if he continues to push this

6   issue on it.

7           MR. BODNAR:  And Dr. Greenberg knows that.

8           MS. GRIFFIN:  And Dr. Greenberg knows that they were

9   picked because many of them resulted in death.

10          MR. SHARMAN:  I've got enough.  I'll leave it.

11          THE COURT:  Okay.  All right.

12          MR. BODNAR:  I just didn't want to get close to that

13  line.

14      (In open court, defendants and jury present.)

15  BY MR. SHARMAN:

16  Q   All right.  Dr. Greenberg, I'm going to direct your

17  attention to a couple of patient files.  Do you still have

18  before you the file of Patient H......?  If you don't, I can

19  approach, Your Honor?

20  A   Patient who?

21  Q   H......?

22          THE COURT:  I don't think he has any patient files in

23  front of him.  If you want to hand that exhibit to the clerk?

24  Is that an exhibit?

25          THE WITNESS:  This isn't it, though.  This is my

DAVID GORDON GREENBERG, MD - CROSS BY MR. SHARMAN                918

 1  website.

 2          THE COURT:  All right.

 3  BY MR. SHARMAN:

 4  Q   All right.  Dr. Greenberg, I want to hand you what has been

 5  identified and also admitted in evidence as Government's

 6  Exhibit 13-7, which is the H...... patient file.  You and

 7  Ms. Griffin discussed Patient H...... on direct, did you not?

 8  A   I believe we did, yes.

 9  Q   All right.  Now, Patient H...... was referred by her

10  primary care doctor and in fact received multi-disciplinary

11  care; right?

12  A   I believe so, yes.

13  Q   All right.  And if you can turn to the page number 209382,

14  and I'll just use the last three numbers because they are

15  pretty much all 209.  So if you can turn to page 382 for me.

16  A   382?

17  Q   Yes, sir?

18  A   All right.

19  Q   And can we have that on the screen?

20  A   That would be great.

21  Q   All right.  382 is a followup note, is it not?

22  A   Yeah, it appears to be a followup note from the Physician

23  Specialists of Alabama, P.C.

24  Q   And if --

25          MR. SHARMAN:  Sam, if you could highlight the portion

1  at the bottom that talks about the GI, please?

2        Little bit -- little bit further down, above the

3  signature.

4  Q  All right.  So Ms. H......, excuse me, came to Dr. Couch

5  from a GI -- a gastroenterologist; right; because she was

6  having significant stomach troubles; right?

7  A  Yeah, I think she was having stomach troubles and possibly

8  other GI-related disorders.

9  Q  And so Dr. Couch is saying, or the order is being given,

10  follow up with the gastroenterologist up in Birmingham for

11  medicine adjustment about that; right?

12  A  Yeah, that's what it appears to be from what I can see on

13  the screen.  Yes.

14  Q  Okay.  As far as you know, that happened; right?

15  A  I have no doubt to think that it didn't happen.

16  Q  Okay.  All right.  And if you will look at page 388, C&R

17  388, that's part of the multi-disciplinary approach here.  You

18  can see that she is seeing a Dr. Kirby and that he had adjusted

19  her medications as well; right?

20  A  I can see that, yes.

21  Q  And that -- if we can look at 432, that when she was

22  continuing to have these pretty significant stomach issues,

23  that the -- well, the medical assistant relayed the issue, the

24  information to the patient that:  Look, with regard to those

25  things, you've got to go back to your GI doctor to figure out

1   what they want to do; right?

2   A   Yeah, I see that.  And it looks like it was signed by a

3   medical assistant named Frankie Goss.

4   Q   Right, who is relating what Stacy said; right?

5   A   And Stacy is one of the nurses?

6   Q   I'll just tell you that she is a CRNA.

7   A   Okay.

8   Q   So these are examples, are they not, of Dr. Couch being in

9   contact with sending patients back to having them consult with

10  other physicians, including the actual referring physician;

11  right?

12          MS. GRIFFIN:  We object to the question.  This is not

13  Dr. Couch telling her to do anything.

14          THE COURT:  Sustained.

15  BY MR. SHARMAN:

16  Q   Dr. Couch's nurse telling the patient:  You've got to go

17  back to your GI; right?

18          MS. GRIFFIN:  Objection.  It's a medical assistant,

19  not even a nurse.

20  BY MR. SHARMAN:

21  Q   Dr. Couch's medical assistant telling the patient she's got

22  to go back to the GI; right?  True?

23  A   It appears to be that's what was being communicated.

24  There's no true signature to it but there is electronic

25  signature.

DAVID GORDON GREENBERG, MD - CROSS BY MR. SHARMAN

921

```
 1   Q   Okay.  And I think on direct you had criticized Dr. Couch
 2   because there was not a -- he did not make an abdominal
 3   examination -- the stomach examination; right?  Do you remember
 4   that?
 5   A   Right.  The patient with acute abdominal pain -- even when
 6   one is not a gastroenterologist or a specialty surgeon or
 7   anything like that, doing an abdominal exam would be an
 8   important thing to do because you could find out immediately
 9   whether or not the patient had what's known as an acute
10   abdomen.  And an acute abdomen can be a surgical emergency and
11   that's why it's good even for a cursory exam to take place,
12   just to make sure that that abdomen isn't rigid and that the
13   patient doesn't look like they're having a pending abdominal
14   catastrophe.
15   Q   All right.  Look at page 538 please, sir.
16           I apologize.  Let's see.
17           All right.  In fact, Dr. Couch examined Patient
18   H's...... abdomen and found that it was soft and nontender;
19   right?
20   A   I have -- I have a lot of difficulty reading this
21   page.  There's a lot of -- a lot of material on it and a lot
22   of -- have things that -- stuff lined through them.
23   Q   All right.  I apologize.  I misspoke.  It's page 346.
24           MS. GRIFFIN:  Could you give the page number again?
25           MR. SHARMAN:  Yes, it's page 346.
```

1          That's better.

2    Q   And if we highlight, it will report about the abdominal

3    examination, it says:  Abdomen nontender to palpation, tone

4    normal without rigidity or guarding, no masses present.

5          So Dr. Couch did examine her abdomen; right.?

6    A   I had -- it appears from this brief note that he did

7    perform an abdominal examination.

8    Q   Had you not seen that when you testified earlier?

9    A   I did not see that when I testified earlier.

10   Q   I believe you also criticized Dr. Couch for paying

11   insufficient attention to inconsistent urine drug screens.  Do

12   you remember that discussion with Ms. Griffin?

13   A   Yes, yes.

14   Q   And this is about again, Patient H.......  So let's take a

15   look at that.  If you could look at page 425, please.  That's a

16   urine drug screen.  It will get up there in a second.  This is

17   a urine drug screen from February 17th of 2014.  So if I'm

18   reading this correctly -- but tell me if I'm wrong -- that

19   shows Ms. H...... positive for benzos and negative for opiates;

20   is that right?  Positive for benzos, negative for opiates?

21   A   That's what it shows.  But it's very important to note that

22   this is a substandard cup urine test which is not a confirmed

23   test.  It's performed by nonprofessional personnel within the

24   office that have virtually no understanding of how to properly

25   do a state-of-the-art urine-type testing.  So this use of these

923

```
 1   types of inadequate testing that are frequently wrong is -- is
 2   a negative sign, I believe, as far as the doctor's willingness
 3   to spend the tiny bit more money and go ahead and protect his
 4   patients the best that he can.
 5          These tests are just an abomination at this point in
 6   time and they're rapidly going out of use in the state of
 7   Arizona because they're so inaccurate.  So I don't put much
 8   credence in this type of testing.
 9   Q   All right.
10   A   And I think you'll see that's a nationwide trend right now.
11   Q   My question was:  The UDS, urine drug screen for
12   Ms. H...... on this date showed her positive for benzos and
13   negative for opiates; right?
14   A   Correct.
15   Q   And you're saying that often the in-office cup drug screen,
16   so to speak, they are often inaccurate; right?
17   A   Correct.
18   Q   That you can get false positives and false negatives;
19   right?
20   A   Correct.
21   Q   You mentioned the staff and their incompetence.  What staff
22   members did you -- did you interview?
23   A   Oh, no.
24   Q   Let me finish my question.  What staff members did you
25   interview of Dr. Couch's or anybody else's to opine about their
```

1  competence or lack thereof?

2  A   No, I didn't do that.  And let me clarify it so that -- to

3  make sure.  These types of frequently incorrect and confusing

4  cup urine tests, the staff that performs them are almost always

5  nonprofessional staff.  And that's one of the other problems

6  with these types of screening tests is that the people who are

7  pretty low on the food chain, as far as with reference to

8  working in the office, are the ones that are given the job to

9  do urine testing.  And unfortunately that even compounds the

10  number of errors that happen with this type of testing.

11  Q   Well, you may consider them low on the food chain but you

12  didn't talk to anybody or examine anybody on Dr. Couch's staff

13  so you don't know whether they're competent or not, do you?

14         MS. GRIFFIN:  Objection, Your Honor.  That's

15  argumentative.

16  A   I was never charged to check on the competency of the

17  staff.

18  BY MR. SHARMAN:

19  Q   All right.  But it is a good thing to go get a cup test and

20  then also have it verified or not by a lab, who you might send

21  it off to; right?

22  A   Yeah, that would be a preferred way to do it for sure.

23  Q   Okay.  So let's turn to page 430, please.

24  A   It's not turning.  There we go.

25  Q   Page 430 --

DAVID GORDON GREENBERG, MD - CROSS BY MR. SHARMAN

```
 1   A   Hang on.

 2   Q   -- is a report --

 3   A   Hang on just a second.  I'm not on 430, but --

 4   Q   Do you see the --

 5   A   Now I see it.  Now I see it.  Okay.  I'm sorry.  Go ahead.

 6   Q   430 is a report from a lab in Georgia called Castle

 7   Medical.  Do you see that?

 8   A   Yes.

 9   Q   Okay.  And take your time to look but I'll try to move

10   along.  I'll represent to you that this is the lab test for the

11   cup UDS we just saw.  You see Ms. H's...... name there and the

12   date collected?

13   A   So this was the confirmatory test?

14   Q   Yes, sir.

15   A   Okay.

16   Q   All right.  So we can go back and look at it if it will be

17   helpful to you, but if I'm reading this right, it shows her

18   prescribed medications and then what is consistent or

19   inconsistent; right?  So what we have is she's on Xanax; right?

20           I realize these are the medical terms.  I'm using the

21   brand names.

22   A   Okay.  Yes.

23   Q   Xanax; right?

24   A   Right.

25   Q   Subsys?
```

926

1  A   I see under prescribed -- I need to fit some more room on

2  the screen because it's cutting off.

3        MR. SHARMAN:  Sam, can you make that section bigger,

4  please?

5        If I give you -- even include, Sam, all the comments,

6  please.  That will be helpful.

7  Q   Okay.  So she's testing positive for Xanax; right?

8  A   Yes.

9  Q   And fentanyl, norfentanyl which would be the Subsys; right?

10  A   Correct.  The fentanyl would be the Subsys and the

11  norfentanyl is the metabolite of the Subsys.

12  Q   Testing positive for the morphine.  That would be the

13  MS Contin she's been prescribed; right?

14  A   Correct.

15  Q   And she is positive for hydromorphone which that can result

16  from MS Contin; right?

17  A   Yeah, hydromorphone would not be the result of MS Contin.

18  It would be more the result of hydrocodone.

19  Q   And that's consistent.  And then she's positive for

20  oxycodone.  And that's inconsistent; right?

21  A   Right.

22  Q   With her prescription?

23        Now, just take a minute to look at what actually

24  happened with Ms. H...... at -- under Dr. Couch's care going

25  back to her visit on February 17th.

```
 1          MR. SHARMAN:  So, Sam, go back to 426, please.
 2          We'll start there.
 3   A   Okay.  I need to point out that there is, I believe, an
 4   error in this lab that I'd like to go over.
 5   Q   Sure.  You can go back.
 6          MR. SHARMAN:  Highlight it again, Sam.
 7   A   And the error that I think I'm seeing is that oxycodone was
 8   something that she was being prescribed.  And that it was --
 9   even though it was being prescribed, the laboratory
10   unfortunately looks like labeled the oxycodone as inconsistent,
11   whereas if she was being prescribed that, that would have been
12   consistent.
13   Q   I was going to get to that.  Do you know when she was in
14   fact prescribed oxycodone?
15   A   No, I don't know exactly when she was prescribed oxycodone
16   from looking at this.  I would have to go back and --
17   Q   Okay.  So let's try to figure that out.
18          MR. SHARMAN:  All right.  Sam, go back to her visit on
19   February 17th, please, which is -- starts at 426.
20   Q   All right.  So when she shows up that day -- when she shows
21   up that day if you look on 427, we'll get a list of her
22   medications on 427.
23          That's what she has when she shows up; right?
24   A   Can you -- well, what I see is Ambien sleeping pills,
25   Bentyl, which is a GI drug, Lexapro, which is a psychiatric
```

928

1    drug, Lopressor, which is a blood pressure drug, Norvasc, which

2    is another blood pressure drug, and then Subsys Sublingual

3    Spray, 800 mics.  So that's what I see on the screen I'm

4    looking at.

5    Q    And there's Synthroid and Xanax; right, also?

6    A    Yes, Synthroid and Xanax.

7    Q    Okay.  Then if you look at the bottom of 428 and going on

8    to 429, we'll see that on that day that date's prescriptions

9    were Subsys, MS Contin and Roxicodone; right?

10   A    If you can make it a little bigger for me for this one.

11        Okay.  So on 2/17.

12   Q    Yes, sir.

13   A    Right.

14   Q    Those are the new prescriptions you got, those three right

15   there.

16   A    Okay.

17   Q    Right?

18   A    Yeah.  That looks likes Roxicodone, MS Contin, and that's

19   about it.  One question -- one question I have if possible,

20   what is a dummy screen?  I don't know what a dummy screen

21   means.  I see this continuously through the records of PPSA and

22   I do not know what a dummy screen is.

23   Q    We'll get to that in a minute.

24   A    Okay.

25   Q    When this examination is over.

DAVID GORDON GREENBERG, MD - CROSS BY MR. SHARMAN

929

1    A    All right.

2    Q    All right.  So if we look to her previous visit on December

3    19th, 2013 -- that's 426.

4         MR. SHARMAN:  I'm sorry.  I apologize, Sam.  That's

5    414.  That's her December visit 2013, 414.

6         MS. GRIFFIN:  Counsel, what's your page number?

7         MR. SHARMAN:  414.  It's going to run 414 through

8    417.  This is the December 2013 visit, so it's just before.

9    Q    Okay.  So under planned medication in the previous visit,

10   we see MS Contin and Subsys, we see those two.  And what we

11   don't see is Roxicodone or oxycodone.  We just see MS Contin or

12   Subsys.

13   A    Yeah, I don't see -- MS Contin or oxycodone.

14   Q    So having looked at all that, wasn't -- isn't it more

15   likely that the reason Ms. H...... was negative for oxycodone

16   on February 17th was that, as you just saw, she didn't get it

17   until that day; right?

18   A    Yeah, that could be a reason for that and that's why it's

19   important for a person who's sending the screen off to put the

20   exact drugs that that person is on at that time.  And then they

21   wouldn't have this confusing result.

22   Q    So that drug screen actually wasn't inconsistent.  All

23   those were perfectly consistent.  She didn't get the Roxicodone

24   until the 17th of February; right?

25   A    Yeah.  Had the lab slip been properly filled out and the

1    lab itself done their diligence, we wouldn't have had the

2    illicit show up on this particular urine screen.

3    Q    But there is no inconsistent drug screen to criticize

4    Dr. Couch for; right?  Because they weren't inconsistent?

5    A    It appears -- it appears that due to the timing of the dose

6    on that day, and I didn't have date time groups on the papers

7    that -- records that I read, that this could have slipped by.

8    Q    I'm sorry.

9    A    I said that it appears that due to the timing of the

10   patient getting the prescription, that that is a situation in

11   which someone just got some extra medication and that it went

12   through without being noted by the lab, that this was one of

13   the drugs that the patient was being prescribed.

14   Q    But do you agree with me now or disagree with me that the

15   UDS results were not inconsistent with her prescription

16   regimen?  There's nothing inconsistent about it?

17   A    Right.  And I think that's due to the timing, the timing of

18   getting the new prescription that day.

19   Q    And I won't make you go through all of them.  But the only

20   urine drug test at least that I saw in Ms. H's...... file that

21   was inconsistent was the very first one where she tested

22   positive for benzo.  Do you remember that?  On her very first

23   visit she tested positive for benzos?

24   A    I remember she did test positive for benzos, yes.

25   Q    But when she got to Dr. Couch she was already on Xanax;

1   right?

2   A   She was.

3   Q   And Xanax is a benzo; right?

4   A   It is a benzo.  And a full-service lab should have been

5   able to identify it exactly as the type of benzo it was.

6   Q   But that would explain why she was -- why she was positive

7   for benzos because she was supposed to be because she was

8   coming with a medication that was a benzo; right?  That's not

9   an inconsistency?

10  A   No, it's not an inconsistency.  It is probably failure to

11  note when they sent off this urine sample for confirmation to

12  the state-of-the-art testing of that urine that somebody may

13  have not accurately recorded all the drugs that she was on

14  prior to the urine test being done.

15  Q   Okay.  So are you still saying that these are inconsistent

16  tests or not?  I just want to be clear.

17  A   I would say the tests that we're talking about right now

18  are the type of errors that can be made when someone's

19  medications are changing and it doesn't necessarily -- it

20  hasn't been necessarily followed up by telling the lab the

21  absolute latest prescriptions that were done on that particular

22  day.  And that's -- that is a problem, sometimes it happens

23  with urine testing and getting results back that indicate that

24  there may have been an unexpected result.  And that would not

25  be something that the physician was attempting to do through

1   any kind of surreptitious or inappropriate manner.

2   Q   All right.  I'm going to turn to Patient Matthew Sansing,

3   because you had some criticisms about Patient Sansing.

4           May I approach, Your Honor, to give the witness the

5   Sansing file?

6           THE COURT:  Yes.

7   BY MR. SHARMAN:

8   Q   I'm going to hand you, Dr. Greenberg, what's been marked

9   and admitted into evidence as Government's Exhibit 13-13, which

10  is Matthew Sansing's patient file.

11          Do you remember talking with Ms. Griffin about

12  Mr. Sansing; right?

13  A   Talking with her?

14  Q   Do you remember testifying on direct --

15  A   Yes.

16  Q   -- about Mr. Sansing; right?

17  A   Yes.

18  Q   Now, you have a criticism, I think, that Mr. Sansing had a

19  prescription for Marinol; is that right?

20  A   Yeah.  And it wasn't so much of a criticism as I just

21  couldn't tell where it came from.

22  Q   Well, did you look at the file?

23  A   Yeah, I did look at the file and when I looked at the file,

24  I, in honesty, couldn't figure out where it came from.  That

25  may have been my mistake but I just had trouble finding out who

Case 1:15-cr-00088-CG-B  Document 775-5  Filed 05/31/18  Page 98 of 227  PageID #:
27118
DAVID GORDON GREENBERG, MD - CROSS BY MR. SHARMAN

933

 1  was the person in charge of prescribing that particular patient

 2  Marinol.

 3  Q   Okay.  If you could look at page 696 to 698, please, in

 4  Mr. Sansing's file.  And if you look through that you'll see

 5  who prescribed the Marinol for Mr. Sansing.  It was Dr. McNair,

 6  wasn't it?  Dr. Alfred McNair?

 7  A   It looks like -- it looks like McNair, yes.

 8  Q   Did you not see that when you reviewed the file?

 9  A   I don't believe that I saw that when I reviewed the file.

10  Q   All right.  And are you saying there's something wrong

11  about Mr. Sansing getting the Marinol?

12  A   No.  I just couldn't figure out where it came from.

13          MS. GRIFFIN:  Your Honor, he's showing alprazolam.  I

14  object.  That's not Marinol.

15  BY MR. SHARMAN:

16  Q   If you'll look, please, sir, at the very bottom of that

17  page, just below where you have made your little green mark.

18  I'm going to mispronounce, I'm sure, dronabinol.  That's one of

19  the brand names or generic names for Marinol; right?

20  A   Yes, it is.

21  Q   Okay.  And Dr. McNair prescribed that?

22  A   Yeah, it appears Dr. McNair did prescribe that.

23          Also, I have no indications for why he prescribed it.

24  Q   And I believe you also criticized me -- criticized me --

25  criticized Dr. Couch for providing Mr. Sansing Subsys --

1   prescribing him Subsys.  Am I remembering that correctly?

2   A   For Subsys?

3   Q   Yes, sir.

4   A   Yeah.  I believe that I did criticize that.

5   Q   All right.  And on direct, you testified frequently that

6   Subsys was to be used only for cancer patients with

7   breakthrough pain at end of life.  Do you remember saying that

8   several times?

9   A   Yeah, I believe that's the FDA indication for that drug.

10  Q   Okay.  But actually the FDA doesn't say anything about end

11  of life, does it?

12  A   I believe they use the term terminal cancer pain or

13  something like that.

14  Q   Are you sure?

15  A   I believe so.  Yeah.  Yeah.

16          MR. SHARMAN:  Your Honor, may I take Government

17  Exhibit 9-10, which has already been admitted into evidence,

18  back to the ELMO?

19          THE COURT:  Sure.

20  BY MR. SHARMAN:

21  Q   And I'm going to -- this is already in evidence and I would

22  like it to be published to the jury.  And Dr. Greenberg, you

23  and Ms. Griffin yesterday discussed Exhibit 9-10, which is part

24  of that big purple Subsys box that's been admitted into

25  evidence.  Okay?

1    A    Okay.

2    Q    Do you remember that?

3    A    I remember that, yeah.

4          MR. SHARMAN:  Can you switch that over?

5          THE CLERK:  I'm sorry.

6    BY MR. SHARMAN:

7    Q    All right.  So this is from the insert out of the Subsys

8    box that's in evidence.  Right?

9    A    Yes.

10   Q    Okay.  And it says that Subsys is an opioid agonist.

11   What's an agonist?

12   A    Means it has opioid activity.

13   Q    The insert for Subsys says:  Subsys is an opioid agonist

14   indicated for the management of breakthrough pain in cancer

15   patients 18 years of age or older who are already receiving and

16   who are tolerant to opioid therapy for their underlying

17   persistent cancer pain.  Patients must remain on

18   around-the-clock opioids when taking Subsys.  It says

19   Limitations of Use:  Subsys can be dispensed only to patients

20   enrolled in the TIRF REMS access program.

21          Let's break that down if we can.  So when it says:

22   Subsys is an opioid agonist indicated.  We talked about that

23   just a few minutes ago, did we not, in our discussion of

24   off-label use, the FDA can approve a medication for a specific

25   use.  And another term for that is indicated; right?

936

1   A    Yeah, this is -- this patient doesn't fit the criteria.  He

2   is not suffering from breakthrough pain as a cancer patient.

3   Q    Indicated means approved by the FDA for that particular

4   purpose; right?  We talked about that about 45 minutes ago;

5   right?

6   A    Yeah, that's correct.  And this patient does not have

7   cancer pain.  There's no reason why he should be getting an

8   extremely expensive fentanyl preparation for the treatment of

9   breakthrough pain in cancer when he doesn't have cancer.  The

10  Subsys is an extremely expensive drug, and it's really just

11  fentanyl that comes with a little sprayer on it.  And that --

12  that doesn't -- when I read this, I don't get any inclination

13  at all to think that Mr. Sansing had cancer.  And if he does I

14  wish the -- I wish that you would enlighten me as to the type

15  of cancer he was suffering from.

16  Q    Indicated means approved by the FBI -- FDA for that

17  particular purpose; right?

18  A    It means -- indication means that Subsys is an opioid

19  agonist indicated for the management of breakthrough pain in

20  cancer patients 18 years of age or older.  Please tell me what

21  kind of cancer Mr. Sansing was suffering from because I have no

22  idea.

23  Q    Another requirement is that they should be tolerant of

24  opioid therapy; right?  That's what it says?

25  A    Yes, uh-huh.

1  Q   And that the patient should be somebody who's already on

2  around-the-clock opioids; right?

3  A   Yeah, that doesn't make the drug safe.  But it does make it

4  a little safer if they are on the around-the-clock opioids.

5  Q   But one thing the FDA does not say is anything about end of

6  life; right?

7  A   Well, breakthrough pain in cancer patients is almost always

8  involved in end of life.

9       THE COURT:  Mr. Sharman, how much longer do you intend

10  to be with this witness?

11       MR. SHARMAN:  Considerable.

12       THE COURT:  All right.  Ladies and gentlemen, we're

13  going to break for lunch.  Leave your pads on your chairs.  No

14  discussion about the case over the lunch break.  I have another

15  matter to take up so we'll have you back downstairs in the jury

16  assembly room at 1:30 ready to be called back up.

17       We're in recess.

18   (A recess was taken at 11:58 a.m.)

19   (Afternoon session, 1:30 p.m., in open court, defendants

20  and jury present.)

21       THE COURT:  All right, Mr. Sharman.  Get the witness

22  back on the stand.

23       While we're waiting for the witness I just want to

24  remind you we won't be here Monday.  It's a federal

25  holiday.  So enjoy your three days while you've got it.

```
 1            THE COURT:  All right, Mr. Sharman.

 2            MR. SHARMAN:  Thank you, Your Honor.

 3   BY MR. SHARMAN:

 4   Q    Good afternoon, Dr. Greenberg.

 5   A    Afternoon.

 6   Q    Do you remember testifying on direct about Patient

 7   AP.........?

 8   A    No, I don't believe I did testify on AP......... on direct.

 9   Q    Okay.  We move then to Patient TS..........., do you

10   remember testifying, talking a little bit about Patient

11   S......?

12   A    I don't -- I don't think I gave any testimony on Patient

13   S...... during --

14   Q    Did you review either of those files in preparation for

15   your testimony?

16   A    I did not review AP.........

17   Q    At all?

18   A    I don't believe so, no.

19   Q    What about Mr. S......?  Did you review Mr. S......?

20   A    Yes, I do believe I read Mr. S.......

21   Q    Before we broke, Dr. Greenberg, you mentioned that you were

22   the inventor and applicant for a patent of a device.  Do you

23   remember that?

24   A    Yes.

25   Q    And was that -- has that patent been granted?
```

939

1  A  Yes.  It's a full utility patent, been granted by the U.S.

2  patent office.

3        MR. SHARMAN:  May I approach, Your Honor?

4        THE COURT:  Yes.

5  Q  I'm going to hand you what's been marked as Couch Exhibit

6  142 and ask you to take a look at it, please.  Do you recognize

7  Exhibit 142?

8  A  Yes, I do.

9  Q  Okay.  And what is it, please?

10  A  It is a medical dispensing safety system that my

11  co-inventor Doug Melby and myself invented.  And the purpose of

12  it is to make patient home dispensing more accountable and

13  safer.

14  Q  All right.  And this is the patent that you testified about

15  earlier?

16  A  I have other patents too.

17  Q  But it's one of the patents you testified about earlier?

18  A  Yeah.  The -- I believe the only patent I mentioned in this

19  courtroom was this patent.

20  Q  And this is your application for it; right?  Take a look

21  through it if you're not certain.

22  A  Yeah, this is the application.

23        MS. GRIFFIN:  Excuse me.  I object to the

24  relevance.  There's no showing that this was used any time

25  during the charged time period.

DAVID GORDON GREENBERG, MD - CROSS BY MR. SHARMAN

```
1              MR. SHARMAN:  Your Honor, it goes to credibility.  He
2   testified --
3              THE COURT:  Come to side bar.
4         (At the side bar, jury not present.)
5              MR. SHARMAN:  Your Honor, in response to my questions
6   he bolstered his credibility as a pain management expert by,
7   among other things, saying that he had patented or he had
8   invented devices and patented devices, specifically this one in
9   the pain management area.  So I'm entitled to inquire about it,
10  if that's what he's saying.  This is one reason he is to be
11  believed as a pain management expert.
12             MS. GRIFFIN:  But, Your Honor, the application and the
13  paperwork from the patent office means -- has no relevance to
14  this trial.
15             MR. SHARMAN:  It is his application and it is his
16  description explaining why it's such a great thing.
17             THE COURT:  I think it's basically a rabbit trail.
18  I'll let you go into it some.
19             MR. SHARMAN:  It will be brief.
20             THE COURT:  It's certainly a collateral issue.
21             MR. SHARMAN:  It will be brief.
22        (In open court, defendants and jury present.)
23             MR. SHARMAN:  Dr. Couch moves 142 into evidence.
24             MS. GRIFFIN:  Your Honor, we object to it being
25  admitted; don't know if he asked a question about it.  I don't
```

DAVID GORDON GREENBERG, MD - CROSS BY MR. SHARMAN

```
 1   think it's been shown --
 2           THE COURT:  Yeah.  I sustain the objection to the
 3   admission.  You can use it to question, however.
 4   BY MR. SHARMAN:
 5   Q   All right.  Dr. Greenberg, if you would turn in your paper
 6   copy of 142 to page six.  The pages are paginated at the top in
 7   two columns.
 8   A   Would that be sheet two of six?
 9   Q   It is towards the back -- no, sir, towards the actual
10   narrative in the back, the narrative in the back where it
11   describes your invention.
12           MR. SHARMAN:  May I approach and show the witness?
13           THE COURT:  Sure.
14       (A discussion was held off the record between Mr. Sharman
15   and the witness.)
16   BY MR. SHARMAN:
17   Q   All right.  Dr. Greenberg, what we're looking at, talking
18   about is the narrative description of your position as the
19   inventor of this device as to why it's appropriate and the
20   context in which it arose; right?
21   A   Yeah.  This is -- this is the narrative that explains the
22   patent and the rationale behind it, et cetera.
23   Q   Down there at the bottom of the page you say:  Current drug
24   dispensing problems include -- and then you list a whole bunch
25   of them.  Do you see that down kind of at the bottom of column
```

942

 1    five?

 2    A    Column five, bottom.

 3    Q    Yes, sir, go right to the bottom.

 4    A    Yeah, current drug dispensing problems include --

 5    Q    And then you list quite a few?

 6    A    Right.

 7    Q    All right.  Let me ask you about just a handful of them,

 8    please.  And you number them.  In number four you say that:

 9    Most providers that prescribe pain meds do not check their

10    state's controlled substance prescription databases, again

11    because this is not mandatory.  It takes five more minutes of

12    time and reduces provider income.  Did I read that right?

13    A    Yes.

14    Q    At number five you say:  Most providers who provide

15    controlled substances do not perform random urine or hair drug

16    testing on their patients as this also takes precious time and

17    erodes provider profits.  Did I read that correctly?

18    A    Yes.

19    Q    Skip down to seven, please.  You say:  Most providers --

20    A    Hang on just a second.

21    Q    I'm sorry?

22    A    I'm having trouble seeing seven.

23    Q    You're still on column number six.

24    A    Column number seven?

25    Q    Column number six.

943

1    A    Column number six.  Okay.

2    Q    All right.  Item number seven you say:  Most providers

3    prescribe control pain medicines, do not perform random pill

4    counts on their patients.  Did I read that correctly?

5    A    Yeah, I think that that is very true and I think that

6    that's a major deficiency.

7    Q    And then number eight right after it, you say:  Most

8    providers that prescribe controlled pain medicine do not obtain

9    and properly review old medical records from their patient's

10   previous treating providers because this takes provider and

11   staff time and, therefore, erodes profits.  Did I read that

12   correctly?

13   A    You read it correctly, and that's another shameful problem.

14   Q    And number 10, and lastly, you say:  Most providers that

15   prescribe control pain meds either do not use a written

16   controlled substance treatment contract or agreement.  Did I

17   read that correctly?

18   A    Yeah.  And again, I believe that that is true based upon my

19   experience of many years dealing with this problem.  And again,

20   it's a shameful practice.  But you're absolutely right, it's

21   not against the law to -- not to properly monitor your pain

22   patients.

23   Q    And those items that you described, those are things that

24   in your opinion most prescribers of controlled substances do;

25   right?

```
 1   A   Yeah, I believe that the majority of controlled substance

 2   providers unfortunately do not -- do not protect patient safety

 3   adequately.

 4   Q   And also, Dr. Greenberg, you testified about, on direct,

 5   who could and could not issue prescriptions and conduct

 6   examinations in a pain practice.  Do you remember some of that

 7   discussion you had on direct?

 8   A   Yeah, and that also varies from state to state.

 9   Q   Yes, sir.

10          MR. SHARMAN:  May I approach, Your Honor?

11          THE COURT:  Yes.

12   BY MR. SHARMAN:

13   Q   I show you what's been marked for identification as Couch

14   Exhibit 138, which is a multi-page document styled Alabama

15   Board of Nursing and Alabama Board of Medical Examiners,

16   certified registered nurse practitioner standard protocol and

17   ask you to take a look at that, please, sir.

18          MS. GRIFFIN:  Your Honor, I object to the document.

19   There is no date to show which promulgations or which

20   requirements there are of what year.

21          THE COURT:  Do you have --

22          MR. SHARMAN:  Your Honor, this is a public record of

23   a -- of a public agency.

24          THE COURT:  May I see the exhibit?  Hold on.

25          MR. SHARMAN:  I'm sorry?
```

THE COURT: I need to see a copy of the exhibit. You can ask him if he's familiar with it. I don't think right now it's admissible.

Go ahead. Ask him if he's familiar with it.

BY MR. SHARMAN:

Q Dr. Greenberg, are you familiar with or have you seen any Alabama Board of Medical Examiners, Alabama Board of Nursing Standards for certified registered nurse practitioners, CRNPs?

A No, I have not specifically looked at Alabama CRNPs.

Q So if the rule in Alabama is that CRNPs can conduct physical exams, you don't have a basis to dispute that, do you?

A If CRNPs can perform appropriate physical exams, then that would be within the scope of their practice granted by the -- I guess the nursing board in this state, Alabama, the Alabama state.

Q Dr. Greenberg, you recall that on direct you testified at some length about Patient Patrick Chausse. Do you remember that generally?

A Yes.

Q And you, in response to the government's questions, testified that based upon your review of that file that Mr. Chausse had become addicted in some way or had engaged in some sort of substance abuse; is that right?

A Yeah, I think he made that clear through the -- what I read between him and the interactions between him on what medical

DAVID GORDON GREENBERG, MD - CROSS BY MR. SHARMAN

```
1    record there was and Dr. Couch.  And then also the fact that
2    the patient had a history of being addicted to opiates when he
3    was in the United States Army and almost overdosed, almost had
4    an overdose death previously.
5    Q   And that was going to be my next question.  Based on the
6    records, which is all you reviewed; right?  Because that's all
7    you're testifying about is your record review.  Right?
8    A   Right.
9    Q   Based on the records, isn't it the case that the only
10   addiction or abuse event reflected in the record is when
11   Mr. Chausse by his own admission was either subject to or
12   subjected himself to too many medications and ended up in an
13   ICU while he was in the Army at one event.  That's what's in
14   the record; right?
15   A   Yeah, that's in the record and that's an incredibly
16   powerful piece of information in the record.
17   Q   But there's no other history that you saw in the record of
18   substance abuse, addiction, prior to him arriving; right, other
19   than that event?
20   A   Other than his history in the Army of almost dying of an
21   overdose, no.
22   Q   That's one event; right?
23   A   That's a huge event, though.
24   Q   All right.  And you criticized, if I recall correctly,
25   Dr. Couch for not trying other courses of treatment with
```

947

```
 1   Mr. Chausse; right?
 2   A    Yes.
 3   Q    Now, he was referred to Dr. Couch from the VA, from the
 4   Veterans Administration; right?
 5   A    Yes, I believe that was the referent.
 6   Q    And there he had already been provided with nonsteroidal
 7   analgesics, various other ways to try to control the pain;
 8   right?
 9   A    Yes, and had become opiate-free which was a major stepping
10   stone for him into recovery.
11   Q    And he --
12   A    And tragically -- tragically that was not supported, and he
13   wished not to be given further, you know, further
14   narcotics.  He wanted to be clean.
15   Q    And he had been provided physical therapy at the VA; right?
16   A    He had been provided physical therapy at the VA.
17   Q    And he was prescribed benzos at the VA; right?
18   A    Prescribed medicines from the VA.
19   Q    Yes, sir.
20   A    Yes.
21   Q    And if we would, if we could just turn briefly to
22   Mr. Chausse's file, which is already in evidence.
23            MR. SHARMAN:  Sam, if we could see 207179,
24   please.  207179.
25   Q    And this patient record reflects what, Dr. Greenberg, that
```

1  Mr. Chausse is happy with his pain meds.  Is that the way you
2  read that?
3  A   Yeah.  Could you read for me the date of it because the
4  date I don't see so clearly here.
5  Q   Looks like March 7th of 2013, does that sound right, look
6  right to you?
7  A   Right.
8  Q   So I'm sorry, I may have missed it.  Does that look like
9  what it looks like to me that Mr. Chausse is reported to say
10  that he's happy with his pain meds?
11  A   Yeah.  And one of the things that we see in chronic-pain
12  patients is that if their attending physicians fail to give
13  them encouragement and fail to give them the kind of support
14  they need to stay off of the addicting substances, which of
15  course in this case almost killed this young man, then it is
16  very common that they will go back into their use of and
17  addiction to controlled substances.  And this man was really
18  struggling with those problems.  And he had become clean, he
19  had become drug free.
20         And I didn't see anything in the way of support from
21  Dr. Couch whatsoever as far as telling this guy:  Hey, what you
22  need to do now is just stay away from these drugs that almost
23  killed you.  Okay.  That's the thing that you need right now is
24  just to stay away from the drugs that almost ended your life
25  when you had that near-fatal overdose.

949

```
 1            And that's an important thing for a pain doctor to do
 2   with their patients.  And I don't believe Dr. Couch did that.
 3   Q   Would you look, please --
 4            MR. SHARMAN:  Sam, may we see page 207247?  207247.
 5            And if you could give us the date, Sam, on this one
 6   also, please?
 7   A   Okay.
 8   Q   And that date looks like August 29th, 2013?
 9   A   It's either -- your guess may be as good as mine.  It's
10   August 29th or 28th, '13.
11   Q   And am I correct in reading that, that:  Patient states he
12   has been doing well with the oxymorphone, states it helps with
13   the pain without making him drowsy?
14   A   Yeah, that's kind of an interesting thing because both the
15   patient and his wife were complaining that the pain medicine
16   was making him drowsy.  So that doesn't -- that doesn't
17   fit.  But then again, this was a patient who again should have
18   been encouraged to just stay off narcotics for the rest of his
19   life if at all possible.  And there was no real support as far
20   as getting him to do that, even though he stated at the very
21   beginning of treatment that one of his biggest fears was
22   getting re-addicted to the opioid drugs.
23   Q   Dr. Greenberg, do you recall talking with government
24   lawyers at the very beginning of your direct testimony about
25   the addiction-to-recovery episode?  Do you remember talking
```

950

1  about that with her?

2  A   The addiction-recovery episode, you're talking about my

3  personal --

4  Q   Yes, sir.

5  A   -- or are you talking about Mr. Chausse?

6  Q   I'm sorry.  Yes, sir, your own.  Yes, sir.

7  A   Yes.

8  Q   And do you remember talking about that pretty early in your

9  testimony; right?

10  A   Yes, uh-huh.

11  Q   And you told us about having to intubate the patient;

12  right?

13  A   Right.

14  Q   And intubate means put some kind of air tube or something

15  in a patient's throat?

16  A   Yeah, correct.

17  Q   So they can breathe more readily; right?

18  A   Yes.

19  Q   And you said that the patient had some sort of a seizure or

20  attack and bit a couple of your fingers?

21  A   Correct.

22  Q   And that got infected?

23  A   Yeah, it got infected.  They first thought it was a

24  bacterial infection and then it turned out to be what they call

25  herpetic whitlow, which is like a chickenpox virus that goes

DAVID GORDON GREENBERG, MD - CROSS BY MR. SHARMAN
951

1  into the nerves.

2  Q   And then you were prescribed some medications for that.  I

3  think you said Percodan and Tylenol III; right?

4  A   Not Percodan but close to Percodan.  Oxycodone.  And

5  Percodan is just another brand name for oxycodone back in those

6  times.

7  Q   And then you said that you became concerned that you were

8  becoming dependent on these, you called the surgeon general.

9  A   Called the surgeon general's office.

10 Q   You were concerned that you were becoming dependent, called

11 the surgeon general's office, said you might need some

12 assistance and, in fact, you got some assistance.  Isn't that

13 right?

14 A   Yes.

15 Q   Now, going back a little bit.  After you got bit and you

16 got prescribed the pain medications, that was a prescription by

17 the attending physicians there in your program; right?

18 A   Right.  The department chairman, Dr. Burnell Brown.

19 Q   And then Ms. Griffin in direct alluded to the use of

20 fentanyl at the hospital, University of Arizona where you

21 worked.  Remember she made that allusion to fentanyl?

22 A   Yes, absolutely I remember that.

23 Q   And that fentanyl was used in the ER there; right?

24 A   Yes.

25 Q   And it was used in -- for heart procedures or in the

952

 1   context of heart procedures as well; right?

 2   A   And other general anesthesia work too.

 3   Q   And as a result of those procedures they would produce

 4   surplus or waste fentanyl that was not used in the procedure;

 5   right?

 6   A   It was not used and it was put in the storage area, and it

 7   would be disposed of on a weekly basis.

 8   Q   Right.  And we're talking about -- not talking about

 9   Subsys.  There was no spray fentanyl at that time; right?

10   A   There was no Subsys that I know of at that time no.

11   Q   We're talking about liquid; right?

12   A   Liquid.  That was the only form available then.

13   Q   And the liquid fentanyl was put in a sort of a plastic

14   waste container basically; right?  Then a tech would come along

15   periodically and clean it out?

16   A   Correct.

17   Q   Right?  And there came a time when you started to take that

18   fentanyl and drink it; right?

19   A   Yes, there was a time approximately 40 years ago when I did

20   that when I ran out of the medications that my -- my department

21   chairman had given me and I was on call for another 80 days --

22   pardon me, 80 hours not 80 days -- stretch.  And I felt that I

23   was going into withdrawal.  And that was actually right -- that

24   was just right up to the point where I called the surgeon

25   general's office, shortly after that time, and said to them I

953

1   think I have a problem with this medication that I've been

2   prescribed so that I can work and I think I need help.

3   Q   So you started out, right, by taking the waste liquid

4   fentanyl from the little plastic trash thing and drinking it

5   basically?

6   A   No.  I started out by taking the oxycodone that was

7   prescribed for me by my department chairman, something that

8   would never happen nowadays but certainly did happen back then.

9   Q   So you got prescribed the oxycodone, then you started

10  drinking the liquid fentanyl out of the little plastic waste

11  thing from there; right?

12  A   Correct.

13  Q   Okay.  Then you started taking the liquid fentanyl out of

14  the waste tray but you started shooting it up; right, injecting

15  it?

16  A   No, I didn't -- I didn't hardly inject any fentanyl at all.

17  Q   I'm sorry.  You said you didn't or not very much?

18  A   I had -- I had fentanyl injected into me by a nurse

19  practitioner who was working in the anesthesia unit and she

20  gave me fentanyl when she realized I was on call for 80 hours

21  once and that I wasn't going to make it and she gave me an

22  injection of it.

23  Q   Do you remember testifying in a case in federal court in

24  Arizona called Shield versus Medical Neurology Limited?  Do you

25  remember that?

DAVID GORDON GREENBERG, MD - CROSS BY MR. SHARMAN

954

1   A   Yeah, I remember that case.

2   Q   All right.  And do you remember giving a deposition in that

3   case?

4   A   I do.

5   Q   Did you tell the truth in that case?

6   A   I believe that at that point in time that I may have not

7   mentioned the fact that I did use the fentanyl and have an

8   injection of it.

9   Q   Well, if you said:  I proceeded to start injecting it

10  subcutaneously.  That means under the skin; right?

11  A   Under the skin, right.

12  Q   Then I proceeded to start injecting it subcutaneously

13  sometime right around -- it would have been sometime in June.

14  Was that a true statement when you made that?

15  A   June of what time?  It would have been June about 30 years

16  ago.

17  Q   Was that a true statement when you said:  I proceeded to

18  start injecting it?

19  A   I did have a nurse inject me with fentanyl.

20  Q   All right.  Then you also went to the hospital prescription

21  log, did you not?

22  A   The hospital prescription log?

23  Q   All right.  Didn't there come a time when you went to the

24  prescription logs and started signing out things that didn't

25  make sense on the fentanyl log?

1  A   Uh, not that I remember.

2  Q   So in your deposition in Shield versus Medical Neurology,

3  federal court in Arizona -- I'm sorry, in state court in

4  Arizona, December 2012.  If you said -- if you were asked this

5  question:  What do you mean, you started signing out things

6  that didn't make sense?  And you answered:  I would sign out

7  fentanyl for a case that would normally not need fentanyl.  Was

8  that a true statement?

9  A   I believe that I did that on one occasion, yes.

10  Q   And when you falsify a log for prescription medication --

11  and that's what fentanyl is, is it not, it's a prescription

12  medication?

13  A   Yes.

14  Q   Right?

15  A   Uh-huh (positive response).

16  Q   When you falsify a log for a prescription medication,

17  that's what the DEA calls an example of diversion; right?

18  A   Yeah, that could be an example of that.  Yes.

19  Q   You were diverting fentanyl?

20  A   For a very brief period of time, yes.

21  Q   All right.  Now, you got caught, did you not, in two ways;

22  right?

23  A   Caught in what?

24  Q   You got caught in two different kind of ways; right, about

25  this diverting fentanyl?  You told a nurse, right --

1  A   Uh-huh (positive response).

2  Q   -- you were doing it?  You need to say yes or no for the

3  record.

4       MS. GRIFFIN:  Objection, Your Honor.  He's entitled to

5  explain his answer if it requires further, and we would object

6  to him being --

7       THE COURT:  Well, he said uh-huh.

8       MS. GRIFFIN:  -- by the defense attorney.

9  BY MR. SHARMAN:

10 Q   I need a yes or no?

11 A   Yes.

12 Q   And then that nurse went and told the authorities or told

13 somebody; right?

14 A   I talked with that nurse at length and she talked with me

15 and she convinced me in the right idea, to go ahead and call

16 the surgeon general's office.  Again, this was -- this was 40

17 years ago, sir.

18 Q   And then you also got caught, because a DEA inspector came

19 to the hospital; right?

20 A   The DEA inspectors came to the hospital all the time.

21 Q   And the DEA inspector came through the hospital in the

22 discharge of his or her duty; right?

23 A   Correct.

24 Q   And they discovered the falsifications that you had made on

25 that fentanyl log; right?

1  A   By that point in time, I don't know exactly what they

2  discovered because I had already been transferred to the -- to

3  the Army treatment program in El Paso, Texas 40 years ago.

4  Q   So you don't remember whether or not one of the reasons you

5  got caught was because a DEA inspector in inspecting the

6  fentanyl log at the University of Arizona Hospital, wherever

7  you were working, discovered a discrepancy?  You don't remember

8  that, do you?

9  A   No.  By that time I was already gone from the University of

10  Arizona Hospital and I was in a treatment program at the Army

11  Medical Center, William Beaumont.

12  Q   Now, as a result of that, you didn't get charged with any

13  criminal wrongdoing or anything; right?

14  A   I had a hearing before the medical board and the medical

15  board felt that I did not need to have any serious discipline

16  at that time because of the fact that they felt that me being

17  on for 80 hours at a time was -- was unfair and a dangerous

18  practice.

19  Q   So when you say you went to the medical board, that's the

20  state medical board of Arizona; right?

21  A   Correct.

22  Q   And we discussed that before, medical boards is the board

23  that governs what doctors can and cannot do; right?

24  A   Correct.

25  Q   And they can -- you've got to get your license from them;

958

```
 1   right?

 2   A    Correct.

 3   Q    They can take away your license?

 4   A    Right.  Yes.

 5   Q    They can discipline people in other ways; right?

 6   A    Correct.

 7   Q    They can conduct investigations about what Arizona doctors

 8   do and don't do to determine if they violated, you know,

 9   Arizona laws or Arizona -- or the rules and regulations of the

10   medical board; right?  They can do that?

11   A    Correct.

12   Q    And that's what they were doing when they had this hearing;

13   right; with regard to you?

14   A    Yeah.

15   Q    They were undertaking those considerations, were they not?

16   A    Yes.  They did that and I was put on -- I believe I was put

17   on probation for one year's time.

18   Q    I'm going to show you what's been marked as Couch Exhibit

19   117A, which is a certified copy from the Arizona Medical Board

20   of certain documents enumerated on the cover.

21           MR. SHARMAN:  And we move 117A into evidence.

22           THE COURT:  Any objection?

23           MS. GRIFFIN:  We do, Your Honor.  First of all, it

24   would be asked that he be able to review something that was

25   written in 1981 and then that we be given the opportunity to
```

 1  review it.

 2          THE COURT:  To do what?

 3          MS. GRIFFIN:  To review it.  My apologies.  That we be

 4  given the opportunity to review it before we can tell the Court

 5  if we have an objection.

 6          THE COURT:  All right.

 7          MS. GRIFFIN:  May I inquire?

 8          THE COURT:  Yes.

 9      (A discussion was held off the record between counsel.)

10          MS. GRIFFIN:  Your Honor, we do object to it and we

11  would like to approach at side bar.

12          THE COURT:  All right.

13      (At the side bar, jury not present.)

14          MS. GRIFFIN:  Your Honor, I don't know that this is a

15  public record, but Mr. Sharman says that it is.  It is the

16  proceedings and the findings in connection with that.  He has

17  admitted to it and there is no -- nothing to impeach him on

18  about being admitted.  This says that he received five years'

19  probation, but I don't think anything else in connection with

20  it is relevant because he's admitted every bit of it.

21          MR. SHARMAN:  It is -- it is very relevant, Your

22  Honor.  First the government opened this door for their own

23  purposes.  It wasn't a mistake at the very beginning of the

24  direct.  This is -- this is not about addiction.  This is about

25  credibility, going to what he actually did, which is the

1   board's findings and which goes to theft and fraudulent

2   conduct.  And that has to do with his testimony, not then, or

3   his actions then, but his testimony here now and his veracity

4   and this jury's impression of that veracity.

5           MS. GRIFFIN:  Your Honor, he admitted it on direct, he

6   has admitted it on cross-examination, and this document has

7   nothing to do further with it except to say that he was placed

8   on five years of probation.

9           MR. SHARMAN:  No, ma'am, that's part of the point.  He

10  did not -- even though he was questioned by Ms. Griffin in this

11  very area, he purposefully omitted the significant points of

12  these episodes, including the findings that go to

13  credibility.  It's not addiction.  I've already asked him about

14  that.  It's not addiction.

15          MS. GRIFFIN:  Judge, he's not been asked about the

16  findings on something that happened in 1981, almost 40 years

17  ago.

18          MR. SHARMAN:  And the jury's entitled to make their

19  assessment of his credibility based upon what he said happened

20  and why -- and what he just said.  He just said it was 80

21  hours.  And that has nothing to do with it.  That's not what

22  they said.

23          MS. GRIFFIN:  This is a double-edged sword because

24  there is a similar finding for Dr. Couch when Dr. Couch was

25  fresh out of medical school as to his abuse of the Michael

961

```
 1   Jackson drug.  And I'm assuming that when the opportunity to
 2   admit that certified copy of his discipline for the use of
 3   propofol -- we will find objections they will object if
 4   Dr. Couch testifies, will be the only way that we would attempt
 5   to introduce that.  This is very similar and we object to it.
 6   And we did not intend to bring it up in connection with
 7   Dr. Couch on his findings by the California Medical Board.
 8        THE COURT:  Well, I think that you can certainly use
 9   the portion of the finding that -- the statement that he was
10   placed on five years' probation as opposed to one year of
11   probation.  But the rest of it I don't think contradicts
12   anything he has testified to.  He may have used different
13   language, but in essence it's the same thing he said he did,
14   fentanyl and --
15        MR. SHARMAN:  Your Honor, he just said the board gave
16   him a probation because they thought 80-hour work weeks were
17   unfair.  That is not a truthful statement.  That is not what
18   the board said.
19        THE COURT:  That may not be in the finding, but they
20   may have explained it to him as -- this doesn't prove that that
21   is untrue.  I think you can question him:  Did not the board
22   find X, Y, Z?  But I don't know that this should be admissible
23   because of that.  It doesn't directly contradict what he stated
24   except for the term of his probation.
25        MR. SHARMAN:  Well, I will inquire about it.
```

 1                    THE COURT:  Okay.

 2         (In open court, defendants and jury present.)

 3                    THE COURT:  Dr. Greenberg, do you still have Exhibit

 4    117A before you?

 5    A    Yes, I do.

 6    Q    And was this the event hearing and order before the Arizona

 7    board of medical examiners that you just referenced?

 8    A    Yeah.  I think it has a mistake in it in -- when it has

 9    information about my license being taken away.  My license was

10    never taken away.

11    Q    I can only work with what they gave me, sir.

12    A    No.  I understand that.  I'm just correcting that.

13    Q    And I believe you said that your probationary period is one

14    year but on review of 117A is it more accurate that your

15    probationary period at the outset was five years?

16    A    No, I got one year probation.  There's -- this is a

17    mistake.

18    Q    So a certified record from the Arizona Medical Board is in

19    error?

20    A    It appears to be, yeah, because I was not on probation for

21    five years.

22    Q    So if you will look on page -- well, the second page of the

23    order, where it says:  Therefore, it is ordered that David

24    Gordon Greenberg, MD, be and hereby placed on probation for a

25    period of five years on the following conditions.  That is --

963

1  that is not true?  That is not right?

2  A   No, that's a mistake.

3  Q   And did you not have to go back before the board twice to

4  have that probation lifted?

5  A   I did appear before the board twice at their request.  I

6  was serving in the Army at that period of time and they wanted

7  me to just come back and see them during that one year of

8  probation that I had.  And I did.

9  Q   And you went back at their request and appeared before them

10  twice and then on the third appearance they terminated your

11  probation; right?

12  A   Yes, it would have been on the third time.

13  Q   And since this episode, Dr. Greenberg, you have -- as I

14  think has been discussed before, you have been completely

15  substance free ever since then; right?

16  A   Correct.  This episode was 40 years ago.

17  Q   And when Ms. Griffin was asking you about fentanyl and your

18  addiction problem and your seeking help, you didn't volunteer

19  any of the facts that we have just discussed in the last few

20  minutes, did you?

21  A   I did not.

22  Q   Even though you were testifying under oath, you did not do

23  that, did you?

24  A   I did not.

25  Q   Even though she mentioned fentanyl to you, you didn't do

DAVID GORDON GREENBERG, MD - CROSS BY MR. ARMSTRONG

964

1    it, did you?

2            MS. GRIFFIN:  Objection, Your Honor.  He testified on

3    direct about the fentanyl.  He was not asked about these other

4    matters and it's creating a false impression through counsel's

5    questions.  They will recall his direct testimony.

6    BY MR. SHARMAN:

7    Q   That's true.  Ms. Griffin didn't actually ask you about

8    this, did she?

9    A   I don't think so.

10   Q   And you want the jury to believe that you've been telling

11   the truth here in the last few days, don't you?

12   A   I have been telling the truth.

13           MS. GRIFFIN:  That is argumentative, Your Honor.

14           THE COURT:  Yeah.

15           MR. SHARMAN:  No further questions.

16           THE COURT:  I sustain the objection.

17           MR. SHARMAN:  No further questions, Your Honor.

18           THE COURT:  All right.  Mr. Knizley?  Or

19   Mr. Armstrong?

20           MR. ARMSTRONG:  Judge, I have a few things.  It will

21   take me a moment.

22           THE COURT:  All right.

23                         CROSS EXAMINATION

24   BY MR. ARMSTRONG:

25   Q   Good afternoon, Dr. Greenberg.  My name is Gordon Armstrong

DAVID GORDON GREENBERG, MD - CROSS BY MR. ARMSTRONG

965

1   and I represent Dr. Ruan in this case and I want to ask you

2   some questions.  Mr. Sharman has gone to great length about a

3   great deal of many areas and I assure you I am not going to

4   repeat all of that because I don't think it's necessary.  But

5   also I don't think it needs to be gone over because the jury

6   has heard that.  So I'm going to direct you specifically to

7   just a few items and then to the charts that you talked about

8   that you reviewed of some of Dr. Ruan's patients; okay?

9   A   Okay.

10  Q   First let me start with this.  You had mentioned a few

11  times about referrals that you make and the proper way to make

12  a referral when you make a referral out to a specialist;

13  correct?  Do you remember that testimony?

14  A   Correct.  Yes.

15  Q   And when you make a referral from one of your patients or

16  somebody that is a patient of yours and you're making a

17  referral out to another physician, a specialist, I think you

18  said, you sent people to specialists occasionally, including

19  pain medicine specialists; correct?

20  A   Correct.

21  Q   Do you just send somebody to a specialist whose name is

22  listed in the phone book or do you do -- do you make some type

23  of effort to find out a little bit about that doctor?

24  A   I utilize physicians that I know can do quality work within

25  pain medicine.

1  Q   Okay.  So it's somebody that you trust; right?

2  A   Correct.

3  Q   That you have confidence in; right?

4  A   Yes.

5  Q   That you have faith in?

6  A   Yes.

7  Q   And isn't that the proper way that a lot of physicians make

8  referrals?

9          MS. GRIFFIN:  Objection as to foundation.

10 BY MR. ARMSTRONG:

11 Q   Would you agree with me that that is the proper way

12 physicians should make referrals?

13         MS. GRIFFIN:  Objection, Your Honor, as to foundation.

14         THE COURT:  Sustained.

15 BY MR. ARMSTRONG:

16 Q   You agree with me that is the proper way to make a

17 referral; right?

18 A   The best way to make a referral is to use a physician that

19 you know and --

20 Q   Trust?

21 A   -- who you respect.

22 Q   Now, when you make referrals, do you refer to somebody out

23 of state or several states over or do you make referrals in

24 your local community?

25         MS. GRIFFIN:  Objection as to relevance, Your Honor.

1          THE COURT:  Sustained.

2    BY MR. ARMSTRONG:

3    Q   You mentioned being members of national organizations,

4    specialty-type organizations.  I think you said you're a member

5    of the American Society of Pain --

6    A   American Academy of Pain Medicine and the American Pain

7    Society.

8    Q   Okay.  And do you -- and you get -- as a member of that

9    organization you get a journal periodically?

10   A   Yes, they have journals for both of those.

11   Q   Okay.  And in those journals are usually peer-reviewed

12   articles and publications, things like that?

13   A   Yes, usually.  Yes.

14   Q   And the purpose of that is to keep the members and the

15   specialists within that field up to date in current trends?

16   A   Correct.

17   Q   Developments, research?

18   A   Correct.

19   Q   And the articles that are in there, usually the research

20   papers specifically, the research papers are peer reviewed;

21   right?

22   A   Correct.

23   Q   Explain to the jury what peer review means.

24          MS. GRIFFIN:  Your Honor, we object to the relevance.

25          THE COURT:  Sustained.

 1   BY MR. ARMSTRONG:

 2   Q   You mentioned to the jury on direct that you had an article

 3   that you submitted and it was peer reviewed and was published;

 4   correct?

 5   A   It was reviewed by the -- the State Federation of Medical

 6   Boards and it was chosen as the article of the year for -- for

 7   their yearly award for writing.

 8   Q   Okay.  And these kind of articles are important, are they

 9   not?

10           MS. GRIFFIN:  Objection, Your Honor --

11   BY MR. ARMSTRONG:

12   Q   Is this one of the publications?

13           MS. GRIFFIN:  -- as to the relevance.

14           THE COURT:  Yes.  Can you approach?

15        (At the side bar, jury not present.)

16           THE COURT:  Okay.  Where are you going with this?

17           MR. ARMSTRONG:  Judge, what I'm doing is he has

18   specifically talked about his own publication, and then

19   throughout the rest of his testimony he's talked about how

20   legitimate pain specialists are members of organizations and

21   that they get these journals and magazines, that's how they

22   stay abreast of things, that's how they stay on top of things.

23   He mentioned it in his testimony.  I'm not bringing it up.

24           THE COURT:  Okay.  So where are you going with this?

25           MR. ARMSTRONG:  Oh, I'm going to ask him questions

```
 1    about certain periodicals and whether he reviews them or not.
 2            THE COURT:  And what's in these periodicals that you
 3    are going to be asking?
 4            MR. ARMSTRONG:  Well, not specifically this one, but
 5    I'm going to get him to identify one and it's -- I probably
 6    should have just brought it with me to show you, but there is a
 7    recent table of opioid prescriptions that talks about the
 8    different specialties and who prescribes opioids the most.
 9            THE COURT:  Well, unless you can show that his
10    opinions that he has testified to here in court relied on that
11    particular publication, that particular article, there's no
12    relevance to it.  So -- unless you can show with that
13    particular article it was relied upon by him in giving his
14    opinions in this case, then I don't see --
15            MR. KNIZLEY:  If he accepts it as a learned treatise.
16            MR. ARMSTRONG:  Right.
17            THE COURT:  What?
18            MR. KNIZLEY:  If he accepts it as a learned treatise
19    publication, one he recognizes as a learned treatise.
20            THE COURT:  No, we're not going there.  You can -- you
21    could introduce thousands of learned treatises.
22            MR. KNIZLEY:  Yes, ma'am.
23            THE COURT:  If his opinion is not based on it, it's
24    irrelevant to this.
25            MR. ARMSTRONG:  That's fine.  I'll move on.
```

```
 1          (In open court, defendants and jury present.)
 2          THE COURT:  Okay.  Does -- Mr. Armstrong, we're having
 3   problems with the system picking up the ELMO right now, the
 4   presenter.  So if you were --
 5          MR. ARMSTRONG:  I am only going to use the ELMO.  I'm
 6   not going to use any other system.  But I do have some
 7   questions I can ask while we're waiting on it.
 8          THE COURT:  All right.
 9   BY MR. ARMSTRONG:
10   Q   Dr. Greenberg, I think we were talking about your
11   membership in certain organizations.  In forming your opinion
12   you obviously rely on your training, your knowledge, your
13   experience, but do you not also rely on information you've
14   learned over the years by reading such periodicals and research
15   papers, things like that, to stay on top of current trends?
16   A   Yes.
17   Q   So you do review them regularly to help you stay abreast of
18   the medical field of pain medicine; correct?
19   A   Yes.
20   Q   Okay.  And so your reading of publications in the past,
21   over time, over your career, help you to develop the opinions
22   you arrived at in this court, in this case?
23   A   Yes.
24   Q   Correct?  Okay.
25          And if I showed you some periodicals, could you tell
```

DAVID GORDON GREENBERG, MD - CROSS BY MR. ARMSTRONG

```
 1   me if you recognize them?  Okay?
 2          THE COURT:  You're going to have to come up here
 3   because I'm not sure that it's working.
 4          MR. ARMSTRONG:  Oh, it's not working yet?
 5          THE COURT:  Yeah.
 6          MR. ARMSTRONG:  Judge, I'll show you --
 7          MS. GRIFFIN:  Excuse me.  I want to see the date.
 8      (A discussion was held off the record between counsel.)
 9   BY MR. ARMSTRONG:
10   Q   I'll show you what I've had marked as Ruan Exhibit Number
11   64.  And tell me if you have ever seen a publication like that?
12   A   I've seen this publication.  I prescribe -- I subscribe to
13   the American Academy of Pain Medicine Journal which is
14   different than this one but this is -- this is a good journal.
15   Q   It's a similar journal?
16   A   Uh-huh (positive response).
17   Q   And it's -- you would consider that a valuable resource for
18   physicians in the field of pain medicine?
19          MS. GRIFFIN:  Your Honor.
20   A   Yes.
21          MS. GRIFFIN:  I object to the relevance.  He said he
22   hadn't seen it.
23          MR. ARMSTRONG:  He said he --
24          THE COURT:  He said he subscribed to a different one.
25          MS. GRIFFIN:  Subscribed to a different one.
```

 1              THE WITNESS:  Right.

 2    BY MR. ARMSTRONG:

 3    Q    But this is a good publication; correct?

 4    A    It's a good publication for interventional physicians,

 5    physicians that put needles into people and things like that.

 6    Q    Right.  Do you understand Dr. Ruan is an interventional

 7    pain specialist?

 8    A    Yes, I do.

 9    Q    If this publication -- I want to ask you if you agree with

10    something.  If this publication says that 94 percent of all

11    patients were on long-term opioids prior to presenting to

12    interventional pain management, would you agree with that?

13              MS. GRIFFIN:  Your Honor, I ask for some foundation;

14    what year, who wrote the article.  I mean, it's not -- there

15    are multiple articles within that --

16              THE COURT:  He's just asking if he agrees with his

17    statement.

18    BY MR. ARMSTRONG:

19    Q    Would you agree with that?  Do you want me to repeat it?

20    A    Please do.

21    Q    Again, this is a --

22              THE COURT:  You don't need to be referring to what

23    it's from.  You're just asking him if he agrees with a

24    statement.

25    Q    Would you agree with this?  The results of this evaluation

1    indicate that 94 percent of patients were on long-term opioids

2    prior to -- prior to presenting to interventional pain

3    management.  Do you agree with that?

4    A   All right.  Not in all cases, no.

5    Q   Are you familiar -- well, are we working here?

6    A   It should be working.

7           THE COURT:  Yes, it's working now.

8           MR. ARMSTRONG:  I guess it's just for the witness.

9    Q   I'll show you what I've had marked as Ruan Exhibit 65.  And

10   see if you are familiar with or if you recognize this.  Are you

11   familiar with that publication?

12   A   JAMA?

13   Q   Yes.

14   A   Yes, I am.

15       You are?  Do you subscribe to this publication?

16   A   When I did belong to the American Medical Association I did

17   subscribe to it.  I no longer do.

18   Q   Do you consider this a valuable resource for physicians?

19   A   Yeah, I think it's a valuable resource for physicians.

20   Q   Do you consider it a learned treatise?

21   A   Pardon me?

22   Q   Do you consider it a learned treatise for physicians?

23          MS. GRIFFIN:  Your Honor, we object to whether he

24   considers it a learned treatise.

25          THE COURT:  I sustain the objection.

```
 1  BY MR. ARMSTRONG:

 2  Q   But this, as in a lot of specialty organizational

 3  publications, this also has research papers and peer-reviewed

 4  articles; correct?

 5  A   Correct.

 6          MS. GRIFFIN:  Object to the relevance, Your Honor.

 7          THE COURT:  Sustained.

 8  BY MR. ARMSTRONG:

 9  Q   Would you agree, sir, that of all specialties that were

10  claiming Medicare reimbursement for Schedule II opioids, that

11  the leading prescriber of opioids was family practice

12  physicians?

13  A   Yes, I believe that that is true.

14  Q   That's true?  Second would be internal medicine?

15  A   Probably.

16  Q   Nurse practitioners would be third?

17          MS. GRIFFIN:  Your Honor, we object to the relevance.

18          THE COURT:  I sustain.  Let's move on,

19  Mr. Armstrong.  This has nothing to do with his testimony.

20  BY MR. ARMSTRONG:

21  Q   Let me ask you about some of these charts.  I want to ask

22  you first about Mr. Bosarge, which is the 13-2.  Let me give

23  that to you.

24          Do you have that one?  Do you have Bosarge?

25          Oh, you've got it.
```

DAVID GORDON GREENBERG, MD - CROSS BY MR. ARMSTRONG

1                Thank you.

2    Q    You said on direct that you reviewed this chart?

3    A    Yes.

4    Q    And you talked to the jury about this being a high-risk

5    patient, and I believe Ms. Griffin asked you if he was there

6    for -- secondary to gout and had some knee pain.  Do you

7    remember that?

8    A    Yeah, he was receiving treatment for gout and gout was

9    causing him some pain.

10   Q    Did you review all the records for Mr. Bosarge?

11   A    I believe that I did, yes.

12   Q    Would that mean you reviewed the records that were supplied

13   to you; correct?

14   A    Correct, the records that were supplied to me.

15   Q    Were you made aware that Mr. Bosarge had, prior to seeing

16   Dr. Ruan, had had colon cancer?

17   A    Yes, uh-huh.  That was in his chart.

18   Q    Okay.  And he had had a resection of his colon; correct?

19   A    Correct.

20   Q    Were you aware that he had had 11 right -- 11 surgeries to

21   his right knee?

22   A    I knew that he had surgeries to his right knee but I didn't

23   know it was 11.

24   Q    Did you know one of them was a knee replacement as well?

25   A    I believe one was, yes.

1  Q   Were you aware that four months prior to going to see

2  Dr. Ruan he had had surgery on his left knee?

3  A   I don't know if I remember that, no.

4  Q   You didn't see that in the record?

5  A   I may have seen it but I don't remember the left knee

6  surgery versus the right knee surgeries.

7  Q   Now, I think you said that he -- well, maybe you didn't --

8  he was referred to Dr. Ruan to control his pain; correct?

9  A   Correct.

10 Q   And I think you said you never made any effort to contact

11 any of the referring physicians; correct?

12 A   Yeah, I don't -- I did not contact any of the referring

13 physicians.

14 Q   Does the record reflect who the referring physician is?

15 A   There are a lot of different referring surgeons.  Was it

16 Kirby?

17 Q   No, that was another one of his doctors.

18         THE COURT:  Can you --

19 A   No, I don't remember the names of the referring --

20         THE COURT:  Can you refer him to the page?

21         MR. ARMSTRONG:  I will.

22 Q   Wasn't it Dr. Regina Benjamin?

23 A   One was Dr. Regina Benjamin.

24 Q   Do you know who Dr. Regina Benjamin is?

25 A   No.

DAVID GORDON GREENBERG, MD - CROSS BY MR. ARMSTRONG                977

```
 1   Q   Do you know whether Dr. Ruan and Dr. Regina Benjamin
 2   discussed this patient?
 3   A   No, I don't know that.
 4   Q   Okay.  Do you know that Dr. Regina Benjamin is a local
 5   physician?  Do you know that?
 6   A   I do now.
 7   Q   Because I told you or it's in the record?
 8   A   Because you told me.
 9   Q   Okay.  Do you know that Dr. Regina Benjamin was also the
10   surgeon general for the United States of America?
11   A   I do know that.
12   Q   And she was treating this patient and she felt, I think as
13   we've already discussed, that she had treated him to the point
14   where she couldn't do -- do no more for him and so she referred
15   this patient to a pain management specialist; correct?
16   A   Correct.
17   Q   Just like you said in your practice you refer people out to
18   pain management specialists as well?
19   A   Correct.
20   Q   Now, you mentioned that this was a high-risk patient
21   because of his hypertension and possible cardiac issues and
22   also psyche -- psychological issues possible; correct?
23   A   Correct.
24   Q   Now, Dr. Benjamin -- don't the records reflect that
25   Dr. Benjamin had put him on a regimen of medicines to control
```

1  his hypertension, isn't that right?

2  A   Correct.

3  Q   And those medicines included, and his pain, Ultram,

4  oxycodone, Lortab, and Stadol.  And that's what we talked about

5  earlier, you said that butorphanol, right, that's the Stadol?

6  A   Yes, that's butorphanol.

7  Q   Okay.  And that's the one you said shouldn't be

8  administered with an opioid because you then have an agonist

9  and antagonist; correct?

10  A   Correct.

11  Q   You said that was dangerous.  You thought it was dangerous?

12  A   Yeah, and the package insert states that it's dangerous

13  too.

14  Q   Okay.  Well, that's the package insert and we know that you

15  can prescribe off-label, that's okay; right?

16  A   Doctors can prescribe off-label.

17  Q   And Dr. Benjamin put him on that regimen; right?

18  A   It's true.  And Dr. Benjamin didn't detox him off of his

19  narcotic prior to putting him on the Stadol.

20  Q   You said she did not?

21  A   She did not detoxify him off of his narcotic medicine.

22  Q   So now you're being critical of the surgeon general of the

23  United States?

24         MS. GRIFFIN:  Objection, Your Honor, that is

25  argumentative.

```
1              THE COURT:  Sustained.

2    BY MR. ARMSTRONG:

3    Q   Is that a failure on her part?

4    A   Pardon me now?

5              MS. GRIFFIN:  Objection, Your Honor.

6              THE COURT:  Sustained.

7    BY MR. ARMSTRONG:

8    Q   Are you testifying that that's a failure on her part?

9              THE COURT:  Mr. Armstrong, that is not a subject for

10   this trial.

11   BY MR. ARMSTRONG:

12   Q   Now, you criticized Dr. Ruan because you say that he didn't

13   do enough examination of the patients, didn't get medical

14   records, didn't talk to the referring physician and basically

15   discarded all these other responsibilities of a treating

16   physician.

17   A   Correct.

18   Q   Do you remember that?

19   A   I remember that, yeah.

20   Q   Okay.  Did you review the file and see a lot of the

21   diagnostic tests that Dr. Ruan ran on John or performed on John

22   Bosarge?

23   A   Yeah, I believe he did do some diagnostic testing, the

24   nerve conduction testing, I believe.

25   Q   Right.  And those are proper tests; right?
```

DAVID GORDON GREENBERG, MD - CROSS BY MR. ARMSTRONG

1  Nerve-conducting tests?  Right?

2  A   Sure, they can be appropriate.  Absolutely.

3  Q   When you're trying to focus or isolate on where pain might

4  be generating or where it might not be generating from?

5  A   Sure.

6  Q   Okay.  And he did that; right?

7  A   He did do that.

8  Q   Okay.  He did a lower extremity nerve conduction on August

9  24th of 2009; right?

10  A   I believe that was the date, yes.

11  Q   Upper extremity nerve conduction on August 25th, had him

12  come back the next day; right?

13          MS. GRIFFIN:  Your Honor, we object.  It's outside the

14  time frame charged in the indictment, 2009.

15          THE COURT:  Well, he reviewed the entire file, so --

16  but it's really going outside relevance in this case.

17          MR. ARMSTRONG:  Well, Judge, do you want me to tell

18  you the relevance?

19          THE COURT:  Come to side bar, if you want to pursue

20  this.

21      (At the side bar, jury not present.)

22          MR. ARMSTRONG:  He testifies about his failures to do

23  all these examinations and all these testings and these things

24  started when he first became a patient, which was prior to

25  2011.  So you can't just pick up at 2011 and act like my

1  client's knowledge of everything that happened prior to 2011
2  didn't occur.
3      THE COURT:  I don't recall him testifying about this
4  particular patient, that he failed to do any testing.  You're
5  taking some -- from my recollection of it, you're taking what
6  he testified about other patients and applying it to this file.
7      MR. ARMSTRONG:  Well, what he would do, Judge,
8  throughout his testimony, he would say these are common
9  problems I found throughout all the patients.
10      THE COURT:  I know, but --
11      MR. ARMSTRONG:  Well, I have to address it.
12      THE COURT:  I'm not sure that is something that he
13  said was a common problem throughout all.  You need to limit
14  your cross-examination on the individual patient files to what
15  he testified about those individual patients.  He's testified
16  to the common problems of a lot of different patients, but you
17  need to keep it to the relevant testimony.
18      MR. ARMSTRONG:  All right, I will.  I will.
19      (In open court, defendants and jury present.)
20  BY MR. ARMSTRONG:
21  Q   Dr. Greenberg, he also did a lumbar MRI on February 8th,
22  2012?
23  A   Yes.
24  Q   And what is the -- tell the jury what the purpose of a
25  lumbar MRI is.

DAVID GORDON GREENBERG, MD - CROSS BY MR. ARMSTRONG

1    A    It's to look for any defects in the lumbar spine.

2    Q    It's trying to find out where the problems are, where the

3    pain may be generating from; correct?

4    A    It's one of the things you can do, yes.

5    Q    It's a diagnostic test that physicians use to try to

6    diagnose and treat patients; right?

7    A    Yes.

8    Q    Properly; correct?

9          He did another lower extremity nerve conduction study

10   on February 8th of 2012; isn't that true?

11   A    I believe he did.

12   Q    And he did some genetic testing on October 10th of 2012;

13   right?

14   A    Yeah, that was a genetic testing to see about, I believe,

15   metabolism of drugs, not a genetic testing for -- like people

16   would do before they --

17   Q    Find out about families; right?

18   A    Right.

19   Q    Now, this was to see how the body metabolizes medicines;

20   right?

21   A    Yes, uh-huh.  And it's still somewhat controversial.

22   Q    It's kind of cutting edge stuff; right?  They didn't used

23   to do this in the past, did they?

24   A    They didn't used to, no.

25   Q    But it's becoming more and more prevalent nowadays; right?

1    A    Yes, it is.

2    Q    And tell the jury the benefit to a treating physician of

3    trying to find out how your body metabolizes medicines.

4    A    It can help you pick a -- it can potentially help a doctor

5    pick a better regimen of medicine to use for that person.

6    Q    It's a treatment tool; right?

7    A    Yes.

8    Q    So instead of just trial and error, you try to find out

9    what's going to work and what may not work, may be a waste of

10   time for the patient; right?

11   A    Yeah, it's a -- it's definitely a technique that's been

12   more popular in recent years and it sometimes can give good

13   answers as to why a medication is not working as well as one

14   might think it might be.

15   Q    Now, do you know if you agree with the value of the

16   rotation of medicines, of opioids, in the chronic-pain

17   patients?

18   A    Yeah.  The use of opioid rotation has been proven to be

19   useful in hospice-type patients.  There's no doubt about it

20   that opioid rotation has been useful with hospice

21   patients.  But there are no studies that show that opioid

22   rotation helps in cases that involve chronic-pain patients.  So

23   there are doctors who try to do opioid rotation on chronic-pain

24   patients but there's no science that supports that.

25   Q    All right.  I'll show you what I've had marked as

 1   Plaintiff's Exhibit 70 for the witness only.  And see if you

 2   recognize that.

 3           MR. SHARMAN:  Counsel, do you have a copy?

 4           MR. ARMSTRONG:  I just have one.

 5           THE COURT:  Will you show it to the opposing side

 6   before you use it?

 7           MR. ARMSTRONG:  (Complying.)

 8           MS. GRIFFIN:  Your Honor, we object.  It's a 2009

 9   public access manuscript, not a learned treatise and it's

10   outside the range of the charges for 2011 through 2015.

11           MR. ARMSTRONG:  The witness, Judge, has repeatedly

12   referred to 2009 guidelines he relied upon.

13           THE COURT:  Well, he's referred to guidelines that he

14   relied on in forming to his opinion.  He hasn't testified about

15   this, so far as I know.  You can show it to him and ask him if

16   he's familiar with it, whether he's relied on it in forming his

17   opinions.

18   BY MR. ARMSTRONG:

19   Q   I'll show you Ruan's Exhibit 70, if you are familiar with

20   that.

21   A   Dr. Portnoy is a end-of-life care physician.  That's his

22   area of specialty.  He also -- he also has plenty of experience

23   in chronic-pain medicine.

24   Q   Are you familiar with that document?

25   A   No, I'm not familiar with this document.

1   Q   Okay.  Does it purport to be a study on the best practices

2   of opioid rotation?

3   A   It does.  But the critical thing is again, is that opioid

4   rotation has only been shown in scientific studies to be useful

5   in people who are experiencing end of life in a hospice-type

6   setting.  And that's where opioid rotation can be useful.  With

7   reference to using opioid rotation in people who simply have

8   chronic pain, and I don't mean to demean chronic pain, there is

9   not good science that that works and there hasn't been any good

10  scientific prospective studies done that shows that opioid

11  rotation works in human beings with reference to the people who

12  have -- just have chronic pain.  It's something that really has

13  only been proven within the discipline of hospice, palliative

14  care, end-of-life medicine.

15  Q   This study by Dr. Portnoy who -- you recognize him?

16  A   Right, I recognize him.  Yes.

17  Q   Is not about hospice or end-of-life care, is it?

18  A   But that's what he -- that's his -- that's his specialty.

19  His specialty is hospice and end-of-life care.

20          MS. GRIFFIN:  We object to the form of the question.

21          THE COURT:  Yeah.

22          MS. GRIFFIN:  Because he said he had --

23          THE COURT:  He said he's not familiar with it.  So

24  let's not have any further questions about it.

25          MR. ARMSTRONG:  Well, I'll ask one final question.

1   Q   So if this is not about end-of-life care, you would

2   disagree with Dr. Portnoy's conclusions?

3           MS. GRIFFIN:  Objection.

4           THE COURT:  He says he hasn't read the study so it

5   would be difficult for him to agree or disagree.

6   BY MR. ARMSTRONG:

7   Q   Dr. Ruan changed Mr. Bosarge's medications from time to

8   time; correct?

9   A   Correct.

10  Q   And that would be rotating the opioids; correct?

11  A   Yeah.  Just because somebody rotates the opioids does not

12  mean that that's an effective treatment.

13  Q   And you do not agree with the rotation or you don't

14  subscribe to any studies to rotating other than in hospice care

15  is your opinion?

16  A   That's the only use that I know of for opioid rotation in

17  which there's scientific studies that are prospective and well

18  controlled as far as their science.  Those are the only studies

19  I know of that show that there is some benefit from opioid

20  rotation in that type of a situation.

21  Q   Would you agree that the rotation of opioids would be

22  indicated to assist with the occurrence of intolerable adverse

23  effects during dose titration?  Do you agree with that?

24          MS. GRIFFIN:  Objection, Your Honor.  It's outside the

25  scope of the direct examination.  It is beyond anything he

 1    testified about.  And whether he agrees with it or doesn't

 2    agree with it is not relevant.

 3            MR. ARMSTRONG:  Judge, he testified about the

 4    different medications that Mr. Bosarge was on and why he was on

 5    those different medications, and he saw no benefit of being on

 6    different medications.

 7            THE COURT:  You can ask the question.

 8    BY MR. ARMSTRONG:

 9    Q   Do you want me to repeat that?  Do you want me to repeat

10    the question?

11            THE COURT:  Dr. Greenberg, would you like him to

12    repeat the question?

13            THE WITNESS:  Yes, please.

14    BY MR. ARMSTRONG:

15    Q   Okay.  Would you agree that one of the indications for

16    opioid rotation would be the occurrence of intolerable adverse

17    effects during dose titration?  Would you agree with that?

18    A   Yes, that is one of the uses, especially for opioid

19    rotation in the situation of a palliative-care unit.

20    Q   Would another one be the poor analgesic efficacy despite

21    aggressive dose titration?  Would you agree with that?

22    A   That one I have not heard of, no.

23    Q   Problematic drug-to-drug interactions would be a reason for

24    rotation; right?

25    A   In a palliative-care environment, yes.

1   Q   And again, there's many more I could read to you but your

2   opinion is these would only be used in a hospice situation,

3   that's the only benefit you would see?

4   A   That's the -- those are the only studies that have been

5   done scientifically that show that there is a benefit, and that

6   would be within a hospice-type environment.  Other doctors use

7   opioid rotation but there are not good studies that show that

8   opioid rotation works in those particular patients.

9   Q   I think, just to clarify, there are no good studies that

10  you're aware of; right?

11  A   Correct.

12  Q   That you're aware of?

13  A   Yeah, there's no --

14  Q   There may be studies out there, you're just not aware of

15  them?

16  A   That's certainly possible.

17  Q   And you're not aware of this study, right, that I just

18  showed you?

19  A   No.  I'm aware of the author but not of that study.

20  Q   Moving along to Ms. Walker, Deborah Walker.

21          THE COURT:  13-3?

22          MR. ARMSTRONG:  I'll trade with you.

23  Q   The first thing that I wrote down that you drew up a red

24  flag with Ms. Walker was the fact that she had been in prison

25  for a period of time and that that's a major red flag, and that

DAVID GORDON GREENBERG, MD - CROSS BY MR. ARMSTRONG

```
 1    there was no information by Dr. Ruan or his office as to
 2    anything regarding, I think -- I wrote down no info whatsoever
 3    that I can glean.  And I think you said about how it was, what
 4    it was like, did she suffer any illnesses, things like that.
 5    A    Yeah, there was -- the most important thing is this:  Is
 6    that within the field of chronic-pain medicine, unfortunately
 7    there are a significant number of patients who divert drugs
 8    illegally.  And when a chronic pain physician has a patient and
 9    he or she knows that that patient has been incarcerated for
10    some type of a crime, then, in fact, that means that that
11    physician should really ask some questions about that patient,
12    not to demean them, not to degrade them or anything like that,
13    but to ask questions and try to ascertain what was the
14    situation that made the person wind up in prison at that point
15    in time and also to ask other questions with reference to just
16    how the person did in prison, and what their experiences were.
17              And that type of information was not obtained, and
18    it's a -- it really is a red flag to have a chronic-pain
19    patient come out from a prison sentence and not ask more
20    questions with reference to what the heck was going on.
21    Q    So you did not see that in her medical record?
22    A    Pardon me?
23    Q    You didn't see that in her medical record?
24    A    I did not see that in her medical record.
25    Q    Let me ask you to look in that medical chart and look at
```

990

```
 1   the January 14th, 2014 visit, if you would, please, sir.
 2   A   Is that going to come up on the --
 3   Q   Well, I can show it to you, sure.
 4   A   Okay.
 5   Q   This is what it's going to look like just for your
 6   purposes.
 7           MS. GRIFFIN:  Counsel, would you provide the Bates
 8   number?
 9           MR. ARMSTRONG:  I thought I had gotten all -- I don't
10   have a Bates number on this one.  It's the January 14, 2014,
11   Bates stamp number 208076.
12           If that's easier to find, you can just look at the
13   bottom right corner and look for what they call the Bates stamp
14   number.  It's January 14, 2014.
15           THE COURT:  Do you want him to find it in the exhibit?
16   Because he's still looking.
17           MR. ARMSTRONG:  He said he didn't see it in his
18   review.
19           THE COURT:  Well, I know but do you want him to find
20   that page in the exhibit or just rely on what you've got on the
21   ELMO?
22           MR. ARMSTRONG:  I just asked him to find it.
23           THE COURT:  Give him the Bates number again.
24           MR. ARMSTRONG:  He can rely on the ELMO.
25           THE COURT:  Give him the Bates number again.
```

```
 1            MR. ARMSTRONG:  I thought I just did.

 2            THE WITNESS:  Is it 208060?

 3            MR. ARMSTRONG:  076.  208076.

 4            THE WITNESS:  208076.

 5            MS. GRIFFIN:  Your Honor, is it up on the screen for

 6   everybody?

 7            THE COURT:  Yes.

 8   BY MR. ARMSTRONG:

 9   Q   It's going to be a document that looks like this.

10    (Indicating.)

11   A   I get as far as 208063.

12   Q   So you do not have this document in there?

13   A   Well, I'm looking for it.  Tell me again the number?

14            THE COURT:  76 is the end of it.

15   Q   208076.

16   A   I got 66 -- 208068, 208069.  Am I going in the right

17   direction?

18   Q   Yeah, 076 is what you're looking for, 76.

19            THE COURT:  It should be seven more pages.

20   A   076.  8076.

21   Q   And that's a --

22            MR. ARMSTRONG:  Judge, I would ask that this be

23   published to the jury.

24            THE COURT:  They're looking at it right now.

25            MR. ARMSTRONG:  Oh, they are?  Okay.
```

DAVID GORDON GREENBERG, MD - CROSS BY MR. ARMSTRONG

992

1   Q   A minute ago you testified that they didn't get any

2   information whatsoever about her incarceration.  Do you

3   remember that?  Did you see this, this history and this visit

4   on January 14, 2014?

5   A   Yeah.  No, I didn't see that.  And I don't remember that

6   being in the record.

7   Q   Okay.  Well, in this it talks about how they talked to her,

8   she had been back in, she had been a prior patient.  Last time

9   she was seen was in 2011 but she had to discontinue because of

10  her 19-month incarceration; right?  She was released from

11  prison in November -- of course it's now January.  While in

12  prison she was able to continue her medications for pain.  In

13  prison they were giving her Lortab five milligrams four times a

14  day.  Since she's been out, her primary care physician,

15  Dr. Leytham was giving her a few Lortab but only in small

16  quantities until she could get re-established.  Anyway, they go

17  on with the history that was taken; correct?

18  A   Yeah.  And --

19  Q   So you didn't see this?

20  A   In the records that I read, I don't remember seeing that

21  history and I wouldn't have put in there that there was no

22  information about it if I had seen it.

23  Q   This would have been useful for you in that part of your

24  opinion; correct?

25  A   It would have been useful, yes.

993

1  Q   And then it goes on for a couple of pages.  And the very

2  last one if you look, that's going to be -- about the fifth

3  page from there.  Do you see this page right here?  Look on the

4  screen.

5  A   I see history and physical for Deborah Walker.

6  Q   Okay.  How about starting right here?

7  A   Okay.

8  Q   Read that to the jury.

9  A   Patient was advised of the possible side-effects of chronic

10  opiate therapy, including but not limited to constipation,

11  nausea, vomiting, physical dependence or nervousness.

12       Patient was advised to avoid alcohol and any illicit

13  substances while using opioid medication and to follow the

14  directions.  Yeah, I did not see that in the record that I

15  reviewed.

16  Q   That's pretty important stuff, isn't it?

17  A   It is important stuff, absolutely.

18  Q   Because this is the -- and who signed this?

19  A   It's still moving here.  Dr. Ruan.

20  Q   So that's Dr. Ruan having that conversation with that

21  patient; right?

22       MS. GRIFFIN:  Objection, Your Honor.  It's no --

23  nothing to indicate that that's him having that

24  conversation.  It's to indicate that he signed it, and we

25  object to the form of that question.

DAVID GORDON GREENBERG, MD - CROSS BY MR. ARMSTRONG

1  BY MR. ARMSTRONG:

2  Q   This is how you do electronic records; right?  By the

3  physician signing it, he's verifying and confirming the

4  information in the record; right?

5  A   That's supposedly what is happening.  And again, in the

6  record that I read there was no well-identified history of the

7  present illness.

8  Q   Right.  So these records by Dr. Ruan you either overlooked

9  or you were not provided; correct?

10 A   I would -- I would say that that -- I would say that I most

11 definitely -- I'm sorry.

12     (There was a cell phone interruption.)

13         THE COURT:  Mr. Armstrong, can you clear the lines on

14 the screen?

15         MR. ARMSTRONG:  He did that.

16         THE COURT:  You can clear them as well.

17         MR. ARMSTRONG:  Oh.

18         THE WITNESS:  I apologize for that.

19 BY MR. ARMSTRONG:

20 Q   But that is in the record; correct?  Is that in the chart

21 you have?

22 A   In the record that I reviewed --

23 Q   Do you have 208076, the Bates stamp?

24 A   Yeah.  In the record that I reviewed there was very little,

25 if any, of any kind of true history of present illness.  If I

1  had reviewed something that had this much present illness in

2  there, I would have commented on that.

3          MR. ARMSTRONG:  Judge, I'm going to mark this.  He's

4  never seen it before.  I'm going to mark it as an exhibit.

5          THE COURT:  It's already in the record as a page in

6  that exhibit.

7          MR. ARMSTRONG:  He apparently can't find it.

8          THE COURT:  It's right there in the exhibit.  What's

9  the Bates stamp number page?

10          MR. ARMSTRONG:  All right.

11  Q   So that is in the record, you see that?

12          THE COURT:  Well, let's have the Bates stamp number

13  page so we can look it up.

14          MR. ARMSTRONG:  208076.

15          THE COURT:  This is still 76.  Correct?  That's --

16  that second page you were reading from five pages further on

17  you said, what is the Bates --

18          MR. ARMSTRONG:  Oh, that is the 76, 77, 78, 79.  Do

19  you see that?  They should just follow each other.

20  Q   Are they right there?  Do you see it?

21  A   I see the Bates stamp numbers here that you are referring

22  to.  But I do not remember seeing the Bates stamp or the

23  history of present illness that --

24          THE COURT:  But the question, Dr. Greenberg, is the

25  page numbered 79 already in that booklet, that exhibit?  79,

 1  ends in 79.  It should be four pages over, three or four.

 2  A    78, 79 --

 3          THE COURT:  It's there.

 4  A    80.

 5          MR. ARMSTRONG:  I think it's -- I'll move on to the

 6  next one.

 7          THE COURT:  All right.

 8  BY MR. ARMSTRONG:

 9  Q    So when you testified that Dr. Ruan did not sufficiently

10  take a history, find out what was going on with Ms. Walker or

11  do an examination or have meaningful conversation with her, as

12  far as informed consent or warnings, you gave that opinion

13  without the benefit of seeing that document; right?

14  A    Correct.

15  Q    Does that -- knowing this now, does that kind of change

16  your opinion about that specific opinion you had for the jury?

17  A    It would change my opinion, yes.

18  Q    Now -- and that would be that it was within the scope of

19  professional medical practice to do that; correct?

20  A    This episode of care would be within the scope of

21  legitimate medical practice, yes.

22  Q    Now, you mentioned the drug screen that was taken on

23  Ms. Walker on January 14th of 2014.

24          THE COURT:  Mr. Armstrong, is now a good time to have

25  our break?  Since you're still -- I had thought you were going

1    to move on.

2           MR. ARMSTRONG:  Yes.

3           THE COURT:  All right.  Ladies and gentlemen, leave

4    your pads on your chairs.  Take your break downstairs in the

5    jury assembly room.  No discussion about the case.  We will

6    call you back up in about 15 minutes.

7           (A recess was taken at 3:06 p.m.)

8           (In open court, defendants and jury present.)

9    BY MR. ARMSTRONG:

10   Q   Dr. Greenberg, moving along, I want to draw your attention,

11   that same visit -- we were talking about the visit of January

12   14th, 2014, which I believe you just testified to the jury that

13   you had not seen that.  And based on that, that would change

14   your opinion.  But you also, you also discussed the urine

15   screen that was taken from her that day.  Do you remember that,

16   on direct?  I think you said it was a urine screen and on the

17   urine screen they found Soma or the urine screen revealed Soma

18   and hydrocodone were not in her system.  You said there was no

19   counseling but the major mistake, she should have been

20   confronted.  And your description of that was that it was a

21   therapeutic hole.  Do you remember saying that?

22   A   A therapeutic what?

23   Q   A therapeutic hole.  Do you remember saying -- describing

24   that as a therapeutic hole on direct when Ms. Griffin was

25   walking you through --

998

1  A   Yeah.

2  Q   -- that.  Do you remember testifying to the jury that that

3  was a therapeutic hole?

4  A   Yes.

5  Q   Okay.  And you were referring to -- and this is

6  Bates 208081; right?  You were referring to the January 14th,

7  drug test -- or urine test; right?

8  A   Correct.  The inconsistent one with gabapentin and

9  pregabalin.

10 Q   Right.  And so what you were talking about was that you

11 have these prescribed medications, and inconsistent means they

12 were not in her system; right?

13 A   Inconsistent -- yeah, would, in this case, mean they would

14 not be the system.  Inconsistent could also mean a drug that

15 was in the system but shouldn't have been there too.

16 Q   Well, but this is what we were looking for.  Right?

17 (Indicating.)  The carisoprodol, which is right here?

18 A   Right.

19 Q   And the hydrocodone, right here.  And they were not in her

20 system; right?

21 A   Correct.

22 Q   And you said that was the therapeutic hole because if these

23 were prescribed medications and they were not in her system,

24 then the danger is either she's not taking them as prescribed;

25 right --

1    A    Right.

2    Q    -- was your testimony or she's probably diverting them

3    somewhere else?

4    A    Right.

5    Q    And that's the therapeutic hole, that there was no

6    followup, there was no counseling, she wasn't confronted?

7    A    Right.

8    Q    Right?

9    A    Right.  I saw no followup in the records I reviewed, yes.

10   Q    But that testimony you gave didn't take into account that

11   she had been in prison for 19 months and they hadn't seen her

12   since 2011, and that this was the first visit in 19 months.  So

13   Dr. Ruan had not prescribed anything to her?

14   A    I believe that you or one of your associates stated that

15   the patient was getting her medications in prison.

16   Q    Not from Dr. Ruan.  Right?

17   A    Correct.  But they would still show on -- they would still

18   show -- they would still show up on a urine test.

19   Q    She had gotten out in November; remember?

20   A    Yeah, I --

21   Q    November to December, December to January?

22   A    I don't remember the month when she got out.

23   Q    And you don't know when the last time she took any

24   medication; right?

25   A    Correct.  I couldn't pinpoint it, no.

1  Q   So the last time you know of her getting prescriptions from

2  Dr. Ruan was back in 2011 when she went to prison?

3  A   That would be the last time that I knew for sure that he

4  had prescribed to her.

5  Q   And we know this was -- this January '14 was the last time

6  she came back, she discontinued because she had been in prison

7  for 19 months so her first visit back was January 14th.  So

8  this test was the first test they ran on her in 19 months,

9  because she had been gone; right?

10  A   She had been gone for, yeah, almost 20 months, yes.

11  Q   So those medications were not prescribed by Dr. Ruan and

12  you don't know when they were prescribed, these right here, or

13  why they're even on this drug test; right?

14  A   I would need a prison medical record to know for sure.

15  Q   Right, right.  Well, you understand this is when the

16  doctor's office sends it out to a lab to be tested?

17  A   Correct.

18  Q   But they do the urine cup test in the office; right?

19  A   They do the urine cup test in the office.

20  Q   Did you see the results of the urine cup test in your

21  report?  I'm sorry, not your report, in the chart?

22  A   I'd have to move the chart to look at it.

23  Q   Well, if this is 208081, look in that area.

24  A   I have 208081 and the name -- Castle Medical.

25          THE COURT:  Dr. Greenberg, do you still have the chart

1  in front of you, the exhibit?  He's asking you to find the page

2  prior to number 81.

3         THE WITNESS:  Page prior to?

4         THE COURT:  That's what he said.

5         THE WITNESS:  Okay.

6         THE COURT:  Right before there.

7         MR. ARMSTRONG:  Well, let me save some time.

8  Q   It's not in there, is it?

9  A   No.

10  Q   Let me show you what I've had marked as Ruan Exhibit

11  99.  January 14th, 2014, right?  So we're talking about the

12  same day, January 14, 2014?  You have not seen this, have you?

13  A   I don't believe that I've seen this particular page of the

14  record.

15  Q   Okay.  Well, I submit to you it is not in what you

16  received.  This is the in-house urine drug --

17         MS. GRIFFIN:  Your Honor, object.

18  Q   -- urine test results for Deborah Walker.

19         THE COURT:  Hold up just a minute.  There's an

20  objection.

21         MS. GRIFFIN:  Object to him advising the witness what

22  was in what he saw or wasn't in it.  There's no question that

23  he's testifying.

24  BY MR. ARMSTRONG:

25  Q   Did you see this in the record?

1002

1    THE COURT:  Well, he's got a voluminous record in

2    front of him so why don't you point to the page where it should

3    be if it's not there?

4    BY MR. ARMSTRONG:

5    Q    Consistent with your review of the records, you would see

6    the in-house report of the urine cup test and then that would

7    be followed by the lab that it was sent out as a confirmation

8    of those tests; right?

9    A    Correct.

10   Q    That's right.

11   A    That would be the normal sequence.

12   Q    They are in sequence but this document is not in that file,

13   is it?

14        Well, let me ask it this way:  Do you remember seeing

15   this?

16   A    I do not remember seeing this, no.

17   Q    Okay.  And it shows Deborah Walker, Dr. Ruan's the doctor,

18   collector's name Brandy.  It was sent out; right?  Yes?

19   A    Right.

20   Q    In-house confirm, cup test, yes?

21   A    What was the no there?  I'm sorry.

22   Q    Did they confirm it in-house?  In other words, did they use

23   an in-house lab or did they send it out?

24   A    Okay.

25   Q    Okay.  So then you have the cup test, yes?

DAVID GORDON GREENBERG, MD - CROSS BY MR. ARMSTRONG

1          And their test was negative for everything; right?

2   A   Their test --

3   Q   The cup test?

4   A   Yeah, the cup test was negative for everything.

5   Q   Okay.

6   A   And the cup test doesn't list all the things that the cup

7   tests for either.

8   Q   Right.  But it was negative.  But the cup test that they

9   had there was negative and then they sent it out?

10  A   Right.

11  Q   And when they sent it out, it was negative?

12  A   Correct.

13  Q   Okay.  So there was no therapeutic hole because there was

14  nothing to counsel her about, was there?

15  A   I would have to -- I would have to look at the record

16  again.

17  Q   Okay.  Well, wouldn't you agree with me, sir, that there

18  was no evidence that they had on that day that she was -- had

19  been prescribed any medication and had not been taking it, was

20  there?

21  A   Could you please go back up on the screen just for a

22  minute?

23          Yeah, on this day the only medication that's listed

24  with reference to being prescribed was labeled as inconsistent

25  by the lab.

1  Q   So that's -- but if they hadn't seen her in 19 months they
2  would not have prescribed her anything, so there's nothing
3  missing; right?
4  A   Well, that's correct.  That's correct.  And again, we would
5  need the prison record -- medical records to know for sure.
6  Q   Right.  And you didn't have that; right?
7  A   No.
8  Q   Okay.  And you weren't aware of that January 14th chart
9  entry that we went over, that you said was -- looked like very
10 good documentation of her being in prison and the examination
11 and Dr. Ruan talking with her and counseling her and talking to
12 her about opioid therapy, all those things; right?
13 A   Yeah, I don't -- I don't believe that I saw any good
14 documentation of her being counseled.
15 Q   Okay.  Before I just showed it to you; right?  You didn't
16 see it before.  I just showed it to you.
17 A   Right.
18 Q   Okay.  And you said that that had changed your opinion
19 about that; right?
20 A   Yeah.
21 Q   Correct?
22 A   To a degree, yes.
23 Q   And now when we're looking at this therapeutic hole,
24 there's really no therapeutic hole, is there?  Because he did
25 counsel her, he did talk to her, and he had not prescribed any

DAVID GORDON GREENBERG, MD - CROSS BY MR. ARMSTRONG

1005

1   medication so there was nothing inconsistent; right?  Other

2   than you needed the prison records; right?

3   A   Right.

4   Q   Which you didn't have?

5   A   Right.

6   Q   Okay.  I want to move along to Mr. Erick Gist.

7          Now, with regard to Mr. Gist, the first thing you --

8   or one of the first things you said -- Ms. Griffin asked you:

9   why did Mr. Gist go to Dr. Ruan?  And you said -- your quote

10  was:  I'm not sure why he went to Dr. Ruan.

11         Do you remember telling the jury that?

12  A   Yes.

13  Q   Did you review all of his medical file to see about what

14  his ailments were and why he went there?

15  A   He suffered from a long-term depressive disorder and he was

16  also noted to have the formal DSM-IV diagnosis for opioid

17  addiction.

18  Q   Well, with all due respect, if somebody's got a depressive

19  disorder and an opioid dependency or addiction, a physician

20  does not refer that patient to a pain management specialist, do

21  they?

22  A   Sometimes that happens, sure.  Sometimes.

23  Q   Well, he was actually -- he was referred by Dr. Rubenstein.

24  Were you aware of that?

25  A    I don't remember seeing the referent on that chart when I

```
 1   got it.
 2   Q   Okay.  And you didn't see any of that information in the
 3   chart, about the referring physician?
 4   A   I don't remember seeing the referring information from
 5   that -- from Dr. Rubenstein.
 6   Q   I have to find where that is.  Well, I'll represent to you
 7   that it is in there.  I believe this may be the one you said:
 8   Sometimes picking up these you might get a hernia from picking
 9   up the files; right?
10   A   Right.
11   Q   This file particularly is quite large, is it not?
12   A   It's a large file.
13   Q   That's a -- but it's not just the file, that is the medical
14   chart; right?
15   A   Correct.
16   Q   And it contains multiple visits, multiple notes, procedures
17   that were done by Dr. Ruan; correct?
18   A   Right.
19   Q   Well, isn't it true, sir, that Mr. Gist, he had had lumbar
20   surgery twice?
21   A   Yeah, he'd had lumbar surgeries.
22   Q   He had had two lumbar surgeries.  Explain to the jury what
23   a lumbar surgery is.
24   A   It's an operation on the lower back.
25   Q   And he had had a surgery by Dr. Bendt Petersen who's an
```

1007

1    orthopedic surgeon here in Mobile?  Did you see that in the

2    record?

3    A   I had seen that he had had the procedure done, yes.

4    Q   And Dr. Petersen is with the orthopedic group here in

5    Mobile and he performed these two surgeries?

6            MS. GRIFFIN:  Objection, Your Honor, as to foundation,

7    as to whether he would know who a local doctor is with or not

8    with.

9    BY MR. ARMSTRONG:

10   Q   Did he not also have a third surgery by Dr. Revels, another

11   orthopedic surgeon?  Did you see that in the chart?

12   A   Yeah.  I don't remember the third surgery.  I remember the

13   first two.

14   Q   Okay.  So do you think that orthopedic surgeons perform

15   spine surgery unless somebody's got a problem?

16           MS. GRIFFIN:  Objection, Your Honor, there is --

17           THE COURT:  Sustained.

18   BY MR. ARMSTRONG:

19   Q   Did you review the diagnostic testing that Dr. Ruan

20   performed on Mr. Gist?

21   A   I reviewed some diagnostic testing that was performed on

22   Mr. Gist, yes.

23   Q   Now, he had been a patient going back to 2006; correct?

24   A   I believe so.

25   Q   So a lot of -- a lot of the treatment had occurred prior to

1008

1    2011; correct?

2    A    Correct.

3    Q    All right.  So because we're focusing on 2011 to 2015 I'm

4    just going to move forward.  But quite a bit of this file

5    predates 2011; correct?

6    A    Yes.

7    Q    And there were multiple procedures that he performed and

8    diagnostic tests prior to 2011; correct?

9    A    Right.

10   Q    Including MRIs and these different diagnostic tests that we

11   talked about earlier; correct?

12   A    Correct.

13   Q    Now, you mentioned earlier that you have experience with

14   interventional procedures in the past; correct?

15   A    Yes, I did during residency.

16   Q    During residency.  Now, residency -- so we're talking 40

17   years ago is when you did that?

18   A    Right.

19   Q    Okay.  Did you see the procedures performed -- the

20   interventional procedures performed by Dr. Ruan on Mr. Gist?

21   A    Did I see them?

22   Q    Did you see that in the chart?

23   A    Did I see them happen or did I see --

24   Q    No, did you see them noted in the chart, that these

25   procedures were performed?

1009

```
 1    A    Yes.

 2    Q    And there's a piece of equipment called a fluoroscope;

 3    right?  Isn't that -- a fluoroscope X-ray was used?

 4    A    Yes.

 5    Q    And did you know that they had that equipment in their

 6    office?

 7    A    No, but that's not uncommon equipment to have in the

 8    office.

 9    Q    Do you have one in your office?

10    A    No, I do not.

11    Q    So you don't do those?

12    A    No, I don't do the fluoroscopy.  I refer people out.

13    Q    Right.  That takes special training in interventional pain

14    management; correct?

15    A    Yes, absolutely.

16    Q    Okay.  And you're aware that Dr. Ruan has that specialty

17    training?

18    A    Yes, I'm aware he has specialty training, and I believe he

19    is a member of the Interventional Spine Society too.

20    Q    All right.  And he's board certified; correct?

21    A    Right.

22    Q    And he performed multiple interventional procedures;

23    correct?

24    A    Right.

25    Q    And the purpose of an interventional procedure is not to
```

1  put opiates in your back, it's to put medicine in there to try

2  to block the pain; correct?

3  A   Correct.  Sometimes it's to put opioids in the back, but

4  more often it's what you said later.

5  Q   Like a pain block --

6  A   Right.

7  Q   -- to try to help block the pain so the patient doesn't --

8  at least for a period of time because it doesn't last forever.

9  The medicine eventually wears out; right?

10 A   Correct.

11 Q   And so if the patient got a benefit from that procedure,

12 the patient may come back and want another one; correct, at

13 some point later?

14 A   Yes.

15 Q   And Dr. Ruan performed one, two, three, four, five, six,

16 seven, eight, nine, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20,

17 21, 22, 23, 24 separate interventional procedures with

18 Mr. Gist; correct?

19 A   He performed a lot of interventional procedures on

20 Mr. Gist.

21 Q   And that doesn't involve a prescription, that is an

22 interventional procedure; correct?

23 A   Well, it's an interventional procedure, but often patients

24 also get prescriptions at that time too.

25 Q   Right, to try to help manage what might not have been

DAVID GORDON GREENBERG, MD - CROSS BY MR. ARMSTRONG

1011

1   relieved, what pain might not be relieved; correct?

2   A   Right.

3   Q   Now, you mentioned that Mr. Gist -- where Mr. Gist was also

4   referred out by Dr. Ruan to other specialists while under his

5   care?

6   A   I believe he was referred out.

7   Q   He was referred out to Dr. Bosem who's a neurologist;

8   correct?

9   A   Correct.

10   Q   And Dr. Freeman, who is an orthopedic surgeon?

11   A   I believe he went to Freeman too.

12   Q   And Dr. Revels did the other surgery?  Did you see where he

13   was referred out to Dr. Tom Bennett?  Do you know who Dr. Tom

14   Bennett is?

15   A   No, that name doesn't ring a bell with me.

16   Q   He's a local -- I submit to you, a local clinical

17   psychologist.

18   A   Okay.

19   Q   Why would a pain management physician refer somebody to a

20   clinical psychologist?

21   A   If the patient had problems with depressive disorder other

22   types of mental illness, et cetera.

23   Q   And Dr. Ruan did that, didn't he?

24   A   Pardon me?

25   Q   Dr. Ruan did that, didn't he?

DAVID GORDON GREENBERG, MD - CROSS BY MR. ARMSTRONG

1  A   I know that he went to -- the patient went to Dr. Bennett

2  and I'm not certain whether it was Dr. Ruan or one of his

3  colleagues that recommended that he go see him.

4  Q   Well, you testified yesterday, that one of the shortcomings

5  you found was that they never referred anybody out with

6  psychiatric depressive disorders; right?

7  A   Right.

8  Q   Did you not know that Dr. Bennett was a clinical

9  psychologist?

10  A   Well, he's a clinical psychologist and that's different

11  than a psychiatrist.

12  Q   I'll agree with you that a psychologist is different from a

13  psychiatrist.

14        MS. GRIFFIN:  Your Honor, that's not a question.  And

15  we object to counsel commenting on the answers.

16        THE COURT:  Sustained.

17  BY MR. ARMSTRONG:

18  Q   Now, I want to refer you to Bates stamped 219255.  If you

19  would look at that in the chart, please.

20        THE COURT:  Give him the number again.

21        MR. ARMSTRONG:  219255.

22        THE COURT:  He's asking you to look at the chart, the

23  papers, the big chart, and find -- can you come help him find

24  the page.

25        MR. ARMSTRONG:  Can I just show it to him on the -- on

```
 1    the --
 2            THE COURT:  All right.
 3    BY MR. ARMSTRONG:
 4    Q   I submit to you, Doctor, that this is Bates stamp 219255 in
 5    the chart you have.  And do you remember seeing this?  See the
 6    date up here which is during the dates of this case, this
 7    indictment, May 30th, 2013.  See that?
 8    A   This is when the patient was prescribed the psychiatric
 9    drug Namenda.
10    Q   Do you see it says Mr. Gist?
11    A   Right.
12    Q   I keep touching it.  What I want to focus on here is at the
13    bottom.  What does that say?
14    A   It says:  Drug query, filled Lortab.
15    Q   4-13 from Dr. Simms, gave him a three-day supply; right?
16    A   Correct.  By drug query --
17    Q   What is this?  Do you know what that means?
18    A   No, no.  That would be -- the query the state narcotics
19    profile, yes.
20    Q   The PDMP; right?
21    A   Right.
22    Q   Now, what that means is it's not the same as these
23    documents that you've been looking at.  A drug query means
24    it's -- they call them hits; right?  Because doesn't PDMP track
25    how many times a doctor accesses PDMP?  Are you aware of that?
```

DAVID GORDON GREENBERG, MD - CROSS BY MR. ARMSTRONG

1    A   That can vary from state to state, but the PDMP does track

2    the amount of controlled substances that a patient gets.

3    Q   Right.  Right.  It tracks that and which physicians

4    prescribe it; right?

5    A   Correct.

6    Q   And it's based on their number; correct.

7    A   Correct.

8    Q   And in fact, they did the PDMP query and it showed that a

9    Dr. Simms had filled a Lortab prescription on 4/1, a three-day

10   supply.  And again, this was the following month, more than a

11   month later but the following month.  And so right here, what

12   did they do?

13   A   It says that they gave the patient a warning and reinforced

14   the opioid agreement.

15   Q   So they queried the PDMP, which I think you said is within

16   the scope of medical -- proper medical practice; right?

17   A   Correct.

18   Q   And they warned the patient; right?

19   A   They said that they warned the patient, yes.

20   Q   That's proper documentation, isn't it?

21   A   That would appear to be proper documentation.

22   Q   Did you not see that visit report?

23   A   I don't -- I don't recollect seeing that visit before.

24           THE COURT:  Mr. Armstrong, can you come to side bar

25   with counsel?

DAVID GORDON GREENBERG, MD - CROSS BY MR. ARMSTRONG

1        (At the side bar, jury not present.)

2            THE COURT:  I'm somewhat concerned, because from my

3    view you're taking testimony that he gave about other patients'

4    charts and conflating it with what he had previously testified

5    about this patient.  You did it with Deborah Walker's chart,

6    because things that he testified about that Deborah -- that he

7    opined were not within the usual course of professional

8    practice with Deborah Walker were not the things that you said

9    does it change your opinion about that, because they never gave

10   you the opinion that -- you got him to say he changed his

11   opinion on that particular thing.  Same with the questions

12   you're asking now.  He wasn't queried on direct examination

13   about the lack of appropriate documentation in this patient's

14   chart.  But now you're asking him based on the assumption that

15   he did testify to that.  And I'm finding it difficult to follow

16   what you're really impeaching him on.  You're impeaching him on

17   things he said about other people's chart.  But these -- do you

18   see what I'm talking about?

19           MR. ARMSTRONG:  Oh, I see exactly.  And the reason why

20   I'm doing it --

21           THE COURT:  I don't think it's appropriate.

22           MR. ARMSTRONG:  Well, it's appropriate because in his

23   testimony he would then summarize seemingly, especially near

24   the end when Deborah started asking these very general lines of

25   questioning at the very end and he started talking about his

1   opinion regarding all the files -- these were failings in all

2   the files I've reviewed.  Those were his words.  I can get the

3   transcript, it's right over there, and point to you where he

4   said that.  He said:  These were failings in every file I

5   reviewed.

6           THE COURT:  Well, you're going to have to point me to

7   failings, what that failing is he was talking about at the

8   time.

9           MR. ARMSTRONG:  Well, I'm through with this one.  I'll

10  move on.

11          THE COURT:  Okay.  I just want you to be careful of

12  what you're asking.

13          MR. ARMSTRONG:  I will be more careful.  We've got it

14  right back there.

15          MS. GRIFFIN:  Before y'all leave, this witness has to

16  be in another court in New Mexico or Arizona on Tuesday

17  morning.  So I'm a little bit concerned about the time.

18          THE COURT:  Let's see if we can get through this.

19          MR. ARMSTRONG:  I'll move on to the next one.

20      (In open court, defendants and jury present.)

21  BY MR. ARMSTRONG:

22  Q   I want to refer you to -- do you still have the Gist chart

23  in front of you?

24  A   I have my report for Mr. Gist and I also have the Bates

25  stamp numbers here.

DAVID GORDON GREENBERG, MD - CROSS BY MR. ARMSTRONG

1  Q  Okay.  Will you look on the report -- because yesterday you

2  testified about inconsistent positives for Mr. Gist and that

3  those were problems for you.  Specifically, September 9th,

4  2014, do you remember testifying about that?

5  A  Yeah, that date was problematic.  The biggest problem was

6  with the patient's high level of alcohol that he had in his

7  system.

8  Q  Right.  And that was -- can you find that in the chart,

9  please?

10         THE COURT:  Can you refer him to a page?

11         THE WITNESS:  I'm referring to my report.

12         THE COURT:  No.  I'm asking the lawyer can he refer

13  you to a page in the Gist chart, which is very thick.

14         MR. ARMSTRONG:  Yes, yes.  Just -- it's -- the chart

15  number is 219356.

16         THE COURT:  Mr. Knizley, can you help him find that?

17         MR. KNIZLEY:  Yes, ma'am.  Yes, ma'am.

18         THE COURT:  219356.

19  BY MR. ARMSTRONG:

20  Q  All right.  While he's looking for that I think you said

21  what was most problematic about that test was the alcohol level

22  that you read?

23  A  Right.  The alcohol level was 2.85.  That was a urine

24  alcohol but urine alcohols correspond well to blood alcohols.

25  Q  In fact, I think you said yesterday that that alcohol in

1   that particular test was quite disturbing.  I think those were

2   your words, quite disturbing; right?

3   A   Yes.

4   Q   Because that high level of alcohol combined with opioids is

5   a dangerous combination.

6   A   Yes, it is.

7   Q   Okay.  And again, we're talking about the --

8           THE COURT:  He's got the chart now if you want --

9           MR. ARMSTRONG:  Okay.

10  Q   So look at the 219356, that's the test, September 9th,

11  2014.  Do you see that in front of you?

12  A   Hang on just a second.  I'm reviewing this right now.

13  Q   Do you see that?  Because right behind it is the alcohol

14  screens, so you may have to flip a page to see the alcohol

15  screens, a page or two.  Do you see it?

16  A   I do not see the alcohol on the other side.  But I'm

17  sure -- I'm very certain that it's here.  Let me just look a

18  little bit more.  So we're looking at 219356?

19  Q   That is the -- that is the test, the urine test, September

20  9, 2014.  That's what you said yesterday?

21  A   Yeah.  It was collected -- it was collected September 9th,

22  2014, and it was reported as having a blood alcohol level of

23  .285.  And that is problematic.

24          MR. ARMSTRONG:  Your Honor, may I approach?

25  Q   You're looking at your report.

DAVID GORDON GREENBERG, MD - CROSS BY MR. ARMSTRONG

1  A   Uh-huh (positive response).

2  Q   Let's look at the chart.  Did you find the alcohol test in

3  the chart?

4  A   No, I don't -- I don't have that yet.

5  Q   Is that it?

6  A   No.

7  Q   Is that it?

8  A   Yes, ethanol 2.85.

9  Q   2.85.  Okay.  And that was the alcohol test -- that's the

10  alcohol reading you're referring to; correct?

11  A   That is true.

12  Q   Okay.  And you said that that in combination with the

13  opioids was quite disturbing?

14  A   Correct.

15  Q   Look at the date of that test, the alcohol test.

16  A   The date of the test for alcohol is -- it looks to me like

17  1/30/2013.

18  Q   I'm sorry.  When was it?

19  A   I'm just looking at the -- I'm looking at the printout from

20  the lab, from Physician Specialists, and it looks like the date

21  of the test is 1/30/2013.

22  Q   (Indicating.)  Not September 9th, 2014; correct?

23  A   Correct.

24  Q   So you're looking -- you referenced an alcohol test from

25  almost two years prior?

 1  A   That would still be a problem in the management of this

 2  patient.  I mean, having alcohol level that high regardless of

 3  what month it is, is a dangerous situation.

 4  Q   Well, yesterday when you testified it was because in

 5  conjunction with the opioids that you found in his -- that was

 6  found to be in his system from this test on September 9th, you

 7  didn't say -- you didn't know that it was a year and a half

 8  before yesterday, did you?

 9  A   Right.  Having -- but having this much alcohol in the

10  system of a person who's also receiving narcotics, that's a

11  dangerous situation.  I mean, it really is.  It's -- there

12  could be -- there could be severe complications because of it.

13  Q   A year and 18 months later?  18 months later?

14  A   Yeah.

15  Q   20 months?

16  A   The alcohol issue was not addressed.

17  Q   Let me move you along to -- oh, one last

18  thing.  Mr. Gist -- if you will look in his chart at Bates

19  stamp 219404.

20  A   209?

21  Q   219?

22  A   219.

23  Q   404, Bates stamp.  Do you see that in the chart?

24  A   I've got 219.

25  Q   404?

 1   A   I don't have the 404 yet.  I've got 219374.

 2   Q   25 pages away.  404.

 3        MS. GRIFFIN:  May I help him find it, Your Honor?

 4        THE COURT:  Mr. Knizley, see if you can find that.

 5   BY MR. ARMSTRONG:

 6   Q   Do you see that, the progress note which is just the office

 7   visit note from April 21st, 2015; correct?

 8   A   Correct.

 9   Q   And tells about the history, they noted that he was

10   negative for GC-MS for hydrocodone; right?

11   A   Right.

12   Q   Problem, right?

13   A   Yes.

14   Q   This is his first opioid violation that has been

15   recorded.  And they gave him a verbal warning; right?

16   A   Yeah, I see where they gave him a verbal warning.  This is

17   the first time that I've seen an opioid contract enforced with

18   this practice of pain medicine.

19   Q   Okay.  And didn't I show you on the other patient where

20   there was the warning?

21   A   Yeah, but --

22   Q   This is the second time?

23   A   Pardon me?

24   Q   This is the second time I showed you?

25   A   Yeah, I could be -- I take that back.  It's the second time

1    I've seen one enforced.

2    Q    Well, we've only reviewed -- you only -- you only testified

3    to the jury about five files, and I'm only on the third one.

4            MS. GRIFFIN:  Your Honor, that's not a question.

5            THE COURT:  Yeah.

6            MR. ARMSTRONG:  Right?

7            THE COURT:  Don't be commenting on the witness's

8    answer.

9    BY MR. ARMSTRONG --

10   Q    We've seen it twice already; right?  Right there?  Now,

11   look over -- if that is page -- over two more pages, look at

12   Dr. Ruan's instructions.  (Indicating.)

13   A    Return, revisit request in four weeks, plus or minus two

14   days.

15   Q    Do you see the instructions?

16   A    Instructions were:  The patient -- it says, under

17   instructions, patient seen in collaboration with Dr. Ruan.

18   Q    All right.  The next one?

19   A    MRI spine.

20   Q    What's the next line say?

21   A    The next line says:  Pill count in two weeks.

22   Q    All right.  So the patient is supposed to come back in 30

23   days, but Dr. Ruan orders there to be a pill count in two

24   weeks; right?

25   A    Right.

1  Q   What's a pill count?  Tell the jury again what a pill count

2  is.

3  A   Pill count is when you, on a random basis, not on a regular

4  appointment with the doctor, that you -- that you do a count of

5  the patient's pills to see how much they've been using per unit

6  time.

7  Q   And I submit to you, that's not the instruction they gave

8  the patient.  They didn't tell the patient they were going to

9  do a pill count?

10          MS. GRIFFIN:  Your Honor, objection.  Repeatedly he is

11  testifying.  That is not a question.

12          THE COURT:  Yeah.  Sustain the objection.

13  BY MR. ARMSTRONG:

14  Q   Sir, are you assuming that they instructed the patient that

15  they were going to do a pill count in two weeks?

16  A   No, I'm not saying that they -- that they necessarily did

17  that.  But sometimes that kind of mistake is made in which

18  they'll have a pill count and they'll have it on the same time

19  that someone comes in for their routine appointment.  And that

20  is a mistake.  And we still -- we still have the issue of no

21  alcohol monitoring for the prior patient.

22  Q   Well, I'm talking about this one.  I'm not talking about

23  the prior patient a year and a half before.

24  A   Okay.

25          MS. GRIFFIN:  Your Honor, I object again.  Those are

 1    not questions.

 2            MR. ARMSTRONG:  Okay.

 3            THE COURT:  Sustained.

 4    BY MR. ARMSTRONG:

 5    Q   You said that there's a problem with a regular pill count

 6    on the next visit.  The next visit is when?  (Indicating.)

 7    A   It says four weeks, plus or minus two days.

 8    Q   And pill count is when?

 9    A   And it said:  Pill count in two weeks.

10    Q   Right.  So that's Dr. Ruan's instructions to do a pill

11    count on this patient because they were concerned about the

12    violation.  He was concerned about the opioid violation; right?

13    A   Yeah.  He should have been more concerned about the high

14    alcohol level.

15    Q   From now -- if we're into 2015 and the alcohol test was

16    2013, that should still be the foremost thing on his mind?

17    A   It still should have been addressed, yeah.

18    Q   Okay.  But he orders a pill -- Dr. Ruan orders a pill

19    count, right, in two weeks?

20    A   Right.

21    Q   Do you remember yesterday when you testified that you saw

22    no evidence of pill counting?

23    A   Yeah.  This would be the first evidence of it.  And we

24    still don't see the actual pill count that was performed.  We

25    just have -- we have an order to do one in the future.

DAVID GORDON GREENBERG, MD - CROSS BY MR. ARMSTRONG

1   Q   Okay.

2   A   So I would like to see the actual pill count that was being

3   performed, what the numbers were and what happened with that,

4   which we don't have.

5   Q   Move along to 219404.

6   A   Did you say 219?

7   Q   219 --

8   A   Yeah.

9   Q   404.

10          THE COURT:  Is this what you're showing him?

11          MR. ARMSTRONG:  Yes.

12          THE COURT:  Just read from the screen if you will,

13   because he's still looking for the page.

14   Q   The appointment was April 21st, 2015; correct?  And that's

15   when Dr. Ruan ordered the pill count in two weeks; right?

16   A   Correct.

17   Q   He was supposed to come back in four weeks but he

18   instructed his staff to do a pill count in two weeks; right?

19   A   Correct.

20   Q   May 4th, 2015 would be two weeks later; right?

21   A   Correct.

22   Q   Read to the jury -- and this is in evidence.  This is in

23   the chart.  Read to the jury what that says.

24   A   Called patient and advised him to come in within 24 hours

25   with his medications, and I stated if he does not come in he

1  will be terminated from the practice.  Patient claims he does

2  not have transportation to come in.  Patient was being rude

3  with me because he has no one of going -- that must be a

4  typo -- no one of going and wanted to speak with Dr. Ruan

5  because he has no way to get.  It's kind of broken up.

6  Q   Right.  Well, it's electronic record, though; right?

7           I'll move you along to KL............

8           MR. ARMSTRONG:  Dennis, if you can get that chart,

9  help me speed it up.

10 Q   Do you remember testifying yesterday about KL...........?

11 A   Yes.  Also, we still did not see any proof of a pill count

12 or the numbers of the pill count for the previous patient.

13          MR. ARMSTRONG:  Your Honor, may we approach?

14     (At the side bar, jury not present.)

15          MS. GRIFFIN:  I can't hear him.

16          MR. ARMSTRONG:  This patient died.  I stayed away from

17 it.  He didn't come in.  He never came in.  And I just stayed

18 away from it.

19          THE COURT:  Well, so let's move on.

20          MS. GRIFFIN:  He opened the door.

21          MR. ARMSTRONG:  I didn't open the door.

22          THE COURT:  Let's move on.  How much more do you have?

23          MR. ARMSTRONG:  I've got two patients.

24          THE COURT:  I know, but how much with each patient?

25 She needs time to redirect and it's already 4:20.

```
 1         MR. ARMSTRONG:  All right.  I'll move along.
 2      (In open court, defendants and jury present.)
 3  BY MR. ARMSTRONG:
 4  Q   Do you have the file of KL.......... in front of you?
 5  A   Yes, I do.  What was the Bates stamp on that one?
 6  Q   I'm just asking if you have the file.
 7  A   I have -- I have the file.  I just didn't have the Bates
 8  stamp number.
 9  Q   Well, I haven't gotten to them yet.
10  A   The file -- I have -- the create date was 8/28/2009.
11  Q   I'm going to show you what I've had marked as Ruan Exhibit
12  23, just for the witness.  And I'll ask you if you've seen
13  this.
14         THE COURT:  Is this in evidence?
15         THE CLERK:  No, ma'am.
16         THE COURT:  Is it part of the record that he has?
17         MR. ARMSTRONG:  It is not part of the chart.  I'm
18  asking has he seen it.  I'm not showing it to the jury.
19  A   I don't believe I've seen this particular note.
20  Q   Does it appear to you to be the -- a report of the initial
21  visit, the first visit?  And it's 2008 so it's a couple of
22  years before; right?
23         MS. GRIFFIN:  Your Honor, we would object to reference
24  to this.  It is outside the time frame charged in the
25  indictment.  And it is not covered on direct and it is not in
```

1028

```
 1    the chart.
 2            MR. ARMSTRONG:  Well, in his testimony, Judge, he said
 3    there was no history taken, there was no exam.
 4            THE COURT:  Well, this is not a report of an exam and
 5    history in this chart.  So --
 6            MR. ARMSTRONG:  All right.  Can we approach, then?
 7       (At the side bar, jury not present.)
 8            MR. ARMSTRONG:  Judge, this goes back to 2008, when
 9    the practice used a different system for their records.  They
10    switched over in 2013, I believe, to the Greenway system.  This
11    is Greenway.  Not all the records got scanned to Greenway.  He
12    testified it was -- from what he saw, he didn't see these
13    records and he testified there was no exam, there was no
14    history taken, because he didn't see it.  His opinion is based
15    on what he didn't see.
16            MS. GRIFFIN:  But -- but --
17            MR. ARMSTRONG:  Because of what he didn't see.
18            MS. GRIFFIN:  His opinion is based on what he did see
19    and that is outside of the time frame charged.
20            MR. ARMSTRONG:  No.  His testimony was that this
21    patient never got an exam, never -- get the transcript.
22            There was no history taken, there was no exam
23    performed.  This directly contradicts that.
24            MS. GRIFFIN:  It --
25            THE COURT:  Well, I think you're going -- he did not
```

1    say that the fact that there was no history taken was outside

2    the course of professional practice.  That may have been his

3    response to a question, because all he saw was -- what was

4    given to him was the chart that started in whenever it started.

5            MS. GRIFFIN:  Well --

6            MR. ARMSTRONG:  Well, I'll ask him if it had anything

7    to do with his opinion.  Well, Judge --

8            THE COURT:  No.  Listen --

9            MS. GRIFFIN:  That's not --

10           THE COURT:  The only thing he gave his opinion on was

11   the fact that -- the fact she had severe pain all over her body

12   for 20 years was a red flag, that there was no indication of

13   cancer.  She was given fentanyl and no informed consent.  So --

14           MR. ARMSTRONG:  No consultation with the prior

15   referring physician, no exam, no history.  There was an exam,

16   there was history, and there were records from the referring

17   physician.  He didn't see them.

18           MS. GRIFFIN:  If he didn't see it, then it is not

19   impeachment of him and they need to call another witness to get

20   that information in.

21           MR. ARMSTRONG:  I can ask him if he saw it.

22           THE COURT:  Well, just show him this and ask if he saw

23   it.  Don't ask any questions about it.

24           MR. BODNAR:  Your Honor --

25           MS. GRIFFIN:  We need to correct one thing.  Mr. Gist

1030

```
 1   is still alive and he's going to be a witness.  So he's not

 2   deceased.

 3            MR. ARMSTRONG:  Okay.

 4            THE COURT:  You said he was dead.

 5            MR. ARMSTRONG:  That's what I thought he was.

 6            MR. BODNAR:  He's not.

 7            MR. ARMSTRONG:  Okay.  Well, then I'll do that last

 8   question.  I'll get to the pill count question.

 9            THE COURT:  Let's go.  Let's go.

10            MR. ARMSTRONG:  Well, no.  He commented on it, Judge.

11   Now I have to -- I thought this man was deceased.  That's why I

12   left it alone.  He said:  I never saw it.

13            THE COURT:  Did you have evidence of what happened?

14            MR. ARMSTRONG:  I have evidence of what happened.

15            THE COURT:  All right.  But that --

16            MR. ARMSTRONG:  No.  He never showed up.

17            THE COURT:  That's what --

18            MR. ARMSTRONG:  He never showed up for the pill count.

19   The jury doesn't know that.

20            THE COURT:  Did they terminate him as a patient?

21            MR. ARMSTRONG:  Yes.

22            THE COURT:  You can show that.

23            MS. GRIFFIN:  Is it in the file that he reviewed?

24            MR. ARMSTRONG:  I'll ask him.

25         (A discussion was held off the record between defense
```

DAVID GORDON GREENBERG, MD - CROSS BY MR. ARMSTRONG

1    counsel.)

2        (In open court, defendants and jury present.)

3    BY MR. ARMSTRONG:

4    Q   Doctor, I hate to go back.  You asked -- you never saw

5    evidence --

6            THE COURT:  You're going back to patient Gist; right?

7            MR. ARMSTRONG:  Gist.

8            THE COURT:  All right.

9    BY MR. ARMSTRONG:

10   Q   You testified you never saw any result of the pill count

11   request.  Have you seen this document?  The pill count was

12   requested on May 4th.

13   A   Yeah.  I believe this is the one that I read back that was

14   in a little bit of broken English.  And the patient was advised

15   to come in for his pill count and he was noted --

16   Q   We're not talking about that one.  (Indicating?)

17   A   Pardon me?

18           MS. GRIFFIN:  Your Honor, we object.  Let him finish

19   his answer.

20           MR. ARMSTRONG:  All right.  Go ahead.  I was just

21   trying to clarify.

22           THE COURT:  Can you -- we can't hear you,

23   Mr. Armstrong.

24           MR. ARMSTRONG:  No.  She said to let him finish.

25   Q   Go ahead.

DAVID GORDON GREENBERG, MD - CROSS BY MR. ARMSTRONG

1032

1    A    Okay.  So this was a note stating that Brenda, who I assume

2    worked in the PPSA Clinic, called the patient for random pill

3    count and was advised at that time that he had 24 hours to come

4    in with his medications.  The patient was noted to be rude and

5    demanded to speak with Dr. Ruan.  States that he had a hard

6    time finding transportation.  And was advised that he had --

7    and it's blocked out by the green ink right here, the green

8    color right here.  There you go.  Thank you.  That he had 24

9    hours to go in and if he failed to show he would be terminated

10   from the practice.

11           And the patient never showed or called back.

12   Q    Okay.  So the actual pill count document that was May 4th

13   and then this was the followup; correct?

14   A    Right.  The patient failed to show up for his pill count.

15   Q    I bring that to your attention because you asked me -- you

16   didn't see any evidence of what happened?

17   A    Yeah, I didn't.

18   Q    And there was --

19   A    It looks like there was a good-faith attempt to have a pill

20   count and it didn't happen, not due to a problem with Dr. Ruan.

21   Q    And that is what you would expect to see within the scope

22   of professional practice, professional medical practice?

23   A    Yes.  When a pill count is arranged, that it would be

24   performed.

25   Q    Now, let me show you where we just were, going back to

DAVID GORDON GREENBERG, MD - CROSS BY MR. ARMSTRONG

1   Ms. L..., the L... chart.  Ruan Exhibit 73, and see if you can

2   tell me if you've ever seen that document.

3   A   Yeah, I've seen this document.

4   Q   You have seen it?

5   A   I believe so.  Yes.  Uh-huh.

6   Q   Okay.  And you can see because your testimony was --

7           MS. GRIFFIN:  Your Honor, what's the Bates number on

8   it so we can go to it in the file or so the doctor can go to it

9   in the file?

10          THE COURT:  All right.

11          MR. ARMSTRONG:  I don't have the Bates number.

12  Q   You remember seeing it; right?

13          THE COURT:  Did you not represent that this was not in

14  the patient's chart?

15          MR. ARMSTRONG:  I didn't think it was in the patient's

16  chart but the doctor just said he's seen it.

17          THE COURT:  Well, you showed it to him a minute ago,

18  so beyond that --

19  BY MR. ARMSTRONG:

20  Q   Had you seen it prior to today?

21  A   I don't believe I've seen it prior to today.

22  Q   You have not?

23  A   I don't believe I've seen it prior today.

24  Q   Okay.  All right.  Well, you testified yesterday that there

25  was never a history taken, no exam taken; right?  What does

```
 1   this purport to be?
 2           MS. GRIFFIN:  Objection, Your Honor.  It is outside
 3   the time and it is not something he has reviewed.
 4           THE COURT:  I sustain it.
 5           MS. GRIFFIN:  It's years ago.
 6           THE COURT:  Let's move on.
 7   BY MR. ARMSTRONG:
 8   Q   When you treat a patient, do you disregard all your prior
 9   contact with that patient, when you treat a patient?
10   A   When I treat a patient, do I disregard all my what?  I'm
11   sorry.
12   Q   All of your prior treatment you provided that patient, do
13   you disregard it?
14   A   No.
15   Q   In fact, you refer back to your entire chart, don't you?
16   A   Correct.
17   Q   So it's obvious that there are parts of this chart you have
18   not seen; correct?
19           MS. GRIFFIN:  Your Honor, objection.  That calls for a
20   comment on facts that are not in evidence.
21           THE COURT:  Yes.  Why don't you simply --
22           MS. GRIFFIN:  Not admitted.
23           THE COURT:  -- ask him if in fact an earlier exam was
24   done of her, would you agree that there was an exam done?  So
25   it's a --
```

DAVID GORDON GREENBERG, MD - CROSS BY MR. ARMSTRONG

1  BY MR. ARMSTRONG:

2  Q   If there was evidence that there was a prior exam and if

3  there was evidence that there was a prior history taken and if

4  there's evidence of prior consultation with a referring

5  physician, that would be within the proper course of a

6  professional medical practice; correct?

7  A   So long as the provider that was doing those exams was

8  qualified to do those exams at the level of -- at the level

9  that they were supposed to be done.

10  Q   Right.  And earlier I showed you an example where Dr. Ruan

11  performed the exams personally; right?  On a prior patient.

12  A   Where Dr. Ruan had a record that showed that he performed

13  those exams.

14  Q   Well, you don't have any reason to dispute that that's what

15  happened, do you?

16        MS. GRIFFIN:  Your Honor, objection.  That is

17  argumentative.

18        THE COURT:  Sustained.

19  BY MR. ARMSTRONG:

20  Q   If there's a record of it, you take it as a fact; correct?

21        MS. GRIFFIN:  Objection, Your Honor.  It's the same

22  question.

23        THE COURT:  Sustained.

24  BY MR. ARMSTRONG:

25  Q   Did you see the documentation that was received from the

1   referring physician?

2          THE COURT:  Which patient are you talking about now?

3          MR. ARMSTRONG:  Same one, Ms. L....

4   Q   Does your chart show information from the referring

5   physician?

6   A   I don't remember seeing the information from the referring

7   physician.

8   Q   If that is part of the entire chart, would that be

9   something that would be important to you to want to have to see

10  in evaluating the case file in forming your opinion?

11  A   Yes, especially if there was a referring physician.  Yes.

12  Q   Okay.  And again, if there is information in the entire

13  chart about exams, referring attorney -- I mean, referring

14  physicians, information from the referring physician, that's

15  important; right?

16  A   Yes.  That would be -- often be important, yes.

17  Q   And information about PDMP is important too; right?

18  A   Yes, it is.

19  Q   Do you know if Dr. Ruan was checking PDMP?

20         MS. GRIFFIN:  Your Honor, there's no foundation and

21  he's not referred to a specific file.

22         THE COURT:  Are you still talking about Ms. L...?

23         MR. ARMSTRONG:  Yes.

24         THE COURT:  Well, let's keep your questions specific,

25  if you will.

1037

```
 1   BY MR. ARMSTRONG:

 2   Q   Do you know if Dr. Ruan checked PDMP on Ms. L...?

 3   A   He should --

 4   Q   Or any of the patients that you reviewed?

 5   A   Pardon me?

 6   Q   Or on any of the patient files you reviewed of Dr. Ruan?

 7   A   In this practice the physicians rarely checked the PMP.

 8   Q   Rarely?

 9   A   Yeah, I would say --

10   Q   Have you -- have you seen the PDMP report regarding how

11   many times Dr. Ruan searched PDMP?

12   A   No, I haven't seen that.

13   Q   Okay.  Do you know that we requested that through discovery

14   from the United States Government, do you know that?

15           MS. GRIFFIN:  Objection as to foundation --

16           THE COURT:  Sustained.

17           MS. GRIFFIN:  -- Your Honor.

18   BY MR. ARMSTRONG:

19   Q   Did the United States show you the report of how many times

20   Dr. Ruan was checking PDMP?

21   A   I don't believe that I saw that.

22   Q   Okay.  Would that be important to you in determining

23   whether Dr. Ruan was properly following the course of

24   professional practice by checking PDMP?

25   A   Yes, checking the PDMP is a very appropriate thing to do.
```

1  Q   Hypothetically, if a physician over a 19-month period,

2  between 2013 and May of 2015 checked PDMP 6716 times, would

3  that be something that you would want to know?

4  A   That would be a heavy use of the PDMP.

5  Q   And that would be something that would be important for you

6  in evaluating a chart and formulating an opinion; right?

7  A   Yes, it would.

8  Q   You didn't get those records; right?

9  A   I don't believe I got those 6,000 PDMP queries, no.

10  Q   Did you see -- did you see in KL's...... chart that she

11  brought a pain diary and gave to Dr. Ruan.  Did you see that?

12  A   I think I do believe -- remember that she was keeping a

13  pain diary, yes.

14  Q   And if I can refer you to 218 -- Bates stamp 218064?  Well,

15  let me skip over that.  That's a prior date.

16          You did not -- oh, you did see that.  That's part of

17  the chart; right?  You did see that.  218064.  This is in

18  evidence.  Do you remember seeing this?

19  A   6/12/09.

20          MS. GRIFFIN:  Your Honor, it is outside the period of

21  time that he's testified about, it's outside the direct

22  examination, and it's outside the time frame of the indictment

23  in 2009.

24          MR. ARMSTRONG:  It's in evidence.  It's in the chart.

25  Q   Did you review this?

1          MS. GRIFFIN:  It is beyond the scope of direct, Your

2    Honor.

3          THE COURT:  I sustain the objection.

4    BY MR. ARMSTRONG:

5    Q   You said that she had unresolved psychiatric issues on your

6    direct, there was no history taken, which I think you said that

7    you would want to see it if it existed; you didn't get any

8    referrals information, which you were not shown?

9          THE COURT:  You've already been over most of

10   this.  Let's get to something you haven't discussed with him.

11   BY MR. ARMSTRONG:

12   Q   I believe you testified that you didn't understand why they

13   were giving medications to her based on the lack of the history

14   taken, the lack of the exam; correct?

15   A   I believe I made that comment, yes.

16   Q   Okay.  And just for the witness' sake, this pain diary --

17         MS. GRIFFIN:  Your Honor, that's the same exact one.

18         MR. ARMSTRONG:  I have a question I can ask him.

19         MS. GRIFFIN:  We object.  The Court has previously

20   sustained showing him this.

21         THE COURT:  Let's move along, Mr. Armstrong.

22   BY MR. ARMSTRONG:

23   Q   Ms. L... was presenting information to her physicians about

24   her pain; correct?  You saw that?

25   A   Yes.

1  Q   Finally, let's move along to Ms. G........., last one.  Do

2  you have the chart in front of you about Ms. G.........?

3  A   Yes, DG........., file 8850.

4  Q   It's getting late in the day.  So I'm going to move along

5  as quickly as I can.

6        You mentioned -- the first thing you talked about was

7  you had problems with the Narcan injector; right?

8  A   Yes, that's true.

9  Q   You did say that she had been referred by Dr. Pearsall?

10 A   Yes.

11 Q   Okay.  And Dr. Pearsall is an orthopedic surgeon with USA

12 Hospital?

13 A   I'm -- I'm not sure exactly where the doctor works, but I

14 was aware that he was the referent.

15 Q   And did you know that he was the professor at the medical

16 school as well?

17 A   No, I didn't know that.

18 Q   And the Narcan injector you said, and went to great lengths

19 talking about why someone should not get a Narcan injector.

20 A   It's that -- yeah, it's Narcan is the pronunciation.

21 Q   Pardon me?

22 A   Narcan.

23 Q   Narcan.  I'm sorry.

24 A   Yes.  Or naloxone.

25 Q   Thank you for pointing that out.

1    Have you reviewed the CDC Guidelines regarding Narcan

2  injectors?

3  A   Yeah, I've -- I have reviewed those guidelines and my

4  biggest concern and objection of the Narcan distribution that's

5  being done to untrained people is just the fact that the

6  patient -- if the patient is so obtunded, if they are so under

7  the influence of narcotics and sedative-hypnotic drugs, then

8  the answer for that is to not just throw in a Narcan injector,

9  which would be the antidote for that.  But the answer -- the

10  answer would be to train the patient and train the family with

11  reference to how to make sure that they use the Narcan

12  correctly.

13    And also, the thing that's very important too, is that

14  they understand at that point in time how -- what the

15  indications are for them to call 911 and also what the

16  procedure would be to clear the airway of obstruction like

17  vomit, and things like that, that happen when a person has an

18  overdose and their airway fills of vomit.  So how to clear the

19  airway and how to do the appropriate CPR to keep that patient

20  going.

21  Q   Okay.  I hate to cut you off.  We're running late.  I

22  recall you saying that yesterday.

23  A   Okay.

24  Q   I do.  And I'm sure the jury does too.  My question,

25  though, was have you seen the CDC Guidelines regarding Narcan

1  injectors?

2  A   Yes, I've seen the CDC Guidelines regarding Narcan

3  injectors and I've also read the studies about -- in the field.

4  In the field it doesn't work out so well.

5  Q   So that's yes, you have seen the CDC Guidelines?

6  A   I have seen the CDC Guidelines.

7  Q   Okay.  And I'm showing you what I've had marked as Ruan

8  Exhibit 76.  This is published March 15, 2016, CDC Guideline

9  for Prescribing Opioids for Chronic Pain, United States,

10  2016.  Correct?

11  A   Correct.

12  Q   You've seen this; right?

13  A   Correct.

14  Q   Let me move you over here.  And again, this was published

15  in the JAMA; right?

16  A   It was, I think, in JAMA.

17  Q   Okay.  Let me get you to focus on this paragraph 8.  Read

18  that paragraph 8 to the jury, please.

19  A   Okay.  As soon as it stops moving I'll do it.  Assessing

20  Risk and Addressing Harms of Opioid Use.  8, followed by a

21  period.  Before starting and periodically during continuation

22  of opioid therapy, clinicians should evaluate risk factors for

23  opioid-related harms.  Clinicians should incorporate into the

24  management plan strategies to mitigate risk, including

25  considering offering naloxone when factors that increase the

1   risk for opioid overdose, such as history of overdose,

2   history of substance use disorder, higher opioid doses greater

3   than 50 morphine equivalents per day, or concurrent

4   benzodiazepine use, are present.

5   Q    What is naloxone?

6   A    Naloxone is a medication that when injected into the human

7   body will bind opioid receptors.  Those are the receptors that

8   cause the opioid effects in the body.  And what happens is

9   that --

10  Q    And again, I'm not trying to cut you off.  If you can just

11  tell us what it is, what that is.  Is that a Narcan injector?

12  A    Yes.

13  Q    Is that Naloxone?

14  A    Yes.

15  Q    So the CDC in their guidelines contemplates clinicians

16  incorporating Naloxone into their regimen; correct?

17  A    Yeah, they recommend.

18  Q    To mitigate risk; right?

19  A    They recommend that.  But what I'm saying is that the

20  reports from the field are pretty dismal.  And the reason is

21  because you can inject the Narcan into a person if there's a

22  person around there to do the injecting but you still have to

23  clear the airway of that person who is asphyxiating at that

24  time and you still have to be able to know how to do CPR and

25  other types of things in order to save that patient's life.

DAVID GORDON GREENBERG, MD - CROSS BY MR. ARMSTRONG

1           The other problem with Narcan is that the Narcan does
2   not reverse the benzodiazepines, which most of these patients
3   are on, and so it gives a false sense of security.  So there
4   are studies currently that are being performed to check the
5   efficacy of Narcan.  And in fact, the jury is still out.  It
6   sounds like a great idea.  You know, you inject the antidote,
7   but if you don't train the patient and/or the patient's family
8   how to recognize the problem and how to deal with the problem,
9   how to clear the airway and get them to understand the other
10  important thing, which is that Narcan is very short acting.
11          And a lot of times people get the Narcan from
12  nonprofessional personnel, like at home.  The patient wakes up
13  and then they fall back asleep and can have a fatal event.
14  Q   Is it safe to say you disagree with the CDC?
15  A   I disagree not with the intent of the CDC.  I disagree --
16  what I'm concerned about is the reports from the field are not
17  good for this drug.  And too often people get the Narcan and
18  they get it too late and they wind up being brain dead.
19  Q   Reports from the field?
20  A   Pardon?
21  Q   Reports from the field?
22  A   Right, reports from the field in the literature of the use
23  of Narcan.  Another problem with it is, is that many of these
24  people are risk takers and they will continue to increase their
25  Narcotic use with the false sense of security that they've got

1  Narcan and can maybe use that if they get into trouble.  So

2  there's -- there's -- it's -- on the surface it seems like a

3  great idea.  In practical application it is not a proven

4  methodology yet.

5  Q   Okay.  You mentioned --

6  A   I take that -- I take one thing back.  It is proven if

7  paramedics are using it, that are properly trained.  But when

8  bystanders use it, the results are not that good.

9  Q   That's not what the CDC says.  The CDC in that part I just

10  showed you said "clinicians" using that in their opioid therapy

11  regimens; right, not --

12  A   Yeah.  The problem with that is this --

13  Q   You've already said the problem.  We understand the

14  problem.

15         MS. GRIFFIN:  Your Honor?  I object.  If he's asked a

16  question, the witness is entitled to answer it.  And he's been

17  over it.

18         THE COURT:  Yes, I think we've been over this.  So

19  let's move on.

20  BY MR. ARMSTRONG:

21  Q   Now, you also testified that Ms. G......... was walking

22  around in a stupor, walking around in a stuporous state.

23  A   Yes.

24  Q   Remember that?

25  A   And I think Dr. Ruan documented --

DAVID GORDON GREENBERG, MD - CROSS BY MR. ARMSTRONG

1    Q    Do you remember saying that?

2    A    Yeah.

3    Q    Okay.

4    A    Yeah.

5    Q    And you reviewed the chart and you found evidence from the

6    chart, I suppose, that she was walking around in a stuporous

7    state?

8    A    Yes.  She was so sedated that Dr. Ruan felt that he had to

9    give her amphetamine-type drugs so that she could become more

10   awake.  And that is called oversedation when you have a patient

11   that heavily sedated and you feel that you have to give them

12   stimulant drugs so that they can stay awake.  It's certainly

13   not a safe type of way to be managing these patients because

14   literally they're on the edge of respiratory arrest.

15   Q    So you say Ms. G......... was on the edge of respiratory

16   arrest?

17   A    Yes, if she was that -- if she was that impaired by the

18   opioids and benzodiazepines that she was getting.  Okay.  That

19   yes, that does bring her closer to respiratory arrest, which is

20   one of the huge causation factors that we have with our opioid

21   emergency in the United States of America right now.  People

22   are using those drugs, they are not using them wisely, and

23   things are happening to those patients which are quite adverse.

24   Q    Let me direct your attention to the chart, sir.  If you

25   will look at Bates stamp 220308.

1       MR. ARMSTRONG:  Dennis, do you have it?

2       MR. KNIZLEY:  308?

3   Q   220308.

4   A   220308.

5       THE COURT:  Is that what you're exhibiting?

6       MR. ARMSTRONG:  That's this document.

7       THE COURT:  All right.  Let's just read it off the

8   screen if you can.

9   Q   I submit to you this was October 8, 2014, history of

10  illness, DG..............is a 56-year-old Caucasian white

11  female who presents in followup for evaluation and management

12  of chronic pain in the left knee and right knee.  Medications

13  very helpful.  Subsys is used for her breakthrough pain and it

14  works much faster than Abstral, but Abstral is more user

15  friendly.  Patient works full time and her medications keep her

16  working at Austal as a systems support specialist.  Isn't that

17  what that says?

18  A   Yes.

19  Q   So is that evidence of a person walking around in a stupor

20  near death?

21  A   Yeah, sure.  People that abuse these drugs cannot use them

22  at work and not be impaired at work.  But at home, they can

23  abuse the drugs and become in a stuporous state.  And that was,

24  I think, the reason why Dr. Ruan wanted to prescribe her the

25  amphetamine-class drugs.  There would be no other reason to

1   prescribe those drugs.  She didn't have -- she didn't have ADHD

2   or anything.

3   Q   You're referring to the Provigil?  What's it called?

4   A   I believe it was Provigil and Nuvigil.  Both of them are of

5   the amphetamine class.

6   Q   And -- well, you -- actually your testimony was it was in

7   the same class as methamphetamine?

8   A   Yeah, it is the same class as methamphetamine.

9   Q   What -- on the schedule, the DEA Schedule, where is

10  methamphetamine?

11  A   Methamphetamine is a Schedule II drug.

12  Q   It's Schedule II?

13  A   Right.

14  Q   Okay.  And where is Provigil?  Where is it scheduled?

15       MS. GRIFFIN:  Your Honor, what is the relevance?  It

16  is beyond the scope of direct.

17       MR. ARMSTRONG:  Well, he testified about it and he

18  just talked about it.

19       THE COURT:  Schedule is different from class.  So

20  let's move along, please.

21  Q   It's a Schedule IV; correct?  Correct?

22  A   It's a Schedule IV and it also has been scheduled as a

23  Schedule III at different times in its career.

24  Q   It's a Schedule IV, isn't it?

25  A   It's a Schedule IV right now.  I'm just saying that the

1  history of it is it's been scheduled as a Schedule III and as a

2  Schedule IV.

3  Q   We're talking about your testimony here today.

4        MS. GRIFFIN:  Your Honor, I object to him attempting

5  to counsel or correct the witness.  If he's got a question -- I

6  mean, we've objected to this repeatedly and he's failed to

7  follow the Court's admonition.

8        THE COURT:  All right.  Let's move along.  It's almost

9  10 minutes to 5.  We've got redirect to go through.

10 BY MR. ARMSTRONG:

11 Q   I am going to show you Government's Exhibit 4-13.  Remember

12 that?  Do you remember that from yesterday?

13        THE COURT:  Can you say what it is?

14        MR. ARMSTRONG:  Well, it's a folder and within the

15 folder was this document here.

16 Q   Do you remember that?

17 A   Yeah, I remember seeing this yesterday, I believe.  Yeah.

18 Q   You didn't know what it was for and you didn't know the

19 purpose of it.  But you were -- it was shown to you; right?

20 A   Right.

21 Q   And it's on Dr. Ruan's letterhead?

22 A   It is definitely on what appears to be Dr. Ruan's

23 letterhead, yes.

24 Q   And, of course, it talks about his qualifications, his

25 training, and his board fellowships and boards; correct?

1   A   Correct.

2   Q   And I want you to pay attention to this right here.  What

3   does that say?  Read that.  (Indicating.)

4   A   It says here that 99 percent of their patients use

5   significantly less than the dose limit.

6   Q   Okay.  Do you know how many patients Dr. Ruan had?

7   A   I don't know.  I know that he had a lot of patients but I

8   don't know the exact number.

9   Q   You looked at nine files; correct?

10  A   Right.

11          MR. ARMSTRONG:  Judge, if I could --

12      (A discussion was held off the record between counsel.)

13          MR. ARMSTRONG:  I think that's all.

14          THE COURT:  All right.  Ms. Griffin?

15                      REDIRECT EXAMINATION

16  BY MS. GRIFFIN:

17  Q   I'm still showing you, Dr. Greenberg, the letter that

18  Dr. Ruan appeared to sign.  And it states that they have many

19  patients not on any opioids.  Of the 20 files you examined, the

20  19 files you examined, did every one of those 19 have an opioid

21  prescription and many of them multiple opioid prescriptions?

22  A   Yeah.  The PPSA practice routinely prescribed poly-opioid

23  combinations which have no science behind them with reference

24  to how well they work on human beings.  The problem with the

25  poly-opioid combinations is that you get -- you get

1051

1  increased --

2          MR. ARMSTRONG:  Your Honor, I would impose an

3  objection that.  It's nonresponsive.  She said of the 20 files

4  you reviewed and he's talking about the practice as a

5  whole.  If he could reserve his representations to the files he

6  reviewed and not the whole practice.

7          THE COURT:  Your answer is based solely on the files

8  you reviewed, is it not?

9          THE WITNESS:  Correct.

10          THE COURT:  Yes.  All right.  Let's have another

11  question, Ms. Griffin.

12  BY MS. GRIFFIN:

13  Q   All right.  I show you what's marked as Government's

14  Exhibit 13-3B, the PDMP for Deborah Walker.

15          MS. GRIFFIN:  And, Your Honor, might I just show it to

16  him at first?

17          THE COURT:  Yes.

18          MS. GRIFFIN:  It's not been admitted, although there

19  is an agreement that it may be admitted.

20  Q   Deborah Walker first came back to Dr. Ruan -- I'll show you

21  this, Deborah Walker at the top, from PDMP -- January the 14th

22  of 2014, according to the medical records; is that right?

23  A   Correct.

24  Q   She had been receiving medications since December of 2013

25  from someone; is that correct?

DAVID GORDON GREENBERG, MD - REDIRECT BY MS. GRIFFIN

1   A   Correct.

2   Q   So she had not been in prison since December 5th of '13.

3   She wasn't immediately in prison before coming to Dr. Ruan, was

4   she?

5   A   As far as I know, no.

6   Q   According to this PDMP?

7   A   Yeah, unless -- yes exactly.

8   Q   And she was prescribed certain drugs that were inconsistent

9   on her urine drug screen according to the PDMP that were

10  prescribed to her prior to her coming January the 14th of 2014

11  and being prescribed Soma and hydrocodone by Dr. Ruan; is that

12  right?

13  A   That is correct, along with -- along with another narcotic.

14  Q   Now, you said that the fact that you may or may not have

15  seen the January 14th report on Ms. Walker, that that might

16  change your opinion as to that part of your review.  Does that

17  change your opinion that her total treatment was outside the

18  usual course of professional responsibility, professional care?

19  A   No, that doesn't change it.

20  Q   As to Ms. L... -- if you see a patient in 2008, do you have

21  reason to believe that their circumstances may have changed by

22  2013?

23  A   Circumstances certainly could change.

24  Q   They could change overnight; right?

25  A   Absolutely.

DAVID GORDON GREENBERG, MD - REDIRECT BY MS. GRIFFIN

1    Q    So you did not see a review of her current circumstances or
2    condition in what you were provided during this date range of
3    the indictment and what you opined on; is that correct?
4    A    That is correct.
5    Q    Does your opinion about Ms. L's... treatment during the
6    time frame of this indictment remain the same?
7    A    Yeah, my opinion remains the same.
8    Q    Also as to Mr. Gist, have you been told that the clinic was
9    raided on May the 20th, 2015, and that no patients were seen
10   after May the 19th of 2015?  I don't know if that's been
11   discussed with you or not.  Has it?
12   A    No, I didn't know that.
13   Q    So hypothetically if I told you the last patients were seen
14   on May the 19th, 2015, because of a raid on May the 20th of
15   2015, you don't know from any records provided whether Mr. Gist
16   was terminated or not.  They weren't in what you reviewed, were
17   they?
18   A    That's true.  I couldn't be sure if that was the case.
19   Q    Does your opinion change as to Mr. Gist's treatment being
20   outside the usual course of professional practice?
21   A    No.  Mr. Gist was high risk.  He needed treatment for his
22   alcohol abuse problem and he also needed to be monitored by the
23   doctors who were taking care of him in order to help save his
24   life by having urine testing that would check for both alcohol
25   itself in the system and also urine testing that would check

1  for alcohol metabolites, which are used to track, and that did

2  not happen.  And I believe that that put the doctor -- not the

3  doctor -- that put the patient at peril.  Well, actually it

4  could put the doctor at peril too.

5  Q   And finally, as to Ms. G........., is your opinion still

6  the same, that her series of treatment during the time of this

7  indictment was outside the usual course of professional

8  practice?

9  A   Yes, I do believe that.

10 Q   I'll show you what was introduced yesterday as Dr. Couch's

11 Exhibit 118, which purports to be certain chapters of the

12 Alabama Medical Examiner's Brochure and you were not shown this

13 portion that tells physicians that they should not fear

14 disciplinary action from the board for a legitimate medical

15 purpose and in the usual course of professional practice.  You

16 weren't shown that part, were you?

17 A   No.

18 Q   And it also says that all prescribing must be based on

19 clear documentation and in compliance with applicable state or

20 federal law; is that correct?

21 A   Correct.

22 Q   You wouldn't expect a state medical examiner to state any

23 other way, would you?

24 A   No.

25 Q   Further, you were shown by Dr. Couch's attorney, a

1055

1    practitioner's manual from 2006 from the DEA, Couch Exhibit

2    110, at page 19.  Now, it lists safeguards for prescribers.

3    You weren't shown this yesterday, were you?

4    A   No.

5    Q   Or this morning?  I'm not sure when Mr. -- when Dr. Couch's

6    attorney used that.  Does it state that all prescription blanks

7    must be kept in a safe place where they cannot be stolen or

8    minimize the ones in use?

9    A   Yes, that's just normal discipline of prescription pads

10   that should be done in any practice of medicine, especially of

11   chronic pain.

12   Q   Does it also state that prescription pads should never be

13   signed in advance?

14   A   That's -- I believe that's illegal, that's an illegal

15   practice in all of the states of the union to sign stuff in

16   advance.

17   Q   I'm sorry.  A prescription blank would be a prescription

18   pad or a prescription itself?

19   A   Right.

20   Q   That's what you understand this to be?

21   A   Yes.

22   Q   Also you were shown the CDC Guideline for Prescribing

23   Opioids for Chronic Pain.  It was introduced as one of

24   Dr. Couch's exhibits.

25   A   Yes.

DAVID GORDON GREENBERG, MD - REDIRECT BY MS. GRIFFIN

 1  Q   I show you page 13 of that and ask if you were shown that

 2  part -- and you weren't shown, were you -- regarding specific

 3  opioids and formulations as noted by the FDA, there are serious

 4  risks of ER/LA opioids.  First of all, ER stands for what?

 5  A   Extended release which would mean like long acting.

 6  Q   So extended release and long acting specifically as noted

 7  and the implication for this medicine is for management of pain

 8  severe enough to require daily, around the clock, long-term

 9  opioid treatments in patients for whom other treatment options

10  are ineffective or would be otherwise inadequate to provide

11  sufficient management of pain; is that correct?

12  A   Correct.

13  Q   That there are risks with giving extended release

14  medication opioids to people?

15  A   Correct.  They are absolutely a risk and the

16  recommendations are definitely to use the short-acting drugs

17  whenever possible.

18  Q   And finally, are you aware that this particular guideline

19  from the CDC goes into when to initiate or continue opioids for

20  chronic pain?

21  A   Yes.

22  Q   Are you aware that it discusses that?

23  A   Yes, uh-huh.

24  Q   Are you aware that it discusses what a doctor should do

25  before beginning opioid therapy for chronic pain?

1    A    Yes.  I'm aware of that and unfortunately that's often not

2    followed.

3    Q    Are you aware that it also lists some very specific things

4    that doctors must do about opioids?

5    A    Yes.

6    Q    When patients have sleep disorders to include sleep apnea?

7    A    Correct.

8    Q    When patients are aged 65 or older?

9    A    Yes.

10   Q    And when patients have mental health conditions?

11   A    Right.  All those are special high-risk presentations of

12   patients that need extra care and extra tight management.

13   Q    And are you also aware that the Medical Examiner's Guide

14   introduced by Dr. Couch, Exhibit 118 -- which you weren't --

15   you weren't shown the informed consent and agreement for

16   treatment, were you, in that guide yesterday?

17   A    The guide that was shown by the practice?

18   Q    Yes.  You weren't shown this particular page, were you?

19   A    No.

20   Q    And it, in fact, says:  The physician shall discuss the

21   risks and benefits of the use of controlled substances with the

22   patient.

23   A    Yes.

24   Q    And that's what you testified to.

25   A    Yes.

 1  Q   Correct?  It doesn't say that your nurse assistant can

 2  discuss those with a patient or your physician's assistant.  It

 3  said the physician shall?

 4  A   Yes, that's exactly correct.

 5  Q   That's not a choice, is it?

 6  A   No, that is not a choice.

 7  Q   Finally, I show you what has been marked as Government's

 8  Exhibit 13-21 and ask if you are familiar with the CDC

 9  pamphlet, the three-page pamphlet for prescribing opioids for

10  chronic pain.

11          MS. GRIFFIN:  I'm not going to show it to the jury

12  yet.  And I'd move to admit this Department of Health and Human

13  Services from the CDC.  It is a short analysis of their 2016

14  guidebook that is already in evidence.

15          THE COURT:  Any objection?

16          MR. SHARMAN:  No objection.

17          THE COURT:  All right.  Mark it in.  You can turn it

18  on.

19      (Government's Exhibit 13-21 was entered into evidence.)

20  BY MS. GRIFFIN:

21  Q   Does this guideline for prescribing opioids for chronic

22  pain discuss what should be tried before opioids?

23  A   Yes.

24  Q   Does it discuss clinical reminders that opioids are not a

25  first-line or a routine therapy for chronic pain?

1    A    Right, they shouldn't be.

2    Q    And it goes on to discuss benefits and risks with

3    availability of nonopioid therapies that should be discussed

4    with a patient; is that true?

5    A    Yes.

6    Q    Also on the second page does it discuss that long -- excuse

7    me -- do not prescribe extended-release opioids for acute pain?

8    A    Correct.

9    Q    Is that true?

10   A    That's true.

11   Q    And does it go on to discuss:  Clinical Reminders, avoid

12   concurrent benzodiazepine and opioid prescribing as

13   benzodiazepine, what you've been referring to and what we've

14   heard as benzos?

15   A    Yes, that's -- that's an exceptionally big problem at the

16   present time is the mixing of opioids and narcotics.  And

17   unfortunately this caused -- it has caused tremendous suffering

18   within our country.  The combination of the benzodiazepine

19   drugs and the opiate drugs can be lethal and is lethal, and is

20   one of the number one causes of severe overdose reactions that

21   people have.  Furthermore, there are studies that have come --

22            MR. SHARMAN:  Objection, Your Honor.  Can the witness

23   be cautioned to answer the question?

24            THE COURT:  Let's just limit your answer directly to

25   the question.  And I think you've answered it, so --

 1                THE WITNESS:  Okay.

 2                THE COURT:  Ask another question.

 3     BY MS. GRIFFIN:

 4     Q   So you agree with that, avoiding concurrent benzos and

 5     opioid prescribing?

 6     A   Correct.

 7     Q   Did you see that in some of the files that you reviewed and

 8     you have testified to here yesterday and today?

 9     A   Yes, I saw lots of prescribing of both narcotics and benzos

10     without any life -- potentially life-saving warnings with

11     reference to the dangers that those combinations cause.

12     Q   And quickly, is there a reference to:  Benefits of

13     long-term opioid therapy for chronic pain are not well

14     supported by evidence?

15     A   There's no scientific evidence that supports long-term

16     opioid use for noncancerous chronic pain.  We've known that for

17     quite a number of years and it's a really big problem because

18     so many practitioners continue to prescribe in that manner and

19     yet there is no science that backs it up.  In other words, when

20     you follow these people long term, they show no improvement

21     from the opioids.  What they show is -- over time they show

22     degradation of their abilities to function, degradation of

23     their mental abilities.  And this is serious stuff because it

24     causes impairment of thinking, it causes impairment of

25     judgment, and in many situations this impairment is permanent.

1       So these are not benign drugs.  They have toxic

2   effects and, you know -- I don't want to talk about how you

3   read about it in the newspaper but that's true.

4       MR. SHARMAN:  I'll object, Your Honor.  Again, could

5   he be admonished just to answer the question?

6       THE COURT:  I think he's through with this one.

7       MS. GRIFFIN:  I think he's through, Your Honor.

8   Q   And Dr. Greenberg, finally, in connection with your

9   testimony here today, you testified that one of the first

10  things doctors should do is do no harm.  Did you determine in

11  those 19 files that you reviewed that those were outside the

12  usual course of professional practice and that as a result they

13  did do harm?

14  A   Yes, I believe that they have the potential to do harm.

15  Absolutely.

16      MS. GRIFFIN:  That's all I have of the witness, Your

17  Honor.

18      THE COURT:  All right.  Thank you.  You may step down,

19  Doctor.

20      And ladies and gentlemen, we're going to recess for

21  the weekend.  Remember my instructions to you.  Again, it's

22  especially important because we've got a three-day weekend to

23  remind yourselves not to discuss the case with anybody.  Be

24  back here Tuesday morning, 9 o'clock, downstairs in the jury

25  assembly room to start again.

1    Thank you.  And have a good weekend.

2    (Court adjourned at approximately 5:07 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25