1          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF ALABAMA
2

3   UNITED STATES OF AMERICA
                                      CASE NO. CR15-00088
4   v.
                                      COURTROOM 2B
5   JOHN PATRICK COUCH, M.D.,
    and XIULU RUAN, M.D.,
6                                     MOBILE, ALABAMA
           Defendants.
7   * * * * * * * * * * * * * *       TUESDAY, JANUARY 17, 2017

8   REDACTED

9                        DAY 6 OF TRIAL
10        BEFORE THE HONORABLE CALLIE V. S. GRANADE,
          UNITED STATES DISTRICT JUDGE, AND JURY
11

12

13  APPEARANCES:

14  FOR THE GOVERNMENT:
         DEBORAH A. GRIFFIN
15       CHRISTOPHER BODNAR
         United States Attorney's Office
16       63 S. Royal Street, Suite 600
         Mobile, AL  36602
17       (251) 441-5845

18  FOR THE DEFENDANT COUCH:
         ARTHUR T. POWELL, III
19       P.O. Box 40456
         Mobile, AL 36640-0456
20       (251) 433-8310

21       JACKSON R. SHARMAN, III
         ROBERT JACKSON SEWELL
22       JEFFREY PAUL DOSS
         BENJAMIN SANDERS WILLSON
23       Lightfoot, Franklin & White
         400 North 20th Street
24       Birmingham, AL  35203
         (205) 581-0700
25

1  (Continued)

2      BRANDON KEITH ESSIG
       800 Shades Creek Parkway, Suite 600D
3      Birmingham, AL  35209
       (251) 879-1981

4

   FOR THE DEFENDANT RUAN:
5      DENNIS J. KNIZLEY
       7 N. Lawrence
6      Mobile, AL 36602
       (251) 432-3799

7

       JASON BRADLEY DARLEY
8      Darley & McGough, LLC
       1751 Dauphin Street
9      Mobile, AL 36604
       (251) 441-7772

10

       GORDON G. ARMSTRONG, III
11     P.O. Box 1464
       Mobile, AL  36633
12     (251) 434-6428

13     STEVEN D. MARTINIE
       4955 North Lake Drive
14     Whitefish Bay, WI  53217
       (414) 332-9683

15

   THE CLERK:  MARY ANN BOYLES
16 THE LAW CLERK:  LYNN DEKLE
   U.S. ATTORNEY IT:  BRIAN COCHRAN
17 DEFENSE IT:  SAM MCALLISTER
   COURT REPORTER:  ROY ISBELL, CCR, RDR, CRR

18

19          Proceedings recorded by OFFICIAL COURT REPORTER
           Qualified pursuant to 28 U.S.C. 753(a) & Guide to
       Judiciary Policies and Procedures Vol. VI, Chapter III, D.2.
20          Transcript produced by computerized stenotype.

21

22

23

24

25

1

EXAMINATION INDEX

2

GAIL TETZLAFF

3          DIRECT BY MR. BODNAR   . . . . . . . . . . . . . . . .1071
           CROSS BY MR. DARLEY . . . . . . . . . . . . . . . . .1077

4

RANDALL SCOTT BLACKMON

5          DIRECT BY MR. BODNAR   . . . . . . . . . . . . . . . .1080
           CROSS BY MR. POWELL . . . . . . . . . . . . . . . . .1096

6          REDIRECT BY MR. BODNAR . . . . . . . . . . . . . . . 1131

7    RITA BLACKMON
           DIRECT BY MR. BODNAR   . . . . . . . . . . . . . . . .1142

8          CROSS BY MR. POWELL . . . . . . . . . . . . . . . . .1149
           REDIRECT BY MR. BODNAR . . . . . . . . . . . . . . . 1154

9

TAMISAN BLANKS

10         DIRECT BY MS. GRIFFIN . . . . . . . . . . . . . . . .1158
           CROSS BY MR. SHARMAN  . . . . . . . . . . . . . . . .1181

11         REDIRECT BY MS. GRIFFIN . . . . . . . . . . . . . . .1217

12   LACY FORTENBERRY
           DIRECT BY MR. BODNAR   . . . . . . . . . . . . . . . .1225

13         CROSS BY MR. SHARMAN  . . . . . . . . . . . . . . . .1262
           CROSS BY MR. KNIZLEY  . . . . . . . . . . . . . . . .1278

14         REDIRECT BY MR. BODNAR . . . . . . . . . . . . . . . 1288

15   NATALIE PERHACS
           DIRECT BY MR. BODNAR   . . . . . . . . . . . . . . . .1296

16

17

18

19

20

21

22

23

24

25

| | | EXHIBIT INDEX | | |
|---|---|---|---|---|
| | | | MAR | ADM |
| | GOVERNMENT'S | | | |
| | 13-22 | Blackmon medical file from PPSA | | 1082 |
| | 15-1 | Ruan payment information for Exalgo - Exalgo Speaker Renewal Addendum 10/1/11 (Ruan) | | 1075 |
| | 15-2 | Speaker program payments Exalgo (Ruan) | | 1075 |
| | 15-2A | Chart - Source File - Exalgo (Ruan) | | 1075 |
| | 17-1(2) | Email from Burlakoff to Fortenberry 7/2/12 vacation request-speaker program | | 1246 |
| | 17-1(3) | Email from Fortenberry to Babich & Burlakoff 8/26/12 BAMA - speaker program | | 1249 |
| | 17-1(4) | Email from Fortenberry to Rowan 11/27/12 - Bama - re:  push for prescriptions for Subsys | | 1253 |
| | 32-1(1) | Email from Perhacs to Fordham PA forms faxed to Dr. Ruan | | 1300 |
| | 32-1(2) | Insys prior authorization form - opt-in form | | 1300 |
| | 32-1(3) | Email from Matus to Perhacs 8/7/13 re: opt-in form - I.. (Couch) | | 1300 |
| | 32-1(4) | Email to Perhacs 5/2/13 re:  opt-in form - Barber (Couch) | | 1300 |
| | 32-1(5) | Email to Perhacs 4/16/13 re:  opt-in form - H...... (Couch) | | 1300 |
| | 32-1(6) | Email to Perhacs 6/5/13 re:  opt-in form - P.... (Couch) | | 1300 |
| | 32-1(7) | Email to Perhacs 6/11/13 re:  opt-in form - Sansing (Couch) | | 1300 |
| | 32-1(8) | Email to Perhacs 8/9/13 insurance approval - I.. | | 1300 |

| | | |
|---|---|---|
| 32-1(9) | Email to Perhacs 5/7/13 insurance approval - Barber | 1300 |
| 32-1(10) | Email to Perhacs 9/12/13 insurance approval - H...... | 1300 |
| 32-1(11) | Email to Perhacs 6/7/13 insurance approval - Sansing | 1300 |
| 32-2(1) | Email from Perhacs to Fordham | 1320 |
| 32-2(2) | Insys prior authorization form | 1320 |
| 32-2(3) to 32-2(11) Emails | | 1320 |
| 32-2(12) | Email to Perhacs 3/11/14 insurance conditional approval - Sansing | 1320 |
| 32-2(13) | Email to Perhacs 5/2/13 insurance approval | 1320 |
| 32-2(14) | Email to Perhacs 2/20/14 not approved - Burns (Ruan) | 1320 |
| 32-2(15) | Email to Perhacs 2/25/14 denied Subsys LMN - Burns | 1320 |
| 32-2(16) | Email to Perhacs 4/30/14 denied - Blanks (Witherspoon) | 1320 |
| 32-5 | Plea agreement without factual resume - Perhacs | 1318 |

**DEFENDANT COUCH'S**

| | | |
|---|---|---|
| 5B | Blackmon initial medical record PPSA | 1097 |
| 5F | Blackmon - correspondence with HealthSpring Insurance Agency | 1098 |
| 5G | Blackmon PDMP 1/2011-5/2015 | 1098 |
| 147 | Email chain from Yu to Fortenberry 9/17/12 Daily Rep Report for Low Strength Usage | 1271 |

**DEFENDANT RUAN'S**

| | | |
|---|---|---|
| 102 | Email chain from Fortenberry to Grasso and Burlakoff 8/19/12-8/15/12 group practice and 8/15/12 dinner meeting | 1281 |

```
 1        (Morning session, 8:30 a.m., in chambers, jury not
 2   present.)
 3            MR. BODNAR:  Good morning, Your Honor.
 4            MS. GRIFFIN:  Good morning, Your Honor.
 5            THE COURT:  Good morning, good morning.  Here's your
 6   evidence.  (Indicating.)
 7            MR. SHARMAN:  Good morning.
 8            MR. KNIZLEY:  Good morning, Judge.
 9            THE COURT:  Good morning, good morning.
10            MR. ARMSTRONG:  Good morning.
11            THE COURT:  Find a seat if you can.
12            All right?
13            MS. GRIFFIN:  Your Honor, we learned the information
14   we found in the motion we filed under seal with the Court over
15   the weekend.  Dr. Greenberg has given us permission to talk to
16   his neurologist.  We are going to have someone do that today.
17   Hopefully they can contact him.  We tried over the weekend and
18   they were closed yesterday, of course, being a holiday weekend.
19            We need to develop the facts before we can tell the
20   Court.  Right now what we have is our observations and what
21   Dr. Greenberg told us.
22            So we would like to be able to present that to Counsel
23   and the Court as soon as we are able to talk to his doctor,
24   hopefully today.
25            THE COURT:  All right.
```

1          MS. GRIFFIN:  And then we can make a decision as to

2     what we might ask the Court to do.

3          THE COURT:  All right.

4          MR. SHARMAN:  Your Honor, at least for Dr. Couch,

5     we're certainly willing to listen to whatever the government

6     has to offer.  I think our basic view is that the standard for

7     competency is fairly liberal; as long as the witness

8     understands the oath, in general that makes him

9     competent.  Here we have an expert offered by a party,

10    qualified and accepted as an expert, testified on direct, was

11    cross-examined, testified on redirect, was excused without

12    anybody asking he be subject to recall.  And we don't think

13    that there's anything there.  But we're certainly willing to

14    hear whatever the government has to say.

15         THE COURT:  All right.

16         MR. BODNAR:  And, Your Honor, we had discussed -- all

17    parties had discussed over the weekend as well -- I think we're

18    on the same page with Mr. Sharman and Mr. Knizley in terms of

19    what the standard is for whether ineffective -- ineffective

20    mental capacity to testify.  It seems like it's going to be

21    something that goes to the weight as opposed to admissibility.

22    But at this point we don't have enough facts, because he is

23    telling us he's unreliable and the facts are unreliable and we

24    don't know what they are.

25         THE COURT:  Who is telling you he's unreliable?

1   MR. BODNAR:  Dr. Greenberg.  And the fact that he's

2   saying -- he told us what he told us about having -- believing

3   he's got early onset dementia, and then it was demonstrated by

4   several things he did on the stand, and I think most

5   prominently the fact that he had talked throughout the week

6   about flying possibly straight to Albuquerque to testify in

7   that case in New Mexico supposedly today.  And when I called

8   today to say out there -- let them know what happened on

9   Friday, they told me:  Our case has been postponed.  He knows

10  that.  We told him that a couple of weeks ago.  He doesn't have

11  testimony -- and that was very disturbing to me.

12  MS. GRIFFIN:  And, Your Honor, he did not use the word

13  "unreliable."

14  MR. BODNAR:  Yes.

15  MS. GRIFFIN:  He used the word "cognitive."

16  THE COURT:  I don't think there's any question that he

17  was competent to testify.  I think the whole thing is a

18  credibility issue and I guess the real question is what if

19  anything the government wants to present in connection with

20  that or what would be allowable or admissible.  So we'll just

21  wait until you come up with whatever you're going to present.

22  MS. GRIFFIN:  And one of the things he did offer

23  Friday night is to refund the monies paid and to not charge for

24  his testimony here.  And we are going to take him up on that

25  for not having told us.  But we don't know whether he could

```
 1   have told us or knew to even tell us.  So we may be asking for
 2   an instruction to the jury.  But we can't ask for anything
 3   until we --
 4           THE COURT:  Know the facts.
 5           MS. GRIFFIN:   -- until we know the facts.
 6           THE COURT:  Well, just let me know when you do.
 7           MR. BODNAR:  Thank you, Your Honor.
 8           MS. GRIFFIN:  Thank you.
 9           MR. SHARMAN:  Thank you.
10           THE COURT:  Other than that, are we ready to continue
11   this morning?
12           MR. BODNAR:  Yes.
13           THE COURT:  Okay.
14       (A recess was taken at 8:40 a.m.)
15       (In open court, 9:04 a.m., defendants and jury present.)
16           THE COURT:  Good morning, ladies and gentlemen.
17           All right.  Counsel, you may call your next witness.
18           MR. BODNAR:  United States calls Gail Tetzlaff.
19           THE CLERK:  Ms. Tetzlaff, let me get you to raise your
20   right hand.
21                       GAIL TETZLAFF
22           was sworn and testified as follows:
23           THE WITNESS:  I do.
24                     DIRECT EXAMINATION
25   BY MR. BODNAR:
```

GAIL TETZLAFF- DIRECT BY MR. BODNAR

1  Q   Good morning, Ms. Tetzlaff.

2  A   Good morning.

3  Q   Would you tell us your name for the jury?

4  A   Gail Tetzlaff.

5  Q   And how do you pronounce -- or how do you spell your last

6  name?

7  A   T-E-T-Z-L-A-F-F.

8  Q   And Ms. Tetzlaff, where do you work?

9  A   At Mallinckrodt Pharmaceuticals.

10  Q   And please explain to the jury what is Mallinckrodt

11  Pharmaceuticals?

12  A   Mallinckrodt is a pharmaceutical manufacturer.

13  Q   And are they based in Missouri?

14  A   Yes, headquartered in Hazelwood, Missouri.

15  Q   And what do you do for Mallinckrodt Pharmaceuticals?

16  A   I am director of government reporting compliance.

17  Q   So what does that mean?  Explain to the jury.  What is the

18  government reporting compliance?

19  A   Okay.  So I basically handle our basic financial

20  information when it's required for reporting to the government.

21  Q   And if a subpoena comes in for financial information from

22  your company, is that something that you would then go look at

23  the data and provide?

24  A   Yes.  Right.

25  Q   Now, you mentioned working at Mallinckrodt.  Was there a

1073

 1    portion of time that Mallinckrodt was promoting a drug called

 2    Exalgo?

 3    A   Yes.  That was one of our branded products.

 4    Q   And do you know what Exalgo is?

 5    A   Not really.  It's not really --

 6    Q   Is that part of your job to know what the actual drug is?

 7    A   No.  I mean, I deal with the related financial information.

 8    Q   And in relation to this case did Mallinckrodt receive a

 9    subpoena for details about payment information for a Dr. John

10    Patrick Couch and a Dr. Xiulu Ruan?

11    A   We did, yes.

12    Q   And did you -- was it then assigned to you to look at

13    Mallinckrodt's data to determine if there was any payment data

14    to either doctor?

15    A   Yes.

16    Q   And first with regard to Dr. Couch -- well, first of all

17    have you ever met Dr. Ruan or Dr. Couch before?

18    A   No, I haven't.

19    Q   And can you identify them here in the courtroom?

20    A   No, I can't.

21    Q   With regard first to Dr. Couch, did you find any details

22    about payments made by Mallinckrodt to Dr. Couch?

23    A   No, I didn't.

24    Q   How about to Dr. Ruan?

25    A   Yes, I did.

1  Q   Your Honor, may I approach with what has been marked as

2  Government's Exhibit 15-1?

3          THE COURT:  Yes.

4          MR. BODNAR:  15-2 and 15-2A.

5          THE COURT:  Yes.

6  BY MR. BODNAR:

7  Q   Ms. Tetzlaff, for identification purposes are the documents

8  in 15-1 and 15-2A the documents you provided to the United

9  States in response to the subpoena?

10 A   Yes, they are.

11 Q   And again, these relate only to Dr. Xiulu Ruan; is that

12 correct?

13 A   That's right, yes.

14 Q   And now looking at 15-2, is this the data in terms of

15 dates, name, payments for and amounts paid that were taken from

16 your data and put on a different spreadsheet?

17 A   Yes, they are.

18 Q   And have you previously had an opportunity to look over

19 15-2 to make sure that the numbers are correct, from the raw

20 data that you provided to the data provided here on this

21 spreadsheet?

22 A   Yes.

23 Q   And are they correct?

24 A   Yes, they are correct.

25          MR. BODNAR:  Your Honor, the United States moves to

 1    admit Government's Exhibits 15-1, 15-2 and 15-2A.

 2            THE COURT:  Any objection?

 3            MR. SEWELL:  No objection, Your Honor.

 4            THE COURT:  All right.  Mark them in.1063

 5       (Government's Exhibits 15-1, 15-2 and 15-2A were entered

 6    into evidence.)

 7    BY MR. BODNAR:

 8    Q   Ms. Tetzlaff, now I'm going to show you what has been

 9    admitted as Government's Exhibit 15-2.  Is this the chart that

10    you were just talking about that contains the data that you

11    provided pursuant to the subpoena request?

12    A   Yes, it is.

13    Q   And at the top it says Speaker Programs.  What was it that

14    you found payments for related to the drug Exalgo for Dr. Ruan?

15    A   Yes.  From our vendors that managed our speaker programs, I

16    identified payments made by them on Mallinckrodt's behalf for

17    Dr. Ruan having been a speaker for Mallinckrodt.

18    Q   And just to explain what you said, you said third-party

19    vendors.  So Mallinckrodt doesn't actually run their own

20    speaking programs?

21    A   We used vendors to manage the program.

22    Q   So a third-party vendor would host -- would handle or

23    manage the speaking program and they would provide you the

24    information that you then provided the United States?

25    A   Yes.

GAIL TETZLAFF - DIRECT BY MR. BODNAR

1    Q   So are these the dates starting here on January 13th, 2011?

2    It says:  Dr. Xiulu Ruan, MD, Speaker Program Training, and

3    amount paid $2,500.

4    A   Yes, that would have been reported to Mallinckrodt by the

5    vendor, yes.

6    Q   And same thing here, just using as example the next one,

7    March 31st, 2011?

8    A   Right.  Yes.

9    Q   Xiulu Ruan, Speaker Program, $1,500?

10   A   Right.

11   Q   And based on your records is this the entire amount, this

12   $23,275 that was paid by Mallinckrodt -- well, by vendors on

13   behalf of Mallinckrodt to Dr. Ruan?

14   A   Yes.

15   Q   Were they for two speaker trainings and the rest being

16   speaker programs?

17   A   Yes; correct.

18   Q   And was that between January 13th, 2011 and August 22nd,

19   2013?

20   A   Yes.

21   Q   And Ms. Tetzlaff, were you present at these speaker

22   programs?

23   A   No, I was not.

24   Q   Do you have any other -- any other information of what

25   happened at these speaker programs other than what you found in

 1  the Mallinckrodt data?

 2  A   No.

 3        MR. BODNAR:  Nothing further of this witness, Your

 4  Honor.

 5        THE COURT:  Any cross?

 6        MR. SEWELL:  None from Dr. Couch.

 7        MR. DARLEY:  Yes, ma'am, Your Honor.

 8        THE COURT:  All right.

 9                    CROSS EXAMINATION

10  BY MR. DARLEY:

11  Q   Good morning, Ms. Tetzlaff.

12  A   Good morning.

13  Q   My name is Jason Darley and I represent Dr. Ruan.  You

14  reside in Missouri?

15  A   Yes.

16  Q   Welcome to Alabama.

17  A   Thank you.

18  Q   I want to show you something that the government has marked

19  as Exhibit Number 1.  You said you reviewed the documents.  And

20  do you recognize this document?

21  A   Yes, I believe that's the document that I provided that I

22  identified in some payments documentation.

23  Q   Okay.  And this document, it is purported to be signed by

24  two individuals, one here; could you tell the jury who that is?

25  A   It says it's Dr. Ruan.

1  Q   And tell the jury who this person is.

2  A   Mallinckrodt's chief medical officer at the time, Herb

3  Newman.

4          THE COURT:  Mr. Darley, you identified this as

5  Government's Exhibit Number 1, is that --

6          MR. DARLEY:  15-1, Your Honor.

7          THE COURT:  15-1?

8          MR. DARLEY:  Yes, ma'am.  15-1; right.

9  Q   So this contract at the time that it was dated in March of

10  2010 was between presumably Dr. Ruan and your company; correct?

11  A   Yes.

12          MR. BODNAR:  Your Honor, we -- objection on that.

13  That doesn't look like that -- that looks like a date that was

14  created.  The date here is October 1st, 2011.

15          MR. DARLEY:  I'm sorry.  There it is.  October 1,

16  2011.

17  Q   So in your duties, you testified earlier that you handled

18  the financial information when requested by subpoena?

19  A   Yes.

20  Q   And you said that you pulled information as to speaker

21  programs?

22  A   Yes.

23  Q   Okay.  Now, Mallinckrodt is a large company; correct?

24  A   We're a mid-sized company, yes.

25  Q   Do you have any idea how many billions of dollars of sales

GAIL TETZLAFF - CROSS BY MR. DARLEY

1079

1   you have individually in any given year?

2   A   I'm not sure.

3   Q   Okay.  Do you -- your company, though, markets a variety of

4   different pharmaceutical products; correct?

5   A   We market more than one product at a time, yeah.

6   Q   Okay.  And you said that you -- your company or these

7   third-party vendors managed these speaker programs.

8   A   Yes.

9   Q   Okay.  And is it common in your industry to promote your

10  products with spokespersons, doctors?

11          MR. BODNAR:  Your Honor, objection as to relevance for

12  this witness.  She's here giving the numbers of what the

13  documents say.

14          MR. DARLEY:  Your Honor, they brought up this exact

15  subject.  They said during the course of her retrieval of these

16  documents they looked at these various speaker programs and the

17  data that was provided to Mallinckrodt.

18          THE COURT:  I sustain the objection.  She simply

19  presented the numbers.

20          MR. DARLEY:  Yes, ma'am.

21          That's all I have.  Thank you, Judge.

22          THE COURT:  All right.  Any redirect?

23          MR. BODNAR:  No redirect, Your Honor.

24          THE COURT:  All right.  Thank you.  You may step down.

25          MR. BODNAR:  Your Honor, we have a special agent or a

 1   witness that needs special accommodations right here.  The

 2   United States calls Randall Blackmon.

 3          THE COURT:  All right.

 4          THE CLERK:  Mr. Blackmon, let me get you to raise your

 5   right hand.

 6                    RANDALL SCOTT BLACKMON

 7            was sworn and testified as follows:

 8          THE WITNESS:  Yes, ma'am.

 9          THE CLERK:  Thank you, sir.

10                    DIRECT EXAMINATION

11   BY MR. BODNAR:

12   Q   Good morning.

13   A   Good morning.

14   Q   Could you please -- I'm not sure if that mic's on.  Could

15   you please pull it closer?

16   A   Like that?  Okay.

17   Q   Could you please introduce yourself to the jury?

18   A   My name is Randall Scott Blackmon.

19   Q   And Mr. Blackmon, where do you grew up -- did you grow up?

20   A   In Mobile.

21   Q   Would you please give the jury a little bit about your

22   background?

23   A   Well, I'm 49 years old.  I've lived in Mobile all my

24   life.  I have pretty much -- I mean the basics.

25   Q   Mr. Blackmon, was there a time that you became a patient of

RANDALL SCOTT BLACKMON - DIRECT BY MR. BODNAR                    1081

1   PPSA or Pain Clinic?

2   A   Yes, sir.

3   Q   Could you please explain to the jury the background of how

4   you started going to PPSA?

5   A   I was sent there from one of my other medical doctors for

6   pain management for my legs.  I had some really bad issues with

7   my legs.  I had venous stasis ulcers on both of my legs.

8   Q   You said ulcers on your legs?

9   A   Yes, sir.  Venous stasis ulcers on both legs.

10  Q   And approximately when did you start going to PPSA?

11  A   It was around 2010.

12  Q   And did you have one of these -- of the doctors here,

13  Dr. Ruan or Dr. John Patrick Couch as your doctor at PPSA?

14  A   Dr. Patrick Couch.

15  Q   And do you see Dr. Couch in the courtroom here today?

16  A   Yes, sir.

17  Q   Are you able to identify him for the record?

18  A   Yes, sir.

19  Q   Could you please describe what he's wearing -- point to him

20  or describe what he's wearing?

21  A   Looks like a blue suit, striped tie and striped shirt,

22  looks like.

23         MR. BODNAR:  Your Honor, for the record, let the

24  record reflect that the witness has identified Dr. Couch.

25  Q   And Mr. Blackmon, who was your referring doctor to

RANDALL SCOTT BLACKMON - DIRECT BY MR. BODNAR

1    Dr. Couch?

2    A    Dr. Ronald O'Gorman from --

3    Q    You said that you had come in for pain management for your

4    legs?

5    A    Yes, sir; that's correct.

6    Q    Did you have cancer when you started going there?

7    A    No, sir, not at all.  No way.

8    Q    At any point, have you ever had cancer?

9    A    Never in my life; never.

10           MR. BODNAR:  Your Honor, may I approach with what has

11   been marked as Government's Exhibit 13-22?

12   Q    Mr. Blackmon, I'm showing you what's been marked as

13   Government's Exhibit 13-22.  Is this a copy of your medical

14   file from PPSA?

15   A    Yes, sir, it sure is.

16           MR. BODNAR:  United States moves to admit Government's

17   Exhibit 13-22.

18           MR. POWELL:  No objection.

19           THE COURT:  All right.  Mark it in.1063

20       (Government's Exhibit 13-22 was entered into evidence.)

21   BY MR. BODNAR:

22   Q    Mr. Blackmon, I'm going to show you the history and

23   physical dated January 12th, 2010, which appears to be from

24   your medical records, the first visit.  You said you believe

25   your first visit was in 2010; correct?

1083

```
 1    A    That's correct.
 2    Q    And up here -- can you see on the screen?  It says:  Chief
 3    complaint, burning and tingling of bilateral lower legs.  Is
 4    that really what you came in there for?
 5    A    No, sir.  It was for venous stasis ulcers.
 6    Q    Would that -- could that be described --
 7    A    Oh, yes.
 8    Q    -- as burning and tingling?
 9    A    Yes, yes.  That would be correct.
10    Q    So this appears to be accurate; correct?
11    A    Yes, sir, that's accurate.  I'm sorry.  That's accurate,
12    yes.
13    Q    And how about the biographical information?  Is that your
14    name right there?
15    A    Yes, sir.  Spelled wrong but that's my name.
16    Q    It's spelled wrong, correct.  It's Blackmon?
17    A    M-O-N.
18    Q    M-O-N.; correct?
19    A    Yes, sir.
20    Q    And that is your birth date?
21    A    Yes, sir.
22    Q    Looking down further on the page, it appears it shows a
23    review of systems, is that what it looks like?
24    A    Yes, sir.
25    Q    And then flipping over to the next page, it looks like they
```

1    did your vitals and then it notes physical examination.  Before

2    we get to physical examination do you recall this first visit

3    to PPSA?

4    A    Yes, sir.

5    Q    Did you see Dr. Couch during this first visit?

6    A    Yes, sir.

7    Q    So let's talk about what it says in your file happened at

8    this first visit.  Do you see here where it says vision?

9    A    Yes, sir.

10   Q    Pupils equally round, reactive to light bilaterally.  Do

11   you recall if they looked in your eyes with a light during that

12   first visit?

13   A    No, sir.

14   Q    You don't recall or they didn't?

15   A    They didn't; no, sir.

16   Q    Down here on neck for thyroid.  Do you see that there?

17   A    Yes, sir.

18   Q    Do you see where it says gland size normal, nontender,

19   nodules or masses present on palpitation?  Do you see that?

20   A    Yes, sir, I see that.

21   Q    Did Dr. Couch or anyone else in the office feel around on

22   your neck during that first visit?

23   A    No, sir.  No one touched me.

24   Q    But it does say that in your medical record.  It says that

25   happened, doesn't it?

 1   A   Exactly; yes, sir.

 2   Q   Is that true or is that a lie?

 3   A   That's a lie.

 4   Q   Now, how about here under gastrointestinal?  Do you see

 5   where it says abdomen nontender to palpitation?  Do you recall

 6   them pressing down on your stomach?

 7   A   No, sir, no one's pressed down on my stomach.  That's a

 8   lie.

 9   Q   Is that true or is that a lie?

10   A   That's a lie.

11   Q   Normal bowel sounds.  Was someone listening to your stomach

12   with a stethoscope?

13   A   No, sir.  That's a lie.

14   Q   Now, I'm going to go to the end of that visit.

15   A   Okay.

16   Q   And this is that same visit.  And I see Plan and

17   Instructions here.  Do you see those there?

18   A   Yes, sir.

19   Q   Under Instructions, and I'll read this to you:  Patient was

20   advised of possible side effects of chronic-opioid therapy,

21   including but not limited to constipation, drowsiness, nausea,

22   vomiting, itching, physical dependence or nervousness.  Do

23   you -- did Dr. Couch or anyone else in the office give you that

24   warning on that visit?

25   A   No, sir.  That's a lie.

1086

RANDALL SCOTT BLACKMON - DIRECT BY MR. BODNAR

1   Q    So is that true or is that a lie in your medical record?

2   A    That's a lie.

3   Q    Going on.  Advised to avoid alcohol or any illicit

4   substance while using the prescribed opioid medication and

5   follow directions exactly as prescribed.  Were you given that

6   warning?

7   A    No, sir.  That's a lie.

8   Q    The patient understands that they are not to accept any

9   other opioids or central nervous suppressants from any other

10  physician or clinic.  Do you recall that being told to you?

11  A    No, sir.  That's a lie.

12  Q    Mr. Blackmon, do you recall what medications you were

13  receiving when you first started going to PPSA?

14  A    If I remember, the first medications was morphine,

15  MS-Contin and methadone.

16  Q    And MS-Contin, is that a brand name for morphine?

17  A    Yes, sir.

18  Q    And you said you also received methadone?

19  A    Yes, sir.

20  Q    Where did you go and fill your prescriptions?

21  A    PPSA.  There at the pharmacy, C&R Pharmacy.

22  Q    C&R Pharmacy, the one attached to their clinic?

23  A    Yes, sir.

24  Q    What kind of insurance did you have?

25  A    HealthSpring.

1  Q   During your time at PPSA did you also receive a number of

2  injections by Dr. Couch?

3  A   Sympathetic blocks, yes, sir.

4  Q   And what are those?  Are you able to explain what that is

5  to a jury?

6  A   Sympathetic block is an injection that is put in your back,

7  and it was given to me to try to block -- to help block with

8  the pain in my legs.  I had one done on the right side and one

9  done on the left side.  I had it done three times on each side.

10 Q   Now, when you had procedures done, were those procedures

11 done by Dr. Couch?

12 A   Yes, sir.

13 Q   And you mentioned that you saw Dr. Couch during your first

14 visit.  Did you see Dr. Couch for any other office visits

15 beyond that?

16 A   No, sir.

17 Q   Who did you see during your office visit?

18 A   Justin Palmer.

19 Q   And who, if you know, is Justin Palmer?

20 A   The nurse practitioner.

21 Q   I'm going to show you now what purports to be a progress

22 note from your file dated October 23rd, 2013.  Do you see where

23 it says chief complaint?  And that's correct, isn't it, the

24 left -- you had left leg pain?

25 A   Yes, sir.  Both legs.

1088

1  Q   That's true; right?

2  A   Yes, sir.

3  Q   It says review of systems below, kind of like we saw

4  before?

5  A   Okay.

6  Q   And on the following page do we then see physical

7  examination from that visit?  Do you see that?

8  A   Yes, sir.

9  Q   And again just to point to a few of them.  For thyroid,

10  gland size normal, nontender, no nodules or masses present on

11  palpitation.  On this visit or any visit did Dr. Couch or

12  Justin Palmer or anyone else feel around under your neck for

13  masses?

14  A   No, sir.  That's a lie.

15  Q   General palpitations, same sort of thing.  Did anyone ever

16  press down on your body or feel around your stomach or anywhere

17  else?

18  A   No, sir.  That's a lie.

19  Q   So if it says in your medical file that that happened,

20  you're saying that that's not true?

21  A   No, sir.  I was never touched.

22  Q   Explain to the jury then what did happen when you went in

23  for these doctor's visits?

24  A   Most -- almost 99 percent of the time it was go in, wait a

25  few minutes, Justin would come in, sit down, ask about the

RANDALL SCOTT BLACKMON - DIRECT BY MR. BODNAR

```
 1  medication, write the prescriptions and I was out the door.  It
 2  was usually less than 15-20 minutes at the most.
 3  Q   You said "write the prescriptions," what do you mean by
 4  Justin writing the prescriptions?
 5  A   Well, or signing the prescriptions for my medications.
 6  Q   You saw -- did you actually physically see Justin Palmer
 7  sign a prescription?
 8  A   Yes, I did.  Yes, sir.
 9  Q   Whose name was on that prescription?  Was it signed Justin
10  Palmer or was it signed Dr. Couch?
11  A   It was signed Dr. Couch.
12  Q   And without going through each of your progress notes, if
13  your other progress notes say that they looked in your eyes,
14  was that ever true?
15  A   No, sir.  That's a lie.
16  Q   Feel around under your neck, was that ever true?
17  A   No, sir.  That's a lie.
18  Q   Feel around your stomach, was that ever true?
19  A   No, sir.  That's a lie.
20  Q   Those are lies in your medical record?
21  A   Yes, sir.
22  Q   Mr. Blackmon, was there a time that you were started on a
23  drug called Subsys?
24  A   Yes, sir.
25  Q   Can you please explain to the jury what is Subsys?
```

RANDALL SCOTT BLACKMON - DIRECT BY MR. BODNAR

1    A    Subsys is a medication virtually made of fentanyl.  It's a

2    spray that goes under your tongue and it's given for cancer

3    patients, not for regular patients.

4    Q    And we'll get to that.

5    A    Okay.

6    Q    But let me show you what has been previously marked as

7    Government's Exhibit 1-9.  Is this top picture right here, is

8    this a picture of Subsys?  (Indicating.)

9    A    Yes, sir.

10   Q    And is that the spray that you were prescribed?

11   A    Yes, sir; that's correct.  Yes, sir.

12   Q    And do you see where it says the strength over here?

13   A    Yes, sir.

14   Q    What strength of Subsys were you being prescribed

15   predominantly?

16   A    I was prescribed the 1600 micrograms.

17   Q    So the strongest strength right here?

18   A    Yes, sir.

19   Q    How did it come about that you were first prescribed the

20   spray Subsys?

21   A    Well, when I was on the other two medications, the

22   MS-Contin and the methadone, they had not -- they got to the

23   point where they were not working very well.  So then I was

24   prescribed the Subsys to go along with both of those

25   medications, to knock -- to try to help the pain.

1   Q   Tell me, what did Dr. Couch tell you about Subsys before he

2   started prescribing it to you?

3   A   There was nothing told to me about Subsys when it was

4   prescribed to me.

5   Q   Dr. Couch didn't tell you anything?

6   A   No, sir.

7   Q   Is that because you didn't even see Dr. Couch?

8   A   That's correct.

9   Q   Tell me what Justin Palmer told you about Subsys then.

10  A   Nothing.  I was wrote the prescriptions and handed to me

11  and that was it.  No side effects, no nothing.

12  Q   Nothing was explained to you?

13  A   No, sir.  Nothing.

14  Q   I'm going to show you what has previously been marked as

15  Government's Exhibit 13-1.

16          MR. BODNAR:  Your Honor, we are not admitting this

17  through this witness but was going to ask him if he's ever seen

18  this exhibit before.

19          THE COURT:  All right.

20  BY MR. BODNAR:

21  Q   Showing what's been marked as Government's Exhibit 13-1?

22  A   13, 37?

23  Q   Looks like 37-1.  Mr. Blackmon do you see where it says

24  TIRF REMS access up here?

25  A   Yes, sir.

RANDALL SCOTT BLACKMON - DIRECT BY MR. BODNAR

1   Q   And does this say:  Patient prescriber agreement form?

2   A   That's what it says.  Yes, sir.

3   Q   And it appears to be an area for prescriber and the second

4   page an area for patient?

5   A   Yes, sir; that's correct.

6   Q   Have you ever seen this document before?

7   A   No, sir, I have never laid eyes on that document, ever.

8   Q   Were you ever given a copy to sign of this document?

9   A   No, sir, never.

10  Q   Mr. Blackmon, you mentioned that Subsys is a drug for

11  cancer pain.  At the time it was first prescribed to you, was

12  it ever told to you that it was a drug for cancer pain?

13  A   No, sir.

14  Q   Would it have been important for you to know if this was a

15  drug for cancer pain as opposed to leg pain which you had?

16  A   Yes, sir.  I would have never taken it if I had known it

17  was cancer medication.  I would have never put it in my body,

18  period.

19  Q   Why is that?

20  A   Because I didn't have cancer.  There was no reason for me

21  to take any medication like that.

22  Q   Did Dr. Couch or anybody ever explain to you any financial

23  self-interest the doctors may have had in the product Subsys?

24  A   No, sir, I never heard -- never knew anything of that,

25  never.

1  Q   Would it be important to you to know prior to taking Subsys

2  if the doctors had any financial self-interest in this drug?

3  A   Yes, sir.  I would have thought something was not right and

4  I would not have agreed to that.

5  Q   Where did you fill your Subsys prescriptions?

6  A   C&R Pharmacy.

7  Q   Is that the pharmacy that's connected with PPSA?

8  A   Yes, sir; that's correct.

9  Q   Approximately how long were you taking Subsys for?

10  A   I was on it for right at exactly eight months.

11  Q   And can you please explain to the jury what, if any, side

12  effects you had from the Subsys?

13  A   It made me turn into a totally different person.  I was

14  lethargic, I couldn't really get up and move around or

15  anything.  I was just like a big blob.  That's pretty much

16  it.  I just -- I couldn't do anything.  I was just there.

17  Q   Now, you were on 1600 micrograms of Subsys; correct?

18  A   Yes, sir.  Four times a day.

19  Q   Four times a day --

20  A   Yes, sir.

21  Q   -- you said?

22  A   Yes, sir.

23  Q   And did it actually take away pain?

24  A   Yes, sir, but it ruined -- I couldn't do anything else.  It

25  took away the pain and everything else.  It just --

1094

1  Q   And by "everything else," you said being just a blob.  Can

2  you describe a little more?  How did this affect your life when

3  you started taking Subsys?

4  A   Well, it almost cost me my marriage.  It made me extremely

5  sick.  If I had not have gone to my primary care physician

6  within a couple of days, at the last part of taking it, they

7  told me I would have been dead within two to three days from

8  taking that medication.

9  Q   And we're going to ask you about that.  Specifically was

10  there a time then, that you took Subsys and had to go to the

11  doctor shortly thereafter?

12  A   Yes, sir, around the end.  Right.

13  Q   Around the end of that eight months of taking it?

14  A   Yes, sir.

15  Q   Can you explain to the jury what happened when you took

16  Subsys on that occasion?

17  A   It -- it -- like I said, it just made me lethargic.  I

18  couldn't do anything.  I was just in the world.  I really -- I

19  really didn't know what was going on, that's --

20  Q   And you were taken to your doctor, your primary care

21  doctor?

22  A   Yes, sir.

23  Q   Without telling us what your primary care doctor told you,

24  what happened to you after that?  Did you go somewhere else

25  after that primary care?

RANDALL SCOTT BLACKMON - DIRECT BY MR. BODNAR

1    A   No, sir.  I was sent directly to the hospital.

2    Q   That's what --

3    A   Directly to the hospital.

4    Q   Did there become a point in time where you learned that

5    Subsys was a drug for cancer pain?

6    A   Okay.  After the eight months I was on it, the only way I

7    knew that it was cancer medication, my insurance company called

8    me on the phone.  And their exact words to me was --

9            MR. POWELL:  Object to hearsay, Judge.

10           THE COURT:  Sustained.

11   BY MR. BODNAR:

12   Q   Did you receive a call from your insurance company?

13   A   Yes, sir.  HealthSpring, yes, sir.

14   Q   Without telling me what HealthSpring said, did you -- after

15   that point, did you know that it was a cancer drug?

16   A   Yes, sir; then, yes, sir.

17   Q   Ultimately did you stop taking Subsys?

18   A   Yes, sir.

19   Q   Why did you stop taking Subsys?

20   A   One, it almost -- like I said, the main reason I stopped

21   taking it, it almost killed me.

22   Q   And did there come a point where your insurance would no

23   long cover Subsys?

24   A   That's correct.  Yes, sir.

25           MR. BODNAR:  One moment, please, Your Honor.

1096

1   Q   One last question.  Mr. Blackmon, were you aware of the

2   cost of Subsys to your insurance company?

3   A   Yes, sir.

4   Q   How were you aware of that?

5   A   I have received from my insurance company a monthly

6   statement with all the medications that I took for the month

7   and that's how I found out what the price was when I seen it on

8   the monthly bill.

9   Q   Do you recall how much was being billed for your 1600

10  micrograms of Subsys four times a day, roughly?

11  A   On the sheet of paper I had, it was $21,500.

12  Q   Is that a month?

13  A   Per month, yes, sir.

14  Q   So per prescription?

15  A   Exactly.

16          MR. BODNAR:  Nothing further for this witness, Your

17  Honor.

18          THE COURT:  Any cross?

19          MR. POWELL:  Yes, ma'am.  Thank you.  Judge, if I

20  could have just one second?

21          THE COURT:  Yes.

22                      CROSS EXAMINATION

23  BY MR. POWELL:

24  Q   Good morning, Mr. Blackmon.

25  A   Good morning.

1097

1   Q   Mr. Blackmon, I want to show you what's been identified as

2   Couch Exhibit 5B.  I'll represent to you this is your initial

3   medical record from PPSA.

4           MR. POWELL:  May I approach the witness, Your Honor?

5           THE COURT:  Sure.

6   BY MR. POWELL:

7   Q   Take a minute and flip through that and see if that appears

8   to be a portion of your medical --

9   A   Yes, sir.

10          MR. POWELL:  Judge, we would offer Couch Exhibit 5B.

11          MR. BODNAR:  No objection, Your Honor.

12          THE COURT:  All right.  Mark it in.

13      (Defendant Couch's Exhibit 5B was entered into evidence.)

14      (A discussion was held off the record between counsel.)

15  BY MR. POWELL:

16  Q   Also, Mr. Blackmon, I'd like to show you what's been marked

17  as Couch Exhibit 5F and Couch Exhibit 5G and ask if you

18  recognize these as a portion of your medical record.

19          MR. POWELL:  May I approach, Your Honor?

20          THE COURT:  Yes.

21  BY MR. POWELL:

22  Q   And I'll represent to you that Couch Exhibit 5F is

23  correspondence between your health insurance company,

24  HealthSpring and PPSA; ask if you recognize those documents as

25  part of your medical record?

RANDALL SCOTT BLACKMON - CROSS BY MR. POWELL

1     THE COURT:  Did you say HealthSpring or Health --

2     MR. POWELL:  HealthSpring.

3     THE COURT:  Not Health Screen?

4     MR. POWELL:  No, HealthSpring, Your Honor.

5  A   Yes, sir.

6  Q   Do you recognize that as part of your medical records as

7  far as your file with PPSA; is that correct?

8  A   Yes sir; that's correct.

9     MR. POWELL:  We would move to admit Couch Exhibit 5F.

10    MR. BODNAR:  No objection, Your Honor.

11    THE COURT:  Is that a part of 5B?

12    MR. POWELL:  It should be, Judge.  It is part of the

13 medical record, but we just have it -- have it separated.

14    THE COURT:  You've got it separated out?

15    MR. POWELL:  Yes, ma'am.  It's 5F.

16    THE COURT:  All right.  Mark it in.

17    (Defendant Couch's Exhibit 5F was offered into evidence.)

18    MR. POWELL:  Judge, we also by stipulation would move

19 to admit Couch Exhibit 5G which I would represent to the Court

20 is the PDMP from January 2011 until May 11, 2015, for

21 Mr. Blackmon.

22    THE COURT:  All right.  Mark it in.

23    (Defendant Couch's Exhibit 5G was entered into evidence.)

24 BY MR. POWELL:

25 Q   Mr. Blackmon, tell the jury, please, what venous stasis

RANDALL SCOTT BLACKMON - CROSS BY MR. POWELL

1   ulcers are.

2   A   They are wounds like sores where your skin is broken down

3   from poor circulation in your legs.

4   Q   And that condition is a chronic condition, is it not?

5   A   Yes, sir; that's correct.

6   Q   And it had been a chronic condition of yours for at least a

7   couple of years before you were ever referred to Dr. Couch; is

8   that right?

9   A   Yes, sir; that's correct.

10  Q   In fact, Dr. O'Gorman, who -- you had multiple surgeries

11  prior to being referred to Dr. Couch, didn't you?

12  A   What kind of multiple surgeries?

13  Q   Well, for instance, in 2005 you had gastric bypass surgery,

14  did you not?

15  A   Yes, sir; that's correct.

16  Q   And at the time that you had that surgery, you weighed

17  approximately 600 pounds?

18  A   Close to it, yes, sir.

19  Q   And as a result of the surgery, and your efforts

20  afterwards, you got down to about 300 pounds by the time you

21  were seen by Dr. Couch?

22  A   That would be close, yes, sir, that's pretty --

23  Q   And you were having difficulty ambulating at that time,

24  weren't you, getting around?

25  A   Not really.  I mean, no, sir.

1100

1  Q   But you had these venous stasis ulcers in both of your

2  lower legs; correct?

3  A   Correct.

4  Q   These are open wounds that require constant care; is that

5  right?

6  A   That's correct.

7  Q   And when you presented to Dr. Couch back in January of

8  2010, you were having ongoing procedures regarding the

9  conditions in your legs from Dr. O'Gorman and from other

10 physicians; is that right?

11 A   That's correct.

12 Q   Now, Dr. O'Gorman is a physician here in Mobile who works

13 with Cardiovascular Associates; is that right?

14 A   Yes, sir; that's correct.

15 Q   Vascular surgeon?

16 A   Yes, sir; that's correct.

17 Q   How long had you been a patient of Dr. O'Gorman before

18 Dr. O'Gorman sent you to Dr. Couch for pain management?

19 A   I would recollect to say probably around about two years.

20 Q   And during that two years -- again, you're still having

21 these ulcer problems in your legs; right?

22 A   Yes, sir; that's correct.

23 Q   That's a very painful condition, isn't it?

24 A   Yes, sir.

25 Q   And so -- but at the time you were being treated by

RANDALL SCOTT BLACKMON - CROSS BY MR. POWELL                    1101

1    Dr. O'Gorman you were also -- he was prescribing pain

2    medication to you, wasn't he?

3    A   Yes, sir, one medication that he gave me and that's all he

4    ever gave me.

5    Q   Well, if your record reflected that when you were referred

6    to Dr. Couch by Dr. O'Gorman -- and, of course, they take a

7    history from you and they provide information to the doctor

8    that's going to see you regarding the medications that you're

9    on; correct?

10   A   Yes, sir; that's correct.

11   Q   And you were taking Percocet when you came to Dr. Couch,

12   weren't you?

13   A   I don't remember taking Percocet.  I was taking Mepergan.

14   Q   You were also taking Neurontin too?

15   A   Yes, sir; that's correct, Neurontin.  Yes, sir.

16   Q   So you were taking two medications?

17   A   Yes, sir.

18   Q   Before you ever got to Dr. Couch?

19   A   Yes, sir; that's correct.

20   Q   So if your medical record indicates that you were taking

21   Percocet at the time that you were referred to PPSA, you're

22   saying that would be incorrect?

23   A   Okay.  Can you repeat the question?

24   Q   Could you be mistaken, Mr. Blackmon, regarding the

25   medication that you were taking when you were initially

1   referred to PPSA?

2   A   I don't remember taking the Percocet.  I remember taking

3   the Mepergan and the Neurontin.

4           MR. POWELL:  If I could have one second, Your Honor.

5           Sam, if you could pull up 5B-28, cover sheet?

6   Q   This is a portion of your medical record, Mr. Blackmon.  In

7   fact, it's the initial communication in writing from

8   Dr. O'Gorman's office.  Do you see up at the top it says:

9   Cardiovascular Associates?

10  A   Yes, sir; that's correct.

11          MR. POWELL:  Sam, if you could then go to the next

12  page?

13  Q   This is Couch 5B-29, a portion of your medical record,

14  Mr. Blackmon.  And this indicates writing regarding the

15  referral, it gives your history in handwriting and discusses

16  your medication, it discusses your symptoms at the bottom.

17  Dr. Couch -- did you provide all this information to Dr. Couch?

18  A   All my medical records were transferred from Dr. O'Gorman

19  to Dr. Couch.

20  Q   But you'll see this is a PPSA document; correct?

21  A   That's what it says, yes, sir; that's correct.

22  Q   And it has your history and it has your complaints of pain,

23  it has prior surgical procedures and so on and so forth;

24  correct?

25  A   Yes, sir, but I can barely read it.  I'm trying to --

1      MR. POWELL:  Thank you, Sam.

2  A   -- make out what it says.  It's so jumbled.  I can't

3  really --

4  Q   Okay.  Look over to your right, Mr. Blackmon.

5  A   Okay.

6  Q   Do you see this (indicating) where it says Percocet 7.5?

7  A   Yes, sir, I see that.

8  Q   And then you read this statement that is being attributed

9  to you in this record that says:  It will last less than or

10  equal to four hours, then it, quote, just dies, close quotes;

11  referring to the Percocet.  Does that help refresh your

12  recollection regarding to the pain medication you were on when

13  you were referred by Dr. O'Gorman to Dr. Couch?

14      MR. BODNAR:  Your Honor, we're going to object to

15  pressing him on this.  Percocet and the drug he named are two

16  brand names of virtually the same thing.  They're just

17  different brand names of it.

18      MR. POWELL:  Judge, it goes to his recollection and

19  other issues too.

20      THE COURT:  Well, you can redirect him on that.  Do

21  you understand that, Mr. Powell?

22      MR. POWELL:  Yes, ma'am.  Thank you.

23  Q   Now, you were asked in this initial visit --

24      MR. POWELL:  Sam, if you'll go to 30?

25      Make it a little bit bigger; history and physical.

1104

1    Q   Now, according to the document I just showed you,

2    Mr. Blackmon, when you presented to PPSA and to Dr. Couch in

3    January of 2010, you were in a lot of pain, weren't you?

4    A   Yes, sir.  When I was referred to him, yes, sir, I was.

5    Q   In fact, one of the scales that's utilized on your initial

6    evaluation you described your pain as a seven out of 10?

7    A   Yes.

8    Q   Do you remember that?

9    A   Yes, sir; that's correct.

10   Q   And you're familiar with various degrees of pain because

11   you've been in a lot of pain most of your adult life now over

12   the last 10 years; is that accurate?

13   A   Yes, sir; that's correct.

14   Q   And at that point in time you had just undergone apparently

15   a surgical procedure; correct?  What is an E-V-L-A, if you

16   know, Mr. Blackmon?

17   A   I don't know.

18   Q   If I told you that's a procedure to treat the venous stasis

19   ulcers in your legs, would you have any reason to dispute that?

20   A   No, sir.  The only procedures that I remember having done

21   was called -- they were told -- my understanding it was called

22   reverse ambulation.  That's all I remember, the two procedures

23   I had from -- those were from Dr. O'Gorman.

24   Q   You would agree with me that you had undergone some surgery

25   in the past regarding this chronic condition?

1  A  Well, I guess if you want to call it a surgery.  It was

2  just a one-vein thing.  It really wasn't a major surgery.

3  Q  Now, at the time you presented to PPSA, you said that

4  during the past two years -- so we're talking in 2008, 2009,

5  leading up to January 2010 -- you described your pain as the

6  nerves and the wounds are hurting, it never goes away, I hurt

7  24 hours a day, it is never gone, it will ease up by like

8  this -- it's burning as if someone poured gasoline on them.

9          Do you remember that?

10  A  Yes, sir; that's correct.

11  Q  And is that an accurate description of the pain that you

12  were in back at that point in time in your life?

13  A  Yeah, that's -- yes, sir, that's what it felt like.

14  Q  All right.  Now, you also indicated in this first visit,

15  you mentioned the Neurontin and you mentioned the Percocet but

16  you say it lasts three to four hours and then it just dies.  Do

17  you remember that?

18  A  Yes, sir, that would be an accurate -- yes, sir.

19  Q  Now, when you left that first visit with Dr. Couch, he

20  maintained the same medications that you were on when you got

21  there, didn't he?

22  A  I don't remember.  I have no recollection of that.

23  Q  Now, and he also scheduled you for a series of

24  interventional pain procedures; correct?

25  A  Sympathetic blocks?

RANDALL SCOTT BLACKMON - CROSS BY MR. POWELL
27291

```
 1   Q   Yes, sir.

 2   A   Yes, sir; that's correct.

 3   Q   So after he evaluated your situation, reviewed your medical

 4   records, talked to you during this first visit, he asked you

 5   then about doing these procedures; correct?

 6   A   Yes, sir; that's correct.

 7   Q   And you agreed to those?

 8   A   Yes, sir; that's correct.

 9   Q   And you underwent those procedures.  They're called lumbar

10   -- were they lumbar nerve blocks?

11   A   Sympathetic blocks is what I was told.  Yes, sir.

12   Q   And that's done under an X-ray with injections in the back?

13   A   Yes, sir; that's correct.

14   Q   And those were performed by Dr. Couch; correct?

15   A   Yes, sir; that's correct.

16   Q   And you underwent three of those over the next 45 days;

17   right?

18   A   I don't remember them being that close together.

19   Q   If the records indicate that you had them done February the

20   2nd, February the 9th and February the 23rd --

21   A   Would it be all of them?  Are you saying all of them on the

22   same side?  Because I had one side done, then another side

23   done.

24   Q   That was within four to five days of you going to PPSA?

25   A   I don't remember it being that soon.  But yes, sir, I did
```

1107

 1  have the sympathetic blocks done.  Yes, sir.

 2  Q   Okay.  Now, and those procedures were approved by your

 3  health insurance company, weren't they?

 4  A   Yes, sir; that's correct.

 5  Q   Now, you went back to Dr. Couch in March of 2010, some two

 6  months later, and you had what was referred to as lumbar

 7  radiofrequency sympathectomy.  Do you remember those two

 8  procedures?

 9  A   All I remember is the sympathetic blocks.

10  Q   Now, let's back up to your first visit at PPSA as a new

11  patient.

12           MR. POWELL:  Go to B32, Sam.  At the very bottom.

13           It says:  Skin and subcutaneous tissue.

14  Q   This is a portion of the physical exam that you had some

15  dispute with earlier, Mr. Blackmon.  And where it says:  Skin

16  and subcutaneous tissue, what does the general inspection say?

17           MR. BODNAR:  Objection, Your Honor.  This was not a

18  part that he had any issue with.  It was the section of

19  physical examination but it wasn't anything about the skin.

20           THE COURT:  Overruled.

21  BY MR. POWELL:

22  Q   Where it says:  General Inspection, if the statement is

23  venous stasis discoloration present, ulceration present,

24  bilateral calves, hyperpigmented area noted, areas of skin

25  erosion present, skin turgor normal.  Do you read that?

RANDALL SCOTT BLACKMON - CROSS BY MR. POWELL

1   A   Yes, I see that.

2   Q   After you had these blocks, they improved your pain, didn't

3   they?

4   A   For a little while, yes.

5   Q   Right.  Now, they also -- and after that series, you were

6   continuing on your opioid treatment; correct?

7   A   That's correct.

8   Q   And your medications were continued; correct?

9   A   Yes, sir; that's correct.

10  Q   Now, let's talk about those medications a little bit.

11          All right.  Mr. Blackmon, I want to show you a portion

12  of your medical record that we identified as 5B-36, and that is

13  an Opioid Agreement for Pain Management.  And it has your name

14  at the top of it.  Do you see that?

15  A   Yes, sir.

16          MR. POWELL:  If you could scroll down, Sam.

17  Q   This document tells you what medications you are likely to

18  be prescribed or at least categories of the medications that

19  you're likely to be prescribed and that you understand that

20  there are certain requirements, both for you as a patient and

21  also your family regarding maintaining the correct dosage and

22  the possible side effects of the opioid medications; correct?

23  A   Correct; yes, sir.

24  Q   And among the things that it tells you is that you must

25  receive your opioid medication from one pharmacy.  Do you see

RANDALL SCOTT BLACKMON - CROSS BY MR. POWELL

 1    that?

 2    A    Yes, sir.

 3    Q    Do you see it also says you can't -- you're not to receive

 4    opioid medication from other doctors without prior approval.

 5    A    That's correct; yes, sir.

 6    Q    That you must maintain the dosing schedule?

 7    A    As prescribed, yes.

 8    Q    Talks about the dangers of escalating that dosage of

 9    medication; correct?

10    A    That's what it says; yes, sir.

11            MR. POWELL:  If you will scroll down, Sam.

12    Q    It also goes and tells you what is required of you, what

13    you can and can't do.  And it also tells you that you will be

14    subject to random urine screen drug tests and also potentially

15    other more involved testing to determine whether or not you're

16    taking the medication that you've been prescribed; is that

17    right?

18    A    That's correct; yes, sir.

19    Q    And also whether you're taking any medications that you are

20    not being prescribed; correct?

21    A    Yes, sir; that's correct.

22    Q    It also tells you what is required of you in order to

23    continue your pain treatment therapy in terms of getting

24    medication from PPSA; right?

25    A    Yes, sir; that's correct.

1110

1   Q   Okay.  It tells you what to do if you have an acute episode

2   of pain and what instructions -- and you're given specific

3   instructions on what to do; correct?

4   A   Yes, sir; that's correct.  That's what it says.

5          MR. POWELL:  Go on down, Sam.

6   Q   The last thing it says is that this opioid agreement is in

7   good faith.  We will not tolerate diversion of medications,

8   manipulation by the patient, or any behavior that would attempt

9   to extort opioid medication from the doctor.  Do you see that?

10  A   Yes, sir.

11  Q   And you signed that agreement the first day you went to

12  PPSA, January 10, 2010, didn't you?

13  A   Yes, sir; that's correct, that's my signature.

14  Q   Okay.  Next I'll show you, Mr. Blackmon, what for

15  identification is 5B-38.  That is a document prepared by PPSA,

16  and the title of that document is Patient Consent and Agreement

17  for "Off-Label" Pain Treatment.  Do you see that?

18  A   Yes, sir.

19  Q   Do you understand or know what off-label pain treatment is?

20  A   No, sir.

21  Q   This agreement sets out your consent and your agreement

22  with PPSA regarding the possible use of pain medications being

23  prescribed off-label, doesn't it?

24  A   Yes, sir, that's what it says.

25  Q   And it tells you that certain prescription drugs in this

1  country have a label approved by Food and Drug Administration

2  for the use of that medication.  Do you see that?  That's the

3  very first sentence.

4  A   Yes, sir, I see it now.  Yes, sir, I see that.

5  Q   And this label says:  The label provides an indication and

6  dosage for the drug but neither physician nor patient is

7  legally bound to follow that.  Do you see that?

8  A   Yes, sir; that's what it says.

9  Q   In other words, what that means, doesn't it, Mr. Blackmon,

10  is although the FDA may approve a certain drug as indicated for

11  use, for instance, for cancer pain, that does not limit a

12  physician's use of that same drug for other purposes, do you

13  understand that's what that means?

14  A   Yes, sir, I guess that's what you say it means.  I mean, I

15  didn't --

16          MR. POWELL:  If you will scroll down, Sam.

17  Q   And this document is now six and a half years old, but at

18  the time when you were a new patient of PPSA, paragraph two

19  under the category Specific "Off-Label" Uses.  Do you see that?

20  A   Yes, sir, I see it.

21  Q   Number two?  Do you see that?  Do you know what Fentora is?

22  A   No, sir.

23  Q   If I told you that Fentora is a fentanyl-based medication

24  in the same class as Subsys and Abstral and other

25  fentanyl-based drugs, it simply differs in the form and the

1    compound and how it's administered to a patient, would you have

2    any reason to dispute that?

3    A    I mean, I don't understand it.  But --

4    Q    If I told you by reviewing this document, this agreement,

5    that you are consenting and authorizing off-label use of

6    medications by your doctor, and I represented to you that

7    Fentora is a fentanyl product and that it might be prescribed

8    to you for noncancer pain, would you have any reason to dispute

9    that?

10   A    That's what it says.

11   Q    In fact, you signed it on the same day you signed the

12   opioid agreement, didn't you?

13   A    The 10th, the 1st -- yes, sir, that's what it says.  Yes,

14   sir.

15   Q    Thank you.  Now, in March of 2010 -- I'm sorry.  In June of

16   2010 you had a urinary -- had a urine drug screen.  And you

17   periodically had to be tested there, didn't you?

18   A    At PPSA?

19   Q    Yes.

20   A    Yes, sir; that's correct.

21   Q    They tested you, yet they did drug screens on you to see if

22   you had been taking the medications you had been prescribed and

23   that you weren't taking medications you shouldn't be taking;

24   correct?

25   A    That's correct.

1   Q   Okay.  And you had a drug screen that came back positive

2   for a drug class referred to as benzodiazepine.  Do you know

3   what that is?

4   A   No, sir, I don't have the slightest idea.

5   Q   Were you ever prescribed by your primary care doctor a

6   medication to help you sleep?

7   A   What medical -- what medication?

8   Q   Who was your primary care doctor?

9   A   Dr. Jason West.

10  Q   Dr. West had prescribed Restoril for you.  Do you remember

11  that?

12  A   Yes, sir.

13  Q   If I represented to you that Restoril was a benzodiazepine,

14  would you have any reason to dispute that?

15  A   I don't know what -- exactly what you're talking about.  I

16  mean --

17  Q   Now, in November of 2010 you reported back to PPSA and when

18  you were questioned regarding your medication, you told them

19  that it was not very effective; is that right?

20  A   Which medication?  What are you talking about, which

21  medication.

22  Q   I'm talking about at the time you were taking -- well, back

23  up.  You were also prescribed back in March after you had the

24  blocks done, your medication was changed some more and you were

25  given Duragesic patches.  Do you remember that?

RANDALL SCOTT BLACKMON - CROSS BY MR. POWELL

1114

1    A    I don't remember any -- I don't recall any patches.

2            MR. POWELL:  If you would pull up 56?

3    Q    Up at the top of this document, Mr. Blackmon, where it says

4    Current Meds Prescribed by PPSA, it says Duragesic 75

5    micrograms and Percocet.  Do you see that?

6    A    Yes, sir; that's what it says.

7    Q    Do you know what Duragesic patches are?

8    A    No, sir.

9    Q    If I represented to you that it is also a fentanyl-based

10   pain medication, would you have any reason to dispute that?

11   A    If that's what you say it is, no.  No, sir.

12   Q    And it also indicates down on the procedure when you had

13   your blocks; correct?  And those are the correct dates.  Those

14   are where I got those from earlier.  Do you see those?  Where

15   it says lumbar sympathetic block, February 2nd, 2010, February

16   9th, February 23rd, 2010.  Do you see those?

17   A    Yes, sir, I see the dates.

18   Q    Dr. Couch was trying to help you manage your pain at this

19   time, wasn't he, Mr. Blackmon?

20   A    Yes, sir; that's correct.

21   Q    And he scheduled these three procedures and he performed

22   those procedures and they gave you some relief, did they not?

23   A    For a little bit, yes, sir.

24   Q    And that's why you continued to have them, isn't it?

25   A    When I could get them done; yes, sir.

1   Q   And it also says that you're having issues with your

2   medication; the blocks helped and pain is not nearly as bad as

3   it was.  Do you see that under where it says -- the heading:

4   Objective, below that?

5   A   Yes, sir, I see that.

6   Q   But the Percocet was not working; is that right?

7   A   That's correct.

8   Q   You continued over the course of approximately two years,

9   from the spring of 2010 -- actually almost three years until

10  the winter of 2013 with various, what we call, rotations of

11  opioid pain medications to treat your chronic pain; isn't that

12  right?

13  A   Yes, sir; that's correct.

14  Q   And during that same three-year period where Dr. Couch and

15  his staff were attempting to control your pain, you were also

16  undergoing various medical treatments from other physicians in

17  addition to Dr. Couch; isn't that right?

18  A   Now, what are you talking about?

19  Q   Weren't you also seeing Dr.  -- your primary care doctor at

20  the time?

21  A   Just for basic colds or stuff like that.  Nothing --

22  Q   And they ask you, do they not, when you go to your primary

23  care physician as part of finding out what's going on with the

24  patient, they ask you what medications you're taking, don't

25  they?

RANDALL SCOTT BLACKMON - CROSS BY MR. POWELL
27301

1   A   My primary care doctor?  Yes, sir; that's correct.

2   Q   You told them, didn't you?

3   A   Yes, sir.

4   Q   And your primary care doctor was your primary care doctor

5   for at least three years during the time that you were being

6   treated by Dr. Couch; isn't that right?

7   A   Yes, sir; that's correct.

8   Q   And you were reporting back to your primary care physician

9   the medications that you were being prescribed and taking at

10  PPSA, didn't you?

11  A   Yes, sir; that's correct.

12  Q   That's very important for your primary care doctor to know,

13  isn't it?

14  A   Yes, sir, have to.  Yes, sir.

15  Q   Particularly someone with serious health issues like

16  yourself; right?

17  A   Yes, sir.

18  Q   Now, in -- in February of 2013 you had been a patient at

19  this time for three years; right, at PPSA?

20  A   Close.  Yes, sir; that's correct.

21  Q   And you made your appointments, you took your medication as

22  instructed.  There was never an issue with that, was there?

23  A   No, sir.

24  Q   You got them filled like you were supposed to, took them

25  like you were supposed to?

RANDALL SCOTT BLACKMON - CROSS BY MR. POWELL

```
 1    A    That's correct.
 2    Q    And you reported back to PPSA whether or not whatever
 3    variation of opioids you happened to be on at the time was
 4    working or not working, didn't you?
 5    A    That's correct.
 6    Q    And sometimes you were telling them it's working and
 7    sometimes you were telling them it's not working; isn't that
 8    right?
 9    A    When they would change the medications?  Yes, sir.
10    Q    Correct.  Yes.
11    A    Correct.
12    Q    And in the spring of 2013 after you had another lumbar
13    sympathetic nerve block and in February of 2013 you continued
14    on those same medications for about three months; is that
15    right?
16    A    Which medications are you talking about?  The --
17    Q    Well, apparently you were taking -- you were being
18    prescribed methadone?
19    A    That's correct.
20    Q    You were being prescribed Opana for some period of time?
21    A    That's correct.
22    Q    And those were approved by your insurance company; correct?
23    A    Correct.
24    Q    And in June of 2013 you reported back to PPSA that the
25    medications were no longer working.  Do you remember that?
```

 1    A    Yes, sir; that's correct.

 2    Q    And it was at that time that you were started on Subsys;

 3    correct?

 4    A    Around what time?

 5    Q    In June of 2013.

 6    A    That sounds about right.

 7    Q    Now, you already had a discussion regarding off-label use

 8    of medications.  Do you remember that?

 9    A    Yes, sir.

10    Q    In that document that you signed?

11    A    Yes, sir.

12    Q    Saying that you understood that might be used in your

13    treatment, do you remember that?

14    A    Oh, yes, I remember it.  Yes, sir.

15            MR. POWELL:  Sam, if you could pull up --

16    Q    Now, when you were prescribed Opana, which is a very strong

17    opioid, I'll represent to you, Mr. Blackmon, PPSA had to get

18    approval from your insurance carrier to use that medication;

19    correct?

20    A    Yes, sir; that's correct.

21    Q    And they sent a letter to you dated May 29th, 2013, do you

22    see that?

23    A    Yes, sir, I see that.

24    Q    And is that you Randall S. Blackmon?

25    A    Yes, sir; that's correct.

1   Q   And it says:  We are pleased to inform you that we are --

2   we are pleased to inform you that we are approving your

3   non-formulary exception for Opana.  Do you see that?

4   A   Yes, sir.

5   Q   Do you know what nonformulary exception means,

6   Mr. Blackmon?

7   A   No, sir.  I sure don't.

8   Q   If I represent to you that nonformulary --

9           MR. BODNAR:  Your Honor, objection.

10          MR. POWELL:  Can I finish my question?

11          MR. BODNAR:  He's telling the jury -- or the witness

12  what something means when he says he does not know what it

13  means.

14          MR. POWELL:  I'll tie it up later with another

15  witness, Judge.

16          THE COURT:  Overruled.

17  BY MR. POWELL:

18  Q   Do you know what nonformulary exception means,

19  Mr. Blackmon?

20  A   No, sir.  I sure don't.

21  Q   If I represented to you that that means that your insurance

22  company has approved the use of Opana for something other than

23  what the label for that medication indicates its use to be by

24  FDA statements, do you understand that?  Or do you dispute

25  that?

 1           MR. BODNAR:  And, Your Honor, to the form of this

 2    question, how can he understand or dispute that if he doesn't

 3    know what it is?

 4           THE COURT:  I sustain it.

 5    BY MR. POWELL:

 6    Q   Your insurance company approved Opana for your pain, didn't

 7    it, Mr. Blackmon?

 8    A   Yes, sir.  That's what the form says.  Yes, sir.

 9    Q   June 25th, 2013, just by reference, Mr. Blackmon, this is

10    the time frame when you've already testified that you had told

11    the staff and Dr. Couch at PPSA that your pain medications were

12    not working.  Do you remember that?

13    A   Yes, sir.

14    Q   Okay.  And they made the decision, whether you recall it

15    being discussed with you or not, didn't they, to try to obtain

16    approval from your insurance company for the use of Subsys for

17    your treatment; correct?

18    A   Yes, sir; that's correct.

19    Q   Now, you didn't have cancer.

20    A   No, sir.

21    Q   Right?

22    A   Never had it in my life.

23    Q   And your insurance company knows what you had because

24    they've been paying the bills all along; correct?

25           MR. BODNAR:  Objection, Your Honor, to what the

RANDALL SCOTT BLACKMON - CROSS BY MR. POWELL

1121

1    insurance company would know.

2              THE COURT:  Sustained.

3    BY MR. POWELL:

4    Q   Let me show you something else, if we can -- I'll come back

5    to it.  This letter dated June 25th, 2013 states to you,

6    Mr. Blackmon, we are pleased to inform you that we are

7    approving your nonformulary exception for Subsys.  Do you see

8    that?

9    A   Yes, sir, I see that.

10   Q   They don't ask you in that letter anywhere:  Do you have

11   cancer?  Do you see that anywhere in this letter?

12   A   No, sir.

13   Q   So your insurance company approved based on Dr. Couch's

14   clinical information --

15             MR. BODNAR:  Objection, Your Honor.  Again, he does

16   not know why or for what reason the insurance approved it.

17             MR. POWELL:  It's stated in the letter, Judge.

18             THE COURT:  Well, you can read whatever's in the

19   letter but --

20             MR. POWELL:  Thank you.

21   Q   This approval is based on clinical information that we

22   received from your prescribing physician.  Do you see that?

23   A   Yes, sir, I see it in the letter.  Yes, sir.

24   Q   Nowhere in there does it ask you whether or not you have

25   cancer, does it?

1  A   No, sir.

2  Q   And they approved you being prescribed this substance for a

3  year; correct?

4  A   Yes, sir; that's correct.

5  Q   From June 24th, the day before the letter, to June 24th,

6  2014 you were allowed by your insurance carrier to prescribe

7  Subsys for off-label use to control your chronic pain, weren't

8  you?

9           MR. BODNAR:  Objection, Your Honor.  Again this is for

10  nonformulary use.  That's not necessarily the same as off-label

11  use.

12           THE COURT:  You can go into it on redirect, although

13  he says he doesn't know what it means.  And we haven't had any

14  evidence about what it means, so let's move this along.

15           MR. POWELL:  Sam, if you will go to 5-2.

16  Q   This is another document that I showed you earlier,

17  Mr. Blackmon, from HealthSpring, and it's dated, I believe, the

18  date -- two days before the letter authorizing and approving

19  Subsys for your treatment.  Do you see that where it says June

20  23rd, 2013?

21  A   Yes, sir, it says June 23rd.  Yes, sir.

22  Q   Go down where it says D-I-A-G with a colon.  Do you see

23  that?

24  A   Yes, sir.

25  Q   Do you see cancer in there anywhere?

1   A   No, sir.

2   Q   It describes your lumbar -- lumbosacroiliac disk

3   degeneration as one diagnosis code; correct?

4   A   That's what it says, but what is disk degeneration?

5   Q   I'm not a doctor.  I can't answer that.

6   A   I -- looks like --

7   Q   Next one is joint pain.  Do you see that?

8   A   I see that.

9   Q   So within two days of them -- your insurance company

10  sending you this letter approving Subsys for your chronic pain,

11  they have your diagnosis code as something to do with your back

12  and something to do with your joint pain in your upper

13  extremities, don't they?

14  A   No, sir.  I was not treated for anything like that.  I

15  don't know where they got that from.

16  Q   Now, within a couple of days of you being approved for

17  Subsys, you had -- you were complaining of pain in your

18  shoulder.  Do you remember that?

19  A   No, I have no recollection of that.  I don't remember

20  having any --

21  Q   You don't remember having an MRI of the shoulder?

22  A   Pain --

23  Q   In June of 2014?  I'm sorry.  June 2013.

24  A   Yes, sir, I do remember.  I recall now.  I do remember

25  having an MRI.  I do remember.

RANDALL SCOTT BLACKMON - CROSS BY MR. POWELL

1  Q   And Dr. Couch referred you to an orthopedic surgeon after
2  that MRI, didn't he?  Dr. Bose?
3  A   That's correct; yes, sir.
4  Q   Did you go see Dr. Bose?
5  A   Yes, sir, I sure did.
6  Q   And did you tell Dr. Bose what medication that you were on?
7  A   Yes, sir.  He knew everything that I was on.
8  Q   He knew everything also; just like the primary care doctor;
9  correct?
10  A   Yes, you have to tell everybody.  Yes, sir; that's correct.
11  Q   Now, when you went back to PPSA on June the 9th, 2013, this
12  would have been within two weeks of you being prescribed
13  Subsys; correct?
14  A   Yes, sir.  That sounds correct.
15  Q   And do you remember telling them at that time "meds working
16  perfectly," close quotes?  Do you remember that?
17  A   Which medications?
18  Q   Subsys.
19  A   Yes, sir; that's correct, and that would be right.
20  Q   Sir?
21  A   That would be correct.
22  Q   So before taking Subsys -- within two months of taking
23  Subsys you told PPSA that the medications were not working;
24  isn't that right?  Do you remember telling us that?
25  A   The medications that I was on before I started taking that

 1    Subsys no, sir.  They were not working not well at all, just

 2    barely working.

 3    Q    And then when you come back two months later after having

 4    been prescribed Subsys, you describe your meds as working

 5    perfectly; right?

 6    A    With the Subsys?

 7    Q    Yes, sir.

 8    A    That's correct.

 9    Q    And when you went back three months later in October of

10    2013 you told them you were doing good on the medicine, didn't

11    you?

12    A    With the Subsys?

13    Q    Yes, sir.

14    A    That's correct.  Back then yes, sir.

15    Q    And in December of 2013 you told them the same thing, that

16    it was working, didn't you?

17    A    Yes, sir, the medication was working.  Yes, sir.

18    Q    And that's what you want if you're in chronic pain, isn't

19    it, Mr. Blackmon?

20    A    Yes, sir; that's correct.

21    Q    That's why you go to PPSA, isn't it?

22    A    For pain management, that's correct.

23    Q    And in February of 2014 -- well, back up.  At some point in

24    time they switched you from Subsys to another brand of fentanyl

25    spray or something.  Abstral.  Do you remember that?

 1   A   Abstral?  Yes, sir; that's correct.

 2   Q   And you took Abstral for a little while and then you went

 3   back in February of '14 and you told them that Subsys was more

 4   effective than Abstral.  Do you remember that?

 5   A   That's correct; yes, sir.

 6   Q   And that's true; right?

 7   A   Yes, sir; that's correct.

 8   Q   You were getting more pain relief from Subsys than you were

 9   with Abstral?

10   A   Yes, sir.  The Abstral was not working at all.  Not very

11   well.

12   Q   You come back two months later like you agreed to, April of

13   2014, and you were doing okay on the medications, weren't you?

14   A   Yes, sir; that's correct.

15   Q   And then the Subsys was discontinued in July of 2014

16   because HealthSpring only agreed to pay for it for a year;

17   isn't that right?

18   A   My recollection --

19          MR. BODNAR:  Objection, Your Honor.  He doesn't know

20   why HealthSpring did or didn't do what they did.  In fact, he

21   testified before that it was for a different reason.

22          THE COURT:  Well, he's cross-examining him.  So

23   overruled.

24   BY MR. POWELL:

25   Q   Do you remember I showed you the letter of approval that

1    HealthSpring sent you approving the nonformulary exception use
2    of Subsys for from June 2013 to July 2014?
3    A    That's what the letter said, yes, sir.
4    Q    They would not authorize it after that or to your
5    knowledge, would they?
6    A    Right.  I only -- my recollection I thought, or I recollect
7    I was only on it like eight months and they quit -- they
8    quit --
9    Q    Right.  And during this time, Dr. Couch and his staff were
10   also trying to get you subsidized for free Subsys through a
11   program with the manufacturer, weren't they?
12   A    I have no recollection of that.  I don't remember that.
13   Q    When you took the Abstral and went back to PPSA for your
14   follow-up appointment and they made the note in your chart:
15   Subsys is more effective than Abstral.  Did you complain that
16   the Abstral wasn't working as well as the Subsys?
17   A    I said, yes, sir; that's correct.
18   Q    And you asked to be switched back to Subsys?
19   A    Yes, sir, because that was working the best.
20   Q    Now, you continued to be -- even after the Subsys was
21   discontinued, Dr. Couch and his staff continued to treat you
22   with other forms of fentanyl, didn't they?
23   A    As in what forms of fentanyl?
24   Q    Lazanda.
25   A    I have no recollection of that.  I don't remember that.

RANDALL SCOTT BLACKMON - CROSS BY MR. POWELL

1   Q   Do you know what Lazanda is?

2   A   No, sir.

3   Q   I represent to you it is also a fentanyl-based product that

4   is used in the treatment of chronic pain.  Would you have any

5   reason to dispute that?

6   A   If that's what it says, no, sir.

7   Q   And if a prescription drug database maintained by the state

8   of Alabama indicates that you were prescribed Lazanda after

9   your insurance company would no longer authorize Subsys, would

10  you have any reason to dispute that?

11  A   I just -- I don't remember -- I have no recollection of

12  taking that drug.  I don't remember.

13  Q   You have no recollection of being prescribed and filling in

14  August of 2014 Lazanda 400 microgram nasal spray?

15  A   I have never had any spray in my nose, never.  I've never

16  taken anything like that.  Never.

17  Q   Either this database is incorrect or you don't remember?

18  A   I don't remember putting anything in my nose, period.

19  Because I can't even take nasal spray, that's why I don't

20  remember anything like that.

21  Q   Now, from the time that you were prescribed Subsys, which

22  you've already told us was effective in treatment of your

23  breakthrough pain, wasn't it?

24  A   Yes, sir.

25  Q   You never complained to anyone at PPSA over the course of

 1   that year that this medication was causing you any side

 2   effects, did you?

 3   A   Then it was not causing me any side effects, no, sir.

 4   Q   So for the year that you took it, it wasn't causing you any

 5   side effects?

 6   A   Not until the end.

 7   Q   But you didn't tell them anything about any of that either,

 8   did you?

 9   A   No, sir.

10   Q   And you remained a patient at PPSA for the treatment of

11   your chronic pain from January 12th, 2010, until at least March

12   of 2015, over five years, didn't you?

13   A   That would be correct.  Sounds about right; yes, sir.

14   Q   And at the time that you were being prescribed these

15   various opioids for the treatment of your chronic pain, you

16   were being seen and treated by at least two other physicians

17   here in Mobile, weren't you?

18   A   Which physicians?

19   Q   That would be your primary care doctor?

20   A   Dr. Jason West, yes, sir.

21   Q   I'm sorry?

22   A   Dr. Jason West.

23   Q   Right.

24   A   Yes, sir; that's correct.

25   Q   They were aware of what you were taking, weren't they?

1  A   Yes, sir; that's correct.

2  Q   Okay.  And didn't you go back and have to see Dr. O'Gorman

3  on occasion, O'Gorman, the cardiovascular surgeon?

4  A   I don't remember going back to see him after he had sent me

5  to Dr. Couch.

6  Q   And you also saw Dr. Bose, an orthopedic, regarding your

7  shoulder?

8  A   Yes, sir; that's correct.

9  Q   And they were aware of what you were taking at the time?

10  A   Yes, sir; had to disclose everything you're taking.  Yes,

11  sir.

12         MR. POWELL:  If I could have just a second, Your

13  Honor?

14         THE COURT:  All right.

15         MR. POWELL:  Did we admit the PDMP?

16         THE COURT:  Yeah.  It was admitted without objection.

17         THE CLERK:  5G.

18         MR. POWELL:  And the HealthSpring documents were also

19  admitted?

20         THE CLERK:  5F.

21         MR. POWELL:  Just making sure.

22         THE COURT:  Okay.

23         MR. POWELL:  That's all.  Thank you, Your Honor.

24         MR. BODNAR:  Redirect, Your Honor?

25         THE COURT:  All right.  How long are you going to be?

1           MR. BODNAR:  Probably about 10 or 15 minutes, Your
2    Honor.
3           THE COURT:  All right.  Then we're going to take our
4    break.  But let's ask Mr. Blackmon to excuse himself and then
5    have a seat in the hall so we can get the jury out without any
6    obstructions.
7           All right.  Ladies and gentlemen, we're going to take
8    our recess now.  Leave your pads on your chairs.  Remember no
9    discussion about the case.  Take your break downstairs in the
10   jury assembly room.  We will call you back up in about 15
11   minutes.
12          We're in recess.
13       (A recess was taken at approximately 10:30 a.m.)
14       (In open court, 10:50 a.m., defendants and jury present.)
15          THE COURT:  All right.  Mr. Bodnar.
16          MR. BODNAR:  Yes, Your Honor.
17                       REDIRECT EXAMINATION
18   BY MR. BODNAR:
19   Q   Welcome back, Mr. Blackmon.  Do you recall -- what time of
20   day did you typically go to your appointments at PPSA?  Was it
21   in the morning, the afternoon, midday, afternoon, or do you
22   recall?
23   A   I would say most of the time it was in the morning.
24   Q   And in the morning -- I'll show you now from what has been
25   admitted as Government's Exhibit 13-22 -- wait till it comes up

1132

```
 1    on the screen.
 2           While we're waiting -- I show you what's been marked
 3    as Government's Exhibit 13-22, your medical -- what you
 4    identified as your medical file.
 5    A    There's nothing on the screen I have up here.  It's blank.
 6           THE COURT:  His screen is not attached.  Apparently it
 7    came unplugged.
 8    Q    While we're waiting for that to get fixed, Mr. Blackmon,
 9    when you went to your appointments did anyone else come with
10    you?
11    A    Yes, sir, my wife.
12    Q    And who is that person?
13    A    Rita Blackmon.
14    Q    And when she came with you, does that mean she sat in the
15    car when you went in the doctor's office or what happened?
16    Where was she with you in terms of the process?
17    A    Every time I went she was in the room with me.
18    Q    And by "the room," you mean even in the physical room where
19    you were examined and given your prescriptions?
20    A    That's correct; yes, sir.
21    Q    While we wait for that being fixed I'll move on to one
22    other part first.  Do you recall when defense counsel was
23    talking with you about your insurance approval for Subsys?
24    A    Yes, sir, I remember.  Yes, sir.
25           MR. BODNAR:  Is it up now?
```

RANDALL SCOTT BLACKMON - REDIRECT BY MR. BODNAR

1  Q   I'll show you what the defense admitted as Couch Exhibit

2  5F-02.  Do you recall talking -- 5F-04.  I apologize.  And this

3  is Exhibit 5F-04.  Do you recall going through this letter with

4  defense counsel?

5  A   Yes, sir.

6  Q   And do you recall being asked whether or not it mentioned

7  any sort of diagnoses here of what they were approving your

8  Subsys for?

9  A   Yes, sir; that's correct.

10 Q   And nothing on this letter explains what was told to

11 HealthSpring, does it?

12 A   No, sir.

13 Q   So you have no idea what diagnosis was given to

14 HealthSpring?

15 A   That's correct.

16 Q   But you said that approximately a year later HealthSpring

17 called you; correct?

18 A   That's correct.

19 Q   And when HealthSpring called you, is that when you learned

20 that it was a cancer drug?

21 A   Yes, sir; that's correct.

22 Q   Is that because HealthSpring believed you had cancer?

23        MR. POWELL:  Judge, I'm going to object to that.

24        THE COURT:  Sustained.

25 BY MR. BODNAR:

1134

1  Q   During the course of that conversation you learned it was
2  about a cancer drug?
3  A   That's correct.
4  Q   But you have no idea what HealthSpring, from this letter,
5  believed at the time they approved this?
6  A   That's correct; no, sir, I don't.
7  Q   Mr. Blackmon, I want to jump back to what I was asking you
8  before.  I believe you mentioned that you tended to go early in
9  the mornings to your appointments?
10 A   That's correct.
11 Q   And after your first appointment, your first patient visit,
12 other than for procedures did you ever see Dr. Couch again?
13 A   No, sir.
14 Q   I'm going to show you what purports to be your progress
15 note from a visit from February 12, 2014.  Do you see that?
16 A   Yes, sir, I see that.  Yes, sir, I see the date.
17 Q   And at the end of that date, do you see where it's
18 electronically signed right here (indicating)?
19 A   Yes, sir.
20 Q   And is this Palmer you were talking about?
21 A   Yes, sir; that's correct.
22 Q   What time does he sign it on that date?
23 A   9:31 that morning.
24 Q   And does that seem to be, to your best recollection, about
25 the time of day you would go in for your appointment?

1135

1  A   That sounds about correct; yes, sir.

2  Q   And what time does Dr. Couch sign it?

3  A   3:14 p.m.

4  Q   And since this is not your first visit, did Dr. Couch

5  actually see you or treat you on this visit?

6  A   No, sir.

7  Q   I'm just showing you once more on the front, February

8  12th.  Does this show at that time that you were on Subsys 1600

9  two times a day at that point?

10  A   It says -- my recollection -- what that says, 800

11  micrograms spray times two, that's what the dosage was.

12  Q   I apologize.  So yes, you're right.  So 1600, it's 800

13  times two?

14  A   Correct.

15  Q   And you said you were taking it four times a day?

16  A   Correct.  Every six -- correct.

17  Q   So looking at the next visit, appears to be April 10th,

18  2014.  Do you see that?

19  A   Yes, sir.

20  Q   If I flip to the back where it's electronically signed, do

21  you see Justin Palmer's name?

22  A   Yes, sir.

23  Q   And what time does Justin Palmer sign your file?

24  A   8:13 p.m.

25  Q   On what date?

1136

```
1    A    What day?  It says April the 10th, 2014.

2    Q    And is that the date of your visit?

3    A    It says April 10th, 2014.

4    Q    What date does Dr. Couch sign it, though?

5    A    April 17th, 2014, at 10:32 in the morning.

6    Q    So is that seven days later?

7    A    That's correct.

8    Q    Again, this wasn't your first visit and since this wasn't

9    your first visit did Dr. Couch actually see you or treat you on

10   this visit?

11   A    No, sir.

12   Q    Do you recall talking with defense counsel or him asking

13   you questions about all your other doctors that you've seen?

14   A    Yes, sir; that's correct.

15   Q    And you have a primary care and you talked about a

16   cardiologist you see as well?

17   A    I don't remember -- recollection of seeing a cardiologist.

18   Q    Dr. O'Gorman?

19   A    Oh, the cardiovascular doctor.

20   Q    Cardiovascular, I'm sorry.

21   A    Yes, sir; that's correct.

22   Q    Please describe to the jury your relation -- doctor-patient

23   relationship with those doctors as compared to your

24   relationship with Dr. Couch?

25              MR. POWELL:  Judge, I'm going to object to
```

 1    that.  That's beyond the scope of direct or cross.
 2              THE COURT:  Overruled.
 3    BY MR. BODNAR:
 4    Q   So please explain to the jury what is your doctor-patient
 5    relationship with your other doctors -- not with Justin Palmer
 6    but with Dr. Couch?
 7    A   Basically all the other doctors that I see when I go to
 8    visits, I see those actual doctors, not the nurse practitioner.
 9    Q   And do you recall questions from defense counsel about
10    whether or not your other doctors asked you questions about
11    what medications you were on?
12    A   Yes, sir; that's correct.
13    Q   Did Dr. Couch ever do that?
14    A   No, sir.
15    Q   Did Dr. Couch ever speak to you about anything outside that
16    first visit other than the needle treatments?
17    A   No, sir.
18    Q   So when defense counsel kept saying Dr. Couch and staff
19    were treating you, was Dr. Couch actually treating you?
20    A   No, sir.
21    Q   And who was it that was writing your prescriptions for
22    Subsys?
23    A   Justin Palmer.
24    Q   I'm going to show you now what has been admitted as
25    Government's Exhibit -- sorry -- as Defendant Couch Exhibit

1  5B-38.  And do you recall discussing this document from your
2  medical file with defense counsel?
3  A   No, sir.
4  Q   You don't recall them -- with defense counsel a few minutes
5  ago talking with you about off-label --
6  A   Oh, yes, sir.  I'm sorry, yes, sir.  I misunderstood.  Yes,
7  sir.
8  Q   And he showed you at the bottom where it's your name and
9  signature on your first visit?
10  A   Yes, sir; that's correct.
11  Q   Do you see this section with specific off-label uses?
12  A   Yes, sir.
13  Q   And do you remember when he pointed you to number two,
14  saying Actiq and Fentora for noncancer pain?
15  A   That's correct.
16  Q   And do you recall -- what did you tell him?  Do you know
17  what Actiq and Fentora are?
18  A   No, sir.  I haven't the slightest idea.
19  Q   Did anyone sit down with you and explain to you what those
20  drugs were when you signed this form?
21  A   No, sir.
22  Q   What, if anything, was explained to you by Dr. Couch about
23  this form before you signed it that very first day?
24  A   Nothing.
25  Q   Did anyone tell you there's another drug, but at that time

1  there wouldn't be Subsys, but did they ever tell you later that

2  Subsys is just like Actiq and Fentora and you've agreed to take

3  it off-label?

4  A   No, sir.

5  Q   Did anyone ever talk to you about Subsys being taken

6  off-label?

7  A   No, sir.

8  Q   Do you recall when defense counsel was asking you whether

9  or not you brought up the fact that you were taking Subsys when

10  you went to your other doctors' appointments?

11  A   Yes, sir, I remember saying that.

12  Q   And when you went to your primary care doctor and told him

13  you were on Subsys, where did he send you?

14  A   To the hospital.

15  Q   Do you recall when defense counsel discussed your PDMP

16  report with you, which has been admitted as Government's

17  Exhibit or Couch Exhibit 5G?  Do you remember him asking you

18  about this?

19  A   Yes, sir.

20  Q   And do you remember him asking you about Lazanda?

21  A   Yes, sir.

22  Q   And it's a nasal spray.  Do you remember that?

23  A   Correct.

24  Q   And tell the jury, did you ever take Lazanda?

25  A   No, I've never put any -- I can't even take nasal spray.  I

1  would never squirt anything in my nose.

2  Q   And it's not that you don't remember it; that didn't

3  happen, the nasal spray?

4  A   No, sir.  I never took that medication.

5  Q   I'm going to show you what's been reported to the PDMP.  Do

6  you see right here on August 6th, August 15th, and August 25th

7  of 2014 where it says Lazanda 400 nasal spray next to it?

8  A   Yes, sir.

9  Q   And do you see -- it appears on your PDMP record who it was

10  that prescribed that to you?

11  A   Yes, sir.

12  Q   And do you see which pharmacy is claiming they filled this

13  for you?

14  A   Yes, sir.

15  Q   And what pharmacy is it?  Well, what doctor does it say

16  wrote you that prescription?

17  A   John Patrick Couch.

18  Q   And what pharmacy claims that they filled that prescription

19  for you?

20  A   C&R Pharmacy.

21  Q   And do you know who owns C&R Pharmacy?

22  A   Yes, sir; Dr. Couch and Dr. Ruan.

23  Q   So if this was reported by C&R Pharmacy, you are saying

24  this is not true, that you did not get those prescriptions for

25  Lazanda filled at C&R Pharmacy?

1   A   That's correct, I've never requested anything to squirt in

2   my nose.  And I don't remember filling anything like that.

3   Q   You mentioned that Dr -- or that it was Justin Palmer that

4   started you on Subsys.  Do you recall that?

5   A   That's correct.

6   Q   You had not seen that form I showed you, that patient

7   prescriber enrollment form?

8   A   Yes, sir; that's correct.

9   Q   At any time did Justin Palmer ever give you any warnings

10  about Subsys?

11  A   No, sir, none whatsoever.

12  Q   At any time did Dr. Couch give you any warnings about

13  Subsys?

14  A   No, sir, none whatsoever.

15       MR. BODNAR:  Nothing further from this witness, Your

16  Honor.

17       THE COURT:  All right.  Mr. Blackmon, you may be

18  excused.

19       MR. BODNAR:  Your Honor, the United States calls Rita

20  Blackmon.

21                    RITA BLACKMON

22            was sworn and testified as follows:

23       THE WITNESS:  I swear.

24       THE CLERK:  Thank you, ma'am.  Please be seated.

25       THE WITNESS:  Thank you.

1142

```
1                      DIRECT EXAMINATION
2   BY MR. BODNAR:
3   Q   Good morning.
4   A   Good morning.
5   Q   Could you please tell the jury who you are?
6   A   My name is Rita Blackmon.
7   Q   And Ms. Blackmon, do you know an individual named Randall
8   Blackmon?
9   A   Yes, sir, I do.
10  Q   How do you know Randall Blackmon?
11  A   He's my husband.
12  Q   And during the time period when Randall Blackmon was a
13  patient at PPSA, were you his husband --
14  A   I'm sorry.  Could you repeat?
15  Q   I'm sorry.  Was he your husband --
16  A   Yes, he was.
17  Q   -- during the time period that he was --
18  A   Yes, he was.
19  Q   Would you attend patient visits with your husband?
20  A   Yes, I would.  And I did.
21  Q   Did you attend all of them with him?
22  A   Yes, I did.
23  Q   And when you attended them, did you actually go back into
24  the examination room with your husband?
25  A   Yes, I did.
```

1143

1   Q   How about when he filled his prescriptions at C&R Pharmacy,

2   would you be there with him then as well?

3   A   Yes, I would.

4   Q   I'm going to show you what's already been admitted into

5   evidence as Government's Exhibit 13-22.  This is the medical

6   file for your husband.

7   A   All right.

8   Q   Do you recall the first visit to PPSA?

9   A   Yes.

10  Q   And during that first visit did Dr. Couch -- was Dr. Couch

11  present in the room?

12  A   During the very first visit?

13  Q   Yes.

14  A   Yes, sir.

15  Q   How about after that first visit, during any other office

16  visits was Dr. Couch there?

17  A   No, sir.

18  Q   Do you recall, during the first visit or any visit, anyone

19  feeling around on your husband's throat and his thyroid?

20  A   No, sir.

21  Q   If that is listed as having happened in his medical record,

22  is that true or is that a lie?

23  A   That's a lie.

24  Q   How about pressing around on his stomach, did that happen

25  at the first visit or any visit?

1    A   No, sir.

2    Q   If that's in his medical record, is that true or is that a

3    lie?

4    A   That's a lie.

5    Q   How about shining light into his eyes, do you recall that

6    ever happening?

7    A   No, sir.

8    Q   And if that is reflected in his medical record, is that

9    true or is that a lie?

10   A   That's a lie.

11   Q   Do you remember when your husband was put on a drug called

12   Subsys?

13   A   Yes, sir.

14   Q   And at the time your husband did have legitimate pain,

15   didn't he?

16   A   Yes, sir, he did.

17   Q   And where was his pain?

18   A   In his legs.

19   Q   And was that caused by cancer?

20   A   No, sir.

21   Q   Does your husband have cancer?

22   A   No.  He does not.

23   Q   Did he ever have cancer?

24   A   No.  He does not.

25   Q   Do you recall when he was first prescribed Subsys?

RITA BLACKMON - DIRECT BY MR. BODNAR

1   A   Yes, I do.

2   Q   And is that that spray under the tongue?

3   A   Right, sprays under the tongue.

4   Q   Who prescribed your husband's Subsys that first time?

5   A   Dr. -- sorry, not Dr. Couch but Justin.

6   Q   Who is Justin?

7   A   Justin is the nurse practitioner.

8   Q   Was Dr. Couch in the room at that time?

9   A   No, he was not.

10  Q   What do you mean that Justin Palmer is the one that

11  prescribed Subsys to him?

12  A   He's the one that wrote the prescription and signed it.

13  Q   And when he signed it, did he sign it Justin Palmer or did

14  he sign it Dr. Couch?

15  A   Dr. Couch.

16  Q   Please tell the jury what warnings did Justin Palmer give

17  your husband about Subsys when he put him on Subsys?

18  A   No warnings.

19  Q   Did he tell him that it was a cancer drug?

20  A   No, he did not.

21  Q   Were you aware that it was a cancer drug at that time?

22  A   No, I was not.

23  Q   You said Justin Palmer didn't give him any warnings;

24  correct?

25  A   No.

RITA BLACKMON - DIRECT BY MR. BODNAR

1   Q   Dr. Couch wasn't there?

2   A   No.

3   Q   So could he have given any warnings?

4   A   No.

5   Q   And did he give him any warnings?

6   A   No.

7   Q   Approximately how long was your husband on Subsys?

8   A   Eight months.

9   Q   Now, what was -- what if any side effects did you notice

10  with the Subsys when he was on it?

11  A   He was very lethargic.  He would -- he wouldn't eat.  He

12  wouldn't -- he wouldn't communicate with anybody.  He was more

13  or less slumped over like this (indicating) and he just -- he

14  wasn't able to do anything, wasn't able to function at all.

15  Q   At any of the visits after that, did Justin Palmer or

16  Dr. Couch or anybody give you any warnings about what this drug

17  was?

18  A   No.

19  Q   Did there come a time later that you learned it was a

20  cancer drug?

21  A   Eight months later when the insurance company called, yes,

22  sir.

23  Q   Did there come a time that after taking Subsys you needed

24  to take your husband to a doctor?

25  A   Yes.

RITA BLACKMON - DIRECT BY MR. BODNAR

```
 1   Q   Without saying what the doctor said, what happened to your
 2   husband after that doctor visit?
 3   A   After that doctor visit?  He was put in the hospital in ICU
 4   probably about a month, starting to have -- starting to have
 5   withdrawals from the Subsys.
 6   Q   And by taking him to the hospital do you mean he was taken
 7   directly from the doctor's office in an ambulance?
 8   A   Right.
 9   Q   So he didn't go home and pack a bag and go to the hospital
10   later?
11   A   No.
12   Q   He went immediately to the hospital?
13   A   He went immediately to the hospital.
14           MR. BODNAR:  One moment, Your Honor.
15           THE COURT:  All right.
16   BY MR. BODNAR:
17   Q   Ms. Blackmon, did you say you also go to C&R Pharmacy when
18   your husband picked up his prescriptions?
19   A   Right.
20   Q   Do you recall a time when he received a nasal spray
21   fentanyl drug?
22   A   No, I don't recall.
23   Q   You don't recall or he didn't receive?
24   A   No, I'm sorry.  He didn't.
25   Q   I'm going to show you what has been admitted as Couch
```

RITA BLACKMON - DIRECT BY MR. BODNAR

1   Exhibit 5G-5, which has been already identified as the PDMP

2   report for your husband.  Do you see right here (indicating)?

3   A   Yes, sir.

4   Q   Where it appears that on August 6th, August 15th, August

5   25th of 2014 your husband received Lazanda Nasal Spray?

6   A   Uh-huh (positive response).

7   Q   On three occasions?

8   A   I see it.

9   Q   And are you saying -- well, first, who does it say

10  prescribed him that?

11  A   Dr. Couch.

12  Q   And what pharmacy is claiming that they filled those

13  prescriptions?

14  A   C&R Pharmacy.

15  Q   And do you know what C&R Pharmacy is?

16  A   I know what C&R Pharmacy is.

17  Q   What is C&R Pharmacy?

18  A   It's Dr. Couch's and Dr. Ruan's pharmacy.

19  Q   And did your husband ever receive these prescriptions that

20  Dr. Ruan and Dr. Couch's pharmacy claimed they filled?

21  A   No, he did not.

22        MR. BODNAR:  Nothing further for this witness, Your

23  Honor.

24        THE COURT:  All right.  Mr. Powell?

25        MS. GRIFFIN:  Your Honor, we would call Tamisan

1    Blanks.

2              THE COURT:  No, no.  Mr. Powell's going to be --

3              MS. GRIFFIN:  My mistake.

4              MR. POWELL:  That's all right.

5                        CROSS EXAMINATION

6    BY MR. POWELL:

7    Q   Ms. Blackmon, did you know that C&R Pharmacy was managed by

8    a management company owned by a pharmacist in town by the name

9    of McConaghy?

10   A   No, sir.

11   Q   And did you know that C&R Pharmacy -- or that Drs. Couch

12   and Ruan turned over the management of C&R Pharmacy to the

13   limited liability company owned by Mr. McConaghy for the

14   purpose of managing that pharmacy?

15   A   No, sir.

16   Q   And that they had -- neither had any daily interaction

17   with -- other than filling of prescriptions -- with the

18   management of that pharmacy?

19   A   I did not know that.

20   Q   So when you testify here today that you or your husband

21   received a prescription for Lazanda after his Subsys was

22   discontinued, on four separate occasions, are you telling us

23   that C&R Pharmacy fraudulently reported this data to the state

24   of Alabama regarding this prescription?

25   A   As far as being able to tell you that they did -- that they

 1   did not fill the Lazanda, yes, I'm telling you that.

 2   Q   All right.  Now I'm not sure I understand.  Are you telling

 3   us that it is your recollection as you sit here today, under

 4   oath, that your husband never received these prescriptions and

 5   never filled them at C&R Pharmacy or are you telling us that

 6   you don't recall whether he did or didn't but that he didn't

 7   take it?

 8   A   He did not receive those prescriptions.

 9   Q   So this data that's been reported in here by the people

10   that run C&R Pharmacy is fraudulent?

11   A   Right.

12   Q   Is that right?

13   A   Right.

14   Q   Do you have any reason to believe that other than what

15   you've testified here today?

16   A   That's the truth.

17   Q   Okay.  So you're saying that C&R Pharmacy has fraudulently

18   filled prescriptions?

19          MR. BODNAR:  Objection, Your Honor.  It's asked and

20   answered.

21          THE COURT:  Sustained.  Let's move on.

22   BY MR. POWELL:

23   Q   How long have you known Mr. Blackmon?

24   A   Seven years.

25   Q   How long did you know him before you got married?

 1   A    A year.

 2   Q    And you started going with him to his doctors' appointments

 3   at PPSA after you got married?

 4   A    Before we got married.

 5   Q    Before you got married?

 6   A    Uh-huh (nodding head affirmatively).

 7   Q    Now, you described an incident in July of 2014 when your

 8   husband, Mr. Blackmon, was hospitalized by his primary care

 9   physician; correct?

10   A    Right.

11   Q    And when he was discharged, he continued to receive pain

12   management care from PPSA, didn't he?

13   A    I don't recall.  I'm sorry.

14   Q    Well, in July 2014 to March of 2015 you would have gone to

15   PPSA if you went to every one of his appointments because he

16   had appointments during those times?

17   A    Right.

18   Q    Didn't he?

19   A    Okay.  You're right.

20   Q    And 2014 is a lot sooner to now than 2010, isn't it?

21   A    Right.

22   Q    Would you agree that your recollection would be better --

23   A    Better.

24   Q    -- in terms of what happened in the last two years than

25   what happened five or six years ago?

 1    A    Right.

 2    Q    And in spite of this episode he went back to PPSA to

 3    continue his care, didn't he?

 4    A    Right.

 5    Q    And his primary care doctor -- what was his name?

 6    A    Primary care doctor?

 7    Q    Yes.

 8    A    Jason West.

 9    Q    And Dr. West knew that he was continuing with pain

10    management at PPSA after that episode where he was

11    hospitalized, didn't he?

12    A    Right.

13    Q    You were questioned about the use of Subsys for

14    Mr. Blackmon's breakthrough pain.  Are you aware, Ms. Blackmon,

15    that he just testified under oath that he was treated -- prior

16    to --

17          MR. BODNAR:  Objection, Your Honor, to what another

18    witness testified under oath when she was not in here.

19          THE COURT:  She wasn't in here, so I sustain the

20    objection.

21    BY MR. POWELL:

22    Q    Your husband never reported any side effects from this

23    medication to PPSA, did he?

24    A    Could you repeat that?  I'm sorry.

25    Q    Your husband never reported any side effects from the use

1    of the Subsys to PPSA, did he?

2    A    No, sir.

3    Q    In fact, the medication was working for him to relieve his

4    chronic pain, wasn't it?

5    A    Yes, sir.

6    Q    And he received a letter from his insurance carrier -- were

7    you living with him at the time he got the letter or you were

8    married when he got the letter from HealthSpring?

9    A    We were married.

10   Q    And the letter came in June of 2013, telling him the Subsys

11   had been approved for nonformulary use for him?

12   A    I'm assuming it did.  I'm not sure what it said.  I don't

13   remember what it said.

14   Q    You know they approved him to receive Subsys for his pain,

15   don't you?

16   A    Okay.

17   Q    And you know how health insurance works, don't you?

18   A    Yes, sir.

19   Q    They pay claims based on a diagnosis -- diagnostic code,

20   don't they?

21   A    Right.

22   Q    In other words, a doctor sees a patient and the doctor has

23   a code and he marks on a chart and that code has a description

24   of what that doctor's diagnosis is; correct?

25   A    Right.

RITA BLACKMON - REDIRECT BY MR. BODNAR

1   Q   And so in order for the insurance company to pay the bill

2   for the medical treatment you or your husband have received,

3   there would have to be some diagnostic codes entered, wouldn't

4   it?

5   A   Right.

6   Q   So isn't it a fair statement, Ms. Blackmon, that

7   HealthSpring knew exactly what Mr. Blackmon was being

8   prescribed Subsys for, based on what you just told us?

9   A   Yes, sir.

10  Q   That it was being prescribed off-label for the use of

11  breakthrough pain; isn't that right?

12  A   Yes, sir.

13          MR. POWELL:  That's all.

14          THE COURT:  Any redirect?

15          MR. BODNAR:  Very briefly, Your Honor.

16                  REDIRECT EXAMINATION

17  BY MR. BODNAR:

18  Q   Ms. Blackmon, do you remember when defense counsel was

19  asking you questions about your knowledge of how C&R Pharmacy

20  was -- corporate setup?

21  A   I recall.

22  Q   Do you know who ordered the drugs for C&R Pharmacy?

23  A   No, sir.

24  Q   Where was C&R Pharmacy located in connection with PPSA?

25  A   Where was it located?

1   Q   Yes.

2   A   Behind the building, on -- behind their office building on

3   Airport Boulevard.

4   Q   And behind, you mean attached -- basically attached --

5   A   Attached to PPSA (nodding head affirmatively).

6   Q   You were questioned about your husband going back and

7   seeing Dr. -- well, going back and seeing Justin Palmer after

8   his hospitalization.  Do you recall that?

9   A   Yes, sir.

10  Q   After his hospitalization was your husband ever given

11  Subsys again?

12  A   No, he wasn't.

13  Q   Do you remember when Mr. -- defense counsel was talking

14  with you about diagnostic codes?

15  A   (Nodding head affirmatively.)

16  Q   Do you know what those are?

17  A   No, sir.

18  Q   Did you hear what he said, though?  It lines up with the

19  diagnosis such as cancer --

20  A   Okay.

21  Q   -- or whatever a person has?

22  A   (Nodding head affirmatively.)

23  Q   Do you remember him talking about a letter that your

24  husband received?

25  A   Right.  Yes, sir.

RITA BLACKMON - REDIRECT BY MR. BODNAR

1  Q   I'm going to show you a copy of that letter which the

2  defense has admitted as 5F-4.  And if you could take a moment

3  to look at that, I want you to point out to me where it says

4  what the diagnosis is that they are approving this for, if it's

5  in there at all.

6  A   It's not in there.

7  Q   So based on this letter, it doesn't say why HealthSpring

8  approved Subsys for your husband, do they?

9  A   No, sir.

10         MR. POWELL:  We're going to object to that.  The first

11 paragraph of the letter states the basis for the approval.

12         THE COURT:  I'm sorry.  I couldn't hear the objection.

13         MR. POWELL:  The first paragraph of the letter states

14 the basis for the approval.  The question was:  Does the letter

15 not say why the Subsys was approved?

16         THE COURT:  Overrule the objection.

17 BY MR. BODNAR:

18 Q   Does it say what diagnosis it's being approved for?

19 A   No, sir.

20 Q   And you mentioned that HealthSpring called approximately a

21 year later; correct?

22 A   Right.

23 Q   Based on that call what did you learn that Subsys was a

24 drug for?

25         MR. POWELL:  Judge, I'm going to object to that.  It

1157

1  calls for a hearsay response regardless of the form of the

2  question.

3          THE COURT:  Sustained.

4  BY MR. BODNAR:

5  Q   Did you learn that there was a very specific diagnosis that

6  Subsys is meant for?

7  A   Yes, I did.

8          MR. POWELL:  Same objection.

9          THE COURT:  Overruled.

10 BY MR. BODNAR:

11 Q   Did you learn that there was a very specific diagnosis that

12 Subsys was approved for?

13 A   Yes, I did.

14 Q   And what is that diagnosis?

15 A   Cancer.

16         MR. BODNAR:  Nothing further for this witness, Your

17 Honor.

18         THE COURT:  All right.  Ms. Blackmon, you may step

19 down.

20         THE WITNESS:  Thank you.

21         THE COURT:  You're excused.

22         MS. GRIFFIN:  Now I will call Ms. Blanks, Your Honor.

23         THE COURT:  All right.

24                    TAMISAN BLANKS

25            was sworn and testified as follows:

```
 1              THE WITNESS:  I do.

 2              THE CLERK:  Thank you, ma'am.  Please be seated.

 3                       DIRECT EXAMINATION

 4   BY MS. GRIFFIN:

 5   Q    Tell us your full name, please.

 6   A    Tamisan Witherspoon Blanks.

 7   Q    Would you spell that first name, please?

 8   A    T-A-M-I-S-A-N.

 9   Q    And you go by Ms. Blanks; is that right?

10   A    That is correct.

11   Q    I want to direct your attention to December of 2013.  Can

12   you hear me okay?

13   A    I can.

14   Q    Had you had some type of surgery a few months prior to

15   December of '13?

16   A    I did.

17   Q    What was that?

18   A    A hernia surgery.

19   Q    Did you have some discomfort after having the hernia

20   surgery?

21   A    Yes, ma'am.

22   Q    Were you referred to PPSA?

23   A    Yes, ma'am.

24   Q    And that was by your doctor, Dr. Walsh; is that correct?

25   A    That is correct.
```

1   Q   Now, Ms. Blanks, did you go to PPSA on or about December

2   the 10th of 2013?

3   A   Yes, ma'am.

4   Q   Who did you see on that visit?

5   A   Stacy.

6   Q   Do you know if Stacy was a doctor?

7   A   I did not.  I do not.

8   Q   You do not?

9   A   No.

10  Q   You don't know what she was?

11  A   No, ma'am.

12  Q   Did you see Dr. Couch on that date?

13  A   I did not.

14  Q   Now, I want to talk about this first visit.  Had you been

15  taking Subsys before you went in December of '13 to PPSA?

16  A   No, ma'am.

17  Q   What happened while you were there for that first visit

18  where you were seeing Stacy?

19  A   She asked me a bunch of questions about my surgery and then

20  she gave me some prescriptions.

21  Q   Did she hand you anything?

22  A   She handed me a card to get a free 30-day trial of Subsys.

23  Well, a 30 -- I'm sorry -- 30 vials.

24  Q   30 sprays?

25  A   Yes, 30 sprays; that's correct.

1    Q   Had you taken Subsys at any time prior to that?

2    A   No, ma'am.

3    Q   And at that time were you currently taking Norco and Soma

4    from your referring doctor, Dr. Walsh?

5    A   Yes, ma'am.

6    Q   Did you have to sign any type of form to receive Subsys?

7    A   No, ma'am.  I don't recall.  I don't think I did.

8    Q   I'm not talking about the pharmacy.  I'm talking about

9    while you were seeing Stacy.

10   A   Oh.  No, ma'am.

11   Q   Did a doctor sit down and explain to you that you were

12   taking a drug that you had to register for, a TIRF drug,

13   T-I-R-F?

14   A   No, ma'am.

15   Q   Did you sign any type of informed consent about receiving

16   Subsys?

17   A   No, ma'am.

18   Q   Who did you think you were having an appointment with that

19   first appointment, December 10th of 2013?

20   A   A doctor of the clinic.

21   Q   Do you know which doctor?

22   A   No, I do not.

23   Q   Stacy didn't introduce herself to you as a doctor, did she?

24   A   No, she didn't.

25   Q   Now, you said she gave you a card to get the Subsys free;

TAMISON BLANKS - DIRECT BY MS. GRIFFIN

1    is that right?

2    A    She did.  Yes, ma'am.

3    Q    Had she done any physical examination of you before giving

4    you that card?

5    A    No, ma'am.

6    Q    Had she pressed on your stomach in the area where you had

7    had the hernia surgery?

8    A    No, ma'am.

9    Q    Did she determine by touching you that it was tender in

10   that area?

11   A    No, ma'am.

12   Q    Did she do anything physical to you whatsoever?

13   A    No.  We just talked.

14   Q    Did she touch you anywhere?

15   A    No, ma'am.

16   Q    So you told her you had pain where?

17   A    In my stomach area, where I had the surgery.

18   Q    Did you tell her you were taking Norco and Soma?

19   A    Yes, ma'am.

20   Q    And you said she gave you the card for Subsys?

21   A    Yes, she did.

22   Q    Was that a free trial of Subsys?

23   A    It was.

24   Q    Previously you had been shown your medical record; is that

25   right?

1162

TAMISON BLANKS - DIRECT BY MS. GRIFFIN

1   A   Yes, ma'am.

2   Q   I'll show you what's been introduced as Government's

3   Exhibit 13-16.

4          MS. GRIFFIN:  I'm taking it out of the folder, Your

5   Honor, and will return it to the exhibit.

6          THE COURT:  All right.

7   BY MS. GRIFFIN:

8   Q   And show you the December 10th, 2013 history and

9   physical.  Does it indicate that you have -- past medical

10  history was a hernia and abdominal pain, under the past medical

11  history?  Do you need it larger?

12  A   Yes, I see it.

13  Q   And does it list your current medications when you came in

14  that day?  (Indicating.)

15  A   Yes, ma'am.

16  Q   Now, I'll show you the second page of that report, which is

17  Bates number 210115 and ask if it interviews a review of your

18  symptoms.  Did you go through some symptoms with Stacy as to

19  what you had and what you didn't have?

20  A   Yes, ma'am.

21  Q   Then I'll show you at the bottom where it discusses a

22  physical examination.  Did you have a physical examination?

23  A   No, ma'am.

24  Q   I show you the third page of that report and ask if there

25  was any examination of your eyes, your neck, your lungs, your

1  heart, or your stomach?

2  A   No, ma'am.

3  Q   So where it says:  Abdomen tender to palpitation, was your

4  stomach palpitated or touched?

5  A   No.  No, ma'am.

6  Q   At the bottom there was an assessment that you had pain in

7  the abdomen; is that correct?

8  A   Yes, ma'am.

9  Q   And was there a plan for you to receive any kind of

10  medication?

11  A   Yes, ma'am.

12  Q   What was that?

13  A   Norco and Soma.

14  Q   And you said you received Subsys on that first visit; is

15  that right?

16  A   Yes, ma'am.

17  Q   I'll show you the sign sheet, the electronic sign sheet for

18  that same visit and ask if it was signed on that same day by

19  Stacy Madison, CRNA?

20  A   Yes, ma'am.

21  Q   Was it signed by Dr. Couch eight days later?

22  A   Yes, ma'am.

23  Q   So nothing in that first visit shows that you received

24  Subsys, does it?

25  A   No, ma'am.

1164

```
 1   Q   I want to take you back to the front of your file under the
 2   section entitled Medication History.  I'll show you under Bates
 3   number 210100 where Subsys sublingual spray, it shows that it
 4   was prescribed on December the 10th of 2013.
 5   A   Yes, ma'am.
 6   Q   Do you know the micrograms you were prescribed of Subsys?
 7   A   600.
 8   Q   And how many times a day were you to use it?
 9   A   Four.
10   Q   Did you begin to use the Subsys spray?
11   A   Yes, ma'am.
12   Q   Did you have any problems with it early on?
13   A   Yes, ma'am.
14   Q   What was that?
15   A   Uh, it was very powerful.  It was really strong.
16   Q   And did you on that first day have a urine test to see what
17   type of drugs might be in your system, if you recall?
18   A   I don't recall.
19   Q   Now, when you say Subsys was very strong, what do you mean?
20   A   It was a strong drug.  It was very -- very strong.  Just
21   made you -- made my heart beat real fast and, you know, it was
22   strong like an upper, I guess, what you would call it.
23   Q   Did Dr. Couch give you any warnings about the Subsys at
24   all?
25   A   No, ma'am.
```

1    Q    Did Stacy give you any warnings about the Subsys at all?

2    A    No, ma'am.

3    Q    So you had no informed consent whatsoever about the dangers

4    of taking that medicine?

5            MR. SHARMAN:  Objection; leading.

6            THE COURT:  Sustained.

7    BY MS. GRIFFIN:

8    Q    Did you have any warnings that day about taking the

9    medication?

10   A    No, ma'am.

11   Q    Did you have an appointment thereafter in January '14?

12   A    Yes, ma'am.

13   Q    Before I ask you about that next appointment, you went

14   there for approximately how long?

15   A    11 months.

16   Q    During that 11 months did you ever see Dr. Couch?

17   A    Once.

18   Q    Where was that that you saw him?

19   A    In the office.

20   Q    In the patient room, back in the back?

21   A    Yes, ma'am.

22   Q    In the room where you were to be treated; is that correct?

23   A    Yes, ma'am.

24   Q    And how long did you see him for?

25   A    I'm not sure.  Not long.  Maybe five minutes.

1   Q   Had you ever seen him before that time or after that time?

2   A   No, ma'am.

3   Q   In fact, do you even remember what he looks like?

4   A   No, ma'am.

5   Q   Did you always see females when you were there?

6   A   Yes, ma'am.

7   Q   And did you learn, after seeing Stacy, the name of the next

8   female you began to see?

9   A   Yes, ma'am.

10  Q   Which was what?

11  A   Bridgette.

12  Q   Did you know whether or not Bridgette was a doctor?

13  A   I did not.

14  Q   So I'm going to direct you to this January 20th of '14

15  visit.  It's Bates number 20 -- excuse me -- 210147.  And it

16  shows the date at the top of January the 20th of '14.  Do you

17  recall that being your second visit?

18  A   Yes, ma'am.

19  Q   Do you know if this is the visit where you saw Dr. Couch or

20  which visit where you saw him?

21  A   I don't remember.

22  Q   I'll show you down in the objectives and ask if it says

23  whether or not you were taking Subsys.  I'm sorry.  Up here

24  under the current treatment.  (Indicating.)

25  A   You asked -- excuse me.  What did you ask me?

TAMISON BLANKS - DIRECT BY MS. GRIFFIN

1   Q   Under the Current Treatment.  It says prior to her current

2   medication, the patient had previously tried --

3   previously-failed medications.  Had you provided a list of

4   previously-failed medications?

5   A   No, ma'am.

6   Q   And again, it says you're treating the pain with what?

7   A   Current.  Are you talking about current treatment?

8   Q   Yes.  Currently treating the pain with --

9   A   MS-Contin oral, extended release 15 milligram, Norco oral,

10   tablet 10, 325 milligram.

11   Q   Okay.  Under the objectives does it say that you are using

12   the Subsys?

13   A   Yes, it says that I was using the Subsys and had great

14   results.

15   Q   And that's the Subsys you had received on the first visit;

16   is that right?

17   A   Yes, ma'am.

18   Q   Again, was there a physical examination on this occasion?

19   A   No, ma'am.

20   Q   And your pain medication plan for this visit, Bates stamped

21   210149, does it show your plan is to give you Subsys?

22   A   No, ma'am.

23   Q   But you were taking it; is that right?

24   A   Yes, ma'am.

25   Q   How did you have to fill the Subsys?  Tell us about that.

TAMISON BLANKS - DIRECT BY MS. GRIFFIN
27353

1   A   I had to take the Subsys prescription to C&R Pharmacy every

2   Monday because the company itself paid for the medication.

3   Q   And you had it filled at C&R Pharmacy?

4   A   C&R Pharmacy once a week.

5   Q   Okay.  Was that co-located with the clinic, pain clinic?

6   A   Was it what?  I'm sorry.

7   Q   Co-located at the same place?

8   A   Yes, ma'am.

9   Q   So you could only get a week's worth at a time?

10  A   Yes, ma'am.

11  Q   Do you know who signed each of those prescriptions?

12  A   No, ma'am.

13  Q   Did there come a time that you went in February of '14?

14  A   To the --

15  Q   To the clinic?

16  A   Yes, ma'am.

17  Q   Again, did you see a doctor or did you see Bridgette on

18  this occasion?

19  A   Bridgette.

20  Q   I'll show you Government's Exhibit -- still part of the

21  same, Exhibit 13-16, and ask if this time your current

22  treatment shows that you are taking the Subsys, that you've

23  been taking it the whole time you were there?

24  A   Yes, it shows it.

25  Q   And on this occasion you had some shoulder pain; is that

1    correct?

2    A    Yes, ma'am.

3    Q    And did you also go back there in March of '14?

4    A    Yes, ma'am.

5    Q    Again, were you prescribed Subsys?

6    A    Yes, ma'am.

7    Q    Did you go back in April of '14?  Again, were you

8    prescribed Subsys?

9    A    Yes, ma'am.

10   Q    Still no physical examination?

11   A    No physical.

12   Q    Ever?

13   A    No, ma'am.

14   Q    And do you recall on this occasion that you were seen by

15   Bridgette Parker?

16   A    Yes, ma'am.

17        MS. GRIFFIN:  Your Honor, I'm taking the April 2014

18   notes out and I will replace them in the file.

19   Q    I show you the April 11th, 2014 note and ask if you

20   indicated that you had gone -- had an MRI of the shoulder

21   you've told us was hurting, under Recent Diagnostic Testing?

22   A    Yes.

23   Q    Okay.  You had had the MRI; is that right?

24   A    Yes, ma'am.

25   Q    And did it list any results?

1170

1   A   No, ma'am.

2   Q   But you had had it prior to coming there for that patient

3   visit; is that right?

4   A   Yes, ma'am.

5   Q   Does it list any of the medications you had tried that had

6   failed?

7   A   No, ma'am.

8   Q   And does it indicate that you were taking the Subsys you'd

9   been prescribed?

10   A   Yes, ma'am.

11   Q   Did you tell them at that time that you were pleased with

12   your medications?

13   A   I don't recall.

14   Q   And did you recall telling him whether or not you had any

15   side effects?

16   A   Yes.  I was drowsy from the sleep medications that she gave

17   me.

18   Q   Did you tell them at that time any problems you were having

19   with the Subsys?

20   A   No, ma'am.

21   Q   Now, I direct your attention on throughout your chart.  Did

22   you continue to receive the same Subsys prescription until

23   sometime in November of 2014?

24   A   Yes, ma'am.

25   Q   What happened on or about November of 2014?

1   A    What do you mean?

2   Q    With you and Bridgette; what did you observe?

3   A    The last time I went Bridgette was incoherent.  She -- when

4   I went into the office, she -- she fell asleep for like -- and

5   I -- she and I were in the office and I sat down and she fell

6   asleep for like about 10 minutes.  And I -- I just sat there

7   and I started to cry because I realized that she was in trouble

8   and so was I.  And so when she came back to, I just looked at

9   her and she gave me my prescriptions and she was talking kind

10  of out of her head.  And I know what that's like because I had

11  been in that state myself and I know what that is.  She was

12  just kind of babbling and talking and babbling, and she was

13  going in and out.  And finally she handed me my prescriptions

14  and I left that day, and I called rehab to enter the rehab

15  clinic for myself.

16  Q    Was that from taking a particular drug?

17  A    Subsys.

18  Q    Now, you said you knew what that was like yourself, the way

19  you've described her.  What do you mean?

20  A    She was like babbling and talking and not knowing what she

21  was saying and just falling asleep.  And she was a mess.  She

22  just was out of it.

23  Q    You've told us that you knew what that was like.

24  A    Yes.

25  Q    How is it that you knew what that was like, what you've --

1172

```
 1   A   Because I had been --

 2   Q   Wait just a minute.

 3   A   I'm sorry.

 4   Q   -- what you just described?  How did you know that?

 5   A   Because I had been in that state myself.

 6   Q   With what?

 7   A   Taking medications.

 8   Q   And which medication?

 9   A   Subsys.

10   Q   And explain it.  Tell us what happened.

11   A   With the Subsys?

12   Q   Yes, ma'am.

13   A   I know I had taken too much and I was -- I was -- I was

14   talking, and in and out, sleep and awake, and up one minute,

15   not the next, not knowing what I'm talking about.  And my kids

16   would tell me:  Mom, you're saying crazy stuff, you're just

17   saying -- my daughter was out of school but I told her her

18   snack was in the car.  And I would just say things like that

19   that didn't make sense.  I would tell them that I just got out

20   of the bathtub and I would not have been.  I was just sitting

21   up watching TV and I would wake up and say:  Is it time to go,

22   for me to go to church or, you know, just things that didn't

23   make sense.

24   Q   That was while you were taking the Subsys?

25   A   Yes.
```

1173

1   Q   Did it make you sleep a good bit?

2   A   No, no.  When I wasn't on it I would sleep but while I was

3   on it, no.

4   Q   How were you when you were on it if you weren't sleeping?

5   A   Up, moving around, doing things; you know, just doing

6   what -- just up moving around.

7   Q   And did you feel like it had any impact on your activity

8   taking the Subsys?

9   A   Oh, yes, it had an impact on my activities.  I could -- on

10  the Subsys I actually did like a lot of things because it was a

11  upper and -- but when it was going out of your system, it was a

12  downer.

13  Q   Did you have any changes in your mood?

14  A   Yes.  Yes.  I was usually a very mild-mannered person.  I

15  was really mean.  I'm usually not very agitated and I was very

16  agitated, very upset all the time.  My kids would tell me:

17  Mom, you know, you're just real mean.  It makes you into a

18  monster.  I was really mean, really angry, really upset, really

19  fidgety and short-tempered.  Everything made me mad.

20  Everything made me upset.  I just wasn't real pleasant to be

21  around.

22  Q   I want to also ask if something happened to cause you to

23  have a breast wound while you were taking the Subsys.

24  A   Yes.  Because it's so powerful and it's so strong and it

25  takes away all your pain, it really does.  It's very powerful.

1174

1    I had laid down on a heating pad and I did not know the heating

2    pad was so hot and it burned my breast.  It burned -- it burned

3    it till I had to go to the emergency room.  It burned it really

4    bad.

5    Q   Ms. Blanks, did you ever have cancer?

6    A   No, ma'am.

7    Q   So any treatment of your breast would not have been cancer

8    related?

9    A   No, ma'am.

10   Q   Were you ever advised that Subsys was approved by the FDA

11   for breakthrough cancer pain?

12   A   No, ma'am.

13   Q   Were you ever advised of the side effects of taking Subsys

14   off-label?

15   A   No, ma'am.

16   Q   Do you know what off-label means?

17   A   No, ma'am.

18           THE COURT:  Ms. Griffin, is your microphone on?

19           MS. GRIFFIN:  It is, Your Honor.  I can speak up.  Is

20   that better?

21           THE COURT:  Yes, ma'am.

22   BY MS. GRIFFIN:

23   Q   Let me just ask you that again.  Did you ever have cancer?

24   A   No, ma'am.

25   Q   And did you know what breakthrough cancer pain meant?

1175

1   A   No, ma'am.

2   Q   Did you know what off-label meant?

3   A   No, ma'am.

4   Q   You were never advised of any of that by Dr. Couch?

5   A   No, ma'am.

6   Q   Were you ever advised of that by Bridgette?

7   A   No, ma'am.

8   Q   Were you ever advised of that by Stacy?

9   A   No, ma'am.

10   Q   I show you what's in your record --

11          MS. GRIFFIN:  And I'll take this out and replace it.

12   Q   -- for the June 14th visit before you went into

13   rehabilitation.  And ask if you were told about breast wounds,

14   still going to -- treatment for breast wounds?

15   A   Yes, ma'am.

16   Q   That was the burning you talked about, not any type of

17   cancer pain?

18   A   The burning.  No cancer.

19   Q   And again, does your chart list any medications you had

20   tried that had failed?

21   A   No, it doesn't list them, any medications that I --

22   Q   Did it say that you were pleased with your current

23   medications?

24   A   Yes, ma'am.

25   Q   Did you report to them whether there were any side effects

1   from the medication?

2   A   No, ma'am.

3   Q   Were there at that time?

4   A   Any side effects?

5   Q   Side effects from the Subsys that you've described to us.

6   A   Yes, ma'am.

7   Q   And those are the -- what you've just described?

8   A   Yes.

9   Q   Which is what?

10  A   When I didn't have it, it was slow heartbeat and lots of

11  times to the point to where I had to be -- the ambulance had to

12  be called several times.

13  Q   For what purpose?

14  A   When I -- when I didn't -- when I was not on the Subsys, it

15  slowed my heart rate tremendously.

16  Q   And when you were on it, what happened to your heart rate?

17  A   It made it race, made it go higher.

18  Q   I'll also show you your progress notes for July the 28th,

19  '14.  Do you remember having a visit on that date?

20  A   Yes, ma'am.

21  Q   You know you had one in July; is that right?

22  A   Yes, ma'am.

23  Q   Again, does it say that you were pleased with the current

24  medications?

25  A   Yes, ma'am.

1    Q    No significant side effects?

2    A    Yes, ma'am.

3    Q    And in the next paragraph does it say the medication regime

4    is not working well?

5    A    Yes, ma'am.

6    Q    Can those be the same thing?  Are those different?

7           MR. SHARMAN:  Objection.  The document speaks for

8    itself.

9           THE COURT:  Sustained.

10   BY MS. GRIFFIN:

11   Q    Were you taken off any medication at this time?

12   A    No, ma'am.

13   Q    And I show you the signature page for that date, the

14   electronic signature, and ask who signed it on the date of the

15   visit?

16   A    Bridgette Parker.

17   Q    And was it signed days later by whom?

18   A    John Couch.

19   Q    And last chart to show you, the end of August, 2014.  Do

20   you recall having an August visit in 2014?

21   A    Yes, ma'am.

22   Q    Does this also state that you were pleased with the

23   medications?

24   A    Yes, ma'am.

25   Q    And then it also states that the medications are not

TAMISON BLANKS - DIRECT BY MS. GRIFFIN

1    controlling your pain and the pain is constant?

2    A    Yes, ma'am.

3    Q    Had you become -- were you overusing any of your

4    medications at that time?

5    A    Yes, ma'am.

6    Q    Tell us about that.

7    A    I was overusing all of them.

8    Q    Why was that?

9    A    Because I was severely addicted to all, to my medications.

10   Q    And once you went in rehab, how long were you there?

11   A    A month.

12   Q    Where did you go to rehab, not the name of the facility but

13   what state?

14   A    North Carolina.

15   Q    When you finished the rehab, did you come back to Mobile to

16   live?

17   A    I did.

18   Q    Have you been in recovery since then?

19   A    Yes, ma'am.

20   Q    And without identifying where, have you had occasion to see

21   Bridgette outside of the office -- excuse me -- yes, Bridgette,

22   outside of the office setting since you've been in recovery?

23   A    Yes, ma'am.

24   Q    You've run into her; is that correct?

25   A    Yes, ma'am.

1 Q   Without telling us about your conversation, the substance

2 of it, have the two of you talked about both of you abusing

3 drugs?

4 A   Yes, ma'am.

5 Q   And that took place after your rehabilitation?

6 A   Yes, ma'am.

7 Q   Were you aware who owned C&R Pharmacy?

8 A   No, ma'am.

9 Q   Would you have been interested in knowing that Dr. Ruan and

10 Dr. Couch owned that pharmacy?

11 A   I'm sorry.  I know now but I didn't know prior to this

12 case.

13 Q   You did not know at that time?

14 A   No, ma'am.

15        MS. GRIFFIN:  One moment, Your Honor.

16        THE COURT:  All right.

17     (A discussion was held off the record between government

18 counsel.)

19 BY MS. GRIFFIN:

20 Q   Now, Ms. Blanks, in 2001, some 16 years ago, did you have a

21 misdemeanor conviction for a bad check?

22 A   Yes, ma'am.

23 Q   And in connection with that you've not had any problems

24 since?

25 A   No, ma'am.

1180

1   Q   Also, since going into treatment have you had any surgery?

2   A   Yes, ma'am.

3   Q   Could you tell us what types of surgery?

4   A   When I got home I had revision hernia surgery in December

5   of 2014 and after that I had ankle surgery in 2015 and I had

6   back surgery October 21st of 2016.

7   Q   After each of those surgeries were you prescribed Subsys by

8   anyone?

9   A   No, ma'am.

10  Q   Have you had Subsys since you went into rehab?

11  A   No, ma'am.

12  Q   And did you ever go back to PPSA after November of '14 when

13  you went into rehab?

14  A   No, ma'am.

15  Q   Have you been provided small amounts of controlled

16  substances with each of your surgeries?

17  A   With my last two, yes, ma'am.

18  Q   How did you --

19  A   I'm sorry.  With my last one.

20  Q   How did you do with that?

21  A   Excuse me?

22  Q   How did you do with the small amounts of controlled

23  substances?

24  A   Okay.

25  Q   You did okay?

TAMISON BLANKS - CROSS BY MR. SHARMAN

1    A    Yes, ma'am.

2    Q    And you were prescribed those for what length of time?

3    A    Three to four weeks.

4    Q    Not for months; is that right?

5    A    No, ma'am.

6         MS. GRIFFIN:  That's all I have of this witness at

7    this time, Your Honor.

8         THE COURT:  All right.  Mr. Sharman?

9                   CROSS EXAMINATION

10   BY MR. SHARMAN:

11   Q    Good morning, Ms. Blanks.  My name is Jack Sharman, I

12   represent Dr. Couch.

13   A    Great morning.

14   Q    Now, you were referred to Dr. Couch; right?  You just

15   didn't walk in?

16   A    Yes, sir.

17   Q    And you were referred by Dr. Aimee Walsh; is that right?

18   A    Yes, sir.

19   Q    And you had been seeing Dr. Walsh for pain that you were

20   already experiencing; right?

21   A    Yes, sir.

22   Q    And that was because you had been admitted actually

23   in-patient at Mobile Infirmary for some pain management; right?

24   A    Yes, sir.

25   Q    That was the result of surgeries that you had had before

1182

1   then; right?

2   A   Yes, sir.

3   Q   And before you were referred by Dr. Walsh at Mobile

4   Infirmary, she had examined you and the staff there had

5   examined you; right?

6   A   Yes, sir.

7   Q   They had prescribed some medications for you; right?

8   A   Yes, sir.

9   Q   And some of those helped you somewhat and some didn't;

10  right?

11  A   Yes, sir.

12  Q   So for example, they gave you Lortab and Lortab helped you

13  a little bit; right?

14  A   Yes, sir.

15  Q   And they gave you codeine and codeine helped you a little

16  bit; right?

17  A   Yes, sir.

18  Q   And they gave you MS-Contin and that helped you a little

19  bit; right?

20  A   No, sir.

21  Q   It didn't?  The MS-Contin did not help you?

22  A   No, sir.

23  Q   But then there were some things they tried that weren't of

24  any help to you at all; right, like ibuprofen?

25  A   I never -- I don't recall taking ibuprofen.

1  Q   Trigger point injections, they tried that and that didn't

2  help you?

3  A   Yes, sir, I remember that.

4  Q   And they tried an epidural block at Mobile Infirmary and

5  that didn't really help you either; right?

6  A   I don't remember an epidural block.

7  Q   All right.  We can go over that.  I'd like to refer you a

8  little bit in greater detail to some of the medical records

9  that you just visited with the government about.  Okay?

10  A   Okay.

11  Q   All right.

12         MR. SHARMAN:  If we could take a look, Sam, first at

13  C&R 210114.  114.

14  Q   All right.  Now Ms. Blanks, I think you just saw this a

15  moment ago.  This is part of the record from your first visit

16  to PPSA after you had been referred by Dr. Walsh; right?

17  A   Yes, sir.

18  Q   On December 10th of 2013; right?

19  A   Yes, sir.

20  Q   And then right there under History of Present Illness,

21  there are some kind of subcategories and one of them is Pain

22  Status.  Do you see where I'm reading there?

23  A   Yes, sir.

24  Q   And what does that say, Ms. Blanks, about your pain status

25  there on December 10th?

1    A    The pain is in the lower abdomen, average is nine to 10 on

2    a zero to 10 pain scale and has reached a maximum of 10 to

3    10.  The pain does not radiate and is reported to have aching,

4    and burning, and sharp and stabbing and an unbearable quality.

5    Q    Now, that's an accurate description of your condition when

6    you were referred to PPSA; right?

7    A    Yes, sir.

8    Q    You were in considerable pain; right?

9    A    Yes, sir.

10   Q    And you had had some significant surgeries; correct?

11   A    Yes, sir.

12   Q    And we see some of those, I think a little bit further down

13   the page there.  For example, you had -- I think most recently

14   had hernia surgery; right?

15   A    Yes, sir.

16   Q    And there had been some issues about that and you had to

17   have some mesh put in related to the hernia?

18   A    Yes, sir.

19   Q    Hernia, excuse me.  And you had also previously had gastric

20   bypass surgery?

21   A    Yes, sir.

22   Q    And maybe before that a hysterectomy; right?

23   A    Yes, sir.

24   Q    You had had a number of abdominal-related surgeries; right?

25   A    Yes, sir.

1   Q   And if you will stay on that same page and you'll see the

2   treatment history there, what does that say about your

3   treatment history on the day you showed up at PPSA?

4   A   She is currently treating the pain with Norco and Soma with

5   little improvement.

6   Q   Okay.  That was an accurate and true statement; right?

7   A   Yes, sir.

8   Q   Those are the two medications that you showed up with,

9   taking that first day when you were referred to PPSA, the Norco

10  and Soma; right?

11  A   Yes, sir.

12  Q   And they weren't really helping too much?

13  A   No, sir.

14  Q   All right.  And along those lines you -- that first day as

15  you do normally with a doctor, you had to fill out some

16  information about yourself; right?

17  A   Yes, sir.

18  Q   And about your condition, and so forth?

19  A   Yes, sir.

20  Q   And when you did that, you told the truth?

21  A   Yes, sir.

22  Q   All right.

23          MR. SHARMAN:  Sam, could we see C&R 210120?  This is

24  all in evidence from Ms. Blanks' chart.

25  Q   Ms. Blanks, this is a patient registration form from that

1    December 10th, 2013 visit.  Do you see where it is in front of
2    you on the screen?
3    A    Yes, sir.
4    Q    And that's -- is that your handwriting?
5    A    Yes, sir.
6    Q    And then if we could --
7         MR. SHARMAN:  Sam, if you could flip over to 125,
8    which is the signature page?
9    Q    All right.  Is that your signature at the bottom?
10   A    Yes, sir.
11   Q    All right.  And then if we could go back to page 121, which
12   is the second page, Ms. Blanks, of your patient registration
13   form, it's the one that's got the human figures on it.  Do you
14   see where I am?
15   A    Yes, sir.
16   Q    All right.  And then below the human figures, kind of right
17   under their feet there's a series of three questions that give
18   you sort of a scale like a zero-to-10 scale.  Do you see where
19   I am?
20   A    Yes, sir.
21   Q    And then what does that first question or first request of
22   the new patient ask on the first scale there?
23   A    Rate your pain by circling the one number that best
24   describes your pain at its worst.
25   Q    All right.  And that's what you did?

1    A    Yes, sir.

2    Q    And you told the truth when you did that?

3    A    Yes, sir.

4    Q    And you identified your pain at its worst as a 10 out of

5    10; right?

6    A    Yes, sir.

7    Q    And how is that described there?  In other words, how's the

8    number 10 described there?

9    A    Pain worst imaginable.

10   Q    It's the worst pain imaginable; right?

11   A    Yes, sir.

12   Q    That's what you told PPSA when you walked in; right?

13   A    Yes, sir.

14   Q    And then what's the second request made of a new patient

15   there right below that, above the next scale?

16   A    Rate your pain by circling the one that best describes your

17   pain at its least.

18   Q    And what did you identify as the level of your pain needed

19   to be addressed when it was at its least?

20   A    Nine.

21   Q    That's a nine out of 10; right?

22   A    Yes, sir.

23   Q    And then what is the third piece of information that this

24   pain management clinic wants to know from a new patient about

25   rating their pain?  What's that third piece?

TAMISON BLANKS - CROSS BY MR. SHARMAN

1188

```
 1   A   Rate your pain by circling the one that best describes your

 2   pain on average.

 3   Q   And what did you tell PPSA that your average pain was?

 4   A   10, worst imaginable.

 5   Q   So your pain at its worst is the worst imaginable; right?

 6   A   Yes, sir.

 7   Q   Okay.  And your pain at your least is one digit below the

 8   most imaginable pain; right?

 9   A   Yes, sir.

10   Q   And then your average pain you're telling PPSA is the worst

11   imaginable; right?

12   A   Yes, sir.

13           THE COURT:  Mr. Sharman, is now a good time for us to

14   break?

15           MR. SHARMAN:  Yes, ma'am.

16           THE COURT:  All right.  Ladies and gentlemen, we're

17   going to take our lunch break.  We're going to break for an

18   hour and 15 minutes.  Leave your pads on your chairs.  No

19   discussion about the case over the lunch hour.  Be back

20   downstairs in the jury assembly room to be called back up at

21   about 1:15.

22           We're in recess.

23       (A recess was taken at approximately 12:02 p.m.)

24       (Afternoon session, 1:15 p.m., in open court, defendants

25   and jury present.)
```

```
 1              THE CLERK:  We're trying to locate the witness, Your

 2   Honor.

 3              THE COURT:  I think the witness has stepped away for a

 4   minute, so we'll wait until she comes back.

 5              Yes, ma'am.  If you will just take your seat.

 6              THE COURT:  All right.  Mr. Sharman.

 7              MR. SHARMAN:  Thank you, Your Honor.

 8   Q   Ms. Blanks, before the break we were talking about your

 9   situation when you arrived at PPSA and I want to pick up there

10   again.  Okay?

11   A   Yes, sir.

12   Q   All right.  And if we look at page 121 again, of your

13   medical record, you had said that your average pain was a 10

14   out of 10, the pain that's most -- the worst pain imaginable;

15   right?

16   A   Yes, sir.

17   Q   And that your pain when it was at its least was a nine out

18   of 10; right?

19   A   Yes, sir.

20   Q   And we had also talked a little bit about the things that

21   you had undergone and had done at Mobile Infirmary while you

22   were there before you got referred by Dr. Walsh to PPSA; right?

23   A   Yes, sir.

24   Q   And if we look at the next page in your medical records,

25   122, this is the form that you filled out the first day you
```

1  were referred to PPSA.  If you will look on there, there at the

2  top left, there's a portion that talks about narcotics and

3  there's a list of them and then there's two columns asking did

4  they help, yes or no.  Do you see where I'm pointing to?

5  A   Yes, sir.

6  Q   All right.  And you checked two of those, codeine and

7  morphine or MS-Contin; right?

8  A   Yes, sir.

9  Q   And you said both of those were helpful?

10  A   Yes, sir.

11  Q   And then below that there's a section inquiring about

12  muscle relaxants.  Same sort of thing.  It gives a list of them

13  and then two columns helpful or no.  Do you see where I am?

14  A   Yes, sir.

15  Q   And you checked yes, that Soma, the muscle relaxant, was

16  helpful for you; right?

17  A   Yes, sir.

18  Q   And then it asks some questions about treatment history and

19  gives you again more boxes to check just below it; right?

20  A   Yes, sir.

21  Q   And then again we have two columns, was it helpful, yes or

22  no; right?

23  A   Yes, sir.

24  Q   And you identified two items of treatment that you had

25  received for your pain, trigger point injections and epidural

1   steroid injections; correct?

2   A   Yes, sir.

3   Q   And you said that neither of those had been helpful; right?

4   A   Yes, sir.

5   Q   So you were -- you were in bad shape when you showed up at

6   PPSA; right, as far as pain goes?

7   A   Yes, sir.

8   Q   It was more than just a discomfort that Ms. Griffin asked

9   you about on direct; right?  It was more than discomfort?  It

10  was pain; right?

11  A   Yes, sir.

12  Q   And speaking of Dr. Walsh, let's take a look at page 127,

13  which begins -- the set of documents that Dr. Walsh sent to

14  PPSA.  And remind us again who Dr. Walsh was?

15  A   The referring physician to the PPSA clinic.

16  Q   She was a doctor that saw you while you were in Mobile

17  Infirmary; right?

18  A   Yes, sir.

19  Q   All right.  If we look at page 127, we see up there at the

20  top Metro Anesthesia and Pain Services, P.C.  Do you know that

21  to be the business name for Dr. Walsh and her father, who's

22  also obviously named Walsh, David Walsh?  Do you know that's

23  their clinic, that's their practice?

24  A   Yes, sir.

25  Q   All right.  So Dr. Walsh herself is a pain management

1    physician; right?

2    A    Yes, sir.

3    Q    That's what she was tending to you for?

4    A    Yes, sir.

5    Q    So after tending to you at Mobile infirmary she's referring

6    you out to Dr. Couch, PPSA; right?

7    A    Yes, sir.

8    Q    And you can see right there in the middle of 127 she's

9    saying to Dr. Couch, to PPSA, please evaluate for pain control.

10   Is that right?

11   A    Yes, sir.

12   Q    That's what you -- that's what you wanted; right, is some

13   pain control, some pain management; right?

14   A    She referred me to Dr. Couch to evaluate me for pain

15   control.

16   Q    And you understandably wanted to get it in control; right?

17   A    Yes, sir.

18   Q    And then behind that, and I'm not going to walk you through

19   the whole thing, but behind that are records that Dr. Walsh

20   sent over to PPSA and Dr. Couch.  And if you will turn with me

21   to page 132, which is the care plan that Dr. Walsh and others

22   had created, and if you'll look at the first -- actually the

23   second paragraph called Treatment Plan General?

24   A    Yes, sir.

25   Q    It says:  Overall, the patient has pain that has not

 1   responded well to conservative care.  Do you see where I read

 2   that?

 3   A   Yes, sir.

 4   Q   Did I read that right?

 5   A   Yes, sir.

 6   Q   All right.  And so the patient, that's you?  Right?

 7   A   Yes, sir.

 8   Q   Okay.  Dr. Walsh is saying that you, Ms. Blanks, haven't

 9   responded well to conservative care; right?

10   A   Yes, sir.

11   Q   And conservative care -- conservative there doesn't mean

12   something political; right?  We're not talking about liberal or

13   conservative, we're talking about some kind of medical care;

14   right?

15   A   Yes, sir.

16   Q   So she's saying:  This patient hasn't responded well to

17   things like ibuprofen, that we mentioned; right?  That didn't

18   help you.

19   A   No, sir.

20   Q   And she goes on to say that:  She said she is in too much

21   pain to leave the hospital.  Do you see where I read that?

22   It's like the second -- I'm sorry -- the third full sentence of

23   that paragraph.

24   A   Yes, sir.

25   Q   And the "she" there is referring to you?

1  A   Yes, sir.

2  Q   So at the time, right before you got referred to Dr. Couch,

3  you were in sufficient pain that you made the judgment you

4  didn't even want to literally leave the hospital; right?

5  A   No, sir.  This was a different time.  When I was in the

6  hospital, she treated me when I was in the hospital and she let

7  me go home.  But before that, I told her -- yes, sir, I told

8  her that I was in a lot of pain and she gave me -- that's when

9  she came in and she was trying to help me.  But it was -- I

10 went home before I went to the -- was referred to the PPSA, to

11 the pain clinic.

12 Q   Okay.  Fair enough.  This is when you went back in, then

13 went back home; right, these records right here?

14 A   I'm sorry.  I apologize.  I don't understand what you're

15 asking me.

16 Q   I just want to be clear.  You said this reference right

17 here that we just went over, about she said she had too much

18 pain to leave the hospital?

19 A   That was at a different time.

20 Q   Okay.  Fair enough.  But in both instances your pain was

21 significant in both times; right?

22 A   Yes, sir.

23 Q   Now, if we could, turn back to your first visit, which was

24 December 10th, 2013.  That's page 114.  And Ms. Griffin showed

25 you some of this.

1        All right.  Down there at the -- on the bottom half

2    there's categories for Past Medical History, Past Surgical

3    History and Medication List.  Do you see those categories right

4    there?

5    A   Yes, sir.

6    Q   And all that information is accurate, is it not?

7    A   Yes, sir.

8    Q   All right.  And then you testified on direct that you were

9    provided Subsys even at that first visit; is that right?

10   A   That's correct.

11   Q   And then if you will turn also to page 116, and if you look

12   under the section that says Plan, towards the bottom third,

13   you'll see that there's a section for Orders, Medications, and

14   Disposition.  Do you see where I am there?

15   A   Yes, sir.

16   Q   All right.  And it looks like your existing meds with the

17   Norco and Soma, they were adjusted.  You still kept them but

18   they were adjusted; right?

19   A   Yes, sir.

20   Q   And then also you were ordered a hypogastric nerve block.

21   In other words, not just medicine but a procedure.  That's the

22   first item under Orders there?

23   A   Yes, sir, I see it but I did not get that.

24   Q   You didn't ultimately do that?

25   A   No, sir.  I never got a block.

1196

1    Q    And if I recall, you testified that blocks that you
2    received in the -- at Mobile Infirmary were not helpful.  Those
3    blocks didn't help you; is that right?
4    A    I don't know if it was the same kind of block, but --
5    Q    Fair enough.
6    A    Yes, sir.
7    Q    Now, if we could, let's move to January 20th, 2014, which
8    is your second visit that you also touched on briefly on
9    direct, and that's on page 147 of your records.  And if we
10   could look at Objectives there in the middle of the page.  And
11   then the Objectives note read, and correct me if I misstate it,
12   but that she was recently admitted MIMC.  That's Mobile
13   Infirmary Medical Center; right?
14   A    Yes, sir.
15   Q    For kidney stone, and discharged on January 13th, 2014.  Is
16   that -- does that sound right to you?
17   A    Yes, sir.
18   Q    She was discharged per Dr. Hicks.  Was Dr. Hicks one of the
19   doctors that tended to you in Mobile Infirmary?
20   A    She was a nurse practitioner, she was not a doctor.
21   Q    And given enough liquid Lortab to last until she could be
22   seen per us.
23              Okay.  Was that accurate?  Is that what happened?
24   A    Yes, sir.
25   Q    And then if you go towards the bottom, it says:  She --

```
 1   again referring to you -- states MS-Contin/Norco gives no pain

 2   relief.  She is using Subsys and has great results.

 3           Was that accurate when you said that?

 4   A   No, sir.

 5   Q   Okay.  Was that not a truthful statement?

 6   A   I don't remember saying that.

 7   Q   So you're testifying that this record is not -- is wrong.

 8           MS. GRIFFIN:  Objection, Your Honor.

 9           MR. SHARMAN:  You did not say that?

10           MS. GRIFFIN:  It's asked and answered, that she did

11   not recall, not that she was saying the record was incorrect.

12           MR. SHARMAN:  I just want to be clear in the record,

13   Your Honor.

14           THE COURT:  All right.

15   BY MR. SHARMAN:

16   Q   Are you saying that that record that you said you were

17   using Subsys and had great results, that that is not an

18   accurate record?

19           MS. GRIFFIN:  Your Honor, I object again.  The record

20   says that.  It's not what she said.  She's testified that she

21   didn't say that.

22           THE COURT:  Overrule the objection.  So ask it again.

23           MR. SHARMAN:  Yes, ma'am.

24   Q   There in your record, Ms. Blanks, on January 20th it says

25   that:  She, referring to you, states MS-Contin/Norco gives no
```

 1  pain relief.  She is using Subsys and has great results.

 2          Is that entry in your record accurate or not accurate?

 3  A   Not accurate.  I did not -- I don't remember saying that.

 4  Q   You don't know whether you did or you didn't or you're

 5  affirmative that you didn't say that?

 6  A   I don't remember saying that.

 7  Q   Was, in fact, the Subsys giving you relief?

 8  A   Yes.

 9  Q   Turn with me, please, to page 150 of your records, which is

10  your February 18th visit, roughly a month later.  And again, if

11  we go down to the Objectives column, the record recites:  She,

12  again referring to you, Ms. Blanks --

13  A   Yes, sir.

14  Q   -- states Soma is no longer working well for muscle spasms.

15          Did that happen?  Did the Soma not work as well as it

16  did before?

17  A   No, sir.  It worked well the whole time.

18  Q   So again, this is another inaccuracy in the record?

19  Somebody has made that up?

20  A   Oh, I don't know.  It worked well for me the whole time.

21  Q   Okay.  And it says that you told PPSA that you were taking

22  extra oxycodone due to recent hospitalization and just started

23  retaking the Subsys.  Is that right?

24  A   I'm sorry.  I apologize.  What are you asking me?

25  Q   I said:  Is that what you told them?  Is that accurate?

1    A   Which part?  I'm sorry.

2    Q   That you were taking extra oxycodone due to the recent

3    hospitalization and you had just started retaking the Subsys

4    the previous week?

5    A   No, sir.

6    Q   You did not say that?

7    A   I don't remember saying that.

8    Q   It goes on to say that you say you're awaiting on insurance

9    approval to fill per your insurance company.

10   A   Yes, sir; that is correct.

11   Q   And the fill there was for Subsys; right?

12   A   Yes, sir; that is correct also.

13   Q   And then at this visit on February 18th you identified an

14   additional complaint that you had not identified earlier, which

15   involved your shoulder, right shoulder pain; right?

16   A   I'm sorry.  What are you asking me?

17   Q   At this visit on February 18th, the record recites that you

18   identified an additional or new pain complaint that involved

19   your right shoulder; right?

20   A   Yes, sir.

21   Q   And that you had reported positive results with physical

22   therapy in the past; right?

23   A   Yes, sir.

24   Q   And you wanted to start that again as well; right?  Is that

25   right?

1    A    I apologize.  What are you asking me?

2    Q    You said that -- you said that you had had positive results

3    from physical therapy in the past; right?

4    A    I've never had physical therapy.

5    Q    Ever?

6    A    No, sir.

7    Q    Okay.  So again, this is a completely made-up record?

8    A    I'm sorry.  I didn't say that.  I said I just never had

9    physical therapy.  I apologize.

10   Q    Okay.  So if you never had it, then you never told anybody

11   that you had positive results with it; right?

12   A    I did not say that I had physical therapy, no, sir.

13   Q    And you never told anybody at PPSA whether you wanted

14   physical therapy; right?

15   A    No, sir.

16   Q    So this whole record, or at least this piece of it is just

17   false, somebody made that up; right?

18   A    No, sir.  I didn't say that.  Some of it is very true.

19   Q    Okay.  Now, we're into February.  At this February

20   appointment or the January appointment which was roughly one

21   month earlier, did you identify to anybody at PPSA any side

22   effects from Subsys?

23   A    No, sir.

24   Q    All right.  Let's go to March 18th, 2014, which is your

25   next appointment, which is on page 154.  Now, in all this time

1201

 1   you have been continuing -- that is January, February, and now

 2   March -- with the same medication regimen; right?  The Subsys;

 3   right?

 4   A   Yes, sir.

 5   Q   And the Norco; right?

 6   A   Yes, sir.

 7   Q   And the Soma; right?

 8   A   Yes, sir.

 9   Q   And if we go down on page 154 to Pain Status, and there's

10   an indication there that says:  Visual analog scale with

11   medication and then without.  Do you see -- do you see where I

12   am?

13   A   Yes, sir.

14   Q   Okay.  And it has you reporting that your pain status with

15   medication was four out of 10?

16   A   Yes, sir.

17   Q   Is that accurate?

18   A   Yes, sir.

19   Q   And that your pain status without medication was still

20   pretty high, eight out of 10; right?

21   A   Yes, sir.

22   Q   All right.  And then if we go down to the objectives

23   portion again, and your chart says:  She reports nausea with

24   taking -- and I'll probably mispronounce it -- baclofen?

25   A   Baclofen.

1   Q   Baclofen.  Thank you.  All right.  And baclofen is an

2   appetite suppressant, is it not?

3   A   No.  It's a muscle relaxant as well.

4   Q   Okay.  Muscle relaxer.  So you said that you were getting

5   nauseous with a muscle relaxant; right?  Is that what you said?

6   A   Yes, sir.

7   Q   And you said that the oxycodone is no longer working as

8   well as it has in the past.  Is that right?

9   A   Yes, sir.

10  Q   And that the Subsys was working well without S/E, without

11  side effects; is that right?

12  A   Yes, sir.

13  Q   And it also references that you were taking the pain meds

14  as directed; is that what you told them?

15  A   No, sir.

16  Q   You didn't say that?

17  A   No, sir.

18  Q   And one reason you didn't say it, because it wouldn't have

19  been true; right?

20  A   Yes, sir.

21  Q   Because you were -- you weren't taking the Subsys the way

22  it was prescribed.  You weren't following directions.

23  A   No, sir.

24  Q   In fact, basically for all your medications you weren't

25  taking them as prescribed, as the label said; right?

TAMISON BLANKS - CROSS BY MR. SHARMAN

1203

```
 1    A    That's not correct.
 2    Q    Some you were, a lot you weren't?
 3    A    No.
 4    Q    So all of them except the Subsys you were taking as
 5   prescribed?
 6    A    Yes, sir.
 7    Q    And you didn't tell Dr. Couch or anybody at PPSA about
 8   other medications that you were getting from other doctors, did
 9   you?
10    A    I never saw Dr. Couch.  I only saw Bridgette.
11    Q    You never saw -- you never told Bridgette about other
12   medications you were getting from other doctors or healthcare
13   providers, did you?
14    A    She never asked me.
15    Q    She never asked you?
16    A    No, sir.
17    Q    So you never told and she never asked; right?
18    A    That's correct.
19    Q    And still here in March no mention of side effects from
20   Subsys or anything else; right?
21    A    She never asked me.
22    Q    All right.  Now, let's turn to a month later, April 11th of
23   2014, again about 30 days after the previous.  And if we look
24   down in the objectives portion again, Ms. Blanks, you'll see --
25             MR. SHARMAN:  If Sam will highlight it here in a
```

1  moment for us.  I'm sorry, 163.

2  Q   Your chart reports that she, you, she reports a 10

3  percent -- missing word -- in right shoulder pain from

4  injection, perhaps it's 10 percent decrease in right shoulder

5  pain.  Does that sound about right to you?

6  A   I've never had an injection from them.  Never.

7  Q   And so you never had any injections at all at PPSA?

8  A   No, sir.

9  Q   So if the record says something different, that would be

10  another falsification of your record?

11  A   I'm sorry.  I apologize for not understanding what you're

12  asking me.

13  Q   If your records, Ms. Blanks, say that you got an injection

14  and if you're saying you've never got an injection, then a

15  record that said so would be a false record; right?

16  A   This is false, that part right there.  I don't know about

17  everything else.

18  Q   And you said that the Zohydro is not working well but

19  others were working well without side effects.  Is that right,

20  is that what you told them?

21  A   Yes, sir.

22  Q   Were you ever offered any referrals from PPSA to other

23  healthcare providers?

24  A   No, sir.

25  Q   So if this record says you -- she isn't interested in a

1  referral to have further treatment at this time, again that is

2  something that is just made up, that's not a true statement?

3  A   Make -- could you please repeat that statement?

4  Q   Sure.  That -- I just want to be clear.  PPSA or nobody at

5  PPSA ever referred you or offered the possibility of a referral

6  to another healthcare provider for further or different

7  treatment; right?

8  A   No, sir.  Thank you.

9  Q   So if this record here says that happened, that means

10  somebody made it up because it's a false record; right?

11  A   Yes, sir.

12  Q   And I think you told us you never had any desire or option

13  for physical therapy; right?

14  A   No, sir.

15  Q   And again, in that visit in April you didn't complain of

16  any or identify any sides effects from Subsys or anything else

17  for that matter; right?

18  A   No, sir.

19  Q   All right.  Let's skip over, if we can, to try to shorten

20  the time a little bit.  If we could go to June 3rd, which is on

21  page 364.  We're now in the summer, and it's your appointment

22  on June 3rd.  And if we look towards the top third under the

23  category called Pain Status, we've got that same question we've

24  seen before, which is visual analog scale with medication and

25  then without medication.  Do you see where I am?

1   A   Yes, sir.

2   Q   And what was your reported pain status with your

3   medication?

4   A   Two.

5   Q   Two out of 10?

6   A   Yes, sir.  I'm sorry; two out of 10.

7   Q   So that's -- that's pretty good.  I mean, that's pretty

8   controlled, two out of 10; right?

9   A   Yes, sir.

10   Q   And then what was your recorded pain status without your

11   medication?

12   A   Nine out of 10.

13   Q   And that's not too controlled.  That's pretty close to

14   where you started that first day we saw back in December;

15   right?

16   A   Yes, sir.

17   Q   And then if we go down to Objectives, it talks about you

18   again and it says:  She reports no new complaint.  She is still

19   going to W.C. -- is that workers' comp?  Is that what that is?

20   A   No, sir.  I don't know what that is.

21   Q   Okay.  Fair enough.

22   A   Wound care probably.

23   Q   Wound care.  She is still going to wound care for breast

24   wounds, and that's the issue that you spoke with Ms. Griffin

25   about; right, about the heating pad?

1    A   Oh, yes, sir.

2    Q   Medications working well without side effects, taking meds

3    as directed and tolerating well.  Okay.  Do you see where I

4    read that?

5    A   Yes, sir, I see that.

6    Q   All right.  But that wasn't -- that wasn't really true, was

7    it, because you were experiencing side effects, you just

8    weren't reporting them; right?

9    A   Yes, sir.

10   Q   And it says you were taking meds as directed, but that's

11   not really so either, because at least Subsys you weren't

12   taking as directed; right?

13   A   No.  By this time I was a addict.

14   Q   I'm sorry?

15   A   By this time I was addicted to my medication.

16   Q   And my question was:  You weren't -- at least the Subsys,

17   you weren't taking that as directed; right?

18   A   Uh, yes.  I'm sorry.  What are -- you're asking me about

19   the Subsys?  It's just the Subsys --

20   Q   Yes, ma'am.  Before you were saying that you were taking

21   the meds as directed.  My only question is that's not actually

22   true, at least with regard to the Subsys; right?  You were not

23   taking that as directed.

24   A   I wasn't taking it correctly, no, sir.

25   Q   All right.  Let's skip to the next month, July 1st.  That's

 1  your next appointment, about a month later.  That's on page

 2  367.  And let's check your pain status again here at

 3  mid-year.  Again, we see the visual analog scale with

 4  medication and without; right?

 5  A   Yes, sir.

 6  Q   And what's your pain status with your meds?

 7  A   Five out of 10.

 8  Q   And what's your pain status without them?

 9  A   Eight out of 10.

10  Q   And then down by Objectives it states:  She reports

11  continues going to wound care.  Again, that relates to the

12  injury about the heating pad; right?

13  A   Yes, sir.

14  Q   Taking meds as directed and tolerating well without side

15  effects; right?  Is that what it says?

16  A   That's what it says.

17  Q   But the business about taking the meds as directed and no

18  side effects, here in July just like in June, that's not true,

19  is it?  You weren't taking them as directed and you did have

20  side effects?

21  A   Yes, sir.

22  Q   Let's go to the next month, July 28, which is on page

23  371.  All right.  If we look at the top there, Ms. Blanks,

24  there's a notation just below the visit date that says:

25  Provider.  And it says Tao Chen, MD.  Did you ever meet

1209

1   Dr. Chen?

2   A   No, sir.

3   Q   So in your view that's an inaccurate or false statement;

4   right?

5   A   Wait a minute.  I'm sorry.  The Chinese doctor?

6   Q   There may have been more than one at the clinic.  There's

7   Dr. Ruan and Dr. Chen.

8   A   I saw the Chinese doctor.  That's how I know he's a

9   Chinese.

10  Q   Okay.  So you certainly saw a Chinese physician?

11  A   Yes.  I saw a -- thank you.  I saw a Chinese physician.

12  Q   You're not sure if was Dr. Chen, Dr. Ruan, who; you just

13  know it was a Chinese physician?

14  A   Yes, sir.

15  Q   And did you speak with him?  Did you interact with him?

16  A   He came in and asked me a few questions.  I don't

17  recall why I saw him that day.

18  Q   I'm sorry.  That last part?

19  A   Yes, he came and asked me a few questions.

20  Q   And then under Objectives your chart says that:  She states

21  the medication regimen is not working well.  All right.  Now,

22  in July, kind of mid-summer, was your medication set, your

23  medication regime not working as well?

24  A   It was the same.

25  Q   Well, it was the same regimen but was it not working as

1210

1   well?  Was it working the same as it had been before?

2   A   It was working the same as it had been before.

3   Q   All right.  And it also recites that you were taking meds

4   as directed and tolerating well without side effects.  But

5   again, both of those still here now in July of 2014, those are

6   not accurate; right?

7   A   No, sir.

8   Q   All right.  Now, on direct you said that you, in fact,

9   experienced some significant side effects; right?

10   A   Yes, sir.

11   Q   That you were not sleeping well; right?

12   A   Yes, sir.

13   Q   That you were -- that you were talking out of your head;

14   right?

15   A   Yes, sir.

16   Q   That you would say I just got out of the bath or I need to

17   go to church and none of those things would be remotely logical

18   or sensible in the situation; right?

19   A   Yes, sir.

20   Q   And that it was -- that you were, by nature, a calm person

21   but you would get easily agitated and very agitated; right?

22   A   Yes, sir.

23   Q   And this was such that your children would notice it and

24   point it out to you?

25   A   Yes, sir.

1    Q   And this got so significant that I think you told the

2    government on direct that you became a monster to your

3    children; right?

4    A   I said I became a monster, yes, sir.

5    Q   And you became a monster in your household; right?  Right?

6    A   Yes, sir.

7    Q   And during all this -- and at least once you had to be

8    taken somewhere in a ambulance; right?

9    A   Several times they found me passed out and unconscious.

10   Q   Okay.  Several times you're in such bad shape you've got to

11   be transported by a ambulance to get care?

12   A   No, sir.

13   Q   Right?

14   A   I didn't have to leave.  They would just come in and, you

15   know, bring me back.  And I wouldn't -- I wouldn't leave.  I

16   would stay at home.

17   Q   All right.  I apologize.  So your situation was so bad that

18   you had to get -- you know, you had to get first responders to

19   come and assist you?

20   A   Yes, sir.

21   Q   And back up and going; right?

22   A   That is correct.

23   Q   And so this was, to put it mildly, deeply disruptive in

24   your life; right?

25   A   Yes, sir.

TAMISON BLANKS - CROSS BY MR. SHARMAN

1  Q   And month after month after month you never mentioned that
2  to anybody at PPSA, did you?
3  A   No, sir.
4  Q   You never said:  These things are happening, we need to do
5  something different; right?
6  A   No, sir.
7  Q   And you never got a prescription for Subsys or anything
8  else that you didn't fill; right?
9  A   No, sir.
10  Q   At least not from PPSA; right?  I mean, you may have gotten
11  something somewhere else; right?
12  A   Yes, sir.
13  Q   So -- and you didn't -- you didn't -- nobody at PPSA,
14  Dr. Couch, Stacy, Bridgette, nobody was making you do any of
15  that; right?
16  A   I apologize.  I need to go back.  You said that I had
17  prescriptions that I did not get filled?
18  Q   Yes, ma'am.  I may have -- I just want to be clear.  You
19  filled every prescription you got from PPSA; correct.
20  A   That is incorrect.  When I got ready to go to rehab I had
21  like 12 prescriptions and I did not get all of those filled
22  while I was in rehab.  When I went, I had like 12 left.
23  Q   Fair enough.  Before you made the decision to go to rehab,
24  you filled every prescription; right?
25  A   That is correct.  Thank you.  I'm sorry.

1213

1    Q    And speaking of prescriptions, you never saw Dr. Couch

2    write a prescription; did you?

3    A    No, sir.

4    Q    You never saw Dr. Couch actually write anything, a report

5    or anything; right?

6    A    No, sir.

7    Q    Okay.  So you don't know -- you don't know what his

8    handwriting looks like even; right?

9    A    No, sir.

10   Q    So you couldn't say, if provided a prescription, whether it

11   was signed by Dr. Couch or by somebody forging Dr. Couch's

12   signature; right?  You wouldn't be in a position to say that?

13   A    No, sir.

14   Q    You also mentioned the nurse practitioners that you saw,

15   Stacy and Bridgette.  Do you remember having some of that

16   discussion with Ms. Griffin?

17   A    Yes, sir, I do.

18   Q    You don't know what Bridgette or Stacy were or were not

19   discussing with Dr. Couch about your case, do you?

20   A    That is correct.

21   Q    That you don't -- you don't know what Dr. Couch did or did

22   not know about your case?

23   A    That is correct.

24   Q    You don't know what he approved, did not approve or didn't

25   know about; right?

1214

1   A   That is correct; yes, sir.

2   Q   You don't know if Dr. Couch were -- was speaking with

3   Dr. Walsh or any other physician you were seeing; right?

4   A   That is correct as well.

5   Q   And if they were talking, you don't know what they talked

6   about?

7   A   That is correct.

8   Q   Did there come a time, Ms. Blanks, when you contacted not

9   anybody at PPSA for Subsys but the manufacturer of Subsys,

10  directly?

11  A   Every week I had to (nodding head affirmatively).

12  Q   And you contacted -- and that company's called Insys, I

13  believe; is that right?

14  A   That is correct.

15  Q   So basically you called Insys every -- every week?

16  A   Every Monday to let them know that I had my prescription

17  turned in.

18  Q   And you -- and you'd ask them for what they called super

19  vouchers; right?

20  A   I just let them know that my prescription was turned in.

21  But that is the name of it, yes, it is.

22  Q   You didn't ask for anything.  You claim you were just

23  giving a notice; right?

24  A   Yes, sir.

25  Q   Every Monday?

1  A   Every Monday.

2  Q   So if somebody at Insys said you were actually asking for

3  something, that would not be a true statement, that would not

4  be an accurate statement?

5  A   I apologize.  What are you -- I'm sorry.  I don't know.

6  Q   If somebody at Insys were to testify that you were actually

7  every week bugging them for a new super voucher, that would not

8  be an accurate statement; right?  Because you were just giving

9  them information; right?

10  A   No.  Every week I was calling them, asking them, letting

11  them know my prescription was in.  And yes, I probably did bug

12  them.

13  Q   And you -- so you did ask them every week for a super

14  voucher?

15  A   I did ask them every week for -- to let them know my

16  prescription was in.  That's the way they told me to do it.

17  You know, on Mondays I would let them know that I turned it in

18  and I would have to call them back because sometimes they

19  didn't -- you know, because they close at 6.  Remember, I'm a

20  addict.  They close at 6 -- I mean, C&R closes at 4 and

21  sometimes they would not have it in yet, so I would call them

22  back and let them know that my prescription was turned in.

23  Yes, sir.

24  Q   When you did fill your prescriptions for Subsys or anything

25  else, given your side effects, did you ever ask the pharmacist,

1   whether at C&R or anywhere, about your medication or any side
2   effects?
3   A   No, sir.
4   Q   Did you -- did you ever go back to Dr. Walsh, the physician
5   that referred you to PPSA, to Dr. Couch, and ask her or
6   complain to her about the care you were receiving?
7   A   No, sir.
8   Q   Did you ever say to Bridgette or Stacy:  Look, I don't like
9   this.  I feel bad.  This is not good.  I want to talk to
10  Dr. Couch or somebody in charge about this.
11  A   No.
12  Q   Did you ever say anything remotely like that?
13  A   I apologize.  No, sir.
14  Q   In fact, Ms. Blanks, before you got with the agents and
15  prosecutors in this case, you didn't complain to anybody about
16  Dr. Couch's care and prescribing practices, did you?
17  A   Yes, sir.  I complained when I went to rehab because when I
18  went to rehab they did not even know how to treat me.  I was
19  the first patient they had ever had with Subsys abuse, and so I
20  complained to them at that time when I was trying to get help.
21  Q   You never complained at the time you could have done
22  something about it to anyone who could have done something
23  about it; right?
24  A   No, sir.
25  Q   You mentioned on direct that you had some point after rehab

1   spoken again with Bridgette; is that right?

2   A   That is correct.

3         MS. GRIFFIN:  Your Honor, excuse me.  May I mention

4   one thing to Mr. Sharman about this question?

5         THE COURT:  All right.

6         MS. GRIFFIN:  Excuse me.

7      (A discussion was held off the record between counsel.)

8         MS. GRIFFIN:  Thank you, Your Honor.

9   BY MR. SHARMAN:

10  Q   I don't want to know about any circumstances of your

11  knowledge, but did there come a time when you learned that

12  Bridgette had been fired from PPSA?

13  A   I didn't know she was fired.

14  Q   Okay.  So even today you didn't know about it?

15  A   I didn't know she was fired.

16        MR. SHARMAN:  No further questions, Your Honor.

17        THE COURT:  All right.  Any redirect?

18        MS. GRIFFIN:  Briefly, Your Honor.

19                    REDIRECT EXAMINATION

20  BY MS. GRIFFIN:

21  Q   Ms. Blanks, you couldn't just get Subsys by calling the

22  manufacturer, could you?

23  A   No, ma'am.

24  Q   You had a prescription for each time you called them?

25  A   Yes, ma'am.

1   Q   So you can't just call up the company and say:  I want

2   Subsys?

3   A   No, ma'am.

4   Q   Now, you mentioned that you had become an addict.  What is

5   an addict?  What had you become?

6   A   Somebody that's addicted to medication and pain medication.

7   I was addicted to pain medication.

8   Q   Now, you were asked if you filled out a sheet when you

9   first went to PPSA that described your symptoms; is that

10  correct?

11  A   Yes, ma'am.

12  Q   And you were shown several pages by Dr. Couch's attorney;

13  right?

14  A   Yes, ma'am.

15  Q   I show you the last page of that chart.  It's Bates stamped

16  201125, and ask if that's part of what you were going through

17  in listing your symptoms?

18  A   Yes, ma'am.

19  Q   Could you look at the back under the patient's signature

20  and tell us if that's your signature?

21  A   Yes, ma'am.

22  Q   That appears to be December of '13?

23  A   Yes, ma'am.

24  Q   Does it show whether or not that was reviewed by anyone?

25  A   No, ma'am.

1  Q   Do you have any first-hand knowledge of whether anybody at

2  the clinic reviewed that form you filled out?

3  A   No, ma'am.

4  Q   You also -- it was pointed out that you had said morphine

5  or MS-Contin had worked in the past; is that right, before you

6  started getting Subsys?

7  A   Yes, ma'am.

8  Q   Were you given morphine or MS-Contin to try first to see if

9  that would work before Subsys?

10 A   No, ma'am.

11 Q   When did you realize that you had become an addict?

12 A   I guess after maybe six weeks.

13 Q   About six weeks?  And as an addict, did you want more of

14 what you were taking?

15 A   Yes, ma'am.

16 Q   Did you complain about it to stop it?

17 A   No, ma'am.

18 Q   Why not?

19 A   Because I was an addict.

20 Q   Now, they showed you where it appeared in this record that

21 you had been seen by Dr. Chen; is that right?

22 A   Yes, ma'am.

23 Q   You don't see anyone that looks like Dr. Chen in the

24 courtroom, do you?

25 A   No, ma'am.

1220

```
1    Q   You don't recognize him?

2    A   No, ma'am.

3    Q   Did you ever get a prescription from Dr. Chen?

4    A   No, ma'am.

5    Q   I show you what's been marked as Government's Exhibit

6    13-16A, and direct your attention to on or about July 28th of

7    '14 when the record shows you saw Dr. Chen.  This report has

8    your name at the top; right, Tamisan Blanks?

9    A   Yes, ma'am.

10   Q   And it's represented to you to be a PDMP for your

11   prescriptions.  Do you know what a PDMP is?

12   A   No, ma'am.

13   Q   It's a record that shows who has prescribed you what

14   medicine and what medicine you filled.  Do you recall having

15   seen that before?

16   A   No, ma'am.

17   Q   And if the listed prescriber for your drugs for Dr. Couch

18   starts with a BC, do you see any time from the end of August

19   back -- August of '14, back to the spring of '14 that shows

20   anybody prescribing you anything except a prescriber whose

21   initials begin with BC?  If we go up --

22   A   No, ma'am.

23   Q   So you don't recall having any prescription from Dr. Chen,

24   do you?

25   A   No, ma'am.
```

1221

```
 1    Q    But when you started going to PPSA, you were getting some
 2  prescriptions still from other doctors; is that right?
 3    A    Yes, ma'am.
 4    Q    And nobody at PPSA -- well, did they say anything to you
 5  about don't go to other doctors?
 6    A    No, ma'am.
 7    Q    Were you told not to fill prescriptions that you got from
 8  other doctors?
 9    A    No, ma'am.
10    Q    And do you recall anybody looking on a screen and saying:
11  I see where you're getting such-and-such medicine from
12  certain -- another doctor?
13    A    No, ma'am.
14    Q    You didn't sign any agreement or did you sign an agreement
15  not to go to any other doctors?
16    A    No, ma'am.
17    Q    Now, I want to ask you on page 10175 of your medical file.
18  You are not -- this is not your name.
19         MS. GRIFFIN:  Your Honor, this has been admitted.
20  It's part of her medical record, which is 13-16, and we've
21  taken it out and it's already in evidence if we could show it
22  to the jury?
23         MR. SHARMAN:  Your Honor, it is in evidence, but it's
24  obviously a paper filing error.  This record's not about her.
25  It's not going to illuminate anything about her.  So even
```

1   though it's in evidence, it's not relevant to her or her

2   testimony on direct or cross.

3        MS. GRIFFIN:  Your Honor, it is relevant to show the

4   status of the records about this patient.

5        THE COURT:  All right.  Overrule the objection.

6   BY MS. GRIFFIN:

7   Q   You aren't the named person, last name McKissack, are you?

8   A   No, ma'am.

9   Q   And I show you also in this file of yours 210178.  I'm

10  going to have to turn it sideways because it's put in the

11  binder sideways.  You aren't Ms. White, are you?

12       MR. SHARMAN:  Same objection, Your Honor.  Also

13  exceeds the scope of direct and cross.

14       THE COURT:  All right.  Overruled.

15  BY MS. GRIFFIN:

16  Q   You aren't Ms. White, are you?  (Indicating.)

17  A   No, ma'am.

18  Q   Now, describe Bridgette.  You talked about her having

19  passed out.

20  A   Yes.

21  Q   How did you ever feel about what she knew about your

22  condition?

23       MR. SHARMAN:  Objection.  Calls for speculation, what

24  she felt about what she knew.

25       MS. GRIFFIN:  No.  How did she feel.

1    THE COURT:  Who?

2    BY MS. GRIFFIN:

3    Q    How did Ms. Blanks feel about Bridgette treating you?

4    A    That day, when I saw her do that, that's when I left and I

5    called rehab.  And I decided I was going to get some help

6    because I realized she too had a problem.  So -- something was

7    going on and it wasn't getting any better with me.

8    Q    It was what?

9    A    It wasn't getting any better with myself.

10   Q    So would you have had any knowledge of when your medical

11   charts would have been electronically signed?

12   A    No, ma'am.

13   Q    You didn't know whether they were doing that while you were

14   in the office or not?

15   A    No, ma'am.

16   Q    Did you have a doctor-patient relationship with Dr. Couch?

17   A    I don't know him.  I didn't know him.  No, ma'am.

18   Q    You still don't know him?

19   A    No, ma'am.

20   Q    Did you have a doctor-patient relationship with Dr. Chen?

21   A    No, ma'am.

22   Q    What do you mean by a doctor-patient relationship?  What

23   does that mean to you?

24   A    That I know the doctor, he knows me, he talks to me about

25   what's going on with me, like I had with Bridgette.

1   Q   Did you know whether or not Bridgette was a doctor?

2   A   I didn't know what she was.

3   Q   Did you know whether or not Stacy was a doctor?

4   A   I didn't know that either.  No, ma'am.

5   Q   You didn't know whether or not they were nurse

6   practitioners or not?

7   A   No, ma'am.

8   Q   Now, were you ever warned about taking your Subsys more

9   than prescribed?

10  A   No, ma'am.

11  Q   Were you ever terminated from the practice?  Did they say:

12  We're not going to treat you because you are taking more than

13  you were prescribed?

14  A   No, ma'am.

15  Q   How is the only way you could have gotten Subsys?

16  A   Prescription.

17  Q   You told Dr. Couch's attorney that you had about 12

18  prescriptions you hadn't filled at the time you went to rehab;

19  is that right?

20  A   That is correct.

21  Q   Do you recall what those were for?

22  A   Subsys, fentanyl patch, Soma, OxyContin.  I think that was

23  it.

24  Q   So sometimes during the time you were being treated, the 11

25  months you were treated, you had received a prescription for a

1   patch?

2   A   Fentanyl patch, yes, ma'am.

3   Q   In addition to the Subsys you were being prescribed?

4   A   Yes, ma'am.

5   Q   Who was that prescribed by?

6   A   I don't know who prescribed it but they gave it to

7   me.  Bridgette gave it to me.

8   Q   You received it at PPSA?

9   A   Yes.

10         MS. GRIFFIN:  One moment, Your Honor.  Nothing further

11   of this witness at this time, Your Honor.

12         THE COURT:  All right.  You may step down.  Thank you.

13         THE WITNESS:  Thank you.

14         MR. BODNAR:  United States calls Lacy Fortenberry.

15         THE CLERK:  Ms. Fortenberry, step forward toward the

16   witness stand and I'll swear you in.  Raise your right hand.

17                     LACY FORTENBERRY

18              was sworn and testified as follows:

19         THE WITNESS:  I swear.

20         THE CLERK:  Thank you.  Please be seated.

21                    DIRECT EXAMINATION

22   BY MR. BODNAR:

23   Q   Good afternoon, Ms. Fortenberry.

24   A   Good afternoon.

25   Q   Would you please introduce yourself to the jury?

1226

```
 1   A   Yes.  My name is Lacy Fortenberry, F-O-R-T-E-N-B-E-R-R-Y.
 2   Q   And Ms. Fortenberry, did you grow up here or did you grow
 3   up in Mississippi?
 4   A   I did, yes.
 5   Q   Where did you go to college?
 6   A   I went to college at the University of South Alabama.
 7   Q   And what degree did you get at South Alabama?
 8   A   I received my bachelor's in Science and Nursing.
 9   Q   And so after you graduated, did you work as a nurse for a
10   while?
11   A   I did.  I worked for about six years as a nurse at the
12   University of South Alabama Medical Center.
13   Q   And in particular, did you work at any sort of unit within
14   South Alabama Medical Center?
15   A   I did.  I worked in the Burn Intensive Care Unit.  I took
16   care of critically-burned patients.
17   Q   And when you say critically burned, help us understand.
18   What does it mean if somebody is critically burned?
19   A   Uh, those are the more severe burn cases or burn cases that
20   also had other traumas involved.  A lot of times it would be 30
21   percent body surface area burns or greater.
22   Q   And when you worked in the Burn Unit, did you have occasion
23   to use fentanyl on patients?
24   A   I did.  We actually used it quite often for wound care and
25   other procedures that were especially painful.
```

1   Q   Now, was this fentanyl that you used, was this the Subsys
2   spray that you used with the Burn Care Unit patients?
3   A   No.  We administered it intravenously.
4   Q   So does that mean they have the bag with the shot in their
5   arm and you put it in the bag?
6   A   Yes.
7   Q   So it's liquid fentanyl?
8   A   Yes.  Right.
9   Q   Now, is liquid fentanyl used in -- typically used in burn
10  treatment?
11  A   It is.  It is.  It's been used for many years.  It was --
12  it's an excellent molecule for -- it's a very strong pain
13  medication.  So it's very effective for people with severe
14  pain.  It also works very quickly.
15  Q   And even for use -- even for the liquid use is fentanyl
16  measured in micrograms when it's given to burn patients?
17  A   Yes, it is.
18  Q   And a microgram is that a millionth of one gram?
19  A   Yes.
20  Q   How long did you work at that Burn Unit?
21  A   About six years.
22  Q   After working at the Burn Unit, did you look for a job in
23  the pharmaceutical industry?
24  A   I did.  I did.
25  Q   And were you hired by a company within the pharmaceutical

 1   industry?

 2   A   Yes.  I was hired by Insys Therapeutics.

 3   Q   And could you please explain to the jury who is Insys

 4   Therapeutics?

 5   A   Sure.  Insys Therapeutics is a pharmaceutical company.

 6   They developed a fentanyl product, so fentanyl was already on

 7   the market since 1968, I think.  But they developed a new way

 8   to administer it to patients.  So they came out with a

 9   medication called Subsys that was the fentanyl sublingual

10   spray.  You would spray it underneath the tongue and it would

11   be absorbed into the body that way.

12   Q   So you said fentanyl's been around for a while.  Is the

13   fentanyl, the Subsys and the fentanyl, the liquid fentanyl the

14   same drug that you were using in the Burn Unit?

15   A   Yes, the same active ingredient that's the same opioid.

16   Q   But you said the delivery method is different?

17   A   Correct.

18   Q   What's the delivery method for Subsys?

19   A   Subsys comes in a little spray device, and you can spray it

20   underneath your tongue, kind of like a breath spray, and it's

21   absorbed through the mucosa in the mouth so it -- under the

22   tongue you have a lot of capillaries and a lot of blood flow

23   and it's absorbed into your blood that way, underneath the

24   tongue.

25   Q   Even though you're spraying it in your mouth it's not

LACY FORTENBERRY - DIRECT BY MR. BODNAR

1   something that gets swallowed, is it?

2   A   No, it's not.

3   Q   It's held underneath the tongue?

4   A   It's absorbed, yes, through the mouth.

5   Q   And what position with Insys were you hired for?

6   A   I was a specialty sales professional, which is just -- I

7   was just a sales -- saleswoman.

8   Q   Is that what's sometimes referred to as a drug rep?

9   A   Yes.

10  Q   Could you please explain to the jury what is the job of a

11  salesperson or a drug rep, in general?

12  A   Sure.  The drug rep or the salesperson is just responsible

13  for trying to get the name of the product out there, to try to

14  promote use and to try to sell the product.

15  Q   And when you started with Insys, was this right when Subsys

16  started, prior to Subsys starting, or after Subsys had already

17  been on the market?

18  A   It was prior to coming onto the market.  I started with

19  them about a month, I think, before the product was approved

20  and sold.

21  Q   And just so the jury has a understanding about Insys.

22  Where is Insys located?

23  A   We're located outside of Phoenix, Arizona.

24  Q   And is this a small, little company or is this a very large

25  pharmaceutical company?

1230

1    A    It's a large pharmaceutical company.

2    Q    With over a billion dollars in sales?

3    A    Yes.

4    Q    And the product that you were selling, was that just

5    Subsys?

6    A    Yes.

7    Q    When you -- prior to this, had you ever had any experience

8    in medical or pharmaceutical sales before?

9    A    No.  I had only worked professionally as a nurse until that

10   point.

11   Q    And who hired you at Insys?

12   A    The hiring manager.  His name was Tony Bryant.

13   Q    And why did they hire you if -- this is a big

14   pharmaceutical company and you've never been in drug sales

15   before?

16   A    He said he was looking for people who had clinical

17   experience with similar products and --

18   Q    Clinical experience, you mean you've worked in a hospital

19   or a doctor's office before?

20   A    Yes, and worked with fentanyl products.

21   Q    And you, in fact, had experience --

22   A    Yes; correct.

23   Q    -- clinical experience with fentanyl?

24   A    Yes.

25   Q    How does a sales force for a company like Insys work around

1231

1    the country?  Do you have a region, or how -- explain to the

2    jury what area of the country you were in charge of.

3    A    Sure.  So my personal territory that was just mine was

4    Alabama, Mississippi, and a little bit of Louisiana and the

5    Florida Panhandle.  But I was part of the sales team that made

6    up the southeastern United States.  So there were other reps

7    on -- sales reps on my team that covered Georgia and Texas and

8    other nearby states.

9    Q    So people like you, sales reps for Subsys [sic], were all

10   around the country that had different regions?

11   A    Yes.

12   Q    Now, when you started, how did you go about identifying

13   doctors that you wanted to talk to about Subsys?

14   A    The company provided us with lists of providers with the

15   different types of physicians, mostly oncologists and pain

16   physicians.

17   Q    I want to stop you right there.

18   A    Yeah.

19   Q    Can you explain, what is an oncologist?

20   A    Sure.  Sorry.  An oncologist is a physician that

21   specializes in treating cancer.

22   Q    And why might that be important for selling a drug like

23   Subsys?

24   A    Subsys was only indicated for breakthrough cancer pain.

25   Q    So I believe you're saying you had a list that had

1  oncologists on it?

2  A    Yes.

3  Q    And who were the other types of doctors on that list?

4  A    And pain specialists.

5  Q    And in that capacity did you get to meet Dr. Ruan and

6  Dr. Couch?

7  A    Yes.

8  Q    And do you know what they look like?

9  A    I do.

10  Q    Do you see them sitting here today?

11  A    Yes, I do.

12  Q    First, for the record, can you identify Dr. Ruan, please?

13  A    Yes.  (Indicating.)  Dr. Ruan sitting over here.

14  (Indicating.)

15       MR. BODNAR:  Let the record reflect that she's

16  identified Dr. Ruan.

17  Q    And can you identify Dr. Couch, please?

18  A    Yes, Dr. Couch.  (Indicating.)

19       MR. BODNAR:  And let the record reflect she has

20  identified Dr. Couch.

21  Q    How, if you know, were Dr. Ruan and Dr. Couch on this list

22  that was provided to you by Insys?

23  A    The list specifically had sales targets or people that were

24  likely to write the Subsys product, write prescriptions for it.

25  And they determined that by using the class as a whole, the

1   rapid-onset opioids, or ROOs, they're often referred to.  And

2   they assign the doctors different numbers or different

3   priorities based on how many types of that prescription that

4   they normally wrote.

5   Q   So let's break it down and understand some of those terms.

6   You talked about rapid-onset opioid, R-O-O, or ROO.  Can you

7   explain to the jury what is a rapid-onset opioid as compared to

8   extended release or instant release?

9   A   Sure.  There are several different types of pain

10  medications, different types of opioids and they work in

11  different ways.  And the different types of medications, they

12  take longer to work, or they're quicker, onset.  And then they

13  also stay in your system either a short while or a long time,

14  for treating different types of pain.  If you have chronic

15  long-term pain, you may need a longer-acting opioid, whereas

16  fentanyls are rapid acting so it's for spikes of pain.  So you

17  would take it because it works very quickly and it doesn't stay

18  in the system that long.

19  Q   So is Subsys in that category of R-O-O, or ROO drugs that

20  you were just talking about?

21  A   Yes, sir.

22  Q   And you mentioned that there were ranks of other doctors

23  based on their prior ROO prescriptions?

24  A   Yes.

25  Q   At the time when Subsys came around, was Abstral on the

1234

1    market yet?

2    A    Abstral, I believe, was not on the market at that time.  I

3    think it had been pulled.

4    Q    Was there another fentanyl-based TIRF, fentanyl drug,

5    though, that was an equivalent ROO drug at that time?

6    A    Yes.  The biggest competitor to the Subsys product was

7    Fentora.

8    Q    And was Fentora an instant-release fentanyl that you put in

9    your gum?

10    A    Yes.

11    Q    So with this list that you talked about discussing doctors

12    with previously prescribed large amounts of drugs like Fentora?

13    A    Yes.

14    Q    And you mentioned a ranking.  Can you explain the ranking

15    of how doctors on your list were ranked?

16    A    Sure.  It was a scale from zero to 10.  Zero would be

17    assigned to a physician who has never written a prescription

18    for a ROO product.  And 10 would be the number assigned to a

19    physician who wrote some of the highest or the higher numbers

20    of ROO prescriptions.

21    Q    Do you recall what Dr. Couch and Dr. Ruan's ranking was on

22    the ROO prescriptions?

23    A    Dr. Ruan was ranked as a 10.  I believe Dr. Couch was a 10

24    as well.

25    Q    So if Dr. Ruan and Dr. Couch were ranked as 10s, would that

 1   be somebody that you would then -- is that someone at the top

 2   of your list to target for Subsys?

 3   A   Yes.

 4   Q   Can you explain to the jury how it was that you first

 5   became acquainted with Dr. Ruan and Dr. Couch?

 6   A   Yes.  I don't know for sure if this was our first meeting

 7   but I remember early on having a breakfast in their office.

 8   That's the first time that I met Dr. Couch.  It was a marketing

 9   breakfast with their whole practice, their whole office.

10   Q   And what, if anything, did you explain during this

11   breakfast about what Subsys was?

12   A   I went through the entire prescribing information and the

13   background on what the product is, what it's approved for and

14   how it works.

15   Q   And what did you tell them it was approved for?

16   A   It was approved for breakthrough cancer pain.

17   Q   Were Dr. Ruan and Dr. Couch oncologists?

18   A   No.

19   Q   Did you have any knowledge of how many cancer patients they

20   might have?

21   A   No.

22   Q   And is that information you would have been able to obtain?

23   A   No.  Their patient population wasn't something we were

24   privy to.

25   Q   So you were explaining to the doctor what it is approved

1  for, and did they at that point start writing prescriptions for

2  Subsys and Abstral?  Or sorry, for Subsys?

3  A   I'm not sure at what point they started writing but pretty

4  soon after meeting.

5  Q   When you first -- you said you had a territory that covered

6  parts of three different states; correct?

7  A   Yes.

8  Q   At first were you the sales rep for both Dr. Couch and

9  Dr. Ruan?

10  A   Yes, I was.

11  Q   Did there come a time that you no longer became the sales

12  rep for Dr. Ruan?

13  A   Yes.  About four or five months, I believe, into my time

14  with Insys Therapeutics I was taken off of Dr. Ruan's territory

15  or case.

16  Q   Did Dr. Ruan have a different relationship with Insys than

17  Dr. Couch, to your knowledge?

18  A   Not that I'm aware of.  I wasn't Dr. Ruan's sales

19  representative for very long.

20  Q   Do you know if Dr. Ruan had the ability to reach out

21  directly to individuals at Insys?

22  A   Yes, he did.  He had known some -- some members of the

23  company before from previous jobs that they'd had with other

24  companies.

25  Q   And do you know why someone else was brought in to be

1    Dr. Ruan's representative when you had been the representative

2    for Couch and Ruan?

3           MR. KNIZLEY:  Objection, Judge.  Calls for hearsay.

4           THE COURT:  Can you establish a basis of her

5    knowledge?

6    BY MR. BODNAR:

7    Q   Well, first without saying what anyone said, do you know

8    that Dr. Ruan -- you said Dr. Ruan got his -- a separate sales

9    representative.

10   A   Yes.

11   Q   Do you know why that occurred?

12   A   I was told it was --

13   Q   Without saying what you were told.  Just yes or no?

14   A   Okay.

15   Q   Do you know if that occurred?

16   A   Yes, I know it occurred.

17   Q   Without saying why it occurred or what anyone told you, do

18   you know why that happened?

19   A   Yes.

20   Q   And why was it that that happened that someone else became

21   representative?

22          MR. KNIZLEY:  Are you finished?

23          MR. BODNAR:  Yeah.

24          MR. KNIZLEY:  Judge, I will object on the basis of

25   hearsay.

1    THE COURT:  Unless you can show that it came from

2   something other than what someone told her, I sustain the

3   objection.

4    MR. BODNAR:  We'll move on.

5   Q   Who was the person that then became Dr. Ruan's sales

6   representative?

7   A   His name was Joseph Rowan.

8   Q   To your knowledge, did Dr. Rowan -- sorry.  Did Dr. Ruan

9   and Joe Rowan have a prior relationship with one another?

10  A   Yes.  They had worked together from, again, another

11  company.  Joseph Rowan was a sales rep with a different company

12  in the past and he knew Dr. Ruan that way.

13  Q   So at this point you are the rep for Dr. Couch and other

14  doctors in the region that you described; correct?

15  A   Yes.

16  Q   Did Joe Rowan have any other doctors, to your knowledge,

17  other than Dr. Ruan?

18  A   No, just Dr. Ruan.

19  Q   Were you familiar with other sales reps around the United

20  States?  Did you know other sales reps that worked for Insys?

21  A   Yes.

22  Q   To your knowledge, was there any other instance where a

23  singular doctor had their own personal drug rep?

24    MR. KNIZLEY:  Judge, relevance and foundation.

25    THE COURT:  Overruled.

1239

1  BY MR. BODNAR:

2  Q   To your knowledge, were there any other instances where a

3  singular doctor had his own drug rep for Insys Therapeutics?

4  A   No, sir.

5  Q   Ms. Fortenberry, how were you paid at Insys?  How was your

6  compensation made up?

7  A   I had a base salary and then there was a bonus system.  So

8  that bonus system was based on the prescriptions written.  The

9  sales reps got a percentage of each prescription that was

10 written.

11 Q   So if a doctor writes more prescriptions that you are

12 representing, does that mean that you make more money?

13 A   Yes, it does.

14 Q   So you had a -- did you have a financial incentive in the

15 doctor writing more prescriptions?

16 A   Yes.

17 Q   Can you explain to the jury how did it work for your end at

18 Insys getting a patient on Subsys?  What was -- what was the

19 first step before someone could receive a prescription for

20 Subsys?

21 A   They had to be enrolled in TIRF REMS program, the physician

22 and the patient.  It was a form they had to fill out, an

23 agreement that they understood.

24 Q   After that, are you familiar with something called a PA or

25 a prior approval?

 1   A    Yes.

 2   Q    Can you explain to the jury, what is a prior approval?

 3   A    Sure.  Just because a prescription is written for a patient

 4   who has insurance, whether it be Medicare, Blue Cross/Blue

 5   Shield, whatever insurance they may have, doesn't mean the

 6   insurance will cover it.  That doesn't mean they'll pay for

 7   it.  So if a medication is not on an insurance's formulary

 8   because your insurance, whatever kind of insurance it may be,

 9   will have a list of approved medications that they will cover

10   if the prescription is written for you under that plan.  And if

11   it's not on their formulary, if it's not on those lists, then

12   the patient will have to -- or the physician, really, will have

13   to get a prior authorization form filled out and sent to the

14   insurance company trying to convince them to cover the cost of

15   the medication.

16   Q    Can you explain, how did the prior authorization process

17   work for patients -- or for patients that were trying to get

18   Subsys?

19   A    Sure.  The pharmacy would usually, or the insurance would

20   deny the claim from the pharmacy, the pharmacy would notify the

21   physician's office that originally prescribed it saying they

22   need a prior authorization if they're going to cover the

23   medication.  And then the physician's office would fill this

24   out.  The prior authorization form had basic information about

25   the patient, what their diagnosis was, maybe what other

1  medications that were on formulary they had tried and why they

2  didn't work and the prescription they were writing for or the

3  dose and type of drug that they were trying to get approved.

4  Q   And I'm going to back up a minute.  You said you started at

5  the beginning of when Insys came out with Subsys?

6  A   Yes.

7  Q   Just to put this in comparison, what time period were you

8  with Insys?

9  A   I started either late February or early March of 2012.  And

10  then I left in -- beginning of March 2013.

11  Q   So when you started the beginning of Insys coming out with

12  Subsys, were you involved as the Insys rep in the Subsys PA

13  process?

14  A   I was the rep, yes.

15  Q   How were you -- were you involved in the prior

16  authorization process as the rep?

17  A   I was not involved with the prior authorization process.

18  Q   Do you know if there was a time later where drug reps for

19  Insys were involved in the prior authorization process?

20  A   I believe that -- that they were after they came out with

21  the internal program, but --

22  Q   Was a program known as the Internal Reimbursement Center

23  for Insys around at the time that you started -- that you were

24  there with Insys?

25  A   While I was there, yes, close to the end.

1   Q   Close to the end of your time there?

2   A   Correct.

3   Q   And can you explain to the jury what was the Internal

4   Reimbursement Service or is that also known as the IRC?

5   A   Yes.

6          MR. KNIZLEY:  Your Honor, I will object unless there's

7   some foundation or she has some particular knowledge about this

8   program.  She wasn't -- I believe her testimony is she wasn't

9   associated with it or had anything to do with it.  So I'd ask,

10  before she answers the question, she demonstrate she does have

11  some particular knowledge about it.

12         THE COURT:  Can you establish a basis for her

13  knowledge?

14         MR. BODNAR:  Yes, Your Honor.

15  Q   Towards the end of your time as a drug rep for Insys, was

16  the IRC involved in prior approvals?

17  A   Yes, they were.

18  Q   And were you involved in working with the IRC at Insys to

19  help for prior approvals for patients at PPSA?

20  A   Yes.

21  Q   Can you explain to the jury what is the IRC and what did

22  they do?

23  A   My knowledge of them is that they would assist in the

24  process of getting the prior authorizations done and getting

25  the approvals from the insurance companies.  So they would help

1   the physicians' offices essentially to fill those out or to get

2   those -- try to get them approved through the insurance

3   companies.

4   Q   So the drug company itself is trying to help get the

5   insurance to cover it?

6   A   Yes.

7   Q   Do you have knowledge about the relative price of Subsys?

8   A   I don't know the exact cost but it is multiple thousands of

9   dollars a month.  It also depends -- it's different depending

10  on the dose but it's a very costly product.

11  Q   Towards the end of your time at working at Insys was there

12  a program -- was there a development of what's called a Speaker

13  Program?

14  A   Yes.

15  Q   And were you involved at the tail end of your time at Insys

16  with the speaker programs?

17  A   Yes, I was.

18  Q   Can you explain to the jury what were the Insys speaker

19  programs?

20  A   Sure.  The speaker programs were when Insys Therapeutics,

21  the company, would choose doctors from the community to be

22  spokespeople or educators about the product.  They would have

23  speaker programs which would usually be a dinner or something

24  that we convince other physicians in the area to attend and the

25  doctor that was chosen as a speaker would present slides on the

1    medication and the product and educate them on the use of it.

2    Q    And were the doctors who presented these speaker programs,

3    were they then paid?

4    A    Yes, the speakers were compensated.

5    Q    But from your position as a rep do you have any idea how

6    much they were paid?

7    A    I don't.

8    Q    Do you know how doctors were selected to be -- by Insys to

9    be speakers for Insys Therapeutics in the beginning?

10   A    In the beginning the representatives, the sales reps were

11   responsible for electing certain physicians in their territory

12   that they felt that they were influences in the community,

13   people that other physicians would listen to, maybe people with

14   other publications and things that -- again, that other --

15   their colleagues respected and may listen to when presenting

16   the product.

17   Q    And in that initial figuring out who to be a speaker for

18   Insys, was either Dr. Ruan or Dr. Couch selected by the company

19   to be a speaker?

20   A    Yes.  Dr. Ruan was selected early to be a speaker.

21   Q    Dr. Ruan was selected by the criteria you just said?

22   A    Correct.

23   Q    Was Dr. Couch selected by that criteria to be --

24   A    No.

25   Q    Did something then happen at Insys where you kind of weeded

1245

1   out individuals that were in the first chosen-to-be in the

2   speaker program based on the merits?

3   A   Yes.  By the -- by the end of my time there, the speaker

4   programs had changed a little bit.  The speakers had to be

5   someone -- had to be physicians who had clinical experience who

6   were writing and continuing to write Subsys prescriptions.  And

7   the speaker programs were doled out according to the amount of

8   prescriptions for the product that the physicians were using.

9   Q   So the amount of speaker programs equated to the amount --

10  some way equated to the amount of prescriptions written by each

11  doctor?

12  A   Yes.

13  Q   So if a doctor wrote more prescriptions, would he get more

14  speaker programs?

15  A   Yes.

16  Q   And does more speaker programs mean more money?

17  A   Yes.

18  Q   I'm going to show you now what's been marked as

19  Government's Exhibit 17-1(2).  Without reading this, are you

20  able to first identify what this item is that I'm showing you?

21  A   Yes.  This is an email thread between myself and my boss at

22  the time, Alec Burlakoff.

23  Q   And what is the date on that?

24  A   The date on that is July 1st, 2012 and then his reply on

25  July 2nd, 2012.

1246

 1   Q   And just generally, does this email involve a discussion
 2   about speaker programs?
 3   A   Yes, it does.
 4           MR. BODNAR:  Your Honor, the United States moves to
 5   admit Government's Exhibit 17-2 -- 17-1(2).
 6           THE COURT:  Any objection?
 7           MR. SHARMAN:  No objection.
 8           THE COURT:  All right.  Mark it in.
 9       (Government's Exhibit 17-1(2) was entered into evidence.)
10   BY MR. BODNAR:
11   Q   Ms. Fortenberry, I'm going to show you what's just been
12   admitted as Government's Exhibit 17-1(2).  And is this the
13   email you just looked at up there?
14   A   Yes, it is.
15   Q   Now, at the bottom, on July 1st of '12, is this an email
16   between you and an individual named Alec Burlakoff?
17   A   Yes, it is.
18   Q   Please tell the jury, who is Alec Burlakoff?
19   A   He was the area sales manager at the time.  Tony Bryant was
20   my original area sales manager that I mentioned before, and
21   Alec Burlakoff replaced Tony Bryant.
22   Q   And what area did Alec Burlakoff cover?
23   A   He covered the southeast United States.
24   Q   And are you asking him then for a little bit of time off --
25   A   Yes.

LACY FORTENBERRY - DIRECT BY MR. BODNAR

1  Q   -- in that email?

2  A   Yes, I am.

3  Q   And in his response, what does Alec Burlakoff tell you

4  right there?  (Indicating.)

5  A   He said:  Just get Dr. Ruan and Dr. Couch to start pressing

6  it.  They need clinical experience in the next few weeks so we

7  can use them for speaker programs.

8  Q   And this is dated what?

9  A   This is dated July 2nd, 2012.

10 Q   So let's break that down.  Just get Dr. Ruan and Dr. Couch

11 to start pressing it.  What is the "it" that he's referring to,

12 if you know?

13 A   Subsys prescriptions.

14 Q   And why is it that he wants you to press them to do more

15 Subsys prescriptions on July 2nd?

16         MR. KNIZLEY:  Objection, Judge.  It calls for the

17 undisclosed mental operation of another.

18         THE COURT:  Does it say in the email what you're

19 trying to elicit?

20         MR. BODNAR:  She knows -- she can testify why it is

21 that he wanted her to do this.

22         THE COURT:  No.  But does she get that from talking to

23 him or does she have some other knowledge?

24         MR. BODNAR:  Based on this -- we can say what she did

25 based on this email, Your Honor.

1248

```
 1              THE COURT:  All right.  Well, then ask her that.
 2    BY MR. BODNAR:
 3    Q   Following this email what did you do?
 4    A   I approached Dr. Ruan and Dr. Couch about writing more
 5    prescriptions.
 6    Q   Why would that be necessary at this time period?
 7    A   Prior to using them for the speaker programs, Alec
 8    Burlakoff wanted to make sure that anyone that we were using,
 9    any physicians we were using to be speakers at the speaker
10    programs were also regularly writing prescriptions of Subsys.
11    Q   Regardless if they were meritorious in their community, as
12    you said before.  It was about the prescriptions written?
13              MR. SHARMAN:  Objection.  Leading.
14    A   Yes.
15    BY MR. BODNAR:
16    Q   Was it about the prescriptions --
17              THE COURT:  Sustained.
18    BY MR. BODNAR:
19    Q   -- written?
20    A   It was.
21    Q   Ms. Fortenberry, did you have direct communications with
22    your office or with your company about the number of
23    prescriptions being written by Dr. Ruan and by Dr. Couch and
24    then later by just -- by Dr. Couch?
25    A   Yes.
```

1    Q    Is that something that the company was interested in?

2    A    Yes.

3    Q    If you know, were Dr. Ruan and Dr. Couch valuable clients

4    for the company?

5    A    Yes, they were.

6    Q    Can you explain?  Were they -- was there a term that was

7    used within Insys to describe Dr. Ruan and Dr. Couch?

8    A    Not a term that I recall.  But they were on the national

9    list of important clients, if you will, people who --

10   Q    I'm going to show you now what's been marked as

11   Government's Exhibit 17-1(3).  Without reading this, are you

12   able to identify what this is for the Court?

13   A    Yes.

14   Q    Sorry.  Go ahead.

15   A    It's an email.  It's an email from me to Michael Babich and

16   Alec Burlakoff.

17   Q    And who is Mike Babich?

18   A    He was the CEO at the time.

19   Q    And is this pertaining to Dr. Couch?

20   A    Yes.

21        MR. BODNAR:  Your Honor, the United States moves to

22   admit Government's Exhibit 17-1(3).

23        MR. SHARMAN:  No objection.

24        THE COURT:  All right.  Mark it in.

25        (Government's Exhibit 17-1(3) was entered into evidence.)

1    BY MR. BODNAR:

2    Q   Ms. Fortenberry, I'm now showing you the exhibit you just

3    looked at up there.  Is this the email you just identified for

4    the Court?

5    A   Yes, it is.

6    Q   From you.  And is this the individual you said was the CEO

7    of Insys Therapeutics?

8    A   Correct.

9    Q   Was it -- was it common for you to speak with the CEO of

10   this pharmaceutical company about -- directly about Dr. Couch

11   and Dr. Ruan?

12   A   It wasn't common, no.

13   Q   Were they interested in Dr. Couch and Dr. Ruan?

14   A   But yes.

15   Q   Starting here at this section, 2, what is it -- it looks

16   like a couple of dates after Couch.  What were you telling

17   Mr. Babich?

18   A   Do you want me to read it?

19   Q   Well, just in general, then we're going to read part of it.

20   A   Okay.

21   Q   What are you generally telling him there?

22   A   I am telling him about the -- I'm telling him why this --

23   why Dr. Couch is a top target and why I want to use him for

24   speaker programs.

25   Q   And the date up here, August 26, 2012, if you recall, is

1251

1   that roughly when the speaker program started with Insys

2   Therapeutics?

3   A   Yes.

4   Q   And does it say:  For August 10th, currently writing

5   Subsys, getting great patient feedback, planning speaker

6   program with him starting next week?

7   A   Yes.

8   Q   How do you know that he was getting great patient feedback?

9   Did you speak with the patients yourself?

10  A   No, I didn't speak with the patients, only the clinicians.

11  Q   And by "clinician" what do you mean?

12  A   I mean Dr. Couch or his staff members.

13  Q   So somebody at PPSA would have relayed that information to

14  you?

15  A   Correct.

16  Q   And then you're relaying that to the CEO of the company?

17  A   Yes, sir.

18  Q   Here on August 17th it says:  Excellent speaker.  He's

19  looking for at least two appropriate Subsys patients a day.  Is

20  that what that says?

21  A   Yes, sir.

22  Q   What do you mean there when you're telling Mr. Babich he's

23  looking for two appropriate Subsys patients a day?

24  A   I mean that he was trying to identify in his regular

25  practice two patients a day who would benefit from Subsys.

LACY FORTENBERRY - DIRECT BY MR. BODNAR

1  Q   Again, what was Subsys indicated for?

2  A   Breakthrough cancer pain.

3  Q   And as the drug rep you wouldn't know if someone did or

4  didn't actually have cancer, would you?

5  A   No.

6  Q   And how did you know to tell the CEO that he was looking

7  for at least two Subsys patients a day?

8  A   They were asking for our expectations of the physicians and

9  what they -- what we thought -- what we could project that they

10 would be prescribing.

11 Q   Who was asking for your predictions?

12 A   Mike Babich and Alec Burlakoff.

13 Q   So essentially they wanted to know what do you think?  How

14 many prescriptions they might be able to get a day?

15 A   Yes.

16 Q   And then you said:  Continues to write, utilize as a

17 speaker?

18 A   Yes.

19 Q   You had mentioned Joe Rowan as being Dr. Ruan's

20 representative or drug rep; correct?

21 A   Yes.

22 Q   Was there a time that he became your boss while you were at

23 Insys?

24 A   Yes.

25 Q   And at that point did you then report numbers to Dr. or,

1  sorry, to Joseph Rowan?

2  A   Yes, I did.

3  Q   I'm going to show you now what's been marked as

4  Government's Exhibit 17-1(4).  Could you please identify what

5  this is for the Court?

6  A   Yes.  This is an email between myself to Joseph Rowan.

7  Q   And at the time period in this email would he have been

8  your regional supervisor?

9  A   Yes.

10        MR. BODNAR:  United States moves to admit Government's

11  Exhibit 17-1(4).

12        MR. SHARMAN:  No objection, Your Honor.

13        THE COURT:  Mark it in.

14    (Government's Exhibit 17-1(4) was entered into evidence.)

15  BY MR. BODNAR:

16  Q   I show you what -- we just showed you at the stand and now

17  it's been admitted as 17-1(4).

18        Is this an email from you Lacy Fortenberry to Joe

19  Rowan?

20  A   Yes.  It's actually a thread, Joe Rowan -- between Joe

21  Rowan and myself.

22  Q   Email thread?

23  A   Yes.

24  Q   November 26?

25  A   Yes.

1   Q   What are you telling Joe?  Can you read that, please?

2   A   Sure.  Joe, prescriptions from last week, one script went

3   through from Couch.  You will not see this short of a week

4   again.  I already secured three script promises for today and

5   tomorrow.

6   Q   All right.  Let me stop you there for a second.  Why are

7   you saying you'll never see this again, one script went

8   through?

9   A   Because that was considered below my sales target, to have

10  him write one script.

11  Q   And just one script per Subsys?

12  A   For the week.

13  Q   For an entire week?

14  A   Correct.

15  Q   What did he say that he's going to do for you tomorrow?

16  A   Three script promises for today and tomorrow.

17  Q   What does that mean, that he promised you that he's going

18  to write three scripts today and tomorrow?

19  A   That means he's identified three patients for Subsys that

20  day and the next day that he intended to write scripts for, and

21  he let me know that.

22  Q   And again, you don't know and you wouldn't have a way to

23  know if those individuals were cancer patients or not?

24  A   No.

25  Q   And do you go on then to list below some statistics for

1  people in your office?

2  A   Yes.

3  Q   Sorry.  For some people in your territory?

4  A   Yes.

5  Q   With two doctors redacted out and Dr. Couch being the first

6  one?

7  A   Yes.

8  Q   Help us understand.  What is that -- what are you saying to

9  Joe Rowan there?

10  A   This is the list of top offices in my territory, meaning

11  top prescription writers in my area.  And Dr. J. Patrick Couch

12  is listed.  It also says:  The prior authorization staff, which

13  would mean a staff member in his office that handled the prior

14  authorization forms is Amy.  Scripts ordered to date 25, and

15  location Mobile.

16  Q   So at the time that this email was sent on November 26,

17  2012, does this mean that Dr. Couch was the top prescriber in

18  your region?

19  A   Yes, it does.

20  Q   And to be clear, at this time Dr. Ruan is not considered in

21  your region?

22  A   Correct.

23  Q   Even though Dr. Ruan is in the same exact office?

24  A   Correct.

25  Q   And the top was just 25 prescriptions at this point?

1    A    Yes.

2    Q    Joe Rowan responds to this email, does he not?

3    A    He does.

4    Q    What does he tell you?

5    A    Does it hit home when you have to write it down?

6    Q    What does he -- what would you believe he was talking about

7    there?

8    A    He was talking about my low numbers that I was reporting

9    for sales of that week and the one script from Dr. Couch.

10   Q    And then what did you respond to Joe Rowan up here?

11   A    I responded:  Yes, completely unacceptable.  It makes me

12   frustrated with my performance, which is a great motivator.

13   Hopefully we'll see a turnaround this week.  I'm certainly

14   pushing for it.

15   Q    Pushing for it.  What were you trying to push to do?

16   A    I was pushing for more sales, more prescriptions for

17   Subsys.

18   Q    How would you push for more sales with Dr. Couch?

19   A    I would visit their office more often.  I would ask for

20   prescriptions.  I would ask if he had any patients that he

21   thought that he could identify that would be right for Subsys.

22   Q    How often would you be -- in general -- with Dr. Couch's

23   office?

24   A    It depends.  But often I would say on average three times a

25   week.

1   Q   About how often would you spend there -- how much time

2   would you spend there?

3   A   How much time?  It depended.  Again, sometimes I just

4   stopped in for a minute, sometimes I'd be there up to three

5   hours.

6   Q   Was there any other type of pressure that you would have

7   put on Dr. Couch to get him to prescribe Subsys?

8   A   No.

9   Q   Was there anything inappropriate, any sort of inappropriate

10  relationship between you and Dr. Couch?

11  A   No.

12  Q   Was there pressure put on you by Insys to get Dr. Couch to

13  prescribe more -- to prescribe more Subsys?

14  A   Yes.

15  Q   What would Insys -- what would happen to -- what was --

16  what pressure was put on you to get him to prescribe more?

17  A   Mostly it was just -- just verbally saying that I needed to

18  get more prescriptions from him.  Alec Burlakoff said to do

19  whatever it takes, to befriend him, to -- whatever I needed to

20  do to convince him to write more prescriptions.

21  Q   And were there also incentives that were offered to try to

22  get Dr. Couch to prescribe more?

23  A   Aside from my normal bonus structure, no.

24  Q   Incentives for Dr. Couch?

25  A   Oh, not that I'm aware of.

1   Q   Was he -- but was speaker programs tied into the amount of

2   prescriptions he wrote?

3   A   Yes.

4   Q   And prescriptions -- and you had previously testified, I

5   believe, that speaker programs equated to some amount of money

6   for the doctor?

7   A   Yes.

8   Q   And when you left, had the speaking program really just

9   begun at Insys Therapeutics?

10  A   Yes.

11  Q   Why did you leave Insys Therapeutics?

12  A   It was not a good fit.  I didn't feel especially

13  comfortable there.  I didn't really like their approach and I

14  decided to go back to the nursing world.

15  Q   What didn't you like about their approach?

16  A   I felt like the newer stuff that had come on board at Insys

17  Therapeutics were not necessarily sticking to the original

18  training and the message of -- maybe not as compliant and --

19  Q   What was the original message?

20  A   We kind of touched on it for the speaker programs, but we

21  were -- it was -- I felt like it was started for a good reason

22  to, you know, educate other clinicians, other physicians in the

23  community about the product.  And it became more of a -- more

24  based on just the number of prescriptions written.  And the

25  sales approach from Alec Burlakoff and Joseph Rowan were very

 1   different than originally with Tony Bryant.

 2   Q   Why did you stay a full year at Insys Therapeutics if you

 3   didn't like it?

 4   A   It was my first time in sales and doing anything

 5   nonclinical, so I wanted at least a year on my resume before I

 6   quit.

 7   Q   And you weren't fired, were you?

 8   A   I was not.

 9   Q   When you quit, what did you -- what did you -- did you do

10   the job that you're doing now?

11   A   Yes.  I'm still with the company.  I actually work with a

12   hospice company in Atlanta.

13   Q   And when you say "with the company," you don't mean within

14   Insys; you mean a different company?

15   A   Oh, no.  Sorry.  I left Insys and went to a different

16   company that I'm still with.

17   Q   And the company you're with now does what?

18   A   They're a hospice company.

19   Q   And that's in Atlanta?

20   A   Yes.

21   Q   Would you please explain to the jury, what's hospice?

22   A   Sure.  Hospice is a field of healthcare.  We take care of

23   people at the end of life; usually in the last six months of

24   life.

25   Q   And does that include individuals who are in end of life

```
 1    from cancer?

 2    A   Yes, it does.

 3    Q   In your current capacity, working in hospice care, do your

 4    patients receive Subsys?

 5    A   No, they don't.

 6    Q   Why?

 7    A   Cost, honestly.

 8            MR. BODNAR:  One moment, Your Honor.

 9            THE COURT:  All right.

10    BY MR. BODNAR:

11    Q   Ms. Fortenberry, you talked about your salary being tied in

12    with the amount of prescriptions written, at least in part; is

13    that correct?

14    A   Yes.

15    Q   In the one year that you were at Insys, approximately how

16    much money did you make?

17    A   I'm not positive how much I made.  It was under 100,000.

18    Q   Under 100,000?

19    A   Yes.

20    Q   Above 50,000 do you think?

21    A   Yes.

22    Q   Somewhere in that 50 to $100,000 range?

23    A   Yes.

24    Q   To your knowledge, if you know, do you know where patients

25    from PPSA filled their prescriptions for Subsys?
```

1   A   The majority of them use C&R Pharmacy.

2   Q   And tell me about C&R Pharmacy.  Do you know who owns C&R

3   Pharmacy?

4   A   Yes, Dr. Couch and Dr. Ruan.

5   Q   And we talked about the spray of Subsys.  And does it come

6   in a variety of different strengths?

7   A   It does.

8   Q   And can you just explain that to the jury?

9   A   Sure.  So the drug is measured in micrograms and there are

10  a lot of different doses available, depending on severity of

11  pain and of patient's tolerance.  So I believe it was offered

12  in 100, 200, 400, 600, 800, 1200, 1600 if I recall.  So several

13  different doses or different strengths of the medication were

14  available.

15  Q   And you had mentioned the indication for -- of the FDA

16  indication for Subsys was for breakthrough cancer pain?

17  A   Yes.

18  Q   As someone that worked for a drug company, pharmaceutical

19  company, why is an indication for a drug important to you?

20  A   Because that's what it has been studied for and the FDA has

21  approved it for.

22  Q   Is a drug company or a sales rep allowed to promote a drug

23  off-label?

24  A   No.

25          MR. BODNAR:  Nothing further for this witness, Your

 1    Honor.

 2            THE COURT:  All right.  Cross?

 3                        CROSS EXAMINATION

 4    BY MR. SHARMAN:

 5    Q   Ms. Fortenberry, my name is Jack Sharman.  I'm a lawyer for

 6    Dr. Couch.  On direct you said that you worked as a nurse;

 7    right?

 8    A   Yes, sir.

 9    Q   And you worked at the University of South Alabama Burn

10    Center; right?

11    A   Right.

12    Q   And as you said, that's a medical center that deals with

13    serious burns, trauma-related kind of burns; right?

14    A   Yes.

15    Q   And when y'all were there, y'all used fentanyl; right?

16    A   Yes, sir.

17    Q   It was -- as you have discussed, it was a liquid kind, not

18    the spray but it was still -- it was still fentanyl; right?

19    A   Yes.

20    Q   And the FDA indication, as you say, for fentanyl is for

21    breakthrough cancer pain; right?

22    A   For Subsys, yes.

23    Q   I'm sorry, for Subsys is for breakthrough cancer pain;

24    right?

25    A   Yes.

```
 1   Q   But that was not an issue for burn patients; right?  In

 2   other words, that was not a -- that was not an FDA indicated

 3   use for fentanyl for burn patients; right?

 4   A   I'm sorry.  Could you repeat that?

 5   Q   Sure.  Probably a bad question.  The FDA has not indicated

 6   the use of fentanyl for burn patients; right?

 7   A   For generic fentanyl, it is used for all different types of

 8   pain.

 9   Q   Yes, ma'am.  I know it's used for it.

10   A   Yes.

11   Q   But the FDA hasn't specifically found that it's indicated

12   for use for burns?

13   A   Not that I'm aware.

14   Q   So that's what you call an off-label use; right?

15   A   Yes, sir.

16   Q   It's not FDA indicated; right?

17   A   Uh-huh (positive response).

18   Q   I need a yes or no.

19   A   Yes.

20   Q   And that was a good thing; right, not a bad thing?

21   A   Uh-huh.  Yes.

22   Q   That use of fentanyl for burn patients?

23   A   Yes.

24   Q   And in fact, it's common for physicians to use a range of

25   medications for purposes other than their FDA-indicated
```

1    purposes; right?

2    A    Yes.

3    Q    That happens all the time?

4    A    Yes, it does.

5    Q    Nothing wrong with that by itself; right?

6    A    Yes.

7    Q    I know you said you weren't involved with the speakers

8    program in detail except as it was getting going at Insys;

9    right?

10   A    Yes.

11   Q    But you do know that the goals, especially when you were

12   there, was an education goal; right?

13   A    Yes.

14   Q    Plus to get out a message about the -- about the product;

15   right?

16   A    Yes.

17   Q    When it's -- if the company has got a product; right?

18   A    Yes.

19   Q    All things being equal, they would like people to buy the

20   product; right?

21   A    Right.

22   Q    And so one way of doing that is to get information about

23   the product out to the universe of people who might be in a

24   position to buy, use it and talk to other people about it;

25   right?

1265

```
 1   A    Yes.
 2   Q    That by itself, there's nothing peculiar or suspicious to
 3   you about that; right?
 4   A    No.
 5   Q    And here the purpose was to educate doctors and other
 6   healthcare providers about Subsys, which at least in its nature
 7   and its form and its delivery system was a new thing; right?
 8   A    Yes.
 9   Q    Fentanyl had been around a long time but Subsys --
10   A    Was new.
11   Q    That Subsys was new.
12   A    Correct.
13   Q    And at least every time you were involved in a speaking
14   engagement presentation that involved PPSA, at least one doctor
15   was there; right, every time?
16   A    Yes.
17   Q    And in fact Dr. Couch didn't accept every invitation he got
18   to be a speaker at some event; right?
19   A    I don't recall.  Sorry.
20   Q    Do you recall him accepting every invitation you gave him?
21   A    I don't -- I'm not positive.
22        THE COURT:  Mr. Sharman, is now a good time for us to
23   take our break?
24        MR. SHARMAN:  Yes, ma'am.
25        THE COURT:  Or do you have -- are you going --
```

1          MR. SHARMAN:  I've got probably enough that we could

2     take a break.

3          THE COURT:  All right.  Ladies and gentlemen, leave

4     your pads on your chairs.  Take your break downstairs.  No

5     discussion about the case.  We will call you back up in about

6     15 minutes.

7          (A recess was taken at approximately 3:02 p.m.)

8          (In open court, defendants and jury present.)

9          THE COURT:  All right.  Mr. Sharman.

10          MR. SHARMAN:  Thank you, Your Honor.

11     Q   Ms. Fortenberry, before the break, we were talking about

12     the speakers program.  I just want to return to that briefly.

13     I think we established that the goal of the speakers program

14     was to educate doctors and other healthcare providers about a

15     new product; right?

16     A   Yes.

17     Q   And then I think you said later on you thought the focus

18     changed a little bit; right?

19     A   Yes.

20     Q   We'll get to that in a second.  But from your perspective

21     the value of it was the education; right?

22     A   Yes.

23     Q   And Dr. Couch, while you were still onboard, so to speak,

24     from time to time he did some of these speakers events; right?

25     A   Yes, he did.

1  Q   Some of those were local and some of them were elsewhere;

2  right?

3  A   For the ones when I was on board, it was just local.

4  Q   You mentioned that speakers got paid some amount of money

5  for speaking but you didn't remember how much?

6  A   Yes.

7  Q   Is that right?

8  A   (Nodding head affirmatively.)

9  Q   Do you know whether or not, regardless of the specific

10  amounts of payment, whether Dr. Couch would have actually

11  earned more money hourly, so to speak, working rather than

12  speaking?

13  A   I don't know.

14  Q   You were shown a couple of emails by the government.  Let

15  me turn to those.

16        MR. SHARMAN:  Sam, can we see Exhibit 17-1(2)?

17        And this is in evidence.

18  Q   All right.  This is an email that reflects correspondence

19  between you and Alec Burlakoff; right?

20  A   Yes.

21  Q   And Mr. Burlakoff was one of your bosses at Insys?

22  A   Yes, he was.

23  Q   And you asked for a vacation day so you could go do some

24  continuing medical education; right?

25  A   Yes, sir.

1  Q   Keep up your nursing license; correct?

2  A   Yes.

3  Q   And he said:  Yep, not a problem.  And then he said:  Just

4  get Dr. Ruan and Dr. Couch to start pressing it.  They need

5  clinical experience in the next few weeks so we can use them

6  for speaker programs.

7       Let me take the second half of that first.  They need

8  clinical experience in the next few weeks so we can use them

9  for speaker programs.

10      The reason for that was because you needed somebody

11 who had actual experience using the product to be able to talk

12 about it sort of believably; right?

13 A   Yes.

14 Q   If somebody had never actually prescribed it, they would be

15 less knowledgeable and probably less persuasive about the

16 virtues of the product; right?

17 A   Yes.

18 Q   Now, you never shared Mr. Burlakoff's instructions to you

19 with Dr. Couch to start pressing it; right?

20 A   No.

21 Q   You never said to Dr. Couch -- and you recognized him over

22 here; right?

23 A   Yes.

24 Q   You never said to Dr. Couch, you know:  Hey, I need you

25 to -- I need you to write X so I can make X prescriptions, so I

1  can make Y dollars; right?

2  A    No.

3  Q    Then let's take a look at Exhibit 17-1(3), which you also

4  saw a moment ago.  And this is an email chain between you --

5  from you to Mike Babich; right?

6  A    Yes.

7  Q    Mr. Babich was president of Insys at the time?

8  A    He was CEO, yes.

9  Q    CEO.  And then it's copied to Mr. Burlakoff, your boss;

10  right?

11  A    Yes.

12  Q    Then when it says -- when you say down there, back there in

13  the middle sort of 2A, that he has been getting great patient

14  feedback.  When you wrote that, I mean that was true; right?

15  That was the case?

16  A    Yes.

17  Q    And when you said that he was looking for two appropriate

18  Subsys patients, you meant what you said, that they would be

19  appropriate; right?

20  A    Yes.

21  Q    The right people who would benefit from the right

22  medication; right?

23  A    Yes.

24  Q    And when you're talking about performance, that is, your

25  performance as a salesperson in these emails or otherwise,

1    that's a discussion that's important to you and to Insys;

2    right?

3    A   Yes.

4    Q   You're not engaging in those discussions with Dr. Couch;

5    right?

6    A   No.

7         MR. SHARMAN:  May I approach, Your Honor?

8         THE COURT:  Yes.

9    BY MR. SHARMAN:

10   Q   Ms. Fortenberry, I'm going to show you what's been marked

11   as Couch Exhibit 147, which appears to be an email chain

12   involving you.  First of all, will you take a look at that,

13   please, ma'am?

14   A   Yes.

15   Q   And tell us if that appears to be an email chain involving

16   you and two or three of your former colleagues at Insys.

17   A   Yes, it does.

18   Q   And that's your email address, lfortenberry@insysrx.com?

19   A   Yes, it is.

20   Q   And you recognize the names of the various recipients on

21   the email?

22   A   Yes, I do.

23        MR. SHARMAN:  Your Honor, Dr. Couch moves Exhibit 147

24   into evidence.

25        MR. BODNAR:  No objection, Your Honor.

1271

```
 1          THE COURT:  All right.  Mark it in.
 2          (Defendant Couch's Exhibit 147 was entered into evidence.)
 3          MR. SHARMAN:  Sam, if you could put 147 up, please.
 4   BY MR. SHARMAN:
 5   Q    All right.  This is an email chain, Ms. Fortenberry, so
 6   we'll have to read it from the bottom.  So the first
 7   communication appears to be from Sean Yu at Insys to you on
 8   September 17th, and the time is 11:27 in the morning.  Is that
 9   what that is?
10   A    Yes.
11   Q    Okay.  What did you understand Mr. Yu -- well, who is
12   Mr. Yu first?
13   A    I don't remember his exact title but he worked with Insys
14   Therapeutics and he was responsible for compiling our data from
15   the scripts coming in, and compiled those in charts and
16   spreadsheets and sent them back out to us as needed.
17   Q    And what is the subject matter of the email that he's
18   sending you on September 17th, 2012, at 11:27 in the morning?
19   A    The subject is:  Please note you have low strength, less
20   than or equal to 400 microgram prescriptions dispensed
21   yesterday.  Daily Rep Report for Low Strength Usage.
22   Q    And then on the second page of this exhibit as we go on it
23   says:  Dear SSP, attached please find the list of dispensed
24   Subsys scripts yesterday with low strength.
25          So what was -- what did you understand Mr. Yu to be
```

1  communicating to you here?

2  A   They were -- they -- the upper levels of my company were

3  frowning upon low-strength prescriptions, and 100 and 200

4  micrograms were considered low-strength prescriptions.  And if

5  there was a prescription written for 400 microgram or lower

6  strength at this point in time they wanted us to speak -- go

7  back and speak to the prescribing physician and ask them why

8  they wrote for a lower amount, and refer that information back

9  to them.

10  Q   So it was like a system sort of flag a prescriber for whom

11  you had responsibility who in the company's view was writing a

12  lower dose than the company desired; is that fair?

13  A   Yes.

14  Q   And then you forward this -- forwarded this email on to Joe

15  Rowan; right?

16  A   Yes.

17  Q   And I know you just spoke about it but remind us who

18  Mr. Rowan was.

19  A   Joe Rowan was a sales rep for Dr. Ruan but he was also the

20  area sales manager at this time.  So he was my direct boss.

21  Q   So you forward Mr. Yu's email, you forwarded it to

22  Mr. Rowan with a cover note of your own.  First, why did you

23  forward it to Mr. Rowan and write him a note?

24  A   Those were the expectations.  When we received these emails

25  from Sean, we were to put a response and explanation to our

LACY FORTENBERRY - CROSS BY MR. SHARMAN

1    immediate boss, which was Joe Rowan for me at the time.

2    Q   All right.  And you say:  Dear Joe, I have explained the

3    starting dose of 100 micrograms, the titration process.  What

4    is the titration process?

5    A   The hope of the company was that within the initial 60

6    units, each dose is its own spray and that's considered a unit.

7    So within 60 doses or within 60 units the patient would

8    hopefully be titrated to the appropriate level or the best

9    level of pain control and the dose.

10   Q   Just as a general matter, titration means to modify the

11   dosing level over time so as to obtain the optimal dose for

12   that particular patient; right?

13   A   Yes, sir.

14   Q   Just as a general matter, that's titration; right?

15   A   Yes.

16   Q   All right.  So you say:  Dear Joe, I have explained the

17   starting dose of 100 micrograms, the titration process, and the

18   vouchers to Dr. Couch on multiple occasions.  He continues to

19   write the full initial 60 units for doses of 100 micrograms and

20   200 micrograms, as his method of titration involves such

21   dosing.

22           Did I read that right?

23   A   Yes, sir.

24   Q   Okay.  He insists that he is ultimately providing his

25   patients with effective doses of Subsys and will continue with

1    his titration method.

2         Did I read that right?

3    A   Yes, sir.

4    Q   Okay.  So what you were reporting to Mr. Rowan was that

5    whatever the titration expectations of others might be,

6    Dr. Couch was confident in how he was handling it and that he

7    would do his titration method, not somebody else's; is that

8    fair?

9    A   Yes.

10   Q   Based on your experience as a nurse and in the

11   pharmaceutical industry, and now as a manager in a company that

12   provides hospice services, are you familiar with the term

13   "nonformulary" or "nonformulary exception"?

14   A   Yes.

15   Q   All right.  Well, first what's a formulary, generally?

16   A   Formulary is a list of treatments, medications or other

17   things that a paying company would have that are covered.  Cost

18   covered.

19   Q   They are covered by insurance or by some payor; right?

20   A   Yes.

21   Q   They are sort of preapproved, they are good, they are in

22   the system, no -- no argument, so to speak; right?

23   A   Yes.

24   Q   And then payors, whomever they may be, private insurance

25   company, Medicare, whatever, may have exceptions that can be

1    granted.  That is to say, coverage and payment for a medication

2    that is not on that formulary list; right?

3    A    Yes.

4    Q    So I want to show you a document that is admitted in

5    evidence earlier as Couch 05F-004.

6            MR. SHARMAN:  Sam, if you can go to that letter

7    directly, so I don't have to do the whole thing?

8            THE COURT:  This is in evidence; right?

9            MR. SHARMAN:  Yes, ma'am.

10   Q    Ms. Fortenberry, this letter is from a company called

11   HealthSpring.  Have you ever heard of HealthSpring?

12   A    I have.

13   Q    What's HealthSpring?

14   A    HealthSpring is an insurance coverage plan, I believe.

15   Q    And this is a letter addressed to a gentleman named Randall

16   Blackmon, who I'll just tell you was one of Dr. Couch's

17   patients.  Okay?

18   A    Okay.

19   Q    All right.  And it says here:  We are pleased to inform you

20   that we are approving your nonformulary exception for Subsys.

21   And then it gives the quantities and the dose and so forth.

22           Do you see where I read that?

23   A    Yes, sir.

24   Q    So in the common usage in the medical industry and paying

25   for medications, that's what you and I just talked about.  In

LACY FORTENBERRY - CROSS BY MR. SHARMAN

1276

1   other words, HealthSpring is saying Subsys is not -- is not on
2   the approved list for what you've asked for but we are going to
3   say okay, you may invoke the nonformulary exception; right?
4   A   Yes.
5   Q   All right.  Now, you -- as I think was established earlier
6   you were a salesperson; right?
7   A   Yes, sir.
8   Q   And your compensation had two parts.  You had a base level
9   and then a commission essentially; right?
10  A   Correct.
11  Q   And like all salespeople, the commission is or was an
12  important part of your overall compensation; right?
13  A   Yes.
14  Q   And from your perspective, it's better to sell the product
15  than to not sell the product; right?
16  A   Yes.
17  Q   And as you alluded to on direct, you wanted to get into the
18  pharmaceutical sales after your nursing career; right?
19  A   Yes.
20  Q   And regardless of your employer, it wasn't your intention
21  to stay with your first company for indefinitely anyway?  I
22  mean, you planned to use that as a stepping stone to another
23  company; right?
24  A   Not necessarily.  I didn't have any expectation of it at
25  the time.

1    Q    All right.  Well, you -- when you got going with Insys,

2    there was a lot of pressure on you from the company; right?

3    A    Yes.

4    Q    From Mr. Burlakoff; right?

5    A    Correct.

6    Q    Babich; right?

7    A    Yes.

8    Q    Mr. Rowan; right?

9    A    Yes.

10   Q    They were -- they were -- those guys were about selling

11   product; is that a fair statement?

12   A    Yes.

13   Q    But you didn't communicate to Dr. Couch the kind of

14   approach they were taking or the kind of pressure you were

15   under; right?

16   A    No.

17   Q    And whatever those guys said, you -- because you're a

18   nurse, you held the line as far as your judgment on that;

19   right?

20   A    Yes.

21   Q    And as I think you said at some point, you simply were not

22   comfortable with the way those guys were approaching things; is

23   that fair?

24   A    Yes.

25   Q    Now, a couple of times in your direct you talked about

 1  targets and sales targets and quotas, and so forth.  All of

 2  that discussion was between you and Insys.  That was on the

 3  Insys side of things; right?

 4  A   Yes.

 5  Q   Dr. Couch didn't have, you know, quotas and sales targets;

 6  right.

 7  A   No, he didn't have --

 8  Q   You and he didn't talk about hitting this marker for that

 9  quarter as far as sales, that kind of stuff; right?

10  A   No.

11  Q   And you never did anything, Ms. Fortenberry, regardless of

12  what those guys said or asked you to do that you believed was

13  inappropriate; right?

14  A   Correct.

15  Q   You never did anything to hurt a patient; right?

16  A   Correct.

17  Q   And you've never encouraged Dr. Couch to do anything that

18  could hurt or endanger a patient; right?

19  A   No.

20  Q   As far as you know, he never did?

21  A   Yes; correct.

22          MR. SHARMAN:  No further questions.

23          THE COURT:  Mr. Knizley?

24                      CROSS EXAMINATION

25  BY MR. KNIZLEY:

LACY FORTENBERRY - CROSS BY MR. KNIZLEY

1   Q   Good afternoon, Ms. Fortenberry.

2   A   Hi.

3   Q   My name's Dennis Knizley.  I represent Dr. Ruan.  You had

4   told us that when you went to work for Insys that you were at

5   first assigned to Dr. Ruan and Dr. Couch and other doctors but

6   eventually you were no longer assigned as a sales

7   representative to Dr. Ruan; is that correct?

8   A   Correct.

9   Q   And would it be fair to say you've had a limited

10  involvement with Dr. Ruan while you were at Insys?

11  A   Yes.

12  Q   And about how long, if you recall, did you have any

13  responsibilities in association with Dr. Ruan?

14  A   A couple of months.

15  Q   Okay.  And did you have much interaction with him?

16  A   No.

17  Q   Now, you did tell us that you were familiar with a speakers

18  program -- a speakers program; right?

19  A   Yes.

20  Q   And you said when the program first started that the people

21  that were sought out to participate as speakers in the program

22  were those who were held in high esteem in the community; would

23  that be correct?

24  A   Yes.

25  Q   And I think you mentioned educators or professors and that

LACY FORTENBERRY - CROSS BY MR. KNIZLEY                    1280

1   sort of thing?

2   A   (Nodding head affirmatively.)

3   Q   And you mentioned doctors as well that were well respected

4   by their colleagues; is that right?

5   A   Yes, sir.

6   Q   And I think you further mentioned physicians that had had

7   publications; is that right?

8   A   Yes.

9   Q   And by "publications," did you mean publications in medical

10   journals and that sort of thing?

11   A   Yes.

12   Q   And is that important to physicians in your experience that

13   if some physicians are published or have their articles --

14           MR. KNIZLEY:  Mr. Bodnar?

15           MR. BODNAR:  We're going to object to foundation on

16   this line of questioning, Your Honor.

17           THE COURT:  Overruled.

18   BY MR. KNIZLEY:

19   Q   When you had mentioned the words "publications" and I think

20   you had told the ladies and gentlemen of the jury about

21   publications you meant publications in medical journals and

22   that sort of thing; is that correct?

23   A   Yes.

24   Q   And the reason the publication aspect may be important, did

25   you understand by working in the medical field that other

LACY FORTENBERRY - CROSS BY MR. KNIZLEY

1   physicians held physicians in higher esteem if they had had

2   publications in these type of medical journals?

3   A   Yes, I believe so.

4   Q   Okay.  And you told us that -- initially that Dr. Ruan was

5   one of those individuals that you felt was appropriate for the

6   criteria I have just outlined; is that correct?

7   A   Yes, sir.

8   Q   So he was one that you felt was held in high esteem by his

9   colleagues in the community for the reasons we had just said?

10  A   Yes.

11  Q   And as far as Dr. Couch is concerned, he was held in

12  somewhat high regard as well, was he not?

13  A   He was.

14  Q   Okay.  And I want to show you what's marked as Ruan's

15  Exhibit 102.  And if you can -- is that an email from you on

16  August 19th, 2012, to your boss?

17  A   Yes, it is.  It's to Teresa Grasso and my boss Alex

18  Burlakoff.

19  Q   Okay.

20          MR. KNIZLEY:  Judge, we would offer Ruan's Exhibit

21  102.

22          MR. BODNAR:  No objection, Your Honor.

23          THE COURT:  All right.  Mark it in.

24      (Defendant Ruan's Exhibit 102 was offered into evidence.)

25  BY MR. KNIZLEY:

1282

1  Q   And in looking at the highlighted version I have said on

2  here, you talk about both Dr. Ruan and Dr. Couch, but

3  particularly Dr. Couch at this time, when you talk about a

4  speakers program y'all had that day; is that right?

5  A   Yes.

6  Q   And you tell Teresa who is -- now, who is Teresa?

7  A   Teresa Grasso worked with the SciMedica Group that was a

8  vendor or a group that Insys Therapeutics hired to manage and

9  control the speaker programs.

10 Q   Okay.  And this is going to be probably about midway

11 through your employment; does that look right?

12 A   Correct.

13 Q   Started in March and this is August in 2012.  And you're

14 telling Teresa that there was two speaker programs that day, I

15 believe; right?

16 A   Yes.

17 Q   Evening one?  And what do you say about Dr. Couch and his

18 speaking abilities?

19 A   I say --

20 Q   Right there?  (Indicating.)

21 A   Sure.  Dr. Couch is an experienced speaker and had clearly

22 educated himself thoroughly and was well prepared to present

23 the slides, as well as field questions.  Furthermore, he

24 brought his own clinical experience into the lecture which was

25 an effective addition.

1283

 1   Q   And how did you feel about the lunch program that day?

 2   A   The lunch program served to fully educate and influence the

 3   staff of Physicians Pain Specialists of Alabama, including but

 4   not limited to Dr. Couch, Dr. Ruan, Dr. Chen, Dr. Manchikes,

 5   CNPs and the in-practice pharmacist on the use of Subsys.

 6   Q   And on the dinner program that evening y'all had a --

 7   somewhat more diverse attendees, I believe you put it; is that

 8   right?

 9   A   Yes.

10   Q   And because it's due to location and time being in the

11   evening hours, more people could come, I suppose; right?

12   A   Yes.

13   Q   And I think y'all had a home healthcare nurse there?

14   A   Yes.

15   Q   And you had a couple of family practitioners there, it

16   looks like; right?

17   A   Residents, yes.

18   Q   So no question, this was a beneficial program that was

19   underway at this time, at least in your opinion?

20   A   In my opinion, yes.

21   Q   Okay.  Now, you are a pharmaceutical -- you were a

22   pharmaceutical sales representative; is that right?

23   A   Yes, sir.

24   Q   And, of course, the pharmaceutical company hires you and

25   other sales representatives in order to promote their products;

1   is that right?

2   A   Yes.

3   Q   And you have competitors?

4   A   Yes.

5   Q   Okay.  And there are really other pharmaceutical sales

6   companies that may sell a similar product; is that right?

7   A   That's right.

8   Q   And the similar product may serve a similar purpose for a

9   patient; right?

10  A   Correct.

11  Q   But in order for you to make your commissions and your

12  company to make money y'all want the doctors to promote your

13  product; is that right?

14  A   Yes.

15  Q   And that's why the doctors want you to go to the -- excuse

16  me -- your employer wants you to go through the doctors'

17  offices and tell them of the benefits of your particular

18  product as opposed to some other company's product?

19  A   Correct.

20  Q   Okay.  Now, you're not there to convince the doctor that he

21  should prescribe things the way you think; is that right?

22  A   That's correct.

23  Q   You're there to offer information about your product; is

24  that right?

25  A   Yes.

 1  Q   And sometimes because products change -- I mean, it is good

 2  for doctors' offices to learn what your product does; is that

 3  right?

 4  A   Yes.

 5  Q   And sometimes you know more than some of the clinicians in

 6  there about the particularities of your product; is that right?

 7  A   Yes.

 8  Q   Okay.  Now, when you -- and your employer wants you, as

 9  Mr. Sharman was telling you, to really promote your product to

10  particular doctors; right?

11  A   Yes.

12  Q   And they want you to report back why that this dosage is

13  low, as Mr. Sharman just showed you; right?

14  A   Yes.

15  Q   But you don't share that with the physicians, do you?

16  A   No.

17  Q   Okay.  And you get a lot of pressure from your side, from

18  the pharmaceutical company's side; right?

19  A   Yes.

20  Q   And you go to see the doctors but the doctors make the

21  decisions; right?

22  A   Correct.

23  Q   And that's what happened in this case as well; is that

24  right?

25  A   Uh, yes.  I mean, the doctor is ultimately making the

 1   decision.

 2   Q   And you would -- and you told us about there was an

 3   assistance program, I think, that Insys had about -- to get

 4   preauthorization of certain medicines approved?

 5   A   Yes, correct.

 6   Q   And you utilized, you became familiar with that and you

 7   were involved in it?

 8   A   Somewhat, yes.

 9   Q   But you were involved in it.  You sent some information to

10   that entity, that department in order for some of the people

11   that you or some of the patients there could get pre-approval;

12   right?

13   A   Probably, yes.

14   Q   Okay.  Nothing wrong with that.  Nothing illegal about

15   that, was there?

16   A   Not that I'm aware of.

17   Q   Well, you wouldn't do it if it were illegal, would you?

18             MR. BODNAR:  Objection, Your Honor.

19             THE COURT:  Sustained.

20   BY MR. KNIZLEY:

21   Q   Was anything inappropriate about it that you know of?

22   A   No, sir.

23   Q   And any of the other things you did in as far as

24   interacting with the physicians at PPSA, was anything

25   inappropriate or wrong or illegal, to your knowledge?

1           MR. BODNAR:  Objection, Your Honor, as to whether it

2    was illegal or not.

3           THE COURT:  Sustained.

4    BY MR. KNIZLEY:

5    Q    Was anything inappropriate or wrong, to your knowledge?

6    A    Not to my knowledge, no.

7    Q    And lastly, on the promotion aspect of products,

8    pharmaceutical products, not only were they promoted sometimes,

9    but the speaker programs you have talked to us about; is that

10   right?  And there was also certain programs from time to time

11   that your pharmaceutical company and others may have had that

12   may supply coupons or in some fashion relieve the cost of the

13   medications; is that right?

14   A    Yes.

15   Q    And you know, I think we've all heard about the

16   pharmaceutical salesman with the free samples.  That happens

17   sometimes; right?

18   A    Yes.

19   Q    And what would be an example of that?

20   A    Well, I mean, in this case they were not -- they were not

21   able to provide free samples.

22   Q    Maybe not -- I shouldn't say that.  With Subsys you can't

23   have free samples because it's Schedule II; right?

24   A    Yes.  Yes; correct.

25   Q    Tell us about what you can do, though.  Is there a coupon

1   program or some kind of program you can utilize?

2   A   Yes.  There were -- there were vouchers.  There were

3   vouchers available that would provide a patient with a Subsys

4   prescription, provide them with 60 free units or 30 at the end,

5   that was provided on purpose to allow the physician time to get

6   a prior authorization form to the insurance company and get it

7   approved so that they could start on the medication right away.

8   Q   And that was a coupon provided by your company that, of

9   course, paid for the medication; is that right?

10  A   Yes.

11          MR. KNIZLEY:  Okay.  Thank you.

12                  REDIRECT EXAMINATION

13  BY MR. BODNAR:

14  Q   Good afternoon, Ms. Fortenberry.

15  A   Good afternoon.

16  Q   I just want to clarify a few things from your cross-

17  examination.  Do you recall speaking with Mr. Sharman about the

18  fentanyl that was used in the burn unit?

19  A   Yes.

20  Q   And you were asked whether or not fentanyl was used for

21  burns?

22  A   Yes.

23  Q   And now the fentanyl that you're talking about, is that a

24  liquid fentanyl that you were using for burns?

25  A   Yes, it is.

LACY FORTENBERRY - REDIRECT BY MR. BODNAR

1 Q   And is that -- while it's the same drug, is liquid fentanyl

2 different than Subsys?

3 A   Yes, it is.  IV fentanyl -- intravenous fentanyl is

4 different from the sublingual Subsys fentanyl.

5 Q   So sublingual -- the Subsys fentanyl is what is only

6 indicated for cancer pain; correct?

7 A   Correct.

8 Q   It's not the liquid fentanyl that is only indicated for

9 cancer pain?

10 A   I'm actually not sure of the FDA indications for the

11 intravenous liquid fentanyl.

12 Q   But you do know what it is for?

13 A   For Subsys, yes.

14 Q   That was for cancer pain?

15 A   Yes.

16 Q   I want to show you what has been previously admitted as

17 Couch Exhibit Number 5F-4.  Do you recall seeing this notice of

18 approval letter that the defense showed you?

19 A   Yes.

20 Q   And you were asked about the nonformulary exception for

21 Subsys.  And I believe on direct you explained that formulary

22 was the list of drugs a pharmacy or a company will -- a health

23 insurance company will pay for just automatically?

24 A   Yes.

25 Q   If something is not on the formulary, does that mean

LACY FORTENBERRY - REDIRECT BY MR. BODNAR

```
 1  necessarily it's not in the formulary because it's an off-label
 2  use?
 3  A    No.
 4  Q    So the fact that it's approved for a nonformulary use or
 5  nonformulary exception, does that mean anything about whether
 6  or not this was approved for a on or off-label use of Subsys?
 7  A    No.
 8  Q    And in fact, if you look at this letter, does it say
 9  anywhere of why Subsys was approved here?
10  A    No.
11  Q    Does it simply say it wasn't on its normal list of drugs?
12  A    Yes.
13  Q    And is that why a PA was needed?
14  A    Yes.
15  Q    Ms. Fortenberry, do you recall when defense counsel was
16  talking to you about you're a drug rep and you want someone to
17  essentially buy your product?  That's what sales reps do;
18  correct?
19  A    Yes.
20  Q    And drug reps are a little be bit different than a normal
21  sales rep because you're not trying to get the doctors to buy
22  Subsys, are you?
23  A    No.
24  Q    Is it that you're trying to get them to prescribe it to
25  somebody else?
```

1291

1   A   Yes.

2   Q   So you're not talking to the patient and saying:  Hey,

3   Subsys would be really great for you, are you?

4   A   No.

5   Q   You're trying to convince a doctor to, in the doctor's

6   medical judgment, prescribe it to someone appropriate?

7   A   Yes.

8   Q   But you don't speak to the patients, do you?

9   A   No.

10  Q   So you don't actually know whether or not the doctor is or

11  is not prescribing it appropriately?

12  A   Correct.

13  Q   I'm going to show you what was shown to you on direct and

14  then again on cross-examination, Government's Exhibit 17-1(3).

15  And this was the email between you and the CEO of Insys.  Take

16  it out so there's no glare.

17          And just to be clear here, you are saying you did tell

18  the CEO:  Currently writing Subsys, getting great patient

19  feedback?

20  A   Yes, I did.

21  Q   But that's based on what somebody at PPSA has told you;

22  correct?

23  A   Correct.

24  Q   You didn't speak to any patient?

25  A   No, I didn't.

LACY FORTENBERRY - REDIRECT BY MR. BODNAR

1  Q   You don't have no idea if it's actually getting great

2  feedback?

3  A   Correct.

4  Q   And where you said "appropriate patients," do you have any

5  idea what -- whether or not Dr. Couch is selecting appropriate

6  patients?

7  A   I do not.

8  Q   Do you have any idea if Dr. Couch is actually seeing the

9  patients that received Subsys?

10 A   I do not.

11 Q   Do you have any knowledge of why anybody at PPSA received

12 Subsys?

13 A   No.

14 Q   And is that because that is not your job as a drug rep?

15 A   Yes.

16 Q   Were you not in the patient room?

17 A   I was not in the patient rooms.

18 Q   I'm going to show you what has been admitted as

19 Government's Exhibit -- I'm sorry -- Defense Exhibit Couch

20 147-01.  Do you recall this email between you and Joe Rowan?

21 A   Yes.

22 Q   The defense showed you about the titration method?

23 A   Yes.

24 Q   What's the date of this email from you to Joe Rowan?

25 A   This email was September 17th, 2012.

LACY FORTENBERRY - REDIRECT BY MR. BODNAR                    1293

1   Q   And you were telling him as of -- on that date or as of

2   that date that's what you -- Dr. Couch has explained to you of

3   what he's doing titration-wise?

4   A   Correct.

5   Q   Do you know if he actually is titrating like that?

6   A   I do not know.

7   Q   Do you know if that's how he was titrating in 2013?

8   A   No, I don't.

9   Q   Or '14 or '15?

10  A   No.

11  Q   Is that because you weren't there?

12  A   Yes.

13  Q   So in 2012, according to Dr. Couch, this is what was

14  happening?

15  A   Yes.

16  Q   And you have no independent knowledge of that?

17  A   No.

18  Q   I'll show you what has been admitted as Ruan Exhibit

19  102.  And do you recall this email talking about speaker

20  programs?

21  A   Yes.

22  Q   And what's the date on this email here?

23  A   August 19th, 2012.

24  Q   Would this have been, if not the first, right near the

25  first speaker programs that they had for Insys?

LACY FORTENBERRY - REDIRECT BY MR. BODNAR

1    A    Yes.

2    Q    And you said these ones, apparently, other doctors came to?

3    A    Yes.

4    Q    And Dr. Couch and Dr. Ruan actually spoke at these?

5    A    Yes.

6    Q    But you don't know if later speaker programs, after you

7    were there -- if the same thing occurred?

8            MR. SHARMAN:  Objection to leading.

9            THE COURT:  Sustained.

10   BY MR. BODNAR:

11   Q    Do you know, other than this speaking program you're

12   talking about in this email, whether this happened at future

13   speaking programs?

14   A    No, I don't know.

15   Q    You talked about the voucher program.  And vouchers were

16   given out by whom?

17   A    Insys Therapeutics.

18   Q    So does that mean Insys Therapeutics picks up the cost of

19   the medication?

20   A    It does, yes.

21   Q    So instead of a -- so in a normal case, if someone doesn't

22   have a voucher and they fill the prescription at the pharmacy,

23   who would reimburse the pharmacy for the cost of that

24   medication?

25   A    The insurance company.

1   Q   In this case who reimburses the pharmacy if they have a

2   voucher?

3   A   Insys Therapeutics.

4   Q   So under either scenario does the pharmacy get reimbursed

5   regardless?

6   A   Yes.

7   Q   It's just a matter of they're reimbursed by the company or

8   the insurance company?

9   A   Yes.

10  Q   And did you say in direct what pharmacy did the majority of

11  these patients, to your knowledge, fill their Subsys

12  prescriptions at?

13  A   C&R Pharmacy.

14  Q   So if they had an Insys voucher, Insys reimbursed the C&R

15  Pharmacy?

16  A   Yes.

17  Q   And if they didn't have one, would insurance, health

18  insurance reimburse C&R Pharmacy?

19  A   Yes.

20  Q   Ms. Fortenberry, it was your job to educate doctors on

21  Subsys; correct?

22  A   Correct.

23  Q   And for your own financial interest, you wanted them to

24  prescribe this drug, didn't you?

25  A   Yes.

1   Q   Were you able to force Dr. Couch or Dr. Ruan to prescribe

2   this drug?

3   A   No.

4   Q   Did you ever write prescriptions for them for Subsys?

5   A   No.  No, I did not.

6   Q   Ultimately whose decision was it to prescribe Subsys?

7   A   The doctors.

8   Q   And would that be in this case Dr. Couch and Dr. Ruan?

9   A   Yes.

10          MR. BODNAR:  One moment, Your Honor.

11          THE COURT:  All right.

12          MR. BODNAR:  Nothing further for this witness, Your

13   Honor.

14          THE COURT:  All right.  You may step down.  Thank you.

15          MR. BODNAR:  United States calls Natalie Perhacs.

16          THE CLERK:  Step forward toward the witness stand and

17   I'll swear you in.  Would you raise your right hand?

18                       NATALIE PERHACS

19              was sworn and testified as follows:

20          THE WITNESS:  Yes, ma'am.

21          THE CLERK:  Thank you.  Please be seated.

22                     DIRECT EXAMINATION

23   BY MR. BODNAR:

24   Q   Good afternoon.

25   A   Hello.

LACY FORTENBERRY - DIRECT BY MR. BODNAR

1   Q   Could you please introduce yourself to the jury?

2   A   I'm Natalie Perhacs.

3   Q   And, Ms. Perhacs, how do you spell your last name?

4   A   P-E-R-H-A-C-S.

5   Q   And, Ms. Perhacs, did you grow up here in south Alabama?

6   A   No.

7   Q   Where did you grow up?

8   A   Birmingham.

9   Q   And can you please explain your education to the jury?

10  A   I got my undergraduate degree at Troy University.  Then I

11  went on to get my master's degree at the University of Southern

12  Mississippi in Hattiesburg.

13  Q   And what were your degrees in, Ms. Perhacs?

14  A   Public relations.

15  Q   Ms. Perhacs, did there come a time that you were employed

16  by a company called Insys Therapeutics?

17  A   Yes.

18  Q   Now, we're going to jump back in time to the time period

19  before you were at Insys Therapeutics.  Who was your employer

20  before you worked at Insys?

21  A   Lincare.

22  Q   Can you explain to the jury what is Lincare and what do

23  they do?

24  A   It's a respiratory equipment company.

25  Q   What does that mean, respiratory equipment?

1   A   People that have trouble breathing, COPD, emphysema, things

2   like that, typically need additional help.  So they sold

3   nebulized medication and oxygen therapy, little tanks or a

4   machine that produces oxygen that sits next to their bed.

5   Q   And where is that company located that you worked there

6   for?

7   A   Mobile.

8   Q   And how long were you at Lincare?

9   A   One year.

10   Q   During -- was this right after college, right after your

11   master's degree?

12   A   Close.

13   Q   During your time at Lincare, did you become acquainted with

14   Dr. Ruan and Dr. Couch?

15   A   Yes.

16   Q   How did you know -- how did you meet Dr. Ruan and

17   Dr. Couch?

18   A   I randomly drove by the clinic one day and didn't know what

19   it was so I went in to see what it was.

20   Q   And when you wanted to see what it was, what were you

21   hoping to see?  What were you hoping to get out of meeting with

22   Dr. Ruan and Dr. Couch?

23   A   Potential new prescribers, new doctors to refer business to

24   me.

25   Q   And were you a -- were you basically a sales rep for

1    Lincare?

2    A    Yes.

3    Q    So did you -- were you looking for -- when you say you were

4    looking for the doctors to refer business to you, what do you

5    mean?  Explain that to the jury.

6    A    Other doctors to help identify patients that could use the

7    tools that I sold.

8    Q    And those being the nebulizers and tanks of oxygen?

9    A    Yes.

10   Q    Did there come a time when Dr. Ruan and/or Dr. Couch

11   started sending patients to you?

12   A    Yes.

13   Q    And for about how long -- time period-wise, roughly when is

14   this that you're working at Lincare?

15   A    Bad with dates.  I don't remember the dates.  2012.  The

16   year of 2012.

17   Q    In later 2012 did you begin to communicate with either

18   doctor about moving into the pharmaceutical industry,

19   pharmaceutical rep industry?

20   A    Yes.

21           MR. BODNAR:  Your Honor, I'm going to -- may I

22   approach with what has been marked as Government's Exhibit

23   32-1, subparts (1) through (11)?

24           THE COURT:  All right.

25   BY MR. BODNAR:

LACY FORTENBERRY - DIRECT BY MR. BODNAR

1    Q   Ms. Perhacs, I'm showing you what has been marked as

2    Government's Exhibit 32-1.  Are you able to identify what is

3    contained in this binder?

4    A   Yes.

5    Q   What are these?

6    A   Emails.

7    Q   And are these emails from your time period before you

8    started working at Insys?

9    A   Yes.

10   Q   And are they emails between you and somebody else, either

11   Dr. Ruan or Dr. Couch?

12   A   Yes.

13   Q   Which doctor?

14   A   Dr. Ruan.

15           MR. BODNAR:  United States moves to admit Government's

16   Exhibit 32-1, subparts (1) through (11), Your Honor.

17           MR. KNIZLEY:  No objection, Your Honor.

18           MR. DOSS:  No objection.

19           THE COURT:  All right.  Mark them in.

20       (Government's Exhibits 32-1(1) through (11) were entered

21   into evidence.)

22   BY MR. BODNAR:

23   Q   Ms. Perhacs, I'm going to start and show you what's first

24   been admitted as Government's Exhibit 32-1(1).  Is this an

25   email chain between yourself and Dr. Ruan?

1301

1    A    Yes.

2    Q    November 7, 2012?

3    A    Yes.

4    Q    And starting here at the bottom, please read for the jury.

5    What is it that Dr. Ruan is asking you?

6    A    Do you want me to just read?

7    Q    Yes.

8    A    Hi Natalie, it was nice talking to you today -- talking to

9    you in the clinic today.  I will keep an eye for you in case

10   there is some opportunity some pharmaceutic company in the near

11   future.

12            Well, I wanted to ask you a personal question and

13   hopefully you will not be offended.  Are you involved with

14   someone now?  It seems Dr. Couch really likes you.  Are you

15   involved with him now?  Do you -- involved with him in the

16   future?  You don't have to answer any of these if you do not

17   feel comfortable.  Regards, Dr. Ruan.

18   Q    And Ms. Perhacs, were you involved at that time with

19   Dr. Couch in any way?

20   A    No.

21   Q    Were you involved at any point while you worked for Lincare

22   or Insys Therapeutics with Dr. Couch?

23   A    No.

24   Q    Or Dr. Ruan?

25   A    No.

1  Q   Is that what you told Dr. Ruan right above?

2  A   Hello, to answer your question, no, I am not and do not

3  plan to be.  I am a friend to him.  I do not mix business with

4  pleasure and have had that discussion with him.  He is very

5  clear on where I stand.  I am dating someone.  I will not date

6  a doctor I do business with.  I have lost business over

7  inappropriate pressure from doctors and I will not tolerate it

8  again.  It is part of business.  Dr. Couch is a man I am only

9  interested in doing business with and I have no issue being his

10  friend.

11        I am not aware of him dating anyone at this time and I

12  only know the personal details of his life he chooses to share

13  with me.  Natalie.

14  Q   And Ms. Perhacs, after this email on November 7th, did you

15  and Dr. Ruan begin exchanging emails about helping -- Dr. Ruan

16  helping you get into a drug rep position?

17  A   Yes.

18  Q   And was your Lincare job, is that considered a drug rep

19  position?

20  A   No.

21  Q   I'm going to show you now what has been admitted as

22  Government's Exhibit 32-1(2).  And is this an email from

23  Dr. Ruan to you the following day, November 8, 2012?

24  A   Yes.

25  Q   Would you please read it to the jury?

1    A    Hi Natalie, I will keep my eyes open for you.  My

2    impression with your current job is that it has rather limited

3    potential for your growth.  But, I understand that you need to

4    perform well on it and that will also serve as a positive

5    control for your future.  As long as medic -- medicol --

6    medicoleg -- I don't know how to pronounce that word.

7    Q    Medicolegally?

8    A    Medicolegally it is sold -- solid, and the patients do get

9    benefits from using it and they are happy using your service,

10   then I will be happy to give you the support in using the

11   service from your company.  Have a great day to you

12   too.  Dr. Ruan.

13   Q    And thereafter, did Dr. Ruan in fact reach out to

14   pharmaceutical companies to try to get you a job?

15   A    Yes.

16   Q    I show you what's been admitted as Government's Exhibit

17   32-1(3) from November 13th, 2012.  Is this an example of one

18   such email where Dr. Ruan is trying to get you a job in the

19   pharmaceutical industry?

20   A    Yes.

21   Q    And which company is he trying to get you a job with here?

22   A    I don't remember.

23   Q    Can you start right here:  As a matter of fact --

24   A    Sure.

25   Q    -- if that helps you?

1   A   Sure.  As a matter of fact, I have been involved with -- in

2   Endo speaker bureau over the past -- a few years, such as Opana

3   ER, Lidoderm, Voltaren gel.

4   Q   So was this -- was he trying to get you a job with the

5   pharmaceutical firm Endo here?

6   A   Yes.

7   Q   Did you ever get an interview with Endo?

8   A   No.

9   Q   Did you ever hear back from Endo?

10  A   No.

11  Q   I show you now what's been admitted as Government's Exhibit

12  32-1(4).  Is this an email chain from several days later,

13  November 19th, where he's trying to get you a job at a

14  different pharmaceutical company?

15  A   Yes.

16  Q   And is this one -- flipping to the beginning.  Is this for

17  the company that makes Nucynta?

18  A   Yes.

19  Q   And did you get an interview for that pharmaceutical job?

20  A   No.

21  Q   Did you ever hear anything back from them?

22  A   No.

23  Q   I now show you what's been admitted as Government's Exhibit

24  32-1(5), an email from November 27 -- chain from November 27th,

25  2012.  And is this about two weeks after the emails where he

1  was trying to get you a job with pharmaceutical companies?

2  A   Yes.

3  Q   And at the bottom part of the email can you read what

4  Dr. Ruan is first asking you?

5  A   Yes.  Natalie, if you really have to have a taste of

6  authentic Cantonese dinner, I can help you fulfill that

7  dream.  I have had lots of dining experience here in the U.S.

8  after living here over 23 years.  Osaka chef/owner cooks the

9  very best authentic Cantonese meal.  If you like the idea, I

10 can reserve one for myself and invite you to join me, therefore

11 you don't have to pay.  How does that sound to you?  If you

12 like to do it, which evening is good for you?

13 Q   And did you take Dr. Ruan up on his offer and go to dinner

14 with him?

15 A   No.

16 Q   And is that what you're telling Dr. Ruan right here,

17 approximately eight minutes later?

18 A   Yes.

19 Q   What do you tell Dr. Ruan?

20 A   How about we play it by -- it's supposed to say ear.  I'm

21 never sure about my evenings until my day is closer to

22 over.  If you and Dr. Couch want to grab lunch, I can do that

23 sometime.  We could go eat together like we did about three

24 weeks ago.  I love trying new food.

25         Thanks, Natalie.

1306

```
 1   Q   And during this time period where he's asking you to dinner
 2   and helping you find jobs, are you still working at Lincare and
 3   getting patients referred by Dr. Couch and Dr. Ruan?
 4   A   Yes.
 5   Q   Were there other instances where Dr. Ruan asked you out to
 6   dinner?
 7   A   I think so.
 8   Q   Was there a time that Dr. Ruan asked you, tried to hire you
 9   for a different job to help him --
10   A   Yes.
11   Q   I'm going to show you what's been marked as -- or admitted
12   as Government's Exhibit 32-1(6).  Is this an email chain
13   between you and Dr. Ruan from February 21st of 2013?
14   A   Yes.
15   Q   What is Dr. Ruan asking you?  What is he trying to hire you
16   to do?
17   A   Would you like for me to read it?
18   Q   Yes, please.
19   A   Okay.  Natalie, I wonder if you would like to be my private
20   coach to help me with my speech.  At this point in my life I've
21   accomplished many goals I set for myself, but my skill in
22   public speech is horrible.  I have decided to become an
23   efficient speaker.  Have you watched -- blanked out --
24   commercial?  I want to speak with that level of
25   confidence.  That -- to look and sound like a top-notch medical
```

1   expert.  My deficient speech is a major obstacle that I want to

2   overcome in the years to come.  Please let me know whether you

3   would like to take me as your student.  I am willing to pay you

4   a reasonable -- for your time and effort, Dr. Ruan.

5   Q   And where he says, take me as your student, did you have

6   students that you were training in speech at that time?

7   A   No.

8   Q   Were you a public speech coach?

9   A   No.

10  Q   Did you have any sort of formal training in teaching people

11  public speaking?

12  A   No.

13  Q   Did you agree to be Dr. Ruan's coach?

14  A   Yes.

15  Q   And is that what you said right here?

16  A   I think so.  I have to read it.

17          Dr. Ruan, I find it hard to believe you are bad at

18  anything.  I am always willing to help someone that wants to

19  better themselves.  I would never take your money.  Let's talk

20  about this in person.  I believe you have the ability to become

21  a good public speaker, now you need training.  Let's talk soon.

22          Natalie.

23  Q   And Ms. Perhacs, can you tell the jury, did you ever become

24  Dr. Ruan's personal speech coach?

25  A   No.

1308

1   Q   Did you do anything to help him with his speaking skills?

2   A   Yes.

3   Q   What was that?

4   A   I gave him an outline.

5   Q   Did you ever meet with him one-on-one to help his speech?

6   A   No.

7   Q   The date on that, was that February 21st, 2013?

8   A   Yes.

9   Q   Roughly two weeks later did Dr. Ruan ask you to dinner

10  again on March 5th, 2013?  And this is Government's Exhibit

11  32-1(7).  Is this another email where he's asking you to

12  dinner?

13  A   Yes.

14  Q   And starting at the bottom of the chain, what is Dr. Ruan

15  asking you?

16  A   Dr. Ruan, I can --

17  Q   At the bottom.

18  A   I'm sorry.  Hi Natalie, would you like to have dinner with

19  me at Osaka this evening?  Authentic Chinese cuisine.

20  Dr. Ruan.

21  Q   Did you decide to go out with Dr. Ruan that night?

22  A   No.

23  Q   And is that what you're telling him less than a half hour

24  later right here?  (Indicating.)

25  A   Yes.

LACY FORTENBERRY - DIRECT BY MR. BODNAR

1   Q   What did you tell Dr. Ruan?

2   A   Dr. Ruan, I cannot meet tonight.  I am sick and my goal is

3   to finish my day early and go to bed.  How about next week?  I

4   planned on meeting with you anyway to discuss your lesson

5   plans.  Could we have lunch one day later this week or next

6   week?

7   Q   And with lesson plans, is that referring to the speech

8   coaching he wanted to do with you?

9   A   Yes.

10  Q   Did you ever wind up going out to dinner by yourself with

11  Dr. Ruan?

12  A   I don't remember.

13  Q   In his response to you -- can you read this?  And I want to

14  talk about some of the individuals' names here.

15  A   I am sorry to hear that you are sick.  I am supposed to

16  give a talk on Subsys at Osaka this evening.

17  Q   And I want to stop you there for the moment.  On March 5th,

18  2013 did you have any idea what Subsys was?

19  A   No.

20  Q   Can you -- do you now know what Subsys is?

21  A   Yes.

22  Q   Okay.  Starting now with Joe, can you continue?

23  A   Joe called me from Atlanta this evening that he could not

24  come here, therefore, the talk will need to be

25  rescheduled.  However --

LACY FORTENBERRY - DIRECT BY MR. BODNAR

1   Q   Stop you there for a second.  At the time did you know who
2   this individual named Joe was?
3   A   No.
4   Q   Have you come to learn since that time who is that Joe he's
5   referring to?
6   A   Yes.
7   Q   Who is that Joe?
8   A   Joe was the man who worked at Insys that sold Subsys that
9   ended up hiring me.
10  Q   And was that Joe Rowan?
11  A   Yes.
12  Q   Okay.  Can you please continue on with that?  However --
13  A   However, I already told Judy (Osaka owner) to prepare
14  something special for today's talk, and she has ordered
15  something special from this from Pensacola.  So I will need to
16  go there this evening anyway.  Unfortunately I am on a diet.  I
17  guess it will not hurt for one meal.  I am leaving for Orlando
18  Friday.  Maybe we will find some time next week.  Hope you'll
19  feel better then.  Dr. Ruan.
20  Q   And Ms. Perhacs, after this first email did you have other
21  emails about the individual named Joe Rowan?
22  A   Yes.
23  Q   I'm going to now show you what's been admitted as
24  Government's Exhibit 32-1(8).  And is this an email from March
25  26, 2013, from Dr. Ruan to you?

1311

```
 1   A    Yes.

 2   Q    And it's the subject line, job as drug rep?

 3   A    Yes.

 4   Q    To this point had you received any interviews from the

 5   previous emails Dr. Ruan had sent out on your behalf?

 6   A    No.

 7   Q    Had you had any prior drug rep experience?

 8   A    No.

 9   Q    Starting at the bottom of this email chain, can you please

10   read what Dr. Ruan said to you?

11   A    Natalie, I recommended you to Joe Rowan, the regional

12   director of Insys.  I talked to him today and there might be a

13   position open for you.  I highly recommended you to him.  I

14   think the chance for you to be taken is greater than 90

15   percent.  They have very competitive compensation package based

16   on sale.  I think it is a job on which you can show your

17   capability.  Joe will contact you shortly.  By the way, I am a

18   national speaker, as well as on advisory board for this

19   company.  Dr. Couch is also a speaker for this company.  We

20   both know the product well.  I hope you can get it this

21   time.  Dr. Ruan.

22   Q    And then did you respond to Dr. Ruan above?

23   A    Yes.

24   Q    What did you say?

25   A    Wow.  Dr. Ruan, thank you.  I came by yesterday but didn't
```

LACY FORTENBERRY - DIRECT BY MR. BODNAR

1    want to bother you because you were in a meeting.  I plan on

2    stopping by tomorrow because we had a qualifying oxygen

3    patient.  I can't tell you how much I appreciate your

4    recommendation.  I look forward to talking to you -- talking to

5    Joe soon.  See you soon.

6    Q   And what did Dr. Ruan respond to you at the top?

7    A   Natalie, Thursday will be better as Ngoc will be with me in

8    Springhill Clinic.

9    Q   I'm going to stop you there for a minute.  Do you know

10   who -- pronounced Ngoc, N-G-O-C?  Do you know who that

11   individual is?

12   A   Yes.

13   Q   And who is that individual?

14   A   His girlfriend.

15   Q   Whose girlfriend?

16   A   Dr. Ruan's girlfriend.

17   Q   Okay.  Continue on, please.

18   A   I don't want to -- made her guessing after we break

19   apart.  I was -- her this evening when Joe called me.  Joe

20   initially recommended Ngoc, feeling --

21   Q   I'm going to stop you there for a second.  Who was it that

22   Joe Rowan initially recommended for the Insys job?

23   A   Ngoc.

24   Q   Okay.  Please continue.

25   A   Feeling that I could be most supportive if that is the

LACY FORTENBERRY - DIRECT BY MR. BODNAR

```
 1   case.  I talked him out of this.  Anyway, I will see you on
 2   Thursday.
 3   Q   So did Dr. Ruan talk -- at least talk Joe Rowan out of
 4   hiring Ngoc?
 5   A   Yes.
 6   Q   Who did Dr. Ruan want to be his drug rep instead?
 7   A   Me.
 8   Q   I'll just show you for the date.  Is this March 26th, 2013?
 9   A   Yes.
10   Q   I'm going to show you an email from the following day,
11   admitted as Government's Exhibit 32-1(9).  Is this an email
12   from the following day, March 27th?
13   A   Yes.
14   Q   And is it from Dr. Ruan to Joe Rowan with UCC?
15   A   Yes.
16   Q   Are you the subject of this email?
17   A   Yes.
18   Q   What did Dr. Ruan tell Joe Rowan?
19   A   Joe, it was nice talking to you last night.  I emailed
20   Natalie about this position you have.  She is very
21   excited.  Like I told you, I know she would be an excellent
22   addition to your team with her superb communication
23   skills.  She is driven, dedicated, and she always gives her
24   best effort in achieving beyond she is expected.  I hope you
25   could give her the opportunity to work with your team.  Her
```

 1   number is -- and it gave my number.  Dr. Ruan.

 2   Q   And I want to point to the email address for Joe Rowan

 3   here.  You later do work for Insys; correct?

 4   A   Yes.

 5   Q   And when you worked for Insys, did you have an email

 6   address that said insysrx.com?

 7   A   Yes.

 8   Q   And did other people that worked at Insys also have a

 9   corporate email address like that?

10   A   Yes.

11   Q   Would that include Joe Rowan?

12   A   Yes.

13   Q   Is this email going to Joe Rowan's Insys account?

14   A   No.

15   Q   Does that appear to be going to a different account?

16   A   Yes.

17   Q   After this email from March 27th, did you talk to Joe Rowan

18   the following day?

19   A   I think so.

20   Q   I'm going to show you what's been admitted as Government's

21   Exhibit 32-1(10).

22         Is this the following day, March 28th?

23   A   Yes.

24   Q   Starting here at the bottom, is that an email from Dr. Ruan

25   to you with subject:  Conversation with Joe?

LACY FORTENBERRY - DIRECT BY MR. BODNAR

1  A   Yes.

2  Q   What did you tell Dr. Ruan?

3  A   Dr. Ruan, the conversation with Joe went well.  Joe

4  respects your opinion so much he is willing to give me a chance

5  based on your recommendation.  He did not mention his concern

6  to me about not knowing more doctors.  But either way, I will

7  build the relationships and grow business.  I do not doubt my

8  ability to be a performer with Insys.  Thank you for the

9  powerful recommendation.  Joe and I plan to meet

10 Tuesday.  Natalie.

11 Q   Based on your email to Dr. Ruan, why was it that Joe Rowan

12 hired you at Insys Therapeutics?

13 A   Because I had a strong recommendation from Dr. Ruan.

14 Q   Not because you knew other doctors?

15 A   No.

16 Q   Did you know anything about Insys at the time?

17 A   No.

18 Q   Did you know anything about fentanyl?

19 A   No.

20 Q   About Subsys?

21 A   No.

22 Q   About how to be a drug rep?

23 A   No.

24 Q   I now show you what's been admitted as Government's Exhibit

25 32-1(11).  Is this an email from April 1st, 2013, from Dr. Ruan

1    to you?

2    A    Yes.

3    Q    And is the subject of this email:  Knowledge?

4    A    Yes.

5    Q    And was this email sent to you prior to your interview with

6    Insys?

7    A    I don't remember.

8    Q    Well --

9    A    I think -- yes, I think so.

10   Q    Can you please read what the email says to the jury?

11   A    Natalie, Subsys is sublingual spray of fentanyl, used for

12   breakthrough cancer pain.  Read the following links a few

13   times, then you'll be ready.  Link two and three may be too

14   much, but they will get you beyond what Joe knows about the

15   opioid.  Good luck.

16   Q    And does he then send you two Wikipedia pages, an article

17   about breakthrough cancer pain?

18   A    Yes.

19   Q    Other than that, did you know anything about Insys or

20   Subsys before you went to that interview?

21   A    No.

22   Q    Were you hired during that interview?

23   A    Yes.

24   Q    And then did you ultimately become the drug rep for

25   Dr. Ruan and for Dr. Couch?

1    A    Yes.

2    Q    Now Ms. Perhacs, did you begin with Dr. Ruan and Dr. Couch

3    or with Insys as their drug rep approximately April of 2013?

4    A    Yes.

5    Q    And were you the drug rep throughout the time until they

6    were arrested in this case?

7    A    Yes.

8    Q    And based on your involvement, just your activities, were

9    you charged with a federal crime?

10   A    Yes.

11   Q    Did you plead guilty to conspiring to pay kickbacks to

12   Dr. Ruan and Dr. Couch?

13   A    Yes.

14   Q    I'm going to show you what's been marked as Government's

15   Exhibit 32-5.

16       (A discussion was held off the record between counsel.)

17           MR. BODNAR:  Your Honor, may I approach with what has

18   been marked as Government's Exhibit 32-5?

19           THE COURT:  Yes.

20   BY MR. BODNAR:

21   Q    Ms. Perhacs, do you recognize this document?

22   A    Yes.

23   Q    Is this your plea agreement in this case?

24   A    Yes.

25   Q    And if you flip to the end, does this not contain a factual

1   resume portion?  Was there a factual resume portion on the
2   original part that is not here?
3   A   I don't think so.
4   Q   If I submit to you that this is the plea agreement portion
5   but not the factual resume, would you agree with that?
6   A   Yes.
7           MR. BODNAR:  United States moves to admit Government's
8   Exhibit 32-5, which is the plea agreement without the factual
9   resume.
10          MR. DOSS:  No objection.
11          MR. KNIZLEY:  No objection, Your Honor.
12          THE COURT:  All right.  Mark it in.
13      (Government's Exhibit 32-5 was entered into evidence.)
14  BY MR. BODNAR:
15  Q   Ms. Perhacs, I want to show you now what's been admitted as
16  Government's Exhibit 32-5.  And is this in fact your plea
17  agreement in this case?
18  A   Yes.
19  Q   And were you represented by an attorney prior to pleading
20  guilty?
21  A   Yes.
22  Q   And did you plead guilty because you are guilty?
23  A   Yes.
24  Q   As part of your plea agreement, do you have what's referred
25  to as a cooperation agreement?

1319

1   A   Yes.

2   Q   And is that detailed here in paragraph 21 and then on the

3   next several pages?

4   A   Yes.

5   Q   And you've gone over that with your attorney?

6   A   Yes.

7   Q   Is there anything in your plea agreement that says that you

8   have to convict Dr. Ruan or Dr. Couch to get any sort of

9   benefit from cooperating?

10  A   No.

11  Q   What is it that you have to do to cooperate?

12  A   Tell the truth about what I know.

13  Q   Before we get into your actual details of what you did

14  while you were at PPSA, can you explain to the jury how you

15  were compensated for your work at Insys Therapeutics?

16  A   Yes.

17  Q   How were you compensated for your work?

18  A   I had a salary, plus I made commission.

19  Q   And does commission mean that you make money when Dr. Ruan

20  or Dr. Couch prescribe Subsys?

21  A   Yes.

22  Q   How long were you -- approximately were you the drug rep

23  for Dr. Ruan and Dr. Couch?

24  A   A year and a half.

25  Q   And in that year and a half approximately how much money

1    did you earn from Insys?

2    A    $700,000.

3         MR. BODNAR:  Your Honor, may I approach with what has

4    been marked as Government's Exhibit 32-2, parts (1) through

5    (16)?

6         THE COURT:  Yes.

7    BY MR. BODNAR:

8    Q    Ms. Perhacs, I'm showing you what's been marked as

9    Government's Exhibit 32-2.  Can you flip through that and see

10   if you recognize those documents?

11   A    I recognize them.

12   Q    Are these emails and documents related to the prior

13   authorization process?

14   A    Yes.

15   Q    Involving yourself at PPSA?

16   A    Yes.

17        MR. BODNAR:  Your Honor, the United States moves to

18   admit Government's Exhibit 32-2(1) through (16).

19        THE COURT:  Any objection?

20        MR. DOSS:  No objection.

21        MR. KNIZLEY:  No objection.

22        THE COURT:  All right.  Mark it in.

23      (Government's Exhibit 32-2(1) through (16) were entered

24   into evidence.)

25   BY MR. BODNAR:

1  Q   Ms. Perhacs, for time period-wise, did you -- when you

2  started at Insys Therapeutics, was an individual named Lacy

3  Fortenberry working there?

4  A   When I started, she was not working at Insys.

5  Q   So you and Lacy did not overlap?

6  A   No.

7  Q   How about an individual named Joe Rowan?  Was he there when

8  you were there?

9  A   Yes.

10  Q   Was he the drug rep for Dr. Ruan at the time?

11  A   Yes.

12  Q   After you were hired, did you become a drug rep for both

13  Dr. Couch and Dr. Ruan?

14  A   Yes.

15  Q   And did you have a couple of other doctors in your

16  territory as well?

17  A   Yes.

18  Q   As part of your job with Insys Therapeutics were you

19  involved in what is known as the prior authorization process?

20  A   Yes.

21  Q   Would you please explain to the jury what was the prior

22  authorization process at Insys Therapeutics?

23  A   The prior authorization process at Insys Therapeutics was

24  where the clinic would provide information about the patients,

25  that information was submitted to a group within our company in

 1   Arizona that submitted it to the insurance company to see

 2   whether or not the insurance company would approve or deny the

 3   medication.

 4   Q   And was the goal to get the insurance company to approve so

 5   that the insurance company would reimburse the pharmacy for the

 6   prescription?

 7   A   Yes.

 8   Q   Did you have a process or did you have any setup at Insys

 9   for people that could not get their insurance to approve

10   Subsys?

11   A   Yes.

12   Q   What was that process?

13   A   The Medicare out-of-pocket program.

14   Q   And is that what's sometimes known as vouchers?

15   A   Yes.

16   Q   So is that in essence where somebody else would pay for or

17   would reimburse the pharmacy for Subsys?

18   A   Yes.

19   Q   And were there company vouchers where if they couldn't get

20   anyone else to pay, the company would pay the pharmacy back?

21   A   Yes.

22   Q   So lets walk through these documents to help understand the

23   prior authorization process when you were there.  And again,

24   this is -- the time period you were there was 2013 on; correct?

25   A   Yes.

LACY FORTENBERRY - DIRECT BY MR. BODNAR

1  Q  So starting with Exhibit 32-2(1).  Here on June 21st --

2  first, who is this individual Kimberly Fordham?  Do you know?

3  A  Kimberly Fordham worked in the internal reimbursement

4  center which was where the patient information went in Arizona

5  to get the patient approved through the insurance company.

6  Q  So the internal reimbursement center, is that what's known

7  as the IRC?

8  A  Yes.

9  Q  So that's the division of Insys that helps get the

10  prescription approved?

11  A  Yes.

12  Q  So here she writes:  Good morning, Natalie.  And then she

13  tells you something about being faxed over.  Can you read that,

14  please?

15  A  I just faxed over five patients to you:  WP............,

16  RL............, MM..........., cancer patient, WM............,

17  and Randall Blackmon.

18  Q  Why would somebody from the IRC be faxing you material?

19  A  They weren't.  They were faxing it to the clinic.

20  Q  By "to the clinic" do you mean to PPSA?

21  A  Yes.

22  Q  Now, I see five patients listed here; P....., L.......,

23  M......., M....., and Blackmon.  Why does it say cancer patient

24  after the name M.......?

25  A  Because when a patient had cancer, they became top

```
 1   priority.
 2   Q   The fact that it doesn't say cancer above or next to the
 3   other names, does that mean that P....., L......, M..... and
 4   Blackmon did not have cancer or do you know?
 5   A   I don't know.
 6   Q   So do you have any idea if Randall Blackmon had cancer?
 7   A   I do not have any idea.
 8   Q   And in your position as a drug rep, were you even privy to
 9   the information of whether someone had a particular diagnosis?
10   A   Sometimes.
11   Q   Where did that information about the diagnoses come from,
12   though?
13   A   People that worked in the clinic.
14   Q   So you weren't the one that decided what diagnoses, for
15   instance, MM.......... had.  That information came from
16   elsewhere?
17   A   Yes.
18   Q   And by "elsewhere," that means someone at PPSA?
19   A   Yes.
20   Q   And within this email chain, you respond to Kim Fordham
21   with:  Hey girl -- can you read what you told her?
22   A   I got signatures.  I am just not able to get other info.  I
23   have a suggestion.  If you call Dr. Ruan's office and ask for
24   Allison, she is very good at getting patient info and helping
25   with other extra info.  Please let me know if there is anything
```

LACY FORTENBERRY - DIRECT BY MR. BODNAR

1  else I can do.  Nat.

2  Q   What do you mean by "signatures"?  What signatures are you

3  getting here?

4  A   Sometimes insurance companies would require signatures on

5  additional documents.

6  Q   Signatures of whom?

7  A   The physicians.

8  Q   And you say you don't have the patient info but you're

9  asking her to call someone at the clinic?

10  A   Yes.

11  Q   I'm going to show you what's been admitted as Government's

12  Exhibit 32-2(2).  Just looking at the top header, what is this

13  form that we're looking at here, Ms. Perhacs?

14  A   This is what we refer to as the opt-in form.

15  Q   Okay.  Let's walk through it.  Explain what an opt-in form

16  is to the jury.

17  A   The opt-in form is the form where the patient's information

18  goes.  Then this form is faxed to our company in Arizona.

19  Q   And I want to stop you there for a second.  Where is it

20  faxed from?  Where is this document faxed from?

21  A   The clinic.

22  Q   And the clinic being here in the Southern District of

23  Alabama in Mobile, Alabama?

24  A   The PPSA clinic.

25  Q   Okay.  In Mobile, Alabama?

1326

```
 1   A    Yes.

 2   Q    So this document is faxed to Arizona?

 3   A    Yes.

 4   Q    Okay.  What's -- what is all this information on here?

 5   What does it mean?

 6   A    It means -- it identifies the patient, some general

 7   demographics about the patient, date of birth, type of

 8   insurance, the dose of Subsys.

 9   Q    Is that what we see right here?  (Indicating.)

10   A    Yes.

11   Q    Okay.

12   A    The -- sorry.

13   Q    Go ahead.

14   A    The pharmacy information, and the general contact

15   information for the clinic.

16   Q    And for this particular one does this appear to be for an

17   individual named RI........?

18   A    Yes.

19   Q    And who does it say is the physician for RI........?

20   A    Dr. Couch.

21   Q    And it looks like he's trying to get Subsys 800 micrograms?

22   A    Yes.

23   Q    What does TID, QID mean?

24   A    That's the frequency with which they want the patient to

25   take the medicine.
```

1  Q   And specifically, what is TID?  Does that mean three to

2  four times a day?

3  A   Yes.

4  Q   TID means three times a day?

5  A   Yes.

6  Q   QID means four times a day?

7  A   Yes.

8  Q   According to this form what's the diagnosis for Mr. I..?

9  A   Bladder cancer.

10  Q   Now, I see your name on there too; correct?

11  A   Yes.

12  Q   Now, you weren't privy to Mr. I..'s file, were you?

13  A   No.

14  Q   Would you know if he does or does not actually have bladder

15  cancer?

16  A   No.

17  Q   But is that what's being transmitted to the IRC in Phoenix?

18  A   Yes.

19  Q   Looking at the bottom of this page, do you see a signature

20  there?

21  A   Yes.

22  Q   Based on your time working at PPSA, do you recognize whose

23  signature this appears to be?

24  A   Yes.

25  Q   And whose does that appear to be?

1    A   Dr. Couch.

2    Q   And what's the date for that?

3    A   8/7/13.

4    Q   So would you be the one that faxes this document from PPSA?

5    A   Sometimes.

6    Q   Who else might do that?

7    A   Other staff members.

8    Q   Would you receive notice from the IRC when they received

9    documents such as this?

10   A   Yes.

11   Q   I want to show you now what's been admitted as Government's

12   Exhibit 32-2(3).  And what is the date on this email?

13   A   August 7th, 2013.

14   Q   And is that the same date as signed here in the document we

15   just looked at?

16   A   Yes.

17   Q   And what information are you learning?  What's being told

18   to you on that date?

19   A   That the paperwork for that patient has been received by

20   the internal reimbursement center in Arizona.

21   Q   And are there other people cc'd on this email?

22   A   Yes.

23   Q   Who is Joe Rowan?

24   A   He was my manager.

25   Q   Who is Mike Gurrieri?

1    A    He was the manager of the internal reimbursement center.

2    Q    And who is Liz Gurrieri?

3    A    She -- she worked at the internal reimbursement center.

4    Q    So is this basically telling you the IRC has received this

5    document for RI........ saying bladder cancer?

6    A    Yes.

7    Q    And when the opt-in form was faxed from Mobile, Alabama to

8    Arizona, would you receive notice each time --

9    A    Yes.

10   Q    -- that the document had been received?

11   A    Yes.

12   Q    And just working through the examples very quickly;

13   32-2(4), is this letting you -- putting you on notice that an

14   opt-in form was received for Joyce Barber?

15   A    Yes.

16   Q    Again, do you have any independent knowledge whether Joyce

17   Barber does or does not have cancer?

18   A    No.

19   Q    And 32-2(5), is this an opt-in form for Dr. Couch's

20   patient, BH............?

21   A    Yes.

22   Q    32-2(6), is this a similar document for AP.........?

23   A    Yes.

24   Q    32-2(7), is this a similar one for Matthew Sansing?

25   A    Yes.

1   Q   And in all the examples that we've showed you, those all

2   have been Dr. Couch's patients; correct?

3   A   Yes.

4   Q   But did they work the same way with Dr. Ruan's patients?

5   A   Yes.

6   Q   Once an opt-in form was received in Arizona, you said that

7   they contacted the insurance company, the IRC?

8   A   Yes.

9   Q   Were you involved in that at all?

10  A   No.

11  Q   Do you know what if anything was said to the insurance

12  company about a patient?

13  A   No.

14  Q   Would you receive notice if somebody had been approved for

15  a prior authorization?

16  A   Yes.

17  Q   I want to show you what's been admitted as Government's

18  Exhibit 32-2(8).  Is this the approval for the individual we

19  had just talked about, RI........?

20  A   Yes.

21  Q   And just explain what it is we're seeing here?

22  A   What you're seeing there is the patient's insurance, doctor

23  name, NPI number, my name, the strength of the medication, the

24  pharmacy it goes to, date of approval, LOA is length of

25  approval, and the date the opt-in was received.  And the auth

1331

1   PA, I don't know what that is.

2   Q   For length of approval, does it appear that RI........ was

3   approved for Subsys 800, 120 units for a year?

4   A   Yes.

5   Q   And would emails similar to this come in for every patient

6   that was successfully opted in?

7   A   Yes.

8   Q   So in 32-2(9) is this a similar form for Joyce Barber?

9   A   Yes.

10  Q   And 32-2(10), similar for BH............?

11  A   Yes.

12  Q   And 11, approval for a Matthew Sansing?

13  A   Yes.

14  Q   Now, here on 32-2(12) it looks a little bit different.  It

15  says:  Conditional approval for Matthew Sansing.  Can you

16  please explain to the jury what's happening here on a

17  conditional approval?

18  A   The conditional approval typically meant only approved for

19  one fill of the medicine or one month of treatment.  It would

20  vary.

21  Q   Do you know why that conditional approval would occur?

22  A   Typically they were able to get -- the internal

23  reimbursement center was able to get a conditional approval

24  while the patient was waiting to be approved to enter into our

25  program called the Medicare out-of-pocket program to help pay

1   for the cost.

2   Q    And is that what it says here, Matthew Sansing's approval

3   for Subsys 1200, 240 units through Insys' MOOP, Medicare

4   out-of-pocket program?

5   A    Yes.

6   Q    And if he's approved for that Medicare out-of-pocket

7   program, what does that mean?

8   A    That means he won't have to pay for the medicine.

9   Q    But the pharmacy will still be reimbursed for the medicine,

10   won't they?

11   A    Yes.

12   Q    It's just a matter of who reimburses the pharmacy?

13   A    Yes.

14   Q    And based on your experience of working at PPSA, do you

15   know which pharmacy a majority of Subsys patients filled their

16   Subsys at?

17   A    Yes.

18   Q    Which pharmacy was that?

19   A    C&R Pharmacy.

20   Q    Do you know who owns C&R Pharmacy?

21   A    Yes.

22   Q    Who owned C&R Pharmacy?

23   A    Couch and Ruan.

24   Q    I have one last approval example.  32-2(13), is this a very

25   similar document for Tena Goellner?

LACY FORTENBERRY - DIRECT BY MR. BODNAR

1    A    Yes.

2    Q    And again, these have been Dr. Couch patients we're looking

3    at.  But are the forms the same for when a Dr. Ruan patient was

4    approved?

5    A    Yes.

6    Q    Ms. Perhacs, were there instances where people were not

7    approved for Subsys?

8    A    Yes.

9    Q    And if someone was not approved for Subsys, would you also

10   get a notice for it?

11   A    Yes.

12   Q    I'm going to show you what's been admitted as Government's

13   Exhibit 32-2(14).  And starting at the bottom I see an email

14   from you to the Insys IRC.  Is that the internal reimbursement

15   center you talked about?

16   A    Yes.

17   Q    And what are you telling the IRC right here?  (Indicating.)

18   A    That Dr. Ruan's patient Kathleen Burns still needed a prior

19   authorization.

20   Q    And you don't have any independent knowledge if Kathleen

21   Burns did or didn't have cancer, did you?

22   A    No.

23   Q    And for any of these patients, you wouldn't necessarily

24   know, would you?

25   A    No.

LACY FORTENBERRY - DIRECT BY MR. BODNAR

1  Q   Did you ever meet with patients?

2  A   No.

3  Q   Is that your job?

4  A   No.

5  Q   Whose job was it to meet with the patients?

6  A   The doctors, MAs, nurse practitioners, nurses, et cetera.

7  Q   Does it go on in this email that you asked for help from an

8  individual named Tracy Giles?

9  A   Yes.

10 Q   Who is Tracy Giles?

11 A   Tracy Giles worked at the internal reimbursement center in

12 Arizona.

13 Q   Why are you specifically asking Tracy for help?

14 A   I liked Tracy.  She got things done quickly.

15 Q   Was she somebody if a PA was floundering at the IRC, you

16 could reach out to her to get it pushed along?

17 A   Yes.

18 Q   And did she say that she would help you out?

19 A   Yes.

20 Q   Now, you weren't on any of the phone calls between Tracy

21 and the insurance companies, were you?

22 A   No.

23 Q   So you don't have any information of what was told about a

24 patient from the IRC to the insurance company?

25 A   No.

1   Q    You were just told if they got approved?

2   A    Yes.

3   Q    And when you got the approval emails, would it say they

4   were approved because they were a cancer patient or you just

5   wouldn't know?

6   A    I wouldn't know.  All it would say is approved.

7   Q    I'm going to show you now what's been marked as

8   Government's, or admitted as Government's Exhibit 32-2(15).  Is

9   this another email involving the patient Kathleen Burns?

10  A    Yes.

11  Q    Could you read this email to the jury?

12  A    Sure.  Dr. Ruan's patient, Kathleen Burns, date of birth

13  3/15/61 was denied through HealthSpring for 800 micrograms, 120

14  doses.  Will you please have them fax us an LMN, and any other

15  records that would help with appealing this, including a

16  medication list of tried and failed medications, any current

17  medications that the patient is on, and any records pertaining

18  to why the patient has been prescribed Subsys.  We have a copy

19  of the denial letter on file.

20  Q    And I'm going to ask you to go through a couple of these

21  terms.  First, what is an LMN?  What does that stand for?

22  A    Letter of medical necessity.

23  Q    And what is a letter of medical necessity?

24  A    Additional information as to why the patient should be

25  approved.

LACY FORTENBERRY - DIRECT BY MR. BODNAR

1336

```
1   Q   Who puts together that additional information?

2   A   The clinic.

3   Q   And who signs the letter of medical necessity?

4   A   The physicians.

5   Q   And in this case since it's a Dr. Ruan patient, if an LMN

6   for this patient was done, who would it have been signed by?

7   A   Dr. Ruan.

8   Q   And now in this email you're not given any reason of why

9   she was denied Subsys, are you?

10  A   No.

11  Q   You have no way of knowing if she was or wasn't a cancer

12  patient, do you?

13  A   I have no way of knowing.

14  Q   I'm going to show you now what has been admitted as

15  Government's Exhibit 32-2(16).  Is this another copy or is this

16  another denial email from the IRC?

17  A   Yes.

18  Q   And could you read this one, please?

19  A   Hi Natalie, patient Tami Blanks Witherspoon, date of birth

20  8/9/74, Dr. Patrick Couch, was denied on second level per

21  insurance.  We need the denial letter that was sent to the

22  doctor's office so we may review it and see if any other steps

23  are available to the patient.

24  Q   And do you know who this patient, Patient Tami Blanks, is?

25  A   No.
```

1337

1  Q   Have you ever met with Tami Blanks?

2  A   No.

3  Q   Do you know if she does or does not have cancer?

4  A   No.

5  Q   What does it mean that she was denied on the second level

6  per insurance.  What is that?

7  A   The second time they tried to get it approved, the

8  insurance company said no.

9  Q   But you have no way of knowing why it was denied?

10  A   No.

11        MR. BODNAR:  Your Honor, may we approach at side bar

12  for one moment?

13        THE COURT:  Yes.

14    (At the side bar, jury not present.)

15        MR. BODNAR:  Your Honor, I just finished up a major

16  section.  I'm about to start another major section on these

17  speaker fees.  With five minutes left, I was wondering do you

18  want me to start on the speaker fee portion now or wait till in

19  the morning to start?

20        THE COURT:  We can start in the morning.

21        MR. BODNAR:  Thank you, Your Honor.

22    (In open court, defendants and jury present.)

23        THE COURT:  All right.  Ladies and gentlemen, we are

24  going to break for the day.  We will start again at 9 o'clock

25  tomorrow morning.  Be downstairs in the jury assembly room

1338

1  ready to be called back up at 9 o'clock.  Leave your pads on

2  your chairs.  Remember no discussion about the case.

3       Hope you have a good evening and we'll see you

4  tomorrow.

5     (In open court, defendants present, jury not present.)

6       THE COURT:  Is there anything further from counsel

7  this evening?

8       MR. BODNAR:  Not from the United States, Your Honor.

9       MR. DOSS:  No, ma'am.

10       THE COURT:  We're in recess.

11     (Court adjourned at approximately 4:57 p.m.)

12

13  `

14

15

16

17

18

19

20

21

22

23

24

25