1339



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ALABAMA

UNITED STATES OF AMERICA

                         CASE NO. CR15-00088

v.

                         COURTROOM 2B

JOHN PATRICK COUCH, M.D.,
and XIULU RUAN, M.D.,

                         MOBILE, ALABAMA

        Defendants.

                         WEDNESDAY, JANUARY 18, 2017

* * * * * * * * * * * * * * *

REDACTED


                     DAY 7 OF TRIAL
        BEFORE THE HONORABLE CALLIE V. S. GRANADE,
          UNITED STATES DISTRICT JUDGE, AND JURY




APPEARANCES:

FOR THE GOVERNMENT:
    DEBORAH A. GRIFFIN
    CHRISTOPHER BODNAR
    United States Attorney's Office
    63 S. Royal Street, Suite 600
    Mobile, AL  36602
    (251) 441-5845

FOR THE DEFENDANT COUCH:
    ARTHUR T. POWELL, III
    P.O. Box 40456
    Mobile, AL 36640-0456
    (251) 433-8310

    JACKSON R. SHARMAN, III
    ROBERT JACKSON SEWELL
    JEFFREY PAUL DOSS
    BENJAMIN SANDERS WILLSON
    Lightfoot, Franklin & White
    400 North 20th Street
    Birmingham, AL  35203
    (205) 581-0700

1  (Continued)

2       BRANDON KEITH ESSIG
        800 Shades Creek Parkway, Suite 600D
3       Birmingham, AL  35209
        (251) 879-1981

4
   FOR THE DEFENDANT RUAN:
5       DENNIS J. KNIZLEY
        7 N. Lawrence
6       Mobile, AL 36602
        (251) 432-3799

7
        JASON BRADLEY DARLEY
8       Darley & McGough, LLC
        1751 Dauphin Street
9       Mobile, AL 36604
        (251) 441-7772

10
        GORDON G. ARMSTRONG, III
11      P.O. Box 1464
        Mobile, AL  36633
12      (251) 434-6428

13      STEVEN D. MARTINIE
        4955 North Lake Drive
14      Whitefish Bay, WI  53217
        (414) 332-9683

15
   THE CLERK:  MARY ANN BOYLES
16 THE LAW CLERK:  LYNN DEKLE
   U.S. ATTORNEY IT:  BRIAN COCHRAN
17 DEFENSE IT:  SAM MCALLISTER
   COURT SECURITY OFFICER:  WILLIAM NOEL
18 COURT REPORTER:  ROY ISBELL, CCR, RDR, CRR

19          Proceedings recorded by OFFICIAL COURT REPORTER
           Qualified pursuant to 28 U.S.C. 753(a) & Guide to
20    Judiciary Policies and Procedures Vol. VI, Chapter III, D.2.
            Transcript produced by computerized stenotype.

21

22

23

24

25

1    EXAMINATION INDEX

2

NATALIE PERHACS
3        DIRECT BY MR. BODNAR                    1346
         CROSS BY MR. DOSS                       1382
4        CROSS BY MR. KNIZLEY                    1448
         REDIRECT BY MR. BODNAR                  1510
5
JOYCE BARBER
6        DIRECT BY MS. GRIFFIN                   1528
         CROSS BY MR. SHARMAN                    1555
7        REDIRECT BY MS. GRIFFIN                 1572

8    FBI SA JEFFREY A. YOUNG
         DIRECT BY MR. BODNAR                    1575
9        CROSS BY MR. ESSIG                      1587

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

EXHIBIT INDEX

2

MAR ADM

GOVERNMENT'S

3    6-1        Joyce Barber patient file from Greenway          1529
            files from PPSA

4

5    12-1       Fentanyl patient files reviewed                 1579
            (a,b,c,d,e,f,g,h,i,j) - binders Ruan
            non-cancer chart - top off-label recipients
6           of Subsys and Abstral - Ruan and Couch -
            amounts billed by C&R Pharmacy and total
7           grams administered to 28 patients

8    12-2       Ruan noncancer chart - top off-label            1583
            recipients of Subsys and Abstral - Ruan and
9           Couch - amounts billed by C&R Pharmacy and
            total grams administered to 28 patients

10

    14-1       05/28/13 Subsys Rx (uterine cancer)             1555

11

    32-3(1) E-mail message Perhacs to Burlakoff, Rowan,       1347
12          Simmon & Hill, Ruan and Couch program
            details - 1/31/14

13

    32-3(2) List of ISPs scheduled by date for Dr. Couch      1347

14

    32-3(3) Email Perhacs to Hill 4/6/14 - urgent drop &      1347
15          do - ISP

16   32-4(1) Email Rowan to Perhacs 10/9/13 - Abstral and     1361
            Lazanda weekly tracking

17

    32-4(2) Email Perhacs to Hill 12/5/13 - success          1361
18          story - rejected Abstral patients

19   32-4(3) Email Hill to Perhacs 12/6/13 - outstanding      1361
            charts

20

    32-4(4) Email Perhacs to Rowan 12/9/13 - time is of      1361
21          the absolute essence - Abstral sampled
            patients

22

    32-4(5) Email Perhacs to Yu 2/4/14 - Abstral numbers     1361

23

    32-4(6) Email Perhacs to Hill 2/10/14 Abstral - 435      1361
24          Abstral Rxs

25

| | | |
|---|---|---|
| 32-4(7) | Email Hill to Perhacs 3/6/14 Abstral and Lazanda weekly tracking | 1361 |
| 32-4(8) | Email Hill to Perhacs 3/12/14 - Abstral relies on 5 drs for 53% business | 1361 |
| 32-4(9) | Email Hill to Perhacs 4/814 - reduced ISPs - Couch and Ruan reduced allotments | 1361 |
| 37-1 | Patient prescriber agreement form | 1536 |

**DEFENDANT COUCH'S**

| | | |
|---|---|---|
| 148 | Insys program sign-in sheet 9/11/13 Wintzell's (Perhacs) | 1434 |
| 149 | Insys program sign-in sheet 9/18/13 Fuego | 1439 |
| 150 | Insys program sign-in sheet 10/10/13 Fuego | 1440 |
| 151 | Insys program sign-in sheet 10/16/13 Wintzell's NOT OFFERED (see page 1441) | -- |
| 152 | Insys program sign-in sheet 12/12/13 Fuego | 1440 |
| 153 | Insys program sign-in sheet 12/18/13 Wintzell's | 1440 |
| 154 | Insys program sign-in sheet 1/9/14 Fuego | 1440 |
| 155 | Insys program sign-in sheet 4/7/14 Fuego | 1440 |
| 156 | Insys program sign-in sheet 2/6/14 Fuego | 1440 |
| 157 | Insys program sign-in sheet 3/13/14 Fuego | 1440 |
| 158 | Insys program sign-in sheet 4/14/14 Fuego | 1440 |
| 159 | Insys program sign-in sheet 4/21/14 Fuego | 1440 |
| 160 | Insys program sign-in sheet 10/16/13 Wintzell's | 1448 |
| 161 | Email 5/14/13 Yu to Babich, etc., Q1 all new patients return rate by HCP | 1387 |
| 163 | Email 8/4/13 Perhacs to Hollandsworth - Ruan and Couch | 1410 |

| 164 | Email 8/19/13 Perhacs to Rowan - September programs | 1411 |
| 171 | Text messages between Perhacs and Couch, 4/7 - invite other nurses and doctors to ISP | 1402 |
| 173 | Email 10/3/13 Perhacs to Burlakoff, Dr. Couch and Dr. Ruan | 1421 |
| 174 | Email 9/3/13 Hill to Perhacs - make it happen for yourself | 1414 |
| 175 | Email 6/27/13 Rowan to Burlakoff, important/action required - fwd call from rep | 1400 |
| 177 | Email 11/5/13 Perhacs to Hill, Dr. Couch - program move ISP schedule | 1423 |
| 179 | Email 2/7/14 Perhacs to Hill - due by today | 1429 |

DEFENDANT RUAN'S

| 77 | Email 4/10/13 Yu to Perhacs - daily repo report for low strength usage - Subsys | 1498 |
| 81 | Email 5/8/13 Perhacs to Benavidez - Joe Read LMN | 1500 |
| 87 | Email Ruan to Perhacs 11/9/12 Job Nucynta | 1463 |
| 88 | Email Ruan to Perhacs - Monday talk | 1479 |
| 89 | Email Ruan to Perhacs 2/27/13 - lessons | 1474 |
| 90 | Email Ruan to Perhacs 11/29/12 - quick question | 1468 |
| 91 | Email Perhacs to Ruan 2/21/13 - Couch | 1473 |
| 93 | Insys program sign-in sheet 9/20/13 Osaka | 1480 |
| 94 | Insys program sign-in sheet 9/24/13 Osaka | 1481 |
| 95 | Insys program sign-in sheet 10/2/13 Osaka | 1481 |
| 96 | Insys program sign-in sheet 10/11/13 Osaka | 1481 |

| 97 | Insys program sign-in sheet 10/18/13 Osaka | 1481 |
| 98 | Insys program sign-in sheet 10/25/13 Osaka | 1481 |
| 101 | Insys speaker attendee program sign-in form 3/4/14 Osaka | 1481 |
| 121 | Perhacs' resume 2013 | 1466 |

NATALIE PERHACS - DIRECT BY MR. BODNAR

```
 1        (Morning session, 9 a.m., in open court, defendants and
 2   jury present.)
 3            THE COURT:  Good morning, ladies and gentlemen.
 4            All right.  Counsel, you may continue.
 5            MR. BODNAR:  Yes, Your Honor.
 6                        NATALIE PERHACS,
 7        previously sworn, testified further as follows:
 8                   DIRECT EXAMINATION CONTINUED
 9   BY MR. BODNAR:
10   Q   Welcome back, Ms. Perhacs.  I believe at the end of the day
11   yesterday we were talking about how the ISP or the -- or how
12   the opt-in program worked for prior authorizations is that what
13   you recall?
14   A   Yes.
15   Q   And we finished talking about how there was an IRC, the
16   Insys reimbursement center, that helped with prior
17   authorizations for the drug Subsys?
18   A   Yes.
19            MR. BODNAR:  Your Honor, may I now approach with what
20   has been marked as Government's Exhibit 32-3, subparts (1),
21   (2), and (3)?
22            THE COURT:  All right.
23   BY MR. BODNAR:
24   Q   Ms. Perhacs, I'm now showing you what's been marked as
25   Government's Exhibit 32-3 with three subparts.  Are you able to
```

1    identify what these documents are?

2    A   Yes.

3    Q   And do they relate to something called the speakers

4    programs?

5    A   Yes.

6            MR. BODNAR:  Your Honor, the United States moves to

7    admit Government's Exhibit 32-3.

8            THE COURT:  Any objection?

9            MR. DOSS:  No objection.

10           THE COURT:  All right.  Mark them in.

11       (Government's Exhibits 32-3(1), (2) and (3) were entered

12   into evidence.)

13   BY MR. BODNAR:

14   Q   Ms. Perhacs, before we look at what these documents say,

15   can you explain to the jury the basics?  What was the Insys

16   speaker program, or the ISP?

17   A   It was where a group of people gather at a restaurant and

18   the doctor comes and gives an educational presentation to an

19   audience.

20   Q   And let's -- give a little more detail to that.

21   Educational presentation, what is given, what -- what was said?

22   Is there a slide deck or exhibits that are produced?

23   A   Yes.

24   Q   And who made those slides?

25   A   My company -- Insys.

NATALIE BERKISS - DIRECT BY MR. BODNAR
1348

1    Q   Insys.  And was either Dr. Ruan or Dr. Couch a speaker for

2    Insys?

3    A   Yes.

4    Q   Were they both?

5    A   Yes, both were speakers.

6    Q   And did that -- did the Insys speaker program -- was that

7    established before you came on at Insys?

8    A   Yes.

9    Q   So you weren't there at the beginning, were you?

10   A   I was not there at the beginning.

11   Q   What was the stated goal?  What was the goal -- stated goal

12   for Insys of having these Insys speaker programs?

13   A   To get the doctors to write more prescriptions.

14   Q   Was it -- was that the stated goal?  Is that what they

15   said?

16   A   No.

17   Q   Or is that what happened?

18   A   That's what happened.  And it was also education.

19   Q   Okay.  So was this stated goal to educate other

20   prescribers?

21   A   Yes.

22   Q   So if the goal -- stated goal for the company was to

23   educate other prescribers, would that mean that you would

24   expect other prescribers to be at these speaker programs?

25   A   Yes.

NATALIE BERTAGS - DIRECT BY MR. BODNAR

1  Q   And were there times where Dr. Ruan or Dr. Couch did

2  speaking programs and there were other prescribers that showed

3  up?

4  A   Yes.

5  Q   Were there other times where there were not other

6  prescribers that showed up?

7  A   Yes.

8  Q   And the times -- explain basically what generally happened

9  at these speaker programs for who attended them?

10  A   In the beginning, it would be office staff that worked at

11  PPSA and maybe an outside doctor, maybe his nurse or an outside

12  pharmacist.

13  Q   And so you had an outside pharmacist.  Presumably they

14  might be able to fill a Subsys prescription; correct?

15  A   Yes.

16  Q   An outside doctor presumably might be able to prescribe

17  Subsys?

18  A   Yes.

19  Q   So in those instances would the Insys speaker program be of

20  benefit to the company in terms of educating others?

21  A   Yes.

22  Q   But you said there were times when it was not anybody else

23  other than people that worked at PPSA.  There were no other

24  prescribers; is that correct?

25  A   Yes.

1    Q    In those instances who is the doctor actually educating?

2    A    The office staff.

3    Q    And by "office staff" do you mean the people at PPSA?

4    A    Yes.

5    Q    To your knowledge, other than Dr. Couch and Dr. Ruan and

6    Dr. Chen, was there anybody else at PPSA that could write

7    prescriptions for Subsys?

8    A    I -- I thought that there were.

9    Q    What do you mean that you thought that there were?

10   A    The nurse practitioners.

11   Q    In particular was there one nurse practitioner that you

12   knew to be writing prescriptions for Subsys?

13   A    There were more than one.

14   Q    That was actually signing the prescriptions?

15   A    No.

16   Q    Did you know of any that were actually signing the

17   prescriptions?

18   A    Yes.

19   Q    Who was that?

20   A    Justin Palmer.

21   Q    And do you know who Justin Palmer worked for, which doctor?

22   A    Yes.

23   Q    Which doctor was that?

24   A    Dr. Couch.

25   Q    And you said you thought at the time that the nurse

1    practitioners could actually write prescriptions for Subsys?

2    A   I knew they could initiate the prescription, but it had to

3    be approved by the doctor.  But in the realm of what was

4    appropriate for my company, that was okay.

5    Q   And at the time that these staff were coming to the

6    meetings was PPSA already prescribing Subsys?

7    A   Yes.

8    Q   Were they prescribing a lot of Subsys?

9    A   Yes.

10   Q   Can you give the jury an understanding of how big of

11   prescribers, if you knew, were Dr. Ruan and Dr. Couch amongst

12   Insys -- or doctors prescribing Subsys nationwide?

13   A   They were in our top 10 list of biggest prescribers.

14   Q   Does that mean entire United States?

15   A   I don't know.

16   Q   Was there a term that was used to describe Dr. Ruan and

17   Dr. Couch within Insys?

18   A   Yes.

19   Q   And what was that term?

20   A   Whales.

21   Q   And what did whales refer to?

22   A   Your top prescribing doctors.

23   Q   And you mentioned too, when we talked about what was the

24   stated purpose and what actually happened, what -- what was the

25   actual reason for having these speaker programs?  What did it

1352

```
 1  turn out to be at the beginning?

 2  A   To influence.

 3  Q   What do you mean to influence?

 4  A   To influence the doctors to keep prescribing a lot of

 5  Subsys.

 6  Q   And do you know, were the doctors paid at these speaker

 7  programs?

 8  A   I was told by the company that they were paid.

 9  Q   But it wasn't your job to actually pay them, was it?

10  A   No.

11  Q   And you weren't involved in the payments of it?

12  A   No.

13  Q   So you don't have any knowledge of how much they were

14  actually paid?

15  A   No.

16  Q   You said to influence the prescribing of Subsys.  So was

17  the goal then to get the doctors to continue to write more

18  Subsys prescriptions?

19  A   Yes.

20  Q   And was your salary tied in, in large part, to the doctors

21  prescribing more Subsys?

22  A   Yes.

23  Q   I'm going to now show you what's previously been admitted

24  as Government's Exhibit 32-3(1).  This is an email that you

25  previously identified.
```

1          Starting here at the bottom, what is this -- help the
2    jury understand.  What's this first part, this January 31st
3    email between you and an individual named Karen Hill?  And
4    first let's -- who is Karen Hill?
5    A    She took Joe's place when Joe was promoted as my manager.
6    Q    And by Joe, do you mean Joe Rowan?
7    A    Yes.
8    Q    So first your manager was Joe Rowan and then it became
9    Karen Hill?
10   A    Yes.
11   Q    Did Karen Hill run the southeast region?
12   A    Yes.
13   Q    And later, ultimately did you become that manager?
14   A    Yes.
15   Q    So you took over Karen Hill's job later?
16   A    Yes.
17   Q    So here on January 31st, 2014, what are you telling
18   Ms. Hill?
19   A    I'm telling Ms. Hill that these are the restaurants that
20   will work well for Dr. Couch and Dr. Ruan's speaking programs.
21   Q    And you say here that Mondays are great for Dr. Couch,
22   Dr. Ruan likes Fridays -- loves Fridays?
23   A    Yes.
24   Q    And this is where they're -- for Dr. Couch would be at
25   Fuego and Dr. Ruan at Osaka?

```
 1   A    Yes.
 2   Q    Now, in addition to being paid, you don't know how much,
 3   you said, but you knew the doctors were paid for the speaking
 4   programs; correct?
 5   A    Yes.
 6   Q    Was the meal also paid for by Insys?
 7   A    Yes.
 8   Q    Approximately how often were these speaker programs held
 9   for Dr. Ruan and Dr. Couch?
10   A    Approximately one time a week per doctor.
11   Q    So amongst the people at PPSA, Insys was paying roughly
12   twice a week for them to supposedly speak to other prescribers?
13   A    Yes.
14   Q    I'm going to show you now what's been admitted as
15   Government's Exhibit 32-3(2).  I'm going to zoom out.  Is this
16   essentially a listing by date of when the speaking program
17   should be?
18   A    Yes.
19   Q    So looks like twice in March, then a couple of times
20   eight -- four times April for Dr. Couch, and May -- continues
21   in May, June, and if you go through the whole year like this,
22   first for Dr. Couch, all at Fuego?
23   A    Does it go through the entire year?  I think so.
24   Q    I'll show you.
25   A    Okay.  I don't remember.
```

1355

NATALIE PERHACS - DIRECT BY MR. BODNAR

1    Q   August, September, October, and these are all different

2    speaking programs, dates that they were going to get paid to

3    speak for Insys; correct?

4    A   Yes.

5    Q   November -- we're still just talking about Dr. Couch here;

6    right?

7    A   Yes.

8    Q   December.  Now do we start here with Dr. Ruan?

9    A   Yes.

10   Q   And is this the same thing, are these the lists of dates

11   he's going to be paid to speak at Osaka?

12   A   Yes.

13   Q   More in April, May, June -- June, July, August.  And are we

14   seeing, just for the record, multiple dates per month for the

15   most part?

16   A   Yes.

17   Q   September, multiple dates in October, multiple dates in

18   November and December.  And is this roughly how you recall it,

19   roughly once a week for each doctor?

20   A   Yes.

21   Q   Ms. Perhacs, you mentioned in the beginning that you would

22   have other prescribers that would show up to these speaking

23   programs; correct?

24   A   Yes.

25   Q   Were there times when it was the same prescriber, time and

1356

1    time again, that would show up?

2    A    Yes.

3    Q    So what's the benefit to Insys again to pay these doctors

4    to speak to the same people over and over and over?

5    A    To influence how many prescriptions they write.

6    Q    And by "they" do you mean Dr. Ruan and Dr. Couch?

7    A    Yes.

8    Q    And by "influence" do you mean to give them a financial

9    incentive to write prescriptions?

10   A    Yes.

11   Q    Now, when it started to become not worthwhile for Insys

12   anymore because they're not actually speaking to prescribers,

13   why didn't they just not have these speaker programs?

14          MR. KNIZLEY:  Objection, Judge.  It calls for

15   undisclosed mental operation of another and it's hearsay

16   response.

17          THE COURT:  Well, I don't know.  Can you establish a

18   basis for her knowledge?

19          MR. BODNAR:  Yes.

20   Q    Towards the end when you said there were not other

21   prescribers typically coming to the speaking programs; correct?

22   A    Yes.

23   Q    Were these speaking programs ever canceled?

24   A    Rarely.

25   Q    Were there -- were you ever told or was your job ever tied

NATALIE BERHALSS - DIRECT BY MR. BODNAR

1357

1    to making sure that these speaker programs occurred?

2    A    Yes.

3    Q    What would happen to you if these speaking programs didn't

4    go off and these doctors didn't get paid every week?

5    A    Two things.

6    Q    And what are those two things?

7    A    First, I would be fired.  Second, if a program had to be

8    canceled, no way to avoid it, I would face financial penalty.

9    Q    What do you mean you would face a financial penalty?

10   A    They would take money out of what I was paid in my

11   commission.

12   Q    And by "they" do you mean Insys?

13   A    Yes.

14   Q    So your job as a drug rep was to sell the product or to try

15   to promote the product; correct?

16   A    Yes.

17   Q    But sounds like it got tied in very heavily with making

18   sure that these doctors also got paid every week?

19          MR. KNIZLEY:  Objection.  Leading.

20          THE COURT:  Yes, sustained.

21   BY MR. BODNAR:

22   Q    Was your job tied in with getting these doctors paid every

23   week?

24   A    Yes.

25   Q    I'm going to show you now what's been marked and admitted

NATALIE BRHLASS - DIRECT BY MR. BODNAR

1358

```
 1   as Government's Exhibit 32-3(3).  And at first, is this an
 2   email from Karen Hill to you asking you as -- or of the team,
 3   southeast team, to do something?
 4   A   Yes.
 5   Q   What does she mean here "all ISPs"?  Is that the Insys
 6   speaker programs?
 7   A   Yes.
 8           MR. KNIZLEY:  Excuse me, Judge.  I object to what the
 9   person means as being an undisclosed mental operation of
10   another.
11   BY MR. BODNAR:
12   Q   Do you know what ISP stands for?
13   A   Yes.
14   Q   And what does that stand for?
15   A   Insys speaker program.
16   Q   After receiving this email, what were you supposed to do?
17   A   After receiving this email, I was supposed to gather some
18   dates that would work for the doctors for speaker programs.
19   Q   And what does Ms. Hill remind you, starting right here with
20   "remember"?  (Indicating.)
21   A   Remember ISPs, which stands for Insys speaker programs,
22   equate to sales.  There's a direct correlation between the
23   territories ranked at the top versus the number of ISPs
24   conducted within them.  Statistics don't lie.  Do them.
25   Q   And by "do them," is that referring to the Insys speaker
```

1    program?

2           MR. KNIZLEY:  Objection.  Leading.

3           THE COURT:  Sustained.

4    BY MR. BODNAR:

5    Q   Do you know if that's referring to the Insys speaker

6    program?

7    A   Yes.

8    Q   And was it in fact?

9    A   Yes.

10   Q   And then do you respond to Karen Hill and Joe Rowan?

11   A   Yes.

12   Q   What do you say?

13   A   To my knowledge, all my ISPs have been submitted.  I will

14   cancel two for Dr. Couch as directed.  Please let me know if

15   there's anything else I need to do.

16   Q   And this email was sent on April 7th, 2014.  Do you see

17   that?

18   A   Yes.

19   Q   We're going to get into that time period in a moment, but

20   do you know around that time period why it would be that you --

21   do you recall why you were directed to cancel programs for

22   Dr. Couch?

23   A   I don't remember.

24   Q   Ms. Perhacs, do you know of a competitor drug to Insys

25   called Abstral?

1   A   Yes.

2   Q   Are you familiar with that product?

3   A   Somewhat.

4   Q   Can you explain to the jury what Abstral is in comparison

5   to Subsys?

6   A   Yes.

7   Q   To the best of your knowledge, could you explain that to

8   them?

9   A   Yes.

10   Q   And what is that comparison?

11   A   Abstral is a tablet that contains fentanyl that essentially

12   does the same thing as the drug I sell, and it's a competing

13   product.

14   Q   During the time period that you were the drug rep for

15   Dr. Ruan and Dr. Couch, did Dr. Ruan and Dr. Couch begin

16   prescribing large amounts Of Abstral?

17   A   Yes.

18        MR. BODNAR:  Your Honor, may I approach with what has

19   been marked as Government's Exhibit 32-4, subparts (1) through

20   (9)?

21        THE COURT:  Yes.

22   BY MR. BODNAR:

23   Q   Ms. Perhacs, are you able to identify what it is I've just

24   handed you?

25   A   Yes.

1  Q   And is this a series of emails involving you?

2  A   Yes.

3  Q   Related to Abstral?

4  A   Yes.

5          MR. BODNAR:  United States moves to admit Government's

6  Exhibit 32-4, Your Honor.

7          THE COURT:  Any objection?

8          MR. KNIZLEY:  No objection.

9          THE COURT:  All right.  Mark it in.

10     (Government's Exhibits 32-4(1) through (9) was entered into

11  evidence.)

12  BY MR. BODNAR:

13  Q   Ms. Perhacs, in late 2013 approximately how often were

14  you -- how often were you in PPSA?

15  A   Three days a week.

16  Q   Approximately how much time did you spend there?

17  A   It would vary.  On average I would say an hour to 45

18  minutes each time I was at the clinic; sometimes more.

19  Q   Do you know or did you ever meet a drug rep for the company

20  Galena Biopharma?

21  A   Many times.

22  Q   And was he also in the clinic on occasion?

23  A   Yes.

24  Q   And what product for Galena Biopharma was this individual

25  promoting?

1  A   Abstral.

2  Q   Is that the drug that you said was your competitor?

3  A   Yes.

4  Q   I'm going to show you now what has been admitted as

5  Government's Exhibit 32-4(1).  And starting here at the bottom

6  do you see an email that says:  Time sensitive, Abstral and

7  Lazanda weekly tracking?

8  A   Yes.

9  Q   Was the sale of Abstral and Lazanda or was the prescribing

10  of Abstral and Lazanda something of importance to your company?

11  A   Yes.

12  Q   And it was something that was tracked by Insys?

13  A   Yes.

14  Q   And we just mentioned that Abstral was a competitor.  Was

15  Lazanda also a competitor drug?

16  A   Yes.

17  Q   Similar TIRF fentanyl?

18  A   Yes.

19  Q   Do you know what kind of delivery system it had?

20  A   I have forgotten.

21  Q   Okay.  So after you received -- or forwarded this message,

22  what is your response here?  What do you write after you're

23  being told about the weekly Abstral and Lazanda tracking?

24  A   Thank you.  I was told Dr. Ruan had never written one.  I

25  was wrong.

1363

NATALIE PERHACS - DIRECT BY MR. BODNAR

```
1   Q    And what's the date there?

2   A    October 9th, 2013.

3   Q    I'm going to show you what has already been admitted into

4   evidence as Government's Exhibit 10-19.  And it's labeled

5   Dr. Ruan and Dr. Couch, Abstral prescribed by month in

6   micrograms.  Is that right here in October of '13?

7            MR. KNIZLEY:  Your Honor, I object to this witness

8   testifying as to this document unless she has some familiarity

9   or knowledge about it.

10           MR. BODNAR:  Your Honor, it's already in evidence.

11           THE COURT:  Overruled.

12  BY MR. BODNAR:

13  Q    So is this October '13 on this, is that what it is on that

14  graph?

15  A    Yes.

16  Q    After you mentioned that you didn't realize that Dr. Ruan

17  had ever written one, what does Joe Rowan tell you to do?

18  A    Get him.

19  Q    And what did you take that to mean?

20  A    Fix this quickly.

21  Q    Fix it how?  What does that -- what does fix it mean?

22  A    Don't lose business to Abstral.

23  Q    Over the next few months did Dr. Ruan and Dr. Couch's

24  Abstral prescribing become an issue for you personally?

25  A    Yes.
```

1    Q    How so?

2    A    I almost lost my job.

3    Q    Can you explain that to the jury?  Why would you lose your

4    job because they're prescribing Abstral?

5    A    Because the company was displeased with my performance and

6    they thought that I should have a close enough relationship to

7    both of these doctors to have prevented this.

8    Q    And what, if anything, did you do to try to get them to

9    prescribe Subsys again instead of Abstral?

10   A    I would take clinical data back in and talk about how ours

11   works faster, asked them not to prescribe Abstral; if it would

12   be an appropriate Subsys patient, try to be at the clinic more.

13   Q    And in these communications did you speak to Dr. Ruan in

14   particular about the prescribing of Abstral versus Subsys?

15   A    Yes.

16   Q    And during those communications did Dr. Ruan explain to you

17   why it was that they were prescribing Abstral?

18   A    Yes.

19   Q    What did he tell you?

20   A    He said that he thought that Galena would be the next

21   Insys.

22   Q    And did he tell you if he did anything because he thought

23   Galena would be the next Insys?

24   A    Yes.

25   Q    What was it that Dr. Ruan did?

1  A   He purchased stock.

2  Q   In what?

3  A   In Galena.

4  Q   And did you come to learn if anyone else at PPSA also

5  purchased stock in Galena Biopharma?

6  A   Yes.

7  Q   Who else purchased stock in Galena Biopharma?

8  A   Justin Palmer, Dr. Couch, Caye Renegar.

9  Q   And we've talked about Dr. Couch.  Obviously we know him;

10  talked about Justin Palmer.  Who is Caye Renegar?

11  A   Caye was the head pharmacist at C&R Pharmacy, which was the

12  pharmacy right next to the PPSA clinic.

13  Q   And by "right next to" were they in one attached building?

14  A   Connected, yes.

15  Q   Did you ever tell your bosses at Insys that Dr. Ruan, that

16  Dr. Couch, that Justin Palmer and that Caye Renegar had

17  purchased Galena stock?

18  A   No.

19  Q   Did you ever tell them that that was the reason they were

20  prescribing Abstral?

21  A   No.

22  Q   Why didn't you tell your company that?

23  A   Because I gave --

24          MR. KNIZLEY:  Your Honor, objection.  Undisclosed

25  operation of the witness.

```
 1              THE COURT:  Overruled.
 2   BY MR. BODNAR:
 3   Q   Why didn't you tell your company that they purchased stock?
 4   A   Because I gave Dr. Ruan my word that I wouldn't discuss it.
 5   Q   Had Dr. Ruan asked you not to tell anybody?
 6   A   Yes.
 7   Q   And you -- and you agreed not to tell anybody?
 8   A   Yes.
 9   Q   But did you try to work hard to get everyone back on
10   Subsys?
11   A   Yes.
12   Q   I'm going to show you now what's been admitted as
13   Government's Exhibit 32-4(2).  Appears to be an email that
14   says -- from December 5th from you to Karen Hill, subject
15   success story.  What is it -- what success are you telling
16   Karen Hill about here?  And could you read it for the jury?
17   A   Karen, huge breakthrough today.  Dr. Ruan and his head NP,
18   which means nurse practitioner, agreed to opt in every Abstral
19   patient they sample.  I told them how we recently pulled three
20   prescriptions through this way on second appeal.
21              Dr. Ruan looked at me and said:  Natalie, if it will
22   help you and my patients, we will do it.
23   Q   I want to stop you there for a second.  You said that you
24   told them how we recently pulled three prescriptions through
25   this way on second appeal.  What does that mean?  How did you
```

1   pull -- how are three pulled through from opting in, seeing the
2   patients?
3   A   I don't remember the details of that.  But I remember that
4   the internal reimbursement center let us know.
5   Q   That that worked?
6   A   Yes.
7   Q   Can you please continue?  I set them up.
8   A   I set them up with one of the in-office generic note pads
9   where the head NP labeled three categories looking like this.
10         Name, date of birth, microgram/dosage, they will write
11  patient info in a column under -- from this point on they will
12  communicate with their head employee, Judge.
13  Q   I'm going to stop you there.  We don't mean Judge like the
14  judge here.  Is that someone's actual name that worked there?
15  A   That was his name.
16  Q   Okay.  Sorry.  Employee Judge?
17  A   That will opt-in every rejected Subsys patient that we
18  might have missed and every patient that receives an Abstral
19  sample.  Not only did they love the idea of pulling through
20  rejected Subsys patients, they liked the idea of being able to
21  track how many patients they sampled Abstral to.  I believe not
22  only that this plan will work, I think it will allow us to
23  regain market share with Medicare patients that might have been
24  lost.  I hope this story helps.  Nat P.
25  Q   And, Ms. Perhacs, did you attempt -- was it attempted to

NATALIE BERHLACS - DIRECT BY MR. BODNAR

```
 1    opt-in the Subsys patients -- or sorry -- the Abstral patients
 2    into Subsys?
 3    A    Yes.
 4    Q    Was it successful?
 5    A    No.
 6    Q    As this was going on did Dr. Ruan and Dr. Couch continue to
 7    write Abstral prescriptions?
 8    A    Yes.
 9    Q    Was this something that was being communicated back and
10    forth with the heads of Insys?
11    A    Yes.
12    Q    Was this something that they showed concern about to you?
13    A    Yes.
14    Q    I'm going to show you now what's been admitted as
15    Government's Exhibit 32-4(3).  Is this an email from the
16    following day, December 6th, from Karen Hill to you?
17    A    Yes.
18    Q    And starting down here what is Karen Hill telling you?
19    A    Your territory is amazingly successful.  However, we are
20    taking a huge hit right now on lack of approvals.  And I wanted
21    to make sure that it isn't due to our lack of following
22    through.
23    Q    I'm going to stop you right there.  Do you know or have any
24    reason to know why you would be lacking approvals?
25    A    No.
```

1369

NATALIE PERHACS - DIRECT BY MR. BODNAR

1   Q   That was something the IRC handled; correct?

2   A   Yes.

3   Q   Okay.  Please continue.  Please make --

4   A   Please make it your number one priority right now to get

5   every single chart in your territory approved.  You have gained

6   the commitment of Dr. Ruan to opt in all patients, including

7   every Abstral-sampled patient.  You are in negotiations for

8   them to begin utilizing Linden Care to overcome the enormous

9   barrier of pharmacy ordering restrictions.

10  Q   I want to stop you there for a second.  Can you explain to

11  the jury, what was Linden Care?

12  A   Linden Care was a pharmacy that would mail patients their

13  medicine.

14  Q   Did that include Subsys?

15  A   Yes.

16  Q   But Dr. Ruan and Dr. Couch had their own pharmacy, did they

17  not?

18  A   Yes.

19  Q   Why would they need to use Linden Care, do you know?

20  A   Yes.

21  Q   Why was it that they might have started to need Linden Care

22  at this time?

23  A   Because C&R Pharmacy was having trouble filling it as often

24  as it was written.  Sometimes they would get behind.

25  Q   Do you mean C&R Pharmacy was running out of Subsys?

NATALIE PERHACS - DIRECT BY MR. BODNAR

1    A    Yes.

2    Q    Because it was being written so frequently?

3    A    Yes.

4    Q    So is ordering it from an outside pharmacy something that

5    actually happened?  Did patients, to your knowledge, start

6    ordering their Subsys from Linden Care?

7    A    Yes.  It was short-lived.

8    Q    We'll get into why in a moment.  Could you please continue

9    with "without complete control"?

10    A    Without complete control and a sense of urgency concerning

11    all pull-through none of the above will matter.  Keep doing the

12    phenomenal job you are.  However, this is one area we all need

13    to be tighter on.  Thank you for your commitment to

14    this.  Thanks, Karen Hill.

15    Q    And again, this is all in December of 2013; correct?

16    A    Yes.

17    Q    Was this during the time period where Dr. Ruan and

18    Dr. Couch were still writing lots of Abstral prescriptions?

19    A    Yes.

20    Q    I'm going to show you now what's been admitted as

21    Government's Exhibit 32-4(4).  Is this an email from you to Joe

22    Rowan and Karen Hill?

23    A    Yes.

24    Q    And what are you telling Joe Rowan?

25    A    Joe, I am working with the office to complete three opt-ins

1371

```
 1    for this reason right now.  The internet and computer system
 2    and phone lines are down in the clinic right now so accessing
 3    patient info is a challenge.  I am working to obtain past
 4    Abstral-sampled patients, trying to get them opted in today as
 5    well.  Feel free to reach out if you have any questions.  I
 6    will be in Dr. Ruan's office all day.
 7    Q   At this point we're in December of 2013, is there any sense
 8    of panic amongst you or anyone at Insys regarding Dr. Ruan and
 9    Dr. Couch?
10    A   Yes.
11    Q   And why was that?
12    A   Because we had lost over half of our business.
13    Q   And you had mentioned before that these were pretty high
14    prescribers; correct?
15    A   Yes.
16    Q   So it was very important to Insys to get Dr. Ruan and
17    Dr. Couch back?
18    A   Yes.
19    Q   Is that why you were going to be in his office all day?
20    A   Yes.
21    Q   You mentioned accessing patient information.  Were you
22    actually accessing patient information?
23    A   No.
24    Q   What are you talking about there then?
25    A   Because the computer systems were down, nobody could look
```

NATALIE PERHACS - DIRECT BY MR. BODNAR

1   up anything on their computers.

2   Q   So you never actually accessed patient information;

3   correct?

4   A   Correct.

5   Q   So would you have known -- you talked about these patients

6   that were sampled on Abstral.  Would you have any way of

7   knowing whether or not the Abstral-sampled patients did or

8   didn't have cancer?

9   A   No.

10  Q   That wasn't part of your job, was it?

11  A   No.

12  Q   I'll show you now what's been admitted as Government's

13  Exhibit 32-4(5).  Is this an email from you to Joe Rowan and

14  Sean Yu entitled:  Abstral Numbers?

15  A   Yes.

16  Q   What are you -- excuse me.  What are you asking Sean?

17  A   To please send me how much Abstral they wrote over the past

18  month.  I needed to see the number of prescriptions.

19  Q   Why didn't -- you worked for Insys, though, Subsys.  Why

20  did you need to see Abstral numbers?

21  A   Because I needed to see how much business I had lost.  It

22  was a way to estimate.

23  Q   And at this time period, early 2014, is that something that

24  is very important to you?

25  A   Yes.

1  Q   Now I'm going to show you what is marked as Government's

2  Exhibit 32-4(6).  Email from February 10th.  Is this email --

3  the previous one I showed you was February 4th.  So this is six

4  days later; correct?

5  A   Yes.

6  Q   First, what is your boss Karen Hill telling you down here?

7  Can you read that, please?

8  A   Yes.

9  Q   What does it say?

10  A   Looking at their data between Ruan and Couch -- have

11  written 435 Abstral prescriptions.  Hopefully with a little

12  help from above we can land this.  Thanks.

13  Q   What did that mean to you, help from above?

14  A   I thought nothing of it.

15  Q   During this time period early 2014, did help come in the

16  way of Dr. John Kapoor and Mike Babich to Mobile, Alabama?

17  A   Yes.

18  Q   And please tell the jury, who is Dr. Kapoor?

19  A   Dr. Kapoor owns Insys.

20  Q   And who is Mike Babich?

21  A   He was our chief executive officer.

22  Q   So your CEO?

23  A   Our CEO.

24  Q   And around this time period in early 2014 did Dr. Kapoor

25  and Mike Babich fly to Mobile, Alabama?

1374

NATALIE PERHACS - DIRECT BY MR. BODNAR

1   A   I was told they did.

2   Q   Were you involved in the meeting with Dr. Kapoor and the

3   doctors?

4   A   No.

5   Q   Do you know what occurred in that meeting?

6   A   Vaguely.  I was told a few things but --

7        MR. KNIZLEY:  Objection, Judge, to what she may have

8   been told.

9        THE COURT:  Sustained.

10  BY MR. BODNAR:

11  Q   Do you know what, if anything, changed about the way C&R

12  Pharmacy was able to get Subsys after that meeting?

13  A   Yes.

14  Q   What changed after the CEO and the founder of the company

15  flew here to Mobile, Alabama?

16  A   Arrangements were made for them to purchase Subsys directly

17  from Insys.

18  Q   Prior to that, do you know how Subsys was purchased by C&R

19  Pharmacy?  Who does C&R purchase the Subsys from?

20  A   A third-party vendor.

21  Q   Is that what's called a wholesaler?

22  A   Yes.

23  Q   And did you know if there was a problem with C&R Pharmacy

24  getting enough Subsys from a wholesaler?

25  A   Yes.

NATALIE PERHACS - DIRECT BY MR. BODNAR

1    Q    What was that problem?

2    A    They couldn't get enough.

3    Q    Do you know why that was?

4    A    Yes.

5    Q    Why was that?

6    A    Because the amount that they could stock couldn't keep up

7    with the amount of prescriptions.

8    Q    And do you know if there were limits set by wholesalers on

9    how much of a particular drug a pharmacy can purchase?

10   A    Yes.

11   Q    And do you know if C&R was close to exceeding that or had

12   exceeded that limit?

13   A    I was told they were.

14   Q    And is that why this arrangement was made for the purchase

15   of Abstral -- or Subsys came directly from Insys?

16   A    Yes.

17   Q    To your knowledge, was there any other pharmacy in the

18   country that had such an arrangement?

19   A    Yes.

20   Q    Was it common or uncommon, though?

21   A    Uncommon.

22   Q    Did the problems for you regarding their prescribing of

23   Abstral continue into the spring of 2014?

24   A    Yes.

25   Q    I'm going to show you what's been marked as Government's

1    Exhibit 32-4(7).  Like we saw before, is this another Abstral,

2    Lazanda weekly tracking?

3    A    Yes.

4    Q    And is it ultimately forwarded to you from Karen Hill?

5    A    Yes.

6    Q    What is the message that is being forwarded to you?  Who's

7    it from?

8    A    From Alec.

9    Q    And who was Alec Burlakoff?

10   A    Alec was the vice president of sales.

11   Q    And it was to Joe Rowan and Karen Hill.  What is Alec

12   Burlakoff saying?

13   A    What is Dr. Ruan doing?  55 Abstral in one week.  Wow.

14   Q    Did you receive other communications from Insys regarding

15   their concern about Dr. Ruan and Dr. Couch's Abstral writing?

16   A    Yes.

17   Q    In addition to the time that you just mentioned where

18   Dr. Kapoor and Mr. Babich traveled to Mobile, do you know if

19   any other executives from Insys came down to meet with the

20   doctors?

21   A    I don't remember.

22   Q    I'm going to now show you what's been admitted as

23   Government's Exhibit 32-4(8).  Is this a series of emails that

24   is ultimately forwarded to you from Karen Hill?

25   A    Yes.

 1    Q   And starting here on the bottom, who was Sean Yu, by the
 2    way?
 3    A   He helped process prescription data for the employees of
 4    the company that needed it.
 5    Q   And who is this email going to?  Who is this first person?
 6    A   J. Kapoor.  That's John Kapoor.
 7    Q   Is that the person you said is the founder of this entire
 8    company?
 9    A   Yes.
10    Q   Who is Patrick Fortino?
11    A   I don't know.
12    Q   You said Mike Babich, CEO.
13    A   Yes.
14    Q   You mentioned who Alec Burlakoff is.  Who is Matthew
15    Napolitano and Mike Gurrieri?
16    A   Matthew Napolitano was head of marketing.  Mike Gurrieri
17    was manager of the internal reimbursement center.
18    Q   And starting here, what is Sean telling the executives at
19    Insys?
20    A   Here is a look for the past eight weeks, January and
21    February '14th, Abstral writers, and see how many of them wrote
22    every week, how many of them wrote seven out of eight weeks,
23    and so on; as well as percentage business each group
24    contributed to their totals.
25    Q   And this first part, up here talking about Dr. Ruan and

NATALIE PERHACS - DIRECT BY MR. BODNAR

1  Dr. Couch, could you please read that?

2  A   Five HCPs, which is healthcare professionals, wrote every

3  week in last eight weeks (column, left-most), and accounted for

4  53 percent of all Abstral scripts.  Among them only Ruan,

5  Couch, and Rho write consistently.  Dr. --

6  Q   Thank you.  You can stop there.  Did Alec Burlakoff then

7  comment to Joe Rowan and Karen Hill on this email chain that

8  was sent to you?

9  A   Yes.

10  Q   And what does Alec Burlakoff tell Joe Rowan?

11  A   Dr. Ruan and Dr. Couch are killing us.

12  Q   Based on this was there pressure put on you to make sure

13  that something got done?

14  A   Yes.

15  Q   During this time period when they're prescribing Abstral,

16  are they still involved in speaker programs for Insys?

17  A   Yes.

18  Q   And are they still receiving money for these speaker

19  programs from Insys?

20  A   I was told they were.

21  Q   I'm going to show you now what has been marked as

22  Government's Exhibit 32-4(9).  Is this an email from Karen Hill

23  to you with Joe Rowan cc'd?

24  A   Yes.

25  Q   What is it that Karen Hill is telling you?

1   A   That each of the doctors Insys speaker programs have been

2   reduced -- the number of each have been reduced.

3   Q   Could you read that for us, please, Natalie?

4   A   Yes.  Hey, Natalie, unfortunately I've been informed that

5   Dr. Couch and Dr. Ruan have had their ISPs allotments --

6   allotments reduced to five each for now.  Please remove the

7   additional from the system.  As soon as I receive more, I will

8   let you know.  Thanks, Karen.

9   Q   Why was it that their speaker programs were being reduced

10  at this point in April of 2014?

11  A   Because they weren't prescribing as much Subsys.

12  Q   And if their speaker programs are reduced, does that mean

13  they are receiving some less money, you don't know how much?

14  A   Yes.

15  Q   Ultimately, while reduced, did Dr. Ruan and Dr. Couch

16  continue to be speakers throughout the time period until they

17  were arrested?

18  A   Yes.

19          MR. BODNAR:  One moment, Your Honor.

20  Q   Ms. Perhacs, jumping back to Abstral for a moment.  Did you

21  relay information to Insys about -- sorry.

22  A   Sorry.  Go ahead.  Okay.

23  Q   How was it that Insys in Arizona is getting information on

24  how much Abstral, a competitor drug, Dr. Ruan and Dr. Couch are

25  prescribing?

1380

1    A    Online data.

2    Q    And was any information coming from you as well to the

3    company?

4    A    Yes.

5    Q    Were you inquiring at C&R Pharmacy about how much Abstral

6    was being written?

7    A    Yes.

8    Q    Were you passing that information on to your company?

9    A    Yes.

10   Q    During the course of that, did you learn if there was

11   anybody in the pharmacy that was trying to get patients to ask

12   the doctors to switch them to Abstral?

13   A    I was told there was somebody --

14          MR. KNIZLEY:  Objection, Judge, what she was told.

15   Hearsay.

16          THE COURT:  Sustained.

17   BY MR. BODNAR:

18   Q    Without saying what you were told, did you learn if

19   somebody -- or if anybody was trying to get patients to ask for

20   Abstral over Subsys?

21          MR. KNIZLEY:  Same objection.  She would have to learn

22   it through hearsay unless there's some other basis.

23          THE COURT:  Sustained.

24   BY MR. BODNAR:

25   Q    Without saying what anyone said, do you know if patients

1381

1    were asking for Abstral instead of Subsys?

2           MR. KNIZLEY:  Same objection, Your Honor.

3           THE COURT:  You need to establish a basis --

4           MR. KNIZLEY:  There's no other basis for her

5    knowledge.

6           THE COURT:  You need to establish a basis for her

7    knowledge other than what somebody told her.

8           MR. BODNAR:  Your Honor, could you --

9    Q   Ms. Perhacs, did you have time to be around Caye Renegar,

10   the pharmacist at C&R Pharmacy?

11   A   Yes.

12   Q   Did you happen -- what if anything did you hear her say?

13          MR. BODNAR:  And, Your Honor, this is a coconspirator

14   statement coming under that, not as hearsay.

15          MR. KNIZLEY:  Judge, the same objection.  I don't

16   think it's been established yet.

17          THE COURT:  Overruled.

18   BY MR. BODNAR:

19   Q   What if anything did you hear her say to patients about

20   switching or asking for Abstral instead of Subsys?

21   A   I never heard her.

22   Q   You never heard her say that?

23   A   No.

24   Q   But did you learn that fact in a different way?

25   A   Yes.

NATALIE PERHACS - CROSS BY MR. DOSS

```
 1   Q   Without saying who or what said anything?
 2            MR. KNIZLEY:  Judge, same objection.  Hearsay.
 3            THE COURT:  Sustained.
 4   BY MR. BODNAR:
 5   Q   What data was it that you were transmitting back to Insys
 6   about Abstral prescriptions?
 7            MR. KNIZLEY:  Objection, Judge.  The basis of the
 8   information is hearsay.  It's the same objection.
 9            MR. BODNAR:  What type of data?
10            THE COURT:  Overruled.  You can answer.
11   BY MR. BODNAR:
12   Q   What type of data were you getting on behalf of your
13   company from C&R Pharmacy?
14   A   How many prescriptions were written and how often.
15   Q   But nothing about patient information?
16   A   No.
17   Q   And not whether or not the individual had cancer or not?
18   A   No.
19            MR. BODNAR:  One moment, Your Honor.
20            Nothing further from this witness, Your Honor.
21            THE COURT:  Mr. Doss?
22                         CROSS EXAMINATION
23   BY MR. DOSS:
24   Q   Good morning, Ms. Perhacs.
25   A   Good morning.
```

1383

1  Q   My name is Jeff Doss.  I'm one of Dr. Couch's

2  attorneys.  We've never had the chance to talk before today,

3  have we?

4  A   No.

5  Q   But you have had a chance to talk to the prosecutors and

6  the agents before today; is that correct?

7  A   Yes.

8  Q   About how many times did you meet with the prosecutors or

9  the agents prior to testifying yesterday and today?

10  A   I can't remember the exact number.

11  Q   Do you have a ballpark?

12  A   Yes.

13  Q   What would that be?

14  A   About five.

15  Q   About five.  And when did you first start meeting with

16  them?

17  A   I can't remember the exact date.

18  Q   Did you plead guilty in January of this year, January or

19  January of 2016?

20  A   I don't remember the exact date.  But I pled guilty.

21  Q   Okay.  And you have a cooperation agreement with the

22  government; is that correct?

23  A   Yes.

24  Q   And we'll go through that in a little bit.  You pleaded

25  guilty to conspiring to violate the anti-kickback statute; is

NATALIE PERHACS - CROSS BY MR. DOSS

1   that right?

2   A   Yes.

3   Q   And how long did you work at Insys?

4   A   Three and a half years.

5   Q   What year did you start?

6   A   2013.

7   Q   What year did you leave Insys?

8   A   About one year ago.

9   Q   Maybe 2015?

10  A   Yes.

11  Q   From the period of time from 2013 to 2015 did Insys have

12  any sort of internal hotline where you could report concerns?

13  A   I think so.

14  Q   And you never, during 2013 -- between 2013 to 2015 you

15  never called that internal hotline and said:  I have concerns

16  about the speakers program, did you?

17  A   No.

18  Q   From 2013 to 2015 you never contacted any law enforcement

19  and said:  I have concerns about this speakers program, did

20  you?

21  A   No.

22  Q   And that would include police, FBI, DEA, the U.S.

23  Attorney's Office, the D.A.'s office, you never contacted any

24  of those while you were employed by Insys to express any

25  concerns whatsoever about the speakers program; right?

1385

1   A   That's correct.

2   Q   Now, we've gone through and we've learned about some Insys

3   employees and there were a couple of more I wanted to ask you

4   about.  Do you recall a woman by the name of Desiree

5   Hollandsworth?

6   A   Yes.

7   Q   Who was Ms. Hollandsworth?

8   A   She had many roles within the company.  She was the one

9   that always helped organize the trips.

10  Q   And did she have any involvement with the speakers program?

11  A   Yes.

12  Q   What was her involvement with that program?

13  A   I think she monitored the paperwork at one time.

14  Q   Did she also approve the speakers events from time to time?

15  A   I don't remember.

16  Q   Okay.  Did she monitor the costs associated with the

17  speakers program?

18  A   I don't remember.

19  Q   Okay.  What about Meghan McMillan?  Do you remember an

20  employee by the name of Meghan McMillan at Insys?

21  A   Yes.

22  Q   What did Meghan McMillan do for Insys between 2013 and

23  2015?

24  A   I don't remember.

25  Q   Okay.  And we may have covered this but just so we're

NATALIE PERHACS - CROSS BY MR. DOSS

 1  clear, what was your exact job title while you were at Insys?

 2  A   I had three job titles.

 3  Q   What was your first?

 4  A   SSP.

 5  Q   What did that stand for?

 6  A   Specialty sales professional.

 7  Q   What was your second job title?

 8  A   Team trainer.

 9  Q   And your third?

10  A   Area manager.

11  Q   Were you part of what was known internally at Insys as the

12  MIA sales team?

13  A   Yes.

14  Q   What was the MIA sales team?

15  A   MIA stood for Miami region.

16  Q   And that encompassed Mobile; correct?

17  A   Yes.

18  Q   And Ms. Hill for a period of time was the manager of the

19  MIA sales team; correct?

20  A   Yes.

21  Q   Were you part of a group referred to sometimes within Insys

22  as the sales RDs?

23  A   No.  I don't remember.

24  Q   Do you remember receiving emails from time to time that

25  were sent to the sales RDs at Insys?

1387

 1    A    I don't remember.

 2    Q    Okay.  And Mr. Yu was employed at Insys, as I understood

 3    your direct testimony, and part of his job was to crunch

 4    numbers; is that fair?

 5    A    Will you spell his name?

 6    Q    Yu, "Sean" Yu?

 7    A    X-U-N?

 8    Q    Yes, ma'am.

 9    A    Yes.

10         MR. DOSS:  May I approach the witness, Your Honor?

11         THE COURT:  Yes.

12    BY MR. DOSS:

13    Q    Now, Ms. Perhacs, I've shown you what's been marked for

14    identification purposes as Couch Exhibit 161.  Do you see that?

15    A    Yes.

16         MR. DOSS:  And, Sam, can you bring up that exhibit?

17    Not for publication yet.

18         And Your Honor, I understand the government has no

19    objection, so at this time --

20         MR. BODNAR:  No objection, Your Honor.

21         MR. DOSS:  -- we move to admit Couch Exhibit 161.

22         THE COURT:  All right.  Mark it in.

23         MR. DOSS:  May we publish it to the jury, please?

24         THE COURT:  Yes.

25      (Defendant Couch's Exhibit 161 was entered into evidence.)

```
 1   BY MR. DOSS:
 2   Q   All right.  Ms. Perhacs, I want to draw your attention to
 3   the bottom half of this email first.  And it appears to be an
 4   email sent from Mr. Yu at Insys on May 13th, 2013 to
 5   Mr. Babich, Mr. Burlakoff and copies Mr. Napolitano and
 6   Mr. Gurrieri.  Do you see that?
 7   A   Yes.
 8   Q   All right.  Were you familiar with a report like this where
 9   the return rate was being calculated for various prescribing
10   doctors?
11   A   I'm familiar.
12   Q   All right.  And the return rate based on this email appears
13   to be the number of times that patients would receive a
14   followup prescription for Subsys; is that fair?
15   A   Yes.
16   Q   And if you look to the second page, we have a number of
17   doctors listed, and the second would be Dr. Couch; correct?
18   A   Yes.
19   Q   All right.  Dr. Couch's return rate in May of 2013 was 19
20   percent; right?
21   A   That's what it says.
22   Q   Okay.  You have no reason to doubt that data do you?
23   A   No.
24   Q   Based on this report it appears, and correct me if I'm
25   wrong, that Dr. Couch's prescribing of Subsys was actually
```

1   decreasing; is that correct?

2   A   Yes.

3   Q   Now, if we could look at the top of that first page, it

4   appears to be an email where Mr. Rowan is forwarding that data

5   to the sales team MIA; correct?

6   A   Yes.

7   Q   And you were included on that email distribution; right?

8   A   Yes.

9   Q   And we know that because Mr. Rowan says:  Natalie, check

10  this out.  Look at Couch.

11  A   Yes.

12  Q   Would it be fair to say that he was calling attention

13  to Dr. Couch because his numbers had declined?

14  A   Yes.

15  Q   And this again was in May of 2013; right?

16  A   Yes.

17          MR. DOSS:  Okay.  Your Honor, may I approach the

18  witness?

19          THE COURT:  Yes.

20  BY MR. DOSS:

21      Q     All right.  Ms. Perhacs, do you see what's been

22  marked as Couch Exhibit 162?

23  A   Yes.

24  Q   Okay.  And are you familiar with a document like this?

25  A   No.

1390

```
 1    Q    All right.  Without going into the contents of this
 2    document, I want to ask you some questions about early
 3    2013.  Now, in Couch Exhibit 161 we saw that Dr. Couch's return
 4    rate was down to 19 percent.  During that same time period was
 5    Dr. Couch's number of approved speaker events reduced?
 6    A    I don't remember.
 7    Q    Do you know -- do you have any recollection of what
 8    Dr. Couch's number of speaker events were during this time
 9    frame of early to mid 2013?
10              THE COURT:  Are you referring her to the exhibit?
11              MR. DOSS:  No, ma'am.  Just based on what she recalls.
12    A    I don't remember an exact number.
13    BY MR. DOSS:
14    Q    Do you remember if it increased, decreased or stayed the
15    same during the May to June 2013 time frame?
16    A    I don't -- I don't recall.
17    Q    Okay.  Now, your compensation, Ms. Perhacs, you testified
18    was a base salary plus commission; correct?
19    A    Yes.
20    Q    How was the commission calculated?
21    A    It was a percentage of sales of Subsys in a three-month
22    period.
23    Q    And that was without regard to where the patient was
24    filling the Subsys; correct?
25    A    Yes.
```

1   Q   So a patient could have filled at C&R Pharmacy and you

2   would have financially benefited in the same way as if the

3   patient filled that prescription at any other pharmacy;

4   correct?

5   A   Correct.

6   Q   And the more prescriptions of Subsys benefited you;

7   correct?

8   A   Yes.

9   Q   Now, there were a variety of reasons, I believe you

10  testified on direct, that certain doctors were brought in to

11  this Insys speakers program; correct?

12          MR. BODNAR:  Objection, Your Honor.  That was Lacy

13  Fortenberry's testimony, not this witness.

14          MR. DOSS:  Okay.  Well, I'll back up, Your Honor.

15          THE COURT:  All right.

16  BY MR. DOSS:

17  Q   One of the reasons why a doctor would be asked to

18  participate in the Insys speakers program is that the doctor

19  would have clinical experience with Subsys; correct?

20          MR. BODNAR:  Objection to foundation, Your Honor.  She

21  said that they were already in the speakers program when she

22  started --

23          MR. DOSS:  Your Honor, this witness --

24          THE COURT:  I think if she can answer, she should be

25  allowed to.  So overrule the objection.

BY MR. DOSS:

Q   Do you need me to repeat the question?

A   Yes, please.

Q   Sure.  One of the reasons why Insys would include a doctor in its speakers program is because of that doctor's clinical experience with Subsys; correct?

A   Yes.

Q   And if a doctor doesn't have as much clinical experience with Subsys, is it fair to say that that doctor would be less knowledgeable about the product?

A   Yes.

Q   And if the doctor is less knowledgeable about the product, and lacks that clinical experience, in your experience, did Insys really want those types of doctors speaking on its behalf about its product?

A   We had speakers that did not prescribe much Subsys but clinically had sound knowledge of the product.

Q   Okay.  By the same token, if a doctor is prescribing a competitor of Subsys, maybe even more of the competitor's product than Subsys, is that a doctor that Subsys would have wanted to be its spokesperson in the community?

A   That wouldn't have been my decision to make.

Q   And whose decision would that have been?

A   Alec Burlakoff.

Q   In the summer of 2013 do you recall an Insys speaker

1    program event at a Dr. James Crumb's office here in Mobile?

2    A   I don't recall the date.

3    Q   Do you recall an event at Dr. James Crumb's office here in

4    Mobile where Dr. Couch spoke?

5    A   I think so.

6    Q   And do you recall that Dr. Crumb was a physical medicine

7    and rehabilitation doctor?

8    A   No.

9    Q   Do you recall what kind of doctor he was?

10   A   No.

11   Q   Ms. Perhacs, did you plan that event at Dr. Crumb's office

12   in Mobile where Dr. Couch spoke?

13   A   I think so.

14   Q   And do you recall that there were about eight people who

15   attended that event?

16   A   I don't recall how many came.

17   Q   Do you recall if there were any prescribers other than

18   Dr. Couch present for that event?

19   A   I don't remember who was there.

20   Q   Okay.  Do you remember that you had Moe's bring the food

21   for that event?

22   A   I think so.

23   Q   And do you recall Dr. Couch speaking about Subsys at that

24   event?

25   A   I think so.

1   Q   Now, when Dr. Couch would speak about Subsys at these

2   events, that was a presentation developed by a third party

3   called SciMedica; correct?

4   A   I don't know.

5   Q   When Dr. Couch would speak about Subsys at these events,

6   would he bring with him his own clinical experience to those

7   speaking programs?

8   A   Yes.

9   Q   Would he share stories at those events about his experience

10  with prescribing Subsys?

11  A   Yes.

12  Q   Would he discuss a variety of topics about Subsys such as

13  drug interactions, side effects, label indications?

14  A   Yes.

15  Q   And you were also present during those speaker events,

16  weren't you?

17  A   Yes.

18  Q   And these speaker events gave you an opportunity to

19  interface with others in the medical community, didn't they?

20  A   Yes.

21  Q   And you had the opportunity to discuss things like the

22  voucher program, didn't you?

23  A   I think so.

24  Q   You also had the opportunity to discuss the prior

25  authorization process at these events, didn't you?

1395

1    A    I think so.

2    Q    And that was all part of Insys' sales strategy, wasn't it?

3    A    Yes.

4    Q    Now, on direct I believe you testified that a number of

5    PPSA employees attended these events?

6    A    Yes.

7    Q    And was it part of your sales strategy to use these events

8    to keep the name of the product alive for these people so they

9    might tell their friends in the medical community?

10    A    Yes.

11    Q    So for example, if one of Dr. Couch's nurses attended a

12    speaking event, it was your hope, wasn't it, that that nurse

13    might share the Subsys information with other people he or she

14    knew in the medical community?

15    A    Yes.

16    Q    There were also office staff members from PPSA who would

17    attend these events, weren't there?

18    A    Yes.

19    Q    And that ranged from everyone from the front desk to

20    medical assistants to pharmacy technicians; right?

21    A    Yes.

22    Q    And all of those people were involved or could have been

23    involved with, for example, the prior authorization process;

24    right?

25    A    Yes.  What was -- what was the question?

1396

1  Q   The office staff members of PPSA who attended these

2  speaking events, they could have been involved with the prior

3  authorization process; right?

4  A   Yes.

5  Q   And when you were present at these events and Dr. Couch's

6  office staff was also present, you had the opportunity to

7  educate them on the prior authorization process, didn't you?

8  A   Yes.

9  Q   And answer any questions that they might have?

10  A   Yes.

11  Q   And in fact, as far as you can recall, when Dr. Couch was

12  speaking on behalf of Insys, he always did speak on behalf of

13  Insys and talk about Subsys, didn't he?

14  A   Only one time he didn't.

15  Q   Okay.  Other than that one time, though, he was there

16  speaking about Subsys, didn't he?

17  A   Yes.

18  Q   Okay.  And you were also there every time to answer your

19  questions -- answer questions?

20  A   Yes.  Yes, I was there.

21  Q   Did you visit PPSA frequently?

22  A   Yes.

23  Q   And you interacted with a lot of people who worked there,

24  didn't you?

25  A   Yes.

1   Q   And you were there to answer questions if they had them?

2   A   Yes.

3   Q   And you were not there to influence the doctors'

4   prescribing decisions, were you?

5   A   I was just there if anyone needed help or had questions.

6   Q   It was never your intent, Ms. Perhacs, though, to encourage

7   Dr. Couch to prescribe Subsys for a patient who really didn't

8   need it, was it?

9   A   No.

10          MR. BODNAR:  Objection, Your Honor.  She said she

11   didn't know if the patients did or didn't need it.

12          THE COURT:  Well, he asked about her intent.  So I

13   overrule the objection.

14   BY MR. DOSS:

15   Q   Ms. Perhacs, what was your answer to that?

16   A   No.

17   Q   While you interacted with Dr. Couch at PPSA, you understood

18   that at the end of the day it was his decision whether to

19   prescribe Subsys, wasn't it?

20   A   Yes.

21   Q   Over time, Ms. Perhacs, did it become frustrating that your

22   commission was tied to the prescribing decisions of a doctor,

23   those decisions which you had no control over?

24   A   Yes.

25   Q   In fact, sometimes it felt unpredictable, didn't it?

1398

1    A    Yes.

2    Q    Now, on direct, Ms. Perhacs, you testified that eventually

3    there were discussions about C&R Pharmacy purchasing Subsys

4    directly from Insys; correct?

5    A    I was told there were discussions.

6    Q    Okay.  Before those discussions happened, C&R Pharmacy was

7    purchasing Subsys from a company called McKesson; is that

8    right?

9    A    I don't know.

10   Q    Were you aware that McKesson was one of the distributors of

11   Subsys?

12   A    Yes.

13   Q    Were you aware that from time to time C&R Pharmacy was

14   purchasing Subsys from McKesson?

15   A    I didn't know who they purchased from but I did know that

16   McKesson was a third party that sold Subsys.

17   Q    What is McKesson, generally?

18   A    All I know is it's a place where pharmacies can purchase

19   medicine.

20   Q    Are you aware that from time to time McKesson performed

21   other services such as regulatory monitoring?

22   A    Yes.

23        MR. DOSS:  Your Honor, may I approach?

24        THE COURT:  Yes.

25        THE WITNESS:  Thank you.

 1   BY MR. DOSS:

 2   Q   All right.  Ms. Perhacs, I've shown you what's been marked

 3   for identification purposes as Couch Exhibit 175.  Do you see

 4   that?

 5   A   I do.

 6   Q   All right.  Do you recall being interviewed by agent and

 7   prosecutors in March of 2016?

 8   A   I don't recall the date.

 9   Q   If you look at the bottom of that document, Ms. Perhacs,

10   does that appear to be your initials?

11   A   Yes.

12   Q   Do you recall placing your initials on this document?

13   A   Yes.

14   Q   Do you recall answering questions put to you by federal

15   prosecutors and agents about this document?

16   A   Yes.

17   Q   Does this document appear to be an email kept and

18   maintained in the ordinary course of Insys' business?

19   A   This email is not ordinary.

20   Q   That's a fair point.  I want to ask you some questions

21   about June of 2013.  Do you recall at some point in June of

22   2013 calling McKesson and posing as a employee of C&R Pharmacy?

23   A   No.

24         MR. BODNAR:  Your Honor, may I have one moment with

25   counsel?

1    THE COURT:  All right.

2    MR. DOSS:  Your Honor, I understand the United States

3    does not have an objection to this document so at this point we

4    move to admit Couch 175.

5    MR. BODNAR:  No objection, Your Honor.

6    THE COURT:  Mark it in.

7    (Defendant Couch's Exhibit 175 was entered into evidence.)

8    MR. DOSS:  We would ask to publish it as well.

9  Q   All right.  I want to turn your attention, Ms. Perhacs, to

10   the second and third page.  On the second page begins the email

11   from someone named Laura Baloun from McKesson based on the

12   email, do you see that?

13 A   I do.

14 Q   All right.  On the third page of that document it says:  I

15   want to make you aware that the TIRF REMS call center received

16   a call from a Subsys rep, John Doe.  She initially presented

17   herself as calling from the pharmacy about a rejection for no

18   PPAF.  Do you know what a PPAF is?

19 A   I don't remember.

20 Q   Okay.  When the agent requested the usual information to

21   view the claim, John Doe admitted she was a Subsys

22   representative.  She was informed that we could not discuss the

23   patient with her without the patient's

24   knowledge/permission.  She then put the pharmacy staff member

25   on the line about the rejection so we were able to complete the

 1   call.
 2          Okay.  Did I read that correctly?
 3   A   You did.
 4   Q   Okay.  On the first page of that document there appears to
 5   be an email from Alec Burlakoff to Joe Rowan where he says:
 6   The rep discussed below was Natalie Perhacs.  Please address.
 7          Do you see that?
 8   A   I do.
 9   Q   Okay.  And then Mr. Rowan responds to Mr. Burlakoff and
10   says on it -- do you see that?
11   A   I do.
12   Q   Did you at some point call McKesson and pose as a pharmacy
13   employee?
14   A   No.
15   Q   So this was not true?
16   A   I did not call McKesson.
17   Q   Did you call someone and pose as an employee of the
18   pharmacy?
19   A   No.
20   Q   Was there any truth whatsoever to this email?
21   A   Yes.
22   Q   What's the truth of the email?
23   A   That I called TIRF REMS because a patient didn't have the
24   paperwork and I was standing right next to Caye, the head
25   pharmacist at C&R.  I had worked for the company for a little

1402

NATALIE PERHACS - CROSS BY MR. DOSS

```
 1   less than two months and didn't know I was doing anything
 2   wrong.
 3   Q   Did you identify yourself as a C&R Pharmacy employee?
 4   A   No.
 5   Q   So that would be incorrect in the email?
 6   A   That's incorrect.
 7   Q   And did Mr. Rowan address this with you?
 8   A   Yes.
 9   Q   And did you explain it?
10   A   I did.
11   Q   Ms. Perhacs, I want to show you what's marked as Exhibit --
12   Couch Exhibit 171.  And Ms. Perhacs, do you recognize this text
13   message exchange?
14   A   I think so.
15   Q   Does this appear to be a back and forth between you and
16   Dr. Couch via text message?
17   A   Yes.
18           MR. DOSS:  Your Honor, we move to admit Couch Exhibit
19   171.
20           MR. BODNAR:  No objection, Your Honor.
21           THE COURT:  All right.  Mark it in.
22       (Defendant Couch's Exhibit 171 was entered into evidence.)
23           MR. DOSS:  If we can have it published.
24           THE CLERK:  It's on its way.
25           MR. DOSS:  Thank you.
```

1   Q   All right.  Ms. Perhacs, on the left side, are those text

2   messages from you to Dr. Couch?

3   A   Yes.

4   Q   And on the right side are those responses or text messages

5   from Dr. Couch to you?

6   A   Yes.

7   Q   All right.  Could you read for us the first two text

8   messages that you sent to Dr. Couch here?

9   A   Hey, Dr. Couch, can you invite a nurse or doctor you're

10  friends with to the program tomorrow?  Maybe someone from

11  Infirmary you operate with.  We are eating at Wintzell's.  He

12  responded, I'll try.

13  Q   And then what did you say?

14  A   Okay.  Thank you.  They are really cracking down on

15  attendees.

16  Q   And your response?  Or his response?  Excuse me.

17  A   Okay.

18  Q   Now, Ms. Perhacs, was it part of your job to recruit

19  prescribers to attend the Insys speaking events?

20  A   Yes.

21  Q   But here you're asking Dr. Couch to reach out to nurses or

22  doctors, maybe someone that he's involved with at the

23  Infirmary, to attend those events; correct?

24  A   Yes.

25  Q   As part of the Insys speaking program, it wasn't the

1    speaker's job to recruit people to attend those, was it?

2    A    No.

3    Q    In fact, it was your job, wasn't it?

4    A    It was both.

5    Q    And it was the job of the speaker to have some credibility,

6    that's what was attracting others to those events; right?

7    A    Yes.

8    Q    And as a pharmaceutical sales representative it was your

9    job, wasn't it, Ms. Perhacs, to reach out into the community,

10   try to find other potential business opportunities for Insys;

11   correct?

12   A    Yes.

13   Q    And as part of that, it would have been your job to reach

14   out to potential prescribers to get them to come to these

15   events; right?

16   A    Yes.

17   Q    And certainly you would rely on the speakers who have

18   medical contacts understandably; correct?

19   A    Yes.

20   Q    All right.  There were different types of speaking

21   engagements that I want to go through.  The first was what was

22   sometimes referred to as venue-based speaking engagements;

23   right?

24   A    Yes.

25   Q    What are venue-based speaking engagements?

 1   A   Where you meet at a restaurant.

 2   Q   And there were group practice speaking engagements; right?

 3   A   Yes.

 4   Q   What were group practice speaking engagements?

 5   A   Where you would give -- the speaker would give the

 6   presentation at another doctor's practice.

 7   Q   And from time to time it could have also been to his own

 8   practice; correct?

 9   A   I don't remember.

10   Q   Okay.  Now, in-office speaking engagements did those tend

11   to be larger events where food was brought in?

12   A   Yes.

13   Q   And the out-of-office speaking engagements, those tended to

14   be smaller and usually held at restaurants; right?

15   A   Yes.

16   Q   So for the smaller events it wouldn't have been uncommon

17   for there to be four or five, six, seven, eight people in

18   attendance; fair?

19   A   Yes.

20   Q   Whereas for the in-office events you might have had 20?

21   A   Yes.

22   Q   When you would have in-office speaking events where

23   Dr. Couch would speak, do you recall that you might have gotten

24   food from Papa John's, do you remember that?

25   A   Yes.

1406

```
 1   Q   Do you remember getting food from Olive Garden?

 2   A   Yes.

 3   Q   Do you remember getting food from Panera?

 4   A   Yes.

 5   Q   Do you remember any other places where you might have

 6   catered -- had the food catered for those in-office events?

 7   A   Yes.

 8   Q   What were those?

 9   A   I remember a restaurant called Osaka.

10   Q   Okay.  Now, when they were out-of-office and they were held

11   at a restaurant, do you remember from time to time when

12   Dr. Couch would speak, they might be held at Longhorn?

13   A   Yes.

14   Q   Do you remember they might be held at Fuego?

15   A   Yes.

16   Q   Now, when they were out-of-office speaking engagements, is

17   it fair to say Insys was pretty tight on the budget per person

18   for the food?

19   A   Yes.

20   Q   And it was usually about 20 to $25 per person for the food

21   at the out-of-office speaking engagements; right?

22   A   Yes.  I think so.

23   Q   And you would have to submit receipts for those, wouldn't

24   you?

25   A   Yes.
```

1407

1    Q    And then you would be reimbursed by Insys?

2    A    No.

3    Q    How would that work?

4    A    Insys would call the restaurant, make the reservation, and

5    give them a card number that I didn't know.

6    Q    And you would get the receipt at the end of the meal and

7    take a picture of it and email it back to Insys; right?

8    A    Yes.

9    Q    And at these speaking engagement events you would also have

10   sign-in sheets, wouldn't you?

11   A    Yes.

12   Q    And that's where everybody who came, they would sign the

13   sheet and they would identify what their position was in a

14   doctor's office; right?

15   A    Yes.

16   Q    And then at the end of those events you would take a

17   picture with your phone of the sign-in sheets and mail those

18   back or email those back to Insys; right?

19   A    No.

20   Q    How would that work?

21   A    I took it with my work iPad.

22   Q    Fair enough.  That's a good point.  So you would take the

23   picture of the sign-in sheets with your iPad and then email

24   those pictures back to Insys; right?

25   A    Yes.

1   Q   So at all times Insys knew who was -- or at least in theory

2   knew who was attending these events?

3   A   Yes.

4   Q   And y'all weren't trying to hide who was at these events,

5   were you?

6   A   No.

7   Q   Whether the presentation was in or out of the office,

8   Dr. Couch would present on Subsys, wouldn't he?

9   A   Yes.

10  Q   And during that presentation he would talk about drug

11  interactions; right?

12  A   Yes.

13  Q   He would talk about how Subsys worked on the body, wouldn't

14  he?

15  A   Yes.

16  Q   He would share with people at those events his clinical

17  experience; right?

18  A   Yes.

19  Q   And he would answer any questions that they might have?

20  A   Yes.

21  Q   And I think we covered it but just to make sure, whether it

22  was in the office or out of the office, those speaking

23  engagements, you were also present for all of those, weren't

24  you?

25  A   Yes.

1  Q   And available to answer any questions that anyone had;

2  right?

3  A   Yes.  Yes.

4  Q   I believe you testified on direct that at some point at the

5  speaking engagements where Dr. Couch was speaking there were no

6  new prescribers; it was only PPSA employees.  Do you remember

7  that?

8  A   At times, that's correct.

9  Q   Do you also remember when that would happen, Dr. Couch said

10 to you:  I'll pay for lunch.  There's no need for you to cover

11 it?

12 A   I don't recall that.

13 Q   Do you have any reason to dispute that?

14 A   No.

15         MR. DOSS:  Your Honor, may I approach?

16 Q   Ms. Perhacs, I've shown you what's been marked for

17 identification purposes as Couch Exhibit 163.  Do you see that?

18 A   Yes.

19 Q   Does this appear to be an email sent by you to Desiree

20 Hollandsworth?

21 A   Yes.

22 Q   And is the date on that August 4th, 2013?

23 A   Yes.

24         MR. DOSS:  Your Honor, we move to admit Couch 163.

25         MR. BODNAR:  No objection, Your Honor.

1    THE COURT:  Mark it in.

2    (Defendant Couch's Exhibit 163 was entered into evidence.)

3  BY MR. DOSS:

4  Q   While we're waiting for that to come up, Ms. Perhacs, what

5  is the purpose of that email?  Why did you send it?

6  A   I sent it because I was having trouble pulling up the

7  slides for the presentation.

8  Q   Okay.  Do you see on the second page of that document where

9  you identified Dr. Couch, lunch program, October 3rd, October

10 10th, October 17th, and then below that you say Longhorn

11 Steakhouse, 6201 Airport Boulevard.  Do you see that?

12 A   Yes.

13 Q   Is it fair to say that the purpose of this email -- correct

14 me if I'm wrong -- was to let Ms. Hollandsworth know that these

15 were the up-coming programs for Dr. Couch?

16 A   Yes.

17 Q   And then you see at the bottom where it says:  Both

18 locations will not require a private room and the total

19 expected attendees for both Dr. Ruan and Dr. Couch will be six?

20 A   Yes.

21 Q   And that was fairly common because this was an

22 out-of-office event; right?

23 A   Yes.

24 Q   And from time to time you had to submit this kind of

25 information to Insys about what programs you were putting on;

NATALIE PERHACS - CROSS BY MR. DOSS

```
 1   right?
 2   A   Yes.
 3   Q   Again, there's no effort to conceal that these events are
 4   actually happening; right?
 5   A   Yes.
 6   Q   All right.  I want to show you another one, what's been
 7   marked for identification purposes as Couch Exhibit 164.
 8           MR. DOSS:  Your Honor, I understand the government has
 9   no objection, so we would offer that at this time.
10           MR. BODNAR:  No objection, Your Honor.
11           THE COURT:  All right.  Mark it in.
12       (Defendant Couch's Exhibit 164 was entered into evidence.)
13   BY MR. DOSS:
14   Q   All right.  Now, this is around the same time as the email
15   we just looked at; right?
16   A   Yes.
17   Q   All right.  On August 19th, 2013, you sent an email to
18   Mr. Rowan; correct?
19   A   Yes.
20   Q   And what were you asking Mr. Rowan in this email?
21   A   I was requesting six programs and I was naming the
22   physicians I wanted to do the programs with.
23   Q   And you say right before the thanks line, I know I am
24   asking for a lot.  But if the money is on the table, I'll take
25   it; correct?
```

```
 1   A    Yes.

 2   Q    What did you mean by that?

 3   A    That meant per district.  I worked in the Miami

 4   district.  It was rare, but sometimes the company would allot

 5   an extra budget and extra money for extra speaker

 6   programs.  And they would tell the teams that we have extra

 7   money for these speaker programs, pick your physicians that

 8   you're going to use them with.  Rarely did you get everything

 9   you asked for in these circumstances.

10   Q    Sure.  And the money you were asking for, if I understand

11   correctly, was to pay for the food at these events; is that

12   right?

13   A    Yes.

14   Q    And for one out-of-office event, let's say for Dr. Couch,

15   on average, best guess, what was the total amount of the food

16   cost?

17   A    I don't remember.

18   Q    Okay.

19            THE COURT:  Mr. Doss, is now a good time for us to

20   take our morning break?

21            MR. DOSS:  Yes, ma'am.

22            THE COURT:  All right.  Ladies and gentlemen, leave

23   your pads on your chairs.  No discussion about the case.  Take

24   your break downstairs and we will call you back up in about 15

25   minutes.
```

1413

```
 1          MR. BODNAR:  Your Honor, may we approach at the side
 2    bar on one matter, please?
 3          THE COURT:  Yes.  The jury can go on and be excused.
 4       (In open court, defendants present, jury not present.)
 5          THE COURT:  Do you want to approach or does it need to
 6    be at side bar?
 7          MR. BODNAR:  Yes, Your Honor, it needs to be at side
 8    bar.
 9       (At the side bar, jury not present.)
10          MR. BODNAR:  Your Honor, my concern going forward is
11    on whether or not the company knew or any sort of insinuation
12    that the company knew who was attending these speaker programs,
13    then there couldn't be anything wrong with it, when in fact
14    just about everyone we've talked about this morning -- Mike
15    Babich, Gurrieri, Burlakoff, Rowan have all been indicted in
16    Boston on these exact charges where Dr. Ruan and Dr. Couch are
17    listed in the indictment in Boston, having paid kickbacks.
18    So if there's going to be insinuations that the company knew it
19    was all transparent and, therefore, it's okay, then I think
20    we're getting dangerously close to having to tell the jury:
21    Well, all these individuals that knew and were saying it was
22    okay have also been indicted and the ones that haven't been
23    indicted are targets in other investigations.
24          So that's my fear, if we go too far down the road of:
25    Well, everything's okay, since the company knew about it.
```

```
 1           THE COURT:  So what do you want me to do about it at
 2  this point?
 3           MR. BODNAR:  At this point, if they go further down --
 4           THE COURT:  You're just giving a warning; is that
 5  right?
 6           MR. BODNAR:  Yes, and putting it on the record.  If it
 7  goes further down, I'll ask to be able to tell the jury that
 8  they have been indicted on these.
 9           THE COURT:  All right.  Well, you two have a
10  discussion about that.
11           MR. BODNAR:  Yes.
12           THE COURT:  That's not for me yet.
13       (A recess was taken at 10:36 a.m.)
14       (In open court, 10:55 a.m., defendants and jury present.)
15           THE COURT:  All right, Mr. Doss.
16           MR. DOSS:  Thank you, Your Honor.
17  Q   Let me show you Ms. Perhacs what we've marked for
18  identification purposes as Couch Exhibit 174.
19           MR. DOSS:  Your Honor, I understand the government has
20  no objection to this exhibit, so we would move to admit Couch
21  Exhibit 174 at this time.
22           MR. BODNAR:  Yes.  No objection, Your Honor.
23           THE COURT:  All right.  Mark it in.
24       (Defendant Couch's Exhibit 174 was entered into evidence.)
25  BY MR. DOSS:
```

NATALIE PERHACS - CROSS BY MR. DOSS

1   Q   All right.  Ms. Perhacs, what's the date of this email?

2   A   September 3rd, 2013.

3   Q   This is an email sent by Ms. Hill, who I believe you

4   testified earlier was at one point your direct supervisor;

5   correct?

6   A   Yes.

7   Q   And a number of people received this email, including you;

8   right?

9   A   Yes.

10  Q   Were these people part of the MIA sales team?

11  A   Yes.

12  Q   All right.  How does Ms. Hill begin this email?

13  A   Good morning, greatest team in the universe.

14  Q   What's the next paragraph say?

15  A   Below is an email I received this morning from a brand new

16  SSP, Rob Zarrilli.  Take a look and formulate your own plan of

17  attack in your territory.  You are now working for your

18  Christmas money, which will be paid out around December 1st.

19  You have four weeks to go.

20  Q   Okay.  Is it fair to say that while you were working at

21  Insys, it was a high-pressure environment?

22  A   Yes.

23  Q   And so when you receive emails in September telling you

24  that you're now working for your Christmas money, what effect,

25  if any, did that have on you?

1416

1    A   It was motivating.

2    Q   Ms. Hill then goes down and says:  Here's the easiest way

3    to blow it out quickly.  Do you see that?

4    A   Yes.

5    Q   All right.  I want to walk through the suggestions Ms. Hill

6    has to the MIA sales team.

7         She says:  First, have your docs titrate current

8    patients with BTCP that need higher strength.  Identify areas

9    as units to current patients with breakthrough episodes being

10   left untreated.  Right?

11   A   Yes.

12   Q   And titration, if I understand correctly, is a way for the

13   doctors to increase or decrease dosages in order to find the

14   optimum point of the dosage for that particular patient; is

15   that a fair definition of titration?

16   A   Yes.

17   Q   And she says:  Identify areas to add units to current

18   patients with breakthrough episodes being left untreated.

19        Ms. Hill doesn't suggest finding sham patients to

20   receive Subsys, does she?

21        MR. BODNAR:  Objection, Your Honor.  There's no

22   relevance to sham patients and there hasn't been at any point

23   in this trial.

24        THE COURT:  Well, you can answer the question.  I

25   overrule the objection.

BY MR. DOSS:

Q    Ms. Hill doesn't suggest going out and finding sham patients to receive Subsys, does she?

A    No.

Q    So as far as you understood this tip from Ms. Hill, it was to ensure that patients who are appropriately receiving Subsys got Subsys; right?

A    Yes.

Q    Her second tip is:  Negotiate and gain your doc's agreement to the following before you implement.  Do you see that?

A    Yes.

Q    And what are those two right below it that Ms. Hill suggests, if you wouldn't mind reading that for us?

A    Get your MAs to ask these questions to the patients when they check in:  Are there any times during the day when you find you need an additional Subsys unit?  First thing in the a.m.?  Middle of the night?  Have the MA stick a voucher on every chart that needs more Subsys.

Are there any times when you feel you need a higher strength to handle your breakthrough pain?  Have the MA stick a voucher on every chart with a yellow sticky saying that he needs a higher strength of Subsys.

Q    All right.  What's an MA, Ms. Perhacs?

A    Medical assistant.

Q    And did PPSA employ MAs?

1    A    Yes.

2    Q    And would it have been part of their job to do the sorts of

3    things that Ms. Hill is suggesting here?

4    A    I don't know.

5    Q    Did you ever try to get PPSA to do these sorts of things,

6    having the MAs stick a voucher on every chart with a yellow

7    sticky saying that the patient needs a higher strength of

8    Subsys?

9    A    No.

10   Q    The next tip that Ms. Hill gives, she says:  Have MAs keep

11   vouchers and stickies in every single exam room.  Please

12   provide brochure holders.  This is easy.

13              Right?  Did I read that correctly?

14   A    Yes.

15   Q    Okay.  Did you ever do that at PPSA?

16   A    Yes.

17   Q    The next one:  Gain the doctor's agreement to Rx -- I'm

18   assuming that means prescribe -- prescribe when he sees the

19   voucher.  Do this in all of your current Subsys offices and you

20   will blow it out.  These patients are low-hanging

21   fruit.  They've already been approved.  This is the fastest way

22   to make -- and I'm assuming that means money -- a bunch of

23   dollar signs?

24   A    Yes.

25   Q    Did I read that correctly?

1  A   Yes.

2  Q   All right.  Did you ever do that at PPSA?

3  A   I don't remember.

4  Q   Next tip or next point she says:  You guys are the best in

5  the business and we are number one.  Now that we have more

6  teams the competition has increased.  They think they can

7  surpass us so we need to show them we cannot be taken down.  We

8  are already ahead of the game.  Now it's time to take it to the

9  next level.

10         Did I read that correctly?

11  A   Yes.

12  Q   When you received this email -- and let me back up.  Do you

13  recall receiving this email?

14  A   Yes.

15  Q   When you received this email, Ms. Perhacs, and Ms. Hill

16  referenced the competition, what did you understand her to mean

17  by that?

18  A   I understood her to mean the competition as the other teams

19  within Insys.

20  Q   Okay.  Is it fair to say that teams within Insys were being

21  pitted against each other while you were working at Insys?

22  A   Yes.

23  Q   And did that feed what you testified earlier about the

24  high-pressure environment at Insys while you were working

25  there?

1   A   Yes.

2   Q   On the next page, if you wouldn't mind turning that,

3   Ms. Perhacs; if you could read that paragraph for us, please.

4   A   Sell the GAP program.  It's not only your reimbursement

5   program, it's also us providing free Subsys to any commercial

6   patient that doesn't end up with coverage after opting into our

7   reimbursement program and seeing it through the entire

8   process.  Also, we provide free Subsys for all commercial

9   patients going through the process after opting in while

10  waiting for approval.  This is huge as no other company can

11  even come close to comparing.  Your doctors will be extremely

12  impressed with this.

13  Q   And then she ends with:  Let's go team Miami; correct?

14  A   Yes.

15  Q   All right.  The GAP program, what was that?

16  A   Guaranteed access program.

17  Q   What did the GAP program do?

18  A   Provided medications for commercial patients.

19  Q   And did you ever explain the GAP program to folks at PPSA?

20  A   Yes.

21  Q   Did they ever take advantage of the GAP program?

22  A   Yes.

23  Q   And correct me if I'm wrong, Ms. Perhacs, but nowhere in

24  this email does it mention anything about increasing speaking

25  events, does it?

1   A   No.

2   Q   I'm going to show you what we've marked for identification

3   purposes as Couch Exhibit 173.

4         MR. DOSS:  Your Honor, I understand the government has

5   no objection to Couch Exhibit 173, and we move for its

6   admission.

7         MR. BODNAR:  No objection, Your Honor.

8         THE COURT:  Mark it in.

9      (Defendant Couch's Exhibit 173 was entered into evidence.)

10  BY MR. DOSS:

11  Q   While we're waiting for that to come up, this appears to be

12  a series of emails between you and Mr. Burlakoff; correct?

13  A   Yes.

14  Q   And this was around October 2013.  In particular, October

15  3rd of 2013; right?

16  A   Yes.

17  Q   All right.  On the second page we're going to start with

18  the email, we're going to go to the first one.  Mr. Burlakoff

19  sends you an email saying:  Dr. Ruan and Dr. Couch are way

20  down.  Can you assist, please?

21         This was the topic of conversation today with

22  Dr. Kapoor and Mike; right?

23  A   Yes.

24  Q   And you responded on that same day, copying Ms. Hill, and

25  you say:  They recently swapped to a new computer system and it

NATALIE PERHACS - CROSS BY MR. DOSS

```
 1   has been a tremendous difficulty for the clinic.  I personally
 2   spoke to Dr. Ruan's nurse practitioner and Dr. Ruan himself
 3   about it and the difficulty is it's not only difficult for the
 4   staff, it's difficult for the patients to be seen.  I am happy
 5   to discuss the situation in more detail at any time.
 6            Did I read that correctly?
 7   A   Yes.
 8   Q   Okay.  And Mr. Burlakoff responds saying:  I'm good with
 9   that so long as you're on top of it.  And what was your
10   response to Mr. Burlakoff?
11   A   I give you my word that in the case -- and you will not
12   only see a rebound, I will grow the business this quarter and
13   years to come.  Natalie.
14   Q   And when you sent that email, Ms. Perhacs, to
15   Mr. Burlakoff, it was your intention, wasn't it, to grow the
16   business through good customer service; right?
17   A   Yes.
18   Q   And to be available if the doctors had any questions;
19   right?
20   A   Yes.
21   Q   To be available if the doctor or staff members had any
22   questions; right?
23   A   Yes.
24   Q   And you weren't just limiting yourself to Dr. Ruan and
25   Dr. Couch.  At that point in time, Ms. Perhacs, you had goals
```

1   of trying to increase your business beyond them, didn't you?

2   A   Yes.

3   Q   And so when you said:  I will grow the business in this

4   quarter and years to come, you were hoping to grow the business

5   not just with Dr. Couch and Dr. Ruan but with other doctors

6   too, weren't you?

7   A   Yes.

8   Q   I show you what we've marked for identification purposes as

9   Couch Exhibit 177.

10          MR. DOSS:  Your Honor, I understand the government has

11  no objection.  We would move to admit Couch Exhibit 177.

12          MR. BODNAR:  No objection, Your Honor.

13          THE COURT:  All right.  Mark it in.

14     (Defendant Couch's Exhibit 177 was entered into evidence.)

15  BY MR. DOSS:

16  Q   All right.  Ms. Perhacs, you've seen this email before,

17  haven't you?

18  A   Yes.

19  Q   And those are your initials at the bottom, N.T., 1/15/16;

20  right?

21  A   Yes.

22  Q   And this was an email that was shown to you and discussed

23  with you during one of your interviews with the federal

24  prosecutors and agents; correct?

25  A   I think so.

1    Q    All right.  I want to start from the back, the last page

2    where this email chain starts.

3          And it's an email from you to Ms. Hill, and you copy a

4    woman named Meghan McMillan.  You may remember I first asked

5    you that question what Meghan McMillan did at Insys.  Seeing

6    this email, does that help jog your memory about what her job

7    may have been?

8    A    Yes.

9    Q    What was her job?

10   A    She helped with the programs.

11   Q    And speaker programs; correct?

12   A    Speaker programs.

13   Q    Okay.  All right.  If you wouldn't mind reading that email

14   to us that you sent to Ms. Hill?

15   A    Karen, Dr. Couch just informed me he will be in Atlanta

16   Thursday and he has a program that day.  He wanted to see if we

17   could move it to the following Thursday, the 14th, for the

18   in-clinic lunch.  He just alerted me to this and I wanted to

19   get the date changed immediately.

20   Q    Okay.  And if you could flip to the next page, the second-

21   to-the-last page.  You sent another email -- or excuse me,

22   Ms. McMillan sent an email response and what did she say?

23   A    I canceled the reservation at Fuego.  You will need to

24   resubmit the ISP form with the new info.

25   Q    What's an ISP form?

1425

1   A   I's the speaker program form.

2   Q   And that would contain the information about the event, who

3   was speaking, where the location would be, those sorts of

4   things; correct?

5   A   Yes.

6   Q   You responded to Ms. McMillan and Ms. Hill, and what did

7   you say?

8   A   I wanted to move all of Dr. Couch's programs

9   in-office.  The one tomorrow will be at his office at 4682

10  Airport Boulevard.  Is this change okay?  I know it was

11  previously mentioned, but I wasn't sure the outcome.  It would

12  be for 20 people and Papa John's would be perfect.

13  Q   Okay.  And earlier, Ms. Perhacs, do you remember we were

14  talking about the differences between in-office meeting and

15  out-of-office meeting?  Do you remember those questions?

16  A   Yes.

17  Q   Okay.  This would have been an in-office meeting for maybe

18  20 people; right?

19  A   Yes.

20  Q   And I believe that you testified earlier for the in-office

21  you would expect a higher number of people to be present;

22  right?

23  A   Yes.

24  Q   Okay.  And you were wanting Papa John's to provide the food

25  for that; right?

NATALIE PERHACS - CROSS BY MR. DOSS

```
 1   A   Yes.
 2   Q   All right.  So Ms. McMillan in response to that -- and she
 3   says:  Karen, did you approve this?
 4           Do you see that at the top of that page?
 5   A   Yes.
 6   Q   Okay.  If you flip to the second page of that exhibit,
 7   Ms. Hill responds to Ms. McMillan and she copies you an email
 8   addressed -- and it says:  Insys meetings, and Desiree
 9   Hollandsworth.  Do you see that?
10   A   Yes.
11   Q   And we heard earlier Ms. Hollandsworth had some involvement
12   in the Insys speakers program; correct?
13   A   Yes.
14   Q   And Ms. Hill says:  Yes, ma'am, in response to that
15   question, Karen, did you approve this?
16           What does Ms. Hollandsworth then say in response to
17   Ms. Hill's email?
18   A   Meghan, please hold on this.  I do not approve of doing all
19   these programs to be held in speaker's office.  Karen, we can
20   discuss further at your convenience.  We can move forward with
21   one tomorrow.  All others are on hold until we can discuss
22   further.
23           Natalie, please submit a proper request form with all
24   the details for tomorrow's program.  Need this stat or this too
25   will have to be rescheduled.
```

1  Q   Okay.  If you flip to the first page, Ms. Hill says:  Hey

2  guys, after speaking with Joe and Natalie, I agree that it's

3  best for Natalie to keep several of these in

4  restaurants.  Right?

5  A   Yes.

6  Q   And then you responded to Ms. Hill saying:  Let's make the

7  next two in-office and then the rest will be in restaurants

8  that are already approved.  Can we just use Papa John's for the

9  in-office catering?

10         And what did Ms. McMillan say in response to your

11  email?

12  A   Papa John's is fine, Natalie, but I need a new ISP request

13  form with the complete address including the business name,

14  suite, floor if applicable, et cetera, by EOD, please.  I

15  canceled the Wintzell's reservation.

16  Q   Okay.  And then you sent a followup email at the top where

17  you gave the addresses and the number of expected people;

18  right?

19  A   Yes.

20  Q   Now, I want to show you what's already in evidence as

21  Government's Exhibit 32-4(1).  If we could use the ELMO for

22  that, please?

23         So this is an email Mr. Bodnar was asking you about

24  and it was a time period of October 9th, 2013.  Do you see

25  that?

1    A    I do.

2    Q    All right.  So at this point in time was it on your radar

3    that Dr. Couch and Dr. Ruan's prescribing of Insys' competitor

4    was increasing?

5    A    Yes.

6    Q    So in the email that we were just looking at, Couch Exhibit

7    177, that was November of 2013; right?

8    A    Yes.

9    Q    And if I count correctly, there are about nine emails in

10   this chain discussing whether or not Insys will pay for Papa

11   John's at PPSA; right?

12   A    I don't remember.

13   Q    Okay.  But you would agree there is a fair number of

14   back-and-forth emails within this time frame, internal at

15   Insys, about whether Papa John's would be approved for PPSA's

16   lunch; correct?

17   A    Yes.

18   Q    All right.  I'm going to show you what we've marked for

19   identification purposes as Couch Exhibit 165.  Before we get to

20   the contents of Couch Exhibit 165, Ms. Perhacs, do you see at

21   the top of that email there's a "from" line and a "to" line?

22   A    Yes.

23   Q    When you were working for Insys during this time frame of

24   December 2013, if somebody sent an email to either sales RDs or

25   sales DMs.  Would you have received that email?

 1  A   No.

 2  Q   Okay.  Let me show you what we've marked as Couch Exhibit

 3  179.

 4          MR. DOSS:  Your Honor, I understand there's no

 5  objection to Couch Exhibit 179 so we'd offer it.

 6          MR. BODNAR:  No objection, Your Honor.

 7          THE COURT:  All right.  Mark it in.

 8      (Defendant Couch's Exhibit 179 was entered into evidence.)

 9  BY MR. DOSS:

10  Q   All right.  Ms. Perhacs, are those your initials at the

11  bottom of that page, 3/15/16, N.P.?

12  A   Yes.

13  Q   Okay.  And this was another email that was shown to you and

14  discussed with you when you were interviewed by federal

15  prosecutors and agents; correct?

16  A   I think so.

17  Q   I want to start at the back of this.  And before we go

18  forward, what's the date on that first page?

19  A   Friday, February 7th, 2014.

20  Q   Okay.  Now, if we go to the third to last page, looks like

21  it -- all right.  This third to last page -- all right.

22          At the bottom we've got an email from Darin Fila.  Do

23  you know who that is?

24  A   Yes.

25  Q   Who is Darin Fila?

1430

1    A    He was in charge of the training for the sales reps.

2    Q    And it was being sent to sales RDs?

3    A    Yes.

4    Q    And it says:  We have achieved tremendous success in 2013

5    due in part to effective implementation of Insys speaker

6    programs.  We are continuously striving to improve both the

7    quality of the speakers, the content, and the execution of

8    these programs.  To that end, we are attempting to assess the

9    acumen, expertise and effectiveness of our speakers.  Please

10   review attached list of your active speakers based on the

11   below-following criteria and identify those speakers who may

12   need additional training or may need to be removed from the

13   bureau.

14            And then if you look on the next page, Ms. Perhacs,

15   there's a speaker evaluation criteria page.  Do you see that?

16   A    Yes.

17   Q    All right.  First category is clinical product knowledge

18   and communication.  Right?

19   A    Yes.

20   Q    And there are a number of subcategories.  We're not going

21   to read through them all, but there are a number of

22   subcategories to that overall category; right?

23   A    Yes.

24   Q    And then we've got managed care, PA, GAP knowledge and

25   communication; right?

1    A    Yes.

2    Q    And a number of subcategories under that one?

3    A    Yes.

4    Q    And we've got practical clinical experience, TIRF REMS,

5    medical legal environment, risk mitigation, and on the next

6    page we've got speaking platform skills, availability and

7    reliability and we've got reputation.  Do you see that?

8    A    Yes.

9    Q    Okay.  And is it fair to say there are a lot of

10   subcategories to each of those major categories; right?

11   A    Yes.

12   Q    If you would, turn to the second page of that exhibit and

13   in the middle you sent an email to -- in response to Karen Hill

14   and you said:  Dr. Ruan, a 10 in each area.  FYI:  He helped me

15   recruit Dr. Lee (another speaker).  And you said:  Dr. Couch a

16   nine.  He has great presentation skills and makes programs

17   enjoyable.

18           Were those criteria one out of 10, one to 10, one

19   being worst, 10 being best?

20   A    Yes.

21   Q    So you were rating Dr. Ruan as a 10 and Dr. Couch as a nine

22   out of 10; right?

23   A    Yes.

24   Q    And that was for each of those categories on that

25   evaluation form; correct?

1    A    I think so.

2    Q    Okay.  And if you turn to the first page of this document,

3    you sent an email to Ms. Hill on February 7th, at the top of

4    the page, and you said what?

5    A    Dr. Couch is one of the best presenters as far as fun,

6    integrated with knowledge is concerned.  He is weak in the area

7    of helping recruit new doctors, though.  He is so well

8    connected within the community, I think this should be easier

9    for his -- to draw a more diverse crowd to a program.

10   Q    Okay.  Is it fair to say one of the groups of doctors that

11   Insys was targeting with the speaker programs were oncologists?

12   A    Yes.

13   Q    And early on in the Insys speakers program when Dr. Couch

14   was speaking he did help recruit oncologists to attend those

15   events, didn't he?

16   A    I don't remember.

17   Q    All right.  How many pain management doctors are in this

18   area of Mobile?

19   A    I don't know.

20   Q    You do know that Dr. Couch helped bring pain management

21   doctors to those events, don't you?

22   A    Yes.

23   Q    After a while, though, did you come to understand that the

24   oncologists chose not to attend the event; did you know that?

25   A    I don't remember.

1433

```
 1   Q    Okay.  When you told Ms. Hill in February of 2014 that
 2   Dr. Couch was one of the best presenters, he's integrated with
 3   knowledge and you rated him a nine out of 10, were you telling
 4   Ms. Hill the truth?
 5   A    Yes.
 6   Q    And again, just so I understand the time frame of all of
 7   this --
 8           MR. DOSS:  If we could have the ELMO for just one
 9   minute, please.
10           THE CLERK:  I apologize.
11   BY MR. DOSS:
12   Q    I'm going to show you what's in evidence as Government's
13   Exhibit 32-4(6).  So in February, again it was on your radar
14   that Dr. Couch and Dr. Ruan may have been prescribing Abstral,
15   made by Galena which was Insys' competitor; right?
16   A    Yes.
17   Q    And it was before February 10th when you knew that, didn't
18   you?
19   A    I don't -- I don't remember.
20   Q    Well, let's see.  Here's Government Exhibit 32-4(5).
21   And that was February 4th, 2014; right?
22   A    Yes.
23   Q    And you were asking Mr. Yu for the Abstral numbers for
24   Dr. Couch and Dr. Ruan over the past month; right?
25   A    Yes.
```

1434

```
 1   Q   So is it fair to say that in February, maybe even before,
 2   maybe even in January, Dr. Couch and Dr. Ruan's prescribing of
 3   Abstral was something that you were thinking about.  It was on
 4   your radar as a sales representative?
 5   A   Yes.
 6   Q   And yet on February 7th during the same time frame,
 7   according to Couch Exhibit 171, you were rating them as 10 out
 8   of 10 and nine out of 10 in their presentation skills; correct?
 9   A   Yes.
10   Q   And you were telling the truth?
11   A   Yes.
12   Q   I'm going to show you what we've marked for identification
13   as Couch Number 148.
14               While you're -- while you're looking through
15   that, do you recognize that document, Ms. Perhacs?
16   A   Yes.
17          MR. DOSS:  Your Honor, I understand there's no
18   objection to this document.  We move to admit Couch Exhibit
19   148.
20          MR. BODNAR:  No objection, Your Honor.
21          THE COURT:  All right.  Mark it in.
22       (Defendant Couch's Exhibit 148 was entered into evidence.)
23   BY MR. DOSS:
24   Q   All right.  While we're waiting for that to come up,
25   Ms. Perhacs, is this a program sign-in sheet?
```

1435

NATALIE PERHACS - CROSS BY MR. DOSS

```
 1   A   Yes.
 2   Q   And I believe you testified earlier that all of the
 3   speaking events you would have a sign-in sheet where the
 4   attendees would sign their names; right?
 5   A   Yes.
 6   Q   And we have various information.  For example, we would
 7   have the program dates, program locations, territory ID,
 8   program type and your name; right?
 9   A   Yes.
10   Q   Okay.  So this would have been a speaking event where
11   Dr. Couch was speaking at Wintzell's Oyster House; correct?
12   A   Yes.
13   Q   All right.  So it's a little hard to read.  Well, let me
14   back up.  Is this an example of one of the sign-in sheets where
15   you would take a picture with iPad and then email it back to
16   Insys?
17   A   Yes.
18   Q   Okay.  On this one, we've got the names, the office
19   address, phone number, state license number, specialty, and
20   then we've got a number of check boxes on the far right side.
21   Do you see that?
22   A   Yes.
23   Q   Okay.  And that would allow you to keep track of what types
24   of medical professionals were attending these events; correct?
25   A   Yes.
```

1   Q   So, for example, first one on this list is Justin

2   Palmer.  And you were familiar with him through your work at

3   Insys; correct?

4   A   Yes.

5   Q   He was one of the nurse practitioners at PPSA, wasn't he?

6   A   Yes.

7   Q   Okay.  So he has signed or he's checked the NP box on the

8   far right; correct?

9   A   Yes.

10  Q   Then we've got a Chilean Fletcher, a medical assistant.  Do

11  you remember her?

12  A   I think so.

13  Q   Okay.  You've got Tiffany Gross, a medical assistant.  Does

14  that name ring a bell?

15  A   Yes.

16  Q   Okay.  Bobbi Coburn checked "other" and wrote in

17  "receptionist"; correct?

18  A   Yes.

19  Q   Those are all PPSA employees; correct?

20  A   Yes.

21  Q   Okay.  Let's look at the second page.

22          All right.  We've got Jane Breland; correct?

23  A   Yes.

24  Q   She was a registered nurse at PPSA.

25          Is that right?

```
 1   A   Yes.

 2   Q   Okay.  Emily Dawson.  Do you know who Emily Dawson was?

 3   A   I don't remember.

 4   Q   Was she an employee of PPSA?

 5   A   I don't know.

 6   Q   What about Lynette Lord?

 7   A   I don't know.

 8   Q   What about Ken Bailey?

 9   A   Yes.  Ken -- Ken worked at PPSA.

10   Q   Okay.  As a registered nurse?

11   A   I don't know.

12   Q   Okay.  Let's check the next page.

13           All right.  We've got Frankie Goss.  Do you see that?

14   A   Yes.

15   Q   A medical assistant, maybe?

16   A   I think so.

17   Q   Allison Ahmad, do you see that one?

18   A   I do.

19   Q   Receptionist; correct?

20   A   Yes.

21   Q   Got Chuck Powers, looks like another MA; is that right?

22   A   Yes.

23   Q   Was Chuck Powers an employee of PPSA?

24   A   I don't know.

25   Q   And do you recognize the last name?
```

```
 1   A   No, I can't read it.

 2   Q   Do you know if that was an employee of PPSA?

 3   A   No.

 4   Q   Is there another page on that?

 5           Yes.  Okay.  Joe Bright, do you see that one?

 6   A   Yes.

 7   Q   Was that an employee of PPSA, if you recall?

 8   A   I don't remember.

 9   Q   Amanda Combs, same question.

10   A   I don't -- I don't remember.

11   Q   Judge Lee?

12   A   Yes.

13   Q   He was an employee of PPSA; right?

14   A   Yes.

15   Q   And in fact, Judge Lee was involved with the prior

16   authorization process at some point in time, wasn't he?

17   A   Yes.

18   Q   So if he had attended this event, for example, you were

19   available to answer questions for him about that PA process,

20   weren't you?

21   A   Yes.

22   Q   Tiffany Gross, the last one.  I believe she may have signed

23   that twice.  I think we've already covered her name.  I think

24   that's the last page.

25           I show you what we've marked as Exhibit 149, Couch
```

```
 1   149.
 2              MR. BODNAR:  No objection, Your Honor.
 3              THE COURT:  All right.  Mark it in.
 4         (Defendant Couch's Exhibit 149 was entered into evidence.)
 5   BY MR. DOSS:
 6   Q   Ms. Perhacs, do you recognize that document?
 7   A   Yes.
 8   Q   All right.  Is this another sign-in sheet?
 9   A   Yes.
10   Q   All right.  We've got September 18th, 2013; right?
11   A   Yes.
12   Q   And that was at Fuego?
13   A   Yes.
14   Q   Dr. Couch spoke and those in attendance, according to this
15   sign-in sheet, we have Allison Ahmad, Bobbi Coburn, Terry
16   Sullivan, Ken Bailey, Chilean Fletcher, Brenda Arnold, Emily
17   Dawson, Donna Newburn, do you see those names?
18   A   Yes.
19   Q   Do you know which of those worked at PPSA?
20   A   Donna, and I don't -- I don't remember.
21   Q   Okay.  And we have medical -- according to the boxes they
22   check on the right, the medical assistants, looks like all of
23   them except for the last one who checked the pharm box.  Do you
24   see that?
25   A   Yes.
```

1440

```
 1  Q  Would that indicate to you that was a pharmacy employee of
 2  some sort?
 3  A  Yes.
 4  Q  I'll show you what we've marked as Couch Exhibit 150.
 5     (A discussion was held off the record between counsel.)
 6         MR. DOSS:  Let me -- Your Honor, I think to save time,
 7  we are planning to offer other program sign-in sheets.  Those
 8  would be Couch Exhibit 150, 152, 153, 154, 155, 156, 157, 158,
 9  and 159.
10         MR. BODNAR:  And there's no objection to those.
11         THE COURT:  All right.  Mark them in.
12     (Defendant Couch's Exhibits 150, 152, 153, 154, 155, 156,
13  157, 158, and 159 were entered into evidence.)
14         MR. DOSS:  Can I use the ELMO, please?
15  Q  All right.  I'll show you, Ms. Perhacs, Couch Exhibit 150,
16  which is another program sign-in sheet.  And on this one it was
17  October 10th, 2013, at Fuego; right?
18  A  Yes.
19  Q  Justin Palmer, Allison Ahmad, Ashley Morris and at the
20  bottom Caye Renegar.  Who is Caye Renegar?
21  A  The head pharmacist at Couch and Ruan Pharmacy.
22  Q  Would it have been important for a pharmacist to attend a
23  Subsys presentation if the pharmacist was dispensing Subsys?
24  A  It could be.
25  Q  On the next page, same event.  We've got Kaitlyn Bishell;
```

1441

1    is that right?

2    A    I don't know.

3    Q    Bridgette Parker, Shanna Harrill, Sharon Noland, do you

4    know which of those worked at PPSA?

5    A    Bridgette, Shanna, and Shannon.

6    Q    Okay.

7    A    And the other, I don't remember.

8    Q    Okay.  Next page.  If that's a copy, I think that's it.  So

9    those were the attendees for that event.

10              I'll show you what's in evidence as Couch Exhibit 151.

11              THE CLERK:  That one's not in, Your Honor.

12              MR. DOSS:  Sign-in sheet.

13              THE CLERK:  That one's not.

14   BY MR. DOSS:

15   Q    That looks like October 16th, 2013, at Wintzell's.  Does

16   that appear correct?

17   A    Yes.

18   Q    All right.  We've got Casey Weltlich, who is an RN;

19   correct?

20   A    I don't know.

21   Q    Does it have --

22   A    It indicates it on the sheet, yes.

23   Q    Okay.  Jane Breland, who's checked RN; correct?

24   A    Yes.

25   Q    Got Justin Palmer who's checked RN, and Caye McConaghy.

NATALIE PERHACS - CROSS BY MR. DOSS

```
 1    Now is Caye McConaghy the same as Caye Renegar?

 2    A   I know her as Renegar, but yes.

 3    Q   It is the same person?

 4    A   Yes.

 5    Q   And then on the next page we've got Ashley Morris, Kaitlyn

 6    Bishell, Allison Ahmad, Chilean Scott.  And it looks like, at

 7    least for Ms. Morris, Ms. Bishell and Ms. Scott, they all

 8    checked pharmacy; is that right?

 9    A   Yes.

10    Q   Okay.  152, another program sign-in sheet.  This looks like

11    December 12th, 2013, at Fuego; right?

12    A   Yes.

13    Q   All right.  Casey we talked about.  Tao Chen, is he a

14    physician at PPSA?

15    A   Yes.

16    Q   Okay.  Chris Cunningham, is that an employee of PPSA?

17    A   I don't remember.

18    Q   Okay.  Shannon Hackworth, do you remember that name?

19    A   No.

20    Q   Okay.  Got Bobbi Coburn, Melissa -- do you recognize that

21    name, Melissa?

22    A   No.

23    Q   Okay.  153, got another sign-in sheet.  December 18th,

24    2013.  All right.  We've got Bridgette Parker, Brandon

25    Morrisette and Frankie Goss; right?
```

1   A   Yes.

2   Q   Okay.  And this was held at Wintzell's on December 18th and

3   Dr. Couch spoke; is that correct?

4   A   Yes.

5   Q   Okay.  As far as you recall, Dr. Couch spoke at these

6   events that were -- for the sign-in sheets we're looking at;

7   right?

8   A   Yes.

9   Q   All right.  154.  Got January 9th, 2014 event at Fuego.

10  And we have Dr. Chen, Kelly Hunt, Sharon Hattenstan, Jane

11  Breland; right?

12  A   Yes.

13  Q   And were these -- Ms. Hunt and Ms. Hattenstan, does it look

14  like it's indicated MRI for their position?

15  A   Yes.

16  Q   Do you know if in fact they worked with the MRI at PPSA?

17  A   I don't know.

18  Q   Do you know if they worked on an MRI anywhere?

19  A   I don't know.

20  Q   Okay.  All right.  And we've got Mr. Lee, Amber McDonald,

21  got other names.  And it looks like they're in -- he's an MA,

22  we've got medical records, medical records and billing;

23  correct?

24  A   Yes.

25  Q   Okay.  Chilean Fletcher, Frankie Goss, do you recognize

NATALIE PERHACS - CROSS BY MR. DOSS

1    that name?  (Indicating.)

2    A    No.

3    Q    Bridgette Parker, another MA according to that.

4    (Indicating.)

5    A    Yes.

6    Q    Okay.  And I'm not going to go through all of these because

7    they're now in evidence.  But is it fair to say when Dr. Couch

8    would give a presentation, even if it was just for PPSA

9    employees, or predominantly to them, it was your practice to

10   prepare an attendance sheet; right?

11   A    I prepared some of it.

12   Q    You would provide it and they would fill it out; correct?

13   A    Yes.

14   Q    All right.  Ms. Perhacs, I'm going to shift topics a little

15   bit here.  We talked a little bit about the prior authorization

16   process; correct?

17   A    Yes.

18   Q    Okay.  Was there ever a time when you changed any of the

19   diagnosis codes on those prior authorization forms?

20   A    No.

21   Q    Was there ever a time when people at PPSA asked you whether

22   you changed diagnosis codes on the prior authorization forms?

23   A    No.

24   Q    Was there ever a time that anyone at PPSA confronted you

25   about altering any patient records or files?

1   A   No.

2   Q   And did you, in fact, ever do that?

3   A   No.

4   Q   Did you ever write on any Subsys prescriptions that a

5   patient had a cancer diagnosis?

6   A   No.

7   Q   Okay.  All right.  I want to talk very quickly about FDA

8   approval with you.  Okay?  Do you understand that the FDA

9   approves certain medications for a labeled indication?

10  A   I'm having a little trouble hearing you.

11  Q   Sure.  I'm sorry.

12  A   That's okay.

13  Q   Do you understand that the FDA approves medications for a

14  labeled indication?

15  A   Yes.

16  Q   Do you also understand that if the FDA approves a

17  medication for a labeled indication, it doesn't prohibit a

18  doctor for -- from prescribing that medication for an off-label

19  purpose?

20  A   Yes.

21  Q   So even if Subsys had a labeled indication of being used as

22  a treatment for breakthrough cancer pain, that on its own

23  wouldn't prohibit a doctor from prescribing it for another

24  purpose; correct?

25  A   Yes.

```
 1   Q   All right.  Ms. Perhacs, you have signed a plea
 2   agreement -- you have not yet been sentenced, have you?
 3   A   No.
 4   Q   In fact, you and the government have both asked for your
 5   sentencing date to be postponed; is that correct?
 6   A   I don't remember.
 7   Q   A couple of items in your plea agreement I want to talk
 8   about.
 9        All right.  I'm going to show you what's in evidence
10   as Government Exhibit 32-5.  All right.  And this is a copy of
11   your plea agreement and you were asked some questions about it
12   on direct; do you recall that?
13   A   Yes.
14   Q   Since you pleaded guilty, have you come to understand
15   anything about what is a 5K1 motion?  Have you heard that
16   terminology?
17   A   Yes.
18   Q   And a 5K1 motion -- and correct me if you have a different
19   understanding -- is something the government can file asking
20   the Court to reduce your potential sentence based on whether
21   the government believes you have sufficiently cooperated.  Is
22   that your understanding of what a 5K1 motion is?
23   A   My understanding of the motion is they will file it
24   according to my truthful testimony.
25   Q   Fair enough.  But it goes back to according to your plea
```

1  agreement, correct, if the United States agrees to allow the

2  defendant to cooperate and if the defendant agrees to

3  cooperate, the following terms and conditions apply.  Correct?

4  A   Yes.

5  Q   Okay.  And if the United States -- if the government moves

6  for a 5K1 motion, do you understand that that has the potential

7  to reduce your sentence?

8  A   Yes.

9  Q   And do you also understand that no one, not you, not your

10 lawyer, can seek that reduction.  Only the government can seek

11 that reduction, do you understand that?

12 A   Yes.

13 Q   And as you testify here today, Ms. Perhacs, are you hoping

14 the government will some day make that request on your behalf?

15 A   Yes.

16 Q   And if the government were to make that motion, have you

17 come to understand that it could be the difference between

18 prison time and probation?

19         MR. BODNAR:  Objection, Your Honor, to sentence at

20 that point and what possible sentence she could get.

21         THE COURT:  Well, we're not going to get into

22 specifics.

23         But do you understand that it could cause a lower

24 sentence for you?

25         THE WITNESS:  Yes, ma'am.

1    THE COURT:  All right.

2    MR. DOSS:  And one moment, Your Honor.

3    THE COURT:  All right.

4    MR. DOSS:  One moment, Your Honor.  Before I -- and I

5  just wanted to do one quick housekeeping.

6  BY MR. DOSS:

7  Q   I'm going to show you Defendant's Exhibit 160.

8    (A discussion was held off the record between counsel.)

9    MR. DOSS:  I move to admit Couch Exhibit 160, which is

10  another sign-in sheet.

11    MR. BODNAR:  No objection, Your Honor.

12    THE COURT:  All right.  Mark it in.

13    (Defendant Couch's Exhibit 160 was entered into evidence.)

14    MR. DOSS:  And no further questions, Your Honor.

15    THE COURT:  All right.  Mr. Knizley, can you take the

16  exhibit off the screen, please?

17    MR. KNIZLEY:  Yes, ma'am.

18                    CROSS EXAMINATION

19  BY MR. KNIZLEY:

20  Q   Morning, Ms. Perhacs.

21  A   Morning.

22  Q   My name is Dennis Knizley, and I represent Dr. Ruan.  I

23  want you to go back to a little bit of what Mr. Doss was just

24  speaking to you about, and that was your plea agreement.

25  A   Yes, sir.

1   Q   Okay?  And, of course, when you decided to plead guilty you

2   had a lawyer and you and he talked about your plea agreement

3   and that sort of thing; is that right?

4   A   Yes.

5   Q   Okay.  And you pled guilty to conspiracy to violate an

6   anti-kickback law; is that right?

7   A   Yes.

8   Q   And did you -- in doing so, when you -- you were told about

9   the ranges of punishments that you could be subjected to, were

10  you not?

11  A   Yes.

12  Q   And what do you recall -- did you learn the difference

13  between the statutory range of punishment and the guideline

14  range?  Did y'all talk a little bit about that?

15  A   I think so.

16  Q   Okay.  And did you learn that in federal court there's

17  guidelines that are advisory, that the Court looks to, at least

18  in part, to determine your range of punishment?

19  A   Yes.

20  Q   Okay.  And do you recall what your guideline range was

21  without the 5K1.1 that Mr. Doss had talked about?

22  A   Yes.

23  Q   What was that?

24  A   I think it was one to five --

25          MR. BODNAR:  Objection, Your Honor, to what a possible

 1   sentence might be at this point.

 2          THE COURT:  Sustained.

 3   BY MR. KNIZLEY:

 4   Q   You understood you had a guideline range of punishment?

 5   A   Sir, could you please repeat that question?

 6   Q   You understand that there was federal sentencing guidelines

 7   applicable to your case?

 8   A   Yes.

 9   Q   And did you understand those particular guidelines would

10   set out what the range of punishment may be in your case?

11   A   Yes.

12   Q   And did you understand that a 5K1.1 downward departure

13   would have an effect on that?

14   A   Yes.

15   Q   And I'm going to show you again what's marked as

16   Government's Exhibit 32-5, and that's your plea agreement;

17   correct?

18   A   Yes.

19   Q   And Mr. Doss was telling you -- was asking you about the

20   application of what's called this 5K1.1 and/or Federal Rules of

21   Criminal Procedure, Rule 35; right?

22   A   Yes.

23   Q   And as to the 5K1.1, this document says -- flipping on over

24   a few pages.  If you remember, Mr. Doss said that if you agreed

25   to cooperate and tell the truth as you said; right?

1  A    Yes.

2  Q    Okay.  Then if you do that, if you provide the full and

3  complete truthful and substantial cooperation, what does it say

4  that the government will do?

5  A    The United States agrees to move for a downward departure

6  in accordance with section 5K1.1 of the United States

7  sentencing guidelines or Rule 35 of the Federal Rules of

8  Criminal Procedure, whichever the United --

9  Q    Basically that says if you cooperate, they will ask that

10  your sentence be lower than what the low end of the guidelines

11  are, is that how you understand it?

12  A    Yes, sir.

13  Q    Okay.  I want to back up to a few things.  At the beginning

14  of your testimony you spoke about meeting Dr. Ruan.  And could

15  you tell us again how you met him, please?

16  A    Yes.

17  Q    Tell us, please.

18  A    I met him when I worked at a company called Lincare.

19  Q    And that was, I think, an oxygen equipment supply company;

20  is that right?

21  A    Yes.

22  Q    And how did you come about interacting with Dr. Ruan?  I

23  think you said you just saw the office and thought you would

24  pull in one day; right?

25  A    It was random (nodding head affirmatively).

1   Q   Okay.  And you got an email from him shortly after your

2   visit, that we talked about yesterday?

3   A   Yes.

4   Q   And do you recall what that email said?  Let me put it back

5   up.

6   A   Well --

7   Q   Do you recall the email saying that -- he's asking you:

8   Were you dating anyone, I think is what it said.  Is that

9   right?

10  A   Yes.

11  Q   Or are you interested in anyone was the words.

12  A   Dating anyone, I think.  I think.

13  Q   He asked specifically:  Did you have any dating interest in

14  Dr. Couch; is that right?

15  A   Yes.

16  Q   And you made it clear from the beginning what your approach

17  was as to having those type relationships with people you did

18  business with, didn't you?

19  A   Yes.

20  Q   And you told them that, look, I've had that experience with

21  a doctor before, which was unpleasant, and I have only business

22  relationships with people I do business with; is that right?

23  A   Yes.

24  Q   So from the beginning you told Dr. Ruan that, you know, if

25  you're going to have a business relationship with me it's going

NATALIE PERHACS - CROSS BY MR. KNIZLEY

1    to be just that?

2    A    Yes.

3    Q    Okay.  And he then, I think the next day, had some email

4    communication with you about your job and maybe getting another

5    job; is that right?

6    A    I think so.

7    Q    Okay.  What's the best to your recollection of that?  Was

8    it about the next day when he asked you, when y'all talked

9    about you getting a new job or him helping you?

10   A    I don't remember the date.

11   Q    Okay.  I want to show you what's marked -- and this is just

12   for identification purposes to begin with -- what's Ruan's

13   Exhibit 85.  And if you'll look at the top of this, and if you

14   could tell me what that seems to be.

15   A    Him telling me he'll keep his eyes out.

16   Q    Before -- it's an email between you and he; is that right?

17   A    Yes.

18   Q    Okay.

19            MR. KNIZLEY:  And Judge, we would offer Ruan's Exhibit

20   85.

21            MR. BODNAR:  Your Honor, I think this same email is

22   already in evidence.

23            THE COURT:  It is.

24            MR. KNIZLEY:  It is, Judge, but --

25            MR. BODNAR:  No objection.

1    MR. KNIZLEY:  I can use theirs, if you would

2  like.  But --

3    THE COURT:  Well, I don't want to have duplicates of

4  the same exhibit in evidence.  So if we could pull --

5    MR. KNIZLEY:  It's a little bit different, but I'll be

6  happy to use theirs.  Okay?

7    THE COURT:  Okay.

8  BY MR. KNIZLEY:

9  Q   Let me find theirs and we'll talk about it from that point.

10  I'll get theirs from up there in a moment, but let's just talk

11  about it for a minute.  But he said he would help you look for

12  another job; is that right?

13  A   Yes.

14  Q   And had you and he had any conversation about your need for

15  a little better job than you had?

16  A   Yes.

17  Q   And I think your mother had some medical issues; is that

18  correct?

19  A   Yes.

20  Q   Could you tell the ladies and gentlemen of the jury what

21  you had shared with Dr. Ruan about what your financial needs

22  may have been and why?

23  A   I don't remember the conversation.

24  Q   Okay.  Do you remember telling Dr. Ruan that your mother

25  had a serious -- had cancer?

1455

1   A   Yes, I do.

2   Q   And do you remember telling Dr. Ruan that your mother and

3   father had been divorced?

4   A   Yes.

5   Q   And do you remember telling Dr. Ruan that you shared a

6   great deal of the financial responsibility for your mother?

7   A   Yes.

8   Q   And did he seem sympathetic to your financial needs in that

9   regard?

10  A   Yes.

11  Q   And was that in part your understanding of why you thought

12  he may help you find a better job than you had?

13  A   Yes.

14  Q   And the first job he sought out was not with Insys, was it?

15  A   No.

16  Q   Could you tell the ladies and gentlemen of the jury

17  where -- what your understanding was the first job he tried to

18  find for you?

19  A   I don't remember the name of the company.

20  Q   I want to show you what's marked as Ruan's Exhibit 86.  And

21  tell me if you recognize that.

22  A   Yes.

23          MR. BODNAR:  And, Your Honor, we do object to this

24  one.  This one is already in evidence in redacted form.

25          MR. KNIZLEY:  That's correct, Judge.  I want it in

NATALIE PERILLACS - CROSS BY MR. KNIZLEY

 1  unredacted form.

 2          MR. BODNAR:  And we would object to it coming in in

 3  unredacted form, Your Honor.

 4          THE COURT:  Well, you need to come to side bar because

 5  you will have to explain to me what the objection is.

 6      (At the side bar, jury not present.)

 7          MR. BODNAR:  I'll show it to you.  Your Honor, this

 8  same email is in evidence already.  What's redacted out is

 9  www.xiuluruan.com as well as the part that goes to see his

10  publications.  I don't think that's appropriate to put forth

11  before the jury of going to his website where they can find

12  more information about his publications.  Other than that, the

13  identical email is already in evidence.

14          MR. KNIZLEY:  Judge, that's not right.  But it's in

15  there so the jury doesn't see a black spot, so they can see the

16  entirety of it.

17          THE COURT:  I don't want to tempt the jury to go to

18  his website.  So I think if you could just use the redacted

19  one, it would be better.

20          MR. KNIZLEY:  Sure.

21          THE COURT:  Okay.

22      (In open court, defendants and jury present.)

23  BY MR. KNIZLEY:

24  Q   Okay.  We had a little break.  We found that first email,

25  their version.  Okay?  So we can take a look at it.

1       All right.  I show you what's marked as Government's

2  Exhibit 32-1(2).  Do you remember this one I showed you a

3  minute ago?

4  A   Yes.

5  Q   Okay.  Now, going back to it -- and that is an email from

6  you to Dr. Ruan; is that correct?

7  A   Yes.

8  Q   And what's the date of it?

9  A   November 8th, 2012.

10  Q   And where were you working at that time?

11  A   Lincare.

12  Q   And this was the time after you said you had just dropped

13  by hoping to get some business out of a cold call, if you will?

14  A   I don't -- I don't remember the time frame.

15  Q   Was it shortly before this email, do you think?

16  A   I don't know.

17  Q   Let's read right here.  Okay.  Well, I appreciate you

18  sending me business.  I appreciate all your help with the

19  career search.  I hope you have a great day.

20       Okay.  Was -- you don't recall that as being close to

21  the time that you first met Dr. Ruan?

22  A   No, I -- that's close.

23  Q   Okay.  And what did he say he would do for you then?

24  A   Hi, Natalie, I will keep my eyes open for you.

25  Q   Go ahead.

NATALIE PERHACS - CROSS BY MR. KNIZLEY

1    A    My impression with your current job is that it has rather

2    limited potential for your growth.  But, I understand that you

3    need to perform well on it and that will also serve as a

4    positive control for your future, as long as medicolegally --

5    Q    That was the hard word we had yesterday; correct?

6    A    I stumbled on that one.

7    Q    As long as the medicine, we'll say, is solid; right?

8    A    Yes.

9    Q    Read the rest of it.

10   A    It is solid, and the patients do get benefit from using it

11   and they are happy using your service, then I will be happy to

12   give you the support in using the service from your

13   company.  Have a great day to you too.  Dr. Ruan.

14   Q    I want to ask you about this part right here.  And the

15   patients do get benefit from using it.  That's Dr. Ruan telling

16   you that that's what he feels there should be; is that right?

17   A    Yes.

18   Q    All right.  Did that permeate through your entire

19   relationship with Dr. Ruan, his concern about patients?

20   A    Would you please ask me the question again?

21   Q    He's apparently saying here that he has a concern that if

22   you're medicolegally solid and the patients do get a benefit

23   from using it, and they are happy with your service, then he

24   would be happy to give you support; right?

25   A    Yes.

1   Q   And my question is where he's saying here it appears that

2   he is concerned about the benefit to the patients; is that

3   right?

4   A   Yes.

5   Q   Did that seem to be a concern he had throughout your

6   relationship with him?

7   A   Yes.

8   Q   I'm going to show you what's marked as Government's Exhibit

9   32-1(3).  And tell me if you recognize that.

10  A   Yes.

11  Q   What is that?

12  A   That's an email from Dr. Ruan to John Gilbert.

13  Q   Okay.  And you -- and this was five days, I think, after

14  the first one?  I think the other one was November 8th; is that

15  right?

16  A   Yes.

17  Q   And this is an email where he's asking the gentleman -- and

18  you asked what company he may have been looking for, the

19  endo.com; do you see that?

20  A   Yes.

21  Q   And do you see him make reference to the Endo Speakers

22  Bureau here; right?

23  A   Yes.

24  Q   And this is a pharmaceutical company?

25  A   I think so.  I think so.

1  Q   All right.  It says he has been on the Endo Speakers Bureau
2  over the past few years such as Opana ER, Lidoderm and Voltaren
3  Gel.  That seems to be pharmaceutical products, doesn't it?
4  A   Yes.
5  Q   And so if he's a speaker for those products, it would seem
6  to be a pharmaceutical company; is that right?
7  A   Yes.
8  Q   Okay.  So he is writing on November 13th, to someone named
9  Mr. Gilbert at a pharmaceutical company.  And what is he
10 doing -- what is he saying he's writing them for?
11 A   I am contacting you in reference to Ms. Perhacs.  Natalie
12 has been working in medical sales for quite some time.  She has
13 demonstrated exceptional knowledge and skill in the product she
14 represents.  She has super interpersonal skills and is very
15 much liked by everyone in my clinic.  I understand she is
16 interested in looking for a new career in a solid
17 pharmaceutical company.  I feel delighted to recommend Natalie
18 to you.
19 Q   Now, on that did he attach your resume, if you recall, to
20 that email?
21 A   I think so.
22 Q   Okay.  And let me ask you a moment about your resume.  You
23 were asked earlier did you have any experience in public
24 speaking or any training in that field, do you remember that?
25 A   Yes.

1    Q    And did you?

2    A    I had --

3    Q    Go ahead.

4    A    My master's degree had an emphasis in public speaking.

5    Q    And so Dr. Ruan knew that, did he not?

6    A    Yes.

7    Q    So you did have some background in public speaking; is that

8    right?

9    A    Yes.

10   Q    Okay.  Now, after Dr. Ruan had on the 13th written to

11   Mr. Gilbert, did he later on the 19th write to someone else?

12   A    Yes.

13   Q    And who was that?  Who is this gentleman, if you recall?

14   A    Frank.

15   Q    And it's D-E-M-I-R-O; is that right?  Up here?

16   (Indicating.)

17   A    Yes.

18   Q    And he sends him your CV or your resume; right?

19   A    Yes.

20   Q    And he also sent it to a gentleman named Verne; right?

21   A    Yes.

22   Q    And to Frank -- that was the followup visit.  The first

23   email was telling him somewhat similar to what he had told the

24   other gentleman; right?

25   A    Yes.

1462

NATALIE PERHACS - CROSS BY MR. KNIZELY

1   Q   And sort of recommending you for that job; is that right?

2   A   Yes.

3   Q   And that company is called -- what does it appear to be?

4   A   O-M-P-U-S.

5   Q   And they seem to have pharmaceutical products as well; is

6   that right?  (Indicating.)

7   A   Yes.

8   Q   Okay.  And then he wrote you about that a little later on,

9   did he not, if you recall?

10  A   I think so.

11  Q   I'll show you what's marked as Ruan's Exhibit 87.  And tell

12  me if you recognize it first, please, ma'am.

13  A   I don't remember.

14  Q   Do you see up here at the top it's from Dr. Ruan, and who

15  is it to?

16  A   Myself.

17  Q   And is that your email address at that time?

18  A   Yes, sir.

19  Q   And it seems to be addressing you.  Do you recall this

20  document?

21  A   No.

22  Q   Okay.  Do you have any reason to believe it was an email

23  you received?

24  A   No.  I believe I received this email.

25  Q   Okay.

1    MR. KNIZLEY:  Judge, we would offer Ruan's Exhibit 87.

2    MR. BODNAR:  No objection, Your Honor.

3    THE COURT:  All right.  Mark it in.

4    (Defendant Ruan's Exhibit 87 was entered into evidence.)

5    BY MR. KNIZLEY:

6    Q   And he shows you -- he's sending you an email that he had

7    sent to Verne.  That was the first person, right, earlier?

8    A   Yes.

9    Q   Okay.  And he again is recommending you and sending him

10   your resume; right?

11   A   Yes.

12   Q   All right.  And saying that you're interested in engaging

13   in pharmaceutical sales to build up your career; right?

14   A   Yes.

15   Q   And did he send to you confirming what he has sent to

16   Verne?

17   A   Yes.

18   Q   And did either one of those two companies -- were they

19   successful in getting you a job there?

20   A   No.

21   Q   But those were the first two choices, at least from what it

22   appears here, of Dr. Ruan to try to help you get a job?

23   A   Yes.

24   Q   And it was during this time that Dr. Ruan already knew

25   about your mother's condition and the financial burden it was

1  to you?

2  A   Yes.

3  Q   And it was after that that he finally talked to Mr. Rowan

4  at Subsys; is that correct?

5  A   At Insys, yes.

6  Q   Excuse me; about the product Subsys?

7         THE COURT:  All right.  Mr. Knizley, is now a good

8  time for us to break?

9         MR. KNIZLEY:  Yes, ma'am.

10         THE COURT:  All right.  Ladies and gentlemen, we are

11  going to have our lunch break at this time.  Leave your pads on

12  your chairs.  No discussion about the case.  Be back downstairs

13  in the jury assembly room at 1:20 ready to be called back

14  up.  That should be an hour and 15 minutes.

15         We're in recess.

16     (A recess was taken at approximately 12:04 p.m.)

17     (Afternoon session, 1:24 p.m., in open court, defendants

18  and jury present.)

19         THE COURT:  All right, Mr. Knizley.

20  BY MR. KNIZLEY:

21  Q   Ms. Perhacs, before lunch we had spoke about your resume

22  being attached to some emails?

23  A   Yes.

24  Q   I'm going to show you what's marked as Ruan's Exhibit

25  121.  And tell me if you recognize that.

1    A    Yes.

2    Q    What is that?

3    A    It's my resume.

4    Q    And that's the resume you had back in 2013?

5    A    I think so.

6    Q    I'm going to show you the second page of your resume.  And

7    that speaks of what you told us about yesterday, about your

8    undergraduate studies at Troy University?

9    A    Yes.

10   Q    And you got a bachelor of science in public relations and

11   journalism from Troy?

12   A    Yes.

13   Q    Then you went to the University of Southern Mississippi; is

14   that correct?

15   A    Yes.

16   Q    And you got a masters of public relations there; is that

17   right?

18   A    Yes.

19   Q    Could you tell the ladies and gentlemen of the jury what

20   your resume indicates your emphasis was in your masters of

21   public relations -- in public relations?

22   A    Public speaking and public presentation.

23   Q    When we spoke yesterday regarding --

24        MR. KNIZLEY:  Judge, we would offer Ruan's Exhibit

25   121.

1    MR. BODNAR:  No objection, Your Honor.

2    THE COURT:  All right.  Mark it in.

3    (Defendant Ruan's Exhibit 121 was entered into evidence.)

4  BY MR. KNIZLEY:

5  Q   When we spoke yesterday about whether or not you had some

6  expertise or training in public speaking, you in fact do, do

7  you not?

8  A   I've never trained anybody to be a public speaker.

9  Q   But your formal education, your master's degree has

10  emphasis in public speaking and public presentation; is that

11  correct?

12  A   Yes.

13  Q   Now, you did speak yesterday about whether or not you ever

14  assisted Dr. Ruan in his public speaking, do you recall that?

15  A   I do.

16  Q   And I want to show you what's marked as Ruan's Exhibit

17  90.  And is that an email to you from Dr. Ruan?

18  A   Yes.

19  Q   And the time frame is November 29, 2012; is that correct?

20  A   Yes.

21  Q   And that's -- when we looked earlier before lunch, we

22  talked about him looking for you a job in the neighborhood of

23  November -- mid to late November, do you remember that?

24  A   Yes.

25  Q   So this is later on in that same month; is that right?

```
 1   A   Yes.
 2   Q   All right.  And of course, we had talked about Verne.  And
 3   here it is, you had asked at the bottom here on November 29th
 4   you had written to Dr. Ruan and you were asking about the
 5   Johnson & Johnson; is that right?
 6   A   Yes.
 7   Q   Okay.  And you were asking him whether or not in his
 8   opinion you should try to talk to him; is that correct?
 9   A   Yes.
10   Q   And he responds he had sent the person at Johnson & Johnson
11   an email; is that correct?
12   A   Yes.
13   Q   And then, what do you say to him?
14           THE COURT:  Excuse me.  Mr. Knizley, you realize that
15   this isn't being displayed to the jury.
16           MR. KNIZLEY:  No, Your Honor, I did not.
17   Q   Do you recognize that as one of your emails?
18           THE COURT:  That's a question.  Did you understand the
19   question?
20           THE WITNESS:  I'm sorry.
21   BY MR. KNIZLEY:
22   Q   Do you recognize that as an email between you and Dr. Ruan?
23   A   Yes.
24   Q   And that's Ruan's Exhibit 90; is that correct?  Ruan's
25   Exhibit 90?
```

1  A   Yes, sir.

2          MR. KNIZLEY:  We'd offer Ruan's Exhibit 90.

3          MR. BODNAR:  No objection, Your Honor.

4          THE COURT:  All right.  Mark it in.

5      (Defendant Ruan's Exhibit 90 was entered into evidence.)

6          THE COURT:  And it takes a minute before it's

7  exhibited.

8  BY MR. KNIZLEY:

9  Q   I apologize for asking you some questions because the jury

10 wasn't seeing it, so I want to go back over it just a

11 second.  Okay?

12         Now, again at the bottom on November 29th, 2012, we

13 discussed a moment ago, that's that end of the month that you

14 were -- had had previous conversations with Dr. Ruan about

15 helping you get a job; right?

16 A   Yes.

17 Q   And you've written Dr. Ruan and you've asked him in his

18 opinion as to whether or not you should speak with the Johnson

19 & Johnson people regarding scheduling a meeting; is that right?

20 A   Yes.

21 Q   And that's schedule a meeting for employment; is that

22 correct?

23 A   Yes.

24 Q   Okay.  And in response he indicates that he had -- he would

25 send an email to Verne.  That was one of the contacts he had

 1   with Johnson & Johnson; is that correct?

 2   A   Yes.

 3   Q   And he told you he had a presentation that evening; is that

 4   right?

 5   A   Yes.

 6   Q   And what does he say here?  (Indicating.)

 7   A   Or I may do that later on when I am done with my talk.

 8   Q   Okay.  And what do you tell him at about 7 p.m. at night on

 9   November 29th, or at least that's what the header says.  What

10   do you tell him about his presentation?

11   A   Good luck on your presentation.  I want to hear how it

12   goes.  Don't forget to breathe.

13   Q   And what did you mean by "don't forget to breathe"?

14   A   Try not to be too nervous, because public speaking can be a

15   source of anxiety.

16   Q   A little tip you were giving him about what he should do in

17   public speaking; is that right?

18   A   Yes.

19   Q   All right.  And then he writes you back:  I just emailed

20   Verne and copied Frank.  And he talks about tonight.  And

21   assuming that was the -- after his presentation, does that seem

22   to be correct?

23   A   Yes.

24   Q   And he -- what does he tell you?  If you could read that

25   for us, please.

1 A    Tonight was a lot easier, kind of a round table

2 presentation.  Dr. Couch was there too for a few minutes.  Not

3 the formal type requiring fine details like posture, gesture,

4 eye contact, et cetera.  I gave myself a pass.  Good

5 luck.  Dr. Ruan.

6 Q    Is he sharing with you some of the finer details, as he put

7 it, of his public speaking?

8 A    Yes.

9 Q    And did y'all have a rapport going back and forth about his

10 public speaking?

11 A    Yes.

12 Q    I'm going to show you what's been marked in evidence as

13 Government's Exhibit 31-1(6).  Do you remember this one from

14 yesterday?

15 A    Yes.

16 Q    Okay.  And at the bottom, we'll start --

17        MR. KNIZLEY:  And, Your Honor, that yellow thing, I

18 tried to clear it but it wouldn't go off of there.

19        THE COURT:  Well, touch the screen bottom.

20        MR. KNIZLEY:  I touched that.  Nothing happens.  It

21 says clear.

22        THE COURT:  Can you help him clear that?  Show him how

23 to do it.

24        MR. BODNAR:  (Indicating.)

25        MR. KNIZLEY:  Thank you.

1   Q   If you'll see the bottom here, February 21st, 2013.  And

2   that's -- if you recall, the last one was November 29th, 2012;

3   is that right?

4   A   Yes.

5   Q   So this is going to be about two and a half months later,

6   does that sound right?

7   A   Yes.

8   Q   Okay.  And two and a half months later you and he are still

9   speaking of public speaking; is that correct?

10  A   Yes.

11  Q   And what does he -- what do you -- what does he tell you

12  here on 2012?

13  A   Natalie.

14  Q   2013.  Excuse me.

15  A   Natalie, I wonder if you would like to be my private coach

16  to help me with my speech.  At this point in my life I

17  accomplished many goals I set for myself, but my skill in

18  public speech is horrible.  I have decided to become an

19  efficient speaker.  Have you watched (blanked out) commercial?

20  I want to speak with that level of confidence.  More -- to look

21  and sound like a top-notch medical expert.  My deficient speech

22  is a major obstacle that I want to overcome in the years to

23  come.

24          Please let me know whether you would like to take me

25  as your student.  I am willing to pay you a reasonable -- your

1472

```
 1    time and effort.  Dr. Ruan.
 2    Q    And we read it yesterday.  And you don't have to read it
 3    again, but you responded to him; is that correct?
 4    A    Yes.
 5    Q    And you basically -- complimented him about not being bad
 6    at anything; is that right?
 7    A    Yes.
 8    Q    And you said you would be willing to help anyone who wants
 9    to better themselves and you wouldn't take his money?
10    A    Yes.
11    Q    And you wanted to talk about his proposal in person; right?
12    A    Yes.
13    Q    And you told him that he could become -- that you believed
14    he had the ability to become a good public speaker?
15    A    Yes.
16    Q    Is that right?
17    A    Yes.
18    Q    And yesterday we also read his response to you saying that
19    no, he would rather pay you.  He wanted to get trained well and
20    he wanted you to help him be a public speaker; right?
21    A    Yes.
22    Q    And that's all we read yesterday, though; right?
23    A    I think so.
24    Q    Okay.  Now, as the email exchange went on a little bit
25    further, I'll show you what's marked as -- for identification
```

1    purposes, as Ruan's Exhibit 91.  And if you'll see that's the

2    bottom part of what we just read; right?

3    A    Yes.

4    Q    Okay.  And then this is more up here; right?

5    A    Yes.

6             MR. KNIZLEY:  I offer Ruan's Exhibit 91.

7             MR. BODNAR:  Could I see a copy?

8             MR. KNIZLEY:  Sure.  It's that --

9         (A discussion was held off the record between counsel.)

10             MR. BODNAR:  No objection, Your Honor.

11             THE COURT:  All right.  Mark it in.

12        (Defendant Ruan's Exhibit 91 was entered into evidence.)

13   BY MR. KNIZLEY:

14   Q    Okay.  What we read yesterday was he wanted to give you a

15   fee at 9:51 a.m. on February 21st, but what we didn't see was

16   your response a little later that morning; right?

17   (Indicating.)  Is that correct?

18   A    Yes.

19   Q    Could you read your response please, ma'am?

20   A    Dr. Ruan, first I am flattered you asked for my

21   help.  Second, I feel like making a few small changes will give

22   you big results.  You would be surprised how these little

23   tricks I know can make a world of difference.  I would feel a

24   little strange giving you direction because you are a

25   doctor.  But I think I'll manage.  I think we should set a day

1    to discuss this.  Maybe you should complete your exam before we

2    begin training so you can be focused on your studies.  I will

3    wait for your recommendation on that one.  Natalie.

4    Q   So at least in the content of this email you had accepted

5    the opportunity to help him, did you not?

6    A   Yes.

7    Q   And he responds that that sounds good.  And he goes on

8    about how he wants you to prepare him for various and other

9    things; right?

10   A   Yes.

11   Q   And, for instance, he wants you -- he wants you to be

12   comfortable in front of a camera, posture, voice, eye contact,

13   pronunciation, rhythm, gesture, way to walk, way to stand.  He

14   knows it's going to take a lot of practices and exercises.

15   Essentially he was very serious about this, was he not?

16   A   Yes, he was.

17   Q   I'm going to show you what's marked as Ruan's Exhibit 89,

18   and tell me if that appears to be an email from Dr. Ruan to

19   you.

20   A   Yes.

21          MR. KNIZLEY:  We would offer Ruan's Exhibit 89.

22          MR. BODNAR:  One moment, Your Honor.

23          No objection.

24          THE COURT:  All right.  Mark it in.

25      (Defendant Ruan's Exhibit 89 was entered into evidence.)

```
 1    BY MR. KNIZLEY:
 2    Q   Now, that was February 21st we just spoke of and now this
 3    is six days later.  He is writing to you, and what is he
 4    telling you?
 5    A   Natalie, we can meet sometime to talk about my lesson
 6    schedule, how frequent, how long each duration, what we are
 7    doing to -- going to do it.  I plan to start training after
 8    March 10th.  Do I need to purchase any books?  Dr. Ruan.
 9    Q   And did you respond to this email?
10    A   I did.
11    Q   And what did you say?
12    A   No books.  Let's meet next week.  I'm sorry.  Shirt
13    response.  My manager is with me.  I look forward to our
14    training.
15    Q   Thank you.  You think it was short, maybe, response?
16    A   Yes.
17    Q   And you told him you looked forward to training him; is
18    that right?
19    A   Yes.
20    Q   So at least in the context of these emails you told him you
21    intended to train him?
22    A   Yes.
23    Q   Did y'all have some training?
24    A   I gave him an outline.
25    Q   Okay.  We had talked some about speaking engagements and
```

1  speaking fees which Dr. Ruan did for Insys, do you recall that?

2  A   Yes.

3  Q   And the program had already started at the time you became

4  employed with Insys, had it not?

5  A   You mean the speaker programs were already happening before

6  I was employed with Insys?

7  Q   Yes, ma'am.

8  A   Yes.

9  Q   And would it be true that Insys wanted speakers that were

10 influential in the community and that were respected in the

11 community to speak on their behalf?

12 A   Yes.

13 Q   And did they want respected physicians that other

14 physicians might take their comments seriously and engage in

15 buying their product or using their product, I should say?

16 A   Yes.

17 Q   And was Dr. Ruan such a physician in the Mobile community?

18 A   Yes.

19 Q   And was he held in high esteem in the community?

20 A   To my knowledge.

21      MR. BODNAR:  Objection, Your Honor.  Foundation for

22 whether or not she knows how other doctors viewed Dr. Ruan.

23      THE COURT:  I sustain it.

24 BY MR. KNIZLEY:

25 Q   Did you know other doctors in the Mobile community?

```
 1    A    I'm sorry.  Sir?

 2    Q    Did you know other doctors in the Mobile community?

 3    A    Yes.

 4    Q    And in your work in Insys did you have an opportunity to

 5    call on other doctors?

 6    A    Yes.

 7    Q    And did you have an opportunity to call on doctors with

 8    your previous work?

 9    A    Yes.

10    Q    And among those doctors that you became acquainted with did

11    they tell you whether or not they held him in high esteem?

12          MR. BODNAR:  Objection to the same thing plus now

13    hearsay, your Honor.

14          THE COURT:  Overruled.

15    BY MR. KNIZLEY:

16    Q    You may --

17    A    I don't remember.

18    Q    You don't remember whether they did?  Okay.

19          Now, you did rate him as a speaker for your employer,

20    did you not?

21    A    Yes.

22    Q    And what was his rating?

23    A    A high rating.

24    Q    Did you give him a rating of 10?

25    A    Yes.
```

1    Q    On a scale --

2    A    I think so.

3    Q    I'm sorry?

4    A    I think so.

5    Q    On a scale of one to 10 as you recall?

6    A    Yes.

7    Q    And you also gave Dr. Couch a high rating as well?

8    A    Yes.

9    Q    And I believe that rating was nine, does that sound right?

10   A    Yes.

11   Q    So even though Dr. Couch had a high rating, you gave

12   Dr. Ruan even a higher rating; is that correct?

13   A    Yes.

14   Q    And you made some comments in your emails when Mr. Doss was

15   examining you about how well and how polished, if you will,

16   Dr. Couch was; is that right?

17   A    Yes.

18   Q    And you felt Dr. Ruan was even yet a better speaker?

19   A    He did a good job.

20   Q    And in these speaking engagements it was your

21   responsibility, was it not, to get people to come attend the

22   speeches?

23   A    Yes.

24   Q    And not only was it your responsibility, from time to time

25   Dr. Ruan would assist you, would he not?

 1   A   Yes.

 2   Q   And would he ask generally how many people are we going to

 3   have today?

 4   A   Yes.

 5   Q   And I'm going to show you an email or an exhibit marked

 6   Ruan's Exhibit 88, and show you the top which appears to be an

 7   email from you -- from him to you.  Do you see that?

 8   A   Yes.

 9           MR. KNIZLEY:  Judge, we would offer Ruan's Exhibit 88.

10           MR. BODNAR:  No objection, Your Honor.

11           THE COURT:  All right.  Mark it in.

12       (Defendant Ruan's Exhibit 88 was entered into evidence.)

13   BY MR. KNIZLEY:

14   Q   Now, this exhibit does not seem to have a date on it, but

15   it's for a Monday talk; is that right?

16   A   Yes.

17   Q   And what does Dr. Ruan say about his Monday talk?

18   A   Natalie, I invited Dr. Ronderos and his PA, Dr. Dumlao and

19   his wife Teresa (oncologist), Dr. Reddy and his wife (resident

20   physician), and Dr. Frank Wang and his wife (pharmacist) for

21   Monday evening's talk.  I will let you know if they confirm

22   with me.  Have a great weekend.  Dr. Ruan.

23   Q   Do you recall that particular meeting?

24   A   No.

25   Q   Okay.  So you don't recall whether these people actually

NATALIE PERHACS - CROSS BY MR. KNIZLEY

1480

1    attended or not?

2    A    No.

3    Q    Dr. Ruan was obviously serious about getting people to

4    attend his speeches, was he not?

5    A    Yes.

6            MR. BODNAR:  What number exhibit is that?

7            MR. KNIZLEY:  Ruan 88.

8    Q    Like Dr. Couch, you also have a sign-in sheet for

9    Dr. Ruan's --

10   A    Yes.

11   Q    -- talks, did you not?

12   A    Yes.

13   Q    And I want to show you what's marked as Ruan's Exhibit

14   93.  And if you could take a look at that and tell me if you

15   recognize that.

16   A    Yes.

17   Q    What is that?

18   A    That's a sign-in sheet for a program we did at Osaka.

19   Q    Okay.  And the way we know --

20           MR. KNIZLEY:  Judge, we'd offer Ruan's Exhibit 93.

21           MR. BODNAR:  No objection.

22           THE COURT:  All right.  Mark it in.

23       (Defendant Ruan's Exhibit 93 was entered into evidence.)

24       (A discussion was held off the record between counsel.)

25           MR. BODNAR:  No objection to any of the other sign-in

1    sheets, Your Honor.

2         THE COURT:  All right.  So what are the other numbers

3    on the sign-in sheets you're going to offer?

4         MR. KNIZLEY:  Ruan's 94, Ruan's 95, Ruan's 96, Ruan's

5    97, Ruan's 98, and Ruan's 101.

6         THE COURT:  All right.  You can mark all those in.

7         (Defendant Ruan's Exhibits 94, 95, 96, 97, 98, 101 were

8    entered into evidence.)

9    BY MR. KNIZLEY:

10   Q   Ms. Perhacs, you told us this was a Osaka location; right?

11   A   Yes.

12   Q   And that is a restaurant out on Airport Boulevard, I

13   believe?

14   A   Sir?

15   Q   That's a restaurant on Airport Boulevard, I believe?

16   A   Yes, sir.

17   Q   And that was back on September 2013?

18   A   Yes.

19   Q   And on the sign-in sheet you have Dr. Ruan signs in, does

20   he not?

21   A   Yes.

22   Q   And is that your handwriting?

23   A   Yes.

24   Q   Okay.  And without going through every single entry, on

25   each of these we see that Dan McConaghy attended this one;

1   right?

2   A   Yes.

3   Q   Mike Crawford attended; is that correct?

4   A   Yes.

5   Q   A person named Frankie Goss, do you know who that is?

6   A   I think so.

7   Q   Okay.  Do you know -- who might that be?

8   A   Frankie worked -- she worked in the clinic.

9   Q   Okay.  And Ken Bailey attended; is that right?

10  A   Yes.

11  Q   Same day, second page, Ms. Harville attended?

12  A   Yes.

13  Q   Looks like first name Ahmad attended?

14  A   Yes.

15  Q   Brenda Arnold attended?

16  A   Yes.

17  Q   Can't make out that name.  Donna it looks like; right?

18  A   Yes.

19  Q   Shannon Noland attended?

20  A   Yes.

21  Q   Person named Sue Bright attended?

22  A   Yes.

23  Q   A person -- looks like Kelley Hunt attended?

24  A   Yes.

25  Q   Tammy Tupa, it looks to be?

```
 1   A    Yes.

 2   Q    And showing you Ruan's Exhibit 94, which has been admitted

 3   into evidence, 9-24, Dr. Ruan, you?

 4   A    Yes.

 5   Q    Same location; right?

 6   A    Yes.

 7   Q    And the attendees are named in the document; is that right?

 8   A    Yes.

 9   Q    Ruan's Exhibit 95, October 2nd, similar document?

10   A    Yes.

11   Q    96?

12   A    Yes.

13   Q    October 11th?

14   A    Yes.

15   Q    Another sign-in sheet?

16   A    Yes.

17   Q    97, October 18th?

18   A    Yes.

19   Q    Same thing?

20   A    Yes.

21   Q    98, similar?

22   A    Yes.

23   Q    Then we'll move on out of 2013, on to March 4th, 2014.  See

24   that?

25   A    I do.
```

1484

1   Q   And then by this time we changed our form sheet a little

2   bit; right?

3   A   Yes.

4   Q   But it's still -- you're the person putting it on?

5   (Indicating.)

6   A   Yes.

7   Q   Still going to Osaka; right?

8   A   Yes.

9   Q   Dr. Ruan's still the speaker?

10   A   Yes.

11   Q   And it's some five months after the ones we just looked at

12   because we looked at it in October and here we are in March;

13   right?

14   A   Yes.

15   Q   And did you write that yourself, ma'am?

16   A   Yes.

17   Q   Okay.  And then we have the person named Matt Bean

18   attended; is that right?

19   A   Yes.

20   Q   Let me show you on this particular one, do you know who --

21   I'm not going to dare try to pronounce it -- but this Xing

22   person is?

23   A   Yes.

24   Q   Who is that?

25   A   He's a doctor in Mobile.

```
 1   Q   Okay.
 2           MR. BODNAR:  Which document are you on?
 3           MR. KNIZLEY:  I'm sorry?
 4           MR. BODNAR:  Which exhibit number?
 5           MR. KNIZLEY:  101.
 6   Q   And we have another Xing; right?
 7   A   Yes.
 8   Q   With a different first name?
 9   A   Yes.
10   Q   And what is that person's profession?
11   A   Medical doctor.
12   Q   And what specialty?
13   A   Rheumatology.
14           MR. BODNAR:  Is that still 101?
15           MR. KNIZLEY:  Yes.
16   Q   Now, did you --
17           THE COURT:  Mr. Knizley, would you bring those
18   exhibits to the clerk so she can mark them?
19           MR. KNIZLEY:  (Complying.)
20   Q   We see these speeches were certainly going on into March of
21   2014; is that correct?
22   A   Yes.
23   Q   By that time you had gotten to know Dr. Ruan fairly well?
24   A   Yes.
25   Q   And you and he had conversations from time to time?
```

1  A   Yes.

2  Q   And did you and he have any conversations about whether or

3  not he donated the money from his speeches to the University of

4  South Alabama and to LSU?

5  A   I don't remember that.

6  Q   Do you remember him donating them to anyone?

7  A   Yes.

8  Q   Do you recall him saying that he was taking these fees and

9  donating it to educational institutions?

10  A   I don't -- I don't remember that.

11  Q   Do you remember a donation, though?

12  A   Yes.

13  Q   Tell us what you remember about the donation part.

14  A   He told me he made a donation.

15  Q   Okay.  Do you know if he made more than one or do you

16  recall?

17  A   I do not recall.

18  Q   All right.  Now, you said there came a time in late 2013,

19  mid to late 2013, when your employer began to be concerned

20  about the prescribing of Subsys by Dr. Ruan and Dr. Couch; is

21  that correct?

22  A   Yes.

23  Q   Do you recall about when that concern started?

24  A   I don't remember the exact date.

25  Q   And I'm going to show you what has been marked into

```
 1   evidence as Government's Exhibit 32-4(4).  And do you recall
 2   seeing this earlier today or yesterday?
 3   A   Yes.
 4   Q   And do you see the language; this is from whom?
 5   A   Alec Burlakoff.
 6   Q   Okay.  To whom first?
 7   A   Joe Rowan.
 8   Q   And do you recall him to be your immediate supervisor; is
 9   that correct?
10   A   Yes.
11   Q   And this is December 2009 -- December 9, 2013?
12   A   Yes.
13   Q   And then he's writing to you the same day; is that right?
14   A   Yes.
15   Q   And the subject matter is:  Action required.  Time is of
16   the absolute essence.
17          And do you remember him wanting to know what's going
18   on with your accounts basically; right?
19   A   Yes.
20   Q   Was this during the time frame that there was some concern
21   that the Subsys sales were not as they should be?
22   A   Yes.
23   Q   Did it start before that?  For instance, let me show you
24   this.  Government's Exhibit 34-4(1).  Do you remember seeing
25   this earlier?
```

1488

1   A   Yes.

2   Q   And that's again from your boss.  Okay?

3   A   Yes.

4   Q   And do you remember this is now back in October, two months

5   earlier than what I just showed you; right?

6   A   Yes.

7   Q   And he had written you about what?

8   A   This email was about Abstral prescribing.

9   Q   Okay.  And you didn't think Dr. Ruan had ever written one;

10  right?

11  A   Yes.

12  Q   And that's when he told you to get going with him, do

13  something about it?

14  A   Yes.

15  Q   And was it at this time that you were telling the ladies

16  and gentlemen of the jury that you began to have a fall in the

17  Subsys sales for Dr. Ruan -- Subsys prescriptions for Dr. Ruan?

18  A   Yes.  I think so.

19  Q   Okay.  And did you tell us that about that time that you

20  thought you had heard or knew that Dr. Ruan had purchased some

21  stock in a company known as Galena?

22  A   Yes.

23  Q   And did you tell the jury earlier today that you thought

24  that was -- the reason that the Subsys stock was falling -- the

25  Subsys prescriptions were falling off?

 1   A   I think it's one of the reasons.

 2   Q   Okay.  And that would have been in October, November, and

 3   December of 2013?

 4   A   I -- I'm bad with dates, but I think so.

 5   Q   Let's go back to your emails.  Okay?  Back in October, on

 6   Government's Exhibit 32-4(1), back in October, 2013.  All

 7   right?  What is Mr. Rowan worried about?

 8   A   Please see below, the prescribers of Abstral and Lazanda.

 9   Q   Abstral is made by Galena.  Okay?  Is that right?

10   A   Yes.

11   Q   Does that help you put in a time frame as to when you were

12   concerned that the Abstral sales were increasing and your sales

13   were decreasing as a result of the purchase of Galena stock?

14   A   Yes.

15   Q   Is that the time frame that you thought you should be

16   concerned about the fact that Dr. Ruan had bought Galena stock?

17   A   I was never concerned that he purchased stock from

18   Galena.  I was concerned he wasn't prescribing Subsys.

19   Q   Okay.  You weren't concerned that he purchased stock; is

20   that correct?

21   A   Yes.

22   Q   Okay.  And I think you told us earlier, though, that you --

23   though you were concerned about the sale, the prescription of

24   Subsys, that you thought the reason for that may have been the

25   purchase of the Galena stock?

1    A    Yes.

2    Q    Okay.  And that -- would that be in the time frame, so I'm

3    trying to establish it -- October, November, December, as we

4    looked at these emails?

5    A    Yes.

6    Q    I want to show you what's been marked in evidence as

7    Government's Exhibit 11-4.  And do you see the top of it, it

8    says:  Stock purchases, Galena Biopharma; is that right?

9    A    Yes.

10   Q    And could you look down where in red Dr. Ruan's name

11   appears the first time?

12   A    Yes.

13   Q    And what is the date?

14   A    January 9th, 2014.

15   Q    So he owned -- if this is reflective of the first date he

16   bought stock, he owned no stock in October, November, and

17   December 2013, if this is correct?  Is that correct?

18   A    I -- I don't know.

19   Q    Let me ask you that again.  If this document reflects the

20   first date he bought stock -- okay -- and he would have owned

21   in Galena.  And he would have owned the stock in October,

22   November, and December days, that Mr. Rowan was writing to you

23   about Abstral sales; is that right?

24   A    Yes.

25   Q    Now, I think we also saw in the December time frame, if I

1491

1   recall your testimony correctly, when the prosecutor was asking

2   you about Exhibit 32-4(4) that, if I recall correctly, about

3   that time there was remarks that you had lost half your

4   business to Abstral?  Do you remember something like that?

5   A   I think so.

6   Q   And do you recall that to be correct or incorrect?

7   A   I think that's correct.

8   Q   Okay.  And did that concern -- and Abstral may have been

9   cutting into your market; do you remember saying something like

10  that?

11  A   Yes.

12  Q   And I believe on the next page when the prosecutor was

13  asking you -- in Government Exhibit 32-4(5) from Mr. Yu --

14  could you tell us who he is again?

15  A   He's the man that crunches numbers for the company and runs

16  reports for the company, Insys.

17  Q   Copied to your boss; right?

18  A   Yes.

19  Q   To you?  Right?

20  A   Yes.

21  Q   Copied to your boss; right?

22  A   Yes.

23  Q   And what's it about?

24  A   Abstral numbers.

25  Q   And you said that -- tell me if I'm correct.  Is that about

1    the time you were saying that you had lost half your business,

2    your Subsys business and y'all were having problems with

3    Abstral?

4    A    I don't remember that date.

5    Q    Okay.  Not the date but the general time frame?

6    A    I think so.

7    Q    Let me show you what's been marked into evidence as

8    Government's Exhibit 10-18A.  And if we could start here in

9    January where this shows -- and this purports to be -- the red

10   is Dr. Ruan's Subsys micrograms prescribed by month.  So that

11   would be Ruan's prescriptions of Subsys per month.

12          MR. BODNAR:  Objection, Your Honor.  It's not

13   prescriptions per month, it's total amount of micrograms.

14          MR. KNIZLEY:  Excuse me.

15   Q    Ruan's micrograms prescribed by month of Subsys.  Is that

16   what it looks like?

17   A    Yes.

18   Q    And that's what's important to y'all, or at least it was

19   important to Insys was the micrograms; right, the dosages?

20   A    Yes.

21   Q    Not necessarily the prescriptions, you'd rather have one

22   prescription of 1600 than 10 prescriptions of 100; right?

23   A    No.

24   Q    Okay.  Well, would you make more sales on 1600, one

25   prescription of that, than you would 10 of 100?

1  A   Yes.

2  Q   So that -- and as I say, you said it wasn't that important

3  but are you telling me what's important is what's best for the

4  patient is what you're suggesting?

5  A   I'm telling you that the way you broke it down, one is not

6  more important than the other.

7  Q   Okay.  That was a poor choice of words of being important;

8  is that right?

9         I think that's what you were telling me.

10 A   Yes.

11 Q   Okay.  Well, as far as the sales of the product, and the

12 profit, the -- there's more product and there's more money to

13 be made by one 1600 prescription than there is by 10 100s?

14 A   Yes.

15 Q   Okay.  Now, so this -- we're going to talk about here is

16 the dosages.  The amounts.  Okay?

17 A   Okay.

18 Q   And then we'll go back to January and February and March

19 where we talked about how we were losing half our business --

20 and let's even go back to October.  Okay?

21        Now, starting in October, how many micrograms by month

22 was Dr. Ruan prescribing?

23 A   3,371,000.  So 3,371,000.

24 Q   How about November?

25 A   3,396,000.

1494

NATALIE PERHACS - CROSS BY MR. KNIZLEY

1  Q  That's a little bit more, wasn't it?

2  A  Yes.

3  Q  So we're not dropping there; right?

4  A  Right.

5  Q  We do get a drop in December, don't we?

6  A  Yes.  That's --

7  Q  Excuse me.  Have I got it wrong there?

8  A  Oh, God; you're right.

9  Q  Okay.  December.

10  A  December, yes.

11  Q  A little drop; right?

12  A  Yes.

13  Q  We bounce back in January?

14  A  Yes.

15  Q  We really bounce back in February?

16  A  Yes.

17  Q  And we drop off in March.  But there is no drop in half at

18  all there, is there?

19  A  No.

20  Q  As a matter of fact, between January and February during

21  the time of this talk we've got, it looks like, the greatest

22  amount of sales on this whole list, doesn't it?

23  A  Yes.

24  Q  It drops the next month, picks up a little bit in April,

25  picks up in May, and we stay over that 3 million mark all the

NATALIE PERHACS - CROSS BY MR. KNIZLEY

 1  way to July.  I may have misspoke in -- by July you've got it
 2  even more than the February; is that right?
 3  A   Yes.
 4  Q   So let's now talk about Government's Exhibit 32-4(7).  And
 5  the prosecutor was talking to you about what is Ruan doing 55
 6  Abstrals in one week?  Do you remember that?
 7  A   Yes.
 8  Q   And that's in March?
 9  A   Yes.
10  Q   He acts like there's a drop-off in sales; right, or at
11  least the competition in sales; right?
12  A   Yes.
13  Q   Back to our March, it's there; right?
14  A   Yes.
15  Q   And then it stays right about there, about this 3,000.
16  Same thing and not too far from what it was in January; right?
17  A   Yes.
18  Q   All right.  Let me ask you about the -- the prosecutor was
19  asking you on 32-4A that in February, looking at their -- what
20  does it say there?
21  A   Looking at their data, between Ruan and Couch, have written
22  435 Abstral prescriptions.  Hopefully with a little help from
23  above we can land this.
24  Q   Do you recall what the prosecutor suggested the little help
25  from above was?

1  A   Yes.

2  Q   What was that?

3  A   Help from upper management.

4  Q   Mr. Kapoor?

5  A   Yes.

6  Q   Really in February 2014 was in reality the highest sales

7  y'all had -- according to 10-18A, the Government's Exhibit, the

8  highest sales -- excuse me -- highest prescriptions by

9  microgram y'all had ever had; is that correct?

10 A   Yes.

11 Q   Ms. Perhacs, I'm going to show you what's marked as

12 Government's Exhibit 32-4(2).  And this was back in December

13 when I think, at that time, your employers were being critical

14 of your sales; is that correct?

15 A   Yes.

16 Q   And at that time Karen -- again, what was her role?

17 A   She was my manager.

18 Q   Okay.  And she -- from you, you had written to her on

19 December 5th; is that right?

20 A   Yes.

21 Q   And you had told her of some success you had had, you

22 thought; right?

23 A   Yes.

24 Q   And then what did you say that Dr. Ruan did and said?

25 A   Dr. Ruan looked at me and said:  Natalie, if it will help

1    you and my patients, we will do it.

2    Q   Did he say if it would help you alone or did he include

3    anybody else?

4    A   And his patients.

5    Q   Did he say if it was going to help himself?

6    A   No.

7    Q   And I asked you earlier, did Dr. Ruan's desire to help his

8    patients permeate through the relationship between you and he?

9    And does that reflect it does?

10   A   Yes.

11   Q   I show you what's marked as Ruan's Exhibit 77.  And I'm

12   going to ask you -- it appears to be an email from Mr. Yu to

13   you.  Do you see that?

14   A   Yes.

15   Q   And that's back in April 2013?

16   A   Yes.

17   Q   And that you had not been working there very long at that

18   time, had you?

19   A   No.

20   Q   Okay.  And it appears that -- and again, I'm sorry.  Could

21   you tell us who Mr. Yu is again, please?

22   A   Sure.  He's the man that creates reports and crunches the

23   numbers and data for the company.

24   Q   So he's writing to you about some of those numbers and

25   data; is that correct?

```
 1   A   Yes.

 2   Q   And he's copying your boss with it?  (Indicating.)

 3   A   Yes.

 4   Q   What is the subject matter he's writing about?

 5   A   Please note you have a low strength 400 microgram Rx

 6   dispensed yesterday.  Daily rep report for low strength usage.

 7   Q   And he talks about --

 8           THE COURT:  Mr. Knizley, do you want to introduce that

 9   so the jury can see it?

10           MR. KNIZLEY:  I'm sorry.  I apologize, Your Honor.

11   We'd offer Ruan Exhibit 77.

12           MR. BODNAR:  No objection, Your Honor.

13           THE COURT:  All right.  Mark it in.

14       (Defendant Ruan's Exhibit 77 was entered into evidence.)

15   BY MR. KNIZLEY:

16   Q   Apologize, Ms. Perhacs.  One more time again, from Mr. Yu

17   to you, copied to your boss.  Yu is the number cruncher, Rowan

18   is your boss.  What is it about?

19   A   A low-strength Subsys prescription.

20   Q   And that was dispensed yesterday; right?

21   A   Yes.

22   Q   On a daily basis they want to talk to you about this type

23   thing; right?

24   A   Yes.

25   Q   And he says:  Your doctor -- is that Dr. Ruan?
```

1    A    Yes.

2    Q    Okay.  Right there it says Dr. Ruan; right?

3    A    Yes.

4    Q    Now, you -- Dr. Ruan, did he not -- he decided what the

5    dosage to his patients was going to be, didn't he?

6    A    Yes.

7    Q    And he would listen to people but the decision was his?

8    A    Yes.

9    Q    And if he thought that was proper for the patient, that's

10   what he would prescribe?

11   A    Yes.

12   Q    So you couldn't do much about this, could you?

13   A    No.

14   Q    Now, on another occasion -- I show you what's marked as

15   Ruan's Exhibit 81.  This purports to be an email exchange in

16   May, the next month, 2013, between -- it looks like first from

17   Mr. Benavidez to Ms. Gurrieri, and then from you to

18   Mr. Benavidez.  I know I'm reading it backwards, but is that

19   what that is?

20   A    Yes.

21   Q    Okay.

22        MR. KNIZLEY:  I'd offer Ruan's Exhibit 81.

23        MR. BODNAR:  Just one second, Your Honor.  No

24   objection, Your Honor.

25        THE COURT:  All right.  Mark it in.

1       (Defendant Ruan's Exhibit 81 was entered into evidence.)

2    BY MR. KNIZLEY:

3    Q    From time to time did your employer want you to do certain

4    things to get a patient approved for insurance coverage for

5    Subsys?

6    A    Yes.

7    Q    And one of those things, from time to time, would be to

8    have the physician -- if something was rejected, to have the

9    physician write what's called a letter of medical necessity; is

10   that correct?

11   A    Yes.

12   Q    And could you tell the ladies and gentlemen of the jury why

13   that might be important to getting a patient covered under

14   insurance?

15   A    It's additional -- it's an additional argument as to why

16   the insurance company should pay for the medicine.

17   Q    And this would be something that you might receive from a

18   physician, that physician, you then may forward it to that help

19   center we talked about?  And they put it on some pre-approval

20   form; is that correct?

21   A    Usually the office staff would fax those things.

22   Q    The doctor's office staff?

23   A    Yes.

24   Q    And if the occasion came -- sometimes your employer would

25   ask you to go to the office staff and get one of these letters

NATALIE PERHACS - CROSS BY MR. KNIZLEY

1501

1    of medical necessity, would they not?

2    A   Yes.

3    Q   And I think on this day you were requested to do that, were

4    you not?  And we're going to take it step by step here.  Okay?

5    A   Okay.

6    Q   All right.

7    A   Do you want me to read it?

8    Q   Yes.  I'm starting with Mr -- and who is Mr. Benavidez?

9    A   I don't remember.

10   Q   Would it have been someone involved in the Insys business?

11   A   I think so.

12   Q   And he was writing you -- in fact, looking at it he says

13   his -- what is his -- email address is I-N-S-Y-S-R-X -- or what

14   could be insysprescriptions.com; is that right?

15   A   Yes.

16   Q   Are you relatively confident he worked for Insys?

17   A   Yes.

18   Q   Okay.  And on May 8th, 2013 at 11:41, what did he say to

19   you?

20   A   Natalie, I just received another call from Mary Ann

21   Connors, date of birth 5/26/64, with Dr. Ruan.  She stressed

22   once again about -- that she has not been approved for a

23   voucher.  I let her know that we cannot call in a voucher until

24   we move forward with -- till we move forward with the

25   case.  She proceeded to let me know that the doctor was on

```
 1   vacation.  I confirmed with the office that this is not the
 2   case.  I will be needing a LMN before we can call more --
 3   before we can move forward with the case and call in a voucher.
 4   Q   What is this LMN he's referring to?
 5   A   Letter of medical necessity.
 6   Q   And that's what you've just told the jury about a few
 7   minutes ago?
 8   A   Yes.
 9   Q   Now, what is Mr. Benavidez asking you to do?
10   A   Asked the staff to help get a letter of medical necessity.
11   Q   Now, the person that signs that letter of medical necessity
12   is the physician; right?
13   A   Yes.
14   Q   So when you asked the staff, that means ask the staff to go
15   ask the doctor?
16   A   Yes.
17   Q   And in response to that, what did you tell Mr. Benavidez?
18   A   I emailed about this patient yesterday.  Dr. Ruan is not
19   interested in doing the LMN at this time.  And I spoke to one
20   of his PAs yesterday about helping with the LMN and she told me
21   she'd ask.  I cannot make the doctor write an LMN but I did
22   relay the message.  I appreciate your help and I will keep the
23   bug in their ear about helping this patient.
24   Q   Now, if he wanted to get the insurance to cover the cost of
25   Subsys, it may have been beneficial for him to sign such a
```

 1   thing; right?

 2   A    Yes.

 3   Q    And he was not inclined to do so in this case?

 4   A    No.

 5   Q    Now I'm going to show you what's marked as Ruan's Exhibit

 6   83.  And this appears to be an email from Ms. Hill to you?

 7   A    Yes.

 8   Q    In April 2014?

 9   A    Yes.

10        THE COURT:  Isn't this already in evidence?

11        MR. BODNAR:  This is in evidence, Your Honor.

12        MR. KNIZLEY:  If I can find it on their list then,

13   Judge.

14        THE CLERK:  It should be 32-4(9).

15        MR. KNIZLEY:  Thank you.

16   Q    I show you what's marked as Government's Exhibit 32-4(9).

17   Does this appear to be the same email I just showed you?

18   A    Yes.

19   Q    And that is from Ms. Hill to you?

20   A    Yes.

21   Q    And again, Ms. Hill is --

22   A    My manager.

23   Q    Okay.  And what is she telling you?

24   A    Hey, Natalie, unfortunately I've been informed that

25   Dr. Couch and Dr. Ruan have had their ISP allotments reduced to

1504

 1    five each for now.  Please remove the additional from the

 2    system.  As soon as I receive more I'll let you know.  Thanks.

 3    Q    Okay.  And I think -- was this purportedly in connection

 4    with their prescription writing on being on the -- going down?

 5    A    Yes.

 6    Q    Down to half or somewhere along -- thereabouts?

 7    A    I don't know that.

 8    Q    Okay.  Was that what we talked about earlier today or

 9    yesterday?

10    A    I think so.

11    Q    In April (indicating) of 2014 it was not going down from

12    March, was it?  Which direction was it going?

13    A    Up.

14    Q    Which direction did it continue to go?

15    A    Up.

16    Q    Now, we know in April they cut the speaker allotments; is

17    that correct?

18    A    Yes.

19    Q    So they weren't getting this by five apiece; is that right?

20    No, down to five.  How much was it, do you remember?

21    A    I don't remember.

22    Q    Do you have any idea how much -- was it five for the year

23    you're talking about?

24    A    Five for the quarter.

25    Q    Okay.

1505

1  A   Yeah, five for the quarter.

2  Q   And I think he was doing it every week, so was five apiece

3  or five total, do you know?

4  A   Five per physician.

5  Q   Okay.  And I think at one time we were doing it once a

6  week; right?

7  A   Yes.

8  Q   And in a quarter, 12, 13 weeks; right?

9  A   Yes.

10  Q   So we're cutting down to five; is that right?  Right?

11  (Indicating.)

12  A   Yes.

13  Q   So that's less than half of what they were doing; right?

14  If they were doing it weekly?

15  A   Yes.

16  Q   So five -- when they got cut in April, though, they had

17  increased from March, what did they do in May?

18  A   Increase.

19  Q   What did they do in June?  Slightly less, did you say?

20  A   Yes.

21  Q   And what about August?  That is the absolute highest

22  they've ever done if --

23  A   That's in --

24  Q   Excuse me.  That's July.  I skipped over one.

25  A   Okay.

1  Q   All right.  August, July?

2  A   High.

3  Q   We get cut in April and we don't go down.  Which way do we

4  go?

5  A   Up.

6  Q   Again, the highest he's ever done, according to this list?

7  A   Yes.

8  Q   Now, you have told us that in your employment with Insys

9  that you received an awful lot of pressure.

10  A   Yes.

11  Q   To encourage physicians to increase their prescribing of

12  Subsys?

13  A   Yes.

14  Q   And we've seen a lot of emails that show that pressure?

15  A   Yes.

16  Q   But you never shared those emails with the physicians, did

17  you?

18  A   I don't think so.

19  Q   They never knew that pressured side with any particularity,

20  did they?

21  A   Yes.

22  Q   They knew you were pressured but you didn't ever show them

23  the emails and say:  I've got to have this and I've got to have

24  that.  Did you?

25  A   No.

1  Q   You didn't tell them the way those people were treating

2  you, did you?

3  A   No.

4  Q   And they weren't treating you good, were they?

5  A   No.

6  Q   They were paying you a lot of money but they weren't

7  treating you very well, were they?

8  A   Yes.

9  Q   And they made you do for that money some things you really

10  didn't really want to do; is that correct?

11  A   I willingly followed their directions.

12  Q   And you've told us at the end of the day, as far as Xiulu

13  Ruan was concerned, he's the one that made the decision on his

14  own what he was going to prescribe to who for what?

15  A   Yes.

16  Q   And when you entered into that plea agreement about a year

17  ago, you were under pressure, were you not?

18  A   Sir?

19  Q   You were under some pressure, were you not?  There was

20  pressure?

21  A   Yes.  Yes.

22  Q   You were about to have a baby?

23          MR. BODNAR:  Objection, Your Honor, to going down this

24  line of questioning.  She's already pled guilty and admitted

25  that.  And personal data about her life is not appropriate for

     1    here.

     2              THE COURT:  Sustained.

     3              MR. KNIZLEY:  That's all I have, Your Honor.

     4              THE WITNESS:  (Crying.)

     5              THE COURT:  Any redirect?

     6              MR. BODNAR:  May we approach on one matter, Your

     7    Honor?

     8              THE COURT:  Yes.

     9         (At the side bar, jury not present.)

    10              MR. BODNAR:  Your Honor, Mr. Knizley brought up the

    11    fact that Dr. Ruan started donating as of June 6th, 2014.  He

    12    didn't use the date, but June 6, 2014, Dr. Ruan did start

    13    donating all of his Insys money from speaking programs to

    14    various universities -- the ones that Mr. Knizley said.

    15    However, that came the day after him learning about

    16    Dr. Awerbuch, who was similarly situated as Dr. Ruan and was

    17    indicted in the Eastern District of Michigan.  She had those

    18    conversations with him about Dr. Awerbuch's indictment.  And

    19    that, we're going to show through other evidence tomorrow, was

    20    the reason he donated all that money.  So I feel like I should

    21    be able to ask her about that conversation with Dr. Ruan about

    22    Dr. Awerbuch's indictment since that was what caused or that's

    23    what we are going to argue and show evidence tomorrow that led

    24    him to donating his Insys money.

    25              MS. GRIFFIN:  Dr. Awerbuch was a Subsys writer and he

1509

```
 1    was indicted.

 2             THE COURT:  What?

 3             MS. GRIFFIN:  Was a Subsys writer and he was charged

 4    with activities connected with the writing of Subsys.

 5             MR. BODNAR:  And Dr. Ruan and Dr. Couch are both

 6    identified by the end of their MP number as being prescribers

 7    in Mobile, Alabama, in Dr. Awerbuch's indictment.

 8             MS. GRIFFIN:  So, Your Honor, he's opened the door to

 9    that by bringing all that in on redirect.

10             THE COURT:  He did open the door to whatever

11    conversation she had with Dr. Ruan about the donations because

12    he asked her about it.  So I think you're entitled to go back

13    into that.  Now, how you can show his knowledge about all that,

14    I don't know.  But I think you can certainly go into what he

15    told her about his donations.  So --

16             MR. KNIZLEY:  Judge, I just would caution him not to

17    lead in this area until he's established it at all, but make

18    sure he establishes something before he does so.

19             THE COURT:  All right.

20             MR. BODNAR:  It's going to take me a few minutes to

21    gather up all the things.

22             THE COURT:  Okay.

23        (In open court, defendants and jury present.)

24        (A juror had a conversation with the court security officer

25    off the record.)
```

1    A JUROR:  I didn't understand that last question at

2  all.

3    THE COURT:  All right.  Let's ask the court reporter

4  to read back the last question Mr. Knizley asked the witness.

5  Is that what you want?

6    A JUROR:  Yes, ma'am.

7  (A discussion was held off the record between the Court and

8  court reporter.)

9  (Requested portion of record read as follows:)

10    THE REPORTER:  Question:  You were under some

11  pressure, were you not?  There was pressure?

12    Answer:  Yes.  Yes.

13    Question:  You were about to have a baby?

14    And there was an objection.

15    THE COURT:  And the objection was sustained.

16    All right.

17    Are you ready, Mr. Bodnar?

18  (A discussion was held off the record between counsel.)

19    THE COURT:  I guess not.

20                      REDIRECT EXAMINATION

21  BY MR. BODNAR:

22  Q   Ms. Perhacs, we've got a number of things to go over with

23  you.  To the degree I can, I will try to cover the same time

24  for Dr. Ruan and Dr. Couch.

25    Do you recall both defense attorneys talking with you

1   about your plea agreement that's been marked in as Government's

2   Exhibit -- admitted as 32-5?

3   A   Yes.

4   Q   And you entered into this plea agreement after retaining a

5   lawyer; correct?

6   A   Yes.

7   Q   And is your father also a lawyer?

8   A   Yes.

9   Q   Did you discuss the terms of the plea agreement with both

10   your dad and your attorney?

11   A   Yes.

12   Q   Was it your understanding, as laid out in paragraph 20, as

13   part of this plea agreement the United States will recommend to

14   the Court that the defendant be sentenced at the low end of the

15   advisory sentencing guidelines determined by the Court?

16   A   Yes.

17   Q   Then you were also asked, both by me on direct and by both

18   defense counsel, that you had the opportunity to earn what's

19   called a 5K reduction.  Do you recall that line of questioning?

20   A   Yes.

21   Q   And that was something you also discussed with your father

22   as an attorney and with your attorney; correct?

23   A   Yes.

24   Q   Your attorney's a criminal attorney, he's done these cases

25   before; correct?

1   A   I think so.

2   Q   And he's explained to you what a 5K is.  And does the

3   language right in the 5K talk about completely and truthfully

4   responding?

5   A   Yes.

6   Q   And does it provide for truthful and complete information?

7   A   Yes.

8   Q   And does it go on for page after page talking about the

9   requirement that you give full, complete, truthful and

10  substantial cooperation?

11  A   Yes.

12  Q   What is your understanding from talking with your attorney

13  if you were to not give truthful testimony here today?

14  A   I might not get the recommendation for a lesser sentence.

15  Q   And not only that, not only would you not get the

16  recommendation, but is it your understanding that this plea

17  agreement would therefore be violated and you wouldn't even get

18  a low-end recommendation?

19  A   Yes.

20          MR. KNIZLEY:  Judge, we object to leading.

21          THE COURT:  Don't lead the witness.

22  BY MR. BODNAR:

23  Q   Do you know if your plea agreement would be voided if you

24  came in here and were not truthful today?

25  A   Yes.

1513

1    Q   Do you remember Mr. Doss was asking if you had met with the

2    United States before today?

3    A   Yes.

4    Q   And in fact, you have met with DEA, FBI, and the U.S.

5    Attorney's Office on multiple occasions; correct?

6    A   Yes.

7    Q   At any time during any of those conversations did myself or

8    Ms. Griffin or any agents ever tell you what you have to say

9    here during your testimony?

10   A   No.

11   Q   Was there anything we said that is the one requirement that

12   you must do when you testify?

13   A   Yes.

14   Q   And what was that?

15   A   Give a truthful testimony to what I know.

16   Q   Now, we've talked about what the indication is for Subsys;

17   correct, what the FDA indication for the drug Subsys was?

18   A   I don't remember.

19   Q   Do you know what the FDA indication for Subsys is?

20   A   Yes.

21   Q   And what is that indication?

22   A   It's indicated for patients who are already on

23   around-the-clock pain medicine, that they experience

24   breakthrough cancer pain.

25   Q   And when did the trainings -- or when the speaker programs

 1  were done, is Dr. Couch and Dr. Ruan essentially promoting

 2  Subsys on behalf of the company Insys?

 3  A   Yes.

 4  Q   And you said there were slides that were made up by the

 5  third party, not Dr. Ruan or Dr. Couch?

 6  A   Yes.

 7  Q   Were those slides discussing the on-label use for Subsys?

 8          MR. KNIZLEY:  Objection.  Leading, Your Honor.

 9          THE COURT:  Don't lead the witness.

10  BY MR. BODNAR:

11  Q   Do you know if the slides said what the drug was indicated

12  for?

13  A   Yes.

14  Q   And were the slides used for off-label -- for discussing

15  off-label use of it?

16  A   Doctors, if asked a question, were allowed to answer an

17  off-label question, but within the slides.  It didn't contain

18  off-label prescription direction.

19  Q   So if it didn't contain off-label prescription information

20  in the slides, was it talking about cancer pain in the slides?

21  A   Breakthrough cancer pain.

22  Q   And do you remember what Mr. Doss was talking about, how

23  doctors were chosen for speaker programs because they had lots

24  of clinical experience?

25  A   Yes.

NATALIE PERHACS - REDIRECT BY MR. BODNAR

1  Q   Do you know what, if any, clinical experience Dr. Couch or

2  Dr. Ruan had in treatments of breakthrough cancer pain?

3  A   I don't know.

4  Q   At the time that their prescriptions were being -- or their

5  programs were being reduced -- do you remember we've all talked

6  about that, that April email?

7       At that point, Dr. Ruan and Dr. Couch had been

8  prescribing for a very long period of time, hadn't they?

9  A   Yes.

10 Q   So they had a lot of experience using it at that point,

11 didn't they?

12      MR. KNIZLEY:  Objection.  Leading the witness.

13      THE COURT:  Don't lead the witness.

14 BY MR. BODNAR:

15 Q   Did they have a lot of experience at that point when their

16 programs were being reduced?

17 A   Yes.

18 Q   Were their programs still reduced?

19 A   Yes.

20 Q   Why was that?

21 A   Because they were writing more of the competitor product

22 and the company told me that their prescription levels were

23 going down.

24 Q   Do you recall we looked at, for both Dr. Couch and

25 Dr. Ruan, a bunch of examples of sign-in sheets?

```
 1   A    Yes.
 2   Q    And that's just one of the examples from Dr. Couch, that's
 3   one of the examples of Dr. Ruan?  (Indicating.)
 4   A    (Nodding head affirmatively.)
 5   Q    And do you remember reading down, at least on examples that
 6   were shown, a variety of different names?
 7   A    Yes.
 8   Q    And do you recall being asked whether or not those
 9   individuals worked at PPSA?
10   A    Yes.
11   Q    And did, in fact, a majority of the names that you were
12   shown, do you know if a lot of those individuals worked at
13   PPSA?
14   A    Yes.
15   Q    Do you recall where Mr. Doss asked you:  Well, it would be
16   beneficial -- wouldn't it be beneficial for people that worked
17   there to hear information about Subsys?
18        Do you remember that question from Mr. Doss?
19   A    I do.
20   Q    But weren't you in the clinic three days a week anyway?
21   A    Yes.
22   Q    Could they have asked you questions during that time
23   period?
24   A    Sure.
25   Q    They didn't have to ask you these questions during these
```

NATALIE PERHACS - REDIRECT BY MR. BODNAR

1   speaking programs, did they?

2   A   No.

3   Q   Do you remember Mr. Doss was showing you a variety of

4   emails regarding Papa John's and other food for these programs?

5   A   Yes.

6   Q   And do you recall talking about limits on the cost of food?

7   A   Yes.

8   Q   I think if I recall correctly, I believe you said it was

9   about $20 per meal?

10  A   I think so; per person, per meal, I think.

11  Q   So if that's the case, then -- and this is just looking

12  at -- using as an example Ruan's Exhibit, one of the ones that

13  was shown to you, individuals that signed in would get roughly

14  a $20 meal; correct?

15  A   Yes.

16  Q   But did Dr. Ruan and Dr. Couch, whoever was hosting it, get

17  something in addition to their free meal?

18  A   Yes.

19  Q   And was that a payment?

20  A   Yes.

21  Q   But you don't know the amount?

22  A   I don't know the amount.

23  Q   So on this date -- this is the one for September 20th,

24  2013?

25  A   Yes.

1   Q   People at PPSA would get a free meal?

2   A   People that attended this program.

3   Q   The doctors would get a free meal?

4   A   Yes.

5        MR. KNIZLEY:  Your Honor, I object.  He's leading the

6   witness.

7        THE COURT:  Don't lead the witness.

8   BY MR. BODNAR:

9   Q   And something else was given to the doctor on this date as

10  well?

11  A   I don't -- I don't know.

12  Q   But do you know if they were given honorariums for these

13  speakings?

14  A   Yes.

15  Q   So was it more than just the doctor getting a free meal

16  twice a week?

17  A   Yes.

18  Q   And as we saw these names, was it -- as we asked the

19  names -- this is just another example -- did it appear that

20  it's the same employees?  Did it look like the same employees

21  coming week after week to these speaker programs?

22  A   Yes.

23  Q   Do you remember Mr. Doss showed you some examples of the

24  type of people that were there from PPSA?

25  A   Yes.

NATALIE PERHACS - REDIRECT BY MR. BODNAR

1    Q    And I believe he listed individuals that worked in the

2    medical records department?

3    A    Yes.

4    Q    The MRI techs?

5    A    Yes.

6    Q    RNs?

7    A    Yes.

8    Q    Medical assistants?

9    A    Yes.

10   Q    People in billing?

11   A    Yes.

12   Q    How many Subsys prescriptions did any of those individuals

13   ever write?

14   A    Zero.

15   Q    Do you remember being shown Dr. Ruan's Exhibit 88 by

16   Mr. Knizley?

17   A    Yes.

18   Q    And I believe you said you didn't recall if Dr. Ronderos or

19   Dr. Dumlao or Theresa -- or the other doctors here actually

20   attended.  Was that your testimony?

21   A    Yes.

22   Q    Did you keep track of the number or of the Subsys

23   prescriptions being written in your region?

24   A    Yes.

25   Q    Do you know if Dr. Ronderos ever prescribed Subsys?

1520

1    A    He never prescribed.

2    Q    How about Dr. Dumlao?

3    A    Yes.

4    Q    How about Dr. Reddy?

5    A    No.

6    Q    How about Dr. Frank Wang?

7    A    No.

8    Q    I believe you said, at times, oncologists would come to

9    these trainings; is that correct?

10   A    Trainings?

11   Q    Or the speaking programs?

12   A    Yes.

13   Q    And you said you tracked -- did you track the number of

14   prescriptions and who was writing them in your region?

15   A    Yes.

16   Q    Were these oncologists writing prescriptions by and large

17   here in Mobile?  Were -- I'll rephrase that.

18   A    Okay.

19   Q    Were oncologists writing Subsys in this region?

20   A    Yes.

21   Q    Was it anywhere to the degree that Dr. Ruan or Dr. Couch

22   was writing Subsys prescriptions?

23   A    No.

24   Q    I'm going to show you what was admitted as Couch Exhibit

25   179.  Do you recall this email where you were rating the

1  doctors' speaking ability?

2  A   Yes.

3  Q   And you do mention Dr. Couch is one of the best presenters

4  as far as fun and integrated -- knowledge is concerned.  Is

5  that what you say right there?

6  A   Yes.

7  Q   But read what the next sentence is.

8  A   He is weak in the area of helping recruit new doctors.

9  Q   Is that what Insys was actually -- wanted, recruiting new

10  doctors to prescribe Subsys?

11  A   Yes.

12  Q   You're saying he's weak at it, aren't you?

13  A   Yes.

14  Q   And is that true?

15  A   Yes.

16  Q   And for Dr. Ruan, do you recall when Mr. Knizley said:  You

17  ranked Dr. Ruan even better than Dr. Couch?

18  A   Yes.

19  Q   And you did, in fact, rank him better, didn't you?

20  A   Yes.

21  Q   Would you please read what was it you said about Dr. Ruan?

22  A   Dr. Ruan -- of course, Dr. Ruan -- use improvement in

23  possibly slowing down enough while going over the slides to

24  explain Subsys to his new nurse practitioners.  He usually goes

25  so fast that I know the audience misses some of the very

 1    important info.  He seems to enjoy talking about the mucosa

 2    blood-brain barrier the most, but the part about what qualifies

 3    a patient to be opioid tolerant is always confusing.  He

 4    presents well because of this -- but because of his thick

 5    accent, sometimes it does get confusing in some areas.  I hope

 6    this helps with Dr. Ruan.

 7    Q   Now, with these two times a week speaking programs for the

 8    doctors at PPSA, tell me about all the different oncologists

 9    that would come to this.  Were there lots of oncologists that

10    came to these speaking programs?

11    A   No.

12    Q   Were there lots of other pain doctors that came to these

13    speaking programs?

14    A   No.

15    Q   By and large, was it just people that worked at their own

16    clinic?

17           MR. KNIZLEY:  Your Honor, I apologize.  Objection.

18    Leading.

19           THE COURT:  Sustained.

20    BY MR. BODNAR:

21    Q   Who was it that was coming to these biweekly speaking

22    programs?

23    A   People that worked in the office.

24    Q   To your knowledge, did the people that worked in the office

25    such as the people in medical records, MRI techs, RNs, billing

1  department, were they able to even prescribe Subsys?

2  A   No.

3       MR. KNIZLEY:  Objection.  Asked and answered.

4       THE COURT:  You've already gone over this, Mr. Bodnar.

5  BY MR. BODNAR:

6  Q   Ms. Perhacs, do you recall Mr. Knizley going over what has

7  been admitted as Government's Exhibit 10-18A, which purports to

8  be a Subsys micrograms per month?

9  A   Yes.

10  Q   I'm going to now show you what's been admitted as

11  Government's 10-18.  And does this have the same title but

12  appear to be in graph form?

13  A   Yes.

14  Q   And do you recall discussing the time period of April 2014

15  in connection with the reduction of speaker programs?

16  A   Yes.

17  Q   And do you recall Mr. Knizley talking about an increase in

18  July of 2014?

19  A   Yes.

20  Q   Following that increase, what happened to the number of

21  micrograms prescribed by Dr. Ruan, at least according to this

22  graph?

23  A   They go down.

24  Q   I also want to clarify micrograms per month.  Is that the

25  same as prescriptions per month?

NATALIE PERHACS - REDIRECT BY MR. BODNAR

1    A    No.

2    Q    With -- one moment.

3         Do you recall looking at the emails with United States

4    and with defense attorney about the number of Abstral

5    prescriptions per month?

6    A    Yes.

7    Q    And had you mentioned -- you had mentioned that that was a

8    concern to you and your company?

9    A    Yes.

10   Q    Do you know if those Abstral prescriptions were people that

11   were taken off of Subsys and put on Abstral or do you not know

12   that?

13   A    I'm not sure.

14   Q    So you don't know also if they were just new patients who

15   had not been on Subsys but written Abstral instead?

16   A    Could you please repeat the question?

17   Q    Do you know if they were new patients that had not been on

18   Subsys before but were prescribed Abstral instead?

19   A    I -- I don't know.

20   Q    Were you aware of any of the patient knowledge of why

21   Dr. Ruan or Dr. Couch prescribed Subsys or Abstral?

22   A    Was I aware of the patient knowledge --

23   Q    Were you aware of the patient information about why

24   Dr. Ruan or Dr. Couch ever prescribed Subsys or Abstral?

25   A    No.

NATALIE PERHACS - REDIRECT BY MR. BODNAR

```
 1  Q   You mentioned pressure, but ultimately whose decision was
 2  it to prescribe Abstral or Subsys?
 3  A   The physician's.
 4  Q   Do you recall talking about the GAP program with Mr. Doss?
 5  A   I don't -- I don't remember that.
 6  Q   You don't remember on cross-examination being asked about
 7  the GAP program?
 8  A   I do remember being asked about the GAP program.
 9  Q   And what was the GAP program?
10  A   Guaranteed access program.
11  Q   And what does that mean again?
12  A   Guaranteed access program means that we will provide free
13  Subsys for a commercial patient until they can get it approved
14  through the -- until Insys can get the insurance company to
15  approve it and pay for it.
16  Q   So if a patient is in this -- do they enroll in the GAP
17  program?  How does it work?  How do they get to be part of this
18  GAP program?
19  A   To my knowledge, they were referred a number, I think by
20  the pharmacy.  And they called someone in our company and they
21  helped them.
22  Q   So then who paid the pharmacy back for the Subsys if they
23  were in the GAP program?
24  A   Insys.
25  Q   Do you recall being asked by Mr. Knizley if you knew of a
```

 1   time where Dr. Ruan began donating portions of work or donating

 2   his honorarium from Insys speaker fees?

 3   A   Yes.

 4   Q   Do you recall any conversations with Dr. Ruan about why he

 5   did that?

 6   A   No.

 7   Q   Do you recall being asked about the conversation about

 8   where you learned that Dr. Ruan had purchased stock in Galena

 9   Biopharma?

10   A   Yes.

11   Q   Did he tell you why he wanted to purchase stock in that?

12   A   Yes.

13   Q   What did he tell you?

14   A   That Galena is probably going to be the next Insys.

15   Q   Did he tell you -- what, if anything, did he say he could

16   do about that, or was his plan about that, that he told you?

17   A   I don't -- I don't remember.

18   Q   Do you recall any conversation with Dr. Ruan about the

19   stock other than the fact he purchased it?

20   A   Yes.

21   Q   What was that?

22   A   That he thought they were going to be the next Insys.

23   Q   What did he mean by that or do you know what he meant by

24   that?

25         MR. KNIZLEY:  Objection.  Undisclosed mental operation

1  of another.  She can certainly testify about what he told

2  her.  It's an undisclosed mental operation of -- he is asking a

3  question about what someone may have thought and not

4  disclosed.  Certainly she can tell us about what he disclosed;

5  not about what they thought.

6          THE COURT:  Sustained.

7          MR. BODNAR:  And I'll rephrase.

8  Q   Did he tell you -- did he tell you his thought process on

9  that about what he -- did he tell you what he meant by he hoped

10 Galena would be the next Insys?

11 A   He thought that Abstral was a good drug and this -- because

12 it was re-launched, it would do well.

13 Q   Did he talk at all about his prescribing of Abstral in

14 connection to his stock purchases?

15 A   Yes.

16 Q   What did he say?

17 A   Toward the end when it wasn't doing well, he said:  I can't

18 just let it die.

19 Q   Did he explain to you what that meant?

20 A   No.

21          MR. BODNAR:  One moment, Your Honor.

22          THE COURT:  All right.

23     (A discussion was held off the record between government

24 counsel.)

25          MR. BODNAR:  No further questions for this witness,

1528

```
 1   Your Honor.
 2            THE COURT:  All right.  Ms. Perhacs, you may step
 3   down.  Thank you.
 4            MS. GRIFFIN:  Ready to proceed, Your Honor.  Call
 5   Joyce Barber.
 6                         JOYCE BARBER
 7               was sworn and testified as follows:
 8            THE WITNESS:  I do.
 9            THE CLERK:  Thank you, ma'am.  Please be seated.
10                      DIRECT EXAMINATION
11   BY MS. GRIFFIN:
12   Q   Tell us your name, please, ma'am.
13   A   Joyce Barber.
14   Q   And Ms. Barber, can you pull that microphone right up
15   towards your mouth so we can hear you?
16            THE COURT:  That's about as good as it's going to get.
17   A   Can you hear me?
18   Q   Yes.  Thank you.
19            Ms. Barber nobody likes to be asked their age, do
20   they?  But I'm going to ask approximately what age are you?
21   A   69.
22   Q   And did there come a time in 2013 when you went to PPSA as
23   a patient?
24   A   Yes.
25   Q   Why did you go there?
```

JOYCE BARBER - DIRECT BY MS. GRIFFIN

1  A   Because of back problems.

2  Q   And I want to direct your attention -- who referred you

3  there?

4  A    It was my primary care from Family Practice, which I cannot

5  remember her name.

6  Q   Did you have to fill out any type of paperwork giving your

7  medical history to PPSA?

8  A   Yes, I did.

9  Q   And prior to coming in here today, were you shown your

10  medical record from the PPSA patient files?

11  A   No.

12  Q   Patient book?

13  A   Oh, yes.

14       MS. GRIFFIN:  Your Honor, I move to admit Government's

15  Exhibit 6-1, the Joyce Barber patient file from the Greenway

16  files of PPSA.

17       THE COURT:  Any objection?

18       MR. SHARMAN:  No objection, Your Honor.

19       THE COURT:  All right.  Mark it in.

20    (Government's Exhibit 6-1 was entered into evidence.)

21  BY MS. GRIFFIN:

22  Q   Now, Ms. Barber, had you had a hysterectomy in the mid

23  1960s?

24  A   Yes, I did.

25  Q   Did you put that down on your form when you filled out

1    paperwork about your background?

2    A   Yes, I did.

3    Q   I'll show you what's Bates number 36531.  I'm taking it out

4    of your patient file and will return it to your patient file.

5            First of all, is this general health review your

6    handwriting?

7    A   Yes, it is.

8    Q   And did you list under Surgical History that you'd had a

9    hysterectomy?

10   A   Correct.

11   Q   Again, not to embarrass you, but was your uterus removed

12   during the hysterectomy?

13   A   Yes.

14   Q   And you noted that on the form; is that correct?

15   A   Yes, it was.

16   Q   I also show you part of your initial pain assessment that

17   you filled out, Bates number 36535.  It takes a minute to

18   focus.

19           MS. GRIFFIN:  And Your Honor -- it is.

20   Q   Again, is this your writing?

21   A   Yes, it is.

22   Q   Did you tell them at that time what was the cause of your

23   pain diagnosis?

24   A   Yes, I did.

25   Q   What did you tell them, please?

1    A    It was a disk in my lower back, along with nerve pain and

2    pain in my left leg.

3    Q    Did you go there for any type of cancer?

4    A    No.

5    Q    I will remove and replace in your file Bates number 36542

6    and ask if you were referred by USA Family Medicine to

7    Dr. Couch?

8    A    Yes, by Janet Russell.

9    Q    And this shows your name as a patient?

10   A    Correct.

11   Q    And under the Assessment Plan, does it show what you have,

12   what you're being referred for?

13   A    Yes, it does.

14   Q    What is that, please, ma'am?

15   A    It was a restless leg syndrome, back pain.

16   Q    And back pain?  Now, I want to direct your attention to on

17   or about April the 30th of '13.  Was that around your first

18   visit?

19   A    It seems like I was there before then.

20   Q    Before then?  On the 4/30 visit -- let's go back to your

21   paperwork from your referral, 03542 -- excuse me, 06542.  Does

22   this USA medical form you've just looked at show the date that

23   they sent your referral over?  Up here at the top.

24   A    3/21/2013.

25   Q    And does that help refresh you that you may have first gone

JOYCE BARBER - DIRECT BY MS. GRIFFIN
27717

```
 1   there in April of '13?

 2   A   Yes.

 3   Q   When you went there in April of '13, what doctor were you

 4   to see?

 5   A   Dr. Couch.

 6   Q   Did you see him on your first visit?

 7   A   No.

 8   Q   Who did you see?

 9   A   Stacy.

10   Q   Do you know if Stacy was a doctor or not?

11   A   I assumed she was a registered nurse.

12   Q   She didn't hold herself out as being a doctor, did she?

13   A   No, she didn't.

14   Q   On this first visit did you see Dr. Couch at all?

15   A   No.

16   Q   Did you go there for approximately a year?

17   A   About, yes.

18   Q   About?  Did you ever see Dr. Couch?

19   A   I met him once.

20   Q   How is it that you met him once during that approximate

21   year of going to PPSA?

22   A   I was in the patient room with Stacy and he passed by and

23   she introduced me to him as one of his patients.

24   Q   She introduced you to Dr. Couch as one of his patients?

25   A   (Nodding head affirmatively.)
```

1    Q    Is that the first time you had met him or seen him?

2    A    Yes (nodding head affirmatively).

3    Q    Did he give you any treatment?

4    A    No.

5    Q    Or help of any kind?

6    A    No.

7    Q    Did he examine your body?

8    A    No.

9    Q    Did he look at your file?

10   A    Not that I'm aware of.

11   Q    Do you think you can recognize him?

12   A    Oh, yes.

13   Q    Is he in the courtroom today?

14   A    Yes, he is.

15   Q    Could you point out where he's seated?

16   A    Woops -- right there (indicating).

17   Q    In the -- at this table?  (Indicating.)

18   A    Uh-huh (positive response).

19   Q    And you know what color suit he has?

20   A    I'm having eye surgery so I can't see that good.

21   Q    Okay.

22            MS. GRIFFIN:  Let the record reflect she's identified

23   Dr. Couch.

24   Q    Now, you said he was introduced and he spoke to you.  Did

25   he say anything else to you?

JOYCE BARBER - DIRECT BY MS. GRIFFIN

1    A    No.

2    Q    And you never saw him again?

3    A    No.

4    Q    Now, on this first visit what were you prescribed?

5    A    I can't remember exactly.

6    Q    Did you get a Subsys prescription there?

7    A    Later, not on the first visit.  It was later.

8    Q    And who provided you that Subsys prescription?

9    A    Stacy.

10   Q    Had you ever taken Subsys before?

11   A    No.

12   Q    And after your year of going there and going -- then going

13   somewhere else, have you ever been prescribed Subsys again?

14   A    No.

15   Q    I want to direct your attention to May of 2013 and ask if

16   you received Subsys, approximately May of 2013?

17   A    It was about then, I guess.

18   Q    I can't hear you.  I'm sorry?

19   A    Yes.

20   Q    About that time?

21   A    Yes.

22   Q    Did you also have some procedures at PPSA?

23   A    I -- yes, I had an epidural and a hip injection.

24   Q    Who gave you those?

25   A    Stacy.

JOYCE BARBER - DIRECT BY MS. GRIFFIN

1    Q    I show you a procedure note for May the 28th, 2013, Bates

2    number 36466 and ask if this appears to be the procedure note

3    for a procedure?

4    A    Yes.

5    Q    A joint injection in May the 28th of '13?

6    A    Right.  Yes.

7    Q    Does it discuss with you that you are aware of the

8    expectations of the procedure under Consent?

9    A    Oh, yes.

10   Q    And does it discuss at the bottom that after a discussion

11   of the risks and the benefits, informed consent was obtained?

12   A    Yes.

13   Q    Did you have a procedure by Stacy?

14   A    Yes, an epidural.

15   Q    Now, you said they had given you Subsys around this same

16   time as well.  Had you been given an informed consent for the

17   Subsys?

18   A    No.

19   Q    Did you know what Subsys was?

20   A    No.

21   Q    Who was it that prescribed it for you?

22   A    Stacy.

23   Q    Do you know whether she was authorized to prescribe a

24   controlled substance?

25   A    No, I don't.

1  Q    And did she warn you that it was a pain -- approved for

2  breakthrough pain in cancer?

3  A    No.

4  Q    Did she have you sign an agreement form?

5  A    Not that I recall, no.

6        MS. GRIFFIN:  Your Honor I'd move to admit

7  Government's Exhibit 37-1, a patient prescriber agreement form

8  for TIRF REMS patients.

9        THE COURT:  Any objection?

10       MR. SHARMAN:  No objection.

11       THE COURT:  All right.  Mark it in.

12    (Government's Exhibit 37-1 was entered into evidence.)

13       MS. GRIFFIN:  May I publish it to the jury?

14       THE COURT:  Yes.

15 BY MS. GRIFFIN:

16 Q    Were you required to read and sign an agreement form about

17 the Subsys.

18 A    Not that I recall.

19 Q    Were you told any of those warnings that are contained on

20 the form?

21 A    No.

22 Q    That the risk evaluation and mitigation strategy and that

23 the prescriber had to agree and the patient had to agree?

24 (Indicating.)

25 A    Yes.  I see it now.  But --

```
1    Q   You weren't provided this?

2    A   No.

3    Q   So you didn't know that it's been reviewed by your

4    prescriber or your doctor.  It wasn't, was it?

5    A   No.

6    Q   And did you understand that the medication should only be

7    taken by patients who are using another opioid around the clock

8    for constant pain?

9    A   No.

10   Q   Did you understand that if you weren't taking

11   around-the-clock pain medicine, your prescriber had discussed

12   with you the risk of only taking these medications?

13           MR. SHARMAN:  Objection, Your Honor.  Leading.  The

14   document speaks for itself.

15           THE COURT:  Sustained.

16   BY MS. GRIFFIN:

17   Q   Did you discuss any of the information, under number four,

18   about how you should take the medicine?

19   A   She showed me how to use the Subsys.

20   Q   And what do you mean by showed you how to use it?

21   A   It's a little spray that you spray under your tongue.  And

22   she had an empty one that she showed me how.

23   Q   And when you say it's something you sprayed under your

24   tongue, it was like an aerosol?

25   A   Right.
```

JOYCE BARBER - DIRECT BY MS. GRIFFIN

1538

1    Q    It didn't have medicine in it, the one she demonstrated?

2    A    No.

3    Q    Did she discuss the serious side effects of Subsys with

4    you?

5    A    No.

6    Q    Did Dr. Couch discuss those with you?

7    A    No.

8    Q    Did you agree that you weren't to give your medicine to

9    anyone?

10   A    No.  I'm --

11   Q    I mean, you did -- did you do that?  Did you give your

12   medicine to anyone?

13   A    No.

14   Q    And did it talk -- were you advised to keep your medicine

15   away from children?

16   A    Yes.

17   Q    Were you told how to properly dispose of your medicine?

18   A    No.

19   Q    I show you what's marked as Government's Exhibit 9-10.

20   It's a Subsys box for a 600 mcg Subsys.  This is not your box,

21   is it?

22   A    Right.

23   Q    Can you speak up?

24   A    No.

25   Q    It's not your box?

```
 1  A   No.
 2  Q   Inside this box --
 3          THE COURT:  That's already in evidence; right?
 4          MS. GRIFFIN:  It is, Your Honor.
 5          THE COURT:  Okay.
 6  BY MS. GRIFFIN:
 7  Q   Are there some -- what appear to be some little baggies?
 8  A   Uh-huh (positive response), that you stick them in.  Now I
 9  remember.
10  Q   Okay.  Can you speak up so everybody can hear you?
11  A   Yes.
12  Q   What were these little baggies like used for?
13  A   You put the empty spray into one of those and seal them and
14  throw them in the garbage.
15  Q   So this is how you were to dispose of Subsys?
16  A   Right.
17          THE COURT:  Ms. Griffin, is now a good time for us to
18  take our break?
19          MS. GRIFFIN:  Yes, Your Honor.
20          THE COURT:  All right.  Ladies and gentlemen, we're
21  going to take our afternoon break at this time.  Leave your
22  pads on your chairs.  No discussion about the case.  Take your
23  break downstairs.  We will call you back up in about 15
24  minutes.
25          We're in recess.
```

1540

JOYCE BARBER - DIRECT BY MS. GRIFFIN

```
 1          (A recess was taken at approximately 3:09 p.m.)

 2          (In open court, 3:31 p.m., defendants and jury present.)

 3              THE COURT:  All right, Ms. Griffin.

 4   BY MS. GRIFFIN:

 5   Q   Ms. Barber, we were just going over the form and you said

 6   you had not seen it or signed it.  So obviously you didn't ask

 7   your prescriber, the doctor, questions about it; is that right?

 8   A   That's right.

 9   Q   Now, on May the 28th of '13 you were provided a

10   prescription for Subsys?

11   A   Yes.

12   Q   And who gave you that prescription?

13   A   Stacy.

14   Q   Did you see the doctor when you received that prescription?

15   A   No.

16              MS. GRIFFIN:  I will pull from your file and then

17   replace it.

18              Thank you.

19   Q   Bates Number 36472, and ask if this is a duplicate copy of

20   a prescription you received for Subsys on May the 28th of 2013?

21   A   Yes, it is.

22   Q   Is that your name, Joyce Barber?

23   A   Yes, it is.

24   Q   And the May 28, '13 on the screen?

25   A   Yes.
```

JOYCE BARBER - DIRECT BY MS. GRIFFIN

1   Q   Now, does it purport to be signed by Dr. Couch?

2   A   I can't make it out.

3   Q   Pardon?

4   A   I can't make it out.

5   Q   Can't make it out?  Does it list that you have uterine

6   cancer?

7   A   Yes, it does.

8   Q   Did you have uterine cancer in 2013?

9   A   No.

10  Q   Had you told them that you had uterine cancer in 2013?

11  A   No.

12  Q   Were you provided a copy or a prescription to give your

13  pharmacy?

14  A   I'm sure the prescription was given to me.

15  Q   Where did you normally fill your prescriptions?

16  A   Three Notch Pharmacy.

17  Q   Where is that located, what part of Mobile County?

18  A   It's on Three Notch Road.

19  Q   And I show you what's already been introduced as

20  Government's Exhibit 5-1B and ask if this appears to be a

21  copy -- excuse me -- if this appears to be a prescription for

22  Subsys for you?

23  A   Yes, it is.

24  Q   Is that the prescription you took to your pharmacy?

25  A   Yes, it is.

1542

1  Q   And if I can get them both on the screen at the same time,

2  one is the real prescription that says it has the security

3  background, that's the one you took to your pharmacy?

4  A   Right.

5  Q   And the other one is a duplicate copy --

6  A   Copy.

7  Q   -- from your file; is that right?

8  A   Yes.

9  Q   Did you begin taking the Subsys?

10 A   Yes.

11 Q   And how -- did you have any effects from taking it?

12 A   Yes.  It would knock me out; make me sleepy.

13 Q   Any other side effects?

14 A   Well, I felt like I was in a fog all the time.

15 Q   Did you also receive, at that same time, a prescription on

16 5/28/13 for Lyrica?

17 A   Yes.

18 Q   I show you what's been introduced as Government's Exhibit

19 5-1A, and ask if this is the prescription you received on May

20 the 28th of '13 for the Lyrica?

21 A   Yes.

22 Q   Does it say anywhere on the Lyrica that you have uterine

23 cancer?

24 A   No.

25 Q   So from seeing the duplicate copy and the script, was the

1  uterine cancer on the prescription when you received it from

2  Stacy?

3  A   I really don't know.

4  Q   Well, you saw the duplicate copy in your file?

5  A   Yes.

6  Q   And the original at the pharmacist, did you write it on

7  there?

8  A   No, I didn't.

9  Q   You just -- did you just take it to the pharmacist?

10  A   Yes, I did.

11  Q   Then did there come a time when you received another

12  prescription in June 25th of '13 for Subsys?

13  A   Yes.

14  Q   Approximately a month later; is that right?

15  A   Yes.  I'm not real sure about the dates.

16  Q   So on June -- or sometime in June --

17  A   Right.

18  Q   -- you thought you received a prescription; is that right?

19  A   That's right.

20  Q   And again, I show you what's been introduced as the

21  Government's Exhibit 5-1B that has been introduced as a

22  prescription from Three Notch Pharmacy, and ask if that is a

23  prescription you filled, Joyce Barber?

24  A   Yes, it is.

25  Q   For Subsys 200 micrograms?

JOYCE BARBER - DIRECT BY MS. GRIFFIN

```
 1    A    Right.
 2    Q    And does it show DX, uterine cancer?
 3    A    Yes, it does.
 4    Q    Had you told anyone on this visit that you had uterine
 5   cancer?
 6    A    No.
 7    Q    I also show you in this same exhibit a prescription for
 8   Subsys 400 micrograms in July --
 9    A    Right.
10    Q    -- of '13?  Was this a prescription you filled at Three
11   Notch Pharmacy?
12    A    Yes, it is.
13    Q    Does it also indicate that you have uterine cancer?
14    A    Yes, it does.
15    Q    Had you told anyone at that visit that you had uterine
16   cancer?
17    A    No.
18    Q    I just showed you the June and the July prescriptions for
19   Subsys that said uterine cancer.  I'll show you a duplicate
20   copy from Bates number 36493 from your patient file, and ask if
21   this says first of all that it's a duplicate copy, not a
22   prescription?
23    A    Right.
24    Q    And does it have your name?
25    A    Yes, it does.
```

JOYCE BARBER - DIRECT BY MS. GRIFFIN

1545

1   Q   The date June of '13?

2   A   Yes.

3   Q   And what's written at the top of it?

4   A   Uterine cancer.  DX, uterine cancer.

5   Q   I'll show you the July prescription, a duplicate copy,

6   which is Bates number 36503 from your patient file.  Does this

7   say a duplicate copy?

8   A   Yes, it does.

9   Q   For June the 30th of '13?

10  A   Yes.

11  Q   And does it say uterine cancer?

12  A   Yes, it does.

13          THE COURT:  It looks like it says July the 30th.

14  Q   I'm sorry.  July the 30th?

15  A   Right.

16  Q   What date does it say Ms. --

17  A   7/30.

18  Q   July the 30th of '13?

19  A   Yes.

20  Q   I'll try to put these side by side.  Does this look like a

21  copy of the prescription that you took?  And it's been

22  introduced from Three Notch Pharmacy.

23  A   Yes, it does.

24  Q   Now, I'm going to direct your attention to June of

25  '13.  Apparently you had a visit in June of '13 as well, do you

 1   recall that?

 2   A    No.

 3   Q    Do you recall seeing Stacy in June of '13?  It's Bates

 4   number 36486.

 5   A    Yes.

 6   Q    And you were complaining about some of the problems you

 7   were having?

 8   A    Uh-huh (positive response).

 9   Q    On the second page of that, does it say that you were

10   having some shortness of breath?

11          THE COURT:  Ms. Griffin, as just a tip for you and all

12   the other lawyers, when you're using the presenter or the ELMO,

13   if you will place the document on it at the same level that you

14   took the other one off -- in other words, slide it on there, we

15   won't have this focusing problem.

16          So if you just put it in at the same level that the

17   other one was on, right above it.

18          MS. GRIFFIN:  Thank you.

19   Q    Did you tell them that you had shortness of breath?  Do you

20   recall that?

21   A    She -- Stacy knew that I had COPD.

22   Q    So you don't know that you told her that that time; is that

23   right?

24   A    That's right.

25   Q    Did you tell her that you had constipation, diarrhea and

1  nausea?

2  A   Right.

3  Q   Did you tell her you had some urinary problems?

4  A   No.

5  Q   Did you tell her you had joint swelling, limitation of

6  motion, back spasms?

7  A   Yes.

8  Q   Did you continue to receive -- excuse me.  I'm sorry.  At

9  the end of that same chart we just looked at, Bates number

10  36488, at the bottom, does it list an assessment of you?

11  A   Yes.

12  Q   And that shows a headache?

13  A   Right.

14  Q   Lumbar degenerative disk disease?

15  A   Correct.

16  Q   Continuing on the next page, 36489, Bates number, does it

17  show some other things that you have?

18  A   I didn't know I had sciatica.

19  Q   It doesn't show uterine cancer on this, does it?

20  A   No.

21  Q   And does it show who electronically signed it?

22  A   Yes.

23  Q   Who was that?

24  A   Stacy Madison.

25  Q   Now, Ms. Barber, did there come a time when you received a

JOYCE BARBER - DIRECT BY MS. GRIFFIN

```
 1   higher dosage of Subsys?

 2   A   Yes.

 3   Q   Do you know why?

 4   A   No.

 5   Q   Were you told why?

 6   A   No, or she had looked at my MRI and said:  No wonder you're

 7   in pain.

 8   Q   So you went from Subsys 200 to the Subsys 400?

 9   A   Yes.

10   Q   Did you have any side effects from that?

11   A   Yes.

12   Q   Could you tell us those?

13   A   It was -- all I wanted --

14   Q   Speak up just a little bit.

15   A   Okay.  All I wanted to do was sleep, and it was just like

16   walking around in a fog all the time.  I couldn't get anything

17   done.

18   Q   Now, did you feel like you had to have that medicine?

19   A   Yeah.

20   Q   Explain that to us.

21   A   Well, it's -- it's addictive.

22   Q   Did you have any quality of life while you were on it?

23   A   No.

24   Q   Explain what you mean by that.

25   A   Well, I slept most of the time, you know.  I didn't see my
```

1549

```
 1   friends or family, or anything like that.
 2   Q   Did you have any weight gain or loss?
 3   A   Loss.  Weight loss.
 4   Q   What do you attribute that to?
 5   A   I attribute it to that, to Subsys, because I didn't have an
 6   appetite.
 7   Q   Did you also have some lumbar epidural injections?
 8   A   Yes, I did.
 9   Q   Who performed those?
10   A   Stacy.
11   Q   I'll show you what's marked from the same -- your file but
12   Bates number 36513, and ask if you received an agreement to be
13   treated for that lumbar procedure?
14   A   Yes.
15   Q   Did it explain and tell what you were consenting to be done
16   during the procedure?
17   A   Yes.
18   Q   Did you sign it at the bottom?
19   A   Yes, I did.
20   Q   And who signed at the very bottom of the sheet
21   (indicating)?
22   A   Stacy Madison.
23   Q   So you had a written consent for an injection?
24   A   Right.
25   Q   But no written consent for off-label Subsys?
```

JOYCE BARBER - DIRECT BY MS. GRIFFIN

1   A   No.

2   Q   And no consent to be in the TIRF or the TIRF REMS program?

3   A   I don't know what that is.

4   Q   Did you continue to receive Subsys 400 mcgs for some

5   months?

6   A   I think I was only on it for something like three months.

7   Q   I show you what's marked as September of '13, Bates number

8   36516 from your file, and ask if this is a copy of a Subsys

9   prescription for you?

10  A   Yes, it is.

11  Q   Did there come a time when you weren't having your Subsys

12  paid for?

13  A   Yes.

14  Q   Explain that to us.

15  A   Well, the insurance would not cover it.  So I called the

16  insurance and she said:  Do you have uterine cancer?  And I

17  said:  No, I don't.  And she said:  That's why we won't pay for

18  it.

19  Q   So they quit paying for it; is that right?

20  A   Yes, ma'am.

21  Q   I'll show you what's part of your file, at Bates number

22  36573, and ask if this appears to be a fax from Three Notch

23  Pharmacy?

24  A   Yes.

25  Q   And what date?  Can you see that?

JOYCE BARBER - DIRECT BY MS. GRIFFIN

```
 1   A    May 7th, 2013.

 2   Q    Does it say:  Attention Dr. Couch's nurse; please review?

 3   A    Yes.

 4   Q    And do you note that it says:  Plan limitations exceeded?

 5   Down at the bottom.

 6   A    Yes, I see.

 7   Q    Does it say REMS, TIRF REMS access claim, patient

 8   prescriber agreement is not on file?

 9   A    I see, yes.

10   Q    And once your insurance company would not pay, what were

11   you placed on, if you recall?

12   A    I don't recall that.

13   Q    Do you recall being placed on OxyContin thereafter at one

14   time?

15   A    I remember being on OxyContin, yes.

16   Q    Once there was no payment for the Subsys you weren't

17   continued to be prescribed it, were you?

18   A    No.

19   Q    I want to direct your attention to sometime in February of

20   '14.  Was that near the end of your time at PPSA?

21   A    Yes.

22   Q    I'll show you from your patient file, Bates number 36587,

23   and ask if this appears to be a pharmacy call about you?  Does

24   it say:  Pharm call?

25   A    Right.
```

1552

```
 1   Q   And what date please, ma'am?

 2   A   February 25th, 2014.

 3   Q   And does it say:  Return call to James at Three Notch

 4   Pharmacy.  And then lists a pharmacy number?

 5   A   Yes.

 6   Q   Does it say that:  Patient called last month stating that

 7   both medications, mainly OxyContin 30 milligrams, were giving

 8   her trouble with breathing, and that she felt like her pain

 9   medication was too much?

10          MR. SHARMAN:  Objection to hearsay, Your Honor, unless

11   she has a personal knowledge of it.

12          MS. GRIFFIN:  It's in the patient file.

13          THE COURT:  Well, the file is in evidence.  So --

14          MR. SHARMAN:  Yes, ma'am, but the witness' knowledge.

15          THE COURT:  Well, she just asked her:  Does it say

16   this?

17          So overrule the objection.

18   BY MS. GRIFFIN:

19   Q   Do you recall calling your pharmacist and telling him you

20   thought it was too much because of your breathing?

21   A   Yes.  I talked with James Cruz.

22   Q   He was your regular -- was he your regular pharmacist?

23   A   Yes.

24   Q   Does it further say:  Pharmacist states he is concerned

25   because the scripts she brought in the day before were both an
```

 1   increase?

 2   A   Yes.

 3   Q   And did the person writing this say:  I informed that I do

 4   not see where anything was documented but that that person

 5   would document the phone conversation?

 6   A   Yes.

 7   Q   Does it say:  The patient was warned by the pharmacist to

 8   take medicine only as prescribed?

 9   A   Yes.

10   Q   Had you had a problem with taking the medication only as

11   prescribed?

12   A   Well, it was too much.

13   Q   And how did that make you feel?

14   A   Nauseous.  Just sick.

15   Q   Now, you've not seen this before.  I want to show you

16   what's been introduced in evidence as Government's Exhibit

17   32-2(4) and ask if it states that:  I have received an opt-in

18   from Dr. Couch for patient Joyce Barber for 60 units.  We will

19   try for 120 units.

20           Is that what it says?

21   A   Yes.

22   Q   And can you tell us the date?

23   A   May 2nd, 2013.

24   Q   You had no knowledge of this, or did you?

25   A   No.

JOYCE BARBER - DIRECT BY MS. GRIFFIN

```
 1          MS. GRIFFIN:  One moment, Your Honor.
 2          THE COURT:  All right.
 3   BY MS. GRIFFIN:
 4   Q   I'll also show you another email from Government's Exhibit
 5   32-2, number (9) and ask if this references you (indicating),
 6   patient Joyce Barber?
 7   A   Yes.  Yes, it does.
 8   Q   Does it say, in May of '13, that you've been approved
 9   through Envision Rx for 120 units a month?
10   A   Yes.
11   Q   What type of insurance did you have while you were going to
12   the PPSA?
13   A   Envision.
14          MS. GRIFFIN:  Your Honor, I have copied Bates numbers
15   36472 that the patient identified the Subsys 200 micrograms,
16   the Lyrica prescription that she identified, the Subsys that
17   she identified, and the other Subsys that she identified that
18   are already in evidence.  That's the prescription.
19          I've copied the duplicate copy from her patient file,
20   and I would like to introduce those as Government's Exhibit
21   14-1.  I have placed the Bates numbers at the bottom so that
22   they can be located within the patient file.
23          THE COURT:  Any objection?
24          MR. SHARMAN:  No objection.
25          THE COURT:  All right.  Mark them in.
```

JOYCE BARBER - CROSS BY MR. SHARMAN                                1555

1           MS. GRIFFIN:  That's all I have of the witness at this

2    time.

3       (Government's Exhibit 14-1 was entered into evidence.)

4           THE COURT:  All right.

5                          CROSS EXAMINATION

6    BY MR. SHARMAN:

7    Q   Good afternoon, Ms. Barber.

8    A   Good afternoon.

9    Q   My name's Jack Sharman and I represent Dr. Couch.  And I

10   just have a few followup questions to Ms. Griffin.  Okay?

11          I'm going to refer back to your patient file and you

12   will be able to see it on the screen.

13          MR. SHARMAN:  Sam, can we see 36531?

14          036531.

15   Q   And if you will look in the top third, Ms. Barber, I

16   believe you looked at this earlier with Ms. Griffin just a few

17   minutes ago; is that right?

18   A   Yes.

19   Q   Okay.  And that's your handwriting on this form?

20   A   Yes.

21   Q   Okay.  And this is part of the paperwork that you filled

22   out when you showed up at PPSA; right?

23   A   Right.

24   Q   And --

25          THE COURT:  You're going to have to speak into the

JOYCE BARBER - CROSS BY MR. SHARMAN

1  microphone when you answer because it's not picking you up

2  well.

3          Thank you.

4  BY MR. SHARMAN:

5  Q   And I believe that Ms. Griffin asked you about the surgical

6  history that you identified there where it says hysterectomy;

7  right?

8  A   Right.

9  Q   And then let me direct your attention to the lines right

10  above which address your medical history that you filled out.

11  Do you see where I am up there right at the top of the page?

12  A   Yes.

13  Q   And you said that you had had arthritis; is that right?

14  A   Right.

15  Q   High blood pressure?

16  A   Right.

17  Q   COPD?

18  A   Right.

19  Q   And that's chronic obstructive pulmonary disease; is that

20  what that stands for?

21  A   Correct.

22  Q   And then also you wrote down cancer, and then in

23  parentheses, 1966?

24  A   Yes.

25  Q   Do you see where I've said that?

JOYCE BARBER - CROSS BY MR. SHARMAN

```
 1   A   Yes.

 2   Q   Was that accurate?

 3   A   Yes.  I'm -- you know, that was 50 years ago.

 4   Q   Yes, ma'am.

 5   A   So it was around that time when I was 18.

 6   Q   Okay.  And again, not to -- not to get too much into your

 7   background, but what kind of cancer was that?

 8   A   Uterine cancer.

 9   Q   Was that related to your hysterectomy or was the

10   hysterectomy a totally separate event?

11   A   It was related to the hysterectomy.  That's why I had it.

12   Q   Okay.  So you had the hysterectomy.  You had the surgical

13   procedure because you had uterine cancer?

14   A   Right.

15   Q   All right.  Then if you'll look down at the bottom third of

16   the page we'll see a list of medications?

17   A   Right.

18   Q   And these are the medications that you filled out as you

19   taking when you showed up at PPSA; right?

20   A   That's correct.

21   Q   And among others, you were taking hydrocodone; is that

22   right?

23   A   Yes.  Yes.

24   Q   I'm sorry?

25   A   Yes.  Dr. Walsh had given me an epidural and gave me just a
```

JOYCE BARBER - CROSS BY MR. SHARMAN

 1   few of those hydrocodone from --

 2   Q   And Dr. Walsh was himself a pain management physician?

 3   A   I don't think he's pain management.  He -- he does

 4   epidurals and things like that.

 5   Q   Okay.  Does he practice with his daughter, a lady named

 6   Dr. Aimee Walsh?  Does that ring a bell?

 7   A   No, it doesn't.

 8   Q   And then if you'll -- well, turn a couple of pages over to

 9   page 533, which again is part of the initial paperwork that you

10   filled out.  And it says at the top:  Medicines I have taken.

11   A   Right.

12   Q   And is this in your handwriting?

13   A   Yes.

14   Q   This is part of what you filled out when you showed up at

15   PPSA?

16   A   Right.

17   Q   And were -- were many of these prescribed by Janet Russell,

18   the lady that referred you to Dr. Couch?

19   A   Some of them were.

20   Q   Some of them were prescribed by Ms. Russell?

21   A   Right.

22   Q   And Ms. Russell's not an MD, is she?  She's not a medical

23   doctor?

24   A   I thought she was.

25   Q   You don't -- you thought she was an MD, a medical doctor?

1  A   Yes, I did.

2  Q   Okay.  So you don't know whether or not she's a -- what

3  they call a CRNP, a certified registered nurse practitioner?

4  A   She may be that, but I always thought she was a doctor.

5  Q   And then if we can turn over to page 536, which is another

6  page, page 536 in your medical records as part of the initial

7  information you gave to PPSA.  Up at the top there there's a --

8  there's a list of conditions that somebody might suffer, and it

9  looks like you're kind of asked to circle the ones that you're

10 suffering from when you show up.

11 A   Correct.

12 Q   Is that right?

13 A   Correct.

14 Q   Is that what you did here?

15 A   Yes.

16 Q   And that was -- that was describing what you were going

17 through when you showed up at PPSA?

18 A   Right.

19 Q   That was your condition?

20 A   That's right.

21 Q   And then below that we got several bars that are sort of

22 these continuum where you can describe your pain to somebody.

23 On the far left you've got no pain and on the far right you've

24 got basically worse pain possible.  Do you see where I'm

25 talking about?

JOYCE BARBER - CROSS BY MR. SHARMAN

1   A   I see where you're talking about.

2   Q   And you circled the numbers on that; is that right?

3   A   That's right.

4   Q   And you said that your pain at its worst during the last

5   month, that was a nine out of 10; is that right?

6   A   That's correct.

7   Q   And the least was not too much better.  It was an eight out

8   of 10; right?

9   A   Right.

10   Q   And the average in the previous month was still in the

11   eight out of 10; right?

12   A   Right.

13   Q   And then you said that that day when you were showing up at

14   PPSA it was a 10 out of 10?

15   A   Yes, it was.  I was in severe pain.

16   Q   Okay.  You were in severe pain that day; right?

17   A   Yes.

18   Q   And you'd been in severe pain pretty good for a while;

19   right?

20   A   Off and on, yes.

21   Q   Up to eight out of 10 or nine out of 10 on that kind of

22   scale; right?

23   A   Right.

24   Q   All right.  Let's turn, if we could, to page 539 which is

25   still -- I'll just represent to you it's on this first day.

1561

1   And I think you touched on this with Ms. Griffin.  This is a

2   note from April 30th of 2013.  You'll see up there at the top,

3   April 30th, 2013 and your name, Joyce Barber.  Do you see where

4   I'm pointing to?

5   A   Correct.

6   Q   Okay.  That's -- now, this isn't your handwriting; right?

7   A   No.

8   Q   Do you recognize that handwriting?

9   A   No.

10  Q   When you were talking to Stacy on that first visit, was she

11  writing stuff down?

12  A   No.  She was at her computer.

13  Q   Okay.  All right.  So right below your name and the date we

14  see some notes.  And I'll just read them as best I can.  You

15  correct me if I'm wrong.

16          Complains of low-back pain, radiates down to the feet

17  causing numbness, tingling, and burning.

18          Is that an accurate description of your condition when

19  you showed up?

20  A   Yes.

21  Q   All right.  And then right below that, there are some

22  initials PMH.  Do you see that?  If you go down just a little

23  bit, you'll see the --

24          MR. SHARMAN:  Sam, can you highlight that for her?

25  keep going up.  PMH on the left.

JOYCE BARBER - CROSS BY MR. SHARMAN

1    A    PMH, yes.

2    Q    Okay.  And then just to the right of it it's got some

3    conditions, one which is spinal stenosis?

4    A    Yes.

5    Q    Okay.  And then one -- there's also uterine cancer?

6    A    Yes.

7    Q    Arthritis?

8    A    Right.

9    Q    Weight loss?

10   A    Right.

11   Q    And it says, which I think is failed back surgery.  Does

12   that sound right?

13   A    I suppose so.

14   Q    Had you had back surgery that wasn't completely successful?

15   A    No.  I had two laminectomies.

16   Q    And then if you go down towards the middle where there's

17   some further description, it says:  The patient has had

18   multiple epidural blocks, and so forth.

19         Do you see where I'm reading that there?

20   A    Yes.

21   Q    And that was -- that was accurate; right?  That's what you

22   told Stacy?

23   A    Yes.

24   Q    And it says that:  She states that she's lost 60 pounds?

25   A    Right, I did.

```
 1   Q   Now, this was on the very first -- this was on the very
 2   first day when you showed up; right, April 30th?
 3   A   I guess.  Like I said, it's been a while back, so I don't
 4   know.
 5   Q   Yes, ma'am.  And when you showed up at first, you -- at
 6   this point, you hadn't had any Subsys at all; right?
 7   A   Right.
 8   Q   All right.  So you said you had lost 60 pounds and you
 9   can't cook and clean?
10   A   Right.
11   Q   Was that all accurate?
12   A   Right.  Right.
13   Q   All right.  You said:  I have no -- skipping down just a
14   little bit.  You told Stacy:  I have no life.
15           Do you see that down there?
16   A   Yes.
17   Q   Okay.  And that's what you told her?
18   A   Yes, but I didn't know she wrote it down.
19   Q   Okay.  I understand.  I understand.  But again, this is
20   before you had any Subsys; right?
21   A   Right.
22   Q   And then if you'll look kind of in the bottom right-hand
23   corner there are some numbered items there and number three is:
24   Refer to Dr. Petersen.
25           Do you see where I read that, kind of the bottom
```

 1   right, refer to Dr. Petersen?

 2   A   Yes.  But Dr. Petersen, I think, wouldn't take me in.

 3   Q   Okay.  Dr. Petersen is like an orthopedic surgeon; is that

 4   right?

 5   A   Right.  Uh-huh.

 6   Q   I'm sorry?

 7   A   Yes.

 8   Q   So PPSA was referring you out maybe to see Dr. Petersen?

 9   A   Because I had asked her about surgery, if surgery would

10   correct my back instead of taking medicine to cover it up.

11   Q   So you got the referral from PPSA to Dr. Petersen but it

12   didn't work out?

13   A   Right.

14   Q   And he wouldn't take you or couldn't take you?

15   A   Right.

16   Q   Why was that?

17   A   I have no idea, unless my back wasn't, you know, bad enough

18   for him to do.

19   Q   All right.  So that's in April 30th of '13.  And let's jump

20   ahead about one month to page 476 in your medical records.

21           All right.  And if you will look at the top you'll see

22   your name and the date.  May 28th was about roughly a month

23   later.  Do you see where I am?

24   A   Yes.

25   Q   And then in the -- in the middle section there under

1565

1    Objectives, it says:  Patient states medicines are working

2    well.  States she does not have side effects except the

3    oxycodone, it makes her itch.

4           Do you remember telling Stacy about oxycodone and you

5    having some kind of reaction or it making you itch?

6    A    Yeah, and it also made me nauseous.

7    Q    Okay.  So you had some kind of reaction?  It made you --

8    A    Right.

9    Q    It made you nauseous?

10   A    Right.

11   Q    But other than that, no side effects?  Other than that, you

12   were -- it was all right?

13   A    With the oxycodone?

14   Q    Well, at least on -- on 5/28 where it looks like up there

15   in the top right you had Subsys, Duragesic, Lyrica, and Lortab?

16   A    Right.

17   Q    And then if you look under Assessment, which is maybe in

18   the bottom third, the first one says:  Previous uterine cancer.

19   A    Yes.

20   Q    And that was -- that's on May 28th.  That was accurate;

21   right?  You had had uterine cancer; right?

22   A    Right.

23   Q    Previously?

24   A    Previously, yes.

25   Q    Yes, ma'am.  All right.  And then there's -- there's two

JOYCE BARBER - CROSS BY MR. SHARMAN

```
 1    signatures at the bottom left, one above the line called
 2    Physician Signature and one above a line called CRNP Signature.
 3    Do you see that writing down there?
 4    A    Yes.
 5    Q    Okay.  You don't recognize that handwriting, either one, do
 6    you?
 7    A    No -- well, Stacy.
 8    Q    Okay.  You can read Stacy Madison's name?
 9    A    Yes.
10    Q    Does that say:  Stacy Madison CRNA?
11    A    Yeah.
12    Q    So you recognize her name but not necessarily the
13    handwriting, so --
14    A    Correct.
15    Q    All right.  And then if we can turn to the next month,
16    Ms. Barber, which is on page 495.  Your next visit was on June
17    25th, again, roughly 30 days later.  And at the top do you see
18    your name and June 25th?
19    A    Right.
20    Q    And then under the objective section, you have some
21    discussions including that you would like to have -- is that
22    your knee and hip injected?
23    A    Right.
24    Q    Is that right?
25    A    Right.
```

1    Q    Did that happen?

2    A    Yes, she injected my hip.

3    Q    Was that helpful, the injection?  Were the injections

4    helpful?

5    A    Yeah.

6    Q    All right.  And then if you will look below on Assessment

7    there, sort of again the bottom third, item number one, we've

8    got uterine cancer written down again; right?

9    A    Right.  What is lumbago?  What is that?

10   Q    I'm not a doctor.  I'm barely a lawyer, but I think it's --

11   I think it's back -- lower back pain.

12   A    Okay.  Excuse me.  I didn't mean to ask you.  I just keep

13   seeing it.

14   Q    And if we could turn, and I'll try to do this efficiently,

15   Ms. Barber.  If we could turn to the next month, which is at

16   page 500, which is July 30th of 2013.  Again, roughly 30 days

17   later.  Again, that's you at the top and July 30th.

18          And it looks like on kind of the middle section on the

19   right it says:  Patient states her back hurts.  Would like

20   another epidural.  Do you see that?

21   A    Yeah.

22   Q    And did you get that epidural, as best you recall?

23   A    I don't -- I don't recall getting two epidurals from Stacy.

24   I just remember the one.  There may have been two.

25   Q    And then under Assessment, we've got, as you actually just

1    mentioned, lumbago and then also there's stenosis and also

2    uterine cancer is still there; right?

3    A   Right.

4    Q   And then let's jump ahead if we could to August of 2013,

5    which is at page 512.  So again, we see your name.

6    A   Right.

7    Q   And August 26, and then down sort of in the middle section

8    under Objective, it says:  Patient states pain medications are

9    working well.  Denies side effects.  No new complaints.

10          Now, at any time during these visits, Ms. Barber, did

11   you tell Stacy, Dr. Couch, or anybody at PPSA about some of the

12   effects that you discussed with Ms. Griffin about the medicine

13   you were getting?

14   A   No.

15   Q   And then again, if we look at Assessment, it's basically

16   the same:  Lumbago, stenosis, cancer.  Do you see where I'm

17   reading that there?

18   A   Yes, I see.

19   Q   And again, got those signatures at the bottom left.  But

20   again, other than recognizing Stacy Madison's name you can't --

21   you can't recognize the handwriting or who was doing what;

22   right?

23   A   No.

24   Q   All right.  Do you remember any time, Ms. Barber, asking

25   anybody at PPSA for any medications other than pain

JOYCE BARBER - CROSS BY MR. SHARMAN

1   medications, like anything for depression or -- anything that's

2   not for pain medication?

3   A    No.

4           MR. SHARMAN:   May I switch to the ELMO briefly,

5   please?

6           THE CLERK:   Yes, sir.

7   BY MR. SHARMAN:

8   Q    All right.  Ms. Barber, Ms. Griffin showed you a few

9   prescriptions that you got filled.  Do you remember taking a

10  look at those?

11  A    Yes.

12  Q    And you got your prescriptions filled, I think, at Three

13  Notch Pharmacy; is that right?

14  A    That's correct.

15  Q    You didn't get any of your prescriptions filled at a

16  pharmacy called C&R Pharmacy, did you?

17  A    No.

18  Q    Do you know anything about C&R Pharmacy at all?

19  A    No.

20  Q    All right.  I'm going to show you one of these

21  prescriptions, which is part of Government Exhibit 5-1B.  And

22  there are different color inks and different-looking inks on

23  this -- on this prescription.  Do you see that?

24  A    Yes.

25  Q    Do you know sitting here today who wrote what on this

1    prescription?

2    A    The blue, I don't know.  The others look kind of like

3    Stacy's writing.

4    Q    And I think Ms. Griffin touched on this, but I just want to

5    be sure.  With regard to the script that we're looking at now,

6    which was the one May 28, or the one for June 25th, I believe

7    you said on direct examination with Ms. Griffin that you

8    weren't sure, Ms. Barber, that when you were handed the script

9    that it did or did not have the uterine cancer reference on it;

10   was that right?

11   A    I could not say for sure it was.

12   Q    Okay.  It might have been on there but it might not have

13   been?

14   A    Correct.

15   Q    And if it wasn't on there, you don't know who put it on

16   there?

17   A    I have no idea.

18   Q    When you got your prescriptions filled at Three Notch

19   Pharmacy, they filled it for you and they gave it back to you

20   filled, did you get one of those warning labels that goes with

21   it, the printout that goes with it?

22   A    Inside, yes.

23   Q    I'm sorry.  Ma'am?

24   A    Yes.

25   Q    And you got that every time, as far as you know?

1    A    Yes.

2    Q    That's what James at Three Notch did; he would fill your

3    prescription and give it to you?

4    A    And print out, yes.

5    Q    All the information; right?

6    A    Correct.

7    Q    All right.  You mentioned Stacy at PPSA and also

8    Dr. Couch.  You don't know, Ms. Barber, do you, if Stacy and

9    Dr. Couch talked about your case or not?

10   A    No.

11   Q    Or if they did talk, what they said or talked about; right?

12   A    Right.  I don't have any idea.

13   Q    I'm sorry?

14   A    I don't have any idea if they did.

15   Q    And you don't know if Dr. Couch spoke with USA or with

16   Ms. Russell, who referred you?

17   A    No.

18   Q    Or if they did, you don't know what they talked about;

19   right?

20   A    That's correct.

21   Q    And I may have asked you this.  And if I did, I

22   apologize.  Do you know whether Stacy was or was not a nurse --

23   and I will mess this up -- a nurse anesthetist?

24   A    No, I don't.

25   Q    Do you know what a nurse anesthetist is allowed to do and

```
 1   not do as far as treating and tending to a patient?

 2   A   I don't even know what it is.

 3   Q   And when you --

 4            MR. SHARMAN:  May I approach, Your Honor?

 5            THE COURT:  Yes.

 6   BY MR. SHARMAN:

 7   Q   Ms. Barber, when you got your Subsys, did you get it in a

 8   shoe box looking thing that's much like Exhibit 9-10?

 9   A   Similar, yes.

10   Q   And did it come with a couple of these sort of insert

11   information things?  (Indicating.)

12   A   I'm sure it did.

13   Q   Okay.  Do you recollect whether you read those or not?

14   A   I probably did.

15   Q   Sitting here today do you remember anything about what it

16   said?

17   A   No, since it's been a while.

18   Q   Yes, ma'am.

19            MR. SHARMAN:  Ms. Barber, I don't have any more

20   questions.  I appreciate your time.

21            THE WITNESS:  Thank you.

22            THE COURT:  Any redirect?

23                       REDIRECT EXAMINATION

24   BY MS. GRIFFIN:

25   Q   Ms. Barber, were you diagnosed by anyone at PPSA with
```

```
 1  uterine cancer?
 2  A   No.
 3  Q   Now, I believe you've told us it had been a number of years
 4  since you had uterine cancer?
 5  A   50.
 6  Q   50 years.  Were you still having any pain associated with
 7  uterine cancer?
 8  A   No.
 9  Q   After you healed from that surgery 50 years ago, did you
10  have any pain connected with the uterine cancer?
11  A   No, I didn't.  As a matter of fact, it was really easy.
12  Q   Did you ever tell anybody at PPSA that you had pain from
13  uterine cancer?
14  A   No.
15  Q   Are you taking Subsys now?
16  A   No.
17  Q   Did you have any discussion with Dr. Couch about Subsys?
18  A   No.
19  Q   Did you have -- I believe you said that the --
20          MS. GRIFFIN:  Withdraw that, Your Honor.
21  Q   The handwriting where it said uterine cancer on
22  Government's Exhibit 5-1B, where there is writing in a blue
23  pen --
24  A   Yes.
25  Q   -- does that appear to be different from the rest of the
```

1  printing in black ink?

2  A   Very much so.

3  Q   And does that appear to be Stacy's writing to you in black

4  ink?

5  A   It does to me.

6  Q   I'll show you on the prescription for July the 30th of

7  '13.  There is no blue writing on this particular prescription.

8  A   Right.

9  Q   Is there?

10  A   No.

11  Q   And whose handwriting does the printing appear to be?

12  A   It looks like Stacy's.

13  Q   There is some tiny cursive writing at the top.  Does that

14  appear to be Stacy's writing, where it gives an address?

15  A   No.

16  Q   And then I'll show you at the bottom for the June 25th of

17  '13 prescription, does it appear to be some writing in blue

18  ink?

19  A   Yes.

20  Q   Does that appear in blue ink to be Stacy's writing?

21  A   No.

22  Q   The black ink writing that says DX uterine cancer and the

23  Subsys 200 and the directions of spray, does that appear to be

24  Stacy's writing?

25  A   Yes, it does.

```
 1              MS. GRIFFIN:  That's all I have of this witness, Your
 2    Honor.
 3              THE COURT:  All right, ma'am.  You may step
 4    down.  Thank you.
 5              THE WITNESS:  Thank you.
 6              MR. BODNAR:  United States calls Special Agent Jeff
 7    Young.
 8                        FBI SA JEFFREY A. YOUNG
 9                   was sworn and testified as follows:
10              THE WITNESS:  I do.
11              THE CLERK:  Please be seated.
12              THE WITNESS:  Thank you.
13                        DIRECT EXAMINATION
14    BY MR. BODNAR:
15    Q   Good afternoon.
16    A   Good afternoon.
17    Q   Would you please introduce yourself to the jury?
18    A   Yes, sir.  My name is Jeffrey A. Young, Y-O-U-N-G.  I'm a
19    special agent with the FBI assigned to the Mobile Division
20    White-Collar Crime Squad.
21    Q   And Special Agent Young, could you please pull the
22    microphone a little bit closer?  I'm having trouble hearing
23    you.
24    A   I'm sorry.
25    Q   I believe you said you were a special agent with the FBI?
```

FBI SA JEFFREY A. YOUNG - DIRECT BY MR. BODNAR

1   A   Yes, sir.

2   Q   And what office and division did you tell the jury you're

3   in?

4   A   The Mobile Division.  Headquarters city:  That is Mobile,

5   Alabama, the white-collar Crime Squad.

6   Q   And how long have you been a special agent with the FBI?

7   A   Approximately 13 years.

8   Q   Can you please explain to the jury your education prior to

9   joining the FBI?

10  A   Yes, sir.  I have a bachelor's degree in biomedical science

11  from the University of South Alabama.  A doctor of chiropractic

12  degree from Life University, Marietta, Georgia; postgraduate

13  certification in acupuncture from Parker University in Dallas,

14  Texas.

15  Q   And, Special Agent Young, were you involved in an aspect of

16  the investigation into Dr. Xiulu Ruan and Dr. John Patrick

17  Couch?

18  A   I was.

19  Q   Were you the main case agent for the FBI on this matter,

20  though?

21  A   I was not.

22  Q   Could you please explain to the jury, just generally before

23  we get into it, what part of this investigation you were

24  involved in?

25  A   Yes, sir.  I took a look at two data sets.  One were the

FBI SA JEFFREY A. YOUNG - DIRECT BY MR. BODNAR

1   audit logs from C&R Pharmacy, the other were the patient files
2   from the Greenway System, both of which were provided by the
3   U.S. Attorney's Office.
4   Q   And I'm going to show you what has previously been admitted
5   as Government's Exhibit 10-23 and 10-25.  Here's 10-23.  I'll
6   take it out so there's no glare.
7            Does this purport to be a list of the top 25
8   recipients for Abstral and Subsys for Dr. Xiulu Ruan?
9   A   Yes, sir.
10  Q   And did you review the patient files for the patients
11  listed here?
12  A   I did.
13  Q   I'm now going to show you what has already been admitted as
14  Government's Exhibit 10-25.  Does this appear to be a list of
15  the top 25 Abstral and Subsys patients by total grams for
16  Dr. John Patrick Couch?
17  A   Yes, sir, it does.
18  Q   And did you also review the medical files for these
19  individuals?
20  A   Yes, sir.
21  Q   And specifically, with looking at these files, was there
22  anything in particular that you were looking for with regard to
23  these 50 patient files?
24  A   There was.  I started out with the data from the patient
25  records, the medical file from Doctors Couch and Ruan.  And

1578

```
 1   what I was looking for was a diagnosis of active cancer.
 2   Q   And I'm going to show -- I'm now going to show you what has
 3   been marked as Government's Exhibit 12-1 -- 12-1a through
 4   12-1j.  And this is -- what I'm approaching is 12-1a here.  Is
 5   this binder labeled fentanyl patient files, one of 10?
 6   (Indicating.)
 7   A   Yes, sir, it is.
 8   Q   And does this binder contain some of the patient records
 9   for those 50 patients that you reviewed?
10   A   It does.
11   Q   I'm now showing you what's been marked as Government's
12   Exhibit 12-1b and c.  Are these additional binders with those
13   patient records in them?
14   A   They are.  This one is.  (Indicating.)
15           MR. BODNAR:  And, Your Honor, may he step down to
16   review the remaining binders to identify whether or not they
17   have the patient records in them?
18           THE COURT:  Yes.
19           THE WITNESS:  (Complying.)
20           Those are the files that I reviewed.
21           MR. BODNAR:  Your Honor, the United States moves to
22   admit Government's Exhibit 12-1a through j.
23           THE COURT:  Any objection?
24           MR. ESSIG:  No objection.
25           THE COURT:  All right.
```

1579

1     (Government's Exhibit 12-1 was entered into evidence.)

2   BY MR. BODNAR:

3   Q   Special Agent Young, after -- after reviewing those files,

4   did you compile a list of the names of the individuals in there

5   that did not have any or that you did not find any diagnoses of

6   cancer?

7   A   Yes, sir, I did.

8   Q   Do you recall approximately how many of those patients for

9   each doctor you found did not have a cancer diagnosis?

10  A   Yes, sir.  There were 14 patients for each doctor, 14 for

11  Dr. Couch and 14 Dr. Ruan, who did not have an active diagnosis

12  of cancer and also had no prior history of cancer documented in

13  the patient files for Drs. Couch and Ruan.

14  Q   So 14 plus 14 does that mean 28 of the 50 patients?

15  A   28 total patients.  Yes, sir.

16  Q   Total of the 50 that you examined?

17  A   There were approximately 60, to my recollection, that I did

18  examine.  And those 28 were the ones that had both no active

19  cancer and no history of cancer documented in the files.

20  Q   For those that had histories of cancer, did you exclude

21  them for the purpose of this list?

22  A   I did.  Even if those patients did not have active cancer

23  at the moment.  If they had a history of cancer from several

24  years ago, I also excluded them.

25  Q   After compiling a list of names that didn't have cancer, is

FBI SA JEFFREY A. YOUNG - DIRECT BY MR. BODNAR

1    there something that you looked to then as part of the

2    investigation to this case?

3    A    We looked at the total -- the prescriptions, the total

4    amount of prescriptions of Abstral and Subsys that were -- that

5    were prescribed for these patients and the billed amounts from

6    C&R.

7    Q    And what did you use to determine the billed amounts from

8    C&R Pharmacy?

9    A    Those were the audit logs from C&R.

10   Q    And I'm going to show you what has previously been admitted

11   as part of Government's Exhibit 4-20.

12             And I am taking out one section that will be returned.

13             Special Agent Young, is this an example of the C&R

14   audit logs that you looked at?  And I will blow it up just so

15   they can see how large -- is this the example of what you

16   looked at to make the determination about the amount billed?

17             I'll zoom in if you need it.

18   A    Oh, thank you.  Yes, it is.

19   Q    What does it say up here at the top?

20   A    C&R Pharmacy Daily Audit Log.

21   Q    And going down the columns over here, what does it

22   appear -- the first thing that appears?

23   A    First column says:  Rx, which means prescription.  That's a

24   prescription number, followed by the patient name, followed by

25   the name of the prescriber, Dr. Ruan, Dr. Chen and Dr. Couch.

FBI SA JEFFREY A. YOUNG - DIRECT BY MR. BODNAR

1           Following that is a transaction number and a drug --

2    the name of the drug.  The -- following the name of the drug is

3    the dosage in milligrams or micrograms, or whatever that dosage

4    might be; also the number of units, be it pills, sprays,

5    whatever the method was of administering it.

6           The units are listed under the -- under unit there.

7    And there's information about the dates over here at the end.

8    Looks like it's written in reverse order, like 12 -- 1209 and

9    13 is December 9th 2013.

10   Q    And what is this final column over here?  (Indicating.)

11   A    That is the price.  That is billed price.  And it's -- like

12   35.41 would be $35.41.

13   Q    And now to show you an example from this same thing with

14   Subsys on it, is this another page from the C&R audit logs?

15   A    Yes, sir.

16   Q    And when you reviewed the C&R logs, did you flip through

17   all the paper or did you have it electronically?

18   A    There was a search and find function, which means that I

19   could search on a patient's name and then we would -- we

20   could -- we could find what was billed to that person's name.

21   So I would go through like one of these names here.  Okay.

22   Q    Let's go down to an example of Subsys.

23   A    Okay.  Here is an AS...........  I would put AS..........

24   in the -- in the find.  It would search all the prescriptions

25   that were prescribed to Mr. S......  And then I would record

1   whatever it was, Subsys and/or Abstral.

2   Q   And in this case AS......... received what prescription?

3   A   Here he received -- on December 13th 2013 he received

4   Subsys in the dosage of 1200 micrograms, it's a spray, 120

5   units or 120 dosages.

6   Q   And then going further across, does it show his insurance

7   and how much was billed?

8   A   He has TRICARE.  That is his insurance in front of it.  And

9   he was billed $6,895.19.

10  Q   And how did you come up with the total amount of billed for

11  Subsys and Abstral for the 28 patients that you identified as

12  not having cancer?

13  A   Addition.  We added those -- all of those together.

14  Q   So did you search and find for all the names and then added

15  together all the price --

16  A   I did.

17  Q   -- from this point?

18          Special Agent Young, from the C&R audit logs and from

19  those top 25 recipients, were you able to -- was a document

20  able to be created from the voluminous data that laid it all

21  out in one place?

22  A   Yes, sir.

23  Q   I'm going to now show you what has previously been marked

24  as Government's Exhibit 12-2.  Special Agent Young, are you

25  able to identify this document?

 1   A    I do.  This is a totaling of the amounts billed by C&R

 2   Pharmacy and the total grams administered to 28 of the patients

 3   of Dr. Ruan and Dr. Couch.

 4         MR. BODNAR:  Your Honor, the United States moves to

 5   admit Government's Exhibit 12-2?

 6         MR. ESSIG:  No objection.

 7         THE COURT:  All right.  Mark it in.

 8      (Government's Exhibit 12-2 was entered into evidence.)

 9         MR. BODNAR:  The United States is placing back in the

10   part that was taken out of 4-20.

11   Q    I'm going to now show you what has been admitted as

12   Government's Exhibit 12-2.  Special Agent Young, can you start

13   us off at the top?  What is the heading here?

14   A    The title is Top Off-Label Recipients of Subsys and Abstral

15   as Prescribed by Dr. Ruan and Dr. Couch.

16   Q    And Special Agent Young, do you know what off-label means?

17   A    I do.

18   Q    Can you explain that to the jury?

19   A    An off-label use of a drug is when a drug is prescribed for

20   something other than what is approved.  For example, a drug may

21   be approved as an antidepressant but it can be described -- it

22   can be prescribed for stopping smoking.  A drug can be

23   prescribed for cancer breakthrough pain, which means that I

24   have an active cancer and that's the cause of my pain, but it

25   can also be used for any other sort of pain; failed surgery,

1  injury.

2  Q   And, Special Agent Young, can you help us -- we'll use a

3  couple of examples on here.  Are these listed from one down to

4  28?

5  A   Yes, sir.

6  Q   Is that in order based on total grams?

7  A   It is.

8  Q   And these total grams, did you come up with these numbers?

9  A   Yes, sir.

10  Q   Were these numbers transposed from what has already been

11  admitted as Government's Exhibit 10-23 and 10-25?

12  A   That is correct.

13  Q   So you didn't re-add anything for these numbers, did you?

14  A   I only spot checked.

15  Q   And against what --

16  A   To make sure that they were the same numbers.

17  Q   So looking at the example, this individual Randall

18  Blackmon, walk us through across.  What do we see here?

19  A   Okay.  Randall -- number three, Randall Blackmon was

20  prescribed both Abstral and Subsys.  The units are in grams, so

21  it's .077 grams of Abstral, 4.416 grams of Subsys total.  So

22  that's the micrograms you would have seen in the prescription

23  times the number of units he was prescribed every time he's

24  prescribed it.

25          So the total of both Abstral and Subsys was 4.493

FBI SA JEFFREY A. YOUNG - DIRECT BY MR. BODNAR

1  grams that he was -- he was written prescriptions for.

2  Q   And based on the C&R audit logs how much did you determine

3  was billed for the Abstral and Subsys prescriptions for

4  Mr. Blackmon?

5  A   The total billed amount for Mr. Blackmon was $203,285.85.

6  Q   Would that have counted any prescriptions he may have

7  filled elsewhere outside of C&R Pharmacy?

8  A   It would not.  It does not count any other drugs or any

9  other prescriptions filled outside C&R.

10  Q   Just as another example, does it work the same way -- well

11  first, I see red and blue on here.  How do those correlate with

12  the doctors?

13  A   The patients in red font are the patients of Dr. Ruan, and

14  the patients in blue font are the patients of Dr. Couch.

15  Q   So just looking at one more example -- well, we'll do two

16  more examples.  For BH............, she's in blue so what does

17  that mean?

18  A   That she's a patient of Dr. Couch.  And she was -- she was

19  given .058 grams of Abstral, 2.052 grams of Subsys for a total

20  of 2.110 grams of both products.  And she was billed

21  $271,910.72.

22  Q   And you mentioned these units are in grams but I think you

23  previously said that Subsys and Abstral are in micrograms; is

24  that correct?

25  A   That is the prescribed amount; yes, sir.

FBI SA JEFFREY A. YOUNG - DIRECT BY MR. BODNAR

1   Q   So is micrograms a one-millionth of one gram?

2   A   That is correct.

3   Q   So this is just -- is this dividing the number of

4   micrograms by one million?

5   A   It is --

6   Q   To come up with the grams?

7   A   Multiplying -- multiplying micrograms by -- yes.  Yes.  To

8   get grams you would divide a microgram, the microgram amount by

9   one million.  That is correct.

10  Q   And just looking at one other example here, number 20,

11  Kathleen Burns.  Since she's in red, what does that mean?

12  A   Kathleen Burns was a patient of Dr. Ruan.  She was

13  prescribed .179 grams of Abstral, 1.308 grams of Subsys, for a

14  total of 1.487 grams of both products.  And she was billed

15  $157,875.83.

16  Q   Were these the only patients that were receiving Subsys or

17  Abstral off-label?

18  A   They were not.  They were not.

19  Q   Were these just the ones on the top 25?

20  A   They were.  They were the patients on the top 25 who had no

21  active cancer and no history at all of cancer documented.

22  Q   And did you total up the numbers at the bottom for just

23  these 28 patients?

24  A   I did.

25  Q   The total -- what was the total number of grams of

1   off-label Subsys and Abstral for the top 28?

2   A   67.311 grams.

3   Q   And what was the total amount billed just for these 28, top

4   28 patients --

5   A   For these --

6   Q   -- that their insurance was somehow billed?

7   A   For these 28 patients, for Abstral and Subsys, they were

8   billed $5,576,880.41.

9   Q   And while we just went over three examples, would the same

10  way you explained it apply for all 28 of these patients?

11  A   Yes, sir.

12          MR. BODNAR:  Pass the witness, Your Honor.  Wait one

13  moment, Your Honor.  I'm sorry.

14          No further questions, Your Honor.

15                      CROSS EXAMINATION

16  BY MR. ESSIG:

17  Q   Good afternoon, Agent Young.

18  A   Afternoon, Mr. Essig.

19  Q   You and I have met before; is that correct?

20  A   We have.

21  Q   Good to see you again.  Now, Agent Young, what I want to do

22  is I want to back up a little bit on the patient files that

23  were admitted and then we'll talk a little bit about the

24  exhibits.

25          Now, what I want to start with is Government's Exhibit

1   12-1a through j.  Those are patient files that you reviewed; is

2   that correct?

3   A   That is correct.

4   Q   If it's -- does each letter A through J represent a

5   different patient file; is that right?

6           I guess 12-1a is one patient file?

7   A   I didn't -- I just spot-checked, as you saw, just for a few

8   minutes those books.

9   Q   Sure.

10  A   What I saw was on -- were those exact files but they were

11  on CD form.

12  Q   Okay.

13  A   So I don't know how each of those represent -- how they're

14  broken down because I looked at those as a whole.

15  Q   Did you count the disks to know how many patients are

16  included in those exhibits, do you know?

17  A   I do not.

18  Q   Okay.  So in terms of the patients that exist in 12-1a

19  through j, you don't know which patients those are?

20  A   I do not.

21  Q   And you don't know if it's all of them or if it's just some

22  of them?

23  A   That is correct.

24  Q   Okay.  All right.  Now, just so I understand, too, is that

25  for you to come up with your list that the jury saw in 12-2

1589

1    here, is that this began as for each doctor -- and again

2    they're noted in red and blue; is that right?  Red for Ruan,

3    blue for Couch?

4    A   That's correct.

5    Q   For each doctor you were given a top 25 list; is that

6    right?

7    A   That is correct.

8    Q   And that's top 25 of all Abstral and Subsys prescriptions;

9    is that correct?

10   A   That is correct.

11   Q   Were you given a top 25 -- and those are both fentanyl

12   drugs, you're aware of that; is that correct?

13   A   They are (nodding head affirmatively).

14   Q   All right.  Were you given any other fentanyl drugs that

15   they were writing?

16   A   I was not.

17   Q   So you were not given a list that included like Fentora or

18   some of the other name brands out there?

19   A   No, sir.

20   Q   This was exclusively Subsys and Abstral?

21   A   Yes, sir.

22   Q   All right.  Now, this list right here, I think you said,

23   for each doctor, when you looked at their top 25, that

24   happened -- for each of them there were 14 patients that

25   received an Abstral or a Subsys prescription that had no

FBI SA JEFFERY A. YOUNG - CROSS BY MR. ESSIG

1    history whatsoever of cancer; is that correct?

2    A    That is correct.

3    Q    Okay.  So that would also mean, though, for each doctor out

4    of the top 25 that there were in fact 11 patients that did have

5    cancer in that top 25; is that right?

6    A    Not necessarily.

7    Q    Okay.

8    A    There were patients who had an active diagnosis of

9    cancer.  I cannot testify that it was 11.  Are you taking --

10   you're taking 25 minus the 14, is that --

11   Q    That's correct.

12   A    Is that the way you're getting at it?

13   Q    That's correct.

14   A    That's not correct.

15   Q    Okay.

16   A    Because I also excluded patients who had no active

17   diagnosis of cancer but had a history of cancer.  But out of an

18   abundance of caution and giving every benefit of the doubt to

19   Doctors Ruan and Couch, I excluded those.

20           MR. ESSIG:  Okay.  Your Honor, may I approach?

21           THE COURT:  Yes.

22           MR. ESSIG:  I'm showing the witness what we've

23   previously been provided, which is marked Government's Exhibit

24   12.2.  It's obviously not the admitted version.

25   Q    Agent Young, do you recognize this document, this chart?

1   A   Yes.  Yes, I do.

2   Q   All right.  And if you look at that chart, did you create

3   this chart?

4   A   I helped with the data from this chart.  I didn't actually

5   type this out.

6   Q   Okay.

7   A   But, yes.

8   Q   All right.  And this is the top 25 list for Dr. Couch; is

9   that correct?

10  A   It is.

11  Q   All right.  And is it true and accurate?  Is it a true and

12  accurate depiction of the data in there?

13  A   It is.  It appears that some of the -- some of the --

14  Q   Some of the data points are blank?

15  A   -- data points are blank; right.

16  Q   Right?

17  A   But what is there, if -- I would have to check this with

18  this as well, again, because I didn't type this.  But I did

19  provide data --

20  Q   Sure.

21  A   -- that was -- that was used to generate this.  But it

22  appears -- for example, Randall Blackmon, it appears to be the

23  same numbers.

24  Q   Okay.  Thank you.

25         MR. ESSIG:  Your Honor, I want to mark this --

1        MR. BODNAR:  Your Honor, we object to any more use of
2    this.  This was a draft that was accidentally sent to defense
3    counsel.  They've got the final copy right here, which he's
4    authenticated already.
5        THE COURT:  Can you approach, Mr. Essig?
6        MR. ESSIG:  Yes, Your Honor.
7     (At the side bar, jury not present.)
8        THE COURT:  Will you tell me what --
9        MR. ESSIG:  Judge, it's the top 25 list.
10        MR. SHARMAN:  We want to be able to show the jury
11    every single patient that he reviewed.  They are showing only
12    the non-cancer patients.  I just want to be able to show the
13    entirety.
14        THE COURT:  Don't they already have the top 25
15    patients in evidence?
16        MR. BODNAR:  We do, Your Honor.  It's Government's
17    Exhibit 10-23 and 10-25, which we just showed.
18        THE COURT:  So what's the difference between this one
19    and 10-23 and 10-25?
20        MR. ESSIG:  Your Honor, this one is color coded.  I
21    want to go through and ask him questions about what the dollars
22    mean.  I think the -- my understanding is the designation is
23    the bold are the cancer patients and the non-bold are the -- or
24    the other way around.  Excuse me.
25        The bold are the non-cancer, the unbolded are the

1  cancer patients.  This is just a better illustration of the top

2  25 that goes to the issues that they are discussing with this

3  witness.

4          MR. BODNAR:  Your Honor, this was a draft, and it's

5  not even necessarily 100 percent correct.  The final version is

6  the correct one, all the correct numbers, all the correct data.

7  This was incorrectly -- was not meant to be sent to defense

8  counsel in a -- it was inadvertently sent.  This was used to

9  make the final copy, which was then verified by the agent as

10 being 100 percent accurate.

11         THE COURT:  All right.  Well, unless he's had a chance

12 to verify that everything on there is accurate, which -- I

13 mean, he just spot-checked it right now.

14         MR. ESSIG:  I mean, he says it's true and accurate.

15         THE COURT:  I know.  But he hasn't had a chance to

16 really compare it.  So if you want to use this one, you need to

17 have him compare it to the one that's in evidence.

18         MR. ESSIG:  Okay.

19         THE COURT:  So I'd say let's not do it right now.  Ask

20 him to do it, you know, on a break.

21         MR. ESSIG:  Okay.

22         Do you want to go ahead and quit for the day, Judge?

23         THE COURT:  Do you have anything else you want to ask?

24         MR. ESSIG:  I do.  There's plenty.

25         THE COURT:  Well, let's go for another five minutes.

1        MR. ESSIG:  Okay.  All right.

2        (In open court, defendants and jury present.)

3    BY MR. ESSIG:

4    Q   Agent Young, let me back up and ask you this question.  I

5    want to be clear on the 14 out of 25 that you pulled out to

6    create the 28 for both doctors, what were the other 11?

7    A   The other 11 consist of patients, some of whom had active

8    cancer and breakthrough pain.  And the patient notes indicated

9    that they were being treated for breakthrough pain with Abstral

10   and/or Subsys.  And there were others who were being treated

11   for pain with Abstral and Subsys who had a history of cancer

12   but no current active cancer diagnosis.

13   Q   Okay.  And so for the other 11, those represent patients

14   for each doctor because the number was the same; is that right?

15   A   That's correct.

16   Q   All right.  Those represent the number of patients in the

17   top 25 that had some history of cancer in their medical

18   records; is that correct?

19   A   That is correct.

20   Q   As you were going through the top 25 patients that you were

21   given, did you actually look at their medical files?

22   A   I did.

23   Q   And am I correct you were only looking to see whether there

24   was a history of cancer or active cancer in their file; is that

25   right?

FBI SA JEFFREY A. YOUNG - CROSS BY MR. ESSIG

1    A    That's not correct.  I read the entire file.

2    Q    Okay.  All right.  But was the purpose of reviewing those

3    files to create this chart?

4    A    The -- the purpose -- the purpose of looking through the

5    files was to determine if there was a current diagnosis or any

6    sort of medical rationale for treating cancer breakthrough pain

7    with the Abstral and Subsys.

8    Q    Okay.  You reviewed the entire files but you're looking for

9    cancer.  You're looking for a reason -- a cancer-based reason

10   to give that patient Abstral or Subsys?

11   A    That is correct.

12   Q    Now, you testified on direct examination about the fact

13   that Abstral and Subsys -- you talked about off-label use; is

14   that correct?

15   A    Yes, sir.

16   Q    And you stated, I think, that off-label use is using the

17   medication for other than what is approved?

18   A    That is correct.

19   Q    All right.  Now, if we're clear, though, approved --

20   approved means approved by the FDA specifically; isn't that

21   correct?

22   A    I don't feel like I'm in a position to answer that

23   question.  Because approvals can be both from the FDA and from

24   insurance companies.

25   Q    Okay.  Now, you're aware of the fact that often the

1596

1   insurance company approval is tied to the FDA indicated use for

2   the drug?  You're aware of that fact?

3   A   It can be, yes, sir.

4   Q   And approval in this context are off-label use.  The term

5   off-label, that's an FDA-approval term; isn't that right?

6   A   Off-label use is an FDA term.  It has been used by the FDA.

7   Q   Okay.  And FDA -- and they're the people that give the

8   approval.  It's the government agency that identifies the

9   indicated approved use for the drug.  They're the agency that

10  does that?

11  A   Yes, sir.

12  Q   And FDA stands for Food and Drug Administration; isn't that

13  correct?

14  A   That is correct.

15  Q   All right.  And so what they regulate are foods and drugs

16  that are sold to the public by corporations; isn't that

17  correct?

18  A   That is correct.

19  Q   And the FDA-approval process, that's something that the

20  company that manufactures the product -- that's a process they

21  go through; isn't that right?

22  A   I'm not qualified to answer about the FDA-approval process.

23  Q   All right.  Isn't it true or are you aware, Agent Young,

24  based on your education and your experience, that the FDA does

25  not regulate how doctors practice medicine?

1597

```
 1    A   That is correct.
 2    Q   All right.  The doctor is free to prescribe the medication
 3    other than for an FDA-approved use; is that correct?
 4    A   That is correct.
 5            THE COURT:  All right.  Mr. Essig, is now a good time
 6    to break?
 7            MR. ESSIG:  Yes, ma'am.
 8            THE COURT:  All right.  Ladies and gentlemen, we are
 9    going to break for the day.  Remember my instructions to you
10    not to discuss the case.  I also want to re-emphasize the fact
11    that you are not to do any kind of research for this case or
12    read any publicity about this case.  Just stay away from any of
13    that.
14            We will start again tomorrow morning at 9 o'clock.  So
15    be back downstairs at 9 o'clock to be called back up.
16            Have a good evening.
17            A JUROR:  You too.
18       (In open court, defendants present, jury not present.)
19            THE COURT:  All right.  I think the defense counsel's
20    going to ask you to compare some documents, but that's up to
21    them as to whether they want to do that.  But I didn't want to
22    take the jury's time for you to do that.
23            THE WITNESS:  Yes.  No problem.
24            THE COURT:  All right.  Do the lawyers have anything
25    they need to discuss with me before --
```

1        MR. BODNAR:  Not from the United States, Your Honor.

2        THE COURT:  All right.  We're in recess.

3    (Court adjourned at approximately 5 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25