1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF ALABAMA
2

3    UNITED STATES OF AMERICA
                                    CASE NO. CR15-00088
4    v.
                                    COURTROOM 2B
5    JOHN PATRICK COUCH, M.D.,
     and XIULU RUAN, M.D.,
6                                   MOBILE, ALABAMA
              Defendants.
7    * * * * * * * * * * * * * *    THURSDAY, JANUARY 19, 2017

8    REDACTED

9
                            DAY 8 OF TRIAL
10        BEFORE THE HONORABLE CALLIE V. S. GRANADE,
             UNITED STATES DISTRICT JUDGE, AND JURY
11

12   APPEARANCES:

13   FOR THE GOVERNMENT:
          DEBORAH A. GRIFFIN
14        CHRISTOPHER BODNAR
          United States Attorney's Office
15        63 S. Royal Street, Suite 600
          Mobile, AL  36602
16        (251) 441-5845

17
     FOR THE DEFENDANT COUCH:
18        ARTHUR T. POWELL, III
          P.O. Box 40456
19        Mobile, AL 36640-0456
          (251) 433-8310
20
          JACKSON R. SHARMAN, III
21        ROBERT JACKSON SEWELL
          JEFFREY PAUL DOSS
22        BENJAMIN SANDERS WILLSON
          Lightfoot, Franklin & White
23        400 North 20th Street
          Birmingham, AL  35203
24        (205) 581-0700

25

1    (Continued)

2        BRANDON KEITH ESSIG
         800 Shades Creek Parkway, Suite 600D
3        Birmingham, AL  35209
         (251) 879-1981

4

     FOR THE DEFENDANT RUAN:
5        DENNIS J. KNIZLEY
         7 N. Lawrence
6        Mobile, AL 36602
         (251) 432-3799

7

         JASON BRADLEY DARLEY
8        Darley & McGough, LLC
         1751 Dauphin Street
9        Mobile, AL 36604
         (251) 441-7772

10

         GORDON G. ARMSTRONG, III
11       P.O. Box 1464
         Mobile, AL  36633
12       (251) 434-6428

13       STEVEN D. MARTINIE
         4955 North Lake Drive
14       Whitefish Bay, WI  53217
         (414) 332-9683

15

     THE CLERK:  MARY ANN BOYLES
16   THE LAW CLERK:  LYNN DEKLE
     COURT REPORTER:  ROY ISBELL, CCR, RDR, CRR

17

             Proceedings recorded by OFFICIAL COURT REPORTER
18       Qualified pursuant to 28 U.S.C. 753(a) & Guide to
      Judiciary Policies and Procedures Vol. VI, Chapter III, D.2.
19           Transcript produced by computerized stenotype.

20

21

22

23

24

25

```
 1                    EXAMINATION INDEX

 2

    FBI SA JEFFREY A. YOUNG
 3       CROSS BY MR. ESSIG . . . . . . . . . . . . . . . . 1608
         CROSS BY MR. KNIZLEY  . . . . . . . . . . . . . . .1617
 4       REDIRECT BY MR. BODNAR . . . . . . . . . . . . . . 1625

 5  DAVID CORIN
         DIRECT BY MR. BODNAR  . . . . . . . . . . . . . . .1628
 6       CROSS BY MR. SEWELL . . . . . . . . . . . . . . . .1683
         CROSS BY MR. KNIZLEY  . . . . . . . . . . . . . . .1719
 7       REDIRECT BY MR. BODNAR . . . . . . . . . . . . . . 1784

 8  PATRICK SHAWN KELLEY
         DIRECT BY MS. GRIFFIN . . . . . . . . . . . . . . .1797
 9

10

11                     EXHIBIT INDEX

12
                                                      ADMITTED
13  GOVERNMENT'S

14   20        Disk of videos, 20-1, 20-4, 20-7, 20-16, 20-18,  1809
               20-20
15
     20-03     8/5/14 Rxs (N28 & N29) B357                        1807
16
     20-9      11/05/14 Rxs                                       1825
17
     20-11     1/29/15 Rxs (N58 & 59)                             1835
18
     20-22     Brennan patient file                               1802
19
     38-1      Galena Biopharma RELIEF registry fact sheet        1636
20               - summary of registry program

21   38-2      Renaissance Battle House hotel receipt -           1641
               Corin 11/11/13 trip to Mobile to meet with
22             Dr. Couch and Dr. Ruan

23   38-3      Corin Renaissance Battle House hotel               1658
               receipt 2/25/14 trip to Mobile
24
     38-4      Corin Renaissance Battle House hotel               1658
25               receipt 9/24/14 trip to Mobile
```

| 38-5 | Corin Renaissance Battle House hotel receipt 1/20/15 trip to Mobile | 1658 |
|------|---------------------------------------------------------------------|------|
| 38-6 | Corin Renaissance Battle House hotel receipt 4/21/15 trip to Mobile | 1658 |
| 38-7 | Internal document sent quarterly to prescribers around the country | 1653 |
| 38-8 | Rebate agreement (marketing service agreement) between Galena Biopharma and C&R pharmacy | 1668 |
| 38-9 | Blow-up of Government's Exhibit 10-19 with Corin marks/notes | 1683 |

DEFENDANT COUCH'S

| 194 | Chart similar to Government's 12-22, showing top 25 patients | 1611 |
| 202 | Biopharma Abstral voucher (Corin) | 1701 |

DEFENDANT RUAN'S

| 119 | Chart Ruan top 25 recipients total in grams Abstral and Subsys prescribed 1/11/11-5/19/15 (Young 1/19/17) | 1620 |
| 120 | Email Corin to Palmer 10/22/13 Abstral RELIEF Registry Program (email chain) (Corin 1/19/17) | 1754 |
| 142 | Email from Corin to Lento 12/18/14 - Ruan provider identification number needed (Corin 1/19/17) | 1733 |
| 143 | DENIED | 1777 |

1    (Morning session, 9 a.m., in chambers, jury not present.)

2        THE COURT:  Good morning.

3        MR. KNIZLEY:  Good morning, Judge.

4    (Clock ringing.)

5        THE COURT:  It's 9 o'clock.

6        All right.  Whose party is this?

7        MR. BODNAR:  Mine, Your Honor.

8        So the second witness that's going to come up today...

9    (Redacted.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   ... (Redacted.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    ... (Redacted.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      ... (Redacted.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    ... (Redacted.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20    ... (Redacted.)

21    (A recess was taken at 9:08 a.m.)

22    (In open court, 9:12 a.m., defendants and jury present.)

23        THE COURT:  Good morning, ladies and gentlemen.

24        All right.  You may continue.

25        MR. ESSIG:  Thank you, Your Honor.

 1              FBI SA JEFFREY A. YOUNG,

 2        previously sworn, testified further as follows:

 3              CROSS EXAMINATION CONTINUED

 4   BY MR. ESSIG:

 5   Q   Agent Young, we left off yesterday with me showing you a

 6   copy of an exhibit that had previously been marked as

 7   Government's Exhibit.  I've now marked that as Couch Exhibit

 8   194.  And I asked you yesterday when I showed you the

 9   exhibit -- and we actually discussed it after court recessed.

10   But you testified or you told me that you did in fact recognize

11   that document; is that right?

12   A   That is right.

13   Q   And that the data in the document is true and accurate?

14   A   Yes.

15              MR. ESSIG:  Your Honor, at this time we would move to

16   admit Couch Exhibit 194.

17              MR. BODNAR:  Again, Your Honor, objection.  This was a

18   working draft from which the final project, which is already in

19   evidence, was made.  This was inadvertently sent to defense.

20              THE COURT:  Well, I understand.  But he says the

21   information in it is accurate, so I overrule the objection.

22              MR. BODNAR:  And we object to relevance, Your Honor,

23   based on previous rulings by the Court.

24              THE COURT:  Well, I'm not sure I understand that.

25   From what I understand he wants to use it for, I overrule that

 1   objection.

 2           MR. BODNAR:  Can we approach at side bar, Your Honor?

 3           THE COURT:  Yes.

 4       (At the side bar, jury not present.)

 5           MS. GRIFFIN:  Let me see.  Your Honor, the grayed-out

 6   names are individuals that we are not alleging in any sense

 7   were treated outside the usual course of professional

 8   practice.  This was a part of a whole discussion we had before

 9   the trial began about the relevance of patients that are not

10   being alleged to have been treated outside the usual course.

11           THE COURT:  Are you intending to question about those?

12           MR. ESSIG:  Your Honor, first of all, that's not

13   accurate.  These names on this list already are in evidence.

14   This chart is in evidence.  These 25 names are already in.  The

15   only distinction between the evidence the government has

16   admitted and the evidence here is that the noncancer patients

17   are in bold and the cancer patients are not.  That's the only

18   difference between this evidence and the evidence that's

19   already admitted.

20           Our purpose of admitting it, Your Honor, is we think

21   it's a good illustration and an accurate depiction of what the

22   breakdown is of the cancer and noncancer patients that Agent

23   Young has testified about again --

24           THE COURT:  All right.  Can you get me a copy of

25   whatever you say that this was a draft of?

 1          MR. BODNAR:  The final draft?

 2          THE COURT:  Is it already in evidence?

 3          MR. BODNAR:  Yes, it's already admitted.  It's the top

 4  28 patients.

 5          THE COURT:  Do you have the exhibit number?

 6          MR. BODNAR:  It was whichever one we admitted

 7  through --

 8          MR. ESSIG:  Well, Your Honor, that was 12-2.  There's

 9  another exhibit that I think came in with the -- I forget the

10  name of the agent that was on the stand that was going through

11  the numbers and the percentages.  There's another exhibit that

12  contains, as I understand, these same 25 names.

13          MR. BODNAR:  Those 25 names then were listed as just

14  the top people that received Subsys and Abstral with no bearing

15  on whether or not they had cancer or not.  That was just a

16  listing --

17          THE CLERK:  (Indicating.)

18          MR. BODNAR:  It would be in Paul Short's exhibit.

19          THE CLERK:  Short?  (Indicating.)

20          MR. BODNAR:  The top 25 list, Your Honor, for

21  Dr. Couch.  Just listing the numbers.  (Indicating.)  They were

22  grayed out for no other purpose but so that when the final

23  draft was made, we knew which names to transfer over to the

24  final list.

25          THE COURT:  But this is in evidence?

1611

1       MR. BODNAR:  That's in evidence.

2       THE COURT:  And these are all the same names that are

3  on this list?

4       MR. BODNAR:  Same names.  There's no distinction or

5  anything being made whether they do or don't have cancer here.

6       THE COURT:  All right.  I overrule the objection.

7     (In open court, defendants and jury present.)

8     (Defendant Couch's Exhibit 194 was entered into evidence.)

9       MR. ESSIG:  Is ELMO on?

10      THE CLERK:  ELMO, yes.

11  BY MR. ESSIG:

12  Q   Okay.  Now, Agent Young, I'm showing you what's been

13  admitted as Government's [sic] Exhibit 194, and this is the

14  exhibit you and I discussed yesterday; is that right?

15  A   Yes.

16      THE COURT:  Is this a defense exhibit?

17      MR. ESSIG:  I'm sorry.  Defendant Couch Exhibit 194.

18      THE COURT:  All right.

19  MR. ESSIG:

20  Q   And again, at the top there this purports to be the top of

21  the Dr. Couch Abstral and Subsys prescribed medications; is

22  that correct?

23  A   That is correct.

24  Q   And again, this is the top 25 patients that we discussed

25  yesterday; isn't that right?

FBI SA JEFFERY A. YOUNG - CROSS BY MR. ESSIG

1    A    That's correct.

2    Q    Okay.  Now, in these top 25 patients on this particular

3    exhibit, the bold names -- there's 14 bold names; is that

4    correct?

5    A    That is correct.

6    Q    And the 14 bold names on the Dr. Couch Exhibit 194 are the

7    14 Dr. Couch names that went into the off-label exhibit that

8    the government admitted yesterday and showed you; is that

9    correct?

10   A    That is correct.

11   Q    So the -- and you stated that the way Government's Exhibit

12   28 was created was that you found those 14 names by excluding

13   any patient file that either had an active diagnosis of cancer

14   or cancer at any point in their lives; is that correct?

15   A    That is correct.

16   Q    Okay.  So isn't it true that the names that are not bolded

17   on Couch Exhibit 194, that those names, those 11 names of this

18   top 25 are patients who had either active cancer or some

19   diagnosis of cancer in their past; is that correct?

20   A    That is correct.

21   Q    Now, if we look at this, Agent Young, there's a total of

22   again 11 names that had some history of cancer, 11 through 25?

23   A    That's correct.

24   Q    Okay.  And you were only asked to look at 25 -- at the top

25   25; isn't that right?

1    A    For Dr. Couch.

2    Q    Correct.

3    A    That's correct.

4    Q    So we've got 11 out of 25, would you agree with me that's

5    roughly 44 percent of Dr. Couch's top 25 had some history of

6    cancer?

7    A    That sounds right.

8    Q    Okay.  And as a matter of fact, on Government's Exhibit --

9    or excuse me, Defendant's Exhibit 194, three of his top four

10   patients who received Abstral or Subsys, three of those of the

11   top four had a history of cancer; isn't that correct?

12   A    That's correct.

13   Q    And in the totals there I noticed that on Couch Exhibit 194

14   there's no total amount billed for any of the cancer patients;

15   isn't that correct?

16   A    That is correct.

17   Q    Now, I'm going to show you -- and again, for these numbers

18   in Couch 194, since you were only asked to look at the top 25,

19   we don't know what that breakdown would be or what the

20   percentage would be if you looked at all these prescriptions,

21   do we?

22        We just don't know that today because you weren't

23   asked to look.

24   A    That is correct, I cannot know that because I didn't look

25   at it.

FBI SA JEFFERY A. YOUNG - CROSS BY MR. ESSIG

1   Q    If we had a larger sampling size, it could be a larger
2   percentage?
3   A    I have no way of knowing that.
4   Q    And neither does the jury.
5          MR. BODNAR:  Objection, Your Honor, to that comment.
6          THE COURT:  Sustained.
7   BY MR. ESSIG:
8   Q    Now, looking -- going back to Government's Exhibit 12-2.
9   Now, down here at the bottom, you --
10          THE COURT:  Yes, sir?
11          A JUROR:  I'm sorry, Your Honor.  We didn't hear the
12   comment that he made.
13          THE COURT:  Well, I sustained the objection so it's
14   okay if you didn't hear it.
15          A JUROR:  All right.  Thank you.
16   BY MR. ESSIG:
17   Q    Now, Agent Young, on Government's Exhibit 12-2, if we look
18   down here at the bottom you totaled the total number of grams,
19   is that correct, for this -- for these 28 patients; is that
20   right?
21   A    That's correct.
22   Q    And you totaled the total amount of Abstral and Subsys
23   prescriptions, the money that was billed; is that right?
24   A    That is correct.
25   Q    And these are -- these are off-label prescriptions;

1615

1    correct?

2    A    That is correct.

3    Q    You don't have a total of the on-label prescriptions?

4    A    I do not.

5    Q    Neither in grams or in dollar amount?

6    A    I do not.

7    Q    And just so we're clear also, is that when we have the

8    amount billed by C&R Pharmacy on Government's Exhibit 12-2, all

9    we have is the total amount the pharmacy billed; is that

10   correct?

11   A    For those prescriptions, yes, sir.

12   Q    All right.  What's not included in these numbers is how

13   much the medications would have cost the pharmacy to purchase?

14   A    That is not included; that's correct.

15   Q    Okay.  So this $5 million, the roughly 5 and a half million

16   dollars at the bottom of Government's Exhibit 12-2, that does

17   not actually represent the profit of C&R Pharmacy for these

18   prescriptions, does it?

19   A    I have no way of knowing what their profit was.

20   Q    Okay.  Now, Agent Young, going back to Couch Exhibit 194.

21   For the ones in bold, the ones that did not have cancer -- I

22   take it from your questions on direct examination that you were

23   not asked to go and interview all of these patients?

24   A    That is correct.

25   Q    All right, sir.  You weren't asked to go and find out what

1616

```
1   conditions they presented to Dr. Couch with and talked to them
2   about that?
3           MR. BODNAR:  Objection, Your Honor.  I think we need
4   to approach on this as well.
5           THE COURT:  All right.
6       (At the side bar, jury not present.)
7           MR. BODNAR:  The concern, Your Honor, is if he keeps
8   going down this line of questioning, Special Agent Young is
9   likely going to say the reason he didn't do it is because many
10  of those people on that list are dead.  And we've been trying
11  to stay away from any dead patients in this case.  And the
12  reason he didn't interview -- well, he wasn't asked to
13  interview them.  But, he couldn't interview them, a large
14  percentage of people on that list, because they are dead.
15          THE COURT:  Are you going anywhere else?
16          MR. ESSIG:  I'm not going to say why not.  That's it.
17          THE COURT:  Okay.  Okay.
18      (In open court, defendants and jury present.)
19  BY MR. ESSIG:
20  Q    All right.  Agent Young, the last question I asked you was:
21  For the patients that are in bold on Couch Exhibit 194, and
22  also for all the patients -- all of the patients listed on
23  Couch Exhibit -- excuse me, Government Exhibit 12-2, the 28
24  patients, you weren't asked to go interview any of these
25  patients, were you?
```

1   A   I was not.

2   Q   Okay.  And so you can't testify as to what conditions they

3   may have presented with to Dr. Couch or what they may have told

4   Dr. Couch essentially?

5   A   I cannot testify as to what the patients told --

6   Q   Okay.

7   A   -- Dr. Couch if it was not documented in the patient file.

8   Q   Okay.  Fair enough.  Because you did review all patient

9   files?

10  A   Because I did review all patient files.

11  Q   But no interviews were done to follow up and find out more

12  details?

13  A   No interviews were done.

14          MR. ESSIG:  No further questions, Your Honor.

15          THE COURT:  Mr. Knizley, Mr. Armstrong?

16                      CROSS EXAMINATION

17  BY MR. KNIZLEY:

18  Q   Good morning, Agent.

19  A   Good morning, Mr. Knizley.

20  Q   How are you doing?

21  A   Good.  How are you?

22  Q   Good.  Mr. Essig had just asked you about Couch's Exhibit

23  194, which is in evidence?

24  A   Yes, sir.

25  Q   And you heard the comparison he was making, did you not,

1   about the people on this list that are not highlighted in fact

2   had cancer or some history of cancer in the file?

3   A   Yes, sir; either cancer or history of cancer.

4   Q   And I'm going to show you what's marked as Government's

5   Exhibit 12-1, which is not in evidence.

6           MR. BODNAR:  Your Honor, we object to it being listed

7   as Government's Exhibit 12-1.  Again, this was a draft from

8   which the final copy was sent out.

9           MR. KNIZLEY:  And I'm going to change it out,

10  Judge.  This is -- just happens to be in color.  The one I have

11  is not going to be in color.  I just wanted to show him, make

12  sure he recognizes it is the same thing or we can do it a

13  different way.  Put our sticker on top of it, of course.

14          THE COURT:  So what's the number?  What are you --

15          MR. KNIZLEY:  The number now is Ruan's Exhibit 119.

16  Q   And do you see Ruan's Exhibit 119?

17  A   Yes, sir.

18  Q   And is that Dr. Ruan's version of the Couch Exhibit 194 we

19  looked at a moment ago?

20  A   It is.

21          MR. KNIZLEY:  We would offer Ruan's 119.

22          MR. BODNAR:  Your Honor, same objection.  This was a

23  draft final of -- it's already in evidence.

24          THE COURT:  Well, I understand what your objection is,

25  but there's been no showing that this is accurate as 194

```
 1   was.  So --

 2           MR. KNIZLEY:  Judge, if I could approach the witness?

 3           THE COURT:  Yes.

 4   Q   I'm going to show you Ruan's 119, which was the former

 5   exhibit.  Would you take a look at that, please?

 6   A   Yes, sir.

 7   Q   All right.  Did you help in the creation of that?

 8   A   I did.

 9   Q   So you helped put that together?

10   A   Yes, sir.

11   Q   You were asked to put that together by these people over

12   here?

13   A   Yes, sir.

14   Q   And you gave it to them.  When you got through with it, you

15   gave it to them?

16   A   Yes, sir.

17   Q   And did you put it together properly?  Is that information

18   correct?

19   A   It is correct as far as it's a draft.  It is incomplete.

20   Q   Is it any less or more incomplete than the one we have for

21   Dr. Couch?

22   A   It is -- it is the same in amount of completeness.  It is

23   less complete than the final draft the government has.

24   Q   Sure.  But it's the same as the one we've submitted in

25   amount and completeness --
```

SA AGENT JEFFREY A. YOUNG - CROSS BY MR. KNIZLEY

 1   A    It is similar.

 2           MR. KNIZLEY:  Judge, we would offer Ruan Exhibit 119.

 3           MR. BODNAR:  Same objection, Your Honor.  Again, this

 4   is an incomplete draft.  The final is in evidence.

 5           THE COURT:  All right.  Mark it in.  Overruled.

 6       (Defendant Ruan's Exhibit 119 was entered into evidence.)

 7   BY MR. KNIZLEY:

 8   Q    Now, looking at Ruan's 119 -- and it is a similar list as

 9   we looked at Dr. Couch's earlier; right?

10   A    That's correct.

11   Q    And the one that's highlighted are the ones that did not

12   have some cancer diagnosis in the past; right?

13   A    That is correct.

14   Q    And these look like -- one and two on Dr. Ruan have had a

15   cancer diagnosis in the past; right?

16   A    That is correct.

17   Q    And all the way down to the ones that are not highlighted

18   through 25; is that correct?

19   A    That is correct.

20   Q    And as Mr. Essig told you, if there's 11 out of 25, at

21   least the top 25 we're talking about, that's about 44 percent

22   of them; right?

23   A    Yes, sir (nodding head affirmatively.)  Sounds right.

24   Q    Now, this list that you put together, over what time frame

25   were these patient files you looked at?

SA AGENT JEFFREY A. YOUNG - CROSS BY MR. KNIZLEY

1    A    From January 1, 2013 to May 2015.

2    Q    Okay.  Did the patients' files, though, go back beyond

3    that?

4    A    They did.

5    Q    And did they go back as far as when the patient first came

6    to see the doctor?

7    A    Yes, sir.

8    Q    Okay.  And so you saw -- you told us you looked at the

9    entire files; is that right?

10   A    That is right.

11   Q    And what you looked at was first from C&R who got Abstral

12   and who got Subsys; right?

13   A    Right.

14   Q    And you added up, found out which ones are the top 25?

15   A    Right.

16   Q    And that's just a mathematical analysis.  There's nothing

17   special about that; right?

18   A    That's correct.

19   Q    I don't mean nothing special.  I mean, it didn't take any

20   particular scientific expertise or anything?

21   A    Just math.

22   Q    I know it's hard work.  It's math.

23   A    Yes, sir.

24   Q    And then you went through the files and said:  Well, let's

25   see if I've got anything about cancer on these people.  That's

SA AGENT JEFFREY A. YOUNG - CROSS BY MR. KNIZLEY

1   what you did; right?

2   A   Well, not exactly, because we did -- I went through the

3   patient files first, the Greenway files first.

4   Q   The other way?

5   A   I did it the other way; yes, sir.

6   Q   All right.  You did it the other way.  And if you saw

7   anything about cancer, you then went back to look at who's in

8   the top 25?

9   A   That is correct.

10  Q   All right.  And when you -- you read the entire file you

11  told us; right?

12  A   That is correct.

13  Q   So I'm assuming you saw where many times the patient was

14  referred by another physician?

15  A   That is correct.

16  Q   And you saw where the patients from time to time they had

17  an examination?

18  A   They did.

19  Q   And they had other kind of testing done.  They had spinal

20  blocks and something, things like that within the file; is that

21  right?

22  A   That's correct.

23  Q   And other kinds of treatment as well?

24  A   That's correct.

25  Q   And they received other kind of medications as well?

SA AGENT JEFFREY A. YOUNG - CROSS BY MR. KNIZLEY

1    A    They did.

2    Q    But on these, you see where a prescription was made for a

3    patient for some medicine?

4    A    Okay.

5    Q    And that medicine -- that prescription was taken over to

6    the pharmacy; right?

7    A    Right.

8    Q    And the patient got -- then went to the pharmacy and got

9    their medicine apparently.  You'd have the prescriptions in

10   there and you see where they were filled, so the patient must

11   have gotten the medicine; right?

12   A    According to the file.

13   Q    Okay.  Now, you told us too that on the Government

14   Exhibit 12-2 -- do you remember that?

15   A    Yes, sir.

16   Q    Okay.  And it's got this figure here; right?  (Indicating.)

17   A    Yes, sir.

18   Q    Okay.  Now, that's just the amount that was billed; right?

19   A    That is correct.

20   Q    All right.  And have you seen C&R Pharmacy before?

21   A    I have not.

22   Q    Okay.  Well, it's -- there's nothing on this document, is

23   there, that says anything about the cost of the product; is

24   there?

25   A    There is not.

1    Q   So this figure here, we don't know how much they had to pay

2    for the Subsys --

3    A   I do not know.

4    Q   -- from Insys or how much they had to pay to get Abstral

5    from Galena.  We don't know that, do we?

6    A   I do not know.

7    Q   Okay.  We don't know how much money they paid in salaries

8    to the people that worked there?

9    A   No, sir.  I do not know.

10   Q   You don't know about -- we don't know about insurance,

11   overhead or anything else?

12        MR. BODNAR:  Objection.  Irrelevant to this line of

13   questioning.  He said he didn't know anything about C&R

14   Pharmacy.  This is outside the scope of direct.

15        THE COURT:  Overruled.

16   BY MR. KNIZLEY:

17   Q   We don't know how much C&R Pharmacy may have had to pay for

18   their insurance, do we?

19   A   I do not know.

20   Q   And for -- we don't know how much they may have had to pay

21   for licenses or other overhead expenses, do we?

22   A   No, sir.

23   Q   And so this doesn't really tell us very much about what the

24   profit, if any, of C&R Pharmacy was, does it?

25   A   I do not know.

SA AGENT JEFFREY A. YOUNG - REDIRECT BY MR. BODNAR

| 1 | MR. KNIZLEY:  Thank you. |
| 2 | THE COURT:  Redirect? |
| 3 | MR. BODNAR:  Yes, Your Honor. |

REDIRECT EXAMINATION

BY MR. BODNAR:

Q   Special Agent Young, I'm going to show you what's previously been admitted as Government's Exhibit 12-2.  Is this the final chart with all the final information on it that you created?

A   It is.

Q   Where does it say profit to C&R Pharmacy in that line?  (Indicating.)

A   It does not say so.

Q   What does it say?

A   It says:  Billed for off-label Subsys/Abstral to top 28, $5,576,880.41.

Q   It doesn't purport to be profit, does it?

A   It does not.

Q   Not trying to hide the ball about if it's profit or not, are you, there?

A   No, sir.

Q   Does the amount billed mean the amount that somebody else had to pay, whether an insurance company or the pharmaceutical company itself to C&R Pharmacy?

A   Yes, sir.

SA AGENT JEFFREY A. YOUNG - REDIRECT BY MR. BODNAR

1   Q   So it doesn't say how much profit C&R made, does it?

2   A   It does not.

3   Q   But explains how much somebody else had to pay for that

4   off-label Subsys and Abstral; is that correct?

5   A   Yes, sir.

6   Q   I'm going to show you what's been admitted as Government --

7   sorry -- as Ruan Exhibit 119.  And again, is this -- was this a

8   working draft of the final product that we just looked at?

9   A   It was.

10  Q   You mentioned to the jury that you reviewed all these

11  patient files; is that correct?

12  A   That is correct.

13  Q   And I think on direct you mentioned that some of these

14  patients that are grayed-out either had active cancer or past

15  cancer?

16  A   That is correct.

17  Q   Can you explain to the jury, were these -- were all of

18  these people that were grayed-out, were they being actually

19  treated for any cancer pain based on your review of the record?

20  A   Based on Dr. Ruan's and Dr. Couch's, which is similar,

21  based on their patient notes, it does not appear so because the

22  cancer was either cured or in remission and the diagnosis was

23  taken off of the patient notes at the time that Abstral and

24  Subsys were still being prescribed.  That had happened too.  Or

25  there were some -- or it was a distant cancer from the '90s

SA AGENT JEFFREY A. YOUNG - REDIRECT BY MR. BODNAR

1   that was on the original patient intake form.

2   Q   And is that what you meant by giving Dr. Ruan and Dr. Couch

3   the benefit of the doubt in creating the final chart?

4   A   I -- I did (nodding head affirmatively.)

5   Q   And does it work the same way -- I'm going to show you

6   what's admitted as Defense or Couch Exhibit 194.  Is this the

7   similar working draft of the final copy for Dr. Couch?

8   A   Yes, sir.

9   Q   And for the individuals grayed out, were there individuals

10   there that were receiving -- were some of those individuals

11   that were grayed out receiving Subsys and Abstral for something

12   other than cancer pain?

13   A   It appeared so from the patient notes.

14   Q   I also want to clarify one thing in the record.  For both

15   of these top 25 lists, it wasn't you who came up with the

16   number of Abstral grams, was it?

17   A   I did not -- I didn't do those calculations.  I only spot

18   checked them.

19   Q   Did those calculations come off another exhibit that had

20   already been admitted into evidence?

21   A   They had.  They had been.

22   Q   And were those exhibits -- United States Exhibit 22 --

23   A   Yes, sir, I do recognize --

24   Q   -- 10-22 and United States Exhibit 10-25?  (Indicating.)

25   A   Yes, sir, I recognize that.

1628

1    Q   So were these names and the number of Abstral/Subsys in

2    total grams simply taken off that and put into the draft chart

3    and then what became the final chart?

4    A   Yes, sir; those appear to be the same numbers.

5           MR. BODNAR:  One moment, Your Honor.

6       (A discussion was held off the record between government

7    counsel.)

8           MR. BODNAR:  Nothing further from this witness, Your

9    Honor.

10          THE COURT:  All right.  You may step down.  Thank you.

11          THE WITNESS:  Thank you, Your Honor.

12          MR. BODNAR:  United States calls David Corin.

13                      DAVID CORIN

14            was sworn and testified as follows:

15          THE WITNESS:  Yes, I do.

16          THE CLERK:  Please be seated.

17                   DIRECT EXAMINATION

18   BY MR. BODNAR:

19   Q   Good morning.

20   A   Good morning.

21   Q   Would you please pull the microphone a little bit closer to

22   your mouth?  Could you please?

23   A   Good morning.

24   Q   Could you please introduce yourself to the jury?

25   A   Hi.  My name is David Corin.

DAVID CORIN - DIRECT BY MR. BODNAR

1   Q   And Mr. Corin, where do you work?

2   A   I work for a company called MiMedx.

3   Q   And prior to working for MiMedx, did you work for a company

4   called Galena Biopharma?

5   A   Yes.

6   Q   Before we get into your work at Galena Biopharma, can you

7   please give the jury a little bit of background on your

8   education?

9   A   Sure.  I went to Syracuse University in upstate New York

10  and I've been in the healthcare industry since 2003.

11  Q   What did you get your degree in at Syracuse?

12  A   Psychology in marketing.

13  Q   After you graduated from Syracuse, what jobs did you have

14  leading up to your time at Galena Biopharma?

15  A   Sure.  I was a regional recruiter with Abercrombie & Fitch.

16  I worked for a sales company called Awards.com.  I worked for a

17  company called Forest Pharmaceuticals; then a company called

18  Genzyme Biosurgery as a sales representative, a regional

19  manager, a global sales trainer; then worked for a company

20  called AVEO Oncology as a regional sales manager; and then

21  Galena Biopharma.

22  Q   And sales -- you said sales rep first was --

23  A   Yes.

24  Q   Explain to the jury, what did you do as a sales rep for

25  these pharmaceutical companies?

1    A    Sure.  I would educate the doctors or customers or nurses

2    on our products.

3    Q    And then you said you were a sales manager.  What does it

4    mean to be a sales manager?

5    A    I led a team of sales representatives who did the previous

6    job like I had done before on educating the customers on where

7    to go, and how to do their job on a daily basis.

8    Q    Please explain to the jury when it was that you started

9    working for a company called Galena Biopharma.

10   A    On June 10th, 2013.

11   Q    And could you please explain what is Galena Biopharma?

12   A    Galena Biopharma is a oncology company to meet unmet cancer

13   needs.

14   Q    And oncology company, what do you market to the oncology

15   company?

16   A    Products used to treat cancer.

17   Q    And at the time that you started with Galena Biopharma, did

18   they have any cancer products on the market?

19   A    Yes.  We had a product called Abstral, which was for

20   breakthrough cancer pain.

21   Q    Mr. Corin, I'm going to show you what has previously been

22   marked as Government's Exhibit 10 -- or 1-9.

23            THE COURT:  What's the number?

24            MR. BODNAR:  1-9.

25            THE COURT:  All right.

1631

```
 1   BY MR. BODNAR:
 2   Q   Mr. Corin, can you see that on your screen?
 3   A   Yes.
 4   Q   Is this Abstral right here that you were referring to?
 5   A   Yes.
 6   Q   Is that what Galena Biopharma promoted?
 7   A   Yes.
 8   Q   Can you explain to the jury what is Abstral?
 9   A   Abstral is a product for breakthrough cancer pain.
10   Q   And how is it used?  Is it a spray?
11   A   No, it's sublingual, which means you place the product
12   beneath the tongue and it dissolves within one minute after
13   being placed beneath the tongue.
14   Q   And by "product" what is it -- is it like a dissolvable
15   pill?
16   A   It's a dissolvable pill.
17   Q   For under the tongue?
18   A   Yes.
19   Q   Mr. Corin, when you started at Galena Biopharma, what was
20   your position with the company?
21   A   I was a regional sales director for a third of the country,
22   which encompassed the southeast region.
23   Q   And as regional sales director for Galena Biopharma, what
24   did your job entail?
25   A   It entailed leading our team of sales representatives for
```

1  the commercialization or marketing of our product Abstral.

2  Q   And prior to Galena taking over responsibility for Abstral,

3  had Abstral been available through a different company

4  beforehand?

5  A   Yes, it was on the market through a company called

6  ProStrakan.

7  Q   And can you explain to the jury, how does it work where

8  ProStrakan has Abstral and then somehow Galena has it?  How

9  does that process work?

10 A   Sure.  ProStrakan -- well, Abstral was owned by a European

11 company called Alexo.  Alexo in different countries gives

12 different companies the opportunity to sell the product.  In

13 the United States ProStrakan was the company that sold the

14 product called Abstral, and they sold it for a couple of years.

15 But the parent company Alexo was not pleased with their

16 results.

17 Q   And then at that point did Galena Biopharma take over?

18 A   Yes.  Galena Biopharma acquired the rights of Abstral in

19 April of 2013.

20 Q   When Galena took over the rights to Abstral, did anything

21 about the product change?

22 A   No.

23 Q   Was it the same drug when ProStrakan was promoting it as to

24 when Galena was promoting it?

25 A   Yes, 100 percent.

1633

 1   Q   Same delivery method, dissolvable underneath the tongue?

 2   A   Yes.

 3           THE COURT:  How do you spell ProStrakan?

 4           THE WITNESS:  P-R-O-S-T-R-A-K-K-E-N, I believe.

 5           THE COURT:  Thank you.

 6   BY MR. BODNAR:

 7   Q   And Mr. Corin, I'm going to show you what has previously

 8   been admitted as Government's Exhibit 10-19.  Does this purport

 9   to be Dr. Ruan -- Xiulu Ruan and Dr. John Patrick Couch,

10   Abstral prescribed by both in micrograms?

11   A   Yes.

12   Q   And at the bottom does it appear to be a timeline from May

13   of 2011 through May of 2015?

14   A   That's correct.

15   Q   Have you had an opportunity to look at a draft of this

16   graph previously?

17   A   Yes.

18   Q   Would it assist your testimony to be able to show the jury

19   certain events along this timeline?

20   A   Yes.

21           MR. BODNAR:  Your Honor, may we use a blown-up version

22   of this on the easel?

23           THE COURT:  Yes.

24   Q   Mr. Corin, would you mind stepping down and showing on the

25   larger chart where it was in time when Galena took over for

 1  ProStrakan in the marketing of Abstral?

 2  A   Yes.

 3         THE COURT:  And Mr. Corin, if you will face -- if you

 4  will get on the far side of that chart and face this way so the

 5  court reporter can hear you.

 6         THE WITNESS:  This side?  (Indicating.)

 7         THE COURT:  Yes.

 8         THE WITNESS:  Okay.

 9         THE COURT:  The side toward the prosecutor.  And turn

10  sort of this way.

11         Yeah.  But to the jury as well.

12         THE WITNESS:  Okay.

13         THE COURT:  Yeah.

14  BY MR. BODNAR:

15     Q    Mr. Corin, could you please mark on the graph where

16  it was in time that Galena Biopharma took over from ProStrakan

17  in promoting of Abstral?

18  A   Sure.  It would be right here in April of 2013, Galena.

19  Q   And does it appear, at least from that chart, that there

20  were some prescriptions for Dr. Ruan and Dr. Couch prior to

21  that date?

22  A   Yes.

23  Q   And there was nothing different about the drug before or

24  after that date?

25  A   No.

1  Q   Now, when April -- when it took over, is that when Galena

2  launched the product?

3  A   Galena had the product but they didn't launch it

4  commercially till August of 2013.

5  Q   And actually, can you explain what does it mean when a

6  company launches a product?

7  A   Sure.  We had a team of sales representatives out there

8  meeting with customers starting in August of 2013.

9  Q   Prior to the launch of Abstral from Galena Biopharma, was a

10  program set up called the RELIEF Registry?

11  A   Yes.

12        MR. BODNAR:  Your Honor, may I approach with what has

13  been marked as Government's Exhibit 37-1?

14        THE COURT:  Yes.

15  Q   And after you've identified this, I'll ask you to go back

16  on the stand for a moment.  Are you able to identify what this

17  document is for the Court?

18  A   Yes.

19  Q   What is this document?

20  A   It's a summary of our registry program.

21        MR. BODNAR:  Your Honor, the United States moves to

22  admit Government's Exhibit 37-1.

23        THE COURT:  Any objection?

24        MR. SEWELL:  No objection.

25      (Exhibit improperly identified.)

DAVID CORIN - DIRECT BY MR. BODNAR

```
 1   BY MR. BODNAR:
 2   Q   And Mr. Corin, before we discuss this document, could you
 3   please mark on that timeline where it was that the registry
 4   program began?
 5   A   Sure.  It began in July of 2013.
 6   Q   Mr. Corin, if you wouldn't mind going back up to the stand
 7   so we can see on the screen as we go through this registry.
 8   A   (Witness complying.)
 9   Q   I'm going to show you what has now been admitted as
10   Government's Exhibit 37-1.
11           THE CLERK:  This is different, Your Honor.
12   BY MR. BODNAR:
13   Q   Is this the RELIEF Registry fact sheet?
14   A   Yes.
15   Q   Could you please read this first part?  What is the RELIEF
16   Program?
17           THE COURT:  Mr. Bodnar, you've already got a 37-1.
18   That's a patient prescriber agreement form.  So --
19           MR. BODNAR:  These will all be 38 then, Your Honor.
20           THE COURT:  All right.  Well, change this one to 38-1.
21           MR. BODNAR:  38-1, Your Honor.
22       (Government's Exhibit 38-1 was entered into evidence.)
23   Q   What has now been marked as 38-1, what does RELIEF stand
24   for?
25   A   The rapid evaluation of lifestyle independence in
```

1  elimination of breakthrough cancer pain with freedom from oral

2  discomfort through use of Abstral (fentanyl) sublingual

3  tablets.

4  Q   Can you explain in layman's terms what was this program

5  that Galena started called the RELIEF Registry?

6  A   It is a post-marketing or post-launch study to understand

7  the results of patients who have been prescribed the product.

8  Q   And when you say "post-launch," does that mean the drug is

9  already on the market?

10  A   Yes, the drug is on the market.

11  Q   And what kind of testing is trying to be done here by this

12  RELIEF Program?

13  A   We're trying to understand if the product is working, if

14  the patients are experiencing any side effects, and what's

15  going on in the real world with the product.

16  Q   How would this -- how would a program like this post-launch

17  RELIEF Program be different from a testing of a drug before it

18  has been approved?

19  A   Sure.  With the testing of a drug it's generally a very

20  controlled environment.

21  Q   And just so we're clear, you mean testing the drug before

22  it is approved?

23  A   Correct.

24  Q   Okay.  Please continue.

25  A   So in a controlled environment, there are only specific

DAVID CORIN - DIRECT BY MR. BODNAR
1638

```
 1   patients in specific places and specific doctors who may be
 2   doing the initial reviews, so it's a very limited population.
 3           THE COURT:  Let me --
 4   A   You want to understand how the general population --
 5           THE COURT:  Let me interrupt you for just a
 6   minute.  Can all of you see the witness as he's testifying,
 7   because the chart's in the way?
 8           All right.  Let's move the chart while you've got him
 9   on the stand.
10           And Mr. Corin, if you could sit back just a little so
11   you're not right up on the microphone.
12           THE WITNESS:  Okay.
13           THE COURT:  Thank you.
14   BY MR. BODNAR:
15   Q   Mr. Corin, why don't you start that again and explain the
16   difference between a pre-approval test versus what was trying
17   to be done here with the RELIEF Program?
18   A   Sure.  A pre-approval test is a controlled environment
19   which can be limited in scope, meaning only certain doctors and
20   certain patients are included in the pre-market.  In the post-
21   market you can open it up to more doctors and more patients to
22   understand a little bit more what's going on in the real world.
23   Q   And prior to the RELIEF Program being set up, was there a
24   different program with Galena that was thought about in terms
25   of how to get this test data?
```

1    A    Not that I'm aware of.

2    Q    Why was the -- what was the stated purpose for the RELIEF

3    Program?

4    A    The stated purpose was to get data quickly so we could

5    publish the results of how Abstral was doing.

6    Q    How did you -- what was offered or what incentive was there

7    for doctors to enroll their patients in this RELIEF Program?

8    A    If a doctor enrolled a patient and a patient completed the

9    program, the doctor would get a stipend of $500 per completed

10   patient.

11   Q    What was that $500 paid for?  What was the doctor supposed

12   to be doing for that $500 per patient?

13   A    The doctor was working with the patient to evaluate their

14   feedback and make sure that the patient -- the RELIEF Program

15   had four steps to it.  It was a weekly survey of how the

16   patient was doing.  And the doctor was there to ensure that the

17   patient was completing each step of the process.

18   Q    And to be clear, is it how they were doing on the drug

19   Abstral?

20   A    Yes; that's correct.

21   Q    Were there any limits to the number of patients that a

22   doctor was allowed to enroll into the RELIEF Program?

23   A    Yes.  A doctor could only enroll 25 patients.

24   Q    During your time working for Galena Biopharma do you know

25   if Dr. Ruan ever enrolled patients in this program?

DAVID CORIN - DIRECT BY MR. BODNAR

```
1   A   I don't believe he did.

2   Q   How about Dr. Couch?

3   A   I believe he did.

4   Q   Was there anything different about Dr. Couch's enrollment

5   of patients as opposed to what was the stated plan for the

6   RELIEF Program?

7   A   Yes.  My understanding is the parameters were changed where

8   Dr. Couch was allowed to enroll up to 75 patients.

9   Q   And was Dr. Couch -- did Dr. Couch ask for additional money

10  over the $500 per patient?

11  A   That's my understanding from our team that handled the

12  registry.

13  Q   And what was your understanding for that money?

14  A   That he asked for up to $2,500 per patient.

15  Q   And do you know if Dr. Couch did, in fact, enroll patients

16  in the RELIEF Program?

17  A   My understanding is that he did.  I don't know how many,

18  though.

19  Q   Mr. Corin, in your time as working for Galena Biopharma,

20  did you on occasion come down to Mobile?

21  A   Yes.

22  Q   What was the purpose of coming down to Mobile?

23  A   To meet with Dr. Ruan and Dr. Couch.

24  Q   And at this time, where were you coming down from?  Where

25  were you working?
```

1641

1  A   I'm living in the Raleigh, North Carolina area.

2  Q   And where is Galena Biopharma's office located or was

3  located?

4  A   It's headquartered in Portland, Oregon.

5  Q   So you were working remotely, essentially?

6  A   Yes.

7  Q   I'm going to show you what's previously been marked as

8  Government's Exhibit 37-2.

9        THE CLERK:  38-2?

10        MR. BODNAR:  38-2.

11  BY MR. BODNAR:

12  Q   Are you able to identify what this document is?

13  A   Yes.  That's the first time I visited the area.

14  Q   Well, what is the actual document?

15  A   It's my hotel receipt.

16  Q   And what is the date?

17  A   November 11th, 2013.

18        MR. BODNAR:  United States moves to admit Government's

19  Exhibit 38-2.

20        THE COURT:  Any objection?

21        MR. SEWELL:  No objection.

22        THE COURT:  All right.  Mark it in.

23     (Government's Exhibit 38-2 was entered into evidence.)

24  BY MR. BODNAR:

25  Q   Mr. Corin, I'm now showing you what has been admitted as

1642

```
1    Government's Exhibit 38-2.  Is this a hotel receipt for you?

2    A   Yes.

3    Q   That's your name up there?

4    A   Yes.

5    Q   Do you recall this trip to Mobile?

6    A   Yes.

7    Q   And when was this trip?

8    A   November 11th, 2013.

9    Q   And during this trip did you have an occasion to meet with

10   Dr. Couch and Dr. Ruan?

11   A   Yes.

12   Q   What was the purpose of you coming down on this first trip

13   in November of '13?

14   A   I hadn't met them yet and I was advised to meet with them.

15   Q   Did you come down here with anybody else at that time?

16   A   I did.

17   Q   And which hotel are you staying in while you're down here?

18   A   The Renaissance Battle House.

19   Q   Is that the one on Royal Street, downtown Mobile?

20   A   Yes.

21   Q   During this meeting or during this trip did you, in fact,

22   meet with Dr. Ruan and Dr. Couch?

23   A   Yes.

24   Q   Prior to this meeting, were either Dr. Ruan or Dr. Couch

25   involved as speakers for Galena Biopharma?
```

1   A   No.

2   Q   What, if anything, happened with Dr. Ruan during this

3   visit?

4   A   He had approached our sales representative, who was Jeff

5   Palmer, and during this meeting he had approached me about

6   speaking for the company.

7   Q   Explain to the jury, what happened when he approached you?

8   A   Well, he talked about what a high prescriber he was of all

9   of the products in the class and recommended that it would be

10   good for Galena to have him as a speaker.

11   Q   And by "products in the class," do you mean other TIRF

12   fentanyl drugs?

13   A   Yes.

14   Q   Would that include Subsys?

15   A   Yes.

16   Q   And Fentora?

17   A   Yes.

18   Q   What, if anything, did Dr. Ruan want in exchange for

19   becoming a speaker for Galena Biopharma?

20   A   After our initial conversation, he had asked our sales

21   representative if he could be -- rather than paid a speaking

22   fee, to be paid in stock.

23   Q   And is that stock in the company, in Galena?

24   A   Yes.

25   Q   What did you tell Dr. Ruan about whether or not he could be

1644

1   a speaker for Galena?

2   A   Since he was treating all of the patients in the area, it

3   didn't make sense for him to be a speaker because there would

4   be nobody to speak to.

5   Q   Explain that.  Why wouldn't it make sense for Galena

6   Biopharma to make Dr. Ruan a speaker?

7   A   Because there were no other doctors in the area prescribing

8   TIRF REMS products.  And the purpose of a speaker program is to

9   educate other doctors on the products and the drug.

10  Q   Mr. Corin, would you step down for a moment and on the

11  chart mark where your first visit was?

12  A   (Complying.)  Right here, November of 2013.  (Indicating.)

13  Q   Mr. Corin, at the time of this first visit, were you aware

14  if Dr. Ruan or Dr. Couch had purchased any stock in Galena

15  Biopharma?

16  A   Not yet.

17  Q   You say "not yet."  Was there a time that you later learned

18  that?

19  A   Shortly thereafter.

20  Q   And shortly thereafter, where are we talking about on the

21  graph that you learned that?

22  A   In the November-December time range, 2013.

23  Q   On the graph is there anything -- can you please explain to

24  the jury what happened to the price of the Galena stock as it

25  goes on that timeline right there?

 1   A    The stock went up dramatically from the period of around

 2   October-November 2013 up until January of 2014.  It more than

 3   tripled in price.

 4   Q    Can you show that range?  Where was it that the stock

 5   approximately tripled in price for Galena?

 6   A    (Indicating.)  It would have been this range right here, so

 7   October through January.

 8   Q    Was there something that occurred -- what was the peak time

 9   for the stock for Galena?

10   A    January of 2014 it was trading at $7 -- $7.77 a share.

11   Q    And Mr. Corin, did something occur within Galena Biopharma

12   in January of 2014 that caused the stock to drop?

13   A    Yes.

14   Q    What occurred?

15   A    Our senior executive team, our board of directors, which is

16   the leadership panel of the company, we had what's called a

17   blackout number -- a blackout period where nobody could trade

18   stock based off of information.  The blackout period was opened

19   for a half-hour period and the board of directors sold millions

20   of dollars worth of stock.

21   Q    And to be clear, Dr. Ruan or Dr. Couch didn't sell any

22   stock during this time period related to this blackout, to your

23   knowledge?

24   A    Not that I'm aware of.

25   Q    This was something that happened with insiders working for

1    Galena?

2    A    Yes.

3    Q    What, if anything, did that sell-off do to the stock price

4    for Galena?

5    A    It dropped dramatically.  It went back to its original

6    price, kind of pre- that jump in the $2 range.

7    Q    And at what point is it trading at that $2 range?  At what

8    point in time?

9    A    Before or after?

10   Q    After.

11   A    After it was back down to the $2 range by March.

12   Q    By March?

13   A    Yes.

14   Q    And can you mark where that is on the graph?

15   A    Sure.  (Complying.)  A level stock drop.

16   Q    And did the stock continue to drop in April and May?

17   A    It continued, and it stayed pretty flat but got very low.

18   Q    And by "very low," what are we talking about?

19   A    In the low $2 range for sure.

20   Q    And you said it was almost $8 prior to that?

21   A    Yes.

22   Q    So is that one quarter of its value of what it was in

23   January?

24   A    Yes.

25   Q    Can you please also -- turning from this stock to -- did --

1   did Galena Biopharma have a program called the voucher program?

2   A   We did.

3   Q   First, can you explain what the voucher program was?  And

4   then we'll mark on the graph when it occurred.

5   A   Sure.  The voucher program was a program where a patient

6   could get up to three prescriptions of Abstral at 32 tablets

7   apiece, so up to 96 tablets of Abstral free of charge while

8   that patient worked to get to the right dosage to treat their

9   cancer pain.

10  Q   And we're going to discuss more about the program.  But was

11  there a start/end date to the program?

12  A   Yes.  We launched the program in August of 2013.

13  Q   Could you please mark on it when you launched the voucher

14  program?  And then we'll discuss some more.

15  A   (Complying.)

16  Q   And while you're up here, was there a point in time where

17  there was a material change made to the voucher program?

18  A   Yes.  We changed it in March of 2014.

19  Q   And can you mark on the graph when it was that the voucher

20  program changed?

21  A   (Complying.)

22  Q   Mr. Corin, I'm going to ask you to go back up on the stand

23  so you can be at the microphone, as we explain the voucher

24  program.

25  A   (Complying.)

1648

1    Q   Mr. Corin, what was the purpose of -- what was the stated

2    purpose of the voucher program for Galena Biopharma?

3    A   To try to get these patients to the proper dosage of

4    product.

5    Q   Is that's what's called titration?

6    A   Yes.

7    Q   Can you explain, as an example, how was this -- how was the

8    voucher program supposed to work?

9    A   A patient would start on our starting dose, which is 100

10   micrograms.  Over an eight-day period that patient would

11   determine -- and they could actually up their dosage -- but

12   they've determined if that 100 micrograms was helping them

13   achieve relief during their breakthrough cancer pain episodes.

14   Q   So to break it down; if I'm a patient and I come in for the

15   voucher, what do I get the first time I come in with a voucher?

16   A   You get 32 tablets of the prescribed dose on the voucher.

17   Q   And is that supposed to be for taking it four times a day,

18   so for eight days?

19   A   Yes.

20   Q   And because there's a voucher, if -- do I or my insurance

21   company have to pay for that eight-day prescription of Abstral?

22   A   No.

23   Q   After eight days, if I come back, what is supposed to be

24   done if it's work -- if the voucher program is being done

25   correctly?

1    A   That patient, through the kind of way or direction to get

2    up to the dose, would say to the doctor:  I'm comfortable with

3    my breakthrough pain.  I'm ready to go on a full prescription.

4    Or they would say:  I need a stronger dose, to which that

5    doctor, if they needed a stronger dose, could then write

6    another voucher.

7    Q   So as an example, if I were started on 100 micrograms and

8    after eight days came in and said 100 micrograms was working,

9    is another voucher given or is a full-month prescription for

10   100 written?

11   A   A full-month prescription should be given at that point.

12   Q   What if after eight -- let's say the 100 micrograms was not

13   relieving my breakthrough cancer pain --

14   A   Then another prescription could be given.

15   Q   And by "prescription," another voucher prescription?

16   A   Yes.

17   Q   So does that mean I get eight more days of a higher dosage?

18   A   Yes.

19   Q   And this second time, do either I or my insurance company

20   pay for this second eight-day dosage?

21   A   No.

22   Q   What happens if after that second eight-day period I come

23   back in and the higher level -- let's say, 200 micrograms was

24   still not relieving my pain, what is available through the

25   voucher program?

1650

```
 1   A    There's a third voucher available.  And again, based off
 2   the dosage that patient needed that doctor could prescribe up
 3   to 800 micrograms for that patient.
 4   Q    So again, it could be up to -- try to get me to the right
 5   level?
 6   A    Yes.
 7   Q    How would a doctor know, that's prescribing Abstral, how
 8   the voucher program was supposed to be run?
 9   A    Two ways; either through our sales representative or
10   through also reading the voucher card which described the rules
11   of the program.
12   Q    And you said "sales representative."  Did Galena Biopharma
13   have a sales rep for Dr. Ruan and Dr. Couch?
14   A    We did.
15   Q    And you mentioned printed on the voucher were -- were there
16   instructions printed on the voucher, how the process was
17   supposed to work?
18   A    Yes.
19   Q    Did Dr. Ruan and Dr. Couch abide by the way the voucher
20   program was supposed to work?
21   A    They -- they used the program differently.
22   Q    How did they -- how did Dr. Ruan and Dr. Couch use the
23   voucher program?
24   A    All three prescriptions would be written at once.
25   Q    Why is that different than what you described as the way it
```

1  was supposed to work?

2  A   Because the titration model didn't fall into place, so the

3  dose was pre-selected for all three prescriptions.

4  Q   So rather than getting three prescriptions for the patient

5  for free over three weeks, they received them all at once?

6  A   Correct.

7  Q   Were you aware of how other doctors around the country,

8  from your position at Galena, were running the voucher program?

9  A   Yes.  They were doing one at a time.

10  Q   So was Dr. Ruan and Dr. Couch's conduct the same as other

11  doctors around the country, or different?

12  A   It was different.

13  Q   How did Dr. Ruan and Dr. Couch's use of the voucher program

14  affect Galena?

15  A   It affected us negatively because Galena paid for all the

16  product in the voucher program.

17  Q   Was there a change -- you mentioned that a change was made

18  to the voucher program?

19  A   Yes.

20  Q   When was that change made?

21  A   In March of 2014.

22  Q   Why was that change made?

23  A   Because we were losing money on the voucher program.

24  Q   Specifically -- was the fact that you were losing money in

25  any way tied to Dr. Ruan and Dr. Couch?

1   A   Yes.

2   Q   Can you please explain to the jury how Dr. Ruan and

3   Dr. Couch ranked as compared to other prescribers of Abstral

4   nationwide?

5   A   They were our top two prescribers in the country and

6   accounted for about 30 percent of our total prescriptions.

7   Q   I'm going to show you what's previously been marked as

8   Government's Exhibit 38-7 and ask if you can identify this

9   document.

10   A   Yes.

11   Q   Could you please explain to the Court what is this

12   document?

13   A   It's an internal document that we would send out on a

14   quarterly basis with all of our prescribers in the country, how

15   many prescriptions they had written each quarter.

16   Q   And which quarter is this particular document for?

17   A   From Q3 of 2013 through Q4 of 2014.

18   Q   And was this something that was created for this trial?

19   A   No.  This was to give us a full understanding of our

20   complete customer base.

21   Q   So this was something that was normally kept by Galena

22   Biopharma?

23   A   Yes.

24       MR. BODNAR:  United States moves to admit Government's

25   Exhibit 38-7.

```
1            MR. SEWELL:  No objection.

2            THE COURT:  All right.  Mark it in.

3         (Government's Exhibit 38-7 was entered into evidence.)

4  BY MR. BODNAR:

5  Q   I'll now show you what's admitted as Government's Exhibit

6  38-7.  First from a larger view, explain to the jury what it is

7  we see.  And then we're going to zoom in.

8            What is it that we're looking at here?

9  A   We're looking at total number of prescriptions written each

10 quarter by prescriber, ranked from highest prescriber to lowest

11 prescriber.

12 Q   And are the blacked out names here, are those other

13 doctors?

14 A   Yes.

15 Q   And does this go on for numerous pages?

16 A   Yes.  It was our total prescribers since we launched the

17 product.

18 Q   So every single individual that's ever prescribed Abstral

19 is listed somewhere on this list?

20 A   That's correct.

21 Q   All the way from the top person to someone -- people who

22 only prescribed one?

23 A   Yes.

24 Q   One prescription?  I'm going to focus in on the top.  Who

25 is the number one prescriber at this point through the 4th
```

1654

```
 1    quarter of 2014 for Abstral?

 2    A    Dr. Ruan.

 3    Q    And how many total prescriptions from the third quarter of

 4    '13 through the fourth quarter of '14 had Dr. Ruan written?

 5    A    1,302.

 6    Q    Who is the second highest prescriber for Abstral?

 7    A    Dr. Couch.

 8    Q    And during that same time period how many prescriptions had

 9    Dr. Couch written?

10    A    649.

11    Q    Who is the third highest prescriber?

12    A    Dr. R...

13    Q    And how many had Dr. R.. written?

14    A    611.

15    Q    And how about the fourth person?  Fourth name is blacked

16    out.  But after Dr. R.., what is the next highest?

17    A    153.

18    Q    And is it -- does it appear there's only one, two, three,

19    four, five other doctors that had even written more than 100

20    prescriptions?

21    A    Correct.

22    Q    Prior to taking the stand today, were you asked to add up

23    the numbers all the way from 1302 through the doctors that

24    wrote three, down to two, down to one, and add up the total

25    number of Abstral prescriptions?
```

1   A   Yes.

2   Q   Was that to determine what percentage of all Abstral

3   prescriptions were written by Dr. Ruan and Dr. Couch?

4   A   Yes.

5   Q   Approximately what percentage of all prescriptions written

6   for Abstral were written by Dr. Ruan and Dr. Couch?

7   A   About 30 percent.

8   Q   And is the only other person in the ballpark with those

9   individuals, Dr. R..?

10  A   Correct.

11  Q   Do you know who Dr. R.. is?

12  A   Yes.

13  Q   Who is Dr. R..?

14  A   He is a pain management doctor out in RC.............,

15  California.

16  Q   Mr. Corin, I'm going to show you what's already been

17  admitted as Government's Exhibit 11-5(14).  I'm going to ask if

18  what I'm reading is accurate with what you see.  Does this

19  appear to be an email from Dr. Ruan?

20  A   Yes.

21  Q   To a R. Bernarda at Galena Biopharma?

22  A   Yes.

23  Q   And who is R. Bernarda, if you know?

24  A   Remy Bernarda was our head of investor relations.

25  Q   And does it appear that -- well, subject line:  Dr. R..

1  will try to attend this Thursday afternoon conference?

2  A   Yes.

3  Q   I'm going to read this section to you and you tell me if

4  I'm reading this accurately.

5          Dr. R........ is a good friend of mine, who is an

6  interventional pain specialist in California and also a strong

7  believer in Abstral and an expert in TIRF; is interested in

8  joining the conference on Thursday with you and your board of

9  directors.  I believe he should be no stranger to you or your

10  Abstral sales team, even if you may not know him.

11          As a matter of fact, he has shared with me many

12  positive feedback from using Abstral since last fall.  Just

13  like Dr. Couch and I, Dr. R.. believes in Galena's product and

14  pipeline, and therefore, is a shareholder as well.

15          Is that what you see?

16  A   Yes.

17  Q   Is shareholder another word for stockholder?

18  A   Yes.

19  Q   Mr. Corin, showing back again to Government's Exhibit 38-7,

20  you said you had previously reviewed this document before

21  testifying today?

22  A   Yes.

23  Q   Would you please explain to the jury what, if anything, is

24  unusual with Dr. Ruan and Dr. Couch's prescriptions going from

25  the first quarter to the second quarter of 2014?

DAVID CORIN - DIRECT BY MR. BODNAR

```
1    A    There's a significant drop.

2    Q    And is that from 467 prescriptions to 262 for Dr. Couch?

3    A    For Dr. Ruan.

4    Q    Sorry.  Dr. Ruan?

5    A    Yes.

6    Q    And for Dr. Couch, 223 to 167?

7    A    Yes.

8    Q    And does Dr. R.. have a similar dropoff?

9    A    Somewhat; not as dramatic but somewhat.

10   Q    What, if anything, did Galena attribute that dropoff in

11   prescriptions to?

12            MR. KNIZLEY:  Objection to hearsay.  And no foundation

13   as to what they appeared to, how he would know.

14            THE COURT:  Overruled.

15   BY MR. BODNAR:

16   Q    What, if anything, did Galena Biopharma attribute the

17   dropoff in Dr. Ruan and Dr. Couch to during that time period,

18   from quarter one to quarter two?

19   A    The change in rules that we put into the voucher program.

20   Q    And by and large, as you reviewed this document previously,

21   did you see similar massive dropoffs for a lot of other doctors

22   from first to second quarter?

23   A    No.

24   Q    Mr. Corin, I'm going to approach with what has been marked

25   as Government's Exhibit 37-3.
```

DAVID CORIN - DIRECT BY MR. BODNAR

```
 1              THE CLERK:  38-3?

 2              MR. BODNAR:  38-3, 38-4, 38-5, 38-6.

 3   Q   Mr. Corin, are you able to identify what these documents

 4   are?

 5   A   Yes.  They are my hotel receipts from my visits to Mobile.

 6   Q   And was this during the time period that you worked for

 7   Galena Biopharma?

 8   A   Yes.

 9   Q   And just -- can you read off the dates?

10   A   February 25th, 2014, September 24, 2014, January 20th,

11   2015, April 21st, 2015.

12              MR. BODNAR:  Your Honor, the United States moves to

13   admit Government's Exhibit 38-3 through 38-6.

14              THE COURT:  Any objection?

15              MR. SEWELL:  No objection.

16              THE COURT:  All right.  Mark them in.

17       (Government's Exhibits 38-3 through 38-6 were entered into

18   evidence.)

19   BY MR. BODNAR:

20   Q   Mr. Corin, I'm showing you now what has been admitted as

21   Government's Exhibit 38-3.  Is this another hotel receipt?

22   A   Yes.

23   Q   And for which hotel?

24   A   The Renaissance Battle House.

25   Q   And what is the date on this receipt?
```

1659

1    A    February 25th, 2014.

2    Q    And do you recall this trip down to Mobile?

3    A    Yes.

4    Q    Why did you make this trip down to Mobile?

5    A    Because Dr. Ruan and Dr. Couch were very upset with the

6    company.

7    Q    Why were Dr. Ruan and Dr. Couch very upset with the company

8    during this time period?

9    A    Because our stock -- this was about a month post the sale

10   of all the stock by our board of directors.

11   Q    How do you know that Dr. Ruan and Dr. Couch were upset with

12   the stock price?

13   A    They sent several emails to my boss, whose name was Chris

14   Lento, and others in the organization.  And I was -- I had been

15   forwarded those messages.

16   Q    Did you travel down here to Mobile with anybody else on

17   this visit?

18   A    Yes, with Chris Lento.

19   Q    Was he your boss at Galena Biopharma?

20   A    Yes.

21   Q    Could you please step down and mark where this visit is on

22   the guideline?

23   A    Sure.  (Complying.)

24   Q    You can step back.

25   A    (Complying.)

1  Q   Mr. Corin, what if any meetings did you and Mr. Lento have

2  with Dr. Ruan or Dr. Couch on this visit?  Well, first did you

3  have a meeting with Dr. Ruan or Dr. Couch on this visit?

4  A   Yes.  We saw them in the office, in their practice, and

5  then we were going to meet with Dr. Ruan at a Starbucks.  Jeff

6  Palmer, the sales representative, Chris Lento and myself were

7  supposed to meet with Dr. Ruan.  When Dr. Ruan arrived, he

8  asked Jeff Palmer and I to meet him at dinner because he wanted

9  to talk to Chris Lento about the stock.

10 Q   How do you know he wanted to talk to him about the stock?

11 A   Because that had been prearranged between Jeff and Chris

12 and Dr. Ruan.

13 Q   During any time that you were down here or in communication

14 with Dr. Ruan, did he talk about a drug called NeuVax?

15 A   No.

16 Q   What was NeuVax?

17 A   NeuVax was a breast cancer vaccine that was in our

18 pipeline.

19 Q   In conversations related to the stock, what product did

20 Dr. Ruan discuss with you?

21 A   Abstral.

22 Q   Mr. Corin, at some point did you become the national sales

23 director for Galena?

24 A   I did.

25 Q   What time period was that?

 1    A    In September of 2014.

 2    Q    So this was in -- you were still, at this time, the

 3    regional director; in February '14 we're looking at?

 4    A    That's correct.

 5    Q    Were you involved with meetings concerning Dr. Ruan and

 6    Dr. Couch and the purchase of stock within Galena Biopharma?

 7    A    No.

 8    Q    Were you aware of communications between the doctors and

 9    your company regarding their issues with the stock?

10    A    Yes.

11    Q    What, if anything, was demanded upon Galena?

12    A    That we fire -- that Galena fire the board of directors,

13    fire the CEO, and a change in leadership.

14    Q    To your knowledge, were these demands taken seriously by

15    Galena?

16    A    Yes.

17    Q    Why are the demands of a doctor in Mobile, Alabama taken

18    seriously by the pharmaceutical company, if you know?

19         MR. KNIZLEY:  I'm sorry.  Go ahead.  I'm sorry.

20         MR. BODNAR:  That's all right.

21    A    Because of the --

22         MR. KNIZLEY:  Your Honor, I object.  He's asking him

23    for his undisclosed mental operation and his opinion without

24    the basis for that opinion or the relevance of that opinion --

25    to his particular opinion to these matters in this case.

DAVID CORIN - DIRECT BY MR. BODNAR

```
 1          THE COURT:  He didn't ask for his opinion.
 2          MR. KNIZLEY:  He asked why, and I assume his --
 3          THE COURT:  Well, the company as far as he knows is
 4   the question.
 5          MR. KNIZLEY:  Object as to hearsay and to foundation
 6   as to his knowledge as to why a company may think to the extent
 7   a company does think --
 8          THE COURT:  All right.  Can you establish a basis?
 9          MR. BODNAR:  Sure.
10   Q   Were Dr. Ruan and Dr. Couch important clients or important
11   individuals for Galena Biopharma?
12   A   Yes.
13   Q   Why were they important?
14          MR. KNIZLEY:  Same objection, Your Honor.
15          THE COURT:  Overruled.
16   BY MR. BODNAR:
17   Q   Why were Dr. Ruan and Dr. Couch important to Galena
18   Biopharma?
19   A   Because they were our highest Abstral prescribers.
20   Q   And was it highest by a large margin?
21   A   Yes.
22   Q   Therefore, would their opinion be taken seriously by the
23   company?
24          MR. KNIZLEY:  Your Honor, I object as to his
25   foundation for giving the opinion as to how the company would
```

1663

```
 1   take something seriously.
 2            THE COURT:  Well, I think he's already got the answer
 3   so I sustain the objection.
 4   BY MR. BODNAR:
 5   Q   Was anybody at Galena Biopharma ultimately fired?
 6   A   Yes.
 7   Q   Who was fired?
 8   A   The CEO, Mark Ahn.
 9   Q   And is the CEO, is that the top person in the company?
10   A   The top person in the company, yes.
11   Q   Who -- who became the CEO after Mark Ann was fired?
12   A   Mark Schwartz.
13   Q   And did Mark Schwartz, to your knowledge, ever come down to
14   Mobile, Alabama?
15   A   He did.
16   Q   Why did Mark Schwartz come down to Mobile, Alabama?
17   A   It was demanded by Dr. Ruan that he meet with him.
18   Q   And at this point Mark Schwartz is the CEO?
19   A   Yes.
20   Q   Do you recall approximately when that visit was?
21   A   One in, I believe, November of 2014 and then the latter one
22   was in February of 2015.
23   Q   Did you visit with -- were you there on the first trip when
24   Mr. Schwartz --
25   A   No.
```

1664

1   Q   -- came down?

2   A   No.

3   Q   I'm going to show you what's been admitted as Government's

4   Exhibit 38-4.  Is this a hotel receipt for you from September

5   24th of '14?

6   A   Yes.

7   Q   Do you recall making this trip?

8   A   Yes.

9   Q   What was the purpose of this trip?

10  A   Again, Dr. Ruan was very upset with the company and wanted

11  to understand -- although he was upset, wanted to find ways to

12  work with the company too.

13  Q   And could you come down and mark on the chart when this

14  trip occurred?

15  A   (Complying.)

16  Q   And Mr. Corin, if you would take the stand again so we can

17  have the microphone.

18  A   (Complying.)

19  Q   Mr. Corin, during this trip you said -- well, you

20  mentioned, I believe a moment ago, that Dr. Ruan wanted to find

21  a way to work something out; is that what you were saying?

22  A   Yes.

23  Q   What, if anything, did Dr. Ruan suggest be done during this

24  meeting?

25  A   He suggested that the company work with the pharmacy to

 1    find a better way to procure Abstral.

 2    Q    And when you say "work with the pharmacy," which pharmacy

 3    are you talking about?

 4    A    C&R.

 5    Q    And procure Abstral, what do you mean work with C&R for a

 6    better way to procure Abstral?

 7    A    The concern was that the pharmacy was currently losing

 8    money prescribing the product for the maintenance scripts.

 9    Q    And are the maintenance scripts, are those the full-month

10    scripts, not voucher scripts?

11    A    Yes.  Yes.

12    Q    What, if anything, did Dr. Ruan suggest be done?

13    A    He suggested that the company talk to the pharmacy and

14    the -- and to find a way to partner up.

15    Q    And by "partner up" what do you mean?

16    A    Find a way to make sure the pharmacy wasn't losing money.

17    Q    Was there any discussion about purchasing Abstral directly

18    from Galena?

19    A    Yes.

20    Q    Can you explain to the jury, to the extent you know, how is

21    it that a pharmacy normally purchases a drug such as Abstral?

22    A    Sure.  For drugs such as Abstral, they cannot ship directly

23    to a pharmacy.  The drugs are shipped to a wholesaler, which in

24    our world is called a 3PL, third-party logistics.  Then the

25    wholesaler will then -- they will only allow pharmacies certain

1   amounts of product because of the potency of these kinds of

2   products.

3   Q   So Galena has Abstral and sells it to a wholesaler?

4   A   That's correct.

5   Q   And then it's from this third-party wholesaler that C&R or

6   any other pharmacy can buy Abstral from?

7   A   Yes, if they have an agreement with that particular

8   wholesaler.

9   Q   Did Dr. Ruan -- was -- explain then what Dr. Ruan wanted to

10  do so instead of going through the process with the wholesaler?

11  A   The pharmacy asked us if we could ship direct because our

12  competition was.

13  Q   And you said "because the competition was."  Who was your

14  competition that they were referring to?

15  A   The company was Insys for the product Subsys.

16  Q   So what did -- what was explained then about what Insys was

17  doing?

18  A   Insys was shipping it directly to C&R for the purposes of

19  saving that fee that any pharmacy would pay through the

20  wholesaler.

21  Q   And to be clear, Insys was shipping Subsys, not Abstral?

22  A   Yes.

23  Q   Did Galena Biopharma decide that they were going to then

24  directly ship to C&R Pharmacy?

25  A   The decision was made not to ship directly due to going

1667

1    through legal, and our legal team advised against it.

2    Q    So it did not actually happen?

3    A    It never happened.

4    Q    Do you know if there was anything else that was done on

5    behalf of your company for C&R Pharmacy in order to add

6    additional profit to C&R's prescriber or dispensing of Abstral?

7    A    Sure.  The company and C&R Pharmacy partnered on a

8    marketing services agreement.

9    Q    And I'm going to show you what has previously been marked

10   as Government's Exhibit 38-8.

11          Mr. Corin, I'm going to ask if you are able to

12   identify what this document is.

13   A    Yes.  That's the marketing services agreement, also known

14   as the rebate agreement.

15   Q    And could you flip to the last page and see if this copy is

16   signed?

17   A    It is.

18   Q    And who is it signed by?

19   A    Signed by Mark Schwartz who is Galena's CEO and Caye

20   Renegar who is responsible for the pharmacy.

21   Q    Which pharmacy?

22   A    C&R.

23          MR. BODNAR:  United States moves to admit Government's

24   Exhibit 38-8.

25          MR. SEWELL:  No objection, Your Honor.

1668

1         THE COURT:  All right.  Mark it in.

2         (Government's Exhibit 38-8 was entered into evidence.)

3    BY MR. BODNAR:

4    Q   Mr. Corin, I'm now showing you what's been admitted as

5    Government's Exhibit 38-8.

6    A   Correct.

7    Q   Is this what you were talking about as a rebate agreement?

8    A   Yes.

9    Q   And who is the rebate agreement between?

10   A   Galena Biopharma and C&R Pharmacy.

11   Q   Do you know who owned C&R Pharmacy?

12   A   Dr. Ruan and Dr. Couch.

13   Q   And looking down at the rebate, could you please explain to

14   the jury what it is that we see here?  And in fact, why don't

15   we just read this part?  And then you can explain the chart.

16   A   Sure.  C&R will provide proof of purchases of the products

17   to Galena by the fifth day of each month, which proof of

18   purchase will identify the products purchased during the

19   immediately preceding month, as well as their quantity and

20   price.  Galena will pay C&R by the 30th day after the end of

21   each calendar quarter a rebate based on the following

22   structure.

23   Q   So please explain then, how did this work?  (Indicating.)

24   A   This was --

25   Q   How was it set up to work?

1   A   Sure.  This was for the non-voucher patients, for the

2   patients that are on maintenance prescriptions.

3   Q   So is that prescription for the full month, not for the

4   people that received the eight-day prescription?

5   A   That's correct.

6   Q   Okay.  So explain how does this work, then?

7   A   So normally the fee is different to fill a voucher

8   prescription and a non-voucher prescription.  The fee is much

9   higher for a voucher prescription because you're initiating a

10   patient and there's more work to be done.

11   Q   And by "fee," what do you mean by "fee"?

12   A   A service --

13   Q   What is a fee?

14   A   A service fee.  So we pay the pharmacy 8.75 percent for a

15   voucher to initiate the patient.

16   Q   So now, Abstral was not a $100 product; correct?

17   A   Correct.

18   Q   But just to use $100 as an example, if it is $100, how

19   does -- if a $100 is paid to C&R Pharmacy for a voucher, how

20   would the 8.75 percent factor into all this?

21   A   That's paid for each prescription based off the cost of the

22   prescription as a service fee.  That would be made to any

23   pharmacy that implemented the voucher program.

24   Q   So as an example, if my voucher cost my insurance $100, my

25   insurance reimburses C&R $100?

1670

1    A    No, $108.75.

2    Q    Does the insurance company use the extra $8.75 or is that

3    paid for by Galena?

4    A    That's paid for by Galena.

5    Q    So $100 cost of the product, whatever it's billed out at

6    would come from my insurance and then Galena would pay for the

7    remainder?

8    A    Let me clarify.  For a voucher or for a maintenance script?

9    Q    Okay.  Explain the difference, I guess.

10   A    Right.

11   Q    Why would that have been different?

12   A    So on a voucher, insurance doesn't come into play.

13   Q    So all of the money is paid for -- for the voucher by

14   Galena?

15   A    Yes.

16   Q    If it was a maintenance script, then I'm just going to say

17   it cost $100.  Once my insurance pays the $100, without this

18   rebate agreement, would Galena pay anything to C&R for my

19   maintenance prescription?

20   A    We would pay a service fee but not at the rate of 8.75

21   percent.  It would -- we would actually pay a service fee to

22   the wholesaler who would then -- they negotiated different

23   service fees with the different pharmacies.

24   Q    And how did that change once this rebate agreement was in

25   effect?

1   A    Well, the pharmacy made it clear that they were losing

2   money on Galena maintenance prescriptions.

3   Q    So does this mean then for prescriptions -- if for my $100

4   prescription on a maintenance prescription, now an additional

5   $8.75 would be paid by Galena?

6   A    No.  You're not getting $8.75.

7   Q    What am I getting?

8   A    I'm sorry.  On the rebate?

9   Q    Yes, sir.

10  A    In this agreement?  Yes.  Sorry.  In the rebate agreement,

11  that's what was put in place so it's equal that of the voucher.

12  Q    So Galena wasn't paying that money to C&R prior to the

13  rebate?

14  A    Correct.

15  Q    And then after, for everything up to $225,000 they paid

16  8.75 percent?

17  A    Yes.

18           THE COURT:  All right.  Mr. Bodnar --

19  Q    And I know we used the $100 as an example, but can you give

20  the jury an idea how expensive Abstral actually is?

21  A    The average prescription could be several thousand dollars.

22  For the higher doses you can get into the $10,000 range.

23           THE COURT:  All right.  Mr. Bodnar, is now a good time

24  for us to take our morning break?

25           MR. BODNAR:  Yes, Your Honor.

1672

1    THE COURT:  All right.  Ladies and gentlemen, leave

2  your pads on the chairs.  No discussion about the case.  Take

3  your break downstairs and we will call you back up in about 15

4  minutes.

5    We're in recess.

6    (A recess was taken at approximately 10:36 a.m.)

7    (In open court, 10:57 a.m., defendants and jury present.)

8    THE COURT:  All right, counsel.

9    MR. BODNAR:  United States is ready, Your Honor.

10 Q   Mr. Corin, before we had our break, I believe we were

11 talking about the price of Abstral; is that correct?

12 A   Yes.

13 Q   And approximately how much does a month of a maintenance

14 dose of Abstral cost?

15 A   The average dose would be about $3,000 a month maintenance.

16 Q   You had previously talked about a change to the voucher

17 program, and we had marked it on the chart.  Do you remember

18 that?

19 A   Yes.

20 Q   When the voucher program changed, did it affect the way

21 that pharmacies were reimbursed for Abstral?

22 A   For the voucher fee?

23 Q   Yes.

24 A   Well, it would only affect it in that they couldn't write

25 three vouchers at once.

1   Q   And is that what Dr. Ruan and Dr. Couch had been doing at

2   that time?

3   A   Yes, for the most part.

4   Q   Then I had showed you what had been admitted as

5   Government's Exhibit 38-8.  Is this the rebate agreement we

6   were discussing?

7   A   Yes.

8   Q   And this was the agreement between Galena and whom?

9   A   C&R Pharmacy.

10  Q   And on behalf of C&R Pharmacy do you recognize who that

11  signature is here?

12  A   Caye Renegar.

13  Q   And who is the signature for Galena Biopharma, if you

14  recognize that?

15  A   Mark Schwartz.

16  Q   And who is Mark Schwartz?

17  A   The CEO of Galena.

18  Q   Is that the individual that you told us became the CEO

19  after Mark Ahn was fired?

20  A   Yes.

21  Q   And throughout this agreement does it explain how the

22  rebate program would work between Galena Biopharma and C&R

23  Pharmacy?

24  A   Yes.

25  Q   And is it -- is it overly -- is it fair to say in simple

1674

1    terms that under this agreement that C&R Pharmacy earned more

2    money for filling Abstral prescriptions?

3           MR. SEWELL:  Objection.  Leading.

4           THE COURT:  Overruled.

5    BY MR. BODNAR:

6    Q    Is it fair to say in simple terms that when this agreement

7    went into place, C&R Pharmacy would earn more money from

8    filling Abstral prescriptions?

9    A    Yes.

10   Q    Could you please step down and on the board mark where this

11   agreement went into place?

12   A    (Complying.)  It went into place right here and around

13   October 1st, 2014.

14   Q    After that time period, after it went into place, do you

15   know from working at Galena whether or not prescriptions for

16   Abstral from Dr. Ruan and Dr. Couch increased?

17   A    They did increase.

18   Q    If you would please step back up to the podium.

19   A    (Complying.)

20   Q    Mr. Corin, do you see here at the bottom as -- it looks

21   like Subsection 12 of this agreement.  Do you see what that

22   says there?  (Indicating.)

23   A    Discounts and price reporting.

24   Q    And on the following page is there information about price

25   reporting and discounts?

1675

```
 1  A   Yes.
 2  Q   Does that follow right -- this is one page and then this is
 3  the next page over.  Is this what's under 12?
 4  A   Yes.
 5  Q   I'll blow it up so you can see the first paragraph.  I'd
 6  like you to read this for the jury, please.  Just do the first
 7  paragraph first.
 8  A   The parties agree that all discounts, rebates, or other
 9  reductions in price pursuant to this agreement are "discounts
10  and other reductions in price" under Section 1128B(b)(3)(A) of
11  the Social Security Act, 42 USC Section 1320a-7b(b)(3)(A).
12          Galena and C&R agree to comply with the discount
13  statutory exception, 42 USC Section 1320a-7b(b)(3)(A) and the
14  applicable Discount Safe Harbor regulations, 42 CFR Section
15  1001.952(h), which relates to Galena's obligation to report and
16  disclose any discounts, rebates, and other reductions to C&R
17  for the products purchased under the agreement.
18          C&R shall report all discounts to reimbursing
19  agencies, including, without limitation, Medicare and Medicaid
20  and other entities, maintain records thereof, and provide
21  information to reimbursing agencies and other governmental
22  agencies upon request, in accordance with all the applicable
23  laws and regulations, including without limitation 42 CFR
24  Section 1001.952(h) and 42 USC Section 1320a-7b(b)(3)(A).
25  Q   And could you read the paragraph that immediately follows
```

1676

```
 1   that, please?
 2   A   Where a price concession is required to be reported to the
 3   Centers for Medicare and Medicaid Services or any
 4   state-operated healthcare program under the Discount Safe
 5   Harbor to the Federal Anti-Kickback Statute, C&R shall fully
 6   and accurately report such price concession.
 7            To the extent that the price concession may be
 8   determined at the time of the sale, Galena hereby informs C&R
 9   that the value of the price concessions attributable to the
10   sale are as reflected in this agreement.
11            To the extent that the value of the price concession
12   is not known at the time of sale, C&R acknowledges that the
13   sales made under this agreement reflects a price concession
14   that is not known at the time of sale.
15            When the value of the discount becomes known, Galena
16   shall provide C&R with documentation of the calculation of the
17   price concession identifying the specific goods or services
18   purchased to which the price concession will be applied.
19   Q   And, Mr. Corin, are you an attorney?
20   A   No.
21   Q   Do you understand what this means?
22   A   No.
23   Q   Other than just you read it and what it says?
24   A   Yes.
25   Q   And I believe you mentioned you thought it began in October
```

1677

1    of 2014?

2    A    Yes.

3    Q    And in fact, at the top does it say the effective date for

4    this rebate agreement?

5    A    Yes, October 1st, 2014.

6    Q    Is that what we see right here (indicating)?

7    A    Yes, sir.

8    Q    Following the execution of this agreement do you know if

9    anyone from upper management of Galena traveled down to Mobile

10   to meet with Dr. Ruan and Dr. Couch?

11   A    Yes.

12   Q    Who was that?

13   A    Mark Schwartz, the chief executive officer.

14   Q    Do you know why Mark Schwartz came to Mobile?

15   A    Because Dr. Ruan and Dr. Couch wanted to meet with him.

16   Q    And do you know when that meeting occurred?

17   A    One in November of 2014 and one in February of 2015.

18   Q    And could you please approach and mark those meetings with

19   Schwartz on the timeline?

20   A    Sure.  (Complying.)  So November and then February.

21   Q    And while you're standing up there and looking at that,

22   after the first meeting with Mark Schwartz in November, did

23   anything occur with the stock price of Galena Biopharma stock?

24   A    It went up a little bit.

25   Q    At the point thereafter, did it go down again?

1678

```
 1   A   Yes.

 2   Q   And can you -- when, approximately, did the stock drop

 3   again for Galena?

 4   A   In early 2015.

 5   Q   Can you mark on the graph where it was that the stock price

 6   dropped again?

 7   A   (Complying.)

 8   Q   Do you know if Mark Schwartz's second visit was before or

 9   after that stock price drop?

10   A   After.

11   Q   After Mark Schwartz's second visit do you know if

12   prescriptions for Abstral increased from Dr. Ruan and

13   Dr. Couch?

14   A   They did.

15   Q   Thank you.  You can step back up, Mr. Corin.

16   A   (Complying.)

17   Q   I'm going to show you what has been admitted as

18   Government's Exhibit 38-5.  Is this another receipt for you at

19   the Battle House?

20   A   Yes.

21   Q   What was the date of this trip?

22   A   January 20th, 2015.

23   Q   And do you recall this trip?

24   A   Yes.

25   Q   Why did you come down to Mobile again on January 20th of
```

DAVID COBB, DIRECT BY MR. BODNAR

1    2015?

2    A    To introduce Dr. Ruan and Dr. Couch to Steve Brennan.

3    Q    Who is Steve Brennan?

4    A    He was responsible for our GPS program, which was our prior

5    authorization program.

6    Q    And can you explain a little bit about what the GPS prior

7    authorization program was at Galena?

8    A    Sure.  Most patients who go on these products need a prior

9    authorization from their insurance company that allows the

10   patient to go on product.  Steve -- we had a third-party

11   company that was not part of us, that did the prior

12   authorizations and Steve was responsible for managing that

13   program.

14   Q    Were you involved at all in the prior authorization process

15   for Abstral?

16   A    No.

17   Q    I'm going to show you now what has been admitted as

18   Government's Exhibit 38-6.  Is this another receipt for you at

19   the Battle House here in Mobile?

20   A    Yes.

21   Q    And what's the date of this trip?

22   A    April 21st, 2015.

23   Q    And do you recall making this trip?

24   A    Yes.

25   Q    Why did you travel down to Mobile at that point?

1680

```
 1   A   Post Mark Schwartz's February visit.  He wanted us to have
 2   a more regular cadence in our visits.
 3   Q   A more regular what?
 4   A   Cadence.  He wanted us to be more consistent in how often
 5   we came.
 6   Q   Why would that be important for you to visit more
 7   regularly?
 8   A   Because other companies were visiting consistently and the
 9   higher-ups in those companies, as well -- from CEOs to most
10   C-level employees.  It was important that we had a presence as
11   well.
12   Q   I want to make sure I understand what you're saying.  You
13   said:  A lot of other companies were doing what?  Other
14   companies were doing what?  Are you talking in regard to
15   Dr. Ruan and Dr. Couch?
16   A   They were spending a good amount of time with Dr. Ruan and
17   Dr. Couch.
18   Q   Who was spending a good amount of time with Dr. Ruan and
19   Dr. Couch?
20   A   Other companies.  Insys would be one example.
21   Q   Am I understanding you right?  Are you saying that Insys
22   had sent their CEO or other high-level people down to meet with
23   Dr. Ruan and Dr. Couch?
24   A   That's correct.
25   Q   And is that what prompted more meetings or the need for
```

DAVID COBB - DIRECT BY MR. BODNAR

1    more regular meetings from executives at Galena?

2    A   Yes.  It was made clear that we weren't giving them the

3    same attention that other customers -- other companies were.

4    Q   Who made clear to you that Galena was not giving Dr. Ruan

5    and Dr. Couch the same amount of attention as other companies?

6    A   Dr. Ruan.

7    Q   How did he explain that to you?

8    A   He explained it very clearly that we weren't doing enough.

9    As a business, we weren't listening to them enough and we

10   weren't going to be successful.

11   Q   Who wasn't listening to who?

12   A   We weren't listening to them.

13   Q   What was it that -- and by "them" do you mean Dr. Ruan and

14   Dr. Couch?

15   A   Yes.

16   Q   What was it that they wanted you to listen to or do?

17   A   I don't -- I don't really understand.  I'm not sure.

18   Q   Was this the final trip you've made down to Mobile,

19   Alabama?

20   A   Yes.

21   Q   Do you know what, if anything, occurred in late May of 2015

22   regarding Dr. Ruan and Dr. Couch?

23   A   Our understanding is that their practice was shut down.

24   Q   Following the shutdown of their practice, what happened to

25   prescriptions for Abstral?

1682

```
 1   A    In regards to Dr. Ruan and Dr. Couch?

 2   Q    In regard to overall number of prescriptions written for

 3   Abstral after Dr. Ruan and Dr. Couch's practice was shut down?

 4   A    Our volume dropped.

 5   Q    Did it drop by a little bit or did it drop significantly?

 6   A    Significantly.

 7   Q    What then happened to Galena's ability to promote Abstral?

 8   A    We were limited because we couldn't make up that revenue.

 9   And eventually Galena was forced to sell the product in

10   December of 2015.

11   Q    So does Galena -- Galena no longer owns Abstral?

12   A    Galena no longer licenses Abstral in the U.S.

13            MR. BODNAR:  One moment, Your Honor.

14   Q    Oh.  And do you currently still work for Galena?

15   A    No.

16   Q    At what point did you leave Galena?

17   A    December 31st, 2015.

18   Q    Did you leave on your own or were you fired?

19   A    The commercial team was dissolved.

20   Q    Why was the commercial team dissolved?

21   A    There were no commercial products to sell.

22   Q    And is that after Abstral was sold off?

23   A    Abstral and Zuplenz, which was our other product.

24            MR. BODNAR:  One moment, Your Honor.

25            (A discussion was held off the record between government
```

DAVID CORIN - CROSS BY MR. SEWELL

1   counsel.)

2   BY MR. BODNAR:

3   Q   Mr. Corin, did you ever travel down to Mobile with

4   Mr. Schwartz?

5   A   No.

6   Q   Do you -- if you know or do you know where Mr. Schwartz

7   stayed when he was down here in Mobile?

8   A   We recommended that he stay at the Renaissance Battle House

9   but I'm not sure where he stayed.

10          MR. BODNAR:  Your Honor, at this time the United

11   States moves to admit the chart as it's been marked up as

12   Government's Exhibit 38-9.

13          THE COURT:  All right.  Mark it in.

14      (Government's Exhibit 38-9 was entered into evidence.)

15      (A discussion was held off the record between counsel.)

16          MR. BODNAR:  Pass the witness, Your Honor.

17          THE COURT:  All right.

18          MR. SEWELL:  Just a few moments to get set up.

19                        CROSS EXAMINATION

20   BY MR. SEWELL:

21   Q   Good morning, Mr. Corin.

22   A   Morning.

23   Q   My name is Jay Sewell.  I represent Dr. Couch, and I just

24   have a few questions to follow up with from Mr. Bodnar's

25   questions.  He covered your education and work experience.  You

1684

 1    say you have a degree in marketing from Syracuse University?

 2    A   Psychology in marketing.

 3    Q   Psychology in marketing?

 4    A   Yes.

 5    Q   Okay.  So it's one degree, just mixed together?

 6    A   Right.

 7    Q   And you've had -- you basically -- your whole career has

 8    been in sales or marketing?

 9    A   Most of it.

10    Q   Most of it?

11    A   Uh-huh (positive response).

12    Q   Whether it's in retail -- I think you said you worked for

13    Abercrombie & Fitch and then you entered the medical field or

14    pharmaceutical field?

15    A   I was with a promotional products company in-between before

16    I entered the medical field.

17    Q   Okay.  So marketing and sales is your background?

18    A   Sure.

19    Q   You're familiar with that side of business, I guess?

20    A   Yes.

21    Q   Now, I want to talk about marketing and sales

22    specifically.  Let's -- I want to talk about the rebate

23    agreement that you and Mr. Bodnar talked about.

24         And this -- this rebate agreement -- I'm showing you

25    again Exhibit 38-8.  I'll move that so we can get it all

DAVID CORN - CROSS BY MR. SEWELL

1   in.  This was an agreement between Galena and C&R Pharmacy;

2   correct?

3   A   Yes.

4   Q   Not an agreement between Galena and PPSA?

5   A   No.  Galena and C&R.

6   Q   And not with any of the individual doctors either?

7   A   My understanding it's Galena and C&R.

8   Q   Correct.  And we saw down here, also on the second to last

9   page, that it was signed by Caye Renegar; correct?

10  A   Correct.

11  Q   And she was -- she ran C&R Pharmacy, is your understanding;

12  correct?

13  A   My understanding is she managed it.

14  Q   Okay.  Okay.   And this is an agreement that Galena came up

15  with to work with C&R Pharmacy on supplying Abstral?

16  A   These agreements -- Galena had several agreements with

17  several oncology dispensing clinics across the country.

18  Q   So this type of agreement was nothing new?

19  A   It was -- the only difference is it's C&R.

20  Q   Right.  So I mean, basically I guess what I'm getting at --

21  and maybe I'm not asking it correctly is -- the only thing,

22  pretty much for the most part that changed is, you know, it

23  says:  Galena Biopharma and insert pharmacy name?

24  A   I can't answer that fully because I didn't write the

25  contracts or review the contracts.

DAVID CORIN - CROSS BY MR. SEWELL

```
 1   Q   But you're aware that Galena had similar rebate agreements?
 2   A   I'm aware that they had contracts with oncology dispensing
 3   clinics.
 4           MR. KNIZLEY:  (Indicating.)
 5   BY MR. SEWELL:
 6   Q   So you were aware that -- you are aware that Galena had
 7   rebate contracts with pharmacies other than C&R?
 8   A   Yes.
 9   Q   And to your knowledge, that these were reviewed by Galena
10   corporately -- people within the corporation reviewed them?
11   A   The legal team.
12   Q   The legal team.  So Galena had lawyers look at these
13   documents?
14   A   That's my understanding.
15   Q   And would provide legal advice on these documents?
16   A   Yes.
17   Q   So presumably those attorneys wouldn't lead Galena down an
18   illegal path; correct?
19   A   That's an assumption.  I would hope they didn't.
20   Q   A fair assumption I would hope.
21           One second.  May I approach the witness, Your Honor?
22           THE COURT:  Yes.
23   BY MR. SEWELL:
24   Q   Mr. Corin, I'm showing you what we've marked as Couch
25   Exhibit 199.  Now, this says at the top it's a marketing
```

 1   services agreement; correct?

 2   A   Right.

 3   Q   Between Galena Biopharma and SimfaRose Pharmacy; correct?

 4   A   Correct.

 5   Q   Are you familiar with that pharmacy?

 6   A   Yes.

 7   Q   In fact, they were in your region, weren't they, or your

 8   area?

 9   A   When that agreement went into place, I was -- I was in a

10   different role.  They were not in --

11   Q   You were the national?

12   A   Yes.

13   Q   So you were familiar with this?

14   A   I was familiar but I didn't do the agreements.

15   Q   Okay.  And I understand.  But you knew that it existed?

16   A   Yes.

17   Q   And that Galena made these?

18   A   Yes.

19   Q   And they kept up with them.  It would be part of their

20   files?

21   A   I have no idea about how they kept up or what was in their

22   files.

23   Q   Okay.  But they -- it would be normal for Galena to keep

24   copies of contracts they entered into?

25   A   You would expect that.

1      MR. SEWELL:  Your Honor, Dr. Couch offers Couch

2   Exhibit 199.

3      MR. BODNAR:  Your Honor, United States objects to

4   relevance and a contract which he wasn't able to identify with

5   another pharmacy.  This case is about C&R and PPSA, not

6   SimfaRose.

7      MR. SEWELL:  Your Honor, it goes to the relevance.

8   And our theory of defense is the --

9      THE COURT:  All right.  Let's have a side bar, please.

10     (At the side bar, jury not present.)

11     THE COURT:  Is this Couch 199 word for word the same

12   as the C&R agreement other than a different party substituted?

13     MR. SEWELL:  As best to my review, Your Honor.  I

14   mean, there are some numbers in the chart as far as rebates and

15   things like that and other things that are particular to

16   SimfaRose.  But the general agreement itself appears to be the

17   same.

18     THE COURT:  May I see the Galena and C&R agreements?

19     THE CLERK:  Is it at the podium?

20     MR. SEWELL:  Yes, Your Honor.

21     MR. BODNAR:  Just looking at it, there's more

22   paragraphs.  There's different aspects to this.

23     MR. SEWELL:  Here, Your Honor.  (Indicating.)

24     THE COURT:  I can see on the first page it's

25   different.  So I sustain the objection.

```
1            MR. SEWELL:  Your Honor, may I be heard further?
2            THE COURT:  Yeah.
3            MR. SEWELL:  Your Honor, the government has introduced
4    the Galena agreement with C&R with the implication that this
5    was some kind of special arrangement.
6            THE COURT:  He's already testified that there were
7    other arrangements with other pharmacies.
8            But I sustain the objection to what -- the specifics
9    of these contracts because --
10           MR. SEWELL:  It just goes to our theory that this
11   shows a regular course of events that Galena entered into these
12   types of marketing and rebates contracts --
13           THE COURT:  He's already testified to that.  But the
14   specifics of each of these other agreements are different from
15   the agreement with C&R.  So I sustain the objection
16   specifically because he doesn't know the individual difference.
17           MR. SEWELL:  Yes, Your Honor.
18       (In open court, defendants and jury present.)
19   BY MR. SEWELL:
20   Q   Mr. Corin, we were talking about these rebate agreements
21   and specifically this SimfaRose agreement.  And you stated that
22   it was regular for Galena to have rebate agreements with
23   various pharmacies and providers; correct?
24   A   Galena had agreements with oncology dispensing clinics, and
25   had agreements with two pharmacies that were non --
```

DAVID CORDI - CROSS BY MR. SEWELL

 1  non-oncology dispensing clinics.

 2  Q   But I mean, they were legitimate clinics as far as you

 3  knew?  They were capable of prescribing or dispensing Galena

 4  products?

 5  A   Which -- which are you referring to?

 6  Q   To the non-oncology ones you're talking about.

 7  A   When I say "non," they were not clinics in cancer centers.

 8  Q   Okay.  Now, you said that you weren't exactly familiar with

 9  this SimfaRose agreement; is that correct?

10  A   It's not about not being exactly familiar.  I wasn't the

11  one who instituted the agreement.

12  Q   Didn't you discuss with people in Galena about making a

13  SimfaRose agreement similar to the one with C&R?

14  A   Many folks at Galena discussed that.

15  Q   So it's based on that statement, it's fair to say that you

16  used this agreement with C&R to -- or Galena used the agreement

17  with C&R to establish other agreements with other dispensers?

18  A   I -- I don't know if it's the C&R agreement or the oncology

19  dispensing agreements.  Again, I didn't -- I didn't create

20  those documents.

21  Q   Shifting -- so regardless of how it was set up, this was an

22  agreement with -- again, we said it was with C&R Pharmacy?

23  A   Yes.

24  Q   And it's kind of -- it's a --these kind of rebates are

25  marketing tools for Galena to get pharmacies or dispensing

1   clinics to carry Abstral?

2   A   I don't know about the word "marketing tools."  Again, I

3   wasn't responsible for creating agreements or making -- or

4   creating these rebates or contracts.

5   Q   Well, you -- you were part of sales and marketing; correct?

6   A   I was part of sales.

7   Q   Part of sales.  Okay.  And so it was part of your job to do

8   -- to follow Galena's plan to get more people to buy Abstral?

9   A   No, not buy.  Prescribe.  We -- my job was to make sure

10  doctors prescribe the product.

11  Q   Your job was to make sure doctors prescribe the

12  product.  So -- but in order for them to prescribe it

13  somebody's got to dispense it; right?

14  A   Yes.

15  Q   Okay.  So this rebate agreement that you just identified

16  and testified about was with a pharmacy; correct?

17  A   Yes.

18  Q   And so that would mean that part of that sales strategy has

19  to be with agreeing or having some understanding with a

20  pharmacy to stock and dispense it?

21  A   It was part of our contracting strategy.  That was a

22  different division.

23  Q   And was part -- but it related to sales, wouldn't you

24  agree?

25  A   If they're dispensing product.  But if that pharmacy's not

```
1   going to dispense a product, the patient can go to Walgreens or
2   CVS.
3   Q    Correct.  But in order to make sure that there's an
4   adequate supply of Abstral on the market you want to make sure
5   that there are pharmacies out there that will carry it, doesn't
6   that make just general business sense?
7   A    Certainly.
8   Q    Okay.  And so in order to make sure that there is an
9   adequate supply, Galena enters into these rebate agreements to
10  incentivize pharmacies to carry Abstral?
11  A    I don't know about the word "incentivize."  Galena wanted
12  to make sure the product was stocked.
13  Q    Okay.  Because they wanted to make sure it was stocked, so
14  they would then -- they would enter into these agreements to --
15  and -- but -- and give a benefit or not -- poor choice of
16  words.
17       There were terms that would allow for rebates to the
18  pharmacy for entering into -- to stock Abstral?
19  A    That would have been up to the contracts department to
20  determine that.
21  Q    But you would agree with me in general, as just a general
22  business sense.  If there are pharmacies around that are
23  stocking Abstral, it wouldn't necessarily make sense for a
24  doctor to prescribe it if his patients can't get it?
25  A    Well, ultimately any product that's prescribed you want to
```

DAVID CORN - CROSS BY MR. SEWELL
27878

```
 1   make sure it's available.
 2   Q   Right.  And so having this rebate agreement would help make
 3   sure Abstral was available to this community?
 4   A   That's your assumption.  That's not my assumption.  My
 5   assumption is making sure that the patients can get their
 6   products that are -- pharmacies with the product stocked.
 7   Q   Well, whether it was with C&R or anybody, that was kind of
 8   the point, to make sure that pharmacies had this product?
 9   A   Yes.
10   Q   And if there's not -- if that product, especially this
11   expensive product isn't around, doctors probably aren't going
12   to prescribe it.  They just will make --
13   A   That goes for any product, whether it's expensive or not.
14   If the patient can't get the product, the doctor's not going to
15   prescribe it.
16   Q   Right.  And you testified that this is a very expensive
17   medical product; correct?
18   A   If it's expensive, it's all in the eye of the beholder.
19   There are cancer products that are a quarter of a million
20   dollars.  So what's expensive when you're getting relief?
21   Q   Exactly.  But the point I'm getting at is you said that a
22   month's dose of -- a maintenance dose of Abstral could cost how
23   much a month?
24   A   It can be anywhere from three to $10,000 or more.  It would
25   depend on the dosage and also if the insurance company approved
```

 1   more product for the patient.

 2   Q   Right.  So I mean that's -- three to $10,000 is a lot of

 3   money in a month, wouldn't you agree?

 4   A   I can't agree with you.  That depends on what the patient

 5   is getting treated for.  If I'm in horrible pain where I can't

 6   eat or I can't do anything else and I have the means where my

 7   insurance company will cover that, that's worth it.  So I --

 8   you're putting the word "expensive" in my mouth, and that's not

 9   my word.

10   Q   I'm not trying to put words in your mouth.  I'm just trying

11   to understand that -- I'll just move on.

12          I want to talk about some of the dates that you talked

13   about with Mr. Bodnar as far as Abstral getting into the

14   market.  You said Galena bought the rights to Abstral in the

15   spring of 2013?

16   A   They acquired the U.S. licensing rights.

17   Q   U.S. licensing rights.  So that's whenever they could begin

18   to market or they got the rights and then were going to begin

19   marketing this in the United States?

20   A   Yes.

21   Q   And that didn't happen until the fourth quarter of 2013; is

22   that correct?

23   A   Third quarter.

24   Q   Third -- third quarter.  Are you sure about that?

25   A   That we began -- our sales team went out in Q3 of 2013.

1  Q   Are you sure that that's when Abstral was formally launched

2  was in Q3?

3  A   With our team?

4  Q   Be it by Galena.

5  A   So Galena had the product in Q2.  They acquired the U.S.

6  rights to it.

7  Q   When did they formally launch it?

8  A   In Q3.

9          MR. SEWELL:  May I approach the witness, Your Honor?

10          THE COURT:  Yes.

11  BY MR. SEWELL:

12  Q   Mr. Corin, I'm showing you what we've marked as Couch

13  Exhibit 196.  Does this appear to be a press release from

14  Galena Biopharma?

15  A   Yes.

16  Q   And you're familiar with press releases from Galena

17  Biopharma?

18  A   Yes.

19  Q   It's got their -- their letterhead up there on top.  It

20  says:  Galena Biopharma reports fourth quarter year-end 2013

21  results?

22  A   Yes.

23          MR. SEWELL:  Your Honor, Dr. Couch offers 196 into

24  evidence.

25          MR. BODNAR:  Your Honor, United States has no issue

1696

 1   with him asking questions about the date at the top and when it

 2   was launched.  But to admit this whole thing, there's a lot of

 3   things that are irrelevant in this press release.

 4          MR. SEWELL:  I'll just ask him a few questions then,

 5   Your Honor.

 6          THE COURT:  All right.

 7   BY MR. SEWELL:

 8   Q   I'm pointing you to page two of this where it says:

 9   Commercial Abstral (fentanyl) sublingual tablets.  It says:

10   Galena acquired Abstral in March 2013; correct?

11   A   I believe it was in April but that's what's in the print

12   right there.

13   Q   Right.  And it says:  Formally launched the product in U.S.

14   in Q4 of 2013?

15   A   That's not correct.

16   Q   That's -- so you're saying that this is an official press

17   release for Galena Biopharma, that is incorrect?

18   A   Yes.

19   Q   And if it was put on their investors' website, that's

20   incorrect?

21   A   Right.

22   Q   Galena's use or Galena was managed within what was called

23   kind of the commercial division of -- or Abstral was in the

24   commercial division of Galena; is that correct?

25   A   Yes.

DAVID CORBIN - CROSS BY MR. SEWELL

```
 1    Q    And commercial means those are the products that Galena
 2    actually markets and sells?
 3    A    Correct.
 4    Q    That's different than the research division; correct?
 5    A    Correct.
 6    Q    And they had a research division?
 7    A    Yes.
 8    Q    And they were developing and testing various new
 9    medications?
10    A    Yes.
11    Q    And to help fund that research, Galena would use money from
12    their commercial division from their sales to fund the
13    research?
14    A    The commercial division was not driving the revenue to fund
15    the R&D side of the business.
16    Q    Certainly helped, though, wouldn't it?
17    A    No.  We actually lost money as a commercial team.
18    Q    Okay.  And actually that leads me to a new point.  You
19    said that the commercial team was losing money.  There were
20    some issues and complaints that you talked about with how
21    Galena was being run.
22    A    Specifically --
23    Q    Well, for specific example, in January of 2014 you said
24    there were issues about insider trading.
25    A    There were issues -- no, I didn't say there were insider
```

1   trading issues.  I said there was a blackout period and the

2   blackout period was opened unbeknownst to everybody, and many

3   members of the board sold their stock during that half hour

4   window the period was opened.

5   Q   So the board members who were inside Galena knew about this

6   short window and they sold their stock?

7   A   Yeah.  I wasn't privy to that information.

8   Q   But you know that now?

9   A   After the fact, absolutely.

10  Q   You know that.  I'm not asking if you knew it then.  But

11  that has since come out?

12  A   Yes.

13  Q   And it's fairly public knowledge; correct?

14  A   Yes, sir.

15  Q   There's been litigation over that?

16  A   Yes.

17  Q   There's been class action lawsuits?

18  A   Yes.

19  Q   SEC investigations?

20  A   As far as I know, yes.

21  Q   And this hit the news and people in the investment world

22  heard about this happening.

23  A   Correct.

24  Q   Okay.  And when that -- all that happened, that caused the

25  stock price to drop; correct?

1699

1   A   Yes.

2   Q   Or the stock price dropped?

3   A   Well, the sale -- when that many shares were sold, that

4   alone would cause the stock price to drop.

5   Q   Right.  Okay.  So -- and you're -- again, we're talking

6   about -- you're familiar with that kind of business generally;

7   correct?

8   A   Some business.

9   Q   Some business.  Okay.  I mean -- and in the sales or

10  marketing view of things, a company's image is very important

11  to that company?

12  A   Any company, yes.

13  Q   Yes.  And if it's got a poor image, people aren't likely to

14  invest in a company.

15  A   That's an assumption.

16  Q   Is it a fair assumption?

17  A   I think that would depend on an individual investor to make

18  those decisions.

19  Q   Is it just fair generally that if you don't have a

20  favorable view of a company, you're not going to want to give

21  them your money?

22  A   Personally, I can only speak about myself.  If I didn't

23  have a favorable view of a company, I wouldn't invest in them.

24  Q   You wouldn't invest.  Okay.  And is it also a reasonable

25  view that if a person doesn't have a favorable view of that

DAVID CORIN - CROSS BY MR. SEWELE

 1    company, they may not use the products or services of that

 2    company?

 3    A    That's their choice, whatever they're going to do.

 4    Q    But that is a potential choice?

 5    A    Anything's a choice to prescribe or not prescribe.

 6    Q    Right.  So if a company or if a doctor has concerns about

 7    the way the company's being run, they don't have the confidence

 8    in it, they may not prescribe that drug?

 9              MR. BODNAR:  Objection, Your Honor.  We're really far

10    down the road of speculation at this point.

11              THE COURT:  Sustained.

12              MR. SEWELL:  Your Honor, may I approach the witness

13    with an exhibit?

14              THE COURT:  Yes.

15    BY MR. SEWELL:

16    Q    Mr. Corin, I'm showing you what's been marked as Couch

17    Exhibit 202.  This is one of those Abstral vouchers that you

18    talked about earlier; correct?

19    A    Yes.

20    Q    Okay.  And it says -- on the back it's dated June 2013?

21    A    Yes.

22    Q    Okay.  And this is exactly what you were talking about

23    earlier in your testimony when you were talking about vouchers?

24    A    Yes.

25              MR. SEWELL:  Your Honor, Dr. Couch offers Couch

1  Exhibit 202 into evidence.

2           MR. BODNAR:  No objection, Your Honor.

3           THE COURT:  All right.  Mark it in.

4      (Defendant Couch's Exhibit 202 was entered into evidence.)

5  BY MR. SEWELL:

6  Q   Pull it out and I'd just like to talk to you about it for a

7  few minutes.

8           Okay.  So then it goes on and it talks about inside,

9  you know, the indications for Abstral.  It's got these little

10 plastic cards.  Now, this plastic card, that's what somebody

11 would give to their pharmacy when they went to go get it

12 filled; correct?

13 A   Right.  There's two pieces to that card.

14 Q   Right.

15 A   There's two important --

16 Q   Okay.  Well, tell us about the important piece here.

17 A   So on the left side, right here where you've got --

18          MR. BODNAR:  Your Honor, I object at this point.  Can

19 we put it up on the screen so we can see what it is he's

20 looking at?

21          THE COURT:  Well, that's up to counsel as to whether

22 or not he wants to show it to the jury.  So --

23          MR. SEWELL:  Sure.  I'll be happy to do that.  And

24 just so you know that you can touch on this screen when I put

25 it up.  So if you want to point out something, it will show.

```
 1              THE COURT:  That screen will annotate -- you can draw

 2   lines and such on it.

 3              THE WITNESS:  Okay.

 4   BY MR. SEWELL:

 5   Q   Okay.

 6   A   Like football.

 7   Q   Right.  So here's what we were talking about a second ago,

 8   Couch Exhibit 202.  So can -- I guess tell us again what you

 9   began to tell us about the left side of this voucher card.

10   A   Sir, I can't see that small print on the left side.

11   Q   Okay.  I'm sorry.  See if I can't zoom in.

12              Is that more helpful?

13   A   Right.

14   Q   Okay.

15   A   Okay.  So the left side right here is the voucher that we

16   spoke about for the first -- the first three prescriptions or

17   up to three vouchers.

18   Q   Okay.  So what would a patient do with this?

19   A   Patient would bring that to their pharmacy, the pharmacy

20   would input the VIN number and the other numbers that are

21   involved and that would be tied to the patient, and the patient

22   could get up to three prescriptions.

23   Q   Okay.

24   A   And as you see, it says:  Use this side of the card first.

25   Q   Okay.  And then I guess I'll clear that out.  Can you tell
```

DAVID CORN - CROSS BY MR. SEWELE

1  us about the right side of the card?

2  A   Right.  If the patient were to continue on therapy and go

3  on maintenance therapy, they would use the right side of the

4  card.  And we talked about the cost of prescriptions

5  beforehand, that patient could save up to -- based off what

6  their insurance company chose to cover or not cover -- up to

7  $500 per prescription.

8  Q   Right.  So if I understand you correctly, if a patient gets

9  a prescription for Abstral and it gets to the point they're on

10 a maintenance dose, and let's say it's $1,000, we'll say for

11 their dose, and the insurance only covers $300 we'll say, they

12 can use this up to $500 to help cover that gap?

13 A   Right.  And they would be responsible for the remaining

14 200.

15 Q   Remaining 200, right.  So this is a way for people to get

16 their medication that they may need for pain; right, for

17 inexpensive --

18 A   For breakthrough cancer pain.

19 Q   For breakthrough cancer pain, right.  And I'm glad you

20 brought that up.  That is the FDA-indicated use for Abstral;

21 correct?

22 A   Yes.

23 Q   Is breakthrough cancer pain in adults, opioid tolerant

24 patients?

25 A   For any of the TIRF REMS products.

DAVID CORRN - CROSS BY MR. SEWELE

1  Q   For any TIRF products, right.  And that -- basically

2  FDA-indicated means that's what, in this case, Galena can

3  advertise Abstral for; correct?

4  A   We can educate on.

5  Q   You can educate.  You can't tell them that -- you cannot

6  tell them to use it for anything else?

7  A   Correct.  That label that was on the back of the card that

8  you showed me --

9  Q   Right.

10  A   -- we can get treated from the four corners of that label.

11  Q   Right.  Exactly.  But a doctor is not bound by that label?

12  A   That's correct.

13  Q   If he sees a legitimate use for this, he can prescribe

14  what's called off-label; correct?

15  A   Yes.

16  Q   Okay.  And I'm glad you mentioned the four corners.  You're

17  talking about the medical guide or, excuse me, the medication

18  guide here on the back.  This was on the voucher as well?

19  A   Uh-huh (positive response).

20  Q   Okay.  And so if a patient got this voucher, they should

21  get this medication guide; correct?

22  A   Yes.

23  Q   And it includes what you're talking about, the indications,

24  you know, health warnings, and interactions and safety

25  information on Abstral?

DAVID CORA - CROSS BY MR. SEWELE

1   A   Yes.

2   Q   Now, you mentioned that there was a change in this program

3   at one point because of the way it was being prescribed, the

4   voucher -- as far as frequency in how it was being prescribed,

5   am I correct?

6   A   No.  We made the change because the purpose of the program

7   was to titrate to the appropriate dose.  So titration means

8   time.  So we didn't want physicians writing three prescriptions

9   at once because that would defeat the purpose of titration.

10  Q   I understand.  But under -- but you said that Galena

11  changed this rebate program to specifically say -- to prevent

12  the three at one time?

13  A   Not -- you said rebate?

14  Q   Oh, voucher program.  I apologize.  Voucher.

15  A   Yes, because we wanted it used appropriately for titration.

16  Q   You wanted to make sure that they did not prescribe three

17  at one time?

18  A   Correct.  Because the patient needed to be titrated or may

19  need to be titrated.

20  Q   May need to be titrated.  So you would agree with me that

21  not all patients are the same?

22  A   Not all patients are the same.

23  Q   Some may already be on some kind of TIRF drug and may not

24  need titration necessarily?

25  A   Regarding the label, it's recommended that all patients

1   start on the starting dose of Abstral, even if they're coming

2   from another product.

3   Q   I understand.  I understand what the label says.  But

4   again, that kind of goes back to my point earlier.  If the

5   doctor in his medical judgment does not deem or doesn't think

6   titration is appropriate, he can -- he can make that judgment;

7   right?

8   A   They can.  But with the delivery systems of the different

9   products, not all products are apples to apples.

10  Q   I understand.  I understand.  But I guess getting back to

11  it, with the original voucher program you said that Dr. Couch

12  and Dr. Ruan were writing three at one -- three prescriptions

13  at one time but to be filled at the different intervals, I

14  guess?

15  A   No.  Three prescriptions filled right when they wrote them.

16  Q   Okay.  But I guess my point is that was still within the

17  bounds of the voucher program to the letter of the terms of the

18  voucher program?

19  A   Yes.

20  Q   Okay.  They -- it may not have been what Galena had

21  envisioned, but it wasn't, to your mind, outside the bounds of

22  that voucher program?

23  A   No.

24  Q   They didn't breach any contract?

25  A   No.

1707

```
 1    Q   To your knowledge and your understanding, they didn't
 2    violate any law by doing that?
 3              MR. BODNAR:  Objection, Your Honor, to this point.  He
 4    is not an attorney, violating any laws.
 5              THE COURT:  Sustained.
 6    BY MR. SEWELL:
 7    Q   Galena used these voucher programs across the country;
 8    correct?
 9    A   Yes.
10    Q   I mean, this wasn't just limited to Mobile, Alabama?
11    A   No.
12    Q   They would -- I'm sure in sales you would hand it out to as
13    many people as you thought could use it; right?
14    A   No.  We handed it out where appropriate.
15    Q   I'll rephrase that question.  That could appropriately use
16    the product?
17    A   Right.
18    Q   So when you were doing this, you didn't think -- and you
19    were part of this distribution or the sales with these
20    vouchers; correct?
21    A   What do you mean I was part of the distribution?  I
22    wasn't handing them out.
23    Q   You weren't handing them out?
24    A   No.
25    Q   But you were overseeing people that were?
```

DAVID CORN - CROSS BY MR. SEWELE

```
 1   A   Right, our sales organization.

 2   Q   Your sales organization.  Okay.

 3   A   Patients -- patients or pharmacies or doctors could also go

 4   online.

 5   Q   And get them?

 6   A   Right.

 7   Q   So it was part of a program and you knew about it?

 8   A   Yes.

 9   Q   Okay.  And you were knowledgeable about it?

10   A   I'd like to think so.

11   Q   Right.  I believe you were.  And whenever you -- and you --

12   I'm sure you spoke to people about this voucher program to

13   customers, doctors, prescribers.  You would advertise this

14   voucher program; correct?

15   A   No, we would educate on helping them understand.

16   Q   You would -- educate is a way of saying you would tell

17   people about it; right?

18   A   We would educate them.

19   Q   Okay.  So when you were educating people about it, you

20   didn't think you were doing anything wrong?

21           MR. BODNAR:  Objection, Your Honor.

22           THE COURT:  Sustained.

23           MR. BODNAR:  Relevance of what's going on here.

24   BY MR. SEWELL:

25   Q   You've had training in, whether it's with Galena or other
```

```
 1   people, about medical sales; correct?

 2   A   Yes.

 3   Q   And how to market medical devices and products?

 4   A   How to educate.

 5   Q   How to educate.  When you were doing this with -- as far as

 6   relates to the vouchers and the rebates, to your knowledge,

 7   there wasn't anything wrong with the program?

 8           MR. BODNAR:  Objection, Your Honor.  Again, as far as

 9   his knowledge --

10           MR. SEWELL:  Your Honor, it goes -- Your Honor, may we

11   approach?

12           THE COURT:  Yes.

13      (At the side bar, jury not present.)

14           MR. SEWELL:  Your Honor, this line of questioning goes

15   to his intent.  Our doctor has been accused of being part of a

16   conspiracy involving these rebate programs.  We're trying to

17   use his intent as --

18           THE COURT:  That there's a conspiracy to use these

19   rebates?

20           MR. SEWELL:  It's part of, my understanding, the

21   anti-kickback charges here.

22           MS. GRIFFIN:  Huh-uh (negative response).

23           MR. SHARMAN:  It doesn't make any sense, but that's

24   what they're --

25           THE COURT:  Are you talking about -- the voucher is
```

 1    different from the rebate program.

 2              MR. SEWELL:  Right.

 3              THE COURT:  Because you were asking him about the

 4    voucher.

 5              MR. SEWELL:  I can rephrase the rebate question, Your

 6    Honor.

 7              MR. BODNAR:  Your Honor, the rebate -- with the rebate

 8    program, this witness is not an attorney nor knows the law.

 9    The jury, we expect, will be instructed on what the Anti-

10    Kickback Statute and the Safe Harbor Provision is on.  The part

11    that he read states you're within the safe harbor if you do the

12    following reporting requirements and send that -- pass that

13    money on to Medicare and Medicaid.  Later witnesses are going

14    to come and testify that they didn't.

15              THE COURT:  Wait.  Are you claiming that this witness

16    was a conspirator?

17              MR. BODNAR:  Absolutely not.

18              THE COURT:  I didn't get that sense either.  So

19    whether he thought he was doing anything wrong by

20    participating, I just don't think that's an appropriate

21    question.  So I sustain the objection.

22              MS. GRIFFIN:  Your Honor, may I address another

23    matter?  Every time the witness answers, counsel is saying

24    "right" or "that's correct" or some comment about the witness'

25    answer.  And we contend that that isn't appropriate to be

DAVID CORN - CROSS BY MR. SEWELLE

```
 1    commenting on the witness.
 2           MR. SEWELL:  I apologize, Your Honor.  And I'll work
 3    on my tag lines.
 4           THE COURT:  All right.  Also, Mr. Knizley, you were
 5    thanking the witnesses for their answers.  I don't like that
 6    either.
 7           MR. KNIZLEY:  Yes, ma'am.
 8           THE COURT:  I think that's inappropriate.  And one
 9    other thing --
10           MR. KNIZLEY:  I apologize and I'll try not to do it.
11           THE COURT:  I know it's a style, but I don't think
12    it's good style.
13           There's still some gum chewing going on in this
14    courtroom.
15           MR. KNIZLEY:  Who is the gum chewer, Judge?
16           THE COURT:  The young man that's sitting behind --
17           MR. ARMSTRONG:  By the bench?  I mean behind the bar?
18           MS. GRIFFIN:  With glasses?
19           THE COURT:  He's got dark, very dark hair.  He isn't
20    there right now, but he was sitting -- he was sitting to
21    Dr. Couch's left, his left.
22           MR. ARMSTRONG:  Is that him?
23           MR. KNIZLEY:  He's a notorious gum chewer.  But he
24    told me he had quit two weeks ago.  And I don't think --
25           THE COURT:  Well, he was chewing again.
```

DAVID CORIN - CROSS BY MR. SEWELL

1        MR. KNIZLEY:  Yeah, that's him right there.  The dark

2  hair and his hands on his face?

3        THE COURT:  Yeah, that's him.  That's him.

4        MR. KNIZLEY:  Okay.  I'll tell him right this moment.

5  Okay?

6        THE COURT:  Okay.  It's just a pet peeve.  I don't

7  like gum chewing up in the courtroom.

8        MR. KNIZLEY:  Yes, ma'am.

9        MR. ARMSTRONG:  This is a cough drop (indicating).

10       THE COURT:  Just don't chew it up.

11   (In open court, defendants and jury present.)

12  BY MR. SEWELL:

13  Q  All right.  Mr. Corin, I've just got a few last

14  questions.  I may try and use the easel to hopefully understand

15  everything that you were talking about on direct, and to make

16  sure that the jury understands it.

17       I'll back up so we can all see.  I'll do as best I

18  can.  Sorry.

19       THE COURT:  The only way all the jurors can see is for

20  you to turn it towards them and have him come down from the

21  witness stand.

22       MR. SEWELL:  Okay.  Your Honor, may we do that?

23       THE COURT:  Yes.

24       MR. SEWELL:  Mr. Corin, do you mind stepping down,

25  please?

```
 1          THE COURT:  But again, he will need to face the court

 2   reporter when he's talking.

 3          MR. SEWELL:  Then --

 4          THE WITNESS:  This side?  (Indicating.)

 5          MR. SEWELL:  We'll swap places and I'll try and speak

 6   loudly.

 7   Q   Okay.  Mr. Corin, you had talked about earlier --

 8   Mr. Bodnar had asked you several questions relating to dates as

 9   they related to this chart; correct?

10   A   Yes.

11   Q   And when certain things happened; right?

12   A   Yes.

13   Q   And we see down here you said that Galena first started

14   their marketing and promotion of Abstral in August of 2013.

15   A   Yes.

16   Q   Is that correct?  So up until that point you would say that

17   Galena had not done a lot of advertising to that point or any

18   advertising at that point?

19   A   I don't think Galena ever advertised.

20   Q   Or educated or --

21   A   There was no presence.

22   Q   Rights.  Okay.  Fair.  There was no presence for Abstral as

23   far as it related to Galena?

24   A   Right.

25   Q   It wasn't -- is it fair to say it wasn't as well known by -
```

DAVID CORN - CROSS BY MR. SEWELE

1    - before August 13th?

2    A   That's fair.

3    Q   That's fair.  Okay.  So if it's not as well known is it

4    fair to say that fewer patients or doctors may know about it?

5    A   Yes.

6    Q   So fewer patients and doctors are going to prescribe it?

7    A   Correct.

8    Q   Or doctors prescribing for patients?

9            And then you said -- so they started their

10   advertisement process, and then we see here in

11   September-October, both doctors are prescribing more of

12   Abstral; correct?

13   A   You mean when we started our -- not advertising --

14   commercial process?

15   Q   Your commercial -- right your commercial process.  I'm

16   sorry, I'm not catching up with all your lingo.

17           So once Galena went full bore on Abstral, we see right

18   here, at least with these doctors, an increase in prescribing?

19   A   Yes.

20   Q   And that goes up here until about the first of the year;

21   correct?  So January 14, do you see?

22   A   The peak is there, yes.

23   Q   The peak is there; right.  And remind me again, or tell me

24   if I'm correct, in January of 2014 is whenever this information

25   about improper conduct by the board of directors in this

1715

```
 1   blacked out window, that's when -- that's about the time this

 2   happened?

 3   A   That's when they sold.  Nobody -- improper conduct

 4   wasn't --

 5   Q   That's when -- that's when they sold, then the stock price

 6   went down?

 7   A   Yes.

 8   Q   And as part of your experience in sales, it's important for

 9   you to know Galena's reputation in the medical community;

10   correct?

11   A   Yes.

12   Q   Okay.  And is it fair to say that during that time Galena

13   took a hit to its reputation in the media?

14   A   Well, I don't know about in the media.

15   Q   Okay.

16   A   Certainly there are a lot of questions surrounding it.

17   Q   A lot of negative publicity, I guess?

18   A   Uh-huh (nodding head affirmatively).

19   Q   Wherever it came from?

20         MS. GRIFFIN:  Your Honor, objection.  That's not a

21   question.  He's commenting on the witness' answers.

22         THE COURT:  Just ask questions, please.

23   BY MR. SEWELL:

24   Q   When that information came out, Galena received some

25   negative feedback.
```

1  A   Correct.

2  Q   Is that correct?  And then we see a decrease in Dr. Couch

3  and Dr. Ruan's prescribing habits; correct?

4  A   Correct.

5  Q   And then you said there were -- there were visits here in

6  March or first in November -- or -- sorry -- March of '14 there

7  were -- there were visits with C&R Pharmacy with Dr. Couch and

8  Dr. Ruan?

9  A   Yes.

10 Q   Okay.  And you participated in some of those visits?

11 A   I participated in one of those visits in the front half of

12 the year.

13 Q   This one in March; is that correct?

14 A   Yes.

15 Q   And you came to talk to Dr. Ruan and Dr. Couch about

16 Abstral?

17 A   Yes.

18 Q   And their concerns with Galena?

19 A   We addressed them.

20 Q   You addressed them.  And is it safe to assume that you were

21 trying to reassure them in Galena and the product Abstral?

22 A   We were trying to discuss Abstral with them.  We couldn't

23 speak to their -- I have no control over who gets fired on the

24 board.

25 Q   I understand.  But you would -- as part of sales you would

1  at least want to promote a positive viewpoint in the product?

2  A   What we wanted to do was -- the discussion should be with

3  the sales team about the product, not about the stock.

4  Q   You didn't talk about product at all when you were down

5  here?

6  A   We talked about product.

7  Q   And is that --

8  A   That's what I'm saying.  That's our purpose is to get them

9  re-engaged with the product, not worry about who's working for

10  our company or who's not working for our company.

11 Q   Fair enough.

12        MS. GRIFFIN:  Objection, Your Honor, to commenting on

13 the answers.

14        MR. SEWELL:  I apologize, Your Honor.

15        MR. SHARMAN:  Your Honor, may one government lawyer

16 please raise objections with regard to this witness?

17        THE COURT:  Yes.  Mr. Bodnar, you are the one to raise

18 the objections.

19        MR. BODNAR:  Yes, Your Honor.

20        MR. SEWELL:  Mr. Corin, have a seat.

21        THE WITNESS:  Yes, sir.  (Complying.)

22 BY MR. SEWELL:

23 Q   Mr. Corin, going back to these vouchers for just a moment,

24 this was a means for patients to acquire their Abstral

25 prescriptions at a lower price to that patient?

1    A    The voucher program?

2    Q    Yes.

3    A    No.  I think -- are you talking about the voucher program

4    or the actual -- the voucher program is the three prescriptions

5    up front.  So there was no price to it for the patient.

6    Q    But I thought the second card in this voucher guide, you

7    said, would help --

8    A    That's called the patient assistance program.

9    Q    The patient assistance program.  I apologize.  I thought we

10   were -- they were both part of the voucher program.

11          So either way, these provided Abstral to patients at

12   no -- lower or no cost to that patient?

13   A    Not necessarily no cost.

14   Q    Right.  No cost or lowered cost?

15   A    Well, it would depend on the patient.  If you look at the

16   card to the right, it was only for cash-paying commercial

17   patients.  So if you look at the scope on the left and the

18   scope on the right, it's very different.

19   Q    But it did have that possibility; correct?

20   A    Depending on the patient, yes.

21   Q    Depending on the patient.  And as I understand it, when a

22   doctor writes a prescription and then -- or excuse me.  When a

23   patient fills a prescription, that doctor doesn't get paid for

24   that prescription?

25   A    Doctors do not get paid for prescriptions.

1    MR. SEWELL:  Excuse me.

2    THE COURT:  All right.

3    (A discussion was held off the record between counsel.)

4    MR. SEWELL:  No further questions, Your Honor.

5    THE COURT:  All right.  Ladies and gentlemen, we're

6    going to break for lunch at this time.  Leave your pads on your

7    chairs.  We will take an hour and 15 minutes so be back

8    downstairs in the jury assembly room at 1:15 ready to be called

9    back up.  No discussion about the case over the lunch break.

10    We are in recess.

11    (A recess was taken at approximately 11:58 a.m.)

12    (Afternoon session, 1:18 p.m., in open court, defendants

13    and jury present.)

14    THE COURT:  All right, Mr. Knizley.

15                    CROSS EXAMINATION

16    BY MR. KNIZLEY:

17    Q   Good afternoon, Mr. Corin.

18    A   Good afternoon.

19    Q   Welcome back to Mobile.

20    A   Thank you.

21    Q   My name is Dennis Knizley, and I represent Dr. Ruan.

22    A   Okay.

23    Q   I'll ask you a few questions, if I may.

24    A   Excuse me?

25    Q   I'd like to ask you a few questions, if I may.

1720

```
1    A    Thank you.
2    Q    Now, did I understand you to say that your company did not
3    sell or promote pharmaceuticals, but educated people about
4    them?
5    A    We sold product.
6    Q    Yes, sir.  I'm asking you what you said earlier today.  Did
7    you say that you did not sell or promote them but your company
8    educated people about them, did I understand that correctly?
9    A    No, I never said "did not sell or promote."  I said our
10   folks educated people.
11   Q    But you did say you educated; right?
12   A    Yes.
13   Q    But you do sell?
14   A    The company absolutely sells product.
15   Q    Sure.  In fact, that was your job.  At the end, you were
16   the national -- regional sales manager; right?  National?
17   A    National sales director.
18   Q    Is that right?
19   A    Yes.
20   Q    And some of these medications for pain are very expensive,
21   are they not?
22   A    Expensive?
23   Q    Expensive.
24   A    Expensive?
25   Q    Please, if I don't -- if you don't understand me, stop me
```

DAVID GORDON - CROSS BY MR. KNIZLEY

1    and ask me.  Okay?

2    A    Sure.  I think expensive depends on what somebody would

3    define as expensive.

4    Q    In fact, you said, you know, if it cost a quarter million

5    dollars, it wasn't expensive when you're talking about getting

6    relief; right?

7    A    That's up to that patient to determine.

8    Q    Right.  A quarter of a million dollars is worth it if it

9    gives you relief?

10   A    I said a quarter million dollars for cancer treatments.

11   Q    Yeah.  But it would be worth it if it gives you relief;

12   right?

13   A    I'm talking about if it's helping with your cancer, it's up

14   to the person to decide if it's worth it or not.

15   Q    Now, your company, Galena, was in a very lively competition

16   back in 2013 and '14 with another pharmaceutical sales company,

17   were you not?

18   A    We were in competition with the entire class.

19   Q    And one company in particular, were you not?

20   A    Multiple companies.

21   Q    It wasn't one company in particular?

22   A    Well, there were several products.  There was Subsys and

23   there was Fentora.

24   Q    I want to show you what's marked as Government's Exhibit

25   38.  And tell me if you remember seeing that earlier today.

1722

```
 1   A   Yes, sir.

 2   Q   Okay.  And do you remember we were talking about Dr. Ruan,

 3   Dr. Couch, and Dr. R.. and this quarter, that quarter, that

 4   quarter?  Do you remember that?

 5   A   Yes.

 6   Q   What is the last column over here?  (Indicating.)

 7   A   If the doctors were paid by Insys per what was reported

 8   under the Sunshine Act.

 9   Q   Do you see Fentora on there?

10   A   No.

11   Q   Do you see any other fentanyl competitors over there?

12   A   No.

13   Q   So why is this on this?  Because this is your competitor;

14   is that right?  (Indicating.)

15   A   It's on there because for many doctors we want to see if

16   they've been compensated by the company.

17   Q   By your competitor?

18   A   By Insys.

19   Q   Your competitor?

20   A   That was one of our competitors.

21   Q   The one that your company saw fit to put on the top and the

22   only company that your company saw fit to put on the top of

23   this report; is that correct?

24   A   I didn't create the report.

25   Q   Yes, sir.  I'm not asking if you did or not.  Do you see
```

1723

```
 1   the report?
 2   A   I've seen the report, yes.
 3   Q   Do you see it now?
 4   A   I do.
 5   Q   Okay.  And is that the only competitor company that's on
 6   the top of this report?
 7   A   In this report, yes.
 8   Q   Is there another report that you have some other
 9   competitors like this on with you today?
10   A   Not that I'm aware of.
11   Q   Okay.  And let me ask you again will you agree that there
12   was a very lively competition between Galena and Insys
13   regarding the fentanyl market?
14   A   I think there was competition in the whole market.
15   Q   All right.  You don't -- I don't want to use the word
16   lively, but the competitions were such that your chief
17   executive officer came to Mobile to talk to some of the
18   doctors; right?
19   A   He came to see the customers.
20   Q   And that would be doctors?
21   A   Yes.
22   Q   Okay.  And he did that in part, I think your direct
23   testimony was, because your competitors' CEOs had come here?
24   A   Correct.
25   Q   Okay.  And the only competitor CEOs that came here was who?
```

1   A    I -- I don't know what other competitors came here.

2   Q    Do you know any competitor CEOs that came here?

3   A    I know that folks from Insys were here, I also know folks

4   from Fentora were here too.

5   Q    Okay.  So you do know that.  So the CEO of Fentora  was

6   here?

7   A    I don't what -- what the titles were, but the people that

8   were here.

9   Q    How about chief executive officers, what competitors' chief

10  executive officers, to your knowledge, came to Mobile, Alabama?

11  A    What I was told, Insys.

12  Q    And nobody else?

13  A    I can't say yes or no.

14  Q    Now, and I thought that you were saying that -- if I

15  understood your testimony correctly -- that Dr. Ruan and

16  Dr. Couch was important to your company and important to your

17  management of your company; is that right?

18  A    They were very high prescribers.

19  Q    Were they important to you?

20  A    All of our prescribers were.

21  Q    Okay.  Were they particularly more important than any

22  others?

23  A    Every prescriber was important.

24  Q    Were they particularly more important than any others?

25  A    Every prescriber was important.

1725

```
 1  Q   Okay.  You don't want to tell us whether they were more
 2  important than others?
 3  A   We didn't, we didn't rate prescribers based off the
 4  importance.
 5  Q   I'm going to show you what's marked as Government's Exhibit
 6  38-7.  Was this created by your company?
 7  A   Yes.
 8  Q   And what are you doing here?  Are you rating doctors?
 9  A   We have all of our customers listed from the time of
10  launch.
11  Q   And do you have them listed by rank?
12  A   No, by total prescriptions.
13  Q   By the rank of totals prescriptions?
14  A   By total prescriptions.
15  Q   Okay.  That's not ranking or rating them?
16  A   I don't see numbers ranking on this list.
17  Q   Okay.  Well, you've got the biggest prescriber at the top;
18  right?
19  A   Yes.
20  Q   The next one second; right?
21  A   Yes.
22  Q   The next one was third; right?  Is that a ranking?
23  A   You could call it a ranking.  But I call it a sort.
24  Q   That's just a sort; that's what you would call it.
25  Ranking, is that a good term for it or not?
```

1    A    We didn't rank them.  If they were rankings, there would be
2    numbers.
3    Q    You didn't -- your testimony is your company did not rank
4    these people?
5    A    No.
6    Q    Okay.  Do let me ask you, did you testify in direct
7    examination that Dr. Ruan and Dr. Couch were instrumental in
8    even getting the president fired?  Is that correct or not?
9    A    No.
10   Q    Did I understand you correctly?
11   A    No.
12   Q    They didn't have anything to do with the president getting
13   fired?
14   A    They wanted the CEO --
15   Q    A lot of people wanted the president fired, didn't they?
16   A    The CEO?
17   Q    CEO, president of the whole board?
18   A    I -- I saw -- I saw Dr. Ruan's emails.
19   Q    Okay.  The CEO had engaged in inside trading, had he not?
20   A    I don't know if he's been convicted or not convicted of
21   that.
22   Q    You told this jury earlier today, did you not, that your
23   understanding was the CEO of that company during some blackout
24   time period dumped a great number of his own company's stock in
25   order to profit himself; is that correct?

```
 1   A   That's correct.

 2   Q   And that, as I recall your testimony, caused the stock to

 3   drop from $8 a share to eventually $2 a share; is that correct?

 4   A   From 7.77.  That wasn't just the CEO.  That was multiple

 5   members of the board.

 6   Q   Well, the whole board, or members of the board, did this

 7   illegal thing about --

 8           MR. BODNAR:  Objection, Your Honor.

 9   BY MR. KNIZLEY:

10   Q   The whole board in a blackout period sold a great deal of

11   stock and caused the stock to go down from 7.77 to around $2;

12   right?

13   A   I don't know if it was the whole board.  Members of the

14   board.

15   Q   Okay.  And it made a lot of people mad, didn't it?  It made

16   the stock go -- whether it was a doctor, a paper mill worker,

17   or whoever he may have been, it would have made him mad if he

18   lost 75 percent of his stock in one day, wouldn't it?

19           MR. BODNAR:  Objection to speculation, Your Honor.  A

20   variety of people --

21           THE COURT:  Sustained, sustained.

22   BY MR. KNIZLEY:

23   Q   Dr. Ruan, as a stockholder, was mad, was he not?

24   A   Excuse me?

25   Q   Dr. Ruan, as a stockholder, was upset, was he not?
```

1   A   He made that clear through his emails.

2   Q   Okay.  But he was not of such influence that he could cause

3   the board of directors or anyone else to remove the chief

4   executive officers, could he?

5   A   I wasn't in those discussions when the CEO was removed.

6   Q   You don't know one way or the other?

7   A   I don't.

8   Q   You haven't heard any rumors or anything?

9   A   Again, that was a decision that was made by an internal

10  investigation within the company.

11  Q   So you're not telling this jury that Dr. Ruan and Dr. Couch

12  was instrumental in having the CEO removed?

13  A   I don't know.  That's not my pay grade.

14  Q   Well, would you say, though, that Dr. Ruan was important to

15  the new chief executive officer, Schwartz?

16  A   You'd have to ask Mark Schwartz that.

17  Q   Okay.  You didn't testify earlier that he had demanded

18  Mr. Schwartz -- had demanded that -- Dr. Ruan demanded

19  Mr. Schwartz come to Mobile?  Do you remember that?

20  A   Dr. Ruan wanted to see Mr. Schwartz.

21  Q   And did you use the word "demand"?

22  A   Yes.

23  Q   And did he demand or did he not?

24  A   Through our sales representative that worked with Dr. Ruan,

25  he asked that Dr. Schwartz come down.

1729

1   Q   And I don't mean to mince words with you, sir.  But when

2   you testified on direct, you used the word "demand."  And is

3   that the characterization or was it just asked or a request?

4   A   That's a fair characterization, yes.

5   Q   Sir?

6   A   That's a fair characterization.

7   Q   Demand?

8   A   Yes.

9   Q   And did the CEO acquiesce in the demand?

10  A   He made two trips down here.

11  Q   Okay.  Made a trip in December, I think; right?

12  A   Either November -- I believe it was November.  Maybe it was

13  December.  But in that time frame.

14  Q   You testified it was November.  But do you recall when it

15  was?

16  A   It was in that time frame.

17  Q   And did he come down by himself?

18  A   I don't know who he flew with or didn't fly with.

19  Q   Were there email exchanges about him coming down here among

20  you people at Galena?

21  A   I believe there were.

22  Q   And were you involved in the email exchanges?

23  A   I probably was involved.

24  Q   Was there discussion about the importance of whether or not

25  the chief executive officer coming down here and speaking with

DAVID CORN - CROSS BY MR. KNIZLEY

 1  Dr. Ruan?  Was there some discussion about the importance of it
 2  in some of the emails?
 3  A   He wanted to meet with Mark Schwartz, Dr. Ruan did.
 4  Q   Was there some discussion about the importance of the
 5  meeting in emails which you were involved in?
 6  A   I think every meeting with a customer and our CEO would be
 7  deemed important.
 8  Q   Was the importance of the meeting discussed in emails in
 9  which you were involved?
10  A   I think every customer meeting is important.
11  Q   Yes, I know you think that.  But I'm asking you a question,
12  if you recall -- if you recall -- was the importance --
13  A   I don't know how to answer that question.  I'm sorry.  I'm
14  not understanding your question.
15  Q   Okay.  Let me try again.  I'm sorry.  Let me try again?
16          Was the importance of Mr. Schwartz's visit to Mobile
17  to meet Dr. Ruan discussed in emails in which you were
18  involved?
19  A   I'd have to take a look at the emails.
20  Q   Okay.
21  A   That was several years ago.
22  Q   Let me let you take a look at the emails and see if you can
23  help us some.  Okay?
24          Now, would you say that Dr. -- so I can be clear, was
25  it important, if you know, in your company for Mr. Schwartz to

1    meet with Dr. Ruan?

2    A    Any person that our company met with, whether it was Mark

3    Schwartz or myself or anybody else, that's an important

4    meeting.

5    Q    Did Mr. Schwartz know Dr. Ruan?

6    A    They've had conversations, I believe.

7    Q    Did y'all talking about it in any important email exchanges

8    y'all had?

9    A    (No response.)

10   Q    Was it important in the email exchanges y'all may have had

11   before Dr. -- before Mr. Schwartz came down here?

12   A    I'd have to take a look at the emails.

13   Q    Okay.

14            MR. BODNAR:  Your Honor?

15   BY MR. KNIZLEY:

16   Q    I want to show you what's marked as Ruan Exhibit 142.  It's

17   not admitted into evidence.  And up at the top whose name is up

18   there?

19   A    Chris Lento.

20   Q    That one right there?  (Indicating.)

21   A    David Corin.

22   Q    And who is this email from?

23   A    David Corin.

24   Q    And who is it to?

25   A    Chris Lento.

1732

```
 1   Q   And who is Lento?

 2   A   He was the vice president of sales.

 3           MR. KNIZLEY:  And, Judge, may I approach the witness

 4   and show him the email?

 5           THE COURT:  All right.

 6       (A discussion was held off the record between counsel.)

 7   BY MR. KNIZLEY:

 8   Q   Mr. Corin, again, your name's at the top here, sir?  Is

 9   that your name?

10   A   Yes.

11   Q   Okay.  And it's 12/18/2014?

12   A   Yes.

13   Q   And the subject is what there?

14   A   Dr. Ruan's Provider Identifier Number.

15   Q   Okay.  And let me flip you back to the start of the email.

16           THE COURT:  Does this have a number?

17           MR. KNIZLEY:  It does, Ruan's 142.

18   Q   Now, I'm backing you up to the beginning of the email.  And

19   do you know a person named Roswitha Swensen?

20   A   Yes.

21   Q   Who is that?

22   A   She was the executive assistant to the CEO.

23   Q   Okay.  And the CEO, again, is whom?

24   A   Mark Schwartz.

25   Q   And this is copied to whom?
```

DAVID CORIN - CROSS BY MR. KNIZLEY

 1    A    Looks like Peter -- I'm one of the people on there.

 2    Q    Okay.  You got a copy of this email; is that correct?

 3    A    Yes.

 4    Q    And if you look through the chain, it seems to be the same

 5    chain, if you look?

 6    A    Yes.

 7    Q    So that's an email going to Dr. Ruan that you were involved

 8    in with him; is that right?

 9    A    Going to Dr. Ruan?

10    Q    Involving Dr. Ruan?

11    A    It was involving his NPI number.

12              MR. KNIZLEY:  We'd offer Ruan's 142.

13              MS. GRIFFIN:  Your Honor?  May I take a moment to look

14    at it?

15              No objection, Your Honor.

16              THE COURT:  All right.  Mark it in.

17         (Defendant Ruan's Exhibit 142 was entered into evidence.)

18    BY MR. KNIZLEY:

19    Q    Mr. Corin, I'm going to show you what you just looked at as

20    Ruan Exhibit 142.  Let me ask you one more time do you

21    recognize it as an email which you are part of the chain and

22    from time to time an author of part of the chain?

23    A    Yes.

24    Q    And it is regarding, as you told us previously, Dr. Ruan's

25    provider identification number is needed; is that right?

1734

```
 1   A   Yes.
 2   Q   And I'm going to flip you to the back page and start where
 3   it starts from, and I think it started from this lady right
 4   here; is that right?
 5   A   Yes.
 6   Q   That was on December 17, 2014 at -- it says 8:29 p.m.  All
 7   right?  And she is asking someone for his provider number;
 8   right?
 9   A   Yes.
10   Q   It said they had been -- Dr. Ruan had dinner at Ruth's
11   Chris Steak House; right?
12   A   That's what the email says.
13   Q   Okay.  Would you read for us what it says, starting with
14   recently?
15   A   Dear Jeff, recently you, Mark, and Dr. Ruan had dinner at
16   Ruth's Chris Steak House.  I am reconciling Mark's Concur
17   account.  Because of Sunshine Act, I need his provider
18   identification number.  Can you please get that for me?
19   Q   Okay.  And then Jeff writes her a response; is that right?
20   A   Chris Lento writes a response.
21   Q   Excuse me.  Mr. Lento does.  Go ahead.  What does it say?
22   A   Roswitha, all you need to do is search on Concur for this.
23   Very easy, Chris.
24   Q   And then she responds, I believe -- it's cut off.  Start
25   back here and go back to the front.  (Indicating.)
```

```
 1            What does -- again, this is Ms. Swensen; right?
 2   A   Uh-huh (positive response).
 3   Q   What does she respond with?
 4   A   Mark and Jeff met with him in Mobil [sic], Alabama.  Mark
 5   cannot remember his --
 6   Q   Mark?  And who is Mark?
 7   A   Mark Schwartz.
 8   Q   And who is the "his" we're talking about?
 9   A   Excuse me?
10   Q   Who's the "his" we're talking about here, if you know?
11   A   Dr. Ruan.
12   Q   Okay.  And what can't Mark remember?
13   A   I don't know.  You'd have to ask Mark.
14   Q   Well, look here.  If you keep on reading the email, maybe
15   it will tell us.  What does it say right there?  (Indicating.)
16   A   First -- first name and does not know what clinic he's
17   with.
18   Q   All right.  Let me stop you there.  So he can't remember
19   Dr. Ruan's first name or the clinic he's with; is that right?
20   That's what the email says?
21   A   That's what the email says.
22   Q   Okay.  Continue reading, please.
23   A   Here is what I found in Concur, which is not helpful.  So
24   Mark asked me to email Jeff Palmer last night.  Mark thought he
25   had a Chinese name.  This is what -- this is what Concur.  And
```

1736

```
 1  nothing in Alabama.  I need a little help here.
 2  Q   So at least in this email Mark, the chairman -- chief
 3  executive officer, could not remember Dr. Ruan's first name or
 4  last name; right?
 5  A   I don't know.
 6  Q   Okay.  Well, let's look some more about the last name.
 7   Okay?
 8          And what does Mr. Lento write back to Ms. Swensen?
 9  A   Look under X. Ruan.  You are spelling his name incorrectly.
10  Q   And who does he say is spelling his name incorrectly?
11  A   Roswitha.
12  Q   Do you know her?
13  A   Yes.
14  Q   Okay.  And then you write to her, do you not?
15  A   I respond to the group.
16  Q   Okay.  Well, all right.  And what do you say to the group?
17  A   It's definitely in there.  I've done many times.
18  Q   And you've done what many times?
19  A   There have been different events with Dr. Ruan.  So his
20  name has been put into Concur.
21  Q   And you're saying that you ought to be able to find it;
22  right?
23  A   It should, it should have been in there, yes.
24  Q   Back to the front page.
25  A   And if you look in the subject line, her spelling was
```

1   wrong.  So I corrected it.

2   Q   Okay.  And she writes to Mr. Lento and others, and what

3   does she say?

4   A   How is his name spelled?  Here are the choices in Concur.

5          And then you, I believe -- Chris writes to you then;

6   right?  No.  You write to Chris; right?  Is that you?  David,

7   you write to Ms. Swensen, don't you?

8   A   I don't know who that went to because I don't see the

9   names.

10  Q   Okay.  Who's that name?  (Indicating.)

11  A   That's from me, but I don't know the audience.

12  Q   Okay.  But you wrote it and what do you say?

13  A   I spelled it correctly.  It's Ruan, not R-A-U-N.

14  Q   And then Mr. Lento writes what?

15  A   This can't last much longer.

16  Q   And then what do you say?

17  A   It's amazing, I'm renaming the Essence Award for her.  Well

18  deserved.

19  Q   And who are you renaming the Essence Award for?

20          MR. BODNAR:  Objection, Your Honor, to relevance at

21  this point.

22          THE COURT:  Sustained.

23  BY MR. KNIZLEY:

24  Q   Now, we see that email exchange.  And emails today in

25  corporate America are a very typical way of communicating, are

1738

1    they not?

2    A   I can only -- I don't know for corporate America.

3    Q   Let's talk about Galena, then.  Okay.  When you worked at

4    Galena, were emails a typical way to communicate?

5    A   It was one of the ways to communicate.

6    Q   Yes, sir.  Was it a typical way to communicate?

7    A   One of the ways.

8    Q   Yes, sir.  And I understand it's one of the ways.  But

9    would it be a fair characterization to say it was a typical

10   way?

11            MR. BODNAR:  Your Honor, asked and answered.  He's

12   answered that it was one of the ways he communicated.

13            THE COURT:  Sustained.

14   BY MR. KNIZLEY:

15   Q   Did you use email frequently at Galena?

16   A   We used many methods frequently.

17   Q   Did you use email frequently?

18   A   That was one of the methods we used.

19   Q   Okay.  And did you do so frequently?

20   A   "Frequent" is your word.

21   Q   Okay.  Did you do it over 10 times a day?

22   A   It would depend on the day.

23   Q   Okay.  And on a typical day?

24   A   I don't, I don't remember the exact numbers.

25   Q   Okay.  Would you remember it being more or less than 10?

```
 1            THE COURT:  Mr. Knizley, is this important?  Let's
 2   move on to something.
 3            MR. KNIZLEY:  It is, Judge.  I think it does get
 4   important.  You know, it gets important later on.
 5            THE COURT:  Well, he says he uses email.  So let's
 6   continue on.
 7            MR. KNIZLEY:  Okay.
 8   Q    You use email for both important communications and
 9   communications that are not so important?
10   A    It would depend on the actual message.
11   Q    Okay.  And if it's an important communication, you might
12   use email, would you not?
13   A    It would -- we could use many different methods of
14   communication.
15   Q    You might use email, though; right?
16   A    Potentially.
17   Q    Okay.  You used email, did you not, for the simple task of
18   trying to determine what Dr. Ruan's last name was or what
19   clinic he worked for, didn't you?
20   A    I didn't, I didn't initiate that email.  It was initiated
21   by somebody else.
22   Q    You participated; right?
23   A    I corrected.
24   Q    Now, the Abstral relaunch, you're familiar with it; right?
25   A    Yes.
```

1740

DAVID CORR - CROSS BY MR. KNIZLEY

```
 1   Q   That was sort of your responsibility, was it not?
 2   A   It was several people's responsibility.
 3   Q   Was it your primary responsibility?
 4   A   I don't really know how to answer that question.
 5   Q   Well, I mean, is there something about the question that's
 6   confusing to you?  Was it your primary responsibility?  Can I
 7   restate it some other way for you?
 8   A   I had several responsibilities.
 9   Q   Yes, sir.  Was the Abstral relaunch?
10   A   That's very encompassing.  I'm not -- I'm not understanding
11   where you're going with this question.
12   Q   Okay.  You don't know what Abstral relaunch means?
13   A   I do know what it means.
14   Q   What does it mean?
15   A   It means that we took over the rights to the product and
16   were relaunching it into the commercial space.
17   Q   And were you involved in it?
18   A   Our entire team was?
19   Q   Were you, were you primarily involved with it?
20   A   Help me understand "primarily."
21   Q   You don't know what primarily means?
22   A   I do.  I'm not understanding your question.
23   Q   Okay.  Well, using your interpretation of "primarily," just
24   tell this jury, if you would, whether or not you were primarily
25   involved in the Abstral relaunch?
```

1741

1    A    I still don't understand the question.

2    Q    Do you have a LinkedIn page?

3    A    Yes.

4    Q    Did you talk about being primarily responsible for the

5    Abstral relaunch in your LinkedIn page?

6    A    It sounds as if you've looked at it.  So --

7    Q    Now --

8    A    -- it may have been verbiage.

9    Q    Well, did you do it or not?

10   A    I haven't looked at my LinkedIn page in a long time.  It

11   could very well be in there.

12   Q    Well --

13        THE COURT:  Mr. Knizley, why don't you come show it to

14   him?

15        MR. KNIZLEY:  Let me ask him a couple of more

16   questions and I'll show it to him.

17   Q    Could you tell the ladies and gentlemen of the jury what a

18   LinkedIn page is?

19   A    It's a -- it would be a version of a professional resume

20   online.

21   Q    And do you have such a thing?

22   A    I do.

23        MR. BODNAR:  Your Honor?  We object to the relevance

24   on this point.  We're way beyond what he talked about on direct

25   examination.

1742

```
 1              THE COURT:  Yeah, you're just disputing over whether
 2  he's primarily or not.  So that's completely collateral.  Let's
 3  move along, please.
 4              MR. KNIZLEY:  It really is -- whether it's primary is
 5  not collateral.  It's fundamental to --
 6              THE COURT:  Well, just ask him what his part was
 7  in the relaunch.
 8  BY MR. KNIZLEY:
 9  Q   What was your part?
10  A   I was responsible for hiring people in the southeast and
11  helping train the team.
12              MR. KNIZLEY:  May I approach the witness, Your Honor?
13              THE COURT:  Yes.
14  BY MR. KNIZLEY:
15  Q   Were you responsible for anything else?
16  A   The training.
17  Q   Let me ask you one more time were you primarily
18  responsible?
19              THE COURT:  Mr. Knizley, we are off of that issue.
20  Let's move along, please.
21  BY MR. KNIZLEY:
22  Q   I show you what's marked as Ruan Exhibit 122.
23              THE COURT:  I said we're off of that issue.  Let's
24  move along.
25              MR. KNIZLEY:  Oh, I'm sorry, Your Honor.
```

1743

```
1    Q   Now, your degree of involvement on the Abstral relaunch,
2    you became familiar with a lot of aspects, did you not?
3    A   What do you mean by aspects?
4    Q   Like the voucher program?
5    A   Yes.
6    Q   And you've told us a little bit about your voucher program,
7    did you not?
8    A   I have.
9    Q   And let me ask you, before I get to the voucher program,
10   now, when you were involved in the Abstral relaunch and as a
11   regional and national sales representative, y'all kept up with
12   prescribing practices of physicians, did you not?
13   A   We did.
14   Q   And you kept up with the prescribing practices of
15   physicians for Abstral?
16   A   Yes.
17   Q   Prescribing; right?
18   A   Yes.
19   Q   And you kept up with the prescribing practices of
20   physicians for Subsys to the extent you could?
21   A   The entire class.
22   Q   Did you do so for Subsys?
23   A   Yes.
24   Q   Okay.  And you also created a voucher program, did you not,
25   when y'all were going to relaunch Abstral in 2013; right?
```

1744

1   A   The company recreated --

2   Q   Tell the ladies and gentlemen of the jury again what the

3   voucher program was all about.

4   A   It was a program to allow the patients to get titrated to

5   the dose that they needed to achieve breakthrough -- achieve

6   relief for breakthrough cancer pain.

7   Q   And if you could give us some specifics of it, as to how it

8   worked?

9   A   There were three vouchers involved.  The first voucher was

10  to get the patient potentially titrated up to the next dose

11  they needed.  That contained 32 tablets.  Same deal with the

12  second voucher, same deal with the third voucher, so up to 96

13  tablets.

14  Q   And once they used the first voucher, they all three had to

15  be used in 30 days?

16  A   Yes.

17  Q   And there were 32 units or tablets per voucher; right?

18  A   Yes.

19  Q   And there were 96 that could be used; right?

20  A   Yes.

21  Q   Now, fentanyl, and particularly Abstral, was a drug that

22  had to be used by someone who was already opiate tolerant;

23  right?

24  A   Our products.

25  Q   Abstral?

1745

1    A    The TIRF REMS products.

2    Q    Okay.  And again, am I correct about that?  The person had

3    to be opiate tolerant already?

4    A    To use Abstral, they had to be opiate tolerant.

5    Q    And the Abstral was for breakthrough pain; right?

6    A    Breakthrough cancer pain.

7    Q    Right.  It wasn't for something that you take three times a

8    day?  It wasn't prescribed to take this medicine three times a

9    day; right?

10   A    It was prescribed to take when there was an episode, for up

11   to four episodes, up to four episodes per day.

12   Q    Take as needed for breakthrough pain up to four episodes a

13   day; right?  So that it is not necessarily the patient may go

14   through all of them, 32, in eight days?  Because they may not;

15   right?

16   A    It would depend on the patient.

17   Q    Depend on the patient, whether they had breakthrough pain.

18   So if the patient got all 96 at the first occasion -- right --

19   then that may last that patient four or five months; right?

20   A    I -- I don't know.

21   Q    It could?  I mean, your job, you were a pharmaceutical

22   salesman; right?

23   A    In that role I wasn't a direct salesperson.

24   Q    I'm sorry?

25   A    I was a sales leader in that role.

DAVID CORN - CROSS BY MR. KNIZLEY
27931

```
 1   Q   I'm sorry.  Say it again?
 2   A   I was a sales leader in that role.  I wasn't a salesperson.
 3   Q   And you talked to your pharmaceutical salesman; is that
 4   correct?
 5   A   Excuse me?
 6   Q   You talked to your pharmaceutical salesman?
 7   A   (No response.)
 8   Q   You talked to him about what to do, how to do your job?
 9   A   Yes, yes.
10   Q   Okay.  So that they would know how they should do their
11   job; right?
12   A   Yes, sir.
13   Q   And part of their job, I think you told us earlier, was
14   education; right?
15   A   Uh-huh (positive response).
16   Q   And you need to know your product; right?
17   A   Uh-huh (positive response).
18   Q   And to know how your product is used; right?
19   A   Yes.
20   Q   And you tell the physicians this is the best way to use the
21   product; right?
22   A   Well, the physician will determine the best way to use the
23   product.
24   Q   No question about it.  Whether you think that titration
25   should be used really doesn't matter; it's up to the physician
```

1   whether titration should be used; isn't that right?

2   A   The FDA and label decided how it should be titrated.

3   Q   Yes, sir.  Did you tell us just a moment ago that the

4   physician would make that determination?

5   A   It's ultimately their choice.  But we spoke within the four

6   corners of the label.

7   Q   Okay.  So the physician can, if they so choose, prescribe

8   all 96 at one time as needed; is that correct?

9   A   In the original rules of the program.

10  Q   Right.  And they did, and that's what Dr. Ruan did, did he

11  not?

12  A   They did.

13  Q   And y'all didn't like that; right?

14  A   It wasn't a matter of not liking.  It was a matter of not

15  interrupting the business.

16  Q   Ahh, it cost y'all money; right?

17  A   Well, I didn't see the actual finances for the company.

18  Q   Yes, sir.  Could you tell the ladies and gentlemen of the

19  jury why you thought they would bankrupt your business?

20  A   Why?  Because I saw our actual revenue versus what our

21  expenses were.  Again, without the numbers.  I saw percentages.

22  And we weren't bringing in the revenue based off the

23  prescriptions that were going out the door.

24  Q   Okay.  So the manner of which -- of prescribing them all

25  three at one time was financially detrimental to Galena; is

1  that fair to say?

2  A   It also didn't follow the guidelines of titration.

3  Q   Was it financially detrimental?

4  A   Yes.

5  Q   To Galena?

6  A   Yes.

7  Q   And I'm assuming that the leadership of Galena didn't like

8  that; right?

9  A   It wasn't about not liking it.  It was making sure the

10  program wasn't abused.

11  Q   Okay.  Now, Dr. Ruan and Dr. Couch were stockholders;

12  right?

13  A   That's what they claimed.

14  Q   Sir?

15  A   That's what they've claimed to folks in the organization.

16  Q   Do you know that or not?

17  A   I can't prove whether they were stockholders or not.

18  Q   You talked to this jury about this chart, about whether

19  they owned stock and stuff?

20  A   No.  I talked about what happened with the company and

21  where our stock was.  I talked about their upsetedness when the

22  stock dropped but didn't talk about their ownership.

23  Q   Mr. Corin, do you know whether they were stockholders or

24  not?

25  A   I can't confirm that they're stockholders.

1749

```
1    Q   Okay.

2    A   They said they were.  But I haven't seen their statements.

3    Q   Okay.  Now, they were stockholders and they were

4    prescribing this voucher program all three at one time and they

5    were having a financial detriment to the company.  Then I guess

6    their stockholding wasn't having an effect on the manner in

7    which they were prescribing the drug?

8    A   I don't understand that statement.

9    Q   Okay.  If you're a stockholder, you want your company to do

10   good; right?  If you want to make money?

11   A   That's how most stockholders --

12   Q   Right.  If the company goes bankrupt because of something

13   you did, then that wouldn't be good for you, would it?  If you

14   were a stockholder?

15   A   If the company went out of business, no, it wouldn't be

16   good.

17   Q   And if this doctor and this doctor right here prescribed

18   the medication in a form that would be financially detrimental

19   to the company, it sounds like they were prescribing the

20   medications for what the patient needed, not what the financial

21   interests of them may have been, doesn't it?

22   A   I don't know.  That would be up to them to determine.

23   Q   Okay.  But we do know that, though, prescribing -- that if

24   the patient -- if you did it the way that you would tell us

25   about every eight days, that means the patient would have to
```

1   come back in in eight days to get a new prescription; right?

2   A   Yes.

3   Q   And then after the next eight days, they come in and get a

4   new prescription; right?

5   A   Yes.

6   Q   So we do know that if the prescriptions were -- all three

7   of them were the first day, that would be better for the

8   patient, wouldn't it?

9         MR. BODNAR:  Objection, Your Honor, to what would or

10  wouldn't be better for the patient if he's already --

11        THE COURT:  Sustained.

12  BY MR. KNIZLEY:

13  Q   It would be more convenient for the patient, wouldn't it?

14  A   I'm not sure I understand your question.  I can't determine

15  what is good for a patient or not.  I'm not a doctor.

16  Q   I'm talking about convenience now for the patient.

17  A   I still can't determine that.  What would be convenient for

18  me would be to go back and see my doctor every eight days if I

19  was experiencing breakthrough cancer pain and have a good

20  conversation and be treated appropriately.  That's what I would

21  care about.

22  Q   Okay.  All right.  And if you had been with the same doctor

23  for many, many years and you were just trying out a new

24  product, do you still think you would want to go back every

25  eight days?

DAVID CORR - CROSS BY MR. KNIZLEY

```
 1          MR. BODNAR:  Objection to speculation, Your Honor.

 2          THE COURT:  Sustained.

 3   BY MR. KNIZLEY:

 4   Q    You had another program, a RELIEF Program ; is that right?

 5   A    The company had a program.

 6   Q    Okay.  And it was promoted to physicians, was it not?

 7   A    It was introduced to physicians.

 8   Q    And for what purpose?

 9   A    For the purpose of being able to collect early on data of

10   how patients were doing.

11   Q    And what was the -- you said early to collect on data, but

12   it also had a financial benefit, did it not?

13   A    Financial benefit to who?

14   Q    Did it have a financial benefit to anyone?  Did it?

15   A    It didn't have to.  It would all depend.

16   Q    Okay.  There was a $500 payment associated with the RELIEF

17   Program, was there not?

18   A    Those were in the rules of the program.

19   Q    Sir?

20   A    The $500 was in the rules of the program.

21   Q    Who did the $500 go to?

22   A    (No response.)

23   Q    Who did the $500 go to?

24   A    The doctor.

25   Q    Okay.
```

27937

1    A   Upon completion.

2    Q   Right.  And your company gave the doctors an opportunity to

3    enter into that program; right?

4    A   Yes.

5    Q   And if they had registered in the program, then they would

6    get for every patient they registered $500; right?

7    A   Every patient that completed the program.

8    Q   Registered and completed; right?

9    A   Completed.

10   Q   That goes to the doctor; right?

11   A   (No response.)

12   Q   That went to the doctor; right?

13   A   Excuse me?

14   Q   That went to the doctor; right?

15   A   Yes.  It went to the person who handled the patient in the

16   program.

17   Q   Let me show you what's marked as Ruan's Exhibit 120 and

18   tell me if you recognize that.

19            THE COURT:  Is that in evidence already?

20            THE CLERK:  (Shaking head negatively.)

21            MR. KNIZLEY:  I'm sorry?

22            THE COURT:  Is that already in evidence?

23            MR. KNIZLEY:  No, ma'am.

24            THE COURT:  All right.

25   BY MR. KNIZLEY:

1753

DAVID COBB - CROSS BY MR. KNIZLEY

1   Q   Do you see 120?

2   A   Okay.

3   Q   And up here at the top do you see who that's from?

4   A   Jeff Palmer.

5   Q   Who is it from?

6   A   Me.

7   Q   Okay.  And who is it to?

8   A   Jeff Palmer.

9   Q   And who is he again?

10  A   The sales representative for the area.

11  Q   And what is the subject matter?

12  A   Abstral RELIEF Registry Program.

13  Q   Okay.  And I will --

14          MR. KNIZLEY:  May I approach the witness, Your Honor?

15          THE COURT:  Yes.

16  BY MR. KNIZLEY:

17  Q   Sir, if you could take a look at Ruan's Exhibit 120.  I'll

18  show you the top up here with your name and date.

19  A   Yes, sir.

20  Q   And this 10/22/13 is the date?

21  A   Yes, sir.

22  Q   And as we said, it was to Mr. Palmer and it was about this

23  RELIEF Registry Program; right?

24  A   Yes, sir.

25  Q   Would you take a moment to look at the back and tell me if

1754

```
 1   this email chain is one that you're familiar with?

 2   A   Yes.

 3           MR. KNIZLEY:  Okay.  Judge, we'd offer Ruan's 120.

 4           MR. BODNAR:  Your Honor, the United States needs to

 5   take a look at what it is.

 6           No objection, Your Honor.

 7           THE COURT:  All right.  Mark it in.

 8       (Defendant Ruan's Exhibit 120 was entered into evidence.)

 9   BY MR. KNIZLEY:

10   Q   Let me show you what's marked as Ruan Exhibit 120 again,

11   part of that which we submitted a moment ago.  This is that

12   same email chain on the Abstral RELIEF Registry Program; is

13   that correct?

14   A   Yes.

15   Q   And it's dated October 15, 2013?

16   A   Yes.

17   Q   And this is an email from Mr. Valmonte -- is that how you

18   say his name?

19   A   Yes.

20   Q   -- to Mr. Palmer.  Okay?  Is that correct?

21   A   I can't tell.  The page is blocking it.

22           It looks like it's to the research person.

23   Q   Sir?

24   A   It looks like it's to the research person and Palmer is

25   cc'd.
```

DAVID CORN - CROSS BY MR. KNIZLEY

1   Q   Okay.  And do you know the research person?

2   A   No.

3   Q   And what does it say there?

4   A   Do you want me to read it?

5   Q   Dear Neil.

6   A   Dear Neil, thanks for taking the time to chat today.  As I

7   indicated, Jeff Palmer is our TBM.  And in his conversation

8   with Dr. Ruan, there is interest in the Abstral RELIEF Registry

9   Program.  Therefore I'm attaching our CDA.  If you find the

10  language acceptable, please go ahead and sign off on the PDF

11  version.  The Word version is equivalent, and if you require

12  edits, please do so and track changes and send back to me for

13  review.  Once we have the CDA in place, I can send over the

14  contract template protocol and ICF template in preparation for

15  IRB approval.  Let me know if you have any questions, and I

16  look forward to working with you on the registry program.

17  Q   Going back or upwards to October 22nd, 2013 at 11:16,

18  Mr. Stimpson writes back to Mr. Valmonte, and what does he say?

19  A   Please see attached draft agreement for Dr. Ruan.  Thanks.

20  Q   Okay.  And then eventually Dr. Ruan -- eventually

21  Mr. Lento -- who is he again?

22  A   Vice president of sales.

23  Q   Okay.  And it's copied to you?

24  A   Yes.

25  Q   Okay.  And he tells Dr. Ruan what?

```
 1   A   Dr. Ruan, I hope all is well.  I was surprised to receive

 2   this note today via Neil.  I had thought that you were very

 3   excited to participate in Galena's RELIEF Registry.  I believe

 4   there might exist some confusion on patient eligibility.  Would

 5   it be possible to discuss at your earliest convenience?  I'm

 6   copying Mark Schwartz, the Galena COO, and Allan Valmonte, the

 7   director of clinical affairs, and Dave Rowan, regional business

 8   director.  Thanks for your consideration.

 9   Q   Okay.  And I think Dr. Ruan had already told y'all that he

10   didn't want to participate; right?

11   A   He must -- it looked like this person, from those emails,

12   said something to Allan Valmonte via email.

13   Q   I didn't understand.  Say it again, please, sir.

14   A   It looked like Neil, from the emails I read through,

15   corresponded with Allan Valmonte.

16   Q   You told us on direct evaluation that Dr. Raun did not

17   participate in the program; is that right?

18   A   Correct.

19   Q   And that he just simply turned the money down?

20   A   Yes.  Turned the program down.  I'm not sure -- I want to

21   use the right word.  He elected not to participate.

22   Q   Sorry.  Go ahead.

23   A   He elected not to participate in the program.

24   Q   And as a result, did he not receive the $500 per patient?

25   A   A person would only receive the per patient if the patient
```

DAVID CORN, CROSS BY MR. KNIZLEY

 1  completed the registry program for each patient.

 2  Q   You had told us about this chart, if you recall -- I'll

 3  step up here and ask you a little bit about it.

 4          This chart, you told us what it indicated; is that

 5  right?

 6  A   Do you mind if I stand up?

 7  Q   Sure.  Come over here.

 8  A   (Complying.)

 9  Q   You told us this chart is Dr. Ruan's and Dr. Couch's

10  Abstral prescriptions by month; right?

11  A   I didn't create this chart.

12  Q   Yes, sir.  Did you tell us that's what it is?  Or do you

13  know if that's what it is or not?

14  A   It appears to be that.

15  Q   Okay.  This is your writing on it; right?

16  A   Yes.

17  Q   Okay.  And I'm going to show you what's marked as Ruan's

18  Exhibit 61, which is in evidence.  Take a look at that too.

19  Does that seem to be the same thing with a red line without

20  Dr. Couch on there?

21  A   It looks similar.

22  Q   Okay.  And how about Ruan's Exhibit 62?  I want to talk

23  about this little area right here.  (Indicating.)  Does that

24  look similar too?

25  A   It actually -- it's hard to measure.  It has different

 1  things.

 2  Q   All right.  Thank you.

 3        With the Court's permission, could you step back down

 4  a moment, Mr. Corin?

 5        THE COURT:  Yes.

 6        THE WITNESS:  (Complying.)  Do you want me on this

 7  side?  (Indicating.)

 8        THE COURT:  He needs to stand where you are,

 9  Mr. Knizley.

10  BY MR. KNIZLEY:

11  Q   All right.  Mr. Corin, the red line, we determined, is

12  Dr. Ruan; right?

13  A   Uh-huh (positive response).

14  Q   Could you tell the ladies and gentlemen of the jury when

15  Dr. Ruan began to apparently prescribe the Abstral product more

16  than he had in the past?

17  A   It looks like the first milestone would be between

18  September and October of 2013.

19  Q   And when did y'all start that voucher program you talked

20  about?

21  A   Right when we launched it in July 2013 --

22  Q   Okay.

23  A   -- when it was produced.

24  Q   Do you know when Dr. Ruan ever purchased his first stock?

25  A   I don't.

1  Q   Okay.  And if I told you it was January 9, 2013, would you

2  disagree with that?

3  A   I have no idea.

4  Q   Okay.  But if that's so, it looks like this prescribing

5  took place shortly after your voucher program took place;

6  right?

7  A   Right.  The voucher program was there before we launched

8  the --

9  Q   Remember the registry program, and he didn't want to

10 participate in the program.  And if he didn't complete it, he

11 doesn't get the money; right?

12 A   He didn't enroll the patients.

13 Q   That's that program there.  (Indicating.)  And the voucher

14 program came.  That is free medicine for the patients; right?

15 A   It was, yes, to titrate the patients.

16 Q   Okay.  And he didn't own any stock?

17 A   I'm not aware.

18 Q   To your knowledge.  Okay?

19 A   (No response.)

20 Q   Thank you.

21     (Witness returns to witness stand.)

22 Q   Now I'm going to show you what's marked as Ruan's Exhibit

23 61, which we looked at a moment ago.  It's been admitted into

24 evidence.  Okay.  Do you remember me showing you that a second

25 ago?

1  A   Yes.

2  Q   And do you remember telling us it looked similar to the

3  chart we've been talking about?

4  A   Is this the first one you showed me or the second one?

5  Q   I believe it's the first one.

6  A   The first one was similar.  The second one was a little

7  hard to decipher.

8  Q   Okay.  And if that was correct about the stock, we see that

9  the increase in prescriptions of Abstral started, it looks

10  like, October November, December and part of January before any

11  stock was purchased; right?

12  A   Before what?

13  Q   All right.

14  A   I didn't hear what you said at the last.

15  Q   Yes, sir.  I'm sorry.  I'll try to repeat it.  Okay?

16      If you'll look, it appears, if I'm correct about the

17  stock purchases in January, okay, if I'm correct, all right,

18  that his increase in prescriptions of Abstral started going up

19  back in September and October; right?

20  A   Correct.

21  Q   And that was during the time when you had your voucher

22  program; right?

23  A   That was at the same time.

24  Q   Okay.  And the voucher program is new patients on your

25  product; right?

DAVID CORN- CROSS BY MR. KNIZLEY

1761

```
 1    A    Initiated patients, yes.
 2    Q    I didn't hear you, sir.
 3    A    New initiated Abstral patients.
 4    Q    Okay.  And it's only for one month?
 5    A    Yes.  Well, again, as you described before, it's eight
 6    days, eight days, eight days, which is 24 days.  So up to 30.
 7    Q    Up to 30?
 8    A    Uh-huh (positive response).
 9    Q    And 30 days is up till one month then; right?  Is that
10    fair?
11    A    Yeah.
12    Q    Did I say that right?
13    A    Yes.
14    Q    Okay.  And it's one voucher per patient; right?
15    A    Up to three vouchers per patient.
16    Q    Within a 30-day time period?
17    A    Yes.
18    Q    Three vouchers per patient within a 30-day time period;
19    right?
20    A    Yes.
21    Q    So if you're trying a number of your patients that may be
22    qualified to use the Abstral -- if you started increasing it on
23    those vouchers, right, once they got through, they couldn't get
24    it again, could they?
25    A    No.
```

DAVID CORN - CROSS BY MR. KNIZLEY

1  Q  They couldn't get free medicines again, could they?

2  A  No.

3  Q  Do you know whether or not that attributed to this drop

4  down here?

5  A  Don't know.

6  Q  Just as we don't know whether the problem with the insider

7  trading contributed to the drop, do we?

8  A  Again, I can't confirm insider trading.

9  Q  Let's talk about the insider trading or the blackout time

10  frame we looked at.  Now, there came a time, did there not,

11  when Galena wanted to -- came to Dr. Ruan or wrote Dr. Ruan by

12  email and was interested in him using their product.  Are you

13  familiar with that?

14  A  Which email are you referring to?

15  Q  I'm referring to Government's Exhibit 5-3, 11-5(3).  And

16  it purports to be an email introduced into evidence from whom?

17  A  Chris Lento.

18  Q  To?

19  A  Dr. Ruan.

20  Q  Okay.  And this is in April of 2013; right?

21  A  Before I was with the organization.

22  Q  Okay.  In late 2013; right?

23  A  Yes.

24  Q  And this email appears to be about Mr. Lento introducing

25  himself and the company to the doctor and speaks to him a bit

1763

1    about the product Abstral they are about to launch a little

2    later on in the year; right?  If you will take a look at it.

3    A   He mentions that Galena now has the U.S. rights for

4    Abstral.

5    Q   Okay.  And what does it say about this part here?

6    (Indicating.)

7    A   We will begin marketing and promoting the product to

8    healthcare professionals in the very near future.

9    Q   Okay.  And what does it say next?

10   A   I understand that you prescribed Abstral for your patients

11   in the past and appreciate your support of the brand.

12   Q   And then he asked him to meet him -- meet him at a meeting

13   in New Orleans; right?

14   A   Yes.

15   Q   Okay.  And some months later back in December the doctor

16   writes him back; right?

17   A   Yes.

18   Q   Okay.  And then after that -- and you're about -- by

19   December you're with the team, are you not?

20   A   Yes.

21   Q   And we have the Abstral relaunch by that time; right?

22   A   Yes.

23   Q   And your Abstral relaunch started in August; right?

24   A   Correct.

25   Q   Of 2013.  And were you aware that Galena then asked

1    Dr. Ruan and Dr. Couch to be on their advisory board of

2    directors?

3    A    Galena asked many customers for them to attend an advisory

4    board, not advisory board of directors.  Advisory board.

5    Q    Right.  Were you aware that Galena invited Dr. Couch and

6    Dr. Ruan to attend the advisory board?

7    A    Yes.

8    Q    And do you know whether or not Dr. Ruan agreed to do so?

9    A    He did not attend.

10   Q    Okay.  And I'm going to show you what's marked as

11   Government's Exhibit 11-5(7).  And does this purport to be an

12   email from Dr. Ruan to Mr. Lento?  And what does he tell him?

13   A    Do you want me to read the email?

14   Q    Yes, sir.

15   A    Hi Chris, it seems that I will not be able to make this

16   weekend's advisory board meeting.  The reason is I recently

17   purchased some stocks from Galena online.  Now, if I get

18   involved with the co at advisory board level, then I will be

19   considered an insider; right?  If so, there will be a lot of

20   restrictions and regulations on how these stock can be

21   traded.  Also there may be some legal trouble once I know more

22   about the co and own stocks.  At the current level I know more

23   -- I know no more than the general public; therefore there is

24   no risk for me to trade the stocks I purchased.  I have sent

25   some information to my lawyer to find out the legality of this,

DAVID CORR - CROSS BY MR. KNIZLEY

1   while owning stocks and participating -- the board meeting.  He

2   has not emailed me yet.  So I figured I just want to let you --

3   the page turned.  Sorry.

4   Q   Go ahead.

5   A   -- know.  Hope everything is well, and I hope you all have

6   a successful meeting this weekend.  I have not signed the

7   agreement with Galena, so I am not an insider.  Have a great

8   weekend.

9   Q   He eventually chose not to do that; right?

10  A   He chose not to attend.

11  Q   Did Galena then want him to be a consultant?

12  A   It did.

13  Q   And I show you what's marked as Ruan's 54.  That's admitted

14  into evidence.

15  A   This is the agreement that we ask all of our consultants to

16  sign.  This is what we would need to see prior to the ad board.

17  Please let me know if you have any questions.  Chris.

18  Q   And he also turned your company down on that; right?  Do

19  you recall?

20  A   I recall he chose not to attend the ad board.  Every member

21  who attended the ad board signed the consultant agreement.

22  Q   And he chose not to do that?

23  A   He chose not to attend.

24  Q   Then there came that time, I think it was in January, that

25  you had the problem with the board of directors?

1    A    January of what year?

2    Q    2014.

3    A    Yes.

4    Q    And did you become aware of Dr. Ruan's sentiment about what

5    happened?

6    A    I became aware that he was upset with the organization.

7    Q    I show you what's marked as Government's Exhibit 11-5(12)

8    which is in evidence.  And could you tell us -- and it seems to

9    be from Dr. Ruan in March.  Do you see that?  2014.  Do you see

10   that?

11   A    Yes.

12   Q    Okay.  And if you could read that for us, please, sir,

13   where it says "Hi Guys"?

14   A    Hi Guys.  This is a very interesting paper and a quite

15   accurate one, except for one thing.  The Insys CEO chairman of

16   the board is a wise businessman while the Galena CEO is like a

17   despicable thief.  Yesterday I decided to contact the board of

18   directors of Galena and ask him to fire their CEO, the guy who

19   did so much damage to this company and threw the co into the

20   toilet with what he did.  They will get back to me next week.

21   I believe once the CEO is replaced with a businessman with

22   insight and a team morale and ethic, the competence of

23   shareholders will build up again and the stock will follow the

24   course of Insys.  I have zero confidence in this guy (CEO), and

25   I wonder how he can still lead this co after he single-handedly

1    trashed the confidence of all others with his conduct.  Hope

2    y'all have a great weekend.

3    Q    And how did Dr. Ruan describe this gentleman?

4    A    Despicable.

5    Q    Despicable what?

6    A    Thief.

7    Q    And this gentleman was not fired until August of 2014?

8    A    If that's the person he's referring to, Mark Ahn, Mark Ahn

9    was let go in August of 2014.

10   Q    Mark Ahn, what position did he hold?

11   A    He was the CEO.

12   Q    And let's see.  What position is he talking about?

13   A    CEO.

14   Q    Of Galena is what?

15   A    He writes like a despicable thief.

16   Q    That is the person he's referring to?

17   A    I believe so.  I wasn't the intended audience for that.

18   Q    Now, I'm going to ask you a little bit about the speaking

19   engagements and the opportunity that you say to discuss

20   speaking engagements for Abstral that you were involved in

21   regarding to Dr. Ruan and Dr. Couch.  Do you remember talking

22   about that earlier today?

23   A    Yes.

24   Q    And could you tell the ladies and gentlemen of the jury

25   what a company, a pharmaceutical company like Abstral, would

 1   have a speakers program for?

 2   A   You would have speakers -- a speaker talk to other doctors

 3   in the area about the class of medications and the products.

 4   Q   And what would the purpose as to the pharmaceutical company

 5   be to have those doctors speak to other doctors or

 6   practitioners in the area?

 7           MR. BODNAR:  Objection to relevance, Your Honor.  He

 8   stated on direct neither doctor was a speaker for Galena.

 9           THE COURT:  Overruled.  Overruled.

10   BY MR. KNIZLEY:

11   Q   You can go ahead.  Do you want me to say it again?

12   A   Repeat, yes.

13   Q   Okay.  Pharmaceutical companies -- what would be the reason

14   a pharmaceutical company -- and let me back up a little bit.

15   Pharmaceutical companies pay physicians to make these

16   presentations, do they not?

17   A   They give them honorariums.

18   Q   And that would be money?

19   A   That would be a fair market value payment for their time.

20   Q   Okay.  And that's common throughout the industry, is it

21   not?

22   A   For the companies I've been with, yes.

23   Q   And you're familiar with those companies as well?

24   A   I'm not familiar with how they compensate for time.

25   Q   Well, are you familiar with what Insys does?  Or did back

1   at that time?

2   A   I'm familiar that they had many speaking engagements.

3   Q   They had the same practice?  Some of your other competitors

4   had the same practice?

5            MR. BODNAR:  Objection, Your Honor.  Can we approach

6   at side bar with this?

7            THE COURT:  Yes.

8        (At the side bar, jury not present.)

9        ... (Redacted.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5     ... (Redacted.)

6     (In open court, defendants and jury present.)

7  BY MR. KNIZLEY:

8  Q   Mr. Corin, I think you had told us in direct examination

9  you had an opportunity to come to Mobile and talk with Dr. Ruan

10 and Dr. Couch about a speakers program?

11 A   I talked to Dr. Ruan about it.

12 Q   Okay.  Did you talk to Dr. Couch about it at all?

13 A   No.

14 Q   Okay.  And you told us -- did you speak directly to

15 Dr. Ruan about it?

16 A   We had dinner in November of 2013.

17 Q   I'm very sorry.  You said at the beginning of 2014?

18 A   We had dinner in November of 2013.

19 Q   Okay.  And do you remember where that dinner was?

20 A   It was at a Chinese place somewhere here in Mobile.

21 Q   Okay.  And do you remember who all was present?

22 A   Allan Valmonte from our company, Jeff Palmer and Dr. Ruan.

23 Q   Anyone else?

24 A   I don't remember.  There might have been people from his

25 office.

1  Q   Okay.  Was this -- you say other staff members from his

2  office?

3  A   Yeah.  I didn't know all the staff, though.

4  Q   Was it a lunch meeting?

5  A   Dinner meeting.

6  Q   Okay.  And was it at the meeting during the dinnertime that

7  you had the conversation you related about Dr. Ruan possibly

8  being a speaker with your company?

9  A   Yes.

10  Q   And were other people at the dinner table?

11  A   Yes.

12  Q   And were you sitting close to him or next to him?

13  A   I don't remember where we were sitting.

14  Q   You don't recall whether you were sitting next to him or

15  not?

16  A   I believe he was across from me, but I don't remember -- I

17  don't remember.

18  Q   All right.  Do you remember him saying words to you that

19  night?

20  A   Yes.  That he'd like to be speaker for our company.

21  Q   In front of everyone at the table?  How many people were at

22  the table?

23  A   I don't know how many people heard it.

24  Q   All right.  You can't tell me whether they heard it or not,

25  but how many people were at the table?

 1   A   I don't remember how many people were there.

 2   Q   Okay.  Big restaurant?

 3        MR. BODNAR:  Objection.  Relevance at this point, Your

 4   Honor.

 5        THE COURT:  Let's move along, please.

 6        MR. KNIZLEY:  Okay.

 7   Q   You said that Dr. Ruan said he wanted stock for his

 8   speaking; is that what you recall?

 9   A   That was -- he did not say that to me.  That was not in the

10   meeting.

11   Q   I'm sorry.  You did not hear that?

12   A   He did not say that to me directly, no.

13   Q   He said that to somebody else?

14   A   No, no, no.  That was after the meeting where he wanted to

15   see if he could be compensated with stock.

16   Q   Did he not have that conversation with you?

17   A   He did not have that conversation with me.

18   Q   So what you told this jury earlier was what somebody else

19   told you?

20   A   Specifically what?

21   Q   About him asking for stock for speaking.

22   A   He requested it through the company.

23   Q   Did he write an email?

24   A   He asked -- he asked our sales representative who then

25   asked the question up the ladder.

DAVID CORN - CROSS BY MR. KNIZLEY

1    Q   You don't know that.  You don't know.  Somebody told you;

2    right?

3    A   Correct.

4          MR. KNIZLEY:  Judge, I would move to strike the

5    previous testimony that it was based on hearsay and there's not

6    a proper foundation for it yet.

7          MR. BODNAR:  Objection, Your Honor.  He said it went

8    to his sales representative when he was the boss, and it was

9    worked up the chain.  That was what he was aware of.

10          THE COURT:  I overrule the objection.

11   BY MR. KNIZLEY:

12   Q   And I assume there was an email about that?

13   A   I don't recall what the conversation was, whether it was

14   email or phone or what.

15   Q   And you don't have an email for this jury to look at to

16   confirm that, do you?

17   A   I didn't bring any emails today.

18   Q   I'm going to ask you about your rebate program just a

19   little bit, if I could.  I'm going to show you what's been

20   marked into evidence as Government's Exhibit 38-8, it

21   appears.  It may be 39.  Do you see that?  Do you see it?

22   A   Yes, sir.

23   Q   Okay.  And that is the rebate agreement you spoke about

24   earlier?

25   A   Yes.

1  Q   Okay.  I think you've been asked this, but this is between

2  your company -- right?

3  A   Yes.

4  Q   -- and C&R Pharmacy?

5  A   Yes.

6  Q   Is that right?  And you were asked if this is an agreement

7  that is often used by your company.  Is that correct or not

8  correct?

9  A   Our company entered into agreements with several oncology

10  dispensing clinics.

11  Q   And you're familiar with those agreements, are you not?

12  A   I'm not the contracting person.

13  Q   Are you familiar with the agreements?

14  A   I'm familiar that our company had agreements.

15  Q   This is not in evidence, and I want to show you what's

16  marked as Raun's Exhibit 143.

17            MR. KNIZLEY:  Judge, would you prefer I approach

18  first?

19            THE COURT:  You can show it on the presenter if you

20  want.  The jury's not seeing it until it's admitted.

21  Q   I want to show you what's marked as Ruan Exhibit 143.  And

22  look at the top of this.  And does that appear to be an email

23  from Wednesday --

24  A   November 19.

25  Q   -- November 19, 2014?

DAVID CORN - CROSS BY MR. KNIZLEY

```
 1   A   Yes.

 2   Q   And who is it from?

 3   A   Mike Griek -- or David Corin.  Sorry.

 4   Q   And who is it to?

 5   A   Mike Griek.

 6   Q   And what's it about?

 7   A   SimfaRose.

 8   Q   It's just two pages.  This is the back page.  There's not

 9   much on it, and then at the bottom.  Okay.  Do you recognize

10   it?

11   A   This email?

12   Q   Yes, sir.

13   A   I don't remember it.  But now I see it.

14   Q   Does it look like your email?

15   A   I'm not on this originally, no, sir.

16   Q   Whose name is right up here at the top?

17   A   Mine.

18   Q   Does it look like an email that you had an email chain

19   from?

20   A   Yes.  I didn't initiate it, though.  I got it.  It's there.

21   Q   You're on there; right?

22   A   Yes.

23           MR. KNIZLEY:  All right.  We would offer Ruan Exhibit

24   143.

25           MR. BODNAR:  Let me take a look at it.
```

1    The United States objects on the ground of hearsay,

2  Your Honor.  The document's coming in for the truth of the

3  matter and not the part of the witness that's here testifying

4  today.

5    THE COURT:  I sustain the objection.

6    MR. KNIZLEY:  You haven't seen it.

7    THE COURT:  I read it while it was on the screen.

8    MR. KNIZLEY:  We're not offering it for the truth of

9  what he just said.

10    THE COURT:  Well, it's also on the subject matter that

11 I limited Mr. Sewell's questioning about.  It doesn't matter

12 whether it's the same or different.  I sustain the objection.

13    MR. KNIZLEY:  Yes, ma'am.  We're offering it for the

14 purpose of impeachment of the witness.

15    THE COURT:  Of impeachment of the witness?

16    MR. KNIZLEY:  Yes, ma'am.

17    THE COURT:  Come to side bar.

18    (At the side bar, jury not present.)

19    MR. KNIZLEY:  Excuse me.  Judge, it's simply an email

20 where he says he's not familiar with it, he doesn't know

21 anything about the format of these contracts.  This is about

22 the C&R contract itself, it's about a contract that Jay tried

23 to get in, and he is the one correcting him, so it's the same

24 as the C&R contract.  He's familiar with it.  He says he's not.

25 He's evasive, and we're trying to show that yes, that's not

1   quite true, that you are familiar with these even though you've
2   said you're not.
3            MR. ARMSTRONG:  He testified he had nothing to do with
4   the creation or anything to do with these contracts, and this
5   totally proves that he did.
6            MR. BODNAR:  Your Honor, it shows that at best it's
7   proof-read.
8            THE COURT:  Yeah.  I don't think this impeaches him,
9   so I sustain the objection.  That's a collateral matter anyway.
10  So let's move on.
11       (In open court, defendants and jury present.)
12       (Defendant Ruan's Exhibit 143 was denied.)
13  BY MR. KNIZLEY:
14  Q   Mr. Corin, I'm showing you again what's marked as
15  Government's Exhibit 38-8.  And is that the rebate agreement
16  between your former employer Galena and C&R Pharmacy?
17  A   Yes.
18  Q   And do you know who was the management company for C&R
19  Pharmacy?
20  A   I don't know the -- I don't know who owned C&R or who
21  managed -- I mean there was a person named Bryan, but I don't
22  know who the named manager was.
23  Q   Do you know who owned it?
24  A   I believe Dr. Ruan and Dr. Couch.
25  Q   How do you know that?

DAVID CORN, CROSS BY MR. KNIZLEY

1778

1   A   That's what we were told.

2   Q   Okay.  Other than being told, do you have any other reason

3   to know who owns it?

4   A   No.

5   Q   Okay.  Do you know who managed it or at least the people

6   you dealt with in the pharmacy?  Who did you deal with?

7   A   We dealt with the pharmacy manager, the person inside the

8   pharmacy.  But I believe there was a bigger entity managing the

9   pharmacy.

10  Q   Okay.  And who was the person you dealt with, do you

11  recall?

12  A   We dealt with Caye in the pharmacy.  But people from our

13  company dealt with others.

14  Q   Caye Renegar?

15  A   Yes.

16  Q   Okay.  And you mentioned Bryan?

17  A   That's who I -- I've never met Bryan, but people dealt with

18  Bryan.

19  Q   Bryan Crawford?

20  A   I don't know his last name.

21  Q   Did you meet with Caye Renegar?

22  A   Yes.

23  Q   And did you understand that McConaghy -- did you understand

24  that McConaghy Pharmacy was the bigger company that managed it,

25  or did you know that?

1779

 1   A   No, I didn't know that.

 2   Q   Okay.  Now, how many times did you meet with Ms. Renegar?

 3   A   The times that we came down here.

 4   Q   I'm asking you personally do you have a recollection of how

 5   many occasions you may have met with her?

 6   A   I've been here five times, so five times.

 7   Q   Okay.  And how much time did you spend with Ms. Renegar

 8   each time you went there?

 9   A   We probably spend, you know, from a half hour to an hour in

10   the pharmacy.

11   Q   Okay.  Did y'all talk about your company that you worked

12   for?

13   A   Sure.

14   Q   Did you talk about stock with your company that you worked

15   for?

16   A   No.

17   Q   Did you talk about the breast cancer vaccine ReuVax [sic]?

18   A   I don't recall any conversations about NeuVax with her.

19   Q   NeuVax.  Excuse me.  You might have; right?

20   A   I don't recall any conversations.

21   Q   If you don't recall talking about it once, I assume you

22   don't recall talking about it on multiple occasions then;

23   right?

24   A   I don't recall.

25   Q   You're not saying it didn't happen; you just don't have a

1780

1    recollection?

2           MR. BODNAR:  Objection to relevance, Your Honor.  This

3    is way outside of the direct examination.

4           THE COURT:  Overruled.

5    BY MR. KNIZLEY:

6    Q   You're not saying you didn't talk about it multiple times;

7    you're just saying you don't have a recollection of talking

8    about it; right?

9    A   I don't have a recollection.

10   Q   And you were asked about in this contract a portion on the

11   back page here.  Now, you mentioned it was signed by whom?

12   A   Mark Schwartz.

13   Q   And he wasn't here, was he?

14   A   I don't know where he signed it.

15   Q   Okay.  You didn't participate in the signing of it?

16   A   No.

17   Q   Did you participate in any way in the negotiation of the

18   contract?

19   A   No.  Our team negotiated that.

20   Q   Okay.  Did you participate in any way in the negotiation of

21   the rebate whatsoever?

22   A   No.

23   Q   So you had no interaction with Dr. Ruan in connection with

24   the rebate agreement?

25   A   I don't believe our company did either.

1781

DAVID CORN - CROSS BY MR. KNIZLEY

```
 1   Q   Okay.  No one did?
 2   A   No.
 3   Q   Okay.  So to your knowledge, Dr. Ruan -- to your knowledge,
 4   Dr. Ruan was not involved in it?
 5   A   He made it clear he didn't want to be involved.
 6   Q   In the rebate?
 7   A   Yes.
 8   Q   He made it clear to you?
 9   A   To our entire company.
10   Q   Okay.  Now, although he wasn't involved in it, let's look
11   at the terms of it.  Okay?  Now, the prosecutor had you read
12   this earlier.  But it says that there's a certain section of
13   the Social Security Act that apparently has some requirements
14   in the Social Security Act that you make some -- let's see what
15   it says -- Discount Safe Harbor regulations and the Code of
16   Federal Regulations which relate to your company's obligation
17   to report and disclose any discounts, rebates, or other
18   reductions to C&R Pharmacy for the products you purchased --
19   that they purchased.  Do you see that?  Did he ask you to read
20   it earlier?
21   A   Uh-huh, yes.
22   Q   That says your company had an obligation to report and
23   disclose discounts; right?
24   A   That's what it says.
25   Q   And do you have any idea whether your company met that
```

1    obligation?

2    A   I don't know.

3    Q   It further says when it talks in some legalese way:  To the

4    extent that the value of the price concession is not known at

5    the time of sale, C&R acknowledges that the sales made under

6    this agreement reflect a price concession that is not known at

7    the time of the sale.  And when the discount value becomes

8    known, who's supposed to provide the documentation to C&R?

9    A   It says here Galena.

10   Q   All right.  Do you know if your company did that?

11   A   I don't know.

12   Q   Do you know if your company complied with their obligations

13   under this agreement?

14   A   I don't know.

15   Q   You also told us, did you not, that there was what was

16   called, I think, a maintenance -- a maintenance agreement or

17   maintaining product in the pharmacy; is that right?  What was

18   your terminology about that?  That on maintenance purposes as

19   opposed to coupon purchases, C&R Pharmacy was losing money; is

20   that correct?

21   A   That's what C&R Pharmacy conveyed to our folks who managed

22   that process.

23   Q   Okay.  Was there any confirmation made, if you know, of

24   that one way or the other?

25   A   I didn't -- I don't see their books.

DAVID CORR - CROSS BY MR. KNIZLEY

1  Q   Do you know or did somebody tell you if there was any

2  confirmation of that?

3  A   I don't know.

4  Q   Okay.  And was that in part why the concession on the

5  rebate was made, if you know?

6  A   I don't know what a concession in the rebate agreement is.

7  Q   You don't know anything about this, do you?  Were you

8  involved in it in any way?

9  A   I don't design rebates.  I did the sales --

10 Q   You didn't have anything to do with this, did you?

11 A   I don't design rebates.

12 Q   Okay.  You were just asked to read this piece of paper when

13 you got it; right?

14 A   I was asked to read it, and I read the statement.

15 Q   Other than that, you don't know much about it; right?

16 A   No.  That's not my area of expertise.

17 Q   Okay.  And I asked you a little bit earlier when we were

18 looking at this chart about the coupons.  And you did tell us

19 that the coupons negatively affected your company, the use of

20 them; is that right?

21 A   No.  The overuse of the coupons were.  But the reason for

22 the voucher was to get a patient to the proper dose.

23 Q   Right.  Okay.  The manner in which my client used it

24 negatively affected your business; right?

25 A   Hence why we changed the rules.

 1   Q    And you told us once about a visit on February 25th, 2014,

 2   where you and Mr. Lento and Mr. Palmer came.  Do you remember

 3   that?

 4   A    It was one of the visits.

 5   Q    Did you and Mr. Lento and Mr. Palmer come to town all

 6   together?

 7   A    Three of the five times I think Mr. Lento was here.

 8   Mr. Palmer was here every time.

 9   Q    And do you remember talking about going to the coffee shop

10   and then him going somewhere else and discussing some other

11   matters?

12   A    Palmer and I left the coffee shop, we left the Starbucks.

13   Q    And Dr. Ruan went somewhere else and talked with --

14   A    I believe they might have stayed there and had that

15   conversation.

16   Q    You weren't privy to whatever that conversation may have

17   been?

18   A    No, sir.

19             MR. KNIZLEY:  That's all the questions of the witness.

20             THE COURT:  Any redirect?

21             MR. BODNAR:  Yes, Your Honor.

22                         REDIRECT EXAMINATION

23   BY MR. BODNAR:

24   Q    Good afternoon, Mr. Corin.

25   A    Good afternoon.

DAVID GORN, REDIRECT BY MR. BODNAR
27970

```
 1   Q   I'm going to go over a couple of areas that were
 2   highlighted on cross-examination.  To the best I can, I'll do
 3   both Dr. Ruan's and Couch's together.  But I want to start with
 4   one important point.  Do you recall reviewing Ruan's Exhibit
 5   120 with Mr. Knizley?  This was that email chain about the
 6   Abstral RELIEF Program.
 7   A   Yes.
 8   Q   And do you remember he had you read several different
 9   portions of that?
10   A   Yes.
11   Q   He had you read that email about Neil -- from Neil to Allan
12   Valmonte.  Do you remember that one?
13   A   Yes.
14   Q   But he didn't have you read the followup email, did he,
15   that starts right at the bottom of the first page?  I would
16   like you to read that to the jury now.
17   A   Sure.
18           Allan, I want to offer you my humble apology.
19   Dr. Ruan is unable to participate in the registry trial.
20   Evidently he --
21   Q   It goes on to next page.  Let me get it queued up for you.
22   A   Evidently he was under the impression that the candidates
23   for this study would be patients with nonmalignant pain.
24   Q   I'm going to stop you there for a second.  What is
25   nonmalignant pain?
```

DAVID GORIN - REDIRECT BY MR. BODNAR

```
 1   A   Noncancer pain.
 2   Q   Okay.  Continue.
 3   A   As we discussed in the protocol, he informed me that his
 4   practice does not have very many patients who qualify.
 5   Q   And I want to stop you there.  Who were the patients that
 6   could qualify for the RELIEF Program?
 7   A   Cancer and noncancer patients.
 8   Q   He's saying he didn't realize about the nonmalignant pain.
 9   So who does he say he does not have very many patients -- what
10   type of not very many patients does Dr. Ruan say he doesn't
11   have?
12   A   Not --
13   Q   What is Dr. Ruan saying there?
14   A   He's saying he doesn't have many cancer pain patients.
15   Q   And did you receive other emails from Dr. Ruan or did your
16   corporation about the percentage of cancer patients that
17   Dr. Ruan claimed he had?
18   A   No.
19   Q   So do you recall that Mr. Knizley mentioned to you that
20   Dr. Ruan simply chose not to take the money here?
21   A   Yes.
22   Q   But now that you've seen the full chain, why did Dr. Ruan
23   not enroll patients in the RELIEF Program?
24         MR. KNIZLEY:  Objection.  It calls for the undisclosed
25   mental operation of another.  He can certainly read the words.
```

1          THE COURT:  I think it's evident from the exhibit what

2     the reason is, so I sustain the objection.

3     BY MR. BODNAR:

4     Q   Do you recall talking with Mr. Knizley and you testifying

5     that Dr. Ruan did not want to be involved with the pharmacy

6     rebate agreement?

7     A   Yes.

8     Q   Do you recall that testimony?

9     A   Yes.

10    Q   Did he ever say anything to you about wanting to distance

11    himself from what was going on with the rebate agreement?

12    A   He said he didn't want to be a part of any conversations

13    involving the pharmacy.

14    Q   In your experience of being down there, was Dr. Ruan

15    involved with the pharmacy?

16    A   Yes.

17    Q   Explain to the jury what do you mean by -- what did you

18    personally see or observe with Dr. Ruan's involvement with the

19    pharmacy?

20    A   Sure.  During my time with the pharmacy, he would make

21    several trips into the pharmacy, which was attached to the

22    office, to check on stock of products.

23    Q   And by stock you don't mean Galena stock; you mean actually

24    the number of --

25    A   Actual quantity of product on the shelf.

1788

1  Q   You had mentioned you were aware -- were you aware that he
2  owned it?
3  A   Owned --
4  Q   C&R Pharmacy.
5  A   Yes, I believe he owned it.  I was aware -- yes, I was
6  aware and I believe he owned it.
7  Q   But for some reason he didn't want to be involved with that
8  contract?
9  A   Correct.
10 Q   I'm showing you now what's been admitted as Government's
11 Exhibit 38-8.  Do you recall when Mr. Knizley was going over
12 with you what Galena's obligations were per the contract?
13 A   Yes.  Yes.
14 Q   Without reading this all again, do you recall if these two
15 paragraphs also set out requirements that C&R Pharmacy had to
16 follow?
17 A   Yes.
18 Q   Yes, they had requirements to follow?
19 A   Both sides have requirements they need to follow, both
20 parties do.
21 Q   You had mentioned that trip in November where Dr. Ruan --
22 where it was passed up through the company about Dr. Ruan
23 asking for stock to be a speaker.  Do you recall questions
24 about that?
25 A   He asked to be a speaker and then he asked for the stock

 1   post dinner.

 2   Q   Were there other times in your meetings where Dr. Ruan

 3   spoke to you or said something to you about his disdain that

 4   you wouldn't allow him to be a speaker?

 5   A   Yes.  He was very upset with the company that we didn't

 6   support him the way other companies did.

 7   Q   When did he tell you that?

 8   A   Every single meeting.

 9   Q   And by every single meeting, do you mean the five times

10   that you came down there?

11   A   Yes.

12   Q   What specifically did he tell you?  Explain to the jury

13   what do you mean he was upset about that?

14   A   That we didn't do enough as a company to support

15   physicians.

16   Q   What do you mean?  By "do enough," what are you talking

17   about?

18   A   Number one was spending time; we didn't spend as much time

19   as other companies did.  And we also weren't using him to speak

20   like other companies were.

21   Q   And you had mentioned before -- or do you know if speaking

22   fees -- speaking programs are typically -- the doctors get paid

23   for it?

24   A   The doctors are compensated, yes, for the speaking

25   programs.

1790

```
 1  Q   Did Dr. Ruan ever tell you about the number of speaking
 2  programs he did for other companies?
 3  A   Yes.  He talked about doing a great deal of programs for
 4  Insys; that they were a very common practice.
 5  Q   And was this in comparison to why he was angry at Galena?
 6  A   That was part of it.
 7  Q   And was there any particular example from -- I believe it
 8  was February of 2015 that you can share with the jury?
 9  A   Yeah.  He had come back into the pharmacy one day when Jeff
10  Palmer and I were in there and explained that he had just done
11  five programs for Insys; why can't we do that?
12  Q   And by "why can't we do that," is that referring to being a
13  speaker for Galena?
14  A   We weren't showing the same level of support.
15  Q   Do you recall being asked about whether or not Dr. Ruan
16  attended that advisory board meeting?
17  A   Just now, yes.
18  Q   And did he attend the advisory board meeting?
19  A   No.
20  Q   Did Dr. Couch attend the advisory board meeting?
21  A   Yes.
22  Q   Do you recall being asked by Mr. Knizley and being shown
23  where the stock started to rise and then him saying that, well,
24  what if Dr. Ruan didn't purchase stock until January?  Do you
25  recall that?
```

1  A   Yes.

2  Q   I'm going to show you what's previously been admitted as

3  Government's Exhibit 11-5(1).  Does this appear to be an email

4  from Dr. Ruan --

5  A   Yes.

6  Q   -- to an individual named Ngoc Vo?

7  A   Yes.

8  Q   And what's the date on this email?

9  A   November 21st, 2013.

10 Q   What is Dr. Ruan telling Ngoc Vo here?

11 A   Baby, I found a link.  Do you think we should wait or not

12 for purchase?

13 Q   And what's the subject line here?

14 A   Galena.

15 Q   And is there a hyperlink there?

16 A   There is.  It's StockCharts.com.

17 Q   It's StockCharts.com?

18 A   Yes.

19 Q   So does it appear that in November 2013 Dr. Ruan would be

20 contemplating purchasing stock?

21 A   Especially by that statement.

22 Q   And is that the time period -- and if you don't remember, I

23 can bring it back up.  Is that the time period when the chart

24 starts to rise dramatically?

25 A   That's correct.

1792

1   Q   I'm going so show you now what's been admitted as

2   Government's Exhibit 11-5(2).  Is this an email the same day

3   from Ngoc Vo to Dr. Ruan entitled Galena?

4   A   Yes.

5   Q   And what does Ngoc Vo tell Dr. Ruan?

6   A   Honey, that is a good article.  Here is some analysis about

7   GALE in the past two weeks."

8   Q   What is G-A-L-E?

9   A   That's the stock symbol for Galena.

10  Q   And what does she say?

11  A   She shows the link and she said:  The advice is not to buy

12  now.  Wait for the dip.

13  Q   And again, this is in November; correct?

14  A   Correct.

15  Q   The time period where the stock -- or the milligrams begin

16  to rise?

17          MR. KNIZLEY:  Objection.  Leading.

18  BY MR. BODNAR:

19  Q   Is it the time period when milligrams begin to rise?

20  A   Yes.

21  Q   Do you recall being shown the voucher and the $500 patient

22  assistance by Couch's counsel?

23  A   Yes.

24  Q   And did you mention that there were two separate cards?

25  A   Yes.

1793

```
 1   Q   Could a patient receive the $500 assistance for the
 2   maintenance dose if they hadn't been on vouchers?
 3   A   Yes.
 4   Q   So the fact that two cards were connected physically --
 5   could they be used separately?
 6   A   They could be if it was tied to a patient identification
 7   number.
 8   Q   So it wasn't you had to use the voucher first to get the
 9   $500?
10   A   That's correct.
11   Q   You mentioned that Dr. Ruan and Dr. Couch were prescribing
12   three vouchers at one time.  Do you recall talking about that?
13   A   Yes.
14   Q   Do you recall using the words "abusing the program" when
15   you answered for Mr. Knizley?
16   A   Yes.
17   Q   Were other doctors around the country, to your knowledge,
18   abusing the voucher program the same way?
19   A   No.  We never saw anybody write three prescriptions at
20   once.
21   Q   So that was unique to Dr. Ruan and Dr. Couch?
22   A   Yes.
23            MR. KNIZLEY:  Your Honor, I object to leading.
24            THE COURT:  Don't lead.
25   BY MR. BODNAR:
```

1794

DAVID CORIN - REDIRECT BY MR. BODNAR

```
 1   Q   Was that unique to Dr. Ruan and Dr. Couch?

 2   A   Completely --

 3          MR. KNIZLEY:  Same question, and I object to leading,

 4   Your Honor.

 5          THE COURT:  Overruled.

 6          MR. BODNAR:  Your Honor, may the witness come and take

 7   a look at the chart?

 8          THE COURT:  Yes.

 9          THE WITNESS:  (Complying.)

10   BY MR. BODNAR:

11   Q   Mr. Corin, is this where you marked where the rebate

12   agreement began?

13   A   Yes.

14   Q   Do you recall questions by defense counsel about rebate

15   agreements being a good thing to help the pharmacy stock

16   Abstral?

17   A   That was where the question seemed to be going.

18   Q   Prior to the rebate agreement, though, was C&R Pharmacy

19   already stocking Abstral?

20   A   Yes.

21   Q   You mentioned here where Galena started -- or Galena became

22   licensed to prescribe or to sell Abstral; correct?

23   A   Correct.

24   Q   Was there any difference in Abstral here and Abstral here

25   as a drug?  (Indicating.)
```

1795

1   A   Same exact product.

2   Q   Would it have done anything differently with patients?

3   A   Not at all.

4   Q   Before or after?

5   A   No.

6   Q   How about here in January?  Did the drug itself change at

7   all from here in January to down here in April?  (Indicating.)

8   A   No.

9   Q   Did the drug get better or change anywhere here in

10  September '14?  (Indicating.)

11  A   No.

12  Q   How about here in January '15?  (Indicating.)

13  A   No.

14  Q   During this whole time period was the drug absolutely the

15  same?

16  A   Exactly the same.

17  Q   You can take the stand.

18  A   (Complying.)

19  Q   Do you recall questions about the voucher program helping

20  to educate doctors and pharmacies about -- about Abstral?

21  A   Yes.

22  Q   Based on that chart, did Dr. Ruan and Dr. Couch already

23  know about Abstral --

24  A   Yes.

25  Q   -- prior to the voucher program?

1   A   Yes.

2   Q   Do you recall Mr. Knizley showing you emails where Dr. Ruan

3   was demanding the firing of the CEO of Galena?

4   A   Yes.

5   Q   To your knowledge, had any other doctors written into Remy

6   Bernarda or the company demanding the firing of the CEO?

7   A   Nobody else.

8           MR. BODNER:  One moment, Your Honor.

9           THE COURT:  All right.

10          MR. BODNAR:  Nothing further for this witness, Your

11  Honor.

12          THE COURT:  All right.  Thank you.  You may step down.

13          Ladies and gentlemen, we're going to go ahead and take

14  our afternoon break.  Leave your pads on your chairs.  No

15  discussion about the case.  Go downstairs.  We'll call you back

16  up in about 15 minutes.

17          We are in recess.

18      (A recess was taken at approximately 2:56 p.m.)

19                              * * *

20

21

22

23

24

25

1          * * * * *

2          THE COURT:  All right.  Call your next witness.

3          MS. GRIFFIN:  Call Shawn Kelley, Your Honor.

4          THE CLERK:  Okay.  Raise your right hand.

5                    **PATRICK SHAWN KELLEY,**

6     **having been first duly sworn, testified as follows:**

7          THE CLERK:  Please be seated.

8                    **DIRECT EXAMINATION**

9     BY MS. GRIFFIN:

10    Q.   Tell us your name, please, sir.

11    A.   Patrick Shawn Kelley.

12    Q.   Mr. Kelley, how are you employed?

13    A.   I'm a deputy sheriff with the Lawrence County Sheriff's

14    Office assigned to the D.E.A. task force in Birmingham,

15    Alabama.

16    Q.   How many years of law enforcement experience do you have?

17    A.   Nineteen years.

18    Q.   How long have you been with the D.E.A. task force?

19    A.   Since February 2012.

20    Q.   And in your capacity as a sheriff's deputy and a D.E.A.

21    task force officer, have you had the opportunity to do

22    undercover work in the past?

23    A.   Yes, ma'am, I have.

24    Q.   What is undercover work?

25    A.   It's basically when a police officer takes on a fictitious

1  role in order to find out if illegal activities are going on

2  somewhere.

3  Q.   And, specifically, as to this case, did you participate in

4  an undercover role?

5  A.   Yes, ma'am, I did.

6  Q.   What did you do in connection with this case in an

7  undercover role?

8  A.   I took on the role of a pill seeker and went into the

9  clinic at Dr. Couch's office and made an attempt to get

10  controlled substances.

11  Q.   I want to direct your attention to August the 5th of 2014.

12  Were you acting in an undercover capacity in your role as a

13  D.E.A. task force agent on that day?

14  A.   Yes, ma'am, I was.

15  Q.   Did you have occasion to go to PPSA in Mobile, Alabama in

16  that undercover capacity?

17  A.   Yes, ma'am.

18  Q.   Using what name?

19  A.   Shawn Brennan.

20  Q.   That's B-R-E-N-N-A-N?

21  A.   Yes, ma'am.

22  Q.   And Mr. Brennan -- excuse me.  Mr. Kelley, did you have

23  the ability to take and to videorecord your undercover visit?

24  A.   Yes, ma'am.

25        THE COURT:  Is your microphone on there?  Is the

 1  light lit?

 2         THE WITNESS:  I don't see a light, ma'am.  You need

 3  me to get a little closer to it?

 4         THE COURT:  See if you can pull it up a little bit.

 5  All right.  That's good.  Thank you.

 6  BY MS. GRIFFIN:

 7  Q.   Prior to your going to the PPSA on August the 5th of 2014,

 8  had you received some official government funds to pay for the

 9  undercover visit?

10  A.   Yes, ma'am.

11  Q.   And you said you were wired.  You had the ability to be

12  wired, video and audio; is that right?

13  A.   I was provided devices, yes, ma'am, covert recording

14  devices.

15  Q.   To do that had you also had a fake MRI sent in the name

16  Shawn Brennan to PPSA before your appointment?

17  A.   Yes, ma'am.

18  Q.   That was a real MRI but just not yours?

19  A.   Yes, ma'am.

20  Q.   And it had the name "Shawn Brennan" on the MRI?

21  A.   Yes, ma'am.

22  Q.   Now, what happened when you first got to the first PPSA

23  office?

24  A.   The first day?

25  Q.   Yes.

1    A.    August the 5th.  I went into the office and went to the

2    receptionist area and signed on the little board and told the

3    lady who I was.  She told me -- she asked me for insurance.  I

4    told her I didn't have any insurance but my doctor had referred

5    me there.

6          I was then pulled over to the side by a different

7    lady to a side window.  And I talked to her for a moment, and

8    she explained to me that they didn't take insurance -- they

9    didn't take cash-paying patients.  I explained to her that we

10   had -- my doctor had referred me there to this office.

11         So I went outside and called Special Agent Burt, told

12   him what they said.  Special Agent Burt made a phone call.  A

13   few minutes later, I'm going in the office, and I'm being seen.

14   Q.    Did you ultimately pay cash for that visit that day?

15   A.    Yes, ma'am.

16   Q.    Do you know about how long you were in that common waiting

17   room area before you were called back where patients go in the

18   back?

19   A.    Around 45 minutes, an hour.

20   Q.    And who were you to see that day?  Who was your

21   appointment with?

22   A.    Dr. Couch.

23   Q.    When they called you back into the area where the nurses

24   and the assistants typically are, did they weigh you?

25   A.    Yes, ma'am.

DIRECT - PATRICK SHAWN KELLEY

1    Q.    Did they request you to give a urine sample?

2    A.    They did.

3    Q.    Was that witnessed --

4    A.    No, ma'am, it was not.

5    Q.    -- by a monitor?

6    A.    No.  The urine sample was not, no, ma'am.

7    Q.    Once you were weighed and asked to get a urine sample, who

8    did you see next?

9    A.    I was taken to a patient waiting room, and I was there for

10   a little bit when the lady named Stacey came in.  She

11   introduced herself to me as Stacey.

12   Q.    Prior to Stacey coming in, had you been weighed?

13   A.    I was weighed, yes, in the hallway.

14   Q.    And were you placed in what we will call a patient room, a

15   room where a doctor would typically come see a patient?

16   A.    I was.

17   Q.    Who did you see at that time?

18   A.    I don't know.  I don't know the lady's name.  There was an

19   employee, I would say, that had a little blood pressure monitor

20   on wheels that came in and checked my blood pressure.  Later,

21   after she was finished, a lady named Stacey came in and

22   introduced herself to me as Stacey.

23   Q.    Had you been given any paperwork once you got to PPSA to

24   fill out about your medical history and your condition as to

25   why you were there?

1    A.    I was.

2    Q.    Were you able to finish that before you were called back

3    in to the back of the facility and placed in a patient room?

4    A.    No, ma'am.  It was about 15 pages long, so I was still

5    working on it.

6    Q.    You did, however, fill that out; is that right?

7    A.    Yes, ma'am.

8    Q.    I'll show you what's marked as Government's Exhibit 20-22.

9          MS. GRIFFIN:  And, Your Honor, by stipulation, this

10   is the Shawn Brennan patient file from PPSA.

11         THE COURT:  All right.  Mark it in.

12   [Government's 20-22 was entered into evidence.]

13   BY MS. GRIFFIN:

14   Q.    You've previously had the opportunity to review this file;

15   is that correct?

16   A.    Yes, ma'am.

17   Q.    And this was your patient file from your visit there; is

18   that right?

19   A.    Yes, ma'am.

20   Q.    Had you on the paperwork identified why you were there at

21   PPSA that you filled out?

22   A.    I had to put that in.

23   Q.    I can't hear you.

24   A.    I think I put my back hurt or something like that.

25   Q.    I'll show you the patient registration form that makes up

DIRECT - PATRICK SHAWN KELLEY

1   part of Exhibit 20-22 and ask if you used the name Shawn

2   Brennan.

3   A.   Yes, ma'am.

4   Q.   And you gave an address; is that right?

5   A.   Yes, ma'am.

6   Q.   What did you tell them on that form about your employment?

7   A.   I was self-employed.

8   Q.   On the second page on your patient registration form, what

9   did you tell them about your reason for the visit?

10  A.   I just wrote "low back."

11  Q.   And did you tell them what you expected from treatment?

12  A.   Yes, ma'am.  I put "pain med treatment."

13  Q.   Then did you advise that you were a heavy equipment

14  operator?

15  A.   Yes, ma'am, I did.

16  Q.   Mr. Kelley, did you check what type of pain you were

17  having?

18  A.   No, ma'am, I did not -- oh, you talking about -- I did.

19  The dull pain, yes, ma'am.

20  Q.   Now, there is a section where you can rate your pain by

21  describing your pain as its worst, its least, or average.  Did

22  you check anything as to that part?

23  A.   No, ma'am.

24  Q.   Did you indicate what made your pain worse?

25  A.   Yes:  Work.

DIRECT - PATRICK SHAWN KELLEY

1    Q.   Did you indicate what made your pain better?

2    A.   Medication.

3    Q.   Did you indicate the time of the day when your pain was

4    the worst?

5    A.   Yes, ma'am:  In the afternoon.

6    Q.   I'll show you the next page of your form.  Did you

7    indicate that you had any bladder control problems or any

8    change in pain with coughing?

9    A.   I marked "no."

10   Q.   What narcotics did you indicate you had tried?

11   A.   Hydrocodone and Oxycodone.

12   Q.   Did you also indicate that you had tried some

13   anti-inflammatories, such as Aleve, aspirin, Tylenol, and

14   ibuprofen?

15   A.   I marked them all, yes, ma'am.

16   Q.   Did you indicate if you had received any treatment,

17   history for your current pain condition?

18   A.   I did.

19   Q.   You indicated what, please, sir.

20   A.   I marked "no."  Actually, I put -- I hit chiropractic

21   care.  And it said, "does it help," and I said, "no."

22   Q.   Did you indicate if you had brought an MRI scan?

23   A.   I did.  I see "yes."

24   Q.   Did you indicate that you used tobacco?

25   A.   Yes, ma'am.

1   Q.    Did you indicate whether or not you had any prior surgical

2   history?

3   A.    I marked N/A on that section.

4   Q.    Did you indicate whether you had any allergies?

5   A.    I put "none."

6   Q.    Now, down at the bottom, did you put anything about your

7   use of tobacco and your use of alcohol?

8   A.    Yes, ma'am.  Under "Tobacco," I marked "yes," and I used a

9   pack a day for 15 years.  And then under "Alcohol," I marked

10  "yes," and I had probably four drinks a day for the last

11  15 years.

12  Q.    Then on the last page, did you indicate that you generally

13  had no problems?

14  A.    Yes, ma'am.

15  Q.    Cardiac?

16  A.    Yes, ma'am.

17  Q.    Endocrine, gastro, throughout?

18  A.    That's correct.  All those I put no problems.

19  Q.    Did you sign as Shawn Brennan on August the 5th, 2014?

20  A.    Yes, ma'am.

21  Q.    Was there a signature by anyone to show it had been

22  reviewed?

23  A.    No, ma'am.

24  Q.    Now, you indicated someone named Stacey came in the room;

25  is that right?

1    A.    Yes, ma'am.

2    Q.    Did she advise you as to whether she was a nurse or a

3    doctor?

4    A.    She just told me her name was Stacey and she worked with

5    Dr. Couch.

6    Q.    You knew that Stacey was not Dr. Couch; is that right?

7    A.    Yes, ma'am.

8    Q.    Did you see Dr. Couch during this visit?

9    A.    At the end of the visit, yes, ma'am.

10   Q.    For approximately how long?

11   A.    About 42 seconds.

12   Q.    What did he do?

13   A.    He came into the room, walked over to my right where there

14   was a counter.  There was some prescriptions sitting there and

15   some other papers.  He signed the prescriptions.  The entire

16   time Stacey is talking.  He then walks over to my back where

17   I'm sitting in the chair, touches my left side lower back, and

18   leaves the room.

19   Q.    Were you provided a prescription for a controlled

20   substance at this first meeting?

21   A.    Yes, ma'am.

22   Q.    I'll show you what's marked as Government's Exhibit 20-3.

23   I'd ask if you could identify the prescription?

24   A.    Yes, ma'am.  That's the prescription I received on the 5th

25   of August.

1   Q.   What was it for?

2   A.   Roxicodone, 15 milligrams, 90 pills.

3   Q.   How many tablets?

4   A.   Ninety.

5        MS. GRIFFIN:  Your Honor, we move to admit

6   Government's Exhibit 20-2 [sic] and publish it to the jury.

7        MR. ESSIG:  No objection.

8        THE COURT:  All right.  Mark it in.

9        [Government's 20-3 was entered into evidence.]

10  BY MS. GRIFFIN:

11  Q.   After that undercover visit, did you actually fill this

12  prescription?

13  A.   No, ma'am, I did not.

14  Q.   I'll show you the back of Government's Exhibit 20-3.  Did

15  you also receive a prescription that day for some type of

16  Zanaflex cream?

17  A.   It's a muscle relaxer.  Yes, ma'am, I did.

18  Q.   I'm sorry.  It's a capsule; right?

19  A.   Yes, ma'am.

20  Q.   And you recorded that visit by Stacey?

21  A.   I did.

22  Q.   Had you had the opportunity to look through a transcript

23  of your undercover patient visit with Stacey?

24  A.   Yes, ma'am.

25  Q.   Have you had the opportunity to compare the transcript

1   with the video at the time that Stacey was with you?

2   A.   Yes, ma'am.

3   Q.   Was there a time when Stacey went out of the room and you

4   were left in the patient room by yourself for a few minutes?

5   A.   Yes, ma'am.

6   Q.   Has that part been omitted from the tapes so there's no

7   downtime for the jury?

8   A.   That's correct.

9          MS. GRIFFIN:   Your Honor, as previously identified

10   and viewed what we would call the transcript -- excuse me --

11   the tape, Government's Exhibit 20-1.   It is on the computer,

12   and counsel for Defendant Couch and I have agreed that we would

13   introduce the disk at the end of all the videos.

14          THE COURT:   After you play it.

15          MS. GRIFFIN:   After we play them.   They are all on

16   one disk.

17          THE COURT:   How many are there?

18          MS. GRIFFIN:   There are five.

19          THE COURT:   Oh, okay.   So we are just talking about

20   20-1?

21          MS. GRIFFIN:   20-1 is the first visit.   That's the

22   visit on August the 5th, 2014.

23          THE COURT:   So the disk contains 20-1.   What other

24   exhibit numbers does it contain?

25          MS. GRIFFIN:   It contains 20-4 for a September '14

DIRECT - PATRICK SHAWN KELLEY

1   visit.  It contains 20-7 for a November '14 visit.  It contains

2   20-16 for a January '15 visit.  20-18 for a March 2015 visit.

3   And 20-20 for an April 2015 video.  We will be playing them

4   individually as he discusses -- ask to play each of them as he

5   discusses them, Your Honor.

6           MR. ESSIG:  Your Honor, we will go ahead and agree to

7   the admissibility of all those exhibits.

8           THE COURT:  What is the disk marked?  What's its

9   exhibit number?

10          MS. GRIFFIN:  The disk is No. 20.

11          THE COURT:  All right.  Mark No. 20 in.

12      [Government's 20 was entered into evidence.]

13  BY MS. GRIFFIN:

14  Q.   Now, are you aware, Mr. Kelley, that at the bottom of each

15  picture there is a transcript so the jury can watch the video

16  and read the transcript at the same time that the words are

17  being spoken?

18  A.   That's correct, ma'am.

19          MS. GRIFFIN:  Your Honor, I also have copies of the

20  transcript if the jury would like to see an actual paper copy

21  as well.

22          THE COURT:  Well, it's going to be difficult to read

23  a paper copy transcript and read the subtitled transcript and

24  watch the video at the same time.

25          MS. GRIFFIN:  So we'll try with the video.

1          THE COURT:  Let's try it first with the video and the

2   subtitles.

3          MS. GRIFFIN:  And if anybody needs to actually have

4   one, if they'll raise their hand.

5          Now we start with the first video of that August

6   visit with Stacey.  August of 2014.

7      [Video played in open court.]

8   BY MS. GRIFFIN:

9   Q.   You went to the pain clinic four more times to see

10  Dr. Couch?

11  A.   Yes, ma'am.

12  Q.   Was that the only time you ever saw them?

13  A.   Yes, ma'am.

14  Q.   Now, let's go back to the front of the video.  There

15  appears to be a sound of someone coming in and taking your

16  blood pressure.  Did that happen?

17  A.   Yes.

18  Q.   And when you were asked to bend over, would you show us

19  how far you were able to bend over?  Will you come down and

20  show the jury?

21          With the Court's permission?

22          THE COURT:  Yes.

23          THE WITNESS:  She asked me to bend over forward and

24  touch the ground and lean over backwards and then side to side.

25

DIRECT - PATRICK SHAWN KELLY                    1811

1    BY MS. GRIFFITH:

2    Q.    So you touched the floor when you bent down?

3    A.    Yes, ma'am.

4    Q.    Did you use what is a slang word for Roxicodone when you

5    were describing what you had taken?

6    A.    Yes, ma'am.

7    Q.    What is that?

8    A.    I used the word "blue."  They are called "blues" on the

9    street.

10   Q.    Did you use the word "Roxi"?

11   A.    I did use the word "Roxi" as well.

12   Q.    During the time that you and Stacey were in the room with

13   the exception of the blood pressure person and the exception of

14   someone that sounds like they came in to ask a question, was

15   there anybody else in the room but you and Stacey until

16   Dr. Couch came in?

17   A.    No, ma'am.

18   Q.    Just the two of you?

19   A.    Yes, ma'am.

20   Q.    When Dr. Couch came in, it appears he's bending over.

21   Could you tell us what he was doing as soon as he walked in the

22   room?

23   A.    He walked over to the counter and started signing the

24   scripts that Stacey had apparently already filled out already.

25   Q.    You don't know who filled them out?

```
 1   A.   They were already typed out.  Yes, ma'am.  No signature.

 2   Q.   Over on the counter?

 3   A.   Yes.

 4   Q.   Did you see Dr. Couch sign them?

 5   A.   Yes, ma'am.

 6   Q.   Now, did he touch you anywhere?

 7   A.   In my lower back.

 8   Q.   And could you explain that to us.

 9   A.   I just -- he asked me, as you saw in the video, where my

10   pain was at, and I showed him where I was stiff or hurting at.

11   And if you don't mind, I'll stand up and show you real quick.

12   Q.   You can turn your back to the jury.  Just speak up.

13   A.   It was in this here that I pointed out, mostly my left

14   side.

15   Q.   He didn't actually use the word "pain," did he, Dr. Couch?

16   A.   I don't think so.

17   Q.   Did he touch you anywhere else?

18   A.   No, ma'am.

19   Q.   And about how long did that take, that touching?

20   A.   The touching?  Five, ten seconds.

21   Q.   Did you receive any instructions for taking the

22   prescription you were provided by Dr. Couch or by Stacey?

23   A.   I did not receive anything as far as instructions for the

24   Roxicodone, although I did receive a little bit about the

25   Zanaflex.
```

DIRECT - PATRICK SHAWN KELLY

1   Q.   Were you given any warnings about taking a Schedule II

2   controlled substance?

3   A.   No, ma'am.

4   Q.   Were you told not to abuse it and not to sell it?

5   A.   No, ma'am.

6   Q.   Were you given any warnings about any effects it could

7   have on your body?

8   A.   No, ma'am.

9   Q.   And did anybody question you about your reference to

10  having used drugs but not having received them from a doctor?

11  A.   No, ma'am.

12  Q.   And in your undercover capacity, what were you implying

13  that you had not received Schedule II drugs from a doctor but

14  that you had received them?

15  A.   I was trying to give the clinic the opportunity to see the

16  red flags.  I was throwing red flags at them.

17  Q.   That you were getting those off the street?

18  A.   That I was a pill seeker, yes, ma'am.

19  Q.   Now, had you had the opportunity to review your history

20  and physical for that visit?

21  A.   Yes, I have.

22  Q.   I'll show you from your patient file the --

23           I think maybe we switched out to the Elmo, please.

24           THE CLERK:  It'll take a minute.  It's coming.

25           MS. GRIFFIN:  Your Honor, this is from the exhibit

DIRECT - PATRICK SHAWN KENNEDY                                    1814

1    that's already been admitted, 20-2.  So may we publish it to

2    the jury while we talk to the witness?

3              THE COURT:  Yes.

4    BY MS. GRIFFIN:

5    Q.   I'll show you "History and Physical" for August the 5th.

6    Dr. Couch.  And that's you, Shawn Brennan; is that correct?

7    A.   Yes, ma'am.

8    Q.   Well, are you right-handed or left-handed?

9    A.   Left-handed.

10   Q.   And you are not a female, are you?

11   A.   That's correct.

12   Q.   Does it indicate who you were presented in consultation

13   from?

14   A.   No, ma'am.

15   Q.   And it indicates that the pain is 7 to 10 on here on a 0

16   to 10 and has reached the maximum of 10 out of 10.

17   A.   That's what it says.

18   Q.   Did you say that to anyone?

19   A.   Never.

20   Q.   Does it indicate that she does not report any other

21   symptoms associated with the pain?

22   A.   It does.

23   Q.   And, of course, we know that's not correct?

24   A.   That's correct.

25   Q.   That's not true?

1    A.    That's not true.

2    Q.    Did you tell them that the pain didn't interfere with

3    day-to-day activities?

4    A.    No, I don't think I said that.

5    Q.    Did you indicate that the pain was constant and that no

6    specific activities increase the severity?

7    A.    That's incorrect.  I told them that work -- I wrote down

8    in the paperwork in the beginning that work made it worse and

9    medicine made it better.

10   Q.    Did you tell them you had not had any diagnostic testing?

11   A.    No.  I provided them with an MRI.

12   Q.    Down at the bottom, was there any type of information

13   about your daily use of alcohol?

14   A.    No, ma'am, none at all.

15   Q.    Also, on the second page of that first visit in the

16   patient file, there is a report of review of your systems.

17   Have you previously looked at this before?

18   A.    Yes, ma'am.  I reviewed it before I came down.

19   Q.    Were you asked any of these questions except the back

20   pain?

21   A.    No, ma'am.  I was asked none of these questions except for

22   the back pain.

23   Q.    You weren't asked about fatigue?

24   A.    No, ma'am.

25   Q.    Headaches?

DIRECT - PATRICK SHAWN KENNON

1    A.    No, ma'am.

2    Q.    Chest pain?

3    A.    No, ma'am.

4    Q.    Did you deny shortness of breath, or were you asked?

5    A.    Wasn't asked.

6    Q.    Were you asked about nausea?  Vomiting?

7    A.    No, ma'am.

8    Q.    Were you asked about blacking out?

9    A.    No, ma'am.

10   Q.    Is this the back pain, back spasms, the only thing you

11   were asked about?

12   A.    Yes, ma'am.

13   Q.    And what did you say instead of spasming?

14   A.    I said tightness in my back.

15   Q.    Were you asked about any intolerance to heat or cold?

16   A.    No, ma'am.

17   Q.    Were you asked about anxiety or easy bleeding?

18   A.    No, ma'am.

19   Q.    Further down on this list, did you have a physical

20   examination of your head?

21   A.    No, ma'am.

22   Q.    Your eyes?

23   A.    No, ma'am.

24   Q.    Ears?  Nose?  Mouth?  Throat?

25   A.    No, ma'am.

DIRECT - PATRICK SHAWN KELLY

1  Q.   Anybody look at your neck?

2  A.   No, ma'am.

3  Q.   Did they check your breathing?

4  A.   No, ma'am.

5  Q.   Did they check your heart rate?

6  A.   Yes, they did.

7  Q.   And then on the last page for that visit, was your abdomen

8  touched?

9  A.   No, ma'am.

10 Q.   So they didn't know whether it was tender or not to being

11 touched?

12 A.   That's correct.

13 Q.   Did they inspect your spine?

14 A.   No, ma'am.

15 Q.   What was the only range of motion you were provided?

16 A.   The example I gave the jury earlier.  That's the only

17 thing I did.

18 Q.   Where you could bend over and touch the floor?

19 A.   That's correct.

20 Q.   Did you perform a straight-leg-raise test?

21 A.   No, ma'am.

22 Q.   Do you know what that is?

23 A.   I do not.

24 Q.   But you didn't -- you weren't asked to raise your legs at

25 any --

1    A.    No.  It's pretty obvious.  It's a straight-leg test.

2    Q.    Was your skin looked at to see if you had any needle

3    marks?

4    A.    No, ma'am.

5    Q.    Were you looked at to see if you had any discoloration or

6    lesions?

7    A.    No, ma'am.

8    Q.    And are you aware from reviewing this assessment of you

9    for this first one was right here, the lumbago?

10   A.    Yes, ma'am.

11   Q.    The plan was for you to come back, is that right --

12   A.    Yes, ma'am.

13   Q.    -- in four weeks?

14          Was there any mention in your plan for you to receive

15   this lumbar facet that Stacey had talked to you about?

16   A.    No, ma'am.

17   Q.    In this first visit, did you develop any doctor-patient

18   relationship with Dr. Couch?

19   A.    No, ma'am.

20   Q.    What do you know about the doctor-patient relationship?

21   A.    The doctor-patient relationship is when the doctor comes

22   in and talks to you about your problems, discusses your

23   medication, discusses your plan of medication, and any

24   diagnostic or other medicine he may want to do with you and

25   kind of explain to you and builds a rapport with you.  And we

1    didn't have enough time for that on that day.

2    Q.   Was it because you didn't have enough time?

3    A.   No, ma'am.  He only stayed 42 seconds.

4    Q.   "He" being?

5    A.   Dr. Couch.

6    Q.   Also contained in your medical file was the MRI results in

7    your undercover name; is that correct?

8    A.   Yes, ma'am.

9    Q.   I'll show you what's marked as the Murfreesboro Medical

10   Clinic and Surgicenter of Tennessee.

11           Before we look at this, were you questioned as to why

12   you lived in Montgomery and you were coming to see a doctor in

13   Mobile?

14   A.   Not on this visit, no.

15   Q.   Now, you said this was not your real MRI; is that right?

16   A.   No, ma'am, it's not.

17   Q.   But it was made for the undercover purposes to be in your

18   name?

19   A.   That's correct.

20   Q.   And does it show in connection with this MRI that the disk

21   is normal, the disk is normal, the disk is normal, the disk is

22   normal, the disk is normal?

23   A.   Yes, ma'am.

24   Q.   So your MRI was basically -- or was your MRI basically

25   benign or unremarkable?

1    A.    Yes, ma'am.

2    Q.    You also had a urine test on that trip; is that correct?

3    A.    Yes, ma'am.

4    Q.    And you had indicated that you were taking some drugs off

5    the street?

6    A.    That's right.

7    Q.    I'll show you what is your Castle Medical Lab Report from

8    your undercover file from PPSA file.  It indicates there was

9    nothing prescribed.  And did it indicate that there was

10   anything in your system?

11   A.    Looks like there's no drugs found.

12   Q.    So if you had -- they would have expected to find some

13   drugs if you told them that?

14        MR. ESSIG:  Objection, Judge.  Calls for speculation.

15        THE COURT:  Sustained.

16   BY MS. GRIFFIN:

17   Q.    Were you ever questioned about this first drug test being

18   negative?

19   A.    No, ma'am.

20   Q.    Did there come a time when you went back for a September

21   the 8th, 2014 undercover visit with Dr. Couch?

22   A.    Yes, ma'am.

23   Q.    On this visit did you see Dr. Couch?

24   A.    No, ma'am.

25   Q.    Who did you see on this occasion?

1    A.   The lady named Stacey.

2    Q.   And I failed to ask you.  Can you identify Dr. Couch?

3    A.   Yes, ma'am.  He's sitting right there by the attorney on

4    the end.  Second guy with the striped tie.

5             MS. GRIFFIN:  Let the record reflect that he's

6    identified the defendant, Couch.

7    BY MS. GRIFFIN:

8    Q.   You never saw him again?

9    A.   No, ma'am.

10   Q.   On the September the 8th, 2014 visit, how did that visit

11   start?

12   A.   I went in to the main office, front reception area, same

13   as before.  Went to the desk.  Signed in.  Paid the lady behind

14   the reception glass.  She gave me a receipt.  I set down and

15   waited in the waiting area, 45 minutes to an hour.  And then

16   was called back, subsequently called back, in the back and

17   weighed.

18   Q.   Did you pay cash for this visit?

19   A.   Yes, ma'am.

20   Q.   And they accepted your cash?

21   A.   Yes, ma'am.

22   Q.   After you weighed you, did they take your blood pressure?

23   A.   Yes, ma'am.

24   Q.   Did you also tape the portions -- did you tape this visit?

25   A.   I did.

DIRECT - PATRICK SHAWN KELLER

1    Q.    And did you tape the portions where you saw one of the

2    nurse assistants or nurse physicians -- the nurse physicians?

3    A.    Yes, ma'am.

4    Q.    But you didn't see a doctor, right, just the nurse

5    assistant?

6    A.    I did not.

7    Q.    Did you see a different lady other than Stacey at first?

8    A.    Yes.  It was an employee who did my blood pressure.

9    Q.    Did you learn ultimately what her name was?

10   A.    I think her name was Isis.

11   Q.    And you actually videoed this interaction.  And then did

12   you see Stacey?

13   A.    That's correct.

14   Q.    You videoed all that?

15   A.    Yes, ma'am.

16          MS. GRIFFIN:  Your Honor, that's contained in

17   Government's Exhibit 20.  Within there, it's identified as the

18   video for September the 8th of '14.  Government's Exhibit 20-4.

19          We would move to play that for the jury after I

20   confirm with him that he has compared the words at the bottom

21   of the video with the words that were actually being said

22   during the time you were being seen and videoing.

23          THE WITNESS:  That's correct.

24          MS. GRIFFIN:  May we play that for the jury, Your

25   Honor?

1        THE COURT:  Yes.

2        THE CLERK:  Is there supposed to be sound?

3        MS. GRIFFIN:  Is there a problem with it?  Can you go

4   back to the beginning.

5        MR. COCHRANE:  I'm sorry?

6        MS. GRIFFIN:  Can you go back to the beginning of

7   this video?

8        MS. GRIFFIN:  Your Honor, may he have a moment to

9   check the sound?

10       THE COURT:  Yes.

11       MS. GRIFFIN:  Your Honor, he can play the video with

12  words at the bottom.  It will take about five minutes to work

13  on the tape.  I suggest we go ahead and play it with the words

14  at the bottom and come back to it being audible.

15       THE COURT:  All right.

16       MS. GRIFFIN:  Go ahead, Mr. Cochrane.

17       Have you got it?  It will show the audio feed.

18       MR. COCHRANE:  I can play the audio.  Not the video

19  for that to work.

20       MS. GRIFFIN:  Can you play the third one?

21       MR. COCHRANE:  Yes, ma'am.

22       MS. GRIFFIN:  Okay.  We'll skip the September and

23  come back to it.

24  BY MS. GRIFFIN:

25  Q.   Did you come back on November the 6th, 2014?

1    A.    Yes, ma'am.

2    Q.    Again, did you pay with cash?

3    A.    I did.

4    Q.    And who were you there to see?

5    A.    I was there to see Stacey.

6    Q.    Did you see her on that occasion?

7    A.    No, ma'am.

8    Q.    Do you know where she was?

9    A.    No, ma'am.

10   Q.    Who did you see on the November visit?

11   A.    I lady named Bridget Parker.

12   Q.    Again, did you video and audio that visit, the November

13   visit?

14   A.    Yes, ma'am.

15   Q.    And were you provided four scripts on this visit, four

16   prescriptions?

17   A.    Yes.

18   Q.    I'll show you what's marked as Government's Exhibit 20-9,

19   which you previously have seen, and ask if you can identify --

20         Oh, that's going to require going back to the Elmo,

21   please, ma'am.

22         I believe while we are doing that, the defense does

23   not have an objection to the admission of these.

24         MR. ESSIG:  We do not.

25         THE COURT:  Are they all in 20-9?

1           MS. GRIFFIN:  Yes, Your Honor.

2           THE COURT:  All right.  Mark it in.

3           MR. ESSIG:  Is that all in November?

4           MS. GRIFFIN:  These are the ones he was provided in

5    November.  Some are dated November and two are dated December,

6    but they all are on one page, Government's Exhibit 20-9.

7           THE COURT:  Mark it in.

8       [Government's 20-9 was received in evidence.]

9    BY MS. GRIFFIN:

10   Q.   On this November visit, did you receive a controlled

11   substance prescription for Roxicodone?

12   A.   Yes, ma'am.

13   Q.   For 110 tablets?

14   A.   Yes, ma'am.

15   Q.   Now, this is more than you had received on the first and

16   second visit; is that right?

17   A.   Yes, ma'am.

18   Q.   And this prescription is dated the day that you were

19   actually there for your visit?

20   A.   Yes, that's correct.

21   Q.   Your Zanaflex for that day was dated the day before your

22   visit; is that right?

23   A.   Yes, ma'am.

24   Q.   You said you were given two more scripts that same day?

25   A.   Yes, ma'am.

1  Q.    Now, this is November the 6th; right?

2  A.    Yes, ma'am.

3  Q.    Were you given a prescription for Roxicodone, which

4  appeared to be signed by Dr. Couch, effective date December the

5  4th of '14?

6  A.    Yes, ma'am.

7  Q.    That was a November visit; right?

8  A.    Yes, ma'am.

9  Q.    That was for the 110, an increase in the number of

10 Roxicodone?

11 A.    Yes, ma'am.

12 Q.    And that prescription is actually dated December 4th.

13 Did you have a December visit?

14 A.    No, ma'am.

15 Q.    And then the Zanaflex that you say you received in

16 November, is that dated December the 6th?

17 A.    Yes, ma'am.

18 Q.    But you received all four of these at the November 6th

19 visit?

20 A.    Yes, ma'am.

21 Q.    Let's talk about the November 6th visit.  It, too, was

22 audio and video recorded?

23 A.    That's correct.

24 Q.    And you just told us that it wasn't with Stacey, but it

25 was somebody named Bridget?

1   A.    Yes, ma'am.

2   Q.    Didn't see Dr. Couch, did you?

3   A.    No, ma'am.

4           MS. GRIFFIN:  We would move, Your Honor, to play the

5   audio and video for the November the 6th, 2014 visit.

6           THE COURT:  All right.

7       [Video played in open court.]

8   BY MS. GRIFFIN:

9   Q.    Now, Mr. Kelley, had you done a urine test, asked to do a

10  urine test, before going to this visit as well?

11  A.    No, ma'am.

12  Q.    And you had been receiving your medicines for August and

13  then September.  Had you filled any of those prescriptions?

14  A.    I did not.

15  Q.    And so you were not taking those medications?

16  A.    No, ma'am.

17  Q.    So do you know whether or not you would have shown up on a

18  PDMP as having filled those?

19  A.    No.  It would not have shown up on PDMP as being filled.

20  Q.    They had not been filled, had they?

21  A.    That's correct.

22  Q.    Did anybody ask you why they hadn't been filled?

23  A.    No, ma'am.

24  Q.    Now, you don't know whether or not they've looked at your

25  PDMP or not, do you?

1    A.    No, ma'am, I don't.

2    Q.    If they had run a PDMP for Shawn Brennan, what would come

3    up?

4    A.    Nothing.

5    Q.    Nobody questioned you about that?

6    A.    No, ma'am.

7    Q.    Did you see Dr. Couch on this November 6th, 2014 visit?

8    A.    No, ma'am.

9    Q.    Were you given an increase in your number of Roxicodones

10   from 90 to 110?

11   A.    Yes, ma'am.

12   Q.    That's more than giving you ten more; right?

13   A.    Twenty, yes, ma'am.

14   Q.    Was anything done to determine why you needed more?

15   A.    No, ma'am, nothing at all.

16   Q.    In fact, what did you tell about your pain at the

17   beginning of that?

18   A.    That it was like a 2.

19   Q.    Did you tell them it was low?

20   A.    I think I said 2.

21   Q.    Were you asked to bend over, to show where the pain was?

22   Were you asked anything about whether it got any worse?

23   A.    No, ma'am.

24   Q.    And this is the extent of your second visit with Bridget;

25   is that right?

1    A.   Yes, ma'am.

2    Q.   You knew she wasn't a doctor, but do you know what she

3    was?

4    A.   I had no idea.  I just knew she worked there.

5    Q.   Now, I'll show you on your progress note of November 6,

6    again, from your file for this visit, we've just seen the video

7    for.

8              If we could switch back, Madam Clerk, to the Elmo.

9              And, Your Honor, this is part of the record.  It's

10   already been admitted.

11             THE COURT:  All right.

12             MS. GRIFFIN:  So if we could publish this for the

13   jury.

14             THE COURT:  It's on.

15   BY MS. GRIFFIN:

16   Q.   This is your progress note for November the 6th of 2014,

17   the video we've just seen.

18   A.   Yes, ma'am, it is.

19   Q.   And on this one you've been changed to a male?

20   A.   Yes, ma'am, I have.

21   Q.   And does it say you were there for management of chronic

22   pain?

23   A.   It does.

24   Q.   Had you used the term "chronic pain" in your lower back?

25   A.   No, ma'am.

1   Q.   Had you been asked about your scale with and without

2   medication?

3   A.   She just asked me to tell her what my pain level was right

4   then, and I said maybe a 2.

5   Q.   Did she ask you anything about your body or your back or

6   your ears, eyes, anything?

7   A.   No, ma'am.

8   Q.   In connection with your treatment, does it say you have

9   tried terminating the pain with Roxicodone with little

10  improvement?  Did you indicate that you had had little

11  improvement?

12  A.   No, ma'am.  I wasn't asked.

13  Q.   Does it say you are pleased with the medications?

14  A.   It does.

15  Q.   Were you asked if you were pleased with them?

16  A.   Actually, I think I was.

17  Q.   And did you tell them the Roxicodone was not lasting

18  through the month?

19  A.   Yes, ma'am, I did.

20  Q.   Now, when getting in and noticing this, did they get your

21  blood pressure during this visit, if you recall?

22  A.   I don't recall.

23  Q.   I'll show you the second page of that visit.  And under

24  your view of your symptoms, were you asked any of these again

25  to admit or deny, that being --

1   A.   I was not asked any of the questions -- I can't say for

2   sure about the -- where it says "admit to back pain," I know I

3   did not admit back pain ever.  I did not admit back pain in any

4   of these visits, but I asked about it.  I told them I had

5   stiffness in my back.  That's what I always used:  Stiffness in

6   my back.

7   Q.   You weren't asked about fatigue, chest pain, nausea,

8   blacking out, anxiety, or allergies?

9   A.   No, ma'am.

10  Q.   So that's not correct that you had denied those?

11  A.   That's correct.  I did not deny any of that because I

12  wasn't asked.

13  Q.   I'll show you the last page of that visit, the November

14  visit, and ask on this assessment where you now listed with

15  having four things -- opioid dependence, lumbar, back ache, and

16  lumbago?

17  A.   Yes, ma'am.

18  Q.   Did it indicate that you were being provided an additional

19  20 Roxicodone per month?

20  A.   No.

21  Q.   Did it indicate that you were being provided a signed

22  prescription that was dated in December for 110 Roxicodone?

23  A.   No, ma'am.

24  Q.   Was this electronically signed by Bridget Parker?

25  A.   Yes, ma'am.

1    Q.    What initials does it show?

2    A.    CRNP.

3    Q.    Does it show it was electronically co-signed by Dr. Couch

4    on November 14th?

5    A.    Yes, ma'am.

6    Q.    You did not see him; is that right?

7    A.    That's correct.

8    Q.    And there's nothing in this record of that month to show

9    that your medications had been increased or why they had been

10   increased; is that right?

11   A.    No, ma'am.  I didn't see any.

12          MS. GRIFFIN:  Your Honor, if I might inquire of

13   Mr. Cochrane if you are ready.

14          MR. COCHRANE:  Not for that one.

15   BY MS. GRIFFIN:

16   Q.    Let's go on to your next visit.  Again, on January 29th

17   of 2015, did you have occasion to go back to PPSA?

18   A.    Yes, ma'am.

19   Q.    Who were you to see on this visit?

20   A.    I thought I was going to see Bridget.

21   Q.    Did you see Bridget at the end of January?

22   A.    No, ma'am.

23   Q.    Did you see Dr. Couch at the end of January?

24   A.    No, ma'am.

25   Q.    Did you see a male or a female in this January 29th

1    visit?

2    A.    I saw a male.

3    Q.    Do you remember his first name?

4    A.    I think it's Ben.

5    Q.    In connection with this visit, did you also video and you

6    have audio of this visit?

7    A.    Yes, ma'am.

8    Q.    Have you compared the wording underneath the typing

9    underneath the video and compared it to what was actually being

10   said?

11   A.    Yes, ma'am.

12   Q.    Does it accurately reflect what was said to you during

13   that visit?

14   A.    Yes, ma'am, it does.

15              MS. GRIFFIN:  Your Honor, we move to play the

16   portions of video where he was in with Ben, that being

17   Government's Exhibit 20 containing Government's Exhibit 20-16,

18   January the 29th, 2015 video.

19              THE COURT:  All right.

20              THE CLERK:  It's turned up.  That's as high as I get.

21              THE COURT:  Will it play through the speaker of your

22   computer if you put the microphone up to it?

23              MR. COCHRANE:  If I may?  It -- it won't go through

24   the --

25              THE COURT:  You won't have the video.  You can't

1    unplug the audio?

2            MR. COCHRANE:  No, ma'am.

3            MS. GRIFFIN:  Your Honor, he tested --

4        [Video played in open court.]

5    BY MS. GRIFFIN:

6    Q.   Other than the female who obviously came in to do blood

7    pressure, were you and Ben the only person in the patient room?

8    A.   Yes, ma'am.

9    Q.   That was Ben that we were seeing, not Dr. Couch?

10   A.   That's correct.

11   Q.   Did you see Dr. Couch in this January visit?

12   A.   No, ma'am.

13   Q.   Again, were you given a prescription on that day for the

14   Roxicodone?

15   A.   Yes, ma'am.

16   Q.   And was that for the 110 tablets instead of the 90?

17   A.   Yes, ma'am.

18   Q.   Was there any question asked as to why you had been given

19   an increase?

20   A.   No, ma'am.

21   Q.   I'll show you Government's Exhibit 20-11.

22           If we could switch to the Elmo, please, ma'am.

23           THE CLERK:  It will take a few seconds.

24           MS. GRIFFIN:  Pardon?

25           THE CLERK:  It will take a few seconds.

DIRECT - PATRICK SHAWN KENNEDY

1        MS. GRIFFIN:  I don't believe there's any objection

2   to this, Your Honor.  We could mark this in as Government's

3   Exhibit 20-11.

4        THE COURT:  All right.  Mark it in.

5       [Government's 20-11 was received in evidence.]

6   BY MS. GRIFFIN:

7   Q.   You saved the Roxicodone prescription purportedly signed

8   by Dr. Couch?

9   A.   Yes, ma'am.

10  Q.   On January 29th of '15 for 110 tablets; is that right?

11  A.   Yes, ma'am.

12  Q.   And you also received the Zanaflex oral capsule on this

13  day?

14  A.   Yes.

15  Q.   Still, did you fill the scripts?

16  A.   No, ma'am, I did not.

17  Q.   Was anybody asking why you weren't showing up on the PDMP

18  as not having filled the scripts?

19  A.   No, ma'am.

20  Q.   Did anybody ask why you weren't testing positive for

21  taking the Roxicodone?

22  A.   No, ma'am.

23  Q.   On this visit, you didn't see Bridget?

24  A.   No, ma'am.

25  Q.   Didn't see Stacey?

1    A.   No, ma'am.

2    Q.   Do you know whether they were still employed at PPSA?

3    A.   No, ma'am, I did not.

4    Q.   Nobody told you why they weren't there?

5    A.   No, ma'am.

6    Q.   I'll show you your progress note for that day.  You've

7    previously seen your progress note for January the 29th of

8    2015?

9    A.   Yes, ma'am.

10   Q.   Now, the question -- the questions we saw on the video,

11   are those the only questions you were asked?

12   A.   Yes, ma'am.

13   Q.   This is January 29th, 2015.  Does this appear to be your

14   progress note, Shawn Brennan?

15   A.   Yes, ma'am.

16   Q.   Under the "Pain Status," were you asked the pain scale

17   with medicine and the pain scale without medicine?

18   A.   No, ma'am, I was not.

19   Q.   Did you indicate in this meeting that the Roxicodone was

20   not lasting through the last -- for the entire month?

21   A.   I did.

22   Q.   Does this appear to be almost identical to your November

23   progress note?

24   A.   It appears to be exactly identical, yes, ma'am.

25   Q.   On the second page of this January of '15 report, under

DIRECT - PATRICK SHAWN KERLEY

1   the "Review of Symptoms," again, were you asked about fatigue,

2   chest pain, nausea, blackout spells, back pain -- you were

3   asked about back pain; right?

4   A.   I was.

5   Q.   Were you asked any of the others?

6   A.   I was not.

7   Q.   Does it indicate that you denied having fatigue, chest

8   pain, nausea, blackouts, anxiety, and allergies?

9   A.   Yes, ma'am.

10  Q.   Does that appear to be just a repeat of the prior summary

11  from your last visit?

12  A.   Yes, ma'am.

13  Q.   Then down at the bottom, did you have any physical

14  examination of eyes?  Ears?  Nose?  Mouth?  Neck?  Back?

15  Anything?

16  A.   No, ma'am.

17  Q.   I'll show you the last page.  Again, does it list you as

18  being opioid dependent?

19  A.   Yes, ma'am.

20  Q.   Did the doctor or the nurse or anyone discuss that you

21  were opioid dependent with you?

22  A.   No, ma'am.

23  Q.   Was there any type of positive urine test that showed you

24  were taken opiates?

25  A.   No, ma'am.

1   Q.   In this last January, does the record show the last page

2   that Ben Clark had electronically signed your record?

3   A.   Yes, ma'am.

4   Q.   And that Dr. Couch had electronically signed your record

5   the next day?

6   A.   Yes, ma'am.

7   Q.   Does it still mention anything about your receiving 110

8   instead of just 90 of the Roxicodone?

9   A.   No, ma'am.

10   Q.   And you said you did not see Couch on this visit; is that

11   correct?

12   A.   That's right.

13   Q.   Did you have occasion to go again on March the 19th of

14   2015 to PPSA?

15   A.   Yes, ma'am.

16   Q.   Who were you scheduled to see on that day?

17   A.   I thought I was going to see Ben Clark.

18   Q.   But you actually had an appointment with Dr. Couch?

19   A.   I had an appointment with Dr. Couch, but I hadn't seen him

20   yet since.  So I assumed I was seeing his helpers.

21   Q.   On this March visit, did you do a urine test?

22   A.   I think I did an oral swab.

23   Q.   Okay.  You had not filled the prescription --

24   A.   I had not.

25   Q.   -- that you had got in January?

1    A.    That's correct.

2    Q.    And your testing for March the 19th, 2015 came back

3    negative to opiates; is that correct?

4    A.    Yes, ma'am.

5    Q.    Were you asked why?  If you had been saving opiates?  Why

6    were you not taking them?

7    A.    No, ma'am.

8    Q.    Were you continually prescribed opiates at this

9    March 19th visit?

10   A.    Yes, ma'am.

11   Q.    I'll show you the top half of Government's Exhibit 20-11,

12   which is -- has been admitted along with the January script and

13   ask if this is the prescription you received on January

14   the 19th, purportedly signed by Dr. Couch, for 110 Roxicodone

15   oral tablets, 15 milligrams.

16   A.    It's March 19th.

17   Q.    I'm sorry.  Did I say the wrong date?

18   A.    You said January.

19   Q.    March 19th of 2015.

20   A.    Yes, ma'am.  It was March 19th.

21   Q.    Does also have the Zanaflex oral capsule you received

22   March 19th, 2015?

23   A.    Yes, ma'am.

24   Q.    Did you fill those scripts?

25   A.    I did not.

1   Q.   Again, on March 19th, did you videotape the encounter?

2   A.   Yes, ma'am.

3   Q.   Who was it with this time?

4   A.   Her name is Jennifer.

5   Q.   Did you see Dr. Couch on this visit?

6   A.   No, ma'am.

7   Q.   Did you videotape it, and have you compared the wording at

8   the bottom of each section of the video with the actual words

9   that were showing up at the bottom?

10  A.   I have.

11          MS. GRIFFIN:  We'd move to play this for the jury,

12  Your Honor, and that is contained in the disk, No. 20.  It is

13  actually marked 20-16 -- excuse me -- 20-18 for the March 18,

14  2015 video.

15          THE COURT:  All right.

16      [Video played in open court.]

17  BY MS. GRIFFIN:

18  Q.   Now, Mr. Kelley, did that eliminate some discussions that

19  Jennifer had about the weather and about what she had expected

20  to come in from North Alabama?

21  A.   Yes, ma'am.  There was a bit about she has a house on the

22  river in Selma, Alabama or south of Selma.  We had a lot of

23  small talk.

24  Q.   But nothing else about your medical condition?

25  A.   Nothing at all.

1   Q.   I'll show you your progress notes for this visit,

2   March 19th, 2015.  And before we talk about those, while they

3   are switching over, was anything else said to you about where

4   was Ben, where was Stacey, where was Bridget?

5   A.   No, ma'am.

6   Q.   Do you know if any of them were still employed with the

7   business?

8   A.   I knew that Stacey had been fired, not because of the

9   office, but because one of the agents told me about it.

10  Q.   But you did not learn that at PPSA?

11  A.   No, ma'am, I did not.

12  Q.   I'll show you the March 19th visit.  And under "Current

13  Treatment" -- well, first of all, let's go to your pain status.

14  Did you tell anyone there that it was a 6 out of 10 with

15  medicine or a 10 out of 10 without your medication?

16  A.   No, ma'am.

17  Q.   And does it indicate that your last urine test had been

18  reviewed?

19  A.   Yes.

20  Q.   It showed no opiates?  It would not show that you had

21  taken what you had been prescribed?

22  A.   Yes.

23  Q.   Nobody commented on that?

24  A.   No, ma'am.

25  Q.   Did anybody comment at this meeting in March that it

1   wasn't showing on the PDMP that you were filling the Roxicodone

2   prescriptions?

3   A.   No, ma'am.

4   Q.   Did it list what you had previously tried, or does it just

5   appear to be no information?

6   A.   It's different this tame.  It's like it's supposed to be

7   prefilled or something.  It's not there.  Nothing there.

8   Q.   Did you tell them at this time that you had been out of

9   Roxicodone for 10 days?

10  A.   I did.

11  Q.   I'll show you the next page.  Down at the bottom, again,

12  did you -- were you asked about fatigue, chest pain, nausea,

13  anxiety?

14  A.   No, ma'am.

15  Q.   Under "Physical Examination," were you given a physical

16  examination?

17  A.   I was not.

18  Q.   Does it indicate that you were wearing a soft cervical

19  collar?

20  A.   It absolutely does.

21  Q.   Were you?

22  A.   No, ma'am.

23  Q.   What is that?

24  A.   It's a neck collar.  I had to Google it to figure out what

25  it was, but it's a neck collar like you buy at Walgreens.

1   Soft.  Real soft.  They are white most of the time.

2   Q.   So foam-looking that you see some people wearing on their

3   neck?

4   A.   Yes.

5   Q.   Did you have any kind of soft cervical collar?

6   A.   No, ma'am.  I was wearing regular street clothes.

7   Q.   Were you given any tests for trigger points?

8   A.   No, ma'am.

9   Q.   And were you tested for any spine range of motion?

10  A.   No, ma'am.

11  Q.   I'll show you the next-to-the-last page of this March

12  visit of 2015 and ask if you were given any testing for

13  Spurling's test?

14  A.   No, ma'am.  I don't know what a Spurling test is, but I

15  was given no test.

16  Q.   Were you given an axial traction test?

17  A.   No test at all.

18  Q.   Were you given a shoulder abduction test?

19  A.   No, ma'am.

20  Q.   Any kind of spine testing?

21  A.   No, ma'am.

22  Q.   Were you given a range of motion test for your spine at

23  that visit?

24  A.   No, ma'am.

25  Q.   Were you given any palpitation of your ribs?

DIRECT - PATRICK SHAWN KENNEDY                                    1844

1    A.    No, ma'am.

2    Q.    Do you see where it says "ribs normal on inspection"?  Did

3    anybody touch or look at your ribs?

4    A.    No, ma'am.

5    Q.    Was there any question as to whether you had any lesions

6    or deformities?

7    A.    No, ma'am.

8    Q.    Was your muscle strength tested to see if it was within

9    normal limits?

10   A.    No, ma'am.

11   Q.    Was there any inspection of your upper extremities and

12   your lower extremities?

13   A.    No, ma'am.

14   Q.    Down at the bottom, was there an encounter -- excuse me --

15   an encounter for long-term opioid analgesic use?

16   A.    There is one there in their assessment, yes.

17   Q.    Was this different from your previous opiate dependence

18   assessment?

19   A.    Yes.

20   Q.    You hadn't filled prescriptions.  You hadn't tested

21   positive with it being what you were prescribed; is that right?

22   A.    That's correct.

23   Q.    So do you know what this "encounter for long-term opiate

24   analgesic use" means?

25   A.    I have no idea.

DIRECT - PATRICK SHAWN KELLEY

1   Q.    Did anybody discuss it with you there at the visit?

2   A.    No.

3   Q.    Then the last page of the March visit indicates that you

4   were advised of the possible side effects of chronic opiate

5   therapy, including but not limited to constipation, drowsiness,

6   nausea and vomiting, itching, physical dependence, and/or

7   nervousness.  Were you advised of any of that?

8   A.    No, ma'am.

9   Q.    It also says the patient was advised to avoid alcohol and

10  any illicit substances while using the prescribed opioid

11  medication and to follow the directions exactly as prescribed

12  today.  Were you advised of that?

13  A.    No, ma'am.

14  Q.    It further lists that you are not to accept any other

15  opioids or central nervous system depressants from other

16  physicians or clinics without our knowledge and notify us

17  immediately if this occurs.  Were you advised of that?

18  A.    No, ma'am.

19  Q.    Did it say you understand the agreement and agree to abide

20  by these recommendations?

21  A.    It does say that.

22  Q.    This had not been on your earlier progress notes, had it?

23  A.    Did not.

24  Q.    Did any of this happen except telling you how to use the

25  Zanaflex?

1  A.   That's all.

2  Q.   It also says patient seen in collaboration with Dr. Couch.

3  Were you seen by Dr. Couch?

4  A.   I was not seen by Dr. Couch.

5  Q.   Was there a period of time when Ben could have gone out

6  and talked to Dr. Couch and come back in?

7  A.   Ben?  You mean Jennifer?

8  Q.   Jennifer.

9  A.   No, she didn't.  She was with me.  And then we did what we

10  did, and I left.

11  Q.   So were the prescriptions already signed when you received

12  them?

13  A.   Yes.

14  Q.   Dr. Couch didn't come in and sign them?

15  A.   No, ma'am.

16  Q.   Are you aware of any conversations she had with Dr. Couch

17  about your treatment or about these warnings?

18  A.   No, ma'am.

19  Q.   Do you see where this was signed by Jennifer on

20  March 24th and then reviewed allegedly by Dr. Couch on March

21  the 25th?

22  A.   Yes, ma'am.

23  Q.   You don't know whether it was reviewed by Dr. Couch at

24  all, do you?

25  A.   I do not.

DIRECT - PATRICK SHAWN KENNEDY

```
 1          THE COURT:  All right.  Ms. Griffin, is now a good
 2   time to break for the day?
 3          MS. GRIFFIN:  Yes, Your Honor.
 4          THE COURT:  All right.  Ladies and gentlemen, we are
 5   going to break for the day.  I want you to remember my
 6   instructions not to discuss the case or allow anyone to discuss
 7   it with you.  No research about the case.
 8          Leave your pads on your chairs.  Be back downstairs
 9   in the jury room at 9:00 o'clock tomorrow morning to begin your
10   service again.  Thank you, and have a good evening.
11      [Out of the presence and hearing of the jury in open
12      court.]
13          THE COURT:  Do the lawyers need to see me for
14   anything?
15          MR. SHARMIN:  No, ma'am.
16          THE COURT:  I'll see you in the morning.
17      [Recess.]
18
19
20
21
22
23
24
25
```

<u>INDEX OF WITNESSES</u>

                                    <u>PAGE</u>  <u>LINE</u>  <u>VOL</u>

**PATRICK SHAWN KELLEY**

DIRECT BY MS. GRIFFIN:   . . . . . . . . .1692    9     8


<u>INDEX OF EXHIBITS RECEIVED</u>

                                    <u>PAGE</u>  <u>LINE</u>  <u>VOL</u>

Govt. 20-22 . . . . . . . . . . . .1697   12     8

Govt. 20-3  . . . . . . . . . . . .1702    9     8

Govt. 20  . . . . . . . . . . . . .1704   12     8

Govt's 20-9 . . . . . . . . . . . .1720    8     8

Govt's 20-11  . . . . . . . . . . .1730    5     8

```
1   STATE OF ALABAMA)
                    :
2   COUNTY OF MOBILE)

3

4         I, Melanie Wilkins, do hereby certify that the above

5   and foregoing transcript of proceedings in the matter

6   aforementioned was taken by me in machine shorthand, and the

7   questions and answers thereto were reduced to writing under my

8   personal supervision using computer-aided transcription, and

9   that the foregoing represents a true and correct transcript of

10  the proceedings upon said hearing.

11

12        I further certify that I am neither counsel nor

13  related to the parties to the action, nor am I in anywise

14  interested in the result of said cause.

15  Pages 1797 to 1849.
    Dated:  August 25, 2017
16

17
                                    s/Melanie Wilkins
18                                  Melanie Wilkins
                                    Registered Merit Reporter
19                                  Certified Realtime Reporter
                                    Official Court Reporter
20                                  United States District Court
                                    Southern District of Alabama
21                                  113 St. Joseph Street
                                    Mobile, Alabama  36602
22                                  (251) 690-3371

23

24

25
```