

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ALABAMA

UNITED STATES OF AMERICA

CASE NO. CR15-00088

v.

COURTROOM 2B

JOHN PATRICK COUCH, M.D.,
and XIULU RUAN, M.D.,

MOBILE, ALABAMA

Defendants.

FRIDAY, JANUARY 20, 2017

* * * * * * * * * * * * * *

REDACTED

DAY 9 OF TRIAL
BEFORE THE HONORABLE CALLIE V. S. GRANADE,
UNITED STATES DISTRICT JUDGE, AND JURY

APPEARANCES:

FOR THE GOVERNMENT:
    DEBORAH A. GRIFFIN
    CHRISTOPHER BODNAR
    United States Attorney's Office
    63 S. Royal Street, Suite 600
    Mobile, AL  36602
    (251) 441-5845

FOR THE DEFENDANT COUCH:
    ARTHUR T. POWELL, III
    P.O. Box 40456
    Mobile, AL 36640-0456
    (251) 433-8310

    JACKSON R. SHARMAN, III
    ROBERT JACKSON SEWELL
    JEFFREY PAUL DOSS
    BENJAMIN SANDERS WILLSON
    Lightfoot, Franklin & White
    400 North 20th Street
    Birmingham, AL  35203
    (205) 581-0700

1850

```
 1    (Continued)

 2        BRANDON KEITH ESSIG
          800 Shades Creek Parkway, Suite 600D
 3        Birmingham, AL  35209
          (251) 879-1981
 4
      FOR THE DEFENDANT RUAN:
 5        DENNIS J. KNIZLEY
          7 N. Lawrence
 6        Mobile, AL 36602
          (251) 432-3799
 7
          JASON BRADLEY DARLEY
 8        Darley & McGough, LLC
          1751 Dauphin Street
 9        Mobile, AL 36604
          (251) 441-7772
10
          GORDON G. ARMSTRONG, III
11        P.O. Box 1464
          Mobile, AL  36633
12        (251) 434-6428

13        STEVEN D. MARTINIE
          4955 North Lake Drive
14        Whitefish Bay, WI  53217
          (414) 332-9683
15
      THE CLERK:  MARY ANN BOYLES
16    THE LAW CLERK:  LYNN DEKLE
      U.S. ATTORNEY IT:  BRIAN COCHRAN
17    DEFENSE IT:  SAM McALLISTER
      COURT SECURITY OFFICER:  WILLIAM NOEL
18    COURT REPORTER:  ROY ISBELL, CCR, RDR, CRR

19            Proceedings recorded by OFFICIAL COURT REPORTER
            Qualified pursuant to 28 U.S.C. 753(a) & Guide to
20      Judiciary Policies and Procedures Vol. VI, Chapter III, D.2.
               Transcript produced by computerized stenotype.
21

22            I do not certify that any audio/video recordings

23    played in open court and transcribed herein are verbatim

24    transcriptions, but were transcribed to the best of my ability.

25
```

1851

1                     EXAMINATION INDEX

2

DEPUTY PATRICK SHAWN KELLEY
3      DIRECT BY MS. GRIFFIN . . . . . . . . . . . . . . . 1862
       CROSS BY MR. ESSIG . . . . . . . . . . . . . . . 1893
4      REDIRECT BY MS. GRiFFIN . . . . . . . . . . . . . .1998

5 DEA SA MICHAEL BURT
       DIRECT BY MR. BODNAR  . . . . . . . . . . . . . . .2007

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

EXHIBIT INDEX

2

MAR ADM

GOVERNMENT'S

3    9-1(1) Email Ruan to Bayode 1/11/14                    2017

4    9-1(2) Email Ruan to Couch 2/17/14 – Abstral gains     2017
            5% market share
5
     9-2(2) Email Ruan to Couch 2/17/14 Astral gains        2024
6           5% market share

7    9-2(3) Email Ruan to Crawford 5/28/14 – prior          2024
            approval request
8
     9-2(4) Email Ruan to Phillips 9/9/14 – TIRF drugs      2024
9
     9-2(5) Email Ruan to Couch 9/22/14 – Response to       2024
10          recent audit on TIRF products

11   9-2(6) Email Ruan to Couch 9/23/14 – CMS program       2024
            audit – Medicare Advantage and Rx Drug Plan
12
     9-2(7) Email Ruan to Couch 9/23/14 – CMS program       2024
13          audit – Medicare Advantage and Rx Drug Plan

14   9-3(1) Email Ruan 11/15/11 – Why                       2038

15   9-3(2) Email Ruan 1/26/12 – filing of disability       2038

16   9-4(1) Email Ruan to J. Ruan – income, some received   2055
            on Jan 2013
17
     9-4(2) Printout from Sunshine Act website – Ruan –     2058
18          pharmaceutical payments 2013

19   9-4(3) Printout from Sunshine Act website – Couch –    2058
            pharmaceutical payments 2013
20
     9-4(4) Printout from Sunshine Act website – Ruan –     2058
21          pharmaceutical payments 2014

22   9-4(5) Printout from Sunshine Act website – Couch –    2058
            pharmaceutical payments 2014
23
     9-4(6) Printout from Sunshine Act website – Ruan –     2058
24          pharmaceutical payments 2015

25

1    9-4(7)  Printout from Sunshine Act website – Couch –  2058
            pharmaceutical payments 2015
2

3    9-5(1)  Email Ruan to Rowan 2/12/13 – discussion  2069

4    9-5(2)  Email Ruan to Paravate 2/24/13 – discussion  2069

5    9-5(3)  Email Ruan to Strange 2/26/13 – XLR Exotic  2069
            Auto, LLC

6    9-5(4)  Email Ruan to Rowan 3/4/13 – GCMS  2069

7    9-5(5)  Email Ruan to Phillips 5/21/13 – GCMS tests  2069

8    9-5(6)  Email Ruan to another doctor; bcc Paravate  2069
            6/11/13 – urine confirmation – Castle Medical
9

10   9-5(7)  Email chain 12/12/13 – Smith to Paravate –  2069
            Samples wasted – Castle Medical

11   9-5(8)  Email Ruan to Jain, etc. 1/25/12 – idea.  2069
            Here is a proposal (firing patients)
12

13   9-6(2)  Email Ruan to Li Ma 8/26/12 – Petition on  2094
            opioids and FDA commentary

14   9-6(3)  Email Ruan to Palmer 2/23/14 – patient  2094
            teaching
15

16   9-6(4)  Email Ruan to Couch, etc. 3/16/14 – memo  2094
            regarding pharmacy privacy

17   9-6(5)  Email Ruan to Couch, etc. 4/27/14 – very  2094
            important lessons with Medicare patients
18

19   9-6(6)  Email Ruan to Couch, etc. 7/13/14 – PPSA  2094
            Educational Series:  Drug Diversion

20   9-11    Patient File K. Burns (binder)  2084

21   9-11A  Alabama PDMP Report – Burns  2084

22   9-12    Patient file I..  2029

23   9-13    Chart of Exhibit 10-17 – Couch & Ruan Exalgo  2068
            prescriptions by month mg

24

25



1  20-6    9/8/14 prescriptions                              1885

2  20-23   Chiropractor exam report of Dr. JW.........       1891
           for Brennan dated 7/20/25 faxed to PPSA prior
3          to August 2014 meeting

4

5  DEFENDANT COUCH'S
   61A     Video of first office visit to PPSA 8/5/14 by     1964
6  Patrick Shawn Kelley posing undercover as
           Shawn Brennan
7
   61B     Video of first office visit to PPSA 8/5/14 by     1975
8          Patrick Shawn Kelley posing undercover as
           Shawn Brennan - interaction with staff
9
   61C     Video of first office visit to PPSA 8/5/14 by     1977
10         Patrick Shawn Kelley posing undercover as
           Shawn Brennan - interaction with Stacy
11         Madison (same as Government's Exhibit 20-1)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          (Morning session, 9 a.m., in chambers, jury not present.)
 2              MS. GRIFFIN:  Good morning.
 3              MR. ESSIG:  Good morning, Judge.
 4              THE COURT:  Good morning.
 5              MR. SHARMAN:  Good morning, Judge.
 6              MR. ARMSTRONG:  Good morning.
 7              THE COURT:  Good morning, good morning.
 8              MR. KNIZLEY:  Good morning, Judge.
 9              MS. GRIFFIN:  Your Honor, Brandon is going to cross-
10    examine the undercover when we finish, and he and I have been
11    discussing some matters we thought we should bring to your
12    attention ahead of his cross beginning.  He wants to introduce
13    two calls from the chiropractor who called and had an
14    appointment set up for Mr. Brennan.  We are not going to play
15    those nor offer those.  First of all, they are hearsay, they do
16    not involve this witness.  And, second, they are
17    irrelevant.  He's not charged with letting people come in who
18    don't have insurance.  He's charged, of course, with improper
19    care of the patients.  So we will be objecting to those.
20              Further, counsel has been advised that that particular
21    chiropractor was a source and was not cooperating for any
22    benefit, but was a source who had provided information years
23    ago and who was doing this just to assist the FBI.  So that
24    part is not relevant as to the admissibility of the tape.  But
25    the undercover call, absent one person on the call, is not
```

1     admissible we contend.

2             MR. ESSIG:  Judge, our position is -- first of all,

3     it's not hearsay.  The statements in there are for the referral

4     of Brennan.  He's referring the patient; that is, Brennan.  Of

5     course, that's not true.  So it can't be offered for the truth,

6     because he has no patient named Brennan that's being referred

7     to the doctor.  He's, of course, acting in an undercover

8     capacity.

9             Your Honor, also we -- this goes to our theory of

10    defense in the case.  And part of our theory of defense

11    specifically as it relates to the undercover is that the only

12    reason that we treated Brennan that day is because of the

13    doctor's phone calls.  But for the referral, we would have

14    never seen Brennan, Your Honor.  And it also goes -- in

15    addition, another part of the not being hearsay is, even if it

16    were true, even if we were offering it for the truth, or even

17    if the statements were true, it would be to show the effect on

18    the listener, the effect on the clinic, the reason that we

19    allowed him in.

20            THE COURT:  The clinic is not a witness or a person,

21    you know.

22            MR. ESSIG:  Your Honor, the clinic has been

23    identified, PPSA has been identified, as part of the RICO

24    enterprise in this case -- the other thing, Your Honor.

25            THE COURT:  But it's still not a defendant in this

 1    case.  So --

 2              MR. ESSIG:  No, Your Honor.  But it helps explain for

 3    the jury how Officer Kelley got into the clinic.  Right now the

 4    jury is left with the impression that he showed up on August

 5    5th, walked into the --

 6              THE COURT:  He said it was a referral, it shows it was

 7    a referral from a chiropractor.  So --

 8              MS. GRIFFIN:  Your Honor, further, there's no showing

 9    that Dr. Couch had any idea how he showed up.

10              THE COURT:  I sustain the objection.  I don't think --

11    I think it is hearsay.  If you want to bring the chiropractor

12    or whoever talked to them on the phone, then I think, you know,

13    it may be admissible.  But at this point I think it is not.

14              MR. ESSIG:  The other portion, Your Honor, that I

15    understand they are going to object to is, as he testified

16    yesterday, is that when he came into the clinic he did not have

17    insurance and he was sent out of the clinic because he did not

18    have insurance and he showed up as a cash-only patient.  And so

19    portions of the videos that were not played from that day, we

20    want to play the interaction.  It's a very short interaction.

21    It's about two and a half minutes total of Mr. Brennan going

22    into clinic and interaction with the new-patient coordinator

23    telling Mr. Brennan -- basically explaining to him:  You do not

24    have insurance, we won't see you, your doctor told me you don't

25    have insurance, and him going back outside.  Then we want to

1    play a short portion of his calls back to the DEA to discuss

2    with them the fact that he's been sent out and what they are

3    going to do to get him back in the clinic.

4            THE COURT:  What relevance?

5            MR. ESSIG:  Same thing, Your Honor.  It completes the

6    story for the jury.  And I also note, Your Honor, yesterday he

7    testified to those facts and the best evidence of that

8    interaction with both the staff and the agents would be the

9    actual audio of the interaction itself rather than just his

10   testimony to that fact.

11           MS. GRIFFIN:  Your Honor, we contend that his comments

12   back to the DEA agent have nothing to do with this part of the

13   case.  It's nothing that Dr. Couch was aware of, it's nothing

14   that people inside the clinic were aware of, so there's no

15   relevance to it.

16           THE COURT:  Well, he did testify that he went out and

17   made a couple of calls.  Or maybe you questioned him about

18   that.  I don't know that he actually said anything other than

19   yes.  But I think you brought it up.  So they can show it if

20   they want to.  I don't know what relevance it has.

21           MS. GRIFFIN:  We will object, of course, on the

22   relevance.  Brennan has also provided me a list of some other

23   things he wanted to talk about and we will address those.  One

24   of those particularly is that a police officer checks in at the

25   front desk and sits in the waiting room.  And we contend that's

```
 1    not relevant.  I mean, some of the things are going to be
 2    beyond the scope of direct and are going to have no relevance
 3    to what he's testifying to, which is an undercover visit.
 4              THE COURT:  All right.
 5              MS. GRIFFIN:  We'll address those when --
 6              THE COURT:  Object whenever you feel like objecting.
 7              MS. GRIFFIN:  Further, he wants to use some
 8    transcripts from some of the portions we have not played.  Now,
 9    the clips are authentic, but we can't -- there's no way to
10    authenticate their transcripts.
11              THE COURT:  Well, you'll have to authenticate them if
12    you want to use them.
13              MR. ESSIG:  Okay.
14              THE COURT:  Okay.
15              MR. ESSIG:  And, Judge, just so the Court is aware,
16    I'm going to offer -- we've got a -- the issue is we mostly are
17    going to, other than the stuff we've described here so far, we
18    are mostly going to be playing portions of the same clips that
19    have been admitted for the government.  The problem is they
20    don't match up, the times don't match up perfectly.  You know,
21    we might play 30 extra seconds of what they've already
22    admitted.  That's not an issue because I'm not going to play
23    the entirety of anything they've already shown.  But I have
24    specific sort of divided up time portions that I want to play
25    of what they've admitted.  In order to make it easier for --
```

1   and I've got times identified in the clips that I want to play.

2   And again, they don't match theirs.  What we are going to do is

3   we are going to offer a thumb drive that has our clips that we

4   want to play which includes the clip in the clinic with the

5   undercover being sent out, the short clips of the calls to the

6   agents.  And then again, a lot of the clips in the clinic is

7   the same stuff the jury saw yesterday.  I do not intend to play

8   all of it.  But in order for me to be -- in order for us to be

9   able to navigate just the portions we want to play, we've got

10  to be able to use ours.  So I am going to be offering a

11  separate exhibit.

12          THE COURT:  Well, I don't want you to -- I will not

13  admit anything that has conversations on it that I have said

14  are not admissible.

15          MR. ESSIG:  No, ma'am.  We've got the Dr. W..... phone

16  calls on there.  With the Court's ruling today, we'll just take

17  those off.  What we'll do -- or we will make sure it's not on

18  there if it ever goes back to the jury.  And then for the

19  remainder, I'm not sure that -- you know, except for one

20  interaction with the staff that does the urinalysis on the way

21  into the room when he saw Stacy -- other than that, it's all

22  pretty much encompassed within the government's existing

23  exhibits.

24          MS. GRIFFIN:  And, Your Honor, I know the Court has

25  not ruled on this, but when he attempts to offer where the

```
 1    agent goes out and makes a call -- where the undercover goes
 2    out makes a call to the DEA agent, we will object to those
 3    coming in because it appears as though the agent is talking
 4    back and forth to the chiropractor while he is talking to
 5    Mr. Kelley.
 6              THE COURT:  I'm not following you.
 7              MS. GRIFFIN:  We'll wait till he gets to that portion
 8    and object.
 9              THE COURT:  You mean he pretends like he's talking to
10    the chiropractor?
11              MS. GRIFFIN:  No.  He was outside.  So nobody's
12    listening to him.  The undercover is talking to the DEA agent.
13    It appears from the transcript they provided that the DEA agent
14    is also talking perhaps on another phone to the chiropractor.
15              THE COURT:  You can't hear that on the --
16              MR. ESSIG:  You cannot, Your Honor.
17              MS. GRIFFIN:  You cannot.
18              MR. ESSIG:  Judge, here is -- here's what, here's what
19    the jury will hear.  This is what I intend to play.  I intend
20    to play Officer Kelley walking outside, calling Agent Burt, and
21    just asking him a question.  You know, they talk, you can't
22    hear it, make it out, but there's some discussion.  He says:
23    How are we going to play that?
24              And then that's all I intend to play.  He hangs up,
25    the UC gets another phone call and it's from Dr. W......
```

 1   Dr. W..... does not identify himself.  The UC says:  Hello,

 2   Doc.  How are you?

 3           And then there's about a 40 -- there's a 45-minute --

 4   45-second conversation by the doctor that you can't hear.

 5   Officer Kelley says okay and goes back into the clinic and

 6   that's it.

 7           MS. GRIFFIN:  But that's beyond the transcript you

 8   provided me this morning.  We'll go talk.

 9           MR. ESSIG:  That's beyond the telephone call

10   transcript.  That's right.

11           THE COURT:  All right.

12       (A recess was taken at 9:07 a.m.)

13       (In open court, 9:14 a.m., defendants and jury present.)

14           THE COURT:  All right, Ms. Griffin.

15                   DEPUTY PATRICK SHAWN KELLEY,

16         previously sworn, testified further, as follows:

17                   DIRECT EXAMINATION CONTINUED

18   BY MS. GRIFFIN:

19   Q   Good morning, Mr. Kelley.

20   A   Good morning.

21   Q   We had ended yesterday talking about your March of 2015

22   visit; is that correct?

23   A   Yes, ma'am.

24   Q   Today I want to focus on your last visit.  Did you have

25   occasion to go to PPSA on April the 16th of 2015?  I

1  apologize.  My mic was not on.  Did you have occasion to go to

2  the clinic on April the 16th of 2015?

3  A   Yes, ma'am.

4  Q   Who were you scheduled to see at that appointment?

5  A   Dr. Couch.

6  Q   Did you see Dr. Couch at that appointment?

7  A   No, ma'am.

8  Q   Who did you see?

9  A   A lady named Jennifer.

10 Q   As in the other appointments, did you video and audio the

11 meeting with Jennifer?

12 A   Yes, ma'am.

13         MS. GRIFFIN:  And, Your Honor, if we could, we would

14 move to play the audio and the video.

15 Q   Have you compared the audio of the actual taping with the

16 wording down at the bottom of the transcript that's on the

17 screen?

18 A   I have.

19 Q   Does it accurately reflect what occurred while you were

20 talking with Jennifer inside the clinic?

21 A   Yes, ma'am, it does.

22 Q   Now, during this section was it just the two of you back in

23 the patient room, you and Jennifer?

24 A   Yes, ma'am.

25 Q   And Jennifer's the same person you had seen in March?

```
 1    A    That's correct.

 2            MS. GRIFFIN:  And we would move to play this, Your

 3    Honor.  It is part of Exhibit 20, but it is within Exhibit 20,

 4    Number 20-21.

 5            THE COURT:  All right.  You may play it.

 6        (The video recording was played.)

 7            VOICE OF MR. BRENNAN:  How are you?

 8            VOICE OF JENNIFER:  Fine.  How are you?

 9            VOICE OF MR. BRENNAN:  Good.

10            VOICE OF JENNIFER:  How is everything going?  No more

11    ice storms?

12            VOICE OF MR. BRENNAN:  No more ice storms.

13            VOICE OF JENNIFER:  Just rainstorms.  Oh, my god.

14    Now, where are you -- still up north working?

15    Or...(inaudible).

16            VOICE OF MR. BRENNAN:  (Inaudible.)

17            VOICE OF JENNIFER:  Yeah, you know, I'm going to be

18    heading a little south of Selma tomorrow.  So I'm...

19    (inaudible).

20            VOICE OF MR. BRENNAN:  It's supposed to rain every

21    day.

22            VOICE OF JENNIFER:  (Inaudible.)

23            VOICE OF MR. BRENNAN:  I drove through the rain today

24    all the way down here.

25            VOICE OF JENNIFER:  Well, I'm hoping that it lets up a
```

1   little bit.  Hopefully the river did not flood.

2       (The video recording stopped playing.)

3           MS. GRIFFIN:  Your Honor, can we stop it just a

4   moment, see if we can get the sound increased?  Is there a way

5   to increase the sound?

6           THE CLERK:  That's it.

7           THE COURT:  She's turned it up.  Let's see --

8       (The video recording was played.)

9           VOICE OF MR. BRENNAN:  (Unintelligible.)

10          VOICE OF JENNIFER:  Yeah, I haven't -- the last time

11  I've seen it up high it was a year ago.

12          VOICE OF MR. BRENNAN:  Yeah.

13          VOICE OF JENNIFER:  And it was pretty high then.  Now,

14  tell me, you're on Roxicodone...(unintelligible).  Are you on

15  any other medications?

16          VOICE OF MR. BRENNAN:  No.

17          VOICE OF JENNIFER:  Take any cold medications over the

18  counter or anything else like that?

19          VOICE OF MR. BRENNAN:  Sometimes I will take...

20  (inaudible).

21          VOICE OF JENNIFER:  What typically is it -- uh, what's

22  the name of it?

23          VOICE OF MR. BRENNAN:  Oh, Lord, I can't remember the

24  name of it.  It's Equate stuff.

25          VOICE OF JENNIFER:  Okay.

1           VOICE OF MR. BRENNAN:  It's like Sudafed almost.

2           VOICE OF JENNIFER:  Uh, we sent off -- whenever you

3   came in last time -- and there might have been something in

4   your urine, we don't know for sure -- but whenever we sent it

5   off, it came back showing that it was an amphetamine in your

6   urine.

7           VOICE OF MR. BRENNAN:  What would cause that?

8           VOICE OF JENNIFER:  You're not doing anything illegal

9   or anything, are you?

10          VOICE OF MR. BRENNAN:  No.

11          VOICE OF JENNIFER:  Uh --

12          VOICE OF MR. BRENNAN:  Like are you talking about

13  taking meth?  No, I don't do that.

14          VOICE OF JENNIFER:  Not -- you know, sometimes this

15  could be some cold medications too.

16          VOICE OF MR. BRENNAN:  I take workout medication

17  sometimes.

18          VOICE OF JENNIFER:  What's that?

19          VOICE OF MR. BRENNAN:  You know, like pre-workout

20  supplements and stuff.

21          VOICE OF JENNIFER:  Oh, does that have protein in it?

22          VOICE OF MR. BRENNAN:  Uh-huh (positive response).

23          VOICE OF JENNIFER:  Does it have any hormones?

24          VOICE OF MR. BRENNAN:  You know, I don't know if it

25  does or not.  They say it's called -- they said it was over-

1   the-counter stuff you buy at GNC.

2        VOICE OF JENNIFER:  Uh, what -- what I'm going to do

3   is, uh, I'm gonna put you on some...(unintelligible)

4   over-the-counter...(unintelligible).

5        VOICE OF MR. BRENNAN:  Uh-huh (positive response).

6        VOICE OF JENNIFER:  And we'll check you again at some

7   point in time, make sure that everything's okay.

8        VOICE OF MR. BRENNAN:  That's fine.

9        VOICE OF JENNIFER:  You're right outside Cullman,

10  aren't you?

11       VOICE OF MR. BRENNAN:  Right now, yeah.  Yeah, right

12  north of there.

13       VOICE OF JENNIFER:  Uh-huh?  Just don't take that cold

14  and flu or cold and sinus and that pre-workout, just hold off

15  on it for a minute or two.  We will see what's going on with

16  that.

17       VOICE OF MR. BRENNAN:  Okay.

18       VOICE OF JENNIFER:  All right.  My husband's best

19  friend was taking -- and it has some hormones in it, of course.

20  He didn't do urine or anything because he didn't need any pain

21  medicine, but even the physician said to be careful because it

22  can change some things.

23       VOICE OF MR. BRENNAN:  Okay.  That's kind of odd to

24  me.

25       VOICE OF JENNIFER:  And another reason why he checked

1  on that is because he was -- he was going through, uh, tongue

2  cancer and was going through radiation and chemotherapy and he

3  needed the extra protein so he was taking it.

4          VOICE OF MR. BRENNAN:  Right, right.

5          VOICE OF JENNIFER:  He wanted to make sure the

6  hormones wouldn't change the progression of cancer if it was

7  going to happen.  And he did okay.  But --

8          VOICE OF MR. BRENNAN:  Okay.

9          VOICE OF JENNIFER:  -- the oncologist actually said be

10 careful with them.

11         VOICE OF MR. BRENNAN:  I got you.

12         VOICE OF JENNIFER:  And he got his -- it was an

13 independent guy, a pro golfer from GNC who had his own little

14 weightlifting system locally, and --

15         VOICE OF MR. BRENNAN:  Uh-huh (positive response).

16         VOICE OF JENNIFER:  -- and was selling his own

17 herbs.  That's from GNC.  All right.  So we're continuing doing

18 what we're doing and have you come back in four weeks, see how

19 you do with that.

20         VOICE OF MR. BRENNAN:  Okay.

21         VOICE OF JENNIFER:  I know you've got to travel a

22 little bit.  But then we -- if everything looks okay we might,

23 you know, maybe go to eight weeks okay?

24         VOICE OF MR. BRENNAN:  Okay.

25         VOICE OF JENNIFER:  All right, young man.  Let me put

```
 1   another note here.

 2       (The video recording stopped playing.)

 3           MS. GRIFFIN:  If we could switch over to the ELMO,

 4   please?

 5           THE COURT:  All right.

 6   BY MS. GRIFFIN:

 7   Q   Mr. Kelley, was there anybody else in the room besides you

 8   and Jennifer?

 9   A   No, ma'am.

10   Q   Now, you had had a urine test in March; is that right?

11   A   I had a swab of the mouth.

12   Q   Was the swab in November and the urine in March, you had

13   one one time and one the other?

14   A   No.  I had a urine test the first time and a swab test the

15   second time.

16   Q   All right.  Now, the bottom of the screen has the date of

17   2007.  Can you tell us about that?

18   A   That's just the equipment we used.  It was a different

19   piece than we normally used and we didn't know how to program

20   the date and time on it.

21   Q   In fact, this visit occurred on April the 16th of 2015?

22   A   That's correct.

23   Q   Did you see Stacy, did you see Ben, or did you see

24   Jennifer -- excuse me -- Stacy, Ben, or Bridgette on this

25   visit?
```

DEPUTY PATRICK SHAWN KELLEY - DIRECT BY MS. GRIFFIN

1   A   No, ma'am.

2   Q   Was there any explanation about where they were?

3   A   No, ma'am.

4   Q   Did you receive two prescriptions on that date?

5   A   I did.

6   Q   I show you what's marked as the back of Government's

7   Exhibit 20-11, it's already been admitted into evidence, and

8   ask if this is the prescription you received on April 2015?

9   A   Yes, ma'am, it is.

10   Q   Now, that's dated April the 15th.  But you said you went in

11   the clinic on April the 16th; is that right?

12   A   Yes, ma'am.

13   Q   Does it appear to have been signed by Dr. Couch?

14   A   Yes, ma'am.

15   Q   Or at least over his name?

16   A   Yes, ma'am.

17   Q   And then I show you the -- was that Roxicodone, again, 110

18   tablets?

19   A   Yes, ma'am.

20   Q   And you also received a Zanaflex capsule prescription on

21   that occasion; right?

22   A   Yes, ma'am.

23   Q   Do you know why the prescription shows April the 15th for

24   the Roxicodone, when in fact you were not there until the 16th?

25   A   I do not.

 1   Q   Did anybody make a comment to you about that when they

 2   handed you the script?

 3   A   No, ma'am.

 4   Q   Did you see Dr. Couch come in and sign this prescription?

 5   A   No, ma'am.

 6   Q   Also there was a period of time during the tape when it

 7   appeared that Jennifer's back was to you and she was doing

 8   something.  Can you tell us what she was doing?

 9   A   She was typing on the computer.

10   Q   Had you filled any of your prescriptions prior to that

11   time?

12   A   No, ma'am.

13   Q   Would you have had any information on the PDMP at that time

14   about your prior four visits?

15   A   No, ma'am.

16   Q   Why is that?

17   A   Because I didn't fill any of the prescriptions.

18   Q   So there would have been nothing to report on the PDMP?

19   A   That's right.

20   Q   I want to show you the actual progress note for that

21   visit -- it's part of your patient file from PPSA that's a part

22   of Government's Exhibit 20-22 -- and ask if it shows your visit

23   date was April the 16th of 2015?

24   A   Yes, ma'am, it does.

25   Q   Had you at any time during this visit reported that your

1    scale of pain with medicine was six out of 10?

2    A    No, ma'am.

3    Q    Had you reported at any time during this visit that you

4    were 10 out of 10 without medicine?

5    A    No, ma'am.

6    Q    Is that true or false?

7    A    That's false.

8    Q    I'll show you the bottom of the second page of that report

9    and ask again if you had any physical examination?

10   A    No, ma'am.

11   Q    Down at the very bottom it says that your spine had no

12   lesions or deformities and that it was nontender to being

13   touched.  Did that happen?

14   A    No, ma'am.

15   Q    It starts by saying you were wearing soft -- have you

16   previously seen this?

17   A    And the last one, yes, ma'am.

18   Q    And I'll show you the top of that next page.  It says:

19   Previously wearing soft cervical collar.  Were you wearing a

20   cervical collar during this visit?

21   A    No, ma'am.

22   Q    Were there any trigger points identified or any questions

23   about that?

24   A    No, ma'am.

25   Q    And in connection with the third page, you see where there

1873

1     are a number of indications of your spine, your ribs, the rest

2     of your extremities.  Was there any inspection done?

3     A   No, ma'am, none of that.  I was not touched.  Other than my

4     blood pressure being taken, I wasn't touched at all.

5     Q   I want to point you to this spine and ask you if you had a

6     FABER, F-A-B-E-R, test?

7     A   No, ma'am, I did not.

8     Q   Do you even know what that is?

9     A   I had to look it up.  Yeah, I do know what it is.

10    Q   What was that?

11    A   It says it's a test where they test your hips, rotate your

12    hips and your legs to make sure you don't have any problems

13    there.  That's the best I know about it, from what I've

14    Googled.

15    Q   Was anything done with you on that visit to test your hips?

16    A   No, ma'am.

17    Q   To test any part of your body?

18    A   No, ma'am.

19    Q   Did you have any Gaenslen, G-A-E-N-S-L-E-N, test?

20    A   No, ma'am.  I don't even know what that is.

21    Q   And this states on the report that that test was negative

22    bilaterally; is that correct?

23    A   That's what it says.

24    Q   You did not have such a test?

25    A   No, ma'am.

1874

1   Q   Did you have any Waddell's signs looked for?

2   A   Not that I'm aware of.  I don't know what that is, but no.

3   Q   As you go through where it says inspections, was there any

4   inspection of your joints, your limbs, your range of motion,

5   anything to do with examining your condition?

6   A   No, ma'am, none at all.

7   Q   Then I show you down at the bottom where it says

8   instructions.  Were you advised of any possible side-effects of

9   chronic opioid therapy?

10  A   No, ma'am, I was not.

11  Q   By anyone?

12  A   No, ma'am.

13  Q   Were you advised to avoid, on the last page, alcohol and

14  illicit substances -- illicit substances while using the

15  prescribed opioid medication?

16  A   No, ma'am.

17  Q   Were you advised of anything else it tells you there as in

18  not to accept other opioids from other physicians or clinics?

19  A   No, ma'am.

20  Q   It also ends with saying:  Patient understands this

21  agreement and agrees to abide.  Were you told anything about

22  it?

23  A   No, ma'am.

24  Q   Did you make any agreement?

25  A   No, ma'am.

DEPUTY PATRICK SHAWN KELLEY - DIRECT BY MS. GRIFFIN

1  Q   It says:  Seen in collaboration with Dr. Couch.  Did you

2  see Dr. Couch?

3  A   No, ma'am.

4  Q   Was there a time that Jennifer left you in the room where

5  she could have gone out and consulted with Dr. Couch before

6  giving you a prescription?

7  A   No, ma'am.

8  Q   So you don't know if they believed you had had all this and

9  you had a cervical collar, do you, or that if it was copied

10  from somebody else's chart?

11  A   I don't know if it was or not, no.

12  Q   And you see it was electronically signed by Jennifer?

13  A   Yes, ma'am.

14  Q   And it was electronically signed apparently by Dr. Couch?

15  A   Yes, ma'am.

16  Q   This was your last visit to PPSA?

17  A   Yes, ma'am.

18  Q   I want to direct your attention to the one we were unable

19  to play yesterday with some difficulties with the

20  equipment.  Did you go to the clinic in September, one month --

21  approximately one month after your August 15th visit?

22  A   Yes, ma'am.

23  Q   Who did you see on that occasion?

24  A   Saw Stacy that day.

25  Q   Was that the last time that you saw Stacy?

DEPUTY PATRICK SHAWN KELLEY - DIRECT BY MS. GRIFFIN

1   A   Yes, ma'am, it was.

2   Q   Again, on this visit did you audio and video the visit?

3   A   Yes, ma'am.

4   Q   Have you had the opportunity to compare the transcript at

5   the bottom of the video with the words that were actually being

6   said in the audio?

7   A   Yes, ma'am.

8         MS. GRIFFIN:  And, Your Honor, I believe this has

9   already been admitted as part of Government's Exhibit 20.  But

10  it is the video that is in Exhibit 20, numbered 20-5 [sic].  If

11  you will hold for us for just a second?

12        THE COURT:  All right.

13        THE CLERK:  20-4, Your Honor.

14        THE COURT:  20-4, you say?

15        THE CLERK:  Yes, ma'am.

16        MS. GRIFFIN:  20 is the whole exhibit, and the videos

17  for this particular one within the exhibit so 20-4.

18        THE COURT:  All right.

19        MS. GRIFFIN:  The September the 8th of 2014 video.

20        We're ready.

21     (The video recording was played.)

22        VOICE OF ISIS:  How are you doing today?

23        VOICE OF MR. BRENNAN:  I'm doing all right.

24        VOICE OF ISIS:  That's good.  Okay.  Let's go in here.

25  I don't know about new patient...(unintelligible).

```
 1              VOICE OF MR. BRENNAN:  Here?

 2              VOICE OF ISIS:  Yeah, better safe than sorry.

 3              VOICE OF MR. BRENNAN:  I understand that.

 4              VOICE OF ISIS:  So, Mr. Shawn, anything new going on?

 5              VOICE OF MR. BRENNAN:  Not really.

 6              VOICE OF ISIS:  Any new pain?

 7              VOICE OF MR. BRENNAN:  No.  Everything's pretty much

 8  the same.

 9              VOICE OF ISIS:  What's your pain level?

10              VOICE OF MR. BRENNAN:  Depends on what I'm doing that

11  day.

12              VOICE OF ISIS:  Hmm.  What's your pain level today?

13              VOICE OF MR. BRENNAN:  Today?

14              VOICE OF ISIS:  Uh-huh (positive response).

15              VOICE OF MR. BRENNAN:  Three.

16              VOICE OF ISIS:  That's not bad.

17              VOICE OF MR. BRENNAN:  Yep.

18              VOICE OF ISIS:  Are you pleased with your medications?

19              VOICE OF MR. BRENNAN:  Yeah, they've been working

20  fine.  I ran out because I had to postpone the appointment, you

21  know.

22              VOICE OF ISIS:  Uh-huh (positive response).

23              VOICE OF MR. BRENNAN:  I had something come up and had

24  to go out of town.  So -- I work out of town a lot, like mostly

25  Tennessee and Georgia.  So --
```

1878

```
 1           VOICE OF ISIS:  Uh-huh (positive response).  It's the
 2   same pain?
 3           VOICE OF MR. BRENNAN:  Yeah.  Nothing -- nothing's
 4   changed as far as that goes.
 5           VOICE OF ISIS:  Okay.  Let's see what we've got here I
 6   can work with.  I can work with everything else too, but I can
 7   mostly work with that.  (Laughing.)
 8           VOICE OF MR. BRENNAN:  I hear you.  I haven't met you
 9   before.  What's your name?
10           VOICE OF ISIS:  I apologize.  I normally introduce
11   myself to everybody, but lately I've been reintroducing myself,
12   so I didn't do it.
13           VOICE OF MR. BRENNAN:  Yeah.
14           VOICE OF ISIS:  My name is Isis.  Stacy -- I'm like
15   reintroducing myself, so I kind of like cool down with it.
16           VOICE OF MR. BRENNAN:  I hear it.
17           VOICE OF ISIS:  Just slip through the cracks.
18   (Laughing.)
19           VOICE OF MR. BRENNAN:  It happens.
20           VOICE OF ISIS:  Oh, okay.  That top number is a little
21   high.  Are you sure you ain't in a little pain?
22           VOICE OF MR. BRENNAN:  I'm okay.
23           VOICE OF ISIS:  That's all got -- I mean --
24           VOICE OF MR. BRENNAN:  What's -- what is that?
25           VOICE OF ISIS:  You see, normally when that top number
```

 1   is high like that and the bottom number is normal, that shows

 2   pain.  But --

 3            VOICE OF MR. BRENNAN:  Well, I've got a little bit of

 4   a hangover.

 5            VOICE OF ISIS:  (Laughing.)

 6            VOICE OF MR. BRENNAN:  That might be what it is.

 7            VOICE OF ISIS:  Oh, at least you're honest.

 8            VOICE OF MR. BRENNAN:  I ain't gonna lie to you.  You

 9   know what I mean?

10            VOICE OF ISIS:  That's what's up.

11            VOICE OF MR. BRENNAN:  Yeah.

12            VOICE OF ISIS:  You watching football yesterday?

13            VOICE OF MR. BRENNAN:  Oh, I didn't watch football

14   yesterday.  I just set up -- I just sat out and relaxed because

15   I'd been going so much.

16            VOICE OF ISIS:  Okay.  Nothing wrong with that.

17            VOICE OF MR. BRENNAN:  Sat around and drank beer with

18   my buddies.  I probably shouldn't have, but I did.

19            VOICE OF ISIS:  Hey, enjoy life.  There's nothing

20   wrong with that.  If this computer was any slower, it would be

21   going backwards.

22            VOICE OF MR. BRENNAN:  (Laughing.)

23            VOICE OF ISIS:  Geez.

24            VOICE OF MR. BRENNAN:  Oh, I know.  Right.  So is

25   Stacy not here today?

DEPUTY PATRICK SHAWN KELLEY - DIRECT BY MS. GRIFFIN 1880

```
 1            VOICE OF ISIS:  She is, she is.
 2            VOICE OF MR. BRENNAN:  The last time I came, I
 3   didn't -- you wasn't here.  I came in and there was a mixup
 4   because I don't have insurance right now.
 5            VOICE OF ISIS:  Uh-huh?  Oh, okay.  I see.
 6            VOICE OF MR. BRENNAN:  And my doctor, my chiropractor,
 7   sent me here with a referral.  You know, MRI and all that.
 8            VOICE OF ISIS:  Oh, okay.
 9            VOICE OF MR. BRENNAN:  Well, anyway, they wouldn't --
10   they wasn't gonna see me because they told the doctor they
11   wouldn't, because I didn't have insurance.  But then he had to
12   call them and blah, blah, blah.  And that's after they did all
13   that, that was like in the door right like that, they were like
14   -- I don't know what my doctor said to them, but he got -- he
15   got -- got me in here, you know.
16            VOICE OF ISIS:  That's good.
17            VOICE OF MR. BRENNAN:  Yeah.
18            VOICE OF ISIS:  It's all about money these days.  They
19   don't care about people's pain and whatever.  But one thing I
20   can say about her, a lot of times, you know, when people don't
21   have insurance or whatever, she, she kind of -- she'll still
22   accommodate them.
23            VOICE OF MR. BRENNAN:  Yeah.
24            VOICE OF ISIS:  You know.  And I, I really do respect
25   her for that.  Because a lot of times people just don't have
```

 1   money for the insurance.

 2           VOICE OF MR. BRENNAN:  Right.  They don't.  That's for

 3   sure.

 4           VOICE OF ISIS:  Can't afford it, you can't afford it.

 5   And since you can't afford insurance, you don't deserve to be

 6   seen by somebody?  That's bootleg crap.

 7           VOICE OF BRENNAN:  That's what I said.

 8           VOICE OF ISIS:  I love working with her.  She's --

 9   then just got a...(unintelligible).  She's going to be a

10   wonderful doctor.

11           VOICE OF BRENNAN:  Oh, she is.

12           VOICE OF ISIS:  She -- she --

13           VOICE OF BRENNAN:  I didn't know that.  I thought she

14   was -- I thought she was a -- what do they call it?

15           VOICE OF ISIS:  Nurse practitioner?

16           VOICE OF MR. BRENNAN:  No.  I thought she was an

17   anesthesiologist.

18           VOICE OF ISIS:  She is, she is.  But she's got her

19   doctorate.

20           VOICE OF MR. BRENNAN:  Oh, no kidding?

21           VOICE OF ISIS:  Yeah.  She's going -- she's moving up.

22           VOICE OF BRENNAN:  Wow, that's good.  I guess that's

23   good to know.

24           VOICE OF ISIS:  So what part of your body is giving

25   you the trouble?

 1          VOICE OF MR. BRENNAN:  Lower.

 2          VOICE OF ISIS:  Okay.  And she just finished school a

 3  little while ago.  I was so proud of her.

 4          VOICE OF MR. BRENNAN:  No kidding.  That's

 5  good.  That's real good.

 6          VOICE OF ISIS:  Uh-huh (positive response).  She told

 7  me she was -- like I'm, I'm in school, but it was something I

 8  really -- I was just in it to try to make better money or

 9  whatever.  And she was like:  If -- you need to go to school

10  for something that you love, because you're going to go for

11  something or whatever --

12          VOICE OF MR. BRENNAN:  Right.

13          VOICE OF ISIS:  -- she was like:  You're not going to

14  like it.  Go for something that you love.

15          So I'm gonna try to change my major after the little

16  pep talk that she gave me.

17          VOICE OF MR. BRENNAN:  I never looked at it like that.

18          VOICE OF ISIS:  Watch.  When it does, when it happens,

19  I want you to remember Isis sure did say that.  (Laughing.)

20          VOICE OF MR. BRENNAN:  I hear you.

21          VOICE OF ISIS:  Lower back pain.  Okay.  All right,

22  Mr. Shawn.  She'll be here in a minute.  It was nice to meet

23  you.

24          VOICE OF MR. BRENNAN:  Okay.

25          VOICE OF ISIS:  Don't slip...(unintelligible) hurting

 1  again.

 2          VOICE OF MR. BRENNAN:  I'll try not to.

 3          VOICE OF ISIS:  Go that way.  Because -- to go that

 4  way.

 5          VOICE OF MR. BRENNAN:  Hey, how are you?  I heard you

 6  got your MD.

 7          VOICE OF STACY:  No, not my MD.  Just a doctorate

 8  degree.

 9          VOICE OF MR. BRENNAN:  Oh, that's what the lady was

10  just telling me.  She just...(unintelligible), thought you was

11  gonna get an MD.

12          VOICE OF STACY:  Not an MD, no.

13          VOICE OF MR. BRENNAN:  How are you doing today?

14          VOICE OF STACY:  Good.  How's everything working for

15  you?

16          VOICE OF MR. BRENNAN:  Doing pretty good, doing pretty

17  good.  I ran out because I had to put the -- the week off.  You

18  know, I got to be out of town a week early.  I didn't think I

19  was going to get to go, though.  But I had to go.  So I ran out

20  a week ahead of time.  But other than that, everything's pretty

21  good.

22          I got a new job.

23          VOICE OF STACY:  Good.

24          VOICE OF MR. BRENNAN:  I start in 45 days.

25          VOICE OF STACY:  Okay.

1884

```
1              VOICE OF MR. BRENNAN:  Should have -- should have

2    insurance with that.

3              VOICE OF STACY:  Great.

4              VOICE OF MR. BRENNAN:  That would be good.

5              VOICE OF STACY:  The zanaflex and Roxicodone?

6              VOICE OF MR. BRENNAN:  Uh-huh?

7              VOICE OF STACY:  Just make an appointment for a week

8    -- I mean for a month.

9              VOICE OF MR. BRENNAN:  One month?

10             VOICE OF STACY:  Uh-huh (positive response).

11             VOICE OF MR. BRENNAN:  That's it?

12             VOICE OF STACY:  That's it.

13             VOICE OF MR. BRENNAN:  Thank you, ma'am.

14             VOICE OF STACY:  All right.  See you later.

15             VOICE OF MR. BRENNAN:  See you next time.  I just go

16   straight out; right?

17        (The video recording stopped playing.)

18   BY MS. GRIFFIN:

19   Q   Mr. Kelley, were you provided two prescriptions that day on

20   September the 18th of '14?

21   A   Yes, ma'am.

22   Q   Were you provided Roxicodone or oxycodone?

23   A   Roxicodone.

24   Q   I show you Government's Exhibit 20-6, if we could switch.

25   I'm sorry.
```

1885

```
 1            Is this a copy of the two prescriptions you received
 2   that date?
 3   A   Yes, ma'am.
 4            MS. GRIFFIN:  And, Your Honor, we'd move to admit
 5   Government's Exhibit 20-6.
 6            MR. ESSIG:  No objection, Your Honor.
 7            THE COURT:  All right.  Mark it.
 8       (Government's Exhibit 20-6 was entered into evidence.)
 9            MS. GRIFFIN:  And to publish them to the jury.
10            THE COURT:  Have you switched to the jury?
11            THE CLERK:  Yes, ma'am.
12            THE COURT:  There it is.  Okay.
13   BY MS. GRIFFIN:
14   Q   This was your second visit; right?
15   A   Yes, ma'am.
16   Q   And we were playing this out of order because of the
17   problem with the computer yesterday?
18   A   That's correct.
19   Q   So your first visit, you had received 90 Roxicodone?
20   A   Yes, ma'am.
21   Q   Your second visit you received 90 Roxicodone?
22   A   Yes, ma'am.
23   Q   And your third visit in November is when that was increased
24   to triple digits, 110 tablets; is that right?
25   A   Yes, ma'am.
```

1886

```
 1   Q   You also received the Zanaflex on this September visit?

 2   A   Yes, ma'am.

 3   Q   Did you fill either of these prescriptions?

 4   A   No, ma'am.

 5   Q   So again, your PDMP, before the November visit, would not

 6   have shown that you --

 7           MR. ESSIG:  Your Honor, object to what the PDMP would

 8   have shown.  Without looking at it, he doesn't know.

 9   BY MS. GRIFFIN:

10   Q   Do you know?

11           THE COURT:  Overruled.

12   BY MS. GRIFFIN:

13   Q   Do you know if there was a PDMP for Shawn Brennan?

14   A   There should not have been.

15   Q   Why was that?

16   A   Because I had not filled any prescriptions in that

17   undercover name.

18   Q   It was never discussed with you your PDMP in any of the

19   visits, was it?

20   A   No, ma'am.

21   Q   Going back to the video, there are some breaks in the

22   video.  Can you tell us what was going on during the breaks?

23   A   Mostly nothing.  Without -- mostly just sitting there.

24   When the breaks on the video come, it's either because the

25   video is looping to the next file to continue recording or
```

1  there's nothing going on at all.

2  Q   Was there some language omitted where Isis was telling you

3  about going to school?

4  A   Yes, there was some of that.  I mean, I think we omitted

5  that because it was downplayed.

6  Q   It was general conversation?

7  A   Yes, ma'am.

8  Q   About her, not you?

9  A   Right.  And had nothing to do with us.  It was just her

10 going to school.

11 Q   And she told you that that's all about money, that they

12 didn't care about pain.  Did you follow up on asking her about

13 that?

14        MR. ESSIG:  Objection, Your Honor.  The video speaks

15 for itself.

16        THE COURT:  Overruled.

17 A   Yes.

18 BY MS. GRIFFIN:

19 Q   Did you follow up in asking her about that statement?

20 A   I just kind of replied to it:  Yeah, I'm with you on

21 that -- something like that.  I didn't ask her any question

22 about it.

23 Q   Now, did Stacy appear different to you in this visit than

24 she had appeared to you in the August of 2014 visit?

25 A   Yes, ma'am.

1888

1    Q    Could you tell us what was different to you?

2    A    She was quiet, she didn't have anything to say.  The first

3    time she was real talkative, real nice.  This time she was like

4    short, to the point.

5    Q    You had admitted having a hangover?

6    A    I did.

7    Q    You had admitted that you had been drinking alcohol the

8    whole day ahead of time?

9    A    That's what I told her, yeah.

10   Q    Did anybody warn you about mixing alcohol with opiates?

11   A    No, ma'am.

12   Q    Did you learn whether or not Stacy was a medical doctor?

13   A    Yes.  She told me she was not.

14   Q    For this visit did you also pay in cash?

15   A    I did.

16   Q    Now, you've previously seen your file for this particular

17   visit?

18   A    Yes, ma'am.

19   Q    For September 8th, 2014?

20   A    Yes, ma'am.

21   Q    I show you a progress note from your patient file, patient

22   file being Government's Exhibit 20-22, and ask this is before

23   the file changed you from a female to male on the third visit;

24   is that right?

25   A    Yes, ma'am, it has female here.

DEPUTY PATRICK SHAWN KELLEY - DIRECT BY MS. GRIFFIN

1  Q   Did you tell anyone that your pain was a five out of 10

2  with your medication?

3  A   No, ma'am, I did not.

4  Q   Did you tell anyone that your pain was an eight out of 10

5  without medication?

6  A   No, ma'am.

7  Q   What did you tell Isis your pain was?

8  A   Maybe a two.

9  Q   The last time you had been in, Stacy had been pushing some

10 type of block for you to have?

11 A   Yes, ma'am.  It was a lumbar facet block, what she said.

12 Q   Was there any mention of that block on this second visit?

13 A   No, ma'am.

14 Q   I'll show you the second page of that visit and ask if you

15 had been questioned about fatigue, chest pain, nausea, blackout

16 spells, or anxiety?

17 A   No, ma'am.

18 Q   Down at the bottom of the second page for the September

19 visit, were your eyes, ears, nose, throat, mouth, neck checked?

20 A   No, ma'am, they were not.

21 Q   So you don't -- it's not true that your neck was normal and

22 there was no masses or tenderness?

23 A   They didn't check that, no, ma'am.

24 Q   Were your glands checked to see if they were normal?

25 A   No, ma'am.

1890

1  Q   Was it checked -- excuse me -- if you had any range of

2  motion?

3  A   No, ma'am.

4  Q   This says:  Spine range of motion decreased due to

5  pain.  Was anything done to determine that?

6  A   No, ma'am.

7  Q   It also says that the straight-leg raise test was positive

8  bilaterally.  Did you have a straight-leg test on this visit?

9  A   No, ma'am.  All this is just window dressing.

10  Q   It's not true, is it?

11  A   No, ma'am.

12  Q   I'll show you the last page of that visit and ask if you

13  were inspected to see if you had any lesions?

14  A   No, ma'am, I was not.

15  Q   And do you find that you had had some additional

16  assessments added?

17  A   Yes, ma'am.

18  Q   It says opioid dependence.  Had there been anything on your

19  drug test to show that you were opioid dependent?

20  A   No, ma'am.

21  Q   This is signed by Stacy Madison, and that's who you saw; is

22  that right?

23  A   Yes, ma'am.

24  Q   Is it also signed by Dr. Couch?

25  A   Yes, ma'am.

1   Q   When does it show that it was signed by Dr. Couch?

2   A   September the 10th, 2014, at 10:22 a.m.

3   Q   That was two days after your visit?

4   A   That's correct.

5   Q   Now, you did not see Dr. Couch on this visit, did you?

6   A   No, ma'am.

7   Q   Were you aware that an examination report had been

8   submitted prior to your August appointment by a chiropractor

9   acting in an undercover capacity?

10  A   Yes, ma'am.

11  Q   You did not see that report until yesterday; is that

12  correct?

13  A   That's correct.

14  Q   You didn't help fill in the blanks on this report, did you?

15  A   No, ma'am.

16        MS. GRIFFIN:  Your Honor, by stipulation, the parties

17  have agreed to admit the examination report the chiropractor

18  faxed to PPSA prior to the August 2014 meeting.  That

19  examination report is Government's Exhibit 20-23.

20        THE COURT:  All right.  Mark it in.

21     (Government's Exhibit 20-23 was entered into evidence.)

22  BY MS. GRIFFIN:

23  Q   Mr. Kelley, you did not go back to PPSA after the April

24  visit?

25  A   I did not.

DEPUTY PATRICK SHAWN KELLEY - DIRECT BY MS. GRIFFIN

1892

1   Q   Now, one of the things you mentioned earlier in your

2   testimony, you used the words "red flag."  What to you is a red

3   flag?

4   A   During my training to do undercover in a doctor, we were

5   taught about red flags, like drug-seeking red flags like

6   admitting to criminal use of drugs on the street, the overuse

7   of alcohol, asking for an increase in the medication without

8   any reason, things like that.  That's what I did in here.

9   Q   To see if you would be dismissed as a patient?

10  A   Yes, ma'am.

11  Q   Were you dismissed as a patient?

12  A   I was not.

13  Q   Did you sign any type of agreement about taking opioids

14  that you would not see other doctors?

15  A   No, ma'am.

16  Q   Did you sign any agreement that you would report any abuse

17  or misuse of your medications?

18  A   Not that I recall.

19  Q   Did you -- were you provided anything written or orally

20  about the danger of opioids?

21  A   No, ma'am.

22  Q   Again, you paid for -- how did you pay for this last visit,

23  the April visit?

24  A   Cash.

25  Q   You paid cash for every visit; is that right?

1  A   Every visit.

2          MS. GRIFFIN:  One moment, Your Honor.

3      (A discussion was held off the record between government

4  counsel.)

5          MS. GRIFFIN:  That's all I have of this witness at

6  this time, Your Honor.

7          THE COURT:  All right.  Mr. Essig?

8          MR. ESSIG:  Yes, Your Honor.  Your Honor, may we

9  approach very briefly?

10          THE COURT:  Yes.

11      (At the side bar, jury not present.)

12          MR. ESSIG:  Judge, I just want to revisit the issue of

13  the doctor's recorded referral phone calls to the clinic.

14  There's now been multiple references during the time that

15  Officer Kelley was being treated in an undercover capacity by

16  the referral of his doctor.  At this point in time, Your Honor,

17  I think the best evidence for the jury to hear to know the

18  content of the conversations leading to that referral are the

19  calls from the doctor himself making the referral.

20          THE COURT:  This witness was not a participant in that

21  nor aware of what the doctor told them.  So my ruling is the

22  same.  I sustain the objection to that.

23          MR. ESSIG:  Okay.

24      (In open court, defendants and jury present.)

25                          CROSS EXAMINATION

1894

1    BY MR. ESSIG:

2    Q   Good morning, Officer Kelley.

3    A   Good morning.

4    Q   My name is Brandon Essig, and I'm one of the attorneys for

5    Dr. Couch.  I'm going to ask you a couple of questions,

6    followup to questions Ms. Griffin asked.  Is that okay?

7    A   Yes, sir.

8    Q   All right.  Now, what I want to do is I want to start out

9    with the medical records.  Ms. Griffin showed you medical

10   records from every visit that you made to PPSA; is that

11   correct?

12   A   Yes, sir.

13   Q   Now, you would agree with me; right; if we look -- and I'm

14   just going to show you, as an example, if we put -- I'm going

15   to start with the September 8th visit.  We'll start with the

16   September 8th visit.  Now, if we start with the September 8th

17   visit, this is what the front -- on the September 8th visit, I

18   mean, this is what the front of that -- of the progress notes,

19   which are the medical records, that Ms. Griffin was showing you

20   before; is that right?

21   A   Yes, sir.

22   Q   Okay.  And for all of the visits she showed you, if I

23   understand correctly, there was a visit -- August visit -- is

24   that right?

25   A   Yes.

1  Q   The visit, of course, September 8th?

2  A   Yes.

3  Q   And November 6th; is that correct?

4  A   Yes.

5  Q   And then you had a two-month followup in January of 2015;

6  is that right?

7  A   Yes, sir.

8  Q   And then you had another visit in March and April; is that

9  correct?

10  A   Yes, sir.

11  Q   Okay.  And she showed you portions of the medical records

12  for every single one of those visits; isn't that correct?

13  A   She showed me medical records that I -- all we had.

14  Q   And those were the PPSA medical records that she showed

15  you; is that right?

16  A   Yes, sir.

17  Q   And you would agree with me that basically the format of

18  every single record she showed you is essentially the same?  I

19  mean, other than some of the information, the format of the

20  record is identical, doesn't change, does it?

21  A   Yes, sir; that's right.

22  Q   And you saw and the jury can see on the video there that

23  when you're in there talking to -- whether it's to the staff or

24  to Dr. Couch or to Stacy or Ben or Jennifer or any one of the

25  people you talked to on those days -- that they are sitting at

 1   a computer screen as they are talking to you and they are

 2   entering information; isn't that correct?

 3   A   Yes, sir; that's right.

 4   Q   Okay.  And if you -- this is not the first time you've done

 5   an undercover visit to a doctor's office, is it?

 6   A   No, sir.

 7   Q   Okay.  And you're familiar with the fact that a lot of

 8   doctors' offices use electronic medical records?

 9           MS. GRIFFIN:  Your Honor, objection as to relevance.

10           THE COURT:  Sustained.

11   BY MR. ESSIG:

12   Q   Officer Kelley, are you aware of the fact doctors' offices

13   use medical records?

14           MS. GRIFFIN:  Objection, Your Honor.  It's the same

15   question.

16           THE COURT:  Sustained.

17   BY MR. ESSIG:

18   Q   PPSA certainly used electronic medical records, didn't

19   they?

20   A   I would assume they did.  I did the undercover part.  I

21   don't know anything else about the case.

22   Q   Sure.  But just looking at these records that you testified

23   to and answered a lot of questions about, I'm just going to

24   show you another portion of the September 8th visit.  I mean,

25   these, these appear to be computer printouts.  You wouldn't

1  disagree with that, would you?

2  A    No, sir, I wouldn't disagree with that.

3  Q    Okay.  And then here at the bottom of the November 6th --

4  this is part of the November 6th visit.  It says it's

5  electronically signed; is that correct?

6  A    That's what it says, yes, sir.

7  Q    And electronically signed would indicate that it was some

8  sort of computer record?

9  A    I would agree with that.

10 Q    So it appeared to you and it appears from these records

11 that PPSA had some sort of electronic records system that

12 basically created the same record for every visit essentially?

13 A    That's -- that's a good assumption.

14 Q    The same template, the same format; is that correct?

15 A    I agree with that.

16 Q    And you would agree with me too that when you went to PPSA

17 that -- I mean, they had a lot of patients that they saw; is

18 that right?

19 A    I would agree with that, yes, sir.

20 Q    And as a matter of fact, we heard Ben Clark, who was the

21 nurse practitioner that saw you on January 2015, you heard him

22 reference the fact that they were very busy at that point in

23 time; is that right?

24 A    He did say that, yes, sir.

25 Q    And what he told you in fact on the video which the jury

1   heard was that in January of 2015 they had actually gone from

2   three nurse practitioners and they were down to just one at

3   that point; is that correct?

4   A   That's what he said, yes, sir.

5   Q   Would it be fair to say on the videos you created -- and

6   just so the jury's clear, I think...(inaudible) there are hours

7   of --

8           THE REPORTER:  Wait a minute.  Just so the jury's

9   clear, what?

10          MR. ESSIG:  I'm sorry.  I apologize.

11  Q   Just so the jury is clear and understands -- you and

12  Ms. Griffin talked about this on direct -- there are hours of

13  audio and video through your visits to this clinic?

14          THE COURT:  You're going to have to slow down a little

15  bit and speak more clearly.

16          MR. ESSIG:  I apologize.

17  Q   There are hours of video from your visits to the clinic; is

18  that right?

19  A   Yes, sir.

20  Q   And, of course, we haven't played all of that in here today

21  and yesterday for the sake of time?

22  A   That's correct.

23  Q   And would it be fair to say, though, from your review of

24  the videos after you created them that January of 2015 was

25  probably the busiest you ever saw that clinic at that point in

DEPUTY PATRICK SHAWN KELLEY - CROSS BY MR. ESSIG

1    time?

2    A    I honestly don't remember.  I just reviewed the portions

3    that we were going to put on in the courtroom.  I didn't review

4    the whole thing.  It would take hours and hours to do that.

5    Q    Okay.  Now --

6              MS. GRIFFIN:  Your Honor, we object.  He's answering

7    the witness with either "okay," "sure," "all right."  And we

8    would ask that he not make a comment after the witness makes an

9    answer.

10             THE COURT:  I don't think he intends to be commenting.

11   But let's try and just ask questions.

12             MR. ESSIG:  Yes, ma'am.

13   Q    Now, Officer Kelley, my point being is that with these

14   medical records, these computer records that they have, when

15   they are having a lot of patients that are coming through, it's

16   just reasonable to assume they are going to make mistakes; is

17   that right?

18   A    I guess you could assume that, yes.

19   Q    And, I mean, and you don't know exactly how their medical

20   records system worked, did you?

21   A    I do not.

22   Q    And you don't know if when they began to see you and sit at

23   the computer and begin to type in information, you don't know

24   if they began with some previous patient's record and then they

25   had to go in and change the information?  You don't know that,

DEPUTY PATRICK SHAWN KELLEY - CROSS BY MR. ESSIG

1   do you?

2   A   No, sir.  I do not.

3   Q   And do you have any knowledge as to whether or not these

4   format mistakes or these template mistakes are a common problem

5   with electronic medical problems?

6   A   I wouldn't know.

7   Q   Now, what I do want to do is get a little bit of

8   information from these templates.  And again, you began your

9   treatment at PPSA on August 5th of 2014; is that correct?

10  A   Yes, sir; that's correct.

11  Q   And this, this here, this is the first page of the medical

12  record; is that right?

13  A   Yes, sir.

14  Q   Now, if we look, we know for history of present illness, it

15  has:  Shawn Brennan is a right-handed 38-year-old white female.

16  You're certainly not a female; is that correct?

17  A   That's correct.

18  Q   And, but you presented on this day in consultation from a

19  referring care provider; that's true, isn't it?

20  A   Yes.

21  Q   And that you came in for the evaluation and management of

22  chronic pain in the lower back which has been present for one

23  year?  That's what that medical record says?

24  A   Yes, sir.

25  Q   And you told Stacy on the video during that first visit

1    that you had been having back pain or back problems for about a

2    year?

3    A    That's correct.

4    Q    Let's go to the second page of your medical record.

5             Now, there's a column Review of Systems.  Again, and

6    these -- Ms. Griffin asked you if there was multiple records on

7    multiple visits.  These areas where it has denies or admits a

8    specific condition, she asked you about those?

9    A    Yes, sir, she did.

10   Q    And these line items for deny or admit, those were there in

11   ever single record she showed you; is that right?

12   A    Yes, sir.

13   Q    Now, the history that you presented with to PPSA, when you

14   came in the first day, certainly did not include headaches,

15   chest pain, shortness of breath, that sort of thing; is that

16   right?

17   A    That's correct.

18   Q    So, I mean, you didn't actually get asked about those or

19   give a statement specifically denying those, but those

20   conditions just were not present in you at all; is that right?

21   Is that correct?

22   A    Yes, sir; that's right.

23   Q    And those conditions just were not relevant to your

24   treatment at all; is that right?

25   A    That's correct.

1  Q   I mean, in terms of your medical history and the condition

2  you presented with?

3  A   That's correct.

4  Q   Now, again, going back to the August 5th visit, it states

5  that you admit to back pain and back spasm; is that right?

6  A   That's incorrect.

7  Q   What I'm saying, it says that?

8  A   That's what it says, yes.

9  Q   Okay.  And you say that -- explain to me why you say that's

10  incorrect.

11  A   Because I never said back pain.  I never said I have back

12  pain.  I said my back was stiff.

13  Q   Well, let me ask you this question:  When Stacy came in

14  there, the jury saw and heard the content of her examining you;

15  is that correct?

16  A   The exam, yes.

17  Q   Okay.  As a matter of fact, she had you bend over; is that

18  right?

19  A   That's correct.

20  Q   And you got down in the courtroom the other day and you

21  showed the jury how you did that?

22  A   Yes, sir.

23  Q   And the jury could see Ms. Madison, when she goes to

24  examine you, prior to you bending over she kind of goes off

25  screen; is that right?

DEPUTY PATRICK SHAWN KELLEY - CROSS BY MR. ESSIG

1  A   I don't remember that part, but she may have.  If the video

2  shows it, I'll agree to it.

3  Q   But she came over and she placed her hands on you, got

4  close to you to talk about your back pain?

5  A   Yes, after I bent over and I went to bend backwards, she

6  did that, in my opinion to -- just to brace me in case I was to

7  fall or something, like she was standing there just in case.

8  Q   And before you did all that, the question she asked you

9  was:  Where does your back hurt?  Is that correct?

10  A   Yes, sir.

11  Q   And you said:  Right in this area?

12  A   That's correct.

13  Q   Okay.  You didn't say:  No, it doesn't hurt, it's only

14  tight, did you?

15  A   Not at that point, no, sir.

16  Q   Okay.  So she asked you where your back hurt, you said

17  here, and pointed at the location?

18  A   That's right.

19  Q   Okay.  So it would be reasonable, then, for her to put that

20  you admitted to back pain?

21  A   I disagree with that.

22  Q   Okay.  Do you disagree with the notion that back spasms can

23  manifest themselves as back tightness?

24  A   I wouldn't disagree to that, no.

25  Q   Now, going to the -- let's talk about the September 8th,

DEPUTY PATRICK SHAWN KELLEY - CROSS BY MR. ESSIG

1  2014, record.  Again, it states here Shawn Brennan's history of

2  present illness:  Shawn Brennan is a 38-year-old

3  Caucasian/white female who presents in followup for evaluation

4  and management of chronic pain in the lower back.  Now, again,

5  you're not like -- extreme; is that correct?

6  A   That's correct.

7  Q   But the rest of that statement in that portion of the

8  medical record is true; is that correct?

9  A   I -- no, sir.  I'll say I don't understand why they have

10 chronic pain there.

11 Q   Well, the history you had come in with was back problems

12 and back pain for more than a year; is that correct?

13 A   I never said back pain anywhere on anything.

14 Q   Okay.

15 A   There is a difference.

16 Q   When you were asked if you had back pain, as we established

17 before, you pointed to the portion of the back where it hurt?

18 A   I did do that, yes, sir.

19 Q   Okay.  All right.  So they concluded that, based on that

20 question and answer from you in your initial visit, somebody

21 concluded and put in the records that you had back pain?

22 A   That's their conclusion yes, sir (nodding head

23 affirmatively).

24 Q   Okay.  All right.  And that's a reasonable conclusion?

25 A   I don't -- I don't agree with that conclusion.

DEPUTY PATRICK SHAWN KELLEY - CROSS BY MR. ESSIG

1   Q   Okay.  But that's back in the medical record and you are --
2   this was a followup visit for whatever condition you presented
3   with on August 5th of 2014; is that correct?
4   A   Yes, sir.
5   Q   So if the doctor made or if the nurse practitioner made a
6   reasonable conclusion that you had back pain at the initial
7   visit and then puts that in this record, that's not untrue, is
8   it?
9   A   No, sir, it's not.
10  Q   And there for recent diagnostic testing.  It said you have
11  not had any diagnostic testing performed since last visit to
12  assess pain.  That's correct, isn't it?
13  A   Yes, sir.
14  Q   And it says recent procedures -- again referred to you as a
15  female, which is incorrect -- but says:  Has not had any
16  diagnostic testing since the last test, no other procedures to
17  assess pain; is that correct?
18  A   Yes, sir.
19  Q   Then it says:  Current treatment.  Prior to current
20  medication regime, the patient had previously tried NSAIDs; is
21  that correct?
22  A   Yes, sir.
23  Q   And those are nonsteroid anti-inflammatory drugs; is that
24  right?
25  A   Aleve, things like that, yes, sir.

1906

```
1    Q    Over the counter?

2    A    Yes, sir.

3    Q    And that you had tried opioids without success; is that

4    correct?

5    A    That is incorrect.

6    Q    Well, I'm asking you if that's what the record states.

7    A    Yes, that's what it says, yes.

8    Q    To be fair, what you initially reported is that you tried

9    NSAIDs without succeed but prior opioids had worked for you?

10   A    That is correct.

11   Q    And then it states there the patient is pleased with the

12   current PPSA medications.  That's what the records say; is that

13   right?

14   A    Yes, sir.

15   Q    And I noted each time when the medical assistant or the

16   nurse came in, for each visit one of the first questions they

17   asked you was:  How's your pain medication working?

18   A    That's correct.

19   Q    And they would ask you whether you were satisfied with your

20   pain medication?

21   A    Yes, sir.

22   Q    And I think, if I understand correctly, if I listen

23   correctly, what the jury heard was that for all of these

24   assessments you never reported a pain level above three; is

25   that correct?
```

1   A   Yes, sir; that's correct.

2   Q   So the information they would have gotten from you when

3   they asked you about your medication history was that it was

4   working fine for you; is that correct?

5   A   Yes, sir.

6   Q   And that your pain was being controlled at a three or

7   lower; is that correct?

8   A   Yes, sir.

9   Q   Now, also too I noticed on the video when you present, your

10  speech and your demeanor is essentially the same as it is in

11  the courtroom today.

12  A   Basically, yes, sir.

13  Q   I mean, you're more friendly, more social, but in terms of

14  your tone of your voice, the cadence of your voice and the

15  demeanor you present with, it's essentially the same; is that

16  right?

17          MS. GRIFFIN:  Your Honor, we object to the relevance.

18          THE COURT:  I don't know where he's going.  So --

19          MS. GRIFFIN:  I do and I'd like to approach.

20          THE COURT:  All right.

21      (At the side bar, jury not present.)

22          MS. GRIFFIN:  Your Honor, he's in an undercover

23  capacity and when he goes outside he uses the F. word and he's

24  upset and --

25          MR. ESSIG:  I'm not going there.

1           MS. GRIFFIN:  And if we're headed toward that, to be -

2  -

3           MR. ESSIG:  No.

4           MS. GRIFFIN:  -- to contrast what he said in here, I

5  think that's totally inappropriate.

6           MR. ESSIG:  No, Judge.

7           MS. GRIFFIN:  What he says, you know, in his life as a

8  a cop does not have any bearing on his testimony here, about

9  his cadence and his tone and his politeness.

10          THE COURT:  So what is the point here?

11          MR. ESSIG:  Judge, all -- that's not what I'm trying

12 to establish.  As a matter of fact, there's a portion of the

13 recording that he had used the F. word on it.  I'm not going to

14 play it, so I do not intend to go there.  What I'm getting into

15 at this point in time, Your Honor, is that he has said he's

16 presenting himself as a pill seeker when he comes into the

17 clinic.  The point I'm getting at with his speech, the tone,

18 normal tone, there's no slurring, he's not drowsy, he's not

19 falling asleep, there's no -- when he comes into the clinic,

20 he's exhibits no signs of drug use or strung out on the drugs

21 or anything of that nature.

22          MS. GRIFFIN:  Your Honor, I don't object if he asks:

23 Did you slur your speech?  Did you do this?  Did you do that?

24          THE COURT:  Yes.  I don't think there's any relevance

25 for comparison between today and then.  Everybody heard then,

1  so just ask about now.

2          MR. ESSIG:  Yes, ma'am.  That's what I'm going to.

3  That's my next question.

4          THE COURT:  All right.

5      (In open court, defendants and jury present.)

6  BY MR. ESSIG:

7  Q   All right, Mr. Kelley.  And I was asking you just a moment

8  ago about your demeanor when you're in visits.  My point is

9  when you presented to the clinic, at no point in time did you

10 present with slurred speech?

11 A   No, sir.

12 Q   And at no point in time did you appear to be falling asleep

13 or drowsy or anything of that nature?

14 A   No, sir.

15 Q   And I think the jury could see too when you're moving

16 around the clinic, as you're walking into some of the exam

17 rooms, that you're able to walk?

18 A   Yes, sir.

19 Q   There's no -- you're not stumbling, you're not falling

20 down, you're not doing any of those things?

21 A   That's correct.

22 Q   So in terms of -- you said you presented to the clinic as a

23 pill seeker, you didn't have any outward appearance that you

24 were abusing any of the drugs that they were selling to you; is

25 that correct?

1  A   That's correct.  But a pill seeker's not only just a pill

2  user.  They also sell pills on the street and they don't use

3  their own product.

4  Q   Okay.  Let me ask you this question.  I'm glad you brought

5  that up.  At any point in time did you ever mention to anyone

6  at the clinic that you were selling the drugs that they were

7  giving you or the medicines that they were giving you?

8  A   No, sir.  I wouldn't.

9  Q   Okay.  At any point in time did anybody at the clinic --

10  you're familiar with the term "Holy Trinity"?

11  A   Yes, sir, I am.

12  Q   All right.  And you're familiar that that's a slang, street

13  term?

14  A   No, sir, it's not a street term.  But yes, I'm -- I'm aware

15  of it.

16  Q   At any point in time when you were at PPSA did anybody, any

17  of the nurses, any of the staff, any of the doctors, ever pull

18  you aside and say:  Hey, look, if you want some real drugs, if

19  you want the Holy Trinity, meet me out back and I'll sell it to

20  you?

21  A   No, sir.

22  Q   Did anybody ever use the term "Holy Trinity" with you the

23  entire time you ever visited there?

24  A   That's a law enforcement term, sir.  They would not use

25  that term.

1   Q   Okay.  At any point in time did anybody ever offer you a

2   combination of a benzodiazepine, an opioid, and a carisoprodol?

3        MS. GRIFFIN:  Your Honor, I object as asked and

4   answered.  And we don't see the relevance.

5        THE COURT:  Overruled.  You can answer.

6   BY MR. ESSIG:

7   Q   Did that happen at any point in time?

8   A   No, sir, it didn't.

9   Q   At any point in time did any member of the staff ever offer

10  to sell you drugs other than what Dr. Couch was prescribing, if

11  you would just give them some cash?

12  A   No, sir.

13  Q   Did anybody ever offer to have you meet them around back of

14  the clinic and sell medicines from the clinic?

15  A   No, sir.

16  Q   Every single prescription that you got in this case, you

17  got that prescription after you went to the clinic; is that

18  right?

19  A   Yes, sir.

20  Q   Walked in the front door; is that correct?

21  A   Yes, sir.

22  Q   Signed in with somebody at the front desk?  When you signed

23  in, saw somebody there?

24  A   Yes, sir.

25  Q   And then for every single one of these visits, you at least

1    saw a medical assistant and a nurse practitioner; is that

2    correct?

3    A    Yes.

4    Q    And just so we're clear too, for the cash that you paid

5    when you went into PPSA, all of that cash was provided at the

6    front desk; is that right?

7    A    Was provided?

8    Q    The cash you gave to the clinic?

9    A    Yes, sir, I handed --

10   Q    You provided them cash?

11   A    That's correct.  And I received a receipt; that's right.

12   Q    You weren't paying the nurse practitioners?

13   A    Oh, no, sir.

14   Q    You weren't paying Dr. Couch?

15   A    No, sir.

16   Q    Now, I want to follow up and ask you some questions --

17   Ms. Griffin asked you about the PDMP?

18   A    Yes, sir.

19   Q    And that's the Prescription Drug Monitoring Program; is

20   that correct?

21   A    Yes, sir.

22   Q    All right.  And the PDMP is a database that exists that's

23   designed to track prescribed medications that are filled; is

24   that right?

25   A    Yes, sir.

DEPUTY PATRICK SHAWN KELLEY - CROSS BY MR. ESSIG

1  Q   And each state has their own PDMP; is that correct?

2  A   To the best of my knowledge, yes.

3  Q   Okay.  So, I mean, you don't know in fact how exactly that

4  works state by state?

5          MS. GRIFFIN:  Objection, Your Honor, as to relevance.

6          MR. ESSIG:  Your Honor, they asked him repeatedly

7  about the PDMP on direct examination.

8          THE COURT:  Well, only about here.  So let's limit

9  your questions about Alabama.

10          MR. ESSIG:  Your Honor, there's evidence in this case

11  that he is working in other places and could have been filling

12  his prescriptions in other states.

13          THE COURT:  The questions were about Alabama,

14  here.  So let's stick to that.

15  BY MR. ESSIG:

16  Q   Officer Kelley, are you aware of how other states operate

17  their PDMPs?

18          MS. GRIFFIN:  Again, Your Honor, it's not relevant.

19          THE COURT:  Sustained.

20  BY MR. ESSIG:

21  Q   Officer Kelley, is your knowledge -- excuse me -- of the

22  PDMP limited to your experience as a law enforcement officer in

23  the state of Alabama?

24  A   No.

25  Q   Okay.  Let me ask you this question:  Have you -- you've

DEPUTY PATRICK SHAWN KELLEY - CROSS BY MR. ESSIG

1    reviewed a PDMP report before in your career; is that correct?

2    A   Yes, sir.

3    Q   And you've seen the printout, the PDMP printout that's

4    created?

5    A   Yes, sir.

6    Q   And have you noticed at the end of the PDMP report there is

7    a paragraph of some language about the PDMP?

8    A   That's correct.

9    Q   And are you aware that that language states that the

10   organization that monitors and created the PDMP says that you

11   cannot rely 100 percent on the accuracy of the information?

12          MS. GRIFFIN:  Your Honor, again, we object to the

13   relevance connected with this witness.

14          THE COURT:  Sustained.

15   BY MR. ESSIG:

16   Q   All right.  Officer Kelley, I want to go back and talk

17   about some of the issues that you identified in the medical

18   records here.  Just a moment.

19          Now, you mentioned on direct examination that when you

20   went into the clinic that day that you -- and the jury could

21   see you filling out the paperwork when you went in the clinic;

22   is that right?

23   A   Yes, sir.

24   Q   And you testified that you were handed about 15 pages of

25   medical records?

1915

1    A    Yeah, approximately, yes, sir.

2    Q    Now, you also said that when you were sitting in the lobby

3    and they called you back, that you didn't have a chance to

4    finish those 15 pages at that time; is that right?

5    A    That's correct.

6    Q    Did you ever, during the time you were there in the clinic

7    that day, finish all 15 pages?

8    A    Yes, sir.

9    Q    You did?

10   A    Yes, sir.

11   Q    Now, Ms. Griffin, when that exhibit was entered, she showed

12   you a portion of your record that contained documents with your

13   handwriting; is that right?

14   A    Yes, sir.

15   Q    And is this the first page of that?  (Indicating.)

16   A    Yes, sir, it is.

17   Q    And again, the handwritten portions of this exhibit would

18   be that paperwork you were filling out there at the clinic that

19   day; is that right?

20   A    Yes, sir, that's my handwriting.

21   Q    Now, I just want to show you, Officer Kelley -- my purpose

22   in this is to show you that, looking at that exhibit, there are

23   only this page --

24   A    Okay.

25   Q    -- there's this page, which has the new patient health

1   history and pain questionnaire.  Do you agree with me that's

2   one of the ones you filled out?

3   A   Yes, sir.

4   Q   There's this page that also has your handwriting on it; is

5   that right?

6   A   Yes, sir.

7   Q   And that's the third handwriting page I've shown you; is

8   that correct?

9   A   Yes, sir.

10  Q   Here's the fourth page which also contains your

11  handwriting; is that right?

12  A   Yes, sir.

13  Q   And then in the exhibit I've got, this is the fifth page

14  that has your handwriting?

15  A   Yes, sir.

16  Q   Now, in the document the government admitted yesterday,

17  there's only these five handwritten pages.  Are you aware of

18  that?

19  A   Yes, sir.

20  Q   Okay.  So it's -- there are 10 pages missing?

21  A   That's approximately.  I don't know.  Some of them were

22  reading pages.  There wasn't -- there was just things you had

23  to read, like disclaimers and things.

24  Q   Okay.  But the point is, of the paperwork you were

25  presented that day when you came in, the 15 pages --

DEPUTY PATRICK SHAWN KELLEY - CROSS BY MR. ESSIG

1   A   Yes, sir?

2   Q   -- the only thing we've got in evidence are five pages; is

3   that right?

4   A   That's what it appears to be.

5   Q   Okay.  And I'm not trying to imply that anybody's doing

6   anything wrong.  Something could have gotten lost from the time

7   you filled it out until the time it got in the patient file.

8   Would that be fair to say?  Would that be fair to say?

9   A   It may not have been in the file when they got it.  When

10  they served the search warrant and they got the stuff, I mean,

11  it could not have been there then.

12          MS. GRIFFIN:  Your Honor, we object.  There's no

13  foundation for this witness --

14          THE COURT:  Sustained.

15  BY MR. ESSIG:

16  Q   Now, in the -- Ms. Griffin asked you multiple questions on

17  direct examination about the physical examinations that were

18  reflected in the record that were not done during your visit;

19  is that correct?

20  A   Yes, sir.

21  Q   All right.  And one of the tests that she asked you about

22  was -- the records reflected that there was a straight-leg

23  raise that had been done?

24  A   Yes, sir, she asked me about that.

25  Q   And you stated that nobody did a straight-leg raise any

```
 1    time you came in there?

 2    A   That's right.

 3    Q   And she also showed you where on that first visit of August

 4    5th, 2014, that the records reflected that there had been a

 5    palpation of your lower back and it was tender?

 6    A   Yes, sir.

 7    Q   And you stated there was no real -- somebody touched your

 8    back, but there was no real physical examination of your back

 9    on that first visit; is that right?

10    A   That's correct.

11    Q   Now, Officer Kelley, I want to show you what's been marked

12    and admitted as Government's Exhibit 20-23.  And do you

13    recognize this?

14    A   Yes, sir, that's what I saw the other day, yeah.

15    Q   Okay.  Now, this is the examination report of Dr.

16    JW........; is that right?

17    A   Yes, sir.

18    Q   Can you tell the jury who Dr. JW......... is?

19    A   I really don't know who he is.

20    Q   Do you know that Dr. W..... is the chiropractor that

21    referred you?

22         MS. GRIFFIN:  Your Honor, he's said he doesn't know

23    who it is.

24         THE COURT:  You can -- can you answer the question

25    that he just asked you.  Do know if he's the chiropractor who
```

 1  referred you?

 2          THE WITNESS:  Yes, ma'am.

 3  BY MR. ESSIG:

 4  Q   You don't know him personally?

 5  A   Yes, sir; that's correct.

 6  Q   But you know that JW......... is the name of the

 7  chiropractor that referred you to the clinic?

 8  A   That's correct.

 9  Q   Okay.  All right.  And obviously this is an examination

10  report of you by Dr. W.....; right?  That's what it says that

11  it is?

12  A   An examination of me, yes.

13  Q   Right.  And as you and Ms. Griffin talked about on direct,

14  this was a document that would have been faxed to Dr. Couch's

15  office prior to him visiting you -- or prior to you visiting

16  there?  I apologize.

17  A   Yes -- yes, sir.

18  Q   Now, of course, it's true nothing in Government's Exhibit

19  20-23 actually happened, did it?

20  A   20-23, this entire file?

21  Q   Yes.  I mean, you didn't get -- Dr. W..... never examined

22  you?

23  A   No, he did not.

24  Q   Okay.  That's my point.  And all the medical information

25  reflected in here never actually happened?

1   A   That would be correct.

2   Q   But when it's sent to PPSA and Dr. Couch's office, they

3   would have no way of knowing that none of this happened, would

4   they?

5   A   No, sir, they would not.

6   Q   I mean, as far as you know, this is a real examination

7   report from Dr. W's..... office?

8   A   Yes, sir.

9   Q   The document itself, not the information?

10  A   Yes, sir.

11  Q   Now, I want to refer you -- do you know what lumbar is?  Do

12  you know what lumbar refers to?

13  A   Your lower spine.

14  Q   Okay.  Your lower back.  And the lumbar, that's the region

15  of the lower back; is that right?

16  A   Yes, sir.

17  Q   And you would agree with me the lumbar would be the area

18  where you presented to PPSA -- that's the area where you were

19  complaining of pain or tightness, whatever the issue was; is

20  that correct?

21  A   Yes, sir.

22  Q   And I'll show you here on the front page of Government's

23  Exhibit 20-23, do you see this area here that refers to lumbar?

24  A   Yes, I do.

25  Q   Do you see -- and lumbar is in bold; is that right?

 1    A   I see it in two spots.

 2            THE COURT:  Mr. Essig, can you underline where you're

 3    talking about?

 4            MR. ESSIG:  Yes, Your Honor.  I'll put a yellow dot

 5    next to where --

 6            THE WITNESS:  Okay.  I can see the yellow dot.

 7            THE COURT:  I can't see the yellow dot.

 8            MR. ESSIG:  I apologize, Your Honor.

 9            THE COURT:  Can you underline it?

10            MR. ESSIG:  Yes, ma'am.  (Complying.)

11            THE COURT:  All right.

12            MR. ESSIG:  That part there.  (Indicating.)

13    Q   So below that we see some terms.  We see "Valsalva," do you

14    agree with that?

15    A   Yes.

16    Q   We see "SLR," do you agree with that?

17    A   Yes, sir.

18    Q   We see "Bragard," Do you agree with that?

19    A   Yes, sir.

20    Q   Then there's a word I cannot pronounce.  And then we see

21    "Patrick," do you agree with that?

22    A   Yes.

23    Q   And then there is a "leg lowering," Do you see that?

24    A   Yes, sir.

25    Q   There's "Yeoman"?

1    A   Yes, sir.

2    Q   And then going on down below that there's other words; is

3    that right?  Is that correct?

4    A   I see the last one is "Adam's" -- yes, there is more, yes,

5    sir.

6    Q   We'll stop there.

7    A   Okay.

8    Q   So, and if we go to the right, next to each one of those

9    words there's a plus sign and a minus sign; is that correct?

10   A   Yes, sir.

11   Q   Would it be reasonable to say that the plus stands for

12   positive and the minus stands for negative?

13   A   That would be reasonable.

14   Q   And as we look through these, do you know what these are?

15   A   I have no clue.

16   Q   Do you know if SLR refers to straight-leg raise?

17   A   I do not.

18   Q   But if we look next to SLR, where the plus and the minus

19   sign are, the positive and the negative sign, you would agree

20   with me that next to SLR Dr. W..... circled the positive sign;

21   is that correct?

22   A   Yes, sir.

23   Q   And then if we look out to the right there, there's some

24   doctor's handwriting which honestly I can't make out very well.

25   Can you?

DEPUTY PATRICK SHAWN KELLEY - CROSS BY MR. ESSIG

1    A   Nor can I, sir.

2    Q   Do you see the acronym that I think I can see here, the

3    acronym BLP?  Can you see that?

4    A   That kind of looks like BLP.  I'm not sure.

5    Q   Do you know if in this context that BLP would stand for

6    bilateral pain?

7    A   I do not.

8    Q   Then the same thing, let's go down, the only other one --

9    the only other one I will talk about at this point in time is

10   the leg lowering, do you see that?

11   A   Yes, sir.

12   Q   And again, next to the leg lowering there's a positive and

13   a negative sign; is that right?

14   A   Yes, sir.

15   Q   And next to leg lowering Dr. W..... has circled positive;

16   is that correct?

17   A   Yes, sir.

18   Q   And again, next to that there's some doctor's handwriting

19   which I can't make out.  Can you make it out?

20   A   No, sir, I cannot.

21   Q   If we go back up, you said there are two areas where you

22   see lumbar on here.  And the other area, for the record,

23   actually on the document as we're looking at it, it's slightly

24   above the other lumbar portion; is that correct?

25   A   Yes, sir.

1    Q    And what I'll do is I'll underline so we're clear.  I'm

2    referring to right now that lumbar portion of the record

3    (indicating).  Do you see that?

4    A    Yes, sir.

5    Q    And again, under this, there's a number of -- number of

6    words.  There's "flexion," "extension," RLF, LLF, RR, LR, do

7    you see that?

8    A    Yes, sir.

9    Q    And then to the right of those, instead of a positive or

10   negative sign, there's a number of degrees; is that correct?

11   A    Yes, sir.

12   Q    Do you know what any of those acronyms or words mean?

13   A    No, sir.

14   Q    Do they appear to you -- tell me if you know or not -- do

15   they appear to you to be some sort of diagnostic test?

16           MS. GRIFFIN:  Your Honor, we object to this

17   continuing -- there's no showing that anyone at PPSA even

18   reviewed these whatsoever.

19           THE COURT:  Overruled.

20           MS. GRIFFIN:  And he doesn't have any knowledge of

21   that, so I don't know the relevance, if there's no showing if

22   someone reviewed them.

23           THE COURT:  Overruled.

24   BY MR. ESSIG:

25   Q    Again, do you know, Officer Kelley, if any of these, if

DEPUTY PATRICK SHAWN KELLEY - CROSS BY MR. ESSIG

1    these -- do you know if these are diagnostic tests?

2    A    I do not.

3    Q    You don't know if there's examinations behind them?

4    A    I don't know what it is.

5    Q    But they are all in some way on this medical record

6    relevant to the lumbar region of the body; is that right?

7    A    It would appear to be, yes, sir.

8    Q    And again, the lumbar region is lower back; is that right?

9    A    Yes, sir.

10    Q    Now, if we go to the right for that area next to the

11    degree, there's a category there for grade of pain.  Do you see

12    that?

13    A    Yes, sir.

14    Q    And the grade of pain going left to right is either one,

15    two, three, or four; is that correct?

16    A    Yes, sir.

17    Q    Now, if we look here at the top, do you see range of

18    motion?  (Indicating.)  Do you see that?

19    A    Yes, sir.

20    Q    Up above lumbar region?  And next to range of motion we

21    have parentheses, and do you see where next to one it says

22    grades of pain, and next to one is mild?  Do you see that?

23    A    Yes, sir.

24    Q    Next to two is moderate, do you see that?

25    A    Yes, sir.

1   Q   And next to three is severe; is that correct?

2   A   Yes, sir.

3   Q   Now, when we go through -- again, back down to the lumbar,

4   if we look at the grades of pain, one, two, three, and four,

5   next to every one of these lumbar categories, whether they are

6   tests or examinations or whatever, the grade of pain is three,

7   that's what Dr. W's..... reflecting there; is that correct?

8   A   Yes, sir.

9   Q   And again, if we go up and look at our key at the top,

10  grade three pain is severe; is that correct?

11  A   Yes, sir.

12  Q   And then if we go over further to the right, past degree

13  and past grade of pain, we see location of pain.  Do you see

14  that?

15  A   Yes, sir.

16  Q   And, Officer Kelley, I'll tell you that I think I can

17  actually make out a little bit of that doctor's writing.  Am I

18  correct that it reads --

19          MS. GRIFFIN:  Your Honor?

20  BY MR. ESSIG:

21  Q   -- L4-L5?

22          MS. GRIFFIN:  I object to what counsel can read, what

23  he thinks.

24          THE COURT:  You can ask him if he thinks it's the same

25  thing that you think it is.  So go ahead.

DEPUTY PATRICK SHAWN KELLEY - CROSS BY MR. ESSIG

1  BY MR. ESSIG:

2  Q   Officer Kelley, does it look to you like that reads L4-L5?

3  A   I can see where that would be assumed.  But I don't know

4  what it says.  It just looks like a bunch of chicken scratch to

5  me.

6  Q   We don't know for sure; right?

7  A   No, I don't.

8  Q   But does that look like an L4, a dash, and a 5 to you?

9  A   I would agree with that, yes, sir.

10  Q   Okay.  And you would agree with me also -- well, you may

11  not.  Are you aware of whether L4-5 indicates a location in the

12  spinal canal?

13  A   Yes, sir.

14  Q   And are you aware that L4-5 is a location in the spinal

15  canal that's in the lumbar region?

16  A   Yes, sir; that's correct.

17  Q   And if we go further to the right -- again, this is all

18  identified as location of pain -- and the L4-5 is in the top

19  line next to one of these diagnostic tests or examinations,

20  whatever those are?

21  A   Can you say that -- can you show me that one more time?

22  I'm lost here for a second.

23  Q   If we go back over to lumbar --

24  A   Okay?

25  Q   -- let's just take the first identifier underneath.  Lets

1928

1    take flexion.  Do you see that?

2    A    Yes.

3    Q    Let's go to the right.  Do you see degree?

4    A    Yes.

5    Q    80 degrees; is that correct?

6    A    Yes, sir.

7    Q    And again, grade of pain, and we know already that

8    Dr. W..... circled three?

9    A    Yes, sir.

10   Q    Which is severe.  And then we keep going to the right and

11   we see location of pain -- which perhaps says L4-5?

12   A    Yes, sir.

13   Q    And then we go again to the right of that, and there's two

14   options.  It's either sharp for description of the pain or dull

15   for description of the pain?

16   A    Yes.

17   Q    And then as we go down from the L4-5 line, sharp is circled

18   to the right of every single one of the tests under lumbar; is

19   that right?

20   A    Yes, sir.

21   Q    And that would indicate -- well, do you know if that

22   indicates that every single one of those tests showed that the

23   patient had sharp pain?

24   A    Yes, sir.

25   Q    And then again, if we go back up to L4-5, there's an arrow

1929

```
 1   down through all of the lines to the far right; is that right?
 2   A   Yes, sir.
 3   Q   Then does that seem to indicate to you that that was the
 4   indicator for every single one of those tests done?
 5   A   I would agree with that.
 6           THE COURT:  Mr. Essig, is now a good time for us to
 7   break?
 8           MR. ESSIG:  Yes, ma'am.
 9           THE COURT:  All right.  Ladies and gentlemen, we're
10   going to take our morning break.  Leave your pads on your
11   chairs.  Take your break downstairs.  No discussion about the
12   case, and we will call you back up in about 15 minutes.
13           We're in recess.
14       (A recess was taken at approximately 10:34 a.m.)
15       (In open court, 10:55 a.m., defendants and jury present.)
16           THE COURT:  All right, Mr. Essig.
17           MR. ESSIG:  Thank you.
18   Q   Officer Kelley, when we broke, we were talking about your
19   records from Dr. W......  And what I want to do is -- we
20   covered the first page.  I want to flip to the second page.  Do
21   you see here at the top it says that this is Dr. JW.........
22   and it indicates that this page is a history page; is that
23   correct?
24   A   Yes, sir.
25   Q   All right.  And just -- I don't think we talked about this
```

1930

1    when we showed the jury the first page.  But on the first page,

2    do you see it's dated July 10th, 2014; is that correct?

3    A   Yes, sir.

4    Q   And that date is within a matter of weeks of your first

5    visit to PPSA; is that correct?

6    A   Yes.

7    Q   The first visit was August 5th of 2014; is that correct?

8    A   Yes, sir.

9    Q   And so on the second page, here again dated the same day,

10   July 10th, 2014; is that correct?

11   A   Yes, sir.

12   Q   And again, it says history, and we go through here, and it

13   says complaints.  Is that the first category we see there?

14   (Indicating.)

15   A   Yes, sir.

16   Q   And do you see -- again, we'll read the document there.  Do

17   you see it looks like it says LBP there?

18   A   Yes, sir, I see.

19   Q   Do you think LBP stands for low-back pain?

20   A   It could.

21   Q   And then it states there in this report that the lower back

22   pain is localized; is that right?

23   A   Yes, sir, I agree with that.

24   Q   And let's go down to the next portion of the history.  And

25   again, this purports to be, so we're clear, a history done by

 1  Dr. W..... of a patient by the name of Shawn Brennan?

 2  A   Yes, sir.

 3  Q   And then it says here:  Onset.  Do you understand that to

 4  be the onset of the pain or the condition you presented with?

 5  A   Yes, sir.

 6  Q   And just to be clear, I mean, Dr. W's..... first page of

 7  that report clearly indicates per his record that the patient,

 8  Shawn Brennan, was in pain?

 9  A   You could assume that, yes.

10  Q   As a matter of fact, the first page indicates that patient

11  Shawn Brennan was in severe pain; is that correct?

12  A   That's what it said.

13  Q   And then, according to this report, the second page, that

14  the onset of that pain -- do you understand that to be when the

15  pain began or how the pain came about?

16  A   Yes, sir.

17  Q   And then next to onset there are three choices:  It's

18  either insidious, sudden, or an accident; is that correct?

19  A   Yes, sir.

20  Q   And then what's circled there is insidious.  Do you see

21  that?

22  A   Yes, sir.

23  Q   Do you understand insidious to mean something that has

24  occurred over a long period of time?

25  A   Yes, sir.

1  Q   And then it states there that the first date -- some

2  squiggly line there -- and then it says three weeks ago; is

3  that right?

4  A   Yes, sir.

5  Q   Then the next line of this report indicates aggravated.

6  And that indicates what aggravates the condition or the pain;

7  is that right?

8  A   Yes, sir.

9  Q   And what aggravates the condition of Shawn Brennan on July

10  10th of 2014 is to sit; is that right?

11  A   Yes, sir.

12  Q   And to bend; is that correct?

13  A   Yes, sir.

14  Q   And again, this is July 10th, 2014, and this is the initial

15  assessment, according to this document, of Shawn Brennan done

16  by Dr. W......  And if we go to the area where it talks about

17  how the pain is relieved, Dr. W..... indicates that there is

18  nothing that relieves the pain; is that right?

19  A   Yes, sir.

20  Q   The options next to relieve is ice, heat, walk, lie.  And

21  what do you assume that to mean?  Lies down?  Not tell the

22  truth?

23  A   I would assume it meant lie down, yes, sir.

24  Q   No attempts -- no relief from medication; is that right?

25  A   Yes, sir.

1933

1   Q   And the one that is circled is no relief?

2   A   That's correct.

3   Q   Is that correct?  And then here the quality of the pain is

4   indicated as sharp; is that correct?

5   A   Yes, sir.

6   Q   And that it aches; is that right?

7   A   Yes, sir.

8   Q   And then the next line is timing of the pain; is that

9   correct?

10   A   Yes, sir.

11   Q   And then the choices are intermittent -- and do you

12   understand that to mean that it comes and goes?

13   A   Yes, sir.

14   Q   And then there's constant, positional, a.m./p.m./nocturnal.

15   You would agree with me that a.m., p.m., nocturnal would

16   indicate the time of day the pain occurs?

17   A   Yes, sir.

18   Q   And for Shawn Brennan, again, on July 10th, 2014,

19   Dr. W..... reflected that Shawn Brennan's pain was constant; is

20   that correct?

21   A   Yes, sir.

22   Q   And again, severity of the pain, Dr. W's..... report was

23   less than a month before you presented to PPSA with the pain

24   that was severe?

25   A   Yes, sir.

1  Q   And at this point in time it also indicates the progress

2  was worse?

3  A   Yes, sir.

4  Q   Now I want to go to the bottom of this second page of the

5  Dr. W..... records.  And do you see here this category that

6  says activities of daily living?

7  A   Yes, sir.

8  Q   And do you see next to that it has several categories?

9  There's bathing, dressing, sleep, family care, household

10 chores, and body functions; is that right?

11 A   Yes, sir.

12 Q   And do you see there's columns, three columns next to that,

13 that talk about whether or not those activities are either

14 difficult, painful, or the patient is unable to do them; is

15 that correct?

16 A   Yes, sir.

17 Q   And for difficult, painful, and unable do you see where

18 there's three letters, O., F., C.; is that right?

19 A   Yes, sir.

20 Q   And there's nothing on this record that indicates what O.,

21 F., C. means is there?

22 A   Not that I can see.

23 Q   Okay.  Let's flip over to this, as I count, the sixth page

24 of Government's Exhibit 20-23.  And do you see those acronyms

25 or those letters again C., F., and O.?

DEPUTY PATRICK SHAWN KELLEY - CROSS BY MR. ESSIG

```
 1   A   Yes, sir.
 2   Q   And again, just to be clear, this is a separate record for
 3   July 10th, 2014, for Shawn Brennan; is that right?
 4   A   Yes, sir.
 5   Q   Now, do you see here on the right of this document, do you
 6   see there's a key?  Do you see that?
 7   A   Yes, sir.
 8   Q   And according to that key, C. stands for constant?
 9   A   Yes, sir.
10   Q   F. stands for frequent?
11   A   Yes, sir.
12   Q   And O. stands for occasional?
13   A   Yes, sir.
14   Q   And then there's an I. for intermittent; is that right?
15   A   Yes, sir.
16   Q   Let's go back to the second page of the Dr. W.....
17   documents.  Let's go back to the activities of daily
18   living.  Okay.  And using that code, do you see that Dr. W.....
19   on July 10th, 2014, reported that for patient Shawn Brennan
20   that bathing was -- for difficult there's a C. circled; is that
21   right?
22   A   Yes, sir.
23   Q   That means constant; is that correct?
24   A   Yes, sir.
25   Q   And that bathing is painful, circled the C. again; is that
```

1    correct?

2    A    Yes, sir.

3    Q    Which indicates, according to the key, that there's

4    constantly pain?

5    A    Yes.

6    Q    Is that correct?

7    A    Yes, sir.

8    Q    Same thing for dressing, it's constantly difficult and it's

9    constantly painful; is that correct?

10   A    Yes, sir.

11   Q    And then for sleep, it says it's occasionally difficult,

12   because the O. is circled, occasionally painful, and also that

13   on occasion this patient is unable to sleep; is that correct?

14   A    Yes, sir.

15   Q    And then if we go down to household chores, again on July

16   10th, 2014, for patient Shawn Brennan Dr. W..... indicates that

17   household chores are constantly difficult, do you see that?

18   A    Yes, sir.

19   Q    And constantly painful, do you see that?

20   A    Yes, sir.

21   Q    Now, also part of Dr. W's..... record is this MRI that you

22   talked about on direct examination; is that correct?

23   A    Yes, sir.

24   Q    And this MRI is from Murphreesboro, Tennessee; is that

25   right?

DEPUTY PATRICK SHAWN KELLEY - CROSS BY MR. ESSIG

1   A   That's what it says.

2   Q   I mean, so far as PPSA knew when they saw this guy --

3   A   Right.

4   Q   -- it was from Murphreesboro, Tennessee?

5   A   That's correct.

6   Q   And when you presented to PPSA on that first day that you

7   went in, the nurse practitioner that you saw was Stacy Madison;

8   is that right?

9   A   Yes, sir.

10  Q   And when you were talking to Stacy, do you remember in the

11  video where the jury heard conversation about you being from

12  Montgomery?

13  A   Yes.

14  Q   But you also told them -- and this was consistent with

15  every visit -- you told everybody there that you're from

16  Montgomery, but you're a business owner, you own construction

17  equipment, and you work all over the state; is that right?

18  A   Yes; that's correct.

19  Q   And as a matter of fact, one of the visits, one of the

20  people asked you if you have a preference for what pharmacy you

21  want to have the medication filled; isn't that right?  Do you

22  remember hearing that?

23  A   Yes, sir.

24  Q   And you told that lady no, and that at that time you were

25  working in Pascagoula; is that correct?

DEPUTY PATRICK SHAWN KELLEY - CROSS BY MR. ESSIG

1    A   Yes, sir.

2    Q   And you understand Pascagoula is in Mississippi?

3    A   I do.

4    Q   And it's about what, 40 miles west of here; is that right?

5        MS. GRIFFIN:  Your Honor, objection to the relevance

6    of where it's located.

7        THE COURT:  Overruled.

8    BY MR. ESSIG:

9    Q   Isn't that correct, Officer Kelley?

10   A   Yes, sir.

11   Q   Now, and when you came in that first day too, you talked to

12   Ms. Madison.  And in the video the jury could hear Ms. Madison

13   ask you if you're from Montgomery?  We talked about that;

14   correct?

15   A   Yes, sir.

16   Q   But what you told her in that video is that you were

17   originally from Tennessee; isn't that correct?

18   A   Yes, sir.

19   Q   So when you presented to that clinic on the very first day

20   and for every visit, you presented as a business owner; is that

21   right?

22   A   Yes, sir.

23   Q   An owner of some very expensive construction equipment;

24   isn't that right?

25   A   Yes, sir.

1   Q   And as a matter of fact, you told Bridgette Parker during

2   the November visit that you owned and operated equipment that

3   cost as much as $300,000; isn't that right?

4   A   Yes, sir.

5   Q   And you told her that you supervised a crew?

6   A   Yes, sir.

7   Q   Is that correct?  And you told her too that when you

8   supervised a crew that the quickest way you could get fired was

9   by messing up equipment that could cost you about $30,000 to

10  fix; isn't that right?

11  A   Yes, sir.

12  Q   Okay.  And I just want to be clear.  Was one of the -- you

13  mentioned you wanted to present as a pill seeker?

14  A   Yes.

15  Q   Is that correct?  And you wanted to present the clinic with

16  some red flags; is that right?

17  A   Yes, sir.

18  Q   It's not a red flag to be a guy that owns a business that

19  has $300,000 worth of equipment, is it?

20  A   No, sir.

21  Q   Having that kind of money and that kind of management of a

22  business, that's not a red flag, is it?

23  A   No, sir.

24  Q   And as a matter of fact, every time you presented, by my

25  count, on those videos the jury could hear that on every single

DEPUTY PATRICK SHAWN KELLEY - CROSS BY MR. ESSIG

1940

1    occasion somebody asked you about how your business is doing;

2    is that right?

3    A    Several times, yes, sir.

4    Q    All right.  They are trying to get a work history when they

5    are doing that, aren't they?

6    A    I don't know what they're trying to do.  I couldn't tell

7    you what they're doing.

8    Q    They are getting at that; is that right?  They are getting

9    a work history, they are trying to find out what your work

10   history is?

11   A    I took it that they were just asking me all general

12   conversation:  How's your business doing?

13   Q    Do you agree that it's important for a nurse or a doctor to

14   have a good bedside conversational manner with patients when

15   they treat them?

16   A    I'm sorry.  I couldn't hear the first part.

17   Q    Do you agree with me that it's good for a nurse

18   practitioner or a doctor or a medical assistant or a medical

19   staff when they're going through their list of questions to

20   have a good conversational bedside manner?  Do you agree with

21   that?

22   A    Yes, sir.

23   Q    And that's the way they were getting your work history;

24   right?  They were being friendly and conversational; is that

25   correct?

1  A   It could be seen that way, I guess.

2  Q   And isn't it true, Officer Kelley, that one of the green

3  flags that indicates that somebody is not a pill seeker is that

4  they have a successful work life and a successful work history?

5          MS. GRIFFIN:  Objection, Your Honor, as to foundation

6  for knowledge.

7          THE COURT:  Sustained.

8          MR. ESSIG:  Your Honor, he testified on direct

9  examination that he has been given training on what red flags

10  are.

11          THE COURT:  He has not testified about any training

12  for green flags, and that's what the question was about.

13  BY MR. ESSIG:

14  Q   Is a red flag -- is one of the red flags that you're aware

15  of a poor work history, poor employment history?

16  A   No, sir.

17  Q   You've never been told that before?

18  A   No, sir.

19  Q   Is one of the red flags a doctor that doesn't get an

20  adequate work history from a patient?

21  A   Yes, sir.

22  Q   But they did get an adequate work history with you; is that

23  correct?

24  A   Yes, sir.  We're talking about two different kind of red

25  flags.

1  Q   I understand, I understand.  You've got patient red flags

2  and you've got doctor treatment red flags; is that correct?

3  A   Yes, yes.

4  Q   And both are important?

5  A   Sir?

6  Q   And both are important to investigators in these kinds of

7  cases; right?

8  A   Yes, sir, absolutely.

9  Q   Now, I point all that out to say that one of the red flags

10 you wanted to present with was the fact that you had an MRI

11 from Tennessee; is that correct?  You had an out-of-state MRI?

12 A   That was not the purpose behind the --

13 Q   That was not the purpose behind that?

14 A   No, sir.

15 Q   And it wouldn't be a red flag because, again, you told

16 Stacy that you were originally from Tennessee?

17 A   That's right.

18 Q   So she would have an explanation as to why an MRI came from

19 Tennessee?

20 A   Right.

21 Q   And we know too Dr. W..... faxed the MRI and all these

22 medical records to the doctor's office before you arrived

23 there; is that correct?

24 A   Yes, sir.

25 Q   And so somebody at PPSA had possession of these documents

1   before you arrived; is that correct?

2   A    Should have been, yes, sir.

3   Q    Are you aware, Officer Kelley, that Dr. W's..... office is

4   in Mobile County, in Mount Vernon?  Were you aware of that

5   fact?

6   A    I was, yes, sir.

7   Q    Now, I want to continue to go through some of these

8   records.  But the first thing I want to do, Officer Kelley, is

9   I want to show you for these Shawn Brennan records done by

10  Mr. W....., just very briefly, this one looks a little bit

11  different than the initial intake form or the history form; is

12  that right?

13  A    Yes, sir.

14  Q    I just want to note there's one on July 10th, 2014; do you

15  agree with that?

16  A    Yes, sir.

17  Q    There's one on July 14th, 2014, do you agree with that?

18  A    Yes, sir.

19  Q    There's one on July 16th of 2014, do you agree with that?

20  A    Yes, sir.

21  Q    And there's one on July 17th of 2014, do you agree with

22  that?

23  A    Yes, sir.

24  Q    One on July 21st of 2014?

25  A    Yes, sir.

1   Q   Then one on July 24th of 2014; is that correct?

2   A   Yes, sir.

3   Q   So the last time that it was presented to PPSA that

4   Dr. W..... had treated Shawn Brennan for low-back pain was July

5   24th of 2014; is that correct?

6   A   Yes, sir.

7   Q   And that's just -- July's got 31 days -- that's just about

8   12 days before you go to PPSA for the first time; is that

9   correct?

10  A   Yes, sir.

11  Q   Now, on the July 10th visit, the top portion doesn't have a

12  lot of information.  Do you see where -- can you tell if this

13  handwriting here says -- does that look like to you it says:

14  See exam?

15  A   Yes, sir.

16  Q   And then if we look just at the very next page -- the page

17  prior to that, I apologize -- is the MRI; is that correct?

18  A   Yes, sir.

19  Q   So it would be safe to assume, when he says see exam, he

20  means the MRI?

21  A   I guess you could assume that, yes, sir.

22  Q   I mean, you're not aware of an X-ray or another MRI or

23  anything?

24  A   No, sir.

25  Q   But when we go to the bottom again -- this would all be

1945

```
 1   dated from your first visit -- the very bottom of this page
 2   there's an assessment, do you see that?
 3   A   Yes, sir.
 4   Q   And there's a section that says prognosis; is that right?
 5   Can you read that?
 6   A   Yes, I do, I see it now.
 7   Q   It says -- what's circled is "uncertain"; is that correct?
 8   A   Yes, sir.
 9   Q   Diagnosis, nothing is circled, is there?
10   A   No, sir, nothing's circled.
11   Q   And then for the plan, would that be his treatment plan?
12   A   I would assume it was.
13   Q   Then it says -- it's circled there's an adjustment that was
14   done for Shawn Brennan on July 10th, 2014, do you see that?
15   A   Yes, sir.
16   Q   And an adjustment of the -- it says L-U-M-B.  Would that be
17   lumbar adjustment?
18   A   I would assume it was, yes, sir.
19   Q   And then physiological therapeutics, I'll be honest with
20   you, I don't know what that word says that's circled, do you?
21   A   No, sir, I do not.
22   Q   And then it shows below there what's done is there's a hot
23   pack that was done on that day; is that correct?
24   A   Yes, sir.
25   Q   And then a soft tissue massage?
```

DEPUTY PATRICK SHAWN KELLEY - CROSS BY MR. ESSIG

1    A    Yes, sir.

2    Q    I want to show you that same document for the July 14th,

3    2014, visit, which would have been the next one; is that

4    correct?

5    A    Yes, sir.

6    Q    And again, if we look at -- do you see where it says

7    subjective?  Do you see that?

8    A    Yes, sir.

9    Q    That's at the top of the document.  And subjective is --

10   the options are absent, intermittent, much better, slightly

11   better, which is a three, and then four would be unchanged

12   since last visit; is that correct?

13   A    Yes, sir.

14   Q    And five would be slightly worse; is that right?

15   A    Yes, sir.

16   Q    And so what those are indicating as far as we can tell is

17   how the patient has progressed since the last visit; is that

18   right?

19   A    Yes, sir.

20   Q    If we go here, do you see this line that says low back?

21   A    Yes, sir.

22   Q    And do you see there's L., R.?  Is that correct?

23   A    Yes, sir.

24   Q    And do you see B.L.?

25   A    Yes, sir.

1    Q   Would that stand for bilateral?

2    A   I wouldn't know, sir.

3    Q   Do you know if bilateral means both sides?

4           MS. GRIFFIN:  Your Honor, he's answered that he

5    doesn't know.  It's asked and answered and we object.

6           THE COURT:  Overruled.

7    BY MR. ESSIG:

8    Q   Do you know if bilateral -- I understand you don't know

9    if B. L. means bilateral.  But do you know if bi and lateral

10   refer to both sides of the body?

11   A   I do not.

12   Q   You don't?  And then it indicates there for Shawn Brennan

13   that on that day the progress is a four; is that correct?

14   A   That's what it says, yes, sir.

15   Q   So it's unchanged since the previous visit?  Is that

16   correct?

17   A   That's correct.

18   Q   Now, if we go over to the right of the top portion, do you

19   see there the quality of the pain?  Do you see that?

20   A   Yes, sir.

21   Q   And then circled next to quality are dull and ache; is that

22   correct?

23   A   Yes.

24   Q   And also circled are radiating pain?

25   A   Yes, sir.

1   Q   Now, again, we heard on the videos that the jury saw both

2   Ms. Madison and Dr. Couch asking you at that first visit if the

3   pain went down your legs?

4   A   Yes.

5   Q   Do you recall that?  And do you remember you told both of

6   them a little bit?

7   A   I did.

8   Q   You said it went a little bit, but your toes didn't tingle,

9   I think is what you said; is that correct?

10  A   Yes.

11  Q   And then the intensity at that point in time was moderate;

12  is that correct?

13  A   Yes, sir.

14  Q   Now I want to go just like the very first page we saw and

15  your very first visit.  Do you see there where there's a

16  category for activities of daily living; is that correct?

17  A   Yes, sir.

18  Q   And again, what I want to focus on is for physical

19  activity.  Is your job -- as you described your job to the

20  people at PPSA when you went in, was that you did a lot of hard

21  physical labor; is that correct?

22  A   I said I drove a bulldozer.  That's hard physical labor.

23  Q   Didn't you tell Isis Cook on the September 8th visit that

24  your job physical activity was wearing on your body because it

25  was a lot of wear and tear on your body?

1   A   Yes, sir, I did say that.

2   Q   Okay.  So that was one of the conditions you presented to

3   them, is that you were involved in a physical job that over

4   time had caused you a lot of back problems; is that correct?

5   A   Yes, sir.

6   Q   And you said painful for here -- again, for Shawn Brennan

7   on July 14th, 2014, Dr. W..... indicates when it comes to

8   physical activity that it's constantly difficult?

9   A   Yes, sir; that's correct.

10  Q   Now, as a matter of fact, there's intrinsic and then

11  there's functional for physical activity, intrinsic pain and

12  functional pain; is that correct?

13  A   Yes, sir.

14  Q   And for both of those, for physical activity, it's circled

15  the C. that's constantly difficult?

16  A   That's correct.

17  Q   And you see circled that day that it's constantly painful?

18  A   Yes, sir.

19  Q   And then on the social and recreational activities, on that

20  portion of it, again the same thing, constantly difficult and

21  constantly painful?

22  A   Yes, sir.

23  Q   Now, again, let's go to the next section.  Do you see where

24  it says objective?  Do you see that?

25  A   Yes, sir.

1  Q   And again, like the lumbar we saw before, it gives a couple

2  of options here.  There's palpatory.  Do you know what that

3  means?

4  A   No, sir.

5  Q   And then it looks like the next one is maybe Artic

6  fixation.  Do you know what that means?

7  A   No, sir.

8  Q   Then it says myospasm, do you see that?

9  A   I do.

10  Q   Do you know if that refers to back spasms?

11  A   I do not.

12  Q   But if we go over to the right for myospasm, do you see

13  that right there?  Do you see L4-L5 is circled next to

14  myospasm?

15  A   Yes, sir.

16  Q   And then do you see where it says palpation tenderness

17  below myospasm?

18  A   I do.

19  Q   And palpation tenderness, we saw that in the other records

20  at PPSA, palpation is touching the area; is that correct?

21  A   Yes, sir.

22  Q   So palpation tenderness would mean that the area being

23  touched is tender to the touch; is that correct?

24  A   Yes.

25  Q   And then if we go again -- palpation tenderness -- we go

DEPUTY PATRICK SHAWN KELLEY - CROSS BY MR. ESSIG

1    all the way over to the right, we see that L4-L5 is circled; is
2    that correct?
3    A   Yes, sir.
4    Q   Indicating that L4-L5, the lumbar region, the lower back,
5    Dr. W's..... reporting for Shawn Brennan on July 10th, 2014,
6    that the back is tender to the touch?
7    A   That's what it says, yes.
8    Q   Let me show you next, below that, also in the objectives
9    section, what I want to focus on is this area
10   here.  (Indicating.)  And again we see the -- see the term
11   "lumbar"?
12   A   Yes, sir.
13   Q   Correct?  Now, do you see next to lumbar on that, the first
14   line to the next, it says straight-leg raise, L.?
15   A   Yes, sir.
16   Q   Again, you see the little positive and negative sign there?
17   A   That's correct.
18   Q   And then we see there's an R. next to straight-leg
19   raise.  You would assume that that would be the right leg?
20   A   Yes, sir.
21   Q   And then again, next to the R., there's a positive and then
22   a negative sign; is that correct?
23   A   Yes, sir.
24   Q   And then do you see here there's a double-leg raise below
25   that?

1    A    Yes, sir; that's correct.

2    Q    And that could mean instead of doing the left leg and the

3    right leg, that's double, both legs at the same time?

4    A    That would be a good assumption.

5    Q    And then if we look next to the double-leg raise, the first

6    little symbol, which on all of these is the positive symbol;

7    correct?

8    A    Yes, sir.

9    Q    There's a circle around double-leg raise, meaning it's

10   positive?

11   A    Yes, sir.

12   Q    Do you know if a positive leg raise means that the double-

13   leg raise indicated there was pain in the lumbar region?

14   A    I do not.

15   Q    But Dr. W..... reports that there was a positive leg raise

16   for patient Shawn Brennan on July 14, 2014?

17            MS. GRIFFIN:  Your Honor, it's asked and answered.

18            THE COURT:  Sustained.

19   BY MR. ESSIG:

20   Q    And again, go down here for plan.  Again, it's circled

21   adjustment, lumbar -- a word that I don't know what it means --

22   hot pack, soft tissue massage, do you see all those?

23   A    Yes, sir.

24   Q    And I'll show you --

25            MS. GRIFFIN:  Your Honor, we object.  There's no

1953

```
 1    question.  He's just reading without a question.

 2            THE COURT:  He said:  Do you see all that?

 3            And he said:  Yes.

 4            So let's move on.

 5    BY MR. ESSIG:

 6    Q   I just want to show you again.  These next -- and we

 7    already went through them.  These reports, they are basically

 8    the same format; is that correct?  From Dr. W's..... office?

 9    A   Can you pull it down a little bit so I can see the top?

10    Q   Yes, sure.  I'll go ahead and show you the whole -- it's

11    all got the same, same stuff on it; is that right?

12    A   It appears to be the same, yes, sir.

13    Q   And again, instead of going through all these now, one

14    thing different on the July 16th visit is that your low back

15    subjective presentation is a three, which is slightly better;

16    is that right?

17    A   Can you underline it?

18    Q   Yes, I apologize.  (Indicating.)  Do you see the three

19    there?

20    A   Yes, sir.  I see that.

21    Q   See the three there?  That means slightly better?

22    A   Yes, sir.

23    Q   And, but if we go down, it shows also too that your

24    relieving factors are chiropractic and then PT, do you see

25    that?
```

1   A   Yes, sir.

2   Q   Which would mean physical therapy; is that correct?

3   A   I don't know what it stands for in this form.  It could be

4   that though.  I could see where it was that.

5   Q   Have you seen or heard or know of PT being referred to as

6   physical therapy?

7   A   I have.

8   Q   And then again, quality of pain, dull and ache?

9   A   Yes, sir.

10  Q   Is that correct?  Constant pain; is that correct?

11  A   Yes, sir.

12  Q   And then pain level is moderate at this point in time; is

13  that correct?

14  A   Yes, sir.

15  Q   Then physical activity, again, is indicated as constantly

16  difficult and constantly painful; is that correct?

17  A   Yes, sir.

18  Q   And then for these tests palpation of tenderness, L4 and L5

19  lumbar region, is tender to the touch is what this indicates;

20  right?

21  A   Yes, sir.

22  Q   At this point in time myospasm is not circled, is it?

23  A   No, sir, it's not.

24  Q   But the Artic fixatoin, whatever that is, is; correct?

25  A   Yes, sir.

1955

1   Q   Now, for the subjective, it does indicate that the overall

2   is improved, objective overall is improved; is that correct?

3   Is that right?

4   A   Yes, sir.

5   Q   But the diagnosis still remains uncertain, or the prognosis

6   is uncertain?

7   A   Yes, sir.

8   Q   And the diagnosis is unchanged?  Is that correct?

9   A   That's correct.

10   Q   And again, if we look at that, we see you've got a lumbar

11   adjustment, you've got a hot pack, and a soft tissue massage?

12   A   Yes, sir.

13   Q   If we go through these, let's briefly show each one,

14   because there's not a lot of change.  Again, most of it's the

15   same information; is that right?  Is that correct?

16   A   Is this the second page?

17   Q   This is the third, this is the July 17th visit.  I

18   apologize.

19   A   Yes, sir.

20   Q   Still having constant pain with physical activity?

21   A   I can't read it.  It's not far enough in.

22   Q   (Indicating.)  Is that correct?

23   A   Yes, that's what it says.

24   Q   And again, still, the palpation tenderness is still

25   present; is that correct?  Is that right?

1  A   Yes, sir.

2  Q   All right.  And then again, if we go down, double-leg

3  raise, both legs at the same time, indicates a double straight-

4  leg raise test is positive; is that correct?

5  A   Yes, sir.

6  Q   What I'll do, Officer Kelley, is for the sake of time --

7  again, we've established there's a total of six visits in July.

8  This is the last one, the last one is July 24th of 2014.  Do

9  you see that?

10  A   Yes, sir.

11  Q   Okay.  Again, your pain is slightly better because it's a

12  three; is that correct?

13  A   I think it was the same as the one before, wasn't it?

14  Q   Yeah; that's correct.

15  A   Excuse me.

16  Q   And then physical activity is still constantly painful,

17  constantly difficult; is that correct?

18  A   Yes, sir.

19  Q   And we still have palpation tenderness L4-L5; is that

20  correct?

21  A   Yes, sir.

22  Q   Again, double-leg raise, straight-leg raise for both legs

23  at the same time, shows that it's positive?

24  A   Yes, sir -- well, I really can't tell where the circle

25  is.  You really can't tell.  I can't tell.

DEPUTY PATRICK SHAWN KELLEY - CROSS BY MR. ESSIG

1   Q   Got you.  Down at the bottom, again, the treatments were

2   basically the same; is that correct?

3   A   Yes, sir.  It appears to be so.

4   Q   And again for prognosis, Dr. W's..... prognosis for Shawn

5   Brennan July 24, 2014, is uncertain; is that correct?

6   A   Yes, sir.

7   Q   The diagnosis has not changed?

8   A   Yes, sir; that's right.

9   Q   Again, if we go back up here, if you look at the things,

10  relieving factors, which are things you have already tried, you

11  see chiropractic care; is that right?

12  A   Yes, sir.

13  Q   PT?

14  A   Yes, sir.

15  Q   But reporting still dull pain, aching pain, and constant

16  pain; is that correct?

17  A   Yes, sir.

18  Q   Now, Officer Kelley, I want to go back.  I want to show you

19  the history that was in your medical record, your electronic

20  record, August 5th, 2014.  Now, Ms. Griffin asked you about the

21  physical examination on this day.  And she talked about the

22  inspection and palpation; is that correct?

23  A   Do you want to give me a second and let me look at it?

24  Q   Sure.

25  A   Can you pull it down so I can see the top of the page,

1    please?

2    Q   Sure.

3    A   Okay.

4    Q   I'll represent to you this is -- (indicating).

5    A   What was your question, sir?

6    Q   And the question was you were asked before about for the

7    lumbosacral spine, lumbar region of the spine, you were asked

8    about whether anybody checked you for lesions, deformities, and

9    whether anybody palpated your back?

10   A   That's right.

11   Q   And you stated that they had not?

12   A   And they had not.

13   Q   And by the time you arrived at PPSA, as you testified on

14   direct, Dr. W's..... medical records had been faxed to PPSA; is

15   that correct?

16   A   I do not know.  I have no knowledge if they actually had

17   the records at that time or not.

18   Q   You understood that was part of the undercover plan, was

19   for the records to be --

20        MS. GRIFFIN:  Objection, Your Honor.  He stated he has

21   no knowledge.

22        MR. ESSIG:  Your Honor, he clearly testified on direct

23   examination that they were faxed to Dr. W......

24        THE COURT:  Well, he didn't say when.  So I sustain

25   the objection.

DEPUTY PATRICK SHAWN KELLEY - CROSS BY MR. ESSIG

1  BY MR. ESSIG:

2  Q   Prior to August 5th of 2014, you had been referred to that

3  office; is that correct?

4  A   Yes, sir.

5  Q   And as a matter of fact, when you go into the clinic, you

6  went into the clinic and you were initially turned away; is

7  that right; for not having insurance?

8  A   Well, yeah, kind of, yeah.

9  Q   When you were turned away, you said to the lady:  My doctor

10  faxed over my MRI and everything?

11  A   That's what I was told, yes, sir.

12  Q   Okay.  So that's what you understood, by the time you got

13  to PPSA your records and everything had been faxed to the

14  clinic?

15  A   Yes, sir.  It was pretty obvious to me, though, being

16  turned away, that they had not gotten it.  That's why I walked

17  outside, to double-check.  I made the phone call to Special

18  Agent Burt.

19  Q   Okay.  But you didn't know?

20  A   I did not know, no.

21  Q   The only stated reason for turning you away was a lack of

22  insurance?

23  A   That's what they told me, yes, sir.

24  Q   Now, so this information here, again, lumbosacral spine,

25  paraspinal musculature is tender to palpation -- that is

```
 1   consistent with Dr. W's..... records for Shawn Brennan; isn't
 2   that correct?
 3   A   That is consistent, yes, sir.  But this is a different
 4   date.
 5   Q   Okay.
 6   A   So no one touched me on that day.
 7   Q   Well, that's not my -- I'm not -- that's not what I'm
 8   arguing.  But my point is if somebody's filling out this
 9   record, by referring to your Dr. W..... records, it would be
10   part of your history that your lower back has been tender to
11   palpation; is that correct?
12           MS. GRIFFIN:  Your Honor, I object that he has no
13   foundation about what it would be.
14           THE COURT:  Sustained.
15   BY MR. ESSIG:
16   Q   Is a history of lower back pain tenderness reflected in the
17   PPSA record inconsistent with Dr. W's..... record for Shawn
18   Brennan?
19   A   Did you ask me was it inconsistent?
20   Q   Right.
21   A   No, it's not.
22   Q   And you said you're not familiar with the way that PPSA
23   creates and maintains their medical records, are you?
24           MS. GRIFFIN:  Asked and answered, Your Honor.
25           THE COURT:  Sustained.
```

1  BY MR. ESSIG:

2  Q   Officer Kelley, given your lack of knowledge of how PPSA

3  maintains their medical records, you don't know what their

4  policy was about entering information from referring doctors,

5  do you?

6  A   No, I do not.

7  Q   You don't know if it was their policy to enter into their

8  system any physical exam that had been performed by a referring

9  doctor?

10         MS. GRIFFIN:  Your Honor, he has no foundation to

11  answer what PPSA's policy was.

12         THE COURT:  Sustained.

13  BY MR. ESSIG:

14  Q   Officer Kelley, you don't know -- again, the last record we

15  saw that came from Dr. W's..... office for patient Shawn

16  Brennan was July 24th, of 2014; correct?

17  A   Yes, sir.

18  Q   Less than two weeks before your visit to PPSA; is that

19  correct?

20  A   Yes, sir.

21  Q   And you don't know if it was PPSA's policy --

22         THE COURT:  You've already asked about PPSA's policy.

23  So let's move along.

24         MR. ESSIG:  Okay.  Officer Kelley, what I want to do

25  is I want to go back.  I want to play you some of the videos in

1    this case.

2           And, Your Honor, at this time we would move to admit

3    Couch Exhibit 61.

4           MS. GRIFFIN:  Your Honor, I'd like to be allowed to

5    object to each particular portion.  I understand there are

6    several portions on this and so I'd like to see what it is

7    first.

8           THE COURT:  Can you identify what you are going to be

9    playing on this?

10          MR. ESSIG:  Yes, Your Honor.

11          THE COURT:  I take it --

12          MR. ESSIG:  Do you want me to identify it --

13          THE COURT:  -- I take it that your Exhibit 61 is a

14   media that contains video files; is that correct?

15          MR. ESSIG:  That's correct, Your Honor.  Exhibit 61 is

16   it's a thumb drive and it contains portions of the audio and

17   video of Officer Kelley's visits to PPSA as patient Shawn

18   Brennan.

19          THE COURT:  And how many are on there?

20          MR. ESSIG:  I can't say the exact number, Your

21   Honor.  The way we have them identified is by the DEA exhibit

22   number that they attached to them, these separate files.  They

23   cover the first visit on August 5th and then there are other

24   videos that cover the same visits Ms. Griffin has already

25   played.  I do not intend to play the entirety of any portion

```
 1   already played for the jury, but I do want to be able to play
 2   certain portions of those videos.
 3            MS. GRIFFIN:  Your Honor?
 4            THE COURT:  Tell us --
 5            MS. GRIFFIN:  I'm sorry.
 6            THE COURT:  -- just tell us what you intend to play
 7   first.
 8            MR. ESSIG:  The first video I intend to play, Your
 9   Honor, is the video depicting Officer Kelley again reporting on
10   the first day to the clinic as Shawn Brennan, his interaction
11   with the staff, and Mr. Kelley/Mr. Brennan being turned away by
12   the staff for not having insurance.
13            MS. GRIFFIN:  Your Honor, it's not relevant to his
14   testimony about his treatment.
15            THE COURT:  Well, I agree it's not relevant to his
16   treatment, but it is part of what you originally offered.  So I
17   will allow you to play that.
18            MR. ESSIG:  Thank Your Honor.
19            MS. GRIFFIN:  And, Your Honor, we would ask to stop
20   before going on to any other portions so that we have the
21   opportunity to object.
22            THE COURT:  All right.
23            THE CLERK:  Mark it in?
24            MR. ESSIG:  Your Honor this first video I'm playing --
25            THE COURT:  I'm not, I'm not admitting the entire
```

1  exhibit at this time.

2          MR. ESSIG:  Yes, ma'am.

3          THE COURT:  Just this one.  So let's call this 61A.

4          MR. ESSIG:  Yes, ma'am.  So they will be played for

5  the jury, subject to objection by the government.  And, Your

6  Honor, I will note for the record each time I play one how we

7  have identified it so the record's clear.

8          Your Honor, this first one is identified as N25-2.

9  N25-2 is approximately two minutes and 20 seconds.

10      (Defendant Couch's Exhibit 61A was entered into evidence.)

11      (The video recording was played.)

12          MR. ESSIG:  Is the volume up?

13  Q   Officer Kelley, I don't know if you heard that.  But the

14  video begins with you sitting in the waiting room; is that

15  correct?

16  A   Yes, sir.

17  Q   And when you were sitting in the waiting room that day, you

18  didn't have any difficult finding a seat, did you?

19  A   (Shaking head negatively.)

20          MS. GRIFFIN:  Your Honor, that is beyond what we

21  discussed and I question the relevance.  It's beyond --

22          THE COURT:  Sustained.

23  BY MR. ESSIG:

24  Q   When you walked in the clinic that morning, isn't it true

25  there were empty parking places right in front of the building?

 1          MS. GRIFFIN:  Objection as to relevance.

 2          THE COURT:  Sustained.

 3   BY MR. ESSIG:

 4   Q   This video begins with you sitting in the waiting room; is

 5   that correct?

 6   A   Yes, sir.

 7   Q   And what we just heard, you know, was kind of low.  But it

 8   was somebody in the front office area calling your name,

 9   Mr. Brennan; is that correct?

10   A   To be honest with you, sir, I have no idea.  I couldn't

11   hear it.

12          MR. ESSIG:  Sam, would you replay it?

13      (The recording was played.)

14          A FEMALE VOICE:  Mr. Brennan?

15   BY MR. ESSIG:

16   Q   Did you hear that?

17   A   Yes, sir, I will agree with what you said.

18   Q   Okay.

19      (The video recording continued playing.)

20          VOICE OF MR. BRENNAN:  Hey.

21          VOICE OF UNKNOWN FEMALE:  Are you...(inaudible).

22          VOICE OF MR. BRENNAN:  Ma'am?

23          VOICE OF UNKNOWN FEMALE:  (Inaudible.)

24          VOICE OF MR. BRENNAN:  No.

25          VOICE OF UNKNOWN FEMALE:  We've got a new patient here

1    with no insurance.

2         MR. ESSIG:  Pause that for a second.

3         (The video recording stopped playing.)

4    BY MR. ESSIG:

5    Q   Did you hear that interaction with the lady there at PPSA?

6    A   Yes, sir.

7    Q   And what we heard her say or the jury heard her say was

8    asking you about whether or not you had insurance; is that

9    correct?

10   A   Yes, sir.

11   Q   And then we hear her get on the phone and call somebody

12   named Shannon?  Is that right?

13   A   I couldn't hear the name.

14   Q   But said there was a patient up here without insurance?

15   A   Yes, sir.

16   Q   And specifically said -- I'm sorry.

17        THE COURT:  Well, Mr. Essig, you don't need to repeat

18   everything that was said on the tape.  So let's let the tape

19   speak for itself.  Okay?

20        MR. ESSIG:  I'll do that, Your Honor.

21   Q   And, Officer Kelley, let me ask you this:  Did she sound

22   surprised when she told this person --

23        MS. GRIFFIN:  Objection, Your Honor.  No foundation

24   for him to conclude whether she was surprised.

25        THE COURT:  We're looking at it.  So people can reach

1    their own conclusions.

2         MR. ESSIG:  Okay.  Thank you.  Go ahead and play it.

3       (The video recording continued playing.)

4         VOICE OF UNKNOWN FEMALE:  All right.  Did you have

5    a...(unintelligible)?

6         VOICE OF MR. BRENNAN:  No.  I was referred by my

7    chiropractor, Dr. W....., from Mount Vernon.

8         VOICE OF UNKNOWN FEMALE:  (Inaudible)...driver's

9    license?

10        VOICE OF MR. BRENNAN:  Yes, ma'am.  He should have

11   sent my MRI and everything up here.

12        VOICE OF UNKNOWN FEMALE:  (Inaudible.)  You don't have

13   insurance?

14        VOICE OF MR. BRENNAN:  No.

15        VOICE OF UNKNOWN FEMALE:  (Inaudible.)

16        MR. ESSIG:  Pause it.

17       (The video recording stopped playing.)

18   BY MR. ESSIG:

19   Q   Officer Kelley, do you know who that is that you were

20   talking to at that point in time?

21   A   No, sir.

22       (The video recording continued played.)

23        VOICE OF UNKNOWN FEMALE:  (Unintelligible.)  We don't

24   take patients...cash.

25        VOICE OF MR. BRENNAN:  Not at all?

1           VOICE OF UNKNOWN FEMALE:  No.  The only way we saw a

2    patient -- the only way we can take a patient without insurance

3    if they pay it -- if they're already taken with cash.

4           VOICE OF MR. BRENNAN:  Yeah?

5           VOICE OF UNKNOWN FEMALE:  ...(Unintelligible).

6           VOICE OF MR. BRENNAN:  Even with my doctor referral, I

7    can't -- I can't come here?

8           VOICE OF UNKNOWN FEMALE:  Huh-uh (negative response).

9    Not...(unintelligible).

10          VOICE OF MR. BRENNAN:  I'm sorry?

11          VOICE OF UNKNOWN FEMALE:  Not without insurance.

12          VOICE OF MR. BRENNAN:  Okay.  I don't understand that,

13   but okay.  Thank you.

14      (The video recording stopped playing.)

15   BY MR. ESSIG:

16   Q   Now, Officer Kelley, as you heard on the video there, you

17   were turned away because you didn't have insurance?

18   A   Yes, sir.

19   Q   And that day you came with cash; is that correct?

20   A   Yes, sir.

21   Q   You did not expect to be turned away for not having

22   insurance that day, did you?

23   A   No, sir.

24   Q   Now, after you left the clinic, you went outside and you

25   got on the phone and you called Agent Burt; is that correct?

```
 1   A   Yes, sir.

 2           MR. ESSIG:  Sam, play the next portion.

 3           MS. GRIFFIN:  Your Honor, we object.  It is not

 4   relevant.

 5           THE COURT:  Sustained.

 6           MR. ESSIG:  Your Honor, he has already testified --

 7           THE COURT:  If you want to talk about it, come to side

 8   bar, please.

 9       (At the side bar, jury not present.)

10           THE COURT:  What is the purpose of you offering his

11   conversation with Agent Burt?

12           MR. ESSIG:  Judge, I want the jury to hear it.

13   They've heard over and over again about the fact --

14           THE COURT:  What is it about it that you want -- I

15   mean what substantive thing in that conversation do you want

16   them to hear?

17           MR. ESSIG:  It shows how he gets back into the clinic.

18           THE COURT:  Just ask him.  I don't think we need to

19   play the conversation which is with somebody that's not

20   associated with the defendant.

21           MR. ESSIG:  Okay.  All right.

22           THE COURT:  Okay.

23       (In open court, defendants and jury present.)

24   BY MR. ESSIG:

25   Q   Officer Kelley, when you went outside after that, you said
```

1  you went outside and you called Agent Burt when you were turned

2  away; is that correct?

3  A   Yes, sir.

4  Q   And then what you did is you went out and you explained to

5  him that you had been turned away for not having insurance; is

6  that right?

7  A   Yes, sir.

8  Q   And the question you asked him during that conversation

9  was:  How are we going to play that?

10 A   Yes.

11 Q   And the point of that was just figuring out how are we

12 going to get me back in the clinic; is that right?

13 A   Yes.

14 Q   And on the video you can be seen standing outside, hanging

15 up the phone, and --

16          MS. GRIFFIN:  Objection, Your Honor.  There is no

17 video.

18          THE COURT:  I have sustained the objection to the

19 video.

20          MR. ESSIG:  I'm just asking him what happened.  I

21 apologize.

22          THE COURT:  All right.

23 BY MR. ESSIG:

24 Q   Regardless of what the video shows, after you hung up --

25          MS. GRIFFIN:  No, no, Judge.  We object to the form of

```
 1   that.
 2           THE COURT:  Just ask about what happened.
 3           MR. ESSIG:  Yes, ma'am.
 4   Q   After you asked Agent Burt how are we going to play that
 5   and you hung up the phone with Agent Burt, you waited for a few
 6   minutes in the parking lot; is that correct?
 7   A   Yes.
 8   Q   And after waiting for a few minutes, you got a phone call
 9   on your cell phone from Dr. W.....; is that correct?
10   A   Yes.
11   Q   And Dr. W..... specifically told you --
12           MS. GRIFFIN:  Objection.  Hearsay.
13           THE COURT:  Sustained.
14           MR. ESSIG:  Your Honor, it's not offered for the
15   truth.  I mean, the whole thing was --
16           THE COURT:  Well, just find out how he got back into
17   the clinic without saying what Dr. W..... specifically told
18   him.
19           MR. ESSIG:  Okay.  Will do.
20   Q   After your conversation with Dr. W....., did you go back
21   into the clinic?
22   A   Yes, sir.
23   Q   And when you went back into the clinic, did you ask for a
24   lady named Debi Phillips?
25   A   I remember speaking to Ms. Phillips.  I do not recall if I
```

1   asked for her or she came to me.

2   Q   And do you know why Ms. Phillips was the person you talked

3   to?

4           MS. GRIFFIN:  Objection, Your Honor.  No foundation.

5           THE COURT:  Overruled.

6           THE WITNESS:  Ask again, please.

7   BY MR. ESSIG:

8   Q   Do you know why Debi Phillips was the person that you

9   talked to?

10  A   I think she was a manager or something.

11  Q   But do you recall if Dr. W..... told you to talk to Debi

12  Phillips?

13  A   I do not recall.

14  Q   Would it refresh your recollection to review the DEA 6 that

15  you created after this visit?

16  A   Absolutely.

17          MS. GRIFFIN:  Your Honor, I question the relevance.

18          THE COURT:  Well, I question the relevance too.

19  But --

20          MS. GRIFFIN:  Of who he was told to talk to?  Who told

21  him to --

22          THE COURT:  Come to side bar, if you will.

23      (At the side bar, jury not present.)

24          THE COURT:  Whether he was told to go talk to her or

25  not, I mean, what is the importance of that?

1    MR. ESSIG:  Well, Your Honor, it's just the only

2    importance is really she's an important person in this case.  I

3    mean, overall she's going to be -- her name's going to be heard

4    more and more and more as the case continues.  I can leave it

5    as is, that he talked to her.

6        THE COURT:  Okay.

7        (In open court, defendants and jury present.)

8    BY MR. ESSIG:

9    Q   So, Officer Kelley, you had a conversation with Dr. W.....,

10   you went back in the clinic and at some point in time you met

11   with Debi Phillips?

12   A   Yes, sir.

13   Q   Do you know who Debi Phillips is?

14   A   I do not.

15   Q   Do you know what her role was there at PPSA?

16       MS. GRIFFIN:  Your Honor, it's asked and answered.  He

17   does not know.

18       THE COURT:  Overruled.  Do you know what her role is?

19   Was?

20       THE WITNESS:  No, ma'am, I do not know.

21       THE COURT:  Okay.

22       MR. ESSIG:  Your Honor, we want to play another video

23   of Mr. Kelley's visit to PPSA on August 5th, 2014.  This one's

24   about a minute -- well, it's about two minutes and 15 seconds,

25   Your Honor.

 1          MS. GRIFFIN:  May I speak with counsel, Your Honor,

 2   before I --

 3          THE COURT:  All right.

 4      (A discussion was held off the record between counsel.)

 5          MS. GRIFFIN:  Your Honor, we would object to him

 6   playing this next portion.

 7          THE COURT:  Come back to side bar, please.

 8      (At the side bar, jury not present.)

 9          THE COURT:  What is it you propose to play?

10          MR. ESSIG:  Judge, part of our theory of defense in

11   this case, the government has alleged a wide-ranging indictment

12   that this business, that this clinic, was a criminal

13   enterprise.  The indictment alleges it was in essence a pill

14   mill.  Some of this evidence, it is part of our theory of

15   defense, is exculpatory evidence that demonstrates that the

16   allegations in the indictment are not true.

17          THE COURT:  Tell me what you're getting ready to play.

18          MR. ESSIG:  What I want to show, Your Honor, is we

19   have portions of the interaction with this staff which we think

20   are important to demonstrating this is an ordinary medical

21   clinic.  This video is going to show very briefly Officer

22   Kelley sitting in the waiting room and a medical assistant

23   coming out, getting him back early into the exam room, and as a

24   part of that it's going to show him going into the lab where

25   they do the urine blood screens and a brief interaction where

DEPUTY PATRICK SHAWN KELLEY - CROSS BY MR. ESSIG

```
 1    they handed him his urinalysis cup and that's it.
 2              MS. GRIFFIN:  Your Honor?
 3              THE COURT:  I think it's a waste of time, you can do
 4    it if you want to, but I think, watching this jury, they are
 5    not appreciating having their time wasted with irrelevant
 6    evidence.  Now, that is not out of the ordinary for any
 7    doctor's office.  But there's been no allegation that that is -
 8    - I don't think there's any claim that the employees who
 9    haven't been indicted were a part of any kind of
10    conspiracy.  So let's just get through this as quickly as we
11    can.  I don't think it's really relevant, but you can play it
12    if you want to.
13              MR. ESSIG:  Yes, ma'am.  Thank you.
14         (In open court, defendants and jury present.)
15              THE COURT:  And we'll call this 61B?
16              MR. ESSIG:  Your Honor, it's on the exhibit marked as
17    N271.
18              THE COURT:  All right.  But this is the second portion
19    to be played.  I've only admitted 61A and now B at this point.
20              MR. ESSIG:  Thank you.
21         (Defendant Couch's Exhibit 61B was entered into evidence.)
22         (The video recording was played.)
23              UNKNOWN VOICE:  Yes.
24              UNKNOWN VOICE:  Yes.
25              VOICE OF MR. BRENNAN:  Almost all...(inaudible).
```

```
 1            AN UNKNOWN FEMALE VOICE:  Ready?
 2            UNKNOWN VOICE:  ... most of the other -- yeah
 3   I...there on.
 4            VOICE OF MR. BRENNAN:  Okay.  I'm going to grab me
 5   some water.
 6            UNKNOWN VOICE:  Excuse me.
 7            UNKNOWN VOICE:  How are you?
 8            UNKNOWN VOICE:  ...new patient...
 9            VOICE OF MR. BRENNAN:  Fine.  I signed in, but --
10            UNKNOWN VOICE:  What's the last name?
11            VOICE OF MR. BRENNAN:  Brennan.
12   BY MR. ESSIG:
13   Q   Officer Kelley, where are you right now?  What is the jury
14   seeing?
15   A   That's me in the back of the clinic where they give you the
16   drug test, the original drug tests.
17   Q   Urinalysis drug test?
18   A   Yes, sir.
19       (The video recording continued playing.)
20            VOICE OF STACY:   I had...(inaudible).
21            VOICE OF MR. BRENNAN:  Really?
22            VOICE OF STACY:  Oh, yes.  (Unintelligible.)
23            VOICE OF MR. BRENNAN:  (Unintelligible.)  Huh?
24            VOICE OF STACY:  Stacy.
25            VOICE OF MR. BRENNAN:  Oh, Shawn.
```

 1              VOICE OF STACY:  No...(inaudible).

 2              VOICE OF MR. BRENNAN:  I don't have any idea -- I

 3    don't have any idea.

 4              VOICE OF STACY:  All right.  Fill it up to that black

 5    part and leave it in that window right there.

 6              VOICE OF MR. BRENNAN:  Where do I go?

 7              VOICE OF STACY:  Right here next door.

 8              VOICE OF MR. BRENNAN:  Okay.

 9         (The video recording stopped playing.)

10              MR. ESSIG:  Your Honor, next I want to play a portion

11    of Officer Kelley's interaction with Stacy Madison during the

12    examination.  It's a portion of what the government played

13    yesterday.  We want to play it from our -- our exhibit.

14              MS. GRIFFIN:  Your Honor, it's been played for

15    them.  If he has a question about what happened that the

16    witness can't answer --

17              THE COURT:  How long is it?

18              MR. ESSIG:  Your Honor, it is a minute and 15 seconds.

19              THE COURT:  All right.  Mark it as 61C.

20              This is already a part of the government's exhibit;

21    right?

22              MR. ESSIG:  That's correct, Your Honor.

23         (Defendant Couch's Exhibit 61C was entered into evidence.)

24         (The recording was played.)

25              VOICE OF STACY:  Okay.

1       VOICE OF MR. BRENNAN:  ...(unintelligible) criminal

2  activity.

3       VOICE OF STACY:  Go ahead.  Come on.

4       VOICE OF MR. BRENNAN:  Taking some OxyContin,

5  hydrocodone, which is --

6       VOICE OF STACY:  I know.

7       VOICE OF MR. BRENNAN:  I know.  I'm trying to think.

8       VOICE OF STACY:  Norco?

9       VOICE OF MR. BRENNAN:  Yeah, that's what it was,

10  Norco.  He told me hydrocodone.  I thought, well, what is that?

11  And he said:  That's Norco 10.  So I took some of those.

12       VOICE OF STACY:  And so did that help you with your

13  pain?

14       VOICE OF MR. BRENNAN:  Oh, yeah.

15       VOICE OF STACY:  So does -- how much OxyContin were

16  you taking?

17       VOICE OF MR. BRENNAN:  How many?  I don't know what

18  milligram it was.  They were blue.

19       VOICE OF STACY:  Are you taking oxycodone or

20  OxyContin?

21       VOICE OF MR. BRENNAN:  They called it roxy.

22       VOICE OF STACY:  Roxicodone, Roxicodone, it's not

23  OxyContin.  Okay.  Now, the way we work here, the DEA will let

24  us give one long-acting pain medication and one short-acting

25  pain medication.

1979

```
1              VOICE OF MR. BRENNAN:  Okay.
2              VOICE OF STACY:  So your --
3         (The video recording was stopped.)
4    BY MR. ESSIG:
5    Q    Now, you stated that when you presented as a UC, you wanted
6    to throw out red flags; is that correct?
7    A    Yes, sir.
8    Q    And you were asked yesterday by Ms. Griffin if blue is a
9    street slang term to refer to Roxicodone; is that right?
10   A    I believe so, yes, sir.
11   Q    Is blue a street slang term?
12   A    Yes, it is.
13   Q    In your experience, what is a blue?  What is that?
14   A    A Roxicodone 30 milligram.
15   Q    It's a 30 milligram of Roxicodone; is that right?
16   A    Yes.
17   Q    And so that's what you told Stacy Madison on that day that
18   you had taken, was a blue?
19   A    That is correct.
20   Q    And she's a medical professional, it would be reasonable to
21   assume she knew blue was 30 milligrams?
22   A    You would think.
23   Q    And someone on the video used the term "roxy"; is that
24   correct?
25   A    I said -- she asked me if it was oxycodone or OxyContin,
```

DEPUTY PATRICK SHAWN KELLEY - CROSS BY MR. ESSIG

1    and I said that he called them roxies.

2    Q    "He" had called them roxies?

3    A    The guy I was supposedly getting them from off the street.

4    Q    In response to that, she said:  That's Roxicodone?

5    A    That's correct.

6    Q    Roxy is slang; is that right?

7    A    Sir?

8    Q    Roxy is a slang term to refer to Roxicodone?

9    A    Yes.

10   Q    Stacy Madison never used the term "roxy" during your

11   interaction?

12   A    No, sir.

13   Q    Dr. Couch never used the term "roxy" during your

14   interaction with him; isn't that correct?

15   A    That's correct.

16   Q    And also Ms. Griffin asked you yesterday about you

17   buying -- saying that you bought medication off the

18   street.  What we heard there in the video, you never said that

19   you bought it off the street, did you?

20   A    No, I said I got them off the street.

21   Q    That's what you said in the video?

22   A    No, I got them from a friend, it's assumed.

23   Q    You got it from a guy?

24   A    Yeah, I got it from a guy that I work with, it's assumed.

25   Q    Off the street, is assumed?

1   A   Yes, sir; that's right.

2   Q   But you didn't say those words to Stacy Madison?

3   A   No, I didn't.

4   Q   And the red flag you're trying to throw up there is the red

5   flag of diversion; isn't that right?

6   A   Yes.

7   Q   And what diversion is, diversion is any exchange of a

8   controlled substance that doesn't come from a legally

9   prescribing physician; isn't that correct?

10  A   Yes, sir.

11  Q   Any exchange of a controlled substance?

12  A   Purchase, gift.

13  Q   Right.  So if someone's spouse has left their controlled

14  substance and the other spouse takes it, takes it for their

15  pain, that's diversion; right?

16          MS. GRIFFIN:  Your Honor, object to relevance.

17          THE COURT:  Sustained.

18  BY MR. ESSIG:

19  Q   If someone on your crew, when you operated your

20  construction business with $300,000 worth of equipment, if

21  someone on your crew had legally prescribed controlled

22  substances and gave you one, that would be a diversion,

23  wouldn't it?

24          MS. GRIFFIN:  Objection as to relevance.

25          THE COURT:  Overruled.

 1   BY MR. ESSIG:

 2   Q   That would be a diversion?

 3   A   It would be.

 4   Q   And telling her that you had gotten it from a guy doesn't

 5   tell her anything about how you got it?

 6   A   Well, yeah, it does.

 7   Q   Other than it wasn't prescribed?

 8   A   It is, the words are.

 9           MR. ESSIG:  Two more brief clips, Your Honor.  If you

10   will go to, Sam, 6:0 -- go to 6 minutes, please.

11           THE COURT:  Is this out of the same visit?

12           MR. ESSIG:  It is, Your Honor.

13           THE COURT:  Is it part of the government's exhibit?

14           MR. ESSIG:  It is, Your Honor.

15           THE COURT:  Can you just ask him about it, since we've

16   seen it once, can you ask him about that particular episode?

17           MR. ESSIG:  I'll try, Your Honor.

18   Q   Officer Kelley, when you talked about and Ms. Griffin asked

19   you about the discussions with Ms. Madison which the jury saw

20   on this first video about you getting some injections -- is

21   that right?

22   A   Yes, sir.

23   Q   And as a matter of fact, the jury heard you talk about the

24   fact that you're afraid of needles?

25   A   That's what I said, yes, sir.

1    Q   Isn't it true that by the end of that video that the only
2    answer you had ever given her about procedure was:  We'll see?
3    A   That sounds fair, yes, sir.
4    Q   I mean, you never actually committed to getting that
5    procedure, did you?
6    A   No, sir.
7    Q   And the problem there is, as an undercover, not really
8    being Shawn Brennan, you can't get an injection?
9    A   I'm sorry.  I don't follow the question.
10   Q   Wouldn't that create problems for your undercover
11   operation, to actually undergo a surgical procedure?
12   A   I don't know if injections is considered a surgical
13   procedure, but I have heard in the past of other undercovers
14   taking a shot.
15           MR. ESSIG:  Your Honor, just one moment.
16       (A discussion was held off the record between defense
17   counsel.)
18           MR. ESSIG:  No further questions.
19           THE COURT:  All right.  We're going to break for lunch
20   at this time.  It's 12 o'clock.
21           All right.  Ladies and gentlemen, leave your pads on
22   your chairs.  No discussion about the case.  We will break for
23   an hour and 15 minutes.  So be back in the jury assembly room
24   at 1:15, ready to start back up.  We are in recess.
25       (A recess was taken at approximately 11:58 a.m.)

```
 1        (Afternoon session, 1:15 p.m., in chambers, jury not
 2   present.)
 3             MR. SHARMAN:  Judge.
 4             MR. ESSIG:  Judge.
 5             MR. SHARMAN:  How are you?
 6             THE COURT:  Good.  Did y'all have a good lunch?
 7             MR. ESSIG:  A quick one.
 8             MR. SHARMAN:  Your Honor, in light of the Court's
 9   rulings with regard to the audio/video recordings, we'd like to
10   make a proffer for the record to perfect it and also offer as a
11   Court exhibit, not for admission obviously, those audios that
12   we would have offered in evidence had we been allowed to.
13   Mr. Essig will articulate the actual proffer.
14             THE COURT:  All right.
15             MR. ESSIG:  Yes, Your Honor.  So what we want to offer
16   and make a Court exhibit is the entirety of Couch Exhibit 61.
17   I understand the Court has admitted 61A, B, and C.  And then
18   the way the files are identified on here is the same way they
19   are identified in the DEA -- when they were made DEA exhibits
20   and given to us.  And there are a number of clips, the vast
21   majority of which relate to the patient visits of the UC and
22   other portions of what the government played and some of those
23   are overlapped.
24             Of particular importance to us, which we believe has
25   been made relevant through the examination of Officer Kelley,
```

1    are the two phone calls by Dr. W..... to get him into the

2    clinic.  And for a couple of reasons now, we think those have

3    been made more relevant here, is that there was testimony

4    elicited from him -- and I can't remember if it was either on

5    direct or cross, or it might have been part of an objection in

6    front of the jury -- that there was no indication and no

7    evidence that anyone at PPSA or Dr. Couch himself relied upon

8    the records that were faxed from Dr. W..... when he was treated

9    and when he was evaluated.

10          The phone calls -- the second of the two phone calls

11   specifically says when Dr. W..... gets on the phone with the

12   nurse, he asked a question about whether or not Patient Brennan

13   can be allowed to carry in the MRI and medical records on the

14   day he comes.  And the response from Shannon, who is the new

15   patient coordinator, her response is no, that they need to fax

16   the records ahead of time.  The specific statement is that:

17   Dr. Couch is going to want to look at those before he comes in.

18          So we think that statement on the audio negates and

19   rebuts the contention that's been made in front of the jury,

20   that there's no evidence that Dr. Couch relied on those records

21   or that anybody at PPSA relied on those records.

22          THE COURT:  Well, that still wouldn't refute the

23   evidence.  I mean, I understand your proffer, and I'm not

24   saying you can't bring in Shannon or Dr. Couch himself to

25   testify that that's what happened -- or Dr. W....., for that

1    matter.  But what I ruled upon was that it's hearsay.  They

2    can't cross-examine the tape about what transpired and what

3    happened after that.  So that -- but I understand your proffer.

4              MR. ESSIG:  Yes, ma'am.  And I want to complete it a

5    little bit, sort of set out for the record all of our bases for

6    admission.  The other part of it is, Your Honor, that the first

7    three visits by the UC to Dr. Couch and to PPSA, they are

8    specific counts charged in the indictment.  These aren't just

9    conspiracy counts.  The August, September, and November counts

10   are specifically charged counts.

11             We believe, and we think because they are charged

12   counts of the criminal activity alleged, that the remaining

13   phone calls and the remaining interactions, which would include

14   the phone call back to the agents and the phone call with

15   Dr. W..... in the parking lot, that all of the audio and video

16   that captures that is intrinsic to the case, it's intrinsic to

17   those particular charged accounts.  And again, as I articulated

18   before, it completes the story for the jury.  It's relevant to

19   do that and without that the jury's somewhat misled.

20             MR. SHARMAN:  It's also exculpatory.

21             MR. ESSIG:  Yes, Your Honor.  And we contend it's

22   exculpatory and fits with our theory of the case.

23             THE COURT:  Exculpatory?  What he said outside in the

24   parking lot to the agent?

25             MR. ESSIG:  Your Honor, the fact that Dr. W..... was

1987

```
 1    critical to getting the UC in the door.  And if this evidence
 2    would come in, it would show and the jury would clearly see
 3    that, but for the repeated calls from Dr. W....., Officer
 4    Kelley would have never gotten into the clinic.
 5              THE COURT:  Well, like I say, you can put it on in any
 6    other form.  But I think it's not admissible in the form in
 7    which you want to offer it.
 8              MR. ESSIG:  And one final thing, Your Honor, and I
 9    promise I'll be quiet after this.  Specifically what these
10    interactions show was that the treatment of Officer Kelley
11    posing as Shawn Brennan was within the usual course of medical
12    practice, which is, of course, one of the elements of the
13    crime.
14              THE COURT:  Well, what were you not able to put on
15    showing the usual course of medical practice in the video that
16    you wanted to play?
17              MR. ESSIG:  Well, less the video, Your Honor.  I think
18    that's a good point.  Less the video, more so the phone calls
19    from Dr. W......  The referral from Dr. W..... is critical to
20    demonstrating --
21              THE COURT:  Like I say, you can put that on in any
22    other form.  But it was hearsay and not -- no one would have
23    the ability to cross-examine it in the form in which you wanted
24    to put it on.  So that's why I ruled as I did.
25              MS. GRIFFIN:  Your Honor, we object to that whole
```

1    thumb drive being put in as the proffer because he's not
2    attempted to put in everything in there.  So we would ask that
3    this be a timely objection by them or a timely proffer, but
4    that they do something to articulate what everything on that
5    thumb drive is for the record.
6              MR. ESSIG:  Your Honor, I will note we did offer the
7    entire exhibit and the Court asked us, instead of just
8    admitting it all at one time, to take it clip by clip as we
9    went to admit it.
10             THE COURT:  Right.
11             MR. ESSIG:  But we did offer it.  I mean, our offer on
12   cross-examination was the entirety of it.
13             THE COURT:  I still don't know what else is on the
14   entire stick.
15             MR. ESSIG:  Yes, I understand that.  Your Honor, the
16   only thing I can do is just -- I can proffer the file names and
17   the relevant dates that are on here.
18             THE COURT:  I mean, but as far as my ruling is, I
19   don't know how I would rule on the ones that you haven't
20   offered.  I mean, you described the ones you wanted to
21   offer.  So I think what you need to do is to put each clip on a
22   separate piece of media that you attempted to offer that I
23   denied and make that a Court exhibit.  The others you haven't
24   described or -- I mean, I don't know what else you want to
25   offer that you didn't offer in the courtroom.

1      MR. ESSIG:  Well, I think, Your Honor, I mean, rather

2   than giving a detailed proffer for each one, if we put it on a

3   separate piece of media, it's going to be -- you know, it's

4   probably going to be 15 different pieces of --

5      MR. SHARMAN:  What I suggest, Your Honor, is if we

6   mark the one we have as a Court exhibit, we can submit a

7   separate written description of what each one is, if the

8   government believes it hasn't been offered --

9      THE COURT:  What I say is you haven't offered all of

10   it.  I said I would rule on them individually as they were

11   offered.  I didn't prohibit you from offering all of them, if I

12   found them admissible.  But you only -- you played, what, three

13   of them?  And then the others you said were the same as what

14   the government had already offered.  And beyond that, I don't

15   think you attempted to offer anything.  Am I wrong?  I mean, I

16   denied the one outside.  I denied the phone conversations from

17   the doctor to the clinic -- from the chiropractor to the

18   clinic.  But the other ones I denied were him outside -- him,

19   the witness, Kelley -- outside the office.

20      MR. ESSIG:  Well, Your Honor, for simplicity's sake

21   what we can do is we can mark as a Court exhibit, if it's going

22   to make it simpler, we can mark as a Court exhibit just the

23   specific recordings that the Court sustained the objections to,

24   which would be the two phone calls from Dr. W..... and the

25   interaction in the parking lot.

```
 1          THE COURT:  Yes, I think that would be preferable.
 2          MR. ESSIG:  Okay.
 3          THE COURT:  Because, you know, if in the event it ever
 4  goes up on appeal, the Court of Appeals will not be able to
 5  determine what is on that Court exhibit that was, you know,
 6  distinguished from what I actually ruled on.  And that's what
 7  the record actually needs to reflect.
 8          MR. SHARMAN:  We can do that.
 9          THE COURT:  Okay.
10          MR. SHARMAN:  Do we want to talk about Burt?
11          MR. ESSIG:  Yes.
12          MR. KNIZLEY:  Talking about Burt, I need to get my
13  notes.  Judge, Agent Burt is going to take the witness stand.
14  His exhibits are basically emails largely involving
15  Dr. Ruan.  There are some objections I will have to them and I
16  think Couch has objections as well.  I don't know if the Court
17  wants to take it as it's presented or would prefer to do it
18  right now, to see what the Court's going to allow so it won't
19  interrupt Chris as he's presenting his presentation.
20          There's a number of exhibits, about nine, and they've
21  got subparts.  And we object to some, we object to some of the
22  emails on various grounds and they do too.  Do you want to take
23  that up now or would you want to take it up as they come in?
24  And it would be about four or five objections on Ruan's part.
25          THE COURT:  I would prefer to do them as they are
```

```
 1   offered.  But I don't want to inconvenience the jury too
 2   much.  I mean, how much time are you talking about this is
 3   going to take?
 4           MR. BODNAR:  Well, certainly I think one in particular
 5   we had talked about would require us coming up at side bar to
 6   discuss it any further.  And that's this one that we're
 7   getting, the 9-8 --
 8           MR. KNIZLEY:  The Court's going to have to see every
 9   one to look at it to see.  You're going to have to look at it,
10   say yes or maybe just parts of it are not admissible.
11           THE COURT:  Well, let's just do it when he attempts to
12   introduce them.  Because --
13           MR. ESSIG:  Do you think -- I'm going to ask -- I
14   think one of them we should take up now.
15           MR. KNIZLEY:  Here's one you sort of --
16           MR. ESSIG:  Right, right.  This one.
17           THE COURT:  What is it?
18           MR. SHARMAN:  Famous last words.
19           MR. BODNAR:  Here is a copy.
20           MR. ESSIG:  Judge, what this is, it's an email from
21   Chris Lento and Galena, Dr. Ruan, and others.  It does not
22   include Dr. Couch.  But it's discussing criminal charges
23   against a Dr. Awerbuch in the Eastern District of Michigan.  We
24   would object to those references in the body of the email, but
25   most objectionable, Your Honor, is that attached to the email
```

1992

1    is the criminal complaint, not just the face page of the

2    criminal complaint, but a 38-page affidavit by an agent

3    describing probable cause for the basis for the arrest of

4    Dr. Awerbuch and containing, of course, his legal conclusions

5    about probable cause to arrest him, all of which is completely

6    irrelevant to this case and it's got a tremendous danger of

7    confusing the jury, having them to parse out a probable cause

8    determination of guilt.  And I will note, Your Honor, the

9    conduct for Dr. Awerbuch that's described in the complaint is

10   quite similar to the conduct the doctors are charged with in

11   this case.  As a matter of fact, in many cases the body of the

12   complaint and the description of the complaint mirrors almost

13   exactly the body of the indictment in this case.

14           MR. SHARMAN:  I believe Dr. Ruan and Dr. Couch are

15   referenced in some way.

16           MR. KNIZLEY:  NPI number, I believe.

17           MR. ESSIG:  Right.  It's a signed complaint too,

18   Judge, of course, indicating that the judge found probable

19   cause.  So an agent's belief of probable cause and a judge's

20   finding of probable cause regarding criminal activity in a

21   completely different district and a completely unrelated matter

22   is highly prejudicial.

23           MR. BODNAR:  And, Your Honor, from the United States'

24   position, this email was attached by Chris Lento along with the

25   screenshot that's right here, which that screenshot is tabbed

1   right here -- that's page 38 of the indictment -- and which the

2   agent can identify that that is Dr. Couch, that is Dr. Ruan,

3   and why this is an important email.  This came from Chris Lento

4   on June 5th, 2014.  On June 6th, 2014, Dr. Ruan sends a flurry

5   of emails out to a variety of individuals at different

6   universities, saying he no longer wants his Insys checks coming

7   to him and he started donating them to the University of

8   Wisconsin, LSU, South Alabama.

9          That's something that Dr. Ruan's counsel's already

10  brought up, that he started donating his Insys things.  And

11  there's a series of emails after this that show that he -- in

12  fact, he talks about the only money that he's donating is Insys

13  money.  And it comes the day after he learns that Dr. Awerbuch,

14  who he's acquainted with, was arrested and the fact that he is

15  listed and it's highlighted for him by Chris Lento he and

16  Dr. Couch are listed in the Gavin Awerbuch criminal complaint.

17         Now, there is no evidence that Dr. Couch was ever made

18  aware of this and Dr. Couch does not ever change his, his

19  receipt of Insys money.  But Dr. Ruan changes his the very next

20  day -- or begins the process the very next day, saying he's

21  going to start donating these.  And then, in fact, when Amy

22  White gets up, FBI Special Agent Amy White gets up, she will

23  show that he did in fact start donating from the very next day

24  forward all but one of his checks from Insys.

25         THE COURT:  All right.  And tell me what the -- tell

```
 1   me what the page 38 of the complaint or 35 of the complaint
 2   indicates?
 3            MR. BODNAR:  This is --
 4            THE COURT:  Is it the Alabama --
 5            MR. BODNAR:  Yes.
 6            THE COURT:  -- prescriber ID?
 7            MR. BODNAR:  And by the ending NPI number, 01 is the
 8   one for Dr. Couch, 74 is for Dr. Ruan, and other evidence
 9   that's going to come in later too from Medicare shows that they
10   do rank right behind Gavin Awerbuch, who is here (indicating).
11   He can identify those as being Dr. Ruan and Dr. Couch.  And I
12   think it was clear to Dr. Ruan that it was at least him being
13   referenced in there, because he changed his behavior less than
14   24 hours later.
15            We don't intend to read through the indictment.  We
16   intend to show that it was attached and sent to Dr. Ruan with
17   the screenshot and show what page that screenshot goes to.  And
18   Special Agent Burt can identify, by the end of the NPI number
19   being in Alabama, those are Dr. Couch and Dr. Ruan.
20            THE COURT:  Can you not present this information --
21   this email with the attached screenshot without having the
22   entire affidavit?
23            MR. BODNAR:  We could, but we think that the fact
24   Dr. Ruan received the entire affidavit, which goes into talking
25   about the fact that he was charged with prescribing outside the
```

1       usual course of professional practice Subsys in particular, is

2       highly relevant because that -- that's exactly what Dr. Ruan

3       was doing and we believe that's exactly why he changed his

4       behavior in terms of receiving Insys checks thereafter.

5                    THE COURT:  You know, if Dr. Ruan takes the stand, you

6       will certainly be able to introduce this that he received, you

7       know, to question him about it.  But I think that at this

8       juncture I would allow the admission of the email, including

9       the screenshot that was with it, and then the page from the

10      actual complaint or affidavit.

11                   MR. BODNAR:  So to be clear, then, that's page one and

12      two of this and then the one that is flagged right here?

13                   THE COURT:  And then page 35 of 38.

14                   MR. BODNAR:  We can adjust that.

15                   THE COURT:  And have the agent explain that this was

16      just one page out of the complaint or the affidavit in support

17      of the complaint of this Dr. Awerbuch.

18                   MR. BODNAR:  Yes, Your Honor.

19                   MR. ESSIG:  The other thing, I think with this

20      document, including the email too, there's significant

21      confrontation issues.  None of these people can be confronted.

22      They are all offering conclusory statements about criminal

23      activity of other individuals.

24                   THE COURT:  Well, since Dr. Ruan was the recipient of

25      this information, for what it's worth, that's all it's

1   introduced for, is what is evident in what he received.  So, I

2   mean, there's no -- we're not going to get into the facts of

3   Dr. Awerbuch's case other than the fact that he was a top

4   subscriber of Subsys.

5              MR. BODNAR:  No, Your Honor.  And that Couch and Ruan

6   were listed in that criminal complaint or they were identified

7   as also being top --

8              THE COURT:  Identified, not listed.  There were no

9   charges against them.  You need to make clear there were no

10  charges against them.

11             MR. BODNAR:  Yes.

12             THE COURT:  But the information as to how much Subsys

13  they prescribed was in the information.

14             MR. BODNAR:  Yes, Your Honor.

15             THE COURT:  In the information, but not charged

16  against them.

17             MR. BODNAR:  Yes, Your Honor.

18             THE COURT:  Okay.

19             MR. SHARMAN:  Yes, ma'am.

20             MR. ESSIG:  All right.

21             THE CLERK:  Mr. Bodnar, you mentioned drugs to be

22  introduced?

23             MR. BODNAR:  Yes, Your Honor.  We have -- one of the

24  things that Special Agent Burt is going to do at the beginning

25  is he received that box, the purple box that's already in

1   admission -- or into evidence of Subsys.  He's going to say

2   that during the interview SB........., not saying what she

3   said, but that she brought that box of Subsys and it was full

4   of Subsys at the time.  We're not going to offer the Subsys

5   drugs, which are in a sealed plastic, for admission, but we'd

6   like to show them to the jury so they can actually see what the

7   sealed packages looked like.  She did the same thing, she

8   brought Abstral and turned it in to --

9           THE COURT:  Who?

10          MR. BODNAR:  SB.........  She was a Ruan patient.

11          THE COURT:  Okay.

12          MR. BODNAR:  She turned it in to DEA.  So we would

13   like Special Agent Burt to identify it.

14          THE COURT:  Demonstrate it?

15          MR. BODNAR:  And to demonstrate it, just pass it to

16   the jury.  We're not going to offer it as evidence, because it

17   is the drugs.

18          THE COURT:  Just to see what it looked like.

19          MR. BODNAR:  So do you want a sticker on it, a

20   numbered sticker, or not?

21          THE COURT:  No.  You can just identify it as the

22   contents of that box and then the other one is what she showed

23   him was Abstral..

24          MR. BODNAR:  Yes, Your Honor.

25          THE COURT:  Anything else before we go back?

DEPUTY PATRICK SHAWN KELLEY - REDIRECT BY MS. GRIFFIN

```
 1                MR. SHARMAN:  No, ma'am.

 2                THE COURT:  Go ahead and call for the jury.

 3                THE CLERK:  Yes, ma'am.

 4                MR. SHARMAN:  Thank you, Judge.

 5           (A recess was taken at approximately 1:33 p.m.)

 6           (In open court, 1:38 p.m., defendants and jury present.)

 7                THE COURT:  All right, ladies and gentlemen.  I want

 8      to apologize for being a little late calling you up.  When we

 9      do something like that, you need to understand that I'm usually

10      taking up legal issues with the lawyers.  It's just trying to

11      save time rather than to have to constantly interrupt the

12      testimony by going to the side bar.

13                You know, a side bar is one of the necessary evils of

14      trying a case, because there are many times that legal issues

15      come up as to what evidence is proper for you to hear.  And

16      rather than send you downstairs and bring you back up multiple

17      times during the day, we do it at side bars just as a time-

18      saving device.  I hesitate to do it a whole lot, simply because

19      it does interrupt the progress of the trial.  But I want you to

20      understand we weren't wasting your time when we were late

21      calling you up.  So thank you.

22                All right.  Ms. Griffin, you may continue.

23                          REDIRECT EXAMINATION

24      BY MS. GRIFFIN:

25      Q   On redirect, Agent Kelley, I show you what was previously
```

 1   gone over with you, Government's Exhibit 20-23, the examination

 2   report from Dr. W......

 3          Turning to the second page of that, does that indicate

 4   that the date of your pain has been for about three weeks?

 5   A   Yes, ma'am.

 6   Q   You've previously been shown your first visit history and

 7   physical report from Government's Exhibit 20-22.  Is that

 8   right?

 9   A   Yes, ma'am.

10   Q   Now, it doesn't indicate, or does it indicate, who the

11   referring care provider was?

12   A   No, ma'am.

13   Q   Does it indicate that the lower back has been present for

14   one year?

15   A   Yes, ma'am.

16   Q   And that differs from what you have just seen in

17   Government's Exhibit 20-23 from Dr. W.....; is that right?

18   A   Yes, ma'am.

19   Q   Do you have any indication if this examination report from

20   Dr. W..... was read by Bridgette, Jennifer, Ben, Stacy, or

21   Dr. Couch?

22   A   I have no idea.

23   Q   Did they ever tell you -- Bridgette, Jennifer, Ben, Stacy,

24   or Dr. Couch -- that they had talked to Dr. W..... about your

25   report?

2000

1   A   No, ma'am.

2   Q   Did you ever observe Bridgette, Jennifer, Ben, Stacy, or

3   Dr. Couch looking at this report, Government's Exhibit 20-23?

4   A   No, ma'am.

5   Q   Do you know if this was even in your patient file from

6   PPSA?

7   A   No, ma'am, I do not.

8   Q   You do know -- or do you know -- that your MRI report was

9   in the PPSA file?

10  A   Yes, ma'am, it was.

11  Q   I show you part of that.  And was there in fact a fax cover

12  sheet dated August 4th, '14, referencing your MRI appointment

13  for the next day?

14  A   Yes, ma'am.

15  Q   There was not any -- or was there any such document in your

16  patient file referencing that the history had been provided to

17  PPSA?

18  A   Could you ask me that one more time?

19  Q   Was there anything in your patient file that referenced

20  that the examination report from Dr. W..... had been provided

21  in your PPSA patient file?

22  A   No, ma'am.

23  Q   Now, do you have any way of knowing if Dr. Couch read your

24  history and physical report for the August 5th visit?

25  A   No, ma'am.

1    Q    He obviously could tell that you weren't a female; right?

2    A    Well, I would hope, yes, ma'am.

3    Q    He didn't make any comment that this was wrong, this needs

4    to be corrected?

5    A    No, ma'am.

6    Q    Now, the defense indicated that you might have had another

7    eight to 10 pages that you filled out about your history that

8    didn't appear to be in your file.  Do you remember that being

9    addressed with you?

10    A    Yes, ma'am.

11    Q    On your patient information form, was there anything on any

12    other forms where you said you had been in pain for a year?

13    A    No, ma'am.

14    Q    Was there anything that said you had been prescribed

15    opioids by a doctor before?

16    A    No, ma'am.

17    Q    And when you mentioned to Stacy, you used the word that you

18    had had to admit criminal activity, did you not?

19    A    Yes, ma'am, I did.

20    Q    And did she say:  We don't want you to admit any criminal

21    activity?

22    A    No, ma'am.  She egged me on, to:  Come on, give it to me.

23    Q    Did Dr. Couch address with you that you should not be

24    engaging in criminal activity as to opioids?

25    A    No, ma'am, not at all.

1   Q   Did anybody ever tell you that you shouldn't be stealing,

2   buying, or using opioids off the street?

3   A   No, ma'am.

4   Q   Now, on your history and physical report that was in your

5   file, you didn't answer or did you answer the questions about

6   how you felt?

7          MR. ESSIG:  Objection, Your Honor.  This has already

8   been asked on direct.  We covered this.

9          THE COURT:  We've already been over this.

10  BY MS. GRIFFIN:

11  Q   Did anyone ask you those questions while you were in the

12  clinic?

13  A   Yes.  I was asked a couple of different times throughout

14  the period of the different undercover visits about my pain

15  level and I always gave the answer two to three.

16  Q   You never gave the answer over five; Is that right?

17  A   I never said 5, ever.

18  Q   Did anybody comment that you had not filled out this part

19  of that form?

20  A   No, ma'am.

21  Q   Do you have direct knowledge that Bridgette, Jennifer, Ben,

22  Stacy, or Dr. Couch had reviewed this new patient health

23  history and pain questionnaire?

24  A   No, ma'am, I do not.

25  Q   During the video that counsel for Dr. Couch showed you,

1   there appeared to be a date at the bottom right-hand corner of

2   August the 5th of '14.  Is that right?

3   A   Yes, ma'am.

4   Q   And then earlier on direct examination part of the video

5   appeared to be dated in 2007.  Could you explain the difference

6   to us for the dates on the different parts of the video?

7   A   It's just the video equipment we used, we used every time

8   I've ever done this.  We've always used several pieces of

9   equipment.  We don't use just one, so in case one fails.  So

10  sometimes we can't program the time and date on them.  And

11  that's all that is, is a time stamp, and we're not able to

12  program the time and date.  That's why we write in our reports

13  the actual date and time.

14  Q   When you say you used several pieces of equipment, were you

15  wearing two separate recorders when you went in PPSA?

16  A   Yes, ma'am, both video and audio recorders.

17  Q   And they were two separate recorders, though; right?

18  A   Yes, ma'am, two totally different devices.

19  Q   Were they -- was the date on one 2007?

20  A   Yes, ma'am.

21  Q   On that video?

22  A   Yes, ma'am.

23  Q   And was the date on the other one the actual date of the

24  occurrence?

25  A   Yes, ma'am.

1    Q   You're not suggesting that the 2007 date occurred any other

2    time than the dates you've testified to, are you?

3    A   No, ma'am.  It all took place in 2014 and '15.  The 2007 is

4    just -- you can't change that particular device without

5    revealing the device.  It's a newer piece of equipment we had

6    just gotten, and actually I had ordered it because I did the

7    tech work for that -- for this case.  But we couldn't program

8    it.  There was no way to program it.  It was like just in

9    there.  So we couldn't change it.  And it said what it said on

10   its own.

11   Q   Did anyone at PPSA ever ask you about any examination that

12   Dr. W..... had done?

13   A   No, ma'am.

14   Q   Also you indicated to counsel for Dr. Couch that there were

15   hours you spent in the waiting room?

16   A   Yes, ma'am.

17   Q   Is that right?

18   A   Yes, ma'am.

19   Q   Were there any visits where you saw Ben, Bridgette, Stacy,

20   Dr. Couch, Jennifer that were not shown to the jury?

21   A   No.

22       (A discussion was held off the record between counsel.)

23   BY MS. GRIFFIN:

24   Q   The time frame where you actually saw Bridgette, Jennifer,

25   Ben, Stacy, or Dr. Couch, not some other person taking blood

1  pressure or taking a urine sample, was played for the jury; is

2  that -- is that true?

3  A   Yes, that's accurate.  We did cut out some when someone

4  would leave the room.  But other than that, no (shaking head

5  negatively).  Every time I was with the doctor or with the

6  ladies and gentlemen you talked about, it was all videoed.

7  Q   Was there a portion cut out where Isis talked about going

8  back to school?

9  A   Yes, there was.

10 Q   Was there a portion cut out where Jennifer talked about

11 shipping some items from north Alabama?

12 A   There was.

13 Q   The one time you saw Dr. Couch, did you observe him look at

14 the electronic file?

15 A   I did not.

16 Q   Did you observe him look over anything that you thought was

17 from Dr. W.....?

18 A   No, ma'am.

19       MS. GRIFFIN:  If we could, Your Honor, play just the

20 clip where Dr. Couch comes in the room on the August the 5th,

21 2014, video?

22     (The video recording was played.)

23       VOICE OF DR. COUCH:  How are you doing?

24       VOICE OF STACY:  This is Dr. Couch.

25       VOICE OF DR. COUCH:  How are you?

```
 1          VOICE OF MR. BRENNAN:  Good.  How are you?

 2          VOICE OF STACY:  Mr. Brennan has low-back pain that's

 3   been pretty severe for about a year.  He's a heavy equipment

 4   operator.  Here's his MRI.

 5          VOICE OF DR. COUCH:  Okay.

 6          VOICE OF STACY:  And we're going to do a facet joint

 7   block.

 8          VOICE OF DR. COUCH:  Okay.  Does it go down your legs

 9   or just in your back?

10          VOICE OF MR. BRENNAN:  It goes down the left leg just

11   a little bit.

12          VOICE OF DR. COUCH:  Where?

13          VOICE OF MR. BRENNAN:  Right around here.  Not far.

14          VOICE OF DR. COUCH:  Right in here?

15          VOICE OF MR. BRENNAN:  Yeah, mostly right there.

16          VOICE OF DR. COUCH:  Okay.  We'll try that first and

17   see if that helps.  Okay?

18          VOICE OF MR. BRENNAN:  All right.

19          VOICE OF DR. COUCH:  Get you some medicine going.

20          VOICE OF MR. BRENNAN:  Okay.

21          VOICE OF DR. COUCH:  Any questions?

22          VOICE OF MR. BRENNAN:  No, sir.  She's pretty much

23   thorough.

24          VOICE OF DR. COUCH:  She's thorough.

25          VOICE OF MR. BRENNAN:  (Inaudible.)
```

DEA SA MICHAEL BURT - DIRECT BY MR. BODNAR

 1          VOICE OF DR. COUCH:  Thank you.

 2          VOICE OF MR. BRENNAN:  All right.

 3      (The video recording stopped playing.)

 4  BY MS. GRIFFIN:

 5  Q   Dr. Couch's attorney had asked you about it being important

 6  for a bedside manner and engaging in conversation with a

 7  patient.  Do you recall that?

 8  A   Yes, ma'am.

 9  Q   Is this the only conversation you had in the five visits

10  that you were there with Dr. Couch?

11  A   Yes, ma'am.

12          MS. GRIFFIN:  That's all I have of the witness, Your

13  Honor.

14          THE COURT:  All right Mr. Kelley, you may step

15  down.  Thank you.

16          MR. BODNAR:  United States calls Special Agent Mike

17  Burt.

18                  DEA SA MICHAEL BURT

19          was sworn and testified as follows:

20          THE WITNESS:  Yes, I do.

21          THE CLERK:  Thank you, sir.  Please be seated.

22                  DIRECT EXAMINATION

23  BY MR. BODNAR:

24  Q   Good afternoon.

25  A   Good afternoon.

DEA SA MICHAEL BURT - DIRECT BY MR. BODNAR

1    Q    Could you please bring your microphone a little bit closer?

2         Could you please introduce yourself to the jury?

3    A    My name is Michael Burt, B-U-R-T.  I'm a federal agent with

4    the Drug Enforcement Administration.

5    Q    Is that what's more commonly known as the DEA?

6    A    Yes, sir.

7    Q    And are you a special agent with the DEA?

8    A    Yes, sir, referred to as special agents.

9    Q    How long have you worked for the DEA?

10   A    This is my -- tomorrow it will be 13 years.

11   Q    Prior to working at the DEA, did you have any previous law

12   enforcement background?

13   A    Yes, sir.  I worked for the Mississippi Bureau of Narcotics

14   for approximately seven years.  So this is my 20th year in drug

15   law enforcement on the state and federal level.

16   Q    And prior to working in law enforcement in Mississippi,

17   were you in the military?

18   A    Yes, sir, I was in active duty in the Air Force for

19   approximately five and a half years.

20   Q    And during your time as a Mississippi narcotics officer and

21   as a DEA special agent, did you receive training on

22   pharmaceutical cases, pill mill cases?

23   A    Yes, sir.

24   Q    And prior to working here in Mobile, were you stationed at

25   a different DEA office?

```
 1    A   Yes, sir.  I was stationed in Miami Field Division.

 2    Q   And while in Miami, did you have an occasion to work

 3    pharmaceutical diversion cases?

 4    A   Yes, I did.

 5    Q   Just without going into the cases, can you just give the

 6    jury a sense of your experience level working these types of

 7    cases?

 8    A   It was a case during the Florida pill mill days of 2008

 9    to 2010.  And we worked one -- probably the most notorious pill

10    clinics down in south Florida at the time.  It resulted in

11    the --

12            MR. KNIZLEY:  Your Honor, I object.  This is not

13    relevant to the issues in the case and not -- not a proper

14    foundation for whatever his future testimony may be in relating

15    the events of a separate and different -- factual and separate

16    and different investigation and the results of the

17    investigation.

18            THE COURT:  Well, let's just -- let's just find out

19    how many investigations but not necessarily the results.

20    BY MR. BODNAR:

21    Q   Without going into results or going into the details about

22    that, just your experience, how many of these type cases have

23    you worked before?

24    A   At least three to four.

25    Q   And the one that you started to describe, was that a very
```

2010

```
 1    lengthy investigation?
 2    A   Yes, sir.  It was a five-year case.
 3    Q   So for approximately how many years have you been working
 4    on these type of pill mill type cases?
 5    A   I would estimate nine or 10 years.
 6    Q   And during your time working pill mill cases, have all pill
 7    mills been run the exact same way?
 8    A   No, sir, they're not.
 9    Q   Are there different types of ways that these cases can be
10    run?
11    A   That's correct.
12    Q   With regard to Dr. Ruan and Dr. Couch, were you involved in
13    the investigation into the two defendants here?
14    A   Yes, sir, I was.
15    Q   Were you one of the -- were you the lead case agent for
16    DEA?
17    A   Yes, sir.
18    Q   Can you explain to the jury, in a case this large do agents
19    typically delegate portions of the investigation to other
20    individuals?
21    A   Yes, sir, we do.  Many times that -- when a cases is this
22    big, you have to delegate certain workload out.  One agent
23    can't handle all aspects of the case.  So we have to depend on
24    our co-case agents and other agents to assist.
25    Q   And specifically in this case were aspects of the
```

2011

1  investigation delegated to the FBI or to even other people

2  within DEA?

3  A   Yes, sir.

4  Q   So despite being the lead case agent, do you have first-

5  hand knowledge of every aspect of this investigation or not?

6  A   No, sir, I don't have first-hand knowledge of aspects.

7  Q   Of every aspect?

8  A   Of every aspect.

9  Q   Special Agent Burt, in connection with this case did you --

10  were you involved in interviews with certain patients?

11  A   Yes, sir.

12  Q   Were you involved with interviews of a patient named

13  SB.........?

14  A   Yes.

15  Q   What if anything did SB......... bring to the interview

16  that day?

17  A   Ms. B... brought unused Subsys and Abstral products that

18  she did not -- came from PPSA but no longer wanted.

19  Q   I'm going to show you what has previously been admitted as

20  Government's Exhibit 9-10.  Is this the box that Ms. B...

21  brought to you that day?

22  A   Yes, it is.

23  Q   And for what drug?

24  A   For Subsys.

25  Q   And at the time she -- is the box currently empty?

DEA SA MICHAEL BURT - DIRECT BY MR. BODNAR

1    A   Yes, other than a few inserts.

2    Q   At the time she brought it to you, did it actually have

3    Subsys sprays inside of it?

4    A   Yes, it did.

5    Q   Special Agent Burt, I'm showing you what is sealed in an

6    evidence bag, appears to be Subsys 600.  Are these the items

7    that were inside that box when Ms. B... brought it to you?

8    A   Yes, sir.  This is the Subsys 600 microgram spray.

9    Q   And what -- who's doctor was Ms. B...?  Who was her doctor?

10   A   Dr. Ruan.

11           MR. BODNAR:  United States does not offer for

12   admission but just to publish to the jury so that they can see

13   the contents of what the box looked like.

14           THE COURT:  That's fine.

15   BY MR. BODNAR:

16   Q   And Special Agent Burt, is this sealed so that none of the

17   medication can get on the jurors?

18   A   Yes, sir, it is sealed.  And also, everything is

19   encapsulated and concealed in packaging.

20           THE COURT:  All right.  So just pass that along, one

21   juror to the next.  And when it comes all the way back around

22   they'll pick it up.

23   BY MR. BODNAR:

24   Q   Special Agent Burt, while the last few jurors are looking

25   at that, during that interview did Ms. B... also bring you

1   unused boxes of Abstral?

2   A   Yes, sir.

3   Q   I'm going to show you what has -- is in two clear plastic

4   evidence bags and see if you can identify what these are.

5   A   Yes, sir.  These are Abstral sublingual tablets 600

6   micrograms.

7   Q   And for which patient?

8   A   SB..........

9   Q   And prescribed by which doctor?

10  A   Dr. Ruan.

11  Q   And similar to the Subsys, is this Abstral sealed in a bag

12  so that the jurors can touch it and it will -- none of the

13  medication will get on them?

14  A   That's correct.

15      MR. BODNAR:  United States does not move to admit but

16  to publish to the jury, the Abstral.

17      THE COURT:  All right.  You may pass those around.

18  BY MR. BODNAR:

19  Q   Special Agent Burt, based on your training and experience

20  in the DEA, are you familiar with what a DEA number or a DEA

21  license -- like what's sometimes referred to a DEA license, do

22  you know what that is?

23  A   Yes.

24  Q   Could you please explain to the jury what is a DEA license?

25  A   A DEA license is what a doctor uses that -- prescriptions

2014

```
 1    are ordered under his DEA number through wholesalers and,

 2    things of that nature.  So DEA tracks the amount of scheduled

 3    controlled substances ordered under a doctor's DEA number.

 4    Q   Does every doctor automatically have a DEA number or do

 5    they have to apply for a DEA number?

 6    A   It's something you have to apply for.

 7    Q   Is there a certain type of drugs that cannot be prescribed

 8    if you don't have a DEA number?

 9    A   Yes, there are.

10    Q   Is that controlled substances?

11    A   That's correct.

12    Q   So is it -- do you have to have a DEA number before you can

13    prescribe controlled substances?

14    A   That's correct; you must have a DEA number to prescribe

15    controlled substances.

16    Q   And are all DEA numbers the same, such as allowing you to

17    prescribe II through V no matter what?

18    A   Most medical doctors have II through V privileges to

19    prescribe controlled substances.

20    Q   What about nurse practitioners?  Can a nurse practitioner

21    receive a DEA number?

22    A   Yes, they can.

23    Q   Do they have to go through an application process like a

24    doctor?

25    A   Yes, they do.
```

1  Q   Can there be a more restrictive -- are there more

2  restrictive than just the general II through V prescribing?

3  A   Yes.  A nurse practitioner typically prescribes III through

4  V, not II through V.

5  Q   And III through V if they have a DEA license?

6  A   That's correct.  That's correct.

7  Q   And during the course of this investigation did you learn

8  if an individual named Justin Palmer obtained a DEA license?

9  A   Yes, he did.

10  Q   When did Justin Palmer obtain a DEA license?

11  A   October 2014.

12  Q   What kind of DEA license did he receive in October of 2014?

13  A   He -- for that license Mr. Palmer obtained he was allowed

14  to prescribe schedule III through V controlled substances.

15  Q   Prior to October of 2014, could Justin Palmer prescribe any

16  controlled substance?

17  A   No, sir.  He could not.

18  Q   After October 2014, could he prescribe schedule II drugs?

19  A   He could not.

20  Q   If a nurse practitioner that works under a doctor has their

21  own DEA number, can they sign it using the doctor's signature?

22  A   No, they cannot.

23  Q   If a nurse practitioner works under a doctor and doesn't

24  have a DEA number, can he sign a prescription with the doctor's

25  name?

2016

```
 1   A    No, he cannot or she cannot.
 2   Q    Special Agent Burt, during the course of this investigation
 3   were search warrants issued for a variety of email addresses?
 4   A    Yes, sir.
 5   Q    And did those include xiuluruan@yahoo.com?
 6   A    Yes, sir.
 7   Q    And one for John Patrick Couch as well?
 8   A    Yes, sir.
 9   Q    In addition, were emails provided to the DEA and the FBI
10   from Galena Biopharma?
11   A    Yes.
12   Q    And how about from Insys Therapeutics?
13   A    Yes.
14   Q    During the course of this investigation was part of your
15   role to help examine the emails that came in pursuant to search
16   warrants?
17   A    Yes, they were.
18   Q    I'm going to show you now what has been marked as
19   Government's Exhibit 9-1, subparts (1) through (2) --
20        (A discussion was held off the record between counsel.)
21   BY MR. BODNAR:
22   Q    -- and ask if you can identify what these are for the
23   Court.
24   A    Yes, sir, I can.
25   Q    And what are they?
```

DEA SA MICHAEL BURT - DIRECT BY MR. BODNAR

2017

```
 1  A   These are emails.
 2  Q   And were these emails obtained pursuant to a search warrant
 3  for the xiuluruan@yahoo.com?
 4  A   Yes, they were.
 5          MR. BODNAR:  United States moves to admit Government's
 6  Exhibit 9-1 and 9-2.
 7          MR. KNIZLEY:  Judge, we have an objection to 9-2 in
 8  part, or particularly 9-2(1).
 9          THE COURT:  What is the difference between 9-1 and
10  9-2?
11          MR. BODNAR:  Sorry.  It should be 9-1 part (1) and
12  9-1 part (2).
13          MR. KNIZLEY:  We have no objection to those exhibits.
14          THE COURT:  All right.  Mark them in.
15      (Government's Exhibits 9-1(1) and 9-1(2) were entered into
16  evidence.)
17  BY MR. BODNAR:
18  Q   Special Agent Burt, I'm now showing you what has been
19  admitted as Government's Exhibit 9-1(1).  Can you please tell
20  the jury what this is?  Who is this email from and to?
21  A   This is an email from Xiulu Ruan on December 4th, 2011, to
22  Allan Kaye.
23  Q   During the course of your investigation, did you learn who
24  Dr. Allan Kaye is?
25  A   Mr. Kaye is a doctor of anesthesiology at LSU Medical
```

1    Center.

2    Q   And could you please read the email to the jury?

3    A   Subject:  Regarding Introduction and Interest.  Allan, it

4    was so nice talking to you.  I look forward to meeting you in

5    person sometime in the near future.  What is your schedule like

6    in general?  Is Friday bad for you?  I have two NPR and a pump

7    nurse.  Friday will be easier to reschedule my folks.  Here in

8    Alabama, NPR cannot sign scheduled drugs.

9    Q   I'm going to stop you there for a second.  Is Dr. Ruan

10   correct that a nurse practitioner cannot sign schedule drugs?

11   A   That is correct.

12   Q   Unless they have obtained what?

13   A   A DEA license for prescribing schedule IIIs and below.

14   Q   And at this point, in December of 2011, had Justin Palmer

15   received a DEA license?

16   A   No.  He had not.

17   Q   Can you finish starting with "so"?

18   A   So, if I am out, NPR will need to be out as they cannot

19   sign prescription.  So Friday would be the best for me.

20   Q   All right.  Let me stop you there.  I'm going to now show

21   you what has been admitted as Government's Exhibit 9-1(2).  And

22   it looks like an email and a response starting with this bottom

23   email.  Who was this email written by and what is the date?

24   A   It is written by xiuluruan@yahoo.com and dated July 8th,

25   2014.

1  Q   And on this date did Justin Palmer have a DEA license?

2  A   No, sir.  He did not.

3  Q   Was he able to prescribe any drugs, any controlled

4  substances of any type on that date?

5  A   He could not.

6  Q   Starting with "Pat," could you please read the email?

7  A   Pat, have you been watching the news?  Alabama is the

8  leading state with the most opioid prescriptions written.

9  Q   And at this point is Dr. Ruan correct, that in 2014 Alabama

10  was the leading state for opioid prescriptions?

11  A   Yes, it was.

12  Q   So Dr. Ruan is correct there?

13  A   He is correct.

14  Q   Please continue.

15  A   I noticed you have quite a few patients on Roxicodone 30

16  milligram t.i.d., q.i.d., p.r.n. and OxyContin 80 milligram.

17  Q   I'm going to stop you there for a minute.  Is Roxicodone 30

18  milligrams the highest strength?

19  A   Yes.

20  Q   How about OxyContin 80 milligrams?

21  A   Yes, sir.  I believe there was a higher strength at one

22  time.  But that may be the highest at the time of this email.

23  Q   I'm going to show you what has previously been admitted as

24  Government's Exhibit 10-3, select drug totals for John Patrick

25  Couch.  For Roxicodone 30, how many patients, according to this

2020

1  chart, did Dr. Couch have on that drug?

2  A    980.

3  Q    And how many prescriptions?

4  A    11,874.

5  Q    And how many different oxycodone 30 pills?

6  A    1,145,867.

7  Q    And how about the other drug referenced by Dr. Ruan, the

8  OxyContin 80?

9  A    There were 83 recipients, 1,079 prescriptions, 93,274 pills

10 dispensed.

11 Q    To be clear, these numbers are the total from January 1st,

12 2011 through May 19, 2015; is that correct?

13 A    That is correct.

14 Q    This email is 2014; is that correct?

15 A    That is correct; yes.

16 Q    So presumably by the time this email had been written, not

17 all of these Roxicodone and OxyContin pills had been

18 prescribed; is that safe -- is that an assumption you can make?

19 A    That's correct.

20 Q    Okay.  Continuing on.  Based on the diversion study.

21 A    Based on the diversion study done on Florida pill mills,

22 these two are the most thought of in south Florida, therefore

23 considered biggest red flag.

24 Q    And again stopping you there.  Is Dr. Ruan correct that

25 these are two big red flag drugs?

DEA SA MICHAEL BURT - DIRECT BY MR. BODNAR                    2021

1   A   That is correct, they are.

2   Q   Again, does Dr. Ruan appear knowledgeable about red flags

3   for diversion of drugs?

4            MR. KNIZLEY:  Your Honor, I object to what Dr. Ruan

5   may appear knowledgeable...(inaudible).

6            THE REPORTER:  I can't hear.

7            THE COURT:  Mr. Knizley, just have a one- or two-word

8   objection.  Let's not have a speaking objection.

9            MR. KNIZLEY:  Yes, ma'am.

10           THE COURT:  What is the objection?  Relevance?

11           MR. KNIZLEY:  The objection is it calls for

12  undisclosed mental operation of another.

13           THE COURT:  All right.  Sustained.

14  BY MR. BODNAR:

15  Q   Continue reading, please.

16  A   I think you should talk to Justin on cutting down oxycodone

17  30 milligram usage; especially we are trying to convince

18  Alabama Board of Medical Examiners that we have a great system

19  to keep patients satisfied and addicts out.  You don't want

20  Roxicodone 30 milligram messing things up, or at least

21  contradicts to what we promote.

22           I believe I have two patients on Roxicodone 30

23  milligrams.  One of them is a WC -- workman's comp; cannot

24  handle all others.  Also, try to use OxyContin 60 milligram

25  instead of 80 also now.  Now everyone in the nation knows that

1   Alabama state prescribes the most pain killers in the nation.

2   We will need to adjust our routine regimen a bit.  One of the

3   things I have done is wane off benzo or ask their PCP --

4   primary care physician -- to write their benzo, as benzo

5   prescription is also one of the things they look at to expand.

6   We would rather be careful than sorry.  Please remind Justin

7   about this stuff.

8   Q   And does Dr. Ruan -- I'm sorry.  Does Dr. Couch appear to

9   respond to Dr. Ruan later that day?

10   A   Yes, he does.  Dr. Couch responds to Dr. Ruan on July 8th,

11   2014 regarding meds adjustment.  I reviewed this with him

12   tonight.  We do not write triple digit dispensations of short-

13   acting opioids.  We keep it at 90 tablets per month unless they

14   have a cancer diagnosis.

15   Q   And based on the context of this email, when Dr. Couch says

16   we, who does it appear he is referring to?

17   A   Him and Justin Palmer.

18   Q   And still July 8th, did Justin Palmer have his DEA license

19   at this point?

20   A   No, sir.  He did not.

21   Q   Could Justin Palmer even after October of 2014 ever

22   prescribe Roxicodone or OxyContin in any strength?

23   A   He could not prescribe a schedule II controlled substance.

24   Q   And are those two drugs schedule II?

25   A   Yes.

2023

```
 1   Q   In any strength?

 2   A   Yes.

 3   Q   Furthermore, do you see where it says:  We do not write

 4   triple digit dispensations of short-acting opioids?

 5   Q   Do you know of instances in this case where an individual

 6   did receive triple digit dispensations of short-acting drugs?

 7   A   Yes.  The undercover agent Shawn Kelley received 110

 8   dosages of 50 milligram Roxicodone.

 9   Q   And is Roxicodone a short-acting opioid?

10   A   Yes, it is.

11   Q   So did he receive more than 90 tablets per month?

12   A   He did, yes.

13   Q   And did the undercover agent have a cancer diagnosis?

14   A   No.

15   Q   I'll now show you what has been marked as Government's

16   Exhibit 9-2, subparts (2) through (7).  Subpart (1) has been

17   taken out and won't be offered for admission.

18           THE COURT:  So give me the number again?

19           MR. BODNAR:  9-2, subparts (2) through (7).

20   Q   Special Agent Burt, are you able to identify what it is in

21   9-2?

22   A   Yes, sir.  These are emails.

23   Q   And were these emails obtained from search warrants for

24   xiuluruan@yahoo.com?

25   A   Yes, sir, they were.
```

 1   Q   And do they involve Dr. Ruan and/or Dr. Couch?

 2   A   Yes, they do.

 3           MR. BODNAR:  United States moves to admit Government's

 4   Exhibit 9-2, parts (2) through (7).

 5           MR. KNIZLEY:  No objection.

 6           THE COURT:  All right.  Mark them in.

 7       (Government's Exhibit 9-2(2) through 9-2(7) were entered

 8   into evidence.)

 9   BY MR. BODNAR:

10   Q   Special Agent Burt, I'm now showing you what has been

11   admitted as Government's Exhibit 9-2.  Is this an email first

12   from Dr. Couch to Dr. Ruan and then later a response from

13   Dr. Ruan to Dr. Couch?

14   A   That's correct.

15   Q   Looking first at the email from Dr. Couch, what is the

16   subject of this email?

17   A   Subject is:  Abstral Gains 5 Percent Market Share in Fourth

18   Quarter 2013.

19   Q   And after the hyperlink here, can you please read what

20   Dr. Couch wrote to Dr. Ruan?

21   A   Looking good so far.  There are final financials for Orexo,

22   the company that sold the rights to Abstral to Galena.  Read

23   also at the end where it states that these are the highest

24   sales volume figures since the drug was approved and launched

25   in 2011.

2025

1  Q    And what is the date that Dr. Couch is writing Dr. Ruan

2  about the highest sales totals?

3  A    February of 2014.

4  Q    And then does Dr. Ruan respond to this email regarding

5  something other than Abstral and Galena?

6  A    Yes, sir.

7  Q    What does Dr. Ruan write on February 17th to Dr. Couch?

8  A    Pat, like I mentioned briefly this morning, both you and me

9  have gotten two warnings about noncompliant with TIRF REMS.  I

10  am concerned that this may affect our future prescribing

11  opioids if it continues to happen.  Last Wednesday --

12  Q    Stop you there for a minute.  What is the TIRF REMS

13  program?

14  A    The transmucosal instant release fentanyl.

15  Q    And is this the program that's been discussed, that the FDA

16  set up?

17  A    Yes, sir.

18  Q    Please continue.  Last Wednesday.

19  A    Last Wednesday I talked to the lady, Alice, who told me the

20  problem is that when they tried to contact us by phone to

21  inform us that we are missing those, they could not reach us;

22  either the receptionist could not find us or they were put on

23  hold and no one cared.  Therefore, it has accumulated too large

24  number of patients.  I just did 15 on Wednesday and again they

25  called me on Friday with four more patients, and today with two

1    more.  So it seems it is pretty easy the MAs or nurses miss on

2    these REMs, so we have to correct that otherwise.  If they

3    suspend us prescribing them, it will be really bad.

4    Q    I'll stop you right there.  At this time period, February

5    17th, 2014, do you know what TIRF products in particular

6    Dr. Ruan and Dr. Couch were prescribing at that time?

7    A    I believe it was the Subsys products.

8    Q    And were they also prescribing Abstral at that time as

9    well?

10   A    They were, yes, sir.

11   Q    Now, I show you what has been admitted as Government's

12   Exhibit 9-2(2).  I'm sorry, 9-2(3).

13          Does this appear to be an email exchange between

14   Dr. Ruan and an individual named Bryan Crawford?

15   A    Yes, sir.

16   Q    Based on your role in this investigation, do you know who

17   Bryan Crawford is?

18   A    Bryan Crawford is an associate of C&R Pharmacy.  He's also

19   an associate of McConaghy.

20   Q    And does it appear that it's first an email from Bryan

21   Crawford to Dr. Ruan?

22   A    Yes, sir.

23   Q    What does Bryan Crawford tell Dr. Ruan?

24   A    When assistance with request for PAs for insurance coverage

25   of Subsys is provided from outside the physician's office and

1    includes for cancer pain; verify that a cancer diagnosis is

2    well documented in the patient's chart.  Can be problematic if

3    a diagnosis is used to justify payment but is not substantiated

4    in the chart for audit.

5    Q    Based on your knowledge of this investigation, where Bryan

6    Crawford bolded the words "outside the physician's office," do

7    you know what he might be referring to with regard to Subsys?

8            MR. KNIZLEY:  Your Honor, I object as undisclosed

9    mental operation of the author.

10           THE COURT:  Overruled.

11   BY MR. BODNAR:

12   Q    Do you know, based on your investigation, what -- what is

13   being meant by PAs being done outside physician's office with

14   regard to Subsys?

15   A    It appears Mr. Crawford is referring to an IRC, which is

16   the insurance reimbursement center used by Insys.

17   Q    And what time was this email written?

18   A    4:47 p.m.

19   Q    Approximately how many minutes later does Dr. Ruan -- move

20   down -- respond to Bryan Crawford?

21   A    It appears to be about six minutes later.

22   Q    What does Dr. Ruan talk about -- refer to Mr. Crawford?

23   A    Can you call me?  Dr. Ruan, and a number.

24   Q    Special Agent Burt, I'm going to show you what has been

25   already admitted as Government's Exhibit 32-2(2).  Is this one

1    of the Insys reimbursements or the IRC reimbursement PA forms

2    that was discussed by Ms. Perhacs?

3    A   Yes, sir, it is.

4    Q   And which is -- who is the patient here that this is for?

5    A   Patient is RI.........

6    Q   For which drug?

7    A   For Subsys 800 micrograms.

8    Q   And what diagnosis is on this PA paperwork?

9    A   It states bladder CA.  Bladder cancer.

10   Q   I'll now show you what has previously been marked as

11   Government's Exhibit 9-12.

12           THE COURT:  Is that in evidence?

13           MR. BODNAR:  It is not, Your Honor.  It has been

14   marked but not admitted.

15       (A discussion was held off the record between counsel.)

16   BY MR. BODNAR:

17   Q   Special Agent Burt, are you able to identify what was 9-12?

18   A   Yes, sir.  This is a patient file belonging to

19   RI.........

20   Q   And is that the same individual whose PA is still up on the

21   screen or PA opt-in form is on the screen?

22   A   Yes, sir, it is.

23   Q   Have you had an opportunity to review this file prior to

24   taking the stand today?

25   A   Yes, sir.

1   Q   And in your review of the file did you find any diagnosis

2   or any mention anywhere of Mr. I.. having bladder cancer?

3   A   No, sir, nowhere in the file; the file provided to me

4   identifying any indication this patient was diagnosed with

5   cancer.

6   Q   And in particular, bladder cancer?

7   A   Yes, sir.

8           MR. BODNAR:  United States moves to admit Government's

9   Exhibit 9-12.

10          MR. ESSIG:  No objection.

11          THE COURT:  All right.  Mark it in.

12      (Government's Exhibit 9-12 was entered into evidence.)

13  BY MR. BODNAR:

14  Q   Special Agent Burt, I'm going to show you what has been

15  admitted as Government's Exhibit 9-2(4).  And starting from the

16  back, the heading of it is at the very bottom.  Is this an

17  email sent on September 9, 2014, by an individual named Debi

18  Phillips?

19  A   Yes, sir.

20  Q   And who does the typed signature line say that Debi

21  Phillips is?

22  A   Debi Phillips is the chief operating officer of PPSA.

23  Q   And could you please read what Debi Phillips is telling the

24  doctors?

25  A   Viva Healthcare shared a copy of the letter sent to them

 1    from CMS, Center for Program Integrity.  CMS is auditing

 2    Medicare Advantage Plus for filled prescriptions for TIRF

 3    drugs.  I had a lengthy conversation with Lauren Ward, Viva

 4    Pharmacy representative, regarding the CMS letter.  She

 5    informed me that Viva was not responsible for targeting our

 6    group for its TIRF prescribing habits.

 7           All Medicare Part D carriers are being audited for

 8    filling and paying for TIRF prescriptions.  All patients must

 9    meet the criteria of an active cancer pain diagnosis only.  She

10    also informed me that if they find that the patient does not

11    meet the criteria, they will take back the Medicare payment

12    from the plan and the pharmacy.

13    Q   I'm going to stop you there.  What is supposedly going to

14    happen if a patient is found not to have an active cancer

15    diagnosis?

16    A   That a refund will have to be made back to Medicare.

17    Q   And please go on.  What does it say from "please make

18    sure"?

19    A   Please make sure we are only prescribing to active cancer

20    patients so we are not under scrutiny from Medicare.  I drafted

21    a letter by -- the drafted letter by Dr. Ruan to Viva medical

22    director, Dr. Tonya Bryant, will not help with the Medicare

23    criteria.  Viva suggested you write CMS and lobby for this

24    change in criteria.

25    Q   And does Dr. Ruan respond to Debi Phillips?

2031

1  A   Yes, sir, he does.

2  Q   And does he include Dr. Couch, Dr. Chen, and other

3  individuals that worked at PPSA?

4  A   Yes, sir.

5  Q   What does Dr. Ruan say that they should do?

6  A   I think we will need to discontinue those patients

7  currently on TIRF fentanyl covered by Medicare Part

8  D.  Meanwhile, I will write a letter on behalf of PPSA

9  clarifying why we use them on our end.  Which person do I need

10  to write to?  Dr. Ruan.

11  Q   And TIRF fentanyl, does that include Subsys and Abstral?

12  A   Yes, sir.

13  Q   And here in this middle section does Debi Phillips explain

14  who it is that Dr. Ruan needs to write to?

15  A   Yes, sir.

16  Q   And then what does Dr. Ruan respond?

17  A   We will need to, to share with them -- to share with them

18  what is in the literature on breakthrough pain and breakthrough

19  pain in patients with cancer.  That way they will have an idea

20  there is no wrongdoing on our end.  We use the best available

21  medications designed to treat breakthrough pain for patients

22  suffer (sic) from severe breakthrough pain.

23        It may not be cost effective, but such off-label usage

24  is commonplace or even a general rule of clinical

25  medicine.  Dr. Ruan.

1   Q   I'm going to show you now what has been admitted as
2   Government's Exhibit 9-2(5).  And in this multi-page document,
3   is this an email from Dr. Ruan to Dr. Couch and Dr. Chen with a
4   draft of the letter Dr. Ruan intends to send to CMS?
5   A   Yes, sir, it is.
6   Q   And what does Dr. Ruan tell Dr. Couch and Chen?
7   A   Hi, Pat and Tao, let me know your feedback on the
8   following.  A widespread audit is coming from Medicare Part D
9   prescriptions that have previously paid for TIRF products.  We
10  have had patients who either had cancer or without, some with
11  cancer but in remission.  They have tried TIRF or are on
12  them.  Insurance audit for the following, whether patients have
13  cancer or their cancer are active or not.
14          I write this letter to clarify the misconception and
15  myth about cancer pain.  We need to do this in a proactive way
16  to educate them, let them realize our job as pain physicians
17  are to provide pain relief, using best possible products
18  available.  Meanwhile, I want them to understand their
19  criterion of using active cancer is flawed.  And lastly,
20  breakthrough pain in cancer and noncancer are very similar and
21  only TIRF products are the drug of choice.
22          There are three persons from Medicare that we need to
23  send this letter.
24  Q   And does Chen go on and say who it is he's going to send
25  the letter to?

1  A   Yes, he does.

2  Q   And again, is the draft of the letter contained in the

3  pages following?

4  A   Yes, sir.

5  Q   I'm going to show you what has been marked as Government's

6  Exhibit 9-2(6) and 9-2(7).  Is 9-2(6), is this the email where

7  Dr. Ruan is actually sending the letter?

8  A   Yes, sir, it is.

9  Q   And to whom does he send it?

10  A   He sends it to michael.forman@cms.hhs.gov.

11  Q   And to an individual named Frank Tetkoski?

12  A   Yes, sir.

13  Q   Also at CMS?

14  A   That's correct.

15  Q   And again, is this the letter that we had discussed that

16  Dr. Ruan wanted to write?

17  A   Yes, sir.

18  Q   And what is the time stamp on his email to the individuals

19  at CMS?

20  A   It is 1:08 p.m.

21  Q   On what day?

22  A   On September the 23rd, 2014.

23  Q   I now show you what has been admitted as Government's

24  Exhibit 9-2(7).  Is this the response from Michael Forman that

25  Dr. Ruan forwards on to other individuals at PPSA?

1  A   Yes, sir.

2  Q   How shortly after 1:08 p.m. on the 23rd does the individual

3  at Medicare respond to Dr. Ruan?

4  A   In less than an hour he gets a response.

5  Q   And what is his response?

6  A   We appreciate your response to transmucosal immediate

7  release fentanyl drugs and their potential indication for

8  breakthrough pain.  At this time the only approved indication

9  for TIRF drugs for coverage under Medicare Part D remain for

10  the treatment of cancer pain.  Peer review articles are not

11  acceptable for drug coverage under Medicare Part D.  In the

12  future if TIRF drugs receive additional indications by the FDA

13  or if the official compendia support other issues, future

14  audits will reflect these additional indications.

15  Q   Based on this, does it appear if Medicare is going to pay

16  for TIRF drugs like Subsys and Abstral for noncancer patients?

17  A   No, sir, they won't.

18  Q   How about for patients that had cancer a long time ago?

19  A   No, sir.

20  Q   Oh, what is the date that Dr. Ruan receives notice that

21  they won't pay for it?

22  A   September the 23rd, 2014, at 3:17 p.m.

23  Q   And does Dr. Couch also receive notice on that date?

24  (Indicating.)

25  A   Yes, sir.

DEA SA MICHAEL BURT - DIRECT BY MR. BODNAR

1  Q   Special Agent Burt, I'll approach with what has been marked

2  as Government's Exhibit 9-3, subparts (1) and (2).  Are you

3  able to identify what these are for the jury?

4  A   Yes, sir.  These are emails that were obtained during the

5  search warrant from Dr. Ruan's account.

6  Q   And are they from Dr. Ruan?

7  A   That's correct.

8          MR. BODNAR:  United States moves to admit Government's

9  Exhibit -- United States Exhibit 9-3(1) and (2).

10         MR. KNIZLEY:  Judge, we object.  We would object to

11  9-3(1) and 9-3(2).

12         THE COURT:  All right.  And approach the side bar.

13      (At the side bar, jury not present.)

14         MR. BODNAR:  Your Honor, 9-3(1) is what is --

15  (indicating) and 9-3(2) he is indicating to a family member,

16  which is why it's halfway redacted, that Dr. Ruan has neck and

17  back issues which he notes are worse than 95 percent of the

18  patients at PPSA.  Special Agent Burt will testify that,

19  despite the emails we just showed that says TIRF drugs are the

20  only product of choice, Dr. Ruan never once used those for his

21  own issues, which are 95 percent -- worse than 95 percent of

22  his own patients.  I believe it's all there.

23         THE COURT:  All right.  Tell me about the objection.

24         MR. KNIZLEY:  Judge, on 9-3(1) and 9-3(2), we'd object

25  on the basis of relevance as to each of these.  As I understood

1    his proposed grounds for admission would be he says he has an

2    injury and did not use a certain medication.  That medication

3    may have been used in his clinic, but it is speculation as to

4    why he may or may not.  And whatever speculation may be

5    reached, it still is not relevant as to whether he did or

6    didn't and -- whether he used it.

7          Secondly, I believe on both of those, it just has

8    no -- he's injured.  It says he's injured, has an injury.  And

9    he is saying that he wants to admit this to show that he chose

10   not to use the medication to medicate it.  One, we don't know

11   that.  Two, you know, it could be speculation on 100 reasons

12   why he did not.  Especially on 9-3(1), he blocks out -- I

13   believe this is to Tom Galloway, and it's attorney-client

14   privilege.

15         MR. BODNAR:  That's not.  It is his daughter.

16         MR. KNIZLEY:  Are you sure about that?

17         MR. BODNAR:  That's Jane Ruan.  They are both his

18   daughters.

19         MR. KNIZLEY:  I'm going to go back and look, Judge.  I

20   had it on here.  But I may have read that part wrong.  But I'll

21   check that in a moment.

22         But the relevance issue is the issue -- the objection

23   I am making.  Further, it is a 403 issue.  As to whatever,

24   whatever relevance it may have, the prejudicial effect far

25   outweighs it.

1          THE COURT:  Why?

2          MR. KNIZLEY:  Whether a person has a disability --

3          THE COURT:  It's not a question of whether he has a

4   disability.  It's a question of whether he would or would not

5   prescribe for himself what he prescribes for other patients who

6   have less pain than he has.

7          MR. KNIZLEY:  Well, first -- I know, Your Honor.  I

8   didn't mean he was going to prescribe it for himself.  I mean,

9   go to another physician and get it prescribed for him, have it

10  for himself, is what I was referring to.  Again, Judge, it

11  doesn't -- it's speculation.  He may be allergic to it.  We

12  don't know the answer to these questions.  We're just

13  speculating as to why he may not want to use that.  I think you

14  know there's some history --

15         THE COURT:  I think that's fodder for cross-

16  examination.  Do you intend to prove that he did not

17  prescribe --

18         MR. BODNAR:  We're not asking anything about

19  speculation.  Simply --

20         THE COURT:  I'm asking:  Do you intend to prove that

21  he did not get prescribed for himself any TIRF drug?

22         MR. BODNAR:  We were not going to admit PDMP.  But we

23  have it and we could admit it.  We didn't want to do that for

24  his privacy issues.  But he can state that he has examined

25  Dr. Ruan's PDMP and he was not receiving any opioids and, in

 1  particular, no TIRF drugs, despite the fact that he's saying

 2  TIRF drugs are the only drugs of choice for his patients.  He's

 3  saying he's worse than 95 percent of them.

 4         MR. KNIZLEY:  Now, Judge, he's not saying TIRF drugs

 5  is the only drugs of choice for his patients.

 6         MR. BODNAR:  That's what the words said in the email

 7  we just looked at.

 8         THE COURT:  I think it's admissible in the form in

 9  which he's got it.  So I overrule your objection.

10         MR. KNIZLEY:  Judge, let me look and see if I was

11  mistaken about it.

12         THE COURT:  Make sure it's the one you think it is.

13         MR. BODNAR:  You can check.  I'm 100 percent sure it's

14  the daughter.  That's why I took it off.

15     (In open court, defendants and jury present.)

16     (A discussion was held off the record between counsel.)

17         MR. BODNAR:  United States moves to admit Government's

18  Exhibit 9-3(1) and 9-3(2).

19         THE COURT:  All right.  They are admitted.

20     (Government's Exhibits 9-3(1) and 9-3(2) were entered into

21  evidence.)

22  BY MR. BODNAR:

23  Q   Special Agent Burt, I'm going to show you what's been

24  admitted as Government's Exhibit 9-3(1).  Is this email from

25  Dr. Ruan to a family member?

1  A   Yes, sir.

2  Q   And what is the date on this email?

3  A   Tuesday, November 15th, 2011.

4  Q   I'm going to turn you to the one unredacted section.  What

5  is Dr. Ruan telling the family member?  (Indicating.)

6  A   I have severe cervical disk disease shown on cervical MRI

7  in 2005 and 2006, worse than 95 percent of the patients I see

8  in my clinic.  That would require neck surgeries.  I keep

9  putting it off as I cannot stop.  I have lost 70 percent of my

10 left shoulder girdle muscle due to cervical disk disease but I

11 keep it to myself.

12 Q   I'm now showing you what has been admitted as Government's

13 Exhibit 9-3(2), a similarly heavily-redacted email from

14 Dr. Ruan and a family member.

15 A   Yes, sir.  It's dated Thursday, January the 26, 2012.

16 Q   Starting at the first communication on January 25th, what

17 did Dr. Ruan write?

18 A   I think it is time for me to take off to take care of my

19 health.  I will get my cervical spine MRI tomorrow and see

20 Dr. Martino, the chief neurosurgeon of University of South

21 Alabama, next week.  I will file for disability now.

22 Q   Did he go on further and explain in another email to this

23 same family member?  What did Dr. Ruan say later on January

24 25th, 2012?

25 A   On January 5th, 2012 at 10:43 p.m.:  I have a -- I will

1    have a thorough spinal MRI from neck to sacrum this week and

2    then see Dr. Martino next Tuesday.  I will file for disability

3    after -- though -- my current administrator to whom I already

4    spoke.  I will slow down and seriously pursue filing for

5    disability as I am sick and tired.  If I am disabled, and I

6    have no doubt I am qualified because of my cervical spinal cord

7    issue, as I could not do the injection procedures due to hand

8    weakness and clumsiness.  So our lives will be significantly

9    different from now on.  The money has to come somewhere.

10   Q    And finally, does he tell the family member the results of

11   the MRI?

12   A    Yes, sir.

13         I just got neck MRI and low back MRI today.  Neck scan

14   is very nasty.  Official report pending.

15   Q    Special Agent Burt, during the course of the investigation

16   did you review the PDMP report for Dr. Ruan?

17   A    Yes, sir, we did.

18   Q    And specifically, does that mean the listing of controlled

19   substances that would have been prescribed to Dr. Ruan?

20   A    Yes.

21   Q    And anywhere in his PDMP report did you see if he was

22   prescribed any TIRF drugs for his own pain?

23   A    He was not.

24   Q    I want to show you again what is admitted as Government's

25   Exhibit 9-2(5).  What had Dr. Ruan said on this occasion about

2041

```
 1  breakthrough pain and breakthrough cancer pain?
 2  A   Breakthrough -- breakthrough pain in cancer and noncancer
 3  are very similar and only TIRF products are the drug of choice.
 4  Q   And in connection with the time period in the family emails
 5  or at any time did you ever find an indication that Dr. Ruan
 6  was taking a TIRF fentanyl product?
 7  A   No, sir.  I did not.
 8  Q   Special Agent Burt, I'm going to now show you what's been
 9  marked as Government's Exhibit 9-4(1), subparts (2) through (7)
10  -- I'm sorry -- 9-4 -- yes, (1) through (7).  And actually
11  we're going to have to do this in two separate parts.
12          Just showing you what is marked as Government's
13  Exhibit 9-4, subsection (1).  Are you able to identify what
14  this is?
15  A   Yes, sir.  These are emails obtained from Dr. Ruan's Yahoo
16  account via search warrant.
17          MR. BODNAR:  United States moves to admit Government's
18  Exhibit 9-4(1).
19          MR. KNIZLEY:  Judge, we object.
20          THE COURT:  Do you need to approach?
21          MR. KNIZLEY:  Yes, ma'am.
22          THE COURT:  All right.
23      (At the side bar, jury not present.)
24          MR. BODNAR:  Did you get a copy of (2) through (7), by
25  the way?
```

 1              MR. KNIZLEY:  No.

 2              MR. BODNAR:  I'm going to show it to you.  They are

 3    printouts from -- yes, these are the printouts.  Did you get

 4    this?  These are the printouts of Couch and Ruan from 13, 14,

 5    and 15 from the Sunshine Act.  That's what I'm --

 6              MR. ESSIG:  I don't remember seeing this.

 7              MR. BODNAR:  He printed these.  They were printed off

 8    the website.  Nothing changed.  It's Open Source.

 9         (A discussion was held off the record between counsel.)

10              MR. BODNAR:  How soon are we taking a break?

11              THE COURT:  Do you have anything you can do before you

12    get into this?

13              MR. BODNAR:  I can do that one right now.  This is the

14    second one.  (Indicating.)  They just didn't see these Open

15    Source printouts.

16              MR. KNIZLEY:  He just gave us this.  That, Judge, is

17    the objection, is --

18              THE COURT:  And we're talking about 9-4(1)?

19              MR. KNIZLEY:  Yes, ma'am.  9-4(1), the objection is it

20    appears to be a listing sent to his sister, the subject of --

21    which has the subject on the top:  Income, summary seized in

22    January 2013, of a number of what arguably would be for

23    reimbursement for various type talks.  It has an Insys talk on

24    here and has a Subsys -- several Subsyses and an Exalgo talk on

25    here and a Fentora talk on it.  But the rest of these talks, we

 1    don't know what they are, what the basis of them are, what type

 2    of medications they may be or whether they are

 3    medications.  And the rest of the talks, absent the ones that

 4    are associated with the facts in this case, it would not seem

 5    to have any relevance.

 6            And furthermore, if they did have any relevance, that

 7    whatever the relevance may be would be outweighed by the

 8    prejudicial effect of showing other incomes that we wouldn't

 9    necessarily see in any way associated with the facts of this

10    case.

11            MR. BODNAR:  Your Honor, he's been a speaker for

12    numerous different programs.  That has been brought up in

13    emails already, including the ones with Natalie Perhacs.  He

14    mentioned he's a speaker for a variety of different

15    programs.  They've heard from Dave Corin, who he testified that

16    Dr. Ruan told him he spoke for a number of different

17    programs.  This was also before the date of the Sunshine Act,

18    which Special Agent Burt is going to talk about.  Following the

19    Sunshine Act, all payments made by pharmaceutical companies

20    were posted Open Source online, which are the next several

21    documents starting in August of 2013.  These were all payments

22    made by pharmaceutical companies, including ones directly

23    related to this case, that were not included -- that would not

24    be on the Open Source payments.

25            MR. KNIZLEY:  Judge, there's no evidence of

1   pharmaceutical companies at this stage.  We do -- there is

2   some, of course, the ones we've been speaking of:  Insys and

3   Exalgo and Fentora.  But these others, we don't know what type

4   company, what type medication, even if they are speeches in

5   association with medicine.  And some of this is certainly

6   relevant.  But the ones that we can't associate -- excuse me --

7   or know what the basis of the payment is wouldn't be relevant

8   to these issues.

9           MR. BODNAR:  He can testify from his knowledge of

10  Duexis, Fentora, Subsys, Gralise, Nucynta, Naprelan, Exalgo.  I

11  don't know that there's one on there that he cannot testify is

12  a pharmaceutical drug.

13          THE COURT:  All right.  I think you can -- I think

14  this is admissible whether or not -- if any of these are

15  nonpharmaceutical companies, they may not be relevant.  But I

16  think you can, without going into the subject of the email, if

17  you can ask him about if he knows what they are.  And if he

18  doesn't know what some of them are, then you should take those

19  out --

20          MR. BODNAR:  I won't ask him.

21          THE COURT:  -- out of the exhibit before it's offered.

22          MR. BODNAR:  Before it's offered or before --

23          THE COURT:  Well --

24          MR. BODNAR:  Okay.

25          THE COURT:  Before, before I'll admit it.  How's that?

1           MR. BODNAR:  Yes.

2           MR. ESSIG:  Judge?

3           Go ahead.

4           MR. KNIZLEY:  I apologize.  That last one was a letter

5    to Tom.  Then that was included in it.  But he had gotten

6    the --

7           THE COURT:  That part out.

8           MR. KNIZLEY:  -- that part out.  I apologize for

9    saying that.  But the next one is attorney-client.

10          MR. BODNAR:  Which one?

11          MR. KNIZLEY:  That one there (indicating).

12          MR. BODNAR:  We'll get to that.

13          THE COURT:  Let's move on with this right now and then

14   we'll take a break and you can go over these public information

15   ones.

16          MR. BODNAR:  Do you want to see these?

17          MR. ESSIG:  Are we going to break at 3, Judge?

18          THE COURT:  Yes.

19          MR. BODNAR:  I can take it to 3 o'clock on another

20   part.

21       (The clerk had a discussion with the court security officer

22   off the record.)

23       (In open court, defendants and jury present.)

24          THE COURT:  Well, I think we may be taking a break

25   right now.  Y'all have a seat for a minute.

1          Ladies and gentlemen, we're going to go ahead and take

2    our afternoon break.  Leave your pads in your chairs.  No

3    discussion about the case.

4          The break may be a little bit longer than 15 minutes,

5    but we'll call you back up as soon as we're ready to start back

6    again.

7          Okay.  We're in recess.

8      (In open court, defendants present, jury not present.)

9          THE COURT:  Counsel, to save a little bit of time, I'm

10   going to ask the government to go through those items with him

11   over the break, that he's going to ask him about that are on

12   the email.

13         And, Mr. Knizley, if you can get through those

14   documents in about 15 minutes, let us know.  Because we will

15   call the jury back up in 15 minutes.  If not, we'll take a

16   little bit of extra time.  But --

17         MR. KNIZLEY:  Yes, ma'am.  Thank you very much.

18         THE COURT:  All right.  We're in recess.

19     (A recess was taken at approximately 2:51 p.m.)

20     (In chambers, jury not present.)

21         MR. KNIZLEY:  Hey, Judge.

22         THE COURT:  Hey.

23         MR. BODNAR:  We just wanted to cover two emails, Your

24   Honor, that the parties have objections to, to make it move

25   quicker when the jury comes up.  We'll start with the first

 1    one, Dennis.

 2              MR. KNIZLEY:  Yes.  And, Judge, the government's going

 3    to attempt to introduce Government's Exhibit 9-6(1), which

 4    purports to be an email from my client Dr. Ruan to

 5    djcouch@djclaw.net.  I don't think there is an issue that this

 6    Couch is a lawyer.  And our objection is attorney-client

 7    privilege.  It is copied to Dr. Couch and to Boe Strange, who

 8    is the accountant and was a manager or director, a person who

 9    was engaged in the management of the PPSA, and to Ken Cross,

10    who was the manager of PPSA at that time.  And our contention

11    is it is from my client, copied to -- everyone on the copy is

12    associated or works within the business, to a lawyer, where

13    they're asking:  Pat told me you are drafting the contract with

14    Dr. M.  Thank you for the professional help.  I want to make

15    sure the following items are covered.

16              He goes through one, two, three, four, five, six,

17    seven.  And number seven -- it is very important that he is an

18    independent contractor, therefore if things go wrong, his own

19    malpractice insurance will cover.  We suggest that every

20    portion of the email is regarding an attorney-client subject

21    matter and therefore it would be privileged.

22              MR. BODNAR:  Your Honor, it was not our understanding

23    that Dr. Couch's brother, who is the person that received this

24    email, is the attorney for the PPSA.  It was our understanding

25    that Tom Galloway, not Dr. Couch's brother, represented

1   them.  This goes to multiple other individuals that are not

2   attorneys.  We are offering it to show the sophisticated level

3   that Dr. Ruan has in which he is telling Dr. Couch's brother

4   what needs to be in the contract, including number four, which

5   is most important for us, where he's discussing what is an

6   illegal kickback and goes to his knowledge of the anti-kickback

7   statute and what is and isn't lawful.

8           THE COURT:  (Reading.)  This doesn't look like

9   privileged information to me.  But tell me, it says that

10  Dr. Couch's brother is helping draft a contract for the PPSA.

11  It's not personal to him, because PPSA is not -- if anything,

12  this is advice to -- requesting legal help for PPSA, not for

13  Dr. Ruan individually; right?

14          MR. KNIZLEY:  Well, of course, it would affect --

15          THE COURT:  PPSA and --

16          MR. KNIZLEY:  -- it's attorney-client privileged.

17  It's a privileged document from one client -- from the client

18  to the lawyer.  And my client is the client, or at least one of

19  the clients represented in the entity.

20          MR. SHARMAN:  And Dr. Couch joins in it, Your Honor.

21  And I don't think the privilege --

22          THE COURT:  Dr. Couch doesn't have a privilege as to

23  Dr. Ruan's communications.

24          MR. ESSIG:  It's included.

25          MR. SHARMAN:  He's included.  And if Your Honor is

2049

```
1   correct, that it's seeking legal advice on behalf of PPSA, then
2   I don't -- I think the question is:  Is it a privileged
3   document, not whether it sought --the legal advice is sought by
4   one individual, two individuals, or the two as co-owners of a
5   company.  It's still seeking legal advice.
6           THE COURT:  It's not seeking advice.  He's telling him
7   what he wants in the contract, is what I understood.
8           MR. SHARMAN:  But clients do that --
9           MR. KNIZLEY:  Communication.
10          MR. SHARMAN:  Clients do that in the course of seeking
11  advice.
12          THE COURT:  Well, I know.  But it also went to the
13  accountant, as well as other employees of PPSA.  So it can't
14  be -- you know, it can't be covered by the attorney-client
15  privilege.
16          MR. SHARMAN:  Your Honor, Mr. Strange is a CPA for the
17  company.  Mr. Cross is a senior manager.  Dr. Patrick Couch is
18  a co-owner.  I don't think that distribution to that kind of a
19  group would vitiate a privilege.
20          MR. KNIZLEY:  And discovery is replete --
21          THE COURT:  Can you give me some law on that?
22          MR. SHARMAN:  Not standing here, but I can do so
23  pretty quickly.
24          MR. KNIZLEY:  It's not just his accountant for the
25  purposes of the accounting.  The discovery is replete that
```

2050

 1   Mr. Strange is involved in the operation and management of

 2   PPSA.  I don't think -- I don't think that's an issue.

 3          MR. ESSIG:  And, Your Honor, I would note too that I

 4   know there is case law from past experience that specifically

 5   says communications with an accountant are not themselves

 6   privileged but when the communications are with the accountant

 7   as a part of getting legal advice or communicating with the

 8   attorney, they are privileged.  So the presence of the

 9   accountant and the attorney does not deny the privilege.  And,

10   of course, we would need to get you some law.

11          MR. BODNAR:  Again, Your Honor, the whole thing, this

12   is Dr. Ruan telling everyone on here this is what needs to be

13   in the contract, specifically about anti-kickback, stuff which

14   directly goes to -- I mean, we have to prove knowledge of the

15   anti-kickback statute as part of the defense.  And he talks

16   right in there about illegal kickbacks.

17          MR. SHARMAN:  We don't --

18          MR. BODNAR:  And knowledge of the law and what is and

19   isn't allowed.

20          MR. KNIZLEY:  Judge, it's the client communicating

21   with his lawyer, which he can expect to have a privilege.  And

22   the government is trying to take that privileged communication

23   and defeat the privilege.

24          MS. GRIFFIN:  Is there anything else whatsoever to

25   this man that shows he actually was a lawyer for them?  Because

1    we've not seen where he was a lawyer for them.  Everything's

2    usually to Tom Galloway's firm.

3              MR. KNIZLEY:  Jerry Speegle.

4              MS. GRIFFIN:  Jerry Speegle's in the same firm; right?

5              MR. KNIZLEY:  No.

6              MR. ESSIG:  Your Honor, the opening line says:  Pat

7    told me that you were drafting the contract with Dr. M.  Thank

8    you for your professional help.  I want to make sure the

9    following are covered.

10             It's a communication with an attorney drafting a

11   contract.

12             THE COURT:  All right.  Somebody's going to have to

13   give me some law on this before I can rule on it.

14             MR. BODNAR:  Okay.  We'll take this one out for the

15   purposes of today, Your Honor, and we can get something on it.

16             THE COURT:  Okay.

17             MR. BODNAR:  So we won't admit -- we won't offer 9-6

18   with him right now.

19             THE COURT:  What's the next one?

20             MR. BODNAR:  On cross-examination, if we get the law

21   in -- I mean, I will be done with direct today.  But I doubt

22   we'll be done with cross and redirect.

23             THE COURT:  If you can convince me it's admissible,

24   you can offer it on redirect.  So --

25             MR. BODNAR:  Your Honor, the other one is 9-7, which

2052

```
 1    the United States filed the notice of intent of potential
 2    404(b) evidence back on December 2nd, 2016.
 3              THE COURT:  I don't remember it right offhand.  But --
 4              MR. BODNAR:  This is the emails, two emails, that
 5    starts in the back, related to the money laundering with Ruan.
 6    Dr. Couch is not on here at all.  We think it's intrinsic.
 7              THE COURT:  Who is Joe?
 8              MR. BODNAR:  Joe Byrum was the individual associated
 9    with the cars that are named in the forfeiture count for
10    Dr. Ruan.
11              THE COURT:  Oh, okay.  So tell me, what's the
12    relevance of this?
13              MR. BODNAR:  Your Honor, for the purpose of the money
14    laundering count in which the discussion is moving and hiding
15    assets, here he is talking about -- with Joe Byrum about hiding
16    assets from his wife during the course of their divorce, as
17    well as from the court.  And that email and the email before it
18    are inextricably intertwined with the money laundering count
19    which just affects Dr. Ruan.  In the alternative, we did file a
20    notice of 404(b).  We think it goes to his guilty knowledge and
21    criminal intent, especially in light of his money laundering
22    charges.
23              MR. KNIZLEY:  Judge, we don't think it shows any
24    criminal intent.  This is a situation where he's asking
25    apparently someone to insure his vehicles on 9/7, the first
```

 1  page, to insure his vehicles.  He says:  I don't have insurance
 2  because the title's not done.  I could not get any insurance to
 3  insure them.  I know they are safe.  Could we insure them under
 4  you if I pay you the difference?  Once my divorce is over, I
 5  will keep them in place.
 6         That, I don't see whether there's any secrecy or that
 7  gives us much information about him trying to be secretive or
 8  anything else, except it indicates he is getting divorced and
 9  he has an automobile.
10         On the second one he says:  Hi, Joe.  And then we have
11  the language about the Ferrari 430 Spyder, I can get 160K for
12  it -- and talk about it.  I think that is offered for the
13  prejudicial effect, to say that he may have some nice vehicles.
14  This is not a case where we have unexplained wealth, as in a
15  drug case.  We have income tax returns that certainly say he's
16  made money in his activities.  But it doesn't show -- there's
17  nothing in here that's relevant to the issues in this case.
18         And as to 404(b), I don't see where this helps the
19  jury to say he's being secretive.  Even if he was secretive in
20  a divorce matter, it does not help the jury that he's going --
21  that he's money laundering in some fashion.
22         THE COURT:  Tell me how this relates to money
23  laundering?
24         MR. BODNAR:  Your Honor, in the money laundering
25  section that Special Agent White is going to handle, the

DEA SA MICHAEL BURT - DIRECT BY MR. BODNAR

1    financial person, she will be talking about how he was using

2    the money that came from these alleged offenses and how he was

3    laundering it for the purposes of purchasing vehicles.  And

4    that goes into the forfeiture aspect of this case as well, and

5    that is what he's talking about here, and then allegedly hiding

6    it from his wife and from the court during the process of his

7    divorce.

8              THE COURT:  All right.  Well, it's relevant only

9    insofar as that he was thinking about or wanting to purchase

10   these vehicles; right; for the money laundering?

11             MR. BODNAR:  Yes.

12             MR. KNIZLEY:  They were already purchased, Your Honor.

13             THE COURT:  Sorry.  They're already purchased?

14             MR. BODNAR:  No.

15             THE COURT:  He says:  I can get it for 160,000 on the

16   Ferrari.  Right?

17             MR. KNIZLEY:  On the Ferrari.  On the one other, other

18   ones before, already he's talking about vehicles that have

19   already been purchased.

20             THE COURT:  Okay.  I think the second one may be

21   relevant to the money laundering.

22             MR. BODNAR:  And it may therefore be better to come in

23   through Special Agent White, who's going to handle the money

24   laundering aspect.

25             THE COURT:  I think it's kind of out of place right

1    now.

2              MR. BODNAR:  I won't offer it through Special Agent

3    Burt.  We'll revisit that with Agent White.

4              THE COURT:  What else before we get the jury back?

5              MR. KNIZLEY:  That's it.

6              MR. SHARMAN:  Thank you.

7              THE COURT:  You have no objection to the documents.

8    Okay.  Go ahead and call the jury.

9         (A recess was taken at 3:31 p.m.)

10        (In open court, 3:34 p.m., defendants and jury present.)

11   BY MR. BODNAR:

12   Q   Good afternoon, Mr. Burt.

13   A   Good afternoon.

14             MR. BODNAR:  United States now moves to admit what is

15   the redacted version of 9-4(1).

16             THE COURT:  All right.  Mark it in.

17        (Government's Exhibit 9-4(1) was entered into evidence.)

18   BY MR. BODNAR:

19   Q   Mr. Burt, I'm going to show you what has been marked or

20   admitted as 9-4(1).

21             I'm zooming out.  Who is this an email to and between?

22   A   This is an email from Joan Ruan to -- from Xiulu Ruan to

23   Joan Ruan.

24   Q   And what is the subject?

25   A   Income, some received in January 2013.

DEA SA MICHAEL BURT - DIRECT BY MR. BODNAR

1   Q   And in the nonredacted portions, what do we see down here?

2   For instance, what does it say right here on this line?

3   A   Insys speaking/training, $1,500 Chicago, 7/14/2012.

4   Q   And how about these two lines?

5   A   Subsys speaking, $8,400, 8/8, 8/8, 8/15, 8/16, 2012.

6   Q   How about the next two lines?

7   A   Subsys speaking $2,400, 8/29.

8           Subsys 9/26 Osaka, 2,400.

9   Q   And just looking at one more example, can you read this one

10  right here?  (Indicating.)

11  A   4/12/12 PPSA, Abstral in office talk, PPSA, $1,750.

12  Q   And Special Agent Burt, what is the date on this email?

13  A   Tuesday, January the 15th, 2013.

14  Q   Special Agent Burt, are you familiar with something that's

15  called the Sunshine Act?

16  A   Yes, sir.

17  Q   Can you explain to the jury what the Sunshine Act was --

18  is?

19  A   The Sunshine Act is a federal law enacted to provide

20  transparency from pharmaceutical companies to pharmacists and

21  physicians.  What it does is it shows monies that are

22  distributed from pharmaceutical companies to the doctors,

23  whether it be for speaking or other arrangements.

24  Q   Is it fair to put it simply that if a pharmaceutical

25  company pays a doctor or a pharmacist, that's reported?

DEA SA MICHAEL BURT - DIRECT BY MR. BODNAR

```
 1   A   Yes, it is.
 2   Q   And when did the reporting requirements start for the
 3   Sunshine Act?
 4   A   It started in August of 2013.
 5   Q   So for these -- if these are speaking payments before
 6   January 13 of 2013, would they be listed on the Sunshine Act
 7   website?
 8   A   No, sir, they would not be.
 9   Q   Do you have to be a DEA agent or law enforcement to access
10   the Sunshine Act website?
11   A   No, sir.  Anyone can access it.
12   Q   It's a public access website?
13   A   Yes, sir.
14   Q   During the course of this investigation did you look to see
15   what data was on the Sunshine Act website for Dr. Xiulu Ruan
16   and Dr. John Patrick Couch?
17   A   Yes, sir, I did.
18   Q   I'm going to show you now what's been admitted as -- well,
19   I'm going to show you now what has been marked as Government's
20   Exhibit 9-4(2) through 9-4(7); see if you can identify what
21   these are?
22   A   Yes, sir.  This is the data obtained from the Open Payment
23   data, CMS.gov website.
24   Q   And is that the Sunshine Act website that you were
25   referring to before?
```

1   A   Yes, sir, it is.

2   Q   And are these printouts for Dr. Ruan and Dr. Couch for the

3   years '13, '14, and '15?

4   A   That's correct.

5        MR. BODNAR:  United States moves to admit Government's

6   Exhibit 9-4, subparts (2) through (7).

7        MR. ESSIG:  No objection.

8        THE COURT:  All right.  Mark them in.

9        (Government's Exhibit 9-4(2) through 9-4(7) were entered

10  into evidence.)

11  BY MR. BODNAR:

12  Q   Special Agent Burt, showing you what has been admitted as

13  Government's Exhibit 9-4(2).  Is this the printout you were

14  just talking about?

15  A   Yes, it is.

16  Q   So walk us through the beginning of this.  Who is the

17  doctor here?

18  A   Xiulu Ruan.

19  Q   And what year is this for?

20  A   Year is 2013.

21  Q   And looking below, what is this -- what does this purport

22  to be?

23  A   These are the pharmaceutical companies that have provided

24  payment to Dr. Ruan.

25  Q   Is that all of them or just the top companies?

DEA SA MICHAEL BURT - DIRECT BY MR. BODNAR

```
 1   A   It's just the top companies.
 2   Q   In 2013 -- and first off, is this for the entire year of
 3   2013 or just August 2013 till the end of the year?
 4   A   From August of '13 till the end of the year.
 5   Q   And what company paid the most money to Dr. Ruan during
 6   2013 -- latter part of 2013?
 7   A   Insys Therapeutics.
 8   Q   And on the second page of this printout does it show how
 9   much each of the top companies paid?
10   A   Yes, sir, it does.
11   Q   Reading across on this line, how many payments did Insys
12   Therapeutics make to Dr. Ruan in the latter part of 2013?
13   A   There were 36 payments made, totaling $40,939.83.
14   Q   And among all money paid by pharmaceutical companies at
15   that latter part of 2013, what percentage was paid by Insys to
16   Dr. Ruan?
17   A   66.3 percent.
18   Q   And at the bottom does it show the nature of the type of
19   payments paid to Dr. Ruan that year?
20   A   Yes, sir.  It states compensation for services other than
21   consulting, including serving as faculty or as a speaker at a
22   venue other than a continuing education program.
23   Q   And is that a 71.5 percent?
24   A   That's correct.
25   Q   For compensation other than consulting but serving as
```

1  faculty or a speaker?

2  A   Yes, sir.

3  Q   Did you also do a printout -- did you also examine data for

4  Dr. Couch for 2013?

5  A   Yes, sir.

6  Q   And is it similar to Dr. Ruan in that it would only be

7  payments made after August of 2013?

8  A   That's correct.

9  Q   I show you what has been admitted As Government's Exhibit

10 9-4(3).  Is this data from the Sunshine Act website for

11 Dr. Couch?

12 A   Yes, it's for Dr. Couch in the year 2013.

13 Q   And amongst the top companies making payments, who was the

14 number one company paying Dr. Couch that year?

15 A   Insys Therapeutics.

16 Q   How many payments did Insys make to Dr. Couch in the last

17 months of 2013?

18 A   There were 44 payments totaling $27,007.85.

19 Q   And amongst all payments by pharmaceutical companies in the

20 last few months of 2013, what percentage of it was paid to

21 Dr. Couch by Insys?

22 A   96.2 percent.

23 Q   And does this chart below -- is this 51.3 percent, this

24 part of the pie (indicating)?  Is that what we just talked

25 about, about being for speaking fees and continuing -- other

DEA SA MICHAEL BURT - DIRECT BY MR. BODNAR

1  than continuing education?

2  A   Yes, sir; that's correct.

3  Q   Now, did you also pull the data from the website for 2014

4  for both doctors?

5  A   Yes, sir.

6  Q   Would the data for 2014 be a complete year?

7  A   Yes, it would.

8  Q   Starting first with what's been marked as Government's

9  Exhibit 9-4(4), which doctor do we have here?

10  A   Xiulu Ruan.

11  Q   What year?

12  A   2014.

13  Q   And among the top companies paying Dr. Ruan that year, who

14  was the number one company?

15  A   Insys Therapeutics.

16  Q   Flipping to the second page, how many payments did Insys

17  make to Dr. Ruan that year and for how much?

18  A   84 payments totaling $103,143.13.

19  Q   And what percentage of all the money paid by pharmaceutical

20  companies to Dr. Ruan came from Insys that year?

21  A   71.5.

22  Q   And the chart below, what percentage came from speaking

23  fees?

24  A   86.3.

25  Q   Now I show you what's been admitted as Government's Exhibit

1    9-4(5).  Is this for Dr. Couch?

2    A    That's Dr. Couch for the year 2014.

3    Q    And what was the top company paying Dr. Couch that year?

4    A    Insys Therapeutics.

5    Q    Who was the second highest?

6    A    Galena Biopharma.

7    Q    How much did Insys pay Dr. Couch in the year 2014?

8    A    Total of 54 payments were made in the amount of $48,440.57.

9    Q    What percentage of that was the total amount paid?

10   A    82.7.

11   Q    How about Galena Biopharma; how many times did they pay and

12   how much to Dr. Couch in 2014?

13   A    A total of three payments for $8,157.28; percentage was

14   13.9.

15   Q    Did any other company pay even -- any more than $500 to

16   Dr. Couch that year?

17   A    No, sir.  Not according to this chart, no.

18   Q    And in 2014 what percentage of pharmaceutical payments to

19   Dr. Couch involved speaking engagements?

20   A    22.

21   Q    And I'm sorry.  What percentage?

22   A    I'm sorry.  77.1 percent.

23   Q    Finally, did you pull the data for 2015 as well?

24   A    Yes, sir.

25   Q    Is the 2015 data a full year?

1  A  No, it's not.

2  Q  Why is that?

3  A  Because the DEA and FBI raided PPSA on May 20th of 2015.

4  Q  So would this data just be from January 1st until May 20th,

5  2015?

6  A  That's correct.

7  Q  I'm showing you what's been admitted as Government's

8  Exhibit 9-4(6).  Is this Dr. Ruan for that portion of 2015?

9  A  Yes, it is.

10  Q  Who was the top company paying Dr. Ruan that year?

11  A  Insys Therapeutics.

12  Q  In those five months how much did Insys Therapeutics pay

13  Dr. Ruan?

14  A  Total of 20 payments for $27,194.41.

15  Q  And what percentage of the total pharmaceutical payments to

16  Dr. Ruan was that?

17  A  69.1.

18  Q  During those five months what percentage of the

19  pharmaceutical payments to Dr. Ruan were for speaking

20  engagements?

21  A  83.8.

22  Q  And finally, did you do the same for Dr. Couch?

23  A  Yes, sir.

24  Q  And for his 2015 would it be the same as it is only a

25  partial year?

1   A   Yes, sir.

2   Q   I'm showing you what has been admitted as Government's

3   Exhibit 9-4(7).  Is this for John Patrick Couch -- Dr. John

4   Couch for 2015?

5   A   That is correct.

6   Q   Who was the top paying company to Dr. Couch during those

7   five months?

8   A   Insys Therapeutics.

9   Q   How much did Insys pay Dr. Couch during those five months?

10  A   There were a total of 23 payments for $24,469.55.

11  Q   And what percentage of the total pharmaceutical payments

12  came from Insys?

13  A   95.2 percent.

14  Q   And what's the number two here?

15  A   Number two would be Galena Biopharma.

16  Q   And during those five months what percentage of Dr. Couch's

17  payments from pharmaceutical companies came from speaking

18  programs?

19  A   94.1.

20  Q   Special Agent Burt, I'm going to show you what has

21  previously been admitted as Government's Exhibit

22  15-3.  Sorry.  15-2.  Does this document purport to be speaker

23  program payments to Dr. Ruan?

24  A   Yes, sir.

25  Q   For which drug?

 1   A    Exalgo.

 2   Q    And what is the year range here?

 3   A    Beginning in January 13, 2011, all the way to August 22nd,

 4   2013.

 5   Q    Other than these final two payments would any other

 6   payments show up on the Sunshine Act website?

 7   A    No, sir, they would not.

 8   Q    Why not?

 9   A    Because Sunshine became enacted in August of 2013.

10   Q    I want to show you what has also been admitted as

11   Government's Exhibit 10-17.  Is this the chart that purports to

12   be Exalgo prescribed by monthly milligrams for Dr. Ruan and for

13   Dr. Couch?

14   A    Yes, sir.

15   Q    I'm going to show you --

16            MR. BODNAR:  May I approach the witness, Your Honor?

17            THE COURT:  Yes.

18   BY MR. BODNAR:

19   Q    Showing you now what is a blown-up poster board.  Does this

20   appear to be the document you see in front of you on the ELMO

21   screen?

22   A    Yes, sir.

23   Q    Mr. Burt, in reference to Government's Exhibit 15-2, were

24   these payments just for Dr. Ruan?

25   A    Yes, sir, they were.

2066

DEA SA MICHAEL BURT - DIRECT BY MR. BODNAR

1  Q   Based on your involvement in this investigation, do you

2  know were there any payments paid to Dr. Couch regarding

3  Exalgo?

4  A   I'm not aware of any payments paid to Dr. Couch regarding

5  Exalgo.

6  Q   Was a subpoena sent to Mallinckrodt, the manufacturer of

7  Exalgo --

8         THE COURT:  Mr. Bodnar, if the jury can't see him

9  while he's testifying --

10         MR. BODNAR:  I'm sorry.  Let's put that down for one

11  moment.

12  Q   I'll ask again.  Was a subpoena sent to Mallinckrodt, the

13  manufacturer of Exalgo, seeking any payments to Dr. John

14  Patrick Couch?

15  A   Yes, sir, it was.

16  Q   And were any documents received back showing that there

17  were ever any payments to Dr. Couch?

18  A   I'm not aware of any payments made to Dr. Couch.

19         MR. BODNAR:  Your Honor, may the witness approach the

20  poster board?

21         THE COURT:  Yes.

22         MR. BODNAR:  And walk through the timeline with the

23  jury of the payments for Dr. Ruan.

24         THE COURT:  Special Agent Burt, you will have to get

25  on the other side of the board and face the court reporter so

1   he can get your testimony.

2          THE WITNESS:  Yes, ma'am.

3   BY MR. BODNAR:

4   Q   And, Mr. Burt, while the jury has up 15-2, a copy on the

5   screen, would it be beneficial to you to have a copy in your

6   hand so you can mark where these payments were made?

7   A   Yes, sir.

8   Q   Could you please mark and note for the jury where payments

9   to Dr. Ruan were made along that timeline?  And as you do that,

10  since it's being done for the record, could you say which date

11  is the payment as you draw the line?

12  A   I certainly will.  January.

13  Q   Would you speak up, too?  Because you don't have a

14  microphone.

15  A   January 13th, 2011.

16  Q   You don't need to go all the way up to the top, just above

17  the red line.

18  A   March 31st, 2011.

19          October 20th, 2011.

20          October 25th, 2011.

21          November 22nd, 2011.

22          December 14th, 2011.

23          August 9th, 2012.

24          September 27th, 2012.

25          November 8, 2012.

1          November 26, 2012.

2          February 14th, 2013.

3          February 21st, 2013.

4          May 16th, 2013.

5          June 6, 2013.

6          July 11th, 2013.

7          August 8th, 2013.

8          And August 22nd, 2013.

9   Q    Special Agent Burt, after the final payment to Dr. Ruan on

10  August 22nd, 2013, is there any perceptible change in -- over

11  time of Dr. Ruan's prescribing of Exalgo?

12  A    Yes, sir.  There's a steady decline after that payment.

13  Q    And during the time period where Dr. Ruan was being paid by

14  Exalgo, is there any perceptible -- is there any noticeable

15  changes to Dr. Couch's prescribing of that same drug?

16  A    It maintains a steady line.

17          MR. BODNAR:  United States moves to admit Government's

18  Exhibit 9-13.

19          THE COURT:  Is that the big chart?

20          MR. BODNAR:  It is the big chart, Your Honor.

21          THE COURT:  All right.  Mark it in.

22      (Government's Exhibit 9-13 was entered into evidence.)

23      (The witness returned to the witness stand.)

24  BY MR. BODNAR:

25  Q    Special Agent Burt, I'm now going to show you what has

1    previously been marked as Government's Exhibit 9-5, subparts

2    (1) through (8).  Are you able to identify what these items

3    are?

4    A   Yes, sir.  They are emails obtained via the search warrant

5    for Xiulu Ruan's Yahoo.com account.

6    Q   And do they all involve either Dr. Ruan or Dr. Couch?

7    A   Yes, sir.

8            MR. BODNAR:  United States moves to admit Government's

9    Exhibit 9-5, parts (1) through (8).

10           THE COURT:  Any objection?

11           MR. KNIZLEY:  No, ma'am.

12           THE COURT:  All right.  Mark it in.

13      (Government's Exhibit 9-5(1) through 9-5(8) were entered

14    into evidence.)

15    BY MR. BODNAR:

16    Q   Special Agent Burt, I'm going to show you what has been

17    admitted now as Government's Exhibit 9-5(1).  And Special Agent

18    Burt, who is this email from?

19    A   The email is from Dr. Xiulu Ruan @yahoo.com.

20    Q   The to line is redacted, but who is the blind copy on this

21    email?

22    A   Joe Rowan.

23    Q   Do you know, based on your investigation, who Joe Rowan is?

24    A   Yes, sir.

25    Q   Who is Joe Rowan?

1    A    He's the representative from Insys Therapeutics.

2    Q    Is Dr. Ruan writing to Joe Rowan at his official Insys

3    email address?

4    A    No.  He's writing to him on a gmail account.

5    Q    And what is Dr. Ruan saying?

6         Please read this for the jury.

7    A    Hi, hope you're having a great Mardi Gras.  It has been

8    raining for the whole day.  I feel sad for those folks who

9    prepare for the parade for the whole year only to find a nasty

10   raining Mardi Gras.  Well, I enjoyed the conversation we had

11   and it was my pleasure to have met your father and his

12   colleague.  It seems that we might not be able to put in a

13   confirmation equipment in my office, or at least not as quick

14   as I thought.  So, I recalled your father and his friend were

15   telling me that we could make around $200 per test.  Right?

16   Q    I'm going to stop you there for a second.  Confirmation

17   equipment.  Based on your knowledge of this investigation, do

18   you know what type of confirmation equipment Dr. Ruan is

19   referring to here?

20   A    Yes, sir.  I believe he was referring to urine testing

21   equipment for the pain clinic.

22   Q    And does he go on and say that he would like to set up or

23   discuss setting up a meeting?

24   A    Yes, sir, he does.

25   Q    I will now show you what's been admitted as Government's

1  Exhibit 9-5(2).  And is this an email exchange between an

2  individual named Lou Paravate and Dr. Ruan?

3  A   Yes, it is.

4  Q   And based on your knowledge of this investigation is

5  Mr. Paravate the person who's referred to as father in the

6  previous email?

7  A   Yes, sir.

8  Q   What is Dr. Ruan or what does Mr. Paravate tell Dr. Ruan in

9  this first email?  What are they discussing?

10  A   It says:  Dr. Ruan, in anticipation of our dinner meeting

11  on the 27th, I'd like to maximize the benefits of our proposal

12  to you.  That being the case, there are four pieces of

13  information that would allow me to do so.  Can you give me an

14  approximation of how many monthly urine screens you are

15  currently doing?  And can you give me an approximation of how

16  many monthly confirms you are doing?  Can you give me an

17  approximate projection of how monthly many [sic] urine screens

18  you might do if you maximized that capability?  Similarly, can

19  you give an approximate projection of how many monthly urine

20  confirms you might do if you maximized that capability?

21  Q   I'll stop you there for a second.  Do you know, from your

22  part in the investigation, what company Mr. Paravate worked

23  for?

24  A   Yes, sir.  He worked for Castle Medical.

25  Q   Can you explain to the jury what is Castle Medical?

2072

1   A   Castle Medical is a company that does -- analyzes urine

2   drug screens.  They are shipped to them, they conduct an

3   analysis and it's shipped back to the pain clinic.

4   Q   Is the type of testing done at Castle Medical called GC-MS

5   testing?

6   A   Yes.  I want to talk about -- when I say "shipped back" to

7   the pain clinic, the results of the urine tests are shipped

8   back to the pain clinic.

9   Q   And I'll ask again, GC-MS testing, is that what Castle

10  Medical did?

11  A   Yes.  It stands for gas chromatography-mass spectrometry.

12  Q   And can you explain what kind of test is that, from your

13  understanding?

14  A   My understanding, it's a more-detailed test than having --

15  such as a cup and having a stick put in it in place, or a

16  dipstick test they call it.

17  Q   Is it fair to say GC-MS is a confirmation test?

18  A   Yes, it is.

19  Q   What does Dr. Ruan write back to Mr. Paravate?

20  A   Hi Lou, if we skip the in-house confirmation, in-house

21  confirmation, 35-40 daily.

22  Q   Are they talking about confirmation of urine samples, to

23  your knowledge?

24  A   Yes, sir, to my knowledge.

25  Q   Okay.

1    A   Have been having some problems with the machine, therefore

2    on hold for machine repair.  If we stop in-house confirming,

3    then we can up the GC-MS number to 35-plus.  But we have to be

4    careful not to overdo it.  We go by at least three months

5    before repeating GC-MS.  If we continue in-house confirmation,

6    then we can probably do 20 a day.

7    Q   And I'll stop you there.  And what is the date on this

8    email?

9    A   February the 24th, 2013.

10   Q   I'm going to show you now what's been admitted as

11   Government's Exhibit 9-5(3).  Is this an email two days later

12   between Dr. Ruan and an individual named Boe Strange?

13   A   Yes, sir, it is.

14   Q   And based on your knowledge of the investigation, do you

15   know who Mr. Strange is?

16   A   To my knowledge, Mr. Strange was the accountant for PPSA.

17   Q   What does Dr. Ruan tell Mr. Strange?

18   A   Boe, we need to have a plan for replacing Todd's machine.

19   It has been like hell with the machine.  Literally all tests

20   done were completely useless.  Yes, we bill insurance companies

21   for charges.  We need to completely finish whatever we have

22   billed so far.  Talking about other methods.  I am meeting a

23   couple of guys tomorrow regarding using GC-MS, but we could

24   bill.  Dr. Ruan.

25   Q   And the date, is that February 26, 2013?

1    A    Yes, sir.

2    Q    Now I'm going to show you what's been admitted as

3    Government's Exhibit 9-5(4.)  And is this an email between

4    Dr. Ruan and Joe Rowan approximately a week later?

5    A    Yes, sir.

6    Q    And again, is Dr. Ruan writing to Joe Rowan's special Insys

7    address?

8    A    No, sir, he's not.  It's a gmail account.

9    Q    What's the subject of this?

10    A    GC-MS.

11    Q    Is that the confirmation test that -- outside lab

12    confirmation test for urine you mentioned before?

13    A    Yes, sir.

14    Q    What does Dr. Ruan tell Joe Rowan?

15    A    Joe, it seems I will need to go with another company.  I

16    need to learn more about this from them as they have a very big

17    account in Alabama.  But I need to learn the stuff they

18    do.  Plus I am losing about $8,000 a day from not testing and I

19    cannot just wait.  So I plan to sign up with these guys for

20    now.

21        If you and Brad can give us a deal on machine, we will

22    plan to set a machine using your service.  Now, I need to get

23    started with GC-MS testing ASAP and I will need to use this to

24    learn from the other clinic.  Sorry.  Dr. Ruan.

25    Q    And based on what's written here in this email, why does

1    Dr. Ruan say he needs to get started with GC-MS testing right

2    away?

3    A    He was losing about $8,000 a day for not testing.

4    Q    Does he mention anything about confirmation being good for

5    the patients here?

6    A    It's not in this email, no, sir.

7    Q    To your knowledge, based on this investigation, did PPSA

8    begin doing GC-MS testing with Castle Medical?

9    A    Yes, sir.

10   Q    I'm going to show you now what's been admitted as

11   Government's Exhibit 9-5, subsection (5).  Is this an email

12   chain between Dr. Ruan and Debi Phillips?

13   A    It is.

14   Q    And is Debi Phillips -- well, this point -- what does it

15   say under her signature here?  Who is she, this time period?

16   A    This time period Ms. Phillips was the billing manager of

17   PPSA.

18   Q    What is the date of this email?

19   A    It is Tuesday, May 21st, 2013.

20   Q    Is that approximately three months after the email we just

21   saw of Joe Rowan?

22   A    Yes, sir.

23   Q    And what is Debi Phillips telling the doctors at PPSA?

24   A    Dr. Ruan, Dr. Couch, Dr. Chen, Nicole noticed that a couple

25   of patients had a GC-MS four weeks apart.  Both were

1    comprehensive panels.  Is there a criteria you are following

2    for ordering the GC-MSs that go to Castle and how often?

3            Also, several patients have been calling regarding

4    seeing this billed to their insurance.  Is the clinical staff

5    explaining to the patient that this test is being ordered?  We

6    have been explaining it in billing to the patients, but I think

7    it should be explained to the patient that sometimes we do send

8    a urine sample out for more extensive tests.

9            We did make arrangements with Castle regarding a self-

10   pay rate of $75 and an indigent courtesy (no charge).  They are

11   not charging us for any claims not paid to us or where patients

12   have a high deductible.

13   Q   And I'll stop you there.  Does Dr. Ruan respond the same

14   day, May 21st, 2013, to Debi Phillips, Dr. Couch, and Dr. Chen?

15   A   He does.

16   Q   And what does he say about frequency that GC-MS tests

17   should be ordered?

18   A   He states:  No, we should not order that frequently.  That

19   must be due to mistakes.  Otherwise it will trigger

20   auditing.  The only time that I would see that being ordered is

21   that, for example, previous urine showed THC, COC,

22   methamphetamine, and we are to fire that patient.  Then we will

23   need something definitive to back us up.  With GC-MS it will be

24   over in three months.  On rare occasion, say if we see patients

25   every 12 weeks, or a patient is 150 miles away or on extremely

1    high opioid meds, we can order over 2.5 months, i.e., around

2    one week short of three months.  With that I would document

3    patients that live far away, high opioid amount.  If we did

4    order GC-MS by mistake within one month, we should not bill

5    insurance and let Castle know that it was a mistake.  Because

6    Castle will charge us and yet we might not get paid and

7    possibly get audited.

8    Q    And I want to stop you there.  What is Dr. Ruan's concern

9    about having these outside tests being done too often?

10   A    Concern is it may trigger auditing.

11   Q    I'm going to show you now what's been admitted as

12   Government's Exhibit 9-5(6).  And is this an email

13   approximately a month later from Dr. Ruan to a blacked out

14   individual who is another doctor here in the area?

15   A    Yes, sir.

16   Q    And is Lou Paravate -- or the email appears to be from Lou

17   Paravate blind copied?

18   A    It is.

19   Q    What does Dr. Ruan tell this other doctor?

20   A    Hi, how is it going?  I heard you started doing in-office

21   GC-MS recently using Castle.  I was having dinner with Lou and

22   his son yesterday and asked him how you guys are doing.  I got

23   a feeling that your office manager was being too kind to other

24   GC-MS company.  It seemed that you guys could have done a lot

25   more, but some urine went elsewhere.  Lou did not say that

DEA SA MICHAEL BURT - DIRECT BY MR. BODNAR

```
 1   directly, but I somehow felt that way.  You might want to
 2   clarify with your staff your intention, since GC-MS will not
 3   last long, as everyone is doing it.  So you want to take
 4   advantage of the opportunity before it is gone.  Hope all is
 5   well with your family.
 6   Q   And based on your knowledge of this investigation, what if
 7   anything would he mean when he referred to "since GC-MS will
 8   not last long, as everyone is doing it"?  What is the "it"
 9   that's being referred to here?
10   A   Testing of the urine.
11   Q   And how about the billing, is that -- could that be it as
12   well?
13   A   The billing also, yes.
14   Q   I'm going to show you now what's been admitted as
15   Government's Exhibit 9-5(7).  And is this an email chain
16   ultimately responded to and forwarded to Dr. Ruan and forwarded
17   on involving urine tests at Castle Medical?
18   A   That's correct.
19   Q   And starting at the bottom, what does Ms. Smith tell Lou
20   Paravate?  Oh, what is the subject line first?
21   A   The subject is:  Samples wasted.
22   Q   Okay.  What's she saying to Mr. Lou?
23   A   Mr. Lou, during the period from October 22nd, 2013, through
24   December 11, 2013, the PPSA Springhill office has discarded a
25   total of 112 urine specimens.  The 112 specimens are comprised
```

```
 1   of 22 workmen's comp, 90 commercial insurances.  The 112
 2   includes only specimens that PPSA would direct bill the
 3   patients' insurance.  The average profit is $755 per specimen.
 4   Therefore, the 112 specimens represent a lost profit of
 5   $84,560.
 6   Q   And does her email continue on the back?
 7   A   Yes.
 8          The 112 specimens equate to an average of 4.5
 9   specimens per day or 1,078.52 samples per year.  If this
10   average continues for a year, the lost profit would be
11   approximately $814,281.  Throughout the day we check the EMR to
12   determine if an order has been placed.  If an order has not
13   been placed for a panel by the end of the day, we refrigerate
14   the specimens overnight and check the EMR again in the
15   morning.  If an order has not been placed, the specimen is
16   discarded.
17   Q   Is this email from Ms. Smith forwarded on to Dr. Ruan by
18   Lou Paravate?
19   A   Yes, sir, it is.
20   Q   And did Dr. Ruan then forward it on to Dr. Couch, Boe
21   Strange, and others?
22   A   Yes; on December 12, 2013, he does.
23   Q   What does Dr. Ruan say?
24   A   Pat, this is the email from Lou.  Since we implemented the
25   EMR --
```

2080

1    Q    I want to stop you there for a second.  What does EMR stand

2    for?

3    A    Electronic medical records.

4    Q    Okay.  Continue, please.

5    A    We have dropped the number of GC-MS, especially

6    yours.  This issue is that nurses will need to order them on

7    computer.  If not, Castle Medical cannot run it.  As you know,

8    UDS pays nothing (cost only).

9    Q    I want to stop you there for a second.  What does UDS stand

10   for?

11   A    Urine drug screen.

12   Q    Okay.  Continue on, please.

13   A    GC-MG -- I think he means GC-MS -- is what generates

14   revenue.  And we already got the urine samples.  And patients

15   know that we have done the urine test.  Yet, if we do not run

16   GC-MS, there is no revenue.  Plus we need GC-MS result as there

17   are false positives and false negatives with point of care

18   urine screen.  So we need to look at this seriously so that all

19   nurse practitioners will order them on the computer so that we

20   would not throw them away.

21          I think our nurse practitioners are so busy with

22   trying to finish patients and have no time to order those tests

23   as nurse practitioners are on a production base.  However, we

24   cannot throw the urine samples away already obtained.

25   Q    What is his first concern here?  Is it about false

2081

1    positives and false negatives or is it about revenue to PPSA?

2    A   From this email, he's more concerned about losing revenue.

3    Q   And is the lost revenue and lost profit to PPSA discussed

4    down here by Ms. Smith?

5    A   Yes, sir.

6    Q   Mr. Burt, during the course of this investigation have you

7    had an opportunity to review certain patient files?

8    A   Yes, sir.

9    Q   And as part of those patient files did you see instances

10   where Dr. Ruan or Dr. Couch did in fact fire patients for

11   violating -- for inconsistent urine drug screens?

12   A   That's correct.

13   Q   Were there other instances where patients weren't fired for

14   inconsistent drug screens?

15   A   Yes, sir.

16   Q   I want to show you now what's been admitted as Government's

17   Exhibit 9-5(8).  And is this an email exchange between Dr. Ruan

18   and an individual gjain@siumed.edu?

19   A   Yes, sir.

20   Q   Starting at the bottom, what is being asked of Dr. Ruan,

21   amongst others?

22   A   Dear Doctors -- would you like me to read it?

23   Q   Yes, please.

24   A   Dear Doctors Kaye, Ruan, and Shah, I am a medicine and

25   psychiatry combined resident from Southern Illinois University

1  in Springfield, Illinois.  I am interested in knowing the

2  epidemiology and characteristics for patients who are fired or

3  terminated by the pain physician from their practice.

4  Q   I'll stop you there.  Does this say there's really no data

5  that he could find for his research about why patients get

6  fired?

7  A   Yes, sir.

8  Q   And does Dr. Ruan then respond to this, what appears to be

9  a medical student?

10  A   That's correct.

11  Q   And is this in 2012?

12  A   Yes, it is.

13  Q   What does Dr. Ruan say about firing patients?

14  A   Yes, I think it is a great idea.  In literature, physicians

15  used to say zero tolerance, but in reality we fire patients

16  rather infrequently.  We always give folks one more chance.  In

17  private practice the more you fire, the more revenue you

18  lose.  So it is really how comfortable you feel by keeping

19  folks for a little longer.

20         In academic institutions it is no big deal.  Taking

21  care of extra-trouble patients does not bring any additional

22  income to the physician.  So it is clear -- so it is a clear-

23  cut decision.  Private practice is different.  Another

24  interesting thing is when one patient tests positive for street

25  drugs, that gives you more reason to do more frequent urine

 1   drug screens, which pays three times more than an office

 2   visit.  So there is incentive for taking care of risk

 3   individuals.  So a lot of factors are involved even if you do

 4   not see it on the chart.

 5   Q   I'll stop you there.  Is Dr. Ruan -- is PPSA, is it a

 6   private practice or an institutional practice?

 7   A   It's a private practice.

 8   Q   Why does Dr. Ruan say it's a bad idea to fire or less than

 9   ideal?  What is the ramifications of firing patients if you're

10   in private practice like PPSA?

11   A   It creates less of a patient base and therefore you have

12   less revenue coming in.

13   Q   And what is the benefit if somebody tests positive and you

14   don't fire them?

15   A   You can order additional tests.

16   Q   And does he say that those are profitable or not

17   profitable?

18   A   Profitable.

19   Q   During the course of your investigation have you had the

20   opportunity to review a file of an individual named Kathleen

21   Burns?

22   A   Yes, sir.

23   Q   I'm going to show you now what has been marked as

24   Government's Exhibit 9-11.  Can you identify what this is for

25   the jury?

1    A   Yes, sir.  It's a patient file of Kathleen Burns.

2    Q   I'm going to show you also what's been marked as

3    Government's Exhibit 9-11A.  Are you able to identify what this

4    is?

5    A   Yes, this is an Alabama PDMP report of Kathleen Burns.

6              MR. BODNAR:  United States moves to admit Government's

7    Exhibit 9-11 and 9-11A.

8              MR. KNIZLEY:  No objection.

9              THE COURT:  All right.  Mark it in.

10        (Government's Exhibit 9-11 and 9-11A were entered into

11   evidence.)

12   BY MR. BODNAR:

13   Q   As an initial matter I'm going to show you what has been

14   admitted as Government's Exhibit 12-2.  Is this a chart that

15   purports to be Top Off-Label Recipients of Subsys and Abstral

16   as prescribed by Dr. Ruan and Dr. Couch?

17   A   Yes, sir.

18   Q   And looking down here at number 20, do you see Ms. Burns?

19   A   Yes, sir, I do.

20   Q   Based on the fact she is in red, which doctor does that

21   signify she was a patient of?

22   A   She was, I believe, Dr. Ruan's patient -- I'm sorry.  A

23   Dr. Couch patient.

24   Q   No.  If it's red, would that be Dr. Ruan?

25   A   It would be Dr. Ruan.  My fault.

2085

1  Q   And what was the total amount paid for her Subsys and

2  Abstral for Ms. Burns?

3  A   $157,875.83.

4  Q   Based on the fact that she's on a Top Off-Label Recipients

5  list, did Ms. Burns have cancer or not have cancer?

6  A   She does not have cancer.

7  Q   And is that also reflected in your review of her file, of

8  her not having cancer?

9  A   Yes.  Based on the file I was given to review, I could not

10  find any indication of a diagnosis of cancer.

11  Q   Based on your review of the file, were there numerous

12  instances where it was listed that Ms. Burns was abusing her

13  Subsys?

14  A   Yes, sir.

15  Q   Looking now at portions of the file admitted as

16  Government's Exhibit 9-11 for Kathleen Burns, does this appear

17  to be the history and physical for Ms. Burns?

18  A   Yes, sir.

19  Q   For what date?

20  A   Date of visit is May 17, 2012.

21  Q   Based on your review of the files, does this appear to be

22  her first trip to PPSA?

23  A   Yes, it does.

24  Q   What is her chief complaint?

25  A   Lower back pain, left leg pain.

1  Q   In her family medical history does she list anything about

2  cancer?

3  A   Yes.  It says:  Significant for cancer, heart disease,

4  hypertension.

5  Q   Now, is that her personal medical history or medical

6  history for someone in her family?

7  A   That's family medical history.

8  Q   How about under social history?  What is reported

9  apparently to PPSA right there?  (Indicating.)

10  A   Reports previous narcotic abuse.

11  Q   And is that for the patient or for someone in her family?

12  A   That's for the patient.

13  Q   Now I show you what has been -- appears to be a progress

14  note in the file for what date?

15  A   February 18th, 2013.

16  Q   A remark down at the bottom, what's noted on there?

17  A   We will request PA authorization for Subsys.

18  Q   I now show you what appears to be a progress note from the

19  next visit.  Is that May [sic] 18, '13?

20  A   Correct.  That's March 18th, 2013.

21  Q   What does it list here happened with her Subsys?

22  A   It says Subsys has been approved.

23  Q   Does it say anywhere on there why Subsys was approved?

24  A   No, sir.

25  Q   It does not say why?

2087

1   A   No, sir, I could not find a reason why it was approved.

2   Q   Does the record reflect copies of Subsys prescriptions in

3   there?

4   A   Yes, sir.

5   Q   I show you now what appears to be a progress note from May

6   28, 2013.

7   A   That's correct.

8   Q   What's listed that Ms. Burns mentioned there?

9   A   Wants stronger Subsys, used extra.

10  Q   Then over here, what does it note in quotes for her?

11  A   It states:  Immune to Roxi, overuse due to pain, out of

12  meds.

13  Q   Does that appear to be Roxi or does it appear to say R-O-O

14  for ROO medication?

15  A   Looks like R-O-X-I.

16  Q   Okay.  Now I show you what is a next patient visit on June

17  25th, 2013.  What does it note about her Subsys?

18  A   Been using Subsys, last used Sunday.

19  Q   And what does it say about a warning here?

20  A   One warning given, opioid violation signed.

21  Q   And is this the opioid violation from that same day signed

22  by Ms. Burns?

23  A   Yes, sir.

24  Q   What are the two things marked about her being

25  noncompliant?

```
 1    A    First one states:  Out of prescribed medication
 2    early.  Roxi 90 filled, 6-10, states flushed meds.
 3    Q    And how about the second one?
 4    A    Second one states:  Noncompliance with treatment plans, out
 5    of Subsys early two days, today is fill-on date.
 6    Q    And does she sign it and note that she is going to take the
 7    medicine as prescribed?
 8    A    Yes, sir.  She signs it, yes.
 9    Q    And does it specifically say:  Take medications only as
10    prescribed regardless of pain; we will not approve early fills?
11    A    Yes, sir, that's what it says.
12    Q    What's the date there?
13    A    It is 6/25/2013.
14    Q    Without going through this entire file, you have previously
15    reviewed this, haven't you?
16    A    Yes, sir.
17    Q    Are there numerous examples of warnings given to Ms. Burns
18    about her overuse of Subsys?
19    A    There are, yes.
20    Q    Does it mention that Dr. Couch -- sorry -- that Dr. Ruan
21    specifically warned the patient himself about her overuse?
22    A    Yes, I recall that.
23    Q    Roughly how many times was she warned or noted in her file
24    about overuse or misuse of Subsys?
25    A    At least three or four times that I can recall.
```

1  Q   At some point -- were there also indications in there about

2  whether or not she was being approved for Subsys and Abstral?

3  A   Yes.

4  Q   While she was approved for receiving Subsys, was she ever

5  fired as a patient?

6  A   She was.

7  Q   While she was being approved for Subsys?

8  A   No, not -- not while being approved, no.

9  Q   Did a time come where she was no longer approved for

10  Subsys?

11  A   Yes.

12  Q   I'm going to show you what appears to be a return call from

13  June 30th, 2014.  And what's the date on here?  Sorry.  I just

14  read that.  June 30th, 2014?

15  A   Yes, it does.

16  Q   What is being stated here?

17  A   Returned patient call.  Patient has been denied for Subsys

18  and Abstral.  I sent the info to Krystal and let the patient

19  know that since she does not have an active cancer diagnosis,

20  that she probably would not be approved.

21  Q   Prior to this date you had noted that there were numerous

22  warnings given to her about her misuse of Subsys?

23  A   Yes, sir.

24  Q   Had she been fired before this date, though?

25  A   No.  She had not.

DEA SA MICHAEL BURT - DIRECT BY MR. BODNAR

2090

```
 1    Q   Was she fired shortly after this date?

 2    A   Yes, sir.

 3    Q   Is this the letter to Ms. Burns from Dr. Ruan stating she's

 4    being fired as a patient?

 5    A   Can you -- yes, sir.  It looks like she was fired

 6    approximately nine days after --

 7    Q   Nine days after not being approved for Subsys and Abstral

 8    anymore?

 9    A   That's correct.

10    Q   And what is -- what is the reason that she's being fired?

11    A   It states violation of opioid agreement; habitually running

12    out of prescribed medication.

13    Q   And is that true?

14    A   That is true.

15    Q   She had numerous times been warned of that before this?

16    A   Prior to, yes.

17    Q   And the date on that is?

18    A   July 7th -- I'm sorry -- July 9th, 2014.

19    Q   Prior to firing her for her misuse of Subsys, I'm showing

20    you again what was marked as Government's Exhibit 12-2.  How

21    much had been billed for Kathleen Burns' Subsys?

22    A   $157,875.83.

23    Q   If she's no longer approved for Subsys and Abstral, can

24    they bill her insurance for Subsys or Abstral?

25    A   No, sir, they cannot.  Or should not.
```

2091

1  Q   At any point in her file during the time that she was a

2  patient was there any indication that Ms. Burns had cancer?

3  A   No, sir, none that I could find.

4  Q   I'll now show you from the medical file what appears to be

5  a letter from July 18, 2014.  What does it say on the top here?

6  A   Cigna.

7  Q   And to your knowledge, what is Cigna?

8  A   It's a health insurance company.

9  Q   And does this appear to be a letter to Dr. Ruan from Cigna?

10 A   Yes, sir.

11 Q   Can you read the letter, please?

12 A   On 3/4/2013 our records indicate that you wrote a

13 prescription for Subsys for Cigna-HealthSpring member Kathleen

14 Burns, date of birth 3/15/1961.  As you are most likely aware,

15 on December 28, 2011, the FDA approved a single-risk evaluation

16 and mitigation strategy for the entire class of transmucosal

17 immediate release fentanyl prescription medicines.  The TIRF

18 REMs access program involves a restricted distribution program

19 to reduce the risk of misuse, abuse, addiction, and overdose

20 with TIRF medication.  TIRF medications such as Subsys are FDA

21 approved for the management of breakthrough pain in adults with

22 cancer who are routinely taking other opioid pain medicines

23 around the clock for pain.

24        Healthcare providers who prescribe TIRF medicines for

25 outpatient use are required to enroll in the TIRF REMs access

2092

```
1    program, and to complete and sign a patient-prescriber

2    agreement form with each new patient being -- before writing a

3    patient's first TIRF prescription.

4    Q    I will stop you there for a moment.  In your review of the

5    file did you see any patient-prescriber agreement anywhere in

6    this file?

7    A    No, sir, I did not.

8    Q    Please continue.

9    A    Healthcare providers must also provide payment [sic] with a

10   copy of the medication guide during counseling about the proper

11   use of their TIRF medicines.  Please confirm by signing below

12   that the member listed above received the TIRF medications

13   indicated with approved diagnosis of management for

14   breakthrough cancer pain and that appropriate TIRF REMS access

15   program agreement forms were signed.

16   Q    Does this appear to be signed by Dr. Ruan?

17   A    Yes, sir, it appears to be Dr. Ruan's signature.

18   Q    And is it dated?

19   A    7/24/2014.

20   Q    So by signing below is he confirming that the Subsys was

21   prescribed to Ms. Burns for breakthrough cancer pain?

22            MR. KNIZLEY:  Your Honor, I object.  The letter speaks

23   for itself.  And I suggest that it's open to interpretation,

24   not for the witness to do so.

25            THE COURT:  Sustained.
```

 1  BY MR. BODNAR:

 2  Q   If he is confirming that she has breakthrough cancer pain

 3  and that's why she received the Subsys prescriptions, based on

 4  your review of the medical record would that be true or a lie?

 5  A   It would be true.

 6  Q   That she had breakthrough cancer pain?

 7  A   I'm sorry.  I misheard your question.  That would be a lie,

 8  that she did not have cancer pain.

 9  Q   Mr. Burt, I'm now going to show you what has been marked as

10  Government's Exhibit 9-6, subparts (2), (3) through

11  (6).  9-2 -- 9-6(2) dash 9 -- through 9-6(6).

12           THE COURT:  That's a little confusing.  Say it again.

13  BY MR. BODNAR:

14  Q   I am now showing you what's been marked 9-6, subparts (2)

15  through subpart (6).

16  A   Yes, sir.  I recognize these as search warrants -- obtained

17  via search warrant for xiuluruan@yahoo.com.

18  Q   These are emails obtained by search warrant?

19  A   Yes.

20  Q   And they involve Dr. Ruan and Dr. Couch?

21  A   Yes.

22           MR. BODNAR:  United States moves to admit 9-6,

23  subparts (2) through (6).

24           MR. ESSIG:  No objection.

25           MR. KNIZLEY:  No objection.

```
 1            THE COURT:  All right.  Mark it in.2069
 2        (Government's Exhibits 9-6(2) through 9-6(6) were entered
 3    into evidence.)
 4    BY MR. BODNAR:
 5    Q   I show you now what's been marked and admitted as 9-6(2).
 6    At the top, is this an email from Dr. Ruan to Li Ma?
 7    A   Yes, sir.
 8    Q   Would you please say, what is he telling Dr. Ma?
 9    A   Subject matter is:  Petition on opioids and FDA Commentary.
10            Would you like me to read it?
11    Q   Yes, please.
12    A   Dr. Ma, I want to share this with you.  Most ASIPP board
13    members are against opioids.  See below.
14    Q   And ASIPP stands for the American Society Interventional
15    Pain Physicians?
16    A   Yes, sir.
17    Q   Continue, please.
18    A   No one openly disagrees.  I don't care.  So this is the
19    second time I am against them.  I recently asked them to take
20    my name out of the opioid guide most recent pain physician will
21    publish as I don't want to contradict myself.
22            I believe that says:  However, there are some other
23    members who feel the same way and do the same thing, but they
24    cannot state openly as they are co-authors in the article.
25            Anyway, since I wrote this, there are more people
```

 1    expressing affirmative opinion, although not directly, but I am
 2    still the extreme of them all.
 3    Q   Going to stop you there.  I'm going to show you not for
 4    admission but just identification what has been marked as
 5    Government's Exhibit 9-6(2)(A).
 6          Mr. Burt, is this the guidelines, ASIPP guidelines
 7    that were referenced in that email?
 8    A   Yes, sir, they are the guidelines from 2012.
 9    Q   Is that the one that Dr. Ruan said he was taking his name
10    out of the article?
11    A   Yes, sir.
12    Q   If you turn to page S-42 on there, does it note in the
13    article why it is that Dr. Ruan said he was taking his name out
14    of the article?  Does it note on there?
15    A   Yes, it does.
16    Q   What does it say about why Dr. Ruan is taking his name out
17    of this article?
18          MR. KNIZLEY:  Mr. Bodnar, I think you haven't
19    introduced that yet.
20          MR. BODNAR:  We are not offering it.
21       (A discussion was held off the record between counsel.)
22          THE COURT:  I can't hear you.
23          MR. KNIZLEY:  I didn't want to speak.
24          THE COURT:  You just want to see what he's looking at?
25          MR. KNIZLEY:  May we approach, Judge?

DEA SA MICHAEL BURT - DIRECT BY MR. BODNAR

1          THE COURT:  All right.

2      (A discussion was held off the record between counsel at

3  the side bar, jury not present.)

4      (At the side bar, jury not present.)

5          MR. KNIZLEY:  Judge, starting over, Mr. Bodnar showed

6  the witness Government Exhibit 9-6(2)(A), which is purported to

7  be the ASIPP opioid guideline of 2012 and he had asked the

8  witness to read from it and I asked that he not do so without

9  it first being admitted into evidence.

10         MR. BODNAR:  The reason we were going to bring it up,

11 Your Honor, is it mentions an author withdrawal, the reason for

12 it.  Dr. Ruan -- it says that Dr. Ruan withdrew due to time

13 constraints, whereas in the email he's saying he withdrew

14 because he clearly disagrees with what's in here and he's more

15 extreme than the other authors.

16         MR. KNIZLEY:  And, Judge, he's introduced a document

17 which purports to be a statement of the defendant and now --

18         THE COURT:  Hold on a minute.  What's the relevance of

19 this?

20         MR. BODNAR:  We can move on, Your Honor.  It's not

21 important.

22         THE COURT:  Okay.

23     (In open court, defendants and jury present.)

24 BY MR. BODNAR:

25 Q   Mr. Burt, I'm now going to show you what's been admitted as

DEA SA MICHAEL BURT - DIRECT BY MR. BODNAR

```
1    Government's Exhibit 9-6, subpart (3).  Is this a chain email
2    between Dr. Ruan and Justin Palmer and Dr. Couch?
3    A   Yes, sir.
4    Q   What does Justin Palmer first say to Dr. Ruan?
5    A   It's dated Sunday, February the 23rd, 2014.  Mr. Palmer
6    writes:  I have a really good form that should also be
7    attached.  This tells about the different types of meds and
8    their purpose in treatment.  I feel that patients are not
9    effectively taught the purpose of long- and short-acting pain
10   meds as well as neuropathic and anti-inflammatory meds.  Their
11   ignorance tends to significantly lead to treatment failure.
12   Q   And what does Dr. Ruan respond to Justin Palmer?
13   A   He responds:  Yes, that is true.  We need to educate them
14   more and try to compound ointment more frequently so that when
15   the charts are audited down the road, we may want to show them
16   that we use noncontrolled stuff first.  And only when the
17   noncontrolled fails, we will then step to the opioids, et
18   cetera.  That would help us prove our cases.  Dr. Ruan.
19   Q   Justin Palmer, is he talking about educating the patients
20   because their ignorance can lead to treatment failure?
21           THE COURT:  Hold on just a minute.
22           A JUROR:  I'm sorry.  Are we supposed to be seeing
23   this?
24           THE COURT:  Yes.  They're not seeing it.
25           THE CLERK:  I apologize.
```

1          THE COURT:  You did say this was -- what exhibit
2     number did you say?
3          MR. BODNAR:  This is admitted, Your Honor.  It's
4     Government's Exhibit 9-6(3).
5          THE COURT:  All right.  So read it -- start over again
6     from the Justin email.
7     BY MR. BODNAR:
8     Q   Sorry.  From the Justin Palmer email, February 23rd, could
9     you please read what he wrote to Dr. Ruan?
10    A   Yes, sir.  Mr. Palmer writes:  I have a really good form
11    that should also be attached.  This tells about the different
12    types of meds and their purpose in treatment.  I feel that
13    patients are not effectively taught the purpose of long- and
14    short-acting meds as well as neuropathic and anti-inflammatory
15    meds.  Their ignorance tends to significantly lead to treatment
16    failure.
17    Q   And so why is Justin Palmer saying they should add this
18    form?  Who will it benefit, does he say?
19    A   He wants to educate the patients because their ignorance
20    leads to treatment failure.
21    Q   And what is Dr. Ruan's response?
22    A   He states:  Yes, that is true.  We need to educate them
23    more and try compound ointment more frequent so that the charts
24    are audited down the road -- so when the charts are audited
25    down the road we may show them that we use noncontrolled stuff

1    first.  And only when the noncontrolled fails, we will step up

2    the opioids, et cetera.  That would help us prove our cases.

3    Dr. Ruan.

4    Q   Do Dr. Ruan's concerns appear to be about audits or about

5    patient care?

6            MR. KNIZLEY:  Your Honor, I'm going to object.

7            THE COURT:  I sustain it.

8    BY MR. BODNAR:

9    Q   I'm going to show you now what's been admitted as

10   Government's Exhibit 9-6, subpart (4).  And is this an email

11   chain between Dr. Ruan and others in the pharmacy, including

12   Bryan Crawford?

13   A   Yes, sir.

14   Q   Starting here with "Bryan, thanks very much," can you read

15   these first two paragraphs?

16   A   Bryan, thanks very much.  We have absolutely nothing to

17   gain but everything to lose if we let it happen that

18   way.  Patients' trust is the foundation of our business and

19   without it we will be doomed to fail.  So by all means, we

20   should do everything to preserve that trust without ruining

21   it.  We can lose it very quickly if we do not pay attention to

22   it.

23           We practice based on medical need, truly.  Yes, we do

24   run a medical business.  And since it is a business, we have to

25   provide services to our patients and through which we get

1    compensated.  But we cannot give others an impression what we

2    do is about money.

3    Q   And I'll stop you there.  Is there then further emails in

4    this chain from Dr. Ruan to a variety of individuals?

5    A   Yes, it is.

6    Q   Are they talking about the financials of the pharmacy?

7    A   Yes, they are.

8    Q   And starting here with "drug," could you start there,

9    please?

10   A   Drug reps will tend to tell nurse practitioners we get more

11   by selling their drugs, but nurses don't really care.  Instead,

12   they might feel that Pat and I are doing business only, rather

13   than taking care of patients, which is not true, but self-

14   created.  Really, a bad situation which was totally self-

15   inflicted by sharing information with others who should not

16   know.  Truth is, we do prescribe based on patients' response

17   and within insurance allowance, et cetera.  But when things get

18   messed up this way, it will be painful to deal with and

19   explain.

20   Q   I'll stop you there.  Now I'm going to show you what's been

21   admitted as Government's Exhibit 9-6(5).  Is this the email

22   from Dr. Ruan to Dr. Couch and others at PPSA, the subject:

23   Very Important Lessons with Medicare Patients?

24   A   Yes, sir.

25   Q   Can you start at the "Hi team?"

1  A   Hi team, I just came back from attending a conference at

2  San Diego and have met a few physicians who share the same

3  concerns.  A couple of MDs from Florida and one from Georgia

4  told me that they were aware of feds now catching patients who

5  sell their drugs and then offer them better plea deals if they

6  go back to the doctor who prescribed, to overprescribe opioids

7  again.  As in the end, feds are trying to catch the MDs.  They

8  use -- overprescribing constitutes overbilling and then it

9  becomes Medicare fraud.  So we need to be very careful with our

10 Medicare patients, and make sure we do not overprescribe as

11 this can be a setup.

12 Q   I want to stop you there.  Is Dr. Ruan correct about how

13 these operations work, based on your knowledge of working these

14 cases?

15 A   Yes, sir, he's somewhat correct.

16 Q   And why is it that he -- they don't want to overprescribe

17 to Medicare patients?

18 A   Because of the oversight.  It becomes --

19         MR. KNIZLEY:  Your Honor, I would object to him

20 reading what the reason is.

21 BY MR. BODNAR:

22 Q   Just reading this part right here, why is he saying that

23 they need to be careful not to overprescribe to Medicare

24 patients?

25 A   It can be a setup.

2102

1  Q   I show you now what's been admitted as Government's Exhibit

2  9-6, subsection (6).  Is this an email from Dr. Ruan to

3  Dr. Couch and a variety of other individuals that worked for

4  PPSA and C&R Pharmacy?

5  A   Yes, sir.  Subject matter is PPSA Educational Series:  Drug

6  Diversion.

7  Q   And could you read what Dr. Ruan writes the staff?

8  A   Dear all, hope you have had a great weekend.  I would like

9  to Share this paper with you in this PPSA educational series on

10  drug diversion; specifically how dealers obtain their stock and

11  what drugs are most sought after.  It happens at every level --

12  pain clinic patient, addict, dealer, dealer-sponsored patients,

13  indigent patients who sell drugs for money, pharmacy employees,

14  students, et cetera.  So we could not be more careful with

15  prescribing controlled meds.

16         Also, patients who receive -- who present to pain

17  clinics might have fake MRI reports, so we will need to update

18  MRI to make sure the MRI readings are true findings instead of

19  faked.  Let's avoid OxyContin 80 milligram, Roxicodone 30

20  milligrams, Xanax two milligrams, as much as we can as these

21  are red-flag drugs we already know.

22  Q   And are those the red flags he identified in the first

23  email?

24  A   Yes, sir.

25  Q   And is Dr. Ruan correct, that those are in fact red-flag

1  drugs?

2  A   Yes, sir, they are.

3  Q   Please continue:  "Also, as you may know."

4  A   Also, as you may know, the state of Alabama -- I believe

5  that's ranks -- number one in prescribing controlled drugs and

6  benzo is being looked at very close together with opioid.  I

7  have been trying to taper off benzo use in my patients.  Also,

8  I have started blood draw on high-dose/high risk patients as we

9  know urine samples can be altered while blood samples cannot.

10 Q   Does it appear that Dr. Ruan is knowledgeable about drug

11 diversion based on this email?

12 A   Yes, he does.

13 Q   I'm going to show you now what has previously been marked

14 as Government's Exhibit 9-8, subparts (1) through (11).

15         THE COURT:  Has it previously been admitted?

16         MR. BODNAR:  No.  Previously been marked, Your Honor.

17         THE COURT:  Okay.

18 BY MR. BODNAR:

19 Q   Are you able to identify what's been marked as Government's

20 Exhibit 9-8(1) through (11)?

21 A   Yes, sir.  These are emails obtained by search warrant from

22 Dr. Ruan's Yahoo account.

23 Q   And are there some also that were obtained by subpoena from

24 Insys Therapeutics in here as well?

25 A   Yes, there are.

1          THE COURT:  Wait.  Go ahead.  Do you offer those?

2          MR. BODNAR:  Move to admit Government's Exhibit 9-8.

3          THE COURT:  Any objection?

4          MR. ESSIG:  Your Honor, I just want to make sure.  One

5     of these had an attachment that was discussed earlier.

6          MR. BODNAR:  Yes.  Your Honor, it's been redacted as

7     was discussed per previous ruling.

8          THE COURT:  All right.  This one appears to be fairly

9     lengthy in terms of the number of emails.

10         MR. BODNAR:  Your Honor, actually, I think I can

11    finish the entire direct by 5 o'clock.

12         THE COURT:  Well, let's just go over until Monday.

13         MR. BODNAR:  Yes, ma'am.

14         THE COURT:  Because this jury's put in a long week and

15    I want to give them, you know, a 10-minute break.  (Laughter.)

16         So, ladies and gentlemen, we will start again Monday

17    morning at 9 o'clock.  And remember all of my instructions to

18    you, especially now that you've got a couple of days' break.

19    No discussion about the case with anyone, no research about the

20    case.  Leave your pads here.  Go downstairs, check out, and we

21    will see you Monday morning.

22         Thank you.

23         A JUROR:  At 9; right?

24         THE COURT:  9 o'clock.

25         A JUROR:  Okay.

1          THE COURT:  9 o'clock.

2      (In open court, defendants present, jury not present.)

3          THE COURT:  All right.  Counsel, if you could provide

4  me with any assistance on the privilege issue that we discussed

5  earlier, over the weekend.  You can email any memo or anything

6  to our efiling mailbox.

7          MR. BODNAR:  Yes, Your Honor.

8          THE COURT:  I would appreciate it.

9          We'll see you all Monday morning.

10      (Court adjourned at approximately 4:50 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25