1          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF ALABAMA
2

3    UNITED STATES OF AMERICA
                                         CASE NO. CR15-00088
4    v.
                                         COURTROOM 2B
5    JOHN PATRICK COUCH, M.D.,
     and XIULU RUAN, M.D.,
6                                        MOBILE, ALABAMA
           Defendants.
7                                        MONDAY, JANUARY 23, 2017
     * * * * * * * * * * * * * * *
8    REDACTED

9
                         DAY 10 OF TRIAL,
10        BEFORE THE HONORABLE CALLIE V. S. GRANADE,
             UNITED STATES DISTRICT JUDGE, AND JURY
11

12

13   APPEARANCES:

14   FOR THE GOVERNMENT:
          DEBORAH A. GRIFFIN
15        CHRISTOPHER BODNAR
          United States Attorney's Office
16        63 S. Royal Street, Suite 600
          Mobile, AL  36602
17        (251) 441-5845

18
     FOR THE DEFENDANT COUCH:
19        ARTHUR T. POWELL, III
          P.O. Box 40456
20        Mobile, AL 36640-0456
          (251) 433-8310
21
          JACKSON R. SHARMAN, III
22        ROBERT JACKSON SEWELL
          JEFFREY PAUL DOSS
23        BENJAMIN SANDERS WILLSON
          Lightfoot, Franklin & White
24        400 North 20th Street
          Birmingham, AL  35203
25        (205) 581-0700

1    (Continued)

2        BRANDON KEITH ESSIG
         800 Shades Creek Parkway, Suite 600D
3        Birmingham, AL  35209
         (251) 879-1981

4
     FOR THE DEFENDANT RUAN:
5        DENNIS J. KNIZLEY
         7 N. Lawrence
6        Mobile, AL 36602
         (251) 432-3799

7
         JASON BRADLEY DARLEY
8        Darley & McGough, LLC
         1751 Dauphin Street
9        Mobile, AL 36604
         (251) 441-7772

10
         GORDON G. ARMSTRONG, III
11       P.O. Box 1464
         Mobile, AL  36633
12       (251) 434-6428

13       STEVEN D. MARTINIE
         4955 North Lake Drive
14       Whitefish Bay, WI  53217
         (414) 332-9683

15
     THE CLERK:  MARY ANN BOYLES
16   THE LAW CLERK:  LYNN DEKLE
     U.S. ATTORNEY IT:  BRIAN COCHRAN
17   DEFENSE IT:  SAM McALLISTER
     COURT SECURITY OFFICER:  WILLIAM NOEL
18   COURT REPORTER:  ROY ISBELL, CCR, RDR, CRR

19           Proceedings recorded by OFFICIAL COURT REPORTER
             Qualified pursuant to 28 U.S.C. 753(a) & Guide to
20    Judiciary Policies and Procedures Vol. VI, Chapter III, D.2.
             Transcript produced by computerized stenotype.

21

22

23           I do not certify that any audio/video recordings

24   played in open court and transcribed herein are verbatim

25   transcriptions, but were transcribed to the best of my ability.

1                        EXAMINATION INDEX

2

    DEA SA MICHAEL BURT

3          DIRECT BY MR. BODNAR . . . . . . . . . . . . . . . 2119
           CROSS BY MR. ESSIG . . . . . . . . . . . . . . . . 2145

4          CROSS BY MR. KNIZLEY . . . . . . . . . . . . . . .2168
           REDIRECT BY MR. BODNAR . . . . . . . . . . . . . 2234

5

    RAHUL VOHRA, MD

6          DIRECT BY MS. GRIFFIN . . . . . . . . . . . . . .2246

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

|     |                                                                              |      |      |
|-----|------------------------------------------------------------------------------|------|------|
| 1   | EXHIBIT INDEX                                                                 |      |      |
| 2   |                                                                              | MAR  | ADM  |
|     | GOVERNMENT'S                                                                 |      |      |
| 3   | 9-8(1)   Email Lento to Ruan 6/5/14 – Information and clarification           |      | 2122 |
| 4   |                                                                              |      |      |
|     | 9-8(2)   Email Ruan to Strange 6/9/14 – your letter                          |      | 2122 |
| 5   |                                                                              |      |      |
|     | 9-8(3)   Email Ruan to Strange 6/9/14 – your letter                          |      | 2122 |
| 6   |                                                                              |      |      |
|     | 9-8(4)   Email Hieronymus to Ruan 6/11/14 – your letter                      |      | 2122 |
| 7   |                                                                              |      |      |
| 8   | 9-8(5)   Email Ruan to Lutas 6/16/14 – Insys training – reminder             |      | 2122 |
| 9   |                                                                              |      |      |
|     | 9-8(6)   Email Ruan to Busta 6/17/14 – talk #1 (chain)                        |      | 2122 |
| 10  |                                                                              |      |      |
| 11  | 9-8(7)   Email Ruan to Hollandsworth 7/29/14 – change of recipient of my honorarium |      | 2122 |
| 12  |                                                                              |      |      |
|     | 9-8(8)   Email Ruan to Busta 7/1/14 – talk #2 (chain)                         |      | 2122 |
| 13  |                                                                              |      |      |
| 14  | 9-8(9)   Email Ruan to Busta 7/27/14 – talk #7                                |      | 2122 |
| 15  | 9-8(10)  Email Ruan to Roche 8/20/14 MCW documentation – W-9 form             |      | 2122 |
| 16  |                                                                              |      |      |
| 17  | 9-8(11)  Email Bank to Ruan 10/8/14 – talks (chain) MRI from Douthitt N288    |      | 2122 |
| 18  | 9-9(1)   Email Ruan to Couch and Chen 9/10/14 – trashing our practice         |      | 2141 |
| 19  |                                                                              |      |      |
| 20  | 9-9(2)   Email Ruan to Couch and Chen 10/13/14 – structure (of PPSA)          |      | 2141 |
| 21  | 20-03    8/5/14 Rxs (N28 & N29) B357                                          |      | 2246 |
| 22  | 22-01    Patient file:  K. Daves (Couch)                                      |      | 2279 |
| 23  | 22-03    Patient file:  L. Blouin (Couch)                                     |      | 2322 |
| 24  | 22-04    Patient file:  S. McDonald (Couch)                                   |      | 2279 |
| 25  | 22-07    Patient file:  DP (Couch)                                            |      | 2322 |

| 1 | 22-08 | Patient file: SJ (Couch) | 2279 |
| 2 | 22-11 | Patient file: FNU D...... (Couch) | 2322 |

3

DEFENDANT RUAN'S

| 4 | 125 | Email to Joan Ruan to Xiulu Ruan - income, some received in Jan. 2013 | 2220 |

5

| 6 | 127 | Kathleen Burns' 9/5/12 Patient-Prescriber Agreement Form (Burt 1/23/17) | 2220 |

| 7, 8 | 128 | Patient-Prescriber Agreement Form renewal reminder/TIRF REMS access dated 8/8/14 to Ruan re:  Kathleen Burns | 2220 |

| 9, 10 | 129 | HealthSpring notice of approval letter 3/4/13 Kathleen Burns | 2220 |

| 10, 11 | 130 | HealthSpring letter request for additional information to Ruan 2/6/13 re:  Burns | 2220 |

| 12, 13 | 131 | Handwritten note - internet option - tools - security (Burns) | 2220 |

| 13, 14 | 132 | HealthSpring fax to Ruan 2/6/13 re: Coverage determination - Burns | 2220 |

| 15, 16 | 133 | HealthSpring notice of denial form to Burns 2/8/13 | 2220 |

| 16, 17 | 134 | HealthSpring - notice of important information - appeal rights Burns | 2220 |

| 18, 19 | 135 | HealthSpring fax 7/8/13 coverage determination request to Ruan re:  Burns | 2220 |

| 19, 20 | 164 | Photo of C&R Pharmacy label for Abstral to B... 4/3/14 | 2197 |

| 21, 22 | 165 | Photo of C&R Pharmacy label for Abstral to B... 3/24/14 | 2197 |

| 22, 23 | 167 | Email 12/4/11 Ruan to Kaye unredacted version of Government's 9-1(1) - DENIED | 2203   -- |

24

25

2111

```
 1          (Morning session, 8:30 a.m., in chambers, jury not
 2    present.)
 3          MR. KNIZLEY:  Good morning.
 4          THE COURT:  Good morning.
 5          MR. SHARMAN:  Good morning, Judge.  Good morning, Roy.
 6          THE CLERK:  Mr. Bodnar's on his way.
 7      (Ms. Griffin and Mr. Bodnar entered chambers.)
 8          THE COURT:  Have a seat, if you can find one.
 9          MS. GRIFFIN:  Good morning.
10          MR. BODNAR:  Good morning.
11          MR. ARMSTRONG:  Good morning.
12          THE COURT:  There are chairs available.  (Indicating.)
13          MR. ESSIG:  I'd rather stand.  I'm fine, I'm fine.
14          THE COURT:  Okay.  Well, I think that if it's solely
15    the corporation seeking to assert the attorney-client
16    privilege, they can do it.  Or when individual doctors assert
17    it on behalf of the corporation, they can do it.  But I want
18    you to address whether or not Dr. Ruan has an individual
19    attorney-client privilege that he asserted on behalf of the
20    corporation, whether he can assert it individually.  Do you see
21    what I'm talking about?  Because there's some case law on that
22    that says it has to be about personal legal advice, if it's the
23    individual person that's asserting the attorney-client
24    privilege.
25          MR. SHARMAN:  Your Honor, I believe, if I understand
```

1    the Court's question, I believe the posture would be that

2    Dr. Ruan, or Dr. Ruan and Dr. Couch, as the owners and

3    representatives of the corporate entity, are asserting it on

4    behalf of the corporate entity.  In other words, it's PPSA's

5    privilege and obviously a human has to assert it, PPSA by

6    itself can't do that.  I'm not sure if I understand the Court's

7    question to be that if Dr. Ruan or Dr. Couch individually

8    doesn't benefit from the privilege that then the entire --

9    then, there is no privilege.

10              THE COURT:  Yeah.

11              MR. SHARMAN:  Is that the Court's question?

12              THE COURT:  That's my question.

13              MR. SHARMAN:  I don't believe that's the case, if the

14   Court concludes that the corporation can properly assert the

15   privilege; in other words, it frequently happens that an owner-

16   officer is the assertor of the privilege, he or she has no

17   privilege there.

18              THE COURT:  I guess my conceptual problem I'm having

19   is that it's not -- I mean, the corporation does have the

20   privilege.  Okay?  I don't think there's any question about

21   that.  But it's not been sought to be admitted against the

22   corporation.  So how can the corporation claim a privilege

23   unless Dr. Ruan has a personal privilege seeking to block

24   admission of it?

25              MR. SHARMAN:  I believe the company's position would

1    be that it's our privilege that we seek to protect without

2    regard to the use or anticipated use that somebody else might

3    want to make of our document.  In other words, if we look at it

4    solely from the company's point of view, it's immaterial to the

5    company's privilege whether or not another party wants to use

6    it against or in favor of somebody else.  In other words, I

7    think the Court's inquiry is:  Is the document privileged,

8    regardless of how it plays within the context of the

9    litigation?

10         THE COURT:  Okay.  I think that's fair.  So you say

11   it's the corporation's privilege and they have the right to

12   block use of it anyway, is what you're saying?

13         MR. SHARMAN:  If it's privileged, yes, ma'am, unless

14   there's a countervailing showing by the party seeking to

15   introduce it.  And I don't think that's been shown here.

16         THE COURT:  Okay.  Well, for right now I'm not going

17   to admit it.  If you all can come up with some other way to

18   convince me, that's fine.

19         MR. BODNAR:  Yes, Your Honor.

20         THE COURT:  Okay.  But I'm not saying -- well, you

21   know, theoretically in my mind if Dr. Ruan takes the stand and

22   he denies knowledge of what you're seeking to establish by

23   this, then you could refresh his recollection possibly with it

24   without it being admissible.  But beyond that I don't see the

25   use of it, since the privilege is established.

```
 1            MR. BODNAR:  Yes, Your Honor.
 2            THE COURT:  Okay.  Anything else we need to discuss
 3  this morning?
 4            MR. ESSIG:  No, ma'am.
 5            MR. BODNAR:  Not from us.
 6            THE COURT:  Tell me where do you think we are in
 7  context of --
 8            MS. GRIFFIN:  We had just talked to counsel this
 9  morning about it, Your Honor.  We think we will rest midday on
10  the 7th or the end of the day on the 7th tentatively.  I don't
11  think it will go past there.
12            THE COURT:  Okay.
13            MR. BODNAR:  This week is full of a lot of witnesses
14  that are flying in.  So there are pegs that have to stay in the
15  slot that they're in.  And then we've got a lot of different
16  patients or employees, the smaller ones, kind of on standby to
17  be filler, depending on if we need someone for an hour, two
18  hours, or a half hour.
19            THE COURT:  Okay.  And then do y'all have any sense of
20  how many days, weeks, months, years we might have --
21            MR. SHARMAN:  Your Honor, I'm always happy to return
22  to Mobile.  But we will try to be as efficient as we can.  I
23  believe at pretrial --
24            THE COURT:  I think you said --
25            MR. SHARMAN:  -- five days apiece, something like
```

```
 1    that.
 2              MR. KNIZLEY:  That's what we said.
 3              MR. SHARMAN:  Hopefully things can be done --
 4    certainly no more than that.
 5              MR. KNIZLEY:  I agree.
 6              THE COURT:  Okay.  All right.  Thank you.
 7              MR. SHARMAN:  Thank you, Your Honor.
 8              MR. BODNAR:  Thank you, Your Honor.
 9        (A recess was taken at approximately 8:37 a.m.)
10        (8:59 a.m., in chambers, jury not present.)
11              MR. KNIZLEY:  This will save us a trip to the side
12    bar.  I think it may be helpful.
13              THE COURT:  All right.
14              MR. KNIZLEY:  Chris has got one additional email that
15    we didn't have before, Government's Exhibit -- proposed --
16    9-9(1) which purports to be an email from Dr. Ruan to Dr. Couch
17    and a Dr. Couch response.  And I'll give it to the Court to
18    read.  And I'll state my objection as to the lower part from
19    Dr. Couch -- Dr. Ruan.  Excuse me.
20              THE COURT:  (Reading.)  Okay.
21              MR. KNIZLEY:  Judge, my objection is hearsay, and it
22    says my client is quoting what a patient says another person
23    said to him.  And I understand it's my client's words, but it
24    is a double hearsay situation and it is an accusation of a
25    third party removed person that someone else said about the
```

 1    subject matter of the case.  And we think, even because it may

 2    be the words of the client, because it is a double hearsay,

 3    that the prejudicial effect is outweighed by the reliability of

 4    the information.

 5              MR. ESSIG:  Your Honor, Dr. Couch joins the objection.

 6    We also would note because there are multiple levels of hearsay

 7    and there are parties making accusations within the email that

 8    are not the defendants, that it creates significant

 9    confrontation issues as well, because they are third parties

10    essentially making allegations to the doctor, the jury's going

11    to hear those and those are potentially incriminating

12    statements, certainly the way they are offered against the

13    doctors.  We should have the right to cross-examine those

14    people.  If we can't confront them, it creates a confrontation

15    clause problem.

16              MR. BODNAR:  Your Honor, we're not offering it for the

17    truth that they are in fact pill pushers or that it's a pill

18    mill, but that in September of '14, when things started to

19    change in the clinic, that Dr. Ruan and Dr. Couch were aware

20    that other local doctors, such as the local -- which is the

21    blacked-out name, another local doctor -- are accusing them of

22    being a pill mill.  And it puts into context their actions they

23    took at the end of '14 and early '15.  So it's the effect on

24    the listener that's it's being offered for, not necessarily --

25    not the truth of what a patient or the doctor relayed to the

```
 1   patient about PPSA.
 2           MR. KNIZLEY:  And, Judge, on the question of the
 3   confrontation clause, the original declarant that's blacked out
 4   is, of course -- we would suggest he has credibility problems,
 5   in that he's now been charged with Medicare -- with healthcare
 6   fraud.
 7           MR. BODNAR:  And just to clarify the record, he hasn't
 8   been charged yet.
 9           MR. KNIZLEY:  Excuse me.
10           MR. BODNAR:  But there has been a search warrant and
11   investigation into that blacked-out doctor and it is not
12   covert.
13           MR. KNIZLEY:  Of course, we don't have an opportunity
14   to confront the individual that may have his own particular
15   concerns.
16           THE COURT:  Who is C. G.?
17           MR. BODNAR:  I'm assuming that, based on the context,
18   it appears to be how they are referencing the patient.
19           THE COURT:  The patient?  Okay.
20           MR. BODNAR:  I believe it's:  C. G. told me that the
21   blacked-out local doctor --
22           THE COURT:  Okay.  All right.  Yeah, I think it's
23   admissible for the effect it had on both doctors.  I mean, they
24   were -- it works both ways for you.  You know, they were
25   incredulous that anybody would accuse them of that.  But I
```

1    think it's admissible for that purpose.

2          MR. ESSIG:  Judge, our concern too, I mean, because of

3    the confrontation issue and because of the accusation from the

4    third party in this email that the doctors are commenting on,

5    it's sort of central to the case, they are essentially being

6    accused by a third party of being involved in a pill mill --

7    and again, because we don't have the ability to confront them,

8    there's a strong prejudice as to whether or not the jury can

9    separate out the pill mill accusation in the email, which again

10   is central to the government's theory of the case, from the

11   notion that sort of the, you know, the legal distinction that

12   it's really only for the effect on the doctors and not to

13   consider the accusation itself.  I mean, that would be an

14   additional concern that would be a prejudice concern, if the

15   jury can syphon those off.

16         THE COURT:  Well, the jury knows that the government

17   is accusing them of being a pill mill.  So, I mean, it's not

18   like this is new information to them.

19         MR. ESSIG:  Yes, ma'am.

20         THE COURT:  So I think that it's admissible for the

21   purpose the government's claiming it's admissible for.

22         MR. BODNAR:  There should not be -- I think we've gone

23   over every other objection.  So I don't think it's going to

24   take me more than another 15-20 minutes with Mr. Burt, Special

25   Agent Burt, on direct.

```
 1          THE COURT:  Don't make promises.

 2          MR. BODNAR:  I'm going to go as fast as I can.

 3      (A recess was taken at approximately 9:04 a.m.)

 4      (In open court, 9:09 a.m., defendants and jury present.)

 5          THE COURT:  Good morning, ladies and gentlemen.

 6      All right.  Mr. Bodnar, you may continue.

 7                   DEA SA MICHAEL BURT,

 8      previously sworn, testified further as follows:

 9                DIRECT EXAMINATION CONTINUED

10  BY MR. BODNAR:

11  Q   Good morning, Special Agent Burt.

12  A   Good morning.

13  Q   Do you recall on Friday when we were discussing

14  Government's Exhibit 9-4(2) through (7), the printouts of the

15  Open Payment data, Sunshine Act data, for both doctors?

16  A   Yes, sir.

17  Q   And do you recall us discussing the amounts that were paid

18  by Insys Therapeutics?

19  A   Yes, sir.

20  Q   I neglected to ask you to add up the total amount.  Do you

21  have the ability to use the calculator -- or use a calculator

22  there to tell the total amount for each doctor?

23          THE WITNESS:  Judge, may I use my phone?

24          THE COURT:  Sure.

25  BY MR. BODNAR:
```

2120

1    Q    I'm going to show you first what's been admitted as

2    Government's Exhibit 9-4(3), the 2013 document for

3    Dr. Couch.  Do you see the total up there for Insys for 2013?

4    A    Yes, sir.

5    Q    Let me know when you're ready for the 2014.

6    A    Go ahead to 2014.

7    Q    Exhibit 9-4(5) for Dr. Couch, 2014, do you see the total of

8    $48,440.57?

9    A    Yes, sir.

10   Q    And let me know when you're ready for '15.

11   A    Okay.  I'm ready.

12   Q    I show you what's been admitted as Government's Exhibit

13   9-4(7), Dr. Couch, 2015.  Do you see the payment of 24,469.55?

14   A    Yes, sir, I do.

15   Q    And have you been able to come up with a total amount paid

16   under the Sunshine Act period for Dr. Couch from Insys

17   Therapeutics?

18   A    The calculation I have is $99,917.97.

19   Q    I'm sorry.  Could you speak a little closer to the mic and

20   speak a little slower so I can hear that?

21   A    $99,917.97.

22   Q    Let me know when you're ready to do the same thing for

23   Dr. Ruan.

24   A    I'm ready.

25   Q    I show you first what's been admitted as Government's

DEA SA MICHAEL BURT - DIRECT BY MR. BODNAR

1   Exhibit 9-4(2), Dr. Ruan for 2013.  Do you see the payment of
2   $40,939.83?
3   A   Yes, sir.
4   Q   Let me know when you're ready for 14.
5   A   I'm ready.
6   Q   I show you now what's been admitted as Government's Exhibit
7   9-4(4), Dr. Ruan 2014.  Do you see the payment of $103,143.13?
8   A   Yes, I do.
9   Q   Are you ready for 2015?
10  A   I'm ready.
11  Q   I'll show you what has been admitted as Government's
12  Exhibit 9-4(6), Dr. Ruan 2015.  Do you see the payment for
13  $27,194.41?
14  A   Yes, I do.
15  Q   And have you been able to come up with a total for Dr. Ruan
16  for 2013, '14, and '15?
17  A   Yes, sir.  The total for all those years is $171,277.37.
18  Q   And I believe you testified on Friday that the Sunshine Act
19  payments started being reported in August of '13.  Is that
20  2013?
21  A   That is correct.
22  Q   Were payments being made to Dr. Couch and Dr. Ruan from
23  Insys prior to that time?
24  A   Yes, sir.
25  Q   So the amounts that you gave, is that somewhat less than

```
 1   the total amount paid by Insys to these two doctors?

 2   A   That's correct.

 3   Q   Did there come a time when Dr. Ruan stopped accepting or

 4   personally accepting the money that was being paid for the

 5   speaking engagements from Insys Therapeutics?

 6   A   Yes, sir, I'm aware of that.

 7   Q   I'm going to show you now what has been marked as

 8   Government's Exhibit 9-8, subparts (1) through (11), and ask if

 9   you're able to identify what this is.

10   A   Yes, sir.  These are his emails obtained from the search

11   warrant from xiuluruan@yahoo.com.

12   Q   And were some of them also obtained by subpoena from Insys

13   Therapeutics?

14   A   That is correct.

15          MR. BODNAR:  The United States moves to admit

16   Government's Exhibit 9-8, subparts (1) through (11).

17          MR. ESSIG:  No objection.

18          THE COURT:  All right.  Mark them in.2141

19      (Government's Exhibits 9-8(1) through 9-8(11) were entered

20   into evidence.)

21   BY MR. BODNAR:

22   Q   Special Agent Burt, I'm now going to show you what has been

23   admitted as Government's Exhibit 9-8 part (1) and ask you first

24   to identify who is this email between and what is the date?

25   A   The email is to Xiulu Ruan, it's from Chris Lento at
```

1    galenabiopharma.com, and the date is June 5th, 2014.

2    Q   And based on the signature below, who is Chris Lento?

3    A   Mr. Lento is the vice president of sales and commercial

4    operations for Galena Biopharma.

5    Q   And could you please read what Mr. Lento is telling

6    Dr. Ruan here?

7    A   The email reads:  Dr. Ruan, I hope all is well.  It has

8    been brought to my attention that you might believe, feel or

9    are under the impression that Abstral/Galena Biopharma were

10   part of the story/investigation that was released a few weeks

11   ago in Michigan (Dr. Awerbuch).  I would like to share with you

12   that we are not part of that investigation or any other

13   investigation regarding field promotion of Abstral sales and

14   marketing tactics for Abstral or anything involving Medicare

15   fraud.  The news reports, newspaper articles, and government

16   documents are not related to Galena Biopharma or Abstral in any

17   way other than that Abstral is part of the rapid onset opioid

18   therapy class.  For your consideration I have attached copies

19   of a few of the many relevant articles and government

20   documents.  I would also like to add that I am not sharing this

21   information to disparage our competition in any way, rather to

22   share important information with you in hopes of protecting the

23   ROO class of therapy which are indicated for patients suffering

24   from breakthrough cancer pain.

25   Q   I'm going to stop you there.  Are there two links attached

1    sent by Mr. Lento?

2    A    Yes, there are.

3    Q    In the first one, ABC.com, what does it appear the title of

4    the article is based on the hyperlink?

5    A    Saginaw County Doctor Accused of Healthcare Fraud,

6    Distribution of Controlled Substances.

7    Q    And the New York Times article underneath it?

8    A    Doubts Raised About Off-Label Use of Subsys, a Strong Pain

9    Killer.

10   Q    And what does Mr. Lento say is attached to this email?

11   A    Please see attachments and links below.  P.S., the attached

12   photo is a government document that was shared via the news

13   report.  And attachment two is the actual government complaint

14   against Dr. Awerbuch.  Please note pages seven through 10 which

15   directly relate to one product in the ROO class.

16   Q    And did Mr. Lento in fact attach a screenshot to this

17   email?

18   A    Yes, sir, he did.

19   Q    Turning to the second page of this email, is this the

20   screenshot that Mr. Lento sent to Dr. Ruan?

21   A    Yes, sir.

22   Q    And does this screenshot correlate with the page within the

23   criminal complaint against Dr. Awerbuch?

24   A    It does.

25   Q    And is this the page, page 35 of 38 of the Awerbuch

1   complaint, is this the part that has the screenshot?

2   A   Yes, sir, it appears to be so.

3   Q   What appears to be listed in this chart right here?

4   (Indicating.)

5   A   These are doctors'/prescribers' ID, prescribers' names,

6   state, how much they were paid, and number of PDE records.

7   Q   And this is the Medicare part D ranked by total paid, part

8   D plans?

9   A   Yes, sir, it is.

10  Q   And I know we don't have the pages before this, but does

11  this relate to amounts paid for the drug Subsys?

12  A   Yes.

13  Q   And who's the number one person on there?

14  A   Gavin Awerbuch, Michigan.

15  Q   Do you see an individual listed in Alabama right here?

16  (Indicating.)

17  A   I do.

18  Q   Based on your knowledge of the investigation and prescriber

19  ID number, do you know who that doctor is referenced that's

20  number three on the list?

21  A   That is Dr. Couch.

22  Q   Do you see at number five another Alabama doctor?

23  A   That is Dr. Ruan.

24  Q   Now to be clear, Dr. Ruan and Dr. Couch are not in any way

25  charged in this criminal complaint, are they?

DEA SA MICHAEL BURT - DIRECT BY MR. BODNAR

1    A    They're not.

2    Q    Are they identified in this criminal complaint?

3    A    Only by their prescriber ID number, which has been

4    redacted.

5    Q    And had this page been sent to Dr. Ruan?

6    A    Yes.

7    Q    I'm going to show you again the heading of the email.  Was

8    it sent to Dr. Couch?

9    A    It was not sent to Dr. Couch.

10   Q    Based on your investigation, do you have any independent

11   knowledge of whether or not Dr. Couch ever received this

12   information?

13   A    I'm not aware that Dr. Couch received this.

14   Q    And again, what's the date on here?

15   A    June 5th, 2014.

16   Q    After receiving this document, did Dr. Ruan change the way

17   in which he received his speaker fees from Insys Therapeutics?

18   A    Yes, sir, he did.

19   Q    Did Dr. Couch change the way he accepted his speaker fees?

20   A    I'm not aware that he changed the ways.

21   Q    Special Agent Burt, can you briefly explain to the jury

22   what it was that Dr. Ruan did after June 5th, 2014, and

23   receiving this document?

24   A    Dr. Ruan began taking the speakers fees that he received

25   from Insys and started a foundation, started donating them to

1    colleges and universities that he went to and medical school

2    creating a charitable gift in his name.

3    Q   I'm now showing you what's been admitted as Government's

4    Exhibit 9-8(2).  And at the very bottom is a heading.  Is this

5    email from Dr. Ruan?

6    A   Yes, it is.

7    Q   What's the date on this?

8    A   June the 6th.

9    Q   Is this the day after he received the copy of the Gavin

10   Awerbuch complaint?

11   A   It is the day after he received the complaint, yes.

12   Q   Moving over to the next page, is this to an individual

13   named Diane Braza?

14   A   That's correct.

15   Q   And on the very next day what does Dr. Ruan tell Ms. Braza

16   or Dr. Braza?

17   A   To start, I would like to donate some of my professional

18   speaking engagement fees to the Department of PMR at MCW under

19   your leadership.  I have been on speaker bureau for quite a few

20   companies for quite a few years now.  I would like to set it up

21   that the pharmaceutical company will do that directly every

22   time I give a talk; that is, to send the Department of PMR at

23   MCW rather than paying them to my company and then I rewrite

24   the check to MCW.

25   Q   I'll stop you there for a second.  Does MCW stand for

2128

```
 1   Medical College of Wisconsin?
 2   A   Yes, sir.
 3   Q   Continue with:  I understand.
 4   A   I understand there are many physicians that do that.  I
 5   wonder what is your opinion on that?  If you are agreeable to
 6   it, please send me the information of the person who handles
 7   this so that I can ask my assistant to set that up.
 8   Q   And I'll turn you now to the response in this chain of
 9   emails.  Is there a series of responses in these emails?
10   A   Yes, there are.
11   Q   And does it then end in this chain on June 9, 2014?
12   A   Yes, sir.
13   Q   And who is this email from and to?
14   A   This email is from Dr. Ruan to Boe Strange.
15   Q   And other individuals?
16   A   Yes, other individuals.
17   Q   And what does Dr. Ruan tell Mr. Strange?
18   A   Hi Boe and Mike, I plan to donate some of my speaking fees
19   to the Department of PMR, Medical College of Wisconsin.  Some
20   of them, not all.  I wrote to the department chairman,
21   Dr. Diane Braza, who emailed me back.  See below.  As far as I
22   know, some of the physicians do that.  Will I actually get a
23   tax credit in the end?  Say if I do donate 50K for the rest of
24   the year 2014, if it all goes to MCW directly from the
25   pharmaceutical company, will I get a credit?  Dr. Ruan.
```

2129

1  Q   Based on your work on this case, prior to the June 5th

2  date -- or prior to June 6th, was there any discussion by

3  Dr. Ruan, to your knowledge, of donating his Insys speaker

4  fees?

5  A   No, sir.  It was only after this complaint was received

6  that the speaking -- that the fees he received started to

7  change.

8  Q   I'm now showing you what's been admitted as Government's

9  Exhibit 9-8(3).  Is this a continuation on that chain that we

10 were just looking at?

11 A   Yes, sir.

12 Q   Is this the email you just read before, the Hi Boe and

13 Mike?

14 A   It is.

15 Q   And continuing on above that, what does Mr. Strange say to

16 Dr. Ruan?

17 A   You will receive a donation deduction for only the cash

18 contribution which would yield a 40 percent tax savings to

19 you.  No, you will not get a tax deduction for speaking.  You

20 have to be paid for the speaking event, then write a check to

21 the charitable organization, Boe.

22 Q   And what does Dr. Ruan respond?

23 A   So is there a difference for me to do the traditional way

24 or do this way?  Which is better for me?  Dr. Ruan.

25 Q   And then I'm going to show you now what has been admitted

DEA SA MICHAEL BURT - DIRECT BY MR. BODNAR

2130

```
 1    as Government's Exhibit 9-8(4).  This is another continuation

 2    of that same email chain from June 11th now of '14.

 3    A   Yes, it is.

 4    Q   And is this Mark Hieronymus responding to Dr. Raun?

 5    A   Yes, sir.

 6    Q   What does he tell Dr. Ruan?

 7    A   Dr. Ruan, you will actually get a deduction and probably

 8    not get much benefit from it because your income is too

 9    high.  You would be better off not receiving the payment at all

10    if you intend for it to go back to the college.

11    Q   And is that what ultimately happened, that payments went

12    directly from Insys to the college?

13    A   Yes, sir.

14    Q   Other than the Medical College of Wisconsin, were there

15    other schools that Dr. Ruan started donating Insys money to --

16    A   Yes.

17    Q   -- after June 5th?

18    A   Yes, sir.

19    Q   I'm going to now show you what's been admitted as

20    Government's Exhibit 9-8(5).  Is this an email from Dr. Ruan to

21    a Becky Lutas and D. Hollandsworth at Insys?

22    A   That is correct.

23    Q   And what is Dr. Raun telling those individuals?

24    A   Becky and Desiree, make sure the checks should be paid to

25    University of South Alabama rather than me.  You can send to
```

1    Dr. Joseph Busta who is the one I talk to and is in charge of

2    the fundraising.  Dr. Busta will use the money to set up a

3    pre-med scholarship under my name.  Thanks.  BTW, I have a talk

4    this Friday.  Please make sure this is done correctly.

5    Q    And Dr. Busta, is he associated with the University of

6    South Alabama?

7    A    Yes, sir.

8    Q    Is that another one of the universities along with Medical

9    College of Wisconsin that Dr. Ruan started donating Insys money

10   to?

11   A    That's correct.

12   Q    I'm going to now show you a chain of emails that has been

13   admitted as Government's Exhibit 9-8(6).  And looking first at

14   9-8(6), and looking first at an email earlier in this chain, is

15   this an email from Dr. Ruan to Desiree and Becky again at Insys

16   on June 17th?

17   A    Yes, sir.

18   Q    And what is Dr. Ruan saying?

19   A    Desiree and Becky, I am forwarding this email from

20   Mrs. Banks regarding my decision to donate some of my

21   honorarium directly from your company to USA.  Please send it

22   to Dr. Busta's attention.  Please let me know if there are any

23   other questions.  My next talk is Friday -- my next talk is

24   Friday this week.  All traveling expenses for future talks are

25   negligible except for long distance traveling in which case I

1    will let you know.

2    Q    And honorarium, is that another term for a speaker fee?

3    A    That is correct.

4    Q    Looking further up in this chain of emails, on June 17th

5    does Dr. Ruan send an email to Dr. Busta?

6    A    Yes, he does.

7    Q    And what does Dr. Ruan say?

8    A    Dr. Busta, what I will do is every time I am done with a

9    talk from this company, I will send you an email so that you

10   know the check should arrive in one to two weeks.  That way we

11   are both clear on the total amount that will be

12   received.  Thanks, Dr. Ruan.

13   Q    And does Dr. Busta respond to Dr. Ruan?

14   A    He does.  He states:  Excellent.  You will be proud of this

15   gift, I promise you.

16   Q    And then on June 23rd does Dr. Ruan send an email to

17   Dr. Busta?

18   A    He does.

19   Q    And what does he say?

20   A    Dear Dr. Busta, I had a talk last Friday, June 20th,

21   2014.  My current fee schedule with this company is 3,000 per

22   talk.  Please let me know when you receive it.

23   Thanks.  Dr. Ruan.

24   Q    And based on your work on this case, that $3,000, is that

25   per one of those speaker programs that Ms. Perhacs was

2133

1  discussing?

2  A   Yes, it is.

3  Q   What does Dr. Busta say the following day to Dr. Ruan?

4  A   We will.  Thank you.  What is the name of the company

5  sending the checks, please?  Maya, watch for this check,

6  please, to USA and please advise.  3,000.

7  Q   And does Dr. Ruan tell him who the checks are coming from?

8  A   He does.  He states:  Dr. Busta, you are all welcome.  It

9  will come from Insys Therapeutics.  Dr. Ruan.

10  Q   I'm going to now show you what has been admitted as

11  Government's Exhibit 9-8(8).  Is this a chain of emails under

12  the subject line Talk Number Two?

13  A   Yes.

14  Q   And starting here on June 30th of 2014, what does Dr. Ruan

15  say to Dr. Busta?

16  A   Dear Dr. Busta, I finished my talk number two last Friday,

17  June 27th.  It usually takes less than 10 days for them to ship

18  the checks out.  Please let me know if they are not received by

19  that time.  Have a great week.  Dr. Ruan.

20  Q   While I know you said you did not handle all the financial

21  aspects of this investigation, are you aware if checks did go

22  to USA from Insys on behalf of Dr. Ruan?

23  A   I am aware, yes.

24  Q   And up at the top does Dr. Ruan continue in this chain in

25  his writing to Dr. Busta?

DEA SA MICHAEL BURT - DIRECT BY MR. BODNAR

1   A   Yes, sir.

2   Q   Actually I skipped one.  Does Dr. Busta respond here?

3   A   Dr. Busta responds:  Great.  Thank you again.  Jackie and

4   I -- Jackie and I are out of town on vacation this week.  We

5   will check -- will check be from the same company?  Rachael,

6   please monitor and keep us on top of this one.  I will try to

7   review the endowment agreement so I can -- as soon as I can.

8   I'm sorry.

9   Q   And does Dr. Ruan respond on July 1st to Dr. Busta?

10   A   Yes.  Dr. Ruan responds:  Yes.  They will all come from the

11   same company, Insys Therapeutics, which is the only company I

12   have arranged this type of donation with.  I have another talk,

13   number three, for this evening at Felix's today.  Same fee

14   schedule with this company.  Have a great vacation the Fourth

15   of July.  We need to get together for dinner when you are

16   back.  I hope July will be less busy for you.  Dr. Ruan.

17   Q   Does Dr. Ruan indicate whether he's donating money from any

18   other pharmaceutical company?

19   A   No, he does not.

20   Q   Specifically what does he say?

21   A   They will all be coming from Insys Therapeutics?

22   Q   Is that the only company he has an arrangement with?

23   A   Yeah, this is the only company he has an arrangement with,

24   yes.

25   Q   Now I show you what has been admitted as Government's

1   Exhibit 9-8(9).  Is this an email from Dr. Ruan to Rachael Bank

2   and Dr. Busta and others at South Alabama?

3   A   Yes, sir.

4   Q   What's the title of it?

5   A   Talk number 7.

6   Q   And what does Dr. Ruan say?

7   A   Dear Rachael, thanks for your understanding.  It would be

8   great if we could meet for a dinner sometime in the future.  I

9   will be visiting China the week of August 14th to 25th, so our

10  meeting will need to be before or after that time frame.  Also

11  I gave two talks last week, July 23rd, July 25th.  So up to now

12  I have done a total of seven talks.  You should be expected to

13  receive total of 21,000 from Insys Therapeutics.  Please let me

14  know if you don't in two weeks and I will contact them.  Yes, I

15  will need to sign the agreement with Dr. Busta (USA).  And

16  remember that we need to change it to Dr. Ruan -- Dr. Xiulu

17  Ruan Endowed Scholarship.  Hope you are all having a great

18  weekend.

19  Q   Do you see where he says he has done a total of seven talks

20  at this point?

21  A   Yes, sir.

22  Q   Do you recall what his fee schedule was for the Insys talks

23  that he's mentioned in the emails before?

24  A   That would be 3,000 a talk.

25  Q   And does 3,000 times seven talks equal the 21,000 he's

1   referencing here?

2   A   Yes, sir, it's $21,000.

3   Q   And again, what was the -- do you recall the date when he

4   started switching over or donating money to South Alabama,

5   after which date?

6   A   I believe it was June.

7   Q   Do you need to refresh --

8   A   Please.

9   Q   I'm showing you what's been admitted as Government's

10  Exhibit 9-8(1).  Does this refresh your recollection?

11  A   Yes, sir.  June 5th of 2014.

12  Q   And are we less than two months later?

13  A   Yes.

14  Q   How much has Insys paid -- how much has Insys paid South

15  Alabama at this point on behalf of Dr. Ruan?

16  A   According to this email, $21,000.

17  Q   I'm going to show you now what has been admitted as

18  Government's Exhibit 9-8(10) -- sorry.  We're at 9-8(7).  And

19  is this an email from Dr. Ruan to Desiree Hollandsworth and

20  Becky Lutas at Insys again?

21  A   Yes, sir.

22  Q   This time what is Dr. Ruan saying to the individuals at

23  Insys?

24  A   Dear Desiree and Becky, starting from August 1st --

25  starting from August, I request a change of recipient to

1    Department of Physical Medicine and Rehabilitation, Medical

2    College of Wisconsin.  This is the institution that I did my

3    physical medicine and rehabilitation residency training.  I

4    want to help them too.  I will ask them to give me a W-9.  Can

5    you please email me back to confirm that?  Thank you very much.

6    Q    And again, does it appear here since he's talking to

7    individuals at Insys that he's talking about donating Insys

8    money?

9    A    Yes, he does.

10   Q    I'm now showing you what has been admitted as Government's

11   Exhibit 9-8(10).  This is an email chain between Dr. Ruan and

12   individuals at the Medical College of Wisconsin.

13   A    It is.

14   Q    Starting from here on July 30th, what is Dr. Ruan telling

15   an individual named Christopher Roche?

16   A    Hi Christopher, thanks.  My goal is to donate at least

17   10,000 in this year, 2014, to the Department of PMR at MCW for

18   promoting clinical research or education.  I don't have a clear

19   idea now.  May have one down the road.  Dr. Ruan.

20   Q    And are two individuals from Insys cc'ed on this email?

21   A    Yes, they are.

22   Q    And what does Mr. Roche respond to Dr. Ruan?

23   A    It states:  Dr. Ruan, I want to thank you for your support

24   and kindness in thinking of MCW and the Department of PM&R in

25   donating your speaking engagement payments.  We received two

1    checks from Insys (Plan 365, Inc.) from your recent

2    presentations in early August and will direct those to PM&R

3    accounts.  I want to make certain that your intention was to

4    direct the gift towards the Department of Physical Medicine and

5    Rehabilitation Education and Research Endowment Fund.  This is

6    the fund that Dr. Braza and her team have been working on to

7    increase the number -- increase for a number of years, and the

8    gifts made would help tremendously.  Thank you for your

9    generosity, Dr. Ruan.

10   Q    And does Dr. Ruan then respond on August 20th?

11   A    You are welcome.  Total checks for $6,000 so far; right?

12   Dr. Ruan.

13   Q    And if two checks equal $6,000, does that indicate what his

14   fee is at this time as well?

15   A    Yes, sir.  It's still $3,000 for a speaking engagement.

16   Q    And I see Plan 365 in parentheses here.  Was that the third

17   party that handled the payments for Insys?

18   A    That's my understanding.

19   Q    I'm now showing you what's admitted as Government's Exhibit

20   9-8(11).  Starting at the bottom, it's cut off, is this an

21   email of August 11th?

22   A    Yes.

23   Q    From Ms. Bank at South Alabama?

24   A    Yes.

25   Q    And what does she say to Dr. Ruan?

1  A   Okay.  It says:  Thanks, Dr. Ruan.  We actually have

2  received 24,000 up to this point, and it has been credited to

3  your pre-med scholarship.  Matching funds for the same amount

4  are pending.  This is going to be a wonderful scholarship for

5  all future physicians.  Thank you for your support.  Please let

6  me know if you have any additional questions or need further

7  assistance.  Thanks, Rachael.

8  Q   And further up in the email chain do you see the October

9  8th email from Dr. Ruan?

10  A   Yes.

11  Q   And what does he say he wants to add?

12  A   He states:  Yes.  I have decided to add a few more

13  talks.  Please add this plus a few more to come to the pre-med

14  scholarship.

15  Q   You can stop there on that point.

16        In addition to the Medical College of Wisconsin, and

17  South Alabama, did Dr. Ruan also donate Insys speaker fees to

18  LSU's medical school?

19  A   Yes, sir, he did.

20  Q   Did any of these donations occur before June 5th, 2014, to

21  your knowledge?

22  A   I'm not aware of any, no.

23  Q   And again, looking at the 9-8(1), you mentioned there's no

24  indication that Dr. Couch received this; is that correct?

25  A   No, sir, I'm not aware.

1  Q   And at any point after June 5th, 2014, did Dr. Couch refuse
2  to accept Insys checks?
3  A   No.
4  Q   Did he donate any checks?
5  A   Donated the checks, yes.
6  Q   I believe you said before he did not donate any checks at
7  this date?
8  A   Say your question again.  I misunderstood you.
9  Q   Dr. Couch, he did not donate any checks after this date,
10 did he?
11 A   I'm not aware, no, sir.
12 Q   Special Agent Burt, was there a time period in the fall of
13 2014 when Dr. Ruan and Dr. Couch began becoming concerned about
14 law enforcement involvement at PPSA?
15         MR. ESSIG:  Objection, Your Honor, as to the concern
16 of the doctors, their mental impressions.
17         THE COURT:  Sustained.
18 BY MR. BODNAR:
19 Q   I'm going to show you what's been marked as Government's
20 Exhibits 9-9(1) and (2) and ask if you're able to identify
21 what's been marked as Government's Exhibits 9-9(1) and (2)?
22 A   Yes, sir.  These are emails obtained via a search warrant
23 from Dr. Ruan or Dr. Couch's email account.
24         MR. BODNAR:  The United States moves to admit
25 Government's Exhibits 9-9(1) and (2)?

 1          MR. ESSIG:  Preserve our earlier objection, Your

 2   Honor.

 3          THE COURT:  You preserve your earlier --

 4          MR. ESSIG:  Yes.  We objected earlier to these.

 5          THE COURT:  Let me see which exhibits these are.

 6              All right.  Overruled --

 7      (Government's Exhibits 9-9(1) and (2) were entered into

 8   evidence.)

 9   BY MR. BODNAR:

10   Q   Special Agent Burt, I'm now going to show you what has been

11   admitted as Government's Exhibit 9-9(1).  Is this an email

12   chain between Dr. Ruan and Dr. Couch?

13   A   Yes.  And also Dr. Chen.

14   Q   And is the subject a blacked-out name of a physician

15   trashing our practice?

16   A   Yes, sir.

17   Q   And starting at the bottom, what does Dr. Ruan tell first

18   to Dr. Chen?

19   A   Hi guys, I just saw a return new patient from -- blank -- a

20   lady I saw in 2010 or so.  C.G. told me -- told her and her

21   husband that our clinic is a pill pusher clinic that only wants

22   to make money on patients.  We don't care whether the patients

23   will get better or not, just push pills and make money.  He

24   told the patient that we are not doctors, we are D.O.s.  This

25   guy went too far.  I questioned the patient multiple times, and

```
 1   I believe the patient and her husband are telling me the
 2   truth.  We need to be careful about this guy.  Xiulu.
 3   Q   Does Dr. Couch then respond to Dr. Ruan?  I'll blow it up
 4   for you.
 5   A   Yes, sir, he does.  Dr. Couch states:  That may be true,
 6   Xiulu.  But just remember -- and I agree with and believe in
 7   the concept of innocent until proven guilty.  Patients are
 8   notorious for completely lying, not telling the truth at
 9   all.  It's shocking what they will say.  So I wouldn't give it
10   much credit or credence.  That has just been my experience.  I
11   would just do what you're saying, be careful.  But always
12   remember it's possibly not the whole story -- probably not the
13   whole story.  Especially the D.O. part.  Just turn it around
14   and think about what if he had that experience of some patient
15   telling him that we went around telling everybody that he is a
16   quack, just a pill mill (which is probably true, but I don't go
17   around saying it, only between us three).  And we would want
18   him to do the same for us, not believe it until it is
19   investigated.  It's the concept of "contempt prior to
20   investigation," which I hate.
21   Q   Special Agent Burt, I'm now going to show you what has been
22   admitted as Government's Exhibit 9-9(2).  Is this an email
23   first from Dr. Ruan to Dr. Couch with a response from
24   Dr. Couch?
25   A   Yes, sir, it is.
```

DEA SA MICHAEL BURT - DIRECT BY MR. BODNAR

1  Q   What's the date on this email?

2  A   October the 13th, 2014.

3  Q   And I'll move it down as needed, but please read what

4  Dr. Raun told Dr. Couch.

5  A   Pat, regarding the idea of PPSA, I have mixed feelings.

6  You must have them too considering that you started it from

7  ground zero.  I discussed with Boe if there are any ways of

8  restructuring PPSA so that neither Dr. Chen nor I can be

9  involved in case your team gets investigated or something bad

10  happens down the road.  Just two weeks ago you mentioned to me

11  that we were supposed to be raided by FBI which got you

12  concerned, but thank God it did not happen.  I talked to Boe

13  about this issue afterwards.  Plus there are other issues that

14  I am sure you are aware.  However, if we're going to

15  restructure PPSA, that will imply that resolution of PPSA even

16  if we still practice under one roof.  What is more concerning

17  is the decisionmaking and future company expanding.  It will

18  become individual group decisions.  No one will need to

19  listen -- no one will need to listen to others, and it may very

20  well be the end of our collaboration even if we still practice

21  together and share our overhead.  I feel that this may not be

22  what you want.

23        I am recommending the following:  Let's make a paper

24  agreement between you and me.  If you were out or if I were

25  out, the other party takes over the leaving party's business

 1    until the leaving party comes back for whatever reason.  We

 2    will have a paper agreement between you and me.

 3         Both of us will need to set a perfect example for

 4    others, including our mid levels.  We know they are loyal.

 5    Every practice can get into trouble when there are

 6    opportunities for whistleblowers to gain.

 7         Don't let Dr. Chen sign your nurse practitioner's

 8    prescriptions.  Stacy may have taken advantage of both Dr. Chen

 9    and me signing prescriptions.  Plus if you bill the visits and

10    he signs the prescriptions but your nurses bill under you, of

11    course there will be unpleasant feelings.  On rare occasions if

12    you are sick or in court, it is different.  But if it

13    becomes -- if it becomes a daily thing, then no one will be

14    happy for that.  If you were in his shoes, you would feel the

15    same.  Once again, if there are no billing -- if there is no

16    billing involved, then it will not matter that much.  Do you

17    agree?

18         Also I feel we need to have an alternative to minimize

19    each individual's liability when one partner is

20    involved.  Let's talk to our lawyer and find out if there is

21    any -- without suspending PPSA.  What do you think?  Xiulu.

22    Q   And does Dr. Couch have a response to Dr. Ruan?

23    A   Dr. Couch responds:  I agree with all of your points.

24         MR. BODNAR:  One moment, Your Honor?

25         (A discussion was held off the record between government

1    counsel.)

2    BY MR. BODNAR:

3    Q    Special Agent Burt, one thing that I overlooked on Friday,

4    do you recall talking about whether Justin Palmer had a DEA

5    license?

6    A    I do.

7    Q    And do you recall when it was that he obtained a DEA

8    license?

9    A    October of 2014.

10   Q    Based on your investigation, did any of the other mid

11   levels -- Bridgette Parker, Stacy Madison, Sharon Noland, Matt

12   Bean, Ben Clark -- did they have DEA numbers?

13   A    I'm not aware that any other mid levels had DEA numbers,

14   and Justin Palmer could only prescribe schedule IIIs and below.

15            MR. BODNAR:  Nothing further from this witness.

16            THE COURT:  Cross?

17            MR. ESSIG:  Yes, Your Honor.  Just one moment, Your

18   Honor.

19            THE COURT:  All right.

20                         CROSS EXAMINATION

21   BY MR. ESSIG:

22   Q    Good morning, Agent Burt.

23   A    Good morning, sir.

24   Q    One of the things I wanted to start with was kind of where

25   Mr. Bodnar left off when he asked you about Justin Palmer.  One

 1   of the things that you guys discovered during the course of

 2   this investigation was that Justin Palmer was forging

 3   Dr. Couch's name and signature?

 4   A   That is correct.

 5   Q   Forging his signature to prescriptions.  I apologize.

 6   A   That's correct, yes, sir.

 7   Q   And at some point in time in the investigation the DEA

 8   actually sat down with Mr. Palmer and y'all had him do an

 9   example of how he would prescribe Dr. -- excuse me -- forge

10   Dr. Couch's name on prescriptions; is that correct?

11   A   I'm aware of that, sir.  I may not have been present for

12   that, but I'm aware of that.

13   Q   Now, Agent Burt, I want to back up and sort of begin a

14   little bit and go back to the intro and some of your

15   experiences as a DEA agent.  Now you testified on direct you've

16   been with the DEA -- I'm sorry, I can't remember exactly how

17   long you said.

18   A   13 years.  This is my 13th year.

19   Q   And prior to that you had some experience doing state

20   narcotics in Mississippi; is that correct?

21   A   Yes, sir, I did.

22   Q   And you had mentioned on direct examination -- you and

23   Mr. Bodnar started discussing a little bit sort of the history

24   of how the DEA has investigated pill mills; is that correct?

25   A   If you're talk about my experience in working cases in

 1   Miami, south Florida --

 2   Q   What I want to do is talk about that a little bit.  Now,

 3   the term "pill mill" -- you mentioned your experience in south

 4   Florida -- that is a term that sort of arose out of DEA

 5   diversion investigations in south Florida; is that right?

 6   A   Yes; that's correct, yes.

 7   Q   And "pill mill," the term -- I mean, again, I think we've

 8   talked about this already in this trial -- "pill mill" is not a

 9   legal term, is it?

10   A   No, I'm not aware, no.

11   Q   And it's a term really sort of the DEA uses to describe a

12   certain type of medical clinic; is that correct?

13   A   Yes, sir.  I mean they can take many forms.  For example,

14   they can take the form of a pill mill, they can take the form

15   of making money for prescribing patients -- I mean, there are

16   many forms it can take.

17   Q   I understand.  And I don't disagree with that.  But what I

18   want to do is I want to talk about when the term first came

19   about, I mean, the pill mills -- you mentioned, I think, on

20   your direct examination, you referred to sort of the south

21   Florida pill mill days from 2008 to 2010; is that right?

22   A   Yes, sir.  I was there.

23   Q   And the term "pill mill," as we've already talked about

24   again, came out of those investigations; is that right?

25   A   Yes.

```
 1   Q   And I think you started to talk about on direct examination
 2   your investigation that was a five-year investigation into a
 3   specific pill mill?
 4          MR. BODNAR:  Your Honor, this is the exact topic that
 5   defense objected to when the United States tried to get into it
 6   on direct examination.  So we object.  If we weren't able to
 7   get it out on direct --
 8          THE COURT:  Well, he can go into it if he wants, but
 9   you will have free rein on redirect about it.
10          MR. BODNAR:  Yes, Your Honor.
11          MR. ESSIG:  Your Honor, I would note that thus far I
12   have not gone beyond any of the questions and answers Mr. Burt
13   provided.
14          THE COURT:  Well, let's see where it goes.
15   BY MR. ESSIG:
16   Q   And Agent Burt, that was a pill mill case, that was a five-
17   year investigation into a pill mill; is that right?
18   A   That's correct.  They were a pill mill that made a lot of
19   money in five years.
20   Q   Okay.  And the point I kind of wanted to get out is the
21   term "pill mill" began to be used -- when it was first adopted,
22   the original definition of a pill mill were clinics that opened
23   up and really all they were was a doctor with a prescription
24   pad that handed out pills; is that right?
25   A   That's essentially what it was, yes.
```

DEA SA MICHAEL BURT - CROSS BY MR. ESSIG

1   Q   And that's -- again, the term "pill mill" was created to

2   apply to those types of places?

3   A   Yes, sir.

4   Q   I mean because it sounds like a cotton mill; right?  All

5   they do is generate pills like a cotton mill, all they do is

6   generate cotton?

7   A   That's correct, yeah.

8   Q   And I don't want to take issue with -- I mean, as you used

9   the term "pill mill" -- and I think there was testimony early

10  on that it evolved; that now the term doesn't necessarily apply

11  to just those types of places; is that correct?  That's sort of

12  your position?

13  A   Sir, I will submit that criminal behavior is learned.  Over

14  time people become aware of -- when an organization is taken

15  down, this time by law enforcement, that people learn that type

16  of behavior.  They adjust their way of doing things and become

17  even better at it possibly or find new ways to do it.

18  Q   Okay.  Now, Agent Burt, you talked about things evolving

19  over time.  And as I understand from you, the DEA -- the DEA

20  puts out a lot of guidance and information for doctors to look

21  at; is that correct?

22  A   I'm aware of some guidance, I'm not aware of a whole lot.

23  But yes.

24  Q   I mean you're aware that DEA maintains a website called DEA

25  Diversion; is that correct?

1   A   Yes.

2   Q   And you're aware that's a publicly available website that

3   anyone can go to and look at; is that right?

4   A   Yes, sir, that's true.

5   Q   And that's a website, public website, that is actually

6   maintained by the Drug Enforcement Administration; is that

7   correct?

8   A   Yes, sir.

9   Q   And there doctors can go look and they can find any of the

10  Code of Federal Regulations that are applicable to their

11  practice; is that correct?

12  A   They can, yes.

13  Q   And they can find all of the United States Code provisions

14  that are applicable to doctors' prescribing practices; is that

15  correct?

16  A   Yes, sir.  They have a Code of Federal -- the C.F.R.  It's

17  called the Code of Federal Regulations.  Yes.

18  Q   And in this case what's already been admitted is Couch

19  Exhibit 110.  It's the DEA Practitioners Manual.  Have you seen

20  that before?

21  A   I have, yes, sir.

22  Q   And you had seen that before it was admitted in this trial?

23  A   I saw it, yes.

24  Q   And you're aware that the DEA website -- that doctors can

25  go there and they can actually print off a copy of the DEA

1    Practitioners Manual; is that correct?

2    A   Yes, sir.  It's my understand also that that manual is also

3    being revised as we speak.

4    Q   All right.  But currently if a doctor goes there to find

5    the publication from the DEA, the manual for a practitioner,

6    that is the only one that's available; is that correct?

7    A   My understanding, yes.

8    Q   And one of the reasons that the DEA publishes the

9    information and the guidance that it does is that the DEA wants

10   doctors and nurses and other practitioners to look at

11   information the DEA has published; is that correct?

12   A   Yes, sir.  The DEA wants doctors and nurses to be as

13   knowledgeable as they possibly can.  The DEA is not in the

14   business of telling doctors or nurse practitioners who have DEA

15   numbers how to prescribe their medication or see their

16   patients.

17   Q   But the DEA certainly wants doctors and nurses and other

18   practitioners to tailor how they practice to the information

19   the DEA puts out?  Would that be fair to say?

20   A   I don't know about that, sir.  DEA, our business is to

21   provide doctors with as much information as possible.  The

22   doctor -- their responsibility is to practice how they deem

23   necessary to their practice and what specialties they have.

24   Q   And the DEA in fact allows for a wide range of prescribing

25   practices by doctors; isn't that correct?

1  A   Yes, sir.

2  Q   And there's no specific -- as a matter of fact, I think you

3  talked about -- let's go to -- with Mr. Bodnar you talked

4  about Government's Exhibit 9-1(2).  Actually let me take this

5  out so the glare is not on the screen.

6         Now, y'all talked about this email between Dr. Couch

7  and Dr. Ruan, and this is dated July 8, 2014; is that correct?

8  A   Yes, sir, it is.

9  Q   And you mentioned here -- or y'all talked about the fact

10  that Dr. Ruan and Dr. Couch were discussing red flags for the

11  Florida pill mills; is that correct?

12  A   Yes, sir.

13  Q   And they specifically discussed that one of the red flags

14  is Roxicodone 30 milligrams; is that correct?

15  A   Yes, sir.

16  Q   And would you agree that that is a pill mill red flag?

17  A   Yes, sir.  That's one of the drugs of choice in pill mill

18  operations and one of the drugs that drug seekers often

19  typically ask for.

20  Q   But you would agree also that prescribing 30 milligrams of

21  Roxicodone, even in large volumes, does not make a practice a

22  pill mill?

23  A   Sir, if it was done for a legitimate medical purpose and

24  within the scope of medical practice and it was not deemed

25  unnecessary, it's completely up to the doctor.

1    Q   But that's my point, you know.  There's no rule from the
2    DEA that says they can't prescribe Roxicodone 30 milligrams in
3    large volumes; is that fair to say?
4    A   I'm not aware of any rule of that sort.
5    Q   As long as it's in the usual course; is that correct?
6    A   That's correct, yes, sir.
7    Q   And to be fair, the DEA does not define "usual course of
8    medical practice"?
9    A   I'm not aware that it's -- I'm not aware no, sir, I'm not
10   aware.
11   Q   And it doesn't define "legitimate medical purpose."  Is
12   that correct?
13   A   It's open to interpretation of how the doctor -- again, the
14   doctor is the final authority -- has the authority to make a
15   decision on what the patient needs.
16   Q   Now, I want to talk about here at the top.  You talked
17   about Dr. Couch's response where he's talking about talking
18   about this with Justin Palmer; correct?
19   A   Yes, sir.
20   Q   He said:  I reviewed this with him tonight.  We do not
21   write triple-digit dispenses of short-acting opioids.  We keep
22   it at 90 tablets per month unless they have a cancer diagnosis;
23   is that correct?
24   A   Yes, sir, that's what the email states.
25   Q   Now, and he's responding to an email from Dr. Ruan that

1   mentions nothing other than Roxicodone 30 milligrams and then

2   OxyContin 80 milligrams; is that correct?

3   A   I don't know, sir.  I believe if you read the bottom of the

4   email, it says:  Please remind Justin about this stuff.

5   Q   Now, that's right.  But I'm talking about the dosages of

6   those two medications.

7   A   Yes, sir; that's correct.

8   Q   He's only talking about -- the only thing he mentions to

9   Dr. Couch as a red flag is Roxicodone 30 milligrams and then, I

10  think, OxyContin 80 milligrams; is that correct?

11  A   Yes, sir; that's correct.

12  Q   And in Dr. Couch's response he talks about keeping it at 90

13  for their patients; is that right?

14  A   Yes; that's right.

15  Q   Now, I think earlier you were asked by Mr. Bodnar if you

16  were aware of any patients receiving short-acting opioids in a

17  pill amount or a dosage amount larger than 90 tablets.

18  A   Yes, sir.

19  Q   And you referenced the undercover; is that correct?

20  A   Yes, sir.

21  Q   Now, you're familiar, aren't you, with the fact that

22  Roxicodone 30 milligrams, that is a blue pill; is that right?

23  A   I am.

24  Q   And you recall that the UC, when he came in, he mentioned

25  that the dosage of Roxicodone he had taken prior to coming

2155

1  there was a blue pill; do you recall that?

2  A   Yes, I do.

3  Q   And you're aware too, though, that when Dr. Couch wrote the

4  prescription to the undercover for his initial visit, he wrote

5  him a 15-milligram prescription; isn't that correct?

6  A   That is correct, sir, yes.

7  Q   And so he actually reduced the dosage that the UC had

8  previously taken?

9  A   The milligram dosage.

10  Q   Right.  And when he went up to 110 for Roxicodone for what

11  he had prescribed him again, he kept that at a 15-milligram

12  dosage; isn't that correct?

13  A   He did, yes.

14  Q   And Agent Burt, there's been a lot of talk in this case

15  about off-label usage of medications; isn't that right?

16  A   Yes, sir, there has been.

17  Q   Are you aware that the FDA indication for Roxicodone is for

18  moderate to severe pain?

19  A   Yes, sir.

20  Q   It's not indicated only for cancer patients?

21  A   That's my understanding, yes.

22  Q   And then also again let's go to Couch Exhibit 110.

23        MR. ESSIG:  Sam, can you bring that up?

24  Q   Again, Agent Burt, this is the DEA Practitioners Manual

25  that's already been admitted into evidence.

1      MR. ESSIG:  And, Sam, can you go to page 23, please?

2   And can you highlight the section that begins with "while some

3   states"?

4   Q   Agent Burt, this goes to what we were discussing before.

5   And do you see here this is the DEA Practitioners Manual, and

6   it says:  While some states and many insurance carriers limit

7   the quantity of a controlled substance dispensed to a 30-day

8   supply, there are no specific federal limits to quantities of

9   drugs dispensed via a prescription.

10      Do you agree with that?

11  A   Again, sir, it's completely up to the doctor.  If the

12  doctor deems the patient needs more or less of a controlled

13  substance based on his objective evaluation of the patient,

14  then it's completely up to the doctor.

15  Q   But do you agree with that statement there, there is no

16  federal limit?

17  A   There is no federal limit, no, sir, there is not.

18  Q   So if a doctor wanted to go look at the DEA manual or some

19  other, whether it's the Code of Federal Regulations or the

20  United States Code, if the doctor were to look for a limit of

21  the number of dosages that he can prescribe to a patient at a

22  given time, he would find no limit; is that correct?

23  A   There would be no limit, sir.

24  Q   And as a matter of fact, if he were looking for a limit of

25  the period of time that he could prescribe to that patient, if

1 he looked for that from the DEA, he would see no limit, would

2 he?

3 A   As long as it's for a legitimate medical purpose and in the

4 usual course of professional practice, I'm not aware of any

5 limit, sir.

6 Q   They can give them a year or more of medication at one

7 visit; is that correct?

8 A   If the doctor deems so, yes, sir.

9 Q   All right.  And as a matter of fact, there's no requirement

10 in any of the DEA guidance that they have to ever see that

11 patient again; is that correct?

12 A   I'm not aware that's in there.

13 Q   And again, going back to Government's Exhibit 9-1 where

14 they talk about red flags, I mean, you want doctors to be

15 looking out for red flag medications, don't you?

16 A   Of course, yes.

17 Q   And you want doctors to try to avoid some of these red flag

18 scenarios; is that correct?

19 A   Yes, sir, that's true.

20 Q   Agent Burt, also while we're talking about it, we saw there

21 the discussion of insurance companies potentially having

22 limited the numbers of prescriptions that a doctor can

23 prescribe or the dosage amounts.

24 A   Yes.

25 Q   Maybe the time period also.  And we've seen that in some of

1  the emails; right?  You testified to some of that; correct?

2  A   Yes, sir.

3  Q   And there was some discussion with Medicare, some of the

4  insurers there, about the use of TIRF drugs for noncancer

5  patients?  You saw some of that?

6  A   Correct.

7  Q   But an insurance company's refusal to cover a prescription

8  written by a doctor, that doesn't make that prescription

9  illegal, does it?

10         MR. BODNAR:  Objection, Your Honor, asking him about a

11  legal conclusion.

12         THE COURT:  Sustained.

13  BY MR. ESSIG:

14  Q   The agreements about what an insurance company will cover

15  between the doctor and the insurance company, you understand

16  those are contractual agreements between that doctor and that

17  insurance company?

18  A   I understand that, yes.

19  Q   And that's all that is.  It's between those two parties; is

20  that correct?

21  A   Yes, sir.  I believe the onus is on the insurance company

22  to check the doctor to make sure that things are progressing

23  the right way for the patient based on the patient's needs.

24  Q   Right.  And there's a lot of interaction between the doctor

25  and the insurance company about how to do that?

DEA SA MICHAEL BURT - CROSS BY MR. ESSIG

1    A    Of course, yes.

2    Q    Now, also in this case you were shown an email,

3    Government's Exhibit 9-2(1).  I'll show you this.  And this is

4    an email between -- I'll show you 9-2(1).  And this is an email

5    between Dr. Ruan and Bryan Crawford; is that right?

6    A    Yes, sir.

7    Q    And I think you testified on direct that Bryan Crawford was

8    somebody that was in some way involved with C&R Pharmacy; is

9    that right?

10   A    Yes, sir.

11   Q    And do you understand that Mr. Crawford is a former

12   pharmacist that helps to manage C&R Pharmacy?

13   A    I'm not aware that he's a pharmacist, but I know he's

14   associated through McConaghy, I believe.

15   Q    And you would agree that in this email he's addressing a

16   concern to Dr. Ruan about people outside of the physician's

17   office putting cancer pain diagnoses in preapproval orders?

18   A    Yes, sir.  I believe I referred to the "outside" as the

19   IRC, which is the Internal Reimbursement Center for Insys.

20   Q    And "outside," we've heard of people that aren't employed

21   by either the pharmacy or the physician's office?

22   A    I'm sorry, sir?  Say that one more time.

23   Q    IRC, that's Insys; correct?

24   A    Yes.

25   Q    So "outside" here and as you understand it is referring to

DEA SA MICHAEL BURT - CROSS BY MR. ESSIG

1   people that aren't employed by either C&R or the doctor's

2   office, or PPSA?

3   A   Yes, sir, I agree with that.

4   Q   And as a matter of fact, after you were shown this email

5   addressing Mr. Crawford's concern about outside people can put

6   in cancer pain diagnoses in patients' charts, you were shown a

7   preapproval form for RI........; is that correct?

8   A   That is correct.

9   Q   And I think you testified that it contained a cancer

10  diagnosis?

11  A   I could not find a cancer diagnosis.

12  Q   Right.  The preapproval form contained a cancer diagnosis?

13  A   Yes; that's correct.

14  Q   And then you reviewed his file, and you did not find a

15  cancer diagnosis; is that correct?

16  A   That is correct.

17  Q   And I think you testified and I think the preapproval form

18  actually indicated on its face that that preapproval form was

19  actually done by Natalie Perhacs; is that correct?

20  A   Yes, I believe it was.  She assisted.

21  Q   Now, we talked also -- you talked on direct examination a

22  little bit about how DEA tracks prescription or controlled

23  substance prescription medications from really the point of

24  manufacture all the way to the prescription getting into the

25  patient's hand; is that correct?

1  A   Yes, sir.  Through the doctor's DEA number, we track how

2  much controlled substance a doctor orders or a pharmacy orders

3  under the DEA number.

4  Q   And do y'all track the controlled substances when they come

5  from the pharmaceutical company, from the manufacturer?

6  A   If it has a DEA number, yes, we do.

7  Q   And if it's like Roxicodone, that would be tracked?

8  A   Yes.

9  Q   Is that correct?  Y'all would track it all the way from,

10  again, point of manufacture, to the patient's hand?  And the

11  DEA has some regulation over each step in that process; is that

12  correct?

13  A   I'm not following your question.

14  Q   From point of manufacture, it goes from the manufacturer to

15  the wholesaler?

16  A   Correct.

17  Q   Is that how it works?  Does the DEA have some regulation

18  and oversight of that process?

19  A   Sir, I'm not aware.  If you're asking for like specific

20  limits like we put on companies, I'm not aware of any.  I'm not

21  aware of that.

22  Q   Okay.  But are you aware of whether DEA regulates that at

23  all?

24          MR. BODNAR:  Objection, Your Honor.  He's not aware of

25  this.  We're having a witness tomorrow from ARCOS who will

 1   explain this whole process of how it goes to the ARCOS

 2   wholesaler.

 3           THE COURT:  All right.  Let's move on.

 4           MR. ESSIG:  Yes, ma'am, will do.

 5   Q   Agent Burt, let me show you also Government's Exhibit 9-8.

 6   And this was the email between --

 7           THE COURT:  9-8 what?  Which subpart?

 8           MR. ESSIG:  9-8(1), Your Honor.

 9           THE COURT:  All right.

10   BY MR. ESSIG:

11   Q   Again, this was the email from Chris Lento at Galena and

12   Dr. Ruan; is that correct?

13   A   Yes, sir.  And David Corin is also cc'ed and several other

14   people.

15   Q   Right.  And this discusses -- you had mentioned the

16   complaint for Dr. Awerbuch; is that right?

17   A   Yes, sir.  Out of the Eastern District of Michigan, yes.

18   Q   And you see in this email here the purpose of this email,

19   isn't it, is for Galena to assure Dr. Ruan that Galena is not

20   in any way a part of any criminal investigation in this case;

21   is that right?

22   A   That's what the email states, yes.

23   Q   And he's trying to maintain that relationship with

24   Dr. Ruan?

25   A   It appears so.

1   Q   And he also says too that:  As we have shared, we will

2   continue to operate in only legal, ethical, and within all

3   established industry guidelines and regulations.

4          Is that right?

5   A   That's what the email states.

6   Q   And he mentions also:  This is why our legal and regulatory

7   compliance teams oversee all of our programs, promotional

8   resources, et cetera.

9          Is that right?

10         MR. BODNAR:  Your Honor, may we approach at side bar

11   on this issue?

12         THE COURT:  All right.

13      (At the side bar, jury not present.)

14         ... (Redacted.)

15

16

17

18

19

20

21

22

23

24

25

1        THE COURT:  Okay.  Well, unless you want that to come

2  out --

3        MR. ESSIG:  No, ma'am.

4        THE COURT:  -- you need to tread carefully.

5        MR. ESSIG:  No, ma'am, I'm not going to do that.

6     (In open court, defendants and jury present.)

7  BY MR. ESSIG:

8  Q   Also, Agent Burt, you testified that on this page here

9  there's a screenshot from the complaint that talks about

10  Dr. Awerbuch's prescribing amounts; is that correct?

11  A   Yes, sir.

12  Q   And then I think this is a clearer page of that.  And I

13  think you testified that based on your knowledge of the DEA

14  numbers, that these Alabama individuals are Dr. Ruan and

15  Dr. Couch; is that right?

16  A   No, sir, that's not a DEA number.  That's an NPI number,

17  National Practitioner Identifier.

18  Q   Okay.  But either way you've identified those two

19  individuals as Dr. Ruan and Dr. Couch; is that right?

20  A   Yes.  Dr. Couch is the number three, Dr. Ruan is number

21  five.

22  Q   And in this case Dr. Awerbuch, when this was submitted to

23  these two doctors, he had roughly eight to -- six to eight

24  times the amount of money than those two doctors; is that

25  right?

1   A   Yes, sir.  It's a lot of money.

2   Q   And when we combine their two total PDE records here --

3   excuse me -- here and here (indicating), it's about a quarter

4   of Dr. Awerbuch's total numbers; is that right?

5   A   That's -- that's fair to say, yes.

6   Q   If we go back to page one when Mr. Lento was talking about

7   his legal and compliance team looking at the practices, he

8   never says to Dr. Ruan you and Dr. Couch should be concerned,

9   does he?

10  A   I don't see that in the email, no.

11          MR. ESSIG:  Just a moment, Your Honor?

12          THE COURT:  All right.

13  BY MR. ESSIG:

14  Q   And you were shown two exhibits there toward the end of

15  your direct examination, Government's Exhibit 9-9(2) -- and

16  again, this is the email between Dr. Ruan and Dr. Couch where

17  they discussed the possible suspension of the practice?

18  A   Yes, sir.

19  Q   Is that correct?

20  A   That's correct.

21  Q   And you noted or Mr. Bodnar noted during the email that one

22  of the things they talked about was concerns about the FBI; is

23  that right?

24  A   Yes, sir.  They are concerned they are going to be raided

25  by the FBI.

1    Q   And of course, the only thing that you can see or any of us

2    can see, the jury can see, in these emails are the actual

3    conversations in the email; is that correct?

4    A   I'm sorry, sir.  Say that one more time.

5    Q   The only thing we can see, the only thing we know about

6    their communications, are what we can actually see in these

7    emails; is that correct?

8    A   Yes.  The content of the emails, yes.

9    Q   And if we look at the content and the context of these

10   emails, it's pretty clear there had been a lot of other

11   discussions between these two doctors prior to this email;

12   isn't that right?

13   A   I'm not sure what you're asking.  If you're asking -- I'm

14   not sure, sir.  Go ahead.

15   Q   Well, I just -- as a matter of fact, the first line of

16   Dr. Ruan to Dr. Couch is:  Pat, regarding the idea of

17   restructure of PPSA.  You see that; right?

18   A   Yes, sir.

19   Q   And there's not a preceding email from Dr. Couch before

20   this email from Dr. Ruan, is there?

21   A   No, sir, I'm not aware.

22   Q   My point, my only point is this email would indicate there

23   had been a lot of discussions between the doctors that aren't

24   reflected in the email; is that right?

25   A   I wouldn't know if there's a lot of discussions.  I mean,

DEA SA MICHAEL BURT - CROSS BY MR. ESSIG

1   what we have is just the email to go on.

2   Q   That's my point.  But I mean he raises restructure on his

3   own.  My point is in terms of the FBI and them coming, you have

4   no idea where that information came from, do you?

5   A   No, sir, I don't.

6   Q   You don't know if somebody could have just called up and

7   told them that the FBI was coming, do you?

8   A   I don't have a clue.

9   Q   Then with Government's Exhibit 9-9(1), now, you would agree

10  with me that the way this email reads is what the doctors are

11  discussing is the accusation of another doctor that they were

12  improperly prescribing; is that right?

13  A   It appears to be so, yes.

14  Q   And when they get this email, the response and

15  communication between the two doctors is not:  Hey, we need to

16  change how we're doing things, is it?

17  A   No, sir.

18  Q   As a matter of fact, what they do is they disregard or they

19  refute specifically the doctor's allegations; is that right?

20  A   Yes.

21  Q   But there's no discussion of:  Hey, they're making this

22  allegation, we need to change what we're doing, is there?

23  A   No, sir, I didn't see that in there.

24      (A discussion was held off the record between defense

25  counsel.)

DEA SA MICHAEL BURT - CROSS BY MR. KNIZLEY

```
1        MR. ESSIG:  No further questions, Your Honor.

2        THE COURT:  All right.  Mr. Knizley?

3                    CROSS EXAMINATION

4   BY MR. KNIZLEY:

5   Q    Good morning, Agent Burt.

6   A    Good morning, sir.

7   Q    How are you today?

8   A    Doing fine.

9   Q    Agent Burt, on Friday you had discussed one of Dr. Ruan's

10  patients named Kathleen Burns.  Do you recall that?

11  A    I do.

12  Q    And do you recall that you had her patient file with you

13  that day?

14  A    Yes, sir, I was shown the patient file.

15  Q    And I'm going to show you what's been marked as

16  Government's Exhibit 9-11.  Is that the patient file that you

17  had with you?

18  A    Yes, sir, it appears to be so.

19  Q    Now, as the case agent, you are aware that on May 20th,

20  2015, there was a search warrant executed on the two locations

21  and other places of PPSA; is that right?

22  A    Yes, sir, I'm aware of that.

23  Q    And at the time of the execution of that search warrant,

24  there was gathering of medical files, was there not?

25  A    I believe the FBI CART team was tasked with downloading the
```

1    server from PPSA.

2    Q    And when we say CART team, we're talking about -- and

3    downloading a server, we're talking about that there were

4    electronic files, is that correct, medical files; right?

5    A    Electronic medical records, yes.

6    Q    And that's called the Greenway system; right?

7    A    That's my understanding, yes.

8    Q    And there were other files taken as well that day, was

9    there not?

10   A    Yes, sir.

11   Q    Okay.  And those Greenway electronic files and some paper

12   files and some MedScan files all made up the records of these

13   various patients; is that right?

14   A    Yes.

15   Q    All right.  Now, back to Kathleen Burns, 9-11, did you

16   identify that as her patient file?

17   A    Yes, sir, that's what I was shown.

18   Q    And who showed it to you?

19   A    Mr. Bodnar.

20   Q    Okay.  Well, do you know it to be her patient file or not?

21   A    Sir, based on the file that was given to me to review,

22   that's what was shown to me, yes.

23   Q    And who gave you that to review?

24   A    Someone from the prosecution team.

25   Q    Okay.  But to the best of your knowledge, this is what --

1    this is Mrs. Burns' patient file; is that right?

2    A   Sir, that's what was given to me, yes.

3    Q   And that's what you testified to the jury as to your

4    knowledge what was her file; is that right?

5    A   That is correct.

6    Q   Now, do you recall testifying on Mr. Bodnar's question --

7    do you recall him asking you about whether there was a Patient-

8    Prescriber Agreement Form?

9    A   Yes.

10   Q   And do you recall telling the ladies and gentlemen of the

11   jury that there was no such thing in that file?

12   A   I could not find one.

13   Q   Okay.  And I'm going to show you what's marked as -- and

14   this will be just for the witness only at this time.

15           THE CLERK:  It's off.

16           THE COURT:  It's off, Mr. Knizley.

17           MR. KNIZLEY:  Okay.

18   Q   I want to show you what's marked as Ruan Exhibit 127.  Do

19   you see that?

20   A   I do, yes.

21   Q   And it has a signature at the bottom?

22   A   Yes.

23   Q   And it says Patient-Prescriber Agreement Form at the top?

24   A   Yes, sir.

25           MR. BODNAR:  Your Honor, we're going to object at this

 1  point on authentication grounds of where this was found.  This

 2  is not --

 3          THE COURT:  Let's go to side bar.  Let's go to side

 4  bar.

 5      (At the side bar, jury not present.)

 6          MR. KNIZLEY:  Judge, it came from the government.  It

 7  was in discovery.

 8          MR. BODNAR:  Does it have --

 9          MR. KNIZLEY:  It doesn't have anything on it, but this

10  came from the discovery back to us.

11          MR. BODNAR:  It would have a doc lab number on it.

12          MS. GRIFFIN:  It would have a doc lab number or the

13  doc lab that it came from.

14          THE COURT:  Well, I think just show it to him ask him

15  if he's ever seen it before.

16          MR. KNIZLEY:  Yes, ma'am.

17          THE COURT:  If he hasn't, no more questions about

18  it.  You're going to have to introduce it otherwise.

19          MR. KNIZLEY:  Yes, ma'am.

20          THE COURT:  Okay.

21      (In open court, defendants and jury present.)

22          THE COURT:  Mr. Knizley just hand him the hard copy

23  and ask him that.

24          MR. KNIZLEY:  Okay.  (Complying.)

25  Q   Agent, I've handed you what's been marked as, I think,

1    Ruan's Exhibit 127; is that correct?

2    A    Yes, sir.

3    Q    Okay.  And have you had an opportunity to go through

4    Ms. Burns' file?

5    A    I did, yes.

6    Q    And Ruan's Exhibit 127, were you able to find that document

7    in the file that was given to you that you understood to be

8    Ms. Burns' medical file?

9    A    I could not find this in the file.  And I was given what

10   was thought to be a complete file.

11   Q    Do you recognize that document?

12   A    No, sir.  I mean, I recognize what the TIRF REMS form is,

13   yes.  But I did not see this particular document in the file.

14   Q    Okay.  Thank you.

15        And Agent, do you know how the file was compiled, what

16   was purported to be the entirety of Ms. Burns' file was

17   compiled to give to you?

18        MR. BODNAR:  Objection, Your Honor, as to the

19   accusation that this may not be a complete file when he's

20   identified that this wasn't in the file and there's been no

21   evidence that this would have or should have been in the file.

22        THE COURT:  Overrule the objection to the question.

23        Do you know what the question was?  Do you know how

24   the file was compiled?

25        THE WITNESS:  My understanding is that the patient

 1    file was downloaded from Greenway and I was given the Greenway

 2    -- printout from Greenway.

 3    BY MR. KNIZLEY:

 4    Q   And again, we've talked a lot about Greenway.  Greenway was

 5    an electronic filing system that PPSA put into place sometime

 6    in the year 2013?

 7    A   Yes, sir.  I believe it's the electronic medical records.

 8    The EMR is what they call it.

 9    Q   Right.  And before the Greenway system, did you understand

10    PPSA had another type of system?

11    A   I'm not aware of that.

12    Q   Well, there would have been some other way to maintain

13    medical records prior to 2013; right?

14    A   Yes.  My understanding is it was a handwritten paper file.

15    Q   Okay.  And was that called MedScan, if you know, from your

16    investigation?

17    A   Yes, sir, I believe so.

18    Q   And were some of the MedScan documents put in Greenway and

19    some not, if you know from your investigation?

20    A   I believe some were, some were not.

21    Q   So you don't have personal knowledge whether or not all of

22    those got in there, do you?

23    A   No, Mr. Knizley.  What I testified about was the diagnosis

24    of cancer.  I could not -- based on the file I was given, I

25    could not find a diagnosis of cancer in the file.

2174

 1  Q   And I want to get to that as well, sir.  You did testify
 2  about Ms. Burns and cancer, did you not?
 3  A   I did.
 4  Q   And if you recall, how long had Ms. Burns been a patient,
 5  if you know?
 6  A   I'm not sure, sir.
 7  Q   Let's go back to the file, and I'll show you what's marked
 8  as Government's Exhibit 9-11.  And again, this is -- we're
 9  looking here, I think, at page one of 228.  Do you know where
10  that pagination came from?
11  A   I do not.
12  Q   Okay.  And that's the cover page; right?
13  A   Yes, sir.
14  Q   For patient Kathleen Burns; right?
15  A   Right.
16  Q   And it's got some of her information on it?
17  A   Correct.
18  Q   And then we turn to -- there's a lot of prescriptions and
19  stuff.  And then we turn to a page called History and Physical;
20  right?
21  A   That's correct.
22  Q   And it appears the date on that is May 17th, 2013; is that
23  right?
24  A   May 17th, 2012.
25  Q   Excuse me.  May 17, 2012.  Now, do you recall reading this

1    as being the first history and physical and the first document

2    from Mrs. Burns' file as part of the examination by the

3    physician?

4    A   Yes, sir, I assume that it was.

5    Q   So then that would tell us, if that's the case, if that's

6    her history and physical, that's the date that she first came

7    to PPSA?

8    A   You would assume so, yes.

9    Q   All right.  And did you review the file very closely?  I

10   just want to make sure you have familiarity with it.

11   A   Yes, sir.  A little bit, yes.

12   Q   Sir?

13   A   A little bit, yes.

14   Q   Okay.  And in reviewing the file, did you look to see

15   whether or not there was anything in the file that said

16   anything about Dr. Ruan saying that she had cancer?  Did you

17   see anything that said that except that very last sheet you

18   talked about?

19   A   What I did find was that there was a family history of

20   cancer, not a diagnosis of cancer but a family history.

21   Q   Right.  I'm not talk about a family history.  I'm talking

22   about a diagnosis that Dr. Ruan represented -- do you remember

23   that very last sheet of paper we saw?

24   A   I remember that.

25   Q   As of today, okay, did you see anything in that file where

 1  Dr. Ruan ever represented to anyone, particularly Cigna and the

 2  insurance carrier, that she had cancer?

 3  A   I'm not aware, no, sir.

 4  Q   Okay.  And did you go back and look at when she was first

 5  prescribed Subsys?

 6  A   I don't recall the date, sir, but I know she was.

 7  Q   All right.

 8          THE COURT:  Mr. Knizley, is now a good time for us to

 9  take our morning break?

10          MR. KNIZLEY:  Yes, ma'am.

11          THE COURT:  All right.  Ladies and gentlemen, leave

12  your pads on your chairs.  Take your break downstairs.  No

13  discussion about the case.  We will call you back up in about

14  15 minutes.  We're in recess.

15      (A recess was taken at approximately 10:33 a.m.)

16      (In open court, 10:59 a.m., defendants and jury present.)

17          THE COURT:  All right, Mr. Knizley.

18  BY MR. KNIZLEY:

19  Q   Agent, do you recall Friday that the prosecutor showed you

20  a document from Ms. Burns' file that you had before you called

21  a patient return?  Do you recall that, a phone call return?

22  A   Yes, sir.

23  Q   I'm going to show you what's taken out of the Government's

24  file 9-11 which has the indication page number 202 on it, and

25  is that the return phone call notation that you were showed

```
 1   last Friday?

 2   A   It was, yes.

 3   Q   Okay.  And it's dated June 30?

 4   A   That's correct.

 5   Q   And it says:  Attached patient -- the attached patient

 6   called.  Patient has been denied Subsys and Abstral.  I sent

 7   the info to Krystal to let the patient know that since she does

 8   not have an active cancer, that she probably would not be

 9   approved.

10           Do you see that?

11   A   That's what it says, yes.

12   Q   Did you read it correctly?

13   A   I believe DX is diagnosis.

14   Q   I'm sorry.  And it says -- this return call is telling that

15   there's no need -- the patient does not have active cancer;

16   right?

17   A   That's correct.

18   Q   Okay.  And you looked in the file, and nothing in there

19   said, except that last sheet, that said she had active cancer;

20   is that right?

21   A   Mr. Knizley, based on the file I was provided, I could not

22   find indication of active cancer.

23   Q   And Agent, I know that.  You can just work with what they

24   give you.  And I understand that.  And we're going to -- and I

25   understand your response is what that file is that was given to
```

DEA SA MICHAEL BURT - CROSS BY MR. KNIZLEY

1   you?

2   A   Yes, sir; that's correct.

3   Q   Looking at that now, if you recall, after this then the

4   next thing you were shown was a discharge letter of July 9.  Do

5   you remember that?

6   A   Yes.

7   Q   And they said that -- and you were asked that, okay,

8   although there was some opioid violations, she wasn't

9   discharged until after her coverage for Subsys lapsed.  Do you

10  remember that?

11  A   I do remember, yes.

12  Q   Okay.  And that would sort of leave the indication that was

13  the reason; is that right?

14  A   That's correct.

15  Q   All right.  But in looking at the file -- and this is in

16  the file you looked at.  Did you look in the file for an entry

17  of June 20th, if you recall?

18  A   What year?

19  Q   2014.  And I'm going to show it to you.  I'll take from the

20  file 9-11 and I'm showing you on the page 205 -- okay?  If you

21  look at the top up here, this is again -- it denotes a visit

22  that had -- let me back up so you can get the whole thing

23  printed here.

24          Starting on page 203, this is a progress note; right?

25  A   Yes.

DEA SA MICHAEL BURT - CROSS BY MR. KNIZLEY

1  Q   And it's 10 days previous to that phone call; right?

2  A   Yes, it is.

3  Q   Okay.  And the patient is Ms. Burns; right?

4  A   That is correct.

5  Q   Okay.  And if we go down here and we're looking at the

6  history and we look on this particular day, nothing in here

7  says anything about cancer; right?  Current treatment, nothing

8  says cancer; right?

9  A   Not that I can find, no, sir.

10  Q   You do see history of lumbar spine surgery; right?

11  A   By Dr. Martino in 2013, yes.

12  Q   All right.  And then we go over here to assessment, and

13  this is on June 20th.  Okay?  And we see a number of

14  assessments there; right?

15  A   Yes.

16  Q   A number of codes there?

17  A   Correct.

18  Q   And we've got abdominal pain, hepatitis, lumbar, failed

19  back surgery, lumbar, lumbar radiculitis, opioid dependence,

20  thoracic back, facet joint syndrome, others.  Nothing says

21  anything about cancer; right?

22  A   That's correct.

23  Q   Now, back to your patient call, the fact that she got

24  discharged, okay, let's look at what Dr. Ruan says to her on

25  that day:  Patient was seen in collaboration with Dr. Ruan and

1    -- what's a UDS?

2    A   Urine drug screen.

3    Q   If you could read that sentence for me, please.

4    A   UDS -- if you could blow it up a little bit, please.

5    Q   which way do you want to go?

6    A   Could you just expand it?

7    Q   Okay.  (Complying.)

8    A   Thank you.  UDS with in-house urine confirmation and GC-MS

9    ordered today for routine compliance monitoring and treatment.

10   Q   Okay.  And that means that they had an in-house urine and

11   they sent it off to be confirmed to ensure that she was in

12   compliance with what she was supposed to be doing; right?

13   A   That's what it states, yes.

14   Q   Okay.  And what does the next thing say?

15   A   Per Dr. Ruan, patient will not receive any prescriptions

16   today.  Meds are not due until 7/8/14.

17   Q   Let me hold you, Agent, right there.  So this document says

18   that Dr. Ruan says that the patient is not going to receive any

19   medicine today; right?

20   A   That's what it states, yes.

21   Q   And does it give a reason why she's not going to receive

22   it?  (Indicating.)

23   A   That meds are not due until July 8 of 2014.

24   Q   And we remember that this lady was one that was always

25   running out of her own; right?

DEA SA MICHAEL BURT - CROSS BY MR. KNIZLEY

2181

1  A    Correct.  She was violating the opioid agreement.

2  Q    All right.  And so he said -- this thing says Dr. Ruan is

3  not going to give -- on June 20th you're not doing the

4  June [sic] 8th -- it says you're not going to get any

5  medication; right?

6  A    Till July 8th of '14.

7  Q    Right.  And then what does the next thing say?

8  A    She will RTC on that date or as close as possible for med

9  refills and to wean off the immediate release fentanyl.

10 Q    Let me stop you, Agent.  Now, would that be return to

11 clinic maybe?

12 A    That's what it -- I believe so, yes.

13 Q    Okay.  So this note is saying Ms. Burns is to return to the

14 clinic, if that's what that means; right?

15 A    Correct.

16 Q    On what date?

17 A    On that date, which is July 8th.

18 Q    Okay.  Or as close as she can for possible med refills and

19 to what?  We're going to wean her off of what?

20 A    Immediate release fentanyl.

21 Q    Now, tell the ladies and gentlemen of the jury what that is

22 again.

23 A    That would be Subsys or Abstral, depending on what she's

24 getting.

25 Q    So we know that she's not going to be approved by the

1  insurance; right?

2  A   Correct.

3  Q   For Subsys, immediate --

4  A   That comes later, sir.  That comes on the 30th.

5  Q   That's 10 days later; right?

6  A   Right.  She's violating the opioid agreement.  All this

7  time along she's running out of meds, she's showing that she

8  can't properly take meds as prescribed by Defendant Ruan.

9  Q   So what is Dr. Ruan going to do when she's not taking that

10 Subsys correctly?  What's he going to do?  Right there, start

11 right there.  (Indicating.)

12 A   To wean off the immediate release fentanyl.

13 Q   Then what's he going to do?

14 A   We will adjust the meds at that time.  She did not receive

15 any prescriptions today.  Those that were printed were not

16 [sic] voided.

17        THE REPORTER:  Wait, wait, wait.

18        MR. KNIZLEY:  I'm sorry.

19        THE REPORTER:  Those that were printed were voided.

20        THE WITNESS:  Yes, sir.

21 BY MR. KNIZLEY:

22 Q   Agent, it says:  We will adjust the meds at that

23 time.  What time are they talking about?

24 A   The time she comes back on July 8th, 2014.

25 Q   So it looks from this notation that what's proposed for

DEA SA MICHAEL BURT - CROSS BY MR. KNIZLEY

1   this lady is to take her off Subsys?

2   A   No, sir.  It says wean.

3   Q   And then if you wean, is that for the purposes of generally

4   getting her off of it eventually?

5   A   That's up to the doctor eventually.

6   Q   Sure, sure.  But "wean," you understand that to mean begin

7   to decrease?

8   A   Steady decrease, yes.

9   Q   And then it says they are going to adjust her meds at that

10  time?

11  A   Correct.

12  Q   It sounds like they're going to continue to treat her after

13  June 8th -- July 8th, doesn't it?

14  A   It appears so.

15  Q   Okay.  And, but they're still not going to give any

16  prescriptions other than that; right?

17  A   Correct.

18  Q   So it doesn't appear that this lady is being -- going to be

19  expected to be discharged on the 8th, does it?

20  A   I wouldn't expect so, no.

21  Q   Okay.  Now, you looked at the file.  Did you see anywhere

22  in the file where she showed up on the 8th?

23  A   I would have to see a progress report.  Possibly.

24          MR. KNIZLEY:  May I approach the witness, Your Honor?

25          THE COURT:  Yes.

DEA SA MICHAEL BURT - CROSS BY MR. KNIZLEY

1   BY MR. KNIZLEY:

2   Q   And Agent, is it fairly -- it look likes those progress

3   notes were in chronological order that we looked at.  I'm

4   showing you, you know, the June 20th here, the one we just

5   talked about.

6   A   Yes, sir.

7   Q   And the next thing I see is the June 30th return.  Does it

8   look like it's going in chronological order?

9   A   It does, yes, sir.

10  Q   I'm going to give you a moment to look at it and tell me if

11  you see whether she shows up for her appointment of July 8th.

12  A   I don't see it, Mr. Knizley.  There is a procedure note for

13  June 20th, and there's also violating the opioid agreement

14  where she was discharged as a patient from PPSA on 7/9/14.

15  Q   Okay.  Could I have it back?

16  A   (Indicating.)

17  Q   And that June 20th date is what you and I just were talking

18  about a moment ago; is that right?

19  A   That's correct, yes, sir.

20  Q   So at least for the records of what you have of Ms. Burns,

21  it doesn't appear she appeared for that July 8th meeting that

22  was to begin weaning her off Subsys and adjust her meds for

23  future treatment, does it?

24  A   No, sir.  A letter is in there for her being discharged

25  from the clinic for violating the opioid agreement on the 9th.

1  Q   And that was the next day after July 8th; right?

2  A   That's right.

3  Q   So we don't know why, but we do know she failed to appear

4  and then she got discharged?

5  A   Correct.

6  Q   Okay.  Now, we talked then about that note, that letter

7  that Dr. Ruan got, if you remember on Friday, from Cigna.  And

8  Cigna and HealthSpring are the same thing, are they not?

9  A   Yes, sir, I assume.  I'm not good with insurance.  I assume

10  it is.

11  Q   All right.  Let's look right here.  This is page 224 of the

12  document 9-11, and that was the letter we were talking about;

13  right?   (Indicating.)  On Friday?

14  A   Yes, sir.

15  Q   And what does it say right here?  (Indicating.)

16  A   Cigna-HealthSpring.

17  Q   Do they claim to be at least in some way associated with

18  one another?

19  A   I would agree with that.

20  Q   And this is a letter that says -- on July 18 they're

21  writing Dr. Ruan and they're asking him to confirm something;

22  is that right?

23  A   Yes, sir.  They're asking -- by him signing this, he's

24  stating that his patient has been receiving TIRF REMS

25  medication.

DEA SA MICHAEL BURT - CROSS BY MR. KNIZLEY

```
 1  Q   They're asking him to confirm something, aren't they?
 2  A   Right.  They've been paying the bills for the medication,
 3  TIRF medication, that she's been receiving.
 4  Q   And they're wanting to know what her previous diagnosis --
 5  or confirm what her previous diagnosis was?
 6  A   Yes.
 7  Q   Okay.  Now, did you or the government subpoena some
 8  documents from HealthSpring or Cigna to determine what her
 9  previous -- records that may have indicated what her previous
10  diagnosis was?
11  A   No, sir.
12  Q   Okay.  Now, in reviewing the file --
13          MR. KNIZLEY:  And Judge, this is not admitted into
14  evidence.  It should not be on the screen.
15          THE CLERK:  It's off.
16  MR. KNIZLEY:
17  Q   I'm going to show you what's marked as Ruan Exhibit 129.
18          MR. BODNAR:  And Your Honor, we're going to object to
19  this, especially in the case of reviewing the file, we
20  confirmed during the break that this was not in the file nor
21  any patient file.
22          MR. KNIZLEY:  This is --
23          THE COURT:  Come to side bar.
24          (At the side bar, jury not present.)
25          MR. BODNAR:  Your Honor, all these documents came
```

1  from a file area of Springhill office, not from the medical

2  records and not where medical records were kept in the

3  Springhill office.  The files from this particular box have not

4  been admitted.  We don't have any problem stipulating to the

5  admission of it.  He doesn't need to call back one of the

6  agents to get it in.  But for using it for any purposes of

7  impeachment, these were not put in the medical records not --

8  we downloaded what was in the doctors' own medical records.

9  The doctors did not have -- or Dr. Ruan did not have this in

10  the medical record, and he has not seen it, and it was not even

11  found with the medical records.  (Indicating.)  Therefore any

12  sort of impeachment using it is improper.  But in terms of

13  stipulating to get it in, we're fine.  It came from B139.

14         MR. KNIZLEY:  If I understand, Judge, number one,

15  whatever they consider the medical records is up to them.  But

16  we considered we had medical records in more than just the

17  Greenway files.  The Greenway came in in  --

18         THE COURT:  If he hasn't reviewed it, there's no sense

19  in showing it to him.

20         MR. KNIZLEY:  I just want to confirm that.  Because

21  it's important in the future that if he has given some opinions

22  from -- he has discussed --

23         THE COURT:  All he said is in the file he reviewed,

24  there was no diagnosis of cancer.

25         MR. KNIZLEY:  Well, and then we're going to see -- are

1    you going to stipulate to the admission of these documents?

2            MR. BODNAR:  But not for use with this witness in any

3    sort of impeachment.

4            MR. KNIZLEY:  Well, then a limited admission of some

5    sort?

6            Judge, these documents will clearly say, okay, that

7    the insurance company asked -- okay?  At first they said:

8    We're not going to approve this person for Subsys.  Then they

9    said:  Send us some more information, Doctor.  The doctor sends

10   the information, gives the lumbar codes.  They approve it for

11   that.  There's never been a suggestion that this doctor ever

12   said to them they had cancer; that those people that sent the

13   letter knew at the time --

14           THE COURT:  Wait.  "Those people that sent the

15   letter"?

16           MR. KNIZLEY:  HealthSpring that sent the letter asking

17   him to confirm that, they already had at their own request --

18           THE COURT:  I know.  But that's an undisclosed mental

19   operation of Cigna Insurance Company.

20           MR. KNIZLEY:  No, no, no.  In other words, it's in

21   black and white.  It's not undisclosed.

22           THE COURT:  I understand that.  But it's inappropriate

23   for this witness.  All he's testified to is what is in the file

24   that he reviewed.  You can get this in with a later witness.

25           MR. KNIZLEY:  Judge, I can live with that, I agree

```
 1    with that.  Okay?  But right now with this jury they have the
 2    impression that he has reviewed the entirety of it.
 3              THE COURT:  Disabuse them of that impression.  He only
 4    reviewed the file that they gave him.  That's all we've got.
 5              MR. KNIZLEY:  I just want -- did you review 129?  Did
 6    you review 130?  Did you review 131?
 7              THE COURT:  This is not appropriate for discussion
 8    with this witness.
 9              MR. KNIZLEY:  And I will not discuss it.  I would like
10    for him to confirm that the documents he's looking at were not
11    in the file.
12              THE COURT:  Well --
13              MR. BODNAR:  That is prejudicial in and of itself.
14    It's making some sort of argument that it's not in the medical
15    file.
16              THE COURT:  Show it to him and ask him if he's ever
17    seen it.
18              MR. KNIZLEY:  That's it.
19              THE COURT:  But if he's not, that's all.
20              MR. KNIZLEY:  That's it.  That's all I want to do,
21    Judge.  That's all I wanted to do to begin with.
22              THE COURT:  All right.
23         (In open court, defendants and jury present.)
24    BY MR. KNIZLEY:
25    Q   Agent, I'm going to show you what's marked as Ruan Exhibit
```

DEA SA MICHAEL BURT - CROSS BY MR. KNIZLEY

```
 1   129.  Take a look at that and tell me if you recognize that
 2   document.
 3   A   Can you --
 4   Q   Tell me what -- bigger or smaller?
 5   A   No, sir.  I just want you to keep it still so I can read
 6   it.
 7   Q   Okay.
 8   A   (Reading.)  Mr. Knizley, I'm not aware of this document
 9   being in the files I reviewed.
10   Q   Okay.  I'm going to show you what's marked as Ruan's
11   Exhibit 130.  And likewise could you review that document and
12   tell me if you recognize it?  And Agent, if you need me to
13   slide it up or down, let me know.
14   A   Can you slide it up, please?
15   Q   That way?  (Indicating.)
16   A   Thank you.  (Reading.)  No, sir, I did not see this form in
17   the files I reviewed.
18   Q   Agent, I'll show you what's marked as Ruan's Exhibit
19   131.  Do you recognize that?
20   A   I do not recognize that, no.
21   Q   I show you what's marked as Ruan's 132.  Tell me if you
22   recognize that document.
23   A   No, sir, I don't.
24   Q   Agent, I'll show you what's marked as Ruan's 133.  Take a
25   moment and tell me if you recognize that document.
```

1    A    (Reading.)  No, sir, I don't recognize this.

2    Q    Let me show you what's marked as Ruan's 134.  Tell me if

3    you recognize that document.

4    A    No, sir, I don't recognize that either.

5    Q    I'm going to show you what's marked as Ruan's 135.  Do you

6    recognize it?

7    A    No, sir, I don't.

8    Q    Agent, did you see in the Kathleen Burns' file that you

9    reviewed any information regarding what medical information was

10   given to support the approval of Subsys by Cigna or

11   HealthSpring?

12   A    I could not find any supporting documents showing why she

13   was prescribed fentanyl-based products, no.

14   Q    From time to time when there is a denial from the insurance

15   carrier, sometimes they will ask for different -- for more

16   information from the clinician or the physician; is that

17   correct?

18   A    That's my understanding, yes.

19   Q    And that physician may put a diagnosis on there, and

20   sometimes they may reverse their decision not to pay the claim?

21   A    That's correct; yes.

22   Q    And in your review of the file that they gave you, you did

23   not have the benefit of any of that type of information; is

24   that right?

25            MR. BODNAR:  Objection, Your Honor, to again the

DEA SA MICHAEL BURT - CROSS BY MR. KNIZLEY

1  documents were not in the medical file; he has not seen them.

2          THE COURT:  Well, I think you can answer the

3  question.  Did you have the benefit of review of any

4  information like what he's talking about?

5          THE WITNESS:  No, ma'am, I did not have the benefit of

6  looking at that information.

7  BY MR. KNIZLEY:

8  Q   Now I want to turn your attention, if I could, please, to

9  Ms. B....  Do you remember talking about SB......... on Friday?

10 A   Yes, sir.

11 Q   And I think you had had -- you told the ladies and

12 gentlemen of the jury you had an interview with Ms. B... and

13 she had brought you some unused medications?

14 A   That's correct.  Unused Abstral and unused Subsys.

15 Q   And I think that you may not have told us, but that

16 interview took place July 20th, 2016, I believe?

17 A   Yes, sir.  I believe I have a report on it.

18 Q   Somewhere in July 2016; does that sound correct?

19 A   That sounds correct, yes.

20 Q   Okay.

21     (A discussion was held off the record between counsel.)

22 BY MR. KNIZLEY:

23 Q   Agent, I think you showed us first Government's Exhibit

24 10 -- 9-10; is that right?

25 A   Yes, sir.

1    Q   And this was a box that had -- did you count how many

2    dosages were left?  Was it about 10?  If you know.

3    A   I believe there was more than that.  I don't know the exact

4    amount, sir.  I would have to refer to my report.

5    Q   Okay.  You don't know right -- how many there were then;

6    right?

7    A   I'm sorry?

8    Q   You don't know how many dosages were in here right now;

9    right?

10   A   No.

11   Q   All right.  Now, this prescription at least from this

12   document says that it was written on October 31st, 2013; is

13   that right?

14   A   That's what it states, yes.

15   Q   Now, did you go consult -- excuse me.  You had access to

16   all the medical files that you needed to consult, did you not?

17   A   Yes, sir.

18   Q   Did you go consult Ms. B's... medical file?

19   A   If you're asking me did I review her medical file, no, I

20   did not.

21   Q   Did you take a look at it or look at any aspects of it?

22   A   I don't believe I did, no, sir.  I can't speak for the

23   prosecution.  Someone else might have.

24   Q   I'm just asking did you do it?

25   A   No, sir, I did not.

1  Q   Did somebody on your team look at it and report back to

2  you?

3  A   No, sir.

4  Q   Do you know how long she had been a patient of Dr. Ruan's?

5  A   Again --

6        MR. BODNAR:  Objection, Your Honor.  He just said he

7  did not review the file.  She will be here.  The only reason

8  this was put in was so that we had an example to show the jury.

9        THE COURT:  All right.  Overruled.

10 BY MR. KNIZLEY:

11 Q   Do you know whether or not she had been a patient since

12 2008?

13 A   Mr. Knizley, I don't know.

14 Q   And that's fine.  You know.  In any event, she was given --

15 did you go back and look at the prescription itself for this

16 particular substance?

17 A   In her medical file?

18 Q   Or PDMP or anywhere else.

19 A   I think I did, yes.

20 Q   Okay.  And you see the label on here, it says:  Use one

21 spray under tongue once or twice daily as needed -- for what?

22 A   Severe pain.

23 Q   So that's not something you're supposed to take, at least

24 from the description of this, unless you need it; right?

25 A   If you're in severe pain, I believe you would take it, yes.

```
 1   Q   Right.  But you should be in severe pain before you take
 2   it; right?
 3   A   Correct, sir.
 4   Q   And if you don't get in severe pain -- you understand how
 5   Subsys works; right?
 6   A   I do, yes.
 7   Q   And you understand that you're supposed to be opioid
 8   tolerant; right?
 9   A   You are.
10   Q   And you're supposed to be on an opioid or some other
11   medication that handles the constant pain; is that right?
12   A   Yes, sir.  I'm also aware that it's for breakthrough cancer
13   pain also.  That's what it's designed for.
14   Q   And you know it's for breakthrough pain; right?
15   A   Breakthrough cancer pain.
16   Q   And that the occasion -- we do know that off-label use is
17   appropriate as well?
18   A   I do know that, yes.
19   Q   And so if this was prescribed off label for -- what does it
20   say here?  (Indicating.)
21   A   As needed for severe pain.
22   Q   Now, a patient should not take it, should they, if they're
23   going to follow the instructions, if they don't have severe
24   pain?
25   A   I would agree with that.
```

1   Q   So then it may be when this prescription was done that some

2   were used and some were not; right?

3   A   Sir, I don't know the answer to that.  You would have to

4   ask Ms. B... how she used it.  I don't know.

5   Q   Okay.  Well, you've got this box back here.  Were some of

6   them in there and some of them not?

7   A   She read it to me in the report.  She said she used some,

8   yes.

9   Q   Okay.  But she apparently was astute and did not use it

10  when she didn't need it because she had some left over?

11  A   Correct.  She had unused medication she wanted to return to

12  the DEA, and I willingly accepted it.

13  Q   Okay.  And then she also brought to you some Abstral; is

14  that right?

15  A   That's correct.

16  Q   And you were kind enough to take a picture of it for me,

17  the label, so we didn't have to bring the drugs back the other

18  day; right?

19  A   Yes, sir.

20  Q   And I'm going to show you what's marked as Ruan Exhibit

21  164.  Okay?  And 165.  Do you see that?

22  A   Yes, sir, I do.

23  Q   So we would not have to bring the medications back to the

24  courtroom, did you take a photograph of the label so we could

25  use the labels here?

DEA SA MICHAEL BURT - CROSS BY MR. KNIZLEY

1   A   Correct.

2   Q   And you sent them to me?

3   A   No, sir.  I believe you took a picture of those yourself.

4   Q   I'm sorry.  I thought y'all did.

5   A   I didn't send anything to you, no, sir.

6   Q   Okay.  But these are the pictures of the label?

7   A   Those are the pictures, yes.

8         MR. KNIZLEY:  We'd offer Ruan's 164 and 165.

9         THE COURT:  All right.  Mark them in.

10        MR. BODNAR:  No objection.

11     (Defendant Ruan's Exhibits 164 and 165 were entered into

12   evidence.)

13   BY MR. KNIZLEY:

14   Q   Now I'm going to show you what's been marked as Ruan

15   Exhibit 164, and this is for the label on the Abstral; is that

16   right?

17   A   Correct.

18   Q   Could you read for the ladies and gentlemen of the jury how

19   that was directed to be taken?

20   A   Use one tablet under tongue every day to two times a day as

21   needed for severe breakthrough pain.

22   Q   So this was to be taken as needed for severe breakthrough

23   pain?

24   A   That's what it states.

25   Q   And do you see this date on here?  (Indicating.)

1   A   April 3rd, 2014.

2   Q   And the date on the previous one was March 24, '14?

3   A   That's what it states, yes.

4   Q   All right.  And do you recall during the course of this

5   investigation that that was at or about the time the Abstral --

6   Galena had the coupon program?  Do you recall that?

7   A   I believe it's called super voucher.

8   Q   I believe that's what it's called.

9   A   Yes, sir.

10  Q   Is that the time frame?

11  A   I believe so, yes.

12  Q   So at least we know this was prescribed during that time

13  frame; right?

14  A   I believe so, yes.

15  Q   And therefore, if it were pursuant to that program, no

16  insurance company or patient would have borne the cost of that?

17  A   That's my understanding of how the program worked, yes.

18  Q   Agent, you told us and read from a series of emails that

19  were taken from the Dr. Ruan Yahoo account.  Do you recall that

20  from Friday today?

21  A   Yes, sir, I do.  They were obtained via search warrant.

22  Q   And that search warrant was for the entirety of the Ruan

23  Yahoo account?

24  A   I wasn't the affiant on the search warrant, sir.  I

25  couldn't answer that question.

1  Q   But you had to review those documents from some source;
2  right?
3  A   I did, yes.
4  Q   And the source that you reviewed them from was the
5  collection of emails from that search warrant?
6  A   That is correct.
7  Q   And there were a lot of emails; right?
8  A   It was a lot of emails.
9  Q   143,325?  Does it sound like there were that many?
10  A   I would agree with that, yes.
11  Q   And you brought those other 143,325 emails from the Ruan
12  account to whatever this collection is of 30 or 40 emails;
13  right?
14  A   Yes, sir.
15  Q   And you went through those?  You went through those
16  accounts looking for things that may be relevant to the issues
17  here?
18  A   Yes, sir.
19  Q   Okay.  You also had Dr. Couch's email account?
20  A   That is correct.
21  Q   You also had Galena's email account?  An email account from
22  Galena.  I think you said that on Friday.
23  A   Yes.
24  Q   And one of the accounts from Insys; is that right?
25  A   I'm not aware of Insys, sir.  I believe --

1    Q    Do you recall testifying last Friday?

2    A    You're correct, sir.  You're correct.

3    Q    So we had a number from Dr. Ruan's, in addition to that

4    whatever Couch had, whatever you got from Galena, and whatever

5    you got from Insys; right?

6    A    Yes, sir.

7    Q    And you went through all of those, and you brought for this

8    jury those emails that we needed to discuss in the courtroom;

9    right?

10   A    That's correct.

11   Q    All right.  I'm going to show you what's marked as

12   Government's Exhibit 9-1(1).  And do you recall seeing that

13   email?

14   A    I do.

15   Q    And this is an email from Dr. Ruan to -- and you identified

16   Dr. Kaye, did you not?

17   A    Yes, sir.

18   Q    And you told us he was a professor -- he was a medical

19   doctor; is that right?

20   A    I believe an anesthesiologist.

21   Q    And he's a professor at LSU?

22   A    Yes, sir.

23   Q    And he had engaged in an email exchange back in 2011 with

24   Dr. Ruan?

25   A    That's correct.

1  Q   If you could look here, please, what does Dr. Ruan -- in

2  reading this, he says:  I look forward to meeting you in person

3  sometime in the near future.

4      Right?

5  A   That's what it states, yes.

6  Q   And it was nice talking to you.  So it sounds as if these

7  people have not personally met before; right?

8  A   That's what it appears to be, yes.

9  Q   All right.  And he is sharing with him a little bit about

10 how his practice -- Dr. Ruan is -- about how his practice

11 works, two NPRs and a pump nurse; right?

12 A   Yes, sir.

13 Q   And he makes this representation right here.  (Indicating.)

14 And could you read that for the ladies and gentlemen of the

15 jury?

16 A   Here in Alabama NPR cannot sign scheduled drugs.

17 Q   Go ahead.

18 A   So if I am out, NPR will need to be out as they cannot sign

19 prescriptions.

20 Q   And the last part of that?

21 A   So Friday would be the best for me.  I look so --

22 Q   I'm sorry.  So he is telling the gentleman, the professor,

23 that he knows that nurse practitioners can't sign scheduled

24 drugs, and if he's out, they're going to be out because they

25 can't sign --

1   A   Yes, sir.

2   Q   Now, we had talked a little bit about charitable

3   contributions to LSU; is that right?

4   A   Yes, sir.

5        MR. KNIZLEY:  This is not in evidence, Mary Ann.

6   Q   I'm going to show you what's been marked as Ruan's Exhibit

7   167.  And looking at the top of this exhibit, does it look to

8   be the same identical email that we were just referring to?

9   Can you read that again?  To yourself.  That's fine.  Let's go

10  back --

11  A   It does, Mr. Knizley, yes.

12  Q   9-1(1) and Ruan's 167, does that appear to be the same

13  thing?

14  A   It does, yes.

15  Q   And on Government's 9-1(1) you have some redactions;

16  correct?

17  A   Correct.

18  Q   And on Ruan's 167 those items are not redacted; right?

19  A   That's correct.

20        MR. KNIZLEY:  Judge, we would offer Ruan's 167.

21        MR. BODNAR:  Objection, your Honor.  Hearsay.  The

22  redacted portion are Raun's words.  They're not being used

23  against him.

24        THE COURT:  Let me see you at side bar, please.

25     (At the side bar, jury not present.)

1        THE COURT:  May I read the exhibit?

2        MR. KNIZLEY:  (Indicating.)

3        THE COURT:  (Reading.)

4        MR. KNIZLEY:  Judge?  The relevant part I'm referring

5    to is there's a reference to him going to make charitable

6    contributions prior to June 2014.

7        THE COURT:  I sustain the objection.  I sustain the

8    objection.

9        MR. KNIZLEY:  Yes, ma'am.

10       (In open court, defendants and jury present.)

11       (Defendant Ruan's Exhibits 167 was denied.)

12   BY MR. KNIZLEY:

13   Q   Agent, in your review of the discovery in this case, did

14   you become aware of whether or not Dr. Ruan had ever suggested

15   he was going to make charitable contributions to Louisiana

16   State University prior to June of 2014?

17   A   No, sir, I'm not.

18   Q   And you did a thorough review of the emails in respect to

19   that issue?

20   A   Based on the emails I had to review, I could not find any

21   indication prior to his contribution to LSU.

22   Q   And did you look specifically for that?

23   A   Let me say that, sir, I cannot finding any indication he

24   was donating the monies he was receiving from Insys

25   Therapeutics to LSU or to any other medical facility he may

1    have attended.

2    Q   And just so we're clear, did you see whether he was trying

3    to donate money to LSU prior to June 2014?

4         MR. BODNAR:  Objection to relevance at this point,

5    Your Honor.  He said he didn't see anything with regard to

6    Insys money, which was the point of the direct examination.

7         THE COURT:  Well, I understand.  But is your question

8    about monies other than the Insys money?

9         MR. KNIZLEY:  Any monies, Your Honor.

10        THE COURT:  All right.  Overrule the objection.

11   A   One more time, Mr. Knizley, so I have it right.

12   BY MR. KNIZLEY:

13   Q   In reviewing the emails of Dr. Ruan, were you able to see

14   anything in the emails that would have indicated to you that

15   Dr. Ruan was inclined to make charitable contributions to

16   Louisiana State University prior to -- from any source, Subsys

17   or otherwise?

18   A   No, sir.  No, sir.  Not based on the emails, I could not

19   find any indication of that.

20   Q   I want to show you Ruan's Exhibit 167 again.

21        THE COURT:  Show it to him up here.

22   BY MR. KNIZLEY:

23   Q   Agent, I'm going to show you what's marked as Ruan's

24   Exhibit 167 again.  Do you recall I showed it to you a moment

25   ago?

 1   A   Yes, sir.

 2   Q   I draw your attention to the bottom down here.  And if you

 3   could read those two paragraphs for me, please.

 4              MR. BODNAR:  Objection, Your Honor.

 5              THE COURT:  Out loud?  Out loud or --

 6              MR. KNIZLEY:  To himself.

 7              THE COURT:  All right.  Read it to yourself.

 8        (A discussion was held off the record between Mr. Knizley

 9   and the witness.)

10              THE WITNESS:   (Reading.)

11   BY MR. KNIZLEY:

12   Q   Agent, after reviewing Ruan Exhibit 167, does that refresh

13   your recollection of that?

14              MR. BODNAR:  Objection to relevance, Your Honor, for

15   monies that was not involved with Insys, which is what the

16   subject of his direct examination was.

17              THE COURT:  All right.  Sustained.

18   BY MR. KNIZLEY:

19   Q   I want to show you what's marked as Government Exhibit

20   9-1(2).  Tell me if you recall that email.

21   A   Yes, sir, I do.

22   Q   And that was an email in 2014 from -- beginning from

23   Dr. Ruan to Dr. Couch and a response by Dr. Couch?

24   A   Yes, sir, it is.

25   Q   And drawing your attention down to the last paragraph, do

1    you see the sentence starting with "one"?

2    A   One of the things I have done is to wean off on benzos or

3    ask their PCP, which is primary care physician, to write their

4    benzos.  Benzo prescriptions are also done -- are one of the

5    things they look at.

6    Q   And is Dr. Ruan writing to Dr. Couch saying that it is his

7    intention to reduce the utilization of benzos?

8    A   Sir, my interpretation of this email is completely

9    different from what you just showed me.

10   Q   Okay.  Listen to those words.  The words are:  One of the

11   things I have done is to wean off of benzos or ask their

12   personal physicians to write their benzos as benzos

13   prescriptions is one of the things they look at.

14          Is that what it says?

15   A   That's what it says, Mr. Knizley.

16   Q   I'm going to show you what's been marked as Government's

17   Exhibit 9-2 and particularly Exhibit 9-2(1).  Do you remember

18   seeing this document?

19   A   I do.

20   Q   Okay.  And Mr. Essig has also mentioned this to you as

21   well.  Do you see 9-2(3), it looks like; is that right?

22   A   3, yes.

23   Q   And as Mr. Essig mentioned to you, that first comes from

24   Mr. Crawford from C&R Pharmacy; right?

25   A   Yes, sir.

1    Q    And he is writing to the doctor; is that correct?

2    A    That is correct.

3    Q    Okay.  And he is telling him about what you had described

4    earlier as the outside, if you will, agency that sometimes

5    prepared preapproval forms; right?

6    A    It appears Mr. Crawford is making Defendant Ruan aware of a

7    problem.  It appears that Mr. Crawford is making Dr. Ruan aware

8    of a problem with a prescription; it could be problematic from

9    on outside source, quote unquote, "cancer pain."

10   Q    And he's cautioning him that that's something we should be

11   concerned about; right?

12   A    Yes.

13   Q    I'm going to show you what's marked as Government's Exhibit

14   9-2(4) which is an email exchange between Dr. Ruan and Debi

15   Phillips and others; is that correct?

16   A    Yes, sir, it is.

17   Q    And we've previously identified Ms. Phillips as an office

18   manager, originally a billing person and then ultimately an

19   office manager at PPSA?

20   A    That's correct.

21   Q    And she has indicated that -- what is CMS, if you know?

22   A    Centers for Medicaid and Medicare Services.

23   Q    And they apparently were doing some inquiry or potentially

24   going to have an audit; is that correct?

25   A    I believe it was an audit, yes.

1  Q   Okay.  And could you tell us what Ruan said in response to

2  her concerns about the CMS?

3  A   Starting "we"?

4  Q   "We."

5  A   We will need to share with them what is in the literature

6  on breakthrough pain and breakthrough pain in patients with

7  cancer.  That way they will have an idea there is no wrongdoing

8  on our end.  We use the best possible medications designed to

9  treat breakthrough pain for patients suffering from severe

10  breakthrough pain.  It may not be cost effective, but such off-

11  label use is commonplace or even a general rule in clinical

12  medicine.

13  Q   And Dr. Ruan, at least, seems to be stating his position as

14  to the propriety of use of medications for breakthrough pain

15  both in cancer and noncancer patients; right?

16  A   Yes.  It is his position, yes.

17  Q   And he's he also stating his position with regards to

18  off-label usage?  (Indicating.)

19  A   Yes.

20  Q   And whether or not it's commonplace?

21  A   That's correct.

22  Q   And was that the email that eventually precipitated the

23  letter he was going to send?

24  A   Yes, sir, it was.

25  Q   I'm going to show you what's marked now as Government's

1   Exhibit 2 -- 9-2(5).  And do you remember this one?

2   A    I do.

3   Q    Okay.  And that's Dr. Ruan writing to Dr. Couch and copying

4   Dr. Chen?

5   A    Yes.

6   Q    And what is he going to do here?

7   A    Response to recent audit on TIRF products.

8   Q    Okay.  And in the previous part of the email he had said he

9   had drafted a response regarding it; is that right?

10  A    That's what it states.

11  Q    And he attached that response to the email; right?

12  A    Yes, sir, he did.

13  Q    Now, is this the response he had attached to the email?

14  A    Yes, sir.  I believe the name -- two different individuals

15  are named in the response he sent out to Mr. Forman.

16  Q    And I believe that this may have been the draft and the one

17  to Mr. Forman was the actual thing?

18  A    Correct; yes, sir, it is.

19  Q    What I'm showing you here that's not marked is the actual

20  response that he eventually sent?

21  A    It is, I think so.  Yes, it is.

22  Q    And looking over that response, I'd like to draw your

23  attention, if I could, please --

24       THE COURT:  Wait.  That's not in evidence, is it?

25       MR. KNIZLEY:  Yes, ma'am.

```
 1              THE COURT:  It is in evidence?  The actual response is
 2     in evidence?
 3              MR. BODNAR:  That letter is in evidence.  But it's not
 4     the highlighted version with stars on it.  It's in the next
 5     file with emails attached to it.
 6              MR. KNIZLEY:  I'll use it.
 7              THE COURT:  Yeah, use the one that's in evidence.
 8              MR. KNIZLEY:  I'll use the clean one.
 9              THE COURT:  All right.
10     BY MR. KNIZLEY:
11     Q   Now, is that the clean copy?  (Indicating.)
12     A   Can you push -- pull it?
13     Q   (Complying.)
14     A   Yes, sir, it is.  Yes.
15     Q   Okay.  Do you know who Mr. Forman and Mr. Tetkoski are?
16     A   I know Mr. Forman by his signature block.  He is one of --
17     he's, I believe, Captain Michael Forman who deals with the
18     Medicare Part D.
19     Q   And this was a response that Dr. Ruan was writing to those
20     individuals regarding what, if you recall?
21     A   His prescribing patients with transmucosal immediate
22     release fentanyl TIRF products to noncancer patients.
23     Q   And that's off label?
24     A   That's correct.
25     Q   What does he say starting with "we"?
```

2211

1   A   We want you to know that we are fully cooperative with this

2   audit and will provide all required documents in a timely

3   fashion.  In the meantime, we would like to take this

4   opportunity to share with you our approach on using TIRF

5   products effectively and safely to treat irretractable

6   breakthrough pain.

7   Q   And that's his position; right?

8   A   Yes, sir.  And his response -- he gets a response back from

9   Mr. Forman in less than an hour.

10  Q   He get a response back from the email?

11  A   Yes.

12  Q   We'll go through this.  And then Mr. Forman responds;

13  right?

14  A   Yes, sir.

15  Q   That's part of what he says.  And then on the next page,

16  rather than going through and reading all of this (indicating),

17  what does he -- what is the BTP he's referring to, if you know?

18  A   It's the breakthrough pain.

19  Q   All right.  And what is he saying to Mr. Forman and

20  Mr. Tetkoski about his position regarding breakthrough pain?

21  A   Breakthrough pain is highly prevalent among patients with

22  chronic cancer pain.

23  Q   And what does it say?

24  A   Breakthrough pain --

25  Q   No, no, no.  Right here.  (Indicating.)

1   A   All right.  33 to 89 percent.

2   Q   Then what does this say here?  (Indicating.)

3   A   RK --

4   Q   There's another one.  It seems to be a reference to

5   something.

6   A   I'm sure it's a reference to a peer article possibly.  I'm

7   not sure, sir.

8   Q   And then what does he say about breakthrough pain in a

9   noncancer patient?

10  A   Breakthrough pain in a noncancer pain patient is comparably

11  prevalent 48 to 74 percent and has similar characteristics such

12  as frequency and duration of time to peak intensity as those in

13  the cancer population.

14  Q   So he is at least arguing that there's comparability about

15  breakthrough pain to cancer and noncancer patients and he's

16  trying to tell these people; right?

17  A   That's the argument he's trying to make.

18  Q   And then after that word "cancer," he's got another

19  notation to something; is that right?

20  A   Yes, sir.

21  Q   And that, as you said, is probably some peer-reviewed

22  article or something of that nature?

23  A   Yes, sir.  It appears to be, yes.

24  Q   Okay.  And you didn't go look to see what these things

25  were, did you?

 1    A    No, I did not, sir, no.

 2    Q    All right.  And read the last paragraph here, please.

 3    A    Breakthrough pain episodes in either cancer pain or

 4    noncancer pain often reach peak intensity in less than 10

 5    minutes; therefore the onset of analgesics is critical in

 6    providing the needed relief.

 7    Q    And Dr. Ruan goes on to state his position throughout the

 8    correspondence here; is that right?

 9    A    Yes, sir, he does.

10    Q    At the end of that page and then the next page and on down

11    to yet the next page and then what does he say right here?

12    (Indicating.)

13    A    Proper understanding of the aforementioned etiological

14    classifications of cancer pain is vitally important.  It

15    becomes apparent that the practice of using breakthrough cancer

16    pain to imply breakthrough pain in patients with active cancer

17    is only erroneous [sic] but misleading --

18    Q    Excuse me.  "Not only erroneous."  I don't mean to

19    interrupt, but it's "not only erroneous."

20    A    Not only erroneous --

21    Q    I didn't hear you.  I'm sorry.  Go ahead.

22    A    -- but misleading because it implies that only patients

23    with active cancer will experience breakthrough pain.

24    Q    All right.  Let me hold you right there.  Then what does it

25    say down here?

1    A    Lastly, considering the common features of cancer

2    breakthrough pain and noncancer breakthrough pain -- such as

3    severe intensity, rapid onset, and quick-reaching peak

4    intensity, short duration, together with the challenges

5    encountered in controlling breakthrough pain, as well as the

6    negative impact caused by poorly controlled breakthrough

7    pain -- it is obvious that TIRF drugs represent the best

8    available treatment option for treating breakthrough pain in

9    patients with or without cancer due to its unique

10   pharmacokinetic properties, i.e., good transmucosal absorption,

11   rapid transport across the blood-brain barrier.

12   Q    The last part of this, if you could read this part here.

13   (Indicating.)

14   A    Finally, we would like to emphasize that Physicians Pain

15   Specialists of Alabama is a tertiary pain center located in

16   Mobile, Alabama, where evidence-based, comprehensive pain

17   medicine is practiced.  All physicians at PPSA are fellowship

18   trained and board certified to hold active leadership roles in

19   various national/state professional organizations.

20   Q    Keep going.

21   A    E.g., Dr. Ruan is fellowship trained and currently holds

22   eight active boards/subspecialty board certifications.

23   Dr. Ruan is one of a handful of physicians in our region who is

24   boarded in addiction medicine by the American Board of

25   Addiction.  Dr. Ruan is the immediate past president of the

2215

 1    Alabama chapter and president of the American Society of

 2    Addiction Medicine as well as the Alabama chapter president of

 3    the American Society of Interventional Pain Physicians.

 4            Dr. Patrick Couch is fellowship trained and triple

 5    boarded in anesthesia and pain management who has been a member

 6    of ASAM and currently serves as treasurer of the Alabama

 7    chapter of ASAM.

 8    Q   Go ahead.

 9    A   In addition, Dr. Couch currently serves as the executive

10    director of the Alabama chapter of ASIPP.

11    Q   And then the last page seems to have all three of their

12    names listed on it; is that correct?

13    A   Yes, sir, it does.

14    Q   And then it says references.  Do you see that?

15    A   Yes, sir, I do.

16    Q   And is that paragraph of them?  And then there's another

17    page, various references to these other type things we were

18    talking about earlier; right?

19    A   That's correct.

20    Q   Do you recall Friday, I believe it was, referring to

21    Government's Exhibit 9-3, which purported to be an email from

22    Dr. Ruan to a person whose name was blanked out back in

23    November 15, 2011?  Do you remember that?

24    A   Yes, sir.

25    Q   And do you remember it was highly redacted, of course?  Do

1  you remember that?

2  A   Yes, I do remember that.

3  Q   And the subject was:  "Why."  And we went through there.

4  And if we could please identify each of the things that are not

5  blanked out.  It's very brief.  Could you read for the ladies

6  and gentlemen what this is right here?  (Indicating.)

7  A   I just got neck MRI and low back MRI today.  Neck scan is

8  very nasty.  Official report --

9  Q   I think that's one page too many.

10 A   -- pending.

11 Q   On 9-2(1) we had "Hi," and then we had the redaction, and

12 we had this paragraph; right?  (Indicating.)

13 A   Yes, sir.

14 Q   Would you read that for the jury, please?

15 A   I have very severe cervical disk disease (shown on cervical

16 MRI in 2005 and 2006, worse than 95 percent of the patients I

17 see in my clinic) that will require neck surgeries.  I keep

18 putting it off as I cannot stop.  I have lost 70 percent of my

19 left shoulder girdle muscle due to cervical disk disease, but I

20 keep it to myself.

21 Q   Does he say he's in pain there?

22 A   I don't see the word "pain," used, no, sir.

23 Q   Is the word "hurt" in there?

24 A   I did not see it.

25 Q   Was there a reference to loss of muscle use in there?

1   A   No, sir.  The only thing he talks about is him being worse

2   than 95 percent of his patients.

3   Q   Let me ask you to read, if you would, right there.

4   (Indicating.)

5   A   I have lost 70 percent of my left shoulder girdle muscle

6   due to cervical disk disease, but I keep it to myself.

7   Q   But it's not muscle use, but he is talking about losing 70

8   percent of his left shoulder girdle muscle; right?

9   A   That's what the email says, yes.

10  Q   And the next email in that group was a few days later; is

11  that right?  (Indicating.)

12  A   Yes, sir.

13  Q   2012 now; right?

14  A   Correct.

15  Q   I say a few days.  It's actually really longer than a few

16  days.  It was a couple of months later; right?

17  A   A couple of months, yes.

18  Q   And that's when he got his MRI results back; is that

19  correct?

20  A   It appears so.

21  Q   And he talks about filing for disability; right?

22  A   Correct.

23  Q   And could you read what it says there, please?

24  A   I just got neck MRI and low back MRI today.  Neck scan is

25  very nasty.  Official report pending.

1    Q    Does it mention pain?

2    A    I do not see the word "pain."

3    Q    Does it mention hurting?

4    A    I did not see it.

5    Q    The next part of it on the bottom is the next -- now we're

6    going backwards a little bit.  (Indicating.)  They go in

7    reverse order, do they not, Agent?

8    A    I believe so, yes.

9    Q    I'm looking at the 25th here and the 26th here.

10   (Indicating.)

11   A    Correct.

12   Q    I'll go back and try to read them chronologically.  On the

13   very back page, starting on the 25th, if you could read that

14   for us, please.

15   A    I think it is time for me to take time off to take care of

16   my health.  I will get cervical spine MRI tomorrow and see

17   Dr. Martino, the chief of neurosurgery at the University of

18   South Alabama, next week.  I will file for disability now.

19   Q    Does he mention pain?

20   A    I did not see it.

21   Q    Hurting?

22   A    Did not see it.

23   Q    The next page appears to just be a redaction; is that

24   correct?

25   A    Yes.

1   Q   The next page appears to be a redaction?

2   A   Yes.

3   Q   Correct?  The next page at the top, read that and we will

4   go forward.

5   A   If I am disabled (I have no doubt I am qualified because of

6   my cervical spinal cord issue, as I could not do the injection

7   procedures due to hand weakness and clumsiness) so our lives

8   will be significantly different from now on.  The money has to

9   come from somewhere.

10  Q   Does he speak of weaknesses and clumsiness?

11  A   That's what it states, yes.

12  Q   Does he speak of pain?

13  A   I did not see it.

14  Q   Now, back in the order we were going, read the bottom,

15  please, sir.

16  A   I will have a thorough spinal MRI from neck to sacrum this

17  week and then see Dr. Martino next Tuesday.  I will file for

18  disability after that -- after that through my current

19  administrator to whom I already spoke.  I will slow down and I

20  am seriously pursuing filing for disability as I am sick and

21  tired.

22  Q   And lastly?

23  A   I just got MRI and low back MRI today.  Neck scan is very

24  nasty.  Official report pending.

25          THE COURT:  All right, Mr. Knizley.  Can we break for

 1   lunch at this point?

 2           MR. KNIZLEY:  Yes, ma'am.

 3           THE COURT:  All right.  Ladies and gentlemen, leave

 4   your pads on your chairs.  I need to break for an hour and a

 5   half today as I have something else at 1 o'clock.  So be back

 6   downstairs in the jury assembly room at 1:30 ready to be called

 7   back up.  No discussion about the case.  We are in recess.

 8       (A lunch recess was taken at approximately 11:59 a.m.)

 9       (Afternoon session, 1:30 p.m., in open court, defendants

10   and jury present.)

11           THE COURT:  All right, Mr. Knizley.

12           MR. KNIZLEY:  Your Honor, per our stipulation and

13   prior side-bar conference, Ruan would offer Ruan's Exhibits

14   127, 128, 129, 130, 131, 132, 133, 134, and 135.

15           MR. BODNAR:  No objection.

16           THE COURT:  All right.  Mark them in evidence.

17       (Defendant Ruan's Exhibits 127 through 135 were entered

18   into evidence.)

19           MR. KNIZLEY:  We'd also offer by agreement Ruan's

20   Exhibit 125.  I'd like to display it to the jury.  This is a

21   separate group of emails.

22           THE COURT:  Any objection?

23           MR. BODNAR:  No, no objection.

24           THE COURT:  All right.  Mark it in.

25       (Defendant Ruan's Exhibit 125 was entered into evidence.)

 1  BY MR. KNIZLEY:

 2  Q   Agent, on Friday you had shown us what was marked as

 3  Government's Exhibit 9-4(1).  Do you recall that?

 4  A   Yes, sir.

 5  Q   I want to show you now what's been marked into evidence as

 6  Ruan's Exhibit 125, which appears to be the same email with one

 7  addition to the top.  Does that look like that's correct?

 8  A   It does.

 9  Q   And could you tell us the email that you looked at and

10  showed us of January 15, 2013 -- and this one doesn't have a

11  date on it, but it is to someone named Joan Ruan; is that

12  correct?

13  A   Yes, sir.

14  Q   And could you read for the ladies and gentlemen of the jury

15  what that email says?

16  A   Surely.  Those below are all received by Ruan, CO, and are

17  included in those miscellaneous income forms; am I right?

18  Joan.

19  Q   The author, Ms. Joan Ruan, is at least talking about

20  miscellaneous income forms in association with these entities;

21  is that right?

22  A   That's what it appears to be, yes.

23  Q   I'm going to show you what's been marked in evidence as

24  Government Exhibit 9-5(5) and tell me if you recognize that.

25  A   Yes, I do.

1    Q    And was that an email we talked about on Friday, I believe,

2    from Dr. Ruan to Debi Phillips and Dr. Couch and Dr. Chen?

3    A    Yes, sir.  If you're talking about the top one, that is

4    from Dr. Ruan to -- the original email starts with Debi

5    Phillips to --

6    Q    If we go back down, the original is from Ms. Phillips to

7    Dr. Ruan, Dr. Couch and Dr. Chen; is that right?

8    A    That's correct.

9    Q    And do you recall at least at this point in time

10   Ms. Phillips was a billing manager; is that right?

11   A    That's what it states, yes.

12   Q    Did she inure, from you investigation, to the manager of

13   the business at some point in time?

14   A    Yes.  I think they referred to her as the COO.

15   Q    And on this date of May 20th, could you read to the jury

16   what she is writing to these three doctors?

17   A    Dr. Ruan, Dr. Couch, Dr. Chen, Nicole noticed that a couple

18   of patients had GC-MS four weeks apart both with comprehensive

19   panels.  Is there a criteria you are following for ordering the

20   GC-MSes --

21   Q    And for the jury again, what is that GC-MS name?

22   A    Gas chromatography-mass spectrometry

23   Q    And what does that do?  Is it a urinalysis?

24   A    It's a more-detailed urinalysis, yes.

25   Q    Okay.  And this Castle you're about to read about, is that

1  a company that looks at those, that does those GC-MS reviews?

2  A   I believe that company does the actual analysis of the

3  urine.

4  Q   The actual testing?

5  A   Yes.

6  Q   Go ahead.  Read starting with "that."

7  A   -- that go to Castle and how often?  Also several patients

8  have been calling regarding seeing this billed to their

9  insurance.  Is the clinical staff explaining to the patient

10  that the next -- that test is being ordered?  We have been

11  explaining it in billing to the patients, but I think it should

12  be explained to the patient that sometimes we do send a urine

13  sample out for more extensive tests.  We did make arrangement

14  with Castle -- I'm sorry.  We did make arrangement with Castle

15  regarding a self-pay rate of $75 and an indigent courtesy (no

16  charge.)  They are not charging us for any claims not paid to

17  us or where patients have a high deductible.  Peggy is having a

18  clinical staff meeting which will include the NPs.  I will be

19  going over UDS/GC-MS information for billing and marking

20  superbills.  Let me know if you would like me to add anything

21  else.

22  Q   Ms. Phillips recognized that there was only four weeks

23  between two GC-MSes at least for a couple of patients; right?

24  A   Yes.

25  Q   That's how she started out -- and also she talked about

1  consulting with some patients and explaining what all this was

2  about to the patients?

3  A   Yes.  She's also stating there's some patients talking

4  about their insurance being billed for this, yes.

5  Q   All right.  And then she goes on and says that she thought

6  that here -- we did make an arrangement with Castle regarding a

7  self-pay rate and indigent (no charge), and she's explaining --

8  what their arrangement with Castle is with regard to patients

9  that don't have insurance?

10  A   Correct.

11  Q   And in response to that, shortly thereafter, a few minutes

12  later, Dr. Ruan, just reading the first sentence, says -- the

13  first two sentences, what does it say?

14  A   No.  We should not order that frequently.  That must be due

15  to mistake.

16  Q   All right.  Dr. Ruan is saying that is too soon, the four

17  weeks we spoke of is too soon?

18  A   Yes, sir.  He further explains that it can trigger auditing

19  also.

20  Q   Right.  And he says -- and that's important to him.  We've

21  seen that before; is that right?

22  A   Correct.

23  Q   And if you are audited, you want to be in compliance;

24  right?

25  A   You do, yes.

DEA SA MICHAEL BURT - CROSS BY MR. KNIZLEY

1   Q   Okay.  And so he has concern that he wants to be in

2   compliance in the event he is audited?

3   A   Correct.

4   Q   All right.  And he goes and further explains on what

5   occasion it should ever be less than the 12 weeks, I think.

6   Would you read that for us, please?

7   A   Starting with "the only"?

8   Q   Yes, sir.

9   A   The only time that I would see this being ordered is that

10  for example, previous urine showed THC, cocaine,

11  methamphetamine, and we are to fire that patient, then we will

12  need something definitive to back us up.  With GC -- I think he

13  means GC-MS -- it will be over three months.  On rare

14  occasions, say if we see patients every 12 weeks or a patient

15  is 150 miles away or on extremely high opioid meds, we can

16  order over 2.5 months; i.e., around one week short of three

17  months.  With that I will document:  Patient lives far away,

18  high opioid amount.  If we would order GC-MS by mistake within

19  one month, we should not bill insurance and let Castle know

20  that was a mistake.  Because Castle will charge us, and yet we

21  might now get paid and possibly get audited.  Please make sure

22  all nurse practitioners know about this.

23  Q   So he is saying that every four weeks is too quick and we

24  shouldn't do that; right?

25  A   That's what it states, yes.

DEA SA MICHAEL BURT - CROSS BY MR. KNIZLEY

1  Q   And it also says if that happens by mistake, we're not

2  going to bill the insurance company?

3  A   That's what it states, yes.

4  Q   Let me show you what's marked as Government's Exhibit

5  9-5(7).  Do you recall this document?

6  A   Yes.

7  Q   And it talks about the business aspects or the money

8  aspects of some of the urinalyses, does it not?

9  A   It does.

10  Q   It also talks about, starting right there, "plus" -- can

11  you read that sentence for us, please?

12  A   Plus we need GC-MS results as there are false positives and

13  false negatives with point-of-care urine screen.

14  Q   All right.  A point-of-care urine screen is what we refer

15  to as the cup analysis?

16  A   Yes, sir.

17  Q   And that's a rather simplistic analysis of the urine and

18  can't always be definitive; is that correct?

19  A   That's my understanding.

20  Q   And sometimes there's false positives and false negatives

21  with the cup analysis?

22  A   That's correct.

23  Q   Let me show you what's marked as Government's Exhibit

24  9-6(2).  Do you recall this email?

25  A   Yes, sir.

1  Q   Now, do you see the subject matter Figures on Opioid and

2  FDA Commentary?

3  A   I see it, yes.

4  Q   And it's from Dr. Ruan.  This top part is from Dr. Ruan to

5  a person named Li Ma?

6  A   Yes.

7  Q   And during your investigation did you determine who Li Ma

8  was?

9  A   I know he's another physician, sir.  I'm not sure where he

10  works.

11  Q   But you know he's another physician?

12  A   I do, yes.

13  Q   Okay.  And do you know what the ASIPP is?

14  A   The American Society of Interventional Pain Specialists --

15  Physicians.  I'm sorry.

16  Q   What is interventional pain, if you know?

17  A   My understanding, interventional pain is a pain physician

18  that offers other modalities other than prescription opioids.

19  Q   And we talked about modalities.  That would be nerve blocks

20  and epidurals?

21  A   Physical therapy.

22  Q   Physical therapy.  What might be some others?

23  A   TENS units, things of that nature.

24  Q   And for the most part, if you practice solely

25  interventional pain, interventional pain medicine, it would not

1    include -- if it was all of the practice, it would not include

2    prescription of opioids; is that right?

3    A    Different modalities, yes.

4    Q    All right.  And some physicians do both, though; is that

5    correct?

6    A    Correct.

7    Q    And in Dr. Ruan and Dr. Couch's practice, they did both; is

8    that correct?

9    A    It's my understanding, yes.

10   Q    Okay.  So if you'll read, if you would please, sir, the

11   first three sentences.

12   A    Dr. Ma, I want to share this with you.  Most ASIPP board

13   members are against opioids.  (See below.)  No one openly

14   disagrees.  I don't care.  So this is the second time I am

15   against them.  I recently asked them to take my name out of the

16   opioid guidelines that the most recent Pain Physician will

17   publish as I don't want to contradict myself.  However --

18   Q    Okay.  Thank you, Agent.  He is saying he disagrees with

19   some of the positions of the interventionalists; is that

20   correct?

21   A    Yes, sir.  Reading that, you come to the conclusion that

22   Dr. Ruan is an outlier in this field.

23   Q    Well, an outlier -- he disagrees with most ASIPP board

24   members; is that correct?

25   A    That is correct.

1  Q   And his name was on some publication, and he asked for his
2  name to be taken off of that; right?
3  A   He does.
4  Q   And he had also, in speaking with Dr. Ma, shared his
5  position here starting with "I personally believe."  Would you
6  read those first two sentences right there?
7  A   I personally believe there should be double standards here
8  for well-trained pain physicians versus others.  Those limits
9  are good for PCP, which is primary care physician, not for
10  board-certified pain specialists.
11  Q   And he's talking about a double standard.  He's saying
12  those people that are more specialized or more trained in
13  things should have different limits, if you will, than maybe a
14  primary care physician?  Let's read it again.  What does it say
15  right there?
16  A   For well-trained pain physicians versus others.  I assume
17  "others" are just like primary care doctors or family doctors.
18  Q   Okay.  Go ahead and read that last.
19  A   Those limits are good for PCP, not for board-certified pain
20  specialists.
21  Q   And if you would drop down to here, "I have to."
22  A   I have to agree that proper training of physician and
23  patient selection are the keys.  Accidents happen when an MD
24  abuses their prescribing rights or patients abuse their
25  meds.  I still believe an individualized treatment regimen

1    under vigilant monitoring should be encouraged.

2    Q   Let me show you what's marked as Government's Exhibit

3    9-6(6).  And does that appear to be an email from Dr. Ruan on

4    July 13, 2014, to Dr. Couch?

5    A   Yes, sir.

6    Q   And Dr. Chen?

7    A   Yes.

8    Q   And some staff members?  Do you recognize these people, the

9    other ccs, to be staff members?

10   A   Yes, sir, I do.

11   Q   And do you recognize the blind ccs to be some of the people

12   associated with C&R Pharmacy?

13   A   Yes, sir.

14   Q   What is the subject matter?

15   A   PPSA educational series - drug diversion.

16   Q   Are you familiar with the PPSA educational series that they

17   had produced?

18   A   No, sir, I've never read that.

19   Q   Okay.  If you could read starting with "I would like."

20   A   I would like to share this paper with you in this PPSA

21   educational series on drug diversion, specifically how dealers

22   obtain their stock and what drugs are most sought after.

23   Q   Let me interrupt you, Agent.  When he says -- he's talking

24   about a series on drug diversion, specifically how dealers

25   obtain their stock and what drugs are most sought after, do you

1   understand him to mean drug dealers at this point?  Or do you

2   have an understanding either way?

3   A   Yeah.  It's a drug dealer, yes.

4   Q   So he's telling his staff and others -- he's wanting to

5   share with them how he feels that drug dealers obtain their

6   stock.

7            If you would keep going, please, sir.

8   A   It happens at every level:  pain clinic, patient, addict,

9   dealer, irresponsible patient, indigent patients who sell their

10  drugs for money, pharmacy employees, students, et cetera.  So

11  we could not be more careful with prescribing controlled meds.

12  Q   Let me stop you.  Is he then cautioning his staff and

13  others about being careful in prescribing medications in light

14  of the fact that there are drug dealers out there trying to get

15  these drugs?

16  A   That's what the email purports.

17  Q   Go ahead, please, sir.

18  A   Also patients who present to pain clinic might have fake

19  MRI, so we need updated MRI to make sure MRI readings are true

20  findings instead of faked.  Also --

21  Q   If you could just -- I'm trying to save a little bit of

22  time -- drop down to "I have."

23  A   I have been trying to taper off benzo use in my

24  patients.  Also I have started blood draw on high dose/high

25  risk patients as we all know urine samples can be altered while

1    blood samples cannot.

2    Q    Do you know that PPSA -- they began to use blood samples

3    toward the end of the practice?

4    A    I believe toward the end they did, sir.

5    Q    Okay.  And would you agree with his contention that blood

6    samples are harder to change or alter than a urinalysis?

7    A    I believe that is true.

8    Q    Now, you read a number of emails from the prosecution

9    talking about charitable contributions to the University of

10   South Alabama Medical School?

11   A    Yes, sir.

12   Q    And charitable contributions to the LSU Medical School?

13   A    Yes.

14   Q    And charitable contributions to the College of Medicine of

15   Wisconsin, I believe is how it's described; is that right?

16   A    That is correct.

17   Q    And you saw these emails were both to people in the Insys

18   Therapeutics business -- some of them?

19   A    Yes.  That's correct, yes.

20   Q    And many of them were to Dr. Joel Busta from the University

21   of South Alabama?

22   A    Yes, sir.

23   Q    To people at LSU?

24   A    Correct.

25   Q    To people in Wisconsin?

2233

```
 1   A   Correct.

 2   Q   And there were a number of emails, and they appeared to be

 3   appreciative of his humility, did they not?

 4   A   That's what the email said, yes.

 5   Q   And there was nothing hidden, appeared to be hidden, about

 6   anything he was doing, was there?

 7   A   Do you want the overall context, Mr. Knizley, or just --

 8   Q   I'm just asking you in the emails that you read, did he say

 9   don't tell anybody?

10   A   That was not said in any of the emails, no.

11   Q   Did he say keep this to yourself?

12   A   No.

13   Q   I show you what's been marked as Government's Exhibit

14   9-6(1) -- excuse me -- 9-9(2).  Do you see that?

15           THE COURT:  What is the number, Mr. Knizley?

16           MR. KNIZLEY:  I think it's now 9-9(2), Your Honor.

17   Q   Do you remember this?

18   A   Sir, can you pull it down?

19   Q   (Complying.)

20   A   Yes, yes I do.

21   Q   And that happened to be from -- originally from Dr. Ruan to

22   Dr. Couch?

23   A   Yes.

24   Q   And do you recall the subject matter of this email

25   exchange?
```

1  A   Yes, sir, I do.  It was regarding the restructuring of

2  PPSA.

3  Q   And do you recall Dr. Ruan writing to Dr. Couch and saying:

4  I recommend the following?  Do you see that?

5  A   Yes.

6  Q   And what is his second recommendation?

7  A   Second recommendation?

8  Q   Number two.

9  A   Both of us will need to set a perfect example for others,

10  including our mid levels.  We know they are loyal.  Every

11  practice can get into trouble when there are opportunities for

12  whistleblowers to gain.

13          MR. KNIZLEY:  Thank you, Agent.

14          THE COURT:  Any redirect?

15          MR. BODNAR:  Yes, Your Honor.  Just one moment, Your

16  Honor.

17          THE COURT:  All right.

18                    REDIRECT EXAMINATION

19  BY MR. BODNAR:

20  Q   Good afternoon, Mr. Burt.

21  A   Good afternoon, sir.

22  Q   I just want to clear up two things first.  Towards the very

23  end of your cross-examination with Mr. Knizley, do you remember

24  asking Mr. Knizley if he wanted the context of the donations

25  made by Insys?

1    A   Yes, sir.

2    Q   What was the context?  Explain to the jury what was the

3    context of those emails?

4          MR. KNIZLEY:  Your Honor, I object.  He asked the

5    question, and I don't think it's proper for a witness to ask a

6    question.  I don't think that was in the scope of the cross-

7    examination.

8          THE COURT:  Overruled.

9    BY MR. BODNAR:

10   Q   Explain the context of those emails to Wisconsin Medical

11   School and to USA with regard to Insys donations?

12   A   The context being Defendant Ruan received a criminal

13   indictment of a doctor in the Eastern District of

14   Michigan.  The next day he changes the way he receives his

15   payment from Insys Therapeutics.  He had always gotten checks

16   for $3,000 for speaking engagements.  The next day he changed

17   the way he received his checks.  So now instead of receiving

18   money to benefit him personally, the checks are going to

19   donations to the medical schools, LSU, Wisconsin and South

20   Alabama.

21   Q   And are they donated to endowments in his name?

22   A   Yes.

23   Q   I'm now going to jump back to what Mr. Knizley showed you,

24   admitted Government's Exhibit 9-1(2).  Do you remember going

25   over this email with Dr. -- or with Mr. Knizley?

1  A   Yes, sir.

2  Q   And do you recall that you disagreed with Mr. Knizley about

3  the interpretation of what Dr. Ruan was saying right here?

4  (Indicating.)

5  A   Yes, sir.

6  Q   What is your interpretation of what Dr. Ruan is saying in

7  this email?

8          MR. KNIZLEY:  I object.  It's not relevant what his

9  interpretation is.

10         THE COURT:  Overruled.

11 BY MR. BODNAR:

12 Q   What is your interpretation of what Dr. Ruan is saying

13 right there?

14 A   My interpretation is that all eyes are on Alabama right

15 now.  With what's going on in south Florida, the prescribing of

16 oxi 30s and OxyContin 80s, that Alabama is now the number one

17 state for opioid distribution.  And there are a lot of eyes

18 watching Alabama.  And in my view, Dr. Ruan is telling

19 Dr. Couch they need to be careful and get folks off these

20 benzos because we don't want benzos -- or a red flag in the

21 pill mill industry.  We would rather have our primary care

22 physicians prescribe that to the patients.

23 Q   So if the primary care physician is prescribing benzo, is

24 the patient still on benzos?

25 A   The patient is still on benzos.  The doctors are not

1   prescribing it, the pain doctors are not.

2   Q   Special Agent Burt, I want to clarify a point you made.  Do

3   you recall talking about search warrants for Dr. Ruan's and

4   Dr. Couch's email accounts?

5   A   Yes, sir.

6   Q   And I believe you also mentioned search warrants for Insys

7   and Galena.  Were those actually obtained via subpoena?

8   A   Yes, sir, they were; correct.

9   Q   They weren't search warrants for Galena or Insys material,

10  were they?

11  A   No, they were not.

12  Q   I'm going to try to walk through some of this in

13  order.  Going back to what Mr. Essig mentioned to you, do you

14  remember him asking about different types of pill mills?

15  A   Yes, sir.

16  Q   Is there a one-size-fits-all definition for a pill mill?

17  A   There is not.

18  Q   Is a pill mill only if someone walks in with cash off the

19  street?

20  A   No, sir.  There are many ways it could happen.  It could be

21  through insurance, cash.  There are many ways for it to happen,

22  for pills to be distributed to the patient.

23  Q   And I believe you mentioned in the past it was -- when in

24  south Florida, it was a cash come-in business?

25  A   Yes.

 1   Q   Did that type of pill mill -- was that widely reported in

 2   the media?

 3   A   Yes, it was.

 4   Q   And based on your knowledge, the DEA did have doctors

 5   change the way they do business because of that?

 6   A   Yes.  As I stated before, criminal behavior is learned.

 7   Whether it be from physicians or other criminals, people learn

 8   from how people are arrested and can change their ways of how

 9   they obtain pills or money.

10   Q   I want to clarify one thing that was brought up as

11   well.  Do you recall speaking with Mr. Essig about Roxicodone?

12   A   Yes.

13   Q   And whether it was off label for cancer?

14   A   Yes.

15   Q   With regard to off-label prescribing, as has been discussed

16   in this trial, has Roxicodone been discussed in the discussion

17   of off-label prescribing?

18           MR. KNIZLEY:  Your Honor, I object.  He's asking him

19   to comment on the testimony of another.

20           MR. BODNAR:  I'll ask it this way.

21   Q   Is Roxicodone part of the TIRF class of drugs?

22   A   No, sir.

23   Q   Do you recall talking with Mr. I.. [sic] about the --

24           THE REPORTER:  Wait.  Mr. who?

25           MR. BODNAR:  Sorry.  Mr. Essig.

1    Q    -- about the PA for Mr. Ivy?

2    A    Yes, sir.

3    Q    Do you recall being asked whether it was actually Natalie

4    Perhacs that filled out that form?

5    A    I do.

6    Q    And has Natalie Perhacs pled guilty in this case?

7    A    She has.

8    Q    I'm going to show you that PA form that has been admitted

9    as Government's Exhibit 32-2 subsection (2).  Do you recall

10   seeing this form?

11   A    Yes, sir.

12   Q    Whose signature does it appear to be above?

13   A    It appears to be Dr. Couch's signature.

14   Q    Do you recall talking to Mr. Essig about Government's

15   Exhibit 9-1(2), the email between Dr. Ruan and Dr. Couch?

16   A    Yes, sir.

17   Q    And what two drugs is Dr. Ruan talking about here?

18   A    Roxicodone 30 milligrams and OxyContin 80s.

19   Q    But in Dr. Couch's response, what type of triple-digit

20   dispensing is he talking about?  Is he talking about a specific

21   drug?

22   A    There is no specific drug mentioned.

23   Q    What does he say instead?

24   A    Short-acting opioids.

25   Q    And is the Roxicodone 15 still a short-acting opioid?

 1   A   It sure is, yes.

 2   Q   Is that what the UC agent received?

 3   A   Yes, he did.

 4   Q   And was it a triple-digit dispense?

 5   A   It was.

 6   Q   Let me show you now what's been admitted as Government's

 7   Exhibit 9-8(1).  Do you recall reviewing this email from Chris

 8   Lento to Dr. Ruan with both defense counsel?

 9   A   Yes, sir.

10   Q   And do you recall questions from Mr. Essig about Mr. Lento

11   not mentioning anything about Galena doing anything illegal?

12   A   Yes, I do.

13   Q   Based on this screenshot, what, if anything, does it appear

14   Mr. Lento was trying to inform Dr. Ruan about?

15   A   That Dr. Couch and Dr. Ruan are within the top five

16   prescribers -- top receivers of monies from Insys in the United

17   States.

18   Q   And in what kind of document is he giving the screenshot

19   from?

20   A   The indictment -- sorry -- the complaint.

21   Q   Mr. Burt, do you recall reviewing the Kathleen Burns file

22   with Mr. Knizley?

23   A   Yes, sir.

24   Q   That's what's previously been admitted as Government's

25   Exhibit 9-11?

DEA SA MICHAEL BURT - REDIRECT BY MR. BODNAR

1   A    Yes.

2   Q    Do you recall walking through with Mr. Knizley the timeline

3   from January [sic] 20th through the date of her discharge?

4   A    Yes.

5   Q    And if her date of discharge was on January [sic] 8, do you

6   recall the date being shown as being January 20th?

7   A    I believe so.

8   Q    Do you need me to refresh your memory?

9   A    Please, yes.

10  Q    I'm going to show you what's been pulled out as the

11  progress note from January [sic] 20th.

12  A    It's June 20th.

13  Q    I'm sorry.  June 20th, June 20th.  And is that the note

14  that you were looking at with Mr. Knizley coming back on the

15  8th?

16  A    Correct.

17  Q    Do you recall the date that she was fired as a patient?

18  A    It was July, I want to say the 9th, I believe.

19  Q    I'm going to show you a pull-out from that.  Does that

20  refresh your memory?

21  A    July 9th, 2014.

22  Q    And is that the day after she was supposed to return?

23  A    Yes, sir, it is.

24  Q    And what is the reason she's being fired here?

25  A    Violation of the opioid agreement, habitually running out

DEA SA MICHAEL BURT - REDIRECT BY MR. BODNAR

1    of prescribed medication.

2    Q   Does it say she was fired for not showing up on the 8th?

3    A   It does not say that.

4    Q   Had she in fact habitually been running out of her

5    prescribed medication?

6    A   As I review her medical records, yes, sir.

7    Q   And which medication in particular?

8    A   Particularly the Subsys.

9    Q   Just prior to this, did she receive -- did PPSA receive

10   notice that she was no longer going to be covered for Subsys

11   and Abstral?

12   A   Yes, sir, by her health insurer.

13   Q   I'm going to show you now what's being pulled out as the

14   letter from Cigna-HealthSpring.  Do you recall reviewing this

15   letter with defense counsel?

16   A   Yes, sir.

17   Q   Can you explain to the jury, what is it that Dr. Ruan is

18   being asked to certify here?

19   A   Dr. Ruan is --

20           MR. KNIZLEY:  Your Honor, I object to that.  The

21   letter speaks for itself.

22   BY MR. BODNAR:

23   Q   All right.  Starting at "as you are most likely aware," can

24   you please read this to the jury?  I'll blow it up for you.

25   A   As you are most likely aware, on December 28, 2011, the FDA

DEA SA MICHAEL BURT - REDIRECT BY MR. BODNAR

1  approved a Risk Evaluation and Mitigation Strategy, REMS, for
2  the entire class of transmucosal immediate release fentanyl,
3  TIRF, prescription medicines.  The TIRF REMS Access Program
4  involves a restricted distribution program to reduce the risk
5  of misuse, abuse, addiction and overdose with TIRF
6  medicines.  TIRF medicines such as Subsys are FDA approved for
7  the management of breakthrough pain in adults with cancer who
8  are routinely taking other opioid pain medicines around the
9  clock for pain.  Healthcare providers who prescribe TIRF
10  medicines for outpatient use are required to enroll in the TIRF
11  REMS Access Program and to complete and sign a Patient-
12  Prescriber Agreement Form with each new patient before writing
13  the patient's first TIRF prescription.  Healthcare providers
14  must also provide patients with a copy of the medication guide
15  during counseling about the proper use of their TIRF medicines.
16          By confirming -- please confirm by signing below that
17  the member listed above received the TIRF medication indicated
18  for the approved diagnosis and management of breakthrough
19  cancer pain and that appropriate TIRF REMS Access Program
20  Agreement Forms were signed.
21  Q   And is it signed by -- appear to be signed by Dr. Ruan?
22  A   It is signed.
23  Q   And does that appear, based on your work on the case, to be
24  Dr. Ruan's signature?
25  A   Yes, sir.

DEA SA MICHAEL BURT - REDIRECT BY MR. BODNAR

```
 1   Q   I want to show you what has been marked as Government's
 2   Exhibit 9-2(6).  Do you recall reviewing this email with the
 3   attached letter to Medicare and Medicaid -- I'm sorry -- to
 4   Medicare?
 5   A   Yes.
 6   Q   And following this letter being sent to Michael Forman and
 7   Frank Tetkoski, did they agree with Dr. Ruan's analysis?
 8   A   They did not.
 9   Q   In fact, what did they say?
10   A   They informed him that the TIRF REMS medicine Subsys is
11   used for breakthrough cancer pain.
12   Q   I show you --
13   A   That is the only FDA-approved use for that.
14           MR. KNIZLEY:  Your Honor, I object to what they said.
15           MR. BODNAR:  I will show him what he said, Your Honor.
16           THE COURT:  All right.
17   BY MR. BODNAR:
18   Q   I show you now what's been admitted as Government's Exhibit
19   9-2(7).  Is this the response from Michael Forman?
20   A   Yes, sir.
21   Q   And what does it say?
22   A   We appreciate your response to transmucosal immediate
23   release fentanyl, TIRF, drugs and their potential indication
24   for breakthrough pain.  At this time the only approved
25   indication for TIRF drugs for coverage under Medicare Part D
```

1    remain for the treatment of cancer pain.  Peer-review articles

2    are not acceptable for drug coverage under Medicare Part D.  In

3    the future, if TIRF drugs receive additional indications by the

4    FDA or if the official compendia support their uses, future

5    audits will reflect these additional indications.

6    Q   Do you recall going over with Mr. Essig Government's

7    Exhibit 9-9(2), an email chain between Dr. Ruan and Dr. Couch?

8    A   Yes, sir.

9    Q   Do you remember Mr. Essig saying you don't know why

10   Dr. Ruan thought the FBI was going to raid them?

11   A   That's correct.

12   Q   Does he give any indication of why he believed that?

13   A   Only that Dr. Couch -- in reading this email, Dr. Couch had

14   mentioned it to Dr. Ruan previously.

15   Q   Does Dr. Ruan appear to be concerned about that?

16   (Indicating.)

17   A   He is, yes.

18   Q   What does he say, starting with "just two weeks ago"?

19   A    Just two weeks ago you mentioned to me that we were

20   supposed to be raided by the FBI, which got you concerned.  But

21   thank God it did not happen.

22   Q   And what remedial step does Dr. Ruan suggest doing in that

23   same email?

24   A   Both of us need to set perfect examples for others,

25   including our mid levels.  We know they are loyal.  Every

1  practice can get into trouble when there are opportunities for

2  whistleblowers to gain.

3  MR. BODNAR: One moment, Your Honor.

4  THE COURT: All right.

5  MR. BODNAR: Nothing further from this witness, Your

6  Honor.

7  THE COURT: All right. Agent Burt, you may step down.

8  MS. GRIFFIN: Your Honor, we call Dr. Vohra.

9  While we are waiting for him to come in, pursuant to a

10  stipulation I'd move to admit Government's Exhibit 20-3. Those

11  are prescriptions that were shown that Mr. Kelley testified

12  about and I failed to offer them yesterday. They are offered

13  pursuant to a stipulation.

14  THE COURT: All right. You can mark those in.

15  THE CLERK: Yes, ma'am.

16  (Government's Exhibit 20-3 was entered into evidence.)

17  THE CLERK: Doctor, can I get you to stand up? I

18  apologize. And raise your right hand.

19  RAHUL VOHRA, MD,

20  was sworn and testified as follows:

21  THE WITNESS: I do.

22  DIRECT EXAMINATION

23  BY MS. GRIFFIN:

24  Q  Tell us your name, please.

25  A  Rahul Vohra.

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1   Q   Dr. Vohra, are you a physician licensed to practice in both
2   Mississippi and Texas?
3   A   Yes, ma'am.
4   Q   What type practice -- what type medicine do you practice?
5   A   My specialty is physical medicine and rehabilitation and
6   pain medicine.
7   Q   Where is that office located?
8   A   We're just outside of Jackson, Mississippi.
9   Q   Now let's discuss your education, Dr. Vohra.  Did you study
10  pre-med and receive a bachelor of science in biology with
11  honors from Baylor University in Texas?
12  A   I did.
13  Q   That's in the Houston area?
14  A   It's in Waco.
15  Q   Waco.  Did you then go to medical school and receive a
16  doctor of medicine from the Baylor College of Medicine in
17  Houston?
18  A   I did.
19  Q   During that medical training did you have occasion to be at
20  MD Anderson?
21  A   Yes.  That was one of the hospitals that we rotated
22  through.
23  Q   What is MD Anderson, for the record?
24  A   MD Anderson is one of the foremost leading cancer hospitals
25  in the world.

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1   Q   Did you do some type of oncology training there at MD
2   Anderson in medical school?
3   A   I did.
4   Q   When did you finish medical school, sir?
5   A   1989.
6   Q   Where did you go then for an internship?
7   A   I went to the University of Texas in Galveston and I did a
8   year of internal medicine.
9   Q   What is an internship?
10  A   Internship is usually your first year in residency and
11  tends to be a more generalized year.  Some people do general
12  surgery or internal medicine, some people do what's called a
13  transitional year, where you rotate through different
14  departments, interdepartmental rotation.
15  Q   After that year where did you go for your residency?
16  A   I went back to Baylor in Houston and completed a residency
17  in physical medicine and rehabilitation.
18  Q   Did that include a rotation at MD Anderson in connection
19  with cancer pain?
20  A   Yes, it did.
21  Q   Dr. Vohra, when did you actually begin practicing medicine?
22  A   Well, became a physician in 1990 and I started private
23  practice once I completed residency in 1993.
24  Q   Now, you are board certified in pain medicine?
25  A   I am.

1   Q   You are board certified by the American Board of Physical

2   Medicine and Rehabilitation?

3   A   Yes, ma'am.

4   Q   What type work were you initially doing when you started

5   practicing medicine?

6   A   It was a mixture.  I was working in a rehabilitation

7   hospital, I was medical director for one of the rehabilitation

8   hospitals there in Jackson, and we cared for persons that had

9   strokes, spinal cord injuries, multiple traumas.  And then I

10  also started working as an outpatient practice, taking care of

11  patients with musculoskeletal problems and pain problems.

12  Q   So approximately how long have you practiced pain medicine?

13  A   Since the start of my career.

14  Q   Are you a member of a number of professional medical

15  organizations?

16  A   Yes, ma'am.

17  Q   Specifically are you a fellow of the American Academy of

18  Physical Medicine and Rehabilitation?

19  A   Yes, ma'am.

20  Q   Of the North American Spine Society?

21  A   Yes.

22  Q   Of the American Association of Neuromuscular and

23  Electrodiagnostic Medicine?

24  A   That's correct.

25  Q   And of the American and Mississippi Medical Associations?

1    A    I am.

2    Q    Have you been a nonpaid speaker for a number of

3    presentations?

4    A    Yes, ma'am.  I've given many presentations over the years.

5    Q    Specifically, you have spoken with the State of Mississippi

6    Agencies annual meeting about "A Rational Approach to Chronic

7    Pain" in 2015?

8    A    I did.

9    Q    You have spoken to a Mississippi conference in 2015,

10   "Opioids for Chronic Pain"?

11   A    Yes.

12   Q    You've spoken to the law school at the University of

13   Mississippi about "Narcotics and Chronic Pain"?

14   A    I have.

15   Q    You have spoken to the National Association of Drug

16   Diversion Investigators about chronic pain?

17   A    Yes.

18   Q    You have spoken to the Mississippi Defense Lawyers

19   Association about "Conservative Management of...Pain" on your

20   spine -- "Spine Pain"?

21   A    Yes.

22   Q    You have spoken to the Markow Walker -- M-A-R-K-O-W

23   Walker -- Annual Conference about the "American Medical

24   Association Guidelines to the Evaluation of Permanent

25   Impairment"?

1   A    I have.

2   Q    You have spoken to a conference in Mississippi about

3   "Causation and Low-Back Pain"?

4   A    Yes.

5   Q    You've spoken to the Mississippi Pain Society about

6   "Introduction to EMG and Nerve Studies" and at a separate time

7   about "A Guide to Impairment Ratings"?

8   A    Yes, ma'am.

9   Q    You've spoken at the Mississippi Pain Society on three

10  other occasions; one about "New Concepts in Management of Spine

11  Pain," "Physical Examination of the Shoulder," and then

12  "Biomechanics of the Cervical Spine"?

13  A    Yes, ma'am.

14  Q    Have you also spoken to the Mississippi Pain Society on

15  another occasion about "Myths about Discs"?

16  A    Yes, ma'am.

17  Q    And I will go through quickly reading a number.  You've

18  spoken as well to the Mississippi Pain Society about "Workers

19  Compensation Injuries," "Assessment and Management of Chronic

20  Pain," "Nonoperative Management of Spine Pain," "Management of

21  Post-Stroke...," "Management of Low Back...," "...Management of

22  Reflex...Dystrophy," "Use of Narcotics for Chronic Nonmalignant

23  Pain," "Nonsurgical Low-Back Pain," "Perspective on

24  Fibromyalgia," "Diagnosis and Treatment of...Sympathetic

25  Dystrophy," "Treatment of Musculoskeletal Complications of

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

 1   Stroke" -- and that was at the University of Mississippi

 2   Medical Center -- "Stroke Update"; is that correct?

 3   A   Yes, ma'am.

 4   Q   The others I mentioned were with the Mississippi Pain

 5   Society?

 6   A   Yes, ma'am.

 7   Q   And one to the Department of Neurosurgery at the University

 8   of Mississippi Medical School?

 9   A   That's correct.

10   Q   You've also spoken to "Physical Therapy for Low-Back Pain,"

11   "Treatment of Repetitive Motion Injuries," "Low-Back Pain in

12   Industry," "Lumbar Degenerative Cascade," at Baylor College of

13   Medicine; is that correct?

14   A   Yes.

15   Q   And you have spoken to the Texas Association of

16   Rehabilitation Nurses about "Conservative Care of the Injured

17   Spine"?

18   A   Yes, ma'am.

19   Q   You served as the principal lecturer for that course?

20   A   I did.

21   Q   You've spoken at the Beyond Calliet -- C-A-L-L-I-E-T  --

22   Lecture Series at Baylor College of Medicine.  You'll have to

23   help me with how to pronounce that.

24   A   Calliet.

25   Q   You have spoken to the "Spine Update:  Focus on Low Back

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1    Dysfunction" at Baylor College of Medicine?

2    A   Yes, ma'am.

3    Q   You were the course codirector of that seminar?

4    A   I was.

5    Q   You have spoken at Baylor College of Medicine on "Lumbar

6    Strength Testing"?

7    A   I have.

8    Q   And you have spoken to the Baylor College of Medicine,

9    "Spine Update"?

10   A   Yes.

11   Q   You have spoken at the American Academy of Physical

12   Medicine and Rehabilitation National Meeting about

13   "Rehabilitation of a Patient with Complicated Thrombosis"; is

14   that correct?

15   A   Yes, ma'am.

16   Q   You have also received a number of awards and -- excuse me

17   -- a number of awards; is that correct?

18   A   Yes, ma'am.

19   Q   You have received --

20          THE COURT:  Hold on, Ms. Griffin.

21          A JUROR:  I'm sorry.  Could you repeat your name again

22   and spell that?  I didn't quite get it.

23   A   It's Rahul, R-A-H-U-L, and the last name is Vohra, V as in

24   victor, O-H-R-A.

25          A JUROR:  Thank you.

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1          THE WITNESS:  Yes, ma'am.

2          THE COURT:  All right, Ms. Griffin.

3   BY MS. GRIFFIN:

4   Q   Now, Dr. Vohra, you've received from the Jackson Free Press

5   in 2016 Jackson's Best Doctor Award?

6   A   Yes, ma'am.

7   Q   You've received the Mississippi Healthcare Hero from the

8   Mississippi Business Journal?

9   A   Yes, ma'am.

10  Q   One of America's Top Physicians In 2008?

11  A   Going forward, yes, ma'am.

12  Q   Going forward, continuing.

13          The Robert McGuire, MD, Award for the Administrative

14  Law and Workers Compensation Section of the Mississippi Bar

15  Association.

16  A   Yes, ma'am.

17  Q   A resident teaching award from Baylor College of Medicine;

18  is that correct?

19  A   Yes, ma'am.

20          MS. GRIFFIN:  Your Honor, I would move to qualify

21  Dr. Vohra as an expert in pain management.

22          THE COURT:  All right.

23  BY MS. GRIFFIN:

24  Q   Dr. Vohra, over your approximately 20 years of practicing

25  pain medicine, can you tell us approximately how many

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1   individuals you have treated?

2   A   Many, many thousands.  Over 10,000, I would think.

3   Q   And what is your understanding of the definition of the

4   usual course of professional conduct for a pain management

5   physician?

6   A   That's basically a physician acting within what we would

7   call the standard of care.

8   Q   And what does that mean?

9   A   Standard of care means what -- the standard of care is what

10  a reasonable physician would do or should do in the care of a

11  patient, whether he's tasked with medications, surgery,

12  whatever.  It's a basic standard that physicians need to meet.

13  Q   Would you give us an overview of the doctor-patient

14  relationship as pertains to a pain management doctor?

15  A   Sure.  When someone comes to you as a patient and you

16  become their physician, as their physician it's my duty to

17  communicate with that person to understand what's going on with

18  that person.  It's my duty to be compassionate in caring for

19  that person.  It's my duty to educate that patient as to what's

20  going on with them.  It's my duty to educate that patient as to

21  the potential risks and benefits of any treatment.  It's also

22  my duty to always put the interests of my patients first and

23  not to do anything that's in my best interest over their best

24  interest.

25  Q   So give us an example of a first visit, a new patient

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1  visit, with a pain management doctor.

2  A   Well, you know, of course, talk with the patient first.

3  I'll go over their medical history, whatever medical problems

4  they've had, surgeries they've had, allergies, what medicines

5  they are on.  And then we'll sit and talk about the reason that

6  they're there and when did this start, where has it been

7  hurting, what makes it better, what makes it worse, what tests

8  have you had to get a good idea of what has been going on with

9  this person.

10        Once you have an idea of a good history and what's

11  happened to them, then you, of course, perform a physical

12  examination to try to delineate what the issue might be.  If

13  it's shoulder pain, do you have a rotator cuff tear?  Is that

14  really coming out of their neck?

15        You also, of course, assess for any neurologic

16  deficits.  And once you've completed the physical examination,

17  then you sit down with the patient and you tell them what your

18  thoughts are, what you think is going on, and then you talk

19  about if you feel like any further testing is needed and a plan

20  of care.

21  Q   When you talk about this physical examination, is that

22  actually done by you as the doctor?

23  A   Always.

24  Q   Does it involve an examination directed at the area where

25  the patient is complaining of?

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1    A    Usually you'll do a directed examination.  If someone's

2    complaining of neck pain, then usually you will look at the

3    neck and the shoulders and the upper extremities.  If you're

4    looking at back pain, of course, you'll look lower down

5    (nodding head affirmatively).

6    Q    So you wouldn't necessarily look at a patient's eyes, ears,

7    or nose as you might do with an internal medicine doctor, would

8    you?

9    A    No, no, not unless there's some specific reason to do that.

10   Q    Then early on do you assess whether that person needs to be

11   referred to yet another specialist?

12   A    You know, one of the big questions you always answer when

13   you see somebody for the first time is:  Does this person need

14   surgery?

15   Q    Why is that?

16   A    Well, if someone comes to you and they are having back and

17   leg pain and they are having a significant weakness in their

18   leg, if they are having progressive deficit, neurologic

19   deficit, if they have compression of their spinal cord and

20   their neck from what's called stenosis or narrowing of the

21   canal in the neck, those things are surgical issues.  So if you

22   feel like someone has a surgical issue, then, of course, you're

23   going to send that person on to another provider that can do

24   that.

25          And I'll also assess them, you know, I'll assess

 1    people to see if I feel like they need any type of psychiatric

 2    or psychological help.  If they are having significant

 3    difficulty with depression and anxiety, we work with pain

 4    psychologists as well as psychiatrists to help manage that part

 5    of their problem.

 6    Q   Why is that an important part of being a pain specialist?

 7    A   Well, for several reasons.  It is very common in patients

 8    that have chronic pain that they also have problems with

 9    depression and anxiety.  And pain can cause you to become

10    depressed, it can cause you to become anxious.  And sometimes

11    that can become very, very pervasive, it can really take over.

12    And that in itself then impacts a patient's perception of

13    pain.  The depression itself can make the pain worse.

14         So we work with our colleagues to help not only the

15    physical side of what's going on, but also the emotional or

16    psychological side.

17         And the other reason we use psychologists is if I'm

18    going to be prescribing medications that are potentially habit-

19    forming for an extended period of time, then to have a

20    psychologist evaluate that person, to see -- to get their

21    opinion as to whether they are a reasonable candidate for those

22    drugs.  And it's always risk-benefit.  And certainly if someone

23    has uncontrolled psychiatric disease, if someone has addiction,

24    then those people are going to be at much higher risk for bad

25    outcomes from prescribing controlled medications.

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1    Q   And you do all this before you give the patient an opioid?

2    A   Not always.  You know, in an initial visit, if they are

3    taking a very low dose of opioid, I may continue that if they

4    come in on that.  But as time goes on, within usually three

5    months, if someone is still on opioids or if they are going to

6    be longer than that, then yes, I will have them evaluated.  And

7    certainly if someone comes in and they are already on high-dose

8    opioids, that person will get sent automatically to have that

9    evaluation.

10   Q   What is the standard if early on you feel like the person

11   has some mental health issues beyond just depression and

12   anxiety?

13   A   Well, the standard is that if you feel like someone has

14   severely uncontrolled psychiatric problems, if someone, for

15   example, is an uncontrolled schizophrenic, if someone is

16   severely bipolar, is very uncontrolled, someone's having

17   hallucinations, then those patients you don't start on

18   controlled substances.  You always have to get the psychiatric

19   issue under control before you start a person on those

20   substances.  It's a safety issue.

21   Q   Why is that a safety issue for a patient with some

22   psychiatric issues?

23   A   Well, in patients that -- for example, if you're having

24   trouble with hallucinations, you're schizophrenic or you're in

25   the middle of a psychotic episode from bipolar disorder, they

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

```
 1   have very disordered thinking, they are not able to think
 2   straight.  That's why they are hearing things and that's why
 3   they are seeing things.  And it's very difficult for those
 4   patients to then be able to control what medications they are
 5   using.  You know, did I take my medicine 10 minutes ago or did
 6   I take it two hours ago?  They can't keep track of things like
 7   that.  And so that in itself is a danger.  And then certainly
 8   those medications can also make that confusion worse.  So that
 9   is not a safe thing to do.
10   Q   So you would definitely make sure, if the patients were
11   giving you those indications, that you would have them seen by
12   a psychiatrist prior to continuing to work with them?
13   A   Absolutely.
14   Q   Now, you talked about starting, again, where you would
15   develop sort of a plan for the treatment of the patient; is
16   that right?
17   A   Yes, ma'am.
18   Q   Who goes over that with the patient?
19   A   I do.
20   Q   The doctor?
21   A   Yes, ma'am.
22   Q   Is that in the usual course of professional practice with
23   pain management?
24   A   Yes, ma'am.
25   Q   What do you talk about with the patient?
```

1   A   Well, we'll talk about, of course, first what I think is

2   going on, what's the diagnosis, what's the underlying

3   problem.  And then we'll talk about what I think our options

4   are:  If the cornerstone of treating persons with

5   musculoskeletal pain is physical therapy, to try to address any

6   musculoskeletal fractures that you can.  Injections can be

7   helpful either in the spine or in joints.  Chiropractic can be

8   helpful.  So you talk about those different options.  Of

9   course, medicines also play a role in that.  And you talk about

10   ups and downs and potential risks and benefits of each of those

11   and I'll make my recommendations.  Usually we're going to start

12   with the conservative things, therapy.  We may move on to

13   injections.  And then, you know, if the patient's not doing

14   well, of course, medications.

15   Q   Are there a number of types of pain treatments other than

16   narcotics or opioids for a pain management doctor to utilize?

17   A   Yes, ma'am, there are many other drugs that you can use --

18   anti-inflammatories, muscle relaxants, some of the medications

19   that we use for nerve pain, Neurontin, Lyrica.  There's a whole

20   host or category of medications that you use outside of just

21   opioids.

22   Q   So a first-time patient visitor -- first-time patient

23   visit -- would not necessarily leave with a prescription for an

24   opioid, would they?

25   A   No, not at all.

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1  Q   You talked about discussing a treatment plan with a
2  patient.  Do you also determine if they have any history of
3  drug abuse?
4  A   Yes, that's part of the history when you talk to
5  somebody.  And it's also part of what's asked in our standard
6  form that they fill out before they come in.  And I review that
7  with the patient while I'm sitting there.  (Nodding head
8  affirmatively.)
9  Q   When we say drug abuse, that could be both legal and
10  illegal drugs?
11  A   Well, it could be abuse of prescription drugs or it could
12  be abuse of street drugs, either.
13  Q   Do you also discuss sexual abuse?  Alcohol abuse?
14  A   Yes, certainly, again, these are all risk factors for
15  persons having difficulty with controlled substances.  If you
16  have a history of alcohol abuse, if you have a family history
17  of alcohol abuse, if you have a history of drug abuse, if
18  you're currently abusing drugs.  In women if there's a history
19  of sexual assault, that's a risk factor.  If you have bipolar
20  disorder, that's a significant risk factor as well.  So you go
21  through those things.  Again, it's part of the overall
22  assessment of the patient.
23  Q   Does that help you determine whether that patient would be
24  considered a high-risk patient or not?
25  A   Absolutely.  That's why you're asking these questions.

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1  Q   And at this first visit, where you're talking about the

2  plan, do you explain to the patient what you're going to be

3  doing?

4  A   Yes, I explain to the patient:  Here are my recommendations

5  and why I think that should be done.  And if the patient agrees

6  to that, then we'll move forward.

7  Q   During this initial visit do you also look for what is

8  called or referred to as red flags?

9  A   Sure.  Red flags are warning signs for patients that are at

10  higher risk for substance abuse.  If you look at other

11  providers' records, which we always try to get, if they've had

12  lost prescriptions, stolen prescriptions, psychiatric illness

13  as we talked about, running out early, getting medications from

14  multiple doctors -- we do a pharmacy check where we can see if

15  someone is getting medications from more than one doctor --

16  those are all very concerning if you find those and need to be

17  addressed.

18  Q   What do you mean by a pharmacy check?

19  A   We have the capability to go into the pharmacy system for

20  the state and it will then give us for the last two years all

21  of the controlled substances that have been prescribed for that

22  patient and the doctors that prescribed it.

23  Q   What is that called in Mississippi?

24  A   The pharmacy management program, PMP.

25  Q   Have you learned that that's referred the as the PDMP in

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1   the state of Alabama?

2   A   I think so, yes, ma'am.

3   Q   Do you document in the file that you've referred to that

4   check, that drug check?

5   A   I do.

6   Q   And what's the purpose of the PDMP review, or the

7   Mississippi drug review?

8   A   The purpose is to, again, assess if that patient may be

9   someone that's abusing their drugs and to see if someone is

10  being honest with you about their history.  If someone comes in

11  and tells me they've never taken controlled substances before

12  or just once and they've been taking it from six different

13  doctors for as long as you can see, then obviously someone's

14  not being honest with you.

15  Q   Is that sometimes called a doctor shopper?

16  A   It is, yes, ma'am.

17  Q   And is that a red flag?

18  A   It's a huge red flag.

19  Q   What about misrepresenting to you on the first visit the

20  extent of their prior medication?

21  A   It's, again, a huge red flag.  Part of the physician-

22  patient relationship is that you have to trust each other and

23  you have to be honest with each other.  It's very difficult to

24  treat a patient who has pain complaints who's not being honest,

25  because pain by definition is subjective.  I don't have a meter

1    to put on their head to tell me how much they're hurting or not

2    hurting.  And so if someone is being dishonest with you about

3    their history, that, of course, makes it much more difficult to

4    treat that person.

5    Q    If you do decide at this first visit that you would give a

6    low-dose opioid, what if anything do you tell the patient about

7    that prescription?

8    A    We talk about potential side-effects of the medication, we

9    talk about the common side-effects that can occur,

10   constipation, difficulty going to the bathroom, sometimes you

11   can get wheezing with the medication, sedation, nausea,

12   vomiting, kind of how to deal with those issues.  And we also

13   talk about the habit-forming potential of these medications and

14   that there is always a chance that this could become an

15   addiction.

16   Q    Do you warn the patient to take the drugs as prescribed, as

17   directed?

18   A    Always.  We talk about what they should do, this is how

19   much in a day they can take, and that they are not to go

20   outside the prescriptions that are written.

21   Q    Do you explain to them that they are not to seek

22   prescriptions from other doctors?

23   A    When we start someone on opioids, we will always get them

24   to sign an opioid contract.  It's an agreement.  And one of the

25   things that we ask is if you're getting controlled substance --

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

 1   that you are not to get controlled substances from other

 2   physicians.  So if you're getting opioids from us, you

 3   shouldn't be getting them from anybody else.

 4   Q   On the first visit do you typically do a urine drug screen?

 5   A   If I'm going to write an opioid, yes.

 6   Q   And why is that?

 7   A   Again, it's part of the risk stratification.  I know what

 8   the patient has told me, now we're going to see if that's

 9   accurate, are they being truthful about what they are taking or

10   not taking.

11   Q   You've used the words "risk versus benefit" several times.

12   Explain to us what that means.

13   A   Well, everything in medicine is a risk-benefit.  Every time

14   I order the injection or do an injection or write a pill or

15   will recommend surgery, it's always what are the potential

16   benefits that I'm going to offer this patient with this

17   treatment versus what are the potential risks?  What could go

18   wrong?  And you always want to do the things that have the most

19   benefit and least risk, because that's what's in the best

20   interest of the patient.  So every decision you make as a

21   physician, you're trying to decide in your head is what I'm

22   going to do worth it?  Is it worth the risk?  Because

23   everything has risk.

24   Q   And you're talking about the risk to the patient, of

25   course?

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1    A    Of course.

2    Q    I'm going to show you what's been previously introduced as

3    part of Government's Exhibit 20.  We'll play this for you and

4    then ask you to comment on whether this is within the usual

5    course of professional practice or not.

6    A    Yes, ma'am.

7         (The video recording was played.)

8              VOICE OF STACY:  Mr. Brennan has low-back pain that's

9    been pretty severe for about a year.  He's a heavy equipment

10   operator.  Here's his MRI.

11             VOICE OF DR. COUCH:  Okay.

12             VOICE OF STACY:  And we're going to do a facet joint

13   block.

14             VOICE OF DR. COUCH:  Okay.  Does it go down your legs

15   or just in your back?

16             VOICE OF MR. BRENNAN:  It goes down the left leg just

17   a little bit.

18             VOICE OF DR. COUCH:  Where?

19             VOICE OF MR. BRENNAN:  Right around here.  Not far.

20             VOICE OF DR. COUCH:  Right in here?

21             VOICE OF MR. BRENNAN:  Yeah, mostly right there.

22             VOICE OF DR. COUCH:  Okay.  We'll try that first and

23   see if that helps.  Okay?

24             VOICE OF MR. BRENNAN:  All right.

25             VOICE OF DR. COUCH:  Get you some medicine going.

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

```
 1              VOICE OF MR. BRENNAN:  Okay.

 2              VOICE OF DR. COUCH:  Any questions?

 3              VOICE OF MR. BRENNAN:  No, sir.  She's pretty much

 4     thorough.

 5              VOICE OF DR. COUCH:  She's thorough.

 6              VOICE OF MR. BRENNAN:  (Inaudible.)

 7              VOICE OF DR. COUCH:  Thank you.

 8              VOICE OF MR. BRENNAN:  All right.

 9         (The video recording stopped playing.)

10     BY MS. GRIFFIN:

11     Q   Dr. Vohra?

12              MR. DOSS:  May we approach on this topic?

13              THE COURT:  All right.

14         (At the side bar, jury not present.)

15              MR. DOSS:  Your Honor, asking Dr. Vohra to comment on

16     this particular visit would be undisclosed expert testimony.

17     We haven't received a report from him where he's analyzing this

18     particular visit.  I spoke just now with Ms. Griffin about it.

19     She indicated that supplemental disclosure that a 43-second

20     visit would not be within the standard of care.  To the extent

21     that that question's asked, it would be disclosed.  But we

22     would object to it.  But anything beyond that would be

23     undisclosed expert testimony from this particular witness.

24              MS. GRIFFIN:  And we are certainly aware of that and

25     that's why we are showing it to him, so we may ask it.
```

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

```
 1              THE COURT:  Okay
 2              MR. DOSS:  He's conducting --
 3              THE COURT:  Beyond --
 4              MR. DOSS:  -- to be clear, it's just the 43-second
 5    question, or is it the --
 6              THE COURT:  She needs to -- she hasn't asked her
 7    question yet.  So we shall see.
 8              MR. DOSS:  All right.  Thanks.
 9         (In open court, defendants and jury present.)
10    BY MS. GRIFFIN:
11    Q   Dr. Vohra, do you know Dr. Couch or Dr. Ruan?
12    A   I do not.
13    Q   And prior to your review of files in this matter, did you
14    know anything about PPSA?
15    A   I did not.
16    Q   So you wouldn't know what Dr. Couch looks like or Dr. Ruan
17    looks like?
18    A   No.
19    Q   If we told you hypothetically that the female in this
20    picture did not have a DEA license and that the male in this
21    picture was Dr. Couch, could you tell us whether, based on what
22    you've told us about an initial patient meeting, if we
23    hypothetically told you this was the first meeting, whether
24    this 43 seconds with Dr. Couch is outside the usual course of
25    professional practice?
```

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

```
 1            MR. DOSS:  Same objection, Your Honor.
 2            THE COURT:  All right.  Overruled.
 3   BY MS. GRIFFIN:
 4   Q   Would you like me to rephrase that?
 5   A   No.
 6   Q   It was a double question.
 7   A   Yes, this is outside the standard of care.  40-something
 8   seconds is not nearly enough to actually sit, take a history,
 9   examine that patient.  None of that was done.  And you can't
10   delegate prescriptive authority to someone else that doesn't
11   have a DEA license.  In other words, you can't have a nurse go
12   in, look and talk to that patient, tell you that they need X,
13   Y, Z drug if it's a controlled substance, and then you write
14   it.  You have to make that decision with your own evaluation,
15   not from somebody else's.
16   Q   Thank you.  You also referenced determining if a patient
17   has an addiction problem or an abuse problem?
18   A   Yes, ma'am.
19   Q   And you said that you take a urine sample at the first
20   visit if you're going to be writing narcotics or opioids?
21   A   I do.
22   Q   What's the difference in a narcotic and an opioid?
23   A   A narcotic is basically any medicine that can alter your
24   sensorium, can cause some change in your mental status.  So a
25   narcotic could be anything from morphine to Xanax, even
```

1    alcohol.  Anything that can change your mental status is a

2    narcotic.  An opioid is a medicine that's a descendant of the

3    poppy tree.  The opium comes from the poppy tree.  That's where

4    opioids initially came from.  So it's somehow a cousin of

5    morphine.

6    Q   So if we assume that you get the first urine test back and

7    you are considering what to do with that patient, what is the

8    utilization of the results of a confirmed urine test?

9    A   Well, you have to -- it has to fit with the history.  If

10   someone comes in, tells you they are on X and Y drug and you do

11   the urine drug test and it's confirmed and they are on X and Y

12   drug, then that's consistent with what you've been told.  If,

13   however, they have other medications in their system or if they

14   don't have medications in their system that they told you they

15   were taking, then that's, again, what we would call a red flag.

16   Q   A red flag as to what might be occurring?

17   A   This is either an abuse or diversion situation.

18   Q   What do we mean by diversion?

19   A   Diversion is when someone gets pain medications or other

20   controlled substances from physicians and then sells them.

21   They will take them and they sell them on the street.

22   Q   So depending on the results of that confirmed urine test,

23   you may go forward; is that correct?

24   A   Right.  So when the person comes back, if that urine drug

25   test is inconsistent, then we talk about that.  And unless

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1   there's some significant reason that they can explain why it's

2   inconsistent, then usually at that point if someone's not being

3   honest with you, I'm not going to write them for controlled

4   substances.

5   Q   So you could also tell, if a patient tells you they are on

6   a certain drug, whether their drug check with the state they

7   are from shows they've actually been prescribed that controlled

8   substance?

9   A   Exactly.

10  Q   And you can likewise tell, if they've been prescribed it

11  and they aren't on it, does that raise suspicion?

12  A   It does.  If someone is on morphine and you do the drug

13  check and they've gotten morphine filled and there's morphine

14  in their system, then all of that fits.  If someone is getting

15  morphine but there's none in their system, then that makes you

16  worry that either the person is overtaking their prescription

17  or is diverting the medication.

18  Q   Even during the treatment for a longer-term patient, do you

19  continue sporadically to do a urine test and seek a

20  confirmation?

21  A   Yes.  You have to.

22  Q   Why is that?

23  A   Because you have to ensure that the person that you're

24  caring for is being compliant with your medications.  Sometimes

25  addiction -- and that's what we talked about before --

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1    sometimes people can develop an addiction.  So if down the road

2    they develop a problem, you have to make sure that you're aware

3    of it so that you can then address that that person has now

4    developed some type of substance abuse issue.

5    Q    If you learn or feel early on that the patient is addicted

6    or has a drug-abuse problem, what do you do?

7    A    If I feel like someone is an addict, then at that point we

8    send them to an addictionologist or we will refer them to a

9    center for detoxification.

10   Q    Pain doctors don't do detoxification; is that correct?

11   A    No.  Not where I'm from, I don't think.

12   Q    If they continue to fail drug screens or test positive for

13   drugs they are not prescribed or aren't testing for what they

14   are prescribed, what do you do?

15   A    Well, at that point I will do a couple of things.  I'll

16   tell that patient that I'll continue to be their physician, but

17   I will no longer write any controlled substances.  I'll be glad

18   to manage them the best that I can, but at this point the

19   controlled substances obviously -- the risk of those outweighs

20   the benefits, because they are not taking them

21   appropriately.  And secondly, I will refer them to an

22   addictionologist and hope they will seek treatment.

23   Q    So you don't fire the patient, but you refuse to continue

24   writing; is that correct?

25   A    I'll -- I will stop.  I don't fire my patients, but I will

 1  refuse to write for any abusable substances.

 2  Q   What have you learned, by doing that, happens with that

 3  patient?

 4  A   Most of them never come back.

 5  Q   They don't come back to see you?

 6  A   No.  They move on somewhere else.

 7  Q   I show you what's previously been admitted as Government's

 8  Exhibit 9-5(8), subsection 8.

 9         MS. GRIFFIN:  If we could put this on the -- there it

10  is.

11         THE CLERK:  Yes, ma'am.

12  BY MS. GRIFFIN:

13  Q   You've previously had the opportunity to see this email

14  from Xiulu Ruan?

15  A   I have.

16  Q   Have you had the opportunity to previously read it?

17  A   I have.  I've read this.

18  Q   And it's dated January 25th of 2012; is that right?

19  A   It is.

20  Q   Does it talk about that:  In literature, physicians used

21  to say zero tolerance, but in reality we fire patients

22  infrequently?

23         Now, you've testified that you don't fire them, that

24  basically they fire themselves?  Is that right?

25  A   Yes.

1            MR. ARMSTRONG:  Judge, may we approach?  I'll object

2     to this line of questioning.  May we approach?

3            THE COURT:  All right.

4        (At the side bar, jury not present.)

5            MR. ARMSTRONG:  Judge, I have his -- what he has

6     proposed as his report.  And a review of this email, any

7     discussion of this email, is not part of his report at all,

8     isn't part of his expert commentary in court that would be

9     expected for us to have to respond to.  This is outside of what

10    they have disclosed to us as what he would be speaking about,

11    and we would object to this line of questioning about this

12    email.

13           MS. GRIFFIN:  Your Honor, they've been provided that

14    he's going to talk about what you do to treat a patient, a drug

15    patient, or a patient that's coming for pain management in

16    detail and explain the different types of things you do.  It

17    did not say that he's going to look at emails and comment on

18    them.  I'm going to ask him what he does differently than is in

19    that email and I think that he is entitled to testify that he

20    is a pain expert.  I don't think that requires an opinion.  It

21    just -- it's not an opinion from him.  It's asking him what he

22    does differently.

23           THE COURT:  I think that's legitimate.

24           MR. ARMSTRONG:  Well, Judge, his impression, what he

25    does in his disclosure is he just goes through the visits for

1    this patient and then he gives an impression.  The impression

2    said nothing about this line of questioning.

3             MS. GRIFFIN:  There are pages and pages of the types

4    of things he's going to talk about and it concludes with saying

5    then he's going to talk about the patient reports that he does

6    that were disclosed to you.

7             THE COURT:  I think it's legitimate for him to comment

8    on the practices that have been evidenced by the exhibits in

9    this case and what he might do differently that would meet the

10   general definition of what his methods are.  So I overrule the

11   objection.

12        (In open court, defendants and jury present.)

13   BY MS. GRIFFIN:

14   Q   Dr. Vohra, does it say that private practice is different,

15   that when a patient tests positive for street drugs it gives

16   you more reason to do more frequent urine drug screens?

17   A   It does say that.

18   Q   Does that say that that pays three times more than an

19   office visit?

20   A   It does.

21   Q   Does it indicate that there is an incentive for taking care

22   of risk individuals?

23   A   Yes, it does.

24   Q   In connection with a patient who tests positive, you've

25   described what you do; is that correct?

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1    A    Yes, ma'am.

2    Q    Are you prohibited from continuing to prescribe to them if

3    they continue testing positive?

4    A    For illegal substances?

5    Q    For illegal substances.

6    A    Yes, I'm prohibited.  Once you make a diagnosis of

7    addiction, then you're no longer allowed to write controlled

8    substances.  You have to get that person to an

9    addictionologist.

10   Q    And your manner of firing a patient is to stop writing?

11   A    You know, at the end that's my patient.  I'm going to help

12   them even if that is now an addiction issue.  It's my job to

13   try to get them the help that I can.  Unfortunately very often

14   the addicts don't take that advice and they will move on to

15   somebody else to try to get their medication somewhere else.

16   Q    Now, you indicated also that you start with a low dose and

17   then you may see where that goes in connection with an opiate;

18   is that correct?

19   A    Always, you always start low.

20   Q    Do you typically prescribe an opiate with a benzo?

21   A    No, we try to avoid that combination.  That combination of

22   medications is -- both of those medicines can cause you to

23   suppress your breathing.  Then, put together, the chances are

24   even more that your breathing will be suppressed.  And also

25   that's a combination that's addictive.  I think the two put

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1  together are more addictive than each apart.

2  Q   Than each -- I'm sorry?  I'm having a little trouble

3  hearing.

4  A   Each by themselves.  So whenever possible, which is the

5  vast majority of the time, we will not write benzos,

6  benzodiazepines.  And that's Xanax, Klonopin, those type of

7  drugs, with opioids.

8  Q   Further, can you tell us whether you actually advise the

9  patient of side-effects of the medications you prescribe or is

10  that done by one of your assistants?

11  A   No, I talk with my patients.

12  Q   Is that within the usual course of professional practice?

13  A   It is.

14  Q   Is there a difference, Dr. Vohra, between breakthrough pain

15  and breakthrough cancer pain?  Well, let's start first, what is

16  breakthrough pain?

17  A   Breakthrough pain means that if you have someone that is

18  on a long-acting drug -- so they are on OxyContin that lasts

19  for 12 hours or morphine that lasts for 12 hours -- if their

20  pain is basically controlled, however, sometimes during the day

21  their pain spikes, then that pain has broken through the

22  medication.  That's breakthrough pain.  And there are

23  different -- you know, breakthrough pain and noncancer pain

24  generally tends to be, by definition, benign.  You may have

25  some increase in muscle spasms or some increase in your nerve

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1  pain.  Cancer breakthrough pain tends to be much more -- much

2  worse.  Usually with that type of pain, if someone has a tumor

3  that's just broken through a bone, bones are being eaten by the

4  cancer, and the muscles are -- it tends to be much more intense

5  than in patients that have nonmalignant pain.

6  Q   That have nonmalignant pain?

7  A   That have nonmalignant pain, that don't have pain that is

8  being caused by cancer.

9  Q   Dr. Vohra, were you asked to review a number of medical

10  files from the PPSA clinic?

11  A   Yes, ma'am, I was.

12  Q   I'll show you the first three:  Daves, McDonald, and

13  J.......  Government's Exhibit 22-1 is Daves, D-A-V-E-S.

14  Government's Exhibit 22-4 is McDonald.  Government's Exhibit

15  22-8 is J...............  Have you previously had the

16  opportunity to review all of these patient files from PPSA?

17  A   I have.

18         MS. GRIFFIN:  Your Honor, we'd move to admit those

19  three files at this time.

20         MR. DOSS:  No objection.

21         THE COURT:  All right.  Mark them in.

22      (Government's Exhibits 22-1, 22-4, and 22-8 were entered

23  into evidence.)

24  BY MS. GRIFFIN:

25  Q   Dr. Vohra, let's start with 22-1, Kenneth Daves, D-A-V-E-S.

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1    A    Yes, ma'am.

2    Q    You said you had reviewed this file; correct?

3    A    I have.

4    Q    Could you tell us your initial impressions about the

5    beginning of taking on this patient?

6    A    The initial impression?

7    Q    Yes.

8    A    As well as the diagnosis that was made?

9    Q    Yes, sir.

10   A    The diagnosis -- he was given multiple diagnoses on this

11   first visit, which included headaches, lumbar degenerative disk

12   disease, muscle spasm, cervicalgia, which means neck pain,

13   cervical radiculitis, that means nerve irritation coming out of

14   your neck, where your get pain in your arm, opioid dependance,

15   pain in his hip, pain in his knee, difficulty -- or painful

16   respiration, low-back pain, lumbar radiculitis, which means

17   nerve root irritation, or the irritation of the nerves in your

18   back, and you usually feel that pain in your legs, as well as

19   the same thing in his mid back, thoracic spine.

20   Q    Did he have some indication of a mental illness when he

21   first presented as a patient?

22   A    He did.  In the history that this gentleman filled out, he

23   noted that he has blackout spells, dizziness, falls, anxiety,

24   depression, delusions, hallucinations, impulsive behavior, and

25   suicidal ideation.

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1   Q   What is suicidal?

2   A   Thinking about killing yourself, having thoughts of

3   suicide, but not a plan.

4   Q   What did you determine that information to indicate should

5   be done for this patient early on?

6   A   Well, the initial presentation itself was very worrisome.

7   Basically this gentleman, when he came and was initially seen,

8   complained of pain in his entire body, from his head down to

9   his feet.  There are very few things that will cause diffuse

10  body pain.  So that in and of itself, the presentation, is

11  concerning.

12          And then along with that this gentleman is having

13  clear psychiatric issues, if he's having delusions and

14  hallucinations.  And sometimes mental illness will -- it

15  changes your perception of pain.  People that are not thinking

16  right, it's difficult for them to process properly.  And so

17  you'll see -- that's a red flag to me when someone hurts in

18  their entire body.

19          So we have this gentleman that comes in with these

20  ongoing issues.  And I think the first thing that should have

21  been done at this point is the mental health issues had to be

22  addressed first.  He should have been referred to a

23  psychiatrist to have his mental health issues addressed before

24  any opioids or other controlled substances.

25          Now, certainly you can try to treat this gentleman

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

 1  with less risky things, like anti-inflammatories, things like

 2  that.  But until the mental health issues are addressed, then

 3  you should not write controlled substances.  It's too

 4  dangerous.

 5  Q   Would that be outside the usual course of professional

 6  care?

 7  A   Yes.

 8  Q   To write a script for someone who claims the types of

 9  mental issues you've described?

10  A   Absolutely.  And that's not just my opinion, but even the

11  guidelines which are out, that Alabama follows, says the same

12  thing.

13  Q   I show you his first history and physical, December the

14  2nd, 2013.

15          MS. GRIFFIN:  And, Your Honor, since this is in

16  evidence, may we publish it to the jury?

17          THE CLERK:  Yes.

18          MS. GRIFFIN:  It is?

19          THE COURT:  Yes.  But why don't we go ahead and take

20  our afternoon break before you get into these files?  Can you

21  hear me now?  Yeah, we're going to take our afternoon

22  break.  Leave your pads on your chairs.  Take your break

23  downstairs.  No discussion about the case.  We will call you

24  back up in about 15 minutes.  We are in recess.

25          (A recess was taken at approximately 3:05 p.m.)

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1        (In open court, 3:30 p.m., defendants and jury present.)

2             THE COURT:  All right, Ms. Griffin.

3   BY MS. GRIFFIN:

4   Q    Dr. Vohra, when we left I had just placed on the screen the

5   December 2nd history and physical for patient Daves, D-A-V-E-S.

6   Does that show the visit date and the doctor?

7   A    December 2nd of 2013, and Dr. Couch.

8   Q    Under the complaint section, these are some of the

9   complaints that you told us the patient had made?

10  A    Yes, ma'am.

11  Q    I'll show you the third page of that patient visit and ask

12  if this is where Mr. Daves was admitting blacking out?

13  (Indicating.)

14  A    Yes, ma'am.  This is where I looked at the symptoms that he

15  was describing, the blacking out, dizziness, falls, loss of

16  coordination, anxiety, depression, hallucinations, impulsive

17  behaviors, suicidal ideation.  That's where I gathered that

18  information.

19  Q    Are those very dangerous claims?

20  A    They are very much so.  Especially with someone who is

21  having suicidal ideation, also having hallucinations and

22  delusions, that's very serious.

23  Q    What was done for this patient at the first visit?

24  A    His -- he had a urine drug screen done and he was written

25  for opioids.  He came in.  I think he had been averaging --

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

```
1   looking at the PDMP, he had gotten prescriptions from another
2   physician and on average it looks like he was taking two or
3   three a day that was prescribed.  That equates to about 20 to
4   30 milligrams of morphine a day.  And what I mean by that is
5   the different opioids all have different potencies.  Just like
6   beer can be 10 proof and wine can be 20 proof, bourbon can
7   be 80 proof, Everclear can be 190 proof, they're all different
8   potencies.  So when we look at what amount, what strength of an
9   opioid or the opioids that we're taking, we will covert that
10  into one thing and that's morphine.  And so that gives us an
11  idea about the dosage of opioids we're giving someone with all
12  the different types of opioids that we use.  And generally
13  speaking, a dose of 50 milligrams a day of morphine is
14  considered to be a moderate to moderately high dose.  90 --
15  over 90 is considered to be a high dose of opioid, 90 and
16  above.
17  Q   Dr. Vohra, I'm having a little bit of trouble --
18  A   I'm sorry.
19  Q   -- hearing you.  Can you just pull that more to the side?
20  Thank you, thank you.
21  A   This way?  Better?
22  Q   You said over 90 is considered --
23  A   High dose.
24  Q   -- a high-dose opioid?
25  A   And so at this first visit he went from taking
```

1    approximately 25 to 30 milligrams' worth of morphine a day to

2    about 75 milligrams of morphine.  He was written for, I think,

3    a Duragesic patch.  And Duragesic is fentanyl, which is an

4    opioid that you put on and you take off every two or three

5    days.  And then also the hydrocodone, which is Norco, he was

6    given 10 milligrams, which is three times a day.

7    Q    In connection with this visit, did it appear that he was

8    prescribed four to five Lortabs a day?

9    A    He was not.  He was prescribed three a day.  And the other

10   thing of concern here is the drug screen.  It showed that he

11   had been taking hydrocodone that the other doctor had

12   prescribed him, but he also had a medicine called

13   dihydrocodeine, and that is a different opioid.  And that was

14   not something that I could find had been prescribed by anyone.

15   So that was a medicine that should not have been there.

16   Q    What is dihydrocodeine?

17   A    Dihydrocodeine, again, is an opioid.  It's a cousin of

18   codeine and it's a type of narcotic in the same class of

19   codeine or hydrocodone.

20   Q    Is it somewhat similar to a cough medicine?

21   A    In Europe they use it as a cough medicine.  The other thing

22   he had in his system was dextromethorphan.  Dextromethorphan is

23   a cough suppressant.  And that also can be concerning because

24   very often -- not very often -- but people that abuse drugs

25   will use or take cough syrup, dextromethorphan, along with

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1   their medications because they feel like it gives them a better

2   high.  So the presence of that as well is something that would

3   have gotten my attention.

4   Q   Is it fair to say that it enhances the high that someone

5   gets from these opioids?

6   A   It does.

7   Q   I'll show you the last page of that first visit.  Under the

8   orders do you see a number of tests were ordered for Mr. Daves?

9   A   Yes, ma'am.

10  Q   Did you determine that anything was ordered for his

11  psychiatric issues?

12  A   No, I didn't.  Going forward, I didn't see anything that

13  was ordered to address his ongoing psychiatric issues.

14  Q   I show you down at the bottom of the page -- and you are

15  familiar with electronic signatures, aren't you?

16  A   I am.

17  Q   You see that that was signed by Stacy Madison, listing her

18  herself as a CRNA?

19  A   Yes; that's correct.

20  Q   It was signed the next day by Dr. Couch as the reviewer?

21  A   Yes.

22  Q   Hypothetically, if Dr. Couch did not see this patient on

23  this first visit, is that outside the usual course of

24  professional practice?

25  A   Yes.  An opioid was written here.  Unless someone has a DEA

1    license and is authorized to write those medications, that's

2    outside standard of care.  You cannot give that responsibility

3    to someone else in your office.

4    Q    And if I told you that Stacy Madison did not have any

5    authority to write controlled substances, would those

6    controlled substances be outside the usual course of

7    professional practice?

8    A    Absolutely.

9    Q    The writing of those?

10   A    You can't do that.

11   Q    In connection with treating patients with psychiatric

12   issues, are there some special concerns?

13   A    Yes, ma'am.  You know, the primary concern that you have in

14   someone that has ongoing psychiatric issues, one, if someone

15   has severe psychiatric illness, then their ability to control

16   the use of their medications is significantly diminished.  So

17   certainly those people very commonly will not take their

18   medications as you write them simply because they are unable to

19   think and to remember properly.  Also there's a link between

20   psychiatric illness and addiction.  Very often patients that

21   have addiction also have ongoing psychiatric illness.  So that

22   also puts that person at a higher risk.

23   Q    So that would be outside the usual course of professional

24   practice to have gone ahead and prescribed opioids without some

25   further information about the psychiatric issues?

1   A   Yes, ma'am.  What should have been done, the first thing

2   that should have been done, was this person needed to have been

3   sent to a psychiatrist.

4   Q   Now, I show you what's included in the file which is the

5   drug test, the urine test, taken on December the 2nd of

6   '13.  It's the Castle Medical report of the testing for

7   Mr. Daves.

8   A   Yes, ma'am.

9   Q   It shows it being collected on the day of the visit you

10   just discussed, that 12/2/13 visit.  What does it show in

11   connection with Mr. Daves?

12   A   It shows that the hydrocodone is the Norco, the Lortab that

13   he was being prescribed.  The dihydrocodeine, that is a

14   different medication.  And sometimes you can see that as a

15   very, very, very minor breakdown product of hydrocodone.  But

16   here the concentration of that medication is much too high in

17   comparison to the other breakdown for it to be what we call a

18   metabolite, a breakdown of the primary medicine.  That tells me

19   that this is him taking another pill, a different pill.

20   Q   And while you're talking about that being high, is that the

21   382 number?

22   A   Yes, ma'am.  Compared to the hydromorphone, those two are

23   almost equal.  And that should not be the case, if those were

24   both breakdown products just from the hydrocodone.

25          The hydromorphone he has, that's the breakdown from

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1   the hydrocodone.  So you would expect that to be there if

2   someone's taking Norco or one of those medicines.

3          And then the dextromethorphan is what I mentioned

4   previously, which is the cough suppressant that people take.

5   Q   Now I want to direct your attention to an office visit

6   December the 16th, some 14 days later, of 2013.  And did you

7   review that he was seen with complaints of chronic back pain?

8   A   I did.

9   Q   Did he advise on that occasion how many Lortab he was

10   taking?

11   A   He was taking four or five a day, whereas three a day had

12   been prescribed.

13   Q   Is that a red flag?

14   A   It is.  The patient's not taking the medication as you

15   asked them to, especially these.

16   Q   Could you determine from the progress notes from December

17   the 16th as to Mr. Daves, again, that the provider was

18   Dr. Couch?

19   A   Yes; that's correct.

20   Q   And did you find anything in that record that he was -- why

21   he was taking more pain medicine than had been prescribed him?

22   A   I think he was not happy with his current pain medications.

23   Q   Did they continue to prescribe him medications and did they

24   increase the Duragesic at that time?

25   A   At that point his dose of opioids was tripled, he went from

1    about 75 milligrams a day to over 200 milligrams a day of

2    morphine equivalent.  He was placed on a higher dose of

3    Duragesic, the 50 microgram, which is a doubling, and then also

4    Roxicodone.  Roxicodone is oxycodone, the same medicine as

5    Percocet, and that's significantly more potent than hydrocodone

6    and Norco.  And he was put on 90 milligrams of that a day.

7    Q    And you said that was the morphine equivalent of over 200?

8    A    225.

9    Q    If 95 is high risk, what's 225?

10   A    Substantial.  That's -- you're getting up there.  Your

11   risk -- the higher your dosages go, the more chances you have

12   of side-effects, the more chances you have of respiratory

13   suppression and more chances you have of severe poor outcomes.

14   Q    I show you what's previously been admitted as Government's

15   Exhibit 9-6(2) and ask if you have previously seen this email

16   from Dr. Ruan dated August the 26th of 2012?  Have you

17   previously seen this email?

18   A    I have, yes.

19   Q    Down at the bottom of the email, which still appears to be

20   from Dr. Ruan, does that email discuss with long and short

21   total daily morphine dose of 160 to 180 milligrams makes more

22   sense and is this that dose of the milligrams of morphine that

23   you're talking about?

24   A    Exactly.  He's talking about what he thinks the dose --

25   equivalent dose of medication should be, it should be in that

1   160 to 180 milligrams.

2   Q   So that 160 even is a high dose?

3   A   Yes, anything above 90 to 100 is considered high dose.

4   Q   Did you continue to follow examining Mr. Daves' file

5   throughout each of his visits?

6   A   I did.

7   Q   Did you see any discussion about his psychiatric issues or

8   any treatment for his psychiatric issues?

9   A   No.  There was no intervention at all from that

10   perspective.

11   Q   And I want to direct your attention to December the 15th of

12   2014.

13   A   Yes, ma'am.

14   Q   Did it appear that the patient requested prescriptions

15   early?

16   A   He was.  He said he was going out of town.

17   Q   Can you tell us if that's associated with a risky behavior

18   or red flags?

19   A   You know, early refills can be a red flag, absolutely.  I

20   mean, it is a red flag.

21   Q   Why is that?

22   A   It usually means they are running out of their medication

23   early or taking too much.  So again, you want someone to take

24   the medication as prescribed and it should last the amount of

25   time that you've written that medication for.

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1  Q   In connection with Mr. Daves, let's talk about his March

2  11th, 2014 --

3  A   Yes, ma'am.

4  Q   -- visit where his drug screen had come back from the prior

5  month.  And I will pull that up for you.  I show you the Castle

6  Medical report collected on March the 11th of '14 and ask if

7  you can tell us about the patient's prescription?

8  A   The prescription at that time that he was taking, he had

9  been prescribed the oxycodone.  The Roxicodone is the brand

10  name.  So when you see the oxycodone and then right below that

11  the oxymorphone, that's a breakdown product of that.  That's

12  what he was being prescribed.  But then you also see that he

13  has hydrocodone in his system, and that hydromorphone which can

14  be a breakdown product of that.  But that had been stopped, so

15  that hydrocodone should not have been there.  So that would be

16  an inconsistent test, that this gentleman was taking

17  medications outside of what he had been prescribed.

18  Q   Did you determine any indication to inquire as to why he

19  was taking them or any notation about that?

20  A   Not -- no, I did not.

21  Q   Also during this same time, on or around February of '14,

22  had the patient, Mr. Daves, called about having fallen?

23  A   Yes, ma'am.  He had called and said that he had fallen,

24  that he was in extreme pain, but he had not gone to the

25  emergency room.

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1  Q   What if anything is connected with falling and opioids?

2  A   Opioids cause sedation, they cause decrease in balance and

3  increase your chances of falls.  The sedation especially causes

4  you to have a much higher risk of falling.

5  Q   Is that an indication that something is wrong with the

6  medication?

7  A   It can be, certainly.  And you talk to the patient and see

8  what's going on and are they having issues with the medication

9  that perhaps we need to change the medication if they are

10 having significant sedation or imbalance.

11 Q   And, Dr. Vohra, did you, further, determine what treatment

12 or what medications, what issues, there were in addition to the

13 not being prescribed the hydrocodone in the February visit and

14 then being seen in the March visit and nothing being done about

15 it?

16 A   I didn't see any intervention as far as the abnormal drug

17 screen.

18 Q   And then I show you one of the last progress notes, the May

19 7th, 2014, visit progress note.  Does it indicate that the

20 patient has run out of pain medication and having symptoms of

21 withdrawals?  (Indicating.)

22 A   It does.  Again, he ran out early and now starting to go

23 through withdrawal because of the high dose of medications that

24 he's taking.

25 Q   Would that be a red flag as well?

1  A   It is, yes.  It's one of the red flags we mentioned.

2  Q   And if hypothetically Dr. Couch did not see this patient on

3  that visit, would it be outside the usual course of

4  professional practice for him to have been written

5  prescriptions?

6  A   It would.  You cannot do that.  That's --

7  Q   I'm sorry?

8  A   It would be outside the scope of practice.  If he did not

9  see the patient but an opioid was written, that -- that's not

10 allowed.

11 Q   Controlled substance; is that right?

12 A   Yes, ma'am.

13 Q   I show you what's been introduced as Government's Exhibit

14 5-6, some prescriptions, and ask if you have previously been

15 shown these prescriptions for February of 2015?

16 A   I have, I've seen these.

17 Q   For January of 2015?  (Indicating.)

18 A   Yes.

19 Q   And for March of 2015?

20 A   Yes.

21 Q   Are they all for Roxicodone 30 milligram?

22 A   They are, they are all for Roxicodone 30 milligrams, 120.

23 Q   And 120 is what's called in your language triple digit

24 prescribing?

25 A   Triple digit, yes, more than 99 pills a month.

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1   Q   And these all appear to be signed by Dr. Couch; is that
2   correct?
3   A   Yes, that's the name on the prescription.
4   Q   Or there's a signature over his name; is that right?
5   A   Yes.
6   Q   From your review of this file, were these three
7   prescriptions outside the usual course of professional practice
8   for this patient, Mr. Daves?
9   A   In my opinion, they were.  He had -- just right before that
10  prescription he had another drug screen done and that drug
11  screen also showed that he had medications in his system that
12  were not being prescribed.  The Soma, which is a -- which was
13  being prescribed, wasn't there.  And he also had medication
14  which is a breakdown product of Soboxone, or it also can come
15  from another medicine called Butrans, which is an opioid that
16  we use in a patch?
17  Q   Did you figure his dosage of narcotics and what it came up
18  to by April of 2015?  Approximately how many milligrams of
19  morphine equivalent?
20  A   I think in April of 2014 -- I'm sorry -- May of 2014, I
21  looked at it and we were up to almost 600 milligrams a day,
22  585, based on what he was taking.  And that continued going
23  forward.
24  Q   Is that April of '14 increase, up to 600 milligrams of
25  morphine equivalent a day, a certain percentage increase in his

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

2296

1  narcotics?

2  A    From where he started to where he ended, to where he ended

3  up by mid-2014 it's, I think, over a 2,000-percent increase in

4  his medications.

5  Q    Is that outside the usual course of professional practice?

6  A    It is.  That is very, very aggressive in increasing the

7  dosage of opioids.

8  Q    Did you ever see where his mental health issues were

9  addressed?

10  A    They were not.

11  Q    If I told you that Dr. Couch did not see this patient on

12  several of these visits and these increases were written out by

13  Stacy, would that be outside the usual course of professional

14  practice?

15  A    Absolutely.  That's not allowed under any circumstance.

16  Q    You made a reference to the word "Soma."  What is Soma?

17  A    Soma is a medicine that's marketed as a muscle relaxant.

18  It's really not a muscle relaxant.  It's more a sedative and it

19  is one of the medications -- it's not an opioid, but it's a

20  medication that can be habit forming.

21  Q    Do you have knowledge as to whether or not it's a highly

22  prized drug on the streets?

23  A    It is, that along with two other medications.

24  Q    What are the other two?

25  A    Usually it's oxycodone or Roxicodone, and Soma and

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

 1    Xanax.  That combination of the three is highly sought after.

 2    Q   Now, what do you mean by popular on the streets?

 3    A   It's a very common combination that drug addicts take, that

 4    combination of three medications.

 5    Q   What is that combination typically called, if you know?

 6    A   Where I came from it was called the Texas Trilogy.  I think

 7    I have also called it the Holy Trinity, I've heard it called

 8    that.

 9    Q   And is that something a pain medicine prescriber/

10    specialist should know?

11    A   Of course.  That's common knowledge.  We all know that.

12    Q   What about that grouping of drugs, the Holy Trinity?

13    A   That if someone comes in and that's what they are pushing

14    you to get, that's a red flag, that combination is a red flag.

15    Q   Dr. Vohra, did you have occasion to then review the patient

16    file for Mr. McDonald?

17    A   Stephen --

18    Q   That is Stephen McDonald?

19    A   Stephen McDonald, yes, ma'am, I did.

20    Q   We have a McDonald and a McDowell; is that right?

21    A   That's correct.

22    Q   But we're going to talk about Stephen McDonald.  Initially

23    when he came in to PPSA, what were his symptoms, what did he

24    report complaining of?

25    A   He came in, he was complaining of pain in his back as well

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1  as his left shoulder and wrist and in his right hip, stating

2  that he had been in a car wreck.

3  Q   Now, did you determine in January of 2011 that he was being

4  seen by Dr. Ruan?

5  A   He was, per the medical records, yes.

6  Q   At that time he had been being seen by Dr. Ruan for a few

7  months?

8  A   He had, three or four months.

9  Q   Did he have a drug screen that was positive for certain

10  things on January the 11th, 2011?

11  A   He did.  He had a drug screen.  He had been prescribed

12  Percocet at that time and the drug screen was positive for not

13  Percocet, but hydrocodone, a different medication.  The

14  medication that he was prescribed wasn't there.

15  Q   And I show you what's been introduced as part of his file,

16  Government's Exhibit 22-4, and ask if this is the drug screen

17  instant results you are referring to?

18  A   It is.  The oxycodone that he was being prescribed, where

19  you see oxi, that should have been positive.  The OPI/MOR, that

20  means opiates and morphine, that should not have been

21  positive.  That means he's taking a different opioid than the

22  oxycodone and that also it's positive for amphetamine.

23  Q   That's the AMP?

24  A   That's the AMP, which is also concerning, given his

25  history.

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1  Q   Could that be methamphetamine as well?

2  A   Yes.

3  Q   What is the THC?

4  A   Marijuana.

5  Q   So he was negative for the marijuana, positive for the

6  methamphetamine -- or amphetamine -- and then this was an

7  inconsistent test; is that right?

8  A   It was.

9  Q   This appears to be an instant test, or a cup test?

10 A   Yes.

11 Q   Can you tell us about cup tests as opposed to confirmation

12 testing?

13 A   Cup tests are used in the office to give you an immediate

14 result.  And there are different ways that you can do those

15 tests in the office.  And when you look at a cup test, if there

16 are inconsistencies that are worrisome, either medication is

17 present that shouldn't be, medication is not there that should

18 be, then you always send out to a laboratory for confirmation

19 to do what's called gas chromatography.  And that's actually a

20 much more sophisticated test, that gives you exact results as

21 to the amount and exact type of medications that are in

22 somebody's system.

23 Q   Was the patient determined -- there was a confirmation

24 ordered on a cup test January the 11th, 2011?

25 A   It was.

1  Q   Was he prescribed medication on that visit as well?

2  A   He was.  He was started on morphine and then also was

3  prescribed Xanax again.

4  Q   In connection with Mr. McDonald, I failed to ask you

5  approximately how many years -- how old he was.

6  A   He was 21 when he started treatment.

7  Q   And he started treatment actually in 2010, so 2011 he might

8  be 22?

9  A   22.

10 Q   Okay.  Can you tell if a test was done and he was negative

11 in February of 2011?

12 A   Yes, he had a drug screen done which was negative, there

13 was nothing in it.

14 Q   Can you determine whether or not he was ever counseled or

15 that was discussed with him?  Does that show anywhere in the

16 records?

17 A   No, not that I saw.

18 Q   Now, this patient had given a history to them of

19 methamphetamines -- excuse me -- of amphetamines frequently?

20 A   Yes; that's correct.

21 Q   Of barbiturates frequently?

22 A   Yes.

23 Q   What are barbiturates?

24 A   Barbiturates are what are called sedative hypnotics, they

25 are a type of sedative medication.  They are also used in

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1  medications that are used for migraine headaches, like Esgic.
2  Butalbital is the barbiturate that's in there.  And again, it's
3  a habit-forming drug.
4  Q  With a patient that advises that they have frequently been
5  using these two drugs, what extra care would you have to take
6  as a pain specialist in treating this person?
7  A  Well, when the initial drug screening was done, this
8  gentleman stated that he was no longer using those medications.
9  But his test was positive for amphetamines.  So if I had a
10  young man that tells me he has a history of amphetamine abuse
11  and he -- but I'm not using it anymore -- and now I look and he
12  has amphetamines in his system, then certainly that's not
13  someone that I would start opioids on.  That's not somebody
14  that I would start on controlled substances, because my concern
15  at that point is that, you know, he has an ongoing addiction
16  and that would need to be further evaluated before you even
17  think about putting someone on opioids.
18  Q  Then did you notice in July the 7th of 2011 something about
19  a vacation package?
20  A  Yes, ma'am.  I've never seen that before.  Apparently it
21  was an early refill.  He was given medications early.  Like I
22  said, I've never seen that term, "vacation package," before.
23  Q  What is typically done if you have some verification that
24  an opioid user is going on vacation?
25  A  Well, if someone's actually going on vacation, let's say

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1  their followup appointment is during the time that they are

2  going to be gone, then usually you'll give them enough to get

3  back.  And then they will come back when they get back from

4  vacation to make their routine followup appointment.

5  Q   Would you give them an entire 30 days?

6  A   You know, usually we see these patients back in a fairly

7  consistent basis, and so you try to keep those consistent, the

8  followups.

9  Q   I show you that vacation package that I addressed with you

10  which was July 20th of '11 and ask if it even has "vacation

11  package" written on the duplicate copy?

12  A   It does.

13  Q   And does that appear to be signed under product selection

14  permitted?

15  A   Yes.

16  Q   Now, you indicated that this was a Dr. Ruan patient?

17  A   Yes; that's correct.

18  Q   Did Mr. McDonald then go on vacation again?

19  A   He did.  It looks like about three months later -- or two

20  months later, in January of 2012 -- he was given another

21  vacation package.  And actually that was sooner than that.

22  That was September of 2011.

23  Q   He had been given a vacation package before --

24  A   He was.

25  Q   -- the one we just saw; right?

1   A   Right.

2   Q   Again, is Dr. Ruan's name circled at the top?

3   A   It is.

4   Q   And does it appear that there is a signature but there's

5   not a name under the script?  Is that correct?

6   A   Looks like both sides are signed.

7   Q   Dispense as written and product selection permitted.  Now,

8   what's the difference in those?

9   A   When you say dispense as written, that means that if you're

10  writing for the brand name, the pharmacist can only fill the

11  brand name.  If product selection is written, then if you write

12  for Percocet, for example, then the pharmacist can give you a

13  generic version of that because they tend to be much cheaper.

14  Q   This is actually a Percocet prescription; is that right?

15  A   That's correct.

16  Q   And you don't have any way of knowing who wrote vacation

17  package on the script, do you?

18  A   I don't.

19  Q   This was in the medical file, though, as a duplicate copy;

20  is that right?

21  A   Yes.

22  Q   So it's not a prescription?

23  A   It's a duplicate, I believe.

24  Q   Duplicate of the prescription?  Did you determine that at

25  some point the patient was prescribed fentanyl?  Mr. McDonald?

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1    A    He was.  He was placed on fentanyl in April of 2012.

2    Q    What is fentanyl?

3    A    Fentanyl is a very potent pain medication.  It's something

4    that's several hundred times more powerful than morphine.

5    It's commonly used in anesthesia.  And also in pain management

6    it is used as a patch that you put on, that you take off every

7    two or three days, that -- cancer pain.  You can also use it

8    where you can use a lozenge to put in your mouth or spray under

9    your tongue.

10   Q    Do you commonly prescribe fentanyl?

11   A    I will prescribe it some.  It's not my drug of choice, yes,

12   ma'am.

13   Q    Why is that?

14   A    In older people fentanyl has been linked with significant

15   increase in falls, altered rotation.  And you also see that

16   with even younger folks.  Fentanyl is one of those medications

17   that people tend to have a lot of side-effects with, they tend

18   to get sleepy, forgetful, obtunded.  So it's one of the

19   medications I've just found that usually the side-effects

20   outweigh the benefits.

21   Q    Obtunded means pass out?

22   A    Obtunded means that they are confused (nodding head

23   affirmatively).

24   Q    Now, the jury has heard some information about Subsys and

25   Abstral here being fentanyl drugs.  Are you familiar with those

1   drugs?

2   A   I am.  Those are sprays.  Those are the sprays that you

3   spray in your mouth to get immediate dose of the medication.

4   Q   And by immediate dose, how does that differ from a patch or

5   a pill?

6   A   Well, with a patch you get a steady dose of medication

7   throughout the day.  So -- and it depends on the dosage.  A

8   25-microgram fentanyl patch, that means that it's giving you 25

9   micrograms an hour, that's how much it is absorbed.  Fentanyl,

10  when you take it and you put it on under your tongue or you

11  spray it, that medication is immediately absorbed (indicating).

12  So rather than having just a steady state, you get a huge spike

13  blood level in your system.  And fentanyl sprays are 400, 600,

14  800 micrograms.  So it's a fairly significant dose of

15  medication.

16  Q   Do you prescribe fentanyl or Subsys -- excuse me.  Do you

17  prescribe Subsys or Abstral?

18  A   No.  I've never prescribed those drugs.

19  Q   Why is that?

20  A   They are too risky to use in patients that have

21  nonmalignant pain.  The side-effect profile is much too great.

22  Q   Now, did there come a time after being placed on fentanyl

23  that Mr. McDonald claimed that his grandmother washed his

24  clothes with medication in them?

25  A   Yes, ma'am.  There were two issues within a few months.  In

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

 1   May of 2012 he had said that his grandmother washed his clothes
 2   and he had a drug screen at that time that didn't show any
 3   medications.  And similarly in October of 2011, his drug screen
 4   was negative, none of the medicines that he was prescribed were
 5   there.  He was told -- or he told them that his medications
 6   were stolen.  And those were both red flags -- losing
 7   medication, stolen medications.  Those are things that you
 8   commonly see in patients that have a substance abuse issue.
 9   Q   And in connection with his grandmother washing his clothes
10   with the medication in them, how do fentanyl patches come to a
11   patient?
12   A   They come in a box that's probably six inches long or
13   little bit longer and maybe an inch wide.  And within that you
14   have individual patches which are in almost a foil type water-
15   resistant, air-resistant package.  So you have to tear one open
16   and then put it on you.
17   Q   So they are sealed?
18   A   They are (nodding head affirmatively).
19   Q   Would it be difficult, based on what you know how they are
20   packaged, for them to be lost because they were washed in a
21   washing machine?
22   A   Well, it's just, again, that's it's a fair -- it's not a
23   small box, not a small pill.  But no matter what someone's
24   telling you at that point, you've already had someone that's
25   lost their medication and is having inconsistent drug screens

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1    and now lost these medications that were washed, and certainly

2    that gets your attention that someone is not doing what you

3    asked them to do.

4    Q    And then I want to direct your attention.  You said that

5    there was also a drug test sometime where the patient didn't

6    test positive for anything; is that right?

7    A    Twice.  In 2000 -- October of 2011 and then also -- and so

8    the October of 2011, that's when he said his medicines were

9    stolen.  And then in May of 2012 that's when he said his

10    medicines were washed.

11    Q    I show you what shows a urine drug screen, instant results,

12    May of 2011, Dr. Ruan for Mr. McDonald?

13    A    Yes.

14    Q    Does it show that everything is negative?

15    A    Yes.  There's nothing in his system at that time.

16    Q    Do you see some initials out to the side or what appears to

17    be initials on the screen?

18    A    Looks like X. R.

19    Q    Do you know what that is?

20    A    I believe those are Dr. Ruan's initials.

21    Q    That would be indicative of what, in your profession?

22    A    That he's reviewed the test.

23    Q    Did you see any discussion of this test with the patient?

24    A    Again, I think at that point he said:  Oh, my drugs were

25    stolen.  That was the explanation.

1  Q   And he continued to be prescribed drugs, or did he?

2  A   Yes.  The medications were continued, there was no change.

3  Q   I want to direct your attention to on or about October the

4  30th of 2012.

5  A   Yes, ma'am.

6  Q   What if anything does the patient advise about his fentanyl

7  on this occasion?

8  A   He says that it's not helping, but he'd like to continue

9  it, which is an odd statement.

10 Q   And what would be within the usual course of professional

11 practice with that statement?

12 A   I --

13 Q   What would you do?

14 A   Certainly I think I would talk about:  Why would you want

15 to continue a medication that you're telling me isn't helping

16 you?

17         That's a concerning statement.  And the first thing

18 that would come into my mind is:  Is there's some type of

19 diversion issue?

20 Q   Fentanyl was not present in his drug test for that day, was

21 it?

22 A   It was not.

23 Q   But norfentanyl was present.  What Is norfentanyl?

24 A   Norfentanyl is a breakdown product of fentanyl.  So that

25 tells me that he probably ran out of that medication early.

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1    There are still some metabolites, but the actual medicine's not

2    there.  So he's been out of the actual medication for several

3    days.

4    Q   Did you draw some impressions from the treatment of this

5    patient by Dr. Ruan?

6    A   I did.

7    Q   From reviewing that file?

8    A   I did.  I had some significant concerns.  You know, the

9    first thing that I mentioned was that this young man has a

10   history of abuse of amphetamines and he had amphetamines in his

11   system the first time he came, even though he said he wasn't

12   doing that anymore.  So that right there, you know, when you

13   see something like that, you stop.  You just don't write

14   pills.  You stop.  You talk to the person.  And then you have

15   them evaluated by somebody for their addiction before you even

16   think about writing medications for them.

17          And then, as things went along with this young man,

18   there are multiple red flags, as we just discussed:  the stolen

19   medications, lost medications, inconsistent drug screens,

20   medicines that should not have been there were there and vice

21   versa.  And so what you're seeing here is a pattern of misuse.

22   And anywhere along that line, from day one, all the things we

23   talked about -- medicines should have been stopped because

24   clearly they were not being used appropriately by this young

25   man.

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1  Q   If they are not being used appropriately, are they

2  warranted to be prescribed?

3  A   They are not.  Then, you know, if somebody's abusing the

4  medication, if they are an addict, then it's your obligation to

5  stop prescribing those medications.

6  Q   Also -- excuse me -- I show you February the 6th of 2012,

7  one of his reports of a visit for Mr. McDonald, and ask if

8  there is a notation that says:  Prefers Endocet brand?

9  A   Yes, ma'am.

10  Q   Would you tell us, first of all, what is Endocet?

11  A   Endocet is a brand for oxycodone.  And that's another red

12  flag.

13  Q   That's a brand name for oxycodone?

14  A   It is.

15  Q   Why is requesting of certain brand a red flag?

16  A   Because branded medications are worth more on the

17  street.  An addict, or someone who's buying a pill off the

18  street, an Endocet, or a brand name -- Percocet -- they know

19  what that pill looks like.  Whereas the nonbranded, the

20  generics, that may be the medication, that may not be the

21  medication.  But with the branded, you know what you're

22  getting.  So they are worth more on the street to get brand

23  name medications.

24  Q   By branded, do you mean a certain mark on the tablet?

25  A   The size, the shape, the color of the pill, as well as the

1  mark on the tablet are all unique to those medications.

2  Q   Is a nonbrand name or a generic allowed to use the same

3  mark, the same color, the same shape as a brand name drug?

4  A   No, no, because that's their proprietary brand.  So they

5  can't make their pill look like a branded one.  It looks

6  different and generally most of them are just white pills that

7  can be other colors, can be different sizes and shapes, because

8  you have many, many manufacturers that make the nonbranded

9  medications.  So they can look very different.

10 Q   So that would be a red flag for someone to ask for a

11 specific brand?

12 A   It is.

13 Q   Are brand name drugs typically more expensive than generic

14 drugs?

15 A   Much more expensive.  Essentially any brand name drug is

16 usually significantly more expensive than the generic brand.

17 Q   And you don't know what if anything was done about his

18 request for a brand name drug?

19 A   I think it was written.

20 Q   2/6/12 was the brand name Percocet written per his request?

21 A   It was, yes, ma'am, it was written per his request.

22 Q   What was your final conclusion about Dr. Ruan's care for

23 Mr. McDonald?

24 A   My impression was that the care of this patient was outside

25 standard of care for a physician.

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

2312

1  Q   Would that be outside the usual course of professional
2  practice?
3  A   It would, yes.
4  Q   And is it your opinion that the pattern of behavior is
5  consistent with nontherapeutic prescribing of controlled
6  substances?
7  A   It is.  You have a gentleman who, as I just stated, has a
8  history of addiction, possibly ongoing addiction, is not taking
9  his medications properly, is taking other medications.  And
10  when you see that, you just don't continue to write
11  medications.  You have to intervene as a physician.  You just
12  don't continue to write their narcotics.
13  Q   Is it questionable as to whether this patient should ever
14  have been started on controlled medications?
15  A   Yes.  In my opinion, he should not have until he was
16  evaluated by an addictionologist.  And someone that you think
17  has an ongoing addiction issue, the guidelines state that you
18  cannot write for controlled substances until that patient has
19  been seen by an addictionologist and is in a treatment program.
20  Q   And did you notice any change in his treatment because of
21  the consistent -- inconsistent drug test?
22  A   No, I did not.
23  Q   Now, are there two ways that a confirmed drug test can be
24  inconsistent?
25  A   Yes, there are two ways.  Either it can be inconsistent

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

2313

 1   because the medicine you're writing isn't there, or it can be

 2   inconsistent because there's a medicine there that you're not

 3   writing.

 4   Q    So either way is inconsistent; is that right?

 5   A    Either one is inconsistent.  That's inconsistent with

 6   someone taking the medications that you have given -- given

 7   them.

 8   Q    And are the confirmed drug tests typically more expensive

 9   than the cup test in the office?

10   A    Much more expensive.

11   Q    What would be the purpose of having it confirmed and

12   spending that extra money?

13   A    Well, if you -- on your dip test if you feel like there is

14   an inconsistency, there's always some margin of error with the

15   dip test.  They can be off.  They are not a hundred percent

16   reliable like the confirmations are.  So if you feel like there

17   is some inconsistency, you always send that off for

18   confirmation to make sure that that test is accurate.  The

19   other thing that the confirmation will give you is, for

20   example, when you just do the in-house test, the one in your

21   office, it will tell you that it's positive for opiates, but it

22   doesn't tell you if it means it's hydromorphone or morphine or

23   any other of those opiates.  The confirmation will actually

24   tell you which of those medications they are taking.  Again,

25   that helps you confirm that someone is being consistent with

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1   the prescriptions that you're writing.

2   Q   Once you receive a confirmed drug test back, what should

3   the doctor do with the confirmed drug test if you are a pain

4   specialist?

5   A   Well, if it's consistent, you don't do anything.  If it's

6   inconsistent, generally then I'll ask those patients to come in

7   and discuss the inconsistency with them and then move forward

8   from there.

9   Q   It certainly should be reviewed by the doctor himself?

10  A   Always, yes.

11  Q   Did you also review -- you told us you did -- the

12  SJ...... file in Government's Exhibit 22-8?

13  A   I did.

14  Q   And we're going to talk about her treatment beginning in

15  July of '13 with Dr. Couch.

16  A   Okay.

17  Q   What did you observe in the SJ............ file pertaining

18  to activities after July of '13?

19  A   When she was seen, she -- this is someone who came in and

20  was complaining of back and leg pain -- she was on multiple

21  medications at that time.  Very soon after that Dr. Couch

22  received a letter from this person's psychiatrist.  The letter

23  said -- gave her diagnosis from the psychiatric perspective,

24  said that she had a mood disorder, which means depression.  It

25  says that she has a sedative-hypnotic use disorder, which means

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1  that she's abusing benzodiazepines, Xanax, Klonopin, those

2  kinds of things.  She also has pseudoseizures, chronic pain.

3  And in that letter Dr. Andrew, who's a psychiatrist, also says:

4  Please know that she's being prescribed benzodiazepines --

5  Xanax, Klonopin, those type of medications -- from several

6  practitioners, which means she is getting --

7  Q   I show you a letter dated September 12th, 2013, from

8  AltaPointe Health Systems.  Is this the letter you're referring

9  to?

10 A   It is.

11 Q   And that is signed by a psychiatrist?

12 A   It is.

13 Q   Is this where you're talking about -- excuse me.  The date

14 of that is September of '13; right?

15 A   September 12, 2013.

16 Q   And the patient has been seen since July of '13, so about

17 two months earlier?

18 A   That's correct; yes.

19 Q   This letter says that she is consistently -- excuse me --

20 currently being prescribed several different benzodiazepines

21 from several different doctors?

22 A   That's correct; yes.

23 Q   That wasn't noted in the medical record when she was seen

24 initially in July of 2013, was it?

25 A   No.  I didn't see any mention of that.

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1   Q   Would that be consistent, in your opinion, with the PDMP or

2   the drug record not being checked?

3   A   Yes, I think if you would have seen the drug records from

4   the pharmacies, then you would have seen that she was getting

5   medications from multiple physicians.

6   Q   And in essence this appears to be a warning that she is

7   getting those; is that right?

8   A   That is a warning, yes.

9   Q   And you talk about the diagnosis sedative-hypnotics use

10   disorder.  What does that mean, opiates and benzodiazepines

11   listed?

12   A   It means this person has history of misusing or drug abuse

13   with those medications.

14   Q   Should this certainly be something that was considered in

15   connection with treating Ms. J......?

16   A   Yes, absolutely.

17   Q   I'll direct your attention to November the 1st --

18   A   Yes, ma'am.

19   Q   -- and ask if the patient came for a visit with Dr. Couch

20   on that date?

21   A   She did.

22   Q   And what does she indicate in connection with whether she's

23   doing well or not?

24   A   She's -- she says she is doing well.  She was -- I believe

25   at that point she had had a pump placed.

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1   Q   Well, it actually says:  The patient reports that he is

2   doing very well, but SJ.............. was a female; right?

3   A   Yes, it does.

4   Q   And was there a drug test that had been done the day

5   before?

6   A   There was.

7   Q   On Halloween, October the 31st?

8   A   It was, yes.

9   Q   Had there been a verification of this urine test that was

10   taken on October the 31st?

11   A   There was.

12   Q   And what did the results show?

13   A   Well, the results showed that she was being prescribed from

14   them at that point Restoril, which is in that sedative-

15   hypnotic.  And so that could be the temazepam and oxazepam,

16   although that's a very high dose of those medications just for

17   one Restoril.  And then morphine she was being prescribed.  And

18   then so you can see sometimes hydromorphone as a metabolite of

19   morphine.  So those -- but then she also had tricyclic

20   antidepressants in her system.

21         Tricyclic antidepressants are medications that

22   commonly have been used in the past for depression.  They are

23   no longer used for depression.  They are used for pain.

24   Q   Could you point out which of those you're talking about?

25   A   The desipramine and imipramine.

1    Q    That were not prescribed?

2    A    Not that I saw any prescriptions for.  And the concern is

3    someone is taking this medication -- there are two

4    concerns.  The first is sometimes this is another medication

5    the patients use along with their opiates because it helps

6    their high.  The other is that both of those medications can

7    cause confusion, can cause respiratory suppression, sedation.

8    So if someone is taking those medications and you don't know it

9    and then you're also giving them other drugs that can cause

10   those side-effects, those in combinations can be dangerous.

11   Q    Does it appear that anything was done about these

12   inconsistent drug tests?

13   A    No.  There wasn't.

14   Q    And I notice that the morphine is greater than 10,000

15   nanograms?

16   A    That's correct.

17   Q    Is that a significant morphine level?

18   A    Well, she was at that point on 180 milligrams of morphine a

19   day.  So that's a significant dose.

20   Q    And what is the pre-G-A-B-A -- pregabalin?

21   A    Pregabalin is Lyrica, which is a medication that's used

22   commonly for nerve pain, and she was being prescribed that.

23   Q    Would it be outside the usual course of professional

24   practice not to counsel her on this and not to record what was

25   done in the file?

2319

1  A    I would -- again, I would talk to that patient:  Why are

2  you taking these medications?  Who are you getting these

3  medications from?

4        Because it's important that you know what everybody's

5  taking -- what that patient's taking, no matter where they are

6  getting it, because drugs can interact.  And so for a patient's

7  safety, you have to know.

8  Q    If we told you hypothetically that Dr. Couch did not see

9  this patient after the first visit, would it be outside the

10 usual course of professional practice for her drugs to continue

11 to be prescribed and on occasion increased?

12 A    Yes to both.  You can't do that.  You cannot tell a nurse

13 or a nurse practitioner or anyone else that doesn't have a

14 license with the DEA that they can write for, or change, alter

15 medications.

16 Q    In addition to not having a license, do the nurse

17 practitioners or the nurses and the assistants not have the

18 training and the education that a medical doctor has?

19 A    They do not.

20 Q    Could you tell us your overall assessment of Ms. J......'

21 care --

22 A    My over --

23 Q    -- by Dr. Couch?

24 A    -- my overall impression was that Ms. J...... continued to

25 show issues with her medications.  She had another drug screen

1    done that showed normeperidine.  That's a metabolite of

2    Demerol, which is also another pain medication.  She had a drug

3    screen -- that drug screen also showed that she had Valium in

4    her system which was not being prescribed here.  And so what we

5    see here is that when you have a patient that comes in the door

6    and they are already getting benzodiazepines from multiple

7    physicians, they have a diagnosis of a substance use disorder,

8    then, as with the other patient that we discussed, that always

9    has to be initially addressed.  Because that's important for

10   the safety of the patient.  You don't just keep writing for

11   medications in someone that has a history of substance use

12   disorder and is getting controlled substances from multiple

13   physicians.

14   Q   Now, specifically, you said, of course, that nurse

15   practitioners and nurses and nurse assistants can't write

16   controlled substances; is that correct?

17   A   No, not unless they have a DEA license, they can't here,

18   no.

19   Q   If you are told that no one in that practice except the

20   medical doctors had the DEA license until one employee had a

21   DEA license in October of '14 for only IIIs through Vs, would

22   it be appropriate for any of the nonmedical doctors to

23   determine dosing up or down for a patient?

24   A   No, that's dangerous and it's not appropriate.

25   Q   What is dosing?

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1   A    Dosing is determining the amount of medication that you're

2   going to give a patient.

3   Q    Could a doctor give somebody that authority, just say:  I'm

4   going to be out of the office, so you can decide if you want to

5   go up or down 10 percent on Ms. Smith's medication?

6   A    No, you absolutely cannot do that.

7   Q    That's outside the usual course of professional practice?

8   A    Absolutely.

9   Q    So the doctor just telling a nurse or telling an assistant

10  that they may do that is not authorized?

11  A    That's not authorized.  You're not allowed to do that.

12  Q    I show you what's been marked as Government's Exhibit 22-7,

13  22-11, and 22-3, that being the files of Mr. P...... for 22-7,

14  the files of Mr. D...................., for 22-11, and the

15  files of Laurin Blouin for, B-L-O-U-I-N, for Government's

16  Exhibit 22-3?

17  A    Yes, ma'am.

18  Q    Have you previously reviewed all of these patient files

19  from PPSA?

20  A    I have.

21          MS. GRIFFIN:  Your Honor, we'd move to introduce all

22  three.

23          THE COURT:  Any objection?

24          MR. DOSS:  No objection.

25          THE COURT:  All right.  Mark them in.

```
 1        (Government's Exhibits 22-3, 22-7, and 22-11 were entered
 2   into evidence.)
 3   BY MS. GRIFFIN:
 4   Q   Did you have occasion to talk about -- let's talk about
 5   D...... first.
 6   A   I did.
 7   Q   22-11, you said you reviewed it?
 8   A   I did.
 9   Q   And if you would, tell us.  D...... was a patient of
10   Dr. Couch or Dr. Ruan?
11   A   Dr. Couch.
12   Q   Would you tell us about this patient?
13   A   Certainly.  When he started seeing Dr. Couch in 2009, he
14   was 51, and he came in.  He was complaining of pain in his neck
15   and his arms and his back and he had a history of previous
16   surgery on his neck, he had had a fusion done.  And he was
17   started on that first visit on Opana.  Opana is a medicine
18   called oxymorphone, which is a very potent opioid, as well as
19   Percocet.  And that first day he was put on -- it was about 165
20   milligrams of morphine equivalent.
21        And he then came back in November.  He had a drug
22   screen done.  The drug screen was problematic.  He had been
23   given Restoril, which was not in his system.
24        And then these issues just kind of continued to go
25   forward.  In January of 2010 he ran out of all of his
```

1    medications early.

2    Q    And excuse me for interrupting.

3    A    Yes, ma'am.

4    Q    What is Restoril?

5    A    Restoril is -- it's a benzodiazepine.  It's in the same

6    class of medication as Xanax and Klonopin and those drugs.

7    Q    And I want to direct your attention to November of 2010,

8    just before the charges in this indictment.  Was there a urine

9    drug confirmation done on that date of this patient?

10   A    November of 2010?

11   Q    November of 2010.

12   A    No.  It said that the urine had been spilled.

13   Q    So there was no confirmation?

14   A    There was no confirmation.

15   Q    I want to direct your attention to January of 2011 --

16   A    Yes, ma'am.

17   Q    -- and ask if the patient's medications were changed.

18   A    He came in.  He was out a week early.  His medications were

19   written.  There was no change.

20   Q    I'd like to direct your attention, then, to April the 13th

21   of 2011.

22   A    Yes, ma'am.

23   Q    About his drug screen.

24   A    Yes, ma'am.

25   Q    Could you tell us about that?

2324

1  A  He had a drug screen.  Again, the Restoril, the

2  benzodiazepine -- I'm sorry.  At that time he had been changed

3  to Klonopin, which is another benzodiazepine.  That was again

4  not present in his system.  And so those medications were

5  continued and then also Soma was added to the medications that

6  he was taking.

7  Q  Had he been out of medications or did he claim that he had

8  been out of some of his medications?

9  A  He said that he had been out of his medications for a week.

10  Q  Were his same medications rewritten?

11  A  They were.

12  Q  I want to direct your attention to September of 2011.

13  A  Yes, ma'am.

14  Q  Was there a drug screen on or about that date?

15  A  There was.

16  Q  And what can you tell us about it?

17  A  The drug screen, again, was worrisome.  He didn't have any

18  Klonopin in his system that was being written.  He didn't have

19  any oxymorphone, which is the Opana, in his system which was

20  being written.  He didn't have any Soma in his system which was

21  being written.  He did have hydrocodone and then hydrocodone

22  breakdown.  But those were two medicines that were there and

23  the two medicines that were not being written.

24  Q  Now, this is Mr. D......; is that right?

25  A  It is.

1  Q   And he's a Couch patient?

2  A   He is.

3  Q   I'll show you the drug test results that you've referred to

4  for January the 21st of 2011.

5  A   January --

6  Q   I'll show you the first page, that shows the date of

7  collection of the specimen, and ask if that shows it was

8  collected on January the 21st of 2011?

9  A   September 21st.

10 Q   I'm sorry.  September 21st for Mr. D......?

11 A   Yes, that was collected on September 21st.

12 Q   For Dr. Couch?

13 A   For Dr. Couch, yes.

14 Q   Does it list inconsistent results?

15 A   It does.

16 Q   What does it show was negative?

17 A   The Klonopin, the Opana, and the Soma.

18 Q   What if anything was done at this time to Mr. D......?

19 A   His medications were continued.

20 Q   You saw no indication that anything was done to him?

21 A   As far as intervention, no.

22 Q   And as to Mr. D......, I want to direct your attention to

23 February the 5th of 2013.

24 A   Yes, ma'am.

25 Q   Prior to that date had there been a drug change?  Had his

1    medications been changed to MS Contin a hundred milligrams?

2    A    Yes, three times a day he was taking the long-acting

3    morphine, 100 millimgrams, and then he was taking the short-

4    acting morphine, 30 milligrams, three times a day as well as

5    Xanax and the BuSpar, which is an anxiety medication.

6    Q    And based on that, did he report the next day -- excuse

7    me -- the next visit, February the 5th of '13, that he was

8    unhappy with his medication?

9    A    He was -- yes, he was unhappy with the regimen of

10   medications that he was on.

11   Q    So he was taking several medications, and I believe you

12   determined that there was a morphine equivalent for the

13   medications he was on as of February the 5th, 2013?

14   A    February 5th, 2013 --

15   Q    Or was it later that you determined --

16   A    -- a little bit earlier, but here I think --

17   Q    My mistake.  Was it July of '13 you had determined his

18   morphine equivalent, the ME?

19   A    He was on about 450 milligrams of morphine equivalent at

20   that point.

21   Q    By the summer of '13?

22   A    By the summer of '13, yes.

23   Q    And if 95 is high risk, what is 450?

24   A    It's a very high dose, it's very high risk.

25   Q    Is it outside the usual course of professional practice?

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1    A   Well, I think in this case it is because it's not just a

2    matter of the numbers, but it's also a matter of what's

3    happening with the patient.  And here we see this gentleman,

4    again, has inconsistent drug screens.  His drug screens show

5    marijuana, they show medications that he's not being

6    prescribed, they show absence of medications that he is being

7    prescribed.  So whether someone's on 15 milligrams of morphine

8    or 500 milligrams of morphine, this is not someone that you

9    should be continuing on these medications.  And certainly it's

10   more dangerous, if someone's abusing drugs, the higher the dose

11   of medications that you're giving them.

12   Q   Did you also determine that later in his treatment his drug

13   screens were positive for methadone?

14   A   It was.  Methadone is another opiate, another pain

15   medication.  And again, that was one of the drugs that was

16   present on the drug screen that was not written for.

17   Q   Did you determine that his treatment was thus outside the

18   usual course of professional practice?

19   A   It was.  Given the overall clinical picture, as presented

20   in these records, the continuation of these medications is not

21   warranted.

22   Q   Dr. Vohra, did you determine that this was nontherapeutic

23   prescribing?

24   A   In my opinion, this was nontherapeutic prescribing.

25   Q   What does therapeutic and then nontherapeutic prescribing

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1    mean?

2    A    Therapeutic prescribing means that you're treating someone

3    for an appropriate purpose.  Nontherapeutic prescribing means

4    that you're giving someone medications and either you're giving

5    them for a reason that they don't need or you're giving them

6    outside the standard of care.  And in this case this gentleman,

7    I think, clearly had an ongoing issue with medications.  And

8    it's your job as a physician to always do what's right for the

9    patient.  And if you continue to write medications for someone

10   that's an addict, all you are doing is feeding the addiction.

11   And that's not what's in the best interest of the patient.

12   Q    Now, did you also, as you've told us, examine

13   DP's..... file and determine that he too was a Couch patient?

14   A    He was.

15   Q    And could you give us a general overview of your conclusion

16   about Mr. P's.... file?

17   A    My general overview, here we have almost the exact

18   opposite.  This gentleman had a history of back pain.  He had a

19   pump in.  A pump is a device that's implanted usually in your

20   back and there's a small thin tube that goes into your spine

21   that delivers medication directly into the fluid.  And that's

22   one way to deliver medications to a patient.

23   Q    And let's talk about his visit on January the 21st of 2011.

24   Was that a pump refill for Mr. P......?

25   A    It was.  And in addition to the medication that he was

1    given through the pump, he was also prescribed pills.  So he

2    was also taking these pills by mouth.  And when he came that

3    day, he stated that his medications had been stolen.  And then

4    going forward, his oral medications were continued as well as

5    his pump.

6    Q   I'll show you what's come from his file, his file being

7    Government's Exhibit 22-7, and ask if this is the September

8    21st, 2011, test results you're talking about where he says his

9    medicines were stolen?  (Indicating.)

10   A   January 21st.

11   Q   I'm sorry.  It's late in the day.  January 21st,

12   2011.  Does it show that his medications -- he indicates they

13   got stolen?

14   A   Right; he had been out for two weeks.

15   Q   Why would you give oral medications with a pump?

16   A   You know, the hope of putting pumps in patients was that

17   you could get patients off of their oral medications.  That

18   never really panned out.  Patients almost always ended up

19   wanting or staying on oral medications in addition to their

20   pump.  So basically you've got someone on a pump and they are

21   telling you that their pain's not adequate, so you also give

22   them pills on top of that.

23   Q   And I want to direct your attention to July the 21st of

24   2011 for this patient.

25   A   Yes, ma'am.

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1    Q    Was he complaining of anything?

2    A    He was complaining of side-effects of double vision,

3    difficulty breathing, because of the medication.

4    Q    I'll show you what's the paperwork for that date's visit,

5    July the 21st, 2011.

6    A    Yes, ma'am.

7    Q    And is that where you saw that the note said he was having

8    reactions to going up on the pump in the last refill?

9    A    That's correct.

10   Q    Is anything troubling about the double vision and the

11   trouble breathing?

12   A    More the trouble breathing.  You know, that's the most

13   dangerous side-effect of these medications, is that you can

14   suppress your ability to breathe and stop breathing, and that

15   can be fatal.

16   Q    Was his dosage changed or was it continued the same?

17   A    I think his oral dosage was the same, yes.

18   Q    So that was Roxicodone 30 milligrams, 90 in number?

19   A    That's correct.

20   Q    And was he told not to fill that until sometime in

21   September?

22   A    Yes.

23   Q    Then I direct your attention to February the 11th of '13.

24   A    Yes, ma'am.

25   Q    And ask you if the patient advised that he had been

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1  hospitalized for respiratory failure?

2  A   He had.  He had been hospitalized for respiratory failure.

3  He was -- he had a tracheostomy put in, which is a tube that's

4  put into your throat to help you breathe.  When he came in that

5  day, he was taking about 200 milligrams, a little bit less than

6  that, of morphine a day.  He also stated that his medications

7  had been stolen and he was upset that those were not refilled.

8  Q   And I show you the chart for that day, February the 11th of

9  '13, that indicates where he advised that he had been

10  hospitalized?

11 A   Yes, ma'am.

12 Q   What did you conclude about the overall treatment for

13 Mr. P...... by Dr. Couch?

14 A   My concern was that in the time that he was seen, I think

15 in the very beginning he may have had a drug test done, but

16 then over the next several years he was never tested.  So we

17 don't know if he was taking his medicines appropriately, we

18 don't know if he was taking other medications.  And any time

19 you have someone on pills, you're taking oral medications, even

20 with a pump, you have to know if someone is taking other

21 medications outside of what you're giving them.  And I felt

22 that was outside the standard of care.  You always have to know

23 what a patient's taking.

24 Q   And, Dr. Vohra, you said you also examined the file for

25 Mrs. Blouin?

2332

1  A   I did.

2  Q   Government's Exhibit 22-3.  And if you will, start talking

3  to us about her treatment beginning in March of '13.  And who

4  is her physician?

5  A   Dr. Couch is her doctor.  And she was being seen with

6  complaints of back pain.  She had had a previous surgery in her

7  back.  I'm sorry.  When did you want me to start?  What day?

8  Q   March of '13.

9  A   March of 13.

10        At that date she comes in, she's on oxycodone, the

11  long-acting oxycodone, which is OxyContin, and also Percocet,

12  which is the short acting.  And she had a drug screen done and

13  then the confirmation was sent.  And the concern there was that

14  she did have the oxycodone in her system, but she also had at

15  least two different benzodiazepines in her system, Valium and

16  Valium breakdown products, and Xanax.  And certainly that is a

17  concern, that someone is getting or taking those medications.

18  Q   I'll show you the report for that March 13 of 2013.

19  A   Yes, ma'am.

20  Q   And ask if this is the report you were telling us about?

21  A   That's the report, yes.

22  Q   Was her oxy --

23  A   I'm sorry.  Yes; that's correct.  I'm sorry.

24  Q   Was the OxyContin added?  Increased?

25  A   Yes, her medications were increased on that from twice --

1   the 40 milligrams twice a day to three times a day.

2   Q   And was there a drug test for her for the urine that was

3   taken that day?

4   A   There was.

5   Q   And did that come back inconsistent after being tested

6   in-house with a cup test?

7   A   It did.  And then the confirmation was sent.

8   Q   Did the confirmation show that her urine drug screen was

9   inconsistent?

10  A   It did.  Again, she had two different benzodiazepines in

11  her system which weren't for her prescribed.

12  Q   Did you see any counseling or anything done about the

13  inconsistent drug testing?

14  A   I did not.

15  Q   I want to direct your attention then to June the 2nd of

16  '14.

17  A   Yes, ma'am.

18  Q   And ask what was occurring on that occasion?

19  A   She came in for a followup appointment.  At that time she

20  was taking the Roxicodone 30 milligrams three times a day, she

21  was also on morphine 60 milligrams three times a day.  The cup

22  test that was done was negative for everything, so they sent it

23  off for confirmation.  And the cup test came back positive for

24  both Xanax and marijuana.

25  Q   So that was an example of where the confirmation was

1  different from the in-house cup test?

2  A   Exactly, yes.

3  Q   And was that indicative of abuse or was she compliant in

4  connection with that test?

5  A   No, that would be an inconsistent study, because she had

6  marijuana in her system and then as well as the Xanax.

7  Q   I'll show you what's marked as the progress note for June

8  the 2nd, 2014, and ask if this is the treatment you were

9  telling us about.

10  A   Yes, it is.

11  Q   At the end of that progress note it indicates that she has

12  been seen by Thomas J. Palmer; is that right?

13  A   Yes, that's who signed it.

14  Q   If I told you that that was Justin Palmer and as of that

15  date he could not write controlled substances and he could

16  never write scheduled IIs, and if we asked you to --

17  hypothetically tell you that Dr. Couch did not see the patient

18  that day, would you say any prescriptions written on that date

19  were outside the usual course of professional practice,

20  provided they were controlled substances?

21  A   Of course, for the same reasons that we've talked about

22  before.  That's just simply something that's not allowed.

23  Q   And in fact she did receive controlled substances; is that

24  correct?

25  A   She did.

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1    Q    And I want to also show you June the 2nd of '14.  Did

2    something happen about her test results on that day as well?

3    That's the one I just discussed with you.  My mistake.

4              I want to direct your attention to November of '14.

5    A    Yes, ma'am.

6    Q    November the 19th, could you tell us about the patient

7    being seen that date?

8    A    She came in again for a followup; continued to have

9    complaints of back pain and had a drug test.  The drug test

10   again showed that she had marijuana in her system.  It also

11   showed that she had benzodiazepines in her system.  And neither

12   of those were prescribed.  Obviously marijuana wasn't and the

13   Xanax wasn't.

14   Q    Did she continue to receive prescriptions?

15   A    She did.

16   Q    I'll show you what's marked as a progress note for that

17   November 19, 2014.  And what does she advise about her

18   medication?

19   A    She was concerned that the pharmacists were switching out

20   her medication for counterfeit medication.  And Dr. Couch felt

21   that that was highly unlikely, given the fact that her urine

22   drug screens showed that those medications were in her system.

23   Q    Do you see that as drug-seeking behavior?

24   A    It's an odd statement.  I'm not sure I've ever heard that

25   before.  I assume she was thinking the medications weren't

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1  working.

2  Q   Now I show you --

3          THE COURT:  Ms. Griffin?  Is now a good time for us to

4  break?  It's the end of the day basically.

5          MS. GRIFFIN:  Yes, Your Honor, it is.

6          THE COURT:  Ladies and gentlemen, put your pads on

7  your chairs.  We will be in recess until 9 o'clock tomorrow

8  morning.  No discussion about the case.  And be back downstairs

9  in the jury assembly room, ready to be called back up, at

10  9 a.m.  We're in recess.

11      (In open court, defendants present, jury not present.)

12          MS. GRIFFIN:  Your Honor, may the witness be excused

13  until in the morning?

14          THE COURT:  Yes.  Do the lawyers need anything from

15  me?

16          MR. SHARMAN:  No, ma'am.

17          MR. BODNAR:  Not from the United States, Your Honor.

18          THE COURT:  All right.  See you tomorrow.

19      (Court adjourned at approximately 5 p.m.)

20

21

22

23

24

25