UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ALABAMA

UNITED STATES OF AMERICA

CASE NO. CR15-00088

v.

COURTROOM 2B

JOHN PATRICK Couch, M.D.,
and XIULU RUAN, M.D.,

MOBILE, ALABAMA

Defendants.

TUESDAY, JANUARY 24, 2017

* * * * * * * * * * * * * * *

REDACTED

DAY 11 OF TRIAL
BEFORE THE HONORABLE CALLIE V. S. GRANADE,
UNITED STATES DISTRICT JUDGE, AND JURY

APPEARANCES:

FOR THE GOVERNMENT:
    DEBORAH A. GRIFFIN
    CHRISTOPHER BODNAR
    United States Attorney's Office
    63 S. Royal Street, Suite 600
    Mobile, AL  36602
    (251) 441-5845

FOR THE DEFENDANT Couch:
    ARTHUR T. POWELL, III
    P.O. Box 40456
    Mobile, AL 36640-0456
    (251) 433-8310

    JACKSON R. SHARMAN, III
    JEFFREY PAUL DOSS
    BENJAMIN SANDERS WILLSON
    Lightfoot, Franklin & White
    400 North 20th Street
    Birmingham, AL  35203
    (205) 581-0700

1    (Continued)

2        BRANDON KEITH ESSIG
         800 Shades Creek Parkway, Suite 600D
3        Birmingham, AL  35209
         (251) 879-1981

4
    FOR THE DEFENDANT RUAN:
5        DENNIS J. KNIZLEY
         7 N. Lawrence
6        Mobile, AL 36602
         (251) 432-3799

7
         JASON BRADLEY DARLEY
8        Darley & McGough, LLC
         1751 Dauphin Street
9        Mobile, AL 36604
         (251) 441-7772

10
         GORDON G. ARMSTRONG, III
11       P.O. Box 1464
         Mobile, AL  36633
12       (251) 434-6428

13       STEVEN D. MARTINIE
         4955 North Lake Drive
14       Whitefish Bay, WI  53217
         (414) 332-9683

15
    THE CLERK:  MARY ANN BOYLES
16  THE LAW CLERK:  LYNN DEKLE
    COURT REPORTER:  ROY ISBELL, CCR, RDR, CRR
17
             Proceedings recorded by OFFICIAL COURT REPORTER
18         Qualified pursuant to 28 U.S.C. 753(a) & Guide to
      Judiciary Policies and Procedures Vol. VI, Chapter III, D.2.
19          Transcript produced by computerized stenotype.

20

21

22

23

24

25

```
1                        EXAMINATION INDEX

2

   RAHUL VOHRA, MD
3       DIRECT CONTINUED BY MS. GRIFFIN . . . . . . . . . .  2340
        CROSS BY MR. DOSS . . . . . . . . . . . . . . . . .  2373
4       CROSS BY MR. ARMSTRONG . . . . . . . . . . . . . . . 2487
        REDIRECT BY MS. GRIFFIN . . . . . . . . . . . . . .  2532
5

   KAITLYN KNOWLES
6       DIRECT BY MS. GRIFFIN . . . . . . . . . . . . . . .  2543
        CROSS BY MR. SHARMAN . . . . . . . . . . . . . . .   2566
7

8

9

10                        EXHIBIT INDEX

                                                       MAR    ADM
11  GOVERNMENT'S
        22-04A    Patient File:  S. McDonald (same as GX    2346
12                22-04, except single-sided pages)

13      22-06     Patient File:  JH..... (Ruan)             2347

14      22-09     Patient File:  GM........ (Ruan)          2347

15      22-10     Open Record - General Payments from Top    2359
                  Companies Making General Payments to Dr.
16                Vohra - 2014 & 2015

17      32-7(1)   Renaissance Hotels receipt - John Kapoor  2543
                  2/13/14
18
        32-7(2)   Renaissance Hotels receipt - Michael      2543
19                Babich 2/13/14

20      38-10(1)  Renaissance Hotels receipt - Mark         2543
                  Schwartz 12/4/14
21
        38-10(2)  Renaissance Hotels receipt - Mark         2543
22                Schwartz 2/26/15

23
   DEFENDANT COUCH'S
24      119       Model Policy - Federation of State        2455
                  Medical Boards, July 2013
25
```

1        (Morning session, 9 a.m., in open court, defendants and

2    jury present.)

3            THE COURT:  Good morning, ladies and gentlemen.

4            All right.  Ms. Griffin, you may continue.

5                        RAHUL VOHRA, MD,

6        previously sworn, testified further, as follows:

7                    DIRECT EXAMINATION CONTINUED

8    BY MS. GRIFFIN:

9    Q    Good morning, Dr. Vohra.

10   A    Good morning.

11   Q    When we finished yesterday we were talking about the

12   November 19th, 2014, progress note for Dr. Couch's patient

13   Lauren Blouin, B-L-O-U-I-N, that is in connection with

14   Government's Exhibit 22-3, which is a patient file.  I failed

15   to ask you was she born in January of 1985?

16   A    Yes, ma'am, that was the date of birth.

17   Q    In connection with the November 19, 2014, visit, is that a

18   followup visit?  Is that right?

19   A    It is.

20   Q    She's previously been prescribed morphine and oxycodone?

21   A    Yes, she was on Roxicodone and MS Contin, which is a long-

22   acting morphine.

23   Q    MS Contin is morphine; is that right?

24   A    It is.  It's a long-acting morphine.

25   Q    On this test -- excuse me -- on this visit was she given a

1    urine drug test?

2    A    It was -- she was.  Yes.  It was done.

3    Q    Was it an inconsistent drug test?

4    A    It was.  She had benzodiazepines in her system, which it

5    doesn't say which benzo, but Xanax or Klonopin, one of those

6    drugs.  And those were not being prescribed.  And then she for

7    a second time had marijuana in her system.

8    Q    Could you tell from that report, from this November 19th,

9    2014, visit, if anything was done about the inconsistent urine

10   test?

11   A    I think she denied that she was smoking marijuana, and then

12   Dr. Couch noted that she had never tested for marijuana

13   before -- or had not tested positive for marijuana before.  But

14   in actuality, she had previously tested for marijuana.

15   Q    In June of '14; is that right?

16   A    That's correct.

17   Q    I show you the last page of this November of 2014 progress

18   note and ask when it was signed by Dr. Couch.

19   A    March 31st, 2015.

20   Q    But the visit was November of '14; is that right?

21   A    That's correct.

22   Q    I want to direct your attention, then, to January of '15

23   about the patient and ask you what occurred during that visit.

24   A    She came in and really nothing had changed.  The

25   medications were continued.

1  Q   Then if you can tell us what occurred March the 9th of '15?

2  A   She again came in for followup, was continuing to complain

3  of back pain, and her medications were again continued,

4  including the morphine.

5  Q   That would be the MS Contin?

6  A   Yes, ma'am.

7  Q   And she was continued on the Neurontin and the Zanaflex?

8  A   She was.

9  Q   I'll show you the April 2014 progress note and ask if that

10  appears to be the progress note for that day?

11  A   April 7th, 2014, with Dr. Couch.

12  Q   And I'll show you the signature page for that same visit

13  and ask if you can tell when Dr. Couch signed that 2014 visit.

14  A   March 31st, 2015, same date as previously.

15  Q   I'll also show you the September of 2014 progress note.  Do

16  you see it?

17  A   September 24th of 2014.

18  Q   And the last page of that same September '14 visit, when

19  was it signed electronically by Dr. Couch?

20  A   The same date, March 31st, 2015.

21  Q   I'll show you the February 10th progress note, February

22  10th of '14.  Still for Dr. Couch for Lauren Blouin?

23  A   Yes, ma'am.

24  Q   The last page of that, does it show when it was signed by

25  Dr. Couch?

1   A   Same date, March 31st, 2015.

2   Q   I show you the September of 2013 visit with Dr. Couch for

3   Ms. Blouin.  Is that right?

4   A   On September the 24th, yes, 2013.

5   Q   Excuse me.  September 24th?

6   A   2013, yes, ma'am.

7   Q   I'll show you the last page and ask when it was signed by

8   Dr. Couch.

9   A   Same date, March 31st, 2015.

10  Q   And finally, I will show you the March 9th, 2015, first

11  page of the progress note.  Again, is that Lauren Blouin, from

12  Dr. Couch?

13  A   It is.

14  Q   And I show you the last page of March of '15, that being

15  March the 9th of '15, and ask when it was electronically signed

16  by Dr. Couch?

17  A   Same date, March 31st, 2015.

18  Q   As to the March of 2015 signature on the March 9th visit,

19  does that appear to be signed at 12:34:04 p.m.?

20  A   Yes; that's correct.

21  Q   As to the September 2013 signature, does it appear to be

22  signed 12:32:55 p.m.?

23  A   That's correct, yes.

24  Q   I apologize.  I should have asked you those times while

25  those were up there.  As to the February of '14, does it appear

1    to be signed at 12:26:49 p.m.?

2    A    Yes.

3    Q    As to September the 14th, September the 24th of 2014, does

4    it too appear to be signed around the same time frame, 12:24?

5    A    It does, about two minutes earlier, a minute and a half

6    earlier, 12:24.

7    Q    Is it your opinion that these files could be reviewed in a

8    minute and a half?

9    A    It would be difficult.  I think that to go through a note

10   and to actually review it would take more time than that.

11   Q    I'm having a little bit of trouble hearing you.

12   A    I'm sorry.  To go through a note properly, it would take

13   more time than that.  Not a minute, a minute and a half, if

14   you're actually doing the note.

15   Q    Dr. Vohra, what's the purpose of a patient file?

16   A    The purpose of the patient file is to keep an accurate

17   record of that patient's treatments and ongoing problems in

18   your office.

19   Q    What is the benefit of a patient file to another doctor who

20   might need to pick this file up?

21   A    Well, certainly if I'm looking at someone else's records,

22   then I'm able to see what that person has done for that

23   patient, what tests have been done, what treatment has been

24   done, what medications have been prescribed, what drug screens

25   have been done.  It gives me the history, the medical history,

1    of that patient under another physician's care.

2    Q    If I told you hypothetically that Dr. Couch never saw this

3    patient on an office visit but the first time, would that be

4    outside the usual course of professional practice?

5    A    Absolutely.  You cannot do that.

6    Q    What conclusions did you draw from your review of the

7    Blouin file?

8    A    The conclusions that I drew were that this, as with some of

9    the other patients we've discussed, this patient had several

10   ongoing red flags for drug-use issue.  Even in the very

11   beginning she had obtained 150 oxycodone from another physician

12   and I think within about two weeks was now trying to fill one

13   of Dr. Couch's prescriptions for oxycodone.  She had gone

14   through that medication.

15           And then going forward, we again continue to see that

16   she's had inconsistent drug screens, including the presence of

17   marijuana.  And despite that, no intervention was taken to

18   address the multiple issues that were noted in the chart.  And

19   in my opinion that's outside the standard of care, these issues

20   should have been addressed.

21   Q    She also had an attempt to fill two Percocet prescriptions

22   within two weeks from two different physicians?

23   A    She did.

24   Q    And you could find no indication that anything was done

25   about the positive drug screens?

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN                                    2346

1    A   No, I can't find any indication of that.

2    Q   Is that outside the usual course of professional practice

3    for Ms. Blouin?

4    A   It is, yes.

5    Q   Hypothetically, if Ms. Blouin's husband was also a

6    Dr. Couch patient and received the same medications as Lauren

7    Blouin, would that cause you some concern?

8    A   That would be unusual.  It would be very unusual for a

9    husband and wife to be on the same medication regimen.

10            MS. GRIFFIN:  Your Honor, yesterday the Government's

11   Exhibit 22-4 for Stephen McDonald, M-C-D-O-N-A-L-D, was

12   presented as two-sided pages.  We have printed it as single

13   pages and would move to admit 22-4A, the single pages, for just

14   ease of reading.

15            MR. ARMSTRONG:  I have no objection.

16            THE COURT:  All right.  Then mark that one in.

17            THE CLERK:  Yes, ma'am.

18       (Government's Exhibit 22-4A was entered into evidence.)

19   BY MS. GRIFFIN:

20   Q   Dr. Vohra, I show you the JH......................,

21   patient file, Government's Exhibit 22-6, and the GM...........,

22   .............., patient file, Government's Exhibit 22-9.  Have

23   you previously reviewed and formed opinions as to both of these

24   patient files?

25   A   I have.

```
 1            MS. GRIFFIN:  Your Honor, we'd move to admit the
 2   M....... file, 22-9, and H....., 22-6.  And I --
 3            THE COURT:  Any objection?
 4            MR. ARMSTRONG:  No objection.
 5            MR. DOSS:  No, ma'am.
 6            THE COURT:  All right.  Mark them in.
 7            MS. GRIFFIN:  So I don't confuse M....... with the
 8   other patient, I'm going to call him by his full name,
 9   GM...........
10            THE COURT:  All right.
11       (Government's Exhibits 22-6 and 22-9 were entered into
12   evidence.)
13   BY MS. GRIFFIN:
14   Q   Dr. Vohra, I'm going to direct your attention in the
15   GM.......... file to August the 28th of 2013.  And first,
16   Mr. M....... was a Dr. Ruan patient; is that correct?
17   A   He was, yes.
18   Q   Could you tell us what was going on in August, around
19   August of 2013, with Mr. M.......?
20   A   Mr. M....... had been seeing Dr. Ruan for neck and shoulder
21   pain.  He had been treated with medications and at that time he
22   was on a combination of fentanyl patches as well as oral
23   oxycodone and Klonopin.  On August 28 there was a drug screen
24   done.  The drug screen showed that he had the oxycodone, but he
25   did not have the fentanyl in his system.
```

2348

1    Q   I show you the drug screen for that date from Castle

2    Medical, showing that it was collected on August the 28th of

3    '13.  Does that show inconsistent for the fentanyl he was being

4    prescribed?

5    A   It does.

6    Q   I'll direct your attention, then, to December the 18th of

7    2013 and ask if there is another inconsistent drug test?

8    A   There is.  He came in for a followup.  A drug screen was

9    again done.  And this time it was inconsistent.  He had

10   morphine in his system which was not being prescribed.  He also

11   had Soma in his system and he also had Ambien in his system.

12   Q   Soma is actually what drug?

13   A   Carisoprodol is the name of the medication.  It's the

14   medicine we discussed yesterday that is used as a muscle

15   relaxant but actually isn't a muscle relaxant.  It's a

16   sedative.

17   Q   Is that the one you discussed in connection with the

18   prescribing of the Holy Trinity?

19   A   Yes.

20   Q   And I will direct your attention to November the 12th of

21   2014.

22   A   Yes, ma'am.

23   Q   And show you the drug test for that date from Castle

24   Medical.  Does this show that the sample was collected on the

25   12th?

1   A   It does.

2   Q   Of November 2014?

3   A   It was, yes.

4   Q   For Dr. Ruan's patient, GM..........?

5   A   Yes; that's correct.

6   Q   Could you tell us about this drug screen?

7   A   Well, the oxycodone that he was being prescribed was there.

8   The other medicines that you see in his system were not being

9   prescribed.  Gabapentin, that's Neurontin, which is a medicine

10  we use for nerve pain.  Morphine, as I discussed.  The third

11  medicine, that's the Soma that I had mentioned.  The fourth,

12  the meprobamate, is a breakdown of Soma, it's a metabolite of

13  the Soma.  And then the last one is Ambien.

14  Q   Was there any discussion or any counseling for Mr. M.......

15  about this, this drug test?

16  A   As far as I can tell, nothing changed.  There's no record

17  of any intervention when this drug screen came back.

18  Q   He was continued to be prescribed the same drugs?

19  A   He was, yes.

20  Q   Did you form an opinion after reviewing the M....... file?

21  A   Again, you have the same concern, especially that last drug

22  screen.  This gentleman was taking high doses of medication and

23  now has other medications in his system, which that combination

24  can be potentially fatal.  So when you see something like that,

25  you have to address that.  That's a safety issue and you have

1    to be concerned that there may be an ongoing substance-abuse

2    issue in that patient.

3    Q    Could there also be a diversion issue?

4    A    There could, sure.

5    Q    And it could be that he's receiving those from other

6    doctors?

7    A    He could be receiving those from other doctors or buying

8    them on the street, yes.

9    Q    If the PDMP were checked, should it show if those

10   medications he was testing positive for that were not

11   prescribed by Dr. Ruan were being prescribed by someone else?

12   A    It should, yes.

13   Q    Does that violate an opioid agreement with the pain doctor,

14   to be taking opioids from another source, be it the street or

15   another doctor?

16   A    Yes, absolutely.

17   Q    Would it be your professional opinion that this -- that

18   what should happen in connection with this patient?

19   A    I think, given this set of circumstances, this patient

20   should have been sent to an addictionologist for detoxification

21   off his medications.

22   Q    And was he continued repeatedly on high-dose oxycodone?

23   A    Yes.

24   Q    What do we mean by high-dose oxycodone?

25   A    It would be anything more than 40 to 50 milligrams of

1  oxycodone a day.

2  Q   That is typically equated to the morphine equivalent?

3  A   Yeah, that would be about a hundred, maybe a little bit

4  more, morphine.

5  Q   So did you conclude that Mr. M's....... treatment by

6  Dr. Ruan was outside the usual course of professional practice?

7  A   I did.  In my opinion, those -- that medication regimen

8  should not have been continued, given the significant

9  inconsistencies that were noted on the examination, on the drug

10  screen.

11  Q   Is there a danger with taking outside drugs from the street

12  or from another doctor of the interactions with the drugs that

13  Dr. Ruan was prescribing?

14  A   It's incredibly dangerous.  The primary issue that you

15  worry about is if you're taking these opioids, as we discussed

16  before, one of the primary side-effects can be that they

17  suppress your breathing.  And then if you're taking other

18  opioids from other doctors and other medicines that can then

19  suppress your breathing, that can cause overdose.  And so, you

20  know, as a physician, if someone is taking medications that

21  you're not aware of, then you're not able to safely prescribe

22  for them because you don't know what's going in and out of

23  their system.

24  Q   That would be another reason for testing every several

25  months of a patient who's opioid tolerant or who's been

1   prescribed opioids?

2   A   Yes, you are going to test that patient to make sure that

3   they are taking the medications that you have prescribed, but

4   there are also not medications in the system that you have not

5   prescribed.

6   Q   And you saw the email yesterday where Dr. Ruan was saying

7   that you keep a patient because it gives you more opportunity

8   to do more urine testing, did you not?

9   A   I did.

10  Q   Is that a reason to keep a patient that's testing

11  inconsistent on drug tests?

12  A   No.  That's -- I never heard of anything like that.  You

13  know, if a patient -- you don't do drug tests for the sake of

14  doing drug tests.  You do drug tests because that helps guide

15  the treatment of that patient.  Simply doing more drug tests

16  and then ignoring the abnormalities isn't doing the patient any

17  good.  So no, that's not any -- anything within standard of

18  care.

19  Q   Why do you do tests on pain patients?  What's the medical

20  reason for doing that?

21  A   You know, primarily it's a safety issue.  Because if

22  patients are taking multiple other medications that could

23  potentially interact with what you're giving them, that's --

24  you know, sometimes patients aren't straight with you about

25  what they are taking.  So you want to ensure the safety of that

1    patient.  And the second is that you don't want to be feeding

2    an addiction, and there's significant incidence of patients

3    that have drug-abuse issues and patients that have chronic

4    pain.  You know, one is not exclusive of the other.  And

5    because of that, if someone has become addicted and is abusing

6    the medications, then it's your duty to assess that and get the

7    patient the help he needs.

8    Q    Now, I direct your attention to the JH.......... patient

9    file, 22-6?

10   A    Yes.

11   Q    Is Ms. H..... -- was Ms. H..... a Dr. Ruan patient?

12   A    Yes, she was a Dr. Ruan patient

13   Q    And if you will, turn to her July the 18th of 2011 drug

14   screen.

15   A    Yes, ma'am.  And that drug screen didn't show anything in

16   her system.

17   Q    I'll show you the drug screen in-house for that date.  This

18   is the instant results test.  Does it show Dr. Ruan?

19   A    It does.  I see his initials there.

20   Q    Ms. H.....?

21   A    Yes.

22   Q    And is it negative for everything?

23   A    It's negative for everything.

24   Q    Would you have an opinion as to what Dr. Raun's initials on

25   this drug result indicated?

1    A    We do that when we've looked at a lab or a test so that our

2    staff knows that we've reviewed that and it can be followed.

3    Q    And when you say we, are you talking about that's how

4    you --

5    A    Physicians.  It's a common practice among physicians to do

6    that.

7    Q    This was inconsistent.  Were her drugs continued?

8    A    They were.  She was on morphine and hydrocodone.

9    Q    Then I show you her drug screen for November the 16th of

10   2011, again for Ms. H..... from Dr. Ruan.  And what if anything

11   does it show about what she's positive for?

12   A    She has barbiturates in her system.  Barbiturates are

13   butalbital, phenobarbital, they are sedative hypnotics.  And

14   that was not a medication that she was being prescribed.  And

15   then at that point I believe she told them that she was getting

16   that from another doctor.

17   Q    Was this drug screen negative for the opiates?

18   A    Yes, the -- the morphine that she had been receiving and

19   the hydrocodone did not show up.

20   Q    And that was being prescribed by Dr. Ruan; is that right?

21   A    It was, yes.

22   Q    What if anything were done at this time for Ms. H.....?

23   A    Her medications were continued.

24   Q    And I direct your attention to February the 16th of 2012.

25   A    Yes, ma'am.  Again, she came in for followup.  Another drug

1    screen was done.  And the drug screen was also sent for

2    confirmation.  And she -- there was nothing in her system, none

3    of the medication that she was being prescribed, the controlled

4    substances, were present.

5    Q   I'll show you the in-house chart for February the 16th,

6    2012.  That shows the in-house chart was negative; is that

7    right?

8    A   That's correct; yes.

9    Q   Does it show or appear to show that the initials X. R. are

10   to the right-hand side of the test?

11   A   They are, yes.

12   Q   Did the confirmation show that there was nothing in her

13   system, that she did not test positive for anything?

14   A   There was nothing in her system, yes.

15   Q   What was done?

16   A   She was -- her opioid was changed to a different one.  She

17   was put -- her opioids were continued.

18   Q   She was not taken off her opioids, was she?

19   A   No, no.

20   Q   In fact, on that date she was prescribed Exalgo; is that

21   correct?

22   A   Yes.

23   Q   That being February 16th, 2012?

24   A   Yes.

25   Q   JH..........?

1  A   Yes.

2  Q   And Dr. Ruan?  (Indicating.)

3  A   That's correct, yes.

4  Q   Does that indicate dispense as written?

5  A   It does.

6  Q   What is Exalgo?

7  A   Exalgo is another opioid.  It's a much more potent opioid

8  than morphine, hydromorphone.

9  Q   Hydromorphone?

10  A   Uh-huh (positive response).

11  Q   What is the difference if it's more potent, what does that

12  mean?

13  A   It's just milligram per milligram it has -- it is much

14  stronger than morphine, as far as its ability to treat pain,

15  but also side-effects, respiratory suppression, nausea,

16  vomiting.

17  Q   In your opinion should this have been prescribed with a

18  negative UDS for any of the drugs being prescribed?

19  A   It should not have.  At that point you've got two drug

20  screens that show that she's not taking what you're giving.

21  And that's very concerning either for abuse -- in that you see

22  that sometimes with patients that have compulsive use of

23  medications; they will get 30 pills and they will take them in

24  two days or three days, they can't control it, and then they

25  run out.  Or for diversion; they are taking those pills and

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1  then they are selling them, and so it's not in their system.

2  Q   Do you know whether or not Dr. Ruan was receiving speaking

3  payments from the manufacturer of Exalgo during that time

4  frame?

5  A   I think he was, yes.

6  Q   Was there any justification in the file for increasing the

7  dosage and for switching to the Exalgo?

8  A   No.

9  Q   Did you form an opinion about the treatment of Ms. H.....?

10 A   Again, I felt like this was outside standard of care, it

11 was outside the usual practice, and basically for the same

12 reasons:  You've got someone that is not taking their

13 medications as they should be, if they are taking them at all.

14 And given those issues, the medication should not have been

15 continued.

16 Q   So when you say it's outside of the usual standard of care,

17 do you also mean it's outside the usual course of professional

18 practice for a pain physician?

19 A   It is, yes.

20 Q   We just mentioned payments for speaking.  Dr. Vohra, have

21 you been invited to speak for pharmaceutical companies?

22 A   Many times.

23 Q   Have you accepted those invitations?

24 A   No.

25 Q   Why is that?

1    A    I'm not a salesman.

2    Q    Pardon?

3    A    I'm not a salesman.  It's not something that I would do, is

4    to go out and try to sell other physicians on prescribing one

5    drug or the other.

6    Q    Also in connection with that are you familiar with the

7    Sunshine Act?

8    A    I am.

9    Q    What is that, please, sir?

10   A    The Sunshine Act was basically enacted so that the

11   government could keep track of any gifts, meals, money, that is

12   given by pharmaceutical companies to physicians.

13   Q    Is that a record that's open to the public?

14   A    Yes, that's an open record.  And you can look it up on the

15   government website and see, you know, how much from a monetary

16   perspective a patient -- a physician receives over a year.

17   Q    Have I previously shown you your open payments data for

18   2014 and 2015?

19   A    You have.

20   Q    Is this that data?  (Indicating.)

21   A    It is.

22   Q    Is that numbered Government's Exhibit 22-10?

23   A    (No response.)

24        MS. GRIFFIN:  Your Honor, we'd move to admit

25   Government's Exhibit 22-10.

1          THE COURT:  All right.  Mark it in.

2          (Government's Exhibit 22-10 was entered into evidence.)

3    BY MS. GRIFFIN:

4    Q    Dr. Vohra, does this show your data for 2014?

5    A    Yes.

6    Q    And does it show the payments from Allergan?

7    A    These were all lunches.

8    Q    Lunches?

9    A    And it's usually where a drug rep comes in to tell us about

10   a product.  They will usually bring lunch and then you have to

11   sign that you, you know, that you ate.

12   Q    And in fact on the next page it shows what the payments

13   were for; is that correct?

14   A    Yes.

15   Q    It shows your total amount for 2014 is $587; is that

16   correct?

17   A    Yes; that's correct.

18   Q    And it shows that 100 percent of that was for food and

19   beverage?

20   A    Yes.

21   Q    Do you own stock --

22          (A discussion was held off the record between government

23   counsel.)

24   BY MS. GRIFFIN:

25   Q    Do you own stock in Allergan?

2360

1    A    Allergan?  I don't think so.  (Shaking head negatively.)

2    Q    Allergan makes or has the patent to Botox?

3    A    Yes, that's -- that's our Botox rep.

4    Q    How is Botox used in your pain management?

5    A    We use Botox primarily for spasticity.  And if I have

6    patients that have had strokes or spinal cord injuries and they

7    have problems with spasms, their arm won't straighten out or

8    their wrist is curled in, then we'll inject those affected

9    muscles with Botox and that helps to ease the spasm and the

10   pain in those patients.

11   Q    Mr. Bodnar reminded me that the jury couldn't see the

12   bottom, the total payments amount and the bottom of the pie

13   chart Government's Exhibit 22-10, nine companies in 2014

14   totaling the 500 and something dollars for the year.  Is that

15   correct?

16   A    Yes, ma'am.

17   Q    On this you don't have the manufacturer for Subsys or

18   Abstral buying you lunch, do you?

19   A    No.

20   Q    That's for the whole year, that $500?

21   A    Yes, ma'am.

22   Q    Excuse me.  $587?

23   A    Yes, that's for the year.

24   Q    Then I show you for 2015, still part of Government's

25   Exhibit 22-10, under the open payments.  Again, this is your

2361

1    data?

2    A   Yes, for 2015.

3    Q   And I show you the listing with the numbers, the total

4    payments and amount for -- these were 11 companies at this

5    time; is that right?

6    A   Yes, ma'am.

7    Q   Again, no payments from anyone that makes Subsys or

8    Abstral?

9    A   No.

10   Q   And I show you the pie chart and the total for 2015?

11   A   And it's for lunch, for lunches.

12   Q   That totals $789 and it's 100 percent for food and

13   beverage?

14   A   Yes.

15   Q   No speaking payments?

16   A   No.

17   Q   Dr. Vohra, I have a question to ask you just in general

18   about the type of practice you do.  When you receive a report

19   from a referring doctor, do you review that report?

20   A   Yes, of course.

21   Q   Do you copy that information as your information or do you

22   do your own diagnosis of the patient?

23   A   No.  When someone is sent to you by someone else, if I'm a

24   pain physician and a family practice physician or orthopedist

25   sends me a patient, then it's my job to do my assessment, to

1    talk with that patient, to examine that patient, and then to

2    decide what are the best options for caring for that person's

3    pain.  You don't abandon that responsibility by just taking

4    someone else's diagnosis and taking it.  No.

5    Q    You do your own diagnosis; is that correct?

6    A    Yes, everybody does.

7    Q    Would it be outside the usual course of professional

8    practice just to copy what the referring physician said and use

9    that as your diagnosis or your examination?

10   A    I've never heard of that being done.  And it would be

11   outside the course of professional practice.

12   Q    Would you tell us what rotation means in connection with

13   the prescribing of narcotics or opioids?

14   A    Rotation means changing from one opioid to another from

15   time to time.  And the reason we'll do that is when you use

16   these medications you can develop what's called tolerance.  And

17   that means that your body basically gets used to the medication

18   after you've been taking it for a while and the enzymes that

19   break that medication down tend to rev up, it gets broken down

20   faster and faster.  So instead of steadily going up on the

21   medication and getting to higher and higher levels, we'll

22   rotate to a different medication that the body's not used to so

23   that we don't have just ever-increasing doses of one particular

24   medication.

25   Q    Is that to keep the daily morphine equivalent down as well?

2363

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1   A   Yes.  Because if you don't, and as you develop more and

2   more tolerance, then you're going to get to higher, higher, and

3   higher doses of medication, yes.

4   Q   If you were going to rotate a patient that was on an

5   existing opioid to a different opioid, would you explain that

6   to them?

7   A   Of course.  You know, usually the conversation is the

8   patient comes in and says, you know:  My medicines aren't

9   working as well, they are not lasting as long, I'm not getting

10  the same amount of relief that I was getting two months ago,

11  three months ago, from the medication.

12         And very often that's a tolerance issue.  The patient

13  has gotten used to the medication.  And so once someone tells

14  you that they are having difficulty, more difficulty, with pain

15  because their medications aren't working and you don't think

16  that anything has changed -- in other words, there's no new

17  pathology or issue that might be causing an increase in pain --

18  then we will rotate and say:  Okay, I think you're getting used

19  to this medication.  We're going to go from medication X to

20  medication Y, so hopefully your pain relief will get better

21  because your body's not used to that.

22  Q   Would you be the one, as the physician, to explain that to

23  the patient?

24  A   Always, yes.

25  Q   Hypothetically, if you just sent a nurse or a nurse

1   practitioner in to say the doctor wants you to try this, with

2   no explanation, would that be outside the usual course of

3   professional practice?

4   A   It would.  I think you have to explain to -- a patient has

5   to be knowledgeable about their care, and so they have to be

6   involved with their care.  And so you have to explain to them

7   what you're doing and why you're doing it.

8   Q   Now, you've told us that you did not prescribe Subsys or

9   Abstral because of the dangers associated with them.  But would

10  it be outside of the usual practice to rotate from Subsys to

11  Abstral and back?

12  A   I wouldn't see the point.  They are the same chemical.  So

13  I don't think that's going to treat tolerance.  You know, if

14  someone is on MS Contin, which is a long-acting morphine, and I

15  believe they've developed a tolerance to that MS Contin, which

16  is the morphine, and I change them to another medicine, say

17  Kadian, which is a morphine, it's a different brand but it's

18  the same medicine.  So that's not treating tolerance.

19  Q   Subsys and Abstral are both sublingual?

20  A   They are.  They are taken by mouth and sprayed, but

21  fentanyl.

22  Q   And then a dissolving --

23  A   A lozenge, yeah.

24  Q   So they would both be fentanyl?

25  A   Yes.

1  Q   And you're saying going back and forth between those would

2  not be an example of rotation, is that what you're telling us?

3  A   That's not rotation.

4  Q   We also talked about the over 100 milligrams of morphine

5  equivalent daily.  After 90 to 100 milligrams is the danger

6  increased by a certain number of times?

7  A   You know, if you look at the data, once you hit 90 to a

8  hundred milligrams equivalent of morphine a day and then going

9  higher, the chances of you overdosing or dying goes up by about

10 five-fold.  That really seems to be the breaking point when it

11 comes to significant side-effects and issues with those

12 medications.

13 Q   In connection with the usual course of professional

14 practice, do you take drugs back that a patient has not used or

15 if you're switching a patient and they have drugs left over, do

16 you take those back at your office?

17 A   You can't do that.  That's illegal.  You -- if a patient

18 has controlled substances, at least my understanding is it's

19 illegal.  If someone has leftover controlled substances, what I

20 tell that patient to do is -- where we are the police have drug

21 dropoff boxes at the station.  So I'll tell them to do that and

22 then also once a year we have a drug dropoff day that we do

23 with the DEA where anybody in town, if they have controlled

24 substances that they need to get rid of, then they'll come and

25 drop them off to the authorities.

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1    Q    From these files you reviewed, did you note numerous

2    increases in opioids in the patients further along as the

3    patients were seen?

4    A    That was the general pattern, was that the doses increased

5    on almost all of these patients and were increased pretty

6    quickly.

7    Q    What's the danger with that?

8    A    Well, the danger is, as we were talking about tolerance

9    before, that you get used to the medication, you also become --

10   as you take an opioid, the respiratory suppression, the

11   decrease and the chance of stopping breathing, you also become

12   tolerant, in that perspective.  So if you have someone on 50 or

13   60 milligrams of morphine, they probably become tolerant to

14   that dose.  But then if you double or triple that dose, they

15   are not tolerant to that dose.  So that significantly increases

16   the chance that someone could overdose.

17   Q    Is there such a thing of a danger with too high a dose of

18   opioids, other than what you've just said, with causing pain to

19   be worse?

20   A    Yes.

21   Q    What is that called?

22   A    It's called narcotics-induced hyperalgesia.

23   Q    H-Y-P-E-R-A-L-G-E-S-I-A?

24   A    That's -- yes.

25   Q    What does that mean?

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

```
 1   A    It means that -- and it's an odd effect -- as you start
 2   going up on doses of opioids and you start hitting higher
 3   doses -- 100, 150, 200 milligrams -- sometimes the medication
 4   can have the opposite effect.  Instead of helping pain, it
 5   actually makes your pain worse.  And so that medication can
 6   then end up actually harming the patient and worsening their
 7   pain at the higher doses rather than helping them.
 8   Q    Is that something that pain doctors should know and should
 9   treat accordingly?
10   A    Sure.  The treatment for that is to decrease the opioid.
11   Q    Decrease instead of increasing?
12   A    Right.  Because what happens is, you know, if you have
13   someone on 150 milligrams of morphine equivalent, they come in:
14   Doc, I'm hurting more.
15            So you put them on more opioid and they come back in
16   and say:  I'm hurting more.
17            So you put them on more opioid.  Well, you've got to
18   recognize, as a physician, that maybe the reason they are
19   hurting more is because you are going up on their medication.
20   And so the way to find out is to actually decrease the
21   medication.  And when you do that, those patients will come
22   back and tell you they feel better.
23   Q    Frequently do they have an improved function in terms of
24   what they're able to do with a lower opioid?
25   A    Yes.
```

1   Q    What do we mean by their function?

2   A    You know, functioning from the perspective of pain, if

3   someone has opioid-induced hyperalgesia, they can do more.  But

4   then the other issue you have with the higher doses is that

5   you're a higher risk for being sedated, sleeping all day, being

6   confused, having difficulty with memory.  And those are all

7   side-effects that limit somebody's ability to function.

8   Q    Is falling also a risk for high-dose opioids?

9   A    Again, if it causes you to be confused, it decreases your

10  balance, then, of course, that increases your chances of

11  falling.

12  Q    You've mentioned in discussing the files that some of the

13  drugs prescribed were highly valued on the street; is that

14  right?

15  A    Yes.

16  Q    Did you determine or do you have an opinion about whether

17  selecting the most abused and valuable street drugs in these

18  unjustifiably high doses was medically necessary?

19  A    I just think these very high doses, from what I can see,

20  given the overall medical records and given these folks'

21  clinical presentation and the issues that we've discussed that

22  they had with the medications, that they should have not been

23  on those medications.

24  Q    I show you what's previously admitted as Government's

25  Exhibit 10-2 for Dr. Ruan.  These are selected drug totals for

2369

1  January 2011 through May 19th of 2015.  And I'd direct your

2  attention to the oxycodone HCl, which is Roxicodone 30

3  milligrams?

4  A   Yes, ma'am.

5  Q   The number of units, number of prescriptions, 669, number

6  of units and pills dispensed.  Do you prescribe oxycodone 30

7  milligram?

8  A   Not the immediate release.

9  Q   Why is that?

10  A   If someone needs that high a dose of medication, especially

11  if you're giving it to them three, four times a day, then I'm

12  going to use a long-acting medication, where someone gets that

13  medication and then gets a steady state of medication

14  throughout the day instead of up and down, up and down, all day

15  long.

16  Q   What does the up and down, up and down, all day long do to

17  the patient?

18  A   You know, what happens is, as the patient takes their

19  medication, they get a lot of medication very quickly, which

20  can cause euphoria.  Euphoria can then lead to more drug-

21  seeking behavior.  It's one of the things that addicts crave.

22  And then also when they get a very high dose very quickly, you

23  can also get sedation and confusion and all of the other side-

24  effects.  You know, the quicker and the higher blood levels you

25  get, the more likely you are to have side-effects, whereas if

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

1  you're using a long acting, then you're getting more of a

2  steady state throughout the day and patients generally tend to

3  do better with that.

4  Q   Is that within the usual course of professional practice?

5  A   What I'm doing?

6  Q   Yes.

7  A   Yes, yes, ma'am.

8  Q   Dr. Vohra, you talked about that there was limited

9  documentation of escalating doses of the controlled substances

10 in these files.

11 A   Yes.

12 Q   Would that be outside the usual course of professional

13 practice?

14 A   Yes.  I think you have to document why you're going up and

15 up, especially in patients who continue to have pain levels of

16 eight, nine, 10.  If their pain is still staying in that range,

17 despite very high doses, at that point what are you

18 accomplishing?  It's not making much of a difference in their

19 pain.

20 Q   As with a new patient coming in with a referral, do you

21 have to start that patient on what they come in taking from

22 their last doctor?

23 A   No.  That's -- as a physician, as a pain physician, my job

24 is to assess that patient, to make a diagnosis as to what's

25 going on, and then make a decision as to whether continuation

1   of their current medication regimen is reasonable.  And

2   certainly you'll see patients where they come in on medications

3   and I think that's not in their best interest, and the first

4   conversation we have is:  I think we need to get you off these

5   meds.

6   Q   Would that be within the usual course of professional

7   practice to do what you have described?

8   A   Yes.

9   Q   Would it be outside the usual course to just continue them

10   or increase them on exactly what they come in with?

11   A   Yes.  Again, as a specialist, a pain physician, you have to

12   make your own decision.  You don't rely on someone else's

13   decision about treatment or medications.  And it would be

14   unlikely that your decision is always the same as the referring

15   physician's.

16          MS. GRIFFIN:  One moment, Your Honor.

17          THE COURT:  All right.

18   BY MS. GRIFFIN:

19   Q   Dr. Vohra, if you are prescribing the opioids or switching

20   the opioids, does that come into play with the risk versus

21   benefit that you discussed with us yesterday?

22   A   Yes.  You know, the risks of continuing higher and higher

23   doses, the higher dose of opioid you're on, the more they

24   suppress your hormones, testosterone, estrogen.  We know that

25   opioids suppress the immune system, they suppress your

RAHUL VOHRA, MD - DIRECT BY MS. GRIFFIN

```
 1   pituitary, so you start getting more systemic side-effects the
 2   higher and higher doses that you get on.  So the hope is that
 3   if you can rotate and keep it at a more moderate or lower level
 4   rather than a very high level, the patient's going to have less
 5   of those problems long term.
 6   Q   Would that be an example of the benefit outweighing the
 7   risk?
 8   A   Yes.
 9   Q   In connection with switching a payment -- switching a
10   patient -- you said that you discussed that with the patient
11   yourself; is that right?
12   A   Yes.
13   Q   Is that a form of informed consent?
14   A   Sure.  As I said before, a patient has to be involved and
15   knowledgeable about what's going on with them.  And so when
16   you're talking about changing medications or stopping this or
17   starting that, then you're always talking to the patient about
18   what these potential issues may be with that medication and you
19   want to tell them to look out for it.  If you start having
20   these issues, you need to call me.  If you're having these
21   side-effects, you need to call me.
22   Q   Is it your opinion that that should be information coming
23   from the doctor to the patient?
24   A   It should be coming from someone who is able to write
25   controlled substances, who has an understanding of controlled
```

```
 1  substances, and in this case that would be the physician.
 2  Q   Finally, Dr. Vohra, have you been paid for reviewing the
 3  files?
 4  A   No, ma'am.  I'm not taking any money for this.
 5  Q   Have you been paid for your testimony?
 6  A   No, I haven't taken any money for this.
 7  Q   And have you been paid for consulting with the attorneys
 8  for the United States prior to your time here today?
 9  A   No, I would not agree to take that.
10  Q   Would that be for your testimony either?
11  A   I'm not being paid anything.
12  Q   You are being paid for your mileage and your hotel; is that
13  correct?
14  A   My hotel, yes.
15  Q   That would be what any witness would be entitled to; is
16  that right?
17  A   Yes, ma'am.
18          MS. GRIFFIN:  That's all I have of this witness, Your
19  Honor.
20          THE COURT:  All right.  Mr. Doss?
21          MR. DOSS:  Just a moment, Your Honor, to regroup.
22          THE COURT:  All right.
23                      CROSS EXAMINATION
24  BY MR. DOSS:
25  Q   Good morning, Dr. Vohra.
```

2374

```
 1    A    Good morning.
 2    Q    My name is Jeff Doss, and I'm one of the attorneys
 3    representing Dr. Couch in this case.
 4    A    Yes, sir.
 5    Q    I want to cover with you first some of your general
 6    testimony from yesterday that you went over with Ms. Griffin on
 7    direct.
 8    A    Yes, sir.
 9    Q    And one of the things that you said on direct is that the
10    physical examination by a pain management doctor should always
11    be performed by that doctor.  Do you recall saying that?
12    A    Yes, sir.
13    Q    Where is that written, if it is written at all?
14    A    Where is it written?
15    Q    Is it written down anywhere that pain management doctors
16    should always be the ones who perform the physical examination
17    of the patient?
18    A    You know, in the guidelines that you look at, it says that
19    the physician should evaluate that patient and take a history
20    and do a physical examination.
21    Q    Which guidelines are those?
22    A    The Federation of Medical Boards, as well as -- Federation
23    of Medical Boards, yes.
24    Q    And that's applicable to pain management doctors?
25    A    It's specifically for pain.  Those are the pain guidelines.
```

1    Q   What's the date on those guidelines?

2    A   2000 -- I think the last revision was 2013 that I've seen.

3    Q   Is it within the course, or the usual course of

4    professional practice, though, for a doctor to rely on nurse

5    practitioners and other medical professionals, including

6    referring physicians, to conduct physical examinations?

7           MS. GRIFFIN:  Your Honor, we object to the form of the

8    question.  It's three questions in one.

9           THE COURT:  Can you separate it out?

10   BY MR. DOSS:

11   Q   Is it within the usual course of professional practice for

12   a doctor to rely on nurse practitioners to conduct physical

13   examinations?

14   A   It depends on the purpose of the physical examination.  If

15   you're relying on a physical examination for which you're going

16   to make a decision about whether this person requires

17   controlled substances, unless the person that is doing the exam

18   is able to write the controlled substances, they can't make a

19   recommendation as to what that person needs.

20   Q   So is it your opinion, Dr. Vohra, that if a controlled

21   substance is to be written for a patient suffering from pain,

22   then the person writing the prescription must be the one to

23   conduct the physical examination?

24   A   That's my opinion, yes, sir.

25   Q   Dr. Vohra, do you employ any nurse practitioners in your

RAHUL VOHRA, MD - CROSS BY MR. DOSS

1   practice?

2   A   I do.

3   Q   And do you employ any CRNAs in your practice?

4   A   I do not.

5   Q   What's a CRNA?

6   A   A certified nurse anesthetist.

7   Q   Do you employ any RNs in your practice?

8   A   Yes.

9   Q   And that would be a registered nurse?

10  A   Yes; that's correct.  Yes, sir.

11  Q   From time to time do you ever rely on those professionals

12  to conduct physical examinations as part of your treatment of a

13  patient?

14  A   No, I do my own exams.

15  Q   Do any of your partners in your pain management practice

16  rely on those medical professionals to conduct physical

17  examinations?

18  A   And then report to them?  No, we see those patients

19  ourselves.

20  Q   You testified that it's common for pain patients to suffer

21  from depression.  Do you recall that?

22  A   Yes, sir.

23  Q   And are you aware of the study suggesting that pain

24  patients not only suffer from depression but also

25  anxiety-related conditions relevant to their pain?

2377

1   A   Very common, yes, sir.

2   Q   You also testified on direct that psychiatric intervention

3   may be necessary for severely uncontrolled psychiatric

4   problems.  Do you recall that testimony?

5   A   Yes, sir.

6   Q   You would agree with me, Dr. Vohra, that there's a

7   difference between someone who has severely uncontrolled

8   psychiatric problems and someone who presents with a history of

9   depression or anxiety; correct?

10  A   Yes, sir.

11  Q   And someone with a history of depression or anxiety is not

12  someone who has severely uncontrolled psychiatric problems;

13  fair?

14  A   Depends.  Most people that you see that have depression or

15  anxiety don't have -- they have it mild or moderate.  There are

16  some patients that can -- I mean people that have severe

17  depression sometimes can become psychotic, they can see things,

18  hear things.  Patients with extreme anxiety disorder can also

19  be very, very mentally ill.  So that's not the rule, but it

20  certainly can happen from this diagnosis, yes, sir.

21  Q   There are always extreme circumstances or extreme

22  instances; fair?

23  A   For this, yes, sir.

24  Q   Now, you said one of the standards for a pain management

25  doctor is to look at other prescribers' records and document in

1   the file when that's checked, do you recall that testimony?

2   A   Yes, sir.

3           MR. DOSS:  And if we could use -- if we could switch

4   over to the laptop?

5   Q   I want to show you what's in evidence as Couch Exhibit

6   118.  And, Dr. Vohra, have you ever looked at this document

7   before?

8   A   I have.

9   Q   What is this document generally?

10  A   This is a general outline of the rules and regulations

11  surrounding the use of controlled substances by practitioners

12  in Alabama, physicians.

13  Q   Is it your experience that generally state medical boards

14  promulgate rules such as these?

15  A   They do, yes, sir.

16  Q   And when did you look at these?

17  A   A week ago.

18  Q   So before you -- or after you reviewed the patient files

19  for this case?

20  A   Yes, sir.

21  Q   If you will turn to -- or if you will look on the screen,

22  let's go to page 26 of Couch Exhibit 118.  And just real

23  quickly, did you decide to look at those on your own or were

24  you asked to look at them by anyone?

25  A   Actually I asked to look at them.

RAHUL VOHRA-MD - CROSS BY MR. DOSS

```
 1   Q   On page 26 do you see where it says requirements for the
 2   use of controlled substances for the treatment of pain?
 3   A   Yes, sir.
 4   Q   Did you review this section?
 5   A   I went through all of it.  I didn't commit it to memory.
 6   Q   If you'll go to page 29, and you'll agree with me that
 7   that's also part of this pain management section; is that
 8   correct?
 9   A   Yes, sir.
10   Q   Do you see where it says medical records?
11   A   Yes, sir.
12   Q   Do you see where it says:  The physician shall keep
13   accurate and complete records, to include --
14   A   Yes, sir.
15   Q   Do you see anywhere where it's listed that a pain
16   management doctor in the state of Alabama is expected to look
17   at other prescribers' records and document in the file when
18   checked?
19   A   This document also refers me to the Federation of Medical
20   Boards guidelines to follow as well.  And so when you go to
21   those, that's what it says.
22   Q   And we'll get to those.  But just to make sure, anywhere
23   here does it say that a pain management doctor in the state of
24   Alabama must check other prescribers' records and document it
25   in the file?
```

RAHUL VOHRA, MD - CROSS BY MR. DOSS

1   A   No, sir, it doesn't say that there.

2   Q   You used the word "addiction" throughout your testimony

3   yesterday and today?

4   A   Yes, sir.

5   Q   Keeping on this same page, if you look at the bottom,

6   there's a definition supplied by the Alabama Board of Medical

7   Examiners for addiction.  Do you see that?

8   A   Yes, sir.

9   Q   Could you read that definition to the jury, please?

10  A   Sure.  Addiction is a neurobehavioral syndrome with genetic

11  and environmental influences that results in psychological

12  dependence on the use of substances for their psychic effects

13  and is characterized by compulsive use despite harm.  Physical

14  dependence and tolerance are normal physiologic consequences of

15  extended opioid therapy for pain and should not be considered

16  addiction.

17  Q   There's a difference between physical dependence and

18  addiction; correct?

19  A   Large difference, yes, sir.

20  Q   And the difference is that while someone may be physically

21  dependent on, for example, a controlled substance, he or she

22  may not necessarily be addicted; fair?

23  A   That's accurate, yes, sir.

24  Q   And would you also agree that addiction is the condition of

25  a patient being physically dependent and manifesting antisocial

1   behavior in service of that physical dependence?

2   A   Not the physical dependence.  The psychological dependance.

3   Q   Fair point.  If there's a psychological dependence coupled

4   with manifestation of antisocial behavior, is that evidence of

5   addiction?

6   A   Yes, sir.

7   Q   So we can have a patient who is physically dependent on a

8   controlled substance who isn't also addicted; fair?

9   A   Most patients, once they get up to a certain level of

10  opioids, become physically dependent.  That's normal.

11  Q   And as the Alabama Board of Medical Examiners notes here --

12  and I assume you agree with it, and correct me if I'm wrong --

13  physical dependence and tolerance are normal physiological

14  consequences of extended opioid therapy?

15  A   Yes, sir, absolutely.

16  Q   You also testified that it's within the standard of care to

17  advise patients regarding the side-effects of controlled

18  substances.  Do you recall that testimony?

19  A   Yes, sir.

20  Q   Is there a written standard of care requiring a physician

21  personally to advise a patient about the side-effects of the

22  medications that he or she is prescribing?

23  A   I'm not sure that's written anywhere that I know of.

24  Q   In fact, would you agree, Dr. Vohra, that a physician can

25  rely on his nurse practitioners under his supervision to

RAHUL VOHRA, MD - CROSS BY MR. DOSS

1  perform that task?

2  A   If that person is someone that is knowledgeable and has the

3  ability to write the opioids or other medications, if they are

4  knowledgeable about that and qualified to do that, if they have

5  a license to do that, then they can, yes, sir.

6  Q   Dr. Vohra, where is it written that only someone who can

7  write a prescription for a controlled substance should be the

8  one who is advising a patient about the side-effects of that

9  controlled substance?

10  A   I'm not sure it's written anywhere.  It's a standard

11  practice.

12  Q   So if someone wanted to find out that standard of practice,

13  for example, how would he go about doing it?

14  A   It would be -- based on my knowledge and experience as a

15  pain physician, I don't know of any body of work that says

16  that, sir.

17  Q   You initially testified about breakthrough cancer pain

18  versus breakthrough pain not associated with cancer.  Do you

19  recall that testimony?

20  A   Yes, sir.

21  Q   And you said that breakthrough cancer pain tends to be more

22  intense than nonmalignant pain.  Do you remember that?

23  A   Yes, sir.

24  Q   Although breakthrough cancer pain may tend to be more

25  intense, it's not always more intense than nonmalignant pain;

2383

```
 1   fair?
 2   A   Yes.  I mean, there are very few absolutes in medicine.
 3   Q   And so on that point simply because someone doesn't have
 4   malignant breakthrough pain -- or breakthrough cancer pain --
 5   that on its own is not decisive for a doctor when deciding what
 6   to prescribe for that patient; fair?
 7   A   Yes.
 8   Q   All right.  I want to turn next to the first patient that
 9   you and Ms. Griffin went through, and that would be patient
10   Daves.
11   A   Yes, sir.
12   Q   Mr. Daves.  If I understand your testimony correctly -- and
13   correct me if I'm wrong -- you criticized Dr. Couch's treatment
14   of this patient based on your belief that Mr. Daves suffered
15   from mental illness; is that correct?
16   A   Yes, sir.
17   Q   And in your opinion Dr. Couch shouldn't have prescribed the
18   pain medications that he did because there was no evidence of
19   any psychiatric intervention; is that correct?
20   A   Yes, sir.
21   Q   And your basis for concluding that this patient suffered
22   from mental illness, as you said, was the first progress note
23   in this patient's file.  Do you remember that?
24   A   It was the form that the patient himself filled out.
25   Q   It was the form the patient filled out?
```

1   A   Yes, sir.

2   Q   Let's take a look at that.  That would be Government's

3   Exhibit 22-1.  If you will look at page 42 -- and we'll show it

4   to you on the screen --

5   A   Yes, sir.

6   Q   -- does this appear to be Mr. Daves' patient intake form?

7   A   Yes, sir, that's one of the pages of that.

8   Q   Okay.  And what was his reason for the visit?

9   A   His reason was that he was having pain.

10  Q   And in particular what was the reason for his visit?

11  A   He said bulging disk, deteriorating disk, with sciatic

12  nerve damage.

13  Q   And those would be consistent with pain; right?

14  A   All of those things can cause pain, yes, sir.

15  Q   And if you go to the bottom of that first page, the patient

16  intake form asked time of the day when pain was worse, and what

17  did this patient say?

18  A   All day and night.

19  Q   And let's look at the second page, the next page of that

20  intake form.  All right.  And under medication history, does

21  Mr. Daves indicate that any prior pain medicines have provided

22  him with relief?

23  A   No, sir.  He indicated that none of the medications that he

24  checked had afforded him any pain relief.

25  Q   That's not a red flag for diversion, is it?

2385

1    A    That previous medications haven't helped?

2    Q    Yes, sir.

3    A    No, not necessarily, no, sir.

4    Q    And in fact, if you expected to see some form of drug

5    seeking, in your experience wouldn't the patient come in

6    demanding particular drugs?

7    A    They can.

8    Q    If you will look under that for muscle relaxants, did this

9    patient indicate that any of these muscle relaxants had helped

10   him in the past?

11   A    He did not, no, sir.  He said that they had not helped.

12   Q    That's also not a red flag for diversion, is it?

13   A    For diversion?

14   Q    Pill seeking, drug seeking.

15   A    No, sir.

16   Q    Under treatment history, below that, what treatments had

17   Mr. Daves tried in the past?

18   A    He had psychiatric and psychological care, acupuncture, and

19   physical therapy.

20   Q    What else did he have, if you look to the right side of

21   that?

22   A    I can't see it, sir.

23   Q    (Indicating.)

24   A    He had had -- he had been treated by a chiropractor, he had

25   had injections in his back, including burning of the nerves.

1  And he related the epidural injections, which was steroid

2  injections, around the nerves did sometimes help him.

3  Q   So based on -- so far what we've seen from Mr. Daves'

4  intake form, the only thing that he has reported helping with

5  his current pain condition are epidural steroid injections?

6  A   Yes, sir.

7  Q   Is there any risk of diversion with epidural steroid

8  injections?

9  A   Of course not.

10  Q   And why is that?

11  A   It's --

12        MS. GRIFFIN:  Your Honor, that is beyond the scope of

13  direct.

14        THE COURT:  Overruled.

15  BY MR. DOSS:

16  A   Epidural steroid injections, a physician injects medication

17  into your spine.  And usually it's a steroid, it's not a

18  controlled substance.  The patient never has that medication in

19  their hand.

20  Q   If you will look at the next page, Dr. Vohra, I'll pull

21  that up for you.  On the top it asks for a variety of medical

22  histories or medical conditions that this patient may have

23  suffered in the past.  Do you see that where the boxes are

24  checked and not checked?

25  A   Yes, sir.

1  Q   Under psychological, what boxes are checked?

2  A   Depression.

3  Q   Schizophrenia is not checked, bipolar is not checked,

4  addiction is not checked; right?

5  A   Not there, no, sir.

6  Q   At the bottom of the page do you see where the intake form

7  asked Mr. Daves:  Are you on disability?

8  A   Yes, sir, he is.

9  Q   Now, Dr. Vohra, you've testified before the Mississippi

10  workers' comp board a number of times, haven't you?

11  A   Yes, sir.

12  Q   And you're familiar with what disability means; correct?

13  A   Yes, sir.

14  Q   What does that mean if you've been declared disabled?

15  A   With the Social Security Administration it means you are

16  not able to hold down a minimal functional job, 40 hours a

17  week.

18  Q   And that has to be proven medically; correct?

19  A   Well, you know, usually those judgments are made by a

20  judge, a judge reviews the medical records and then makes a

21  determination.

22  Q   On the next page of this intake form it asks for a review

23  of systems, list only current or very recent symptoms.  Do you

24  see that?

25  A   Yes, sir.

RAHUL VOHRA, MD - CROSS BY MR. DOSS

1   Q   Now, let's look down at neurological.  What did Mr. Daves

2   check here?

3   A   Blackouts, weakness, dizziness, numbness.

4   Q   Did he check hallucinations?

5   A   Not there, no, sir.

6   Q   Let's look at psychiatric.  What did he check here?

7   A   Depression, anxiety.

8   Q   Did he check suicidal ideation?

9   A   Not there, no, sir.

10  Q   Or drug abuse?

11  A   No, sir.

12  Q   So is it your testimony, Dr. Vohra, that, based on this

13  intake form, Mr. Daves was suffering from a psychiatric

14  condition that precluded him or should have precluded him from

15  receiving controlled substances?

16  A   Not based on this form.  But there is another, there's more

17  data in this chart, sir.

18  Q   On the intake form?

19  A   On -- on that first day there's other data.

20  Q   So let's look at page 36.  And is this the intake -- or is

21  this the page you're referencing?

22  A   That's one of them, yes, sir.

23  Q   Was this based on your review of this patient's file, his

24  first visit to PPSA?

25  A   Yes, sir.

RAHUL VOHRA, MD - CROSS BY MR. DOSS

1   Q   So let's look two pages over.  That will be page 38.  And

2   under psychiatric, it says:  Admits anxiety, depression,

3   delusions, difficulty sleeping, excessive anger,

4   hallucinations, impulsive behavior, suicidal ideation?

5   A   Yes, sir.

6   Q   Is that what you're relying on to conclude that Mr. Daves

7   suffered from untreated mental illness?

8   A   Yes, sir, that's what it says.

9   Q   Does there seem to be a difference between what's on this

10  chart and what's on the patient's intake form?

11  A   There is.

12  Q   In fact, on the patient's intake form he says he suffers

13  from depression.  He doesn't say that he suffers from any of

14  these other things, does he?

15  A   Not on that form, no, sir.

16  Q   So is it your opinion, Dr. Vohra, that this patient was

17  suffering from an untreated mental illness based on this single

18  piece of paper?  (Indicating.)

19  A   Yes, sir, that paper states that he's having those issues.

20  Q   Do you know if that was entered because the patient said

21  that he was suffering from those things?

22  A   I wasn't there, sir.  I just know what it says.

23  Q   Now, he did admit to depression.  Do you remember that?

24  A   Yes, sir.

25  Q   And I believe, as you testified earlier, depression is

1   common amongst people suffering from chronic pain; fair?

2   A   Yes, sir.

3   Q   Let's look at page 46 of this file.  Do you remember this

4   page from when you were reviewing this patient's file,

5   Dr. Vohra?

6   A   Yes, sir.  I believe this was the referral.

7   Q   Okay.  What's the diagnosis on this referral sheet?

8   A   DDD, degenerative --

9   Q   What does that stand for?

10  A   Degenerative disk disease.

11  Q   Does this appear to be a referral from a Dr. Sudeep Rao?

12  A   Yes, sir.

13  Q   And does it appear that Dr. Rao is associated with the

14  Diagnostic and Medical Clinic of Infirmary Health?

15  A   Yes, sir.

16  Q   Let's look at page 49.  Does this appear to be part of that

17  referral file from Dr. Rao?

18  A   It does, yes, sir.

19  Q   Do you see where it says HPI and below it there's one, two,

20  three?

21  A   Yes, sir.

22  Q   All right.  The first point is Mr. Daves was recently

23  released from prison.  Do you see that?

24  A   Yes, sir.

25  Q   Okay.  Now, someone who's released from prison, that could

1    be a red flag for prescribing issues; correct?

2    A    Yes, sir, if they went to prison for some type of drug

3    issue.

4    Q    Sure.  And we don't know based on this record, do we,

5    Dr. Vohra, why Mr. Daves was in prison?

6    A    I have no idea, sir.

7    Q    But just because you were released from prison doesn't mean

8    that you're disqualified from receiving pain management

9    treatment; fair?

10   A    Fair.

11   Q    In fact, someone who is released from prison could have a

12   legitimate pain issue; correct?

13   A    Yes, sir.

14   Q    What does the second point on Dr. Rao's note say?

15   A    Recently been deemed disabled because of degenerative disk

16   disease in the lumbosacral region, claims that he is in pain

17   and now needs referral to pain management.

18   Q    And that's consistent with what Mr. Daves represented on

19   his intake form, isn't it?

20   A    It's one of the things he's complaining of, yes, sir.

21   Q    What's the third point?

22   A    He also needs me to fill out his handicapped placard.

23   Q    Is that consistent with being disabled?

24   A    Some people are disabled and aren't able to walk very far,

25   yes, sir.

1  Q   And that would be consistent with degenerative disk
2  disease, an inability to walk very far?
3  A   Well, degenerative disk disease in itself is not really a
4  diagnosis.  I'm just being technical.  There isn't a soul over
5  30 that doesn't have that.  You have it, I have it.  It's just
6  part of getting older.  Some people it gives problems, some
7  people it doesn't.  So just the presence of degenerative disk
8  disease in and of itself doesn't mean that it's painful.
9  Q   Based on this record, does it appear that his degenerative
10 disk disease was significant enough to make him eligible for
11 disability?
12 A   It would appear that he was placed on disability based on
13 that diagnosis, based on what it says here, sir.
14 Q   And based on this record, that could affect his ability to
15 walk very far?
16 A   Yes, sir.
17 Q   Let's look below that review of symptoms.  What's the first
18 one that Mr. Daves apparently told Dr. Rao?
19 A   Allergic, allergies.
20 Q   Does a cough sometimes develop as a result of your
21 allergies?
22 A   Of course.
23 Q   And one might take cough syrup, for example, if you have
24 allergic rhinitis?
25 A   Sometimes I assume you could, yes, sir.

2393

1    Q    Now, do you recall with this patient on December 2nd, 2013,

2    during his first visit at PPSA -- let's turn to page 54.  I'll

3    start over with the question.

4         Do you recall with this patient, Dr. Vohra, at his

5    first visit to PPSA he was drug tested, wasn't he?

6    A    Yes, sir.

7    Q    And under not prescribed, remind us what are those two

8    drugs?

9    A    Those are the cough medicines, sir.

10   Q    And you testified on direct that sometimes people would

11   take cough medicines to intensify their high.  Do you remember

12   that?

13   A    Yes, sir.

14   Q    And do you see that Mr. Daves visited with Dr. Rao

15   approximately 30 days before being drug tested at PPSA?

16   A    Yes, sir.

17   Q    So another explanation is Mr. Daves was taking cough syrup

18   because he had a cough; right?

19   A    If that's what he was prescribed or given.

20   Q    You can buy that over the counter, can't you, Dr. Vohra?

21   A    I don't know if he took it or not, sir.  I mean, I know

22   it's in his system.  I don't know the reason that he took it.

23   And in that context what we are talking about is in the general

24   context that can sometimes be a red flag.  It's not definitive,

25   but it's a red flag.

1   Q   And it can also be used to treat a cough; right?

2   A   Yes, sir, as we discussed.

3   Q   Let's go back to page 50.  Now, this is also a part of

4   Dr. Rao's referral file.  Do you agree?

5   A   Yes, sir, it appears to be.

6   Q   Let's look at the bottom, where it says physical exam.

7   A   Yes, sir.

8   Q   What did Dr. Rao note for Mr. Daves' physical exam?

9   A   He noted his blood pressure and his pulse, temperature,

10  noted that he was oriented to person, place, and time.  He

11  appeared well nourished.

12  Q   Does that seem consistent with someone suffering from an

13  undiagnosed mental illness?

14  A   You can have mental illness and still be oriented, sir.

15  Q   But does that seem consistent with someone suffering from

16  an undiagnosed mental illness?

17  A   It's not consistent with either.

18  Q   Let's look at the next page, page 51.  Do you see where it

19  says psychiatric?

20  A   Yes, sir.

21  Q   What did Dr. Rao write for psychiatric?

22  A   Normal mood and affect that day.  His behavior is normal.

23  Q   Is that consistent with an untreated mental illness?

24  A   Not on that day, no, sir.

25  Q   And let's look at plan.

1    A    Yes, sir.

2    Q    So Mr. Daves appears to have hypertension?

3    A    Yes, sir.

4    Q    You're going to have to help me with that.  Hyperlipidemia?

5    A    Hyperlipidemia, high cholesterol, high triglycerides.

6    Q    We'll come back to depression.  Hypothyroidism?

7    A    Yes, sir.

8    Q    Mr. Daves also has low-back pain?

9    A    He does.

10   Q    Correct?

11   A    Yes.

12   Q    What did Dr. Rao do for Mr. Daves on this visit for his

13   low-back pain?

14   A    He gave him a few Ultram.

15   Q    What is Ultram?

16   A    Ultram is tramadol.  It's a pain medication which is

17   significantly less potent than the medications we've been

18   discussing today.

19   Q    What else did Dr. Rao plan to do for Mr. Daves?

20   A    I think that was the time that he sent him to pain

21   management; right?

22   Q    Now, let's go back to depression.  What did Dr. Rao note

23   about Mr. Daves' depression?

24   A    Felt like when he saw him at that time that there was not

25   much of an issue and that he had been off Prozac for some time.

1   Q   Does that seem consistent with an undiagnosed mental
2   illness?
3   A   Not on that day, no, sir.
4   Q   Sitting here today, Dr. Vohra, you don't know if this
5   patient actually was suffering in a psychiatric disorder, do
6   you?
7   A   Sir, I've never met this person.  So I don't have any
8   personal knowledge.  I just know the concerns that were raised
9   when I saw those things in his chart.
10  Q   Let's look at page 56.  Does this appear to be the second
11  time Mr. Daves visited PPSA?
12  A   It is.
13  Q   Could you read to the jury what it says under objectives?
14  A   Yes, sir.  He states that the medications are not working,
15  that he's been taking four-five hydrocodone a day and with
16  patches and not getting any relief.  He wants to have a
17  procedure done.
18  Q   Is a patient asking for procedures a red flag for
19  diversion?
20  A   No, sir.
21  Q   Why is that?
22  A   Again, there's nothing for that person to sell, if they are
23  going to get an injection.
24  Q   Are you familiar with the term "interventional pain
25  management," Dr. Vohra?

1   A   Of course.

2   Q   What is that?

3   A   Interventional pain management is a specialty in which --

4   it's usually anesthesiologists or physical medicine physicians

5   and some surgeons do interventional procedures to try to help

6   patients with pain, spine injections, joint injections,

7   catheter placement, pump placement, things like that.

8   Q   Let's look to page 60 of this file.  What is this document,

9   Dr. Vohra?

10  A   It's an EMG, or it's a nerve conduction study.

11  Q   What's the purpose of a nerve conduction study?

12  A   A nerve conduction study is done to assess the health of

13  your nerves in your arms or your legs to see if there's any

14  entrapment or ongoing disease that's affecting the nerve.

15  Q   It's a way of diagnosing or helping a doctor understand

16  what the cause of pain is, for example; fair?

17  A   It can be helpful in finding that, yes, sir.

18  Q   What does an abnormal study in this context mean?

19  A   What they did here was just the sensory nerves in the lower

20  extremities and then one sensory nerve in the arm.  They

21  weren't able to get any responses in the lower extremities, so

22  that would give you concern that this gentleman may have what's

23  called peripheral neuropathy.  A neuropathy is a process which

24  can affect your nerves, you see it most commonly in people that

25  are diabetics, and can cause numbness, tingling, pain.

RAHUL VOHRA, MD - CROSS BY MR. DOSS

```
 1    Q   Is this an example of PPSA trying to identify the cause of
 2   Mr. Daves' physical suffering?
 3    A   Yes, sir, that's part of the diagnostic process.
 4    Q   And that's within the usual course of professional
 5   practice, that a pain management doctor would not only
 6   prescribe medication, but also try to diagnose and treat the
 7   patient for the underlying cause of that pain; correct?
 8    A   Yes, sir.
 9    Q   Let's look at page 66.  What is this document, Dr. Vohra?
10    A   This is the MRI that they sent him for of his low back.
11    Q   Is this also an example of PPSA trying to identify the
12   cause of Mr. Daves' physical suffering?
13    A   Yes, sir.
14    Q   And that would also be within the usual course of
15   professional practice, for a pain management doctor to try to
16   understand what is the root cause of the patient's suffering;
17   correct?
18    A   Yes, sir.
19            THE COURT:  Mr. Doss, how much longer are you going to
20   be with this file?
21            MR. DOSS:  It's going to be a while.  So --
22            THE COURT:  All right.  Ladies and gentlemen, we'll
23   take our morning break at this time.  Leave your pads on your
24   chairs.  Take your break down in the jury assembly room.  No
25   discussion about the case.  And we will call you back in about
```

1    15 minutes.  Thank you.

2            We're in recess.

3        (A recess was taken at approximately 10:33 a.m.)

4        (In open court, 10:55 a.m., defendants and jury present.)

5            THE COURT:  All right, Mr. Doss.

6            MR. DOSS:  Thank you, Judge.

7    Q   Dr. Vohra, earlier in your testimony you made reference to

8    the Federation of State Medical Boards' model policy on the use

9    of opioid analgesics in the treatment of chronic pain from

10   2013.  Do you remember that?

11   A   Yes, sir.

12   Q   And your testimony was that this guideline required

13   physicians to perform the physical examination.  Do you

14   remember that?

15   A   It says the -- that that should be done, the physical

16   examination should be done.  It doesn't say either way, sir.

17   Q   It doesn't say that the physician has to perform the

18   physical examination; correct?

19   A   It also doesn't say that you can allow somebody else to do

20   it.

21   Q   Would it be fair to say that under this model policy it

22   allows for the doctor to have some discretion on how the

23   physical examination is conducted and by whom; correct?

24   A   Again, it doesn't say.

25   Q   So it doesn't require a physician to perform a physical

1  examination?

2  A   It's not clear.  It doesn't say either way.

3  Q   Does it prohibit a nurse practitioner from performing a

4  physical examination?

5  A   Not that I saw, no, sir.

6  Q   What about a CRNA?  Does it prohibit a CRNA from performing

7  a physical examination?

8  A   I don't recall seeing that, sir.

9  Q   All right.  Turning back to Mr. Daves' file --

10  A   Yes, sir?

11  Q   -- do you agree with me, Dr. Vohra, that placing a patient

12  on opioid therapy while ordering further tests, diagnostic

13  tests, is within the usual course of professional practice?

14  A   Yes, sir, we can do that.

15  Q   And you saw evidence of that in Mr. Daves' file, didn't

16  you?

17  A   I did, yes, sir.

18  Q   Let's look at page 74.  Excuse me.  72.  What is this

19  document, Dr. Vohra?

20  A   That's the nerve conduction study that we were looking at

21  previously, sir.

22  Q   Is it the same one or a different one?

23  A   I can't tell.  It's covered.

24  Q   (Indicating.)

25  A   No, that's different.  That's more on the arms than -- the

1    other one was probably on the legs.  That one's on the arms.

2    Q    And do you recall that this patient presented to PPSA

3    complaining of pain in not only his back but also his arms and

4    his legs?

5    A    Yes, sir, he had pain in the entirety of his body.

6    Q    And if I remember correctly -- and correct me if I'm

7    wrong -- you criticized Dr. Couch because the patient presented

8    with, quote, "total body pain," but there wasn't a diagnosis to

9    justify that, do you remember that?

10   A    Yes, sir.

11   Q    Now, we heard that this patient had degenerative disk;

12   correct?

13   A    Yes, sir.

14   Q    He was on disability; right?

15   A    Yes, sir.

16   Q    That might explain his back pain; right?

17   A    Might, yes, sir.

18   Q    We've seen a nerve test for his legs; correct?

19   A    Yes, sir.

20   Q    And we've seen a nerve test for his arms; correct?

21   A    Yes, sir.

22   Q    Fair to say that PPSA was trying to understand what would

23   be causing the pain in his legs and his arms in addition to the

24   pain in his back?

25   A    Well, again, yes, sir, that's what's going on here.  But

2402

1  when you have someone with the presentation that is present

2  here, you try to make a diagnosis first before you just start

3  on medications, especially given his initial office visit.

4  Q   He had a diagnosis coming into PPSA, didn't he?

5  A   He had a diagnosis of back pain and on his first visit

6  degenerative disk disease.

7  Q   And these would be examples subsequent to that initial

8  visit where PPSA was trying to understand what was causing his

9  other complaints; fair?

10 A   Yes, sir, some of them.

11 Q   Let's look at page 74.  Do you recall this record in your

12 Review of Mr. Daves' patient file, Dr. Vohra?

13 A   Yes, sir.

14 Q   Could you read this note for the jury, please?

15 A   Patient's calling Stacy on the personal phone, requesting

16 medications.  I returned call, stating he needs to call the

17 office for any questions and also bring in his medications for

18 pill count before medications can be prescribed.

19 Q   Requiring a pill count for patients is within the usual

20 course of professional practice, isn't it, Dr. Vohra?

21 A   It is, yes, sir.

22 Q   And that would be a way of combating potential drug

23 diversion, isn't it, Dr. Vohra?

24 A   Or misuse.

25 Q   And that's within the usual course of professional

1    practice?

2    A   Yes, sir.

3    Q   It's also within the usual course of professional practice

4    for a pain management clinic like PPSA to require their

5    patients to contact the clinical staff officially and not

6    through their personal telephone number, isn't it?

7    A   Yes, sir, that's -- you always ask the patient to call the

8    office, not on someone's personal phone.

9    Q   Do you see where it says:  Electronically signed by Frankie

10   Goss, MA?

11   A   Yes, sir.

12   Q   What does that mean, MA, if you know?

13   A   I don't know.  Master of Arts is the only thing I can think

14   of.  Medical assistant maybe?

15   Q   Medical -- what is a medical assistant?

16   A   A medical assistant is just a general term for anyone that

17   is helping a doctor in his practice.

18   Q   Is the advice provided to the patient, as reflected in his

19   patient note, within the usual course of professional practice?

20   A   Yes, sir.

21   Q   Let's look at page 83.  Well, all right.  Does this appear

22   to be the next time Mr. Daves came to PPSA?

23   A   Yes, sir.

24   Q   And Mr. Daves reported that he was pleased with his

25   medication, didn't he?

2404

1    A   He did.

2    Q   Let's look at page 85.  Do you see where it says:  Review

3    of systems:  Psychiatric?

4    A   Yes, sir.

5    Q   And that indicates that Mr. Daves denied anxiety,

6    depression, and hallucinations; correct?

7    A   Yes, sir.  It changed on that day.

8    Q   And that was approximately 30 to 45 days after his initial

9    visit, wasn't it?

10   A   Yes, sir.

11   Q   That would also be consistent with his patient intake form;

12   right?

13   A   It was consistent with part of it, yes, sir, the intake

14   form, but not the note.

15   Q   And the only thing listed here that he denied that he

16   admitted on his patient intake form was depression; right?

17   A   On his -- yes, that's on the intake form, yes, sir.

18   Q   And do you recall Dr. Rao noted that his history of

19   depression, he seemed to be okay, he was off his Zoloft; right?

20   A   Off of his Prozac, yes, sir.

21   Q   Thank you.  Off of his Prozac.  Based on this record,

22   Dr. Vohra, does it appear more or less likely that the initial

23   progress note was an error or mistake in the record?

24   A   You know, I don't know.  I mean, hindsight's 20/20.  My

25   point was that when you have someone in your note you're

 1   putting that this person is having all of these issues, then

 2   those issues have to be addressed.  And if someone comes in, I

 3   don't know if a month from now they are going to be doing

 4   better or not.  So, you know, was this an error in the medical

 5   record?  Was it something that was really going on?  I wasn't

 6   there.  I can only tell you what the record says, sir.

 7   Q   So sitting here today, Dr. Vohra, you don't know whether

 8   this patient in fact suffered from hallucinations, do you?

 9   A   Again, I wasn't there.  I just know what the record says.

10   Q   On the next page, page 86, what were the instructions under

11   plan for this patient?

12   A   To continue his present medications and then to come back

13   in about a month and return if his symptoms got worse.

14   Q   Is there anything that requires pain management doctors to

15   see their patients every four weeks?

16   A   Not a requirement, no, sir.  I think the requirement is

17   every three months.

18   Q   In fact it would be within the standard of care not to see

19   your patient every four weeks; correct?

20   A   It depends.  You know, if it's a new patient and you're

21   keeping an eye on them fairly close, then you will see them.

22   Usually I will, most people will, see them fairly regularly.

23   And then once you have a handle on what's going on and they are

24   stable, then yeah, usually you'll push those appointments out

25   to every two or three months.

RAHUL VOHRA, MD - CROSS BY MR. DOSS

1   Q   And Mr. Daves was a new patient to PPSA at this point,
2   wasn't he?
3   A   Yes, sir.
4   Q   And so it was within the standard of care for PPSA to have
5   Mr. Daves return within four weeks; correct?
6   A   Yes, sir.
7   Q   Let's look at page 75.  In fact Mr. Daves returned on
8   February 11th, 2014; correct?
9   A   He did.
10   Q   Under objectives, what did this patient report?
11   A   Patient states he needs something for severe pain.
12   Q   And if you will look on page 77, under psychiatric:
13   Patient admitted to anxiety, but denied depression and
14   hallucinations; correct?
15   A   Right.  So today he's having anxiety, where he wasn't
16   before, and is denying depression or hallucinations.
17   Q   And if I understand correctly, anxiety is something that is
18   not uncommon among patients with chronic pain; correct?
19   A   That's correct.  Yes, sir.
20   Q   That would not necessarily be a red flag; correct?
21   A   For abuse?  No, sir.
22   Q   And it wouldn't necessarily make this patient a high-risk
23   patient, would it?
24   A   Not necessarily.  It can, but not necessarily.
25   Q   Now, Mr. Daves wanted something stronger on this visit.  Do

1    you recall that?

2    A    I do, yes, sir.

3    Q    He was already on some strong medications, wasn't he?

4    A    He is.

5    Q    Let's look at page 78.  Under plan, under orders, what did

6    PPSA set as Mr. Daves' next step?

7    A    The lumbar injection, and then they changed his

8    medications.

9    q    What is a pres-free Dilaudid?

10   A    I'm not sure what that means, sir.

11   Q    What's a lumbar epidural?

12   A    Lumbar epidural injection is an injection where steroids

13   are injected around a nerve root in the spine or directly into

14   the middle of the spine in order to diminish inflammation

15   around a nerve root, to hopefully improve someone's neuropathic

16   pain, their leg pain.

17   Q    That's within the usual course of professional practice,

18   isn't it?

19   A    Yes, sir.  It's very common.

20   Q    And that would be another example of interventional pain

21   management; correct?

22   A    Yes, sir.

23   Q    Let's look at page 81.  You testified on direct about this

24   note.  If you would, please read that to the jury.

25   A    I called the patient, but got his answering machine.  The

 1   call was pertaining to his fall.  Patient claims he was in

 2   extreme pain but did not go to the emergency room.

 3   Q   Now, on direct you testified that that could have been

 4   caused by his medication.  Do you remember that?

 5   A   Possibility, yes, sir.

 6   Q   Does it appear that this occurred maybe a week or two after

 7   his last visit to PPSA?

 8   A   Yes, sir.

 9   Q   His fall could have also been the result of his disability;

10   is that fair?

11   A   It was one possibility.  I wasn't there.  I don't know why

12   he fell, sir.

13   Q   Sitting here today, you can't say more likely than not that

14   he fell because of his medication, can you?

15           MS. GRIFFIN:  Your Honor, I object as asked and

16   answered.

17           THE COURT:  Sustained.

18   BY MR. DOSS:

19   Q   Let's look at page 89.  Does this appear to be a progress

20   note from March 11, 2014?

21   A   Yes, sir.

22   Q   And if you look on page 91, under psychiatric, does it say

23   that the patient denies anxiety, depression, and

24   hallucinations?

25   A   It does, yes, sir.

1  Q   And it doesn't make any reference to suicidal ideation,

2  does it?

3  A   No, sir.

4  Q   Under psychiatric physical examination, do you see where it

5  says mood and affect?

6        MS. GRIFFIN:  We object, Your Honor.  This has been

7  over and over throughout.  It's repetition.  It's beyond the

8  scope of direct.  The point has been made that it doesn't

9  always say it each time, and we think it's not relevant at this

10 point.

11       MR. DOSS:  Your Honor, Dr. Vohra's criticism of

12 Dr. Couch's treatment was based on the assumption that the

13 patient had an untreated medical illness.  And it's important

14 to go through the patient file where that is being reviewed

15 every time and there's no indication of it.

16       MS. GRIFFIN:  May we approach?

17       THE COURT:  Yes.

18    (At the side bar, jury not present.)

19       THE COURT:  Mr. Doss, my understanding of his

20 testimony was it was based on that first visit and what was

21 noted in the file.  Nothing he said about psychiatric illness

22 after that was criticized, from the testimony.  And the fact

23 that you're going through the entire file noting the changes

24 each time I don't think is very relevant.  I'll let you keep

25 doing it, but his opinion was based on the first visit.

1        MR. DOSS:  And our only point, Your Honor, is it makes

2    that first record more likely to have been error, that each

3    subsequent record doesn't substantiate it.

4        THE COURT:  But when the doctor sees the patient the

5    first time, what is appropriate to do is based on his

6    information that he has at that time, not information that he

7    has later.  So I don't think this is very relevant.  So let's

8    move along, if we can.

9        MR. DOSS:  We will.

10        (In open court, defendants and jury present.)

11   BY MR. DOSS:

12   Q   If you'll look at page 92, Dr. Vohra?

13   A   Yes, sir.

14   Q   Under orders does it appear that PPSA ordered a urine drug

15   screen?

16   A   They did.

17   Q   That's in the usual course of professional practice, isn't

18   it?

19   A   It is, to order and then act upon that drug screen.

20   Q   Especially for a new patient like Mr. Daves?

21   A   All patients on controlled substances.

22   Q   And under the instructions it indicates that PPSA was going

23   to continue him on his present medications, do you see that?

24   A   Yes, sir.

25   Q   Now, in this visit he reported that he sometimes takes more

2411

 1    medication than prescribed for his pain.  Do you remember that?

 2    A   Yes, sir.

 3    Q   And that sometimes happens with pain patients; correct?

 4    A   Should not.

 5    Q   It should not, but it sometimes does, doesn't it?

 6    A   Patients overtake their medications.

 7    Q   Do you know, sitting here today, whether anyone at PPSA

 8    educated Mr. Daves on that exact point on March 11, 2014?

 9    A   No, sir.

10    Q   All right.  On March 11th he was drug tested, and you

11    discussed this on your direct.  Let's look at page 94.

12    A   Yes, sir.

13    Q   And one of the issues that you criticized was the presence

14    of Lortab, the hydrocodone.  Do you remember that?

15    A   Yes, sir.

16    Q   Do you realize that on the same day Mr. Daves received a

17    lumbar epidural steroid injection?

18    A   I'm sorry?

19    Q   Do you realize that on this same day, March 11, 2014,

20    Mr. Daves received a lumbar epidural injection at PPSA?

21    A   Okay.  If you say so, yes, sir.

22    Q   Do you have any reason to doubt that?

23    A   No, sir.

24    Q   Do you know if any additional medications relevant to that

25    particular procedure were prescribed for Mr. Daves on that day?

2412

RAHUL VOHRA, MD - CROSS BY MR. DOSS

1   A   No, sir.

2   Q   And do you remember that Dr. Couch had prescribed Lortab

3   for this patient at his original visit in December 2013?

4   A   Yes.  And then he had stopped it, changed it to the other

5   medications.

6   Q   So simply testing positive for Lortab would not necessarily

7   be consistent with diversion, would it, Dr. Vohra?

8   A   No, not diversion.  With misuse.  You're taking medication

9   that you're not supposed to be taking.

10  Q   And again, that happens from time to time, doesn't it?

11  A   But patients misuse their medications, yes, sir.

12  Q   All right.  Let's look at page 97.  Does this appear to be

13  a patient note for April 9th, 2014?

14  A   Yes, sir.

15  Q   Does it indicate that the patient is pleased with his

16  current PPSA medications?

17  A   Yes, sir.

18  Q   Does it also show that there are no new significant

19  side-effects or excessive drowsiness from the medication?

20  A   It does.

21  Q   Do you know what an LESI is, Dr. Vohra?

22  A   It's a lumbar epidural steroid injection.

23  Q   Does it indicate that the patient said that that wasn't

24  really helping with his pain?

25  A   He did, yes, sir.

```
 1   Q   And that would have been approximately a month of two after
 2   he had received that; correct?
 3   A   Yes, sir.
 4   Q   And then if you will look at page 100, or plan
 5   instructions, does it indicate that he would be continued on
 6   his present medication?
 7   A   It does, yes, sir.
 8   Q   And that's after he reported that he was satisfied with
 9   them?
10   A   Right.
11   Q   All right.  Let's look at page 101.  You discussed this on
12   direct.  This is the May 7, 2014, patient visit.  And under
13   objectives it notes:  Patient states that he ran out of pain
14   medication a couple of days ago and he is now having symptoms
15   of withdrawals.
16   A   Yes, sir.
17   Q   Do you see that?
18   A   Yes, sir.
19   Q   And that can happen if you stop taking your opioids;
20   correct?
21   A   If you run out, yes, sir.
22   Q   And sometimes that happens with chronic-pain patients, they
23   take too much of their medication?
24   A   Yes, sir.  Misuse can happen.
25   Q   On page 104, same visit, it indicates under instructions
```

RAHUL VOHRA, MD - CROSS BY MR. DOSS

```
 1    that PPSA continued him on his present medications.  Do you see

 2    that?

 3    A   They did.

 4    Q   And that was despite having run out; correct?

 5    A   Yes, sir.

 6    Q   Let's look at page 105.  In your experience in the medical

 7    field, Dr. Vohra, do you understand what this document is?

 8    A   It looks like a referral sheet.

 9    Q   Do you know what HealthSpring is?

10    A   I don't.

11    Q   You do not?

12    A   I don't know, sir.

13    Q   Does it say at the bottom:  Six visits were added to a

14    previous referral?

15    A   Yes, sir.

16    Q   And does it also indicate at the top:  PCP information?

17    A   Yes, sir.

18    Q   In your experience in the medical field, Dr. Vohra, what

19    does PCP usually refer to?

20    A   Primary care physician.  It's their internist or their

21    family physician.

22    Q   And would this indicate in your experience, Dr. Vohra, that

23    while Mr. Daves was being treated by Dr. Couch at PPSA, he was

24    also seeing a primary care physician?

25            MS. GRIFFIN:  Your Honor, objection as to foundation.
```

```
 1    It states they were approved, but does not mention whether or
 2    not someone was seen.  It's beyond the scope of direct.
 3              MR. DOSS:  I'll move on, Your Honor.
 4              THE COURT:  Sustained, sustained.
 5    BY MR. DOSS:
 6    Q    All right.  Let's look at page 115.  And this is the last
 7    note I want to go over with you on this patient.
 8    A    Yes, sir.
 9    Q    Is this a June 20th, 2014, procedure note?
10    A    Yes, sir.
11    Q    Do you recall seeing this in your review of Mr. Daves'
12    patient file?
13    A    Yes, sir.
14    Q    Does it indicate that Mr. Daves received a lumbar epidural
15    steroid injection with fluoroscopy?
16    A    Yes, sir.  That was the second injection that he had
17    gotten.
18    Q    And this is in addition to the pain medications he was
19    being prescribed; correct?
20    A    Yes, sir.
21    Q    And, Dr. Vohra, do you usually perform lumbar epidural
22    steroid injections with fluoroscopy?
23    A    Injections are always done with fluoroscopy.  I don't do
24    them any more.  I used to, but I don't any more.
25    Q    You don't do epidurals?
```

1    A   Not any more, no, sir.

2    Q   And again, while the patient is receiving opioid treatment,

3    receiving a lumbar epidural steroid injection, that would be

4    within the usual course of professional practice; fair?

5    A   Very common, yes, sir.

6    Q   I want to turn your attention now to Patient J.......

7    A   Yes, sir.

8    Q   Now, Ms. J...... presented to Dr. Couch on July 10, 2013;

9    correct?

10   A   Yes, sir, I believe that was the first visit.

11   Q   Let's take a look at page 54.  Does this appear to be the

12   notes regarding Ms. J's..... first visit with Dr. Couch on July

13   10th, 2013?

14   A   It does, yes, sir.

15   Q   And I'm not going to make you decipher this.  I can barely

16   read it myself.  But I do want to draw your attention here.

17   What does that seem to indicate that Ms. J...... was

18   complaining of?

19   A   She was complaining of pain and she was complaining of

20   difficulty with activities, stiffness in the morning washing

21   dishes, folding clothes, having to use an electric cart when

22   she went to the store.  And that basically says:  The pain

23   keeps me at home, not able to do much.  Can walk maybe 10

24   minutes before having to sit.

25   Q   Okay.  Do you recognize these diagrams that are drawn out

RAHUL VOHRA, MD - CROSS BY MR. DOSS

1    to the side?

2    A   Which ones, sir?

3    Q   (Indicating.)

4    A   Yes, sir.

5    Q   What are those?

6    A   The one on the left is reflex, strength testing.  And the

7    one on the right, I don't know what that one means.  I've not

8    seen that before.

9    Q   The one on the left, what did you say that was?  I

10   couldn't --

11   A   It looks like there's strength testing where it says five

12   out of five.  That means five out of five strength.  And then

13   the two next to that, I assume, means the two out of four

14   reflex when they were checking the reflex.  There are three

15   reflexes in your arm that you check.  I don't know if that

16   means all of them were two or just one of them.  And then in

17   the legs, where you see four out of five, that means that she

18   has weakness in both of her legs, significant weakness.

19   Q   That would be an indication of a diagnostic test; fair?

20   A   It's a physical exam, yes, sir.

21   Q   And then I also want to draw your attention to here.  Well,

22   right there.  (Indicating.)  Do you see those?

23   A   Yes, sir.  The straight-leg raise?

24   Q   What is that?

25   A   Straight-leg raise is a test where you have someone lie

```
 1   down on their back and then you raise their legs straight
 2   up.  If that causes pain then to radiate down the leg, that can
 3   be a sign that someone has irritation or inflammation of a
 4   nerve in their low back.
 5   Q   In your experience what does a positive sign next to that
 6   mean?
 7   A   That means that it's positive, that the patient had pain
 8   going down their leg when you did the test.
 9   Q   What about those other two next to SLR?  What does that
10   mean?
11   A   I don't know.  Does that say T?
12   Q   I believe that's S-T.
13           MS. GRIFFIN:  Counsel could you blow it up?
14           MR. DOSS:  Sure.
15   A   Is it maybe positivish, as if the plus is positive, plus
16   S-H?
17   BY MR. DOSS.
18   Q   Does it appear to be plus S-T, plus S-N?
19   A   Sir, I don't know.
20   Q   Fair enough, fair enough.  Like I said, I wasn't going to
21   make you decipher the handwriting.
22           All right.  I want to draw your attention now here.
23   (Indicating.)  Do you know what any of those things mean?
24   A   I would assume that T there means thoracic spine, and a
25   plus -- again, an assumption on my part -- means that she's
```

1  tender, and then the L would mean lumbar spine or low back, and

2  then plus would mean the same thing.

3  Q   Would that also --

4  a   Tender, that she complained of pain.

5  Q   Is that also a part of a physical examination?

6  A   Yes, sir.

7  Q   Now, Ms. J...... was drug tested on this day, wasn't she?

8  A   Yes, sir.

9  Q   Let's look at page 56.  All right.  You testified on direct

10  about this.  Now, this was the first visit with Dr. Couch;

11  correct?

12  A   Yes, sir.

13  Q   She tested positive for BAR, which I understand are

14  barbiturates; is that right?

15  A   Yes, sir.

16  Q   BZD?

17  A   Benzodiazepines.

18  Q   OPI/MOR.

19  A   Opiates/morphine.

20  Q   PCP?

21  A   It's angel dust.

22  Q   We'll get to that.  TCA?

23  A   Tricyclic antidepressants.

24  Q   Okay.  Are you familiar with false positives for urine drug

25  screens?

1    A    Yes, sir.

2    Q    In fact, sometimes other substances that are not illicit

3    can cause a false positive for an illicit drug; fair?

4    A    Yes, sir.  We talked about that yesterday, that when you

5    get an abnormality on one of these in-office screens, then you

6    always send that for a confirmation to make sure that it was

7    accurate.

8    Q    And PCP, you mentioned, was angel dust.  That's a street

9    name for it; right?

10   A    Yes, sir.

11   Q    What does PCP stand for?

12   A    Phencyclidine.

13   Q    What can give a false positive for PCP?

14   A    There are a number of medications, I think, that can cause

15   false positives for PCP.  They can be -- I think sometimes

16   cough medicines can do that.  I believe I've even seen PCP

17   false positives with some blood pressure medicines.

18   Q    Benadryl?  Have you seen those?

19   A    I've not, but it can.

20   Q    Robitussin-DM would be the cough syrup?

21   A    Cough syrup; that's right.

22   Q    Could cause a false positive; right?

23            MS. GRIFFIN:  Objection as to relevance.

24            THE COURT:  What's the relevance?

25            MR. DOSS:  The criticism for this patient was the

1    failure of the urine drug screen on the first visit.  I would

2    like to explore the possibility that there are false positives

3    known to doctors for these types of drug screens.

4           MS. GRIFFIN:  Your Honor, he has established that.

5    But asking every drug that could possibly cause a false

6    positive is not relevant.

7           THE COURT:  Sustained.

8    BY MR. DOSS:

9    Q    For everything that tested positive here, Dr. Vohra, and

10   then I'll move on, there can be perfectly legal, perfectly

11   legitimate chemicals that can cause false positives for these

12   things?

13          MS. GRIFFIN:  I object to asking the doctor to give a

14   legal conclusion.

15          THE COURT:  Sustained.

16          MR. DOSS:  I'll rephrase, Your Honor.

17   Q    For the items on this urine drug screen result for which

18   there is a positive check mark, there are lawful substances

19   which can cause false positives?

20          MS. GRIFFIN:  Object.  It's the same question.

21          THE COURT:  That's asking for a legal conclusion

22   again.

23          MR. DOSS:  All right.  Let me rephrase.  I think we

24   can get there.

25   Q    For every item checked here where there is a positive, are

RAHUL VOHRA, MD - CROSS BY MR. DOSS

```
 1   there substances which can cause false positives for those?
 2   A   Yes, sir.
 3   Q   So simply because Ms. J...... tested positive, it doesn't
 4   mean that she had, for example, angel dust in her system?
 5   A   That's why you would do the confirmation.
 6   Q   All right.  Let's go back to her initial visit.  Do you see
 7   on page 54 -- all right.  Do you see where it says drugs?
 8   A   Yes, sir.
 9   Q   And do you see where it says:  UDS, positive BAR, positive
10   BZD, positive OPI/MOR, positive PCP, and positive TCA?
11   A   Yes, sir.
12   Q   In your medical experience, does that indicate that that
13   was discussed with the patient on this visit?
14   A   It was noted.  I don't know if it was discussed.
15   Q   So you don't know one way or the other?
16   A   I don't know.
17   Q   All right.  Let's look at page 38, which is the August 7th,
18   2013, visit, which would have been the followup to this;
19   correct?
20   A   Yes, sir.
21   Q   All right.  Under objective, what does it appear
22   Ms. J...... is asking for, based on this record?
23   A   Looks like she's -- they are talking about putting in an
24   intrathecal pain pump, a pain pump.
25   Q   And what is a pain pump?
```

1   A    Pain pump is a device which has a battery and a reservoir.

2   It's about the size of a deck of cards, maybe a little bit

3   bigger.  That's implanted usually in the lower back, under the

4   soft tissue, and then a catheter is run into the area of the

5   spine and it delivers medication directly to your central

6   nervous system.

7   Q   Have you ever surgically implanted a pain pump, Doctor

8   Vohra?

9   A   No, sir.

10  Q   Pardon?

11  A   No, sir.  We have surgeons that do that.

12  Q   A pain pump has no risk of drug diversion; correct?

13          MS. GRIFFIN:  Again, we object.  It's beyond the

14  scope.  He's not alleging the diversion in connection with this

15  patient.

16          THE COURT:  Sustained.

17  BY MR. DOSS:

18  Q   Would a patient asking for pain pump be a red flag for a

19  pain management doctor?

20          MS. GRIFFIN:  Your Honor, objection.  Again, it's not

21  an allegation of red flags with this patient.

22          THE COURT:  Sustained.

23          MR. DOSS:  Your Honor, if I may be heard on that?

24          THE COURT:  Let's come to side bar.

25      (At the side bar, jury not present.)

RAHUL VOHRA, MD - CROSS BY MR. DOSS

1          MR. DOSS:  Your Honor, Dr. Vohra --

2          MS. GRIFFIN:  Wait.  Everybody's not here.

3          MR. DOSS:  Your Honor, Dr. Vohra testified this was a

4   high-risk patient requesting pain medication.  The use of a

5   pain pump would be contrary to being high risk.  She's asking

6   for something for which it cannot be diverted, for which it is

7   controlled in the clinic.  It is relevant to show that this was

8   not a high-risk patient.  She was asking for something that

9   would be contrary to such a high-risk patient.

10          MS. GRIFFIN:  Your Honor, high risk and red flags have

11  no correlation.  Somebody can be a high-risk patient and not

12  have red flags.  They could be high risk because of their

13  condition.  She's asking -- she's waiting for it.  She's not

14  asking for it, according to the record.  We think it's

15  irrelevant.

16          MR. DOSS:  And that can be brought out on redirect,

17  Your Honor.  The state of the evidence --

18          THE COURT:  The problem, as I see it, you're going

19  through it with these patient files and asking about things

20  that he did not testify at all about on direct.  You're not

21  cross-examining on the things that he said were.

22          MR. DOSS:  Matters that we're cross-examining on, Your

23  Honor, go to the whole story of the patient, whereas what was

24  presented on direct were pieces of the patient file that were

25  taken out of context.  So to get the before and the after is

1    essential to show why the pieces about which he testified on

2    direct make sense in context of the particular patient. And it

3    goes to show this was not outside the usual course of

4    professional practice.

5         MS. GRIFFIN: Your Honor, he's not being asked at all

6    about the drug prescribed, which is the allegation. And the

7    questions that are being asked are not relevant as to --

8         THE COURT: Yes, I think there are many, many things

9    that were done that were probably in the usual course of

10   professional practice on all of these patients. But what the

11   government has presented through his expert testimony was what

12   was considered not within the usual course of professional

13   practice. And the fact that you can point out 50 things in

14   each file that were in the usual course of professional

15   practice is not relevant to the opinions that he gave. If you

16   can tie it to the opinions that he gave, then I think it's

17   okay. But simply to go through these files wholesale and find

18   everything that was appropriate I don't think is relevant.

19        (A discussion was held off the record between defense

20   counsel.)

21        MR. DOSS: And our issue with that, Your Honor, is

22   that to the extent that it's criticism of the prescriptions,

23   for example, it is necessary to look at other procedures that

24   were explored that may or may not have helped.

25        THE COURT: Well, I agree. In this particular case

 1    you can ask about the pain pump.  But let's not do what you did

 2    with the previous file and go through every page that shows

 3    what was appropriately done.

 4              MR. DOSS:  And, Your Honor, our issue with that first

 5    file is that is a stand-alone count in the indictment.  It is

 6    not part of the conspiracy.

 7              THE COURT:  I'm just telling you from here forward.

 8    Okay?

 9              MS. GRIFFIN:  It is part of the conspiracy, but there

10    is also a substantive count as to that.

11              MR. DOSS:  And that's why we think it's important to

12    go through that one in such depth.

13              MS. GRIFFIN:  Well --

14              THE COURT:  All I'm saying is I don't think it's

15    relevant for you to keep pointing out what was an

16    appropriate -- what was within the medical usual course of

17    professional practice.  And it's like -- it's like saying

18    everything that was done appropriately negates those things

19    that were done inappropriately.

20              MR. DOSS:  And we don't mean to make that point.  Our

21    point is simply that looking at the patient file in totality,

22    it puts into context the prescribing decisions.

23              THE COURT:  I'm just worried about going off course

24    and basically wasting the jury's time on some of this.  I will

25    certainly let you go into anything that is direct subject

1   matter of the direct examination.  But it's not -- you can have

2   your experts do the things that you want to do on these.  Okay?

3       (In open court, defendants and jury present.)

4   BY MR. DOSS:

5   Q   Let's look at page 29.

6   A   Yes, sir.

7   Q   Does this appear to be a record created a few days after

8   the record we just looked at on August 7th, 2013?

9   A   Yes, sir, about three days later.

10  Q   And does it indicate in general Ms. J...... is suffering

11  from pain?

12  A   Yes, she has multiple pain complaints on that day, from

13  basically her head down into her legs.

14  Q   Now, on direct you testified about a letter that Dr. Couch

15  received from a psychiatrist.  Do you recall that?

16  A   I do, yes, sir.

17  Q   Okay.  On August 10th, if you look to the next page, page

18  30, if you look at psychiatric, what does it indicate about

19  Ms. J......?

20  A   That she has anxiety and depression but no hallucinations.

21  Q   Okay.  Now, Ms. J...... was referred to Dr. Couch by

22  another physician, wasn't she?

23  A   Yes, sir.

24  Q   Okay.  Let's look at page 60.  Does this appear to be the

25  referring physician's file sent to PPSA?

1   A   Yes, sir, I believe that is.

2   Q   And sitting here today, you don't know who Dr. Cecil Parker

3   is, do you?

4   A   I have no idea, sir.

5   Q   Let's look at page 67.

6           MS. GRIFFIN:  Your Honor, again we object.  It is

7   beyond the scope of direct.

8           MR. DOSS:  This is directly relevant to the

9   psychiatric letter, Your Honor.

10          THE COURT:  Overruled.

11  BY MR. DOSS:

12  Q   All right.  On this page -- and again, I'm not going to ask

13  you to decipher the handwriting -- but do you see where it says

14  anxiety noted in this patient's file?

15  A   Yes, sir.

16  Q   Do you see what it says under it?  Can you make that out?

17  A   Pain meds given by Dr. --  Codwell maybe?  Not

18  working.  Not able to sleep at night.

19  Q   Okay.  Do you also see where it appears that she either has

20  had or has been prescribed Zoloft?

21  A   Yes, sir.

22  Q   What is Zoloft for?

23  A   Zoloft's an antidepressant, sir.

24  Q   All right.  We talked a second ago about the pain

25  pump.  Based on your review of this patient's file, Dr. Vohra,

1  do you understand that Ms. J's..... insurer required her to

2  undergo a psychiatric evaluation before it would approve

3  payment for a pain pump?

4  A   That's standard, yes, sir.

5  Q   Let's look at 74.  The date on this letter is September

6  10th, 2013; correct?

7  A   Yes, sir.

8  Q   And this was two days before the letter that you were shown

9  on direct examination; correct?

10  A   Yes, sir.

11  Q   What does this letter say about Ms. J......?

12  A   It says that she's been an active consumer -- I assume

13  means patient -- at BayView Professional Associates since May

14  of 2013, that her levels of narcotics have increased -- excuse

15  me -- due to her level of narcotics, it has been recommended

16  that she be a candidate for a morphine pump and that she was

17  not a threat to herself or others.

18  Q   Two days later, if you turn to the next page, page 75, this

19  letter was sent; correct?

20  A   Yes, sir.

21  Q   Does this appear to be a different group, AltaPointe Health

22  Systems than BayView Professional Associates?

23  A   Yes, sir.

24  Q   And this was the letter you were shown on direct

25  examination; correct?

```
 1   A   It is, yes, sir.
 2   Q   All right.  Now, it makes a reference to a number of
 3   potential diagnoses, and it says she is requesting a morphine
 4   pump due to the number of current oral narcotics she is being
 5   administered as it would be of great benefit to her lifestyle.
 6   Do you see that?
 7   A   Yes, sir.
 8   Q   And then let's look at page 82.  What is this document,
 9   Dr. Vohra?
10   A   This is a note from Dr. Pollard.  He appears to be a
11   psychiatrist.  It says there are no psychiatric
12   contraindications for Ms. Schmitt.
13   Q   Maybe -- maybe an error in the file?
14   A   I don't know.  It's -- I don't know what the date of birth
15   is.
16   Q   Okay.  Let's look at page 80.  All right.  What is this
17   document, Dr. Vohra?
18   A   It looks like this is --
19   Q   Maybe look under:  Why we are writing.
20   A   Yes, sir.
21          MS. GRIFFIN:  Your Honor, this is beyond the scope of
22   direct.  There's no allegation that she wasn't going to have
23   that covered.
24          MR. DOSS:  Your Honor, this puts into context the
25   letter shown to Dr. Vohra on direct examination about this
```

2431

1    patient's potential psychiatric issues.  It places it -- it

2    explains why it's being --

3            THE COURT:  I sustain the objection.  Let's move on.

4    BY MR. DOSS:

5    Q    All right.  On September 24th, 2013, do you recall seeing

6    where Dr. Couch performed a lumbar epidural steroid injection?

7    A    He did, yes, sir.

8    Q    And as we talked about, treating pain with procedures is in

9    the usual course of professional practice; right?

10   A    Yes, sir, it is.

11   Q    October 29 she received a tunneled Microject epidural

12   catheter placement under fluoroscopy; correct?

13   A    Yes, sir.

14   Q    What is that known as?

15   A    Pump trial.

16   Q    Okay.  All right.  Let's look at page 86.

17           Does this appear to be a progress note from October

18   30th, 2013?

19   A    It is, yes, sir.

20   Q    And this would have been after Ms. J...... received her

21   trial pump; correct?

22   A    Right.  This was the followup appointment after her trial

23   pump was placed.

24   Q    On page 90, does this appear to be from the same day?

25   A    It is, yes, sir.

RAHUL VOHRA, MD - CROSS BY MR. DOSS

1  Q   Okay.  Does it say that Ms. J...... is off her oral

2  morphine?

3  A   Yes, sir.

4  Q   Okay.  For breakthrough pain she states:  The pain relief

5  in my legs is awesome, I still have some back pain and a little

6  nausea, not bad; correct?

7  A   Yes, sir.  She was doing better.

8  Q   All right.  On page 93, this was shown to you on direct,

9  and there was a note made that it says:  The patient reports

10  that he is doing very well, and you were asked is Ms. J...... a

11  he or a she.  Do you recall that?

12  A   Yes, sir.

13  Q   From time to time mistakes happen in files; fair?

14  A   Yes, sir.

15  Q   Describing her as a he here didn't affect her treatment,

16  did it, as far as you can tell?

17  A   No, sir.

18  Q   All right.  Let's look at page 95.  This was a urine drug

19  screen confirmation result that you were shown on direct

20  examination.  Do you remember that?

21  A   Yes, sir.

22  Q   All right.  At the top part, under prescribed --

23  A   Yes, sir.

24  Q   -- that indicates that Ms. J...... is taking her

25  medications as prescribed by Dr. Couch; correct?

2433

1    A    Yes, sir.

2    Q    At the bottom, what are those three items?

3    A    Well, the sertraline at the very bottom, that's the Zoloft

4    that we mentioned previously.  And then the desipramine and

5    imipramine are tricyclic antidepressants.

6    Q    Do you recall, Dr. Vohra, from the referring physician's

7    file where it noted Zoloft?

8    A    Yes, sir.

9    Q    That would be consistent with Zoloft; correct?

10   A    Yes, sir.  And that was not one of the drugs I was

11   concerned with yesterday when we spoke.

12   Q    And being consistent at the top for prescribed, does that

13   indicate to you that Ms. J...... is taking her medications as

14   prescribed by Dr. Couch?

15   A    Yes, sir.  The medications that were being prescribed were

16   in her system, and that's what you would expect to see.

17   Q    And just to be clear, Zoloft isn't a schedule II controlled

18   substance, is it?

19   A    None of them are, sir, they are not controlled.

20   Q    All right.  On page one of five, November 27, 2013,

21   progress note, do you remember reviewing this, Dr. Vohra?

22   A    Yes, sir.

23   Q    Do you see under objectives where it states:  Patient would

24   like to try Dilaudid and come off morphine?

25   A    Yes, sir.

RAHUL VOHRA, MD - CROSS BY MR. DOSS

1    Q   Is that an example of drug rotation that you were asked

2    about on direct examination?

3    A   Usually patients don't ask to rotate medications.

4    Q   But would that be an example of drug rotation, as you

5    described on direct examination?

6    A   That is drug rotation, yes, sir.

7    Q   And that can have therapeutic justification; correct?

8    A   Yes, sir.  We talked about that, why we do that.

9    Q   All right.  Eventually Ms. J's..... requests for a pain

10   pump, a permanent pain pump, was approved.  Do you remember

11   that?

12   A   Yes, sir.  And it was put in.

13   Q   Does it appear that Ms. J's..... permanent pain pump was

14   implanted by Dr. Couch on February 11th, 2014?

15   A   Yes, sir.

16   Q   Now, you testified on direct that Ms. J...... eventually

17   had a urine drug screen that tested positive for a variety of

18   medications that Dr. Couch had not prescribed, including

19   Valium.  Do you remember that?

20   A   Yes, sir.

21   Q   Now, at some point in late February, 2014, do you recall,

22   based on your review of the records, that Ms. J...... developed

23   an infection secondary to her pain pump?

24   A   Yes, sir, she developed an infection and the pump was taken

25   out on February 21st.

RAHUL VOHRA, MD - CROSS BY MR. DOSS

1  Q   Okay.  And she had to be admitted to Springhill Memorial

2  Hospital; correct?

3  A   She did.

4  Q   She was in the hospital for several days, based on your

5  review of these records, wasn't she?

6  A   Yes, sir.

7  Q   Okay.  Let's look at page 136.  Does this appear to be

8  Ms. J's..... discharge summary from her stay at the hospital

9  where the pain pump was removed?

10  A   Yes, sir.

11  Q   Do you see where it says:  Discharge medications?

12  A   Yes, sir.

13  Q   Now, on direct, I believe you testified that a subsequent

14  urine drug screen which tested positive for Valium was

15  concerning to you.  Do you remember that?

16  A   It was, yes, sir.

17  Q   Do you see where Ms. J...... had been prescribed Valium by

18  the hospital?

19  A   Yes, sir, I do.

20  Q   Now let's look at that urine drug screen.  Let's look at

21  page 133.  Now, this was on March 18, 2014?

22  A   That's correct.

23  Q   That would have been five days after Ms. J...... was

24  discharged from the hospital?

25  A   Yes, sir.

1  Q   And she did test positive for which of these which would be

2  indicative of Valium?

3  A   The diazepam and the nordazepam, sir.

4  Q   And that could be explained by her prescription for Valium

5  from the hospital; correct?

6  A   It could, yes, sir, that one would.

7  Q   These other items, under the not prescribed, she could have

8  also received those while she was staying in the hospital,

9  couldn't she?

10  A   If she received them while in the hospital, that would have

11  been long out of her system.

12  Q   Five days?

13  A   Yes, sir.

14  Q   Even if she had been given take-home prescriptions?

15  A   I didn't see Demerol as a take-home prescription, sir.

16  Q   And do you know what level of Demerol, if any, she received

17  while she was in the hospital?

18  A   No, sir.  I believe she was discharged on February 25th or

19  6th.  I'm sorry.  Could I see that discharge note?

20  Q   Yeah, sure.  It's page 136, please.  The discharge date is

21  at the top.  Do you see that?

22  A   3/13, yes, sir.

23  Q   That would have been five days earlier?

24  A   Five days, yes, sir.

25  Q   Now, just to clarify, if we turn back to page 133, when it

```
 1   says not prescribed, how does someone like Castle Medical
 2   figure out what's not prescribed versus what is prescribed?
 3   A   When you do the drug test, you fill out on the drug test
 4   what medication is being prescribed.  So that's how they know.
 5   Q   So, for example, PPSA would fill out a form indicating
 6   which medications Ms. J...... was being prescribed.  Castle
 7   would then do the confirmation.  To the extent they showed up,
 8   they would state consistent.  And to the extent anything not
 9   listed by PPSA, it would be listed under not prescribed and
10   inconsistent; correct?
11   A   Yes, sir, that's how it works.
12   Q   So a document like this -- and we've seen several
13   throughout these patient files -- it doesn't mean; correct;
14   that Ms. J...... didn't have a prescription for these things
15   from someone, it just means she didn't have a prescription for
16   these things that PPSA maybe knew about or checked upon the
17   form; right?
18   A   It means that they are not aware that she's taking this
19   medication.
20   Q   But she may have a prescription for those items from
21   someone else; correct?
22          MS. GRIFFIN:  Your Honor, it's asked and
23   answered.  And it's speculation as well.
24          THE COURT:  Can you answer that?
25   A   She -- could she have a prescription?  She may.  I don't
```

1    know, sir.

2    BY MR. DOSS:

3    Q    All right.  The last document in this patient file I'm

4    going to show you is page 141.  And this is May 14th,

5    2014.  And her objective, Dr. Vohra, does it indicate:  Patient

6    states that she would like to talk to Dr. Couch about her

7    options since the pain pump did not work, states that she is

8    still in a lot of pain?

9    A    Yes, sir.

10   Q    Now I want to turn your attention to Patient D.......,

11   Dr. Vohra.

12   A    Yes, sir.

13   Q    On direct, Dr. Vohra, do you remember Ms. Griffin asking

14   you this question:  Did you also determine that later in

15   D's..... treatment his drug screens were positive for

16   methadone?  Do you remember that question?

17   A    Yes, sir, I think so.

18   Q    And do you remember that your answer was:  It

19   was.  Methadone is another opiate, another pain medication.

20   And again, that was one of the drugs that was present on the

21   drug screen that was not written for.  Do you remember that

22   answer?

23   A    Yes, sir.

24   Q    I want to show you page 97 of Mr. D's..... file.  And this

25   would have been the in-office urine drug screen; correct?

RAHUL VOHRA, MD - CROSS BY MR. DOSS

```
 1    A    Yes, sir.
 2    Q    And do you see under results where it indicates positive
 3    for methadone?
 4    A    Yes, sir.
 5    Q    And that's what you were talking about where Mr. Dunaway
 6    tested positive for methadone; correct?
 7    A    What date are we looking at, sir?
 8    Q    November 19th, 2013.
 9    A    Yes, sir; that's correct.  And he had the confirmation done
10    that didn't show it.
11    Q    Now let's look at page 99.
12    A    Yes, sir.
13    Q    Does this appear to be a confirmation testing of that urine
14    sample?
15    A    Yes, sir.  And this was the urine sample that was
16    inconsistent because he didn't have the Klonopin in his system.
17    Q    Do you see methadone listed on this drug test?
18    A    I don't, no, sir.
19    Q    Did that indicate that the urine drug screen was a false
20    positive for methadone?
21    A    Yes, sir.
22    Q    So with your direct testimony, that testing positive for
23    methadone was concerning to you, do you still stand by that
24    opinion Dr. Vohra?
25    A    No, sir.  That's --
```

1    Q    Because the confirmation tests revealed no methadone?

2    A    Yes, sir, I just overlooked that.  My fault.

3    Q    What's the accuracy rate for urine drug screens in-office?

4    A    It depends on which --

5         MS. GRIFFIN:  Your Honor, object to the foundation.

6         MR. DOSS:  I will ask some followup questions, Your

7    Honor.

8         THE COURT:  All right.

9    BY MR. DOSS:

10   Q    Are you familiar with urine drug screens that pain

11   management clinics like PPSA would have used in-clinic?

12   A    I'm not sure exactly what they were using, sir.

13   Q    Okay.  So you're not here to testify about any accuracy

14   rates for urine drug screens you've seen?

15   A    No, sir.

16   Q    Dr. Vohra, you testified on direct that fentanyl is not

17   your drug of choice.  Do you remember that?

18   A    Yes, sir.

19   Q    Have you ever advocated for the use of fentanyl for a

20   patient who was suffering from back pain?

21   A    Have I ever prescribed it?  Yes, I have.

22   Q    For back pain?

23   A    Yes.

24   Q    And so prescribing a fentanyl product in and of itself is

25   not a red flag; correct?

2441

1    A    I -- no, sir.  I mean, it's an option that we have.

2    Q    All right.  Let's look at page 41.  Now, you were shown

3    this record on direct.  Do you remember this?

4    A    Yes, sir.

5    Q    And you said patient unhappy about previous meds.  Do you

6    remember that?

7    A    Yes, sir.

8    Q    What does the rest of that sentence say?

9    A    Feels that Dr. Couch was pressured into changing by

10   adjuster.

11   Q    That would be a medication change; correct?

12   A    Yes, sir.

13   Q    Now, in your review of this file, Dr. Vohra, did you come

14   to understand that this patient had been referred to Dr. Couch

15   by a workers' comp adjuster?

16   A    I was not aware of that, sir.

17   Q    Did you see any records from Coventry Workers' Comp

18   Services in your review of this patient file?

19   A    I think I did see some things in there.  But I didn't know

20   how he was referred there.

21   Q    Did you see at the end of 2012, Dr. Vohra, where this

22   patient's medical regimen was submitted to Coventry Workers'

23   Comp Services for what was called a peer-to-peer drug

24   assessment?

25   A    I did, yes, sir.

1   Q   What is a peer-to-peer drug assessment, if you know?

2   A   It's physicians that basically will review someone's chart

3   and then give their opinion as to any changes that should be

4   made, if they feel like something different needs to be done.

5   Q   And that happened with this patient file at the end of

6   2012, didn't it?

7   A   I did, yes, sir.

8   Q   And based on that peer-to-peer review, did you find that

9   the workers' comp carrier recommended changing OxyContin to

10  morphine sulfate ER, Oxycodone to morphine sulfate IR, the

11  alprazolam to Buspar, and the carisoprodol to baclofen?

12  A   Yes, sir.

13          MS. GRIFFIN:  Your Honor, we object to the relevance.

14          THE COURT:  He didn't testify about any of that on

15  direct.

16          MR. DOSS:  He has criticized --

17          THE COURT:  Counsel, if you want to justify your

18  question, come to side bar, please.

19      (At the side bar, jury not present.)

20          MR. DOSS:  He was asked about the patient note.  It

21  was read into evidence:  Patient states he is unhappy with

22  meds.  That was not what the sentence said in the record.  It

23  said:  Feels like Dr. Couch pressured to change by insurance

24  adjuster.

25          The rest of the story with these records is that the

1  insurance adjuster made the change after this peer-to-peer

2  document review of the patient file, then when patient came in

3  and said his meds were not working well for me, I want to go

4  back to what I had before, that's when the change back was

5  made.  So it's relevant to show that we're taking into

6  consideration the patient's input, open to insurance companies.

7  We're not hiding anything about how we're prescribing.  There's

8  no criticism by the insurance company about dosages or anything

9  like that.  They are changing one thing to another without any

10 significant change between them.  That shows that this is not

11 outside the ordinary course of professional practice and

12 directly responds to the patient record which was brought out

13 on direct by the government.

14         MS. GRIFFIN:  Your Honor, he has brought out the next

15 sentence what the patient said.  But to go into what peer-to-

16 peer review was, it has no relevance, it is beyond the scope of

17 direct, and it's purpose -- they can call their own expert,

18 they can call their own --

19         THE COURT:  What was the date of this peer-to-peer

20 review?

21         MR. DOSS:  The peer-to-peer review was at the end of

22 2012.

23         THE COURT:  My notes don't indicate that he testified

24 about anything between September of 2011 and February of 2013

25 in the charts.

1          MR. DOSS:  February of 2013 is when he is changed back
2     to what he was on before the insurance company reviewed --
3          THE COURT:  So what relevance does the insurance
4     company's recommendation have to anything if he didn't testify
5     what was done during that time?
6          MR. DOSS:  It shows there was nothing hidden about the
7     way these things were being prescribed.
8          THE COURT:  Hidden from -- he's not accused of hiding.
9     I think that's irrelevant.  So let's just limit your cross-
10    examination to things that are relevant to what his testimony
11    was on direct.
12         MR. DOSS:  And, Your Honor, respectfully, we think
13    what the patient's reaction to the drugs was and the preference
14    what he was on before the insurance company prevented or said
15    change it to a different type, we think that is relevant.
16         THE COURT:  So he did, he changed it back and that's
17    what he's criticizing.
18         MR. DOSS:  And to show that we have to put in some
19    background to explain how it's being changed.  And that's our
20    only point with this line of questioning.
21         THE COURT:  Well, I don't think it's relevant that it
22    was changed and then changed back.  As far as his testimony, it
23    was the same all the way through, and that's what his testimony
24    was about.  I mean, there was no testimony about the fact that
25    it was changed or the significance of it.  So I don't think

 1    it's relevant.

 2         MR. DOSS:  And the only point we would make on that,

 3    the insurance company does not say:  You're on way too high of

 4    a dosage for this patient.

 5         THE COURT:  That's not their job.  Really, that is not

 6    relevant.  So let's limit it to what is relevant.

 7         MR. DOSS:  Understood.

 8         THE COURT:  We're going to go ahead and break for

 9    lunch now.

10         MS. GRIFFIN:  Thank you.

11         THE COURT:  Mr. Doss?  I said we're going -- I'm going

12    to let the jury go to lunch right now.

13         MR. DOSS:  Okay.  Thank you.

14      (In open court, defendants and jury present.)

15         THE COURT:  All right.  Ladies and gentlemen, I'm

16    going to give you your lunch break at this time.  We are going

17    to break until 1:30.  No discussion about the case.  Leave your

18    pads on your chairs.  Be back downstairs in the jury assembly

19    room, ready to be called back up, at 1:30.  Thank you.

20      (In open court, defendants present, jury not present.)

21         THE COURT:  Counsel, over the lunch hour if you have

22    the time, I want you all to be thinking about a schedule for

23    submitting proposed jury instructions in this case.  I would

24    like to have them around about the time the government rests,

25    if possible.  So discuss it among yourselves and see what is

1   appropriate for your schedules that would accommodate the Court

2   as well and then let's talk about it later this afternoon.

3        Okay?

4        MR. SHARMAN:  Yes, ma'am.

5        THE COURT:  All right.

6        MS. GRIFFIN:  Your Honor, from the government, we can

7   have them to the Court that day we rest.

8        THE COURT:  All right.  I would like them before you

9   rest.

10        MS. GRIFFIN:  Before then.  My mistake.

11        THE COURT:  Just a few days before you rest.  So maybe

12   that Monday of that week or something like that.

13        MS. GRIFFIN:  We will do that.

14        THE COURT:  But y'all discuss it, because I want it

15   simultaneous.  I don't want responses and then replies.  I want

16   what you can agree on together maybe be submitted as one, and

17   then anything different from the two of you as other

18   submissions.  Okay?

19        MS. GRIFFIN:  Will do, Your Honor.

20        THE COURT:  Thank you.  We're in recess.

21        (A recess was taken at approximately 12:05 p.m.)

22        (Afternoon session, 1:35 p.m., in open court, defendants

23   and jury present.)

24        THE COURT:  All right, Mr. Doss.

25        MR. DOSS:  Thank you, Judge.

1    Q    Good afternoon, Dr. Vohra.

2    A    Good afternoon.

3    Q    I believe we left off with Patient Dunaway; is that right?

4    A    Yes, sir.

5    Q    If I understood your testimony on direct examination about

6    this particular patient, the primary criticism was that over

7    time Mr. Dunaway had inconsistent drug screens but there was no

8    intervention taken; was that a fair summary?

9    A    Yes, sir.  He continued to be prescribed medications,

10   controlled substances, despite inconsistent drug screens.

11   Q    Now let's take a look at page 59.  Excuse me.  45.  All

12   right.  This appears to be a urine drug screen on March 5th,

13   2013; correct?

14   A    Yes, sir.

15   Q    Would this have been an inconsistent result?

16   A    Let's see.

17   Q    Based on what Mr. Dunaway had been prescribed?

18   A    Yes, sir.

19   Q    And let's look at page 59.  And this appears to be

20   Mr. D's..... next visit to PPSA on May 28, 2013; correct?

21   A    I have a note from April, sir.

22   Q    Okay.  But let's look at this one.

23   A    Okay.  Yes, sir.

24   Q    He appears at PPSA on May 28, 2013; correct?

25   A    Yes, sir.

RAHUL VOHRA, MD - CROSS BY MR. DOSS

1    Q    Do you see at the bottom there's a handwritten note:  Pill

2    count two weeks, call patient biweekly, pill count/UDS?

3    A    Yes, sir.

4    Q    Based on your medical experience and your review of these

5    files, what does that mean?

6    A    Well, pill count, you're going to ask the patient to come

7    in and see how much of their medication they've used, and to

8    see if they are taking it properly.  And the UDS, of course, is

9    doing a drug screen.

10   Q    Is that a form of intervention?

11   A    No, sir.  It's just a form of -- what's the word I'm

12   looking for?  It's a way of assuring that the patient's being

13   compliant with their medications.  It's not intervention.

14   Q    What do you mean by intervention, Dr. Vohra?

15   A    Intervention would be to sit down and talk with the

16   patient, assess why they are continuing to have drug screens

17   which are not consistent, and then assessing at that point, if

18   someone is having repeatedly inconsistent drug screens, that

19   that person probably needs to be looked at by an

20   addictionologist.

21   Q    Based on your review of this file, Dr. Vohra, do you know

22   one way or the other whether that actually happened?

23   A    I never saw anything about a referral to an

24   addictionologist, sir.

25   Q    Well, it could have happened, it might not have happened;

1   fair?

2   A   Like I said, I didn't see anything in the chart about that.

3   Q   But you did see that there was a pill count order for this

4   patient; right?

5   A   There was, yes, sir.

6   Q   And that's an effort, is it fair to say, by PPSA to ensure

7   that this patient was taking his medications as prescribed?

8   A   Yes, sir.

9   Q   Let's look at page 65.  Before we talk about this note,

10  just a general question, Dr. Vohra:  Based on your review of

11  these files for PPSA, did you find that generally speaking the

12  records were in chronological order?

13  A   Generally, yes, sir.

14  Q   So a record after a date generally meant that record was

15  added after the date, based on your review of the files,

16  Dr. Vohra?

17          MS. GRIFFIN:  Your Honor, objection to relevance and

18  there's no foundation for him to know about whether their

19  records were put in chronologically.

20          MR. DOSS:  I'll back up the question, Your Honor.

21          THE COURT:  All right.

22  BY MR. DOSS:

23  Q   How many patient files or how many hundreds of pages of

24  patient files for PPSA did you review in preparation for your

25  testimony here today, Dr. Vohra?

1    A   Several hundred.

2    Q   Several hundred.  And based on your review, as a general

3    rule -- there may be exceptions here and there -- but as a

4    general rule, were the records in chronological order per

5    patient?

6    A   Most of them were, some of them weren't.

7    Q   Okay.  This page that we're looking at now, page 65, that

8    came after the May 28, 2013, record; correct?

9    A   If you say so, sir.  I don't recall the order I looked at

10   it.

11          MS. GRIFFIN:  Your Honor, object.  There's no

12   foundation for Dr. Vohra's knowledge.

13          MR. DOSS:  And I'll move on, Your Honor.

14          THE COURT:  All right.

15   BY MR. DOSS:

16   Q   What does this note say, Dr. Vohra?  (Indicating.)

17   A   Drug twice a month, pill counts, less than two weeks,

18   random drug screen.

19   Q   And that symbol on the note, the circle with the slash

20   through it, is that sometimes shorthand for no?  (Indicating.)

21   A   Yes, sir.  That's what that means.

22   Q   And do you see at the bottom, it says:  Pills dispenser?

23   A   Yes.

24   Q   Do you have any idea what that means?

25   A   Yes, sir.

1  Q   What is that?

2  A   A pills dispenser is a dispenser that you put medications

3  in and then it will allow you to get to one particular or

4  several medications at the time that you're supposed to get

5  them.

6  Q   Is this a form of intervention by PPSA?

7  A   I think, yes, sir, I would say that they are trying to make

8  sure he'll take his medications correctly.

9  Q   Would you agree with me that your original opinion that

10 there were inconsistent drug screens but no intervention was

11 taken might have been a bit overbroad?

12 A   No, sir.

13 Q   All right.  Let's look at page 72.  This is a July 23rd,

14 2013, patient visit; correct?

15 A   Yes, sir.

16 Q   And if you -- then let's look at page 77.  Does this appear

17 to be a prescription that was -- it's at least dated on the

18 same date as that progress note?

19 A   Yes, sir, for Roxicodone.

20 Q   And that's 15 milligrams; right?

21 A   Yes, sir.

22 Q   You would agree with me that that's a fairly low dose of

23 Roxicodone?

24 A   Three times a day, that's a moderate dose of Roxicodone,

25 oxycodone, yes, sir.

1   Q   Now, on the July 23rd, 2013, patient note on page 72,

2   there's a note where it says toward the bottom -- what does

3   that say?

4   A   Did not bring pills to appointment this month.

5   Q   And then if we zoom back out, there's a note here with a

6   check box.  What does that say?

7   A   Patient is not compliant, has not been compliant with their

8   opioid agreement.

9   Q   Are you familiar with opioid agreements?

10  A   Of course.

11  Q   Have you seen some opioid agreements in these patient

12  files?

13  A   Yes, sir, I think I saw them in all of them.

14  Q   Is this a form of intervention by PPSA?

15  A   No, sir.  Nothing was done.  It's just noted that he had

16  been noncompliant.

17  Q   And again, just to make sure we're clear, there's nothing

18  documented in this record that anything was done, but you don't

19  know whether anything was done; fair?

20  A   All I know is what was in the record, sir.

21  Q   All right.  Let's look at page 94.  This would appear to be

22  a November 19th, 2013, progress note; correct?

23  A   Yes, sir.

24  Q   And do you see under current treatment where the patient is

25  not pleased with his current PPSA medications and he says:

1  Needs to up dosage?  Do you see that?

2  A   Yes, sir.

3  Q   And then if we look at page 96, what did PPSA do with his

4  medications?

5  A   They did not change them.

6  Q   So even though the patient was asking for them to be

7  increased, PPSA still continued him on his present medications;

8  correct?

9  A   Yes, sir.  I assume the physician felt that the medication

10  should not have been increased at that time.

11  Q   And then on page 99, I believe you testified about this one

12  on direct.  This would have been a urine drug screen for a

13  collection that same date.  And he tested consistently with his

14  prescribed medications; correct?

15  A   That was -- sir, what was the date of that, sir?  11/19?

16  Q   Yes, sir.

17  A   I believe it was inconsistent -- I think he was also being

18  prescribed Klonopin at that time, which was not present.  So

19  that would be inconsistent.

20  Q   And that would have been for his anxiety; is that correct?

21  A   Anxiety or sleep, yes, sir.

22  Q   But as to his pain medications, oxycodone, and the Opana,

23  that was showing up on his urine drug screen; correct?

24  A   Yes, sir.

25  Q   So there were some inconsistent drug screens earlier in

1  2013; correct?

2  A   Yes, sir.

3  Q   But after PPSA had some pill counts and a documented note

4  that he was not compliant with his opioid agreement, is it fair

5  to say by the end of 2013 he had consistent urine drug screens

6  for his pain medication?

7  A   No, sir, they continued to be inconsistent.

8  Q   Well, then, let's look at -- and that would have been the

9  drug screen that we talked about earlier, the methadone one?

10 Is that the one you're referring to?

11 A   That one that we just talked about, the 11/19, and the next

12 one that was done in March.

13 Q   And again, sitting here today, Dr. Vohra, after those

14 inconsistent drug screens, you don't know whether any

15 intervention was taken, all you can testify about is what's in

16 the patient record; fair?

17 A   All I can testify about is what I've had a chance to

18 review, sir.

19 Q   Okay.  I want to shift gears and turn to Patient Paulson,

20 Dr. Vohra?

21 A   Yes, sir.

22      MR. DOSS:  Before we begin, if I could use the ELMO,

23 please?  And this is not to be published at this time.

24 Q   Dr. Vohra, I show you what we've marked for identification

25 purposes as Couch Exhibit 119.

1  A   Yes, sir.

2  Q   Do you see at the top?  Do you recognize that organization

3  in the top left-hand corner?

4  A   Yes, sir.

5  Q   Do you recognize this document?

6  A   Yes, sir.

7  Q   Is this in fact the guideline document that you referenced

8  earlier in your testimony?

9  A   Yes, sir, it was one of them.

10         MR. DOSS:  Your Honor, at this time we offer Couch

11  Exhibit 119.

12         MS. GRIFFIN:  No objection.

13         THE COURT:  All right.  Mark it in.

14     (Defendant Couch Exhibit 119 was entered into evidence.)

15         MR. DOSS:  If we could switch back to the laptop,

16  please?

17  Q   I want to show you, Dr. Vohra -- let's start with page --

18  okay -- page 10 of this document.  And let me -- before we go

19  into the details of this, what is the Federation of State

20  Medical Boards?

21  A   It's the organization to which all of the state medical

22  boards belong to.  It's an oversight organization.

23  Q   Is it a voluntary organization?

24  A   Are you asking me if state medical boards have to be part

25  of this?

1   Q   Yes, sir.

2   A   I don't know the answer to that, sir.

3   Q   When it says model policy on the use of opioid analgesics

4   in the treatment of chronic pain, what is your understanding of

5   a model policy, what is that?

6   A   Model policies -- it's a baseline policy that they think is

7   a good set of guidelines to use when you're prescribing these

8   medications.

9   Q   And this was adopted in July of 2013; correct?

10  A   Yes, sir, this one that I looked at was 2013.

11  Q   Throughout this document -- let me ask you this:  Are you

12  familiar generally with the contents of this document?

13  A   Yes, sir.

14  Q   Okay.  And did you review this in preparation for your

15  testimony here today?

16  A   Quickly, yes, sir.

17  Q   Did you find that this document drew a distinction between

18  physicians generally and pain management specialists

19  particularly?

20  A   I don't recall that, sir.  If it did, I'll take your word

21  for it.

22  Q   All right.  But let's look at page 11, for an example, if

23  you don't mind.  And the top paragraph, would you read that to

24  the jury, please?

25  A   Yes, sir.  If the patient's progress is unsatisfactory, the

```
 1    physician must decide whether to revise or augment the
 2    treatment plan, whether other treatment modalities should be
 3    added or substituted for the opioid therapy, or whether a
 4    different approach -- possibly involving referral to a pain
 5    specialist or other health professional -- should be employed.
 6    Q   Is that an example of where the policy or this model
 7    document, this model policy, is drawing a distinction between
 8    the physicians generally, maybe primary care physicians, for
 9    example, and pain specialists in particular?
10    A   Yes, sir.
11    Q   Now let's look at page 10, please.  And before we zoom in,
12    do you see that there's a section here titled Periodic Drug
13    Testing?
14    A   Yes, sir.
15    Q   All right.  I want to draw your attention to the first
16    paragraph, periodic drug testing.
17    A   Yes, sir.
18    Q   If you could, read the first two sentences for us, please.
19    A   Periodic drug testing may be useful in monitoring adherence
20    to the treatment plan, as well as in detecting the use of
21    nonprescribed drugs.  Drug testing is an important monitoring
22    tool because self-reports of medication use is not always
23    reliable and behavioral observations may detect some problems
24    but not others.
25    Q   Okay.  And this document, you would agree, acknowledges
```

RAHUL VOHRA, MD - CROSS BY MR. DOSS

```
 1    that drug testing can be helpful in the treatment of pain;
 2    fair?
 3    A   Yes, sir.
 4    Q   Okay.  What does that last sentence say?
 5    A   Patients being treated for addiction should be tested as
 6    frequently as necessary to ensure therapeutic adherence.  But
 7    for patients being treated for pain, clinical judgment trumps
 8    recommendations for frequency of testing.
 9    Q   Okay.  Does this draw a distinction between patients being
10    treated for pain and patients being treated for addiction?
11    A   Yes, sir.
12    Q   And what does it mean, if you know, what is clinical
13    judgment?  What does that mean?  What does that term mean in
14    this policy?
15    A   That's just in the physician's best judgment how often they
16    feel a particular patient needs to be tested while they are
17    being treated.
18    Q   And clinical judgment can be informed by why the patient is
19    coming to the clinic; correct?
20    A   Yes, sir.
21    Q   It can be informed by how long the patient has been treated
22    at the clinic; fair?
23    A   Yes, sir.
24    Q   It can be informed by the patient's family life; fair?
25    A   Yes, sir.
```

1  Q   And a variety of factors can go into that; right?

2  A   Yes, sir.

3  Q   This document, though, Dr. Vohra, doesn't mandate drug

4  testing, does it?

5  A   It's not -- that paragraph's not written that way, no, sir.

6  Q   Are you aware of anywhere in this model policy that drug

7  testing is mandated for chronic pain in patients?

8          MS. GRIFFIN:  Objection, Your Honor.  It is a model

9  policy.  It's nothing binding and it is beyond the scope of

10  direct.

11          MR. DOSS:  Your Honor, he testified that this is the

12  standard that he relied on in forming his judgment about

13  Dr. Couch's practice.

14          THE COURT:  All right.  I overrule the objection.

15  BY MR. DOSS:

16  Q   Dr. Vohra, do you need me to repeat the question?

17          MS. GRIFFIN:  Your Honor, may we approach?

18          THE COURT:  All right.

19      (At the side bar, jury not present.)

20          MS. GRIFFIN:  It's not our recall that Dr. Vohra said

21  this is what he relied on.  As I recall that, he said it was

22  one of several things that he relied on.  And I think -- do you

23  think he said this is the only thing he relied on?

24          MR. DOSS:  When I asked him what he meant by

25  guidelines, this is what he said.

2460

1          THE COURT:  Well, my notes don't reflect what he was

2    answering when he said he -- when he referenced these

3    particular guidelines.  But I don't have a recollection that it

4    was his entire opinion about Dr. Couch.

5          MR. DOSS:  I'm happy to ask followup questions, but I

6    would like to at least ask him about this particular guideline

7    and then I can ask him:  What other guidelines if any did you

8    rely on in forming your opinions?

9          I have no issue asking him that question, Your Honor.

10         THE COURT:  Okay.  Well, the only problem that I see

11   with the question was a model policy something mandated or kind

12   of opposite --

13         MR. DOSS:  I agree.  And if Your Honor recalls, we

14   tried offering this with Dr. Greenberg, the government

15   objected, saying it was a model policy.  Now Dr. Vohra's saying

16   he relied on it in parts.  We wanted to explore that.

17         THE COURT:  The objection was to the fact, as I

18   understood it, to the fact that you asked if the model policy

19   mandated it.

20         MR. DOSS:  I can clarify that question, Your Honor.

21         THE COURT:  Okay.

22      (In open court, defendants and jury present.)

23   BY MR. DOSS:

24   Q   Dr. Vohra, in this document are you aware of any point in

25   this document -- and I'm happy to provide you a copy, if you'd

2461

1   like to look through it -- are you aware of any point in this

2   document where pain specialists are advised that they should

3   always drug test their patients?

4   A   Sir, I don't recall.  I don't know if it's in there or not,

5   you know.  And I didn't just use this.  I used standard of care

6   in these patients.  This is not the sole basis for my opinions,

7   sir.

8   Q   When you say standard of care, if I wanted to go and look

9   that up, is that written down somewhere?

10  A   Standard of care is what a reasonably diligent physician

11  would do in management of a patient.  There is no notebook or

12  book that you can go to that says:  If you have a 55-year-old

13  man with X, Y, and Z, that you do this or the drug screen shows

14  that.  It's just not there.

15  Q   Because every patient is different; is that fair?

16  A   Right.  It's impossible to -- to do that.

17  Q   Is it fair to say also that there are few brightline rules

18  in the practice of medicine?

19  A   I mean, there certainly are brightline rules and there are

20  some patients that those don't apply to, yes, sir.

21  Q   And when it references clinical judgment in this paragraph

22  that's called out, is it your understanding that that's taking

23  into account that the doctor is there to eyeball the patient,

24  understand the patient's history, and understand why the

25  patient is presenting, taking all of that information into

1    account when deciding whether to test for drugs?

2         MS. GRIFFIN:  Your Honor, objection.  There's no

3    allegation that drugs were not tested for.  It has no

4    relevance.

5         MR. DOSS:  Your Honor, these last two patients, his

6    criticism is they were not drug tested.

7         THE COURT:  Yes, I overrule the objection.

8    BY MR. DOSS:

9    Q   And to be clear on the drug testing, before we move on, you

10   said you relied on this standard that we just looked at, the

11   model policy, and you relied on the standard of care, which is

12   an unwritten idea; right?

13   A   My training, my education, my experience as a physician, my

14   understanding of the standard of care as a treating pain

15   physician, yes, sir.

16   Q   Is there any other written document on which you relied to

17   form your opinions that you're presenting in court today, other

18   than --

19   A   Than what we've talked about, no, sir.

20   Q   All right.  Now turning to Patient Paulson, in your review

21   of Mr. Paulson's patient file, Dr. Vohra, did you understand

22   that he was a pain pump patient?

23   A   Yes, sir, he had a placement of a pump, I believe, in 2009,

24   late 2009.

25   Q   Okay.  And in your review of Mr. Paulson's patient file,

1    did you come to understand, at least based on the records, why

2    he was seeking pain management in the first place?

3    A    He was having difficulty with his neck and his shoulder and

4    his back.

5    Q    He had been in a motor vehicle accident; correct?

6    A    I don't remember, but if you say so, yes, sir.

7    Q    A horse had flipped over on top of him; correct?

8    A    Yes, sir.

9    Q    He had had a crushed and slipped disk; correct?

10   A    Yes, sir.

11   Q    And he was referred to PPSA; is that correct?

12   A    He was.

13   Q    All right.  Now, on direct examination you testified that

14   in January of 2011 the patient reported that his medications

15   were stolen; do you recall that?

16   A    Yes, sir.

17   Q    Sitting here today, do you know whether his medications

18   were in fact stolen?

19   A    I don't know if they were lost or stolen, no, sir.

20   Q    Nothing in your review of this file suggests one way or the

21   other; correct?

22   A    It just says the patient said they were stolen.

23   Q    And in February of 2013, you also testified on direct

24   examination, that he also had his medication -- he reported his

25   medications being stolen, do you remember that?

```
 1   A   Yes, sir.
 2   Q   Now, this patient was treated for several years; fair?
 3   A   Yes, sir.
 4   Q   And as a pain pump patient, he had to come in on almost a
 5   45-day basis to have his pain medication replenished in his
 6   pump; correct?
 7   A   Yes, sir.
 8   Q   Approximately how many times did he present to PPSA?
 9   A   Gosh, 40-50, it looks like.
10   Q   And he only reported his medications were stolen twice;
11   correct?
12   A   Stolen twice, lost once.
13   Q   So three times he had a problem with his medications over a
14   40- to 50-time visit; correct?
15   A   Yes, and he also, I think, ran out.
16   Q   And that sometimes happens with chronic-pain patients,
17   doesn't it?
18   A   Yes, sir.
19   Q   In February 2013 you testified about this patient's
20   respiratory problems, do you remember that?
21   A   Yes, sir.
22           THE COURT:  Mr. Doss, you keep saying:  In February
23   2013, you testified.  In fact he testified in 2017; right?  I
24   mean, the record reads that you're saying that he testified
25   about this in 2013.
```

1  BY MR. DOSS:

2  Q   Is it your understanding, Dr. Vohra, that Mr. Paulson had

3  respiratory problems or at least reported them in February of

4  2013 or February of 2017?

5  A   It was February of 2013, sir, that he had respiratory

6  failure.

7         MR. DOSS:  Thank Your Honor.

8         While we're waiting for that -- I'm sorry.

9  Q   All right.  Now, respiratory problems, that can be the

10 result of opioids; correct?

11 A   Opioids can worsen respiratory problems and can cause them,

12 both.

13 Q   Okay.  And it indicates under notes, and the part you read

14 to the jury was:  Patient has been hospitalized for respiratory

15 failure.  Do you remember reading that?

16 A   Yes, sir.

17 Q   What does the rest of that say after that semicolon?

18 A   He was trached on a ventilator, and then he still has a

19 tracheostomy, and then the Passy-Muir is a type of valve on the

20 tracheostomy.

21 Q   After that?

22 A   He has -- he had pneumonia, a flareup of his COPD, which he

23 had had, along with heart disease, and he was using a cane to

24 walk.

25 Q   It could have been the opioids had nothing to do with his

```
 1   respiratory problems; fair?
 2   A   Again, we don't know.
 3   Q   And it appears that the patient was using a cane to assist
 4   with his ambulation, do you see that?
 5   A   Yes, sir.
 6   Q   Over time did you see, in review of this patient's files,
 7   that his wife would accompany him from time to time at his
 8   visits?
 9   A   I believe so, yes, sir.
10   Q   And that can be important in ensuring proper use of
11   medication; correct?
12   A   Yes, sir.  Family members can be helpful in making sure
13   someone is doing what they're supposed to be doing.
14   Q   If we could look at the top right corner of that particular
15   progress note?  And I believe that's where you testified,
16   Dr. Vohra, that the patient had complained of stolen
17   medications; is that right?
18   A   Yes, sir.  He was upset that they had not replaced his
19   stolen medications.
20   Q   And does it say:  I explained our policy to patient and
21   wife?
22   A   Yes, sir.
23   Q   Based on your review of the medical records, do you have
24   any idea what that means?
25   A   I would assume that meant that they were not going to
```

1  replace his stolen medication, his reported stolen medications.

2  Q   Pardon?  I didn't --

3  A   That they were not going to replace his medications that he

4  had reported had been stolen again.

5  Q   Now, your primary criticism, if I understood it

6  correctly -- and correct me if I'm wrong -- is that this

7  patient had been seen for a number of years but does not appear

8  to have been drug tested; is that fair?

9  A   Yes, sir.

10 Q   Are you aware of anything requiring Dr. Couch to have drug

11 tested this patient?

12 A   Standard of care.

13 Q   Aside from the two reports -- two or three reports -- of

14 either running out of his medication or having his medication

15 stolen, did you see anything in his file which led you to

16 believe that this patient wasn't taking his medications as

17 prescribed?

18 A   We don't know.

19 Q   So he could have been, just as equally as he could not have

20 been; correct?

21 A   He could have been, he may not have been.  We don't know.

22        MR. DOSS:  All right.  If we could zoom back out?

23 And, then, I want to focus in on the bottom half.

24 Q   We've talked -- talked a lot about pain pumps.  In your

25 review of PPSA's patient files, is this type of record common

1    for a patient with a pain pump when he or she comes to the

2    clinic?

3    A    I think it was in this chart, yes, sir.  I would assume

4    that's a standard record that you would have for anybody that

5    you have on a pump.

6    Q    And if we see last refill 12/17/12, do you see that?

7    A    Yes, sir.

8    Q    And we have today's refill prescriptions, do you see that?

9    A    Yes, sir.

10   Q    Do you understand this to be keeping track of how much of

11   which medication is in the pain pump for that particular

12   patient?

13   A    Yes, sir.

14   Q    And then under procedure note, it notes what was done this

15   visit; correct?

16   A    Yes, sir.

17   Q    Also on this visit it appears that the patient was

18   prescribed Percocet, at the top, an oral Percocet?  Do you see

19   that?

20   A    Yes, sir.  That's the medication.

21   Q    I believe you testified on direct examination that that's

22   not necessarily uncommon, to supplement a pain pump regimen

23   with some oral medication like a Percocet?

24   A    It's more the rule than the exception, sir.  Most pain pump

25   patients end up taking oral medications as well.

```
 1   Q   There's nothing outside the usual course of professional
 2   practice on that, is there?
 3   A   No, sir.
 4   Q   And as I understand your testimony, you're criticizing the
 5   lack of drug screens for Mr. Paulson, but you're not
 6   criticizing the medications he was on, are you?
 7            MS. GRIFFIN:  Your Honor, I'd object to the use of
 8   that term, "criticizing."  He stated an opinion about it being
 9   outside the usual course of professional practice.  It's not a
10   criticism.
11            MR. DOSS:  I'll use another word, Your Honor.
12            THE COURT:  All right.
13   BY MR. DOSS:
14   Q   For Patient Paulson, Dr. Vohra, you're taking issue with no
15   drug screens but you're not taking issue, at least with this
16   patient, on what he was prescribed; fair?
17   A   Fair.
18   Q   Final patient, Dr. Vohra.
19   A   Yes, sir?
20   Q   Ms. Blouin.
21   A   Yes, sir.
22   Q   I'm going to start in reverse order.
23   A   Okay.
24   Q   At the very end of your direct examination on Ms. Blouin's
25   file, you were shown a number of records that indicated that
```

2470

 1    they were electronically signed on March 31st, 2015.  Do you

 2    recall that?

 3    A    Yes, sir.

 4    Q    Do you have any knowledge one way or the other about why it

 5    says March 31st, 2015?

 6              MS. GRIFFIN:  Your Honor, may we approach?

 7              THE COURT:  All right.

 8         (At the side bar, jury not present.)

 9              MS. GRIFFIN:  Your Honor, this patient died.  And one

10    of the records we subpoenaed by the coroner was the first time

11    Dr. Couch saw them and he signed them after they were signed by

12    the coroner.  So I think the doctor should be allowed to answer

13    that.

14              MR. DOSS:  Your Honor?

15              MS. GRIFFIN:  And I had discussed that with Mr. Doss

16    this morning, that before any answer was given that talked

17    about death, we were going to ask to approach the Court.  But I

18    would request that he withdraw it or we would contend that he's

19    entitled to testify as to why they were signed.

20              MR. DOSS:  I mean, I don't -- certainly don't want to

21    open the door on any of that and I'll withdraw the question I

22    asked.  My question was brought out on direct as being an issue

23    with the patient file.  And we're kind of left without any --

24              THE COURT:  I don't think he gave any opinion about

25    this date in signing it.

1        MR. DOSS:  Okay.  I'll withdraw the question.

2        THE COURT:  Okay.

3     (In open court, defendants and jury present.)

4  BY MR. DOSS:

5  Q   Dr. Vohra, I want to turn your attention to the June 2014

6  urine drug screen.

7  A   Yes, sir.

8  Q   Okay.  Now, Ms. Blouin tested positive for both Xanax and

9  THC; correct?

10 A   Yes, sir.

11 Q   And is it a high dose or low dose of THC?

12 A   I don't recall, sir, the dosage.

13 Q   In your medical experience do you ever find patients

14 suffering from chronic pain turn to marijuana to alleviate

15 their pain?

16        MS. GRIFFIN:  Objection as to the relevance, Your

17 Honor.  He's not testified anything about what patients turn to

18 to relieve their pain.  It's not relevant to his direct.

19        THE COURT:  Sustained.

20        MR. DOSS:  I'll move on, Your Honor.

21 Q   And then in November 19th -- on November 19th, 2014,

22 Ms. Blouin tested again positive for THC; correct?

23 A   She did, yes, sir.

24 Q   Do you remember if that was a high dose or a low dose?

25 A   I don't recall, sir.  And dosages with THC vary very much

1   by patient to patient because marijuana is fat soluble.  So if

2   someone like myself, who has a little extra girth going on, is

3   going to absorb that marijuana to the fat and it will be

4   released slowly over time, whereas someone who's thin, you

5   know, it's going to get out of their system faster.  So it's

6   very difficult to quantify based on that what dosage someone

7   was smoking.

8   Q   Let's take a look.  Let's turn to page 98.  Does this

9   appear to be the patient's driver's license at the bottom?

10  A   Yes, sir.

11  Q   She appears to be, at least based on the driver's license,

12  105 pounds?

13          MS. GRIFFIN:  Again, this series of questions is not

14  relevant, whether she had smoked a little marijuana, whether

15  she had smoked a lot, or whether she had smoked any at all.

16  It's not relevant to his testimony about his opinion.

17          THE COURT:  Sustained.

18  BY MR. DOSS:

19  Q   If I understand your testimony correctly, Dr. Vohra, you

20  take issue with this patient's treatment because she did not

21  receive any followup apparently after her inconsistent drug

22  test; is that fair?

23  A   That was one of the things, yes, sir.  It was not the only

24  thing.

25  Q   Okay.  Did you take issue with the medication she was

1  prescribed?

2  A   I did, given the clinical circumstances.

3  Q   Those clinical circumstances would be the two drug tests we

4  just discussed; is that right?

5  A   And the fact that she was getting multiple medications from

6  multiple providers.

7  Q   Do you know, sitting here today, whether anyone at PPSA was

8  aware of those alternative prescriptions she was getting from

9  other providers?

10  A   Yes, sir.  That was a note in the chart on January of 2012

11  where a drug query was done and they state that it appears the

12  patient receives different medications from different doctors.

13  Q   And that January 2012 note would have been two years before

14  these drug tests that you are taking issue with; is that right?

15  A   Those two that we mentioned, yes, sir.  There were some

16  before that as well.

17  Q   Do you know one way or the other whether that issue, the

18  obtaining medications from other prescribers, was ever

19  addressed with Ms. Blouin?

20  A   Not that I saw in the chart, sir.

21  Q   Do you know whether anyone at PPSA was checking, for

22  example, the PDMP and learning about her other prescribers'

23  medications?

24  A   That was the one time that I saw that the PDMP was checked,

25  sir.

1    Q   But simply because it's not noted in the file doesn't mean

2    it didn't happen; right?

3    A   All I know is what's in the chart.

4    Q   Why was Ms. Blouin being treated at PPSA, based on your

5    review of the file?

6    A   For back pain, sir.

7    Q   Okay.  And did you find in your review of the file that

8    surgery was discussed with her early on in her treatment?

9    A   Yes, sir.  In late 2011 she went to see Dr. Clark, who is a

10   neurosurgeon, and at that time I believe that she underwent

11   what's called an ALIF, which is an anterior fusion at the

12   lowest level, L5-S1.

13   Q   Did you also find where when she discussed it with

14   Dr. Couch, the idea of surgery, she said that she was too young

15   to get surgery?

16   A   I believe I recall that, yes, sir.

17   Q   Do you take issue with the prescriptions written for

18   Ms. Blouin -- let me back up.  Set aside the inconsistent drug

19   screens.  If the inconsistent drug screens had not been present

20   in Ms. Blouin's file, would you take issue with the

21   prescriptions that she was being written by PPSA?

22           MS. GRIFFIN:  Objection, Your Honor.  Speculative.

23           MR. DOSS:  It's a hypothetical, Your Honor.

24           THE COURT:  I don't believe he testified to that.

25           MR. DOSS:  There was testimony about the unreliability

1   of urine drug screens.  If we set that aside, I'm just trying

2   to understand if he takes issue with the medications as

3   prescribed, setting aside --

4          THE COURT:  All right.  Overrule the objection.

5   BY MR. DOSS:

6   Q   Dr. Vohra, assume with me that there were not inconsistent

7   urine drug screens for Ms. Blouin.  Knowing what you know about

8   her issues and why she presented to PPSA, would you still take

9   issue with the medication she was prescribed?

10  A   Yes, sir.  I would not have prescribed these medications in

11  light of the fact that she was getting other medications from

12  other doctors.

13  Q   Would you not have prescribed them only because she didn't

14  apparently tell the doctors or would you not have prescribed

15  them because the medications on their own were improper?

16  A   Well, I mean, it's a combination of things, sir.  I mean,

17  it's the overall clinical picture.

18  Q   And assume that PPSA was checking the PDMP and was aware of

19  her receiving medications from other providers.  Do you still

20  take issue with the prescriptions as written by PPSA?

21  A   Yes, sir.  Because she's breaking her opioid contract and

22  they know she's breaking her opioid contract.

23  Q   Okay.  She had an opioid agreement in place, didn't she?

24  A   She did.

25  Q   She was getting routine drug screens; right?

1    A    She was.

2    Q    And what were the other medications she was getting which

3    she didn't reveal to --

4    A    He never noted it.

5    Q    Was she getting Xanax?

6    A    We don't know.

7    Q    Let's look at page 99.  She tested positive for alprazolam,

8    delta-9-THC, alprazolam's another name for -- Xanax would be a

9    brand name for alprazolam; is that right?

10   A    Yes, sir.

11   Q    Do you know if she was being treated by a primary care

12   physician while she was being treated by PPSA?

13   A    I don't know who that was or if she was or where that

14   medication came from, sir.

15   Q    Based on your review of the medical file, did you see any

16   indication that she was also being treated by a primary care

17   physician while she was being treated at PPSA?

18   A    Well, there are three -- in the initial records, the

19   initial note, it says that she's been getting Xanax, Lyrica,

20   Phenergan from one doctor, hydrocodone -- and that doctor was

21   Dr. Laughlin.  Dr. Gillespie was giving her hydrocodone.  And

22   she was seeing Dr. Ola (phonetic) for Soma.  So I don't know if

23   one of those might have been her family physician.

24   Q    And one was prescribing Xanax; correct?

25   A    Yes, sir.

RAHUL VOHRA, MD - CROSS BY MR. DOSS

1  Q   Do you have any reason to believe, based on your review of

2  the files, that PPSA was unaware of that?

3  A   Again, all I know is what's in the chart.

4  Q   I want to turn generally to some principles that you

5  discussed with Ms. Griffin, if that's okay.

6  A   Yes, sir.

7  Q   With regard to the patient files.  You testified about what

8  you called opioid-induced hypoalgesia?

9  A   Hyper.

10  Q   Hyper?

11  A   Yes, sir.

12  Q   Okay.  And you testified that increasing doses of opioids

13  can make your pain worse; is that right?

14  A   It can, yes, sir.

15  Q   Did you find any instances, based on your review of the

16  patient files we just went through, of anyone being diagnosed

17  with opioid-induced hyperalgesia?

18  A   I did not see that diagnosis in any of the charts, sir.

19  Q   And sitting here today, you don't know one way or the other

20  if these patients had that condition; fair?

21  A   No, sir.  We were just talking about general potential

22  complications of opioids.  It wasn't specific to any of these

23  patients.

24  Q   And at one point in yesterday's testimony you used the

25  expression triple digits; do you remember that?

1   A    Yes, sir.

2   Q    From time to time, Dr. Vohra, you've prescribed patients

3   triple digits, haven't you?

4   A    Yes, sir.

5   Q    And that was based on your clinical judgment, wasn't it?

6   A    It was, yes, sir.

7   Q    So the prescription of triple digits in and of itself is

8   not beyond the usual course of professional practice, is it?

9   A    No.  I think we were talking about whether that would be

10  considered a high number or high number of pills, and it would.

11  Q    Along those lines, you talked about high dosages, medium

12  dosages, very high dosages.  Do you remember that testimony?

13  A    Yes, sir.

14  Q    Would you agree with me that that is relative to the pain

15  being presented by the patient to the physician?

16  A    No, sir.  A dosage is a dosage.  It's not pain dependent.

17  Q    So if I go in and I have absolutely no problems whatsoever

18  and a doctor decides to put me on -- and I tell them, I tell

19  the physician, I have no problems, I feel great, not a problem

20  at all.

21  A    Yes, sir.

22  Q    The physician puts me on a triple-digit prescription --

23  A    Yes, sir.

24  Q    -- are you saying we wouldn't judge whether that's

25  appropriate or not, based on the relative prescriptions for the

RAHUL VOHRA MD - CROSS BY MR. DOSS

1    pain?

2    A   I'm sorry.  I misunderstood you.  What I was saying was,

3    you know, if someone comes in with a pain level of five or

4    someone comes in with a pain level of eight, if you put them on

5    90 milligrams of morphine, that's still considered a high dose

6    of morphine.

7    Q   Fair point.  And so would you agree with me, then,

8    Dr. Vohra, that we can't judge whether a particular

9    prescription is appropriate or not unless we take into account

10   the full picture of the patient?

11   A   You can't just look at a number.  I think I had mentioned

12   that before.  You don't just look at a number above that or

13   below that as not right.  You have to look at it in the entire

14   context of the patient, yes, sir.

15   Q   And it's important to look at all the pages from these

16   patient files you reviewed in preparation for your testimony

17   here today to evaluate whether one snapshot is right or wrong

18   or proper or not proper; correct?

19   A   Oh, it's just looking at the overall picture, yes, sir.

20   Q   I have some general questions for you as well, Dr. Vohra.

21   A   Yes, sir.

22   Q   Are you licensed to practice medicine in the state of

23   Alabama?

24   A   No, sir.

25   Q   Have you ever been licensed to practice in the state of

1  Alabama?

2  A   No, sir.

3  Q   Have you interviewed any pain management doctors in the

4  state of Alabama in preparation for your testimony here today?

5  A   No, sir.

6  Q   I think we've talked about the rules provided by the

7  Alabama Board of Medical Examiners.  And you did review those

8  last week; correct?

9  A   I did, yes, sir.

10 Q   Were you aware of any other standard specifically

11 applicable to pain management doctors in the state of Alabama

12 other than the rules of the Alabama Board of Medical Examiners?

13 A   If there are any, I'm not aware of them, sir.

14 Q   Have you interviewed -- well, scratch that.

15         Just to be clear, the only thing you've done in

16 preparation for your testimony here today is to review the

17 files provided by the government to you; is that correct?

18 A   Yes, sir.

19         MR. DOSS:  One moment, Your Honor.

20         THE COURT:  All right.

21     (A discussion was held off the record between defense

22 counsel.)

23 BY MR. DOSS:

24 Q   All right.  Dr. Vohra, do you remember earlier today in

25 response to one of my questions you said that hindsight is

2481

1   20/20 and that you were looking at these filings in hindsight?

2   Do you remember that?

3   A   We were talking about that gentleman's hallucinations and

4   whether that was a charting error or if that was true.  And so

5   we were speaking of it in that context, yes, sir.

6   Q   Okay.  Would you agree with me that all of your opinions

7   offered in this case are hindsight?

8   A   By definition, I'm looking back.

9   Q   And you have a full picture in front of you at the time

10  that you're offering these opinions -- future, past, and

11  present -- at any given point in time in the patient file;

12  correct?

13          MS. GRIFFIN:  Your Honor, object.  He can't testify

14  about the future.

15          THE COURT:  Sustained.

16  BY MR. DOSS:

17  Q   And one last question, one last couple of questions.  You

18  were shown a video clip yesterday.  Do you recall that?

19  A   Yes, sir.

20  Q   Another hypothetical.

21  A   Yes, sir.

22  Q   If you would assume with me that the patient presented at

23  PPSA with a recommendation for -- excuse me -- a referral from

24  a chiropractor, that referral indicated a series of visits

25  between patient and the chiropractor, a number of diagnostic

1    tests were performed, the diagnosis of back pain was made, a
2    referral was then made by the chiropractor to PPSA for lower
3    back pain and pain management treatment, approximately 10
4    minutes of interaction between a CRNA at PPSA and the patient
5    where information was gathered about the patient by the CRNA?
6    A    A history was taken?
7    Q    Well, say a history.  You might have a different
8    understanding of history than me, but let's just say a
9    history.  The patient said that he had tried blues, 30
10   milligram Roxicodone, and even said that he had not gotten them
11   by prescription.  The CRNA then left the room, potentially had
12   a discussion with Dr. Couch, Dr. Couch then came back in the
13   room, talked with the patient, which is what you saw, and then
14   the patient was prescribed 15 milligrams of Roxicodone and
15   maybe a muscle relaxer.  Does that information help you in
16   evaluating the video clip that you were shown yesterday?
17   A    It's a better overall picture, yes, sir.
18   Q    That starts to look a little bit more inside the standard
19   of care, doesn't it?
20   A    No, sir.
21   Q    What's wrong with that?
22   A    Well, a couple of things.  First, there's no exam, which is
23   the crux of how you make a diagnosis in someone that presents
24   with pain.  It's a history and the examination.  So at this
25   point we don't know if this gentleman has neurologic deficit,

1    what his exam looks like, because when you decide to do

2    injections, your injection -- the injection you decide to do is

3    guided based on your exam.  In this case they decided to do

4    facet injections.  We don't know if the facet hurt, we don't

5    know if it was a slight pain, we don't know if it was muscular

6    pain.

7              The second is:  Someone that comes to me and tells me

8    that they bought street drugs, that's not somebody I'm going to

9    write for an opioid on their first prescription.

10   Q   Okay.  I want to break that down.  No exam was taken.  Are

11   you aware of any written document requiring a physician to

12   perform an exam prior to writing a controlled substance?

13   A   You're required to do an exam to assess the patient's

14   clinical condition, yes, sir.

15   Q   Where is that written down?

16   A   I think it's in those guidelines, if I'm not mistaken.  And

17   it's certainly standard of care.

18             MR. DOSS:  Could we look at the ELMO please?

19   Q   I'll show you Couch Exhibit 119, which is in

20   evidence.  I'll represent to you, Dr. Vohra, that this is the

21   only time the expression "physical examination" appears in this

22   document -- unless you're aware of a different one.  Please

23   tell me if you are.

24             MS. GRIFFIN:  Your Honor, there's no reference in the

25   record as to what document he's showing him.

```
 1            MR. DOSS:  I said Couch 119.
 2   A   Yes, sir.  It says results of physical examination.
 3   BY MR. DOSS:
 4   Q   Where does it say that the physician writing a controlled
 5   substance in this information is required to perform a physical
 6   examination before writing a prescription for a controlled
 7   substance?
 8   A   Well, in order to document the results of the physical
 9   exam, you have to do a physical exam.
10   Q   Does it say that the treating physician has to do it?
11   A   It doesn't say, no, sir.  We've covered that.  No.
12   Q   Can the referring physician do it?
13   A   No.
14   Q   Where does it say that in this document, if it does?
15            MS. GRIFFIN:  Your Honor, objection to relevance.
16            THE COURT:  Overruled.
17   A   No, sir.  You are, as that person's physician, obligated to
18   assess that patient yourself.  You're the pain specialist.
19   You're the person that's supposed to figure out what's
20   hurting.  You're supposed to decide what type of injection is
21   going to be done.  You're not going to base that on someone
22   else's exam.
23   BY MR. DOSS:
24   Q   Assume no injection was done, Dr. Vohra.  Set that aside
25   for a moment.  Is there anything in this standard, this model
```

1  policy, requiring the physician writing a prescription for

2  controlled substances to perform a physical examination or does

3  it just require the medical records to document physical

4  examination?

5  A   I think you're -- that's twisting the intent, sir.  That

6  doesn't say that exactly.  But I've never in my career heard of

7  someone adopting someone else's physical exam as their own and

8  then going forward with that as their own physical exam.

9  Q   Would asking a patient to bend over be part of a physical

10  exam?

11  A   That's one part (nodding head affirmatively).

12  Q   And so under this standard, for example, a CRNA could ask

13  the patient to bend over, if he presents with back pain?  That

14  would be an example of part of a physical exam; fair?

15  A   That's part of a physical exam.

16  Q   Is there anything in this section that we're looking at

17  right now requiring or saying that a doctor can't rely on the

18  referring file in addition to having a CRNA have the patient

19  bend over, for example?

20  A   It doesn't say that specifically, but that's just common

21  sense.

22  Q   And does it say information that should appear in the

23  medical record includes the following:  Results of the physical

24  examination and all laboratory tests?

25  A   Yes, sir.

1   Q   All right.  You said there was an issue with buying drugs

2   off the street.  You used the expression "street drugs"; is

3   that correct?

4   A   Yes, sir.

5   Q   Do you agree with me that if somebody says -- well, let me

6   back up.  Why did you assume that I was talking about street

7   drugs?

8   A   You said blues.  That's a street drug name.

9   Q   What if he said they are the blue ones?  That's not a

10  street drug name, is it?

11  A   No, sir.

12  Q   Okay.  If the patient presented saying that:  I've

13  previously taken the blue ones, does that change your opinion?

14  A   No, sir.  At this point we don't have a diagnosis.  We

15  don't have anything.  We have someone that comes in the door,

16  says:  My back hurts.

17          They bend forward, and you write them an

18  opioid.  That's not how this happens.  This is not how it

19  should happen.

20  Q   And that's based on the unwritten standard of care and this

21  document we're looking at right now; is that correct?

22  A   Based on standard of care for pain physicians throughout

23  this country, yes, sir.

24          MR. DOSS:  One moment Your Honor.

25      (A discussion was held off the record between defense

 1    counsel.)

 2           MR. DOSS:  No further questions, Judge.

 3           THE COURT:  Mr. Armstrong?

 4                      CROSS EXAMINATION

 5    BY MR. ARMSTRONG:

 6    Q   Good afternoon, Dr. Vohra.

 7    A   Afternoon.

 8    Q   My name is Gordon Armstrong, and I represent Dr. Ruan in

 9    this case.  And I'd like to ask you a few questions.  And I

10    want to apologize up front because I've kind of got a little

11    cough.  So if you don't understand me or if I cough in the

12    middle, please just ask me to repeat the question.  I'll be

13    more than happy to do that.

14    A   Yes, sir.

15    Q   I will also try not to waste your time by repeating a lot

16    of questions you've already been asked.  But I will maybe have

17    to touch on a few things that may also affect Dr. Ruan --

18    A   Yes, sir.

19    Q   -- if you will permit me.

20           You talked about three patients of Dr. Ruan's that you

21    had reviewed their files, and that would be the McDonald file,

22    the M....... file, and then finally the H..... file?

23    A   Yes, sir.

24    Q   Ms. -- Deborah asked you a few other questions about some

25    emails you saw that she showed you and she asked you questions

```
 1    about how you handled those kind of things in your practice and
 2    how things are run in your practice.  And a lot of your answers
 3    you kind of based on your own personal experience; correct?
 4    A    Sir, I would never hold someone -- I would not say just
 5    because I wouldn't do something this way, that would be out of
 6    standard of care.
 7    Q    Right.
 8    A    The opinions that I gave would be based on standard of
 9    care, not just what I would do in that situation.
10    Q    Well, a lot of what you've told the jury about you draw
11    from your personal experience; right?
12    A    Certainly that's part of it, being a clinician.
13    Q    And in your own practice in Mississippi; correct?
14    A    Yes, sir.
15    Q    Okay.  And one of the things that you looked at was some
16    emails.  And there was some discussion also about red flags;
17    right?
18    A    Yes, sir.
19    Q    What doctors look for?  And that's not just something that
20    doctors keep to themselves; right?  As far as the discussions
21    about red flags?
22    A    You mean as far as speaking to a patient, sir?
23    Q    Well, that is something that is common in the literature
24    and all the publications you see?
25    A    Yes, sir.
```

1    Q   It's common if you go to conferences, sometimes you talk

2    about these things?

3    A   Yes, sir, it's well known.

4    Q   And physicians talk to each other about it; correct?

5    A   Yes, sir.

6    Q   Okay.  And is it appropriate that physicians within their

7    own practice talk about it?

8    A   Of course.

9    Q   And so whether it's in person or by email, to discuss

10   issues about compliance with regulations and compliance with

11   guidelines or whatever there may be; right?  That's perfectly

12   appropriate?

13   A   Of course.

14   Q   Okay.  And in fact, you would expect physicians to discuss

15   those kind of things with each other, especially within their

16   own practice?

17   A   That would be normal, yes, sir.

18   Q   That would be normal; right?

19   A   Yes, sir.

20   Q   I want to direct your attention to the McDonald file --

21   A   Yes, sir.

22   Q   -- if I may.  And this was a young man that had been

23   referred to Dr. Ruan.  He had had an automobile accident some

24   years before; correct?

25   A   Yes, sir.  He had said he had had an auto accident.  I'm

1   not really sure when that was.

2   Q   And that was -- he still had pain and he had low-back pain,

3   hip pain that he had related to this automobile accident;

4   correct?

5   A   Yes, sir.

6   Q   Okay.  And the referring physician sent all his notes over

7   there; correct?  At least you saw that in the file, that there

8   were some notes from the referring physician?

9   A   I believe so, yes, sir.

10  Q   And the first thing that Ms. -- I'm trying to get to that.

11  The first thing y'all talked about was the January 11th --

12  there was a January 11th urine test; correct?  That was a UDS,

13  what they call the UDS, the cup test?

14  A   Yes, sir.

15  Q   Correct?

16  A   Yes, sir.

17  Q   And that came back as being inconsistent; correct?

18  A   Yes, sir, it did.

19  Q   It showed some amphetamines?  Something triggered

20  amphetamines; correct?

21  A   They did, yes, sir.

22  Q   Benzos?

23  A   Yes, sir.

24  Q   And something was in the OPI or morphine column possibly,

25  but it was negative in the oxy column?

RAHUL VOHRA, MD, CROSS BY MR. ARMSTRONG

1    A   Yes, sir; that's correct.

2    Q   And that's what -- that's what you found to be abnormal

3    about this; correct?

4    A   Well, what was abnormal was that it should have been

5    positive for oxy and negative for opiates.

6    Q   Right.

7    A   So backwards.

8    Q   So that would trigger the clinician to do something; right?

9    A   Yes, sir, that would.

10   Q   In your mind?  To try to verify what's going on with the

11   patient?

12   A   Yes, sir.  And he said he had retried some of the old

13   hydrocodone that he had.

14   Q   Right.  And so what Dr. Ruan did in this case was he

15   ordered the GC-MS, which is the confirmation test; right?

16   A   I believe so, yes, sir.

17   Q   So he did something proactive after getting that in-office

18   cup test; right?

19   A   Yes, sir.

20   Q   So he did something to try to verify it; right?

21   A   He did the test to further delineate what was or wasn't in

22   his system, yes, sir.

23   Q   Okay.  And the records revealed that that GC-MS test came

24   back and confirmed the cup test; correct?

25   A   Yes, sir.

1   Q   And based on that confirmation, which was then addressed

2   with the patient at the next visit on January 24th; correct?

3   He came back?

4   A   Yes, sir.

5   Q   And based on that, Dr. Ruan changed the medications, didn't

6   he?

7   A   Yes, sir, he changed them to morphine and Xanax.

8   Q   Well, didn't he change him to Embeda?

9   A   That's morphine.

10  Q   Right.  Well, I'm talking about the actual prescription was

11  for Embeda?

12  A   I'm sorry.  Yes, sir.  That's a long-acting morphine.

13  Q   It's long acting, but is it also tamper resistant?

14  A   It is, yes, sir.

15  Q   In fact, it's designed so that it can't be crushed; right?

16  A   Yes, sir, it's designed that it makes it difficult to snort

17  or shoot.

18  Q   Right.  And so it would be less desirable for, for

19  instance, people who might be trying to divert medication?

20  A   Yes, sir.

21  Q   And so he did take action based on the UDS, the original

22  UDS, and then the confirmation test; right?

23  A   Yes.  He changed him to a different medication, yes, sir.

24  Q   And not only that, but he took him off the Percocet; right?

25  A   He did, yes, sir.

RAHUL VOHRA, M.D. CROSS BY MR. ARMSTRONG

2493

1    Q   Now, those things would be within the standard of care, if

2    you're trying to make sure that somebody -- you're trying to

3    take actions or steps to assure that the patient is actually

4    using the medication properly; right?

5    A   I would disagree with that, sir.  I think if you think

6    someone has an addiction issue and abuse issue at that point,

7    you don't continue writing them for controlled substances.  You

8    have that issue evaluated by an addictionologist.

9    Q   Do you know that Dr. Ruan is board certified in addiction

10   medicine?

11   A   There's no such board.

12   Q   There's no board certification in addiction medicine?

13   A   Not that I'm aware of.

14   Q   You're not aware of that?

15   A   No.  There are -- the only boards he has are physical

16   medicine and rehabilitation, pain medicine, and neuromuscular

17   medicine.  Those are the only true boards.  The rest are

18   organizations that you belong to that call themselves boards.

19   Q   So you just don't agree with that, that that's a

20   certification?

21   A   Sir, the boards, it's called the -- there is an

22   organization that oversees medical boards.  It's called the

23   ABMS, the American Board of Medical Specialties, and they

24   oversee residency programs and the boards of these different

25   specialties and they recognize boards, cardiology, GI,

1    dermatologist, physical medicine.  And those are the only true

2    boards.  The other boards are not true medical boards, they are

3    not in the same category, sir.

4    Q    Did you look at the Alabama PDMP in January of 2011 for

5    this patient?

6    A    Sir, if I did, it's been a long time.  I don't recall.

7    Q    Okay.  What was positive for AMP, or the amphetamine, did

8    you know he had a prescription for Adderall?

9    A    Yes, sir.

10   Q    And that was something he had been taking for years by his

11   primary care physician for ADHD?

12   A    He had been prescribed that by a physician, yes, sir.  I

13   knew that.

14   Q    And so when it's positive for amphetamines, that means

15   that's just showing the Adderall?

16   A    Yes, sir.  My concern was that this young man stated that

17   he had had an issue of use, misuse, with medication.  And so

18   whether a doctor is giving it to him or not, if he's had a

19   history of misuse, that's an issue.

20   Q    Okay.  Well, let's talk about that.  If you are a drug

21   abuser and your goal is to go to a pain physician to get

22   medicine, opioids or whatever you can get your hands on --

23   right -- would you tell that doctor that you've got a history

24   of drug usage?

25   A    No, you would not.

1  Q   So the fact that the clinician who's actually treating the

2  patient and is actually looking him in the face and talking to

3  him and evaluating his demeanor -- isn't that important?

4  A   That's part of it, yes, sir.

5  Q   Yeah.  And then trying to evaluate whether the person that

6  you're treating is actually being honest with you or not, isn't

7  that important?

8  A   Yes, sir.

9  Q   Don't you have to trust?  There's a level of trust with the

10  patient?

11  A   You have to have trust in your patient.

12  Q   Right.  And so if you think that your patient is being

13  honest with you, then you can have more trust in your patient

14  and what they're telling you; right?

15  A   As long as what they're telling you and what's happening

16  are consistent, yes, sir.

17  Q   Now, do you know anything about other than what's in this

18  chart that you reviewed that the government provided you, do

19  you know anything else about this young man or his family?

20  A   I don't know anything about this young man, sir.

21  Q   Did you know that both his mother and his grandmother were

22  patients of Dr. Ruan?

23          MS. GRIFFIN:  Your Honor, I'd object to the relevance.

24          THE COURT:  Sustained.

25  BY MR. ARMSTRONG:

1  Q   Dr. Ruan would know who else in the family would come with
2  him to visits and talk to Dr. Ruan about this patient, wouldn't
3  he?
4        MS. GRIFFIN:  Your Honor, no foundation.
5        THE COURT:  Sustained.
6  BY MR. ARMSTRONG:
7  Q   It's important for the clinician who's actually meeting
8  with the patient to be -- that that clinician is the best
9  person to evaluate the circumstances at that moment in time;
10 right?
11 A   Yes, sir, I would agree with that.
12 Q   And like Mr. Doss asked you, at some point down the road in
13 the future it's easier to look back and say:  I might have done
14 something different; right?  But at that moment in time, based
15 on the information you know, you're making a decision at that
16 moment; right?
17 A   You are, yes, sir.
18 Q   And you don't know anything, I think you said, about this
19 man -- this young man's family?
20 A   No, sir.
21 Q   You do know that his grandmother was involved in his life;
22 correct?
23        MS. GRIFFIN:  Objection as to relevance.
24        MR. ARMSTRONG:  Judge, part of what --
25        MS. GRIFFIN:  May we approach?

```
 1            MR. ARMSTRONG:  -- they talked about --
 2            THE COURT:  Can you come to side bar, please?
 3       (At the side bar, jury not present.)
 4            THE COURT:  Who is this person coming inside the bar,
 5   talking to Dr. Ruan?
 6            MR. KNIZLEY:  That is his sister.
 7            THE COURT:  She doesn't need to be inside the bar.  Go
 8   ahead, go ahead.  You were wanting to make a point?
 9            MR. ARMSTRONG:  Oh, she objects.  I don't know what
10   the objection was.
11            MS. GRIFFIN:  Whether his grandmother is or isn't in
12   his life as part of his treatment has nothing to do about what
13   Dr. Vohra's testified about, what's outside the usual course of
14   professional practice.  It's not relevant.
15            MR. ARMSTRONG:  Part of the testimony that they went
16   over in great detail was the grandmother washed his clothes and
17   washed his medicines and that that --
18            THE COURT:  No, we're not going into that.
19            MR. ARMSTRONG:  I can't go into that?
20            THE COURT:  No.
21            MR. ARMSTRONG:  They talked about it.
22            THE COURT:  No, you cannot.  That is not pertinent to
23   anything he testified to other than the fact that he lost some
24   of his medicines.
25            MR. ARMSTRONG:  He said that's part of his opinion
```

 1   about the --

 2           THE COURT:  We're not going into his relationship with

 3   his grandmother.  Come on, let's go on.

 4       (In open court, defendants and jury present.)

 5   BY MR. ARMSTRONG:

 6   Q   Doctor, part of what a treating physician does is takes a

 7   family history as well and they do all the intake information?

 8   A   Yes, sir.

 9   Q   Okay.  And that's important when you're evaluating your

10   care you give a patient?

11   A   Yes, sir, yes, sir.

12   Q   And that was done in this case?

13   A   I believe so, yes, sir.

14   Q   As far as you know?  Okay.  Now, the next incident that you

15   spoke about on direct was February 21st of 2011.  Do you

16   remember that?  Or -- I'm sorry.

17   A   Yes, sir, yes, sir.

18   Q   February 2011?

19   A   Yes, sir, you're correct.

20   Q   Okay.  And there was a drug screen that was negative, I

21   think you said?

22   A   Yes, sir.  The drug screen was, I believe, the in-house

23   one.  Actually the drug screen was negative, yes, sir.

24   Q   Pardon me.  This file is rather large.  I have to find

25   these --

1   A   Yes, sir.

2   Q   -- specific tests because they are not marked.  The

3   February drug screen I believe that you referred to, Doctor,

4   was that February 6 of 2012?  Wait a minute.  They are out of

5   order.

6           You're talking about February '11; correct?

7   A   I believe it was 2000 -- it was the 21st, sir, is what my

8   note says here.

9   Q   I apologize to you.  The file, I have found the treatment

10  of that date but the drug screen is not with it.  The file was

11  changed on me last night, so I don't have that.  So let's look

12  at this.

13          This was the February 21st?  That's what you're

14  talking about.

15  A   Yes, sir.

16  Q   And he was currently on Embeda, which was the tamper

17  resistant that he changed him to?

18  A   Yes, sir.

19  Q   And then that's the benzo?

20  A   Yes, sir, that's the Xanax.

21  Q   And I believe the results of the treatment are over here

22  from that day?  (Indicating.)

23  A   As far as the diagnosis, the assessment, yes, sir.

24  Q   And this is Dr. Ruan's signature?  (Indicating.)

25  A   If you say so.  I'm not sure.

1  Q   Well, if I represent to you that this is Dr. Ruan's

2  signature --

3  A   Then it is, yes, sir.

4  Q   -- then it is?  Did you find something consistent

5  throughout, not just this file, but the three files you

6  reviewed for Dr. Ruan?  Didn't he see all his patients?

7          MS. GRIFFIN:  Objection as to foundation, Your Honor.

8          THE COURT:  Sustained.

9  BY MR. ARMSTRONG:

10 Q   You reviewed each of the charts for the three patients of

11 Dr. Ruan's that you discussed with this jury, didn't you?

12 A   I did.

13 Q   And don't the records that you reviewed indicate that

14 Dr. Ruan saw each of the patients on every visit?

15 A   I believe that's accurate, yes, sir.

16 Q   And what's going on over here is there's a lot of diagnosis

17 information; correct?  (Indicating.)

18 A   Yes, sir.

19 Q   And based on this treatment date, Dr. Ruan changed his

20 medications; correct?

21 A   He did, he changed them to Opana.

22 Q   He said that the Embeda was too expensive?

23 A   Yes, sir.

24 Q   Is Embeda expensive because it's a specific drug that is

25 tamper resistant, so it's more expensive to produce?  Correct?

RAHUL VOHRA, MD - CROSS BY MR. ARMSTRONG

1   A   It's an expensive drug, yes, sir.

2   Q   Right.  And so insurance will pay a portion, but probably

3   the copay or the noncovered charge is probably higher; correct?

4   To the patient?

5           MS. GRIFFIN:  Objection as to foundation, Your Honor.

6   There's no showing that this doctor knows what insurance this

7   patient has.

8           THE COURT:  Sustained.

9   BY MR. ARMSTRONG:

10  Q   Would that make sense to you, though?

11  A   It depends on the insurance plan.

12  Q   Right.  Well, you find that in your practice; right; that

13  some medications are more expensive to the patients and others

14  are not?

15          MS. GRIFFIN:  Objection, Your Honor.  He's testified

16  it's an expensive medication.  This additional line of

17  questioning is not relevant.

18          THE COURT:  Sustained.

19  BY MR. ARMSTRONG:

20  Q   Doctor, I know why I wanted to bring that up to you --

21  A   Yes, sir.

22  Q   -- about the February visit.  Because I couldn't find in

23  the file where there was a drug test on that date.  Did you?

24  A   I noted it there in my notes, sir.  So it's always possible

25  I made an error.  That's what I have there.

1   Q   Well, the next drug screen I see is March 18th of 2011?

2   A   Yes, sir.

3   Q   Do you think that might have just been a mistake?

4   A   I may have -- well, but the March one, it says it's

5   positive for oxycodone, whereas the other one said it was

6   negative.  So I may have made a date error, sir, if it's

7   actually not there.

8   Q   Well, the chart will speak for itself; right?  What's in

9   the chart is in the chart?

10  A   Yes, sir.

11  Q   Let me show you this.  On the 21st this was performed?  Did

12  you see this in the chart?  (Indicating.)

13  A   I did, yes, sir.

14  Q   And again, we saw one of these in one of the other files

15  you reviewed before.  This is a report of the NCS that was

16  performed?

17  A   Yes, sir.

18  Q   Okay.  And again, that is a -- that is a nerve conduction

19  test?

20  A   Yes, sir.

21  Q   And that, again, is used by pain management physicians to

22  try to diagnose where pain may be or may not be generating

23  from; correct?

24  A   It helps you try to delineate if there are some type of

25  underlying neurologic issues that may be contributing to

```
 1   someone's pain, yes, sir.
 2   Q   And so this would be an indication that Dr. Ruan on that
 3   date was trying to diagnose where the pain was coming from or
 4   maybe rule something out?
 5   A   Yes, sir.
 6   Q   And that's within the course of professional care?
 7   A   It is, yes, sir.
 8           THE COURT:  All right.  Mr. Armstrong, is now a good
 9   time for us to break for our afternoon?
10           MR. ARMSTRONG:  Yes, Your Honor.
11           THE COURT:  All right.  Ladies and gentlemen, leave
12   your pads on your chairs.  We will be in recess for 15 minutes.
13   No discussion about the case.  And take your break downstairs
14   in the jury assembly room.  We are in recess.
15       (A recess was taken at approximately 2:59 p.m.)
16       (In open court, 3:21 p.m., defendants and jury present.)
17   BY MR. ARMSTRONG:
18   Q   All right.  Dr. Vohra, I apologize.  I think I've got it
19   figured out, the confusion over the February test.
20   A   I actually figured it out.
21   Q   Did you find it too?
22   A   Did you --
23   Q   Well, let me -- just for your recollection --
24   A   Yes, sir.
25   Q   -- if you look at your report -- and this is not for the
```

1  jury, but just to refresh you -- this is the test that we're

2  talking about; right?

3  A   I misread that.  That's why I was going to say I think I

4  figured it out.  But what I meant -- and I misread that, it's

5  my error -- was that was the nerve conduction study that was

6  negative, not the drug screen.  That's my fault.

7  Q   So there was no negative drug test in February?

8  A   It was the nerve conduction study.

9  Q   I didn't think so, but I couldn't find where it was.

10  A   I looked at it while we were taking a break and realized my

11  error.

12  Q   All right.  Thank you, sir.  All right.  So we won't worry

13  about that.  We'll move on.

14         Now, the next thing you talked about was the

15  prescriptions that had vacation package written on them, do you

16  remember those?

17  A   Yes, sir.

18  Q   And you talked about you just weren't familiar with

19  prescriptions being written that way?

20  A   I've just never heard that term before.

21  Q   You never heard that term.  And Ms. Griffin was asking you

22  about -- and I think you testified that if somebody was going

23  to be gone beyond either their next appointment or whenever

24  their medicines were to run out, I think you testified you

25  would give them enough to get back and hopefully you would see

RAHUL VOHRA, MD - CROSS BY MR. ARMSTRONG

```
 1    them consistently enough to where that wouldn't be too far?

 2    A   Yes, sir.

 3    Q   Okay.  Did you look in the chart to see where Mr. McDonald

 4    was going to be gone to?

 5    A   I think Alaska.

 6    Q   All right.  He was going to Alaska for work; right?

 7    A   I believe so, yes, sir.

 8    Q   And he was going to be gone a couple of months; right?

 9    A   If you say so.  I don't remember that.

10    Q   Well, he had an appointment in July; right?

11    A   Yes, sir.

12    Q   And the next appointment was in September; correct?

13    A   Yes, sir.

14    Q   So he got two months' worth and that was what was written

15    on the vacation package?

16    A   Yes, sir.

17    Q   And that's so if you're up in Alaska and your medication

18    runs out, you don't have to try to find a pharmacy up there

19    that's going to recognize some type of out of town or try to

20    have to get it filled up there and that might be a problem;

21    right?

22    A   That's reasonable, yes, sir.

23    Q   So you do it before you leave?

24    A   Yes, sir.

25    Q   Okay.  And the chart reflects that he did go or at least
```

1  representations were made that he was going to Alaska; right?

2  A   Yes, sir.

3  Q   Okay.  And just prior to that trip to Alaska, in March,

4  there was a drug test in March; correct?

5  A   Yes, sir, and that was a consistent drug test.

6  Q   And it was consistent?

7  A   Yes, sir.

8  Q   And then there was another one on July 7th, right before he

9  left for Alaska, and that was consistent too; right?

10  A   It was, yes, sir.

11  Q   All right.  So he's got two consistent drug tests in a row?

12  A   Yes, sir.

13  Q   Then he goes to Alaska; right?

14  A   Yes, sir.

15  Q   Okay.  Now, the next thing I believe that Ms. Griffin asked

16  you about was April 12th.  She asked you about the fentanyl.

17  Do you remember that?

18  A   April 12th?

19  Q   At least I have that in my notes.  That was the last

20  thing -- the next thing after the vacation packages that she

21  asked you about was the April 12th, when he had the fentanyl

22  prescribed, do you remember that?  And then you started talking

23  at that point about you used the fentanyl patch in your pain

24  management practice?

25  A   That's right.

RAHUL VOHRA, MD - CROSS BY MR. ARMSTRONG

1   Q   Okay.  Do you remember that?

2   A   Yes, sir.  I'm sorry.  I was -- mine said April 25th.  That

3   was April 12th.

4   Q   April 25th of -- no, I'm sorry.  Well, she asked you about

5   April of 2012?

6   A   Yes, sir.  So that would be the 4/25 note, yes, sir.

7   Q   Correct.  Well, April 25th, there was actually an MRI

8   conducted; correct?

9   A   Yes, sir.  He had an MRI and a visit that day.

10  Q   And again, the purpose of an MRI, just like maybe some of

11  these nerve conduction tests, is you're trying to find out

12  what's wrong with the person?

13  A   Yes, sir.

14  Q   Okay.  And he has a history of a motor vehicle accident?

15  A   Yes, sir.

16  Q   And the MRI, do you remember what the MRI revealed?

17  A   Yes, sir, he had mild degenerative changes in his back.

18  Q   So he actually had disk budges in L3-4 and L4 and 5;

19  correct?

20  A   Yes, sir.

21  Q   With arthritis set in?

22  A   Yes, sir.

23  Q   And he's a young man?

24  A   (Nodding head affirmatively.)

25  Q   Correct?  He'd already had an MRI that --

1    A    I think he was 21-22 at that time, yes, sir.

2    Q    And he's already got arthritis set in in his lower back?

3    A    It's mild arthritis, yes, sir.

4    Q    And that MRI was read not by Dr. Ruan or anybody in his

5    office, it was read by a board certified radiologist,

6    Dr. Goddard; correct?

7    A    I believe so, yes, sir.  I don't think they read the MRI.

8    The radiologist did.

9    Q    Okay.  And again, you do an MRI to try to diagnose injury

10   and treat the pain, the condition; correct?

11   A    Yes, sir, it helps you in trying to delineate what might be

12   going on with somebody.

13   Q    Also it helps you try to determine if somebody might be

14   exaggerating or faking their injury or their pain; right?

15   A    Based on an MRI alone, I think it's very difficult to do

16   that.

17   Q    Ms. Griffin next asked you about the grandmother washing

18   his clothing?

19   A    Yes, sir.

20   Q    And she asked you about could you wash -- could you wash

21   the fentanyl patches in a box; right?  Do you remember she --

22   A    Yes, sir.

23   Q    -- was asking you about that?

24   A    Yes, sir.

25   Q    Well, that's not the only medication he was prescribed at

1   the time, was it?

2   A   He was being prescribed fentanyl, Soma, and Percocet, and

3   Xanax.

4   Q   Okay.  And when the representation was made about that

5   visit -- and I believe you said that was in May of 2012?

6   A   Yes, sir, I believe it was May 25th.

7   Q   And they performed a cup test; correct?

8   A   Yes, sir, they did another cup test and it was negative.

9   Q   And it was negative?

10  A   Yes, sir.

11  Q   And he said that he was not taking his medicine and he had

12  stopped taking his patch; correct?  I mean, he had taken the

13  patch off; right?

14  A   I think it said he had washed -- the medicines had been

15  washed, if I recall correctly, sir.  If I could see the note,

16  that would help me.

17  Q   Again, these things are not in any kind of order.  Okay.

18  May 25th, 2012?

19  A   Yes, sir.  It states the patches fell off after one day.

20  Complaining of increased back pain.  Been out of his medicines

21  for a week because his grandmother washed his clothes with the

22  medications in the pocket.

23  Q   Right.  So he was talking about the medications separate

24  from the patches?  So he wasn't saying the patches were washed?

25  He said the patches fell off after a day and the other

2510

 1   medicines were washed; correct?

 2   A   Yeah, I guess you could read it that way, yes, sir.

 3   Q   Pardon me?

 4   A   Yes, sir, I think that's one way to read it, yes, sir.

 5   Q   Well, I mean, it says what it says; right?

 6   A   Yes, sir.

 7   Q   Okay.  And it says:  Doctor UDS after hearing this?

 8   A   I don't know which order that was done.  I don't know if

 9   they came in and just did a UDS and then saw the doctor or

10   which --

11   Q   Okay.  And this is the UDS; right?  That showed what you

12   referred to?

13   A   Yes, sir, that was the second drug screen --

14   Q   Right.

15   A   -- that was negative in a row.

16   Q   And over here, again -- and Ms. Griffin made a point of

17   pointing this out to you -- Dr. Ruan looked at this; right?

18   A   He did, yes, sir.

19   Q   And then he wrote this down?  (Indicating.)

20   A   Yes, sir.

21   Q   Where do you think he got that information from?

22   (Indicating.)

23   A   From the patient, I would assume, sir.

24   Q   So it's safe to assume he's talking to the patient about

25   what's going on?

1  A   Somebody did, yes, sir.  And it certainly may have been

2  him.

3  Q   Well, but if he signed it, then it's him doing it; right?

4  A   Yes, sir.

5        MS. GRIFFIN:  Objection, Your Honor.  There's no

6  foundation to when it was signed.  The doctor can't possibly

7  know.

8        THE COURT:  Sustained.

9  BY MR. ARMSTRONG:

10 Q   Well, do you remember when Ms. Griffin was asking you about

11 the signature over here or the initials over here?

12 A   Yes, sir.

13 Q   It just makes sense that's who's looking at it; right?

14 A   Yes, sir.  If he signed it, I assume he looked at it, yes,

15 sir.

16 Q   And you said in your testimony that it's important for the

17 physician to talk to the patient about what's going on, what

18 may have happened, why it may have happened -- to counsel the

19 patient; correct?

20 A   Of course.

21 Q   And it appears in this case that was done; correct?

22 A   If that's his handwriting, yes, sir.

23 Q   Okay.  Now, what's important about this too -- let me --

24 okay.  What else is not showing up?  (Indicating.)

25 A   That's marijuana that you were pointing at.  There was

1   nothing in his system at that point, sir.

2   Q   Right.  So there's no street drugs?  He's not smoking

3   marijuana?

4   A   He's not.

5   Q   He's not using cocaine?

6   A   No, sir.

7   Q   He's not taking methamphetamines?

8           THE COURT:  Mr. Armstrong, nothing is nothing.  So

9   let's move on.

10  BY MR. ARMSTRONG:

11  Q   So, but that's -- is that also important to the physician

12  in evaluating whether somebody's using drugs or not --

13  A   Of course.

14  Q   -- illegally.  Or illicitly, as they say?

15          And he was next tested in September; correct?

16  A   Yes.  July, I think.  July 18th is the date I have.  And

17  that was --

18  Q   You've got a July drug test?

19  A   I believe so.  And it was a consistent study.

20  Q   It was consistent?

21  A   Yes, sir.

22  Q   Okay.  So the next one was consistent?

23  A   Yes, sir.

24  Q   Another one in September which was consistent?

25  A   Yes, sir -- no.  The September -- yes.  And he had one in

1   October.

2   Q   Now, the October one, October 30th of 2012, that's when you

3   said, even though he was on the fentanyl patch, the drug test

4   showed that he didn't have fentanyl in his system; right?  On

5   October 30th?  That's what you told us on direct?

6   A   Yes, sir.  Only norfentanyl, the breakdown product, was

7   present.

8   Q   Right.  Which means that he had had the patch on within a

9   few days of taking the test?

10  A   Yes, sir.

11  Q   Okay.  So he didn't have the patch on at the time of the

12  test?

13  A   Yes, sir.  I would say the patch had been off probably for

14  about two days, if there was just norfentanyl in his system.

15  Q   Okay.  And if there's a diversion issue with fentanyl

16  patches, then it would be safe to assume that the person's not

17  going to be wearing the fentanyl patches; right?  If somebody's

18  diverting them, they wouldn't be wearing them too?

19  A   If they are diverting all of them (nodding head

20  affirmatively).

21  Q   Well, the fact that he had norfentanyl in his system shows

22  that he's using the fentanyl patches; right?

23  A   Yes, sir.  I don't think we ever talked about him diverting

24  fentanyl.

25  Q   Well, in your direct you -- and maybe Ms. Griffin asked you

1    the question and you just agreed with it -- that there was a

2    diversion issue with fentanyl patches?

3         MS. GRIFFIN:  Your Honor, we object to the form.  Is

4    that a question or is he arguing with the witness?

5    BY MR. ARMSTRONG:

6    Q    Okay.  Let me just clear it up.  You're not suggesting to

7    the jury that this man was diverting fentanyl patches; right?

8    A    I don't think so.  No, sir.

9    Q    Okay.  Good.  Okay.  Well, then, I'll move on.

10        And they sent that drug test, the October drug test,

11   out for a GC-MS; right?

12   A    They did, yes, sir.

13   Q    And, of course, the GC-MS is not available at the time, the

14   results are not available at the time of the patient visit, on

15   that visit?

16   A    Yes, sir, it takes several days to come back.

17   Q    Right.  So usually they counsel them the next time they

18   come in; correct?

19   A    Yes, sir.

20   Q    If they counsel them at all, it would be the next visit;

21   correct?

22   A    Yes, sir.

23   Q    And didn't that occur on the next -- this young man's next

24   visit?

25   A    And which date is that?

1  Q   November 27th of 2012?

2  A   Yes, sir, I assume they asked him why he had hydrocodone in

3  his system and he stated that he had gotten some from the

4  dentist.

5  Q   Right.  And on that date they gave him -- there's a

6  warning, opioid violation warning; correct?  On November 27?

7  A   Yes, sir.

8  Q   And that's what you would expect they would do, they would

9  warn the person and remind them about the opioid agreement they

10  signed; correct?

11  A   It's one of the things you could do, yes, sir.

12  Q   And in fact, at that time they discontinued the fentanyl

13  patch; correct?

14  A   Yes, sir.  He was written for Soma and Percocet and Xanax.

15  Q   And the next time he came in, in January of 2013, again he

16  had a consistent drug test; correct?

17  A   Yes, sir.

18  Q   I'll move on to the next file with you.

19  A   Yes, sir.

20  Q   I show you Mr. M........

21  A   M......., sir?

22  Q   GM..........., yes.

23  A   Yes, sir.

24  Q   Now, Mr. M....... had lots of issues, didn't he?

25  A   Yes, sir, he did.

1    Q   Pretty serious?  He was in a wheelchair?

2    A   I believe.

3    Q   Or he was bound to a wheelchair because of his medical

4    problems?

5    A   Yes, sir.  The chart says he was wheelchair dependent.

6    Q   I think he had cervical spondylosis?

7    A   Yes, sir.

8    Q   Displacement of the cervical disk?

9    A   Yes, sir.

10   Q   Cervicalgia?

11   A   Yes, sir, neck pain.

12   Q   Cervical stenosis?

13   A   Yes, sir.

14   Q   Cervical radiculitis?

15   A   Yes, sir.

16   Q   Cervical spasms with dystonia?

17   A   Yes.

18   Q   And what is that?

19   A   Dystonia is abnormal spasm or contraction of the muscles in

20   your neck, also called torticollis, where it usually happens in

21   the muscles in the front, where you turn your head to one side,

22   rotate one way and then go the other, you have difficulty

23   straightening your head.

24   Q   Is it fair to say the muscle spasms are fairly painful when

25   you're --

1    A    Dystonia can be painful, yes, sir.

2    Q    He also had other problems, obviously he had depression and

3    anxiety, but we've talked about how that can be caused by your

4    pain and your physical condition?

5    A    Yes, sir.

6    Q    He had diabetes?

7    A    He did.

8    Q    And he was suffering obesity as well; correct?

9    A    Yes, sir, and sleep apnea.

10   Q    And he had all these things when he came to Dr. Ruan, when

11   he was referred to Dr. Ruan; correct?

12   A    He did, yes, sir.

13   Q    And one thing I noticed from your report, even he had come

14   to Dr. Ruan, I believe, sometime in 2008 and I think you said

15   in your report that this gentleman was relatively compliant

16   with his medications until November of 2014; is that correct?

17   A    Yes, sir.  And that's when things apparently -- actually, I

18   would say before August of 2013.  I know that's what my report

19   says.  But about that time, 2013-2014, is when things began --

20   began to turn.

21   Q    Well, let's talk about that.  You said even though your

22   report says he was compliant till November of '14, you

23   testified, I believe, yesterday that it was August 28 of 2013

24   the first time you noticed an inconsistent test; correct?

25   A    There had been one previous to that, sir, that we did not

RAHUL VOHRA, MD - CROSS BY MR. ARMSTRONG

1    discuss as well back in 2011, and then August of 2013 we did

2    talk about.

3    Q    Did you see what Dr. Ruan did as a result of that August

4    28th inconsistent drug screen?

5    A    He -- I believe he stopped his fentanyl.

6    Q    Pardon me?

7    A    He stopped his fentanyl.

8    Q    Well, the inconsistency from August 28th was the fentanyl;

9    correct?

10   A    Yes, sir.

11   Q    And what Dr. Ruan decided to do, since that was

12   inconsistent, was to wean him off the fentanyl patch; correct?

13   A    That was the decision he made, yes, sir.

14   Q    Right.  So he, based on that drug screen, did something;

15   correct?

16   A    I would respectfully disagree.

17   Q    You don't think --

18   A    He did something, but I don't think that's what should have

19   been done.

20   Q    Well, you may disagree with what he did.  But he did

21   something; right?

22   A    He did something, yes, sir.

23   Q    Right.  And that was the decision to take him off the

24   fentanyl patch?

25   A    Yes, sir.

1    Q   Because if he wasn't going to use it right, he may as well

2    not prescribe it to him; right?

3    A   But he prescribed -- continued to prescribe opioids.

4    Q   And I think you've touched a little bit on this with

5    Mr. Doss.  The first patient was 2011-2012 time period.  This

6    is 2013.  Were there national standards at that time of what to

7    do with the results of drug screens?

8    A   Yes, sir.  That hasn't changed.  It's gotten much more

9    media attention in the last couple of years.  But that standard

10   of care has been there for as long as I've been practicing.

11   Q   Well, let me change that.  Are there national guidelines --

12   were there at that time national guidelines on what to do with

13   patients who may fail a drug screen?

14   A   For pain physicians?

15   Q   For pain physicians.

16   A   There are no national guidelines now for pain physicians.

17   Q   Well, let me show you what I've had marked as Ruan's

18   Exhibit 166.  And you're familiar with the CDC, aren't you?

19   A   Yes, sir.

20   Q   Okay.  Are you familiar with this guideline, the CDC

21   guideline for prescribing opioids for chronic pain, 2016?

22        MS. GRIFFIN:  Your Honor, I believe this has already

23   been admitted under --

24        MR. ARMSTRONG:  Not the 2016 guidelines.  Maybe it

25   has, but I think it's the 2013, a different form.

 1   A   Yes, sir.  And this is not for pain physicians.

 2           MR. ARMSTRONG:  Okay.  Well, I take that back.  I

 3   think it has been admitted.

 4           THE COURT:  Under what number?

 5           MR. ARMSTRONG:  Is it 101?

 6           THE CLERK:  76, that's Couch.  This is Ruan.

 7           MR. ARMSTRONG:  No, it's going to be a Couch exhibit.

 8       (A discussion was held off the record between counsel.)

 9           MR. ARMSTRONG:  Here it is.

10   Q   Okay.  I show you Couch Exhibit 107.  Same document?

11   A   Yes, sir.

12   Q   Are you familiar with this?

13   A   I am.

14   Q   While I'm looking for my notes in the already introduced

15   exhibits, I'm going to move on to something else.

16   A   Yes, sir.

17   Q   Talking about Mr. M......., do you recall the medications

18   Mr. M....... was on at the time he came to see Dr. Ruan?

19   A   He was he was on a hundred micrograms of fentanyl and

20   hydrocodone and Soma.

21   Q   Let me show you --

22   A   And Opana, I believe.

23   Q   Right.  Can you see those milligram dosages?  This is from

24   the chart.

25           MS. GRIFFIN:  Do you have a date on that, Counsel?

1      MR. ARMSTRONG:  It's the --

2   A   12/30/08.

3      MS. GRIFFIN:  It's outside the scope of direct and

4   it's outside the time frame charged in the indictment.

5   BY MR. ARMSTRONG:

6   Q   Are you aware of the medications he was on at the time he

7   came?

8      MS. GRIFFIN:  We object, Your Honor.

9      MR. ARMSTRONG:  Well --

10     THE COURT:  Well --

11     MR. ARMSTRONG:  -- he just testified he continued him

12  on medications despite the drug tests and being taken off.

13     THE COURT:  Well, we need to talk about time frames,

14  though.

15     MR. ARMSTRONG:  Okay.

16  Q   At the time he initially came to see Dr. Ruan, he was on

17  heavy dosage morphine equivalent levels; correct?

18  A   Yes, sir.

19  Q   When he came in?

20  A   He was.

21  Q   And based on your review, would you equate that to about

22  700 to 800 milligrams of morphine at the time he came to see

23  Dr. Ruan?

24  A   I think that looks about right, maybe a little bit less,

25  but --

1  Q   Those would be medications that were prescribed by someone

2  other than Dr. Ruan; correct?

3  A   Yes, sir.

4  Q   Okay.  Now, did you see what level that Dr. Ruan had him on

5  at the time of his last visit, morphine equivalent of what he

6  had him on?

7  A   And which the last visit would be the 3/24/15, sir?

8  Q   Yes, sir.  I believe so.

9  A   Okay.  That would look like -- best guess -- 250.

10 Q   Is it actually a hundred milligrams morphine equivalent

11 dosage?

12 A   No.  This is more than that.

13 Q   Well, would it be fair to say Dr. Ruan significantly

14 reduced the morphine equivalent during his period of treating

15 him?

16 A   From the start date to where it ended, yes, sir, it did go

17 down.

18 Q   So Dr. Ruan actually over time reduced the medications he

19 was taking?

20 A   Yes, sir, at the time it ended, he did.

21 Q   Now let's talk about the November test that you talked

22 about.

23 A   Which year, sir?

24 Q   November of 2014.  That's the only other test you talked

25 about with Ms. Griffin.

1  A   Yes, sir.

2  Q   Okay.  And at that -- on that date they did a saliva test;

3  right?

4  A   Yes, sir.

5  Q   And I think you said that at that time, despite the drug

6  test, they didn't make any changes, Dr. Ruan didn't make any

7  changes?  At least that's what you said on direct?

8  A   Yes, sir, he continued on the oxycodone and the tramadol

9  that he was prescribing.

10 Q   Well, actually, didn't he take him off the oxycodone?

11 A   No, sir, he was still writing Percocet.

12 Q   November 2014?

13 A   Oxycodone 10 milligrams, 180 were refilled.

14 Q   I'll show you the last page --

15 A   Yes, sir.

16 Q   -- of the plan, 11/12/2014.  What was discontinued?

17 A   The oxycodone.  But he was written for Percocet, which is

18 oxycodone.

19 Q   But he took him off this right here; right?  (Indicating.)

20 A   Yes, sir.  He took him off the oxycodone 30 milligram

21 tablets and put him on Percocet 90 -- of the 10 milligram

22 tablets.  So they are both oxycodone, sir.

23 Q   The oxycodone 30 milligram three times a day was changed to

24 the Percocet 10s three times a day as needed; correct?

25 A   Yes, sir.

1   Q   Correct?

2   A   Yes, sir.

3   Q   Isn't that a change?

4   A   It's the same medicine, it's just a change in dosage.

5   Q   He changed the dose; correct?  He decreased it?

6   A   He did.

7   Q   He went down?

8   A   Yes, sir.

9   Q   You said there were no changes.

10  A   In the medication, yes, sir.

11  Q   Well, there were no changes in medication, but he changed

12  the dosage, he decreased the dosage; right?

13          MS. GRIFFIN:  Your Honor, it's been asked and

14  answered.

15          THE COURT:  Sustained.

16          MS. GRIFFIN:  And he's arguing with the witness.

17          THE COURT:  Sustained, sustained.

18  BY MR. ARMSTRONG:

19  Q   Now let's move on to Ms. H......

20  A   Yes, sir.

21  Q   You talked about or Ms. Griffin asked you about the

22  November 16th, 2011, I believe, test.

23  A   Yes, sir.

24  Q   Prior to that she had had two prior tests that were

25  consistent; correct?

1    A    No, sir.  July it was negative for everything.

2    Q    Are you talking about July 28th of --

3    A    July 2011, yes, sir.

4    Q    Pardon me?

5    A    July 2011.

6    Q    I thought you were talking about November.

7    A    You asked -- you said prior to that she had had a normal

8    drug screen.  I said no, prior to that she had an abnormal drug

9    screen.

10   Q    Well, on November 15th, did you look at the file to see

11   what happened on November 15th, the day before this November

12   16th note?

13   A    She had a knee injection done.

14   Q    Did you find an appointment or a visit, a progress note for

15   November 16th?

16   A    Just -- if I did, I didn't mention it.  Just the drug

17   screen.

18   Q    Well, this is on November 15th, which is the day before the

19   test you testified about?

20   A    Yes, sir.

21   Q    She was in the office for a procedure; correct?

22   A    She had a Synvisc injection in her knee, yes, sir.

23   Q    And this is the procedure note and the report of what

24   happened on that day?

25   A    It is, yes, sir.

RAHUL VOHRA, MD, CROSS BY MR. ARMSTRONG

1   Q   And do you know where Ms. H..... lived?

2   A   I have no idea.

3   Q   Do you know she lived over in Mississippi?

4   A   I don't know, sir.

5   Q   Okay.  And then what you testified about was this, the

6   November 16th, 2011, report?

7   A   Yes, sir.

8   Q   Okay.  Do you -- but there's no office visit note from this

9   date, November 16th?

10  A   If there is, I don't think I saw it.

11  Q   So these actually are -- these dates are kind of

12  inconsistent with each other, aren't they?

13  A   Well, they are two different dates, yes, sir.

14  Q   So they are back to back?  One's November 15th, when she

15  was in the office and had a procedure, and then we've got this?

16  (Indicating.)

17  A   Yes, sir.

18  Q   And so you can't tell whether she actually got this test on

19  this date or not (indicating), other than it says that date?

20  A   All I know is what it says, sir.

21  Q   We don't have any report of her actually being in the

22  office that day other than this report; correct?

23  A   Yes, sir.  Actually, sir, I think there is a note.  Because

24  in my note it says that she -- it was noted that she was taking

25  Esgic from another provider.  So there must be a note

1   somewhere.

2   Q   The chart will speak for itself.

3   A   Yes, sir.

4           MS. GRIFFIN:  Your Honor, object to counsel commenting

5   on the witness' answers and not asking him questions.

6           THE COURT:  Sustained.

7   BY MR. ARMSTRONG:

8   Q   Now, in February, you next testified of a drug screen in

9   February.

10  A   Yes, sir.

11  Q   And this is -- and when I refer to a progress note, I'm

12  talking about one of these forms; right?  When they come in?

13  2/16, and this is the date you're talking about on the next

14  one?  (Indicating.)

15  A   I am, yes, sir.

16  Q   And then there is a corresponding -- corresponding drug

17  test from that date?

18  A   Is that the confirmation?

19  Q   Collected on the 16th?

20  A   Yes, sir.

21  Q   So this is what an office visit report looks like; right?

22  A   Yes, sir.

23  Q   Okay.  And on this date, based on the drug screen, this was

24  ordered; right?

25  A   Yes, sir.

1    Q    And, of course, it came back on the 20th?

2    A    It did.

3    Q    When it came back.  And so you would expect that once the

4    GC-MS is ordered to confirm the in-office test, that the doctor

5    would discuss that with the patient next time the patient comes

6    in?

7    A    Yes, sir.

8    Q    Now, on this date, based on the drug screen, the cup in the

9    office, Dr. Raun changed her medicine; right?

10   A    Yes, sir, he changed it to a different opioid.

11   Q    All right.  And it was done based on:  We have to change

12   meds per Dr. Ruan; right?

13   A    Yes, sir.  Someone wrote that, yes, sir.

14   Q    Okay.  They ordered the GC-MS?

15   A    They did.

16   Q    Okay.  And Ms. H..... never came back, did she?

17   A    It's the last note I have, sir.

18   Q    So they were unable to discuss it with her, because she

19   never came back; right?  Dr. Ruan couldn't?

20   A    Of course.

21   Q    Now, you talked with Ms. --

22        (A discussion was held off the record between counsel.)

23   BY MR. ARMSTRONG:

24   Q    Do you remember going over this with Ms. Griffin?

25   A    I do, yes, sir.

RAHUL VOHRA, MD - CROSS BY MR. ARMSTRONG

1   Q   And specifically, she asked you about the oxycodone, the 30
2   milligram?
3   A   Yes, sir.
4   Q   Do you remember that?
5   A   I do.
6   Q   And this column here shows the number of recipients, and
7   that's 167?
8   A   Yes, sir.
9   Q   And that's over this four-and-a-half, four- and five-month
10  period roughly?
11  A   Yes, sir.
12  Q   Okay.  So that's 167 patients?
13  A   Yes, sir.
14  Q   Do you know how many patients total Dr. Ruan treated?
15  A   I have no idea, sir.
16  Q   Do you know he's treated close to 6,000 patients?
17          MS. GRIFFIN:  Object, Your Honor, as to foundation.
18          THE COURT:  Sustained.
19  BY MR. ARMSTRONG:
20  Q   Well, you've testified, yourself, you've treated thousands
21  of patients; right?
22  A   Yes, sir.
23  Q   Would it make sense that over the period of time Dr. Ruan
24  also treated thousands of patients?
25          MS. GRIFFIN:  Objection, Your Honor.  No foundation.

```
 1              THE COURT:  Sustained.
 2    BY MR. ARMSTRONG:
 3    Q   167 patients out of thousands is not a very high
 4    percentage, is it?
 5              MS. GRIFFIN:  Objection, Your Honor.
 6              THE COURT:  Sustained.
 7    BY MR. ARMSTRONG:
 8    Q   Now, would you agree with me that the best way to evaluate
 9    a patient is to be the clinician that's actually treating the
10    patient?  Correct?
11    A   That's the person that's usually in the best position to
12    evaluate somebody, yes, sir.
13    Q   Kind of the human touch, can't take -- you can't take the
14    human interaction out; right?
15    A   Of course.
16    Q   And you're looking at a cold file or cold chart without
17    that; right?
18    A   I am.
19    Q   And Dr. Ruan, I believe you've testified, saw each of these
20    patients?
21    A   As per the charts, he saw all of them, yes, sir.
22    Q   And you saw -- you looked at three files for Dr. Ruan?
23    A   I believe so, yes, sir.
24    Q   Or you testified about three files for Dr. Ruan?
25    A   Yes, sir.
```

1  Q   Okay.  And those three files were picked by the government

2  and presented to you to look at?

3            MS. GRIFFIN:  Your Honor, may we approach?

4            THE COURT:  Yes.

5        (At the side bar, jury not present.)

6            MS. GRIFFIN:  The patient file -- excuse me.  The

7  patient files were picked because most of the patients died

8  during their treatment.  And you're going terribly close to

9  that in asking him that.

10           MR. ARMSTRONG:  I'm just saying they picked the files.

11           MS. GRIFFIN:  He may tell you that they picked the

12  dead people for him to review.  So I'm just --

13           MR. ARMSTRONG:  I'll leave it where it is.

14           MS. GRIFFIN:  He's been warned not to say it.  But if

15  he's asked it --

16           MR. ARMSTRONG:  Okay.

17       (In open court, defendants and jury present.)

18  BY MR. ARMSTRONG:

19  Q   You only looked at these three files; correct?  That you

20  testified about?  As far as Dr. Ruan is concerned, you only

21  looked at the three files that you testified about?

22  A   These are the three that I -- yes, sir -- that I testified

23  about.

24  Q   And three out of however many he's treated; correct?

25  People?

1   A   Yes, sir, I looked at these three.

2           MR. ARMSTRONG:  I think that's all.

3           THE COURT:  Any redirect?

4           MS. GRIFFIN:  Briefly, Your Honor.

5                       REDIRECT EXAMINATION

6   BY MS. GRIFFIN:

7   Q   Dr. Vohra, you referenced the American Board of Medical

8   Specialties, the ABMS?

9   A   Yes, ma'am.

10  Q   That lists the boards that are recognized in the United

11  States by the American Board of Medical Specialties?

12  A   It does.

13  Q   And you indicated there were approximately 20; is that

14  right; or so?

15  A   I think it's more than that.

16  Q   And you mentioned that addictionology was not one of those;

17  is that correct?

18  A   I'm not aware that that's an ABMS recognized board.

19  Q   I'll show you what's marked as Government's Exhibit 22-12

20  and ask if this is a letter from the board that you've

21  referenced, the American Board of Medical Specialties?

22  A   Yes, that's it.

23  Q   And does it list the 24 medical specialty boards for the

24  American Board of Medical Specialties?

25  A   It lists the specialty boards, yes, ma'am, I think 24, if

```
 1   you say so, yes.
 2   Q   If you would look over the front page and tell me when
 3   you're ready?
 4   A   Okay.
 5   Q   And then the listing of boards on the second page?
 6   A   Yes.
 7   Q   And I ask if addictionology is a board within -- a
 8   recognized board within the American Board of Medical
 9   Specialties?
10   A   No.
11   Q   You were shown SJ.............' file, that being
12   Government's Exhibit 22-8; is that correct?
13   A   Yes.
14   Q   SJ.............?
15   A   Yes.
16   Q   And that's a Dr. Couch file?
17   A   It is.
18   Q   Now, I know they talked to you about there being mistakes
19   in their files, but you were shown a Gulf Coast Behavioral
20   Medicine document in SJ.............' file.
21           MS. GRIFFIN:  And, Your Honor, this has been
22   admitted --
23           THE CLERK:  It should be up in a moment.
24           MS. GRIFFIN:  This has been admitted in Government's
25   Exhibit 22-8.  So may it be published to the jury?
```

2534

```
1           THE COURT:  Yes.
2    BY MS. GRIFFIN:
3    Q   This Gulf Coast Behavioral Medicine is not for
4    SJ.............., is it?
5    A   No.  It's for Donna Schmitt.
6    Q   So in addition to them saying the files had errors, they
7    also had other people's medical information; is that right?
8    A   Yes, in that chart.
9    Q   I show you for SJ.............., for May the 14th of
10   2014 -- I think I said C........  It's S.......; is that
11   right?  Does it indicate:  The patient said she would like to
12   talk to Dr. Couch about her options?
13   A   It does.
14   Q   Does that imply to you that she's not seen Dr. Couch on
15   this visit?
16           MR. DOSS:  Objection.  Speculation.
17           THE COURT:  Sustained.
18   BY MS. GRIFFIN:
19   Q   Does it say she would like to talk to Dr. Couch?
20   A   Yes, that's what it says.
21   Q   That's the May 14th, 2014, progress note?
22   A   Yes.
23   Q   I'll show you where that note was then -- that progress
24   note was signed.  (Indicating.)  Was it signed by Stacy Madison
25   on May the 27th of '14?
```

RAHUL VOHRA, MD - REDIRECT BY MS. GRIFFIN

1  A   It was.

2  Q   Was it signed by Dr. Couch as a reviewer on May the 27th of

3  '14?

4  A   It was.

5  Q   I show you SJ.............' file for May the 28th, 2014.

6  A   Okay.

7  Q   And ask if it says that she's there crying and wanting to

8  talk to Dr. Couch.

9  A   Yes, that's what it says.

10  Q   Do you know whether she saw Dr. Couch that day or not?

11  A   I wasn't there.  I don't know if he saw her or not.

12  Q   Does it say anything that Dr. Couch told her that day or

13  advised her that day?

14  A   No.  It says I.  I assume that's the author.  So:  I told

15  her.  So, but nothing about Dr. Couch telling her.

16  Q   For the signature page of that visit, does it show it was

17  just signed by Stacy Madison?

18  A   It does.

19  Q   Further, does it show under the medications that the

20  medication was adjusted?

21  A   Yes.

22  Q   On May the 28th, 2014?

23  A   The morphine was adjusted.

24  Q   As to the patient Kenneth Daves?

25  A   Yes, ma'am.

RAHUL VOHRA, MD - REDIRECT BY MS. GRIFFIN

```
 1  Q   Government's Exhibit 22-1.  You were shown, indicating --
 2  you were shown a patient call where the patient was allegedly
 3  told he needed to bring medications for a pill count?
 4  A   That's correct.
 5  Q   You didn't -- or did you see any indication where a pill
 6  count was ever done for Mr. Daves?
 7  A   No, I don't think so.
 8  Q   I show you the progress note for Mr. Daves on January the
 9  14th of 2014 and ask if it says that there is little
10  improvement, in one line?
11  A   Yes.
12  Q   And the next line says he's pleased with his medications?
13  A   Yes.
14  Q   Is that inconsistent?
15  A   It is.
16  Q   Does that appear to be a cut and paste?
17          MR. DOSS:  Objection.  Speculation.
18          THE COURT:  Sustained.
19  BY MS. GRIFFIN:
20  Q   Also as to JD..........., Government's Exhibit 22-11, do
21  you recall this file?
22  A   I do.
23  Q   And this is a Dr. Couch file?
24  A   Yes, this is a Dr. Couch file.
25  Q   I'll show you May the 28th of '13, a notation for
```

RAHUL VOHRA, MD - REDIRECT BY MS. GRIFFIN

 1  Mr. Dunaway.  Does it indicate at the bottom:  Biweekly pill

 2  count?

 3  A   It does.

 4  Q   Was there any indication in the file that a pill count was

 5  ever done?

 6  A   Not that I saw.

 7  Q   Do you recall being asked about Exalgo being prescribed for

 8  JH.........?

 9  A   I do.

10  Q   And it indicates that the patient was placed on Exalgo and

11  the note said that Dr. Ruan said to switch the patient; is that

12  right?

13  A   That's correct.

14  Q   Do you recall that that's during the period of time you

15  were previously asked if Dr. Ruan was being paid speaking fees

16  by Exalgo's manufacturer?

17  A   I believe that's in that time frame, yes.

18  Q   Now, you were asked some about Dilaudid and some about

19  morphine?

20  A   Yes, ma'am.

21  Q   Which of those is stronger?

22  A   Dilaudid.

23  Q   More so, maybe twice as much?

24  A   A little bit more.

25  Q   So when SJ............. was changed to Dilaudid eight

2538

1    milligrams a day in February of '14 -- I'm so sorry -- that's

2    Kenneth Daves was changed to Dilaudid February 2014, that would

3    be an increase in medication; is that right?

4    A    Let me find it.

5    Q    Kenneth Daves, February the 11th, 2014?

6    A    Okay.  Let me just look.  Yes, his overall opioids were

7    increased.

8    Q    And one more patient.  Excuse me.  One more patient

9    file.  Stephen McDonald.  Do you recall testifying Dr. Ruan

10   prescribed Percocet, Soma, and Xanax?

11   A    Yes.

12   Q    Is that what's commonly known as the Holy Trinity?

13   A    Yes.

14   Q    What are the dangers of the Holy Trinity?

15   A    It's a red flag for someone that's a drug abuser, it's also

16   an addictive combination.

17   Q    For Mr. McDonald, if the record shows he was given a

18   vacation package July of '11, September of '11, January of '12,

19   and February of '12, from July of '11 to February of '12 is a

20   seven-month period; is that correct?

21   A    Yes.

22   Q    He was given more vacation packages in a seven-month period

23   by Dr. Ruan?

24   A    Yes.

25   Q    Does that appear to be outside the usual course of

2539

1    professional practice?

2    A    It's a lot of travel.

3    Q    I show you what's been introduced and referenced as the

4    Alabama Board of Medical Examiners Administrators Code?

5    A    Yes.

6    Q    It's Couch Exhibit 118, at page 10.

7    A    Yes, ma'am.  I've seen this.

8    Q    Number five.  You're previously seen it of course?

9    A    I have.

10   Q    Does it indicate what should happen about whether or not a

11   physician can delegate the responsibility of determining the

12   type, dosage form, frequency of application, and number of

13   refills?

14   A    This is what we had talked about previously.  It says that

15   when you prescribe a controlled substance, you cannot delegate

16   the responsibility of determining what medication, how often

17   the medication is given, the strength of the medication to

18   anybody else.  You have to make that decision.

19   Q    The physician?

20   A    The physician that's writing the medication.

21   Q    Does that guide further say at page 27 that all

22   prescriptions in Alabama must be based on clear documentation

23   and compliance with applicable state or federal law?

24   A    It does.

25   Q    And it discusses the legitimate medical purpose and the

2540

1    usual course of professional practice?

2    A    It does.

3    Q    Finally, as to this Alabama requirement, does it discuss

4    informed consent?

5    A    It does.

6    Q    Does it say the physician shall discuss the risks and

7    benefits of the use of controlled substances with the patient?

8    A    It does.

9    Q    Persons designated by the patient or the patient's

10   surrogate or guardian?

11   A    Yes.

12   Q    What would typically be a person or what could be a person

13   designated by the patient?

14   A    A caregiver or family member.

15   Q    And that says:  The physician shall; is that correct?

16   A    Yes.

17   Q    It's not a multiple choice?

18   A    No.  That's what we talked about previously as well.  It's

19   my responsibility, or a physician's responsibility.

20   Q    Finally, you talked about the word "blues" having a street

21   connotation other than in music?

22   A    Yes, ma'am.

23   Q    What does that mean?

24   A    It's 30 Roxicodone.

25   Q    And that's a street -- is that a street slang?

RAHUL VOHRA, MD - REDIRECT BY MS. GRIFFIN

1   A   That is.

2   Q   Dr. Vohra, you reviewed the Daves, McDonald, J......,

3   Dunaway, Paulson, Blouin, M......., and H..... files; is that

4   correct?  That you've testified to here today?

5   A   I did.

6   Q   Has anything changed your mind about your opinion as to

7   each of those files that the total treatment was outside the

8   usual course of professional practice?

9   A   No.  My opinions are the same as they were.

10          MS. GRIFFIN:  That's all I have of this witness, Your

11  Honor.

12          MR. ARMSTRONG:  Judge?

13          THE COURT:  Thank you, Doctor.  You may step down.

14          MR. ARMSTRONG:  Before he's excused, may I talk to

15  Ms. Griffin for a moment?

16          THE COURT:  I'm sorry?

17          MR. ARMSTRONG:  Before he's excused, may I talk to

18  Ms. Griffin?

19          THE COURT:  All right.

20      (A discussion was held off the record between counsel.)

21          THE COURT:  Counsel, do y'all want to go out in the

22  hall and have a discussion?

23          MR. ARMSTRONG:  May we approach?

24          THE COURT:  All right.

25      (At the side bar, jury not present.)

1          MR. ARMSTRONG:  All right.

2          MS. GRIFFIN:  Wait, wait, wait.  Wait till everybody

3     gets here.

4          MR. ARMSTRONG:  Okay.  Do you recall my question about

5     addiction medicine being a board specialty?  My client was

6     board certified.

7          THE COURT:  All right.

8          MR. ARMSTRONG:  He said no, it's not a board

9     specialty.  Then Deborah got up on redirect, showed him a

10    letter, and then now the jury's left with the impression that

11    addiction medicine is not a board specialty.  Two things:  One,

12    Dr. Greenberg testified he was boarded in addiction medicine

13    That was Dr. Greenberg's testimony.

14          Secondly, the ABMS, which is what he testified to,

15    officially recognizes addiction medicine as a subspecialty.

16          THE COURT:  He wasn't asked about subspecialty.  You

17    can go into it with some other witness.  You're not going into

18    that, it's not that important for this particular witness.

19          MR. ARMSTRONG:  Okay.

20          THE COURT:  I'm going to excuse him.

21          MR. ARMSTRONG:  Okay.

22      (In open court, defendants and jury present.)

23          THE COURT:  All right, Doctor, you may be

24    excused.  Thank you.

25          THE WITNESS:  Yes, ma'am.

1          MR. BODNAR:  Your Honor, as the next witness is coming

2    up, the United States per stipulation offers Government's

3    Exhibit 32-7, subparts (1) and (2), and the United States

4    Exhibits 38-10, subparts (1) and (2).

5          THE COURT:  All right.  Mark them in.

6       (Government's Exhibits 32-7(1), 32-7(2), 38-10(1), and

7    38-10(2) were entered into evidence.)

8          MS. GRIFFIN:  We call Kaitlyn Knowles, Your Honor.

9                    KAITLYN KNOWLES

10              Was sworn and testified as follows:

11          THE WITNESS:  Yes.

12                  DIRECT EXAMINATION

13   BY MS. GRIFFIN:

14   Q    Good afternoon.

15   A    Hi.

16   Q    Tell us your name, please, ma'am.

17   A    Kaitlyn Knowles.

18   Q    Could you spell your first and last name?

19   A    K-A-I-T-L-Y-N  K-N-O-W-L-E-S.

20   Q    Ms. Knowles, where are you currently employed?

21   A    C&M Vital Care.

22   Q    Where is that located?

23   A    Satsuma.

24   Q    Is that in connection with McConaghy Pharmacy?

25   A    Yes, ma'am.

1   Q   I want to direct your attention to when C&R Pharmacy

2   existed.  Did you work at C&R Pharmacy?

3   A   Yes, ma'am.

4   Q   Was that prior to May the 20th of 2015?

5   A   Yes, ma'am.

6   Q   Could you tell us when you went to work for C&R Pharmacy?

7   A   It was in 2012.

8   Q   Was it the beginning or the end, if you recall?

9   A   Towards the end.  I'm not sure.

10  Q   Where was that located?

11  A   In Mobile.

12  Q   C&R Pharmacy?

13  A   In Mobile.

14  Q   Was it next door to PPSA?

15  A   Yes, ma'am.

16  Q   How were you employed?  What was your employment to do?

17  A   Pharmacy technician.

18  Q   What were your duties?

19  A   To intake prescriptions, count medications and check

20  patients out.

21  Q   What do you mean by "intake prescriptions"?

22  A   When a patient brings a prescription in.

23  Q   What would you do?

24  A   We take the prescription in and put it into a computer and

25  process it.

1    Q    Was it entered electronically then?

2    A    Yes, ma'am.

3    Q    What do you mean by "counting the medications"?

4    A    When the prescription was processed we would count the

5    correct amount of medication.

6    Q    And checking the patients out would be when they'd come to

7    pay for their prescription?

8    A    Yes, ma'am.

9    Q    What do you type into the computer about the prescription?

10   A    The patient's name, the insurance, doctor, medication,

11   quantity and refills.

12   Q    And the directions?

13   A    And the directions; yes, ma'am.

14   Q    With schedule II controlled substances, are refills

15   allowed?

16   A    No, ma'am.

17   Q    Now, once you type that information in from a prescription,

18   you got the information from the prescription you were handed?

19   A    Correct.

20   Q    What did you do with it, with the computer once you typed

21   it in?

22   A    I don't understand the question.

23   Q    Did you send it somewhere?

24   A    If it was processed through insurance, we electronically

25   submit it through insurance.

KAITLYN KNOWLES - DIRECT BY MS. GRIFFIN

1    Q    To the insurance company?

2    A    Yes, ma'am.

3    Q    What was the purpose of that?

4    A    To collect the copay.

5    Q    Is it to collect a copay or to see if the insurance

6    company's going to pay?

7    A    Yes, ma'am.

8    Q    Which is it?

9    A    To see if the insurance company will cover the medication.

10   Q    And so that was transmitted electronically; right?

11   A    Yes, ma'am.

12   Q    If it was a new patient that came in with a prescription,

13   what additional would you do?

14   A    We would have to get all the patient's information.

15   Q    Would that too, go in the computer?

16   A    Yes, ma'am.

17   Q    Is that how you knew which company to send it to if it was

18   insurance for the -- for the prescription?

19   A    Yes, ma'am.

20   Q    Now, if it was a regular patient or a patient who had been

21   there before, you didn't have to type in that additional

22   information?  Could you pull that patient up?

23   A    Yes, ma'am.

24   Q    That would show you who their insurance was, what type

25   coverage they had; is that right?

KAITLYN KNOWLES - DIRECT BY MS. GRIFFIN

1   A   Yes, on their print file.

2   Q   Was it common for patients to pay their copay in cash?

3   A   I don't remember.

4   Q   You don't recall?

5   A   (Shaking head negatively.)

6   Q   What's the difference in a copay and what their insurance

7   is going to pay?

8   A   The copay is the part that the patient is responsible to

9   pay.

10  Q   Once you type the prescription and learn that the patient

11  had coverage, what would you do next with the prescription?

12  A   Put it in a bin to be counted.

13  Q   What do you mean by "put it in a bin"?

14  A   We had little baskets that their prescriptions would go in

15  and then they would go to be counted by a technician.

16  Q   What do you mean "counted by technician"?

17  A   The technician would count the medication.

18  Q   I show you what's been marked as Government's Exhibit 4-11,

19  identified as from C&R Pharmacy and ask if the little plastic

20  bin I'm holding up to show you is what you were referring to?

21  A   Yes, ma'am.

22  Q   After it went in the bin and after the prescription was

23  filled and counted, what happened?  Did some identifying

24  information go on the pill bottle?

25  A   Yes, ma'am; a label was put on the pill bottle.

KAITLYN KNOWLES - DIRECT BY MS. GRIFFIN

1   Q   How did you get the label?

2   A   It prints from the computer.

3   Q   Explain that to us.  Is it one part, two parts, three

4   parts?

5   A   I don't understand.

6   Q   What is printed?  Is it a duplicate printout of the

7   information on the prescription?

8   A   There's a -- there's two parts of the label, yes, ma'am.

9   Q   Explain that to us.

10  A   There is one part that goes on the prescription bottle and

11  one part that goes on the back of the prescription.

12  Q   What is significant about placing that label on the back of

13  the prescription?

14  A   So you know the prescription number that goes with that

15  prescription.

16  Q   So typically the front of the prescription does not have a

17  prescription number?

18  A   No, ma'am.  It would go on the label on the back.

19  Q   Does that signify that that script has been filled, putting

20  the white label on the back?

21  A   No, ma'am.  It could have been put on hold.

22  Q   What do you mean by "put on hold"?

23  A   Put on hold on the patient's profile, as in not filled

24  right then.

25  Q   I'll show you what has come out of this little green basket

1    you've identified from Government's Exhibit 4-11 from C&R

2    Pharmacy and show you a prescription.  And this contains

3    information, a name, who it's been -- what's been prescribed,

4    different things; is that correct?

5    A    Yes, ma'am.

6    Q    On the back of the prescription there appears to be a white

7    stick-on tag.  Was this what you were referencing?

8    A    Yes, ma'am.

9    Q    What information is contained on this back -- this white

10   stick-on form that's placed on the back of the prescription at

11   C&R?

12   A    Are you asking what all information is on here?

13   Q    Yes.  Does it have the patient's name and address?

14   A    Yes, ma'am.

15   Q    Does it have their date of birth?

16   A    Yes, ma'am.

17   Q    What else does it have?

18   A    The medication, the prescription number, the quantity, NDC,

19   date supply, date written, directions, refills, insurance, the

20   prescriber, their address, their phone number, DEA number.

21   Q    What do you mean by NDC?

22   A    That's the medication -- each medication has an NDC number.

23   Q    Does it indicate if there are any refills?

24   A    The prescription?

25   Q    Yes.

1    A    Yes, ma'am.

2    Q    And is that also indicated on the back of the prescription,

3    on this label you put on the back of the prescription?

4    A    Yes.

5    Q    It shows the quantity of tablets?

6    A    Yes.

7    Q    And of course, it shows the date; is that right?

8    A    Yes, ma'am.

9    Q    Is it at that time given a prescription number?

10    (Indicating.)

11    A    Yes.

12    Q    And that's how that prescription is referred to from then

13    on?

14    A    Yes.

15    Q    Do you recognize this as a prescription that was filled at

16    C&R Pharmacy?

17    A    I don't remember.  I mean, I don't understand the question.

18    Q    Do you recognize this label as the type label that was used

19    at C&R Pharmacy?

20    A    Yes.

21    Q    And at C&R Pharmacy are you familiar with the pharmacist's

22    initials, her handwriting?

23    A    Yes, ma'am.

24    Q    Can you tell us if you see those on the back of this

25    prescription?

2551

1    A    Yes, ma'am.

2    Q    Where do they appear to be?  You can draw with your finger

3    on the screen.

4    A    (Complying.)

5    Q    And do you see what appears to be the handwriting of the

6    same person anywhere else on the back of the prescription?  Is

7    this her handwriting?  (Indicating.)  Is this?  That you

8    recognize or --

9    A    Just circles --

10   Q    Do you recognize what you have circled in green, what

11   appears to be a C?  And what's the next letter?

12   A    Maybe an M.

13   Q    Do you recognize that as anybody's initials from the

14   pharmacy?

15   A    Yes.

16   Q    From C&R Pharmacy?

17   A    Yes.

18   Q    Who would that be?

19   A    Caye McConaghy.

20   Q    What would this be indicative of, this CM on the back of

21   the prescription at C&R Pharmacy?

22   A    That she's checked it.

23   Q    And that that prescription has been filled?

24   A    She checks hold prescriptions also, so just that she has

25   checked the prescription.

KAITLYN KNOWLES - DIRECT BY MS. GRIFFIN

1   Q   And how would you determine whether somebody had come and
2   picked this prescription up?  What type recordkeeping?
3   A   You could check the computer.
4   Q   What would be indicated in the computer?
5   A   A signature.
6   Q   By whom?
7   A   The patient.
8   Q   That picked up the prescription?
9   A   Yes.
10  Q   Does the pharmacist also go by another name other than Caye
11  McConaghy?
12  A   Yes.
13  Q   What is that?
14  A   Caye Renegar.
15  Q   And is Caye C-A-Y-E?
16  A   Yes.
17  Q   Renegar is -- how is it spelled?
18  A   R-E-N-E-G-A-R.
19  Q   You saw on the prescription that there's a place that says
20  "product selection permitted" and then a place to sign that
21  says "dispense as written."  Is that right?
22  A   Yes.
23  Q   Could you explain what those mean to us?
24  A   If a prescription is signed "dispense as written," then you
25  dispense what's on the prescription.  If it says "product

1    selection permitted," you can fill generic, if I understand

2    that correctly.

3    Q    What would happen if there was something missing on the

4    front of the prescription as in the number of tablets or the

5    dosage?  What would happen if you were handed a prescription

6    that didn't contain the number of tablets or the strength?

7    A    You would have to get a new prescription.

8    Q    Why is that?

9    A    Because you have to have that on a prescription.

10   Q    Because it was required?

11   A    Yes, ma'am.

12   Q    Was there a window and actually a door from the pharmacy --

13   into C&R Pharmacy?

14   A    Yes, ma'am.

15   Q    Would it be possible for someone from the doctor's office,

16   from the clinic, to come up to the door?

17   A    Yes.

18   Q    During office hours was the top of that door open?

19   A    Sometimes.

20   Q    Were there occasions when people from the pharmacy --

21   excuse me -- from the clinic came up to the pharmacy door?

22   A    Yes.

23   Q    For what purpose?

24   A    To ask questions or to walk a patient back.

25   Q    So sometimes the patient would come to that door as well?

KAITLYN KNOWLES - DIRECT BY MS. GRIFFIN

```
 1   A   Yes, ma'am.
 2   Q   Not just employees of the clinic; is that right?
 3   A   Yes.
 4   Q   Did you have an occasion to see an employee named Justin
 5   Palmer?
 6   A   Yes.
 7   Q   Do you know who he was?
 8   A   Yes.
 9   Q   Who was that?
10   A   He's a nurse practitioner.
11   Q   Did you see him in the pharmacy on occasion?
12   A   Yes.
13   Q   He was a nurse practitioner for PPSA?
14   A   Yes.
15   Q   Did you have occasion to see him signing prescriptions at
16   that door?
17   A   Yes.
18   Q   Do you know why he was signing prescriptions?  Did he tell
19   you why he was signing prescriptions?
20           MR. SHARMAN:  Objection.  Hearsay.
21   BY MS. GRIFFIN:
22   Q   I'm not asking what he said but did he tell you why?
23   A   Not that I remember.
24   Q   Did you ever see unsigned prescriptions from PPSA in C&R
25   Pharmacy?
```

KAITLYN KNOWLES - DIRECT BY MS. GRIFFIN

1   A   Yes.

2   Q   What does unsigned prescription mean?

3   A   Prescription that's not signed.

4   Q   By the doctor?

5   A   Yes.

6   Q   Did you see a stack of unsigned prescriptions in C&R

7   Pharmacy?

8   A   There were some (nodding head affirmatively).

9   Q   What happened with those?  What did you see happen with

10  those?

11  A   I would give them to the pharmacist and she would take them

12  to the doctor.

13  Q   Would she come back with those prescriptions?

14  A   I assume so, yes, ma'am.

15  Q   Were they signed when she came back?

16  A   I don't remember.  But --

17  Q   You don't know?

18  A   (Shaking head negatively.)

19  Q   How is it that she could go to the doctors?

20  A   I don't understand the question.

21  Q   Because you were right next door, could she just walk into

22  the clinic?

23  A   Yes, ma'am.

24  Q   She didn't have -- the pharmacist did not have to go

25  outside of the pharmacy to go into PPSA clinic, did she?

KAITLYN KNOWLES - DIRECT BY MS. GRIFFIN

1   A   No, ma'am.

2   Q   When the pharmacist came back, would she hand you

3   prescriptions that had previously been unsigned?

4   A   You mean would we file --

5   Q   Would she hand you prescriptions that were unsigned, that

6   she had gone to get signed and she had brought back?

7   A   If she had --

8   Q   To be filled.  Do you recall?

9   A   No, ma'am.  I mean, we would just file them if she brought

10  them back.  She would give them to us to file.

11  Q   To fill or to file?

12  A   File.

13  Q   Had they already been filled?

14  A   I don't remember.  I mean, I don't have any way to remember

15  that.

16  Q   Well, once she came back to see you with them, were the

17  pills already counted and ready to go?

18  A   I don't remember.

19  Q   Do you remember filling them after she came back; that is,

20  counting the pills and putting them in a bottle?

21  A   I don't -- I'm sorry.  I don't remember.

22  Q   You don't know?

23  A   (Shaking head negatively).

24  Q   When did you last work there?

25  A   May.

KAITLYN KNOWLES - DIRECT BY MS. GRIFFIN

1    Q   Of '15?

2    A   Yes, ma'am.

3    Q   Have you worked as a pharmacy tech since then?

4    A   Yes.

5    Q   And you've worked as a pharmacy tech since then with the

6    pharmacist Caye McConaghy Renegar; is that correct?  At another

7    location?

8    A   On occasion.

9    Q   Same building?

10   A   Yes, ma'am.

11   Q   Still McConaghy Pharmacy?

12   A   It was a partner of McConaghy's, not at --

13   Q   But you've worked with her since May 15th -- excuse me, --

14   May 20th of '15; is that right?

15   A   Yes, ma'am.

16   Q   Have you yourself ever gone from C&R Pharmacy while you

17   were employed there into the clinic to have information

18   corrected or completed on a prescription from the clinic?

19   A   Yes, ma'am.

20   Q   Tell us about that.

21   A   What about it?

22   Q   What would you go do?

23   A   If there was something wrong, take it back to the nurse and

24   have them fix it.

25   Q   Did you ever have occasion to ask the doctor to fix it?

1    A    I don't remember.

2    Q    So the prescription would be -- would the prescription be

3    fixed by a nurse after the doctor had already signed it?

4    A    I assume.  But I don't -- I don't remember for certain.

5    Q    Do you have any recall of what you took the prescriptions

6    over to the nurses for?

7    A    No, ma'am; just if something was wrong with it like the

8    date or the prescription quantity or anything like that.

9    Q    Would you -- would it be fair to say that you took it back

10   because it didn't -- did not have all the information on it

11   that was required to fill it?

12            MR. SHARMAN:  Objection.  Leading.

13            THE COURT:  Overruled.

14   BY MS. GRIFFIN:

15   Q    Do you want me to repeat that?

16   A    Yes, ma'am.  Sorry.

17   Q    Would it be fair to say you would take the prescription

18   from C&R Pharmacy into the pain clinic because the prescription

19   did not have everything that it needed on it for you to be able

20   to fill it?

21   A    Yes, ma'am.

22   Q    Do you recall whether C&R Pharmacy filled any prescriptions

23   without them being signed by a doctor?

24   A    Not that I remember.

25   Q    You don't know or you don't remember?

1   A   Not that I -- not that I remember.

2   Q   Now, did you go ever to the doctor himself to have a script

3   signed before filling it?

4   A   Yes, ma'am.

5   Q   Would that be a prescription that had been presented to be

6   filled that did not contain one of the doctor's names at PPSA?

7   A   I don't understand the question.

8   Q   Would that be a prescription from an outside doctor or

9   would that be a prescription from one of the doctors at the

10  PPSA clinic?

11  A   At PPSA.

12  Q   Now, you know Dr. Ruan and Dr. Couch; is that right?

13  A   Yes, ma'am.

14  Q   Are they here today?

15  A   Yes, ma'am.

16  Q   Could you point them out for us?

17  A   Dr. Ruan (indicating) and Dr. Couch (indicating).

18          MS. GRIFFIN:  Let the record reflect that she's

19  identified the defendants.

20  Q   Did you ever take prescriptions that had been presented to

21  C&R Pharmacy to Dr. Ruan to sign after they had been presented

22  to the pharmacy?

23  A   Say that one more time.

24  Q   Did you ever take prescriptions to Dr. Ruan to sign after

25  someone had presented that prescription to the pharmacy?

KAITLYN KNOWLES - DIRECT BY MS. GRIFFIN

1    A    I can't say that for certain but I'm sure.

2    Q    Did you ever take prescriptions to Dr. Couch to sign after

3    that prescription had been presented to C&R Pharmacy?

4    A    It's possible.

5    Q    Ms. Knowles, did C&R Pharmacy fill prescriptions for

6    outside doctors -- that is, doctors who were not in PPSA?

7    A    Not that I remember.  We would normally just fill for our

8    doctors.

9    Q    And by our doctors, what do you mean?

10   A    In the clinic.

11   Q    In the PPSA clinic?

12   A    Yes, ma'am (nodding head affirmatively).

13   Q    Do you know who owned C&R Pharmacy?

14   A    Dr. Ruan and Dr. Couch.

15   Q    Did you ever have occasion to see Dr. Ruan in C&R Pharmacy?

16   A    Yes, ma'am.

17   Q    Why would he come there inside the pharmacy?

18   A    To speak with a pharmacist.

19   Q    Did you ever see him look for anything within C&R Pharmacy?

20   A    Like look for what?

21   Q    Subsys, Abstral, aspirin, anything?

22   A    I don't remember.

23   Q    You don't remember?

24   A    (Shaking head negatively).

25   Q    Did you ever see Dr. Couch inside the pharmacy?

KAITLYN KNOWLES - DIRECT BY MS. GRIFFIN

1    A    Yes, ma'am.

2    Q    Do you recall what Dr. Couch would be doing inside the

3    pharmacy?

4    A    Come talk to the pharmacist.

5    Q    Did you see any doctors that weren't with the pain clinic

6    in the pharmacy talking to the pharmacist?

7    A    Not that I remember.

8    Q    Did you see Justin Palmer in the pharmacy, C&R Pharmacy?

9    A    Yes, ma'am.

10   Q    Did you see Sharon Noland inside C&R Pharmacy?

11   A    Yes, ma'am.

12   Q    Sharon Noland was employed by the pain clinic; is that

13   right?

14   A    Yes.

15   Q    And where was Justin Palmer employed?

16   A    The pain clinic.

17   Q    Pain clinic?  Did you have occasion to see either of them

18   look for types or quantities of drugs that were in the

19   clinic -- excuse me -- that were in the pharmacy?  Sharon

20   Noland or Justin Palmer come in the pharmacy, C&R, and look to

21   see how many of a certain drug were available there?

22   A    Like to check to see if we have something in stock?

23   Q    Yes.

24   A    I can't say for certain, but possibly.

25   Q    You can't say for certain?  You don't recall or you know

KAITLYN KNOWLES - DIRECT BY MS. GRIFFIN

1    that never happened?

2    A   I don't know that that ever happened.  It could have.

3    Q   You don't know?

4    A   No, ma'am.

5    Q   Now, you said you have observed some unsigned scripts from

6    the doctors at the clinic in C&R Pharmacy; is that correct?

7    A   Yes.

8    Q   Were those scripts already filled out at the top?  In other

9    words, were they completely blank or was there something on the

10   script, the unsigned script?

11   A   I don't understand what you're asking.

12   Q   For a prescription?  You said you had seen some unsigned

13   scripts.

14   A   Uh-huh (positive response).

15   Q   I'll show what's from Government's Exhibit 4-11 and ask if

16   this unsigned script from the pharmacy has been filled in or if

17   it is blank at the top.

18   A   Blank at what top?  I'm sorry.

19   Q   Does it have the name of the patient?

20   A   Yes, ma'am.

21   Q   Does it have the drug?

22   A   Yes, ma'am.

23   Q   Does it have the date?

24   A   Yes, ma'am.

25   Q   Does it have the doctor's name typed and his DEA number?

2563

KAITLYN KNOWLES - DIRECT BY MS. GRIFFIN

1    A    Yes, ma'am.

2    Q    Does it have the quantity of drugs?

3    A    Yes, ma'am.

4    Q    Does it contain a signature?

5    A    No, ma'am.

6    Q    Would this be what you would call an unsigned prescription?

7    A    Yes, ma'am.

8    Q    The unsigned prescriptions that you saw in the pharmacy,

9    did they have this information about the drug, about the

10   patient, about the dosage at the top of the prescription?

11   A    I honestly don't remember which ones they were, so I can't

12   say.  I don't know.

13   Q    But you've told us you did see some unsigned scripts in the

14   pharmacy; is that correct?

15   A    Yes, ma'am.

16   Q    Ms. Knowles, when you actually filled a prescription,

17   processed it on the computer, would you push a button to send

18   that information electronically to an insurance company?

19   A    Yes, ma'am.

20   Q    Were there any occasions when you actually called an

21   insurance company and relayed the information by telephone to

22   check on to see if a prescription would be paid for?

23   A    Instead of electronically filing it?

24   Q    Yes, ma'am.

25   A    Not that I -- I don't remember doing that.

KAITLYN KNOWLES - DIRECT BY MS. GRIFFIN

1    Q    So you would basically send that information

2    electronically.  What would you receive back, if anything, when

3    you pushed a button to send that electronic information?

4    A    It tells you if the medication's covered.

5    Q    So you would receive something back electronically from an

6    insurance company?

7    A    Yes, ma'am.

8         MS. GRIFFIN:  One moment, Your Honor.

9         (A discussion was held off the record between government

10   counsel.)

11   BY MS. GRIFFIN:

12   Q    Do you recall C&R Pharmacy ever refusing to fill a Couch or

13   a Ruan prescription?

14   A    I don't remember if we have or not.

15   Q    You don't remember one way or the other?

16   A    No, ma'am.

17        (A discussion was held off the record between government

18   counsel.)

19   BY MS. GRIFFIN:

20   Q    Now, Ms. Knowles, did you ever see Natalie Perhacs in C&R

21   Pharmacy?

22   A    Yes, ma'am.

23   Q    Did you ever see Jeff Palmer in C&R Pharmacy?

24   A    Yes, ma'am.

25   Q    Do you know who Natalie Perhacs was?

1    A    Yes, ma'am.

2    Q    Was she a representative for Subsys?

3    A    Yes, ma'am.

4    Q    And who was Jeff Palmer?

5    A    A representative for Abstral.

6    Q    You saw him in C&R Pharmacy as well?

7    A    Yes, ma'am.

8    Q    Did you see any IOU logs in C&R Pharmacy?

9    A    Yes.

10   Q    What's an IOU log, or what was an IOU log used at C&R

11   Pharmacy?

12   A    If you have to partially fill a patient's medication, they

13   come back for an IOU.

14   Q    What would be a reason to just partially fill a patient's

15   prescription?

16   A    If you're out of the medication.

17   Q    Was it frequent for C&R Pharmacy to run out of Subsys or

18   Abstral?

19   A    I don't remember.

20   Q    You don't recall?

21   A    No, ma'am.

22        MS. GRIFFIN:  That's all I have of this witness at

23   this time, Your Honor.

24        THE COURT:  All right.  Mr. Sharman, how long are you

25   going to be with this witness?

1     MR. SHARMAN:  Very brief, Your Honor.

2     THE COURT:  All right.  Go ahead.

3                CROSS EXAMINATION

4  BY MR. SHARMAN:

5  Q   Ms. Knowles, I'm Jack Sharman.  I represent Dr. Couch.

6  A   Hey.

7  Q   You were a pharmacy tech at C&R; right?

8  A   Correct.

9  Q   And C&R Pharmacy was at the Airport Boulevard location of

10 PPSA; right?

11 A   Correct.

12 Q   It was not at the Springhill location; right?

13 A   Not when I worked there.

14 Q   And Dr. Couch worked primarily at the Springhill location;

15 right?

16 A   Correct.

17 Q   You saw him roughly maybe once a week; is that right?

18 A   Correct.

19 Q   And sitting here today you don't actually recall ever

20 asking Dr. Couch to sign an unsigned prescription; right?

21 A   Not for certain, no, sir.

22     MR. SHARMAN:  Thank you.  That's all.

23     THE COURT:  Anybody for Dr. Ruan?

24     MR. DARLEY:  No questions, Your Honor.

25     THE COURT:  Any redirect?

1          MS. GRIFFIN:  I don't have any.  May the witness be

2     excused?

3          THE COURT:  Yes, she may.  You may step down.  Thank

4     you, ma'am.

5          THE WITNESS:  Thank you.

6          THE COURT:  All right.  Ladies and gentlemen, we are

7     going to break for today.  Leave your pads on your chairs.  We

8     will start again tomorrow morning at 9 o'clock.  So be back

9     downstairs in the jury assembly room, ready to start back up at

10    9 o'clock.  No discussion about the case.  And I hope you have

11    a good evening.

12        (In open court, defendants present, jury not present.)

13         THE COURT:  All right.  Counsel, did you have a chance

14    to discuss my request for the jury charges?

15         MR. SHARMAN:  Your Honor, we didn't.  Can we report to

16    the Court in the morning on that?

17         THE COURT:  That's fine.

18         MR. SHARMAN:  Thank you.

19         THE COURT:  Thanks.

20         THE CLERK:  Do you want them to come in early for

21    that?

22        (Court adjourned at approximately 4:52 p.m.)

23

24

25