

1                 UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF ALABAMA
2

3

4  UNITED STATES OF AMERICA
                          CASE NO. CR15-00088
5  v.
                          COURTROOM 2B
6  JOHN PATRICK COUCH, M.D.,
  and XIULU RUAN, M.D.,
7                          MOBILE, ALABAMA
          Defendants.
8  * * * * * * * * * * * * * *    WEDNESDAY, JANUARY 25, 2017

9

10
                    DAY 12 OF TRIAL
11       BEFORE THE HONORABLE CALLIE V. S. GRANADE,
       SENIOR UNITED STATES DISTRICT JUDGE, AND JURY
12

13  APPEARANCES:

14  FOR THE GOVERNMENT:
      DEBORAH A. GRIFFIN
15     CHRISTOPHER BODNAR
      United States Attorney's Office
16     63 S. Royal Street, Suite 600
      Mobile, AL  36602
17     (251) 441-5845

18
  FOR THE DEFENDANT COUCH:
19     ARTHUR T. POWELL, III
      P.O. Box 40456
20     Mobile, AL 36640-0456
      (251) 433-8310
21
      JACKSON R. SHARMAN, III
22     JEFFREY PAUL DOSS
      BENJAMIN SANDERS WILLSON
23     Lightfoot, Franklin & White
      400 North 20th Street
24     Birmingham, AL  35203
      (205) 581-0700
25

1  (Continued)

2      BRANDON KEITH ESSIG
       800 Shades Creek Parkway, Suite 600D
3      Birmingham, AL  35209
       (251) 879-1981

4

   FOR THE DEFENDANT RUAN:
5      DENNIS J. KNIZLEY
       7 N. Lawrence
6      Mobile, AL 36602
       (251) 432-3799

7

       JASON BRADLEY DARLEY
8      Darley & McGough, LLC
       1751 Dauphin Street
9      Mobile, AL 36604
       (251) 441-7772

10

       GORDON G. ARMSTRONG, III
11     P.O. Box 1464
       Mobile, AL  36633
12     (251) 434-6428

13     STEVEN D. MARTINIE
       4955 North Lake Drive
14     Whitefish Bay, WI  53217
       (414) 332-9683

15

16 THE CLERK:  MARY ANN BOYLES
   THE LAW CLERK:  LYNN DEKLE
   U.S. ATTORNEY IT:  BRIAN COCHRAN
17 DEFENSE IT:  SAM MCALLISTER
   COURT REPORTER:   ROY ISBELL, CCR, RDR, CRR

18

19          Proceedings recorded by OFFICIAL COURT REPORTER
           Qualified pursuant to 28 U.S.C. 753(a) & Guide to
      Judiciary Policies and Procedures Vol. VI, Chapter III, D.2.
20          Transcript produced by computerized stenotype.

21

22

23

24

25

Case 1:15-cr-00088-CG-B   Document 775-12   Filed 05/31/18   Page 3 of 275   PageID #: 28756

2570

```
 1                          EXAMINATION INDEX

 2

     NANCY JACKSON
 3        DIRECT BY MR. BODNAR  . . . . . . . . . . . . . . . 2578
          CROSS BY MR. ESSIG . . . . . . . . . . . . . . . . .2603
 4        CROSS BY MR. DARLEY . . . . . . . . . . . . . . . . 2614
          REDIRECT BY MR. BODNAR . . . . . . . . . . . . . . .2622
 5
     CINDY McKENZIE
 6        DIRECT BY MR. BODNAR  . . . . . . . . . . . . . . . 2625
          CROSS BY MR. ESSIG . . . . . . . . . . . . . . . . .2659
 7        CROSS BY MR. KNIZLEY . . . . . . . . . . . . . . . . 2679
          REDIRECT BY MR. BODNAR . . . . . . . . . . . . . . .2698
 8
     TONYA WINGATE
 9        DIRECT BY MR. BODNAR  . . . . . . . . . . . . . . . 2707
          CROSS BY MR. ESSIG . . . . . . . . . . . . . . . . .2724
10        CROSS BY MR. KNIZLEY . . . . . . . . . . . . . . . . 2731

11   DOUG MOORE
          DIRECT BY MR. BODNAR  . . . . . . . . . . . . . . . 2736
12        CROSS BY MR. ESSIG . . . . . . . . . . . . . . . . .2745
          CROSS BY MR. KNIZLEY . . . . . . . . . . . . . . . . 2748
13        REDIRECT BY MR. BODNAR . . . . . . . . . . . . . . .2753

14   TOM COUFAL
          DIRECT BY MR. BODNAR  . . . . . . . . . . . . . . . 2755
15        CROSS BY MR. ESSIG . . . . . . . . . . . . . . . . .2763
          CROSS BY MR. KNIZLEY . . . . . . . . . . . . . . . . 2766
16
     JESSI KAMPER
17        DIRECT BY MS. GRIFFIN . . . . . . . . . . . . . . . 2771
          CROSS BY MR. SHARMAN . . . . . . . . . . . . . . . .2790
18        REDIRECT BY MS. GRIFFIN . . . . . . . . . . . . . . 2817

19   DWIGHT TIMOTHY BURNS
          DIRECT BY MR. BODNAR . . . . . . . . . . . . . . . .2822
20        CROSS BY MR. KNIZLEY  . . . . . . . . . . . . . . . .2829

21

22

23

24

25
```

1                            EXHIBIT INDEX

2                                                         MAR   ADM
       GOVERNMENT'S
3      6-2        Patient file from Greenway Files from PPSA    2773
                  (binder), patient:  J. Kamper
4
       27-1       BC/BS Subsys prescriber comparison 1/1/11     2652
5                 - 5/20/15

6      27-2       BC/BS Abstral prescriber comparison 1/1/11    2652
                  - 5/20/15
7
       27-3       BC/BS pharmacy comparison -Subsys 1/1/11 -    2652
8                 5/20/15

9      27-4       BC/BS pharmacy comparison - Abstral 1/1/11    2652
                  - 5/20/15
10
       27-6       United Healthcare Subsys prescriber           2740
11                comparison 1/1/11 - 5/20/15

12     27-7       United Healthcare Abstral prescriber          2740
                  comparison 1/1/11 - 5/20/15
13
       27-8       United Healthcare Subsys pharmacy             2740
14                comparison 1/1/11 - 5/20/15

15     27-9       United Healthcare Abstral pharmacy            2740
                  comparison 1/1/11 - 5/20/15
16
       27-11      Tricare Subsys prescriber comparison          2757
17                1/1/11 - 5/20/15

18     27-12      Tricare Abstral prescriber comparison         2757
                  1/1/11 - 5/20/15
19
       27-13      Tricare Subsys pharmacy comparison 1/1/11     2757
20                - 5/20/15

21     27-14      Tricare Abstral pharmacy comparison 1/1/11    2757
                  - 5/20/15
22
       27-22      BC/BS Credentialing Application - Provider    2629
23                Application - Couch

24     27-23      BC/BS Credentialing Application - Provider    2629
                  Application - Ruan
25

27-24   BC/BS Provider Manual – Physician Extender        2647
        Guidelines

27-25   BC/BS of Alabama prior authorization             2712
        request form – Timara Geil

33-1 & 33-2 BC/BS office visit graphs                    2643

40-1(1) Comparisons of 2011 hydrocodone purchases        2584
        by practitioner

40-1(2) Comparisons of 2012 hydrocodone purchases        2584
        by practitioner

40-1(3) Comparisons of 2013 hydrocodone purchases        2584
        by practitioner

40-1(4) Comparisons of 2014 hydrocodone purchases        2584
        by practitioner

40-1(5) Comparisons of 2015 hydrocodone purchases        2584
        by practitioner

40-2(1) Comparisons of 2011 morphine purchases by        2584
        practitioner

40-2(2) Comparisons of 2012 morphine purchases by        2584
        practitioner

40-2(3) Comparisons of 2013 morphine purchases by        2584
        practitioner

40-2(4) Comparisons of 2014 morphine purchases by        2584
        practitioner

40-2(5) Comparisons of 2015 morphine purchases by        2584
        practitioner

40-3(1) Comparisons of 2011 oxycodone purchases by       2584
        practitioner

40-3(2) Comparisons of 2012 oxycodone purchases by       2584
        practitioner

40-3(3) Comparisons of 2013 oxycodone purchases by       2584
        practitioner

40-3(4) Comparisons of 2014 oxycodone purchases by       2584
        practitioner

40-3(5) Comparisons of 2015 oxycodone purchases by     2584
        practitioner

40-4(1) Comparisons of 2011 fentanyl purchases by      2584
        practitioner

40-4(2) Comparisons of 2012 fentanyl purchases by      2584
        practitioner

40-4(3) Comparisons of 2013 fentanyl purchases by      2584
        practitioner

40-4(4) Comparisons of 2014 fentanyl purchases by      2584
        practitioner

40-4(5) Comparisons of 2015 fentanyl purchases by      2584
        practitioner

40-5(1) Comparisons of 2012 Subsys Fentanyl Spray      2584
        purchases by pharmacies, C&R Pharmacy

40-5(2) Comparisons of 2013 Subsys Fentanyl Spray      2584
        purchases by pharmacies, C&R Pharmacy

40-5(3) Comparisons of 2014 Subsys Fentanyl Spray      2584
        purchases by pharmacies, C&R Pharmacy

40-5(4) Comparisons of 2015 Subsys Fentanyl Spray      2584
        purchases by pharmacies, C&R Pharmacy

40-5(5) Suppliers of Subsys Fentanyl Spray to C&R      2584
        Pharmacy


DEFENDANT COUCH'S
205     Blank prescription sheet                       2816

```
 1          (Morning session, 9:05 a.m., in chambers, jury not
 2     present.)
 3               MS. GRIFFIN:  Good morning.
 4               MR. SHARMAN:  Good morning, Judge.
 5               THE COURT:  Good morning, good morning.
 6               MR. ESSIG:  Good morning, Your Honor.
 7               MR. BODNAR:  Good morning.
 8               THE COURT:  Okay.  So have you selected a date for the
 9     jury instructions to be submitted?
10               MS. GRIFFIN:  Monday, the 6th, if we could, Your
11     Honor.  Is that too late?
12               THE COURT:  No.  That's okay.  Monday the 6th.
13               MR. SHARMAN:  What we anticipate, Your Honor, is
14     probably a joint submission as to those things we agree upon
15     and, if there's anything else, just a separate submission.
16               MS. GRIFFIN:  And if we could do the joint one prior
17     to that, we certainly will.
18               THE COURT:  All right.  That's fine.  Tell me what
19     this is.  (Indicating.)
20               MR. BODNAR:  Where did that come from?
21               MS. GRIFFIN:  That is from the ARCOS witness, the
22     automated system witness for DEA.  ARCOS is required to collect
23     data of the distribution of controlled substances that are
24     shipped to any DEA number.  And she's going to testify about
25     the numbers of drugs that were shipped to Dr. Ruan and to PPSA.
```

```
 1   And we've shown the first two paragraphs to the defense.  They
 2   are willing to stipulate to the first two paragraphs but not
 3   the third paragraph, that keeping of the data is mandated by
 4   the CFR.
 5              THE COURT:  All right.  So you want me to read them
 6   this as judicially noticed law?  Or --
 7              MR. ESSIG:  Stipulation between the parties.
 8              MS. GRIFFIN:  Stipulation.
 9              THE COURT:  Stipulation?
10              MS. GRIFFIN:  Yes, ma'am.  Or we can read it as a
11   stipulation, Your Honor.
12              THE COURT:  Yeah.  Why don't you do that?  I don't
13   have any clue what ARCOS is.
14              MR. BODNAR:  We'll read it as a stipulation, Your
15   Honor.
16              MS. GRIFFIN:  We'll read it as a stipulation.
17              THE COURT:  All right.  Are you ready to start?
18              MR. ESSIG:  One more thing, Judge.  The Blue Cross
19   witnesses that they are putting on today, we had issued a
20   separate trial subpoena to Blue Cross/Blue Shield to have
21   actually witnesses come and testify.  So there's a couple of
22   matters that we wanted to get into with them.  I talked to
23   Chris a little bit yesterday.  I'm not sure exactly where he's
24   going on direct.
25              I guess what I'm asking is we would ask for a little
```

1    bit of latitude perhaps on scope of direct examination during

2    the cross to keep from having to bring them back down here

3    again and call them as a defense witness.  Because it would be

4    the exact same two people, from what Blue Cross/Blue Shield

5    tells us.  So they've asked us to make that request.  Again, I

6    think it's probably going to be within the scope.  But there's,

7    you know, a couple of topic areas and I don't want to have to

8    send them back up to Birmingham and bring them back.

9            THE COURT:  If it's not within the scope -- I will

10   allow you to do that, but I won't allow you to lead them.  So

11   you will have to differentiate between what is your direct

12   examination of them and your cross.

13           MR. ESSIG:  Yes, ma'am.  I understand.  That's fine.

14           THE COURT:  Okay.  All right.

15           MR. BODNAR:  That's fine by us.  Assuming the same

16   thing, that on redirect, if there's issues that they brought up

17   for the first time as their essential direct, that I have the

18   opportunity to cross-examine them on that.

19           THE COURT:  Okay.  All right.  Yeah.  Anything else?

20           MR. BODNAR:  Not from the United States.

21           MR. SHARMAN:  No, ma'am.

22           THE COURT:  Okay.

23      (A recess was taken at 9:08 a.m.)

24      (In open court, 9:08 a.m., defendants and jury present.)

25           THE COURT:  Good morning, ladies and gentlemen.

2577

1              All right, Mr. Bodnar.

2              MR. BODNAR:  Your Honor, before we call Ms. Nancy

3     Jackson, by stipulation, all parties have agreed that the

4     Controlled Substances Act of 1970 created the requirement for

5     manufacturers and distributors to report their controlled

6     substance transactions to the Attorney General.  The Attorney

7     General delegates this authority to the Drug Enforcement

8     Agency, the DEA.

9              ARCOS is an automated comprehensive drug reporting

10    system which monitors the flow of DEA controlled substances

11    from their point of manufacture through commercial distribution

12    channels to point of sale or distribution at the

13    dispensing/retail level, hospitals, retail pharmacies,

14    practitioners, mid-level practitioners, and teaching

15    institutions.

16             Included in this list of controlled substance

17    transactions tracked by ARCOS are the following:  All Schedule

18    I and schedule II materials (manufacturers and distributors);

19    schedule III narcotics and GHB materials (manufacturers and

20    distributors); and select schedule III and IV psychotropic

21    drugs for the manufacturers only.

22             United States calls Ms. Nancy Jackson.

23             THE COURT:  All right.

24                          NANCY JACKSON

25             was sworn and testified as follows:

```
 1                    DIRECT EXAMINATION
 2   BY MR. BODNAR:
 3   Q   Good morning.
 4   A   Good morning.
 5   Q   Would you please introduce yourself to the jury?
 6   A   Yes.  My name is Nancy Jackson, I'm a supervisory diversion
 7   investigator working as the unit chief of ARCOS in Arlington,
 8   Virginia.
 9   Q   And, Ms. Jackson, I'm not sure if your mic is on or it just
10   needs to be pulled a little closer.
11   A   Maybe a little closer.  Is it better?
12   Q   Yes.  I think you said that you were an agent with the DEA?
13   A   I'm a diversion investigator; yes, sir.
14   Q   Can you please explain to the jury what does a diversion
15   investigator do?
16   A   We enforce the rules and -- the regulations and laws of the
17   Controlled Substances Act by preventing, detecting and
18   deterrence of diversion of controlled substances, while at the
19   same time making sure that there is a great supply for the
20   medical needs of the people in the United States.
21   Q   And are you currently in a role in the Washington area for
22   DEA called ARCOS?
23   A   Yes, I am.
24   Q   Could you please first explain what the acronym for ARCOS
25   is?  And then explain what it is that ARCOS does.
```

1    A    ARCOS stands for the Automation of Reports and Controlled

2    Substance Ordering System.

3    Q    And what is it that ARCOS, A-R-C-O-S, does?

4    A    ARCOS captures all the transactions from -- starting at the

5    manufacturer level all the way down to the retail level, which

6    includes the pharmacies, physicians, hospitals, researchers.

7    And those transactions -- in our office, what we do is we do

8    analysis on that, those transactions.

9    Q    And is it fair to say that ARCOS keeps track of the data

10   from the manufacturer where the drug is made until it gets to

11   the pharmacy or hospital or doctor's office where it's going to

12   be dispensed?

13   A    That's correct.

14   Q    Can you please walk through -- walk the jury through the

15   process that a drug travels.  It starts at the manufacturer?

16   A    Actually those particular drugs that are -- that ARCOS

17   captures, schedule I, schedule II, and schedule III narcotics,

18   that starts what we call a closed distribution center system

19   where --

20   Q    And explain.  What is a closed distribution system?

21   A    Well, it's a system where a pill travels and any -- there

22   are -- any level during that system we use it to close, and

23   that's where we do our investigations to make sure that at

24   every step, that those systems are closed.  Because in those

25   instances, a drug could be diverted at any of those levels.

NANCY JACKSON - DIRECT BY MR. BODNAR

1           The way a pill goes through the raw material, it's

2    imported and that comes through an importer who goes to a

3    manufacturer and then the manufacturer makes that pill and

4    then they --

5    Q   Let's break it down into chunks so it's easier to

6    understand.

7    A   Okay.

8    Q   So raw materials for any given drug are imported?

9    A   Imported.

10   Q   And is that information tracked by DEA through ARCOS?

11   A   Not through ARCOS.

12   Q   When the drug gets to the manufacturer, is it made into a

13   pill or a spray or whatever type of drug it is?

14   A   Yes.

15   Q   At that point is it starting to be tracked by the ARCOS?

16   A   Yes, it is.

17   Q   From the factory or manufacturer where it's made into a

18   pill or a spray, where is the next step in the chain it goes

19   before it gets to a pharmacy?

20   A   The next step is to a wholesaler or distributor.

21   Q   And can you explain, what is a wholesaler or distributor?

22   A   A distributor -- I'll use wholesale.  They are the ones

23   that will normally sell to the retail level.  They're the

24   interaction between the manufacturer -- they get it from the

25   manufacturer in bulk and then therefore, they are able to fill

NANCY JACKSON - DIRECT BY MR. BODNAR

1    the specific orders from the pharmacy, the physician, or for

2    the hospital.

3    Q   So as an example, would it be maybe 1,000 pills of any

4    given drug being sent from the manufacturer to the wholesaler?

5    A   That's not normally the way it goes.

6    Q   How does it normally go then?

7    A   Like I said, the manufacturers sell in millions and

8    millions of pills to that wholesaler.  They go -- they buy in

9    bulk.

10   Q   And so millions of pills might go from a manufacturer to a

11   wholesaler?

12   A   That's correct.

13   Q   And then does the pharmacy order what it needs --

14   A   Exactly.

15   Q   -- from the wholesaler?

16   A   That's correct.

17   Q   So if the pharmacy doesn't need a million pills but needs

18   10,000?

19   A   Maybe 1,000.

20   Q   And that goes then to the pharmacy?

21   A   And that goes then to the pharmacy, or the pharmacy orders

22   from the distributor.

23   Q   And does ARCOS track each step from manufacturer to

24   distributor and then from distributor to pharmacy?

25   A   That's correct.

1   Q   How does ARCOS track who is ordering drugs from the

2   wholesaler?

3   A   Well, we do our different reports.  That's part of the

4   ARCOS system.  We track like who's buying OxyContin.

5   Q   And is that done by individuals or the buyer's DEA number?

6   A   That's correct.

7   Q   If a doctor is purchasing a drug, would it show up under

8   the doctor's DEA number?

9   A   Yes.

10  Q   What about if a pharmacy is buying a drug?

11  A   If it's buying from a wholesaler, yes.

12  Q   Would it be under the doctor's number then or under the

13  pharmacy's number?

14  A   Under the pharmacy.

15  Q   And from this data do analysts at ARCOS create charts and

16  graphs based on the data that's captured at ARCOS?

17  A   That's correct.

18  Q   And is that done by either a doctor -- can that be done by

19  either a doctor or a pharmacy's DEA number?

20  A   That's correct.

21  Q   Will that tell you how many they -- any particular drug a

22  doctor has ordered or a pharmacy has ordered over a given

23  period of time?

24  A   That's correct.

25          MR. BODNAR:  May I approach, Your Honor, with what has

NANCY JACKSON - DIRECT BY MR. BODNAR

1   been marked as Government's Exhibit 40-1 through -- in fact,

2   I'll identify all of them at once and then show them.

3           What is marked 40-1, 40-2, 40-3, 40-4, and 40-5.

4           THE COURT:  Yes.

5   BY MR. BODNAR:

6   Q   Ms. Jackson, I'm showing you now what has been marked as I

7   just read them.  Are those a series of charts that were created

8   by ARCOS?

9   A   Yes.

10  Q   And is the first one, 40-1, is that chart comparing 2011

11  through 2015 for hydrocodone?

12  A   Yes, it is.

13  Q   And what is 40-2?

14  A   40-2 is the comparison from 2011 to 2015 for morphine

15  purposes.

16  Q   And what is 40-3?

17  A   Comparison from 2011 of oxycodone purchases through 2015.

18  Q   And what is 40-4?

19  A   Comparison of 2011 fentanyl purchases by practitioner

20  through 2015.

21          And can I add something?

22  Q   Yes.

23  A   I notice that the 2015 only covered a certain period

24  between January 1st and January [sic] 30 of 2015, not a full

25  year.

1  Q   Is that June 30?

2  A   Yes, it is.

3  Q   And is that the same for the 2015 for hydrocodone?

4  A   For all of the controlled substances.

5  Q   And could you please identify 40-5?

6  A   It's a comparison of 2012 of Subsys, fentanyl spray

7  purchases by pharmacies through 2015.  And that's also through

8  January 1st through June 1st, 2015.

9  Q   And is the last page of 40-5 -- 40-5 subpart (5), is that a

10  listing of the wholesalers from which Subsys was purchased?

11  A   That's correct.

12         MR. BODNAR:  United States moves to admit Government's

13  Exhibit 40-1, 40-2, 40-3, 40-4, and 40-5 with subparts.

14         MR. ESSIG:  No objection.

15         MR. DARLEY:  No objection.

16         THE COURT:  All right.  Mark them in.

17      (Government's Exhibit 40-1(1)-(5), 40-2(1)-(5), 40-3(1)-

18  (5), 40-4(1)-(5), and 40-5(1)-(5) were entered into evidence.)

19  BY MR. BODNAR:

20  Q   Ms. Jackson, I'm now going to show you what has been

21  admitted as Government's Exhibit 40-1 Subsection (1) and ask if

22  you can walk the jury through what it is that they're seeing

23  here.

24         Okay.  What do we have here at the top?  (Indicating.)

25  What is this graph supposedly showing?

1   A   This graph is a comparison of Dr. Ruan's --

2   Q   And I'm sorry.  Could you pull your microphone a little bit

3   closer?  I still can't --

4   A   Let me --

5   Q   Thank you.

6   A   What this graph is showing is a comparison of 2011

7   hydrocodone purchases by a practitioner.  And we're comparing

8   what Dr. Ruan ordered compared to the Alabama average and to

9   the U.S. average.

10  Q   Now, if this -- if these drugs were being ordered by a

11  pharmacy owned by Dr. Ruan, would these orders be under the

12  pharmacy number or the doctor's number?

13  A   It would be under the pharmacy number.

14  Q   And were these under the pharmacy number or the doctor's

15  number?

16  A   It's under the doctor's number.

17  Q   So would that be stuff distributed outside of the pharmacy

18  from the doctor's office?

19  A   That's correct.

20  Q   And for hydrocodone, what is -- what does it mean by

21  "dosage units," the 33,300?

22  A   Dosage unit is -- we consider that a pill.

23  Q   So this is -- does this appear to show then that in 2011

24  Dr. Ruan ordered 33,300 hydrocodone pills?

25  A   That's correct.

NANCY JACKSON - DIRECT BY MR. BODNAR

1   Q   Now, ARCOS doesn't say anything about how many, if any,

2   were actually prescribed, does it?

3   A   No.  We don't collect that information.

4   Q   Simply the amount that were ordered?

5   A   That was ordered through the system.

6   Q   And this second gray column here, what does this represent?

7   A   That represents the number of practitioners in the state of

8   Alabama that has ordered hydrocodone.

9   Q   And that number is 800 and --

10  A   860, I think.  Yes.

11  Q   And of those 860, what was the average --

12  A   The average was 1,691.

13  Q   And you -- across the whole United States how many doctors

14  or how many people's individual DEA licenses ordered

15  hydrocodone pills?

16  A   23,398.

17  Q   And what was the average for those?

18  A   2,165.

19  Q   Would those numbers include all doctors across all

20  specialties?

21  A   That's correct.

22  Q   So it's not excluding pain doctors from that list?

23  A   That's correct.

24  Q   I'm going to show you now what has been admitted as

25  Government's Exhibit 41-2 -- 41-1 Subsection (2).

```
1              THE COURT:  41 or 40-1?

2              MR. BODNAR:  40-1 Subsection (2).

3    Q   Is this a similar chart for Dr. Ruan for hydrocodone

4    purchases?

5    A   That's correct.

6    Q   And for what year?

7    A   It's for 2012.

8    Q   And how many pills of hydrocodone did he purchase that

9    year?

10   A   71,640.

11   Q   And in 2013 -- I'm showing you now what is 40-1 Subsection

12   (3).  How many hydrocodone pills did Dr. Ruan purchase that

13   year?

14   A   75,330.

15   Q   I'm showing you 40-1(4).  How many in '14?

16   A   72,510.

17   Q   And 40-1(5)?

18   A   That's 29,100 and that's only for a six-month period.

19   Q   And is that the date range down here, January 1st through

20   June 30th of 2015?

21   A   That's correct.

22   Q   Did you create similar charts for Dr. Ruan for the

23   purchasing of morphine pills under Dr. Ruan's number?

24   A   That's correct; yes.

25   Q   And Dr. Ruan's DEA number, is that unique to him?
```

1   A   Yes, sir.

2   Q   So is it similar to like a Social Security number where

3   you're able to track by a unique number, the number of

4   purchases?

5   A   Yes, sir.

6   Q   Showing you what's been admitted as Government's Exhibit

7   40-2 Subsection (1).  Is this Dr. Ruan's purchase of morphine?

8   A   Yes, sir.

9   Q   In 2011?

10  A   Yes, sir.

11  Q   Zooming in -- well, first, how many morphine units did

12  Dr. Ruan purchase in '11?

13  A   15,510.

14  Q   How many different doctors in the state of Alabama?

15  A   13.

16  Q   And what's the number -- what's the average number for

17  Alabama doctors?

18  A   2,656.

19  Q   And does this show 300 doctors nationwide ordered morphine

20  that year?

21  A   Yes, it does.

22  Q   Show you now what's been admitted as Government's Exhibit

23  40-2 Subsection (2).  Is this a similar morphine chart for

24  2012?

25  A   Yes.

1  Q   How many did Dr. Ruan order?

2  A   30,210.

3  Q   And what was the Alabama average?

4  A   5,559.

5  Q   And just like we looked at for hydrocodone, does morphine

6  also -- do these numbers also include all doctors across all

7  specialties?

8  A   Yes.

9  Q   So that would include oncologists?

10  A   Yes.

11  Q   And pain doctors?

12  A   Yes.

13  Q   40-2(3), is this the comparison chart for 2013?

14  A   Yes.

15  Q   And what is Dr. Ruan's purchase amount?

16  A   19,830.

17  Q   And what is the Alabama average?

18  A   5,319.

19  Q   Showing you now what's been admitted as Government's

20  Exhibit 40-2 Subsection (4).  Is this the similar chart for

21  2014?

22  A   Yes.

23  Q   How many did Dr. Ruan order?

24  A   23,910.

25  Q   And what was the Alabama average?

NANCY JACKSON - DIRECT BY MR. BODNAR

1   A   4,463.

2   Q   And finally, 40-2(5).  What is this showing?

3   A   Showing purchases of morphine from January 1st through June

4   30th, 2015.  And the total was 10,350.

5   Q   And how many different practitioners during that time

6   period in Alabama purchased morphine?

7   A   10.

8   Q   And what was the total number?

9   A   2,615.

10  Q   Again, this is going to Dr. Ruan, not to C&R Pharmacy; is

11  that correct?

12  A   That's correct.

13  Q   So would these be units that he presumably is dispensing

14  out of his office?

15          MR. ESSIG:  Your Honor, speculation.  She has no idea

16  how these drugs were dispensed.

17          THE COURT:  Sustained.

18  BY MR. BODNAR:

19  Q   Is it typical for a doctor to order drugs and then transfer

20  it over to a pharmacy?

21          MR. ESSIG:  Objection, Your Honor.  No foundation.

22  She has no expertise to give that answer.

23          THE COURT:  Yeah, you need to establish some

24  foundation for that.

25  BY MR. BODNAR:

NANCY JACKSON - DIRECT BY MR. BODNAR

1  Q   Based on your training and experience do you know how the

2  typical drugs are ordered by a doctor and by a pharmacy?

3  A   Typically a doctor orders from a distributor -- I mean, a

4  pharmacy orders from a distributor.  Doctors can order by --

5  from a pharmacy.  However, in my 12-and-a-half years

6  experience, there's never been -- where a doctor supplied a

7  pharmacy.

8  Q   Is there a process that would need to happen or paperwork

9  that would need to be done if a doctor was purchasing under his

10  own number to supply a pharmacy?

11  A   They would have to have the exchange of a DEA order form, a

12  222, and the doctor would have to -- the pharmacy would have to

13  provide the doctor with a 222 form, the doctor would give them

14  the pills, they both maintain copies of that 222 form.

15  Q   And during the course of your investigation or during your

16  analysis for this case did you come to see if C&R was in fact

17  purchasing drugs under its own number as well?

18  A   It was purchasing their own drugs.

19  Q   I'm going to now show you what's been admitted as

20  Government's Exhibit 40-3 Subsection (1).  Is this a similar

21  comparison chart for oxycodone?

22  A   Yes.

23  Q   And how many oxycodone pills were purchased by Dr. Ruan in

24  2011?

25  A   38,700.

1  Q   What was the Alabama average?

2  A   6,023.

3  Q   And from 38,000 -- I'm now showing you what's been admitted

4  as Government's Exhibit 40-3(2.)  From 38,000 in 2011 to 2012

5  how many oxycodone pills did Dr. Ruan purchase?

6  A   106,110.

7  Q   What was the Alabama average?

8  A   6,653.

9  Q   And in 2013, on Government's Exhibit 40-3(3), how many

10  oxycodone pills were purchased by Dr. Ruan?

11  A   81,750.

12  Q   And what was the Alabama average?

13  A   6,118.

14  Q   For 2014, on Government's Exhibit 40-3(4), what does it

15  show for Dr. Ruan's purchase?

16  A   82,020.

17  Q   And what was the Alabama average?

18  A   6,930.

19  Q   And finally, on 40-3(5), what does this show for part of

20  the year 2015?

21  A   37,920.

22  Q   And what was the Alabama average?

23  A   4,651.

24  Q   I'm now showing you what has been admitted as Government's

25  Exhibit 40-4(1).  What is this that we see?

NANCY JACKSON - DIRECT BY MR. BODNAR

1    A    It's a comparison of 2011 fentanyl purchases by

2    practitioner.

3    Q    And did you have an opportunity to check and see -- do

4    these fentanyl purchases include Subsys and Abstral or is this

5    patches?

6    A    No, this is patches.

7    Q    So does that mean 705 fentanyl patches were purchased?

8    A    That's correct.

9    Q    And what was the Alabama average?

10   A    314.

11   Q    So from 2011 to 2012, on Government's Exhibit 40-4

12   Subsection (2), now how many fentanyl patches were purchased by

13   Dr. Ruan?

14   A    2,050 [sic].

15   Q    And how many was the Alabama average?

16   A    Excuse me.  That should have been 2,250.

17   Q    And what was the Alabama average?

18   A    403.

19   Q    I'm now showing you what has been admitted as Government's

20   Exhibit 40-4 Subsection (3).  Is this a similar chart for 2013?

21   A    Yes, it is.

22   Q    How many fentanyl patches were purchased by Dr. Ruan in

23   2013?

24   A    17,000 -- I mean 1705.

25   Q    And what was the Alabama average?

1    A    285.

2    Q    Now showing you what has been admitted as Government's

3    Exhibit 40-4 Subsection (4).  Is this for 2014 fentanyl

4    patches?

5    A    Yes.

6    Q    How many were purchased by Dr. Ruan?

7    A    2,470.

8    Q    And how many was the Alabama average?

9    A    304.

10   Q    And finally with Government's Exhibit 40-4(5); is this for

11   the partial year of 2015?

12   A    That's correct.

13   Q    Is that that same time period we've discussed, January 1st

14   through June 30th?

15   A    Yes.

16   Q    What was the number of fentanyl patches purchased by

17   Dr. Ruan?

18   A    875.

19   Q    And how many was the Alabama average?

20   A    141.

21   Q    Again, are these charts that we just looked through,

22   hydrocodone through these fentanyl patches, comparing doctor to

23   doctor?

24   A    Yes, it is.

25   Q    It's not comparing doctor to pharmacy?

2595

1  A   No, sir.

2          THE COURT:  May I see counsel at side bar a minute?

3      (At the side bar, jury not present.)

4          THE COURT:  I have a question about the exhibit, which

5  you don't need to ask if you don't want to.  And she may have

6  already testified to this.  But when you're talking about the

7  Alabama average and U.S. average, does the Alabama average

8  include Dr. Ruan or is it all doctors other than Dr. Ruan?

9          MR. BODNAR:  I will ask that.

10          THE COURT:  Well, you don't have to.  But that's -- I

11  wanted to know that information.

12          And also, does the U.S. average include all of the

13  Alabama physicians as well or is it all the doctors other than

14  Alabama physicians?

15          MR. BODNAR:  It should be everybody, but I will

16  clarify that.

17          THE COURT:  All right.

18      (In open court, defendants and jury present.)

19  BY MR. BODNAR:

20  Q   Ms. Jackson, we're going to use the -- wrap this up here at

21  the moment just to clarify one point.

22          When the Alabama average is calculated, does that

23  Alabama average include Dr. Ruan, so all doctors in Alabama or

24  all doctors in Alabama without considering Dr. Ruan?

25  A   Without considering Dr. Ruan.

NANCY JACKSON - DIRECT BY MR. BODNAR

1   Q   Without considering Dr. Ruan?

2   A   Without considering Dr. Ruan.

3   Q   When you consider the U.S. average, is that the U.S.

4   average including all 50 states or just the 49 states that

5   don't include Alabama?

6   A   They're all states.

7   Q   So this, the U.S. average would encompass --

8   A   Yes.

9   Q   -- numbers that came from Alabama?

10  A   Yes, it would.

11  Q   But do -- is Dr. Ruan excluded when looking at the average

12  for Alabama and average from the United States?

13  A   Yes.

14  Q   And is that the same on all the charts that we've looked

15  at?

16  A   Yes, it is.

17  Q   As I asked you earlier, did you have an opportunity to

18  determine if C&R was purchasing -- if C&R Pharmacy was

19  purchasing drugs under its own number?

20  A   Yes, it was.

21  Q   I'm going to now show you what has been admitted as

22  Government's Exhibit 40-5 Subsection (1).  And what is

23  different about this set of charts than the charts that we saw

24  previously?

25  A   This set of charts is in grams because we -- Subsys is a

1    spray so it's measured by gram, micrograms.

2    Q    It's measured by micrograms?

3    A    Yes.

4    Q    Is that 1 millionth of one gram?

5    A    Yes.

6    Q    And is that then totaled up and figured out in grams here?

7    A    Yes, it is.

8    Q    And who is the purchaser here?

9    A    C&R Pharmacy.

10    Q    So does that mean that a different DEA number separate from

11    Dr. Ruan's purchased this Subsys?

12    A    Yes.

13    Q    How many grams were purchased of Subsys in 2012 by C&R

14    Pharmacy?

15    A    5.38 grams.

16    Q    How many other pharmacies in the state of Alabama purchased

17    Subsys in 2012?

18    A    22.

19    Q    And what was the average amount of grams purchased by

20    pharmacies other than C&R in Alabama?

21    A    .30.

22    Q    And across the entire United States how many pharmacies

23    purchased Subsys in 2012?

24    A    .15.

25    Q    Well, how many different pharmacies purchased it?

1    A    894.

2    Q    And what was the average purchasing grams of Subsys that

3    year?

4    A    .15.

5    Q    I'm now showing you what has been admitted as Government's

6    Exhibit 40-5 Subsection (2).  Is this a comparison for 2013?

7    A    Yes, it is.

8    Q    And again, are these purchases being made by C&R Pharmacy?

9    A    That's correct.

10   Q    How many grams of Subsys were purchased by C&R in 2013?

11   A    57.51.

12   Q    And what was the Alabama average?

13   A    2.02.

14   Q    And what was the U.S. average?

15   A    .68.

16   Q    And just as comparison, from 2012 how many grams did we

17   talk about for C&R in 2012?

18   A    5.38.

19   Q    And the following year how many were purchased?

20   A    57.51.

21   Q    And into 2014 -- from '13 it was 57.51?

22   A    That's correct.

23   Q    In 2014 how many grams of Subsys were purchased by C&R

24   Pharmacy?

25   A    105.03.

1  Q   Is that almost doubling from what it was the year before?

2  A   That's correct.

3  Q   And is that roughly 20 times what was purchased in 2012?

4  A   That's correct.

5  Q   So in 2014 what was the Alabama average?

6  A   3.48.

7  Q   And these charts are exclusive to Subsys; is that correct?

8  A   That's correct.

9  Q   It doesn't include any other type of fentanyl?

10 A   That's correct.

11 Q   Finally, in the partial year 2015 -- I'm going to show you

12 what's been admitted as Government's Exhibit 40-5(4).  How many

13 grams of Subsys were purchased by C&R Pharmacy that year?

14 A   22.42.

15 Q   And I think you have explained before that Subsys is

16 measured in micrograms; correct?

17 A   That's correct.

18 Q   And does it come in individual sprays, if you know?

19 A   That's what -- yes.

20 Q   So is it actually being purchased from a wholesaler in

21 grams or is that just adding up the total amount of Subsys

22 purchased?

23 A   No.  When they would purchase it, when they put in for it,

24 it's in a liquid form.  So the distributor is selling by gram.

25 Q   Total grams?

1  A   Total.

2  Q   To however it's divided up into the sprays?

3  A   The sprays (nodding head affirmatively).

4  Q   And for Subsys, does it work the way that you explained

5  before where it will go from the manufacturer to the wholesaler

6  to a pharmacy?

7  A   That's the normal route, yes.

8  Q   I'm going to show you now what has been admitted as

9  Government's Exhibit 40-5 Subsection (5).  Can you explain to

10  the jury, what is this that we see here?

11  A   Insys is the supplier for C&R Pharmacy for the Subsys

12  fentanyl spray.

13  Q   And by supplier, is that what -- does that mean wholesaler?

14  A   That's correct.

15  Q   So who are these three companies here?  (Indicating.)

16  A   They are Integrated Commercialization Solutions, Inc.; and

17  the AmerisourceBergen Drug Corp. and McKesson Corporation.

18  Q   Are these three companies what you described for us, kind

19  of the middle spot for a drug from the manufacturer before it

20  gets to the pharmacy?

21  A   Correct.

22  Q   If I'm reading across -- using the first line as an

23  example, Integrated Commercial (sic) Solutions, what are these

24  numbers under the year?

25  A   Each year shows what is purchased during that time frame.

 1  So during 2012 there was nothing purchased.

 2  Q   From this particular wholesaler?

 3  A   From this particular wholesaler.

 4  Q   Same as 2013?

 5  A   Same as 2013?

 6  Q   And how about '14 and '15?

 7  A   In '14 it was 83.68 grams, and 2015 was 22.37 grams.

 8  Q   What was the total number of grams purchased by C&R

 9  Pharmacy from 2012 through that partial year of 2015?

10  A   190.34 grams.

11  Q   And is that the total that came from the three wholesalers?

12  A   That's correct.

13  Q   Is it possible for a pharmacy to buy directly from the

14  manufacturer?

15  A   It is possible, if you would let me explain.

16  Q   Okay.

17  A   It's possible.  There are transactions where a pharmacy can

18  buy directly from it, but it's highly unusual for them to buy

19  directly from a manufacturer.

20          When we do our ARCOS analysis, that is one of the

21  things that will stick out to us and that we would forward that

22  information to the field for further investigations because

23  that is unusual.

24  Q   The usual path would be to purchase from a wholesaler?

25  A   Especially -- yes.  If -- we also look at the history to

1    see if they had bought this substance from a distributor

2    before.  Like let's say AmerisourceBergen or McKesson, if they

3    purchased that before, then we would check -- that's one of the

4    -- another red flag.  We would send it to the field to see why

5    they stopped buying from those wholesalers to actually buying

6    from a manufacturer.

7    Q   And I believe you said you have 12 years of experience?

8    A   12 and a half.  Almost 13.

9    Q   In your career as a DEA diversion agent, how often have you

10   seen instances where pharmacies are buying directly from a

11   manufacturer?

12   A   It's -- sometimes manufacturers would -- like if it's a

13   special type of drug and they will donate -- like some drugs

14   they donate because the individual -- for low-income

15   individuals, and they will donate that directly to a pharmacy

16   to be dispensed to those low-income people.  But, you know --

17   and if it's something, you know, a certain exchange like if

18   they exchanged a drug, or something -- like say when they redid

19   the hydrocodone, they took back some of -- the manufacturer

20   took back some of those hydrocodone; they give them the newer

21   product.  But it's not -- we don't see it every day in our

22   investigations.

23   Q   Now, when you said "donate," would that be the manufacturer

24   giving free product that then the pharmacy will give out for

25   free?

1  A   The pharmacy -- you know, they have a doctor that is one of

2  the -- I'll use Suboxone.  I see that happen a lot, where

3  people can't afford it and the makers will donate a certain

4  percent to certain pharmacies to give to those patients.

5  Q   And just so I'm clear, when there -- when it is donated and

6  given to the patient, is it then billed to that patient's

7  insurance company or is it just free and clear?

8  A   It's free.

9          MR. BODNAR:  One moment, Your Honor.

10  Q   Do you know if the numbers that we looked at here on

11  Government's Exhibit 40-5 include any amount that was donated

12  for free by Insys to C&R Pharmacy?

13  A   No.

14  Q   You don't know that or this is not free product?

15  A   We don't -- we don't know that because we don't get into --

16  ARCOS does not collect -- doesn't collect that information.

17  Q   And does this chart reflect any amount that may have come

18  directly from Insys?

19  A   Not -- I don't think so, no.

20  Q   Just the three wholesalers?

21  A   Just the three wholesalers.

22          MR. BODNAR:  Pass the witness, Your Honor.

23          THE COURT:  Mr. Essig?

24                    CROSS EXAMINATION

25  BY MR. ESSIG:

1  Q   Good morning, Ms. Jackson.

2  A   Good morning.

3  Q   My name is Brandon Essig and I'm one of the lawyers for

4  Dr. Couch.  I've got a few questions for you this morning.

5  A   Okay.

6  Q   What I want to do is I want to start and kind of go back

7  over a couple of things that Mr. Bodnar talked to you about and

8  just make sure that I'm clear on a couple of things.

9        So ARCOS -- you mentioned ARCOS is a system that

10  tracks pharmaceutical medicines that are manufactured,

11  controlled substances; right?  It doesn't track noncontrolled

12  substances?

13  A   It doesn't collect noncontrolled substance; only schedule

14  I, schedule II, and schedule III non -- excuse me.  Schedule

15  III narcotics.

16  Q   Okay.  So it doesn't actually track schedule IV and

17  schedule V; is that correct?

18  A   No, it doesn't.

19  Q   Why doesn't it track schedule IV and schedule V?

20  A   Because the -- the regulations require that we -- those are

21  the drugs that they want to track.  And we do it because of the

22  quota system.

23  Q   Yes, ma'am.

24  A   So that when we -- at the time when we -- companies come in

25  and want quotas to produce those, we have a limit on how much

1    of those are made.

2    Q   Okay.  And would it also be true that you track schedule I

3    and schedule II and schedule III because those medicines have

4    the greatest danger of diversion; would that be fair to say?

5    A   That's fair.

6    Q   And you mentioned again that ARCOS tracks from point of

7    manufacture by the company that makes the drugs to the retail

8    point; is that correct?

9    A   That's correct.

10   Q   But ARCOS, if I understand correctly, and correct me if I'm

11   wrong, ARCOS does not track sale of the medicine from the

12   pharmacy or the doctor to the patient; is that right?

13   A   No.  That's usually done by the state prescription

14   monitoring program, or some other -- (nodding head

15   affirmatively).

16   Q   Okay.  And I think you also mentioned too, when Mr. Bodnar

17   was asking you -- you didn't get into the details but that --

18   you talked about the raw materials that the company that

19   manufactures the medicine, when they import or when they

20   purchase the raw materials, that that's tracked in some way but

21   not by ARCOS; is that correct?

22   A   It's not tracked -- it's tracked but it's considered to

23   be -- when an importer puts it in there and the manufacturer

24   receives it, it's put in another category.

25   Q   Okay.  But is that tracked by the DEA; is that right?

NANCY JACKSON - CROSS BY MR. ESSIG

```
 1    A    Yes, it is.
 2    Q    And then you mentioned the state-run systems that track the
 3    point of sale by the customer, the end user --
 4    A    End user.
 5    Q    -- of the product?
 6    A    That's correct.
 7    Q    That's tracked separately but DEA has some oversight of
 8    that as well?
 9    A    No, we don't.
10    Q    You don't have any oversight of that?
11    A    Not over the prescription monitoring program.
12    Q    Other than what maybe your law enforcement agents may have?
13    A    Only -- prescription -- at the state level it's handled by
14    the state and each state has their owner prescription
15    monitoring program.
16    Q    Yes, ma'am.
17    A    DEA does not have an overview over that, no.
18    Q    Okay.  So for purposes of the supply chain -- and that's
19    the term I'll use, if that's okay with you to refer to the
20    entire ARCOS process.
21    A    Okay.
22    Q    DEA has oversight of every step of that; is that correct?
23    A    That's correct.
24    Q    And would it be fair to say -- would it be correct to say
25    that there are actually DEA regulations that apply at each
```

1    stage and apply to each company, wholesaler, pharmacy or

2    whatever that may be in possession of those medicines; is that

3    right?

4    A    That's correct.

5    Q    And if we talk about -- what I wanted to do -- if we go to

6    40-5, the one you were showed -- and what I want to do is

7    actually start with the very last page of that.  And this is

8    40-5(5).

9              Ms. Jackson you stated that these are the three

10   companies that C&R Pharmacy was purchasing their Subsys from;

11   is that correct?

12   A    That's correct.

13   Q    Now, you said there's three companies but are you aware

14   that Integrated Commercialization Solutions is actually a

15   subsidiary of AmerisourceBergen?  Are you aware of that fact?

16   A    I am aware of that fact.

17   Q    Okay.  So really, number one and number two -- I guess

18   different entities on the purchase order but it's the same

19   company; is that right?

20   A    That's correct.  If you'll let me explain.

21   Q    Yes, ma'am.

22   A    They're -- they're the same company.  However, they're

23   separate because they have a separate DEA number.  So we treat

24   them as two different companies.

25   Q    Okay.  I got you.  I understand.  Separate DEA numbers but

2608

1    it's the same corporation?

2    A    That's correct.

3    Q    And for these companies here, for Amerisource -- so if we

4    talk about -- you know, we established we're really talking

5    about two companies, and I understand separate DEA numbers.

6             We're talking about AmerisourceBergen and McKesson.  I

7    mean, that's two of the largest wholesalers of pharmaceutical

8    medicines in the country; is that correct?

9    A    Yes, they're one -- they're one of the top five.

10   Q    Yes, ma'am.  These are very large companies?

11   A    That's correct.

12   Q    And these are companies that are heavily regulated by the

13   DEA; is that right?

14   A    That's correct.

15   Q    And they have some reporting requirements to the DEA; is

16   that correct?

17   A    That's correct.

18   Q    And these companies employ a large staff of compliance and

19   legal personnel; is that -- is that also true?

20   A    I would imagine.  I'm not sure.

21   Q    And again, if we go back for AmerisourceBergen and

22   McKesson, these companies are -- they're sort of -- if we start

23   at import for ARCOS -- or excuse me -- start at manufacturer,

24   wholesaler, distributor, they're sort of at point two; is that

25   right?

1   A   That's correct.

2   Q   Now, you talked about before that in your experience as a

3   diversion investigator -- and for clarity's sake too, at some

4   point in your career were you a special agent?

5   A   No, I wasn't.

6   Q   Okay.  So you've been a diversion investigator?

7   A   Diversion investigator, yes.

8   Q   And you said it's rare to see that a pharmacy or a retail

9   location will purchase directly from the manufacturer.  You

10  said that's rare?

11  A   It's -- it's rare.  It's not -- it's not in your everyday

12  thing of --

13  Q   Yes, ma'am.

14  A   -- that we see.  And like I said, when we see it in our

15  ARCOS analysis, we -- we do some check -- it makes us go back

16  and do some more in depth --

17  Q   Yes, ma'am.

18  A   -- research on that.  And if we continue to -- if we see

19  something that we think the field should know, we will notify

20  the field for them to do an in-depth investigation.

21  Q   Okay.  I understand that.  And you mentioned too, that in

22  that situation where you've had the direct link between the

23  pharmacy and the manufacturer, that in many cases it's donated

24  medications; is that correct?

25  A   The ones that I've seen, yes.

1  Q   And you said typically it involves specific types of

2  medication; is that right?

3  A   Pretty much, yes.

4  Q   And you mentioned -- like an example you gave was Suboxone?

5  A   Suboxone, yes.

6  Q   And Suboxone is not an ordinary every-day medication, would

7  that be fair to say?

8  A   It's not an ordinary medication, and it's very expensive.

9  Q   Yes.  And it's kind of a -- this might not be the right

10  term, but it's a little bit unusual even within schedule I,

11  schedule II and schedule III; is that right?

12  A   It's a schedule III drug.

13  Q   Yes, ma'am.

14  A   And it's for drug treatment.

15  Q   Yes, ma'am.

16  A   And so that's why a lot of the companies, they donate that

17  to help the opiates problem.

18  Q   But just to be clear, there's nothing illegal about the

19  pharmacy purchasing directly from the manufacturer, is there?

20  A   No.

21  Q   And there's no DEA rule that says that's not allowed; is

22  that correct?

23  A   No, it's not.

24  Q   Now, to talk a little bit about the charts, what I'm going

25  to do is I'm going to show you -- they all -- although the

1    numbers are different and the years are different and the drugs

2    are slightly different, they all basically show us the same

3    information; is that correct?

4    A    That's correct.

5    Q    And they all -- what they all compare is purchases by

6    Dr. Ruan through this ARCOS supply chain?

7    A    That's correct.

8    Q    Is that correct?  As compared to all other doctors in the

9    state of Alabama, all other doctors in the United States; is

10   that correct?

11   A    That's correct.

12   Q    All right.  Now, just to be clear too, you were asked

13   questions about typically when a doctor is purchasing medicine

14   through the ARCOS supply chain, you said it's typically how his

15   relationship with the pharmacy operates.

16   A    That's correct.

17   Q    In your experience; is that correct?

18   A    In my experience, yes.

19   Q    But to be fair, in this particular case you don't know how

20   Dr. Ruan dispensed these medicines after he ordered them, do

21   you?

22   A    No, I don't.

23   Q    And in terms of the DEA, the form you mentioned --

24   A    The 222 form, the order form.

25   Q    Yes, ma'am.  And you don't specifically know how or if

1  those might have been utilized by Dr. Ruan?

2  A  No.

3  Q  And you certainly can't testify here today that Dr. Ruan

4  actually personally dispensed all of these medications, can

5  you?

6  A  No, I can't.

7  Q  And in the comparison here, and I think you said this

8  includes all other practitioners.

9  A  That's correct.

10  Q  Doesn't exclude pain management doctors?

11  A  It includes everybody.

12  Q  It includes everybody.  So it can include anybody from a

13  dentist to an orthopedic?

14  A  That's correct.

15  Q  And what we are not comparing here, if we took these 860

16  doctors -- and again, I'm looking at 40-1(1).  If we took these

17  860 doctors and re-ranked them one through 860, their numbers

18  are going to look quite different; is that fair?

19  A  That's fair.

20  Q  I mean, some are going to be significantly higher than

21  1,691 and some are going to be significantly lower; is that

22  right?

23  A  That's correct.

24  Q  But we can't -- we can't make that comparison by looking at

25  this chart, can we?

1   A   We can't -- we can't show what that is, no.

2   Q   And the same thing with the numbers in the United States.

3   A   In the United States.

4   Q   Is that correct?

5   A   That's all practitioners.

6   Q   Yes, ma'am.  And just so I understand too -- and again,

7   we're doing a comparison here but there's no analysis in these

8   charts of how Dr. Ruan specifically compares to other pain

9   management doctors?

10  A   No, it's not.

11  Q   There's no specific comparison of how Dr. Ruan compares to

12  other pain management doctors who have a pharmacy and a

13  practice?

14  A   No.

15  Q   There's no specific comparison of how Dr. Ruan compares to

16  other doctors who serve a similar patient population, is there?

17  A   No.

18  Q   And are you familiar with a common statistic for measuring

19  a doctor/patient population is the number of doctors per

20  100,000, are you familiar with that?

21  A   No, I'm not.

22  Q   But this makes no comparison to doctors in similar

23  geographic regions with similar patient populations, does it?

24  A   No.

25  Q   And none of these numbers compare Dr. Ruan or C&R or PPSA

1  as against patient populations with similar issues of chronic

2  pain?

3  A   No.

4  Q   The same question for the pharmacy slide or exhibit that we

5  looked at.  That pharmacy -- again C&R is compared to all other

6  pharmacies; correct?

7  A   That's correct.

8  Q   Whether it's CVS or whether it's a mom-and-pop pharmacy; is

9  that correct?

10 A   That's correct.

11 Q   So there's no breakdown in those numbers that would compare

12 C&R to other pharmacies co-located with pain management

13 physicians at a pain management clinic; is that correct?

14 A   No.

15         MR. ESSIG:  Thank you.  No further questions.

16         THE COURT:  Mr. Darley?

17                    CROSS EXAMINATION

18 BY MR. DARLEY:

19 Q   Good morning, Ms. Jackson.

20 A   Good morning.

21 Q   I am Jason Darley and I represent Dr. Ruan.  Mr. Bodnar and

22 Mr. Essig have gone over the lion's share of what I had so I'll

23 be brief.  But I do want to touch on a few points.

24         These -- these charts that you arrived at, each of the

25 ones that have been marked as Government's Exhibits 40-1 all

```
 1   the way to 40-5, who specifically created the charts?

 2   A   One of my analysts.

 3   Q   Okay.  Under your supervision.

 4   A   That's correct.

 5   Q   Correct?  And you -- what is your specific title?  You're a

 6   chief, aren't you?

 7   A   I'm the unit chief for that section, yes.

 8   Q   Targeting and analyst for -- very CSI?

 9   A   Yes, target and analysis.

10   Q   Okay.  And you guys work with a lot of numbers, a lot of

11   statistics?

12   A   That's correct.

13   Q   And would you agree that numbers can tell us a great deal

14   of information on one end of the spectrum, and on the other

15   they can tell us very little?

16   A   That's correct.

17   Q   Context is important; correct?

18   A   (Nodding head affirmatively.)

19   Q   I want to point your attention to a few of these charts.

20   For instance, this is what's been marked and admitted as

21   Government's Exhibit 40-1 --

22   A   Can you turn it around?  Can you turn it around?

23   Q   Sorry.  This right here, this chart, if you look at this,

24   this is total dosage units, is it not?

25   A   That's correct.
```

```
 1   Q   Okay.  But this is --
 2           THE COURT:  Mr. Darley, don't talk over her, please.
 3           MR. DARLEY:  Sorry.
 4           THE COURT:  That's all right.
 5   BY MR. DARLEY:
 6   Q   But then, Ms. Jackson, these right here are actually
 7   averages, are they not?
 8   A   That's correct.
 9   Q   So it's a little bit different of a measuring mechanism, is
10   it not?
11   A   It is.
12   Q   Okay.  The -- the numbers that you arrived at here, who
13   chose which data to put into these charts?
14   A   I don't understand your question.
15   Q   When you made up these charts or when you supervised the
16   making of these charts, who decided how or which format to use
17   as far as total dosages versus simply average dosages?
18   A   Well, when we get a request for a comparison, we do --
19   that's what we do.  We look at what the doctor that they -- the
20   DEA number that was given to us and we compare that with the --
21   with the state and the U.S. average.
22   Q   Okay.  And you -- so you had a comparison request?
23   A   Yes.
24   Q   Okay.  Who would have made -- if you know, who would have
25   made that comparison request?
```

1    A    Probably the case agent.

2    Q    Okay.  Do you know who that is in this situation?

3    A    I'm not for sure.

4    Q    Okay.  But it's not somebody in your office identified this

5    doctor, is it?

6    A    When we run -- no, it's not someone in our office.

7    Q    Okay.

8    A    If you let me explain?

9    Q    No.

10   A    Okay.

11   Q    So I guess what I'm getting at is this chart here -- like I

12   said, it's important.  We're looking at a total here; correct?

13   A    That's correct.

14   Q    But only averages here?

15   A    Correct.

16   Q    So it's not necessarily an apples-to-apples chart, is it?

17   A    I think it shows a snapshot of what, you know, the doctor,

18   what he ordered compared to what the state ordered average is

19   and compare it to the U.S. average.

20   Q    Okay.

21   A    That's how we do our charts.

22   Q    But under cross-examination by Mr. Essig you stated that

23   this could include all kinds of specialties in these here and

24   here (indicating)?

25   A    Yeah.  All practitioners, yes.

1   Q   Okay.  It could be somebody that treats -- a dermatologist,

2   say, that treats a rash that never prescribes medicine or never

3   purchases medicine; correct?

4   A   That's correct.

5   Q   Or like I say, it could be an oncologist?

6   A   It could be.

7   Q   But I guess what I'm getting at is -- let me ask it a

8   different way.  How did you arrive at this chart format

9   selecting totals versus averages (indicating)?

10  A   I guess we -- this is what we -- we prepared based on the

11  request.  We run a comparison between Dr. Ruan and what is the

12  average in Alabama.

13  Q   Okay.

14  A   And across the U.S.

15  Q   Okay.  And I mean, were you asked if Dr. Ruan was in the

16  top 10?

17  A   That is -- I don't recall the request.  This was done --

18  this started a long time ago.  This was before I arrived as the

19  ARCOS unit chief.

20  Q   Do you -- do you even know if he's in the top 10?

21  A   No, I don't.

22  Q   Were you asked to find out that information?

23  A   No, I wasn't.

24  Q   Would you have that data at your disposal in your office in

25  Washington?

2619

1   A   I'm sure he wasn't in the top 10.

2   Q   You're sure he wasn't?

3   A   I'm sure he wasn't.  But --

4   Q   But -- I'm sorry.  Go ahead.

5   A   I'm sure he wasn't in the top 10 for the U.S.  But I don't

6   know what -- where his ranking was in the state either.

7   Q   So you don't even know if he's in the top 10 of Alabama?

8   A   No, I don't.  No, I don't.

9        MR. DARLEY:  Your Honor, may I approach the witness?

10        THE COURT:  All right.

11      (A discussion was held off the record between counsel.)

12   BY MR. DARLEY:

13   Q   Take a look at that.

14   A   I can't see this.

15   Q   I'm sorry.

16   A   Okay.  This table right here?  (Indicating).

17   Q   Can you -- can you read it?

18   A   I can't read it.

19        THE COURT:  Is this something you've ever seen before?

20   A   It's not something that I'm familiar with.

21   Q   Can you read the top and at least -- what it is?

22        MR. BODNAR:  Objection.

23   A   Okay.  This says --

24        MR. BODNAR:  Objection to her reading it into the

25   record.

NANCY JACKSON - CROSS BY MR. DARLEY

```
 1  BY MR. DARLEY:

 2  Q   No, don't read it out loud.  Read it to yourself.

 3  A   Okay.

 4          THE COURT:  I sustain the objection.

 5          Mr. Darley, she's not seen it before.  How can she

 6  testify about it?

 7          MR. DARLEY:  Yes, ma'am.

 8          THE WITNESS:  I can't testify to that.

 9  BY MR. DARLEY:

10  Q   Ms. Jackson, your office -- under your duties, you compile

11  the ARCOS data you have?

12  A   Pardon me?

13  Q   You compare the ARCOS data that comes in --

14  A   Yes.

15  Q   -- from the past, all the way to the present day it's

16  coming in?

17  A   That's correct.

18  Q   And if you had been asked by the case agent, you could have

19  accessed the top prescribers by state and by national?

20  A   That's correct.

21  Q   But you weren't asked to do that?

22  A   I wasn't asked to do that.

23  Q   So what we're left with here is a chart that is showing one

24  doctor that just simply purchased it; correct?

25  A   Yes.
```

 1   Q   And we don't know who is prescribing under him once this

 2   has been purchased; correct?

 3   A   That is correct.

 4   Q   But to go further, we're showing the jury a total here --

 5   again, a total here versus an average here, are we not?

 6            THE COURT:  You've been over this three times now,

 7   Mr. Darley.

 8            MR. DARLEY:  May I walk through an example?

 9   Q   This is a -- this is what is the actual exhibit and this is

10   just a copy that was provided to us as an exhibit, or a copy of

11   the exhibit.  Do those, Ms. Jackson, look the same?

12   A   Okay.  Can you go down to the next one?  Okay.

13   Q   Okay.  Just using this example -- for instance, let me walk

14   you through an analogy.  If you were asked how many points

15   Michael Jordan scored in his NBA career and we say he's got

16   33,300; correct?  And you're comparing --

17            MR. BODNAR:  Your Honor, objection to relevance at

18   this point.  He's made the point that it's a total versus an

19   average.  I don't know if an example is needed.

20            THE COURT:  Yeah.  I think the rest of this is

21   argument so --

22            MR. DARLEY:  Yes, ma'am, Your Honor.

23   Q   And I think Mr. Essig covered, you could have broken these

24   down by numbers; correct?  And actual total dosages of other

25   doctors rather than just averages?

 1   A   It would be a long list, yes.  It would be a big chart.

 2   Q   But you could have done it.  You have that data.

 3   A   We have the data, yes.

 4           MR. DARLEY:  Thank you.

 5           THE COURT:  Any redirect?

 6           MR. BODNAR:  Very briefly.

 7                     REDIRECT EXAMINATION

 8   BY MR. BODNAR:

 9   Q   Ms. Jackson, I believe you were asked something and you

10   asked if you could explain further.  Do you recall that?

11   A   I can't recall that.

12   Q   You do or you don't recall that?

13   A   I don't recall.  I recall that I asked him but now I can't

14   remember what it was.

15   Q   I'll move on to this then and ask you:  Do you recall being

16   asked whether or not this was comparing -- these charts were

17   comparing one doctor versus all different types of doctors

18   including doctors that don't ever prescribe the drug at all?

19   A   It's -- the average that was shown there, it shows all the

20   doctors that has ordered the drug.

21   Q   And that's -- this is not about number prescribed in any

22   way?

23   A   No, that's just for ordering.

24   Q   And just as an example, we'll look at the 2011 fentanyl

25   patches?

NANCY JACKSON - REDIRECT BY MR. BODNAR

1   A   That's correct.

2   Q   So is this 314 average comparing every doctor, dentist,

3   dermatologist or is that the average of just the 17 other

4   doctors that have ordered it here in Alabama?

5   A   That's the 17 doctors that ordered it.

6   Q   And does that work the same way here?  This is not 80 on

7   average with every single doctor in the United States?

8   A   Only those doctors that ordered it.

9   Q   And those doctors that ordered it included every specialty,

10  including pain; correct?

11  A   That's correct.

12  Q   And same thing with cancer?

13  A   That's correct.

14  Q   And does that work the same way for the pharmacy data?

15  We'll use 2014 Subsys as the example.  Is this comparing C&R to

16  just the 35 other pharmacies in Alabama that ordered it?

17  A   That's the 35 that ordered Subsys.

18  Q   And the 1,382 that ordered Subsys nationwide?

19  A   Nationwide; that's correct.

20  Q   You mentioned getting requests in from the DEA.  Can you

21  explain how does that process work that you come about to make

22  a chart like this, or that your office does?

23  A   Usually there's an ongoing investigation and they will

24  request -- our ARCOS portion of it is just a small portion of

25  the total case.  Because we -- this is kind of just to show a

2624

```
 1  picture to them.

 2  Q   And is this something that your office does frequently?

 3  A   Yes, it does.

 4  Q   Does your office create charts -- comparison charts like

 5  this frequently?

 6  A   Yes.

 7  Q   And is this the standard format you use where you're

 8  comparing whatever pharmacy, whatever doctor versus the state

 9  and national average?

10  A   That's the standard.

11  Q   And finally, you mentioned that there was another type of

12  system, not the ARCOS system, which tracks orders.  But what is

13  that other system that tracks the number actually prescribed?

14  A   That's a prescription monitoring program.  I think all the

15  states have them now, or most of them do.  And that's usually

16  done at the state level.  And they --

17  Q   Is that something that's sometimes referred to as a PMP or

18  a PDMP?

19  A   That's correct.

20          MR. BODNAR:  Nothing further from this witness, Your

21  Honor.

22          THE COURT:  All right.  You may step down.  Thank you,

23  Ms. Jackson.

24          MR. BODNAR:  United States calls Cindy McKenzie.

25                      CINDY McKENZIE
```

CINDY McKENZIE - DIRECT BY MR. BODNAR

```
1                  was sworn and testified as follows:
2                  THE WITNESS:  I do.
3                  THE CLERK:  Thank you, ma'am.  Please be seated.
4                            DIRECT EXAMINATION
5    BY MR. BODNAR:
6    Q   Good morning.
7    A   Good morning.
8    Q   Could you please introduce yourself to the jury?
9    A   My name is Cindy McKenzie.
10   Q   And, Ms. McKenzie, where do you work?
11   A   I work at Blue Cross/Blue Shield of Alabama.
12   Q   Prior to -- well, how long have you been at Blue Cross/Blue
13   Shield?
14   A   I've been there 20 years.
15   Q   Prior to working at Blue Cross and Blue Shield, did you
16   have any medical experience?
17   A   Yes, I'm a registered nurse.
18   Q   How long did you work as a registered nurse?
19   A   From '83 to '96.
20   Q   What is your -- is that approximately 13 years?
21   A   Yes.
22   Q   And since then, the 20 years has been at Blue Cross/Blue
23   Shield?
24   A   Correct.
25   Q   What is your current position within Blue Cross/Blue
```

1    Shield?

2    A    I'm the operations manager of the network integrity unit

3    and I oversee and manage all fraud, waste, and abuse

4    activities.

5    Q    And how long have you been over the fraud, waste, and abuse

6    unit?

7    A    Since 2009.

8    Q    Can you explain what it is that your unit does?

9    A    I have a staff of investigators and we investigate fraud,

10   waste, and abuse on providers like physicians or nurse

11   practitioners.  We investigate member fraud and then also group

12   fraud.

13   Q    What do you mean by member fraud?  What does a member of

14   Blue Cross/Blue Shield mean?

15   A    So someone who's a person who purchases Blue Cross/Blue

16   Shield insurance.  And so sometimes we have identity theft,

17   that kind of thing or we have a member who may be working with

18   a provider to file services that weren't actually rendered or

19   something like that, so they may be involved in a scam.

20   Q    And do you work for a specific part, a specific state of

21   Blue Cross/Blue Shield?

22   A    So I cover fraud and abuse activities for all lines of

23   business.  So we do the federal lines of business like Medicare

24   or Medicaid, but also commercial lines of business such as

25   PEEHIP, State of Alabama, Alabama Power, and that kind of

2627

 1   thing.

 2   Q   What I'm trying to get at is it Blue Cross/Blue Shield just

 3   for the state of Alabama that you cover or do you handle Blue

 4   Cross and Blue Shield whether it's in New Mexico, Texas, New

 5   York?

 6   A   I got you.  So Blue Cross/Blue Shields are independent

 7   companies.  And so Blue Cross/Blue Shield of Alabama is an

 8   independent company, although we are part of the Blue

 9   Cross/Blue Shield Association, which most Blue Crosses across

10   the country are.  And we do, we do have members sometimes that

11   are Blue Cross Alabama members who live in other states.  And

12   so they may actually see providers in other states and we

13   utilize the networks in those states of other Blue Crosses.

14   It's a little bit confusing.  But --

15   Q   And just so I understand what members and providers are,

16   are members the ones that if I have Blue Cross/Blue Shield

17   insurance then I'm a member?

18   A   Right, right.

19   Q   And is the provider the doctor or the nurse practitioner,

20   whoever is --

21   A   Right.  Or a lab or any kind of provider.

22   Q   How does a doctor become a provider within the Blue

23   Cross/Blue Shield network?

24   A   So to be a participating provider, a physician would submit

25   an application to us online.

CINDY McKENZIE - DIRECT BY MR. BODNAR

```
 1  Q   And are there documents also called credentialing and
 2  provider applications --
 3  A   Correct.
 4  Q   -- that are used to start your relationship -- the doctor's
 5  relationship Blue Cross/Blue Shield?
 6  A   Right, to be participating.
 7  Q   I'm going to show you now what has been marked as
 8  Government's Exhibit 27-22 and 27-23.
 9      (A discussion was held off the record between counsel.)
10  BY MR. BODNAR:
11  Q   Now showing you what has been admitted -- or marked as
12  Government's Exhibit 27-2 and 27-3 and ask if you're able to
13  identify what these documents are.
14          THE COURT:  You said before 27-22.
15          MR. BODNAR:  27-22 and 27-23.
16          THE COURT:  All right.
17  A   These are the credentialing applications.
18  BY MR. BODNAR:
19  Q   And 27-22, who is that the application for?
20  A   John P. Couch.
21  Q   And 27-23, who is that for?
22  A   Xiulu Ruan.
23          MR. BODNAR:  United States moves to admit Government's
24  Exhibit 22-22.  Mr. Essig just pointed out there's one page in
25  there that needs to be removed.  So we're offering it for
```

1   admission and we will remove that page in one moment since we

2   identified it.

3           THE COURT:  All right, sir.

4           MR. BODNAR:  And then 27-23.

5           THE COURT:  All right.

6           MR. ESSIG:  No objection.

7           THE COURT:  All right.  Mark it in.

8       (Government's Exhibit 27-22 and 27-23 were entered into

9   evidence.)

10          MR. BODNAR:  One moment, Your Honor.

11  Q   Ms. McKenzie, I'm now showing you what's been admitted as

12  Government's Exhibit 27-23.  Is this the application you were

13  discussing before for Dr. Ruan?

14  A   Yes, it is.

15  Q   Will you please explain what is it that we see here at the

16  top, what is this first page?  I'll zoom out so you can see it

17  overall.  What is this showing?

18  A   So this is our standard application to be in our provider

19  network for a physician and so it includes the general

20  information, medical information, where they received their

21  training, that kind of thing.

22  Q   And pages behind it are further pages of the application,

23  in this case for Dr. Ruan?

24  A   Right.  It's all the specific information.

25  Q   And ultimately is the application signed by the doctor?

1  A   Yes, signed on May 10th, 2003.

2  Q   And what is the physician certifying at the top?  And I'll

3  zoom it in.

4  A   Well, they are basically certifying that, one, everything

5  on this application is true and correct --

6  Q   And what does that down here...(unintelligible) --

7  A   -- to the best of their knowledge.

8  Q   -- say?  I'm sorry.  I asked you if you could see it from

9  there.

10       THE REPORTER:  Excuse me.  You're both cutting each

11  other off.

12       MR. BODNAR:  I apologize.

13       THE REPORTER:  It doesn't read well.

14       THE WITNESS:  Okay.  I'm sorry.

15  BY MR. BODNAR:

16  Q   Continue, please.

17  A   So the second sentence, is that what you asked about?

18  Q   Yes, starting:  I have used.

19  A   Okay.  It says:  I have used reasonable care in determining

20  the truthfulness, correctness, and completeness of all

21  information in this application before signing below.

22  Q   Do they make -- does the signer make any certification that

23  they intend to provide future truthful information to Blue

24  Cross and Blue Shield?

25  A   Down below it says:  I am familiar with and agree to abide

1  by the Blue Cross -- I'm sorry, I'm sorry --the Blue Shield

2  programs that apply to my provider type.

3  Q   I'm now showing you what has been admitted as Government's

4  Exhibit 27-22.  Is this a similar document for Dr. Couch?

5  A   It is.  This cover page is actually our work document

6  internally.

7  Q   And is it also signed -- is this a similar application as

8  we just saw in terms of joining Blue Cross/Blue Shield's

9  network for Dr. Couch?

10 A   It is, it is.

11 Q   When you join a network such as Blue Cross and Blue Shield,

12 are there certain rules that Blue Cross and Blue Shield says

13 that if you want to be part of our network you need to abide

14 by?

15 A   Yes, we have a participating provider agreement as well as

16 online we have a provider manual with additional guidelines.

17 Q   And for Blue Cross and Blue Shield, can you choose to have

18 different guidelines than, say, Medicare or United Healthcare?

19 Can they be different for your company?

20 A   Oh, definitely.  We're an independent company.

21 Q   And is that something -- do doctors have to be part of Blue

22 Cross/Blue Shield or do they choose to be part of the network?

23 A   No, they choose to be, and then they have to be approved.

24 Q   And if you choose to be and are approved, are you agreeing

25 to abide by whatever rules it is that Blue Cross and Blue

CINDY McKENZIE - DIRECT BY MR. BODNAR

1    Shield sets out?

2    A    Correct.

3    Q    Does Blue Cross and Blue Shield have a particular rule with

4    regard to billing for office visits?

5    A    We have a rule that says you will bill accurate and true

6    information based on what service you provide.

7    Q    And --

8    A    It's not specific just for office visits.  It's for any

9    services.

10   Q    So for services for Blue Cross and Blue Shield, if it is --

11   well, let's go back first.  Can you explain to the jury what an

12   NPI number is?

13   A    That's a national provider identification number.  So each

14   provider, whether it's a doctor or nurse practitioner, whatever

15   type, has a unique identifier.  It's a national number.  It's

16   not -- it's not assigned by Blue Cross.

17   Q    So would Dr. Couch and Dr. Ruan have unique NPI numbers?

18   A    Right.  They each have their own.

19   Q    What about nurse practitioners?  Would they have a separate

20   NPI number?

21   A    They would have a different one; correct (nodding head

22   affirmatively).

23   Q    What if a nurse practitioner worked underneath Dr. Couch,

24   worked for Dr. Couch?  Would they share the same NPI or would

25   they have two separate NPIs?

1   A    They would still have their own.

2   Q    Why is an NPI number important in terms of billing?  How

3   does -- how does insurance billing work with regard to an NPI?

4   A    So when we receive the claims -- and we usually receive

5   them electronically, send them electronic information -- it

6   includes who provided the service, which is usually identified

7   as the doctor's or the provider's name and also the NPI number.

8   We at Blue Cross, we also assign a national provider number

9   that is unique to Blue Cross to help identify for us.  So they

10  submit the claim with that information, the name of the

11  patient, the contract number, the date of the service, and then

12  their procedure codes for whatever services they provided to

13  the patient on that day, and then lastly the diagnosis of what

14  was the patient's complaint that day or what the final

15  diagnosis was that day for the visit.

16  Q    So looking at two particular things, the NPI and the

17  procedure code, how do you use or how does Blue Cross/Blue

18  Shield use the NPI and the procedure code to determine how much

19  is reimbursed to the doctor?

20  A    So different provider types, we have different fee

21  schedules.  So we have a fee schedule for physicians that is at

22  one rate and, for instance, we have a fee schedule for nurse

23  practitioners that is 30 percent less than a fee schedule for a

24  doctor, because a doctor has more training.

25  Q    And by fee schedule, do you mean the amount that you will

CINDY MCKENZIE - DIRECT BY MR. BODNAR

2634

1   pay for a particular service?

2   A   For a procedure code (nodding head affirmatively).

3   Q   Let's say for the same procedure code -- let's say a knee

4   injection, as an example.  Does that mean if a doctor does the

5   knee injection it's paid at one rate and if a nurse

6   practitioner were to do it it's paid at a different rate?

7   A   Correct.

8   Q   Why is that?

9   A   Because the level of expertise of the doctor is higher,

10  based on training.

11  Q   So more money is paid if it is billed out under the NPI of

12  the doctor?

13  A   Correct.

14  Q   Specific to Blue Cross and Blue Shield, whose NPI must be

15  included for a treatment to be paid accurately?

16  A   The NPI of the doctor or the provider who actually renders

17  the service.

18  Q   Does that mean the person that physically does the office

19  exam or physically does whatever procedure it is for the knee

20  injection?

21  A   Correct.  The person who actually sees the patient,

22  evaluates the patient, treats the patient.

23  Q   If a nurse practitioner is working under a doctor and sees

24  that patient, the nurse practitioner sees the patient and the

25  doctor reviews the chart later, can that be billed for Blue

2635

1    Cross and Blue Shield under the doctor's NPI?

2    A    No, it cannot.

3    Q    Whose NPI does it need to be billed under?

4    A    Under the nurse practitioner.

5    Q    What about if the nurse practitioner treats a patient

6    during the office visit but makes a phone call and called the

7    doctor in a different state to ask his advice, can that be

8    billed under the doctor's NPI?

9    A    No, it couldn't.

10   Q    Whose NPI does it need to be billed under?

11   A    Under the nurse practitioner's.

12   Q    Do you know, do other insurance companies do it differently

13   than what you just described?

14   A    I'm not -- I'm not sure.

15   Q    When you join Blue Cross and Blue Shield, are you agreeing

16   to abide by what that rule is for Blue Cross and Blue Shield?

17   A    Yes, it's part of the provider manual.

18   Q    During the course of -- well, were you asked to look to see

19   if for these two Doctors, Dr. Ruan and Dr. Couch, if office

20   visits and other procedures billed to Blue Cross and Blue

21   Shield were billed under their nurse practitioners' NPIs?

22   A    They were not.

23   Q    Well, first, were you asked to look for that?

24   A    I was asked to look.  I'm sorry.  Yes, I was.

25   Q    Did you find any payments made out for office visits under

CINDY MCKENZIE - DIRECT BY MR. BODNAR

1   Dr. Ruan or Dr. Couch's nurse practitioner numbers?

2   A   I did not.

3   Q   Which numbers were they that you saw?

4   A   They were all under their numbers, Dr. Couch and

5   Dr. Ruan's.

6   Q   Based on the data, does that indicate, then, that Dr. Ruan

7   and Dr. Couch were the ones who actually rendered the service

8   on any particular day?

9   A   Correct.

10   Q   Would that be every instance, then, with Blue Cross and

11   Blue Shield?

12   A   Yeah.  There's no claims for any physician extenders.

13   Q   I'm sorry.  I missed what you said.

14   A   There was no claims filed for any nurse practitioners or

15   physician assistants.

16   Q   If a nurse practitioner did do an office visit or procedure

17   without the doctor and it was billed under the doctor's NPI,

18   would that be accurate?

19   A   No.  That's a false claim.

20   Q   I'm going to ask you now about -- are you familiar with CPT

21   codes?

22   A   Yes, I am.

23   Q   Can you explain to the jury what is a CPT code?

24   A   The American Medical Association puts out a book every year

25   of all the different procedures that could happen when you

1    visit a provider's office, when you go to a doctor's office.

2    So there's an individual CPT code for a knee injection, for an

3    ultrasound.  For any kind of procedure you have at the doctor's

4    office there's a specific CPT code and there's rules around

5    those that are written by the American Medical Association.

6    That book comes out every year.

7    Q   And is that for all insurers or just specifically for Blue

8    Cross and Blue Shield?

9    A   It's for all insurers.

10   Q   Do diagnoses have their own codes as well?

11   A   Yes.  There's a book, the ICD-10 book, that comes out with

12   all the diagnosis codes.  And that's standard, as well, for all

13   insurers.

14   Q   And are those usually three digit numbers and sometimes a

15   few digits after that?

16   A   They used to be.  It just expanded this past year and now

17   it's seven, I think.

18   Q   Are there also codes that signify what type of office visit

19   was held?

20   A   Yeah, there's evaluation and management codes that are

21   specific for visits just to bill for a visit to a doctor,

22   because you may go see a physician and you just have a visit

23   where he examines you and prescribes medicine he doesn't do a

24   procedure, but he still saw you as a visit.  So there are

25   specific codes just for visits.

2638

1    Q    And for office visit codes do those -- are there different

2    codes for different levels of office visit, how long it takes

3    or how complex it is?

4    A    Right.  There's five different codes for the level of

5    intensity of the visit, includes factors like how long the

6    visit was, how complex the visit was, any kind of comorbid

7    conditions the patient may have.  They may have, you know,

8    complications such as diabetes and hypertension and they have

9    to attribute to all those things as they are trying to come up

10   with their diagnosis on the patient.

11   Q    And are there lower level codes for office visits for just

12   a really quick office visit?

13   A    There are (nodding head affirmatively).

14   Q    And would those pay a lesser amount of money on

15   reimbursement back to the doctor?

16   A    They do.

17   Q    And then are there higher codes, are there higher codes for

18   very complicated office visits?

19   A    There are.

20   Q    And do those get reimbursed at higher rates?

21   A    They do.

22   Q    Are you familiar with the code 99213?

23   A    Yes, I am.

24   Q    And 99214?

25   A    Yes.

1    Q   Are those office visit codes?

2    A   They are.

3    Q   First, explaining 99213, can you explain to the jury what

4    is that code used for?

5    A   I don't have a CPT book in front of me.  But the actual

6    criteria is written in the book.  But the codes are 99211, 212,

7    213, 214, 215, with the 215 being the most complex.  The 213 is

8    kind of the middle of the road.  An analogy I might could give

9    you is if you went into an urgent care clinic with a sore

10   throat, sinus infection, something pretty simple, the doctor

11   evaluated just that one thing and wrote you a script for an

12   antibiotic.  That would probably meet for a 213, just a quick

13   visit, pretty simple, what they're looking at, whereas a 214

14   would be something a little bit more complex.  Maybe you were

15   having ear pain and fever and other things going on.  And then

16   a 215 may be something like you have a lot of comorbid problems

17   going on at the same time or you're going in with a diagnosis

18   of possible cancer and they are evaluating a tumor mass and

19   it's a lot more complex visit.

20   Q   Comparing 99213 and 99214, is 99214 reimbursed at a higher

21   rate because it's signifying a more-complicated visit?

22   A   It is.

23   Q   Does Blue Cross and Blue Shield keep data about the billing

24   codes that are used by its providers?

25   A   Yes, we do.

CINDY McKENZIE - DIRECT BY MR. BODNAR

1   Q   And is that information that you're able to access for an

2   individual provider such as Dr. Ruan and Dr. Couch?

3   A   Yes, we are.

4   Q   Were you asked to look at various office visit codes,

5   including 99213 and 99214, for these two doctors?

6   A   I was.

7   Q   For 2010?  For the full year 2010 through 2014?

8   A   Yes.

9   Q   I'm going to show you now what has been marked as

10  Government's Exhibit 33 --

11          (A discussion was held off the record between counsel.)

12  BY MR. BODNAR:

13  Q   -- 33-3.

14          MR. BODNAR:  And, Your Honor, this is underlying data

15  that won't be admitted.

16          THE COURT:  I'm sorry?

17          MR. BODNAR:  33-3 is the underlying data for 33-1 and

18  2.

19          THE COURT:  All right.

20  BY MR. BODNAR:

21  Q   Is that data that was analyzed and provided to the United

22  States?

23  A   Yes, it is.

24  Q   I'm going to show you now -- and are those for office visit

25  codes?

CINDY McKENZIE - DIRECT BY MR. BODNAR

 1  A   Yes, they are.

 2  Q   I'm now going to show you what has been marked as

 3  Government's Exhibit 33-1 and 33-2.  Are these graphs that were

 4  created from those numbers on the charts for Dr. Ruan and

 5  Dr. Couch?

 6  A   I'm sorry.  The font's really small.  Yes, they are.

 7  Q   And are these graphs for the codes 99213 and 99214?

 8  A   Correct.

 9  Q   And is 33-1 the graph for Dr. Ruan and 33-2 the graph for

10  Dr. Couch?

11  A   Correct.

12       MR. BODNAR:  United States moves to admit Government's

13  Exhibit 33-1 and 33-2.

14       THE COURT:  Any objection?

15       MR. KNIZLEY:  Your Honor, we'd object to the

16  relevance.

17       THE COURT:  Let me see the charts.  Do y'all want to

18  come to side bar?

19    (At the side bar, jury not present.)

20       THE COURT:  Okay.  What was your objection?

21       MR. KNIZLEY:  Judge, two things.  One, office visits

22  fraudulent conduct is not charged in the indictment.  It's --

23  other matters charged in the indictment.  So that's not

24  relevant to the issues before the Court.  Secondly, I think he

25  referenced some 2010 data that the witness was testifying

 1    about, which is outside the scope, outside the time frame of

 2    the conspiracy.  But first, the primary one, Judge, is that the

 3    office visits are not charged in the indictment.  It's other

 4    matter charged in the indictment.

 5            MR. BODNAR:  Your Honor, they're charged with

 6    healthcare fraud conspiracy and one of the things that later

 7    witnesses that worked at PPSA are going to testify to is that

 8    when they set up the EMR system, it was done as a template to

 9    make it look like a complicated examination each time even

10    though, as the jury's already heard, complicated exams were not

11    being done.  And what can be seen in Blue Cross/Blue Shield

12    data as well as other data coming in today is there's a marked

13    change from the five-year period that they were giving to us,

14    billing at 99213 and then suddenly billing at 99214.

15            THE COURT:  So --

16            MR. BODNAR:  It goes to the healthcare fraud.

17            MS. GRIFFIN:  (Indicating.)

18            THE COURT:  I understand -- do you want to talk to

19    him?

20            MS. GRIFFIN:  May I, please?

21            THE COURT:  Okay.

22        (A discussion was held off the record between counsel.)

23            MR. BODNAR:  It also goes to wire and mail fraud and

24    conspiracy.

25            THE COURT:  So that I understand, your inclusion of

2643

```
 1    2010 is for comparison purposes for this date where the change-
 2    over occurred?
 3           MR. BODNAR:  Correct.
 4           THE COURT:  All right.  I think it's relevant.
 5           MR. KNIZLEY:  Judge, I want to say that there are
 6    specific allegations as to healthcare fraud in the indictment
 7    and of the, I think, four specific allegations this is not one
 8    of them, and as for office visits, upcoding, if you will, so --
 9           THE COURT:  I think it's relevant to the
10    conspiracy.  So I overrule the objection.
11        (Government's Ex. 33-1 & 33-2 were entered into evidence.)
12        (In open court, defendants and jury present.)
13           THE COURT:  Let's take our morning break at this
14    time.  Ladies and gentlemen, leave your pads on your
15    chairs.  Take your break downstairs in the jury assembly room.
16    No discussion about the case.  And we will call you back up in
17    about 15 minutes.  We are in recess.  (Indicating.)
18        (A recess was taken at 10:33 a.m.)
19        (In open court, 10:55 a.m., defendants and jury present.)
20           THE COURT:  All right, Mr. Bodnar.
21    BY MR. BODNAR:
22    Q   Ms. McKenzie, before we broke, do you recall me showing you
23    two graphs created from data provided by Blue Cross and Blue
24    Shield of Alabama?
25    A   Yes, I do.
```

2644

1    Q    And were those graphs of the CPT codes 99213 and 99214?

2    A    Yes, they were.

3    Q    And which one did you say amongst those codes is the higher

4    reimbursed code?

5    A    The 99214.

6    Q    I'll now show you what's been admitted as United States

7    Exhibit 33-1.  And I'll zoom out.  Can you please first

8    identify which of the lines here is the 99213 code?

9    A    The blue line.

10   Q    And the 99214 code is which one?

11   A    Is the red line.

12   Q    And which doctor are we talking about here?

13   A    Dr. Ruan.

14   Q    And are these the years across the bottom?

15   A    Correct.

16   Q    Are these the number of times billed for those two codes?

17   A    Yes -- actually not billed, but paid.

18   Q    Paid for those codes?  And from 2000 to 2014, what's the

19   general trend of billing -- or claims paid for 99213 for

20   Dr. Ruan?

21   A    A decrease, a sharp decrease.

22   Q    And how about for 99214?

23   A    A corresponding increase.

24   Q    I'm going to show you now what's been admitted as

25   Government's Exhibit 33-2.  Is this a similar chart for

1   Dr. Couch?

2   A   It is.

3   Q   And again, are the lines the same, blue line being 99213

4   and red line being 99214?

5   A   Correct.

6   Q   From 2010 through 2014, what was the trend of 99213 as paid

7   for Dr. Couch visits?

8   A   It was almost stable till 2013, then a sharp drop.

9   Q   Then how about 99214?

10  A   Similarly, it was pretty stable until 2013, it drastically

11  increased.

12  Q   And, now, for either of these charts, Dr. Couch or

13  Dr. Ruan, do either of these codes, 99213 or 99214, say

14  anything about which or who was the person that actually

15  rendered this service?

16  A   No.  All we know is the claim was submitted under the NPI

17  of that provider.

18  Q   And the 99213 and 99214, do they just go to the level of

19  complexity of the visit?

20  A   There's three criteria, but complexity is one of them.

21  Q   And what are the other criteria?

22  A   Time and comorbid conditions, that kind of thing.  I don't

23  remember the exact wording.

24  Q   I'm sorry?  What was the last part?

25  A   I said I don't remember the exact wording that's in the

CINDY McKENZIE - DIRECT BY MR. BODNAR

2646

1   book.  It's defined very specifically in the CPT book.

2   Q   And to determine how much is reimbursed for an office

3   visit, along with the CPT code for the type of visit, do you

4   need the NPI number?

5   A   Yes, to know which fee amount to pay.

6   Q   I'm going to show you now what has been marked as

7   Government's Exhibit 27-24.

8           THE COURT:  Is this in evidence?

9           MR. BODNAR:  It is not yet.

10  Q   Ms. McKenzie, I'm showing you now what has been marked as

11  Government's Exhibit 27-24.  Are those the Blue Cross/Blue

12  Shield policies regarding billing under particular NPI numbers?

13  A   They are.

14  Q   And at some point in 2014 did the policy change slightly?

15  A   The policy actually -- we published the new policy in

16  October '14, but the effective date was January 1st of '15.

17  Q   And do those two documents in front of you, is that the

18  policy prior to 2014 and then the one going forward?

19  A   Correct.  The one in the back is the current one.

20          MR. BODNAR:  The United States moves to admit

21  Government's Exhibit 27-24.

22          THE COURT:  Any objection?

23          MR. ESSIG:  No objection.

24          MR. KNIZLEY:  No objection.

25          THE COURT:  All right.  Mark it in.

CINDY McKENZIE - DIRECT BY MR. BODNAR

1          (Government's Exhibit 27-24 was entered into evidence.)

2    BY MR. BODNAR:

3    Q   I will now show you what's been admitted as Government's

4    Exhibit 27-24.  Are these the Blue Cross/Blue Shield guidelines

5    you said were in place prior to 2014?

6    A   Prior to January of '15.

7    Q   Prior to January of '15?

8    A   Correct.

9    Q   And what is a physician extender?  Can you explain that to

10   the jury?

11   A   So that could be a nurse practitioner, registered nurse

12   practitioner, or a physician assistant.  So it's a different

13   level of professional licensure that sometimes works underneath

14   a physician, like in a collaborative agreement.

15   Q   And could you read, please, for the jury this third

16   paragraph here?  And I'll blow it up for you.

17   A   Blue Cross requires claims to be billed under the name and

18   national provider identifier (NPI) of the provider who actually

19   rendered the service and does not recognize incident-to

20   billing.  Under no circumstances should services performed

21   solely by a CRNP, CMN, PA, or PA/SA be billed under a

22   physician's name and NPI.  However, a physician may bill for

23   these services under his or her name and NPI if the physician

24   also sees and renders services to the patient, reviews the

25   notes of the physician extender, and concurs with the findings.

CINDY McKENZIE - DIRECT BY MR. BODNAR

 1  Q   And I see this says "and" here.  Does that mean everything
 2  needs to be done in that sentence, that it can be billed under
 3  the NPI of the physician if they see and render and review
 4  notes and they concur with the findings?
 5  A   Correct.
 6  Q   And what is a incident-to billing, that it says Blue
 7  Cross/Blue Shield does not recognize?
 8  A   That's a Medicare rule that Blue Cross Alabama doesn't
 9  follow.  And I don't remember exactly how it reads, but it
10  basically says the physician doesn't always have to be in the
11  room to bill under his number.
12  Q   And while that may be different for Medicare or a different
13  insurance company, is that allowed if you sign up to be a Blue
14  Cross/Blue Shield provider?
15  A   It's not.  It's actually specifically not allowed.
16  Q   And is that specifically in this guideline right here?
17  A   Correct.
18  Q   How would a doctor know that that's what Blue Cross and
19  Blue Shield requires?
20  A   This is part of our provider manual that's online and it's
21  actually public.  I mean, anybody can look at it.  But the
22  provider manual has a lot of guidelines for the doctor to
23  follow.
24  Q   And does the doctor have any duty to follow those
25  guidelines once they sign up as a provider with Blue Cross and

CINDY McKENZIE - DIRECT BY MR. BODNAR

1   Blue Shield?

2   A   Yes, they do.

3   Q   You had mentioned that starting in January of '15 this

4   physician extender guideline changed slightly?

5   A   It did.

6   Q   And is that what we see on the second page --

7   A   Correct.

8   Q   -- of 27-24?

9           And is this something else that a doctor could find

10  online?

11  A   Correct.  It's online right now.

12  Q   I'm going to ask you to read from this paragraph, please.

13  (Indicating.)

14  A   For evaluation and management services, Blue Cross requires

15  claims to be billed under the name and national provider

16  identifier (NPI) of the provider who physically evaluates the

17  patient to collect or confirm the patient's history of present

18  illness (HPI).  The provider who is physically conducting or

19  affirming the HPI and performing an in-person examination can

20  bill for the evaluation and management service.

21  Q   And could you read one more sentence, please?

22  A   This work -- this work is not relegated to ancillary staff.

23  Q   And finally, down here at the bottom, additionally?

24  A   Additionally, Blue Cross does not recognize incident-to

25  billing.  Under no circumstances should services performed

CINDY McKENZIE - DIRECT BY MR. BODNAR

1   solely by a CRNP, CNM, CRNA, PA, or PASA be billed under a

2   physician's name and NPI.

3   Q   So while the language is changed slightly, even after

4   January 2015 does Blue Cross and Blue Shield require billing to

5   be done under the person that actually renders the service or

6   sees the patient?

7   A   Yes; correct.  One thing, these are coverage guidelines.

8   So they actually apply whether you network with us or not.

9   Q   So that would cover -- this would be for anybody that wants

10  to submit a claim to Blue Cross and Blue Shield?

11  A   Correct, correct.

12  Q   And in this instance, Dr. Ruan and Dr. Couch, they are

13  providers in contract with Blue Cross and Blue Shield?

14  A   Right.  They are both in network -- or they were at the

15  time.

16  Q   They were at the time?  Does Blue Cross and Blue Shield

17  also gather data regarding payments for various types of

18  prescriptions?

19  A   Yes, we do.

20  Q   During the course -- or were you requested by the United

21  States to examine prescriptions paid for for both Subsys and

22  Abstral?

23  A   I was.

24  Q   And was Blue Cross and Blue Shield requested to compile a

25  list ranking the doctors and ranking the pharmacies in terms of

1    prescriptions written and prescriptions filled for those two

2    drugs?

3    A    Yes.

4    Q    I'm going to now show you what has been marked as

5    Government's Exhibit 27-1 through 27-5.

6         (A discussion was held off the record between counsel.)

7    BY MR. BODNAR:

8    Q    Showing you first what has been marked as Government's

9    Exhibit 27-5, do you recognize this as data provided by Blue

10   Cross and Blue Shield to the United States?

11   A    Yes.

12   Q    And what kind of data is it?

13   A    This is pharmacy data.

14   Q    And is it data specific to two particular drugs?

15   A    It is, Abstral and Subsys.

16   Q    And prior to your testimony here today, were you able to

17   check to see if the same or if the data on there was correctly

18   transcribed into the charts that are marked 27-1, 27-2, 27-3,

19   and 27-4?

20   A    I did.

21   Q    And is the information on 27-1 through 4 accurate as to the

22   information that was provided by Blue Cross/Blue Shield?

23   A    Yes.

24   Q    Does 27-1 through 27-4, though, only contain the names of

25   C&R Pharmacy and of the two defendant doctors in this case?

```
 1   A   Correct.
 2   Q   Whereas your original contained the name of all the doctors
 3   and all the pharmacists?
 4   A   Correct -- well, top 25.
 5   Q   Top 25.
 6           MR. BODNAR:  United States moves to admit Government's
 7   Exhibit 27-1, 27-2, 27-3, and 27-4.
 8           THE COURT:  Any objection?
 9           MR. ESSIG:  No objection, Your Honor.
10           THE COURT:  All right.  Mark them in.
11       (Government's Exhibits 27-1, 27-2, 27-3, and 27-4 were
12   entered into evidence.)
13   BY MR. BODNAR:
14   Q   Ms. McKenzie, showing you first what has been marked as
15   Government's Exhibit 27-1, can you please explain to the jury
16   what it is we're looking at here?
17   A   So these are the top 25 providers in the state of Alabama
18   that prescribed Subsys and the claims were filed to Blue
19   Cross/Blue Shield of Alabama and the dollars paid for those
20   prescriptions.
21   Q   And is it from the time period January 1st, 2011, through
22   May 20th of 2015?
23   A   Correct.
24   Q   And does this rank them within the state of Alabama in
25   order based on total amount paid by Blue Cross and Blue Shield?
```

CINDY McKENZIE - DIRECT BY MR. BODNAR

```
 1   A   Correct.

 2   Q   And is this total amount paid just for the drug Subsys?

 3   A   Correct.

 4   Q   Who is ranked number one in the state of Alabama for

 5   payments for Subsys?

 6   A   Dr. Ruan.

 7   Q   Can you read across line one what it says about Dr. Ruan?

 8   A   What it says -- he's in Mobile practicing, but he wrote 353

 9   prescriptions for Subsys to 179 different patients, and total

10   paid was 1.5 -- 1,518,369.32

11   Q   Who was the number-two prescriber of Subsys based on

12   payments made by -- sorry -- by Blue Cross/Blue Shield of

13   Alabama?

14   A   Dr. Couch.

15   Q   And how many prescriptions were reimbursed for Subsys from

16   Dr. Couch?

17   A   179.

18   Q   And for how many Blue Cross/Blue Shield patients?

19   A   55.

20   Q   And how much was paid out based on Dr. Couch's

21   prescriptions?

22   A   $1,444,036.41.

23   Q   Are both Dr. Ruan and Dr. Couch right around the $1.5

24   million mark?

25   A   Yes.
```

2654

1   Q   What is the number three highest paid individual?

2   A   402,000.

3   Q   Did you create a similar chart for top 25 prescribers of

4   Abstral for Blue Cross and Blue Shield of Alabama?

5   A   I did.

6   Q   I'm going to show you now what has been marked and admitted

7   as Government's Exhibit 27-22.  And is this that chart that was

8   created from the data that you provided?

9   A   It is.

10   Q   Why are there only seven people ranked here for the state

11   for Blue Cross and Blue Shield?

12   A   Because, based on our claims data, only seven providers

13   were prescribing this medication for our members.

14   Q   In the entire state of Alabama?

15   A   Uh-huh (nodding head affirmatively).

16   Q   Sorry.  To Blue Cross and Blue Shield of Alabama --

17   A   Correct.

18   Q   -- patients?

19         Who was the number-one prescriber in Alabama for Blue

20   Cross and Blue Shield for Abstral?

21   A   Dr. Ruan.

22   Q   How many prescriptions for Abstral did Dr. Ruan write for

23   Blue Cross/Blue Shield patients?

24   A   256.

25   Q   To how many different patients?

1    A    116.

2    Q    And what was the total paid by Blue Cross/Blue Shield?

3    A    898,807.

4    Q    And who was the number two ranked person for Blue

5    Cross/Blue Shield?

6    A    Dr. Couch.

7    Q    How many prescriptions did he write?

8    A    106.

9    Q    To how many patients from Blue Cross/Blue Shield?

10   A    33.

11   Q    And what was -- how much was reimbursed based on

12   Dr. Couch's prescriptions?

13   A    $724,481.14.

14   Q    Now, for the third highest person for Alabama Blue Cross

15   and Blue Shield, how many prescriptions were written?

16   A    Four.

17   Q    How many patients?

18   A    Two.

19   Q    And what was the total paid to the number three highest

20   person?

21   A    $6,028.

22   Q    Did you create similar data or did you obtain similar data

23   from Blue Cross and Blue Shield billing records with regard to

24   pharmacies -- or paid to pharmacies for Subsys and Abstral?

25   A    I did.

1  Q   I'll show you now what has been admitted as Government's

2  Exhibit 27-3.

3          THE COURT:  Dash 23?

4          MR. BODNAR:  Dash 3.

5          THE COURT:  Dash 3.  All right.

6  BY MR. BODNAR:

7  Q   All right.  Is this the top 25 chart that was created for

8  Subsys?

9  A   Correct.

10 Q   And like the doctor charts, is this ranked by the total

11 amount paid by Blue Cross and Blue Shield?

12 A   Correct.

13 Q   What pharmacy received the most reimbursement from Blue

14 Cross and Blue Shield of Alabama from January of '11 through

15 May 20th of 2015?

16 A   C&R Pharmacy.

17 Q   How many prescriptions were filled at C&R Pharmacy?

18 A   479.

19 Q   For how many patients?

20 A   205.

21 Q   And how much was reimbursed by Blue Cross/Blue Shield?

22 A   Over 2.8 million.

23 Q   And for the second highest pharmacy, how many prescriptions

24 were written?

25 A   21.

CINDY McKENZIE - DIRECT BY MR. BODNAR

2657

1   Q   For how many patients?

2   A   Two.

3   Q   For how much money?

4   A   451,000.

5   Q   Is there any other pharmacy that did over $1 million?

6   A   No.

7   Q   Any other pharmacy other than C&R that did over 2 million?

8   A   No.

9   Q   Did you create a similar document for Abstral?

10  A   I did.

11  Q   I show you now what has been admitted as Government's

12  Exhibit 27-4.  Is this the chart of pharmacy comparison for

13  Abstral?

14  A   It is.

15  Q   Why are there only 10 pharmacies listed here?

16  A   Because those are the only pharmacies that filed a claim

17  for Abstral to Blue Cross.

18  Q   And how many claims were filed by C&R Pharmacy -- well,

19  where does C&R Pharmacy rank on this list?

20  A   Number one.

21  Q   And how many prescriptions were done by C&R Pharmacy?

22  A   242.

23  Q   To how many patients?

24  A   110.

25  Q   How much was reimbursed?

2658

CINDY McKENZIE - DIRECT BY MR. BODNAR

1   A   1.185 million.

2   Q   What is the number two highest paid pharmacy or reimbursed

3   pharmacy for Abstral?

4   A   It's over 13,000.

5   Q   For these pharmacies that you compared, did this include

6   any type of pharmacy that prescribed Abstral and then billed to

7   Blue Cross and Blue Shield?

8   A   Any pharmacy in Alabama.

9   Q   For the prescribers does this list of the top 25 include

10  any type of doctor that prescribed Subsys to a patient that was

11  billed to Blue Cross and Blue Shield?

12  A   Yes, all specialties.

13  Q   So does that include all pain doctors in the state?

14  A   Yes.

15  Q   Does that include all cancer doctors in the state?

16  A   Yes.

17          MR. BODNAR:  One moment, Your Honor.

18          THE COURT:  All right.

19      (A discussion was held off the record between government

20  counsel.)

21  BY MR. BODNAR:

22  Q   One clarifying point.  I believe I said that C&R Pharmacy

23  prescribed.  Did C&R Pharmacy prescribe or did they just fill

24  prescriptions?

25  A   They just filled the prescription.

1          MR. BODNAR:  Nothing further from this witness, Your

2    Honor.

3          THE COURT:  Mr. Essig?

4          MR. ESSIG:  Yes, Your Honor.  Just a moment to gather

5    the exhibits.

6                        CROSS EXAMINATION

7    BY MR. ESSIG:

8    Q   Good morning, Ms. McKenzie.  How are you?

9    A   Good morning.

10   Q   My name is Brandon Essig, and I'm one of the attorneys that

11   represent Dr. Couch.  You and I have never met personally

12   before, but we have spoken on the phone before; is that

13   correct?

14   A   Yesterday.

15   Q   And, Ms. McKenzie, what I want to do, I'll start out with

16   tell us just so I'm clear what's your position at Blue

17   Cross/Blue Shield?

18   A   I'm the network integrity operation manager.

19   Q   Okay.  And I think you testified on direct that part of

20   your job responsibilities are to investigate instances of

21   fraud, waste, and abuse; is that correct?

22   A   Correct.  Well, I manage the staff that does that.

23   Q   Yes, ma'am.  Okay.  And when a practitioner, such as a

24   doctor like Dr. Couch or Dr. Ruan, when they go through the

25   process of Blue Cross/Blue Shield of being approved as a

1   provider, they sign contracts as part of that process; is that
2   correct?
3   A   They actually sign their application, and the contract's
4   part of that.
5   Q   I got it.  And then there are multiple policies that Blue
6   Cross/Blue Shield have that apply to those doctors once they
7   are approved to be a part of the Blue Cross network; is that
8   correct?
9   A   Correct.
10  Q   And one of the rights that Blue Cross/Blue Shield has is
11  the right to audit the doctors and their practice; is that
12  correct?
13  A   Correct.
14  Q   And I think we saw through the exhibits that were admitted
15  in this case that Dr. Couch has been a provider, a Blue
16  Cross/Blue Shield approved provider, since 1996; is that right?
17  A   I think that's what it said; correct.
18  Q   And the audit rights that Blue Cross/Blue Shield have,
19  those are basically blanket audit rights; is that right?
20  A   Correct.
21  Q   And y'all have the right to come in and audit either the
22  doctor or his practice at any point in time; is that correct?
23  A   Correct.
24  Q   Now, in this case you spent some time with Mr. Bodnar on
25  direct examination discussing the physician extender policy at

2661

1    Blue Cross/Blue Shield; is that right?

2    A   Yes.

3    Q   Is that correct?  I think one of the things you testified

4    to is that the extender policy at Blue Cross/Blue Shield, as it

5    stands today, is there's a fairly strict restriction on

6    allowing physicians to bill at all when a physician extender

7    renders the service; is that correct?

8    A   It depends on who performs the history of present illness.

9    Q   Yes, ma'am.  So it depends solely on who performs the

10   history of present illness; is that correct?

11   A   I'd have to have it back in front of me.  But that is

12   the -- that was the biggest difference, I think, in the two

13   guidelines.

14           MR. ESSIG:  Okay.  Your Honor, may I approach?

15           THE COURT:  Yes.

16   BY MR. ESSIG:

17   Q   Ms. McKenzie, I'm handing you the exhibit admitted by the

18   government.

19   A   Okay.

20   Q   Ma'am, what's the exhibit number you have in front of you

21   there?

22   A   27-24.

23   Q   All right.  And again, when you're looking at -- if you

24   would explain to the jury, please, what you're referring to for

25   the history of present illness?

1   A   Yes, the second page of what you handed me.  And it says

2   the provider who physically evaluates the patient to collect or

3   confirm the patient's history of present illness.

4   Q   Okay.  So the current and the present rule today is that

5   the practice can only bill for the services of the person that

6   does that particular thing, the history of present illness; is

7   that right?

8   A   Correct.  Previously it just said rendered the service.  So

9   it wasn't as clear.  And so the American Academy of Coding came

10  out with a clearer definition and we decided to adopt it for

11  clarity.

12  Q   Okay.  And so prior to that it was okay, regardless of who

13  did the history of present illness, but if the doctor came in

14  later on after a nurse practitioner and rendered some service

15  to the patient, that the practice or the doctor could bill

16  under the doctor's NPI code; is that correct?

17  A   If he came in and physically saw the patient and rendered

18  services, yes.

19  Q   And today that's no longer allowed under Blue Cross/Blue

20  Shield policy?

21  A   Correct, correct.

22  Q   And for clarity's sake, that new policy, the stricter

23  policy, didn't come into effect until January 1st of 2015; is

24  that right?

25  A   Correct.  We published it in October so people would have

 1    time to ask questions and review it.

 2    Q   Yes, ma'am.  And when you say publish it, can you describe

 3    how that's done, please?

 4    A   So most of the information for providers is available

 5    online, and so we put it on our website and providers know

 6    that's where most of the guidelines and rules are.

 7    Q   Okay.

 8    A   So they can access them there.  We also have a Listserv so

 9    that provider offices, when we publish something new, will get

10    an email or a message saying:  You need to go look, we just put

11    some new guidelines out there.

12    Q   And that would be somebody within that practice would get

13    notification?

14    A   Whoever the doctor designates.

15    Q   And Ms. McKenzie, I think you stated too that one of the

16    reasons for creating this new policy -- I think it actually

17    says it in the policy -- the purpose was to clarify the

18    physician extender issue or billing practice; is that right?

19    A   Correct.

20    Q   And because -- Is it fair to say that previously there was

21    some confusion among practitioners and their offices about what

22    the rule exactly was?

23    A   Well, it said rendered the service.

24    Q   Yes, ma'am.

25    A   We actually felt like it was pretty clear.  But just to

1   make sure nobody could misinterpret rendered, we clarified it

2   more.

3   Q   Because render could be a lot of different things; is that

4   right?

5   A   You would -- yes, but you would assume that -- and it's

6   very clear that it says physician has to see and render

7   services to the patient.

8   Q   Yes, ma'am.  And I --

9   A   That's in the old, that's in the old one.

10  Q   Yes, ma'am.  And I'm not arguing with that point.  I guess

11  the point, one of the things that makes it confusing is that

12  there's many different ways that someone can render services;

13  would that be fair to say?

14  A   I believe (nodding head affirmatively).

15  Q   Now, you mentioned too that when you publish these rule

16  changes or policy changes for Blue Cross/Blue Shield, that

17  there's some notification that goes to the practice; is that

18  correct?

19  A   Correct (nodding head affirmatively).

20  Q   And you're aware in the course of your work at Blue

21  Cross/Blue Shield that it is very, very common for a doctor's

22  office to have a staff specifically designated to handle

23  billing; is that correct?

24  A   Correct.

25  Q   And it's very often the case that it would be that staff,

1   that office staff or personnel, who would actually receive that

2   notification of a change; is that correct?

3   A    Maybe.

4   Q    And is it common or have you seen in your experience that

5   many doctors' offices have nowadays gone to electronic medical

6   records?

7   A    Correct.

8   Q    And as a matter of fact, the change of your policy that you

9   mentioned, the notification of that change, was all done to

10  your providers electronically; is that right?

11  A    They also presented in the town meetings across the state.

12  Q    Okay.  And you said the town meetings.  What are those?

13  A    Our provider reps, which is kind of like the Blue Cross

14  liaison between the provider doctors' offices and Blue Cross,

15  there are regions -- they are assigned by regions.  And so if a

16  physician's office has a question about something, they can

17  reach out to their rep and ask that question or submit that

18  call.  So those reps have town meetings -- I'm pretty sure they

19  are quarterly -- at different areas across the state.  All the

20  offices are invited and they go over any changes there as well.

21  Q    Yes, ma'am.  And you're aware that commonly in those

22  situations for those town meetings that those are attended very

23  often by the personnel at a doctor's practice that is

24  responsible for the billing?

25  A    Correct.

1   Q   And are you also aware that, again, in today's age with the

2   predominance or the prevalence of electronic medical records,

3   that many doctors' offices' billing systems are done

4   electronically; is that right?

5   A   Yes, we actually prefer it that way.

6   Q   Yes, ma'am.  And there's a lot of doctors' offices that

7   have people that do data entry to actually submit the claims

8   for the bills; is that correct?

9   A   I mean, it's possible.

10   Q   Yeah, you're aware that that's a common practice?

11   A   Yeah.  I mean, there's billing companies.

12   Q   Yes, ma'am.  And also too, so we understand, you said some

13   discussion -- there was some discussion on direct examination

14   and you mentioned a doctor's duty to follow -- if they are in

15   your provider network, they have a duty to follow and abide by

16   your policy updates and their contractual obligations; is that

17   right?

18   A   Correct.

19   Q   But that duty, that's a contractual duty based on their

20   contract with Blue Cross/Blue Shield; is that correct?

21   A   There are contractual obligations.  But there's also

22   coverage guidelines based -- that defines what we cover.

23   Q   Yes, ma'am.  And those are all unique to Blue Cross/Blue

24   Shield; is that right?

25   A   Correct.

1  Q   And I think, as you testified on direct, too, there's a lot

2  of insurance companies and different providers that have widely

3  different extender policies; is that correct?

4  A   I'm not familiar with other people's.  I'm sorry.

5  Q   Well, Ms. McKenzie, I know that.  I think you testified on

6  direct examination that you are aware that there are other

7  providers that allow for a physician to bill if he's present

8  when the nurse practitioner is rendering the service; is that

9  correct?

10 A   I know Medicare does.

11 Q   Yes, ma'am.  And that's my point.  And I know you can't

12 testify as to everybody.  And let me ask you this question too,

13 Ms. McKenzie:  The need for an extender policy, that is a need

14 because it's very common in the medical profession for a nurse

15 practitioner to render a significant portion of the medical

16 care; isn't that right?

17         MR. BODNAR:  Objection to foundation for this

18 question, Your Honor.

19         MR. ESSIG:  If she knows, Your Honor.

20         THE COURT:  If you can answer.

21         THE WITNESS:  Can you state the question again?

22 BY MR. ESSIG:

23 Q   Yes, ma'am.  The physician extender policy, what it's

24 designed to do is it's designed to create a Blue Cross/Blue

25 Shield contractual provision that lets the doctor know or the

```
 1   practice know when the practice can bill for services rendered
 2   by a nurse practitioner, services rendered by a doctor, or
 3   services rendered by a doctor and a nurse practitioner in
 4   collaboration; that's the purpose of this policy; is that
 5   right?
 6   A   It's a coverage policy.
 7   Q   Yes.  And one of the reasons that that coverage policy is
 8   necessary, if you know this, is because nurse practitioners
 9   nowadays are substantially involved in rendering care to
10   patients; is that correct?
11   A   They do have a role in rendering care.  Blue Cross actually
12   did not recognize nurse practitioners as a network until -- I
13   don't remember exactly -- five or 10 years ago.
14   Q   Yes, ma'am.  But it's been for a little while?
15   A   It's been for a little while.  But we still have some
16   groups that may carve out those services.
17   Q   And so the idea of a nurse practitioner having an NPI is
18   something that's relatively new, within the past five to 10
19   years?
20   A   Not that they would have an NPI, but that we would cover
21   their services.
22   Q   Yes, ma'am.  That y'all would cover them separately?
23   A   That we had a network specific for them.
24   Q   And the reason for that network and the purpose of that
25   network would be the recognition by Blue Cross/Blue Shield that
```

 1  modern healthcare recognizes that nurse practitioners render a

 2  significant amount of the care to the patient; is that correct?

 3          MR. BODNAR:  Objection to foundation again for this.

 4  This is way outside --

 5          THE COURT:  Sustained, sustained.

 6  BY MR. ESSIG:

 7  Q   Are you aware of the fact that nurse practitioners provide

 8  a substantial amount of the care to patients?

 9          MR. BODNAR:  Objection.  Same question and foundation,

10  Your Honor.

11          THE COURT:  Sustained.

12  BY MR. ESSIG:

13  Q   And, Ms. McKenzie, are you also aware -- again stating

14  about the Medicare physician extender policy -- you are aware

15  very often that a doctor's office, Blue Cross/Blue Shield is

16  not their only insurance company that they are dealing with; is

17  that correct?

18  A   I mean, I don't know specifically.  I know Blue Cross is

19  the major provider in this state.

20  Q   Yes, ma'am, the vast majority; is that fair to say?

21  A   Probably.

22  Q   But is it also fair to say that doctors' offices deal with

23  multiple different insurance companies and multiple different

24  contracts during the course of their care?

25  A   Most likely.

CINDY MCKENZIE - CROSS BY MR. ESSIG

1    Q    Now I want to ask you too, Ms. McKenzie, you were shown

2    these graphs here.  This is Government Exhibit 33-2?

3    A    Uh-huh (positive response).

4    Q    And these are the office visits billed to Blue Cross/Blue

5    Shield by Dr. Couch from -- well, let me just ask you, is it

6    from 2010 to 2014?  Is that right?

7    A    Correct.

8    Q    And is this going to take us all the way from January of

9    2010 to December 31st, 2014?  Do you know?

10   A    I'd have to look back at my other sheet.

11   Q    Okay.  I mean, that's not that important.

12   A    Okay.

13   Q    But we think it covers --

14   A    It's full years, if that's what you're asking.

15   Q    Yes.  Fiscal years for each one of those?

16   A    Calendar years.

17   Q    Calendar years?

18   A    Yes, January to December.

19   Q    Yes, ma'am.  Now, in this, as Mr. Bodnar asked you on

20   direct examination, the CPT codes that are billed here are

21   99213 and 99214; is that right?

22   A    Correct.

23   Q    And I think the graph makes it fairly obvious that

24   somewhere between 2013 and 2014 for Dr. Couch there was sort of

25   a marked change in which of these two codes were billed; is

1    that right?

2    A    Correct.

3    Q    And so we see somewhere in 2013 that there were a lot more

4    CPT codes entered into the system and a lot fewer -- or excuse

5    me -- a lot more CPT 99214 codes entered into the system and a

6    lot fewer 99213; is that correct?

7    A    Correct.

8    Q    But this data does not tell us and you can't testify, as

9    you sit here today, who in his practice made the decision to

10   change the way those CPT codes were billed?

11   A    No, I cannot.

12   Q    And, Ms. McKenzie,  you can't testify either who was

13   actually entering this information into the system?

14   A    No, I cannot.

15   Q    And you certainly know that in addition to Blue Cross/Blue

16   Shield rules and procedures and contractual obligations, that

17   individual practices very often have their own rules for how

18   they bill?

19          MR. BODNAR:  Objection to foundation on that question

20   as well, Your Honor.

21          THE COURT:  Sustained.

22   BY MR. ESSIG:

23   Q    Do you know if that's true or not, Ms. McKenzie?

24   A    I don't know.

25   Q    But we wouldn't know, sitting here today, who set the

1  policy that determined which of these codes would then be

2  billed on a particular visit, do we?

3  A   I just know we received claims under their NPI and issued

4  electronic funds back to these physicians based on those

5  submissions.

6  Q   Yes, ma'am.  And so we can't -- you can't testify here

7  today as to what might have been going on in this practice

8  which drove this change in the billing?

9  A   (Shaking head negatively.)

10 Q   I'm sorry?

11 A   I'm sorry.  I have no idea.

12 Q   Now, you were asked on direct examination also about the

13 submission of a bill to be paid under a physician's NPI when

14 the service is rendered by a nurse practitioner?  You were

15 asked --

16 A   Right.  We talked about it.

17 Q   And I think your response to one of the questions was that

18 if a doctor's office did that, submitted under their

19 physician's NPI and the nurse practitioner solely rendered

20 service, that that would be a false claim; is that correct?

21 A   Correct.  Because the NPI submission was not the provider

22 who rendered the service.

23 Q   Okay.  And it's a false claim based on the contractual

24 provision; is that correct?

25 A   It's a false claim regardless.  The doctor who provided the

1  service didn't -- I mean, didn't submit the claim under his

2  NPI.

3  Q   And it's a false claim by the person that's actually

4  submitting that claim to Blue Cross/Blue Shield; right?  The

5  person with knowledge of the billing system?

6  A   I -- I don't --

7       MR. BODNAR:  Objection to this line of questioning,

8  Your Honor.  No foundation.  It's also calling for speculation

9  of somebody else.

10      THE COURT:  I sustain the objection.

11      MR. ESSIG:  Your Honor, she testified on direct

12  examination that it's a false claim.  I'm just trying to dig

13  into that and demonstrate by whom.

14      THE COURT:  Well, her response didn't say anything

15  about who was responsible for the false claim.  She just said

16  it was a false claim.  And she has no knowledge of what was

17  going on in the practice, so let's move on.

18  BY MR. ESSIG:

19  Q   The false claim would be on the part of the person that had

20  knowledge of how the service was rendered and submitted the

21  claim?

22      MR. BODNAR:  Objection, Your Honor.

23      THE COURT:  Sustained.

24  BY MR. ESSIG:

25  Q   Now, let me ask you this, Ms. McKenzie, you stated before

 1  during your testimony in my questioning that it's very common

 2  or you're aware of doctors' offices having staff and computer

 3  programs that are responsible for billing and handling this NPI

 4  issue; is that correct?

 5  A   Yes.

 6  Q   And isn't it also true that it's very common in your

 7  experience that doctors are not specifically aware of how their

 8  billing is done and what their contractural provisions are --

 9  obligations are?

10          MR. BODNAR:  Objection to foundation of how she knows

11  what other doctors do.

12          THE COURT:  Sustained, sustained.

13  BY MR. ESSIG:

14  Q   Do you know that to be the case?

15          MR. BODNAR:  That's the same question, Your Honor.

16          THE COURT:  I sustain the objection.

17  BY MR. ESSIG:

18  Q   Now, Ms. McKenzie, as part of the responsibility for your

19  unit to Blue Cross/Blue Shield, we've already stated that you

20  supervise people who are involved in investigating fraud,

21  waste, and abuse; is that correct?

22  A   Correct, correct.

23  Q   Now, in the course of your investigations, you don't make

24  decisions at Blue Cross/Blue Shield within your unit based

25  solely on statistics and numbers, do you?

1    A   We make decisions on what to do next sometimes based on

2    that.

3    Q   Right.  But in terms of your final analysis when you're

4    looking at numbers provided by a doctor or a pharmacy or a

5    practice, it's important to note how they can compare to other

6    similar practices or other similar pharmacies; is that true?

7    A   That is one of the elements we'll look at --

8    Q   Yes, ma'am?

9    A   -- is peer comparison.

10   Q   Now, I want to show you some of the information that the

11   government showed you.  This is Government's Exhibit 27-1.  And

12   these are the Subsys prescriptions that you were shown before;

13   is that correct?

14   A   Correct.

15   Q   And it shows that Dr. Ruan and Dr. Couch, that they ranked

16   number one and two from 2011 to 2015 in Subsys prescriptions;

17   is that right?

18   A   Correct.

19   Q   Now, you testified on direct that you're Blue Cross/Blue

20   Shield of Alabama?

21   A   That's where I'm employed.

22   Q   Yes, ma'am.  And you didn't run these numbers to compare

23   them to the top prescribers in any other states, did you?

24   A   We ran it against the national data and we eliminated those

25   to make it down to just Alabama.

CINDY MCKENZIE - CROSS BY MR. ESSIG

1  Q   Okay.  So those are actually eliminated from -- from this
2  exhibit?
3  A   Yes.
4  Q   Is that also true with these other exhibits as well?
5  A   Yes.
6  Q   Now, as a part of your creation of some of these statistics
7  and charts, was there any analysis done for this chart of where
8  Dr. Ruan and Dr. Couch ranked compared to other similar pain
9  management practices in other states?
10  A   They were number one and two.
11  Q   These include everybody, not just pain management doctors;
12  is that right?
13  A   They do.  It's all specialties.
14  Q   And again, this chart does not show us how they compare to
15  such practitioners nationwide, does it?
16  A   No, it does not.
17  Q   And the same thing for the pharmacy comparison,
18  Ms. McKenzie, same question there:  This ranks them related
19  only to other pharmacies in the state of Alabama?
20  A   Correct.
21  Q   And this does not tell us how they rank related to other
22  pharmacies that are colocated with a pain management practice?
23  A   No, it does not.
24  Q   And we don't know how they would compare to other
25  pharmacies colocated with a pain management practice, would we?

CINDY McKENZIE - CROSS BY MR. ESSIG

1   A   I don't know.

2   Q   And we certainly wouldn't know how they would rank compared

3   to other pharmacies colocated with pain management practices

4   nationwide?

5   A   I don't know.

6   Q   And again, as part of these numbers and these charts that

7   were created, did you do any analysis to determine what the

8   total patient population was for Dr. Ruan, Dr. Couch, or their

9   clinic?

10  A   We looked at that.  I don't remember the numbers.  I'm

11  sorry.

12  Q   And you certainly can't testify as to how their total

13  number of patients would have compared to the total number of

14  patients for the doctors or practices ranked lower on the list?

15  A   No, I don't know that.

16  Q   And certainly, again, not to the total patient population

17  for doctors, pain management doctors, in other states?

18  A   I don't have that information.

19          MR. ESSIG:  Just a moment, Your Honor.

20      (A discussion was held off the record between defense

21  counsel.)

22  BY MR. ESSIG:

23  Q   Now, Ms. McKenzie, just so we're clear too, your unit when

24  you conduct the investigations that you do, you don't just

25  investigate the doctors?  You sometimes investigate the

1    practices themselves and also physician extenders?

2    A   We have contracts with individual providers.  We don't

3    contract with practices.

4    Q   Yes, ma'am?

5    A   So we may initially look at one provider and then realize

6    that several other people in the same practice are doing

7    something similarly and expand it.  But we don't investigate a

8    practice per se.

9    Q   Yes, you would investigate individuals within the practice?

10   A   Correct.

11   Q   And sometimes your investigations are of doctors, sometimes

12   they are of nurse practitioners?

13   A   Any kind of provider.

14   Q   And can it also be an investigation of the person

15   responsible for doing the billing?

16   A   The person responsible for doing the billing is working up

17   under the provider's direction.  So our contract's with the

18   physician or the nurse practitioner, so they are ultimately

19   responsible for what gets submitted under their number.

20   Q   Yes, ma'am?

21   A   So we've not investigated a billing person.

22   Q   And sometimes your investigations conclude that it's the

23   fault of a nurse practitioner rather than a doctor?

24           MR. BODNAR:  Objection to this line of questioning --

25           THE COURT:  Sustained.

1       MR. BODNAR:  -- in terms of relevance.

2       THE COURT:  Sustained.

3       MR. ESSIG:  No further questions.

4       THE COURT:  Mr. Knizley?

5                         CROSS EXAMINATION

6  BY MR. KNIZLEY:

7  Q   Good morning, Ms. McKenzie.

8  A   Good morning.

9  Q   How are you?

10 A   Good.

11 Q   Ms. McKenzie, I represent Dr. Ruan.  I want to follow up on

12 a couple of questions by Mr. Essig.  He showed you what was

13 marked as Government's Exhibit 32-2 regarding the line graph in

14 association with office visits billed to Blue Cross/Blue Shield

15 by Dr. Couch?

16 A   Correct.

17 Q   Do you remember that?  And there was a similar line graph,

18 Government's Exhibit 32-1, on office visits billed by Dr. Ruan

19 to Blue Cross/Blue Shield on two specific codes; is that

20 correct?

21 A   Correct.

22 Q   And that was 99213 and 99214?

23 A   Correct.

24 Q   And without repeating the questions that Mr. Essig asked

25 you, you don't know what may have transpired in the office that

1   caused this change in billing pattern; is that correct?

2   A   No.

3   Q   And all you can tell us today is there appears from your

4   research there was a change in the billing pattern?

5   A   Correct.

6   Q   Now, asking you again about 99213 and 99214, I think you

7   told us that starting at, I think, 11, 12, 13, 14, 15, that

8   sort of goes from the least complex to the most complex of

9   office visits?

10  A   Correct.

11  Q   And was I correct that you said that on 99213, which is one

12  of these, which is the blue one here, that you said that might

13  be analogous to a sore throat at an urgent care; is that a fair

14  analogy?

15  A   I was just making that up, but yeah.

16  Q   Sure, sure.  But just so the jury has some perspective

17  about it -- and it could be many, many, many other things;

18  right?

19  A   It's usually simple, direct, one body system kind of thing.

20  Q   And that would be 13; right?

21  A   Usually.  It could actually be a 12.

22  Q   Okay.  It could be a 12, could be a 13; is that fair or

23  not?

24  A   It just depends on -- it just depends on the circumstances

25  of that visit.

2681

 1   Q   And it's not always clear what the circumstances are, I
 2   would assume?
 3   A   It's clear in the CPT book.
 4   Q   Right?
 5   A   It's a whole page dedicated to what are the requirements
 6   for each level.
 7   Q   And 99214, the other line on here, I think you used as an
 8   example going to the doctor for ear pain or fever; is that a
 9   fair example or not?
10   A   Again, yeah.  But it was just made up.
11   Q   It could be many, many other things?
12   A   It could be a variety of things.
13   Q   But that might reasonably fall into that category?
14   A   It might.
15   Q   And 15 would be a little more complex that 14?
16   A   15 is the most complex.
17   Q   All right.
18   A   It's also usually 45 to 60 minutes face to face.
19   Q   Okay.  And they have a function of time as one of the
20   factors; is that right?
21   A   It's one of the factors, but it doesn't have to be the
22   deciding factor.
23   Q   And it could be you might spend more time and not be able
24   to bill at 15 and less time and be able to bill at 15?
25   A   Right.

CINDY MCKENZIE - CROSS BY MR. KNIZLEY

1  Q   Depending on all the factors that's in the CPT code?

2  A   Right.

3  Q   Okay.  And Mr. Essig asked you about electronic billing and

4  you said you were familiar with it.  And that's an advent in

5  the practice of medicine that's came about in the last several

6  years; is that right?

7  A   We've been receiving electronic claims more then 10-15

8  years.

9  Q   And that's electronic billing.  But then electronic medical

10  records is a little different; is that right?

11  A   Oh, yes, it is.  That's different.

12  Q   I said billing.  I meant medical records.

13  A   Yes, electronic medical records has come around, partially

14  because of the President pushing everybody to go paperless.

15  Q   Okay.  And we'll say the old days -- five, six, seven years

16  ago -- you saw a lot of doctor entries in handwriting; is that

17  right?

18  A   Correct.

19  Q   They may have a history of a patient in handwriting or a

20  procedure done in handwriting.  But when we moved to this

21  electronic medical records, it's generally computer generated

22  or computer printed out at least; is that right?

23  A   Correct.

24  Q   And, of course, someone has to put the information into the

25  computer to make it look like that; right?

1   A   Correct.

2   Q   And has there now been some programs, computer programs,

3   that not only have your electronic recordkeeping but also

4   generate the billing codes from time to time?

5   A   There are some programs that will suggest levels of visit

6   coding.

7   Q   And so when the -- whoever the enterer or the person is

8   that's entering what happened and in the old days would have

9   written down, what happens there are some programs that now

10  generate what a suggested CPT code may be; right?

11  A   There are.  And there's been quite a few articles recently

12  about how that is not a good thing, because the provider's

13  responsible for what's documented in the record, whether they

14  have a scribe that enters it or not.  Because when the patient

15  comes back in, they need to know that what was submitted that

16  first time was accurate; right; so they can treat the patient

17  appropriately the next time.

18  Q   Electronic recordkeeping has caused some problems in

19  billing; is that right?

20  A   Doing what?  I'm sorry.

21  Q   Electronic recordkeeping, electronic medical records, has

22  caused some problems with billing; is that correct?

23  A   I think it just requires the physician to be more diligent

24  in their oversight of what gets in there.

25  Q   And are you familiar with the Greenway billing system,

1    medical records system, by any chance?

2    A   I'm not.  I'm sorry.

3    Q   And I want to take you to a couple of the charts.  And I'm

4    going to show you what's marked as Government's 27-1 and that,

5    if you recall, was a Blue Cross/Blue Shield of Alabama

6    prescriber comparison on Subsys?

7    A   Correct.

8    Q   Is that right?  And prescriber, we're talking about the

9    doctor?

10   A   Right.  The one who wrote the prescription.

11   Q   The other one we looked at was pharmacies, but this is

12   about doctors; right?

13   A   Right.

14   Q   And this is only about the medication on the Subsys?

15   A   Correct.

16   Q   And through a certain time frame?

17   A   Uh-huh (positive response).

18   Q   And we see where Dr. Ruan and Dr. Couch ranked as far as

19   prescribing comparison; is that right?

20   A   Correct.

21   Q   And over here on the side here we have Dr. Ruan's name and

22   Dr. Couch's name and it says total paid.  Now, none of this was

23   paid to them, was it?

24   A   No.  That's paid per dose prescriptions that they wrote.

25   Q   Okay.  So this is paid to the pharmacy that filled --

CINDY McKENZIE - CROSS BY MR. KNIZLEY

2685

1   A   Paid to the pharmacy who filled it.

2   Q   So this total paid doesn't go with this name over here

3   (indicating)?  This would actually be what was paid to a

4   pharmacy?

5   A   This is the total dollar paid as a result of them writing

6   those prescriptions for Subsys.

7   Q   Not to the doctor?

8   A   Not to the doctor.

9   Q   Okay.  Now, and I'm going to ask you a few things about

10  this document.

11          We see here the total amount paid per the prescription

12  and then we see this is the total number of Blue Cross/Blue

13  Shield patients of Dr. Ruan that received this Subsys over

14  about four -- a little less than a four-and-a-half-year period?

15  A   Correct.

16  Q   Is that right?

17  A   Correct.

18  Q   And a little arithmetic on that, if we divided, let's say,

19  4.4 into that number, we could determine about how many Blue

20  Cross/Blue Shield patients per year were prescribed this; is

21  that right?

22  A   Not necessarily.  I mean, it could --

23  Q   For Dr. Ruan, I'm talking about.

24  A   But he could have written half of those in one year.  I

25  don't know that.

CINDY McKENZIE - CROSS BY MR. KNIZLEY

1   Q   On average?  I'm sorry.  On average?

2   A   I haven't done the math.  But whatever you say.

3   Q   Okay.  All right.  Well, let's say we can also look at this

4   right here, could we not, and determine, you know, the total

5   amount paid for prescriptions of Dr. Ruan.  And if you look

6   down here at some of these, other people have very, very few

7   patients compared to Dr. Ruan?  Would that be a fair assessment

8   of this chart?

9   A   This is not his total Blue Cross patients.  This is his

10  total Blue Cross patients that he gave a prescription for

11  Subsys and they filed a claim and Blue Cross paid it.

12  Q   And I'm not suggesting otherwise --

13  A   Okay, okay.

14  Q   -- at all.

15  A   Okay.

16  Q   This is to make clear that 179 equals the number of

17  patients over that time frame which he prescribed Subsys and

18  Blue Cross paid for that Subsys?

19  A   Correct.

20  Q   And that's all that's suggesting right there?

21  A   That's what it says.

22  Q   If you look at some of the other subscribers, there's  a

23  very, very small amount, small number, single digits for

24  actually most of rest of them; right?

25  A   Right.  They were not prescribing Subsys very much.

1   Q   So if we wanted to get a little more information from this
2   chart, we could maybe find out how much per patient was paid on
3   Dr. Ruan's, couldn't we, if we divided those two numbers?
4   A   You could.
5   Q   And if we wanted to know per prescription, we could find
6   that out too; right?  By just simply dividing the prescriptions
7   into the total paid?
8   A   Yeah.  That's just a generality, though, because it could
9   be 10 patients that got a hundred scripts.
10  Q   Sure.
11  A   I mean, I can't tell that.
12  Q   It's math; right?
13  A   Yes.
14  Q   And, of course, we could do the rest with the people down
15  below as well?  In other words, like this could be 10 patients
16  for this doctor, okay?
17  A   Uh-huh (positive response).
18  Q   If it's 10 patients, the total paid was about $40,000 a
19  patient, it looks like; right?
20          MR. BODNAR:  Objection to relevance, Your Honor.  This
21  is all speculative of averages that aren't -- this isn't what
22  the chart's supposed to be.
23          THE COURT:  Sustained.  I mean --
24          MR. KNIZLEY:  Ma'am?  I mean it's there in the chart
25  and we're just evaluating the data in the chart that's been

2688

1  submitted in evidence.

2       THE COURT:  But the relevance to what you want her to

3  evaluate hasn't been demonstrated.  So let's move along.

4       MR. KNIZLEY:  I don't want to violate the Court's

5  order.  But I'd like to illustrate something from the chart to

6  the witness, if I might.

7       THE COURT:  All right.

8       MR. KNIZLEY:  If I could just ask the questions and

9  entertain the objection as it comes.

10 Q   All right.  This is not for -- this is for visual aid

11 purposes only.  But I ask you -- and you told us already that

12 if we wanted to find out how much was paid per patient, we

13 could just divide these numbers; right?

14      MR. BODNAR:  Objection to relevance, Your Honor.

15 That's not how we would find out how much was paid.  That

16 evidence of how much was paid is already in evidence as the C&R

17 data.

18      MR. KNIZLEY:  Judge, this is --

19      THE COURT:  It would be an average.  It wouldn't be

20 how much was paid per patient.  But I don't understand the

21 relevance.  So let's come to side bar --

22      MR. KNIZLEY:  Judge, I think she could recite --

23      THE COURT:  -- let's come to side bar, if you want to

24 discuss this, please.

25      (At the side bar, jury not present.)

```
 1              MR. KNIZLEY:  Judge, what we're trying to show is they
 2    presented a chart that said that my client is the top
 3    prescriber of Subsys in the state of Alabama.  The chart also
 4    contains information that could tell us how much -- very simply
 5    by an arithmetic division, which I have done and will be happy
 6    to show to the witness -- how much per patient was paid and how
 7    much per prescription on average and -- on average -- and how
 8    much per prescription was paid.
 9              THE COURT:  What's the relevance of that?
10              MR. KNIZLEY:  Well, if it's relevant --
11              THE COURT:  I mean, we've got the actual numbers in
12    evidence.  So what is the relevance of tearing this chart
13    apart?
14              MR. KNIZLEY:  I'm not tearing the chart apart at all.
15    I agree with the chart.  I think the chart's great.
16              THE COURT:  What is the relevance?
17              MR. KNIZLEY:  The relevance is the same relevance that
18    if he is the top prescriber, the same relevance is that he is
19    not a top prescriber of per patient and per prescription.  If
20    that's relevant, certainly per patient and prescription's just
21    as relevant.  And the same is going to go --
22              THE COURT:  I'm not understanding what you're saying.
23              MR. KNIZLEY:  Okay.  Judge, apparently the government
24    has submitted that it is relevant that Dr. Ruan prescribed more
25    Subsys than anybody in the state.  Okay?
```

2690

1          THE COURT:  No.  This shows that Blue Cross/Blue

2     Shield paid for more Subsys.

3          MR. KNIZLEY:  Excuse me.  That Blue Cross and Blue

4     Shield paid for more Subsys from Dr. Ruan than anybody in the

5     state.  I want to show that per patient that's not true and per

6     prescription that's not true and that many other physicians per

7     patient and per prescription --

8          THE COURT:  I don't think you can say that because

9     you're talking about the difference between specifics and

10    averages.  And so --

11         MR. KNIZLEY:  On average.  Still --

12         THE COURT:  Well, average means nothing.  So let's --

13         MR. KNIZLEY:  I respectfully disagree.

14         THE COURT:  I don't think this is relevant.  So let's

15    move on.  Especially since we have the actual numbers in

16    evidence.

17         MR. KNIZLEY:  And, Judge --

18         THE COURT:  So I say no more cross-examination along

19    that line.

20         MR. KNIZLEY:  If I might, then, Judge, I think that

21    limits the defendant's right to a thorough and sifting cross-

22    examination of this witness.

23         THE COURT:  This woman is just reporting numbers.

24         MR. KNIZLEY:  And I want to illustrate, as they have

25    illustrated numbers, where the ranking would be if she just did

CINDY McKENZIE - CROSS BY MR. KNIZLEY

2691

```
 1   a simple division, which I've done for her on each of these
 2   for --
 3          THE COURT:  What you're wanting, the ranking, is an
 4   average.  That doesn't mean anything, so let's move along.
 5          MR. BODNAR:  One thing for the record, Your Honor,
 6   too, I don't know if Mr. Knizley did, but I know Dr. Couch did
 7   subpoena the same witness.  They could have --
 8          THE COURT:  Mr. Essig?
 9          MR. BODNAR:  Mr. Essig or someone from Dr. Couch
10   subpoenaed the same witness.  If this is what they want, they
11   want a chart showing something different, they could ask this
12   witness.
13          MR. KNIZLEY:  I'll bring the witness back in our case
14   then.
15          THE COURT:  Well, you'd better ask her to prepare such
16   a chart.
17          MR. KNIZLEY:  Sure.
18          THE COURT:  To me that makes no -- the relevance
19   hasn't been shown.  Let's move along.
20          MR. KNIZLEY:  I respect the Court's ruling.  Yes,
21   ma'am.
22       (In open court, defendants and jury present.)
23   BY MR. KNIZLEY:
24   Q   I draw your attention again to Government Exhibit
25   27-1.  And within this chart you've got information about not
```

CINDY McKENZIE - CROSS BY MR. KNIZLEY

1   only the total amount paid, but about how many patients there

2   were that got prescriptions from Blue Cross/Blue Shield that

3   were paid these amounts of money; is that right?

4   A   Correct.

5   Q   And you've got how many prescriptions themselves; is that

6   right?

7   A   Correct.

8   Q   And we see, don't we, for instance, this one patient ranked

9   number nine here, with the doctor number nine, one patient was

10  paid -- filled how many prescriptions?

11  A   45,000.

12  Q   Okay.

13  A   But remember, now, this is Subsys for all different

14  strengths.  So different strengths pay different amounts.

15  Q   Sure.

16  A   So if that one patient was getting the highest strength,

17  that would cost more than patients who were getting a lower

18  strength.

19  Q   Sure.  And that was out of five prescriptions total; right?

20  A   Correct.

21  Q   Likewise, these people, whatever doctor this was, had two

22  patients; right?

23  A   Right.

24  Q   Wrote four prescriptions total?

25  A   Correct.

1  Q   And of the two patients, the pharmacy -- the Blue

2  Cross/Blue Shield paid the pharmacy this much money; right?

3  (Indicating.)

4  A   Correct.  One aspect, this is over a span of several years.

5  So what that prescription paid per our formulary may have

6  changed in the years.  So if most of these claims came through

7  when the formulary was paying higher, then that would also add

8  to why it looks a little different for some.

9  Q   That also applies to Dr. Ruan and Dr. Couch as well; right?

10  A   Right.  It applies across the board.

11  Q   Look down here.  Here's one patient, two prescriptions,

12  paid $33,000?  (Indicating.)

13  A   Right.

14  Q   One patient, three prescriptions, how much is that?

15  A   25,000.

16  Q   One patient, two prescriptions?

17  A   Right.  You just can't tell the strength or what year it

18  was.  So you don't know if the formulary was paying it at a

19  hundred dollars or if it was paying it at $400.

20  Q   So if we had more information on this chart, it could help

21  the jury a little bit more?

22       MR. BODNAR:  Your Honor, objection, to the argument

23  that the chart --

24       THE COURT:  Sustained.

25  BY MR. KNIZLEY:

CINDY McKENZIE - CROSS BY MR. KNIZLEY

1  Q   Let me show you what's marked as Government Exhibit 27.3.

2  Do you see that?

3  A   Yes.

4  Q   And so we understand what this is, this is the total Blue

5  Cross/Blue Shield payments for this medication --

6  A   Correct.

7  Q   -- to all pharmacies in Alabama --

8  A   Correct.

9  Q   -- over this time frame?

10 A   Correct.

11 Q   And we have similar analysis we can make here; right?

12 A   Correct.

13 Q   Because we know how many patients there were and how much

14 money was paid to the pharmacy.  And by the way, this 2.8 to

15 C&R --

16 A   Yes, sir?

17 Q   -- okay -- that's not in addition to this money here; is

18 that correct?  It has nothing to do with it; right?

19 A   These are exclusive.

20 Q   Right.  They are two different things?

21 A   Well, with those totals, if you added up Ruan and Couch's

22 prescriptions -- and I haven't done that -- it probably equals

23 a little more than that for C&R because some patients took

24 their scripts somewhere else maybe.

25 Q   I believe you're exactly right about that.  If you just

CINDY McKENZIE - CROSS BY MR. KNIZLEY

1  take a quick look at it, that's about 2.9 and that's 2.8?

2  A   Right.

3  Q   So some of these patients went to some other pharmacy;

4  right?

5  A   Right.  They may have been out of town or something.

6  Q   Back to 27.3, now, we see how many patients went and got

7  this much money filled over that time frame; right?

8  A   Correct.

9  Q   Okay.  And then the second one here, two patients filled

10 $451,000; right?

11 A   For 21 scripts.  And I guess what I'm saying, those could

12 have been Couch and Ruan's patients because they are in

13 Mobile.  I don't know.

14 Q   Could have been.  Two patients, paid $89,000 for five

15 prescriptions; is that right?

16 A   That's what -- yes, sir.

17 Q   What city was that?

18 A   That's in Birmingham.

19 Q   Okay.  One patient, paid how much?  (Indicating.)

20 A   33,000.

21 Q   How many scripts?

22 A   Two.

23 Q   What city?

24 A   Montgomery.

25 Q   One patient?  (Indicating.)

2696

CINDY McKENZIE - CROSS BY MR. KNIZLEY

1    A    Paid 25,000.

2    Q    How many scripts?  (Indicating.)

3    A    Three.  Alabaster.

4    Q    Where is Alabaster?

5    A    Just outside of Birmingham.

6    Q    And the jury can look at this and see this analysis, can

7    they not?

8    A    Uh-huh (nodding head affirmatively).

9    Q    And on the Blue Cross/Blue Shield prescribers for Abstral

10   over this same period -- and, again, so we're clear, that's

11   Blue Cross/Blue Shield paid for particular prescribers' filled

12   prescriptions for Abstral; right?

13   A    Correct.

14   Q    And if you look here, it just didn't look like very many --

15   well, obviously there's only five other pharmacies all over the

16   state ever prescribed -- ever filled -- excuse me --

17   prescribers of the state ever wrote them; is that right?

18   A    Yeah.  I actually looked up these providers.  The one in

19   Montgomery hasn't been practicing since 2012.

20   Q    Okay.

21   A    The other four are all oncologists or radiation

22   oncologists.

23   Q    Okay.  Thank you.  Also on the pharmacy comparison here,

24   Government Exhibit 27.3, we see these figures.  And this is

25   applicable to all of them.  And that is the amount of money

1  that Blue Cross/Blue Shield reimbursed for the cost of the
2  medication, retail cost; is that right?
3  A   That's the amount we paid based on the claims submissions
4  by C&R Pharmacy.
5  Q   And this figure doesn't take into consideration the actual
6  costs to the pharmacy of the medication; is that right?
7  A   No.  That's just the payment amount based off a formulary.
8  Q   Or the overhead or anything else of the pharmacy, payroll
9  or anything like that?
10 A   No.  That's strictly what Blue Cross reimburses for that
11 drug, depending on which strength it was.
12 Q   And that would hold true for the Abstral --
13 A   Correct.
14 Q   -- pharmacies as well?
15         Now, Blue Cross/Blue Shield does not have contracts
16 with all pharmacies in the state of Alabama, do they?
17 A   No.  I mean, I don't specifically know which ones, but we
18 have a network of pharmacies.
19 Q   And so you can't go to just -- if you have Blue Cross/Blue
20 Shield insurance and you want your prescription filled, there
21 is a specific list of pharmacies you can go to; is that right?
22 A   It's -- it's almost every pharmacy, I think.  I don't know
23 of any that aren't.  I'm sure there are, because we have
24 terminated some for bad practices.  But that's available on the
25 website where you can search that.

CINDY McKENZIE - REDIRECT BY MR. BODNAR

1            MR. KNIZLEY:  Thank you.

2            THE COURT:  How much redirect do you have?

3            MR. BODNAR:  Probably less than five minutes, Your

4    Honor.

5            THE COURT:  All right.  Let's go ahead.

6                        REDIRECT EXAMINATION

7    BY MR. BODNAR:

8    Q   Ms. McKenzie, do you recall Mr. Knizley talking with you

9    about the Abstral prescriber chart?

10   A   Yes.

11   Q   Government's Exhibit 27-2?

12   A   Yes.

13   Q   Did you say that you had looked up to see who these other

14   nonnamed doctors are ranking three through seven?

15   A   I did.

16   Q   And what specialty were they in?

17   A   The first two are oncologists in Huntsville, at the big

18   cancer center in Huntsville.

19   Q   Does an oncologist mean a doctor that treats cancer?

20   A   Yes, cancer.  It's a medical cancer doctor.

21   Q   And is that what you also said about number five and number

22   seven?

23   A   Those are radiation oncologists.  They do radiation therapy

24   for cancer.

25   Q   And any doctor that would have been billed out -- there

2699

1   weren't any doctors that billed for Abstral or Subsys that were

2   excluded on -- well, for this one for Abstral -- that were

3   excluded from this list, were there?

4   A   No, this is all Alabama doctors.

5   Q   So if any pain doctor was prescribing it, they are on that

6   list?

7              MR. KNIZLEY:  Objection to leading.

8   BY MR. BODNAR:

9   Q   If there were any pain doctors in the state that were

10  prescribing this drug, are they on this list?

11  A   Yes.

12  Q   Is that the same thing for an oncologist?

13             MR. KNIZLEY:  Objection.  Leading.

14             THE COURT:  Overruled.

15  BY MR. BODNAR:

16  Q   Is that the same thing for an oncologist?

17  A   Its's all, all physicians.

18  Q   Does that work the same way with the Subsys prescriber

19  charts?

20  A   It does.

21  Q   And is that all physicians?  Does it take into account --

22  is this all physicians, regardless of how many patients they

23  have?

24  A   Yes.

25             MR. KNIZLEY:  Your Honor, I object to the form of the

1   question, based on the witness' testimony that's not all

2   physicians --

3   BY MR. BODNAR:

4   Q   Is this the top 25?

5          MR. KNIZLEY:  -- for Blue Cross and Blue

6   Shield.  Object to the form of the question.

7          THE COURT:  Well, the name of the chart is Blue Cross

8   and Blue Shield Prescribers Comparison.  So that's all we're

9   talking about, isn't it?

10          MR. BODNAR:  Yes.

11   Q   To clarify for the record, is this the top 25 that Blue

12   Cross/Blue Shield has paid out for all different types of

13   physicians?

14   A   Yes.

15   Q   On the pharmacy chart, if you will look at 27-4, do you

16   know who owns C&R Pharmacy?

17   A   I understand Couch and Ruan.

18   Q   Do you remember being asked questions about electronic

19   medical records and billing of codes?

20   A   I do.

21   Q   Does a -- does a staff member -- well, does a clinic like

22   PPSA, do they have a contract with Blue Cross/Blue Shield?

23   A   They do not.

24   Q   Who has the contract with Blue Cross/Blue Shield?

25   A   The physicians, Dr. Couch and Ruan.

1   Q   As individuals?

2   A   As individuals.

3   Q   Whose responsibility is it to make sure that billing is

4   done accurately?

5   A   It's the physician's.

6   Q   And who ultimately gets reimbursed based on what is

7   submitted to Blue Cross and Blue Shield?

8   A   The physicians.

9       MR. BODNAR:  Nothing further from this witness, Your

10  Honor.

11      THE COURT:  All right.  You may step down,

12  Ms. McKenzie.

13      THE WITNESS:  Am I excused?

14      THE COURT:  Yes.

15      THE WITNESS:  I was called also for the defense.

16      THE COURT:  You will have to ask them.  Are you

17  excusing this witness or does anybody intend to call her back

18  later?

19      MR. KNIZLEY:  Judge, right now we may intend to call

20  her back later.  We will contact her and her counsel and let

21  them know about that if necessary.

22      THE COURT:  All right.  You may step down.  Thank you.

23      All right.  Ladies and gentlemen, we're going to take

24  our lunch break at this time.  Leave your pads on your

25  chairs.  No discussion about the case.  We're going to break

1  for an hour and 15 minutes.  So if you will be back downstairs

2  in the jury assembly room at 1:20 -- yeah, 1:20.  We're in

3  recess.

4      (A recess was taken at approximately 12:10 p.m.)

5      (Afternoon session, 1:20 p.m., in chambers, jury not

6  present.)

7          MR. BODNAR:  Your Honor, this next witness is

8  Doug Moore -- well, not the next one, but the one coming after

9  Tonya Wingate is Doug Moore, who works for United Healthcare.

10 One of the things that his unit does at United Healthcare is

11 they look at media reports for doctors that are in their

12 providers in case they find out that somebody has been arrested

13 or something has happened to one of their doctors.

14         What part of his testimony is going to be is that his

15 unit, sometime after Dr. Ruan and Dr. Couch were indicted in

16 2015, found out from online that Dr. Ruan and Dr. Couch had

17 been indicted, they had a program already in place in which

18 they looked at certain doctors to see whether or not they were

19 prescribing -- or what level of Holy Trinity combinations any

20 given doctor at United Healthcare was prescribing.

21         His testimony is -- not asked by the DEA or FBI or

22 U.S. Attorney's Office, but once they learned that Dr. Ruan and

23 Dr. Couch had been indicted, they created a report about the

24 number of Holy Trinity combinations that Dr. Raun and Dr. Couch

25 have prescribed and then contacted the U.S. Attorney -- well, I

1    think they contacted the FBI and passed us this document.

2            We're not going to admit the document, but we do want

3    to get into how it was created and what the ultimate numbers

4    are; that is, 130 different United Healthcare patients that

5    were receiving the Holy Trinity combination at least one time

6    during April 1st of 2013 through April 1st of '15.

7            MR. ESSIG:  Judge, we don't have an objection to the

8    data.  Right.  We don't have an objection to United Healthcare

9    coming in and saying:  We looked at Dr. Ruan and we looked at

10   Dr. Couch, here are these prescriptions for these patients.

11           That's -- I don't -- if it's within the scope of the

12   indictment, certainly I don't think that's objectionable.  But

13   we do have problems with -- the report itself has lots of

14   conclusions about what was lawful and what was not and that

15   sort of thing.  But -- and I also don't think -- I think it's

16   prejudicial for him to testify that:  We saw these doctors get

17   indicted, then we went and we did an investigation and we did

18   an investigation of the Holy Trinity, here's what we came up

19   with.

20           If they just want to say:  Here's the data of the

21   information, what these doctors were prescribing for this

22   period of time -- we don't have a problem with it.

23           THE COURT:  I think that's the way you ought to go at

24   it on direct.  If on cross anything is questioned about why or

25   how or when this data came to their attention, I think they

```
 1   would be allowed to go into that.
 2          MR. BODNAR:  Can we get out with him that this wasn't
 3   done uniquely for Dr. Ruan and Dr. Couch, that this was a
 4   program that was already in place and they just ran the doctors
 5   through this program?
 6          MR. ESSIG:  I don't have a problem with that as long
 7   as there's no reference to the indictment or criminal charge.
 8          THE COURT:  Yes.
 9          MR. BODNAR:  Let's --
10          MS. GRIFFIN:  Excuse me.
11      (A discussion was held off the record between counsel.)
12          MR. KNIZLEY:  Judge, I don't think -- is there any
13   relevance to saying they did a report?  I mean, the data, I
14   totally agree with what Brandon says.  But, you know:  When we
15   saw this in the media, we did a report?  I mean, is that what
16   you're suggesting you want to say?
17          MR. BODNAR:  I'm sorry.  I was listening to two
18   people.
19          MR. KNIZLEY:  I'm sorry.
20          MR. BODNAR:  I thought you were talking to the judge.
21          MR. KNIZELY:  When you said run the data through a
22   program, are you suggesting you're going to say that:  we did a
23   report after the fact and the report revealed --
24          MR. BODNAR:  I can tell him not to say the report.  He
25   can say --
```

2705

```
 1          THE COURT:  Well, the report is not going to be
 2   admitted.  So it doesn't matter whether he did a report or not.
 3          MR. KNIZLEY:  It's not relevant.
 4          THE COURT:  So here's the data from the report.  You
 5   know, so --
 6          MR. KNIZLEY:  Here's the data from wherever, the
 7   report, I guess.
 8          MR. ESSIG:  If the testimony is:  On these dates we
 9   decided to run an audit, whatever the term is, we have a
10   program where we can see what doctors are prescribing, on this
11   date we decided to do that, here's the data -- we have no
12   objection to it.
13          THE COURT:  All right.  Well, I think the fact that he
14   ran a report is neither prejudicial or anything.  He can say
15   what the data in the report is, but just don't talk about the
16   instigation of running these doctors in his report.
17          MR. BODNAR:  And lastly, then, are we able to talk
18   about why they started this program at United Healthcare at
19   all?  The reason being is they had a concern at United
20   Healthcare independent of anything to do with our doctors about
21   the Holy Trinity combination being prescribed, and that's why
22   they created this program that they could run the doctors
23   through and ultimately did run Dr. Couch and Dr. Raun through
24   the program.  He wants to --
25          THE COURT:  You know, I'm just going to have to meet
```

2706

```
 1   objections as they come.  I don't see anything particularly
 2   wrong with that.
 3         MR. ESSIG:  Your Honor, my concern would be there's
 4   been a lot of objections from the government and from us as
 5   well getting into collateral matters and collateral issues.
 6         THE COURT:  Well, there's been plenty of testimony
 7   about the Holy Trinity in this case and why it's called that
 8   and what it means.  So it wouldn't be surprising, based on the
 9   evidence presented, that anybody is concerned about --
10         MR. ESSIG:  Yes, ma'am.
11         THE COURT:  -- that combination of prescriptions.
12   But, you know, let's not overdo it.
13         MR. BODNAR:  We'll get in and out with that
14   quickly.  Your Honor, if I can have just a few moments before
15   we call for the jury to go talk with him and make sure he knows
16   not to say anything we don't want?
17         THE COURT:  That's fine.  And the Blue Cross lawyer
18   was concerned about calling her back.  Are you intending to
19   call her back?
20         MR. KNIZLEY:  Judge, I haven't really given it enough
21   thought right now.  I think -- Brandon and I talked.  We would
22   like to see what the next Blue Cross lady says, who is Tonya,
23   who is with her.  And I think we can make a decision whether to
24   release her at that time.
25         THE COURT:  Okay.
```

1          MR. ESSIG:  We are likely to release them.

2          MR. KNIZLEY:  I think we'll be able to.

3          THE COURT:  Okay.  All right.

4      (A recess was taken at approximately 1:27 p.m.)

5      (In open court, 1:40 p.m., defendants and jury present.)

6          THE COURT:  All right.  Ladies and gentlemen, I

7   apologize for calling you up later than I had indicated before

8   lunch.  But we did have some other legal matters we needed to

9   take up.  So again, we're not trying to waste your time

10  here.  You need to always be aware of that, and I try and be

11  very aware of that.

12         All right.  Counsel, you may continue.

13         MR. BODNAR:  The United States calls Ms. Tonya

14  Wingate.

15                       TONYA WINGATE

16         was sworn and testified as follows:

17         THE WITNESS:  I do.

18                     DIRECT EXAMINATION

19  BY MR. BODNAR:

20  Q    Good afternoon.

21  A    Hello.

22  Q    Would you please introduce yourself to the jury?

23  A    Yes.  My name is Tonya Wingate.

24  Q    And, Ms. Wingate, can you pull the microphone a little

25  closer to you?

TONYA WINGATE - DIRECT BY MR. BODNAR

2708

1   A   (Complying.)  Is that better?

2   Q   Ms. Wingate, where do you work?

3   A   I work at Blue Cross and Blue Shield of Alabama.

4   Q   And prior to working at Blue Cross/Blue Shield, did you

5   have a medical background?

6   A   Yes, I am a pharmacist.

7   Q   And could you explain your level of education to the jury?

8   A   Yes, I have a doctor of pharmacy degree.

9   Q   And all people that are pharmacists, are they doctors of

10   pharmacy?

11   A   No.  There were bachelor's programs as well as doctorate

12   programs.  So I went through the doctorate program and became a

13   Pharm.D., or a doctor of pharmacy.

14   Q   After becoming a doctor of pharmacy, where did you work?

15   A   I worked at several hospitals as a clinical pharmacist,

16   working with the physicians on the floor, so with patients,

17   looking at their medications.

18   Q   And what does a clinical pharmacist do?

19   A   We had more involvement in the actual prescribing of the

20   medications alongside the physicians.

21   Q   And this was in the hospital setting?

22   A   Yes, it was.

23   Q   And at what point did you come to work at Blue Cross and

24   Blue Shield?

25   A   2007.

TONYA WINGATE - DIRECT BY MR. BODNAR

1   Q   And is that Blue Cross and Blue Shield of Alabama?

2   A   Yes, sir.

3   Q   What does a -- what is your role currently at Blue Cross

4   and Blue Shield of Alabama?

5   A   Currently I am a clinical manager in our pharmacy area.  I

6   manage our clinical pharmacy programs and our prescription

7   benefits for most of our members.

8   Q   And how long have you been in that position?

9   A   I have been in that position since 2015.

10  Q   And prior to that were you working in that department as

11  well?

12  A   I have been working either directly for or with the Blue

13  Cross and Blue Shield of Alabama pharmacy department on and off

14  since 2007.

15  Q   And what would a clinical pharmacist do for an insurance

16  company like Blue Cross and Blue Shield?

17  A   We help to determine what type of prescription benefits our

18  members will have.

19  Q   By members, do you mean people that have Blue Cross/Blue

20  Shield --

21  A   Yes.

22  Q   -- insurance?

23  A   Yes, if they have a Blue Cross insurance card, that would

24  be considered one of our members.

25  Q   And what do you mean, help determine the benefits that a

1   member gets?

2   A    Prescription benefits.  You know, when you go to the

3   pharmacy, what drugs are going to be covered, what drugs would

4   not be covered, when a drug might need additional clinical

5   criteria to be met, if there are safety concerns about the

6   medication.  So we look at all of that in order to help decide

7   what type of programs to offer.

8   Q    And is it your department that deals with prior approval or

9   works with what's called prior approvals?

10  A    Yes, we have a third party that does prior approval reviews

11  for us.

12  Q    At the direction of your unit?

13  A    Yes.

14  Q    And could you please explain to the jury what do you mean

15  by prior approval?

16  A    There are certain drugs where we have had some safety or

17  clinical appropriateness concerns, where we feel like there

18  needs to be a little bit of documentation submitted about the

19  member and either what their disease state is, what their

20  condition is, what other medications they are on.  We need that

21  information to be submitted to us by a doctor before we approve

22  coverage.

23  Q    And by approve coverage, does that mean Blue Cross/Blue

24  Shield agrees to pay for the medication?

25  A    Yes.

TONYA WINGATE - DIRECT BY MR. BODNAR

1  Q   Is Subsys one of the drugs that Blue Cross/Blue Shield

2  requires a PA for?

3  A   Yes.

4  Q   How about Abstral?

5  A   Yes.

6  Q   I'm going to show you now what has been marked as

7  Government's Exhibit 27-25.  Ms. Wingate, are you able to

8  identify what this exhibit is for the Court?

9  A   Yes, this is a standard Blue Cross and Blue Shield of

10  Alabama prior authorization request form.

11  Q   And are there several different requests stapled together

12  there?

13  A   Yes, there are.

14  Q   And is it for the patient Timara Geil?

15  A   Yes.

16        MR. BODNAR:  United States moves to admit Government's

17  Exhibit 27-25.

18        THE COURT:  Can you spell that patient's name?

19        MR. BODNAR:  Timara, T-I-M-A-R-A, Geil, G-E-I-L.

20        MR. KNIZLEY:  Judge, we object.  He hasn't shown the

21  predicate that this person is familiar with these particular

22  documents, these particular --

23  BY MR. BODNAR:

24  Q   Are you familiar with what type of documents these are?

25  A   Yes, sir.

2712

1  Q   And are these documents that you deal with in your course

2  of work at Blue Cross and Blue Shield?

3  A   Yes, sir.

4  Q   And prior to taking the stand, have you reviewed the

5  documents for this particular patient?

6  A   Yes, sir.

7       MR. BODNAR:  The United States moves to admit

8  Government's Exhibit 27-25.

9       MR. KNIZLEY:  Judge, I object, if she just happened to

10  look at those pieces of paper not in the normal course of her

11  business, as they being business records she looked at, she

12  just happened to look at the papers being presented.  I would

13  object.  I don't think it's established that that is a business

14  record of Blue Cross/Blue Shield that she has observed.

15       THE COURT:  Well, she's identified them as prior

16  authorization request forms for a particular patient that are

17  Blue Cross/Blue Shield forms.

18       MR. KNIZLEY:  As the form, I think, Judge.  I don't

19  think she's particularly -- these particular entries on this

20  particular form she has any familiarity with.

21       THE COURT:  I overrule the objection.

22     (Government's Exhibit 27-25 was entered into evidence.)

23  BY MR. BODNAR:

24  Q   Ms. Wingate, I'm now going to show you what has been

25  admitted as Government's Exhibit 27-25.  Is this what you're

TONYA WINGATE - DIRECT BY MR. BODNAR

1    talking about about the prior authorization form?

2    A    Yes.

3    Q    Is this the standard type form that's used by Blue

4    Cross/Blue Shield?

5    A    Yes, it is.

6    Q    Up here at the top, what is this top general part

7    information?

8    A    This is intended to provide the patient information and

9    indicate what type of exception they are requesting.

10   Q    And so in this case a prior authorization?

11   A    Correct.

12   Q    Now, is this information filled out by Blue Cross and Blue

13   Shield or does this come to Blue Cross and Blue Shield filled

14   out?

15   A    It should be filled out.

16   Q    Prior?

17   A    Before it is submitted, it should be filled out by the

18   physician or someone as designated by the physician.

19   Q    And is this second portion of it the doctor information?

20   A    Yes, it is.

21   Q    What's request type and treatment information?

22   A    The request type indicates whether it is the first time

23   they are requesting it, or if it is a request for renewal which

24   would be if they had requested the drug and had had it approved

25   previously and it had just expired and they needed it

1    updated -- similar to how your prescriptions expire.  So with

2    the prior authorizations, they are not indefinite.

3    Q    And for this treatment information, what information is

4    placed here?

5    A    So we have the drug information, which is the Subsys, and

6    it should include all of the information that you would see on

7    an actual prescription.  We ask that the physicians provide the

8    diagnosis of the patient and why they are requesting the

9    medication.  They can attach additional information if they

10   would like.

11   Q    And down here at the bottom, what is this list of

12   medications?

13   A    This is intended to demonstrate the medications that the

14   patient has already tried or has been on in the recent past.

15   Q    And do you or does anyone at Blue Cross and Blue Shield

16   have access to the actual patient file?

17   A    I do not.

18   Q    Is it someone at Blue Cross and Blue Shield that's filling

19   out this information?

20   A    No, sir.  And if it is not completed, if it comes to us

21   incomplete, we need to send it back to the physician and ask

22   them to complete it.

23   Q    And does it -- do they have signatures at the bottom for

24   the physician?

25   A    Yes.

2715

1   Q   On this one do you see where it says:  See attached sheet?

2   A   Yes.

3   Q   Would that be what's on the next page?

4         MR. KNIZLEY:  Your Honor, I'd renew my objection.

5   A   That's correct.

6         MR. KNIZLEY:  Excuse me.  Your Honor, I'd renew my

7   objection.  There is no foundation for this to be a business

8   record.  This is not the custodian of the record.  This witness

9   has no familiarity with these records except the exhibition of

10  them by the prosecutor.

11        THE COURT:  Can you establish that these are the

12  business records and that she's familiar with them?

13  BY MR. BODNAR:

14  Q   These documents here, Blue Cross and Blue Shield prior

15  authorization records, are these records that are kept by Blue

16  Cross and Blue Shield or by a third party at Blue Cross and

17  Blue Shield's direction?

18  A   Yes.

19  Q   Are these documents that Blue Cross and Blue Shield uses in

20  the regular course of its business?

21  A   Yes.

22        MR. KNIZLEY:  Your Honor, I object to the foundation

23  for this witness to have that knowledge.  This is not the --

24  this witness does not have that occupation at Blue Cross/Blue

25  Shield.

TONYA WINGATE - DIRECT BY MR. BODNAR

```
 1              THE COURT:  I'm not sure I'm understanding your
 2    objection.  But come to side bar.
 3              MR. KNIZLEY:  Object to foundation.
 4              THE COURT:  Come to side bar, if you will.
 5         (At the side bar, jury not present.)
 6              THE COURT:  Okay.  Let's wait for your cohorts here.
 7              MR. KNIZLEY:  I'm sorry, Judge.  I thought you were
 8    asking me for my explanation out there.
 9              THE COURT:  That's all right.
10              MR. KNIZLEY:  Judge, this is -- we object to the
11    introduction of the records in that they are not -- there's no
12    foundation to show that these are business records.  This is
13    not the custodian of the records nor has this witness been
14    offered as the custodian of the records.  There's also no
15    foundation or predicate being laid to show that she is the
16    custodian.  That would be the person that would know whether
17    these are business records.  They are, of course, hearsay
18    otherwise.  And --
19              THE COURT:  Let me ask where did these records come
20    from?
21              MR. BODNAR:  These records come from Dr. Ruan and
22    Dr. Couch's office, from Blue Cross/Blue Shield.  This one is
23    Dr. Ruan, signed by Dr. Ruan.  She doesn't know nor do I need
24    to ask her does she know if he filled out all this information
25    on there.  But this is one of the patients.  We received this
```

1    from Blue Cross and Blue Shield.

2            THE COURT:  Wait a minute.  When you say this came

3    from his office, from their office, was this in the search

4    warrant?

5            MR. BODNAR:  No.  This was received by us.  It is Blue

6    Cross/Blue Shield.  Several of these documents, though, did

7    come in through the search warrant.  This particular one --

8            THE COURT:  No, no, no.  Is this whole thing one

9    exhibit?

10           MR. BODNAR:  I marked it as one.  I can break it up

11   into others if need be.

12           THE COURT:  All right.  Well, you need to establish --

13   I thought that she had brought these with her.  So maybe I

14   misunderstood.  But when you originally asked --

15           MR. BODNAR:  This was provided, this packet of all the

16   ones for Timara Geil, were provided by Blue Cross and Blue

17   Shield.

18           THE COURT:  Including this?

19           MR. BODNAR:  Including this one.  A copy of this one

20   was also found in the records --

21           THE COURT:  All right.

22           MR. BODNAR:  -- during the search.

23           THE COURT:  You need to establish that this is

24   admissible through this witness as a business record that she

25   is familiar with.

2718

```
1          MR. BODNAR:  As to --
2          THE COURT:  And used in the normal course of business.
3          MR. BODNAR:  Okay.  Will do.
4      (In open court, defendants and jury present.)
5  BY MR. BODNAR:
6  Q   Ms. Wingate, these Blue Cross/Blue Shield prior
7  authorization forms that we discussed, is this information that
8  is collected by Blue Cross and Blue Shield or by a third party
9  at Blue Cross/Blue Shield's direction?
10 A   This information would be submitted to the third party at
11 our direction.
12 Q   Who submits these forms to the third party?
13 A   The physician or his staff.
14 Q   And are these documents -- and we've got the first one here
15 that we looked at.  And when I showed you there, were there
16 other ones for this same patient for just different dates?
17 A   Yes.
18 Q   Were these kept by Blue Cross and Blue Shield or by the
19 third party at their direction in the usual course of business
20 for Blue Cross and Blue Shield?
21 A   They are kept by the third party, but Blue Cross and Blue
22 Shield of Alabama has access to the documents.
23 Q   And within the line of work that you do as the clinical
24 pharmacist in your department, does your office work with and
25 rely on these documents?
```

1  A   Yes, all the time.

2  Q   This is something -- this particular packet for Timara

3  Geil, was this provided pursuant to an RFI, request for

4  information, from Blue Cross and Blue Shield?

5  A   Yes, it was.

6  Q   And are these all of the documents for Timara Geil in terms

7  of prior authorizations that Blue Cross/Blue Shield had in

8  their normal course of business?

9  A   Those are all the ones that I am aware of.

10  Q   And are these sheets behind it, as I showed you that first

11  one, were those also submitted and kept by Blue Cross and Blue

12  Shield in the normal course of business?

13  A   Yes.

14  Q   And were those secondary sheets provided to Blue Cross and

15  Blue Shield?

16  A   Yes.

17  Q   And are they relied upon?

18  A   Absolutely.

19        MR. BODNAR:  The United States moves to admit

20  Government's Exhibit 27-25 as a business record of Blue Cross

21  and Blue Shield.

22        THE COURT:  All right.  I overrule the objection.

23        MR. KNIZLEY:  Yes, ma'am.

24  BY MR. BODNAR:

25  Q   Ms. Wingate, do you recall mentioning that sometimes when

 1   we looked at the see attached sheet that additional information

 2   could be attached --

 3   A   Yes.

 4   Q   -- to the prior authorization?

 5   A   Yes.

 6   Q   In this case for the prior authorization from January 2nd,

 7   2013, is there a second sheet attached?

 8   A   Yes, there was.

 9   Q   And does that show the same sent date?

10   A   Yes, it does.

11   Q   And what are the notes here for diagnosis?

12   A   Malignant neoplasm of female breast or breast cancer.

13   Q   And what is the explanation?

14   A   Patient has tried and failed alternative medications.  The

15   patient must continue as prescribed for her severe breakthrough

16   cancer pain.

17          And then:  The patient has already been approved for

18   prior strength of the same medication, Subsys.

19   Q   Was this information written down on this form by Blue

20   Cross and Blue Shield?

21   A   No, sir.  This is what was submitted.

22   Q   Does Blue Cross and Blue Shield rely upon the information

23   submitted as part of a prior authorization?

24   A   Yes.  On the first page, where we ask the provider to sign,

25   there's a statement that says that they are attesting that the

1   information is complete and correct to the best of their

2   knowledge.  And so with the volume of requests that we get in

3   on a daily basis, over 400, we are taking the physicians to be

4   truthful and honest in what they provide to us.

5   Q   So Blue Cross and Blue Shield doesn't do any independent

6   check of this patient's medical record to see if this is true?

7   Do they?

8   A   We would not have verified whether or not the patient

9   actually had that diagnosis, if that's what you're asking.

10  Q   Once --

11  A   We would not take this information and go into another

12  source of information and try to validate it.

13  Q   And is that true for -- is that the usual course of

14  practice at Blue Cross and Blue Shield?

15  A   That is the standard process.  And if additional

16  information is required or information is not completed, the

17  request is sent back to the doctor's office and we ask them to

18  provide us with the information.  So we put the ownership of

19  doing all of that on the physician's office.

20  Q   You had mentioned that prior authorizations run out at a

21  certain point?

22  A   Yes.

23  Q   Can you explain what that means?

24  A   Yes.  So we typically would approve prior authorizations

25  for controlled substances like Subsys for no more than six

TONYA WINGATE - DIRECT BY MR. BODNAR

2722

```
 1   months.  And that would be documented in each individual
 2   medical policy for the individual drugs, how long the
 3   authorization period may be.
 4   Q   And does the authorization depend on the strength of the
 5   drug as well?
 6   A   In this case it does.
 7   Q   So on this first one we looked at, from January 2nd, 2013,
 8   what request is being made?
 9   A   So they were specifically requesting Subsys 400 micrograms,
10   90 per 30 days.  So the authorization that was entered into our
11   prescription claims processor would only have allowed that
12   strength of the drug and that quantity of the drug, no more.
13   Q   If a decision was made to move someone up to a higher
14   strength of Subsys or a different amount of times per day, is
15   another prior authorization needed?
16   A   Yes, it is.
17   Q   Within 27-25 I'm going to show you a prior authorization
18   dated February 26th, 2014.  I'll zoom out.  Is this the same
19   type of form we were just looking at?
20   A   Yes, that is the form.
21   Q   In this case what is the drug being requested?
22   A   Subsys 600 micrograms.
23   Q   And how many times a day?
24   A   One sublingually, under the tongue, four times a day.
25   Q   And who is the doctor listed here?
```

```
 1   A   Dr. Ruan.

 2   Q   And is there a signature at the bottom?

 3   A   Yes.

 4   Q   Does this have the same certification?

 5   A   Yes, it does.

 6   Q   Is there somebody in your office that writes all down --

 7   this handwritten information about tried and failed medications

 8   or what the patient needs it for?

 9   A   No, we do not alter these forms in any way.  If -- if

10   somebody who is reviewing this request would have additional

11   information that was not on the form, they would not be able to

12   alter this form in any way.

13   Q   So --

14   A   So they would have to just enter it into a database with

15   additional notes related to the patient case.

16   Q   So would it have been someone in your office that would

17   have written the notes in the margin?  (Indicating.)

18   A   No, no.

19   Q   And would it be similar to the prior authorization we

20   looked at before, that Blue Cross/Blue Shield takes the

21   doctor's word that this is accurate?

22   A   Yes, sir.

23   Q   If a prior authorization is approved, what happens now for

24   a patient?

25   A   The member received a letter in the mail to say:  Your
```

1    medication has been approved and here is specifically what has

2    been approved.  So in this case it would have said Subsys 600

3    micrograms, one sublingually four times daily, was

4    approved.  The physician receives a fax within 24 hours of the

5    approval and at the time of the approval there would be

6    something entered into our claim system so that if the

7    prescription was taken to the pharmacy, that the claim would

8    process appropriately.

9    Q   If this Subsys 600 was approved, would that be Blue Cross

10   and Blue Shield verifying that the patient did in fact have

11   cancer?

12   A   No.

13   Q   Why not?

14   A   This is just a request for coverage.

15   Q   If a prescription is approved or a prior authorization is

16   approved, is Blue Cross and Blue Shield weighing in one way or

17   the other on whether it was a legitimate prescription?

18   A   No, sir.

19        MR. BODNAR:  One moment, Your Honor.

20      (A discussion was held off the record between government

21   counsel.)

22        MR. BODNAR:  Nothing further from this witness, Your

23   Honor.

24                    CROSS EXAMINATION

25   BY MR. ESSIG:

2725

1   Q   Good afternoon, Ms. Wingate.  How are you?

2   A   I'm good.  How are you?

3   Q   Good.  My name is Brandon Essig, and I'm one of the

4   attorneys who represents Dr. Couch.  I've got some followup

5   questions for you.

6   A   Okay.

7   Q   Now, you said your department at -- excuse me -- Blue

8   Cross/Blue Shield, your department is responsible for

9   preapprovals or prior authorizations for drugs that require

10  prior authorization; is that correct?

11  A   We oversee all the pharmacy programs which would -- we have

12  the final say in which drugs require a prior authorization, we

13  give direction to our third party on how to perform the prior

14  authorizations.

15  Q   Okay.

16  A   Yes.

17  Q   Okay.  All right.  And your third party, it stands as --

18  HID is the acronym; is that correct?

19  A   That's correct.

20  Q   And what, what does that acronym stand for?

21  A   Health Information Design.

22  Q   And who are they, what's their purpose for you guys?

23  A   They are our clinical review vendors.  So all of these

24  prior authorization requests go directly to HID and then they

25  follow our direction on how to review them and handle them.

1   Q   Okay.  You say clinical review.  You mean -- what kind of

2   people are working there?

3   A   There's a variety.  There are some people who are nurses,

4   there are some pharmacists, there are some pharmacy

5   technicians, they have a medical director, and then they also

6   have some staff that do intake that are not healthcare

7   professionals.

8   Q   Okay.  What's the purpose of employing practitioners or

9   healthcare professionals in that HID unit as a part of your

10  preauthorization process?

11  A   So the nurses and the physicians, is that who you're

12  referring to?

13  Q   Yes, ma'am.

14  A   So if there's additional information submitted by the

15  doctor that requires interpretation outside of the medical

16  policy, it would have to be a clinician that would do that.

17  Q   And you said an interpretation outside of Blue Cross/Blue

18  Shield's medical policy?

19  A   Correct.

20  Q   And so what the purpose those people serve is to see is

21  this information we're getting from the physician requesting

22  coverage for this member, does this make sense medically,

23  basically; is that right?

24  A   Yes, that's what they are entitled to do.

25  Q   Okay.  And they are independent from your unit because you

1  want to have them there to allow them to exercise some

2  independent medical judgment; is that correct?

3  A   We hired them just based on resources.

4  Q   Okay.

5  A   It was more efficient.

6  Q   All right.  And you said Blue Cross/Blue Shield has medical

7  policies that dictate basic terms or basic ways of covering

8  prescription medications; is that right?

9  A   That's correct.

10 Q   And then the HID people, the practitioners in that group,

11 they are there when there's perhaps a need for an approval

12 that's outside of your standard policy; is that right?  Am I

13 understanding that correctly?

14 A   They are there to review the request, to determine whether

15 or not it meets the medical criteria that Blue Cross had

16 defined.  And if there are any -- if it falls outside of the

17 criteria, then they need to use clinical judgment, if they have

18 appropriate experience with that.

19 Q   Yes, ma'am.  And so I guess my only point is there is a way

20 for Blue Cross/Blue Shield to cover medications that are

21 outside sort of your typical policy, medical policy?

22 A   Correct.

23 Q   Now, on these forms I want to go -- I just want to look at

24 the top again.  This is 27-25, Government's Exhibit.  I just

25 want to talk about this a little bit and the use of these

2728

1  forms.  Now, we can see here that for Ms. Geil -- if that's the

2  way you pronounce it --

3  A   Yeah.

4  Q   -- this is a prior authorization; is that right?

5  A   Yes.

6  Q   But is it true that this same form would be used if the

7  practice or your member wanted to appeal Blue Cross/Blue

8  Shield's decision?

9  A   It could be.  It could be used for multiple purposes.  And

10  in fact they don't necessarily need to use this form if they

11  choose to submit a request.

12  Q   Can you describe for the jury how an appeal would come

13  about?

14  A   If the initial review is done and the third party

15  determines that they are not able to approve for whatever

16  reason -- it could be because they don't have enough

17  information or it could be because the information that was

18  provided doesn't meet what we consider to be medical

19  necessity -- then the physician and the member both have rights

20  to appeal that request and ask for a subsequent review.

21  Q   And do you sometimes approve a medication that was

22  initially denied after either the member or their provider

23  appeal your initial decision?  Do y'all do that?

24  A   That is something that occurs, yes.

25  Q   And that occurs within that HID unit; is that correct?

TONYA WINGATE - CROSS BY MR. ESSIG

1    A   Well, HID does have the ability, if additional information

2    is provided, to handle the appeal.  There are also some rules

3    and restrictions that require an appeal to be handled by either

4    another external party or, depending upon the level of appeal,

5    a completely independent entity altogether.

6    Q   And can the HID unit or some of these independent entities,

7    are they allowed to approve the medication be used off label?

8    Can they do that?

9    A   They are able to approve based on their clinical judgment.

10   Q   Do they from time to time approve medications to be used

11   off label?

12   A   Yes, they do.

13   Q   And do they from time to time specifically approve fentanyl

14   to be used off label?

15   A   I don't know.

16   Q   You don't know?

17   A   I -- based on some of the records that I've seen, it

18   appears that they have.  But I don't have the background on why

19   they made that decision.

20   Q   And that's -- I'm just wondering if it -- if it happens.

21   A   I don't have -- I don't have the rationale to say why they

22   would have done that.

23   Q   Yes, ma'am.  But it happens?

24   A   Yes.

25   Q   And Blue Cross/Blue Shield pays for those, covers those

1   prescriptions?

2   A    If something has an authorization, it would be covered,

3   yes.

4   Q    Okay.  And, Ms. Wingate, just so I understand too, it's

5   that you -- your role at Blue Cross/Blue Shield and your unit's

6   role and the HID role, your role there is to assess the

7   information that you get from members and providers in the

8   context of what you're contractually obligated to cover for the

9   member or the physician; is that right?

10  A    I'm not sure I understand your question.  Could you

11  rephrase that?

12  Q    It's probably not a very good question.  My point is you

13  guys don't regulate doctors in the practice of medicine?

14  A    In the pharmacy department?

15  Q    Yes.

16  A    No.  That's handled through our network contracting,

17  credentialing, and fraud and abuse area.

18  Q    And in sort of the appeal process and that sort of thing

19  you make it clear to the doctors they are free, regardless of

20  what their contract says, they're free to prescribe medications

21  for their patients as they deem those medications to be

22  appropriate for their patients; is that right?

23  A    We do not, as Blue Cross, ever state that a treatment or a

24  medication is not able to be prescribed or provided to the

25  patient.  We are only determining what we will cover.

1   Q   And there's nothing wrong with a doctor pursuing an appeal

2   of a denial of a medication based on a contract provision,

3   there's nothing wrong with that, is there?

4   A   It's -- you're completely within your rights to request an

5   appeal.

6   Q   Okay.  And that's something Blue Cross/Blue Shield allows?

7   A   Yes.

8           MR. ESSIG:  Thank you.

9           THE COURT:  Mr. Knizley?

10                      CROSS EXAMINATION

11  BY MR. KNIZLEY:

12  Q   Good afternoon, Ms. Wingate.

13  A   Hi.

14  Q   How are you?

15  A   I'm fine.

16  Q   Ms. Wingate, you had looked at Government's Exhibit 27-25?

17  A   Yes, sir.

18  Q   And you didn't bring this with you, did you?

19  A   I do have copies of this.

20  Q   Did you bring it from Birmingham with you?

21  A   I submitted it to the government through the RFI

22  previously.

23  Q   Okay.  Did you give it to them, is what I'm asking?

24  A   Yes.  It was requested within the RFI.  This was a subset

25  of that information.

TONYA WINGATE - CROSS BY MR. KNIZLEY

1   Q   Okay.  And this particular document or it was just the
2   whole thing?
3   A   There was a request for multiple pieces of documentation
4   and all of the pieces within this exhibit were included in that
5   initial file.
6   Q   Okay.  Okay.  Do you have any particular information about
7   this particular file?
8   A   Other than the fact that I've reviewed the data on the
9   pieces of paper included here.
10  Q   And so other than what this -- Government's Exhibit 27-25,
11  you, like everyone here in the courtroom, has looked at it;
12  right?
13  A   Correct.
14  Q   But other than that, you don't have any other information
15  about Ms. Geil, do you?
16  A   Actually I do know some additional information about the
17  determinations and what determinations were made.
18  Q   Do you know something what somebody told you or do you have
19  some personal information about it?
20  A   No, I've seen records of paid claims or documentation to
21  show where HID had approved or denied some of these requests.
22  Q   But what you have, you've look at some other documents?
23  A   Correct.
24  Q   And see some claims have been paid?
25  A   Yes.  I have access to our claim system.

1   Q   Right.  And HID is what, again?

2   A   Health Information Design, they do the reviews on our

3   behalf.

4   Q   And you've seen the reviews; right?

5   A   Yes.

6   Q   But other than what the patient -- other than seeing the

7   claims have been paid and some documents regarding health

8   information review -- is that right?

9   A   Correct.

10  Q   You don't know anything else about Ms. Geil, do you?

11  A   I do not.  I have not seen her medical record, if that's

12  what you're asking, only what pieces of it or -- I mean what's

13  submitted as part of their medical record when they submit

14  these documents.  But aside from what was submitted, I don't

15  have access to the rest of her medical records.

16  Q   And those HID records, you don't have them with you here in

17  the courtroom today, do you?

18  A   What was submitted to HID from the physician office is in

19  this packet.

20  Q   Well, other than what's in this packet, as far as Ms. Geil,

21  you don't have anything else document-wise with you in the

22  courtroom today?

23  A   I did not bring anything in.

24  Q   So what you have document-wise is in this exhibit right

25  here?  (Indicating.)

1   A   That was part of the RFI, yes.

2   Q   Okay.  And other than document-wise, you don't know

3   anything more about Ms. Geil?

4   A   Well, I've stated that I -- I do have additional knowledge

5   about her request history, what was approved, what was denied,

6   but I do not know her as a patient or anything else that might

7   be documented within her medical record.

8   Q   And I don't mean to belabor it, but you saw the documents

9   Blue Cross/Blue Shield's got and that's how you learned about

10  Ms. Geil, but not from any other source; is that right?

11  A   Correct.

12  Q   And you were asked by Mr. Essig about, I think, when

13  there's an appeal, as we talked about, that from time to time a

14  physician or a member that would be a policyholder may want to

15  appeal and you were asked, I think, by Mr. Essig does from time

16  to time that appeal may be whether or not fentanyl could be

17  used off label?  Do you remember him asking you about that?

18  A   Yes.

19  Q   And you said you wasn't sure about that; right?

20  A   Well, the members and the physicians, as I stated, have the

21  right to appeal.

22  Q   Uh-huh?

23  A   I do not know how many times there were appeals for

24  fentanyl products and how many times they may have been

25  approved or denied.

```
1   Q   And that's what I wanted to ask you about.  As you know,

2   Mr. Essig said fentanyl.  Fentanyl products are Subsys and

3   Abstral; right?

4   A   Correct.

5   Q   And Fentora and Lazanda; right?

6   A   There are others, yes.

7   Q   And from time to time there have been appeals that have

8   requested off-label use for Subsys, have there not?

9   A   I --

10  Q   If you know.

11  A   -- I saw some documentation for appeals for Subsys, yes.

12  Q   Okay.  And the same thing for Abstral, do you know whether

13  there's been any appeals for off-label use of that?

14  A   I don't know, I don't know for Abstral.

15          MR. KNIZLEY:  Okay.  Thank you.

16          THE COURT:  Any redirect?

17          MR. BODNAR:  No redirect, Your Honor.

18          THE COURT:  All right.  Thank you, Ms. Wingate.  You

19  are excused.

20          MR. BODNAR:  United States calls Doug Moore.

21          THE COURT:  Counsel, let me see you at side bar for

22  just a minute, all of you, before you bring the next witness.

23      (At the side bar, jury not present.)

24          THE COURT:  Have you made a determination as to

25  whether or not Ms. McKenzie can be excused?
```

```
 1              MR. ESSIG:  Yes, ma'am, I told their lawyer.

 2              THE COURT:  And you've allowed that?

 3              MR. KNIZLEY:  Yes, ma'am.

 4              THE COURT:  So she is excused as well.

 5              MR. KNIZLEY:  Right.

 6              THE COURT:  Thank you.  That's all I wanted.

 7          (In open court, defendants and jury present.)

 8                          DOUG MOORE

 9              Was sworn and testified as follows:

10                       DIRECT EXAMINATION

11   BY MR. BODNAR:

12   Q   Good afternoon.

13   A   Good afternoon.

14   Q   Could you please introduce yourself to the jury?

15   A   My name is Doug Moore.  I am --

16   Q   Mr. Moore, where do you work?

17   A   United Healthcare.

18   Q   And what do you do for United Healthcare?

19   A   I'm an associate director with payment integrity.

20   Q   And what is that unit?  Well, first off, what is United

21   Healthcare?

22   A   United Healthcare is a collection of companies.  You may

23   know us as an insurance company or a managed care organization.

24   Q   And is health insurance one of the things that United

25   Healthcare does?
```

```
 1    A    Yes.
 2    Q    And again, what is the unit that you work in?
 3    A    The payment integrity group is responsible for ensuring
 4    that claims are paid properly.
 5    Q    And what role do you have in the program integrity group?
 6    A    Currently I'm working in a long-term services and support
 7    program.  And in the past I've worked in what we call our drug
 8    diversion program.
 9    Q    How long have you been in the unit that you're in now?
10    A    Four years, sir.
11    Q    And how long have you been with United Healthcare, period?
12    A    Four years.
13    Q    Did there come a time that United Healthcare began looking
14    into what is known as the Holy Trinity?
15    A    Yes.
16    Q    And was a program established at United Healthcare to
17    determine which doctors or what doctors might be prescribing
18    the Holy Trinity combination?
19    A    Yes.
20    Q    And what is that combination of drugs?
21    A    It's a combination of three drugs.  The first is a narcotic
22    pain reliever, an opiate, such as hydrocodone.  The second drug
23    in the combination is a muscle relaxer, branded as Soma, or
24    carisoprodol.  And the third drug in the combination would be a
25    drug class called benzodiazepines; you may have heard of Xanax
```

2738

1    as a brand name or alprazolam.

2    Q   At some point did you and that unit at United Healthcare

3    run a report for Dr. Ruan and Dr. Couch with this program?

4    A   Yes.

5    Q   And what if anything did you determine about whether or not

6    they had prescribed the Holy Trinity combination?

7    A   We found out a number of members, 130 to be precise,

8    received the Holy Trinity combination as prescribed by the two

9    doctors.

10   Q   And by members, do you mean patients that had United

11   Healthcare insurance?

12   A   Yes, sir.

13   Q   And I'm sorry.  I didn't hear what that number was?

14   A   130.

15   Q   And over what time period were 130 patients receiving this

16   combination?

17   A   We looked at April the 1st, 2013, through April the 30th,

18   2015.

19   Q   And does that 130 combine Dr. Ruan and Dr. Couch patients?

20   A   Yes, sir.

21   Q   At United Healthcare, does United Healthcare keep track of

22   prescription data regarding the drugs that they pay out

23   reimbursements for?

24   A   Yes.

25   Q   Do they do that for the drugs Subsys and Abstral?

DOUG MOORE - DIRECT BY MR. BODNAR

```
 1   A   Yes, sir.

 2   Q   Was United Healthcare asked to come up with a list of the

 3   top 25 prescribers for Subsys and Abstral?

 4   A   Yes.

 5   Q   Was that asked to be a nationwide list?

 6   A   Yes.

 7   Q   How about for pharmacies dispensing Subsys and Abstral?

 8   A   Yes.

 9   Q   I'm going to show you now what has been marked as

10   Government's Exhibit 27-6, 27-7, 27-8, 27-9, and 27-10.  I'm

11   going to show you now what has been marked as Government's

12   Exhibit 27-10.  Is this underlying data provided by United

13   Healthcare to the U.S. Government?

14   A   Yes.

15   Q   And have you had an opportunity prior to your testimony

16   today to see if the data that was provided was accurately put

17   onto the charts that are identified as 27-6 through 27-9?

18   A   Yes.

19   Q   And are these the charts?  (Indicating.)

20   A   Yes.

21           MR. BODNAR:  United States moves to admit Government's

22   Exhibit 27-6, 27-7, 27-8, and 27-9.

23           THE COURT:  Any objection?

24           MR. ESSIG:  No objection.

25           MR. ARMSTRONG:  No objection.
```

1       THE COURT:  All right.  Mark them in.

2       (Government's Exhibits 27-6, 27-7, 27-8, and 27-9 were

3  entered into evidence.)

4  BY MR. BODNAR:

5  Q   Mr. Moore, I'm now going to show you what has been marked

6  as Government's Exhibit 27-6.  Can you explain to the jury what

7  this chart is?

8  A   It's a ranking by total paid dollars of national

9  prescribers who prescribed the Subsys, the drug Subsys, from

10  January the 1st, 2011, to May the 20th, 2015.

11  Q   And are either Dr. Ruan or Dr. Couch in the top 25

12  prescribers of Subsys as paid by United Healthcare?

13  A   Yes.

14  Q   Which doctor is that?

15  A   Dr. Couch.

16  Q   Do you know why it is listed as Pensacola, Florida, for

17  Dr. Couch?

18  A   It's probably most likely because one of the pay-to

19  addresses was listed by Dr. Couch in his enrollment form as

20  Pensacola, Florida.

21  Q   And just walking across the line, where does Dr. Couch

22  rank?

23  A   Number nine.

24  Q   And how many prescriptions to United Healthcare patients

25  were written?

2741

1    A    107.

2    Q    And how many different United Healthcare patients?

3    A    15.

4    Q    And how much was reimbursed by United Healthcare?

5    A    $1,014,590.

6    Q    And is Dr. Ruan listed in the top 25 prescribers of Subsys

7    to United Healthcare patients?

8    A    No, sir.

9    Q    Did you create a similar chart of prescribers for Abstral?

10   A    Yes.

11   Q    I'm going to show you now what has been admitted as

12   Government's Exhibit 27-7.  Is this the top 25 chart for

13   Abstral?

14   A    Yes, sir.

15   Q    Do you see Dr. Ruan or Dr. Couch on this chart?

16   A    Yes.

17   Q    Where do you see Dr. Couch?

18   A    He's ranked number one by paid amounts for Abstral.

19   Q    And how many prescriptions for Abstral did he write and to

20   how many United Healthcare patients?

21   A    42 prescriptions written to 10 United Healthcare patients.

22   Q    And what was the total paid?

23   A    $406,808.32.

24   Q    What was the number two, the number two doctor, how much

25   was paid to the number two doctor?

DOUG MOORE - DIRECT BY MR. BODNAR

1  A   $193,391.46.

2  Q   Does this list include all doctors that prescribed -- well,

3  the top 25 doctors that prescribed Abstral to United Healthcare

4  patients regardless of subspecialty?

5  A   Yes.

6  Q   So would pain doctors be included on this list?

7  A   Yes.

8  Q   How about cancer doctors?

9  A   Yes.

10 Q   And was the same true for the Subsys list that we just

11 looked at?

12 A   Yes.

13 Q   Where does Dr. Ruan list in the nation for prescribing

14 Abstral to United Healthcare patients?

15 A   Number nine.

16 Q   And how many prescriptions did he write and to how many

17 United Healthcare patients?

18 A   17 prescriptions written to 11 United Healthcare patients.

19 Q   For how much?

20 A   $37,779.20.

21 Q   Did you also run comparisons for pharmacies?

22 A   Yes.

23 Q   And again, was the pharmacy comparison a nationwide

24 comparison?

25 A   Yes.

DOUG MOORE - DIRECT BY MR. BODNAR

2743

1  Q   I'm going to show you what's been marked as 27-8.  Is this

2  the top 25 pharmacies for Subsys?

3  A   Yes.

4  Q   And that's as paid by United Healthcare?

5  A   Yes.

6  Q   Do you see C&R Pharmacy on there?

7  A   Yes.

8  Q   Where does C&R Pharmacy rank?

9  A   Number seven.

10  Q   And how many United Healthcare patients filled Subsys

11  prescriptions at C&R Pharmacy?

12  A   32.

13  Q   And how many different prescribers wrote Subsys

14  prescriptions that were filled at C&R Pharmacy?

15  A   Two.

16  Q   How much did United Healthcare reimburse C&R Pharmacy for

17  Subsys?

18  A   $1,405,806.93.

19  Q   And at number one, I see a pharmacy from Woodbury, New

20  York, for 643 United Healthcare patients and 287 prescribers.

21  Do you see that?

22  A   Yes.

23  Q   Have you had the opportunity to determine beforehand what

24  pharmacy that is?

25  A   Yes.

DOUG MOORE - DIRECT BY MR. BODNAR

1   Q   What pharmacy is that?

2   A   Linden Care.

3   Q   How does Linden Care differ from a typical pharmacy, a

4   brick and mortar pharmacy?

5   A   Linden Care is a national mail-order pharmacy.

6   Q   So would they be filling prescriptions from individuals all

7   over the country?

8   A   Possibly, yes.

9   Q   Did you create a similar chart for Abstral?

10  A   Yes.

11  Q   I show you what has been admitted as Government's Exhibit

12  27-9.  Is this the top 25 list for Abstral?

13  A   Yes.

14  Q   Do you see C&R Pharmacy on that list?

15  A   Yes.

16  Q   Where does C&R Pharmacy rank in the nation in terms of

17  dollars paid by United Healthcare for Abstral?

18  A   Number one.

19  Q   And how many different United Healthcare patients filled

20  Abstral prescriptions at C&R?

21  A   17.

22  Q   How many different prescribers wrote prescriptions for

23  Abstral that were filled at C&R Pharmacy?

24  A   Two.

25  Q   And what was the total paid for Abstral by United

1  Healthcare to C&R Pharmacy?

2  A   $408,103.12.

3  Q   And is that roughly twice as much as the second place?

4  A   Yes.

5  Q   These pharmacies, would this include pharmacies that were

6  attached to pain clinics?

7  A   Yes.

8  Q   Would it include pharmacies associated with hospitals?

9  A   Yes.

10 Q   This is a total list of all pharmacies and then broken off

11 at the top 25?

12 A   Yes.

13         MR. BODNAR:  One moment, Your Honor.

14         THE COURT:  All right.

15     (A discussion was held off the record between government

16 counsel.)

17         MR. BODNAR:  Pass the witness, Your Honor.

18         THE COURT:  All right.  Mr. Essig?

19                     CROSS EXAMINATION

20 BY MR. ESSIG:

21 Q   Good afternoon, Mr. Moore.

22 A   Good afternoon.

23 Q   My name is Brandon Essig, and I'm one of the attorneys for

24 Dr. Couch.  What I wanted to look at here to start with is

25 Government's Exhibit 27-9.  And you said this would include all

DOUG MOORE - CROSS BY MR. ESSIG

```
 1    pharmacies in the top 25; is that right?

 2    A    Yes.

 3    Q    And this would include pharmacies that are colocated with a

 4    pain clinic; is that right?

 5    A    Yes, sir.

 6    Q    But you don't know if any of these pharmacies are colocated

 7    with a pain clinic, do you?

 8    A    I'm not aware, no, sir.

 9    Q    And you weren't asked to do that analysis, were you?

10    A    Correct.

11    Q    You were just asked to name the top 25?

12    A    Yes, sir.

13    Q    It didn't matter what kind of pharmacy it is?

14    A    Correct.

15    Q    In any of these numbers that you did, in any of these

16    charts that you did, did you do any analysis to determine how

17    Dr. Couch, Dr. Ruan, or C&R Pharmacy compared to other

18    pharmacies colocated with a pain management practice?

19    A    No.

20    Q    Did you do any analysis of these prescriptions as against

21    the total patient population that those doctors served at their

22    clinic?

23    A    No.

24    Q    Did you do any analysis comparing them to the total patient

25    population served by any of the other doctors or any of the
```

DOUG MOORE - CROSS BY MR. ESSIG

1   other pharmacies?

2   A   No.

3   Q   For the determination of United Healthcare of the

4   prescriptions of the Holy Trinity, you mentioned that; is that

5   right?

6   A   Yes.

7   Q   And just so I understand and just so the jury is clear, the

8   Holy Trinity program that you talked about, that's an internal

9   creation of United Healthcare; is that right?

10  A   Yes.

11  Q   I mean, in analyzing the records, I mean, you didn't see

12  any prescriptions from these doctors or from C&R that had the

13  words "Holy Trinity" written on them, did you?

14  A   No, sir.

15  Q   And the 130 members of United Healthcare that got

16  prescriptions for that combination of drugs -- and again, you

17  said that was over a two-year period?

18  A   Yes, sir.

19  Q   Did you do any analysis to determine what the percentage

20  was or what percentage of the total practice of these two

21  doctors that 130 patients or 130 prescriptions made up?

22  A   No, sir.

23  Q   And those, again, would have been 130 prescriptions or 130

24  members -- let me back up.  I want to make sure I'm clear on

25  that, because I don't want to mislead.  We're talking about 130

1   members that got that combination of prescriptions; is that

2   right?

3   A   Right; at one time where those three prescriptions

4   overlapped at least one instance.

5   Q   In at least one instance?

6   A   Yes, sir.

7   Q   Got it.  Because we don't know -- we're not getting a total

8   number of prescriptions.  Just that's how many people got that

9   combination at some point in time?

10  A   Exactly.  For at least one day of overlap.

11  Q   Okay.  Got you.  And again, you don't know the percentage

12  that that made up of the entire practice?

13  A   No, sir.

14  Q   And in order for United Healthcare to take a look at those

15  prescriptions being written for those members, those would have

16  to be prescriptions that United Healthcare covered and paid

17  for; is that right?

18  A   Yes, sir.

19          MR. ESSIG:  No further questions, Your Honor.

20          THE COURT:  Mr. Knizley?

21                      CROSS EXAMINATION

22  BY MR. KNIZLEY:

23  Q   Good afternoon.

24  A   Good afternoon.

25  Q   I show you what's marked as Government's Exhibit 27-6, the

1    United Healthcare prescriber comparison for Subsys from January

2    2011 to May 2015.  Dr. Ruan does not appear in your top 25 of

3    those prescribers, does he?

4    A    Correct.

5    Q    And looking at Government's Exhibit 27-7, which -- correct

6    me if I'm wrong -- it's United Healthcare's prescriber

7    comparison of the medication Abstral from January 2011 to May

8    2015; is that correct?

9    A    Yes.

10   Q    And Dr. Ruan appears here at number nine; is that correct?

11   A    Yes.

12   Q    And this Total Paid column, that's not paid to Dr. Ruan, is

13   it?

14   A    Correct.  That's paid to the pharmacy for dispensing the

15   drugs prescribed by Dr. Ruan.

16   Q    Same thing for Dr. Couch; that's not paid to Dr. Couch, is

17   it?

18   A    Correct.

19   Q    Now, the total paid to Ruan was how much?

20   A    For the prescriptions written by him and filled,

21   $37,779.20.

22   Q    And I say Ruan.  Was it paid to a pharmacy that he had

23   prescribed medication?

24   A    Yes, sir; that's correct.

25   Q    And how many of the United Healthcare patients received

2750

```
 1   these prescriptions?
 2   A   11.
 3   Q   And how many prescriptions in all were written?
 4   A   17.
 5   Q   And immediately before that, at number eight, that person,
 6   that prescriber, prescribed $47,000 worth; right?
 7   A   Correct.
 8   Q   And how many patients?
 9   A   One.
10   Q   And how many times?
11   A   Nine prescriptions.
12   Q   Okay.  And 53 before it?  (Indicating.)  One Patient?
13   A   Yes.
14   Q   24?
15   A   Yes, sir.
16   Q   58, with one patient?  (Indicating.)
17   A   Correct.
18   Q   Right?
19   A   Yes, sir.
20   Q   10 times?
21   A   10 times, yes, sir.
22   Q   81,920, one patient, seven times?
23   A   Yes, sir.
24   Q   That's above.  And what about below Dr. Ruan?  Immediately
25   below and about $1,100 difference, how many patients did number
```

DOUG MOORE - CROSS BY MR. KNIZLEY

2751

1   10 have?

2   A   Two.

3   Q   And how many prescriptions?

4   A   11 prescriptions.

5   Q   And again, it looks like we've got a difference of about

6   another maybe $1,200.  For number 11, how much money was paid

7   for number 11's prescriptions?

8   A   $36,605.80.

9   Q   How many patients did he have?

10  A   One patient.

11  Q   And how many scripts did he write?

12  A   Five prescriptions.

13  Q   And going on down, the rest of them are in single digits as

14  well; right?

15  A   For which column, sir?

16  Q   For United Healthcare patients, for which Abstral was

17  prescribed and paid?

18  A   Yes, sir, single digits.

19  Q   In fact, there is one below him with eight; right?

20  A   Yes.

21  Q   The rest of them are either one or two?

22  A   Correct.

23  Q   And number 15 is one, for two prescriptions, $29,000?

24  A   Yes, sir.

25  Q   One for three prescriptions, $26,000?

2752

1  A   Yes.

2  Q   Of course, we can all make the comparisons.  But looking at

3  Government Exhibit 27-6 -- and again, this is your insurance

4  company, Subsys, pharmacy comparisons for Subsys over that same

5  time period; right?

6  A   Yes.

7  Q   And, of course, the figures speak for themselves.  But, for

8  instance, the one right below C&R Pharmacy -- and this is

9  doctors right here; right?

10 A   Correct, sir.

11 Q   All right.  Had -- let's see -- 17 patients?

12 A   Yes.

13 Q   And rather one for 4 million, one for 1 million?

14 A   Yes.

15 Q   This one had eight patients; right?

16 A   Number 12, yes, sir.

17 Q   7.8?

18 A   Yes, sir.

19 Q   Let me ask, this figure here, the total paid, does that

20 take into consideration the cost of the drug itself to the

21 pharmaceutical company?

22 A   No, sir.

23 Q   I mean -- excuse me -- to the pharmacy?

24 A   No, sir.

25 Q   Overhead, salary, things of that nature?

DOUG MOORE - REDIRECT BY MR. BODNAR

```
 1   A    No, sir.
 2   Q    This is just what was paid on a retail basis for the
 3   prescription?
 4   A    Correct.
 5            MR. KNIZLEY:  That's all we have, Your Honor.
 6            THE COURT:  Any redirect?
 7            MR. BODNAR:  Very briefly.  Very briefly, Your Honor.
 8            THE COURT:  All right.
 9                      REDIRECT EXAMINATION
10   BY MR. BODNAR:
11   Q    Mr. Moore, do you remember being asked if it was the
12   doctors that received the payment or if it was the pharmacy?
13   A    Yes, sir.
14   Q    Who was the one that was reimbursed?
15   A    The pharmacy.
16   Q    I'm just using as an example 27-9, the Abstral chart.  How
17   is this money reimbursed?  Is a check sent or is it an
18   electronic transfer?
19   A    I'd have to look at the contract and see how C&R Pharmacy
20   was set up.  But it could be either of two ways.
21   Q    What are the two ways it could be?
22   A    It could be an electronic funds transfer or it could be a
23   traditional hard copy check.
24   Q    If a hard copy check is mailed, do you know where those
25   checks are mailed from?
```

DOUG MOORE - REDIRECT BY MR. BODNAR

1  A   From United Healthcare's headquarters, so the Minneapolis-

2  Saint Paul area?

3  Q   So outside of the state of Alabama?

4  A   Yes, sir.

5  Q   If the money is wired to C&R Pharmacy, do you know where

6  that wire would come from?

7  A   From United Healthcare, who is headquartered in the

8  Minneapolis-Saint Paul area.

9  Q   So the wire transfer would also come from outside the state

10 of Alabama?

11 A   From Minnesota, yes, sir.

12 Q   Do you know who owns C&R Pharmacy?

13 A   Yes, sir.

14 Q   Who owns C&R Pharmacy?

15 A   Dr. Couch and Dr. Ruan.

16        MR. BODNAR:  Nothing further for this witness, Your

17 Honor.

18        THE COURT:  All right.  May this witness be excused?

19        MR. KNIZLEY:  Yes, ma'am.

20        THE COURT:  All right.  Mr. Moore, you may be excused.

21 Thank you.

22        THE WITNESS:  Thank you.

23        MR. BODNAR:  United States calls Tom Coufal.

24                        TOM COUFAL

25             was sworn and testified as follows:

1                       DIRECT EXAMINATION

2    BY MR. BODNAR:

3    Q    Good afternoon.

4    A    Good afternoon.

5    Q    Could you please pull the mic a little bit closer to you?

6    And could you please introduce yourself to the Court and to the

7    jury?

8    A    Hi.  My name is Tom Coufal.  I'm with the Defense Health

9    Agency.

10   Q    And can you please spell your last name, Coufal?

11   A    Yeah, it's spelled C-O-U-F-A-L.

12   Q    And what agency did you say you're with, Mr. Coufal?

13   A    The Defense Health Agency.

14   Q    And what does the Defense Health Agency do?

15   A    They oversee the military's healthcare system, Tricare, and

16   the delivery of health care for our troops, their families,

17   retirees and their families.

18   Q    What role do you have with the Defense Health Institute?

19   A    I'm a healthcare fraud specialist.

20   Q    And are you a member of the military or are you a civilian?

21   A    I'm a civilian.

22   Q    How long have you worked with the Defense Health Institute?

23   A    The Defense Health Agency, I've worked with them since

24   2010, and prior to that was a contractor for them.

25   Q    And does your office work with and manage data for Tricare?

2756

1   A   We -- we work with the data.  I'm not sure I would use the

2   term "manage" the data.  We work with it, produce reports from

3   it.

4   Q   And can you explain to the jury how is Tricare different

5   from a commercial insurance carrier such as Blue Cross and Blue

6   Shield or United Healthcare?

7   A   Well, there are some similarities, but the major difference

8   is we're an entitlement.

9   Q   What does that mean?

10  A   It's something that the military members and their families

11  are entitled to for the service they've given to their country.

12  Q   Is it fair to say that it is essentially insurance for

13  people that have been in the military?

14  A   That's probably a fair statement, although we don't use the

15  term "insurance" a lot.

16  Q   And is the money paid -- the monies that are paid for

17  reimbursement for Tricare, do they come from the federal

18  government?

19  A   Yes, they do.

20  Q   Were you involved in or did your office receive a request

21  to do a national ranking for the drugs Subsys and Abstral for

22  both prescribers and pharmacies?

23  A   We did.

24  Q   I'm going to show you now what has been marked as

25  Government's Exhibit 27-11, 27-12, 27-13, and 27-14, and

TOM COUFAL - DIRECT BY MR. BODNAR

27-15.  Showing you first what has been marked as Government's
Exhibit 27-15, is this the data that was provided to the United
States from your office?

A   It was.

Q   Prior to taking the stand today, did you have an
opportunity to examine whether or not the data from that
document was correctly put onto the charts marked 27-11 through
27-14?

A   I did, and it was correct.

        MR. BODNAR:  The United States moves to admit
Government's Exhibit 27-11, 27-12, 27-13, and 27-14.

        THE COURT:  Any objection?

        MR. KNIZLEY:  No, ma'am.

        MR. ESSIG:  No.

        THE COURT:  All right.  Mark them in.

    (Government's Exhibits 27-11, 27-12, 27-13, and 27-14 were
entered into evidence.)

BY MR. BODNAR:

Q   Mr. Coufal, I'll show you now what has been admitted as
Government's Exhibit 27-11.  Can you tell the jury what they
are looking at here?

A   That's a comparison for -- a prescriber comparison for
Subsys.

Q   Is this a nationwide comparison?

A   It is.  It's a national comparison and it shows in

TOM COTTA, DIRECT BY MR. BODNAR

2758

1    descending order of total paid the amount that was prescribed

2    by prescribers for this drug.

3    Q    And would this list include all types of doctors?

4    A    It would.

5    Q    So --

6    A    Anybody who prescribed would be included in this, any

7    provider.

8    Q    Well, anyone who prescribed was included in the underlying

9    data which was then cut off at 25?

10   A    Yes.

11   Q    So that would include other pain doctors?

12   A    Yes, it would.

13   Q    And cancer doctors?

14   A    Yes.

15   Q    Who was the number-one prescriber in the nation as paid by

16   Tricare for the drug Subsys?

17   A    The number-one ranking would be Dr. Ruan.

18   Q    Could you read across?  How many prescriptions to Tricare

19   patients did Dr. Ruan write?

20   A    557.

21   Q    How many different Tricare patients?

22   A    49.

23   Q    And how much was paid from the federal government?

24   A    $2,686,696.57.

25   Q    Who was the number-two prescriber of Subsys to Tricare

 1  patients in the whole country?

 2  A   The number-two ranking was Dr. Couch.

 3  Q   How many prescriptions did he write?

 4  A   210.

 5  Q   To how many different patients?

 6  A   24.

 7  Q   And how much was paid by the federal government for those

 8  Subsys prescriptions?

 9  A   $2,243,810.37.

10  Q   Now, are these doctors paid personally or does the money go

11  to the pharmacy that filled it?

12  A   This would be to the pharmacy that filled it.

13  Q   And how -- do you know how, how the money is paid from

14  Tricare to a pharmacy?  Is it paid electronically or in a

15  check?

16  A   Normally it would be electronic.

17  Q   Do you know where the electronic money transfer originates

18  for Tricare?

19  A   It would be from our claims processor for Pharmacy Express

20  Scripts.

21  Q   And where is that located?

22  A   Saint Louis, Missouri.

23  Q   That's outside of the state of Alabama?

24  A   Yes.

25  Q   If a check was sent, would it also be sent from Saint

1   Louis?

2   A   I can't be positive on that.

3   Q   Was a similar list of top 25 created for the drug Abstral?

4   A   Yes, it was.

5   Q   And actually before I leave this number, dropping down to

6   the third, is that roughly half of what Dr. Couch was at number

7   two?

8   A   It is.

9   Q   I'm going to show you now what has been admitted as

10  Government's Exhibit 27-12.  Is this the nationwide chart for

11  Tricare by prescriber for Abstral?

12  A   It is.

13  Q   And who is the number-one prescriber to Tricare patients

14  during this time period, January 1st of '11 to May 20th of '15,

15  who is the number-one prescriber in the country?

16  A   In the country, Dr. Couch.

17  Q   How many prescriptions did he write?

18  A   86.

19  Q   How many Tricare patients received those 86 prescriptions?

20  A   15.

21  Q   And how much was paid based on those prescriptions written

22  by Dr. Couch?

23  A   $825,726.31.

24  Q   And again, like with Subsys, was that money paid by the

25  federal government?

2761

1   A   Yes, it was.

2   Q   Who was the number-two person in the United States?

3   A   Dr. Ruan was rated number two in the United States.

4   Q   How many prescriptions did he write and to how many Tricare

5   patients?

6   A   206 prescriptions to 36 patients.

7   Q   And how much was paid based on those prescriptions?

8   A   $815,018.46.

9   Q   And what's the number for the amount reimbursed by Tricare

10  to the third highest?

11  A   $230,358.14.

12  Q   Is that roughly just slightly over a quarter of what

13  Dr. Ruan and Dr. Couch prescriptions were reimbursed at?

14  A   It is.

15  Q   Were charts also created comparing pharmacies?

16  A   They were.

17  Q   I show you now what has been admitted as Government's

18  Exhibit 27-13.  Is this a national pharmacy comparison for the

19  drug Subsys?

20  A   It is.

21  Q   And from January 1st of 2011 through May 20th of 2015, do

22  you see C&R Pharmacy ranked anywhere in the top 25?

23  A   I do.  I show them as number two.

24  Q   How many Tricare patients filled Subsys prescriptions

25  there?

2762

1  A   70.

2  Q   How many prescribers wrote Subsys prescriptions that were

3  filled at C&R Pharmacy?

4  A   Three.

5  Q   And do you know what the total paid was to C&R Pharmacy for

6  those 70 -- for those 70 prescriptions?

7  A   $3,849,277.29.

8  Q   Do you see this pharmacy from Woodbury, New York, right

9  above C&R Pharmacy?

10  A   I do.

11  Q   Do you happen to know what pharmacy that is in Woodbury,

12  New York?

13  A   I believe that's Linden Pharmacy.

14  Q   Do you know anything about Linden Pharmacy or how it might

15  compare to a brick-and-mortar pharmacy?

16  A   They are a national pharmacy, so prescribers from across

17  the country can get their drugs there.

18  Q   Is it a mail-order pharmacy?

19  A   It is.

20  Q   Finally, I'll show you what has been admitted as

21  Government's Exhibit 27-14.  Is this a national chart for

22  Tricare payments to pharmacies for the drug Abstral?

23  A   It is.

24  Q   Where does C&R Pharmacy rank in the nation for

25  prescriptions -- for amounts paid?

TOM COTTA, DIRECT BY MR. BODNAR

1   A   They are ranked number one in the nation.

2   Q   And is that Linden Care Pharmacy right below them at number

3   two?

4   A   I believe so.

5   Q   How many Tricare patients filled Abstral prescriptions at

6   C&R Pharmacy?

7   A   There were 50 patients.

8   Q   How many prescribers prescribed Abstral that was filled at

9   C&R Pharmacy?

10  A   Three.

11  Q   And what was the total paid to C&R Pharmacy by the federal

12  government for Abstral?

13  A   $1,594,866.15.

14  Q   And how much was paid to the number two, Linden Care?

15  A   $355,704.81.

16  Q   Is that roughly one fifth of what was paid to C&R Pharmacy?

17  A   It is.

18  Q   Do you know who owns C&R Pharmacy?

19  A   Yes, I do.

20  Q   Who owns C&R Pharmacy?

21  A   Drs. Ruan and Couch.

22      MR. BODNAR:  No further questions from this witness.

23      THE COURT:  All right.  Mr. Essig?

24      MR. ESSIG:  Yes, Your Honor.

25                CROSS EXAMINATION

```
 1   BY MR. ESSIG:
 2   Q   Good afternoon, Mr. Coufal.  My name is Brandon Essig, and
 3   I'm one of the attorneys for Dr. Couch.
 4   A   Good afternoon.
 5   Q   I just want to ask you a few followup questions.
 6           For the national prescriber information, we'll just
 7   use as an example Government's Exhibit 27-11.  Do you see that?
 8   A   I do.
 9   Q   Now, the Tricare includes both active duty and retired
10   military personnel; is that correct?
11   A   Right.
12   Q   Not all former military personnel are entitled to Tricare,
13   but those who have a full retirement are entitled to it; is
14   that correct?
15   A   Correct.
16   Q   And in many cases -- do you note here, for example, for
17   number three, Oceanside, California, is there a military base
18   near Oceanside, California?
19   A   I'm not aware if there is or not.
20   Q   Do you know if that's where Marine Corps Base Pendleton is?
21   A   I do not.
22   Q   And for prescriptions that are being filled near military
23   bases -- bases, excuse me -- this data would not exclude a
24   prescription that's filled onbase would it?
25   A   You mean in a military treatment facility?
```

TOM COYLE, AL - CROSS BY MR. ESSIG

```
 1   Q   Right.

 2   A   It would.

 3   Q   It would include that?

 4   A   No, it would exclude that.

 5   Q   It would exclude prescriptions filled in a military

 6   facility; is that right?

 7   A   Yes.

 8   Q   So if a member gets a prescription -- excuse me -- for

 9   Subsys or Abstral and they are Tricare member and they fill

10   that at a military facility, that's not going to be reflected

11   in this data?

12   A   Correct.

13   Q   Why is that?

14   A   I'm not that familiar with how military treatment

15   facilities work because in my day-to-day work I really don't

16   deal with them.  I could give a hypothesis.  But --

17   Q   That's all right.  You just know that it's not -- that it's

18   not included in this data?

19   A   Yes.

20   Q   And another thing in your data is that you don't have, as

21   you testify here today, these other prescribers or pharmacies

22   included in your data, you don't know what kind of health care

23   providers they are, do you?

24   A   No.

25   Q   Like on this sheet, the other 23, you have no idea of what
```

2766

1  kind of practice they have?

2  A   No.

3  Q   And you don't know if their practice is colocated with a

4  pharmacy that they operate?  You wouldn't have that

5  information?

6  A   No.  Well, I don't have it available to me now.

7  Q   Right; as you sit here today testifying?

8  A   Correct.

9  Q   And that would be true for all of the charts that you

10  prepared or -- excuse me -- all of the charts the government

11  has shown you today that you testified to; is that right?

12  A   Well, not necessarily.  Obviously a pharmacy's a pharmacy.

13  But if you're talking about only the prescribers, I would not

14  know.

15  Q   Now, you say a pharmacy's a pharmacy.  Are you familiar

16  that some pharmacies are colocated with a treatment facility?

17  A   I know that can happen, yes.

18  Q   Yes.  And that's different from a stand-alone pharmacy,

19  like a CVS or a Walgreens; right?

20  A   It can be.

21          MR. ESSIG:  No further questions, Your Honor.

22          THE COURT:  Mr. Knizley?

23                          CROSS EXAMINATION

24  BY MR. KNIZLEY:

25  Q   Mr. Coufal; is that right?

TOM COFFAL - CROSS BY MR. KNIZLEY

1   A   Coufal.

2   Q   Coufal.  Good afternoon.

3   A   Good afternoon.

4   Q   Sir, I'm going to show you what's marked as Government's

5   Exhibit 27-11, which we looked at a moment ago.  And that's the

6   Tricare prescribers.  That would be doctor; right?

7   A   Yep, Tricare national prescriber comparison.

8   Q   Nationwide comparison for this particular medication?

9   (Indicating.)

10  A   Yes.

11  Q   From that time frame; right?  (Indicating.)

12  A   (No response.)

13  Q   And I represent Dr. Ruan.  Dr. Ruan, from your -- from

14  Tricare, he had -- he prescribed medications that were paid to

15  a pharmacy, I suppose, or something.  That's paid to the

16  pharmacy; right?

17  A   Correct.

18  Q   He had 49 Tricare patients and he wrote 557 prescriptions;

19  right?

20  A   Correct.

21  Q   And his was 2,686,000, the number three was 1,189,000 and

22  he had six Tricare patients; right?

23  A   Correct.

24  Q   As opposed to 49.  And he had 73 prescriptions, as opposed

25  to 557; is that right?

TOM COHEN, CROSS BY MR. KNIZLEY

```
 1   A   Correct.
 2   Q   And going on down, the next prescriber, number four, had
 3   only four patients and he prescribed this much; right?
 4   (Indicating.)
 5   A   Uh-huh (nodding head affirmatively).
 6   Q   And he only -- he wrote 60 prescriptions; is that right?
 7   A   Correct.
 8   Q   And then we have one with 25.  And then, as we can all
 9   compare this as it goes down, are single digits except for the
10   15 and the 11.  Like this one right here, number 13, only had
11   one patient; right?
12   A   Uh-huh (nodding head affirmatively).
13   Q   And he or she prescribed $661,000 for one patient; right?
14   A   Uh-huh (nodding head affirmatively).
15   Q   Same thing down here, with one patient, that person
16   prescribed 421,000; is that right?
17   A   Correct.
18   Q   Over 30 prescriptions; is that right?
19   A   Correct.
20   Q   Compared to Dr. Ruan's numbers up at the top; right?
21   A   Right.
22   Q   Let me show you what's marked as Government's Exhibit
23   27-13, and that is basically the same comparison for Abstral;
24   is that correct?
25   A   That's -- as the one we previously saw.
```

1    Q    We looked at it a little bit earlier; right?

2    A    Yes.

3    Q    But it's very similar to what we just looked at for Subsys;

4    right?

5    A    Yeah.

6    Q    And again, just looking at Dr. Ruan, $815,000 paid to the

7    pharmacy for what he wrote; correct?

8    A    Correct.

9    Q    And he had 36 patients and wrote 206 prescriptions; right?

10   A    Yeah.

11   Q    Is that correct?

12   A    Correct.

13   Q    And number three had three patients and wrote this much

14   (indicating) with 31 prescriptions?

15   A    Correct.

16   Q    And we can look as it goes down, it's all single digits.

17   When you get past Dr. Ruan and Dr. Couch, every one of these

18   are single digits; is that right?  (Indicating.)

19   A    Correct.

20   Q    And like this number seven here had one patient, $68,000

21   for 17 scripts; right?

22   A    Correct.

23   Q    And, of course, for each of these doctors, I show you

24   Government's Exhibit 27-14, which is your Tricare national

25   pharmacy comparison this time; right?

TOM COHEN - CROSS BY MR. KNIZLEY                    2770

```
 1   A    Correct.
 2   Q    For Abstral.  And for each of these, the jury can look at
 3   it and see like C&R Pharmacy had 50 patients and was paid this
 4   much money?  (Indicating.)
 5   A    Correct.
 6   Q    And like number three had one patient and was paid this
 7   much money?  (Indicating.)
 8   A    Correct.
 9   Q    And we can all look at these and make our own comparisons;
10   right?  We can look at these and make the comparison?
11   A    Sure.
12           MR. KNIZLEY:  Thank you.
13           THE COURT:  Any redirect?
14           MR. BODNAR:  No redirect, Your Honor.
15           THE COURT:  All right.  Thank you.  You may step down.
16           May this witness be excused?
17           MR. BODNAR:  Yes, Your Honor.
18           THE COURT:  All right.  Thank you.  You're excused.
19   Thank you.
20           MS. GRIFFIN:  May we approach, Your Honor?
21           THE COURT:  Yes.
22       (At the side bar, jury not present.)
23           MS. GRIFFIN:  Could we possibly take our break at
24   point?
25           THE COURT:  (Nodding head affirmatively.)
```

JESSI KAMPER - DIRECT BY MS. GRIFFIN

```
 1              MS. GRIFFIN:  Thank you.

 2              THE COURT:  I was going to anyway.

 3              MS. GRIFFIN:  Oh, I didn't know.

 4         (In open court, defendants and jury present.)

 5              THE COURT:  All right.  Ladies and gentlemen, we're

 6    going to take our afternoon break.  Leave your pads on your

 7    chairs.  No discussion about the case.  Take your break

 8    downstairs and we will call you up in about 15 minutes.  Thank

 9    you.  We're in recess.

10         (A recess was taken at approximately 3 p.m.)

11         (In open court, 3:22 p.m., defendants and jury present.)

12              THE COURT:  All right.  Ms. Griffin?

13              MS. GRIFFIN:  Call Jessi Kamper, Your Honor.

14                           JESSI KAMPER

15              was sworn and testified as follows:

16                        DIRECT EXAMINATION

17    BY MS. GRIFFIN:

18    Q    Tell us your name, please, ma'am.

19    A    My name is Jessi Kamper.

20    Q    How do you spell your first name?

21    A    J-E-S-S-I.

22    Q    And your last name?

23    A    K-A-M-P-E-R.

24    Q    Ms. Kamper, you live in the Mobile area?

25    A    Yes, ma'am.
```

JESSI KAMBER - DIRECT BY MS. GRIFFIN

1  Q   How old are you?

2  A   I am 24.

3  Q   I want to direct your attention to sometime in October of

4  2013.  Had you had an injury prior to that date?

5  A   Yes, ma'am.

6  Q   What had happened?

7  A   I had hurt my back while I was moving.

8  Q   Moving furniture?

9  A   Moving furniture, boxes, yeah.

10  Q   Had you been to see a particular doctor about that before

11  going to PPSA?

12  A   Yes, ma'am.

13  Q   That was a doctor at which group?

14  A   I saw one back home in northern Alabama, and then I saw

15  one down here, Dr. West.  I don't remember the practice name,

16  but --

17  Q   Do you remember that it was in The Orthopaedic Group?

18  A   Yes.

19  Q   He was an orthopedic doctor?

20  A   Yes, ma'am.

21  Q   Were you ultimately sent to PPSA in Mobile?

22  A   Yes, ma'am.

23        MS. GRIFFIN:  Your Honor, I'm going to show her what's

24  marked as 6-2, her patient file from PPSA, and ask to admit it

25  pursuant to a stipulation about the patient files.

JESSI KAMPER - DIRECT BY MS. GRIFFIN

```
 1              MR. SHARMAN:  No objection.
 2              THE COURT:  All right.  Mark it in.
 3         (Government's Exhibit 6-2 was entered into evidence.)
 4    BY MS. GRIFFIN:
 5    Q    Ms. Kamper, did you first go to PPSA in October of '13?
 6    A    Yes, ma'am.
 7    Q    Do you know who you were scheduled to see?
 8    A    Dr. Couch.
 9    Q    On that first meeting, who did you first see back in the
10    patient room?
11    A    Justin Palmer.
12    Q    What did he do in the patient room?
13    A    He asked me some questions.  He told me to bend over so he
14    could look at my back, and that was it.
15    Q    Did he touch your back?
16    A    No, ma'am.
17    Q    Do you know what palpitate [sic] means, pressing to see if
18    there's an area of pain?
19    A    Yeah, that didn't happen.
20    Q    Did he do any other physical examination of you?
21    A    No.
22    Q    Nothing?
23    A    Nothing.
24    Q    He did ask you questions?
25    A    Yes, ma'am.
```

JESSI KAMBER - DIRECT BY MS. GRIFFIN

1   Q   Did you have occasion to see Dr. Couch on that first visit?

2   A   Can you repeat?

3   Q   Did you see Dr. Couch on the first visit?

4   A   Yes, I did.

5   Q   Could you tell us about that?

6   A   He came in and he told me that we were going to do an

7   injection and he pointed to the bottom of my back and said:

8   That's where we'll do it.  And then he left.

9   Q   Did he say anything to you about the medications that were

10  going to be prescribed to you?

11  A   No, ma'am.

12  Q   Did he touch your back at all?

13  A   No, ma'am.

14  Q   Did he ask you if you had any questions?

15  A   No, ma'am.

16  Q   And did he give you any warnings about the medications you

17  were going to be prescribed?

18  A   No, ma'am.

19  Q   Did you receive some medications on that first visit?

20  A   Yes, ma'am.

21  Q   In fact did you receive Lortab at that time?

22  A   Yes, ma'am.

23  Q   A Butrans patch?

24  A   Yes, ma'am.

25  Q   Ambien?

1   A   Yes, ma'am.

2   Q   And a nasal spray?

3   A   Yes.

4   Q   Who gave you those prescriptions?

5   A   Justin Palmer.

6   Q   And do you know who signed those prescriptions?

7   A   I saw him sign them.

8   Q   Saw who sign them?

9   A   Justin.

10   Q   Justin Palmer?

11   A   Palmer.

12   Q   About how long were you in on the first visit with Justin

13   Palmer?

14   A   I think from start to finish it was 25 minutes.

15   Q   How long did you see Dr. Couch during that visit?

16   A   Three to five minutes maybe.

17   Q   Is he in the courtroom today?

18   A   Yes, ma'am.

19   Q   Could you tell us what he's wearing?

20   A   He is in the red tie and glasses (indicating).

21       MS. GRIFFIN:  If the record will reflect that she's

22   identified the defendant?

23   Q   Now, after that first visit, did you have a procedure?

24   A   Yes, ma'am.

25   Q   Who performed that procedure?

JESSI KAMBER - DIRECT BY MS. GRIFFIN

1  A    Dr. Couch.

2  Q    After the procedure -- well, prior to the procedure was

3  anything discussed with you about informed consent, to consent

4  to having the procedure done?

5  A    Yeah, I signed some paperwork that I could have it done.

6  Q    So how did the procedure go?

7  A    I went in there and I was on a table on my stomach and they

8  gave me something to relax me.  And then they had supposedly

9  put numbing medicine in my back before the injection, but I

10 wasn't numb.  So --

11 Q    When you said they gave you something, who are you talking

12 about?

13 A    There was a -- I think that was Dr. Couch.  The lady in

14 there was the one that gave me stuff to relax me, and he was

15 the one that gave me the numbing medication.

16 Q    Who gave you the injection, if you know?

17 A    Dr. Couch.

18 Q    Now, thereafter did you go back to PPSA in November of

19 2013?

20 A    Yes, ma'am.

21 Q    Had you been taking the medications you were being

22 prescribed?

23 A    Yes, ma'am.

24 Q    Did you go back in fact through about the spring of 2015?

25 A    Yes, ma'am.

JESSI KAMBER - DIRECT BY MS. GRIFFIN

1    Q    For an office visit?

2    A    Uh-huh (nodding head affirmatively).

3    Q    Did you ever see Dr. Couch again in an office visit?

4    A    No.

5    Q    Were your medications changed during the time you were

6    having office visits?

7    A    Yes.

8    Q    Who were you seeing when your medications were changed?

9    A    Justin Palmer and later on Ben Clark.

10   Q    Did you see Dr. Couch for procedures?

11   A    Yes.

12   Q    Same type procedure you've described, a needle injection in

13   your back?

14   A    Uh-huh, yes.

15   Q    Again, you did a consent for each of the procedures?

16   A    Yes, ma'am.

17   Q    But when your drugs were changed in the office visits where

18   you didn't see Dr. Couch, do you know who signed your

19   prescriptions?

20   A    It was Justin.

21   Q    Justin Palmer?

22   A    Justin Palmer.  I saw him sign it.

23   Q    Now, tell the jury sometimes how you would receive your

24   prescriptions.  What would they look like?

25   A    It came like a regular size piece of paper and it would

JESSI KAMBER - DIRECT BY MS. GRIFFIN

```
 1   have one prescription on it and the rest would be blank and
 2   they were handed all to me.
 3   Q   So there would be four prescriptions?
 4   A   Yeah.
 5   Q   On a page of paper?
 6   A   Yes, ma'am.
 7   Q   And how many of them would be written on or typed on?
 8   A   One would be like an actual prescription I got from them.
 9   Q   Yes?
10   A   And the rest would be blank.
11   Q   Didn't have Justin Palmer's signature?
12   A   No.
13   Q   Or Dr. Couch's signature?
14   A   No, ma'am.
15   Q   Didn't have anything else on it?
16   A   No, ma'am.
17   Q   What did you do with those prescriptions, the three
18   completely blank ones and the one prescription?
19   A   Well, I threw them away.  I had no --
20   Q   Threw the blank ones away?
21   A   Yes.
22   Q   Did anything ever happen, while you were going for an
23   office visit in the patient room, to Justin?  Did you notice
24   anything that happened to him?
25   A   He was asleep a lot.
```

2779

1   Q   While you were in the patient room?

2   A   Yes.

3   Q   Could you tell us about that?

4   A   I was sitting on the exam table and he would be at the

5   computer and he would just be asleep and I had to wake him up

6   several times.

7   Q   After that initial visit, your entire time there through

8   October of '13, through sometime in '15, spring of '15, did you

9   ever have an examination by Justin, Ben Clark, or Dr. Couch?

10  A   No, ma'am.

11  Q   Do you know whether or not Justin Palmer is authorized to

12  sign prescriptions?

13  A   I don't think that he is.

14  Q   Did you see him signing prescriptions?

15  A   Multiple times.

16  Q   The ones you received?

17  A   Yes.

18  Q   Now, whose name was he signing?

19  A   Dr. Couch's.

20  Q   He wasn't signing it Thomas Justin Palmer?

21  A   Huh-uh, no, ma'am.

22  Q   Were you able to fill those prescriptions?

23  A   Yes, ma'am.

24  Q   Did you continue having an office visit, then sometimes

25  having a procedure, then having an office visit, then sometimes

2780

1   having a procedure?

2   A   Yes, ma'am (nodding head affirmatively).

3   Q   When you were in the patient room and Justin was in the

4   patient room with you, did anybody else ever come in the room?

5   A   Yes.

6   Q   To see Justin?

7   A   Nurses would come in and out constantly for him to sign

8   other prescriptions.

9   Q   Do you know if he was signing his name or if he was signing

10  Dr. Couch's name?

11  A   I didn't see it.  I could just tell that it was a

12  prescription.  So I would assume that he was signing Dr. --

13          MR. SHARMAN:  Object to speculation.

14          THE COURT:  Yes.  Don't tell us what you assumed, just

15  what you saw.

16  BY MS. GRIFFIN:

17  Q   You don't know what name he was signing?

18  A   Yeah.

19  Q   How many times did this happen that a nurse would come in

20  and hand a prescription and you'd see Justin sign it?

21  A   At least every office visit.

22  Q   Would there ever be more than one prescription that he was

23  signing at a time?

24  A   Yes, ma'am.

25  Q   When you came for the visits, would you get one or two

JESSI KAMPER - DIRECT BY MS. GRIFFIN

```
 1  prescriptions for the same drug?

 2  A   I got that a few times, yes.

 3  Q   Explain that.

 4  A   Like if I came in for a January visit, they would also

 5  sometimes give me all the prescriptions for my February month

 6  so that I wouldn't come back every month.

 7  Q   So you'd come back every other month?

 8  A   Yeah, that only happened like one or two times though.

 9  Q   Ever with the visits was anything discussed with you -- the

10  visits as opposed to the procedure -- about the medications,

11  the risks and benefits, the dangers, how to take them, how not

12  to take them?

13  A   No, ma'am.

14  Q   Did you Ever see someone named Chilean Fletcher, who was a

15  medical assistant?

16  A   No, ma'am.

17  Q   I show you the progress note for December the 4th of 2013

18  and ask if this is your progress note?  Your name, Jessi

19  Kamper?  (Indicating.)

20  A   Yes, ma'am.

21  Q   December 4th of '13?

22  A   Yes, ma'am.

23  Q   Does it indicate that it is signed by Chilean Fletcher in

24  January of '14?

25  A   It does.
```

1    Q    Do you know who that is?

2    A    No, ma'am.

3    Q    Did there come a time when, in addition to the medications

4    that Justin had given you, that you were prescribed Valium

5    along with your Ambien, your Duexis, your Duragesic patch,

6    Roxicodone?

7    A    Yes, ma'am.

8    Q    Ultram, and Zanaflex; is that right?

9    A    Yes, ma'am.

10   Q    Had you had an MRI before you ever went to PPSA?

11   A    No, ma'am.

12   Q    With your --

13   A    I did at the orthopedic, yes.  Yes, ma'am.

14   Q    Do you know what your orthopedic had told Dr. Couch's

15   office about that MRI?

16   A    I was told that there was nothing to be surgically done.

17   So that's why he sent me to Dr. Couch.

18   Q    When you received the Roxicodone 120 tablets for a 30-day

19   supply, were you given any warnings?

20   A    No, ma'am.

21   Q    That was a new drug.  And did Dr. Couch give you that drug?

22   A    It was Justin Palmer.

23   Q    I show you the signature page for the December 14th visit

24   and ask if it was signed by Justin Palmer and a day later by

25   Dr. Couch as a reviewer  Can you see that?

 1   A   Yes, ma'am.

 2   Q   Is that correct?

 3   A   Yes, ma'am.

 4   Q   You continued through January going the same way you've

 5   just described, seeing Justin Palmer?

 6   A   Yes, ma'am.

 7   Q   Not Dr. Couch, except for a procedure?

 8   A   Yes, ma'am.

 9   Q   You continued receiving the medications?

10   A   Yes, ma'am.

11   Q   When you complained about pain, what would happen?  What

12   was done in the office visits?

13   A   My medication would be upped to a higher milligram.

14   Q   Was that ever discussed with you as to why they were

15   increasing your medications?

16   A   No.  They just did it.

17   Q   Not by Justin?

18   A   No, it was Justin.

19   Q   Did Justin discuss that with you?

20   A   No.

21   Q   Did Dr. Couch ever discuss it with you?

22   A   No, ma'am.

23   Q   I show you your January 20th, 2014, visit and ask if this

24   is your progress note for January of '14, Jessi Kamper?

25   A   Yes, ma'am.

2784

1   Q   At this visit did you see Dr. Couch?

2   A   No, ma'am.

3   Q   On that January 20th visit do you note that the electronic

4   signing of your record was February 26 of '14?

5   A   Yes, ma'am.

6   Q   Was that by Justin Palmer?

7   A   Yes, ma'am.

8   Q   And when did Dr. Couch sign as a reviewer?

9   A   March 11th.

10  Q   Of what year?

11  A   2014.

12  Q   Ms. Kamper, did there come a time in April of '14 when you

13  wanted to come off your medication?

14  A   Yes, ma'am.

15  Q   Tell us about that.

16  A   I had asked to come off of it.  And since the prescriptions

17  were already made ahead of time, they told me to just take it

18  and maybe discuss it next time.

19  Q   Who told you that?

20  A   Justin Palmer.

21  Q   Did you take the prescriptions and have them filled?

22  A   Yes, ma'am.

23  Q   I show you your progress note for April the 23rd of '14.

24  That's your name; right?

25  A   Yes, ma'am.

JESSI KAMBER - DIRECT BY MS. GRIFFIN

1    Q    April 23rd, does it indicate in capitals:  Patient states

2    feeling better and ready to DC narcotic pain meds?

3    A    Yeah.

4    Q    Is that what you asked to do?

5    A    Yeah, I did.  That's not what happened.

6    Q    In fact, your plan for that same date shows that your

7    prescriptions were refilled; is that correct?

8    A    Yes, ma'am.

9    Q    To include the Duexis oral tablets?

10   A    Yes, ma'am.

11   Q    And can you tell us when Dr. Couch signed that file?

12   A    May 1st.

13   Q    Did anybody call you on May 1st or anytime thereafter and

14   ask you about discontinuing your narcotic medications?

15   A    No, ma'am.

16   Q    Did there come a time when you were having problems with

17   the Duragesic patch?

18   A    Yes, ma'am.

19   Q    Tell us about that.

20   A    It was starting to burn my skin and I would have like -- it

21   looked like I had been burned.  So I had told Justin that and

22   he had decided to change my patch.

23   Q    What did you receive instead of the Duragesic patch?

24   A    Fentanyl.

25   Q    A fentanyl patch?

1    A    Yes, ma'am.

2    Q    How did that -- how did you adjust to that?

3    A    Well, it was prescribed for 12.5 milligrams or -- yeah --

4    and I went and tried to get that filled and then they didn't

5    have it.  And I --

6    Q    Wait for me just a minute.  Where did you go to have it

7    filled?

8    A    At that particular time I got it at C&R Pharmacy, because

9    that's where I had my appointment that day.

10   Q    Okay.  They didn't have a 12.5 milligram fentanyl patch?

11   A    No, ma'am.

12   Q    What did you do?

13   A    I went back and told Justin Palmer and he gave me a new

14   prescription for a 25 milligram and he told me to cut it in

15   half.

16   Q    What did you do with the prescription?

17   A    I got it filled.  But I had then called my mother and told

18   her that because --

19   Q    Do not tell us what she said.

20   A    Yeah.

21   Q    But tell us what you did.

22   A    I called the pharmacy -- or she called the pharmacy.

23   Q    Could you overhear what your mother was saying?

24   A    Yes, ma'am.

25   Q    Do you know whether or not your mother was talking to a

2787

1  pharmacist?

2  A   She was, yes.

3  Q   Could you hear what the pharmacist was saying?

4  A   Yes, ma'am.

5  Q   Without telling us what either one of them said, once your

6  mother got off the phone what did you do or what did you not

7  do?

8         MR. SHARMAN:  Objection, Your Honor.  The only basis

9  is hearsay.

10         THE COURT:  Overruled.

11         MS. GRIFFIN:  Explains her conduct, Your Honor.

12  Q   What did you do or not do with the patch?

13  A   I did not cut it in half.

14  Q   How did you feel when you took the fentanyl patch?

15  A   I didn't feel any different.

16  Q   It didn't have an effect on you, making you sleepy?

17  A   No, it didn't.

18  Q   Now, did there come a time that you were taking triple

19  digit Roxicodone tablets?

20  A   (Nodding head affirmatively.)  Yes, ma'am.

21  Q   How many is that?

22  A   120.

23  Q   A month?

24  A   Yes, ma'am.

25  Q   When that dosage was increased, were you consulted about

1   the risks and the benefits of that high dosage?

2   A   No, ma'am.

3   Q   Were you given any dangers?

4   A   No, ma'am.

5   Q   Ms. Kamper, when you would be at PPSA, waiting for an

6   appointment, would you have an appointment every time you went?

7   A   Yes, ma'am.

8   Q   And when you went there for your appointed time, were there

9   occasions when you had to wait in the waiting room?

10  A   Yes, ma'am.

11  Q   Could you tell us approximately how long?

12  A   Pretty consistently about two and a half to three hours.

13  Q   Even though you were there at your appointed time?

14  A   Yes.

15  Q   Did you ever complain about that?

16  A   Yes.

17  Q   What were you -- were you told -- did you complain to

18  Justin about it?

19  A   I complained to the front desk people.

20  Q   Did you ever complain to Dr. Couch about that?

21  A   No.

22  Q   Do you recall when PPSA was raided?

23  A   Yes, ma'am.

24  Q   You had had some prescriptions given to you a few days

25  earlier before that?

```
 1   A   Yes, ma'am.

 2   Q   Did you end up being able to take those prescriptions?

 3   A   Yes, ma'am.

 4   Q   And did there come a time after PPSA was raided that you

 5   didn't have any medication?

 6   A   Yes, ma'am.

 7   Q   What happened to you?

 8   A   I went into withdrawal and --

 9   Q   Could you tell us about that?

10   A   Yes.  You can't sleep.  Hot, very hot flashes and chills.

11   Very restless, headache, diarrhea, that kind of stuff.

12   Q   How long did that last?

13   A   A good week, I would say.

14   Q   Since that time have you taken any fentanyl products?

15   A   No, ma'am.

16           MS. GRIFFIN:  One moment, Your Honor.

17           THE COURT:  All right.

18   BY MS. GRIFFIN:

19   Q   Ms. Kamper, when you discussed with us that your mother had

20   called the pharmacy, do you know if she called C&R Pharmacy or

21   another pharmacy?

22   A   She called Publix.

23   Q   How do you know that?

24   A   Because I saw, saw her dial it.  And that's -- that's where

25   we get our prescriptions filled usually.
```

```
 1   Q   Do you recall with the Roxicodone if those were 30
 2   milligram Roxicodones that you were prescribed?
 3   A   Yes, ma'am.
 4   Q   So 120 a month Roxicodone 30s; is that right?
 5   A   Yes, ma'am.
 6           MS. GRIFFIN:  One moment.
 7   Q   Did you develop a belief about your treatment at PPSA?
 8   A   Yes, ma'am.
 9   Q   Could you tell us about that?
10   A   I believe that they were not having my best interest at
11   heart in wanting to help me, that I was being extremely
12   overmedicated.
13           MS. GRIFFIN:  That's all I have of this witness at
14   this time, Your Honor.
15           THE COURT:  All right.  Mr. Sharman?
16           MR. SHARMAN:  Thank you, Your Honor.
17                          CROSS EXAMINATION
18   BY MR. SHARMAN:
19   Q   Ms. Kamper, my name's Jack Sharman.  I'm one of Dr. Couch's
20   lawyers.  You're 24 years old right now; right?
21   A   Yes, sir.
22   Q   So the time period that you were just discussing with
23   Ms. Griffin, you were 21-22 years old?
24   A   Yes, sir.
25   Q   All right.  And you were referred to Dr. Couch by Dr. West;
```

1   right?

2   A   Yes, yes, sir.

3   Q   And he was your orthopedic doctor; right?

4   A   Yes, yeah.

5   Q   And you don't have any problem with Dr. West's decision to

6   send you to Dr. Couch, do you?

7   A   No, no, sir.

8   Q   I'm sorry?

9   A   No, sir.

10  Q   All right.  And when you were seeing Dr. West, you were

11  suffering from back pain; right?

12  A   Yes, sir.

13  Q   That's because you had hurt your back?

14  A   Yes, sir.

15  Q   You hurt your back moving boxes and stuff; right?

16  A   Yes, sir.

17  Q   All right.  And so you went to see Dr. West about that

18  pain?

19  A   Yes, sir.

20  Q   And Dr. West and his staff tried several different ways of

21  treating that; right?

22  A   Yes, sir.

23  Q   Okay.  And they tried physical therapy?

24  A   Yes, sir.

25  Q   They tried triggerpoint injections?

2792

1  A   Yes, sir.

2  Q   They tried sending you to a chiropractor?

3  A   Yes, sir.

4  Q   Okay.  None of that helped?

5  A   No, it didn't.

6  Q   In fact, the chiropractor actually hurt?

7  A   Yes.

8  Q   And then at some point later on you had what's called

9  gastric bypass surgery; right?

10  A   Yes, sir.

11  Q   And that caused you a bunch of pain too?

12  A   It did, yes.

13  Q   Okay.  And you had some follow-on events from that; right?

14  A   Uh-huh (positive response).  Yes, sir.

15  Q   You actually had to go back and be treated for some

16  complications arising from that; right?

17  A   Yes, sir.

18  Q   And that caused you pain too?

19  A   Yes, sir.

20  Q   So that pain was having a significant effect on your daily

21  life, wasn't it?

22  A   Yes, sir.

23  Q   In fact, even when you were seeing Dr. West, you were

24  describing it on a scale of zero to 10 as about consistently an

25  eight out of 10; is that right?

1    A    Yes, sir.

2    Q    And as you just touched on with Ms. Griffin, Dr. Couch or

3    PPSA didn't only prescribe you medication; right?

4    A    No, he didn't.

5    Q    There were procedures; right?

6    A    Yes, sir.

7    Q    Blocks and stuff like that; right?

8    A    Yes.

9    Q    Now, before you went to PPSA, you had not used a lot of

10   pain medication; right?

11   A    No, I haven't.

12   Q    Was Dr. West giving you some Lortab, I believe?  Is that

13   right?

14   A    I don't think he ever gave me Lortab.  I think it was

15   Ultram.

16   Q    It was Ultram?

17   A    Yes.

18   Q    All right.  But he sent you to a pain management clinic;

19   right?

20   A    Yes.

21   Q    So it didn't surprise you that a pain management clinic

22   would be likely to use pain management medication; right?

23   A    No, that did not surprise me.

24   Q    Especially for someone in significant pain, hitting eight

25   out of 10 on a zero to 10 scale; right?

2794

1    A    Yes.

2    Q    And as you went over with Ms. Griffin, you were prescribed

3    different medications at PPSA; right?

4    A    Yes.

5    Q    You were given prescriptions for them?

6    A    Yes.

7    Q    And you got those prescriptions filled sometime at C&R, but

8    more commonly at your pharmacy at a Publix; right?

9    A    Yes.

10   Q    And there weren't any times, setting aside the patch

11   incident that you just described, there weren't any times when

12   you got a prescription and didn't fill it; right?

13   A    Right.

14   Q    You filled every single one; right?

15   A    No, I didn't fill every single one.  There was some that I

16   did not fill.

17   Q    Okay.  And I'm not talking about the ones that were blank

18   that you threw away.

19   A    No, I'm talking about ones that were given to me by Justin

20   Palmer.

21   Q    Other than the incident or event with the patch, did you

22   ever ask any pharmacist about the prescriptions you were given?

23   A    No.

24   Q    Did any pharmacist ever say anything to you about the

25   prescriptions you were given?

1  A   No.

2  Q   And you never went back to Dr. West about your treatment at

3  PPSA, did you?

4  A   No.

5  Q   You never went back to Dr. West and said:  This is

6  terrible.  Why did you send me to this guy?  Send me to

7  somebody else.

8       You never did that, did you?

9  A   No.

10 Q   Did you ever speak with Dr. Couch about any complaints you

11 had about care or lack of care?

12 A   No.

13 Q   Did you ever ask to speak or demand to speak to Dr. Couch

14 about your care?

15 A   No.

16 Q   Did you ever complain to anybody at PPSA about side-

17 effects?

18 A   No.

19 Q   And in fact the first time you complained publicly, so to

20 speak, not with your family or so forth, but publicly about any

21 medications, not about the wait in the waiting room or

22 anything -- but the first time you actually complained about

23 the medication was when you talked with the government; right?

24 A   Yes, sir.

25 Q   I'm sorry?

1  A   Yes, sir.

2  Q   You mentioned that you got treated by nurse practitioners

3  and other folks that were on Dr. Couch's staff; right?

4  A   Yes.

5  Q   Sitting here today, you don't know whether or not they

6  talked with Dr. Couch about your situation outside of your

7  presence?

8  A   No, I don't know.

9  Q   You don't know if Dr. Couch talked with Dr. West about your

10 case?

11 A   No, I don't.

12 Q   Or if they did talk, what they talked about?

13 A   Yeah.

14 Q   Is that right?

15 A   Yes.

16 Q   All right.  I want to follow up on some of the records that

17 Ms. Griffin went over with you on direct and some of the

18 records surrounding that.  Bear with me.

19         MR. SHARMAN:  All right.  Sam, could we go to page 42

20 of 165, please?  42 of 165.

21         THE COURT:  Is this from the government exhibit?

22         MR. SHARMAN:  It's the same file, Your Honor.  It's

23 the same Greenway file.  I'm just using it on the screen rather

24 than the hard copy.

25         THE COURT:  That's fine.  But for record purposes,

1   when you go to them, you need to just say what the exhibit is.

2           MR. SHARMAN:  Yes, ma'am.  And that is --

3           THE COURT:  Okay.  It's 6-2?

4           MS. GRIFFIN:  6-2.

5           THE COURT:  Yes.

6   BY MR. SHARMAN:

7   Q   This is Exhibit 6-2, looking at page 42 of 65.  All right.

8   And, Ms. Kamper, this is the record from October 9th of 2013,

9   which was your first visit to PPSA; right?

10  A   Yes.

11  Q   And then sort of in the top half there's a subsection

12  called history of present illness.  Do you see where I am?

13  A   Yes.

14  Q   And it describes you:  who is in consultation with James

15  West, MD, for the evaluation and management of chronic pain in

16  the low back which has been present for 10 months.

17          Does that sound about right to you?

18  A   Yes, sir.

19  Q   And later on it says that you were sent for physical

20  therapy and seen by a chiropractor, which caused some more

21  pain.  Does that sound right?

22  A   Yes, sir.

23  Q   And that you had taken several medications, Ultram did not

24  help, and you had nausea with Percocet.  Does that sound right?

25  A   Yes, sir.

2798

```
 1   Q   But that you did get some relief from Lortab.  Does that
 2   refresh your recollection about whether you had had Lortab
 3   before or not?
 4   A   I had had it before, but Dr. West never prescribed it.  It
 5   was --
 6   Q   Forgive me.
 7   A   Yeah.
 8   Q   And you said that the pain was sharp, burning, dull, and
 9   always there.  Does that sound right?
10   A   Yes, sir.
11   Q   And that you could not make it all the way around Wal-Mart;
12   is that right?
13   A   Yes, sir.
14   Q   And that your lower back pain averaged eight out of 10 on a
15   zero to 10 pain scale; is that right?
16   A   Yes, sir.
17   Q   And reached a maximum of 10 out of 10; right?
18   A   Yes, sir.
19   Q   And that was all true; right?
20   A   Yes, sir.
21   Q   I'm sorry?
22   A   Yes, sir.
23         MR. SHARMAN:  Sam, could we see, please, page 61 of
24   165 in Exhibit -- I'm sorry, Ms. Griffin.  I didn't write it
25   down.
```

```
 1              MS. GRIFFIN:  6-2.
 2              MR. SHARMAN:  Thank you.  Of Exhibit 6-2, which is
 3   Ms. Kamper's Greenway file.
 4   Q   All right.  Ms. Kamper, when you showed up at PPSA, you had
 5   to fill out some paperwork, including giving a little history
 6   about who you are and what your condition is; right?
 7   A   Yes, sir.
 8   Q   Okay.  Is that your signature there?  (Indicating.)
 9   A   Yes, sir.
10   Q   All right.  And it looks like here that you checked that
11   you had -- if you will look down kind of in the middle in
12   musculoskeletal, where you checked that you had muscle cramps
13   and joint stiffness; is that right?
14   A   Yes.
15   Q   And then if we go down to psychiatric, that you checked
16   that you suffered from anxiety; is that right?
17   A   Yes, sir.
18   Q   And that was all -- that was all true?  You said that;
19   right?
20   A   Yes.
21   Q   And then if we go over a couple of pages to page 63 of 165,
22   I think we'll see more of the patient intake form that you
23   filled out.  Do you recognize that?
24   A   Yes, sir.
25   Q   All right.  And then if you will take a look there at the
```

2800

1  top, under narcotics and anti-inflammatory, you'll see there

2  are some boxes that you can check about medication and then you

3  are asked if they help and you can answer yes or no.  Do you

4  see where I am?

5  A   Yes, sir.

6  Q   And you said that Percocet and Ultram had helped you?

7  A   Yes, sir.

8  Q   But I think you said the Percocet tended to make you

9  nauseous?

10 A   It sometimes did make me nauseous.

11 Q   And then if you will look over there, you checked that the

12 Tylenol and the ibuprofen, which is things like Advil and

13 Motrin, that that realty didn't help you; right?

14 A   No, it did not.

15 Q   And then again if we'll go down to treatment history, you

16 identify physical therapy.  You said that helped?

17 A   Yes.

18 Q   And then but the chiropractic care did not help you at all;

19 right?

20 A   No, it did not.

21 Q   All right.  Then if we turn over to the next page of the

22 form you filled out, page 64 of 165, okay, then again up at the

23 top that's still you, Jessi Kamper; right?

24 A   Yes, sir.

25 Q   That's all your handwriting?

```
 1   A   Yes, sir.

 2   Q   Then if we skip down to the bottom third of the page,

 3   you'll see three ranges going from zero to 10.  Do you see

 4   where I am?

 5   A   Yes, sir.

 6   Q   And the top range asked you to describe your pain at its

 7   worst.  Do you see where I am?

 8   A   Yes, sir.

 9   Q   You circled 10; right?

10   A   Yes.

11   Q   And 10 represents the worst pain imaginable; right?

12   A   Yes (nodding head affirmatively).

13   Q   And then the second one asked you to identify your pain

14   when it's at the least.  Do you see where that is?

15   A   Yes, sir.

16   Q   That's at a number five?

17   A   Yes.

18   Q   And then it asks you to pick an average pain.  That's a

19   seven; right?

20   A   Yes.

21   Q   And was that true when you filled all that out?

22   A   Yes; that is true.

23   Q   And then if we look at the next page -- you testified about

24   this on direct, I believe -- on October 28th, there's your name

25   again?
```

```
 1   A   (Nodding head affirmatively.)

 2   Q   And if we look down under procedure note?

 3         MR. SHARMAN:  I'm sorry, Sam.  Go up -- actually up a

 4   little bit, where it says -- there you go.

 5   Q   And this was the procedure that you had with Dr. Couch;

 6   right?

 7   A   Yes, sir.

 8   Q   All right.  Let's go quickly, Ms. Kamper, to your visit of

 9   November 6th of 2013.  Okay?

10   A   Okay.

11   Q   And then if we can look down to the history of present

12   illness, it says there in the second sentence:  Patient --

13   that's you; right?

14   A   Yes.

15   Q   -- states the LFJB -- and that's the procedure that we read

16   that's got the long name; right?

17   A   Yeah.

18   Q   Patient states that LFJB helped about a week very well, but

19   has worn off significantly.  Was that true?

20   A   That is true.

21   Q   So helped a little bit, but then it kind of went away;

22   right?

23   A   Yeah, it went away completely.

24   Q   And your pain came back?

25   A   Yes.
```

1   Q   Butrans works well -- that was a patch; right?  That was a

2   Butrans patch; right?

3   A   Yes, sir.

4   Q   But still having to take Lortab two to three times a day;

5   is that right?

6   A   Yes, sir.

7   Q   Was that your situation?

8   A   Yes, sir.

9   Q   Okay.  So that you had the patch and it was working well;

10  right?

11  A   Yeah.

12  Q   Okay.  But it wasn't working completely?

13  A   Yeah, it wasn't.

14  Q   Well, because that's why you were taking the --

15  A   Yeah.

16  Q   -- that's why you were taking Lortab; right?

17  A   Yes.

18  Q   You weren't taking Lortab because you were abusing it.  You

19  were taking the Lortab because you needed it to control the

20  pain; right?

21  A   Yes.

22  Q   And that's what you told them; right?

23  A   Yes.

24  Q   What's reflected here?

25  A   Yes.

1   Q   And you were truthful about that; right?

2   A   Yes, sir.

3   Q   And you didn't report any side-effects, bad things going

4   on; right?

5   A   No.

6           MR. SHARMAN:  Sam, let's turn to page 71 of 165,

7   please.

8   Q   Ms. Kamper, this is your visit of November 21st, 2013.  Do

9   you see where I am?

10  A   Yes.

11  Q   Okay.  And then we see another procedure note.  And I'm not

12  going to try to pronounce it, but that's the same kind of

13  procedure you got the previous time; right?

14  A   Yes.

15          MR. SHARMAN:  And, Sam, if we could please go to 74 of

16  165?

17  Q   Ms. Kamper, this is your December 4th visit.  And if we

18  look down under current treatment, which is almost in the

19  middle of the page, we see the bottom of it is:  The patient is

20  pleased with the current PPSA medications.  There are no new

21  significant side-effects or excessive drowsiness from the

22  medications.  Is that true?

23  A   At that time, yes, it was.

24  Q   Okay.  And December 2013, no side-effects; right?

25  A   No.

2805

1   Q   Or at least that's what you were telling them, no side-

2   effects; right?

3   A   Yeah (nodding head affirmatively).

4   Q   All right.  So in January 2014 that changed at least

5   somewhat; right?

6   A   Yes.

7   Q   I'm sorry?

8   A   Yes, sir.

9          MR. SHARMAN:  Sam, could we go to page 77 of 165,

10  please?

11  Q   All right.  This is your January 2nd, 2014, progress note,

12  your visit from January 2nd.

13  A   (Nodding head affirmatively.)

14  Q   Okay?  All right.  And then down in the objectives

15  paragraph, it says:  She reports increased lower back pain due

16  to muscle spasms to the area; right?  Is that what you told

17  them, you were having more lower back pain?

18  A   Yes.

19  Q   So your pain wasn't being controlled as well as it had been

20  on the previous visit?

21  A   That's right.

22  Q   And you said that at that point you were only using the

23  Percocet p.r.n., which is as needed; right?  You were only

24  using it as you felt like you needed it; right?

25  A   Yes.

JESSI KAMPER - CROSS BY MR. SHARMAN

2806

1  Q   And you said you wanted to decrease it or decrease to
2  something not so strong; right?
3  A   Yes.
4  Q   And it says the Butrans patch you were still using on your
5  lower back; right?
6  A   Yes.
7  Q   And you were tolerating it okay, along with the Percocet;
8  right?
9  A   Yes.
10  Q   And that you were still reporting no side-effects of the
11  medications?
12  A   That's right; yes.
13  Q   Is that true?
14  A   True.
15  Q   And then you said you wanted to discuss the possibility of
16  having an ablation, which is a surgical procedure; right?
17  A   Yes.
18  Q   All right.  I'm going to try to skip ahead a little bit,
19  Ms. Kamper, just to save us a little time and go to your visit
20  of February 26th.
21       MR. SHARMAN:  And, Sam, if we could please go to page
22  85 of Exhibit 6-2.
23  Q   This is your February 6th visit, Ms. Kamper.  Do you see
24  that?
25  A   Yes.

1  Q   And there under history of present illness, it says:

2  Patient states relief -- not spelled very well -- but relief

3  with LJB -- and again, that's that same procedure that's got

4  the long name; right?

5  A   Yes.

6  Q   For approximately two weeks, mild to moderate amount of

7  relief, able to walk longer.  Is all that true?

8  A   Yes.

9  Q   And that your current meds are doing good.  Started the

10  patch two weeks ago.  Pain relief with patch and Percocet is at

11  a pain level of four out of 10, which is tolerable.  Was that

12  all true?

13  A   Yes.

14  Q   And you weren't complaining of any side-effects; right?

15  A   No.

16  Q   I'm sorry?

17  A   No.

18        MR. SHARMAN:  All right.  Again, just to save a little

19  time, I'm going to skip ahead, if we can, to May 21st, 2014,

20  which is, Sam, page 100, please, of Exhibit 6-2.

21  Q   All right, Ms. Kamper.  I'm going to direct your attention

22  to your visit of May 21st, 2014.  Do you see where I am?

23  A   Yes.

24  Q   And then if you will turn over -- or if Sam can turn over

25  -- to page 102, which is actually the third page of your

JESSI KAMPER - CROSS BY MR. SHARMAN

```
 1   progress note, and go down and look under medications, the
 2   last -- the very last bullet point.  And this is talking about
 3   your Butrans patch; right?
 4   A   Yes.
 5   Q   Again, we're just talking about a patch put on your skin;
 6   right?
 7   A   Yes.
 8   Q   And it says it was discontinued on May 21st, 2014?
 9   A   Yes.
10   Q   Is that right?
11   A   Uh-huh (positive response).
12   Q   Because you had -- you had asked for something to be
13   changed because the Butrans patch was irritating the site where
14   you put the patch on; right?
15   A   Yes.
16   Q   And when they changed the patch on you, that helped
17   alleviate some of that irritation at the site; right?
18   A   Yeah.
19   Q   I'm sorry?
20   A   Yes, sir.
21   Q   All right.  And then, as you walked through with
22   Ms. Griffin, you continued to go back to PPSA either on a
23   monthly or sometimes, as you testified on direct, a 60-day
24   basis; right?
25   A   Uh-huh, yes.
```

1  Q   So let's move ahead, bearing that in mind, to your visit of

2  January 8th, 2015, which is on page 131.  All right.  And then

3  if you look at the top, that's you on January 8th, 2015; right?

4  A   Yes.

5  Q   And then in the history of present illness, the last

6  sentence says:  She is to have gastric bypass this week.  She

7  states that the surgeon defers to us for post-op pain

8  management.  She is requesting a decrease on the Roxicodone to

9  15 milligrams.  I am feeling a little better.

10        Is that all true?

11  A   Yes, sir.

12  Q   You were anticipating planning for gastric bypass surgery?

13  A   Yes.

14  Q   And you recall that your surgeon was basically looking to

15  PPSA and Dr. Couch to handle whatever pain management you

16  needed to have handled; right?

17  A   Yes.

18  Q   And you had asked for a decrease of the Roxicodone to 15

19  because you were feeling better?

20  A   Yes.

21  Q   And you felt like you didn't need the larger dosage; right?

22  A   Yes.

23        MR. SHARMAN:  And then, Sam, if we could turn over to

24  the third page of that note, which is page 134, please?

25  Q   And then if we look, Ms. Kamper, at the section called Plan

1  and then the subheading called Instructions, do you see where I

2  am there?

3  A   Yes, sir.

4  Q   Okay.  And there's two instructions, are there not?

5  A   Yes.

6  Q   One is to continue the present medications; right?

7  A   Yes.

8  Q   And the other is to decrease the Roxicodone to 15 and then

9  plan to wean opiates in the next few weeks; right?

10  A   Yes.

11  Q   And wean is just another word for decrease, or to get off

12  of opiates; right?

13  A   Yes.

14  Q   And that was what you wished to do; right?

15  A   Yes, that was my idea.

16  Q   And they were -- they were honoring your request; right?

17  A   Yes.

18  Q   Okay.  Reducing the Roxicodone?

19  A   Uh-huh (nodding head affirmatively).

20  Q   Yes?

21  A   Yes.

22  Q   And having a plan to taper or wean the treatment; right?

23  A   Yes.

24  Q   And then, as we discussed just a few minutes ago, you had

25  the gastric bypass surgery; right?

```
 1   A    Yes.
 2   Q    And you had some complications and pain that followed on
 3   from that; right?
 4   A    Yes.
 5   Q    And you reported that on your visit to PPSA; right?
 6   A    Yes.
 7   Q    And then at one point after the gastric bypass surgery, you
 8   actually asked to go up on the quantity of Roxicodone, did you
 9   not?
10   A    Yes, because I didn't know at the time that I was going to
11   have complications.  It happened like a month after that.  So
12   at this doctor appointment I was wanting to decrease.  But --
13   Q    I'm sorry.  To decrease or increase?
14   A    Yes, at this, what we're looking at here, I did decrease.
15   Q    Yes, ma'am.  But then later you had the --
16   A    Yes.
17   Q    -- surgery?
18   A    I had -- I had already had surgery at this point.  I had my
19   surgery in December.
20   Q    You had -- you had your surgery, you decreased, but then
21   you had the complications?
22   A    Yes.
23   Q    And then you had increased pain and difficulties from the
24   complications?
25   A    Yes.
```

1   Q   And so in April of 2015 you asked to go to have a larger

2   dosage of Roxicodone?

3   A   Yes.

4   Q   To address your increased pain?

5   A   Uh-huh (nodding head affirmatively).

6   Q   Is that right?

7   A   Yes, sir.

8   Q   All right.  Now, let me skip ahead, if I may, to your visit

9   of May 18th, 2015.  Sam, that's page 162 of Exhibit 6-2?

10          This is your visit, Ms. Kamper, of May 18, 2015.  Do

11   you see where I am?

12   A   Yes.

13   Q   All right.  And then if we can look down in the objectives

14   section, the progress note of May 18th, 2015, said:  Patient

15   reports being in the hospital last week secondary to another

16   episode of nausea and vomiting.  Is that -- is that accurate?

17   A   That is true.

18   Q   And this is still -- this is still all follow-on conditions

19   from the gastric bypass?

20   A   Yes, sir.

21   Q   And an explore. lap. was done along with a couple of other

22   things, and then you reported all is normal.  Do you see where

23   I read that?

24   A   Yes.

25   Q   Okay.  Was that accurate?

1    A   That is accurate, yes.

2    Q   And then kind of skipping towards the end, it says you

3    stated that the current Roxicodone is beneficial, but is

4    requesting an increase of medication to 120.  Do you see where

5    I read that?

6    A   Yes.

7    Q   And you made that request, did you not?

8    A   Yes.

9    Q   To 120?

10   A   Yes.

11   Q   And then you were informed unable -- presumably PPSA unable

12   -- and if she is having this type of pain, we are going to need

13   to increase her extended release medication, which she is not

14   wanting to do at this time.  Do you see where I read that?

15   A   Yes.

16   Q   Did I read that correctly?

17   A   You did.

18   Q   And that was -- that's what you told PPSA?

19   A   Yes.

20   Q   Okay.  And that was all true; right?

21   A   That is all true.

22   Q   On direct examination, Ms. Kamper, you mentioned an episode

23   or maybe more than one episode when you were given a

24   prescription on or as part of a larger piece of paper, do you

25   remember that?

```
 1  A   Yes.

 2  Q   Do you remember talking to Ms. Griffin about that?

 3  A   Yes.

 4  Q   And you said the piece of paper is about the size of a

 5  normal eight and a half by 11 piece of paper?

 6  A   Yes.

 7  Q   It was sort of divided into four pieces?

 8  A   Yes.

 9  Q   And one quarter had your prescription on it?

10  A   Yes.

11  Q   And the other three quarters were blank?

12  A   Yes, sir.

13          MR. SHARMAN:  May I approach, Your Honor?

14          THE COURT:  Yes.

15          Do we have any issue over here?  Do you need a pad is

16  that what it is?

17          A JUROR:  Ma'am, no.  I need -- (indicating).

18          THE COURT:  I'm sorry.  I don't understand what the

19  problem is.

20          A JUROR:  I'm sorry.  I have to go to the bathroom.

21          THE COURT:  Well, that's fine.  We will take a break.

22  And I didn't mean to embarrass you.  I just -- we need to know

23  what's going on.  We're going to take a 10-minute break.  And

24  if you want, you can go back in the jury room, if nobody else

25  needs to go at this time.
```

1          A JUROR:  Sure.

2          THE COURT:  All right.  Why don't you let her in the

3    jury room so she can use the restroom?

4          And if anybody else needs a break, though, we'll be

5    glad to let you have one.

6          Yeah, if you'll just walk all the way to the back, the

7    court security officer will let you in there and you can.  So

8    why don't we just take a stretch break while she does that.

9       (A recess was taken at 4:19 p.m.)

10      (In open court, 4:22 p.m., defendants and jury present.)

11         THE COURT:  All right.  I think we're ready to

12   proceed.

13         MR. SHARMAN:  May I proceed, Your Honor?

14         THE COURT:  Yes, please.

15   BY MR. SHARMAN:

16   Q   Ms. Kamper, we were just discussing your visit of May 18th.

17   That was the visit where you had requested an increase to 120,

18   and they told you that if your pain was like that, they were

19   going to have to increase it or change it to an extended

20   release.  Do you remember that?

21   A   Yes.

22   Q   I'm sorry?

23   A   Yes, sir.

24   Q   And May 18th, 2015, that was your last office visit; right?

25   A   That was, yes.

1  Q   And you know that PPSA was raided two days later, on May

2  20th, 2015?

3  A   Yes, yes.

4         MR. SHARMAN:  All right.  May I approach, Your Honor?

5         THE COURT:  Yes.

6  BY MR. SHARMAN:

7  Q   I want to show you, Ms. Kamper, what's been marked for

8  identification as Couch Exhibit 205 and ask you to take a look

9  at it, please, ma'am.  Does that look like the piece of paper

10 that you were describing earlier that had your prescription?

11 That is to say, it had four parts and three of the four were

12 not completed?

13 A   Yes.

14        MR. SHARMAN:  Dr. Couch moves 205 in evidence.

15        THE COURT:  Any objection?

16        MS. GRIFFIN:  No objection.

17        THE COURT:  All right.  Mark it in.

18        MR. SHARMAN:  May I have the ELMO, please?

19        THE CLERK:  Yes, sir.

20     (Defendant Couch's Exhibit 205 was entered into evidence.)

21 BY MR. SHARMAN:

22 Q   All right.  Ms. Kamper, I want to show you what has been

23 identified as Couch Exhibit 205.  Is this the page that you

24 were talking about when you said that one quarter of it was

25 filled out with a prescription and then the other three-

1  quarters were blank; is that right?

2  A   Yes, sir.

3  Q   So, for example, that quarter may have had a prescription

4  and the other three may have been blank; right?

5  A   Yes.

6        MR. SHARMAN:  Ms. Kamper, I appreciate your time.  No

7  further questions, Your Honor.

8        MS. GRIFFIN:  Briefly, Your Honor.

9        THE COURT:  All right.

10                    REDIRECT EXAMINATION

11 BY MS. GRIFFIN:

12 Q   Ms. Kamper, did The Orthopaedic Group give a report about

13 your MRI to Dr. Couch's office?

14 A   It was handed to me.  I got a copy of it and I took it to

15 my first visit.

16 Q   I'll show you part of that.  It's dated 4/11/13, and that's

17 The Orthopaedic Group and you're the patient; is that correct?

18 A   Yes, ma'am.

19        THE COURT:  Is that part of Government's Exhibit --

20        MS. GRIFFIN:  I'm sorry, Your Honor.  It is part and

21 parcel of Government's Exhibit 6-2, the Jessi Kamper patient

22 file.

23 Q   Does it indicate that your X-rays were essentially normal

24 and your MRI was essentially normal?

25 A   Yes, ma'am.

JESSI KAMPER - REDIRECT BY MS. GRIFFIN

1  Q   You indicated that you filled out some paperwork, and

2  Dr. Couch's attorney showed you some paperwork you had filled

3  out; is that right?

4  A   Yes, ma'am.

5  Q   This is your signature at the bottom of the page of the

6  review of symptoms?

7  A   Yes, ma'am.

8  Q   Is it signed as having been reviewed by anyone?

9  (Indicating.)

10  A   No, ma'am.

11  Q   Do you report in the psychiatric section as having anxiety?

12  A   Yes, ma'am.

13  Q   Did you have anxiety?

14  A   Yes, ma'am.

15  Q   And I take you to your first visit, October the 9th of

16  2013, where you told us you saw Dr. Couch for about three to

17  five minutes.  Here's the first page, October the 9th of 2013.

18  And the second page of that same report, does it show:  Denies

19  anxiety?

20  A   Yes, it does.

21  Q   Was that true?

22  A   That is not true.

23  Q   If I represent to you that each of the others showed no

24  anxiety -- denies anxiety, did you ever talk to them about

25  anxiety, do you recall?

1   A   No.

2   Q   You did not?

3   A   Anxiety was never mentioned.

4   Q   Were you ever asked about it?

5   A   No.

6   Q   But you had put it on your form when you --

7   A   Yes.

8   Q   -- first got there, when you first went there.

9          Now, when you were ready to DC or quit with your meds,

10  that was April of '14?

11  A   Yes, ma'am.

12  Q   Is that right?  Feeling better, ready to undo.  That didn't

13  happen at that time, did it?

14  A   No, it did not.

15  Q   Did you discuss with Dr. Couch in any of the visits the

16  increasing of the medication or the decreasing of the

17  medication?

18  A   No, ma'am.  I never -- he wasn't there.  So --

19  Q   You didn't have the opportunity to discuss it with him?

20  A   Yeah, I didn't.

21  Q   In January of 2015, you had already had the bypass surgery?

22  A   Yes, ma'am.

23  Q   You had an January 8th visit; is that right?

24  A   Yes, ma'am.

25  Q   And that's the visit where it was indicated that you wanted

```
 1   to decrease the Roxicodone; is that right?
 2   A   Yes, ma'am.
 3   Q   Did you discuss that with Dr. Couch?
 4   A   No, ma'am.
 5   Q   And you were feeling better and wanted lower medications?
 6   A   Yes, ma'am (nodding head affirmatively).
 7   Q   Who did you have to discuss that with?
 8   A   Justin.
 9   Q   Do you know who made the change in medications?
10   A   It was either Justin or -- Justin Palmer or Ben Clark.
11   Q   Who was Ben Clark?
12   A   He was the new nurse practitioner that I saw at the
13   beginning of the year.
14   Q   Do you know why you weren't seeing Justin after December of
15   2014, if you know?
16   A   He had a problem with addiction and went to rehab.
17   Q   And when you began to see Ben, were you seeing Dr. Clark --
18   excuse me -- Dr. Couch in the visits where Ben Clark was the
19   assistant?
20   A   No, ma'am.
21   Q   So you only saw Dr. Couch once the entire time that you
22   were there in a patient visit?
23   A   That is true.
24           MS. GRIFFIN:  That's all I have of the witness, Your
25   Honor.
```

1           THE COURT:  All right.  May this witness be excused?

2           MR. SHARMAN:  Yes, ma'am.

3           MS. GRIFFIN:  Please.

4           THE COURT:  Thank you.  You may step down.

5           MR. BODNAR:  Your Honor, may we approach briefly

6    before we call this next witness?

7           THE COURT:  Yes.

8       (At the side bar, jury not present.)

9           MR. BODNAR:  The next witness is Mr. Burns.  He is the

10   husband of Kathleen Burns, the patient that we filed the review

11   for.  She is dead, completely unrelated to this.  Long after

12   she was a patient, she died of a heart condition.  I think so

13   as not to leave the impression that there is any drug issue

14   related to her death -- and I've talked with them about that --

15   that he just mentions in the beginning she is dead and it was

16   after she was a patient and it was due to her heart issue.  I

17   just want to put that on the record so we don't leave any

18   implication that she died --

19          THE COURT:  You intend to make that clear through his

20   testimony?

21          MS. GRIFFIN:  I do.  Absolutely.

22      (In open court, defendants and jury present.)

23          MR. BODNAR:  The United States calls Mr. Burns.

24                      DWIGHT TIMOTHY BURNS

25                  was sworn and testified as follows:

```
1              THE WITNESS:  I do.

2              THE CLERK:  Thank you, sir.  Please be seated.

3                         DIRECT EXAMINATION

4   BY MR. BODNAR:

5   Q    Good afternoon.

6   A    Good afternoon, sir.

7   Q    Could you please introduce yourself to the jury?

8   A    My name is Dwight Timothy Burns.

9   Q    And, Mr. Burns, where do you live?

10  A    I live at on 2261 Cedar Point Road, Mobile, Alabama.

11  Q    And are you currently retired?

12  A    Yes, sir.

13  Q    Have you ever been a patient of either Dr. Couch or

14  Dr. Ruan?

15  A    No, sir, I have not.

16  Q    Was any member of your family a patient of either Dr. Couch

17  or Dr. Ruan?

18  A    My wife was a patient of Dr. Ruan's.

19  Q    And who was your wife?

20  A    Kathleen Burns.

21  Q    And do you see -- do you know what Dr. Ruan looks like?

22  A    Yes, sir.

23  Q    Do you see him in the courtroom today?

24  A    (Indicating.)  Right there.

25  Q    Let the record reflect that he has identified Dr. Ruan.
```

DWIGHT TIMOTHY BURNS - DIRECT BY MR. BODNAR

```
 1            And, Mr. Burns, after the time period that your wife
 2    was a patient, did she pass away?
 3    A   Yes, sir.
 4    Q   And was it related to a heart condition not related to
 5    anything she was being treated for or any drug she was
 6    receiving?
 7    A   Yes, sir.
 8    Q   Mr. Burns, what did your wife, Kathleen, first start going
 9    to PPSA for?
10    A   She had a car wreck and the nerves in her back was messed
11    up and so she was in pain.
12    Q   And did she start going approximately 2012?
13    A   Yes, sir.
14    Q   I'm going to show you from Government's Exhibit 9-11 the
15    Kathleen Burns patient file what is being pulled out as her
16    history and physical from May 17th, 2012.  Is that --
17    A   Yes, sir.
18    Q   -- your wife and her birthday?  (Indicating.)
19    A   Yes, sir.
20    Q   At the bottom here for social history, do you see where it
21    says previous narcotics abuse?
22    A   Yes, sir.
23    Q   Had your wife had drug abuse issues before going to
24    Dr. Ruan and Dr. -- before going to Dr. Ruan?
25    A   Yes, sir.
```

1  Q   Would you please explain to the jury about her prior abuse?

2  A   It was street drugs.

3  Q   And this was -- did this occur before you were married to

4  her?

5  A   Yes, sir.

6  Q   And how long had you been married to her?

7  A   I was married almost 17 years.

8  Q   Did there come a time that -- did you attend the visits

9  with your wife?

10  A   Yes, sir, I -- not the visits.  I would sit in the waiting

11  room with her.

12  Q   So you never actually went in to see what was done or said

13  to her?

14  A   No, sir.

15  Q   Do you know if at any point she was put on a drug called

16  Subsys?

17          MR. KNIZLEY:  Objection.  Hearsay.

18          THE COURT:  Well, I don't know if it is or not.  So I

19  mean he may have knowledge of it.  Overruled.

20  BY MR. BODNAR:

21  Q   Did you?

22  A   Sir?

23  Q   Were you living with your wife, Kathleen Burns, during the

24  time she was a patient of Dr. Ruan's?

25  A   Yes, sir.

2825

```
1   Q   Do you -- did you ever see her --

2           MR. BODNAR:  And may I approach, Your Honor?

3           THE COURT:  Yes.

4   BY MR. BODNAR:

5   Q   Did you ever see if your wife received a prescription for a

6   drug called Subsys, a fentanyl spray, that appeared to be

7   somewhat similar to a box marked Government's Exhibit 9-10?

8   (Indicating.)

9   A   Yes, sir.

10  Q   And you actually saw your wife get this prescription?

11  A   Yes, sir, I did, more than one box.

12  Q   Were you with her when she would fill her prescriptions?

13  A   Yes, sir.

14  Q   Where did she fill her prescriptions for Subsys?

15  A   Most of the time at the pain clinic on Airport Boulevard.

16  They had their own pharmacy there or -- not the pharmacy.  A

17  pharmacy.

18  Q   And that is where your wife would fill her Subsys

19  prescriptions?

20  A   Yes, sir.

21  Q   You mentioned more than one box.  Would she receive more

22  than one box --

23  A   Yes, sir.

24  Q   -- of prescriptions?

25  A   I would see her come home with three or four boxes.
```

1   Q   Did you ever see your wife using Subsys?

2   A   Yes.

3   Q   Will you explain to the jury what if anything happened to

4   her after she was using her Subsys?

5   A   She would mainly do like any drug addict would do, get

6   lethargic, pass out, and if she took too much I'd find her in

7   the kitchen floor or anywhere else in the house, never knowing.

8   Q   Mr. Burns, were there ever instances where you needed to

9   call for medical assistance for your wife?

10   A   Yes, sir.

11   Q   Was that due to her taking Subsys?

12   A   Yes, sir.

13   Q   Can you explain to the jury what happened?

14   A   She had taken too much and I walked into the living room, I

15   woke up and she wasn't in bed.  I walked into the living room

16   and she was laying in the living room and I could not -- she

17   was laying on the couch in the living room.  And I could not

18   wake her up.  And something happened and I pulled her shirt up,

19   you know, it came up some, and she had some patches on her plus

20   the little bottles were there on the couch.

21   Q   Did you have to call the ambulance?

22   A   Yes, sir.

23   Q   And did they -- did anyone come and treat her?

24   A   Sir?

25   Q   Did anyone come and treat her?

2827

1  A   Yes, sir.  The ambulance came and they took her to the

2  hospital.

3  Q   Did this happen on more than one occasion?

4  A   Yes, sir, it happened three times.

5  Q   Do you know if there was a time period where she was fired

6  or discharged from the --

7  A   Yes, sir.

8  Q   Can you -- what happened, if you know?

9  A   I don't know exactly what happened in the office.  But when

10  she came back out to the car -- I always waited on her -- she

11  came back out there and said:  They -- they let me go.

12  Q   Was she -- did she receive any medication?

13  A   No.

14  Q   What happened to her in the days immediately after being

15  discharged?

16  A   Well, she had -- we had to find another pain clinic that

17  would help us get her down off that medicine.

18  Q   Before you found another pain clinic, what if anything did

19  your wife do?

20  A   She went through withdrawals, just like anybody else would

21  if they were on that stuff.

22  Q   Did she try to obtain opiates anywhere else?

23  A   Yes, she did.

24  Q   What did she do?

25  A   She would buy them off the streets illegally.

2828

1   Q   Mr. Burns, I'm going to show you from Government's Exhibit

2   9-11 a page that is in the medical file for your wife.  Do you

3   see the date up there, July 18, 2014?

4   A   Yes, sir.

5   Q   And was Cigna your wife's insurance?

6   A   Yes, sir.

7   Q   And Kathleen Burns, is that the correct birth date?

8   A   Yes, sir.

9   Q   And at the bottom of this letter does it say:  Please

10  confirm by signing below that the member listed above received

11  the TIRF medication indicated for the approved diagnosis of the

12  management of breakthrough cancer pain and that appropriate

13  TIRF-REMS Access Program agreement forms were signed?  Is that

14  what that says?

15  A   Yes, sir.

16  Q   Does this appear to be signed?

17  A   Yes, sir.

18  Q   Mr. Burns, did your wife have cancer in July of 2014?

19  A   No, sir.

20  Q   Did your wife have cancer at any time when she was on

21  Subsys?

22  A   No, sir.

23  Q   Was your wife ever treated by an oncologist in any way?

24  A   No, sir.

25  Q   Mr. Burns, I neglected to ask you this in the

 1  beginning.  But did you have two DUIs, one in the late '80s and
 2  one in the early '90s?
 3  A   Yes, sir.
 4  Q   Have you had any other criminal conviction?
 5  A   No, sir.
 6       MR. BODNAR:  Nothing further from this witness.
 7       THE COURT:  All right.  Mr. Knizley?
 8       MR. KNIZLEY:  Yes, ma'am.
 9                   CROSS EXAMINATION
10  BY MR. KNIZLEY:
11  Q   Good afternoon, Mr. Burns.  Very sorry about your
12  wife.  Mr. Burns, the prosecutor asked you when your wife went
13  to see Dr. Ruan that she indicated that she had unfortunately
14  had narcotics abuse in the past?
15  A   Yes, sir.
16  Q   And the prosecutor asked you what it was and you said
17  street drugs; is that right?
18  A   Yes, sir.
19  Q   Could you tell us a little bit about that?  I know it's
20  uncomfortable.
21  A   I can't tell you too much about it because it was before we
22  were married.  I know she went to -- she also had -- drinking
23  was a problem to her too.  But I could not tell you exactly
24  when it was or what happened.  Because it was before we met.
25  Q   And you know when she had a wreck, you said she got in a

1    car wreck and nerves in her back got messed up?

2    A   Yes, sir.

3    Q   Do you remember when she had the car wreck?

4    A   Yes, sir, it was right before we had gotten married, '94,

5    we were both working for the City of Mobile and a car hit her

6    from behind.

7    Q   I'm sure she had medical care and hospitalization and stuff

8    like that associated with the car wreck?

9    A   Yes.

10   Q   And she had been having trouble with her back.  I think she

11   first came to see Dr. Ruan in May of 2012; does that sound

12   right?

13   A   Yes, sir.

14   Q   And you said she came to Dr. Ruan because of her back

15   problems where she got her nerves messed up in the car wreck.

16   Had she been struggling with that pain since the car wreck?

17   A   Yeah and no.  Sometimes it was and sometimes it

18   wasn't.  But it got worse during this time, you know, after the

19   car wreck.  After she had her back operated on it got worse.

20   Q   And who operated on her back, if you remember?

21   A   I don't know the doctor's name right offhand.  It was

22   somebody in the Mobile Infirmary group.

23   Q   All right.  And it was -- and did that doctor continue to

24   treat her after the car wreck for her back issues?

25   A   I believe that was the doctor that sent her to him.

2831

1  Q    All right.  And so she stayed with that doctor from '94 at

2  least off and on all during the time --

3  A    Yes, sir.  She had a second operation on her back by the

4  same doctor.

5  Q    Okay.  About when was that, if you remember?

6  A    Sir?

7  Q    About when was that, if you remember?

8  A    '11, I think, it was.  I'm not positive on the dates.

9  Q    Okay.  Do you remember if it was lower back or upper back?

10  Do you remember?

11  A    Sir?

12  Q    Was it in the lower part of her back?

13  A    The lower part of her back.

14  Q    And the second operation, was it to repair some damage that

15  was still --

16  A    They were trying to repair some of the nerves in her back

17  and they found like a little tumor ball or where the nerves was

18  all gathered up in a ball and were latched onto each other.  I

19  don't know the specific -- you know, exactly what it was.

20  Q    And I'm sure after her problems with the car wreck and

21  nerves and the second and first surgery and then the second

22  surgery, she had pain issues, I'm sure?

23  A    Yes, sir, she did.

24  Q    And the doctor that did the first surgery and the second

25  surgery -- and the second surgery in 2011 -- I'm assuming he

2832

```
 1   tried to manage her pain to some degree?

 2   A   Yes, sir.

 3   Q   And did there come a time where he felt it would be better

 4   for her to go to a pain management specialist?

 5   A   Yes, sir.

 6   Q   Is that correct?

 7   A   Yes, sir.

 8   Q   And did that doctor refer her to Dr. Ruan?

 9   A   As far as I know, sir, yes, he did.

10   Q   And was it a lady doctor, Melissa Schroeder?

11   A   Yes, sir, I -- I believe.

12   Q   Okay.  And it was about May 17th or somewhere around there

13   in 2012, does that sound about right?

14   A   Yes, sir.

15   Q   And --

16   A   Yes, sir.

17   Q   He referred her to Dr. Ruan.  Okay.  And your wife had

18   never had cancer, had she?

19   A   No, sir.

20   Q   Never been a question about cancer?

21   A   No, sir.

22   Q   And you went and she went to Dr. Ruan and when she first

23   met Dr. Ruan there was no reason for her to say she had cancer;

24   right?

25   A   No, there was no reason at all.
```

2833

```
 1   Q   Okay.  And did you go in with her on that first visit?

 2   A   No, sir, I did not.

 3   Q   And I'm going to show you what's marked Government's

 4   Exhibit 9-11 and page 29 out of that exhibit.  Okay?

 5   A   Okay.

 6   Q   And I'll represent to you this is from your wife's medical

 7   file that's been admitted into evidence.  All right?

 8   A   Uh-huh (positive response).

 9   Q   And as you said, it has your wife's name right there;

10   right?  (Indicating.)

11   A   Yes, sir.

12   Q   And as you said, she was having some lower back pain;

13   right?

14   A   Yes, sir.

15   Q   And apparently it had radiated down her leg; is that right?

16   A   Yes, sir, yes, sir.

17   Q   Okay.  And she presented her history.  And again, we talked

18   about her being referred by the lady doctor; right?

19   A   Right.

20   Q   And that tells us that the evaluation for treatment of

21   chronic pain-- and she reported that the worse pain was in her

22   lower back and left leg and she reports the pain began 15 years

23   ago and she reports that there was an injury related to her

24   current pain and reports that the injury resulted from a motor

25   vehicle accident.  That was the car wreck you were telling us
```

DWIGHT TIMOTHY BURNS - CROSS BY MR. KNIZLEY

1   about; is that right?

2   A   Uh-huh (positive response).

3   Q   Kathleen Burns also reports she had a herniated disk as a

4   result of the motor vehicle accident?

5   A   Yes, sir.

6   Q   And she denies numbness and tingling in the lower

7   extremities, she reports that she is currently taking Lortab

8   10/500 alternating with Tylox for pain and somewhat helpful.

9   And she said her pain was five on a scale of 10 and nine on a

10  scale of 10 and zero on a scale of 10 -- on a zero to 10 pain

11  scale and that average pain is nine out of 10.

12          She's saying her pain was five to 10 to 9 to 10 on a

13  zero to 10 scale, 10 being the highest.

14  A   Yes, sir.

15  Q   Would you agree that she was in that type of pain?

16  A   Yes, sir, sometimes.

17  Q   Okay.  And she's describing pain that's continuous and

18  unbearable and that her pain -- she stated her pain was

19  alleviated by medicine.  Does that sound right to you?

20  A   Yes, sir.

21  Q   And she reports that the pain is aggravated by walking and

22  standing for a prolonged period of time.  Did that sound like

23  your wife?

24  A   Yeah.

25  Q   And did she report that her pain interfered with general

1   activity, mood, walking, ability, normal work routine,

2   relations with other people, sleep, enjoyment of life, and

3   other things?

4   A   Yes, sir.

5   Q   Was she having those type difficulties --

6   A   Yes, sir, she was.

7   Q   -- Mr. Burns?

8          And she had already tried a TENS unit before coming to

9   Dr. Ruan?

10  A   Yes, sir.

11  Q   And do you recall whether that gave her relief or not?

12  A   Temporary, very temporary.

13  Q   And then she had had physical therapy before she came to

14  Dr. Ruan?

15  A   Yes, sir.

16  Q   And do you know if that helped her much?

17  A   Very little, sir.

18  Q   And epidurals?

19  A   Very little.

20  Q   And the same thing with the nerve block?

21  A   Yes, sir.

22  Q   And did it help her much, the nerve block?

23  A   No, sir.

24  Q   The CV things such as TENS units and physical therapies and

25  epidurals and nerve blocks that she had had in the past, now

2836

 1   she says they were helpful, and you're saying they were helpful

 2   for a short period of time?

 3   A   Yes, sir.  That's what --

 4   Q   Not lasting relief?

 5   A   No, sir.

 6   Q   And did you feel like that she was going to have to have

 7   some medications in order to get some relief from this pain?

 8   A   Did I feel like that?

 9   Q   Yes, sir.

10   A   No, sir, I didn't know what she would have to have.

11   Q   Okay.

12   A   I'm not a doctor.

13   Q   And that's why you went to the doctor, to see what the

14   doctor had to say?

15   A   Right, right.

16   Q   She had already been to the doctor and the TENS wasn't

17   helping, the physical therapy wasn't helping, the epidurals and

18   the nerve blocks at least wasn't helping much?

19   A   That's what she said.

20   Q   She went to the doctor, the pain specialist, now, and said:

21   I need your help; right?

22   A   Yes, sir.

23   Q   All right.  She had had an MRI back in March 20 of 2013 and

24   that was about just two months before; right?

25   A   Yes, sir.

1    Q    And that was at Knollwood?

2             THE COURT:  That was 2012.

3    BY MR. KNIZLEY:

4    Q    Excuse me.  2012.  I'm sorry.  This was 2012, you're in the

5    office, and it's also just a couple of months earlier in 2012

6    that she had her MRI at Knollwood; right?

7    A    Yes, sir.

8    Q    All right.  And her medication list at the time coming in,

9    she was taking some Ambien.  Do you remember what she was

10   taking that for?

11   A    For sleep, I believe.

12   Q    Okay.  And I'm going to say gabapentin.  I don't know.  Do

13   you know what that's for, by any chance?

14   A    No, sir.  All I know, as far as that also would help her

15   sleep and there was supposed to be a couple of them here would

16   help her with the pain.  But that -- it was only just like

17   everything else, just for a while.

18   Q    Right.  And so we're clear, the list I'm reading is what

19   she was on when she came to Dr. Ruan; right?

20   A    Yes, sir.

21   Q    And the next one is Keppra Oral, a thousand milligrams.

22   Did you know what that one was?

23   A    I don't know what it was for, no, sir.

24   Q    How about Lortab?

25   A    Lortabs.  Yes, sir.

DWIGHT TIMOTHY BURNS - CROSS BY MR. KNIZLEY

1  Q   And what was that for?

2  A   For pain.

3  Q   And that was 10 tablets, 500 milligrams.  And then do you

4  know what the Prozac was for?

5  A   No, sir.

6  Q   And the Seroquel oral tablets, do you know what that might

7  be for?

8  A   No, sir.

9  Q   And how about the Topiramate oral tablets?

10  A   All I know that stuff was for was to help her with her pain

11  problems.

12  Q   All right.  And I'm just going to ask about the trazodone,

13  do you know any particular reason she was taking that except

14  generally for pain?

15  A   Dealing with the pain and the mental part of it too.

16  Q   And by mental part of it, what do you mean?

17  A   By mental part what do I mean?  If you was in pain all the

18  time, wouldn't that get you mentally down?

19  Q   That and a lot of other things, yes, sir, it would.

20  A   Okay.  That's exactly what I mean by it.

21  Q   Yes, sir.  She was having pain and it -- that caused

22  anxiety, depression and all kind of concerns; is that right?

23  A   Yes, sir.

24  Q   And all you knew is she was taking a number of medications

25  to deal with the pain and maybe to deal with the --

1  A   Going to doctors and seeing doctors for her pain and that's

2  what I knew, sir.

3  Q   Yes, sir.  And I understand that.  And I'm just trying to

4  get me and the jury familiar with how she was when she first

5  got to see the doctor.

6  A   I understand that, sir.

7         THE COURT:  Mr. Knizley, how much longer are you going

8  to be with this witness?

9         MR. KNIZLEY:  I'll be a little while, Your Honor.

10         THE COURT:  A little while --

11         MR. KNIZLEY:  30 minutes.

12         MS. GRIFFIN:  May we approach, Your Honor?

13         THE COURT:  Yes, please.

14     (At the side bar, jury not present.)

15         MR. BODNAR:  Your Honor, I'm not sure how 30 minutes

16  is going to be anywhere within the scope of what the direct

17  was.  My direct couldn't have been more than about five or 10

18  minutes.

19         THE COURT:  Do you intend to go through her entire

20  medical file?

21         MR. KNIZLEY:  Judge, only the relevant parts.  And the

22  theory is here that --

23         THE COURT:  He's never seen any of this medical file

24  and he wasn't with her during the things.  I'm just wondering

25  if you can in the next 10 minutes wrap up his testimony so he

2840

 1    wouldn't have to come back tomorrow.

 2              MR. KNIZLEY:  Judge, if you might recall, this was the

 3    witness we had -- this was the patient with Agent Burt that we

 4    had a number of documents that were admitted into evidence but

 5    we weren't able to cross-examine him about it.  And I know that

 6    he wasn't in there with her.  But the government went through

 7    the medical file, the documents that have been admitted into

 8    evidence.

 9              THE COURT:  Not with this witness.

10              MR. KNIZLEY:  Yes, ma'am.

11              THE COURT:  Went through the whole medical file?

12              MR. KNIZLEY:  No, no.  Went through the file, not the

13    entire file, but went through parts of the file, which this

14    witness would not have any knowledge about except for the fact

15    that it's in evidence -- and through this witness identify the

16    documents, particularly the one about the cancer, the critical

17    document.  I would go through the -- I would proffer or inform

18    the Court it would be my intention to go through the file to

19    show where there's never been an indication from her to

20    Dr. Ruan that she ever had cancer nor has there ever been any

21    indication by Dr. Ruan throughout the medical file she had

22    cancer.  There had been correspondence that came to his home

23    directed to her from the insurance company that -- they are not

24    in the file.  They are in evidence now.  These are the ones

25    that were admitted in through Agent Burt, that she was

1    acquitted, she was denied, then approved for Abstral -- for

2    Subsys.  And the corresponding medical record would reflect

3    nothing -- would reflect about lumbar pain and on three

4    different diagnoses signed by the doctor, not anything to do

5    with cancer.  There's never been any indication --

6          THE COURT:  That's what the government contends, there

7    is no indication of cancer except for that one document signed

8    by Dr. Ruan.

9          MR. KNIZLEY:  Yes.  And then also we contend that the

10   defendant makes representations throughout the file, the

11   defendant makes representations throughout the file there is no

12   cancer.

13         THE COURT:  Well, so he can't say what she said,

14   because he wasn't in there.

15         MR. KNIZLEY:  And I'm not saying he said what she

16   said, Judge.  We've allowed the government --

17         THE COURT:  No.  I'm just saying there's no need to

18   prolong the witness' testimony because the government's not

19   contending the file has anything about cancer in it except for

20   that one piece of paper that Dr. Ruan signed.  I'm just telling

21   you I'll make the man come back in the morning, if that's what

22   you want to do.  But we're not going to go through everything

23   in the file just to show that there's no indication of cancer.

24         MR. KNIZLEY:  Yes, ma'am.  And that's not all of it.

25   There's other too.  I hate to ask the man to come back too, but

1   I feel like I have the duty to cross-examine him properly.

2          THE COURT:  All right.

3     (In open court, defendants and jury present.)

4          THE COURT:  All right.  Mr. Burns, we're going to have

5   to ask you to come back in the morning.

6          Ladies and gentlemen, we're going to take our

7   recess.  Remember my instructions to you not to discuss the

8   case or allow anyone to discuss it with you.  Leave your pads

9   on your chairs.  Be back downstairs in the jury assembly room

10  at 9 o'clock tomorrow morning ready to be called back up.

11         Thank you and have a good evening.

12         We're in recess.

13     (Court adjourned at approximately 4:57 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25