

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ALABAMA


UNITED STATES OF AMERICA

v.                                          CASE NO. CR15-00088

                                            COURTROOM 2B
JOHN PATRICK COUCH, M.D.,
and XIULU RUAN, M.D.,

                                            MOBILE, ALABAMA
        Defendants.
                                            THURSDAY, JANUARY 26, 2017
* * * * * * * * * * * * * * *


                    DAY 13 OF TRIAL
        BEFORE THE HONORABLE CALLIE V. S. GRANADE,
           UNITED STATES DISTRICT JUDGE, AND JURY


APPEARANCES:

FOR THE GOVERNMENT:
     DEBORAH A. GRIFFIN
     CHRISTOPHER BODNAR
     United States Attorney's Office
     63 S. Royal Street, Suite 600
     Mobile, AL  36602
     (251) 441-5845


FOR THE DEFENDANT COUCH:
     ARTHUR T. POWELL, III
     P.O. Box 40456
     Mobile, AL 36640-0456
     (251) 433-8310

     JACKSON R. SHARMAN, III
     JEFFREY PAUL DOSS
     BENJAMIN SANDERS WILLSON
     Lightfoot, Franklin & White
     400 North 20th Street
     Birmingham, AL  35203
     (205) 581-0700

1  (Continued)

2      BRANDON KEITH ESSIG
       800 Shades Creek Parkway, Suite 600D
3      Birmingham, AL  35209
       (251) 879-1981

4

   FOR THE DEFENDANT RUAN:
5      DENNIS J. KNIZLEY
       7 N. Lawrence
6      Mobile, AL 36602
       (251) 432-3799

7

       JASON BRADLEY DARLEY
8      Darley & McGough, LLC
       1751 Dauphin Street
9      Mobile, AL 36604
       (251) 441-7772

10

       GORDON G. ARMSTRONG, III
11     P.O. Box 1464
       Mobile, AL  36633
12     (251) 434-6428

13     STEVEN D. MARTINIE
       4955 North Lake Drive
14     Whitefish Bay, WI  53217
       (414) 332-9683

15

   THE CLERK:  MARY ANN BOYLES
16 THE LAW CLERK:  LYNN DEKLE
   U.S. ATTORNEY IT:  BRIAN COCHRAN
17 DEFENSE IT:  SAM McALLISTER
   COURT REPORTER:  ROY ISBELL, CCR, RDR, CRR

18
           Proceedings recorded by OFFICIAL COURT REPORTER
19      Qualified pursuant to 28 U.S.C. 753(a) & Guide to
    Judiciary Policies and Procedures Vol. VI, Chapter III, D.2.
20        Transcript produced by computerized stenotype.

21

22

23

24

25

1                          EXAMINATION INDEX

2

DWIGHT TIMOTHY BURNS
3        CROSS BY MR. KNIZLEY . . . . . . . . . . . . . .2862
         REDIRECT BY MR. BODNAR . . . . . . . . . . . . .2876

4

TONYA COLQUHOUN
5        DIRECT BY MR. BODNAR . . . . . . . . . . . . . .2880
         CROSS BY MR. ESSIG . . . . . . . . . . . . . . .2888
6        CROSS BY MR. KNIZLEY . . . . . . . . . . . . . .2893
         REDIRECT BY MR. BODNAR . . . . . . . . . . . . .2900

7

B. J. GUERRERO
8        DIRECT BY MR. BODNAR . . . . . . . . . . . . . .2903
         CROSS BY MR. ESSIG . . . . . . . . . . . . . . .2909
9        CROSS BY MR. KNIZLEY . . . . . . . . . . . . . .2911
         REDIRECT BY MR. BODNAR . . . . . . . . . . . . .2912

10

KEVIN McCASH, Ph.D.
11       DIRECT BY MR. BODNAR . . . . . . . . . . . . . .2914
         CROSS BY MR. WILLSON . . . . . . . . . . . . . .2930
12       REDIRECT BY MR. BODNAR . . . . . . . . . . . . .2937

13

THOMAS JUSTIN PALMER
         DIRECT BY MS. GRIFFIN . . . . . . . . . . . . .2938
14       CROSS BY MR. SHARMAN . . . . . . . . . . . . . .3011
         REDIRECT BY MS. GRIFFIN . . . . . . . . . . . .3077

15

16

17

18

19

20

21

22

23

24

25

1    EXHIBIT INDEX

2                                                          MAR   ADM
     GOVERNMENT'S
3    7-5    Plea agreement without factual resume          3010
            (Justin Palmer)
4
     27-16  Medicare Subsys prescriber comparison          2882
5           1/1/11 - 5/20/15

6    27-17  Medicare Abstral prescriber comparison         2882
            1/1/11 - 5/20/15
7
     27-18  Medicare Subsys pharmacy comparison 1/1/11     2882
8           - 5/20/15

9    27-19  Medicare Abstral pharmacy comparison 1/1/11    2882
            - 5/20/15
10
     27-27  Medicare Doctor Data Analysis Project          2917
11
     27-28  Medicare List of Risk Factors and Scores       2925
12          for Physicians, Jan-Dec 2015

13   27-29  Declaration of Mark Hogle, director of         2902
            Enterprise Data Services Group
14
     33-5   CMS fact sheet CPT code 99213                  2904
15
     33-6   CMS fact sheet CPT code 99214                  2904
16
     33-7   Medicare office visits billed to Medicare      2907
17          (Couch)

18   33-8   Medicare office visits billed to Medicare      2907
            (Ruan)
19

20

21   DEFENDANT COUCH'S
     208    PPSA Severance Agreement with Justin           3030
22          Palmer  effective 1/9/15 (Palmer -
            1/26/17)
23
     209    Proffer letter from USA to Justin Palmer       3036
24          2/18/15 (Palmer - 1/26/17)

25

 1          (Morning session, 8:58 a.m., in chambers, jury not

 2    present.)

 3          THE COURT:  Good morning.

 4          MR. WILLSON:  Good morning.

 5          THE COURT:  Good morning.

 6          MR. ESSIG:  Good morning, Judge.

 7          MR. BODNAR:  Your Honor, we have our -- well, once

 8    Mr. Burns is off the stand, our third witness today is an

 9    individual from --

10          THE COURT:  That will be your first witness today.

11          MR. BODNAR:  No, my third.  Well, it will be the third

12    overall today.

13          THE COURT:  Well, we've only got one on today so

14    far.  I'm not following you.

15          MR. BODNAR:  Okay.  After Mr. Burns, we have three

16    individuals from Medicare that are coming in.

17          THE COURT:  Okay.

18          MR. BODNAR:  The third individual from Medicare, one

19    of what's called -- or he is part of a team that does a project

20    that Medicare has called the Pill Mill Doctor Data Analysis

21    Project.  What this does and what he can testify to is that

22    every month they look at a full year's worth of data from

23    Medicare on 17 different factors and these are the 17

24    factors.  And from these 17 factors there's a computer

25    algorithm that's run that scores all roughly 70,000 doctors

1    each month on a score from zero to 1,000.

2            Scores above 951 are considered high risk as

3    potentially being pill mill doctors.  Dr. Couch scored -- on

4    the 17 different times that this project was run during the

5    time period where the doctors were part of this indictment,

6    Dr. Couch scored a perfect 1,000 all 17 times, Dr. Ruan scored

7    1,000 eight times, 996 eight times, and 992 one time.

8            So we wanted to admit this chart which shows the

9    listing of the factors, because they are much smaller on the

10   printout.  And then one of the printouts from the month which

11   he can say -- I believe he said it's from January to January of

12   '14 to '15 which shows both doctors there a perfect 1,000.

13           THE COURT:  All right.  And what is the data that they

14   examine and where do they get the data they examine?

15           MR. BODNAR:  The two witnesses before them and one

16   stipulation from Medicare is going to explain that.  It's

17   called -- they're going to have to tell you the name.  It's a

18   contractor with Medicare, which is what the stipulation will be

19   first thing, that is given access to all the Medicare data and

20   they are the ones that handle any sort of data analysis for

21   Medicare, whether it be like Tonya Colquhoun, who will be the

22   first witness, who does peer-to-peer comparisons for law

23   enforcement or like this which is not done for law enforcement

24   purposes but for Medicare's own purposes so they can see which

25   doctors have which risk factors.  That's what this project is

2849

1    about.

2            THE COURT:  All right.

3            MR. ESSIG:  Judge, I've got Mr. Willson in here

4    because he's done a lot of the analysis on the data.  What I

5    want to do first is just state what the grounds of our

6    objections are.  As I understand, this will be the third

7    witness.  The first two witnesses, based on the exhibits that

8    we have, will have admitted into evidence -- the government

9    will have admitted into evidence -- all of the statistics.

10   They will do the same thing they did with Tricare, United

11   Healthcare, and with Blue Cross/Blue Shield, showing the value

12   of the prescriptions, the total number of the prescriptions,

13   where the doctors rank on the -- you know, in the scale of

14   other providers.  I don't know if it's either the state of

15   Alabama or nationwide or both.  So this evidence, this sort of

16   statistical data, would be cumulative of those other two.

17           Also, Your Honor, I mean, the fact that -- I mean,

18   this says -- the fact they have a program that says Pill Mill

19   Doctor Data Analysis Project, I mean, that's their internal

20   classification of it.  It doesn't prove that the doctors are

21   running a pill mill.  But that obviously is very inflammatory

22   for the jury, given the charges in this case.

23           And also Medicare's determination that these doctors

24   statistically fall in an area based on prescribing volume that

25   they internally determine is indicative of a pill mill doesn't

```
 1   help the jury make their decision at all.  It's completely
 2   irrelevant.
 3              The other thing, Your Honor -- and I'll let
 4   Mr. Willson speak a little bit more to this -- if you note, for
 5   this -- I don't know if this exhibit is numbered.  But, I mean,
 6   the 1,000 score that Mr. Bodnar is referring to here is a
 7   predicted score, is what this analysis is.  It's a predicted
 8   score, as I understand, for 2015.  It's not like this is
 9   capturing historical data.  It's making a prediction about
10   where they are going to fall as a pill mill or as a high
11   risk.  So this sort of third-party determination, that's not a
12   law enforcement determination, it's conclusory.  And
13   Mr. Willson --
14              THE COURT:  So you're only objecting on that basis to
15   the 2015 year?
16              MR. ESSIG:  No, Your Honor.  I mean, we would object
17   to any of this pill mill doctor data analysis information.  I
18   mean, the fact that Medicare has a program called --
19              MR. BODNAR:  That's something separate (indicating).
20              MR. ESSIG:  -- a Pill Mill Doctor Data Analysis
21   Project doesn't mean anything, doesn't help the jury in any way
22   whatsoever.
23              THE COURT:  Well, you know, I agree.  It's what they
24   named their project.
25              MR. BODNAR:  Your Honor, one thing:  It is not
```

2851

 1   cumulative at all.  These factors, the 17 factors that are

 2   taken into account, those are not factors that were looked at

 3   in terms of where they rank in the United States.  That is

 4   simply, based on Subsys and Abstral, the amount paid back by

 5   Medicare.  Subsys and Abstral are not -- this is not cumulative

 6   in any respect.

 7           And in terms of predictive, I didn't notice that word

 8   in there, but that is not what his testimony is going to be.

 9   His testimony is:  This is a snapshot.  This is how each doctor

10   in the United States is scored every single month.  And

11   they've --

12           THE COURT:  Well, I think he was just talking about

13   2015 as being predictive.  Is that correct?

14           MR. WILLSON:  Your Honor, if I may, in response?  In

15   the confusion of the jury piece this does say predicted.  And

16   from my understanding, looking at what --

17           THE COURT:  What says predicted?

18           MR. WILLSON:  Your Honor, on this chart, the column

19   that indicates the score, it says predicted risk score.  And

20   the reason, as I understand it, is that this is for January

21   1st, 2015, to the end, to December 31st, 2015.  And, of course,

22   the raid was in May.  And if you will look at the rankings, you

23   will see that there's a one, two, three, four, five, et cetera,

24   but Ruan and Couch appear to be essentially plugged in.  So the

25   potential to confuse the jury with this predictive analysis,

1      Your Honor, we would say is high.

2              MR. BODNAR:  And, Your Honor, it's not predictive.

3      The way it is run is it looks back 12 months.  So if the test

4      is -- well, when the project was ran this month, in January of

5      '17, it captured all data from January '16 to '17.  So next

6      month it will capture everything from February '16 to '17.

7              MR. WILLSON:  (Indicating.)

8              MR. BODNAR:  Yes.  This is the time frame.  And one of

9      the things he will testify in there, this was done on December

10     '15, so it captured everything from January '15 to December

11     '15.  And I've already gone over this with the witness, that

12     even though they were only prescribing for five months during

13     that period, the volume of prescriptions that they had and the

14     number of risk factors that hit caused them to be a 1,000 for

15     the entirety of this time period.

16             MR. WILLSON:  And, Your Honor, if I may come back?

17     The analysis here, the risk factor number is sort of a final

18     yield, as I understand it.  It's a multi-phased process.  The

19     earlier phases produce potential outliers and then the

20     subsequent, the next phase, produces probable, you know,

21     something like probable high risk and so forth.  And in those

22     initial phases the analysis is not just quantitative, it's

23     multi-variant.  It takes into account relationships between the

24     various pieces of data and it establishes sort of that next

25     echelon to be analyzed just quantitatively.  So there's no

1    telling what, for example, if the number of prescriptions for

2    controlled -- you know, for schedule II/III drugs is low

3    compared to the number of beneficiaries because it was only

4    half of a year.  That may be a factor in those -- in that

5    initial analysis that yields the potential set of physicians

6    to be --

7              THE COURT:  Well, I think all that is subject for and

8    fodder for cross-examination.  But I don't think it affects the

9    admissibility of it.  I mean, apparently to me all they are

10   doing is taking the data that they have and manipulating it to

11   make certain analyses about that.

12             MR. ESSIG:  Judge, a couple of things about that:  The

13   reference to Pill Mill Doctor Data Analysis is highly

14   prejudicial.  And the fact that they've concluded on their own

15   by looking at this data that PPSA and Dr. Ruan and Dr. Couch

16   fall within a certain risk factor for pill mills is completely

17   irrelevant.  It's conclusory.  I mean, we can't -- the other

18   thing I would point out, Your Honor, is that as Mr. Bodnar is

19   describing this is that these statistics and their conclusions

20   in 2015 are based on a complicated analysis done of these

21   doctors for all -- for just a five-month period.

22             Your Honor, that is expert analysis.  That is expert

23   testimony that goes beyond just looking at data.  If they're

24   just going to rank them on data, they've got the ability to do

25   that.  If they're going to take the next step with this witness

1   and have him give:  Here's a program that's unique to us, I'm

2   going to describe for you my conclusions, our conclusions, that

3   they fall at the highest level of a pill mill risk factor based

4   on a unique program that nobody else has, based on a unique

5   qualitative and quantitative analysis that nobody else is doing

6   -- that's expert testimony and this was not disclosed to us as

7   an expert in this case.

8           MR. BODNAR:  Your Honor, all this stuff was disclosed

9   to them.  But it is not expert testimony.  He is a data

10  analyst.  He will explain the program and that those 17 risk

11  factors -- he walks down what they are, and those numbers are

12  collected by Medicare in their normal course of business.  They

13  are plugged into the computer.  He's not going to give any

14  analysis other than this is what the score was.  And once that

15  goes from zero to 1,000 in the 17 months that was looked at --

16  because it's run every month starting in -- I believe it was

17  probably early 2014.

18          THE COURT:  And what does the score represent?

19          MR. BODNAR:  The score represents the cumulative total

20  of how the algorithm ranks those 17 factors.  So the computer

21  system was set up -- and he can explain it much better than I

22  can -- and those 17 risk factors are plugged in and then it

23  spits out the score and ranks the doctors.

24          THE COURT:  Where do the risk factors come from?

25          MR. BODNAR:  Those were selected by the people that

1    created the project.  He was one of them.

2            THE COURT:  What does it mean, number of beneficiaries

3    exceeding travel threshold and percent exceeding travel

4    threshold?  What does that mean?

5            MR. BODNAR:  That's one of the things he'll explain.

6    There's a certain mileage that -- and at the moment I don't

7    recall what it is -- that they looked at.  If you have Medicare

8    patients that are traveling -- let's just use an example --

9    more than a hundred miles, it ranks the number of ones you have

10   that went that far and then a percentage of your total Medicare

11   patients that went that far.

12           MR. WILLSON:  And, Your Honor, it's actually two

13   parts, as I understand it.  If the beneficiary is in a rural

14   zip code, it is a 120-mile radius.  If the beneficiary's in an

15   urban or in an urban zip code, it's 30.  And so it entails

16   essentially, you know, a map of the area and which zip codes

17   are urban and which are rural.  And so it is a multifaceted

18   piece of data.

19           THE COURT:  Okay.

20           MR. ESSIG:  Judge, again, I think making that sort of

21   quantitative analysis -- I mean, that's expert testimony and

22   the fact that an insurance company runs a program that for

23   their own purposes determines the distance that our customers

24   or patients are traveling makes us a risk factor as a pill

25   mill, I mean, that's -- I mean, that's irrelevant.  I mean,

 1 | that's not helpful to the jury and it's prejudicial.

 2 |             MR. KNIZLEY:  On the flip side, the defense would no

 3 | more likely be able to put together some database that says

 4 | they are low risk for a pill mill and be able to admit it.

 5 |             THE COURT:  Do you have one?

 6 |             MR. KNIZLEY:  No.

 7 |             MR. ESSIG:  We can come up with one.

 8 |             MR. BODNAR:  They've had this data for probably close

 9 | to a year now.

10 |             THE COURT:  I understand that.  But, you know, really,

11 | until I hear the testimony, it's difficult to say.  But it does

12 | say -- I mean, who is going to be testifying about how they

13 | selected the factors and how those factors are in fact

14 | indicative of pill mills?

15 |             MR. BODNAR:  That should be something he should be

16 | able to explain.  I haven't asked him that exact question this

17 | morning.  But he was part of or one of the creators of the

18 | program and should be able to answer that question.

19 |             MR. ESSIG:  Judge, that's irrelevant.  I mean, the

20 | fact that the insurance company thinks certain factors are

21 | indicative of a pill mill, that's just --

22 |             THE COURT:  I mean, it's not irrelevant.  But it may

23 | be expert testimony.  I'm having some difficulty with this in

24 | terms of how this is not expert testimony.  I understand they

25 | just, you know, plugged these factors in and went through the

```
1    data analysis.  But the selection of what the factors are, how
2    they came to, you know, decide what those factors were and what
3    analysis went into deciding what those factors were, I don't
4    understand how that is not expert testimony.
5              MR. BODNAR:  Well, we weren't even planning to get
6    into that aspect, because I don't know if it's even
7    relevant.  The program was started, those were the factors that
8    were chosen.  I mean, they are free on cross-examination, I
9    think, to say:  Well, aren't there other factors that could be
10   considered, or this or that?
11             His point is he helps run the program.  These are the
12   factors that there are, and they plug in this data.  And all
13   he's saying is that, based on these factors and how they run
14   it, this is what the data shows.  And they run this in the
15   regular course of their business every single month at --
16   whatever this data analysis contractor is for Medicare.  And
17   he'll have to tell you the name of the institution.  They keep
18   changing the names.
19        (The law clerk entered chambers.)
20             THE COURT:  What do you mean, they keep changing the
21   names?
22             MR. BODNAR:  It was Health Integrity.  And then it was
23   -- there's so many --
24             THE COURT:  You mean third party?
25             MR. BODNAR:  Yes.
```

1          MR. WILLSON:  NBI Medic --

2          MR. BODNAR:  Yes, that's what they are now.  That's

3    what the stipulation will be first.  All these people that are

4    coming in, they're contractors that have access to this data.

5          THE COURT:  Well, are the first two witnesses being

6    put on solely to introduce the data that went into this

7    analysis?

8          MR. BODNAR:  No.

9          THE COURT:  Or is there some other person?

10          MR. BODNAR:  The first witness will be one that did

11    the peer-to-peer comparison and it will be the charts just like

12    we saw from Tricare and Blue Cross/Blue Shield and United

13    Healthcare.  But it will be the Medicare data.  The second

14    person is going to be the individual that did the analysis for

15    the 922 -- 99213 and 99214 office visit codes just like we saw

16    from Blue Cross/Blue Shield.  This pill mill project is

17    separate, and the first two witnesses don't touch on that at

18    all.

19          THE COURT:  Okay.  So who introduces all the data that

20    goes in, this guy does?

21          MR. BODNAR:  Yes.  Kevin McCash.

22          THE COURT:  And that is --

23          MR. BODNAR:  That is one month's pull of it.

24          THE COURT:  And one month being --

25          MR. BODNAR:  Sorry.  That is -- when they did that

1    one, it would have been in December of '15, that is one year's

2    worth of data that went into it going back from December '15 to

3    January '15.  So it's a full year's pull, but they do it every

4    month.  So each month it shifts one month.

5              THE COURT:  So it only shows five months' worth for

6    them?

7              MR. BODNAR:  Yes.  The data -- they have five months'

8    worth of data that went into that one.  And -- but he testifies

9    that he has gone back and checked and in the 17 different times

10   that this has been run in which Dr. Ruan and Dr. Couch had

11   enough data to even qualify, Couch scored a perfect 1,000 all

12   17 times and Ruan eight of the 17 times.

13             THE COURT:  If he's not going to go into how the

14   criteria, the 17 factors, were chosen and/or why they are

15   indicative of a pill mill, I think it is admissible solely as

16   an analysis of the data without the pill mill title on there.

17             MR. BODNAR:  Okay.  So take the title off, then?

18             THE COURT:  Yeah.  But, I mean, if he's going to start

19   giving expert -- I mean, his analysis of the data, I think, is

20   okay in and of itself.  But to come to the conclusion that

21   because of this this is a pill mill --

22             MR. BODNAR:  And he's not going to give that answer.

23   That is not something he's qualified to give and there are

24   further people at Medicare who we didn't bring because we

25   didn't think it was relevant -- with that information.  But he

```
 1    is not going to say that this makes them a pill mill at
 2    all.  He's going to say this is what the data says.
 3            THE COURT:  All right.  Well, I think it is admissible
 4    solely as an -- and I don't think it matters if they are only
 5    looking at five months' worth, even though they did it for
 6    December, December to December.  I mean, if he's only looking
 7    at what the -- they can still analyze the data; right?
 8            MR. BODNAR:  Yes.
 9            THE COURT:  Are the ones they compared them against,
10    is that the full --
11            MR. BODNAR:  It's the full year.
12            THE COURT:  -- full year?  And theirs is only five
13    months, obviously.
14            MR. BODNAR:  Yes.
15            THE COURT:  Or four and a half months.
16            MR. ESSIG:  I'll let Mr. Willson speak.  Well, my
17    concern is, even if he's not testifying as to the underlying
18    system and how it comes about, that's part of the problem.  I
19    mean, we don't know how it works.  I mean, clearly this is,
20    again, a unique, complicated algorithm, mathematical system.
21    We would point out despite the five months, it clearly states
22    there it's a predicted score.
23            THE COURT:  Well --
24            MR. ESSIG:  And there's no way to --
25            THE COURT:  -- we need to find out more about what
```

1    that means, predicted.

2              MR. BODNAR:  I had not noticed that.  But I do know he

3    has explained it.  It's going back -- it's the score that they

4    get for looking back at the data.

5              THE COURT:  All right.  But you're obviously going to

6    need to talk to him a little bit to find out, number one, can

7    he give his testimony about the analysis without saying pill

8    mill.

9              MR. BODNAR:  Yes, I'll make sure he does not say that.

10             THE COURT:  You need to correct the chart.  You will

11   need to find out what are they predicting.  It sounds like they

12   are predicting whether or not there's a pill mill.  So --

13             MR. BODNAR:  I will find out.

14             THE COURT:  And if you could just call it, you know,

15   this is the score, the highest score of this analysis is 1,000,

16   the lowest is zero, whatever.

17             MR. BODNAR:  Yes.

18             THE COURT:  But I think, given all that, it's

19   appropriate for them to know what their data shows about these

20   events.  So that's where I am right now.

21             MR. ESSIG:  Judge, I understand the Court.  I  want to

22   state one additional thing.  I think our concern is we think

23   the underlying data is arrived at through something, some

24   scientific or specialized knowledge or program.  Our point is

25   we can't meaningfully cross-examine that at this point in time.

 1   Again, we've had this information, but it was never disclosed

 2   to us as an expert witness.

 3          THE COURT:  Well, he's not an expert witness if he's

 4   just testifying about the analysis of their data and not what

 5   it means or how the factors were chosen or anything.

 6          MR. ESSIG:  Yes, ma'am.  And just for clarity's sake,

 7   for the record, our position would be, without the ability to

 8   go into that and have an independent expert explain the

 9   underlying data and the underlying process for us, we can't

10   meaningfully cross-examine it.  That's our position.

11          THE COURT:  Okay.  Well, I note your objection to

12   that.  But you need to revisit this before --

13          MR. BODNAR:  Will do.

14          THE COURT:  -- before you put him on.

15          All right.  Are we ready to call them up?

16      (No response.)

17      (A recess was taken at 9:18 a.m.)

18      (In open court, 9:23 a.m., defendant and jury present.)

19          THE COURT:  Good morning, ladies and gentlemen.

20          All right.  Mr. Knizley, you may continue.

21                    DWIGHT TIMOTHY BURNS,

22       previously sworn, testified further, as follows:

23                  CROSS EXAMINATION CONTINUED

24   BY MR. KNIZLEY:

25   Q   Good morning, Mr. Burns.

1   A    Good morning.

2   Q    Mr. Burns, yesterday you had been shown from Government's

3   Exhibit 9-11 a document dated 4/24/14 [sic] from your wife's

4   insurance carrier.  It's actually dated July 18th, 2014 and

5   signed or initialed on July 24th, 2014.  And it's from the

6   insurance company talking about a March 4th, 2013 record that

7   indicates that you wrote -- that would be the doctor wrote a

8   prescription for Subsys for Ms. Burns.  Do you remember looking

9   at that yesterday?

10  A    Yes, sir.

11  Q    And we also talked about how it was in 2012 and I believe

12  it was May 2012 when your wife first came to Dr. Ruan; is that

13  right?

14  A    Yes, sir.

15  Q    So the March 2000 -- March 4, 2013, was about a year after

16  she had first came there; is that right?

17  A    Yes (nodding head affirmatively).

18  Q    So initially when she came to Dr. Ruan, she was not put on

19  this Subsys; is that correct?

20  A    Yes, sir.  That's correct.

21  Q    And during that year time frame Dr. Ruan had done a number

22  of things to try to improve your wife's health, did he not?

23  A    Yes, sir.

24  Q    And I believe that we -- that on May -- first came in May

25  and on May 21st of 2012 do you recall Dr. Ruan, or somewhere

2864

1  about that, having a lumbar spine MRI or MRI done on her?

2  A   Yes, sir.

3  Q   And do you further recall that on -- a little bit after

4  that, on May 30th that there was a nerve conduction test?

5  A   Yes, sir.

6  Q   And do you recall after that there were some other tests,

7  other procedures, excuse me.  On May 31st there was a procedure

8  called a nerve block procedure.  Do you remember her having one

9  of those type procedures?

10  A   Yes, sir.

11  Q   And I'm going to show you what -- out of that same Exhibit

12  9-11 at page 163 and -- and is this an exam -- and this is was

13  emailed at a later date, in January of 2010, that your wife was

14  having a lumbar selective nerve root block; is that correct?

15  A   Yes, sir.

16  Q   And without going through each of these documents in this

17  file, did she also have some things such as epidurals done?

18  A   I believe so, sir.

19  Q   And other MRIs, and I see epidural done in November 2012,

20  maybe another joint block in June of 2015 -- 12, excuse me.

21  A   Yes, sir.

22  Q   And MRIs.  And there was a number of procedures that were

23  done before we went to the Subsys; is that correct?

24  A   Yes.

25  Q   And so after some time was your wife not getting

2865

 1  satisfactory relief from these various procedures and other

 2  medications, so Dr. Ruan went to something else or attempted to

 3  go to something else?

 4  A   Yes.

 5  Q   Subsys?

 6  A   Yes.

 7  Q   Now, do you remember when Dr. Ruan, in February of 2013,

 8  had made some efforts to get the insurance to pay for the

 9  Subsys, do you remember that?

10  A   Yes, sir, I believe so.

11  Q   Okay.  I'm going to show you what's been marked in evidence

12  as Ruan Exhibit 129.  And show you a letter dated March --

13          MR. BODNAR:  Your Honor, I object.  This has not been

14  admitted yet and it's being published to the jury.

15          MR. KNIZLEY:  It has been admitted, Your Honor.

16          THE COURT:  Well, let's find out.

17          MR. BODNAR:  This has been admitted?

18          MR. KNIZLEY:  Right there.  (Indicating.)

19          THE CLERK:  Yes, sir.

20          MR. BODNAR:  I'm sorry.  I apologize.

21          THE COURT:  All right.  Go ahead.

22  BY MR. KNIZLEY:

23  Q   Mr. Burns, and that's y'all's address; right?

24  (Indicating.)

25  A   Yes, sir.

2866

```
1  Q   And do you recall your wife getting -- you and your wife or
2  your wife getting this letter from your insurance company
3  telling y'all that:  We are pleased to inform you that the
4  Subsys 400 spray of a certain quantity for certain days had
5  been approved from 2/6/2013 through 2/6/2014, and it was based
6  upon the clinical information that the insurance company
7  received from your prescribing physician.
8          Do you remember receiving a letter something like
9  that?
10 A   Yes, sir.
11 Q   And do you remember before getting this approval letter
12 that your wife and you had gotten from the insurance company --
13 and I'll show you what's marked as Ruan's Exhibit 133 that's
14 been admitted into evidence -- a denial of that same stuff back
15 in February of 2013, that your wife got from the insurance
16 company, a denial of this Subsys sublingual spray.  Do you
17 remember them telling you that to begin with?
18 A   I don't -- I remember what you're talking about.
19 Q   They denied it, but then --
20 A   But not right offhand, no.
21 Q   I'm sorry.  I spoke over you.  I spoke over you, Mr. Burns.
22 I apologize.
23 A   I remember it, yes, but not all in detail.
24 Q   Right.  But -- and do you -- and I'm going to show you
25 what's been marked into evidence as Ruan's Exhibit 130.  And
```

1  you see it's another letter from the insurance company, this

2  time addressed to Dr. Ruan's address but directed to your wife

3  about this same sublingual spray on the 6th which is the same

4  day we saw back there they had denied it; right?

5  A   Right.

6  Q   And it says:  Ms. Burns, this letter is in response to your

7  request for a nonformulary exception that Dr. Ruan filed on the

8  6th.

9        And when -- a nonformulary exception request is when

10  you ask for a drug not on their list of covered drugs and/or

11  you have not asked for prior authorization or other requirement

12  to a drug on our formulary.  In order to process your request,

13  we need additional information from your physician.

14        And then they list out the additional information

15  they're asking for.  And do you see -- first off, it says:

16  List diagnosis.

17        And, of course, you probably don't know what that is

18  and I certainly didn't know either, what these numbers mean;

19  right?

20  A   Right.

21  Q   But if you look, if I told you and you looked in the file,

22  in your wife's file, and there's basically a back diagnosis,

23  would you have a reason to think that's not correct?

24  A   Right.

25  Q   Because your wife had never said anything about cancer;

2868

1  right?

2  A   No, sir.

3  Q   So assuming that would be the case, this is back diagnosis,

4  that's what Dr. Ruan's office, at least this document says,

5  faxed to your insurance company; right?

6  A   Yes, sir.

7  Q   At least that's what the piece of paper says; right?

8  A   Yes, sir.

9  Q   With her diagnosis of these numbers and certain medications

10  she was on; is that right?

11  A   Yes, sir.

12  Q   And after that, back to this 129 we talked about, that the

13  insurance company wrote you and your wife at your home on March

14  4 and said that the redetermination request for that was

15  approved?

16  A   Yes, sir.

17  Q   Okay.  And we approved this medication on 2/6 back from the

18  date of this other one; right?  (Indicating.)

19  A   Yes, sir.

20  Q   So when the insurance company asked in the other letter to

21  tell us what you were approved of, they already -- apparently

22  we had already told them what the approval was for the Subsys;

23  is that correct?

24  A   Excuse me.  I didn't understand.

25  Q   All right.  Let me go there.  I didn't say it very good.

DWIGHT TIMOTHY BURNS - CROSS BY MR. KNIZLEY

```
1          Do you remember the letter from the insurance company
2     that said you got approved on March 4th or you got a
3     prescription on March 4th.  And what was the basis of that
4     prescription?  Do you remember that letter you looked at
5     yesterday?
6     A   Yes, sir.
7     Q   Okay.  Well, these documents we see right here tells us
8     that the insurance company already knew because we had given
9     them the diagnosis in Ruan's Exhibit 130 as to why she should
10    have this Subsys 400.  Do you see what I'm saying?
11    A   Yes, sir.  But if she didn't have cancer, why was she given
12    that medicine?
13    Q   Why would he give her medicine when she didn't have
14    cancer.  Okay.  I think that issue is your insurance company
15    here -- okay -- your insurance company here --
16    A   HealthSpring, yes, sir.
17    Q   Okay.  Is asking on behalf of your wife for the doctor to
18    tell us what the exception should be.  Okay?  And in order to
19    process your request for the exception, we need additional
20    information from your physician.
21          MR. BODNAR:  Objection, Your Honor.  At this point
22    he's not asking questions.  He's just testifying.
23          THE COURT:  Yeah.  Let's move along because we've been
24    over this document.
25          MR. KNIZLEY:  Okay.
```

```
 1              THE COURT:  All right.
 2    BY MR. KNIZLEY:
 3    Q   The document lists a diagnosis, does it not, whatever these
 4    numbers mean?
 5    A   Yes, sir.
 6    Q   Okay.
 7    A   Can I ask what the numbers mean?
 8              THE COURT:  Well, Mr. Burns, it's up to the lawyers to
 9    determine what information they want the jury to have.
10              THE WITNESS:  Okay.  Thank you, ma'am.
11              THE COURT:  You're welcome.
12    BY MR. KNIZLEY:
13    Q   Mr. Burns --
14    A   Sir?
15    Q   I'm going to show you what's -- from your wife's medical
16    file at page 182.  And looking up here at the top -- and this
17    may answer some of your questions.  If you look at that 722.52,
18    can you see what 722.52 is right there?  Do you see that?
19    A   Yes, sir.
20    Q   Lumbar DDD.  And if you look at 724.2, 724.2, lumbago?
21    A   Yes, sir.
22    Q   And 724.4, lumbar.  Is that what it says?
23    A   (Nodding head affirmatively.)
24    Q   And it's hard to read that word.  Does it say lumbar
25    radiculitis?  Is that what it says?
```

DWIGHT TIMOTHY BURNS - CROSS BY MR. KNIZLEY

1    A    Yes, sir.

2    Q    None of those, sir, did they appear to be a cancer

3    diagnosis, did they?

4    A    No, sir.

5    Q    And as time went on Dr. Ruan, as we said, had done some

6    procedures and then we got to the Subsys and then the Subsys

7    finally got approved by your insurance company in March of

8    2013?

9    A    Yes, sir.

10   Q    And then we got on the Subsys and you told us that your

11   wife had had some problems with it, I think; is that right?

12   A    Yes, sir.

13   Q    She had had that patch on and was also taking the Subsys

14   too; right?

15   A    Yes, sir.

16   Q    And did you understand that the prescription for the Subsys

17   was only to take as needed for breakthrough pain?

18   A    Yes, sir, I understood that.

19   Q    And as unfortunate as it may have been, your wife may have

20   taken it differently; is that right?

21   A    Yes, sir.

22   Q    And sometimes she would take it to the point that she took

23   too much and -- before she had had time to get a -- before the

24   time for it to refill came about; right?

25   A    Yes, sir.

DWIGHT TIMOTHY BURNS - CROSS BY MR. KNIZLEY

1  Q   And do you remember back in June of '13 -- and if you

2  remember, it was March of '13 when they approved it?

3  A   Yes, sir.

4  Q   That she had to go to the doctor and she had ran out early.

5  And I'm going to show you what is marked as an exhibit from her

6  file, now Government's Exhibit 9-11.  Is that your wife's

7  signature right there?

8  A   Yes, sir.

9  Q   And on that date did she have to sign -- if you recall, did

10 she sign a PPSA opioid agreement violation?  Do you remember if

11 she had to sign a piece of paper that said if she took too much

12 of it or she violated the agreement?

13 A   Yes, sir.  It looked like it.

14 Q   Okay.  And you said that she -- and was that part of the

15 reason she was having problems and had to call the ambulance

16 and stuff like that, because she took too much of it?

17 A   Yes, sir.

18 Q   Now, in looking at your wife's file, I didn't see it but

19 did you see that your wife ever told the doctors she went to

20 the hospital by ambulance?

21 A   I don't -- I don't know because I didn't go into the office

22 with her.

23 Q   Okay.  So you don't know whether the doctors were ever made

24 aware of that or not?

25 A   No, sir.  But they were aware that she had an earlier drug

 1  problem, to be given this strong of a medicine.

 2  Q   Yes, sir.  And I think you told us that was before you were

 3  married to her; right?

 4  A   Sir?

 5  Q   The earlier drug problems you had talked about was before

 6  you had married her?

 7  A   Yes, sir.

 8  Q   And let me ask you:  During the time that Dr. Ruan was

 9  treating her -- you told us about an automobile accident she

10  had and two surgeries she had; right?

11  A   Right.

12  Q   Did Dr. Ruan also send her to Dr. Martino at USA to have

13  another surgery for a lump, a spine -- a lump -- a cyst in her

14  spine, if you remember?

15  A   Yes, sir.

16  Q   And would that have been about September of 2013?

17  A   Yes, sir.

18  Q   Did there come a time that she was finally discharged from

19  the clinic?

20  A   Yes, sir.

21  Q   They told her they wouldn't treat her no more?

22  A   Yes, sir.

23  Q   And do you recall her going to the clinic a few weeks

24  before that on June 20th?  Let's say -- I know you can't

25  remember the date.

1   A   I don't remember.

2   Q   Let's say the discharge letter, and I'll show it to you.

3   At page 217 of 228 from her file, signed by Dr. Ruan, and sent

4   to your wife -- from PPSA, sent to your wife, dated July 9th,

5   2014, saying:  Ms. Burns, that on that date PPSA was no longer

6   providing services because you violated the opioid agreement

7   because you kept running out of medicine.  Do you remember her

8   getting that letter or being told this?

9   A   No, sir.  I did not see this letter.

10  Q   Do you remember you told us yesterday or Monday --

11  yesterday, that you did learn she was no longer going to be

12  treated by the clinic?

13  A   Yes, sir.

14  Q   And you didn't know that they followed up with a letter; is

15  that correct?

16  A   Yes, sir.

17  Q   Okay.  But do you recall her going to the clinic a few

18  weeks and particularly on June 20th, a few weeks before she was

19  discharged from the clinic?

20  A   Not really, sir.  I don't remember the specific dates when

21  she went.

22  Q   Sure.  Do you remember sometime, a few weeks before,

23  maybe --

24  A   Okay.

25  Q   Did she go a lot?

DWIGHT TIMOTHY BURNS - CROSS BY MR. KNIZLEY

1   A   Sir?

2   Q   Did she go to the clinic a lot?  Did she go to the clinic a

3   lot?

4   A   Yes, sir.

5   Q   Okay.  And I'm going to show you --

6   A   She had appointments.

7   Q   Yes, sir.  And I'm going to show you about an appointment

8   she had on June 20th.  And at least from this file it says:

9   Per Dr. Ruan, she will not receive any Rx, and -- prescriptions

10  today.  Meds are not due until 7/8/14, which that was the day

11  before.  We saw that letter; right?

12  A   Okay.

13  Q   She will return to clinic on that date or as close as

14  possible for meds refill and to wean her off the immediate

15  release fentanyl.  We will adjust the meds at that time and

16  she -- do you remember a time she came and she came early for

17  the prescriptions and Dr. Ruan wouldn't give her any about a

18  few weeks before she got cut off?

19  A   I don't remember that, sir, offhand.  But I knew -- I do

20  know they cut her off without anything.

21  Q   Okay.

22  A   And she had to go through the withdrawals and she was

23  buying drugs off the street because of that.

24  Q   Yes, sir.

25  A   I do remember that.

DWIGHT TIMOTHY BURNS - REDIRECT BY MR. BODNAR

```
 1   Q   Yes, sir.  But at least what this piece of paper says is
 2   that they wanted her to come back on the 8th for possible med
 3   refills and to wean her off of it.  At least that's what this
 4   piece of paper says.
 5   A   Well, that ain't what happened, sir.  They did not wean her
 6   off of it.  They let her go.
 7   Q   Yes, sir.
 8   A   And this letter might say that.  But I -- I know what she
 9   did.
10   Q   Yes, sir.  And after she left the care of Dr. Ruan, was she
11   able to get some care from another physician?
12   A   Yes, sir.  She had to go across the bay.
13   Q   Okay.
14   A   But that was a few weeks before she could go over there.
15   And in the meantime she was looking for drugs on the street
16   because they let her go.  Period.
17   Q   Yes, sir.
18           MR. KNIZLEY:  That's all the questions we have, Your
19   Honor.
20           THE COURT:  Any redirect?
21                       REDIRECT EXAMINATION
22   BY MR. BODNAR:
23   Q   Morning, Mr. Burns.
24   A   Morning, sir.
25   Q   Do you recall looking at that June 25th letter with
```

1   Mr. Knizley a moment ago?

2   A   Yes, sir.

3   Q   Where your wife signed the opiate agreement again?

4   A   Yes, sir.

5   Q   And do you recall saying that she was misusing her Subsys?

6   A   Yes, sir.

7   Q   And did she do -- was that June 25th, 2013?

8   A   Yes, sir.

9   Q   Did she continue to misuse her Subsys after that?

10  A   Yes, sir.

11  Q   I'm going to show you as part of Ms. Burns' file, page --

12  which is 9-11, what is page 209 of 228.  And is this a

13  return -- a note about a return call from June 30th of '14?

14  A   Yes, sir.

15  Q   Is that approximately one year after she signed her

16  noncompliance letter?

17  A   Yes, sir.

18  Q   Does this say:  Returned patient call.  Patient has been

19  denied for Subsys and Abstral.  I sent the info to Krystal and

20  let the patient know that she does not have an active cancer

21  diagnosis, that she probably would not be approved.  Is that

22  what that says?

23  A   Yes, sir.

24  Q   And is that June 30th, 2014?

25  A   Yes, sir.

DWIGHT TIMOTHY BURNS - REDIRECT BY MR. BODNAR

1  Q   And then approximately nine days later, this is page 217,

2  on July 9th, 2014, is this the letter when -- you were shown

3  about when she was discharged?

4  A   Yes, sir.

5  Q   What is the reason given for the discharge on this letter?

6  A   Violation of opiate agreement.

7  Q   Does it say:  Habitually running out of prescribed

8  medication?

9  A   Yes, sir.

10  Q   Does it say anything about her missing appointments?

11  A   No, sir.

12  Q   Had she been missing appointments?

13  A   No, sir.

14  Q   Had she been habitually running out of her medication?

15  A   Excuse me?

16  Q   Had she been running out of her medication habitually?

17  A   Yes, sir.

18  Q   And is that what it stated a year earlier on that letter

19  Mr. Knizley showed you?

20  A   Yes, sir.

21  Q   I'm going to show you what has been admitted as Ruan

22  Exhibit 130.  Do you recall going over this document --

23  A   Yes, sir.

24  Q   -- with Mr. Knizley?  Is there anywhere on here that you

25  can see that Dr. Ruan signed this letter?

```
 1   A   No, sir.

 2           MR. BODNAR:  One moment.

 3       (A discussion was held off the record between counsel.)

 4           MR. BODNAR:  One moment, Your Honor.

 5           THE COURT:  All right.

 6           MR. BODNAR:  Here it is, Dennis.

 7           MR. KNIZLEY:  All right.

 8           MR. BODNAR:  I'll put it back in the right spot.

 9   Q   Mr. Burns, do you see anywhere on this letter that Dr. Ruan

10   signed it?

11   A   No, sir, I don't.

12   Q   I'm going to show you now the letter from Cigna Health Care

13   that we discussed the other day.

14   A   Yes, sir.

15   Q   Do you see a signature --

16   A   Yes, sir.

17   Q   -- on that?  And again, does it say here at the bottom:

18   Please confirm by signing below that the member listed above

19   received the TIRF medication indicated for the approved

20   diagnosis of management of breakthrough cancer pain, and that

21   the appropriate TIRF-REMS Access Program agreements or forms

22   were signed?

23   A   Yes, sir.

24   Q   And is that signed?

25   A   Yes, sir.
```

1      MR. BODNAR:  No further questions, Your Honor.

2      THE COURT:  All right.  Mr. Burns, you may step

3  down.  May this witness be excused?

4      MR. BODNAR:  Yes, Your Honor.

5      MR. KNIZLEY:  Yes, ma'am.

6      THE COURT:  Thank you.

7      THE WITNESS:  Thank you, ma'am.

8      MR. BODNAR:  United States calls Tonya Colquhoun.

9                  TONYA COLQUHOUN

10         was sworn and testified as follows:

11                 DIRECT EXAMINATION

12  BY MR. BODNAR:

13  Q   Morning.

14  A   Good morning.

15  Q   Could you please pull the microphone a little closer?

16  A   Sorry.

17  Q   Would you please introduce yourself to the jury?

18  A   My name is Tonya Colquhoun.

19  Q   And, Ms. Colquhoun, I know you have a slightly unusual

20  spelling of your last name.  Could you please spell the way you

21  spell Colquhoun?

22  A   Yes, it's C-O-L-Q-U-H-O-U-N.

23  Q   And, Ms. Colquhoun, where do you work?

24  A   I work for Health Integrity.

25  Q   And what is Health Integrity?

1  A   Health Integrity is the company that holds the contract for

2  the NBI Medic.  The NBI Medic is the National Benefit Integrity

3  Medicare Drug Integrity contractor.

4  Q   And in simple terms, do you work for the contractor that

5  manages data for Medicaid -- I'm sorry -- Medicare?

6  A   For the Part D program, yes.

7  Q   And what is the Part D program of Medicare?

8  A   The Part D portion is the part that handles the

9  prescription drugs.

10  Q   And in your capacity was it requested for to do a peer-to-

11  peer comparison for the drugs Subsys and Abstral?

12  A   Yes.

13  Q   I'm going to show you now what has been marked as

14  Government's Exhibit 27-16, 27-17, 27-18, 27-19, and

15  27-20.  Showing you, Ms. Colquhoun, 27-20, is that the data

16  that was provided to the United States from the peer-to-peer

17  comparison?

18  A   Yes.

19  Q   And have you had an opportunity before your testimony today

20  to see if that data was accurately translated onto the charts

21  that are marked 27-16 through 27-19?

22  A   Yes.

23        MR. BODNAR:  The United States moves to admit

24  Government's Exhibit 27-16, 27-17, 27-18, and 27-19.

25        MR. ESSIG:  No objection, Your Honor.

2882

1          THE COURT:  All right.  Mark them in.

2          (Government's Exhibits 27-16, 27-17, 27-18, and 27-19 were

3    entered into evidence.)

4    BY MR. BODNAR:

5    Q    Ms. Colquhoun, showing you first what has been admitted as

6    Government's Exhibit 27-16, will you please explain to the jury

7    what this is?

8    A    This is a national peer comparison for all prescribers for

9    the Medicare Part D regarding the drug Subsys from the time

10   frame of 1/1/2011 to 5/20/2015.

11   Q    And does this include all -- well, did the data that you

12   provided include all doctors across all specialties?

13   A    Yes, this is for any prescriber that prescribed Subsys for

14   Medicare Part D, regardless of specialty.

15   Q    And, then, this list was just cut off at the top 25?

16   A    Correct.

17   Q    So that would include pain doctors as well?

18   A    Yes.

19   Q    And cancer doctors?

20   A    Correct.

21   Q    Do you see Dr. Couch's name on there?

22   A    I do.

23   Q    And where is he?  First, is this an Alabama ranking or a

24   national ranking?

25   A    National.

TONYA COLQUHOUN - DIRECT BY MR. BODNAR

1   Q   Where does Dr. Couch rank in the nation for Subsys?

2   A   Four.

3   Q   And could you read across?  How many prescriptions did

4   Dr. Ruan write -- I'm sorry -- did Dr. Couch write to Medicare

5   patients?

6   A   381 prescriptions for 50 beneficiaries.

7   Q   And by beneficiaries, does that mean a patient that has

8   Medicare?

9   A   A patient, yes.

10  Q   And how much was paid in connection with those claims?

11  A   $3,838,880.54.

12  Q   And is Medicare a federal program?

13  A   Yes.

14  Q   So are those federal dollars being paid?

15  A   Yes.

16  Q   Do you see Dr. Ruan on this list?

17  A   I do.

18  Q   Where is he located?

19  A   Number 16.

20  Q   And could you please tell the jury how many prescriptions

21  he wrote and for how many Medicare patients?

22  A   378 prescriptions for 59 patients.

23  Q   And what was the total paid?

24  A   $1,752,567.68.

25  Q   And did you have an opportunity to examine who this

1    individual was at number one here?

2    A    I did.

3    Q    And who was that individual from Southfield, Michigan?

4    A    Gavin Awerbuch.  I hope I pronounced that correctly.

5    Q    Ms. Colquhoun, do you know, does Medicare reimburse --

6    well, first, does this money go to the doctor or does it go to

7    the pharmacy where the drugs were filled?

8    A    The pharmacy.

9    Q    Do you know how the pharmacies are paid?  Are they paid

10   electronically or are they reimbursed with a check, if you

11   know?

12   A    It depends on how the pharmacy has their contract set up

13   with the individual plans.  Most of them are electronic.

14   Q    Do you know, if it's done electronically, where the wire

15   transfer would originate to send the money to the pharmacy?

16   A    I do not.  I apologize.  It should be the plan itself,

17   whichever plan paid it out.

18   Q    Do you happen to know where a check would be sent from if

19   the pharmacy is being reimbursed by check?

20       It would be multiple locations.  It wouldn't be just one

21   location.  The way Medicare Part D works is there's the

22   individual plan that pays for the prescriptions.  So if a

23   beneficiary has a plan in one state like, for instance, their

24   plan is based out of Alabama or another beneficiary might have

25   a plan based out of Pennsylvania, those checks would come from

1    the plans regarding where the plan is located.  So there could

2    be multiple states that these checks would be sent from.

3    Q   Okay.  Did you create a similar chart like this for the

4    drug Abstral?

5    A   I did.

6    Q   I'm going to show you what has been admitted as

7    Government's Exhibit 20-17.  And is this a national ranking for

8    the drug Abstral as prescribed to Medicare patients?

9    A   It is.

10   Q   And do you see Dr. Couch's name on there?

11   A   I do.

12   Q   Where is Dr. Couch listed in the nation?

13   A   Number two.

14   Q   And how many prescriptions for Abstral did he write and to

15   how many patients?

16   A   98 for 24 beneficiaries or patients.

17   Q   How much was paid out of federal dollars for those Abstral

18   prescriptions?

19   A   787 -- $787,864.12.  Sorry.

20   Q   And do you see Dr. Ruan on this list?

21   A   I do.

22   Q   And where is he listed?

23   A   He is number five.

24   Q   And can you tell the jury how many prescriptions to how

25   many patients?

TONYA COLQUHOUN - DIRECT BY MR. BODNAR

1   A   66 prescriptions and 24 patients.

2   Q   And how much was paid out on those claims?

3   A   $271,700.18.

4   Q   Was an analysis done comparing pharmacies that filled

5   Subsys and Abstral as well?

6   A   Yes.

7   Q   I'm going to show you now what has been admitted as

8   Government's Exhibit 27-18.  Is this a pharmacy comparison?

9   A   This is.

10  Q   Do you see C&R Pharmacy on there?

11  A   I do.

12  Q   Where is C&R Pharmacy ranked?

13  A   Number three.

14  Q   And how many Medicare patients filled Subsys prescriptions

15  at C&R Pharmacy?

16  A   There was 90 beneficiaries or patients.

17  Q   How many different prescribers wrote those prescriptions to

18  those 90 Medicare patients?

19  A   Three.

20  Q   And how much was reimbursed to C&R Pharmacy?

21  A   $4,740,711.22.

22  Q   Prior to testifying today did you have an opportunity to

23  look and see what pharmacy this is in Woodbury, New York?

24  A   I did.

25  Q   And what pharmacy is that?

2887

1    A    Linden Care.

2    Q    Do you know what if any difference Linden Care is compared

3    to a brick-and-mortar pharmacy?

4    A    Yes.  Linden Care is a mail-order pharmacy.  So they supply

5    prescriptions to people around the world -- around the United

6    States.

7    Q    Finally, I'm going to show you what has been admitted as

8    Government's Exhibit 27-19.  And is this the pharmacy

9    comparison for the drug Abstral?

10   A    It is.

11   Q    And where in the nation does C&R Pharmacy rank with regard

12   to filling Abstral prescriptions?

13   A    Number one.

14   Q    And how many Medicare patients received Abstral dispensed

15   from C&R Pharmacy?

16   A    43 patients.

17   Q    How many prescribers wrote those prescriptions?

18   A    Two.

19   Q    And how much was paid for those Abstral prescriptions?

20   A    $983,139.63.

21   Q    And did you have an opportunity to look at this number two

22   ranked from Woodbury, New York?

23   A    Yes.

24   Q    Was that Linden Care?

25   A    Yes.

1  Q   And is that the nationwide online pharmacy that you

2  mentioned?

3  A   Yes.

4          MR. BODNAR:  No further questions from this witness.

5          THE COURT:  Any cross?

6          MR. ESSIG:  Yes, Your Honor.

7                      CROSS EXAMINATION

8  BY MR. ESSIG:

9  Q   Good morning, Ms. Colquhoun.  My name is Brandon Essig.

10 I'm one of the attorneys for Dr. Couch, and I'm going to follow

11 up with a few questions.

12 A   All right.

13 Q   Now, in this case did you take part in the charts that

14 Mr. Bodnar showed you, the exhibits that were admitted, did you

15 participate in compiling these numbers?

16 A   I did.

17 Q   And you're aware that Subsys and Abstral, those are TIRF

18 medications?

19 A   Yes.

20 Q   And they are a specific type of fentanyl; is that right?

21 A   Correct.

22 Q   And Subsys and Abstral, as TIRF medications, are TIRF

23 medications that are designed for sort of a quick benefit or

24 relief from the dosage, are you aware of that fact?

25 A   Yes.

```
 1   Q   Now, in this case, as part of your analysis, were you asked
 2   to determine what number or what percentage of Dr. Couch's
 3   patients who received TIRF drugs or TIRF medications were
 4   cancer patients versus noncancer patients?
 5   A   Not for this particular analysis, no.  It was just based
 6   off of the drug itself.
 7   Q   Okay.  But at some point in time in your analysis did you
 8   do that?  Did you determine the number or the percentage of
 9   cancer versus noncancer patients that Dr. Couch wrote TIRF
10   prescriptions to?
11   A   We did do a TIRF analysis, yes.
12   Q   And your TIRF analysis showed that over 70 percent of
13   Dr. Couch's TIRF prescriptions went to cancer patients?  Is
14   that correct?
15           MR. BODNAR:  Objection, Your Honor.  This is well
16   outside of what was on direct.
17           THE COURT:  Sustained.
18   BY MR. ESSIG:
19   Q   Do you have any reason to disagree with that number?
20           MR. BODNAR:  Objection, Your Honor, to this line of
21   questioning.
22           THE COURT:  Sustained, sustained.
23   BY MR. ESSIG:
24   Q   Now, Ms. Colquhoun, you also stated that, looking at these
25   numbers, that you had done a comparison of C&R Pharmacy to
```

1    Linden Care Pharmacy; is that correct?

2    A    It was all pharmacies.

3    Q    I understand that.  But you were asked specifically on

4    direct examination about Linden Care.

5    A    Yes, sir.

6    Q    And when the jury saw the chart that included Linden Care,

7    I mean, they were -- they exceeded every other prescriber by

8    quite a bit; isn't that correct?

9    A    Correct.

10    Q    I mean, there was nobody else that was really even close to

11    them for most of these numbers; is that right?

12    A    Correct.

13    Q    I mean, if you look, for example, at Government's Exhibit

14    29-18, I mean, they -- their total paid value is $62 million;

15    is that right?

16    A    Correct.

17    Q    And the next two are only roughly 4 to $5 million; is that

18    right?

19    A    Uh-huh (positive response).

20    Q    So they are 12 to 15 times the number two and number three?

21    A    Correct.

22    Q    And that number, that difference, is explainable because,

23    as the jury's heard more than once, Linden Care is a different

24    type of pharmacy; isn't that right?

25    A    Yes.

1  Q   They are a pharmacy that serves through the mail

2  prescriptions that are filled all over the country; is that

3  right?

4  A   Correct.

5  Q   Now, other than Linden Care, when you look at the

6  statistics for these doctors, I think you mentioned

7  Dr. Awerbuch is the only one you know of specifically on this

8  list; is that right?  He's number one, the one from Southfield,

9  Michigan; is that correct?

10 A   Correct.

11 Q   And again, he's more than double Dr. Couch and he's almost

12 six to seven times the amount for Dr. Ruan; is that right?

13 A   Correct.

14 Q   I mean, his numbers of prescriptions, his number of

15 patients, and the total amount paid is significantly higher

16 than both of these doctors?

17 A   Yes, sir.

18 Q   Now, for the rest of the doctors that would be listed here

19 have you done any analysis of the type of practice they had,

20 how they wrote their prescriptions, where their prescriptions

21 were filled, or was it just that you just listed the total

22 numbers here?

23 A   This particular chart has the total numbers.  The actual

24 data itself does have the specialties, but --

25 Q   Okay.  Now, would you have any way of knowing -- let me ask

1    you this:  Were you aware that the clinic where Dr. Ruan and

2    Dr. Couch practiced, that they operated two clinics?  Were you

3    aware of that fact?

4    A   I'm not sure, no.

5    Q   Are you aware that their clinics were colocated with a

6    pharmacy?

7    A   Yes.

8    Q   Are you aware that their clinics offered their patients

9    every service from medication to include MRIs?  Are you aware

10   of that fact?

11          MR. BODNAR:  Objection to foundation on this, Your

12   Honor.  She got in the data from Medicare.

13          THE COURT:  Sustained.

14          MR. ESSIG:  Your Honor, what I'm trying to explore is

15   what the data means and how reliable it is.  I mean, she

16   actually testified to her knowledge of Linden Care.  I'm trying

17   to compare and contrast that.

18          THE COURT:  You can ask a few more questions, but this

19   is really not relevant.

20          MR. ESSIG:  Yes, ma'am.

21   Q   Are you aware of that fact?

22   A   Yes.

23   Q   You're aware that they had an MRI, that they performed MRIs

24   at their facility?

25   A   No, no, I'm sorry.

2893

1  Q   Are you aware of the fact that they did epidurals and nerve

2  blocks at their facility?

3  A   No.

4  Q   And you certainly wouldn't know whether any of the other --

5        MR. BODNAR:  Your Honor, we object to this.  Also

6  Linden Care is a pharmacy.  He's asking what the doctor did

7  versus Linden Care.

8        THE COURT:  Yeah, I think this is -- this is outside

9  the realm of the direct examination.

10        MR. ESSIG:  Yes, ma'am.

11  Q   My only question, ma'am, Ms. Colquhoun, is do you know how

12  the practice and the services that these doctors offered

13  compared to the other doctors listed with them on these charts?

14  are you aware of that?

15  A   No.

16        MR. ESSIG:  No further questions, Your Honor.

17        THE COURT:  All right.  Mr. Knizley?

18                    CROSS EXAMINATION

19  BY MR. KNIZLEY:

20  Q   Good morning.

21  A   Good morning.

22  Q   Ms. Colquhoun, I'm going to show you what's marked as

23  Government's Exhibit 27-16, and that is the document you

24  prepared; is that right?

25  A   Yes, sir.

2894

1  Q   And as you told the other lawyers, that this is the

2  Medicare national prescriber or doctor comparison; right?

3  A   Correct.

4  Q   For Subsys, a particular substance, for a particular time

5  frame?

6  A   Correct.

7  Q   Now, I represent Dr. Ruan.  He appears down here at number

8  16; is that right?

9  A   Correct.

10  Q   And I see here that his number is 1,752,000 and 378

11  prescriptions; is that right?

12  A   Correct.

13  Q   If you go up just a little and you look at this number 13

14  -- and, of course, he has like a couple of hundred thousand

15  more dollars; right?

16  A   Correct.

17  Q   Is that correct, ma'am?

18  A   Yes, sir.  Sorry.

19  Q   And, but he only has, I mean, like exactly one-third of the

20  prescriptions; is that right?  See, 126 and 378?

21  A   Correct.

22  Q   What, if you know, accounts for the fact that you have more

23  money but a third of the prescriptions?

24  A   I would have to look at the data directly.

25  Q   Might it be the dosage?

2895

1    A    It could be the dosage.  It could be the -- the amount that

2    was paid by the plan.  It could be a number of different

3    things.  I would have to investigate the data further to give

4    you an exact answer.

5    Q    Would dosage be a primary consideration as to why there

6    would be such a disparity in prescription versus amount?

7    A    I wouldn't be comfortable answering that without looking.

8    Q    But it's clear that more money, on 13, was paid for one

9    third of the prescriptions?

10    A    Correct.

11    Q    Is that right?

12    A    Yes.

13    Q    And even a lesser percentage, 14, of the patients?

14    A    Correct.

15    Q    Right?  And that holds true not only for number 13, but if

16    you look at number nine, who's half of the prescriptions,

17    600,000 more dollars and less patients?

18    A    Correct.

19    Q    Do you see that?  So something is driving more pay for less

20    prescriptions?

21    A    Correct.  And with further investigation of the data, I

22    would be able to tell you.  But --

23    Q    And if we go a little -- and that's the one above.  And if

24    we go look at the ones below, and just roughly less than a

25    hundred thousand dollars difference, again, we have the same

 1   situation here with only 119 prescriptions and almost the same

 2   amount of money; is that right?

 3   A   Yes, sir.

 4   Q   And again, a smaller number of the patients.  In fact, that

 5   looks to be about 25 percent of the patients?

 6   A   Correct.

 7   Q   Okay.  And it appears that below every single one of them

 8   -- except for this one right here, number 18 -- appears to be

 9   half or less than Dr. Ruan's; right?

10   A   Correct.

11   Q   But even if you go to the bottom, it's not half the money;

12   right?

13   A   No, sir.

14   Q   For whatever reason, it appears Dr. Ruan's prescriptions

15   are yielding less money; is that right?

16   A   That's what it appears, yes.

17   Q   And it seems per patient he's also yielding less money?

18   A   Yes, sir.

19   Q   I'm going to show you what's been marked as Government's

20   Exhibit 27-17.  And is that a very similar chart for Medicare

21   nationwide for the doctors for Abstral?

22   A   Yes, sir.

23   Q   And it's very similar to the Subsys chart we just looked

24   at?

25   A   Yes, sir.

TONYA COLQUHOUN - CROSS BY MR. KNIZLEY

1  Q   For the same time frame?

2  A   Same criteria, just a different drug.

3  Q   And again we see Dr. Ruan coming in here?  (Indicating.)

4  All right.

5  A   Yes, sir.

6  Q   And do we see a similar situation where Dr. Ruan had

7  written 66 prescriptions for 271,000, and the one right below

8  him was a third of the prescriptions for $28,000 less; is that

9  right?

10 A   Yes, sir.

11 Q   And less than a third of the patients; is that correct?

12 A   Yes, sir.

13 Q   And you see, if you go down, as it goes down, 19

14 prescriptions and it looks to be less than a third of the

15 prescriptions; right?

16 A   Yes, sir.

17 Q   And that's a hundred thousand dollars less money; is that

18 correct?

19 A   Yes, sir.

20 Q   And the jury can look at this and determine if there's a

21 correlation between the number of prescriptions and the amount

22 of money reimbursed as among the various physicians; is that

23 right?

24 A   Yes.

25 Q   And I'm going to show you what's been marked as

 1   Government's Exhibit 27-19.  And this is another Medicare

 2   nationwide -- but this was the pharmacies; is that correct?

 3   A   Correct.

 4   Q   And this was for Abstral through the time frame that we've

 5   been talking about?

 6   A   Correct.

 7   Q   And we saw the C&R Pharmacy, where it came in, and we saw

 8   the number of Medicare -- this is just the number of doctors

 9   that had the prescriptions filled there; right?

10   A   Correct.

11   Q   And as to the Medicare patients, we see -- and you talked

12   about that nationwide one, but we see 43 patients paid that

13   much money, but then in Orange County we saw this for two

14   patients were paid that much money; right?  (Indicating.)

15   A   Correct.

16   Q   And for six patients, paid that much money; right?

17   (Indicating.)

18   A   Correct.

19   Q   And two patients, paid that much?  (Indicating.)

20   A   Correct.

21   Q   And from that it's hard to say that could be dosage, but

22   for some reason the patients are being -- not receiving as much

23   medication for those particular prescriptions from those

24   pharmacies than they were from C&R?

25   A   Again, I'd have to look at the data to determine.

1   Q   Well --

2   A   But yes.

3   Q   -- without looking at the data we can see that --

4   A   There are definitely --

5   Q   -- that only two patients here got that much money and got

6   that much prescription; right?  (Indicating.)

7   A   Correct.

8   Q   And 43 patients got not much more?  (Indicating.)

9   A   Correct.

10  Q   And that's six patients here, for 850.  Two patients for

11  240.  It appears that many of these are all single digits down

12  below; right?

13  A   Correct.

14  Q   That these pharmacies are paying apparently more money to

15  fulfill one patient's prescription than C&R was, at least on

16  average?

17          MR. BODNAR:  Objection, Your Honor.  That's not

18  prescription numbers.  Those are number of patients.

19          MR. KNIZLEY:  I'm sorry if I misstated.  I

20  apologize.  I meant prescriptions.

21          THE COURT:  All right.

22  BY MR. KNIZLEY:

23  Q   Let me say that again, if I can, if I did say it wrong.

24  Per patient on 27-14, comparing C&R, for instance, to number

25  three, per patient there's a tremendously less amount of money

```
 1   paid to fill prescriptions per patient?

 2   A   Correct.

 3   Q   Is that correct?

 4   A   Correct.

 5         MR. KNIZLEY:  That's all we have, Your Honor.

 6         THE COURT:  Any redirect?

 7         MR. BODNAR:  Briefly, Your Honor.

 8         THE COURT:  Okay.

 9                   REDIRECT EXAMINATION

10   BY MR. BODNAR:

11   Q   Ms. Colquhoun, I'm going to show you what has been admitted

12   as Government's Exhibit 27-16.

13   A   Yes, sir.

14   Q   Do you recall going over these charts with both myself and

15   defense counsel?

16   A   Correct.

17   Q   And does this chart make any indication of how much was

18   paid per prescription or per patient?

19   A   Yes.

20   Q   Does it show what the average is per patient or does it

21   just show what the total was that was paid based on these

22   prescriptions?

23   A   Just the total.

24   Q   And is that the same for all of these charts?

25   A   Yes.
```

1  Q   Do you --

2  A   The pharmacy charts do not have the number of prescriptions

3  written on them.  They just have the number of patients and the

4  number of prescribers.

5  Q   And with regard to the pharmacy chart, I'll show you what's

6  been admitted as Government's Exhibit 27-18.  Is this the

7  pharmacy chart we looked at for Subsys?

8  A   Yes, sir.

9  Q   We talked about Linden Care being a nationwide pharmacy?

10 A   Correct.

11 Q   And clearly that one was reimbursed a lot more than anyone

12 else on this list?

13 A   Yes.

14 Q   What's the difference, though, roughly between the

15 number-two and number-three pharmacy, with three being C&R

16 Pharmacy?

17 A   The number-two pharmacy had 17 different prescribers for 69

18 different patients, so it was spread out more.  C&R Pharmacy

19 only had three prescribers for 90 patients.

20 Q   And with regard to Abstral, 27-19, does C&R Pharmacy

21 actually come out ahead of Linden Care on this one?

22 A   It does, yes.

23         MR. BODNAR:  Nothing further from this witness, Your

24 Honor.

25         THE COURT:  All right.  May this witness be excused?

1          MR. KNIZLEY:  Yes, ma'am.

2          MR. BODNAR:  Yes, ma'am.

3          THE COURT:  All right.  You may step down.  Thank you.

4          THE WITNESS:  Thank you.

5          MR. BODNAR:  Your Honor, next, before we call the next

6    witness, per stipulation the United States is moving to admit

7    Government's Exhibit 27-29, which is the declaration of Mark

8    Hogle.  He's the director of the Enterprise Data Service Group.

9          THE COURT:  Can you spell his name?

10         MR. BODNAR:  H-O-G-L-E.

11         He's the director of the Enterprise Data Service Group

12   for the Office of Technology Solutions for the Centers for

13   Medicare and Medicaid Services for the Department of Health and

14   Human Services.  And in his declaration he explains how third-

15   party contractors maintain and handle data related to Medicare.

16         THE COURT:  All right.  Mark it in.  What's the

17   Exhibit Number again?

18         MR. BODNAR:  27-29.

19      (Government's Exhibit 27-29 was entered into evidence.)

20         MR. BODNAR:  The United States calls B. J. Guerrero.

21         THE CLERK:  Come forward and I'll swear you in.

22                        B. J. GUERRERO

23            was sworn and testified as follows:

24         THE WITNESS:  I do.

25         THE CLERK:  Thank you, sir.  Please be seated.

2903

```
 1                    DIRECT EXAMINATION
 2   BY MR. BODNAR:
 3   Q    Good morning.
 4   A    Good morning.
 5   Q    Would you please introduce yourself to the jury?
 6   A    Hello.  I'm B. J. Guerrero.  I am a statistician at
 7   AdvanceMed Corporation.
 8   Q    And, Mr. Guerrero, what is the corporation that you just
 9   talked about?
10   A    We are a company, we're a subsidiary of NCI, and we focus
11   on identifying fraud, waste, and abuse in entitlement programs
12   such as Medicare and Medicaid.
13   Q    And what is MCI?
14   A    NCI --
15   Q    NCI?
16   A    -- is a company that provides services and solutions to
17   several government agencies in areas such as engineering, IT
18   infrastructure, data analytics, health and program integrity,
19   to name a few.
20   Q    And does Medicare contract with your company to do analysis
21   of Medicare data?
22   A    The Centers for Medicare and Medicaid Services contract us
23   to do that, yes.
24   Q    And were you asked to do data analysis regarding the codes
25   99213 and 99214 with regard to Dr. Ruan and Dr. Couch?
```

1   A   Yes.

2   Q   And prior to doing that had you looked up on the CMS

3   website, the Center for Medicare and Medicaid Services, the

4   fact sheets regarding the codes 99213 and 99214?

5   A   Yes.

6   Q   I'm going to show you now what has been marked as

7   Government's Exhibit 33-5 and 33-6.  And are these fact sheets

8   that CMS prepared for Medicare and Medicaid Services published

9   online?

10  A   Yes.

11  Q   And are those for the CPT codes 99213 and 99214?

12  A   Yes.

13          MR. BODNAR:  The United States moves to admit

14  Government's Exhibit 33-5 and 33-6.

15          MR. ESSIGN:  No objection.

16          THE COURT:  All right.  Mark them in.

17      (Government's Exhibits 33-5 and 33-6 were marked for

18  identification.)

19  BY MR. BODNAR:

20  Q   I'm going to show you now what has been admitted as

21  Government's Exhibit 33-5.  And is this, at the bottom, is that

22  the logo, if you know, for the Center for Medicare and Medicaid

23  Services?

24  A   Yes.

25  Q   And does this purport to be the fact sheet for the code

2905

```
 1   99213?

 2   A   Yes.

 3   Q   And what does it say underneath that?

 4   A   Office or other outpatient visit.

 5   Q   And without going through this whole chart -- I'm going to

 6   blow it up on the left-hand column in the yellow -- I would

 7   like you to read that, please, for the jury.

 8   A   Office or other out-patient visit for the evaluation and

 9   management of an established patient which requires two of

10   these three key components:  an expanded problem-focused

11   history, an expanded problem-focused examination, medical

12   decision making of low complexity.

13           Documentation to support this service should include,

14   but is not limited to, the following:  Medicare allows only the

15   medically necessary portion of the visit.  Even if a complete

16   note is generated, only the necessary services for the

17   condition of the patient at the time of the visit can be

18   considered in determining the level of an E/M code.

19   Q   And do you know what an E/M code is?

20   A   E/M stands for evaluation and management.

21   Q   And is that what -- do you know is that what the 99213 code

22   is?

23   A   Yes.

24   Q   I'm going to show you now what has been admitted as

25   Government's Exhibit 33-6.  And is this a similar CMS fact
```

1   sheet for the code 99214?

2   A   Yes.

3   Q   And can you please just read again that box, giving the

4   summary of 99214?

5   A   Office or other outpatient visit for the evaluation and

6   management of an established patient, which requires two of

7   these three key components:  a detailed history, a detailed

8   examination, medical decision making of moderate complexity.

9          Medicare allows only the medically necessary portion

10  of the visit.  Even if a complete note is generated, only the

11  necessary services for the condition of the patient at the time

12  of the visit can be considered in determining the level of an

13  E/M code.

14  Q   Mr. Guerrero, I believe you had mentioned before, but did

15  you do a data analysis with regard to Dr. Ruan and Dr. Couch

16  for the billing of the codes 99213 and 99214 to Medicare?

17  A   Yes.

18  Q   I'm going to show you now what has been marked as

19  Government's Exhibit 33-7, 33-8, and 33-9.  Showing you first

20  what has been marked as Government's Exhibit 33-9, is that data

21  that was provided to the United States with regard to the codes

22  99213 and 99214 for the years 2010 through '14 for Dr. Ruan and

23  for Dr. Couch?

24  A   Yes.

25  Q   And have you had an opportunity prior to your testimony

1   today to ensure that the codes for 99213 and 99214 per year

2   match what is on the graphs marked Government's Exhibit 33-7

3   and 33-8?

4   A   Yes.

5           MR. BODNAR:  United States moves to admit Government's

6   Exhibit 33-7 and 33-8.

7           MR. ESSIG:  No objection.

8           THE COURT:  All right.  Mark them in.

9       (Government's Exhibits 33-7 and 33-8 were entered into

10  evidence.)

11  BY MR. BODNAR:

12  Q   Mr. Guerrero, showing you first United States Exhibit 33-7,

13  is this the office visit graph for Dr. Couch?

14  A   Yes.

15  Q   And which code is represented by the blue line?

16  A   The procedure code 99213.

17  Q   And which is represented by the red line?

18  A   Procedure code 99214.

19  Q   Is there a point on this chart where 99214 surpasses 99213?

20  A   Yes.

21  Q   And this is a touch screen, so you can touch the screen and

22  show us where that is.

23  A   The year of 2014 right there (indicating).

24  Q   And you don't know anything or do you know anything about

25  Dr. Ruan and Dr. Couch's practice independent of what you've

```
 1  seen in the data?
 2  A   No.
 3  Q   So you wouldn't have any information of what may have
 4  caused the change?
 5  A   No.
 6  Q   Are you just testifying that this is what the data says?
 7  A   Correct.
 8  Q   And I'm now showing you what has been admitted as
 9  Government's Exhibit 33-8.  Is this a similar chart for
10  Dr. Ruan?
11  A   Yes.
12  Q   Does the blue still represent 99213?
13  A   Yes.
14  Q   And does the red still represent 99214?
15  A   Yes.
16  Q   And at what point -- or is there a point where it appears
17  99213 is surpassed by 99214?
18  A   Yes.
19  Q   And what is that?
20  A   99214 again (indicating).
21  Q   And does the same hold true, that you have no independent
22  knowledge of why this may have happened?
23  A   Yes; that's true.
24          MR. BODNAR:  Nothing further from this witness.
25          THE COURT:  Mr. Essig?
```

```
 1          MR. ESSIG:  Yes, ma'am.
 2                    CROSS EXAMINATION
 3   BY MR. ESSIG:
 4   Q   Good morning, Mr. Guerrero.
 5   A   Good morning.
 6   Q   My name is Brandon Essig.  I'm one of the lawyers for
 7   Dr. Couch.  Just a few questions here.  Now, you stated you
 8   worked for -- is it Events Medical Corporation?
 9   A   AdvanceMed.
10   Q   Advance Medical Corporation.  Okay.
11   A   Yes, sir.
12   Q   And your position with them is as a statistician?  Is that
13   right?
14   A   Yes, sir.
15   Q   And you stated on direct examination that y'all's purpose
16   is to detect fraud, waste, and abuse, that's your company's
17   purpose?
18   A   Yes.
19   Q   Does your company's determination of fraud, waste, and
20   abuse end with statistics?
21   A   No.
22   Q   All right.  What happens after you find statistics?
23   A   We forward our results to a team of subject matter experts
24   and medical review personnel and they go onsite or they
25   determine from medical documents whether or not the
```

1  documentation in the medical documents they receive are

2  consistent with the data.

3  Q    Okay.  So your company does not make a finding of fraud,

4  waste, and abuse just because a doctor or their practice is a

5  statistical outlier?

6  A    Yes.

7  Q    Not on that basis alone?

8  A    Correct.

9  Q    Now, here -- excuse me.  For Dr. Couch, Government's

10 Exhibit 33-7 for these two CPT codes right there, and we have

11 the first change sometime in 2013 for Dr. Couch; is that right?

12 A    Yes.

13 Q    The first time -- the first time they start going in

14 different directions?

15 A    Right.

16 Q    And certainly because you work for the statistical portion

17 of your company, you have no knowledge as to why that occurred?

18 A    That's correct.

19 Q    Right?

20 A    That's correct.

21 Q    You don't know what was going on in their practice at the

22 time?

23 A    I don't know.

24        MR. ESSIG:  No further questions.

25        THE COURT:  Mr. Knizley?

1                              CROSS EXAMINATION

2    BY MR. KNIZLEY:

3    Q   Good morning.

4    A   Good morning.

5    Q   Mr. Guerrero, I'm going to show you what's marked as

6    Government's Exhibit 33-5.  And here we talk about two CPT

7    codes; right?

8    A   Yes, sir.

9    Q   One is 99213; is that right?

10   A   Yes, sir.

11   Q   And 99213 is for medical decision making of low complexity;

12   is that correct?

13   A   Yes.

14   Q   And two out of three says the decision making of low

15   complexity involves two of three of limited management options

16   for diagnosis or treatment, and limited amount of data to be

17   reviewed, and low risk of complications and/or morbidity; is

18   that what that says?

19   A   Yes, sir.

20   Q   And then when you get to 14, the other one we talked about,

21   it is not about low, CPT code 14, it's moderate; right?

22   A   Yes, sir.

23   Q   It sets out its criteria too; is that right?

24   A   (Nodding head affirmatively.)

25   Q   I assume there's a high after that?

```
 1   A   Yes, sir.  In this -- in this spectrum, 99215 was the last
 2   code in that spectrum.
 3   Q   So the two you showed us was the low one and the medium?
 4   A   Yes, sir.
 5            MR. KNIZLEY:  Thank you.
 6            THE COURT:  Any redirect?
 7            MR. BODNAR:  Just one question, Your Honor.
 8                          REDIRECT EXAMINATION
 9   BY MR. BODNAR:
10   Q   Do you recall Mr. Knizley just asked you if 99213 and 99214
11   are the low code and medium code?
12   A   Yes.
13   Q   Are there in fact codes below 99213?
14   A   Yes.
15   Q   So there are codes lower?
16   A   Yes.
17            MR. BODNAR:  No further questions, Your Honor.
18            THE COURT:  All right.  May this witness be excused?
19            MR. BODNAR:  Yes, Your Honor.
20            THE COURT:  Thank you, Mr. Guerrero.  You may step
21   down.
22            Let's take our morning break at this time.
23            Ladies and gentlemen, leave your pads on your chairs.
24   Take your break downstairs in the jury assembly room.  No
25   discussion about the case.  And we will call you back up in
```

```
 1    about 15 minutes, I hope.  We're in recess.
 2         (A recess was taken at approximately 10:29 a.m.)
 3         (In chambers, 10:45 a.m.)
 4              THE COURT:  Okay.
 5              MR. ESSIG:  Judge, I asked for this because I wanted
 6    to correct one thing from this morning.  I wanted to make sure
 7    the record was clear.  We have an expert report that references
 8    some of this analysis and data.  Our objection is we don't have
 9    an expert report that talks about sort of the underlying
10    process algorithm that arrives at the predicted 1,000
11    score.  So I just wanted to be clear.
12              The government did provide an expert report that
13    references some of the findings and some of the data from the
14    NBIC.  Is that correct?  I didn't want to misrepresent to the
15    Court.  That's the whole purpose of this.
16              THE COURT:  Okay.  Anything further?
17              MR. BODNAR:  No.  The only thing is we did change the
18    title.  Pill mill has been taken off.  It now says Doctor Data
19    Analysis Project.  We checked through and there's nowhere else
20    that says pill mill, and he knows not to say pill mill.
21              THE COURT:  All right.  Let's see what happens.
22         (A recess was taken at 10:45 a.m.)
23         (In open court, 10:51 a.m., defendants and jury present.)
24              THE COURT:  All right.  Call your next witness.
25              MR. BODNAR:  United States calls Kevin McCash.
```

KEVIN McCASH, Ph.D. - DIRECT BY MR. BODNAR

1    THE CLERK:  Mr. McCash, would you step forward and
2    raise your right hand.
3                    KEVIN McCASH, Ph.D.
4              Was sworn and testified as follows:
5    THE WITNESS:  I do.
6    THE CLERK:  Thank you, sir.  Please be seated.
7                    DIRECT EXAMINATION
8    BY MR. BODNAR:
9    Q    Good morning.
10   A    Good morning.
11   Q    Would you please pull the microphone a little bit closer to
12   you.
13   A    (Complying.)  Is this better?
14   Q    Yes.  And could you introduce yourself to the jury?
15   A    I'm Dr. Kevin McCash, Ph.D.
16   Q    And Mr. McCash, where do you work?
17   A    I work for Health Integrity, LLC.
18   Q    And what is Health Integrity, LLC?
19   A    Health Integrity is a government contractor that holds the
20   NBI MEDIC contract, which is the National Benefit Integrity
21   Medicare Drug Integrity contract.
22   Q    And is it safe to say that your company works with Medicare
23   data?
24   A    Yes.
25   Q    Is that what you do for your company?

1    A    Yes.  I work with Medicare Part D predominantly.

2    Q    And what is Part D of Medicare?  What kind of data is that?

3    A    That's the prescription benefit for Medicare.

4    Q    You mentioned that you were a doctor.  You are not a

5    medical doctor, though; correct?

6    A    No, I am not.

7    Q    Are you a Ph.D. doctor?

8    A    Yes.

9    Q    And what is your Ph.D. in?

10   A    Applied physics.

11   Q    And what is it that you do at your -- what is your current

12   title?

13   A    I am the data analytics manager.

14   Q    What does data analytics mean?

15   A    Data analytics is a general term that means the

16   manipulation and analysis of data in order to uncover facts and

17   statistics to make conclusions.

18   Q    Is another way to put it looking at data and seeing if you

19   can find patterns within data?

20   A    Yes.

21   Q    And how long have you been in that position?

22   A    I've been with Health Integrity for two and a half years.

23   Q    And doing that type of work for Health Integrity?

24   A    Yes.

25   Q    Does Health Integrity have a program that is a doctor

1   analysis project?

2   A   Yes, we do.

3   Q   Can you explain to the jury what is the doctor analysis

4   project that your office runs?

5   A   Sure.  The doctor analysis project is a data analysis

6   algorithm that runs against prescription information given to

7   us by the Centers for Medicare and Medicaid Services , and it

8   is intended to identify prescribers who are prescribing

9   schedule II, III, and IV controlled substances to Medicare

10  beneficiaries and identifying those that are at high risk for

11  fraud, waste, and abuse in doing so.

12  Q   Now, looking at the statistics, you don't know if someone

13  actually is committing fraud, waste, and abuse, do you?

14  A   No.

15  Q   Are you simply looking at the data to see if certain

16  prescribers may be abnormal compared to others?

17  A   Yes.

18  Q   And with the data -- the doctor data project that we just

19  discussed, are there 17 factors that are looked at in the data?

20  A   Yes, there are.

21  Q   I'm going to show you now what has been marked as

22  Government's Exhibit 27-27.

23          MR. WILLSON:  Your Honor, based upon our prior

24  discussion, we object to that material.

25          THE COURT:  All right.  I overrule the

KEVIN McCASH, Ph.D. - DIRECT BY MR. BODNAR

```
 1   objection.  Mark it in.
 2        (Government's Exhibit 27-27 was entered into evidence.)
 3   BY MR. BODNAR:
 4   Q   I'm going to show you what has been offered as Government's
 5   Exhibit 27-27.  Is that a listing of the 17 factors for this
 6   data project?
 7   A   Yes, it is.
 8             MR. BODNAR:  United States moves to admit 27-27.
 9             THE COURT:  It's in.
10   BY MR. BODNAR:
11   Q   Mr. McCash, I am now showing you what has been marked as
12   Government's Exhibit 27-27, and we're going to take a look at
13   these factors.  What is the first factor we have here?
14   A   This is the number of schedule II controlled substance
15   beneficiaries.
16   Q   And is that just the number of Medicare patients that
17   receive schedule II from any particular prescriber?
18   A   That is correct.
19   Q   And for number two is that -- number two and number three,
20   are those the same, the number of Medicare patients that
21   receive schedule III or schedule IV controlled substances?
22   A   Yes, it is.
23   Q   And if a patient is receiving schedule II, schedule III,
24   and schedule IV, will they be counted in each of the factors?
25   A   Yes, they will.
```

KEVIN McGASH, Ph.D. - DIRECT BY MR. BODNAR

2918

1  Q   Looking down here at number four, what is the 30-day

2  equivalent prescription drug event records for schedule II

3  controlled substances?  What does that mean?

4  A   Prescription drug records are the records given to CMS that

5  contain the prescription information.  A 30-day equivalent

6  would be a standardized way for us to analyze the number of

7  those types of events, those records, so that the number of

8  days is equivalent across all of the counts that we make.  Some

9  prescriptions can have many, many days worth of doses while

10  some may only have a few.  So instead of using the raw number

11  or the actual number of prescriptions that were written, we use

12  an equivalent number that's standard.

13  Q   And if, for instance, the prescription is written for just

14  five days, let's say it's five pills for five days, would the

15  30-day equivalent be 30 pills for 30 days?

16  A   Yes.  A 30-day -- a 30-day equivalent would be -- excuse me

17  -- six five-day -- five-day prescriptions.

18  Q   So it would count as six then?

19  A   No.  It would count as one -- one-sixth of a 30-day

20  equivalent PDE record.

21  Q   So even though -- so because it's not multiplied times six,

22  you just take a 30-day equivalent and say this is one-sixth of

23  it?

24  A   Yes.

25  Q   And is that the same for schedule III and IV drugs here on

KEVIN McGASH, Ph.D. - DIRECT BY MR. BODNAR

1  factor five?

2  A   Yes, it is.

3  Q   Why does factor six differentiate and say new fills?

4  A   The difference between six and five is that the

5  prescription had to have been a new prescription without the

6  refill indication.  That's simply to say that a new script had

7  to have been written and processed by a pharmacy rather than

8  just a refill in which a pharmacy can dispense the drugs

9  without getting the new prescription.

10  Q   And do we not have a similar one for four because there are

11  no refills for schedule II?

12  A   Yes.  Due to regulations, there are no -- refills for

13  schedule II controlled substances are not allowed.

14  Q   What is number seven and eight?

15  A   Number seven is the quantity of schedule II controlled

16  substances that have been dispensed to beneficiaries.

17  Q   So does that look at a given doctor and how many schedule

18  II drugs were prescribed to Medicare patients during that time

19  period?

20  A   Yes.  This is the physical quantity of doses or capsules or

21  tablets that are -- that have been prescribed.

22  Q   And what's the difference between seven and eight?

23  A   Number eight looks at the number of tablets or capsules

24  that have been prescribed in a given month, and it is the total

25  of all of the quantity divided by the number of months in which

2920

 1    the prescriber had prescribed that particular class of

 2    medication.

 3    Q   So, for example, if there were 1,000 pills of schedule II,

 4    to come up with number eight you would divide 1,000 by 12?

 5    A   If they prescribed in 12 months.

 6    Q   And if they only prescribed in five months, would it be

 7    divided by five?

 8    A   It would be divided by five, yes.

 9    Q   And I believe this should say for number eight -- for

10    number nine schedule III controlled substances.  Does nine and

11    10 and 11 and 12 work the same way you just explained seven and

12    eight?

13    A   Exactly.

14    Q   So the total number of schedule three and then divided by

15    the number of months prescribed?

16    A   Yes.

17    Q   And for schedule IV?

18    A   Yes.

19    Q   Now, for 13, what does it mean number of beneficiaries

20    exceeding travel threshold?  What does that mean?

21    A   In this particular factor we look at the distance listed

22    between the listed address of a beneficiary and the listed

23    practice address of a prescriber in order to see if that

24    beneficiary had to travel over a specific distance in order to

25    see the particular prescriber.

KEVIN McGASH, Ph.D. - DIRECT BY MR. BODNAR

2921

1   Q   What is the particular travel threshold?

2   A   If the beneficiary's address is located in a county that

3   has been designated as a rural county, it's 120 miles.  If they

4   live in an urban-indicated county, then the threshold is 30

5   miles.

6   Q   So if there is one patient that travels 35 miles but lives

7   in an urban area, is that counted as one time here in factor

8   13?

9   A   Yes.

10  Q   And how does number 14 correlate with number 13?

11  A   Number 14 would be number 13 divided by the total number of

12  beneficiaries that receive schedule II, III and IV medications

13  from a specific prescriber.

14  Q   So if there were 10 patients that counted in number 13 that

15  traveled a sufficient far distance and there were a hundred

16  patients overall, that would be 10 percent?

17  A   That is correct.

18  Q   Number 14?

19  A   Yes.

20  Q   What is 15?  What does it mean prescribers with no part B

21  claims?

22  A   This particular factor looks into the Medicare part B

23  claims.  Part B are the normal doctor visit claims in Medicare.

24  And if it sees that there are no claims at all for that

25  particular physician under part B, this indicates that the

1    physician has not -- the physician has not billed Medicare part

2    B as a normal doctor visit and is simply writing prescriptions

3    in large quantities.

4    Q   And is this simply a yes or no as to factor 15?

5    A   Yes.

6    Q   Such as yes, the doctor does file office visit claims with

7    Medicare and prescribes, or no, the doctor has not billed for

8    any office visits?

9    A   In this case it would be reversed.  So a yes would be that

10   they have no claims.

11   Q   Okay.  And number 16, what is number 16?

12   A   Number 16 is the count of Medicare beneficiaries who have

13   had a drug abuse or misuse diagnosis during an ER visit during

14   the time frame of interest.

15   Q   So if a particular doctor's practice has two people during

16   the time period that went to the hospital and the hospital

17   diagnosed them with drug misuse or drug abuse, that would count

18   as two against the doctor?

19   A   Yes.

20   Q   And then by percentage, do they just take the number from

21   16 and divide it by the number of patients or Medicare patients

22   the doctor has?

23   A   The number of Medicare part -- Medicare beneficiaries

24   receiving schedule II, III and IV medications.

25   Q   Can you explain to the jury how are these factors utilized?

2923

 1   What -- how often are these factors looked at in the doctor

 2   analysis project?

 3   A   We run monthly updates on our algorithm every single month

 4   since December of 2014, and they are calculated using a rolling

 5   12-month time frame.  So that in a given month, the year

 6   previous to that specific month is the time frame of interest.

 7   Q   So, for example, this month is January of '17.  For the

 8   analysis run this month does it cover January of '16 through

 9   December of '16?

10   A   That is correct.

11   Q   And next month we're in February, will it cover February of

12   '16 to January of '17?

13   A   That is correct.

14   Q   When these factors are analyzed is a score come up with?

15   A   Yes, we calculate a score.

16   Q   And how -- what is the range for the score?

17   A   Score ranges from zero to 1,000.

18   Q   And how many doctors, roughly, are analyzed through this

19   Medicare project each month?

20   A   It varies from month to month, but it's usually between

21   60,000 and 70,000 prescribers.

22   Q   And from zero to 1,000, which end of the spectrum shows the

23   most abnormal as compared to other doctors?

24   A   1,000.

25   Q   Is that the highest possible score?

KEVIN McCASH, Ph.D. - DIRECT BY MR. BODNAR

1   A   Yes, it is.

2   Q   Roughly, approximately how many doctors score a 1,000 each

3   month when this is run?

4   A   Again, it varies from month to month, but usually it's

5   between 15 and 25.

6   Q   Out of about 60 to 70,000?

7   A   That is correct.

8   Q   Prior to coming here, had you checked to see if Dr. Ruan or

9   Dr. Couch had ever been scored at a 1,000?

10  A   Yes, I had.

11  Q   How many times had Dr. Couch scored at a 1,000?

12  A   Dr. Couch scored a 1,000 out of 1,000 17 consecutive times

13  from December 2014 to April 2016.

14  Q   And for Dr. Ruan did you check to see where he scored?

15  A   I did.

16  Q   And where did Dr. Ruan score?

17          MR. KNIZLEY:  Your Honor, we would for the record

18  object as to foundation and opinion.

19          THE COURT:  Overruled.

20  BY MR. BODNAR:

21  Q   Where did Dr. Ruan score?

22  A   In the time frame between September 2015 and April 2016 he

23  scored 1,000 eight times.  In the time frame between December

24  2014 and August of 2015 he scored 996 eight times and 992 one

25  time.

1   Q   And each month when you run this project is a printout done

2   of people that score 951 and above?

3   A   Yes.

4   Q   I'm going to show you now what has been marked as

5   Government's Exhibit 27-28.  Are you able to identify what this

6   document is?

7   A   I am.

8   Q   What is this document?

9   A   This document is a listing of the factors and scores for

10  physicians in a specific run of this -- of the project from

11  January 1st, 2015, to December 31st, 2015.

12  Q   So does that mean it was considering data for the entire

13  year of 2015, January through December?

14  A   That is correct.

15          MR. BODNAR:  United States moves to admit Government's

16  Exhibit 27-28.

17          MR. WILLSON:  Renew our objection, Your Honor.

18          THE COURT:  All right.  Overruled and mark it in.

19      (Government's Exhibit 27-28 was entered into evidence.)

20  BY MR. BODNAR:

21  Q   Mr. McCash, I'm now showing you what has been admitted as

22  Government's Exhibit 27-28.  I know it's small.  We will blow

23  this up.  While the lettering is very small still, along the

24  top are these the 17 factors that were discussed on the sheet

25  previous?

KEVIN McGASH, Ph.D. - DIRECT BY MR. BODNAR

1  A   Yes, they are.

2  Q   And are the numbers below them the numbers that

3  correlate with each factor?

4  A   That is correct.

5  Q   Let's see if I can blow up this one column so we can see

6  what we're talking about.  Looking at number of CS-II, what

7  does CS-II stand for?

8  A   Controlled substance.

9  Q   And II stands for --

10 A   Schedule II.

11 Q   -- schedule II?

12 A   Yes.

13 Q   So this number underneath it in the line that says Xiulu

14 Ruan, how many during this time period Medicare patients

15 received controlled II substances?

16 A   822.

17 Q   And for Dr. Couch how many received that?

18 A   1,163.

19 Q   And do the numbers going across correlate with the factors

20 that we just discussed on the other page?

21 A   Yes, they do.

22 Q   And I see right here it says predicted risk score.  Why

23 does its say predicted risk score?

24 A   This is a standard column name that is used by my group.

25 Some of our models are predictive in nature, and the first

KEVIN McCASH, Ph.D. - DIRECT BY MR. BODNAR

2927

1   models we made were predictive.  So they were predicted risk

2   scores.  In this case it's an anomaly detection project, which

3   means it's an abnormality detection project and it's not a

4   predicted score, it's similarly a risk score.

5   Q   So this is not predicting anything in the future but

6   looking back at a year's worth of data?

7   A   That is correct.

8   Q   Or whatever data was there during that one-year time

9   period?

10  A   That is correct.

11  Q   Now, I see it cuts off here with 1,000.  And do you see

12  Dr. Ruan's and Dr. Couch's names listed next to a score of

13  1,000?

14  A   I do.

15  Q   Why does one start below Dr. Ruan and seems to skip a

16  number for Dr. Couch here?

17  A   As this particular document contained the names and

18  identifying numbers of other physicians, they have been

19  deidentified with only Dr. Ruan and Dr. Couch's names and IDs

20  present.

21  Q   So when this is actually run in your office, would this

22  include instead of numbers a bunch of doctors' names and NBI

23  numbers?

24  A   Yes, it would.

25  Q   Are these numbers here just signifying the number of blank

1    spaces?

2    A    Yes.

3    Q    Now, I see Dr. Ruan's name at the top and Dr. Couch about

4    three levels below him.  within the grouping of 1,000, is there

5    any ranking in that group?

6    A    No, there is not.

7    Q    So that just happens to be where their names fall on the

8    page?

9    A    That is correct.

10   Q    So the individual who scored 1,000 here is scored at the

11   same level as Dr. Ruan who is up here with 1,000?

12   (Indicating.)

13   A    That is correct.

14   Q    And does it work the same way with all those that are 999,

15   998, and so forth?

16   A    Yes.

17   Q    Now this is simply statistics about the risk factors that

18   we looked at previously; is that correct?

19   A    Yes.

20   Q    Nothing about the data can tell you what actually happened

21   in the practice or how patients were treated or what they

22   had -- what their morbidities were; is that true?

23   A    This is correct.

24   Q    Is this simply a program set up to look for anomalies in

25   the data?

KEVIN McCASH, Ph.D. - DIRECT BY MR. BODNAR

1    A    Yes.

2    Q    And is 1,000 the top anomaly?

3    A    Those individuals scoring 1,000 are most at risk for fraud,

4    waste, and abuse.

5    Q    But it does not mean that they necessarily are committing

6    fraud, waste, and abuse?

7    A    No, it does not.

8    Q    You mentioned before that this -- this poll that's on this

9    sheet was from January of '15 through December of '15?

10   A    Yes.

11   Q    If Dr. Ruan and Dr. Couch were only prescribing until May

12   20th of '15, why are they considered in a full-year chart here?

13   A    It would be because the volume in which the months they did

14   prescribe was large enough that they were allowed to be

15   admitted into the project to be scored.

16   Q    So does that mean in the five months their volume was large

17   enough to reach a score of 1,000?

18   A    That is correct.

19   Q    Even though they didn't do a full year?

20   A    Yes.

21        MR. BODNAR:  One moment, Your Honor.

22   (A discussion was held off the record between government

23   counsel.)

24        MR. BODNAR:  Nothing further from this witness, Your

25   Honor.

KEVIN McCASH, Ph.D. - CROSS BY MR. WILLSON

1          THE COURT:  All right.  Mr. Willson?

2                    CROSS EXAMINATION

3  BY MR. WILLSON:

4  Q   Good afternoon, Dr. McCash.  How are you today?

5  A   I'm very well.  Thank you.

6  Q   I have some questions for you about this, these numbers you

7  have here.  When you say that this is -- it only includes the

8  first five months of the year -- is that right?  For Drs. Ruan

9  and Couch?

10 A   No.  The data is collected for the entire year.

11 Q   Okay.  But the data that's reflected here for Drs. Ruan and

12 Couch comes from the first five months only of the year; is

13 that right?

14 A   I'm unable to tell you whether or not it was only the first

15 five months.  That would require inspection of the data itself.

16 Q   Okay.  And you didn't inspect the data?

17 A   I did not inspect the data, no.

18 Q   And when we say inspect, does that entail asking questions

19 about the data?

20 A   No, it does not.

21 Q   At some point in time -- well let me back up a little bit

22 and ask you -- you've talked about this, about this

23 project.  Would you agree that the work of your company, NBI

24 MEDIC, is to identify, investigate, and proactively prevent

25 potential fraud, waste, and abuse in Medicare's prescription

KEVIN McCASH, Ph.D. - CROSS BY MR. WILLSON

1    drug programs?

2    A    I would.

3    Q    And there's three words:  identify, investigate,

4    proactively prevent; is that right?

5    A    Yes.

6    Q    Now, this project, the doctor -- I'm sorry, I forgot the

7    name of it.  The project we're talking about here is a -- it

8    identifies prescribers from all specialties; right?

9    A    This is correct.

10   Q    Okay.  With an aggregated risk score above the established

11   thresholds; is that accurate?

12   A    Yes.

13   Q    Okay.  So this just identifies; is that right?

14   A    Yes.

15   Q    In other words, we talked about those three steps of what

16   your company does.  This is just the first step, identifying?

17   A    That is correct.

18   Q    And when you used the word "anomaly" with Mr. Bodnar, an

19   anomaly means an abnormality; right?

20   A    That is correct.

21   Q    But according to this project and the process you used to

22   get your numbers here and your list, it wouldn't matter, would

23   it, what the actual numbers are; it's just going to take

24   essentially the top of the list in the country and that's going

25   to be the result; is that right?

KEVIN McCASH, Ph.D. - CROSS BY MR. WILLSON

2932

```
 1   A   Not entirely, no.

 2   Q   Okay.  Well, let's look at some of these, some of these

 3   factors.  I'd like to ask you about a few of them.  We might

 4   come back to that question.

 5           Would you agree, Dr. McCash -- let's see if I can get

 6   it all in there -- that the project here, in this project,

 7   prescribers were considered as high risk if the number of

 8   beneficiaries prescribed controlled II substances, which is --

 9   well, let me just go through the list -- the number of

10   beneficiaries prescribed controlled II substances, the number

11   of beneficiaries prescribed controlled -- substances of

12   schedule III, and the number of 30-day equivalent PDE records

13   for controlled substances II through IV were all above the 75

14   percentile among the potential prescribers.  Is that -- is that

15   right?

16   A   In order to be considered high risk, yes, that is the

17   threshold.

18   Q   Okay.  So it looks like there are just a handful of these

19   17 that make a high-risk prescriber.  And I'll go through them

20   again because I bumbled a couple of the terms.

21           The number of beneficiaries prescribed controlled

22   substance schedule II drugs.  That's one; right?

23   A   Yes.

24   Q   The number of beneficiaries prescribed controlled substance

25   III medications.  That's two; right?
```

1   A   Yes.

2   Q   And the number of 30-day equivalent PDE records for

3   controlled substances II through IV.  That's the third?

4   A   Yes.

5   Q   And if all of those are above the 75th percentile, you're

6   high risk?

7   A   As long as you were also above the 95th percentile in the

8   nation for all of the 17 risk factors combined.

9   Q   Okay.  And about how many are there of those?  Are you

10  talking about -- it sounds like there's kind of an initial

11  stage and then subsequent stage.  But you just referred to "as

12  long as you're above the 95th percentile."  How many providers

13  does that yield?

14  A   It's usually between 1,000 and 800.

15  Q   Okay.  So if you're in the upper 75th percentile of that

16  bunch with those three factors, you're high risk?

17  A   The 75th percentile applies to the entire -- the entire

18  population of prescribers that are included in the project that

19  can receive scores, those meeting the minimum thresholds.

20  Q   Okay.  I think I got that, Dr. McCash.  Basically if you're

21  big, if you prescribe a lot of medications, controlled

22  medications, you're likely to be high risk according to your

23  project analysis?

24  A   Not necessarily.

25  Q   Okay.  But you would agree that it's just those three.  So

KEVIN McCASH, Ph.D. - CROSS BY MR. WILLSON

2934

1  it's the number of beneficiaries, the number of beneficiaries

2  prescribed controlled substance III, and the number of 30-day

3  equivalents.  That's the set that gives you the benchmark, and

4  above that benchmark you're high risk; is that fair?

5  A   As long as you're above the 95th percentile in the

6  combination of all of the risk factors, yes.

7  Q   Okay.  And that comes first?

8  A   That comes first.

9  Q   The first thing you do is you take a whole set of 60 to

10  70,000 -- and we're not talking about pain management

11  physicians; we're talking about physicians in the United

12  States, 60 to 70,000 physicians?

13  A   Yes.  That are prescribing controlled substances, yes.

14  Q   Okay.  And you do that first piece, above the 95th

15  percentile; right?  And then you get --

16  A   Yes.

17  Q   Okay.  Let's assume then.  So assuming that, if you are

18  above the 75th percentile on those three factors I listed, you

19  are high risk; is that accurate?

20  A   Yes.

21  Q   Thank you.  Now, being big, Dr. McCash, is that the basis

22  of any determination of fraud, waste, and abuse at NBI MEDIC?

23  A   The determination of fraud, waste, and abuse is outside of

24  the scope of my work.

25  Q   Okay.  So you didn't do any examination of anything further

KEVIN McCASH, Ph.D. - CROSS BY MR. WILLSON

 1   beyond those factors?

 2   A   My job is to assign the risk score and to produce that

 3   result.

 4   Q   Sure.  And I want to ask you -- I'm not going to go through

 5   them all, Doctor.  But I do want to ask you about just a

 6   couple -- a few of these.  Would you agree that most of these

 7   are quantitative?  In other words, number of schedule II

 8   controlled substance beneficiaries, that's a number; right?

 9   A   Yes.

10   Q   Okay.  And the same with number two; right?

11   A   Yes.

12   Q   And let's just say three as well.  And then four through

13   six, there's some analysis there.  But essentially it's just a

14   number; right?

15   A   Yes.

16   Q   Okay.  Now, this travel threshold business right here, you

17   said, I believe, that for beneficiaries who are in rural

18   environments, it's 120 miles?

19   A   That's correct.

20   Q   And for beneficiaries who are in urban environments, it's

21   more like 30 miles; right?

22   A   Yes.

23   Q   And you didn't -- did you look at a map of the regional

24   area here to determine how many ZIP codes are rural and how

25   many are urban?

KEVIN McCASH, Ph.D. - CROSS BY MR. WILLSON

1  A   No.  We used the Federal Information Processing Standards,
2  FIPS county codes.
3  Q   Sure.  And if you're doing an actual analysis -- in other
4  words, if you're doing that second piece, identifying -- and
5  then the second piece is what?  Investigate; right?
6  A   Yes.
7  Q   If you're doing that investigating, you're going to ask
8  questions, aren't you, about the number of schedule II
9  controlled substance beneficiaries; right?
10 A   That is out of the scope of my work.
11 Q   Okay.  Are there folks at Health Integrity that do that
12 kind of work?
13 A   Yes, there are.
14 Q   Okay.  And they make an assessment.  In fact, they engage
15 their reason, do they not, to determine whether or not, for
16 example, a pain management clinic is going to be a high risk,
17 according to your project, a high-risk prescriber?
18 A   I cannot speak to the methods and techniques that they use.
19        MR. WILLSON:  Okay.  Just a moment.
20        THE COURT:  All right.
21 Q   Just a couple more, Doctor.  The threshold of travel,
22 that's just simple mileage; right?  It's a number?
23 A   Yes.
24 Q   Okay.  It has nothing to do -- in terms of what you do, it
25 has nothing to do and you didn't look at, for example, how many

KEVIN McCASH, Ph.D. - REDIRECT BY MR. BODNAR

```
 1   other providers there are in the regional area?
 2   A   No.
 3   Q   That has nothing to do with how many practitioners there
 4   are who have a full sweep of treatment options in their
 5   facility?
 6   A   No.
 7           MR. WILLSON:  Okay.  I believe that's all I have.
 8           THE COURT:  Mr. Knizley?
 9           MR. KNIZLEY:  We don't have any questions, Your Honor.
10           THE COURT:  Any redirect?
11           MR. BODNAR:  Briefly, Your Honor.
12                       REDIRECT EXAMINATION
13   BY MR. BODNAR:
14   Q   Mr. McCash, do you recall the defense attorney going over
15   with you that the first thing that's done is look for -- or
16   examine which doctors are in the 95th percentile based on all
17   17 factors?
18   A   Yes.
19   Q   So that's the top 5 percent; is that correct?
20   A   That is correct.
21   Q   Of anomalies?
22   A   They would be the anomalies.
23   Q   And then of that 5 percent, then you look at what's the top
24   25 percent of that as well?
25   A   It's not of that particular group, it's of the group as a
```

THOMAS JUSTIN PALMER - DIRECT BY MS. GRIFFIN

1   whole.

2   Q   Of the group as a whole?  And when you said that yields the

3   high-risk number, is that the 951 to 1,000?

4   A   The 951 to 1,000 is determined by the 95th percentile.  The

5   75th percentile is used to determine whether or not they are

6   high risk.

7   Q   So if Dr. Ruan and Dr. Couch scored at 1,000 then, does

8   that put them at the highest level you can be of high risk?

9   A   Yes.

10  Q   I just want to scroll over to -- let me find it here.

11          MR. BODNAR:  No further questions, Your Honor.

12          THE COURT:  All right.  May this witness be excused?

13          MR. BODNAR:  Yes, Your Honor.

14          THE COURT:  All right.  Thank you Dr. McCash.  You may

15  be excused.

16          Call your next witness.

17          MS. GRIFFIN:  Call Justin Palmer.

18                      THOMAS JUSTIN PALMER

19              was sworn and testified as follows:

20          THE WITNESS:  I do.

21          THE CLERK:  Thank you, sir.  Please be seated.

22                      DIRECT EXAMINATION

23  BY MS. GRIFFIN:

24  Q   Good morning, Mr. Palmer.

25  A   Good morning.

1    Q   Tell us your full name, please.

2    A   Thomas Justin Palmer.

3    Q   Mr. Palmer, did you receive a nursing degree from the

4    University of South Alabama?

5    A   I did.

6    Q   When was that?

7    A   I received a bachelor's degree in December of 2001.

8    Q   Thereafter did you receive a nursing master's degree?

9    A   I did.  I believe that was in May of 2010.

10   Q   Who did you receive that degree from?

11   A   The University of South Alabama.

12   Q   So that entitles you to be called an NP?

13   A   A Certified Registered Nurse Practitioner.  That's after

14   you take a certification exam, of course.

15   Q   Did you take that certification and pass?

16   A   Yes.

17   Q   So you were referred to as an NP?

18   A   Yes.

19   Q   Which means --

20   A   Nurse practitioner.

21   Q   Nurse practitioner.  What does that allow you to do as a

22   nurse practitioner?

23   A   Evaluate, diagnose, treat patients, you know, with various

24   problems.

25   Q   Does the degree in and of itself allow you to write

 1   controlled substances?

 2   A   No.

 3   Q   Were you allowed to write controlled substances by the

 4   State of Alabama or by the DEA?

 5   A   In October of 2014 I was.  But until prior to then no.

 6   Q   Prior to October the 1st of '14, you did not have any

 7   authority to write a controlled substance?

 8   A   No.

 9   Q   Is that right?

10   A   Correct.

11   Q   In October the 1st of '14, what levels of controlled

12   substances were you allowed to write?

13   A   Levels three and below.

14   Q   Three, four, and five?

15   A   Correct.

16   Q   After your nursing degree, before you received the NP

17   degree, where did you work?  What type nursing did you do?

18   A   Emergency room and ICU.

19   Q   Did there come a time during that emergency room and ICU

20   when you began to use drugs yourself?

21   A   Yes.

22   Q   Could you tell us what happened?

23   A   Uh, I would take oral pain killers on occasion.  They gave

24   me energy and, you know, a sense of well being.  And I wouldn't

25   say it was an everyday thing.  But, you know, I abused -- I

1  abused drugs then and eventually went to a rehab.

2  Q   Did you report yourself to the nursing board?

3  A   I did.

4  Q   What happened with your nursing license?

5  A   I was placed -- I voluntarily reported and I was placed on

6  a nondisciplinary program to where I took random drug screens,

7  I went to AA meetings as well as counseling for three years,

8  and after that -- I was a supervisor, of course -- and after

9  that I was released and, you know, could go back to full

10  unsupervised practice as a nurse.

11  Q   How long were you sober; that is, without unprescribed

12  medication?

13  A   From when?  Until --

14  Q   From the time you went into the program with the nursing

15  board.

16  A   I'm sorry.  From the time I completed it?

17  Q   Yes.  From the time you completed the nursing board, how

18  long were you sober?

19  A   Probably -- I completed it, I think, in 2009 and was sober

20  probably till mid to late 2011.

21  Q   Did there come a time when you applied for employment at

22  PPSA as an NP?

23  A   Yes.

24  Q   Who did you interview with?

25  A   Dr. Couch and Dr. Ruan.

THOMAS JUSTIN PALMER - DIRECT BY MS. GRIFFIN

1   Q   Are they in the courtroom today?

2   A   Yes.

3   Q   Can you point them out to us?  Tell us what they are

4   wearing.

5   A   Dr. Couch has a blue jacket on, Dr. Ruan has a black jacket

6   on.

7   Q   Anything further about them?  Both wearing glasses?

8   A   Both wearing glasses, yeah.

9           MS. GRIFFIN:  Let the record reflect he's

10  identified the defendants, Couch and Ruan.

11  Q   How long did you interview?

12  A   It wasn't very long.  I'd say the initial interviews, maybe

13  20 minutes.

14  Q   Did you advise Dr. Couch and Dr. Ruan about your history of

15  abuse of drugs?

16  A   I don't think I mentioned it to Dr. Ruan.  He was, I think,

17  just in and out.  I think I briefly mentioned it to Dr. Couch,

18  but I didn't go into detail.

19  Q   Were you hired as a nurse practitioner at that time?

20  A   Yes.

21  Q   And approximately when was this?

22  A   July of 2010.

23  Q   Initially who did you work for at PPSA?

24  A   Initially I was with both Dr. Ruan and Dr. Couch.

25  Q   What were you doing?

```
 1   A    I would see patients and see how their treatment was going

 2   and confer with Dr. Couch or Dr. Ruan on any change in

 3   treatment or any procedures that needed to be ordered.  I would

 4   see new patients and examine them.  I would come up with a

 5   treatment plan and, you know, go over it with Dr. Couch

 6   initially.

 7   Q    Before we get to going over with Dr. Couch, initially, did

 8   there come a time when you no longer worked so much for

 9   Dr. Ruan and worked almost exclusively for Dr. Couch?

10   A    That might have been six, eight months, a year later, I

11   guess I was pretty much exclusive with Dr. Couch.

12   Q    After you began; is that correct?

13   A    Correct.

14   Q    Now, what do you mean by going over a treatment plan with

15   Dr. Couch initially?

16   A    Well, I mean, generally when we saw new patients I would

17   see them, do an exam, come up with a plan.  Dr. Couch would

18   come in, see the patient.  He would, you know, either agree or

19   disagree, and that, I guess -- slowly it evolved more.  I would

20   see the patient and come up with a plan and, you know,

21   generally he would just sign off on it.

22   Q    What do you mean by he would sign off of it?

23   A    I would just say, you know, this is what I want to do.  You

24   know, and he would say:  Okay.  Sounds good.

25   Q    Were you actually prescribing controlled substances at that
```

THOMAS JUSTIN PALMER - DIRECT BY MS. GRIFFIN

1    time without a license?

2    A    Uh, I think -- I mean, that was later.  Not at first.  I

3    would -- I would write the prescription out and sign his name,

4    yes.

5    Q    Sign Dr. Couch's name?

6    A    Yes.

7    Q    Were you authorized to do that?

8    A    No.

9    Q    Was Dr. Couch aware that you were doing that, if you know?

10   A    It would be hard for me to say that he wasn't.  Because I

11   was there early in the morning seeing patients before he got

12   there.  And, you know, patients were seen and had already left

13   by the time he got there.  So --

14   Q    What time did you go to work?

15   A    Generally 7 o'clock.

16   Q    What time did the practice open?

17   A    7 o'clock.

18   Q    Were patients actually there to be seen that early?

19   A    They were waiting at the door.

20   Q    At 7 a.m.?

21   A    And before.

22   Q    And you said Dr. Couch wasn't there a lot.  What do you

23   mean?

24   A    Generally came in, you know, after 9, 9:30.

25   Q    Would you be seeing his patients from 7 till whatever time

THOMAS JUSTIN PALMER - DIRECT BY MS. GRIFFIN

1    he came in?

2    A    Yes.

3    Q    Then were there times when he was on vacation or out of the

4    office?

5    A    Yes.

6    Q    Would you see his patients when he was out of the office?

7    A    Yes.

8    Q    Early on did you have access to any of Dr. Couch's

9    prescription pads?

10   A    When he went out of town, he would leave prescription pads

11   that were presigned so I could write what I needed to, you

12   know, if something needed to be changed.

13   Q    When you say prescription pads that were presigned, are you

14   talking about a paper prescription or an electronic

15   prescription?

16   A    A paper prescription.  This was before we had electronic

17   medical records.

18   Q    How did it come to pass that you had access to Dr. Couch's

19   presigned prescription pads?

20   A    He signed them before he left and gave them to me.

21   Q    What if anything did he tell you about those?

22   A    He said not to let anybody else see them or, you know,

23   don't let anybody else get a hold of them.

24   Q    Did they have the patients' names and the prescription

25   written on them or just Dr. Couch's signature?

THOMAS JUSTIN PALMER - DIRECT BY MS. GRIFFIN

1    A    Just his signature.

2    Q    Approximately how many prescription pads did he provide you

3    at that time?

4    A    Maybe five or six pads that -- you know, I'm not sure how

5    many actual prescriptions were on a pad.  Maybe 50.  So a total

6    of probably 300.

7    Q    Will you explain to us those paper prescriptions?  Did they

8    have a prescription and then a duplicate or a copy underneath

9    it that was a different color?

10   A    They did.  They were white on top and had a yellow copy

11   beneath so, when you wrote on them, it's just a carbon copy.

12   Q    The yellow copy, could you use that as a prescription?

13   A    No.

14   Q    Did it say that it wasn't a prescription?

15   A    I think it said "duplicate" on it.  I'm not sure.  I can't

16   remember.

17   Q    Typically during that time when you had these paper

18   prescriptions, what would go with anything in the patient files

19   when you wrote a prescription that had been presigned by

20   Dr. Couch?

21   A    I -- I --

22   Q    Would you put a copy of the prescription --

23   A    Yes, yes.

24   Q    -- given the patient?

25   A    Yes, it would be the prescription and the exam sheet.

THOMAS JUSTIN PALMER - DIRECT BY MS. GRIFFIN

1  Q   Would there usually be -- the yellow copy would go in the
2  file?
3  A   Right; correct.
4  Q   And the patient would take the original?
5  A   Yes, yes.
6  Q   Now, did there come a time when you went through those
7  presigned prescription pads?
8  A   Yeah.  Sometimes I ran out.  And do you mean did I use them
9  all?  Or --
10 Q   Yes.
11 A   Yeah.  Sometimes I ran out and I just signed his -- you
12 know, I put his signature down.
13 Q   Are you right-handed or left-handed?
14 A   I'm left-handed.
15 Q   Do you know whether Dr. Couch is right-handed or left-
16 handed?
17 A   I think he's right-handed.
18 Q   How is it that you were able to sign his name?
19 A   That's a fairly simple signature.  His -- I mean, it's just
20 not hard to -- it wasn't hard for me to sign it.  I mean, it's
21 not complicated.
22 Q   Approximately how often did you do that?
23 A   If I had to -- in an average day after probably 2011-12,
24 maybe 15, 20 times.
25 Q   A day or overall?

1    A    A day.

2    Q    And were you licensed to do that?

3    A    No.

4    Q    Those were controlled substances?

5    A    Correct.

6    Q    Did there come a time when anybody asked you to sign

7    Dr. Couch's name on prescriptions?

8    A    That was kind of commonplace.  You know, I've had the

9    pharmacist ask me, pharmacy assistants ask me, other nurses ask

10   me.  You know, I was just walking down the hallway and they

11   would be:  Hey, sign this.

12           I did.

13   Q    Whose name would you sign?

14   A    I would sign generally Dr. Couch, if it was controlled.

15   Q    People that were asking you, did they know whether you were

16   Dr. Couch or not?

17   A    They knew who I was.

18   Q    And when you're talking about this, where was this

19   happening?  Was it inside PPSA?

20   A    Yes.

21   Q    You made reference to the pharmacists and the pharmacy

22   techs.  Was there a pharmacy connected to one of the PPSA

23   buildings?

24   A    There was C&R Pharmacy.  One was at Springhill and then

25   eventually one on Airport, at the office on Airport.

2949

1  Q   Did one of those locations become the workers' comp

2  dispensary?

3  A   Well, there was always the workers' comp dispensary.  That

4  was separate from the pharmacy.

5  Q   What was the name of the pharmacy?

6  A   C&R Pharmacy.

7  Q   Do you know who owned that pharmacy?

8  A   Dr. Couch and Dr. Ruan.

9  Q   Now, you said the pharmacist and pharmacy techs would ask

10  you to sign Dr. Couch's name.  Would that be to prescriptions?

11  A   Yes.

12  Q   Why were you having to sign his name to prescriptions that

13  the pharmacist had?

14  A   They had gotten written out by, you know, an MA or a

15  medical assistant, or somebody needed a refill and the

16  prescriptions weren't signed.  So they needed his signature on

17  them.

18  Q   These would be prescriptions that had already been taken to

19  the C&R Pharmacy?

20  A   Sometimes -- no.  Generally it was -- yeah, sometimes they

21  were and sometimes they weren't.  Like I remember one day Caye

22  asked me to sign the dispense as written portion of the

23  prescription which is for basically a brand name drug because

24  they were signed under product selection permitted.  And she

25  had a stack of them that were already filled and the pharmacist

2950

```
 1   just needed a signature.
 2   Q    So the scripts had been filled without a doctor's
 3   signature?
 4   A    Well, it was signed on the wrong line, signed for product
 5   selection.
 6   Q    Who was Caye?  You said Caye would ask you.
 7   A    Caye McConaghy, she was a pharmacist.
 8   Q    At C&R Pharmacy?
 9   A    Correct.
10   Q    Were you ever asked to do this by a pharmacist from C&R --
11   I mean, excuse me -- from CVS or Walgreens?
12   A    No.
13   Q    Or Walmart?
14   A    No.
15   Q    Just C&R Pharmacy?
16   A    Correct.
17   Q    Were these controlled substances that you were signing the
18   name for C&R Pharmacy?
19   A    Yes.
20   Q    Now, you could write drugs that were noncontrolled under
21   your name, Justin Palmer; is that right?
22   A    Correct.
23   Q    Give us an example of something you could write without a
24   DEA license.
25   A    Antibiotics, muscle -- certain muscle relaxants,
```

2951

1   antidepressants.

2   Q   That weren't controlled?

3   A   Right, right.

4   Q   Would you sign Justin Palmer on those noncontrolled

5   prescriptions?

6   A   Sometimes.  But they generally weren't written that often,

7   you know.  I know I have signed my name on it.

8   Q   Have you signed your name on a controlled substance?

9   A   No, no.

10   Q   You also said that early on you would consult with

11   Dr. Couch about seeing the patients.  Would Dr. Couch see the

12   new patients?

13   A   Most always, but there were some occasions he didn't.

14   Q   When he saw them, can you tell us how long he saw them for

15   that you were involved in?

16   A   It would vary.  Sometimes maybe two minutes, sometimes he

17   would spend 10 minutes in there.  It depended on what the

18   problem was or what was brought up.

19   Q   Were there occasions where you were the only one that saw a

20   new patient?

21   A   Yes, yes.

22   Q   Was that considered a Couch patient?

23   A   Yes.

24   Q   How was it billed if you were the one that saw the patient?

25   A   I assume it was billed under Dr. Couch.

1  Q   What made you think that?

2  A   I didn't have a billing number.

3  Q   You didn't have what's known as an NPI number for there?

4  A   No.  I wasn't credentialed, I didn't have any credentials

5  as far as billing.  The NPI number I did have was from another

6  place I worked at part time.  But I never filled out any

7  credentialing information on myself for Physicians Pain

8  Specialists.

9  Q   So if you saw the patient by yourself, are you telling us

10 it couldn't be billed under you?

11 A   Not that I'm aware of, no.

12 Q   Because you did not have a number?

13 A   And I wasn't credentialed.

14 Q   Did you have what was known as a superbill for patients?

15 A   Yes.

16 Q   What was that?

17 A   It was basically a sheet of paper with all of the procedure

18 codes and diagnosis codes on it and you would circle, you know,

19 what diagnosis and, you know, the relevant codes for seeing the

20 patient.

21 Q   At the top of the superbills for Dr. Couch was there

22 anything identifying whose patient that was?  Was there

23 anything written at the top of the superbill on a Dr. Couch

24 patient?  Was his name written, for example?

25 A   Yes, yes.

THOMAS JUSTIN PALMER - DIRECT BY MS. GRIFFIN

2953

1   Q   Do you know whether or not on a Dr. Ruan patient it had

2   Dr. Ruan's name at the top of the superbill?

3   A   I'm pretty sure it did because they had to be separated and

4   I don't think they would bill the same.

5   Q   I can hardly hear you.

6   A   I'm sorry.  I believe, yes, they were -- his name was at

7   the top of the superbill and corresponded with the patient he

8   saw.

9   Q   Now, when you say Dr. Couch would come in for two minutes

10  with a new patient, would that allow him time to do an exam and

11  an assessment and explain the drugs that were being prescribed?

12  A   Generally no.  I did the exam and he would sometimes do

13  another, you know, fast exam pertaining to the exact complaint.

14  Q   What would that consist of within two minutes?

15  A   Palpation or straight-leg raise or range of motion.

16  Q   Did that ever happen on repeat visits where Dr. Couch came

17  in to see the patients?

18  A   Rarely.  You know, maybe one or two, three a day.

19  Q   How many were you seeing a day?

20  A   I probably averaged 30.

21  Q   Now, how were you paid, Mr. Palmer?

22  A   I was paid per patient.

23  Q   Per patient that you saw?

24  A   Correct.

25  Q   Did that cause you to slow down or speed up?

2954

1    A    I definitely, I would say, had motivation for me to speed

2    up.

3    Q    Why was that?

4    A    The more patients I would see, the more money I would make.

5    Q    You said Dr. Couch wouldn't come in hardly ever on these

6    repeat visits?

7    A    Correct.

8    Q    Would you be changing prescriptions or adding

9    prescriptions, increasing dosage?

10   A    I would.  I would change, I would change the dose or

11   discontinue medicine, write a new medicine.  And, you know, if

12   I could -- if he was readily available, I would consult with

13   him.  But, you know, a lot of times I didn't.

14   Q    Were there many times when he was not available and you

15   continued doing that?

16   A    Yes.

17   Q    In connection with those files did you electronically sign

18   the files?

19   A    I signed my portion of them.

20   Q    Signed your name?

21   A    Right.

22   Q    What do you mean by electronically signing a patient file?

23   A    After you put in the information pertaining to the exam,

24   the plan, diagnosis, I would sign off.  You know, I would sign

25   off under my name and then he would go back and sign off his

THOMAS JUSTIN PALMER - DIRECT BY MS. GRIFFIN

 1  portion of the electronic files.  I mean, they were stored in

 2  the computer.  So --

 3  Q   You had a unique number to go in to sign your name?

 4  A   Yes.

 5  Q   Did you sign anybody else's name on the electronic files?

 6  A   No, I didn't know anybody else's password.

 7  Q   Did you sign Dr. Couch's name on the electronic patient

 8  files?

 9  A   No.

10  Q   Let's talk about the paper files.  Did those exist before

11  the electronic files?

12  A   Yes.

13  Q   How would you sign those files to show that you had treated

14  the patient?

15  A   I would sign my name.  I believe it had -- my name was

16  printed out and had "nurse practitioner" by it and I would sign

17  by that.

18  Q   What happened with those files if you saw the patient and

19  it was a paper file?

20  A   I would take the charts, at the end of the day I would sign

21  off on them and I would take the stack of charts and then I'd

22  put them on Dr. Couch's desk.

23  Q   What would then happen with those charts?

24  A   He would sign off on them.

25  Q   Do you recall a time when he ever came back and told you he

THOMAS JUSTIN PALMER - DIRECT BY MS. GRIFFIN

1   disagreed with what you had done and to call a patient and

2   change something you had done on those paper charts?

3   A   Not off the top of my head, no.

4   Q   Do you know whether he reviewed those charts or not at the

5   end of the day?

6   A   I personally don't know what he did with them.

7   Q   Do you know where they went after you placed them on his

8   desk at all?  Do you know?

9   A   They went to medical records, I guess, to be scanned.

10  Q   And would they typically eventually go to billing after you

11  had left them on Dr. Couch's desk?

12  A   Yeah -- I think I would pull off the billing sheet and put

13  it in his box.

14  Q   Were there times when that stack of paper patient files

15  would stack up in his office?

16  A   Yes.

17  Q   Explain that to us.

18  A   If he was out for a few days, gone on vacation, there would

19  be a lot of charts on his desk.

20  Q   Could you show us about how high a stack you've seen there?

21  A   Probably a couple of stacks about this high (indicating).

22  Q   And how high are you showing?

23  A   About a foot maybe.

24  Q   And there would be a couple of those stacks?

25  A   Yes.  Because I couldn't stack them too high because they

1  would fall over because they were uneven, because the

2  prescriptions were attached.  So I had to turn them around.

3  Q   Now, you said when Dr. Couch was not in the office, hadn't

4  come in yet or when he was out of town.  Did he go out of town

5  a lot?

6  A   I would say maybe three or four times a year.

7  Q   Would anything change in your day-to-day activity of seeing

8  patients whether Dr. Couch was in the office or not?

9  A   No.

10  Q   You wouldn't discuss the files with him over the phone?

11  A   No.  I mean, the only thing that changed when he was out of

12  town is we generally didn't schedule new patients.  That's

13  about it.

14  Q   Dr. Couch did some procedures when he was there?

15  A   Correct.

16  Q   Approximately how many patients would he actually see

17  outside of procedures when he was in the office?

18  A   Like I said earlier, you know, probably anywhere from one

19  to three, four patients.

20  Q   A day?

21  A   A day.

22  Q   Were you working long hours?

23  A   I came in at 7.  I usually left about 4:30 or 5.

24  Q   Did there come a time when you began to use drugs again?

25  A   Yes.  That was around mid to late 2011.

1  Q   How did that happen?

2  A   There were a lot of patients that brought back medication

3  and it was not -- there was no particular way to dispose of

4  it.  I mean, we started off flushing it down the toilet.  You

5  know, if it's something like hydrocodone, I would just -- if

6  the patient didn't want it, I'd take it back to my office and

7  put it in my drawer.  And I started taking -- taking pills.

8  And it progressed from there.

9  Q   Let me stop you a moment.  The patients would return

10  controlled substances to PPSA?

11  A   Correct.

12  Q   Why?

13  A   Either it didn't work for them or it made them sick or they

14  didn't like it for some reason.

15  Q   Patients weren't told to turn those in to DEA?

16  A   No.  I mean, I never told anybody that.

17  Q   Were those drugs accounted for or were they left fairly

18  loose within PPSA?

19  A   Initially it was fairly loose.  Like I said, we generally

20  just flushed them and threw them out.  I don't -- sometimes I'd

21  document it, sometimes not.  As time went on, it got a little

22  more strict as far as accounting for in disposal.  But that was

23  a while down the road.

24  Q   Now, you said you began to take some of the returned

25  prescription pills; is that correct?

```
 1   A    Correct.

 2   Q    Did there come a time when you did something other than

 3   just taking prescription pills?

 4   A    Yeah.  Eventually my tolerance built up and I started

 5   taking I.V. medication -- I.V. opiates, because we had a lot of

 6   that for the pump patients.  So, you know, anything by mouth

 7   wouldn't -- wouldn't do anything for me and I started taking

 8   I.V. Dilaudid.

 9   Q    What is Dilaudid?

10   A    It's a synthetic opiate, hydromorphone.  It's probably a

11   bit stronger than morphine.  It's for pain.

12   Q    When you say intravenously, what do you mean?

13   A    I would inject the medicine into my vein.

14   Q    Where would you inject it?

15   A    In my left arm.

16   Q    Now, there came a time in early January of '15 when you

17   went into treatment again?

18   A    Correct.

19   Q    Do you still have a mark?

20   A    Yes.

21   Q    A track mark on your arm?

22   A    Yes.

23   Q    Could you show that to us?  I know that will be difficult,

24   but could you roll your sleeve up and show us that?

25   A    (Complying.)
```

1          MS. GRIFFIN:  If the record will reflect that the

2     witness is raising his shirt sleeve on his arm and showing a

3     mark.

4     Q   Is that the area where you regularly injected yourself?

5     A   Yes.

6     Q   Did there come a time when someone caught you or saw you

7     injecting yourself in that vein?

8     A   Yes.  I think I was in my office in between patients or

9     maybe at lunch.  The procedure nurse, Casey Weltlich -- I don't

10    remember her last name -- came in and saw me injecting into my

11    arm and she went and told one of the other nurses and I believe

12    they told Dr. Couch.

13    Q   What happened?

14    A   Dr. Couch called me in his office and I played it off, I

15    think I told him it was -- I didn't tell him exactly what drug

16    it was.  I think I told him it was Ativan or something, or

17    something for nausea or something like that.  And he

18    recommended that I take time off work and get straightened out.

19    Q   Did he report you to the nursing board?

20    A   No.

21    Q   Did you take some time off?

22    A   I did.

23    Q   How long?

24    A   I think I took two weeks.

25    Q   Were you paid during that time?

2961

1   A   I believe I was.

2   Q   Did you stop using the Dilaudid during that time?

3   A   No.

4   Q   Were there times when you would come into the office and

5   get some of the Dilaudid during that two-week time at night?

6   A   I don't remember if I did or not because I had plenty at

7   home.

8   Q   How is it that you had plenty of Dilaudid at home?

9   A   Because I was making medication for the pumps; I was making

10  a bag of Dilaudid and I was making a bag of morphine, and I got

11  the medications mixed up.  I poured one in the same bottle and

12  couldn't use it anymore, so it was quite a bit of Dilaudid and

13  morphine that had to be wasted.  And I told the pump nurse,

14  Tammy, what I had done and I told her I would throw it out, but

15  I didn't.  I took it home.  So I had probably enough for a year

16  and a half at the house.

17  Q   Was there no witness for the destroying of drugs so that

18  two people had to verify that drugs were wasted or gotten rid

19  of?

20  A   No, no.

21  Q   And how is it that you had access to Dilaudid and morphine

22  there at the office?

23  A   I would make the pump medications for the patients with

24  pain pumps.  Dr. Couch had shown me how to mix the medication

25  to be used for those refills.

THOMAS JUSTIN PALMER - DIRECT BY MS. GRIFFIN

1   Q   That has a name, doesn't it?  Is that compounding?

2   A   I'm not sure if you would call it compounding, because it

3   was one medication.  I wasn't actually mixing medications or

4   compounding anything.  I was just taking the powder medication

5   and turning it into a liquid at a different dose.  I mean, I'm

6   not sure if you would call it compounding.

7   Q   Were you licensed to do any of the mixing of the pump

8   medications?

9   A   I don't have any particular license other than nursing.

10  Q   Is that part of a nurse's duty, to mix up the drugs to go

11  in a pump medication?

12  A   I'm not sure about that.  I mean, we do mix medicines.  But

13  I'm not sure if that would be considered a nursing duty.

14  Q   And other than you having access through mixing the drugs,

15  was there Dilaudid around the office?

16  A   No, just in the safe.

17  Q   Who had access to the safe?

18  A   I believe the doctors did and the pump nurse, I did.  As

19  far as that, I think that's all.

20  Q   So you came back --

21          THE COURT:  Ms. Griffin, is now a good time for us to

22  stop for lunch?

23          MS. GRIFFIN:  Yes, Your Honor.

24          THE COURT:  All right.  Ladies and gentlemen, leave

25  your pads on your chairs.  We will take our break until

2963

```
 1    1:15.  Be back downstairs in the jury assembly room, ready to

 2    be called back up, at 1:15.  No discussion about the

 3    case.  Have a good lunch.  We're in recess.

 4         (A recess was taken at 12:01 p.m.)

 5         (Afternoon session, 1:20 p.m., in open court, defendants

 6    and jury present.)

 7              THE COURT:  All right, Ms. Griffin.

 8    BY MS. GRIFFIN:

 9    Q   Mr. Palmer, when we took our lunch break, you were talking

10    about using Dilaudid intravenously; is that right?

11    A   That's correct.

12    Q   You said you got that at PPSA?

13    A   Yes.

14    Q   Did you ever write yourself a script for Dilaudid?

15    A   Never.

16    Q   Did there come a time when you --

17         (Ms. Griffin's microphone was turned on.)

18              MS. GRIFFIN:  Do I need to start over or could you

19    hear?

20              THE COURT:  No, I think it's all right.

21    BY MS. GRIFFIN:

22    Q   Did there come a time when you would reconstitute Dilaudid

23    and use it?

24    A   That was typically what I did.

25    Q   Was that Dilaudid from PPSA?
```

1    A    Yes.

2    Q    What does reconstitute mean?

3    A    Basically you take a powdered form and mix it into a liquid

4    and make it into a solution.

5    Q    Now, in early January of '15 did you seek help for

6    yourself?

7    A    Yes.

8    Q    What did you do?

9    A    I told my wife what I'd been doing and called Dr. Couch,

10   told him what I had been doing, and I went to my -- I

11   eventually went to my sister's house where I could detox myself

12   to some degree.

13   Q    What were you taking by that time?

14   A    Anywhere from 600 to a thousand milligrams of Dilaudid per

15   day.

16   Q    All of that was Dilaudid you had gotten from PPSA?

17   A    Yes.

18   Q    How were you able to do that without being caught?

19   A    It was measured in such small quantities and, you know, we

20   had such a large amount of it, it could be either written off

21   as waste while reconstituting or basically -- I don't think it

22   was ever accounted for, because when we started running low we

23   just ordered more.  So if there was a -- there was really never

24   any discrepancies reported on the log.

25   Q    Is that a large dose, 600 to 1,000  milligrams a day?

1  A   It's probably enough to make everybody in the courtroom

2  stop breathing a couple of times over in one dose.

3  Q   How is it that you had worked up to that dose?

4  A   Just tolerance over time.  It develops quickly.

5  Q   You were getting the Dilaudid from the office; is that

6  right; PPSA?

7  A   Correct.

8  Q   Were you also using it --

9  A   Yes.

10  Q   -- at PPSA?

11  A   Yes.

12  Q   During the day you'd use?

13  A   Probably once in the morning about 10 o'clock, maybe around

14  1 or 2 in the afternoon, then at the end of the day.

15  Q   And were you seeing these patients you had told us you saw?

16  A   Yes.

17  Q   While you were using the Dilaudid?

18  A   Yes, I was.

19  Q   You detoxed; is that correct?

20  A   Yes.  Eventually, yes.

21  Q   You went to treatment?

22  A   I did.

23  Q   How long have you been sober?

24  A   Since January 6th of '15.

25  Q   Late December, early January of '15 -- did you leave PPSA

1   in early January of '15?

2   A   I think I actually -- I don't think I came back after

3   Christmas.  I'm not sure.

4   Q   Christmas of '14?

5   A   Of '14.

6   Q   Now, were you the only employee there using drugs?

7   A   No.  No.

8   Q   Who else did you have direct knowledge that was using drugs

9   there while they were working?

10  A   Stacy Madison; she was a CRNA there.  And Bridgette Parker.

11  Q   What was Bridgette Parker?

12  A   She was a nurse practitioner.

13  Q   And what was Stacy Madison?

14  A   She was a nurse anesthetist.

15  Q   What was her job at PPSA?

16  A   I believe she was initially hired to do procedures such as

17  epidurals and the injections, but basically she did the same

18  thing as I did, saw and treated patients.

19  Q   Whose patients did Stacy Madison see and treat?

20  A   She was on Dr. Couch's side of the building.  So, I mean,

21  she saw Dr. Couch's patients.

22  Q   Who did Bridgette Parker see at the end, whose patients?

23  A   Dr. Couch's.

24  Q   So he had three people seeing patients at the same time?

25  You, Stacy, and Bridgette?

THOMAS JUSTIN PALMER - DIRECT BY MS. GRIFFIN

1    A    Correct.

2    Q    Had Bridgette previously worked for Dr. Ruan or do you

3    know?

4    A    Yes, she did.

5    Q    Then she became came to work for Dr. Couch?

6    A    Correct.

7    Q    So were there any more nurse practitioners or nurse

8    anesthetists seeing Dr. Couch's patients, or the three of you?

9    A    I believe it was just us three that were seeing Dr. Couch's

10   patients.

11   Q    And that was as of the time you left late December 2014?

12   A    I think Ben -- I can't remember his last name -- started

13   before I left.

14   Q    Had Stacy left sometime in October of '14?

15   A    That sounds about right.

16   Q    And did you come to learn that Bridgette Parker had left

17   and gone in rehab?

18   A    Actually when she showed up at the same rehab I was at,

19   that's when I found out.

20   Q    And that was January of '15?

21   A    That was, yes, January of '15.

22   Q    How is it that you knew Stacy and Bridgette were using

23   drugs while they were working and seeing patients?

24   A    Well, Stacy and I, we both used drugs together.  And

25   Bridgette, she appeared obviously impaired.

1    Q    What do you mean by that?

2    A    Slurred speech, unsteady gait or, you know, she wasn't

3    walking too well at times.  I didn't really see her a bunch,

4    but the interactions I did have with her, it was obvious to me.

5    I think I said something to a number of people.

6    Q    Did you talk to Dr. Couch about Bridgette?

7    A    I believe I did.

8    Q    What did you tell him or what do you recall?

9    A    I'm not exactly sure of the conversation word for

10   word.  But, I mean, I told him I thought she was impaired and

11   she needed to go.

12   Q    Did she stay, to your knowledge?  Did she continue there

13   until she went in rehab herself?

14   A    Yes.

15   Q    Now, Stacy, Bridgette, and you, when you were all three

16   there through October of '14, would you all three be seeing

17   Dr. Couch's patients?

18   A    Yes.

19   Q    Different patients; you had one, Stacy had one, Bridgette

20   had one all at the same time?

21   A    Correct.  We all had different rooms we saw patients in.

22   Q    And do you know if they were seeing approximately as many

23   patients a day as you were?

24   A    I don't think they were.  I think I was seeing the most.

25   Q    What was your highest number of patients a day, if you

2969

1  recall?

2  A   I think the most I saw in one day was in the 60 range, 60

3  patients.

4  Q   60 patients in one day?

5  A   Right.

6  Q   Why did you keep up with how many you saw?

7  A   Because I was paid for every patient I saw, one amount for

8  a followup patient, another amount for a new patient.

9  Q   Do you know whether Stacy and Bridgette were paid the same

10 way?

11 A   I am not sure on that.  I can't remember.  I think, but I'm

12 not -- (shaking head negatively).

13 Q   Now, you talked about Bridgette slurring her speech and

14 moving slowly.  Did you, yourself, do that on the dosage of

15 Dilaudid you were on?

16 A   I don't know for sure if I did.  But I know that, you know,

17 I walked around just drenched in sweat all the time.

18 Q   Did you say sweat?

19 A   Sweat, yes.  And I was very drowsy at times, I remember

20 that.  But I think the biggest tell was how I was always just

21 drenched from profuse sweating.

22 Q   Based on your experience, what's that a sign of?  Or what

23 can it be a sign of?

24 A   I mean, it can be a sign of, you know, lots of different

25 things.  But, I mean, you know, for a reasonably healthy person

1  to walk around all day drenched in sweat, you know, you would

2  think that would be a sign of opiate use.

3  Q   Why is it that you decided to go into treatment at the end

4  of 2014?

5  A   I didn't like what I was doing.  I hadn't liked it for a

6  long time.  I felt like a hypocrite.  You know, I was -- I knew

7  I was addicted to drugs and I couldn't not go to work.  Because

8  if I didn't, then I couldn't get my drug.  There's nothing I

9  couldn't do without having to worry about, you know, how I'm

10  going to function because I didn't have that drug.  You know,

11  it was -- it was starting to have noticeable effects on my

12  health, my marriage.  You know, I just became more and more

13  depressed.

14  Q   Were you tired of it?

15  A   Yeah, yeah.

16  Q   Had there come a time sometime in mid to late '14 where

17  there was occasional drug testing at PPSA of employees?

18  A   There was -- it was -- everybody was supposed to get a drug

19  test.

20  Q   Did that happen?

21  A   As far as I know, it did.  I took one.

22  Q   Did you pass it?

23  A   I did.

24  Q   How did that happen?

25  A   I used someone else's urine to pass the drug screen.

2971

1   Q   Were you aware of any patients at PPSA using another

2   person's urine to pass a drug screen?

3   A   I wasn't -- I wasn't personally aware but, I mean, I knew

4   it happened.

5   Q   How did you know it happened?

6   A   I mean, people had brought in, you know, apple juice or

7   anything to make the -- put in the urine cup when they did

8   testing.  I mean, that's just something that they do, you

9   know.  When you test, you want to make sure the temperature is

10  right and color is right and everything else.  But people, I

11  mean, have always tried to pass the test using something.

12  Q   And you, yourself, did that?

13  A   I did.

14  Q   What about Stacy and Bridgette, or do you know?

15  A   I don't know.

16  Q   When patients took drug tests, were those drug tests

17  monitored?

18  A   No.

19  Q   What does monitored mean on a drug test?

20  A   It means somebody observes you giving a specimen, you know,

21  directly watches you.

22  Q   What would that -- how would that help?

23  A   You could -- you couldn't -- generally, for most people,

24  you couldn't adulterate or fake a drug screen.

25  Q   Because why was that?  Somebody would be watching you?  Is

1   that what you're talking about?

2   A   Right.  And they would actually watch the urine go into the

3   cup.

4   Q   In connection with the time you were using and you were

5   still there, that was about from -- did you say mid '11 until

6   you left in late '14?

7   A   Correct.

8   Q   Did you write all types of drugs, all types of schedule II

9   drugs?

10  A   Yes.

11  Q   Fentanyl?

12  A   Yes.

13  Q   Abstral?

14  A   Yes.

15  Q   Subsys?

16  A   Yes.

17  Q   Morphine?

18  A   Yes.

19  Q   Everything?

20  A   Everything.

21  Q   Can you tell us the difference between prescribing fentanyl

22  patch and Subsys and Abstral?

23  A   A fentanyl patch is a continuous-release fentanyl.  You

24  know, it releases so many micrograms per hour for 48 to 72

25  hours, whatever you prescribe it for.  And it's kind of a

2973

1  baseline pain control, whereas Abstral or Subsys is an

2  immediate-release fentanyl that you spray under the tongue or

3  put the pill under your tongue and it's quick release and it's

4  generally used for breakthrough pain.

5  Q   The patches, the fentanyl patches that you've described,

6  were those TIRF drugs, TIRF drugs?

7  A   No.  The fentanyl patches?

8  Q   Yes.

9  A   I don't believe so.

10 Q   Was Subsys and Abstral a TIRF or TIRF drug?

11 A   Yes.

12 Q   And you wrote those while you were impaired?

13 A   Yes, I wrote everything while I was impaired.

14 Q   Had you had occasion to also try liquid fentanyl -- not

15 Subsys, not Abstral -- but the liquid fentanyl?

16 A   I did.

17 Q   Did you ever use it after trying it?

18 A   No.  It didn't do anything for me.

19 Q   In connection with signing Dr. Couch's signature on

20 prescriptions, did you also sign it on other medical-related

21 paperwork?

22 A   I believe I signed disability paperwork.  I'm not

23 sure.  But generally it was prescriptions.  If anything, it

24 would be disability.

25 Q   Did you learn to distinguish your handwriting from that of

1  Dr. Couch's?

2  A   For the signature?  For the most part.

3  Q   Yes, for the signature.  Sorry.

4  A   For the most part, yes.

5  Q   I'll show you what's been introduced as Government's

6  Exhibit 5-1B, three prescriptions for Joyce Barber.  You've

7  previously seen these; is that correct?

8  A   Yes.

9  Q   And can you tell us, please, if these are signatures you

10  signed for Subsys or if Dr. Couch signed these?

11  A   I think the one on the left is my signature.

12  Q   Right here?  (Indicating.)

13  A   Correct.  It's got kind of a flat circle.  And that's

14  Dr. Couch's signature (indicating).

15  Q   (Indicating.)  The one dated -- which date is Couch's

16  signature?

17  A   July 30th, 2013.

18  Q   And the one dated what date is your signature?

19  A   May 28, 2013, is my signature, it looks like.

20  Q   What did you learn to be the difference between your

21  signatures?

22  A   Like I said, the loop on mine is generally a little

23  flatter.

24  Q   And you're describing the top of the --

25  A   Correct.

THOMAS JUSTIN PALMER - DIRECT BY MS. GRIFFIN

1   Q   And down at the bottom?

2   A   I can't see that.

3   Q   I'll show it to you.  For June the 25th of '13, can you

4   tell us if this Subsys prescription is signed by you or

5   Dr. Couch?

6   A   That looks like that's my signature.

7   Q   Is it sometimes hard for you to tell even whether it's your

8   signature or Dr. Couch's?

9   A   It is, it is sometimes hard.

10  Q   Now, on this same exhibit we talked about there being a

11  paper prescription and a prescription that was printed by

12  computer.  Do you recall that?

13  A   Yes.

14  Q   What would these be examples of?  Paper prescriptions?

15  A   Those are paper prescriptions, yes.

16  Q   They are not computer generated?

17  A   No, they are not.

18  Q   Does it have a security background on the script?

19  (Indicating.)

20  A   Yes.

21  Q   And then in the same exhibit, on the first page, I will

22  show you a Joyce Barber script that appears to be a blue

23  background and ask what type of script is this?  (Indicating.)

24  Is it a paper or --

25  A   That's a computer-generated prescription.

1  Q   How can you tell that?

2  A   There are two different styles of prescriptions.  And the

3  paper was -- the old style was just black and gray.  These are

4  blue and have a blue background.

5  Q   And can you tell if this is Dr. Couch's signature on this

6  November 26 of '13 script?

7  A   Honestly, I can't.  I can't tell on that one.

8  Q   You told us -- I'm going to show you the back of one of

9  these scripts you've identified as being a paper script and ask

10  if you can see anything yellow at the top of the script.

11  A   Yes.

12  Q   What would that have been on the prescription, paper?

13  A   That's where it's torn away from the duplicate.

14  Q   The duplicate was what color?

15  A   Yellow.

16  Q   I also see uterine cancer written on these scripts for

17  Joyce Barber that we showed you.  Do you recognize that

18  writing?

19  A   I don't know whose writing that is.  It's not mine.

20  Q   Is it yours?

21  A   Ma'am?

22  Q   Is it your writing?

23  A   No, no, it's not my writing.

24  Q   If this uterine cancer had been written on it at PPSA,

25  would the yellow sheet that was copied and put in the file have

THOMAS JUSTIN PALMER - DIRECT BY MS. GRIFFIN

1    also had that on it?

2    A    It should have, yes.

3    Q    I show you part of Government's Exhibit 6-1, Joyce Barber's

4    patient file.  We were just looking at a Joyce Barber script;

5    is that correct?

6    A    Yes.

7    Q    I show you the prescription for May the 28th of '13 that's

8    in the patient file and ask you what it says at the

9    top.  (Indicating.)

10   A    It says duplicate copy.

11   Q    Is this the yellow sheet that you described?

12   A    That's the yellow sheet; correct.

13   Q    If this is in the patient file, this copy that says uterine

14   cancer, where would this have come from to go in the patient

15   file?

16   A    That would have come from the original prescription.

17   Q    I show you what's marked as Government's Exhibit 4-11,

18   previously been admitted, and ask if this duplicate copy which

19   is yellow appears to be what you've just been describing to us

20   as the back of the paper prescription?

21   A    That, that would be the copy of the prescription.

22   Q    And I show you what's marked as Government's Exhibit Number

23   32-2(2), and see if you have previously seen this Ins

24   Reimbursement Assistance form for Ronald Ivy.  Were you shown

25   this?

THOMAS JUSTIN PALMER - DIRECT BY MS. GRIFFIN

```
1   A   I've -- yes, I've seen it before.

2   Q   Does it indicate that Mr. Ivy has bladder cancer?

3   A   Yes.

4   Q   As a diagnosis?

5   A   Correct.

6   Q   Is this your signature at the bottom or is that Dr. Couch's

7   signature?

8   A   That's not my signature.  I --

9   Q   Do you recognize that as being Dr. Couch's signature?

10  A   Yes.  And I've never -- before recently I'd never seen that

11  form.

12  Q   Did there come a time when you purchased stock in Galena?

13  A   I did.

14  Q   Do you know what Galena manufactured?

15  A   Galena manufactured Abstral.

16  Q   Why did you decide to buy stock?

17  A   Based on the company Ins and their increase in stock price

18  with Subsys.

19  Q   What do you mean by that?

20  A   Their -- I believe the stock price went from $2 to like $70

21  a share within, you know, a year and they were the

22  manufacturers of Subsys, the sublingual fentanyl spray, and

23  Galena had come out with or was distributing Abstral, which is

24  a sublingual tablet for fentanyl, and it seemed to be a better

25  product in my mind and I figured the stock price would follow
```

1   along the same lines as Ins did.

2   Q   Do you know of anyone else at PPSA that bought stock in

3   Galena?

4   A   The only two people I know of other than myself were

5   Dr. Couch and Dr. Ruan.

6   Q   How did you know that Dr. Couch and Dr. Ruan purchased

7   stock in Galena?

8   A   I think we had talked about it.  Not necessarily Dr. Ruan,

9   but Dr. Couch and I talked about it.  And I -- it seemed like

10   it would do well.

11   Q   Do you know whether or not Dr. Ruan -- excuse me --

12   Dr. Couch had purchased any Galena stock?

13   A   He -- he did, or at least he told me he did.

14   Q   Based on that, did you buy Galena stock?

15   A   I did.

16   Q   Did you buy as much stock as Dr. Couch or do you know?

17   A   No, I don't believe I did.  I'm not sure exactly how much

18   he had, but I think it was considerably more than what I could

19   afford.

20   Q   Did you have occasion, after you bought Galena stock, to

21   discuss prescribing Abstral with Dr. Couch?

22   A   We -- we did.  We talked about -- I mean, patients that

23   were, you know, candidates or suitable candidates for that

24   drug.

25   Q   Did you begin to put a number of individuals on Abstral,

2980

1  number of patients?

2  A   Yes, yes.

3  Q   Had you been encouraged to do that by anyone?

4  A   I don't know if I would say encouraged.  But, you know, it

5  was suggested to find people that could benefit or -- I guess

6  so, I mean.

7  Q   What was the purpose of that, finding people to put on

8  Abstral?

9  A   Well, I mean, we did have shares in the company.  So --

10  Q   You and who?

11  A   Dr. Couch and, I guess, Dr. Ruan.  And it was -- you know,

12  it would have been financially a good decision.

13  Q   For you?

14  A   For me.

15  Q   And for who else?

16  A   For Dr. Couch and Dr. Ruan.

17  Q   Did the Abstral prescriptions at PPSA go up during that

18  time initially?

19  A   Yes.

20  Q   After you bought stock?

21  A   Yes.

22  Q   Where could patients fill the Abstral that was prescribed

23  to them?

24  A   They could fill it at C&R Pharmacy.  I mean, they could

25  fill it anywhere.  But it was such an expensive drug, that

THOMAS JUSTIN PALMER - DIRECT BY MS. GRIFFIN

2981

1   nobody else really carried it and we did.

2   Q   C&R did?

3   A   Yes.

4   Q   Now, when you say we did, what did you mean?

5   A   Well, C&R was part of PPSA, at least in my mind, and it was

6   connected to the building.

7   Q   Did C&R also stock Subsys?

8   A   Yes.

9   Q   I show you what's been introduced as Government's Exhibit

10  9, 9-10, and ask if you recognize the box.

11  A   Yes, that's the Subsys box.

12  Q   Did C&R carry Subsys?

13  A   Yes.

14  Q   Did many other pharmacies in the area carry Subsys?

15  A   From what I can remember, it was hard to find anywhere

16  else.  They'd have to order it.

17  Q   Did you find a number of people that you placed on Subsys

18  and Abstral?

19  A   Did I find them?

20  Q   Yes.

21  A   Uh --

22  Q   Did you prescribe it to a number of people?

23  A   I did (nodding head affirmatively).

24  Q   Were the majority of those people cancer patients?

25  A   No.  I don't -- we didn't have that many cancer

1    patients.  I mean, I used it, I prescribed it for migraines

2    that, you know, weren't responsive to other things.  And if I

3    could, I would give it to the patients for breakthrough pain

4    because I could give it to them and it wouldn't cost them

5    anything to get it filled with the promotions that the

6    companies had.

7    Q   Do you know if C&R Pharmacy was being paid for the

8    promotion?

9    A   I don't know.  I didn't know first-hand about any of the

10   billing or money or how any of that worked.

11   Q   Now, since you said you were prescribing it for non cancer,

12   you made reference that you didn't have many cancer

13   patients.  Approximately what percentage or how many cancer

14   patients did you see?

15   A   I probably had 10 or 15 active cancer patients that I can

16   remember or think of.

17   Q   Over what period of time?

18   A   Over -- from 2011 to 2015.  I couldn't really put an

19   exact -- it would be hard to estimate or put an exact number on

20   it, but it wasn't many.

21   Q   Were all of those 10 or 15 active cancer patients on Subsys

22   or Abstral?

23   A   I don't know.

24   Q   You don't recall?

25   A   I don't remember.

THOMAS JUSTIN PALMER - DIRECT BY MS. GRIFFIN

1  Q   When you said active cancer, did you have some patients who

2  had had a history of family cancer as patients?

3  A   For me that wasn't something that I concerned myself with,

4  with family history.  I generally wanted to know if they had

5  active cancer or a history of cancer themselves.  I mean,

6  family history of cancer, as far as what we were doing, wasn't

7  that important.

8  Q   So family history without a patient having a history didn't

9  mean much to you?

10 A   No.

11 Q   What about someone who had had cancer years ago?  Would

12 that be an active cancer patient?

13 A   That wouldn't be an active cancer patient, no.

14 Q   Would that have a determination if they had had cancer

15 years ago but did not currently have it, in terms of what you

16 prescribed?

17 A   That was kind of a gray area.  because I remember there

18 was -- I think maybe Dr. Ruan said because they had previously

19 had cancer, that doesn't mean -- and it's cured -- that doesn't

20 mean they still don't have cancer pain.

21 Q   Well, for Ms. Barber, for example, it says uterine cancer;

22 right?

23 A   Correct.

24 Q   And that's part of Government's Exhibit 5-1B?

25 A   Correct.

THOMAS JUSTIN PALMER - DIRECT BY MS. GRIFFIN

1  Q   So if she had had a hysterectomy in 1968, would she still

2  be considered to have uterine cancer in 2013?

3  A   She would have a history of uterine cancer, but she would

4  not have active cancer.

5  Q   Would you consider that hysterectomy years ago to have

6  anything to do with pain some 50 years later?

7  A   No, I wouldn't.

8  Q   Now, you talked about that you thought you started writing

9  more Abstral once you and Dr. Couch and Dr. Ruan purchased

10  Abstral stock; is that right?

11  A   Correct.

12  Q   I'll show you what's been introduced as Government's

13  Exhibit 10-19.  This has been admitted as a chart.  Dr. Ruan is

14  in red, Dr. Couch is in blue, the Abstral prescribed by month

15  in micrograms.  And I'll show you -- you've previously seen

16  this chart; is that right?

17  A   Yes.

18  Q   I show you what's marked in September of '13 where numbers

19  begin to go up.  Do you see where it goes way up and peaks with

20  one doctor here, peaks for the other here and here?

21  (Indicating.)

22       Was there some outbreak of people coming to PPSA with

23  cancer during this period of time that you're aware of?

24  A   No.

25  Q   Do you know why the spike in the Abstral numbers?

```
 1              MR. SHARMAN:  Objection.  Speculation.

 2              MS. GRIFFIN:  Your Honor, I believe he can answer does

 3    he know why without --

 4              THE COURT:  The question is do you know?

 5              THE WITNESS:  I don't know for sure, no.

 6    BY MS. GRIFFIN:

 7    Q    Did you ultimately lose money in investing in Abstral?

 8    A    Yes.

 9    Q    Did there come a time when you also were taking Adderall?

10    A    Yes.

11    Q    What is Adderall?

12    A    Adderall is a schedule II.  Amphetamine sulfate is the

13    generic name.  It's used for narcolepsy or ADHD and it's

14    basically speed, you know.  So I was taking it to be more

15    productive, stay awake.

16    Q    Where were you getting the Adderall?

17    A    I wrote --

18    Q    A person?

19    A    -- a person a prescription.  And also I would -- I had a

20    friend of mine that took it too, and they would give it to me.

21    So --

22    Q    They would give you Adderall?

23    A    Yes.

24    Q    Did you write Adderall to yourself?

25    A    Never, never wrote anything to myself.
```

2986

```
 1   Q   Was Adderall a drug that was kept there at PPSA?

 2   A   No.

 3   Q   Other controlled substances were kept there?

 4   A   Yes.

 5   Q   Now, you said you had previously worked in a hospital; is

 6   that right?

 7   A   Yes.

 8   Q   An ER?

 9   A   Correct.

10   Q   Did you know how drugs were maintained in the ER when you

11   worked there, controlled substance drugs?

12   A   Yes.

13   Q   Could you tell us that?

14   A   They were kept in a lock box and you signed out everything

15   you took.  And if you had to waste something, you had to have a

16   second person witness the waste and it was accounted for daily.

17   Q   How were the drugs at PPSA, the controlled substances?

18   A   They were kept in a safe.  There was a log, but, you know,

19   there was no accounting really.

20   Q   What about the returned drugs?

21   A   Initially if someone brought back something, you could

22   chart that, you know, they brought back X amount of pills and,

23   you know, then you'd flush them or I'd give them to the medical

24   assistant and they would chart it and do whatever they did with

25   them.  And then it would move to like a disposal box where when
```

2987

```
 1   they brought back drugs, you would return them.  And then they
 2   eventually got a safe and then things were documented better,
 3   but it still wasn't foolproof.
 4   Q   You said that you had taken some of the returned drugs
 5   before you started injecting --
 6   A   Yes, that was generally --
 7   Q   -- Dilaudid?
 8   A   -- that's generally how -- I mean, that's how I got them.
 9   Q   Do you know of anyone else at PPSA that was helping
10   themselves to the returned drugs?
11   A   Yeah, there were several people.
12   Q   Stacy Madison?
13   A   Stacy.  I don't know, you know, about Bridgette.  You know,
14   I think if somebody needed something, they just took it.
15   Q   Without a prescription?
16   A   Correct.
17   Q   And did you ever give some of the drugs that were returned
18   to anyone?
19   A   No.
20   Q   Did you give them to anyone within PPSA?
21   A   No.
22   Q   You talked about -- excuse me -- when you split the drugs
23   with this individual, did that ever come to Dr. Couch's
24   attention?
25   A   It did.
```

THOMAS JUSTIN PALMER - DIRECT BY MS. GRIFFIN

1  Q   Was this a person, if you know, that Dr. Couch liked or did
2  not like?
3  A   He did not like them.
4  Q   And so we're going to call this person A, okay?
5  A   Okay.
6  Q   What happened when Dr. Couch learned that you had been
7  prescribing Adderall for person A and splitting the Adderall
8  with that person?
9  A   He fired me.
10  Q   Approximately when was that?
11  A   I don't -- maybe early 2014?
12  Q   How long were you fired?
13  A   10 minutes.
14  Q   Did you ever even leave the premises?
15  A   No.
16  Q   Did there come a time also in 2014 when you had a
17  conversation with Dr. Couch about Roxicodone 30 milligrams?
18  A   Yeah.  We -- that was one that was not -- he did not want
19  me to write as much of the Roxicodone 30 milligrams or to avoid
20  it.  You know, always -- don't write triple digit amounts of,
21  you know, narcotics.  Talked about, you know, the patients that
22  were on benzodiazepines like Xanax or Klonopin, they need to
23  get it from their primary providers.
24  Q   So it wouldn't show that they were getting it from PPSA?
25  A   Excuse me?

2989

1  Q   So that wouldn't show that the benzos were coming from

2  PPSA?

3          MR. SHARMAN:  Object to form.  Leading.

4          THE COURT:  Sustained.

5  BY MS. GRIFFIN:

6  Q   What did he tell you about the benzos -- Dr. Couch?

7  A   I don't -- I can't remember.  I don't think we went into

8  detail.  I mean, I understood because a lot of the physicians

9  that the patients came from came over already on those

10  medications, then the physicians would refuse to, quit writing

11  them, and they expected us to do it and it's really not a pain

12  drug.  And we didn't generally like to write that, but you

13  can't just jerk somebody off that.  And I know I called a

14  couple of the primary physicians and said we can't do that and

15  then eventually I caved and wrote it for them.

16  Q   You said you couldn't jerk somebody off of it.  Could you

17  wean them down off of a benzo?

18  A   I could.

19  Q   Were you required to write the same prescription for the

20  patient as what they had been written before?

21  A   No.

22  Q   Now, let's go back to Dr. Couch telling you not to write

23  that.  You said that was sometime in 2014?

24  A   I couldn't tell you the exact date.

25  Q   Let me show you what's been introduced as Government's

1  Exhibit 9-1(2) and ask if you have previously seen this email

2  from Dr. Couch to Dr. Ruan.

3  A   Yes.

4  Q   And starting at the bottom, have you seen where it says

5  that Alabama's the leading state with the most opioids?  Do you

6  see that?

7  A   Yes.

8  Q   Is Dr. Ruan telling Dr. Couch that he, Dr. Couch, has quite

9  a few patients on Roxicodone?

10  A   I see that.

11  Q   And OxyContin 80 milligrams?

12  A   Correct.

13  Q   Does it tell Dr. Couch that these two are the most thought

14  of in south Florida, therefore considered to be biggest reg

15  [sic] flag?

16  A   Correct.

17  Q   Do you think that was intended to be red flag or do you

18  know?

19  A   It looks like it to me.

20  Q   Okay.  What's a red flag?  What would you interpret a red

21  flag to be?

22  A   In that case a red flag, to me, would be a warning sign

23  that they're too -- they're being prescribed too much.

24  Q   Does it say:  I think you -- referring to Dr. Couch --

25  should talk to Justin on cutting down Roxicodone 30 milligram

THOMAS JUSTIN PALMER - DIRECT BY MS. GRIFFIN

1   usage?

2   A   I see it.

3   Q   Okay.  Were you in July of 2014 able to write any

4   controlled substances?

5   A   No.

6   Q   Were you ever allowed to write schedule II controlled

7   substances?

8   A   No.

9   Q   Were oxycodone and Roxicodone both schedule II controlled

10  substances?

11  A   They are and were.

12  Q   And then does it say:  Please remind Justin.

13        Dr. Couch responds that he reviewed it with you

14  tonight.  Do you recall that being approximately around that

15  same time frame?

16  A   Yes.

17  Q   And does it say:  We do not write triple digit dispensions

18  of the short-acting opiods?

19  A   Yes.

20  Q   What's a triple digit dispension?

21  A   Anything over 99 for quantity, you know, usually you would

22  write three times a day for 90 pills a month.  But that's about

23  the limit for short acting.  If they need more than that, they

24  need to be on long acting.

25  Q   In fact, did you and Dr. Couch write triple digit

1    dispensions of certain drugs?

2    A    Not very often.

3    Q    They were written or not?

4    A    They were written, but not very often.

5    Q    So at this time Dr. Ruan is telling Dr. Couch to tell you

6    to watch what you are writing; is that right?

7    A    That's what it appears.

8    Q    And then Dr. Couch represents that he's gone over that with

9    you; is that right?

10   A    Yes.

11   Q    But you weren't allowed to write anything except

12   noncontrolled drugs?

13   A    Correct.

14   Q    Were any of the NPs or the nurses or anyone else at that

15   office allowed to write scheduled controlled substances besides

16   the three doctors that were there?

17   A    No.

18   Q    Was it in the usual course of professional practice for you

19   to write scripts that you were not authorized to write?

20   A    No.

21   Q    Did you know that was inappropriate?

22   A    I did.

23   Q    Did there come a time when you were asked to go to

24   Dr. Couch's house on a personal errand for him?

25   A    Yes.

1  Q    What was that about?

2  A    Uh --

3        MS. GRIFFIN:  I'm going to lead just a little bit, if

4  I can here, Your Honor, just to limit the conversation, if

5  that's okay with Mr. Sharman.

6        THE COURT:  All right.  They can object whenever they

7  want to.

8  BY MS. GRIFFIN:

9  Q    Were you asked to go get $7,000 cash from Dr. Couch's

10 house?

11 A    Yes.

12       MR. SHARMAN:  Objection.  Relevance.

13       THE COURT:  I don't know yet.

14 BY MS. GRIFFIN:

15 Q    Did you do that?

16 A    I did.

17 Q    Did you find more than $7,000 at the location where you

18 were directed to go at the house?

19 A    Yes.

20 Q    And what did you do with the money?

21 A    I took the money to -- can I say the name?

22 Q    Did you take it to someone?

23 A    I took the money to someone.  And I didn't feel comfortable

24 leaving the rest of the money there, so I took it home and

25 brought it back to him when I came back to work.

THOMAS JUSTIN PALMER - DIRECT BY MS. GRIFFIN

1    Q   Brought it back to who?

2    A   Dr. Couch.

3    Q   Were you asked to give the $7,000 to someone?

4    A   Yes.

5    Q   Did you do so?

6    A   Yes.

7    Q   Where did that take place?

8    A   At PPSA on Springhill.

9    Q   While you were there seeing Dr. Couch's patients, did you

10   see what you would call drug-seeking behavior?

11   A   Yes.

12   Q   Explain what that means.

13   A   Patients needing more and more medication or they said they

14   had lost their medication or they'd come back early for refills

15   or, you know, they've got new pain.

16   Q   And what happened over time with patients that you thought

17   had drug-seeking behavior?

18   A   I generally changed their medication or tried to change it

19   to a different type medicine or reduce it.  Sometimes, you

20   know, honestly, they -- you know, it got increased.

21   Q   And why was that?

22   A   Just tired of fighting with them.

23   Q   Why were you having to fight with a patient?

24   A   Because they felt their pain was worse than it really -- I

25   mean worse and I didn't think it was.  You know, it's

1  subjective.  So, I mean, you can't -- there's no test for

2  pain.  So, you know, I would have to go with what they were

3  telling me.

4  Q   Did you feel like you were overwriting?

5  A   I did.

6  Q   Approximately what percentage of the patients did you feel

7  like were overwritten?

8  A   At least -- at least half, half to maybe more.

9  Q   Did you ever discuss that with Dr. Couch?

10  A   I don't know if I -- I don't know if I did discuss that

11  with him or not.  I would think I would have.

12  Q   Without telling us what you said, did you discuss it with

13  anybody else employed at PPSA?

14  A   I'm -- I'm almost positive I had.  I mean, that was just a

15  common feeling or, you know, common complaint.  You know, it

16  was just never enough.

17  Q   Did you ever discuss drug-seeking behavior or being

18  overmedicated with some of the patients or their families?

19  A   Yes.

20  Q   Do you recall particularly telling something of that nature

21  to one patient's family member in PPSA?

22  A   I think I talked about it with a couple of patients.  I

23  mean, we had a good rapport -- that I had a good rapport with.

24  Q   And do you recall what you told them?

25  A   Not word for word, no.

1   Q   Do you know whether or not Dr. Ruan and Dr. Couch were paid

2   by the maker of Subsys?

3   A   They were paid for speaking.

4   Q   What do you mean by speaking?

5   A   Like, say, we would go to lunch or dinner and they would

6   speak about the drug and they would get a speaking fee.

7   Q   Are you talking about they being Dr. Ruan and Dr. Couch?

8   A   Yes.

9   Q   How did you know that they were getting a speaking fee?

10  A   From conversations with the drug reps, because I wanted to

11  do it myself but never got the opportunity to.

12  Q   Why weren't you given the opportunity to do that?

13  A   Actually I think it was either Subsys or Abstral they

14  wanted me to or got it approved that I could do one of the

15  speaker meetings or lunches or whatever they were called.  And

16  I think, from what I heard from the rep, was Dr. Ruan --

17          MR. KNIZLEY:  I object to what the rep said.  It's

18  hearsay.

19          THE COURT:  Sustained.

20  BY MS. GRIFFIN:

21  Q   Were you allowed to do any of the programs?  Without

22  telling us what somebody told you.

23  A   No, I wasn't.

24  Q   Now, you said they would speak.  Would Dr. Couch and

25  Dr. Ruan speak at the same time?  I mean, the same program?

THOMAS JUSTIN PALMER - DIRECT BY MS. GRIFFIN

1  A   No, no, it was separate.

2  Q   Describe the programs for us.  First of all, before you

3  describe them, did you attend many of them?

4  A   I did.

5  Q   Where would they be held?

6  A   At Ruth's Chris or Osaka.

7  Q   Ruth's Chris being a nice steakhouse?

8  A   Yes.

9  Q   And Osaka being what?

10 A   A Japanese restaurant.

11 Q   And these were programs on behalf of what companies?

12 A   From what I can recall, there were more than -- I think

13 there were more than two or three.  But, I mean, generally it

14 was Abstral or Subsys.

15 Q   Do you know who the Abstral rep was?

16 A   Jeff Palmer.

17 Q   Did you know who the Subsys rep was?

18 A   Natalie Perhacs.

19 Q   Now, you said you attended a number of these?

20 A   Yes.

21 Q   Tell us about them.

22 A   Generally we would meet at the restaurant, sit down.

23 Q   Who would?

24 A   It was generally people from the office.  I mean, it was

25 rarely anybody else outside of the office.  I think there might

```
 1    have been one or two occasions that maybe another physician
 2    came and it was the drug rep and anybody that wanted to come
 3    actually.  You didn't have to be a -- it could have been
 4    anybody that came.  And we'd sit down and order, Dr. Ruan or
 5    Dr. Couch would go through the slide show on the computer and
 6    briefly talk about the drug, you know.  It wouldn't last -- I
 7    would say the max time it would last would be five to seven
 8    minutes.  And, you know, on one occasion it was noted, you
 9    know, we have to do this because that's what they're paying us
10    to do, or something like that.
11    Q   Who do you recall saying that?
12    A   I think Dr. Ruan said that.
13    Q   Was there anybody in the group when it was you, Dr. Ruan,
14    Dr. Couch, and the other PPSA office employees -- or
15    employees -- that could write Abstral or Subsys?
16    A   Generally, no.
17    Q   Nobody else was licensed to, were they?
18    A   No.  That's why I kind of thought it was kind of
19    silly.  But --
20    Q   Did it give you a free lunch?
21    A   Yeah, it did.
22    Q   Or a free dinner?
23    A   It did.
24    Q   Do you know how much Dr. Ruan and Dr. Couch were getting
25    paid for these programs?
```

1  A   No, I didn't know.

2  Q   Do you know where their checks were being sent for their

3  speaking?

4  A   No.

5  Q   And would Natalie attend some of these programs --

6  A   Yes.

7  Q   -- for Subsys?

8  A   The rep would always be there, if there was a speaker

9  program.

10 Q   So Mr. Jeff Palmer -- is he any relation to you?

11 A   No.

12 Q   -- would be there if it was an Abstral program?

13 A   Correct.

14 Q   And Natalie Perhacs would be there if it was a Subsys

15 program?

16 A   Correct.

17 Q   Now, you didn't attend all the lunches or dinners, did you?

18 A   No.  I mean, especially during lunch I couldn't get away, I

19 was so busy.

20 Q   So you don't know who may have come there, of course, when

21 you weren't present?

22 A   Right.

23 Q   You don't know who else may have attended?

24 A   I can't attest to all the events.

25 Q   Did there come a time when you learned there was some

```
 1   competition between Abstral and Subsys for the market?
 2   A   Well, I mean, we took people off of Subsys and put them on
 3   Abstral and sometimes we took people off of Abstral and put
 4   them on Subsys.  There's always competition between the two.
 5   They're basically the same drug.
 6   Q   Were you aware as to whether some executives came down from
 7   either of those countries -- companies -- excuse me -- to see
 8   Dr. Ruan or Dr. Couch?
 9   A   I mean, that was commonplace, somebody coming from, you
10   know, Abstral or Galena or Ins.
11   Q   Ins being the Subsys --
12   A   Yes.
13   Q   -- manufacturer?  And Galena being the Abstral
14   manufacturer?
15   A   Right.
16   Q   What about executives from other pharmaceutical companies?
17   A   I am not positive.  I think there may have been one
18   other.  It was for a nonnarcotic that we used a lot.  But
19   that's the only one I can think of.
20   Q   Are you aware why a Subsys executive or an Ins executive
21   would come to Mobile, Alabama?
22           MR. KNIZLEY:  Your Honor, I object as speculating.
23           MS. GRIFFIN:  Your Honor, I asked if he knew why.
24           THE COURT:  Yes.  The answer is yes or no.
25           THE WITNESS:  No, I couldn't -- I could only
```

3001

```
 1   speculate.
 2   BY MS. GRIFFIN:
 3   Q   How would you know they were there?
 4   A   I would see them in the office.  I think I met a few of
 5   them.
 6   Q   Is that the same for Abstral?
 7   A   Yes.
 8   Q   You would meet some of the executives?
 9   A   I would -- I would always try and make it a point of
10   meeting some of these people that came down to see us.
11   Q   They came more than one time for Subsys and more than one
12   time for Abstral?
13   A   As far as I can recall, I believe they were there more than
14   once.
15   Q   I want to switch and talk to you about the urine drug
16   screens.
17   A   Okay.
18   Q   And we talked a little bit about the fact they weren't
19   monitored.  But what would happen if a patient continued to
20   show street drugs in their urine drug screen?  What would you
21   do?
22   A   Well, there are different factors.  If they were honest
23   with me and told me, it depends on what street drug it was.
24   You know, some things like cocaine, that would be an automatic,
25   you know, dismissal.  You know, like marijuana, you know, I
```

1    might give them a warning or might not write their prescription

2    that month.  If they didn't have the drugs in their system, you

3    know, it depended on was it -- did they run out and what they

4    had to say about it.  So it was different for different people.

5    Q   Did you fire these patients?

6    A   Some of them.

7    Q   And did you keep some of them?

8    A   Yes.

9            MS. GRIFFIN:  One moment, Your Honor.

10           THE COURT:  All right.

11   BY MS. GRIFFIN:

12   Q   Do you know whether Dr. Couch ever fired any of the

13   patients of his that you were seeing?  If you know.

14   A   I don't know for sure.  I think if anybody would have done

15   it, it would have been left to me or he might have told me to

16   do it.

17   Q   But you weren't the doctor; right?

18   A   No.

19   Q   In connection with patients, did you just come to believe

20   what the patient would tell you about their condition or what

21   they had been on?

22   A   Not always, no, no.  A lot of times I gave them the benefit

23   of the doubt.

24   Q   What do you mean by that?

25   A   I mean, if they told me they were taking a medication and I

3003

1    looked at their chart and saw there might have been a good

2    reason, you know, I would probably go with that.  You know, if

3    that seemed appropriate, I would continue it.

4    Q    Did you always check the PDMP for each new patient?

5    A    No.

6    Q    Did Dr. Couch, to your knowledge, check the PDMP for each

7    new patient?

8    A    Not to my knowledge.

9    Q    Did you make much use of the PDMP?

10   A    I don't really -- I really wouldn't say I did.

11   Q    Did you observe Dr. Couch making much use of the PDMP?

12   A    I can't say I observed that, no.  It would have been left

13   to the medical assistant to pull all that information up.

14   Q    Did you have patients from out of state?

15   A    I did.

16   Q    Do you recall any of those states?

17   A    Mississippi, Florida.  I think I had one lady from

18   Tennessee.  I think it was mainly the surrounding states.

19   Q    You don't recall patients from further away than the ones

20   you've mentioned?

21   A    No.  I can't say I do.

22   Q    Did you pay much attention to where a patient lived?

23   A    Well, if they were coming from Tennessee or, you know,

24   somewhere like north Mississippi, I would, you know, question

25   that.

3004

1   Q   Would that be a red flag?

2   A   Yes.

3   Q   Do you know if you had patients that were selling their

4   drugs?

5   A   I don't know for sure.  I mean, I never had actual proof of

6   that.  But yes, I'm pretty sure we did.

7   Q   Did you have suspicion of that?

8   A   Yes.

9   Q   Did you have some patients come in that were what you'd

10  call pill sick?

11  A   Yes.

12  Q   What does that mean?

13  A   They're in withdrawal, you know, they're out of their

14  medicine.

15  Q   What would you do?

16  A   I had one guy come in that was so sick he was actively

17  vomiting and shaking and just basically incapacitated.  So I

18  gave him an injection of Dilaudid and he was -- you know, that

19  pretty much took care of his symptoms and I was able to write

20  his prescription.  You know, he said he had run out.  And I was

21  able to write his prescription.  And we talked about, you know,

22  him using too much of his medicine.

23  Q   So you gave him a drug?

24  A   Right.

25  Q   There in the office?

1    A    Right.  I just couldn't let him suffer.

2    Q    Did you get approval to do that?

3    A    No.

4    Q    For a controlled substance?

5    A    No.

6    Q    Did there come a time in April of 2014 when Couch told you

7    something about being investigated?

8    A    That Couch -- Dr. Couch didn't tell me anything about that.

9    Somebody else did.

10   Q    About you being investigated?

11   A    No, that was -- I think that was later, I think November of

12   '14, maybe October.

13   Q    Okay.  Did there come a time when Dr. Couch told you

14   something about you being investigated?

15   A    That was October or November.

16   Q    And what did he tell you?

17   A    I think it was:  They're not looking at me, they're looking

18   at you.

19   Q    And tell us who the me and you is in that sentence.

20   A    I guess whoever's doing the investigation with the federal

21   government.  You know, it was pretty vague.  I don't know.

22   Q    Who told you that you were being investigated?

23   A    Who told me that --

24   Q    Yes.

25   A    I was being, me.

THOMAS JUSTIN PALMER - DIRECT BY MS. GRIFFIN

1   Q   Did Dr. Couch tell you, Justin Palmer, that you were being

2   investigated?

3   A   Yes.

4   Q   Okay.  What else did he say about you being investigated?

5   A   I don't think there was much else said, because I asked and

6   he said he didn't know.

7   Q   Were you told anything about continuing the signing of his

8   name on controlled substances?

9   A   I was told not to do it.

10  Q   So how -- did Dr. Couch start seeing the patients?

11  A   I took a more proactive approach at finding him to sign the

12  prescriptions.

13  Q   And were there some prescriptions signed the day before

14  patients would come in?

15  A   Yes.

16  Q   By whom?

17  A   Dr. Couch.

18  Q   Did you go back shortly thereafter to continuing to write

19  controlled substances by signing Dr. Couch's name?

20  A   I did when I was in a real pinch or I had to or I couldn't

21  find any way around it.

22  Q   Did there come a time when Dr. Couch told you that he had

23  heard the FBI was going to raid PPSA?

24  A   No, I didn't know anything about that one.

25  Q   Now, you were gone, of course, on May the 20th of 2015 when

1   PPSA was in fact raided; is that right?

2   A   Yes.

3   Q   Mr. Palmer, when you were prescribing the medicines, the

4   controlled substances that you were not licensed to do, did you

5   know anything about morphine equivalence?

6   A   Yes.

7   Q   And did you know what considering the morphine equivalent

8   meant?

9   A   It was basically what one amount of a drug would be in an

10  equivalent amount of morphine, like one gram of Dilaudid -- or

11  one milligram of Dilaudid would be equivalent to five to eight

12  milligrams of morphine.

13  Q   Had you been told By Dr. Couch not to go over a certain

14  daily limit of morphine equivalent in prescribing controlled

15  substances?

16  A   No, I can't recall that.

17  Q   He didn't warn you about that?

18  A   Not that I can recall.

19  Q   I want to direct your attention to January of '15.  You

20  were gone?

21  A   Correct.

22  Q   Stacy was gone?

23  A   Correct.

24  Q   Bridgette was gone?

25  A   Yes.

1    Q    Is that right?

2    A    Yes.

3    Q    Do you know whether or not anything changed at PPSA -- not

4    what somebody told you -- do you have any direct knowledge if

5    anything changed?

6    A    I didn't have any association with PPSA after I left.

7    Q    You left on your own?

8    A    Yes.

9    Q    You were not terminated?

10   A    No.

11   Q    Was your behavior at PPSA in the usual course of

12   professional practice?

13   A    No.  It was far below any standard of any medical

14   threshold.

15   Q    Was your seeing patients for the doctor outside the usual

16   course of professional practice for your degree?

17   A    Yes.

18   Q    Was your writing controlled substances outside the usual

19   course of professional practice?

20   A    Yes.

21        MS. GRIFFIN:  One moment, Your Honor.

22        THE COURT:  All right.

23        (A discussion was held off the record between government

24   counsel.)

25   BY MS. GRIFFIN:

THOMAS JUSTIN PALMER - DIRECT BY MS. GRIFFIN

```
 1   Q   Mr. Palmer, did you enter a guilty plea in this court?
 2   A   I did.
 3   Q   To conspiracy to possess with intent to distribute and
 4   conspiracy to distribute a controlled substance outside the
 5   usual course of professional medical practice and for no
 6   legitimate medical purpose?
 7   A   Yes.
 8   Q   That's a felony conviction; is that right?
 9   A   It is.
10   Q   I show you what's been marked as Government's Exhibit 7-5.
11       (A discussion was held off the record between counsel.)
12   BY MS. GRIFFIN:
13   Q   That's the plea agreement itself and not the factual
14   resume.  Did you have a written plea agreement?
15   A   I believe so.
16   Q   I'll show you what's marked as Government's Exhibit
17   7-5.  Does it say:  Plea agreement, Thomas Justin Palmer?
18   A   It does.
19   Q   And I show you your signature on the back of
20   it.  (Indicating.)  Does that refresh your recollection that
21   this is a copy of your written plea agreement?
22   A   Yes.
23           MS. GRIFFIN:  Your Honor, we'd move to admit
24   Government's Exhibit 7-5.
25           MR. SHARMAN:  No objection.
```

 1         THE COURT:  All right.  Mark it in.

 2         (Government's Exhibit 7-5 was entered into evidence.)

 3   BY MS. GRIFFIN:

 4   Q   Now, Mr. Palmer was there also a --

 5         MS. GRIFFIN:  May we publish it to the jury?

 6         THE COURT:  Yes.

 7   BY MS. GRIFFIN:

 8   Q   Was there also a portion of the plea agreement that

 9   contained a summary of facts, the facts that made up the basis

10   for your guilty plea?

11   A   There was.

12   Q   This is just the plea agreement, not the factual part of

13   it?  (Indicating.)

14   A   Right.

15   Q   And does this state what you pled guilty to?

16   A   Yes.

17   Q   Conspiracy to distribute or cause to be distributed a

18   controlled substance outside the usual course.  Did it indicate

19   in this plea agreement a place for you to cooperate if you

20   wished to do so?  Did it contain a cooperation agreement?  Do

21   you recall?

22   A   I think so.

23   Q   Does this help refresh your recollection that you have no

24   right to cooperate, but that you, if you were allowed to

25   cooperate, you had certain rules?

```
 1   A   Yes.

 2   Q   Is what you are doing today cooperating?

 3   A   I mean, I'm -- I'm telling the truth.  I guess yes, sure.

 4   Q   What do you hope to receive in return for your cooperation?

 5   A   Well, I know that if I don't cooperate or I'm not honest, I

 6   think it would be worse than if -- I mean, if -- I don't expect

 7   to receive anything, I mean.

 8   Q   Did you have an attorney when you entered into this plea

 9   agreement with the United States?

10   A   Yes.

11   Q   Do you understand that it is entirely up to the judge as to

12   your sentence?

13   A   I do.

14   Q   Do you understand that the United States, if we determine

15   that you have cooperated truthfully, could ask the Court to

16   consider reducing your sentence?

17   A   Yes.

18   Q   Who do you understand makes the final decision as to your

19   sentence?

20   A   The judge.

21           MS. GRIFFIN:  That's all I have of this witness, Your

22   Honor.

23           THE COURT:  All right.  Mr. Sharman?

24                         CROSS EXAMINATION

25   BY MR. SHARMAN:
```

1  Q   Mr. Palmer, my name is Jack Sharman.  I represent

2  Dr. Couch.  Mr. Palmer, as a younger man you worked hard and

3  got a good education, didn't you?

4  A   Yes, sir.

5  Q   You got a bachelor's degree?

6  A   Yes, sir.

7  Q   You got a master's degree?

8  A   Yes, sir.

9  Q   You went into healthcare?

10  A   Yes, sir.

11  Q   You made a success of it?

12  A   I wouldn't call it a success now.

13  Q   Well, for a long time you were successful, were you not?

14  A   For a few years.

15  Q   And you held some responsible positions in -- for example,

16  in an emergency room; right?

17  A   Yes, sir.

18  Q   And in a hospital; right?

19  A   Yes.

20  Q   And you made a decent living at it; right?

21  A   I did.

22  Q   And throughout all that time and in all that training, you

23  knew right from wrong, didn't you?

24  A   Yes.

25  Q   And you enjoyed helping people who were sick?

THOMAS JUSTIN PALMER - CROSS BY MR. SHARMAN

1  A   I do.

2  Q   And you enjoyed helping people who were hurting; right?

3  A   I do.

4  Q   Now you've given up your nursing license; right?

5  A   Correct.

6  Q   You turned in your DEA license; right?

7  A   Yes.

8  Q   And you pled guilty to a federal felony involving

9  narcotics; right?

10  A   Correct.

11  Q   The chances of you ever treating a patient again are pretty

12  low, aren't they?

13  A   I'm not sure what they are, but they are not that great.

14  Q   All right.  As you testified on direct, you were convicted

15  of conspiracy to violate the Controlled Substances Act; right?

16  A   Correct.

17  Q   And you were convicted on December 16th of 2015 of one

18  count of conspiracy to violate that narcotics statute; right?

19  A   Correct.

20  Q   All right.  That was by a guilty plea; right?

21  A   Yes.

22  Q   You pled guilty?  Right?

23  A   Yes.

24  Q   In this courtroom?

25  A   Yes.

1   Q   Before Judge Granade; right?

2   A   Yes.

3   Q   Now, you haven't been sentenced yet; right?

4   A   No, sir.

5   Q   You had your sentencing date set at different times

6   earlier; right?  Right?

7   A   Yes, sir.

8   Q   Then it got moved; right?

9   A   Yes, sir.

10  Q   To make sure that you'd be able to testify at this trial

11  before you were sentenced; right?

12  A   I can only speculate to that.

13  Q   All right.  Let's take a look at the plea agreement that

14  you were just shown by Ms. Griffin, which has been admitted as

15  Exhibit 7-5.

16          MR. SHARMAN:  And, Sam, could you pull that up?  It's

17  our 211.

18  Q   All right.  Can you see that okay?

19  A   I can.

20  Q   And this is the plea agreement that you entered into with

21  the government; right?

22  A   Yes.

23  Q   All right.  Let's look first at page two, at paragraph 11,

24  please, sir.

25          MS. GRIFFIN:  Your Honor, we object to the penalty

```
 1   section.
 2            THE COURT:  I sustain.
 3            MS. GRIFFIN:  Relevance.
 4            MR. SHARMAN:  It's in evidence, Your Honor.
 5            THE COURT:  I sustain the objection to demonstrating
 6   it to the jury at this point.
 7   BY MS. GRIFFIN:
 8   Q   All right.  Well, you've got children, don't you,
 9   Mr. Palmer?
10   A   Yes, sir.
11            MS. GRIFFIN:  Objection, Your Honor.  It's beyond the
12   scope of direct and it's not relevant.
13            MR. SHARMAN:  Goes -- goes to his -- I'm sorry.  Goes
14   to his credibility, Your Honor.
15        (At the side bar, jury not present.)
16            MS. GRIFFIN:  Your Honor, the fact that he has
17   children has nothing to do with his credibility and we object
18   to him going into his personal life.  There's plenty to cross-
19   examine him on without talking about his children.
20            MR. SHARMAN:  I'm not going to identify them, but he
21   has young children.  That gives him extra incentive to do what
22   they want.  It goes to his credibility to stay out of prison,
23   it absolutely does.
24            MS. GRIFFIN:  Your Honor, I object to saying "do what
25   we want."  Yes, we want him to tell the truth and that's what
```

THOMAS JUSTIN PALMER - CROSS BY MR. SHARMAN

1   his plea agreement states and I think that's an improper --

2          THE COURT:  I think you can certainly ask about the

3   fact he may get a lesser sentence because of his cooperation

4   and that it may be a substantially lesser sentence than what

5   his exposure may be.  But I think the fact that he has children

6   is not relevant.  You know, you can talk about:  You have

7   relatives, you would like to stay out of jail and all that sort

8   of stuff.  But it's getting a little too close to personal

9   identifiers.

10         MR. SHARMAN:  May I say family?

11         THE COURT:  Sure.

12         MR. SHARMAN:  Thank you.

13      (In open court, defendants and jury present.)

14  BY MR. SHARMAN:

15  Q   Mr. Palmer, you have family, do you not?

16  A   I do.

17  Q   And whatever your ultimate sentence is, you want to

18  minimize your time, understandably, being away from your

19  family, don't you?

20  A   I think that was what any normal person would do.

21  Q   And so you would like to minimize your time being away from

22  them, wouldn't you?

23  A   I -- I don't want to be away from them.  But you know, if

24  that's -- if that's what it comes to, that's what it is.

25  Q   All right.  Let's look at page five, please, of your plea

3017

THOMAS JUSTIN BALMER - CROSS BY MR. SHARMAN

```
 1   agreement, and paragraph 20.  All right.  And Ms. Griffin just
 2   showed you portions of this, did she not?
 3   A   Correct.
 4   Q   And there's some various conditions in here and statements
 5   about your cooperation with the government; right?
 6   A   Yes.
 7   Q   And a couple of those are -- just going further down --
 8   that you're going to respond to all questions that they have;
 9   right?
10   A   Yes.
11   Q   And you're going to cooperate completely; right?
12   A   Yes.
13   Q   And you're going to comply with all instructions?
14   A   Yes.
15   Q   Okay.  An instruction is when somebody tells somebody to do
16   something else; right?
17   A   Correct.
18   Q   So you're going to comply with what they tell you to do;
19   right?
20   A   As long as it's truthful.
21   Q   And interviews?  You have to make yourself available for
22   interviews; right?
23   A   Correct.
24   Q   And you've done that?
25   A   I have.
```

1  Q   And you agreed to testify in the grand jury; right?

2  A   I did.

3  Q   You've done that?

4  A   Yes, sir.

5  Q   Right?

6  A   Yes, sir.

7  Q   And you agreed to testify for them at trial; right?

8  A   Yes, sir.

9  Q   And that's what you're doing right now?

10  A   I'm just telling the truth.

11  Q   All right.  And you also agreed to record phone calls for

12  them; right?

13  A   Yes.

14  Q   And to even go undercover for them; right?

15  A   I didn't realize it said that in there.  But --

16  (indicating).

17  Q   Okay.

18  A   I would if I was told to.

19  Q   All right.  And let's look at -- skip over to page seven

20  and paragraph G, if we could.  All right.  And if we could --

21  it's a long paragraph.  But if we could start looking at the

22  top third of it, your agreement provides that if the government

23  finds that you have provided substantial assistance, some other

24  things may happen; right?

25  A   That's what it says.

1    Q   And that's what you understand it to mean, substantial

2    assistance; right?

3    A   Yes, sir.

4    Q   It's got to be substantial, not little; right?

5    A   I don't know how you would grade substantial, but --

6    Q   Well, you know what substantial means, don't you,

7    Mr. Palmer?

8    A   Yes.

9    Q   It means not a little, but a good bit; right?

10   A   Right, right.

11   Q   And then also it says that that determination about whether

12   your assistance is little or big, that's in the sole discretion

13   of the United States?  I mean the government; right?

14   A   I would assume it meant the judge.

15   Q   Well, in the first instance, whether you have substantially

16   assisted or not, it says right there that the United States may

17   exercise its sole discretion; right?

18   A   Correct.

19   Q   And you understand what discretion means; right?

20   A   Yes.

21   Q   It means that the person exercising that quality isn't

22   accountable to the other person, they can do it based on

23   whatever reason they want; right?

24   A   Correct.

25   Q   Okay.  And it's in their sole discretion; right?

1    A    Correct.

2    Q    Okay.  Sole meaning only their discretion, not anybody

3    else's; right?

4    A    Correct.

5    Q    And then if you meet the standards of their sole

6    discretion, they may do something that would benefit you;

7    right?

8    A    I -- I -- correct.

9    Q    Okay.  Let's go down a little bit further.  If in their

10   sole discretion they decide that you contributed not a little

11   bit but a lot, then they'll file a legal motion, a paper on

12   your behalf with Judge Granade, won't they?

13   A    Yes.

14   Q    Okay.  And that's called a 5K motion; right?  See it in

15   there?

16   A    Okay.

17   Q    And you know what that means; right?  You had a lawyer when

18   you entered into this.  You know what that means; right?

19   A    Yes, sir.

20   Q    And that means that if you get a 5K motion, that's the

21   government saying:  He helped a whole lot, and please sentence

22   him less than he might otherwise get sentenced; right?

23   A    Correct.

24   Q    So sitting here right now today and all day that you've

25   been testifying, you've known that; right?

THOMAS JUSTIN PALMER - CROSS BY MR. SHARMAN

1   A   Yes.

2   Q   And by doing what you've done -- that is to say, being

3   interviewed, testifying in the grand jury, testifying today --

4   you're hoping to get one of those motions; right?

5   A   Sure, yeah.

6   Q   I'm sorry.  I beg your pardon?

7   A   I mean, I would have done this without any of this.

8   Q   All right.  You've met with these prosecutors, have you

9   not?

10  A   I have.

11  Q   And you've met with some of these agents, have you not?

12  A   I have.

13  Q   Once or more than once?

14  A   More than once.

15  Q   How many times?

16  A   Maybe six or seven.

17  Q   And you met with them this morning before you got up on the

18  witness stand; right?

19  A   Yes.

20  Q   All right.  Now, Mr. Palmer, you have been in this

21  courtroom before today, have you not?

22  A   I have.

23  Q   Now, one time was the one we just discussed where you pled

24  guilty; right?

25  A   Correct.

3022

1   Q   And that time you were standing up in front of the bench;

2   right?

3   A   Yes.

4   Q   You weren't on the witness stand, you were standing up

5   here; right?  (Indicating.)

6   A   Right.

7   Q   And you had your lawyer with you?

8   A   Yes.

9   Q   And that was on Wednesday, December 16th of 2015, does that

10   sound about right?

11   A   It sounds about right.

12   Q   Now, you've been in this courtroom another time, have you

13   not?

14   A   Yes.

15   Q   And you've been on that witness stand another time; right?

16   A   Yes.

17   Q   Okay.  And that was right before Christmas of 2016, just a

18   little over a month ago; right?

19   A   Correct.

20   Q   Maybe Thursday morning, December 22nd, does that sound

21   about; right?

22   A   Sounds about right.

23   Q   And that morning Judge Granade wasn't on the bench; right?

24   A   Correct.

25   Q   And the jury wasn't in the jury box?

THOMAS JUSTIN BALMER - CROSS BY MR. SHARMAN

1   A   Correct.

2   Q   I obviously was not here; right?  Is that right?

3   A   That's correct.

4   Q   And in fact the courtroom was empty except for you on the

5   witness stand and one other person here; right?

6   A   Yes, sir.

7   Q   And you were up on the witness stand just like you are now;

8   right?

9   A   Yes, sir.

10  Q   And Mr. Bodnar, one of the prosecutors, he was the other

11  person in the room; right?

12  A   He was.

13  Q   And he was standing more or less where I am now, right at

14  the lectern; right?

15  A   Right.

16  Q   And you were up there and he was here and he was trying out

17  some questions; right?

18  A   Correct.

19  Q   You were trying out some answers?  Right?

20  A   Yes.

21  Q   And sometimes Mr. Bodnar, he would let you finish your

22  answer all the way through; right?

23  A   Yes.

24  Q   And sometimes he'd stop you in the middle of the answer;

25  right?

3024

```
 1   A   I -- I'm not sure.

 2   Q   He'd suggest a better way or a different way to say it when

 3   he stopped you; right?

 4   A   Maybe.  I -- I can't really remember exactly how he did it.

 5   Q   Okay.  And y'all rehearsed a fair amount that morning;

 6   right?

 7   A   Maybe about an hour.

 8   Q   Okay.  And he did a pretty good job getting you ready;

 9   right?

10   A   Uh, sure.

11   Q   It sure helped today, didn't it?

12           MS. GRIFFIN:  Objection, Your Honor.  It's

13   argumentative.

14           THE COURT:  Sustained.

15   BY MR. SHARMAN:

16   Q   Now let me take you back, Mr. Palmer, to October of

17   2014.  That's toward the end of your tenure at PPSA; right?

18   A   Correct.

19   Q   You started in the summer of 2010; right?

20   A   Yes.

21   Q   And you were gone either right at the end of December 2014

22   or right at the very beginning of 2015; right?

23   A   Right.

24   Q   So in October 2014 you were still working at PPSA; right?

25   A   Yes.
```

1  Q   And around October 2014 you had also just gotten your DEA

2  license; right?

3  A   Correct.

4  Q   You testified a little bit about that on direct, do you

5  remember that?

6  A   Yes.

7  Q   And getting your DEA license, that was a -- that was a good

8  thing; right?

9  A   It -- it eased some things.

10 Q   Well, it increased the range of things you could do for

11 patients; right?

12 A   A little bit.  Not a whole bunch.

13 Q   All right.  And then, as you testified on direct, by that

14 point you were taking a significant amount of Dilaudid; right?

15 A   I was.

16 Q   600 to a thousand milligrams a day; right?

17 A   Yes, sir.

18 Q   And that ultimately ended with your separation from PPSA;

19 right?

20 A   Yes.

21 Q   And as part of that separation, after Dr. Couch and you had

22 the conversation that you recounted on direct, Dr. Couch wanted

23 to assist you, didn't he?

24 A   As far as I can remember, he wished me the best in

25 treatment and offered me a position if I wanted to come back

1  eventually.

2  Q   Well, that was certainly part of it; right?  That he wished

3  you the best and that if you, after rehabilitation, thought it

4  would be appropriate, you could come back; right?

5  A   Correct.

6  Q   He also paid for your rehab, didn't he?

7  A   No.

8  Q   He didn't pay for your rehab?

9  A   No, I paid for that out of pocket.  I wrote a check for, I

10 think, almost $30,000 after I cashed in my 401K.

11         MR. SHARMAN:  May I approach, Your Honor?

12         THE COURT:  All right.

13 BY MR. SHARMAN:

14 Q   Mr. Palmer, I going to show you what's been marked for

15 identification as Couch Exhibit 208 and ask you to take a look

16 at it, please, sir.

17         MS. GRIFFIN:  Your Honor, may we approach?  This is a

18 power of attorney document.

19         THE COURT:  All right.

20     (At the side bar, jury not present.)

21         MS. GRIFFIN:  This appears or purports to be a release

22 and settlement between PPSA and Palmer and his estranged wife.

23 He did not sign this.  It's a power of attorney.  And we object

24 to it being gone into.  He was in rehab at this time and the

25 fact that he signed a power of attorney to his wife, I don't

1    think that entitles him to talk about the terms of the

2    agreement between the parties.

3            MR. SHARMAN:  It's his severance agreement with PPSA.

4    He has an appropriate power of attorney from his wife, his wife

5    executed it on his behalf, both of them were properly

6    notarized, and he gets $20,000 in severance which was intended

7    for his rehab.

8            MS. GRIFFIN:  Does it say that in his report?  I do

9    not think it does.

10            MR. SHARMAN:  That is going to be the conclusion I

11    want the jury to draw.  I should be allowed to offer that since

12    he said that he got nothing from Dr. Couch.

13            MS. GRIFFIN:  No.  He said Dr. Couch didn't pay for

14    his rehab, that he wrote a check.

15            THE COURT:  Yes, that's what he said.  But if his

16    signature is not on this and you can't -- I don't see how

17    this is admissible through this witness.  You can certainly ask

18    him --

19            MR. SHARMAN:  I can lay the foundation with the power

20    of attorney because his signature's on there, and then the

21    attorneys so to speak, who his wife signed it as attorney --

22            THE COURT:  Well, you may be able to make it

23    admissible.  But, you know, I don't think it's good for

24    impeachment unless you can show he doesn't agree he was given

25    this $20,000 severance.  You haven't asked him that yet.  I

THOMAS JUSTIN PALMER - CROSS BY MR. SHARMAN

1    mean, that says nothing about the intent, what it was supposed

2    to be used for.  You can't really impeach him on something that

3    doesn't contradict what he said.  I'm not saying this isn't

4    admissible at the time.  I just think you haven't established a

5    basis for its admission yet, I mean, to make it relevant.

6            MR. SHARMAN:  Well, let me -- I will try to do both.

7    I will try to establish a foundation and then I will try to

8    make it relevant.

9            THE COURT:  Okay.

10           MR. SHARMAN:  Okay.

11       (In open court, defendant and jury present.)

12   BY MR. SHARMAN:

13   Q   Mr. Palmer, when you separated from PPSA, did you get a

14   payment that's commonly called a severance payment?

15   A   Yes, sir.

16           MR. SHARMAN:  Your Honor, we'd move into evidence

17   Exhibit 208, please.

18           MS. GRIFFIN:  Not at this point, Your Honor.  We

19   object at this point.

20           THE COURT:  I sustain at this point.

21   BY MR. SHARMAN:

22   Q   All right.  You were given a severance -- a payment

23   pursuant to a severance agreement; right?

24   A   It appears that way.

25   Q   And you had given your wife what's called a power of

1   attorney; right?

2   A   I did.

3   Q   And you had done that because you were going or preparing

4   to go into rehab; right?

5   A   Partially, yes.  I mean, I wasn't in any condition to make

6   any decisions anyways.

7   Q   And a power of attorney allows the person who's given that

8   power to enter into contracts and sell stuff, buy stuff, that

9   kind of thing; right?

10  A   Correct.

11  Q   On behalf of the person giving the power?

12  A   Yes.

13  Q   Okay.  And that's what your wife did for you at that

14  particular time; right?

15  A   Correct.

16  Q   And then, exercising that power of attorney, she then dealt

17  on your behalf with PPSA for the severance agreement; right?

18  A   Yes.

19  Q   And so exercising that power that you had given her, she

20  executed the agreement for you; right?

21  A   Correct.

22          MR. SHARMAN:  Your Honor, I again move into evidence

23  Exhibit 208.

24          THE COURT:  Well, he hasn't identified it yet.

25          MR. SHARMAN:  All right.  Well, I apologize.

1   Q   You have before you what's been marked as Couch Exhibit

2   208, do you not, Ms. Palmer?

3   A   I do.

4   Q   Have you had a chance to look through that?

5   A   Yes, sir.

6   Q   And does it contain both the power of attorney that your

7   wife provided and also the severance agreement itself between

8   you and PPSA?

9   A   Yes, sir.

10          MR. SHARMAN:  Dr. Couch moves in evidence Exhibit 208.

11          MS. GRIFFIN:  No objection.

12          THE COURT:  All right.  Mark it in.

13      (Defendant Couch's Exhibit 208 was entered into evidence.)

14          MR. SHARMAN:  Sam, could you bring up 208, please?

15          All right.  And if we could look at the power of

16  attorney piece so that the jury can know what we're talking

17  about?

18  Q   And then on the second page at the bottom there's a date

19  and a signature.  Do you see that, Mr. Palmer?

20  A   Yes.

21  Q   And that's dated January 21st, 2015; is that right?

22  A   Yes, sir.

23  Q   And that's your signature below there?

24  A   That is.

25  Q   Okay.  So this is the power of attorney document giving

1   your wife power to enter into contracts and do other stuff on

2   your behalf; right?

3   A   Right.

4   Q   And then if you will turn back, sir, to the actual document

5   itself, and on the second page you will see there's a signature

6   line at the bottom and a date there too as well; right?

7   A   Correct.

8   Q   And that date is February 6, 2015; right?

9   A   Yes, sir.

10  Q   And that is signed your name, but that's by your wife

11  exercising the power of attorney that you had given her; right?

12  A   That's her signature.

13  Q   Okay.  All right.  And then if we can look at the beginning

14  of this document, on the first page there's a bunch of what

15  lawyers call recitals.  Do you see where that is?

16  A   Yes, sir.

17  Q   It's got a bunch of whereases?  Do you see that?

18  A   I do.  I see it.

19  Q   And consistent with what you've said, I believe the third

20  whereas says:  Whereas Palmer has advised PPSA that he has an

21  addiction and needs treatment for the same, do you see where I

22  read that?

23  A   Yes.

24  Q   And that's true; right?

25  A   Correct.

1  Q   And then it says:  Whereas PPSA has advised Palmer that he

2  can take time off from his employment to obtain the treatment

3  he deems necessary to address the addiction and that, upon

4  obtaining such a treatment, can return to work as a nurse

5  practitioner?  Do you see where I read that?

6  A   Yes.

7  Q   And that was all true; right?

8  A   Yes.

9  Q   And then it's also says below that:  Whereas, despite the

10 reassurance of PPSA regarding his employment, Palmer has

11 advised PPSA that Palmer does not believe that it is in his

12 best interests to continue in his employment with PPSA even

13 after treatment.  Do you see where I read that?

14 A   Yes.

15 Q   Is that true?

16 A   That is true.

17 Q   And so you decided not to return; right?

18 A   Correct.

19 Q   But Dr. Couch was willing to give you a second chance?

20 A   Yes.

21 Q   Right?

22 A   Yes.

23 Q   And then if you will look a little further down, there's

24 another paragraph that begins:  Now therefore.  Do you see

25 that?

1    A    Yes, sir.

2    Q    Do you see where it says:  PPSA agrees to pay Palmer a

3    severance in the amount of $20,000?

4    A    Yes.

5    Q    Okay.  And that was in fact paid; right?

6    A    It was.

7    Q    All right.  And that agreement, as we saw, was dated

8    February 6th; right?

9    A    Yes, sir.

10   Q    And that $20,000 as part of your severance pay for your use

11   was paid right then or right around then; right?

12   A    Yes, sir.

13   Q    And then you sat down with the government about 12 days

14   later for the first time; right?  On February 18th?  Does that

15   sound about right?

16   A    Yes, sir, that sounds about right.

17   Q    That was over in Hattiesburg; right?

18   A    Yes, sir.

19   Q    Okay.  And that was at your rehab facility; right?

20   A    Yes, sir.

21   Q    So 12 days after Dr. Couch gave you a second chance to come

22   back and kicked in $20,000, you sat down with the government;

23   right?

24   A    That's the right chain of events, yes.

25             THE COURT:  Mr. Sharman, is now a good time for us to

1  take our break?

2          MR. SHARMAN:  Yes, ma'am.

3          THE COURT:  All right.  Ladies and gentlemen, we're

4  going to take our afternoon break now.  Leave your pads on your

5  chairs.  Take your break downstairs in the jury assembly

6  room.  No discussion about the case.  We will call you back up

7  in about 15 minutes.  We're in recess.

8      (A recess was taken at approximately 3:01 p.m.)

9      (In open court, 3:21 p.m., defendants and jury present.)

10          THE COURT:  All right, Mr. Sharman.

11          MR. SHARMAN:  Thank you, Your Honor.

12  Q   Mr. Palmer, before we broke, we were talking about some

13  events in January and February 2015.  Do you remember that

14  discussion before we broke?

15  A   Yes, sir.

16  Q   And this was a -- to put it mildly -- difficult time in

17  your life, was it not?

18  A   The worst.

19  Q   Because you had recognized and come to terms with your

20  addiction issues; right?

21  A   Correct.

22  Q   And you were leaving, being separated from the place where

23  you worked; right?

24  A   I was getting divorced, I knew I would be bankrupt, lose my

25  license, and it was -- it was bad.

THOMAS JUSTIN PALMER - CROSS BY MR. SHARMAN

```
 1   Q   Yes, sir.  It was a very difficult time, was it not?
 2   A   The worst time I can ever remember.
 3   Q   And in addition to all that, you knew that there were some
 4   potential legal issues involved; right?
 5   A   Not at that time, not prior to -- I mean, meeting with the
 6   DEA when they came to Hattiesburg.
 7   Q   All right.  At some time in early January or February of
 8   2015 you retained a lawyer; right?
 9   A   Yes.
10   Q   Ms. Hernandez; is that right?
11   A   My wife at that time retained her.
12   Q   All right.  So a lawyer was retained to represent you;
13   right?
14   A   Right.  I actually didn't even know what I needed one for.
15   Q   And, as you said, the DEA and the prosecutors came over to
16   your rehab place over in Hattiesburg; right?
17   A   Correct.
18   Q   And they interviewed you?
19   A   Yes.
20   Q   And it was a pretty good -- I won't go through the whole
21   list, but there was a pretty good number of them; right?
22   A   Yes, sir.
23            MR. SHARMAN:  May I approach, Your Honor?
24            THE COURT:  Yes.
25   BY MR. SHARMAN:
```

1   Q   Mr. Palmer, I'm going to show you what's been marked for

2   identification as Couch Exhibit 209 and ask you to take a look

3   at that, please, sir.

4           MS. GRIFFIN:  Your Honor, we don't object to its

5   admission as a proffer statement.

6           THE COURT:  All right.

7           MR. SHARMAN:  All right.  We'd move for the admission

8   of 209, please.

9           THE COURT:  All right.  Mark it in.

10       (Defendant Couch's Exhibit 209 was entered into evidence.)

11          MR. SHARMAN:  If we can have it on the screen and

12  published to the jury, please.

13  Q   Now, if you will turn, Mr. Palmer, to the third page, which

14  is the signature page?

15  A   Yes, sir.

16  Q   Do you see where I am?

17  A   I see it.

18  Q   Okay.  And is that signature yours there on the left?

19  A   That is.

20  Q   And that was your lawyer or your then lawyer's signature on

21  the right?

22  A   Yes, sir.

23  Q   And then that's Ms. Griffin right above, right above

24  y'all's signatures?

25  A   That's her printed name, yes.

THOMAS JUSTIN BALMER - CROSS BY MR. SHARMAN

```
 1   Q    All right.  And this is dated February 18th of 2015; right?

 2   A    Yes, sir.

 3   Q    All right.  And on February 18th of 2015 you were at the

 4   rehab facility; right?

 5   A    Yes, sir.

 6   Q    The one over in Hattiesburg?

 7   A    Correct.

 8   Q    So they carried this over there with them and had you sign

 9   it?

10   A    Right.

11   Q    While you were in rehab?

12   A    Correct.

13   Q    And, then, if you would look under the numbered paragraph

14   three or numbered section three, there's the second paragraph,

15   that begins:  It is further understood, do you see where I am?

16   A    Yes, sir.

17   Q    And it says there that it is further understood that after

18   the off-the-record proffer or discussion is held, then the

19   United States Attorney's Office for the Southern District of

20   Alabama will evaluate the information provided and will contact

21   you concerning whether or not an agreement can be reached as to

22   what concessions or recommendations, if any, the United States

23   Attorney for the Southern District of Alabama would be willing

24   to make on your client's behalf.  Do you see where I read that?

25   A    Yes, sir.
```

THOMAS JUSTIN PALMER - CROSS BY MR. SHARMAN

1   Q   And this was the first meeting you had with the government

2   representative; right?

3   A   Yes, sir.

4   Q   All right.  I'm going to switch topics, Mr. Palmer.

5   Forgive me if I jump around.  But I'll try to be efficient.

6           In your experience in pain management, that requires

7   some degree of trust between patient and doctor or patient and

8   nurse; right?

9   A   Yes, sir.

10  Q   And particularly in pain management, because the healthcare

11  provider has to be able in large part to depend on how the

12  patient presents and describes his or her condition; right?

13  A   Right.

14  Q   And that's -- that's because in general pain is subjective

15  rather than objective; right?

16  A   It is subjective, yes.

17  Q   There's -- there's no painometer that you can hook somebody

18  up to; right?

19  A   Correct.

20  Q   And that's why, for example, you're stuck with zero to 10

21  scales of pain; right?

22  A   Yes, sir.

23  Q   Or sometimes the frowny face versus happy face kind of

24  scale; right?

25  A   Correct.

1    Q   And that's certainly within the usual course of medical

2    practice and fair to use those tools when trying to figure out

3    the degree of a patient's pain; right?

4    A   It is a tool.

5    Q   Nothing unusual or wrong about that; right?

6    A   No.

7    Q   Now, to treat pain, PPSA's practice and Dr. Couch's

8    practice and your practice was not just about prescribing

9    pills; right?  There was more to it than that; right?

10   A   Correct.

11   Q   For example, Dr. Couch performed different procedures;

12   right?

13   A   Yes.

14   Q   Different kinds of blocks and epidurals so to speak?

15   A   Yes.

16   Q   He also with some patients implanted what are called pain

17   pumps; right?

18   A   Yes, sir.

19   Q   And briefly just tell us what a pain pump is.

20   A   It's a device that delivers pain medication directly into

21   the spinal canal, where you use less actual medication to

22   control the pain.  You know, it's implanted under the skin and

23   you come back, you know, at intervals to have it refilled.

24   Q   And in general the risk of diversion -- that is to say

25   drugs going someplace they shouldn't go -- it's less with an

THOMAS JUSTIN BALMER - CROSS BY MR. SHARMAN

1   implanted device like a pain pump than it is with a

2   prescription of pills?

3   A   Definitely for the patient, yes.

4   Q   And as you said, from time to time the pain pump has to be

5   refilled with the medication; right?

6   A   Yes, sir.

7   Q   And I believe you said at a couple of points on direct that

8   it was one of your duties from time to time to prepare or mix

9   some of the medicine that was to be used to fill or refill

10  patients' pain pumps; right?

11  A   It is one thing I did.

12  Q   And that is a common duty of nurses and other medical

13  staff; right?

14  A   I'm not sure about in this capacity where you actually mix

15  a large quantity under a ventilation hood.  I couldn't tell you

16  yes or no on that one.  But yes, nurses can mix medications and

17  administer them.

18  Q   And in particular, Dr. Couch had shown you with regard to

19  his pain pump patients how to mix the appropriate medications;

20  right?

21  A   I mixed the main medications that were used in the pain

22  pumps.  Those medications could have been mixed together, you

23  know, for individual patients.  But as far as the large

24  portions, I sometimes made those for the company.

25  Q   And I believe you testified to this on direct, but that was

3041

1    not compounding a new medicine but, rather, you were taking a

2    powder or other reduced form and putting it in solutions so it

3    could be delivered as opposed to putting two substances

4    together to make a new third substance?

5    A   Correct.

6    Q   All right.  On direct you were asked a few questions about

7    signatures and medical records and the contents of records, and

8    I want to go into that for a moment.  Now, before 2013 PPSA's

9    medical records were in a system called Medway; right?

10   A   I believe so.

11   Q   And in Medway, in general, notes and the charts that we've

12   been seeing were either handwritten or dictated or maybe both;

13   right?

14   A   Actually it was called Greenway, I believe.

15   Q   Well, did there come a time when Greenway was the new or

16   replacement system for -- I'm sorry -- MedScan.  I'm sorry.

17   MedScan and Greenway.  Was MedScan the earlier system and

18   Greenway the later system?

19   A   Right.  MedScan, I think, was just the handwritten

20   documents scanned into the computer, and Greenway was then the

21   electronic medical records.

22   Q   So PPSA switched from a system of handwritten or perhaps

23   dictated notes that were scanned into a system to what's called

24   EMR, electronic medical records; right?

25   A   Right.

3042

1  Q   That was the Greenway system; right?

2  A   Yes, sir.

3  Q   And that changeover from the one system to the other,

4  although it was accomplished, it wasn't as smooth as it might

5  have been; right?

6  A   I couldn't attest to how difficult it was.  I wasn't really

7  involved in handling medical records.

8  Q   All right.  With regard to Greenway and to electronic

9  medical records in general, there are some advantages and some

10  disadvantages to them; right?

11  A   Yes, sir.

12  Q   And some of the disadvantages are that electronic medical

13  records will tend to autofill fields; right?

14  A   Yes, sir.

15          MS. GRIFFIN:  Your Honor, we object to the relevance.

16  It's beyond the scope of direct as well.

17          MR. SHARMAN:  Your Honor, we --

18          THE COURT:  Sustained.

19  BY MR. SHARMAN:

20  Q   As far as you know, PPSA didn't adopt Greenway or any other

21  recordkeeping system in order to deceive insurance companies or

22  the government, did they?

23  A   No, sir.

24          MS. GRIFFIN:  Object to foundation.

25          THE COURT:  Sustained.

THOMAS JUSTIN BALMER - CROSS BY MR. SHARMAN
3043

 1  BY MR. SHARMAN:

 2  Q   And on direct you and Ms. Griffin talked a little bit about

 3  your caseload, how many patients you saw and the professional

 4  demands on your time.  Do you remember some of that discussion?

 5  A   Yes, sir.

 6  Q   And PPSA as a whole, including Dr. Couch's practice, grew

 7  considerably during your tenure there; right?

 8  A   Yes, sir.

 9  Q   And we're talking thousands and thousands of patients;

10  right?

11          MS. GRIFFIN:  Objection as to relevance, Your Honor.

12          THE COURT:  Overruled.

13  BY MR. SHARMAN:

14  Q   We're talking as it grew, thousands and thousands of

15  patients; right?

16  A   I'm not sure about the numbers, but it was a considerable

17  amount.

18  Q   And by the time you left, it had grown to be one of the

19  largest pain management clinics in this part of the Gulf Coast;

20  right?

21  A   Yes, I would say so.

22  Q   And that growth, while good in some ways, that could put

23  stress on people and systems at PPSA; right?

24  A   Yes, sir.

25  Q   It could put stress on healthcare providers; right?

THOMAS JUSTIN PALMER - CROSS BY MR. SHARMAN

1   A   Yes, sir.

2   Q   By increasing time demands; right?

3   A   Correct.

4   Q   Put stress on the recordkeeping?

5   A   Yes, sir.

6   Q   And on the billing and business side?

7           MS. GRIFFIN:  Objection, Your Honor, as to foundation

8   with regard to the billing system.

9           THE COURT:  Sustained.

10  BY MR. SHARMAN:

11  Q   On the subject of billing, as far as you know, Dr. Couch,

12  like you, didn't do any actual billing himself; right?

13  A   Correct.

14  Q   And you weren't intimately involved in sort of that end of

15  things, getting bills out, collections, all that kind of stuff;

16  right?

17  A   No, sir.

18  Q   And you weren't familiar with all the billing guidelines

19  from insurance companies, Blue Cross and Medicare and so forth;

20  right?

21  A   No, sir, I wasn't.

22  Q   But when you participated in a patient's office visit, one

23  of the things you did do was you had to fill out the form that

24  had the codes pertinent to that visit; right?

25  A   Correct.

1    Q    And is that what you call -- or is that system what you
2    call the CPT codes?
3    A    Yes, sir.
4    Q    And CPT codes are codes for procedures and other medical
5    activities that's set up by the American Medical Association;
6    right?
7            MS. GRIFFIN:  Your Honor, we object.  There is no
8    foundation.  It's beyond the scope of direct.
9            THE COURT:  Well, it is beyond the scope of
10   direct.  So I sustain the objection.
11   BY MR. SHARMAN:
12   Q    Well, when you saw a patient, as you discussed at length on
13   direct, after that visit at some point you had to code the
14   visit; right?
15   A    Right.  I generally marked the level office visit that I
16   felt was appropriate and the diagnosis and any procedures such
17   as if a drug screen was performed, I would mark that.
18   Q    And you always did that marking and coding to the best of
19   your ability; right?
20   A    Yes, sir.
21   Q    And you were always as accurate about that as you could be;
22   right?
23   A    Yes, sir.
24   Q    Okay.  And as truthful as you could be; right?
25   A    Yes, sir.

THOMAS JUSTIN BALMER - CROSS BY MR. SHARMAN

1  Q   And Dr. Couch didn't give you any particular instructions

2  one way or another about how to code or not code a particular

3  patient's visit; right?

4  A   No, he didn't.

5  Q   On direct you and Ms. Griffin touched on the subject of

6  retaining or firing patients.  Do you remember that discussion?

7  A   Yes, sir.

8  Q   Now, a doctor or a doctor's practice has a right to fire a

9  patient; right?

10  A   Yes, sir.

11  Q   And a patient could be fired for really several different

12  reasons potentially; right?

13  A   Yes, sir.

14  Q   And in pain management one of those reasons is failing to

15  abide by an opioid agreement or some of the conditions in that

16  agreement; right?

17  A   Yes, sir.

18  Q   And another reason to discharge a patient might be their

19  failure or at least their repeated failure of a urine drug

20  screen?

21  A   Yes, sir.

22  Q   Now, I think you testified on direct that from time to time

23  you fired or discharged patients; right?

24  A   Yes, sir.

25  Q   And from time to time there were patients that arguably, in

1   your professional judgment, you could have fired but you gave

2   them a second chance; right?

3   A   Yes, sir.

4   Q   And there were times that, you know, Dr. Couch fired

5   patients; right?

6   A   Yes, sir.

7   Q   And there were times when, although Dr. Couch in his

8   professional judgment could have fired a patient, he gave a

9   second chance as well; right?

10  A   Correct.

11  Q   And you didn't find anything inappropriate or wrong about,

12  in that situation, you exercising judgment to either give a

13  patient a second chance or not; right?

14  A   I didn't.

15  Q   And you didn't find anything wrong or peculiar about

16  Dr. Couch's exercise of that judgment either, did you?

17          MS. GRIFFIN:  Objection as to foundation, to

18  Dr. Couch's judgment.

19          MR. SHARMAN:  He was -- he was present, Your Honor.

20          THE COURT:  Well, you haven't established that.

21  BY MR. SHARMAN:

22  Q   All right.  Did you discuss patients and their files and

23  cases with Dr. Couch?

24  A   Occasionally.

25  Q   And sometimes arising from those discussions and the review

3048

1  of the charts, you came to understand that Dr. Couch sometimes

2  discharged patients?

3  A   Yes.

4  Q   And sometimes from those discussions and review of the

5  charts you also came to know that Dr. Couch gave some patients

6  a, so to speak, second chance just as you did; right?

7  A   Yes, sir.

8  Q   You didn't find anything wrong or peculiar about that;

9  right?

10  A   No, sir.

11  Q   As part or as a result of the growth that PPSA as a whole

12  experienced, there was a great deal to do, was there not?

13  A   Yes, sir, there was.

14  Q   And you were very diligent at working; right?

15  A   Not as diligent as I should have been, I think.

16  Q   But certainly you got there early in the morning; right?

17  A   I did.

18  Q   You stayed all day, worked the day through; right?

19  A   I did.

20  Q   And for example, although you had a PPSA email account, you

21  didn't really check it that often; right?

22  A   I never checked it.

23  Q   Because you were too busy, you were doing stuff; right?

24  A   My feeling was if it was that important, I was in the

25  office and somebody could tell me.

THOMAS JUSTIN BALMER - CROSS BY MR. SHARMAN

1    Q    And, you know, there were some points where you felt that
2    on a daily basis you were more or less running the clinic; is
3    that a fair statement?
4    A    Yes.
5    Q    And you had, as you established on direct, you had had
6    professional experience in emergency medicine and in the
7    hospital; right?
8    A    Yes, sir.
9    Q    And by that time you'd already gotten your undergraduate
10   and your master's in nursing; right?
11   A    Yes, sir.
12   Q    And you were already a certified nurse practitioner after
13   having taken the appropriate test; right?
14   A    Yes, sir.
15   Q    And even though you weren't a licensed physician, you had
16   indeed accumulated a reasonable amount of medical knowledge and
17   judgment; right?
18   A    Yes, sir.
19   Q    And Dr. Couch relied on -- was aware of and relied on that
20   judgment; right?
21          MS. GRIFFIN:  Objection as to foundation, Your Honor.
22          THE COURT:  Sustained.
23   BY MR. SHARMAN:
24   Q    In the course of all that, you came to have a professional
25   relationship with Dr. Couch; right?

THOMAS JUSTIN PALMER - CROSS BY MR. SHARMAN

1   A   Yes, sir.

2   Q   And you were able to work with him and observe him; right?

3   A   Yes, sir.

4   Q   And you were, after a certain amount of time, were able to

5   perceive that he -- with regard to that professional

6   relationship and your professional judgment -- valued it;

7   right?

8            MS. GRIFFIN:  Objection as to relevance, Your Honor.

9   A   Yes.

10           THE COURT:  Overruled.

11           MR. SHARMAN:  Can I lay a foundation for his

12  knowledge?

13           THE COURT:  Overruled.

14  BY MR. SHARMAN:

15  Q   And based on that knowledge and perception, you

16  appreciated -- meaning you understood that Dr. Couch admired

17  your qualifications and relied on it; right?

18  A   Yes, sir, I did appreciate that.

19  Q   I beg your pardon?

20  A   I did appreciate that.

21  Q   And so if you created a treatment plan for a patient after

22  your assessment of that patient and Dr. Couch did not disagree

23  with it, that wasn't a shock to you, was it?

24  A   No, sir.  Not after a certain amount of time, and once I

25  became familiar with how things worked.

3051

1  Q   And on occasion when he did disagree with an assessment or

2  treatment plan, he'd tell you; right?

3  A   Yes, sir.

4  Q   And in fact, that trust posed in you, that even extended to

5  physicians or healthcare providers even outside of PPSA; right?

6  A   I'm not sure.

7  Q   Well, for example, sometimes didn't doctors send their

8  patients to you when they, the referring physicians, thought

9  they might have drug issues?

10 A   Oh, yes, sir.  Yes, sir.

11         MS. GRIFFIN:  Your Honor, we object to the relevance.

12         MR. SHARMAN:  I'll move on, Your Honor.

13 Q   All right.  On direct you answered a few questions,

14 Mr. Palmer, about a couple of medications called Subsys and

15 Abstral.  Do you remember that discussion?

16 A   Yes, sir.

17 Q   All right.  And both Subsys and Abstral, as you said, I

18 believe, they are largely the same medication; right?

19 A   They are, yes, sir.

20 Q   They are fentanyl medications?

21 A   Yes, sir.

22 Q   And the FDA approved fentanyl for use with cancer patients

23 who were opioid intolerant [sic] and it was approved in those

24 patients for breakthrough pain; right?

25 A   For patients that are opioid tolerant.

THOMAS JUSTIN PALMER - CROSS BY MR. SHARMAN

1  Q   Yes, sir.  I guess for patients who are opioid tolerant who
2  are already on opioids; right?
3  A   Right.
4  Q   And for breakthrough pain?
5  A   Correct.
6  Q   And so that's the FDA indication for a fentanyl product;
7  right?
8         MS. GRIFFIN:  Objection, Your Honor.  It's a TIRF
9  product and we want to make sure we get those --
10        THE COURT:  Are you speaking about all fentanyl
11  products or just the TIRF drugs?
12        MR. SHARMAN:  Well, that's a fair point.  Let's just
13  stick with one, make it easy.
14  Q   Subsys.  Subsys was approved by the FDA for breakthrough
15  pain in cancer patients who were already on opioids; right?
16  A   Yes, sir.
17  Q   And when the FDA does that, that's often referred to as an
18  indicated use for that medication; right?
19  A   Correct.
20  Q   And what that indication does is it allows the
21  pharmaceutical company to market, to sell that medication, for
22  that purpose?
23  A   Yes, sir.
24  Q   There is also a usage for medications called off label;
25  right?

THOMAS JUSTIN PALMER - CROSS BY MR. SHARMAN

```
 1              MS. GRIFFIN:  Your Honor, I object to foundation.
 2   BY MR. SHARMAN:
 3   Q   Are you aware, Mr. Palmer, of the usage of medicine off
 4   label?
 5   A   Yes, sir.
 6   Q   Have you, yourself, been in situations or provided
 7   medicines in an off-label capacity?
 8   A   I believe so.
 9   Q   In fact, in your experience, that is fairly common; that is
10   to say, doctors and other healthcare professionals will provide
11   medicines --
12   A   Right.
13   Q   -- in an off-label capacity; right?
14   A   Yes, sir.
15   Q   And off-label use occurs when a doctor or other healthcare
16   professional decides in his or her professional judgment that
17   that medication will help that particular patient even if it's
18   not for the FDA-indicated purpose; right?
19              MS. GRIFFIN:  Your Honor, he has no foundation.  He's
20   testified that he could not prescribe anything.
21              THE COURT:  I sustain.
22   BY MR. SHARMAN:
23   Q   Do you know if that's what off-label use means?
24              MS. GRIFFIN:  And that's been asked and answered.
25              MR. SHARMAN:  I'm asking if he knows, Your Honor.
```

THOMAS JUSTIN PALMER - CROSS BY MR. SHARMAN

1        THE COURT:  Well, you've already asked him about

2   off-label use.  So let's move along.

3   BY MR. SHARMAN:

4   Q   All right.  I believe you testified on direct that,

5   although Abstral and Subsys were very similar medicines if not

6   identical, that in general you thought Abstral was better than

7   Subsys?

8   A   I thought it had a better delivery system.

9   Q   And when you say delivery system, you mean the way the

10  medicine gets in the patient's body?

11  A   Right.  Like where Subsys was a spray, a lot of times the

12  sprayer malfunctioned or people would not spray it in the right

13  place, and the box is huge, whereas Abstral was a small box and

14  is a small tablet, went under the tongue, and it just seemed

15  more logical than having that, Subsys.  (Indicating.)

16  Q   You thought it was a better product basically?

17  A   I did.

18  Q   And if a patient was prescribed Subsys, it became, at least

19  after the first month or so, a very expensive product for the

20  patient; right?

21  A   Yes, sir.

22  Q   And that was because Ins, the maker of Subsys, at least for

23  a certain portion of time, provided vouchers for patients;

24  right?

25        MS. GRIFFIN:  Your Honor, no foundation as to why it

 1   was or wasn't expensive, or not expensive.

 2         THE COURT:  I think he testified on direct about the

 3   voucher, so overruled.

 4   BY MR. SHARMAN:

 5   Q   Was that right, that Ins, the manufacturer of Subsys, at

 6   least for a while had a program where they would provide

 7   vouchers for patients?

 8   A   Yes, sir.

 9   Q   But thereafter, if the voucher was no longer available for

10   the patient, it could get quite expensive for the patient;

11   right?

12   A   That's what I recall, yes.

13   Q   And so when Dr. Couch or the clinic in general switched

14   patients from Subsys to Abstral, you didn't have a problem with

15   that; right?

16         MS. GRIFFIN:  Your Honor, I object to the foundation,

17   the clinic in general.  And there's no showing through this

18   witness that Dr. Couch switched people back and forth.  So it

19   would be no foundation.

20         THE COURT:  I sustain.

21         MR. SHARMAN:  I'll lay a foundation.

22   Q   I thought you testified on direct, Mr. Palmer, that from

23   time to time you and others at PPSA would switch a patient from

24   Subsys to Abstral or either the other direction; right?

25   A   Yes.

3056

1  Q   So when that happened, you didn't have a problem with it

2  because you thought Abstral was the better product anyway;

3  right?

4  A   Yes, sir, I did.

5  Q   All right.  You were asked a few questions on direct about

6  your number of patients that you saw and your compensation

7  related to the number of patients.  Do you remember some of

8  those questions?

9  A   Correct.

10  Q   By the time you left PPSA, you were compensated $60 for

11  each new patient and $22 for each followup patient; is that

12  right?

13  A   Sounds about right.

14  Q   It had been lower in earlier years and had increased over

15  time; right?

16  A   I think it started at 15 for followups and 55 for new

17  patients.

18  Q   All right.  And so I think you alluded to on direct you had

19  a personal incentive to see more patients rather than fewer

20  patients; right?

21  A   Yes, sir.

22  Q   You also testified on direct about urine drug screens.  Do

23  you remember some of those questions?

24  A   Yes, sir.

25  Q   All right.  Now, in general, in the practice and for your

1    work, the urine drug screen, if one had been obtained from a

2    patient, that had already happened by the time the patient got

3    to you; right?

4    A   Most of the time.

5    Q   Sometimes you had to deal with it, but in general that was

6    somebody else's job in the system; right?

7    A   Ideally.

8    Q   Now, based on your experience in pain management, it's

9    true, isn't it, that the prospect of a urine drug screen can

10   have a deterrent effect on behavior that we would rather not

11   see with regard to pain medication; right?

12   A   Yes, sir.

13   Q   And that's because obviously the patient knows that he or

14   she may be subject to a urine drug screen and that any misuse

15   or other inappropriate handling of medication may be

16   discovered?

17   A   Correct.

18   Q   The urine drug screen that was used at PPSA and Dr. Couch's

19   practice, that's sometimes referred to as an in-office or cup

20   urine drug screen; right?

21   A   Yes.

22   Q   As opposed to going to another professional's office or a

23   lab to have a test done there; right?

24   A   Yes, sir.

25   Q   And those in-office cup urine drug screens, they weren't

1    always completely accurate, were they?

2    A    No, sir, they weren't always accurate.  There are some

3    drugs that they would test false positives, some that wouldn't

4    show up.

5    Q    You could get false positives or you could get false

6    negatives; right?

7    A    Yes, sir, and we had that happen.

8    Q    And that's what some people refer to as inconsistent test

9    results; right?

10   A    Yes, sir.

11   Q    And a false positive means positive for medications they

12   shouldn't have; right?

13   A    Yes, sir.  I think like Protonix can cause a false positive

14   for marijuana and some anti-virals that people with HIV use can

15   cause false positives for marijuana and we've had that happen

16   before where we've had to take patients off the medication, off

17   their opiates, because they were positive on their urine drug

18   screen done in the office until the GC-MS comes back, the one

19   we send out.

20   Q    Now, by itself, an inconsistent drug screen wasn't a reason

21   to stop treating a patient for their pain, was it?

22   A    Not always, not always.

23   Q    It was a factor, but it wasn't a determinative factor by

24   itself?

25   A    Correct.

1   Q   Fair enough.

2        MS. GRIFFIN:  Your Honor, I object to counsel

3   commenting on the answers that the witnesses give.

4        THE COURT:  Yes.  No commenting, please.

5        MR. SHARMAN:  Yes, ma'am.

6   Q   When there were inconsistent urine drug screens,

7   Mr. Palmer, would you from time to time discuss those results

8   with patients?

9   A   Yes, sir.

10  Q   And that was an appropriate thing to do; right?

11  A   Yes, sir.

12  Q   All right.  Now, on direct, Mr. Palmer, you talked about a

13  person that Ms. Griffin identified as person A.  Do you

14  remember some of those discussions?  I mean some of those

15  questions?

16  A   Yes, sir.

17  Q   And can you remind us again of what it was that you did

18  with person A?

19  A   Are we talking about the person that came in that was in

20  withdrawals?

21  Q   No, sir.  I believe this was the person for whom you wrote

22  a prescription for Adderall; is that right?

23  A   Okay.  What was your question?

24  Q   So there was a person you got to be social or professional

25  friends with?

1   A   Right.

2   Q   This person A; right?

3   A   Right.

4   Q   And then there came a time when you wrote a prescription

5   for that person in his name; right?

6   A   Yes, sir.

7   Q   And on that prescription you forged Dr. Couch's signature;

8   right?

9   A   Yes, sir.

10  Q   And you did the same for person A's family members; is that

11  right?

12  A   Yes, sir.

13  Q   Okay.  And to sort of make that look better, you created

14  dummy files for those folks at PPSA; right?

15  A   I did.

16  Q   To make it look like they were patients; right?

17  A   Right.

18  Q   But they really weren't?  Or maybe one was?

19  A   I mean, they weren't there for -- I mean, I had no business

20  prescribing what I did.  So --

21  Q   Yes, sir.  But you created files to make it look like they

22  were --

23  A   Yes, sir.

24  Q   -- patients; right?

25  A   Yes.

3061

1  Q   All right.  I believe you said that Dr. Couch found out

2  about this; right?

3  A   He did when one of the -- the pharmacy faxed the

4  prescription back.

5  Q   And you said that Dr. Couch was not happy about this?

6  A   No, he wasn't.

7  Q   You said that he did not care for person A anyway; right?

8  A   Correct.

9  Q   And he wasn't happy with you for doing this; right?

10  A   That's an understatement.

11  Q   And he discharged you, he fired you?

12  A   Yes.

13  Q   But then he had second thoughts?

14  A   Yes.

15  Q   And gave you a second chance?

16  A   Yes.

17  Q   All right.  On direct, Mr. Palmer, you had a few questions

18  from Ms. Griffin about your forging of Dr. Couch's signature on

19  prescriptions and his awareness or lack thereof of that.  Do

20  you remember some of those questions and answers?

21  A   Yes, sir.

22  Q   And I believe you said -- but correct me if I'm wrong --

23  that it would be hard for me to say if he was not aware?  Do

24  you remember saying that or something pretty close to it?

25  A   Yes, sir.

3062

1   Q   Now, sitting here today under oath, you can't affirmatively

2   say that in fact Dr. Couch knew what you were or were not

3   forging with regard to prescriptions; right?

4   A   That's why I said it would be hard for me to say.  I can't.

5   Q   You really can't?

6   A   No.

7   Q   And similarly, Ms. Griffin asked you a few questions about

8   prescription pads that were signed and signed in blank.  Do you

9   remember some of those questions?

10   A   Yes, sir.

11   Q   And you described, I believe, that there were a total of

12   five or six pads that fit that description; is that right?

13   A   Well, that was, you know, only on one episode.  I mean,

14   there were other occasions when they were left, you know,

15   prescription pads were left.

16   Q   Okay.  And when you think of a pad, are we talking about

17   something like with a bunch of pieces of paper in it?

18   A   Yes, like a Post-it note pad.

19   Q   Maybe a little bit bigger than a Post-it note, but

20   something with a bunch of pages in it; right?

21   A   Probably about 40 pages in it.

22   Q   And if I understood your testimony on direct, you said that

23   Dr. Couch perhaps, when he was going out of town or for other

24   purposes, would sign those prescription pages in those pads and

25   otherwise leave them blank; right?

1   A   Yes, sir.

2   Q   And you said that you or others would fill them in; right?

3   A   It was generally just me that I know of.

4   Q   You also said, I believe, that there was a duplicate page

5   behind the original prescription; right?

6   A   Yes, sir.

7   Q   And you said that that was on yellow paper; right?

8   A   Carbon copy.

9   Q   It was essentially one of those things where you would

10  write on it and whatever you wrote, even though there wasn't a

11  piece of actual carbon paper, it would just copy what was on

12  the top?

13  A   Right, right.

14  Q   And the bottom copy that was the duplicate, you said, was

15  yellow colored; right?

16  A   Yes, sir.

17  Q   All right.  And Ms. Griffin on direct showed you one yellow

18  copy; do you remember seeing that?

19  A   Yes, sir.

20  Q   And you said that that -- the yellow copy was the one that

21  would go in the file?  Was that right?

22  A   Yes, sir.

23  Q   Now, other than that one yellow copy which was Exhibit

24  4-11, other than that one yellow copy, Mr. Palmer, have you

25  seen any other yellow copies that are supposedly a prescription

1  signed in blank by Dr. Couch?  Other than the one that

2  Ms. Griffin showed you today, which is 4-11?

3        MS. GRIFFIN:  Your Honor, we would ask for some type

4  of a time frame or some reference or some location or some

5  specificity to the question.  Otherwise there's no foundation.

6  BY MR. SHARMAN:

7  Q   Since you left PPSA, Mr. Palmer --

8  A   Yes?

9  Q   -- have you seen any yellow duplicate copy that is an

10 alleged copy of a signed in blank prescription by Dr. Couch

11 other than Exhibit 4-11, the one that Ms. Griffin showed you

12 today?

13       MS. GRIFFIN:  And what's the relevance, if it's after

14 he left?  We would object to that, Your Honor.

15       MR. SHARMAN:  Your Honor, I'm just trying to find out

16 if the witness, having testified on direct about yellow copies

17 of supposedly presigned prescriptions in blank, has been shown

18 any or knows of any other than Exhibit 4-11.

19       THE COURT:  Well, they wouldn't be in the file, would

20 they, unless they were prescribed?  I mean, I don't understand

21 the basis for the question.  So I sustain the objection.

22 BY MR. SHARMAN:

23 Q   Mr. Palmer, have you ever pointed the government to any

24 particular actual pieces of paper --

25 A   No.

1  Q  -- yellow -- okay, let me finish my question -- yellow or

2  otherwise that you contend is an example of Dr. Couch signing a

3  blank prescription?

4  A  No.

5  Q  Has the government ever shown you, other than the one we

6  just saw this afternoon, 4-11, an example of what is supposed

7  to be a prescription signed in blank by Dr. Couch?  Has the

8  Government ever showed you that?

9       MS. GRIFFIN:  Your Honor, we object to the form of the

10  question.  He can break it down.  It's confusing for anyone.

11       MR. SHARMAN:  I'll ask it.

12  Q  Mr. Palmer, has the government -- anybody at that table --

13  ever shown you a piece of paper that they contend is a copy of

14  a prescription signed in blank by Dr. Couch other than Exhibit

15  4-11?

16  A  I have not seen or been shown by anyone at that table a

17  blank prescription signed by Dr. Couch.

18  Q  And you haven't pointed out any to them either; right?

19  A  I don't think I have.  Not a blank one.

20  Q  Not a -- that's what we're talking about.  We're talking

21  about signed blank prescriptions.  You haven't pointed out to

22  them and said:  Hey, here's an example of a signed blank

23  prescription; right?

24  A  No, I haven't.

25  Q  And just to be clear, when I was saying blank, I meant a

1  prescription signed by Dr. Couch left in blank, which then

2  you -- or maybe somebody else, but probably you -- then filled

3  in the medication for; right?

4  A   Right.

5  Q   All right.  On direct you talked a little bit about new

6  patients versus returning patients and the different events

7  that would occur with new patients versus returning patients.

8  Do you remember some of those questions?

9  A   Yes, sir.

10  Q   And I believe you said that Dr. Couch most always saw new

11  patients; is that right?

12  A   Yes, sir.

13  Q   That was his general practice?

14  A   In general.  There were some occasions where they were

15  scheduled and he wasn't there and I saw them.

16  Q   And in general the way that worked is that you would do the

17  complete examination or an examination as complete as you

18  thought was appropriate for that particular patient; right?

19  A   Yes, sir.

20  Q   And then Dr. Couch, the custom was, would come in and

21  examine more specifically the area of complaint or concern that

22  had brought the patient in in the first place?

23  A   Yes, sir.

24  Q   And in doing that, Mr. Palmer, you believed that you were

25  providing good care to these people who were in pain; right?

1    A    Yes, yes, sir.

2    Q    And you believed Dr. Couch was providing good care to these

3    people that were in pain; right?

4    A    Yes, sir.

5    Q    You weren't setting out to intentionally harm anybody;

6    right?

7    A    Oh, no, sir.

8    Q    Similarly, with regard to new patients, Ms. Griffin on

9    direct asked you a few questions about when Dr. Couch might go

10   out of town and would any activities or the schedule, at least

11   insofar as it impacted you, would change.  Do you remember a

12   couple of questions about that?

13   A    Yes, sir.

14   Q    I believe you said that Dr. Couch normally might go out of

15   town three or four times a year?

16   A    That would be an estimate, yes.

17   Q    And that you said your day-to-day practice didn't change on

18   those occasions except that there were no new patients seen;

19   right?

20   A    In general.

21   Q    Okay.  You'd see returning patients for whom there was

22   already a record and an assessment and so forth?

23   A    Yes, sir.

24   Q    But you wouldn't see new patients unless he was back in

25   town; right?

1    A    Correct.

2    Q    There were three physicians at PPSA as a whole; right?

3    A    Yes, sir.

4    Q    Dr. Couch; right?

5    A    Dr. Couch, Dr. Ruan, and Dr. Chen.

6    Q    So even if or when Dr. Couch was out of town, there was

7    always at least one other physician there either at Airport

8    Boulevard or at Springhill; right?

9    A    Yes, sir.

10   Q    All right.  You got a few questions on direct about how you

11   handled paper files and acknowledging them and then how

12   Dr. Couch handled them after you did.  Do you remember some of

13   those questions?

14   A    Yes, sir.

15   Q    So you said your practice would be, with regard to the

16   files, that you would sign or acknowledge whatever you needed

17   to sign or acknowledge; right?

18   A    Correct.

19   Q    And here I'm talking about paper files like you actually

20   had to, I think, carry over someplace?  Okay?

21   A    Yes, sir.

22   Q    You said you would do that and then you would take files

23   that you had signed off on and you'd take them to Dr. Couch's

24   office and lay them on a desk; right?

25   A    Yes, sir.

1  Q   And he would sign them although it sounds like sometimes he

2  was kind of tardy about signing them; is that right?

3  A   Yes, sir.

4  Q   You said they kind of pile up sometimes; right?

5  A   Correct.

6  Q   Did you ever observe his tardiness in signing anything to

7  affect any patient care?

8  A   No, sir.

9  Q   And you don't know, once you put those files on the desk,

10 the extent of his review of those files once they were there;

11 right?

12 A   No, I don't know.

13 Q   There were times, were there not, Mr. Palmer, where you and

14 Dr. Couch would discuss a patient situation or condition or

15 chart outside the presence of the patient; right?

16 A   Yes, sir.

17 Q   So those discussions occurred and a patient might not ever

18 even know they happened; right?

19 A   Correct.

20 Q   We were talking about Abstral and Subsys a moment ago.  And

21 forgive me; I should have asked you this.  On direct you got a

22 few questions about speaking with Dr. Couch about patients and

23 identifying patients who could be Abstral patients.  Do you

24 remember some of those questions?

25 A   Yes, sir.

1    Q   And if I understood you correctly, what you were doing was

2    identifying patients who in your professional judgment or

3    Dr. Couch's judgment would be suitable candidates for Abstral;

4    right?

5    A   Yes, sir.

6    Q   You weren't just grabbing people by place in the alphabet

7    or something; right?

8    A   No.

9    Q   All right.  You were asked a few questions on direct,

10   Mr. Palmer, about conversations that you had had with Dr. Couch

11   about the use and prescription of certain particular

12   medications, including Roxicodone, and certain particular

13   dosage amounts.  Do you remember some of those questions?

14   A   Yes, sir.

15   Q   And that in general the policy was to not write

16   prescriptions in so-called triple digits; right?

17   A   Yes, sir.

18   Q   And that was the policy in general, was it not?

19   A   Yes, sir.  I mean, that's something that when I first

20   started, I mean, that was kind of understood that you don't do

21   that.

22   Q   It happened occasionally, did it not?

23   A   It did, it did.

24   Q   And that in general patients who came to the clinic with a

25   benzo prescription were referred back to their primary care

1  physician or whoever had sent them to obtain additional benzos;

2  right?

3  A    In general if they were written by their primary care, we

4  would rather their primary care continue to write them.  But a

5  lot of times the primary care felt that it was our duty to do

6  it, since we prescribed other controlled substances.  So --

7  Q    That the primary care physician didn't want to do it and

8  they said:  You guys need to take care of it?

9  A    They pawned it off to us.

10 Q    I'm sorry?

11 A    They kind of pawned it off to us to do.

12 Q    And in general you thought those were good practices;

13 right?

14 A    Which practice?

15 Q    To try to avoid writing triple digit prescriptions?

16 A    Yes.

17 Q    And to, where appropriate in the circumstances, send the

18 patient back to the originating physician for their benzo

19 prescriptions or other medications that were not necessarily

20 immediate, you know, pain medications?

21 A    I think that would have been optimal, yes.

22 Q    All right.  In your discussion on direct, you responded to

23 a few questions about whether or not you thought patients at

24 PPSA or Dr. Couch's patients were overwritten.  Do you remember

25 some of those questions?

1  A   Yes, sir.

2  Q   And you said that you thought that at least half the

3  patients you saw, you thought, were overwritten; is that

4  accurate?

5  A   Yes, sir.  I believe it is accurate.  At least half.  I

6  think that's a fair representation.  And that's my opinion.

7  Q   And sitting here today under oath, you don't have an

8  affirmative recollection of raising that observation to

9  Dr. Couch, do you?

10  A   No, I don't have a recollection of specifically talking

11  about, you know, there's too many people that are -- the

12  patients are on too much medicine.

13  Q   And on the subject of firing patients, I believe you

14  testified on direct that in general, although Dr. Couch sort of

15  personally discharged a patient from time to time, in general

16  that job was delegated to you, is that a fair statement?

17  A   Yes, sir.

18  Q   Did you find anything inappropriate or wrong about that?

19  A   Delegating me to discharge somebody?

20  Q   Yes, sir.

21  A   No, I didn't.

22  Q   Also on direct you got a few questions about the issue of

23  diversion and in particular whether patients were selling their

24  medications.  Do you remember some of those questions?

25  A   Yes, sir.

1  Q   And if my notes are correct, you said that you had a

2  suspicion that that happened from time to time, but you didn't

3  have any actual factual knowledge about that; is that right?

4  A   I mean, if I had actual factual knowledge, I mean, the

5  person would have been discharged from the practice.

6  Q   I'm sorry, sir.  I couldn't hear you.

7  A   If I had actual factual knowledge, the person would have

8  been discharged from the practice.  That's just something that

9  -- I mean, there's always a suspicion.  But that's all it is.

10 Q   And you, you never relayed that suspicion to Dr. Couch;

11 right?

12 A   I may have.  I can't recall any particular times.  You

13 know, if there was a suspicion, there would be certain steps

14 taken like a random pill count or urine drug screen or

15 something like that.

16 Q   So when he did have those suspicions, at least some form of

17 action was taken; right?

18 A   Yes, sir.

19 Q   And earlier in your tenure at PPSA, there were occasional

20 urine drug screens of employees; right?

21 A   No, there was -- not that I know of.  I don't remember any.

22 Q   But there came a time when there were more regular drug

23 screens; right?

24 A   No.  There was just -- I think it was December of '14 where

25 they just tested everybody.

1  Q   And that's the only one that you personally recall?

2  A   That's -- yeah.  There might have been one or two people

3  that were tested because of suspicion or something.  But I

4  couldn't tell you that for sure.  I mean, it was just one month

5  that everybody was supposed to get drug screened.

6  Q   And you said that you passed that drug test at PPSA; is

7  that right?

8  A   Yes, sir.

9  Q   And you said, I believe, that you had used somebody else's

10  urine; is that right?

11  A   Yes, sir.

12  Q   Okay.  Where did you obtain that?

13  A   From a friend of mine.

14  Q   Was that the only time you falsified a urine test at PPSA?

15  A   That's the only time I've ever falsified my own urine test,

16  yes -- or any urine test actually.

17      (A discussion was held off the record between defense

18  counsel.)

19          MR. SHARMAN:  Court's indulgence, Your Honor.  I'm

20  trying to organize this.

21  Q   Mr. Palmer, given the number of patients that you saw, it's

22  reasonable to assume that from time to time you made a mistake

23  somewhere in somebody's record; right?

24  A   Yes, sir, I'm sure I made plenty of mistakes.

25  Q   You never intentionally made a false entry in a patient's

1    record, did you?

2    A    No.

3    Q    As far as you know, Dr. Couch never made a false entry in

4    anybody's record; right?

5            MS. GRIFFIN:  Objection as to foundation.

6            MR. SHARMAN:  As far as he knows, Your Honor.

7            THE COURT:  Overruled.

8    BY MR. SHARMAN:

9    Q    As far as you know, Dr. Couch never made a false entry in

10   any patient record; right?

11   A    No.  As far as I know, no.

12   Q    And as far as you know, nobody at PPSA made a false entry

13   in any patient record; right?

14   A    As far as I know, no.

15   Q    On direct, Mr. Palmer, on the subject of the quality of

16   your forgery of Dr. Couch's signature, I believe you said that

17   there are times that even you can't tell the difference anymore

18   which is which; right?

19   A    Yes, sir.

20   Q    And that would be especially true after the passage of

21   time; right?

22   A    Yes, sir.

23   Q    Mr. Palmer, did you or Dr. Couch or you at Dr. Couch's

24   request refer patients out for psychiatric treatment or

25   counsel?

1    A   We did for patients that were candidates or potential

2    candidates for spinal cord stimulators or pain pumps.  They

3    would have to have a psychiatric screening before that process

4    was started.

5    Q   And why in particular for those patients?

6    A   Because they were having an implantable device placed and

7    it was a requirement of, I believe, Medicare or -- well, the

8    insurance company.

9    Q   It was some external requirement --

10   A   Right, right.

11   Q   -- that that be obtained before the procedure?

12   A   Right.

13   Q   And I believe you testified on direct, Mr. Palmer, that you

14   had no advanced knowledge of the raid on PPSA on May 20th; is

15   that right?

16   A   No, I didn't have any advance knowledge of that.

17   Q   And that had not been communicated to you by the government

18   in any way; right?

19   A   I mean, I think I heard it was going to happen, but I

20   didn't know when or -- you know.

21   Q   Did you hear that from the government or did you hear it

22   from somebody else?

23   A   I don't think I heard it from the -- I don't, I don't

24   remember.  I don't think I heard it from the government though.

25        (A discussion was held off the record between defense

1  counsel.)

2  BY MR. SHARMAN:

3  Q   If somebody were to claim, Mr. Palmer, that you prescribed

4  more medications to them than was appropriate in the hopes of

5  them bringing them back for your advantage, for you to use,

6  would that be true?

7  A   No.

8  Q   That never happened?

9  A   No.

10         MR. SHARMAN:  Mr. Palmer, I appreciate it and I thank

11  you.  No more questions.

12         THE COURT:  Mr. Knizley?

13         MR. KNIZLEY:  We don't have any questions of this

14  witness, Your Honor.

15         THE COURT:  All right.  Any redirect?

16         MS. GRIFFIN:  Briefly, Your Honor.

17                     REDIRECT EXAMINATION

18  BY MS. GRIFFIN:

19  Q   Mr. Palmer, did you know ahead of time about the urine drug

20  screen?

21  A   The one that I was supposed to take?

22  Q   Yes, the one you told us you took.

23  A   Yes.

24  Q   Is that how you were able to prepare and have someone

25  else's urine?

 1  A    Yes.

 2  Q    So it wasn't a surprise test, was it?

 3  A    No, it wasn't.  And it took place at an outside facility.

 4  It wasn't there at the office.

 5  Q    Would other people at the PPSA have known when the drug

 6  test was going to be?

 7  A    I think they all had a certain amount of time to have it

 8  done.

 9  Q    So it wasn't a surprise for people to go there and be

10  tested, was it?

11  A    No, huh-uh.

12  Q    Now, you made up, you told us, for person A, you made up a

13  dummy patient file; is that right?

14  A    Yes.

15  Q    So that was a false file?

16  A    Yes.

17  Q    And there were false files in PPSA, then?

18  A    The one -- yeah, I mean, the ones that I made up, yeah,

19  that I know of.

20  Q    And if there was a file that said someone saw a patient who

21  hadn't seen a patient, would that be a false file?

22  A    Yes.

23  Q    I want to go back to where you said that you believed that

24  over -- or right at half the patients were overmedicated.  Were

25  you a doctor?

1  A   No.

2  Q   Were you board certified in pain management?

3  A   No.

4  Q   You could tell these people were overmedicated?

5  A   I felt I could.

6  Q   Certainly people more trained and more experienced than you

7  would be able to look at them and form their own opinion as

8  well?

9  A   Yes.

10         MR. SHARMAN:  Object to leading.

11         THE COURT:  Overruled.

12  BY MS. GRIFFIN:

13  Q   You also said that you didn't read the emails, that you

14  depended on people to tell you what was important if it was

15  important; is that right?

16  A   Yes.  I figured if it was that important that I needed to

17  know about it right then, somebody would tell me.

18  Q   Did Dr. Couch or Dr. Ruan ever tell you that anything you

19  were doing was inappropriate or wrong?

20  A   I wasn't told directly by them that I can remember, besides

21  the time I wrote the prescription and was dismissed.

22  Q   I can't hear you, sir.

23  A   The only -- I mean, I can't ever remember directly being

24  told that.  I don't think they would have had to tell me.  I

25  mean, I already knew it.

1   Q   Do you think they knew it too?

2          MR. SHARMAN:  Objection.  Speculation.

3          MR. KNIZLEY:  Objection.

4          THE COURT:  I beg your pardon?

5          MS. GRIFFIN:  I asked if he thought they knew that he

6   was doing things wrong as well.

7          MR. SHARMAN:  And we object to speculation about

8   somebody else's thought pattern.

9          THE COURT:  Overruled.

10  A   I think, yeah, I agree they probably thought the same

11  thing.

12  BY MS. GRIFFIN:

13  Q   That you were doing things you shouldn't have been doing?

14  A   Yes.

15  Q   Is that correct?

16  A   Yes.

17  Q   I show you the agreement your estranged spouse signed on

18  your behalf that was shown to you by Dr. Couch for payment.

19  A   Yes.

20  Q   For the second page on the screen -- and that's Defense

21  Exhibit Couch 208, page two, paragraph three.  In consideration

22  of receipt of the payment, you agreed to accurately and

23  completely finalize any outstanding pending charts of patients

24  for which he -- being you -- provided treatment prior to his

25  absence from PPSA; is that what you agreed to do?

1   A   Yeah, I guess I need to do that.  I haven't done it yet.

2   Q   On the first page, they knew you were addicted and needed

3   treatment; right?

4   A   Yes, ma'am.

5   Q   And you were addicted and needed treatment?

6   A   Yes, ma'am.

7   Q   But you were going to receive a payment to complete charts

8   of patients?

9          MR. SHARMAN:  Object to the form.

10         THE COURT:  Overruled.

11         MR. SHARMAN:  The document speaks for itself.

12         THE COURT:  Overruled.

13  BY MS. GRIFFIN:

14  Q   Is that; right?

15  A   That's what it says.  This is the first time I've actually

16  read it.

17  Q   Does it also say -- paragraph four, page two, Couch 208 --

18  that you were not to say anything bad about PPSA?

19  A   That's what it says.

20  Q   So you received a payment to fix some charts.  Did you fix

21  any such charts?

22  A   No, I haven't.

23  Q   And were you to not say anything or air any commentary

24  about PPSA and its practice?

25  A   That's -- I mean that's --

THOMAS JUSTIN PALMER - REDIRECT BY MS. GRIFFIN

1  Q   I can't hear you, sir.

2  A   That's what it says.

3  Q   In connection with your plea agreement, which the United

4  States introduced and the defense showed you as well, did it

5  state that should you provide untruthful information to the

6  United States, what would happen?

7  A   (Reading.)  What was the question again?

8  Q   Do you understand what would happen if you provided

9  untruthful information?

10 A   Yes.

11 Q   What was that?

12 A   If I provide untruthful information or fail to disclose

13 anything, that the United States will not make a downward

14 departure for my sentence.

15 Q   And also said if you committed a new crime?

16 A   Right.

17 Q   Did it set out what would result in a breach of your plea

18 agreement?  What would mean the plea agreement was null and

19 void?

20 A   It looks like it would constitute a waiver.

21 Q   You've seen this before; right?

22 A   Yeah, I have.  But I haven't paid real close attention to

23 all the legal jargon in there.  But --

24 Q   Your attorney went over it with you?

25 A   He did.

THOMAS JUSTIN PALMER - REDIRECT BY MS. GRIFFIN

```
 1  Q   And the Court asked when you pled guilty if you understood
 2  it?
 3  A   Yeah.
 4  Q   So do you see where it says that any breach of this
 5  agreement -- right?
 6  A   Right.
 7  Q   What could happen?  Could other charges be brought?
 8  A   Yeah, I could be charged with other things.
 9  Q   And you could be prosecuted for things pertaining to not
10  being truthful?
11  A   Right.
12  Q   Did you understand that this agreement was between you and
13  the United States?
14  A   Yes.
15  Q   And not between you and the Court?
16  A   Yes.
17  Q   Now, you said you thought Dr. Couch knew you were signing
18  his name and writing scripts?
19  A   Right.
20  Q   You were seeing a number of patients every day; is that
21  right?
22  A   Yes.
23  Q   And you were making $22 a patient on a repeat patient?
24  A   Yes.
25  Q   PPSA made more than that on a return patient each day;
```

 1    right?

 2          MR. SHARMAN:  Object to foundation.

 3    BY MS. GRIFFIN:

 4    Q    Do you know whether or not they did?

 5    A    I would assume if they could pay me $22, they would have to

 6    make more than that.

 7    Q    I show you what was previously shown to you, Government's

 8    Exhibit 9-1(2).

 9          MR. KNIZLEY:  Your Honor, I object.  That's for my

10    client outside the scope.  There was no cross, so it's not a

11    matter of cross on redirect.

12          MS. GRIFFIN:  Your Honor, he was asked if Dr. Couch

13    knew that he was writing prescriptions, and this directly

14    addresses that issue and we contend it is appropriate for

15    redirect.

16          THE COURT:  I think so.  Overruled.

17    BY MS. GRIFFIN:

18    Q    You've seen this before today; right?

19    A    Yes.

20    Q    From reading this, does it say that you, Dr. Couch, should

21    talk to Justin on cutting out Roxicodone usage and OxyContin?

22    A    Yes, it says --

23    Q    Does it say:  Please remind Justin?

24    A    Yes.

25    Q    Did Dr. Couch review that with you?

3085

1   A   We did talk about that.

2   Q   Does his response to Dr. Ruan say:  We do not write triple

3   digit dispensions?

4   A   Yes.

5   Q   Did you have any authority to write anything?

6   A   I didn't have any authority to prescribe.  I mean, I could

7   write it, but technically he was supposed to sign it.  So --

8   Q   You were not authorized to sign, were you?

9   A   No.

10  Q   You were not licensed to sign, were you?

11  A   No.

12  Q   You were not a doctor, were you?

13  A   No.

14  Q   You were not authorized in any manner by DEA?

15  A   No.

16  Q   Or your type license?

17  A   No.

18  Q   Or your type training, were you?

19          MR. SHARMAN:  Objection.  Leading.

20          THE COURT:  Overruled.

21  A   No, I wasn't authorized.

22  BY MS. GRIFFIN:

23  Q   Now, you indicated that you had previously been in the

24  courtroom to go over what the question-and-answer process

25  looked like in a trial; is that right?

3086

1   A   Correct.

2   Q   It wasn't just you and Mr. Bodnar here in this courtroom,

3   was it?

4   A   No.

5   Q   There were agents, and I was present as well?  There were

6   other people besides you and Mr. Bodnar when you came into this

7   courtroom where nobody was present?

8   A   Right.  You were here and Mr. Bodnar was here.

9   Q   And you recall the agent being here?

10  A   Uh, I don't recall the agent.

11  Q   Did anybody at that time tell you to say anything other

12  than to tell the truth to this jury?

13  A   No, that's been the whole focus, is just tell the truth and

14  it will be okay.

15  Q   You talked about with Dr. Couch's attorney that there had

16  to be some trust in the doctor-patient relationship; is that

17  right?

18  A   Yes.

19  Q   Was there time enough for that to develop with Dr. Couch

20  seeing the patients for two to five to seven minutes that

21  you've testified about?

22  A   No, not with new patients, I don't -- (shaking head

23  negatively).

24  Q   Did he see the old patients, the people who were returning?

25  A   Occasionally.  Not very often.  But he -- before I started

 1  there, I mean, he had been seeing them.

 2  Q   So it's a doctor-patient relationship, not a nurse

 3  practitioner relationship that's important; is that correct?

 4  A   As far as -- I mean, I think --

 5  Q   Does a doctor have to form a relationship with a patient,

 6  doctor-patient relationship, to properly assess and prescribe

 7  for that patient?

 8  A   I think that would be advisable.  It doesn't have to -- I

 9  don't know if it really has to be done that way.

10  Q   Do you know that it couldn't be done the way you did it?

11  A   No, that's not the right way to do it.

12  Q   You indicated that you were taught how to mix controlled

13  substances by Dr. Couch and his company.  Are you talking about

14  a company other than PPSA?

15  A   It was the compounding company.  I believe there's some

16  name for it.

17  Q   Was there a compounding company that Dr. Couch had?

18  A   I think so.  But I'm not sure.

19  Q   Well, now, you mentioned the word "company."  So tell us

20  what you mean.

21  A   I think there was previously like a compounding company

22  that did the -- the charging of the medicines or

23  something.  I'm not sure.

24  Q   Were you paid by another company --

25  A   No.

1  Q   -- for mixing up medicine?

2  A   No, no.

3  Q   Do you know whether Dr. Couch had another company that was

4  paid for mixing controlled substances?

5  A   No, I don't know anything about that.

6  Q   You do not know?

7  A   No.

8  Q   And all this time you've talked about with us you were

9  using Dilaudid every day?

10  A   Yes.

11  Q   Saturdays and Sundays too?

12  A   Every -- multiple times a day every day.

13  Q   I just want to make sure.  You had no authority to write

14  controlled substances and sign your name?

15          MR. SHARMAN:  Asked and answered and ambiguous.

16          THE COURT:  I sustain.

17  BY MS. GRIFFIN:

18  Q   What authority did you have when it came to writing

19  controlled substances?

20  A   None until October of 2014.  After 2014 I could write

21  limited controlled substances, but none of them that were --

22  very few were really relevant to what we generally prescribed.

23  Q   Could you write schedule IIs after October?

24  A   No.

25  Q   You were only there from October the 1st of '14 till when?

 1          MR. SHARMAN:  Asked and answered, cumulative, leading.

 2          THE COURT:  Overruled.

 3      (A discussion was held off the record between counsel.)

 4  A   I was there from October of 2014 till the end of December

 5  of '14.

 6  BY MS. GRIFFIN:

 7  Q   Let's talk about the files that you said you left on

 8  Dr. Couch's desk.  You left them there.  Did they contain

 9  copies of scripts that you had signed Dr. Couch's name on?

10  A   Yes.

11  Q   Those would have been visible that somebody had signed the

12  name Dr. Couch if somebody had looked at them?

13  A   Correct.

14  Q   You don't know whether they were looked at or not, do you?

15  A   No.

16  Q   Now, on any of this did you give informed consent to the

17  patients that you weren't authorized to sign a prescription?

18  A   No.

19  Q   You did not tell them that?

20  A   No.

21  Q   Did you call yourself doctor?

22  A   No.

23  Q   Did some of the patients?

24  A   Some of the patients did.

25  Q   Did you correct them?

1   A   I did.

2   Q   When you talk about there being blank prescriptions that

3   Dr. Couch signed, once you filled in a medication on a blank

4   presigned script, there weren't any blank scripts, were there?

5   Were they blank scripts once you filled in a drug on them?

6   A   Well --

7   Q   If you filled in a name of a drug, name of a patient, on a

8   script that had been blank that Dr. Couch had signed, that

9   would no longer be considered a blank prescription, or would

10  it?

11  A   No, that wouldn't be.  That would not.

12  Q   It would not be?

13  A   No.

14  Q   Is that what you're saying?

15  A   It would not be a blank prescription if you wrote on it or

16  filled it in.

17            MS. GRIFFIN:  One moment, Your Honor.

18       (A discussion was held off the record between government

19  counsel.)

20  BY MS. GRIFFIN:

21  Q   When Dr. Couch was out of the office, did it matter that

22  Dr. Ruan and Dr. Chen might be in the office, in terms of your

23  signing a prescription?

24  A   I didn't think anything about it.

25  Q   You didn't -- or did you take prescriptions you had written

1  to Dr. Couch's patients for Dr. Ruan or Dr. Chen to sign?

2  A   Very rarely.  Only if I had, you know, concerns about, you

3  know, that prescription, if I was unsure.

4  Q   The patients of Dr. Couch's, were they also Dr. Ruan and

5  Dr. Chen's patients?

6  A   No.

7  Q   So you're not telling us that Dr. Chen or Dr. Ruan saw

8  Dr. Couch's patients when Dr. Couch was out of the office, are

9  you?

10  A   No, I saw them.

11  Q   Did it matter whether there was another doctor in one of

12  the other offices if it wasn't the doctor whose patient it was?

13  A   I'm not sure what --

14  Q   Couch's attorney asked you if when you were seeing the

15  patients by yourself and Dr. Couch was there, were there other

16  doctors at one of the other offices, at least one doctor?

17  A   No, no, it didn't matter.

18  Q   Why is that?

19  A   Because they were Dr. Couch's patients and I was seeing

20  them and they were billed, I guess, under Dr. Couch.  I mean,

21  the other doctors didn't have anything to do with the patient.

22  Q   So if you were at Springhill seeing a Dr. Couch patient,

23  Dr. Couch wasn't there and one of the other doctors happened to

24  be at the Airport location, did you go over to Airport to have

25  a prescription signed for one of Couch's patients?

```
 1   A    No.
 2   Q    Did you go anywhere else, a hospital or another doctor's
 3   office, to have Dr. Couch's patient's prescription signed?
 4   A    No.
 5   Q    Mr. Palmer, do you have any promise or any recommendation
 6   for any specific sentence?
 7   A    No.
 8           MS. GRIFFIN:  That's all I have of this witness, Your
 9   Honor.
10           THE COURT:  May this witness be excused?
11           MR. SHARMAN:  Yes, ma'am.
12           THE COURT:  All right.  You may step down, Mr. Palmer.
13           Do you have a short witness onhand?
14           MS. GRIFFIN:  We do not, Your Honor.
15           THE COURT:  All right.  We're going to go ahead and
16   recess, then.
17           Ladies and gentlemen, leave your pads on your
18   chairs.  We will start again at 9 o'clock tomorrow morning.  No
19   discussion about the case tonight.  Be back downstairs in the
20   jury assembly room, ready to be called up, at 9 a.m.  We are in
21   recess.
22           (Court adjourned at approximately 4:52 p.m.)
23
24
25
```