

1                   UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF ALABAMA
2

3

4    UNITED STATES OF AMERICA
                                        CASE NO. CR15-00088
5    v.
                                        COURTROOM 2B
6    JOHN PATRICK COUCH, M.D.,
     and XIULU RUAN, M.D.,
7                                       MOBILE, ALABAMA
            Defendants.
8    * * * * * * * * * * * * * *        FRIDAY, JANUARY 27, 2017

9

10                        DAY 14 OF TRIAL
           BEFORE THE HONORABLE CALLIE V. S. GRANADE,
11             UNITED STATES DISTRICT JUDGE, AND JURY

12

13
     APPEARANCES:
14
     FOR THE GOVERNMENT:
15       DEBORAH A. GRIFFIN
         CHRISTOPHER BODNAR
16       United States Attorney's Office
         63 S. Royal Street, Suite 600
17       Mobile, AL  36602
         (251) 441-5845
18

19   FOR THE DEFENDANT COUCH:
         ARTHUR T. POWELL, III
20       P.O. Box 40456
         Mobile, AL 36640-0456
21       (251) 433-8310

22       JACKSON R. SHARMAN, III
         JEFFREY PAUL DOSS
23       BENJAMIN SANDERS WILLSON
         Lightfoot, Franklin & White
24       400 North 20th Street
         Birmingham, AL  35203
25       (205) 581-0700

1   (Continued)

2       BRANDON KEITH ESSIG
        800 Shades Creek Parkway, Suite 600D
3       Birmingham, AL  35209
        (251) 879-1981

4
    FOR THE DEFENDANT RUAN:
5       DENNIS J. KNIZLEY
        7 N. Lawrence
6       Mobile, AL 36602
        (251) 432-3799

7
        JASON BRADLEY DARLEY
8       Darley & McGough, LLC
        1751 Dauphin Street
9       Mobile, AL 36604
        (251) 441-7772

10
        GORDON G. ARMSTRONG, III
11      P.O. Box 1464
        Mobile, AL  36633
12      (251) 434-6428

13      STEVEN D. MARTINIE
        4955 North Lake Drive
14      Whitefish Bay, WI  53217
        (414) 332-9683

15
    THE CLERK:  MARY ANN BOYLES
16  THE LAW CLERK:  LYNN DEKLE
    U.S. ATTORNEY IT:  BRIAN COCHRAN
17  DEFENSE IT:  SAM McALLISTER
    COURT REPORTER:   ROY ISBELL, CCR, RDR, CRR

18
            Proceedings recorded by OFFICIAL COURT REPORTER
19      Qualified pursuant to 28 U.S.C. 753(a) & Guide to
    Judiciary Policies and Procedures Vol. VI, Chapter III, D.2.
20          Transcript produced by computerized stenotype.

21

22

23

24

25

1                    EXAMINATION INDEX

2

  KEN CROSS
3      DIRECT BY MR. BODNAR . . . . . . . . . . . . . . 3096
       CROSS BY MR. DOSS . . . . . . . . . . . . . . . 3137
4      CROSS BY MR. KNIZLEY . . . . . . . . . . . . . . 3156
       REDIRECT BY MR. BODNAR . . . . . . . . . . . . .3177
5
  TENA SHAREE GOELLNER
6      DIRECT BY MS. GRIFFIN . . . . . . . . . . . . . 3182
       CROSS BY MR. POWELL . . . . . . . . . . . . . . 3211
7      REDIRECT BY MS. GRIFFIN . . . . . . . . . . . . 3266

8  KAYLA SHAREE DESALVO
       DIRECT BY MS. GRIFFIN . . . . . . . . . . . . . 3269
9      CROSS BY MR. POWELL . . . . . . . . . . . . . . 3280

10 PEGGY TIMS
       DIRECT BY MS. GRIFFIN . . . . . . . . . . . . . 3288
11     CROSS BY MR. SHARMAN . . . . . . . . . . . . . . 3308
       CROSS BY MR. DARLEY . . . . . . . . . . . . . . 3317
12     REDIRECT BY MS. GRIFFIN . . . . . . . . . . . . 3322

13 FRANKIE GOSS
       DIRECT BY MS. GRIFFIN . . . . . . . . . . . . . 3327
14     CROSS BY MR. WILLSON . . . . . . . . . . . . . . 3343
       REDIRECT BY MS. GRIFFIN . . . . . . . . . . . . 3349

15

16

17

18                   EXHIBIT INDEX

19
                                                MAR   ADM
20 GOVERNMENTS
       41-1   Photo of T. Goellner and granddaughter   3277
21
       41-2   Medical file from PPSA (Patient T.        3201
22            Goellner)

23     41-3   Photo of Justin Palmer                    3210

24

25

```
 1          (9 a.m., in open court, defendants and jury present.)
 2              THE COURT:  Good morning, ladies and gentlemen.
 3          All right.  Counsel, you may continue.
 4              MR. BODNAR:  Yes, Your Honor.  The United States calls
 5   Ken Cross to the stand.
 6              THE CLERK:  Mr. Cross, if you will step forward to the
 7   witness stand, I'll swear you in.  Let me get you to raise your
 8   right hand.
 9                          KEN CROSS
10              was sworn and testified as follows:
11              THE WITNESS:  Yes.
12              THE CLERK:  Thank you, sir.  Please be seated.
13                       DIRECT EXAMINATION
14   BY MR. BODNAR:
15   Q   Good morning.
16   A   Good morning.
17   Q   Could you please pull your microphone a little bit closer
18   to you?  Could you please introduce yourself to the jury?
19   A   I'm Ken Cross.
20   Q   And, Mr. Cross, did you previously work at Physicians Pain
21   Specialists of Alabama?
22   A   Yes.
23   Q   What was your position at PPSA?
24   A   I was the practice administrator.
25   Q   And what time period were you the practice administrator?
```

KEN CROSS - DIRECT BY MR. BODNAR

1    A    From November 1st of 2004 through the end of May 2014.

2    Q    Prior to working at PPSA, what was your education and prior

3    work experience?

4    A    Education, started in science, went towards business.  I

5    was previously a comptroller for a rehab, wheelchair, DME

6    company here in Mobile and then was hired on by PPSA to be

7    their administrator.

8    Q    And you said started in science.  Did you have degrees in

9    biology and chemistry first?

10   A    I had a major in chemistry and a minor in biology, yes.

11   Q    And then how did it work you moved into business?

12   A    Well, I was thinking med school at the time, and then I was

13   just better at numbers and not quite as good -- I didn't really

14   care to go into med school.  So I changed focus, I got a

15   master's in public health and took a statistics course in that

16   as well and really liked working with some of the data and

17   decided I liked business, and so I went back and got a master's

18   in public and private management and then came here to Mobile.

19   That was in Birmingham, then I'd moved to Mobile, and that's

20   where I took all the undergrad accounting courses at South.

21   Q    And when you were at the DME company, the wheelchair

22   company, what was your position there?

23   A    I started off there just in payroll, just to get my feet

24   wet in the accounting field.  And they had some, I guess,

25   changes in the company and their, I guess, comptroller at the

3098

```
 1   time left and I just kind of filled in.  So --
 2   Q   And then you moved into the office manager position at
 3   PPSA?
 4   A   Yes.
 5   Q   And you mentioned accounting.  Were you the accountant for
 6   PPSA?
 7   A   No.
 8   Q   But did you handle some payroll and other --
 9   A   Yes.
10   Q   -- accounting purposes?
11   A   Yes, yes.
12   Q   Prior to testifying today, did you meet with the United
13   States and FBI and DEA?
14   A   Yes.
15   Q   On a couple of different occasions?
16   A   Yes.
17   Q   Were you ever stopped during the middle of your answers and
18   told:  No, you must say this to --
19   A   No, no.
20   Q   Were you ever told what you needed to say in order to
21   prosecute these two individuals?
22   A   No.
23   Q   Other than to tell the truth, have you ever been told to
24   say anything?
25   A   No.
```

KEN CROSS - DIRECT BY MR. BODNAR
3099

```
 1   Q   Do you have any financial motivation for testifying today?
 2   A   No.
 3   Q   Have you filed any whistle blower lawsuits against the
 4   defendants?
 5   A   No.
 6   Q   Do you have any agreement with the United States or any
 7   party about your testimony here?
 8   A   No.
 9   Q   Are you able to identify the defendants in the courtroom?
10   A   Yes.
11   Q   First could you identify Dr. Couch, please?
12   A   There (indicating).
13   Q   And just for the record, what is he wearing?
14   A   It's sort of a purplish kind of tie, jacket, glasses.
15   Q   And do you see Dr. Ruan in the courtroom?
16   A   Yes.
17   Q   Can you identify him, please?
18   A   On the end here (indicating).
19           MR. BODNAR:  Let the record reflect that the witness
20   has identified both defendants.
21   Q   Mr. Cross, what was your role as an office manager at PPSA?
22   A   Basically the daily operations of the company, plus I guess
23   I was over the hiring and firing of employees, payroll, just
24   day-to-day operations.  If anything went wrong, they'd call me
25   and I'd either solve it myself or call in somebody else to fix
```

1    it.

2    Q   Was part of your job also providing advice to either

3    Dr. Ruan and/or Dr. Couch?

4    A   I don't know that it was part of my job.  But yes, I mean,

5    I did --

6    Q   Did you provide advice?

7    A   -- advise as I saw fit, yes.

8    Q   At some point during your time at PPSA, did you become

9    aware of Dr. Couch leaving blank prescription pads?

10   A   Yes.

11   Q   Could you please explain to the jury what happened and then

12   what you did?

13   A   I don't know who, but one of the medical assistants just

14   brought to my attention that there were some blank

15   prescriptions that had been signed.  They were in Dr. Couch's

16   desk.  I went, I opened the drawer, they were there.  And I

17   talked to Dr. Couch about it.  I told him that you can't -- you

18   shouldn't do that.  That's --

19   Q   And before we get to that, by blank scripts, do you mean it

20   had a signature on it but nothing up top about the patient?

21   A   Correct.

22   Q   And whatever drug was on there?

23   A   Correct.

24   Q   So you physically saw that?

25   A   Yes.

3101

1    Q    Where were those?

2    A    They were in the top desk drawer of Dr. Couch's desk.

3    Q    Where was Dr. Couch at the time?

4    A    He was out of town.  I don't know where he was.

5    Q    When he came back into town, what if anything did you tell

6    Dr. Couch?

7    A    I just told him that, you know, I saw the scripts and that

8    he, you know, shouldn't be doing that.  That's -- you know, I

9    thought he could lose his license over something like that.

10   Q    I'm sorry.  What did you say?

11   A    I thought he could lose his license over something like

12   that, so I advised him not to do that.

13   Q    What if anything did he say to you?

14   A    I don't think he really had much of a response.  Just, you

15   know, shrugged it off, I guess.

16   Q    If you know, why was it important for there to be

17   prescriptions left when Dr. Couch was out of the office?

18   A    Can you repeat that, please?

19   Q    Were Dr. Couch's patients being seen when he was out of the

20   state or out of the country?

21   A    Yes.

22   Q    Why were his patients being seen during that time?

23   A    Some of them just had -- I guess they ran out of their

24   medications and it was just time for them to be refilled.

25   Q    If he was out, was one of the other doctors, Dr. Ruan or

KEN CROSS - DIRECT BY MR. BODNAR

3102

1  Dr. Chen, seeing Dr. Couch's patients?

2  A   At the time, yes.  That's what --

3  Q   Please explain at that time -- yes -- what happened, what

4  was happening earlier on?

5  A   Well, actually, I guess, earlier on I know Dr. Chen -- I

6  mean Dr. Ruan had seen some of Dr. Couch's patients while he

7  was out of town and therefore got credit for, you know, the

8  office visit.  He was basically paid for it.

9  Q   Please explain.  What do you mean by credit?  How was

10  Dr. Ruan getting credit for Dr. Couch's patients?

11  A   Well, he would bill for them because he was the one who

12  actually did the office visit.  So he billed for it.

13  Q   So you're saying Dr. Ruan would get the credit since he

14  actually saw the patient, even though it was a Couch patient?

15  A   Correct.

16  Q   And did that cause any problems within the office?

17  A   Yes.  Dr. Couch didn't like Dr. Ruan seeing his patients

18  and therefore getting the money associated with the office

19  visit.

20  Q   And is that what led to signed prescription pads in

21  Dr. Couch's desk?

22  A   I believe so, yes.

23  Q   After you informed Dr. Couch -- or after you confronted him

24  about the signed prescription pad, did he continue to go out of

25  town and patients still be seen?

KEN CROSS - DIRECT BY MR. BODNAR

```
 1   A   Yes.
 2   Q   How about -- compare that to what Dr. Ruan was doing.  When
 3   Dr. Ruan was out of the town or country, what was the practice
 4   for Dr. Ruan?
 5   A   Generally Dr. Ruan would shut down his whole side.  His
 6   nurse practitioners would take off and his patients weren't
 7   seen.
 8   Q   So there were no patient visits for Dr. Ruan patients when
 9   he was out of town?
10   A   As far as I know, that's correct.
11   Q   And that was different for Dr. Couch?
12   A   Yes.
13   Q   Did you raise your concern about the unsigned scripts to
14   anyone else at PPSA?
15   A   Dr. Ruan may have known.  But no.
16   Q   How about to an individual named Boe Strange?
17   A   Yes, yes, I did.
18   Q   And who is Mr. Strange?
19   A   He's the accountant for PPSA.
20   Q   Along with accounting, did he help manage the business as
21   well?
22   A   Towards the end, yes, he took a very --
23   Q   And had he asked you to report certain things to him?
24   A   Yes.
25   Q   I'm going to now show you what has been marked as
```

 1    Government's Exhibit 16-1 and ask if you recognize this

 2    document.

 3    A    Yes.

 4    Q    And what is this?

 5    A    It's an email I sent to Boe Strange.

 6    Q    And was it connected with what we're talking about, about

 7    blank prescriptions?

 8    A    Yes.

 9          MR. BODNAR:  The United States moves to admit

10    Government's Exhibit 16-1.

11          MR. DOSS:  Objection.  Hearsay and hearsay within

12    hearsay on this particular exhibit, Your Honor.

13          THE COURT:  Let me see it.

14          Mr. Doss, do you want to come to side bar?

15       (At the side bar, jury not present.)

16          THE COURT:  (Reading.)  Okay.  So how do you say it's

17    admissible?

18          MR. BODNAR:  As foundation.  We set up that Boe

19    Strange was one of the office managers within the office and he

20    had requested to be notified about certain instances.  This was

21    one of the instances that Ken Cross notified Boe Strange of

22    what was happening at PPSA.  And in this email, he's going to

23    testify about what he said and subject to all the cross-

24    examination on it, but it's regarding his warnings to the

25    office about what could happen if Dr. Couch continues to be

1    signing prescriptions and not seeing his patients while he's

2    out of town.

3            MR. DOSS:  And as I understand it, they then are

4    offering it for the truth of the matter asserted and,

5    therefore, it is hearsay.  Dr. Couch is not the recipient of

6    this, he is not copied on this email, and therefore it is

7    hearsay, not subject to an exception.  In addition, there is

8    hearsay within hearsay.  There are things such as:  I have been

9    told, I have heard, I've said many, many times.  So the hearsay

10   within hearsay is not subject to an exception in the same way

11   the email itself is not subject to an exception.  This entire

12   document is hearsay.

13           MR. BODNAR:  It explains his conduct and he has -- he

14   is testifying as to the truth of the fact there were these

15   blank scripts in there.  And this goes to that he was also, as

16   he explained, notifying other people in the office that this

17   was occurring.

18           THE COURT:  I think this is hearsay.  So I sustain the

19   objection.

20       (In open court, defendants and jury present.)

21   BY MR. BODNAR:

22   Q   Mr. Cross, did you notify Mr. Boe Strange that Dr. Couch

23   was having blank prescriptions filled out before he left out of

24   town?

25   A   Yes.

3106

1   Q   Did you explain to him what if any liability --

2   A   Yes.

3   Q   What liability did you discuss?

4   A   Well, I believe I mentioned that he could lose his DEA

5   license over something like that.

6   Q   Who could lose his DEA license?

7   A   Dr. Couch.

8   Q   Did you explain to him about the risks associated with

9   that, in your mind?

10   A   Yes.

11   Q   What did you explain?

12   A   I said that he was risking basically millions in order to

13   get thousands.  Or I quoted 50,000 in that.

14   Q   I'm sorry?  That last --

15   A   Just as a figure, I said he's risking a million to get

16   50,000.

17   Q   And can you explain, were you familiar with how the payment

18   system worked for Dr. Ruan and for Dr. Couch in the office?

19   A   Yes.

20   Q   Were you in charge of handling bonuses and salaries?

21   A   Yes.

22   Q   Can you first explain how the general salary worked at PPSA

23   for Dr. Ruan and Dr. Couch?

24   A   They were each paid 300,000 annual salary.

25   Q   Were there quarterly bonuses in addition to the 300,000?

1    A    Yes.

2    Q    How did that work?

3    A    Basically through the quarter, money would accumulate in

4    the account and at the end of the quarter we would run a bonus

5    calculation to basically drain the account.

6    Q    And which account are we talking about?  Are we talking

7    about PPSA?

8    A    The main PPSA bank account -- checking account, yes.

9    Q    What is the money that's being accumulated into that PPSA

10   account?

11   A    It's just the money that was left over after paying all the

12   business operations, everybody -- payroll, including the

13   doctors, the building, everything.

14   Q    The money coming into that account, is that reimbursement

15   for office visits?

16   A    Yes, it's the -- yes.

17   Q    How about for procedures?

18   A    Everything, yes, all the revenue.

19   Q    But how about for prescriptions being filled at C&R

20   Pharmacy?

21   A    No, that's completely separate.

22   Q    So the C&R money was separate?

23   A    Yes.

24   Q    So the reimbursements for what occurred in PPSA is what

25   went into that account?

KEN CROSS - DIRECT BY MR. BODNAR

1    A    Correct.

2    Q    Approximately how much were the bonuses each quarter?

3    A    They were generally at least 300,000 apiece.

4    Q    Four times a year?

5    A    Four times a year.

6    Q    Is that in addition to salary?

7    A    Yes.

8    Q    If Dr. Ruan -- sorry.  If Dr. Couch was not seeing patients

9    and was shutting down his practice when he was out of town, how

10   would that have affected his quarterly bonuses?

11   A    Well, not seeing patients would cause your collections to

12   go down a little bit.  And then when I do the bonus

13   calculations, it's based on collections -- however much

14   Dr. Couch collected for the time period, how much Dr. Ruan

15   collected -- and then they would share the expenses based on

16   ratio of collections.  So if Dr. Couch collected, say, 55

17   percent of the total collections and Dr. Ruan 45, he would then

18   take on 55 percent of the expenses.  And then whatever's left

19   over, that would come out of, you know, his total collections.

20   Q    You had mentioned that the C&R Pharmacy money was separate

21   from the PPSA account; is that correct?

22   A    Completely separate, yes.

23   Q    Do you know how the C&R money was paid to Dr. Ruan and

24   Dr. Couch?

25   A    No.

KEN CROSS - DIRECT BY MR. BODNAR
3109

1   Q   Do you know how C&R was structured in terms of ownership?

2   A   I believe that it was just a 50-50 ownership between the

3   two doctors.

4   Q   Can you explain to the jury was there a time when C&R

5   Pharmacy was located somewhere else other than its current

6   location?

7   A   It started at the Springhill office.

8   Q   Explain that to the jury.  What was it in the early days?

9   A   It was just a small, I would say, maybe just a six or -- it

10  was just barely around the minimum number of square footage

11  that a pharmacy could legally have.  So it was a very small

12  space there in the office.

13  Q   And when the Airport location was opened, is that when it

14  moved out to Airport Boulevard?

15  A   Yes.

16  Q   Was that a larger pharmacy?

17  A   Much larger.

18  Q   Do you know was it a retail pharmacy or a specialty

19  pharmacy?

20  A   It was set up as retail pharmacy.

21  Q   Can you explain to the jury what is a retail pharmacy?

22  A   It's basically the licensing -- I guess the licensing

23  structure.  It's just like a Rite Aid or CVS.  Those would be

24  called retail.

25  Q   Could C&R Pharmacy dispense any type of drug as a retail

3110

```
 1    pharmacy?

 2    A    Yes.

 3    Q    What kind of drugs did they dispense, though?

 4    A    I believe they focused on the pain medications.

 5    Q    Was there a management company brought in to run C&R

 6    Pharmacy at some point?

 7    A    Yes.

 8    Q    Who was that?

 9    A    The McConaghy Pharmacy.

10    Q    Can you explain how that -- how that occurred and what was

11    done?

12    A    Well, I guess none of us at PPSA, including myself, really

13    had any experience with a pharmacy.  So we opened it at the

14    Springhill office.  We just felt like we needed outside help.

15    And I don't know exactly who brought in McConaghy.  I didn't

16    know them before.  So I assume the doctors, maybe Boe

17    Strange -- somebody knew of them and brought them in.

18    Q    When the pharmacy was ordering drugs for C&R Pharmacy, do

19    you know, did they use a C&R Pharmacy DEA number or did they

20    use Dr. Ruan's number?

21    A    I believe they used the C&R Pharmacy number.

22    Q    Do you know what percentage of the profit went to McConaghy

23    versus what went to the defendants?

24    A    McConaghy got, I believe it was, 25 percent of the profits.

25    Q    And does that mean that 75 percent was split by Dr. Ruan
```

3111

1   and Dr. Couch?

2   A    Yes.

3   Q    Located at the Springhill office was there what's called a

4   workers' comp dispensary?

5   A    Yes.

6   Q    First, before we talk about the dispensary, can you explain

7   to the jury what is workers' comp?

8   A    It's basically if someone's injured on the job, you have

9   what's called -- it's a workers' compensation type insurance.

10  It doesn't hit your personal insurance.  It's the company pays

11  a portion.  So --

12  Q    As an example, if someone has Blue Cross and Blue Shield

13  but gets hurt on the job, there's a separate workers' comp

14  insurance --

15  A    That's correct.

16  Q    -- that will cover that?

17  A    Yes.

18  Q    Do you know if the payment rates or the reimbursement rates

19  are different between a commercial insurance like Blue Cross

20  and Blue Shield and a workers' comp insurance?

21  A    Yes, the payment for workers' comp is higher than pretty

22  much any insurance company.

23  Q    Can you explain why, why is that?

24  A    It --

25              MR. KNIZLEY:  At this point I object unless there's a

KEN CROSS - DIRECT BY MR. BODNAR

3112

1    predicate or foundation as to the basis of his knowledge.

2    BY MR. BODNAR:

3    Q    Did you handle the billing for PPSA or were you involved

4    with the reimbursements that came in from workers' comp versus

5    commercial insurance?

6    A    Was I involved with --

7    Q    In the bookkeeping for that.

8    A    Yes, I saw the rates, yes.

9    Q    Are you familiar with how adjustments worked for commercial

10   insurance?

11   A    Yes.

12   Q    And do you, based on your bookkeeping work, do you know if

13   adjustments were made at workers' comp?

14   A    No.

15   Q    Can you explain now why it is that workers' comp pays at a

16   higher rate than a commercial insurance?

17   A    Commercial insurance companies, in order for a practice,

18   hospital, whoever wants to sign up to accept, say, a Blue Cross

19   patient, they have to agree to a contract.  The contract then

20   specifies, they have a set fee schedule and they say:  we don't

21   care what you're going to charge, it may be $110 for this

22   office visit, but we're going to reimburse you $75.  That's our

23   allowable.

24   Q    Is that what's called -- what you're referring to as an

25   adjustment?

3113
KEN CROSS - DIRECT BY MR. BODNAR

1    A    It would be the difference in the two, yes.

2    Q    So the adjusted --

3    A    So if they charge $110 and they say $75 is the allowable,

4    then the adjustment would be the difference between the two.

5    They would say:  You're going to automatically write off that

6    amount.

7    Q    And that's for commercial insurance?

8    A    Yes.

9    Q    And, then, what is different with workers' comp insurance?

10   A    Workers' comp basically pays the going -- the rate.  They

11   don't have the independent contracts like Blue Cross or Humana

12   or whoever else would, so they generally pay the 110 or very

13   close to it.

14   Q    Now, were workers' compensation patients being seen at

15   PPSA?

16   A    Yes.

17   Q    What was the dispensary, the workers' comp dispensary?  Can

18   you explain that to the jury?

19   A    That was a -- it wasn't owned by PPSA.  It was an

20   independent pharmacy that had arranged to come in and dispense

21   the medications that the doctors were prescribing to work comp

22   patients.

23   Q    And so are we now talking about a second pharmacy, not C&R

24   Pharmacy?

25   A    Correct.

1   Q   Where is this second workers' comp dispensary located?

2   A   It was in a much smaller room towards the -- the back of

3   the practice.

4   Q   At the Springhill location?

5   A   Yes.

6   Q   So C&R's out on Airport Boulevard and then there's a

7   dispensary at Springhill Ave.?

8   A   Yes.

9   Q   Do you know whose DEA number was used to purchase the drugs

10  for the workers' comp dispensary?

11  A   Yes.

12  Q   Whose was that?

13  A   Dr. Ruan's.

14  Q   You had mentioned that PPSA did not own the

15  dispensary.  Can you explain what you mean by that?

16  A   There was another company that came in and actually managed

17  it, had employees.  They had one or two employees there that

18  would actually do the dispensing of the medications.

19  Q   And what is dispensing as opposed to -- what is workers'

20  comp dispensing as opposed to getting a prescription from PPSA

21  generally?

22  A   Well, basically it means they could pick up the drugs right

23  there in the pharmacy.

24  Q   And so right there --

25  A   Or right there at the location, yes.

3115

1  Q   So if a workers' compensation patient is seen at Springhill
2  Ave., their prescription is filled right inside of the PPSA
3  building there?
4  A   Yes.
5  Q   And they walk out of the office visit with whatever
6  prescription they have?
7  A   Yes.
8  Q   Do you know how Dr. Ruan and Dr. Couch were compensated for
9  having the workers' comp dispensary?
10 A   I know they were paid by that pharmacy, by the company.
11 Q   Do you know what the name of the company is that ran the
12 dispensary?
13 A   I believe it was IPM.
14 Q   Do you know what IPM stood for?
15 A   Not exactly.  It's been a while.
16 Q   Did there come a time that you saw how much money either of
17 the doctors received from IPM?
18 A   Yes.
19 Q   Can you explain that to the jury?
20 A   I saw -- they would send them checks.  So I saw both
21 Dr. Couch's and I saw Dr. Ruan's.
22 Q   Let's not use pronouns, so as to make it clear.  By they,
23 do you mean IPM?
24 A   Yes.  Mailed checks to PPSA for the doctors.
25 Q   Okay.  And at one point did you happen to see one of the

KEN CROSS - DIRECT BY MR. BODNAR

```
 1   checks?

 2   A   Yes.

 3   Q   Whose check was it?

 4   A   I've seen both of them.

 5   Q   Okay.  Can you explain to the jury what you saw?

 6   A   I know Dr. Couch had a check or his checks were routinely

 7   in the $18,000 range for a month.

 8   Q   Each month an $18,000 check?

 9   A   Yes.

10   Q   How about for Dr. Ruan?

11   A   The one check maybe that I saw was right at 54,000.

12   Q   I'm sorry.  54,000?

13   A   54,000.

14   Q   At some point after seeing Dr. Ruan's $54,000 check, did

15   you bring that to the attention of Dr. Couch?

16   A   Yes.

17   Q   What did you tell Dr. Couch?

18   A   Well, I had been in Dr. Ruan's office.  He had it open on

19   his desk and I just happened to see it.  I went to Dr. Couch,

20   because I worked -- the way I saw it, I was paid equally by

21   both of them.  So if I had any advice to give, I would go

22   routinely to either one of them.  And I brought it to

23   Dr. Couch's attention just to say, you know:  I'm not sure

24   what -- you know, it could be perfectly fine, but his check,

25   Dr. Ruan's, is about three times yours.  And I was a little
```

1    concerned, I guess.  I just thought he should know.

2    Q    Did Dr. Couch say anything in response?

3    A    No, not really.

4    Q    The checks from IPM, did that go into the PPSA account we

5    just heard about?

6    A    No.

7    Q    Where did those checks go?

8    A    They went to them personally.

9    Q    So was that money separate and apart from what you just

10   said about the salary and the bonuses?

11   A    Yes, completely separate.

12   Q    And also completely separate from any money from C&R

13   Pharmacy?

14   A    Yes.

15   Q    Are you familiar with the company called Physicians

16   Compounding Solutions?

17   A    Yes.

18   Q    Can you explain to the jury what is Physicians Compounding

19   Solutions?

20   A    That was a company owned solely by Dr. Couch.  It was

21   started before I got there.

22   Q    And what did Physicians Compounding Solutions do?

23   A    It compounded medications primarily for the pain pumps.

24   Q    Okay.  Can you explain what you mean?  What was Dr. Couch

25   doing with this other company?

3118

1  A  Well, there were certain patients that had what's called --

2  it's an implantable pain pump, where they would actually put a

3  device inside the abdomen with some leads going to, I guess,

4  the spine, certain areas.  And it would hold -- the device

5  would hold morphine or whatever pain medication was

6  needed.  The morphine was bought by Physicians Compounding as a

7  raw material, the powder.  Dr. Couch -- and baclofen and

8  others, whatever these other medications were.  Dr. Couch would

9  then compound the medications, take that powder or whatever the

10  raw material was, mix it into it with a bag of saline or

11  whatever solution was required in a hood there at PPSA and then

12  those medications would be sold from Physicians Compounding to

13  PPSA for use in the practice.

14  Q  So although the mixing was being done at PPSA, it was being

15  technically done by a separate company?

16  A  Yes.

17  Q  And PPSA then purchased these bags of reconstituted or

18  compounded liquids?

19  A  Yes.

20  Q  Was the money that went to Physicians Compounding

21  Solutions, was that included in the bonuses or salary that we

22  just discussed for Dr. Couch?

23  A  No.

24  Q  At some point did Dr. Ruan become concerned about this

25  practice?

3119

```
1   A   I wouldn't say concerned.  He was a little -- he, I guess,
2   wanted me to check the pricing at one time or two.
3   Q   And why was that?
4   A   Just to make sure it was fair.  He didn't want to be
5   overcharged for the medications.
6   Q   And by be overcharged, he didn't want PPSA to be
7   overcharged?
8   A   Correct.
9   Q   To your knowledge was Dr. Ruan involved at all in
10  Physicians Compounding Solutions other then PPSA was purchasing
11  the pump medicine from them?
12  A   No, he wasn't involved at all.
13  Q   Do you recall a time where either Dr. Ruan or Dr. Couch
14  began buying stock for a company called Galena Biopharma?
15  A   Yes.
16  Q   Can you explain what was your role -- what was told to you
17  by Dr. Ruan or Dr. Couch?
18  A   Dr. Couch, I believe, had the idea first or approached me
19  first about buying a large number of shares of stock in this
20  Galena Biopharma company.
21  Q   Now I'll stop you there for a moment.  When he approached
22  you, do you mean he was asking you if you wanted to buy it
23  personally or if you would buy some on behalf of the company
24  PPSA?
25  A   Well, sort of both.  He wanted the company to buy it, but
```

3120

1   they thought it was a good deal, everybody should buy it.  He

2   told me that I should buy it.  I didn't have any money, so I

3   didn't get into it, thank goodness.  I believe Justin Palmer

4   did buy some.

5   Q   Other than Justin Palmer, do you know if anyone else at

6   PPSA bought stock in Galena Biopharma?

7   A   I know that Dr. Couch had bought some personally as well.

8   Q   Do you know if Dr. Ruan bought any?

9   A   I believe he did.

10  Q   Can you explain to the jury what occurred in December of

11  2013 regarding purchasing Galena Biopharma stock for the

12  company PPSA?

13  A   Around December of 2013 I was tasked with setting --

14  Dr. Couch had been buying stock through his E*Trade account,

15  personal E*Trade account.  I had been tasked with setting up a

16  corporate E*Trade account so that they could use the money to

17  buy Galena stock.

18  Q   On behalf of PPSA?

19  A   On behalf of the company, between the two doctors, yes.

20  Q   And was that done?  Did you set up a corporate account?

21  A   Yes.

22  Q   Prior to setting up a corporate account, was PPSA money

23  used to purchase Galena Biopharma?

24  A   Yes.

25  Q   I'm going to show you what has already been admitted as

1    Government's Exhibit 11-4 and ask have you had an opportunity

2    to examine this chart prior to your testimony today?

3    A    Yes.

4    Q    Can you explain to the jury what -- how did -- and first

5    how much money from PPSA and then how was it purchased on

6    behalf of PPSA for Galena Biopharma stock?

7    A    We made, I believe it was, three separate purchases with

8    PPSA money.

9    Q    How did that money -- how was that money drawn out of the

10   PPSA accounts?

11   A    We would -- it was given basically to Dr. Couch.  It was

12   put into his personal E*Trade account because the corporate

13   account had not been set up yet.  And they wanted to go ahead

14   and purchase the stock in case it increased.  They wanted to

15   take advantage of the current price at that time.

16   Q    And how much money was taken out of the PPSA corporate

17   account to buy Galena stock?

18   A    In total it was 300,000, in about three different

19   purchases.

20   Q    And did that money come from bonuses that would have been

21   paid to Dr. Ruan and Dr. Couch?

22   A    Yes.

23   Q    And prior to your testimony, did you look at this chart to

24   see which of the dates you thought were the ones that were

25   purchased under Dr. Couch with the PPSA money?

KEN CROSS - DIRECT BY MR. BODNAR

1    A    Yes.

2    Q    And was that the December 5th, 6th, and 19th?

3    A    Yes, that looks about right.

4    Q    Did Dr. Ruan know that this was occurring?

5    A    Yes.

6    Q    I'm going to show you -- and did you say that December 5th,

7    this was likely one of the purchases made by PPSA?

8    A    Yes.

9    Q    Even though it was made in the Dr. Couch personal account?

10   A    Correct.

11   Q    I'm going to show you now what is marked as Government's

12   Exhibit -- or what's admitted as Government's Exhibit 11-5 and

13   ask is this an email from Dr. Ruan on December 5th?

14   A    Yes.

15   Q    And was that the date that we just looked at that appears

16   to have been the first purchase of corporate stock?

17   A    Yes.

18   Q    And is this -- do you know who Chris Lento is?

19   A    No, I'd never met him.

20   Q    Does the email say:  Hi, Chris --

21        MR. KNIZLEY:  Your Honor, I object.  He's not involved

22   in the email, not the chain.  He's just reading it.  It's not

23   the appropriate witness.  I would object to this witness

24   reading this document.

25        THE COURT:  Well, it's already in evidence.  So he can

```
 1   use it.
 2   BY MR. BODNAR:
 3   Q    And does he say in this email:  Hi Chris, this is the
 4   initial email you sent me back in April, before Galena started
 5   promoting Abstral.  In a little over six months, Abstral has
 6   begun to take a significant role as one of the unique
 7   transmucosal fentanyl formulations in offering patients with
 8   severe breakthrough pain.  I am very excited about the
 9   opportunity to be involved with Galena at the highest
10   advisory/consultatory level as we discussed in our previous
11   conversations.
12           Is that what that says?
13   A    Yes.
14   Q    Following the purchase of the corporate stock for PPSA,
15   what if anything did you advise or warn Dr. Ruan and Dr. Couch
16   about?
17   A    I just thought it was risky to purchase that kind of stock.
18   Q    Why did you think it was risky?
19   A    It was around --
20           MR. KNIZLEY:  Judge, I object.  Relevance.
21   BY MR. BODNAR:
22   Q    Why did you explain --
23           THE COURT:  Well, yes.  I mean, you need to establish
24   that whatever he's going to say, it was told to the doctors or
25   one of them.
```

1   BY MR. BODNAR:

2   Q   Did you explain to Dr. Ruan and Dr. Couch why you thought

3   it was risky --

4   A   Yes.

5   Q   -- to purchase this stock?  What was it that you told

6   Dr. Ruan and Dr. Couch?

7   A   It was just -- it was cheap stock.  Basically at $3 a

8   share, that's a penny stock and it's very risky.  I just

9   thought it was probably not a good investment.

10  Q   Did you tell Dr. -- did you discuss with Dr. Ruan and

11  Dr. Couch about what might happen if their prescribing habits

12  changed after this?

13  A   Yes.

14  Q   What did you tell Dr. Ruan and Dr. Couch?

15  A   I just advised that if you purchase stock in the company

16  that you, you know, prescribe drugs for, it can't change your

17  prescribing habits.  I mean, you certainly can't increase your

18  prescriptions when you purchase stock or any kind of

19  investment.

20  Q   Now, did you work in the clinical side of the house in

21  terms of the patient care side of PPSA?

22  A   No.

23  Q   So do you have any -- would you have any knowledge of how

24  their prescribing may or may not have changed after purchasing

25  the stock?

3125

```
1    A    No, no.

2    Q    I'm sorry?  You said no?

3    A    No.

4    Q    Were there other instances in which you warned either

5    Dr. Ruan or Dr. Couch about the risk of changing behavior after

6    purchasing something?

7    A    Yes, I wouldn't say I warned them, but yes, there were --

8    Q    Did you advise them?

9    A    Advised, yes.

10   Q    And what was this other instance that you advised them

11   about?

12            MR. KNIZLEY:  Your Honor, I don't mean to interrupt.

13   But if he could distinguish is it directed to the individual

14   people he's speaking of?

15            THE COURT:  You need to establish that.

16   BY MR. BODNAR:

17   Q    Did you advise Dr. Ruan and Dr. Couch surrounding the

18   purchasing of the MRI machine?

19   A    Yes.

20   Q    Can you explain, before an MRI machine was purchased by

21   PPSA, what were you tasked to do?

22   A    I was tasked to, I guess, run certain -- just numbers.

23   It's called a pro forma statement to kind of figure out the

24   investment and the recollection of recoupment of the money and

25   how much it might benefit the practice.
```

1  Q   What do you mean by pro forma statement?  What is that?

2  A   It's basically a spreadsheet showing expenditures for an

3  investment and then what you expect to receive from that

4  expected -- that investment.  For instance, I would put in for

5  the first month maybe we see X number of patients a day and try

6  to see how much money that would be coming back to the

7  practice, so that we could try to make a management decision as

8  to whether or not it was a good investment, whether it was

9  going to pay itself off in an appropriate amount of time and

10  make money from it.

11  Q   And so part of the purpose was to see how long it would

12  take to -- to pay a piece of equipment off?

13  A   Correct.  Yes.

14  Q   In connection with this MRI machine, did you advise

15  Dr. Ruan and Dr. Couch at all about changing the patterns of

16  prescribing or of ordering MRIs after the machine was ordered?

17  A   Yes.

18  Q   What did you say?

19  A   Well, I just mentioned that when, you know, you open

20  something or any kind of investment, you don't want your

21  numbers to all of a sudden change, you know, at the same

22  time.  If you're ordering, say, 10 percent of your patients to

23  get an MRI right now and then you open the doors to your MRI

24  machine that you just bought and all of a sudden that number

25  jumps way up, I just advised that it wouldn't look good.  Now,

```
 1   I don't know if there really are legal ramifications.  That was
 2   just my advice.
 3   Q   What if anything did Dr. Ruan say to you in connection with
 4   that?
 5   A   He said he could -- they could basically fill all the slots
 6   immediately.
 7   Q   Fill all the slots for ordering MRIs?
 8   A   Yes, he felt like they could run it full -- at full
 9   capacity from the very start.
10   Q   Had they been ordered -- had Dr. Ruan been ordering MRIs at
11   that rate prior to purchasing the MRI machine?
12   A   I don't know, I don't know what he ordered before and
13   after.
14   Q   Do you know an individual named Bridgette Parker?
15   A   Yes.
16   Q   Who was Bridgette Parker?
17   A   She is a nurse practitioner that started working for
18   Dr. Ruan.
19   Q   At some point did she move from Dr. Ruan to Dr. Couch?
20   A   Yes.
21   Q   Was it after -- did you ever witness Bridgette Parker being
22   impaired at work?
23   A   Yes.
24   Q   Can you explain to the jury what you witnessed?
25   A   She had had trouble with one of the computers, she couldn't
```

3128

1    log on, her user name and password.  She came to my office

2    and --

3    Q    And this is during the workday?

4    A    This is during the workday, yes.

5    Q    Okay.  Continue.

6    A    She was -- I guess we were just talking about it.  And when

7    she went to leave my office, she went to, I guess, grab the

8    handle and basically missed it.

9    Q    Like you mean the handle of -- like a doorknob?

10   A    It's one of those that you kind of just pull down.  It's

11   not the knob.  It had the little lever that you just -- but

12   yes, she --

13   Q    And is this at the PPSA clinic?

14   A    Yes.

15   Q    What if anything did you do after witnessing what she was

16   doing?

17   A    I told her -- and I approached Dr. Couch and said she needs

18   to stop seeing patients and basically go home or, you know,

19   take a break.

20   Q    Was she sent home?

21   A    I believe so, yes.

22   Q    And you said Dr. Couch was aware of this?

23   A    Yes.

24   Q    Did Bridgette Parker after that come back to work at PPSA?

25   A    Yes.

KEN CROSS - DIRECT BY MR. BODNAR

1  Q   Did she continue to see patients after that date?

2  A   Yes.

3  Q   Approximately what time did Dr. Couch -- what time did PPSA

4  open in the morning?

5  A   We were open at generally 8 o'clock, although sometimes we

6  were there earlier.  Justin sometimes started his schedule

7  earlier, maybe 7:30 sometimes.  But generally 8 o'clock.

8  Q   When you say Justin started his schedule earlier, who is

9  the Justin you're talking about?

10  A   Justin Palmer.

11  Q   Is Justin Palmer a doctor?

12  A   No.

13  Q   What do you mean, seeing his patients then?

14  A   Just the patients on his schedule.

15  Q   What time did Dr. Couch typically show up for work?

16  A   After 9 o'clock, 9:30 maybe.

17  Q   Were Dr. Couch patients being seen prior to Dr. Couch

18  getting there?

19  A   Yes.

20  Q   What time did Dr. Couch typically leave the office?

21  A   I would say typically 5 or --

22  Q   Were there times when Dr. Couch patients were being seen

23  after he had left the office?

24  A   I believe so.

25  Q   Do you know if there were times when Dr. Couch was in the

 1    office but his patients were still being seen by Justin Palmer?

 2    A   Yes.

 3    Q   Did there come an instance where you warned Dr. Couch and

 4    Dr. Ruan about potential criminal investigations in Florida?

 5    A   Yes.

 6    Q   Explain what did you -- what did you tell Dr. Ruan and

 7    Dr. Couch about criminal investigations in Florida?

 8    A   Well, it was the time when there was a being -- I guess it

 9    was a bust in the panhandle.  They had hit several pain

10    clinics.  And I just simply advised, I just said, you know,

11    this is -- they've certainly got to be looking at everybody.

12    And we were one of the largest ones, I believe, in the

13    southeast, or it seemed like it to me.  We were fairly large.

14    And I just said, you know:  We just need to make sure you're

15    doing everything correctly, that they're probably being

16    monitored.

17    Q   Did you mention at all about the need to see the patients

18    at least for a moment?

19    A   Yes.

20    Q   Are you aware of how the billing works for Blue Cross and

21    Blue Shield for office visits?

22    A   Yes.

23    Q   And are you aware of what's called incident to billing for

24    Medicare?

25    A   Yes.

1    Q    Can you explain the difference to the jury?

2    A    Incident to billing is when a mid-level, a nurse

3    practitioner or a physician's assistant who is not a doctor,

4    sees a doctor's patients and you can still bill under the

5    doctor's license for the office visits.

6    Q    And how is the Blue Cross and Blue Shield contract

7    different?

8    A    They did not recognize incident to billing.

9    Q    Did you ever advise Dr. Ruan or Dr. Couch about what they

10   needed to do with regard to Blue Cross and Blue Shield?

11   A    Yes.

12   Q    What did you tell the doctors?

13   A    I said they needed to at least see the patients every

14   visit.

15   Q    Why was that?

16   A    Because Blue Cross doesn't recognize incident to billing

17   and they needed to at least spend -- you know, if it was a

18   15-minute office visit, I figured they needed to be in there at

19   least five minutes of it in order to bill under their names.

20   Q    And do you know if Dr. Ruan or Dr. Couch were or were not

21   doing that?

22   A    I just assumed they were.  I wasn't in the back.

23   Q    Are you familiar with a system called the Greenway system?

24   A    Yes.

25   Q    Can you explain to the jury what was the Greenway system?

KEN CROSS - DIRECT BY MR. BODNAR

3132

1    A    It's just an electronic medical health record and billing
2    system.
3    Q    Approximately when did PPSA switch over to the Greenway
4    system?
5    A    I would say it was -- I believe it was around November of
6    2008.
7    Q    Did the Greenway system have an ability to set up
8    templates?
9    A    Yes.
10   Q    And what is a template?  Please explain that to the jury.
11   A    Template is just any kind of document with some wording
12   already provided.  If you know you're going to have it in there
13   every time, it's just already there and then you can just kind
14   of fill in the blanks or anything else that might change.
15   Q    And do you know if the template would auto populate in the
16   Greenway medical records?
17   A    I don't believe that it did.
18   Q    Do you know if the doctors were required to sign medical
19   records at this point?
20   A    Yes, they were.
21   Q    And do you know if they did that?
22   A    In order to get paid, the bill to go through the Greenway
23   system, I believe they had to electronically sign off on them,
24   yes.
25   Q    And are they certifying the correctness of that?

3133

```
 1   A    Yes.
 2   Q    Was there ever a time that it was brought to your attention
 3   that needles were being autoclaved at PPSA?
 4   A    Yes.
 5   Q    First, can you explain what is autoclaving?
 6   A    Autoclave is just a high temperature steam device.  It can
 7   be very large and they are used to sterilize surgical
 8   instruments.
 9   Q    And do you know what these needles were being used for at
10   PPSA?
11   A    They were being used, I believe, for injections in the
12   spinal region.
13   Q    At some point did you bring to the attention of Dr. Ruan
14   and Dr. Couch concern about the autoclaving of needles?
15   A    Yes.
16   Q    What did you tell Dr. Ruan and Dr. Couch?
17   A    I told -- I told them that the sales rep had approached me
18   and was concerned and --
19          MR. KNIZLEY:  Your Honor, I object to what the
20   salesman may have said.  Hearsay.
21          MR. BODNAR:  Your Honor?
22          THE COURT:  He's testifying what he told Dr. Ruan and
23   Dr. Couch.  So overruled.
24   BY MR. BODNAR:
25   Q    So what did you tell Dr. Ruan and Dr. Couch about
```

1   autoclaving of these disposable needles?

2   A   I told them that I was made aware they were supposed to be

3   disposable, meaning one use only, and we were reusing them and

4   that was against the -- I guess the guidelines set by the

5   company we bought the needles from.

6           MR. BODNAR:  One moment, Your Honor.

7       (A discussion was held off the record between government

8   counsel.)

9   BY MR. BODNAR:

10  Q   Mr. Cross, do you recall talking about telling the doctors

11  that after the Florida investigations that they needed to be

12  seeing their patients?

13  A   Yes.

14  Q   Did you tell it to Dr. Ruan and Dr. Couch or just one of

15  the two doctors?

16  A   I believe it was both of them, yes.

17  Q   How about telling about the Blue Cross/Blue Shield billing

18  and being present in the office visit?

19  A   That would be to both.

20  Q   That was to both Dr. Ruan and Dr. Couch?

21  A   Yes.

22  Q   Do you know how Dr. Ruan and Dr. Couch's partnership in the

23  business was set up?

24  A   Yes.

25  Q   How was their partnership set up?

3135

```
 1   A   They owned 50-50.

 2   Q   Of --

 3   A   Of PPSA.

 4   Q   Was Dr. --

 5   A   And the pharmacy.

 6   Q   I'm sorry.  Say that --

 7   A   And the pharmacy.

 8   Q   Was Dr. Chen an owner as well?

 9   A   No.

10   Q   Were decisions made jointly by Dr. Ruan and Dr. Couch

11   regarding PPSA?

12   A   Yes.

13   Q   How about about C&R Pharmacy?

14   A   Yes.

15   Q   How about business decisions regarding the dispensary or

16   whether to open up the MRI machine?

17   A   Yes, that would be both.

18   Q   When Bridgette Parker was sent home, you mentioned that you

19   had informed Dr. Couch about that.  Did you inform Dr. Ruan

20   about that?

21   A   No, I guess I did not.

22   Q   And at the time that happened, was she a Dr. Couch nurse

23   practitioner?

24   A   Yes.

25   Q   Did there come a time in 2014 you were fired from PPSA?
```

KEN CROSS - DIRECT BY MR. BODNAR

3136

1    A    Yes.

2    Q    Can you explain who fired you and what happened?

3    A    It was Boe Strange, who was the accountant.  I just came in

4    one morning and he was there with Debi Phillips and Melissa

5    Baggett.

6    Q    And who is Debi Phillips?

7    A    Debi Phillips was the -- I believe her title was the chief

8    operating officer.

9    Q    And who was Melissa Baggett?

10   A    She was more the, I guess, administrative.  She would help

11   do some of the, I guess, QuickBooks, more the administrative

12   type work for managers.

13   Q    Were Dr. Ruan and Dr. Couch present when you were fired?

14   A    No.

15   Q    Was any reason given for your firing?

16   A    No.

17   Q    Subsequent to you being fired, were you given any sort of

18   severance package or anything along those lines?

19   A    Yes.

20   Q    Explain that to the jury, please.

21   A    I was paid -- I had some remaining sick and vacation time

22   that was paid time off, and then I was paid above that to help

23   train whoever else they hired.

24   Q    And did you in fact train someone else after you?

25   A    Yes.

KEN CROSS - CROSS BY MR. DOSS

```
 1  Q   And what was the time period that you were fired?
 2  A   It was late May of '14.
 3  Q   And after your firing were there ever any -- were you ever
 4  told why it was that you were fired?
 5  A   No.
 6          MR. KNIZLEY:  Your Honor, I object.  At the present
 7  time hearsay, unless he says the source of the person telling
 8  it.
 9          THE COURT:  Well, he said no.
10          MR. KNIZLEY:  I'm sorry.  I didn't hear.
11          THE COURT:  So overruled.
12          MR. BODNAR:  Pass the witness, Your Honor.
13                     CROSS EXAMINATION
14  BY MR. DOSS:
15  Q   Good morning, Mr. Cross.  My name is Jeff Doss, and I
16  represent Dr. Couch.  I have some followup questions from
17  Mr. Bodnar.  I want to go through and get some dates to the
18  best of your recollection, if that's okay with you.
19  A   Okay.
20  Q   On direct examination do you recall testifying that you
21  became aware from maybe an MA that there were blank
22  prescription pads in Dr. Couch's desk drawer?
23  A   Correct.
24  Q   About when did that happen?
25  A   I'm really not sure.  I don't know.  It would have been
```

1    sometime probably late 2013 or --

2    Q   Or?  Did you say or?

3    A   -- or around the time of that email that I sent to Boe.  It

4    was a bit before that when I first was aware.

5    Q   And your concern, if I understood, Mr. Cross, was that it

6    was in his desk drawer; is that correct?

7    A   My concern was just that he was signing blank prescription

8    pads.

9    Q   And that blank prescription pad was in his desk drawer;

10   correct?

11   A   Yes.

12   Q   And when you say blank prescription pad, Mr. Cross, do you

13   mean that it was a pad for prescriptions signed without the

14   medication information filled in or the medication information

15   had been filled in and signed?

16   A   They were completely blank and signed, so you could put

17   anything you wanted in there.

18   Q   And you brought that to Dr. Couch's attention; correct?

19   A   Yes.

20   Q   And you testified that you were concerned about these blank

21   prescriptions because you thought Dr. Couch could lose his DEA

22   license; correct?

23   A   Correct.

24   Q   Mr. Cross, do you hold yourself out as an expert on DEA

25   rules and regulations?

KEN CROSS - CROSS BY MR. DOSS

```
1    A    No.
2    Q    And sitting here today, you don't know one way or the other
3    whether signing blank prescription pads and leaving them in a
4    desk drawer is in fact a violation of DEA rules and
5    regulations, do you?
6    A    Correct.
7    Q    You also testified that you spoke with Dr. Couch, if you
8    remember, about the IPM money that was being received by
9    Dr. Couch and Dr. Ruan.  Do you remember that?
10   A    Yes, uh-huh.
11   Q    When did that happen?
12   A    I'm not sure when that happened.  I don't -- it was soon
13   after the IPM pharmacy came in.
14   Q    When did IPM start handling the workers' comp dispensary
15   for PPSA?
16   A    I really don't recall when they came into the practice
17   first.
18   Q    Do you have any sense of a ballpark of when you may have
19   had this conversation with Dr. Couch about the compensation?
20   A    I would say it was probably, you know, 2000 -- you know,
21   2000 and probably '12 or '11, somewhere around there, fairly
22   soon.
23   Q    And you were asked some questions about Bridgette Parker
24   and that you witnessed Ms. Parker impaired at work.  Do you
25   remember that?
```

3140

```
 1   A   Yes.

 2   Q   About when did that happen?

 3   A   I would say that was probably -- that was in 2014.

 4   Q   Do you know if Ms. Parker at any point in time had neck

 5   surgery?

 6   A   I believe she had -- I thought she had back surgery.  I

 7   knew she had some issue, yes.

 8   Q   So you're aware that she had back surgery at some point?

 9   A   Yes.

10   Q   Do you know if it was around that time?

11   A   I don't know when it was.  I believed it to be before.

12   Q   You testified about the MRI investment.  Do you remember

13   that?

14   A   Yes.

15   Q   And you testified that you put together some pro forma

16   statements associated with the MRI purchase.  Remember?  Do you

17   remember that?

18   A   Yes, uh-huh.

19   Q   And that's not uncommon?

20   A   No.  All businesses should do it.

21   Q   And about when did that happen that they purchased the MRI

22   equipment?

23   A   Around 2007, when we opened.

24   Q   You testified that you advised Dr. Couch and Dr. Ruan, I

25   believe, about a criminal investigation in Florida.  Do you
```

 1  remember that?

 2  A   Yes.

 3  Q   About when did that happen?

 4  A   I don't recall.  I just remember seeing it on the news.  It

 5  made pretty big news at the time and it was definitely

 6  pertinent to our practice, so I just thought I'd talk to them

 7  about it.

 8  Q   And you testified that Justin Palmer started earlier than

 9  Dr. Couch and would see patients before Dr. Couch arrived;

10  correct?

11  A   Yes.

12  Q   About how long was that going on?

13  A   That was going on for quite a while.  I mean, probably from

14  the time Dr. -- I mean Justin was hired.

15  Q   And you testified about advising the doctors that they

16  needed to see the patients at least for a moment.  Do you

17  remember that?

18  A   Yes.

19  Q   About when did that happen?

20  A   That was when we first started hiring nurse practitioners.

21  Q   When would that have been?

22  A   I don't recall the exact time.  But it was -- I really

23  don't know.  I believe Justin may have been one of the first

24  ones we hired.

25  Q   Okay.  With Blue Cross/Blue Shield, you distinguish between

 1   other payors and Blue Cross, that Blue Cross didn't cover

 2   incident to billing.  Do you remember that?

 3   A   Correct.

 4   Q   When did you become aware that Blue Cross/Blue Shield

 5   didn't cover incident to billing?

 6   A   I just heard about it.  They had sent out a letter to

 7   practices.

 8   Q   You don't remember when that was?

 9   A   I don't know exactly when.

10   Q   Do you remember when you had any conversations with

11   Dr. Couch or Dr. Ruan about incident to billing?

12   A   Just in passing, I was just telling them they needed to see

13   their patients in order to bill Blue Cross.

14   Q   Was that one conversation you had or multiple?

15   A   No.  It was probably just one.

16   Q   What was your involvement with billing at PPSA, Mr. Cross?

17   A   I was not directly over the billing.  I did manage, you

18   know, the AR, see the numbers coming in.  But I was not over

19   the billing.

20   Q   And if you saw any concern with how things were being

21   billed at PPSA, you would have brought that to someone's

22   attention, wouldn't you?

23   A   Correct.

24   Q   With McConaghy Pharmacy, about when did McConaghy -- about

25   when was McConaghy Pharmacy brought in to handle C&R Pharmacy?

1    A    They came in fairly early.  It was still at the Springhill

2    office.  So within a year of it opening, I would say.

3    Q    Do you remember about when that would be?

4    A    I would just guess maybe the fall of 2011.  I can't

5    remember exactly when we opened it.  Maybe 2011.

6    Q    Mr. Cross, can you remember sitting for a deposition in

7    February of 2013?

8    A    Yes.

9    Q    And a deposition is sort of like what we're doing here;

10   questions are asked, answers are given, we have a court

11   reporter present; right?

12   A    Yes.

13   Q    And during that deposition, Mr. Cross, did you tell the

14   truth?

15   A    Yes.

16   Q    And that was February of 2013; correct?

17   A    I don't know exactly when it was.  I just remember giving a

18   deposition for Dr. Couch.

19          MR. DOSS:  And, Your Honor, may I approach the

20   witness?

21          THE COURT:  Yes.

22          MR. BODNAR:  Your Honor, we have not seen a copy of

23   this.  So we need to see a copy and what is the context of

24   this.

25          THE COURT:  Yes.  You need to show it to counsel

1    before you question him.

2          MR. BODNAR:  We're going to need to approach on this,

3    Your Honor.

4          THE COURT:  Okay.

5       (At the side bar, jury not present.)

6          MR. BODNAR:  Your Honor, first, we're not even sure

7    what this is.

8          THE COURT:  Well, let's find out.  What is that?

9          MR. DOSS:  This is Mr. Cross' deposition.  It was

10   taken during Dr. Couch's divorce proceedings in 2013.

11         MR. BODNAR:  We object to the relevance of crossing

12   him on it.

13         THE COURT:  What do you intend to ask him on it?

14         MR. BODNAR:  Yeah.

15         MR. DOSS:  Let me see.

16         Question:  And you have not participated in or have

17   any knowledge of any illegal drug sales or anything like that

18   at the facility where you work and that Dr. Couch owns, you

19   don't know of anything?

20         And the answer was no.

21         THE COURT:  That's not impeachment.

22         MR. BODNAR:  Way outside.  Yeah.

23         MR. DOSS:  Question:  You don't know of any hiding of

24   money or assets or taking cash or trying to cheat the

25   government or anything like that?

 1            The answer was no.

 2            Question:  You don't know of any improper

 3  prescriptions being signed or whatever by someone other than

 4  Couch or Ruan, anything that's not right going on around there?

 5            The answer was no.

 6            Question:  Nothing at all, period?

 7            Answer:  Nothing.

 8            Question:  If you do, I want to hear it today or

 9  forever hold your peace.  You are under oath to tell the truth.

10  Anything bad, anything weird, anything you think is not right

11  that's going on, I want to know about it.

12            Answer:  Nothing that I know of.

13            MS. GRIFFIN:  Your Honor, first, I'm sorry to speak,

14  since it's Mr. Bodnar's witness.  But I had understood those

15  proceedings were sealed.  Not just this, but the whole domestic

16  case.  And so I'd like to inquire first if that's a sealed

17  proceeding.

18            MR. DOSS:  The deposition, I'm not aware of it being

19  sealed, no.  The proceedings themselves, filings in the court,

20  that may be one thing.  But a deposition is a discovery

21  document.

22            THE COURT:  Well, he has not said anything contrary to

23  what is in that deposition.  So I don't know what the purpose

24  of this is.

25            MR. DOSS:  Our concern, Your Honor, is that any

1  testimony about Justin seeing patients without a

2  doctor present, which he's testified to the whole time --

3      THE COURT:  What you're doing is getting him to

4  characterize what he's testified about as being criminal,

5  because I don't think this is impeachment of him.  Already, he

6  hasn't testified that any of those things actually

7  happened.  He's testified to facts of what he saw, but he

8  hasn't characterized them as being illegal.  So I sustain the

9  objection to these.

10      MR. DOSS:  And to be clear, if we ask followup

11  questions and it does become potential impeachment material,

12  can we revisit the issue at that point in time?

13      THE COURT:  Well, I will address whatever issues come

14  up when they come up.

15      MR. DOSS:  Sure.  Thank you, Judge.

16      MS. GRIFFIN:  Can we see the date?

17      MR. DOSS:  February 17.

18      (In open court, defendants and jury present.)

19  BY MR. DOSS:

20  Q   All right.  Mr. Cross, I want to go back to your testimony

21  about Mr. Palmer seeing patients.  Do you remember that?

22  A   Okay.

23  Q   And you testified that Justin Palmer was seeing patients

24  without the physician necessarily being present almost from the

25  time he started; right?

```
 1  A   Yes.
 2  Q   Okay.  There's nothing wrong about that, was it?
 3          MR. BODNAR:  Objection, Your Honor, to asking whether
 4  or not it was wrong for him.  He advised that he notified him
 5  about it, but he's not in a position to say if it's wrong or
 6  right.
 7          THE COURT:  Sustained.
 8  BY MR. DOSS:
 9  Q   Were you aware of that violating any billing requirement
10  for an insurance company?
11  A   No.
12  Q   And that would include the incident to billing requirement
13  or prohibition by Blue Cross?
14  A   Yes.
15  Q   So as far as you knew, even if Mr. Palmer was in fact
16  seeing patients without Dr. Couch being present, that didn't
17  run afoul of Blue Cross's billing requirements, did it?
18  A   I didn't know which patients he was seeing and which
19  insurance companies.  So --
20  Q   And there were some patients who weren't Blue Cross
21  patients?
22  A   Correct.
23  Q   And those insurance companies didn't require Dr. Couch to
24  be present for those visits --
25  A   Correct.
```

1  Q   -- did they?

2  A   Correct.

3  Q   All right.  On the Galena topic, Mr. Cross, you testified

4  that it was risky because it was cheap; right?

5  A   Yes.

6  Q   And that also offers the opportunity -- correct -- that if

7  you can purchase it low and it has the potential to build

8  value, you can make a lot of money off of that?

9  A   Of course, yes.

10 Q   So in fact that can sometimes be a good investment

11 strategy, to buy low and hope it gets high?

12 A   Yes.

13 Q   And were you aware that Galena sold Abstral?

14 A   Yes.

15 Q   And were you also aware that Galena was developing a breast

16 cancer vaccine?

17 A   Yes, I had heard a cancer drug.  I didn't know exactly what

18 kind.

19 Q   So it was at least possible that the development of that

20 cancer vaccine could have offered the potential for the stock

21 price to increase?

22         MR. BODNAR:  Objection to speculation, Your Honor.

23         THE COURT:  Sustained.

24 BY MR. DOSS:

25 Q   You testified that approximately $300,000 was used from a

1  PPSA account to purchase Galena stock on December 5th, December

2  6th, and December 19th?

3  A   Somewhere around those dates, yes.

4  Q   But you're not positive; right?

5  A   Well, the money was put from the PPSA account into

6  Dr. Couch's personal E*Trade and then he made the purchases.

7  So I couldn't tell you exactly the dates that he did it.

8  Q   And that was in lieu of Dr. Couch's quarterly bonus;

9  correct?

10  A   Not in lieu of, I wouldn't say, no.

11  Q   That money was -- Dr. Couch had access to that money at

12  PPSA, didn't he?

13  A   Both of them did, yes.

14  Q   Because they were the owners of PPSA; right?

15  A   Correct.

16  Q   And an owner can draw from his company money to use as he

17  or she sees fit; fair?

18  A   Correct.

19  Q   And there's nothing wrong with that, is there?

20  A   No.

21  Q   You testified that PPSA started using the Greenway system

22  in November of 2008; correct?

23  A   Somewhere around there, yes.

24  Q   Before Greenway was used, do you know what system PPSA had

25  in place to keep track of its medical records?

KEN CROSS - CROSS BY MR. DOSS

```
 1   A    Yes.

 2   Q    What system was that?

 3   A    There were two systems.  One was call Lytec.  That was the

 4   billing software, billing and scheduling software.  The other

 5   was a software called MedScan.

 6   Q    Were those paper files?

 7   A    No.  They were --

 8   Q    Well, let me back up.  Did they start as paper files and

 9   then were scanned into the system?

10   A    Yes, yes, yes.

11   Q    So those would be files that the doctor or the nurse or

12   whomever would take by hand, fill out the form, they would then

13   be sent to someone who would scan them in and those would be

14   the medical records; fair?

15   A    Correct, correct.

16   Q    Okay.  And at some point PPSA moved from that MedScan

17   system to the Greenway system; correct?

18   A    Yes.

19   Q    And do you know if there was an effort after the Greenway

20   system started to take the old MedScan files or the old paper

21   files and import those into the Greenway system?

22   A    I believe we just ran the two systems concurrently and just

23   kept -- that way we didn't have to put a lot of effort and

24   expense into putting the files into Greenway per se unless they

25   were absolutely necessary.  You just keep them both running at
```

 1   the same time.

 2   Q   The Physicians Compounding Solutions was a company owned by

 3   Dr. Couch, you testified; right?

 4   A   Yes.

 5   Q   And for how long was Physicians Compounding Solutions

 6   compounding medications for the pain pumps and essentially

 7   selling it to PPSA?

 8   A   From before I started till after I left, I guess.  I don't

 9   know the exact dates.

10   Q   Well, at least a decade; is that fair?

11   A   Yes.  I was there nine and a half years.

12   Q   And there was nothing wrong about Physicians Compounding

13   Solutions -- well, let me back up.

14           Are you aware of anything that would have prohibited

15   Physicians Compounding Solutions from compounding and selling

16   medications to PPSA?

17   A   No.

18   Q   You testified on direct that you advised Dr. Couch and/or

19   Dr. Ruan that if they purchased the Galena stock, they can't

20   change their prescribing habits.  Do you remember that?

21   A   Yes.

22   Q   About when did that happen, if you remember, when you had

23   that conversation?

24   A   When they first brought up the notion of purchasing a large

25   sum of stock.

1    Q    Okay.  And let me show you what's in evidence as Government

2    Exhibit 11-4.  This was shown to you.  And it appears, based on

3    this chart, Mr. Cross, that Dr. Couch's first purchase of

4    Galena stock was November 27, 2013; right?

5    A    Yes.

6    Q    In relation to that purchase, do you know if your

7    conversation happened before or after that?

8    A    It happened -- it happened after that.

9    Q    Do you know what Dr. Couch's prescribing habits were for

10   Abstral before November 27, 2013?

11   A    No.

12   Q    And to be clear -- and I think you covered this a little on

13   direct -- but you were not on the medical team at PPSA, were

14   you?

15   A    No.

16   Q    You weren't meeting with patients in exam rooms, were you?

17   A    No.

18   Q    You have really no knowledge first-hand about what was or

19   was not happening in those examination rooms with the patients,

20   do you?

21   A    That's correct.

22   Q    And you've not been to medical school; correct?

23   A    Correct.

24   Q    Or nursing school?

25   A    No.

1    Q   Okay.  And so you're not here to testify, if I understand
2    correctly, that you have first-hand knowledge of the
3    prescribing decisions, prescribing habits, anything on the
4    medical side of PPSA; is that right?
5    A   Correct.
6    Q   To be clear, on the Blue Cross/Blue Shield topic,
7    Mr. Cross, you weren't ever aware of a nurse practitioner
8    seeing a Blue Cross/Blue Shield patient when a doctor wasn't
9    there, were you?
10   A   I couldn't tell for sure, no.
11           MR. DOSS:  One moment, Your Honor.
12           THE COURT:  All right.
13       (A discussion was held off the record between defense
14   counsel.)
15   BY MR. DOSS:
16   Q   And, Mr. Cross, while you were employed at PPSA, you're not
17   aware of anyone trying to cheat the government, are you?
18           MR. BODNAR:  Objection, Your Honor.  He's asking for a
19   legal conclusion here.
20           THE COURT:  By anyone, whom do you mean?
21   BY MR. DOSS:
22   Q   Well, Mr. Cross, you're not aware of anyone in the billing
23   department trying to cheat the government, are you?
24   A   No.
25           MR. BODNAR:  And objection, Your Honor, to

```
 1   foundation.  He said he wasn't over billing.
 2            THE COURT:  Sustained, sustained.
 3   BY MR. DOSS:
 4   Q   And, Mr. Cross, you don't know of any improper
 5   prescriptions or you didn't know of any improper
 6   prescriptions --
 7            MR. BODNAR:  Again, objection to foundation.  He said
 8   he was not involved in the medical side of this either.
 9            THE COURT:  Sustained.
10            MR. DOSS:  One moment, Your Honor.
11            THE COURT:  All right.
12       (A discussion was held off the record between defense
13   counsel.)
14   BY MR. DOSS:
15   Q   And one last line of questions, Mr. Cross.  During your
16   time at PPSA, were there employment policies in place?
17   A   Yes.
18   Q   What sort of employment policies?
19   A   Standard -- I mean, there was a drug policy in place.
20   Q   Were you in charge of that?
21   A   Yes.
22   Q   When did that come about?
23   A   I don't know the date.
24   Q   So there was drug testing for employees; correct?
25   A   Yes.
```

KEN CROSS - CROSS BY MR. DOSS

1   Q   Did you recommend that policy be put into effect?

2   A   Yes.

3   Q   What other employment policies did you recommend be put in

4   effect?

5   A   I don't know that there were others.  They already had

6   several in effect at the time.  Just your standard policies, I

7   mean.

8   Q   Sure.  And were you responsible for making sure that those

9   were followed?

10  A   Yes.

11  Q   And you did your best to make sure that they were followed;

12  right?

13  A   Correct.

14  Q   And if you had any issues from time to time, you might take

15  those to Dr. Couch or Dr. Ruan; correct?

16  A   Yes.

17  Q   And what was the management team at PPSA?

18  A   The -- at first it was mainly myself and the two

19  doctors.  Towards the end, for the last year especially, Boe

20  Strange took a significant role.

21  Q   Boe Strange in 2014; is that right?

22  A   I don't know exactly when he started, but yes.

23  Q   Who else was on the management team while Boe Strange was

24  on it?

25  A   Mostly it was just -- as far as PPSA was concerned, it was

KEN CROSS - CROSS BY MR. KNIZLEY

1   him and the doctors and myself.

2   Q   What about Debi Phillips?

3   A   She did play a role, yes.

4   Q   What about Melissa Baggett?

5   A   She was more administrative.  She didn't make management

6   decisions.

7           MR. DOSS:  One moment.

8           Nothing further, Your Honor.

9           THE COURT:  Mr. Knizley?

10                  CROSS EXAMINATION

11  BY MR. KNIZLEY:

12  Q   Good morning, Mr. Cross.

13  A   Good morning.

14  Q   I'm Dennis Knizley, and I represent Dr. Ruan.

15          I think you told us you went to work at PPSA in about

16  2004.  Does that sound right?

17  A   Yes.

18  Q   And I'm going to ask you at the time, let's say, in the

19  last five years -- and I believe you said you left in around

20  May of 2014?

21  A   Yes.

22  Q   So let's say the four or five years before you left, your

23  duties and responsibilities at PPSA, you said you were the

24  office manager; right?

25  A   Yes.

KEN CROSS - CROSS BY MR. KNIZLEY

1   Q   You were responsible for hiring and firing office staff?

2   A   For the most part, yes.  As it grew, other managers -- say

3   a billing manager could hire her own staff, yes.

4   Q   Mr. Strange and others, is that what you're referring to,

5   or someone else?

6   A   More just like maybe Debi.  She was over billing.  She

7   might recommend somebody or interview someone for billing.

8   Q   And so for the jury's sake, you're talking about Debi

9   Phillips?

10  A   Debi Phillips, yes.

11  Q   Okay.  And there came a time -- and we'll talk about the

12  time frame -- that Ms. Phillips came in and was over billing;

13  is that right?

14  A   Yes.

15  Q   And then she really moved on up to be the manager -- the

16  CEO, I think they called it; right?

17  A   COO, yes.

18  Q   COO, chief operating officer?

19  A   Yes.

20  Q   Okay.  Were you still there at that time?

21  A   Yes.

22  Q   Okay.  Do know about when --

23          THE COURT:  Mr. Knizley?  Excuse me.  Mr. Knizley,

24  when you asked about Ms. Phillips over billing, do you mean she

25  was in charge of or she was actually overbilling.

1    MR. KNIZLEY:  Not overbilling as in excessive billing.

2    THE COURT:  So you meant in charge of billing?

3    MR. KNIZLEY:  In charge of billing.  That was a very

4 poor choice of words.  Thank you, Your Honor, for straightening

5 me out there.

6 Q Ms. Phillips wasn't overbilling, was she?

7 A Yes.

8 Q She was in charge of billing?

9 A In charge.

10 Q You don't have any reason to believe she was overbilling,

11 do you?

12 A No, I didn't.

13 Q And I apologize for that.  That was a bad choice of words.

14    And back to your responsibilities.  You said that you

15 did some hiring and firing, but when people like Ms. Phillips

16 came along and others, if they had a particular area such as

17 billing, they may have inured to that responsibility?

18 A Yes.

19 Q Is that correct?

20 A Yes, yes.

21 Q And you also did the payroll?

22 A Yes.

23 Q And how many employees were we talking about, let's say, in

24 2014?

25 A Towards the end it was upwards of around 50.

KEN CROSS - CROSS BY MR. KNIZLEY

1   Q   Okay.  And would that include both the Springhill and

2   the --

3   A   Yes.

4   Q   -- Airport Boulevard?

5   A   (Nodding head affirmatively.)

6   Q   And you did some IT, I believe you said; right?

7   A   Yes.

8   Q   And what does that mean, IT?

9   A   Just some of the information technology.  Just very

10  minimal.  I don't pose myself as an expert.  But fixing simple

11  network-computer-printer issues, no sense calling outside when

12  it's not that involved.

13  Q   And you'd do some of the bank deposits --

14  A   Yes.

15  Q   -- and that type thing; is that right?

16  A   Yes.

17  Q   And as Mr. Doss had inquired, your responsibilities were

18  not those of a medical person or a clinical person or a

19  pharmaceutical person; is that correct?

20  A   Correct.

21  Q   You were an administrative person running the business, if

22  you will?

23  A   Correct.

24  Q   So you didn't have the need to go to the examinations or

25  procedure rooms and that sort of thing?

KEN CROSS - CROSS BY MR. KNIZLEY
3160

```
 1   A   Correct.

 2   Q   That was not what you did?

 3   A   No.

 4   Q   Now, your office, from the time you got there in 2004,

 5   remained in the same location the entire time, did it not?

 6   A   Yes.

 7   Q   And could you tell the ladies and gentlemen of the jury

 8   where your office was?

 9   A   It was in the Springhill office.

10   Q   Sort of in the middle of the building?

11   A   Towards -- towards the front, I guess.

12   Q   Near the front, but the exam rooms were on the outside and

13   you were sort of in the middle front?

14   A   No.  I was on the front -- I guess one of the side -- the

15   west side.

16   Q   And there came a time when Dr. Ruan's practice moved

17   substantially out to Airport Boulevard; is that right?

18   A   Yes.

19   Q   And you remained at Springhill at that time?

20   A   My office did, yes.

21   Q   You had your computers and your files and that stuff at the

22   Springhill office; is that right?

23   A   Yes, yes.

24   Q   You had mentioned there was a Greenway system created.  And

25   I think you told Mr. Doss that was the electronic medical
```

3161

1    records system; is that correct?

2    A    Yes.

3    Q    And previous to that time the system, as was discussed,

4    notes were handwritten out and then scanned into what was known

5    as the MedScan system; is that correct?

6    A    Well, they weren't necessarily handwritten.  I know

7    Dr. Couch dictated using Dragon dictation and he had another

8    Software program that he would actually do dictations and those

9    would be printed and scanned into the system.

10   Q    So there were two kinds, some handwritten, some -- and

11   Dragon Speaking is something you speak into that will actually

12   print out your words?

13   A    Exactly.

14   Q    And you had that.  So when you had the MedScan system, some

15   of it was handwritten and scanned in, some of it was printed

16   out and scanned in?

17   A    Yes.

18   Q    But the process there was a complete scanning process into

19   a system?

20   A    Yes, manual scanning.

21   Q    I'm sorry?

22   A    Manual scanning, yes.

23   Q    Okay.  And then there came a time when the Greenway system

24   came about?

25   A    Yes.

1  Q   And I thought I may have misunderstood you.  You thought

2  maybe that would have been in the 2008 time frame?

3  A   It was around October-November of 2008, yes.

4  Q   Might that have been like November of 2011 possibly?  And

5  let me show you.  If I showed an email to you from Mr. Strange

6  in connection with it, might that help you remember?

7  A   It could have been, yes.  Okay.

8        MR. KNIZLEY:  This is not in evidence, Your Honor, and

9  it's Ruan Exhibit 170.

10  Q   Mr. Cross, I'm showing you what's been marked Ruan's

11  Exhibit 170.  And that's Dr. Ruan's response to this.  But this

12  is from Mr. Strange, November 11, 2011, to you and it refers to

13  Greenway in here.  Do you recall that email?

14  A   Let's see.

15  Q   Take a moment to take a look at it.  From Mr. Strange, it

16  looks like, to you, that date.

17  A   Uh-huh (positive response).

18  Q   (Indicating.)  Do you remember that email?

19  A   Yes.

20        MR. KNIZLEY:  Judge, we'd offer Ruan's Exhibit 170.

21        MR. BODNAR:  Objection to it's admissions, Your Honor.

22  If it's used to refresh his memory, that's one thing.  But

23  otherwise it's hearsay.

24        THE COURT:  Yes.  Sustained.

25  A   I don't believe that's when we purchased the system.

```
 1  BY MR. KNIZLEY:
 2  Q   Sir?
 3  A   I don't believe that's when we purchased the system,
 4  though.
 5  Q   Let me just ask you does this email, in looking at it, does
 6  it refresh your recollection of when you started the scheduling
 7  of Greenway, the onsite training of Greenway, and you began
 8  to -- when you started training people on Greenway, does this
 9  refresh your recollection when that happened?
10  A   We trained on a couple of different times, one when we
11  initially went on with Greenway and once much later, as the
12  practice grew.  Most of the employees that had been -- due to
13  turnover, you know, most of the employees there had not been a
14  part of the initial training.  So we brought Greenway back in
15  to train the office again.  So this could be the second round
16  of training.
17  Q   And it could be.  And if you look at it, does it refresh
18  your recollection if you're looking at the word "Greenway"
19  here, where it says next, what does it say there?
20  A   Initial phase.
21  Q   So would this be the initial phase?
22  A   Of this training, yes.
23  Q   Okay.  And do you know of any previous training other than
24  this training that is mentioned in this email?
25  A   I believe -- I still believe we purchased the Greenway in
```

1  2008 and that would have been the initial training, would have

2  been back then.

3  Q   Okay.  Well, who was in charge of training on Greenway,

4  seeing that it got done?

5  A   When we first bought the program, the Greenway company sent

6  reps down to train.  The second round was done by a local

7  company here called the Bienville Group.

8  Q   From PPSA were you in charge of seeing that the Greenway

9  people came down and properly trained PPSA people initially?

10 Was that your responsibility?

11 A   My responsibility was to set up and install the program and

12 then have the people come down, yes.

13 Q   And did you look into what the program was to do for the

14 clinic, how it would help the clinic?  Was that part of your

15 responsibility?

16 A   Yes.

17 Q   And as not only the entry of medical information, but also

18 as to the billing?  Were you overseeing how it could assist in

19 the billing?

20 A   Yes.

21 Q   And it not only entered information for recordkeeping, but

22 also was helpful in the billing aspect as well?

23 A   Correct.

24 Q   It could tell you who the insured was and that information

25 for the patient and the insurer would already be in there?

3165

```
 1   A    Yes.
 2   Q    And then the billers would just have to enter the
 3   information of what the procedure was or whatever office visit
 4   was, whatever it may have been; right?
 5   A    Yes.
 6   Q    And that was your responsibility to see that got
 7   implemented at PPSA?
 8   A    Yes.
 9   Q    All right.  Now, you mentioned the IPM and the workmen's
10   compensation dispensary.  Remember that?
11   A    Yes.
12   Q    And do you remember who the IPM gentleman was, who the
13   representative was?
14   A    No.
15   Q    Now, you told us, I believe -- and so we understand, it was
16   a workmen's compensation dispensary or pharmacy; is that
17   correct?
18   A    Yes.
19   Q    And you said that workmen's compensation paid a hundred
20   percent?
21   A    I don't know the exact amount.  But I said it might -- it
22   was very close to it.  It was a lot more than we get from the
23   insurance company.
24   Q    Wasn't in fact workmen's compensation set by the state?
25   A    Okay (nodding head affirmatively).
```

```
 1  Q   I mean I'm asking you.  Do you know?
 2  A   I don't know.  I don't know whether -- I do not know.
 3  Q   You said it pays a hundred percent.  Do you know that or
 4  not know it?
 5  A   I did not say it paid a hundred percent.
 6  Q   I'm sorry.  I misunderstood you.  Do you know anything
 7  about how workmen's compensation's reimbursement for medicines
 8  are set or were set when that clinic was opened?
 9  A   I simply know they are much higher than what insurance
10  companies --
11  Q   You don't know any more about it?
12  A   No.
13  Q   Do you know who sets it?
14  A   No, I don't know who sets it.
15  Q   Do you know whether it's full payment, not full payment, or
16  in between?
17          MR. BODNAR:  Objection.  Asked and answered on this.
18  He said he didn't know other than what he's testified to.
19          THE COURT:  Overruled.
20  BY MR. KNIZLEY:
21  Q   Do you know if it's full payment, less than full payment,
22  or do you have any idea?
23  A   I don't know.
24  Q   Now, but you did tell us that you understood that the
25  medications that went into the workmen's compensation pharmacy
```

KEN CROSS - CROSS BY MR. KNIZLEY

3167

1  or dispensary that was managed by IPM were bought under

2  Dr. Ruan's DEA number; is that right?

3  A    Yes.

4  Q    And they were paid for by Dr. Ruan's money and Dr. Couch's

5  money; right?

6  A    Not that I was aware, no.

7  Q    Okay.  Well, do you know how the medications were bought?

8  Do you have any idea?

9  A    I believe IPM paid for them.

10  Q    Well, do you know that or have any reason to believe that?

11  A    I never wrote checks for them, for the medications.  So I

12  didn't specifically --

13  Q    You never received checks either; right?

14  A    Did I receive checks?  No.

15  Q    PPSA never wrote checks or received checks for the

16  workmen's compensation pharmacy's medications?

17  A    No; correct.

18  Q    So you don't know one way or the other, do you?

19  A    About what?

20  Q    Whether Dr. Ruan and Dr. Couch bought the medicines that

21  stocked the pharmacy or someone else?

22  A    I know it didn't come from any PPSA account.

23  Q    Yes, sir.  But you don't know if Dr. Ruan and Dr. Couch

24  purchased them, do you?

25  A    Okay.  Correct.

KEN CROSS - CROSS BY MR. KNIZLEY

1    Q   Okay.  You do know -- or do you know that IPM had a
2    management contract to manage the pharmacy?
3    A   Yes, that was -- (nodding head affirmatively) -- yes, they
4    had a contract in place.
5    Q   And when you say you saw checks from IPM, you don't know
6    whether or not that is the profit above the purchases or not,
7    do you?
8    A   I know they were paid per bottle.  The number of bottles
9    that were dispensed, they got a flat fee for each bottle.
10   Q   IPM did?
11   A   The doctors did.
12   Q   Okay.
13   A   That was their cut of the money.
14   Q   You don't know whether the doctors bought the medication,
15   do you?
16   A   I would say they did not.
17   Q   Do you know?  Have any basis at all?
18   A   I can say it didn't come from any PPSA account.  Other than
19   personal --
20   Q   Other than that, do you have any other basis?
21   A   No.
22   Q   Okay.  So if the doctors bought it, IPM managed it solely,
23   they are just giving the doctors back the money after their
24   profits; right?  Right?
25   A   I would say that's highly unlikely.

1    Q    Sir?

2    A    I just don't know how, when you're saying the doctors

3    bought it.  I don't know --

4    Q    I'm saying you don't have any idea, do you?

5    A    I would -- I would say I could have a pretty good idea they

6    didn't.  I don't know where the money would have come from.

7    Q    Sir, you said every quarter -- you said they got a $300,000

8    bonus; right?

9    A    Correct.

10   Q    Might it come from there?

11   A    I guess they could have given -- written personal checks.

12   Q    Or could have set up another business that you weren't

13   involved in; right?

14   A    That's possible.

15   Q    And it was another business, because the C&R money never

16   came back to PPSA; right?

17   A    Correct.

18   Q    Excuse me.  Not C&R money.  The workmen's comp money never

19   came back to PPSA; right?

20   A    Right.

21   Q    So you don't know how that business operated, do you?

22   A    Correct.

23   Q    Now, you mentioned the stock as to Galena being risky and

24   you were asked the question by the prosecutor did you tell

25   Dr. Couch and Dr. Ruan.  Do you specifically recall telling

3170

1   Dr. Ruan anything about the Galena stock?  Specifically?

2   A   Yes.  I just remember they were both there and I just

3   thought it was a risky investment.

4   Q   Both where?

5   A   In the office.

6   Q   Which office?

7   A   We were at the Springhill office at the time.

8   Q   Okay.  And was anybody else present that you recall?

9   A   Not that I recall, no.

10  Q   All right.  And other than -- and do you know about what

11  time frame it was when you said that?

12  A   This would have been around November-December of that 2013,

13  I believe.

14  Q   And other than telling Dr. Ruan in the Springhill office

15  around November-December that you thought it was risky, do you

16  recall telling him anything else about Galena stock?

17  A   No.

18  Q   So that --

19          THE COURT:  Mr. Knizley, is now a good time for us to

20  take or morning break?

21          MR. KNIZLEY:  Yes, ma'am.  Yes, ma'am.

22          THE COURT:  All right.  Ladies and gentlemen, leave

23  your pads on your chairs.  No discussion about the case.  Take

24  your break downstairs in the jury assembly room.  We will call

25  you back up in about 15 minutes.  We are in recess.

3171

```
 1        (A recess was taken at approximately 10:34 a.m.)
 2        (In open court, 10:57 a.m., defendants and jury present.)
 3           THE COURT:  All right, Mr. Knizley.
 4  BY MR. KNIZLEY:
 5  Q   Mr. Cross, you testified regarding the purchase of an MRI
 6  machine by PPSA?
 7  A   Yes.
 8  Q   Do you recall that?
 9  A   Yes.
10  Q   Now, it is not uncommon for a large medical practice to
11  have an MRI machine, is it?
12  A   No, no.
13  Q   And the MRI machine in the pain management practice is a
14  useful tool, is it not?
15  A   Yes.
16  Q   And if the MRI machine is at a remote location not in the
17  office, then the patients would have to leave the office, go
18  there, have the MRI done, and the results sent back?
19  A   Correct.
20  Q   So it is certainly a convenient and needed thing in a pain
21  management practice, is it not?
22  A   Yes.
23  Q   And you did not know what rate of patients Dr. Ruan or
24  Dr. Couch may have had in whether or not it would justify the
25  use of the machine; is that correct?
```

1    A   Correct.

2    Q   And so you don't have a criticism of them buying the MRI

3    machine and putting it in the office, do you?

4          MR. BODNAR:  Objection to relevance on this.  He

5    wasn't asked if he was criticizing on that.  He was asked what

6    it was on direct that he advised them about the MRI machine.

7          THE COURT:  All right.  Overruled.

8    BY MR. KNIZLEY:

9    Q   You don't have a criticism, do you, of Dr. Ruan and

10   Dr. Couch purchasing an MRI machine for PPSA, do you?

11   A   No.

12   Q   Now, you spoke of needles and autoclaving needles.  Do you

13   know what a radiofrequency needle is?

14   A   Not -- not specifically, no.

15   Q   Okay.  Do you know what disposable -- what the distinction

16   between a radiofrequency needle is and a disposable needle?

17   A   I mean, that's -- I don't know that there's a

18   difference.  I mean, disposable just means it's a single use.

19   I would assume there could be disposable and reusable of any

20   kind of needle possibly.

21   Q   The rep you spoke of, was his name Justin Nettles?

22   A   Dusty Nettles?

23   Q   Justin Nettles?

24   A   I thought his name was Dusty.  But okay.

25   Q   Is that the rep you were speaking of?

KEN CROSS - CROSS BY MR. KNIZLEY

```
 1   A    Yes.

 2   Q    What was he trying to sell?  Was he selling radiofrequency

 3   needles?

 4   A    He sold the machine and the needles, yes.

 5   Q    I didn't understand you, sir.

 6   A    He sold the machine and the needles.

 7   Q    Okay.  The machine and the needles.  Did he sell

 8   radiofrequency needles, if you know?

 9   A    Yes.

10   Q    And they are much more expensive, are they not?

11   A    They are expensive, yes.

12   Q    Okay.  And they are to be autoclaved, are they not?

13   A    According to the rep in the company, the needles were

14   disposable, meaning one-time use only and then they are

15   supposed to be disposed of.

16   Q    Is it your understanding that radiofrequency needles are to

17   be disposed of?

18   A    Yes.

19   Q    And it's your understanding that they are totally metal?

20   A    I don't know the composition, no.

21   Q    Do you understand that the one-use needles have a plastic

22   component to them?  Do you understand that?

23   A    No, I don't know what makes them one use.

24   Q    You don't really have any idea, do you?

25   A    Correct.
```

KEN CROSS - CROSS BY MR. KNIZLEY

3174

1   Q   If it does have a plastic component, that would not be

2   compatible to autoclaving, would it?

3   A   I wouldn't think so.

4   Q   So you don't really -- did you ever see any needles being

5   autoclaved?

6   A   I saw them in the pouches, yes.

7   Q   Do you know whether they are radiofrequency needles?

8   A   Yes, I was shown by the rep.

9   Q   They were radiofrequency needles?

10  A   Yes.

11  Q   And is that the ones that should be autoclaved?

12  A   They were not to be autoclaved, he said.

13  Q   Okay.  That's what you understand?

14  A   Correct.

15  Q   Sir?  I'm sorry?  Did you add to that?

16  A   No.

17  Q   I'm sorry.  Now, you said that there came a time when there

18  was a criminal investigation in the Florida panhandle.  Do you

19  recall that?

20  A   Yes.

21  Q   And I think Mr. Doss asked you were you able to put any

22  type of time frame on that?

23  A   I do not know the time frame, no.

24  Q   Okay.  Was it a year or two years or do you recall before

25  you really --

3175

1   A   I don't recall.  I just remember it happening, I just

2   remember it making the news.

3   Q   And you said that was a newsworthy item and you saw it in

4   the news?

5   A   Yes.

6   Q   And you relayed that to Dr. Ruan and Dr. Couch; is that

7   correct?

8   A   Yes.  I'm sure they had seen it on their own.

9   Q   Okay.  And you said one of your concerns was that PPSA was

10  one of the largest clinics, pain clinics, in the southeast?

11  A   Yes.

12  Q   And other than suggesting they be careful in everything

13  they do, was there any more to it other than you relating that

14  to them?

15  A   No.

16  Q   And do you recall specifically relating that to Dr. Ruan or

17  just Dr. Couch or do you recall?

18  A   It would have been both.

19  Q   And were they together at the time you did that?

20  A   Yes.

21  Q   And where was that?

22  A   It was in the Springhill office.

23  Q   Okay.  Now, Dr. Ruan was only at the Springhill office one

24  day a week; is that correct?

25  A   Not -- I mean, before we opened the Airport office, he was

KEN GROSS - CROSS BY MR. KNIZLEY

1    there all the time.

2    Q   And after they opened the Airport office in 2012, he was

3    there one day a week?

4    A   Generally one day a week, yes.

5    Q   And do you recall if this conversation took place before or

6    after the opening of the Airport office?

7    A   I believe it was before.

8    Q   Okay.  Now, you have told the jury several times about

9    cautioning the doctors about various things that you may have

10   saw in the practice; is that right?

11   A   Yes.

12   Q   Now, and you said you made these verbal cautions?

13   A   Yes.

14   Q   And you used email a good bit in your practice, did you

15   not?

16   A   Yes, we used email.

17   Q   In fact, routinely email was done; right?

18   A   Yes.

19   Q   Dozens of times a day, would that be fair?

20   A   I don't know that I did dozens a day, but yes.

21   Q   10-20 times a day, how about that?

22   A   Possibly.

23   Q   And this caution about needles, about anything about MRIs,

24   there was never any email to a doctor about any of the things

25   you've told the jury today to a doctor?  Have there?

```
 1   A   Not that I know of, no.

 2   Q   Okay.  Now, would you agree with me that it was your

 3   opinion in January of 2014 that PPSA was one of the best, well-

 4   rounded pain centers in the area?

 5   A   I'm not -- in the area?  I mean, I'm not sure exactly what

 6   you mean by that.  But I mean yes, we were --

 7   Q   Let me -- I'm sorry.

 8   A   We were the largest, yes.

 9   Q   Sir?

10   A   Yes, I guess so.

11   Q   That you would agree that in January 2014 that PPSA, in

12   your opinion, was one of the best, well-rounded pain centers in

13   this area?

14   A   As far as I knew, yes.

15          MR. KNIZLEY:  Thank you.  Pass the witness.

16          MR. BODNAR:  Redirect, Your Honor?

17          THE COURT:  All right.

18                    REDIRECT EXAMINATION

19   BY MR. BODNAR:

20   Q   Mr. Cross, do you remember when you were speaking to

21   Mr. Doss you mentioned about AR coming in, that you saw the AR

22   coming in?

23   A   Yes.

24   Q   What is AR?

25   A   The accounts receivable.
```

1   Q   And could you pull the mic a little bit closer?

2   A   Accounts receivable.

3   Q   What does accounts receivable mean for a business?

4   A   It means you've basically sold items or services and

5   haven't been paid for them yet, so it's called receivable, as

6   in it's something you're expecting to receive.

7   Q   Could you just check to make sure your microphone is on?

8   I'm having trouble hearing you.

9           THE CLERK:  It's on.

10          THE COURT:  It's on.

11          THE CLERK:  I can turn it up a little bit.

12  BY MR. BODNAR:

13  Q   So would accounts receivable be the amount being reimbursed

14  by an insurance company for an office visit or procedure?

15  A   Yes, that would add to it.

16  Q   How did PPSA receive the reimbursements?  Was it electronic

17  or were checks sent from the insurance companies?

18  A   Both.

19  Q   For electronics being sent, were they being deposited in

20  banks here in the Southern District of Alabama or here in

21  Mobile?

22  A   Yes, they were going to our main PPSA account, all deposits

23  did.

24  Q   And where was that main PPSA account?

25  A   Our branch was the Springhill branch right across from

1    Mobile Infirmary.

2    Q    For what kind of bank?

3    A    Wells Fargo.

4    Q    And if a check was received by PPSA, what was done with the

5    check?

6    A    It was deposited in the account.

7    Q    I guess I should ask first were these checks received

8    through the mail?

9    A    Yes.

10   Q    And they were deposited in that same account?

11   A    Yes.

12   Q    Mr. Cross, do you know if either Bridgette Parker or Stacy

13   Madison ever saw Couch patients while he was not there?

14   A    Yes.  They did.

15   Q    Yes, they did?

16   A    Yes, I believe they did, yes.

17   Q    Do you remember a question from Mr. Doss about whether or

18   not you believed Ruan and Couch were billing falsely?

19   A    Yes.

20   Q    And you mentioned, though, you did raise concerns to

21   Dr. Ruan and Dr. Couch about their billing at least with regard

22   to Blue Cross and Blue Shield?

23   A    Yes, I just told them how I felt they should bill or the

24   way it went, you know.

25   Q    And is that because you had been made aware of what the

```
 1   Blue Cross/Blue Shield rules were?

 2   A    Yes.

 3   Q    And had you passed that information on to the doctors?

 4   A    Yes.

 5   Q    Do you recall being asked whether or not Dr. Ruan was using

 6   his money from the bonuses to purchase the drugs that went to

 7   the IPM dispensary?

 8   A    Yes.

 9   Q    And do you have any knowledge of him ever doing that?

10   A    No.

11   Q    Do you know what if anything he was using his bonus money

12   for?

13   A    No.  Some cars.

14   Q    I'm sorry.  What?

15   A    Some cars.

16   Q    How were the other employees -- not the doctors -- how were

17   the other employees paid at PPSA?  Were they paid by salary or

18   did they receive a certain percentage of the profit?

19   A    Well, most employees were paid hourly.  The nurse

20   practitioners, with the exception of one, was paid -- were paid

21   on production.  They would get a portion of their collections.

22   Q    Was there anybody else except for Dr. Ruan and Dr. Couch

23   that shared in the profit that was left over once everyone was

24   paid?

25   A    I'm sorry.  They actually got paid a fixed amount per
```

KEN CROSS - REDIRECT BY MR. BODNAR
3181

```
 1   patient, per visit, a certain amount for a new patient and a
 2   certain amount for followup visits.
 3   Q   I'm sorry.  Is that the nurse practitioners that were paid?
 4   A   Yes; that's correct.  Except for one.  One was paid
 5   straight hourly.
 6   Q   Do you know who was the one who was paid hourly?
 7   A   Sharon Noland.
 8   Q   Was she a Dr. Ruan or Dr. Couch nurse practitioner?
 9   A   She was with Dr. Raun.  At the end I believe she worked
10   with Dr. Chen, but for most of it Ruan.
11   Q   Was there anybody else at PPSA other than Dr. Couch and
12   Dr. Ruan who received the profits after the expenses were paid?
13   A   Dr. Chen was involved in some of the later bonuses.
14   Q   And some -- I'm sorry.  Some of the later --
15   A   Later, yes.  As he worked through his employment agreement,
16   he was guaranteed, you know, a percentage of his -- you know,
17   his money that he collected would be included in the
18   calculations.
19   Q   But he was not a partner?
20   A   He was not a partner, no.
21   Q   Were there any other partners at PPSA other than Dr. Ruan
22   and Dr. Couch?
23   A   No.
24           MR. BODNAR:  No further questions, Your Honor.
25           THE COURT:  All right.  May this witness be excused?
```

1    MR. BODNAR:  Yes, Your Honor.

2    THE COURT:  All right.  You may step down,

3  Mr. Cross.  Thank you.

4    MS. GRIFFIN:  We'd call Tena Goellner, Your Honor.

5    THE CLERK:  Ms. Goellner, if you would step forward

6  toward the witness stand, I'll swear you in.  Raise your right

7  hand.

8                  TENA SHAREE GOELLNER

9              was sworn and testified as follows:

10    THE WITNESS:  Yes, I do.

11    THE CLERK:  Thank you, ma'am.  Please be seated.

12                  DIRECT EXAMINATION

13  BY MS. GRIFFIN:

14  Q   Tell us your name, please, ma'am.

15  A   Tena Sharee Goellner.

16  Q   Can you spell Tena?

17  A   T-E-N-A.

18  Q   And Goellner?

19  A   G-O-E-L-L-N-E-R.

20  Q   Ms. Goellner, do you live in Mississippi?

21  A   Yes, ma'am.

22  Q   How were you employed early in 2000?

23  A   I worked as an officer and dispatch at Jackson County

24  Sheriff's Department.

25  Q   That's in Mississippi?

TENA SHAREE-GOELLNER - DIRECT BY MS. GRIFFIN

1    A    Yes, ma'am.

2    Q    Did you have occasion to do any other law enforcement work?

3    A    Yes, ma'am.  I worked in the correctional facility there

4    for three and a half years.

5    Q    So that employment in law enforcement terminated before you

6    ever went to PPSA as a patient?

7    A    Yes, ma'am.

8    Q    I want to direct your attention to around 2012.  Had you

9    had some problems with your pancreas?

10   A    Yes, ma'am.  I went in on February the 6th and had a

11   procedure done that's called the Nissen wrap, and the doctor

12   nicked my pancreas during that procedure and I've had problems

13   since then.

14   Q    You were not employed at the time you had the pancreas

15   surgery?

16   A    Yes, ma'am, I was.  I worked in the engineering department

17   as a designer at Ingalls, Huntington Ingalls Industries.

18   Q    When is the last time you worked there at Ingalls?

19   A    It was March the 18th of 2014, I believe, or '13.  I

20   can't -- I can't remember now.  But March the 18th was the last

21   date at Ingalls.

22   Q    Were you still working at Ingalls when you started going to

23   PPSA?

24   A    Yes, ma'am.

25   Q    How often did that last, you working at Ingalls after you

1   started going to PPSA?

2   A   I think I worked there four months -- no, I'm sorry.  I'm

3   sorry.  Yeah, I think it was four months, I believe.  I'm not

4   sure.

5   Q   In other words, did you quit working at Ingalls while you

6   were seeing the doctors at PPSA?

7   A   Yes, ma'am.  I -- after I started -- well, when I went out

8   on March the 18th, I was never able to go back because of

9   medication and everything that I was on and the problems I was

10  having.

11  Q   I want to direct your attention to March -- excuse me -- to

12  early 2013.  Did you have an appointment to go to PPSA?

13  A   Ma'am?

14  Q   Did you have an appointment to go to PPSA?

15  A   Yes, ma'am.

16  Q   And that was in Mobile; right?

17  A   Yes, ma'am, on Springhill Avenue.

18  Q   Do you recall the date of your first visit?

19  A   No, ma'am, I do not.

20  Q   Who were you to see the first time you went there?

21  A   I was to see Dr. Couch, was who my first appointment was

22  with.

23  Q   Who did you see on your first visit?

24  A   Stacy.

25  Q   Do you know Stacy's last name?

TENA SHAREE GOLLNER - DIRECT BY MS. GRIFFIN

 1   A   No, ma'am, I do not.

 2   Q   Did you know whether Stacy was a doctor or not?

 3   A   No, ma'am, she was a nurse practitioner, I believe.

 4   Q   Did you see Dr. Couch on this first visit?

 5   A   No, ma'am.

 6   Q   Not at all?

 7   A   No, ma'am.

 8   Q   Did you see anyone other than Stacy on the first visit?

 9   A   Yes, ma'am.  I don't remember the gentleman's name, but he

10   had like a scar on his face, like a burn or a scar on his face.

11   (Indicating.)  But I don't remember his name.

12   Q   Did he come into the examining room?

13   A   Yes, ma'am.  I told them -- I had been there for three

14   hours and told them that I had to go get my granddaughter.  And

15   Dr. Couch was tied up and couldn't come in, and Stacy asked me

16   if the other doctor could come in to finalize my visit.  And

17   that's when he came in and they gave me -- he talked to me,

18   questioned me, asked me a few questions, and gave me my

19   prescriptions.

20   Q   Now, you know that wasn't Dr. Ruan; right?

21   A   I didn't know that until six or eight months ago.  I did

22   not know that.

23   Q   So you're not contending it was Dr. Ruan that came in?

24   A   No, ma'am.

25   Q   And you know it -- do you know whether it was Dr. Chen?

```
 1   A   No, ma'am, it was not.

 2   Q   Can you describe the person that came in?

 3   A   Yes.

 4   Q   Other than what you've described about his face?

 5   A   Well, I mean, he was a little heavier set, had real short

 6   hair, and I remember the scar.  (Indicating.)

 7   Q   Did someone introduce you to him?

 8   A   Stacy introduced me and he introduced -- and he introduced

 9   himself as Dr. -- and I'm not good with names, I don't remember

10   his name -- but as Dr. So and So.

11   Q   You don't believe he was one of the doctors associated with

12   the practice, do you?

13   A   I did at that time, but I know now otherwise.

14   Q   Did you identify a photograph of the man that came in?

15   A   Yes, ma'am (nodding head affirmatively).

16   Q   And did you recall what his name was?

17   A   Did I then?

18   Q   Do you now?

19   A   I --

20   Q   And if you don't --

21   A   I can identify a photograph, but I can't tell you what his

22   name is.

23   Q   What happened when this man came in?

24   A   He just went over basically what Stacy had said and what

25   prescriptions they were going to give me, and they went out and
```

TENA SHAREE GOELLNER - DIRECT BY MS. GRIFFIN

1   got my prescriptions.

2   Q   What were they going to give you?

3   A   I was on Lortab 10, 90 of those a month.  I was on a

4   fentanyl patch, and I believe it was a 200 milligram [sic]

5   Subsys spray twice a day, is what I was started on, if I'm

6   remembering right.

7   Q   Had you been on Subsys before?

8   A   No, ma'am.  I had never heard of it.

9   Q   In connection with this visit, was there any examination of

10  you?

11  A   No, ma'am.  They talked to me, but no one ever physically

12  laid their hands on me or anything.

13  Q   Nobody touched you?

14  A   No, ma'am.

15  Q   In connection with the Subsys you were prescribed, had you

16  been asked if you had cancer?

17  A   No, ma'am.

18  Q   Had you ever had cancer?

19  A   No, ma'am.

20  Q   Were you told anything particular about the Subsys drug you

21  were being prescribed?

22  A   No, ma'am, nothing other than it was a new medication that

23  had come on the market.

24  Q   Were you told that it was a drug for breakthrough cancer

25  pain?

TENA SHAREE GOELLNER - DIRECT BY MS. GRIFFIN

```
 1   A   No, ma'am.

 2   Q   Were you told anything about the possible side-effects?

 3   A   No, ma'am.

 4   Q   Were you told how to use it?

 5   A   Yes, ma'am.  They told me to use one thing at a time and it

 6   was to be sprayed underneath my tongue.

 7   Q   When you say one thing, are you describing -- what are you

 8   describing?

 9   A   They come in a little individual packet that is sealed and

10   it's one spray per packet.

11   Q   Did you tell this man or Stacy anything about pain

12   medication?

13   A   My reason for going to pain management was because --

14            MR. POWELL  I'm going to object.  Unresponsive to the

15   question.

16            THE COURT:  Overruled.  You can answer.

17   A   My reason for going to pain management to begin with was

18   because I had been -- it had been over a year and a half since

19   I had started the problems with my pancreas and I had been in

20   and out of the hospital and on pain medication and I was very

21   worried about getting addicted to pain medication.  And the

22   pain -- just the Lortab was not controlling my pain.  And I

23   talked to Dr. McNair and I told him, I said:  There's got to be

24   something else that can be done to help with the pain that I'm

25   going through.
```

```
 1            And that's when he -- his office made the appointment
 2    at Dr. Couch's office and referred me there.
 3    BY MS. GRIFFIN:
 4    Q   So if the records show you went sometime in March of '13
 5    for your first visit, would that be about right?
 6    A   Yes, ma'am.
 7    Q   Did you advise Stacy or the man who came in to see you on
 8    that first visit anything about your fears of addiction?
 9    A   Yes, ma'am.
10    Q   What did you tell them?
11    A   I told them that I was worried about having to take pain
12    medication all the time and becoming addicted to it.  I've
13    never been one that took a lot of medication.  And both of
14    them -- her before he came in, she told him that I was
15    concerned about that when he came in the room.  And both of
16    them told me that I didn't have an addictive personality.
17    Because Lortab makes me feel very sluggish, it doesn't hype me
18    up.  I feel like a slug when I take it.  And they said that 15
19    percent of the population has an addictive personality and that
20    I did not, that I didn't need to worry about that.
21    Q   Had they done any personality test on you?
22    A   No, ma'am.
23    Q   Did they explain what they meant by an addictive
24    personality?
25    A   No, ma'am.
```

3190

1   Q   Were you able to get the Subsys prescription filled

2   immediately, the 200 milligrams -- micrograms?

3   A   I got the Subsys spray.  If I'm remembering correctly, they

4   had their pharmacy opened and it was filled at -- I believe it

5   was called C&R Pharmacy and that it was filled there.

6   Q   Was that connected to the pain clinic, C&R Pharmacy?

7   A   Yes, ma'am.

8   Q   Did there come a time that you had a second office visit in

9   2013 to PPSA?

10  A   Yes, ma'am.

11  Q   Who did you see on that occasion?

12  A   Stacy.

13  Q   Did you see Dr. Couch at all?

14  A   I've never seen Dr. Couch.

15  Q   In an office visit?

16  A   No, ma'am.

17  Q   Have you seen him in a procedure?

18  A   I had one procedure done.  Shortly after I started going

19  they did a -- I believe it was called like a nerve block, where

20  they did injections into my back to try to prevent some of the

21  pain.  But that is the only time I seen Dr. Couch.

22  Q   Did he introduce himself to you?

23  A   No, ma'am, I don't remember him introducing hisself.  I was

24  already prepped and on the table when him and the other

25  individual came in to do the procedure.

TENA SHAREE GOELLNER - DIRECT BY MS. GRIFFIN

1   Q   Did you have any conversation with Dr. Couch about how you

2   were feeling or how your medications were doing?

3   A   No, ma'am, no.

4   Q   That's the only time you saw him?

5   A   Yes, ma'am.

6   Q   Is he in the courtroom today?

7   A   I honestly don't -- I honestly don't know what he looks

8   like.  I'm sorry.

9   Q   You don't know what he looks like?

10  A   No, ma'am.

11  Q   So on the second visit did you see the man you've described

12  from the first visit?

13  A   On the second?  No, ma'am, no, ma'am.

14  Q   Just Stacy on the second visit?

15  A   Yes, ma'am.

16  Q   Were you asked about your medication?

17  A   Yes, ma'am.

18  Q   What did you advise?

19  A   I told them that the Subsys spray helped with the pain but

20  that it made me sleepy.

21  Q   Did it make you sleepy?

22  A   Yes, ma'am.

23  Q   What did you have to do as a result of the Subsys

24  medication?

25  A   I'm sorry.  I don't understand.

TENA SHAREE GOELLNER - DIRECT BY MS. GRIFFIN

3192

1  Q   Well, did you have to do anything as a result of that?  Did
2  you sleep a lot?
3  A   Oh, yes, ma'am.  After you use it, usually within a minute
4  to two minutes you became very groggy.  And the stronger the
5  dosage got, the quicker it would get in your system.  And when
6  I was on -- once they got me on the 800 milligrams [sic] four
7  times a day, I slept the majority of the time.
8  Q   Now let's talk about before you got on the 800 micrograms a
9  day.  On the second visit was your Subsys increased to 600
10 micrograms?  Do you recall?
11 A   I -- if I'm remembering correctly, it went from two a day,
12 on my second visit we went to 200 micrograms or whatever four
13 times a day.  And then the next time I think I went, we went to
14 400 milligrams -- or micrograms and then to 800.
15 Q   You don't recall going to 600?
16 A   No, ma'am.
17 Q   How did the Subsys come?  Was it in a pill form?  You
18 talked about the spray.
19 A   It was in a spray, it was in a box that had 30 individual
20 spray things in a box.  And I got four boxes.
21 Q   I'll show you what's been introduced as Subsys sublingual
22 spray, 600 micrograms, Government's Exhibit 9-10, and ask if
23 you recognize the box.
24 A   Yes, ma'am.
25 Q   What does this appear to be?

3193

1    A    It's the Subsys spray box.  That's the 600 micrograms.  And

2    each box for the different micrograms is a different color.

3    Q    Did you at one time take the 600 micrograms?

4    A    I think I went from four to eight.

5    Q    You had talked about Lortab that you had taken.  I'll show

6    you what's previously been shown for demonstrative purposes

7    only, Government's Exhibit 1-3, and ask if you recognize either

8    of these tablets.

9    A    Yes, ma'am.

10   Q    What are those pictures of, please, ma'am?

11   A    Lortab.  Mine was the Lortab 10.

12   Q    That you were prescribed?

13   A    Yes, ma'am.

14   Q    Now, as the Subsys went up from the initial prescription,

15   did you ever see Dr. Couch?

16   A    No, ma'am.

17   Q    Did you ever see the man you saw in the first visit again?

18   A    I seen him after Stacy left, I seen him two times before

19   the new male nurse practitioner came in, and I don't remember

20   his name.

21   Q    While you were still seeing Stacy, was that when your

22   Subsys prescriptions were being increased?

23   A    Yes, ma'am.

24   Q    Could you tell if the prescriptions were filled out before

25   you got there or did Stacy have to leave to go get a

TENA SHARP-GOELLNER - DIRECT BY MS. GRIFFIN                    3194

1  prescription and come back in to you?

2  A   They always left the room.

3  Q   Approximately how long would they be gone?

4  A   Just a couple of minutes.  It usually wasn't just two or

5  three minutes.  It wasn't very long.

6  Q   After that first visit, you continued going till sometime

7  in the spring of '15?

8  A   Yes, ma'am, until I believe it was May of '15 (nodding head

9  affirmatively).

10  Q   How long were your visits after the initial visit?

11  A   Not very long.  I was usually in and out within an hour,

12  hour and a half.

13  Q   I am referring to the time you were back in the patient

14  room.

15  A   Oh, not very long.  A lot of times -- at the end -- I don't

16  know if you want me to jump that far ahead, but the last, I

17  guess, eight to 10 months or so I would go in to get my

18  prescriptions and to see the doctor and the nurse would check

19  me in and I would never even see Stacy.

20  Q   Would you see anybody other than Stacy?

21  A   No, ma'am.  The nurse would ask me if I had any problems or

22  any questions, if I needed to talk to the doctor, and had

23  anything changed.  And I would tell her no, everything was

24  still the same.  And she would get my prescriptions and bring

25  them back to me.

TENA SHARLE COLLNER - DIRECT BY MS. GRIFFIN

3195

1   Q   So you never went in a patient room those last eight or 10

2   months?

3   A   No, ma'am.  They would take me into a patient room.  My

4   daughter was always with me, her and my little granddaughter.

5   They would take me into the back, into a patient room, and the

6   nurse would talk to me in the patient room and then go get my

7   prescriptions and bring them back to me.

8   Q   You were not seeing a nurse practitioner, just a nurse?

9   A   Not in -- not at that time.  It was just the nurse.

10  Q   Let's talk about between your first two visits and your

11  last eight to 10 months in late '14, into '15.  Were you seeing

12  a nurse practitioner during that period of time when you would

13  go in?

14  A   What were the dates again?

15  Q   You went for -- your first visit with Stacy, you said a

16  male came in the room?

17  A   Yes, ma'am.

18  Q   Thereafter you said that that male did not come back in the

19  room?

20  A   Right.

21  Q   Then did you continue to see Stacy?

22  A   Yes, ma'am, I saw Stacy until she left the practice.

23  Q   Approximately how long would you see Stacy for after that

24  first visit?  How long or short was your time with Stacy?

25  A   When she would come in the room?

TENA SHARI GOELLNER - DIRECT BY MS. GRIFFIN

1  Q   Yes, ma'am.

2  A   The nurse would ask me everything, go over it, and usually

3  Stacy would come in and ask me if everything was still the

4  same.  And I would tell her yes, nothing basically had changed,

5  the medication was still affecting me the same.  I'm sorry.

6  I'm croupy.  The medication still was affecting me the same way

7  and she would give me -- tell me she would get my prescriptions

8  and be back.  She usually was just in there just a couple of

9  minutes.

10 Q   So when you told us you were there for an hour and a half,

11 what was going on the rest of that time you referred to at a

12 patient visit?

13 A   When you come in, check in, usually it was anywhere from 45

14 minutes or so in the waiting room, the nurse would come get

15 you, take you into the back, into a room, talk to you, you

16 know, go over, ask me of any changes, what my pain level was

17 with the medicine, what it was without the medication, and if I

18 had any questions, and then she would leave.  Stacy usually

19 came in and would give me my prescriptions and I would leave.

20 Q   Ms. Goellner, did you ever discuss with Stacy how the

21 medicines were working?  Did you ever describe for her anything

22 about being sleepy?

23 A   Yes, ma'am.  I did initially, in the beginning.  But once I

24 got on the medication and that was what kept being prescribed,

25 after several months I just told her it affected me the same

TENA SHARP-GOLLINER - DIRECT BY MS. GRIFFIN

1   way --

2   Q   Which was --

3   A   -- every time I went.

4   Q   -- which was what?  How did it affect you?

5   A   When I would take the Subsys spray, especially once I got

6   on the higher dose -- I'm sorry.

7   Q   Would you like some water?  When you got on the higher

8   dose, what happened?

9   A   I basically didn't have a life.  (Crying.)  I couldn't keep

10  my grandkids.  I had a new grandbaby.  And when I'd take it, it

11  would knock me out for several hours.  And I lost a lot of

12  weight.  I got so weak because all I did was sleep.  But I

13  never really questioned it, because I had hurt for so long,

14  that I was just -- I was glad I wasn't hurting any more.  But I

15  didn't have a life.  I just slept.

16  Q   Did you tell Stacy that you slept all the time?

17  A   Yes, ma'am.

18  Q   Did you tell her that you were losing weight?

19  A   Oh, yes, ma'am.

20  Q   About how much did you lose?

21  A   About 45 pounds.

22  Q   What were you told?

23  A   Nothing.

24  Q   And you said you weren't able to keep your grandchildren?

25  A   No, ma'am.

TENA SHAREE GOELLNER - DIRECT BY MS. GRIFFIN                    3198

```
 1   Q   Why was that?

 2   A   Because I would just fall asleep.  I mean, I would -- I

 3   would even get up sometimes and move around and not have any

 4   memory of it.  I mean, just -- I didn't know what I was doing

 5   most of the time.  And it affected my personality.

 6   Q   What do you mean?

 7   A   I got very depressed.  At the time I didn't realize how

 8   depressed I had gotten.  And it affected my moods.  I would get

 9   agitated very quickly.  My oldest granddaughter would come

10   spend the weekend sometimes with me and my daughter.  I live

11   with my daughter and son-in-law -- well, rather, they live with

12   me.  And there was quite a few times that my granddaughter

13   would wake me up because she couldn't see that I was

14   breathing.  She would do me and say:  Bambie, wake up.

15            That's what they called me.  Because she thought I had

16   quit breathing.

17   Q   What age was she at that time?

18   A   She's 11 now, so she was eight and nine years old.

19   Q   Eventually were you allowed to keep your grandchildren

20   while you were on this medicine?

21   A   No, no, ma'am.

22   Q   Why was that?

23   A   Because it was too dangerous.  I mean, I couldn't -- my

24   little granddaughter, it was too much of a danger that I would

25   fall asleep or drop her.  You know, I couldn't do that.
```

3199

1    Q    And, Ms. Goellner, at any time did anyone at PPSA discuss

2    the side-effects of the Subsys with you?

3    A    No, ma'am.

4    Q    Were you required to fill out any form that said you

5    understood the side-effects of the Subsys?

6    A    No, ma'am.

7    Q    Now, you indicated that there was a time that Stacy was no

8    longer there; is that right?

9    A    Yes, ma'am.

10   Q    Who did you begin to see after Stacy left?

11   A    I saw the man that had came in on my first visit.  If I'm

12   remembering right, I saw him twice, and then they got the new

13   nurse practitioner in.  It was a male.  I don't remember his

14   name, but that's who I saw after that.

15   Q    Are you currently on Subsys?

16   A    No, ma'am.

17   Q    Can you describe your life now?

18   A    Much better.  I still take pain medication.  I still have

19   to take pain medication because my problem with my pancreas is

20   never going to go away.  But I function now.  I mean, I can go

21   to town with my daughters for a couple of hours and I can hold

22   my grandbabies and walk across the floor and not worry about

23   dropping one of them.  My granddaughter that's 11 stays with me

24   just about every weekend now.

25   Q    You have not taken Subsys since PPSA closed?

TENA SHAREE GOELLNER - DIRECT BY MS. GRIFFIN

1    A    The last time I took Subsys, I believe, was in December

2    before that happened in May.  Because after December, that

3    January my insurance would no longer pay for it.  So --

4    Q    When your insurance would no longer pay for it --

5    A    Yes, ma'am.

6    Q    -- what were you given by PPSA?

7    A    It started with an A.  It was a little pill that you put

8    under your tongue.  I'm not good with --

9    Q    Do you remember if it was Abstral?

10   A    That's what it was, Abstral.  Yes, ma'am.

11   Q    You started with Abstral prescribed by PPSA?

12   A    Yes, ma'am.

13   Q    Did Dr. Couch prescribe that for you?

14   A    No, ma'am.

15   Q    Who did?

16   A    It was the other gentleman, that had the scar on his face,

17   the one that initially --

18   Q    How long did you take the Abstral?

19   A    I was still on that -- let me think.  I went -- no.  I went

20   from the Abstral to a nose spray.  I don't remember how long I

21   took the Abstral.  I went to a nose spray.  I don't think I was

22   on it but a month or two and then I went to a nose spray.  Was

23   it Lazanda or something like that, nose spray?

24   Q    When you left PPSA, since then have you taken any fentanyl

25   product?

1  A   Taken?  No, ma'am.  I was on a fentanyl patch, but I no --
2  I'm not on that any longer either.
3  Q   Were you being given the fentanyl patch from PPSA as well?
4  A   Yes, ma'am, I was on a hundred milligram [sic] patch as
5  well.
6  Q   I'll show you what's marked as Government's Exhibit
7  41-2.  This is the Tena Goellner medical file from PPSA.
8         MS. GRIFFIN:  And we would move to admit it per
9  stipulation, Your Honor.
10         THE COURT:  All right.  Mark it in.
11     (Government's Exhibit 41-2 was entered into evidence.)
12  BY MS. GRIFFIN:
13  Q   From your file, Ms. Goellner, I want to direct your
14  attention to a report from March the 28th of 2013 and ask if
15  this is you, Tena Goellner?  (Indicating.)
16  A   Yes.
17  Q   Referred by Dr. McGee [sic]?
18  A   Dr. McKee, yes, ma'am.
19  Q   Dr. McKee.  Excuse me.
20  A   Yes, ma'am.
21  Q   Does it say that you are worried about getting addicted?
22  A   Yes, ma'am.
23  Q   This is the visit where you were prescribed the Subsys 200?
24  A   Yes, ma'am.
25  Q   So the Subsys went up from there?

3202

1  A   Yes, ma'am.

2  Q   And I show you your first prescription from PPSA.  This is

3  a duplicate copy, but it's from your file, March 28th of

4  '13.  Does that show your name?

5  A   Yes, ma'am.

6  Q   And the Subsys 200?

7  A   Yes, ma'am.

8  Q   Do you know how long it was before the Subsys was

9  increased?

10  A   That's been a long time.  But if I'm remembering correctly,

11  the next visit -- it's either the next visit or the third visit

12  they went from twice a day to four times a day with the 200

13  milligram [sic].

14  Q   I show you in July of '13 from your patient file a

15  prescription for July the 31st of '13.  Does that show that you

16  went to a 600 microgram?

17  A   Yes, ma'am, yes, ma'am.

18  Q   Then I show you the visit for that July 31st of '13 and ask

19  if it indicates at the top that you were seen by Stacy Madison?

20  A   Yes, ma'am.

21  Q   Does it say:  Pain meds discussed, no new complaints?

22  A   Yes, ma'am.

23  Q   Do you know why they increased the Subsys on that visit, if

24  you had no new complaints?

25  A   No, ma'am.

TENA SHARP KOLLNER - DIRECT BY MS. GRIFFIN

1  Q   Were you told why?

2  A   No, ma'am (shaking head negatively).

3  Q   I show you your next visit for August the 28th of '13 from

4  your patient file and ask if this says that you saw Dr. Couch

5  and Stacy Madison?

6  A   Yes, ma'am, it does.

7  Q   Did you see Dr. Couch on that visit?

8  A   No, ma'am.

9  Q   Do you see where this report of the visit says that you

10  denied side-effects?

11  A   Yes, ma'am.

12  Q   Is that true?

13  A   No, ma'am.  It made me sleep from the very first time I

14  started taking it, but I slept more the stronger the dosage

15  got.

16  Q   And I show you the October 23rd of '13 progress

17  note.  That's your name at the top; right?

18  A   Yes, ma'am.

19  Q   Does it indicate that you are trying the Subsys with little

20  improvement?  (Indicating.)  Do you need me to make that

21  larger?

22  A   No, ma'am.  I'm just trying to read it.  Yes, ma'am, it

23  states that.

24  Q   It says you have little improvement.  But then it says you

25  are pleased with the medicine and there are no new side-effects

1  or excessive drowsiness?

2  A   Yes, ma'am, it says that.

3  Q   Are those consistent, that you're pleased with the medicine

4  in one sentence but there's little improvement in the sentence

5  before it?

6  A   I'm sorry?

7  Q   Are those consistent statements, that you have little

8  improvement with the medication and then the next sentence that

9  you're pleased with the medication?

10 A   There -- as far as the pain, I did not have a lot of pain

11 when I took the medication.  But as far as the sleepy and

12 drowsiness, it did make me very sleepy.  So -- and I guess the

13 statement pleased with current medication, I don't -- I mean, I

14 guess I was pleased with it, because I wasn't hurting.

15 Q   Did you tell them that you still had the side-effects and

16 the drowsiness?

17 A   Yes, ma'am.

18 Q   Is it fair to say that you told them that on every visit

19 once you had started taking Subsys?

20 A   Yes, ma'am, I told them that every time I went that it made

21 me sleep a lot -- every time I went.

22 Q   And did there come a time in February of '14 -- your

23 progress note; is that correct?  (Indicating.)  That's your

24 progress note?

25 A   Yes, ma'am, yes, ma'am.  (Nodding head affirmatively.)

3205

```
 1   Q    -- where you were placed on Subsys 800 microgram spray?

 2   A    Yes, ma'am.

 3   Q    Does it again say:  No new side-effects or excessive

 4   drowsiness?

 5   A    Yes, ma'am.

 6   Q    It says you're pleased with your medications; is that

 7   right?

 8   A    I was never really asked if I was pleased with it.  But I

 9   was pleased that it did -- I wasn't hurting as bad all the time

10   on it.  So yes, ma'am (nodding head affirmatively).

11   Q    Did you tell them that there was no excessive drowsiness?

12   A    No, ma'am.

13   Q    Do you know why they increased the micrograms up to 800?

14   A    No, ma'am.

15   Q    Were you told or were you warned anything about Subsys?

16   A    No, ma'am.  I had no idea Subsys spray would -- could do

17   some of the stuff that I've later found out that it could do.

18   Q    Which was what?

19   A    Go to sleep and never wake up.

20   Q    You were not told that?

21   A    No, ma'am.

22   Q    Would you have taken it had you been advised of its

23   dangers?

24   A    No, ma'am.

25   Q    I want to show you a progress note from January the 15th of
```

3206

1  '14.  This has your name; right?

2  A   Yes, ma'am.

3  Q   And it's January 15th of '14?

4  A   Yes, ma'am.

5  Q   Does it have a question mark about your location of your

6  pain?

7  A   Yes, it does.

8  Q   Did they know where your pain was?

9  A   Yes, ma'am.  My pain had never changed and it still has

10  never changed from where it has been.

11  Q   It's not gone to your neck or your legs or anywhere else?

12  A   No, ma'am, no, ma'am (nodding head affirmatively).

13  Q   But did they know what medicines you had previously used?

14  A   From them?

15  Q   No, from anyone.

16  A   They had my records from Dr. McNair's office and Dr. McKee.

17  They're the ones that referred me.

18  Q   And by this time you had been going to PPSA for

19  approximately a year?

20  A   Yes, ma'am, almost a year.

21  Q   Did there come a time when your insurance company would no

22  longer pay for Subsys?

23  A   Yes, ma'am.

24  Q   How did you learn that?

25  A   When I went in for my next doctor visit -- I believe it was

3207

1    in January -- they told me that they were having to change my

2    medication because insurances were no longer paying for Subsys

3    spray unless you were a cancer patient.

4    Q    You had told us you had never had cancer; is that right?

5    A    No, ma'am.

6    Q    I'll show you a patient call in the file that appears to be

7    from January the 30th of 2015.  Do you recall placing a call

8    about another formula?

9    A    No, ma'am, I never called.  They changed my medicine when I

10   went in for my visit that time.

11   Q    You were told that your insurance company wouldn't cover

12   it?

13   A    Yes, ma'am, unless I had had cancer.

14   Q    Did you try Abstral thereafter or was it also denied?

15   A    Actually, I believe it was that December before January --

16   it's been a while, so the dates -- but I think in December,

17   when they filled my prescription, they did not have the full

18   amount of the Subsys spray, so they give me part of it in the

19   Abstral and then my insurance subsequently refused to pay for

20   the Abstral, is how I wound up being on -- I think it was

21   Lazanda.  It's a nasal spray.

22   Q    So you had a prescription for Subsys; is that right?

23   A    Yes, ma'am.

24   Q    But they gave you some Subsys and some Abstral at C&R

25   Pharmacy?

TENA SHARP GOELLNER - DIRECT BY MS. GRIFFIN

1   A   Yes, ma'am, that one month.  Yes, ma'am.

2   Q   You didn't have a prescription for Abstral, did you?

3   A   No, ma'am.

4   Q   How were you told to take that medication?

5   A   The pharmacist --

6   Q   Abstral.  Sorry.

7   A   The Abstral?

8   Q   Yes, ma'am.

9   A   The pharmacist told me.  When they filled the prescription,

10  they told me that they didn't have enough of the Subsys spray,

11  but that the Abstral was basically the same thing but, instead

12  of spraying it, it was a pill that you put under your

13  tongue.  But I used it the same -- like the same number of

14  times a day that I would the Subsys spray.

15  Q   You continued going to PPSA up until the time they were

16  closed; is that right?

17  A   Yes, ma'am.

18          MS. GRIFFIN:  One moment, Your Honor.

19          THE COURT:  All right.

20      (A discussion was held off the record between government

21  counsel.)

22  BY MS. GRIFFIN:

23  Q   Do you know what type insurance you had when you were going

24  to PPSA?

25  A   Blue Cross/Blue Shield.  It was through my job, through

1    Huntington Ingalls.

2    Q    Do you know how much money C&R Pharmacy was paid for your

3    Subsys during the time you were going to PPSA?

4    A    The one -- for the year that I was on it for a complete

5    year, from January through December, for 12 months, if I'm

6    remembering correct, it was 170-something thousand dollars.

7    Q    I'll show you what's marked as Government's Exhibit 12-2.

8    It's already been admitted.  This is the top recipients of

9    Subsys and Abstral.  And do you see your name at number 16?

10   A    Yes, ma'am.

11   Q    Do you see the amount that was paid?

12   A    $185,535.94.

13   Q    Ms. Goellner, I'll show you what's marked and has not been

14   introduced yet and ask if you can identify this photograph,

15   Government's Exhibit 40-3 [sic]?

16   A    Yes, ma'am.  That's the gentleman that I -- that came in on

17   my very first visit and then I seen those two times after Stacy

18   left.

19             MS. GRIFFIN:  We'd move to mark this.

20             THE COURT:  We already have an exhibit numbered

21   40-3.  Is that what you said?

22             MS. GRIFFIN:  This should be 41-3.  I'm sorry.

23             THE COURT:  All right.  Are you offering it 41-3?

24             MS. GRIFFIN:  Yes, Your Honor.

25             THE COURT:  Any objection?  Mr. Powell?

1          MR. POWELL:  No objection.

2          THE COURT:  All right.  Mark it in.

3       (Government's Exhibit 41-3 was entered into evidence.)

4          MS. GRIFFIN:  Exhibit 41-3, may we publish it to the

5    jury?

6          THE COURT:  Yes.

7    BY MS. GRIFFIN:

8    Q   You identified this as the man Stacy introduced you to as a

9    doctor?

10   A   Yes, ma'am.

11         MS. GRIFFIN:  One moment, Your Honor.

12         THE COURT:  All right.

13      (A discussion was held off the record between government

14   counsel.)

15   BY MS. GRIFFIN:

16   Q   Were your office visits also covered by Blue Cross and Blue

17   Shield?

18   A   Yes, ma'am.

19   Q   Now, if you started in March of '13, at PPSA, you said you

20   worked a couple of months thereafter?

21   A   I had surgery -- yes, ma'am (nodding head affirmatively).

22   I did.

23   Q   Were you able to hold down a job while you were on the

24   Subsys?

25   A   No, ma'am.

TENA SHAREE GOELLNER - CROSS BY MR. POWELL

```
1   Q   Why was that?
2   A   I haven't worked since I started taking the higher dose
3   because I sleep all the time.  I couldn't function.
4   Q   What are you able to do now that you're off Subsys and
5   Abstral?
6   A   I've -- I still have to take pain medicine and deal with
7   pain, but I can function.  I have at least a pretty normal
8   life.  I mean, I can go to town, I can go keep my grandkids.  I
9   mean, my life is pretty much normal.
10          MS. GRIFFIN:  That's all I have of this witness at
11  this time, Your Honor.
12          THE COURT:  Mr. Powell?
13                      CROSS EXAMINATION
14  BY MR. POWELL:
15  Q   Good morning, Ms. Goellner.  How are you?
16  A   Good morning.
17  Q   My name is Art Powell, and I'm one of the lawyers
18  representing Dr. Couch.
19          Ms. Griffin asked you some questions about your prior
20  medical history.  In other words, what led up to you being
21  referred to PPSA for pain management.  Correct?
22  A   Yes, sir.
23  Q   You mentioned that you had had some surgery, I believe, in
24  2012?
25  A   Yes, February the 6th.
```

3212

TENA SHARPE-GOLLNER - CROSS BY MR. POWELL

```
 1   Q   Of 2012?

 2   A   Yes, sir.

 3   Q   Tell us, please, what that surgery was about.

 4   A   I had acid reflux that had caused Barrett's esophagus, and

 5   I had biopsies done that they were worried about it turning

 6   into cancer.  And Dr. McNair advised me or recommended that I

 7   have a procedure done.  And I think it's pronounced a Nissen

 8   wrap.

 9   Q   Yes, ma'am?

10   A   And when they did that procedure, the doctor messed my

11   pancreas up during that procedure.

12   Q   You said that was in February of 20 --

13   A   February the 6th.

14   Q   February of 2012?

15   A   Yes, sir.

16   Q   And as a consequence of that surgery --

17   A   Yes, sir.

18   Q   -- you had -- and correct me if I'm wrong -- and I don't

19   know much about the procedure that you're talking about.  But

20   from looking at your medical records -- and you're aware your

21   medical records were sent to PPSA?  You mentioned them in your

22   direct testimony?

23   A   Yes, sir.

24   Q   So PPSA had the advantage of knowing at least the

25   significant portions of your current medical condition at the
```

TENA SHAREE GOLLINER - CROSS BY MR. POWELL

1    time that you were first treated there for your pain; correct?

2    A    Yes, sir.

3    Q    Now, a Nissen procedure in February 2012, you said you told

4    the PPSA this, I believe; correct?

5    A    Yes, yes.  Dr. McNair referred me there, yes.

6    Q    That the surgeon had somehow injured your pancreas during

7    this surgery that you were undergoing and it was something to

8    do with your bile ducts; is that correct?

9    A    It was my esophagus, the reason I had the surgery, because

10   of acid reflux.

11   Q    And you also had to have some stents put in during the

12   process?

13   A    In my pancreas.

14   Q    In your pancreas?

15   A    Yes, sir.  I was in and out of the hospital once I had that

16   procedure done.

17   Q    Yes, ma'am?

18   A    I went in.  I didn't know what was wrong when I started

19   having so much problem in a couple of weeks.  The doctor that

20   did the procedure released me.  And I went to Dr. McNair, wound

21   up in the hospital, and that's when we found out that my

22   pancreas had been messed up.

23   Q    And so you then had to have another surgical procedure in

24   order to attempt to repair the damage to the pancreas?

25   A    They did.  It was an ERCP.  They go down your throat and go

TENA SHARI BOHLNER - CROSS BY MR. POWELL

1   in, go through that way and put stents.  They actually opened

2   the opening of my pancreas up for it to be able to drain,

3   because it was so swelled.

4   Q   Right?

5   A   I was in the hospital four times and I was there in May,

6   out for a few weeks, back in there again, out for a few weeks,

7   back again.  So this was my --

8   Q   This is what's going on in the months leading up to your

9   being referred to PPSA; is that right?

10  A   Yes, sir.

11  Q   At least medically?

12  A   Yes, sir.

13  Q   And how many times would you say that you were hospitalized

14  because of the problems with your pancreas?

15  A   I had surgery in February, I was hospitalized four times

16  that summer, I went back to work in November -- I believe it

17  was November 7th of that year, and then went back out of work

18  in March, on March the 18th, went back in the hospital, and

19  then was back in the hospital again that August.

20  Q   Okay.  Now, when you went back into the hospital in March

21  of 2013, that would have been --

22  A   That would have been a --

23  Q   -- that would have been a matter of a couple of weeks

24  before you were referred to PPSA for pain management; correct?

25  A   Was it right before I went in the hospital I was referred

TENA SHAREE GOELLNER - CROSS BY MR. POWELL

1   to them?  I don't really remember the date.  I think it was all

2   in March.  I don't remember the date.

3   Q   Let me --

4          THE COURT:  Mr. Powell, is this a good time to break

5   for lunch?

6          MR. POWELL:  Yes, ma'am.  This is a good time.  Yes,

7   ma'am.

8          THE COURT:  All right.  Ladies and gentlemen, leave

9   your pads on your chairs.  We're going to be in recess for

10  lunch until 1:30.  No discussion about the case.  And be back

11  downstairs in the jury assembly room at 1:30, ready to be

12  called back up.  We're in recess.

13     (A recess was taken at approximately 11:59 a.m.)

14     (Afternoon session, 1:30 p.m., in open court, defendants

15  and jury present.)

16          THE COURT:  All right, Mr. Powell.

17  BY MR. POWELL:

18  Q   Good afternoon, Ms. Goellner.  How are you?  We're going to

19  pick up I think approximately where we left off.  We were

20  talking about your medical history.  Okay?

21  A   Yes, sir.

22  Q   And your problems with your pancreas surgeries and

23  hospitalizations and all those things that occurred immediately

24  prior to or within several months prior to your being referred

25  to PPSA for pain management.  Okay?

3216

TENA SHARIF-JOHLINER - CROSS BY MR. POWELL

1    A   Yes, sir.

2    Q   And I believe you told us that when this mistake was made

3    in your surgery causing this injury to your pancreas, that you

4    had to have -- you were hospitalized five times?

5    A   Four times that summer.  Then the following year, March the

6    18th I went in, and then I went back in the first of August.

7    Q   You had several hospitalizations?

8    A   Yes, sir, yes, sir.

9    Q   Even after you were referred to PPSA, weren't you?

10   A   Two or three, yes.

11   Q   Now, let me back up a little bit.  So you had this surgery

12   in July of 2012?

13   A   No, sir.  It was in February.

14   Q   I'm sorry.  February 2012 you had this surgery at Singing

15   River Hospital over in Pascagoula?

16   A   Ocean Springs Hospital.

17   Q   Ocean Springs.  And this injury occurs to your pancreas;

18   right?

19   A   Yes, sir.

20   Q   Okay.  You weren't -- you weren't having this surgery to

21   repair any problem that you had with your pancreas, this was to

22   treat acid reflux disease?

23   A   Yes, sir, yes, sir.

24   Q   And it was during the course of that procedure, surgical

25   procedure, that the surgeon injured your pancreas?

TENA SHAREE GOHLNER - CROSS BY MR. POWELL

1    A    Yes.

2    Q    Correct?

3    A    (Nodding head affirmatively.)

4    Q    Okay.  I'm just trying to make sure I get this

5    straight.  And so as a result of that injury during the surgery

6    in February of 2012, you developed acute problems with your

7    pancreas; is that correct?

8    A    Yes, sir, yes, sir.

9    Q    And so that we make sure we understand, acute means an

10   immediate onset, if you will?  Does that sound about right to

11   you?

12   A    Yes, yes, sir.

13   Q    In other words, this is something you didn't have one day

14   and the next day you did; right?

15   A    Yes, sir.

16   Q    Okay.  And it was bad?

17   A    Yes, sir.

18   Q    Okay.  And so beginning at least probably in February of

19   2012, after your surgery, you were prescribed opioid pain

20   medications, weren't you?

21   A    Yes, sir.

22   Q    Okay.  In fact, you were prescribed 10 milligram Lortabs?

23   A    Yes, sir.

24   Q    And how many a day of those were you taking?  And I'm

25   talking about back in 2012.

TENA SHAREE GOELLNER - CROSS BY MR. POWELL          3218

```
 1    A    I didn't -- I didn't take a lot of them because of the way
 2    they made me feel.  Probably initially, when it flared up, two
 3    or three a day for a short period of time.
 4    Q    Okay.  All right.  And then apparently you then began to
 5    have these series of episodes where you were hospitalized and
 6    had to have these procedures done to surgically repair or treat
 7    your pancreas; correct?
 8    A    Yes, sir, yes, sir.
 9    Q    And that's when you had these stents placed in the opening
10    of your --
11    A    Pancreas.
12    Q    -- pancreas?
13    A    Yes, sir.
14    Q    And those were done via surgical procedure?
15    A    It's called an ERCP, yes, sir.
16    Q    It goes down your throat; correct?
17    A    Yes, sir.
18    Q    In the aftermath of those procedures, you were in a lot of
19    pain, weren't you?
20    A    Yes, sir.
21    Q    You had severe abdominal pain?
22    A    Yes, sir.
23    Q    In the area of the pancreas?
24    A    Yes, sir.
25    Q    And tell us where that is.
```

TENA SHARIT-GOHLNER - CROSS BY MR. POWELL

```
 1   A   Center abdomen, kind of right at the fork of your rib cage.
 2   Q   So your rib cage is here?  (Indicating.)
 3   A   Yes, sir.  Right here in the center of your abdomen.
 4   Q   Right there?  (Indicating.)
 5   A   Into your back, towards the left side.
 6   Q   And it radiated into your back?
 7   A   Yes, sir.
 8   Q   And it was a constant pain?
 9   A   Yes, sir.
10   Q   And you lived like that throughout these five different
11   procedures for over a year, didn't you?
12   A   I still live like that.
13   Q   And it was much -- it was very, very bad in that year to
14   year and a half following your surgery --
15   A   Yes, sir.
16   Q   -- wasn't it?
17   A   Yes, sir.  They actually referred me to Oschner's Clinic
18   and then to Tulane.
19   Q   We're going to get to that.  I'm not trying to cut you off.
20   We're going to get to that.  And so you also had -- and this
21   surgical procedure was done by a Dr. McKee?
22   A   No, Dr. McKee was my gastroenterologist.  The surgical
23   procedure to do the Nissen wrap was done by Dr. Jenkins.
24   Q   At the time you had the procedure, you were being treated
25   by a gastroenterologist?
```

3220

1    A    Dr. McNair and McKee, yes, sir.

2    Q    And that's who arranged for you to have the surgery in

3    February of 2012?

4    A    Yes, sir.

5    Q    Now, so you began -- you were also prescribed what is

6    referred to as a benzodiazepine, a sleep medication; right?

7    A    Yes, sir.

8    Q    And that was following surgery in 2012?

9    A    I believe so.  I still take sleep medication occasionally.

10   Q    And would it be fair to say that one of the reasons, if not

11   the primary reason, why you needed sleep aids and were having

12   to take this benzodiazepine drug back in 2012 was because the

13   pain was so bad you couldn't sleep?

14   A    Yes, sir.

15   Q    And that was in addition to the Lortabs that you were

16   taking; correct?

17   A    Yes, sir.

18   Q    And you were also taking another opioid, Nucynta?  Does

19   that sound right?

20   A    Nucynta?  That must be a patch, because they had me on a

21   patch.  Is that the pain patch?  I can't remember.

22   Q    It says it's a narcotic analgesic opioid.  Do you recall

23   that?

24   A    No, sir.  I remember them putting me on a patch and I was

25   on the Lortab, but I don't remember that.

1  Q   Okay.  I just want to make sure I get this right.  At the

2  bottom, where it says medication history, I want to show you

3  what's for identification --

4          THE COURT:  What are we looking at?

5          MR. POWELL:  We are looking at --

6          THE COURT:  What exhibit number?

7          MR. POWELL:  Judge, it's Government's Exhibit -- what

8  was the exhibit number?

9          MS. GRIFFIN:  41-2.

10          MR. POWELL:  -- 41-2.

11          THE COURT:  Is this from her patient file?

12          MR. POWELL:  Yes, ma'am.  And I believe it would be

13  page 63.

14          MS. GRIFFIN:  Your Honor?

15          MR. POWELL:  I'm sorry.

16          MS. GRIFFIN:  Ask for some foundation in time as to

17  which doctor file this --

18  BY MR. POWELL:

19  Q   This would be -- this would be a medical record that was

20  sent to PPSA from, I believe, your primary care doctor or maybe

21  even Dr. McNair for an office visit on March 11th, 2013.  Do

22  you see that at the very top?

23  A   Yes.

24  Q   And at the bottom of that you will see a list of

25  medications.  Do you see those?

3222

1    A    Yes, sir.

2    Q    Now, you referenced -- obviously we talked about the

3    Lortabs.  And you see those at the very top?

4    A    Yes, sir.

5    Q    See that?

6    A    Yes, sir.

7    Q    Okay.  And then if you go down, you will see Restoril.  Do

8    you see that?

9    A    Yes.

10   Q    That would be the benzodiazepine sleep medication; correct?

11   A    Yes, sir.

12   Q    Okay.  If you go down or go one right above there, where it

13   says Nucynta ER, that's Nucynta Extended Release, do you see

14   that?

15   A    Yes, sir.

16   Q    All right.  Now, you were started on that medication in

17   February of 2013 according to that, that item; is that right?

18   A    Yes, sir.

19   Q    Okay.  And then if you go down a little further you will

20   see the fentanyl?

21   A    Fentanyl patches, yes, sir.

22   Q    Now, that is a fentanyl-based patch?

23   A    Yes, sir.

24   Q    Pain patch; correct?

25   A    Yes, sir.

1    Q    So would I be accurate, then, in my earlier statement that

2    you were on two separate oral opioid medications before you got

3    to PPSA?

4    A    Yes, sir.

5    Q    And that would be the Lortabs?

6    A    Uh-huh (positive response).

7    Q    And the Nucynta; correct?

8    A    Yes, sir.

9    Q    Okay.

10   A    Yes.

11   Q    And then the other opioid-based product would be the

12   fentanyl patch; correct?

13   A    Yes, sir.

14   Q    Okay.  So we have a total of three; right?

15   A    Yes.

16          MR. POWELL:  Okay.  Now, if you will go to the next

17   page, Sam, 64.

18   Q    This is a continuation of the same medical record from

19   Digestive Health Center in Pascagoula.  And that's the name

20   of --

21   A    Yes, Dr. McNair's office.

22   Q    -- Dr. McNair's office?

23          And on the next page, again, this is the March 11th,

24   2013 medical record.  Who is Katrina Henderson?  Do you see

25   that name at the very top?

1   A   No, sir.  It's too small.

2   Q   (Indicating.)  See it now?

3   A   Yes.

4   Q   Do you know who that is?

5   A   No, sir.

6   Q   Would that be a medical assistant of Dr. McNair possibly?

7   A   Possibly, yes, sir.

8           MR. POWELL:  If you will go back to page 63, Sam, at

9   the very top?

10  Q   Do you see the name under history of present illness, and

11  it has the name Gracie Hudson?

12  A   Yes, sir.

13  Q   And then it has the initials PA after that?

14  A   Yes, sir.

15  Q   Do you know who Gracie Hudson is?

16  A   Yes.  That's one of Dr. McNair's -- I do know her, yes.

17  Q   She is a physician's assistant?

18  A   Yes, sir.

19  Q   So a physician's assistant took your history of present

20  illness on this office visit with Dr. McNair?

21  A   Yes.

22  Q   And then it appears as if Katrina Henderson completed at

23  least some portion of your exam; is that correct?

24  A   I think she must be the nurse that checks you in and checks

25  your blood pressure and all that kind of stuff.

3225

```
1    Q    Okay.  All right.  And, now, it was -- your symptoms that
2    you described, you described as having persistent insomnia;
3    right?
4    A    Yes, sir.
5    Q    And that's what you were telling us earlier; that you were
6    in so much pain you couldn't sleep?
7    A    Yes, sir.  My brain doesn't -- it's like I sleep, but my
8    brain doesn't shut down.  And then when I was in so much pain,
9    it just compounded it.
10   Q    Those two -- those two issues, your brain --
11   A    Yes, sir.
12   Q    -- and the pain together --
13   A    Yes, sir.
14   Q    -- prevented you from sleeping?
15   A    Yes, sir.
16   Q    Is that fair?
17   A    Yes, sir.
18   Q    You also complained of nausea?
19   A    Oh, yes, sir.
20   Q    Tell us about that.  Why were you -- did anybody, any of
21   your medical care providers tell you why you were nauseated?
22   A    I finally found that out when I went to Tulane.  The
23   problem -- and part of the problem with the pain as well --
24   Q    Okay.
25   A    -- when I went to Tulane.
```

3226

```
1   Q   And you were also -- you also had abdominal pain; correct?

2   A   Yes, sir.

3   Q   Chronic pancreatitis; correct?

4   A   Yes, sir.

5   Q   Slow to -- this is an electronic note in the record, so it

6   probably means slow to improve; correct?  Do you see that?

7   A   I see, yes, sir.  I see where you're talking about.

8   Q   All right.  All right.  Now, migraine headaches, did you

9   have migraine headaches also?

10  A   I -- I'd have a migraine occasionally, yes, sir, not very

11  often.

12  Q   Now, and were you examined on this visit with Dr. McNair?

13  A   Dr. McKee or Dr. McNair (nodding head affirmatively).

14  Q   Conducted a physical examination of you?

15  A   Yes, sir.

16  Q   And this would be after you met with the physician's

17  assistant or the nurse --

18  A   Yes, sir.

19  Q   -- to get your history, your current medical issues?  They

20  asked you questions:  How are you feeling?  Tell us -- that

21  sort of thing; correct?

22  A   There's always a physician assistant that comes in and then

23  after that Dr. McNair, Dr. McKee, or the other doctor in their

24  office, one of them always comes in to see you.

25          MR. POWELL:  All right.  Sam, if you will go to page
```

1    65.  At the very top.

2    Q   Do you see the heading Physical Exam on this chart note

3    from your visit to Dr. McNair's office?

4    A   Yes, sir.

5    Q   And it indicates:  Physical exam, Gracie Hudson?

6    A   Yes, sir.

7    Q   Who we already established that's Dr. McNair's physician

8    assistant?

9    A   Yes, sir.

10   Q   And it has a date and a time, doesn't it?

11   A   Yes, sir.

12   Q   So is it your recollection that Gracie Hudson performed the

13   physical exam of you on this date?

14   A   Probably.  One of his physician's assistants always seen

15   me.  I mean, I can't say for sure she was the one on that

16   day.  But --

17   Q   She's the one that authored this medical record; right?

18   A   Yes, sir.

19   Q   And you don't have any reason to believe that this is a

20   mistake of some type?

21   A   No, sir.

22   Q   So it appears as if Dr. McNair's physician's assistant

23   actually conducted the physical exam of you on March 11th?

24   A   Yes, sir.

25   Q   Of 2013; correct?

TENA SHAREE JOELLNER - CROSS BY MR. POWELL

```
 1   A   (Nodding head affirmatively.)
 2           MR. POWELL:  Okay.  And if you would, Sam, if you
 3   could show us the whole document to this?  And scroll down.
 4   Q   It appears as if Gracie, in conducting this physical exam,
 5   checked your chest and lungs, your head and neck?
 6   A   Uh-huh (positive response).
 7   Q   Cardiovascular?  Your abdomen; correct?
 8   A   Yes, sir.
 9   Q   Including a palpation of your abdomen, feeling around;
10   correct?
11   A   Yes, sir.  They typically do that.
12   Q   I know it's been a while back.  But do you have any
13   specific memory of this physical exam?
14   A   No, sir.
15   Q   Does this refresh your recollection?
16   A   That's done every time you go in Dr. McNair's office.
17   Q   Okay.  All right.  And if you will go down to the bottom.
18   Now, you apparently had already made an appointment with PPSA
19   at the time of this office visit.  Do you see where it says:
20   Today's impression?  Do you have any memory of that?
21   A   No, sir.  I do not.
22   Q   But we know that Dr. McNair referred you to PPSA; correct?
23   A   Yes, sir, he did.
24   Q   All right.  And he continued you on your current
25   medications; right?
```

TENA SHAREE DOELLNER - CROSS BY MR. POWELL

```
 1   A   Yes, sir.
 2   Q   Now, how long had you been a patient of Dr. McNair and
 3   Dr. -- I mean, just Dr. McNair?
 4   A   I've been a patient of Dr. McNair's for over 20 years.  I
 5   don't know exactly when, but it's been a long time.
 6   Q   And you developed -- you have developed a trust in
 7   Dr. McNair, haven't you?
 8   A   Yes, sir.
 9   Q   And you trusted Dr. McNair with most of your medical care;
10   is that true?
11   A   Yes, sir.
12   Q   And he coordinated most of your medical care for over 20
13   years?
14   A   Yes, sir.
15   Q   Including referrals to other medical specialists for any
16   specific problem that he felt warranted a referral to a medical
17   specialist, another doctor; correct?
18   A   Yes, sir.
19   Q   And he had done that over those 20 years, hadn't he?
20   A   Yes, sir.
21   Q   When did you first develop problems with the disease
22   process that led you to have the surgery in February of 2012
23   that injured your pancreas?
24   A   When -- I'm sorry?
25   Q   When was the onset of that?
```

```
 1        MS. GRIFFIN:  Your Honor, we would object to the
 2   relevance.  He's gone over the reasons that she was referred to
 3   PPSA.  But --
 4        THE COURT:  Yeah, I don't see the relevance of
 5   this.  So let's move forward.  Let's move forward to her
 6   treatment by PPSA.
 7   BY MR. POWELL:
 8   Q   You were treated by Dr. McNair and had a complete physical
 9   exam done on March 11th of 2013.  We just talked about that;
10   right?
11   A   Yes, sir.
12   Q   And approximately a little over two weeks later you were
13   seen at PPSA for the first time?  March 28th of 2013; correct?
14   A   That should be right, because it was -- I think, if I
15   remember, it was right after I got back out of the hospital,
16   because I went in the hospital on the 18th of March.
17   Q   I didn't ask you that.  After you were treated at
18   Dr. McNair's office on March the 11th of 2013 for problems
19   associated with your -- at that time it was acute pancreatitis,
20   wasn't it?
21   A   Yes.
22   Q   You were hospitalized a little over a week later; correct?
23   A   On the 18th.
24   Q   And was that on an emergency basis?
25   A   I went to the doctor and they sent me straight from the
```

1    office back to the hospital.

2    Q    And do you know why?

3    A    Why?

4    Q    Why were you sent to the hospital?

5    A    Because of my pancreas.

6    Q    And were you admitted?

7    A    Yes, sir, I stayed in five or six days.

8    Q    You spent five or six days there?

9    A    Yes, sir (nodding head affirmatively).

10   Q    And you received medication during that five or six days,

11   didn't you?

12   A    Yes, sir.  They put me NPO.  They say it's like to cool

13   down the pancreas.  You have -- I can't eat or drink anything

14   and it gives my pancreas time to readjust and a lot of times it

15   helps with the swelling and it will calm it back down.

16   Q    Would it be fair to say that you were in a considerable

17   amount of acute pain leading up to that hospitalization?

18   A    Yes, sir.

19   Q    And when you got out -- when did you get out?  Do you

20   remember?

21   A    I was in five or six days.

22   Q    And you went to PPSA within a matter of a few days after

23   you were discharged from the hospital?

24   A    I believe that's correct.

25   Q    When you got to PPSA, you had been on Lortab 10s; right?

3232

```
 1   A   Yes, sir.

 2   Q   This Nucynta Extended Release opioid; correct?

 3   A   Yes, sir.

 4   Q   And a fentanyl patch?

 5   A   Yes, sir.

 6   Q   Among other medications; correct?

 7   A   Yes, sir.

 8   Q   And you gave the history to PPSA and you had all your

 9   medical records sent over by Dr. McNair; correct?

10   A   Yes, sir.

11   Q   Including some of ones that were --

12   A   I assume they were, yes, sir.

13   Q   And in your initial office visit the plan was for a

14   hypogastric block.  Do you know what that is?

15   A   No, sir.

16   Q   And they continued on your Lortab -- I mean, on your

17   Duragesic fentanyl patch; correct?

18   A   I don't know who you're talking about.

19   Q   About PPSA.

20   A   On my first visit?

21   Q   Yes, ma'am.

22   A   Yes, they continued the fentanyl patch, gave me Lortab and

23   Subsys spray.

24   Q   Which was -- well, you had a prescription for the Subsys;

25   right?
```

TENA SHARICO PELLNER - CROSS BY MR. POWELL                3233

```
1   A   I'm sorry?

2   Q   You got a prescription for the Subsys?

3   A   When I went to my visit.

4   Q   Right.

5   A   Yes, sir.

6   Q   In March?

7   A   Yes, sir.

8   Q   Okay.  But you weren't able to get the Subsys for a few

9   months; isn't that right?

10  A   I honestly don't remember when I -- I don't think so.  I

11  honestly don't remember the date the Subsys was first

12  filled.  I'm sorry.  I can't tell you that for sure.

13  Q   Other than the issue with the Subsys and whether or not you

14  actually got it, you were continued on your same medications?

15  A   Yes, sir.

16  Q   And you were scheduled for a procedure to be performed at

17  PPSA by Dr. Couch?

18  A   Yes.

19  Q   And so you came back April 22nd and you had that procedure

20  done by Dr. Couch; correct?

21  A   I don't know about the date.  But yes, sir, I went back and

22  had the procedure done.

23  Q   Take my word for it, it was April 22nd?

24  A   Yes, sir.

25  Q   If it's --
```

1  A   Right.

2  Q   All right.  And then three days later, on April the 25th of

3  2013 -- this was again from your medical record -- you had

4  another office visit with PPSA?

5  A   Yes, sir.

6  Q   And at that time, according to the chart notes --

7          MR. POWELL:  And, Sam, if you could pull up 69?

8  Q   In that record you indicate that you had a positive

9  response from the hypogastric nerve block?  Do you see that?

10  A   Yes, sir.

11  Q   That would indicate that you got some relief from that

12  procedure; correct?

13  A   That's what it says.  But that's not correct.

14  Q   Because you were still in a lot of pain?

15  A   Uh-huh (positive response).

16  Q   In spite of that procedure, you still had a considerable

17  amount of pain?

18  A   Yes, sir.  That's why I never had another one done.

19  Q   Okay.  And it says:  Has not been able to get Subsys.  Do

20  you see that?

21  A   Yes, sir.

22  Q   Now, at this point in time you're still on the same

23  medications and you're still having an incredible amount of

24  pain, aren't you?

25  A   Yes, sir.

TENA SHAREE GOLLNER - CROSS BY MR. POWELL

```
 1   Q   And the hypogastric nerve block didn't help?
 2   A   That is correct.
 3   Q   Lortabs didn't help?
 4   A   No, sir, not really.
 5   Q   The 25 milligram fentanyl patch didn't help?
 6   A   No, sir.
 7   Q   And you had to take a benzodiazepine drug in order to sleep
 8   at night?
 9   A   Yes, sir.
10   Q   And the reason you were at PPSA is because you -- I believe
11   you made the statement that you had no life, that you were in
12   pain all the time?
13   A   Yes, sir.
14   Q   That all you did was go to work and come home and live in
15   pain?
16   A   Yes, sir.
17   Q   Do you remember saying that?
18   A   My last day I worked was March the 18th of that year.  I
19   haven't been back to work since then.
20   Q   In fact, are you on disability now?
21   A   No, sir.
22   Q   You're not?
23   A   No, sir.
24   Q   Now, you came back on -- it appears to be May the 5th of
25   2013 would be your next office visit, which would be -- and at
```

3236

```
 1    this point in time you're being seen every couple of weeks?

 2    A    By Dr. McNair or --

 3    Q    By PPSA?

 4    A    Every four weeks, every four weeks.

 5    Q    And you're also being seen during this same treatment

 6    period at PPSA, you're also being seen and treated by

 7    Dr. McNair, aren't you?

 8    A    Yes, sir.

 9    Q    And you discuss your care and your treatment with

10    Dr. McNair, don't you?

11    A    Yes, sir.

12    Q    It appears as if you told PPSA in an office visit shortly

13    after you became their patient that you report -- that you

14    reported being tired all the time?

15    A    Yes, sir.

16    Q    That you had no life?

17    A    Yes, sir (nodding head affirmatively).

18    Q    And that you just go to work and home due to the pain?

19    A    Yes, sir.

20    Q    Now, after you had the block, which you've already told us

21    was unsuccessful, you had an evaluation done, you had to fill

22    out some forms at PPSA, and you were asked some questions

23    regarding your pain.  Do you remember that?  A form, filling

24    out some forms?

25    A    When I went in the first time?
```

1   Q   Yes, ma'am.

2   A   Yes, sir.

3           MR. POWELL:  Sam, if you could go to 44?  Highlight

4   that -- that's good.

5   Q   Now, I want to show you -- again, this is from your medical

6   record.  Do you see that document?

7   A   Yes, sir.

8   Q   Is it large enough for you to read?

9   A   Yes, I can see it.

10  Q   And it says:  Circle the numbers below that best describe

11  how pain has interfered with your daily functioning.  Do you

12  see that?

13  A   Yes, sir.

14  Q   First category is general activity.  And this goes from a

15  scale of one to 10?  Okay?

16  A   Correct.

17  Q   One meaning it does not interfere and 10 meaning it

18  completely interferes?

19  A   Yes, sir.

20  Q   Now, completely interferes, to me, means you can't do

21  anything at all?

22  A   Right.

23  Q   Is that fair?

24  A   Yes.

25  Q   Is that your understanding of what completely interferes

3238

1   would mean?

2   A   Yes, sir.

3   Q   That you can't function at all?

4   A   Yes, sir.

5   Q   Fair enough.  Okay.  You indicate that you are an eight?

6   A   Yes, sir.

7   Q   Out of 10?

8   A   Uh-huh (positive response).

9   Q   That is severe pain, is it not?

10   A   Yes, sir.

11   Q   And that's all the time; correct?

12   A   Yes, sir.

13   Q   At this point in time, this is all the time; right?

14   A   The majority of the time, yes (nodding head affirmatively).

15   A Lortab would take the edge off, but not very much.

16   Q   And so would it be fair to say that there were times when

17   you were taking the oral opioid medications like Lortab and it

18   would simply dull the pain but it would not stop it?

19   A   Yes, sir; that's correct.

20   Q   And there were times when the pain was so bad that it broke

21   through whenever the Lortab was able to control; is that fair?

22   A   Yes, sir.  That is correct.

23   Q   And that's one of the reasons why you sought and your

24   primary care doctor sought referral to a pain clinic because

25   the current medications that you were taking -- the Lortabs,

1    the fentanyl patches, and the Nucynta -- were not controlling

2    your pain?

3    A    That is correct.  And I was worried about getting addicted

4    to it.

5    Q    Okay.  To the Lortabs and the opioid pills?

6    A    Yes.  Correct.

7    Q    Now, you were prescribed Subsys; correct?

8    A    Correct.

9    Q    And you understood when you got Subsys -- which I believe

10   would have been sometime in the spring or summer of 2013?

11   A    (Nodding head affirmatively.)

12   Q    Do you remember?

13   A    Do I remember the date?

14   Q    Do you remember -- you mentioned something earlier about

15   Blue Cross and Blue Shield approving you for Subsys --

16   A    Yes.

17   Q    -- for some period of time; correct?

18   A    Yes, sir.

19   Q    Do you recall what that period of time was?

20   A    No, sir.  I can't tell you a date on that.

21   Q    It was for approximately a year?

22   A    No.  I was on it over a year.

23   Q    I mean the approval process, wasn't it -- didn't they

24   approve it for about a year?  Or longer?

25   A    I'm not sure what you're asking me.  I'm sorry.

TENA SHAREE GOELLNER - CROSS BY MR. POWELL

3240

1  Q   Do you remember whether Blue Cross approved your Subsys

2  prescription for more than a year?

3  A   I know whenever I started taking it in 2013, I took it for

4  the remainder of that year and for the entire year of 2014.

5  Q   Okay.  All right.  And you started out on a 200 milligram

6  [sic] dose of Subsys?

7  A   Yes, sir.

8  Q   Is that right?  And it was effective, wasn't it?

9  A   Yes, sir.

10 Q   And did you understand that the Subsys was to be utilized

11 for those times when you had breakthrough pain from your

12 pancreatitis and associated symptoms resulting from that?

13 A   I was told to take the medication four times a day.

14 Q   As needed?

15 A   Yes, sir, four times a day.

16 Q   As needed for breakthrough pain?

17 A   Uh-huh (nodding head affirmatively).  Yes, sir.

18 Q   Now, in August you were asked some questions about -- I'm

19 sorry -- in May of 2013, this would have been about your fifth

20 office visit, you finally had the Subsys.  It appears as if you

21 got the Subsys at the beginning of May.  Does that sound about

22 right?

23 A   Yeah, I think that was my third visit.  And yes, that --

24 that should be about right.

25 Q   May of 2013?

TENA SHAREE GOELLNER - CROSS BY MR. POWELL                                    3241

1    A    Uh-huh (nodding head affirmatively).

2    Q    And they continued your Lortabs; right?

3    A    Yes.

4    Q    And they continued the Duragesic patch; right?  The

5    fentanyl?

6    A    The fentanyl patch?  Yes, sir.

7    Q    Fentanyl patch.  And when you came back in May, on May the

8    23rd of 2013 --

9         MR. POWELL:  Sam, I think this is going to be 7?  No,

10   that's not it.

11        Yeah, that's it.  (Indicating.)

12   Q    This appears to be a chart note from PPSA for May the 23rd,

13   2013.  Do you see that?

14   A    Yes, sir.

15   Q    And in the handwritten portion it says mid-abdominal.  That

16   means here, where we talked about earlier, right here?

17   (Indicating.)

18   A    Yes.

19   Q    To back pain, meaning radiating into the back left side?

20   A    Yes, sir.

21   Q    And it says:  Used her Subsys once with a flareup and it

22   worked well.  Is that accurate?

23   A    That's what it says on there.

24   Q    Okay.  Then it also says that you had a bad bacterial

25   infection and you were on antibiotics too.  Do you see that?

TENA SHAREE GOELLNER - CROSS BY MR. POWELL

```
 1   A   Yes, sir.

 2   Q   Do you remember that?

 3   A   Not right offhand, no, I don't.

 4   Q   This record indicates that the Subsys was working for you;

 5   correct?

 6   A   Yes.

 7   Q   And it was -- it was at least helping to control your

 8   breakthrough pain that the Lortab and the other two opioids

 9   could not control; is that accurate?

10   A   Yes, sir.

11   Q   But you also told us that side-effects of this drug were

12   that they made you sleepy; right?

13   A   Yes.

14   Q   So at least at some point in time you had a choice to make;

15   you could decide to live with this awful pain?  Okay?  Right?

16   A   Yes, sir.

17   Q   Or you could take medication prescribed to you for the

18   treatment of that pain and not have to live with that level of

19   pain, but you spent a lot of time sleeping; is that right?

20   A   Yes; that is correct.

21   Q   So you had to choose between uncontrollable breakthrough

22   pain and/or sleeping?

23   A   Yes, sir.

24   Q   Now, in July -- this would have been after you had been on

25   Subsys 200 milligrams [sic] for a couple of months and the
```

3243

```
 1   other around-the-clock opioid medications that you were taking;
 2   right?
 3   A   Yes, sir.
 4   Q   Okay.  And you apparently --
 5           MR. POWELL:  Sam, if you could pull up 74, I hope?
 6           No, that's not it.
 7           I'm looking for July the 31st.
 8           Okay.  There you go.
 9   Q   You had been in the hospital; correct?
10   A   Yes, sir.
11   Q   And was that for another episode of acute pancreatitis?
12   A   Yes, sir.
13   Q   And that's why you missed your appointment in June?
14   A   Yes, sir.
15   Q   With PPSA?
16   A   No.
17   Q   Ma'am?
18   A   It should have been in July, when I went like the last --
19   very last day of July or something.
20   Q   When was it that you were in the hospital for another
21   episode of acute pancreatitis?  Was it in June or July of '13?
22   A   It was the end -- I don't -- I can't remember.  It seems
23   like it was the end of June, because it seems like I was in
24   there right before the Fourth of July.
25   Q   Okay.  And when you came back on July the 31st, you
```

3244

1  informed them that you had been hospitalized because of --

2  A   Yes, sir.

3  Q   -- your pancreatitis?

4  A   Yes, sir.

5  Q   Would it be fair to say that when you had to be

6  hospitalized for this condition, that you were at your absolute

7  worst when it came to pain?

8  A   Yes, sir.

9  Q   And so within a matter of a few weeks after you were

10  discharged from yet another hospitalization, you would go back

11  to PPSA; right?

12  A   Yes, sir.

13  Q   And that's this July 31st office visit?

14  A   Yes, sir.

15  Q   And in that office visit you tell them about the

16  pancreatitis hospitalization and you also told them that you

17  were in severe pain; right?

18  A   Yes, sir.

19  Q   And it was at that point in time, it says, meds were

20  discussed and a decision was made to increase your Subsys

21  microgram prescription, wasn't it?

22  A   Yes, sir.

23  Q   Because 200 micrograms of Subsys together with your opioid

24  oral therapy was not controlling your breakthrough pain, was

25  it?

1   A   I'm sorry?  I was -- I didn't see where it said they were

2   increasing it on there.  I'm sorry.

3   Q   That's okay.  My question was when you went back after

4   being hospitalized for pancreatitis, this hospitalization

5   occurred after you began taking Subsys 200, didn't it?

6   A   That's correct; yes.

7   Q   And in spite of taking Subsys 200 -- and you always took

8   your medications as directed, didn't you?

9   A   No, sir.

10  Q   You didn't?

11  A   No, sir.

12  Q   Did you try?

13  A   I didn't take Lortab like it was prescribed on the bottle

14  because of the way that it made me feel.

15  Q   Okay.  You took less?

16  A   I took less, yes, sir.

17  Q   Okay.  Well, then let me rephrase the question.  You never

18  abused your opioid medications when you were -- as they had

19  been prescribed to you?  If anything, you were taking a little

20  less of the Lortab?

21  A   That is correct.

22  Q   Okay.  But you took the Subsys as it was prescribed?

23  A   Yes, sir.

24  Q   And 200 micrograms of Subsys together with your other

25  opioid therapy was not controlling your breakthrough pain in

1  July of 2013, was it?

2  A   That is correct.

3  Q   And so when you go back to PPSA and you tell them that:

4  I've been in the hospital again because of my acute

5  pancreatitis, the decision is made to increase your Subsys

6  prescription; correct?  Increase the dosage of it?

7  A   Well, it doesn't say -- that's what I was looking for on

8  here.  I can't remember exactly when they increased it.  I

9  don't see it on there.

10  Q   Now, if you will take my word for it, your Subsys -- you

11  know it was increased to 600 milligrams [sic], don't you?

12  A   No, sir.

13  Q   You don't have any reason to dispute that this would have

14  been when that happened?

15  A   No, sir.

16  Q   Ms. Griffin asked you about it earlier, do you remember?

17  A   Yes, yes.

18  Q   Okay.  Now, if we could -- do you see where this document

19  shows that the medication was increased?

20  A   Yes, sir, I see it now.

21  Q   Thank you.  If we could go back to 44, I got a little off

22  track, Ms. Goellner.  I want to back up a little bit.  Okay?

23  A   Okay.

24  Q   This is back to -- so we can get a picture of what your

25  pain was when you first got to PPSA.  Okay.  I know we've

3247

 1   jumped ahead several months, but let's go back.  We left off

 2   with general activity.  Right?  Eight out of 10.  Your mood was

 3   a five.  So that's sort of middle of the road; right?

 4   A   Yeah.

 5   Q   Okay.  You're seven out of 10 on ability to walk; is that

 6   right?

 7   A   Yes, sir.

 8   Q   You would agree with me that that is very significant,

 9   isn't it?

10   A   Yes, sir.

11   Q   Normal work routine is a five.  So you were able to get

12   through daily work?

13   A   Yes, sir.

14   Q   Not without pain, but about half as bad as it would be at

15   its worst?

16   A   Yes, sir.

17   Q   Okay.  Relations with other people is a six.  So the level

18   of your pain is interfering with your ability, at a level six,

19   significantly interfering with your ability to deal with and

20   function with other people?

21   A   Yes, sir.

22   Q   And that would be like your family; right?

23   A   With everything.  I was very involved in church and I

24   didn't go most of the time and -- yeah (nodding head

25   affirmatively).

3248

1    Q    Because you were in too much pain?

2    A    Yes.

3    Q    Ability to concentrate was a seven out of 10?

4    A    Uh-huh (positive response).

5    Q    That's very significant, isn't it?

6    A    Yes, sir.

7    Q    And would it be fair to say that your ability to

8    concentrate was substantially impaired to the level of a seven

9    because of the amount of pain that you were having to deal

10   with?

11   A    Yes, sir.

12   Q    And it makes it very difficult to function or to think

13   about much of anything else, doesn't it?

14   A    Yes, sir.

15   Q    And your appetite was a five out of 10.  So it had an

16   impact on your appetite also, the pain did?

17   A    Yes, sir.

18   Q    And yet you were asked basically at the end of this to

19   speculate on what level of pain that you thought you could

20   function with on a daily basis; right?

21   A    Yes, sir.

22   Q    And you told PPSA you didn't -- you didn't circle a one.

23   You didn't expect that you would be completely pain free as a

24   result of this.  You would be satisfied if you had a pain that

25   you could live with --

TENA SHAREE DOELLNER - CROSS BY MR. POWELL

```
 1   A    Yes, sir.

 2   Q    -- somewhat comfortably; is that fair?

 3   A    Yes, sir.  That's fair.

 4   Q    And would that be a three?

 5   A    Yes, sir.

 6   Q    Now, going back once again to your referral from Dr. McNair

 7   to PPSA, I wrote down when you were asked by Ms. Griffin the

 8   reasons why you wanted pain management.  Do you remember that

 9   question?

10   A    Yes, sir.

11   Q    And I think you made the statement that you had been in and

12   out of the hospital --

13   A    Uh-huh (positive response).

14   Q    -- ever since this mistake was made during your surgery;

15   right?

16   A    Yes, sir.

17   Q    Those were very painful episodes; right?

18   A    Yes, sir.

19   Q    And you made the statement, I believe, that you told

20   Dr. McNair:  Something else has to be done?  Do you remember

21   that?

22   A    Yeah, there has to be something better that can be done

23   besides what I was doing -- what they were doing (nodding head

24   affirmatively).

25   Q    And again, we know what you were doing at that time; right?
```

TENA SHAREE GOELLNER - CROSS BY MR. POWELL

1  A   Yes, sir.

2  Q   You were taking Lortabs, Nucynta, and fentanyl patches, and

3  they were not working; correct?

4  A   Correct.

5  Q   Now, you then went back for followup in, it appears to be,

6  August the 28th of 2013.  Can you see that?

7  A   Yes, sir.

8  Q   Where it says objective and then handwriting?

9  A   Yes, sir.

10 Q   Patient is having a lot of abdominal pain; states that her

11 primary care physician has found a specialist in Biloxi.  Do

12 you see that?

13 A   It was not Biloxi.

14 Q   Let me finish reading it, then you can -- I'll let you tell

15 me what it is.  Okay?

16       Found a specialist in Biloxi for her to go to.

17       And then this statement is attributed to you:  States

18 that the Subsys works, but that she has a hard time getting it.

19       What do you mean by that?  Do you remember?

20 A   The Subsys -- yes, sir.  It was hard to get at other

21 drugstores.

22 Q   Okay.  It was hard for you to fill the prescription?

23 A   Yes, sir.

24 Q   Okay.  You are continued on the same medications at that

25 point; correct?

3251

```
 1   A   Yes, sir.
 2   Q   600 milligrams [sic] Subsys, same for your 10 milligram
 3   Lortab?
 4   A   Yes, sir.
 5   Q   And the medication was working, wasn't it?
 6   A   The Subsys spray?
 7   Q   Yes, ma'am.
 8   A   Yes, sir.  It helped the pain.
 9   Q   It helped control those episodes when you had breakthrough
10   pain that could not be controlled by oral medications; is that
11   right?
12   A   Yes, sir.  Yes, sir.
13   Q   You go back a month later, October 23rd of 2013, and I
14   believe that's -- thank you.
15        Now, you described your pain -- they would ask you
16   what your pain level was when you came in, didn't they?
17   A   I'm sorry?
18   Q   When you went to PPSA, you would be asked -- they would
19   ask:  How's your pain?
20   A   Yes, the nurse would always ask:  What is your pain level
21   now?  How is it with medication?  How is it without medication?
22   Q   Do you see where it says pain status?
23        MR. POWELL:  Sam, if you could highlight that for us?
24   Q   Do you see where it says your scale with medication was an
25   eight out of 10?
```

TENA SHAREE GODELINER - CROSS BY MR. POWELL

1    A   Yes, sir, I see that.

2    Q   And without medication it's a 10 out of 10?

3    A   I see that.

4    Q   And is that what you told them when you came in?

5    A   No, sir.  I never told them my pain was a 10 out of 10.

6    Q   So you're saying that's a mistake?

7    A   Yes, sir.  And with medication it usually would go down to

8    about a three.  But without it, it would be about an eight.  So

9    that is not correct.

10   Q   So if you went back in a month later and told them that

11   with medication it was a seven out of 10 and without medication

12   it was a nine out of 10, that would not be accurate?

13   A   No, sir.

14       MS. GRIFFIN:  Your Honor, I believe he's misquoted the

15   document.

16       MR. POWELL:  Oh, that's a different one.  I'm talking

17   about October -- I mean November now, the next one.

18       THE COURT:  Well, you need to show the record, if

19   you're going to --

20       MR. POWELL:  Can you go to the next one, Sam?  I think

21   it's 86.

22       There it is.  I apologize.

23   Q   The numbers are different this next month, aren't they?

24   A   Yes, sir.

25   Q   It shows seven out of 10 with and nine out of 10 without;

```
 1   right?

 2   A   Yes, sir.

 3   Q   And you disagree with that?

 4   A   Yes, sir.

 5   Q   But without medication, it was at least an eight, wasn't

 6   it?

 7   A   Yes, sir.

 8   Q   All the time?

 9   A   Pretty much, yes, sir.

10   Q   Now, if you will go to 89?

11           The next office visit is in December of 2013.  Now, at

12   this point in time you have been a patient for about six or

13   seven months; right?

14   A   Yes, sir.

15   Q   Since March?

16   A   Yes, sir.

17   Q   Maybe a little longer than that?

18   A   Uh-huh (positive response).

19   Q   And it says --

20           MR. POWELL:  If you will go down to the objective

21   part, Sam?

22   Q   -- patient states that medications are working well?  Do

23   you see that?

24   A   Yes, sir.

25   Q   We've already established that they were working well;
```

3254

```
 1  correct?
 2  A   Yes, sir.
 3  Q   They were controlling your breakthrough pain and your
 4  constant pain; right?
 5  A   Yes, sir.
 6  Q   States she is scheduled to have -- I'm sorry.  Back
 7  up.  Working well, but that she feels like she needs to go up
 8  on Subsys.  Do you see that?
 9  A   Yes, sir.  I see that.
10  Q   And that's when you went up on Subsys to 800 milligrams
11  [sic]?
12  A   I don't know the date.  They put me up to 800 milligrams
13  [sic].  It should be in my record.
14  Q   It is.  She states that she is scheduled to have surgery at
15  Oschner's in January for her chronic pancreatitis.  They are
16  trying to find some way to get her relief from her pain.
17           Is that accurate?
18  A   No, sir.
19  Q   What's not accurate about it?
20  A   I was scheduled to go in and see a specialist at Oschner's
21  Clinic for them to try to decide if I should have the Nissen
22  wrap undone or leave it and if they could figure out why I was
23  in chronic pain all the time; if it was just my pancreas.  I
24  never had a surgical procedure done at Oschner's Clinic.
25  Q   When was it that you went to Tulane?
```

TENA SHAREE DOLLNER - CROSS BY MR. POWELL

```
1    A    I went to Oschner's Clinic first, then to Tulane.  I don't
2    remember the dates.  But Tulane is actually the one that found
3    out not only did he damage my pancreas, but all the nerves in
4    my stomach.
5    Q    When was that?
6    A    Sir?
7    Q    When was that?
8    A    It was after I went to Ocshner's Clinic.  I can't remember
9    the date.
10   Q    Was it while you were still a patient at PPSA?
11   A    Yes, sir.  Yes, sir.
12   Q    Okay.  So while you were a patient at PPSA, you went to the
13   Oschner Clinic?
14   A    Yes, sir.
15   Q    And that was to get some more advanced diagnostic
16   procedures?
17   A    Try to see if they could figure out something that might
18   could be done and more what was going on than what Dr. McNair
19   could find.
20   Q    And this is some other specialty that's doing this;
21   correct?
22   A    Yes, sir.
23   Q    And so you go to Oschner, and then how soon after that did
24   you go to Tulane?
25   A    After I went to Oschner's and they advised not to have the
```

3256

1    Nissen wrap undone, I went back to Dr. McNair.  Dr. McNair then

2    referred me to Tulane to get a second opinion from someone else

3    on it.

4    Q    Okay.

5    A    I don't remember the dates on those.

6    Q    When you went back in February 2014, your Lortabs were

7    discontinued and replaced with Norco; is that right?

8    A    Yes, sir.

9    Q    And do you recall why the Norco replaced the Lortabs?

10   A    I think she said that they discontinued Lortab and come out

11   with Norco, because of the Tylenol in it.

12   Q    Okay.  Now, given your -- given your medical history and

13   these ongoing problems that you had with your pancreas --

14   extensive problems; right?

15   A    Yes, sir.

16   Q    During this time frame?

17   A    Yes, sir.

18   Q    The only reason that you went to PPSA was for pain relief;

19   is that right?

20   A    Yes, sir.

21   Q    You relied on all these other medical specialists, like

22   gastroenterologists, surgeons, whatever type medical

23   specialties there are that deal with the pancreas, you relied

24   on all of those people to try to help you fix the problem that

25   was causing you to have this excruciating around-the-clock

TENA SHARP GOELLNER - CROSS BY MR. POWELL

1    pain, didn't you?

2    A   Yes, sir.

3    Q   You understood that PPSA could not treat the underlying

4    cause of all this pain?  You knew that, didn't you?

5    A   Yes, sir.

6    Q   And you did not expect them to do anything but treat that

7    pain; is that right?

8    A   Yes, sir.

9    Q   When you went to the Oschner Clinic in an effort -- you and

10   Dr. McNair's efforts to try to figure out why you were in such

11   Bad shape, you told them -- they ask you what medications

12   you're taking, don't they?

13   A   Yes, sir.

14   Q   And Dr. McNair knew what medications you were taking,

15   didn't he?

16   A   Yes, sir.

17   Q   And you told the people at Oschner's you were on Lortab

18   10s, now 50 milligram fentanyl patches, and 600 milligram [sic]

19   Subsys spray; right?

20   A   Yes, sir (nodding head affirmatively).

21   Q   Okay.  So Dr. McNair knew this; right?

22   A   Yes, sir.

23   Q   Whoever the doctors are at Oschner Clinic knew this; right?

24   A   Yes, sir.

25   Q   And the physicians and the staff at Tulane knew what your

3258

1   medication history was, didn't they?

2   A   Yes, sir.

3   Q   And all of these people were aware that you were being

4   prescribed Subsys for the treatment of your breakthrough

5   pancreatic pain; is that right?

6   A   Yes, sir.

7   Q   And they knew that you had tried everything else, didn't

8   they?

9   A   Yes, sir.

10  Q   Ms. Goellner, it didn't matter to you, did it, at the time

11  that you were in all of this pain and taking this medication,

12  it didn't matter to you whether your pancreatitis was caused by

13  cancer or caused by some surgeon's error, did it?

14  A   No, sir.

15  Q   You were still in an incredible amount of pain regardless?

16  A   Yes, sir.

17  Q   And your insurance company, Blue Cross/Blue Shield,

18  approved the prescriptions that you got for Subsys, didn't it?

19  A   Yes, sir.

20  Q   And would it be fair to say they had access to all of your

21  medical records because all of your treatment was a coded

22  billing?

23          MS. GRIFFIN:  Objection, Your Honor, as to foundation.

24          THE COURT:  Sustained.

25  BY MR. POWELL:

TENA SHARLE ODELLNER - CROSS BY MR. POWELL

1  Q   You never told Blue Cross/Blue Shield that you had cancer,

2  did you?

3  A   No, sir.

4  Q   They knew you had acute pancreatitis, didn't they?

5       MS. GRIFFIN:  Objection again as to foundation.

6       THE COURT:  She cannot testify as to what Blue Cross

7  knew.

8  BY MR. POWELL:

9  Q   You had conversations with them, didn't you?

10  A   No, sir.  Blue Cross/Blue Shield?

11  Q   Yes, ma'am.

12  A   No, sir.

13  Q   You didn't ever have to talk to anybody at Blue Cross/Blue

14  Shield about whether or not your medical expenses were going to

15  be paid or not?

16  A   No, sir.

17  Q   Okay.  Now, it appears as if you were again admitted to the

18  hospital in February of '15?  Do you remember that?  Were you

19  admitted to the hospital again for your pancreas in February of

20  2015?

21  A   That sounds right.

22  Q   That's why it's referenced in your medical record at PPSA?

23  A   I don't think that's right.  No.  That's not right.  I went

24  back in the hospital again after they shut them down.  I went

25  back in the hospital again because Dr. McNair was trying to get

1    my pain under control, and he gave me medication until I could

2    get back in with a different pain management doctor.  That was

3    during the summer.  That was after they closed them down like

4    in May, and I was in the hospital in like July.

5    Q   Now, in November of 2014 you were still on the same

6    medications; right?

7    A   Yes, sir.

8    Q   And you see the notation that says:  With little

9    improvement, or a little improvement?  With a little

10   improvement?  Do you see that?

11   A   Yes, sir, I see that.

12   Q   Does that mean that your symptoms were improving somewhat

13   or the medication was helping you with your pain somewhat?

14   Were you in more or less pain at this point in time or do you

15   remember?

16   A   In 2014, my symptoms were still pretty much the same.

17   Q   In late 2014?

18   A   Yes, sir.  If I didn't take my pain medication, I would be

19   in severe pain.

20   Q   And again, in November of '14, you'd been a patient at PPSA

21   now about 20 months; right?  Maybe a little longer, 21?

22   A   Something, yes, sir.

23   Q   And the only thing that provided you any significant relief

24   for your breakthrough pain, which you've already told us about,

25   was Subsys?

TENA SHAREY OELLNER - CROSS BY MR. POWELL

```
 1    A   Yes, sir.

 2    Q   Is that right?

 3    A   Yes, sir.

 4    Q   Nothing else worked?

 5    A   No, sir.

 6    Q   Nothing else worked before you got to PPSA?

 7    A   No, sir.

 8    Q   And at some point in time, in 2015 I believe you told us,

 9    that Blue Cross would no longer authorize you to receive

10    Subsys; is that right?

11    A   January the 1st, yeah (nodding head affirmatively).

12    Q   And so an effort was made by PPSA to switch you over to

13    another breakthrough pain medication called Abstral; is that

14    right?

15    A   Yes, sir.

16    Q   And again, when that happened in early 2015, there was no

17    pain medication or other modality of whatever type that was

18    relieving your breakthrough constant pain, was there?

19           MS. GRIFFIN:  Your Honor, I object as to foundation.

20    She doesn't know if there's another one that would have treated

21    her.

22           THE COURT:  Sustained.

23    BY MR. POWELL:

24    Q   In November of 2014 was there any substance or treatment

25    that relieved your breakthrough pain other than Subsys?
```

TENA SHARBER-OBELUINER - CROSS BY MR. POWELL                3262

1    A    Not that they had tried me on, no, sir.

2    Q    So when you could no longer get Subsys, they made an effort

3    and were successful in getting Abstral for you; correct?

4    A    Yes, sir.

5    Q    And you understand that Abstral is also a fentanyl-based

6    product for the treatment of breakthrough pain; correct?

7    A    Yes, sir.

8    Q    It only differs in its delivery system; is that right?

9    A    Yes, sir.

10    Q    Subsys, Subsys is a spray; right?

11    A    Yes, sir.

12    Q    Abstral is a lozenge that you put under your tongue; right?

13    A    No.  What I had was a little pill.

14    Q    Okay.  A pill.  And you put it under your tongue?

15    A    Yes.

16    Q    And it dissolves?

17    A    Yes, sir.

18    Q    And then you get the immediate relief or within minutes?

19    A    Yes.

20    Q    You start to get the relief that you took the medication

21    for in the first place?

22    A    Yes, sir.

23    Q    And you tried Abstral for a while and then you couldn't get

24    Abstral any more; right?

25    A    Correct.  Yes, sir.

3263

1   Q   That's when they switched you to Lazanda?

2   A   Yes, sir.

3   Q   Now, Lazanda is also a fentanyl-based product for the

4   treatment of breakthrough pain, isn't it?

5   A   Yes, sir.

6   Q   And did the Lazanda work as effectively as the Abstral?

7   A   No, sir.

8   Q   Did it work as effectively as the Subsys?

9   A   No, sir.

10  Q   And so would it be fair to say that your pain levels then

11  increased over what they had been prior to Blue Cross refusing

12  to authorize you to take Subsys any more?

13  A   Yes, sir.

14  Q   When was it that you had the testing done at Tulane?

15  A   I don't remember the date.  It was after I went to

16  Oschner's Clinic.

17  Q   Would it have been in 2015?

18  A   It was the end of '14 or the beginning of '15.  But I'm not

19  sure of the dates.

20  Q   Now, you said when you first went to PPSA that you were

21  concerned about becoming addicted, and I believe you just

22  testified earlier that you were afraid of becoming addicted to

23  the Lortabs; is that right?

24  A   Yes, sir.

25  Q   Because that was what you were on when you got to PPSA?

3264

1    A    Yes, sir.

2    Q    So you expressed a concern to them, after giving your

3    history of taking Lortabs for at that point in time almost a

4    couple of years; right; since the surgery?

5    A    It had been a little over a year.

6    Q    Okay.  But you didn't want -- you didn't want to become

7    addicted to this stuff; right?

8    A    No, sir.

9    Q    Now, and they never increased your Lortabs, did they?

10   A    I mean, what do you mean?

11   Q    The dosage?

12   A    The dosage?  No.  It was -- Lortab 10 is what I was on.

13   Q    Now, you didn't -- you didn't bring your experience at Pain

14   Management, PPSA, to the attention of the government, did you?

15   They came to you, didn't they?

16   A    Yes, sir.

17   Q    And they wanted to talk to you about your experience with

18   Subsys and Abstral didn't they?

19   A    Just the Subsys spray is all they talked to me about.

20   Q    And you went and met with them at the DEA office; is that

21   right?

22   A    Yes, sir.

23   Q    And that would have been in July of '16?  Does that sound

24   about right?

25   A    Yes, sir.

3265

TENA SHAREE GELLNER - CROSS BY MR. POWELL

```
 1   Q   This past summer?

 2   A   Yes, sir.

 3   Q   Now the clinic had been closed 14 months or so by then?

 4        MS. GRIFFIN:  Your Honor, objection as to the

 5   relevance.

 6        THE COURT:  Sustained.

 7   BY MR. POWELL:

 8   Q   Let me ask you this:  You were asked a question in that

 9   interview.  You were asked if you thought that you had become

10   addicted to the pain medication that you were prescribed.  And

11   apparently you said that you did not think that you had become

12   addicted because you always took the drugs as they were

13   prescribed --

14        MS. GRIFFIN:  Your Honor, I object.

15   BY MR. POWELL:

16   Q   -- and you never ran out early?  Did you say that?

17        MS. GRIFFIN:  Objection, Your Honor, to the question

18   from the report.  It's not a Jencks Act statement.  Further,

19   she's not been asked the question before it being read from an

20   agent's report and not her statement.

21        THE COURT:  Sustained.

22   BY MR. POWELL:

23   Q   You never became addicted, did you?

24   A   No, sir, not to my knowledge, I did not.

25   Q   And the medications that you were prescribed for the
```

1   treatment of your then-acute pancreatic pain was successful,

2   wasn't it?

3   A   It helped with the pain, yes, sir (nodding head

4   affirmatively).

5   Q   And you had to make the decision of whether or not you

6   wanted to live with an eight-out-of-10 pain 24 hours a day

7   without sleep or take this pain medication?

8           THE COURT:  You've already asked this, Mr. Powell.  So

9   let's move on.  You've already asked her about this.

10          MR. POWELL:  That's all.

11          THE COURT:  All right.  Any redirect?

12          MS. GRIFFIN:  Briefly, Your Honor.

13                      REDIRECT EXAMINATION

14  BY MS. GRIFFIN:

15  Q   Ms. Goellner, in the beginning of Mr. Powell asking you

16  questions on behalf to Dr. Couch you made reference to the fact

17  that they thought initially you might have some cancer when

18  they discovered you had some other related problems; is that

19  right?

20  A   I'm --

21  Q   In the beginning of your medical issues, you indicated at

22  first they thought you might have cancer; is that right?

23  A   Who?

24  Q   When you were seeing Dr. McKee and Dr. McNair, early on,

25  before you went to PPSA, they thought you might have cancer?

TENA SHAREL GOELLNER - REDIRECT BY MS. GRIFFIN

1   A   No.  I've never had cancer.

2   Q   You've never been determined to have cancer?

3   A   No, ma'am.

4   Q   Did you know that Abstral and Subsys were approved by the

5   FDA for breakthrough cancer pain, not just breakthrough pain?

6   A   No, ma'am.  Not when I was taking it, I did not.

7   Q   Would you have taken those medicines if you had been told

8   they were only approved for breakthrough cancer pain?

9   A   No, ma'am.  If I would have known all the side-effects, I

10  would not have taken it.

11  Q   What were the side-effects for you?

12  A   I slept all the time.  I mean, I was not functioning that

13  well anyway.  But when I started taking the Subsys spray,

14  especially as the doses got higher, I really became

15  nonfunctioning.  I slept.  I would go from the bed to the

16  recliner and I never really realized how bad it had gotten

17  until I got off of it and realized that, I mean, for almost two

18  years I existed.  I didn't live, I just existed.  And it helped

19  with the pain.  I mean, I was not in pain.  It did, it helped

20  with the pain.  But I'm on medication now that at least I can

21  function.  I mean, I have some sort of a life.

22  Q   You don't sleep all the time, do you?

23  A   No, ma'am.

24  Q   Ms. Goellner, did you sign any kind of agreement with PPSA

25  about taking Subsys or Abstral, acknowledging that they were

3268

1   for breakthrough cancer pain?

2   A   No, ma'am.

3   Q   Was that explained to you ever?

4   A   No, ma'am.  I was just told it was a new medication for

5   pain.

6   Q   Now, ultimately Blue Cross/Blue Shield refused to pay for

7   Subsys and Abstral; is that right?

8   A   Yes, ma'am, unless you had been diagnosed with cancer.

9   Q   As to Dr. McKee and Dr. McNair, you said you saw them each

10  time you went to their office for visits; is that right?

11  A   Yes, ma'am.

12  Q   Did you ever see Dr. Couch during a patient visit?

13  A   No, ma'am.

14  Q   Did you get to talk to Dr. McKee when you saw him one on

15  one and tell him what was going on?

16  A   Yes, ma'am.

17  Q   Did you get to talk to Dr. McNair one on one and tell him

18  what was going on?

19  A   Yes, ma'am.

20  Q   Did they actually examine you?

21  A   Yes, ma'am.

22  Q   Did you ever get to talk to Dr. Couch about what was going

23  on?

24  A   No, ma'am.

25          MS. GRIFFIN:  That's all I have of this witness, Your

1  Honor.

2          THE COURT:  All right.  May this witness be excused?

3          MS. GRIFFIN:  Yes.

4          THE COURT:  All right.  You may step down.

5          MR. POWELL:  Yes, ma'am.

6          THE COURT:  Thank you, ma'am.

7          MS. GRIFFIN:  Call Carla [sic] DeSalvo.

8                    KAYLA SHAREE DESALVO

9             was sworn and testified as follows:

10          THE WITNESS:  I do.

11          THE CLERK:  Thank you.  Please be seated.

12                    DIRECT EXAMINATION

13  BY MS. GRIFFIN:

14  Q   Tell us your name, please, ma'am.

15  A   My name is Kayla Sharee DeSalvo.

16  Q   Can you spell your first and last names?

17  A   K-A-Y-L-A, D-E, capital S-A-L-V-O.

18  Q   Is the lady who just left the stand, Ms. Goellner, your

19  mother?

20  A   Yes, ma'am.

21  Q   I want to direct your attention to late 2013 into

22  2014.  Did you have occasion to go with your mother to PPSA in

23  Mobile, Alabama?

24  A   Yes, ma'am.

25  Q   Now, you and your mother live in the Mississippi area; is

KAYLA SHAREE DESALVO - DIRECT BY MS. GRIFFIN

1  that correct?

2  A   Yes, ma'am.

3  Q   How many times did you go with your mother to PPSA in

4  Mobile?

5  A   There was probably maybe only three times that I didn't go

6  with her.  Every other time I was with her.

7  Q   So the majority of the time you were with her?

8  A   Yes, ma'am.

9  Q   Now, on the first visit did you go in, back behind the

10  counter?

11  A   No, ma'am, I didn't go back behind.  She had been there for

12  probably two hours, and I had an infant at the time and I just

13  couldn't sit there any longer with her.  So we left and drove

14  around while she actually went in the back that time.

15  Q   While your mother went in the back?

16  A   Yes, ma'am.

17  Q   The other times that you were there, except two or three,

18  did you go back into the patient room with your mom?

19  A   Yes, ma'am.  Yes, ma'am, I did.

20  Q   Did you ever see Dr. Couch in with your mother?

21  A   No, ma'am.  I couldn't tell you who was -- which I'm sure

22  he's probably sitting in front of me.  But I don't know who he

23  is.

24  Q   You never saw him?

25  A   No, ma'am.

3271

```
1  Q   Did you know Stacy?

2  A   Yes, ma'am.

3  Q   Or see --

4  A   She had longer brown hair, kind of medium build.

5  Q   Did you ever see a man come in to talk to your mother?

6  A   No, ma'am, the only person I ever seen was Stacy, and then

7  her -- I guess the nurse that would bring you back.

8  Q   The nurse that would take your mother back to the room?

9  A   Yes, ma'am.

10 Q   Did you ever see, later in her treatment, a male physician

11 assistant after Stacy left?

12 A   After Stacy left, she saw -- I can't remember his name, but

13 he had darker hair.  It was shorter.

14 Q   Short hair?

15 A   Uh-huh (positive response).

16 Q   Okay.  But was that Dr. Couch?

17 A   No.  It was another nurse practitioner, it wasn't an

18 actual -- I don't think he was an actual doctor.

19 Q   Was your mother ever told that Subsys was a breakthrough

20 cancer drug?

21 A   To my knowledge, no.

22 Q   Were you aware at some point during the treatment that your

23 mother was taking Subsys?

24 A   Yes, I knew that was what it was called.

25 Q   And can you tell us what you observed while your mother was
```

1   on Subsys, starting from the beginning when she started taking

2   it and then we'll ask you about the middle and then we'll ask

3   you about toward the end.

4   A   When she first got put on it, she would sleep some with it

5   and be kind of groggy, but she could still -- she was still

6   having breakthrough pain with it and stuff like that.  But

7   that's how she was in the beginning.  Do you want me to tell

8   how it progressed?

9   Q   Yes.  How about thereafter?

10   A   We would go back and they would always ask her:  Well,

11   how's your pain?  And when she would tell them she was having a

12   breakthrough pain, they would increase it.  And when they did

13   that, I think, twice and she ended up, I believe it was, on 600

14   milligrams or something.  I think that's how it's given

15   out.  And by the time she was on those, once she would take the

16   medicine, it wouldn't be long and you couldn't carry on a

17   conversation with her or anything.  In fact, I called it kind

18   of comatose-looking almost, kind of like -- you've seen

19   somebody at the hospital, they've been laying in the bed for a

20   while, their mouth is just draped open, you know, they are kind

21   of -- you look at them to make sure they're still breathing

22   because they are just so, I guess, relaxed in a sense because

23   their muscles are just, I guess, asleep -- I guess from the

24   medicine.

25   Q   Did you know early on that she was on 200 micrograms of

KAYLA SHAREE DESALVO - DIRECT BY MS. GRIFFIN

1   Subsys?

2   A   Yes, I knew she started on a lower dosage.

3   Q   Did you know that was tripled to 600 micrograms?

4   A   I guess technically, yeah, because two plus two plus two

5   equals six.  But I'm not a doctor, I don't really know how

6   effective each types of those things are.

7   Q   Then did you know finally that initial dose of 200 was

8   quadrupled to 800 micrograms?

9   A   I remember them increasing it three times.  I just -- I

10  knew she had got up to at least 600, but I didn't recall that

11  it had gotten that high.

12  Q   Prior to taking Subsys, had she been able to keep your

13  children on occasion?

14  A   Yeah, I could -- I would leave my little girl with her.  I

15  am breastfeeding mother, so I didn't leave her that often.  But

16  in the evenings, you know, me and my husband could actually go

17  on a date, you know, and I would feel comfortable leaving her

18  with my mom.  Even though she was going to sleep, I knew my mom

19  would be fine with her.

20  Q   Did that change?

21  A   I didn't even really like going to the Dollar Store, which

22  is out within two miles from my house and leaving my little

23  girl with her because when she would be on that medicine, she

24  couldn't even take care of herself, much less my one or two

25  year old.  It's just, as a mother, you can't -- you have to be

 1   careful with who you let keep your child.  And it's sad when
 2   you don't even feel comfortable with your own mother keeping
 3   your child for more than 10 minutes.
 4   Q   Was that because of the medication she was on?
 5            MR. POWELL:  Judge, I'm going to object to this
 6   witness speculating on the cause of somebody else's problem.
 7            THE COURT:  Overruled.
 8   BY MS. GRIFFIN:
 9   Q   Was that because of the medication she was taking?
10   A   Yes, ma'am.  Because once she started hurting or whatever,
11   she would get the medicine and she would have to put it under
12   her tongue.  That's how she took it.  And within five minutes
13   of having to take that medicine is when she was like this.  She
14   wasn't typically like this before she took that medicine and it
15   got in her system and the effects from being on the medicine.
16   Q   Did she ever spray the medicine?
17   A   Yeah, it comes -- it's in a tube about this big and has a
18   button on the end, had like a hook at the end (indicating).
19   She would stick that part in her mouth and press the back of
20   the button, because every now and then some of them wouldn't
21   work, like it would press but nothing would come out.  But she
22   would press that, it would go under her tongue, she would have
23   to hold it under her tongue, I think, for probably 10-15
24   minutes so it would absorb into her system.  And by that time
25   she was sitting in a chair and typically asleep.

KAYLA SHARFF DESALVO - DIRECT BY MS. GRIFFIN

```
1   Q   Do you know which medicine was the medicine you've
2   described as the spray medicine?
3   A   That's the Subsys spray medicine.
4   Q   Now, they are taking down what you're saying, so it doesn't
5   reflect on the transcript what size you are showing when you
6   held up your hand to show the size of the little bottle.  Could
7   you tell us about how many inches?
8   A   Probably about an inch and a half was the length of the
9   little -- I guess you would call it like an applicator or
10  whatever that it came in.  Of course, out of the about inch and
11  a half, there was about a half inch that stuck out the back
12  that you popped it so the medicine would release out the end of
13  it into your mouth.
14  Q   You are familiar with what the packaging looked like?
15  A   Yes, ma'am.
16  Q   Have you previously seen similar --
17  A   Oh, yes, ma'am.  We would have stacks of four of those, I
18  think, is typically what she picked up, when we picked them up
19  every month.  And there would probably be, I would say, about
20  15 in a box of them and they're each individually packaged.
21  And she would pull the package open each time she would have to
22  take it.
23  Q   And what I was showing you was Government's Exhibit 9-10,
24  which is the Subsys 600 microgram box.  Is that what you were
25  referencing?
```

KAYLA SHAREE DESALVO - DIRECT BY MS. GRIFFIN

1   A   Yes, ma'am.  Yes, ma'am.

2   Q   Ms. DeSalvo, did you have -- without telling us what you

3   said, did you have some conversations with your mother about

4   how she reacted when she took Subsys?

5   A   Yes, ma'am.

6   Q   Did her personality change while she was taking Subsys?

7   A   Yes, ma'am, drastically.

8   Q   Could you explain that to us, without telling us anything

9   she said?

10  A   Okay.

11  Q   Just how her personality changed.

12  A   My mom's kind of like me, has a bubbly personality, you

13  know, outgoing.  And once she had been on this medicine, it

14  wasn't very long, she started getting more depressed, more

15  grouchy, more -- kind of makes you want to walk on eggshells

16  because you don't want to upset her, because you don't want to

17  say anything in the wrong tone or upset her about anything

18  because she would just get so emotional or this and that or --

19  you know.

20  Q   Did you decide that you were going to show her how she was

21  on the medication?

22  A   Yes, ma'am.  Because I always told her:  You don't realize

23  how just kind of comatose you get when you're on this.  I was

24  like:  You're just kind of, you know, out of it.  There's

25  nothing.

3277

```
 1          You know, so she was -- we were coming home from town
 2   one day -- which we couldn't stay in town very long, because if
 3   she ever had to take that medicine, it's not like she could go
 4   walk around the store.  She was out for a while.  Especially
 5   the more the doses increased, the longer she would be out with
 6   the medicine.  And we were coming home one day and she was in
 7   the back with my little girl, because she always rode back
 8   there with her, and my little girl was asleep and then here's
 9   my mom passed out next to my daughter, and it's 2 o'clock in
10   the afternoon.
11   Q   Did you take a picture of that?
12   A   Yes, ma'am, I did.
13   Q   I show you what you provided as Government's Exhibit
14   41-1.  And we have covered the photograph of the little girl
15   you provided and ask if that's a photograph of your mother as
16   you have described her.
17   A   Yes, ma'am.
18          MS. GRIFFIN:  We move to admit Government's Exhibit
19   41-1, Your Honor, and publish it to the jury.
20          THE COURT:  All right.  Mark it in.
21          MR. POWELL:  No objection.
22          THE COURT:  Mark it in.
23      (Government's Exhibit 41-1 was entered into evidence.)
24   BY MS. GRIFFIN:
25   Q   Is this the photograph --
```

1    A   Yes, ma'am, it is.

2    Q   -- that you took of your mother next to your daughter?

3    A   Yes, ma'am.

4    Q   And does that show what you've described to the jury how

5    she would look after taking Subsys?

6    A   Yes, ma'am.

7    Q   About how long would that last approximately each time?

8    A   She was at least going to be like that for at least an

9    hour.  Sometimes she could wake up after an hour and kind of

10   function.  But a lot of times it would be two hours or so

11   before she could actually get up and, you know, move around and

12   kind of do a few things.

13   Q   While she was on Subsys, did you allow her to keep your

14   children?

15   A   No, ma'am.

16   Q   After May 2015, did your mother come off of Subsys, after

17   the clinic was closed?

18   A   Yes, she did.

19   Q   She's not been on Subsys since?

20   A   No, ma'am, she has not.

21   Q   Can you tell us any difference in how she is able to

22   function?

23        MR. POWELL:  I'm going to object to the relevance of

24   this.  It's outside the scope of what we're here about.

25        THE COURT:  Overruled.

3279

 1    BY MS. GRIFFIN:

 2    Q   You can go ahead and answer.

 3    A   Okay.  I'm sorry.  I didn't know if I should.  She has

 4    actually kept my daughter twice since then.  She's actually

 5    spent the night at my mother's house, because her personality

 6    is different.  I don't -- she does take some pain medicine, but

 7    it's by mouth.  It doesn't function -- make her function

 8    differently.  She's not taking it and just passing out for a

 9    while.  You know, I feel comfortable as a mother.  Even if she

10    had to take one of her pills, she's perfectly capable of

11    watching my little girl and making sure nothing happens to her

12    while she's with her.

13    Q   Is your mother able to go and do things now?

14    A   Yes, ma'am, she is.  (Nodding head affirmatively.)  We can

15    go shop all day, if we feel like it now.

16    Q   And she still has the pancreas problem; right?

17    A   Yes, ma'am.  The new medicine that they're controlling it

18    with, I'm not sure of the name because it's a new name brand,

19    but she's still able to function properly.  And it's still

20    controlling her pain.  She has breakthrough pain every now and

21    then, but she can function and be on her own.  I don't worry

22    about her being at her own house now by herself.

23          MS. GRIFFIN:  One moment, Your Honor.

24          THE COURT:  All right.

25      (A discussion was held off the record between government

```
 1    counsel.)

 2           MS. GRIFFIN:  Nothing further for this witness.

 3           THE COURT:  Mr. Powell, how long are you going to be

 4    with this witness?

 5           MR. POWELL:  10 minutes.

 6           THE COURT:  All right.  Let's continue.  Everybody

 7    okay?

 8           MR. POWELL:  If that long.

 9           THE COURT:  All right.

10                         CROSS EXAMINATION

11    BY MR. POWELL:

12    Q   Good afternoon, Ms. DeSalvo.  My name is Art Powell, and

13    I'm one of the lawyers representing Dr. Couch here today.

14    A   (Nodding head affirmatively.)

15    Q   Your mother, who, as you know, just testified --

16    A   Yes, sir.

17    Q   -- had a very serious incident back in 2012 that

18    significantly damaged her pancreas; is that right?

19    A   Yes, sir.  2,000 --

20    Q   2012; right?  February?

21    A   Refresh my memory.

22    Q   I'll try.  She told us February 2012.  Does that sound

23    right?

24    A   Refresh my mind about the incident.

25    Q   That she had a medical procedure and the surgeon --
```

1  A  Okay.  Yeah, yeah, yeah.  I'm sorry.  (Laughing.)  Yes.

2  Q  And that was the beginning of all of this incredible pain?

3  A  Yes.  The doctor went to fix her and to fix her stomach.

4  They damaged her pancreas, damaged the nerves in her stomach.

5  Of course, you already know all that mess.

6  Q  And so that was about five years ago; right?  2012?

7  A  Yes.

8  Q  And that's when her acute pancreatic pain began; is that

9  right?

10  A  Yes, sir.

11  Q  And that's when she started taking the Lortabs and the

12  other medication that was prescribed to her by her primary care

13  doctor.  Do you remember that?

14  A  Yes, sir, because she had been on so long, she had to be

15  referred to a pain management center because it was going to be

16  a long-term thing.  It's not like she was just going to use the

17  pain medicine for a short period of time and then get off of

18  them.

19  Q  And if she came in here and told us that the Lortabs did

20  not control her pain, you don't have any reason to dispute

21  that, do you?

22     MS. GRIFFIN:  Objection, Your Honor, to asking a

23  witness to comment on another witness' testimony.

24     THE COURT:  Sustained.  Just ask her about her

25  knowledge.

3282

1  BY MR. POWELL:

2  Q   The Lortabs did not control your mom's pain, did they?

3  A   Completely, no.

4  Q   And in fact when she went to PPSA, it was because she was

5  not getting the pain relief that she wanted; is that right?

6  A   Exactly.

7  Q   And she was having what you referred to as breakthrough

8  pain; right?

9  A   That's what I had been told.  Like when we would go to the

10 doctor visits, they would ask her how her pain was and she

11 would say:  Well, I take the medicine at this time, and before

12 I can take it again I'm having pain.

13          And they would tell us:  Well, that's called

14 breakthrough pain.

15          That's how I know how it's referred to.

16 Q   All right.  And you understood, didn't you, because you

17 went, that the Subsys was for that specific situation when your

18 mother experienced breakthrough pain, meaning pain that the

19 other opioid medications she was taking could not or did not

20 control; right?

21 A   No.

22 Q   That's not right?

23 A   That's not right.

24 Q   Okay.

25 A   What I was under the assumption of how it was, the --

KAYLA SHAREE DESALVO - CROSS BY MR. POWELL

1    Q    I'm not asking you about any assumptions.  I'm asking

2    you --

3    A    No, this is how I understood the medicine application

4    process to go.  She would take the Subsys first and, if she was

5    having breakthrough pain, she would use like Lortab or stuff to

6    help manage the breakthrough pain.

7    Q    So you're telling us, then, that you're --

8    A    The Subsys came first and then came the Lortab -- or I

9    think it had a different name or whatever, the off brand of

10   it.  No.  It was Norco, now.  That's what I'm thinking of.  It

11   was Lortab, then it went to Norco.

12   Q    But your understanding is that the Norco and the Lortab

13   were used to treat the breakthrough pain?

14   A    Yes.

15   Q    Are you sure you don't have that backwards?  Subsys was

16   used for breakthrough pain?

17   A    She used the Subsys -- that was her primary -- because they

18   gave her enough to take it every four hours.  Because it

19   controlled the pain better than when she was strictly on the

20   Lortab.

21   Q    Okay.

22   A    So then she would take the Subsys.  And if it wasn't

23   controlling it, then she would take the Lortab.

24   Q    Let's move on.

25   A    Okay.

3284

1    Q    Your mother had serious medical issues ongoing from

2    February 2012 for at least two or three years after that,

3    didn't she?

4    A    Yes.

5    Q    She was hospitalized multiple times because of her

6    breakthrough pain caused by the problems that she had with her

7    pancreas; isn't that right?

8    A    Yes.  She would go into the hospital and she started having

9    the -- her pancreas would start having attacks and you have to

10   go in and let it -- they call it calm down or

11   whatever.  Because you have to go NPO and all that.

12   Q    And she went to the Oschner Clinic and she went to Tulane?

13   A    Because they couldn't figure out -- because when you have

14   pancreas problems --

15   Q    Excuse me, excuse me.  Let me finish my question.

16   A    I'm sorry.

17   Q    That's okay.

18   A    I'm sorry.

19   Q    That's okay.  Your mother went to great lengths, she and

20   her primary care doctor, to try to figure out medically what

21   was causing her to have this ongoing acute pancreatic pain; is

22   that right?

23            MS. GRIFFIN:  Your Honor, it's beyond the scope of

24   direct.

25            THE COURT:  Yes, it is.  She only testified about the

1    effects of the medicine really on her.  So let's limit your

2    cross to that.

3    BY MR. POWELL:

4    Q    Your mother got better after some period of time, didn't

5    she?

6    A    You've got to be a little more specific.  What do you mean?

7    Q    It's 2000 -- now we are at the end of January 2017.

8    Sometime after 2015 your mother's condition improved, didn't

9    it, to the point she was able to manage her pain?

10   A    Yes.

11   Q    She's not in nearly as bad a shape pain-wise or medically

12   now as she was in 2012, and 2013, 2014; is that right?

13   A    I wouldn't -- she's better -- yes, she's better now in 2016

14   than she was in 2012.

15   Q    Okay.  She's improved?

16   A    Yes.

17   Q    She's no longer in the amount of pain that she was in the

18   years immediately -- two years or so that immediately followed

19   that bad surgery?

20   A    Yes.

21   Q    Is that right?

22   A    Yes.

23   Q    Okay.  So she doesn't have nearly the amount of episodes of

24   breakthrough pain as she did during that two-year period of

25   time we just talked about.

1  A   She is still having breakthrough pain, yes.  But her

2  pancreas has calmed down some since then and so she doesn't

3  have as many severe episodes as she used to.  She's still

4  having the constant pain and the breakthrough pain.  She just

5  isn't having the episodes of the severe -- where her pancreas

6  goes into spasms and stuff like that.

7  Q   And she can't tolerate pain, that doesn't happen to her

8  much any more?

9  A   Right.

10  Q   Versus back then, that happened all the time?

11  A   Right.  Because she was getting put in the hospital and

12  everything back then because even the medicine at home wasn't

13  -- (indicating).

14  Q   So the answer to my initial question on that subject would

15  be yes, she's much better now --

16  A   Yes.

17  Q   -- than she was in the first two years after that surgery?

18        MS. GRIFFIN:  Your Honor, it's been asked and

19  answered.

20        THE COURT:  Sustained.

21        MR. POWELL:  I just want to make sure.

22        THE COURT:  Well, I think we're sure.  Let's move on,

23  please.

24  BY MR. POWELL:

25  Q   Now, I think you said -- and correct me if I'm wrong --

1    that when she would have an episode of intense breakthrough

2    pain, that she would -- the pain would come and then she would

3    take the Subsys?

4    A    Uh-huh (positive response).

5    Q    And within a few minutes she was no longer experiencing

6    that pain?

7    A    Not necessarily.

8    Q    Or she would be asleep?

9    A    Right.  And then sometimes when she would wake up from the

10   pain, it wouldn't have -- because there were times that she

11   took two Subsys sprays within like 30 minutes because you would

12   take it and if you were still having the pain after I think

13   it's like 15-20 minutes, you could take one more.  She did have

14   times where she had to do that as well.  But most of the time,

15   once she got into the higher milligrams, I know with the 600

16   she could take one and pretty much most of the time it would --

17   she would just be out of it once she took that.

18   Q    And it would take care of the pain?

19   A    I would assume so.  She was asleep, not saying anything.

20        MR. POWELL:  That's all.  Thank you.

21        THE COURT:  Any redirect?

22        MS. GRIFFIN:  No, Your Honor.

23        THE COURT:  May this witness be excused?

24        MS. GRIFFIN:  Yes.

25        THE COURT:  All right.  Thank you, ma'am.  You may

PEGGY TIMS - DIRECT BY MS. GRIFFIN

1   step down.

2           Ladies and gentlemen we're going to take our afternoon

3   break.  Leave your pads on your chairs.  Take your break

4   downstairs.  No discussion about the case.  We'll call you back

5   in about 15 minutes.

6       (A recess was taken at 3:09 p.m.)

7       (In open court, 3:29 p.m., defendants and jury present.)

8           THE COURT:  All right, Ms. Griffin.

9           MS. GRIFFIN:  We'd call Peggy Tims, Your Honor.

10          THE CLERK:  Ms. Tims, if you will stand up and raise

11  your right hand.

12                          PEGGY TIMS

13              was sworn and testified as follows:

14          THE WITNESS:  I do.

15          THE CLERK:  Thank you, ma'am.  Please be seated.

16                      DIRECT EXAMINATION

17  BY MS. GRIFFIN:

18  Q   Tell us your name, please, ma'am.

19  A   My name is Peggy Tims.

20  Q   Can you spell your last name for us?

21  A   T-I-M-S.

22  Q   Ms. Tims, are you a registered nurse?

23  A   Yes, I am.

24  Q   How long have you been a registered nurse?

25  A   17 years.

PEGGY SIMS - DIRECT BY MS. GRIFFIN

1   Q   After nursing school, how were you first employed
2   initially?
3   A   With Mobile Infirmary, as a staff nurse.
4   Q   How long were you there at Mobile Infirmary?
5   A   Almost 12 years.
6   Q   As a staff nurse, what would be your responsibilities?
7   A   To manage the care of assigned patients and also other
8   staff members that were assigned to my medical team.
9   Q   Did you eventually apply for a position with PPSA in
10  Mobile?
11  A   Yes, I did.
12  Q   Do you know approximately when that was?
13  A   Around March of 2013.
14  Q   How long did you stay there?
15  A   For one year.
16  Q   Till March of '14?
17  A   Yes, ma'am.
18  Q   Now, I want to talk about your employment interview.  Did
19  you interview with someone?
20  A   I did.
21  Q   Who was that?
22  A   Boe Strange.
23  Q   Was that at the PPSA location?
24  A   No, ma'am.
25  Q   Where was that?

1  A   At Boe's office in Mobile.

2  Q   Was he an accountant?

3  A   Yes, ma'am.

4  Q   Do you know why you interviewed with him as opposed to

5  someone actually at PPSA?

6  A   I have no idea.

7  Q   You were hired; is that right?

8  A   Yes, ma'am.

9  Q   Initially what were you hired to do?

10  A   I was hired to be their clinical manager for both of their

11  offices.

12  Q   What does that mean?

13  A   Hiring and training of medical staff, clinical staff like

14  medical assistants, scheduling, just a variety of managerial

15  duties.

16  Q   You would not be actually seeing patients; is that correct?

17  A   No, ma'am.

18  Q   Had you had some experience with that in the Mobile

19  Infirmary?

20  A   Yes, ma'am.

21  Q   Did you work at both offices?

22  A   Yes.

23  Q   How was it that you worked at both?

24  A   I would split my time there like Monday, Wednesday, Friday

25  at one location, Tuesday, Thursday, at the other.

1   Q   And where were you located in each of the offices?  Were

2   you stationary?

3   A   Yes, I had an office in both locations.

4   Q   I want to direct your attention while you were there.  Did

5   you have occasion to know how many patients were seen daily

6   approximately?

7   A   Sometimes upwards of 200, 150 to 200.

8   Q   How is it that you would know that?

9   A   Because my office was up front, I'd see the patients as

10  they come in.

11  Q   Do you know approximately how many per day were under the

12  care of Dr. Couch?  And if you don't -- do you know?

13  A   I'm not sure.

14  Q   Do you know if any of the patients were from out of state?

15  A   Yes.

16  Q   How did you know that?

17  A   I just know that we had some that traveled from other areas

18  because they had to call and make arrangements for their

19  appointment.

20  Q   Do you know where they came from, what states?

21  A   I think we had some from South Carolina, North Carolina.

22  Q   Did you have some from Mississippi and Florida?

23  A   Yes.

24  Q   And some from other locations within the state of Alabama?

25  A   Yes, yes.

1  Q   Were you able to observe what would go on in each of the

2  clinics; that is, Dr. Ruan's and Dr. Couch's?

3  A   Somewhat, yes.

4  Q   How is it that you were able to do that if you had an

5  office?

6  A   I was out monitoring the clinical staff to make sure they

7  were doing their job.  So I was kind of floating around,

8  walking around during my time there.

9  Q   Did there come a time that one of the nurse practitioners

10 had to be sent home?

11 A   Yes.

12 Q   Could you tell us who that was?

13 A   Bridgette Parker.

14 Q   Why is it that she was sent home?

15 A   It was brought to my attention that she was medicated and

16 slurring her speech, appeared to be, you know, heavily

17 medicated.

18 Q   Did you in fact send her home?

19 A   I took the -- I took it to Dr. Ruan and he sent her home.

20 Q   She was there as a nurse practitioner at that time; right?

21 A   Yes, yes.

22 Q   Did she remain with PPSA after that?

23 A   Yes.

24 Q   So she wasn't terminated, she was just sent home for the

25 day?

3293

```
1    A    Yes, ma'am.
2    Q    Did you have occasion also to take complaints from
3    patients?
4    A    Daily.
5    Q    How is it that you did that in your capacity?
6    A    Well, they would call the front desk complaining or be, you
7    know, in the office complaining and they would call me to come
8    and deal with them.
9    Q    Did you deal -- so you dealt with them in person and on the
10   phone?
11   A    And on the phone, yes.
12   Q    Did you also know that sometimes medications were returned
13   to PPSA?  Did you learn that early on?
14   A    Yes, I did.
15   Q    How was that being handled when you got there?
16   A    When I got there, there was no -- not really a system for
17   them to be handling that kind of thing.  They were just put
18   into a Wal-Mart bag in the office and just left there when I
19   came about it.  So --
20   Q    Did you do something toward the end of your stay to correct
21   that?
22   A    Well, it was towards the beginning of my stay.  I had safes
23   put in place at both locations and had a log of the medications
24   done and they were counted and signed in and secured in the
25   office and then disposed of by one -- you know, two people.
```

PEGGY SIMS - DIRECT BY MS. GRIFFIN

1  Q   Why did you decide to do that?

2  A   Because it's -- I mean, it's the right thing to do.  You

3  can't have narcotics just lying around freely.  Anybody could

4  pick it up.

5  Q   In fact, were there some partial pills or personal bottles

6  of returned pills found in one of the nurse practitioners' work

7  spaces?

8  A   Yes.

9  Q   Who was that?

10  A   Bridgette Parker.

11  Q   Did you have occasion to know how many assistants or nurse

12  practitioners Dr. Couch had and Dr. Ruan had?

13  A   Dr. Ruan had three and Dr. Couch had two.

14  Q   Did there come a time when Dr. Couch hired a third person?

15  A   Not while I was there.

16  Q   So he had two nurse practitioners.  Did he have anybody

17  else?  Stacy, was she there?

18  A   Well, yeah, she was there.  I mean, I was counting her as

19  one of those, and Justin.

20  Q   Did there come a time when Bridgette worked for Dr. Couch?

21  A   Yes, she did.

22  Q   So Justin, Bridgette, and Stacy for Dr. Couch --

23  A   Yes.

24  Q   -- while you were there?  Who for Dr. Ruan?

25  A   When I first came on, Bridgette, Sharon, and I can't

PEGGY IMS - DIRECT BY MS. GRIFFIN

```
 1   remember the other girl's name that was working for him.  It
 2   was three of them.
 3   Q   But there were three?
 4   A   Yes.
 5   Q   So did there come a time that Bridgette then went to work
 6   for Dr. Couch instead of Dr. Ruan?
 7   A   Yeah, she transferred over to Dr. Couch (nodding head
 8   affirmatively).
 9   Q   So did Dr. Ruan pick up someone else to total three?
10   A   Not while I was there.
11   Q   Not while you were there?
12   A   No, ma'am.
13   Q   Can you tell us if you had occasion to see whether the
14   doctors were seeing their patients or not?
15   A   Yes.
16   Q   How did you have occasion to see that?
17   A   Because, I mean, my office was right up front where
18   everything was happening.  So I could see the patients come in
19   and out of the rooms.
20   Q   What did you observe about Dr. Ruan and his patients?
21   A   That his nurse practitioners saw his patients and reported
22   back to him at his office.
23   Q   And what if anything did you observe about prescriptions?
24   A   That he would sign the prescriptions and give them back to
25   the nurse practitioners to give to the patients.
```

PEGGY SIMS - DIRECT BY MS. GRIFFIN

```
1   Q   Did this occur on all the visits or --
2   A   No, ma'am.  Most visits.  I can't say all.
3   Q   Do you know whether or not Dr. Ruan would see the patients
4   on the first visit or not?
5   A   Yes.
6   Q   So are you referring to the patients -- the visits
7   thereafter, after the first one?
8   A   Followup visits, yes.
9   Q   So he wasn't seeing the patients after the first occasion,
10  after the first visit?
11  A   Not that I'm aware.
12  Q   Not based on what you saw?
13  A   No, ma'am.
14  Q   What about Dr. Couch?
15  A   No, he didn't either.
16  Q   He did not either?
17  A   No.
18  Q   And you were able to see that as well?
19  A   Yes.
20  Q   Now, they were at different offices on different days; is
21  that correct?
22  A   Yes.
23  Q   They weren't always in the same place?
24  A   Right.
25  Q   And you rotated one office to the other; is that right?
```

PEGGY TIMS - DIRECT BY MS. GRIFFIN

```
 1   A   Yes.
 2   Q   So you didn't see every single day what went on?
 3   A   No, ma'am.
 4   Q   But you had the opportunity to observe both doctors?
 5   A   Yes.
 6   Q   What did you observe about signing prescriptions for
 7   Dr. Ruan?
 8   A   There were times, I know, that he had signed prescriptions
 9   and gave them to Sharon to hold onto to give to patients at a
10   later time.
11   Q   When you say he, being --
12   A   Dr. Ruan.
13   Q   -- Dr. Ruan?
14   A   Uh-huh (positive response).
15   Q   Had presigned prescriptions?
16   A   Yes.
17   Q   And had given them to Sharon?
18   A   (Nodding head affirmatively.)
19   Q   Who is Sharon?
20   A   A nurse practitioner.
21   Q   How did you know that?
22   A   Because I've seen her pull them out of her pocket.  I've
23   seen -- I visibly saw the prescriptions.
24   Q   You saw who pull them out of her pocket?
25   A   Sharon.
```

PEGGY IMS - DIRECT BY MS. GRIFFIN

3298

1    Q    Were the drugs already written on there --

2    A    No.

3    Q    -- or was the script just signed in blank?

4    A    It was signed in blank.

5    Q    Signed by Dr. Ruan?

6    A    Yes.

7    Q    But blank and Sharon had it?

8    A    Yes.

9    Q    Did you ever see or do you know if Sharon later filled in

10   what drugs were to be put -- were to be prescribed?

11   A    I never saw her do that.

12   Q    Why is it that she was showing or had pulled out a blank

13   prescription signed by Dr. Ruan, if you recall?

14   A    She pulled them out at the nurses station and would give

15   them to some of the other nurse practitioners for their

16   patients that were there.

17   Q    Did you see this on more than one occasion?

18   A    Yes.

19   Q    What about prescriptions signed by Dr. Couch?

20   A    I never saw any prescriptions that he signed ahead of time.

21   Q    Do you know who signed his prescriptions?

22   A    Justin.

23   Q    How do you know that?

24   A    I saw him do it.

25   Q    On more than one occasion?

3299

```
1    A    On more than one, daily.

2    Q    And that would be on the days that you were in the same

3    location?

4    A    Yes, yes.

5    Q    Now, of course, you know Dr. Couch and Dr. Ruan from

6    working there?

7    A    Yes.

8    Q    And are they both in the courtroom today?

9    A    Yes.

10        MS. GRIFFIN:  If the record would reflect the

11   defendants are present in the courtroom?

12   Q    Ms. Tims, did you observe how long the nurse practitioners

13   would see the patients in these followup visits for Dr. Ruan?

14   A    They would be in there a good few minutes with the

15   patients.  I don't know exactly the time.

16   Q    And were you aware that patients had to wait a long time to

17   be seen?

18   A    Yes.

19   Q    Can you tell us how patients were booked for Dr. Couch and

20   Dr. Ruan?

21   A    I know, say if it was 8 o'clock, there would be four

22   patients booked for 8 o'clock.

23   Q    Are you talking about 8 a.m.?

24   A    8 a.m.

25   Q    What time did the office open?
```

1   A   7.

2   Q   And is four a large number to be booked for the 8 a.m.

3   slot?

4   A   Yes.

5   Q   Could you explain that to us?

6   A   Well, you can't see four patients at one time.

7   Q   Was that done all the way through the day on Dr. Ruan's

8   schedule?

9   A   Yes.

10  Q   Was it done through the day on Dr. Couch's schedule?

11  A   Yes.

12  Q   Did there come a time when you decided you wanted to leave

13  PPSA?

14  A   Yes, ma'am.

15  Q   Why was that?

16  A   Well, I was fearful of going to work because of having to

17  deal with irate patients, you know, just about on a daily

18  basis.  Just did not feel comfortable working there.

19  Q   Was there anything specific that made you feel

20  uncomfortable about patient treatment?

21  A   Uh, yeah, I mean, I didn't like the way the patients were

22  treated.  They were just, you know, brought in in large

23  numbers.  It didn't feel like they were getting the attention

24  that they needed, in my opinion.

25  Q   Do you know how long the patients would stay after they

3301

1    finally were able to get back to see either Dr. Couch or

2    Dr. Ruan in the back?

3    A    In the back, just a few minutes.

4    Q    And what if anything do you know about C&R Pharmacy, if

5    there were any directions to the patients about the pharmacy?

6    A    They were told there was a pharmacy in the back of the

7    office at the Airport location, at the back of the building,

8    that they could fill their prescriptions there.

9    Q    Now, you also said you were able to observe the

10   doctors.  Did Dr. Couch come in every day at 7 or 8?

11   A    No.

12   Q    Could you tell us what you observed?

13   A    That he was late a lot of the time.

14   Q    What times would you observe him come in?

15   A    Between 9 and 10.

16   Q    Was anyone there seeing his patients before 9 or 10?

17   A    Justin.

18   Q    That's Justin Palmer?

19   A    Yes.

20   Q    Ms. Tims, did you have occasion to see or overhear any

21   patients complaining about one of the doctors?

22   A    Well, patients were complaining a lot about just having to

23   wait so long and then not getting to see the doctors that much.

24   Q    You overheard that?

25   A    Yes.

```
1    Q   And did you receive any telephone calls from patients to
2    that --
3    A   Yes.
4    Q   Did you oversee a nurse known as Sarah Carpenter?
5    A   I was not her supervisor.
6    Q   You were not her supervisor.  You knew her there; right?
7    A   Yes.
8    Q   Did she complain to you about her duties?
9    A   Yes.
10   Q   What were her duties?
11   A   She took care of the pain pump patients.
12   Q   Are you aware, without telling us what she said, were you
13   aware of what she was complaining about before she talked to
14   you about it?
15           MR. SHARMAN:  Objection, Your Honor, unless there's
16   some basis other than what Ms. Carpenter told her.
17           THE COURT:  Overruled.
18           MR. SHARMAN:  Hearsay.
19           THE COURT:  You're not asking what she said; correct?
20           MS. GRIFFIN:  I'm not asking her what Ms. Carpenter
21   told her.
22           THE WITNESS:  Can you repeat the question?
23   BY MS. GRIFFIN:
24   Q   Yes.  When Ms. Carpenter complained to you about something
25   to do with the pump fills, were you already aware of what she
```

3303

1    was complaining about or was that new information to you?

2    A    It was new information.

3    Q    Did you have an area in either of the pain clinics to mix

4    pump medication?

5    A    Yes.

6    Q    Tell us where that was located.

7    A    We had a hooded area that was off one of the hallways at

8    the Springhill location.

9    Q    Was that located in what was commonly called the workers'

10   comp dispensary?

11   A    Yes.

12   Q    Describe it for us.

13   A    It was just a small room off the main hallway and there was

14   a hood where they mixed medications and then there was some

15   desks in there where the pharmacist would sit and dispense

16   medication.

17   Q    And you said that was at the Springhill location?

18   A    Yes.

19   Q    I show you what's marked as Government's Exhibit

20   2-2.  Well, I'll have to come back to it when I can locate it.

21        Tell me who you saw in that compounding area

22   compounding drugs.

23   A    Justin Palmer.

24   Q    Did you ever see Dr. Couch in that area compounding drugs?

25   A    Yes.

1  Q   Did that area have what appeared to look like some type of

2  metal container over the top of it where the compounding was

3  done?

4  A   Yes.

5  Q   Here is a jpeg picture, 92 from Government's Exhibit 2-2,

6  that's previously been admitted, and ask if you recognize this

7  area.

8  A   Yes.

9  Q   Could you tell us what that's a photograph of, please?

10  A   That's the hooded area where they would mix the

11  medications.

12  Q   When you say hooded --

13  A   Well, it had a light, like a hood light over the top of it.

14  Q   Over the top here?  (Indicating.)

15  A   Uh-huh (positive response).

16  Q   Somewhat like an oven hood?

17  A   Yeah.

18  Q   Where were the medications maintained that were being mixed

19  in this area, if you know?

20  A   I do not know.

21  Q   Do you know whether or not Justin had a license to compound

22  drugs?

23  A   Not to my knowledge.

24  Q   Do you know whether Justin had a DEA license to write

25  controlled substances?

PEGGY SIMS - DIRECT BY MS. GRIFFIN

```
 1   A   No.

 2   Q   He did not?

 3   A   No.

 4   Q   Did any of the nurse practitioners have a license, a DEA

 5   license, to write controlled substances?

 6   A   No, not that I knew of.

 7   Q   And Stacy, did Stacy?

 8   A   No.

 9   Q   Stacy wasn't a nurse practitioner, was she?

10   A   No, she was a nurse anesthetist.

11   Q   Did she work in the capacity of a nurse anesthetist?

12   A   No.

13   Q   How did she work?

14   A   As a nurse practitioner.

15   Q   Do you know why she was hired at PPSA?  Well, first of all,

16   was she hired while you were there or was she there when you

17   got there?

18   A   She was already there when I got there.

19   Q   So I'll move on from that.

20            Now, did you ever comment to anyone about the

21   presigned prescriptions or about Justin signing Dr. Couch's

22   prescriptions?

23   A   No.

24   Q   You kept that to yourself?

25   A   Yes.
```

PEGGY SIMS - DIRECT BY MS. GRIFFIN

1  Q   And when you decided to leave, you had been there about a
2  year; is that right?
3  A   Yes.
4  Q   You work for a doctor currently?
5  A   Yes.
6  Q   You've worked for a doctor since then; is that right?
7  A   Yes.
8  Q   And have you had the opportunity at your current employment
9  with a doctor to see presigned prescriptions?
10 A   No.
11 Q   Were you familiar with that when you worked the 11 years at
12 the Mobile Infirmary?
13 A   No.
14         MS. GRIFFIN:  One moment, Your Honor.
15         THE COURT:  All right.
16 BY MS. GRIFFIN:
17 Q   Tell me about the controlled substances in the dispensary,
18 the workers' comp dispensary.  First of all, that was located
19 in the same room with the compounding area?
20 A   Yes.
21 Q   In which of the offices?
22 A   Springhill office.
23 Q   So it was not in the same location as C&R Pharmacy?
24 A   No.
25 Q   Who worked there, if you recall, in the workers' comp

3307

1   dispensary?

2   A   Sherry.

3   Q   And do you know Sherry's title?

4   A   She was a pharmacist -- I assumed she was.  I don't know

5   for sure.

6   Q   You don't know if she was a pharmacist or a pharmacy tech?

7   A   I don't know.

8   Q   Could workers' comp patients receive drugs there at that

9   hospital -- excuse me -- at that Springhill location of PPSA?

10  A   Yes.

11  Q   Would they go to the dispensary to receive the medications?

12  A   No, she would take them up front, to the patients at the

13  desk.

14  Q   She being --

15  A   Sherry.

16  Q   -- Sherry?

17  A   Uh-huh (nodding head affirmatively).

18  Q   Do you know who owned that dispensary?

19  A   No.

20  Q   You do not?

21  A   No.

22  Q   And, Ms. Tims, were there some controlled substances in

23  either clinic that weren't returned substances or weren't in

24  the workers' comp dispensary?

25  A   Yes.

3308

1  Q   Why would there be controlled substances within the clinic

2  that weren't in either of those?

3  A   There were controlled substances used for procedures, pain

4  procedures, in the office.  And then there was -- I found some

5  when I came to that office to work, just in the desk drawer in

6  the office that I took over.

7  Q   What type of drugs did you find in the desk drawer?

8  A   Fentanyl patches.

9  Q   What did you do with those?

10  A   I took them to Ken Cross.

11  Q   Who was he?

12  A   He was the practice manager.

13  Q   Did you find any other controlled substances within the

14  building other than being in the workers' comp dispensary or in

15  the safes?

16  A   No.

17          MS. GRIFFIN:  That's all I have of this witness at

18  this time, Your Honor.

19          THE COURT:  All right.  Mr. Sharman?

20                      CROSS EXAMINATION

21  BY MR. SHARMAN:

22  Q   Ms. Tims, my name's Jack Sharman.  I represent Dr. Couch.

23          You were the clinical manager at PPSA for one year;

24  correct?

25  A   Yes, sir.

PEGGY JIMS - CROSS BY MR. SHARMAN

1    Q   You hired people?

2    A   Yes.

3    Q   You trained people?  You -- I'm sorry?

4    A   Yes.

5    Q   You discharged other managerial duties; right?

6    A   Yes.

7    Q   You didn't see patients; right?

8    A   No.

9    Q   You didn't take blood pressures or personal histories from

10   patients; right?

11   A   No.

12   Q   You had no duties with the preparation of medications to be

13   provided to patients; right?

14   A   No, sir.

15   Q   You didn't assist in any invasive procedures that were

16   conducted on patients; right?

17   A   Once or twice.

18   Q   Kind of pitching in?

19   A   Just filled in for a short -- (indicating).

20   Q   So you were not, for example, in exam rooms when any nurse

21   practitioner was meeting with or taking a history from a

22   patient; right?

23   A   No, sir.

24   Q   You were not in Dr. Couch's office if he were consulting

25   with one of his nurse practitioners about a patient; right?

3310

```
1    A    No, sir.

2    Q    So you don't know what they did or didn't talk about;

3    right?

4    A    Right.

5    Q    You don't know what treatment plans were created for a

6    patient or who created it; right?

7    A    Right.

8    Q    Is that right?

9    A    Right.

10             THE COURT:  Ms. Tims, if you could scootch a little

11   closer to the microphone, it will help.

12             THE WITNESS:  All right.

13             THE COURT:  Okay.  Thank you.

14   BY MR. SHARMAN:

15   Q    You don't know what treatment plans were created for which

16   patients or who created them; right?

17   A    Right.

18   Q    What you were observing was either from wherever your

19   office was located; right?

20   A    Yes.

21   Q    Or in the course of you sort of walking the floor to manage

22   people; right?

23   A    Yes.

24   Q    All right.  You mentioned that a nurse practitioner named

25   Bridgette Parker needed to be sent home one day; right?
```

1    A    Yes.

2    Q    And that was because she appeared to more than one person

3    to be medicated or under the influence; right?

4    A    Yes.

5    Q    And that was brought to your attention; right?

6    A    Yes.

7    Q    You brought it to Dr. Ruan's attention?

8    A    Yes.

9    Q    She was sent home?

10   A    Yes, sir.

11   Q    All right.  That was the right thing to do?

12   A    She should have been sent home, yes.

13   Q    And she was?

14   A    Yes.

15   Q    And then Ms. Griffin on direct asked you a few questions

16   about medications that were returned by patients to PPSA.  Do

17   you remember those questions?

18   A    Yes.

19   Q    And you said that on your arrival there there wasn't, in

20   your view, a good system for handling those returned

21   medications properly; right?

22   A    Yes.

23   Q    And as part of your duties, you turned to that problem;

24   right?

25   A    Yes, I did.

PEGGY JIMS - CROSS BY MR. SHARMAN

```
 1   Q   And you instituted a system that you thought to be
 2   satisfactory; is that right?
 3   A   Yes, sir.
 4   Q   And once you instituted that system, you continued to
 5   consider that system satisfactory; right?
 6   A   For the most part, yes, sir.
 7   Q   Well, no system's perfect for that; right?
 8   A   Right.
 9   Q   And you did the best you could setting up that system;
10   right?
11   A   Yes.
12   Q   That was part of your job?
13   A   Yes, sir.
14   Q   And you did your job well?
15   A   Yeah, I would like to think so.
16   Q   Ms. Griffin also asked you a few questions about the
17   scheduling of patients.  Do you remember a couple of those
18   questions?
19   A   Yes.
20   Q   And I believe you used, as an example, that four patients
21   might be scheduled for an 8 a.m. slot; is that right?
22   A   Yes.
23   Q   Now, that includes, in that estimate or example you gave,
24   all types of patients; right?
25   A   Well, she -- she asked about the doctors' schedules, so
```

PEGGY JIMS - CROSS BY MR. SHARMAN

```
 1    that pertained to their schedule.
 2    Q    And their schedule would encompass all kinds of patients;
 3    right?
 4    A    Yes.
 5    Q    So new patients?
 6    A    Yes.
 7    Q    Returning patients?
 8    A    Yes.
 9    Q    Patients who were there for an office visit?
10    A    Uh-huh (nodding head affirmatively).
11    Q    Right?
12    A    Yes.
13    Q    And patients who were there for a procedure; right?
14    A    That would be a different schedule.  Procedure schedules
15    were different.
16    Q    Okay.  So the procedure people were not counted in the
17    four, to use your example; right?
18    A    Right.
19    Q    But other than the procedure people, that was all the rest
20    of the patient population; right?
21    A    Yes, sir.
22    Q    All right.  Ms. Griffin also asked a few questions about
23    C&R Pharmacy.  Do you remember those questions?
24    A    Yes, sir.
25    Q    And I believe you said that when patients were provided
```

1   with a prescription, they were told that there was a pharmacy

2   available for them to fill those prescriptions; right?

3   A   Yes.

4   Q   And those patients were told about the availability of the

5   pharmacy, but they were not forced to go there, were they?

6   A   Not that I know of.

7   Q   You also told Ms. Griffin on direct that you saw a nurse

8   practitioner named Justin Palmer signing prescriptions.  Do you

9   remember telling her that?

10   A   Yes.

11   Q   And you testified on direct, I believe, that you perceived

12   that to be a frequent and sometimes even daily activity; right?

13   A   Yes, yes.

14   Q   Sitting here today, you don't know what, if anything,

15   Dr. Couch knew about Mr. Palmer's practice of signing any

16   prescriptions; right?

17   A   I'm sorry.  Say that again.

18   Q   Sitting here today, under oath --

19   A   Yes.

20   Q   -- you don't know what if anything Dr. Couch knew or didn't

21   know about Mr. Palmer's practice of signing prescriptions?

22   A   No.

23   Q   And a gentleman named Ken Cross was the person to whom you

24   reported; right?

25   A   Yes, sir.

1    Q    He was basically your boss; right?

2    A    Yes.

3    Q    And I believe you told Ms. Griffin that with regard to any

4    of the areas that you discussed on direct, you didn't go to

5    anybody, including Mr. Cross, to complain about them or express

6    your concern to him; right?  You kept it to yourself?

7    A    Right.  Mr. Cross knew that he was signing prescriptions.

8    Q    Well, with regard to any of the complaints, I thought on

9    direct you said that you had kept all these matters to

10   yourself.  Is that not accurate?

11   A    Yes, it was.

12   Q    It was accurate?

13   A    It was accurate, yes.

14   Q    You predicted it to be so?

15   A    I did.

16   Q    You also answered some questions about the geographical

17   location of some of those patients.  Do you remember some of

18   those questions?

19   A    Yes.

20   Q    I'm sorry?

21   A    Yes.

22   Q    And I think you mentioned that you recalled that there were

23   patients from South Carolina; was that right?

24   A    Yes.

25   Q    North Carolina?  Is that right?

PEGGY TIMS - CROSS BY MR. SHARMAN

1    A    Yes, yes.

2    Q    And taking those as an example, sitting here today, you

3    don't recall anything about those particular patients; right?

4    A    No, sir.

5    Q    You don't know why they were in the Mobile area or not;

6    right?

7             MS. GRIFFIN:  Your Honor, it's asked and answered.

8    BY MR. SHARMAN:

9    Q    You don't know that?

10   A    I do know about some of them, yes.

11            THE COURT:  Hold on just a minute, ma'am.

12            What's the --

13            MS. GRIFFIN:  He asked her if she knew why they were

14   there from out of state and she said no.  And then he started

15   to say:  You don't know that -- whether they were --

16            THE COURT:  Sustained.

17            MR. SHARMAN:  I'll take the answer, Your Honor, and

18   I'll move on.

19            THE COURT:  Sustained.

20            MR. SHARMAN:  With the Court's indulgence.

21            THE COURT:  All right.

22   BY MR. SHARMAN:

23   Q    With regard to your duties pertaining to management,

24   Ms. Tims, were there employees from time to time discharged for

25   various reasons?

3317

```
 1   A   Yes.

 2   Q   From time to time were there patients discharged for

 3   noncompliance?

 4   A   Yes.

 5         MR. SHARMAN:  Ms. Tims, I appreciate your time.  No

 6   further questions.

 7         THE COURT:  Any redirect?  Sorry.  Mr. Darley?

 8                    CROSS EXAMINATION

 9   BY MR. DARLEY:

10   Q   Good afternoon, Ms. Tims.  Can you tell us your title at

11   PPSA while you were working there, again, please?

12   A   I was their clinical manager.

13   Q   Were you an Occupational Safety and Health Administration

14   compliance officer?

15   A   Yes.

16   Q   So you had a myriad of duties?

17   A   Yes.

18   Q   Instituted some policies; correct?

19   A   Yes.

20   Q   Supervised employees, and you had hiring and firing powers

21   of some of those employees as well?

22   A   Yes.

23   Q   And you testified earlier that you worked out of both

24   locations; correct?

25   A   Yes.
```

1  Q   Okay.  And you testified maybe about 30 minutes ago about

2  the location of your office --

3  A   Yes.

4  Q   -- in each respective building?

5  A   Right.

6  Q   Where was your office in the PPSA Springhill location?

7  A   Right off the nurses station, between the front desk and

8  the nurses station.

9  Q   And that's PPSA Springhill?

10  A   Yes.

11  Q   Was it similarly situated at the Airport?

12  A   It was behind the nurses -- behind the front desk.

13  Q   So up front?

14  A   Uh-huh (nodding head affirmatively).

15  Q   Okay.  Approximately --

16       MR. DARLEY:  Well, Your Honor, may I approach the

17  witness?

18       THE COURT:  Yes.

19       MR. SHARMAN:  Your Honor, I want to show what has been

20  admitted previously as Government's Exhibit 2-4 and 3-4, they

21  are maps of the locations.

22  Q   Ms. Tims, I want to show you first this and ask you if you

23  recognize that.  (Indicating.)

24  A   Yes, Springhill location.

25  Q   Okay.  Do you see that pink tab right there?

PEGGY SIMS - CROSS BY MR. DARLEY

1    A    Yes.

2    Q    Can you place where your office would be with that pink tab

3    on the map?

4    A    Yes.

5    Q    And then this one is the -- I'll need to ask you do you

6    recognize that one.  (Indicating.)

7    A    Yes, the Airport office.

8    Q    Okay.  And with the same or similar pink tab can you place

9    where your office would be?

10   A    Right here.  (Indicating.)

11   Q    Okay.  I want to show you what's been marked and what you

12   just looked at, and this is Government's Exhibit 2-4.  Okay?

13   And this is -- can you tell the jury and the Court what we're

14   looking at here?

15   A    The Springhill office.

16   Q    Okay.  And okay.  This map is fairly lengthy right here you

17   can see; correct?

18   A    Yes.

19   Q    Now, your office is -- is this where you placed the tab?

20   (Indicating.)

21   A    Yes, that appears to be the front office, the front desk,

22   and I was behind that.

23   Q    Okay.

24   A    Some of this is not labeled correctly.

25   Q    Can you see -- do you see up here at the top, right here

3320

PEGGY SIMS - CROSS BY MR. DARLEY

```
 1   where it says Dr. Ruan's office?

 2   A   Yes.

 3   Q   Is that accurate?

 4   A   Yes.

 5   Q   That is?

 6   A   Uh-huh (positive response).

 7   Q   And I think Mr. Sharman touched on this:  You were

 8   supervising, you were moving about?

 9   A   Yes.

10   Q   You weren't often stationary, were you?

11   A   Right.

12   Q   But you were not in the patient exam rooms, were you?

13   A   No, no.

14   Q   Okay.  And that applies for both offices; correct?

15   A   Correct.

16   Q   And you had testified earlier that four patients were set,

17   for instance, at 8 o'clock for each -- for Dr. Ruan, for

18   instance?

19   A   Yes.

20   Q   And so if you're moving around, if you're in your office,

21   can you tell if Dr. Ruan or the nurse practitioners were seeing

22   those patients?

23   A   I wouldn't know.

24   Q   Okay.  And theoretically, if the four patients are back in

25   exam rooms, the nurse practitioners and Dr. Ruan could be
```

3321

```
 1   moving about; correct?

 2   A   Could be.

 3   Q   And Dr. Ruan could be seeing those patients, could he not?

 4   A   I don't know.  He could be.

 5   Q   Now, you testified earlier you are a nurse?

 6   A   Yes.

 7   Q   By degree?

 8   A   Yes.

 9   Q   And are you familiar, in your 17 years --

10   A   Yes, yes.

11   Q   -- you've got quite a bit of experience, you've at least

12   been a nurse for a while?

13   A   Yes, sir.

14   Q   Do you know what the term "incident to" means?

15   A   No.

16   Q   As far as treatment and in relation to Medicare?

17   A   No.

18   Q   Okay.  Did Dr. Couch and Dr. Ruan treat people, patients,

19   of varying types of insurance?

20   A   Yes.

21   Q   Some had Blue Cross/Blue Shield, other types of insurance?

22   A   Yes.

23   Q   Medicare, Medicaid?

24   A   Yes.

25            MR. DARLEY:  One moment, Your Honor.
```

3322

1    THE COURT:  All right.

2      (A discussion was held off the record between defense

3  counsel.)

4        MR. DARLEY:  Your Honor, that's all I have.  Thank

5  you, Ms. Tims.

6        THE COURT:  Any redirect?

7                    REDIRECT EXAMINATION

8  BY MS. GRIFFIN:

9  Q   Briefly, Ms. Tims, did you have final decision on who was

10  hired or fired?

11  A   On the medical assistants, yes.

12  Q   Did you discuss that with Dr. Ruan or Dr. Couch?

13  A   Yes.

14  Q   Would you generally abide by what their wishes were or you

15  would make the call?

16  A   Their wishes.

17  Q   I mean, you couldn't just walk down the hall and fire

18  somebody on your own, could you?

19  A   No.

20  Q   Did there come a time when there was talk about terminating

21  Bridgette while you were there?

22  A   (Pause.)  No, not while I was there.

23  Q   Not while you were there?

24  A   No.

25  Q   In connection with incident-to billing or incident to, did

1    you know anything about the billing?

2    A    No.

3    Q    Did you know anything about the electronic program that was

4    switched to, that PPSA switched to, while you were there?

5    A    Yes.

6    Q    Do you know if it contained information about billing?

7    A    Yes.

8    Q    And do you know if it was set for a certain type of

9    billing?

10   A    Yes.  I mean, there were templates set for different types

11   of visits.

12   Q    Workers' comp visits?

13   A    Yes.

14   Q    Regular visits?

15   A    Yes.

16   Q    Procedures?

17   A    Yes.

18   Q    Was it set for a certain level visit for the doctors?

19        MR. SHARMAN:  Objection.  This exceeds the scope of

20   direct and cross.

21        MS. GRIFFIN:  Your Honor, I thought Mr. Darley had

22   asked about the incident to in relation to billing.

23        THE COURT:  He did.  But I think this is beyond what

24   he asked.

25   BY MS. GRIFFIN:

3324

1    Q   Now, Ms. Tims, you pointed out -- and this is a little

2    awkward to show you -- that your office was here at the

3    Springhill location; is that correct?

4    A   Yes.

5    Q   And you pointed out, as we pulled this down, that

6    Dr. Ruan's office was on the side of the building instead of

7    the middle?

8    A   Yes.

9    Q   Where were his exam rooms as shown here?

10   A   Towards the end of that hallway.

11   Q   Further away from you?

12   A   Yes.

13   Q   How is it you were able to see what was going on down the

14   back?  (Indicating.)

15   A   I would have to be walking around the office.

16   Q   Did you do that or did you stay in your office most of the

17   time?

18   A   I walked around some.

19   Q   Were you able to see when Dr. Ruan was or was not in his

20   office?

21   A   I could tell when he was in his office.  The door would be

22   open.

23   Q   And you told us that you knew he did not see some of the

24   patients, that his nurse practitioners did.  How were you able

25   to tell that?

1    A    Because if I had to go ask him a question, I would have to

2    wait for them to get done presenting patients to him before I

3    could, you know, talk with him myself about different things.

4    Q    Wait for who to present patients to him?

5    A    Nurse practitioners.

6    Q    So was the patient there in the room also?

7    A    No.  They were in the exam room.  The nurse practitioners

8    came to his office to present the patients to him.

9    Q    You actually saw that?

10   A    Heard that, saw that, yes.

11   Q    So that's how you knew --

12   A    Yes.

13   Q    -- that he had not been in the room with patients?

14   A    Yes.

15   Q    Did that same thing apply to Dr. Couch?

16   A    No.

17   Q    How did you know Dr. Couch was not in the rooms with the

18   patients?

19   A    Because he would be in his office.

20            MS. GRIFFIN:  That's all I have of this witness, Your

21   Honor.

22            THE COURT:  May this witness be excused?

23            MR. SHARMAN:  Yes, ma'am.

24            THE COURT:  All right.  You may step down.  Thank you,

25   ma'am.

3326

1        MS. GRIFFIN:  Call Frankie Goss, G-O-S-S.

2        Your Honor, could we approach just briefly about this

3   witness?

4        THE COURT:  All right.

5     (At the side bar, jury not present.)

6        MS. GRIFFIN:  Who's going to do the --

7        MR. DARLEY:  (Indicating.)

8        MS. GRIFFIN:  Do you want to come on?  (Indicating.)

9        Your Honor, Ms. Goss had to go to AltaPointe and have

10  some psychiatric treatment while she was employed at PPSA,

11  based on the fact that she had two deaths in her family right

12  in a row and that she had to put her sister on some type of

13  life support.  And she's taking Lexapro now for that.  And I

14  don't want to go into that with her during her testimony.  I

15  don't think it's relevant to what happened.  It was not

16  something that happened at PPSA.  It was her family situation,

17  about the deaths in a row and her sister's situation, that

18  caused her to go to AltaPointe.  So I would ask that that not

19  be addressed.

20        THE COURT:  Do either of you think you need to go into

21  that?

22        MR. WILLSON:  No, I don't, no, ma'am.

23        MR. DARLEY:  No, ma'am.

24        THE COURT:  Okay.

25        MS. GRIFFIN:  Thank you.

```
 1          (In open court, defendants and jury present.)

 2                          FRANKIE GOSS

 3              was sworn and testified as follows:

 4                       DIRECT EXAMINATION

 5   BY MS. GRIFFIN:

 6   Q    Tell us your name, please.

 7   A    Frankie Goss.

 8   Q    Could you spell your last name, Ms. Goss?

 9   A    G-O-S-S.

10   Q    Ms. Goss, did you work at Physicians Pain Specialists of

11   Alabama?

12   A    Yes, ma'am.

13   Q    Approximately when was that?

14   A    December of 2013 to March of 2015.

15   Q    So approximately about a year and a fourth?

16   A    Yes, ma'am, something like that.

17   Q    What were you initially hired to do?

18   A    A medical assistant.

19   Q    That's known as an MA?

20   A    Yes, ma'am.

21   Q    What were your initial duties?

22   A    Would be to check in the -- once the patient was checked

23   in, we would do triage, do their blood pressure, vital signs,

24   and then bring them into the room, find out if there was any

25   new problems, ask them how their medications were working, what
```

FRANK GOSS - DIRECT BY MS. GRIFFIN

1    their pain levels were, and then would leave the room.

2    Q    So you weren't in the room as the MA if a doctor saw the

3    patient?

4    A    No, ma'am.

5    Q    Were you assigned to a particular doctor?

6    A    I was assigned with Dr. Couch.

7    Q    At the time you were working with Dr. Couch's group, who

8    else was working for his group, what physicians, nurse

9    practitioners?

10   A    There was Justin Palmer, Stacy Madison, and then Bridgette

11   Parker.

12   Q    Before you left PPSA, had all three of those people left

13   PPSA?

14   A    Yes, ma'am.  And then there was Ben Clark.  I'm sorry.

15   Q    Mr. Clark was still there when you left in March of '15?

16   A    Yes, ma'am.

17   Q    Did there come a time when you went from being the medical

18   assistant to being at the front desk?

19   A    Yes, ma'am.

20   Q    Now, tell us what your duties were there.

21   A    At the front desk, you would check the patient in, get

22   their copay or deductible that was necessary, and then check

23   them out once they were through seeing.

24   Q    For the copay what form of payment was accepted?

25   A    Cash, check, or a credit card.

FRANK GOSS - DIRECT BY MS. GRIFFIN

```
1    Q   And when the patient was finished, if there was money due,
2    what form of payment was accepted?
3    A   When they checked out, we did not take any forms of
4    payment.  If there was something that was left over, the
5    billing department would send out statements.
6    Q   So the cash, check, or credit card at the time they came
7    in?
8    A   Yes, ma'am.
9    Q   Paid up front?
10   A   Yes, ma'am.
11   Q   I want to go back to while you were working with Couch's
12   crew.  Did you have occasion to observe anyone sign Dr. Couch's
13   name?
14   A   Yes, ma'am.
15   Q   Who was that?
16   A   Justin Palmer and Stacy Madison.
17   Q   How is it that you were able to see them?
18   A   We would hand them the paperwork.
19   Q   Pardon?
20   A   Handing them the paperwork.
21   Q   You would hand the paperwork to Justin Palmer?
22   A   Any of them, any of them that needed a signature, yes,
23   ma'am, we would.
24   Q   Why weren't those presented to Dr. Couch?
25   A   He may have not been in the building.
```

FRANK GOSS - DIRECT BY MS. GRIFFIN

3330

1   Q   Were you aware of what time Dr. Couch came into the office

2   most days?

3   A   It could be anywhere from 9:30 on.

4   Q   Ms. Goss, what time did the office open?

5   A   Most mornings we opened at 7:30.

6   Q   And do you know why Dr. Couch wasn't coming in till 9 or

7   9:30?

8   A   That's when his first patients for procedures were put on

9   schedule.

10  Q   As opposed to office visits?

11  A   Yes, ma'am.

12  Q   Would someone be seeing his patients prior to 9 or 9:30?

13  A   Justin, Stacy, Bridgette, or Ben.

14  Q   How do you know that?

15  A   Because I was working the front -- well, I worked as an MA

16  bringing patients back and I worked at the front desk checking

17  them in.

18  Q   Now, do you know whether or not exams were done on the

19  patients by Stacy, Bridgette, or Justin?

20  A   No, ma'am.  I was not in the rooms as exams were done.

21  Q   Did there come a time when you completed prior

22  authorization forms for the drug Subsys?

23  A   Yes, ma'am.

24  Q   Did you know what Subsys was?

25  A   Yes, ma'am.

FRANK GOSS - DIRECT BY MS. GRIFFIN

1  Q   What was it?

2  A   It was medication that was for cancer patients.

3  Q   Did y'all have many cancer patients?

4  A   There was quite -- I mean, we did have quite a few cancer

5  patients.

6  Q   Do you know how many?

7  A   No, ma'am, not offhand.

8  Q   Now, Ms. Goss, what is a prior authorization?

9  A   It's when the insurance required this authorization before

10  they will approve it for the patient to get the medication.

11  Q   What is it you would do for the prior authorizations for

12  Subsys?

13  A   You would fill out your patient's information, what

14  medications they had tried and failed, and then their medical

15  diagnosis, whether like -- if they had a cancer diagnosis,

16  you'd put that or whichever diagnosis that was charted in the

17  patient's chart.

18  Q   You did a number of those for patients who did not have

19  cancer; is that right?

20  A   Yes, ma'am.

21  Q   Who helped you with that, if anyone?

22  A   There was a couple of people that done prior authorizations

23  and then the Subsys rep, Natalie.

24  Q   Do you know Natalie's last name?  Do you recall?

25  A   It was Perseus?  Perseus?

1    Q    Was it Perhacs?

2    A    That could be it.  It was a P.

3    Q    What happened -- well, where did you get the information to

4    put on the prior authorization?

5    A    Patients' charts.

6    Q    What happened once those charts -- those prior

7    authorization forms were filled out?

8    A    We would fax them to the fax number and then get feedback

9    of whether they were approved or denied.

10   Q    Did you also help with some of those for Abstral or just

11   Subsys?

12   A    All I did was Subsys.  I did not do Abstral.

13   Q    I'm going to show you what's been introduced as

14   Government's Exhibit 32-2 and then parens (2) and ask -- let me

15   pull this out so there's not a glare with the ELMO -- ask if

16   this is the type prior authorization form you were referring

17   to?

18   A    Yes, that is the Subsys paper that we had.

19   Q    Do you recognize the handwriting on this?

20   A    No, ma'am, honestly I don't.

21   Q    All right.  But this is what you would fill out?

22   A    Yes, ma'am.

23   Q    The patient information, the doctor information, and then a

24   diagnosis?

25   A    Yes, ma'am.

FRANK GOSS - DIRECT BY MS. GRIFFIN

3333

1    Q    When you filled -- pardon?

2    A    Also these other two, like the medication information, what

3    their dosage was going to be, and then whatever pharmacy they

4    were using.

5    Q    And would you typically put C&R Pharmacy in the forms that

6    you filled out?

7    A    It would be whichever pharmacy the patient was using.

8    Q    The patient was going to use?

9    A    Yes, ma'am.

10   Q    Did the drug rep for Subsys help you fill these forms out

11   as well?

12   A    She would fill out -- well, she would put her rep's name

13   with it and then we had the form.  Then whoever was doing PAs

14   -- with this one, it was Judge -- we would fill that out.

15   Q    Now, when you say Judge, what do you mean?

16   A    The contract person.  So I'm assuming this would have been

17   the medical assistant, Judge, that filled that one out.

18   Q    And do you know who signed this particular form?

19   A    No, ma'am.  I cannot say.

20   Q    You don't recognize that signature?

21   A    It could be Dr. Couch's or it could be where Justin signed

22   it.  I'm not for sure.

23   Q    Did you ever fill out any of the prior authorization forms

24   that had been presigned in Dr. Couch's name?

25   A    No, ma'am.

FRANK GOSS - DIRECT BY MS. GRIFFIN

1  Q   What happened with the forms once you filled out the prior
2  authorization?
3  A   We should have put them in the box for medical records.
4  Q   Did you ever send them to Natalie Perhacs or to Insys?
5  A   Whatever the fax number that was on that paper is who we
6  sent it to.  If I'm not mistaken, that is Insys.
7  Q   Did you send the prior authorizations to the insurance
8  company?
9  A   Yes, ma'am.
10 Q   So you sent them to both?
11 A   They should have been sent.  I sent mine to both.  One
12 would -- once we got the letter of denial from the insurance,
13 then we filled out the Insys referral, or PA.
14 Q   Did you have occasion to observe the patients that were
15 coming and going to see Dr. Couch when you were there working
16 with him?
17 A   Yes, ma'am.
18 Q   Did you have occasion to see the patients who were coming
19 to see Dr. Ruan and Dr. Couch when you were working at the
20 front desk?
21 A   Yes, ma'am.
22 Q   And could you tell us what you observed about the patients
23 that you would check in at the front desk?
24 A   As far as what?
25 Q   Did they appear to be walking well?

3335

1    A    You had some that you could tell were in pain and some
2    maybe not.
3    Q    What do you mean by some that were not?  What --
4    A    Well, I mean, some you have with different things could be
5    wrong with them, you may not be able to physically tell.
6    Q    Did you have some that you checked in that it did not
7    appear that there was anything wrong with them?
8    A    Honestly, I mean, you can't tell if -- I don't know.
9    Q    You don't know?
10   A    Yes, ma'am.
11   Q    When you were working on Dr. Couch's team, would you ask
12   the patients their pain level?
13   A    Yes, ma'am, we would ask them pain level of one to 10 with
14   their medication and one to 10 without their medication.
15   Q    Where did you put that information once they answered?
16   A    When we were in paper records, there was a -- on the form
17   we would fill it out.  And then once we went to electronic
18   records, there was a section in that form to fill out what
19   their levels were.
20   Q    How long were you working with Dr. Couch's team before you
21   went to the front desk, if you recall?
22   A    A little over a year before I went to the front desk.
23   Q    Once you were at the front desk, were you aware of how many
24   patient appointments were booked for each day?
25   A    Yes, ma'am, we always printed out a form.

FRANK GOSS - DIRECT BY MS. GRIFFIN

1   Q   Could you tell us how patients were booked?

2   A   Depending on the day, some days you would have them double,

3   triple, or sometimes quadruple booked.

4   Q   What do you mean by that?

5   A   So if your time slot was for 8, on our computer screen we

6   had four different blocks that the patient -- we could put

7   patients in.

8   Q   Did that create an issue with patients waiting?

9   A   Yes, ma'am.

10  Q   Could you explain that to us?

11  A   Because if you have a patient that's checked in -- or all

12  four of them show up at 8 o'clock, they all cannot be seen at 8

13  o'clock.  So you're having to push back.  So that would push

14  the time frame back for the other patients once they were

15  checked in also.

16  Q   While you were there on Dr. Couch's team, did he typically

17  see the first-time patients or do you know?

18  A   Normally he would see the first-time patients.  There was

19  occasions when a first-time patient would come in when he

20  wasn't in the office.

21  Q   Would someone see the first-time patient when Dr. Couch was

22  not in the office?

23  A   Yes, ma'am.  Either the nurse practitioner or the nurse

24  anesthetist would see the patient.

25  Q   Not another doctor, though?

FRANKIE GOSS - DIRECT BY MS. GRIFFIN

1    A    Not to my knowledge, no, ma'am.

2    Q    Then what would happen on the return visits for Dr. Couch's

3    patients?

4    A    Usually it was a four-week followup and then they tried to

5    make sure that he sees them at that appointment.

6    Q    Do you know whether he saw them or not?

7    A    I cannot tell you that, no, ma'am.

8    Q    And do you know how long Dr. Couch would see the patients

9    while you were on his team in that connection with their first

10   visit?

11   A    Honestly, no, ma'am, I cannot, because I was not in -- I

12   was working up the next patient.

13   Q    About how many patients went through in an hour?

14   A    I honestly -- I can't honestly say how many went through in

15   an hour.  I mean, you could -- because our time blocks for

16   office visits were 15 minutes.  For a new patient it was

17   blocked off for an hour.  So if -- it could be -- you figure

18   four --

19   Q    Do you know?

20   A    No, ma'am, not honestly, I could not tell you.

21   Q    Were repeat patients booked at the same time that new

22   patients were booked?

23   A    On occasion, yes, ma'am, that did happen.

24   Q    And did new patient visits take an hour?

25   A    They would take anywhere from 40 -- about 45 minutes for a

1  new patient, yes, ma'am.

2  Q  Ms. Goss, in connection with the patients, what would

3  happen when Dr. Couch was out of town?

4  A  They were seen by the nurse practitioners or the nurse

5  anesthetist.

6  Q  How were they given prescriptions at that time, with

7  Dr. Couch out of town?

8  A  We would do our -- normally our prescriptions, like when we

9  were on paper, we always wrote our prescriptions out for the

10  day ahead.  So if we knew he was out, we would have the

11  prescriptions that were written on the last appointment, have

12  him sign them before he'd leave, and there was occasions where

13  there was blank scripts signed, left with the nurse manager.

14  Q  Who had signed those?

15  A  I'm assuming it was Dr. Couch.

16  Q  So the prescriptions were written out and presigned before

17  the patient -- the day before the patient came?

18  A  No, ma'am.  When he was out of town, if he was going to be

19  in the office that day, we would write our prescriptions out

20  the day before.  So when they'd come in, their charts were

21  ready for whoever was seeing them, prescriptions are ready.  If

22  nothing was being changed, the doctor could sign off on the

23  prescriptions.  If there was something changed, then he would

24  fix the prescription and hand it to the patient.

25  Q  I'm talking about when Dr. Couch was out of town.

FRANK GOSS - DIRECT BY MS. GRIFFIN

1    A    Then those were already signed and ready for the nurse

2    practitioner or nurse anesthetist to see the patients.

3    Q    They were blank prescriptions?

4    A    No, ma'am.  We had already signed -- already filled them

5    out, of what they had been prescribed the month before.

6    Q    And they were presigned --

7    A    Yes, ma'am, they were signed before.

8    Q    -- before anyone saw the patient?

9    A    Yes, ma'am.

10   Q    So what if the patient didn't need those medications, did

11   they still get the same medication?

12   A    Then -- I cannot say yes or no.  Because that would have

13   been when one of the nurse practitioners or the nurse

14   anesthetist was in the office and could have changed it.

15   Q    You don't know whether they were authorized to change

16   prescriptions or not, do you?

17   A    No, ma'am, I do not.

18   Q    You didn't have any authority to change prescriptions, did

19   you?

20   A    No, ma'am.

21   Q    What happened if, when Dr. Couch was out, you ran out of

22   these presigned prescriptions?

23   A    Then Justin would sign or Stacy would sign his name on

24   them.

25   Q    Whose name?

FRANK GOSS - DIRECT BY MS. GRIFFIN

1    A    Dr. Couch's.

2    Q    How did you know that?

3    A    I witnessed it.

4    Q    Pardon?

5    A    I witnessed it.

6    Q    Would Dr. Couch sign that he had seen those patients on the

7    electronic charts or do you know?

8    A    I do not know.

9    Q    Did you have access to the electronic charts?

10   A    Yes, ma'am, because when we brought the patients back after

11   triage, we had to put information into the electronic

12   record.  Then we would send it to the nurse -- like for myself,

13   I would send it to the nurse anesthetist that I worked for and

14   then, when she got through, she was supposed to have sent it to

15   Dr. Couch.

16   Q    Did you fill in all the questions about the patient's

17   condition on the electronic charts that you worked on for

18   Dr. Couch?

19   A    The only thing that I would fill out would be -- it would

20   ask us what problem, what the issues were for the patient, we

21   would put that in the chart.  And then there was a section that

22   asks like if they were having chills, if they were running

23   fever, if there was any muscle spasms, different parts of the

24   body, it would go through and ask you did they have any of

25   these things, And you would just mark yes or no.  And that was

FRANKIE GOSS - DIRECT BY MS. GRIFFIN

3341

1   as far as I went in the medical record.

2   Q   Ms. Goss, while you were there, were you aware of certain

3   employees at PPSA using drugs?

4   A   I knew that one of our nurse practitioners was a patient of

5   ours.

6   Q   Who was that?

7   A   Bridgette Parker.  And Matthew Bean.

8   Q   And did you have reason to know whether any of the other

9   nurse practitioners were using drugs?

10  A   No, ma'am.

11  Q   Was there another MA at the same time you were an MA for

12  Dr. Couch?

13  A   Yeah, each nurse practitioner and the nurse anesthetist had

14  their own MA.

15  Q   So there were three MAs for Dr. Couch at the time you were

16  the MA?

17  A   Yes, because his was an RN.

18  Q   Pardon?

19  A   Dr. Couch's assistant was an RN.

20  Q   So you didn't handle all of Dr. Couch's patients, is that

21  right?

22  A   Correct.

23  Q   Now, explain that to us, his MA was an RN?

24  A   No.  His assistant was actually a registered nurse that

25  helped him with procedures.

FRANKIE GOSS - DIRECT BY MS. GRIFFIN                                                      3342

1   Q   Then did he have three MAs, one for each nurse --

2   A   Yes, ma'am.

3   Q   -- practitioner?

4   A   Yes, ma'am.

5   Q   What were the names of the other two while you were there?

6   A   Let's see.  Justin had Chilean Fletcher and Amanda Combs at

7   different times.  Bridgette Parker had Judge, and I think

8   Anastasia had worked with her at one time.  Stacy, I worked

9   with her.  Then when I went to the front desk, Isis Cook worked

10  with her.

11          MS. GRIFFIN:  One moment, Your Honor.

12          THE COURT:  All right.

13  BY MS. GRIFFIN:

14  Q   Do you know Matthew Bean?

15  A   Yes, ma'am.  He was a nurse practitioner for Dr. Ruan.

16  Q   Was he working there at the time you were working there?

17  A   Yes, ma'am.

18  Q   Ms. Goss, what made you think a lot of the patients were

19  cancer patients?

20  A   By their medical chart.  When they'd come in, you would see

21  what diagnoses they had.

22  Q   Do you know if that would be history of family cancer?

23  A   It would be in their history.

24  Q   That they had active cancer or past cancer?

25  A   It could be active or past, because it would still be in

3343

 1   their diagnosis.

 2           MS. GRIFFIN:  That's all I have of this witness.

 3           THE COURT:  Mr. Willson?

 4                       CROSS EXAMINATION

 5   BY MR. WILLSON:

 6   Q   Good afternoon, Ms. Goss.

 7   A   Good afternoon.

 8   Q   I'm Ben Willson, and I'm one of the lawyers who represent

 9   Dr. Couch.

10           You testified when the prosecutor was questioning you

11   that you had several jobs at PPSA; is that right?

12   A   Yes, sir.

13   Q   You were hired as an MA; right?

14   A   Yes, sir.

15   Q   And then you went to the front desk for a time; is that

16   right?

17   A   Yes, sir.

18   Q   You handled some of the PA issues as well; is that right?

19   A   Yes.

20   Q   Now, Ms. Goss, when you were in the capacity of an MA, you

21   described to the prosecutor how you would meet the patients at

22   the door essentially, at the waiting room; is that right?

23   A   Yes, sir.

24   Q   Was that the east waiting room door or the west one or

25   either?

FRANKE-JOSS - CROSS BY MR. WILLSON

1   A   Whichever side I was working that day.

2   Q   Okay.  And you'd bring them back.  And would you take their

3   weight?

4   A   We had our scale and our blood pressure machine once they'd

5   come in, yes, sir.

6   Q   And was there one of those in every exam room or was there

7   a --

8   A   Not a scale.  There was blood pressure machines in every

9   room.

10  Q   Okay.  So you'd take them into the exam room; is that

11  right?

12  A   Yes, sir.

13  Q   And there was usually a blood pressure machine there and

14  you would take their blood pressure?

15  A   Yes, sir.

16  Q   Okay.  And you talked about how you would ask them

17  questions?

18  A   Yes, sir.

19  Q   About how they're doing?

20  A   Yes, sir.

21  Q   How their medications are working?

22  A   Yes, sir.

23  Q   And you would ask them on a scale of zero to 10 how their

24  pain is; is that right?

25  A   Yes, sir, with and without medication.

FRANKE, JOSS - CROSS BY MR. WILLSON

```
 1   Q   Okay.  And the prosecutor asked you a few questions about
 2   how these patients presented.  When the patients would tell you
 3   their level of pain, would you indicate that on their chart?
 4   A   Yes, sir.
 5   Q   Okay.  Would you ever question them about that?
 6   A   We -- I would just ask them, like I said, what their pain
 7   level is, one to 10, with medication or without, and there at
 8   the end we had a little chart in the room, trying to see how
 9   that level was.
10   Q   Okay.  But was there -- you would just write that down;
11   right?
12   A   Yes, sir.
13   Q   Because pain is subjective, you can't see it; is that
14   right?
15   A   Yes, sir.
16   Q   Okay.  But you would go through a list of examinations --
17   you described a checklist; is that right?
18   A   Yes, sir.
19   Q   Okay.  And is that how electronic medical records work?
20   A   That's how the electronic records worked, yes, sir.
21   Q   Okay.  So you would ask a question or you would make an
22   observation even and then you would just check the box; is that
23   right?
24   A   Yes, sir.
25   Q   And then that would sort of populate in electronic medical
```

```
 1   records?
 2   A   Yes, sir.
 3   Q   Okay.  Now, Ms. Griffin asked you about some of your work
 4   at the front desk.
 5   A   Yes, sir.
 6   Q   Now, did you work at the very front desk, where there was a
 7   series of computers or check-in stations, or did you work
 8   behind that, in the area where the other desks were?
 9   A   I worked in the front desk all the way to the left.
10   Q   So you were literally checking in patients?
11   A   Yes, sir.
12   Q   Okay.  Now, I think you told Ms. Griffin that patients
13   could pay cash; is that right?
14   A   If their -- yes, sir, their copays.
15   Q   Oh, it was a copay?
16   A   Yes, sir, whatever their copay or deductible was, they
17   would pay it by cash, check, or credit card.
18   Q   Okay.  So they had insurance?
19   A   Yes, sir.
20   Q   Okay.  So what if a patient didn't have insurance?
21   Would --
22   A   If it was a new patient, we did not accept patients that
23   did not have insurance.
24   Q   Okay.
25   A   If they were an established patient, then there was a set
```

3347

```
 1   fee that our billing department had them pay.
 2   Q   Okay.  But a new -- a new patient, first of all, did they
 3   have to be referred?
 4   A   Yes, sir, they have to be referred from another doctor.
 5   And like I said, they had to have insurance.  The only
 6   insurance we did not accept was Medicaid.
 7   Q   Okay.  So when you said you accepted cash, all you meant
 8   was that you accepted cash as payment of their insurance copay?
 9   A   Yes, sir.
10   Q   Okay.  Thank you.  And those copays were always paid up
11   front?
12   A   Yes, sir.
13   Q   Ms. Griffin asked you a little bit about the -- I guess she
14   said sometimes you would double and triple and quadruple book?
15   A   Yes, sir.
16   Q   And you were very busy and there were patients waiting?
17   A   Yes, sir.
18   Q   Was this a problem at PPSA?
19   A   Yes, sir.
20   Q   Was it something that was -- were there occasionally
21   meetings that would be had among staff at PPSA?
22   A   If -- normally if we had a meeting, we tried to do it
23   before the office or on Friday after we closed.
24   Q   And if you recall, was it ever expressed to you that this
25   was something that needed to be addressed?
```

3348

```
 1    A   Some of the nurse practitioners would come to us and say
 2    that they had too many patients, but whoever was doing
 3    check-out would get them in when they could.
 4    Q   Okay.  Kind of moving to another hat that you wore at PPSA
 5    while you were there, with these PAs, prior authorizations --
 6    A   Yes, sir.
 7    Q   -- and Ms. Griffin asked you a number of questions about
 8    those.  Was there anything wrong with that?
 9    A   With PAs?
10            MS. GRIFFIN:  Objection, Your Honor.
11            THE COURT:  Sustained.
12            MS. GRIFFIN:  As to foundation.
13            THE COURT:  Sustained.
14    BY MR. WILLSON:
15    Q   I think you described how you would fill out the patient's
16    info on those and that was from the medical charts; right?
17    A   Yes, sir.
18    Q   Okay.  Now, you spoke a little bit with Ms. Griffin about
19    Justin Palmer signing prescriptions for Dr. Couch.
20    A   Yes, sir.
21    Q   You didn't know, did you, what if anything Dr. Couch knew
22    about Justin Palmer doing that; is that right?
23    A   No, sir.  I do not.
24    Q   And you said that at some point Justin Palmer left?
25    A   Yes, sir.
```

3349

1  Q   And was he replaced by -- I believe you said --

2  A   Once Justin left, it was Ben Clark.

3  Q   To your knowledge, did Ben Clark ever sign Dr. Couch's name

4  on any prescriptions?

5  A   No, sir.

6  Q   Okay.  And when Ben Clark was there not signing Dr. Couch's

7  name on prescriptions, was Dr. Couch arriving at about the same

8  time that he arrived when Justin Palmer was there?

9  A   Yes, sir.

10       MR. WILLSON:  Okay.  Just a moment, Your Honor,

11  please.

12       That's all the questions I have.  Thank you.

13       THE COURT:  Anybody for Dr. Ruan?

14       MR. DARLEY:  No questions, Your Honor.

15       THE COURT:  All right.  May this witness be excused?

16  Or do you have any redirect?

17       MS. GRIFFIN:  Just one, one question.

18                    REDIRECT EXAMINATION

19  BY MS. GRIFFIN:

20  Q   After Justin left, and Dr. Couch would arrive at 9 or 9:30,

21  who was signing the prescriptions for the patients that were

22  seen before then?

23  A   They would have to come back once Dr. Couch was in the

24  office and pick up prescriptions.

25  Q   So he didn't see them, but they came back later and got a

1    prescription signed by him?

2    A    Yes, ma'am.

3    Q    And that didn't happen until after Justin left; is that

4    right?

5    A    Correct.

6    Q    So Dr. Couch still wasn't seeing the patient, was he?

7    A    He was seeing the new patients but not the re -- the

8    established patients.

9    Q    Talking about in the mornings before he got there?

10   A    They would have to come back in or we would try to schedule

11   them so that it -- they would come in once Dr. Couch was in the

12   office.

13   Q    So you might have patients there waiting till whenever

14   Dr. Couch decided to come in?

15   A    Yes, ma'am, or they would come back later in that day and

16   pick them up.

17   Q    Well, you just told us that they would come back later and

18   pick up a signed prescription.  So did somebody see them before

19   he got there after Justin left?

20   A    Ben would see them.

21   Q    Ben would see them?

22   A    The patients, the established patients.  Then they would

23   come back once Dr. Couch had got in the office, signed the

24   prescriptions.

25   Q    Later in the day the patient would come back?

FRANKIE GOSS – REDIRECT BY MS. GRIFFIN

1  A   Come, yes, ma'am.

2  Q   So you're not saying that you rescheduled the visits?  The

3  patients were still seen without Dr. Couch being in the

4  building; is that right?

5  A   Yes, ma'am.

6           MS. GRIFFIN:  That's all I have of the witness.

7           THE COURT:  May she be excused?

8           MS. GRIFFIN:  Yes, Your Honor.

9           THE COURT:  Thank you, ma'am.  You may step down.

10           THE WITNESS:  Thank you.

11           MR. BODNAR:  Your Honor, may we approach before the

12  next witness?

13           THE COURT:  Well, I was going to recess the jury.

14           MR. BODNAR:  I was going to say it's going to be

15  lengthy.  So --

16           THE COURT:  All right.  Ladies and gentlemen, we've

17  got another weekend ahead of us.  So remember my instructions

18  about not talking about the case to anybody.  Go home and try

19  and forget about this for the weekend.  Enjoy your weekend.

20           Be back in the jury assembly room at 9 o'clock Monday

21  morning, ready to be called back up.  Thank you and have a good

22  weekend.

23       (In open court, defendants present, jury not present.)

24           THE COURT:  Counsel, do you need to see me for

25  anything?

1          MS. GRIFFIN:  No, Your Honor.

2          MR. SHARMAN:  No, ma'am.

3          MR. KNIZLEY:  No, ma'am.

4          THE COURT:  All right.  Y'all have a good weekend.

5          MS. GRIFFIN:  Thank you, Your Honor.

6      (Court adjourned at approximately 4:50 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25