

1      UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF ALABAMA
2

3

4  UNITED STATES OF AMERICA
                                   CASE NO. CR15-00088
5  v.
                                   COURTROOM 2B
6  JOHN PATRICK COUCH, M.D.,
   and XIULU RUAN, M.D.,
7                                  MOBILE, ALABAMA

           Defendants.
8                                  MONDAY, JANUARY 30, 2017
   * * * * * * * * * * * * * *
9  REDACTED

10

                         DAY 15 OF TRIAL
11        BEFORE THE HONORABLE CALLIE V. S. GRANADE,
             UNITED STATES DISTRICT JUDGE, AND JURY
12

13
   APPEARANCES:
14
   FOR THE GOVERNMENT:
15     DEBORAH A. GRIFFIN
       CHRISTOPHER BODNAR
16     United States Attorney's Office
       63 S. Royal Street, Suite 600
17     Mobile, AL  36602
       (251) 441-5845
18

19  FOR THE DEFENDANT COUCH:
       ARTHUR T. POWELL, III
20     P.O. Box 40456
       Mobile, AL 36640-0456
21     (251) 433-8310

22     JACKSON R. SHARMAN, III
       JEFFREY PAUL DOSS
23     BENJAMIN SANDERS WILLSON
       Lightfoot, Franklin & White
24     400 North 20th Street
       Birmingham, AL  35203
25     (205) 581-0700

1    (Continued)

2        BRANDON KEITH ESSIG
         800 Shades Creek Parkway, Suite 600D
3        Birmingham, AL  35209
         (251) 879-1981

4

   FOR THE DEFENDANT RUAN:
5        DENNIS J. KNIZLEY
         7 N. Lawrence
6        Mobile, AL 36602
         (251) 432-3799

7

         JASON BRADLEY DARLEY
8        Darley & McGough, LLC
         1751 Dauphin Street
9        Mobile, AL 36604
         (251) 441-7772

10

         GORDON G. ARMSTRONG, III
11       P.O. Box 1464
         Mobile, AL  36633
12       (251) 434-6428

13       STEVEN D. MARTINIE
         4955 North Lake Drive
14       Whitefish Bay, WI  53217
         (414) 332-9683

15

   THE CLERK:  MARY ANN BOYLES
16 THE LAW CLERK:  LYNN DEKLE
   COURT REPORTER:  ROY ISBELL, CCR, RDR, CRR

17
              Proceedings recorded by OFFICIAL COURT REPORTER
18         Qualified pursuant to 28 U.S.C. 753(a) & Guide to
       Judiciary Policies and Procedures Vol. VI, Chapter III, D.2.
19            Transcript produced by computerized stenotype.

20

21

22

23

24

25

1                      EXAMINATION INDEX

2

CHRISTOPHER MANFUSO
3         DIRECT BY MR. BODNAR  . . . . . . . . . . . . . 3362
          CROSS BY MR. KNIZLEY  . . . . . . . . . . . . . 3424
4         REDIRECT BY MR. BODNAR . . . . . . . . . . . . .3467

5    BRIAN BECHTOL
          DIRECT BY MS. GRIFFIN . . . . . . . . . . . . . 3477
6         CROSS BY MR. POWELL . . . . . . . . . . . . . . 3483

7    GARY DOUTHITT
          DIRECT BY MS. GRIFFIN . . . . . . . . . . . . . 3494
8         CROSS BY MR. KNIZLEY  . . . . . . . . . . . . . 3529
          REDIRECT BY MS. GRIFFIN . . . . . . . . . . . . 3581
9
     AMY COLLINS
10        DIRECT BY MR. BODNAR  . . . . . . . . . . . . . 3584
          CROSS BY MR. SHARMAN  . . . . . . . . . . . . . 3594
11        CROSS BY MR. DARLEY . . . . . . . . . . . . . . 3595
          REDIRECT BY MR. BODNAR . . . . . . . . . . . . .3597
12
     LAKEISHA CRAWFORD
13        DIRECT BY MS. GRIFFIN . . . . . . . . . . . . . 3599
          CROSS BY MR. SHARMAN  . . . . . . . . . . . . . 3612
14        CROSS BY MR. DARLEY . . . . . . . . . . . . . . 3613

15

16

17

18

19

20

21

22

23

24

25

Roy Isbell, CCR, RDR, CRR, Official Court Reporter
113 St. Joseph Street, #231, Mobile, Alabama  36602

1                        EXHIBIT INDEX

2                                                    MAR  ADM
    GOVERNMENT'S
3    23-1   Douthitt Rxs                                 3506

4    23-2   Douthitt patient file (Greenway)             3522

5    23-3   Douthitt plea agreement                      3515

6    28-01  Plea agreement:  Christopher Manfuso         3364

7    28-02  IMP agreement with Ruan Companies, LLC,      3375
            3/5/11 - Physician Office Dispensing Claims
8           Purchase and Assignment Agreement

9    28-03  Amendment to 3/5/11 agreement                3375

10   28-04  IMP Agreement with Ruan Companies, LLC,      3375
            4/29/13 - Physician Office Dispensing
11          Program Claims Purchase and Assignment
            Agreement
12
     28-05  Comprehensive Agreement with Ruan           3375
13          Companies, LLC, 12/2/13 - Physician Office
            Dispensing Program Claims Purchase and
14          Assignment Agreement

15   28-06  IPM Agreement with Physicians' Compounding   3375
            Solutions, 4/24/13 - Physician Office
16          Dispensing Program Claims Purchase and
            Assignment Agreement
17
     28-07  Comprehensive Rx Agreement with Physicians'  3375
18          Compounding Solutions, 12/2/13 - Physician
            Office Dispensing Program Claims Purchase
19          and Assignment Agreement (Couch)

20   28-08  Email chain Manfuso to Ruan - 7/25/11 - mid  3389
            July, Figures Coming
21
     28-09  Email Manfuso to Ruan - 6/12/13 - Right to   3389
22          Choose in AL

23   28-10  Email Ruan to Manfuso - 5/23/12 - Number     3389
            (704 prepackaged bottles)
24
     28-11  Email Manfuso to Ruan - 7/15/13 - June #     3389
25          (525)

| | | |
|---|---|---|
| 28-12 | Email Manfuso to Ruan - 8/1/13 - July meds (842) | 3389 |
| 28-13 | Email Manfuso to Ruan - 11/12/13 - Audit Findings | 3389 |
| 28-14 | Email Manfuso to Ruan - 1/15/13 - 2012 Revenue | 3389 |
| 28-15 | Email chain Manfuso to Ruan - 11/18/13 - Couch | 3389 |
| 28-16 | Email Manfuso to Ruan - 8/19/13 - Meds | 3389 |
| 28-17 | Email Manfuso to Ruan - 8/23/13 - Check/new meds plan | 3389 |
| 28-18 | Email Manfuso to Ruan - 11/12/13 - Meeting in person | 3389 |
| 28-19 | Email Manfuso to Ruan - 11/26/13 - Contract and check (Comprehensive Rx) | 3389 |
| 28-20 | Email chain Manfuso to Ruan - 5/27/11 - Dr. Chen | 3389 |
| 28-21 | Email Ruan to Manfuso - 7/20/11 Med Programs Financial Statements | 3389 |
| 28-22 | Email Ruan to Manfuso - 7/26/11 - Address (re: check) | 3389 |
| 28-23 | Email Ruan to Manfuso - 7/26/11 - Address | 3389 |
| 28-24 | Email Ruan to Manfuso - 10/31/11 - Dr. Couch Request | 3389 |
| 28-25 | Email Ruan to Manfuso - 10/20/13 - Meds Program - Good News Coming Soon (send checks to address at XLR Properties LLC) | 3389 |
| 28-26 | Email Manfuso to Ruan - 4/23/15 - DNA testing | 3389 |

DEFENDANT RUAN'S
| 175 | Email from Manfuso to Ruan 5/6/14 (add products to formulary) | 3456 |

3358

```
 1          (Morning session, 9 a.m., in chambers, jury not present.)
 2          THE COURT:  Who's party is this?
 3          MR. ESSIG:  I guess it's mine, Judge.  The government
 4   gave us sort of a collection of their exhibits for the first
 5   witness this morning.  They include emails between Dr. Ruan and
 6   Mr. Manfuso, who is the first witness.  We think there's one
 7   Bruton issue -- well, two Bruton issues with two separate lines
 8   of one of the emails in the government's exhibit.  And what
 9   they are is it's an email.  This is 28-8.  The date of the
10   email is July 19th, 2011.
11          MR. BODNAR:  Here's a copy.
12          MR. ESSIG:  It's the second one, Judge.
13          THE COURT:  All right.
14          MR. ESSIG:  And what Dr. Ruan is emailing --
15          THE COURT:  It's July what?
16          MR. ESSIG:  It's the very bottom, July 19th, 2011.
17          THE COURT:  All right.
18          MR. ESSIG:  It's the top of the second page, Your
19   Honor.  And as you can see the context here, there's a
20   back-and-forth email chain between Mr. Manfuso and Mr. Ruan
21   exclusively.  Dr. Couch is not included in these emails.  And
22   if you will look on sort of the end of the second line, top of
23   the second page, Ruan is telling Manfuso, referring to
24   Dr. Couch, he said someone told him now it is the same whether
25   prepackaged or buy in bulk.  And then he says:  I told him we
```

1    signed one year with IPM and you told me not very good.

2           And then the next line, Your Honor, again, he,

3    referring to Dr. Couch, asked what the numbers are, which I

4    have no clue.  He told me he has been writing more than before

5    and he likes to know how we are doing.

6           Your Honor, we contend that those statements between

7    Ruan and Manfuso by Dr. Ruan referencing statements Dr. Couch

8    made to him violate Bruton and the confrontation clause

9    because, although they are admissions by Dr. Couch, they are

10   number one, they are second level of hearsay, they are double

11   hearsay and also, Your Honor, of course, Dr. Ruan is

12   unavailable because he's a codefendant in this case, a

13   nontestifying codefendant.  And we don't have the ability to

14   cross-examine him on these statements that he is attributing to

15   Dr. Couch in these emails.

16          MR. BODNAR:  With regard to Bruton, Your Honor, it's

17   not a confession and it's not made after the fact.  And for the

18   confrontation clause, this is not a testimonial statement.

19   This is made during the course of the conspiracy in furtherance

20   of the conspiracy for the kickback.

21          THE COURT:  Who is Manfuso?

22          MR. BODNAR:  Manfuso the first witness.  He is the one

23   that pled guilty.  He worked for IPM, which was the workers'

24   compensation dispensary that they had and he was the one that

25   paid almost 2.6 million dollars worth of alleged kickbacks to

```
 1    Dr. Ruan and Dr. Couch.  So this is in the beginning of their
 2    relationship.  Dr. Ruan -- and one of the things he's going to
 3    testify is that he had very, very, very little communication
 4    with Dr. Couch.  And Dr. Ruan negotiated on Dr. Couch's behalf.
 5    And even amongst the emails, there are only maybe one or two
 6    between Manfuso and Couch.  Everything came through Ruan.  So
 7    he's relaying for the two of them, who have already signed the
 8    contracts, that Dr. Couch has some concerns and then he goes on
 9    to explain:  Here's why you do make more at the dispensary as
10    opposed to going through C&R Pharmacy.
11              MR. ESSIG:  Your Honor, we don't have an objection to
12    emails where Dr. Ruan talks about negotiating on behalf of the
13    practice.  Our specific objection here is, again, these are
14    statements by Dr. Couch to Ruan in which Ruan is relating to
15    Mr. Manfuso, which creates confrontation issues.  And Bruton
16    does not only apply to confessions to law enforcement, it also
17    applies to out-of-court statements of a codefendant that the
18    government intends to use to prove an element of the crime.
19    And that's exactly the purpose, as Mr. Bodnar just pointed out.
20              THE COURT:  I've never seen it in that context.  Can
21    you give me some case law on that?
22              MR. ESSIG:  I can, yes, ma'am.  Not this moment, not
23    this very second, but I can.  But yes.
24              THE COURT:  You say it doesn't?
25              MR. ESSIG:  We can find some.
```

```
 1            MR. BODNAR:  My understanding of Bruton is confession
 2    means to law enforcement.  And it's a statement outside the
 3    course of the conspiracy.  For confrontation, it's not --
 4            THE COURT:  This doesn't appear to be a statement in
 5    furtherance of the conspiracy.  My inclination is to allow it
 6    at this point.  How far into this testimony do you intend --
 7            MR. BODNAR:  Fairly soon into the testimony.
 8            THE COURT:  Okay.
 9            MR. ESSIG:  We'll see what we can find very quickly,
10    Your Honor.
11            THE COURT:  Well, okay.  Even if Bruton applies, this
12    appears to me to be a statement in furtherance of the
13    conspiracy by one of the coconspirators, relating something
14    that another coconspirator has said.  So I'm not sure that it's
15    inadmissible because of that.  So that's my take on it right
16    away.
17            MR. ESSIG:  Yes, ma'am.  We'll see what we can find.
18            THE COURT:  Okay.
19            MR. KNIZLEY:  Your Honor, we had tried to limit doing
20    this, but this witness, Mr. Manfuso, is primarily Dr. Couch --
21    excuse me -- Dr. Ruan.  And with the Court's permission, could
22    we reverse the order in this particular case, and let me
23    examine him first as opposed to Mr. Essig?  Because he'll have
24    very little.
25            THE COURT:  Do you intend to cross-examine him?
```

1          MR. ESSIG:  Judge, it's possible, depending on how

2    Mr. Knizley's cross-examination goes.  I may not ask him any

3    questions.  But it just kind of depends.

4          THE COURT:  Well, I mean, okay.  I'll allow it for

5    this time.

6          MR. KNIZLEY:  Thank you.

7          MR. ESSIG:  Thank you.

8          MR. BODNAR:  Thank Your Honor.

9       (In open court, defendants and jury present.)

10          THE COURT:  Good morning, ladies and gentlemen.

11          All right.  Counsel, you may continue.

12          MR. BODNAR:  United States calls Christopher Manfuso.

13          THE CLERK:  Let me get you to step forward toward the

14    witness stand and I'll swear you in.  Raise your right hand.

15                    CHRISTOPHER MANFUSO

16              was sworn and testified as follows:

17          THE WITNESS:  I do.

18          THE CLERK:  Thank you.  Please be seated.

19                    DIRECT EXAMINATION

20    BY MR. BODNAR:

21    Q   Good morning.

22    A   Good morning.

23    Q   Would you please introduce yourself to the jury?

24    A   Hi, my name is Chris Manfuso.

25    Q   And, Mr. Manfuso, can you please explain to the jury your

1  educational background?

2  A   Yes, I have a bachelor's degree from James Madison

3  University in Virginia.

4  Q   And what is your degree in?

5  A   Finance.

6  Q   Prior to 2015, what industry did you work in?

7  A   I both worked at and owned a company in the medication

8  dispensing management industry.

9  Q   And was that involving workers' comp dispensaries?

10 A   Yes.

11 Q   And as you sit here today, are you currently a convicted

12 felon?

13 A   Yes.

14         MR. BODNAR:  Your Honor, may I approach with what has

15 been marked as Government's Exhibit 28-1?

16         THE COURT:  Yes.

17 BY MR. BODNAR:

18 Q   I show you what has been previously marked as Government's

19 Exhibit 28-1.  Are you able to identify what this document is

20 for the Court?

21 A   Yes, this is my plea agreement.

22 Q   And is it a plea agreement involving conduct in this case?

23 A   Yes, it is.

24         BY MR. BODNAR: The United States moves to admit

25 Government's Exhibit 28-1.

3364

1          MR. KNIZLEY:  No objection.

2          THE COURT:  All right.  Mark it in.

3      (Government's Exhibit 28-1 was entered into evidence.)

4  BY MR. BODNAR:

5  Q   Mr. Manfuso, prior to your arrest, did you work for

6  companies called IPM and Comprehensive Rx?

7  A   Yes, I worked for Industrial Pharmacy Management, IPM, and

8  actually owned Comprehensive Rx.

9  Q   And was it your conduct at IPM and Comprehensive Rx that

10  led to your felony conviction?

11  A   Yes, it was.

12  Q   I'm going to show you now what has been admitted now as

13  Government's Exhibit 28-1.  And is this a copy of the plea

14  agreement, your plea agreement, in this case?

15  A   Yes.

16  Q   Prior to signing this plea agreement, did you have a

17  defense attorney to help you?

18  A   Yes.

19  Q   Did you go over the document with that attorney?

20  A   Yes, I did.

21  Q   And did you know what it was that you were pleading guilty

22  to, specifically conspiracy to violate the anti-kickback

23  statute?

24  A   Yes.

25  Q   And you understood what the elements were and what conduct

CHRISTOPHER MANFUSO - DIRECT BY MR. BODNAR

1   was illegal?

2   A   Yes, I did.

3   Q   Did you understand or were you aware if there was a

4   cooperation agreement or a cooperation clause in this plea

5   agreement?

6   A   Yes, I was.

7   Q   Can you explain to the jury what is your understanding of

8   the cooperation agreement in your plea agreement?

9   A   If I cooperate and tell the truth, there's a chance that

10  my sentence could be reduced.

11  Q   Looking here at paragraph 21, does it say the defendant

12  shall fully, completely, and truthfully respond to all

13  questions?

14  A   Yes.

15  Q   And have you reviewed this document prior to testifying

16  today?

17  A   Yes, I have.

18  Q   Does it repeatedly say that you must be truthful?

19  A   Yes, it does.

20  Q   What is your understanding of what would happen if you are

21  not truthful here today?

22  A   The deal would be off, so to speak.

23  Q   And does that mean not just getting a sentence reduction,

24  but your plea agreement would be broken?

25  A   Correct.

1  Q   Other than what's in this document, do you have any other

2  agreements with the United States?

3  A   No.

4  Q   Do you have any agreement that you are going to get any

5  specific sentence because of your testimony today?

6  A   No.

7  Q   Prior to today, you have met with the United States before;

8  is that correct?

9  A   Yes.

10  Q   Does that include myself, Ms. Griffin, and agents with the

11  FBI and DEA?

12  A   Yes, it does.

13  Q   During those meetings -- all except for, I believe, one of

14  them -- was your attorney also present?

15  A   Yes.

16  Q   At any point during any of these meetings did either the

17  United States or the FBI or DEA tell you what you must say or

18  you have to say, anything to convict one or both of these

19  doctors?

20  A   No.

21  Q   Other than to tell the truth, was anything told to you that

22  you have to say?

23  A   No.

24  Q   Mr. Manfuso, can you explain to the jury what is the

25  workers' compensation system?

1    A   The workers' compensation system is set up so that injured
2    workers in each state get medical care and in some cases
3    reimbursed for lost wages if they are injured on the job.
4    Q   So if someone is injured on the job, let's say at a
5    factory, and they have regular Blue Cross/Blue Shield
6    insurance, how is workers' comp different than if they were
7    just to go to the doctor and show their Blue Cross/Blue Shield
8    card?
9    A   If it's a work injury, it's to be paid for by the workers'
10   comp insurance of the injured party.
11   Q   And would that insured party be the factory owner or the
12   store owner that has the policy as opposed to the insurance
13   policy of the person that got injured?
14   A   Correct.
15   Q   And do you know if state workers' comp, in particular
16   Alabama workers' comp, is subsidized by federal money?
17           MR. KNIZLEY:  Objection.  Lack of foundation.
18           MR. BODNAR:  I'm just asking if he knows, Your Honor.
19           THE COURT:  Sustained.
20   BY MR. BODNAR:
21   Q   Do you know if the Alabama state workers' compensation
22   program is subsidized by federal dollars?
23           MR. KNIZLEY:  Same objection.
24           THE COURT:  Sustained.  I mean overruled.  Do you
25   know?  The answer is yes or no.

1    A    I'm unaware.

2    BY MR. BODNAR:

3    Q    Would you please explain to the jury what is a workers'

4    comp dispensary?

5    A    A workers' comp dispensary is -- it's an area within a

6    doctor's practice where prepackaged medications are stored so

7    just like in a pharmacy when you buy a bottle of, say, 30

8    ibuprofen, these bottles are prepackaged, safety sealed,

9    there's no counting of pills, there's no pharmacist onsite.

10   Basically it's an area within a doctor's practice where

11   medications are kept that are to be provided to the patients

12   before they leave, to be work comp patients.

13   Q    Is this something workers' compensation laws allow to

14   happen?

15   A    Yes.

16   Q    Now, compared to a normal pharmacy, what is the difference

17   between how medication is handed out in a normal pharmacy, like

18   behind the counter on the pharmacy prescription medicine,

19   versus at a dispensary?

20   A    At a dispensary the medications are prepackaged and safety

21   sealed, a staff member from the practice is allowed to help

22   assist the physician by getting a bottle from the shelves and

23   handing it to the doctor to provide to the patient.  In a

24   pharmacy there's an actual pharmacist that needs to be a

25   licensed pharmacist onsite and a pharmacist would actually

3369

```
 1    count pills into individual bottles, they would not be
 2    prepackaged and safety sealed.
 3    Q   So at a normal pharmacy, is it correct that they buy just
 4    bulk of, let's say, Roxicodone pills?
 5    A   Yes.
 6    Q   And if your prescription says 90, a pharmacist will count
 7    out 90 pills and put it into that little orange plastic bottle?
 8    A   Correct.
 9    Q   But at a dispensary there's no counting, it's just like you
10    buy an Advil bottle from a store?
11    A   Correct.
12    Q   At a dispensary, are controlled substances dispensed as
13    well?
14    A   Yes.
15    Q   And does that include schedule II controlled substances?
16    A   It does.
17    Q   But is a pharmacist needed at a dispensary?
18    A   No, it is not.
19    Q   Why is that?
20    A   The physicians in the state of Alabama are permitted to
21    dispense all scheduled drugs.
22    Q   Can you explain to the jury what was IPM?
23    A   Industrial Pharmacy Management was a --
24    Q   Is that the name of the company you used to work for?
25    A   Yes.
```

1    Q    So what was Industrial Pharmacy Management?

2    A    A company that provided a management service to physicians

3    who wanted to establish a dispensary in their office.

4    Q    So how did it work?  What was the service that IPM sold to

5    doctors?

6    A    Basically doctors don't want to get -- the reason there's a

7    need for the business, a market for the business, is doctors

8    don't want to manage all that goes along with the dispensary,

9    they'd rather outsource that.  So IPM, Industrial Pharmacy

10   Management, would help train the staff how to dispense, help

11   them establish a formulary, which is basically a list of the

12   medications that they'd like to dispense, help ensure

13   compliance with all the regulations and laws, and then also

14   bill and collect on the doctor's behalf.

15   Q    Now, does a workers' compensation patient have to go to a

16   dispensary to get their medication or can they go to a regular

17   pharmacy?

18   A    The patient in Alabama has the right to choose where they

19   get their medications.

20   Q    And could they choose, then, a regular pharmacy as opposed

21   to a dispensary?

22   A    Yes, they can.

23   Q    What is the benefit, then, to a practice of having a

24   dispensary for workers' comp?

25   A    Convenience.  The workers' compensation system can be

CHRISTOPHER MANFUSO - DIRECT BY MR. BODNAR

 1   cumbersome at times.  So often an injured worker would go to a

 2   retail pharmacy and that retail pharmacy may not process their

 3   work comp claim for one reason or another.  It could be a

 4   contested claim, it could be the worker was just injured and it

 5   hasn't gone through the computer system yet.  So one of the

 6   benefits of the service of dispensing within the office is you

 7   get the patients their medications quickly and without hassle.

 8   So even if maybe the claim isn't accepted yet, the doctor can

 9   go ahead and dispense it anyway and the patient can get it

10   right there on the site.

11   Q   And does that mean the patient doesn't even go out to a

12   pharmacy, they literally just get a bottle in a bag and walk

13   out the door from the doctor's practice?

14   A   Correct.

15   Q   Now, in this case where Dr. Ruan and Dr. Couch owned their

16   own pharmacy, why would they also have a dispensary?  What's

17   the benefit of having a dispensary as well?

18   A   The benefit of dispensaries is we specialize in the billing

19   and collecting of these work comp medication claims and

20   basically there's more money to be made when you dispense

21   through or when you prescribe and dispense versus sending it

22   through a pharmacy.

23   Q   Will you explain to the jury why is there greater profit

24   using a workers' comp dispensary than there would be sending

25   the prescription to get filled at C&R Pharmacy?

3372

1    A    Pharmacies are set up to process claims

2    electronically.  And when you process electronically the work

3    comp carriers apply a steep discount.  When we manage the

4    dispensaries, we don't bill electronically.  We bill on paper

5    and collect upwards of 10 times as much as if the pharmacy had

6    processed the same claim through its electronic network.

7    Q    So potentially for the same drug, let's say a Roxicodone 30

8    bottle, it could be ten times more profitable at the

9    dispensary?

10   A    I don't know exactly on that medication.  But yes, there

11   are certainly medications that are in that same times range.

12   Q    In addition, is there a difference between the amount paid

13   by a workers' comp program for a particular drug compared to a

14   drug at a Blue Cross/Blue Shield or United Healthcare?

15   A    Yes, there's also a drastic difference.

16   Q    Can you explain the difference to the jury?

17   A    Yes, commercial insurance, which is private insurance, Blue

18   Cross, United Healthcare, et cetera, they have very steep

19   discounts with the pharmacies because they have such buying

20   power.  And the workers' compensation carriers aren't nearly as

21   sophisticated and don't have those discounts.  There's

22   literally probably a 10 to 20 full difference on the average

23   reimbursement between work comp and commercial insurance.

24   Q    And is that because Blue Cross and Blue Shield or United

25   Healthcare has specific contracts set up with the pharmacy at

3373

 1    specific reimbursement rates?

 2    A    Yes.

 3    Q    So, for instance, if a drug costs -- whatever it costs --

 4    Blue Cross/Blue Shield might say we're only reimbursing a

 5    hundred dollars, even if it's a $150 drug?

 6    A    Correct.

 7    Q    But does workers' comp typically have those same contracts

 8    in place that say we're only paying this rate no matter what it

 9    costs?

10    A    In Alabama there's a fee schedule for reimbursement, and

11    it's quite generous compared to commercial insurance.

12    Q    Who sets that fee schedule for the state of Alabama?

13    A    I don't know.

14    Q    In connection with your work at IPM, did you begin working

15    with Dr. Ruan and Dr. Couch?

16    A    Yes, I did.

17    Q    Can you explain how you first became acquainted -- well,

18    first, how long had you been working at IPM prior to meeting

19    Dr. Ruan and Dr. Couch?

20    A    Five or six years.

21    Q    How did you become acquainted with Dr. Ruan and Dr. Couch?

22    A    One of our sales reps, Laura Terranova, is from this area,

23    I believe the Fairhope area, knew Dr. Ruan from her previous

24    job before she came to work for us.  So she introduced me to

25    Dr. Ruan and Dr. Couch.

CHRISTOPHER MANFUSO - DIRECT BY MR. BODNAR

3374

1  Q   What was that previous job that Laura Terranova worked at?

2  A   She worked at a mail order pharmacy that provided

3  medications to work comp patients.  The name escapes me.

4  Q   Prior to you working with Dr. Ruan and Dr. Couch, did they

5  have another dispensing company that they were working with?

6  A   Yes.  The company was called Linear Solutions.

7  Q   And can you explain what Linear Solutions was, if you know?

8  A   Linear Solutions was actually a direct competitor of my

9  company, IPM, and they provided very similar services.

10  Q   And how was it that you went about getting the business

11  from Dr. Ruan and Dr. Couch -- excuse me -- from Linear

12  Solutions?

13  A   Dr. Ruan provided his checks, the reimbursement he had been

14  making for the previous several months, as well as the

15  medications that had been dispensed, and I calculated that it

16  averaged in the low $40,000 a month and I offered a contract

17  that guaranteed at least 45.  So we offered to guarantee that

18  he would make more with our service than his service.

19  Q   And by low 40s, I think you said 41,000, is that the profit

20  that Dr. Ruan had been making per month at the dispensary or is

21  that the overall cost?

22  A   That is the profit.

23  Q   I'm going to show you now what has been marked as

24  Government's Exhibit 28-2 through 28-7.

25         Would you please look at these documents and see if

 1   can you identify them for the Court, what these documents are?

 2   A   Yes, this is some of the contracts between Industrial

 3   Pharmacy Management as well as Comprehensive Rx and Dr. Ruan

 4   and Dr. Couch.

 5   Q   And does this grouping encompass all of the contracts that

 6   IPM and CRx had or is this some of the contracts?

 7   A   I think it's some.  I don't see the initial contract with

 8   Dr. Couch.

 9           MR. BODNAR:  United States moves to admit Government's

10   Exhibit 28-2 through 28-7.

11           MR. KNIZLEY:  No objection.

12           THE COURT:  All right.  Mark it in.  Mark them in

13   evidence.

14       (Government's Exhibits 28-2 through 28-7 were entered into

15   evidence.)

16   BY MR. BODNAR:

17   Q   Mr. Manfuso, when you began working or when IPM began

18   working with Dr. Ruan and Dr. Couch, were contracts signed

19   about what service was going to be provided by IPM?

20   A   Yes.

21   Q   I'm going to show you now what has been admitted as

22   28-2.  And is this a copy of one such contract?

23   A   Yes, it is.

24   Q   And flipping to the last page, first, to identify which

25   contract, or second to the last page, what is the -- when were

3376

1   these contracts signed -- or this contract signed?

2   A   Initially March 1st, 2011, by Dr. Ruan.

3   Q   And what is the company name that it's signing for?

4   A   Ruan Companies, LLC.

5   Q   And Industrial Pharmacy Management, is that the IPM we were

6   talking about?

7   A   Correct.

8   Q   Who is Michael Drobot?

9   A   He was the owner of Industrial Pharmacy Management and my

10  direct boss.

11  Q   Where was he located?

12  A   Southern California.

13  Q   Now, flipping back, is this the first contract that IPM had

14  with Dr. Ruan?

15  A   Yes.

16  Q   Who negotiated this contract, if you know?

17  A   I did.

18  Q   With whom?

19  A   Primarily with Dr. Ruan.

20  Q   Was there a similar contract for Dr. Couch?

21  A   Yes, there was.

22  Q   Who negotiated the contract for Dr. Couch?

23  A   Dr. Ruan.

24  Q   With you as well?

25  A   Correct.

CHRISTOPHER MANCUSO - DIRECT BY MR. BODNAR

1  Q   All right.  So looking here at the top, who is the

2  agreement between?

3  A   Ruan Companies and Industrial Pharmacy Management.

4  Q   And Ruan Companies, do you know, is that something

5  different than PPSA, their practice?

6  A   I actually don't know.

7  Q   Looking down, what does it say -- well, are these

8  whereases, is this explaining why the contract was going to

9  take place in the first place?

10 A   Yes.

11 Q   Appointment of the manager, is that -- is that IPM?

12 A   Yes, it is.

13 Q   Okay.  So could you please read paragraph one for the jury?

14 A   Appointment of the manager.  Physician shall hereby engage

15 as manager to implement and maintain a dispensing program in

16 physician group's various offices and places of practice for

17 physician group's patients covered under the state of Alabama

18 workers' compensation program.

19 Q   And does this discuss about opening up the dispensary at

20 PPSA or that they are going to have a manager that maintains

21 the dispensary?

22 A   Yes.

23 Q   Where was the dispensary, which location of PPSA?

24 A   I believe it's called Springhill.

25 Q   Have you ever been there before?

1   A    I have.

2   Q    This paragraph two, does that identify what the duties of

3   the manager will be?

4   A    Yes, it does.

5   Q    Can you explain what was it, how did it work once a

6   contract was set up between IPM and Ruan Companies, how did the

7   billing and the purchasing of the drugs work?

8   A    Initially, actually we established a formulary.

9   Q    Can you explain to the jury what is a formulary?

10  A    A formulary's a list of medications that doctors are going

11  to keep on their shelves to provide to their patients.

12  Q    And by the shelf, do you mean basically what the doctor is

13  going to keep in stock in that dispensary?

14  A    Correct.  In the appropriate locked cabinet.

15  Q    And once the formularies come up -- well, who decided on

16  what was going to be in the formulary?

17  A    The doctors,

18  Q    And which doctors in particular are we talking about?

19  A    Dr. Ruan.

20  Q    Once the formulary was created, what was IPM's role in

21  terms of stocking the dispensary?

22  A    As far as stocking and ordering, we trained their staff and

23  they have a technician who would order the medications from the

24  repackager, which is the supplier of the prepackaged

25  medications.  (Indicating.)

3379

```
 1   Q    Is a repackager similar to what's called a wholesaler?
 2   A    Yes.
 3   Q    A third party from which drugs are purchased, not the
 4   actual manufacturer?
 5   A    Correct.
 6   Q    So how were these drugs actually ordered?  Did IPM order
 7   the drugs under their own DEA number?
 8   A    No.  The medications were ordered under the physician's DEA
 9   number.
10   Q    Which physician's DEA numbers?
11   A    Dr. Ruan was the physician that we used for the appropriate
12   forms.
13   Q    So once the drugs were ordered under Dr. Ruan's number, how
14   were the drugs paid for initially?
15   A    Industrial Pharmacy Management, or eventually my company
16   when I took over, would pay the supplier and then that money,
17   that amount of money, would be deducted from that month's
18   reimbursement to the physicians.
19   Q    So just in terms of getting the drugs into the dispensary,
20   say if they are ordered under Dr. Ruan's number, and then the
21   bill comes to IPM in California?
22   A    Correct.
23   Q    What is the next step?  How is bills collected then and
24   paid for?
25   A    So the physician -- I'm sorry.  The practice would provide
```

```
 1   Industrial Pharmacy Management with the billing information and
 2   our electronic software would track what was dispensed so we
 3   would know what to bill.  So we would go ahead and bill the
 4   medication that was dispensed on behalf of the practice.
 5   Q   So in a given month, let's say a hundred thousand dollars
 6   came in from billing.  How does it work with the money coming
 7   out from the purchase, that you guys already purchased the
 8   drugs?  Can you explain an example of how this works for the
 9   jury?
10   A   Sure.  Given a hundred thousand-dollar example, generally
11   there's a management fee.  Our management fee's around 30
12   percent.  In this case it was 30 percent.  So if a hundred
13   thousand dollars was reimbursement for the medication, we would
14   take our 30 percent management fee, 30 -- $30,000, and then
15   that would leave $70,000.  And if $30,000 of medication was
16   purchased, that would be deducted as well and the physician
17   would be left with $40,000.
18   Q   And is that the way your contracts typically -- well, did
19   you have other contracts with other doctors elsewhere in the
20   United States?
21   A   Yes, and that's generally how they worked.  This particular
22   contract is different in that there is a minimum set.
23   Q   And is that what is explained in paragraph four?  I'll show
24   you here.  (Indicating.)
25   A   Correct.  The minimum of $45,000.
```

1    Q   So explain here -- that 70,000 accumulated -- 70 percent

2    accumulated cash profit, is that what you were talking about

3    before, IPM takes its 30 percent management fee, and then cash

4    after expenditures, so then subtract out the cost that you paid

5    for the drugs on the front end?

6    A   Yes.

7    Q   Tell us about this part up here though (indicating).

8    A   So, this was unique to this contract, in that we had to

9    provide Dr. Ruan and Dr. Couch -- this particular contract,

10   Dr. Ruan some level of assurance that he would make more than

11   he was making with the previous vendor, Linear Solutions.

12   Q   Explain how this clause limits Dr. Ruan's or eliminates

13   Dr. Ruan's risk of loss.

14   A   The way it's supposed to be done legally is --

15           MR. KNIZLEY:  Objection as to legal conclusion.

16           THE COURT:  Overruled.

17   BY MR. BODNAR:

18   Q   You can answer the question.

19   A   The way it's supposed to be done legally is you stick with

20   the formula, that you get a fee, and whatever is produced is

21   what's produced.  We set an artificial floor of $45,000.

22   Q   So does this mean that Dr. Ruan couldn't get any less than

23   $45,000 a month?

24   A   Correct.

25   Q   If he went above the amount -- could he get over $45,000 a

3382

1   month?

2   A   Yes.

3   Q   Was this money paid to PPSA, the business?

4   A   It was paid to the name on the contract.

5   Q   Did Dr. Couch have a similar guarantee in his contract?

6   A   Yes.

7   Q   Can you explain that to the jury, do you recall what his

8   initial guarantee was?

9   A   I believe it was $15,000.

10   Q   Who negotiated the guarantee for Dr. Couch which is

11   different than Dr. Ruan's?

12   A   Dr. Ruan.

13   Q   Did you have negotiations directly with Dr. Couch about his

14   level of guarantee?

15   A   Not directly, no.

16   Q   Was this guarantee supposed to be only for a short time

17   period?   (Indicating.)

18   A   I believe in this particular contract it's for the length

19   of the contract.

20   Q   Were there other contracts where it was set up just for a

21   term of months?

22   A   Yes.   In subsequent contracts I convinced Dr. Ruan that I

23   needed to get away from the guarantee because I didn't think it

24   was fair.

25   Q   Why didn't you think the guarantee was fair?

CHRISTOPHER MANGUSO - DIRECT BY MR. BODNAR

 1   A   Because it wasn't -- we weren't making any money for our

 2   services.

 3   Q   And by we, do you mean IPM wasn't?

 4   A   Correct.

 5   Q   Why would that be -- why would IPM not make money for their

 6   services because of this guarantee?

 7   A   Basically all the money was going to the client.

 8   Q   Why did you have the guarantee in the contracts with

 9   Dr. Ruan and Dr. Couch?

10   A   It was the only way to get their business.

11   Q   What do you mean?  Please explain that to the jury.

12   A   They had worked at the previous company, Linear Solutions,

13   and were making a large amount of money.  And Dr. Ruan was an

14   extremely aggressive and difficult negotiator and the only way

15   I could get the business was to guarantee that he would get at

16   least 45, he would definitely get more every month than the

17   previous vendor.

18   Q   Were you trying to induce Dr. Ruan and Dr. Couch to sign up

19   with you by guaranteeing them money?

20   A   Yes.

21   Q   In your other contracts nationwide were these guarantees in

22   there?

23   A   No.

24   Q   I'm going to show you now what has been admitted as

25   Government's Exhibit 28-3.  Is this a subsequent amendment to

1    the contract we just saw, to the March 5th, 2011, agreement?

2    A   Yes, it is.

3    Q   And just flipping to the last page, who is this amendment

4    for?

5    A   Ruan Companies and Industrial Pharmacy Management.

6    Q   Again signed by Michael Drobot?

7    A   Correct.

8    Q   What is the change being made here in paragraph four now?

9    A   The amount of the minimum is being increased from 45,000 to

10   $53,000 per month.

11   Q   Does this mean that Dr. Ruan was guaranteed a minimum of

12   $53,000 a month?

13   A   Yes, it does.

14   Q   And are we talking about just money coming from the

15   dispensary?

16   A   Yes.

17   Q   I'm going to show you now what has been admitted as

18   Government's Exhibit 28-4.  And at the top is this another

19   contract between Ruan Companies and IPM?

20   A   Yes, it is.

21   Q   And I'll turn to the last page so you can see the date on

22   it.  Is this the April 2013 contract?

23   A   Yes, it is.

24   Q   Again, between Ruan Companies and Industrial Pharmacy

25   Management?

1    A    Yes.

2    Q    Is this contract similar to the first one we saw, with

3    changes to paragraph four in them?

4    A    Yes.

5    Q    This time what's happening in paragraph four?

6    A    What's happening is we're reducing from the guaranteed

7    amount of return each month from $53,000 back down to $45,000

8    and we're eliminating it after three months.

9    Q    Why did you implement a lower guarantee and this time only

10   limit it to three months?

11            MR. KNIZLEY:  Your Honor?

12   A    I was able to convince --

13            MR. KNIZLEY:  Excuse me.  Your Honor, I'll object to

14   his reason why unless he's disclosed it to someone.   I object

15   to his testimony as to why he did something unless that was

16   disclosed to someone else, undisclosed mental operation.

17            THE COURT:  Overruled, overruled.

18   BY MR. BODNAR:

19   Q    Were you involved in the negotiation of this contract?

20   A    Yes.

21   Q    Why was it that it was lowered to 45,000 guaranteed and

22   only for the first three months of the contract?

23   A    I was receiving pressure from my -- the owner of Industrial

24   Pharmacy Management to reduce the guarantee because we weren't

25   making any money.  I was able to convince Dr. Ruan to reduce it

 1   from 53 to 45 and to eliminate it after 90 days.

 2   Q   What happened after the 90-day period?

 3   A   Then it went to the formula we discussed, the 70-percent

 4   formula.

 5   Q   Were contracts then renegotiated adding in additional

 6   guarantees?

 7   A   Once Comprehensive Rx started, yes.

 8   Q   And was Comprehensive Rx the company that you mentioned

 9   that you then owned?

10   A   Yes.

11   Q   Without going through each one of these exhibits, I'm going

12   to show you now one.  This is Government's Exhibit 28-7.  Is

13   this a similar contract between Physicians Compounding

14   Solutions and -- well, in this case, Comprehensive Rx?

15   A   Yes, it is.

16   Q   And who is signing this contract?

17   A   Dr. Couch and myself.

18   Q   And were you the owner of Comprehensive Rx at this time?

19   A   I was.

20   Q   And did this contract work in a similar way to the Dr. Ruan

21   ones we just saw, with the guarantee?

22   A   I believe so.  Could I see section four, please?

23   Q   (Complying.)

24   A   Yes, this had a minimum of $20,000 in the first three

25   calendar months.

1   Q   Again, with that guarantee, could Dr. Couch in this case

2   get any less than $20,000 a month from the dispensing?

3   A   No.

4   Q   What would happen if, after costs were deducted and the 30

5   percent management fee, there was only $10,000 left?

6   A   He would still get $20,000.

7   Q   Have you had an opportunity to review these contracts

8   before you came in and testified today?

9   A   Yes.

10  Q   Were any of these contracts between IPM or Comprehensive Rx

11  with PPSA, the medical practice?

12  A   I don't believe so.

13  Q   Approximately how many years were you involved with

14  Dr. Ruan and Dr. Couch and their dispensary?

15  A   The first contract was dated 2011, I guess until the FBI

16  raid in 2015.

17  Q   So approximately a little over four years?

18  A   Correct.

19  Q   During that time period did you exchange emails

20  predominantly with Dr. Ruan about the dispensary?

21  A   Yes, I did.

22  Q   I show you now what has been marked as Government's

23  Exhibits 28-8 through 28-26.  Please take a look at these and

24  see if you are able to identify what these documents are for

25  the Court.

3388

1  A   These are emails regarding the dispensary between myself,

2  Dr. Ruan, and in some cases Laura Terranova and Dr. Couch.

3        MR. BODNAR:  United States moves to admit Government's

4  Exhibit 28-8 through 28-26.

5        MR. KNIZLEY:  No objection.

6        MR. ESSIG:  Your Honor, we have an objection to 28-2

7  and we would like to approach, proffer additional basis.

8        THE COURT:  All right.

9        MR. BODNAR:  28-2 is not in here.

10        THE COURT:  This is 28-8 through 26.

11        MR. ESSIG:  I'm sorry.  28-8, then.  I'm sorry.  28-8.

12        THE COURT:  So you still have an objection?

13        MR. ESSIG:  Yes, ma'am.

14        THE COURT:  Come forward.

15     (At the side bar, jury not present.)

16        MR. ESSIG:  All right.  Judge, same objection as

17  before.  We've got some additional authority to cite for the

18  Court.  One of the cases is an Eleventh Circuit case, it is

19  United States versus Schwartz.  The cite, Your Honor, is 541 F.

20  3d, 1331, an Eleventh Circuit case from 2008.  And in that

21  case, Your Honor, the Eleventh Circuit stated this specific

22  analysis of the Bruton issue:  A defendant's confrontation

23  right is violated when the Court admits a codefendant statement

24  that in light of the government's whole case compels a

25  reasonable person to infer the defendant's guilty.  That's our

1    basic argument, Your Honor.

2          Also the Eleventh Circuit has extended the Bruton

3    analysis beyond confessions and also the case law indicates

4    that the Eleventh Circuit has not limited it to the context of

5    coconspirator statements or codefendant statements that are in

6    furtherance of the conspiracy.

7          And I would note a couple of cases -- one case for the

8    Court's consideration.  One is United States versus Turner, 474

9    F. 3d 1265.  Direct quote from the Eleventh Circuit -- and

10   that's a 2007 case, Your Honor -- is that the Bruton errors in

11   that case occurred during the testimony of two of the

12   government's witnesses, Robert Parrish, who had been William

13   Broxton's cellmate in jail, and Lakisha Thorp, who had used

14   drugs on several occasions, with Broxton.

15         So based on those facts in those cases, Your Honor,

16   Bruton's not limited to confessional statements.  It extends to

17   out-of-court statements that violate the confrontation clause

18   because they are being related by a coconspirator or a

19   codefendant.  So on that basis, Your Honor --

20         THE COURT:  This is still -- this is still a statement

21   in furtherance of the conspiracy made during the course of the

22   conspiracy.  So I overrule your objection.

23         MR. ESSIG:  Yes, ma'am.

24      (Government's Exhibit 28-8 through 28-26 were entered into

25   evidence.)

1      (In open court, defendants and jury present.)

2  BY MR. BODNAR:

3  Q   Mr. Manfuso, when you first started working with Dr. Ruan

4  and Dr. Couch, were you aware if they owned a pharmacy?

5  A   Initially they did not own a pharmacy, but shortly

6  thereafter they established a pharmacy.

7  Q   And just to be clear, is this pharmacy different than what

8  we're talking about, about the IPM dispensary?

9  A   Yes, completely separate.

10 Q   In fact, actually can you give the jury a picture of what

11 the IPM dispensary looked like in the Springhill office?

12 A   There's an employee in that office that we trained from the

13 practice to dispense the medications, had a small desk, working

14 area, there was a computer terminal which housed a bar code

15 scanner, and there was a cabinet with two or three locks on it

16 as well as a security camera to keep an eye on the cabinet as

17 far as theft, et cetera, a small room where the medications

18 were stored in those locked cabinets.

19 Q   So this wasn't the size of a normal pharmacy?  Or was this

20 the size of a normal pharmacy?

21 A   No.  In fact, it was about the size of an exam room in a

22 doctor's office.

23 Q   Early on in your relationship with Dr. Ruan and Dr. Couch,

24 was there some confusion by Dr. Couch regarding why use the

25 dispensary when they could write prescriptions and just send

 1   them to a pharmacy?

 2   A   Yes.

 3   Q   I'm going to show you now what has been admitted as

 4   Government's Exhibit 28-8.  Is this a chain of emails where

 5   Dr. Ruan relays to you about some concerns from Dr. Couch?

 6   A   Yes, it is.

 7   Q   I'm going to show you up here at the top.  Is this an email

 8   from Dr. Ruan to you?

 9   A   Yes.

10   Q   Would you please read that to the jury?

11   A   Hi, Chris.  Dr. Couch may have heard from others or from

12   Sallie, our pharmacist, that we probably will make more when we

13   use our pharmacy.  I told him yesterday about the prepackage

14   billing staff.  He said someone told him now it is the same,

15   whether prepackaged or buy in bulk.  I told him we signed one

16   year with IPM and you told me our numbers are very good.  But

17   he asked what the numbers are, which I have no clue.  He told

18   me he has been writing more than before and he likes to know

19   how we are doing.  Can you let me know where we are?  I told

20   him before we have a lot more potentials with you all.  Can you

21   give me an update?

22   Q   And did you respond to Dr. Couch to explain why it was a

23   dispensary could be more profitable?

24   A   I do believe I replied to that email, yes.

25   Q   I'm going to show you now -- is this your reply from July

3392

1    20th, 2011?

2    A   Yes, reply to Dr. Ruan.

3    Q   And I'll move it down as we need.  Can you please explain

4    what you told Dr. Ruan?

5    A   Read it or explain?

6    Q   Yes, would you please read it?

7    A   Dr. Ruan, Dr. Couch is very pleased with the report that I

8    shared.  However, if he still wants to know more about how IPM

9    can make you more money than a pharmacist, please let me know.

10   I'd be happy to speak with him about why we can make so much

11   more money for you than if you use your own pharmacy.  Recall

12   that, one, companies like IPM and Linear use repackaged

13   medication.

14   Q   I'll stop you there for a minute.  Is Linear the company

15   you were talking about before that Dr. Ruan and Dr. Couch used

16   before they contracted with you?

17   A   Yes, our competitor.

18   Q   Okay.  Please continue.  The billed amount?

19   A   The billed amount for repacked medication is about a

20   hundred percent higher than when you buy bulk medication from

21   original manufacturers.  I have attached a comparison of a few

22   popular medications to illustrate my point.  Please see

23   attached.  Two, your pharmacist is using software that connects

24   to a clearinghouse.  When you use a clearinghouse there is no

25   ability to negotiate with the payor and you end up with the

1    same situation that you had with Linear -- with Linear where

2    the clearinghouse tells you that you can't dispense to a

3    certain payor any longer.  Also many clearinghouses have very

4    low-contracted reimbursements from insurance companies, so

5    you'll get paid little when you do get paid.

6    Q    This middle part where you're talking about issues that

7    they had with Linear, are you aware of what issues Dr. Ruan or

8    Dr. Couch previously had with Linear?

9    A    When they were with Linear, they had a large number of

10   insurance companies that refused to pay for office-dispensed

11   medications.  So Dr. Ruan and Dr. Couch had to stop dispensing

12   to the patients of those work comp carriers.

13   Q    Can you please explain why, why would these particular

14   insurance companies not pay for workers' comp under Linear?

15   A    Linear did not negotiate with the insurance companies.  So

16   it was kind of a yes or no answer.  So the insurance company

17   said:  If you're not going to give us a discount, we won't

18   allow you to dispense to our patients.

19   Q    And was that different under IPM?

20   A    Yes.  IPM had the ability to negotiate and provide

21   discounts to the workers' comp carriers.

22   Q    In the state of Alabama can a doctor direct a workers'

23   compensation patient to use their dispensary?

24   A    No.  The patient has the right to choose where they get

25   their medications.

```
 1   Q   At some point did it come to your attention that patients
 2   at PPSA were not being given the choice of whether to go to the
 3   dispensary or go elsewhere?
 4           MR. KNIZLEY:  Your Honor, I object.  It calls for
 5   hearsay without some further foundation.
 6   BY MR. BODNAR:
 7   Q   Without saying what anyone told you, did you become aware
 8   of that?
 9   A   Yes.
10           MR. KNIZLEY:  Same objection, Your Honor.
11           THE COURT:  Overruled.
12   BY MR. BODNAR:
13   Q   After you became aware of it, did you voice your concern to
14   Dr. Ruan and Dr. Couch?
15   A   Yes, I did.
16   Q   I'm going to show you what has been admitted as
17   Government's Exhibit 28-9.  Is this an email from you to
18   Dr. Ruan?
19   A   Yes, with a cc to my then-employee, Laura Terranova.
20   Q   And we've heard about her.  But how did she fit into the
21   picture here?  Explain that to the jury.
22   A   Laura, I was Laura's boss.  I was the vice president of
23   IPM.  Laura lived here locally and was kind of the boots on the
24   ground, the sales rep that covered the southeast and primarily
25   in her home state of Alabama.
```

1  Q   And is the subject Right to Choose in Alabama?

2  A   Yes, it is.

3  Q   And I see it says addressed to Dr. Ruan and Dr. Couch.  But

4  is Dr. Couch actually on this email?

5  A   I don't see his address, no.

6  Q   Can you please read for the jury what it was that you told

7  Dr. Ruan, with Couch not being on the email?

8  A   Hello, Dr. Ruan and Dr. Couch.  I am reminding all of our

9  Alabama clients that in the state of Alabama the patient has a

10  right to choose where they want to get their medications.  An

11  insurance company is not allowed to force the patient to use a

12  certain pharmacy or pharmacy service.  Conversely, a doctor is

13  also not allowed to force the patient to get their medications

14  dispensed from the office.  If the patient chooses to get their

15  medications filled outside the office, the physician has to let

16  them do so.  I am writing my Alabama -- I am writing my Alabama

17  to remind them of this law to prevent any issues with

18  carriers.  Some carriers have complained that doctors are

19  telling their patients that they have to get their meds from

20  them, and that isn't allowed.  As long as the doctors of

21  Alabama give their patients the right to choose where to get

22  their meds filled, they will be in good standing.  When

23  patients are informed that it is their choice where to get

24  their meds filled and that nobody is allowed to tell them what

25  pharmacy to use, they will fill their meds in the doctor's

3396

1   office 99 percent of the time.  Talk to you soon.

2   Q   If a workers' compensation patient was seen at PPSA but

3   chose to fill their prescription not at the dispensary but just

4   at a Rite Aid, how would that affect the profit for IPM?

5   A   There would be less money, less profit.

6   Q   Would it necessarily affect the profit for Dr. Ruan and

7   Dr. Couch?

8   A   Not -- not necessarily, because there was guarantees.

9   Q   During your time working with Dr. Ruan and Dr. Couch, was

10  there discussion, frequent discussion, about the volume

11  of drugs being dispensed?

12  A   Yes.

13  Q   Was that typical with your other doctors you dealt with

14  around the country?

15  A   Extremely atypical.

16  Q   And by atypical, what do you mean?

17  A   I had no other practices in my dozen or so years in this

18  industry that would monitor the volume to that degree.

19  Q   Did you have any other pain management doctors?

20  A   Yes.

21  Q   And approximately how many doctors over your 12 years did

22  you deal with outside of Dr. Ruan and Dr. Couch?

23  A   Hundreds.

24  Q   And are those doctors across the United States?

25  A   Yes.

1   Q   I'm going to show you now what has been marked or admitted

2   as Government's Exhibit 28-10.  Is this an email from Dr. Ruan

3   to you?

4   A   Yes, it is.

5   Q   And what's going on here in this email?

6   A   Dr. Ruan is telling me that he's calculated that we're

7   dispensing -- they are dispensing 704 medications per month.

8   Q   And did you have any understanding of how often Dr. Ruan or

9   Dr. Couch saw workers' compensation patients?

10   A   It was my understanding that workers' compensation patients

11   were seen once a week on Wednesdays.

12   Q   So per month would that be four to five times a month

13   depending on how many Wednesdays there are?

14   A   Correct.

15   Q   How does this number, 704, compare -- well, first, what is

16   that 704?  Is that 704 pills?

17   A   It's 704 bottles, actual prepackaged bottles.

18   Q   Does that make a difference if it's a bottle of 90 pills or

19   a bottle of 30 pills or is it just one bottle is one bottle?

20   A   It does.  One bottle could be for 30 days, one bottle could

21   have enough pills in it for 90 days.

22   Q   But would they still be considered one bottle or would they

23   be considered multiple bottles?

24   A   Still one bottle.

25   Q   How does this average compare with what you saw from your

```
 1    other doctors across the country?
 2           MR. KNIZLEY:  Objection.  Relevance.
 3           THE COURT:  Overruled.
 4    BY MR. BODNAR:
 5    Q    How does this average compare with your other doctors you
 6    saw?
 7    A    Extremely high.
 8    Q    Does that include amongst other pain management doctors?
 9    A    Yes, it does.
10    Q    Did you and Dr. Ruan have email exchanges concerning drops
11    in the number of bottles prescribed per month?
12    A    Yes.
13    Q    I'm going to show you what has been admitted as
14    Government's Exhibit 28-11.  Is this an email from you to
15    Dr. Ruan?
16    A    Yes, it is.
17    Q    Again, why is it that you would include Laura Terranova on
18    these emails?
19    A    She was the local sales rep who had a direct relationship
20    with the account.
21    Q    And here what are you and Dr. Ruan discussing?
22    A    Drop in volume.
23    Q    Is that the 525 bottles that month?
24    A    Yes.
25    Q    Would that include bottles from just Dr. Ruan or also
```

1   Dr. Ruan and Dr. Couch?

2   A   We had separate accounts -- separate counts.

3   Q   If you recall, do you recall which doctor was prescribing

4   on average more bottles per month?

5   A   Dr. Ruan.

6   Q   Was Dr. Chen also prescribing or dispensing at the

7   dispensary?

8   A   I believe Dr. Chen prescribed towards the very end.

9   Q   How did his numbers compare with Dr. Ruan and Dr. Couch, if

10  you know?

11  A   Extremely small.  It was infrequent that he used the

12  program.

13  Q   And would you reach out to Dr. Ruan when the numbers were

14  good, when the bottle numbers were good?

15  A   Yes.

16  Q   I show you now what's been admitted as Government's Exhibit

17  28-12.  Is this such an email?

18  A   Yes, it is.

19  Q   Why is it important to know for your end of the business

20  how many bottles were dispensed in a month?

21  A   Generally the revenue follows the number of bottles, so the

22  more bottles, the more revenue.

23  Q   Were there differences in the revenue depending on what

24  kind of bottle it was, what kind of drug was in that bottle?

25  A   Yes.

CHRISTOPHER MANFUSO - DIRECT BY MR. BODNAR

1   Q   Can you explain how the price variances worked to the jury?

2   A   Meaning as far as comparing different medications?

3   Q   Yes.

4   A   Some medications would have a profit margin of just a few

5   dollars, some would have a profit margin of several hundred

6   dollars.

7   Q   Would you and Dr. Ruan ever have discussions about the

8   profit margin on particular drugs?

9   A   Yes.

10  Q   In what context were those discussions had?

11  A   Generally as part of negotiations.

12  Q   What about in terms of what should be on the formulary?

13  A   Yes, in discussions regarding formulary.

14  Q   Can you explain to the jury how those discussions went with

15  Dr. Ruan?

16  A   Initially when we started providing the service in 2011, we

17  reviewed the formulary and Dr. Ruan asked us to provide

18  alternatives of medication that they currently -- or they were

19  not dispensing with Linear, additional medications.

20  Q   What if anything did he tell you that he wanted to know

21  about these additional medications?

22  A   The profit margins.

23  Q   Throughout your time working with Dr. Ruan was that a

24  frequent discussion, about profit margins of various drugs?

25  A   Yes.

3401

1   Q   Compared to other doctors you dealt with, was that typical

2   or not typical?

3   A   Atypical.

4           MR. KNIZLEY:  Your Honor, objection as to relevancy.

5           THE COURT:  Overruled.

6   BY MR. BODNAR:

7   Q   I'm sorry.  I didn't hear your answer.  Compared to other

8   doctors, was this typical or not typical?

9   A   Atypical.

10  Q   And does that mean not typical?

11  A   Correct.

12  Q   Were there times where Dr. Ruan would ask you how much or

13  would ask for sum totals of how much he had earned to a

14  specific date?

15  A   Yes.

16  Q   I'm going to show you what has been admitted as

17  Government's Exhibit 28-24 [sic].  Is this such an email?

18          THE COURT:  What's the number?  What's the number?

19          MR. BODNAR:  I'm sorry 28-14.

20  Q   Is this an email from you to Dr. Ruan?

21  A   Yes, it is.

22  Q   And how much are you telling Dr. Ruan that he earned in the

23  year 2012?

24  A   $626,791.86.

25  Q   And does that come strictly from the monthly paid amount

CHRISTOPHER MANFUSO - DIRECT BY MR. BODNAR

3402

```
 1    from IPM?

 2    A    Yes.

 3    Q    Did you have similar conversations with Dr. Couch?

 4    A    I believe so.

 5    Q    Did Dr. Ruan reach out to you to ask also for what

 6    Dr. Couch's numbers were?

 7    A    Yes.

 8    Q    Did Dr. Couch ever reach out to you to find out what

 9    Dr. Ruan's numbers were?

10    A    No.

11    Q    I'm going to show you now what has been admitted as

12    Government's Exhibit 28-15.  Is this an email chain between

13    yourself and Dr. Ruan?

14    A    Yes, it is.

15    Q    Starting here at the bottom, is this an email from you to

16    Dr. Ruan with the subject line Couch?

17    A    Yes.

18    Q    Is Dr. Couch included on this email?

19    A    No.

20    Q    What was it that you told Dr. Ruan about Dr. Couch?  Could

21    you read that, please?

22    A    Hello, Dr. Ruan.  I will be in touch with you soon to get

23    you started with my company, Comprehensive Rx.

24    Q    And is that the company we had talked about, which was the

25    predecessor to IPM?
```

3403

```
 1   A   No, that is my company.

 2   Q   And you took over when you left IPM?

 3   A   Correct.

 4   Q   I think you started when you left IPM?

 5   A   Correct.

 6   Q   Okay.  In the meantime, can you please continue?

 7   A   In the meantime, Dr. Couch's checks are below.  If

 8   Dr. Couch is willing to work with me for at least six months, I

 9   can guarantee him 17K for three months and then he will get 70

10   percent of the cash received minus the meds and tech.  Please

11   let him know.

12   Q   And continue on down at the bottom, what you're telling him

13   about Dr. Couch's amount he received.

14   A   Total Dr. Couch received from IPM is $574,997.76.

15   Dr. Couch had an 18K guarantee initially and then a 15K

16   guarantee.  Last few months he has not had a guarantee and he's

17   made 16, 22, and 19.  Averaged 19K for the last three months.

18   Q   And was this part of the negotiations you had with Dr. Ruan

19   about Dr. Couch's contract?

20   A   Yes.

21   Q   When if ever did you negotiate directly with Dr. Couch for

22   Dr. Couch's contract?

23   A   I never did that.

24   Q   And does Dr. Ruan tell you what he thinks that you should

25   give Dr. Couch instead?  Up here on the next chain up on the
```

CHRISTOPHER MANFUSO - DIRECT BY MR. BODNAR

3404

1  email?  (Indicating.)

2  A   Yes, Dr. Ruan's requesting Dr. Couch get a monthly

3  guarantee of $20,000 for three months.

4  Q   And are you willing to do that?

5  A   I believe I say yes.  Yes, Dr. Ruan, I can do 20.

6  Q   During the course of your business dealings with Dr. Ruan

7  and Dr. Couch, were there times that Dr. Ruan brought up what

8  the competitors were offering him?

9  A   Yes, constantly.

10  Q   Can you please explain what was occurring?

11  A   Dr. Ruan would either contact or be approached by my

12  competitors, who would then promise him to make him more money

13  than my company was making him.  So then Dr. Ruan would come

14  back to me and either threaten to quit, try to quit, and then

15  we'd end up negotiating again.

16  Q   And by negotiate, do you mean start a new contract?

17  A   Correct.

18  Q   In exchange for him not quitting, what did you put in those

19  contracts?

20  A   Guarantees.

21  Q   Mr. Manfuso, during this time period, where were you

22  physically located for work?

23  A   State of Maryland.

24  Q   Did you ever come down here to Mobile, Alabama?

25  A   Yes, I believe approximately a dozen times over that

 1    timespan.

 2    Q    Is that roughly once every three months?

 3    A    Yes.

 4    Q    Why were you coming down to Mobile every quarter?

 5    A    Dr. Ruan was just never satisfied or happy with the

 6    business and I had to fly down to try to keep it, keep him

 7    happy.

 8    Q    How often did you fly -- did you have other doctors

 9    elsewhere in the country?

10    A    Yes, I believe approximately 69 different contracts.

11    Q    How often did you fly elsewhere to visit those doctors?

12    A    Sometimes never, very infrequently.

13    Q    Was there any other doctor that you flew to 12 times?

14    A    No.  This was very abnormal.

15    Q    Would you provide Dr. Ruan information about particular

16    drugs in order to convince him not to go with your competition?

17    In terms of profit margin?

18    A    Yes.

19    Q    I'm going to show you now what has been admitted as

20    Government's Exhibit 28-16.  Is this an email from you to

21    Dr. Ruan entitled Meds?

22    A    Yes.

23    Q    And starting in that second paragraph, what is it that

24    you're telling Dr. Ruan?  Could you please read this for the

25    jury?

1  A   The paragraph starting:  I wanted?  Or:  Also?

2  Q   Yes, with I wanted.

3  A   I wanted to pass along some information.  Your program is

4  starting to pull in good cash.  I don't want you to pull too

5  many patients or Rx away from IPM to Trident, because we

6  haven't reached the peak yet with your monthly check.  If you

7  start pulling --

8  Q   Let me stop you there for a second.  Who is Trident?

9  A   Trident is a competitor.  And in fact, it's a former

10  employee of Linear who I took the business from.

11  Q   And why is it that you were concerned that he was going to

12  pull patients or prescriptions from IPM to Trident?

13  A   Dr. Ruan told me that he was going to give Trident some

14  business because they had two medications that I hadn't offered

15  him.

16  Q   And is that what you go down and explain here further?

17  A   Correct.  The cyclobenzaprine 7.5 and the Ultram ER.

18  Q   And could you continue with:  If you start pulling away?

19  Or pulling --

20  A   If you start pulling the Rx away, we won't ever know what

21  you could have truly made under IPM's model.  We still need

22  another three or four months to see what you are ultimately

23  going to make with the contract.  Also I think you should be

24  cautious in moving too many of your patients over to Trident's

25  cyclobenzaprine 7.5 milligrams and Ultram, as the insurance

3407

 1  co's are aware that these meds have high reimbursement.

 2  Perhaps it's safer for you to give those meds to new patients

 3  than it is to switch existing patients?  You may need to

 4  justify that the medication that they were previously taking

 5  from IPM (Soma, Ultram 50 milligram, et cetera) wasn't working

 6  and that there is a reason to switch to the other meds that

 7  cost the work comp carrier more to reimburse.  I just want you

 8  to be careful.

 9  Q   I want to turn now to Government's Exhibit 28-17.  Did you

10  have continued discussions about what you could do for Dr. Ruan

11  so that he wouldn't go to Trident?

12  A   I'm sorry.  The answer is -- there you go.  Sorry.

13  Q   28-17, is this an email between you and Dr. Ruan regarding

14  the drugs we just talked about?

15  A   Yes.

16  Q   What did you tell Dr. Ruan here?

17  A   I will order all the new meds (cyclo 7.5, Ultram ER 150, et

18  cetera) next week.  Please use up all of Trident's meds and

19  then you can use our meds only after their inventory is

20  gone.  You can use Trident for the medical foods only.  IPM can

21  also buy the meds off of you/Trident and put them in our

22  program.  Do you want to do that instead of using them up with

23  Trident?  I also wanted to let you know that you received your

24  last guaranteed check (45K) last month.  This month's check is

25  for $41,769 and it should grow quite a bit as the collections

1    build up under the new contract and as we add cyclo 7.5 and

2    Ultram ER 150, et cetera, where you can.  We are going to make

3    really good money, Dr. Ruan.

4    Q   Why those two drugs in particular, cyclobenzaprine 7.5 and

5    Ultram ER 150?  Why are these two drugs focuses of multiple

6    emails?

7    A   These were two new variations of very popular drugs that

8    remimbursed much higher than their predecessors.  For instance,

9    cyclobenzaprine five milligrams and 10 milligrams are very

10   popular but don't pay anywhere near what the 7.5 pays.

11   Q   And can you explain to the jury, what do you mean by the

12   reimbursement rate of why one would pay better than another?

13   Is there a cost and then a rate?  Can you explain all that to

14   the jury?

15   A   Yeah.  The state of Alabama sets the reimbursement based on

16   a drug's -- what's called an average wholesale price.  And

17   basically the average wholesale price for cyclobenzaprine 7.5

18   was considerably higher than that of the cyclobenzaprine five

19   milligrams or 10 milligrams.

20   Q   And would workers' compensation typically pay close to if

21   not what the AWP was?

22   A   Yeah, their regulation from Alabama is to pay a hundred

23   percent of the reimbursed amount based on the AWP.

24   Q   And would the AWP be significantly higher than what the

25   drug could be purchased for and put in Dr. Ruan's dispensary?

 1   A   Yeah, like -- yes.

 2   Q   Was one of the reasons that you took your trips down here

 3   to Mobile to help convince Dr. Ruan to stay with IPM as opposed

 4   to jump to Trident?

 5   A   Frequently, yes.

 6   Q   What kind of pressure were you receiving from your bosses

 7   at IPM about that?

 8   A   He was my biggest account, so lots of pressure.

 9   Q   By he, do you mean Dr. Ruan?

10   A   Pardon me.  No.  My boss and the owner of my employer,

11   Michael Drobot, Jr.

12   Q   Explain that again, please.

13   A   I'm sorry.  I may have confused the question.  Would you

14   reask it?

15   Q   Yes.  What kind of pressure was put on you from Michael

16   Drobot, Jr., regarding to make sure you keep Dr. Ruan and

17   Dr. Couch?

18   A   A lot of pressure.  It was our biggest account, and so I

19   was constantly trying to negotiate with Dr. Ruan to make it

20   work for us.

21   Q   Did Michael Drobot, Jr., ever tell you to make it happen?

22   A   Yes.

23   Q   What did you take that to mean?

24           MR. KNIZLEY:  Your Honor, I object to what he took --

25           THE COURT:  Sustained.

BY MR. BODNAR:

Q   On your trips down there, did you meet with Dr. Ruan in person?

A   Yes.

Q   Where would you meet with Dr. Ruan?

A   Generally either in the office in Springhill, come in the side door and kind of go right to the office, or at a restaurant, I think commonly Osaka.

Q   I'm going to talk -- well, when you were meeting with him at the office, do you mean at PPSA or physically in Dr. Ruan's office within PPSA?

A   Physically in Dr. Ruan's office.

Q   And is that the same as a patient exam room or is it an office with a desk and computer?

A   It's an office with a desk and computer.

Q   Approximately how many times did you meet with him in the office?

A   Probably six.

Q   During those times what if anything did you observe with regard to nurse practitioners while you were in the office with Dr. Ruan?

A   The nurse practitioners would interrupt the meeting to get signatures for prescriptions.

Q   Would Dr. Ruan sign those prescriptions while you were there?

1    A    Yes.

2    Q    Was there discussion about patient care going on between

3    the nurse practitioners and Dr. Ruan while you were in the

4    meeting with him?

5    A    Very briefly.

6    Q    Now, you mentioned Comprehensive Rx.  Could you please

7    explain to the jury why it was that you went and formed

8    Comprehensive Rx?

9    A    My previous employer, Industrial Pharmacy Management, was

10   raided by the FBI.

11   Q    And what happened after IPM was raided by the FBI?

12   A    The owner pled guilty to paying kickbacks.

13   Q    Who was that owner?

14   A    Michael Drobot, Jr.

15   Q    Do you know or did you ever discuss with Dr. Ruan the FBI

16   raid on IPM?

17   A    Yes, we did.  He was concerned about it.

18   Q    What if anything did he voice concern about with you?

19   A    He was concerned that the FBI had raided, you know, my

20   employer.

21   Q    Once the FBI raided IPM, what did you do?

22   A    I started my own company.

23   Q    And was that Comprehensive Rx?

24   A    Yes.

25   Q    How did you get your clients or how did you get clients for

CHRISTOPHER MANCUSO - DIRECT BY MR. BODNAR

1  Comprehensive Rx?

2  A   Generally I purchased all of my previous -- my accounts

3  from my previous employer, including Dr. Ruan and Dr. Couch's

4  accounts.

5  Q   And then did you negotiate new contracts on behalf of

6  Comprehensive Rx with Dr. Ruan and Dr. Couch?

7  A   I did.

8  Q   In those cases did you ever negotiate with Dr. Couch

9  directly?

10  A   No.

11  Q   Who did negotiations on Dr. Couch's behalf?

12  A   Dr. Ruan.

13  Q   Compared to what Dr. Ruan was receiving on a monthly basis,

14  what was Dr. Couch receiving?

15  A   Less.

16  Q   Was it significantly less?

17  A   Significantly, yes.

18  Q   I'm going to show you now what has been admitted as

19  Government's Exhibit 28-19.  Is this an email between yourself

20  and Dr. Ruan regarding the switchover to Comprehensive Rx?

21  A   Yes.

22  Q   And could you please read for the jury -- and I'll move it

23  up as we go -- what is it that you're telling Dr. Ruan?

24  A   Hello, Dr. Ruan.  I will be sending you a contract to sign

25  today for my new company, Comprehensive Rx.  Below is an

1    explanation of the timing of the change from IPM to

2    Comprehensive Rx and what checks you will receive.  This week

3    you will receive a check for $23,834 for October

4    dispensing.  This is another low check from IPM, so I'm going

5    to give you another $15,000 for signing the new contract, a

6    total of $38,834.

7              December:  You will receive a check from IPM for

8    November dispensing.

9              January:  You will receive a check from IPM for

10   December dispensing.  This will be your last check from IPM.

11             February through April you will receive $50,000

12   guaranteed each month for three months.

13             May through July you will receive 70 percent of the

14   cash received from the program, less medication price and

15   tech.  I will send you the contract later today once my

16   attorney has completed.  Have a great day.

17   Q   And again, these guarantees, is that similar to the

18   guarantees we saw before for IPM?

19   A   Yes.

20   Q   This email dated November of 2013, did Dr. Ruan's monthly

21   guarantee increase even beyond $50,000?

22   A   The guarantee did increase, yes.

23   Q   To what point did it increase?  If you recall, what was the

24   maximum amount guaranteed to him per month?

25   A   We had a verbal agreement for a guarantee of $80,000.

1   Q   And was that ultimately paid, 80,000 a month?

2   A   Yes.

3   Q   After he received the 85,000 -- $80,000 a month, was there

4   further negotiations to reduce that down?

5   A   There was.  I told -- I told Dr. Ruan it was just too much

6   and I wasn't making any money.

7   Q   What was the -- what did Dr. Ruan tell you?

8   A   We agreed to $75,000, but I asked for there to be some

9   level of volume, because I didn't want to be paying him if he,

10  for instance, went on vacation.  And he said it would be

11  $75,000, and if I do more -- I think there was a number of low

12  700 bottles per month -- if I do more than that number, it goes

13  up.  If I do less, it stays the same.

14  Q   So is that essentially another guarantee he won't get less

15  than $75,000?

16  A   Yes.

17  Q   With your Comprehensive Rx doctors, did you have these

18  guarantees built in any other contracts?

19  A   No.

20  Q   Did Dr. Chen negotiate on his own behalf with IPM?

21  A   No.

22  Q   Who negotiated on Dr. Chen's behalf?

23  A   Dr. Chen did not have a contract with either of my

24  companies.

25  Q   Did there come a time where Dr. Ruan asked you about

1    Dr. Chen using the program?

2    A   Yes.

3    Q   I'm going to show you now what has been admitted as

4    Government's Exhibit 28-20.  Is this an email chain, first,

5    between yourself and Dr. Ruan and Laura Terranova?

6    A   Yes, it is.

7    Q   Is Dr. Chen or Dr. Couch anywhere on that email?

8    A   No.

9    Q   What are you telling Dr. Ruan?

10   A   Go ahead and read?

11   Q   Yes, please.

12   A   Hello, Dr. Ruan.  I am happy to add Dr. Chen to your

13   program.  Please have him use the IPM program.  We don't want

14   him sending his patients to your pharmacy, as this will cause

15   work comp carriers to question why one of the doctors in your

16   practice uses the pharmacy in the lower billings while you and

17   Dr. Ruan [sic] use the IPM dispensary.

18   Q   And did you -- it appears that you meant to say Dr. Couch

19   there.  Is that what you would have meant?

20   A   Yes; correct.

21        We will need to add Dr. Chen beneath your contract or

22   Dr. Couch's contract.  I assume that I should put Dr. Chen into

23   your contract?  Basically this just means that all of his money

24   comes to you and you can do with it what you please.  You can

25   pay him some of it, or not.  Dr. Chen will not be able to see

CHRISTOPHER MANFUSO - DIRECT BY MR. BODNAR
3416

```
 1    any of the financial information and he will not receive any
 2    money from IPM.  If you want to pay Dr. Chen a part of what he
 3    produces for you, it will be easy for you to see how much he's
 4    dispensing each month and how much it's generating for you.  We
 5    break out our financial statements each month by each doctor,
 6    so you will see how many bottles he dispensed, how much they
 7    billed for, and how much we collected on his behalf.  Please
 8    confirm if I should include Dr. Chen beneath your program and
 9    we'll get started.
10    Q   And at the top did he answer you, Dr. Ruan answer you,
11    about Dr. Chen?
12    A   Yes.  He replied:  That will be fine.  Add Dr. Chen under
13    my -- will be fine as long as he will not see how much I am
14    doing.  Dr. Ruan.
15    Q   Was this a frequent concern for Dr. Ruan, about not having
16    others see how much he got from -- how much money he made from
17    IPM?
18    A   Yes.
19    Q   Was he concerned about Dr. Couch knowing how much money he
20    made?
21    A   Yes.
22    Q   I'm going to show you now what has been admitted as
23    Government's Exhibit 28-21.
24            And at the bottom is this an email between you and
25    Dr. Couch now this time?
```

3417

1   A   Could you scroll down just a tiny bit?

2   Q   This part right here.  (Indicating.)

3   A   Okay.  Yes.

4   Q   Mentioning that a financial statement is attached?

5   A   Yes.

6   Q   Moving up in the chain of emails, what does Dr. Couch say

7   to you?

8   A   Great, Christopher.  That's very good and exciting

9   news.  We'll keep working and growing it.  Thanks for the

10  information and keep the updates coming.

11  Q   Did you share that information with Dr. Ruan, then, without

12  Dr. Couch being on the email?

13  A   Yes.

14  Q   What did you say?

15  A   Dr. Ruan, Dr. Couch is very pleased.

16  Q   And what did Dr. Ruan say to you without Dr. Couch being on

17  the email?

18  A   Thanks, don't share mine with him.

19  Q   And by mine, do you know what he was talking about?

20  A   His amount, his amount of money he was getting.

21  Q   Did there come a time where you learned that Dr. Ruan's IPM

22  check was observed by somebody else?

23  A   Yes.

24  Q   I'm going to show you now what has been admitted as

25  Government's Exhibit 28-22.  Is this an email from Dr. Ruan to

3418

1    you?

2    A   Yes.

3    Q   And what does he say?

4    A   Hi, Chris, can you please make sure that the check be sent

5    to my home address, not company.  Also please put it in an

6    envelope saying confidential.  I hate -- others open it.  This

7    one was opened by other and they saw it.  Dr. Ruan.

8    Q   And what's the date on this email?

9    A   July 26, 2011.

10   Q   Thereafter, on the 26th, what was the plan so that someone

11   wouldn't inadvertently open up Dr. Ruan's check again?

12   A   We sent it to his home.

13   Q   Sent the check to his home?

14   A   Yes.

15   Q   I'm going to show you now what has been admitted as

16   Government's Exhibit 28-23.  And at the bottom of this chain is

17   this an email from you to Dr. Ruan and Laura Terranova on that

18   same day, the 26th?

19   A   Yes.

20   Q   Of 2011?

21   A   Yes.

22   Q   What did you tell Dr. Ruan?

23   A   Dr. Ruan, I will call you shortly.  I am very sorry that

24   someone from your staff opened the envelope and saw the

25   check.  This will not happen again.  I want to make sure that

CHRISTOPHER MANFUSO - DIRECT BY MR. BODNAR

3419

1   you know that we took measures to prevent this situation when

2   we started the program.  We had you fill out the attached form

3   that said exactly where to send the financial statements and

4   checks to each month.  That document is attached to this email

5   and it says to send everything to your office, attention Ken

6   Cross.  Clearly this is not where you'd like the checks and

7   statements to go, so we will make a change immediately so this

8   does not happen again.  Please tell me the address where you

9   would like the check sent.  If you would like it sent to your

10  home, please indicate that address.  Please also tell me where

11  Dr. Couch would like his checks sent.  I will call you

12  shortly.  Again, my apologies and concerns.

13  Q   And does Dr. Ruan respond with what's redacted here as his

14  home address?

15  A   Yes.

16  Q   Did Dr. Couch ever send you his home address to send his

17  checks to?

18  A   Yes, he did.

19  Q   And did that information for Dr. Couch's house also come

20  through Dr. Ruan?

21  A   I believe so.

22  Q   And I'll show you what has been admitted as Government's

23  Exhibit 28-24.  Is this an email from Dr. Ruan to you with

24  Dr. Couch cc'd?

25  A   Yes.

3420

```
 1   Q   And at this point does he give you what has been redacted
 2   as Dr. Couch's home address to send the checks to?
 3   A   Yes.
 4   Q   Was there a time that Dr. Ruan wanted to switch which
 5   company his checks were being sent to?
 6   A   Yes.
 7   Q   Did he ask for it to be sent to PPSA, the business itself?
 8   A   No.
 9   Q   I'm going to show you what has been admitted as
10   Government's Exhibit 28-25.  Is this an email from Dr. Ruan to
11   you regarding a change of address?
12   A   Yes, it is.
13   Q   And what does he say?
14   A   Hi, Chris, can you change the upcoming check to XLR
15   Properties, LLC, instead of Ruan Companies, LLC.  I want to use
16   XLR Properties, LLC, instead.  Can you issue the next check to
17   XLR Properties, LLC?  Dr. Ruan.
18   Q   Did Dr. Ruan ever explain to you why it was he wanted this
19   change?
20   A   Yes.  He told me he was getting divorced and didn't want
21   his wife to know about the money.
22   Q   And this in '13, did this continue to be a concern for
23   Dr. Ruan, that others not learn how much he was making from
24   IPM?
25   A   Yes.
```

3421

1    Q    I'm going to show you what has been admitted as

2    Government's Exhibit 28-26.  Is this an email to Dr. Ruan from

3    you?

4    A    Yes.

5    Q    Actually starting at the bottom, is this an email from

6    Dr. Ruan to you?

7    A    Yes.

8    Q    Is this April of 2015?

9    A    Yes, April 23rd.

10   Q    What was it that Dr. Ruan told you?

11   A    No.  By the way, I was trying to tell you our management

12   team -- get bonus on how much PPSA generate.  [sic.]  Those

13   work comp dispensing does not count.  Also, they are not aware

14   how much Dr. Couch and I get from work comp dispense.  So when

15   you are -- communicate with them, make sure keep that

16   confidential.  They care more about how much PPSA generate,

17   anything other than that they are less interested.  We do not

18   plan to do DNA testing onsite.  Dr. Ruan.

19   Q    And did you respond?

20   A    I responded:  Okay, Dr. Ruan, I will keep that confidential

21   between just you and me, Dr. Ruan.

22   Q    Mr. Manfuso, you said you had an attorney represent you

23   prior to you pleading guilty in this case; is that correct?

24   A    Correct.

25   Q    Can you explain to the jury what was your conduct that was

1  illegal?

2  A   Paying kickbacks to get and keep the business.

3  Q   What do you mean, paying kickbacks?  What aspect of the

4  contracts led you to pleading guilty today?

5  A   By removing the risk for the doctor, we paid a guaranteed

6  amount, which is illegal to get and keep the dispensing

7  business.

8        MR. BODNAR:  One moment, Your Honor.

9     (A discussion was held off the record between government

10  counsel.)

11  BY MR. BODNAR:

12  Q   Mr. Manfuso, do you know approximately when the discussions

13  occurred about the $80,000 guarantee and then later the 75,000

14  guarantee to Dr. Ruan?

15  A   Approximately the last six months of the program prior to

16  the FBI raid on the office.

17  Q   So would that be late 2014 or early 2015?

18  A   Yes.

19  Q   Did Dr. Couch ever make anywhere near $80,000 a month in

20  guarantees?

21  A   No.

22  Q   I saw emails that mentioned checks.  Is that how Dr. Ruan

23  and Dr. Couch were paid by IMP and then later Comprehensive Rx?

24  A   Yes.

25  Q   When the checks were from IPM, do you know where they were

1  mailed from?

2  A  Where they were mailed from, from IPM?  From California.

3  Q  And received here in the state of Alabama?

4  A  Yes.

5  Q  When was Comprehensive Rx -- how were the payments made?

6  Was it done by wire transfer or done by check?

7  A  Also by check.

8  Q  Where were the checks sent from at that time?

9  A  My business partners in California.

10  Q  So at all times the checks came from somewhere in

11  California?

12  A  Correct.

13  Q  Prior to your testimony here today, did you have an

14  opportunity to go back and look at what the total amount paid

15  to Dr. Ruan and Dr. Couch were from IPM and Comprehensive Rx?

16  A  Yes.

17  Q  Starting first with Dr. Couch, what was the total amount

18  paid from IPM and CRx, Comprehensive Rx, to Dr. Couch?

19  A  $864,770.41.

20  Q  Mr. Manfuso, I notice a lot of people were taking notes.

21  Could you say it a little bit closer, please?

22  A  I apologize.  $864,770.41.

23  Q  Were you able to look up and see the amount paid to

24  Dr. Ruan as well and could you please tell us slowly?

25  A  Yes.  $1,765,132.46.

```
 1  Q   And what was the total amount paid by IPM and Comprehensive
 2  Rx to Dr. Ruan and Dr. Couch?
 3  A   $2,629,902.87.
 4  Q   And was that money paid solely for drugs dispensed --
 5  solely because of the dispensary as opposed to C&R Pharmacy or
 6  any other part of the practice?
 7  A   Yes.
 8          MR. BODNAR:  Nothing further for this witness, Your
 9  Honor.
10          THE COURT:  All right.  We're going to take our
11  morning break at this time.  Leave your pads on your
12  chairs.  Remember my instructions not to discuss the case.  And
13  take your break downstairs.  We will call you back up in about
14  15 minutes.
15          We are in recess.
16      (A recess was taken at approximately 10:30 a.m.)
17      (In open court, 10:53 a.m., defendants and jury present.)
18          THE COURT:  All right, Mr. Knizley.
19                      CROSS EXAMINATION
20  BY MR. KNIZLEY:
21  Q   Good morning, Mr. Manfuso.
22  A   Good morning.
23  Q   My name is Dennis Knizley, and I represent Dr. Ruan.  You
24  told the ladies and gentlemen of the jury that when you first
25  became involved with Dr. Ruan that you worked for an entity
```

CHRISTOPHER MANFUSO - CROSS BY MR. KNIZLEY

1  known as IPM; is that correct?

2  A   Yes.

3  Q   And I believe you told us that entity was owned by a

4  Michael Drobot?  Is that the pronunciation?

5  A   Yes.

6  Q   It had been also owned by his father?

7  A   Previously.  He had since sold his shares.

8  Q   And did you work for the entity while Mr. Drobot, Sr., also

9  owned it?

10 A   I don't recall the time line.

11 Q   In about 2010 was when the sale took place?  Does that

12 sound right?

13 A   That sounds about right.

14 Q   And what was your position in 2011 with IPM?

15 A   Vice president.

16 Q   Vice president of what?

17 A   My title was the current vice president, I was involved in

18 sales.

19 Q   Okay.  And you were based in Baltimore, Maryland, or

20 somewhere around the Maryland area?

21 A   Correct.

22 Q   And you told the ladies and gentlemen of the jury that you

23 had, aside from Dr. Couch and Dr. Ruan, you had other

24 physicians which you also had relationships with; is that

25 right?

CHRISTOPHER MANFUSO - CROSS BY MR. KNIZLEY

3426

1   A   Yes.

2   Q   And you said that what you did was manage workmen's

3   compensation dispensaries; is that correct?

4   A   Correct.

5   Q   And in Alabama the workmen's compensation rate for the

6   medications that are dispensed is set by the state; is that

7   correct?

8   A   Correct.

9   Q   So it doesn't matter what the price is that you purchase it

10  or what profits anyone may make, the cost of the medication to

11  the state is always going to remain the same, is it not?

12  A   The cost is based on the average wholesale price.

13  Q   Right.

14  A   So, but different manufacturers of the same product have

15  different average wholesale pricers.  So you can have a wide

16  range of prices for the same medication.

17  Q   But the state of Alabama sets the reimbursement rate, does

18  it not?  Isn't that what you told us on direct?

19  A   They do set it, but the variable is which medication is

20  submitted.

21  Q   Sure.

22  A   So you could have an ibuprofen that reimburses at $75 or

23  $90 and they both would be based on the fee schedule.

24  Q   But that rate, 70 or 90, for the ibuprofen is a fixed rate

25  that cannot be changed?

CHRISTOPHER MANFUSO - CROSS BY MR. KNIZLEY

3427

1  A   The formula can't be changed.  But each manufacturer

2  establishes their own reimbursement amount.

3  Q   And before Dr. Ruan entered into the March 5th, 2011,

4  agreement with IPM, he had been doing business with Linear

5  Medical Solutions; is that correct?

6  A   It's my understanding, yes.

7  Q   And that's Mr. Jeff Bowen?

8  A   He's the owner, yes.

9  Q   And you are familiar with that company; right?

10 A   Yes, competitor.

11 Q   As Trident was a competitor of yours?

12 A   Correct.

13 Q   And did you learn that Linear Medical solutions had been

14 managing Dr. Ruan's workmen's compensation dispensary for about

15 five years previous to your involvement?

16 A   That sounds about right.

17 Q   And Mr. Drobot was your competitor; right?

18 A   Yes.

19 Q   He wanted to keep the business, I suppose?

20 A   Yes.

21 Q   And you wanted to get the business, I suppose?

22 A   Yes.

23 Q   And I suppose you wanted to get it because it was

24 profitable?

25 A   Hopefully, yes.

3428

1    Q    And was there a distinction in what Mr. Bowen and Linear

2    Medical Solutions was doing and what you contemplated doing in

3    the sense of schedule II controlled substances?

4    A    Yes, I believe -- I believe --

5    Q    I'm sorry.

6    A    Sorry.

7    Q    Go ahead and tell the ladies and gentlemen of the jury.

8    A    I believe with Linear Solutions they did not keep the

9    schedule II narcotics onsite.

10   Q    And so then when the workmen's compensation dispensary was

11   managed by Linear, those schedule II controlled substances came

12   from some other place; right?

13   A    They were mailed directly to the patient; correct.

14   Q    And Linear didn't have anything to do with that; right?

15   A    That is incorrect.  It's my understanding that Linear

16   mailed the class II medications directly to the patient,

17   something called a drop ship.

18   Q    Okay.  But you were going to have a different plan when IPM

19   came along; is that right?

20   A    Correct.

21   Q    Y'all were going to have it onsite?

22   A    Correct.

23   Q    It was more profitable too as well; right?

24   A    Possibly, yeah.  More medications, more profit.

25   Q    Hopefully; right?

CHRISTOPHER MANFUSO - CROSS BY MR. KNIZLEY

1   A   (Nodding head affirmatively.)

2   Q   So what you had contemplated was a more profitable

3   dispensary than what Linear had?

4   A   Yes, that's what Dr. Ruan was interested in.

5   Q   And that's what you wanted too; right?

6   A   Yes.

7   Q   Now I'm going to show you what's been marked into evidence

8   as Government's Exhibit 28-2.  That was the first agreement.

9   I'll flip it to the back.  That was the first agreement, on

10  March 5th, 2011, between Industrial Pharmacy Management, IPM,

11  and Dr. Ruan; is that correct?

12  A   Yes.

13  Q   And you negotiated that agreement; is that right?

14  A   Yes, I did.

15  Q   And prior to that time you had told Dr. Ruan how you felt

16  you could make more money in the dispensary than your

17  predecessor did?

18  A   I did, yes.

19  Q   Now, let's go over the agreement and go over a few things

20  in here.  By the way, a lawyer drafted this; right?

21  A   Pardon me?

22  Q   A lawyer drafted this; right?

23  A   Yes.

24  Q   And a lawyer drafted each of these contracts; would that be

25  fair to say?

3430

1   A   Yes.

2   Q   Does that lawyer work for IPM or was he a private lawyer or

3   do you know?

4   A   It's contracted.  IPM -- he had his own firm.  He wasn't

5   in-house, but he was contracted to work for IPM.

6   Q   Okay.  He was an outside lawyer.  He did work for IPM, but

7   it was like the law firm was on retainer that they always used

8   to do that?

9   A   That's correct.

10   Q   Is that right?

11   A   Yes.

12   Q   What -- where was that law firm, if you recall?

13   A   Jerry Sparks is the name of the lawyer.  I think it's

14   called Sparks Law.

15   Q   Okay.  I said where was it?  In California?

16   A   California.

17   Q   All right.  So the Physician Office Dispensing Program

18   Claims Purchase and Assignment Agreement that was between

19   Dr. Ruan's company and Industrial -- IPM, it first makes the

20   citation that there was not enough retail pharmacies that would

21   accept workmen's comp claims; is that correct?

22   A   Yes.

23   Q   And that's a little difficult sometimes because retail

24   pharmacies sometimes don't want workmen's comp cases; right?

25   A   Correct.

1   Q   And you have told that jury earlier that; right?

2   A   Right.

3   Q   And, of course, Dr. Ruan can -- because he's a physician,

4   it's unlawful for him to dispense pharmaceuticals in this

5   state; right?

6   A   Yes.

7   Q   And also it was determined that it would probably be

8   convenient, as you told us on direct, that for the people that

9   were getting the workmen's compensation prescriptions, to have

10   those prescriptions filled onsite; is that correct?

11   A   Yes.

12   Q   Not only for the convenience of the location, but I think,

13   as you told the jury earlier, for convenience of the fact that

14   sometimes they just -- other pharmacies wouldn't take it;

15   right?

16   A   Correct.

17   Q   And this sentence right here, manager, now, who are they

18   referring to in the contract there?  (Indicating.)

19   A   Industrial Pharmacy Management.

20   Q   Okay.  And y'all have expertise in doing what?

21   A   It says managing pharmacies.  It should say dispensaries.

22   Q   Okay.  But either one.  But do you have experience in

23   managing pharmacies too?

24   A   No.

25   Q   Or just dispensaries?

CHRISTOPHER MANFUSO - CROSS BY MR. KNIZLEY

1   A   Just dispensaries.

2   Q   All right.  But you're a manager that has some expertise in

3   managing what should say dispensaries; right?

4   A   Correct.

5   Q   And y'all have a program that y'all offer the physicians'

6   groups; is that right?

7   A   Right.

8   Q   For the managing of the dispensary?

9   A   Correct.

10  Q   And because of these reasons, then, this contract says that

11  there's going to be an appointment of a manager; right?  Is

12  that right?

13  A   Yes, it is.

14  Q   And that's not an appointment of an owner or anything else.

15  The job that you're being appointed -- your company's being

16  appointed to do is manage a dispensary?

17  A   Yes.

18  Q   And the duties of you, as the managing -- whose dispensary

19  is it?

20  A   The doctor owns his own dispensary.

21  Q   And that would apply to Dr. Ruan?

22  A   Yes.

23  Q   And Dr. Couch?

24  A   Yes, it would.

25  Q   Y'all didn't own anything?

1    A    Correct.

2    Q    And whose medicines were bought -- or who bought the

3    medicines?

4    A    Doctors buy their own medicines.

5    Q    And whose DEA number do you use?

6    A    The doctors'.

7    Q    And whose medicine is it?

8    A    The doctors'.

9    Q    So y'all don't own the company -- excuse me -- y'all don't

10   own the dispensary, you don't own the medicine, you don't pay

11   for the medicine, that belongs to the doctor; right?

12   A    Correct.

13   Q    The chairs and tables and stuff and the location, it all

14   belongs to the doctor?

15   A    Yes.

16   Q    Y'all are simply managers?

17   A    Right.

18   Q    And that's what the contract says; is that correct?

19   A    Yes.

20   Q    And y'all would do things like y'all would identify some

21   pharmacy vendors and see who has the product out there and see

22   if you can't get it purchased; right?  And purchased at a good

23   price too; right?

24   A    Yeah.

25   Q    And y'all do the labels, record keeping, and stuff in the

CHRISTOPHER MANFUSO - CROSS BY MR. KNIZLEY

3434

1    pharmacy, y'all -- that's what managing the pharmacy is; is

2    that correct?

3    A    Correct.

4    Q    Okay.  And y'all are going to make sure that you keep it

5    properly inventoried, because that's the manager's job; right?

6    A    Yeah.

7    Q    Stock and inventory?

8    A    Correct.

9    Q    Okay.  And, now, this formulary, inventory of formulary

10   products, you told us on direct examination -- and who decides

11   what products are going to be in there?

12   A    Physicians.

13   Q    And in the case of Dr. Ruan, did he make those decisions?

14   A    Yes, he did.

15   Q    And he was in control of the dispensary; is that correct?

16   A    What do you mean by control?

17   Q    Well, if something was going to be purchased -- you managed

18   it, but at the direction of Dr. Ruan?

19   A    Yes.

20   Q    He approved everything?

21   A    Correct.

22   Q    Okay.  Because it was his pharmacy?

23   A    Dispensary.

24   Q    Excuse me.  Dispensary.

25   A    (Nodding head affirmatively.)

CHRISTOPHER MANFUSO - CROSS BY MR. KNIZLEY

1    Q   And another thing you did was that you billed and collected
2    in the name of the physician group under what?
3    A   The state of Alabama's work comp program.
4    Q   Okay.  And are you familiar with that?
5    A   Yes.
6    Q   It's a state program, is it not?
7    A   Yes.  The work comp is administered by the state.
8    Q   Okay.  And y'all bill and collect -- y'all did billing and
9    collection of what?
10   A   For the medication claims.
11   Q   And whose money were you billing for and collecting?
12   A   The doctors, physicians.
13   Q   Not your money, not IPM's money?
14   A   That was the physicians' money.
15   Q   Now, on the second page, like you've already told us, who
16   does it say has the responsibility for purchasing --
17   A   It reads:  The physician group shall purchase the product
18   necessary for the dispensing program.
19   Q   And was that in fact the truth?
20   A   We would advance them the funds and then deduct those funds
21   from their reimbursement.
22   Q   So who paid for it?
23   A   We paid up front and then they paid us back.
24   Q   Who ultimately paid for it?
25   A   Physicians.

1  Q   And so this is true, is it not, in here the physicians

2  group had the responsibility for the purchase of the products

3  for the dispensing program?  Financial responsibility?

4  A   I'm sorry.  Can you reask the question?

5  Q   All right.  I think you told us that you may advance the

6  money, but it is taken out of the physician's money that you

7  collect; right?

8  A   Correct.

9  Q   So the physician pays for the medications?

10  A   Yes.

11  Q   And owns the medications?

12  A   Yes.

13  Q   Now, on the first contract you had, it had this $45,000

14  guaranteed or $70,000 accumulated profit; right? (Indicating.)

15  A   (No response.)

16  Q   Now, you told the ladies and gentlemen of the jury that

17  that was -- I think you told them that that was -- you took

18  your 30 percent first; is that correct?

19  A   30 percent of what's collected, yes.

20  Q   Total collections?

21  A   (Nodding head affirmatively.)

22  Q   Did you add onto the back of this an example of how that

23  might work?  And before we go there, let's read this a little

24  bit further.

25  A   Actually, I'd need to see that.

1    Q    And I'll show it to you.  I'm not --

2    A    Okay.  Only because --

3    Q    -- I just want to read the front here and then we'll go to

4    the back part.  Okay?

5    A    Okay.

6    Q    And the front part says 70 percent of the accumulated cash

7    profit -- what does it say right there?  (Indicating.)

8    A    After expenditures.

9    Q    So, at least reading this, we're not taking the total

10   receipts.  We're going to take the expenditures out first;

11   right?  If that's what that says anyway?  Could you read those

12   words there, please?

13   A    Yes.  Cash after expenditures.

14   Q    That's at least what it says right there; right?

15   A    (No response.)

16   Q    All right.  And then could you read the next paragraph for

17   me, please?

18   A    Accumulated cash profit is the total gross collections of

19   all monthly periods after deducting medications purchased and

20   other direct dispensing costs, onsite technicians, if

21   applicable, supplies, et cetera, and a 10 percent charge for

22   billing and collection based on cash collections.

23   Q    Okay, sir.  That really doesn't say that you're getting 70

24   percent of the gross amount, does it?

25   A    No.  I forgot this contract is slightly different than our

1   standard contract.

2   Q   Does your standard contract with these other doctors you

3   were talking about just give you 70 percent off the top?

4   A   Generally, yes.

5   Q   And that would give you a little risk there, wouldn't it,

6   if you didn't get your expenses paid for up front and that sort

7   of thing?

8   A   We don't really have any expenses.

9   Q   Let me see this.  You don't have expenses in the sense of

10  -- let's just look at this.  Okay?  Did you prepare or did

11  someone at IPM prepare this exhibit A to your contract?

12  A   Yes.

13  Q   And this gives an example of what would happen; is that

14  right?

15  A   Yes.

16  Q   Okay.  For an example, if you had a cash collection on one

17  month of a hundred thousand dollars, okay, now, the medications

18  purchased comes off first; right?  Is that correct?

19  A   It does, yes.

20  Q   All right.  Now, this is the money, cash collections, of

21  the doctor's money; right?

22  A   Yes.

23  Q   And out of the doctor's money, first the medications get

24  paid for like we talked about; right?

25  A   Correct.

CHRISTOPHER MANFUSO - CROSS BY MR. KNIZLEY

1    Q   And then leased employees, if your company has any expense

2    for employees, they get paid for; right?

3    A   If the physician has a technician that we're leasing to

4    them, yes, that cost comes out.

5    Q   Okay.  And so if a physician has a technician to dispense

6    the medications in the workmen's compensation pharmacy that is

7    your employee, the physician pays for that?

8    A   No.  It's their -- it's their employee.

9    Q   Okay.  So if their employee comes into the workmen's

10   compensation pharmacy and does the dispensing, you don't have

11   to pay for it?

12   A   Correct.

13   Q   If you lease their employee, they have to pay for it?

14   A   That's in theory, yes.

15   Q   In theory or in reality?

16   A   Sorry.  Yes.

17   Q   And then if you have some incidental supplies, I suggest,

18   maybe you don't have to pay for them either; right?  Is that

19   correct?

20   A   We are not paying for these items, yes.

21   Q   And that would be, I guess, paper items, pens, pencils and

22   stuff like that?

23   A   Correct.

24   Q   And, of course, that's an approximation.  But then you also

25   get another 10 percent, don't you?

1    A    Yes.

2    Q    And that's just for doing the billing?

3    A    Correct.

4    Q    All right.  So however much the billing is, no matter what,

5    every month you get 10 percent of it?

6    A    Yes.

7    Q    And that is whether there's a fixed payment or not fixed

8    payment, that's before we ever get to this question of fixed

9    payment?

10   A    No, no.

11   Q    All right.  Well, let's look at it a little bit further and

12   see.  Okay.  And then cash after expenses, cash profit, okay,

13   and that's after a hundred thousand, you took out the cost of

14   the medications, took out the cost of the employees, we took

15   out your money, your company's money, your 10 percent you got

16   for the billing, and then that was your total cash

17   expenditures, and let's look and see if that's the terminology

18   we used on the back page -- on the other page -- all

19   right.  See that, cash after expenditures; right?

20   A    Yes.

21   Q    Total gross collections after all these deductions -- and

22   let's go back and look at it again.  So at least the example

23   you gave here says after the medication's paid for, the

24   employees, the billing expenses, the $10,000 that goes to your

25   company; right?

3441

```
 1   A   Yes.
 2   Q   All right.  Then we start making this 70-30 split; right?
 3   A   That's what that says, yes.
 4   Q   Well, is that true?
 5   A   In this particular contract, yes.  In most of our
 6   contracts, no.  We were told this was illegal.
 7   Q   Now --
 8   A   After the fact.
 9   Q   -- just a second.  You're not a lawyer, are you?
10   A   No, but we had one.
11   Q   And the lawyer drafted the agreement?
12   A   Correct.
13   Q   Now, back to this.  70 percent to the -- after all these
14   expenses is when this 70-30 we're talking about -- right?
15   A   Correct.
16   Q   So you're not going to -- you don't have to pay any rent?
17   Do you?
18   A   Right.  Correct.  No.
19   Q   It's in the contract; right?
20   A   No rent; correct.
21   Q   The contract says -- what does it say there about the
22   space?
23   A   Physician group shall supply manager with sufficient space
24   to operate program.
25   Q   You don't have to pay any liability insurance or anything,
```

CHRISTOPHER MANCUSO - CROSS BY MR. KNIZLEY

 1   do you?

 2   A   No.

 3   Q   Paragraph six, who has to pay that?  Read that, please,

 4   sir?

 5   A   Physician group shall maintain suitable general business

 6   and professional liability insurance.

 7   Q   So before we ever start talking about the 70-30 split,

 8   you've got no expenses; correct?

 9   A   (No response.)

10   Q   Have I missed one?  Is there an expense you have up there?

11   A   No.

12   Q   So your company's expense-free, plus already made 10

13   percent of collections?

14   A   As long as there's money to collect.

15   Q   Well, was there ever a month there wasn't money to collect?

16   A   Yes.  For instance, the first month.  No money comes in for

17   60 days.

18   Q   After the first month, have you ever had that problem?

19   A   There were lots of months where we paid more than the

20   contract afforded us.

21   Q   I thought you said if there was any money to collect.  Was

22   there ever a month after the first month there wasn't money to

23   collect?

24   A   Perhaps the second month.

25   Q   And after the second -- you're getting started; right?

CHRISTOPHER MANFUSO - CROSS BY MR. KNIZLEY

1   A   Yes, sir.

2   Q   You're beginning the account?

3   A   Yes, sir.

4   Q   But then for the rest of the contract there was always

5   money to be collected, wasn't there?

6   A   Always some money, yes.

7   Q   And some substantial amounts of money; right?

8   A   Over time.

9   Q   All right.  Now, this contract, this first one, provided

10  for that guaranteed payment or 70 percent -- or guaranteed

11  payment of 45 or 70 percent, that was to last a year; is that

12  right?

13  A   I believe this is a one-year contract.

14  Q   Right.  And the subsequent contracts were a little

15  different, were they not?

16  A   They were -- yeah, each contract is different.

17  Q   And most of the subsequent contracts -- and we'll take a

18  look at them -- I believe had three months, a guarantee, then

19  it was back to the 70 percent; is that right?

20  A   Each one was different.  I know one had three months.  I

21  don't recall all of them.

22  Q   Also, although the contract was for a year, it was really

23  just a month-to-month contract, was it not?

24  A   Yeah, you could -- you could terminate without reason in 30

25  days.

3444

1  Q   And if we could just look at that, please, sir?  Could you

2  read paragraph five for us, please?

3  A   Term and termination.  This agreement shall be for a term

4  of one year from the date first written below, with two

5  automatic renewals of one year each, unless one party notifies

6  the other at least 30 days prior to the then current expiration

7  date of its intention not to renew the agreement.  Either party

8  may terminate this agreement with or without cause upon 30 days'

9  prior written notice.

10 Q   So Dr. Ruan could fire your company in 30 days; is that

11 correct?

12 A   Yes, it's correct.

13 Q   And you could get out of the contract in 30 days?

14 A   Both parties could get out in 30 days.

15 Q   Right.  And what you were hired to do, your company, was to

16 manage his money and his pharmacy?

17 A   Manage his dispensary, yes.

18 Q   And whatever money you paid and he received out of that was

19 to come from his own money?

20 A   Correct.

21 Q   So you're giving him his money back?

22 A   So long as there's money to give him.

23 Q   And there always was, wasn't there?

24 A   No.  We actually ran into debt.  So we were handing him our

25 money.

1   Q   You say you ran into debt.  Now, we know we've got the 10

2   percent situation, right?

3   A   On this particular contract?

4   Q   Yes, sir.

5   A   (Nodding head affirmatively).

6   Q   Yes, sir.  Was there a different contract?

7   A   There's several contracts.

8   Q   I show you what's marked as Government's Exhibit 28-2.  And

9   is this the second contract?  Excuse me.  Let me get the

10  government's exhibit.  I show you what's marked as Government's

11  Exhibit 28-3.  And was that the second contract that was

12  actually an amendment to the March 5th contract we just looked

13  at?

14  A   Could I see the date on this one, on the signature page?

15  Q   Sure.  (Complying.)

16  A   I believe this is the second contract with Dr. Ruan.

17  Q   All right.  And it's actually just an amendment to the

18  first contract, is it not?

19  A   Yes, this is.

20  Q   And because the parties are agreeing to amend the original

21  agreement; is that correct?

22  A   Correct.

23  Q   So everything that was in that first contract was in the

24  second one except for this amendment; is that right?

25  (Indicating.)

1   A   Yes.

2   Q   Okay.  We also see in fact our same old language about

3   total gross collections after expenses and 10 percent for

4   billing; is that right?

5   A   Yes, same language.

6   Q   Is that in every one of them?

7   A   No, just the amendment to the first one.  They change.

8   Q   Sir?  You said it is not or is?

9   A   It's -- the language --

10  Q   Do you know?  Maybe I should say that.

11  A   The language in future contracts is different, based on

12  guidance from my attorney that we were to take our fee off the

13  top.

14  Q   Okay.  And when you did that, you could actually make more

15  money by taking it off the top; is that right?

16  A   I'd have to look at the math.

17  Q   Now, you were asked about what you pled guilty to.  You

18  never mentioned the word "kickback" to Dr. Ruan, did you?

19  A   We did not use that word, no.

20  Q   Ever?

21  A   No.

22  Q   Or to Dr. Couch?

23  A   Correct.

24  Q   Or to your boss?

25  A   Correct.

1   Q   Or he to you?

2   A   With relation to these contracts?  We obviously used the

3   word.  It's the management of business.

4   Q   In relation to what you were doing and the business you

5   were in with Dr. Ruan?

6   A   We did not.

7   Q   And your -- and there came a time, you told us, I believe,

8   that you were having competitors trying to get your business;

9   is that right?

10  A   Constantly, yes.

11  Q   Okay.  And would it be fair to say that was because it was

12  a profitable business?

13  A   Yes.

14  Q   It was quite profitable, wasn't it?

15  A   If you had a good contract.

16  Q   And they were offering, at least from Dr. Ruan's

17  perspective, to give him more money than you were giving him;

18  right?

19          MR. BODNAR:  Objection to foundation, Your Honor,

20  about what other companies, competitors, were going to give to

21  Dr. Ruan.

22          MR. KNIZLEY:  I'll rephrase that.

23          THE COURT:  All right.

24  BY MR. KNIZLEY:

25  Q   Trident?

1    MR. BODNAR:  And again, same thing.  He should

2  establish foundation first if he even knows that, Your Honor.

3  BY MR. KNIZLEY:

4  Q   Okay.  Well, did you ever have any conversations with

5  Dr. Ruan toward the end of your relationship with him or even

6  at the time around 2013, early 2014, that Trident wanted to get

7  your business?

8  A   Yes.

9  Q   And was Dr. Ruan telling you that Trident would pay him

10 more than you would?

11 A   He was saying that they would make him more than we would.

12 Q   And did he say that they would give him a fixed amount

13 greater than yours?

14 A   I don't know what they promised him.

15 Q   Okay.  But you do know that, at least from him, he

16 indicated the promise was greater than what you were doing?

17 A   He said that they could make him more money.  I don't know

18 what they promised.

19 Q   As a result of that, you were willing to adjust your

20 management fee; is that right?

21 A   I was willing to pay him more in the kickback.

22 Q   Say it again, please, sir?

23 A   I was willing to pay him more in the kickback.

24 Q   Now, you didn't say:  Dr. Ruan, I'll pay you more of a

25 kickback, did you?

```
 1   A   No, we didn't call it that.

 2   Q   Well, in your contract you called it a management fee;

 3   right?

 4   A   This was above and beyond the management fee.

 5   Q   Well, sir, you entered into a contract with your name on

 6   it; right?  Is that correct?

 7   A   That's correct.

 8   Q   And that was drafted by your lawyer; right?

 9   A   Correct.

10   Q   Who was your lawyer?

11   A   Also Jerry Sparks at the time.

12   Q   Okay.  And Mr. Sparks had been in this business and been

13   drafting these agreements for quite some time; right?  For

14   several years?

15   A   He has experience, yes.

16   Q   And he drafted it over and over and over again; right?

17   A   Correct.

18   Q   The contract between either your predecessor company or

19   your company with Dr. Ruan; right?

20   A   Correct.

21   Q   And the agreement, looking at Government Exhibit 28-6 --

22   we're going to look at one that has your name on.  Government's

23   Exhibit 28-5 has your name on it; right?

24   A   Correct.

25   Q   And you mentioned the word "kickback."  But that's not what
```

 1   your agreement says, is it?

 2   A   No, it isn't.

 3   Q   The agreement says that you're going to manage a clinic --

 4   a dispensary?

 5   A   Correct.

 6   Q   And your agreement says, like all the rest says:  I'm going

 7   to collect the money owed to the doctors; is that right?

 8   A   Correct.

 9   Q   And it's their money; is that correct?

10   A   That's correct.

11   Q   And I'm going to pay them their money; is that right?

12   A   That's what the agreement says, yes.

13   Q   And to sell their drugs, their medicines; right?

14   A   Correct.

15   Q   Out of their building?

16   A   Yes.

17   Q   And that would then be -- if you're paying them money back

18   for selling that, that would be kicking money back to

19   themselves?  Their own money?

20   A   We -- we were giving them part of our management fee

21   because the business did not --

22   Q   Right?

23   A   -- support the amount of money we're giving.

24   Q   Correct.  What you did was you cut your management fee a

25   bit to keep the business; right?

CHRISTOPHER MANFUSO - CROSS BY MR. KNIZLEY

 1   A   Yes.

 2   Q   And that's all you did; right?

 3   A   No; that's not correct.  In response to Trident's

 4   competitive threat, we had a phone conversation, made a verbal

 5   contract with Dr. Ruan to pay him $80,000 a month.  And that

 6   was not on any paper because it was verbal.

 7   Q   Because why?

 8   A   It was verbal.

 9   Q   Right.  You agreed to pay even more because somebody was

10   about to get your business?

11   A   Correct.

12   Q   And they were going to pay, at least according to him, were

13   going to pay more?

14   A   That's what he said, yes.

15   Q   And I guess you think they were doing something illegal

16   too?

17           MR. BODNAR:  Objection, Your Honor, to that question

18   to this witness regarding Trident.

19           THE COURT:  Sustained.

20   BY MR. KNIZLEY:

21   Q   Well, you know that Jeff Bowen and Medical Linear were in a

22   very similar management agreement before you came along; right?

23   A   Yes.

24   Q   And Trident was attempting to get in a similar management

25   agreement and take your business; is that correct?

3452

1    A    That's correct.

2    Q    And the monies you were paying were monies that you had

3    collected that belonged to the doctors?

4    A    Correct.

5    Q    Now, you said you had met several times with Dr. Ruan here;

6    is that correct?

7    A    Correct.

8    Q    And you said you met with him, I think -- how many times do

9    you recall meeting him?  Do you recall?

10   A    About a dozen times.

11   Q    Okay.  And that was over how long a time frame?

12   A    Four, four and a half years.

13   Q    So three times a year?

14   A    Three or four times a year.

15   Q    Was it -- was it routinely each year about that time, was

16   it spread out that way, or if you recall?

17   A    It was about once a quarter.

18   Q    And you met at the Springhill Avenue office?

19   A    There or the restaurants generally.

20   Q    Do you recall how many times you -- when's the last time

21   you met at the Springhill Avenue office, time frame?

22   A    This would have been a few months prior to the raid.

23   Q    Okay.  Now, you do know that Dr. Ruan relocated his office

24   to a different location?

25   A    From --

1   Q    Do you know that?

2   A    -- from where?  I'm not familiar with where he moved.  The

3   last few times we met at Osaka.

4   Q    Okay.  You said a few months before the raid you met at

5   Springhill Avenue; is that correct?

6   A    No.  I said I met him a few months before.  I didn't say

7   where.

8   Q    I'm sorry.  I thought my question was when was the last

9   time you met him at Springhill Avenue?

10  A    I don't recall.  I believe the last few times I met him was

11  actually at Osaka.

12  Q    Now, although the money for the reimbursement, again, was

13  set by the state -- is that correct?

14  A    Yeah, the fee schedule; correct.

15  Q    And you couldn't change it; right?

16  A    Correct.

17  Q    Dr. Ruan couldn't change it?

18  A    Correct.

19  Q    That's the fee schedule; right?

20  A    (Nodding head affirmatively.)

21  Q    Though you did try to get Dr. Ruan to get some various

22  products from time to time that you thought would be less

23  expensive so you could make more money; is that right?

24  A    I actually am not sure what you're saying.

25  Q    Well, the fee schedule never changes, but you can buy it

```
 1   cheaper; right?
 2   A   Sure.
 3   Q   And you tried to do that from time to time, did you not?
 4   A   Sure.  Part of the service is helping the doctor save money
 5   on their inventory cost.
 6   Q   And you'd make more money?
 7   A   No.  Actually in the initial contract, yes.  Subsequent
 8   contracts, no.
 9   Q   Well --
10   A   If you take it off the top, then no.  In the first contract
11   we didn't take it off the top, so your answer is yes.
12   Q   And you offered that a number of times and Dr. Ruan turned
13   you down several times, didn't he?
14   A   I don't recall that.
15   Q   Do you recall having email exchanges with him in connection
16   with certain products?
17   A   I don't know.  We certainly had lots and lots of
18   discussions about products.  I can't tell you --
19   Q   And you don't recall from time to time that Dr. Ruan may
20   have proposed -- you may have proposed a -- you may have
21   proposed to buy a particular product and Dr. Ruan declined to
22   do so?
23   A   You'll have to give me an example.  I'm not following you.
24   Q   Okay.  Do you remember the discussions about the Lidoderm
25   patch?
```

3455

```
 1   A    Yes.

 2   Q    And would that be one of those that you had suggested to

 3   the doctor and he turned you down?

 4   A    No.  He actually added that to the formulary.

 5   Q    Let me see if I can show it to you.  I show you what's

 6   marked as Ruan's Exhibit 175.

 7              MR. KNIZLEY:  And it's not in evidence, Your Honor.

 8              THE COURT:  All right.

 9   BY MR. KNIZLEY:

10   Q    See this?  (Indicating.)

11   A    I do.

12   Q    Now, do you remember, is that an email from you -- excuse

13   me.  I said Lidoderm.  It's really LidoPro Ointment and

14   LenzaPatch.  Do you remember that?

15   A    I do.

16   Q    And is this an email that purports to be from you to

17   Dr. Ruan?

18   A    Yes.

19   Q    And dated May 6, 2014?

20   A    Yes.

21   Q    On that subject matter?

22   A    Yes.

23              MR. KNIZLEY:  Judge, we would offer Ruan's Exhibit

24   175.

25              MR. BODNAR:  No objection, Your Honor.
```

1          THE COURT:  All right.  Mark it in.

2          (Defendant Ruan's Exhibit 175 was entered into evidence.)

3   BY MR. KNIZLEY:

4   Q   Okay.  Now, what do you say in here?

5          THE COURT:  Do you want to wait until the jury can see

6   it?

7          MR. KNIZLEY:  Yes, ma'am.  I'm sorry.

8          THE COURT:  Look at that screen and you will see when

9   they can see it.  There you go.

10          MR. KNIZLEY:  Thank you, Your Honor.

11   Q   What do you tell Dr. Ruan?

12   A   Would you like me to read it to you?

13   Q   Yeah, sure.

14   A   I wanted to give you two attractive options to add to your

15   formulary.  I'm guessing that you are going to want to add

16   them.  LidoPro.  LidoPro is a topical analgesic gel that

17   contains 4.5 percent lidocaine.  Many of my doctors are using

18   it as alternative to brand name Lidoderm patches which contain

19   five percent lidocaine.  The cost of LidoPro is $20.99.  The

20   AWP is $465.85.  This is a very profitable product.  This would

21   most likely replace Dendracin on your current formulary, as you

22   don't need two analgesics and the lidocaine and LidoPro

23   generally makes it a preferred formulation and better payment.

24   The inclusion of lidocaine legitimizes LidoPro in the eyes of

25   payors versus Dendracin.  LenzaPatch.  This product is very

1    similar to LidoPro and it is in a patch form.  The product is

2    four percent lidocaine.  Many of my doctors prescribe LidoPro

3    Gel during the day and LenzaPatches for night/sleeping.  Nobody

4    wants to roll around in bed in the gel, so the patch allows for

5    the application of the lidocaine at night via a clean and easy

6    patch.  The cost is $34 and AWP is $160.

7    Q    And did you later have to write Dr. Ruan again about that?

8    A    I believe there was additional conversation about those

9    products.

10   Q    Could you read that, the top part?

11   A    Just following -- Dr. Ruan, just following up on this email

12   that I sent you.  Are you okay adding these two products to

13   your formulary?  They are alternates to Lidoderm patches and

14   also to Dendracin.  Please let me know.

15   Q    And Dr. Ruan never added those, did he?

16   A    Actually, I disagree.  I believe he did add those.

17   Q    Do you have an email or anything that may concern that?

18   A    I can provide it, but I don't have it with me today.

19   Q    Okay.  But it's your recollection that's what happened?

20   A    In fact he actually -- because he actually asked me how to

21   prescribe it.  He was asking for prescribing information.

22   Q    Okay.

23   A    Because he had added it to the formulary.

24   Q    Now, you had mentioned you had entered a guilty plea in

25   this case; is that right?

3458

```
 1   A   Correct.

 2   Q   And in your guilty plea you have a cooperation agreement;

 3   is that correct?

 4   A   Yes, I do.

 5   Q   And did you understand that there's a guideline range of

 6   punishment that is advisory that you could be exposed to?

 7   A   I do understand there's -- yes.

 8   Q   And did you understand that as a general rule -- or at

 9   least the Courts are advised to follow that guideline range?

10   Do you know that?

11   A   Yes.

12   Q   And there's a low end and a high end?

13   A   Correct.

14   Q   And that generally -- and that one way to request the Court

15   to go below the low end of the guidelines would be by

16   cooperation;  is that right?

17   A   I -- I guess so.  I believe so, yes.

18   Q   Well, I'm going to show you what's been marked as

19   Government's Exhibit 28-1.  And is that your plea agreement?

20   A   Yes, it is.

21   Q   Okay.  And if you recall, you said you recognize that your

22   sentence is subject to advisory guidelines; right?

23   A   Yes.

24   Q   And do you remember this section right here, application of

25   USSG and 5K1.1, do you recall that?
```

1  A   Yes, I do.

2  Q   And that talks about your cooperation with the government;

3  is that right?

4  A   That's right.

5  Q   And the prosecutor asked you that if you fully and

6  completely and truthfully respond to questions, that you could

7  get some favorable treatment; is that right?

8  A   That's right.

9  Q   And that favorable treatment is the government asking that

10 you have a downward departure from those guidelines; is that

11 right?

12 A   I believe so.

13 Q   Well, let's look on page eight.  It says starting -- it

14 says -- if you could start and read that starting at if?

15 A   If the defendant provides full, complete, truthful and

16 substantial cooperation to the United States which results in

17 substantial assistance to the United States in the

18 investigation or prosecution of another criminal offense, a

19 decision specifically reserved by the United States in the

20 exercise of its sole discretion, then the United States agrees

21 to move for a downward departure in accordance with 5K1.1 of

22 the United States Sentencing Guidelines or rule 35 of the

23 Federal Rules of Criminal Procedure, whichever the United

24 States deems applicable.  The United States specifically

25 reserves the right to make the decision relating to the extent

 1   of any such departure request made under this agreement

 2   based -- I actually can't read the rest.

 3   Q   Okay.  And is it your understanding that if you came and

 4   testified, in the sole discretion of the -- in the sole

 5   discretion of the United States, if they think you cooperated,

 6   then you could get this downward departure; is that right?

 7   A   That's right.

 8   Q   And that's what you're hoping to get by testifying here

 9   today?

10   A   That's right.

11   Q   And there's a little more to it, do you agree, than just

12   getting a downward departure in this jurisdiction, isn't there?

13   A   Yes, I have to tell the truth.

14   Q   Well, there's a little more than just telling the truth in

15   this jurisdiction, is there not?

16   A   No.  That's incorrect.

17   Q   I show you --

18   A   Could you elaborate by what you mean by more?

19   Q   Yes, sir.  On page six, now, let's look back up to page

20   five.  And it talks about the United States' obligations if you

21   plead guilty; right?

22   A   Okay.

23   Q   All right.  And could you read that for us, please, sir?

24   A   Sure.  The United States will not bring any additional

25   charges against the defendant related to the facts underlying

1   the information and will move to dismiss any remaining charges

2   against the defendant once sentence is imposed in this

3   case.  This agreement is limited to the United States

4   Attorney's Office in the Southern --

5   Q   And if you will finish the sentence?  (Indicating.)

6   A   -- District of Alabama.

7   Q   Well, actually it goes beyond that in your case, doesn't

8   it?

9   A   I'm not sure what you mean.

10  Q   If you will read the next sentence, please?

11  A   However, the United States Attorney's Office for the

12  Central District District of California also agrees to be bound

13  by this plea agreement so long as the defendant agrees to fully

14  cooperate with that district as well.

15  Q   So we're back to talking about cooperation, remember, the

16  5K.  So if you cooperate and you come in here, you won't get

17  charged -- tell me if this is your understanding of this

18  agreement -- you won't get charged with anything out in

19  California?

20  A   That is my understanding, yes.

21  Q   And Mr. Drobot, you told us, was charged in California?

22  A   Correct.

23  Q   And Mr. Drobot pled guilty in California?

24  A   He did.

25  Q   And he pled guilty to a kickback scheme, didn't he?

1   A   I believe so, yes, sir.

2   Q   And that kickback scheme involved workmen's compensation

3   dispensaries, didn't it?

4   A   I believe it did, yes.

5   Q   And it also involved paying monies from the workmen's

6   compensation --

7           MR. BODNAR:  Objection, Your Honor, to anything

8   further down this line.  May we approach?

9           THE COURT:  Yes.

10      (At the side bar, jury not present.)

11      ...(Redacted.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          ...(Redacted.)

CHRISTOPHER MANCUSO - CROSS BY MR. KNIZLEY

1          ...(Redacted.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7            ...(Redacted.)

8       (In open court, defendants and jury present.)

9    BY MR. KNIZLEY:

10   Q   Now, Mr. Manfuso, we referenced the fact that your plea

11   agreement included if you cooperate, you could avoid being

12   prosecuted for anything in the Middle District of California;

13   is that correct?

14   A   Correct.

15   Q   And you told us on direct examination that Mr. Drobot was

16   raided by the FBI at IPM?

17   A   Correct.

18   Q   While you worked there?

19   A   Correct.

20   Q   And you further told us that he pled guilty in California?

21   A   Correct.

22   Q   And I believe you mentioned it was a kickback scheme?

23   A   Correct.

24   Q   And your understanding of the kickback scheme involving IPM

25   while you worked there was that they were taking moneys from

1   workmen's compensation dispensaries and giving that money to
2   doctors in 10 and $15,000 increments and more to refer spinal
3   patients to Drobot's father's hospital?
4   A   I believe that's what he pled to, yes.
5   Q   Okay.  And you're asking this district for you not to be
6   charged with that conduct?
7   A   I -- I'm not sure you're --
8   Q   Well --
9   A   -- of all of your question.
10  Q   -- what is the criminal conduct in the Middle District of
11  California that you want excluded from prosecution in your plea
12  agreement?
13  A   I was told I was a target of the investigation.  That's all
14  I know.
15  Q   In that kickback scheme?
16  A   In something in California.  I don't know.  They didn't
17  say, my attorney didn't tell me -- no one told me -- exactly
18  what was going on.
19  Q   In that scheme of using workers' compensation dispensaries
20  monies to pay the doctors to refer spinal patients to his
21  father's hospital is totally different than what's going on
22  here; right?
23  A   It is different, yes.
24          MR. KNIZLEY:  One moment, please, Your Honor.
25          (A discussion was held off the record between defense

 1  counsel.)

 2  BY MR. KNIZLEY:

 3  Q   Mr. Manfuso, you never attempted to dictate the manner in

 4  which Dr. Ruan and Dr. Couch practiced their medicine, did you?

 5  A   No.

 6  Q   And they practiced their medicine on their own and you

 7  don't have any -- and you weren't involved in their medical

 8  practice in any way, were you?

 9  A   Certainly not.

10  Q   Okay.  And Dr. Ruan and Dr. Couch never referred anybody,

11  any patient, to any medical facility for any other medical care

12  in connection with the involvement you had with them, did they?

13  A   No.

14          MR. KNIZLEY:  That's all we have, Your Honor.

15          THE COURT:  All right.  Does Dr. Couch have anything?

16          MR. ESSIG:  No cross, Your Honor.

17          THE COURT:  Any redirect?

18          MR. BODNAR:  Yes, Your Honor.

19                    REDIRECT EXAMINATION

20  BY MR. BODNAR:

21  Q   Mr. Manfuso, do you remember discussing with defense

22  counsel about your plea agreement?

23  A   I do.

24  Q   I'm going to show you your plea agreement marked 28-1.  And

25  do you remember them showing you the sections requiring you to

1   testify or to fully, completely, and truthfully respond?

2   A   I do.

3   Q   And have you gone over this with your attorney?

4   A   I have.

5   Q   What is your understanding of what happens if you don't

6   fully, completely, and truthfully respond?

7   A   All deals are off.

8   Q   And does that mean the deal here in the Southern District

9   of Alabama?

10   A   Yes.

11   Q   Does it also mean the deal in the Central District of

12   California?

13   A   Yes, it does.

14   Q   So are you potentially liable for prosecution here in

15   Mobile and in Los Angeles if you don't fully and truthfully

16   cooperate?

17   A   Yes, I am.

18   Q   Did you know that before you got on the stand today to do

19   your direct examination?

20   A   Yes, I did.

21   Q   Do you recall Mr. Knizley talking with you about what

22   Mr. Drobot -- part of his plea agreement regarding the spine

23   referrals?

24   A   Yes.

25   Q   Were you involved in that aspect of the IPM business at

1    all?

2    A    No.

3    Q    What aspect of the IPM business were you involved in?

4    A    The dispensary management business.

5    Q    Do you know if Mr. Drobot, Jr.'s, plea agreement also

6    includes language about kickbacks to Dr. Ruan and Dr. Couch?

7    A    It does.

8    Q    And is that separate from the kickbacks to the spine

9    facility?

10   A    Yes, it is.

11   Q    Do you recall Mr. Knizley going through with you several of

12   the contracts, such as this one which is 28-2, your first

13   contract with IPM and Ruan Companies?

14   A    Yes, I do.

15   Q    I believe you said on cross-examination it was drafted by

16   an attorney?

17   A    Yes.

18   Q    Was this an attorney that worked frequently with IPM?

19   A    Yes, it was.

20   Q    How was this contract, or these contracts with Dr. Ruan,

21   though, different than -- and Dr. Couch -- than the other

22   contracts that IPM had?

23   A    Contained guarantees.

24   Q    And ultimately what happened to IPM?

25   A    IPM was basically raided by the FBI and the owner was found

CHRISTOPHER MANFUSO - REDIRECT BY MR. BODNAR

 1  guilty of paying kickbacks.

 2  Q   Do you recall walking through the example that's attached

 3  to that first contract with Mr. Knizley?

 4  A   Yes.

 5  Q   Now, you explained, I believe, that after the money was

 6  deducted this 70 percent went back to the doctors; is that

 7  correct?

 8  A   In this particular contract, yes.

 9  Q   And would that be -- is there anywhere on here that talks

10  about the monthly guarantee?

11  A   Not in this one, no.

12  Q   So if the amount, after cash expenditures were out and

13  after the 30 percent management fee was out, was less -- let's

14  say it was $30,000, are the doctors getting back more than just

15  their money?

16  A   Yeah, we would advance them, we would give them the extra

17  money.

18  Q   What do you mean, you would give them the extra money?

19  A   Whatever the difference was to get to 45, we would give it

20  to them.

21  Q   And when that went up to 54, would it be whatever the

22  difference between what it was and 54?

23  A   Correct.

24  Q   And 80?

25  A   Correct.

CHRISTOPHER MANFUSO - REDIRECT BY MR. BODNAR

1  Q   So were there months, then, where the doctors weren't

2  getting just their money or were being given money by IPM?

3  A   Yes.

4  Q   How about with Comprehensive Rx?

5  A   Yes.

6  Q   Why was it that you were giving Dr. Ruan and Dr. Couch that

7  money?

8  A   To keep the business.

9  Q   How often was that happening?

10 A   Well, on a monthly basis.  You know, the months where the

11 minimum wasn't met, but the formula, we gave them the extra

12 monies quite frequently.

13 Q   And because you would give the extra money, was there any

14 risk for Dr. Ruan and Dr. Couch if they didn't dispense a

15 certain amount each month?

16 A   No, we removed the risk.  They would get that money

17 regardless.

18 Q   You had mentioned too that it was the doctor's money that

19 paid for the drugs.  But who paid for the drugs on the up-front

20 end?

21 A   IPM and Comprehensive.

22 Q   So if at the end of the day the drugs cost more than were

23 collected in a given month, who lost money?

24 A   We did, the company.

25         MR. KNIZLEY:  Object.  Belated objection to

 1   speculation.

 2          THE COURT:  Well, it's a hypothetical, so overruled.

 3   BY MR. BODNAR:

 4   Q   I'll ask you again.  If you advanced the money and

 5   collections were less than the cost than what was paid for that

 6   month, who lost money?

 7   A   We would eat that money.

 8   Q   By we, who is we?

 9   A   Comprehensive, Industrial Pharmacy Management.

10   Q   Was there a loss then to Dr. Ruan or Dr. Couch in the

11   months where they had guarantees?

12   A   Could you rephrase that?  Sorry.

13   Q   Would Dr. Ruan or Dr. Couch absorb any of that loss in the

14   months they had the guaranteed amount?

15   A   No, they'd get the same amount.

16   Q   Do you recall Dr. Ruan's attorney going over with you

17   Ruan's Exhibit 175?

18   A   Yes, I do.

19   Q   And the conversation here, is this you telling Dr. Ruan

20   about a more profitable -- excuse me -- medication?

21   A   Yes, I believe this is an alternative to a brand name

22   patch.

23   Q   And were conversations like this common between you?

24   A   Very frequent, yes.

25   Q   Would it also include schedule II drugs, discussions with

1   up to schedule II drugs?

2   A   Yes, it did.

3   Q   During those times did Dr. Ruan bring up the clinical

4   aspects of the drugs with you?

5   A   No, he did not.

6           MR. KNIZLEY:  Your Honor, I object to leading.

7           THE COURT:  Overruled.

8   BY MR. BODNAR:

9   Q   Were there times where Dr. Ruan brought up the clinical

10  aspects of the drug with you?

11  A   No, there were not.

12  Q   Was that different from your dealings with other doctors?

13  A   Yeah, generally other doctors would speak clinically at

14  times about their goals for their patients.

15  Q   During your communications with Dr. Ruan -- we've seen the

16  emails -- where would you be when you're sending those emails

17  to Dr. Ruan?

18  A   In my -- in my office or on my phone.

19  Q   Which was where?

20  A   In Maryland.

21  Q   And when you made phone calls to Dr. Ruan during the course

22  of this, where would you be typically when you were making

23  phone calls?

24  A   Generally in my office in Maryland or in the field in a

25  different state.

Q   And when you traveled down to Mobile, typically where did you travel from?

A   Baltimore-Washington Airport.

Q   And I believe you looked at numerous contracts with Mr. Knizley and he asked you does it say kickbacks anywhere in there.  Do any of these contracts use the term "kickbacks"?

A   No, they don't.

Q   What have you pled guilty to doing?

A   Paying kickbacks.

        MR. BODNAR:  Nothing further from this witness, Your Honor.

        THE COURT:  All right.  May this witness be excused?

        MR. KNIZLEY:  Yes, ma'am.

        THE COURT:  Mr. Bodnar?  Mr. Bodnar?  May this witness be excused?

        MR. BODNAR:  Oh, yes, Your Honor.

        THE COURT:  All right.  Thank you.  You may step down.

        THE WITNESS:  Thank you.

        THE COURT:  Ladies and gentlemen, we're going to break for lunch at this time.  You will be in recess until 1:15.  Leave your pads on your chairs.  Remember my instructions to you not to discuss the case or allow anyone to discuss it with you.

        Be back downstairs in the jury assembly room at 1:15, ready to be called back up.  We are in recess.

1        (A recess was taken at approximately 11:56 a.m.)

2        (Afternoon session, 1:19 p.m., in open court, defendants

3    and jury present.)

4            MS. GRIFFIN:  May we approach, Your Honor?

5        (At the side bar, jury not present.)

6            MS. GRIFFIN:  The next witness is Brian Bechtol.  His

7    wife was a patient of Dr. Couch's.  She died about a month and

8    a half after the clinic was closed.  We have all agreed that

9    before he comes on the stand I will just announce that, Your

10   Honor, Mr. Bechtol's wife has died since this case started --

11   not this trial, but since the raid -- and it's completely

12   unrelated to this case.  But that I need to announce that I

13   have warned him two times not to say it, Chris Bodnar has also

14   warned him not to say it.  I have told him if he feels like he

15   has to say something, to please ask if he can speak to the

16   Court and I will -- we will all come up here.  But I have

17   warned him and warned him that it's prohibited by the Court and

18   it is prohibited by us.  His testimony, will be relatively

19   brief and hopefully that won't come up.  I wanted to make sure

20   we had it on the record.

21           THE COURT:  Okay.

22           MR. POWELL:  Judge, in addition to what Ms. Griffin is

23   going to say, we're stipulating in front of the jury, we are

24   asking that Mr. Bechtol's testimony be excluded as outside of

25   any relevance parameters that Your Honor has set regarding

1    former patients.  This patient, Ms. Odom, is not one of the

2    so-called fentanyl patients that have testified or family

3    members that have testified regarding the fentanyl conspiracy

4    count.  She is not, Ms. Odom that is, was not a patient whose

5    records were subject of or will be the subject of expert

6    testimony by the government regarding the care the patient

7    received from Dr. Couch.  Again, we're not -- this is a pump

8    patient.  We're not -- the most that -- we're not charged with

9    having bad pain pump management.  This is a bad practice

10   witness outside the parameters, we believe Your Honor's

11   relevance programers that you set pretrial regarding what

12   patients could testify about what acts and what care, and we

13   believe she's outside the scope of that.

14          MS. GRIFFIN:  Your Honor, we were unaware of an order

15   that said because of the conspiracy that we couldn't --

16          THE COURT:  My order of other patients was directed to

17   other patients that the defense was planning to put on to show

18   good practice.  And it wasn't directed at any patients that the

19   government contends is part of the outside the usual course of

20   professional practice.  So I don't think -- I mean, I don't

21   know what this witness is going to say about the patient, but I

22   don't think that --for that reason it's not prohibited.

23          MR. POWELL:  Yes, ma'am.

24          THE COURT:  Okay.

25          MS. GRIFFIN:  Thank you.

1          MR. POWELL:  Thank you.

2          MS. GRIFFIN:  May I make that announcement?

3          THE COURT:  Will you call him?

4          MS. GRIFFIN:  I will call him, make the announcement,

5   and then let him come in, if you don't mind.

6          THE COURT:  That's fine.

7      (In open court, defendants and jury present.)

8          THE COURT:  All right.  The government may call its

9   next witness.

10          MS. GRIFFIN:  Brian Bechtol, Your Honor.  And before

11   he comes in, I have an agreement with the defense to announce

12   to the jury that Mr. Bechtol's wife, Ms. Odom, died after the

13   search of PPSA in May of 2015 and that her death is completely

14   unrelated to this case whatsoever.

15          THE COURT:  All right.

16          THE CLERK:  Mr. Bechtol, please step forward toward

17   the witness stand and I'll swear you in.  Let me get you to

18   raise your right hand.

19                        BRIAN BECHTOL

20              was sworn and testified as follows:

21          THE WITNESS:  Yes, ma'am.

22          THE CLERK:  Thank you, sir, please be seated.

23                      DIRECT EXAMINATION

24   BY MS. GRIFFIN:

25   Q   Tell us your name, please, sir.

1    A    Brian Bechtol.

2    Q    Can you spell your last name, Mr. Bechtol?

3    A    B-E-C-H-T-O-L.

4    Q    Mr. Bechtol, were you married to Ms. Odom?

5    A    Yes.

6    Q    And was she a patient of Dr. Couch's at PPSA during the

7    time charged in the indictment?

8    A    Yes.

9    Q    Did you have occasion to go to her visits, doctor visits,

10   with her?

11   A    I took her to all of them.

12   Q    I believe --

13   A    Except for one.

14   Q    -- on one occasion.  Would you stay in the waiting room or

15   would you go back in the back?

16   A    I would go in the back with her (nodding head

17   affirmatively).

18   Q    Into the actual patient room?

19   A    Yes, ma'am.

20   Q    Can you tell us, starting in her treatment in 2011, if

21   while you were there with her Dr. Couch ever came in the

22   patient room where your wife was waiting?

23   A    Seldom, but he did.

24   Q    Typically who was your wife seen by on the visits?

25   A    They called themselves the pump nurse.

1    Q    The pump nurse?

2    A    Yes.

3    Q    Did your wife have a pump?

4    A    Yes, ma'am, had a baclofen pump implanted in her.

5    Q    Was there also a time when she would actually have office

6    visits and go in what would be called where you have a patient

7    visit?

8    A    Yes.

9    Q    Did you see Dr. Couch in the patient visit rooms when you

10   were in those rooms with your wife?

11   A    She's only went twice.  And yes, we'd seen him once in the

12   back.

13   Q    Did she go to PPSA more than twice?  Did she go to the

14   clinic more than twice?

15   A    Yes, she had to go every 60 days or 60-something days.

16   They gave her leeway, since she was in a wheelchair, they gave

17   her extra time to come in and get her baclofen pump filled,

18   approximately every two months.

19   Q    What were you talking about when you said she only went two

20   times?

21   A    She was having severe pain, the way her posture was over

22   time, being in the wheelchair, and Dr. Couch gave her some sort

23   of an injection.  It was compared to a --

24   Q    That's okay.

25   A    Okay.

BRIAN BECHTOL - DIRECT BY MS. GRIFFIN

```
 1   Q   There were two visits that were not what you would call a
 2   patient visit?  An injection visit?
 3   A   It wasn't a pump visit.
 4   Q   Okay.
 5   A   Two visits where she -- but she still got an injection.
 6   Q   Well, when you said to us she only went twice, she actually
 7   went to the clinic more than twice; is that right?
 8   A   Yes, ma'am.  She had to go to the clinic to get her
 9   baclofen pump filled every two months.
10   Q   All right.  You went with her?
11   A   Yes.
12   Q   Who was typically filling her baclofen pump?
13   A   The pump nurse.  I remember a few names, not all their
14   names.
15   Q   Do you remember some of their names?
16   A   Yes, ma'am.  Angel.
17   Q   If you can't remember, that's okay.
18   A   Yes, they went blank all of a sudden.
19   Q   Now, during the visits you said you saw Dr. Couch rarely;
20   is that correct?
21   A   Yes.
22   Q   Each time you were there, would Ms. Odom receive a refill
23   on her pump?
24   A   Yes.
25   Q   And would she also receive some oral medications?
```

BRIAN BECHTOL - DIRECT BY MS. GRIFFIN

1  A   Yes.

2  Q   Were there some problems at your house with running out of

3  medications or her taking too many medications?

4  A   She had so much medication, that I developed a red flag

5  system and took them -- took all the pills away from her when

6  she got disoriented and I went and recalibrated all of her

7  medicines.  She -- we had a lot of issues.

8  Q   When you say you took her medicines, would you give them to

9  her as indicated on the prescription bottle?

10 A   No, ma'am.

11 Q   What would you do?

12 A   I would take them away and give them to her as needed.

13 Q   As you thought she needed them?

14 A   Well, she was the boss, so as she thought she needed them.

15 Q   When she thought she needed the medication?

16 A   But -- but I made sure she didn't forget that she took

17 some.

18 Q   Was there a time when she was on oxycodone?

19 A   Yes.

20 Q   How did that work for her?

21 A   She didn't like the oxycodones that they prescribed and she

22 asked to be taken off of them.

23 Q   Was she taken off of the oxycodone?

24 A   No.

25 Q   Now, Mr. Bechtol, did there come a time when you had

3482

1    occasion to see a nurse and Dr. Couch in the same room with you

2    and your wife and you had a conversation about the proceedings?

3    A    Yes.

4    Q    Could you tell us about that?

5    A    Well, we seen Dr. Couch when her medicine was changed in

6    the baclofen pump.  And it was a very chaotic day and there was

7    a few outbursts out in the front office.  Everybody seemed on

8    edge.  And we finally got back to the patient room and the

9    nurse was doing her procedures and Dr. Couch came in and was

10   going over -- changing her medication.

11   Q    And before you finish, when you're talking about her, are

12   you talking about Ms. Odom, is that who you're talking about?

13   A    Changing Theresa's medication in the pump.

14   Q    Okay.

15   A    And --

16   Q    What occurred?

17   A    I just asked them, I said:  Do you ever get tired of all

18   these people coming up and asking you for drugs?

19   Q    Who did you ask that to?

20   A    I just said it out loud.  And the nurse said:  Oh, my God,

21   you just don't know.  And Dr. Couch --

22          MR. POWELL:  I'll object to what the nurse said.

23          THE COURT:  Overruled.

24   BY MS. GRIFFIN:

25   Q    Tell us what Dr. Couch said.

1   A   Dr. Couch stepped back from the computer, put his hands up

2   and put his head down and shook his head.  It was a rough

3   day.  And under his breath -- he didn't say it to me -- but he

4   just said:  I'll write them a script just to get them the hell

5   out of here.

6          MS. GRIFFIN:  That's all I have of this witness, Your

7   Honor.

8          THE COURT:  All right.  Mr. Powell?

9          MR. POWELL:  Thank you, Your Honor.

10                     CROSS EXAMINATION

11  BY MR. POWELL:

12  Q   Good afternoon, Mr. Bechtol.

13  A   Good afternoon.

14  Q   My name's Art Powell, and I represent Dr. Couch.  Do you

15  remember talking to the DEA several months ago?  Sir?

16  A   The FBI?

17  Q   Or the FBI?

18  A   Yes.

19  Q   You talked to them for a long time, didn't you?

20  A   No.

21  Q   Well, you talked to them long enough to fill up four pages

22  of an FBI report?

23          MS. GRIFFIN:  Your Honor, I object.

24  BY MR. POWELL:

25  Q   Do you have any reason to dispute that?

3484

```
 1            MS. GRIFFIN:  Objection as to --

 2   A   I didn't fill anything out.

 3            MS. GRIFFIN:  Objection.

 4            THE COURT:  Yeah.  I sustain the objection.

 5   BY MR. POWELL:

 6   Q   You were asked numerous questions during that interview,

 7   weren't you?

 8   A   Yes.

 9   Q   And you never said anything about some spontaneous

10   statement that you claimed Dr. Couch made at an office visit

11   that you just related to this jury, did you?

12   A   I'm not sure.

13   Q   Would you like to look at it?

14   A   No, I'm just not sure.

15   Q   That's important.  Wouldn't that be something that would be

16   important, if the FBI comes and talks to you?

17   A   I talked to them more extensively than I talked with the

18   FBI.  I just answered their questions (indicating).

19   Q   And that would be an important thing to tell them, if they

20   are interviewing you about some alleged criminal activity,

21   wouldn't it?

22   A   They didn't ask me that specific question.

23   Q   You were asked numerous questions about your experience and

24   your wife's experience at PPSA.  That was the purpose of the

25   interview, wasn't it, Mr. Bechtol?
```

1   A   Yes.

2   Q   And wouldn't you agree that that would be a very important

3   thing to tell somebody if it were true?

4           MS. GRIFFIN:  Object, Your Honor.

5   A   Certainly, sir.

6           MS. GRIFFIN:  Objection as to foundation.  He doesn't

7   know whether it would be important or not.

8           THE COURT:  Sustained.

9   BY MR. POWELL:

10  Q   Mr. Bechtol?

11  A   Yes?

12  Q   Your wife was injured in 1999; is that correct?

13          MS. GRIFFIN:  Your Honor, it's beyond the scope of

14  direct.

15          THE COURT:  Sustained.

16  BY MR. POWELL:

17  Q   The injury that your wife sustained that required pain

18  management, Mr. Bechtol, was the fact that she was a

19  paraplegic; correct?

20  A   Yes.

21  Q   In an automobile accident; right?

22          MS. GRIFFIN:  Objection, Your Honor, as to the

23  relevance.  It is beyond the scope.

24          MR. POWELL:  Judge, I think this jury's entitled to

25  know what medical condition this woman had.

1          THE COURT:  He didn't testify at all about her medical

2   condition, other than taking pain medicine.  So let's keep to

3   that.

4   BY MR. POWELL:

5   Q   What is your understanding of the medical purpose that your

6   wife had a pain pump implanted in her back?

7          MS. GRIFFIN:  Your Honor, I object to --

8          THE COURT:  Sustained.

9   BY MR. POWELL:

10  Q   Mr. Bechtol, your wife was referred to PPSA following her

11  initial treatment by another pain management specialist by the

12  name of Dr. Charles Hall, do you remember that?

13  A   Yes.

14  Q   And that would have been back in 2003; correct?

15         MS. GRIFFIN:  Your Honor, object.  It's outside the

16  scope and it's not relevant.  We asked him specifically about

17  the time period charged in this case.

18         THE COURT:  Sustained.

19  BY MR. POWELL:

20  Q   How long was your wife a patient of PPSA?

21         MS. GRIFFIN:  Objection, Your Honor.

22         THE COURT:  Well, I don't know about that.  I'll

23  overrule it.

24  A   Over 15 years.

25  BY MR. POWELL:

1    Q    And she had that pain pump or had pain pumps during that

2    entire time, did she not?

3    A    Yes.

4    Q    She initially had a baclofen pain pump; correct?

5    A    That was it, yeah.

6    Q    And that was the first one?

7    A    They were all baclofen pumps.

8    Q    Well, if I told you that she had to have another procedure

9    in 2008 or 2009 to replace that pain pump with a Codman Pain

10   Pump, does that help you with your memory?

11         MS. GRIFFIN:  Your Honor, that's outside the scope of

12   direct.

13         THE COURT:  Sustained.  Mr. Powell, let's limit the

14   questioning to what he testified to on direct.

15         MR. POWELL:  Yes, ma'am.

16   Q    So that the jury will understand how a pain pump works,

17   Mr. Bechtol --

18         MS. GRIFFIN:  Your Honor, object to the

19   relevance.  That's not the substance of his testimony.  It's

20   beyond the scope.

21         THE COURT:  Sustained.

22   BY MR. POWELL:

23   Q    How often did you have to take your wife to PPSA to get the

24   pain pump refilled?

25         MS. GRIFFIN:  Your Honor, again --

```
 1            THE COURT:  Well, he testified about that.  So go
 2   ahead.
 3   A   Approximately every two months.
 4   BY MR. POWELL:
 5   Q   For approximately 15 years?
 6   A   Yes.
 7   Q   So that would mean you would go at least six times a year
 8   to get the pain pump refilled; correct?
 9   A   Yes.
10   Q   So 15 times six would be the number of times that you went
11   just to have the pain pump refilled?
12   A   Give or take.  It's not an exact science.  I don't remember
13   that far back.
14   Q   Right.  You could be a few days later or a few days early;
15   right?
16   A   Early.
17   Q   If you were a few days late, then she would go into
18   withdrawal symptoms because she didn't have the medication; is
19   that correct?
20   A   A bunch of days late.  They scheduled her earlier because
21   if she did have a problem, she would have time to reschedule it
22   and go because, yes, she would.
23   Q   Right.  And you wanted to -- you both wanted to avoid that,
24   you didn't want her going through withdrawal because she didn't
25   have her pump medication?
```

1  A   That's correct.

2  Q   Because the pump medication was what controlled her pain,

3  is it not?

4  A   Yes.

5  Q   That together with the various medications that she was

6  prescribed in addition to the pump medication; correct?

7  A   I didn't understand what you said just now.

8  Q   She also had oral medications that she was prescribed to

9  also help her with her pain control, didn't she?

10  A   Yes.

11  Q   And her pain -- her pain was a result of spasticity and

12  uncontrolled tremors; is that right?

13  A   A lot of it, not all of it.

14  Q   And that was a result of her underlying medical condition;

15  correct?

16  A   Yes.

17  Q   How long was she in a wheelchair?

18       THE COURT:  Mr. Powell, that's beyond the scope of

19  direct.

20       MR. POWELL  Yes, ma'am.

21       THE COURT:  Let's move on.

22       MR. POWELL:  Yes, ma'am.

23  Q   It wasn't necessary, was it, Mr. Bechtol, for Ms. Odom to

24  be seen and treated by Dr. Couch in order to have her pump

25  refilled, was it?

1        MS. GRIFFIN:  Objection as to foundation.

2        MR. POWELL:  Judge, he's already testified to that.

3        THE COURT:  Well, no, he hasn't.  Come to side bar,

4  please.

5     (At the side bar, jury not present.)

6        THE COURT:  I don't think he said anything on direct

7  about Dr. Couch not being there during the pain pump refills.

8        MR. POWELL:  And I don't mean to dispute the Court,

9  but my understanding of his direct testimony was that he never

10  saw Dr. Couch when he came for a pump refill.  And my question

11  to him was, was it his understanding that it was not necessary

12  to refill the pump and Dr. Couch be there?

13        MS. GRIFFIN:  And my understanding was that he saw him

14  sometimes but not every time.

15        MR. ARMSTRONG:  When he changed the medicine.

16        THE COURT:  I can't hear you.

17        MR. ARMSTRONG:  When he changed the medicine is when

18  he saw him.

19        MR. POWELL:  When he changed the medication.

20        MR. ARMSTRONG:  When he changed it.

21        MS. GRIFFIN:  So --

22        THE COURT:  So what's the point of all that?  Let's

23  please just try and limit it to the very few things he

24  testified about.

25        MR. POWELL:  I'm trying to, Judge, but the

1    government's taken the position that there's something wrong

2    with this patient not seeing Dr. Couch when she came in for a

3    refill.

4          THE COURT:  The only purpose I saw in this was the

5    statement he made.  So that's try and move on.

6          MR. POWELL:  Yes, ma'am.

7       (In open court, defendants and jury present.)

8    BY MR. POWELL:

9    Q   Mr. Bechtol, you mentioned there was a nurse present when

10   you were in an office visit with your wife in front of

11   Dr. Couch and he made this statement that you claim that he

12   made.  Who was that nurse that was present?

13   A   What was the last part of that?

14   Q   Who was the nurse that was present when you claim that

15   Dr. Couch made the statement --

16   A   I don't remember her name.

17   Q   Excuse me.  Let me finish my question.  Who was present

18   when you claim that Dr. Couch made the statement about writing

19   medication prescriptions?  Do you remember who the nurse was?

20   A   I could recall it if the name was said, but I don't

21   remember her name.

22   Q   Do you know when this supposedly took place?

23   A   It was a few years back.  It was a few years back from when

24   this problem first started, came to.

25   Q   I'm sorry?

1   A   When this, when this first -- when -- it was a few years

2   back from the point that they got raided.  So that was a few

3   years back from this point.

4   Q   So you're talking 2013 maybe?

5   A   Approximately.

6   Q   '12?

7   A   Yes.

8   Q   Once you and your wife got to the back so that the pump

9   could be refilled, you said, I believe, that that was done by

10  the pump nurse?

11  A   Most of the time, yes.

12  Q   And how long did that procedure actually take?

13  A   About 20 minutes.

14  Q   And during those procedures, or at the conclusion of them

15  or beforehand, your wife was questioned about her other

16  medications and whether or not she was due for refills and that

17  sort of thing, on her prescribed medication; is that accurate?

18  A   Yes.

19  Q   And those medications were filled during that or following

20  the pump procedure; correct?

21  A   Yes.

22  Q   And then unless something came up of an emergency basis or

23  there was some issue regarding her care, then she would come

24  back in 60 or so days for another refill and the same process

25  would repeat itself; is that accurate?

BRIAN BECHTOL - CROSS BY MR. POWELL

1  A   That's correct.

2  Q   And you said that went on for 15 years?

3  A   A little over, I believe.

4          MR. POWELL:  That's all.

5          MS. GRIFFIN:  Nothing further, Your Honor.

6          THE COURT:  All right.  Thank you, Mr. Bechtol.  You

7  may step down.

8          THE WITNESS:  Thank you.

9          MS. GRIFFIN:  We call Gary Douthitt, Your Honor.

10          THE COURT:  All right.

11          MS. GRIFFIN:  Your Honor, he's in custody.  It may

12  take just a second.

13          THE COURT:  All right.

14          MS. GRIFFIN:  They knew to be out here.

15          THE COURT:  Ladies and gentlemen, when we have an

16  in-custody witness, it takes a little while to get them down

17  here.  They are usually on a different floor in the

18  courthouse.  So you just have to be patient.

19          THE CLERK:  Mr. Douthitt, let me get you to step

20  forward toward the witness stand and raise your right hand as

21  best you can.

22                      GARY DOUTHITT

23              was sworn and testified as follows:

24          THE WITNESS:  I do.

25          THE CLERK:  Thank you, sir.  Please be seated.

3494

1          MS. GRIFFIN:  Ready to proceed, Your Honor?

2          THE COURT:  Yes.

3                    DIRECT EXAMINATION

4   BY MS. GRIFFIN:

5   Q   Tell us your name, please.

6   A   Gary Douthitt.

7          THE COURT:  Mr. Douthitt --

8          MS. GRIFFIN:  Can you speak up a little bit?

9          THE COURT:  Yes.  Scoot up just a little bit and try

10  and speak into the microphone, if you will.

11  A   Gary Douthitt.

12  BY MS. GRIFFIN:

13  Q   Could you spell that last name?

14  A   D-O-U-T-H-I-T-T.

15  Q   Mr. Douthitt, how old are you?

16  A   33.

17  Q   I want to direct your attention to 2013.  Did you have

18  occasion to go to PPSA as a patient in 2013?

19  A   Yes, ma'am.

20  Q   You were to see which doctor?

21  A   Dr. Ruan.

22  Q   Now, Mr. Douthitt, were you a drug addict?

23  A   Yes, ma'am, I was.

24  Q   When did that begin?

25  A   My early twenties.

3495

1   Q   What type drugs did you use?

2   A   Opiates, methamphetamines, marijuana.

3   Q   And what was your choice of administration?

4   A   Intravenous.

5   Q   Which means by needle?

6   A   Yes, ma'am.

7   Q   Why is it that you went to Dr. Ruan?

8   A   So I can get pain medicine.

9   Q   Were you also selling pain medicine?

10  A   Yes, I was.

11  Q   And using?

12  A   Yes, ma'am.

13  Q   Was it more expensive to buy drugs on the street or to get

14  prescriptions?

15  A   It was actually more expensive to buy it off the street.

16  Q   Why was that?

17  A   The price was just a lot higher.  The doctor's visit,

18  compared to buying pills one by one, was just a big difference.

19  Q   So on the street prescription pills were sold one at a

20  time?

21  A   Yeah, one at a time or multiples.

22  Q   But not a whole bottle?

23  A   I mean, if you wanted to, you could.  But it would be a big

24  difference.  I mean, the price of paying for a prescription

25  with my insurance, compared to buying a single pill, was about

3496

1   the same.  You know, I could pay for my prescription at the

2   pharmacy for the same price that I could by a single pill for

3   it.  So it was just a lot easier just to go to the doctor and

4   get it.

5   Q   Did you attempt to make an appointment at Physicians Pain

6   Specialists of Alabama?

7   A   Yes, ma'am.

8   Q   Were you able to get an appointment right away?

9   A   It might -- I think it took about a month or two.  But --

10  Q   Did you ask someone to refer you to Dr. Ruan at PPSA?

11  A   Yes, ma'am, I did.

12  Q   At the time that you got an appointment in 2013, were you

13  having any legitimate pain?

14  A   No, ma'am.

15  Q   No neck pain, no back pain, no -- nothing?

16  A   No, ma'am (shaking head negatively).

17  Q   Did you go to PPSA the first time and did you see Dr. Ruan

18  on that first visit in 2013?

19  A   No, ma'am, I didn't.

20  Q   Who did you see?

21  A   A nurse practitioner.

22  Q   Do you recall her name or what she looked like?

23  A   She -- I don't recall her name.  But she -- I can recall

24  what she looked like, yes, ma'am.

25  Q   Looked what?

1    A    I recall what she looked like.  She -- I seen two nurse

2    practitioners, but on the first visit she was -- she had like a

3    brown -- I want to say the same color like you, that you have,

4    maybe shoulder length.

5    Q    And that was a different appearance from the nurse

6    practitioner you saw later; is that right?

7    A    Yes, ma'am.

8    Q    Okay.  The first nurse practitioner, your first visit, did

9    you have a physical exam?

10   A    Not really, no.

11   Q    Could you tell us what was done?

12   A    Asked a few questions.

13   Q    You're going to have to speak up, if you don't mind.

14   A    Asked a few questions.  That's about it.

15   Q    And what did you advise about your pain level?

16   A    I told them, I believe, like a seven or an eight because

17   they asked on a pain scale.

18   Q    You did have your heart checked?  They listened to your

19   heartbeat?

20   A    Yeah, they listened to your heartbeat.  That's really about

21   it.  I mean, it wasn't really a hands-on type of examination

22   really.  It's kind of like when you go to a family doctor.  You

23   know, they might check your heartbeat, your lungs, organs, type

24   things likes that, and ask a few questions about it.  Pretty

25   simple.

GARY DOUPHIT - DIRECT BY MS. GRIFFIN

1  Q   Did you fake any symptoms such as limping or holding your
2  neck or doing anything to indicate you were in pain?
3  A   Not really.
4  Q   What did you tell them about your abuse of illicit
5  prescriptions from the street?
6  A   I didn't tell them anything about abuse.
7  Q   You denied abuse?
8  A   Yes, ma'am.
9  Q   Was that true?
10 A   No, ma'am, it wasn't.
11 Q   The day of this first visit, had you been using drugs?
12 A   Yes, ma'am.
13 Q   Were you still on the drugs or were you coming off them or
14 do you recall?
15 A   I really don't recall.
16 Q   Did you observe people in the waiting room before you went
17 back into the patient room?
18 A   Yes, ma'am.
19 Q   Other patients?
20 A   Yes, ma'am, every visit.
21 Q   What did you observe about them?
22 A   Some of them seemed like they were on -- on -- I couldn't
23 really tell what type of drugs.  Some of them seemed like they
24 were slurring --
25         MR. KNIZLEY:  Your Honor, I object to the speculation

 1   as to what they seemed to appear to be on.  Without speculating

 2   as to the causation or whatever the appearances is -- it would

 3   be speculation.  We would object.

 4   BY MS. GRIFFIN:

 5   Q   If you would just describe what you observed?

 6        THE COURT:  Yes.

 7   A   I observed people from maybe the age of maybe 20 up to

 8   about the age of 40.  Some of them maybe had slurred speech.

 9   None of them really had any -- any physical appearance of

10   having many injuries really at all.

11   BY MS. GRIFFIN:

12   Q   Now, on this first visit were you provided a prescription

13   for Percocet and for Valium?

14   A   Yes, ma'am.

15   Q   What is Percocet?

16   A   It's a pain reliever.

17   Q   What happened to that Valium and Percocet?

18   A   I sold some and I used some.

19   Q   Did you go back for a second visit to PPSA in early July?

20   A   Yes, ma'am.

21   Q   And did you see the same nurse practitioner the second

22   time?

23   A   Yes, ma'am, I believe so (nodding head affirmatively).

24   Q   Did you or do you recall seeing Dr. Ruan on that second

25   visit?

1  A   No, ma'am.

2  Q   Was there any mention by you about wanting different drugs

3  than Percocet and Valium?

4  A   Yes, there was.

5  Q   Could you tell us about that?

6  A   I believe I asked to either up my dose -- my goal was to

7  get Opana, but --

8  Q   Which is what?

9  A   It's a stronger narcotic pain reliever.

10  Q   Do you know what kind of narcotic it is?

11  A   It's -- I don't know the schedule.  I know it's

12  oxymorphone.

13  Q   Oxymorphone?  That's what you were seeking?

14  A   Yes, ma'am (nodding head affirmatively).

15  Q   Was that stronger than the Percocet you had been

16  prescribed?

17  A   Yes, ma'am, a lot stronger.

18  Q   Mr. Douthitt, did you express that specifically, that you

19  wanted oxycodone to the nurse on the second visit?

20  A   I don't recall really.

21  Q   Were you asked what you were there for on the second visit

22  or were you given Percocet again?

23  A   I was given Percocet again.

24  Q   Did there come a time when you did finally see Dr. Ruan?

25  A   Yes, I think it was the third visit.

1   Q   How is it that you saw Dr. Ruan on that visit?

2   A   You mean how was it that I -- like what made him --

3   Q   Yes.

4   A   I asked to be upped to my dose and the nurse practitioner

5   went and got him and he came in and he recommended morphine.

6   Q   I can't hear you.

7   A   The nurse -- I asked to be upped on my dosage, and the

8   nurse practitioner went and got Dr. Ruan and he came in and

9   recommended morphine.

10  Q   Is Dr. Ruan in the courtroom?

11  A   Yes, he is.

12  Q   If you'll tell us what he's wearing?

13  A   A black suit and glasses.

14          MS. GRIFFIN:  If the record will reflect that he's

15  identified the defendant Ruan?

16  Q   Is that the first time you had seen Dr. Ruan?

17  A   Yes, ma'am.

18  Q   What if anything did Dr. Ruan tell you about morphine?

19  A   Not really anything.

20  Q   Were you warned about the dangers?

21  A   No, ma'am.

22  Q   Were you warned about its usage?

23  A   No, ma'am.

24  Q   And, Mr. Douthitt, around that time were you having drug

25  screens?

1    A    Yes, ma'am, I was.

2    Q    What did you do in connection with the drug screens?

3    A    I used my son's urine.

4    Q    You had taken him with you?

5    A    Yes, ma'am.

6    Q    To the visit?  Approximately how old was your son at that

7    time?

8    A    About five years old.

9    Q    How would you take the urine into the PPSA?

10   A    In a pill bottle.  I would warm it up either with a hand

11   warmer or I would go in the restroom that's in the waiting room

12   and I would heat it up under warm water.

13   Q    Why did you do that?

14   A    To try to keep the temperature at the right level.  That

15   way when I would pour it in the urine sample cup, that it would

16   be at the right temperature when I gave it to them.

17   Q    It would be warm, is that what you're saying?

18   A    Yes, ma'am.

19   Q    Now, what do you mean, a hand warmer?

20   A    It's called HotHands.  It's like what you would use

21   whenever you go hunting.  You shake it up and it gets -- you

22   put it in your pocket to keep your legs warm or hands or

23   anything like that.  And I would just rubberband it to the pill

24   bottle with the urine in it and just keep it in my pocket.

25   Q    Were you taking drugs other than the Percocet you had

1   initially been prescribed when you were having these urine

2   tests?

3   A   Yes, ma'am.

4   Q   What type drugs?

5   A   Marijuana, or methamphetamines usually, or some other kind

6   of opiate.

7   Q   You were taking drugs you had not been prescribed?

8   A   Yes, ma'am.

9   Q   Those were street drugs?

10  A   Yes, ma'am.

11  Q   Did you ever test positive when you did any of the urine

12  tests?

13  A   No, ma'am.

14  Q   Were you also taking some of the Percocet that you had been

15  prescribed on the two earlier occasions?

16  A   Yes, ma'am.

17  Q   And when Dr. Ruan gave you the morphine, that was actually

18  Roxicodone; is that correct?

19  A   Yeah, it was -- yeah, yes, ma'am.

20  Q   Does that have a street name?

21  A   Roxy.

22  Q   R-O-X-Y?

23  A   Yes, ma'am.

24  Q   What did you do with the Roxicodone Dr. Ruan prescribed?

25  A   I injected it.

1    Q    How did you inject it?  It wasn't in a tablet?

2    A    Yes, ma'am.  I would crush it up, mix it up with water, and

3    then use like a Q-tip, the cotton off of it, and use that to

4    filter out, stick the needle in the cotton and draw it up.

5    Q    Now, while you were going to PPSA, you were injecting

6    drugs?

7    A    Yes, ma'am, I was.

8    Q    Where did you inject those drugs?

9    A    In my arms, right and my left arm (indicating).

10   Q    Did you ever have your blood pressure checked at PPSA?

11   A    Yes, ma'am, every visit.

12   Q    Did anybody comment on the track marks on your arm?

13   A    No, ma'am.

14   Q    What are track marks?

15   A    It's marks from where the needle entered my skin where I

16   would inject it.

17   Q    Do you still have some scars from the injections?

18   A    Yes, ma'am.

19   Q    Would you please stand up and show the jury what you're

20   talking about, the track marks?

21   A    I've got scars right there (indicating).

22   Q    Can you turn that arm -- turn around so -- thank you.  Can

23   you face them?

24   A    I got them there, and both here.  You probably can't see

25   because of the shirt.

3505

1   Q   You have to speak up.

2   A   You probably can't see because of my shirt, but I have them

3   there, you see there, got the scar on my tattoo, and got them

4   there (indicating).

5   Q   Thank you.  Did you have anyone check your arms for track

6   marks or injection marks?

7   A   No, ma'am.

8   Q   Were you ever fearful that they might be seen?

9   A   Yes, ma'am, I was.

10  Q   Did you do anything to conceal the track marks?

11  A   Sometimes I would put on a long-sleeve shirt.

12  Q   To keep them from being seen?

13  A   (Nodding head affirmatively).

14  Q   Once you got the Roxicodone -- and I'll show you what's

15  marked as Government's Exhibit 23-1 and ask if this is a

16  prescription you received for Roxicodone?

17  A   Yes, ma'am, it is.

18  Q   Does this contain several prescriptions you received during

19  your time as a patient at PPSA?

20  A   Yes, ma'am.

21        MS. GRIFFIN:  Your Honor, I would move to admit

22  through stipulation that these prescriptions were picked up by

23  the DEA diversion from various pharmacies for Gary Douthitt and

24  they are all contained in Government's Exhibit 23-1.

25        THE COURT:  All right.  Mark it in.

1        (Government's Exhibit 23-1 was entered into evidence.)

2   BY MS. GRIFFIN:

3   Q   Now, Mr. Douthitt, this shows --

4           MS. GRIFFIN:  May we publish it?

5           THE CLERK:  It will up be up in a minute.

6           THE COURT:  It just takes a minute.  There it is.

7   BY MS. GRIFFIN:

8   Q   This shows the prescription for August of 2012; is that

9   right?  The date?

10  A   Yes, yes, ma'am.

11  Q   And you're going to have to speak up for us.

12  A   Yes, ma'am.

13  Q   I believe I had started out asking you if you began in

14  2013.

15  A   Okay.

16  Q   You actually began sometime in 2012 going; is that right?

17  A   Yes, ma'am.

18  Q   Along with the Roxicodone, did you also receive a

19  prescription for Soma?

20  A   Yes, ma'am, I did.

21  Q   Do you know what Soma is, what drug?

22  A   It's a muscle relaxer.

23  Q   Then did there come a time when you continued receiving the

24  Roxicodone?

25  A   It actually switched to morphine, I believe.

3507

1   Q   All right.  Let's talk about October of 2012.  Did you

2   receive a prescription?

3   A   Yes, ma'am.

4   Q   For MSIR?

5   A   Yes, ma'am, I did.

6   Q   What is that?

7   A   Morphine sulfate instant release.

8   Q   How is it that you went to the MSIR morphine?

9   A   I told the nurse practitioner that the roxy wasn't strong

10  enough.

11  Q   This was approximately your fourth visit by now, fourth or

12  fifth?

13  A   I believe so.

14  Q   Did you receive 120?

15  A   Yes, ma'am.

16  Q   Of the morphine?

17  A   Yes, ma'am.

18  Q   You received them both in October and then November?  Can

19  you see the November date?

20  A   Yes, ma'am.

21  Q   Again, did you receive Soma on each of those visits?

22  A   Yes, ma'am.

23  Q   Did you see Dr. Ruan when you went up to MSIR?

24  A   Yes.

25  Q   Or morphine?

GARY DOUTHIT - DIRECT BY MS. GRIFFIN

1    A    Yes, ma'am.  That was the first time I seen him, was when I

2    got switched to morphine.

3    Q    You did not see him when he first gave you --

4    A    The roxy?

5    Q    -- the roxy?

6    A    No, ma'am, no, ma'am.

7    Q    Okay.

8    A    I was mistaken.

9    Q    When he gave you the morphine?

10   A    Whenever I went up to morphine, he came in and that's when

11   he recommended the morphine.

12   Q    I can't hear you, please.

13   A    Whenever he recommended the morphine, that's when I got to

14   see him for the first time.

15   Q    Were you counseled about morphine?

16   A    No, ma'am.

17   Q    Did you also have any procedure with Dr. Ruan?

18   A    Yes, ma'am, I had an epidural done to my back.

19   Q    Why is it you went through that if you didn't have back

20   pain?

21   A    Basically I was told that if he didn't -- if I would not

22   let him treat me, that he would refer me to a holistic doctor

23   and I didn't want to see a holistic doctor.

24   Q    What were you there for?

25   A    I was there for pain medicine.

```
 1   Q   Did there -- when you were starting to be there in the
 2   summer and into the fall of '12, did you see a different nurse
 3   or a different nurse practitioner?
 4   A   Yes.  After a few visits I was -- I started seeing a
 5   different nurse practitioner, the one with darker hair.
 6   Q   What did you do with the morphine?
 7   A   I used them and I sold some.
 8   Q   You still hadn't gotten the oxycodone that you were looking
 9   for?
10   A   The Opana?  No, ma'am.
11   Q   Opana?
12   A   No, ma'am.
13   Q   Why did you want a brand name drug?
14   A   It was a lot stronger and it sold for a lot more money.
15   Q   Why is that?
16   A   Just for the strength of it, it's a -- on the streets it's
17   a lot better pill.  You get more, you get more for your dollar
18   really.
19   Q   Is there a difference in a counterfeit drug and a brand
20   name drug?
21   A   Oh, yes, ma'am.
22   Q   Would you tell us what you mean?
23   A   A counterfeit drug is -- it's fake.  It's pressed.  You can
24   buy a pill press online and you can make your own pills.  But
25   they are not real, it's just a fake pill.
```

1  Q   So would the MSIR 120 tablets you were getting those two

2  months, would they be marked in a certain manner to indicate

3  what drug they were?

4  A   Yes, ma'am.

5  Q   Those were brand name drugs?

6  A   Yes, ma'am.

7  Q   So you injected some and you sold some; is that right?

8  A   Yes, ma'am.

9  Q   Were you continuing to use other street drugs at this time?

10  A   Yes, ma'am.

11  Q   Were you continuing to take urine tests and test negative?

12  A   Yes, ma'am.

13  Q   In connection with the urine test, you've described how you

14  took your child's urine and used it for the test.  Were any of

15  your urine tests monitored?

16  A   No, ma'am.

17  Q   What does monitored mean?

18  A   Monitored would mean somebody would be there to make sure

19  like maybe to watch you take the urine test or something like

20  that.

21  Q   Is that something that's done on occasion other places that

22  you have taken urine tests or do you know?

23  A   Yeah.  I mean, I've been monitored before.

24  Q   When you took a urine test?

25  A   Yes, ma'am.

1  Q   Did there come a time that you were told you would not be

2  maintained as a patient at PPSA?

3  A   Yes, ma'am.

4  Q   Why?  What were you told?

5  A   I was told that my last -- I believe two or three urine

6  tests were negative for the medications that I was being

7  prescribed, so they had to discharge me as a patient.

8  Q   But you had been going there about six or seven months at

9  that time?

10  A   Yes, ma'am.

11  Q   You had been getting controlled substances each visit?

12  A   Yes, ma'am.

13  Q   And you continuously had tested negative for any drugs?

14  A   Yes, ma'am.

15  Q   In connection with your office visits there, approximately

16  how long were they?

17  A   From the time that I got there, it lasted a couple of

18  hours, probably four hours, maybe five sometimes.

19  Q   And break that down for us.  How long were you in the

20  waiting room and then how long were you actually in a patient

21  room?

22  A   I was -- from in the waiting room, if I stayed for a four-

23  or five-hour visit, if I was in the waiting room, I would be

24  there for about three hours.  And then once I got to the back,

25  I would have to sit for probably another hour and wait to be

GARY DOTHERT - DIRECT BY MS. GRIFFIN

1  urine tested.  And then once I got in the office or -- I mean

2  in the examination room, I would be in there for just a couple

3  of minutes.

4  Q   And that was whether you saw Dr. Ruan or not?

5  A   Yes, ma'am.

6  Q   On the final visit, which was January of '13, were you

7  given a half a prescription for the morphine and a half a

8  prescription for the Soma?

9  A   Yes, ma'am, I was.

10  Q   Actually you were given 42 of the morphine instead of the

11  120?

12  A   Yes, ma'am.

13  Q   And that was January of 2013?

14  A   Yes, ma'am.

15  Q   Again, even with the last prescription, did you sell and

16  use some of those drugs, the morphine?

17  A   Yes, ma'am, I did.

18  Q   Could you tell us how much you were able to sell the

19  morphine for on the street?

20  A   One pill would go for about 20, $25.

21  Q   And do you recall what you had paid for the whole 120

22  tablets of morphine?

23  A   I probably didn't pay more than $20.

24  Q   For the prescription?

25  A   For the prescription, yes, ma'am.

3513

```
 1   Q   You never told anyone at PPSA that you were using street
 2   drugs while you were there?
 3   A   No, ma'am.
 4   Q   You never did get the Opana that you were seeking, though;
 5   is that right?
 6   A   No, ma'am, I didn't.
 7   Q   Had you ever been asked before the day you were terminated
 8   for not testing positive why you had not been testing positive?
 9   A   No, ma'am.
10   Q   Nobody had ever discussed that with you?
11   A   No, ma'am.
12   Q   Now, you've told us about waiting in the waiting room and
13   how long it would take.  Would you go there early to wait or
14   did you go at your scheduled time?
15   A   Sometimes I would go early, hoping that I would get in
16   early.  But I really didn't, because there were so many people
17   there.
18   Q   Was the waiting room crowded typically?
19   A   Yes, ma'am.  Yes, ma'am.  It was enough people there that
20   they had a security guard in the waiting room.
21   Q   Did you ever tell them that you had any additional pains to
22   justify increased drugs and increased numbers of pills?
23   A   Yes, ma'am, I would.  I would go in there and I would tell
24   them sometimes that I -- well, just about every time -- I would
25   lie to them and tell them that I had a pain level of like an
```

```
 1  eight.  I never told them a 10, because I figured they wouldn't
 2  believe me.  But I would tell them that I was in pretty bad
 3  pain.
 4  Q   That wasn't true, was it?
 5  A   No, ma'am.
 6  Q   What was your purpose in doing that?
 7  A   To obtain medication.
 8  Q   Did you see Dr. Ruan other than the time he came in and
 9  increased your drugs to the morphine and the procedure, did you
10  see him any other time?
11  A   No, ma'am.
12  Q   Who was it that actually terminated you and told you they
13  would not continue seeing you?
14  A   The nurse practitioner.
15  Q   You told us that you continued using the drugs even when
16  you were terminated?
17  A   Yes, ma'am.
18  Q   And did you continue using street drugs until the time of
19  your arrest sometime in 2015?
20  A   Yes, ma'am, I did.
21  Q   You were arrested for heroin and for possession of a gun?
22  A   Yes, ma'am.
23  Q   And you pled to possession of a firearm during a drug-
24  trafficking crime; is that correct?
25  A   Yes, ma'am.
```

3515

1  Q   I show you what's marked as Government's Exhibit 23-3 and

2  ask if you have previously been shown your plea agreement.

3  A   Yes, I have.

4         MS. GRIFFIN:  Your Honor, we would move to admit his

5  plea agreement, Government's Exhibit 23-3, which just contains

6  the plea agreement and not the factual resume.

7         THE COURT:  All right.  Mark it in.

8     (Government's Exhibit 23-3 was entered into evidence.)

9  BY MS. GRIFFIN:

10  Q   Mr. Douthitt, did you have about 13 and a half grams of

11  heroin?

12  A   Yes, ma'am; that's about right.

13  Q   Did you have a gun?

14  A   Yes, ma'am.

15  Q   And you pled guilty to possession of a firearm during a

16  drug-trafficking crime; is that correct?

17  A   Yes, ma'am.

18  Q   That was an ATF case?

19  A   Yes, ma'am, it was.

20  Q   Not FBI, not DEA?

21  A   Yes, ma'am.

22  Q   Did you begin to give some information to ATF?

23  A   Yes, ma'am.

24  Q   Thereafter were you contacted by DEA because of some

25  information you had provided about PPSA?

3516

```
 1   A   Yes, ma'am.

 2   Q   Then did you have an interview with DEA?

 3   A   Yes, ma'am.

 4   Q   Mr. Douthitt, did you agree to cooperate?

 5   A   Yes, ma'am, I did.

 6   Q   What do you hope to receive for your cooperation?

 7   A   Hopefully I will receive some kind of time cut.  But I'm

 8   not promised anything really.

 9   Q   You had an attorney in connection with that plea agreement?

10   A   Yes, ma'am.

11   Q   And you understand that you may or may not receive a

12   reduction; is that correct?

13   A   I understand.

14   Q   What was your responsibility under the plea agreement?

15   A   My responsibility under the plea agreement is just to plead

16   guilty to the firearm.

17   Q   Were you to tell the truth?

18   A   Yes, ma'am, I was.

19   Q   Have you been told that repeatedly?

20   A   Yes, ma'am.

21   Q   Now, I want to talk about something you've previously

22   described.  When you first got the morphine from your PPSA

23   visits, what would you do with it as soon as you got it?

24   A   As soon as I got it, I would -- I would go fill it.  And

25   then as soon as I got the medication in my hand, I would go and
```

1    I would mix up a shot and I would get high.

2    Q    Did there ever come a time when that scared you?

3    A    Yeah, quite a few times.

4    Q    Could you tell us about that?

5         MR. KNIZLEY:  Your Honor, I object as to, first, the

6    time frame.  And relevance as to whether he was scared or not.

7         THE COURT:  (Indicating.)

8         MR. KNIZLEY:  Relevance and time frame, relevance as

9    to whether he was scared or not.

10        THE COURT:  All right.  Well, you're talking about

11   after he got these prescriptions from PPSA; right?

12        MS. GRIFFIN:  Yes.

13   Q    I'm talking about after you received a morphine

14   prescription from PPSA, you said you would go fill it; right?

15   A    Yes, ma'am.

16   Q    Then what would you do?

17   A    I would get high.  And, I mean, there was a few times when

18   I would do it I thought I'd overdosed.  There was a few times

19   when I would go take a shower and I would get high while I was

20   taking a shower, laying in the tub and I'd fall asleep, nod

21   out, and wake up throwing up, vomit all over me.  I woke up a

22   couple of times in bed with vomit all over me, where I'd stop

23   breathing, stuff like that.

24   Q    You continued using, though; right?

25   A    Yes, ma'am.

GARY DOOLITTLE - DIRECT BY MS. GRIFFIN

```
 1   Q   Once you were arrested by ATF -- and this was after PPSA
 2   closed; is that right?
 3   A   Yes, ma'am.
 4   Q   Did there come a time when you were sober for a while?
 5   A   Yes, after my arrest.
 6   Q   Were you working also?
 7   A   Yes, ma'am, I was.
 8   Q   Offshore?
 9   A   Yes, ma'am.
10   Q   So that meant -- did you work a schedule?
11   A   Yeah, I worked a schedule of 28-14.
12   Q   What does that mean?
13   A   I'd go on the boat for 28 days and I'd come home for 14
14   days.
15   Q   Were you using on the boat?
16   A   No, ma'am.
17   Q   Were you using in the 14 days?
18   A   Yes, ma'am.
19   Q   Did you ultimately test positive?
20   A   Yes, I did.
21   Q   While you were on release, after pleading guilty?
22   A   Yes, I did.
23   Q   Were you revoked by the United States?
24   A   Yes, I was.
25   Q   Have you been in custody since then?
```

1  A   Yes, ma'am.

2  Q   When was that?

3  A   September 24th, I believe.

4  Q   Of what year?

5  A   2016.

6  Q   Now, Mr. Douthitt you gave us an example of the pill price

7  that you were able to sell some of these pills for prior to

8  PPSA being raided.  I'll direct your attention to after May the

9  20th of 2015 and ask if you were able to buy and sell pills on

10  the street after PPSA was raided.

11  A   Not really.  The pills on the street --

12        MR. KNIZLEY:  Your Honor, I'll object.  Beyond the

13  scope of --

14        MS. GRIFFIN:  May we approach?

15        THE COURT:  All right.

16     (At the side bar, jury not present.)

17        MS. GRIFFIN:  Your Honor, there is an allegation, of

18  course, that this is a pill mill.  And he's going to talk about

19  the prescription pills dried up on the street right after PPSA

20  closed and that people began to have counterfeit pills and that

21  people who had legitimate pills, the price was sky high.  And

22  it's our contention that was as a result of the search and the

23  shutting down of PPSA.

24        MR. KNIZLEY:  Your Honor, that's total speculation.

25  No basis whatsoever for that.  It's just -- there would have to

1    be a basis he knew this complete market, if you would, in the

2    community and he would have to know the volume of PPSA pills

3    that were illegitimate that went into the community.  And for

4    him to make an assessment or imply or opine to the jury that

5    there was now an increase in price driven by the closure of the

6    clinic, it's just sheer speculation on his part.

7            MS. GRIFFIN:  Your Honor, he's testified that he had

8    been a buyer and a seller on the street and he certainly knows

9    whether he was able to buy again and whether the prices went up

10   and whether there were any available.

11           THE COURT:  I don't think he can speculate as to the

12   cause, but I think it's relevant testimony and subject to

13   cross-examination.  So --

14           MR. KNIZLEY:  Okay.  The only objection for the

15   record, Judge, is outside the scope of the time frame of

16   allegations of the indictment.

17           THE COURT:  I think it's relevant to it.  So I

18   overrule the objection.

19       (In open court, defendants and jury present.)

20   BY MS. GRIFFIN:

21   Q   Mr. Douthitt, you had been buying and selling pills on the

22   street; is that right?

23   A   Yes, ma'am.

24   Q   After May the 20th, 2015, could you tell us, on your

25   experience, if the pills were harder to find?

3521

1   A   Yes, they were a lot harder to find.

2   Q   I cannot hear you.

3   A   Yes, ma'am, they were a lot harder to find and they were

4   more expensive.

5   Q   What do you mean by more expensive?

6   A   The price almost doubled.  Say if I was to buy roxy for

7   about 20 or $25 a piece, they went up to 35-$40 a piece and

8   usually they were fake.

9   Q   What do you mean by fake?

10  A   People were buying pill presses and pressing counterfeit

11  pills.

12  Q   So they weren't real?

13  A   No, they wasn't.

14  Q   Did you then switch to something other than prescription

15  pills that you were using?

16  A   Yes, ma'am, I did.

17  Q   What was that?

18  A   It was heroin.

19  Q   How is it that you were able to afford heroin?

20  A   I had a job.

21  Q   And what would you do with the heroin?

22          MR. KNIZLEY:  Your Honor, relevance.

23          THE COURT:  Sustained.

24          MS. GRIFFIN:  Your Honor, if I might just ask him

25  whether he used some of the heroin?

3522

```
 1            THE COURT:  All right.
 2   A   Yes, I did.
 3   BY MS. GRIFFIN:
 4   Q   Mr. Douthitt, you were aware that you had a patient file at
 5   PPSA; is that correct?
 6   A   Yes, ma'am.
 7            MS. GRIFFIN:  Your Honor, we'd show Mr. Douthitt
 8   Government's Exhibit 23-2, the Gary Douthitt patient
 9   file.  Move to admit it by stipulation with the defense that
10   this is the Greenway PPSA file for Gary Douthitt.
11            THE COURT:  All right.  Mark it in.
12       (Government's Exhibit 23-2 was entered into evidence.)
13   BY MS. GRIFFIN:
14   Q   Mr. Douthitt, I show you a May 29th, 2012, urine drug
15   screen from your file and ask is this the drug screen for Gary
16   Douthitt?
17   A   Yes, ma'am, it is.
18   Q   Does it show everything is negative in connection with your
19   urine drug screen?
20   A   Yes, it does.
21   Q   Did you have insurance during this time, Mr. Douthitt, that
22   you were visiting?
23   A   Yes.
24   Q   I'll show you your visit July of 2012, your progress note,
25   and ask if it has a name circled at the top here and here?
```

1    (Indicating.)

2    A    Yes, it does.

3    Q    Can you read those names or do I need to enlarge it?

4    A    I can read them.  One of them -- I don't know how to

5    pronounce the first name -- is Dr. Ruan's and another one is

6    Sharon Noland.

7    Q    Do you know if that was the name of one of the NPs that you

8    saw there at PPSA?

9    A    I'm not really sure.  If I was to say yes, I would be

10   lying.

11   Q    You're not sure of the name?

12   A    No, ma'am.

13   Q    This is you, Gary Douthitt?  (Indicating.)

14   A    Yes, ma'am, it is.

15   Q    And do you see where it says:  I want him to try perco

16   regularly?

17   A    Yes, I do.

18   Q    And does it say:  If no effect, will add a long acting next

19   month?

20   A    Yes, ma'am.

21   Q    Did you also, in addition to having an injection, have an

22   MRI there at PPSA?

23   A    Yes, I believe so, I did.

24   Q    Was that in the same building?

25   A    Yes, it was.

GARY DOUTHITT - DIRECT BY MS. GRIFFIN

1  Q   Now, you indicated that you were able to sell Percocet.

2  Were you able to sell the Soma as well?

3  A   Yeah, I was.

4  Q   And I direct your attention to August the 8th of 2012 for

5  Gary Douthitt and ask if you see Roxicodone listed in the

6  bottom right-hand corner?

7  A   Yes, I do.

8  Q   And does that appear to be signed by Dr. Ruan?

9  A   Yeah, there's something there.

10 Q   Do you know who's signature that is?

11 A   No, ma'am.

12 Q   Then I show you another urine screen for October the 13th

13 of '12.  Is that yours, Gary Douthitt, from your file?

14 A   Yes, ma'am.

15 Q   And does it show that everything's negative?

16 A   Yes, it does.

17 Q   So by this time you have been taking -- been prescribed

18 Soma, Percocet, Roxicodone, and shortly thereafter the MSIR; is

19 that correct?  The morphine?

20 A   Yes, ma'am.

21 Q   You were negative for all of these?

22 A   Yes, ma'am.

23 Q   Can you tell what this says?  (Indicating.)

24 A   Hold something -- I don't know -- something network.

25 Q   Is it network or not work?  Do you know?

1    A    Maybe not work.

2    Q    Were you telling the nurse practitioners that what you were

3    receiving was not working?

4    A    Yes, I was.

5    Q    And that urine test you just saw was the same day that you

6    received the prescription for 120 of the morphine; is that

7    right?

8    A    Yes, ma'am.

9    Q    You continued to receive the Soma with the morphine?

10   A    Yes, I did.

11   Q    And then I show you one more drug screen.  On January the

12   23rd of '13, is that your drug screen, Gary Douthitt?

13   A    Yes, it is.

14   Q    Does it show that you were negative for everything?

15   A    Yes, it does.

16   Q    Were you ever high or losing your high during any of your

17   visits to PPSA?

18   A    Yes, ma'am.

19   Q    Explain that to us.

20   A    When I would go into my visit sometimes I would be either

21   high on, you know, some other kind of opiate or weed or meth or

22   something like that or I'd be coming down off of it because I

23   had done did all my medications before my doctor visit.

24   Q    Did anybody ever inquire about that, was something wrong

25   with you or were you on something?

1   A   No, never.

2   Q   No one?

3   A   No, ma'am.

4           MS. GRIFFIN:  One moment, Your Honor.

5           THE COURT:  All right.

6   BY MS. GRIFFIN:

7   Q   Did you ever have a pill count, Mr. Douthitt?

8   A   No, ma'am, I didn't.

9   Q   What is a pill count?

10  A   Most of the time a doctor or the nurses want you to bring

11  your pill bottle whenever you go in for your visit because

12  usually whenever you're -- at the time of your visit you should

13  have maybe a couple of them left and they'd want to just check

14  to make sure that you've been taking your medications and you

15  haven't been using them or selling them.

16  Q   Were you able to do that?  Were you able to bring the

17  medicines in?

18  A   No, ma'am, I wasn't.

19  Q   What did you do to cover yourself if you were asked about a

20  pill count?

21  A   Sometimes --

22          MR. KNIZLEY:  Judge, object, whoever he was asked

23  by.  There's --

24          THE COURT:  I thought he testified that there wasn't

25  any pill count.

1    BY MS. GRIFFIN:

2    Q    You didn't have a pill count, did you?

3    A    No, I didn't have a pill count.  But --

4    Q    Did you do anything in anticipation of a pill count if you

5    were asked?

6    A    Sometimes, yes, I would try to put -- I would calculate how

7    many I should have left and I would try to put them to the side

8    to bring with me when that -- to try to just --

9    Q    But you never had a pill count there?

10   A    No.

11   Q    Now, do you know whether or not the prescriptions you were

12   prescribed were signed when you got there for the second,

13   third, and subsequent visits?

14   A    Yeah, a lot of the times whenever I would come in -- or I

15   mean the nurse practitioner would come in, they would have a

16   file, a patient file, and they would have a paperclip and there

17   would be a prescription already made out in the patient file.

18   Q    When you asked for an increase, were you given the

19   prescription that was paperclipped to your patient file?

20   A    Some -- usually when I asked for an increase, if there was

21   a change to it, the nurse practitioner would go to Dr. Ruan's

22   office and get it changed.  But if there was nothing that

23   changed, they would just hand me the paper out of the file.

24   Q    Had it been signed already by the doctor or by someone?

25   A    Yes, ma'am.

1  Q   Did you assume that was Dr. Ruan?

2  A   Yes, I did.

3  Q   And was it handed to you that way, already signed, on the

4  times when you did not see Dr. Ruan?

5  A   It was always the same.

6  Q   It was already signed?

7  A   Yeah, unless something changed, yeah.

8  Q   And then what happened?  Would the nurse practitioner go

9  out of the room and come back in?

10  A   Yes, ma'am.  There was an office in the back back there and

11  when I had a change, she would go back there and I guess okay

12  it with Dr. Ruan, and she would come back with a different

13  paper.

14  Q   Now, you described the nurse practitioner that you

15  initially saw.  Can you describe the nurse practitioner that

16  you ended up seeing thereafter?

17  A   I want to say she was maybe my height, dark hair, maybe

18  dark brown, a little bit curly, always had it in a ponytail.

19  Q   So you saw two different nurse practitioners?

20  A   Yeah.  In the beginning I seen one with hair about your

21  color, a little bit longer, and then later, after a few visits,

22  I got changed to the one with the dark hair.

23          MS. GRIFFIN:  One moment, Your Honor.

24          THE COURT:  All right.

25      (A discussion was held off the record between government

 1     counsel.)

 2          MS. GRIFFIN:  Nothing further for this witness at this

 3     time, Your Honor.

 4          THE COURT:  Mr. Knizley?

 5                         CROSS EXAMINATION

 6     BY MR. KNIZLEY:

 7     Q   Mr. Douthitt, my name's Dennis Knizley.  You and I have

 8     never met, have we?

 9     A   No, sir.

10     Q   Before coming to court today, have you had an opportunity

11     to talk with the prosecutors sitting at this table, Mr. Bodnar

12     and Ms. Griffin?

13     A   Yes, I did.

14     Q   And when's the last time you spoke with them?

15     A   I spoke with her earlier.

16     Q   Earlier today?

17     A   Yes, ma'am -- yes, sir.

18     Q   And before that had you had an opportunity to speak with

19     either of the prosecutors sitting here?

20     A   Yeah.  I don't recall which one it may have been.  But yes,

21     I did speak with them.

22     Q   About how long ago?

23     A   It's been a couple of months, maybe five months, six months

24     or so.

25     Q   Five months ago, to your best recollection?

1   A   I believe so, yes, sir.

2   Q   And was that Ms. Griffin again, as well?

3   A   I think so, yeah.

4   Q   And did you have an opportunity to talk with other law

5   enforcement agents after your arrest for heroin?

6   A   Yes, I did.

7   Q   And who was that?

8   A   Wade Vittitow, ATF agent.

9   Q   Was that about another matter or about this matter?

10  A   It was about my -- my arrest.

11  Q   Okay.

12  A   But not this matter.  The only people I spoke with on this

13  matter was them.

14  Q   Were you cooperating with law enforcement in the matters

15  involving your arrest?

16  A   Yes, sir, yeah (nodding head affirmatively).

17  Q   And were you doing any undercover activity?

18  A   Yes.

19  Q   Were you wearing a wire or anything like that?

20  A   Yes, I was.

21  Q   Okay.  And were you -- okay.  And after that did you see

22  some other law enforcement officers and were handed over to

23  testify in this case?

24  A   I didn't speak with any law enforcement officers on this

25  case, no.

3531

1    Q   Okay.  Just the prosecutors?

2    A   Just prosecutors.

3    Q   In your work with police officers or FBI or DEA or ATF, you

4    spoke with them about your other case?

5    A   Yes.

6    Q   And who was that?  I put a bunch of letters out there.  Was

7    it ATF or who?

8    A   ATF, yes, Wade Vittitow.

9    Q   And were you talking about firearms cases or drug cases or

10   what?

11   A   Drug case.

12   Q   Drug cases?

13   A   Yeah.

14   Q   And have you cooperated with other drug cases?

15   A   Yes, I have.  Just mine.

16   Q   I'm sorry?

17   A   Yes, just mine.  My case.

18   Q   Other people you may have been dealing drugs with, is that

19   what you're talking about or what?

20   A   Well, I don't recall what the relevance is to that -- my

21   cooperation has to do with this case, though.

22   Q   Yes, sir.  Did you -- were you cooperating in your drug

23   case --

24   A   Yes, I was.

25   Q   -- against -- regarding people you had had some drug

```
 1   dealings with?

 2   A   Yes.

 3   Q   And are you continuing to do so?

 4   A   No.

 5   Q   That's over?

 6   A   That's over with, yes.

 7   Q   And after -- when did that end, if you know?

 8   A   Around maybe October last year, November something.

 9   Q   October 2016?  Were you already back in jail by that time?

10   A   Not at that time, no.

11   Q   You went back to jail September 30th; right?

12   A   Yes, September 24th.

13   Q   So it would have been before that; right?

14   A   Uh-huh (positive response).

15   Q   Sir?

16   A   September 24th of this year.

17   Q   So your cooperation had ended before you went back to jail

18   or do you recall?

19   A   Yes, yes.

20   Q   Do you know how long before you went back to jail your

21   cooperation ended in the other case?

22   A   It was probably -- yeah, it was about five months.

23   Q   Okay.

24   A   Four months or so.

25   Q   Four to five months, to the best of your recollection?
```

1    A    Yeah.

2    Q    From September 24th, 2016 --

3    A    Yes.

4    Q    -- is when your cooperation ended on the other case?

5    A    As a matter of fact, I spoke with the prosecutors here in

6    May.  That's whenever I was -- I had got out of jail in Brewton

7    in May.  That's when I spoke with them.

8    Q    You got out of jail in Brewton and you were in federal

9    custody in Brewton?

10   A    Yes.  Yes, sir.

11   Q    On this, on your heroin case?

12   A    Yes.

13   Q    And the gun case?

14   A    Yes (nodding head affirmatively).

15   Q    And you got out and you came and talked with Ms. Griffin on

16   this case?

17   A    Yes, ma'am -- yes, sir.

18   Q    All right.  Were you still cooperating on your --

19   A    No.

20   Q    -- other case?  That was over with?

21   A    That was over with, yeah.

22   Q    Okay.  So your cooperation with your other case ended up --

23   when were you arrested on your drug case?

24   A    In July.

25   Q    When did you come into federal custody on your drug case?

1    A    In May.

2    Q    Okay.  So by the time you got in in May, were you finished

3    with your cooperation on your drug case?

4    A    Yes (nodding head affirmatively).

5    Q    And so when you came into federal custody, the drug case

6    cooperation was over?

7    A    Yes.

8    Q    And I assume you had not made your deal, if you will, or

9    had your plea bargain and plea agreement before that time; is

10   that right?

11   A    No, I didn't get my plea on the -- I didn't get my plea for

12   the firearm until I came into court.

13   Q    You got your plea to the firearm.  Was it in association

14   with your cooperation in this case?

15   A    No, not this case.

16   Q    The other case?

17   A    The other case, yes.

18   Q    This was something more; is that right?

19   A    Yes.

20   Q    All right.  Now, I think the prosecutor had asked you some

21   stuff about when you started your drug life.  Do you remember

22   that?

23   A    Yes, I do.

24   Q    And you said in your early 20s; is that right?

25   A    Yes, sir.

3535

1    Q    How old are you?

2    A    33.

3    Q    So it was -- your best recollection -- 23; is that right?

4    A    21, 23, somewhere around there.

5    Q    Okay.  And you had said your drug of choice was injections;

6    is that correct?

7    A    Yes, it is.

8    Q    There's other drugs you had a choice of as well, is there

9    not?

10   A    Yes.

11   Q    Could you tell the ladies and gentlemen of the jury what

12   kind of drugs you've been involved in in your drug life?

13   A    Marijuana, methamphetamines, opiates, sometimes cocaine.

14   Q    Anything else?

15   A    No.

16   Q    And you've been doing that for about 10 years; does that

17   sound right?

18   A    10 or better, yeah.

19   Q    And you said that you were a drug addict and a drug

20   distributor at the time you went to PPSA?

21   A    Yes, sir.

22   Q    And you had a five-year-old child you brought with you?

23   A    Yes, sir.

24   Q    And did you bring that five-year-old child with you

25   routinely when you had to do a drug test?

1   A   Yes, I did -- well, not every time, no.  Sometimes I would
2   just bring the urine with me.  Sometimes he was with me.
3   Q   All right.  Well, you only took three urine tests; right?
4   A   Yes, I believe.  I don't recall the number now.
5   Q   Well, if it were three, do you recall how many times you
6   brought your five-year-old child in there to give his urine for
7   you?
8   A   I could get his urine before or during.  It didn't matter.
9   Just -- me bringing him with me didn't -- didn't have any
10  effect on whether or not I was taking my urine test.
11  Q   Tell me when you got your five-year-old child's urine to
12  bring in.  Did you do it on the first occasion?  Did you use
13  your five-year-old child's urine every time you falsified --
14  A   Every time I falsified, yes.
15  Q   Excuse me.  Excuse me.  Every time you falsified your
16  urinalysis?
17  A   Yes, I did.
18  Q   You involved your five-year-old child at least three times?
19  A   Yes.
20  Q   And then did you get the urine from your child at home or
21  did you bring him to the office and get it?
22  A   Usually I could get it at home.  Sometimes I would do it
23  there.
24  Q   Did you do -- if you only went three times --
25  A   Yes.

 1   Q   -- do you ever recall taking his urine while there?

 2   A   Yes.  One time, yes, I recall doing it at the office, yes.

 3   Q   Two other times you got his urine from your home?

 4   A   Yeah (nodding head affirmatively).

 5   Q   And you said you were high when you went there; is that

 6   right?

 7   A   Yes, sometimes.

 8   Q   Coming off your high?

 9   A   Sometimes, yes.

10   Q   Well, how many times did you go there?

11   A   A total of probably six times maybe.

12   Q   All right.  Were you there high every time?  One time?  Or

13   two times?

14   A   I -- I can't tell you an exact number.  Most of the time I

15   was high, yes.

16   Q   All right.  Were you high the first time?

17   A   I don't recall.

18   Q   So sometimes you were high with your five year old?

19   A   Uh-huh (positive response).

20   Q   And you were using him to lie about the drug test?

21   A   Yes, sir.

22   Q   Now, you said you were arrested for heroin.  Could you tell

23   the ladies and gentlemen of the jury what the charge was you

24   were arrested for?

25   A   Possession with the intent to distribute.

1  Q   Now, what charge were you originally arrested for?

2         MS. GRIFFIN:  Objection, Your Honor.  And I don't know

3  what he's referring to or the relevance.  May we approach?

4         THE COURT:  You may.

5      (At the side bar, jury not present.)

6         MS. GRIFFIN:  Your Honor, the rule allows him -- the

7  rule, of course, allows him to talk about convictions.  He was

8  arrested for trafficking in the state with the gram weight, and

9  the fact that that's not still pending doesn't have anything to

10  do with him being convicted here today.

11         MR. KNIZLEY:  Except for the fact he was asked:  Were

12  you arrested for heroin?  And that's not what he was arrested

13  for.  He was arrested for trafficking in heroin.  And if we're

14  going to ask him what he's arrested for, we have a right for

15  the jury to know exactly what he was arrested for, not

16  characterize it as something it's not.

17         MS. GRIFFIN:  Judge, I believe I asked if he was

18  charged with heroin and a gun and allowed to plead to the gun,

19  and that covers the federal indictment.

20         THE COURT:  Yeah.

21         MR. KNIZLEY:  I wrote down arrested and that's why I

22  asked the question.

23         THE COURT:  Well, let's just stick with the federal

24  charges unless he's been convicted of something else.

25         MR. KNIZLEY:  Well, Judge, you know -- and I'm

1    obviously going to follow the Court's order.  But, you know, if

2    we ask questions and say it one way and the truth is the other,

3    we need to be able to make it very clear what he actually was

4    arrested with.

5            MS. GRIFFIN:  That's not --

6            MR. KNIZLEY:  He wasn't arrested for heroin.  He was

7    arrested for trafficking in heroin.

8            THE COURT:  He was arrested for possession of a

9    firearm in connection with dealing heroin.

10           MR. KNIZLEY:  No, he was arrested for trafficking in

11   the state court for heroin.  That's what he was arrested for.

12           THE COURT:  That's what she asked him about.  But it

13   could be -- but I just don't know.  But let's just stick with

14   the federal charges.  Okay?  He hasn't been convicted of the

15   state charges; right?

16           MR. KNIZLEY:  No, ma'am.  But the issue is we were

17   trying to ask him a question about what he was arrested for and

18   we were asking it in such a fashion we want to minimize the

19   impact of his arrest and we don't want to --

20           THE COURT:  You do?

21           MR. KNIZLEY:  She does.

22           MS. GRIFFIN:  No.

23           THE COURT:  You said we.

24           MR. KNIZLEY:  Well, okay.

25           THE COURT:  What you're talking about --

1          MR. KNIZLEY:  That's In the courtroom.  And I'm

2  getting to what the truth of the answer should have been, which

3  was:  I was arrested for -- she said:  You were arrested for

4  heroin, was the question.  And I had said:  Yes, well, that's

5  not right.  He was arrested for trafficking in heroin, which

6  the jury is entitled to know, if we're going to talk about it,

7  if we're going to talk about it --

8          THE COURT:  Hold on.  The very fact that he was

9  convicted of possession of a firearm in connection with

10  trafficking in heroin answers that question.  So let's just

11  move on.  Okay?

12      (In open court, defendants and jury present.)

13  BY MR. KNIZLEY:

14  Q   Sir, you were arrested and then you were -- on state court

15  charges and then you were brought to the federal court system;

16  is that right?

17  A   Yes, sir.

18  Q   What were you charged with in the federal court system?

19  A   Possession with the intent to distribute heroin.

20  Q   What else?

21  A   Possession of a firearm in furtherance of a drug-

22  trafficking crime.

23  Q   And you understand that's an extremely serious allegation,

24  do you not?

25  A   Yes, I do.

1  Q   And do you understand that if you were convicted of the

2  first charge --

3          MS. GRIFFIN:  Objection, Your Honor, as to

4  relevance.  He was not convicted of the first charge.  And we

5  ask that be stricken from the record.

6          THE COURT:  Rephrase the question, if you will.

7  BY MR. KNIZLEY:

8  Q   If you had been convicted of the two charges you were

9  facing in federal court, if you had been --

10          MS. GRIFFIN:  Your Honor, I object.  It goes into the

11  penalty portions of those cases and that's for the Court.

12          THE COURT:  Yeah.  I sustain the objection.

13          MR. KNIZLEY:  Judge, I haven't --

14  Q   Did you have two charges?

15  A   Yes.

16  Q   Did you understand -- did you plead guilty to two charges?

17  A   No, I didn't.

18  Q   Which one did you plead guilty to?

19  A   Possession of a firearm in furtherance of a drug-

20  trafficking crime.

21  Q   Do you know if you're charged with the more serious of the

22  two charges?

23  A   The one I pled guilty to.

24  Q   And why is that?

25  A   Because at the time, I mean, it's -- it's only five years.

3542

1  Q   But if you pled guilty to both of them, what would it be?

2       MS. GRIFFIN:  Objection as to relevance, Your Honor.

3  He did not.

4       MR. KNIZLEY:  And, Judge, that's the relevant --

5       THE COURT:  Sustained.  All right.  Sustained.

6  BY MR. KNIZLEY:

7  Q   Did your lawyer negotiate with the prosecutors for you in

8  order for you to plead guilty to a charge that would have

9  reduced your exposure to the penitentiary?

10 A   No.  I'm going to the penitentiary regardless.

11 Q   Let me say it again, please.  Did your lawyer negotiate

12 with the prosecutors to allow you to plead guilty to charges --

13 a charge, a singular charge -- that you felt would have reduced

14 your exposure in sentencing?

15      MS. GRIFFIN:  Your Honor, it's asked and answered.

16      THE COURT:  Overruled.

17 A   Yes.

18 BY MR. KNIZLEY:

19 Q   And one reason they did that is because you were

20 cooperating; right?

21 A   Yes.

22 Q   And you began your cooperation, did you not, by deciding to

23 talk about people that were involved in the drug trade; is that

24 right?

25 A   Yes.

3543

1  Q   And you told the ladies and gentlemen of the jury your

2  familiarity with the drug trade today; right?

3  A   Yes.

4  Q   And you began to tell on them; right?

5  A   Yes.

6  Q   And when you first came to federal court, were you in jail

7  or out of jail?

8  A   I was out of jail -- no, I was in jail.  I was in jail.

9  Q   You were in jail; right?  Remember, you was in Brewton;

10 right?

11 A   Yes, yes.

12 Q   And Brewton is a county facility that holds federal

13 prisoners; is that right?

14 A   Yes.

15 Q   And you came here and you had what's called a detention

16 hearing, did you not?

17 A   Yes.

18 Q   And were you detained or not detained?

19 A   I was detained.

20 Q   And then did there come a time after the detention

21 hearing -- what -- tell the ladies and gentlemen of the jury

22 what it means when you're detained in federal court?

23 A   I'm in jail.

24 Q   And until when?

25 A   Until I'm released.

3544

1   Q   Well, until your trial; right?

2   A   Yeah.

3   Q   And if you have a trial and you're successful, then you're

4   found not guilty and you go home; right?

5   A   Uh-huh (nodding head affirmatively).

6   Q   But if you're not, whatever the consequences may be, you

7   remain in jail; right?

8   A   Yes, sir.

9   Q   All right.  Now, and once you're detained in federal court,

10   you stay there; right?

11   A   Yes.

12   Q   Until trial?

13   A   (Nodding head affirmatively.)

14   Q   Did you stay there?

15   A   No.

16   Q   Well, did something happen that caused you to get out of

17   jail?

18   A   Yes.

19   Q   And I think you had told us that you had already negotiated

20   with the --

21   A   Yes.

22   Q   -- law enforcement before you came here; right?

23   A   Yes, yes.

24   Q   And you had struck a deal?

25   A   (Nodding head affirmatively.)  Yes.

1  Q   To plead guilty to one thing?

2  A   Yes.

3  Q   And you pled guilty to one thing?

4  A   Yes.

5  Q   Right?  And not two?

6  A   Yes.

7  Q   And you also struck a deal to get yourself out of jail;

8  right?

9  A   Yes.

10  Q   And what was that deal?

11  A   I got out on pretrial.

12  Q   All right.  Because you agreed to cooperate again; right?

13  A   No.

14  Q   They just changed it for no reason?

15  A   I don't know what made them change it.  I didn't cooperate

16  again or anything.

17  Q   So you're telling the ladies and gentlemen of the jury that

18  you were detained and just -- it happened that you got out of

19  jail?

20  A   I believe my pretrial was because of the cooperation that I

21  did before, not after.

22  Q   Go ahead.  I'm sorry.

23  A   I didn't have any cooperation after.

24  Q   But your pretrial began for whatever reason; in your

25  understanding, it was for your cooperation; is that right?

GARY DOLIHITE - CROSS BY MR. KNIZLEY

1   A   Before, yes.

2   Q   You got detained and got out of jail, and the reason you

3   got out of jail was because you were cooperating; right?

4   A   Because I did cooperate.

5   Q   And when you told -- did you tell the judge that you were

6   going to follow by the rules of your release?

7   A   Yeah, I did.

8   Q   And did you do that?

9   A   No.

10  Q   Did you lie to the judge?

11  A   No, I didn't intend to do it.

12  Q   You just unintentionally did it?

13  A   I guess.  At the time I did not intend to get out and use

14  drugs, no.

15  Q   But you did, still?

16  A   Yeah, I did.  A couple of months later, yes.

17  Q   A couple of months after you got out, it was only about

18  three months ago; right?

19  A   Yes.

20  Q   So three months ago you had already violated your terms of

21  release; right?

22  A   Yes.

23  Q   And by coming in here today, you're hoping that you're

24  going to get a favorable sentence, are you not?

25  A   Yes.

1  Q   And that's after you've already got a favorable plea

2  bargain; right?

3  A   Yes.

4  Q   You got a deal there for not having to plead to but the

5  one; right?

6  A   Yes.

7  Q   Or cooperating?

8  A   Right.   (Nodding head affirmatively.)

9  Q   Right?  Right?

10  A   Yes.

11  Q   You got out of jail for cooperating; right?

12  A   Yes.

13  Q   And now you're in jail and you come in here to cooperate in

14  hopes that you can reduce whatever jail time you may be getting

15  again?

16  A   Not again.  It's all the same thing.  It's all the same

17  case.

18  Q   You're hoping for -- you're hoping for the cooperation to

19  be of assistance to you at least for the third time, one being

20  when you got your only pleading to one count; right?

21  A   Yeah.

22  Q   Second time, when you got out of jail?

23  A   Yeah.

24  Q   Third time, now you want a better deal; right?

25  A   I guess, yeah.

1  Q   Do you guess you want a better deal or do you want a better
2  deal?
3  A   Yeah.  But you're making it sound like I got out of jail
4  and wasn't going to be coming back.  When I got out on
5  pretrial, pretrial release is a release until you come for
6  sentencing, just to make that clear.  So he's trying to make it
7  seem like I just got out of jail and wasn't coming back, like I
8  just got a better deal and was going to get a better deal.
9  It's not like that.
10  Q   But when you do get out of jail like that, it's something
11  other people don't get; right?
12          MS. GRIFFIN:  Objection as to foundation.
13          THE COURT:  Sustained, sustained.
14  BY MR. KNIZLEY:
15  Q   Well, do you know what other people --
16          MS. GRIFFIN:  Objection, Your Honor.  There's no
17  foundation.
18          THE COURT:  Sustained.  Sustained.
19  BY MR. KNIZLEY:
20  Q   Do you remember going to Dr. Rockwell in Baldwin County?
21  A   Yeah.
22  Q   And when did you do that, if you recall?
23  A   I -- I don't have a date that I went.  That's my family
24  doctor.
25  Q   How long have you gone to Dr. Rockwell?

3549

GARY DOUTHIT - CROSS BY MR. KNIZLEY

1   A   I've gone to Dr. Rockwell for a couple of years.

2   Q   So you said Dr. Rockwell was your family doctor?

3   A   Yes.

4   Q   And you said a couple, a couple of years.  Do you mean two

5   years or do you mean more than two years?

6   A   More than two years.

7   Q   About how long have you been going to Dr. Rockwell?

8   A   Possibly five, six years maybe.

9   Q   And did -- what did you first go to Dr. Rockwell for, if

10  you recall?

11  A   He's a family doctor.  I go to him for anything.

12  Q   Did you go to him for any pain problems that you had?

13  A   Yeah.  He's referred me to two pain management clinics.

14  Q   Well, before he referred you, did you go to him because you

15  had some pain?

16  A   Yeah, I did.

17  Q   Did you -- did you lie to Dr. Rockwell or did you have

18  pain?

19  A   I lied.

20  Q   When did you first lie to Dr. Rockwell about your pain?

21  A   I don't recall.

22  Q   Did you tell Dr. Rockwell when you went to see him that you

23  had been injured in a football accident?

24  A   Yeah.

25  Q   Football?  What else did you tell him?  Did you tell him

1   you had broke your neck, patella bone, playing football in

2   1997?

3   A   Yes.

4   Q   Did you tell him you had a four-wheeler wreck?  Well, did

5   you break your neck?

6   A   I did, yeah.

7   Q   Your patella bone?  Huh?

8   A   Yeah, I did.  I did

9   Q   So that was true?

10  A   Yeah.

11  Q   Okay.  Did you have a four-wheeler wreck in 2007, was that

12  true?

13  A   No, it wasn't.

14  Q   You just told that lie?

15  A   Yeah.

16  Q   To Dr. Rockwell?

17  A   Yeah.

18  Q   And he -- and you'd been going to him for a long time, he

19  was your family doctor?

20  A   (Nodding head affirmatively.)

21  Q   Did you fall at work and fracture your right collarbone in

22  2008?

23  A   No.

24  Q   Did you tell Dr. Rockwell you did?

25  A   Possibly, yeah.

3551

1  Q  Do you recall?

2  A  I don't recall.

3  Q  I mean, you may have told him, may not?

4  A  I might have, yeah.

5  Q  Might have lied to him, might not; right?

6  A  Yeah.

7  Q  Can't remember the lie you told?

8  A  I don't know if I did.  I mean, when it comes to the pain,

9  I don't know if I lied to him about trying to get more

10  medication or not.  No telling.

11  Q  Did you tell Dr. Rockwell in 2011 that you fell and hurt

12  your waist [sic] and broke your middle and ring finger on your

13  right hand?

14  A  Yeah, I did do that.

15  Q  That was true?

16  A  Yeah.

17  Q  And do you recall whether Dr. Rockwell had prescribed you

18  some medications when you came to see Dr. Ruan?

19  A  Repeat the question?

20  Q  Do you recall whether you were under medication,

21  prescription medication, from Dr. Rockwell when you came to see

22  Dr. Ruan?

23  A  No, I wasn't.

24  Q  You weren't taking from Dr. Rockwell Xanax, Lortab, and

25  Soma?

```
 1   A   Not pain medications, no.  I probably was -- I was probably
 2   being prescribed Xanax, yeah.
 3   Q   All right.  So if the records indicate that that's what you
 4   told Dr. Ruan you were on, that would be incorrect?
 5           MS. GRIFFIN:  Which doctor?  Excuse me, Your Honor.
 6   Can we have him clarify which doctor?  I believe he said
 7   Dr. Ruan.
 8           THE COURT:  I think he did.
 9           MR. KNIZLEY:  Dr. Rockwell.
10   Q   Did you understand what I asked you?
11   A   No.  Repeat the question.
12   Q   Do you remember coming to see Dr. Ruan?  Do you remember
13   when you first came to see Dr. Ruan?
14   A   Yes, sir.
15   Q   May 29th, 2012?
16   A   Yes, sir.
17   Q   Do you remember him asking you what medications you were
18   on?  Or his staff?
19   A   Yes.
20   Q   And do you remember telling them that you was on Soma,
21   Lortab, Xanax?
22   A   It was possible, yeah.
23   Q   And do you know what the Holy Trinity is?  Ever heard that
24   term?
25   A   No, I don't.
```

3553

1   Q   Do you recall being on Xanax, Lortab, and Soma from

2   Dr. Rockwell when you came to see Dr. Ruan?

3   A   No, no.

4   Q   But when you came to see Dr. Ruan, you know he did not

5   prescribe that combination of drugs for you, did he?

6   A   I don't believe so.

7   Q   All right.  Well, you told the ladies and gentlemen of the

8   jury that you remembered what he prescribed you.  Do you

9   remember or not?

10  A   I mean, Dr. Ruan did not prescribe me Xanax.

11  Q   Right.  But do you remember what -- do you or do you not

12  remember --

13  A   He prescribed me Percocet and Soma.

14  Q   -- what Dr. Ruan prescribed you?  I'm sorry.  I didn't

15  understand you.

16  A   He prescribed me Percocet and Soma.

17  Q   All right.  So no Xanax?  No Lortabs?

18  A   No.  He don't prescribe Xanax -- or he didn't prescribe me

19  Xanax.

20  Q   And you say he doesn't.

21  A   I'm not going to say he doesn't, because I don't know.  I'm

22  saying he did not prescribe me Xanax.

23  Q   I'm going to show you what's from your medical file from

24  Dr. Ruan and show you -- that's your initial information sheet.

25  A   Yes.

3554

 1   Q   And in that initial information sheet does it say the

 2   nature of the medications you were on here?  Do you see that?

 3   A   That's not medication I was on.  That's medication I had

 4   taken.

 5   Q   All right.  Well, how about treatment medications?  Did you

 6   relate the Lortab, Oxycontin, and Soma when you first came in

 7   there?

 8   A   What is this?  What paper is that?

 9   Q   That's the initial indication when you came to his office

10   the first time.

11   A   Initial indication, what are you saying this is, though?

12   This says it's medication that I have taken?

13   Q   That you were taking.

14   A   Not at the time.  When I went to the doctor visit, there's

15   no way I could be taking medications like pain medications when

16   going to that visit and be able to get anything.

17   Q   And I'm not making myself clear.

18   A   You can't overlap your prescriptions like that.

19   Q   I'm saying what was the last prescription either

20   Dr. Rockwell or Dr. McKnight had given you prior to you coming

21   to see Dr. Ruan?

22   A   I don't know what the last prescription that he had given

23   me was.

24   Q   Okay.  And do you --

25   A   That's been since 2013.  This is 2017 right now.  You're

 1   talking multiple doctor visits.

 2   Q   I'm sorry.  What did you say?

 3   A   I said you're talking about multiple doctor visits.  I

 4   can't tell you exactly what the last prescription Dr. McKnight

 5   had given me was.

 6   Q   I'm just asking do you remember you getting those three,

 7   that Lortab --

 8   A   Dr. Rockwell's never given me Lortab that I can recall.

 9   Q   Now, when you came to see Dr. Ruan, you said there was a

10   lady named -- that you saw.  Was her name Sharon Noland or do

11   you recall that?

12   A   I don't recall her name.

13   Q   I'm going to show you the progress note or the initial

14   visit note.  And tell me whose name appears at least down here,

15   on June 12, 2013 [sic], visit?

16   A   Sharon Noland.

17           THE REPORTER:  2012.

18   BY MR. KNIZLEY:

19   Q   That's signed by Dr. Ruan the next day; is that right?

20   A   Yeah, that's what it says.

21   Q   And that lady was there on that visit, on the June 12th

22   visit, if that lady's name was Sharon Noland.  Could you tell

23   us again what her appearance was?

24   A   My first visit, I want to say she had lighter brown hair.

25   Q   And it's your testimony that Dr. Ruan never came in the

 1   examination room on the first visit?

 2   A   That's -- yes.  That's right.

 3   Q   Now, did you sign some other documents when you came in

 4   there with Dr. Ruan that first visit?

 5   A   I'm sure I -- I'm sure I signed multiple documents that

 6   day.

 7   Q   Did you sign what's called on opioid agreement?  Do you

 8   remember that?

 9   A   No, I don't.

10   Q   I'm going to show you what's out of your medical file.  And

11   do you see your signature on the second page of this?

12   A   Yes, I do.

13   Q   And it's dated May 29th?

14   A   Yes.

15   Q   And that was the first day you came in there?

16   A   I believe so.

17   Q   Okay.  And do you see what it says this is?  An opioid

18   agreement; right?

19   A   Yes, sir.

20   Q   And in this agreement do you agree to do various things?

21   A   Yeah, at the bottom.

22   Q   Do you agree to take the opioids that you're prescribed in

23   the manner consistent with what the doctor tells you to take

24   it?

25   A   Yeah.

```
 1   Q   And you agree not to divert them or use them or give them
 2   to someone else?
 3   A   Yes.
 4   Q   Did you lie in that document?
 5   A   Yeah.
 6   Q   Now, on your first visit did the doctor tell you he was
 7   going to give you certain procedures?
 8   A   No.
 9   Q   Did he tell you that?
10   A   I didn't speak with the doctor my first visit.
11   Q   Well, at the first visit were you told by anyone that you
12   were going to get a first procedure -- that you were going to
13   be given some procedure?
14   A   No, not on my first visit.  I don't believe so.
15   Q   Okay.  How about on your visit of July 11?  They didn't
16   tell you they was going to do an epidural or anything like
17   that?
18   A   No.
19   Q   Or give you an MRI?
20   A   Not on my first visit, no.
21   Q   Are you sure?
22   A   Pretty sure.
23   Q   Are you positively sure or just pretty sure?
24   A   I'm pretty sure.
25           MS. GRIFFIN:  Object.
```

 1  A    I mean, the epidural didn't come for a couple of months

 2  later.

 3  BY MR. KNIZLEY:

 4  Q   Couple of months?  Okay.

 5        THE COURT:  Mr. Knizley, can we take our afternoon

 6  break at this time?

 7        MR. KNIZLEY:  Yes, ma'am.

 8        THE COURT:  All right.  Ladies and gentlemen, leave

 9  your pads on your chairs.  Take your break downstairs in the

10  jury assembly room.  No discussion about the case.  We will

11  call you back in about 15 minutes.

12        We're in recess.

13    (A recess was taken at approximately 3:01 p.m.)

14    (In open court, 3:23 p.m., defendants and jury present.)

15        THE COURT:  All right, Mr. Knizley.

16  BY MR. KNIZLEY:

17  Q   Mr. Douthitt, taking you back to your May 29, 2012, visit,

18  that was your first visit; is that right?

19  A   Yes, sir.

20  Q   I show you down here it says that you were currently using

21  Valium three times a day; is that right?  Do you remember that?

22  A   Yes, sir.

23  Q   Is that correct?

24  A   Yes.

25  Q   All right.  And what Dr. Ruan did, aside from taking you

1   off any other pain medication you may have been on, he reduced

2   that Valium too, did he not?

3   A   Yeah, I think he took me off of it.

4   Q   Well, he reduced it, is what he did, didn't he, to one time

5   a day?  See it down here?  (Indicating.)

6   A   Okay.

7   Q   Okay?  And he also gave you a cream for your injury, did he

8   not?

9   A   Okay.

10  Q   And that's because you were complaining of pain; right?

11  A   Yes.

12  Q   Again, that was a lie?

13  A   I told him I was in pain.

14  Q   Were you in pain or not in pain?

15  A   No, I wasn't.

16  Q   After May, then you came in July next.  Does that sound

17  right?

18  A   Yes.

19  Q   Okay.  And in July 11, 2012, you came again?  Do you

20  remember that?

21  A   Yes, sir.

22  Q   All right.  Did you have an MRI at that time?

23  A   I had an MRI at one point, yeah.  It was probably that day.

24  Q   All right.  Well, let's look.  Does it say right there:

25  Just did MRI?  And do you know what NCV is, nerve conduction --

3560

```
 1   A   Yeah, that's probably that electronic thing they did where
 2   they put the little probes on you.
 3   Q   And that was that day; is that right?
 4   A   Yes, sir.  Yes, sir.
 5   Q   What did he do with the Valium then?
 6   A   It says:  Stopped Valium.
 7   Q   Okay.  And is he trying to get you some medication and he
 8   wanted you to try Percocet then, did he not?
 9   A   Yes, sir.
10   Q   And said he appeared to be -- you told him you had lower
11   back pain; right?
12   A   Yes.
13   Q   Is that a lie?
14   A   Yes.
15   Q   And you couldn't get back for followup, going through a
16   separation with your wife.  Was that true?  Was that true or a
17   lie?
18   A   No.  I was, I was.
19   Q   Okay.  That part was true?
20   A   Yes.
21   Q   Okay.  Now, and he was trying to help you out based on your
22   representations; is that right?
23   A   Yes.
24   Q   And you claim you weren't hurt at all; right?
25   A   Yes.
```

1   Q   You were just fibbing?

2   A   Yes.

3   Q   Now, do you know what an MRI is?

4   A   Yes.

5   Q   What is that?

6   A   It's like an X-ray, but it's -- I mean, I don't know

7   exactly what it is, but I know it's more than an X-ray.  It's

8   more in depth.

9   Q   Okay.  Did you have two MRIs that day?

10  A   I'm not sure how many it was.

11  Q   Did you have an MRI for your cervical spine and one for

12  your lumbar spine?

13  A   That's possible.

14  Q   I'm going to show you out of your same medical file.  Is

15  that the same date?

16  A   Yes.

17  Q   7/11/12, cervical spine MRI, did you have that?

18  A   Yes.

19  Q   And could you tell the jury what it says going on at C3 and

20  4?

21  A   There is a central and leftward disk protrusion with --

22          MS. GRIFFIN:  Your Honor, this is beyond the scope of

23  direct.

24          THE COURT:  Overruled.

25  BY MR. KNIZLEY:

3562

1   Q   Go ahead.

2   A   There's a central and leftward disk protrusion with

3   indentation of the thecal sac and cord contact.  AP diameter is

4   moderately narrowed at eight millimeters without definite cord

5   compression.  There's a mild left foraminal encroachment at

6   this level.  The right foramen is satisfactory.

7   Q   Did you have a disk protrusion?

8   A   I don't believe I did.

9   Q   This MRI is wrong?

10  A   Possibly, it is.  I mean, he could have said whatever he

11  wanted to.

12  Q   Okay.  So your contention is you did or did not, if you

13  know, have a left disk protrusion with indentation of the

14  thecal sac and cord contact?

15  A   I'm not saying I don't, but I've never had an injury to

16  cause anything like that.

17  Q   Do you know what an eight millimeter narrowing may do to

18  your spine?

19  A   No, I don't.

20  Q   Do you know if you had that?

21  A   No, I don't.

22  Q   What's happening at C4 and C5?

23  A   Disk, desiccation is present with posterior disk bulge and

24  and mild AP stenosis of 8.8 millimeters and foramina are

25  patent.

1   Q   Are you saying you had that or didn't have that?

2   A   Any of this stuff right here, I don't believe I did.  I've

3   never had an injury causing anything like this.  But, I mean,

4   if the MRI says I did, it's possible.

5   Q   Possible or you just don't believe it's so?

6   A   I don't believe it.

7   Q   Okay.  You think this is a falsification?

8   A   Yes, I do.

9   Q   Okay.  What does it say at C5 and 6?

10  A   Posterior disk bulge and facet hypertrophy present with

11  mild AP stenosis of 9.5 millimeters with foramina are patent.

12  Q   Do you think that's true or false?

13  A   False.

14  Q   How about the last one?

15  A   Normal appearance of these disk levels.

16  Q   Okay.  And you show down here at the bottom of this page

17  here -- see this down here?  (Indicating.)

18  A   Yes.

19  Q   First of all, didn't you tell him about your football

20  injury?

21  A   Yes.

22  Q   Did you have that?

23  A   Yes.

24  Q   Okay.  What does this say down here at the bottom of the

25  page here?  (Indicating.)

GARY DOUTHIT - CROSS BY MR. KNIZLEY

1  A   Name?

2  Q   Yes, sir.  What does it say?

3  A   Reviewed and electronically signed by Mark Goddard.

4  Q   And right up here what does it appear to be who Mark

5  Goddard is?

6  A   A medical doctor.

7  Q   And if he is the one who read this, are you saying he's the

8  one that fibbed about it?

9       MS. GRIFFIN:  Objection, Your Honor, as to the

10  relevance.

11       THE COURT:  Sustained.

12  BY MR. KNIZLEY:

13  Q   How about your lumbar MRI on the same day, do you see that?

14  A   Yes.

15  Q   And do you see this one's cervical and this one's lumbar?

16  (Indicating.)  Do you see it was also read by Dr. Goddard as

17  well; right?

18  A   Yes, sir.

19  Q   And do you remember he's a doctor; right?

20  A   Yes.

21  Q   What does the MRI say about your L4 and L5?

22  A   Central disk protrusion is present at this level with

23  anterior thecal sac effacement and AP diameter over one

24  centimeter, there is a minimal bilateral foraminal encroachment

25  due to disk margin and mild hypertrophy.

1    Q   Did you have a central disk protrusion?

2    A   I don't believe I did.

3    Q   L5 and S1?

4    A   Posterior disk protrusion is present at this level with

5    mild anterior thecal sac effacement but no AP stenosis,

6    protruding disk material extending to the foramina particularly

7    on the right.  There is minimal left and mild to moderate right

8    foraminal encroachment at this level.

9    Q   Did you have that?

10   A   I don't believe I did.

11   Q   What does that look like there to you?  (Indicating.)

12   A   Ruan's signature.

13   Q   And on the other one?

14   A   Ruan's signature.

15   Q   So at least these documents that were in your file read by

16   Dr. Goddard indicated that you had disk bulging, did they not?

17   A   Yes.

18   Q   And spinal narrowing?

19   A   Yes, that's what it said.

20   Q   At various locations in your back?

21   A   Uh-huh (nodding head affirmatively).

22   Q   But it is your testimony to this jury that didn't hurt you

23   none?

24   A   Yes.

25   Q   Now, that was on July 9th and I think it was July

3566

1    11th.   July 11th.   Okay.   And they asked you to come back in

2    about a month, didn't they?

3    A    I believe so.

4    Q    Did you come back around August 8th, if you recall?

5    A    If it says that I did, then I did.

6    Q    All right.   Do you recall on August 8th -- you know what

7    Roxicodone is; right?

8    A    Yes, I do.

9    Q    And is Roxicodone 30 the popularest one on the street?

10   A    Yes.

11   Q    You never got 30, did you?

12   A    No, I didn't.

13   Q    What did Dr. Ruan give you?

14   A    15.

15   Q    Both times?

16   A    Yes, sir.

17   Q    Would you rather have had 30?

18   A    Yeah, I would have rather had, yeah.

19   Q    Now, on the third visit, and you told us -- did Dr. Ruan

20   see you then, if you recall?

21   A    It was around the third -- it was whenever I got the

22   morphine sulfate.

23   Q    All right.   Well, this was --

24   A    That was the third or the fourth visit, one of those.

25   Q    The morphine sulfate is what you got; right?

1    A    He came in and he told me he was changing my medication to

2    morphine.

3    Q    Is that the same thing as Roxicodone or not?

4    A    No, it's not.

5    Q    Okay.  So let's look at this one here, if we can.  On the

6    August 8th visit -- okay -- you were getting the Percocet and

7    the Valium; right?  And then this is the time when you

8    changed the prescription -- I can't really read that.

9    A    Interferon.

10   Q    You had hepatitis C; right?

11   A    Yes, I did.

12   Q    And Tylenol's not good for that, is it?

13   A    No, it's supposedly not.

14   Q    And Tylenol's in that Percocet, isn't it?

15   A    Yes.

16   Q    So on this visit you said you had LBP, is that lower back

17   pain?

18   A    Possibly, yeah.

19   Q    Well, if it is lower back pain, was that true or not true?

20   A    No, I didn't have any low back pain.

21   Q    Did you tell him you had lower back pain?

22   A    Yes.

23   Q    You lied to him again?

24   A    Yes.

25   Q    And you got the Roxicodone 15, because the Percocet had

1   Tylenol in it and you had the hepatitis, and this is what you

2   got?  (Indicating.)

3   A   Yes.

4   Q   So that's not the time that Dr. Ruan saw you; right?

5   A   No.

6   Q   You wouldn't recognize his handwriting, would you?

7   A   I wouldn't recognize his handwriting, no.

8   Q   And then you came back after August 8th, on September the

9   5th?  Do you remember that?

10  A   Yeah.

11  Q   And what did Dr. Ruan do for you this time?

12  A   It says:  Procedure, cervical epidural steroid injection

13  under fluoroscopy.

14  Q   Did you take that epidural?

15  A   Yes, I did.

16  Q   And will you tell the ladies and gentlemen of the jury --

17  you told us that you had back pain, because you needed it?  And

18  you needed it?

19  A   I didn't have that back pain, but I took the epidural, yes.

20  Q   You lied to him about the need for the epidural?

21  A   I didn't tell him I needed it.  He recommended it.

22  Q   And did you tell the doctor:  I don't need that, I don't

23  have back pain?

24  A   He told me that if I -- if I denied or rejected doing the

25  procedure, that he would recommend me to a holistic doctor, if

3569

1  I did not.  He said:  I'm your doctor.  You need to let me

2  treat you.

3  Q   Tell me if this is what you told Dr. Ruan on September the

4  5th, 2012.  Did you -- this note reads, beginning right there,

5  please?  (Indicating.)

6  A   The patient presents today with worsening neck pain and

7  upper extremity pain.  Today the history and clinical exam is

8  consistent with the cervical DDD flareup and cervical --

9        MS. GRIFFIN:  Your Honor, object to the relevance of

10  him reading that.

11        THE COURT:  Overruled.

12  A   The patient previously tried conventional treatment,

13  including medications, physical therapies, with home

14  exercises.  TENS without significant efficiency.  The patient

15  previously received cervical epidural steroid injections with

16  excellent result.  The patient previously received such

17  procedure with excellent result.  Very much improved pain

18  relief with improved functional level and quality of life.

19  Because of severity of the pain symptoms, in order to offer the

20  patient significant pain relief and improve quality of life,

21  the procedure is felt to be medically indicated and necessary.

22  The patient was explained about the procedure in plain English

23  in detail as well as alternative.  The patient has no NPO and

24  has driver available.

25  BY MR. KNIZLEY:

1   Q   Okay.  Were you explained in plain English about the
2   alternatives?
3   A   What alternatives?
4   Q   Well, the alternatives to having an epidural.
5   A   I mean, he went over the -- I mean, he went over the
6   procedure with me.
7   Q   Okay.
8   A   But, I mean, the alternative would have been going to a
9   holistic doctor.
10  Q   Okay.  Now, did you persist that day with worsening neck
11  pain in upper extremity?  Did you tell the doctor that?
12  A   It's possible I did say that.
13  Q   And would that be the truth or not?
14  A   I mean, it would have been a lie.
15  Q   Every time we see that, you just tell lie after lie after
16  lie; right?
17  A   Yeah.  I wanted pain medication.
18  Q   Okay.  And then the doctor gave you an epidural; right?
19  A   Yes.
20  Q   Your insurance company had to pay for that?
21  A   It was supposed to, but the insurance didn't pay for it
22  because he ran the -- he ran my insurance before the procedure.
23  And he scheduled it, I guess, a month ahead of time.  And then
24  when I came in for the procedure and they charged me for it, my
25  insurance was -- was canceled.  So --

3571

1   Q   You were -- it wasn't canceled.  First, you told us you was

2   having trouble with your insurance and then finally it got

3   canceled; right?

4   A   Yeah, because I wasn't working at the time any more.

5   Q   Okay.  Now, you came in the first time and three months

6   later they gave you another -- you came in May.  Then on

7   October 3rd they gave you another test that you talked about on

8   direct examination?

9   A   Yeah.

10   Q   Another drug screen test?

11   A   Yeah.

12   Q   Okay.  Again, you came up negative on all this; right?

13   A   Yes.

14   Q   And someone wrote a question mark there; right?

15   A   Yes.

16   Q   That was your second test; right?

17   A   Yes.

18   Q   And you hadn't gotten one of these GC-MS tests yet, had

19   you?

20   A   I don't even know what that is.

21   Q   Well, to your knowledge, they had to send your test off for

22   more extensive testing to see whether these were false

23   positives or false negatives, to your knowledge?

24   A   I don't -- I had no idea what it is.  But --

25   Q   Okay.  The prosecutor had you read this -- looks like hold?

GARY DOUTHIT - CROSS BY MR. KNIZLEY

```
 1   A   Yeah.

 2   Q   Right?

 3   A   Hold something.

 4   Q   GC-MS, it looks likes; right?  Right?

 5   A   Yeah.

 6   Q   And:  It is not in network?  Is that what it says?

 7   A   It says something now, not work, or network.

 8   Q   Insurance network?  Or did you -- did you understand that

 9   you weren't in the particular network of insurance that would

10   pay for the GC-MS?  Did you understand that to be the problem

11   or not?

12   A   I don't think I was even -- that that was even brought to

13   my attention.

14   Q   Okay.  But did you know whether your insurance carrier

15   would pay for a GC-MS?

16   A   I did not know whether it did or not.

17   Q   At least that's what this note says --

18   A   That's what the note says, yes.

19   Q   -- something about network; right?

20   A   They didn't even discuss that again.

21   Q   Okay.  But your test results did not get sent off that

22   time?  Is that right?

23   A   I guess.  They didn't say anything else about that to me.

24   Q   That was the October 3rd testing, and then the notes that

25   day when you came in.  And this is a different date than what
```

3573

1   we talked about.  Here we go, lower back pain again?

2   A   Uh-huh (nodding head affirmatively).

3   Q   Neck pain?

4   A   Uh-huh (positive response).

5   Q   Did you have those pains?

6   A   No.

7   Q   Did you tell them you had those pains?

8   A   Yes.

9   Q   That was untrue?

10  A   Yes.

11  Q   And did you take any -- if it says meds helpful, no side-

12  effects, did you say that to them?

13  A   I don't know if I did or not.  I don't believe I did.

14  Q   You don't think --

15  A   I mean, it's possible, yeah.  It's possible I did.

16  Q   And if you did say it, would that have been true or untrue?

17  A   It would have probably have been true.  I mean, when

18  they're talking about side-effects, they're talking about bad

19  side-effects.

20  Q   Let's take it one step at a time.  Taking medications and

21  helpful.

22  A   Yes.

23  Q   Is that true or not true?

24  A   No, that -- I mean, yeah it was helping me.  I wanted it,

25  so yeah, it was helping me.

GARY DOUTHET - CROSS BY MR. KNIZLEY

1  Q   Okay.  So whatever medication you were taking, you told the
2  physicians it was helpful to you?
3  A   Yeah.
4  Q   And you told them you had no side-effects; is that true or
5  untrue?
6  A   That's true.
7  Q   Okay.  Hepatitis; right?
8  A   Yes.
9  Q   And then after that, you had your current medications,
10  whatever they were, refilled?  Right?
11  A   Yes.
12  Q   Is that what it says?
13  A   That's what it says.
14  Q   After you said you were taking them and there were no side-
15  effects and you had your pain, and they refilled your
16  medications -- it doesn't have any check medication here, check
17  additional medications here, does it?
18  A   Okay.
19  Q   And it said you had a UDS that day, does it?  Drug screen;
20  right?  Urine drug screen?
21  A   Yeah.
22  Q   Now, after that, they told you to come back, as they do, in
23  about two months; right?  Three months maybe, does that sound
24  right?  Every three months you get one of these drug screens?
25  A   Yeah, every three months.  They give them to you every 90

 1  days.

 2  Q   When you came back in three months, though, they couldn't

 3  send the one off because -- well, they didn't send the one off,

 4  said something about network.  Do you remember that?

 5  A   Yes.

 6  Q   You came back in three months on this day and you took

 7  another drug screen right?  (Indicating.)

 8  A   Uh-huh (positive response).

 9  Q   And then they asked you -- did you involve your five year

10  old in this drug screen?

11  A   I involved his urine in every drug screen.  Whether or not

12  he was there, I used his urine.

13  Q   Do you remember when you took your little boy on the last

14  one?

15  A   I told you before I don't recall what visit I took him on.

16  There were multiple visits.  Because there was times that I

17  took him with me to the doctor's office when I didn't take a

18  drug test.  That's my son.  He's with me all the time.  I used

19  his urine.

20  Q   Were you high?

21  A   Possibly, yeah.

22  Q   Did you drive?

23  A   No, I didn't drive.

24  Q   How did you get there?

25  A   My father.

GARY DOUTHIT - CROSS BY MR. KNIZLEY

```
 1   Q   Did he know you was high?

 2   A   He knew I was taking medications.

 3   Q   Did he know you was high?

 4   A   Probably not.

 5   Q   So it wasn't evident to him you were high; is that right?

 6   A   No.

 7   Q   Is that correct?

 8   A   That's correct.

 9   Q   You didn't tell the doctors you were high, did you?

10   A   No.  They didn't ask either.

11   Q   On that date, what did they tell you on 1/23?  Let me ask

12   you:  Patient states pain, lower right side of back.  True or

13   untrue?

14   A   It is untrue.

15   Q   Still lying; right?

16   A   Uh-huh (positive response).

17           MS. GRIFFIN:  Objection, Your Honor.  It's asked and

18   answered.

19           MR. KNIZLEY:  It's a new time, Judge.

20           THE COURT:  I'm sorry.  I can't hear you.

21           MR. KNIZLEY:  It is a new occasion of his

22   representation to the physician.

23           THE COURT:  Well, he has stated that every time he

24   said he was in pain it was a lie.  So you don't need to keep

25   going over it.
```

3577

```
 1   BY MR. KNIZLEY:
 2   Q   Over here, this says UDS, and that's urine drug sample,
 3   looks likes a circle with a minus or dash in it, opioids times
 4   two visits.  It says -- do you take that to read that you had
 5   been two visits with negative opioids in your UDS?
 6   A   Uh-huh (positive response).
 7   Q   Does that sound right?
 8   A   Yeah.
 9   Q   What does the doctor tell you here?  (Indicating.)
10   A   Violated opioid agreement, instructed to see Dr. Crumb.
11   Q   So they let you go; right?
12   A   Yeah.
13   Q   And I did mean to ask you about one more.  On the
14   next-to-the-last visit, did you see Dr. Ruan on the next-to-
15   the-last visit or do you remember?
16   A   I don't believe I did.
17   Q   And do you remember this was the last visit?  (Indicating.)
18   A   Yeah.
19   Q   On January 23rd?
20   A   I seen -- the last time I seen Dr. Ruan was on my epidural.
21   That was the last time I seen Dr. Ruan.
22   Q   Okay.  And that wasn't this visit, was it, or was it?  The
23   next-to-the-last visit?
24   A   That's not the -- the epidural, no, I didn't see him on
25   that visit.
```

1   Q   Is that not his handwriting right there?  (Indicating.)

2   A   Just because he wrote it doesn't mean I seen him.

3   Q   Do you recognize the handwriting as his?

4   A   No, I don't.

5   Q   Okay.

6   A   I told you before I don't recognize his handwriting.

7   Q   You told us you had a plea agreement with the government;

8   is that correct?

9   A   Yes, sir.

10  Q   And the terms of that plea agreement is you give truthful

11  testimony?

12  A   Yes.

13  Q   What would you expect to get?

14  A   I wasn't expecting anything.

15  Q   I'm sorry.  I said that poorly.  Do you expect to get -- I

16  don't mean what time or sentence you --

17  A   I hope I do, but I wasn't promised anything.

18  Q   You hope to get some --

19  A   Something, yes.

20  Q   -- favorable treatment from the government?

21  A   Yes, I hope so, yes.

22  Q   And that's -- you hope to do that because you entered into

23  an agreement with them; is that right?

24  A   I haven't entered into an agreement with anything.  I pled

25  guilty to my charge.  And there is no agreement at all.

3579

```
 1   Q   Well, I don't want to belabor it.  But the Government's
 2   Exhibit 23-3 is entitled what?
 3   A   It says Plea Agreement.
 4   Q   And whose name is it?
 5   A   Mine.
 6   Q   And you signed it?
 7   A   Yes.
 8   Q   Did you enter into a plea agreement?
 9   A   Yes, entered into a plea agreement.
10   Q   And it's that plea agreement by which you hope to get some
11   favorable treatment; is that right?
12   A   My plea agreement is to the gun charge, which carries 60
13   months, and that's what the plea agreement is.
14   Q   Yes.
15   A   It's not a -- the plea agreement isn't an entry to get
16   anything else other than the 60 months.
17   Q   Okay.  You know, I'm not going to go over it, but do you
18   remember going over that 5K stuff that said if you want a 5K,
19   cooperate to get something lower than the --
20   A   That's what a 5K is, yeah.  But I wasn't promised a 5K, no.
21   Q   No, you're not promised.  But it's in your plea agreement,
22   is it not?  Right here?  (Indicating.)
23   A   It's in there, yeah, that it's possible.
24   Q   And it is possible; right?
25   A   Yeah, it's possible.
```

1    Q    And certainly you would hope to get that, wouldn't you?

2    A    Yeah, I would hope so.

3    Q    But if you violate the plea agreement, you don't get it;

4    right?

5    A    Yes.  That plea agreement was done before I even spoke

6    about any of this, though.  So that has nothing to do with

7    this.

8    Q    Sure.  But if you violate the plea agreement, you don't get

9    your deal; right?

10   A    Okay.

11   Q    And that's what this -- it in turn sets out what the

12   violations are; right?

13   A    Yes.

14   Q    And this plea agreement was done, as you said, way back in

15   May; is that correct?

16   A    In May, yes.

17   Q    Would that be right?

18   A    Yes.

19   Q    May 6, '16.  Could you read for the ladies and gentlemen of

20   the jury paragraph 29?

21   A    In addition, if the defendant is released from detention

22   prior to sentencing, he understands that the United States will

23   no longer be bound by this agreement, if he violates any

24   condition of his release prior to sentencing or prior to

25   serving his sentence after it is imposed.

3581

1    Q   Did you do that?

2    A   Yes.

3    Q   Your deal's off; right?

4    A   My pretrial, yes.

5    Q   Is this plea agreement off?  You hope not, don't you?

6    A   I hope not, yeah.

7           MR. KNIZLEY:  Thank you.

8           THE COURT:  Any redirect?

9           MS. GRIFFIN:  Yes, Your Honor, briefly.

10                    REDIRECT EXAMINATION

11   BY MS. GRIFFIN:

12   Q   Mr. Douthitt, you're in jail right now; is that right?

13   A   Yes, ma'am.

14   Q   You've been in jail since September?

15   A   Yes, ma'am.

16   Q   Because you violated the plea agreement?

17   A   Yes, ma'am.

18   Q   Tested positive?

19   A   Yes, ma'am.

20   Q   Went back to using?

21   A   (Nodding head affirmatively.)

22   Q   And then ended you up in jail; right?

23   A   Yes, ma'am.

24   Q   Now, you pled to a count that had a minimum mandatory

25   sentence of 60 months; is that right?

1  A   Yes, ma'am.

2       MR. KNIZLEY:  Your Honor, I object to this line of

3  questioning.

4       MS. GRIFFIN:  Well, Your Honor --

5       MR. KNIZLEY:  It was not allowed to be gone into on

6  cross.  If it does, I would ask the opportunity -- excuse me --

7  I would ask the opportunity for recross if we go into it.

8       THE COURT:  Overruled.

9  BY MS. GRIFFIN:

10  Q   And do you know that the other count to which you were not

11  required to plead did not have a minimum mandatory?

12  A   Yes, ma'am.

13  Q   You met with the prosecutors, and agents were also present

14  when you were interviewed; right?

15  A   Yes, ma'am.

16  Q   In connection with being interviewed about this case, did

17  you plead guilty -- I'll show you your plea agreement, 23-3 --

18  on May the 16th of 2016?

19  A   Yes, ma'am.

20  Q   Did you first talk about this case on May the 19th of '16?

21  A   Yes, ma'am.

22  Q   Prior to entering your plea agreement, you had cooperated

23  with ATF about some unrelated drug activity on the street; is

24  that right?

25  A   Yes, ma'am.

```
 1              MR. KNIZLEY:  Objection.  Leading.
 2              THE COURT:  Overruled.
 3  BY MS. GRIFFIN:
 4  Q   Now, I just want to make clear.  When Mr. Knizley was
 5  asking you on your six visits, when you got Percocet on the
 6  first one, Percocet on the second one, 90 Roxicodone on the
 7  third one, 120 morphine on the fourth one, 120 morphine on the
 8  fifth one, and 45 morphine on the -- excuse me -- 42 morphine
 9  on the last one, did you see Dr. Ruan for all of those visits?
10  A   No, ma'am.
11  Q   When did you see him?
12  A   Probably the third or the fourth visit.  I got -- I seen
13  him whenever I got my morphine and I seen him whenever I got my
14  epidural.
15  Q   What was your goal for going there?
16  A   To get pain medication.
17              MR. KNIZLEY:  Your Honor, this has been gone over
18  before and was not the subject of cross.
19              THE COURT:  Sustained.
20  BY MS. GRIFFIN:
21  Q   Did you receive controlled substance pain medication every
22  time you went there?
23  A   Yes, ma'am.
24  Q   Did it steadily increase?
25  A   Yes, ma'am.
```

1          MS. GRIFFIN:  One moment, Your Honor.

2          THE COURT:  All right.

3          MS. GRIFFIN:  That's all I have of the witness, Your

4   Honor.

5          THE COURT:  May this witness be excused?

6          MS. GRIFFIN:  Yes.

7          THE COURT:  All right.  You may step down

8   Mr. Douthitt.

9          MR. BODNAR:  United States calls Amy Collins.

10                        AMY COLLINS

11             was sworn and testified as follows:

12          THE WITNESS:  Yes.

13          THE CLERK:  Thank you, ma'am.  Please be seated.

14                     DIRECT EXAMINATION

15   BY MR. BODNAR:

16   Q   Good afternoon, Ms. Collins.

17   A   Good afternoon.

18   Q   Would you pull the microphone just a little bit closer,

19   please?

20   A   I'll scooch up.  Is that better?

21   Q   Yes.  Would you please introduce yourself to the jury?

22   A   I'm Amy Collins.

23   Q   And, Ms. Collins, prior to mid-2012 did you work at PPSA?

24   A   I did.

25   Q   Can you explain to the jury what job you had at PPSA?

AMY COLLINS - DIRECT BY MR. BODNAR

1    A    I was the urine drug screen nurse, medical assistant.

2    Q    And can you explain what is a medical assistant?

3    A    The medical assistant, they have to prepare the patient

4    charts, bring the patients back, take their vitals -- which is,

5    I think, blood pressure, heart rate, temperature -- and put

6    them in the room.

7    Q    What kind of educational background did you have to be a

8    medical assistant?

9    A    I attended a technical school, vocation school.

10   Q    Was that here or in California?

11   A    California.

12   Q    Prior to working for PPSA had you worked as a medical

13   assistant elsewhere?

14   A    I did.

15   Q    Where was that?

16   A    It was an internal medicine office.

17   Q    Was that also in California?

18   A    It was (nodding head affirmatively).

19   Q    As a medical assistant at PPSA, what was your -- what was

20   your role in the beginning?

21   A    In the beginning I was just a floater nurse, and then I

22   ended up being Dr. Couch's procedure nurse, which I prepped his

23   procedure patients for him.

24   Q    Now, you said medical assistant first and then you said

25   nurse.  Is there a difference between a medical assistant and

AMY COLLINS - DIRECT BY MR. BODNAR

1    nurse or are the words interchangeable?

2    A   Well, it was a procedure medical assistant.  I'm sorry.

3    Q   So you don't have a -- you're not a CRNP, you're not a

4    certified nurse practitioner?

5    A   No, I'm not.

6    Q   What about a registered nurse, are you an R.N.?

7    A   No.

8    Q   So when you became the procedure medical assistant for

9    Dr. Couch, what did that mean?  What was your job to do?

10   A   I had to bring the patients back, put them up on the table

11   and put them in what position, depending on what the procedure

12   was, get all Dr. Couch's tools ready, and wait for him to come

13   in to perform the procedure.

14   Q   What types of procedures were performed that you were

15   assisting with?

16   A   We did epidurals, knee injections, shoulder injections,

17   steroid injections, stuff like that.

18   Q   Roughly how long would these procedures take?

19   A   It depended on -- are you talking about the actual

20   procedure?

21   Q   The actual procedure, yes.

22   A   Not very long at all, maybe five minutes.

23   Q   How about the entire time that the patient is back there,

24   the prep time to get them all ready?

25   A   Depending on when Dr. Couch would come in, it could take up

1    to an hour.

2    Q    And approximately at the time you were there -- and first,

3    can you give the jury a time?  What was the time period that

4    you were at PPSA?

5    A    I was hired in July of 2010 and I left in November of 2012.

6    Q    And during the time period you were there, approximately

7    how many procedures did Dr. Couch have per day?

8    A    Per day?  Maybe about six or seven per day.

9    Q    After being the medical assistant for procedures, did you

10   move on to another role at PPSA?

11   A    I did.  In November of 2010 I got pregnant and I was moved

12   to the urine drug screen room to -- because there's radiation

13   exposure in the procedure room.  So --

14   Q    At the time that you were there in 2010 through 2012, how

15   were the urine drug tests done at PPSA?

16   A    The nurses for the doctors would bring the patient to me, I

17   would give them a cup and send them into the restroom and when

18   they were done they would pass the specimen through a little

19   cubby hole.

20   Q    Now, were the patients monitored to ensure that they are

21   doing the tests correctly?

22   A    They were not.

23   Q    Was there anybody else in the urine collection room with

24   the patient?

25   A    No.

1   Q   Have you personally ever done urine drug tests outside of

2   here in terms of have you ever had to take one for work?

3   A   Yes.

4   Q   In instances when you've taken urine drug tests, were you

5   monitored?

6   A   Yes.

7   Q   Were you the one that saw the results of the urine drug

8   tests?

9   A   I was.

10  Q   At this time was it the cup test we're talking about?

11  A   Yes.

12  Q   Explain to the jury, how did the cup test work?

13  A   You would tip it over, tip the cup over, and it would draw

14  up the urine and there would be little lines to tell you it was

15  positive or it was negative.

16  Q   And would that also include whether it was positive or

17  negative for certain street drugs like cocaine or

18  methamphetamine?

19  A   Yes.

20  Q   And was that an occurrence that -- did that occur where

21  patients were testing positive for those drugs at PPSA?

22  A   Many times, yes.

23  Q   And still, if you had tested positive for those drugs, was

24  there ever monitoring going forward of someone watching you

25  give your urine sample?

1   A   No.

2   Q   Were there times that the urine drug screens were sent out

3   for additional testing during the time period you were there?

4   A   Yes.

5   Q   Can you explain that for the jury, what that was?

6   A   The GC-MS testing?

7   Q   Yes.

8   A   Yes.  I would package -- they had like prepackaged things,

9   cups.  You had to pour it in there, pack it up, fill out some

10  information and send it off via Fed Ex to the laboratory.

11  Q   At the time that you were there, do you know if Dr. Ruan

12  and Dr. Couch were using Castle Medical as their lab?

13  A   I don't believe they were using it while I was there.

14  Q   Did one doctor order GC-MSs more than the other between

15  Dr. Ruan and Dr. Couch?

16  A   Dr. Ruan would, ordered more (nodding head affirmatively).

17  Q   Approximately how often did Dr. Ruan send out the samples

18  for additional GC-MS testing?

19  A   He told me every patient, to go ahead and send them out

20  regardless of the results.

21  Q   And how about for Dr. Couch?

22  A   He wasn't so much -- he didn't order as many -- near as

23  many at all, unless there was something wrong.  That's when it

24  was to be sent out.

25  Q   What do you mean, something was wrong?

AMY COLLINS - DIRECT BY MR. BODNAR

1   A   They didn't come up positive for the drugs they were

2   prescribed or they came up positive for street drugs, then I

3   was to send it off.

4   Q   Would that be what's called an inconsistent test?

5   A   I'm sorry?

6   Q   Would that be what's considered, if you know, what's called

7   an inconsistent test, not testing positive for what should be

8   there or testing positive for something that shouldn't be

9   there?

10  A   Right, right.

11  Q   At some point during your employment did you start working

12  and doing the prior approvals at PPSA?

13  A   For medications, yes.

14  Q   Can you explain to the jury what was your role with regard

15  to prior approvals?

16  A   The -- I would get faxes from insurance companies stating

17  that, you know, a patient had this new medication, they weren't

18  going to pay for it, and my job was to fill out a form and send

19  it off to the insurance companies to see if they would pay for

20  it.

21  Q   Did Dr. Ruan or Dr. Couch ever tell you anything with

22  regard to how to do your job for prior approvals?

23  A   I don't remember if they did or not.

24  Q   Did Dr. Ruan ever say anything about making sure to get it

25  done?

1   A   It was my job, so, yeah (nodding head affirmatively).

2   Q   But do you recall if Dr. Ruan ever told you something in

3   connection with this?

4   A   I can't say for sure.

5   Q   How did you know what diagnoses codes to put down on the

6   prior approval forms?

7   A   The way I was trained to do it was to -- there was just

8   kind of like a -- I don't know what the word is, I'm trying to

9   think -- a certain one that was used a lot.

10  Q   Certain what?

11  A   Diagnosis code that was used on these forms.

12  Q   Do you know, though, if the patient actually had whatever

13  diagnosis it was that you would use?

14  A   Not always, no.

15  Q   How do you know that?

16  A   I don't know if they had it or not.

17  Q   Would you actually be checking the medical record or would

18  you just be using certain codes?

19  A   I would just be using certain codes.

20  Q   At other times while working as a medical assistant, were

21  you involved in patients who had just received a prescription

22  and what to do next?

23  A   Are you talking about prior authorizations?

24  Q   No.  Prescriptions.  Was there ever a time where either

25  Dr. Ruan or Dr. Couch told you to do something with a patient

1   who had just received a prescription?

2   A   Oh, with the C&R Pharmacy, to send them to the C&R

3   Pharmacy?

4   Q   Did anyone ever tell you to send a patient to C&R Pharmacy?

5   A   Yes, sir.

6           MR. SHARMAN:  Object to leading.

7           THE COURT:  Overruled.

8   BY MR. BODNAR:

9   Q   Which doctor told you to send patients to C&R Pharmacy?

10  A   Dr. Ruan.

11  Q   Did Dr. Couch ever tell you that?

12  A   I don't recall him ever telling me that.

13  Q   At the time period you were there, where was C&R Pharmacy

14  located?

15  A   At the Springhill office.  It was located in front, near

16  the waiting room.

17  Q   Is this prior to the Airport office opening and C&R moving

18  out there?

19  A   Yes.

20  Q   At the time period that you were working, was there a

21  workers' comp dispensary located in the Springhill Avenue

22  location?

23  A   Yes.

24  Q   Can you explain to the jury what the dispensary was?

25  A   On Wednesdays we had workmen's comp patients come in.  And

1    after they would see the doctor, the prescriptions were sent to

2    the dispensary to have their medications filled.

3    Q    You said the prescriptions were sent to the

4    dispensary.  Can you walk the jury through the process?  Was it

5    handed to the patient and they were brought back to the

6    dispensary or how did this work?

7    A    No.  They were automatically sent back there.  The patient

8    didn't have the prescriptions.

9    Q    When you say they, are you referring to the prescription?

10   A    Yes, I'm sorry.  The prescriptions were sent to the

11   dispensary.

12   Q    Who would bring it over to the dispensary?

13   A    I believe their nurses would.

14   Q    And is that what we also were talking about, a medical

15   assistant?

16   A    Yes.  I'm sorry.  Medical assistant.

17   Q    And what would happen after the workers' comp prescription

18   was brought over to the dispensary?

19   A    They would fill them and bring them out to the patients.

20   Q    And by they, do you mean they brought out the bottles for

21   the patients?

22   A    The bottles in the back, yes.

23   Q    Did you ever witness anyone ever telling a patient -- a

24   workers' comp patient -- that they were free to use an outside

25   pharmacy or dispensary?

1    A    I don't recall ever hearing that, no.

2         MR. BODNAR:  One moment, Your Honor.

3         Nothing further from this witness, Your Honor.

4         THE COURT:  Cross?

5                    CROSS EXAMINATION

6    BY MR. SHARMAN:

7    Q    Ms. Collins, my name is Jack Sharman.  I represent

8    Dr. Couch.  You mentioned urine drug screen procedures.  Do you

9    remember some of those questions and answers with Mr. Bodnar?

10   A    Yes.

11   Q    And I think you said on direct that the patient was not

12   observed while giving the sample; is that right?

13   A    Right.

14   Q    And the patient, in order to deceive the system, would have

15   to take some affirmative steps to do so, though; right?

16   A    I'm sorry.  What do you mean?

17   Q    In other words, to avoid an unwanted result from the urine

18   drug screen, that patient would have to do something to try to

19   avoid that; right?

20   A    Right.

21   Q    Like they would have to bring in somebody else's urine or

22   something?

23   A    Oh, yes.

24   Q    Right?  And so it would take some effort and planning on

25   that patient's part to deceive the system; right?

1    A    Yes.

2              MR. SHARMAN:  No further questions.  Thank you.

3              THE COURT:  Anyone for Dr. Ruan?

4              MR. DARLEY:  Yes, ma'am.  Just a few, Your Honor.

5                            CROSS EXAMINATION

6    BY MR. DARLEY:

7    Q    Good afternoon, Ms. Collins.

8    A    Good afternoon.

9    Q    I'm Jason Darley, and I represent Dr. Ruan.  I just have a

10   few questions for you.  Let me get the dates straight.  Could

11   you tell the jury again when you worked for PPSA?

12   A    Yes.  I worked -- I was hired in July in 2010.  I left in

13   November of 2012.  I left for maternity leave.

14   Q    You never returned?

15   A    Right.

16   Q    Okay.  And you said you were a floating nurse of sorts?

17   A    When I was first hired, yes.

18   Q    And you filled in for Dr. Ruan basically on an as-needed

19   basis; correct?

20   A    In that time I was with Dr. Chen and Couch mostly.

21   Q    Okay.  And then at some point you got switched to the urine

22   drug-testing duties that you described earlier?

23   A    Right.

24   Q    Okay.  Do you have any knowledge of the rate of reliability

25   on the cup test?

1   A   How do you mean?

2   Q   Well, I mean, in your experience, or in the medical

3   experience that you have, how reliable typically are those

4   initial cup tests?

5   A   They seemed pretty reliable, comparing to like the GC-MS

6   reports.

7   Q   Okay.  And it was your testimony earlier that Dr. Ruan had

8   virtually all of these cup tests sent off; correct?

9   A   Yes.

10  Q   All right.  And you said earlier that you left in November

11  of 2012?

12  A   Yes.

13  Q   Did you ever recall having worked with a company or seeing

14  a company called Castle involved?

15  A   I do not recall working with Castle.

16  Q   Okay.  So to your knowledge -- to your knowledge, you were

17  gone before then?

18  A   I believe so, yes.

19  Q   And based on these urine drug tests, you saw some of them

20  test positive; correct?

21  A   Positive for --

22  Q   For illegal substances?

23  A   Yes.

24  Q   Substances outside of what was being prescribed; correct?

25  A   Yes.

AMY COLLINS - REDIRECT BY MR. BODNAR                                    3597

1   Q   Do you have any knowledge about PPSA and the doctors within

2   PPSA discharging patients?  Firing patients basically?

3   A   Yeah.  There was a couple, yeah.

4   Q   Just a couple?

5   A   I don't know how many for certain.  But I do remember that

6   happening.

7   Q   So patients were discharged if there were irregularities on

8   those tests?

9   A   Yes.  It would take multiple times, though.  It wasn't one.

10          MR. DARLEY:  One moment, Your Honor.

11          THE COURT:  All right.

12  BY MR. DARLEY:

13  Q   Now, Ms. Collins, one or two more questions.  As you were a

14  floating nurse with your other duties, you never worked for the

15  workmen's comp dispensary, did you?

16  A   I never worked for the workmen's comp dispensary.

17          MR. DARLEY:  That's all I have.  Thank you,

18  Ms. Collins.

19          THE COURT:  Any redirect?

20          MR. BODNAR:  Very briefly, Your Honor.

21                      REDIRECT EXAMINATION

22  BY MR. BODNAR:

23  Q   Ms. Collins, when you worked as the medical assistant for

24  the urine drug testing, whose job was it to notify the doctor

25  if a test came back inconsistent, such as positive for a drug

1    that shouldn't have been there or negative for a drug that

2    should be?

3    A    I would place the test on the front of the patient chart,

4    they would be sent back to the room, and they would have been

5    notified either by me or their medical assistant that the

6    patient was ready to be seen.  And they would see it on the

7    patient chart.

8    Q    And by testing, you mean you literally put the cup of urine

9    or you put the sheet?

10   A    I'm sorry.  The sheet that I wrote the results on.

11   Q    And you mentioned with Mr. Darley that, when asked about

12   the discharges, do you recall saying something about it would

13   take multiple times?

14   A    Yes.

15   Q    Could you please explain to the jury what is it that you

16   were talking about?  What would take multiple times?

17   A    I remember patients testing positive for either things they

18   were not supposed to be testing positive for, testing negative

19   for the medication they were supposed to have in their system,

20   and sometimes even illicit drugs on their tests and they

21   weren't fired.

22   Q    So what did you mean, then, it would take multiple times?

23   A    If they were a repeat offender, then eventually they were.

24   Q    So again, do you mean multiple inconsistent tests before

25   firing?

 1   A   Right.  Over so many months.

 2          MR. BODNAR:  One moment, Your Honor.

 3          THE COURT:  All right.

 4          MR. BODNAR:  Nothing further from this witness.

 5          THE COURT:  May she be excused?

 6          MR. BODNAR:  Yes, Your Honor.

 7          MR. SHARMAN:  Yes, Your Honor.

 8          THE COURT:  All right.  Ms. Collins, you may step

 9   down.  Thank you.

10          MR. BODNAR:  Ms. Griffin is bringing the next witness,

11   Your Honor.

12          THE COURT:  All right.

13          MR. BODNAR:  I apologize, Your Honor.  I believe the

14   next witness is going to be Lakeisha Crawford, and she should

15   be coming in here at any moment.

16                        LAKEISHA CRAWFORD

17               was sworn and testified as follows:

18          THE WITNESS:  Yes, ma'am.

19          THE CLERK:  Thank you, ma'am.  Please be seated.

20                       DIRECT EXAMINATION

21   BY MS. GRIFFIN:

22   Q   Tell us your name, please, ma'am.

23   A   Lakeisha Crawford.

24   Q   Ms. Crawford, would you spell your first name?

25   A   Yes.  It's L-A-K-E-I-S-H-A.

1   Q   I want to direct your attention from early 2011 till

2   October of 2013.  Were you working at PPSA during that time?

3   A   Yes, ma'am.

4   Q   In what capacity?

5   A   I was a certified medical assistant.

6   Q   What were you called?  Was that an MA?

7   A   Yes, ma'am.

8   Q   What training does that mean you had had?

9   A   I went to a two-year college.  I have an associates's

10  degree.  It pertains with vital signs, venipuncture,

11  phlebotomy, which is the venipuncture injections, assisting in

12  X-ray, assisting in EKG.

13  Q   Were those some of your duties there at PPSA?

14  A   Yes, ma'am.

15  Q   Were you assigned as an MA to Dr. Ruan?

16  A   Yes, ma'am.

17  Q   Is he in the courtroom today?

18  A   Yes, ma'am.

19  Q   Could you point him out for us?

20  A   He's right here (indicating).

21         MS. GRIFFIN:  If the record will reflect she's

22  identified the defendant Ruan?

23  Q   Now, Ms. Crawford, during the time you were there

24  approximately how many patients was Dr. Ruan seeing a day?

25  A   He could see as much as like 50 patients a day.

LAKEISHA CRAWFORD - DIRECT BY MS. GRIFFIN

1  Q   Was he actually seeing all 50 of those patients?

2  A   He had nurse practitioners assisting.

3  Q   What did they do?

4  A   They also seen patients based off our vital signs, the

5  triage that we did as medical assistants, seeing new patients

6  coming in, intaking them.

7  Q   Would Dr. Ruan see all 50 of those patients during each

8  visit?

9  A   No, ma'am.  Sometimes the nurse practitioners did.

10  Q   Did you have occasion to see any prescription pads at PPSA

11  that were Dr. Ruan's?

12  A   Yes, ma'am.

13  Q   Could you tell us how it is that you had access to those?

14  A   We would write prescriptions for the patients prior to them

15  coming in, give them to Dr. Ruan or the nurse practitioner when

16  he needed to sign.  Also when new patients will come in, we

17  will write whatever prescriptions were prescribed at that time.

18  Q   Now, Ms. Crawford, you said you would get the prescriptions

19  ready before the patient came in?

20  A   Yes, ma'am, if they were returning patients.  Uh-huh

21  (nodding head affirmatively).

22  Q   So you would base it on what they had been prescribed

23  before?

24  A   Yes, ma'am.

25  Q   And would Dr. Ruan sign some of those repeat patient

1    prescriptions before the patient came in?

2    A    Yes, ma'am.

3    Q    Did you also have occasion to see what is referred to as a

4    blank prescription that was presigned by Dr. Ruan?

5    A    Yes, ma'am.

6    Q    Can you explain what a blank prescription means?

7    A    A blank prescription will be no medication, no quantity

8    filled in, just the signature of the doctor.

9    Q    No patient name either?

10   A    No patient name either.

11   Q    But the prescription would have Dr. Ruan's signature

12   already on it?

13   A    Yes, ma'am.

14   Q    How is it that you were able to see those?

15   A    If, by occasion, he is out of the office, if the nurse

16   practitioner was seeing them or the patient will call in for a

17   medication refill, sometimes we'll just go in and tell him that

18   the patient called in for the prescription and he'll just sign

19   the prescription and we'll put the information on there as far

20   as the medicine, the patient's name, and the quantity.

21   Q    And would those be controlled substances on occasion?

22   A    Some, yes, ma'am.

23   Q    But I want to go back to the ones that you said were

24   presigned, blank prescriptions.  Who would use those blank

25   presigned prescriptions that you saw?

LAKEISHA CRAWFORD - DIRECT BY MS. GRIFFIN

3603

1    A    The nurse practitioner and the prescription nurse.

2    Q    Was the prescription nurse different from the nurse

3    practitioner?

4    A    Eventually it was throughout the time that I was

5    there.  All the -- the MA used to do all of the prescriptions,

6    along with the nurse practitioner.  But then they assigned a

7    nurse, prescription nurse.

8    Q    To take telephone calls?

9    A    Telephone calls, refills on the prescriptions.

10   Q    So are you telling us that Dr. Ruan would leave

11   prescription pads that already had his name on it to give to a

12   patient with whatever prescription the NP decided to put on

13   there?

14   A    Yes, ma'am.

15   Q    Would you prepare prescriptions the day before someone was

16   to come in for the next day's patients?

17   A    Yes, ma'am.

18   Q    And would Dr. Ruan presign those as well on occasion?

19   A    Yes, ma'am.

20   Q    Were these controlled substances that were being filled in

21   on the blank prescriptions, blank signed by Dr. Ruan

22   prescription pads?

23   A    Yes, ma'am.

24   Q    Who would go about approving refills of the controlled

25   substances?

1    A    Dr. Ruan would.

2    Q    Would his NPs ever approve the refills?

3    A    Yes, ma'am.

4    Q    How would you know that?

5    A    We -- if Dr. Ruan wasn't in the office or able to contact,

6    then our go-to person would be the nurse practitioner to find

7    out about refills.

8    Q    So if the nurse practitioner approved a refill on a

9    controlled substance, the patient would receive the refill?

10   A    That is possible, yes, ma'am (nodding head affirmatively).

11   Q    Was there a time when your group moved to the office next

12   door, to C&R Pharmacy; that is, the office of the Airport

13   location?

14   A    Yes, ma'am.

15   Q    That was the first time you had a pharmacy right next door

16   under the same roof; is that right?

17   A    Yes, ma'am.

18   Q    What if anything did Dr. Ruan tell you about patients using

19   C&R Pharmacy?

20   A    To encourage them to use our pharmacy, notify them that we

21   do have an in-house pharmacy.

22   Q    And I think you told us there were times that patients came

23   in and they would not see Dr. Ruan at all; is that correct?

24   A    Yes.

25   Q    Who would see them when they didn't see Dr. Ruan?

1  A   Nurse practitioners.

2  Q   Ms. Crawford, did you have any participation in the

3  procedures that Dr. Ruan performed?

4  A   Yes (nodding head affirmatively).

5  Q   What was your -- what were your duties in connection with

6  the procedures?

7  A   We would sedate the patient prior to the procedure, set the

8  patient as far as the fluoro is concerned, making sure it's in

9  the right area for the injection, pass the medication for the

10  doctor to draw, to administer to the patient, and then see to

11  the patient going back to their family members and/or placing

12  them in their cars after the procedure.

13  Q   Did you have some concern about the patients being on the

14  tables?

15  A   Sometimes they were there for a long period of time, so

16  that concerned me.  (Nodding head affirmatively.)

17  Q   After they were sedated?

18  A   Yes, ma'am.

19  Q   And when you say they were there for a long period of time,

20  what do you mean?

21  A   They would be in position on the table, waiting on their

22  procedure -- some of them would actually take a long nap while

23  they were waiting, to see other patients and go in to perform

24  the procedure.

25  Q   Why did that concern you?

1    A    We would get very busy in the office.  I was concerned

2    about the patient either being forgotten or needing to be

3    checked on a little more often than what we -- what we did

4    check on them.

5    Q    And when you're saying we, who are you referring to?

6    A    The medical assistants, nurse practitioners, or Dr. Ruan.

7    Q    Was your group that you worked with with Dr. Ruan colocated

8    with Dr. Couch's group?

9    A    Yes, we were.

10   Q    And did there come a time when y'all were not colocated,

11   that y'all were in different offices on different days?

12   A    Yes, ma'am.

13   Q    Did you ever have occasion to see any of Dr. Couch's

14   patients as an MA?

15   A    Yes, if Dr. Couch wasn't there, sometimes Dr. Ruan will see

16   his patients in certain circumstances.

17   Q    Was that a frequent occurrence or a rare occurrence?

18   A    It was pretty rare.

19   Q    Did you have occasion to know when Dr. Couch was in the

20   office or when he was not?

21   A    Could you repeat the question?

22   Q    Did you have occasion to know when Dr. Couch would be in

23   the office or when he would not be in the office?

24   A    Yes.

25   Q    How would you know that?

1   A  His nurse practitioner sometimes would let us know that

2   he's out for the afternoon or he won't be in that day.

3   Q  So you didn't necessarily see that he was gone, you just

4   heard that he was gone?

5   A  Well, if a patient called in that was one of Dr. Couch's

6   patients, either the medical assistants, even along with

7   myself, will go to see if he was in the office to address the

8   patient's concerns.

9   Q  Did you have occasion to take telephone calls from patients

10   for Dr. Ruan and Dr. Couch?

11   A  On occasions, yes.

12   Q  Why would you be doing that?

13   A  Well, they'd come -- when the phone call comes in, if

14   Dr. Couch's medical assistant or nurse practitioner is busy, we

15   would take the call and relate the message.

16   Q  Now, without telling us what was said, did you have

17   occasion to receive a call from Dr. Couch patients concerning a

18   refill and involving Justin Palmer?

19   A  Yes.

20   Q  Could you tell us about that?  Just what happened, but not

21   what was said.  What did you observe happened?  You answered

22   the phone?

23   A  Uh-huh (nodding head affirmatively).

24   Q  Who --

25   A  Go ahead.

1  Q   And who would be on the line or who was on the line?

2  A   I would answer the phone.  It could -- Dr. Couch could call

3  in saying that he has a patient that is coming in for a refill

4  or what have you, and we will relate the message to Justin

5  Palmer.  And I have witnessed or heard in passing --

6          MR. SHARMAN:  Objection.  Hearsay, heard.

7  BY MS. GRIFFIN:

8  Q   Not to what you've heard.  Just what you saw.

9  A   What I saw?  I saw Justin Palmer actually signing a

10 prescription pad.

11 Q   Signing Justin Palmer's name or do you know?

12 A   Uh, I'm not sure.

13 Q   Would it be in close proximity to the call from Dr. Couch?

14 A   Yes.

15 Q   And when you say Dr. Couch wasn't in the office, do you

16 have a reason to know what time he came in most days?

17 A   No, ma'am.

18 Q   Toward the end, when you were with PPSA, you would be with

19 Dr. Ruan at one location and Dr. Couch would be at the other

20 location; is that right?

21 A   That's correct.

22 Q   Now, Ms. Crawford, in connection with your duties, did you

23 notice that Dr. Ruan would switch medications with patients

24 back and forth?

25 A   Yes, sir -- yes, ma'am.

1   Q   Could you explain that to us?

2   A   A patient could call in or either come into the office

3   stating that the medication's not working.  He in return will

4   change the medication, either keep the patient on the same

5   medication at a higher dose or change the medication

6   altogether.

7   Q   Would that be just a phone call, call-in, or would that be

8   sometime when the patients were there in person?

9   A   Sometimes either way, either the patient came in or a phone

10  call.

11  Q   Have you had occasion to have to take a change of

12  prescription in to one of Dr. Ruan's patients?

13  A   Yes.

14  Q   Could you tell us how that would go?

15  A   The patient will say that the medication is possibly not

16  working, we will go to Dr. Ruan's office and explain what the

17  patient is telling us as far as the medication not working, he

18  in return will sign a prescription pad and then let us know

19  what to change the medication to.  So we will write it for

20  whatever we were told the medication would be changed to.

21  Q   And when you're saying we would go and we would do, who are

22  you referring to?

23  A   The medical assistant, myself and other medical assistants

24  that were working.

25  Q   Who was responsible for telling the patients that their

1  prescriptions were being changed?

2  A   If we went to Dr. Ruan's office, we in return would write

3  the prescription and go tell the patient that Dr. Ruan stated

4  that he wanted to change it to whatever the prescription is.

5  Q   And did you have occasions when patients were upset with

6  that?

7  A   Yes, ma'am.

8  Q   Could you tell us about that?

9  A   After the prescription has been changed and I take the

10  prescription into the office, when the patient asks the

11  question:  Well, why was I changed?  You know, why the

12  medication -- if the medication was working, why was it

13  changed?  And then in return I will let them know -- either we

14  will say, for example, if it was Lortab, well, it had too much

15  acetaminophen in it, the doctor was concerned about the GI

16  tract or he felt like this would be better pain-relieving

17  medication.

18  Q   Why -- had you gotten that response from Dr. Ruan or where

19  did you get those responses?

20  A   That would be a normal response that we've heard.  Dr. Ruan

21  explained why -- on occasions he will tell us why he was

22  changing it and we will relate that to the patient.

23  Q   On occasions would he not tell you why he was changing it?

24  A   There has been occasions.  Not often, but occasions.

25  Q   Now, can you tell us if there was anything called a nurse

1   visit?

2   A    Yes.

3   Q    Could you explain that?

4   A    A nurse visit will be when a patient comes in and it's

5   basically just a prescription change, no procedure was done on

6   the patient.

7   Q    Who would the patient see?

8   A    Nurse practitioner.

9   Q    And that was called a nurse visit?

10  A    Yes, ma'am.

11  Q    Were there times when patients came and picked up

12  controlled substance prescriptions without seeing anyone?

13  A    Yes.

14  Q    Could you explain that to us?

15  A    They would call in, it could be a medication change, we

16  will relate the message to Dr. Ruan.  When I say we, I'm

17  speaking for myself.  He in return would let us know what to

18  change the medication to and we would either leave it with the

19  prescription nurse or leave it at the front for them to pick

20  up.

21  Q    So that would be a change where the doctor had not seen a

22  patient and the nurse practitioner had not seen the patient?

23  A    Yes, ma'am.

24  Q    Now, did you have a DEA license that you could write

25  scripts?

```
 1   A   No, ma'am.

 2   Q   Did any of the nurse practitioners working with Dr. Ruan,

 3   to your knowledge, have DEA licenses?

 4   A   Not to my knowledge.

 5           MS. GRIFFIN:  One moment, Your Honor.

 6           THE COURT:  All right.

 7       (A discussion was held off the record between government

 8   counsel.)

 9           MS. GRIFFIN:  That's all I have of this witness.

10           THE COURT:  Mr. Sharman?

11           MS. GRIFFIN:  I do have one last question, Your Honor.

12           THE COURT:  All right.

13           MS. GRIFFIN:  My apologies, Mr. Sharman.

14   Q   I forgot to ask you how you're currently employed.

15   A   Where?

16   Q   How you are currently employed.

17   A   I am currently employed as an instructor at Remington

18   College.

19           MS. GRIFFIN:  That's all I have, Your Honor.

20           THE COURT:  All right.

21                         CROSS EXAMINATION

22   BY MR. SHARMAN:

23   Q   Ms. Crawford, my name is Jack Sharman.  I represent

24   Dr. Couch.

25   A   Yes.
```

3613

1   Q   On direct I believe you said that you saw Justin Palmer

2   once or perhaps more than once signing a prescription pad; is

3   that right?

4   A   Yes, sir.

5   Q   And sitting here today, you're not sure exactly what name

6   he was signing, whether his own or somebody else's; right?

7   A   Yes, sir.

8   Q   Or for what patient?

9   A   Yes, sir.

10   Q   Or for what medications?

11   A   On occasions I have observed what medication it was.  But

12   I'm not sure about whose name was being signed.

13   Q   And sitting here today, you don't know what Dr. Couch did

14   or didn't know about what Mr. Palmer was signing or writing on

15   that pad; right?

16   A   No, I can't definitively say.  I just don't.

17           MR. SHARMAN:  Thank you.  No more questions.

18           THE COURT:  Mr. Darley?

19                     CROSS EXAMINATION

20   BY MR. DARLEY:

21   Q   Good afternoon, Ms. Crawford.  I'm Jason Darley.

22   A   Good afternoon.

23   Q   I represent Dr. Ruan.  You said that you were a medical

24   assistant?

25   A   Yes, sir.

1  Q   And you, in the course of your duties, you would check

2  patients in, vitals were taken, things like that?

3  A   Yes, sir.

4  Q   Now, you said that each doctor had nurse practitioners;

5  correct?

6  A   Yes, sir.

7  Q   All right.  And medical assistants?

8  A   Yes, sir.

9  Q   All right.  And you testified on direct that you -- it

10  appeared you were often interacting with Dr. Ruan,

11  collaborating with him; correct?

12  A   Yes, sir.

13  Q   Now, while at the clinic, employed by the clinic, you're

14  aware that you saw patients with all different sorts of

15  insurances; correct?

16  A   Yes, sir.

17  Q   As well as Medicare and Medicaid?

18  A   Yes, sir.

19  Q   Okay.  Are you familiar with the term "incident to" as far

20  as billing or what that means?

21  A   No, sir.

22  Q   You're not?  Now, you were supervised in your work by

23  Dr. Ruan at times; correct?

24  A   Yes, sir.

25  Q   Can you tell the jury who Ken Cross is?

1   A   He was the office manager.

2   Q   And Ken was around quite a bit during this time too, wasn't

3   he?

4   A   Yes, sir.

5   Q   Okay.  Now, on the subject of changes in medications, you

6   testified that Dr. Ruan would often change medications for some

7   of the patients; correct?

8   A   Yes, sir.

9   Q   And you would work with him during those changes and with

10  the patients as well, would you not?

11  A   Yes, sir.

12  Q   Okay.  You're aware that certain manufacturers of these

13  medications gave free trials and coupons and stuff like that to

14  help offset the cost of the medications to the patients, aren't

15  you?

16  A   Yes, sir.

17  Q   Okay.  And that's a common practice within the

18  pharmaceutical industry?

19  A   Yes, sir.

20  Q   Those coupons are offered and that actually helps lower the

21  cost to the patients; correct?

22  A   Yes, sir.

23          MR. DARLEY:  One moment, Your Honor, please.

24      (A discussion was held off the record between defense

25  counsel.)

1          MR. DARLEY:  That's all I have.  Thank you.

2          THE COURT:  Any redirect?

3          MS. GRIFFIN:  No, Your Honor.

4          THE COURT:  All right.  May this witness be excused?

5          MS. GRIFFIN:  Please.

6          THE COURT:  Thank you.  You may step down.

7          MS. GRIFFIN:  May we approach, Your Honor?

8          THE COURT:  All right.

9      (At the side bar, jury not present.)

10          MR. ARMSTRONG:  Has the well run dry today?

11          MS. GRIFFIN:  Do we have everybody?  Judge, we had a

12  witness call in this morning with the flu.  It was one of the

13  named patient witnesses in one of the counts.  We intended for

14  him to be about an hour witness on our part and we have called

15  in two extra witnesses to fill in.  But most everybody else we

16  have scheduled for the week had already changed their work

17  schedules to be here the rest of the week, so we could not have

18  another witness because of Mr. Gist being out with the flu.  So

19  I apologize to the Court.  We have called in two others and --

20          THE COURT:  Do you still think that you are going to

21  rest on February the 7th?

22          MS. GRIFFIN:  We do.

23          THE COURT:  Not before?

24          MS. GRIFFIN:  I do not think we're going to rest

25  before.  We have a doctor witness, that's our last expert, who

 1   cannot come until the 6th.  Now, we may finish on the 6th.  We

 2   could finish that day.

 3          THE COURT:  How long are you all anticipating for the

 4   defense in this case?

 5          MR. SHARMAN:  Your Honor, we've been discussing

 6   that.  I think the pretrial predictions were no greater than, I

 7   believe, five apiece.  And I would be very surprised, at least

 8   from Dr. Couch's perspective, if it exceeded that.  It will

 9   probably be less.

10          MR. KNIZLEY:  I concur, Your Honor, concur with this.

11          THE COURT:  Less for Ruan as well?

12          MR. KNIZLEY:  Yes.

13          MR. ARMSTRONG:  Judge, we're also anticipating working

14   together to call one of our experts actually out of turn and on

15   a date that they can't get anybody in court.  So we will

16   actually bring in one of our witnesses early, before they're --

17          THE COURT:  Through?

18          MR. ARMSTRONG:  -- before they rest.

19          MR. DARLEY:  The 10th.

20          MR. KNIZLEY:  I told you --

21      (A discussion was held off the record between counsel.)

22          THE COURT:  All right.  We'll recess for today.

23          MS. GRIFFIN:  Thank you.

24          MR. BODNAR:  Thank you, Your Honor.

25      (In open court, defendants and jury present.)

1          THE COURT:  All right, ladies and gentlemen.  It's

2     your lucky day.  We're going to recess for today.  25 minutes

3     of free time.

4          I will say you all have been very diligent, very

5     attentive, and I appreciate your work as jurors.  I know this

6     is a long trial and it's not easy for anybody.  But I

7     appreciate you.

8          Go home tonight, don't think about this case, no

9     discussion about it.  Be back downstairs in the jury assembly

10     room, ready to start back up, at 9 o'clock in the

11     morning.  Thank you.

12          We're in recess.

13     (Court adjourned at approximately 4:35 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25