3619

1    UNITED STATES DISTRICT COURT
        SOUTHERN DISTRICT OF ALABAMA

2

3  UNITED STATES OF AMERICA
                                    CASE NO. CR15-00088
4  v.
                                    COURTROOM 2B
5  JOHN PATRICK COUCH, M.D.,
   and XIULU RUAN, M.D.,
6                                   MOBILE, ALABAMA
            Defendants.
7  * * * * * * * * * * * * * * *    TUESDAY, JANUARY 31, 2017

8  REDACTED

9
                          DAY 16 OF TRIAL
10       BEFORE THE HONORABLE CALLIE V. S. GRANADE,
            UNITED STATES DISTRICT JUDGE, AND JURY
11

12

13  APPEARANCES:

14  FOR THE GOVERNMENT:
        DEBORAH A. GRIFFIN
15      CHRISTOPHER BODNAR
        United States Attorney's Office
16      63 S. Royal Street, Suite 600
        Mobile, AL  36602
17      (251) 441-5845

18
    FOR THE DEFENDANT COUCH:
19      ARTHUR T. POWELL, III
        P.O. Box 40456
20      Mobile, AL 36640-0456
        (251) 433-8310
21
        JACKSON R. SHARMAN, III
22      JEFFREY PAUL DOSS
        BENJAMIN SANDERS WILLSON
23      Lightfoot, Franklin & White
        400 North 20th Street
24      Birmingham, AL  35203
        (205) 581-0700
25

1   (Continued)

2       BRANDON KEITH ESSIG
        800 Shades Creek Parkway, Suite 600D
3       Birmingham, AL   35209
        (251) 879-1981

4

    FOR THE DEFENDANT RUAN:
5       DENNIS J. KNIZLEY
        7 N. Lawrence
6       Mobile, AL 36602
        (251) 432-3799

7

        JASON BRADLEY DARLEY
8       Darley & McGough, LLC
        1751 Dauphin Street
9       Mobile, AL 36604
        (251) 441-7772

10

        GORDON G. ARMSTRONG, III
11      P.O. Box 1464
        Mobile, AL   36633
12      (251) 434-6428

13      STEVEN D. MARTINIE
        4955 North Lake Drive
14      Whitefish Bay, WI   53217
        (414) 332-9683

15

    THE CLERK:  MARY ANN BOYLES
16  THE LAW CLERK:  LYNN DEKLE
    U.S. ATTORNEY IT:  BRIAN COCHRAN
17  DEFENSE IT:  SAM MCALLISTER
    COURT REPORTER:   ROY ISBELL, CCR, RDR, CRR

18
            Proceedings recorded by OFFICIAL COURT REPORTER
19        Qualified pursuant to 28 U.S.C. 753(a) & Guide to
        Judiciary Policies and Procedures Vol. VI, Chapter III, D.2.
20          Transcript produced by computerized stenotype.

21

22

23

24

25

1               EXAMINATION INDEX

2

SHARON NOLAND
3       DIRECT BY MR. BODNAR  . . . . . . . . . . . . . . . 3622
        CROSS BY MR. SHARMAN  . . . . . . . . . . . . . . . 3664
4       CROSS BY MR. DARLEY . . . . . . . . . . . . . . . . 3667
        REDIRECT BY MR. BODNAR  . . . . . . . . . . . . . .3684

5

SARAH CARPENTER MCMICHAEL
6       DIRECT BY MS. GRIFFIN . . . . . . . . . . . . . . . 3691
        CROSS BY MR. SHARMAN  . . . . . . . . . . . . . . . 3728
7       REDIRECT BY MS. GRIFFIN . . . . . . . . . . . . . . 3739

8  ANGELA CAUSBY
        DIRECT BY MR. BODNAR  . . . . . . . . . . . . . . . 3745

9

ASHLEY DOMINGUEZ BUCKLEY
10      DIRECT BY MS. GRIFFIN . . . . . . . . . . . . . . . 3759
        CROSS BY MR. DARLEY . . . . . . . . . . . . . . . . 3774
11      REDIRECT BY MS. GRIFFIN . . . . . . . . . . . . . . 3784

12  AMANDA CHAUSSE
        DIRECT BY MR. BODNAR  . . . . . . . . . . . . . . . 3791
13      CROSS BY MR. POWELL . . . . . . . . . . . . . . . . 3818
        REDIRECT BY MR. BODNAR  . . . . . . . . . . . . . .3846

14

15

16

17

18

19

20

21               EXHIBIT INDEX

22                                              MAR  ADM

GOVERNMENT'S
23  6-3    Pump refill notes for various patients,      3708
               2012

24
    6-4    Photo of patient P. Chausse                  3793
25

3622

1     (Morning session, 9 a.m., in open court, defendants and

2     jury present.)

3          THE COURT:  Good morning, ladies and gentlemen.

4          All right.  Counsel, you may continue.

5          MR. BODNAR:  United States calls Sharon Noland.

6                    SHARON NOLAND

7          was sworn and testified as follows:

8          THE WITNESS:  Yes.

9          THE CLERK:  Thank you, ma'am.  Please be seated.

10                   DIRECT EXAMINATION

11    BY MR. BODNAR:

12    Q   Good morning, Ms. Noland.

13    A   Good morning.

14    Q   Would you please pull the microphone just a little bit

15    closer to you?

16    A   How's this?

17    Q   Perfect.  Could you please introduce yourself to the jury?

18    A   My name is Sharon Noland, and I'm a family nurse

19    practitioner.

20    Q   And how do you spell your last name, Ms. Noland?

21    A   N-O-L-A-N-D.

22    Q   And you said a family nurse practitioner.  Can you explain

23    what is a family nurse practitioner?

24    A   A nurse practitioner is a mid-level provider.  We've been

25    trained to evaluate patients, see patients, prescribe

3623

1   medications, and we usually work under the direction of a

2   physician.

3   Q   Is there a difference between a family nurse practitioner

4   and just a regular nurse practitioner?

5   A   Well, you can specialize in many different areas.  A family

6   nurse practitioner can see patients from birth to death in

7   essence.

8   Q   And could you explain to the jury what is your educational

9   background to become a family nurse practitioner?

10   A   I have a bachelor's degree from Eastern Kentucky University

11   and a master's degree in nursing from Vanderbilt University as

12   a nurse practitioner.

13   Q   And how long have you worked as a nurse practitioner?

14   A   Since 1996, approximately 20 years.

15   Q   Prior to working at PPSA, did you work as a nurse

16   practitioner anywhere else?

17   A   Yes.  I was for eight years at Georgia Southern University

18   where I worked for student health, and I was also an adjunct

19   clinical faculty instructor.

20   Q   And was that an instructor in the field of nursing?

21   A   Yes, it was.

22   Q   Explain to the jury when it was that you came to work at

23   PPSA?

24   A   I joined PPSA in November of 2011.

25   Q   And why was it that you joined PPSA?

SHARON NOLAND - DIRECT BY MR. BODNAR

1  A   I had relocated to this area, was looking for a position as

2  a nurse practitioner, and saw an advertisement in the paper and

3  it was for PPSA.

4  Q   And as a general overview, which doctors did you work for

5  during your time at PPSA?

6  A   Dr. Ruan initially, and then later on I transferred over to

7  Dr. Tao Chen.

8  Q   And while you were there did you ever have a DEA license?

9  A   Yes, I did.

10  Q   So what were you -- well, first, when was that?

11  A   Oh, let's see here.  I can't remember initially.  I believe

12  probably from 2013 is when the DEA license came (nodding head

13  affirmatively).

14  Q   At what level of controlled substances were you able to

15  prescribe while you were there?

16  A   You would be allowed to prescribe III, IV, and V.

17  Q   And were you actually prescribing under your own name and

18  number III, IV and V?

19  A   No.

20  Q   Were you ever prescribing schedule II drugs?

21  A   Yes, under the direction of the physician.

22  Q   Were you signing your name to it?

23  A   No.

24  Q   Were you forging anyone else's name at the time?

25  A   No.

SHARON NOBAND - DIRECT BY MR. BODNAR

1  Q   During your time at PPSA, were you ever using drugs while

2  in the office?

3  A   No.

4  Q   Starting now with the time that you worked for Dr. Ruan,

5  when did you begin working for Dr. Ruan?

6  A   Approximately November of 2011 through May of 2014.

7  Q   And during your time period with Dr. Ruan, how was it that

8  you were compensated?

9  A   I was paid hourly.

10  Q   Do you know was that different compared to how the other

11  nurse practitioners at PPSA were paid?

12  A   Yes.  I believe the other nurse practitioners -- all the

13  other ones were paid on a per patient basis, whether it was an

14  established patient, a certain rate, versus a new patient.

15  Q   So did you have any incentive to see as many patients as

16  you could during the day?

17  A   No.

18  Q   Can you explain to the jury how did it work when you were

19  seeing patients under Dr. Ruan, first as a new patient?  If it

20  was a new patient, what would happen?

21  A   Normally a new patient, I would perform a full physical

22  exam on the patient, do an assessment, perhaps come up with a

23  treatment plan, and then I would go and present that patient to

24  Dr. Ruan.  And then Dr. Ruan would accompany me back into the

25  room to meet the patient.

1    Q   Explain to the jury what do you mean by present the

2    patient?  Are you bringing the patient from the exam room to go

3    meet Dr. Ruan?  Or what's happening?

4    A   Generally no.  I would leave the exam room and then go to

5    Dr. Ruan in his office and present the patient verbally to him.

6    Q   And what do you mean by present?  What would you do if

7    you're presenting a patient?

8    A   I would tell him the chief complaint, the reason why they

9    were there, maybe if they had any workup to date, if they had

10   had any MRIs, what regimen of medicine they may have been on.

11   Q   You mentioned that you would do at least with the patients

12   you saw a workup or physical?

13   A   Yes.

14   Q   Would you ever just take what a previous doctor had done

15   and type it into the system as if that was the physical you had

16   done?

17   A   No.

18   Q   Why wouldn't you do something like that?

19   A   Because, I mean, you have to physically touch the patient

20   in order to document a physical exam.

21   Q   And in your cases were you actually physically touching the

22   patient?

23   A   Yes.

24   Q   How did it work when patients were return patients when you

25   were with Dr. Ruan?  Did it work the same way?

3627

1   A   Yes.  The patient would come back.  We would talk with the

2   patient, see if the medication was working, not working.  And

3   before any prescriptions were written, we would go back and

4   discuss with Dr. Ruan, myself or, you know, the other nurse

5   practitioners, each patient with Dr. Ruan.

6   Q   And when you say "we," are you referring to yourself and

7   the other nurse practitioners?

8   A   Yes.

9   Q   Who were the other nurse practitioners for Dr. Ruan at this

10  time?

11  A   That was Bridgette Parker and Shanna Harville.

12  Q   And you say you would go present at that time.  Would

13  Dr. Ruan necessarily see all the return patients?

14  A   No.

15  Q   What happened if a medication needed to be switched?  How

16  did that work?

17  A   Generally medication decisions were made by Dr. Ruan.  So

18  he would give us guidance on what he wanted to switch the

19  patient to.

20  Q   How was that done if Dr. Ruan wasn't seeing a return

21  patient?

22  A   We would go present that to him at the office, and he would

23  say:  I want this prescription, this is the prescription we're

24  going to use.  And that's what -- and then I would take that

25  prescription back to the patient and go over that with the

SHARON NOLAND - DIRECT BY MR. BODNAR

1   patient.

2   Q   Were there times where the patient would be upset about

3   changing from one medication to the other?

4   A   Yes, there were.

5   Q   Can you explain that to the jury?

6   A   Some patients had been on a certain regimen and a new

7   medication was presented to them, and they often questioned --

8   some of them questioned why they were being switched.  And I

9   would tell them for whatever reason, perhaps this medication

10  Dr. Ruan wanted them to try, give it a try, and see maybe if it

11  would work at controlling their pain better.

12  Q   And the patients that were upset, do you know if it was

13  because their previous medicines had been working?

14  A   Yes.  Generally speaking, a lot of times they felt their

15  medications were working.

16  Q   And yet they were still switched?

17  A   Yes.

18  Q   Were you aware of speaking engagements or drug reps being

19  present in the office?

20  A   Yes.

21  Q   And was it for a variety of different drugs?

22  A   We had a number of reps coming in.

23  Q   What, if any, correlation did you observe between the drug

24  reps that were there and speaking programs and what was being

25  prescribed to the patients?

1   A    Natalie Perhacs, who was the Insys rep, was at the office

2   quite frequently.  And I knew that Dr. Ruan was participating

3   in the speaker programs for them.  And she would come in once

4   or twice a week.

5   Q    And what was the drug that Insys made?

6   A    Subsys.

7   Q    And was there any correlation between her being there and

8   speaker programs that you saw and patients being prescribed

9   Subsys?

10  A    Yes.  We had a big push initially to prescribe

11  Subsys.  They offered a voucher for the product free.  And when

12  that product was launched and Dr. Ruan became a speaker for

13  Insys, there was a big push to push -- put patients on that

14  drug.

15  Q    Now, when you say -- do you know what Subsys is intended

16  for, what its indication is?

17  A    Yes.  It's for breakthrough cancer-related pain.

18  Q    Do you have a rough estimate of approximately how many

19  patients at PPSA had cancer, active cancer?

20  A    Probably 10 to 15 percent.

21  Q    Were there patients being put onto Subsys that did not have

22  active cancer pain?

23  A    Yes.

24  Q    Were there other patients that in your clinical belief that

25  you didn't think needed Subsys at all?

SHARON NOLAND - DIRECT BY MR. BODNAR

1    A    Yes.

2    Q    Can you explain that to the jury, please?

3    A    For example, I had a patient that was on three Norco a day,

4    three short-acting pain pills a day, that she felt her pain was

5    being well controlled.

6    Q    And is Norco -- what kind of drug is Norco?

7    A    Norco is hydrocodone.  It's a short-acting opioid.

8    Q    And is that less potent than fentanyl?

9    A    Oh, yes, by a hundred times or plus less potent.

10   Q    And was that patient ultimately put on Subsys?

11   A    She was given a prescription for Subsys.  And she had just

12   been diagnosed with breast cancer.  We were not treating her

13   for that.  And Dr. Ruan wanted her to be prescribed Subsys.

14   And she did not want it.  And she ultimately did not fill that.

15   Q    Were there other drugs in which you observed a correlation

16   between the reps being there and a push to get patients on

17   those drugs?

18   A    Yes.  Oftentimes it would depend on -- there would be a

19   focus or a flavor of the day, I called it.  There might be --

20   depending on which speaker programs that he was with, it

21   switched.  We might go months with a certain drug, and then he

22   -- then we might switch to a different -- these were brand name

23   prescriptions.

24   Q    Where, if you know, were patients filling these brand name

25   prescriptions?

1   A   At C&R Pharmacy.

2   Q   And where was C&R Pharmacy located?

3   A   It was located in the building on Airport.

4   Q   And is that the building you also worked at?

5   A   Yes.

6   Q   What, if any, direction was given to patients about going

7   to C&R Pharmacy?

8   A   They were strongly encouraged to fill their prescriptions

9   in-house at the pharmacy.

10   Q   Who gave that strong encouragement?

11   A   Dr. Ruan.

12   Q   Did he personally do it or was it through a nurse

13   practitioner?

14   A   Well, I mean, that was the instructions, that we wanted

15   patients to be filling prescriptions in-house.

16   Q   When you put patients on Subsys, what, if any, warnings

17   were given to the patient about what the drug was?

18   A   The drug -- there was a form that came with that, a REMS

19   form, a risk form.  And you're supposed to review that with the

20   patient and go over the risks of the medication, including

21   respiratory depression, even death, keeping the medications

22   safe and away from others.

23   Q   And was Dr. Ruan giving the -- was Dr. Ruan himself giving

24   those warnings to patients?

25   A   No.  That was left up to the nurse practitioner.

SHARON NOLAND - DIRECT BY MR. BODNAR

1  Q   And would that be someone like you?

2  A   Yes.

3  Q   Did you have the ability to actually prescribe Subsys?

4  A   No, I did not.

5  Q   What, if anything, did you tell the patients about being a

6  cancer medication?

7  A   That we were using it off label for pain unrelated to

8  cancer and that we were using it for breakthrough pain.  We

9  used many medications off label.

10 Q   And what does it mean if you're using something off label?

11 A   Off label means that it's not been studied by the FDA and

12 given an indication.  Many medications, such as seizure

13 medication, Neurontin, gabapentin, was indicated for seizures,

14 but we used that off label for nerve-related pain.

15 Q   And we talked about Subsys.  You mentioned flavors of the

16 week.  Do you remember any of the other brand name drugs that

17 were, as you described, flavors of the week?

18 A   Nucynta ER, Exalgo, Duexis, which is an anti-inflammatory,

19 Abstral, and then, of course, Subsys.  Those are probably the

20 biggest ones.

21 Q   And Duexis is a drug that -- what is Duexis?

22 A   Duexis is an ibuprofen 800 combined with Pepcid to protect

23 the stomach.

24 Q   And is ibuprofen similar to Advil?

25 A   Yes.  Same medication, just prescription label.

SHARON NOLAND - DIRECT BY MR. BODNAR

1  Q   And what, if anything, do you know about the difference in

2  price of Duexis versus a just over-the-counter Advil?

3  A   Okay.  Over-the-counter Advil is a dollar, two dollars, you

4  know.  It depends on which one.  Duexis is probably 5, $600

5  plus.

6  Q   And would that be a medication that was being filled at C&R

7  Pharmacy?

8  A   Yes.

9  Q   Do you know if there was a Duexis rep that would come to

10  C&R Pharmacy?

11  A   Yes.

12  Q   Or there to the PPSA?

13  A   Yes.

14  Q   Who was that individual?

15  A   Jay Powell.

16  Q   What, if anything, do you know of that Jay Powell did to

17  earn the business of prescribing at PPSA?

18  A   Uh, I'm not familiar with any specifics.  I mean, Jay was

19  in there a lot too.  I knew that he had a relationship with

20  Dr. Ruan.  They had been hunting together, I believe, something

21  like that.  But beyond that, I'm not sure.  Dr. Ruan was on the

22  speakers program for Duexis.

23  Q   Do you know of any other drug reps that performed tasks

24  outside the normal bringing in lunch for Dr. Ruan or Dr. Couch?

25  A   Yes.  When I was first there, there was a Nucynta rep who

3634

1  had taken Dr. Ruan's car to get it serviced, which I thought

2  was a little bit unusual.

3  Q   Did you explain that to any other drug rep, that particular

4  event?

5  A   Yes.  I have a -- my best friend is a drug rep in

6  Wisconsin.  And I jokingly told her if she needed more scripts

7  written, maybe she needed to go have her doctor's oil changed.

8  Q   Were procedures such as MRIs done at PPSA?

9  A   Yes, they were.

10  Q   Can you explain to the jury what is an MRI?

11  A   An MRI is a special test using a magnet that performs a

12  study, for example, of the spine so that we're able to see what

13  the disks look like and the bone structure of the spine.

14  Q   Did PPSA have an MRI machine?

15  A   Yes, they did.

16  Q   What was offered to patients or what was required for

17  patients as part of the workup?

18  A   Part of their workup, we needed to document the disease

19  process.  So we would often order an MRI on the patient to

20  document.

21  Q   And based on your clinical experience, are MRIs a useful

22  tool to use when diagnosing a patient?

23  A   Yes, they are.

24  Q   What would happen if a patient wanted to get an MRI

25  elsewhere other than PPSA?

1  A   They were strongly encouraged to have their MRIs done

2  in-house at PPSA.

3  Q   If it was done in-house, would PPSA be able to bill for

4  that MRI?

5  A   Yes.

6  Q   Were there other tests that were strongly encouraged to be

7  done at PPSA?

8  A   Yes.  Nerve conduction tests.

9  Q   Can you explain to the jury what's a nerve conduction test?

10 A   A nerve conduction test is a series of basically shocks in

11 a body area to determine how the nerve function is and if

12 there's impairment.

13 Q   And again, is that a test that is useful in clinical

14 determination of what might be wrong with a person?

15 A   Yes, it is.

16 Q   And where were those tests performed?

17 A   They were performed at PPSA.

18 Q   Was there any discouragement about performing them -- or

19 getting it done elsewhere?

20 A   Yes.  We did not ever order those because Dr. Ruan was able

21 to perform those.

22 Q   How did the billing work when you were working under

23 Dr. Ruan in terms of selecting the level for an office visit?

24 A   We had a superbill, and all the superbills went to Dr. Ruan

25 at the conclusion of the day.  And then for new patients we

1   would forward the note to Dr. Ruan, and then he would make the

2   determination on what level of service was billed.

3   Q    And for repeat visits, is that what is referred to as a

4   99213 or a 99214 code?

5   A    Yes.  That's an established patient followup, yes.

6   Q    And who would be making the determination if it would be

7   billed as 99213 or 99214?

8   A    Generally the person who saw the patient.  But in our case

9   we forwarded all the charge sheets to Dr. Ruan.

10  Q    Was he personally involved in choosing the codes for

11  billing?

12  A    Yes.

13  Q    Would that be the case even if he didn't -- if he was not

14  present to see the person?

15  A    Yes.

16  Q    Can you explain to the jury what level of management

17  Dr. Ruan had over the practice at PPSA?

18  A    Dr. Ruan was very involved with the practice.

19  Q    Did he tend to micromanage --

20  A    Yes.

21  Q    -- stuff that happened there?

22  A    Yes.

23  Q    With regard to the business and billing, were things

24  occurring, to your knowledge, that were outside what Dr. Ruan

25  was aware of?

3637

1   A   No.  I mean Dr. Ruan was involved in every aspect of the --

2   it was his practice.

3   Q   Could the same be said about Dr. Couch?

4   A   No.  It did not give me that impression that Dr. Couch was

5   involved as heavily as Dr. Ruan was.

6   Q   I'm going to ask you now about presigned scripts.  Are you

7   aware of -- or what is a presigned script?

8   A   A presigned script is a blank prescription that has been

9   presigned by the physician.

10  Q   So do you mean signature at the bottom but no name or

11  medication?

12  A   Yes, yes.  It's completely blank except for a signature.

13  Q   During your time working with Dr. Ruan, were blank

14  prescriptions for Dr. Ruan used?

15  A   Yes.

16  Q   Can you explain that to the jury, please?

17  A   There were a few blank prescriptions left.  This was not a

18  common practice.  Generally speaking, if Dr. Ruan was not in

19  town, like if he had gone on an extended trip to China, and if

20  we had an emergency need to address something for a patient,

21  there were a few blank presigned scripts that were left.

22  Q   And where were those blank presigned scripts left?

23  A   In Dr. Ruan's desk.

24  Q   Who had knowledge of where those were?

25  A   I had knowledge.  I assumed the other nurse practitioners

1    did.  I'm not sure if any of the staff did.

2    Q   And from time to time were those actually used?

3    A   Yes, they were.

4    Q   If Dr. Ruan was out of town, why couldn't a patient be just

5    sent over to see Dr. Chen or Dr. Couch?

6    A   Generally it would be more of an inconvenience.  As I said,

7    this wasn't a common thing.  Normally, you know, it might have

8    been that one of the other physicians wasn't available or we

9    didn't want to add them to their schedule.

10   Q   And explain that.  Why wouldn't you want to add someone to

11   their schedule?

12   A   I mean, I'm not sure that they would have -- I didn't have

13   a whole lot of confidence in Dr. Couch's team to send my

14   patients over there, and I didn't really want to bother

15   Dr. Chen.  He didn't really know our patients either.  I felt I

16   knew my patients better.

17   Q   So instead a prescription was written by someone that

18   doesn't have a DEA license?

19   A   Yes.

20   Q   While you were working for Dr. Ruan, did you treat a

21   patient named Kathleen Burns?

22   A   Yes, I did.

23   Q   Can you please explain to the jury who was Kathleen Burns?

24   A   Ms. Burns was referred to us.  I can't remember all the

25   specifics of her case.  I do remember she had had back surgery

 1  since she became a patient.  I don't know if that was her

 2  second back surgery.  But she had a lot of issues with chronic

 3  pain.

 4  Q   Do you know if she had active cancer?

 5  A   She did not, to my knowledge.

 6  Q   Was there a time that she began taking Subsys?

 7  A   Yes.

 8  Q   Were there times where she was abusing her Subsys?

 9  A   It appeared to be.

10  Q   And were you one of the nurse practitioners that counseled

11  her against abuse.

12  A   More than likely, yes.  I was seeing her primarily for

13  quite a long time.

14  Q   Were there other patients that you had that you had to

15  counsel about abusing Subsys?

16  A   Yes.

17  Q   Would you please explain that to the jury?

18  A   I had several patients that would come in and they would be

19  out of their Subsys early or tell me that some of the units

20  weren't seeming to spray correctly, they seemed to be empty.  I

21  reported this to the drug rep.  And I didn't have any reason to

22  not believe the patient, and I wanted to make sure that the

23  company knew this, that some of the units they were claiming

24  was empty.  I don't, again, know if the patient was being

25  evasive or, you know, untruthful on that.  But there were

SHARON NOLAND - DIRECT BY MR. BODNAR

3640

1  several patients that would run out of their Subsys early.

2  Q   And what, if anything, was done in terms of terminating

3  patients that were not following the agreement with Subsys?

4  A   Well, generally we would counsel the patient.  And

5  generally I did not terminate a patient just because they ran

6  out of their medication early.  It would have to be a repeat

7  behavior, you know.  So we might counsel them and tell them

8  they need to follow the dosing directions on it (nodding head

9  affirmatively).

10  Q   Were you involved or did you ever attend any of the Subsys

11  talks given by either Dr. Ruan and Dr. Couch?

12  A   Yes, I did.

13  Q   Did Dr. Chen ever give talks for Subsys?

14  A   No, he did not.

15  Q   Well, whose talks did you go to?  Was it Dr. Couch's or

16  Dr. Ruan's?

17  A   I went to one for Dr. Couch and several for Dr. Ruan.

18  Q   Could you please explain to the jury what these events were

19  like?

20  A   Generally these were lunches.  One time with Dr. Couch I

21  believe it was Outback, and primarily Dr. Ruan's took place at

22  Osaka, a Japanese restaurant.

23  Q   Who would attend these speaking engagements?

24  A   Generally it would be myself, some of the office staff,

25  maybe some MAs, the other nurse practitioners in the office.

SHARON NOLAND - DIRECT BY MR. BODNAR

3641

1  Q   Was there ever an occasion that outside doctors attended?

2  A   At one that I attended for Dr. Ruan we had a rheumatologist

3  in the area that came.

4  Q   Other than her, were there other instances where doctors

5  would show up at these speaking events?

6  A   Not when I was present.

7  Q   And explain to the jury was there a slide show or a deck of

8  slides that needed to be gone through?

9  A   Sometimes there would be.  With Dr. Ruan generally he

10  always made a statement that we were here to talk about the

11  product.  And then we might have a discussion back and forth

12  with Dr. Ruan about the product and some points that he wanted

13  to make to us.

14  Q   And approximately how long or what percentage of the lunch

15  would that take?

16  A   Probably 10 to 15 minutes.

17  Q   And how long were these lunches generally?

18  A   Maybe an hour.

19  Q   And at the time that these discussions were going on with

20  the PPSA staff, were you already or was the office already

21  prescribing Subsys?

22  A   Yes.

23  Q   The people that he was discussing it with, such as yourself

24  and other staff, did you have the ability to subscribe Subsys

25  yourself?

1  A   No, not individually, no.

2  Q   Were there other speaking programs that you were aware of

3  that either Dr. Ruan or Dr. Couch were involved in?

4  A   Yes.

5  Q   Would you please explain that to the jury?

6  A   I went to a program for Duexis.  And that was the anti-

7  inflammatory, and Dr. Ruan was the speaker there.  That was

8  attended by several outside people not affiliated with PPSA.

9  Q   So would that be different than what happened at --

10 A   Yes.

11 Q   -- Subsys talks?

12 A   Those would be different, uh-huh.

13 Q   How about other talks?

14 A   Those are pretty much primarily the ones that we would

15 have, you know -- several of those where he was an outside --

16 where they might bring in clinicians or mid-level providers.

17 Q   Did there come a time where you became aware of Dr. Ruan

18 donating his Subsys money?

19 A   Yes.

20 Q   Would you please explain that to the jury?

21 A   Dr. Ruan had shown me an article that was published, I

22 believe, for LSU that had discussed a donation he had made to

23 the LSU -- I don't know if it was the School of Medicine for

24 some money that he had donated.  It didn't specifically say

25 where the money had come from; it was just from Dr. Ruan.

1  Q   What, if any, reaction did you have upon learning that?

2  A   I was shocked.

3  Q   Why were you shocked?

4  A   It was, you know, just a philanthropic gesture.  And I had

5  not really heard of any other gestures prior to this by

6  Dr. Ruan.  So it was a little bit out of character.

7  Q   Did he ever explain to you why it might be that he was

8  donating Subsys money?

9  A   No.

10  Q   You had mentioned that at one point you switched over to

11  Dr. Chen?

12  A   Yes.

13  Q   What was the time period that you switched over to

14  Dr. Chen?

15  A   In May of 2014.

16  Q   Can you please explain to the jury how does Dr. Chen relate

17  in the practice to Dr. Couch and Dr. Ruan?

18  A   Dr. Chen acted more as an employee of the practice.  He

19  took -- you know, he was pretty much on the same level as any

20  of the other mid levels.  He was told, you know, these were his

21  patients, and basically he was like an employee.

22  Q   To your knowledge, was he at all a part owner with Dr. Ruan

23  and Dr. Couch?

24  A   Not that I'm aware of.

25  Q   Were you aware if he made any sort of business decisions or

3644

1   practice decisions with Dr. Ruan and Dr. Couch?

2   A   No, not at all.

3   Q   I should have asked you in the beginning do you still work

4   for Dr. Chen now?

5   A   Yes, I do.

6   Q   Can you explain to the jury what were some of the

7   differences of when you switched over from Dr. Ruan to

8   Dr. Chen?

9   A   It was pretty much night and day.  There was not a pressure

10  to prescribe certain medications with Dr. Chen.  He primarily

11  used a lot of generic medications.  He did not -- was not as

12  forward on ordering perhaps an MRI on the patient or a nerve

13  study.  You know, the patient may have had one that was three

14  years old, but that seemed to satisfy Dr. Chen for his

15  documentation purposes.

16  Q   How about Subsys?  Were you prescribing -- was Dr. Chen

17  prescribing Subsys at the same level as Dr. Couch and Dr. Ruan?

18  A   No.  And the only Subsys that I'm aware of that Dr. Chen

19  prescribed were the few patients that came over, that were

20  allowed to come over with me when I switched.  And those would

21  have been the only ones that would have -- Dr. Chen, I don't

22  believe, ever put anybody on it otherwise.

23  Q   Can you explain to the jury -- you said "were allowed to

24  come over with me."  What do you mean by patients being allowed

25  to come to Dr. Chen with you?

1  A   When I was transferred over to Dr. Chen, I had, you know,

2  obviously a large number of patients that I was following for

3  Dr. Ruan.  But they were not allowed to switch and come over

4  with me and continue to be seen by me.

5  Q   Who didn't allow them to switch?

6  A   Dr. Ruan.

7  Q   Why didn't he allow them to switch?

8  A   Because he said they were his patients ultimately.

9  Q   If they had switched over to Dr. Chen, how would that have

10 affected Dr. Ruan?

11 A   That would have been a loss of revenue.

12 Q   Based on your working and nursing before, have you ever

13 seen that where a doctor forbids a patient to go with another

14 doctor?

15 A   No.  And the patients did not understand it either.

16 Q   Did patients ever ask you about why they couldn't switch to

17 see you and Dr. Chen?

18 A   Yes.

19 Q   Explain that to the jury.

20 A   I had several patients that were upset because they felt

21 that I had seen them during this time period and that I knew

22 their history better.  Some said they had not even really ever

23 seen Dr. Ruan very much and felt that they wanted to continue

24 with their provider; we had a relationship.  So I explained to

25 them that ultimately they were Dr. Ruan's patients and that

1   they had to stay there with him.

2   Q   Did you have any concern about some of your patients that

3   you had been seeing now being treated by Bridgette Parker?

4   A   I believe Bridgette had already switched over by that time,

5   before that time.  But yes, in general, the patients initially

6   that we were following under Dr. Raun's team with Bridgette, I

7   had a lot of issues with Bridgette.

8   Q   Can you please explain to the jury who was Bridgette -- who

9   is Bridgette Parker?

10   A   Bridgette Parker was a nurse practitioner that joined PPSA

11   in approximately October of 2012.

12   Q   Had she had years of experience, clinical experience?

13   A   No.  She had just graduated from a nurse practitioner

14   program.

15   Q   What were the concerns that you had about Bridgette Parker?

16   A   Bridgette did not seem to have a very firm ground on

17   prescribing.  She didn't seem to understand the dangers of the

18   narcotics that she was prescribing.  She oftentimes would make

19   a suggestion, talking about putting a patient on something

20   perhaps that was -- that did not seem appropriate, in my

21   opinion.  And there were just some general issues like that.  I

22   didn't feel she was qualified.

23   Q   Did you ever have an opportunity to see if she appeared to

24   be impaired at work?

25   A   Yes.  Many times.

3647

1  Q   Can you explain that to the jury, please?

2  A   Several instances where Bridgette would appear to be

3  impaired, she appeared glassy eyed, almost spacey, and didn't

4  seem to really know what was going on.  We had patients that

5  commented on this.  I did bring this up to the management

6  staff.  I brought this up to Dr. Ruan.  Bridgette was also out

7  sick quite a few times, and she was generally an unreliable

8  person.

9  Q   During your tenure with Dr. Ruan, what happened -- did at

10 some point she stop working for Dr. Ruan?

11 A   Yes.  I don't remember the -- I think this was maybe her

12 third or fourth instance of being absent from work, which then

13 left myself and Shanna Harville the majority of the patients to

14 deal with.  And she and -- I don't remember the exact

15 circumstance, but she and Dr. Ruan got into an argument, and

16 Dr. Ruan terminated her.  And she asked --

17 Q   Did he fire her?

18 A   Yes.  And she did ask to borrow my car that day to drive

19 over to the other office to go talk to Dr. Couch.  But I was

20 concerned about her getting in my car and I would not let her

21 have my car.

22 Q   Why were you concerned about her getting in your car?

23 A   Because she seemed impaired.

24 Q   What happened, if you know, to her after she was fired by

25 Dr. Ruan?

```
 1   A   She then went over to Dr. Couch.  And prior to this, she
 2   had already, I believe, been speaking to Dr. Couch.  And she
 3   went and started working for Dr. Couch.
 4   Q   So was she fired by one of the doctors and hired by the
 5   other one?
 6   A   Yes.
 7   Q   Do you know how close in time that fired by one and hired
 8   by the other was?
 9   A   Same day.
10   Q   Now, during your time period at PPSA, did you ever work
11   directly for Dr. Couch?
12   A   Yes.  One day.
13   Q   And was that at the very end?
14   A   That was probably after Bridgette and Justin had left.
15   Q   Prior to that, had you had many dealings with Dr. Couch?
16   A   No.
17   Q   Was there an incident that occurred with a woman that had
18   been left on the procedure table?
19   A   Yes.
20   Q   Would you please explain to the jury what happened?
21   A   I was -- we were at the West Mobile office, and I happened
22   to be over there in my office.  And I could hear a patient
23   moaning.  And I went back there, and there was a patient lying
24   on the procedure table.  And I asked the nurse what the problem
25   was, and he said that --
```

1           MR. SHARMAN:  Objection.  Hearsay.  "He said."

2    BY MR. BODNAR:

3    Q   Without saying what he said -- and we'll get to what you

4    did after that.

5    A   Okay.

6    Q   Can you describe this patient?  What did this patient look

7    like?

8    A   She was an elderly lady and lying on her stomach on the

9    exam table.

10   Q   And had she been prepped up with a gown on and --

11   A   Yes.

12   Q   -- dressed to go?

13   A   Yes.

14   Q   Without saying what the nurse practitioner -- or the

15   medical assistant told you, what did you do after speaking with

16   the medical assistant?

17   A   I went to Dr. Couch's office.  And he was on the phone.

18   And I told him that a patient had been lying on the table for a

19   prolonged period of time and that he needed to come in there

20   right now and do the procedure because she was uncomfortable.

21   Q   Did you have any other concerns while you were working at

22   PPSA before you started working for Dr. Couch about what went

23   on on the Dr. Couch side of the house?

24   A   Yes.

25   Q   Could you explain that to the jury, please?

3650

1    A    Normally we did not look at other patient charts.  If I was

2    working under Dr. Ruan, I did not go look at Dr. Couch's

3    patients.  Because we didn't see each other's patients.

4    Everybody had their own patients.

5             After Bridgette and Justin left, the office was in a

6    little bit of chaos.  A lot of times the medical assistants

7    might bring me a chart to look at or -- I became very -- trying

8    to be very involved in seeing what was being prescribed.  And I

9    was concerned at the high number of what I thought were high-

10   dose narcotics that were being prescribed on Dr. Couch's side.

11   Q    Were there any types of medication in particular that

12   raised your concern?

13   A    High-dose MS Contin 100 milligrams three times a day,

14   oxycodone 30, Dilaudid, which generally was not recommended to

15   be using for chronic pain.

16   Q    And the oxycodone 30, is that the brand name known as

17   Roxicodone?

18   A    Roxicodone 30, yes.

19   Q    You had mentioned that Bridgette and Stacy left.  Did

20   Dr. Couch have another nurse practitioner who left shortly

21   before -- I'm sorry -- before Bridgette and Justin?

22   A    Yes.  That was Stacy.

23   Q    So in early 2015 was Bridgette gone?

24   A    That was probably January-February of 2015.

25   Q    So in that early part of the year was Bridgette gone?

1   A    Yes.

2   Q    Was Justin gone?

3   A    Yes.

4   Q    Was Stacy gone?

5   A    Yes.

6   Q    Who was it that came in to help with Dr. Couch's patients?

7   A    Ben Clark.

8   Q    Is he another nurse practitioner?

9   A    He was.

10   Q    Did you say that at times you went to help out the

11   Dr. Couch team during that time period?

12   A    Yes.

13   Q    During that time do you know if you reviewed a file for an

14   individual named Jessi Kamper?

15   A    Yes, I did.

16   Q    I'm going to show you now what has been taken out of the

17   United States Exhibit 6-2, which has already been admitted, and

18   ask you is this a note that you put into the file of Jessi

19   Kamper?

20   A    Yes, it is.

21   Q    And when did this -- when did you write this note?

22   A    February 12th, 2015.

23   Q    And could you please read it for the jury?

24   A    Patient's mother also patient in practice.  Mother filling

25   meds from other provider.  Review of drug query shows patient

SHARON NOLAND - DIRECT BY MR. BODNAR

1   filled Roxicodone from our practice several times.  1/27/15

2   filled Roxicodone 30 number 120, Rx dated November 5th; January

3   8th Roxicodone 15 milligrams number 120, Rx dated January 8th,

4   three days later; 12/31 Roxicodone 30 milligrams number 120 Rx

5   dated 12/9; and 12/3 of 2014 Roxicodone 30 number 120, the

6   prescription was dated November 5th.  And then November 7th,

7   2014 Roxicodone 30 number 120.  And then I put:  Rx also dated

8   November -- I can't see the other side of it there.

9   Q   It's cut off.

10  A   Yeah, it's cut off there.  And then I put:  Clearly some

11  irregularities on the query.  I am not sure if prescriptions

12  were given, et cetera, in error or if error on query.  In

13  addition, Duragesic and Roxicodone medications appear to be

14  excessive for a 22-year-old history -- 22-year-old per history

15  evaluation of a normal MRI.

16  Q   And the Roxicodone 30, do you know is that the strongest

17  strength of Roxicodone?

18  A   Yes, that I'm aware of.

19  Q   And were it says #120, what does that mean?

20  A   That means 120 pills per month, which could be taken one

21  four times a day or one every six to eight hours.

22  Q   And do you know is Roxicodone a short-acting or        long-

23  acting --

24  A   It's a short-acting opioid.

25  Q   And so is this an example of a triple digit dispensing of a

1    short-acting opioid?

2    A    Uh-huh, yes.

3    Q    Now, this was not one of your patients; is that correct?

4    A    No, it was not.

5    Q    What led you to write this note into a patient's file

6    that's not your patient?

7    A    Probably either the, again, medical assistant may have

8    approached me to look at something or we had a refill nurse

9    that the patient may have called in for a prescription refill.

10    And I looked at it and started reviewing the chart.

11    Q    When you went over to the Dr. Couch side, as well, did you

12    actually see some patients to help out Dr. Couch's team?

13    A    Yes, I did.

14    Q    Could you please explain when that was and then what you

15    did to help.

16    A    That was on a Wednesday, I remember vividly.  And prior

17    to -- they had asked me would I be able to help out because Ben

18    was there alone.  And I told them sure.  So there were about 50

19    patients, I think, on the schedule for that day.  And the night

20    before I went ahead and ran a PDMP, a prescription drug query,

21    on all of those patients, because I wasn't sure, you know, what

22    they had been prescribed to date and I wanted to be a little

23    aware of who I was going in and seeing.

24    Q    What, if any, reaction did you have when you ran the PDMP

25    on those patients?

1   A   They were on a high volume of narcotics.

2   Q   Was that concerning to you?

3   A   Yes, it was.

4   Q   Did you do anything after seeing that or inform any of the

5   doctors?

6   A   Yes.  I had a discussion with Dr. Ruan at one of the Osaka

7   meetings for the Subsys.  And I told him I was very concerned

8   at the things that I had seen.  There was a lot of high-dose

9   morphine 100, you know, for example, number 90 oxycodone 30

10  that had been prescribed.  And I was very concerned that that

11  level of medication was being prescribed on Dr. Couch's side.

12  Q   Did you ever bring that up to Dr. Couch or just to

13  Dr. Ruan?

14  A   Just to Dr. Ruan.

15  Q   What, if anything, did Dr. Ruan say in response to that?

16  A   He said:  Well, maybe it will be better now that they're

17  gone.

18  Q   And by "they're" in that context who was he referring to,

19  if you knew?

20  A   He was referring to Justin and Stacy and Bridgette.

21  Q   Do you know if Justin and Bridgette and Stacy were able to

22  prescribe Roxicodone or MS Contin or any of the schedule II

23  drugs?

24  A   No.  Mid-level prescribers -- mid-level providers are not

25  able to prescribe those medications.

1   Q   And to clarify, do you mean no, you don't know or no, they

2   could not?

3   A   No, we could not.

4   Q   Do you know if Justin Palmer was actually writing

5   prescriptions while working for Dr. Couch?

6   A   It is -- yes.  I did witness Justin signing prescriptions

7   for Dr. Couch.

8   Q   Do you know if he was signing it Justin Palmer or if he was

9   signing it Dr. Couch?

10  A   No.  They were signing as Dr. Couch.

11  Q   Do you know if Dr. Ruan ever voiced the concerns with

12  Dr. Couch that you raised with Dr. Ruan?

13  A   No, I don't have any idea of that.

14  Q   While you worked at PPSA, was there a workers' comp

15  dispensary?

16  A   Yes, there was.

17  Q   Can you please explain to the jury where that was?

18  A   That was at the Springhill office.

19  Q   And what was the workers' comp dispensary?  How did

20  workers' comp work at PPSA?

21  A   I don't have any idea.  I didn't work with workers' comp.

22  But there was one employee there that I believe did run the

23  workers' comp pharmacy.

24  Q   And by saying you weren't involved in it, would you see

25  patients, though, that were workers' comp patients?

 1   A    No, I generally did not see any patients that were work

 2   comp patient.  That was Dr. Ruan (nodding head affirmatively).

 3   Q    So Dr. Ruan would be the one that saw the workers' comp

 4   patients?

 5   A    Yes.

 6   Q    Do you know how workers' comp patients filled their

 7   prescriptions?

 8   A    Yes.  When a workers' comp patient was seen, they were

 9   filled directly in-house from an in-house dispensary.  And they

10   were presented, for example, with a brown paper bag with their

11   three months' worth or their two months' worth of their

12   medications in that.

13        (A discussion was held off the record between government

14   counsel.)

15   BY MR. BODNAR:

16   Q    I'm going to go back and touch on a few areas.  Do you

17   recall discussing about how you would present patients to

18   Dr. Ruan while you worked there?

19   A    Yes.  I mean --

20   Q    When you did that -- and you mentioned his office --

21   would the nurse practitioners have to wait and line up for

22   their turn?

23   A    Yes.  If we all were overlapping, it would be not uncommon

24   that it would be whoever could be first in line so we could,

25   you know, move along with our day.  So, you know, it might be

SHARON NOLAND - DIRECT BY MR. BODNAR

1   myself first, Shanna second, Bridgette third in the line.

2   Q   And would that be a repeat process throughout the day?

3   A   Yes, throughout the day.

4   Q   What would happen for a return patient who needed their

5   medications changed?  How would that work?

6   A   Generally I might talk to the patient, and then I would go

7   to Dr. Ruan and present that.  And I would say:  This medicine

8   is not being effective.  Do you want to consider changing her

9   to this or that?  And then let Dr. Ruan make the ultimate

10   decision.

11   Q   In those instances where medication was being changed or

12   the dosage was being changed, would Dr. Ruan always go in and

13   see the patient?

14   A   No.

15   Q   Who then relayed the information about your medicine is

16   being changed to a different drug?

17   A   Myself.

18   Q   When you talked about Bridgette, you mentioned that you

19   thought she had no grasp on what to prescribe?

20   A   (Nodding head affirmatively.)

21   Q   Explain, though, did Bridgette have a DEA license?

22   A   No.

23   Q   So what do you mean that she had no grasp on what to

24   prescribe?

25   A   For example, there's usually a protocol that we follow

1   for instituting certain drugs.  For example, if a patient was

2   opioid naive or they had not been on a certain pain medication,

3   you wouldn't go in and start that patient on, for example, a

4   fentanyl patch.  That would be dangerous for that patient.

5   Q   Why would that be dangerous for that patient?

6   A   Because their body is not used to any narcotic.  And

7   putting a fentanyl patch on someone could pose a danger if

8   their body wasn't prepared for that.

9   Q   Is that what's called opiate naive?

10  A   Yes.

11  Q   Were there other issues that you had with Bridgette and her

12  clinical dealings?

13  A   Yes.  She just didn't seem like she was, again, focused,

14  keeping up with -- following through with, you know, knowing

15  what the patient was there for.  I had complaints from

16  patients.  I had some patients that complained that they

17  believed Bridgette had taken some of their pain medicine and

18  one patient who told me that -- after I came in, she said --

19  she was an elderly woman, and she said:  Well, I'm going to

20  tell you all you need to get that girl some help.  I think she

21  needs more help then I do.  And I asked her who she was talking

22  about, and she explained Bridgette had seen her the visit

23  before.  And she said that Bridgette was talking to her and

24  then kind of fell over on the exam table herself.  And the

25  patient was obviously a little bit upset by this.

3659

1  Q   And did you ever raise these concerns about Bridgette with

2  either Dr. Ruan or Dr. Couch?

3  A   Yes.

4  Q   What did you -- well, first, who did you tell?  Dr. Ruan or

5  Dr. Couch?

6  A   Dr. Ruan.

7  Q   And what did you tell Dr. Ruan?

8  A   That I had concerns about Bridgette and her capabilities.

9  And I also reported it to the management staff of PPSA that

10 Bridgette appeared impaired.

11 Q   Who would be the management staff?

12 A   That would have been Debi Phillips and Hunter Swanzey.

13 Q   Prior to Hunter Swanzey, was there another individual named

14 Ken Cross?

15 A   Ken Cross, yes.

16 Q   What, if anything, did Dr. Ruan say to you about Bridgette?

17 A   I don't recall specifically that Dr. Ruan and I, you know,

18 had a discussion on that beyond that I just told him I was

19 concerned.

20 Q   Now, you had mentioned it appeared that -- you said that

21 Bridgette was obviously impaired to you?

22 A   Yes.

23 Q   Do you think or do you know if that would be obvious to

24 somebody else looking at her?

25 A   I would assume, yes.

1  Q   Would that include doctors?

2  A   Yes.

3  Q   Did the doctors have occasion to actually see Bridgette

4  throughout the day?

5  A   Yes.  And I also discussed this with Justin at length.

6  Q   Discussed what with Justin?

7  A   That Bridgette seemed to have some problems.  And Justin --

8  I told Justin that I thought that he and Dr. Couch needed to

9  have some type of intervention with Bridgette, and I felt that

10  was more on their end because she was working with them at the

11  time.

12  Q   And during this whole time period, Bridgette, is she still

13  seeing patients?

14  A   Yes.

15  Q   And making judgment calls about patients?

16  A   Yes.

17  Q   When patients were fired, who was the one that physically

18  had to go do that?

19  A   Me.

20  Q   Can you explain that to the jury?  How did it work if a

21  patient was going to be fired?

22  A   Generally if a patient had violated their opioid agreement,

23  maybe they were filling medications from another provider,

24  perhaps if they had an irregularity on their urine drug test,

25  maybe they were positive for an illicit substance or they

1    weren't following the directions of the medication, then that

2    would give us cause to terminate the patient from our

3    practice.  And generally I would go into the room and talk to

4    the patient and tell them that we were terminating them and

5    suggested that they follow up with their primary care doctor to

6    go talk about their medications and that we would no longer be

7    able to provide them with any prescriptions.

8    Q    During your time period working at PPSA, were you ever

9    aware of when -- or were you aware of when Dr. Couch would be

10   or wouldn't be in the office?

11   A    Yes.  When I was at that building, we did share office

12   space up until we moved over into the west Mobile office.

13   Q    And by "that building," do you mean Springhill?

14   A    Springhill, yes.

15   Q    And is west Mobile the one on Airport Boulevard?

16   A    Yes, yes.

17   Q    Approximately what time did Dr. Ruan get to the office in

18   the morning?

19   A    Dr. Ruan generally got --

20   Q    I'm sorry.  Dr. Couch.

21   A    Oh, Dr. Couch?  Usually Justin would be there early, around

22   7 to 7:30, starting to see patients.  Sometimes Dr. Couch

23   wouldn't come in until 10.

24   Q    Do you know if patients were being seen on the Dr. Couch

25   side of the house while Dr. Couch was out of town or out of the

3662

1  country?

2  A   Yes, they were.

3  Q   How is that different than what happened with Dr. Ruan?

4  A   Dr. Ruan -- we did not see patients.  Dr. Ruan didn't want

5  patients seen.  That was -- we did not see patients.

6  Q   Were you involved in any of the other business discussions

7  of PPSA?

8  A   Generally not.

9  Q   Do you know who it appeared amongst the two doctors to run

10  the aspects of this business?

11  A   Dr. Ruan.

12  Q   What makes you think that?

13  A   Pretty much all the decisions came from Dr. Ruan.  He was

14  involved with the pharmacy, the lab aspect, the urine drug

15  screens, all of that, the coding of the urine drug screens.

16  All of that came from the direction of Dr. Ruan.

17  Q   You mentioned that you currently work for Dr. Chen?

18  A   Yes.

19  Q   Following the FBI raid on the clinic, did you stay with

20  Dr. Chen that whole time or did you go elsewhere?

21  A   No.  I went elsewhere.

22  Q   Where did you go?

23  A   I went to Springhill Physician Practices, pain management.

24  Q   Why did you come back to work with Dr. Chen?

25  A   Because Dr. Chen is a good man and I -- he practices very

3663

1   conservatively.

2   Q   And do you still see some of the patients now with Dr. Chen

3   who used to be patients for Dr. Ruan or Dr. Couch?

4   A   Yes, I do.

5   Q   What, if anything -- or any difference is there in the

6   treatment of those patients now?

7   A   We --

8          MR. SHARMAN:  Objection, Your Honor.  This is way

9   beyond the scope of the Court's in limine motion ruling earlier

10  about particular patients in the indictment and so forth.

11         THE COURT:  Overruled.

12  BY MR. BODNAR:

13  Q   With the patients that are seen now, how, if any way, are

14  they treated differently than what you -- or first, did you see

15  their notes in their medical file of what happened --

16  A   Yes.

17  Q   -- while they were at PPSA --

18  A   Yes.

19  Q   -- compared to how they are treated now?

20  A   Yes.

21  Q   Could you please explain that to the jury?

22  A   We have decreased a lot of their opioids, their narcotics

23  that they're taking and trying to get them on the lowest dose

24  of medication as possible to control their pain.

25  Q   And do you have patients currently on Subsys?

SHARON NOLAND - CROSS BY MR. SHARMAN

1   A   No.

2   Q   How about Abstral?

3   A   No.

4         MR. BODNAR:  One moment, please, Your Honor.

5         THE COURT:  All right.

6     (A discussion was held off the record between government

7   counsel.)

8         MR. BODNAR:  Pass the witness, Your Honor.

9         THE COURT:  Mr. Sharman?

10                    CROSS EXAMINATION

11  BY MR. SHARMAN:

12  Q   Ms. Noland, my name is Jack Sharman.  I represent

13  Dr. Couch.

14  A   Uh-huh (positive response).

15  Q   On direct you mentioned that you became concerned with a

16  number of Dr. Couch's patients that you believed had high-dose

17  narcotics.  Do you remember some of those questions and

18  answers?

19  A   Yes.

20  Q   Those were not your patients; right?

21  A   They were not.

22  Q   You had not seen those patients at intake; right?

23  A   Correct.

24  Q   You hadn't done physicals on them?

25  A   No.

SHARON NOLAND - CROSS BY MR. SHARMAN

1  Q   You hadn't treated them over time?

2  A   No, I had not.

3  Q   And you were picking up the file basically; right?

4  A   Basically, yes, and reviewing that, uh-huh.

5  Q   And even within the file, your focus was on the medications

6  prescribed; right?

7  A   Correct.

8  Q   As opposed to other data in the file?

9  A   Correct.

10 Q   You also on direct answered a couple of questions about

11 what's been admitted in evidence as Exhibit 6-2.  And we

12 established, I believe, that this was a note that you put in

13 the file of Ms. Kamper; is that right?

14 A   Yes, correct.

15 Q   And there in the middle you say:  Not sure if Rxes were

16 given.

17         Rx is an abbreviation for prescription; right?

18 A   Correct.

19 Q   You say:  Not sure if Rxes were given, et cetera, in error

20 or if error on query.

21         Do you see where I read that?

22 A   Yes.

23 Q   So you were saying you were uncertain based on your review

24 of the file whether there was a mistake in a prescription

25 actually given or if there was a mistake in the drug query

SHARON NOLAND - CROSS BY MR. SHARMAN

```
 1   result that you were reviewing?

 2   A   Correct.

 3   Q   You just weren't sure?

 4   A   Correct.

 5   Q   Also on direct you spoke about a Wednesday when you were

 6   asked to assist with some Dr. Couch patients.

 7   A   Yes.

 8   Q   And if my recollection is correct, you said that you in

 9   reviewing those files became concerned about the volume of

10   narcotic prescriptions at least those particular patients had;

11   is that right?

12   A   Correct.

13   Q   And that you reported that to Dr. Ruan; is that right?

14   A   Yes.

15   Q   But that you did not bring that up to Dr. Couch?

16   A   I perhaps discussed with Dr. Couch that day some of those

17   patients and adjusting their medication dosages down.

18   Q   On a case-by-case basis?

19   A   Yes, case by case.

20   Q   You also said on direct that you saw Justin Palmer signing

21   some prescriptions; is that right?

22   A   Yes, I did.

23   Q   And Palmer was a nurse practitioner for Dr. Couch; right?

24   A   Correct.

25   Q   And that when you saw Mr. Palmer signing those
```

1  prescriptions and then sitting here today, you don't know what,

2  if anything, Dr. Couch knew or didn't know about Mr. Palmer

3  signing those prescriptions; right?

4  A    No, I have no idea.

5  Q    Also on direct you mentioned that you had expressed some

6  concerns about Bridgette Parker to Mr. Palmer; is that right?

7  A    Correct.

8  Q    And I believe you said that you told Mr. Palmer that he or

9  he and Mr. Couch -- Dr. Couch or he, Dr. Couch and others

10  needed to in your view effect some sort of intervention with

11  with Ms. Parker; is that right?

12  A    Correct.

13  Q    And you know that in fact an intervention was in fact

14  effected with Ms. Parker?

15  A    I'm not aware of the details of that.  But yes, I'm aware

16  something happened with her (nodding head affirmatively).

17  Q    And something of the nature of an intervention?

18  A    Yes.

19          MR. SHARMAN:  Thank you, Ms. Noland.  No further

20  questions?

21          THE WITNESS:  Thank you.

22          THE COURT:  Mr. Darley?

23                      CROSS EXAMINATION

24  BY MR. DARLEY:

25  Q    Good morning, Ms. Noland.

1  A   Hello.

2  Q   I'm Jason Darley.  I represent Dr. Ruan.  How are you this

3  morning?

4  A   Fine.  Thank you.

5  Q   Good.  When you were employed at PPSA, there was Dr. Couch

6  there; correct?

7  A   Correct.

8  Q   Dr. Ruan there?

9  A   Correct.

10 Q   And then at some point Dr. Chen; correct?

11 A   Correct.

12 Q   Now, Dr. Couch and Dr. Ruan under PPSA, they were separate;

13 correct?

14 A   As far as --

15 Q   Their patients --

16 A   Yes, yes.

17 Q   -- and how they each treated their patients?

18 A   Oh, yes, yes.

19 Q   Correct?  But Dr. Chen, he had his own patients.  But he

20 was employed, was he not?

21 A   Yes, he appeared to be.

22 Q   So you would have Couch, Ruan, and then Chen underneath

23 them?

24 A   Uh-huh (nodding head affirmatively).

25 Q   Okay.  So that was the hierarchy there?

```
 1   A    Yes.

 2   Q    Now, you said you worked under the direction of a

 3   physician?

 4   A    Correct.

 5   Q    And what I want to talk to you about is your time under

 6   Dr. Ruan.

 7   A    Yes.

 8   Q    And Ms. Noland, you were interviewed by, I guess, the FBI

 9   and the government at least twice; correct?

10   A    Correct.

11   Q    You went down to the FBI building over here --

12   A    Yes.

13   Q    -- somewhere around here, and just sat down with them?

14   A    Yes.

15   Q    And you gave these two interviews?

16   A    Yes.

17   Q    One in late July of '15?

18   A    Probably.  I'm not sure of the exact date.

19   Q    And then another one in November?

20   A    Okay.  I believe you.

21   Q    All right.  Now, at this meeting you basically, as you've

22   testified today -- this was the subject matter covered;

23   correct?

24   A    Correct.

25   Q    Now, you said on direct you never forged Dr. Ruan's
```

1    signature?

2    A    Correct.

3    Q    You took all of these prescriptions to him to have him sign

4    after treating a patient?

5    A    That is correct.  Dr. Ruan was always present.

6    Q    He was micromanager, I think you called him; right?

7    A    Definitely a micromanager.

8    Q    So he had direct input on every one of these prescriptions,

9    did he not?

10    A    Yes, he did.

11    Q    And with each of these prescriptions, you know, you

12    consulted with him on them, didn't you?

13    A    Yes.

14    Q    And are you familiar with Dr. Ruan's -- what he called his

15    educational series?

16    A    Most -- yes (nodding head affirmatively).

17    Q    The emails?  Could you tell the jury about these

18    educational series, specifically the emails he would send out?

19    A    Yes.  Dr. Ruan tried to educate, I think, the mid-level

20    providers and always provide guidance for us.  He was the

21    preeminent pain management certified doctor, and he was sharing

22    his knowledge with us.

23    Q    Highly qualified?

24    A    Yes, highly qualified.

25    Q    And he would talk about medicines on these things; for

1   instance, opioids and other types of prescription medicines?

2   A   Yes.

3   Q   And you being the thorough practitioner that you've

4   described today, you responded with him on these, didn't you?

5   A   Yes.  Dr. Ruan had certain medications that were not

6   prescribed and were considered high-risk medications.

7   Q   Would that be the OxyContin and the MS Contin?

8   A   Yes.  The high-dose MS Contin.  I don't believe Dr. Ruan

9   had any patients except for maybe less than 10 on MS Contin

10   100.

11   Q   Any patients?

12   A   Any patients.

13   Q   And those were, quote, unquote, "good patients," were they

14   not?

15   A   Yes, they were.

16   Q   And could you tell the jury in your impression why Dr. Ruan

17   would not use those combinations and those high dosages?

18           MR. BODNAR:  Objection, Your Honor.

19           MR. DARLEY:  If you know.

20           THE COURT:  Sustained.

21           MR. DARLEY:  I'm sorry, Your Honor?

22           THE COURT:  I said sustained.

23   BY MR. DARLEY:

24   Q   Do you know why Dr. Ruan would not use those dosages?

25   A   He felt that they were excessive and higher risk.

1   Q   Okay.  Higher risk for what?

2   A   For abuse and diversion.

3   Q   Resulting in what?

4   A   Excuse me?

5   Q   He avoided them because he did not want that happening

6   under his watch?

7   A   Exactly.

8   Q   And Dr. Ruan supervised you; correct?

9   A   Yes, he did.

10  Q   And you said when you would have a patient, new patient,

11  returning patient, you would do a full physical?

12  A   Yes.

13  Q   And Dr. Ruan had knowledge of that, did he not?

14  A   Yes, he did.

15  Q   And then the government had mentioned something about

16  presenting.  You would present the patient to Dr. Ruan.  You

17  would basically walk up to him and tell him what was going on;

18  correct?

19  A   That's pretty standard for mid-level providers with any

20  practice, yes.

21  Q   Okay.  And he adhered to that?

22  A   Generally, yes.

23  Q   And you would even take him then at times to the patient?

24  A   Yes.  If I had some concerns or he wanted to make mention

25  of something, yes, he would accompany me into the room.

1  Q   And I think you testified -- well, excuse me.  You worked
2  with Bridgette Parker for some time?
3  A   Yes.
4  Q   And then Shanna Harville?
5  A   Yes.
6  Q   And I think you said we would talk to the patient and we
7  would discuss each patient with Dr. Ruan.  The three of you
8  would talk about each patient with Dr. Ruan?
9  A   Right.  We did not discuss -- we weren't discussing between
10  myself and Shanna and Bridgette.  We would be discussing it
11  with Dr. Ruan.
12  Q   Okay.  And as to these discussions with Dr. Ruan, he would
13  make the decisions on the medications that were prescribed;
14  correct?
15  A   Yes, yes.
16  Q   And you've worked in this field, have you not, for some
17  time?
18  A   Uh-huh (positive response).
19  Q   Some doctors prefer brand names, some doctors prefer
20  generics; right?
21  A   That is true.
22  Q   Some people prefer Nikes and some people prefer other
23  shoes.
24  A   That is true.
25  Q   But generally they're the same medication, are they not?

1   A   Correct.

2   Q   And you said flavors of the month or types of trends, I

3   think you may have mentioned in one of your interviews.  What

4   types of trends did the patients -- or did the medicine being

5   prescribed follow out at PPSA?

6   A   Well, generally, again, that's not that uncommon for a

7   physician who is being employed through a speaker program to

8   focus on one particular drug.

9   Q   But these drug companies, it's common that they gave out

10  free samples or trials, did they not?

11  A   Yes.

12  Q   Did Subsys give out --

13  A   Yes.

14  Q   -- free trials?

15  A   They had vouchers, uh-huh.

16  Q   Vouchers?  And that helped offset the cost to the patients,

17  did it not?

18  A   Yes.

19  Q   And Dr. Ruan used this medicine during that time; right?

20  A   Yes, he did.

21  Q   And then, for instance, Abstral, did they offer -- Galena

22  and Abstral, did they offer the same --

23  A   They did.  And so did Exalgo.

24  Q   And then Dr. Ruan used those medications when they were

25  offering these free trials, did he not?

1    A   Yes, uh-huh.

2    Q   And you said drug reps would often be in the clinic?

3    A   Correct.

4    Q   PPSA.  And Dr. Ruan knew some of those, had relationships

5    with some of them?

6    A   Yes.

7    Q   And some of these drug reps left, did they not?  They would

8    move on with their lives, go other places?

9    A   Yes, many times.

10   Q   And kind of out of sight, out of mind; then the

11   prescriptions would taper off, would they not?

12   A   Yeah.  I'm not -- yes, could have been, uh-huh.

13   Q   And you made the statement that Dr. Ruan -- at some point

14   somebody -- a drug rep had changed his oil?

15   A   Yes.

16   Q   Okay.  Do you know the nature of Dr. Ruan's relationship

17   with that drug rep?

18   A   Not at all.

19   Q   Could they have been friends?

20   A   They could have.

21   Q   As a matter of fact, you testified on direct that you have

22   a friend that's a drug rep in Wisconsin, did you not?

23   A   I do.

24   Q   Okay.  Are you close to that person?

25   A   Very close.

3676

1  Q   Okay.  So that can also be common within the industry, can

2  it not?

3  A   Very common, very common.

4  Q   Now, you testified -- earlier the government asked you

5  about being encouraged to fill prescriptions at C&R Pharmacy.

6  A   Yes.

7  Q   It was not forbidden, the patients weren't forbidden to go

8  to other pharmacies, were they?

9  A   No, they were not forbidden.

10 Q   And as to some of these drugs -- off label has been bandied

11 about in your direct.  Off label.  You said it was common to

12 use drugs off label?

13 A   Yes, very common.

14 Q   And Subsys and Abstral were used off label?

15 A   They were.

16 Q   MRIs, encouraged to use the in-house MRI?

17 A   Yes.

18 Q   Procedures that Dr. Ruan did, encouraged to use Dr. Ruan to

19 do those procedures?

20 A   Sure.

21 Q   Logically if you're being treated by a doctor or seeing the

22 doctor, would you also not want him to do the procedures?

23 You're there.

24 A   Correct.

25 Q   So Dr. Ruan, you said, was involved in everything.

SHARON NOLAND - CROSS BY MR. DARLEY

 1  A   (Nodding head affirmatively.)

 2  Q   And this is indicated by when he left, his side shut down,

 3  did it not?

 4  A   It did.

 5  Q   And at some point, though, you said there were some

 6  prescriptions left that he may have signed --

 7  A   Yes.

 8  Q   -- that were occasionally used?

 9  A   Yes.  Emergencies.

10  Q   Emergencies, not common practice?

11  A   Not a common practice at all.

12  Q   And this was more along the lines of your decision, was it

13  not?  You testified that you didn't want -- you didn't have

14  faith in one side?

15  A   Right.

16  Q   And you didn't want to bother Dr. Chen?

17  A   Correct.

18  Q   So under these emergency circumstances, you had to make a

19  clinical decision, did you not?

20  A   Yes.

21  Q   Patient's need and interest versus leaving them out --

22  hanging them out to dry?

23  A   Correct.

24  Q   And you made your best judgment, did you not?

25  A   I did.  And this was probably no more than two times during

SHARON NOLAND - CROSS BY MR. DARLEY

1    the entire time that I worked with Dr. Ruan.

2    Q   And how long -- would you tell the jury how long -- two

3    times it occurred over how long?

4    A   Over a period from November of 2011 until probably May of

5    2014.

6    Q   Thank you very much.

7         You said that Dr. Chen sometimes prefers to use

8    generics.

9    A   Yes.

10   Q   And you work for Dr. Chen currently?

11   A   Currently, yes.

12   Q   Doctors come from a myriad of different backgrounds, do

13   they not?

14   A   Yes, they do.

15   Q   And there's a lot of latitude in medical judgment, is there

16   not?

17   A   Yes.

18   Q   And there are preferences.  Each doctor may have

19   preferences.  And this is their practice; right?

20   A   This is.

21   Q   But there's nothing wrong with preferring brands over

22   generics, is there?

23   A   No.  It's very common.

24   Q   Now, you had talked about you left PPSA after the raid?

25   A   Yes.

1   Q   And you went somewhere else for a moment, and then you

2   ended up back with Dr. Chen?

3   A   Yes.

4   Q   So you currently to this day still work in pain management?

5   A   Yes, I do.

6   Q   Now, let's go back to the time where you were working for

7   Dr. Ruan and you switched for Dr. Chen.

8   A   Yes.

9   Q   Switched to Dr. Chen.  Now, these patients are Dr. Ruan's

10   patients; right?

11   A   Yes, they are.

12   Q   But you were seeing them?

13   A   (Nodding head affirmatively.)

14   Q   Are you familiar with what incident to billing is under the

15   rules?

16   A   Yes.

17   Q   Billing rules?  You guys saw -- your company saw a lot of

18   different types of insurance?

19   A   Yes.

20   Q   Medicare, Medicaid.  And some insurances allow for the

21   attending physician to supervise and the nurse practitioner

22   seeing them; correct?

23   A   Yes.

24   Q   And you said Dr. Ruan saw all his workers' comp patients?

25   A   Yes.

SHARON NOLAND - CROSS BY MR. DARLEY

1  Q   Now, you're seeing these patients, but you testified

2  earlier you're collaborating with Dr. Ruan?

3  A   Correct.

4  Q   So there's a continuity of care, there's two parts of it,

5  yours and his; correct?

6  A   Correct.

7  Q   So it's not like these patients were switched -- wanted to

8  switch completely separately to Dr. Couch; they wanted to go to

9  an employee, Dr. Chen; right?

10 A   (Nodding head affirmatively.)

11 Q   And these were Dr. Ruan's patients, though, were they not?

12 A   There again, they had started with Dr. Ruan.

13 Q   Yes, ma'am.  And you said you brought your concerns to

14 Dr. Ruan about Bridgette; right?

15 A   Yes.

16 Q   And Dr. Ruan either had terminated or terminated Bridgette

17 at some point, did he not?

18 A   Yes, he did.

19 Q   He did not keep her under his employ?

20 A   That is correct.

21 Q   And she went and moved somewhere else or at least moved

22 locations?

23 A   Uh-huh, she did.

24 Q   But he no longer supervised her, did he?

25 A   That is correct.

3681

1    Q   And we talked about continuity of care.  Dr. Ruan has his

2    patients.  He's responsible for a number of patients, is he

3    not?

4    A   Yes.

5    Q   And he's responsible also in some form or fashion to the

6    patients that you are seeing at the same time?

7    A   Yes, yes.

8    Q   So he's got patients, lots of them, that he's concerned

9    for; correct?

10   A   Yes.

11   Q   Ms. Noland, I just have a few more.  While you were there,

12   to ensure that patients were ingesting the drugs they were

13   prescribed and also not ingesting other drugs they weren't

14   prescribed, you guys had a safety mechanism to check that, did

15   you not?

16   A   Yes, we did.

17   Q   Were there urine tests?

18   A   Yes.  There were urine drug tests, there were pill counts,

19   different mechanisms that you do use in pain management.

20   Q   So you tried to prevent problem patients and problems that

21   could arise; correct?

22   A   Most definitely.

23   Q   And one of these ways was the urine test.  That's the cup

24   test; you go into the bathroom and --

25   A   Yes.

SHARON NOLAND - CROSS BY MR. DARLEY

1  Q   -- urinate.  Do you have much faith in those urine tests?

2  A   It depends.  There can be false positives on those and

3  false negatives.  And normally what we do, want to do, is send

4  that specimen out for further testing called a GC-MS.  Or not

5  necessarily send it out; we might have done that in-house to

6  verify those medications more on a microscopic-type level.

7  Q   So the initial reading of the urine test right there, it's

8  somewhat subjective, is it not?

9  A   It's very subjective, yes.

10 Q   So that's why you said normally, you normally send them

11 out; right?

12 A   Yes.

13 Q   And Dr. Ruan was a big fan of that?

14 A   Yes.

15 Q   Correct?

16 A   Correct.

17 Q   You had talked about some of the other prescribing habits

18 and Dr. Ruan's methods.  Did Dr. Ruan use Dilaudid?  Did he

19 prescribe Dilaudid?

20 A   Rarely.

21 Q   Would you tell the jury why he would rarely --

22 A   Dr. Ruan felt that was a high-risk medication and it should

23 only be used after surgery and it was not an appropriate

24 medication in the short-acting form for pain management and it

25 had a high potential for abuse.

3683

1   Q   And do you still adhere to that in your practice today?

2   A   Most definitely.

3            MR. DARLEY:  One moment.

4       (A discussion was held off the record between defense

5   counsel.)

6   BY MR. DARLEY:

7   Q   One more brief line, Ms. Noland.  When you recognized a

8   patient was having issues with potential diversion or testing

9   issues --

10  A   Yes.

11  Q   -- what did you do again?

12  A   I would discuss that with Dr. Ruan.  And then if we felt

13  that that patient had violated the opioid agreement, we would

14  terminate that patient.

15  Q   And I think you testified you counseled them; right?

16  A   Yes, yes.

17  Q   You didn't just boot them out?

18  A   No, no, no, we never do that.  But, you know, we would

19  counsel the patient that they probably needed followup with

20  their primary care provider.  But they had violated the opioid

21  agreement and we would no longer be allowed to prescribe

22  medications.  Some patients were kept on for procedure only.

23  Q   Okay.

24  A   We wouldn't prescribe a narcotic, but Dr. Ruan would

25  continue to provide care for them.

3684

1  Q   And if the counseling didn't work, if they kept offending,

2  that's when they would be gone?

3  A   Yes.

4  Q   And that was for their own safety and liability?

5  A   Most definitely.  We terminated quite a few patients.

6  Q   Quite a few?

7  A   Yes.

8  Q   And that was for your safety and liability and his as well,

9  Dr. Ruan's as well; right?

10 A   Yes.

11         MR. DARLEY:  Ms. Noland, thank you for your time.

12         THE WITNESS:  Thank you.

13         THE COURT:  Any redirect?

14         MR. BODNAR:  Yes, Your Honor.

15                    REDIRECT EXAMINATION

16 BY MR. BODNAR:

17 Q   Ms. Noland, do you remember being asked by counsel for

18 Dr. Couch about the Jessi Kamper note --

19 A   Yes.

20 Q   -- on cross-examination?

21 A   Yes.

22 Q   Is Jessi Kamper a patient that you have seen with Dr. Chen

23 since the raid?

24 A   Yes.

25 Q   And she's someone that you've reviewed her medical file and

SHARON NOLAND - REDIRECT BY MR. BODNAR

1    her treatment?

2    A    Yes.

3    Q    Do you know was she actually getting high doses of

4    Roxicodone or was that in fact just an error?

5    A    No --

6           MR. SHARMAN:  Objection to the testimony based on the

7    time frame outside of the indictment or treatment or

8    interactions after the indictment.

9           THE COURT:  Overruled.

10   BY MR. BODNAR:

11   Q    At the time you wrote you weren't sure if it was an error

12   or not.  Since have you come to know whether or not she was in

13   fact receiving high doses of Roxicodone?

14   A    She was.

15   Q    Do you recall being asked about an intervention for

16   Bridgette Parker?

17   A    Yes.

18   Q    Do you know if that occurred after she was arrested?

19   A    I don't have any idea the specifics of that.

20   Q    Do you know roughly when it was that that intervention

21   occurred?

22   A    No.  I remember I was very concerned and wanted to know if

23   Justin and Bridgette and Stacy had been reported to the Board

24   of Nursing.

25   Q    Why were you concerned if Justin and Stacy had been

3686

1  reported to the Board of Nursing?

2  A   Because that's -- I'm a nurse also, and my license is very

3  valuable to me.  And I wanted to know that they had been

4  reported for their behavior.  And I brought this up several

5  times to Debi Phillips and Hunter Swanzey.

6  Q   What behavior are you talking about?

7  A   Excuse me?

8  Q   What behavior are you talking about?

9  A   Just their irregular prescribing, what I thought was

10 irregular prescribing.  And then later on I found out that

11 Justin had apparently been using narcotics also.

12 Q   You mentioned that Dr. Ruan and Dr. Couch had separate

13 bodies of patients; is that correct?

14 A   Correct.

15 Q   However, were they still business partners under PPSA?

16 A   Yes.

17 Q   Do you recall being asked whether or not Dr. Ruan had

18 direct input on all the drugs that were being prescribed to his

19 patients?

20 A   Yes.

21 Q   Does that mean he had direct input on the patients that

22 were prescribed Subsys?

23 A   Yes.

24 Q   And why they were prescribed Subsys?

25 A   Yes.

SHARON NOLAND - REDIRECT BY MR. BODNAR

1  Q   Does that mean he had direct input on the patients that

2  were prescribed Abstral?

3  A   Yes.

4  Q   And why they were prescribed Abstral?

5  A   Yes.

6  Q   Do you remember questions about certain drugs such as

7  MS Contin 100 and Roxicodone 30?

8  A   Yes.

9  Q   And do you recall being asked if those were drugs that

10  Dr. Ruan was prescribing?

11  A   Yes.

12  Q   I'm going to show you now -- and what was your response?

13  A   Generally those were not drugs that Dr. Ruan would

14  prescribe.  We did have a few patients, again, that were on

15  MS Contin 100 that I was aware of, but it wouldn't have been

16  that many in conjunction to the volume of patients that we had.

17  Q   And I'm going to show you what's been marked as

18  Government's Exhibit -- admitted as Government's Exhibit

19  10-2.  And does it say at the top:  Dr. Xiulu Ruan selected

20  drug totals --

21  A   Yes.

22  Q   -- January 1st, 2011, through May 19th of '15?

23  A   Yes, uh-huh.

24  Q   According to this chart, how many recipients for Dr. Ruan

25  received MS Contin 100?

1   A   That was 56.

2   Q   And how many prescriptions were written?

3   A   548.

4   Q   And how many pills were dispensed of MS Contin 100?

5   A   40,670.

6   Q   And with regard to the other one that you mentioned,

7   Roxicodone 30 --

8   A   30 milligrams, uh-huh (positive response).

9   Q   How many recipients?

10  A   It was 167 recipients, 669 prescriptions, for a total of

11  58,534 pills.

12  Q   And with this drug right here called Opana, do you know was

13  Dr. Ruan ever a speaker for Opana?

14  A   Not that I'm aware of.

15  Q   You don't know one way or the other?

16  A   No, I don't have any idea.

17  Q   Do you recall being asked if you had made the clinical

18  decision to give those emergency presigned scripts to patients?

19  A   Yes.

20  Q   Did you have the authority to actually write those

21  prescriptions?

22  A   No.

23  Q   And were there other doctors within PPSA that did have

24  authority to write prescriptions?

25  A   Yes.

SHARON NOLAND - REDIRECT BY MR. BODNAR

1   Q   Who owned PPSA?

2   A   Dr. Ruan and Dr. Couch.

3   Q   And I believe you mentioned that Dr. Ruan had knowledge of

4   what was going on in the practice?

5   A   Yes.

6   Q   When Dr. Ruan fired Bridgette from working for him, was she

7   still employed by PPSA?

8   A   Yes, she was.

9   Q   And at that time was Dr. Ruan aware that she was still

10   working for his company?

11   A   Yes.

12   Q   You mentioned the big differences at least that you saw

13   between Dr. Ruan and Dr. Couch; is that correct?

14   A   Correct.

15   Q   And Dr. Ruan and Dr. Couch -- or you mentioned that

16   Dr. Ruan was highly qualified?

17   A   Yes.

18   Q   And did you feel the same way about Dr. Couch and the way

19   he was practicing?

20   A   Yes.

21   Q   How about the way he was practicing?  Did you feel it was

22   at the same level as Dr. Ruan?

23   A   No.

24   Q   And yet who was Dr. Ruan's business partner throughout this

25   entire time?

```
 1   A   Dr. Couch.

 2           MR. BODNAR:  Nothing further for this witness, Your

 3   Honor.

 4           THE COURT:  May this witness be excused?

 5           MR. BODNAR:  Yes, Your Honor.

 6           THE COURT:  All right.  You may step down.  Thank you.

 7           THE WITNESS:  Thank you.

 8           THE COURT:  Ladies and gentlemen, we're going to go

 9   ahead and take our morning break at this time.  Leave your pads

10   on your chairs.  Take your break downstairs in the jury

11   assembly room.  No discussion about the case.  And we will call

12   you back up in about 15 minutes.  Thank you.  We're in recess.

13       (A recess was taken at approximately 10:27 a.m.)

14       (In open court, 10:48 a.m., defendants and jury present.)

15           THE COURT:  All right.  Call your next witness.

16           MS. GRIFFIN:  We would call Sarah Carpenter McMichael,

17   Your Honor.

18           THE COURT:  All right.

19           THE CLERK:  If you'll step forward toward the witness

20   stand, I'll swear you in.  Let me get you to raise your right

21   hand.

22                   SARAH CARPENTER McMICHAEL

23               was sworn and testified as follows:

24           THE WITNESS:  I do.

25           THE CLERK:  Thank you.  Please be seated.
```

3691

```
 1                    DIRECT EXAMINATION
 2   BY MS. GRIFFIN:
 3   Q   Tell us your name, please.
 4   A   I'm Sarah Carpenter McMichael.
 5   Q   How do you spell your last name?
 6   A   It's M-C-M-I-C-H-A-E-L.
 7   Q   Ms. McMichael, are you a nurse?
 8   A   Yes, ma'am.
 9   Q   Did there come a time when you worked at Physicians Pain
10   Specialists of Alabama?
11   A   Yes.
12   Q   When was that that you worked there full time?
13   A   I believe it was October of 2011 through about May of 2013,
14   and then I continued on on a part-time basis until December of
15   2013.
16   Q   Where had you worked as a nurse prior to going to PPSA?
17   A   My last job before PPSA was at Infirmary West, also known
18   as Knollwood Hospital.
19   Q   Was that in an emergency room?
20   A   Yes, ma'am.
21   Q   At PPSA what were your responsibilities?
22   A   I was a full time RN at the office and I was in charge of
23   refilling patients with implanted pain pumps.
24   Q   What do you mean by implanted pain pumps?
25   A   For certain patients that met a criteria, they would have
```

1  surgery to have a device implanted, usually in their abdomen,

2  and it would contain medication that was released very slowly

3  but continuously to help manage chronic pain, but have lesser

4  side-effects than taking pills.

5  Q   Now, you mentioned that they had to meet certain criteria,

6  a patient, to have a pain pump.  Could you explain that?

7  A   To my knowledge -- I don't know exactly the criteria -- but

8  I know that it required, for one thing, a psychiatric

9  evaluation, also I would think some kind of, you know,

10 documentation regarding their chronic pain, whatever their

11 issues were, if they had back problems or surgeries or

12 whatever.

13 Q   In connection with the pain pumps, how were they filled?

14 A   We would -- it was a sterile procedure.  So each patient --

15 everything was, you know, individualized for each patient.  The

16 area was cleaned and prepped on their stomach, wherever their

17 pump was.  We would use some Kool Spray or lidocaine to numb

18 the area and then a needle and a syringe would go into the

19 filling chamber of the pump and we would withdraw whatever

20 medication was left.

21 Q   Let me stop you.  Would that be the old medication you

22 would be withdrawing?

23 A   Yes, ma'am.  That's what --

24 Q   What would happen with the medication you drew out of the

25 pump?

```
 1    A   Anything that was used we just immediately pushed down the
 2    sink.
 3    Q   So you wasted it in the sink?
 4    A   Correct.
 5    Q   Was there some documentation as to what amounts had been
 6    wasted?
 7    A   It would just show how many ccs were removed as far as
 8    total volume.  And then -- and you would have like your
 9    previous note from their previous refill to show what those
10    medicines contained.  But as far as what was actually wasted,
11    it would just show how many ccs of that previous refill would
12    be washed down the sink.
13    Q   Then would you refill the pump?
14    A   Yes, ma'am.
15    Q   How would you go about doing that?
16    A   Whatever their specific prescription was, if it's, you
17    know, two ccs of this medication and five ccs of this
18    medication, we would draw up the total, the total amount, all
19    in one syringe, taking care to keep everything clean and
20    sterile as possible.  And then the same needle that -- like it
21    was a needle, but it had like a -- I'm trying to think how to
22    put this in lay terms -- kind of like a pigtail on it that you
23    could screw the syringe into to refill the new medication.  And
24    then, once the refill was complete, you would remove the needle
25    and it would be done.
```

1  Q   Would the refill contain a mixture of controlled

2  substances?

3  A   If that's what the patient was prescribed, yes.

4  Q   So to make it clear, could it be all one drug or could it

5  be a combination of drugs?

6  A   It could be all one, whatever the doctor decided to order

7  for them, but usually it was a combination.

8  Q   Approximately how many of the refills did you do a day?

9  A   I would say on average we probably saw eight to 10 patients

10 a day.

11 Q   And when you're saying we, who are you referring to?

12 A   Oh, well, I was the only full-time nurse.  There was

13 another RN that worked part time, like half a day, two days a

14 week, and then there was a medical assistant that worked with

15 the pump patients as well.

16 Q   What did the medical assistant do with the pump patients?

17 A   She was more to like help pull their notes from their

18 previous visit so we could have that in comparison with their

19 new visit, to help write up the charts for the current visit,

20 help write out prescriptions that needed to be signed, they

21 would call the patients back to the exam room to get their

22 vital signs -- just kind of an overall assistant, I guess.

23 Q   In connection with the refills, approximately how

24 frequently would a patient have to have a pump refilled?

25 A   On average we would try to schedule patients every seven to

SARAH CARPENTER McMICHAEL - DIRECT BY MS. GRIFFIN

```
 1   eight weeks.  And there were certain patients that, depending
 2   on what kind of pump they have, that needed to come more often
 3   and there were a few that could go a little bit longer.  But
 4   that was our average, was every seven to eight weeks.
 5   Q   Do you know approximately how many pump patients PPSA had?
 6   A   I honestly don't know, because there would be some that we
 7   might have had at one time that may have moved away or, you
 8   know, ended up opting to have their pump removed.  So I really
 9   don't know a number.
10   Q   Did you mainly work with Dr. Couch?
11   A   I would say mostly, but Dr. Ruan had a fair amount of pump
12   patients as well, and Dr. Chen had a few, two or three, I
13   think.
14   Q   Dr. Chen had less than Dr. Ruan or Dr. Couch?
15   A   That's correct.
16   Q   Did you have access to the medications used in the pain
17   pump refills?
18   A   Yes, ma'am.  We had a safe in our little office and that's
19   where the medications were stored.
20   Q   What type medications were they?
21   A   Let's see.  For the pumps we used there was morphine and
22   Dilaudid, which are your narcotic pain relievers.  There was
23   clonidine, which we used.  A lot of people take it by mouth and
24   it can be used for blood pressure control.  But apparently in
25   the pumps it helped with nerve pain, so I was taught.  And then
```

3696

 1  there was baclofen, which is for muscle spasms.  And then some

 2  patients would have Marcaine, which is kind of like lidocaine,

 3  something in that family.  And then if we needed to add

 4  anything else to it to get the total proper volume, we would

 5  just add sterile saline to that.

 6  Q   What do you mean, to get the total proper volume?

 7  A   Depending on what kind of pump they had, most of the pumps

 8  that our patients had had a 30 cc or a 30 ml volume.  And so

 9  whatever their prescription was, say if they were only

10  prescribed two ccs of the morphine and two ccs of it, we still

11  had to add something to it to get that total 30 cc volume, to

12  fill up the dead space, if you will.

13  Q   What do you mean by a cc?

14  A   Stands for cubic centimeter or milliliter.

15  Q   It's a measurement amount?

16  A   Yes, ma'am.  I'm sorry.  Yes, ma'am.

17  Q   Where were those drugs kept that were used in the pain

18  pump?

19  A   At the end of the day, when we were done with them, they

20  were locked back up in the safe.

21  Q   What happened to them during the day?

22  A   We had like a little caddy that -- I don't even know how to

23  describe it -- kind of a plastic bucket with a handle and it

24  just was a convenient way to carry medications back and forth

25  between the two exam rooms that we used.

SARAH CARPENTER McMICHAEL - DIRECT BY MS. GRIFFIN

1   Q   Do you know who compounded the powder medication to produce
2   the liquid that you were putting in the pain pumps?
3   A   Yes, ma'am.  Dr. Couch.
4   Q   Did you observe him do that --
5   A   Yes.
6   Q   -- on occasion?
7   A   At times, yes.
8   Q   Could you explain what was actually done to compound the
9   powder into a liquid?
10  A   Very basic.  I didn't try to get too close.  I just know
11  that there was -- that he was very particular about everything
12  being sterile and you had to wear a mask, and if you were in
13  the room you had to wear a mask.  And it was some way of mixing
14  so much powder with so much liquid, and the specifics I really
15  don't know.
16  Q   Who was responsible for putting the correct mixture into
17  the syringe that you were using to fill the pumps?
18  A   That would be myself or the other RN or Dr. Couch.  Whoever
19  was actually doing the filling of the pump would be the one
20  withdrawing the medication.
21  Q   How would you go about doing that?
22  A   I would look at the actual note that would list their
23  prescription as far as what they needed to have, and I would
24  just start from the top and if, say, if they needed two ccs of
25  morphine, then go to the morphine bag and withdraw two ccs.

1    And then if they needed, say, baclofen next, then withdraw

2    however many ccs.  I would just go down the line as far as

3    whatever they were prescribed to have.

4    Q   So that was done manually?

5    A   Yes, ma'am.

6    Q   I want to differentiate the drugs that were maintained in

7    the pain pump room from drugs kept anywhere else in the

8    office.  Was the pain pump room a separate room?

9    A   Yes.

10   Q   It was not really a patient room, was it?

11   A   No, ma'am.  It looked like just an office.  It had a couple

12   of desks and computers.  And if you didn't know the safe was

13   there, you wouldn't have known it was there.  It was just kind

14   of up under a desk under a cabinet.

15   Q   And is that area for the pain pump medications different

16   from the lockbox in the procedure room?

17   A   Yes.  The procedure rooms had their own little -- I don't

18   really know how to describe it other than to say it looked like

19   a lockbox almost like in a medicine cabinet or something.  But

20   that was different than the pump medications.

21   Q   Now, Ms. McMichael, you have stated that you would see the

22   prescription that the patient had had filled previously when

23   the patient came in for a refill?

24   A   Yes.

25   Q   Would there always be a new prescription when a patient

1  came in for what to put in the refill?

2  A   Do you mean would there be a preexisting new prescription?

3  Q   Yes.

4  A   Okay.  No.  A lot of times that prescription was written at

5  the time if -- you know, based on what the patient -- if the

6  patient said that they didn't want any changes.  If the patient

7  was requesting changes, the prescription for the actual pump

8  refill would be written at that time, based off of whatever

9  changes may or may not have been made.

10  Q   Written at the time of the refill?

11  A   Yes, ma'am.

12  Q   What do you mean by the patient would make some changes?

13  A   Some patients would complain of increased pain and ask if

14  they could have their pain medications raised a little bit.

15  Some may complain of more muscle spasms and ask if the baclofen

16  could be increased.  Or on the flipside, some patients may say:

17  You know, I just feel really tired or just overly drowsy, and

18  they may want a decrease a little bit, you know, so something

19  along those lines.

20  Q   What would you do if the patient said:  I need to have my

21  medication increased?

22  A   I would go --

23  Q   Before you answer, did you have a DEA license?

24  A   Oh, no, ma'am.

25  Q   You could not prescribe; is that right?

SARAH CARPENTER McMICHAEL - DIRECT BY MS. GRIFFIN

1   A   That's correct.

2   Q   So a patient comes in during this time, when you were doing

3   the refills, and wants increased medication that's a controlled

4   substance?

5   A   Well, depending on who their doctor was, Dr. Chen, like I

6   said, he only had a few patients.  He would always come and

7   talk to his patients and decide, whatever.  If they would

8   decide together, he would have the final say.  He would write

9   out what he wanted done.

10  Q   I want to direct you to Dr. Couch's patients.

11  A   Okay.  Dr. Couch's patients, if they didn't want any

12  changes made after I had been there for -- I don't know -- a

13  while and he felt confident that I had a good technique and

14  that I had trained enough with him and with the other RN, he

15  would -- if the patient didn't want any changes, he would say:

16  Okay, we'll just keep it the same, and just refill it like it

17  was last time.  And so we would do that and write out a

18  prescription for exactly the same as on The previous visit.

19  Q   And if the patient wanted a change?

20  A   If the patient wanted a change, then, I would go to

21  Dr. Couch and, you know, this is -- a lot of times I would just

22  have the paper with me from their previous visit and say -- and

23  it would have their vital signs from today and just, you know,

24  some basic information to go by and kind of show him:  Hey,

25  this is so and so, or Mr. So and So, and they want -- they're

1  having X problem today and they are asking for an

2  increase.  You know, what should I do?

3          And then he would either come see them or write on the

4  paper or verbally tell me what to do.

5  Q   Were there times when you could not find Dr. Couch while

6  you had a pump patient that needed an increase or that

7  requested an increase?

8  A   Yes.

9  Q   Could you tell us what you did during those times?

10  A   If he was not in the office, I would try to text him, if I

11  could.  If I could -- you know, just to get an answer, to get

12  some information.

13          Worst case scenario, if I couldn't get a hold of him,

14  if I just never could hear anything back, then I would just go

15  based off of what I've seen him do before when a patient would

16  come in with the same request, maybe go up a little bit or down

17  a little bit.  Now, he had given us like leeway to do like a

18  10-percent change, like a verbal order.  I guess kind of a

19  standing order, if you will.  He told me and Angel if he was

20  ever unavailable or couldn't come see the patient, if they

21  needed to go up or down, you know, 10 percent, that we could do

22  that.

23  Q   So without a DEA license, you would increase the amount of

24  a controlled substance in a pain pump refill?

25  A   Yes, based off of his verbal instruction, yes.

SARAH CARPENTER McMICHAEL - DIRECT BY MS. GRIFFIN

1   Q   There was no written order to that effect, was there?

2   A   No, ma'am.

3   Q   Why would Dr. Couch be out of the office or why would you

4   be unable to find him?

5   A   I know that he had some things going on at different times.

6   I don't begin to know his personal schedule, to be perfectly

7   honest.  I don't know.

8   Q   Would you start procedures, pain pump procedures, refills,

9   on days before he arrived at the office?

10  A   As long as there was a doctor present, that was what I had

11  been told by him before, you know.

12  Q   By who, now?

13  A   I'm sorry.  By Dr. Couch before:  Just as long as somebody

14  is there and can get started, I'll be there, you know, as soon

15  as I can get there.

16  Q   If another doctor were there and Dr. Couch's patient was

17  having a refill and you couldn't reach Dr. Couch, did you go

18  consult with the other doctors?

19  A   I think I maybe -- maybe did once.  I think I may have

20  asked Dr. Chen, but usually the doctors kind of didn't want to

21  step on each other's toes, I guess is probably the best way to

22  put it.  They didn't want to.  Unless it was something they had

23  previously discussed or made arrangements about, they didn't

24  want to get in each other's business, I guess.

25  Q   They didn't want to treat each other's patients; right?

1  A   Right.  Unless somebody was having an emergency or

2  something.

3  Q   Then what would you do if you could not reach Dr. Couch and

4  he was not there and a patient requested additional medication?

5  A   I just -- I would do the best I could.  I felt pressed to

6  -- felt pressed to try to do -- to do my best to make the

7  patients happy, to do the best we could for them, because you

8  can't let them run out.  Because if they run out of

9  medications, then they go through profound withdrawals that can

10 make them very, very sick.  And, you know, I just -- I felt

11 like I had to do something.  I didn't want people to run out of

12 medication and I kind of felt like my hands were tied and I

13 would just do what I had seen him do before, you know, when

14 people would come in and ask, you know:  I want to have this

15 changed or that changed.

16 Q   So you would increase the medications, is that what you're

17 saying?

18 A   If that's what the patient was requesting, yes (nodding

19 head affirmatively).

20 Q   Without a doctor ordering that?

21 A   Sometimes, yes (nodding head affirmatively).

22 Q   Did you also have occasion to sign Dr. Couch's name on

23 patient prescriptions?

24 A   Not for the pump part.  But for the actual like pills and

25 things, unfortunately, yes, there were a few times when we --

1    you know, when he wasn't available.  We tried our best to get

2    all -- tried to write up our patients' prescriptions a day or

3    two ahead time to make sure that he would even be able to be

4    there to sign them.  Sometimes somebody would fall through the

5    cracks or something wouldn't get signed and, yeah,

6    unfortunately there were a couple of times, a handful of times.

7    I don't -- I don't know a number.

8    Q   Did you sign Dr. Couch's name on a prescription?

9    A   Yes, ma'am.

10   Q   Were you aware of anyone else signing Dr. Couch's name on a

11   prescription?

12   A   It was -- yeah.  I kind of -- it was never ever openly

13   talked about, but I kind of caught on after a while that his

14   nurse practitioner Justin was signing prescriptions.

15   Q   Did you in fact see him do that?

16   A   Yes, ma'am.

17   Q   When you are saying the pills, the pills weren't being put

18   in the pumps, were they?

19   A   No.

20   Q   What do you mean by the pills, after a pump refill?

21   A   Some patients would have like what they call breakthrough

22   pain medication.  The pumps were great for constant pain relief

23   and pain control, but sometimes they would need something for

24   breakthrough pain.  And so some of our patients had that.

25   Q   Are you telling us that sometimes after a pump refill you

3705

1  would write a prescription for a controlled substance pill?

2  A   Yes, sometimes.  I mean, that was for a lot of patients,

3  they would have something onhand for breakthrough pain.

4  Q   So they would be having a refill and then an oral

5  medication?

6  A   Right.  We wouldn't give them the oral medication in the

7  office, just the prescription.  Yes, ma'am.

8  Q   Were there times when you also did what's called a

9  one-for-the-road or an injection?  Not in the pump.  After the

10  pump was refilled?

11  A   For certain patients, if they were really, really

12  complaining of a lot of pain or if they had had something

13  specific.  Say if they'd had a -- I remember one lady had a

14  fall or something and she was complaining about hurting all

15  over.  And if they would ask specifically for like an

16  intramuscular shot, something that would go like in their arm

17  or their hip or something until, you know, their new, fresh

18  pump medication got through to them, then yes, occasionally we

19  would give them a shot as well.

20  Q   And have you done that without Dr. Couch ordering that shot

21  after a pump refill?

22  A   On the occasions that like that, which didn't happen too

23  often, if Dr. Couch was not available, I would ask Justin or

24  Stacy or one of his providers if, you know, they thought it

25  would be okay.  You know, like if he's not here for me to ask,

1  but so and so's asking for a shot, and I wanted to run it by

2  somebody, you know.

3  Q   But they were frequently provided without -- the ones that

4  were provided, were they provided without anyone with a DEA

5  number approving those shots for the road?

6  A   No.  Well, verbally approving, I always got verbal approval

7  from somebody in the office.

8  Q   A medical doctor?

9  A   Oh, no, no.  Like what you call a mid level, like a nurse

10 practitioner.

11 Q   Did you know that none of the nurse practitioners had DEA

12 licenses and could not give such authority?

13 A   No, ma'am, I guess I did not (indicating).

14 Q   Now, you keep talking about a prescription for the pump

15 refill?

16 A   Uh-huh (nodding head affirmatively).

17 Q   Yet you've made reference to there being a pump chart that

18 showed what the previous medication was.  Can you explain the

19 difference between those two to us?

20 A   What I was told when I started doing the pump refills at

21 PPSA was --

22 Q   No, no, not what you were told.  I want you to -- if you

23 can tell us the difference between those two, please.

24 A   Between the actual prescription for the refill and the

25 note?

SARAH CARPENTER-MCMICHAEL - DIRECT BY MS. GRIFFIN

3707

```
 1    Q    Yes.
 2    A    The best way I can describe it is the prescription would be
 3    just written out what today's refill contained, but it would be
 4    written on prescription paper and I was told they had to have
 5    that separately for billing purposes, because it was a
 6    doctor-prescribed thing, so it had to be written on a
 7    prescription paper.  But it was -- it was whatever refill we
 8    had done that day, that visit.  Am I answering your question?
 9    I'm sorry.
10    Q    Is it fair to say that it was a prescription for what went
11    in the pump that was being refilled?
12    A    Yes; that's correct.
13    Q    Was that always done before the actual refill took place,
14    the prescription?
15    A    No, ma'am.
16    Q    Were there times when it was obviously done after the
17    refill?
18    A    Yes.
19         (A discussion was held off the record between counsel.)
20    BY MS. GRIFFIN:
21    Q    I'll show you what's marked as Government's Exhibit 6-3 and
22    ask if you recognize the document.
23    A    Yes, that is what we would call the pump note.  That would
24    be the note for the day.
25    Q    Would you have one of these for each pump patient that you
```

1  refilled a pump for?

2  A   Yes, ma'am.

3  Q   And would that --

4          THE COURT:  Is this in evidence?  Excuse me.

5          MS. GRIFFIN:  No, Your Honor.

6          THE COURT:  Okay.

7  BY MS. GRIFFIN:

8  Q   Have you previously been shown a number of these pump

9  refill sheets to go over?

10  A   Yes.

11  Q   You've reviewed them before; is that right?

12  A   Yes, ma'am.

13          MS. GRIFFIN:  Your Honor, I'd move to admit

14  Government's Exhibit 6-3 --

15          MR. SHARMAN:  No objection.

16          THE COURT:  All right.  Mark them in.

17          MS. GRIFFIN:  -- which is from various files in 2012,

18  from PPSA files.

19      (Government's Exhibit 6-3 was entered into evidence.)

20          MS. GRIFFIN:  May we publish them to the jury?

21          THE COURT:  Yes.

22  BY MS. GRIFFIN:

23  Q   Now, Ms. McMichael, you were Sarah Carpenter when you were

24  there at PPSA?

25  A   Yes, ma'am.

1  Q   So throughout these, where the name is signed Sarah

2  Carpenter, was that you?

3  A   Yes, ma'am.

4  Q   And if you will explain to us for this 2012 pump refill

5  what type information is contained in connection with the

6  patient?

7  A   I will just start at the top.  And if you need me to be

8  more specific, just stop me.  Obviously the patient's name and

9  date are listed.  At the top of the note it will be circled

10  what type of pump we had.  VAS, that is the pain score.  When

11  people say:  What is your pain from zero to 10, they give a

12  number.  They list the blood pressure, the heart rate,

13  respiration, temperature, if applicable, allergies on the

14  right-hand side, any drugs that they have allergies to.

15  Diagnosis, some people have multiple listed.  Some just, you

16  know, have one.

17  Q   Can you speak up a little bit for us?

18  A   Oh, sure.  I'm sorry.

19  Q   Or pull that microphone closer to your mouth?

20  A   (Complying.)

21  Q   Thank you.

22  A   Okay.  Under diagnosis, there where it says LDDD, it stands

23  for lumbar degenerative disk disease.  And then where it says

24  meds prescribed by PPSA, we would list medications prescribed

25  previously on a previous visit, would have like the name of the

1    drug, the strength, the number prescribed, and the date that it

2    was prescribed.

3    Q   Would you also have some notes from the date you were

4    seeing the patient?  (Indicating.)

5    A   Yes, any complaints, concerns, anything that the patient

6    voiced, we would just, you know, kind of just jot down there.

7    Q   Do you recognize the date on this particular patient's pump

8    refill form?

9    A   It says February 20, 2012.

10   Q   And does this patient have the first name beginning with an

11   M. and the last name as Ms. B....?

12   A   That's correct.

13   Q   What did you write about Ms. B.... in your notes?

14   A   Actually, that's not my handwriting.  That was the medical

15   assistant, Desiree.  I recognize her handwriting.  She wrote:

16   Patient complained of increased lumbar pain and bilateral leg

17   pain, requesting increase today.

18   Q   So that's a medical assistant that writes that, not even a

19   nurse?

20   A   Well, it could be either.  She just happened to write it

21   before I came in the room.  And if I had anything to change or

22   add, then I would add my note as well.

23   Q   Then where it says last refill and today's refill, could

24   you tell us where your handwriting starts?

25   A   My handwriting is in the numbers displayed.  The last

1  refill, it's got numbers on two different sides of the column,

2  where it says morphine, Dilaudid, baclofen, et cetera.  On the

3  right-hand side, that's my handwriting filling in the numbers

4  there.

5  Q   So today's refill would be your handwriting on the numbers;

6  is that right?

7  A   That's right.

8  Q   And is this your handwriting, "requesting," and then an

9  arrow up, "today"?

10  A   No, ma'am.  That would be the medical assistant as well.

11  Q   What did you do with this particular patient whose last

12  name is Ms. B....?

13  A   We increased her Dilaudid by one cc and increased her

14  baclofen by one cc, and increased the clonidine by one cc, and

15  then we decreased the Marcaine down to two ccs.

16  Q   Do you know if Dr. Couch was in the country or in the state

17  on this date?

18  A   I really don't remember.  That was a while back.

19  Q   Were you just asked to look at pump fills from 2012?

20  A   Yes, ma'am.  That's all I've gone over so far.

21  Q   I show you the second page of this particular note and ask

22  if it is the prescription for the refill that you have been

23  referring to?

24  A   Yes; that's right.

25  Q   This shows what is added to the pump refill?

SARAH CARPENTER-McMICHAEL - DIRECT BY MS. GRIFFIN

3712

1   A   That's correct.

2   Q   Were there times when there was no Dilaudid in a fill at

3   all -- excuse me -- in a pain pump at all and you would add

4   Dilaudid to the pain pump?

5   A   Yes, ma'am.  There were several times that if a patient was

6   requesting an increase and they already had a substantial

7   amount of morphine in their pump, that I had heard Dr. Couch

8   explain to people before that it was dangerous to have too much

9   morphine in their pump, so I didn't feel comfortable increasing

10   their morphine.  But what I had seen him do before, if he

11   didn't feel comfortable increasing their morphine, he would add

12   a little bit of Dilaudid to see if that would give them some

13   pain relief.

14   Q   I show you a patient whose first name begins with a C. and

15   last name is B.....  Was this a refill July 23rd, of '12?

16   A   Yes, ma'am.

17   Q   Is this a patient that has PT -- can you read that?

18   A   Yes, ma'am, that is my handwriting on that sheet for sure:

19   Patient requests increase today.

20   Q   Did you give the patient an increase?

21   A   I did.

22   Q   Of what, please?

23   A   I added one cc of Dilaudid.

24   Q   And you know Dilaudid is a schedule II controlled

25   substance?

1    A    That is correct.

2    Q    Do you know if Dr. Couch was in the office that day?

3    A    I don't -- off the top of my head, I really don't.

4    Q    Does the prescription that goes along with Ms. B's.... pump

5    note show the Dilaudid she actually received on that pump

6    refill?

7    A    Yes.

8    Q    And do you know, is this your signature signing Dr. Couch's

9    name?  Or do you know?

10   A    Oh, no, no.  I never signed any of the pump refill

11   prescriptions.

12   Q    So which were the prescriptions you were telling us you

13   signed?

14   A    The only time I ever signed anything is if it was for

15   someone's breakthrough pain medication and it was something

16   that we couldn't call in, couldn't -- either he wasn't

17   available or couldn't get a hold of him or something like that

18   and the patient was adamant they were going to run out of their

19   medication if we didn't take care of it.

20   Q    Were you aware of any emergency provision for you to

21   prescribe controlled substances?

22   A    No, ma'am.

23   Q    On this prescription, last name Mrs. B...., are you telling

24   us that this prescription was not done until after the refill?

25   A    Done as in that I wrote it?

3714

1  Q   Prepared, prepared.

2  A   Prepared?  Usually I would do it all at the same time, like

3  you would -- the pump refill itself was a sterile procedure.

4  And whether you filled out the prescription right before or

5  right after, it was done all right at the same time.

6  Q   You couldn't have done all of them simultaneously.  So was

7  this typically done after you had filled the pump?

8  A   Typically, yes.  But when I say at the same time, I mean

9  like within the same, you know, 15-20 minute period in the room

10  with the patient.

11  Q   And then you previously looked through each of the patient

12  files in this grouping I'm showing you; is that correct?

13  A   Yes, ma'am.

14  Q   Is there some indication in each of these that the patient

15  wants more drugs?

16  A   Yes.  That note says:  Patient requests to add Dilaudid

17  today.

18  Q   And the one you were quoting from is dated what date?

19  (Indicating.)

20  A   July 23rd, 2012.

21  Q   In fact, did you provide more Dilaudid to that patient that

22  day?

23  A   Yes, ma'am.

24  Q   Would you note on the days refilled what you had increased?

25  A   Yes.

SARAH CARPENTER McMICHAEL - DIRECT BY MS. GRIFFIN

1    Q   The next time the patient came for a refill -- so today,

2    this one is July the 23rd of '12 -- when they came 60 days

3    later, would this, today's refill prescription amount, be on

4    the form for the next visit as the last refill?

5    A   That's correct.

6    Q   Then I show you what's marked as last name Malloy, a female

7    last name Malloy, also for June 23rd, '12, and ask if the

8    patient wanted Dilaudid added?

9    A   Yes.  I made a note:  Patient requesting increased versus

10   adding Dilaudid.

11   Q   Okay.  Dilaudid had not been prescribed, had it?

12   A   No, ma'am, not on her last refill, no.

13   Q   Do you know whether Dr. Couch was in the country or in the

14   office on this date?

15   A   I don't recall off the top of my head, no.

16   Q   So this person had not been having Dilaudid in their pump;

17   is that right?

18   A   At least as of the previous refill.  I don't know prior to

19   that.

20   Q   And they requested it and you added it?

21   A   That's correct.

22   Q   So if you weren't the next person who filled that script 60

23   days later, it would look like they had been receiving Dilaudid

24   in their pump; is that right?

25   A   Yes, ma'am.

3716

1   Q   Now, you've previously been through these that are part of

2   Government's Exhibit 6-3.  They are all in 2012; is that right?

3   A   Yes, ma'am.

4   Q   And they are all patient increases of pump medications; is

5   that correct?

6   A   Yes, ma'am.

7   Q   How would you determine if a patient needed more medicine

8   in their pump other than them just asking for it?

9   A   That would be the general indicator, what they -- how they

10  were describing their complaints, how they were describing how

11  they felt, if they were just complaining:  I can't get out of

12  bed, or:  I'm having to take more of my breakthrough medicine

13  than I'm supposed to, or various things that the patient would

14  say when they requested an increase.

15  Q   So you would do it based on what they requested?

16  A   Yes, ma'am.

17  Q   And did you tell us that you would always -- if Dr. Couch

18  were not available, you would increase it 10 percent up or

19  down?

20  A   Try to stay within those guidelines, yes, ma'am.

21  Q   Were there times when you couldn't stay within those 10

22  percent guidelines?

23  A   I'm sure there were a few, yes, ma'am.

24  Q   And nothing was written to give that you authority?

25  A   Nothing written, no (shaking head negatively).

SARAH CARPENTER-McMICHAEL - DIRECT BY MS. GRIFFIN

1  Q   Were you aware that you were not authorized to do that on

2  your own?

3  A   Yes.

4  Q   Even with oral orders?

5  A   I'm sorry?

6  Q   Were you aware that you had no authority to make a decision

7  to add Dilaudid or any drug to a patient's pump?

8  A   Yes.

9  Q   Now, that's something going into their body; right?

10  A   Yes, ma'am.

11  Q   Is there a difference in what goes in the pump versus the

12  pump flow?

13  A   Okay.  The flow, or the flow rate, usually describes how

14  quickly or how slowly they get their medication, how fast the

15  pump gives them their medicine.  And whatever it gives them

16  obviously is whatever that we put in it.

17  Q   But can you alter or set the flow?

18  A   There is one type of pump that -- we had a few patients

19  that have an electronic pump where you can program or adjust

20  the flow rate.

21  Q   Would that mean that the patient would get the medication

22  faster or slower, depending on how you set it?

23  A   That's correct.

24  Q   Were there occasions that you couldn't find Dr. Couch and

25  you had to set the flow rate?

1   A   Maybe once or twice.  We didn't have many of those patients

2   with those kind of pumps.

3   Q   That had that brand pump?

4   A   Correct.

5   Q   You see up at the top there is a listing of pump refill; is

6   that right?

7   A   Yes, ma'am.

8   Q   Are there different kinds of pumps listed there?

9   A   Yes, ma'am.  And the programmable one is the Medtronic that

10  I'm referring to.

11  Q   The one in the middle?

12  A   Yes, ma'am.

13  Q   So if it was not the Medtronic that the patient had, is it

14  fair to say you couldn't change the flow up or down?

15  A   That's correct.

16  Q   Then I show you Mr. Cobb, July 26 of '12, and ask if he

17  requested to go up on Dilaudid as well?

18  A   Yes, ma'am, that's what Desiree wrote.

19  Q   And did you increase his Dilaudid?

20  A   Yes, ma'am.0

21  Q   Do you know if this is Dr. Couch's signature at the bottom

22  or not?

23  A   I really don't know.

24  Q   Do you know if Dr. Couch was in the country or in the

25  office that day?

3719

```
1   A    I have no way of knowing, no, ma'am.

2   Q    Again I show you August the 13th of 2012, on someone last

3   name Dixon, is that person also requesting an increase in

4   Dilaudid?

5   A    Yes; that's correct.

6   Q    Was an increase in Dilaudid provided?

7   A    Yes.

8   Q    Again, do you know if Dr. Couch was in the country or in

9   the office that day?

10  A    No, ma'am, I'm not sure.

11  Q    Is it fair to say that for all the refill forms contained

12  in this exhibit that you've previously reviewed, Government's

13  Exhibit 6-3, that if they requested an increase in medication,

14  they received an increase in medication?

15  A    Based off those notes, yes, ma'am.

16  Q    Now, Ms. Carpenter, for the drugs that were taken out of

17  the pump and wasted, was there any documentation of what drugs

18  were put down the sink?

19  A    No, ma'am.

20  Q    Did there come times when Dr. Couch would give you other

21  directions than the 10 percent up or down?

22  A    Sometimes, yes, ma'am.

23  Q    Give us an example of when that happened.

24  A    Like I say, if a patient was -- if a patient had to have a

25  pump emptied or if their pump had run out, then he might say
```

1    specifically:  Well, let's put this and this and this in today,

2    and then in two weeks we'll get them to come back and we'll top

3    off their dose to try to slowly get them back up to where they

4    were in a safe way.

5    Q   Were there times when you had to text or call Dr. Couch and

6    he would respond to you without directions, specific

7    directions?

8    A   I don't recall specifically.  But yeah, I mean, there were

9    quite a few times that I would try to reach him by text and ask

10   what -- you know:  What do you want me to do?  Or should I

11   reschedule these people?

12          And, you know, I kind of got the general:  Just take

13   care of it.

14   Q   Are those his words?

15   A   Yes.

16   Q   Just take care of it?

17   A   (No response.)

18   Q   Did he seem pleased that you were contacting him or

19   otherwise?

20   A   Well, if it's via text, you can't really read emotion that

21   way.  Sometimes if I reached him by phone or if he was in his

22   office -- there were times I think he had a lot of maybe

23   personal things going on at the time when he was --

24   Q   No, ma'am.  The question is just --

25          MR. SHARMAN:  Your Honor, if the witness could be

1    allowed to finish her answer please?

2            THE COURT:  Overruled.  Just answer directly the

3    question.

4    A   Oh, yes, There were times when he seemed less than pleased.

5    BY MS. GRIFFIN:

6    Q   How did you know that?

7    A   Well, if you're speaking to someone directly and their tone

8    of voice or their body language -- you know, if someone seems

9    aggravated or exasperated, you know, you can kind of tell.

10   Q   And you could base it on having talked to him at other

11   times, is that what you're telling us?

12   A   Yes.

13   Q   Did there come a time when you left PPSA?

14   A   Yes.

15   Q   Why was that?

16   A   Uh, honestly, for a variety of reasons.  I missed the

17   structure in place at a hospital job.  You have backup, you

18   have other nurses there.  You have other -- how to put it?  I

19   felt that there was a lot of -- things seemed unsafe in several

20   ways at PPSA.  And I didn't like places where I know that I had

21   overstepped my bounds, where I felt pushed to just try to keep

22   things going and just take care of things, and I knew it didn't

23   feel right and I didn't like it and I just wanted to go back to

24   something where I felt where I had experience and I knew what

25   the boundaries were and I knew what was expected of me at all

1  times, period.

2  Q   What do you mean by unsafe?

3  A   Well, like you mentioned some of the things that I did as

4  far as, you know, trying to handle people's pump refills, like

5  the procedure rooms, you know, they had medications there that

6  they could give like for procedural sedation that, you know, it

7  seemed -- it seemed like pretty easy access if somebody was in

8  the wrong or had the wrong mindset or probably shouldn't be

9  tempted with such things.  It just seemed kind of a dangerous

10 environment to be in.

11 Q   Did that have to do with access to controlled substances?

12 A   Yes, ma'am.

13 Q   What do you mean?

14 A   Well, like in the procedure rooms there were lockboxes.

15 They would keep like Versed or Dilaudid and morphine for

16 intramuscular injections, like for people getting procedures

17 and things.  And it was locked, you know, but it wasn't hard to

18 pass around a set of keys and people, you know, just signed out

19 whatever they took out of there.  And I don't know, it just --

20 it seemed like there was a large potential for error or for

21 things to go wrong and it just made me uncomfortable.

22 Q   Did there come a time when you were concerned that someone

23 might be taking controlled substances out of the pump room as

24 opposed to the procedure room that you've just talked about?

25          MR. SHARMAN:  Objection, Your Honor.  This still

1    exceeds the scope of the indictment.  There's nothing like this

2    changed in the indictment.  This is essentially practice

3    testimony, not anything about particular patients or particular

4    events alleged in the indictment.

5            THE COURT:  Overruled.

6    A   There was one instance, yes.

7    BY MS. GRIFFIN:

8    Q   Could you tell us about that?

9    A   I had come into work early one morning.  And if I could

10   just -- I wish I could describe the office setup.  But there

11   was a desk and a computer, and a desk and a computer here.

12    (Indicating.)  And kind of under the printer in a cabinet was

13   the safe where the pump medications were kept.  And the cabinet

14   door was ajar about that much or so.  (Indicating.)

15   Q   And how much are you showing?  Because --

16   A   I'm sorry.  About --

17   Q   -- the testimony -- excuse me.  The testimony's being

18   transcribed and you're showing us with your hands.  Could you

19   tell us about how many inches you're showing with your hands?

20   A   I would say maybe three to four inches ajar and it just

21   kind of caught my eye because I'm just weird like that about

22   having cabinet doors open and things like that.  And there was

23   a three cc syringe wrapper on the floor near the garbage can

24   and it just seemed odd.  And, of course, I opened the safe and

25   checked everything out and I couldn't see where -- obviously

1  where anything was wrong.  But it just troubled me.

2  Q   When you say a three cc wrapper, what are you talking

3  about?

4  A   I'm sorry.  It was a wrapper for an individualized three cc

5  syringe that we would use for -- like to give shots like for

6  procedural sedation and things like that.

7  Q   Was the actual needle still in the wrapper or was it an

8  empty wrapper?

9  A   It was an empty wrapper.

10  Q   Did you have occasion to suspect that Justin Palmer was

11  using drugs at PPSA?

12  A   I was worried that he was going to relapse for a long

13  time.  But I never knew or saw that he was like mentally

14  impaired or like speech slurred or anything like that.  But he

15  was very anxious, angry, jumpy, sometimes he would be sweaty,

16  and I was very concerned about his stress level and scared that

17  he was going to relapse and talked to him about it a couple of

18  times.

19  Q   You talked to him about it?

20  A   Yes, ma'am.

21  Q   Did you know whether or not he was using at the time you

22  were talking to him about it?

23  A   No, I had no idea.

24  Q   And you're not suggesting he's the one who had gone into

25  the safe, are you?

1  A   No.  I have no, no way to know anything like that.  It just

2  concerned me because it was odd.

3  Q   You felt like something had happened but you didn't know

4  what; is that fair?

5  A   That's -- that's fair to say, yes, ma'am.

6  Q   Now, you also said that you wanted to go back to where

7  there was more structure.  What did you mean by more structure?

8  A   Any kind of nursing job in a hospital, there are policies

9  and procedures for everything.  And while that can be a little

10  bit tedious, it provides you a little bit of comfort because

11  you know what's expected of you, what's not expected of you,

12  you have a chain of command like if there's a situation going

13  on that where you need help or you need some advice, you know

14  who you -- you know, who your supervisor is and who their

15  supervisor is and numbers to contact people after hours and

16  just more of a structured environment.

17  Q   Did you have that at PPSA?

18  A   No, I can't say that we did.

19  Q   Ms. McMichael, had you previously, when you worked in the

20  ER, been allowed to sign any doctor's names?

21  A   No, ma'am.

22  Q   Had you been, in the ER, allowed to make decisions on

23  increasing or decreasing controlled substances for a patient?

24  A   No, ma'am.

25  Q   Had you been allowed to make any decisions in the ER about

1   adding a new controlled substance for a patient?

2   A   No, ma'am.

3   Q   Did you have some concern for your pain pump patients?

4   A   Yes.  Just in general I felt that sometimes they didn't get

5   the kind of time, or if they wanted to talk to a doctor about

6   something or ask about something, that sometimes they did get

7   to and then sometimes, I think, things were so busy that they

8   didn't get a lot of time, you know, to talk to the doctor about

9   treatment options or concerns that they had.

10   Q   Did you develop some concerns about the nonpump patients

11   that you had the opportunity to observe?

12   A   Just generalized concerns as far as just how they looked

13   out in the waiting room or walking down the hall.  I didn't

14   take care of any of them specifically, but in general they were

15   just kind of sad, glassy eyed, kind of like -- zombie's

16   probably not a good word, but sort of.

17   Q   So sort of zombie-like?

18   A   Uh-huh (positive response).

19          MS. GRIFFIN:  One moment, Your Honor.

20      (A discussion was held off the record between government

21   counsel.)

22   BY MS. GRIFFIN:

23   Q   Did the medical assistant always do the exams on the pump

24   sheet refill forms we've gone over or would you do that on

25   occasion?

1  A   By exams, do you mean the vital signs?

2  Q   Yes.

3  A   I would do it on occasion, it just -- it varied.

4  Q   Did you ever witness a doctor-patient relationship with

5  Couch and the pump patients?

6  A   Sure, quite a few times.

7  Q   Did you experience any times when there was no

8  doctor-patient relationship between Dr. Couch and the pain pump

9  patients?

10  A   No, he knew them all pretty well, because he usually was

11  the doctor that implanted their pump and they had seen him at

12  least once a month for however long they had had it.  So he

13  usually had a pretty good relationship with them.

14  Q   In connection with that, you said he had seen them before,

15  do you know whether he had actually seen them at any time

16  except to put the pump in?

17  A   I wouldn't have any knowledge of that, no, ma'am.

18  Q   You would not know one way or the other?

19  A   That's correct.

20  Q   When you left, did you express any of these concerns to

21  anyone?

22  A   I know I talked about it with the other pump nurse.  And

23  the only reason I stayed as long as I did was to try to -- I

24  wanted to help train the next nurse coming on as a replacement,

25  because it was important to me that, you know, that the

1  patients were cared for properly and I wanted to make sure they

2  had somebody that I felt would do a good job.

3  Q   Is that why you stayed the part-time portion?

4  A   Yes, ma'am (nodding head affirmatively).

5  Q   Were you working another job while you were working at PPSA

6  toward the end, part time?

7  A   Yes.

8        MS. GRIFFIN:  That's all I have of this witness at

9  this time.

10        THE COURT:  Mr. Sharman?

11                      CROSS EXAMINATION

12  BY MR. SHARMAN:

13  Q   Ms. McMichael, my name is Jack Sharman.  I represent

14  Dr. Couch.  You were a pain pump nurse; right?

15  A   Yes, sir.

16  Q   And your main job was to refill the pumps; right?

17  A   Yes, sir.

18  Q   And that's not something that's unusual in medicine; right?

19  Refilling pain pumps?

20        MS. GRIFFIN:  Objection as to foundation, Your Honor.

21        MR. SHARMAN:  Your Honor, she's a pain pump nurse.

22        THE COURT:  Yeah.  But your question was whether it is

23  unusual.

24  BY MR. SHARMAN:

25  Q   Are you familiar with the practice of refilling pain pumps?

1   A   This was my first and only job, refilling pain pumps.

2   Q   So you don't know, for example, whether that's commonly

3   done in hospitals?

4   A   No, sir, I don't.

5   Q   Or by home health nurses?

6   A   I have no knowledge of that, no.

7   Q   All right.  At your time at PPSA and working for Dr. Couch,

8   you always did what you believed was the best for the patient;

9   right?

10   A   That's right.

11   Q   And that applies to the pump refills; right?

12   A   Correct.

13   Q   And to any injections that were given?

14   A   Correct.

15   Q   And to any adjustments on flow rate; right?

16   A   Yes.

17   Q   And to any of the sort of top-off refills that you briefly

18   talked about, the same principle; right?

19   A   Yes, sir.

20   Q   You always did what you thought was in the best interest of

21   the patient; right?

22   A   Right.

23   Q   And what you did was in fact in the best interest of the

24   patient; right?

25   A   To the best of my knowledge, always.

1  Q  Well, you never had any reason to think otherwise; right?

2  A  No.

3  Q  And I think you addressed this on direct briefly, but the

4  medications that were used in the pain pumps, they were kept in

5  a safe in the pain pump room; right?

6  A  That's correct.

7  Q  And they were kept in a safe?

8  A  Yes.

9  Q  That safe had a push code on it; right?

10  A  Yes.

11  Q  There was also a log sheet to sign medications out; right?

12  A  Yes, sir.

13  Q  In the preparation area there were scales so that

14  medications could be properly measured for the compounding;

15  right?

16  A  Yes.

17  Q  And that was a process that was set up and overseen by

18  Dr. Couch or Dr. Couch and Dr. Ruan; right?

19  A  The compounding?  Yes, sir, Dr. Couch handled that.

20  Q  And with regard to prescriptions and those occasions when

21  you did sign a prescription, did I understand you correctly

22  that there were occasions when you signed Dr. Couch's name; is

23  that right?

24  A  Yes, sir, there were a few times.

25  Q  Dr. Couch never told you or instructed you to sign his name

1   on anything, did he?

2   A   No, sir.

3   Q   And on those occasions you didn't go up to him at the time

4   or afterwards and say:  Hey, I just want to let you know, I

5   signed a prescription or some other document on your behalf;

6   right?

7   A   No, sir.

8   Q   And you said, I believe, that you saw Mr. Palmer signing

9   some prescriptions; was that right?

10   A   That's correct.

11   Q   And sitting here today under oath, you can't recall what

12   name Mr. Palmer was actually signing on the prescriptions,

13   whether it was his own, Dr. Couch's, or even somebody else's?

14   A   No, sir, I didn't study it.

15   Q   I'm sorry?

16   A   No, I didn't study or, you know, watch him closely enough

17   to see, no.

18   Q   At the beginning of your direct testimony you were asked

19   some questions about pain pumps generally and some of their

20   benefits in operation.  Do you remember some of those

21   questions?

22   A   Yes, sir.

23   Q   All right.  And, for example, you said that one benefit of

24   pain pumps is that there tend to be fewer side-effects than

25   with oral medications; is that right?

SARAH CARPENTER McMICHAEL - CROSS BY MR. SHARMAN

1   A    Yes.

2   Q    And another benefit of pain pumps is that the chances of

3   diversion of the medication is less likely because it's a

4   device inside the body; right?

5   A    That's correct.

6   Q    And Dr. Couch provided you with sort of in-house training,

7   so to speak, about pain pumps and how to refill them and how to

8   handle all this; right?

9   A    That's correct.

10  Q    And you received some external training about how to handle

11  pain pumps and do refills as well; right?

12  A    No, sir.  All my training was at PPSA.

13  Q    You didn't travel anywhere else to go get any other

14  training?

15  A    No, sir.

16  Q    And then -- and Dr. Couch, I think you said, had had

17  confidence in you; right?

18  A    Yes, sir, he seemed to.

19  Q    Because he had taught you; right?

20  A    Right.

21  Q    And he had observed your work; right?

22  A    Right.

23  Q    And y'all communicated about patients; right?

24  A    Yes, sir.

25  Q    And you had carried out his instructions?

1   A   Yes, sir.

2   Q   And apparently satisfactorily; right?

3   A   Yes, sir.

4   Q   You also answered a few questions on direct about

5   prescriptions, meaning the actual handwritten scripts.  Do you

6   remember some of those questions?

7   A   Right; yes, sir.

8   Q   And the reason or the operation or effect of those

9   prescriptions was to record what happened in that pain pump

10  visit; right?

11  A   Yes.

12  Q   So in other words, it's a record essentially of the

13  medications, whether they were changed or not and the

14  quantities and dose and so for; right?

15  A   Correct.

16  Q   So they are not a prescription -- excuse me -- in the sense

17  of writing it out and giving it to a patient and he or she's

18  going to take it someplace; right?

19  A   That's right.

20  Q   And you said that your normal practice was that if a

21  patient wanted a change, whether an increase or a decrease,

22  your normal practice was first to go seek out Dr. Couch,

23  present that to him and get his feedback and instruction;

24  right?

25  A   Correct.

1  Q   And that was a normal base-line thing to do; right?

2  A   Yes.

3  Q   And then he would say yes or no or go see the patient

4  himself; right?

5  A   That's right.

6  Q   And then you said if he wasn't in the office or not

7  immediately available, you would text him or try to find some

8  other means of communication to get his guidance; right?

9  A   Yes, sir.

10  Q   And so that was sort of the secondary thing you did?

11  A   Right.

12  Q   And then only if, you know, those were not successful did

13  you rely on your sort of standing order, so to speak, to use

14  your judgment; is that right?

15  A   Correct.

16  Q   And especially if we're talking about dosage volume, a

17  standing order that you could use your judgment, after your

18  training, to modify the prescription within a 10-percent range;

19  right?

20  A   That's right.

21  Q   And you said that you always did the best you could with

22  those instructions; right?

23  A   Yes, sir.

24  Q   And you said in particular it was important to you that the

25  patients not run out of their medication in the pain pump;

3735

1    right?

2    A    Yes.

3    Q    Because that could have some unwanted effects; right?

4    A    Yes, sir.

5    Q    Including withdrawals and other maybe bad stuff; right?

6    A    Yes, sir.

7    Q    All right.  And what was marked Government Exhibit 6-3,

8    Ms. Griffin walked you through several notes about procedures

9    and asked you some questions about that.  Do you remember that?

10   A    Yes, sir.

11   Q    And I'm not going to walk you through all of them

12   again.  But with regard to all of them that you testified

13   about, you didn't change medication simply because the patient

14   asked you to; right?  That wasn't the only reason you did it?

15   A    Right.  I mean, yes, on a case-by-case basis, yes.

16   Q    Because the patient was communicating something to you;

17   right?

18   A    Yes.

19   Q    About their condition?

20   A    Yes.

21   Q    Something was hurting or not hurting; right?

22   A    Correct.

23   Q    Something was better or worse?

24   A    Exactly.

25   Q    Is that right?

1  A   Yes, sir.

2  Q   The old condition continued or a new condition had arisen

3  since the last visit; right?

4  A   Yes.

5  Q   And you used your judgment and your experience to assess

6  whether or not this was a request that might appropriately be

7  granted or not; right?

8  A   Yes, sir.

9  Q   So you weren't simply just relying on:  I want more or I

10  want less, and agreed with it; right?

11  A   No.

12  Q   Because you were exercising professional trained judgment?

13  A   Exactly.

14  Q   And Ms. Griffin showed you instances where after that

15  exercise of judgment and after the request by a patient for an

16  increase you actually authorized an increase and performed an

17  increase; right?

18  A   Yes, sir.

19  Q   There were also instances where a patient presented, you

20  exercised your judgment, they asked for a decrease, and a

21  decrease was implemented; right?

22  A   Yes, sir.

23  Q   And frequently a patient would in those situations say he

24  or she had experienced improvement or the pain had decreased

25  and they accordingly wanted only some sort of decrease in the

1  medication; right?

2  A   That's correct.

3  Q   And did you exercise your judgment after talking with them

4  and consulting with Dr. Couch or, exercising your own judgment,

5  you would go ahead and decrease it; right?

6  A   That's correct.

7  Q   Before you left PPSA, did you relay any safety concerns to

8  Dr. Couch?

9  A   Regarding --

10  Q   Well, you responded to some of the government's questions

11  that one of your reasons for leaving PPSA was that you said

12  that things seemed unsafe.  Do you remember saying that?

13  A   Yes.

14  Q   Did you ever address any concern about safety with

15  Dr. Couch?

16  A   No, sir, I don't believe so.

17  Q   In your experience working with him, if you raised any

18  issue with him, was he generally responsive, positively or

19  negatively?

20  A   Yes, sir.

21  Q   You also said that these were in general -- these pain pump

22  patients -- long-term patients; right?

23  A   Yes.

24  Q   These were multi-year patients in general; right?

25  A   Usually by the time someone gets to the point of having a

1  pain pump, they've been dealing with these problems for a long,

2  long time and it's their last resort.

3  Q   You weren't there that long but, based on your familiarity

4  with their charts, you know that some of these patients were

5  multi-year patients; right?

6  A   Yes, sir.

7  Q   Some of them even 10-, 15-year kind of patients; right?

8  A   Yes, sir.

9  Q   And Dr. Couch had been familiar with them for that kind of

10 length of time; right?

11 A   Yes.

12 Q   You also said that you found PPSA to not be a structured

13 environment; is that right?

14 A   Yes, sir, compared to a hospital, yes.

15 Q   All right.  Compared to a hospital, it wasn't a structured

16 environment; right?

17 A   Correct.

18 Q   And it was a busy environment; right?

19 A   Definitely.

20 Q   Sometimes maybe a little too busy; right?

21 A   Agreed.

22 Q   But you didn't think that anything you were doing or

23 anything you were being told to do was in any way criminal;

24 right?

25 A   No, sir.

 1            MR. SHARMAN:  Ms. McMichael, thank you for your

 2     time.  No further questions.

 3            MS. GRIFFIN:  Your Honor, I object to counsel thanking

 4     her for her time.

 5            MR. SHARMAN:  Your Honor, I will try to watch that.

 6     Thank you.

 7            THE COURT:  Yes.  And I have noticed several counsel

 8     have thanked various witnesses for their answers, which is not

 9     appropriate.  So let's not be thanking the witnesses for their

10     testimony.

11            All right.  Anybody for Dr. Ruan?

12            MAY:  DARLEY:  No questions, Your Honor.

13            A JUROR:  May I ask a point of clarification in the

14     testimony, Your Honor?  The 10 percent standing order, if

15     that's an absolute 10 percent or is that plus 10, minus 10

16     possibly?  And there's also dosage and strength to consider.

17     Or is it just 10-percent volume?

18            THE COURT:  I will ask the prosecutor if she's

19     interested in asking that question.  If not, you'll have to be

20     satisfied with what's already been stated.

21            A JUROR:  All right.  Thank you.

22            THE COURT:  All right.  Go ahead, Ms. Griffin.

23                         REDIRECT EXAMINATION

24     BY MS. GRIFFIN:

25     Q   Ms. McMichael, were you given any directions as to whether

1    the 10 percent up or down was an exact or could you go a little

2    more each way and what did you do with the strength?

3    A   Well, the pump medications were compounded so that each

4    particular medication was a set strength.  But the 10-percent

5    rule we were just told was up or down and it wasn't really

6    elaborated about whether it was to the decimal or a guideline.

7    It was never really clarified.

8    Q   So it wasn't exact, was it?

9    A   No, ma'am.

10   Q   And, of course, if it were written down, we would know what

11   it said; right?

12   A   Yes, ma'am.

13   Q   It wasn't, was it?

14   A   Not to my knowledge.

15   Q   And did you on occasions go up in not only volume, but in

16   strength?

17   A   (Pause.)  I guess I don't know quite how to answer that.  I

18   mean, if you increased the volume of something, the overall

19   strength would increase.  Is that what you're asking?

20   Q   Yes.

21   A   Okay.  So yes, if you add -- say if you were to increase

22   somebody's pump medication by two ccs of Dilaudid, for an

23   example, it's going to increase the overall concentration just

24   by that addition of the medication.

25   Q   Were you aware that the board of medical examiners for the

1    state of Alabama requires dosing decisions to be made by a

2    physician?

3    A   No, ma'am.

4    Q   You weren't trained in dosing as a nurse, were you?

5    A   No, ma'am.

6    Q   I show you what's been admitted by Dr. Couch's attorneys as

7    Couch Exhibit 118, page 10, and ask your attention to paragraph

8    number five.

9             MR. SHARMAN:  Your Honor, I'm going to object to this

10   line of questions because it requires speculation.  The witness

11   has already testified she has no basis and has no familiarity

12   with these regulations, plus it goes beyond the scope of direct

13   and cross.

14            THE COURT:  Overruled.

15   BY MS. GRIFFIN:

16   Q   Does that say that when a physician prescribes a controlled

17   substance, he or she shall not delegate the responsibility of

18   determining the type, dosage form, frequency of application,

19   and number of refills of the drug prescribed?

20   A   Yes, ma'am.

21   Q   It's not a multiple choice; it says shall, doesn't it?

22            MR. SHARMAN:  Objection.  Same objection.  And

23   leading.

24            THE COURT:  Sustained as to leading.

25   BY MS. GRIFFIN:

1   Q   You answered Dr. Couch's attorney about compounding.  Did

2   you see anyone other than Dr. Couch compounding the medications

3   that were going to go in the pump?

4   A   I know several times Justin Palmer was in there with him.

5   I don't know if he actually did any of the compounding with him

6   or if he was just trying to learn about it.  They had their

7   masks on and I just -- you know, I knew that they were in

8   there, but it was a small room.  I didn't stay in there.

9   Q   You don't know what they were doing in the room?

10  A   Well, I knew that Dr. Couch was compounding medications and

11  I knew that Justin was watching.

12  Q   Now, in addition to not being trained on dosing to

13  increase, you weren't trained on dosing to decrease either,

14  were you?

15  A   No, ma'am.

16  Q   In other words, some of these medications could have side-

17  effects if they were decreased too quickly; is that right?

18  A   Yes.

19  Q   And you didn't know the rules for that, did you?

20  A   No, ma'am.

21  Q   You weren't trained as a doctor?

22  A   That's correct.

23  Q   You weren't trained as a nurse practitioner?

24  A   That's correct.

25          MR. SHARMAN:  Objection, leading a lot.

1    BY MS. GRIFFIN:

2    Q    Were you trained as a nurse practitioner?

3    A    No, ma'am.

4    Q    Were you trained as a doctor?

5    A    No.

6    Q    When you finished with a patient file, what would you do

7    with those files, a pump file?

8    A    At the end of the day, once we had completed our day, each

9    patient's pump note and their little prescription and any

10   copies of prescriptions for oral medications, they were all

11   clipped together and then Dr. Couch or Dr. Ruan or whoever,

12   whatever respective doctors had their own respective inboxes

13   and the chart would go to their inboxes so they could complete

14   the billing sheets or whatever it is that they have to do after

15   that.

16   Q    So who could complete the billing sheets?

17   A    The respective doctors for their patients.

18   Q    So each doctor had a separate box for those?

19   A    That's right.

20   Q    And what do you mean by complete their billing sheets?

21   A    I think it's either a superbill or something like that that

22   the office prints up when a patient comes in for a visit and

23   it's got a bunch of codes on the last page that I guess is how

24   they bill insurance or whatever and the doctors would assign

25   whatever codes are appropriate and anything else that they

1    needed to do for the chart before it was turned.

2    Q    So you didn't make the coding decisions then?

3           MR. SHARMAN:  Objection.  This well exceeds the scope

4    of direct.  There was to testimony about billing coding or

5    anything like that.

6           THE COURT:  Well, there wasn't on cross, so I sustain

7    the objection.

8    BY MS. GRIFFIN:

9    Q    Ms. McMichael, in your direct examination you had answered

10   that the prescriptions for the pain pump refills were done for

11   billing.  And then you answered with the defense attorney that

12   they were done for the record.  What were these prescriptions

13   used for?  (Indicating.)

14   A    To my knowledge they were used for both.  When I was first

15   training with Dr. Couch, he was telling me that for each pump

16   refill we had to fill out one of these prescriptions, that they

17   had to have it legally for insurance purposes in order to know,

18   I guess, what to bill for for the pump refill.  But then

19   there's also, like with all our other prescriptions, there was

20   a carbon copy that would get scanned into the patient's file so

21   we would have records for subsequent visits.

22          MS. GRIFFIN:  That's all we have of this witness, Your

23   Honor.

24          THE COURT:  May this witness be excused?

25          MS. GRIFFIN:  Please.

3745

1       MR. SHARMAN:  Yes, ma'am.

2       THE COURT:  You may step down.  Thank you, ma'am.

3       Ladies and gentlemen, we're going to break for lunch

4   now.  We will break until 1:25.  So leave your pads on your

5   chairs.  No discussion about the case over the lunch break.

6   And Be back in the jury assembly room at 1:25, ready to be

7   called back up.  We are in recess.

8       (A recess was taken at approximately 12:08 p.m.)

9       (Afternoon session, 1:30 p.m., in open court, defendants

10  and jury present.)

11      THE COURT:  All right, Counsel.

12      MR. BODNAR:  United States calls Angela Causby.

13      THE CLERK:  Ms. Cosby, step forward toward the witness

14  stand and I'll swear you in.  Let me get you to raise your

15  right hand.

16                  ANGELA CAUSBY

17          was sworn and testified as follows:

18      THE WITNESS:  I do.

19      THE CLERK:  Thank you.  Please be seated.

20                  DIRECT EXAMINATION

21  BY MR. BODNAR:

22  Q   Good afternoon, Ms. Causby.

23  A   Good afternoon.

24  Q   Could you please introduce yourself to the jury?

25  A   I'm Angela Causby.

1   Q   And how do you spell Causby?

2   A   C-A-U-S-B-Y.

3   Q   Ms. Causby, could you please tell the jury about your

4   educational background?

5   A   I am a licensed practicing nurse by trade, LPN.

6   Q   And can you explain what is an LPN, a licensed practicing

7   nurse?

8   A   It's where you spend at least one year in a certified

9   college and then you sit for your license.

10  Q   Ms. Causby, could you come just a little bit closer to the

11  mic, please?

12  A   Is that better?

13  Q   Yes.  Thank you.  Is an LPN different from a medical

14  assistant?

15  A   Yes.

16  Q   How so?

17  A   Well, first of all, you have a little bit more education

18  than you do on a medical assistant.  You sit for a state

19  license board.

20  Q   And is an LPN different than an RN as well, a registered

21  nurse?

22  A   Yes.

23  Q   What's the difference there?

24  A   The difference with an RN is they can start IVs.

25  Q   And how about for nurse practitioners?

3747

```
 1   A   I'm pretty sure they have more education than an RN, yes.

 2   Q   And so is an LPN between medical assistant, LPN, registered

 3   nurse, nurse practitioner, is that kind of the hierarchy?

 4   A   Correct.

 5   Q   How long did you work as a licensed practicing nurse, an

 6   LPN?

 7   A   Around seven and a half years.

 8   Q   And where did you work as an LPN?

 9   A   William Fleet and Dr. Benjamin Schrubbe.

10   Q   Where are though located?

11   A   Dr. Fleet has retired.  And the other group, we're in

12   Daphne, Alabama.

13   Q   And did there come a time that you left the clinical side

14   of medicine?

15   A   Yes, I did.  Because of medical reasons, I unfortunately

16   got sick with an autoimmune disorder, and on the advice of my

17   doctor I needed to stay out of the reach of sick people.

18   Q   After you left being an LPN, what work did you do?

19   A   I learned medical billing.

20   Q   And is that what you were then hired for at PPSA?

21   A   Yes.

22   Q   Did you ever work as a nurse at PPSA?

23   A   No.

24   Q   Can you explain to the jury when it was that you were hired

25   as a medical biller?
```

1    A    In August of 2013.

2    Q    And what does a biller do at a doctor's office?

3    A    Their responsibilities are to ensure that the information

4    is submitted to the insurance company that the doctors or nurse

5    practitioners prepare on encounter forms.

6    Q    When you worked as a biller at PPSA, which location were

7    you at, Springhill or Airport?

8    A    Springhill.

9    Q    Is that where you stayed the whole time?

10   A    Yes.

11   Q    Who else worked in billing at the time when you were there?

12   A    Do you want all the names?

13   Q    Yes.  Who was there, who were the billers while you were

14   there?

15   A    Misty Thompson, Nicole Pate, Elaine McDonald, Sandy

16   Williams, and myself.

17   Q    And did all of you do roughly the same type of work or did

18   each of you have a specialty within billing?

19   A    We all basically entered charges.  I entered nurse

20   practitioner charges and Misty and Nicole did more of the

21   procedures.

22   Q    And who trained you for medical billing when you got to

23   PPSA?

24   A    Debi Phillips.

25   Q    And who was Debi Phillips?

3749

```
 1   A    At the time she was the office manager.  And then months
 2   later she moved into the role of practice administrator.
 3   Q    Can you explain to the jury what did you do on a daily
 4   basis as a biller at PPSA?
 5   A    Entered in charges.  We -- you don't really enter in
 6   realtime, which is today.  You entered in charges from the day
 7   prior and also posted the accounts receivable, money.
 8   Q    So starting on the billing side, you said you would bill
 9   what had happened the previous day?
10   A    Correct.
11   Q    How would you get the information of what to bill for a
12   particular patient's insurance?
13   A    It was already prepared by the practitioner.
14   Q    And would that be a nurse practitioner or the doctor or
15   would you even know?
16   A    I wouldn't know, because I didn't see all that in action.
17   Q    So with regard to office visits, are you familiar with the
18   codes 99213 and 99214?
19   A    Yes.
20   Q    Can you tell the jury the difference between the three code
21   and the four code?
22   A    The four code is of higher reimbursement than the three
23   code.
24   Q    Now, how did you know what code to pick when you were
25   entering in the billing?
```

ANGELA CRUSBY - DIRECT BY MR. BODNAR                                    3750

1   A   I didn't pick codes.

2   Q   You didn't pick the codes in the billing?

3   A   No, no.

4   Q   How did you know, then, what code to use?

5   A   They were already selected.

6   Q   And do you know who it was that selected it before it got

7   to billing?

8   A   No, I do not.

9   Q   Were you ever changing codes in the billing department?

10  A   Absolutely not.

11  Q   So if it came in as a 99214, is that what you entered into

12  the computer?

13  A   Yes.

14  Q   And if it came in as a 99213, is that what you entered into

15  the computer?

16  A   Yes.

17  Q   Were you back on the clinical side, like where the exam

18  rooms were at PPSA?

19  A   Never.

20  Q   Where was your office?

21  A   I was at the front, adjacent to the waiting room, and there

22  was a door that connected from where we were to the back

23  clinical area.

24  Q   So would you have any idea whether or not it was a short

25  99213 visit or a longer 99214 visit?

3751

ANGELA CRISBY - DIRECT BY MR. BODNAR

1    A    I had no idea, because the door was always closed and it
2    was closed in our office also.
3    Q    And was it always that way, where the code was already on
4    the form that you got to enter in for insurance?
5    A    Yes.
6    Q    How about for billing under the NPI?  Can you explain to
7    the jury what is an NPI?
8    A    It's a national provider identifier.  That way it
9    identifies the doctor.
10   Q    Does it identify the person whose name is being billed
11   under?
12   A    Just the doctor, yes, who it was billed under.
13   Q    And during your time at PPSA, do you recall any bills going
14   out under any of the nurse practitioners' numbers?
15   A    No.
16   Q    Whose name -- or whose NPI number did the bills go out
17   under?
18   A    Either Dr. Couch or Dr. Ruan.
19   Q    Can you explain to the jury how did the actual billing
20   system work?  Was this something that you wrote out a bill and
21   then put it in the mail to the insurance company or was it done
22   electronically?
23   A    It was all done electronic.
24   Q    And once you entered in the -- did you in billing have any
25   choice of what codes to put on the bills?

3752

```
 1   A   Never.

 2   Q   Were all the codes for you to bill insurance already on

 3   there?

 4   A   Yes.

 5   Q   To your knowledge -- to the best of your knowledge, do you

 6   know if the others who worked in billing were given choices

 7   about what codes to put on the bills?

 8   A   No.

 9   Q   Did it work roughly the same way it worked for you, where

10   they received the information from a doctor or nurse

11   practitioner?

12   A   Yes, we all received it the same way.

13   Q   You mentioned that you also worked on the accounts

14   receivable side of billing.  Can you explain to the jury, what

15   is accounts receivable?

16   A   It's money that has already come in from the insurance

17   companies.

18   Q   So is that essentially the back half of what you did, the

19   first half you bill out to the insurance, and then accounts

20   receivable is the money that comes back in?

21   A   Yes.

22   Q   In your work dealing with accounts receivable, were you

23   able to tell about the profit margin on certain procedures and

24   certain visits?

25   A   Yes.
```

3753

1   Q   Did you have an opportunity to learn what the profit margin

2   was for the urine tests that were done in the cup?

3   A   Yes.

4   Q   Approximately how much was the profit on that?

5   A   Around $10.

6   Q   Did you also have an opportunity to learn what the profit

7   margin was for the GC-MS send-out urine test?

8   A   Around 800.

9   Q   Is that $800 per test?

10   A   For the whole panel.  They were done in panel form.

11   Q   And by panel, would that be for one cup of urine, though,

12   or one patient's urine?

13   A   Yes.

14   Q   And is that versus the $10 for one cup test?

15   A   Yes.

16   Q   How about for office visits?  At this time when you were

17   there in 2013, what office visit code was being used primarily?

18   A   99214.

19   Q   And do you know what was the approximate amount of profit

20   on a 99214 code?

21   A   Around 75 to $77.

22   Q   At that time, in 2013 through 2015, did you see many if any

23   99213 codes?

24   A   Very rare.

25   Q   Did you have an opportunity to see patient records during

3754

ANGELA CROSBY - DIRECT BY MR. BODNAR

```
 1   your time as a biller?

 2   A   Yes.

 3   Q   Can you explain to the jury what is cloned patient notes?

 4   A   It's from the prior visit, just the date's changed.

 5   Q   What do you mean by that?

 6   A   If someone was seen the month before and the information

 7   was exactly the same as that day that they were seen the next

 8   month.

 9   Q   And who if anyone's patient records did you see that

10   appeared to be cloned to you?  Were there any nurse

11   practitioners in particular whose documents appeared to be

12   cloned?

13   A   I saw some of Bridgette's.

14   Q   And is that Bridgette Parker?

15   A   Yes.

16   Q   In your position of where you were in the office, did you

17   have an occasion to see Bridgette Parker throughout the day?

18   A   On occasions I did.

19   Q   During these occasions that you saw her did she ever appear

20   to be impaired to you?

21   A   Yes.

22   Q   Can you explain that to the jury, please?

23   A   Her eyes would be fully dilated and she would be sluggish

24   in speech and having a hard time staying awake.

25   Q   Did you ever raise these concerns to Bridgette or to anyone
```

1   else within the office?

2   A   Yes.

3   Q   Who did you say that to?

4   A   I spoke with Debi and other people within the office, the

5   billing office, that she did not need to be there.

6   Q   And what do you mean by Bridgette didn't need to be there?

7   A   She didn't need to be in that form in front of other

8   patients.

9   Q   This was during the day while patients were there?

10  A   Correct.

11  Q   During your time as a biller at PPSA, how much interaction

12  did you have with Dr. Ruan or Dr. Couch?

13  A   None.

14  Q   Who was your primary contact within the office, or who did

15  you primarily deal with?

16  A   Are you talking about doctor-wise or just --

17  Q   Who were your bosses?

18  A   Misty Thompson became the billing manager.  So any issues

19  went to her.

20  Q   At any time did either Dr. Ruan or Dr. Couch ever say:

21  Hey, this billing is done wrong, you need to do it a different

22  way?

23  A   No, not -- I didn't see anything.

24  Q   Did Misty Thompson ever say, or Debi Phillips prior to her

25  ever say:  Hey, the billing's being done wrong, you need to do

ANGELA CROSBY - DIRECT BY MR. BODNAR

1  it a different way?

2  A    No.

3  Q    Were you literally just taking one set of numbers and codes

4  from one page and transferring it to the computer system to get

5  the bill paid?

6  A    Now, when I first went there, we did have encounter forms,

7  which was --

8  Q    Which were the --

9  A    The superbills, which was -- you know, you could check off

10  what was -- what they coded.  Then we went into the billing

11  system, where everything was loaded into the computer system.

12  Q    When you had superbills, were you or anyone else in the

13  billing department picking whether you would bill a 99213 or

14  99214 code?

15  A    Never.

16  ,Q  Had that already been selected on the or checked off on the

17  superbill?

18  A    Yes.

19  Q    Is that how you knew what code to bill?

20  A    Yes.

21  Q    How were payments received by PPSA from the insurance

22  companies?

23  A    You had some that were received through the mail service

24  and then you had some that were electronically.

25  Q    And by mail service, do you mean physical mail comes in a

1  mailbox and gets delivered?

2  A  Correct.

3  Q  And some were electronic?

4  A  Yes.

5  Q  Were you involved in putting the money for PPSA into the

6  bank?

7  A  No.

8  Q  From where you were sitting in the billing department, did

9  you have an opportunity to observe any of the patients coming

10 in and out of PPSA?

11 A  Yes.

12 Q  Where were you located compared to the waiting room?  How

13 were you able to see patients?

14 A  On occasions we would leave the door open because it would

15 get kind of stuffy in our office.  So we would be able to see

16 the patients walking by each time they were called back.

17 Q  Were you able to see patients particularly for Justin

18 Palmer, that were to be seen by Justin Palmer?

19 A  There were patients being seen of Justin's and then there

20 were patients of Bridgette's also.

21 Q  And --

22 A  So it's abundance of both, but --

23 Q  What do you mean by abundance of both?

24 A  I know Justin had a large schedule, he liked to keep it

25 heavy.

1  Q   Do you know what time -- what time did you get to work in
2  the morning?
3  A   8 o'clock.
4  Q   Do you know were patients being seen prior to 8 o'clock?
5  A   Where I was at, some of them were.  But mainly they
6  started, you know, about 7:30.
7  Q   And do you know or would you have known from where you were
8  located whether or not Dr. Couch was already in the office?
9  A   No.
10          MR. BODNAR:  One moment, Your Honor.
11          THE COURT:  All right.
12      (A discussion was held off the record between government
13  counsel.)
14          MR. BODNAR:  Pass the witness, Your Honor.
15          THE COURT:  All right.  Cross?
16          MR. ESSIG:  No questions by Dr. Couch, Your Honor.
17          MR. DARLEY:  None by Dr. Ruan, Your Honor.
18          THE COURT:  May this witness be excused?
19          MR. BODNAR:  Yes, Your Honor.
20          THE COURT:  Thank you, ma'am.  You may step down.
21          MS. GRIFFIN:  Your Honor, we call Ashley
22  Buckley Dominguez -- Ashley Dominguez Buckley.
23          THE COURT:  All right.
24                  ASHLEY DOMINGUEZ BUCKLEY
25              was sworn and testified as follows:

3759

```
 1              THE WITNESS:  I do.
 2              THE CLERK:  Thank you.  Please be seated.
 3                      DIRECT EXAMINATION
 4  BY MS. GRIFFIN:
 5  Q   Tell us your name, please, ma'am.
 6  A   Ashley Buckley.
 7  Q   Did you go by a different name when you were at PPSA?
 8  A   I did.  Ashley Dominguez.
 9  Q   Could you spell that last name for us?
10  A   D-O-M-I-N-G-U-E-Z.
11  Q   And you have since married, thus the last name Buckley; is
12  that right?
13  A   Yes, ma'am.
14  Q   Ms. Buckley, I want to direct your attention to sometime in
15  2014 when you became a PPSA patient.  But I want you to tell
16  us, if you will, how you were professionally trained.
17  A   I'm a licensed practical nurse in the states of Alabama and
18  California and I'm a nurse liaison in emergency room.
19  Q   What is a nurse liaison?
20  A   Go between the doctor and the RNs that are out and take
21  them any information they need from the doctors so they can go
22  ahead and start their plan of care.
23  Q   Now, did there come a time when you could no longer work as
24  an LPN?
25  A   Yes, ma'am.
```

ASHLEY DOMINGUEZ BUCKLEY - DIRECT BY MS. GRIFFIN

1  Q   Were you referred at some point to go to PPSA?

2  A   Yes, ma'am.  My primary care physician, Howard Rubenstein,

3  referred me.

4  Q   And specifically were you referred to Dr. Ruan?

5  A   Yes.

6  Q   Did you ever see Ruan for treatment at PPSA?

7  A   I did.  Maybe two or three times.

8  Q   How long were you a patient there?

9  A   Oh, I don't even know.  Maybe almost three years or almost

10  two years.

11  Q   Do you remember starting sometime in May of 2014?

12  A   That sounds about right, yes.

13  Q   And when did your visits stop?  When did you quit going

14  there?

15  A   I saw Dr. -- I saw Matt on Friday before the raid happened

16  on Wednesday.

17  Q   So you're talking about the FBI search warrant?

18  A   Yes, ma'am.

19  Q   That was May 20th of '15; does that refresh when you last

20  were going to PPSA?

21  A   Yes, ma'am.

22  Q   Now, you said you saw Dr. Ruan only two or three times

23  during that year; is that right?

24  A   Yes, ma'am.

25  Q   Were you going every month during that year or close to

3761

1    every month?

2    A   I was going every month.  And when they didn't feel like I

3    needed my medicines changed and I was in a stable place, they

4    would let me go every two months.

5    Q   I want to talk about when you first went there, could you

6    tell us what you observed when you went in the waiting room?

7    A   Well, it was way crowded, there was no place to sit,

8    especially if you're claustrophobic.  And I went outside and

9    hung outside until someone came and got me and told me it was

10   my time to see Dr. Ruan.

11   Q   When you went into the patient room what happened, on this

12   first visit?

13   A   I saw Matt.  He took a physical; just, you know, he asked

14   questions, I answered.  And he said:  I believe we can help

15   you.

16   Q   Did you know at that time who Matt was?

17   A   I thought Matt was Dr. Ruan.

18   Q   Did you learn that he was not?

19   A   Yes, ma'am.

20   Q   Do you know if Matt was a doctor?

21   A   I believe Matt Bean is a nurse practitioner.

22   Q   And Matt Bean is the one you were referring to?

23   A   Yes, ma'am.

24   Q   Why did you think Matt Bean was the doctor at first?

25   A   Well, because he always -- he did all of the stuff that a

3762

```
 1   doctor would do.  I mean, he would ask me questions and wanted
 2   to make sure that I felt like my medications were okay.  So I
 3   just assumed -- other than him going out of the room -- I
 4   thought he had a desk that he did prescriptions at.
 5   Q   How is it you learned that he was not Dr. Ruan?
 6   A   I was talking to him and I said:  Dr. Ruan.
 7           He said:  I'm not Dr. Ruan.  I'm Matt, Dr. Ruan's
 8   nurse practitioner.
 9   Q   Did there come a time when you did see Dr. Ruan or were
10   introduced to him rather?
11   A   Yes, ma'am.
12   Q   Could you tell us about that?
13   A   That was probably maybe the fourth or fifth visit.  And he
14   just stuck his head in the door and said:  I'm Dr. Ruan, nice
15   to meet you.  Is everything going okay?  That's basically what
16   he did.
17   Q   Did he ever do any exam of you, Dr. Ruan?
18   A   Not that I recall.  Everything was done by Matt.
19   Q   When you first met Dr. Ruan, did you see him thereafter on
20   any of your patient visits?
21   A   Maybe two or three (nodding head affirmatively).
22   Q   Would you be seeing him alone or would you see him while
23   Matt Bean was in with you?
24   A   Matt was always in there (nodding head affirmatively).
25   Q   How is it that you saw Dr. Ruan if Matt was in there those
```

3763

1  two or three times?

2  A   Well, Dr. Ruan just stuck his head in the door and said:

3  How are you doing?  Everything okay?  See you next time.

4  Q   Approximately how long did you see Dr. Ruan the three or

5  four times you saw him?

6  A   Maybe 30 seconds.

7  Q   Each time?

8  A   Yes, ma'am.

9  Q   In connection with your first visit, you said you did not

10  see Dr. Ruan; is that right?

11  A   Right.

12  Q   Did you receive any prescriptions that first visit?

13  A   I did.

14  Q   Do you recall how many?

15  A   Maybe eight to 12.

16  Q   Was that a large number for you?

17  A   It was kind of shocking, yes, ma'am.  But I was willing at

18  that point to do whatever anybody said who had a medical

19  license because I was in severe pain.

20  Q   So did you fill the majority of those prescriptions?

21  A   Yes, ma'am.

22  Q   Then when it came time for the second and third visits,

23  were any of those medications changed?

24  A   They would change doses, play around, higher a dose, lower

25  a dose, trying to get me, I guess, leveled out and not -- but

1   one time that I did see Dr. Ruan and Matt together, they told

2   me I needed to go to my primary care physician and have a liver

3   profile done at least every three months and bring them a copy.

4   Q   And when you said "they" would change your prescription,

5   who are you talking about?

6   A   Matt.

7   Q   Did you know whether or not Matt had a DEA license that he

8   could prescribe prescriptions?

9   A   No, ma'am, I did not know.

10  Q   You never had a DEA license, did you?

11  A   No, ma'am.  I don't think that's normal for nurses to have

12  a DEA license.  I don't know.  But --

13  Q   Ms. Buckley, were you also -- were some studies and

14  procedures ordered for you?

15  A   Yes, ma'am.

16  Q   Were some nerve studies ordered for you?

17  A   Yes, ma'am (nodding head affirmatively).

18  Q   Did you have a high copay for those nerve studies?

19  A   Yes, ma'am.

20  Q   Do you recall approximately what it was?

21  A   I believe it was $150 that was my copay.  And my MRI, I

22  believe, was maybe $200.

23  Q   Now, you indicated that sometimes you would come every

24  month and then on one or two occasions you were allowed to come

25  every 60 days; is that right?

 1   A   Yes, ma'am.

 2   Q   How would you get your prescriptions if you weren't coming

 3   back for 60 days?

 4   A   Well, they would give a whole new set of prescriptions and

 5   tell -- with a date 60 days prior to the day that I was there

 6   to have them filled.

 7   Q   So if you went January the 1st and got a prescription for

 8   January the 1st, what are you telling us the next prescription

 9   would be dated?

10   A   March the 1st.

11   Q   Okay.  Did you get a prescription for February when you

12   were there in January?

13   A   Yes, ma'am.

14   Q   Would it be dated January 1st or would it be dated February

15   the 1st?

16   A   It would be dated February the 1st.

17   Q   But you weren't actually there on February the 1st?

18   A   No, ma'am.

19   Q   Do you know whose signature would appear on those

20   prescriptions?

21   A   Yes, ma'am.  Dr. Ruan's.

22   Q   Signature?

23   A   Yes, ma'am.

24   Q   Did there come a time when that abruptly stopped when you

25   weren't getting predated prescriptions?

1    A    No, ma'am.  Not until the next to the last visit when I

2    asked him:  Is there anything else we can do for my legs?  They

3    just stay in pain.  I feel like I'm in a fire ant bed to a wasp

4    bed every day.

5              And he said:  Nothing else I can do for you.  I don't

6    make any money on you.  I can't do any procedures on you.  You

7    either take it or leave it.

8    Q    Who told you that?

9    A    Dr. Ruan.

10   Q    Were you on Medicare?

11   A    Yes, ma'am.

12   Q    Where would you get your prescriptions filled?

13   A    At Dr. Ruan and Dr. Couch's pharmacy.

14   Q    Where was that located?

15   A    Airport Boulevard.

16   Q    Next to the clinic?

17   A    In front of the clinic, yes, ma'am (nodding head

18   affirmatively).

19   Q    Did you know at the time you were filling those

20   prescriptions who owned C&R Pharmacy?

21   A    I did not.

22   Q    Ms. Buckley, did there come a time that you received

23   Abstral or Subsys?

24   A    Subsys -- yes, ma'am.

25   Q    Which of those?

3767

```
 1   A   I believe both of them.
 2   Q   Who actually gave you the Subsys or the Abstral
 3   prescription?
 4   A   The pharmacy in the front of Dr. Ruan's office.
 5   Q   Did you have any explanation from Dr. Ruan himself about
 6   the dangers of Abstral or Subsys?
 7   A   No, ma'am.
 8   Q   Now, you've not told us why you were there, but you have
 9   told us you had some leg pain.  Did you ever have cancer?
10   A   No, ma'am.
11   Q   Were you told that Subsys and Abstral were approved by the
12   FDA for breakthrough cancer pain?
13   A   No, ma'am.
14   Q   Did anyone give you an informed consent to be treated with
15   Abstral or Subsys that you recall?
16   A   I recall Matt giving me a form to fill out a couple of
17   times, and I know being a nurse I should have read it.  But I
18   already felt rushed.  So he said it's just part of the
19   procedure, so I just signed it.
20   Q   Was there a time when you had provided to us a description
21   of how you felt a visit at PPSA went?
22   A   I'm sorry.  I don't understand.
23   Q   About how long your visits took.  Did you have an opinion?
24   A   Oh, waiting in the waiting room, it could be up to two
25   hours.  Seeing the doctor is a matter of no more than 10 to 15
```

```
 1   minutes at the most.
 2   Q   Now, when you say seeing the doctor --
 3   A   Well, I always called Matt the doctor.  Seeing Matt.
 4   Q   Did you feel like he was your doctor?
 5   A   I did.
 6   Q   Did you have any feelings about your treatment at a
 7   specialist's office?
 8   A   Yes, ma'am.  I felt like, I don't know, rushed, maybe a
 9   little bit paranoid at all the people that were around,
10   especially in the parking lot at both Airport Boulevard and the
11   Springhill office.  More at Airport than Springhill.  I just
12   felt -- I don't know.  It was like -- I don't even know -- I
13   was kind of scared to go.  I got my mother to go with me a few
14   times.
15   Q   Why were you scared?
16   A   Well, I noticed that transactions for drug dealings were
17   going on.  I assume that's what they were.  People would walk
18   to the pharmacy, come out, and there would be people parked way
19   out in the back.  And I saw money being exchanged for a white
20   bag, so I just assumed that that was a drug deal.
21   Q   That made you feel uncomfortable?
22   A   Yes, ma'am.
23   Q   And so you began to get your mother to go with you?
24   A   Yes, ma'am.
25   Q   Did she do that toward the end of your --
```

1    A    Yes, ma'am.

2    Q    -- of PPSA being open?

3    A    (Nodding head affirmatively.)

4    Q    What else did you observe at PPSA?

5    A    In regards to --

6    Q    You said that you observed what you thought were drug deals

7    in the parking lot?

8    A    Yes, ma'am, I also noticed that sometimes Matt -- in the

9    beginning he told me he couldn't do this.  Towards the end he

10   would call and tell them she needs 90 Percocet, hold them, and

11   he would take the prescription to the pharmacy.  Even though he

12   said in the beginning he could never do that, he did start

13   doing that.

14   Q    What do you mean by take them to the pharmacy?

15   A    He would take a prescription to the pharmacy, and they

16   would have my medicines ready by the time I came to pick them

17   up.

18   Q    To which pharmacy?

19   A    To C&R Pharmacy.

20   Q    You were not a workers' comp patient, were you?

21   A    No, ma'am.

22   Q    Were you given a choice of pharmacies to use to fill your

23   prescriptions?

24   A    Well, they said I could fill them anywhere I wanted to, but

25   it was quicker just to fill them at C&R.  So that's what I did.

1  Q   Now, Ms. Buckley, you had a regular doctor before you came
2  to PPSA; is that right?
3  A   Yes, ma'am.
4  Q   Can you compare your experience at PPSA with Dr. Ruan and
5  your prior doctor?
6  A   Well, Dr. Rubenstein is my primary care physician.  And him
7  or his nurse practitioners come in.  But when they come in,
8  they introduce theirselves so I know whether I'm dealing with a
9  doctor or a nurse practitioner.  And usually either one, the
10 doctor or the nurse practitioner, usually spends at a minimum
11 15 to 20 minutes.
12 Q   Did you ever have more than the 30 seconds with Dr. Ruan
13 which you've described to us?
14 A   No, ma'am.
15 Q   Now, you also said you had been prescribed Subsys on some
16 occasions and Abstral on some occasions.  Could you tell us the
17 effect of taking the Subsys and the Abstral?
18 A   Yes, ma'am.  It was the greatest high.  I weighed 93 pounds
19 the week before the office got closed down, and I've gained to
20 230 pounds because I cannot do the things that I could do when
21 I was taking Subsys.
22 Q   What were you able to do when you were taking Subsys?
23 A   I could clean my house, wash my car.  Of course, Subsys was
24 only covering up the pain.  So when it wore off, the pain was
25 worse than ever.

3771

1  Q   Can you describe how you felt on Subsys and Abstral?

2  A   Ma'am?

3  Q   Can you describe how you felt on Subsys and Abstral?

4  A   I felt wonderful.  I didn't feel a pain in the world.  I

5  mean it was like a big high.  I guess I've never been high, but

6  I guess that -- I would compare it as just a wonderful high.

7  Q   Were you able to continue taking Subsys and Abstral?

8  A   No, ma'am.

9  Q   So why not?

10  A   Because my Medicare would not pay for it, and so that was

11  it.  He said:  When the samples are up, that's it.  And he did

12  write me a prescription, but I brought it back, which I watched

13  the girl in the front shred, because who knows what would have

14  happened to it.  But my insurance wouldn't pay for it.

15  Q   Your Medicare wouldn't pay for it?

16  A   No, ma'am.

17  Q   There were no more vouchers for you to be able to purchase

18  it?

19  A   No, ma'am.

20  Q   And when you say "he" gave you the prescription, who gave

21  you the Subsys and Abstral prescriptions?

22  A   Matt.

23  Q   Did you have any conversation with Dr. Ruan about Subsys or

24  Abstral?

25  A   Absolutely none.

3772

1  Q   Were you aware that there was a program that could have

2  been available if you could not afford your medications?

3  A   No, ma'am.

4  Q   That was not discussed with you?

5  A   No, ma'am.

6  Q   Now, Ms. Buckley, you said you felt like Matt Bean was your

7  doctor; is that right?

8  A   Yes, ma'am.

9  Q   The last visit you went to PPSA you said was the week

10 before the clinic was raided?

11 A   On Friday.  Before that next Wednesday.

12 Q   Who had you seen at that last visit?

13 A   Matt.

14 Q   Ms. Buckley, were you familiar with, being an LPN, urine

15 drug tests?

16 A   Yes, ma'am.

17 Q   How did you know that from being an LPN?

18 A   Well, I mean, you just learn it as textbook in school.  And

19 when you get out of school, if you work in a doctor's office or

20 somebody who does CLDs and stuff like that, you have to give

21 them a drug test.

22 Q   Could you describe the drug tests that you took at PPSA?

23 A   Yes, ma'am.  The girl handed me a cup, told me to write my

24 name on it; when I got through, stick it in a window.

25 Q   Did you do that?

1  A   I did.

2  Q   Was your urine sample monitored?

3  A   No, no.

4  Q   Do you know what monitored means?

5  A   Yes, ma'am.  No telling how long it sat in the window.  And

6  I had a problem with that because all the drug screens that

7  I've been a part of either getting hired or given to, you know,

8  it's like a chain of custody thing.  And there was no chain of

9  custody here.

10 Q   What do you mean by that?  Was your name not on the --

11 A   No, ma'am.  A chain of custody is you start -- when they

12 start filling out the form, you're there from the time they

13 fill out the form until you seal it.  I used to let my patients

14 seal their own urine, and then I would make sure that it was

15 labeled correctly and send it -- just put it in a bag, and that

16 way I know that no one has tampered with it.

17 Q   Now, Ms. Buckley, are you currently still under the care of

18 a doctor for your leg pain?

19 A   I am.

20 Q   Have you taken Subsys or Abstral -- excuse me.  Have you

21 been prescribed Subsys or Abstral since PPSA shut down?

22 A   No, ma'am.

23 Q   Have you taken Subsys or Abstral since they shut down?

24 A   No, ma'am.

25          MS. GRIFFIN:  One moment, Your Honor.

3774

```
 1           THE COURT:  All right.
 2  BY MS. GRIFFIN:
 3  Q   Could you describe your withdrawal from the Subsys and the
 4  Abstral?
 5  A   It was really horrible.  I had diarrhea.  I mean I just --
 6  I was in the bed for like almost three months without even
 7  getting out of the bed to shower or anything.  It was really,
 8  really bad.  The pain was severe.  It was worse than the pain I
 9  remembered before getting on all these medicines.
10  Q   Now are you able to get around and to do most of your daily
11  things with the medicines you're on?
12  A   I do the best that I can.  My neurologist is the one who is
13  prescribing my medications now, but I'm on a waiting list to
14  see a pain management doctor.
15  Q   But you don't receive the high narcotics you were receiving
16  at PPSA?
17  A   No, ma'am.
18           MS. GRIFFIN:  That's all I have of this witness, Your
19  Honor.
20           THE COURT:  All right.  Mr. Darley?
21                    CROSS EXAMINATION
22  BY MR. DARLEY:
23  Q   Ms. Buckley, my name is Jason Darley.  I represent
24  Dr. Ruan.
25           Starting from the beginning, when Dr. Reubenstein
```

1    referred you to Dr. Ruan in May -- or in 2014, you had severe

2    lower back pain; correct?

3    A    Correct.

4    Q    And you had been dealing with that for more than a decade,

5    had you not?

6    A    Correct.

7    Q    How many years specifically do you recall?

8    A    I hurt my back in 1998 and have had five surgeries since

9    then.

10   Q    Okay.  And was it your testimony -- I don't want to

11   misunderstand.  But was it your testimony that before Dr. Ruan

12   put you on Abstral or Subsys, you weighed 90 pounds?

13   A    That's correct.

14   Q    Okay.  And it was only after this point --

15   A    Oh, wait.  No, no, no, no, that is not correct.

16   Q    Clarify then, please.

17   A    After I was put on Subsys and Abstral, that's when I

18   started losing weight.

19   Q    Okay.

20   A    The 93 pounds was the last visit I saw him.  But they

21   weighed me on my request every time I went in.

22   Q    Okay.  And from your initial visit in May of 2014 until,

23   you say, the Friday before the raid, that was approximately --

24   it was almost a year to the day, was it not?

25   A    Pretty much, I think so.

ASHLEY DOMINGUEZ-BUCKLEY - CROSS BY MR. DARLEY

1  Q   All right.  And you had been dealing with this lower back

2  pain obviously for more than a decade.  You had had surgeries,

3  had you not?

4  A   Right.

5  Q   Lumbar surgeries.  How many of those had you had before

6  coming to see Dr. Ruan?

7  A   Four or five.

8  Q   And you reported this pain to Dr. Rubenstein?

9  A   I didn't understand what you said.

10 Q   You reported the pain that you were having from the lower

11 lumbar surgery?

12 A   I did.

13 Q   You reported that to Dr. Rubenstein.  That's how you ended

14 up with our doctor, Dr. Ruan?

15 A   Yes.

16 Q   And he and Matt tried a lot of different things to aid you,

17 did they not?

18 A   Correct.

19 Q   Before seeing Dr. Ruan, had you ever tried morphine?

20 A   Yes.

21 Q   Had you ever tried oxycodone?

22 A   Yes.

23 Q   Had you ever had the fentanyl patch?

24 A   Yes.

25 Q   You had had all that before you saw Dr. Ruan?

3777

1    A    Right.

2    Q    And you were also on Norco 10s, were you not?

3    A    That's been so long ago, I don't really know.  I was not on

4    Percocet and Norcos at the same time.

5    Q    But you at least tried them before seeing Dr. Ruan?

6    A    I'm -- probably.

7    Q    Okay.  And you had tried acupuncture, had you not?

8    A    No.

9    Q    You never tried acupuncture?

10   A    No.

11   Q    Did you ever report to Dr. Ruan or Mr. Bean, Matthew, that

12   you were afraid of needles?

13   A    No.

14   Q    You didn't report that to them?

15   A    No.

16   Q    They tried nerve conduction studies on you, didn't they?

17   A    Noninvasive, yes.

18   Q    But they did.  And did those nerve conduction studies

19   result in you finding out you had neuropathy?

20   A    Yes.

21   Q    Okay.  And you reported to them, did you not, that you had

22   severe pain?

23   A    Correct.

24   Q    Severe breakthrough pain?

25   A    Yes.

ASHLEY DOMINGUEZ-BUCKLEY - CROSS BY MR. DARLEY

1   Q   And I think you also testified on direct that you, when

2   given the Abstral or when given the Subsys, you were able to

3   accomplish tasks?  You were able to live your life?

4   A   Yes.

5   Q   At the end of your -- or at the end of your initial

6   evaluation and as you were seeing Mr. Bean and Dr. Ruan, were

7   they making recommendations as to different courses of

8   treatment; for instance, MRIs, physical therapy?

9   A   Yes.

10  Q   Other sorts of treatment?

11  A   (Nodding head affirmatively.)

12  Q   So they were attempting to help you, weren't they?

13  A   Uh-huh, yes.

14  Q   You were getting medicines prescribed, were you not?

15  A   Yes.

16  Q   And I think you testified that you got after this first

17  visit somewhere between eight and 12 medications?

18  A   Yes.

19  Q   Are you sure of that?

20  A   No.

21  Q   Okay.  Could it have been seven?

22  A   I don't know.  I have no idea.  I'd have to go look back on

23  my records at home.

24  Q   Okay.  You do have your records at home, you said?

25  A   Yes.

3779

1    Q   Let me ask you this:  Do you recall if you were given
2    Ambien?
3    A   Yes.
4    Q   Okay.  So you were.  And that's for sleep, is it not?
5    A   Correct.
6    Q   Were you given Klonopin?
7    A   Yes.
8    Q   That's for anxiety --
9    A   Correct.
10   Q   -- correct?  Okay.  So these aren't all just pain
11   medicines, are they?
12   A   That's correct.
13   Q   So six, seven, eight medications, not all of them were for
14   pain.  It's not eight or 12 necessarily for pain, is it?
15   A   Say that again.
16   Q   It's not necessarily eight or 12 medications specifically
17   for pain, is it?
18   A   It is not for pain, but it is -- it's always prescribed to
19   try to make me feel better.  Because one of the problems I had
20   is insomnia because of pain.  That's why I have the
21   Ambien.  Sometimes I have panic attacks.  That's why I was
22   given the BuSpar, the maximum dose, and Klonopin.
23        Which other medicine did you ask me about?
24   Q   I asked you about Klonopin and Ambien.
25   A   Okay.

ASHLEY DOMINGUEZ-BUCKLEY - CROSS BY MR. DARLEY

1    Q   So you're voicing these concerns and these issues with your

2    healthcare professional, Mr. Matthew Bean and Dr. Ruan, and

3    they're trying to solve those, are they not?

4    A   Yeah.  But when you say that, you're saying Dr. Ruan.  And

5    Dr. Ruan -- I never saw him.  Maybe 30 seconds four or five

6    times at the most.

7    Q   Yes, ma'am.  And I understand that.  And you're an LPN;

8    right?

9    A   Yes.

10   Q   You've worked in the medical field before?

11   A   Yes.

12   Q   And you're a -- what type of insurance or healthcare did

13   you have?

14   A   Medicare.

15   Q   Medicare.  And are you familiar with what "incident to" is

16   as it relates to billing or services that can be billed with a

17   nurse practitioner versus a doctor?

18   A   I have no idea.

19   Q   You don't know what "incident to" is?

20   A   Huh?

21   Q   You don't know what the term "incident to" is as it relates

22   to services provided by a doctor or nurse practitioner?

23   A   I can't understand that word you said.

24   Q   "Incident," I-N-C-I-D-E-N-T, second word "to," "incident

25   to."

1   A   I've never heard -- I don't know what that means.

2   Q   All right.  Yes, ma'am.  As a nurse are you familiar with

3   the term "off-label prescribing"?

4   A   Yeah.  But it's generic is what I always call it.

5   Q   Generic?  Okay.  Now, you raised -- let me ask you this,

6   Ms. Buckley:  What medications are you on right now?  What are

7   you prescribed right now?

8           MS. GRIFFIN:  Your Honor, objection as to relevance.

9           THE COURT:  Overruled.

10  BY MR. DARLEY:

11  Q   What medications are you prescribed by a doctor right now?

12          THE WITNESS:  Can I answer that, Judge?

13          THE COURT:  Yes.

14  A   Okay.  I'm taking -- do you want to know every medicine I

15  take?

16  BY MR. DARLEY:

17  Q   Yes, ma'am, please.

18  A   Okay.  I take HCTZ 50 milligrams once in the morning.  I

19  take Norvac five milligrams once in the morning.  I take Ambien

20  five milligrams once at night, may repeat one time if no

21  sleep.  I take -- I have a fentanyl patch on, 25 micrograms,

22  change every 72 hours.  I have Percocet one PO TID PRN.

23          Is it okay for me to say that?  Do you understand what

24  that means?

25  Q   I'm just trying to find out which ones you're on.  Yes,

ASHLEY DOMINGUEZ BUCKLEY - CROSS BY MR. DARLEY

```
 1   ma'am.  Go ahead.
 2   A    Okay.  I take Buspar twice a day, the maximum dose.  I take
 3   cholesterol medicine 20 milligrams at bedtime.  I take an
 4   aspirin a day in the morning.  I take B12 complex, one in the
 5   morning, one at night.  I take acyclovir, one in the morning,
 6   one at night.  And that's it.
 7   Q    And are all of these prescription drugs?
 8   A    They are -- no, no, no, no.  I'm sorry.  The B complex are
 9   vitamins.
10   Q    Okay.  So you're on nine right now, give or take a
11   prescription or two?
12   A    Yeah.
13   Q    Now, you raised some concerns about some nefarious dealings
14   that you may have seen in the parking lot, did you not?  Like
15   maybe a drug deal going on in the parking lot?
16   A    Several times.
17   Q    All right.  You were in PPSA.  Did they not employ a
18   security guard?
19   A    Sure, they did.
20   Q    Did you point this out to the security guard?
21   A    I couldn't find her.
22   Q    Okay.  Did you call the police?
23   A    That was not my duty.  I was in there to get what I needed
24   to get for my pain and get out without any problems from
25   anybody hanging around outside.
```

1   Q   Yes, ma'am.  Did you notify Mr. Bean, Dr. Ruan or any of

2   the nurses?

3   A   I told Matt several times that there were drug dealings

4   going on in the parking lot.

5   Q   Okay.  Ms. Buckley, the Subsys and Abstral, do you know

6   what dosages you were given when you were initially prescribed

7   those?

8   A   I do not.

9   Q   You don't?  Okay.  And you said that at some point Dr. Ruan

10  told you he couldn't do anything else for you?

11  A   Second to last visit, correct.

12  Q   Okay.  And you testified earlier all the different things

13  that they had tried, all the medications they had put you on,

14  the procedures; correct?  They had tried a lot of different

15  things for you, had they not?

16  A   The MRI and the nerve conduction studies were not for pain

17  management.  They were to see where my -- where my pain comes

18  from.

19  Q   So that it could then be treated; correct?

20  A   Yeah.

21  Q   If you found out you had a headache, they were going to try

22  to treat your headache, were they not?

23  A   I --

24  Q   They were trying to find the origin and the causes of the

25  pain, were they not?

1   A   Yes.

2   Q   So that it could be treated?

3   A   Yes.

4          MR. DARLEY:  One moment Your Honor.

5      (A discussion was held off the record between defense

6   counsel.)

7   BY MR. DARLEY:

8   Q   A couple more questions, Ms. Buckley.  When you were being

9   treated by PPSA, the Abstral and the Subsys, that relieved your

10  pain, did it not?

11  A   It did something to me because it would make me get up and

12  go and do.

13         MR. DARLEY:  That's all.

14         THE COURT:  Any redirect?

15         MS. GRIFFIN:  Briefly, Your Honor.

16                    REDIRECT EXAMINATION

17  BY MS. GRIFFIN:

18  Q   You were no longer taking oxycodone after PPSA closed, were

19  you?

20  A   No, ma'am.

21  Q   You were no longer taking Subsys or Abstral, were you?

22  A   No, ma'am.

23  Q   Now, Dr. Ruan's attorney asked you if Dr. Ruan said he

24  couldn't do any more for you.  That wasn't all he said to you,

25  was it?

1   A   No, ma'am.

2   Q   What did he say?

3   A   He told me he couldn't make any money doing procedures on

4   me and he was done with the medicine, I could take it or leave

5   it, and that was it.  He said:  You can find another doctor if

6   you want to.  That's why my mother went to the next visits with

7   me.

8   Q   Had you been complaining about the medication to Dr. Ruan?

9   A   No, ma'am.

10  Q   Had you caused him any reason to say that to you?

11  A   That's why I didn't say anything much about the people in

12  the parking lot and stuff.  I didn't want him to retaliate on

13  me.

14  Q   Now, Ms. Buckley, as you pointed out, Dr. Ruan's attorney

15  kept asking you if Dr. Ruan and Matt were prescribing for

16  you.  Who did you think was prescribing for you?

17  A   I thought Matt was.

18          MS. GRIFFIN:  That's all I have of this witness, Your

19  Honor.

20          THE COURT:  May this witness be excused?

21          MS. GRIFFIN:  She can be excused.

22          All right.  Thank you, ma'am.  You may be excused.

23          THE WITNESS:  Thank you.

24          MR. BODNAR:  Your Honor, may we approach the side bar

25  before the next witness?

3786

1          THE COURT:  Yes.

2       (At the side bar, jury not present.)

3          MR. BODNAR:  Your Honor, this next witness is Amanda

4   Chausse.  She is the -- this next witness is Amanda Chausse.

5   She is the widow of Patrick Chausse.  She has been -- she was

6   one of the ones that was originally in the death count

7   enhancement which has been dropped.  The reason the enhancement

8   was dropped was because on further notice the medical examiner

9   said he couldn't rule out aspirational pneumonia as a

10   complication of the death.  She is a relevant witness and she

11   was in --

12          THE COURT:  Wait, wait.  Who's the witness?  Who is

13   the dead person?

14          MR. BODNAR:  Patrick Chausse.

15          THE COURT:  That's her husband?

16          MR. BODNAR:  Her husband, named in a count.  The

17   reason we didn't go forward on that was because of aspirational

18   pneumonia.  She's aware of that.  She is a relevant witness and

19   she was in virtually all of the office visits with her husband

20   and has first-hand knowledge of what occurred and what was said

21   to Stacy Madison and the lack of Dr. Couch being there.  She

22   has been instructed repeatedly -- and I talked to her just two

23   minutes ago.  She understands that she is under no circumstance

24   to mention overdose at all and that we were going to say he

25   died of complications of aspiration of pneumonia.  And she's

1   okay with that.  She'll answer yes to that.

2          MR. POWELL:  Judge, the problem with that is, one,

3   this gentleman had a history of aspirational pneumonia that

4   predated --

5          THE COURT:  You can go into that.

6          MR. BODNAR:  We are going to go into that.

7          MR. POWELL:  The problem with that is it is going to

8   potentially cause this jury to infer that the care and

9   treatment that he received from PPSA was the contributing cause

10  of his death.  There are other patients that would fit a

11  similar categorical pattern and we have a real problem with it.

12         THE COURT:  Help me understand.  Since there are no

13  death enhancements involved, are you saying that it's simply

14  too prejudicial to say that one of the patients died?

15         MR. POWELL:  It is if one of the reasonable inferences

16  that can be drawn from that by this jury is that this person

17  died while under our care and that we're somehow responsible

18  for that death.  You know, if they want to put this patient's

19  wife on to talk about the care and treatment he received at

20  PPSA and make no mention of the fact that this particular

21  patient is dead, then that's one accommodation.  Because this

22  man died literally days after he was last seen at PPSA for

23  routine pain management.

24         MR. BODNAR:  And none of the mention of his timing of

25  death is going to be brought up.  The problem is she is not --

3788

1   she's 29 years old.  There is no way she is going to be able to

2   make it through this testimony without crying.  And it's -- if

3   we don't mention the fact that he died of aspirational

4   pneumonia, I think it's going to be more prejudicial left out

5   there.  What caused his death?  Why isn't Patrick Chausse

6   himself here?  Why is his wife here and why is she crying?

7           MR. POWELL:  Go ahead.  Jump in.  Go ahead.

8           MR. SHARMAN:  Your Honor, there is no way a reasonable

9   juror is going to be able to not conclude that Mr. Chausse is

10  not here for any reason other than he is dead or incapacitated

11  and it's because of Dr. Couch, unlike, for example, other

12  patients who have died where we've had another family member.

13  We're not going to -- we're not going to -- I'm sorry -- where

14  we've had a live patient that had a family member, that's not

15  going to work here.  I mean, Ms. Chausse is not going to be

16  able to testify at all if they get -- I mean, I know we're not

17  saying it, but if death gets in front of that jury, it's going

18  to be a mistrial.  We're filing either in court or online,

19  whichever the Court would prefer, a motion to exclude the

20  testimony.  Because if it gets in front of that jury, it will

21  be grounds for a mistrial.  And we've all been doing this for

22  too long to risk that.  Also Dr. Greenberg testified at length

23  about Mr. Chausse on direct and then on cross.  There is ample

24  evidence about Mr. Chausse in the record.

25          MR. POWELL:  And, Judge, absent literally a disclaimer

 1    that the government has by stipulation presented to this jury

 2    each time they've called the relative of a dead patient that

 3    this patient is dead and it had nothing to do with -- it's

 4    something totally unrelated, whatever the words were -- it was

 5    a complete disclaimer that the death had anything to do with

 6    the care rendered at PPSA -- not only are they not going to do

 7    that, they want this jury to know, A, he's dead and, B, what

 8    the cause of death is and there is going to be prior history of

 9    this same ailment existed during the course of his treatment

10    both with PPSA and even back when he was in the military.

11              MR. BODNAR:  It's --

12              MR. POWELL:  The inference is that that somehow caused

13    or contributed to this man's death.  That's 180 degrees from

14    where we were with these other similarly situated witnesses.

15    And we think, as Mr. Sharman raised, it's very prejudicial and

16    there's no way to cure it and we object to it.  Well, I take

17    that last part back.

18              MR. BODNAR:  Your Honor, the aspirational pneumonia,

19    the previous time he had it before his death, about six months

20    before his death it's specifically noted in the patient file

21    and Amanda was there with her husband on that occasion and told

22    Stacy Madison.  She's going to testify that she told Stacy

23    Madison, as Dr. Couch was not there, that he had been in the

24    hospital, he did not need to be on any more pain medicine, and

25    this is something she's going to testify that she routinely

1    pled with Stacy, not to continue him on this medication.

2            The United States has no problem -- actually, if we

3    want to do it before she gets in here, to announce to the jury

4    that she is here because Mr. Chausse is dead and there are no

5    allegations that PPSA's care contributed to his death because

6    that's not part of this trial -- but if we're going to do that,

7    I need a few minutes on a break to talk with Ms. Chausse about

8    that and just tell her we're not going to mention with her at

9    all that he died, but that will be before she came in.  In

10   fact, I think she would prefer that so she doesn't have to talk

11   about that.

12           THE COURT:  Okay.  That's fine.

13           MS. GRIFFIN:  Go tell her?

14           THE COURT:  You go tell her, you go tell her.

15           MR. POWELL:  I'm not clear.

16           THE COURT:  We'll take a five-minute stretch break.

17           MR. POWELL:  Thank you.

18      (In open court, defendants and jury present.)

19           THE COURT:  It's not quite time for our afternoon

20   break.  But we're going to take a five-minute stretch break

21   while they tend to some matters.  So feel free to stand up and

22   move around for a bit.

23      (A recess was taken at approximately 2:31 p.m.)

24      (In open court, 2:36 p.m., defendants and jury present.)

25           THE COURT:  Okay.  Let's come back to order.

1      Mr. Bodnar?

2          MR. BODNAR:  Ladies and gentlemen of the jury, before

3    we bring in the next witness, this will be Amanda Chausse.

4    Amanda Chausse is the wife of Patrick Chausse, who was a

5    patient.  Patrick Chausse has passed away.  There are no

6    allegations whatsoever that his death resulted in any way from

7    the treatment of Dr. Ruan, Dr. Couch, or anyone at PPSA.

8          The United States calls Amanda Chausse.

9          THE CLERK:  Ms. Chausse, if you'll step forward toward

10   the witness stand, I'll swear you in.  Let me get you to raise

11   your right hand.

12                        AMANDA CHAUSSE

13              was sworn and testified as follows:

14         THE WITNESS:  Yes, I do.

15         THE CLERK:  Thank you, ma'am.  Please be seated.

16                      DIRECT EXAMINATION

17   BY MR. BODNAR:

18   Q   Good afternoon, Ms. Chausse.

19   A   Hello.

20   Q   Would you please introduce yourself to the jury?

21   A   Amanda Chausse.

22   Q   And, Ms. Chausse, you have a little bit unusual last name.

23   Could you please spell it slowly for the Court?

24   A   C-H-A-U-S-S-E.

25   Q   And, Ms. Chausse, how do you know Patrick Chausse?

3792

AMANDA CHAUSSE - DIRECT BY MR. BODNAR

1   A   We -- he's my husband.

2   Q   And, Ms. Chausse, at some point was Patrick Chausse a

3   patient at PPSA?

4   A   Yes.

5   Q   Prior to his time at PPSA, was your husband in the

6   military?

7   A   Yes.

8   Q   Can you please explain what he did in the military to the

9   jury?

10  A   He was in the infantry.

11  Q   For the Army?

12  A   Yes, United States Army.

13  Q   And how old -- when was Mr. Chausse's birthday?

14  A   June 20th, 1986.

15  Q   Did he serve in combat overseas?

16  A   Yes, he did, twice.

17  Q   Where did Mr. Chausse serve in combat?

18  A   Iraq twice.

19  Q   At any point during his time in Iraq did he become injured?

20  A   Yes, he did.

21  Q   Would you explain to the jury what happened to Patrick?

22  A   He got blown up by an IED.

23  Q   And what if any injuries did he sustain from the IED blast?

24  A   A knee injury, a back injury, and head injury.

25  Q   How did he get out of the military?

3793

1  A   He was honorably discharged.

2  Q   And was he discharged in part due to medical reasons?

3  A   Yes, medical.

4  Q   When was he discharged from the military?

5  A   I believe it was 2012.

6  Q   And, Ms. Chausse, were you married to Patrick at that time?

7  A   Yes, I was.

8  Q   At the time that you were married, did he have the injuries

9  that he received in Iraq?

10 A   Yes, he did.

11 Q   I'm going to show you now what has been marked as

12 Government's Exhibit 6-4 and ask if this was the photograph

13 that you provided to the United States.

14 A   (Nodding head affirmatively.)  Yes, it was.  (Crying.)

15         MR. BODNAR:  United States moves to admit Government's

16 Exhibit 6-4.

17         MR. POWELL:  No objection.

18         THE COURT:  All right.  Mark it in.

19     (Government's Exhibit 6-4 was entered into evidence.)

20 BY MR. BODNAR:

21 Q   Ms. Chausse, at the time of your wedding, did you say --

22 did he have the injuries still he sustained in Iraq?

23 A   He did.

24 Q   And I'm showing you now what's been admitted as

25 Government's Exhibit 6-4.  Is this a picture of you and

AMANDA CHAUSSE - DIRECT BY MR. BODNAR

1    Patrick?

2    A    Yes, it is.

3    Q    At this time in his life was he able to have functional

4    ability with those injuries?

5    A    Yes, he was.

6    Q    Can you explain to the jury what it is you were able to do

7    with your husband at this time?

8    A    Excuse me?

9    Q    What it was that you were able to do -- what kind of

10   activities could you participate with with your husband at that

11   time?

12   A    We were able to go hiking, grocery shopping, out on dates,

13   movies, everything.

14   Q    And this is all despite the fact that he does have injuries

15   from Iraq at that point?

16   A    Yes.

17   Q    Did he seek help for his knee and back injuries?

18   A    Yes.

19   Q    Can you explain to the jury prior to going to PPSA?

20   A    We went to an orthopedist to see what else we could do for

21   these injuries.  It was -- that was it.  Therapy was provided

22   as well.

23   Q    How debilitating was his pain at this point in his life?

24   A    It was, but he was able to normally function.

25   Q    Was he able to attend classes?

AMANDA CHAUSSE - DIRECT BY MR. BODNAR

3795

1    A    Yes.

2    Q    Where was he attending classes?

3    A    University of South Alabama.

4    Q    At what point did you -- did Patrick start going to PPSA?

5    A    In 2013, I believe.

6    Q    Why did he start going to PPSA?

7    A    To basically get a hold of a little bit more of his pain.

8    Q    Prior to this had he had issues with pain medicine while he

9    was in the military?

10   A    No, he did not.

11   Q    Had he ever been hospitalized in the military for pain

12   medicine?

13   A    No.

14   Q    Do you know if he had been on pain medicine before?

15   A    He did, he was.

16   Q    Do you know if he was concerned about being addicted?

17   A    No.

18   Q    No, or you don't know?

19   A    No, he was not concerned about --

20   Q    Can you tell the jury did you attend the patient visits

21   with your husband?

22   A    I did.

23   Q    Why was that?

24   A    Just to make sure that they understood what he was talking

25   about, how I felt as well, basically to make sure everything

AMANDA CHAUSSE - DIRECT BY MR. BODNAR

1   was going okay.

2   Q   And which doctor was Patrick assigned to see, if you

3   could --

4   A   Ms. Stacy, the PA.

5   Q   Which doctor?

6   A   Dr. Couch, Dr. Couch.

7   Q   Approximately how many visits did you have with your

8   husband?

9   A   About eight or nine.

10  Q   Over the course of about how many months?

11  A   I believe it was about two years.

12  Q   So is that roughly a little less than half of the visits

13  you were there?

14  A   Yes.

15  Q   And in any of the visits that you were there -- well, were

16  you there for the first visit?

17  A   Yes, I was.

18  Q   In that first visit did you see Dr. Couch at all?

19  A   No, I did not.

20  Q   In any subsequent visit that you were there did you see

21  Dr. Couch?

22  A   No, I did not.

23  Q   Are you able to identify if he's even in the courtroom here

24  today?

25  A   No.

3797

1  Q   Ms. Chausse, I'm going to show you what is being taken out

2  of Exhibit 13-1, which has already been admitted as the patient

3  file for Patrick Chausse, and pull up a page that reads:

4  History and physical.  And do you see the date of January 26,

5  2013?

6  A   Yes.

7  Q   And is this your husband, Patrick Chausse, and his date of

8  birth?  (Indicating.)

9  A   It is.

10 Q   Ms. Chausse, could you please read what his history of

11 illness was, as written down in this medical file?

12 A   Patrick Chausse is a 26-year-old white male referred by

13 Hazel Dickinson, MD, for evaluation and treatment of lower back

14 pain, right shoulder pain, left knee pain, and lower back pain.

15 Q   And is that true, are those the pains that your husband did

16 in fact have?

17 A   Yes.

18 Q   Would you please continue on?

19 A   He reports that the worst pain is in his left knee and that

20 his migraines are -- deplete --

21 Q   Debilitating?

22 A   -- debilitating.  He had a traumatic brain injury in Iraq

23 and he has had several severe migraines since and ringing in

24 the ears.  He twisted his knee when he stepped out of a hole in

25 Iraq and he states that his left knee is not right since.  He

1    reports the pain has been throbbing.  He states that his right

2    shoulder is from lifting heavy backpack in Iraq.  He states

3    that his back pain is localized to his lower back.  Mr. Chausse

4    states that he is unable to work due to these problems and has

5    been on disability for six months.

6    Q    And is all that to this point true?

7    A    Yes.

8    Q    He was in fact on disability?

9    A    He was.

10   Q    And then was he medically retired from the military?

11   A    He was medically retired from the military.

12   Q    And skipping down here to his wife was with him and states

13   that he has an anger problem, do you recall ever telling Stacy

14   Madison or Dr. Couch if your husband had an anger problem?

15   A    No.

16   Q    No, you don't remember, or no, you didn't?

17   A    No, he did not have an anger problem.

18   Q    And do you recall ever saying that?

19   A    No, I did not.

20   Q    What does the next part say?  He is --

21   A    He is very concerned about becoming addicted to pain

22   medicine because he became addicted to pain medicine while in

23   the military -- in the military hospital.

24   Q    To the best of your knowledge, is that true?

25   A    No.

3799

1    Q   It is not true?

2    A   It is not true.

3    Q   Could you continue on, please?

4    A   He states he took too much pain medication and ended up on

5    a ventilator in ICU while in the military.  He has been

6    injected in his left knee and shoulder in the past and it was

7    unsuccessful.

8    Q   And do you know if any of that is actually true?

9    A   The ICU part, I don't ever really recall that situation in

10   the military.  The injections in his knee, yes, because that

11   was something that the orthopedist had done when we saw him

12   when he got out of the military.

13   Q   And was that Dr. Hazel Dickinson, was that who had seen

14   him?

15   A   No, that was not the doctor.

16   Q   Who was handling that for him?

17   A   Dempsey, Dr. Dempsey.

18   Q   You said -- it shows that you were in this first visit.

19   And do you recall being in that first visit?

20   A   Yes, I do.

21   Q   I want to ask you, looking now at the second page of that

22   visit, this section marked physical examination, do you see

23   that up at the top here?

24   A   Yes.

25   Q   And ask you, do you see where it says:  Pupils equal round

3800

1   and pupils reactive bilaterally to light?  Do you see that?

2   A   Yes.

3   Q   Do you recall at any time during this visit of anyone

4   shining a light into Patrick's eyes?

5   A   No, sir.

6   Q   You don't remember it or it didn't happen?

7   A   It did not happen.

8   Q   How about down here on thyroid:  Gland size normal,

9   nontender, no nodules or masses present on palpation.  Did

10  anyone press on Patrick's throat?

11  A   No, sir.

12  Q   Similarly, with the abdomen nontender to palpation, did

13  anyone press down on Patrick's stomach on that visit?

14  A   No, sir.

15  Q   Can you please explain to the jury what did happen during

16  that first visit?

17  A   They just basically touched his knee and that was it.

18  Q   And who is they?

19  A   Stacy.

20  Q   Was Dr. Couch present at any point during this?

21  A   No, sir.

22  Q   Was he prescribed -- to your knowledge, was he prescribed

23  medicine, drugs, that day?

24  A   At that visit, yes, sir.

25  Q   I'm going to ask you to look now at the third page of his

3801

1  first visit.  Ms. Chausse, do you see who it says

2  electronically signed this at the bottom?

3  A  Yes, sir.

4  Q  Whose name is that?

5  A  Stacy Madison.

6  Q  Do you see any signature for Dr. Couch?

7  A  No, sir.

8  Q  And is that how you remember that it was Stacy Madison?

9  A  It was.

10  Q  Can you tell the jury what were the drugs that began to be

11  prescribed to Mr. Chausse?

12  A  Lortabs, oxymorphone, morphine.  There were quite a few.  I

13  can't --

14  Q  And the oxymorphone, was that the brand Opana?

15  A  Yes.

16  Q  And which office did you and Patrick go into when you

17  visited PPSA?

18  A  The one on Springhill.

19  Q  Where did he fill his medicine that was prescribed to him?

20  A  The C&R Pharmacy on Airport and --

21  Q  How did you know to go to C&R Pharmacy to get those

22  prescriptions filled?

23  A  They told us it would cost a little bit cheaper and may be

24  better on our insurance.

25  Q  They?  Who is they that said that?

1   A   Stacy did.

2   Q   At the time when you were going to PPSA, did you have any

3   idea who owned C&R Pharmacy?

4   A   No, I did not.

5   Q   Did you even know that PPSA had a second location out there

6   on Airport Boulevard?

7   A   No, I did not.

8   Q   I'm going to show you now out of 13-1 a patient visit sheet

9   from April 4th, 2013.  Do you see that, Ms. Chausse?

10  A   I do.

11  Q   And I'm going to direct your attention to a couple of

12  different spots on here.  Do you see where it says here:

13  Patient states has been two weeks since his right shoulder

14  surgery.  Did he have right shoulder surgery?

15  A   No.

16  Q   Did he have any shoulder surgery?

17  A   No, sir.

18  Q   Is that true or is that a lie?

19  A   That's a lie.

20  Q   Do you see where it says here:  He would like to come off

21  pain meds, would like to try -- maybe Suboxone?  Do you see

22  where it says that?

23  A   Yes.

24  Q   In any visits that you were in did either you or your

25  husband tell Stacy that he wanted to come off the pain

1   medicine?

2   A   Yes.

3   Q   Who would tell Stacy Madison that?

4   A   I would, both of us would.

5   Q   Did you ever tell Dr. Couch that?

6   A   No, sir.

7   Q   And why is that?

8   A   Because he wasn't there.

9   Q   Does it say right here also:  Patient states he wants to

10  have sex but can't?

11  A   Yes.

12  Q   And was that true?

13  A   Yes.

14  Q   Was that one of the reasons -- is that something that was

15  discussed with Stacy Madison?

16  A   Yes.

17  Q   Ms. Chausse, prior to him going on pain medicine, was he

18  able to -- did he have erectile dysfunction beforehand?

19  A   No, he did not.

20  Q   Was that one of the reasons that you also wanted to come to

21  the visits?

22  A   Yes.

23  Q   Once he began on the medication at PPSA, can you explain to

24  the jury how, if at all, his mood changed or his ability to

25  function changed?

3804

1  A   He became very, very lethargic, didn't want to do anything.

2  Every time that we did try to go out it was extremely

3  embarrassing because he would stumble a little bit.  We

4  couldn't really go to the movies or anything because he would

5  fall -- fall asleep in the movies.  He wouldn't -- he wouldn't

6  really eat if we went out to eat anywhere.  It was -- it was

7  very, very upsetting, because he could not function really at

8  all.  (Crying.)  He couldn't function like he did before.  At

9  all.  He would constantly stumble; sleep.  You couldn't really

10  talk to him because he would be incoherent sometimes.

11  Q   Ms. Chausse, because of that behavior, did you take on the

12  role of caregiver in terms of making sure he took his medicine

13  at the right times?

14  A   I did.

15  Q   Will you please explain to the jury what you did to be your

16  husband's caregiver?

17  A   As far as medication?

18  Q   Yes.

19  A   I got one of the pill dividers that you get in the regular

20  pharmacies and I would divvy out his medication morning,

21  afternoon, and evening.  But I would only give him the morning

22  dose, make sure he took it, and then whenever he was at school

23  he would take the afternoon dose, and then whenever he came

24  home I would give him the evening dose.  Or if it was a little

25  bit -- that he had to take it maybe every four hours or

1  something like that, we would figure it out, but it was

2  always -- I would only give him one case of those dividers, the

3  one little pocket of that little divider, to make sure he took

4  the adequate amount of medication.

5  Q   Is there anything else you had to do to be his caretaker

6  once he started on pain medicine?

7  A   I would have to make sure he ate, and cook his meals.  Made

8  sure he took his medication.  Made sure he showered.  (Crying.)

9  Made sure his clothes were clean.  Would have to clean where we

10  lived.  I would have to start driving him places.

11  Q   Ms. Chausse, prior to beginning at PPSA, were these tasks

12  he was able to do on his own?

13  A   Yes.

14  Q   I'm going to now show you from the file 13-1 a date of -- a

15  progress note from August of 2013.  Do you see that?

16  A   Yes.

17  Q   I draw your attention to this first part:  Patient's wife

18  states he is out of it on his meds.  Was that true?

19  A   Yes.

20  Q   And did you tell Stacy Madison that?

21  A   I did.

22  Q   Did you tell her that every time you had an appointment?

23  A   Yes.

24  Q   How about to Dr. Couch?

25  A   I never saw Dr. Couch.

1   Q   Did you also say that:  After increase of meds, he is
2   lethargic and he feels he is on too much meds?
3   A   Yes.
4   Q   Is that something you recall saying?
5   A   Yes.
6   Q   How about this next part:  Patient and his wife came in the
7   other day to increase meds because he was still in pain.  At
8   any point did you go in and ask that Patrick's medicines be
9   increased?
10  A   No, sir.
11  Q   Is that true or is that a lie?
12  A   It's a lie.
13  Q   At the bottom do you see where it says:  Stacy Madison?
14  A   Yes.
15  Q   Do you know whose signature that is above that?
16  A   No, I do not.
17  Q   I'm going to now show you from 13-1 the progress note from
18  September 20, 2013, the next visit, and direct your attention
19  up here.  It says:  Patient was in MVA, motor vehicle accident,
20  this morning.  Do you remember when Patrick had that motor
21  vehicle accident?
22  A   No, I do not.
23  Q   Patrick, was he ever in a motor vehicle accident at this
24  time?
25  A   No, sir.

1    Q    Is that true or is that a lie?

2    A    That's a lie.

3    Q    States he was shaken up but not hurt.  Just has

4    migraines.  Do you see this part here:  Requests an occipital

5    nerve block, states meds are working well but wants to switch

6    them up so he doesn't get used to them.  Do you recall that

7    being said to Stacy Madison?

8    A    No, I do not.

9    Q    Could it have been a time that you were not there?

10   A    Yes.

11   Q    Do you know if this was true that he did want to switch it

12   up?

13   A    No.  He never asked for it to be switched up.

14   Q    I'm going to now show you what has been admitted -- or from

15   13-1, the progress note for the following month, October 3rd,

16   2013.  Do you see this progress note for your husband?

17   A    I do.

18   Q    I draw your attention down to the bottom, under current

19   treatment.  Do you see where it says:  The patient is pleased

20   with current PPSA medications, there are no new side-effects or

21   excessive drowsiness from medications?  Do you see that?

22   A    I do.

23   Q    Is that true?

24   A    No.

25   Q    What part of that is not true?

```
 1  A   He was drowsy from the medication and there were side-
 2  effects.
 3  Q   And had this been something that you had been repeatedly
 4  telling Stacy Madison?
 5  A   It was.
 6  Q   From this same office visit of October 3rd, 2013, I'm going
 7  to show you the final page in there.  Do you see an electronic
 8  signature by Stacy Madison?
 9  A   Yes.
10  Q   What was the date that she signed it?
11  A   October 5th, 2013.
12  Q   And what was the date that Dr. Couch signed this?
13  A   October 10th, 2013.
14  Q   Do you recall if you attended this visit on October 3rd of
15  2013?
16  A   I do not.
17  Q   If you had been there, would Dr. Couch have been there?
18  A   No, no, he wouldn't have.
19  Q   Ms. Chausse, in October of 2013 did there come a time where
20  your husband had to be taken to the hospital?
21  A   Yes, sir.
22  Q   Could you explain to the jury what happened?
23  A   It was a Saturday.  It was his mother's birthday.  We had
24  tried to wake him up a little bit later than usual so we could
25  probably sleep in.  I tried to go in there to wake him up to
```

AMANDA CHAUSSE - DIRECT BY MR. BODNAR

1   tell him to call his mother to wish her a happy birthday, and
2   whenever I went to wake him up he would not wake up.  (Crying.)
3   Q   And was he taken by ambulance to the hospital?
4   A   He was.
5   Q   Was he diagnosed with pneumonia?
6   A   Aspiration pneumonia.
7   Q   Following his diagnosis -- how long was he in the hospital
8   for aspirational pneumonia?
9   A   He was in there, I believe, a total of 10 or 11 days.
10  Q   During that time period did he have any issues with
11  withdrawls from the pain medicine he had been on?
12  A   No, because he was on a ventilator for eight of them.
13  Q   Did he go back to PPSA after that hospitalization?
14  A   He did.
15  Q   And did you attend that meeting as well in November?
16  A   I did.
17  Q   I'm going to show you the progress note from November 26th,
18  2013.  And under objectives do you see it says -- looks like:
19  Patient states medications are working, but not long enough.
20  Would like to increase Opana ER to 15 milligrams.
21          Do you ever recall that being said by you or him
22  during that visit?
23  A   No.
24  Q   How about the next part:  Patient was admitted to Thomas
25  Hospital in Fairhope for pneumonia, patient stated he has to

1  take more meds on some days?

2  A   No.

3  Q   Is the pneumonia part correct, though?

4  A   Yes.

5  Q   After he -- during -- after this visit was he still given

6  pain medicine?

7  A   He was.

8  Q   Had you said anything to Stacy Madison about your concern

9  about him being on pain medicine after this point?

10 A   I was.

11 Q   What did you tell Stacy?

12 A   I asked her not to increase the medication because he had

13 already withdrew from everything and maybe the very limited

14 dose, the smallest dose that she could possibly give him,

15 because he didn't need it any more.

16 Q   Why did you think he didn't need it any more?

17 A   Because he wasn't -- he was back to his normal self.

18 Q   What do you mean by back to his normal self?

19 A   We could actually go do things again and go out and he

20 could actually do laundry, cook, things of that nature.

21 Q   Ms. Chausse, I'm going to show you, then, the progress note

22 from March 18th, 2014, and again direct your attention down to

23 the current treatment.  Do you see where it says:  The patient

24 is pleased with his current PPSA medications, there are no new

25 side-effects or excessive drowsiness from medications?  In

1  March of 2014, was that a true statement?

2  A   That is not a true statement.

3  Q   Is that something that had been repeatedly told to Stacy

4  Madison?

5  A   Yes.

6  Q   Do you recall if you attended this March 2014 appointment?

7  A   I don't remember.

8  Q   Ms. Chausse, did the pain medicine that was given to your

9  husband take away his pain?

10 A   (Pause.)  I don't think it -- I think it did, but it was

11 more of a hassle, I think, because he knew, once he took it, he

12 couldn't really function any more.

13 Q   And did it take away his functionality on the pain

14 medicine?

15 A   It did.

16          MR. BODNAR:  Pass the witness, Your Honor.

17          THE COURT:  All right.  We're going to have our

18 afternoon break now.  Leave your pads on your chairs.  Take

19 your break downstairs in the jury assembly room.  We will call

20 you back up in about 15 minutes.  No discussion about the

21 case.  We are in recess.

22     (A recess was taken at 3:04 p.m.)

23     (In chambers, 3:21 p.m., jury not present.)

24          MR. BODNAR:  Good afternoon, Your Honor.

25          THE COURT:  Good afternoon.

```
 1              Y'all have a seat, if you can find one.  I understand
 2   you're having scheduling problems?
 3              MS. GRIFFIN:  We are, Your Honor.  Mr. Gist came
 4   today.  He did not show up yesterday because he had the flu.
 5   He's running a fever today.
 6              THE COURT:  I don't want him in the courtroom.
 7              MS. GRIFFIN:  We don't either.  So we're going to ask
 8   -- try to get him back another day.  But --
 9              THE COURT:  Just tell him, I mean, there's too big a
10   risk to have any of the participants in this trial exposed to
11   the flu at this point.
12              MS. GRIFFIN:  I agree.
13              THE COURT:  So, I mean, I would really -- if you could
14   bring him back in a few days when maybe he's not contagious?
15              MS. GRIFFIN:  We are more than willing to do that.
16              THE COURT:  Maybe we could find a doctor to examine
17   him.
18         (Laughter.)
19              MR. BODNAR:  And but for him being a named witness, we
20   would probably just cut him loose at this point.  His testimony
21   largely would be very short; that he was on Subsys, Abstral,
22   Fentora, Lazanda.  He says that he was not given warning that
23   it was a cancer drug and that, if he had known, he would have
24   made the decision not to take it.  And it's that last part --
25   we have spoken with defense counsel already.  The record speaks
```

3813

1   itself that he did not have cancer and he was on those drugs.

2   It's only his choice --

3           THE COURT:  You know, it's up to you as to whether you

4   want to put him on or they want to stipulate to anything.  All

5   I'm saying is I don't want to expose the jurors or anybody in

6   this case with the flu.

7           MS. GRIFFIN:  And we agree, Your Honor.

8           THE COURT:  Yeah.

9           MS. GRIFFIN:  Also we had two other witnesses who did

10  not show up today that we are attempting and have been

11  attempting to contact.  We don't want to have to send somebody

12  to go bring them in.  But we've transferred Bridgette Parker --

13  one of the ones they've heard a lot about -- she's first thing

14  tomorrow.  We think she will take the majority of the day.  We

15  have four witnesses behind her and then we have the case agent,

16  the closing witness for Thursday.  We have a potential for two

17  witnesses Friday.  They would be very short, and we may not

18  call them at all.  Dr. Aultman cannot come -- she's our last

19  expert, last witness -- until Monday, the 6th.  She examined

20  only five patient files as compared to the large number of

21  patient files the two experts examined.  We believe we can

22  finish with her before lunch and we hope that the defense can

23  finish with her by the end of the day.  So we would rest

24  Monday, the 6th.

25          And I don't know that we will have but two very short

1  witnesses for Friday.  And we all collectively would like to

2  see if we could finish as many as we can Wednesday and Thursday

3  and possibly not have court on Friday.

4          THE COURT:  What do you think to -- I mean, you know

5  what Dr. Aultman's at least going to say from her report, I

6  would assume.  Could you file any motions that need to be filed

7  by Friday, assuming they're going to rest after?

8          MR. SHARMAN:  Your Honor, you mean, for example, rule

9  29 motion and that sort of thing?

10         THE COURT:  Right, right.

11         MR. SHARMAN:  I would probably be advised to speak

12  with the people who would actually be doing that before I make

13  a recommendation.

14         THE COURT:  You need to talk to your lawyers; right?

15          MR. SHARMAN:  But we could certainly consider that.

16  I've never done that, but we could certainly consider it.  I

17  just haven't thought about it.  It's certainly possible.

18         THE COURT:  Well, I was just thinking if there's any

19  way we can truncate the process and, you know, if I told the

20  jury that I had some legal matters I had to take up on the case

21  on Friday, I wouldn't be telling any kind of a fib.

22         MS. GRIFFIN:  Could we possibly argue it on Friday,

23  whether the motion is ready or not, and then ask the Court to

24  withhold ruling until we rest?

25         THE COURT:  Yeah.

1          MS. GRIFFIN:  Could you do that?

2          MR. SHARMAN:  I think it would be more beneficial to

3    the Court and the parties, because presumably you would want to

4    respond to a written submission, and so I think the argument

5    would be a little more productive for the Court if the Court

6    actually had the material before it.  But again, I mean, we'll

7    follow the Court's wishes.

8          THE COURT:  Well, I mean, you'll know generally the

9    outline of what your lawyers want to say --

10         MR. SHARMAN:  Yes, ma'am.

11         THE COURT:  -- by Friday.  So let's -- you know, if we

12   do as the government suggests -- and, you know, I don't want to

13   put any pressure on anybody other than what the case is, so, I

14   mean --

15         MS. GRIFFIN:  I guess there's a remote possibility

16   Agent White could go into Friday.  But --

17         THE COURT:  You just have to wait and see?

18         MS. GRIFFIN:  -- I doubt it.

19         THE COURT:  All right.  Well, let's plan to, if you

20   can file the rule 29 motion Friday, as soon as she finishes

21   with her witnesses, then plan on doing that.  Maybe meet Friday

22   after lunch or something to argue the case, argue the motion.

23   That would --

24         MR. SHARMAN:  Yes, ma'am.

25         THE COURT:  -- that would suit me better, so I have a

1    reason for letting the jury not come in.

2            MR. ARMSTRONG:  That's assuming that after we file the

3    rule 29 they can't then bring in more witnesses?

4            THE COURT:  I'm assuming that.

5            MR. ARMSTRONG:  Shorten it up.

6            THE COURT:  If they find some, they might.  Some of

7    these missing witnesses --

8            MS. GRIFFIN:  If these two show up, if these two show

9    up without the flu --

10           MR. ARMSTRONG:  Right.

11           MS. GRIFFIN:  Well, you know Dr. Aultman's coming

12   Monday, of course, and you have --

13           THE COURT:  But you don't have any after that?

14           MS. GRIFFIN:  Do not.

15           MR. BODNAR:  The only possibility, Your Honor, is two

16   individuals that were getting -- for the Medicare rebate

17   agreement, the Galena contract, the aspect of the rebate

18   agreement that takes it outside of the safe harbor is whether

19   the rebate is passed on to Medicare or Tricare or any other

20   federal healthcare.  The witness for Medicare that was on

21   last -- the end of last week had previously told us:  Yes, we

22   have checked the Medicare documents and, of course, there are

23   no rebates passed along.

24           We also know that through speaking with individuals in

25   the pharmacy who cannot be called to testify because they've

3817

```
1    got Fifth Amendment issues.  When the lady from Medicaid came
2    at the end of last week, she said:  I learned from my boss the
3    reason we don't have any records of rebates showing in Medicare
4    is because that information is actually kept by the plan
5    itself.
6          So Humana, HealthSprings, United Healthcare.  I've
7    been on the phone with all three of those last night and the
8    night before, and they are doing their records search as we
9    speak, which we believe will come up negative.  And they plan
10   to send a certification -- assuming it is negative -- saying
11   there are no rebates which would have been for the Medicare
12   patients that we manage as part of Cigna.  Should there not be
13   a stipulation to that records certification of no records, then
14   we will fly one down just to testify that they did the records
15   search for rebates for C&R Pharmacy for Abstral after October
16   1st, 2014, and found none.
17         So there is a possibility that we would have to have
18   one or two records custodians on Monday after Dr. Aultman.
19   That's all they would say.
20         THE COURT:  They would know what the proposed
21   testimony is?
22         MR. BODNAR:  They would already know because they will
23   send a certification and we may be able to stipulate to lack of
24   records.
25         MS. GRIFFIN:  And further, Your Honor, we have all
```

AMANDA CHAUSSE - CROSS BY MR. POWELL

1    talked and stipulated on a number of things that are coming in

2    through Agent White without the calling of witnesses that we

3    had anticipated calling.  So to the extent that everybody

4    could, we've also offered -- entered into discussions with

5    Mr. Knizley about a potential stipulation on one of his defense

6    witnesses.

7              THE COURT:  Okay.

8              MS. GRIFFIN:  So we continue to try for all, for

9    everyone, to condense it to the extent we can.

10             THE COURT:  Okay.  Anybody else?

11             MR. BODNAR:  So we will be done today.  Then we'll

12   have no other witnesses after Mrs. Chausse.

13             THE COURT:  Okay.  And I guess y'all cross-examine her

14   at your peril, is all I can say.

15             MR. KNIZLEY:  (Laughing.)  Good luck, Art.

16        (A recess was taken at approximately 3:29 p.m.)

17        (In open court, 3:36 p.m., defendants and jury present.)

18             THE COURT:  All right, Mr. Powell.

19             MR. POWELL:  Thank you, Your Honor.

20                         CROSS EXAMINATION

21   BY MR. POWELL:

22   Q    Good afternoon, Ms. Chausse.

23   A    Hello.

24   Q    My name's Art Powell, and I'm one of the lawyers that

25   represent Dr. Couch.

AMANDA CHAUSSE - CROSS BY MR. POWELL

```
 1              THE COURT:  Could you turn your microphone on?

 2              MR. POWELL:  I'm sorry.

 3              THE COURT:  Be sure and speak into it.  Speak into it,

 4     if you will.

 5              MR. POWELL:  Okay.

 6     Q    Now, Ms. Chausse, when was it that your husband served in

 7     Iraq in his second tour of duty?

 8     A    On his second tour of duty was 2009 to 2010.

 9     Q    And is it during that tour that he was injured?

10     A    No.  It was his first tour.

11     Q    It was his first tour?

12     A    Yes, sir.

13     Q    When was that?

14     A    2000 -- I think 2006 to 2007.

15     Q    And it was in that deployment that he suffered the wound

16     from the IED?

17     A    Yes.

18     Q    Is that correct?

19     A    Yes, sir.

20     Q    That's an explosive device; correct?

21     A    Yes, sir.

22     Q    And in that, a bomb exploded basically; right?  And it is

23     in that scenario that he had his traumatic brain injury; is

24     that correct?

25     A    Yes, sir.
```

1    Q    And he also injured his back and his knee as well?

2    A    Yes, sir.

3    Q    And he was hospitalized as a result of those injuries?

4    A    I'm assuming, yes.  I didn't know him before that, but yes.

5    Q    Okay.  This was a few years before you met?

6    A    Yes.

7    Q    The two of you met?

8    A    It was.

9    Q    And so he had had a medical history of treatment that dated

10   back to 2007, when he was wounded in Iraq?

11   A    Yes, sir.

12   Q    Okay.  And he was treated for those injuries while in the

13   military; correct?

14   A    Yes, sir.

15   Q    And even when he got out of the military, he was then

16   treated by the VA medical facilities in various places;

17   correct?

18   A    Yes, sir.

19   Q    Okay.  Including here in this area?

20   A    Yes, sir.

21   Q    How long, if you remember, was he a patient with the VA

22   prior to seeking private healthcare here in the Mobile area?

23   A    Let's see.

24   Q    If you remember.

25   A    It was probably a year or two years.

AMANDA CHAISSE - CROSS BY MR. POWELL

1    Q    Okay.

2    A    Yeah.

3    Q    And when he was treated at the -- was he treated at the VA

4    medical center?

5    A    Well, half of it was whenever he was getting discharged,

6    his medical discharge, he spent time over in Georgia.  And then

7    whenever he was discharged, it was about a year that we had

8    seeked with the VA.

9    Q    So he was getting outpatient medical care for his injuries

10   and his wounds through the VA?

11   A    Yes, sir.

12   Q    And that would have been in 2011 -- 2010, 2011, 2012?

13   A    2013, 2014.

14   Q    Okay.  In fact his medical care with the VA continued,

15   including the time when he was being treated for his pain

16   management at PPSA; is that accurate?

17   A    With Stacy?

18   Q    Yes, ma'am.

19   A    Yes.

20   Q    Okay.  And he was seeing -- how many different physicians,

21   if you recall, was he seeing at the VA at the same time?

22   A    One.

23   Q    One?  And was that his primary care physician?

24   A    No.

25   Q    Who was his physician at the VA?

1    A    I cannot recall.

2    Q    Was it that physician that referred him to PPSA here in

3    Mobile?

4    A    I believe so.

5    Q    And that would have been in January of 2013; right?

6    A    Yes.

7    Q    In addition to the VA medical care that he was receiving,

8    he was also being treated for his injuries by a Dr. Thomas

9    Dempsey; is that right?

10   A    Only his knee.

11   Q    Only his knee?

12   A    Yes, sir.

13   Q    And he was treated by Dr. Dempsey for some period of months

14   prior to being referred to PPSA for pain management; is that

15   right?

16   A    He was not referred -- yeah, well, yes.  Yes.

17   Q    I don't mean by Dr. Dempsey.  I mean --

18   A    Yes.

19   Q    -- he was also seeing him.  Now, he was also on various,

20   assorted medications for his traumatic head injury and his knee

21   and his back injury from the VA, wasn't he?

22   A    Yes, he was.

23   Q    He also had excruciating migraine headache episodes, didn't

24   he, during this time?

25   A    It wasn't excruciating.  It was manageable.

AMANDA CHAUSSE - CROSS BY MR. POWELL

1   Q   I -- I recall on your direct you used the word in reciting

2   one of the medical record as "debilitating" headaches?

3   A   Yes.

4   Q   And those are migraine headaches?

5   A   Yes.

6   Q   And in fact there were occasions where he was so sensitive

7   to light and that sort of thing that he actually had to wear

8   glasses, sunglasses, to avoid those headaches or to try to

9   avoid the onset of those migraines?

10  A   No.

11  Q   So if the medical record says that, that's inaccurate?

12  A   Yeah.  I mean, he didn't wear sunglasses or anything like

13  that.

14  Q   All right.  Now, when he got to pain management at PPSA in

15  January of 2013, he was on medication prescribed by

16  Dr. Dempsey?  Duexis, does that sound right?

17  A   Yes, sir.

18  Q   And that was an anti-inflammatory medication?

19  A   Yes, sir.

20  Q   He was also on tramadol from the VA?

21  A   Yes.

22  Q   Sulindac by the VA, Wellbutrin by the VA?

23  A   Yes.

24  Q   Now, Wellbutrin is a medication that's used for treatment

25  of depression and that sort of thing.  Are you familiar with

1    that?

2    A    No, I didn't know.

3    Q    Your husband also was diagnosed -- when he returned from

4    his military duties -- also diagnosed as having post-traumatic

5    stress disorder; isn't that right?

6    A    Yes, that is.

7    Q    Now, he was also prescribed Imitrex.  Do you know what

8    Imitrex is for?

9    A    For migraines.

10   Q    In fact he stayed on Imitrex for years, didn't he, or

11   always had Imitrex available to him?

12   A    With the VA?

13   Q    No, just period.

14   A    No.

15   Q    He didn't have Imitrex continuously through his care at

16   PPSA?

17   A    I believe through PPSA -- yes, through Stacy.

18   Q    Okay.  And that's what I'm getting at.

19   A    Yeah.

20   Q    That was my -- okay.  He had been on Imitrex for a long

21   time, since he got home, at least from the time he got home

22   from Iraq?

23   A    Not from Iraq, no.

24   Q    But he was on it when he came to PPSA?

25   A    Yes, whenever he saw Stacy.

AMANDA CHAUSSE - CROSS BY MR. POWELL

1  Q   From the VA?

2  A   Yes.

3  Q   He was also prescribed Valium at the VA; correct?

4  A   Yes.

5  Q   And that medication was to treat his post-traumatic stress

6  disorder and his anxiety?

7  A   Yes, for PTSD.  Not anxiety.

8  Q   Now, when he got to PPSA in January of 2013, he was asked

9  to fill out some forms and the medical record -- in fact, his

10  medical record has already been admitted into evidence and so

11  I'm just going to reference some specific pages of that

12  record.  Okay?  And ask you a few questions.

13  A   Okay.

14       MR. POWELL:  Sam, if you would go to page 16?

15  Q   Ms. Chausse, I want to show you what is a portion of the

16  intake forms that appear to have been completed by your husband

17  at his initial office visit at PPSA.  Do you see that document?

18  A   Yes, sir.

19  Q   Okay.  At the top it asks to identify essentially the

20  locations of the pain that the patient is experiencing and it

21  indicates left knee, right shoulder, lumbar, and head, and that

22  the pain is described as aching and throbbing.  And this would

23  have been January of 2013.  And this does appear to have been

24  completed by your husband, doesn't it?

25  A   It does.

1   Q  And do you see the question that says:  Circle the number

2   that best describes your pain at its worst --

3   A  Yes, sir.

4   Q  -- last month?  And I realize this is darkened.  But if I

5   represent to you that this is a scale of from one to 10, that

6   appears to be in the vicinity of an eight, doesn't it?

7   A  Yes, sir.

8   Q  So if he's describing his pain at that time as being --

9   thank you -- as being eight out of 10, does that make it a

10   little clearer to see?

11   A  Yes, sir.

12   Q  And then it says:  Circle the number that best describes

13   your pain at its least, and that appears to be a four out of

14   10; correct?

15   A  Yes, sir.

16   Q  You would agree with me, wouldn't you, that if Mr. Chausse

17   is being honest in his completion of this pain assessment, that

18   he is in -- at least at that time was in a significant amount

19   of pain all the time and at his worst it's an eight out of 10;

20   is that right?

21   A  Yes, sir.

22   Q  And then it's asked:  Your average pain?  And that appears

23   to be a six.  Do you see that?

24   A  Yes, sir

25   Q  And at the time that he presented that day, right now, it

1    was a six?

2    A   Yes, sir.

3    Q   Were you with him on this first visit -- I believe you told

4    us you were?

5    A   I was, yes, sir.

6    Q   Were you with him when he completed this form?

7    A   I -- he filled out a lot of forms that day.

8    Q   Were you sitting with him when he was filling out these

9    forms?  Do you remember?

10   A   Well, I recall a lot of forms.  I just don't recall this.

11   Q   Okay.  Now, at his initial office visit at PPSA, he

12   reported -- and this is the question that I believe Mr. Bodnar

13   asked you earlier -- that he described that the worst pain was

14   in his left knee and that his migraines are debilitating, do

15   you remember that?

16   A   Yes, sir.

17   Q   You have had an opportunity to observe your husband when he

18   was experiencing these debilitating migraine headaches, had you

19   not?  Were you?

20   A   Yes, sir.

21   Q   And these headaches were caused by the traumatic brain

22   injury that he sustained in Iraq?

23   A   Yes, sir.

24   Q   And there were times when these headaches were extremely

25   severe with ringing, constant ringing, in his ears?  Do you

AMANDA CHAUSSE - CROSS BY MR. POWELL

1  recall that?

2  A   Yes, sir.

3  Q   I know it's difficult for you.  And that's the situation

4  that he presented himself in, at least according to this, when

5  he first got to the pain clinic; is that right?

6  A   Yes, sir.

7  Q   Now, he also indicates that he had been unable to work

8  because of his pain and then he had been on disability for six

9  months.  Was he working up until that six-month period before?

10  A   No, sir.

11  Q   Was he in the military, active military, up till six months

12  before?

13  A   I believe so, yes.  Because he was getting ready to get

14  discharged.

15  Q   All right.  And that helps me clear this up.  So he went

16  straight from active military to medical retirement?

17  A   Medical boarding.

18  Q   I'm sorry?

19  A   Medical boarding.  He was -- it was technically active

20  duty, but it was a medical board, a process of which they

21  decide.  You know, they go through the motions and see all his

22  injuries and things like that.

23  Q   So essentially he was declared by the military to be

24  medically disabled and discharged?

25  A   Yes.

3829

1    Q    Honorably and accordingly; correct?

2    A    Yes, sir.

3    Q    And so six months later is when he -- he goes to the VA on

4    an outpatient basis and then he ends up at PPSA?

5    A    Yes, sir.

6    Q    Okay.  Now, this is what I was mentioning earlier.  He said

7    that he reported that he has to wear dark glasses continuously.

8    And you don't recall that?

9    A    No, sir.  He did not wear dark glasses.

10   Q    Now, at that point in time, based on these symptoms and his

11   description of his migraine headaches and that sort of thing,

12   the decision was made to put him on Percocet, do you remember

13   that?

14   A    I believe I do.

15   Q    He was also continued on some of the medications that he'd

16   already been on, wasn't he?

17   A    Yes, sir.

18   Q    From his -- from his primary care physician?

19   A    From the VA, yes, sir.

20   Q    Now, and that was the only pain medication, if you

21   remember, that he was prescribed on that first visit; is that

22   right?

23   A    I believe there was Lortabs in there as well.

24        MR. POWELL:  Sam, if you could pull up January the

25   26th, page 25, at the bottom?  Go to the next page.  Next page.

1   Q   Now, I'm going to show you, Ms. Chausse, what is in the

2   medical record and appears to be an opioid agreement for pain

3   management.  This is a note form that your husband was asked to

4   review and, if he agreed with it, to sign this agreement.  Do

5   you recall him signing this agreement?

6   A   I don't.

7   Q   Now, arrangements apparently were made in his initial

8   office visit, we didn't really talk much about this earlier,

9   for -- do you know what interventional pain procedures are?

10  A   No, sir.

11  Q   Are you aware that PPSA, and Dr. Couch particularly,

12  routinely perform interventional pain procedures to relieve the

13  effects of acute chronic pain?

14  A   No, sir, not at the time.

15  Q   You found that out, though, when you got there, didn't you?

16  A   After -- several months afterwards.

17  Q   You started there, and you started there in mid to late

18  January; right?

19  A   Yeah, yes, sir.

20         MR. POWELL:  And, Sam, if you could go to 68, please?

21  Q   I show you what we're going to call a procedure note.  It's

22  dated April 30th, 2013, and the patient is Patrick

23  Chausse.  And it indicates that Dr. Couch performed a medical

24  procedure on that date consisting of a cervical Myobloc

25  injection.  Do you recall that?

```
 1   A   Yes.
 2   Q   Were you with Patrick when Dr. Couch treated him on that
 3   date?
 4   A   No, sir.  I never went into the room.
 5   Q   You only went to the office visit?
 6   A   Yes, sir, because he needed somebody to drive afterwards.
 7   Q   Right.  And you understood that he would have to have
 8   somebody drive --
 9   A   Yeah.
10   Q   -- after these medical procedures performed by Dr. Couch?
11   A   Yes.  Well, I didn't know that Dr. Couch was doing it.  I
12   had always understood Stacy had done the procedure.
13   Q   Okay.  You will see at the bottom where it says care
14   provider, procedure, and procedure is explained in medical
15   terms?  Do you see that?
16   A   Yes.
17   Q   It indicates Dr. Couch performed this interventional pain
18   procedure?
19   A   Yes.
20   Q   Now, about two weeks later, on May the 14th --
21           MR. POWELL:  If you will go to 78, Sam?
22   Q   -- you had to take Patrick back to Dr. Couch for an
23   appointment to have another procedure done about two weeks
24   later, do you remember that?
25   A   Can you explain what this is?
```

AMANDA CHAUSSE - CROSS BY MR. POWELL

1    Q    This is a greater occipital nerve block done under --

2    basically under X-ray, do you remember that?

3    A    I don't recall.  No, sir.

4    Q    If you don't, you don't recall taking him for another

5    medical procedure?

6    A    No, sir, not two weeks after the first one.

7    Q    You don't dispute this record is accurate, do you?

8    A    I don't dispute it.  But it wasn't two weeks after.

9    Q    The first one was May -- I mean April the 30th?

10   A    Uh-huh (positive response).

11   Q    And this one shows being May 14th; right?

12   A    Yes, but --

13   Q    Is that the same year?

14   A    I don't recall that close of a --

15   Q    You're not saying it didn't happen, you just don't remember

16   it being that close?

17   A    Yeah, it wasn't, it wasn't that close, no, sir.

18   Q    Okay, okay.  Now, backing up just a little bit,

19   Ms. Chausse, when your husband was seen in the office visit on

20   April the 30th, he was also prescribed medication as well,

21   wasn't he?

22   A    I do not recall that.

23         MR. POWELL:  Sam, if you could go to 72?

24   Q    If you will look, this is a handwritten note of an office

25   visit dated May the 2nd, 2013.  This would have been about

AMANDA CHAUSSE - CROSS BY MR. POWELL

1  three days after the first medical procedure done by

2  Dr. Couch.  Okay?

3  A   Correct.

4  Q   And it indicates here that the medication was changed from

5  Percocet to methadone.  Do you see that?

6  A   Yes.

7  Q   Do you remember that?

8  A   I don't remember the methadone, but they had changed so

9  many times.

10  Q   Well, I'm sorry.  The regimen had changed to include

11  methadone to go with the Percocet; is that right?

12  A   Yes.

13  Q   Mr. Chausse was in a lot of pain during this time, wasn't

14  he?

15  A   It was manageable.

16  Q   It was manageable if he was medicated and if he had

17  procedures that he chose to go through in order to relieve his

18  pain; is that a fair statement?

19  A   Can you repeat that?

20  Q   He was -- he was managing his pain based upon the

21  medication regimen he was on and the procedures that he was

22  undergoing with Dr. Couch; is that a fair statement?

23  A   It's a fair statement.

24  Q   And those procedures and that medication, including some

25  variation of the medication, continued over the course of

3834

1    several months after May of '13; is that right?

2    A    It did continue.

3    Q    In fact, about a little over a month and a half later -- if

4    you will go to 89 -- he had another procedure, didn't he?

5    A    I do not recall this.

6    Q    June 18th of 2013, it appears -- well, I believe you said

7    earlier -- and I don't doubt that you don't recall it.  But you

8    knew when these procedures were being performed that you would

9    have to drive him or someone would have to drive him?

10   A    Yes, sir, and I was always the one to drive him.

11   Q    All right.  For all of these procedures?

12   A    Yes.

13   Q    And this one was to treat the pain in his lower back, a

14   lumbar epidural steroid injection with fluoroscopy?  Do you see

15   that?

16   A    Yes.

17   Q    Do you recall that?

18   A    I do not recall.

19   Q    And who does it indicate that the surgeon was performing

20   this procedure?

21   A    Dr. Couch.

22   Q    So this would have been the third interventional pain

23   procedure performed by Dr. Couch between April the 30th and

24   June the 18th, so we're talking a period of less than two

25   months; is that right?

1    A    My understanding it was Stacy, but yes.

2    Q    Because you didn't go back there; right?

3    A    No, they wouldn't allow me to go back.

4    Q    Right.  Now, then again, about two months later, on August

5    the 8th -- you know what the cervical area of the body is,

6    don't you?

7    A    Yes.

8    Q    This appears to be another interventional pain procedure

9    performed by Dr. Couch consisting of a cervical myobloc

10   injection, do you see that?

11   A    Uh-huh (positive response).

12   Q    Do you remember taking your husband to PPSA for Dr. Couch

13   to perform this procedure?

14   A    Yes.

15   Q    Now, there was a time when you said that Patrick went in

16   and complained to Stacy -- or told Stacy, rather -- that he

17   would like to decrease the dosage that he was taking because it

18   was making him drowsy, do you remember that?

19   A    Yes, sir.

20   Q    And that would have been on June 28th, 2013.  So about 10

21   days after Dr. Couch performed his third procedure, he came in

22   for his office visit?

23   A    Uh-huh (positive response).

24   Q    And he made the statement that Percocet makes him drowsy?

25   A    It was making him drowsy before this.

3836

```
 1   Q   But you would agree that's the first time this appears in
 2   the medical record?
 3   A   In the medical records, yes.  But not in the office visit
 4   with Ms. Stacy.
 5   Q   Okay.  And at that time the medication was changed,
 6   presumably because he was saying that the Percocet was making
 7   him too drowsy?
 8   A   Yes.
 9   Q   The medication was then changed from it to a different pain
10   medication, do you remember that?
11   A   Yes.
12   Q   He was changed to a low dose, five milligrams, of
13   oxycodone, do you remember that?
14   A   I do.
15   Q   And you will agree with me, you know something about these
16   medications obviously?
17   A   Yes.
18   Q   Five milligrams is a low dose, isn't it?
19   A   It is.
20   Q   And he was also kept on low dose methadone, five milligrams
21   as well?
22   A   Yes.
23   Q   He also indicated in that office visit, did he not, that
24   the occipital nerve block had worked to help him?
25   A   It did not work, I do remember this.
```

 1   Q   So this medical record is inaccurate?

 2   A   It is inaccurate.

 3   Q   It's not inaccurate in terms of reducing and changing the

 4   medications that your husband was on, is it?

 5   A   Can you repeat?

 6   Q   The medications were in fact changed and reduced based on

 7   his statements --

 8   A   Yes.

 9   Q   -- that the Percocet was making him too drowsy?

10   A   Yes.  But those in turn also made him extremely lethargic

11   and drowsy as well.

12   Q   Yes, ma'am.  Now, in between the third procedure that was

13   performed and the fourth procedure, which we've already talked

14   about, August the 8th, he was seen in an office visit -- and

15   you've already testified about this -- on June -- I'm sorry --

16   July the 29th of 2013?

17   A   Uh-huh (positive response).

18   Q   And then again three days later, August the 1st, 2013.  Do

19   you remember going within a matter of three days twice?

20   A   I believe, yes.  I believe, yes.

21   Q   All right.  Now I'm going to ask you some questions about

22   that.  I just want to make sure you remember.

23   A   Okay.

24   Q   Okay.  And the record, if you go to 103, this is the July

25   the 29th office visit.  And I know it's difficult to read down

1    here under objective, but it says:  Increased pain in thoracic

2    spine.  That's what this indication is.  Do you see that?

3    A    Uh-huh (positive response).

4    Q    And then it says:  States he can't feel his lumbar

5    spine.  Do you see that?

6    A    I see it.

7    Q    He also says that he has increased pain but he is not

8    taking much pain medication; right?

9    A    It says that, yes, sir.

10   Q    So at least in this office visit in between these

11   procedures he's apparently, if this record is accurate, he has

12   reduced the amount of pain medication that he has been

13   prescribed -- I'm sorry -- he's reduced the amount of pain

14   medication that he is taking; is that right?

15   A    He wasn't.  So --

16   Q    Okay.  So this is not accurate, that he did not -- you're

17   telling us that he didn't, he didn't say that he had increased

18   pain but he's not taking much pain medication?

19   A    He was taking the same amount that was prescribed to

20   him.  Where the less medication came in, I have no idea.

21   Q    All right.  And at least in response to what he purportedly

22   was telling whoever's taking down this history of this visit,

23   in response to that in an examination, his medication is

24   changed to MS Contin 15 milligrams; right?

25   A    Yes.

1  Q   And his oxycodone is increased to 15 milligrams from five;

2  correct?

3  A   Yes.

4  Q   And then, of course, we already know he comes back in three

5  days later, on August the 1st, 2013.

6        MR. POWELL:  If you will go to 110, Sam?

7  Q   This is the office visit where you testified earlier,

8  Ms. Chausse, that you told Stacy that he was out of it on his

9  meds.  Do you remember talking about that?

10 A   Uh-huh (nodding head affirmatively).

11 Q   That he's too lethargic.  But also it's stated in here that

12 you and your husband had been in a few days before to increase

13 the meds because he was still in pain?

14 A   Yes.

15 Q   Do you remember that?

16 A   No, I don't remember telling her that.

17 Q   But --

18 A   I recall telling her to decrease the medication because he

19 was lethargic and all that kind of stuff.  I never said that

20 he -- he needed to go increase and neither did he.

21 Q   Well, okay.  But you would agree with me, wouldn't you,

22 that at least the medical record indicates that three days

23 before this that -- I'm not trying to argue with you -- but

24 that he can't feel his lumbar spine, but he hadn't been taking

25 his pain medication and he had increased pain?

AMANDA CHAUSSE - CROSS BY MR. POWELL

```
 1   A    That statement that you just said --
 2   Q    Yes, ma'am?
 3   A     -- is a lie.
 4   Q    So when you go back three days later, in response to the
 5   statements that the medications were sedating you too much, or
 6   sedating him too much -- the oxycodone and MS Contin were
 7   discontinued; is that right?
 8   A    For a period of time, yes.
 9   Q    And they were replaced with a lower dose of medication;
10   correct?
11   A    I believe so.
12   Q    And in fact it was changed downward to oxymorphone 10
13   milligrams and oxymorphone extended release 15 milligrams, do
14   you remember that?
15   A    I do.
16   Q    And then it was a week later, as we've already established,
17   that he underwent his fourth medical procedure by Dr. Couch, do
18   you remember that?
19   A    Which fourth procedure?
20        MR. POWELL:  13.
21   Q    This would be the cervical myobloc injection.
22   A    Yes.
23   Q    Do you see that?  So in the span of about 10 days,
24   Mr. Chausse had an office visit at PPSA, had his medication
25   increased, at least according to the medical record, based on
```

3841

1   his complaints of increased pain, three days later you go back,

2   he goes back, and the medication is too much, he's too drowsy?

3   A   Yes.

4   Q   So it is reduced in response to that complaint; correct?

5   A   Yes.

6   Q   And then seven days later he undergoes this medical

7   procedure by Dr. Couch; correct?

8   A   As far as I know, Stacy.  But --

9   Q   It says on the bottom here who the care provider is and it

10  says Dr. Couch, doesn't it?

11  A   It does.  But I didn't see him.  So --

12  Q   Because you didn't go in the back?

13  A   No, I didn't, because I wasn't allowed.  But whenever

14  Patrick got finished, I asked him if Dr. Couch had done it and

15  he said:  No, Stacy.

16         Every time it was the same reply.  Did Dr. Couch do

17  your procedure?

18         No, Stacy did.

19  Q   Now, and over the course of the next few months, the

20  medication regimen or rotation, if you will, changed according

21  to whatever Mr. Chausse's condition was at the time, whether he

22  was better, whether he was worse, each time some variation was

23  made in his medication based on what he was reporting worked

24  and didn't work to PPSA; is that a fair statement?

25  A   To Stacy, yes.

1  Q   And then in October -- in fact, October the 29th, on page

2  135, he has his fifth medical procedure done on that date.  Did

3  you take him to that procedure?

4  A   No, because he had just gotten out of the hospital, I

5  believe.  We went in to talk to Stacy about leaving the

6  medication, because he had already went through his withdrawals

7  and everything like that.

8  Q   Yes, ma'am.  I understand.  My question is -- I'm not

9  meaning to cut you off -- my question is did you take him to

10  have this procedure?

11  A   Not this procedure.

12  Q   And this procedure was -- he was complaining of bilateral

13  occipital frontal headaches, do you see that?

14  A   Yes.

15  Q   Would those be consistent with describing the debilitating

16  migraines that you've told us about earlier?

17  A   Yes.

18  Q   And so this particular medical procedure performed by

19  Dr. Couch was to treat that particular issue, the debilitating

20  headaches; is that right?

21  A   Yes.

22  Q   Now, in November of 2013, at this point in time your

23  husband had been a patient at PPSA for approximately 10 months;

24  is that fair?

25  A   Yes, sir.

3843

1   Q   And during that 10 months he was also being seen and

2   treated by his primary care physician?

3   A   Yes, sir.

4   Q   For whatever medical issues he may have other than

5   management of his chronic pain and his debilitating migraines;

6   is that fair?

7   A   Which was -- which was done by Stacy, yes, sir.

8   Q   But he was also being treated by his primary care doctor?

9   A   Yes.

10   Q   And you are familiar with how various healthcare providers,

11   physicians, want to know what medications a patient might be

12   taking whether they are prescribed by that particular physician

13   or another physician who may also be treating the patient?

14   A   Yes, sir.

15   Q   Correct?

16   A   Yes, sir.

17   Q   So everybody knew, who was involved in Patrick's care, what

18   medications he was taking?

19   A   Yes, sir.  I made it perfectly clear to the VA what was

20   being given.  I was allowed in the rooms to talk and everything

21   like that on every visit.  So --

22   Q   All right.  So you made sure everybody knew?

23   A   I did, I did.

24   Q   Now, after this 10-month period of time and after this

25   continuation apparently of symptoms, pain symptoms that

 1   required treatment, the decision was made for your husband to

 2   undergo a series of MRIs; is that right?

 3   A   I believe so.  Yes, sir.

 4   Q   In fact, he underwent three different MRIs in December of

 5   2013?

 6   A   Yes, sir.

 7   Q   Now, he returned for a couple of office visits after --

 8   after the end of the year, beginning of 2014, January of 2014,

 9   didn't he?

10   A   Yes, sir.

11   Q   And he had another procedure done on March the 31st, 2014,

12   do you remember that?

13   A   Yes, I do.

14        MR. POWELL:  That's 168, Sam.

15   Q   This indicates that he had another lumbar epidural steroid

16   injection, doesn't it?

17   A   Yes.

18   Q   Okay.  Now, before that, March the 18th of 2014 -- and

19   that's 161 -- it appears at least in that particular office

20   note that he was being treated with oxymorphone 10 milligrams

21   and oxymorphone extended release 15 milligrams, with no

22   improvement, do you see that?

23   A   Yes.

24   Q   So his medications had essentially been unchanged for

25   several months since they were reduced down or changed from

3845

1    Percocet or reduced down to these two medications; is that

2    accurate?

3    A    That's not accurate.

4    Q    He was not prescribed oxymorphone 10 milligrams, and

5    oxymorphone extended --

6    A    He was.  But every -- almost every single office visit that

7    I went into they changed the medication either to a higher dose

8    or just changed the medication completely.

9    Q    Or changed it to a lower dose?

10   A    To a different medication of a lower dose.

11   Q    Okay.  So -- all right.  So in addition to changing the

12   medication, they changed it to a lower dosage of a different

13   medication?

14   A    Yes.

15   Q    Is that fair?

16   A    Yes.

17   Q    Okay.  At that time he was apparently asked, as he was on

18   probably each office visit, what his pain level was, do you

19   remember that?

20   A    Some of the office visits I didn't go in with him, so --

21   Q    And didn't he consistently evaluate his pain with

22   medication at around a five?

23   A    It was -- no, it was more -- it was more like a seven.  I

24   mean, he managed the pain along with the medication.  So --

25   Q    Okay.  So with medication his pain was a seven out of a 10?

3846

1  A   Yes.

2  Q   And without the medication it's indicated that it was an

3  eight out of 10?

4  A   Yes.  It didn't help him very much.  It just made him not

5  drowsy, but -- I mean everything he did was manageable.

6  Q   It's fair to say, then, that at least over the course of

7  approximately 13 or 14 months that your husband was a patient

8  at PPSA, that efforts were made to help him control his pain;

9  is that fair?

10 A   To help him, yes.

11 Q   Including prescribing various medications of different

12 brands, different classes, different dosages?  I mean, he would

13 indicate this one wasn't working or that one was making me

14 drowsy -- changes were made as you've already told us about?

15 A   Uh-huh (positive response).

16 Q   And also during that 14 months he underwent six different

17 medical procedures to help him relieve his pain, didn't he?

18 A   Yes.

19            MR. POWELL:  That's all.  Thank you.

20            THE COURT:  Any redirect?

21            MR. BODNAR:  Briefly, Your Honor.

22                      REDIRECT EXAMINATION

23 BY MR. BODNAR:

24 Q   Ms. Chausse, do you recall going through the various

25 medical procedures as they appear in your husband's medical

3847

1    record?

2    A    I don't remember one of them.

3    Q    Well, and of the ones he showed you, do you recall where it

4    said Dr. Couch's name at the bottom?

5    A    Yes.

6    Q    But that was not what you recall actually happening?

7    A    By Patrick's recollection.

8    Q    And were there numerous other examples within this medical

9    record, when I went through it and when Mr. -- when defense

10   counsel went through it, where you found stuff you said was not

11   true?

12   A    Yes.

13   Q    So do you know if it is true or not true that Dr. Couch

14   actually performed those procedures?

15   A    I don't know.

16   Q    But you do know that there are many other things that are

17   false in this medical record?

18   A    Yes.

19   Q    Do you recall talking about the visits to the VA hospital?

20   A    With --

21   Q    With defense counsel?

22   A    Yes.

23   Q    And did you say you went in with Patrick to see the doctor?

24   A    Yes.

25   Q    At those visits did you actually see a doctor?

AMANDA CHAUSSE - REDIRECT BY MR. BODNAR

1    A   Yes, I did.

2    Q   Were there ever visits where you never saw a doctor at all?

3    A   No, not at the VA.

4    Q   Did Patrick have a doctor-patient relationship with his

5    doctor at the VA?

6    A   Yes, yes.

7    Q   Was there any doctor-patient relationship between Patrick

8    and Dr. Couch?

9    A   No.

10           MR. BODNAR:  No further questions, Your Honor.

11           THE COURT:  May this witness be excused?

12           MR. BODNAR:  Yes, Your Honor.

13           MR. POWELL:  Yes, ma'am.

14           THE COURT:  All right.  You may step down.  Thank you.

15           All right.  Ladies and gentlemen, we're going to

16    recess for the day.

17           Leave your pads on your chairs.  Remember my

18    instructions to you not to discuss the case or allow anyone to

19    discuss it with you.  Be back downstairs in the jury assembly

20    room tomorrow morning at 9 a.m., ready to be called back up.

21    Hope you have a good evening.

22           We're in recess.

23           MR. SHARMAN:  Your Honor, can we approach?

24           THE COURT:  We're not in recess.

25      (In open court, defendants present, jury not present.)

 1          MR. SHARMAN:  I just didn't want to yell, Your Honor.

 2              Following up on our discussion in chambers, we can't

 3      get a substantive rule 29 motion filed on Friday.  And I think

 4      Mr. Knizley may want some time too.  What I would suggest is we

 5      get it filed on Monday either at or right before or as the

 6      government closes.  If the Court wishes to have further

 7      consideration of it, the Court may wish to get us in early on

 8      Tuesday morning to do that before the jury comes in before we

 9      get going with our case.

10          THE COURT:  All right.  Well, I would really like you

11      all to argue the motion, even though I hadn't read it.  But

12      surely you'll know what points you're going to make as to which

13      counts by Friday.

14          MR. SHARMAN:  I think we could certainly do a bare

15      bones argument, Your Honor.  But I think that, given the amount

16      of testimony and evidence that's been offered, both lay and

17      expert, it would not -- it would not provide as fulsome a basis

18      for the Court's consideration as if we could actually provide a

19      substantive motion.

20          THE COURT:  Well, I expect you to provide a

21      substantive motion.  But if you want to argue it at all, I want

22      to hear it on Friday.  Okay?

23          MR. KNIZLEY:  Judge, I concur with Mr. Sharman, that I

24      did want to prepare a more substantive motion too.  But

25      whatever the Court's pleasure, whatever the Court decides we

3850

1    should do.  And we'll talk about whether we want to have oral

2    argument on Friday or submit it on the motion.

3            THE COURT:  Well, you all let me know.

4            MR. KNIZLEY:  Yes.

5            THE COURT:  But if you want to argue it, I want to

6    hear your argument Friday.

7            MR. KNIZLEY:  Yes, ma'am.

8            MR. SHARMAN:  Yes, ma'am.

9            THE COURT:  Okay.  Anything else this afternoon?

10           MR. SHARMAN:  No, ma'am.

11           MR. BODNAR:  Not from the United States.

12           MR. SHARMAN:  Thank you, Your Honor.

13           THE COURT:  See you tomorrow.

14       (Court adjourned at approximately 4:25 p.m.)

15

16

17

18

19

20

21

22

23

24

25