

1          UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF ALABAMA

2

3

4   UNITED STATES OF AMERICA
                                    CASE NO. CR15-00088
5   v.
                                    COURTROOM 2B
6   JOHN PATRICK COUCH, M.D.,
    and XIULU RUAN, M.D.,
7                                   MOBILE, ALABAMA
          Defendants.
8                                   WEDNESDAY, FEBRUARY 1, 2017
    * * * * * * * * * * * * * * *
9   REDACTED

10              DAY 17 OF TRIAL
        BEFORE THE HONORABLE CALLIE V. S. GRANADE,
11          UNITED STATES DISTRICT JUDGE, AND JURY

12

    APPEARANCES:
13

    FOR THE GOVERNMENT:
14      DEBORAH A. GRIFFIN
        CHRISTOPHER BODNAR
15      ADAM W. OVERSTREET
        CHRISTOPHER B. BRINSON
16      United States Attorney's Office
        63 S. Royal Street, Suite 600
17      Mobile, AL  36602
        (251) 441-5845
18

19  FOR THE DEFENDANT COUCH:
        ARTHUR T. POWELL, III
20      P.O. Box 40456
        Mobile, AL 36640-0456
21      (251) 433-8310

22      JACKSON R. SHARMAN, III
        JEFFREY PAUL DOSS
23      BENJAMIN SANDERS WILLSON
        Lightfoot, Franklin & White
24      400 North 20th Street
        Birmingham, AL  35203
25      (205) 581-0700

```
 1   (Continued)

 2       BRANDON KEITH ESSIG
         800 Shades Creek Parkway, Suite 600D
 3       Birmingham, AL  35209
         (251) 879-1981
 4
     FOR THE DEFENDANT RUAN:
 5       DENNIS J. KNIZLEY
         7 N. Lawrence
 6       Mobile, AL 36602
         (251) 432-3799
 7
         JASON BRADLEY DARLEY
 8       Darley & McGough, LLC
         1751 Dauphin Street
 9       Mobile, AL 36604
         (251) 441-7772
10
         GORDON G. ARMSTRONG, III
11       P.O. Box 1464
         Mobile, AL  36633
12       (251) 434-6428

13       STEVEN D. MARTINIE
         4955 North Lake Drive
14       Whitefish Bay, WI  53217
         (414) 332-9683
15
     THE CLERK:  MARY ANN BOYLES
16   THE LAW CLERK:  LYNN DEKLE
     U.S. ATTORNEY IT:  BRIAN COCHRAN
17   DEFENSE IT:  SAM McALLISTER
     COURT REPORTER:  ROY ISBELL, CCR, RDR, CRR
18
             Proceedings recorded by OFFICIAL COURT REPORTER
19        Qualified pursuant to 28 U.S.C. 753(a) & Guide to
       Judiciary Policies and Procedures Vol. VI, Chapter III, D.2.
20         Transcript produced by computerized stenotype.

21

22

23

24

25
```

<pre>
1                        EXAMINATION INDEX

2

  BRIDGETTE MICHELLE WILLIAMS PARKER
3      DIRECT BY MS. GRIFFIN . . . . . . . . . . . . . . . .3857
       CROSS BY MR. SHARMAN  . . . . . . . . . . . . . . . .3941
4      CROSS BY MR. KNIZLEY . . . . . . . . . . . . . . . . 3988
       REDIRECT BY MS. GRIFFIN . . . . . . . . . . . . . . 4040
5
  MELISSA DUPREE
6      DIRECT BY MR. BODNAR  . . . . . . . . . . . . . . . .4063

7  ANGELA ANTHONY
       DIRECT BY MR. BODNAR  . . . . . . . . . . . . . . . .4066
8      CROSS BY MR. WILLSON . . . . . . . . . . . . . . . .4073
       REDIRECT BY MR. BODNAR . . . . . . . . . . . . . . . 4077
9
  ALFRED E. WALKER
10     DIRECT BY MS. GRIFFIN . . . . . . . . . . . . . . . .4080
       CROSS BY MR. ARMSTRONG . . . . . . . . . . . . . . .4088
11     REDIRECT BY MS. GRIFFIN . . . . . . . . . . . . . . .4097

12

13                        EXHIBIT INDEX

14
                                                    MAR ADM
15 GOVERNMENT'S
       8-1    Letter to Board of Nursing from Ruan re:     3868
16            Bridgette Parker 4/16/13

17     8-2    Plea agreement without factual resume        3938

18     8-3    CCC.................. patient file            3920

19     8-4    Alabama query report, patient Rx history     4055
              report - Parker PDMP
20

21 DEFENDANT COUCH'S
   239        Aug. 18, 2015, letter to Bridgette Parker    3976
22

23            I do not certify that any audio/video recordings

24 played in open court and transcribed herein are verbatim

25 transcriptions, but were transcribed to the best of my ability.
</pre>

3854

```
 1          (Morning session, 9 a.m., in chambers, jury not present.)
 2               MR. SHARMAN:  Good morning, Judge.
 3               MS. GRIFFIN:  Good morning, Judge.
 4               THE COURT:  Good morning.
 5               MR. KNIZLEY:  Good morning.
 6               MR. SHARMAN:  Morning, Judge.  We wanted to bring
 7     something to the Court's attention.  In anticipation of our
 8     case, we've been starting to meet with witnesses, schedule
 9     witnesses and the like.  We served a subpoena on yesterday and
10     met with a potential witness named Bryan Crawford.
11     Mr. Crawford is a former C&R employee.  In the course of our
12     visit with him, he told us that he had received and had
13     reviewed trial transcripts from this trial, including
14     apparently primarily C&R witnesses, but also potentially other
15     witnesses' testimony as well.
16               We believe this is probably a rule 615 problem.  And
17     we researched it and we believe that the controlling case is an
18     Eleventh Circuit case called Jimenez, if I may provide to the
19     Court.  I highlighted it.  And the bottom line, Your Honor,
20     seems to be that the Court in this situation -- the Court
21     likely already knows -- has three basic options:  the Court
22     could, if it found a basis to do so and reason to do so, could
23     sanction the witness, the Court could provide that there be
24     cross-examination on the subject of the witness' review of the
25     transcripts -- that is, should the witness take the stand -- or
```

```
 1   the Court could strike the testimony, assuming there was

 2   sufficient finding of intentional wrongful kind of conduct.

 3           Based upon what we know, we believe that, should this

 4   witness take the stand, the appropriate course would be to

 5   allow robust cross-examination.  But the reality is, after

 6   sitting with him, we don't plan to call him.  So probably it's

 7   not an issue.  But we were concerned enough that we wanted to

 8   tell the government and the Court.

 9           THE COURT:  Okay.  And the government hasn't

10   subpoenaed him; right?

11           MS. GRIFFIN:  We have not, Your Honor.

12           .....................

13           THE COURT:  Okay.

14           MS. GRIFFIN:  So we ask Mr. Sharman if we could wait

15   until they decided whether they thought they were going to call

16   him or not before we made a decision on what to do.

17           .....................

18           THE COURT:  Okay.  All right.  Well, I appreciate you

19   alerting me to this.  When are you going to make a decision as

20   to whether or not you're going to call him or do you know?

21           MR. SHARMAN:  I think --

22           MR. ESSIG:  We've essentially made it, Judge.  We are

23   not going to call him.

24           MR. SHARMAN:  Nevertheless, we wanted to tell the

25   Court.
```

1          THE COURT:  Okay.  Just in case?

2          MR. ESSIG:  Yes, ma'am.

3          MR. SHARMAN:  Yes, ma'am.  And we didn't want the

4     Court or government to think we were sitting on a potential

5     violation.

6          THE COURT:  Okay.

7          MS. GRIFFIN:  And, Your Honor, we'd like to seal this

8     little portion, if we could.

9          ..................

10         THE COURT:  Yes, all right.  That can be sealed.

11         MS. GRIFFIN:  Then this morning I received a call that

12    I've advised counsel about from Nancy Jackson, the ARCOS

13    witness who testified from DEA.  She said in going back and

14    reviewing some additional things we asked her to check on, she

15    learned that the numbers for the comparisons on Dr. Ruan to the

16    state average and to the federal average include Dr. Ruan's

17    numbers, and that she had testified that it did not.  She

18    wanted to clarify that.  She's going to send me an email

19    telling me what she told me orally and we'll provide it to

20    counsel.  And then I would like to make that at least part of

21    the record to clarify what she said.  And then Mr. Knizley and

22    I would like to discuss among ourselves whether we want to ask

23    the Court to correct it.  My thought is that it should be

24    corrected on the record.

25         THE COURT:  Okay.  All right.  Thank you.

3857

1          MS. GRIFFIN:  Thank you.

2          MR. SHARMAN:  Thank you.

3          MR. KNIZLEY:  Thank you, Your Honor.

4          MR. ESSIG:  Thank you, Your Honor.

5      (A recess was taken at approximately 9 a.m.)

6      (In open court, 9:05 a.m., defendants and jury present.)

7          THE COURT:  Good morning, ladies and gentlemen.

8          All right, Ms. Griffin.

9          MS. GRIFFIN:  Your Honor, we'd call Bridgette Parker.

10         THE COURT:  All right.

11         THE CLERK:  Ms. Parker, if you'd step forward to the

12    witness stand, I'll swear you in.  Raise your right hand.

13              BRIDGETTE MICHELLE WILLIAMS PARKER

14              was sworn and testified as follows:

15         THE CLERK:  Please be seated.

16                  DIRECT EXAMINATION

17    BY MS. GRIFFIN:

18    Q   Good morning, Ms. Parker.

19    A   Good morning.

20    Q   Can you tell us your full name?

21    A   Bridgette Michelle Parker.

22    Q   How do you spell your first name?

23    A   B-R-I-D-G-E-T-T-E.

24    Q   Ms. Parker, were you trained as a nurse?

25    A   Yes, ma'am.

BRIDGETTE PARKER - DIRECT BY MS. GRIFFIN

1   Q   You have a nursing degree?

2   A   Uh-huh (positive response).

3   Q   Did there come a later time when you received a nurse

4   practitioner degree?

5   A   Yes, ma'am.

6   Q   Tell us after you first got your nursing degree where you

7   began your nursing career.

8   A   University of South Alabama, the ER, and then Infirmary

9   Home Health, then Cardiology Associates, and then PPSA.

10  Q   How long were you with Cardiology Associates?

11  A   About 15 years.

12  Q   Then how long were you with PPSA?

13  A   From September 2012 until January the 5th of 2015.

14  Q   At any time during this time did you have a DEA license?

15  A   Yes, ma'am.

16  Q   When did you receive that?

17  A   I believe it was October of 2014, so just for a couple of

18  months.

19  Q   Prior to that DEA license could you write any controlled

20  substances?

21  A   Yeah.  I wrote them, I did -- yeah.

22  Q   But you weren't allowed to?

23  A   I wasn't.

24  Q   Is that correct?

25  A   Right, I wasn't -- yeah.

3859

1   Q   After you received the DEA license, were you able to write

2   schedule II controlled substances?

3   A   No, ma'am.

4   Q   And I want to direct your attention to being at PPSA.  You

5   said you started sometime in early 2012?

6   A   Yes, ma'am.

7   Q   Who did you begin -- excuse me -- September of '12; is that

8   right?

9   A   Uh-huh (positive response).

10  Q   Who did you start working for?

11  A   Dr. Ruan.

12  Q   Dr. Ruan?

13          THE COURT:  Ms. Parker, if you'll sit up a little bit

14  so you can be directly in front of the microphone.

15          THE WITNESS:  Sorry.

16  BY MS. GRIFFIN:

17  Q   Dr. Ruan?

18  A   Yes, ma'am.

19  Q   The first few days you were there who were you to shadow to

20  learn how to work?

21  A   Justin Palmer.

22  Q   Justin Palmer?

23  A   Uh-huh (positive response).

24  Q   Who directed you to do that?

25  A   Dr. Ruan.

BRIDGETTE PARKER - DIRECT BY MS. GRIFFIN

3860

1    Q    Is Dr. Ruan in the courtroom today?

2    A    Yes.

3    Q    Could you point him out for us?

4    A    (Indicating.)  Right there.

5         MS. GRIFFIN:  The record will reflect that she's

6    identified the Defendant Ruan.

7    Q    By the time you went to PPSA you had received the NP

8    degree; is that right?

9    A    Yes, ma'am.  I had just gotten it.

10   Q    Just gotten it.  However, you did not have the DEA

11   certificate or license until the very end?

12   A    Yes, ma'am.

13   Q    Is that right?

14   A    Yes, ma'am.

15   Q    Once you followed Justin around, what then were your

16   duties?

17   A    To start seeing patients at the clinic on my own, start

18   seeing patients.

19   Q    Whose patients were those?

20   A    Dr. Ruan's.

21   Q    And describe for us what you would do as seeing Dr. Ruan's

22   patients while you worked with him.

23   A    Say that again.

24   Q    Tell us what you would do in seeing Dr. Ruan's patients.

25   A    Okay.  First of all, the nursing assistant brought the

```
 1   patients back, got their vitals, brought them to the room.  And

 2   when they were ready, I went in and talked to the patient,

 3   evaluated whatever situation it was.  And then if I needed to

 4   make medication changes, I made changes then.  The doctor would

 5   have to sign off on everything.

 6   Q    You made dosing decisions up and down?

 7   A    Uh-huh (nodding head affirmatively).

 8   Q    Did you make decisions on medication changes?

 9   A    Yes, ma'am.

10   Q    And when you say the doctor had to approve, which doctor

11   are you talking about early on?

12   A    Oh, Dr. Ruan.

13   Q    You said medication changes.  Would this be a decision you

14   would make as to a new patient or just returning patients?

15   A    Both.  But definitely the first time the patient was seen

16   as a new patient, it was -- the doctor and I agreed on a plan

17   of care.

18   Q    How would that be presented to Dr. Ruan?

19   A    As far as my new patient information?

20   Q    Yes.

21   A    Go in his room, tell him, you know, whatever physical

22   findings that I had, you know, that made the patient hurt.  And

23   then schedule -- if we have referrals, schedule for referrals

24   outside the clinic, order tests.  I think that's about it.

25   Q    When you say present it to Dr. Ruan, a patient, what do you
```

1    mean?

2    A    I would -- I would go tell him what I found, you know, with

3    the patient.  I'd tell him, you know, this is their complaint.

4    I think I'd like to put them on such and so medication.  And

5    then we decide -- we decide on a plan of care for the new

6    patient.

7    Q    At the time you would go talk to Dr. Ruan about a new

8    patient, would he have seen the new patient typically?

9    A    Would he come in the room and see them?

10   Q    Would he have seen them at the time you went to present a

11   plan to Dr. Ruan?

12   A    No, not until he -- I mean I would go out of the room and

13   go talk to him, and then he would come back in.  And if changes

14   needed to be made, we'd make them.

15   Q    Would Dr. Ruan always go back in with you on a new patient?

16   A    Go back in the room?

17   Q    Yes, in the patient room.

18   A    After he'd initially seen the patient?

19   Q    No, ma'am.  On the first visit --

20   A    Uh-huh (positive response).

21   Q    -- would Dr. Ruan go back in the room with you once you had

22   a plan --

23   A    Oh, yes, ma'am.

24   Q    -- discussed with him?

25   A    Yes, ma'am.

3863

1    Q   Were there times when he would not see a new patient?  Do

2    you recall?

3    A   No, ma'am.

4    Q   You don't recall or --

5    A   I don't -- I don't recall.

6    Q   Now, were you the only NP working for Dr. Ruan at this

7    time?

8    A   No, ma'am.

9    Q   How many others were there?

10   A   One, two -- five NPs and one CRNA.

11   Q   Just for Dr. Ruan?

12   A   Oh, just for Dr. Ruan?  It was just the two, Justin and

13   me.  I mean -- I'm sorry.  It started out -- I can't remember

14   who I started out with.  Oh, it was Sharon Noland and a lady

15   named Peggy is who I started out with.

16   Q   So Dr. Ruan had two other NPs?

17   A   Uh-huh (positive response).

18   Q   Did all three of you see patients?

19   A   Yes, ma'am.

20   Q   And Peggy was there early on when you were at PPSA; is that

21   right?

22   A   Yes, ma'am, uh-huh (positive response).

23   Q   Where would you go to tell Dr. Ruan your plan or what you

24   thought about the patient and the dosing?

25   A   In his office.

3864

 1  Q   Would you see the other nurse practitioners there on

 2  occasion in his office?

 3  A   Yes, ma'am.

 4  Q   Would y'all go in an order, just one of you, then the next

 5  one, then the next one?

 6  A   Just whoever came in first, yeah.

 7  Q   Were there occasions when you had to wait to see him until

 8  another nurse practitioner presented a patient?

 9  A   Uh-huh (nodding head affirmatively).

10  Q   Then I want to talk about returning patients while you were

11  with Dr. Ruan.  Could you tell us what happened about Dr. Ruan

12  seeing a patient on a return visit?

13  A   Typically the mid-level person saw them when they came back

14  unless there was a problem, something different.

15  Q   By mid-level, who do you mean?

16  A   I'm sorry.  Nurse practitioners or the CRNA.

17  Q   You would be the nurse practitioner; is that right?

18  A   Yes, ma'am.

19  Q   And you said unless there was a problem.  What do you mean?

20  A   You know, if the patient has a new complaint, you know,

21  their medications aren't working, they need to make, you know,

22  changes in medication or if we need to order some different

23  tests and just to see, you know, how they're doing on their

24  medication.

25  Q   Would you typically make the decision on whether to change

1    medications or to increase the medications?

2    A    Yes, ma'am.

3    Q    On a return patient?

4    A    Uh-huh (nodding head affirmatively).

5    Q    Would you also present that to Dr. Ruan?

6    A    Uh-huh (nodding head affirmatively).

7    Q    Again, where would you present that to him?

8    A    Usually in his -- in his office.  I mean, every once in a

9    while I might see him in the hall, but that wasn't typical.

10   Q    Was it typical for Dr. Ruan to see the return patients

11   while you were one of his NPs?

12   A    No, ma'am.

13   Q    I --

14   A    No, ma'am.

15   Q    You have to answer.  No, it was not?

16   A    No, ma'am.

17   Q    So did you make decisions about increasing medications or

18   changing medications for Dr. Ruan's patients?

19   A    Yes, ma'am.

20   Q    Now, did there come a time while you were working for

21   Dr. Ruan when you learned that you needed a letter for the

22   Nursing Board?

23   A    Yes, ma'am.

24   Q    Could you explain that to us.

25   A    I can't remember the date.  But I think it was around 2009

3866

BRIDGETTE PARKER - DIRECT BY MS. GRIFFIN

1    or 2010 someone anonymously reported me to the Board of

2    Nursing.

3    Q    That was prior to your working at PPSA?

4    A    Yes, ma'am.  While I was at Cardiology Associates.

5              So this -- you know, the investigation went on for

6    months.  And what they required for me, the Board, was to do a

7    three-day suspension -- probation, and I had to do some

8    continuing education units.  And -- ask me that question one

9    more time.

10   Q    Yes.  Did you have occasion to ask Dr. Ruan --

11   A    Yes.  I'm sorry.  Yes.

12   Q    Let me finish the question.

13   A    I'm sorry.

14   Q    Did you have occasion to ask Dr. Ruan to write a letter in

15   connection with the Board of Nursing?

16   A    Yes.

17   Q    Tell us --

18   A    So I'm employed there, and that's what the Board of Nursing

19   required, is a letter from my employer.  And so he wrote me a

20   letter then.

21   Q    I want to make sure that we have this straight.  The

22   anonymous reporting occurred before you came to PPSA?

23   A    Yes, ma'am.

24   Q    But the need for the letter for the Board occurred while

25   you were working for Dr. Ruan; is that correct?

BRIDGETTE PARKER - DIRECT BY MS. GRIFFIN

1    A    Yes, ma'am.

2    Q    Did he provide you such a letter?

3    A    Yes, ma'am.

4    Q    Do you know what the nature of the complaint was to the

5    Board of Nursing?

6    A    That -- I can't remember the exact title.  But using -- I'm

7    not sure exactly -- I guess just the use of a controlled

8    substance.

9    Q    Were you using prescription controlled substances at the

10   time that complaint was made?

11   A    Yes, ma'am.

12   Q    What were those -- why were you prescribed those?

13   A    For back issues, for back pain.

14   Q    At the time you went to ask Dr. Ruan to write you a letter,

15   was he aware that there was such an allegation before the

16   Nursing Board about you?

17   A    Yes, ma'am.

18   Q    Did he agree to write you a letter?

19   A    Yes, ma'am.

20   Q    Did he also provide you a copy of the letter?

21   A    Uh, I don't think I got a copy, but I'm not sure.

22   Q    And while you talked about three days probation and taking

23   some continuing education courses, were you able to work during

24   those three days of probation?

25   A    Yes, ma'am.

3868

1   Q   And did you work at PPSA during that, those three days?

2   A   Yes, ma'am.

3   Q   I'll show you what's been marked as Government's Exhibit

4   8-1 and ask if you have seen this letter before.

5   A   Yes, ma'am.

6   Q   Is this the letter Dr. Ruan provided on your behalf to the

7   Board of Nursing?

8   A   Yes, ma'am.

9       MS. GRIFFIN:  Your Honor, I'd move to admit

10  Government's Exhibit 8-1.

11      MR. KNIZLEY:  No objection.

12      THE COURT:  All right.  Mark it in.

13   (Government's Exhibit 8-1 was entered into evidence.)

14  BY MS. GRIFFIN:

15  Q   Ms. Parker, if you could speak up a little bit for

16  us.  Does this have a date on the letter?

17  A   Yes, ma'am.

18  Q   What date is that?

19  A   April 16, 2013.

20  Q   And does it indicate it's on behalf of you, Bridgette

21  Parker?

22  A   Yes, ma'am.

23  Q   Does it talk about you joining the practice as a nurse two

24  weeks after you had a lumbar fusion?

25  A   Yes (nodding head affirmatively).

BRIDGETTE PARKER - DIRECT BY MS. GRIFFIN

1  Q   And does it talk about after you had failed some treatment

2  for over 13 years?

3  A   Yes, ma'am.

4  Q   Does it indicate that his practice is high paced and he

5  wondered if you would be able to handle it?

6  A   Yes, ma'am.

7  Q   Did he indicate that your performance in his clinic had

8  been exceptional?

9          Her professional performance in my clinic has been

10  exceptional.

11          Does the letter say that?

12  A   Yes, ma'am.

13  Q   Does it even have an exclamation point after that sentence?

14  A   Yes, ma'am.

15          MR. KNIZLEY:  Objection.  Leading.

16          THE COURT:  She's reading from it.  Let's just read

17  it.

18  BY MS. GRIFFIN:

19  Q   Would you read the entire paragraph that I have placed in

20  the bracket?

21  A   Her professional performance in my clinic has been

22  exceptional.  She has handled her workload well without

23  difficulties.  She is determined and given -- and given her

24  best effort functioning as a nurse practitioner.  As a result

25  she is well liked by patients and our staff.  I'm very pleased

1  to work with her.

2  Q   On the second page of the letter at the bottom will you

3  read the paragraph that was sent to the Board of Nursing by

4  Dr. Ruan?

5  A   Since September 2012 when Bridgette was hired as a full-

6  time nurse practitioner, I have never observed her to be

7  incoherent or impaired in any way.  On the contrary, she has

8  been completely proficient -- completely proficient in getting

9  things done.  I consider Bridgette an excellent example of

10  professionals; that is, to be functional and productive despite

11  having medical problems.  She certainly exemplifies herself for

12  chronic-pain patients of our clinic and elsewhere.

13  Q   Thereafter, how long did you continue to work for Dr. Ruan

14  at PPSA?

15  A   Until December of '15, 2015.

16  Q   But just specifically on Dr. Ruan's team.

17  A   Right, uh-huh.

18  Q   December of '15?

19  A   No.  '14.

20  Q   Or December of -- when did you go -- when did you leave

21  PPSA?

22  A   I left January the 5th of 2015.

23  Q   Does that help you know when you switched from Dr. Ruan to

24  another doctor in PPSA?

25  A   Yeah.  I was there with Dr. Couch for right at a year, so

1    it was before then.

2    Q    So approximately late December of '13 when you switched to

3    Dr. Couch from Dr. Ruan?

4    A    Uh-huh (nodding head affirmatively).

5    Q    Prior to switching from Dr. Ruan were you regularly making

6    appointments and going -- taking off to go see your doctor

7    about your back?

8    A    No, ma'am.

9    Q    Were you seeing a pain doctor while you were working for

10   Dr. Ruan?

11   A    Yes, ma'am (nodding head affirmatively).

12   Q    Did there come a time that he requested a change with you

13   taking off and going to see a pain doctor?

14   A    Yes, ma'am.

15   Q    Could you tell us about that?

16   A    I went to Dr. Ruan and told him I had a doctor's

17   appointment.  And he wanted me to stay at the office so I could

18   keep seeing patients.  And he called Dr. Chen in his office and

19   asked him if he would see me, which Dr. Chen worked in the

20   practice too.  And so Dr. Chen took over my care.

21   Q    Do you know why that was, why that request was made by

22   Dr. Ruan?

23   A    Well, because I -- we saw patients, you know, per patient.

24   And we had to try to get as many in as we could.  And he didn't

25   want me to leave because it was a busy clinic.

BRIDGETTE PARKER - DIRECT BY MS. GRIFFIN

1   Q   Did you begin to see Dr. Chen?

2   A   Yes, ma'am.

3   Q   Was he an employee although a doctor there at PPSA?

4   A   Yeah, uh-huh (nodding head affirmatively).

5   Q   Did Dr. Chen continue to write controlled substances for

6   you?

7   A   Yes, ma'am.

8   Q   Ms. Parker, you talked about continuing to see patients

9   while you were with Dr. Ruan.  Approximately how many

10  percent -- what percentage of the patients were cancer patients

11  that you recall?

12  A   Maybe -- maybe 15 percent.

13  Q   And you've told us about your day-to-day duties with

14  Dr. Ruan.  Could you tell us as to whether on return patients

15  Dr. Ruan would change medications for the patient?

16  A   How would he?

17  Q   Would he?

18  A   Sometimes.  It just depended, you know, on the situation.

19  If the current medication was working, then we wouldn't make

20  changes.

21  Q   Were there times when he made changes whether the patient

22  had complained about the medication or not?

23  A   Say that again.

24  Q   Would Dr. Ruan make changes in the prescriptions whether

25  the patient had complained about the medications or not?

3873

BRIDGETTE PARKER - DIRECT BY MS. GRIFFIN

1   A   Oh, yes.

2   Q   Could you tell us about that?

3   A   Well, the drug that -- the one that just stands out is the

4   fentanyl drugs.  Patients would come in; they were

5   prescribed -- say, a new patient appointment, they come back

6   and they can't stand the medication.  It's either too sedative,

7   it's too expensive.  And lots of times the patients say:  I

8   don't need this.  Why are you giving me this --

9           MR. KNIZLEY:  Objection to what the patient said, Your

10  Honor.

11          MS. GRIFFIN:  Your Honor, it explains conduct.

12          THE COURT:  Yeah.  Overruled.

13  BY MS. GRIFFIN:

14  Q   Go ahead, ma'am.

15  A   I forgot what I was saying.

16  BY MS. GRIFFIN:

17  Q   You were talking about fentanyl.

18  A   Oh, yes, ma'am.  I remember now.  Yeah.  The patients, you

19  know, when they would come back after the first visit, they --

20  a lot of them would be very, very upset and not understanding

21  why their medication would change.  And I couldn't give them a

22  good reason.

23  Q   Why were you the one giving them the reason?

24  A   It was my job.

25  Q   Who had made the decision to switch them?

1  A   Uh, who makes the decision?

2  Q   Who had made the decision?

3  A   Oh, Dr. Ruan.

4  Q   Would he not go in and tell the patient why he was changing

5  the medication?

6  A   Sometimes.

7  Q   Were you left to do that sometimes as well?

8  A   Yeah.  Most of the time it was -- it was me.

9  Q   Without describing what a patient said, can you tell us

10  whether or not the patients were upset about this?

11  A   Very upset (nodding head affirmatively).  Patients were --

12  some of them would just get irate with you, and there was

13  nothing I could do but, you know, try to talk to the doctor,

14  see what we could do to make changes.  But patients, they got

15  very upset often.  And then I was the person that it all got

16  dumped on, you know.  Because they come to me first and then to

17  see the doctor.  So --

18  Q   Did they always see the doctor when you had to tell the

19  patients about changes?

20  A   No, ma'am.

21  Q   So were you the one that ended up advising some of the

22  patients what Dr. Ruan wanted them to do?

23          MR. KNIZLEY:  I object as to leading.

24          THE COURT:  Don't lead.

25  BY MS. GRIFFIN:

1  Q   What would happen when changes were made by Dr. Ruan in

2  some of the patients?

3  A   Are you talking about patients being upset over --

4  Q   Would you tell them the changes?

5  A   Yeah.  I would explain the best I could, you know, the

6  changes that were made, you know, and why.  But I really

7  couldn't give, you know, the most definitive answer if it

8  didn't work or the patient didn't want it.

9  Q   Ms. Parker, you started telling us about fentanyl and some

10 patients saying they didn't need this.  Can you tell us the

11 difference between fentanyl and between Subsys and Abstral?

12 A   They're all the same drug.

13 Q   Did they have a different delivery system?

14 A   Uh-huh (nodding head affirmatively).

15 Q   Could you explain that to us?

16 A   There's a patch, then there's a spray that you put under

17 your tongue, and then one that you put like in the cheek of

18 your mouth.

19 Q   What were the spray and the one you put in the cheek of

20 your mouth -- what was the brand name?

21 A   Abstral and Subsys.

22 Q   Those were different from the patch fentanyl; is that

23 correct?

24 A   Uh --

25 Q   They were still fentanyl but their delivery was --

1   A   Right.  The delivery -- yeah, it delivered rapidly.

2   Q   And by "delivery," what do you mean?

3   A   It started working, you know -- it started relieving their

4   pain.

5   Q   Can you tell us if there were some special rules pertaining

6   to Subsys and Abstral?

7   A   Well, the patient had to have cancer and, you know, that's

8   what it was indicated for.  But it was used off label a lot,

9   you know, for anything we could use it on.

10  Q   Were there any warnings that had to be given with Abstral

11  and fentanyl that were different from warnings with a patch of

12  fentanyl?

13  A   Yes, ma'am.

14  Q   Could you explain that to us?

15  A   It just -- it lists, I believe -- I can't tell you for

16  sure.  Hmm.  I know we had to do a TIRF REMS.  That was

17  something that we had to do,  We had to get that in the

18  system.  I can't think of anything else right this second.

19  Q   Did you use the TIRF REMS when you were prescribing

20  fentanyl or Subsys?

21  A   Uh-huh (nodding head affirmatively).

22  Q   Who would explain the TIRF REMS form to the patient?

23  A   Either myself or my nursing assistant.

24  Q   Now, nursing assistant, can you tell us if they have a

25  nursing degree?

BRIDGETTE PARKER - DIRECT BY MS. GRIFFIN

```
 1   A   No, ma'am.

 2   Q   They do not?

 3   A   Huh-uh (shaking head negatively).

 4   Q   Would you advise the patients on Subsys or Abstral that it

 5   was approved for cancer pain?

 6           MR. KNIZLEY:  Your Honor, I'm going to object to the

 7   leading.

 8           THE COURT:  Overruled.

 9   BY MS. GRIFFIN:

10   A   I'm sorry.  Say again.

11   Q   Would you advise the patients that Subsys and Abstral were

12   approved for breakthrough cancer pain?

13   A   Did I tell the patients that?

14   Q   Yes.

15   A   Sometimes.  Not always.  Because it was -- we could use it,

16   you know, off label.

17   Q   Dr. Ruan was not the one that explained the TIRF or the

18   TIRF REMS form to the patient?

19   A   Huh-uh (shaking head negatively).

20           THE COURT:  Ms. Parker, you have to say either yes or

21   no.

22           THE WITNESS:  Okay.  I'm sorry.

23           THE COURT:  It's difficult for a transcript to be made

24   if you go "huh-uh."

25           THE WITNESS:  Okay.  I'm sorry.
```

BRIDGETTE PARKER - DIRECT BY MS. GRIFFIN

```
 1   BY MS. GRIFFIN:

 2   Q    In connection with the prescribing of Subsys and Abstral,

 3   why were you placing patients on Subsys and Abstral?

 4   A    It was no different than any other medication.

 5   Q    Were you the one that made the call to place a patient on

 6   Subsys or Abstral?

 7   A    Uh-huh (nodding head affirmatively).

 8            THE COURT:  You have to say yes or no.

 9   A    Yes, ma'am.

10   BY MS. GRIFFIN:

11   Q    Did Dr. Ruan change between Subsys and Abstral?

12   A    Yes, ma'am.

13   Q    Could you explain that to us?

14   A    It just -- I mean, I can't explain exactly why he did it.

15   Q    Could you tell us if he changed a patient on one to the

16   other and back on occasion?

17   A    I never knew why -- I never understood why I was doing

18   that.

19   Q    Did he do that is what we're asking?

20   A    Oh yes, ma'am, uh-huh.

21   Q    Could you explain that to us?

22   A    Well, you know, a patient -- some of it is cost, some of it

23   is the availability to get the drugs.

24   Q    By "availability" what do you mean?

25   A    It was such a uncommon drug that patients had a hard time
```

1  finding it, someone to prescribe -- I mean, you know, to fill

2  it.  And then if they found someone, they had to wait for, you

3  know, usually precertification.  Whatever has to be done with

4  insurance.

5  Q   Did PPSA have a connected pharmacy?

6  A   Yes, ma'am.

7  Q   What was the name of the pharmacy?

8  A   C&R.

9  Q   Which of the buildings was it connected to?  Which of the

10  PPSA locations?

11  A   The one on Airport Boulevard.

12  Q   Is that right?

13  A   Yeah, the one on Airport Boulevard.

14  Q   Do you know if C&R stocked Subsys and Abstral?

15  A   Yes, ma'am.

16  Q   How do you know that?

17  A   You know, sometimes I would walk in there for whatever

18  reason, you know, for them to give -- some question about the

19  prescription.  But then other times I was -- I mean he just

20  wanted to know what we had in stock.  So I'd walk around there

21  and see.

22  Q   All right.  Let's break that down.  You said sometimes you

23  would go in there.  Go in where?

24  A   In the pharmacy.

25  Q   Into C&R?

1    A   Yes, ma'am.

2    Q   And you said he wanted to see what they had.  Who is "he"?

3    A   Dr. Ruan.

4    Q   So would he tell you to go to C&R?

5    A   Uh-huh (nodding head affirmatively).

6    Q   And to do what?

7    A   See what dosages they have of the drug.

8    Q   What dosages were in stock?

9    A   Yes, ma'am.

10   Q   Once you learned that information, what would you do?

11   A   Go back and tell him.  And then he'd prescribe accordingly.

12   Q   To the dosages available at C&R Pharmacy?

13   A   (Nodding head affirmatively.)

14   Q   Is that right?

15   A   Yes, ma'am.

16   Q   Would that be with Abstral and Subsys that you would go

17   check the dosages?

18   A   Uh, not -- I don't remember checking for Abstral.  But

19   Subsys I would check a lot.

20   Q   You checked a lot?  Is that what you said?

21   A   Yeah.  I mean, I had to go back there all the time to see

22   what dosages we had.

23   Q   Now, you said that Subsys and Abstral were no different

24   from other drugs; is that right?

25   A   Uh-huh (nodding head affirmatively).

1  Q   Were they stronger than some drugs?

2  A   Oh, absolutely.

3  Q   How did you know that?

4  A   Well, because -- first of all, because of the schedule that

5  it is, the schedule, the drug schedule.

6  Q   Which was what schedule?

7  A   II.  It was the strongest medication we could give, give

8  them over the counter.

9  Q   Do you know whether or not Dr. Ruan received any payments

10  from the manufacturer of Subsys?

11  A   He did.

12  Q   How do you know that?

13  A   Because Natalie was the rep, and she would take us to lunch

14  often.  And, you know, they just talked about all kinds of

15  stuff.

16  Q   Do you know Natalie's last name?

17  A   Perhacs.

18  Q   She was the rep for which company?

19  A   For Subsys.

20  Q   Do you know whether Dr. Ruan owned stock in the Abstral

21  company -- Abstral manufacturer?  Excuse me.

22  A   Yes.  Yes.

23  Q   How did you know that?

24  A   One day I was standing -- well, I wasn't working with him

25  then.  I was working with Dr. Couch when I can remember

1  this. I forget what I was saying. Will you repeat the

2  question?

3  Q  Yes. Do you know if Dr. Ruan owned stock in the company

4  that manufactured Abstral?

5  A  Yes, ma'am. Okay. So whenever -- I didn't know for sure

6  with him until later on. But Dr. Couch wanted me to -- I was

7  in his office one day and he was looking at stocks, and said,

8  hey, if you have any extra money, you should invest in this.

9  And so I heard -- I just was hearing, you know, things through

10  the grapevine at work that Justin had bought some too. Now as

11  far as him, I'm not positive. I was told that he did, but I

12  don't know.

13  Q  When you're talking about "him," who are you talking about?

14  A  Dr. Ruan.

15  Q  You mentioned Natalie Perhacs being a rep for Subsys. Was

16  there a rep that came to PPSA before Natalie came to PPSA from

17  Subsys?

18  A  Yes.

19  Q  Do you remember his name?

20  A  I think it was Joe.

21  Q  Where had you seen Joe at PPSA?

22  A  In Dr. Ruan's office most of the time.

23  Q  Would Joe be there on occasion when you were presenting

24  patient information to Dr. Ruan?

25  A  Yes, ma'am (nodding head affirmatively).

BRIDGETT PARKER - DIRECT BY MS. GRIFFIN

1   Q   How many days of the week was Joe there at PPSA?

2   A   Oh, gosh, there for a little while it seemed like he was

3   there every day.  I'm not saying he was, but he was there very

4   often.

5   Q   Where would you frequently see him?

6   A   In Dr. Ruan's office.

7   Q   Without telling us what was said, what did you observe

8   Dr. Ruan and Joe doing in Dr. Ruan's office?  Were they

9   talking?

10  A   Oh, yes, ma'am, they were talking.  Other than that, I

11  don't know what they were doing.

12  Q   Did there come a time then when Natalie became the rep and

13  Joe was not there as frequently?

14  A   Yes, ma'am.

15  Q   Where would you see Natalie within the PPSA office?

16  A   She would come to his office most of the time.

17  Q   Whose office?

18  A   To Dr. Ruan's office.  Sometimes we'd see her when she took

19  us to lunch.

20  Q   Did you later, after you switched to Dr. Couch, ever see

21  Natalie in Dr. Couch's office?

22  A   Yes, ma'am.

23  Q   Now, was there ever one of the doctors who asked you or

24  encouraged you to prescribe Subsys or Abstral?

25  A   Did one of the doctors encourage me?

BRIDGETTE PARKER - DIRECT BY MS. GRIFFIN

1   Q   Yes.

2   A   Uh-huh, yes, ma'am.

3   Q   You're going to have to answer.

4   A   Yes, ma'am.

5   Q   Which doctor?

6   A   Well, both of them.  But, you know, we're talking about

7   Ruan right now.  So --

8   Q   Did Dr. Ruan encourage you to put patients on Subsys or

9   Abstral?

10  A   Yes, ma'am.

11  Q   What would he tell you?

12  A   Uh, you know, with medications -- sometimes he just changed

13  it.  I mean, I have no explanation.

14  Q   What do you mean "he," first of all?  Who are you talking

15  about?

16  A   Dr. Ruan.

17  Q   Dr. Ruan?

18  A   Uh-huh (positive response).

19  Q   And what do you mean "he just changed it"?

20  A   I mean, patients would say that their medications were

21  working okay, and he still -- he wouldn't keep them on that.

22  He would add Subsys to their regimen.  And I could not explain

23  to the patient why, particularly if their medications were

24  working fine.

25  Q   Would it have been a patient you would have prescribed

3885

1   Subsys to?

2   A   (Shaking head negatively.)  Like -- huh-uh.

3   Q   You'll have to answer yes or no.

4   A   No, ma'am.

5   Q   Did there come a time after Dr. Ruan had placed a patient

6   on Subsys where he might switch that patient to Abstral?

7   A   Uh-huh (nodding head affirmatively).

8   Q   Could you explain -- you have to answer yes or no.

9   A   No, ma'am.  I can't explain it.

10  Q   You can't explain it?

11  A   (Shaking head negatively.)

12  Q   Did it happen that he would switch them --

13  A   Uh-huh (positive response).

14  Q   -- from Subsys --

15  A   Subsys.

16  Q   -- to Abstral?

17  A   Uh-huh (positive response).

18          THE COURT:  You can't say "uh-huh."  You have to say

19  yes or no.

20  BY MS. GRIFFIN:

21  Q   Do you want to sit back and pull the mic closer to you.

22  You can lower it a little bit and make it closer to your mouth.

23  A   Is that better?

24  Q   Yes.  Were there times Dr. Ruan would switch a patient he

25  had placed on Subsys to Abstral?

BRIDGETTE PARKER - DIRECT BY MS. GRIFFIN

1   A   Yes, ma'am.

2   Q   Did you know why that decision was made?

3   A   No, ma'am (shaking head negatively).

4   Q   Were there times when Dr. Ruan would switch a patient from

5   Abstral to Subsys?

6   A   No, ma'am (shaking head negatively).

7   Q   There weren't?

8   A   No.  I wasn't given any explanation.

9   Q   Ma'am I'm asking you did he, Dr. Ruan, switch some patients

10   from Abstral -- excuse me -- from Subsys to Abstral?

11   A   Yes, ma'am, uh-huh.

12   Q   You weren't given an explanation for those?  Is that what

13   you told us?

14   A   Right.

15   Q   Did you have a name, you and some of the other NPs, for the

16   switching back and forth of drugs by Dr. Ruan?

17   A   Can I name --

18   Q   Did y'all have a nickname, you and the other NPs that

19   worked for Dr. Ruan, for switching the drugs Subsys and Abstral

20   back and forth?

21   A   Not that I can recall.

22   Q   Okay.  Now, Ms. Parker, did there come a time when you were

23   let go by Dr. Ruan?

24   A   Oh, I'm sorry.  Yes, ma'am.

25   Q   At that time did you begin working for Dr. Couch?

1    A    Yes, ma'am.

2    Q    And I believe you told us that was the end of 2013; is that

3    right?

4    A    '13, uh-huh (nodding head affirmatively).

5    Q    End of?

6    A    Uh-huh (positive response).

7    Q    How long were you without a job between the two doctors?

8    A    I wasn't.  Dr. Ruan called Dr. Couch, and Dr. Couch -- he

9    told him what he had done, and Dr. Couch told him to tell me to

10   come talk to him and he would hire me.  And Dr. Ruan got really

11   upset.

12   Q    But you didn't lose -- you didn't lose a PPSA job?

13   A    No, ma'am, huh-uh.

14   Q    When you went to work for Dr. Couch, who were his NPs?

15   A    Stacy Madison and Justin Palmer.

16   Q    When you went to Dr. Couch, were you still taking

17   controlled substances prescribed to you by Dr. Chen?

18   A    Yes, ma'am.

19   Q    What were your duties when you transferred to Dr. Couch for

20   approximately a year?

21   A    Basically doing the same thing I did for Dr. Ruan.

22   Q    Would you see the new patients with -- for Dr. Couch?

23   A    Yes, ma'am.

24   Q    Would Dr. Couch always see the new patients?

25   A    As much as I can remember, yes, ma'am.

1    Q    He would see the new patients?

2    A    Uh-huh, uh-huh (nodding head affirmatively).

3    Q    Would Dr. Couch see the return patients?

4    A    No, ma'am.

5    Q    Now, when you talk about Dr. Couch seeing the new patients,

6    will you describe that for us, how a new patient visit went

7    under Dr. Couch?

8    A    First of all, they came back and they got -- they had to

9    have a urine drug screen, and then an assessment was done on

10   the patient.

11   Q    By whom?

12   A    By myself for the initial visit.  Then, you know, order

13   whatever needs to be done, whether it's just medication change

14   or if we needed to order some type of procedure for them.  And

15   then I came up with a plan of care and presented it to him, and

16   then he came in there with me and decided.

17   Q    Where would you present that to Dr. Couch?

18   A    In the patient's room.

19   Q    How long would Dr. Couch see a new patient?

20   A    About 10 minutes or so.

21   Q    How long would Dr. Couch see the returning patients?

22   A    He wouldn't unless there was a problem.

23   Q    Who was making the decision on Dr. Couch's patients that

24   you saw for the drug and the dosage?

25   A    Say that again.

BRIDGETTE PARKER - DIRECT BY MS. GRIFFIN

1   Q   Who made the decision for Dr. Couch's patients that you saw

2   for the drug and the dosage?

3   A   I did that.  And then he signed for -- you know, he would

4   sign the prescription.

5   Q   Did Dr. Couch always sign the prescription?

6   A   No.

7   Q   Explain that to us.

8   A   There was a couple of occasions that Justin signed scripts

9   for me, and he would prescribe them for the whole office.

10  Q   When you say "he," who are you talking about?

11  A   Justin.

12  Q   For the whole office?

13  A   (Nodding head affirmatively.)

14          THE COURT:  You need to answer.

15  A   Oh, yes, ma'am.

16  BY MS. GRIFFIN:

17  Q   Did Justin sign Dr. Couch's name or his own name, or do you

18  know?

19  A   Dr. Couch's name.

20  Q   Did you see that happen?

21  A   Yes, ma'am.

22  Q   What do you mean by Justin prescribed for the whole office?

23  A   I mean he signed, he signed Dr. Couch's name on

24  prescriptions.  People all over in the office, you know, would

25  have to come to him for signature.  And if he wasn't there,

BRIDGETT PARKER - DIRECT BY MS. GRIFFIN

```
 1  sometimes Justin would sign.
 2  Q   When you're talking about "he," we don't know if you're
 3  talking about Justin or Dr. Couch.  Who would not be there?
 4  A   Dr. Couch.
 5  Q   And what would happen when a prescription was signed --
 6  when Dr. Couch was out, who signed it?
 7  A   Justin Palmer.
 8  Q   Was Dr. Couch out frequently?
 9  A   Yes, ma'am (nodding head affirmatively).
10  Q   Do you know what time Dr. Couch would come in most mornings
11  while you worked for Dr. Couch?
12  A   I mean it could be anywhere from 8 o'clock to 10,
13  11 o'clock.
14  Q   Would you and Justin and the other NP be seeing patients
15  prior to Dr. Couch arriving at the office?
16  A   Yes, ma'am.
17  Q   What would happen about prescriptions for those patients
18  that were coming in before Dr. Couch arrived?  Who signed
19  those?
20  A   Well, for myself, I had to make my patients wait until he
21  got there to get his signature, and that was very frustrating.
22  Q   Were there times when you would have Justin sign them and
23  give them to the patient before Dr. Couch came in?
24  A   He only did it a few times.  I don't recall when.  I think
25  it was just during the office -- you know, stuff in the office.
```

BRIDGETT PARKER - DIRECT BY MS. GRIFFIN

1  Q   Just during what?

2  A   Just like stuff -- like, say, for -- what is her title?

3  The phone nurse.  And then just different -- for various

4  reasons.

5  Q   Would you make your patients wait till Dr. Couch got there

6  or would they come back later in the day?

7  A   Some would stay and some would leave and come back.

8  Q   In connection with signing the scripts, were you aware of

9  any presigned prescriptions by Dr. Couch?

10  A   Yes, ma'am.

11  Q   How did you know that there were such presigned

12  prescriptions by Dr. Couch?

13  A   Well, I mean, people -- you know, the staff used them.  I

14  mean, I had to use them myself.

15  Q   Where were they located within the office?

16  A   That I don't know.  My nurse always handled that, so I'm

17  not sure exactly where they were.

18  Q   When you say your "nurse," who do you mean?

19  A   Sam, nursing assistant, Sam Homan.

20  Q   When you said she handled that, what do you mean?

21  A   I mean she would go get the prescriptions wherever -- Debi

22  was the one that was in charge of it, so I'm not sure.  I never

23  had to go to them and get them.  And most of the time the

24  prescriptions were already done the night before, and he'd sign

25  them that night.  And then if we had changes, you know, the

BRIDGETTE PARKER - DIRECT BY MS. GRIFFIN

1    next day, we would make changes.

2    Q   Who is "he" that you said would sign them the day before?

3    A   Dr. Couch.

4    Q   Dr. Couch?

5    A   Uh-huh (positive response).

6    Q   What do you mean by "Debi was the one in charge"?  Who was

7    Debi?

8    A   She was our office manager.

9    Q   What do you mean she was the one in charge?

10   A   She's the one that came to us and told us, you know, that

11   we were able to do that.  Because he wouldn't get there till

12   late, till late in the morning sometimes, and we would just be

13   in a bind.

14   Q   Who wouldn't get there till late in the morning?

15   A   Dr. Couch.

16   Q   Who would that be that was in a bind?

17   A   Who would be in a bind?

18   Q   Yes.

19   A   The practitioners and the patients, everybody would be.

20   Q   What did you hear Debi say about the presigned

21   prescriptions?

22           MR. SHARMAN:  Object to the hearsay, what Debi said.

23           THE COURT:  Sustained.

24           MS. GRIFFIN:  Your Honor, it's part and parcel of the

25   conspiracy.

3893

1      MR. SHARMAN:  If she's not a coconspirator, Your

2   Honor, it's still hearsay.

3      THE COURT:  I sustain.

4   BY MS. GRIFFIN:

5   Q   When you say presigned prescription, I'll show you what's

6   part of Government's Exhibit 2-12 and show you a prescription

7   for Norco and ask if this is what you mean, that the doctor's

8   signature would be on the script prior to the patient coming in

9   the office?

10  A   Yeah.  We did that often.

11  Q   By "presigned script," do you mean the name and the drug

12  was already on the script before the patient came to the

13  office?

14  A   Yes, ma'am.

15  Q   And the doctor's signature was already on the script before

16  the patient came to the office?

17  A   Yes, ma'am.

18  Q   I want to make sure I give you the date of the one I just

19  showed you.  That is a prescription.  It appears to be signed

20  by Dr. Couch for a female whose last name begins with a B; is

21  that correct?

22  A   Yes, ma'am.

23  Q   Do you know the date of that prescription?

24  A   May the 26th, 2015.

25  Q   Do you know that PPSA was raided on May the 20th of 2015?

1   A   Yes, ma'am.

2   Q   Is this an example of what you mean by a prescription being

3   signed before a patient ever came?

4   A   Yes, ma'am.

5   Q   Were there ever prescriptions available to you by Dr. Couch

6   where a prescription was blank except for the doctor's name?

7   And I'm showing you a completely blank prescription from

8   Government's Exhibit 2-12.

9   A   Yeah, there were some of those.  It was mainly the paper

10  prescriptions, but on these too.

11  Q   Are you telling us that Dr. Couch left some scripts that

12  had a signature but did not have the patient and the drug

13  filled out?

14          MR. SHARMAN:  Objection.  Leading.

15          THE COURT:  Overruled.

16  BY MS. GRIFFIN:

17  Q   Where were those --

18          THE REPORTER:  Wait, wait.  What was your answer?

19  A   Yes.

20  BY MS. GRIFFIN:

21  Q   Where were those kept at PPSA?

22  A   I know Dr. Ruan, he used to leave it in his desk.  I'm not

23  sure about Dr. Couch.

24  Q   When you said Dr. Ruan used to leave it in his desk, leave

25  what?

1   A   Blank prescriptions.

2   Q   I'll show you --

3   A   Just a signature.

4   Q   I'm sorry.  I didn't mean to interrupt you.

5   A   That's all right.  Just a signature.

6   Q   I show you what's marked as Government's Exhibit 2-3 and

7   already admitted into evidence and ask if this is what you mean

8   by blank prescriptions for Dr. Ruan?

9   A   Yes, ma'am.

10   Q   Would they have the patient's name filled out?

11   A   No, ma'am.

12   Q   Would they have the drug or the dosage filled out?

13   A   No, ma'am.

14   Q   Would Dr. Ruan's signature be the only thing on the

15   scripts?

16   A   Uh-huh, yes, ma'am.

17   Q   What do you refer to these as?

18   A   Like a blank prescription.

19   Q   You saw those when you worked for Dr. Ruan in the office?

20   A   Yes, ma'am.

21   Q   Now, I want to go back to Dr. Couch.  Have you since

22   learned that there was a time that you saw an undercover

23   patient while you were working for Dr. Couch at PPSA?

24   A   Yes, ma'am.

25   Q   Have you had occasion to see the video --

1    A   Yes, ma'am.

2    Q   -- and to compare what was said on the video to the

3    transcript?

4    A   (Nodding head affirmatively.)

5    Q   You'll have to answer.

6    A   Yes, ma'am.

7    Q   Were you in one of those videos treating a patient using

8    the name Brennan?

9    A   Yes.

10           MS. GRIFFIN:  Your Honor, I'd move to play that video

11   at this time.

12           THE COURT:  All right.

13       (The video was played as follows:)

14           VOICE OF BRIDGETTE PARKER:  I'm Bridgette.

15           VOICE OF PATIENT:  Shawn.

16           VOICE OF BRIDGETTE PARKER:  Nice to meet you.

17           VOICE OF PATIENT:  Nice to meet you.

18           VOICE OF BRIDGETTE PARKER:  Shawn, have you been

19   seeing Stacy?

20           VOICE OF PATIENT:  Ma'am?

21           VOICE OF BRIDGETTE PARKER:  Have you been seeing

22   Stacy?

23           VOICE OF PATIENT:  I have been.

24           VOICE OF BRIDGETTE PARKER:  Okay.  Well, is your

25   medicine doing okay?

3897

```
1              VOICE OF PATIENT:  It is.

2              VOICE OF BRIDGETTE PARKER:  Okay.

3              VOICE OF PATIENT:  And I've been -- I run out every

4    time now.  This time, though, I was out of town because I had a

5    family emergency.  I had to stay gone for like three weeks,

6    take care of some family business, and didn't get to come back.

7    I've been running out.  I was wanting to see if I could get a

8    few more.  But if I can't, that's fine too.

9              VOICE OF BRIDGETTE PARKER:  I can't give you a 120.

10             VOICE OF PATIENT:  Okay.

11             VOICE OF BRIDGETTE PARKER:  I can't give you 120 of

12   the long acting.

13             VOICE OF PATIENT:  Okay.

14             VOICE OF BRIDGETTE PARKER:  I can give you 10 more.

15   It's just something that...(inaudible).

16             VOICE OF PATIENT:  10 will probably be fine, to be

17   honest with you.

18             VOICE OF BRIDGETTE PARKER:  He...(inaudible).

19             VOICE OF PATIENT:  Right.  I understand that.  I'm not

20   looking for, you know, 200 or nothing like that.  If I can get

21   -- 10 more would probably be fine.  That would probably be just

22   fine.

23             VOICE OF BRIDGETTE PARKER:  Okay.

24             VOICE OF PATIENT:  Now, I don't want to get him in any

25   trouble.  So if he's fine --
```

3898

1          VOICE OF BRIDGETTE PARKER:  No.  He's not going to do
2     it unless he feels comfortable with it.
3          VOICE OF PATIENT:  Okay.
4          VOICE OF BRIDGETTE PARKER:  All right.  So no other
5     new complaints?
6          VOICE OF PATIENT:  No, ma'am.
7          VOICE OF BRIDGETTE PARKER:  Okay.
8          VOICE OF PATIENT:  Will I be seeing you now?
9          VOICE OF BRIDGETTE PARKER:  Uh-huh (positive
10    response).
11         VOICE OF PATIENT:  Okay.
12         VOICE OF BRIDGETTE PARKER:  Uh-huh (positive
13    response).  I'm usually very chipper and happy and --
14         VOICE OF PATIENT:  You seem like you are.
15         VOICE OF BRIDGETTE PARKER:  I just got out of the
16    hospital.
17         VOICE OF PATIENT:  Oh.
18         VOICE OF BRIDGETTE PARKER:  Not even 12 hours
19    ago.  I'm weak and I --
20         VOICE OF PATIENT:  Well, I hate to hear that.
21         VOICE OF BRIDGETTE PARKER:  I just don't feel
22    good.  I'm usually pretty happy.
23         Did you have a procedure last time?
24         VOICE OF PATIENT:  Huh-uh, no, ma'am, I did not.
25         VOICE OF BRIDGETTE PARKER:  You live in Montgomery?

3899

```
 1    You come all the way down here --
 2            VOICE OF PATIENT:  Well, I don't live in
 3    Montgomery.  I'm from Montgomery.  I work a lot.  I have a
 4    construction business, you know.
 5            VOICE OF BRIDGETTE PARKER:  Oh.
 6            VOICE OF PATIENT:  And I travel around.  I'm working
 7    out of Mississippi right now, out of Pascagoula.
 8            VOICE OF BRIDGETTE PARKER:  Hmm.  Blood pressure's up
 9    and it has been.  You better get that taken care of.
10            VOICE OF PATIENT:  That's Red Bull every morning.
11            VOICE OF BRIDGETTE PARKER:  Well, you better quit
12    drinking that Red Bull.
13            VOICE OF PATIENT:  Okay.  I will.  Is that what -- how
14    bad is it?
15            VOICE OF BRIDGETTE PARKER:  I mean, it was number 150s
16    and now it's 140s.  You know, the American Heart Association,
17    they dropped the ideal number for blood pressure.  It used to
18    be like 140 over 90 and then, you know, like 130 over 80.  It's
19    110 over 70 now.
20            VOICE OF PATIENT:  Why would they drop it so low?
21            VOICE OF BRIDGETTE PARKER:  The lower, the better.
22            VOICE OF PATIENT:  Oh, of course.  But, you know, some
23    people like me, I just -- that's just natural, that's normal
24    for me, 140 over 80, 140 over 82, you know.
25            VOICE OF BRIDGETTE PARKER:  But that's not normal,
```

 1  though.

 2          VOICE OF PATIENT:  Yeah.

 3          VOICE OF BRIDGETTE PARKER:  It might be normal for

 4  you, but it needs to be lower.

 5          VOICE OF PATIENT:  Okay.

 6          VOICE OF BRIDGETTE PARKER:  I worked in cardiology 15

 7  years, so I'm a big blood pressure Nazi person.

 8          VOICE OF PATIENT:  Blood pressure Nazi (laughing).  I

 9  like that.

10          VOICE OF BRIDGETTE PARKER:  Uh-huh.  Just -- you know,

11  I've seen what it does to you.

12          VOICE OF PATIENT:  Yeah.

13          VOICE OF BRIDGETTE PARKER:  I can tell you all the bad

14  things that can happen.

15          Let's see here.  Your business doing okay right now?

16          VOICE OF PATIENT:  Uh-huh (positive response).

17          VOICE OF BRIDGETTE PARKER:  That's good.

18          VOICE OF PATIENT:  Oh, yeah, my business is doing

19  fine.

20          VOICE OF BRIDGETTE PARKER:  What type of -- do you do

21  like commercial?

22          VOICE OF PATIENT:  Excavating and stuff, yeah.

23          VOICE OF BRIDGETTE PARKER:  Oh, uh-huh (positive

24  response).

25          VOICE OF PATIENT:  The biggest cost in that kind of

1    business is keeping your machines and equipment up and

2    running.  And as long as -- you know, I've got a good bunch of

3    guys.  They get out every morning at 5 o'clock and service

4    machines and get started.

5            VOICE OF BRIDGETTE PARKER:  Well, that's good.

6            VOICE OF PATIENT:  And they know that I don't want --

7    I don't want those machines running if they're not being

8    serviced.  That would be the quickest way to get fired at my

9    place.  That would cost me -- when you've got a $300,000 piece

10   of equipment, it would cost me 25 or $30,000 to replace a part

11   on it.

12           VOICE OF BRIDGETTE PARKER:  Uh-huh (positive

13   response).  That would not make me happy either.

14           VOICE OF PATIENT:  No.  I would be very unhappy, very

15   unhappy.

16           VOICE OF BRIDGETTE PARKER:  Zanaflex, Zanaflex.  Let

17   me go get the new Roxicodone.

18           VOICE OF PATIENT:  Okay.

19           VOICE OF BRIDGETTE PARKER:  And you'll come back in

20   eight weeks.

21           VOICE OF PATIENT:  Okay.

22           A FEMALE VOICE:  Hey, Mr. Brennan.  He's in a

23   procedure, so it will be just a few minutes.  Okay?

24           VOICE OF BRIDGETTE PARKER:  Here's your Roxi.  And one

25   is for December.

1          VOICE OF PATIENT:  Right.

2          VOICE OF BRIDGETTE PARKER:  And one is for your check

3  now in November.

4          VOICE OF PATIENT:  Okay.

5          VOICE OF BRIDGETTE PARKER:  All right?

6          VOICE OF PATIENT:  All right.

7      (The video recording stopped playing.)

8          MS. GRIFFIN:  Thank you.  Your Honor, if we could

9  switch back to the ELMO.

10          THE COURT:  All right.

11  BY MS. GRIFFIN:

12  Q   Ms. Parker, during this, what do you mean by Dr. Couch has

13  an agreement with DEA about writing 120?

14  A   We really shouldn't prescribe -- if you're on a long-acting

15  medicine, you really shouldn't prescribe 120 tablets.

16  Q   Was the prescription that he was on, the Roxicodone, a long

17  acting?

18  A   Huh-uh (negative response).  Short acting.

19  Q   Short acting?  Do you know if there was an agreement

20  between Dr. Couch and DEA not to write those scripts that you

21  referenced in the video?

22  A   Say that again.

23  Q   Do you know -- you represented that Dr. Couch had an

24  agreement with DEA --

25  A   Okay.  I mean I was just told that.  And then there was --

3903

```
 1   there's another drug --

 2   Q   Wait a minute.  You were told that by whom?

 3   A   Somebody in the office.

 4   Q   So when you were telling him that Dr. Couch had an

 5   agreement with DEA, do you know if Dr. Couch did or did not

 6   have an agreement with DEA?

 7   A   I'm not sure.

 8   Q   Did you provide a prescription to this undercover,

 9   Mr. Brennan, the person using the name Mr. Brennan, for an

10   increased number of Roxicodone?

11   A   Yes, ma'am.

12   Q   Do you recall how many you provided him?

13   A   I think it was 110.

14   Q   I show you what's been introduced as Government's Exhibit

15   20-9 and ask if this contains a prescription for Shawn Brennan

16   for Roxicodone for 110 tablets?

17   A   Yeah.

18   Q   Can you see that?

19   A   Yes, ma'am.

20   Q   Does it contain a prescription for 110 tablets?

21   A   Uh-huh, yes, ma'am.

22   Q   Do you know if that's Dr. Couch's signature under Product

23   Selection Permitted?

24   A   I can't say for sure.

25   Q   Was it your signature?
```

BRIDGETTE PARKER - DIRECT BY MS. GRIFFIN

1   A   No, ma'am.

2   Q   Do you know who it would have been if it were not

3   Dr. Couch's?

4        MR. SHARMAN:  Object to speculating.

5        MS. GRIFFIN:  Your Honor, I just asked her does she

6   know.

7        THE COURT:  Overruled.

8   A   Yes, ma'am, I know.

9   Q   Who would it have been if it was not Dr. Couch's?

10  A   Justin's.

11  Q   What is the effective date for that prescription?

12  A   November 6, 2014.

13  Q   Did you hear in the tape where Mr. Brennan is also handed a

14  prescription for December?

15  A   Do I -- yeah.

16  Q   Did you hear that in the tape?

17  A   Uh-huh (nodding head affirmatively).

18  Q   I show you still part of Exhibit 20-9 and ask if this is a

19  prescription for Roxicodone to Mr. Brennan dated December the

20  4th, 2014?

21  A   Yes, ma'am.

22  Q   Is it for 110 Roxicodone?

23  A   Yes, ma'am.

24  Q   Was this the prescription that was referenced as the

25  December prescription in the tape we just heard?

3905

1   A   I think it went back further than December.

2   Q   Now, is this the December one you just referenced in the

3   tape, that he was being handed one for November and December?

4   A   Oh, for -- okay.  I didn't hear that.  Yes.  Because the

5   effective date would be December on both of them actually.

6   Q   But was it provided to Mr. Brennan in the November patient

7   meeting?

8   A   Yes, uh-huh.

9   Q   So the December script for the 110 Roxicodone was not

10  signed on December the 4th, 2014, or was it?

11  A   If that was the December prescription, then it would have

12  been signed by the doctor, the 12/4.

13  Q   Did you see the video where you handed Mr. Brennan a

14  November and a December prescription?

15  A   Uh-huh (positive response).  Oh, so this was presigned.  Is

16  that what you're asking me?

17  Q   I'm asking you was it?

18  A   It had to have been if the patient took both of them that

19  day.

20  Q   In the video were you typing on the typewriter during part

21  of the time while the undercover was in the patient room?

22  A   Yes, ma'am.

23  Q   What were you typing?  What --

24  A   Whether they were -- their medications were working okay,

25  you know, any side effects, have they had, you know, procedures

3906

1  done, any tests.  Basically just going over some of the stuff

2  from the previous visit also.

3  Q   Did you do any examination of that patient in that video?

4  A   Not then, no, ma'am.

5  Q   You didn't touch him, did you?

6  A   Huh-uh (shaking head negatively).

7  Q   You didn't do any leg stretches to see or he didn't have to

8  bend over, nothing that would be an exam?

9  A   Right.

10  Q   Did you do any exam on him?

11  A   No, ma'am.

12  Q   In connection with that, now, is Roxicodone long acting or

13  short acting?

14  A   Short acting.

15  Q   Ms. Parker, by the time you were seeing this patient, this

16  undercover, had you begun to have some additional problems with

17  controlled substances yourself?

18  A   Oh, yes, ma'am.

19  Q   Tell us about that, please.

20  A   Like whenever I first started working there?  Or from that

21  day?

22  Q   When you were working with Dr. Couch.

23  A   Uh-huh (positive response).  I had been taking pain

24  medicine for like 10 years, I believe.  And then there towards

25  the end, the last few months that I was there, it got really

```
 1   bad.  I was in a lot of pain and I was taking my medicine like
 2   I wanted to take it instead of the way I should.  And --
 3   Q   What were you doing to make up for other medicine?
 4   A   What was I doing?
 5   Q   Yes.
 6   A   Oh, if I ran out, I was sick as a dog.
 7   Q   What would happen if you got sick while you were there
 8   working?  Did anybody help you?
 9   A   Uh, yeah, a couple of people helped me.
10   Q   Who was that?
11   A   Debi and Stacy.
12   Q   Who was Stacy?
13   A   She was a nurse anesthetist.
14   Q   She worked with Dr. Couch?
15   A   Yes, ma'am.
16   Q   Was she working in a capacity as an anesthetist or
17   something else?
18   A   It was more of, you know, like a mid-level person.  She
19   could do procedures, but we couldn't -- and we also saw the
20   same type patients.
21   Q   She saw patients as well --
22   A   Yes, ma'am.
23   Q   -- in addition to sometimes doing procedures?
24   A   Uh-huh (nodding head affirmatively).
25   Q   How would she and Debi help you?
```

BRIDGETT PARKER - DIRECT BY MS. GRIFFIN

1   A   Oh, there at the end they got real concerned about my drug

2   use.  And they both came and sat down and talked with me, you

3   know, encouraged me, to see whatever they could do to help me.

4   So I promised them that I would come to them if I felt like I

5   needed more.  That way they could help me control, you know,

6   my -- not overtake my medication.

7   Q   Did they try to do that?

8   A   Oh, yes, ma'am, uh-huh.

9   Q   Were you sometimes taking some medication that had been

10  returned to the office?

11  A   Yes, ma'am.

12  Q   Where would you get that medication?

13  A   From the patient.

14  Q   Explain that.

15  A   Like if the patient left their medicine there or if we

16  needed to destroy it, you know, the rest of it.

17  Q   You would take some of it?

18  A   Uh-huh (nodding head affirmatively).

19  Q   Were you taking from the returned prescriptions the same

20  drugs you had been prescribed by Dr. Chen?

21  A   Yeah, yeah.  Yes, ma'am.

22  Q   Did you ever take medication from the pump room?

23  A   No, ma'am.

24  Q   Did you ever take medication from the procedure room?

25  A   No, ma'am.

BRIDGETTE PARKER - DIRECT BY MS. GRIFFIN

1   Q   Were you taking medication orally or in your veins?

2   A   Orally.

3   Q   Did there come a time, Ms. Parker, that you had an accident

4   in connection with medication?

5   A   Yes, ma'am.

6   Q   Could you tell us approximately when that was?

7   A   I believe it was January the 5th.  I either --

8   Q   Of what year?

9   A   Of 2015.  And I had left the office and I was on my way to

10  an outpatient rehab program that Dr. Couch had agreed to help

11  me, you know, pay for.  And I got a DUI on my way over there

12  from a controlled substance.  And at that point my -- my

13  counselor said:  You've got to go for in-patient, this isn't

14  enough.

15          So at that point I went to Bradford and stayed there

16  for 10 weeks and got my life back.

17  Q   I want to talk about the DUI arrest.  Did you have any

18  drugs on your person?

19  A   Yes, ma'am.

20  Q   What type drugs?

21  A   I think it was -- it was either Abstral or Subsys.  I want

22  to say it was Subsys.

23  Q   Did you take Abstral or Subsys?

24  A   Did I --

25  Q   Did you use it?

BRIDGETT PARKER - DIRECT BY MS. GRIFFIN

1   A   Oh, no, ma'am, huh-uh (shaking head negatively).

2   Q   How was it that you had those in your pocket or on your

3   person?

4   A   I think I -- I just wasn't alert enough at work, because

5   this happened right before I left for the day.  So the patient

6   said they didn't want to take the medicine anymore.  So I left

7   out of the room and went and got Sam, and we come back in there

8   to count them.  Well, all I can think is I stuck it in my

9   pocket on the way going back and forth.  But first I had two of

10  them, and I like came around the corner for Dr. Couch and said:

11  Can I change so and so to this?

12              And he was like:  Sure.

13              But that's all I know.

14  Q   Was there also a syringe in your car at the time of the

15  DUI?

16  A   Uh-huh (positive response).

17  Q   Was it an empty syringe?

18  A   Uh-huh (positive response).

19  Q   It wasn't something you had taken?

20  A   Yes, ma'am.  I took Phenergan for nausea.

21  Q   Had you given yourself a Phenergan shot?

22  A   Uh-huh, yes, ma'am.

23  Q   Now, prior to this date when you went to rehab, had you

24  been having these issues with overtaking your drugs for a few

25  months?

1    A    Yes, ma'am.  For a long time.

2    Q    Had you in fact been sent home once while you were employed

3    by PPSA?

4    A    Yes, ma'am.

5    Q    Who sent you home?

6    A    I believe it was Debi.  I know Justin and Stacy and Debi

7    all came in there.  They were, you know, trying to help me

8    while I was sick.  So I think it was Debi.  I'm not sure.  They

9    called my parents and asked them to come get me.

10   Q    What do you mean while you were sick?

11   A    I got really, you know, nauseated and vomiting while I was

12   at work.

13   Q    Were you in withdrawal?

14   A    Oh, yes, ma'am.

15   Q    You talked about Stacy and Justin.  Did Stacy also use

16   drugs while employed with Dr. Couch and PPSA?

17   A    Yes, ma'am.

18   Q    How do you know that?

19   A    She showed them to me, and sometimes she would appear to be

20   very sedated.

21   Q    What type drugs was she taking?  Or what did she show you

22   she was taking?

23   A    I know she had taken Percocet, but she -- and I couldn't

24   tell you what the rest of them were.  That was the only one I

25   can remember.

3912

1   Q   Do you know whether Justin was using drugs while he was

2   there working for PPSA?

3   A   Yes, ma'am.

4   Q   How did you know that?

5   A   I mean he told me.  And he appeared, you know, very

6   diaphoretic all the time, sweating all the time and just

7   appeared sedated as well.

8   Q   Was it obvious to you that Justin appeared like he was

9   using drugs?

10  A   Yes, ma'am.

11  Q   Was it obvious to you that Stacy appeared like she was

12  using drugs?

13  A   Yes, ma'am.

14  Q   Did you have a conversation with Dr. Couch after Debi sent

15  you home about why you were sent home?

16  A   No, ma'am.

17  Q   I can't hear you.

18  A   No, ma'am.

19  Q   Did you have a conversation with Dr. Couch the day after

20  your DUI --

21  A   Yes, ma'am.

22  Q   -- about your DUI?

23  A   Uh-huh, yes, ma'am.

24  Q   What did you tell him?

25  A   I told him -- I'm not sure that I told him all the details.

BRIDGETTE PARKER - DIRECT BY MS. GRIFFIN

3913

1   But I just told him that I had just gotten out of jail and that

2   I had a couple of -- I think it was Subsys, and I didn't want

3   him -- I wanted -- I wanted him to know that I didn't take the

4   medicine.  So I told him what had happened.  He said:  I'll

5   give you the benefit of the doubt.  You know, if you told me

6   that you didn't do it, you know, then I trust you.

7   Q   And did he pay some $5,000 towards you having treatment?

8   A   Yes, ma'am.

9   Q   Now, you indicated that you went to Bradford for treatment?

10  A   Uh-huh (positive response).

11  Q   Where is that located?  What city?

12  A   Warrior, Alabama.

13  Q   That's near Birmingham?

14  A   Yes, ma'am.

15  Q   Prior to you going to Bradford, had Stacy been terminated

16  from PPSA in late 2015?

17  A   Yeah.  She -- right.  I went after she passed away.

18  Q   And had you -- did you know that Justin had left PPSA in

19  late December of 2015?

20  A   Yes, ma'am.  I --

21  Q   Did you run into him at Bradford?

22  A   Yes, ma'am.

23  Q   Is that when you learned that he was in treatment --

24  A   Yes, ma'am.

25  Q   -- as well?

3914

1   A    Uh-huh (nodding head affirmatively).

2   Q    After your treatment, what were you required to do in

3   connection with your addiction?

4   A    I had to go to intensive outpatient therapy three days a

5   week for a couple of months, and then now I go every week to

6   aftercare.  And I should be finished with that in about two

7   months because it's a two-year program.

8   Q    What happened to your nursing license, your NP license?

9   A    Well, I had to voluntarily surrender my license and my

10  nurse practitioner certificate.

11  Q    Are you employed now?

12  A    Yes, ma'am.

13  Q    Are you employed in any medical field now as a nurse or

14  nurse practitioner?

15  A    Oh, no, ma'am, huh-uh.  I can't.  I don't have any license.

16  Q    So you don't see patients anymore?

17  A    No, ma'am.

18  Q    How long have you been sober, Ms. Parker?

19  A    Since January the 6th of 2015.

20  Q    Since you have been sober, have you had occasion to run

21  into one of the patients who also had been to treatment, a

22  patient that you had treated?

23  A    Yes, ma'am.

24  Q    Who is that?

25  A    Tamison -- I can't remember her last name.  It seems like

1    it starts with an M.

2    Q   Without telling us what you said, what was said, have you

3    had the opportunity to discuss your drug treatment with

4    Tamison?

5    A   Oh, yes, ma'am.

6    Q   I want to direct your attention back while you were still

7    with Dr. Couch in the fall of 2014.  Did you have occasion to

8    see a patient known as CCC..................?

9    A   Yes, ma'am.

10   Q   How is it that you saw that patient?

11   A   That was a patient of Stacy's, and he had been harassing

12   Stacy.  And she just -- she didn't want to see him.

13          MR. SHARMAN:  Objection, Your Honor.  This is well

14   beyond the scope of the Court's in limine motion.  This is not

15   about patients in the indictment and so forth.

16          MS. GRIFFIN:  May we approach?

17          THE COURT:  Yes.

18      (At the side bar, jury not present.)

19          MS. GRIFFIN:  Your Honor, Mr. C... was a long-time

20   patient of Dr. Couch's.  And when he began to complain at PPSA

21   and have an incident with one of Dr. Couch's NPs, Dr. Ruan took

22   him and treated him for a period of two months and gave him the

23   very identical medications that Mr. C... had told Dr. Ruan he

24   had been splitting with Stacy.  So this really is more a

25   question about C... going to Dr. Ruan than to Dr. Couch.

 1          MR. KNIZLEY:  Well, what does this witness know about
 2   it, though?
 3          MS. GRIFFIN:  Because she was called in to see C...
 4   because Stacy was scared of C....  I am not going into the
 5   accident that C... had in December of '15 where he killed
 6   someone.  I'm not going to ask that.
 7          MR. KNIZLEY:  You're saying it's directed towards me,
 8   but you're saying -- how is any information from this witness
 9   going to be about -- that Mr. C... told Dr. Ruan --
10          MS. GRIFFIN:  It's not if you'll give me a chance to
11   ask the question.
12          MR. KNIZLEY:  I'm sorry.
13          MS. GRIFFIN:  It's not going to be.
14          MR. KNIZLEY:  But you mentioned it would.
15          THE COURT:  Is there some other evidence that you're
16   going to put on about that?
17          MS. GRIFFIN:  His medical record.
18          MR. SHARMAN:  You're going to put in C's... medical
19   record?
20          MS. GRIFFIN:  Yes, I am.  He was a patient.
21          MR. SHARMAN:  Well, the record is the record.  But
22   there is --
23          MS. GRIFFIN:  She saw the patient.
24          MR. SHARMAN:  -- a significant amount of irrelevant
25   allegations about Mr. C..., including this accident that he had

BRIDGETT PARKER - DIRECT BY MS. GRIFFIN

```
 1    when he was drunk apparently somewhere.
 2            THE COURT:  Well, there's not going to be any evidence
 3    about that.
 4            MR. SHARMAN:  It's well beyond the scope of
 5    anything --
 6            THE COURT:  We're not going to go into that.
 7            MS. GRIFFIN:  I don't intend to go into anything about
 8    that.  And if she starts to say it, she's been instructed not
 9    to say it, and I will stop her.
10            MR. SHARMAN:  Okay.
11            MR. KNIZLEY:  Judge, I'm just trying to figure out
12    what the evidence is that's going to be attempted to be
13    solicited from this client in connection with Dr. Ruan and some
14    representation Mr. C... said --
15            THE COURT:  Well, just object to the question when
16    it's asked.
17            MR. KNIZLEY:  Yes, ma'am.
18            MS. GRIFFIN:  Your Honor -- excuse me, gentlemen.
19            THE CLERK:  Counsel --
20            MS. GRIFFIN:  If we could have a break now, I'm going
21    to ask one of our other attorneys to instruct her not to say
22    anything about Mr. C's... accident.  She was actually gone by
23    the time that happened, and she doesn't -- has no first-hand
24    knowledge.  But I would like for Mr. Bodnar to just instruct
25    her in front of one of you that she's not to say anything about
```

 1    the accident, with the Court's permission.

 2              THE COURT:  Okay.  We'll go ahead.

 3              MR. SHARMAN:  I'd also request an instruction of a

 4    caution about Stacy Madison.

 5              MS. GRIFFIN:  And that had been previously given to

 6    her.

 7              THE COURT:  All right.  We'll take a break now.

 8        (In open court, defendants and jury present.)

 9              THE COURT:  All right, ladies and gentlemen.  We're

10    going to go ahead and take our morning break.  Leave your pads

11    on your chairs.  No discussion about the case.  Take your break

12    downstairs, and we will call you back up in about 15 minutes.

13              We're in recess.

14        (A recess was taken at 10:23 a.m.)

15        (In open court, 10:48 a.m., defendants and jury present.)

16              THE COURT:  I apologize.  I got tied up for a few

17    minutes.

18              All right, Ms. Griffin.

19              MS. GRIFFIN:  Your Honor, may we approach just

20    briefly?

21              THE COURT:  Yes.

22        (At the side bar, jury not present.)

23              MS. GRIFFIN:  At the break our witness coordinator

24    took Ms. Parker to the restroom and then brought her back.  And

25    Ms. Parker said she had thought of something that she had said

BRIDGETTE PARKER - DIRECT BY MS. GRIFFIN

1    that she needed to correct.  I do not know what it is.  I

2    advised Mr. Sharman and Mr. Knizley through Gordon.  And I

3    would like to just ask her exactly that, did you advise the

4    witness coordinator in the hall, and see what it is.

5              THE COURT:  Okay.

6              MR. SHARMAN:  No objection, Your Honor.

7              MR. KNIZLEY:  No objection.

8              THE COURT:  All right.

9         (In open court, defendants and jury present.)

10   BY MS. GRIFFIN:

11   Q   Ms. Parker, at the break were you walked down the hall by

12   the witness coordinator?

13   A   Yes, ma'am.

14   Q   Did you mention to her that you needed to correct something

15   you had told the jury?

16   A   Oh, yes, ma'am.

17   Q   Could you tell us what that is?

18   A   When I first started working there for Dr. Ruan, I followed

19   Sharon and Peggy, as far as, you know, orienting me.  And then

20   I went with Justin when I went to Dr. Couch; he helped me.

21   Q   You did not train with Justin under Dr. Ruan?

22   A   Right; not under Dr. Ruan.

23   Q   Thank you, ma'am, for telling the coordinator that so we

24   could address it.

25              I want to direct your attention to while you were

 1    still with Dr. Ruan -- excuse me -- Dr. Couch.  I believe I had

 2    asked you about a patient named CCC....................

 3    A    Uh-huh (positive response).

 4    Q    Did there come a time when you saw Mr. C... while he was a

 5    Couch patient?

 6    A    Yes, ma'am.

 7    Q    I show you what's marked as Government's Exhibit 8-3, the

 8    CCC.................. patient file from PPSA.

 9          MS. GRIFFIN:  And Your Honor, we move to admit it as

10    one of the files from the PPSA.

11          MR. SHARMAN:  No objection.

12          THE COURT:  Mark it in.

13       (Government's Exhibit 8-3 was entered into evidence.)

14    BY MS. GRIFFIN:

15    Q    How is it that you came to see Mr. C...?

16    A    Stacy was who he had been seeing.  And she came to me one

17    time and told me that he was going to come in and asked me if I

18    could see him for her.  And I asked her why, you know, she

19    didn't want to see him, and she said that --

20          MR. SHARMAN:  Objection, hearsay.

21          THE COURT:  All right.  Sustained.

22    BY MS. GRIFFIN:

23    Q    Did you agree to see him for her?

24    A    Just to see --

25    Q    To see Mr. C... for Stacy?

BRIDGETTE PARKER - DIRECT BY MS. GRIFFIN

1  A   Yes, ma'am (nodding head affirmatively).

2  Q   Approximately how long -- how many visits did you see

3  Mr. C... before he was switched to someone else?

4  A   One time.

5  Q   Do you know whether Mr. C... was then switched to seeing

6  Dr. Ruan?

7  A   I was told he did.

8  Q   You didn't see Mr. C... but the one time?

9  A   Yes, ma'am.

10  Q   Is that right?

11  A   Uh-huh (positive response).

12  Q   Also in talking to you about Shawn Brennan that you had

13  seen in the undercover tape, in his progress note from that

14  date, November 6, 2014 -- I'm going to show you his file,

15  Government's Exhibit 20-22 for Shawn Brennan and ask you if

16  this information about his prior treatment indicates that he's

17  pleased with his current medications?

18  A   Yes, ma'am.

19  Q   Does it also say that he's had little improvement?

20  A   Yes, ma'am.

21  Q   Are those inconsistent?

22  A   Uh-huh, yes, ma'am.

23  Q   Did you perform all the tests that this progress note

24  indicates were performed; that is, a physical examination?

25  A   No, ma'am.

3922

1  Q   Did you go through a review of symptoms with him while he

2  was there?

3  A   Oh, no, ma'am.

4  Q   Did you make a determination about whether he was oriented

5  to place and time?

6  A   No, ma'am.

7  Q   Able to stand without difficulty?

8  A   I mean the able to stand, I'm sure he was okay because he

9  walked in.

10  Q   And does this say continue his present medications?

11  A   Yes, ma'am.

12  Q   I can't hear you.

13  A   Yes, ma'am.

14  Q   But he had an additional number of pills; is that right?

15  A   Uh-huh, yes, ma'am.

16  Q   So that wasn't correct on his medical record to continue

17  the same, was it?

18  A   No, ma'am.

19  Q   Was there a time when you had a conversation with Dr. Ruan

20  about Adderall, Soma or Xanax?

21  A   Yeah.  Yes, ma'am.  For Dr. Ruan and Dr. Couch.

22  Q   You talked to both of them?

23  A   Yeah.  At separate times when I worked with one or the

24  other.

25  Q   Let's start with what did Dr. Ruan tell you about those

 1    drugs?

 2    A    They're highly addictive and they're very sedative.

 3    Q    Were you told by Dr. Ruan whether to write them or not?

 4    A    Not that I can recall from Dr. Ruan.

 5    Q    What were you told, if anything, by Dr. Couch about those

 6    drugs?

 7    A    They were written up until like two or three months, I

 8    would say, before I left.  And then he told us we couldn't

 9    prescribe all those; they would have to get some of their

10    medications from their primary doctor.  It might have been when

11    I was with Dr. Ruan.  I can't remember.  And I know with

12    Dr. Couch.

13    Q    You also told us that Dr. Ruan would send you to C&R to see

14    what drugs were available to be prescribed?

15    A    Yes, ma'am.

16    Q    Would he base then his prescribing decisions on what you

17    came back and reported?

18    A    Lots of times.

19    Q    Did Dr. Couch ever go check the inventory himself at C&R or

20    did he send you there?

21    A    I think I went a couple of times for him, for Dr. Couch.

22    Q    Do you recall what drugs you were checking for Dr. Couch?

23    A    Abstral and Subsys.

24    Q    Then did you notice whether Dr. Couch would write the drugs

25    that were in inventory or not?

BRIDGETT PARKER - DIRECT BY MS. GRIFFIN

1    A    I'm sorry.  Say that again.

2    Q    Do you know if Dr. Couch would then prescribe the drugs

3    that were actually there at C&R?

4    A    Yes, ma'am.

5    Q    Did there come a time when there were more pharmaceutical

6    reps that came to PPSA than Natalie and Joe that you have

7    described from Subsys?

8    A    Someone else from Subsys?

9    Q    No.

10   A    Just others?

11   Q    Other reps.

12   A    Oh yes, ma'am.

13   Q    What would happen after a rep would see Dr. Couch or

14   Dr. Ruan while you were there?

15   A    Typically they stayed in their offices.  They hung out

16   for -- I don't know what they were doing.

17   Q    Who is "they" stayed in their offices?

18   A    Well, Natalie and Joe, and then I can't remember all of

19   them, there's a lot of them.

20   Q    For other companies or for the Subsys manufacturer?

21   A    Oh, for Subsys.

22   Q    Were there other drug reps for other companies than Subsys

23   or Abstral?

24   A    Yes, ma'am.

25   Q    Would you see those reps from other companies than the

3925

1    Subsys and Abstral companies in Dr. Ruan's or

2    Dr. Couch's office --

3    A    Yes, ma'am.

4    Q    -- with the doctor?

5    A    Uh-huh (positive response).

6    Q    You'll have to answer.

7    A    Yes, ma'am.

8    Q    Do you know the companies that those other representatives

9    actually represented?

10   A    Do I know -- say that again.

11   Q    Do you know the names of the companies that the other drug

12   reps represented?

13   A    The Insys.  That's the only -- I can't recall the others.

14   Q    Do you know if anybody came to see Dr. Ruan or Dr. Couch

15   that was a rep for Exalgo?

16   A    Yes.

17   Q    What is Exalgo?

18   A    Hydromorphone.

19   Q    Do you recall there being a rep for Exalgo at PPSA?

20   A    Yes, ma'am.

21   Q    Could you tell us what, if anything, changed with

22   prescribing after the Exalgo rep left PPSA?

23   A    Oh, after he left?  We didn't write very much after that.

24   Q    After he would leave the office, did you write much while

25   he was still visiting the office?

BRIDGETT PARKER - DIRECT BY MS. GRIFFIN

1  A   Oh, if he was still in the office?  Yeah, we wrote, uh-huh

2  (nodding head affirmatively).

3  Q   What do you mean by after he left the office, you didn't

4  write very much?

5  A   Oh, I didn't mean -- I thought you were talking about left

6  the company.

7  Q   Well, explain that for us.  Straighten it out for us.

8  A   Okay.  He was the drug rep for that company, for Exalgo.

9  And I think -- I mean we wrote quite a bit of it because

10  Dr. Ruan wanted to help Buddy out.

11  Q   Was Buddy the Exalgo rep?

12  A   Yes, ma'am.

13  Q   Who told you that Dr. Ruan wanted to help Buddy out?

14  A   He did.

15  Q   He being --

16  A   Dr. Ruan.

17  Q   Dr. Ruan.  So did you write a large number of Exalgo?

18  A   Yes, ma'am.

19  Q   Did there come a time -- and you've already discussed

20  Natalie working for Insys.  Did there come a time when Natalie

21  was new repping for Insys when you had a conversation with

22  Dr. Ruan about prescribing Insys products, the Subsys?

23  A   Yes, ma'am.

24  Q   Could you tell us that?

25  A   Say it one more time.

BRIDGETTE PARKER - DIRECT BY MS. GRIFFIN

1  Q   Yes.  Do you remember who the rep was for Insys, the female

2  rep?

3  A   Uh-huh (positive response).

4  Q   What was her name?

5  A   Oh, Natalie.  Okay.

6  Q   Do you remember when Natalie first got hired as a rep --

7  A   Uh-huh (positive response).

8  Q   -- for Subsys?

9  A   Uh-huh (positive response).

10  Q   Did you have a conversation thereafter with Dr. Ruan about

11  writing Subsys?

12  A   I mean he wanted -- he was encouraging us to write more

13  prescriptions for it.

14  Q   Did he make any comment about Natalie being the rep?

15  A   Yeah.  He wanted -- yes.  He wanted to help Natalie as

16  well.

17  Q   Did he tell you that?

18  A   Yes, ma'am.

19  Q   Dr. Ruan told you that?

20  A   Uh-huh (nodding head affirmatively).

21  Q   Now, you also talked about being transferred from Dr. Ruan

22  over to Dr. Couch in late 2013; is that right?

23  A   Yes, ma'am.

24  Q   Did you have occasion for Dr. Ruan to yell at you?

25  A   No, ma'am.  Just -- yes, I had an occasion.

1    Q    Did he yell at you?

2    A    Yes, ma'am.

3    Q    Why was that?

4    A    Because he -- he fired me, and then he got mad because

5    Dr. Couch was going to hire me that same day.  Anyway, he

6    called.  I told him, well, you know, whenever he fired me that

7    hopefully Dr. Couch would let me come on with him, and he got

8    very upset, called Dr. Couch, hung up on him, just a screaming

9    match.  And then finally I left and went to the Springhill

10   office with Dr. Couch, that day.  All that happened that day.

11   Q    You were using several pronouns about he did this and he

12   did that.  Who called Dr. Couch?

13   A    Who did what?

14   Q    Who called Dr. Couch in your presence when you were

15   terminated from Dr. Ruan?

16   A    Who was in there with me?

17   Q    Yes.  Who made the telephone call to Dr. Couch?

18   A    Oh, Dr. Ruan.

19   Q    Okay.  Could you hear both ends of the conversation?

20   A    No, ma'am, I didn't hear both.

21   Q    Could you hear that Dr. Ruan was yelling?

22   A    Yes, ma'am.

23   Q    Did Dr. Ruan also yell at you?

24   A    Yes, ma'am.

25   Q    Had you heard Dr. Ruan yell at any patients?

1   A   Yes, ma'am.

2   Q   Why was that?

3   A   Usually it was because they weren't doing what he wanted

4   them to do.

5   Q   He would actually yell at a patient?

6   A   I've heard him yell.

7   Q   And you also talked about going to Dr. Couch after you were

8   terminated from Dr. Ruan. That was still within PPSA; right?

9   A   Yes, ma'am.

10  Q   Was Dr. Couch out of the office for vacation sometimes?

11  A   Uh-huh, yes, ma'am.

12  Q   Was he out of the office for unknown reasons sometimes?

13  A   Yeah. We didn't always know what he was doing.

14  Q   Would you know day to day what time Dr. Couch was coming in

15  that day?

16  A   I wouldn't know for sure that day.

17  Q   When Dr. Ruan was on vacation, were Dr. -- excuse me --

18  Dr. Couch was on vacation, were his patients still being seen?

19  A   Oh, yes, ma'am.

20  Q   Did your day-to-day responsibilities change when Dr. Couch

21  was gone on vacation?

22  A   Yes, ma'am.

23  Q   They did change?

24  A   Some.

25  Q   Did you still see patients?

1   A   Yes, ma'am.

2   Q   Did you still prescribe for patients?

3   A   It just depends on what they needed.

4   Q   Were you seeing patients when Dr. Couch was on vacation?

5   A   Yes, ma'am.

6   Q   I want to direct your attention to a few months before you

7   left.  So that would be late 2014 -- excuse me -- yeah, late

8   2014.  Did Dr. Couch tell you anything about the FBI?

9   A   Yeah.  He was -- he said that someone had anonymously

10  reported us, you know, to the DEA.

11  Q   What, if anything, else did he tell you?

12  A   He told me that everything was going to be okay, we weren't

13  doing anything wrong, not to worry about it.

14  Q   Did he tell you anything about somebody might be watching?

15  A   Yeah, that too, that that they felt like -- Dr. Ruan and

16  Dr. Couch felt like somebody was watching them.  And around

17  that time is when we backed off on giving the Soma and Adderall

18  and Valiums, all those drugs.

19  Q   Was when who backed off?

20  A   Whenever -- I'm sorry -- the nurse practitioners and the

21  doctor.

22  Q   At whose direction was that that the nurse practitioners

23  were to back off the Soma and the Adderall?

24  A   Who told us that?

25  Q   Yes.

1  A   Dr. Couch.

2  Q   Do you know what the Holy Trinity is?

3  A   Yes, ma'am.

4  Q   What is that?

5  A   Well, I know it's Soma, Xanax -- I don't know it for sure.

6  I just know it's Soma, Xanax --

7  Q   Was it Soma and Adderall --

8  A   Adderall, Adderall.

9  Q   -- that you were told to back off on by Dr. Couch?

10  A   Uh-huh (nodding head affirmatively).

11  Q   Did Dr. Ruan ever tell you that as well?

12  A   No, ma'am, I don't recall that.

13  Q   What, if anything, were you told by either Dr. Couch or

14  Dr. Ruan about what words to use in the patient charts?

15  A   How to document what --

16  Q   What words to use in the patient charts.

17  A   To document that the patients --

18      MR. KNIZLEY:  Excuse me.  If you would distinguish.

19  BY MS. GRIFFIN:

20  Q   Distinguish which doctor.

21  A   Okay.  I was working for Dr. Couch around that time.  That

22  we were to put -- well, some with Dr. Ruan -- that we were to

23  put in there how medication was working, if it was effective,

24  did it change their activities of daily living, you know, stuff

25  like that to justify what we were doing.

3932

1   Q   Were you ever told anything about Dr. Ruan -- by Dr. Ruan

2   what to put in the patient charts?

3   A   I don't -- I don't recall him.

4   Q   Did there come a time when you gave fentanyl patches to

5   Dr. Couch?

6   A   Yes, ma'am.

7   Q   Was that toward the end of your time at PPSA?

8   A   Yes, ma'am.

9   Q   What happened?

10  A   When I gave them to him?

11  Q   How did it happen that you gave the fentanyl patches to

12  Dr. Couch?

13  A   If a patient brought them back.

14  Q   Were you asked to do that or did you voluntarily give them

15  to Dr. Couch?

16  A   No.  I was asked to give it to him, if I had any extra, by

17  Dr. Couch.

18  Q   How many did you give him?

19  A   Maybe a dozen.

20  Q   Were those patches that had been returned by patients that

21  did not use them?

22  A   Yes, ma'am.

23  Q   Was there any record made that you had given those fentanyl

24  patches to Dr. Couch?

25  A   No, ma'am.

3933

1   Q   Are you familiar with the term "opioid-induced

2   hyperanalgesic"?

3   A   Yes, ma'am.

4   Q   How do you know about that term?

5   A   Well, I personally had it.

6   Q   Explain that.

7   A   When you overtake your medication, your body is -- it

8   actually makes you hurt worse when you take more than you're

9   prescribed.

10   Q   And you said you actually experienced that?

11   A   Yes, ma'am.

12   Q   Did that happen to you, that you hurt worse when you over

13   took drugs?

14   A   Yes, ma'am (nodding head affirmatively).

15   Q   Were you behind on your progress notes when you went into

16   treatment in early January of 2015?

17   A   I was -- let's see.  A little bit at that time.  It was

18   2013 when I was really -- had a lot of charts behind.

19   Q   What do you mean by charts behind?

20   A   I had probably 40 or 50 charts, and I had to, you know, log

21   them into the computer, into the EMR system.  So I spent like

22   my whole Christmas break doing charts because I couldn't do

23   them at work.  I didn't have enough time.

24   Q   How would you treat a returning patient if you hadn't

25   completed the chart?

3934

1  A   Whether it be the nursing assistant or whoever would have

2  to go find the chart, you know, that was waiting to be put into

3  the computer and go from there.

4  Q   Did you take notes as you saw the patients --

5  A   Yes, ma'am.

6  Q   -- to later put in a chart?

7  A   Uh-huh (nodding head affirmatively).

8  Q   Where did you maintain those notes?

9  A   I kept them in my briefcase, because we had to go back and

10  forth between offices, and I never knew, you know, which one I

11  might need.

12  Q   Did there come a time when you caught up with most of your

13  charts?

14  A   Yes, ma'am, uh-huh (positive response).

15  Q   Could a patient's visit be billed unless a chart was

16  completed?  Do you know?

17  A   That I don't know.

18  Q   Were you ever -- did you ever have a discussion about

19  getting the medical records completed so the service could be

20  billed?

21  A   Yeah, yeah.  They wanted it to be done, you know, as quick

22  as we could so they could -- so they could charge for it.

23  Q   Who is "they"?

24  A   Like Debi, our office manager.

25  Q   And I asked you when you wrote 110, an extra 20 scripts for

3935

1    Mr. Brennan, did you and Dr. Couch typically write triple-digit

2    drug numbers?

3    A   Typically we weren't -- yeah, we didn't.  We weren't -- I'm

4    not sure as far as the others, but I tried to stay under 100.

5    Q   Why was that?

6    A   Well, because if they're having to take -- if they're

7    having so much breakthrough pain, the pain is not being treated

8    adequately.  So you have to have breakthrough medication

9    because it doesn't last long enough.

10   Q   The medication that's being prescribed doesn't last long

11   enough?

12   A   Yeah.  Like the one that they are currently on.

13   Q   And would you write then a triple-digit more of the same

14   medication?

15   A   Sometimes.

16   Q   So was there any rule at PPSA that you could not write

17   triple-digit quantities of drugs per month?

18   A   Yeah.  They asked us not to do it.

19   Q   Did both of the doctors sign prescriptions for triple-digit

20   numbers of drugs for you?

21   A   Yes, ma'am.

22   Q   Not for you personally but for you to provide to a patient?

23   A   Yes, ma'am.

24         MS. GRIFFIN:  One moment, Your Honor.

25         THE COURT:  All right.

```
 1        (A discussion was held off the record between government
 2   counsel.)
 3   BY MS. GRIFFIN:
 4   Q   I want to make sure that we have this right about your
 5   duties with Dr. Ruan while you were his nurse
 6   practitioner.  Were you in charge of examining the patients?
 7   A   Yes, ma'am.
 8   Q   Were you in charge of analyzing the drug screens?
 9   A   Yes, ma'am.
10   Q   Were you in charge of looking for signs of compliance or
11   diversion?
12   A   Yes, ma'am.
13   Q   And then were you in charge of dosing?
14   A   Yes, ma'am.
15   Q   What is dosing?
16   A   It's choosing the right medication and the right strength.
17   Q   When you transferred to Dr. Couch, were you also in charge
18   of those very same things?
19   A   Yes, ma'am.
20   Q   When a urine drug test was done while you were with
21   Dr. Couch -- excuse me -- while you were with Dr. Ruan, who
22   decided what drug test was going to be ordered?
23   A   For Dr. Ruan?
24   Q   Yes.
25   A   Dr. Ruan.
```

BRIDGETTE PARKER - DIRECT BY MS. GRIFFIN

3937

 1   Q   When you were with Dr. Couch, who decided what drug test

 2   was going to be ordered?

 3   A   It was usually up to the practitioners.

 4   Q   Do you know if the cup tests were paid -- were cheaper than

 5   the urine tests that were sent out?

 6   A   Huh-uh (shaking head negatively).

 7   Q   You don't know?

 8   A   No, ma'am.

 9   Q   Ms. Parker, did you plead guilty to conspiracy to

10   distribute or cause to be distributed a controlled substance

11   outside the usual course of professional practice and for no

12   legitimate medical purpose?

13   A   Yes, ma'am.

14   Q   Did you enter into a plea agreement with the United States?

15   A   Yes, ma'am.

16   Q   I'll show you -- have you previously seen the plea

17   agreement?

18   A   Yes, ma'am.

19   Q   Gone over it with your lawyer?

20   A   Uh-huh (positive response).

21   Q   I'll show you what's marked as Government's Exhibit 8-2 and

22   ask if this is a copy of your plea agreement?

23   A   Yes, ma'am.

24       MS. GRIFFIN:  Your Honor, I'd move to admit her plea

25   agreement without a copy of the factual resume.

BRIDGETTE PARKER - DIRECT BY MS. GRIFFIN

1          MR. SHARMAN:  No objection.

2          THE COURT:  All right.  Mark it in.

3      (Government's Exhibit 8-2 was entered into evidence.)

4  BY MS. GRIFFIN:

5  Q   Excuse me.  Ms. Parker, have you been sentenced yet?

6  A   No, ma'am.

7  Q   Did you agree to attempt to cooperate?

8  A   Yes.

9  Q   What do you hope to receive in return for your cooperation?

10  A   That's going to be left up to the judge.

11  Q   Do you hope to receive -- excuse me -- a recommendation

12  from the United States to request that the Court consider

13  lowering your sentence?

14  A   Say that again.

15  Q   Do you hope to receive a request from the United States for

16  the judge to lower your sentence?

17  A   Oh, no, ma'am.

18  Q   Pardon?

19  A   No, ma'am.

20  Q   Do you remember talking to your attorney about a

21  substantial assistance motion?

22  A   Yes, ma'am.

23  Q   That if you cooperated fully and truthfully, you might

24  receive such a request by the United States?

25  A   Yes, ma'am.

BRIDGETTE PARKER - DIRECT BY MS. GRIFFIN

1    Q    Did your attorney go over your plea agreement with you?

2    A    Yes, ma'am.

3    Q    And do you hope to receive some cut in your sentence?

4    A    I would hope so.

5    Q    Do you have any promise of any cut in your sentence?

6    A    No, ma'am.

7    Q    I show you the last page of your plea agreement,

8    Government's Exhibit 8-2, and ask if it is signed on the last

9    page by you and your attorney?

10   A    Are you asking is that my signature?

11   Q    Yes.

12   A    Yes, ma'am.

13   Q    And is it signed by your attorney further down on the page?

14   A    Yes, ma'am.

15   Q    What date was that signed?

16   A    December 11, 2015.

17   Q    And is that the date you actually entered a guilty plea?

18   A    I don't know the exact date.

19   Q    Was it around that time?

20   A    Yeah, it was around that time.

21   Q    You have had the opportunity to see both Dr. Ruan's and

22   Dr. Couch's patients; is that correct?

23   A    Yes, ma'am.

24   Q    When you worked for Dr. Ruan, would you have occasion to

25   see any of Dr. Couch's patients in passing?  In the hall, for

3940

1    example?

2    A   Yes, ma'am.

3    Q   When you worked for Dr. Couch, did you have the opportunity

4    to see any of Dr. Ruan's patients in passing?

5    A   Yes, ma'am.

6    Q   Did you develop an opinion about how many of the patients

7    appeared overmedicated to you?

8    A   Yes, ma'am.

9    Q   What was that?

10   A   I would say --

11            MR. KNIZLEY:  Objection, Your Honor, on relevance.

12   And further basis, how they appeared is speculation.

13            THE COURT:  Overruled.  You can answer.

14   A   I would say maybe half of our patients.

15   BY MS. GRIFFIN:

16   Q   What did you base that on?

17   A   First of all, if they came in there and they looked, you

18   know, overmedicated, wanted more medication.  I can't think of

19   anything else.  Repeat your question again.

20   Q   Did you develop an opinion about how many of the patients

21   appeared overmedicated?  You answered 50 percent.

22   A   Yeah.

23   Q   And I asked you what did you base that on.

24   A   I think I -- I know I based it on how they appeared to

25   be.  You know, if they're overmedicated, you know, if I --

1   there was lots of ways to know.

2   Q   And other than looking overmedicated or asking for more

3   medicines, which you just told us, were there any other ways

4   that you based that determination?

5   A   We could pull up the -- my mind's just blank -- the

6   physicians' PDMP, where you go on there and it tells you the

7   prescription history, who wrote it, the date and pharmacy.

8   That's one way that you could check on them to see, you know,

9   if they were getting medicine from somebody else and our

10  clinic.

11  Q   If they were receiving medication from other doctors?

12  A   Uh-huh (nodding head affirmatively).

13         MS. GRIFFIN:   That's all I have of this witness at

14  this time, Your Honor.

15         THE COURT:   All right.   Mr. Sharman?

16         MR. SHARMAN:   Could I have just a moment, Your Honor?

17      (A discussion was held off the record between counsel.)

18                         CROSS EXAMINATION

19  BY MR. SHARMAN:

20  Q   Ms. Parker, my name is Jack Sharman, and I represent

21  Dr. Couch.

22         Ms. Parker, the time that you were at PPSA or at least

23  a significant part of it, that was a very difficult period in

24  your life, was it not?

25  A   Yes.

BRIDGETTE PARKER - CROSS BY MR. SHARMAN                                              3942

1   Q   Despite that, with regard to patient care, you did the very

2   best that you could do; right?

3   A   Uh-huh (positive response).

4           THE COURT:  Ms. Parker, you're going to have to sit

5   up --

6   A   Oh, yes.

7           THE COURT:  -- and answer with a yes or a no.

8   A   Yes.

9           THE COURT:  Thank you.

10  BY MR. SHARMAN:

11  Q   Despite your difficulties, with regard to patient care, you

12  did the best you could; right?

13  A   Sure.

14  Q   And even when you were struggling with addiction, you did

15  the best you could; correct?

16  A   Yes, sir (nodding head affirmatively).

17  Q   You never did anything intentionally wrong regarding

18  patient care; right?

19  A   No, sir.

20  Q   As far as you know, you never did anything wrong about

21  patient care intentional or otherwise; right?

22  A   Right.

23  Q   And with regard to any of your professional activities and

24  your duties, for example, as a licensed nurse, you never did

25  anything that in your view contradicted your nurse duties;

3943

```
 1   right?
 2   A   No.
 3   Q   And you never did anything that at the time you even
 4   thought was criminal; right?
 5           MS. GRIFFIN:  Objection, Your Honor, as to foundation
 6   or conclusion as to the legality of her behavior.
 7           MR. SHARMAN:  It's her understanding of what she was
 8   doing that I'm seeking, Your Honor.
 9           MS. GRIFFIN:  She's already pled guilty.
10           THE COURT:  Yeah.  I thought she just said she pled
11   guilty.
12   BY MR. SHARMAN:
13   Q   Well, at the time you didn't think you were violating any
14   medical rules; right?
15           MS. GRIFFIN:  Your Honor, objection again to the
16   foundation.  She stated she pled guilty.
17           THE COURT:  Overruled.
18   BY MR. SHARMAN:
19   Q   At the time you didn't think you were violating any medical
20   rules or regulations; right?
21   A   No -- yeah, I was.
22   Q   You thought you were or you thought you were not?
23   A   I thought I was.
24   Q   A lot of pain management involves trust, does it not,
25   between the healthcare provider and the patient?
```

3944

```
 1    A    Sure.
 2              THE COURT:  I'm sorry.  You will need to answer out
 3    loud.
 4    A    Yes.
 5    BY MR. SHARMAN:
 6    Q    As the healthcare provider, you need to be able to trust
 7    the patient; right?
 8    A    I need to be able -- say that again.
 9    Q    To trust the patient.
10    A    To trust my patient?
11    Q    Yes, ma'am.
12    A    Yes.
13    Q    You need to be able to do that; right?
14    A    Yes, yes.
15    Q    And they need to be able to trust you; right?
16    A    Yes.
17    Q    And part of that is because in pain management pain is
18    subjective, right, rather than objective?
19    A    Some of it is.
20    Q    There's no device, there's no painometer that you can hook
21    somebody up to to get an objective reading of pain; right?
22    A    No.
23    Q    So you have to depend in part on their words about the pain
24    they're experiencing; right?
25    A    Right.
```

BRIDGETTE PARKER - CROSS BY MR. SHARMAN

1  Q   You have to use devices such as a zero to 10 scale to ask
2  somebody where their pain falls along that scale; right?
3  A   Yes.
4  Q   Or sometimes you see it maybe like with the happy face at
5  one end and the frowny face at the other end; right?
6  A   Yes.
7  Q   On direct examination you answered some questions about
8  Subsys, Abstral, and fentanyl.  Do you remember some of those
9  questions and answers?
10  A   Today?
11  Q   Yes, ma'am.
12  A   Yes.
13  Q   And you know what TIRF medicines are; right?
14  A   Uh-huh (positive response).
15  Q   You need to say yes or no.
16  A   Yes.
17  Q   And TIRF is an abbreviation for transmucosal immediate
18  release fentanyl; right?
19  A   Right.
20  Q   And Subsys and Abstral are two examples of TIRF medicines;
21  right?
22  A   Right.
23  Q   If I told you or if the record reflected that less than one
24  percent of Dr. Couch's prescriptions were for TIRF medications,
25  would you have any reason to disagree with that?

1          MS. GRIFFIN:  Your Honor, there's no foundation for

2     the question.  There's been no testimony about the percentage

3     of the patients.

4          MR. SHARMAN:  I'll ask it as a hypothetical, Your

5     Honor.

6          MS. GRIFFIN:  Your Honor, she's not an expert witness.

7     She's not entitled to answer that.

8          MR. SHARMAN:  Your Honor, we've asked lay witnesses

9     all kinds of hypothetical questions.

10          THE COURT:  I overrule the objection.

11    BY MR. SHARMAN:

12    Q   If I were to tell you or if the record were to show that

13    less than one percent of all of Dr. Couch's prescriptions were

14    for TIRF medications, would you have any reason to disagree

15    with that?

16    A   Yes, I disagree.

17    Q   You would disagree even if the record showed that less than

18    one percent of all his medications were TIRF medications, you

19    would disagree with that?

20    A   I mean it seemed to me that we wrote lots of it, more than

21    one percent.  But I haven't seen, you know, anything

22    definitive.

23    Q   So you haven't reviewed prescription records one way or the

24    other; right?

25    A   I haven't reviewed prescriptions?  Is that what you're

3947

 1   saying?

 2   Q   You have not reviewed the universe of Dr. Couch's

 3   prescriptions in total; right?

 4   A   No.

 5   Q   The only prescriptions you are familiar with are those that

 6   you personally handled; right?

 7   A   Yeah (nodding head affirmatively).

 8   Q   Is that right?

 9   A   Yes.

10   Q   You were also asked on direct about some comparison between

11   Subsys, Abstral, and how they're delivered.  Do you remember

12   some of those questions then?

13   A   Yes.

14   Q   Subsys and Abstral are basically the same medication but in

15   different delivery systems; right?

16   A   Right.

17   Q   And I think you touched on this on direct.  But the FDA

18   approved Subsys for use in cancer patients with breakthrough

19   pain who are already on opioids; right?

20   A   Uh-huh (positive response).

21   Q   Is that right?

22   A   Right.

23   Q   And when the FDA approves a particular medicine for a

24   particular purpose, sometimes that's referred to as that

25   medicine being indicated for that purpose; is that another way

1    of saying that?

2    A    Yes.

3    Q    And as you mentioned on direct, I believe, there's also a

4    practice called off-label use or off-label prescription of

5    medicine; right?

6    A    Yes.

7    Q    And off-label use of medicine occurs when the healthcare

8    professional believes that medication will help a patient in a

9    particular circumstance even where that medication is not FDA

10   indicated for that use; right?

11            MS. GRIFFIN:  Objection as to foundation, Your Honor.

12            MR. SHARMAN:  She testified about it on direct.

13            THE COURT:  Overruled.

14   BY MR. SHARMAN:

15   Q    Off-label use occurs when the healthcare professional with

16   regard to a particular patient in a particular situation

17   decides that that medication will help that patient even though

18   that medication is not FDA indicated for that particular

19   purpose; right?  That's what off-label use is?

20   A    Right.

21   Q    And there's nothing unusual about that; right?

22            MS. GRIFFIN:  Objection as to foundation for whether

23   it's unusual or not.

24            THE COURT:  Sustained.

25   BY MR. SHARMAN:

1   Q   You're familiar with the use of off-label medications;

2   right?

3   A   Those that are only the TIRF REMS.

4   Q   You never heard of any other medicine being used off label?

5           MS. GRIFFIN:  Objection, Your Honor, as to relevance.

6           MR. SHARMAN:  Your Honor, we've had weeks of

7   discussions about off-label and on-label use of

8   medications.  It was raised on --

9           THE COURT:  I know.  But her testimony is that the

10  only ones she is familiar with are the TIRF drugs.

11  BY MR. SHARMAN:

12  Q   And I believe your testimony also on direct was there was

13  nothing wrong in your view with the off-label use of those

14  medications?

15          MS. GRIFFIN:  And Your Honor, I object as asked and

16  answered.

17          MR. SHARMAN:  It is not, Your Honor.  It was testified

18  on --

19          THE COURT:  All right.  Overruled.

20  BY MR. SHARMAN:

21  Q   And it is your view with regard to those medications that

22  you were talking about on direct the off-label use was not

23  inappropriate; right?

24  A   I only -- I'm only familiar with the forms of Subsys.

25  Q   Yes, ma'am.  And it was your testimony on direct, I

3950

1   believe -- but correct me if I'm wrong -- that you did not find

2   the off-label use of Subsys and Abstral in those circumstances

3   to be wrong or inappropriate; right?

4   A   No.  I felt that it was used often when it shouldn't be.

5   Q   Dr. Couch made decisions about prescriptions and treatment

6   plans based in part, at least, on what you told him; right?

7   A   Right.

8   Q   After you, for example, took a patient history; right?

9   A   Uh-huh, yes.

10  Q   And after you examined the patient; right?

11  A   Yes.

12  Q   After you had spoken with the patient?

13  A   Yes.

14  Q   And then after all that, you recommended a treatment plan;

15  right?

16  A   Yes.

17  Q   And usually he agreed with that treatment plan; right?

18  A   Sometimes.  I mean, there were times that he didn't.

19  Q   Yes, ma'am.  Usually he agreed with it, sometimes he

20  didn't; right?

21  A   Right.

22  Q   He relied on you, did he not?

23  A   Yeah, he relied on me.

24  Q   He reposed great trust in you, did he not?

25  A   Yeah.

3951

1    Q    Now, with regard to treatment plans, you were asked some

2    questions about medication changes.  Do you remember some of

3    those questions you got earlier today?

4    A    No.  You'll have to refresh my memory.

5    Q    You were asked some questions about changing a patient's

6    treatment plan, for example, from Subsys to Abstral or Abstral

7    to Subsys.  Do you remember that?

8    A    Yeah.

9    Q    Do you remember that?

10   A    Yes.

11   Q    Now, Subsys, for example, could be very expensive, could it

12   not?

13   A    Yes, it's very expensive.

14   Q    And you know that there was a voucher program by the

15   manufacturer of Subsys; right?

16   A    I didn't know anything about the one with Subsys.

17   Q    You never heard about that?

18   A    Huh-uh (shaking head negatively).

19   Q    And you know there was a voucher program for Abstral;

20   right?

21   A    Yeah, for Abstral.

22   Q    And the purpose or one of the purposes of a voucher program

23   is to provide the medication to the patient at a greatly

24   reduced cost or perhaps even for free; right?

25   A    Uh-huh (positive response).

1   Q   I'm sorry?

2           THE COURT:  You have to answer yes or no.

3   A   Yes.

4   BY MR. SHARMAN:

5   Q   And then when a voucher program for a particular patient

6   was finished -- that is because of time limitation or for

7   whatever reason -- then in the normal course the patient's

8   insurance would have to kick in; right?

9   A   Right.

10  Q   And again, as you said, that could get expensive either for

11  the patient, the insurance company or both; right?

12  A   Right.

13  Q   All right.  So sitting here today under oath, you don't

14  know whether or not any changes between Subsys and Abstral were

15  made so that the patient might be able to get medicine for free

16  or at a reduced cost, right?  You don't know that sitting here

17  today?

18  A   No.  I -- we had coupons for Actos [sic], I think, at one

19  time.

20  Q   My question is sitting here today, Ms. Parker, you don't

21  know and cannot say whether or not any changes in a patient's

22  treatment plan from Abstral to Subsys or Subsys to Abstral were

23  made so that the patient could get his or her medicine at a

24  reduced price or even for free, right?  You can't say that

25  because you don't know; right?

3953

1   A    No.  I do know.  That is true.  And sometimes they go from

2   one drug to the next because of, you know, how -- the cost or

3   whatever.  And as far as insurance and a coupon for Actos [sic]

4   -- and then like once that ran out, then they'd swap them over

5   to another form of fentanyl like Subsys lots of times.

6   Q    When you viewed the video that Ms. Griffin showed you about

7   the undercover visit, Ms. Parker, she asked you a number of

8   questions about that visit; right?

9   A    Who is she?

10  Q    Ms. Griffin, the prosecutor, this morning.  She asked you

11  some questions about that video; right?

12  A    Right, yes.

13  Q    And she asked you questions about what you were doing when

14  you were typing on a keyboard while you were speaking with the

15  undercover agent; right?

16  A    We didn't talk about a keyboard.

17  Q    On the undercover video, Ms. Parker, you were seen entering

18  information by using a keyboard; right?

19  A    Right.

20  Q    You were using that keyboard to enter information into a

21  computer; right?

22  A    Right.

23  Q    The information you were entering was about the fake

24  patient, the undercover agent; right?

25  A    Yeah.

BRIDGETTE PARKER - CROSS BY MR. SHARMAN

1  Q   Now, you were having to do that because by that time --

2  that is, the time that we saw the video -- PPSA had switched to

3  an electronic medical records system; right?

4  A   Say that again.

5  Q   You were typing information, Ms. Parker, into the computer

6  because by the time of that undercover visit PPSA was no longer

7  using solely paper records but rather was using an electronic

8  medical records system.  That's what you were inputting.

9  A   Right.

10  Q   Is that right?

11  A   Right.

12  Q   Is that right?

13  A   Right.

14  Q   And that system was called Greenway, was it not?

15  A   Yes.

16  Q   All right.  And there are some helpful things and some

17  unhelpful things about electronic medical records systems;

18  right?

19  A   Uh-huh (positive response).

20  Q   I'm sorry?

21  A   Yes.

22  Q   And one thing an electronic medical records system does is

23  that it will populate the various fields usually with

24  information from the previous encounter or visit; right?

25  A   Right.

BRIDGETTE PARKER - CROSS BY MR. SHARMAN

1    Q    It does that so you don't have to redo everything; right?

2    A    Right.

3    Q    All right.  And that is supposed to be a function that's

4    helpful and efficient; right?

5    A    Yes.

6    Q    But it also means sometimes that -- when you open that

7    system and start entering data as you were asked about on

8    direct, that you might have to change information that's

9    already populated; right?

10   A    Yes.

11   Q    And if you're really busy in your practice, you don't

12   always do that; right?

13   A    Right.

14   Q    But if --

15   A    You have to come back at a later date.

16   Q    Ideally you would come back at a later dated and correct

17   it; right?

18   A    Right.

19   Q    Even if you don't come back at a later date and correct it,

20   whether for the press of work or any other reason, you never

21   failed to change a record because you were trying to cheat

22   somehow; right?

23   A    Say that again.

24   Q    You never failed to change a record or modify an electronic

25   record because you were trying to, for example, enter a false

```
 1   record in a patient's chart, were you?

 2   A   That's not true (shaking head negatively).

 3   Q   That's right.

 4   A   No.

 5   Q   You never did that, did you?

 6   A   No, I didn't.

 7   Q   You never did that to try to cheat the government out of

 8   money, did you?

 9   A   No.

10   Q   You never did that?  Ma'am?

11   A   No.

12   Q   You never did that to try to deceive an insurance company;

13   right?

14   A   No.

15   Q   You never wrote down a description entry or note, whether

16   for procedure or an office visit, that it was in any way in

17   your view deceptive; right?

18   A   Nothing that I did I felt was deceptive to my patients.

19   Q   That's right.  Nothing you did was deceptive to your

20   patients, and nothing you did that was reflected in the records

21   you prepared was intentionally deceptive; right?

22   A   Was intentionally what?

23   Q   Deceptive.  You never tried to lie or cheat or deceive

24   somebody --

25   A   No.
```

BRIDGETTE PARKER - CROSS BY MR. SHARMAN

1    Q   -- with an electronic medical record; right?

2    A   No.

3    Q   And on that subject and on the subject which you testified

4    about on direct of new patient visits, there were some

5    distinctions between a new patient visit on the one hand and

6    then return patient visits on the other hand; right?

7    A   Right.

8    Q   One of those distinctions was that it was Dr. Couch's

9    practice to see the patient on the first or initial visit

10   right?

11   A   Right.

12   Q   And then it was frequently his practice to not see the

13   patient on the followup visits unless the patient presented

14   with a new problem or a new issue or there had to be some

15   substantial change made; is that right?

16   A   Right.

17   Q   So your practice was in general for a new patient visit you

18   would do a full or much more complete examination the first

19   time; right?

20   A   Right.

21   Q   And then on return visits your practice was to focus more

22   on those particular complaints or those parts of the body that

23   were at issue for the returning patient; right?

24   A   That wasn't my primary focus.

25   Q   I beg your pardon?

1    A    That wasn't the primary focus.

2    Q    Okay.  So you didn't subsequently focus on the particular

3    complaints that the patient had; is that what you say?

4    A    No.  I did whatever I could to help the patients that had a

5    complaint.

6    Q    Yes, ma'am.  And so on each successive visit you would ask

7    a patient, and the patient would tell you about their

8    particular complaint; right?

9    A    Uh-huh, yes.

10    Q    Is that right?

11    A    Yes.

12    Q    And that became more the focus on recurring visits; right?

13    A    Yes.

14    Q    And that practice -- that is, how you handled initial

15    patient visits and then how you handled subsequent patient

16    visits -- that never struck you as inappropriate or wrong in

17    any way; right?

18    A    Repeat your question.

19    Q    The way you handled initial patient visits, in your view,

20    there was nothing wrong with that; right?

21    A    The way I was handling my patients?

22    Q    Yes, ma'am.

23    A    At a new appointment?

24    Q    Yes, ma'am.

25    A    Yeah.

1  Q   There was nothing wrong with that; is that right?

2  A   That's right.

3  Q   The way you handled returning patient visits, there was

4  nothing wrong with that in your view; right?

5  A   Right.

6  Q   Had you thought at the time that there was something wrong

7  about it, you would have brought it to Dr. Couch's attention;

8  right?

9        MS. GRIFFIN:  Objection, Your Honor.  There is no

10  foundation.  That's speculation.

11        THE COURT:  Sustained.

12  BY MR. SHARMAN:

13  Q   Did you ever bring to Dr. Couch's attention any concerns

14  about the way you were handling new patient visits?

15  A   The way I was handling the visits?

16  Q   Yes, ma'am.  Yes, ma'am.

17  A   No.

18  Q   Did you ever bring to Dr. Couch's attention any concern you

19  had about the way you were handling returning patient visits?

20  A   No, not unless there was a problem.

21  Q   On direct examination the government lawyer asked you a few

22  questions about Abstral and in particular the manufacturer of

23  Abstral.  Do you remember a few of those questions and answers?

24  A   Yes.

25  Q   A company called Galena was the manufacturer of Abstral;

3960

1    right?

2    A    Yes.

3    Q    And you said on direct that you believed or understood that

4    Dr. Couch had purchased stock in Galena; is that right?

5    A    Yes.

6    Q    And you testified on direct that Dr. Couch mentioned Galena

7    stock to you, at least once; right?

8    A    Right.

9    Q    Dr. Couch said that he thought this was a good company and

10   you might want to invest in it; right?

11   A    Right.

12   Q    You ultimately did not do that; correct?

13   A    Right.

14   Q    Dr. Couch never put any kind of pressure on you to try to

15   make you buy any stock in Galena; right?

16   A    No.

17   Q    And there was no requirement or pressure on the staff as

18   far as you know to buy Galena stock because Dr. Couch happened

19   to buy some; right?

20   A    No.

21   Q    I beg your pardon?

22   A    No.

23   Q    On direct examination you were asked a few questions about

24   signatures on various documents.  Do you remember some of those

25   questions?

1   A   Yes.

2   Q   And I believe you talked about two kinds of documents in

3   particular, and I want to take those one at a time.  First you

4   talked about blank prescriptions.  Do you remember some of

5   those questions --

6   A   Yes.

7   Q   -- you got about blank prescriptions; is that right?

8   A   Yes.

9   Q   And I believe on direct the government showed you what is

10  claimed to be a prescription pad or a prescription sheet that

11  supposedly has Dr. Ruan's signature on it.  Do you remember

12  being shown that?

13  A   Yes.

14  Q   With regard to Dr. Couch, at any time has the government

15  shown you any piece of paper, any blank prescription pad --

16  A   No.

17  Q   -- that bears Dr. Couch's signature?

18  A   No.

19  Q   Have you ever pointed out to the government any piece of

20  paper, any blank prescription pad that bears Dr. Couch's

21  signature?

22  A   No.

23  Q   On direct you testified that there were a couple of

24  patients of yours that Dr. Couch did not sign a prescription

25  for but somebody else signed; is that right?

1   A   Right.

2   Q   And for those couple of patients, that someone else was

3   Justin Palmer; right?

4   A   Right.

5   Q   And Mr. Palmer was also a nurse practitioner; right?

6   A   Right.

7   Q   I beg your pardon?

8   A   Right.

9   Q   Sitting here today under oath, you --

10          MS. GRIFFIN:  Your Honor, I object to counsel

11   reminding the witness that she's under oath.

12          THE COURT:  Yes.  Don't use that phrase.  All

13   witnesses are under oath all the time.  So you don't need to

14   use that phrase.

15   BY MR. SHARMAN:

16   Q   Sitting here today testifying, you can't recall and you

17   don't know what, if anything, Dr. Couch knew or didn't know

18   about Mr. Palmer signing any particular script; right?

19   A   Repeat the question.

20   Q   Sitting here today, you cannot say what Dr. Couch knew or

21   didn't know about Mr. Palmer signing any prescriptions; right?

22   A   That's not true.

23   Q   You never went to Dr. Couch and said:  Hey, Dr. Couch,

24   Justin Palmer is signing your name to prescriptions, did you?

25   A   No, sir.

1   Q   You never went to Dr. Couch and said:  Dr. Couch, I am very

2   concerned because somebody is signing your name to

3   prescriptions, did you?

4   A   No, I didn't.

5   Q   You never went to Mr. Palmer and said:  Justin, if you

6   don't stop this, I'm going to report you to Dr. Couch, did you?

7   A   No.  The reason why is because he already knew.

8   Q   My question was you didn't do any of those things, did you?

9   A   He signed a few for me, yes.

10  Q   No, ma'am.  I'm sorry.  My question was you didn't go to

11  Justin Palmer and say:  Justin, if you don't stop this

12  practice, I'm going to complain to Dr. Couch or somebody else?

13  You never did that, did you?

14  A   No.  I didn't have to.  Because everybody knew that he knew

15  about it.  I mean, I've stood in his office and heard them talk

16  face to face:  Don't sign my name on a prescription.

17  Q   Oh, Dr. Couch instructed Mr. Palmer to not do that?

18  A   Right.

19  Q   So if Mr. Palmer did it, he was disobeying Dr. Couch's

20  instruction?

21  A   Yeah.  I don't know what agreement they had.

22  Q   That wasn't my question.  If Dr. --

23          MS. GRIFFIN:  Your Honor, I object to him attempting

24  to correct the witness.  He has asked the question and she has

25  answered it.

```
 1              MR. SHARMAN:  Your Honor, the witness is being

 2    nonresponsive.  So I would request that she be admonished to

 3    respond to the question.

 4              THE COURT:  Well, you do, Ms. Parker, need to answer

 5    specifically the question asked.  If further information is

 6    needed, one of the lawyers will ask you.  Okay?

 7              THE WITNESS:  Okay.

 8    BY MR. SHARMAN:

 9    Q   Do you want the question again?

10    A   Sure.

11    Q   So Mr. Palmer, if he continued to sign Dr. Couch's name,

12    did so against the express instructions of Dr. Couch; right?

13              MS. GRIFFIN:  Objection as to foundation.

14              THE COURT:  Overruled.

15    BY MR. SHARMAN:

16    Q   So Mr. Palmer, if he continued to sign prescriptions like

17    that, he was doing so against the express instructions of

18    Dr. Couch; right?

19    A   Right.

20    Q   Both with regard to the video of the undercover visit and

21    also with regard to several scripts that the government lawyer

22    showed you, you got some questions about prescriptions that

23    were provided to the patient in advance; that is, for a date to

24    be filled in the future.  Do you remember some of those

25    questions?
```

3965

1    A    Yeah.

2    Q    All right.  And, for example, in the undercover video, we

3    saw you provide two prescriptions to the undercover agent;

4    right?

5    A    Right.

6    Q    One was for Zanaflex; is that right?

7    A    Right.

8    Q    And one was for Roxicodone; right?

9    A    Right.

10   Q    And Zanaflex is not a controlled medication; right?

11   A    Right.

12   Q    So you could do that your own self?

13   A    Right.

14   Q    Roxicodone is a controlled medication; right?

15   A    Right.

16   Q    So you provided the undercover with those prescriptions;

17   right?

18   A    Right.

19   Q    And you provided them both for immediate fill and then for

20   fill later on, at a later date; right?

21   A    Right.

22   Q    There is nothing wrong with that; right?

23   A    No.  That's -- it's not right.

24   Q    You cannot do that?

25   A    No.

BRIDGETTE PARKER - CROSS BY MR. SHARMAN

1   Q   And what do you base that on?

2   A   What am I basing --

3   Q   What is the basis of your belief that that is not

4   appropriate?

5   A   Because mid-level is not allowed to do that.

6   Q   Oh, I may have been unclear.  I'm not talking about whether

7   you could or could not prescribe schedule II medications;

8   rather my question went to the provision of two prescriptions,

9   one to be filled immediately, one to be filled not before a

10   date in the future, like 45 days or 60 days in the

11   future.  With regard to that question, there's nothing wrong

12   with that; right?

13   A   I later found out yes, it is wrong.

14   Q   And what is your basis for that belief that it's wrong?

15   A   What is my basis?

16   Q   Why do you think that?

17   A   I've been told.

18   Q   By whom?

19   A   By professionals and I've talked with the Board.

20   Q   All right.  So you're saying that the Alabama Nursing Board

21   or the Alabama Board of Medicine prohibits that practice?

22   A   Yes.  They won't let you sign them a month ahead of time.

23   Q   Did the government tell you that?

24   A   Did the government tell me that?

25   Q   These prosecutors and the agents, did they tell you that?

```
 1    A    No.

 2    Q    I beg your pardon?

 3    A    No.

 4    Q    And with regard to the video of the undercover visit, you

 5   had interaction with the undercover agent; right?  You talked

 6   with him?

 7    A    Uh-huh (positive response).

 8    Q    Is that right?

 9    A    Yes.

10    Q    He asked you questions; right?

11    A    Yes.

12    Q    He responded to your questions?

13    A    Yes.

14    Q    All right.  So, for example, you told him flat out that you

15   could not give him 120; right?

16    A    Right.

17    Q    And you told him flat out that Dr. Couch was not going to

18   do something unless he, Dr. Couch, was comfortable with it;

19   right?

20    A    Right.

21    Q    And you reviewed his chart or you were reviewing his chart

22   as you were talking to him; right?

23    A    Right.

24    Q    You asked him about, for example, whether he had had a

25   procedure; right?
```

BRIDGETTE PARKER - CROSS BY MR. SHARMAN

1   A    Right.

2   Q    You asked him about him having an address as living in

3   Montgomery; right?

4   A    Right.

5   Q    Because you were curious as to what was going on there;

6   right?  Why somebody from Montgomery might be a patient at

7   PPSA; right?

8   A    Sure.

9   Q    You asked him how his -- how his business was doing; right?

10  A    Right.

11  Q    And whether it was going well or poorly; right?

12  A    Right.

13  Q    And you asked him that because having a business or being

14  employed, that's a sign of stability in a patient; right?

15  A    Right.  Can be.

16  Q    And you were asking him about the Montgomery address

17  because you were trying to get a sense of where he actually

18  lived and why somebody would be seeking medical treatment for

19  pain perhaps that far from home; right?

20  A    Right.

21  Q    And you were doing that because you were trying to press a

22  little bit on whether this was appropriate or not; right?

23  A    Sure.

24  Q    You even asked him about and cautioned him about his blood

25  pressure; right?

BRIDGETTE PARKER - CROSS BY MR. SHARMAN

1    A    Right.

2    Q    And you did that because you spent a lot of time at a

3    cardiology clinic; right?

4    A    Right.

5    Q    Beg your pardon?

6    A    Right.

7              THE COURT:  Mr. Sharman, is now a good time for us to

8    break for lunch?

9              MR. SHARMAN:  Yes, ma'am.

10             THE COURT:  All right.  Ladies and gentlemen, we're

11   going to break for an hour and 15 minutes.  Leave your pads on

12   your chairs.  Be back downstairs in the jury assembly room at

13   1:15, ready to be called back up.  No discussion about the

14   case.  We're in recess.

15        (A recess was taken at 12:01 p.m.)

16        (Afternoon session, 1:20 p.m., in open court, defendants

17   and jury present.)

18             THE COURT:  All right.  Before you continue,

19   Mr. Sharman, I just want to remind the witness that we're

20   having a difficult time hearing you.  Make sure that you answer

21   directly into the microphone and keep your voice loud enough so

22   I can hear your responses.  Okay?  All right.  Thank you.

23             Go ahead Mr. Sharman.

24             MR. SHARMAN:  Thank you, Your Honor.

25   Q    Ms. Parker, what medications are you taking today?

3970

```
 1    A   Did I take last night?  I haven't taken any today.

 2    Q   What medications have you taken in the last 24 hours?

 3    A   Multivitamin, Esterol, ibuprofen.  I have an injection,

 4    it's a new medication, I'm not sure, for diabetes.  Flexeril,

 5    and I think that's it, what I took last night.

 6    Q   As a follow-on to your guilty plea, are you drug tested?

 7    A   Oh, yes, sir.

 8    Q   How frequently?

 9    A   Whenever they call my color.  And also I have to go to the

10    Board of Nursing.  So some days I have to go both places.

11    Q   On direct you were asked a few questions about something

12    called the Holy Trinity.  Do you remember those questions?

13    A   Uh-huh, yes, sir.

14    Q   That term "Holy Trinity" is not a term or phrase that you

15    used in your professional life; right?

16    A   I've heard it used, be used.

17    Q   The phrase "Holy Trinity" is not a phrase that you used in

18    your professional nursing healthcare life; right?

19            MS. GRIFFIN:  Your Honor, it's asked and answered.

20            MR. SHARMAN:  It's not, Your Honor.

21            THE COURT:  Well, the question is have you used it,

22    that phrase?

23            THE WITNESS:  No, no, ma'am.

24    BY MR. SHARMAN:

25    Q   You never heard Dr. Couch use that phrase; right?
```

1   A   No, sir.

2   Q   And you got a couple of questions about Adderall.  Based on

3   your understanding Adderall is not part of the so-called Holy

4   Trinity; right?

5   A   Sure, yeah.  I mean I'm not familiar enough with it.

6   Q   Before the lunch break, Ms. Parker, we were discussing

7   prescriptions and whether or not it was okay to provide a

8   patient with two or more prescriptions, one for an immediate

9   fill and then one not to be filled until a date certain in the

10  future.  Do you remember some of those questions and answers

11  you and I had?

12  A   Yes.

13  Q   All right.

14          MR. SHARMAN:  Sam, can we take a look at Exhibit 110?

15  Practitioner's Manual, page 23, please.

16  Q   I'm going to show you, Ms. Parker, what's already in

17  evidence as Couch's Exhibit 110, which is the DEA

18  Practitioner's Manual, I'm going to direct your attention to

19  the bottom of what's page 19 where it says:  Issuance of

20  multiple prescriptions for schedule II substances.

21          Do you see where I am?

22  A   Yes.

23  Q   It says there on page 19 of Exhibit 110 of the DEA

24  Practitioner's Manual:

25          The DEA has revised its regulations regarding the

BRIDGETTE PARKER - CROSS BY MR. SHARMAN

1  issuance of multiple prescriptions for schedule II controlled

2  substances.  Under the new regulation, which became effective

3  December 19, 2007, an individual practitioner may issue

4  multiple prescriptions authorizing the patient to receive a

5  total of up to a 90-day supply of a schedule II controlled

6  substance provided the following conditions are met.

7           Now, first, do you see where I read that?

8  A   Yes.

9  Q   Did I read that correctly?

10 A   Yes.

11 Q   And you were employed at PPSA after December 19th, 2007;

12 right?

13 A   Yes.

14 Q   All right.  And then the DEA Practitioner's Manual goes on

15 to identify several conditions that must be satisfied.

16          MS. GRIFFIN:  Your Honor, we object to the relevance

17 with this witness.  She's not a physician.

18          THE COURT:  Overruled.

19 BY MR. SHARMAN:

20 Q   The DEA Practitioner's Manual, Ms. Parker, goes on to

21 identify several conditions that must be satisfied so that the

22 language I just read to you can apply.  Is the language I just

23 read to you consistent with your understanding of whether or

24 not a practitioner may issue multiple prescriptions within a

25 90-day period provided certain conditions are met?

BRIDGETTE PARKER - CROSS BY MR. SHARMAN

1    A    Say that again.

2    Q    Is what I just read to you consistent with your

3    understanding or inconsistent with your understanding about

4    whether or not a healthcare practitioner may prescribe schedule

5    II narcotics within a 90-day period?

6    A    Yes.

7    Q    That is consistent with what you understand?

8    A    Right.

9            MR. SHARMAN:  And if I could switch over to the ELMO,

10   please.

11   Q    I want to show you, Ms. Parker, what you were shown on

12   direct, which is Government's Exhibit 20-9.  And I'll direct

13   your attention --

14           MS. GRIFFIN:  Your Honor, we object.  She was not

15   shown this particular -- I'm sorry.  She was shown this one.  I

16   was thinking you were talking about the one dated after

17   May.  Excuse me.

18           THE COURT:  All right.

19   BY MR. SHARMAN:

20   Q    I'll direct your attention to Government's Exhibit 20-9 and

21   to the two prescriptions on the left-hand side of the page.  Do

22   you see where I am there?

23   A    Yes.

24   Q    And the bottom prescription has an effective date of

25   November 6th, 2014; correct?

1    A    Right.

2    Q    And then the prescription above it has an effective date of

3    December 4th, 2014, roughly 30 days later; right?

4    A    Right.

5    Q    So those are multiple prescriptions, two prescriptions;

6    right?

7    A    Right.

8    Q    Within a 90-day period; right?

9    A    Right.

10   Q    You also mentioned in response to my question that you had

11   checked with the Alabama Board of Medicine about the practice

12   of one prescription versus more than one prescription for a

13   later fill.  Do you remember telling me that?

14   A    Uh-huh, yes (nodding head affirmatively).

15   Q    And you did do that?

16   A    Yes.

17   Q    All right.  I'm going to show you what's -- if I could have

18   the ELMO again, please -- what's been previously marked in

19   evidence as Couch's Exhibit 118, which is the Alabama Board of

20   Medical Examiners' administrative code section that talks about

21   the registration, recordkeeping and dispensing of controlled

22   substances.  Have you consulted any regulations like this,

23   including this one, Exhibit 118?

24   A    You mean have I checked into anything else?

25   Q    Have you considered the regulations of the Alabama Board of

1   Medical Examiners concerning whether or not it's okay to write

2   multiple prescriptions, one of which is due to be filled right

3   away and one of which is due to be filled at a later date?

4   A   Yeah, I questioned it, because you're not supposed to be

5   able to sign ahead of time.

6   Q   My question is did you look at the regulations of the

7   Alabama Medical Board for that purpose, Ms. Parker?

8   A   No.

9   Q   So you don't know whether those regulations address that

10  question or not because you didn't look at it; right?

11  A   Right.

12          MR. SHARMAN:  May I approach, Your Honor?

13          THE COURT:  Yes.

14  BY MR. SHARMAN:

15  Q   Ms. Parker, I show you what's been marked as Couch's

16  Exhibit 239, which is a one-page document, and ask you to take

17  a look at it, please, ma'am.  Is Exhibit 239 a document you

18  have seen before?

19  A   This document looks -- yeah, it looks familiar.

20  Q   Yes, ma'am.  And it's addressed to you, Ms. Bridgette

21  Parker; is that right?

22  A   Uh-huh (positive response).

23          THE COURT:  You have to answer out loud.

24  A   Yes, sir.

25  BY MR. SHARMAN:

1   Q   And it's dated August 18, 2015?

2   A   Correct.

3           MR. SHARMAN:  Your Honor, Dr. Couch moves Exhibit 239

4   into evidence.

5           MS. GRIFFIN:  No objection.

6           THE COURT:  All right.  Mark it in.

7       (Defendant Couch's Exhibit 239 was entered into evidence.)

8           MR. SHARMAN:  May it be published to the jury, please?

9           THE COURT:  Yes.

10          MR. SHARMAN:  May I switch over to the laptop, please?

11          THE CLERK:  Yes, sir.

12  BY MR. SHARMAN:

13  Q   All right.  Ms. Parker, this is a letter directed to you

14  dated August 18th, 2015; right?

15  A   Correct.

16  Q   Okay.  So this is the late summer after you had left PPSA;

17  right?

18  A   Right (nodding head affirmatively).

19  Q   You left in January?

20  A   Right.

21  Q   We're now in August; right?

22  A   Right.

23  Q   And PPSA was raided on May 20th, 2015; right?

24  A   I don't know the exact date.

25  Q   Does that sound about right?

1    A    It was in May.

2    Q    All right.  Let's look, Ms. Parker, at the first paragraph

3    of Exhibit 20 -- I'm sorry -- Exhibit 239.

4            MS. GRIFFIN:  Your Honor, I don't object to it being

5    admitted.  It's a target letter.  But I do object to the

6    relevance of going through it with this witness.

7            MR. SHARMAN:  Your Honor, it is --

8            THE COURT:  Can you come to side bar, please.

9        (At the side bar, jury not present.)

10           MS. GRIFFIN:  The fact that in August of '15 she was

11   notified by the United States that she was the subject of a

12   healthcare fraud investigation has no bearing on what has

13   happened here.  She was subsequently indicted for drugs, and

14   she subsequently pled guilty to a drug count, title 21 offense.

15   And I don't know that going through with her what the

16   government thought about her and particularly pertaining to

17   grand jury has anything to do -- it's beyond the scope of

18   direct, and it does not go to any deals she has with the United

19   States.

20           MR. SHARMAN:  It goes to her credibility, Your Honor.

21   She got a target letter in August, and she started realizing

22   that she was going to have to do something about it.  That's

23   exactly what this letter invites her to do.  The fact that she

24   ultimately pled to an offense doesn't change the fact that this

25   goes to her credibility and especially with the time frame that

 1   she's ultimately going to plead in December.  So I think I'm

 2   entitled to go through it.  There's nothing -- there's nothing

 3   prejudicial about it.

 4           MS. GRIFFIN:  But, Your Honor, what it goes to is that

 5   she went out and got a lawyer and advice.  Well, what did the

 6   lawyer tell you to do -- which, of course, she can't answer.

 7   And I don't think it has any relevance connected to this; that

 8   she was told she was under investigation --

 9           MR. SHARMAN:  And, Your Honor --

10           MS. GRIFFIN:  -- which she obviously knew she was

11   under investigation at some point.

12           MR. SHARMAN:  I'm not going to seek privileged

13   information.  But receiving a target letter is something that

14   is important to show a witness' motive, bias, and incentive to

15   come up with a story.

16           MS. GRIFFIN:  Your Honor, she was indicted, and that's

17   her incentive to plead guilty.

18           MR. SHARMAN:  They are both incentives, and I should

19   be allowed to explore it.

20           THE COURT:  Did she begin cooperating prior to the

21   indictment?

22           MR. BODNAR:  I think she met with us once but --

23           MS. GRIFFIN:  It was sometime after.

24           MR. SHARMAN:  The proffer letter is actually --

25           MS. GRIFFIN:  The proffer letter is December 15 --

1          MR. SHARMAN:  It was after.

2          MS. GRIFFIN:  -- and she pled guilty in December of

3    '15.

4          MR. SHARMAN:  The 11th.  It's very odd.

5          MR. BODNAR:  I think we did a reverse proffer where we

6    spoke to her -- but she didn't speak to us, if I recall

7    correctly -- and asked her if she wanted to plead to an

8    information.  She didn't.  Then she was indicted and then

9    pled.  I don't think we actually talked, to the best of my

10   recollection -- do you remember her talking to us prior to her

11   pleading?  Do you remember?

12         MS. GRIFFIN:  I can go get the dates of all her

13   statements.

14         THE COURT:  That's all right.  It appears to me that

15   if any debriefing occurred after the indictment, then I don't

16   see the relevance of this.  So I sustain the objection to just

17   going through it with her.  You've already established that she

18   received a target letter, and you can ask her did she know she

19   was target of an investigation.

20         MR. SHARMAN:  May I ask her if she understood that she

21   was target of a federal grand jury investigation?

22         THE COURT:  Right.

23      (In open court, defendants and jury present.)

24   BY MR. SHARMAN:

25   Q   Ms. Parker, we were just looking at Exhibit 239, which is a

1    letter dated August 18, 2015, addressed to you.  Did you

2    understand after you received and looked at this letter that

3    you were the target of a federal grand jury investigation?

4    A   After I got it, yeah, I realized it.

5    Q   Did you take any steps after you came to the realization

6    that you were the target of a federal grand jury investigation?

7    A   Yes.

8    Q   What did you do?

9    A   I found an attorney.

10   Q   And then did you or your attorney on your behalf enter into

11   discussions with the government?

12           MS. GRIFFIN:  Your Honor, I object to what happened

13   with her attorney.  She can say what she did.  But I think it's

14   improper to ask her about her attorney.

15           MR. SHARMAN:  I'm not asking for communications.  I'm

16   asking what she or her attorney did.

17           THE COURT:  Yeah.  Overruled.

18   BY MR. SHARMAN:

19   Q   After you got that target letter telling you that you were

20   the target of a federal grand jury investigation, did you take

21   any steps?

22   A   Yes.

23   Q   You said you got an attorney; right?

24   A   Right.

25   Q   Then did you or your attorney enter into discussions with

3981

 1    the government?

 2    A    Sure, yes.

 3    Q    And did those discussions have any results?  Did anything

 4    happen as a result of those discussions?

 5    A    Yes.

 6    Q    And what happened was that you pled guilty; right?

 7    A    Right.

 8    Q    And you discussed that a little bit on direct with

 9    Ms. Griffin, did you not?

10    A    Yes, I discussed it with her.

11    Q    All right.  I want to turn your attention to your plea

12    agreement, which is in evidence as Exhibit 8-2.

13            All right.  Ms. Griffin touched with you briefly --

14    well, first, just to make sure we're on the same page, if

15    you'll just look at the top third there, will you confirm that

16    this is in fact your plea agreement that you and Ms. Griffin

17    discussed?

18    A    Yes.

19    Q    And you pled guilty on December 11th, 2015; does that sound

20    right?

21    A    It sounds right, but I don't have the -- I can't see the

22    date.

23    Q    And that was -- that was in this courtroom; right?

24    A    I believe so.

25    Q    Before Judge Granade?

BRIDGETTE PARKER - CROSS BY MR. SHARMAN

1   A   Yes, yes.

2   Q   And you pled guilty to one count of conspiracy to violate

3   the Controlled Substances Act; right?

4   A   Right.

5   Q   And you haven't been sentenced yet; correct?

6   A   Right.

7   Q   And as Ms. Griffin touched upon, you would rather have a

8   shorter than a longer potential prison sentence, would you not?

9   A   Would I want a shorter --

10  Q   Yes, ma'am.

11  A   -- prison sentence?  Yes.

12  Q   And because you have a family, you'd rather not spend time

13  away from them if you don't have to; right?

14  A   Right.

15  Q   All right.  Let's look at a couple of provisions here

16  briefly, if we could turn to page -- I'm sorry -- page six,

17  paragraph 20.  All right.  In paragraph 20 you agree to

18  cooperate with the government; right?

19  A   Correct.

20  Q   And then if we look at paragraph 20(c), it says that you're

21  going to --

22          MR. SHARMAN:  I'm sorry, Sam.  If we could go onto the

23  next page for (c), please.

24  Q   It says you're going to comply with all instructions from

25  law enforcement authorities.  Do you see where I read that?

1    A    Yes.

2    Q    Did I read that correctly?

3    A    Yes.

4    Q    That means you're going to do what they tell you; right?

5    A    Yes.

6    Q    And then you're also agreeing to monitor or record phone

7    conversations; right?

8    A    Say that again.

9    Q    If you'll look there, it says that you consent to monitored

10   or recorded telephone conversations.  You said you would be

11   willing to do that; right?

12   A    Whatever is in here.  I can't see.

13         MR. SHARMAN:  Sam, can you highlight it for the

14   witness, please.

15   Q    See where the yellow is?

16   A    Okay.

17   Q    Do you see that?

18   A    Uh-huh (positive response).

19   Q    In yellow?

20   A    Yeah.

21   Q    You consent to monitored or recorded telephone

22   conversations?

23   A    Uh-huh (positive response).

24   Q    Right?

25   A    Right.

```
 1              THE COURT:  Please speak directly into the microphone.
 2   BY MR. SHARMAN:
 3   Q   And you agreed to participate in undercover operations.
 4   We'll get that in yellow for you.  Do you see that on the
 5   screen there?
 6   A   Yes.
 7   Q   And you agreed to testify and to testify completely and
 8   truthfully at any grand jury.  Do you see that?
 9   A   I can't see -- okay.
10   Q   And anything before trial; right?
11   A   Yes.
12   Q   At any pretrial proceeding?
13   A   Yes.
14   Q   And during trial like you're doing now; right?
15   A   Right.
16   Q   Okay.  So you agreed to do all that?
17   A   Correct.
18   Q   That's what you understand cooperation is?
19   A   Right.
20   Q   Right?  And you're cooperating because you hope to spend
21   less time in prison; right?
22   A   Correct.
23              MR. SHARMAN:  All right.  Let's go to page eight, Sam,
24   please, and paragraph G, if we could.
25   Q   Okay.  So if we look at paragraph G on page eight of your
```

1  plea agreement, do you see there the government is looking for

2  substantial assistance?  Do you see that?

3  A   Uh-huh, yes.

4  Q   Okay.  And that's what they want -- you understand that's

5  what they want from you, substantial assistance; right?

6          MS. GRIFFIN:  Objection, Your Honor.  She has no

7  understanding about what the United States wants from her.  She

8  can testify what she believes are her responsibilities.  We

9  object to the form of that question.

10         MR. SHARMAN:  I think she can testify to her

11 expectations and understanding, Your Honor.

12         THE COURT:  All right.  Yes.  But you asked what the

13 United States wants, so I sustain the objection.

14 BY MR. SHARMAN:

15 Q   All right.  Ms. Parker, it's your understanding that the

16 United States expects you to provide substantial assistance;

17 right?  That's your understanding?

18         MS. GRIFFIN:  Your Honor, we object again to the

19 form.  It requires her to say what she thinks the United States

20 expects.  And I think that that form is inappropriate.

21         THE COURT:  Sustained.

22 BY MR. SHARMAN:

23 Q   Do you have or do you not have an understanding,

24 Ms. Parker, about what is expected of you in this agreement?

25 A   Yes.

BRIDGETTE PARKER - CROSS BY MR. SHARMAN

 1   Q   And your understanding is that substantial assistance to

 2   the government is expected of you; is that correct?

 3   A   Yes.

 4   Q   And substantial, you understand, means a good bit of, a

 5   meaningful amount of; right?  That's what substantial means;

 6   right?

 7   A   Sure.

 8   Q   Not just a little bit; right?

 9   A   Right.

10   Q   It means a lot; right?

11   A   Yes.

12   Q   And then that decision about whether your help, your

13   substantial assistance, is in fact substantial, the government

14   gets to make that decision in its sole discretion.  Do you see

15   that in your plea agreement?

16   A   Yes.

17   Q   And you understand that sole discretion means the ability

18   to make a decision without anybody else having an impact on it;

19   right?

20   A   Right.

21   Q   And you understand under your plea agreement that it's the

22   government alone that makes the decision as to whether they do

23   or do not file what's called a 5K1 motion with Judge Granade.

24   You understand that; right?

25   A   I don't know the numbers, but I know the decision is

BRIDGETTE PARKER - CROSS BY MR. SHARMAN

1    ultimately with the judge.

2    Q   The sentencing decision is for the judge.  You understand

3    that; right?

4    A   Right.

5    Q   The decision about whether the government does or does not

6    ask the judge to show you leniency is solely up to the

7    government.  You understand that, don't you?

8    A   Yes.

9    Q   And by being interviewed and then by coming in here and

10   testifying today, you're hoping they're going to make one of

11   those requests to the Court; right?  That's what you're hoping?

12   A   Yeah, that's what I'd hope for.

13   Q   I beg your pardon?

14   A   I said that's what I'd hope for.

15   Q   You went over on direct your employment history with PPSA

16   first with Dr. Ruan and then with Dr. Couch.  Do you remember

17   that, going over that with the government lawyer?

18   A   Yes.

19   Q   And Dr. Ruan let you go.  He fired you; right?

20   A   Right.

21   Q   When Dr. Ruan fired you, Dr. Couch gave you a second

22   chance; right?

23   A   Right.

24   Q   And then, as you talked about on direct, when you got

25   addicted and were struggling at work, Dr. Couch gave you a

1    second chance then too, did he not?

2    A    Yeah.

3    Q    I beg your pardon?

4    A    Yes.

5    Q    He contributed towards your rehab expenses, did he not?

6    A    Yes.

7    Q    And he said that you could continue or come back to PPSA to

8    work as long as you abided by the rules and regs of the rehab

9    place; right?

10   A    Right.

11   Q    So he helped pay for your rehab and he kept open the

12   possibility of you continuing to work; right?

13   A    Right.

14   Q    Is that a good thing, Ms. Parker, to give people second

15   chances?

16          MS. GRIFFIN:  Objection, Your Honor.

17          THE COURT:  Sustained.

18          MR. SHARMAN:  No further questions, Your Honor.

19          THE COURT:  Mr. Knizley?

20                      CROSS EXAMINATION

21   BY MR. KNIZLEY:

22   Q    Good afternoon, Ms. Parker.

23   A    Good afternoon.

24   Q    My name is Dennis Knizley, and I represent Dr. Ruan.

25          Ms. Parker, you told us on direct examination that you

 1  had some educational background or training to be a nurse; is

 2  that correct?

 3  A   Yes, sir.

 4  Q   You attended the University of Mobile where you got an

 5  undergraduate degree; is that correct?

 6  A   Yes, sir.

 7  Q   And you attended Troy State university and you got a

 8  master's degree in nursing; is that correct?

 9  A   Yes, sir.

10  Q   And of course, that was prior to your employment at PPSA?

11  A   Correct.

12  Q   And in addition to your educational background, you had

13  some home healthcare experience, did you not?

14  A   Yes, sir.

15  Q   And you also worked at the emergency room at the University

16  of South Alabama Medical Center, did you not?

17  A   Yes.

18  Q   And in addition to that, you spent 15 years working for a

19  cardiologist as a registered nurse?

20  A   Correct.

21  Q   And then after that experience -- you also knew Justin

22  Palmer, did you not?

23  A   While I was working at the -- before I started at PPSA?

24  Q   Before you came to work at PPSA.

25  A   I met him about two months prior to.  He was my preceptor

1   while I was in school.

2   Q   And I think you had done maybe some interning at PPSA or

3   something?

4   A   Yeah.  That's what I'm talking about.

5   Q   And so you knew him prior to your employment there?

6   A   Right.

7   Q   Well, after your work experience and your educational

8   experience, you thought you might want to apply for a job at

9   PPSA; is that right?

10   A   Yes, sir.

11   Q   And you did so when you were interviewed by Mr. Ruan; is

12   that correct?

13   A   Correct.

14   Q   And after that interview -- during the interview did you

15   share with him your educational background?

16   A   Yes.

17   Q   Did you share with him your work experiences in the

18   emergency room and home healthcare and with the radiologist --

19   or excuse me -- the cardiologist for 15 years?

20   A   Yes, sir.

21   Q   And based on that, and the rest of the interview, he hired

22   you; is that correct?

23   A   Yes.

24   Q   And you went to work as a nurse practitioner for him in

25   September of 2012; is that right?

1  A   Yes, sir.

2  Q   Now, in April of -- and you had told the ladies and

3  gentlemen of the jury that you had had a concern or problem

4  with the Nursing Board regarding an anonymous complaint someone

5  had made about you?

6  A   Yes.

7  Q   And in April of 2013 you had been working for Dr. Ruan

8  about six or seven months?

9  A   Okay.

10 Q   Is that correct?

11 A   Sure, yeah.

12 Q   And I'm going to show you what's marked as Defendant's

13 Exhibit 8-1.

14         THE COURT:  That's Government's Exhibit 8-1.

15 BY MR. KNIZLEY:

16 Q   Excuse me.  Government's Exhibit 8-1.  Do you see that?

17 A   Yes, sir.

18 Q   Okay.  And is this the letter that you -- and this is an

19 email of the letter; is that correct?

20 A   Yes, sir.

21 Q   Was it emailed to you as an attachment and you sent it on

22 to whoever you needed to send it on to; is that correct?

23 A   It was in an email, and I printed it and sent it to the

24 Board.

25 Q   This was in April of 2016 (sic) after you had been there

3992

```
 1   six or seven, and Dr. Ruan --
 2            MS. GRIFFIN:  No, Your Honor.  Excuse me.  I believe
 3   Mr. Knizley's date is wrong, 2016.
 4   BY MR. KNIZLEY:
 5   Q   I'm sorry.  April 16, 2013.  That's the date; correct?  And
 6   you had been doing good working for Dr. Ruan, had you not?
 7   A   I suppose I was.
 8   Q   Well, you got this letter and you -- did you agree with the
 9   content of the letter before you sent it to the Nursing Board
10   to support your position regarding the complaint that had been
11   made against you?
12   A   Did I agree with the letter?
13   Q   What Dr. Ruan said.
14   A   Yeah.
15   Q   And was it true?
16   A   Not all true.
17   Q   As far as what Dr. -- you don't say Dr. Ruan intentionally
18   said anything wrong in this letter, do you?
19   A   No, I'm not saying he said anything intentionally wrong.
20   Q   You're saying there may have been something going on that
21   he had not been made aware of?
22   A   Right.
23   Q   Something that you may have been doing?
24   A   Right.
25   Q   Now, as far as Dr. Ruan is concerned, though, would you say
```

3993

```
 1   that was a fair impression he had of what you were doing at
 2   that time?  What's in this letter was a fair impression of what
 3   he had?
 4           MS. GRIFFIN:  Object, Your Honor.  Object to
 5   foundation for her to answer the impression that Dr. Ruan had.
 6           THE COURT:  Sustained.
 7   BY MR. KNIZLEY:
 8   Q   Did you get this letter from Dr. Ruan?
 9   A   Yes.
10   Q   Did you read it?
11   A   Yes.
12   Q   And after reading it, did you take it upon you to send it
13   to the Nursing Board in support of the opposition to the
14   complaint that had been made against you?
15   A   Yes.
16   Q   You weren't trying to lie to the Nursing Board, were you?
17   A   No.
18   Q   And you were using Dr. Ruan's letter because you thought
19   the letter was helpful?
20   A   They asked for it.  The Board of Nursing had needed a
21   letter from my employer.
22   Q   And did you think the letter was helpful?
23   A   Yes, it was.
24   Q   And it was --
25   A   I'm assuming it was.
```

3994

1   Q   You were hoping it was?

2   A   Yeah.

3   Q   Okay.  And you sent it on.  And Dr. Ruan said some mighty

4   nice things about you?

5   A   Uh-huh (positive response).

6   Q   And to your knowledge, he didn't know anything in this

7   letter that wasn't true, to your knowledge?

8   A   Not to my knowledge.

9   Q   And he said about you in this letter, did he not, that he

10   was sending it on your behalf and that you worked in his

11   clinic, since September; right?

12   A   Right.

13   Q   And he talks about his qualifications.  And then he said

14   that two weeks after you had a lumbar fusion -- you had some

15   surgery just immediately prior to coming to work for him, did

16   you not?

17   A   Yes.

18   Q   And you had had some problems over 13 years due to a lumbar

19   disk; is that correct?

20   A   Yes.

21   Q   And he says in the letter he was a bit hesitant; right?

22   A   Right.

23   Q   And wanting to know -- didn't know if you could actually

24   handle the job, but he gave you the opportunity and you did

25   handle the job; is that right?

1  A   Right.

2  Q   And he spoke highly of your professional performance in the

3  clinic and being exceptional; is that correct?

4  A   Yes.

5  Q   And that you had handled your workload well without

6  difficulties?

7  A   Yes.

8  Q   And was that true?

9  A   Did I handle my workload?

10  Q   At this time in April of 2013.

11  A   No.

12  Q   Okay.

13  A   I was --

14  Q   You were not doing your work well?

15  A   Sir?

16  Q   You were not doing your work well?

17  A   I wasn't.  I couldn't keep up with all my documentation.

18  Q   We know by the time December came you certainly couldn't

19  keep up; right?

20  A   Yeah, I had a lot of charts out.

21  Q   Right.  By December; right?

22  A   Yes.

23  Q   But that didn't happen right away, did it?

24  A   I pretty much stayed behind always.

25  Q   Okay.  So you stayed behind all the way with Dr. Ruan, and

3996

 1   he kept on letting you -- you tried to make your way; is that

 2   right?

 3   A   Tried to what?

 4   Q   Tried to do your job.  He gave you a job, and you say --

 5   you say that you weren't doing that well, but he kept on

 6   letting you work there; right?

 7   A   Right.

 8   Q   He tried to help you.  In April he sent a letter to the

 9   Medical Board for you; right?

10   A   Uh-huh (positive response).

11   Q   Trying to give you a chance?

12   A   Uh-huh (positive response).

13   Q   And that went on, did it not, until December; right?

14   A   Right.

15   Q   And then things changed a good bit; right?

16   A   Right.

17   Q   All right.  Before we get to December, let's talk about

18   what you were doing.  During your direct examination you had

19   talked about what you do as a nurse practitioner.  And I'm

20   talking about when you were working for Dr. Ruan.  Okay?  And

21   my questions to you will be oriented around the time frame of

22   working with Dr. Ruan, not after you worked for Dr. Couch.

23   Okay?

24   A   Uh-huh (positive response).

25   Q   Okay.  If I don't make myself clear, will you stop me?  And

BRIDGETTE PARKER - CROSS BY MR. KNIZLEY

1    I'll try to clear it up.  Okay?

2    A    Okay.

3    Q    All right.  When you first started working for Dr. Ruan,

4    you told us a little bit about what happens when a new

5    patient -- a new patient comes in.  They have to take a urine

6    drug test, don't they?

7    A    Right.

8    Q    And if they have illicit drugs on the first test, they

9    don't get any drugs; is that right?  They don't get any

10   narcotics if they have illicit drugs on a UDT?

11   A    Right.

12   Q    And that was the rule; right?

13   A    Right.

14   Q    And that was Dr. Ruan's rule?

15   A    Uh-huh; that's right.

16   Q    Ma'am?

17   A    That's right.

18   Q    And then if they did come -- a patient comes in and they

19   don't have illicit drugs in their UDT, then the patient would

20   come first to the medical assistant; is that right?

21   A    Correct.

22   Q    And they would have their blood pressure taken and they

23   would be weighed and get that type information from them;

24   right?

25   A    Right.

1  Q   And then they would come to the exam room where the nurse

2  practitioner such as you would be there; right?

3  A   Right.

4  Q   And when they came in there you would assess the patient;

5  is that correct?

6  A   Correct.

7  Q   And in assessing the patient, is one of the things you do

8  would be to get the charts from the physician that referred

9  them?

10  A   Right.

11  Q   And almost all of your patients, if not all of your

12  patients, were referred from other physicians, were they not?

13  A   Correct.

14  Q   And after you looked at those documents, would you then

15  talk to the patient?

16  A   Yes.

17  Q   And then after talking to the patient, would you give the

18  patient a physical examination?

19  A   Yes.

20  Q   And after giving the patient a physical examination and

21  talking to the patient and reviewing the records -- and was

22  that the standard procedure each time a new patient came in?

23  A   To review the records?

24  Q   Physical exam, review the records, talk to the patient?

25  A   Right.

BRIDGETTE PARKER - CROSS BY MR. KNIZLEY

```
 1  Q   And after that, with your training and expertise, you would
 2  make an assessment; right?
 3  A   Right.
 4  Q   And then you may make a recommendation about medications,
 5  and/or procedures to the doctor; is that right?
 6  A   Correct.
 7  Q   And in this case we're talking about Dr. Ruan.  And then
 8  after that Dr. Ruan would go in and see the patient himself; is
 9  that correct?
10  A   Yes.  With me.
11  Q   With you?
12  A   Uh-huh (positive response).
13  Q   Now, you didn't prescribe any medications, did you?
14  A   Yeah, I prescribed some.
15  Q   You're telling the ladies and gentlemen of the jury -- a
16  schedule II controlled substance?
17  A   No, not a schedule II.
18  Q   Let's go back.  When you were working for Dr. Ruan -- okay?
19  Okay?  And I'm not talking about your DEA license.  You didn't
20  prescribe any schedule II medications, did you?
21  A   No.  I couldn't sign.
22  Q   Okay.  What could you prescribe?  Tell the jury what you
23  could prescribe legally.
24  A   I didn't -- well, at the time I couldn't even -- I couldn't
25  prescribe a level -- schedule III.  So it was a level II,
```

4000

1   schedule II back then.

2   Q   Now, you couldn't prescribe schedule II now, could you?

3   A   I'm sorry.  Just the opposite.  IV and V.

4   Q   Ma'am?  IV and V?  Of course, you had a license to do that;

5   right?

6   A   Right.

7   Q   Let's talk about the things you didn't have a license to

8   do, schedule II and schedule III; right?

9   A   Right.

10  Q   There's no such thing as a prescription for schedule I;

11  right?  That's illicit drugs.

12  A   Uh-huh (positive response).

13  Q   Correct?

14  A   Right.

15  Q   So we're talking about schedule II and schedule III.  You

16  don't have a license to do that; right?

17  A   No.

18  Q   When you were working for Dr. Ruan, you never prescribed --

19  working for Dr. Ruan, you never prescribed any schedule II or

20  schedule III substances, did you?

21  A   Yes, if it was my -- if I was seeing the patient.  I was

22  the one that always went in.  But the doctor -- it was the

23  doctor's ultimate decision whether they want the patient to

24  have it or not.

25  Q   You say yes, if it was my patient.  What you mean is you

1  may have had a recommendation?

2  A   Exactly, had a recommendation (nodding head affirmatively).

3  Q   And that's what you had, was a recommendation?

4  A   Right.

5  Q   When the prosecutor asked you did you prescribe a schedule

6  II or schedule III, you never prescribed schedule II or

7  schedule III while working for Dr. Ruan, did you?

8  A   No, I didn't.  I never signed behind any schedule II.

9  Q   In fact, all the medical decisions when you were working

10 for Dr. Ruan were ultimately made by the doctor, were they not?

11 A   No, not all of them.

12 Q   Are you telling me -- well, let me ask you this.  Well,

13 first off, did you meet with Agent Burt and Agent White and

14 Ms. Griffin and Mr. Bodnar in December of '15 over at the U.S.

15 Attorney's Office and did you talk with them?  Do you remember

16 doing that?

17 A   Yes.

18 Q   The first time you talked with them.  Did you tell them in

19 that meeting at their office that all medical decisions were

20 made by the doctors?

21         MS. GRIFFIN:  Your Honor, object to the use of the

22 agent's report.  It's not a Jencks statement.

23         MR. KNIZLEY:  Judge, I'm not using the report.

24         THE COURT:  All right.  Overruled.

25 BY MR. KNIZLEY:

BRIDGETTE PARKER - CROSS BY MR. KNIZLEY                                    4002

```
 1   Q   Did you -- Agent Burt, Agent White, Ms. Griffin, and
 2   Mr. Bodnar on December 29th at the U.S. Attorney's Office, did
 3   you meet with them and did you tell them that all the medical
 4   decisions were made by the doctor?
 5          MS. GRIFFIN:  Your Honor, the only objection is as to
 6   foundation as to the year.
 7          MR. KNIZLEY:  2016.
 8          THE COURT:  2000 what?
 9          MR. KNIZLEY:  '15.
10          THE COURT:  You've talked about December the 15th, and
11   now --
12          MR. KNIZLEY:  '15 -- I'm sorry.
13          THE COURT:  -- now it's the 29th?
14          MR. KNIZLEY:  December -- this particular one --
15   Q   There's one of them you met on the 15th and the 29th.  I'm
16   talking about December 29th of 2015.  Okay?  The end of
17   December 2015 did you meet with these four people at the U.S.
18   Attorney's Office?
19   A   I thought it was 2014.  Okay.  I met with them -- I have
20   met with them.
21   Q   Okay.  And when you met with them, you sat down with them
22   and they asked you a lot of questions, didn't they?
23   A   Yes.
24   Q   Okay.  And did you tell them in that meeting that all --
25   that when you were working for Dr. Ruan, that all the medical
```

BRIDGETTE PARKER - CROSS BY MR. KNIZLEY

1   decisions when you were working for Dr. Ruan were made by the
2   doctor?
3   A   Are you talking about every -- everything that was done?
4   Q   Well --
5   A   Or are you talking about medications?
6   Q   Well, we'll start with the medications.  Did you tell them,
7   first, all of it, if you recall?
8   A   Sir?
9   Q   To start with, did you tell these four people that all the
10  medical decisions were made by the doctor?
11  A   I don't remember.  I can't recall.
12  Q   Don't know one way or the other.  All right.  As to -- I'm
13  not asking about what you told them; now I'm asking you what
14  you know.  Now, all the prescriptions you told us, every single
15  prescription was written by Dr. Ruan; is that right?
16  A   Not always, no.
17  Q   Every single prescription for schedule II and schedule III.
18  A   No, it was not always.
19  Q   When you worked for Dr. Ruan, you're saying someone other
20  than Dr. Ruan wrote a prescription for schedule II and schedule
21  III?
22  A   That he signed them, the prescriptions?
23  Q   Approved them and signed them.
24  A   Yeah, he approved them and signed them, Dr. Ruan did.
25  Q   No one else ever did, did they?

BRIDGETTE PARKER - CROSS BY MR. KNIZLEY

1    A    When I was working with him?

2    Q    Yes.

3    A    Not to my knowledge.

4    Q    And any decision whether to go up or down on the dosage was

5    ultimately made by Dr. Ruan, was it not?

6    A    No.

7    Q    Are you saying that you made a decision?  You made a

8    recommendation, didn't you?

9    A    Right.

10   Q    But the ultimate decision was Dr. Ruan's, wasn't it?

11   A    Right.

12   Q    And no prescription went out without his signature on it;

13   right?

14   A    Right.

15   Q    So he made every decision on up and down ultimately, didn't

16   he?

17   A    He was the ultimate decisionmaker, yes.

18   Q    Now, what is PDMP?

19   A    It's the drug query.

20   Q    And that was something that was needed when y'all had a

21   patient come in to see what the patient may have been using in

22   the past; is that right?

23   A    Right.

24   Q    And that was something Dr. Ruan wanted you to check, was it

25   not?

4005

1    A    Right.

2    Q    And you could do it and maybe a couple of other people in

3    the clinic could do it?

4    A    Right.

5    Q    And was that something typical that you did when a patient

6    came in?

7    A    On a new patient visit we tried to have every new patient

8    have one.

9    Q    Tell the jury why Dr. Ruan would want you to do that.

10   A    So we can see their drug history, you know, where they got

11   their medication, what they're taking, all the information on a

12   prescription.

13   Q    And not only -- and if for any reason you couldn't get the

14   PDMP, did you sometimes get the medical assistant to call the

15   pharmacy that they may have used in the past to check up on

16   what they had been getting?

17   A    Yes, sir.

18   Q    Was that something else Dr. Ruan wanted you to make sure

19   you did if you couldn't get the PDMP?

20   A    Yes.

21   Q    And also, once you looked at the PDMP or called the

22   pharmacy, you did a urinalysis as well; is that right?

23   A    Right.

24   Q    And that was a cup test, was it not --

25   A    Right.

4006

1   Q   -- to begin with?  And I think you told the ladies and

2   gentlemen of the jury the cup test is a test that you test in

3   the office first; is that right?

4   A   Yeah.  Not the GC-MS.

5   Q   And could you tell them again what that GC-MS is?

6   A   It's the quantitative amount of medication that's in your

7   system of whichever medication.  It gives the amount that's in

8   the patient's system.

9   Q   And on the cup test that's not always reliable; is that

10  correct?

11  A   Sometimes it isn't.

12  Q   Sometimes it is not?

13  A   Right.

14  Q   Sometimes it may have a false negative or a false positive?

15  A   Uh-huh (positive response).

16  Q   And so it is always good, whatever the result may be, to

17  send off a GC-MS, is that correct, as to confirm what the cup

18  test may say?

19  A   Well, that's something that we started doing later on when

20  I was working there.  Before that we didn't do that, so I have

21  no --

22  Q   Okay.  Now,  I'm talking about the Dr. Ruan time frame.

23  Remember?  Okay?  When you were with Dr. Ruan, did from time to

24  time you send off a GC-MS after the cup test?

25  A   Yes.

1  Q   And is that something you typically did when you worked for

2  Dr. Ruan?

3  A   Yeah, part of the time.

4  Q   And not only that, you had pill counts from time to time,

5  did you not?

6  A   Right.

7  Q   Tell the ladies and gentlemen of the jury what the pill

8  counts are.

9  A   A patient brings their medication in, and we count what

10  their -- what's left in their prescription and decide according

11  to the date if they're taking the medication right.

12  Q   So after you've done the initial assessment with the things

13  you told us about and you've had the PDMP and the urinalysis

14  and maybe the GC-MS sent off, maybe called the other pharmacy

15  and the pill counts -- those are some things that you did to

16  make sure the patient was abiding by the orders of the doctor;

17  is that right?

18  A   Yes, sir.

19  Q   And you've told us before that Dr. Ruan wanted his patients

20  the follow his orders; is that right?

21  A   Uh-huh, yes, sir.

22  Q   And that went on and you're working for Dr. Ruan until

23  December of 2013; is that correct?

24  A   Yes.

25  Q   In December of 2013 Dr. Ruan decided that you couldn't work

4008

```
 1   for him anymore; right?

 2   A   Right.

 3   Q   He fired you?

 4   A   Right.

 5   Q   And it wasn't necessarily a pleasant thing, was it?

 6   A   No.

 7   Q   I think you said he hollered at you?

 8   A   Yes.

 9   Q   And he told you that you weren't doing your paperwork

10   properly and that's why he fired you; is that right?  You

11   weren't keeping up, as you said?

12   A   Yeah.  He said I wasn't keeping up with the pace.

13   Q   And was he right?  You weren't keeping up?

14   A   No, I couldn't keep up.

15   Q   And so you just weren't doing the work he hired you to do?

16   A   No.  I was doing the work I was hired to do.  I didn't have

17   enough time in the day.

18   Q   Well, part of the work he hired you to do was to complete

19   the medical records of the patients he had; is that right?

20   A   Right.

21   Q   And that part of your work you could not perform, is that

22   correct, within the time frame that you had?

23   A   No.  I couldn't get it all done.

24   Q   So Dr. Ruan said because you're not performing the entirety

25   of the work, including keeping the medical records of his
```

4009

```
 1   patients, that he had to discharge you?
 2   A   (Nodding head affirmatively.)  Correct.
 3   Q   And you argued with him a little bit?
 4   A   Correct.
 5   Q   Right?
 6   A   I didn't holler, but I'm sure I had some words.
 7   Q   All right.  And when he told you you had to go, you had to
 8   leave the premises; right?
 9   A   Uh-huh, yes.
10   Q   Is that what he told you?
11   A   Yeah.
12   Q   And you didn't do that, did you?
13   A   Yeah.  I left and went to Dr. Couch's office because
14   Dr. Couch -- he talked to him on the phone, and he told me to
15   come down and talk to him.  So I left.
16   Q   I say the premises.  And went from one PPSA premises to the
17   other one; right?
18   A   Right.
19   Q   And Dr. Couch was kind enough to let you work there?
20   A   Right.
21   Q   And Dr. Ruan wasn't real pleased about that, was he?
22   A   Was he pleased?
23   Q   Yes.
24   A   No, he wasn't.
25   Q   But nonetheless, you were able to work for Dr. Couch?
```

4010

1    A    Right.

2    Q    Now, before PPSA you had a good educational background and

3    you had your good work background for 15 years.  Then after

4    this first year at PPSA it wasn't going -- after 14 months it

5    didn't go so well because you got fired; right?

6    A    Right.

7    Q    But then you got back on with Dr. Couch and you started

8    working for him, and things began to get a little rocky then,

9    didn't they?

10   A    Explain to me what you mean "rocky."

11   Q    Okay.  Well, you had missed a bunch of work with Dr. Ruan,

12   had you not?

13   A    Yeah.  I was having lots of health issues.

14   Q    All right.  And Dr. Ruan didn't like you missing work;

15   right?

16   A    Right.

17   Q    And when you went to Dr. Couch, you still missed some work,

18   didn't you?

19   A    I can't -- I can't tell you for sure.  I know I got sick at

20   work one day and had to go home.

21   Q    Well, you got sick, you said.  Really you were having

22   withdrawals at work, were you not?

23   A    Yeah, I was.

24   Q    And you did some things at work you probably shouldn't have

25   done, didn't you?

1    A    Correct.

2    Q    In fact, you got other employees to inject you with

3    Phenergan, did you not?

4    A    Correct.

5    Q    You didn't tell anybody, though; right?  You didn't tell

6    Dr. Ruan and you didn't tell Dr. Couch, did you?

7    A    Somebody said they went and told Dr. Couch.  I didn't.

8    Q    I'm asking whether you did.

9    A    No, I didn't go to him.  I was laying on the floor sick.

10   Q    Sick from withdrawing from drugs; right?

11   A    Yeah.

12   Q    And these were drugs you weren't supposed to be taking;

13   right?

14   A    That's not true.  They were my prescription drugs.

15   Q    What about the Abstral you stole?  Did you steal some

16   Abstral from --

17   A    That was the night I got my DUI.

18   Q    But you stole Abstral?

19   A    Right.

20   Q    Okay.  And you also took liquid -- you took tramadol,

21   Zofran, if I'm saying it right, and I.V.s as well at work,

22   didn't you?

23   A    Say that again.

24   Q    Tramadol, Zofran, Z-O-P-H-R-A-N (sic), and I.V.s from

25   Justin while you were at work, didn't you?

BRIDGETTE PARKER - CROSS BY MR. KNIZLEY                                    4012

 1   A   Yeah.  Justin and Stacy.

 2   Q   You didn't tell Dr. Couch about that?

 3   A   I thought they told him.

 4   Q   I'm asking what you did, ma'am.

 5   A   No, I didn't go directly to him.

 6   Q   Abstral you took, you stole, tramadol you took.  Did you

 7   steal Dilaudid from the safe in the pump room?

 8   A   Yes.

 9   Q   Did you steal tramadol and Soma from your mother's purse?

10   A   Yes.

11   Q   Did you take things from a patient's purse or go through a

12   patient's purse?

13   A   No.  But when patients resent their medicines in, sometimes

14   I kept some of them, the ones I was prescribed.

15   Q   Those are all real bad things, aren't they?

16   A   Yeah.

17   Q   All crimes; right?

18   A   Yeah.

19   Q   And you told these four people every bit of that, didn't

20   you?  (Indicating government's counsel and agents.)

21   A   I shared as much with them as I could.

22   Q   And you haven't been charged with any of that, have you?

23   A   Haven't been charged?

24   Q   Charged.

25          MS. GRIFFIN:  Objection, Your Honor.  She has entered

1    a guilty plea.

2        THE COURT:  Overruled.

3    BY MR. KNIZLEY:

4    Q   You haven't been charged with stealing Abstral, stealing

5    Dilaudid, taking tramadol, Zofran I.V.s from the office,

6    stealing tramadol and Soma from your mother, have you?

7    A   Are you asking me did I do that?

8    Q   No.  Have you been charged criminally with any of that?

9    A   No, sir.

10   Q   And you do understand those are all crimes, don't you?

11   A   Right.

12   Q   Now, you talked about that DUI and you talked about what

13   you had when you were stopped with the DUI.  And I think you

14   told the prosecutor that it was Abstral and Subsys; is that

15   right?

16   A   It was -- I can't remember.  It was either Abstral or

17   Subsys.  I think it was Subsys, two doses.

18   Q   Let's go back and think that through a little bit one more

19   time.  Ms. Phillips had gotten you -- Debi Phillips had got you

20   an outpatient rehab that you could go and still work; right?

21   A   Right.

22   Q   And this was your fourth trip, I believe, was it not?

23   A   Right.

24   Q   And you got stopped -- I think it was in Baldwin County; is

25   that right?

BRIDGETTE PARKER - CROSS BY MR. KNIZLEY

1    A    It was.

2    Q    And you got a DUI on the way to the rehab?

3    A    Exactly.

4    Q    And you had stuff in your purse, did you not?

5    A    Probably the medication from my mom.

6    Q    It wasn't Abstral and it wasn't Subsys?

7    A    No.  The Subsys I had put in my little rolling bag with all

8    my charts.

9    Q    Okay.  Well, let me get that straight then.  You had in

10   your purse, did you not, the tramadol and Soma you had stole

11   from your mama?

12   A    Yes.

13   Q    And then you had other stuff, Abstral, that you had stole

14   from somebody else or what?

15   A    When one of the patients brought hers back.

16   Q    That you stole?

17   A    Yeah.  To do a drug count.

18   Q    And you told all those people about this; right?

19   A    Yes, sir.

20   Q    And then after that you got fired again; right?

21   A    Oh, yeah, yeah, I did.  I thought you were talking about

22   somewhere else.

23   Q    No, ma'am.

24   A    No.  At PPSA.

25   Q    Right.  And this was -- and, of course, I think you tried

---

Roy Isbell, CCR, RDR, CRR, Official Court Reporter
113 St. Joseph Street, #231, Mobile, Alabama  36602

4015

```
 1   to go back to work the next day, and people at the police
 2   department had called and said, you know, she's been arrested;
 3   right?
 4   A   Right.
 5   Q   Then after that Dr. Couch helped you out with your rehab;
 6   right?  Helped you pay for your rehab?
 7   A   Which one?  The outpatient?
 8   Q   Well, I don't know.  You tell the jury which one did he
 9   help you with?
10   A   He paid for the outpatient, and I had to pay for Bradford.
11   Q   He didn't give you $5,000 toward Bradford?
12   A   No, sir.
13   Q   Okay.  Now, when you went to Bradford, you saw Justin,
14   didn't you?
15   A   The very first person I saw was Justin.
16   Q   And he was a friend of yours; right?
17   A   Yeah.  We were coworkers.
18   Q   And do you know whether or not law enforcement came to
19   Bradford and talked with Justin?
20   A   Yeah, I do.  Because there was a guy that was in the
21   program with us, and he came up to me and told me -- he said:
22   Your friend is gone.
23            And I said:  What friend?
24            And he told me:  Justin.
25            I said:  Where did he go?
```

BRIDGETTE PARKER - CROSS BY MR. KNIZLEY

 1            He said:  The FBI was talking to him and moved him to

 2   COPAC.  Somewhere in Mississippi.  I think it's called COPAC.

 3   Q   Did that scare you a little bit?

 4   A   Well, at the time I didn't know what was going on.  You

 5   know, I didn't know -- I didn't know anything.

 6   Q   But you found out, though, at a later time when you got

 7   that target letter that says you're the target of the

 8   investigation; right?

 9   A   Right.

10   Q   So you began to find out what was going on then, that

11   somebody thought you may have done something wrong; right?

12   A   Right.

13   Q   And you had done a lot of things wrong, hadn't you?

14   A   Right.

15   Q   Ma'am?

16   A   Right.

17   Q   So eventually you got indicted then; is that right?

18   A   Yes.

19   Q   And that was in December; is that right?

20   A   Yes.

21   Q   And then after you got indicted, you felt like -- after you

22   got indicted you had a lawyer; right?

23   A   Yeah.  I got -- well, actually -- yeah.  Go ahead.

24   Q   And you pled guilty on December 11th?

25   A   Uh-huh (positive response).

4017

1   Q   And you agreed to cooperate; right?

2   A   Yes.

3   Q   And you understood that cooperating means telling these

4   people, the prosecution team, some things that would help you

5   to get a lesser sentence; right?

6   A   I was just speaking the truth to them.

7   Q   Okay.

8   A   They asked a question, I answered honestly.

9   Q   All right.  But do you understand that if you don't tell

10  them things, as Mr. Sharman was asking you about, if you don't

11  tell them something, you don't get a downward departure?  Do

12  you understand that?

13  A   Right.

14  Q   Okay.  So when you decided to cooperate, you needed to tell

15  those people some things that would help you with your

16  cooperation, truthful or not; right?  Well, truthful; right?

17  A   Right.

18  Q   Is that right?

19  A   Right.

20  Q   So now let's talk about some of the things that you have

21  said here in the courtroom in furtherance of that effort to

22  cooperate.  Okay?

23  A   Okay.

24  Q   All right.  And you first told the prosecutor -- and I

25  think we've been over this -- that you prescribed medications.

1    Do you remember saying that on your direct examination?

2    A   Yes.

3    Q   Now, we cleared that up, that you never while working for

4    Dr. Ruan prescribed anything; right?

5    A   No medication?  Or just --

6    Q   No schedule II and III medication?

7    A   Yeah, I would.  And he signed them.  But I couldn't do it

8    on my own.

9    Q   Ma'am, you know what a prescription is?

10            MS. GRIFFIN:  Your Honor, he's arguing with the

11   witness.

12            THE COURT:  Yeah.  We've been through this before.  We

13   understand what she means by prescribe and what you mean by

14   prescribe.  So let's move on.

15            MR. KNIZLEY:  Okay.

16   Q   Now, you never signed any prescription with Dr. Ruan's

17   name, did you?

18   A   Never.

19   Q   He signed every prescription for the drugs that he was

20   prescribing, didn't he?

21   A   Yes.

22   Q   Now, the prosecutor, I think right at the end of your

23   examination, asked you were you in charge of drug screens with

24   patients and were you in charge of compliance.  You weren't in

25   charge of those type things, were you?

BRIDGETTE PARKER - CROSS BY MR. KNIZLEY

1   A   I had to make sure they were ordered, yes.

2   Q   Well, you make sure they're ordered.  But what you did was

3   when the patient came in, as we discussed before, part of your

4   duties and responsibilities was to see that a drug screen was

5   ordered; right?

6   A   Correct.

7   Q   And to see that there was compliance with the opioid

8   agreement; is that right?

9   A   Right.

10   Q   And that was part of your job; right?

11   A   Right.

12   Q   And when you say "in charge of it," do you really think

13   that's being in charge of it or just part of your duties?

14   A   It was part of my duties and I was in charge.  It was an

15   order.

16   Q   That was your job?

17   A   Right.

18   Q   That was an order from this gentleman over here; right?

19   Dr. Ruan; is that correct?

20   A   Yes.

21   Q   Now, you also talked about some things -- one thing you

22   talked about in your direct examination was some changes from

23   time to time of a prescription from Subsys to Abstral or

24   Abstral to Subsys.  Do you remember talking about that?

25   A   Yes.

BRIDGETTE PARKER - CROSS BY MR. KNIZLEY

1    Q   And do you remember when the prosecutor said to you that --

2    was asking you the difference in Abstral and Subsys.  Do you

3    remember her asking you some of the distinctions between that?

4    A   Yes.

5    Q   And you agreed, I believe, when she asked you that both of

6    them were fentanyl products; is that right?

7    A   Yes.

8    Q   And she asked you about the different delivery systems, I

9    think.  Do you remember that?

10   A   Correct.

11   Q   You do?

12   A   Yes.

13   Q   And she asked you about Subsys and you said it was a spray;

14   right?

15   A   Uh-huh (positive response).

16   Q   And she said to you that Abstral was something that you put

17   in your cheek.  Do you remember that?

18   A   Uh-huh, yes.

19   Q   That's not true, is it?

20   A   Abstral?  You don't put it in your -- your cheek?

21   Q   I'm talking about your testimony.  You were testifying on

22   direct examination.  What is your testimony in connection with

23   Abstral and whether it goes in your cheek or not?

24   A   If I remember correctly, that's what it does.

25   Q   You told the ladies and gentlemen of the jury that's what

4021

1   it was on direct; right?

2   A   (Nodding head affirmatively.)

3   Q   Are you telling them now you're not sure?

4   A   No.  You're trying to confuse me right now.

5   Q   I'm sorry.  If I am, I apologize.  But are you telling the

6   ladies and gentlemen -- tell the ladies and gentlemen of the

7   jury is Abstral something you put in your cheek or something

8   you put under your tongue?

9   A   Under the tongue.  Just like the spray, under your tongue.

10  Q   And do you know what Fentora is?

11  A   I believe it's a form of fentanyl.

12  Q   And it goes in your cheek, doesn't it?

13  A   I'm not familiar with that one.

14  Q   Now, you also were asked about -- they were asking you

15  about changing Subsys to Abstral.  And I think you told the

16  ladies and gentlemen of the jury that there was no coupon

17  system for Subsys?

18  A   I don't remember for Subsys.  I just remember for Abstral.

19  Q   Well, do you remember what you told these people an hour

20  ago about Subsys, whether it was a coupon or not?

21  A   Are you talking about the TIRF REMS that had to be done?

22  Q   No, ma'am.  I'll get to that in just a moment.  Okay?  What

23  I'm asking -- you were asked about coupons for Abstral and

24  Subsys.  And do you recall whether or not you told the jury

25  earlier that there was no coupon system for Subsys?  Do you

4022

1   remember saying that?

2   A   No, I don't.

3   Q   Is there a coupon system for Subsys?

4   A   Not to my knowledge.

5   Q   Do you remember when you met with these four people on

6   December 29 of -- December 29, 2015?  Do you remember meeting

7   with Ms. Griffin, Mr. Bodnar, Mr. Burt, and Agent White at the

8   U.S. Attorney's Office?  Do you remember that?

9   A   Uh-huh (positive response).

10  Q   Do you remember them asking you -- do you remember them

11  asking you about some reasons that there may be a change from

12  Abstral to Subsys?  Do you remember that?

13          MS. GRIFFIN:  Your Honor, if he's going to refresh her

14  memory, the appropriate way is to have her see that.  But that

15  is not a Jencks Act statement.  We object.

16          MR. KNIZLEY:  Ma'am, it's not a recollection

17  refreshing.  I would be happy to show the witness the document,

18  but --

19          MS. GRIFFIN:  Your Honor --

20          MR. KNIZLEY:  -- that's not the purpose of the

21  inquiry, for impeachment purpose, but whether she had made a

22  prior statement at a different time.

23          THE COURT:  All right.  Overrule the objection.

24  BY MR. KNIZLEY:

25  Q   Do you remember meeting with the agents?

1   A   Yes.

2   Q   And do you remember them asking you about some of the

3   reasons, whether it may have been a change from Subsys to

4   Abstral?  Do you remember that?

5   A   Yes.

6   Q   And do you remember you telling them that the Subsys had a

7   coupon system?  Do you remember telling them something to the

8   effect that when a patient was on Subsys, they received three

9   months free Subsys through a voucher that the patient presented

10  at the pharmacy?  Do you remember saying that?

11  A   No, I didn't say that.  But now that you said it, they did

12  have one, I remember now.

13  Q   Okay.  But you didn't say it to these people?

14  (Indicating.)

15  A   I couldn't remember until you refreshed my memory.

16  Q   Okay.  And did you tell them that that seemed to be from

17  time to time the driving force by Dr. Ruan and Dr. Couch that

18  when there were coupons in place, that they may change the

19  medication because of the coupons?  Do you remember saying

20  that?

21  A   Correct, correct.

22  Q   So that was a reason from time to time there may have been

23  a change from Subsys to Abstral or back; is that correct?

24  A   Correct.

25  Q   And, of course, there were other reasons, were there not,

1    for changing from Subsys to Abstral?

2    A    Some of it was the cost of the prescription.

3    Q    Sure.  Some of it may have been just the cost of the copay

4    sometimes; is that right?

5    A    And some people didn't have insurance to cover it.

6    Q    Some people's insurance might cover one but not the other;

7    is that correct?

8    A    Uh-huh (nodding head affirmatively).

9    Q    Some it was better for the patient, the efficacy of it.

10   Some -- Subsys was better for some patients than Abstral and

11   Abstral was better for some patients than Subsys; is that

12   right?

13   A    Correct.

14   Q    And those are some of the considerations that were made

15   when Dr. Ruan changed a prescription from Subsys to Abstral,

16   wasn't it?

17           MS. GRIFFIN:  Objection, Your Honor.  She has no

18   foundation for knowing why Dr. Ruan changed it.

19           THE COURT:  Sustained.

20   BY MR. KNIZLEY:

21   Q    Now, you talked about the availability -- or you talked

22   about going to C&R Pharmacy and looking at the availability of

23   Subsys, I think; is that right?

24   A    Yes.

25   Q    Was it only Subsys or Abstral too or just Subsys?

4025

1   A   I just remember seeing the Subsys.

2   Q   And do you remember going in there from time to time and

3   being asked what Subsys may be in C&R Pharmacy; is that right?

4   A   (Nodding head affirmatively.)

5   Q   Do you remember clearly doing that now?

6   A   Yes.

7   Q   All right.  Now, you know, don't you, from your experience

8   working there that the Subsys was not available in any other

9   retail pharmacies; right?

10  A   Correct.

11  Q   And so it was sort of a little bit of a specialty thing; is

12  that right?

13  A   Correct.

14  Q   And it was convenient to the patients if you're going to

15  prescribe it to see if it was going to be available in the

16  pharmacy; is that correct?

17  A   Correct.

18  Q   So that was something good for the patients; is that right?

19  A   Yes.

20  Q   And when you'd go to see what's in there, you know, if it's

21  200 milligrams that were available or two 100 milligrams that

22  were available, that's a different prescription; is that right?

23  A   Yeah.

24  Q   So if you wanted to prescribe two and they didn't have 200

25  micrograms, I should say, then they may prescribe two 100

BRIDGETTE PARKER - CROSS BY MR. KNIZLEY

4026

1   micrograms; is that right?

2   A   Yes.

3   Q   So it was something that the patients would need to know

4   before the prescription was written if they were going to use

5   the convenience of the C&R Pharmacy, wouldn't they?

6         MS. GRIFFIN:  Your Honor, objection.  Calls for a

7   conclusion that she doesn't have a foundation for.

8         The COURT:  Sustained.

9   BY MR. KNIZLEY:

10   Q   I think you were asked a moment ago about the REMS form, do

11   you remember?

12   A   Yes.

13   Q   And I think you were asked -- did the patients that came

14   there -- you did show them the REMS form; is that right?

15   A   Either myself or the nursing assistant.

16   Q   I show you what's marked into evidence as Government's

17   Exhibit 1-1.  Is that a TIRF REMS form?

18   A   Yes.

19   Q   And is this a form that from time to time you may show a

20   patient?

21   A   Yes.

22   Q   And you were asked about did anyone explain to the patients

23   about TIRF medications and what they were for.  Do you remember

24   being asked about that?

25   A   Right.

BRIDGETTE PARKER - CROSS BY MR. KNIZLEY

1  Q  And do you remember being asked were patients ever told

2  about --

3        MS. GRIFFIN:  Your Honor, I object.  This is the

4  practitioners form, not the patient form.  This is for the

5  doctor.  The patient form is number 38.

6        MR. KNIZLEY:  Judge, the witness identified this is

7  the form she recognized.  I'll go through --

8        THE COURT:  I would use the correct form with her, if

9  you would.

10 BY MR. KNIZLEY:

11 Q  I don't think I understood the objection, but maybe I can

12 straighten it out here.  Government's 1-1, do you recognize

13 this form?

14 A  Yes, sir.

15 Q  Is this the form you showed the patients?

16 A  (Nodding head affirmatively.)

17 Q  This is the one?

18 A  Yes, sir.

19 Q  And did you show -- give it to the patients so the patients

20 could read it; is that right?

21 A  Yeah.  We were supposed to go over it with them.  My nurse,

22 if I was busy, went over everything with them.

23 Q  I'm sorry?

24 A  Medications.

25 Q  Say again.

1  A   If I was busy, then my nursing assistant would go over it

2  with them.

3  Q   And if not, you would go over it with them?

4  A   Uh-huh (positive response).

5  Q   You would go over it with them.  Will you read paragraph

6  three -- excuse me -- three for us, please.

7          MS. GRIFFIN:  Your Honor, we object again.  This is

8  the doctor form.  And I understand --

9          THE COURT:  Well, she's identified it as the patient

10 form.  So --

11 A   This right here is what I'm familiar with.  (Indicating.)

12 I'm not familiar so much with the other pages.

13 BY MR. KNIZLEY:

14 Q   Okay.  You're familiar with this form?

15 A   With this piece right here.  (Indicating.)

16 Q   All right.  Would you read paragraph three of the form,

17 please, ma'am.

18 A   I understand that TIRF medications are indicated only for

19 the management of breakthrough pain in patients with cancer who

20 are already receiving and who are tolerant to around-the-clock

21 opioid therapy for their underlying persistent pain.

22 Q   That tells the patient if you go -- if they read it

23 themselves, that the TIRF medicine is indicated for the

24 management of breakthrough pain in cancer patients; is that

25 right?

4029

1  A   Right.

2  Q   And you've also told us that there is an off-label use form

3  you go over with them as well?

4  A   That one I've seen, but I haven't -- I can't recall enough

5  information on that one.

6  Q   Okay.  You talked with us about some prescription pads that

7  you found -- or excuse me -- some presigned prescriptions from

8  Dr. Ruan.  And I'll show you what's been marked as Government's

9  Exhibit 2-3, and within 2-3 are these prescriptions that seem

10  to be signed; is that right?

11  A   I can't see the one -- the one to the left I can.

12  Q   All right.   Just tell me which one you want me to show

13  you.

14  A   Both.

15  Q   Is that what you may have seen in Dr. Ruan's drawer?  Or

16  did you see it in the drawer?

17  A   Yeah, we saw -- and Brenda was the one that was in charge

18  of them most of the time.

19  Q   Brenda who?

20  A   Arnold.

21  Q   Okay.  How about Ms. Noland?

22  A   I don't know about Ms. Noland.

23  Q   Now, Brenda was -- you weren't in charge of them right?

24  A   No.

25  Q   All right.  They weren't for you to come get; right?

4030

```
 1   A   Right.

 2   Q   And Brenda was in charge of them?

 3   A   I believe Brenda was in charge of them.

 4   Q   Okay.  And we see here now Peggy Holder's name on this; is

 5   that right?

 6   A   Yes.

 7   Q   All right.  She had been gone, I think, in mid 2012; is

 8   that right?  2013?

 9   A   Uh-huh (nodding head affirmatively).

10   Q   About April?

11   A   I'm not sure, but it wasn't too long after I got there.

12   Q   She was gone by the time you left Dr. Ruan; is that right?

13   A   Yeah, she was gone -- yeah, I was still with him then.

14   Q   And your name is not on here, is that right, on the top?

15   A   No.

16   Q   Now, see, these are some older prescription forms, are they

17   not?

18   A   Yes.

19   Q   All right.  And Brenda was in charge of it, and these were

20   for emergencies, weren't they?

21   A   Supposed to be (nodding head affirmatively).

22   Q   And that was the purpose of them; right?

23   A   Yes (nodding head affirmatively).

24   Q   And that was for the benefit of a patient in the event that

25   there was an emergency that Dr. Ruan was not immediately
```

1   available to sign the prescription; isn't that correct?

2   A   That's what they were available for.

3   Q   You never touched them, did you?

4   A   I can't recall.  I don't remember.  I may have.

5   Q   Well, you don't recall ever touching them, do you?

6           MS. GRIFFIN:  Your Honor, she's asked and answered

7   that she did not recall.

8           THE COURT:  Sustained.

9   BY MR. KNIZLEY:

10  Q   You don't recall touching them and you don't ever recall

11  using them either, do you?

12  A   I can't tell you if I did or not.  I may have.

13  Q   Now, you said sometimes Dr. Ruan had disagreements with the

14  patients about the medications?

15  A   Yes.

16  Q   Dr. Ruan did not give the patients what they wanted just

17  because they wanted it, did he?

18  A   Yeah, lots of times.

19  Q   Well, did you tell the ladies and gentlemen -- if they

20  wanted it and needed it, he was agreeable with it; right?

21  A   If they needed it, yes.

22  Q   And wanted it and needed it.  But if they needed it and --

23  sometimes they wanted things they didn't need, didn't they?

24  A   Sometimes they did.

25  Q   And he wouldn't give it to them, would he?

1    A    I mean it just depended on the situation.  Sometimes the

2    patient -- I mean he would do what the patient wanted.

3    Q    And often he denied what they wanted, did he not?

4    A    He did.

5    Q    And you've told us about some patients that you said

6    complained about things and may have been angry and may have

7    been upset about increases, but you haven't given us today any

8    names of those patients, have you?

9    A    Not of Dr. Ruan's patients.

10   Q    Right; not of Dr. Ruan patients?

11   A    Right.

12   Q    And you didn't give these people sitting at this table in

13   the two meetings you had with them any names of those people,

14   did you?

15   A    Say the question again.

16   Q    On December 12th, 2015, and December 29th, 2015, when you

17   met with the four people at this table, you did not give them

18   names of people that had complained about Dr. Ruan, did you?

19   A    Yes.

20   Q    You did?

21   A    Yes.

22   Q    Could you tell me the names you gave them, please, ma'am?

23   A    I can't tell you just standing here.

24   Q    Do you have a name of anybody that was angry that you gave

25   them?

BRIDGETTE PARKER - CROSS BY MR. KNIZLEY

4033

```
 1    A   Give me some names.  I can go through it.  I can't tell you
 2    right off.
 3    Q   No, ma'am.  I don't have any names.  I'm --
 4             MS. GRIFFIN:  Your Honor, I object to him just
 5    engaging in conversation with the witness instead of asking her
 6    a question.
 7             MR. KNIZLEY:  Let me ask a further question.
 8             THE COURT:  All right.
 9    BY MR. KNIZLEY:
10    Q   Do you recall any name you gave to these four people that
11    said -- of a patient -- that said they complained about
12    Dr. Ruan, any one named patient that you gave to any of these
13    people?  Do you remember any name?
14    A   I just -- my mind is blank.  I can't tell you.  But if you
15    give me something to look at, I can --
16    Q   I'm not trying to confuse you, ma'am.  Might it be you
17    didn't give them any specific names?  Might that be the case?
18    A   No.  I did.  But at the time I had something to look at.  I
19    don't have anything now.
20    Q   Okay.  And in your direct examination today you had not
21    given any specific names, had you?  When Ms. Griffin asked you
22    these questions earlier today, you didn't give any specific
23    names of the patients --
24             MS. GRIFFIN:  Your Honor, I object.
25             MR. KNIZLEY:  If I could complete the question.
```

BRIDGETTE PARKER - CROSS BY MR. KNIZLEY

4034

```
 1          MS. GRIFFIN:  I object because she wasn't asked that
 2  on direct.  I don't object to --
 3          THE COURT:  I sustain.
 4  BY MR. KNIZLEY:
 5  Q   There has not been a name mentioned today of a patient of
 6  Dr. Ruan's that has complained, has there?
 7          MS. GRIFFIN:  Your Honor, I object.  It is asked and
 8  answered.  It's asked and answered about six times.
 9          THE COURT:  Overruled.
10  BY MR. KNIZLEY:
11  Q   There has not been a patient you have named today, has
12  there been --
13          THE COURT:  Well, wait.
14  BY MR. KNIZLEY:
15  Q   -- of Dr. Ruan's?
16          THE COURT:  Mr. Knizley, that's not the same question
17  you asked.
18  BY MR. KNIZLEY:
19  Q   You have not -- you have not named a patient today in your
20  examination of Dr. Ruan's that you say complained, did you?
21          THE COURT:  I sustain the objection to that question
22  because that's the same thing that you asked before.  So let's
23  move on.
24  BY MR. KNIZLEY:
25  Q   Have you named any patients today of Dr. Ruan's?
```

1    A    One patient was mentioned.

2    Q    Who was that?

3    A    Cc....  He was Dr. Couch's patient --

4    Q    All right.

5    A    -- and then started seeing Dr. Ruan.

6    Q    Let me go back to the patients.  Have you named any of

7    Dr. Ruan's patients while you were working for Dr. Ruan except

8    this patient you were just telling me about?

9    A    Did any of them complain?

10   Q    No.  Have you named them today?

11   A    I can't right this second.

12   Q    Okay.  As such, Dr. Ruan hasn't had an opportunity to

13   respond to those type complaints; right?

14            MS. GRIFFIN:  Objection, Your Honor.

15            THE COURT:  Sustained.

16   BY MR. KNIZLEY:

17   Q    I want to show you what's marked as Government's Exhibit

18   8-2.  And is that your plea agreement, ma'am?

19   A    Yes, sir.

20   Q    And Mr. Sharman went over the plea agreement with you a

21   bit.  And without going back over the same issue again, you

22   know that if you pled guilty, the United States is going to --

23   at page five -- see this right here?  Let me first say you had

24   a lawyer; is that right?

25   A    Excuse me?

4036

1  Q    You had a lawyer?

2  A    Yes.

3  Q    And you and your lawyer discussed your options in the case;

4  is that right?

5  A    Yes.

6  Q    And did you and your lawyer discuss guideline sentencing?

7  A    Did we discuss it?

8  Q    Yes, ma'am.

9  A    Yes.

10  Q    And did your lawyer tell you that it was advisory, that the

11  judge may or may not follow the guidelines?

12  A    May or may not?

13  Q    Yes.

14  A    Yes.

15  Q    And did your lawyer tell you that when -- well, when you

16  entered into this agreement, the lawyer told you there was a

17  high end and low end of the guidelines, did he not?

18  A    Yes.

19  Q    Okay.  And when you entered into this agreement initially,

20  was your agreement as set out in paragraph 19 as to the low end

21  and high end of the guidelines initially?  Would you read that

22  for us please, ma'am?

23  A    The United States will recommend to the Court that the

24  defendant be sentenced at the low end of the advisory

25  sentencing guideline range as determined by the Court.

1  Q   And that was the agreement that you had to begin with, that
2  you would either -- that the government would recommend a
3  low-end sentence; is that right?
4  A   That's correct.
5  Q   But you're hoping for better than that, are you not?
6  A   Correct.
7  Q   And you're hoping for a downward departure from the low end
8  of the guidelines, are you not?
9  A   Yes.
10 Q   And there's only one way, at least in this plea agreement,
11 that you're going to get that; is that right?
12 A   Right.
13 Q   And the way you're going to get that is by a 5K1.1 downward
14 departure; is that right?
15 A   Yes.
16 Q   Is that your understanding?
17 A   I have to -- wait.  Let me read it.
18 Q   Okay.  Well, let's just go through it.  If you'll read the
19 first sentence.
20        MS. GRIFFIN:  Your Honor, object.  She's asked for the
21 opportunity to read it.
22        THE COURT:  Yeah.  Well --
23        MR. KNIZLEY:  Sure.
24        THE COURT:  Mr. Sharman went over this, so do we need
25 to go over it again?

4038

```
 1              MR. KNIZLEY:  I'm going to get to a different point.
 2              THE COURT:  Well, let's get to that point then.
 3   BY MR. KNIZLEY:
 4   Q   Do you understand that in order to get the 5K1, that you
 5   have to cooperate; is that right?
 6   A   That I'd have to what?
 7   Q   Cooperate.
 8   A   Yes.
 9   Q   Okay.  And you have to cooperate to get a substantial --
10   you have to cooperate substantially.  Do you remember
11   Mr. Sharman asking you about that?
12   A   Yes.
13   Q   And do you remember him asking you about what substantial
14   means?
15   A   Right.
16   Q   And to cooperate substantially means that -- how do you
17   cooperate?  What do you have to do to cooperate?  Do you
18   remember?
19   A   As far as, I mean, I have to --
20   Q   What is cooperation is what I'm asking?
21   A   I'm sorry.  What is what?
22   Q   Does it start right there?  I'll back it up if you'd like
23   for me to.  Let me do that, back it up.  At page six, (c), it
24   says --
25              THE COURT:  Mr. Knizley, Mr. Sharman did go over that
```

4039

1    paragraph entirely.  So let's move on.  Okay?

2          MR. KNIZLEY:  Judge, I think it's the last part he may

3    not have.  That's the only one -- I just want to get to the

4    content is the reason I want to reread it again.

5    Q   What is cooperation?

6    A   (Indicating.)  That I'll testify.

7    Q   Read the rest of it.

8    A   Testifying completely and truthfully before any grand jury,

9    at any pretrial proceeding, during any trial, and in any

10   post-trial proceeding.

11   Q   And this is the trial you're supposed to be testifying in;

12   right?

13   A   Yes.

14   Q   And you've got to give substantial assistance in this trial

15   to get that downward departure, don't you?

16   A   Yes.

17         MR. KNIZLEY:  Thank you.

18         MS. GRIFFIN:  Your Honor, may we gather some exhibits

19   briefly?

20         THE COURT:  Are you through, Mr. Knizley?

21         MR. KNIZLEY:  Yes, ma'am.  I wasn't thanking -- excuse

22   me, Judge.  I was thanking at the conclusion.  I apologize for

23   that.  I didn't mean to thank her for each question.  I

24   apologize for that.

25         MS. GRIFFIN:  I believe I can go ahead, Your Honor.

4040

 1                     REDIRECT EXAMINATION

 2   BY MS. GRIFFIN:

 3   Q   Ms. Parker, has anyone in this entire courtroom told you

 4   what to say today?

 5   A   No, ma'am.

 6   Q   Do you understand that no matter what happens, the Court

 7   decides your sentencing?

 8   A   Yes, ma'am.

 9   Q   I want to direct your attention to January of '15.  You

10   went into rehab; is that right?

11   A   Yes, ma'am.

12   Q   You didn't go back to PPSA?

13   A   No, ma'am.

14   Q   So is it -- did you have any access to PPSA's records after

15   January of '15?

16   A   Yes.

17   Q   How is that?

18   A   I had a bunch of charts that I had to bring home to work

19   on.  And I got fired, so I couldn't -- couldn't finish them.

20   Q   What happened to those charts?

21   A   I gave them to someone.  It seems like I might have given

22   them to you.  I'm not sure who I gave them to.

23   Q   Were they patient file charts --

24   A   Yes, ma'am.

25   Q   -- that you had brought home to work on?

4041

```
 1   A   Right (nodding head affirmatively).

 2   Q   Were they in your vehicle the night you got the DUI?

 3   A   Yes, ma'am.

 4   Q   When you say you received a DUI, had you been drinking

 5   alcohol?

 6   A   No, ma'am.

 7   Q   What was the DUI for?

 8   A   I took Phenergan.

 9   Q   So it was driving under the influence of a drug; is that

10   correct?

11   A   Right.

12   Q   Now, did you have access to any other files within PPSA

13   once you left PPSA January 15th?

14   A   Well, I still had a stack of charts at that point.

15   Q   Inside the business did you have access -- did you go back

16   to the business --

17   A   No, ma'am.

18   Q   -- ever?

19   A   I think I went in one time just to visit with everybody but

20   nothing to do with charts or anything; just went to say hey.

21   Q   You didn't have access to change or alter any records at

22   PPSA after you left, did you?

23   A   No, ma'am.

24   Q   And you know that the records of PPSA were seized on May

25   the 20th of 2015?
```

1   A   Yes, ma'am.

2   Q   In connection with your testimony, do you understand that

3   there is a patient agreement-prescriber form, Government's

4   Exhibit 37-1, for fentanyl and Subsys?

5   A   Yes, ma'am.

6   Q   Do you know that this is different from the form that you

7   have discussed with Dr. Couch's lawyer which says a prescriber

8   form?

9           THE COURT:  I think that was for Dr. Ruan.

10          MS. GRIFFIN:  Dr. Ruan.  My mistake.  Thank you.

11  A   This one says patient-prescriber agreement form.

12  Q   And does the patient understand -- have to be explained

13  these facts about Subsys and Abstral?

14  A   Yes.  The risks and benefits.

15  Q   This doesn't apply to other fentanyl drugs, does it?

16  A   Yes.  It had to do -- I believe it had to do -- no.  I

17  think it was just for Subsys.

18  Q   Just for Subsys?

19  A   I was thinking maybe the Fentora, but I know for sure

20  Subsys.

21  Q   And was there a required place for a patient to sign an

22  agreement that they had been explained the dangers of fentanyl

23  and Subsys?

24  A   Yes, ma'am.

25  Q   You didn't go over this with the patients, did you?

4043

```
 1   A   Sometimes I did, either myself or my nursing assistant.
 2   Q   You didn't see -- or did you see Dr. Ruan go over this with
 3   any patients?
 4   A   No, ma'am.
 5   Q   Did you see Dr. Couch go over it with any patients?
 6   A   No, ma'am.
 7   Q   Do you recall there being a PPSA patient of Dr. Couch's
 8   named Joyce Barber?
 9   A   No, ma'am.
10           MR. SHARMAN:  Objection, Your Honor.  This exceeds the
11   scope of cross.
12           MS. GRIFFIN:  Your Honor, she testified about that
13   only the C&R Pharmacy was the only pharmacy that stocked
14   Subsys.  And I would like to show her a prescription that was
15   filled for Subsys at another pharmacy.
16           MR. SHARMAN:  Still it exceeds the scope.
17           THE COURT:  Overruled.
18   BY MS. GRIFFIN:
19   Q   I show you what's marked as Government's Exhibit 5-1B and
20   ask you if the front of this prescription shows it is a
21   prescription for Subsys?
22   A   Yes.
23   Q   Does it show an effective date?
24   A   Yes.
25   Q   What date is that, ma'am?
```

BRIDGETTE PARKER - REDIRECT BY MS. GRIFFIN

1   A   October 22nd, 2013.

2   Q   Then I'm going to turn that prescription over and see if it

3   shows it was filled at a pharmacy other than PPSA -- excuse

4   me -- than C&R.

5   A   Repeat --

6   Q   Are you familiar with what the back of C&R prescription

7   forms look like?

8   A   I don't see anything on here.

9   Q   Do you see anything that says C&R?

10  A   No, ma'am.

11  Q   Do you see anything that has Caye McConaghy's initials on

12  it?

13  A   No, ma'am.

14  Q   Do you know that other pharmacies carry Subsys?

15  A   Yes, ma'am.

16  Q   So C&R was not the only place in town you could get a

17  Subsys prescription?

18  A   No, ma'am.  Usually -- it most of the time had to be

19  ordered, though, because it was a specialty drug.  But outside

20  pharmacists would fill it.

21  Q   Any pharmacist that had a prescription, a valid

22  prescription, for it could order it; is that right?

23  A   Yes, ma'am.

24  Q   And I show you the medical examiner's -- Board of Medical

25  Examiner's Couch's Exhibit 118 on page nine and ask what it

4045

1   says about prescription guidelines for physicians under section

2   (a).  Would you read that to us?

3   A   The prescription shall be dated as of, and signed on, the

4   day when issued.

5   Q   I show you the prescriptions for Shawn Brennan,

6   Government's Exhibit 20-9.  Related to the video you saw, was

7   one prescription for Roxicodone given November the 6th, 2014?

8   A   Was it given to him?  I don't know the exact date, if it

9   was dated earlier.  I'm not sure.

10  Q   You don't know if it was dated earlier than that?

11  A   Right.

12  Q   Did you give a prescription for Roxicodone for November and

13  December at the same visit?

14  A   I'm not sure.

15  Q   You don't remember seeing the video earlier today?

16  A   Oh, yes, yes, yes.  I'm sorry.  Yes, I gave him two.

17  Q   I show you the prescription for Shawn Brennan for December

18  the 4th, '14.

19  A   Right.  That was the extra one for the next month.

20  Q   But the visit was in November; is that right?

21  (Indicating.)  November in '14?

22  A   Yeah, I guess so.

23  Q   Would you like to see the procedure note for that date?

24  A   (Nodding head affirmatively.)  Sure.

25  Q   Would that help you refresh the date of the visit?

1    A    Yes, ma'am.  I just don't know if it was -- if the patient

2    was actually seen that day.

3    Q    Do you know that two scripts were given to the undercover

4    at the same time, one for November and one for December?

5    A    Yes, ma'am.

6    Q    Were those the two scripts that you have identified?

7    A    Yes, ma'am.

8    Q    And if they were given the same day, if both of those

9    scripts in Government's Exhibit 20-9 were given on the same

10   day, is one of these effective dates wrong?

11   A    I mean it could be.  That's why I'm asking to look at it.

12   Q    Would you like to actually see the prescriptions in your

13   hands?

14   A    Well, no.  Do you have like the office note?  Because I

15   don't know exactly the day they came in.

16   Q    I show you the procedure note from Government's Exhibit

17   20-22 for November the 6th and the progress note.  Let's start

18   with the progress note.  Does that list a visit?

19   A    Yes.  The visit was on November the 6th, 2014.

20   Q    And do you recall from the video prescribing -- handing

21   Shawn Brennan, the undercover, two prescriptions when you said

22   November and December?

23   A    Yes, ma'am.

24   Q    The two prescriptions, Government's Exhibit 20-9, one is

25   dated November for Roxicodone, one is dated December for

1    oxycodone -- excuse me.  Roxicodone for both of those.

2    A    (Nodding head affirmatively.)  That's two different

3    prescriptions, one for the next month, the current month and

4    one for the next.

5    Q    This one for December was presigned?  (Indicating.)

6    A    Now, that, I don't think it was presigned.  No, no.

7    Because I never had any presigned prescriptions from him, from

8    Dr. Couch.

9    Q    Well, if you were seeing the patient on November the 6th of

10   2014 and you handed them a prescription for November and

11   December, December of 2014 wouldn't have occurred yet, would

12   it?

13   A    No.

14   Q    So would this prescription have had to be signed before

15   that day?

16   A    Or either that day.

17   Q    If you handed them to him on November the 6th of '14 --

18   A    Yeah, it would have been signed before he left.

19   Q    In November?

20   A    In November.

21   Q    That does not meet with what we've just shown you, Couch's

22   Exhibit Number 118, page nine, does it?

23           MR. SHARMAN:  Objection, calls for a legal conclusion.

24           THE COURT:  Overruled.

25   A    Right, correct.

```
 1  BY MS. GRIFFIN:
 2  Q   That December prescription that you handed out in November,
 3  December of '14 you handed out in November of '14, couldn't
 4  have been dated on the date that it represented it was dated,
 5  could it?
 6  A   No.
 7  Q   I also show you from Couch's Exhibit Number 118, the
 8  Medical Board, page 10, paragraph eight.  What does this say?
 9  (Indicating.)
10  A   It is improper, under any circumstances, for a physician to
11  presign blank prescription pads or forms and make them
12  available to employees or support personnel.
13  Q   And I show you from Government's Exhibit 2-3 a booklet of
14  presigned prescriptions by Dr. Ruan.  Do you see that?
15  A   Yes, ma'am.
16  Q   Do you see anything on these prescriptions that says they
17  are void?
18  A   No, ma'am.  It's usually in the body of it.
19  Q   So these prescriptions prior to May the 20th of 2015
20  contain the doctor's signature.  Could they have been filled in
21  with a name and a drug and filled?
22        MR. SHARMAN:  Objection, calls for speculation.
23        MR. KNIZLEY:  Objection.
24        THE COURT:  Overruled.
25  A   Sure.
```

1  BY MS. GRIFFIN:

2  Q   Do you know whether, while you were there working for

3  Dr. Ruan, if any of the presigned prescriptions that Dr. Ruan

4  left were used to prescribe drugs to a patient?

5  A   Yes, ma'am.

6  Q   I also show you Couch's Exhibit 118 and ask you about

7  paragraph seven.  Could you read that for us?  Do I need to

8  pull it up some for you?

9  A   I'm fine.  It is improper for any prescription -- for any

10 prescription for a controlled substance to be signed by any

11 person in the place of or on behalf of the prescribing

12 physician.

13 Q   You testified that you overheard a conversation between

14 Dr. Couch and Justin Palmer about Justin Palmer being

15 instructed not to sign Dr. Couch's name; is that correct?

16 A   Correct.

17 Q   Do you recall when that was in relation to Dr. Couch

18 telling you that there has been some information about the FBI

19 looking at PPSA?

20 A   It seems like it all just kind of tied in together.  I

21 think it was -- he was alarmed somehow, and I think that's when

22 it was.

23 Q   Were you aware as to whether Dr. Couch knew before that day

24 that Justin Palmer had been signing his name on prescriptions?

25 A   Yes.

 1          MR. SHARMAN:  Objection, calls for speculation.

 2          THE COURT:  Overruled.

 3   BY MS. GRIFFIN:

 4   Q   Were you aware?

 5   A   Yes, ma'am.

 6   Q   How did you know that?

 7   A   Well, for one, he signed a few for me.

 8   Q   Who is "he" now?

 9   A   I'm sorry.  Justin.  And he -- his clinic started very

10   early in the morning, so he had to make a lot of changing and

11   do different things in the morning.  So he would sign his name

12   then if he wasn't there.

13   Q   Who would sign whose name?

14   A   Justin would sign Dr. Couch's name.

15   Q   Where did those files go of the patients that you and

16   Justin saw when Dr. Couch wasn't -- hadn't gotten to the office

17   yet for patients you had seen?

18   A   Where were they kept?

19   Q   What happened to them after you and Justin saw a patient

20   before Dr. Couch got to the office?  What did you do with those

21   files?

22   A   I had to hold onto it until he got there.  My patients

23   would wait to get a signature.

24   Q   Until who got there?

25   A   Dr. Couch.

1    Q   Do you know from personal experience what Justin did with

2    his files of patient files he saw before Dr. Couch would get

3    into the office?

4    A   I can't tell you that for sure.

5    Q   Now, in connection with the prepopulated -- let me go back

6    to Couch's Exhibit 118 before we leave that.

7            In connection with Couch's Exhibit 118 from the

8    Medical Board, does it also say anything about delegating

9    responsibility for the drugs prescribed?  (Indicating.)

10   A   Yeah.

11   Q   Paragraph five?

12   A   Uh-huh (positive response), I read it.  Do you want me to

13   read it out loud?

14   Q   Please.

15   A   I'm sorry.  When a physician prescribes a controlled

16   substance, he or she shall not delegate the responsibility of

17   determining the type, dosage, form, frequency of an

18   application, and number of refills of the drug prescribed.

19   Q   You've previously told us that there were times when Joe

20   Rowen or Natalie Perhacs would be in Dr. Ruan's office when you

21   would go in to try to update him about a patient; was that

22   right?

23           MR. KNIZLEY:  Your Honor, I object.  It's outside the

24   scope of cross.  That was not gone into.

25           THE COURT:  Sustained.

 1   BY MS. GRIFFIN:

 2   Q   I want to point you also to paragraph two about

 3   prescriptions for controlled substances.  Could you read that

 4   to us?  This is from Couch's Exhibit 118, the medical rules of

 5   the State of Alabama.

 6   A   Where an oral order is not permitted, prescriptions for

 7   controlled substances shall be written with ink or indelible

 8   pencil or typewriter and shall be manually signed by the

 9   physician issuing the prescription.  For purposes of this rule,

10   manually signed requires a nonelectronic, handwritten

11   signature.  Oral orders are not permitted for prescriptions for

12   schedule II and schedule IIN controlled substances.

13   Q   Does it require that those prescriptions be signed by the

14   physician?

15   A   Yes.

16           THE COURT:  Ms. Griffin, is now a good time for us to

17   take our afternoon break?

18           MS. GRIFFIN:  Yes, Your Honor.

19           THE COURT:  All right.  Ladies and gentlemen, leave

20   your pads on your chairs.  Take your break downstairs in the

21   jury assembly room.  No discussion about the case.  And we will

22   call you back up in about 15 minutes.

23           We're in recess.

24       (A recess was taken at 3:06 p.m.)

25       (In open court, 3:27 p.m., defendants and jury present.)

4053

```
 1            THE COURT:  All right Ms. Griffin.
 2   BY MS. GRIFFIN:
 3   Q   Ms. Parker, you were asked on direct what medications you
 4   had taken before you came here today; is that right?
 5   A   Yes, ma'am.
 6   Q   Have you been prescribed any controlled substances since
 7   January of 2015?
 8   A   No, ma'am.
 9   Q   I'll show you what's marked as Government's Exhibit 8-4 --
10   this has not been admitted -- and ask if you recognize this
11   document?
12   A   Yeah.  It's my drug query.
13   Q   From where?
14   A   From PPSA.  I mean I was being treated there.  It's the
15   Alabama query report.
16   Q   Can you speak up for us?
17   A   I'm sorry.  It's the Alabama query report.
18   Q   Does it show whether you've been prescribed any controlled
19   substances by anyone since January of 2015?
20   A   Oh, no, ma'am.
21   Q   You have not?
22   A   No, ma'am.
23            MS. GRIFFIN:  Your Honor, we move to admit
24   Government's Exhibit 8-4.
25   A   Excuse me, I have.  When I had my back surgery while I was
```

BRIDGETTE PARKER - REDIRECT BY MS. GRIFFIN

4054

1    at Bradford, they gave me some pain medicine.  But then I had

2    to go back and haven't had any more.  So that was in March.

3    Q    March of 2015?

4    A    Uh-huh (nodding head affirmatively).

5    Q    Was that provided in-house by Bradford?

6    A    No.  By my doctor at the Andrews Clinic.

7    Q    That did the surgery?

8    A    Right.

9    Q    But you've not been on any controlled substances day in and

10   day out --

11   A    Huh-uh (shaking head negatively).

12   Q    -- since you were -- went to drug rehab?

13   A    Yes, ma'am.

14   Q    Have you been drug tested since you went to Bradford?

15   A    Yes, ma'am.  Sometimes two places in one day.

16   Q    What do you mean?

17   A    I have to come downtown here for my probation officer.  And

18   then I go to a place here in Mobile for the Board of Nursing, a

19   site that they want me to go to.

20   Q    And the probation officer, is that in connection with your

21   supervision after your guilty plea?

22   A    Yes, ma'am.

23        MS. GRIFFIN:  Your Honor, we would move to admit

24   Exhibit 8-4, her PDMP.

25        MR. SHARMAN:  No objection.

```
 1              THE COURT:  All right.  Mark it in.
 2         (Government's Exhibit 8-4 was entered into evidence.)
 3    BY MS. GRIFFIN:
 4    Q    Ms. Williams -- excuse me -- Ms. Parker, you've told us
 5    about prepopulated patient reports, is that right, patient
 6    visits?
 7    A    Uh-huh (positive response).
 8    Q    For a report to say something different the next month than
 9    it did the month of a visit, would somebody have to change the
10    data?
11    A    Yeah.  You have to go in and put what's according to --
12    what's going on with the patient that day.
13    Q    So if a visit were in January and didn't say a symptom and
14    the next visit was in March and did state a symptom, how would
15    that be possible?
16    A    I'm sorry.  I don't understand.
17    Q    Would somebody have to put information in --
18    A    Oh, yes.
19    Q    -- if it's prepopulated?
20    A    Yes, you'd to put new information in.
21    Q    So when it's prepopulated --
22    A    It rolls over from the month before.
23    Q    -- it rolls over from the month before.  I'm going to show
24    you the progress note from Government's Exhibit 20-22 for
25    Mr. Brennan for January the 29th of 2015.  And I'm going to ask
```

1    you if it says anything about him wearing a cervical collar

2    under musculoskeletal?

3    A    If he's wearing what?

4    Q    A cervical collar.

5    A    Oh.

6    Q    Down at the bottom.

7    A    I don't see where there's a cervical collar.

8    Q    Okay.  Then I'll show you the report for the next visit,

9    which is March 19th, 2015, for the same Shawn Brennan, the

10   undercover.  Do you see that?

11   A    Yes, ma'am.

12   Q    And I ask you to look under musculoskeletal, if it says

13   that the patient is wearing a soft cervical collar?

14   A    Yes, it does there.

15   Q    If the reports are prepopulated, would someone have had to

16   type that in this patient report?

17   A    Yes, ma'am.

18   Q    Do you know if the reports that you said you were behind on

19   when Dr. Ruan fired you were ever corrected?  Not whether you

20   did it, but do you know?

21   A    I did the charts, so I feel like I did everything -- what I

22   was supposed to.

23   Q    When he fired you, did you have some charts you were behind

24   on?

25   A    Oh, yes, ma'am.

4057

1   Q   Did you correct or update those charts?

2   A   I think I mixed it up.  There was a time whenever I was out

3   during the holiday.  I think that was it because I think that

4   was around the same time, was December.  And so I had lots of

5   charts that I had to do and correct.

6   Q   How did you correct them?  There at PPSA or somewhere else?

7   A   At my house.

8   Q   How were you able to do that at your house?

9   A   My husband had bought me a laptop, and the administrator,

10  Ken, loaded the program on my computer so I could work from

11  home.

12  Q   Were you required to update those charts by anyone before

13  you were allowed to go work for Dr. Couch?

14  A   Well, I would -- yeah, I was required to get all that done.

15  Q   By whom?

16  A   Dr. Ruan.

17  Q   And what, if anything, did he tell you as to why you had to

18  get those charts completed?

19  A   They couldn't bill until it was done.

20  Q   Is that what he told you?

21  A   Yeah.

22  Q   Now, you talked about with counsel for either Mr. -- either

23  Mr. Knizley or Mr. Sharman about reasons that certain drugs

24  were prescribed; is that right?

25  A   Yes, ma'am.

1  Q   And one of the things you talked about was that it might be
2  better for the patient.  Did you -- are there some other
3  reasons why Subsys and Abstral might have been prescribed that
4  you are aware of by Dr. Ruan and Dr. Couch?
5  A   Why?  Why they would be prescribed for --
6  Q   Yes.
7  A   Like for back pain.  It could be anything.  It didn't have
8  to be cancer.
9  Q   Did you know whether or not Dr. Ruan and Dr. Couch owned
10  stock in the company that manufactured Abstral?
11  A   Yeah, I found out they did.
12  Q   Did you know whether Dr. Ruan and Dr. Couch received
13  speaking fees from the company that manufactured Subsys?
14  A   Yes.
15  Q   Was there a time that Dr. Ruan prescribed a lot of Exalgo?
16  A   Yes.
17  Q   Did you know whether Dr. Ruan was receiving speaker fees
18  from the manufacturer of Exalgo?
19  A   I'm not sure.
20          MR. KNIZLEY:  Your Honor, it's outside the scope of
21  cross.
22          MS. GRIFFIN:  Your Honor, she's answered that she's
23  not sure.
24          THE COURT:  Sustained.
25  BY MS. GRIFFIN:

BRIDGETTE PARKER - REDIRECT BY MS. GRIFFIN

1   Q   You were also asked about pain schedules zero to 10.  Would

2   you always believe a patient that told you their pain was 10

3   after 10 --

4   A   No.

5   Q   -- 10 out of 10?  Why is that?

6   A   Because if it was 10 out of 10, they wouldn't be in the

7   office.  I couldn't do much for them.  They needed to be in the

8   hospital and be treated.

9   Q   Were there any things, based on your training and

10  experience, that you could look at and decide if somebody was

11  in pain?

12  A   I mean for obvious reasons, they -- it's subjective, so I

13  don't know for sure.  Now, I'm going by what the patient tells

14  me.  You know, they could have a certain diagnosis that would

15  warrant pain medication.

16  Q   But can you look at them and tell if they're laughing?

17  A   Oh if they're laughing, they're typically not hurting.

18  Q   Can you tell if they are walking without any difficulty?

19  A   Right, yeah, I could tell.

20  Q   Is that something you look for?

21  A   Oh, yeah, yes, ma'am.

22  Q   What other things would you look for that you could tell no

23  matter what pain score a patient gave you?

24  A   What could I look for?  Well, they gave a pain scale when

25  they first came in when they were initially getting their vital

1   signs and we were getting them worked up into the computer.  I

2   mean, it would have to be, you know -- I'm not sure.  It would

3   just have to be very obvious to me.

4   Q   But laughter or no difficulty walking might be two of those

5   things you would look for?

6   A   Yes.  Or slurred speech, yeah (nodding head affirmatively).

7   Q   In connection with your guilty plea, you pled to a

8   conspiracy charge; is that correct?

9   A   Yes, ma'am.

10  Q   That's not just a one -- or is that just a one-time act?

11  A   For my --

12  Q   For your behavior.  Does that cover the entire time you

13  were with PPSA?

14  A   Does what?

15  Q   Your guilty plea.

16  A   Oh, yes, ma'am.

17  Q   You pled to the conspiracy?

18  A   Yes, ma'am.

19  Q   And you recall that from your plea agreement?

20  A   Was I called out?

21  Q   Do you recall that --

22  A   Oh, yes, ma'am.

23  Q   -- you pled to a conspiracy?

24  A   Yes, ma'am.

25  Q   As opposed to a single transaction that began -- for

4061

1  example, you might say on September 3rd you did something.  Did

2  you plead to a conspiracy that covers a range of dates?

3  A   A range of dates from the time I started till the time I

4  left.

5  Q   And it covered your activities during that time in that

6  guilty plea, didn't it?

7  A   Yes, ma'am.

8  Q   Do you know when you were talking about a voucher or a

9  coupon if there's a difference between the words "voucher" and

10 "coupon" when it comes to prescriptions?

11 A   No.

12 Q   You don't know or there isn't?

13 A   A coupon is -- I mean, it gives a discount; so does a

14 voucher.  So it's the same.

15 Q   Do you know if C&R Pharmacy was being paid for the voucher

16 or the coupon value for Subsys and Abstral vouchers and coupons

17 that were used?

18 A   I'm not sure of that.

19 Q   You don't know?

20 A   No, ma'am.  I would think -- well, I would think so because

21 that's where most of our patients went and received their

22 prescriptions.

23 Q   Ms. Parker, was Justin fired while you were there at PPSA?

24 A   No.

25 Q   You weren't fired at PPSA even though there had been

1    complaints about you?

2    A    Not until the very end.

3    Q    Looking back, do you think it was obvious that you had a

4    problem?

5    A    Yes, ma'am.

6              MR. SHARMAN:  Objection, speculation.

7              THE COURT:  Overruled.

8    BY MS. GRIFFIN:

9    Q    Do you think it was obvious you had a problem?

10   A    (Nodding head affirmatively.)

11   Q    Why was that?

12   A    I just struggled.  (Crying.)

13   Q    You struggled?

14   A    (Nodding head affirmatively).

15   Q    Were you still allowed to see and treat patients?

16   A    (Nodding head affirmatively.)  Yes, ma'am.

17             MS. GRIFFIN:  That's all I have for this witness, Your

18   Honor.

19             THE COURT:  May this witness be excused?

20             MS. GRIFFIN:  She may.

21             THE COURT:  All right.  You may step down.  Thank you.

22             MR. BODNAR:  United States calls Melissa Dupree.

23                         MELISSA DUPREE

24             was sworn and testified as follows:

25             THE WITNESS:  Yes.

```
 1                THE CLERK:  Thank you, ma'am.  Please be seated.

 2                      DIRECT EXAMINATION

 3   BY MR. BODNAR:

 4   Q   Good afternoon, Ms. Dupree.

 5   A   Good afternoon.

 6   Q   Could you please introduce yourself to the jury?

 7   A   My name is Melissa Dupree.

 8   Q   And how do you spell Dupree?

 9   A   D-U-P-R-E-E.

10   Q   And, Ms. Dupree, what is your educational background?

11   A   Medical assistant.

12   Q   And what is a medical assistant?

13   A   We pretty much assist the doctors in taking the patients

14   back and taking blood pressure and their chief complaint.

15   Q   And did you work for a very brief time at PPSA?

16   A   Yes.

17   Q   And how brief was that time?

18   A   Two weeks.

19   Q   During your two weeks at PPSA did you work for one or the

20   other of the two doctors?

21   A   Yes.

22   Q   Which doctor?

23   A   Dr. Ruan.

24   Q   Do you see Dr. Ruan here in the courtroom today?

25   A   Yes.
```

4064

1    Q    Would you please identify him?

2    A    He's at that table right there (indicating).

3    Q    And because the record can't reflect what you point at, can

4    you just describe one thing he's wearing?

5    A    Glasses.

6          MR. BODNAR:  Let the record reflect that she has

7    identified Dr. Ruan.

8    Q    What were your tasks at PPSA during those two weeks?

9    A    I would call the patient back, weigh them, take their blood

10   pressure, take their chief complaint, and put them in the room

11   for the doctor to see.

12   Q    After the patient had been seen, was it also part of your

13   job to walk them out into the main waiting room?

14   A    Yes.

15   Q    I want to turn your attention to a specific -- did you have

16   a specific instance where something troubled you when you

17   walked a patient out to the waiting room?

18   A    Yes.

19   Q    Would you please explain to the jury what happened?

20   A    I was walking a patient out and I had handed her her

21   prescriptions.  And as I walked her to the waiting room, when I

22   opened up the door, she was on the 5 o'clock news.  It was 5

23   o'clock.

24   Q    Who was on the 5 o'clock news?

25   A    The patient.

1    Q   And what do you mean, she was on the news?

2    A   They were doing -- her picture was on there for selling her

3    prescription medication.

4    Q   What did you do after you saw the patient you had just

5    walked out on the 5 o'clock news?

6    A   I went to the back and asked the other medical assistants

7    did I need to call her back or take her prescriptions or do

8    anything?

9    Q   And what was said to you?

10   A   They said no, that they --

11          MR. DARLEY:  Objection, Your Honor.  That's hearsay.

12          THE COURT:  Overruled.

13   BY MR. BODNAR:

14   Q   What was said to you when you asked should you go stop the

15   lady and get her medications?

16   A   They said no, that was the police's job, not theirs.

17   Q   How long after that were you fired from PPSA?

18   A   I don't know the exact time, but it wasn't long.

19   Q   Sometime in that two-week period?

20   A   Yes.

21   Q   And do you recall what was it -- why were you fired from

22   PPSA?

23   A   I was told that I did a workmen's comp claim paperwork

24   wrong.

25   Q   And had you ever been trained about how to do workers'

4066

```
 1   comp?

 2   A    No.

 3           MR. BODNAR:  Nothing further for this witness, Your

 4   Honor.

 5           THE COURT:  Any cross?

 6           MR. WILLSON:  Dr. Couch has none, Your Honor.

 7           MR. DARLEY:  No questions, Your Honor.

 8           THE COURT:  All right.  May this witness be excused?

 9           MR. BODNAR:  Yes, Your Honor.

10           THE COURT:  All right.  You may step down, Ms. Dupree.

11           MR. BODNAR:  United States calls Angela Anthony.

12                          ANGELA ANTHONY

13                was sworn and testified as follows:

14           THE WITNESS:  Yes, ma'am.

15           THE CLERK:  Thank you, ma'am.  Please be seated.

16                       DIRECT EXAMINATION

17   BY MR. BODNAR:

18   Q    Good afternoon, Ms. Anthony.

19   A    Good afternoon.

20   Q    Could you please introduce yourself to the jury?

21   A    Yes.  My name is Angela Anthony.

22   Q    And, Ms. Anthony, what is your educational background?

23   A    I'm a medical receptionist.

24   Q    And what do you mean, a medical receptionist?  What does a

25   medical receptionist do?
```

4067

1  A   A medical receptionist is just like a regular receptionist,

2  except you just work in a physician's office.

3  Q   Are you the person that typically sits right up at the

4  front desk when a patient arrives?

5  A   Yes, sir.

6  Q   Prior to working at PPSA, did you have any prior, previous

7  experience working as a medical receptionist?

8  A   Yes, sir, I did.

9  Q   Can you tell the jury about that, please?

10  A   Yes, sir.  Previously, before working at PPSA, I worked at

11  Dr. Howard Rubenstein's office at Rubenstein Family Medical in

12  Saraland.

13  Q   And what kind of medical practice did Dr. Rubenstein have?

14  A   He was a general practitioner.

15  Q   How long were you a receptionist for Dr. Rubenstein?

16  A   Almost four years.

17  Q   At some point did you become the medical receptionist at

18  PPSA?

19  A   Yes, sir, I did.

20  Q   And which -- well, first, when did you become a medical

21  receptionist there?

22  A   That would have been in January of 2014.

23  Q   And how long did you work as a receptionist at PPSA?

24  A   From January of 2014 until May of 2015.

25  Q   Had you left before or after the FBI raid?

1    A    I left after.

2    Q    Can you explain to the jury, which of the two PPSA

3    locations did you work at?

4    A    I worked at the one on Springhill Avenue.

5    Q    And which of the two doctors, Dr. Ruan or Dr. Couch,

6    primarily worked at the Springhill Avenue location?

7    A    Dr. Couch.

8    Q    And just orienting the jury to where you were, where was

9    your position in the Springhill office?

10   A    Well, originally when I was hired, I was hired up front and

11   I worked up there for a couple of months.  And then when the

12   position became available in the back, in the medical records

13   department, then I moved to the back.

14   Q    During your time that you were up front, from your vantage

15   point, were you able to observe the waiting room?

16   A    Yes, sir.

17   Q    Can you explain to the jury -- well, were individuals there

18   for long periods of time before they were seen?

19   A    Yes, sir.

20   Q    Can you explain a little about that to the jury?

21   A    Well, we just -- at that practice we had a large number of

22   patients there, you know, and then they saw, you know, all

23   three physicians, Dr. Couch, Dr. Chen and Dr. Ruan.

24   Q    Do you know if patients were scheduled at the same time as

25   other patients, such as double or triple or quadruple booking,

4069

 1    or did you know how they were scheduled during the day?

 2    A    Yes, sir, they were all of the above:  single, double,

 3    triple, and quadruple booked.

 4    Q    Approximately how long did patients have to wait from the

 5    time that they were supposed to be seen until the time they

 6    actually started going back?

 7    A    For several hours.

 8    Q    Compared to the time that they spent in the waiting room,

 9    did you have a sense from your vantage point up front about how

10    long they were actually in the back of the practice, where the

11    medical treatment areas were?

12    A    They were not usually back there for very long.

13    Q    When the people -- when the patients came out of the

14    medical practice area, would they pass by you again in the

15    front?

16    A    Yes, sir.

17    Q    Would they have -- were you ever able to see if they had

18    prescriptions in their hand?

19    A    Yes, sir.

20    Q    And was it typically one prescription or multiple

21    prescriptions?

22    A    Typically they were multiple prescriptions.

23    Q    Where you were located, were you able to know or did you

24    know when Dr. Couch was not coming in to work, whether he was

25    out of town or out of the country, were you aware of when he

4070

```
 1   would or would not be there?
 2   A    No, sir.
 3   Q    Did you know if there were days that he was not there,
 4   though, in the office?
 5   A    Yes, sir, I knew if he was there or not there.
 6   Q    You did know if he was there or not there?
 7   A    Uh-huh (nodding head affirmatively).
 8   Q    On days that Dr. Couch was not in the office, were
 9   Dr. Couch's patients still being treated?
10   A    Yes, sir.
11   Q    Do you know who was treating Dr. Couch's patients when he
12   was not there?
13   A    The nurse practitioners.
14   Q    And who were those nurse practitioners?
15   A    The nurse practitioners were Jason, Stacy, and Bridgette.
16   Q    And for Jason, do you mean Justin?
17   A    Justin, I'm sorry.  Justin Palmer.
18   Q    How often did you see Stacy Madison, Bridgette Parker, and
19   Justin Palmer at PPSA?  Would you see them during the day?
20   A    Yes, sir.
21   Q    Did you ever have occasions to see them where you believed
22   that they were impaired?
23   A    Yes, sir.
24   Q    What made you think that they were impaired?
25   A    To me just classic signs of being under the influence of
```

4071

 1    something, something that would alter the way they looked,

 2    slurred speech, squinty eyes.

 3    Q    And was this apparent to you, just seeing them walking by

 4    as you were up front?

 5    A    Yes.

 6    Q    Was this during the time of the day when they were also

 7    seeing patients?

 8    A    Yes, sir.

 9    Q    At any point during your time at PPSA, did you ever observe

10    blank presigned prescriptions?

11    A    Yes, sir.

12    Q    For which doctor?  Dr. Ruan or Dr. Couch?

13    A    Dr. Couch.

14    Q    Can you explain to the jury where did you see these blank

15    signed Dr. Couch prescriptions?

16    A    Usually they were in the area where the MAs were.

17    Q    And is an MA a medical assistant?

18    A    Yes, sir.

19    Q    Now, you actually saw those blank scripts?

20    A    Yes, sir.  They were there and also in Mr. Palmer's office.

21    Q    At any point while you were at PPSA, did you ever see

22    Justin Palmer signing Dr. Couch's name on a prescription?

23    A    Yes, sir.

24    Q    Can you explain to the jury how it was that you saw that?

25    A    We had a patient to arrive at the office and they were told

1    that their prescriptions would be ready and they weren't.  And

2    Dr. Couch was not there.  And so, working at the front desk and

3    everything, I was given a prescription -- or I had to go to the

4    back to get the prescription.  It wasn't ready.  And so

5    Mr. Palmer wrote the prescription out.

6    Q    So you physically brought him prescriptions for him to

7    sign?

8    A    Yes, sir.

9    Q    At the time did you have any idea of whether or not Justin

10   Palmer was authorized to do that?

11   A    No, sir, I didn't.

12   Q    On the prescriptions that you brought him to sign, do you

13   know if he signed Justin Thomas Palmer or was he signing a

14   Dr. Couch signature?

15   A    He signed Dr. Couch's name to it.

16   Q    While you worked up front, were there instances of what you

17   call nurses visits?

18   A    Yes, sir.

19   Q    Can you explain to the jury about a nurse's visit?

20   A    On occasions when Dr. Couch was not there, the patients

21   would come in, it would be time for their prescriptions, and so

22   the patients would be in the room.  So when the MA went in to

23   take their vital signs, they would ask the patients if they

24   were having any problems or any issues with their prescriptions

25   that they were on.  And if the patients said no, then they

4073

 1   would give them their prescriptions and send them on their way.

 2   Q   And they would give the patient the prescriptions?

 3   A   Yes, sir.

 4   Q   And were those prescriptions already in the MA's hands as

 5   the patient went back?

 6   A   Yes, sir, already attached to their -- their stuff.

 7   Q   So during those nurses visits, was the patient ever seen by

 8   Dr. Couch?

 9   A   No, sir.  He wasn't there at that time.

10   Q   How about by any of the nurse practitioners?

11   A   No, sir.

12   Q   How frequently did nurses visits like this occur?

13   A   Rather frequently.

14   Q   And by rather frequently, are we talking maybe once a

15   month?  Once a week?

16   A   Probably once a month.

17   Q   And would there be multiple people that would have nurses

18   visits on those high-volume days?

19   A   Yes, sir.

20           MR. BODNAR:  Pass the witness, Your Honor.

21                       CROSS EXAMINATION

22   BY MR. WILLSON:

23   Q   Good afternoon, Ms. Anthony.

24   A   Good afternoon.

25   Q   On your direct testimony I believe you told Mr. Bodnar that

 1  you were at PPSA from January 14 to May 15; is that right?

 2  A   Yes, sir.

 3  Q   And that you were at the medical receptionist, that's

 4  basically the front desk; right?

 5  A   Yes, sir that's right.

 6  Q   For a couple of months?

 7  A   (Nodding head affirmatively.)

 8  Q   60 days?

 9  A   That or a little longer.  I'm not exactly sure when I moved

10  to the back.

11  Q   Okay.  And you spent the rest of your time as a medical

12  records clerk; is that right?

13  A   Yes, sir, yes, sir.  That's right.

14  Q   And that was not at the front desk; right?

15  A   Correct.

16  Q   And it wasn't immediately behind the front desk; is that

17  right?

18  A   Correct.

19  Q   And it wasn't in the hallways near the exam rooms; is that

20  correct?  In fact it was off to the side, in an office; is that

21  right?

22  A   Yes, sir.

23  Q   And you would stay in there maybe not --

24         MR. BODNAR:  Objection to relevance, Your Honor.  She

25  testified about her time period at the front desk.  And this is

```
 1   all about the stuff that she did when she wasn't at the front
 2   desk.
 3           MR. WILLSON:  Your Honor, she testified as to --
 4           THE COURT:  Overruled.  You can ask her.  Go ahead.
 5   BY MR. WILLSON:
 6   Q   Ms. Anthony, when you worked in medical records, you pretty
 7   much stayed in that office, didn't you?
 8   A   Yes, sir.
 9   Q   Okay.  So you came out to retrieve a chart maybe?
10   A   Yes, sir, to retrieve paperwork from the basket that was up
11   front.
12   Q   And you go back in; right?
13   A   Yes, sir.
14   Q   Did you spend 95-98 percent of your time in the medical
15   records office?
16   A   Yes, sir.
17   Q   98 percent?
18   A   (Nodding head affirmatively.)
19   Q   Okay.  And that was, again, for the entire period of time
20   that you were at PPSA, with the exception of those first couple
21   of months; right?
22   A   Yes, sir.
23   Q   All right.  You don't know what a nurse -- did you --
24   Mr. Bodnar asked you about a nurse's visit.  During those two
25   months, Ms. Anthony, when you were outside that office, did you
```

1    ever observe patients being treated in exam rooms?

2    A    Yes, sir, I did.

3    Q    Okay.  So you would go back and physically watch for the

4    entire period of time when that patient was treated in the exam

5    room?

6    A    No, sir.

7    Q    Okay.  Ms. Anthony, you talked about blank prescriptions.

8    Did you ever see such a blank prescription actually handed to a

9    patient?

10   A    A blank prescription?

11   Q    Did you talk -- did you tell Mr. Bodnar that there were

12   blank prescriptions?

13   A    Not blank prescriptions.  They were -- they were filled

14   out.

15   Q    Okay.  They were filled out?

16   A    They were filled out.  They had what the patient's

17   medication was that they were on and they were presigned.

18   Q    Presigned?  Now, would you agree that there's a substantial

19   difference between a prescription that is presigned -- that is

20   to say it has the medication, it has the name of the patient,

21   and it is signed by the doctor -- on the one hand and on the

22   other hand a prescription that is signed by the doctor,

23   completely blank?  In other words, it does not have the

24   medication, it does not have the name of the patient, or the

25   date.  Would you agree that there's a substantial difference

1    between those two things?

2    A    Yes.

3    Q    And what you are saying is what you observed was presigned

4    prescriptions; is that right?

5    A    Yes, sir.

6              MR. WILLSON:  One moment, Your Honor.

7              I don't have any other questions, Your Honor.

8              MR. BODNAR:  Very briefly, Your Honor on redirect.

9              THE COURT:  Do you want --

10             MR. ARMSTRONG:  Nothing.

11        (A discussion was held off the record between counsel.)

12                       REDIRECT EXAMINATION

13   BY MR. BODNAR:

14   Q    Ms. Anthony, I want to clarify.  I thought you had

15   mentioned that in the MA station and in Justin Palmer's office

16   you saw blank scripts that had a doctor's signature on it.  Is

17   that not correct?

18   A    Those prescriptions had signatures on them.

19   Q    And were they otherwise blank or did they have other

20   material on them?

21   A    No, they were -- they were blank.  But they had -- it's

22   kind of hard to explain.  There were several different

23   prescriptions at the facility.  Some were blanks with nothing

24   on it, with their signatures on it.

25   Q    So, for instance, if this is a prescription that just had a

 1    name down here at the bottom?

 2    A    Yes, sir.

 3    Q    And you did see those?

 4    A    Yes.

 5    Q    And as defense counsel pointed out, you might have only

 6    been up front to see those in two-three months?

 7    A    That's correct.

 8    Q    And during that time you did see those?

 9    A    Yes.

10    Q    And during that short time period that defense counsel

11    brought up, you also saw Justin Palmer forging scripts?

12    A    Yes, sir.  I was in his office in one instance where he

13    signed Dr. Couch's name because Dr. Couch was not there.

14    Q    Right in front of you he signed that?

15    A    Yes, sir.

16    Q    And you saw, in that very short period of time, you saw

17    nurses visits too?

18    A    Yes, sir, I did.

19          MR. BODNAR:  Nothing further from this witness, Your

20    Honor.

21          THE COURT:  May this witness be excused?

22          MR. BODNAR:  Yes, Your Honor.  May we approach before

23    this next witness?

24          THE COURT:  All right.  Thank you.  You may step down.

25       (At the side bar, jury not present.)

1    MR. BODNAR:  Your Honor, similarly like we did with

2    Mrs. Chausse yesterday, Mr. Walker is here today.  His wife is

3    a deceased patient who is named in the indictment.  We would

4    like to make the same announcement before he even comes in the

5    room that Mr. Walker is here in lieu of his wife because she

6    has passed away and there are absolutely no allegations that

7    Dr. Ruan, Dr. Couch, or PPSA was involved in the death of

8    Deborah Walker.

9          MR. ARMSTRONG:  And she's been warned -- he's been

10   warned not to bring that up.

11         MS. GRIFFIN:  He has.

12         MR. ARMSTRONG:  Okay.

13         THE COURT:  Okay.

14         MS. GRIFFIN:  He is going to testify that he came home

15   some days and she was passed out in her recliner and that

16   explains why he hid the medicine and doled it out to her.  But

17   he has been warned specifically that he cannot use the word

18   that she has died.

19      (In open court, defendants and jury present.)

20         MR. BODNAR:  Ladies and gentlemen, you're about to

21   hear from Alfred Walker.  His wife was the patient.  He is here

22   in lieu of his wife, Deborah Walker, who is deceased.  There

23   are absolutely no allegations, period, that Dr. Ruan or

24   Dr. Couch or that anyone at PPSA was involved in any way

25   causing the death of Deborah Walker.

4080

```
 1                   ALFRED E. WALKER

 2            was sworn and testified as follows:

 3         THE WITNESS:  I do.

 4         THE CLERK:  Thank you, sir.  Please be seated.

 5                   DIRECT EXAMINATION

 6  BY MS. GRIFFIN:

 7  Q   Tell us your name, please, sir.

 8  A   Alfred Walker.

 9  Q   Mr. Walker, where are you employed?

10  A   Fausak Tire Center.

11  Q   Here in Mobile?

12  A   Yes, yes.

13  Q   Mr. Walker, I want to direct your attention to a time when

14  Deborah Walker was going to PPSA.  Was Deborah Walker your

15  wife?

16  A   She was.

17  Q   And did you go to the appointments with her?

18  A   Most of the time I did.

19  Q   Did you go into the patient room with her?

20  A   No.  I just made it to the waiting area and then she went

21  back to talk to the doctors herself.

22  Q   Do you know which doctor she saw?

23  A   Dr. Ruan.

24  Q   Did you ever meet Dr. Ruan?

25  A   I did.
```

4081

1   Q   How is it that you met him?

2   A   When he would be making -- telling her about her

3   appointments, I would occasionally speak to him.  I didn't know

4   him personally, but I saw him.

5   Q   Where would you be that you could see him when that

6   happened?

7   A   In the waiting area, waiting on her to come out.

8   Q   Had she got there in 2014?

9   A   She did.

10   Q   And what was she prescribed by Dr. Ruan?

11   A   She was first prescribed Lortab 7.5s, and then they gave

12   her 10 milligram Lortabs, and then they gave her Somas, and

13   then they prescribed Opana for her.

14   Q   Now, Mr. Walker, had Deborah had an addiction problem with

15   drugs prior to going to PPSA?

16   A   She did.

17   Q   Had she actually served some time?

18   A   She did.

19   Q   What had she served time for?

20   A   Basically burglary and stealing.

21   Q   What, if you know, was she doing with the things she stole?

22   A   Say that again.

23   Q   What was she doing with the things she stole, if you know?

24   A   She'd -- would take clothes and stuff out of stores to

25   support her drug habit.

ALFRED E. WALKER - DIRECT BY MS. GRIFFIN

1   Q   Was she using street drugs --

2   A   She was.

3   Q   -- or prescription drugs?  Street drugs?

4   A   (Nodding head affirmatively.)

5   Q   Did she go to jail?

6   A   She did.

7   Q   And that was before she went to see Dr. Ruan?

8   A   It was.

9   Q   Did she use drugs from the street when she got out of jail?

10  A   No.

11  Q   What happened to change that?

12  A   Well, she had a stroke.  But then her back was continuing

13  to give her -- to hurt her.  And when she got referred to Pain

14  Specialists, that's when she got under Dr. Ruan's care.

15  Q   So when she got out of jail, she had a stroke?

16  A   Yes.

17  Q   And then later she went to Dr. Ruan?  Is that the sequence?

18  A   Yes, ma'am.

19  Q   Would you see the drugs your wife would come out with from

20  her appointments?

21  A   I would have to drop the prescriptions off at Walgreens at

22  Tillman's Corner to have them filled.

23  Q   Would the prescriptions change when she went there or did

24  they stay roughly the same as you've told us?

25  A   When the -- I guess the 7.5, the Lortabs, didn't work, they

ALFRED E. WALKER - DIRECT BY MS. GRIFFIN

1   upped the dosage on it to 10 milligrams.  And then they gave

2   her Somas for muscle relaxers to help her back.  And after that

3   they gave her -- they prescribed Opana for her.

4   Q   Did they increase the dosage ever of either of those?

5   A   At first they gave her 7.5 Lortab, then they gave her 10

6   milligram Lortab.  And I did know the dosage of the Somas.  But

7   after they took her off Lortab, they changed her to Opana.

8   Q   Did there come some times when you would come home and find

9   your wife asleep?

10  A   Yes.

11  Q   Could you tell us about that?

12  A   I would come home and find her almost comatose and the

13  house filled with smoke, where she'd be done went to sleep and

14  couldn't wake her up because the medicine had her so groggy

15  that she couldn't function.  And I would get her up and I

16  started telling her not to -- I took efforts to take the

17  medicine and hide it and just leave enough dosage out for her

18  to take during the day while I was gone to work.  I would take

19  the other and put it up.

20  Q   You would hide it from her?

21  A   I would.

22  Q   What do you mean about the house being filled with smoke?

23  A   Well, you couldn't hardly see your way in where she had

24  started cooking and she'd take the medicine and then when she

25  passed out or whatever, she -- whatever was on the stove would

ALFRED E. WALKER - DIRECT BY MS. GRIFFIN

1   be burned until the house would be filled with smoke and the

2   smoke alarm would be going off and I could see smoke coming out

3   of the front door before I could get in the house.

4   Q   Did that scare you?

5   A   It did.

6   Q   Did you stop her from cooking?

7   A   I told her not to cook anything, to wait till I got home

8   from work to cook.  And she told me that she needed to cook

9   because I was out working.  But I told her don't worry about

10  it, wait till I get home and we both would do it.  Because it

11  had got to the point to where I was afraid that the house may

12  burn down with her in it or she may not be able to get out.

13  Q   The house didn't burn down, did it?

14  A   No.  But --

15  Q   So would you dole out the tablets to her that she was

16  prescribed?

17  A   Whenever -- when I would come home or whatever, the house

18  would be smoked.  But then when she would wake up, she wouldn't

19  remember ever cooking nothing or putting it on the stove, I

20  mean.

21  Q   Mr. Walker, prior to going to PPSA and seeing Dr. Ruan, did

22  Mrs. Walker have those problems with going to sleep and leaving

23  food on the stove?

24  A   No.

25  Q   Was she able to move around and --

ALFRED E. WALKER - DIRECT BY MS. GRIFFIN

1   A   She did, she was.

2   Q   After going to PPSA and taking the medicines, what did she

3   do, what was her activity?

4   A   They -- that they changed her medicines, the dosage was so

5   great that it kept -- she would have to lay down and go to

6   sleep immediately, not wait.  Immediately she would be asleep.

7   If she took it, five minutes after she took it she had to be

8   somewhere where she could either sit down or lay down.

9   Q   Did that limit her activities?

10  A   It did.

11  Q   Did you come home a number of times from work while she was

12  going to PPSA and find her asleep?

13  A   I did.

14  Q   Would you try to wake her?

15  A   I did.  And sometimes it would be an hour or hour and a

16  half later or two hours later, but she would wake up.

17  Q   Would she fall asleep with her glasses on?

18  A   Yes.  And I would have to remove them from her face.  And

19  she had just brought a brand new pair and hadn't removed them,

20  because they were broke -- she almost broke them.

21  Q   Did you feel like she was addicted again?

22  A   In my opinion, she was.

23  Q   Did you ask her what she had told Dr. Ruan, if anything,

24  about being a previous addict?

25  A   I asked her --

ALFRED E. WALKER - DIRECT BY MS. GRIFFIN

1  Q   Not what she said, but did you ask her?

2  A   I asked her on numerous occasions did she remind him that

3  she was a recovering drug addict.  And she told me --

4        MR. ARMSTRONG:  Object to what she said, Judge.

5  That's hearsay.

6  A   -- she did.

7  BY MS. GRIFFIN:

8  Q   Not what she told you.  But did you ask her --

9  A   I asked her about it.

10  Q   Why were you asking her that?

11  A   Because I had started getting concerned about her actions

12  and what I was seeing in the home and how she would -- not

13  being able to cook, not being able to stay awake and stuff.  I

14  started asking her about it.

15  Q   Did she have the care of a small child?

16  A   She did.

17  Q   Whose child was that?

18  A   It was our adopted son.

19  Q   What age was he while she was going to PPSA?

20  A   He was about 13 at that time.

21  Q   Was he in school?

22  A   He was.

23  Q   Now, Mr. Walker, were you ever -- did Ms. Walker ever bug

24  you about giving her some more medication that you had hidden?

25  Without telling us what she said to you.

ALFRED E. WALKER - DIRECT BY MS. GRIFFIN

```
 1   A   No, she never did.  But when I took it to her and left it,
 2   she took only what I gave her.  But I was always afraid
 3   whenever I didn't take it, to leave it out for her, that I was
 4   always afraid that somehow she would take more than what she
 5   was supposed to.
 6            MS. GRIFFIN:  One moment, Your Honor.
 7            THE COURT:  All right.
 8   BY MS. GRIFFIN:
 9   Q   Well, before we do that, you didn't go back in the patient
10   room to know who she was talking to, did you?
11   A   No.  But she always told me that Dr. Ruan was her doctor.
12   Q   But you did not go back in the room?
13   A   No, they wouldn't allow me back there.
14   Q   You didn't hear --
15   A   No.
16   Q   -- the conversations back in the patient room?
17   A   No.
18   Q   And you don't know exactly what she may have told Dr. Ruan,
19   do you?
20   A   No.
21   Q   You don't know exactly what he may have told her?
22   A   I do not.
23            MS. GRIFFIN:  One moment, Your Honor.
24       (A discussion was held off the record between government
25   counsel.)
```

```
 1   BY MS. GRIFFIN:

 2   Q   Mr. Walker, was there a time when you had a drug problem

 3   yourself?

 4   A   It was.

 5   Q   And how long have you been sober?

 6   A   Almost 30 years.

 7   Q   Almost 30 years ago did you plead guilty to a robbery and a

 8   burglary?

 9   A   I did.

10   Q   Did you serve 18 months time for that?

11   A   I did.

12   Q   What did that do to your drug addiction?

13   A   I had made my mind up when I was in there that I did not

14   want to live that life again, and ever since that day I've been

15   clean.

16   Q   When did you marry Deborah?

17   A   May the 15th of 1999.

18   Q   So you married her long after the 18 months?

19   A   Yes.

20         MS. GRIFFIN:  That's all I have of this witness at

21   this time.

22         MR. POWELL:  No questions.

23         THE COURT:  All right.  Mr. Armstrong?

24                      CROSS EXAMINATION

25   BY MR. ARMSTRONG:
```

1  Q   Good afternoon, Mr. Walker.  My name's Gordon Armstrong.  I

2  represent Dr. Ruan.

3  A   How are you doing, sir?

4  Q   I've just got a few questions for you.  I promise you I

5  won't be too long.  You said that Dr. Ruan was involved in your

6  wife's care; right?

7  A   Yes.

8  Q   And as far as you know, you didn't go back to the back

9  patients room, but it was your impression from your wife that

10  Dr. Ruan was seeing her; right?

11  A   Yes.

12  Q   And in fact, that was confirmed by you because Dr. Ruan

13  would actually come up to the front on occasion and you could

14  see him talking about your wife's care; right?

15  A   That's right.

16  Q   And your wife had a real injury, didn't she?  She was in

17  pain, wasn't she?

18  A   Yes.

19  Q   And so she wasn't going to Dr. Ruan to try to get drugs;

20  right?

21  A   No.

22  Q   In fact, she had gone to other physicians and those

23  physicians couldn't do anything else for her and they referred

24  her over to Dr. Ruan?

25  A   That's right.

4090

1    Q    And I think you described her pain as being on the pain

2    scale somewhere around a seven?

3    A    Yes.

4    Q    Right?  And that was real pain she was having?

5    A    Yes.

6    Q    And while -- you mentioned she was in prison.  And she was

7    given Lortabs while she was in prison; right?

8    A    No.  She got the Lortabs from Dr. Ruan.

9    Q    Okay.  Are you aware that she told Dr. Ruan's office that

10   she was getting Lortabs while she was in prison?

11   A    No.

12   Q    Okay.  And in fact I think you told the jury that you're

13   not sure what she told Dr. Ruan?

14   A    Huh-huh (negative response).

15   Q    So if his records, the chart, reflects that she told

16   Dr. Ruan that she got Lortabs while she was in prison, you

17   wouldn't have any reason to disagree with that, would you?

18           MS. GRIFFIN:  Your Honor, objection as to foundation.

19           THE COURT:  Sustained.

20   BY MR. ARMSTRONG:

21   Q    Now, you mentioned she got out of prison in late 2013;

22   right?

23   A    That's right.

24   Q    And it was shortly after there, at some point in 2014, when

25   she started going to see Dr. Ruan?

1   A   Well, actually she was seeing him, I think, before she had

2   the stroke.  She was already under his care.

3   Q   Right.  I'm not talking -- I'm talking about when she got

4   out of prison.  I hadn't got to the stroke yet.

5   A   Oh, she went after she -- she still went, but she went back

6   after she got out that time too.

7   Q   Right.  And she went to him and she was treated there for a

8   period of time, then she had her stroke?

9   A   Yes.

10  Q   And then she continued with that care for the rest of 2014;

11  correct?

12  A   That's correct.

13  Q   And that was for a period even after her stroke; correct?

14  A   Yes.

15  Q   And whether it was before her stroke or even after her

16  stroke, she was still in pain; right?

17  A   Yes.

18  Q   And wasn't she seeing other doctors during that period of

19  time?

20  A   The only other doctor she had to go -- went to see, was

21  whenever she had migraines she had to go to the ER.

22  Q   And was that Dr. Ochoa?

23  A   I believe it's so.

24  Q   And then he was -- Dr. Ochoa was prescribing butorphanol

25  spray for her headaches?

ALFRED E. WALKER - CROSS BY MR. ARMSTRONG

1   A   Yes.

2   Q   Okay.  Well, do you recall her going to see Dr. Miller,

3   Dr. Jonathan Miller, at USA Physians?

4   A   Yes.

5   Q   Okay.  And she went to see him in October of 2014, August

6   of 2014, and even in June of 2014.  Do you remember taking her

7   to those visits?

8   A   I didn't take her on those visits.  She -- she drove

9   herself there that time because she was still able to function.

10  Q   Okay.  And did you know that that doctor was prescribing

11  her Xanax?

12  A   Yes.

13  Q   And she was taking those Xanax prescriptions and getting

14  them filled; correct?

15  A   Yes.

16  Q   And she was using those at the same time; right?

17  A   Yes.

18  Q   And was she also going to see Dr. Lane, Dr. Daniel Lane?

19  Do you remember -- do you remember the surgeon?  In May of

20  2014?

21  A   I don't remember him.

22  Q   You don't remember that?  Well, if the records show that

23  Dr. Lane prescribed her hydrocodone for pain in May of 2014,

24  you weren't aware of that?

25  A   No.

1    Q    Okay.   And do you remember Dr. Thomas Leytham at USA?

2    A    Leytham?

3    Q    Leytham?  Is that how you pronounce it?

4    A    Yes.

5    Q    And do you recall her going to see him between December of

6    2013 through March of 2014, for that period of a couple of

7    months?

8    A    She may have.  But Dr. Mike something -- I can't think of

9    Mike's last name -- was her physician at the time and he moved

10   from USA Physicians to something -- to another practice and

11   they referred her to Dr. Leytham.

12   Q    Okay.  But during that period of time between December of

13   2013 through March, she went to see Dr. Leytham 11 times?  Were

14   you aware of that?

15   A    I know at least four or five times that she went.  But I

16   know the last time she went, she went to take me.

17   Q    Okay.  Well, were you aware that the records reflect that

18   Dr. Leytham gave her 11 prescriptions during that period of

19   time?

20        MS. GRIFFIN:  Your Honor, we'd ask for some foundation

21   as to what records he's referring to.

22        MR. ARMSTRONG:  I'm referring to the PDMP, Judge.

23   It's in the chart.  I can give you the number.

24        THE COURT:  Is the chart in evidence?

25        MR. ARMSTRONG:  The chart's in evidence.  This is C&R

 1  208050, is the Bates stamp.

 2          MS. GRIFFIN:  Your Honor, I don't believe the PDMP is

 3  in evidence.

 4          THE COURT:  What exhibit number are you talking about?

 5          MR. ARMSTRONG:  It would be Ms. Walker's file.  We

 6  were just looking at it.  I'm not sure what the exhibit number

 7  is.

 8          THE COURT:  We need to make sure that whatever you're

 9  referring to is in the exhibit.

10          MR. ARMSTRONG:  I can move on without it, Judge.

11          THE COURT:  All right.

12  BY MR. ARMSTRONG:

13  Q   Were you aware that she was getting prescriptions from

14  other physicians during the same period of time?

15  A   No.

16  Q   For hydrocodone, Lyrica --

17          MS. GRIFFIN:  Your Honor, we would ask for some

18  foundation.

19          THE COURT:  Yeah.  You need to --

20          MR. ARMSTRONG:  I'm just asking if he was aware of it.

21          THE COURT:  Well, I know.  But you need to have a

22  foundation for the question.  And are you referring to

23  something that's already in evidence?

24          MR. ARMSTRONG:  I'm referring to the PDMP, Judge.  I

25  was just -- then I was just trying to see if he's aware of it.

 1          THE COURT:  I know.  But we need to make sure it's in
 2   evidence or you offer it if it's not in evidence.
 3   BY MR. ARMSTRONG:
 4   Q   You were not aware that she was seeing or getting
 5   prescriptions from other physicians other than Dr. Ruan during
 6   that period of time?
 7   A   The only ones I knew of were the ones that they gave her
 8   when she went to the ER and when she had her intestine cut.
 9   Q   Okay.  Now, Dr. Ruan, during this period of time, he didn't
10   just give her medications, he also did other things for your
11   wife too, didn't he?
12   A   Basically gave her shots in the back when she went and
13   then -- just the shots in the back and then medicine
14   prescriptions to make sure she was taking them like he said.
15   Q   Well, the shots that you're referring to, was that what
16   they call procedures?
17   A   Yes.
18   Q   When they try --
19   A   Put about four shots in her back.
20   Q   And they try to pinpoint the nerve and try to put some
21   medicine in there?
22   A   Yes, sir.
23   Q   To try to block the pain for her?
24   A   Yes, sir.
25   Q   And he did that several times for her?

ALFRED E. WALKER - CROSS BY MR. ARMSTRONG

```
 1    A    She -- he did.
 2    Q    Okay.  And he also, I believe in March of that year, sent
 3    her to go get some physical therapy done?  Do you remember her
 4    doing physical therapy?
 5    A    Yes.
 6    Q    And do you remember when Dr. Ruan also gave her or
 7    prescribed for her a back brace?  She had to get a back brace?
 8    A    Yes.
 9    Q    To try to help with her back, the pain?
10    A    Yes.
11    Q    Did the back brace help?
12    A    It did.  She would pump it up.  But after a while she said
13    it hurt worse with it on than it did off.
14    Q    So she stopped using it because it made it worse?
15    A    Yes.
16    Q    Do you remember when he also did some nerve testing on her
17    and they would hook up some electrodes?  Or were you back there
18    when they did that?
19    A    I think so, yeah.  Because she had, I guess, a little pack
20    with batteries and stuff to it that gave a little back charge
21    to her back to try to relieve that pain.
22    Q    That's the TENS unit?
23    A    Yes.
24    Q    Is that what you're talking about?  Did that help any?
25    A    She said it didn't.
```

1   Q   So the only thing that really relieved any of her pain on

2   occasion was the pain medicine?

3   A   That's what she said.

4   Q   Now, did you ever meet with Dr. Ruan and tell him about the

5   problems that were going on at home?

6   A   I did not.  I only talked to her about it.

7           MR. ARMSTRONG:  Thank you, sir.  That's all.

8           THE COURT:  Any redirect?

9           MS. GRIFFIN:  Just briefly, Your Honor.

10                      REDIRECT EXAMINATION

11  BY MS. GRIFFIN:

12  Q   Mr. Walker, how did those shots work?

13  A   She would come home, she -- they would have to lay her -- I

14  guess lay her on the table and shoot in her back.  And then she

15  would come home and I had to help her to the car.  She wouldn't

16  be able to drive.  And I had to help her in, in the house.  And

17  after it, from out the car, then into the house.  And then when

18  they started giving her, I guess, the battery charge thing, she

19  would have to hook them to batteries and mash a button on the

20  side every so often to release a charge to her back.

21  Q   Did the shots seem to help her, from what you could tell?

22  A   She said it maybe felt better, but it did not.

23  Q   How -- how could you tell that?

24  A   Well, when she took -- when the charges hit her -- excuse

25  me -- wasn't a big charge.  When she took it, she said it felt

```
 1   good, it stimulates it.  That's all she said it did, it just
 2   stimulated it, and it looked like it may have helped.  But,
 3   now, soon after, you know, the battery -- that she did it so
 4   frequently, the batteries went dead.
 5   Q   Did you feel like she took too much medication?
 6   A   I do.
 7             MS. GRIFFIN:  That's all I have of this witness, Your
 8   Honor.
 9             THE COURT:  All right.  Mr. Walker, thank you.
10             May he be excused?
11             MS. GRIFFIN:  Please, Your Honor.
12             THE COURT:  You may step down.  Thank you.
13             MR. BODNAR:  Your Honor, may we approach?
14             THE COURT:  All right.
15        (At the side bar, jury not present.)
16             MR. BODNAR:  Your Honor, we don't have any other
17   witnesses for today.  We have FBI Special Agent Amy White,
18   whose ready to start first thing tomorrow and should carry us
19   through the entire day tomorrow, as well as some potential
20   backup witnesses, if needed, at the end of the day.  But we
21   don't have anyone else present, ready to testify at this time,
22   Your Honor.
23             THE COURT:  So tell me what you expect tomorrow.
24             MS. GRIFFIN:  Agent White is going to admit a number
25   of exhibits.  She's going to do the financial evidence, the
```

1    bank records.  She is going to talk about the times the doctors
2    were out of the country and the billing records that were
3    submitted for treatments while they were out of the country.
4    She's going to go through the monies that PPSA took in.  She's
5    going to go through the monies that were transferred from PPSA
6    into the doctors' various accounts.  She's going to testify
7    about the monies that went to LSU and to South Alabama from
8    Insys for Dr. Ruan, and she's going to testify about the checks
9    that went from Insys to their residences for their speaking
10   engagements, to each of the doctors' residences.  She is going
11   to testify about the IPM checks that came from Drobot and then
12   ultimately came from Manfuso.  And she's going to testify about
13   some items that were found in the search of Dr. Ruan's
14   warehouse where he stored his vehicles.
15            THE COURT:  Do you anticipate -- do you anticipate
16   putting on any witnesses on Friday?
17            MS. GRIFFIN:  No.
18            THE COURT:  Well, I mean, you say you've got backup
19   witnesses.  Are you just not going to dispense with those
20   witnesses if --
21            MR. BODNAR:  Yeah.
22            MS. GRIFFIN:  We are going to dispense with those
23   witnesses.  But if she somehow ends before the end of the day,
24   we will call them at the end of the day tomorrow, if she
25   finishes in time.

```
 1              THE COURT:  All right.  So are we in agreement that I
 2     can tell this jury they won't be here on Friday?
 3              MR. POWELL:  (Nodding head affirmatively.)
 4              MR. SHARMAN:  Yes, ma'am.
 5              MS. GRIFFIN:  Yes, ma'am.
 6              THE COURT:  All right.  So you all promise that if
 7     they take half a day with the agent, you're not going to go
 8     over until Friday with her?
 9              MR. KNIZLEY:  If they are in by half a day, by lunch
10     time, we're not going over.
11              MR. SHARMAN:  I can't imagine.
12              THE COURT:  Even if they take three-quarters?  What
13     I'm trying to determine is whether or not if this agent
14     testimony may bleed over into Friday morning.  Because I'm not
15     going to let her go and come back Monday.
16              MR. KNIZLEY:  Right.
17              MS. GRIFFIN:  (Shaking head negatively.)
18              MR. POWELL:  How long do you think your direct will
19     take?
20              MS. GRIFFIN:  I don't anticipate being longer than two
21     hours.
22              MR. KNIZLEY:  Sure.  If that's the case, there's no
23     way we'll even get close.
24              MR. SHARMAN:  We'll finish.
25              THE COURT:  Okay.
```

1           MR. KNIZLEY:  Judge, if it is anywhere before lunch,

2   there's no question we will be -- I will be through for sure.

3           THE COURT:  Okay.

4           MS. GRIFFIN:  Jack, you?

5           MR. SHARMAN:  I think we will be through.

6           THE COURT:  All right.

7       (In open court, defendants and jury present.)

8           THE COURT:  All right.  Ladies and gentlemen, we are

9   going to recess for today.  I need to let you know for your

10  planning purposes that we will be in session tomorrow, but we

11  will not be in session on Friday.  We will resume the following

12  Monday.  So we will be in session all day tomorrow, then again

13  we'll start back on Monday.  Okay?

14          That's for your planning purposes.

15          All right.  Remember my instructions to you not to

16  discuss the case or allow anyone to discuss it with you.  Be

17  back downstairs in the jury assembly room at 9 o'clock tomorrow

18  morning, ready to be called back up.  We are in recess.

19      (Court adjourned at approximately 4:33 p.m.)

20

21

22

23

24

25