

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF ALABAMA
 2

 3    UNITED STATES OF AMERICA
                                        CASE NO. CR15-00088
 4    v.
                                        COURTROOM 2B
 5    JOHN PATRICK COUCH, M.D.,
      and XIULU RUAN, M.D.,
 6                                      MOBILE, ALABAMA

 7            Defendants.              THURSDAY, FEBRUARY 2, 2017
      * * * * * * * * * * * * * *
 8    REDACTED

 9
                            DAY 18 OF TRIAL
10        BEFORE THE HONORABLE CALLIE V. S. GRANADE,
            UNITED STATES DISTRICT JUDGE, AND JURY
11

12

13    APPEARANCES:

14    FOR THE GOVERNMENT:
          DEBORAH A. GRIFFIN
15        CHRISTOPHER BODNAR
          United States Attorney's Office
16        63 S. Royal Street, Suite 600
          Mobile, AL  36602
17        (251) 441-5845

18
      FOR THE DEFENDANT COUCH:
19        ARTHUR T. POWELL, III
          P.O. Box 40456
20        Mobile, AL 36640-0456
          (251) 433-8310
21
          JACKSON R. SHARMAN, III
22        ROBERT JACKSON SEWELL
          JEFFREY PAUL DOSS
23        BENJAMIN SANDERS WILLSON
          Lightfoot, Franklin & White
24        400 North 20th Street
          Birmingham, AL  35203
25        (205) 581-0700
```

1   (Continued)

2       BRANDON KEITH ESSIG
        800 Shades Creek Parkway, Suite 600D
3       Birmingham, AL  35209
        (251) 879-1981

4
    FOR THE DEFENDANT RUAN:
5       DENNIS J. KNIZLEY
        7 N. Lawrence
6       Mobile, AL 36602
        (251) 432-3799

7
        JASON BRADLEY DARLEY
8       Darley & McGough, LLC
        1751 Dauphin Street
9       Mobile, AL 36604
        (251) 441-7772

10
        GORDON G. ARMSTRONG, III
11      P.O. Box 1464
        Mobile, AL  36633
12      (251) 434-6428

13      STEVEN D. MARTINIE
        4955 North Lake Drive
14      Whitefish Bay, WI  53217
        (414) 332-9683

15
    THE CLERK:  MARY ANN BOYLES
16  THE LAW CLERK:  LYNN DEKLE
    COURT REPORTER:  ROY ISBELL, CCR, RDR, CRR

17
            Proceedings recorded by OFFICIAL COURT REPORTER
18         Qualified pursuant to 28 U.S.C. 753(a) & Guide to
    Judiciary Policies and Procedures Vol. VI, Chapter III, D.2.
19          Transcript produced by computerized stenotype.

20

21

22

23

24

25

1                    EXAMINATION INDEX

2

FBI SA AMY WHITE
3       DIRECT BY MS. GRIFFIN . . . . . . . . . . . . . . 4107
        CROSS BY MR. ESSIG . . . . . . . . . . . . . . .4190
4       CROSS BY MR. KNIZLEY  . . . . . . . . . . . . . 4215
        REDIRECT BY MS. GRIFFIN . . . . . . . . . . . . 4241

5

SHARON BYRD
6       DIRECT BY MR. BODNAR  . . . . . . . . . . . . . 4245
        CROSS BY MR. ARMSTRONG . . . . . . . . . . . . .4259
7       REDIRECT BY MR. BODNAR . . . . . . . . . . . . .4289

8  ERICK LEE GIST
        DIRECT BY MR. BODNAR  . . . . . . . . . . . . . 4292
9       CROSS BY MR. ARMSTRONG . . . . . . . . . . . . .4303
        REDIRECT BY MR. BODNAR . . . . . . . . . . . . .4316

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                        EXHIBIT INDEX

 2                                              MAR   ADM
          GOVERNMENT'S
 3        18-1    Delta Airline records               4108

 4        18-2    American Airlines records           4109

 5        18-3    United Airlines records             4109

 6        18-4    American Airlines records           4109

 7        18-6    Delta Airlines records supplement   4111

 8        34-1    Couch 2012 Pump Refills on Days Out 4132

 9        34-2    Couch 2011 Billing on Days Out of Office  4114

10        34-3    Couch 2012 Billing on Days Out of Office  4122

11        34-4    Couch 2014 Billing on Days Out of Office  4125

12        34-5    Couch 2015 Billing on Days Out of Office  4130

13        34-6    Ruan Billing on Days Out of Office  4135

14        34-7(a) Progress note B..... - Couch 5/5/15 4140

15        34-7(b) Progress note B.... - Couch 5/5/15  4140

16        34-7(c) Progress note J...... - Couch 5/5/15 4140

17        34-7(d) Progress note D.... - Couch 5/5/15  4140

18        34-7(e) Progress note R.... - Couch 5/5/15  4140

19        34-7(f) Progress note M.... - Couch 5/5/15  4140

20        34-7(g) Progress note L.... - Couch 5/5/15  4140

21        34-7(h) Progress note H..... - Couch 5/5/15 4140

22        34-7(i) Progress note S...... - Couch 5/5/15 4140

23        36-2    Ruan Financials Vol. 1 (binder)     4174

24        36-2A   Ruan Financials Vol. 2 (binder)     4174

25
</pre>

4106

1    36-3     PPSA Wells Fargo Bank Records, acct 6971          4184
              (binder)
2
     36-5     C&R Pharmacy, LLC, Wells Fargo Bank              4156
3             Records, acct 7003

4    36-6     Binder of documents re:  1994 Lamborghini        4147
              Diablo V7 - Ruan - XLR Exotic Autos, LLC
5
     36-7     Binder of documents re:  2011 Audi R8            4151
6             Spyder - Ruan - XLR Exotic Autos, LLC

7    42-1     LSU Foundation records - Insys Donations -        4145
              Ruan
8
     42-2     USA Office of Development and Alumni              4147
9             Relations Records - Insys donations - Ruan

10   100      Summary of payments to Couch, Physicians         4164
              Compounding Solutions, from IPM & CRM
11
     101      Summary of payments to Couch from Insys,         4168
12            Plan 365, Inc., Insys Therapeutics
              SciMedica
13

14

15

16   DEFENDANT RUAN'S
     183      Patient file for S. Byrd                         4269
17

18

19

20

21

22

23

24

25

4107

```
 1        (Morning session, 9 a.m., in open court, defendants and

 2   jury present.)

 3             THE COURT:  Good morning, ladies and gentlemen.

 4             All right, Ms. Griffin.

 5             MS. GRIFFIN:  Your Honor, we'd call FBI Special Agent

 6   Amy White.

 7                      FBI SA AMY WHITE

 8             was sworn and testified as follows:

 9             THE WITNESS:  I do.

10             THE CLERK:  Thank you, ma'am.  Please be seated.

11                      DIRECT EXAMINATION

12   BY MS. GRIFFIN:

13   Q   Good morning, Ms. White.  Tell us your name.

14   A   Amy White.

15   Q   How are you employed?

16   A   I'm a special agent with the FBI.

17   Q   How many years of law enforcement experience do you have?

18   A   20.

19             THE COURT:  Wait.  Is the -- now it's on.  The sound

20   system wasn't working.  Go ahead, Ms. Griffin.

21             MS. GRIFFIN:  Should I start over, Your Honor?

22             THE COURT:  Just ask her her name again.

23   BY MS. GRIFFIN:

24   Q   Tell us your name, please.

25   A   Amy White.
```

FBI SA AMY WHITE - DIRECT BY MS. GRIFFIN

1  Q   How are you employed?

2  A   I'm a special agent with the FBI.

3  Q   How many years of law enforcement experience do you have?

4  A   20.

5  Q   Agent White, I want to direct your attention to the

6  investigation that resulted in the execution of federal search

7  warrants on May the 20th of 2015.  Were you the FBI case agent

8  for that investigation?

9  A   I was, yes (nodding head affirmatively).

10 Q   As such did you have numbers of other people helping you

11 with the gathering of various records in connection with the

12 case?

13 A   I did.

14 Q   Did you request that someone gather the flight records, the

15 airline records, for Dr. Couch and Dr. Ruan during the period

16 of the conspiracy?

17 A   I believe the DEA did that, yes.

18         MS. GRIFFIN:  And, Your Honor, I would move to admit

19 Government's Exhibit 18-1, which is Delta Airlines travel

20 records for Dr. Ruan and Dr. Couch during the period of the

21 conspiracy.

22         THE COURT:  Any objection?

23         MR. ESSIG:  No objection.

24         THE COURT:  All right.  Mark them in.

25     (Government's Exhibit 18-1 was entered into evidence.)

 1          MS. GRIFFIN:  Government's Exhibit 18-2, which is the

 2     airline records for American Airlines during the period of the

 3     conspiracy for Dr. Couch and Dr. Ruan.

 4          THE COURT:  Any objection?

 5          MR. ESSIG:  No, ma'am.

 6          MR. KNIZLEY:  No, ma'am.

 7          THE COURT:  All right.  Mark them in.

 8       (Government's Exhibit 18-2 was entered into evidence.)

 9          MS. GRIFFIN:  Government's Exhibit 18-3, airline

10     records for United Airlines for Dr. Ruan and Dr. Couch during

11     the period alleged in the indictment.

12          THE COURT:  Any objection?

13          MR. ESSIG:  No, ma'am.

14          MR. KNIZLEY:  No, ma'am.

15          THE COURT:  All right.  Mark them in.

16       (Government's Exhibit 18-3 was entered into evidence.)

17          MS. GRIFFIN:  And a second set of records from

18     American Airlines, Government's Exhibit 18-4, for the period of

19     time alleged during the conspiracy.

20          THE COURT:  All right.  Mark them in.

21       (Government's Exhibit 18-4 was entered into evidence.)

22          MS. GRIFFIN:  Your Honor, I would just briefly publish

23     them to the jury to show the number and what the record is.

24          THE COURT:  All right.

25          MS. GRIFFIN:  Government's Exhibit 18-1, Delta

 1  Airlines records, and they show the dates and the times of the

 2  flights.

 3  Q   Ms. White, if you can look over to the names, do they also

 4  show the name of the person taking the flights?

 5  A   Yes, they do.

 6  Q   I show you Government's Exhibit 18-2 for American Airlines.

 7  Here's the exhibit number and the airline record.  Do these

 8  records also show, Ms. White, the passenger name?

 9  A   Yes, it does.

10  Q   And, Agent White, I'll show you the United Airline records,

11  number 18-3, and ask if these also are business records and

12  show you the flights and the name of the individual for the

13  flight?

14  A   Yes.

15  Q   Government's Exhibit 18-4, additional American Airlines

16  records.  There's the exhibit number, 18-4, and ask you if

17  these also show flight records for Dr. Couch and then Dr. Ruan?

18  A   They do.

19          THE COURT:  Ms. Griffin, let me ask you what

20  differentiates the 18-2 and 18-4, which are both American

21  airline records?

22          MS. GRIFFIN:  They were provided at a different time,

23  with a separate business record certification.  But they are a

24  continuation of the period of time.

25          THE COURT:  All right.  They don't duplicate at all?

```
 1            MS. GRIFFIN:  They do not.

 2            THE COURT:  Okay.

 3   BY MS. GRIFFIN:

 4   Q   Agent White, have you previously had the opportunity to

 5   review the airline records?

 6   A   Some of them, yes.

 7   Q   And I show you also Government's Exhibit 18-5, which is an

 8   additional supplement from Delta Airlines.

 9            MS. GRIFFIN:  We'd move to admit it as a business

10   record as well, Your Honor.

11            THE CLERK:  There's already an 18-5.

12            THE COURT:  There is already an 18-5.

13            MS. GRIFFIN:  Well, we will make this 18-6, Your

14   Honor.  Is there an 18-6?

15            THE CLERK:  No, ma'am.

16            THE COURT:  All right.

17   BY MS. GRIFFIN:

18   Q   Does this contain additional records for Delta Airlines?

19   A   It appears to, yes.

20            THE COURT:  Are you offering that?

21            MS. GRIFFIN:  I'm offering that, 18-6, Your Honor.

22            THE COURT:  All right.  Mark it in.

23       (Government's Exhibit 18-6 was entered into evidence.)

24   BY MS. GRIFFIN:

25   Q   Agent White, did you also have the opportunity to review
```

1   the billing for certain days from the Greenway files?

2   A   Yes.

3   Q   What is the billing?

4   A   The billing you're referring to would be healthcare claims

5   that were billed to third-party insurance companies.

6   Q   Did you print out the billing forms for certain days?

7   A   I did.

8   Q   Were those the days that you determined from the flight

9   records and from various emails and from the billing data that

10  Dr. Couch and Dr. Ruan were out of the office?

11  A   Mainly I determined they were out of the office from the

12  PPSA schedule.

13  Q   And what was the PPSA schedule?

14  A   It was a part of their -- their data management system that

15  they used to schedule patients each day.  So every day there

16  would be a different schedule for each doctor and all the

17  extenders that worked for each of the doctors.

18  Q   Was that contained in the files that were seized by the FBI

19  from PPSA on May the 20th, 2015?

20  A   Yes.

21  Q   Have you documented those schedules to show the times that

22  both Dr. Couch and Dr. Ruan showed on the schedules to be out

23  of the office?

24  A   Yes.

25  Q   This does not include days that a doctor may have come in

1  late or left early, does it?

2  A   I just included where the schedule said that the doctor was

3  out that day or if we had flight records or credit card

4  statements/bank statements that showed that someone was using

5  that credit card or that debit card out of town.

6  Q   And those would be credit card or debit card financial

7  records for both Dr. Ruan and Dr. Couch?

8  A   Correct.

9  Q   Now, can you say that the doctor did not come in during a

10  period of the time that that time showed it was blocked out on

11  the business record?

12  A   I just looked at the records.  So my summary is just based

13  on what's on the records.

14  Q   Records of financials and of the schedule from PPSA; is

15  that correct?

16  A   That's correct; yes.

17  Q   Did you combine those for Dr. Couch for 2011, 2012, 2014,

18  and January through May 20th of 2015?

19  A   I did.

20  Q   I show you what's marked as Government's Exhibit 34-2 and

21  ask if you can tell us what this folder consists of.

22  A   Those are the days that Defendant Couch was out of the

23  office, according to their records, for 2011.

24  Q   You've previously reviewed this document, the contents of

25  this document?  (Indicating.)

1    A   Yes.

2    Q   In fact, you prepared the document; is that right?

3    A   I did you.

4    Q   Do you need to see that this is your same exhibit that you

5    prepared?

6    A   Yes.  It is.

7            MS. GRIFFIN:  Your Honor, we move to admit the 2011

8    Billing on Days Out of the Office for Dr. Couch, Government's

9    Exhibit 34-2.

10           MR. ESSIG:  Your Honor, subject to some agreed-upon

11   redactions from that document, we do not object.

12           THE COURT:  All right.  Are they redacted?

13           MS. GRIFFIN:  Those pages will not be published and we

14   will redact them.  We just discussed that this morning.

15           THE COURT:  Okay.  All right.  Mark it in.

16      (Government's Exhibit 34-2 was entered into evidence.)

17   BY MS. GRIFFIN:

18   Q   I show you and the jury Government's Exhibit 34-2,

19   Dr. Couch's 2011 Billing on Days Out of the Office.  Agent

20   White, did you prepare a summary of the data contained in this

21   exhibit for 2011?

22   A   I did.

23   Q   Is it on the first three pages of the exhibit?

24   A   I don't know if it's three pages, but it would be in the

25   first part of that exhibit.

FBI SA AMY WHITE - DIRECT BY MS. GRIFFIN

1   Q    And I ask you what is shown on your billing out of office

2   document?

3   A    So there should be a tab in the binder that would be

4   numbered.  So for tab one, it would contain the schedule for

5   the days March 7th, March 9th, March 10th, and March 11th of

6   2011 and it also reflects on my spreadsheet that there was a

7   certain amount of time that was blocked on Defendant Couch's

8   schedule for those days.

9   Q    Now, where you used the airline records, did you exclude

10  the date that the flight left and exclude the day that the

11  flight came back to Mobile, or the Mobile area?

12  A    I did not count the days where he left, flew out after work

13  hours.  And I did not include the times where he returned

14  before work hours, because those days he could have gone into

15  the office.

16  Q    So you include a tab number.  What do the tab numbers show

17  within the chart, or do the tab numbers show what is

18  represented --

19  A    They are numbered numerically.

20  Q    Okay.  And you show the dates, the days of the weeks, the

21  description of the absence of the clinic?

22  A    Right.

23  Q    And does that show what you have pulled the data from?

24  A    Yes, for example, the first tab, I pulled this information

25  from the schedule for those days, the schedule being what I

1  pulled out of their Greenway system.

2  Q   Does it also show the amount billed in Dr. Couch's absence?

3  A   Yes.

4  Q   That data comes from --

5  A   That comes from billing reports run out of their Greenway

6  system.

7  Q   Did you contain -- did you include in the chart -- I mean

8  in the exhibit the references where you pulled all this

9  information from?

10  A   I'm sorry.  Say that again.

11  Q   Did you include in the entire exhibit the various tabs that

12  support your data?

13  A   Yes.

14  Q   That being data from Couch not in the office from the

15  airlines and/or the billing from PPSA?

16  A   Yes.

17  Q   I show you what's marked as tab two.  Does that also tell

18  you a date?  The schedule says Dr. Couch in Mississippi.

19  A   Yes, it says on April the 11th of 2011, the schedule says

20  that Couch was in Mississippi and there was 540 minutes

21  blocked.

22  Q   How much was billed while he was out of the office?

23  A   $34,038.

24  Q   As for tab number three, did you determine, based on the

25  records, that Dr. Couch was out of the office on April the 15th

FBI SA AMY WHITE - DIRECT BY MS. GRIFFIN

1  of 2011?

2  A    According to their schedule, yes.

3  Q    And did the Wells Fargo records for Dr. Couch show charges

4  in Atlanta, Georgia, that day?

5  A    Yes.

6  Q    You don't know if he was in Atlanta or not?

7  A    I do not.

8  Q    As to tab number three, did you determine how much was

9  billed?

10 A    $25,471.

11 Q    I show you tab number four and ask if you determined that

12 June the 6th of 2011, June the 7th of 2011, June the 8th of

13 2011, and June the 9th, and the 10th of 2011 the schedule shows

14 Dr. Couch out of the office?

15 A    Correct.

16 Q    And did you show some charges in other places?

17 A    Yes.

18 Q    Those came from Dr. Couch's financial records that were

19 subpoenaed during the trial?

20 A    That's correct -- or from credit card statements that were

21 seized during the search warrants on May 20th.

22 Q    As to the number four tab, did you show various amounts for

23 the various days that were billed during that time period?

24 A    I did.

25 Q    Could you read those for us?

FBI SA AMY WHITE - DIRECT BY MS. GRIFFIN

1  A   The first one is $32,105, the second one is $32,108, the

2  third one is $38,521, the fourth one is $13,483, and the last

3  one is $18,348.

4  Q   And when you are talking about billings, from the records

5  of the billing, do these show either office visits or

6  procedures that were billed for?

7  A   It could.  It could also be pump refills (nodding head

8  affirmatively).

9  Q   I show you at the bottom, part of tab number five goes over

10  to the second page, and ask you if from Thursday, June the

11  23rd, 2011, continuing to the second page, through July the

12  7th, 2011, the schedule shows Dr. Couch being out of the

13  office, according to the records, for 615 minutes then for 555

14  minutes and down through the various dates in June of 2011?

15  A   Yes.

16  Q   As to the first page, for those four dates, could you tell

17  us the amounts that were billed for either a procedure, a pump

18  fill, or an office visit during those dates?

19  A   The first one is $10,936, the second one is $33,709, the

20  third one is $9,141, and the fourth one is $34,016.

21  Q   Now, the records show that those were billed for services

22  performed on these dates; is that correct?

23  A   That's correct.  And the schedule shows what type of

24  service it is.

25  Q   You don't have any personal knowledge of that, you've

4119

 1   concluded that from the records?

 2   A   Correct.

 3   Q   On the second page does tab five continue?

 4   A   It does.

 5   Q   Again, the same thing, you pulled your information from the

 6   schedule and from Wells Fargo and Trustmark records showing

 7   various charges for Dr. Couch other places?

 8   A   Correct (nodding head affirmatively).

 9   Q   So for the 29th of June through July the 7th, did you

10   determine how much was billed on those dates?

11   A   I did.

12   Q   For services in Dr. Couch's absence?

13   A   Yes.

14   Q   Could you read us the numbers that were billed during that

15   period of time you've just described?

16   A   $24,480, $7,988, $18,319, $22,922, $18,820, and $27,437.

17   Q   Did you likewise do the same in tab six for November the

18   21st through the 23rd of 2011?

19   A   I did.

20   Q   Does that information come from the PPSA schedule and from

21   various bank records of Dr. Couch's shown charges?

22   A   It does.

23   Q   In connection with those three dates, could you tell us the

24   amounts that the PPSA records show were billed for Dr. Couch's

25   office visits, procedures, and pump fills?

FBI SA AMY WHITE - DIRECT BY MS. GRIFFIN

1  A  $14,956, $11,632, $6,954.

2  Q  Tab number 7 is August the 27th and August -- excuse me --

3  December the 27th and December the 28th of 2011.  Did you

4  determine that the records from PPSA showed Dr. Couch was out

5  and blocked 555 minutes?

6  A  Yes.

7  Q  As to those two dates, did you show the billing that was

8  done for services alleged to have been provided by Dr. Couch?

9  A  Yes.

10  Q  What were those numbers?

11  A  $20,990 and $21,459.

12  Q  Page three of your 2011 summary chart shows a continuation

13  of tab seven; is that correct?

14  A  Correct.

15  Q  Does that show a record from PPSA that reflects that

16  Dr. Couch was out of the office on December the 29th to

17  December the 30th of 2011?

18  A  Yes.

19  Q  Could you tell us the amounts that the records show were

20  billed for Dr. Couch's services during those days he was out of

21  the office?

22  A  $15,846, and $42,467.

23  Q  Did you total the 2011 amount billed that you have just

24  testified to?

25  A  I did.

4121

1   Q   What is that total for 2011 for Dr. Couch?

2   A   $601,268.

3   Q   Agent White, did you do the same for 2012 for Dr. Couch?

4   A   I did.

5   Q   I'll show you what's marked as Government's Exhibit 34-3

6   and ask if this is the Couch 2012 Billing on Days Out of the

7   Office.

8   A   Yes, it is.

9   Q   Again, have you previously reviewed this notebook?

10  A   I have.

11  Q   In fact, did you prepare this notebook from records

12  subpoenaed during the trial and from items seized from PPSA?

13  A   I did.

14  Q   Did you combine what you have previously combined in the

15  first notebook, that being the amounts billed during certain

16  days and the records you saw that indicated Dr. Couch was out

17  of the office from the PPSA records?

18  A   Yes.

19  Q   As well as information from financial information connected

20  with Dr. Couch that was subpoenaed?

21  A   Correct.

22          MS. GRIFFIN:  Your Honor, I'd move to admit

23  Government's Exhibit 34-3 and publish it to the jury.

24      (A discussion was held off the record between counsel.)

25          THE COURT:  Any objection?

FBI SA AMY WHITE - DIRECT BY MS. GRIFFIN

```
 1          MR. ESSIG:  No, Your Honor.

 2          THE COURT:  All right.  Mark it in.

 3      (Government's Exhibit 34-3 was entered into evidence.)

 4  BY MS. GRIFFIN:

 5  Q   Agent White, as before, did you do a summary chart for all

 6  of the documents for the 2012 summary?

 7  A   I did.

 8  Q   I show you the two-page summary and ask if you prepared it

 9  the same way you previously have identified the chart for 2011?

10  A   I did.

11  Q   That is, a tab, a date, the day of the week, what you

12  relied on for the absence from the clinic, and the procedures

13  billed during that time frame?

14  A   Correct.

15  Q   I ask you if tab one shows Dr. Couch being out January the

16  19th of 2012?

17  A   It does.

18  Q   Does it go on through tab two to indicate him being out

19  from February the 20th of '12 through February the 24th?

20  A   Yes.

21  Q   Then what date range does tab three show?

22  A   April 19th and April 20th, 2012.

23  Q   What date range does tab four show?

24  A   July 23rd through July 26th of 2012.

25  Q   As to tab five, does it show dates that the records say
```

1   Dr. Couch was out of the office?

2   A    August the 10th and August the 13th of 2012.

3   Q    As to tab number six, what date range does it show

4   Dr. Couch was out of the office?

5   A    September the 2nd through September the 5th of 2012.

6   Q    And as to tab seven, could you tell us the date, please?

7   A    September 25th of 2012.

8   Q    As to tab eight, does it tell the dates that the records

9   show Dr. Couch was out of the office?

10  A    November the 9th and November the 12th of 2012.

11  Q    And that's on the second page of your summary; is that

12  correct; for tab eight?

13  A    Looks likes it, yes.

14  Q    I show you again the first page in the dates that you've

15  indicated.  Did you use the schedule from PPSA that was seized?

16  A    I did.

17  Q    Did you use airline flights, airline flight records?

18  A    I'm not sure that I used airline flight records.

19  Q    Did you use American Express records for Dr. Couch?

20  A    Yes.

21  Q    Did you use Trustmark records and Regions Bank records for

22  Dr. Couch?

23  A    I did.

24  Q    And did you also place beside each date the amounts billed

25  in Dr. Couch's absence?

4124

1    A    I did.

2    Q    That information came from where?

3    A    That information came from billing reports from the PPSA

4    Greenway system.

5    Q    For those specific dates?

6    A    Correct.

7    Q    Did you total the dollar amount for 2012 that was billed

8    where the records show Dr. Couch was out of the office in 2012?

9    A    I did.

10   Q    What was that total?

11   A    $479,780.

12   Q    Did you also prepare the same data for 2014 for Dr. Couch,

13   Billing on Days Out of the Office?

14   A    I did.

15   Q    I show you what's marked as Government's Exhibit 34-4.  The

16   cover sheet says J. Patrick Couch, 2014 Billing on Days Out of

17   Office.  Did you prepare this notebook and these summaries

18   contained in this exhibit?

19   A    I did.

20   Q    Did you prepare it from records either seized from PPSA or

21   financial records that were subpoenaed?

22   A    Yes.

23   Q    And possibly some from the airline records that have been

24   introduced; is that right?

25   A    That's right; yes.

1  Q   We move to admit Government's Exhibit 34-4, Your Honor, and

2  publish it to the jury.

3          THE COURT:  Any objection?

4          MR. ESSIG:  No objection.

5          THE COURT:  All right.  Mark it in.

6      (Government's Exhibit 34-4 was entered into evidence.)

7  BY MS. GRIFFIN:

8  Q   As with the other exhibits, did you prepare a summary for

9  2014 for Dr. Couch?

10  A   I did.

11  Q   Did you gather the information that you included in the

12  2014 chart summary from the various records you have described?

13  A   Yes, in the same way.

14  Q   Are they included in the notebook and are they tabbed

15  according to the tab number on your charts?

16  A   They are, yes.

17  Q   I'll show you what's marked as tab number one and the

18  summary contained in the front of the exhibit and ask if you

19  can tell us the date that shows Dr. Couch out of the office?

20  A   February the 10th of 2014.

21  Q   And the date that tab two shows he's out of the office?

22  A   March the 5th of 2014.

23  Q   The dates that tab three shows he's out of the office?

24  A   June the 13th of 2014.

25  Q   The dates that tab four show he's out of the office?

4126

1    A    July 21st through July 25th of 2014.

2    Q    The date that tab five shows he's out of the office?

3    A    August the 8th of 2014.

4    Q    The dates that tab six shows he's out of the office?

5    A    August the 20th and August the 21st of 2014.

6    Q    And the date of tab seven that shows Dr. Couch is out of

7    the office?

8    A    September the 12th of 2014.

9    Q    On this first sheet of your summary, did you indicate the

10   various documents you have relied on to show the dates he was

11   out of the office?

12   A    Yes.

13   Q    And that information is based on the records you reviewed;

14   is that right?

15   A    That's correct.

16   Q    Did you indicate the number of pump refills and procedures

17   billed while Dr. Couch was out of the office?

18   A    I did.

19   Q    Where did you get that information from?

20   A    From the scheduling.

21   Q    Now, you didn't have this information for 2011.  Were those

22   specifics not represented in the other files?

23   A    Wait.  I'm sorry.  Let me correct that.  The number of

24   procedures and office visits billed, I believe, came from the

25   billing report.

1  Q   From the billing report?

2  A   Yes, ma'am.

3  Q   And that is specifically for the date of the week and the

4  date that you've identified in tab one?

5  A   Correct.

6  Q   Is that the same for all the tabs in this exhibit,

7  Government's Exhibit 34-4?

8  A   Yes.

9  Q   So you had pump refills and procedures billed and then you

10  had office visits billed for that day?

11  A   Correct.

12  Q   Then did you total the amount billed in Couch's name where

13  it appears that he's out of the office that day?

14  A   I did.

15  Q   Does it go all the way down, each tab shows pump refills

16  and procedures and the office visits billed during that time?

17  A   Yes.

18  Q   Is that right?

19  A   That's right.

20  Q   As to the second page of your summary on this exhibit,

21  could you tell us what tab eight shows as to the date Dr. Couch

22  was out of the office?

23  A   September the 26th of 2014.

24  Q   And that's based on the PPSA schedule?

25  A   Correct.

4128

1    Q   As to tab nine, the dates that Dr. Couch is shown out of

2    the office, based on the schedule and a Wells Fargo charge?

3    A   October the 6th through October the 10th of 2014.

4    Q   As to tab 10, the date it shows Dr. Couch is out of the

5    office?

6    A   October 24th of 2014.

7    Q   As to tab 11, the date it shows Dr. Couch is out of the

8    office?

9    A   November 21st of 2014.

10   Q   As to tab 12, and then tab 13, what dates it shows

11   Dr. Couch is out of the office?

12   A   December the 5th of 2014, December the 8th of 2014,

13   December the 9th of 2014, and December the 19th of 2014.

14   Q   Again, are the descriptions of absence from the clinic

15   identified that you relied on the records to establish dates

16   out of the office?

17   A   Yes.

18   Q   Have you included those documents tabbed within the

19   notebook?

20   A   I have, yes.

21   Q   You also indicate the pump refills on that date and the

22   office visit billed on those dates?

23   A   Yes.

24   Q   Those came from --

25   A   The billing reports.

4129

```
 1   Q   And finally, did you determine how much was billed during
 2   that time that the records show Dr. Couch was absent?
 3   A   I did.
 4   Q   Did you total the numbers, the amount of money, that was
 5   billed when Dr. Couch was out of the office in 2014?
 6   A   I did.
 7   Q   What was that total, please?
 8   A   $646,130.50.
 9   Q   Agent White, did you also prepare 2015 billing for
10   Dr. Couch on days out of the office?
11   A   I did.
12   Q   Is that just from January through May the 19th of 2020 --
13   excuse me -- 2015?
14   A   Yes.  The records stopped on May 20th, 2015, because that's
15   the day we did the searches.
16   Q   In fact, the searches were done in the morning and the
17   clinic did not operate on the 20th, did it?
18   A   It did not.
19   Q   So it would be from January the 1st of '15 through May the
20   19th of '15; is that right?
21   A   That's right.
22   Q   Did you prepare this summary just as you have previously
23   described the summaries to us?
24   A   I did.
25   Q   From records either seized or subpoenaed?
```

1  A   Yes.

2  Q   Have you previously had the opportunity, of course, to

3  review it since you prepared it?

4  A   Yes.

5          MS. GRIFFIN:  Move to admit Government's Exhibit 34-5,

6  Dr. Couch 2015 Billing on Days Out of the Office.

7          THE COURT:  Any objection?

8          MR. ESSIG:  No objection.

9          THE COURT:  All right.  Mark it in.

10     (Government's Exhibit 34-5 was entered into evidence.)

11          MS. GRIFFIN:  May we publish it to the jury, Your

12  Honor?

13          THE COURT:  Yes.

14  BY MS. GRIFFIN:

15  Q   Again, did you do a summary chart for the records and tab

16  the records that are referenced in the summary chart?

17  A   Yes.

18  Q   I'll show you that summary chart and ask if it contains

19  three tabs.

20  A   It does.

21  Q   For what three dates, please?

22  A   January 23rd of 2015, March 20th of 2015, and May 7th of

23  2015.

24  Q   Does it describe the information you used to conclude that

25  he was out of the office that day?

1    A    Yes.

2    Q    Now, you don't know whether he was or wasn't, but do the

3    records show this information?

4    A    Correct.  It's based solely on the records.

5    Q    Did you indicate the pump refills, procedures billed, the

6    office visits billed on those particular dates?

7    A    Yes.

8    Q    Did you total the amounts billed from January the 1st of

9    '15 through May the 19th, 2015, for office visit, pump refills,

10   and/or procedures for Dr. Couch?

11   A    Yes.

12   Q    What was that total, please?

13   A    $19,893.70.

14   Q    Agent White, I forgot to ask you, you were an accountant by

15   trade before you came to the FBI?

16   A    Yes, I was a CPA.

17   Q    Did you also for Dr. Couch provide a list, summary, of the

18   2012 pump refills on the days he was out of the office?

19   A    I did.

20   Q    Now, the 2012 summary of billing did not have the specific

21   pump refills contained in those tabs, did it?

22   A    It did not have copies from the patients' charts.  So it

23   would be the pump progress note.  I'm not sure how they are

24   titled on there, but the actual patient record is not included

25   in the billing binder.

FBI SA AMY WHITE - DIRECT BY MS. GRIFFIN

4132

1  Q   The totals are included from the billing for the pump

2  refills along with the procedures and the office visits?

3  A   Yes.

4  Q   But not the specific supporting actual pump refill sheets?

5  A   Right.

6  Q   Did you prepare Exhibit 34-1, which I show you on the

7  screen?

8  A   Yes.

9  Q   Does it show Dr. Couch's 2012 pump refills on days out of

10  the office based on records that were seized?

11  A   Yes.

12  Q   Have you previously prepared this document?

13  A   Yes.

14         MS. GRIFFIN:  I move to admit Government's Exhibit

15  34-1, Your Honor.

16         THE COURT:  Any objection?

17         MR. ESSIG:  No objection.

18         THE COURT:  All right.  Mark it in.

19     (Government's Exhibit 34-1 was entered into evidence.)

20         MS. GRIFFIN:  May we publish it to the jury?

21         THE COURT:  Yes.

22  BY MS. GRIFFIN:

23  Q   In connection with Exhibit 34-1, did you also prepare a

24  written summary of the review of the documents?

25  A   I did.

FBI SA AMY WHITE - DIRECT BY MS. GRIFFIN

1  Q   Could you tell us what the list consists of?

2  A   My -- my summary?

3  Q   Yes.

4  A   It's basically a summary of what is contained in the

5  patient records that I've copied and placed in the binder.

6  Q   Is it by date and patient name?

7  A   Yes.

8  Q   Does it indicate, if they were there, what the notes from

9  those dates say?

10  A   Yes, a summary, yes.

11  Q   Of the injections that were added or changed?

12  A   Of the pump refills.  So if there were changes made, I

13  would have included that in my summary.

14  Q   And you did that for January 2012 through November of 2012;

15  is that correct?

16  A   That's correct.

17  Q   The information contained in your summary is from the

18  charts contained in the exhibit; is that right?

19  A   Say that again?

20  Q   The information contained in your summary is from the

21  various charts?

22  A   The records in the binder?  Yes, ma'am.

23  Q   The records in the binder.

24  A   Yes, ma'am.

25  Q   Have you also highlighted in yellow the information that

4134

 1  you have used on your charts?

 2  A   Yes.

 3  Q   That's showing the last refill and the current refill for

 4  the date indicated; is that right?

 5  A   It shows the changes that were made, yes, ma'am.

 6  Q   And the dates you picked to include in this were the days

 7  from 2012, from the 2012 exhibit, that showed Dr. Ruan [sic]

 8  was out of the office on those dates?

 9  A   That's right.

10          MR. KNIZLEY:  I'm sorry, what was that you said?  Was

11  it Dr. Ruan or --

12          MS. GRIFFIN:  If I said Dr. Ruan, that was

13  incorrect.  Government's Exhibit 34-1 is for Dr. Couch.

14  BY MS. GRIFFIN:

15  Q   So Exhibit 34-1, the dates you included, were they the

16  dates that the records show Dr. Couch was out of the office?

17  A   Yes.

18  Q   Did you also prepare dates for Dr. Ruan billings for dates

19  he was out of the office?

20  A   I did.

21  Q   I'll show you what's marked as Government's Exhibit 34-6

22  and ask if this is an exhibit you prepared.

23  A   Yes, it is.

24  Q   That shows Dr. Ruan's Billing on Days Out of the Office?

25  A   Yes.

4135

1   Q   Did you prepare it as you have described the documents for

2   Dr. Couch's out-of-office billings?

3   A   I did, yes.

4   Q   Did you put the supporting documents behind a summary you

5   prepared?

6   A   I did.

7   Q   And you prepared the summary from the records that have

8   either been seized and/or subpoenaed; is that correct?

9   A   That's correct.

10       MS. GRIFFIN:  Move to admit Government's Exhibit 34-6

11   and to publish it to the jury.

12       MR. KNIZLEY:  No objection, Your Honor.

13       THE COURT:  All right.  Mark it in.

14    (Government's Exhibit 34-6 was entered into evidence.)

15   BY MS. GRIFFIN:

16   Q   As to Government's Exhibit 34-6, you indicated that you

17   prepared a summary; is that correct?

18   A   Yes.

19   Q   Did you prepare this summary in the manner you have

20   previously described, that indicating a date, a day of the

21   week, a description of the absence from the clinic, and the

22   amount billed in absence?

23   A   I did.

24   Q   In connection with Dr. Ruan, did you also include the

25   supporting documents that you relied on?

FBI SA AMY WHITE - DIRECT BY MS. GRIFFIN

1   A   Yes.

2   Q   That you relied on the various records that were seized

3   about the dates -- excuse me -- you relied on the information

4   about the patients that were seen on certain days and whether

5   they had Dr. Ruan marked as being off on those dates?

6   A   Yes.

7   Q   Could you tell us the dates that the various tabs

8   represent?

9   A   March the 22nd, March 23rd, and March 24th of 2011, June --

10  Q   That's tab one?

11  A   Yes.

12  Q   And then tab two?

13  A   June 3rd of 2011.

14  Q   Tab three?

15  A   July 15 of 2011.

16  Q   Tab four?

17  A   May 1st and 2nd of 2013.

18  Q   And if you will, give us tab five.

19  A   August the 20th and August the 25th of 2014.

20  Q   Did you go through the records to see what was billed on

21  those dates that the PPSA schedule has Dr. Ruan blocked as off?

22  A   I did.

23  Q   Did you total that for the dates that you have indicated?

24  A   Yes.

25  Q   What was the total, please?

1   A   $25,804.

2   Q   And I show you the billings for out of the office for

3   office visits and a pump.  Did you break those down from the

4   records included in the document, in the exhibit?

5   A   Yes.

6   Q   Could you tell us how those are broken down?

7   A   By office visit or pump visit.

8   Q   And did you give the patient name?

9   A   I did.

10  Q   Date of service in the records?

11  A   Yes.

12  Q   The gross charge and the daily subtotal?

13  A   I did.

14  Q   And those were for days that the PPSA records showed

15  Dr. Ruan was out of the office?

16  A   Correct.

17  Q   Have you included in the exhibit the supporting backup

18  documents either seized or subpoenaed?

19  A   I have.

20  Q   Agent White, did you determine from your investigation that

21  billing from PPSA was done largely electronically?

22  A   Yes.

23  Q   What do we mean by electronically?

24  A   It was submitted electronically to the insurance companies

25  for payment.

1   Q   By wire?  That is, by computer?

2   A   Correct.

3   Q   Did you determine that PPSA received payments coming in by

4   wire?

5   A   Yes.

6   Q   And by mail?

7   A   And by mail, yes.

8   Q   Did you determine that they also received various items, be

9   they drugs or checks or letters by commercial carrier such as

10  Fed Ex, United Parcel Service?

11  A   Yes.

12  Q   Did you determine that the same was true for C&R Pharmacy,

13  that they received drugs by commercial carrier, either the

14  United States Postal Service, Fed Ex, or UPS?

15  A   Yes.

16  Q   And some perhaps other commercial interstate carriers?

17  A   Yes.

18  Q   Did you determine that they too, C&R Pharmacy, billed

19  electronically by wire?

20  A   Yes.

21  Q   And that they received some payments from other states,

22  from outside the state of Alabama, to C&R Pharmacy?

23  A   Correct; yes.

24  Q   Did you determine that members of the PPSA and the C&R

25  would use or cause to be used commercial interstate carriers

4139

1  and the United States Postal Service and would use or cause to

2  be used interstate wire communications -- that is, emails and

3  telephone calls -- in connection with the conduction of their

4  business?

5  A   Yes.

6        MS. GRIFFIN:  One moment, Your Honor.

7        THE COURT:  All right.

8     (A discussion was held off the record between counsel.)

9  BY MS. GRIFFIN:

10  Q   Agent White, I show you what's marked as Government's

11  Exhibit 34-7, containing 34-7(a) through (i) and ask if you

12  have previously seen these selected progress notes from records

13  seized from Greenway?

14  A   Yes.

15  Q   For PPSA?

16  A   I have.

17  Q   Do these contain progress notes for various patients, each

18  one numbered a different letter of the alphabet within the

19  exhibit?

20  A   Yes.

21  Q   That is, 34-7(a) or 34-7(b) through (i)?

22  A   Yes.

23  Q   Do these contain, within the progress notes, the dates and

24  times that the records were electronically signed by Dr. Couch?

25  A   Yes, they do.

 1   Q   Again, you don't know whether this was the exact date or

 2   time, you are relying on the records in reviewing these?

 3   A   Correct.

 4          MS. GRIFFIN:  We'd move to admit those exhibits, Your

 5   Honor, Government's Exhibit 34-7(a) through (i).

 6          THE COURT:  Any objection?

 7          MR. ESSIG:  No objection.

 8          MS. GRIFFIN:  And to publish them to the jury.

 9          THE COURT:  All right.

10      (Government's Exhibits 34-7(a) through 34-7(i) were entered

11   into evidence.)

12   BY MS. GRIFFIN:

13   Q   Agent White, you've previously reviewed these documents?

14   A   I have.

15   Q   Could you tell us as to 34-7(a), which is for patient

16   B.............

17   A   Yes.

18   Q   -- on May the 5th of 2015, on the third page of that visit,

19   the date and time that Dr. Couch electronically signed the

20   record, according to the records seized?

21   A   May 5th, 2015, at 9:31 a.m.

22   Q   Could you tell us as to Government's Exhibit 34-7(b)?  I'm

23   sorry.  Let me go back and ask you the seconds as to the first

24   one.

25   A   9:31:54.

FBI SA AMY WHITE - DIRECT BY MS. GRIFFIN

4141

1  Q   As to 34-7(b) for the progress note for Mr. B...., a visit

2  on May 4th of 2015, could you give us the date that the

3  electronic record shows Dr. Couch signed?

4  A   It says May the 5th, 2015, at 9:32:28.

5  Q   And that is shortly behind the time that he signed the

6  Exhibit (a)?

7  A   Looks like about 30 seconds later.

8  Q   I show you Government's Exhibit 34-79(c), a progress note

9  May 5th for a Mr. J.......

10 A   Yes.

11 Q   And ask on the third page if you were able to determine

12 what time the record showed it was electronically signed by

13 Dr. Couch?

14 A   It says May the 5th of 2015 at 9:32:33.

15 Q   I'll show you Exhibit (b) along with Exhibit (c), and ask

16 you how much time appears to have passed between one electronic

17 signature and the next one?

18 A   About five seconds.

19 Q   As to Government's Exhibit 34-7(d), I'll show you a

20 progress note for a patient, last name D...., visit date May

21 5th, 2015, and ask if you have seen the electronic signature

22 for that date?

23 A   Yes.

24 Q   What time does it show, please?

25 A   9:32:34.

1  Q   I'll show you the time for the electronic signature in (c)

2  that you just testified to, to compare that with the time on

3  the electronic signature on (d).

4  A   Looks like it was about one second later.

5  Q   I show you Government's Exhibit 34-7(e) Mr. or Ms. R.... --

6  don't know if that's a male or a female -- from May 5th, 2015;

7  is that right?

8  A   Yes, ma'am.

9  Q   Did you look at the electronic signature for that progress

10  note?

11  A   I did.

12  Q   What does the time show for Exhibit (e) that Dr. Couch

13  electronically signed this record?

14  A   At 1:28:08.

15  Q   P.m.?

16  A   P.m., yes.

17  Q   I show you the record Government's Exhibit 34-7(f) for May

18  the 5th, 2015, for Mr. M............., did you determine the

19  time that he electronically signed this record?

20  A   Yes, May 5th, 2015, at 1:28 p.m. and 10 seconds.

21  Q   I'll ask you to compare that with Exhibit (e) that you just

22  testified to.  The top one being (e) and the bottom one being

23  (f), would you tell us how much time passed between the first

24  click and second click?

25  A   Looks like two seconds.

4143

1    Q    I show you Government's Exhibit 34-7(g), a progress note

2    for May 5th, 2015, for Mr. L.....   Have you examined an

3    electronic signature on this progress note from the Greenway

4    file for Mr. L....?

5    A    I have.

6    Q    I'll ask you to tell us the time the record shows it was

7    signed?

8    A    1:28 p.m. and 26 seconds.

9    Q    And ask you to compare the time for Exhibit (g) with

10   Exhibit (f)?

11   A    There's a difference of about 16 seconds.

12   Q    I show you the electronic signature for May the 5th, 2015,

13   for a patient last name H...........   Did you have occasion to

14   look at the electronic signature on this date?

15   A    I did.

16        THE COURT:   Does this one have a separate number?

17        MS. GRIFFIN:   Government's Exhibit 34-7(h).

18   Q    If you will, tell us the time of the electronic signature.

19   A    1:28 p.m. and 37 seconds.

20   Q    Will you compare the signature, electronic signature time,

21   on (h) with the electronic signature time on the one you just

22   testified to, that being 34-7(g)?

23   A    It's a difference of 11 seconds.

24   Q    11 seconds?

25   A    Yes, ma'am.

4144

1  Q   And finally, I'll show you Government's Exhibit 34-7(i),

2  ask if you have previously seen the progress note for

3  Mr. S......?

4  A   Yes.

5  Q   For May the 5th of 2015?

6  A   I have.

7  Q   And if you will, tell us the electronic time this progress

8  note was electronically signed by Dr. Couch.

9  A   1:28 p.m. and 52 seconds.

10 Q   And I'll show you the progress note just before that and

11 ask if you can tell us how much time passed between the signing

12 of these two progress notes.

13 A   About 15 seconds.

14        MS. GRIFFIN:  One moment, Your Honor.

15        THE COURT:  All right.

16     (A discussion was held off the record between counsel.)

17 BY MS. GRIFFIN:

18 Q   Agent White, I'll show you what's marked as Government's

19 Exhibit 42-1 and ask if you have previously seen records from

20 the LSU Foundation.

21 A   Yes.

22 Q   These were subpoenaed for records of Insys payable to LSU

23 on Dr. Ruan's behalf?

24 A   I believe so.

25        MS. GRIFFIN:  Your Honor, I'd move to admit pursuant

FBI SA AMY WHITE - DIRECT BY MS. GRIFFIN

1  to a stipulation of a business record that the LSU Foundation

2  has certified that these are true copies of original records

3  maintained by the LSU Foundation for honorarium paid to LSU

4  Foundation by Insys on behalf of Dr. Ruan.

5          THE COURT:  All right.  Mark it in.

6          MR. KNIZLEY:  Yes; that is correct.

7          THE COURT:  All right.  Mark it in.

8      (Government's Exhibit 42-1 was entered into evidence.)

9          MS. GRIFFIN:  May I publish them to the jury?

10         THE COURT:  Yes.

11 BY MS. GRIFFIN:

12 Q   I show you Government's Exhibit 42-1.  And does this first

13 page contain the certification of authenticity, Agent White?

14 A   It appears to, yes.

15 Q   And, then, are you familiar that it contains copies of

16 records showing payments to LSU from Insys on behalf of

17 Dr. Ruan?

18 A   It appears to, yes.

19 Q   Likewise, you have previously seen records from the

20 University of South Alabama that were produced by South Alabama

21 pursuant to a subpoena?

22 A   Yes.

23 Q   For payments from Insys on behalf of Dr. Ruan?

24 A   Yes.

25         THE COURT:  Does that have a different number?

 1              MS. GRIFFIN:  It does.  It's 42-2, Your Honor.  And I

 2    move to submit the records of money donated by Insys on behalf

 3    of Dr. Ruan pursuant to a stipulation that these are business

 4    records and these documents are payments by Insys on behalf of

 5    Dr. Ruan to the University of South Alabama.

 6              MR. KNIZLEY:  That's correct.

 7              THE COURT:  All right.  Mark it in.

 8         (Government's Exhibit 42-2 was entered into evidence.)

 9              MS. GRIFFIN:  May I publish them, Your Honor?

10              THE COURT:  Yes.

11    BY MS. GRIFFIN:

12    Q    Agent White, does this contain the certificate of the

13    custodian that these are records of the payments donated by

14    Insys on behalf of Dr. Ruan?

15    A    Yes.

16    Q    And does this appear to show the dates and the amounts?

17    A    It does.

18    Q    Does it show a total in the amount of $39,500?

19    A    Yes.

20    Q    Agent White, did you participate in the search of a

21    warehouse or were you familiar with the search of a warehouse

22    on May the 20th, 2015, belonging to Dr. Ruan?

23    A    Yes.

24    Q    Were you aware that certain records for various vehicles

25    were seized from that search?

1   A   Yes.

2   Q   I'll show you what's marked as Government's Exhibit 36-6

3   and ask if you have previously seen these records for a 1994

4   Lamborghini Diablo?

5   A   I have.

6   Q   Were these records seized from Dr. Ruan's warehouse in west

7   Mobile?

8   A   They were.

9   Q   On May the 20th, 2015?

10  A   Yes.

11  Q   And in addition to marking them as Government's Exhibit

12  36-6, have you also identified them by a document number or a

13  reference number the FBI assigned to them?

14  A   Yes.  That first number is an FBI evidence number and the

15  second notation is the tab that this car corresponds to in my

16  financial analysis binder.

17  Q   Is this the actual binder that was seized there at the

18  warehouse?  (Indicating.)

19  A   Yes, it is.

20         MS. GRIFFIN:  Move to admit Government's Exhibit 36-6.

21         THE COURT:  Any objection?

22         MR. KNIZLEY:  No objection.

23         THE COURT:  All right.  Mark it in.

24      (Government's Exhibit 36-6 was entered into evidence.)

25          MS. GRIFFIN:  And if we may publish it to the jury,

FBI SA AMY WHITE - DIRECT BY MS. GRIFFIN

1   Your Honor?

2         THE COURT:  Yes.

3   BY MS. GRIFFIN:

4   Q   Agent White, is this the tab, yellow tab, that you

5   referenced that you added to the exhibit?

6   A   Yes.

7   Q   The 1B21 internal number and it relates to tab C of another

8   exhibit you're going to identify?

9   A   Yes, it does.

10  Q   And, of course, it shows the Government's Exhibit 36-6; is

11  that right?

12  A   That's right.

13  Q   Is this the actual notebook that was seized?

14  A   It is.

15  Q   Did it already have this information on the front?

16  A   It did.

17  Q   Does that include the year and the VIN number for a

18  Lamborghini?

19  A   Yes, it does.

20  Q   Did it contain documents inside the folder that were

21  seized -- excuse me -- that were in the folder at the time that

22  the folder was seized?

23  A   Yes.

24  Q   Are those documents pertaining to the purchase and the

25  maintenance of this particular vehicle by Dr. Ruan?

1   A   They are, yes.

2   Q   Within Government's Exhibit 36-6 about the Lamborghini, I

3   show you information about a vehicle transfer and reassignment

4   form that was seized and contained in the folder, binder.  What

5   does this show?

6   A   It shows the purchase of a 1994 Lamborghini for $115,000

7   from Bobileff Motorcar Company.

8   Q   Who was it purchased -- who was the bill of sale to?

9   A   XLR Exotic Autos, LLC.

10  Q   Are you aware that this is an LLC of Dr. Ruan's?

11  A   Yes.

12  Q   It shows the date?

13  A   9/19 of 2014.

14  Q   And the price?

15  A   $115,000.

16  Q   Have you determined from the financial records that you

17  have subpoenaed and reviewed that there was a wire transfer

18  sent on this date in the amount of $115,000?

19  A   No.

20  Q   Pardon?

21  A   No.  There were two wire transfers sent, one was for 5,000

22  and one was for 110,000.

23  Q   Totaling the 115?

24  A   Yes, ma'am.

25  Q   And I'll show you --

1        MS. GRIFFIN:  Your Honor, if we may just publish this

2   to the agent?

3   Q    Did you determine from the review of the State Bank & Trust

4   account records in Dr. Ruan's name, that being account --

5        THE COURT:  You need to give us a little warning if

6   you just want it to be published to the agent, because we have

7   to make some changes here.

8        MS. GRIFFIN:  Sorry.

9   Q    In connection with your review of the records, did you

10  review records from State Bank & Trust account ending 5553?

11  A    I did.

12  Q    Whose name is that account in?

13  A    It's XLR Exotic Autos, LLC.

14  Q    And did you determine that that was a bank account of

15  Dr. Ruan's?

16  A    Yes.

17  Q    Did you determine that on September the 26th, 2014, there

18  was a wire transfer from that State Bank & Trust account ending

19  5533 [sic] in the name of XLR Exotic Autos, LLC, in the amount

20  of $110,000?

21  A    Yes, account number 5553.

22  Q    Where was the wire transfer sent from?

23  A    Comerica Bank in San Diego, California.

24  Q    I'm sorry.  Is that where it was sent to?

25  A    To, yes.

1  Q   And have you determined from the records if that is an

2  account number for Bobileff Motorcar Company?

3  A   Yes.

4  Q   Is that the name of the company that the Lamborghini was

5  purchased from?

6  A   Yes.

7  Q   If this will still be just to the agent, I'll show you

8  36-7, ask if you can identify the exhibit.

9  A   Yes.

10 Q   What is this, please, ma'am?

11 A   That's a similar binder to what we just looked at for a

12 different car.

13 Q   Was this document seized from a warehouse belonging to

14 Dr. Ruan on May the 20th, 2015?

15 A   Yes.

16 Q   Have you added to it an internal tab number for the FBI?

17 A   Yes.

18        MS. GRIFFIN:  Your Honor, we'd move to admit

19 Government's Exhibit 36-7 and to publish it to the jury.

20        MR. KNIZLEY:  No objection.

21        THE COURT:  All right.  Mark it in.

22     (Government's Exhibit 36-7 was entered into evidence.)

23 BY MS. GRIFFIN:

24 Q   Ms. White, at the top right-hand corner of Government's

25 Exhibit 36-7, is the yellow tabbing the number that you placed

4152

1   on the actual exhibit?

2   A   Yes, it is.

3   Q   Other than that, is everything in the exhibit, to include

4   the writing on the front of the binder, what was seized from

5   Dr. Ruan's warehouse?

6   A   Yes.  I believe I put a couple of tabs on the wire transfer

7   document, but other than that everything is as it was found.

8   Q   So as it was found, the binder had "2011 Audi R8 Spyder"?

9   A   Yes.

10  Q   And it had a VIN number; is that correct?

11  A   That's correct.

12  Q   Did you locate documents inside indicating that there had

13  been a wire transfer used to purchase this particular vehicle?

14  A   Yes.

15  Q   I show you what you tabbed in the exhibit and ask what this

16  document appears to be.

17  A   It says it's a client proposal to XLR Exotic Autos, LLC,

18  from Park Place.

19  Q   Where is Park Place located?

20  A   It says it's in Dallas, Texas.

21  Q   And what is the date of the proposal?

22  A   August the 4th, 2014.

23  Q   Does it show who is purchasing a particular vehicle?

24  A   It shows XLR Exotic Auto is purchasing a vehicle.

25  Q   Is that Dr. Ruan's account?

1    A    It is.

2    Q    And does it show it's at Leroy Stevens Road in Mobile,

3    Alabama?

4    A    Right.

5    Q    Does it show the purchase price of the vehicle?

6    A    Go down -- yes, it shows $124,355.87.

7    Q    Is this a client proposal for the purchase of the vehicle

8    you have just described, the Audi?

9    A    Yes, ma'am.

10         MS. GRIFFIN:  Now, Your Honor, if we could go back

11    just to the agent?

12         THE COURT:  All right.

13         MS. GRIFFIN:  Are you ready, Madam Clerk?

14         THE CLERK:  It's off.

15    BY MS. GRIFFIN:

16    Q    Agent White, you previously testified that State Bank &

17    Trust account ending 5553 is in the name of XLR Exotic Autos,

18    LLC; is that right?

19    A    That's right.

20    Q    Did your review of the bank records as to that account from

21    State Bank & Trust show a wire transfer on August the 14th of

22    2014?

23    A    Yes.

24    Q    Could you tell us who the wire transfer was to?

25    A    It was to JPMorganChase Bank in Dallas, Texas.

4154

```
 1   Q   And did you determine the amount of the wire transfer?
 2   A   $124,355.87.
 3   Q   Did that correspond to the amount that you've just
 4   identified for the purchase of the 2011 Audi?
 5   A   Yes.
 6   Q   Could you tell us whose account that JPMorgan Chase Bank
 7   funds went into?
 8   A    I would have to look on the spreadsheet.
 9   Q   Did that go to Park Place?
10   A   Yes.
11   Q   In Dallas, Texas?
12   A   Yes, it did.
13   Q   And is that the same company that you've identified on the
14   client proposal?
15   A   Yes.
16   Q   For the purchase of that vehicle?
17   A   That's correct.
18           MS. GRIFFIN:  One moment, Your Honor.
19           THE COURT:  All right.
20   BY MS. GRIFFIN:
21   Q   Agent White, did you have occasion, with the aid of other
22   individuals in your office and in the DEA office, to have
23   prepared a summary sheet from the bank records, Wells Fargo
24   Bank records of PPSA?
25   A   Yes.
```

1   Q   Did you also have assistance in comparing the bank records

2   for C&R Pharmacy, LLC?

3   A   Yes.

4   Q   Were there two C&R, LLC, sets of records, one for the

5   pharmacy and one for the other?

6   A   No, ma'am.  There was one for C&R, LLC, and then there was

7   a second one for C&R Pharmacy, LLC.

8   Q   Did you have occasion to review the spreadsheet that was

9   prepared from the bank records from Wells Fargo Bank account

10  ending in 7003?

11  A   Yes, ma'am.

12  Q   For the C&R Pharmacy, LLC?

13  A   Yes, ma'am.

14  Q   Did you prepare a summary chart from those Wells Fargo

15  records?

16  A   I did.

17  Q   I'll show you what's marked as Government's Exhibit 36-5.

18          MS. GRIFFIN:  Your Honor, these are going to be

19  admitted by stipulation, as I understand it, as business

20  records, except for her analysis part.

21          MR. ESSIG:  Yes, Your Honor.

22          MR. KNIZLEY:  That's correct.

23          THE COURT:  All right.  Is the analysis within the

24  exhibit?

25          MS. GRIFFIN:  It is, Your Honor.

```
 1              THE COURT:  All right.  But they are not stipulating
 2   to the analysis; is that correct?
 3              MR. KNIZLEY:  That's correct.
 4              MR. ESSIG:  The narrative; is that correct?
 5              MS. GRIFFIN:  There is no narrative.  Just numbers.
 6         (A discussion was held off the record between counsel.)
 7              MS. GRIFFIN:  So we would move to admit it and publish
 8   it to the jury.
 9              THE COURT:  All right.
10              MS. GRIFFIN:  36-5.
11              THE COURT:  Mark it in.
12         (Government's Exhibit 36-5 was entered into evidence.)
13   BY MS. GRIFFIN:
14   Q   Agent White, I ask you if 36-5 contains information from
15   the Wells Fargo Bank records pertaining to account ending in
16   7003 from C&R Pharmacy, LLC's, bank statements?
17   A   Yes, ma'am.
18   Q   Does it contain the supporting documents for a chart which
19   you prepared?
20   A   It does.
21   Q   Does it also contain an account reconciliation?
22   A   It does.
23   Q   What do you mean by that?  What is an account
24   reconciliation?
25   A   Well, it's just a reconciliation of different numbers.  But
```

1   in my particular one we had several different people who were

2   taking the actual bank records and converting them into an

3   electronic spreadsheet and then I used those electronic

4   spreadsheets to make a summary pivot table so that it was -- it

5   was a much shorter version of a thousand-page spreadsheet.  So

6   my reconciliation is just where I've made sure that the dates

7   for my summary match the dates on the bank statement and it was

8   a way that I could ensure that nothing was duplicated and

9   nothing was left out when I made that conversion.

10  Q   And when you said it includes debits and credits, those are

11  some words used in accounting; is that right?

12  A   That's right; yes.

13  Q   Explain to us what those mean.

14  A   Well, a debit would be something that came out of the

15  account and a credit would be something that went into the

16  account.

17  Q   I show you the same we just discussed, the account

18  reconciliation, and ask you if you had information on the date

19  ranges for January 2012 including through January 30th of 2015

20  for this reconciliation?

21  A   Those date ranges reflect the records that were converted

22  into an electronic spreadsheet.

23  Q   It's fair to say that all the Wells Fargo records for this

24  account weren't received at one time; is that right?

25  A   That's correct.

1   Q   They were all received pursuant to subpoena as business

2   records of Wells Fargo for this account?

3   A   They were.

4   Q   That is the account ending in 7003?

5   A   Yes.

6   Q   And you did not seek to introduce the voluminous bank

7   records; rather, the reconciliation; is that correct?

8   A   That's correct.

9   Q   Did you determine the total credits that came into the C&R

10  Pharmacy, LLC, account during January the 1st of 2012 through

11  March the 30th, 2015?

12  A   Yes.

13  Q   You did not have the records for 2011 until later; is that

14  correct?  Down at the bottom of your chart?

15  A   If you go down to the bottom where it says "account

16  statement summary totals," that shows the totals of all the

17  bank records that ultimately we received during the

18  investigation.

19  Q   Okay.  And does that show, then, from September the 21st of

20  '11 through July of '15?

21  A   Yes, it does.

22  Q   Were there still some monies coming into the PPSA and C&R

23  Pharmacy accounts, bank accounts, after the May 20th, 2015,

24  seizures?

25  A   Yes.

4159

1   Q   Could you tell us the total amounts of monies that came in

2   during that period of time?  (Indicating.)

3   A   $36,106,258.85.

4   Q   Also did you prepare a summary of the debits from April the

5   14th, January 12th -- excuse me -- from January the 1st of '12

6   through January the 30th of '15?

7   A   I'm sorry.  I don't have the dates committed to memory.  If

8   I could see it?

9   Q   Certainly.  I'll show you the first page and ask if you

10  prepared the debits from January 1st of '12 to March 31st of

11  '14?

12  A   Yes.

13  Q   And then page one of three for the second summary of April

14  of '14 to January the 30th of '15?

15  A   Yes.

16  Q   That was based on your availability of the records?

17  A   Correct.

18  Q   Did you show payments in the summaries to John P. Couch

19  from this C&R Pharmacy, LLC, account?

20  A   I believe so.  I'd have to look at it.  There were so many

21  accounts, I would need to see it.

22  Q   (Indicating.)

23  A   Yes.

24  Q   And that period of time is what dates?

25  A   January 1st, 2012, to March 31st, 2014.

1   Q   Does it show payments during that period of time to

2   Dr. Couch?

3   A   It does.

4   Q   What's the amount?

5   A   $105,000.

6   Q   Does it also show the payments from C&R Pharmacy to

7   Dr. Ruan?

8   A   Yes.

9   Q   And Dr. Ruan Companies?

10  A   It does.

11  Q   How much to Dr. Ruan Companies?

12  A   21,000.

13  Q   How much to Xiulu Ruan?

14  A   105,000.

15  Q   Then I show you the summary chart, three pages of debits

16  from April 1st, '14, to January 30th of '15; is that correct?

17  A   That's correct.

18  Q   Did you show payments from C&R Pharmacy, LLC, to Insys

19  Therapeutics?

20  A   Yes.

21  Q   Did you list all those payments from C&R Pharmacy, LLC, to

22  Insys?

23  A   I did.

24  Q   Did you total them toward the end of the page?

25  A   I did.

FBI SA AMY WHITE - DIRECT BY MS. GRIFFIN

1   Q   Could you tell us how much C&R Pharmacy, LLC, paid Insys

2   Therapeutics in total based on the bank records you reviewed?

3   A   $5,568,826.50.

4   Q   Did you further show during that period of time, April of

5   '14 through January 30th of '15, additional monies paid to

6   Dr. Couch?

7   A   Yes.

8   Q   What amount was that?

9   A   450,000.

10  Q   Did you show monies paid to McConaghy drugstores?

11  A   Yes.

12  Q   What amount, please?

13  A   $303,895.85.

14  Q   Did you show monies paid to Physicians Pain Specialists;

15  PPSA, that is?

16  A   Yes.

17  Q   What was the total?

18  A   $136,314.79.

19  Q   And did you show additional monies paid to Ruan Companies?

20  A   Yes.

21  Q   What amount, please?

22  A   30,000.

23  Q   Also during this same period of time, page three of the

24  summary from April 1st of '14 through January 30th of '15, did

25  you show monies paid to Ruan personally?

FBI SA AMY WHITE - DIRECT BY MS. GRIFFIN

1   A   Yes.

2   Q   How much?

3   A   450,000.

4           THE COURT:  Is now a good time for us to take our

5   break?

6           MS. GRIFFIN:  Yes, Your Honor.

7           THE COURT:  Ladies and gentlemen, we'll take our break

8   at this time.  Leave your pads on your chairs.  No discussion

9   about the case.  And take your break downstairs in the jury

10  assembly room.  We will call you back up in about 15 minutes.

11          We're in recess.

12      (A recess was taken at approximately 10:30 a.m.)

13      (In open court, 10:52 a.m., defendants and jury present.)

14          THE COURT:  All right, Ms. Griffin.

15  BY MS. GRIFFIN:

16  Q   Agent White, I was asking you about C&R Pharmacy, LLC,

17  Government's Exhibit 36 --

18          THE COURT:  Make sure your microphone is on.

19          MS. GRIFFIN:  I'm sorry.

20          THE COURT:  All right.

21  BY MS. GRIFFIN:

22  Q   I was asking you about Government's Exhibit 36-5, the C&R

23  Pharmacy, LLC, Wells Fargo Bank account 7003?

24  A   Yes, ma'am.

25  Q   You've given us some numbers from that account.  I'd like

4163

```
 1   to show you contained in your exhibit information about a wire
 2   transfer.
 3   A   Yes.
 4   Q   And ask if you have previously seen this document.
 5   A   I have.
 6   Q   Could you tell us what this is, please?
 7   A   That's a document that came from the Federal Reserve that
 8   shows wire transfer detail for a transaction that took place on
 9   February the 18th, 2015, in the amount of $97,924 between C&R
10   Pharmacy and Galena Biopharma, Inc.
11   Q   Does that show an incoming wire from Galena Biopharma?
12   A   Yes, Galena is the originator, meaning it's the sender and
13   then C&R Pharmacy is the beneficiary, meaning that that's who
14   received the funds.
15   Q   And you know from working this case that Galena Biopharma
16   manufactures Abstral; is that correct?
17   A   Yes, ma'am.
18   Q   This came to C&R Pharmacy as the beneficiary?
19   A   That's correct.
20   Q   And the amount again?
21   A   $97,924.
22   Q   And the date?
23   A   February the 18th of 2015.
24   Q   And these are documents from the federal wire transfers for
25   those accounts?
```

1    A    From the Federal Reserve, yes.

2    Q    As to Dr. Couch I'll show you what's marked as Government's

3    Exhibit 100.

4              MS. GRIFFIN:  Your Honor, there's a stipulation that

5    this may be admitted, so may we begin by publishing it to the

6    jury?

7              THE COURT:  Yes.  Can you describe it for the record?

8              MS. GRIFFIN:  Yes.  Government's Exhibit 100 is

9    payments to John Patrick Couch from Industrial Pharmacy

10   Management, or IPM, and from Comprehensive Rx Management, or

11   CRM.

12             THE COURT:  All right.

13        (Government's Exhibit 100 was entered into evidence.)

14   BY MS. GRIFFIN:

15   Q    Agent White, I'll show you what's marked as Government's

16   Exhibit 100 and ask if you prepared this summary based on

17   checks that were pulled from various bank accounts belonging to

18   Dr. Couch.

19   A    Yes.

20   Q    Did you have them compiled in a summary fashion to show

21   where the check came from?

22   A    Yes.

23   Q    Where it was deposited?

24   A    Yes.

25   Q    The check date?

FBI SA AMY WHITE - DIRECT BY MS. GRIFFIN

1    A    Yes.

2    Q    Did you indicate the check number?

3    A    I did.

4    Q    And the check amount?

5    A    I did.

6    Q    Did you do the same thing on Exhibit 100 from Comprehensive

7    Rx Management?

8    A    Yes, I did.

9    Q    Do you know that that's been referred to during the trial

10   as CRM?

11   A    Yes.

12   Q    Do you know that Industrial Pharmacy Management has been

13   referred to as IPM during the trial?

14   A    Yes.

15   Q    Did you also include the checks from Industrial Pharmacy

16   Management, City National Bank, to Dr. Couch that support each

17   of the entries that you have in summary fashion in the front of

18   the exhibit?

19   A    I believe the checks came from various bank accounts, but I

20   made a copy of every check.  And if a deposit slip was provided

21   with each check, I made a copy of the deposit slip as well so

22   you could see what account it went into.

23   Q    So the particular check I'm showing you is dated what date?

24   A    March 25th of 2012, I believe.

25   Q    Let me move that over so you can see.  (Indicating.)

4166

1   A   Thank you.  Yes, March 25th of 2012.

2   Q   In what amount?

3   A   $18,000.

4   Q   And it's from whom?

5   A   Industrial Pharmacy Management.

6   Q   And it's payable to?

7   A   John Patrick Couch MD.

8   Q   At what address?

9   A   319 Woodbridge Drive in Daphne, Alabama.

10  Q   Do you know that to be Dr. Couch's residence address?

11  A   Yes, it is.

12  Q   Did you total the monies paid by Industrial Pharmacy

13  Management or IPM to Dr. Couch based on the checks you had

14  received and examined?

15  A   Yes, I did.

16  Q   Did you come up with a total paid to Dr. Couch from

17  Industrial Pharmacy Management?

18  A   I did.

19  Q   Could you tell us that amount?

20  A   $587,488.15.

21  Q   Did you also total the amount of monies paid to Dr. Couch

22  from Comprehensive Rx Management?

23  A   I did.

24  Q   Would you tell us that total?

25  A   $329,434.64.

FBI SA AMY WHITE - DIRECT BY MS. GRIFFIN

1   Q   Then did you total the amounts paid from the two companies

2   to Dr. Couch?

3   A   I did.

4   Q   That was during the period of the conspiracy; is that

5   correct?

6   A   That's correct.

7   Q   What was the dollar amount?

8   A   $916,922.79.

9   Q   I showed you a check from IPM.  I want to show you one of

10  the checks on Comprehensive Rx Management as well.  Could you

11  identify the date of the Comprehensive Rx Management check?

12  A   It's dated February the 20th of 2014.

13  Q   And the amount?

14  A   $20,000.

15  Q   And it's payable to whom?

16  A   Physicians Compounding Solutions, LLC.

17  Q   Is that at the Woodbridge Drive address in Daphne?

18  A   It is.

19  Q   Is that Dr. Couch's residence address?

20  A   Yes, it is.

21  Q   And from your review of the records do you know that

22  Physicians Compounding Solutions, LLC, is a company that is

23  Dr. Couch's company?

24  A   Yes, it is.

25  Q   I show you also Government's Exhibit 101, payments to

1    Dr. Couch from Insys.

2          MS. GRIFFIN:  And, Your Honor, this will be coming in

3    pursuant to a stipulation as well, Exhibit 101.

4          THE COURT:  All right.  Mark it in.

5       (Government's Exhibit 101 was entered into evidence.)

6    BY MS. GRIFFIN:

7    Q    Agent White, I show you what's marked as payments to John

8    Patrick Couch from payor 365, or Insys, and then payments from

9    Insys Therapeutics directly.  You prepared this chart?

10   A    Yes.  The first one is Plan 365.

11   Q    Through Insys; is that correct?

12   A    And I believe there may be one from another company called

13   SciMedica.

14   Q    On the second page?

15   A    Yes, ma'am.

16   Q    Is there also an Insys-connected check from SciMedica?

17   A    Yes.

18   Q    Did you include copies of the checks of those payments to

19   Dr. Couch --

20   A    I did.

21   Q    -- from the exhibits?  If you could tell us the total paid

22   to Dr. Couch under total Plan 365?

23   A    $48,400.

24          MS. GRIFFIN:  And, Your Honor, the stipulation is this

25   is a payor company for Insys Therapeutics.

FBI SA AMY WHITE - DIRECT BY MS. GRIFFIN

1            THE COURT:  All right.

2  BY MS. GRIFFIN:

3  Q    Could you show us the amount paid to Dr. Couch for Insys

4  Therapeutics which is totaled on the second page of your

5  summary?

6  A    $52,528.20.

7  Q    The amount from SciMedica?

8  A    1,600.

9  Q    And the combined total of the Insys-related payments to

10  Dr. Couch?

11  A    $102,528.20.

12  Q    I show you one of the Plan 365 checks and ask if this came

13  from various records from Insys and/or from the bank?

14  A    Yes.

15  Q    Is this an example of a check to Physicians Compounding

16  Solutions from Plan 365?

17  A    It is.

18  Q    And what date?

19  A    October 16, of 2014.

20  Q    What amount?

21  A    $2,200.

22  Q    Who is this payable to and what address?

23  A    It's made payable to Physicians Compounding Solutions, LLC,

24  at 319 Woodbridge Drive in Daphne, Alabama.

25  Q    Again, Dr. Couch's residence?

1    A    Yes.

2    Q    And Physicians Compounding Solutions, LLC, is Dr. Couch's

3    business?

4    A    Yes.

5    Q    I show you a JPMorgan check payable to Dr. Couch from Insys

6    Therapeutics.  Is this check in the amount of $1,600?

7    A    It is.

8    Q    On what date?

9    A    January 17th of 2014.

10   Q    And payable to?

11   A    John Patrick Couch.

12   Q    Is this payable at the Springhill -- addressed to the

13   Springhill address?

14   A    It is.

15   Q    Did you include deposit slips if they were available for

16   the deposits of these various checks?

17   A    I did.

18   Q    Agent White, have you also verified through the bank

19   records for C&R Pharmacy, LLC, that that February 18, 2015,

20   Galena wire transfer in the amount of 97,924 actually went into

21   the C&R Pharmacy, LLC, bank account?

22   A    Yes, it did.

23   Q    Based on your investigation, do you know if that Galena

24   check -- excuse me -- that Galena wire of February the 18th,

25   2015, is payment in connection with the Galena Biopharma rebate

FBI SA AMY WHITE - DIRECT BY MS. GRIFFIN

 1  agreement with C&R Pharmacy?

 2  A   That's my understanding, yes.

 3  Q   Did you total the amounts that Dr. Ruan and Dr. Couch

 4  received from CRM and from IPM?

 5  A   Yes.

 6  Q   And after I show you Dr. Ruan's payment schedules, we will

 7  ask about the totals on those.  In connection with Dr. Couch's

 8  payments, Government's Exhibit 100 and Government's Exhibit

 9  101, from Insys, from Industrial Pharmacy Management and

10  Comprehensive Rx Management, can you tell us if those show --

11  and I'll hand you the records.  This will be just as to

12  Dr. Couch.  Do you show from IPM that Dr. Couch received check

13  number 11667?

14  A   Yes.

15  Q   On September the 20th, 2012?

16  A   Yes.

17  Q   In what amount?

18  A   $38,543.70.

19  Q   Can you also tell us if on September the 18th, 2013,

20  Dr. Couch received check number 13570?

21  A   Yes.

22  Q   Was that payable to Physicians Compounding Solutions?

23  A   I don't know.  Let me find the check.

24          It was.

25  Q   In the amount of?

FBI SA AMY WHITE - DIRECT BY MS. GRIFFIN

1   A   $21,860.95.

2   Q   Would you also see if there is a check number 1280?

3   A   Yes, there is.

4   Q   Is it payable to Physicians Compounding Solutions from CRM?

5   A   Yes, it is.

6   Q   Is that in the amount of $33,020.85?

7   A   It is.

8   Q   In connection with Exhibits 100 and 101, did you determine

9   that certain select checks were payable to Dr. Couch from

10  Insys?

11  A   Yes.

12  Q   Could you tell us --

13  A   Wait.

14  Q   -- about check Number 1047 -- excuse me, I'm sorry -- check

15  number 11090?

16  A   I'm sorry.  You wanted the Insys or are you on the IPM?

17  Q   Insys?

18  A   Okay.  I'm sorry.  Ask me again.

19  Q   Check number 11090?

20  A   Yes.

21  Q   What date and what amount?

22  A   The date is May the 9th of 2013, in the amount of $3,200.

23  Q   And payable to Dr. Couch?

24  A   Let me see.  Okay.  Check 11090 is made payable to John

25  Patrick Couch from Insys Therapeutics.

1  Q  Also do you have records for check number 1920?

2  A  Yes.

3  Q  Payable to John Patrick Couch?

4  A  Payable to John Patrick Couch from Insys.

5  Q  What date and what amount?

6  A  February 13th of 2014, in the amount of $1,600.

7  Q  And do you also have check number 5091 from Insys payable

8  to John Patrick Couch?

9  A  Yes.

10  Q  Could you tell us what date and what amount?

11  A  October 31st, 2014, in the amount of $3,750.

12  Q  Now, the checks I've asked you about from IPM and from CRM

13  and for Insys, the specific checks you've identified are not

14  all the checks to them, are they?

15  A  No.

16  Q  These are select ones that are included in the indictment?

17  A  Yes.

18  Q  Agent White, I also show you Dr. Ruan's financials, volume

19  one and two.  They are Government's Exhibit 36-2 for volume one

20  and 36-2A for volume two.

21      MS. GRIFFIN:  These are being admitted, Your Honor,

22  pursuant to a stipulation that these are based on bank and

23  financial records of Dr. Ruan.  There are a few matters that

24  will be redacted before they are actually published to the

25  jury.  Then that's in agreement with Mr. Knizley for his

4174

```
 1   client.
 2          THE COURT:  All right.  Mark it in.
 3          MR. KNIZLEY:  That's correct.
 4          THE COURT:  Mark them in.  And you say these are
 5   Dr. Ruan's financial --
 6          MS. GRIFFIN:  Dr. Ruan's financials.
 7      (Government's Exhibits 36-2 and 36-2A were entered into
 8   evidence.)
 9   BY MS. GRIFFIN:
10   Q   36-2 is Ruan financial volume one; is that correct, Agent
11   White?
12   A   If I could see it.
13          THE CLERK:  Okay.
14          THE COURT:  We have a technical problem.
15          MS. GRIFFIN:  I'll bring it to you, Agent White.
16          THE CLERK:  I apologize.  I don't know what's going
17   on.
18   BY MS. GRIFFIN:
19   Q   I show you what's been introduced as 36-2, Ruan financials
20   volume one.
21   A   Yes.
22   Q   Did you prepare the documents -- did you prepare a summary
23   of these documents?
24   A   Yes.
25   Q   Did the documents contain bank records and other financial
```

```
 1   records that pertain to Dr. Ruan?

 2   A   Yes.

 3           THE COURT:  Ms. Griffin, put something on the ELMO so

 4   we can see if it's working.

 5           MS. GRIFFIN:  It's working --

 6           THE COURT:  Well, it's not showing up on our

 7   screens.  Are y'all seeing it on the screen?

 8           A JUROR:  (Shaking head negatively.)

 9           THE COURT:  All right.  We're going to call the

10   technical people.

11           MS. GRIFFIN:  Your Honor, is there someone that could

12   come check that I didn't push the wrong thing?

13           THE COURT:  I'm not sure that I could tell you.

14           We're rebooting it, so hold on a minute.

15           All right.  We're seeing something, but it's upside

16   down.

17           All right.  We're seeing it.

18       (A discussion was held off the record between counsel.)

19   BY MS. GRIFFIN:

20   Q   I'll show you Government's Exhibit 36-2A, and ask if this

21   is Ruan financials volume two.

22   A   It is.

23   Q   You prepared this compilation of financial records for

24   Dr. Ruan as well?

25   A   I did.
```

4176

FBI SA AMY WHITE - DIRECT BY MS. GRIFFIN

1  Q   Did you likewise with Dr. Ruan prepare his payments from
2  Insys and from IPM and CRM?
3  A   I did.
4  Q   I show you first tab Q of Ruan financials, Government's
5  Exhibit 36-2A, and I'm pulling Exhibit Q from the folder and
6  will replace it.  What does this show, please?
7  A   Shows payments to Defendant Ruan from Insys Therapeutics.
8  Q   Does it also show payments to Dr. Ruan from Plan 365?
9  A   It does.
10  Q   And the SciMedica group?
11  A   Yes.
12  Q   Those are all Insys connected; is that correct?
13  A   They are.
14  Q   What was the total of payments from those three Insys
15  payment connections for Dr. Ruan?
16  A   $166,461.
17  Q   Did you list those by check number?
18  A   I did.
19  Q   Deposit account number?
20  A   I did.
21  Q   That's the account they were deposited into?
22  A   That's correct.
23  Q   The check date?
24  A   Yes.
25  Q   The check number?

FBI SA AMY WHITE - DIRECT BY MS. GRIFFIN

1   A   Yes.

2   Q   The check amount?

3   A   Yes.

4   Q   Were the deposit accounts, the companies that the checks

5   were deposited into, all Dr. Ruan's related accounts?

6   A   Yes.

7   Q   Did you also include the checks and the deposit slips where

8   available in connection with tab Q?

9   A   I did.

10          MS. GRIFFIN:  May I carry these to the witness, Your

11   Honor?

12          THE COURT:  Yes.

13   BY MS. GRIFFIN:

14   Q   As to the Insys payments to Dr. Ruan within that, are there

15   various payments, to include check number 10479?

16   A   Yes.

17   Q   Could you tell us the date and the amount?

18   A   The date is March the 1st of 2013 and the amount is $2,400.

19   Q   Could you determine if that was payable to Xiulu Ruan?

20   A   Let me find the check.

21          It was payable to Xiulu Ruan.

22   Q   Then could you determine if there is a check number 3057?

23   A   Yes, there is.

24   Q   Is it payable in the amount of $6,000 on May the 1st, 2014?

25   A   Yes.

FBI SA AMY WHITE - DIRECT BY MS. GRIFFIN

1    Q    Who is it payable to?

2    A    Let me find the check.  Check 3057 is payable to Xiulu

3    Ruan.

4    Q    Does it say Xiulu Ruan, XLR Properties, LLC?

5    A    It does.

6    Q    Do you know that that is one of Dr. Ruan's companies?

7    A    Yes.

8    Q    Again, this is a check payable to him connected with Insys?

9    A    Yes.

10   Q    And finally, did you find specifically within that grouping

11   check number 5390?

12   A    Yes.

13   Q    What date and what amount?

14   A    The date is November 14th, 2014, in the amount of $3,750.

15   Q    Is that payable to Xiulu Ruan, XLR Properties, LLC?

16   A    Yes.

17   Q    These are Insys payments connected to Insys; is that right?

18   A    That's right.

19        MS. GRIFFIN:  Your Honor, I'm returning the documents

20   from tab Q to the Exhibit 36-2A.

21   Q    Agent White, did you have occasion to go through the

22   records and prepare a chart for the payments from CRM and IPM

23   to Dr. Ruan?

24   A    I did.

25        MS. GRIFFIN:  One moment, Your Honor.

4179

1    Q    I'll show you what's contained in tab G of Exhibit 36-2A

2    and ask if this contains the payments to Dr. Ruan from

3    Comprehensive Rx Management or CRM?

4    A    Yes.

5    Q    And from Industrial Pharmacy Management or IPM?

6    A    Yes.

7    Q    Are these connected with the testimony of Mr. Drobot --

8    excusing me -- of Mr. Manfuso?

9    A    Yes.

10   Q    Did you total the amount payable to Dr. Ruan from your

11   review of the checks provided in Dr. Ruan's financials from

12   Comprehensive Rx Management?

13   A    I did.

14   Q    What was the total?

15   A    $962,858.44.

16   Q    Did you likewise total the payments from IPM or Industrial

17   Pharmacy Management to Dr. Ruan?

18   A    Yes.

19   Q    And could you tell us the total of payments connected to

20   the two, IPM and CRM, to Dr. Ruan?

21   A    $2,407,061.52.

22   Q    Again, Agent White, did you attach checks and deposit slips

23   from Dr. Ruan's financial documents that were subpoenaed or

24   seized to support the summary you have just provided?

25   A    I did.

FBI SA AMY WHITE - DIRECT BY MS. GRIFFIN

1   Q   As to specific checks within this tab, could you tell us if
2   there is a check number 12649?
3   A   Yes.
4   Q   What amount and what date?
5   A   The date is February 25th, 2013, in the amount of $53,000.
6   Q   Who is that payable to?
7   A   One moment, let me find the check.  It's made payable to
8   Xiulu Ruan.
9   Q   As to Dr. Ruan, did you also determine there was a check
10  numbered 1452?
11  A   Yes.
12  Q   Payable to whom?
13  A   Let me find that check.  Payable to Ruan Companies, LLC.
14  Q   How much and what date?
15  A   The date is November 18th of 2014 in the amount of 80,000.
16  Q   Is that from CRM?
17  A   Yes, it is.
18  Q   Did you also determine there is a check number 1555?
19  A   Yes.
20  Q   What amount and what date?
21  A   The amount is 75,000, the date is January 21st of 2015, to
22  Ruan Companies from Comprehensive Rx.
23  Q   Ruan Companies is one of Dr. Ruan's LLCs; is that correct?
24  A   That's correct.
25  Q   Now, the checks you just identified are not all the checks,

1   but all the checks are contained in your summary; is that --

2   A   That's correct.

3   Q   I'll replace that tab in the exhibit.  Agent White, have

4   you also highlighted the specific check numbers within the

5   chart that you've just identified by the specific check

6   numbers?

7   A   Yes, I did.

8   Q   Did you, from Dr. Ruan's records, identify a wire transfer

9   contained in tab C of Exhibit 36-2A?

10  A   I'm not sure if it's tab C, but it's a wire transfer

11  detail.

12  Q   And what does this show, please?

13  A   It shows that -- can you move down a little bit?  I could

14  tell you the date.  On September 26 of 2014, there was a

15  $110,000 wire transfer from Comerica Bank -- I'm sorry -- from

16  State Bank and Trust to Comerica Bank with the beneficiary

17  listed as Bobileff Motorcar Company.

18  Q   And this is the $110,000 wire transfer you previously

19  testified about; is that correct?

20  A   That's correct.

21  Q   Agent White, did you include a summary in the beginning of

22  account reconciliation for Dr. Ruan's financials in the front

23  of volume two, Government's Exhibit 36-2A?

24  A   Yes.

25  Q   And you've previously explained to us what that

4182

1   reconciliation means; is that correct?

2   A   That's correct.

3   Q   For the records that were available to you and in

4   connection with this reconciliation, did you show the amount of

5   monies that went into Dr. Ruan's accounts connected with these

6   documents, these SB&T and Wells Fargo and Community Bank

7   accounts of his?

8   A   Yes.

9   Q   From the spreadsheets and from the pivot table?

10   A   Yes.

11   Q   How much is that?

12   A   $10,519,552.98.

13   Q   Did you determine that during the period of the conspiracy

14   some monies were moved back and forth between these accounts?

15   A   Yes.

16   Q   Does this listing of accounts show all of the accounts of

17   Dr. Ruan's or just the selected ones that you have identified

18   in this exhibit?

19   A   Just the ones identified in this exhibit.

20   Q   Did you include as well in your exhibit statements in

21   support of your summary chart?

22   A   I did.

23   Q   And the financials for Ruan are all records from his

24   various bank accounts but not including all of his bank

25   accounts; is that --

FBI SA AMY WHITE - DIRECT BY MS. GRIFFIN

4183

1   A   That's correct.

2   Q   -- correct?

3        Agent White, you've testified about two wire transfers

4   that you've shown us for the purchase of -- one for the

5   purchase of a Lamborghini and one for the purchase of an Audi

6   Spyder.  Were both of those wire transfers in excess of

7   $10,000?

8   A   Yes.

9   Q   Did both of those come from Ruan's XLR account at SB&T

10  Bank?

11  A   Yes.

12  Q   Have you also had the opportunity to determine that as to

13  patient Greathouse that her file reflects that she received

14  certain drugs on certain dates?  Did you get to review those?

15  A   No.

16  Q   No?

17  A   I wasn't asked to.

18  Q   And in connection with your summary documents, if a record

19  contained a deposit slip, you included the deposit slip with

20  the document?

21  A   If it was available, I did.

22  Q   And if it wasn't available, you just had the front and the

23  back of the check?

24  A   Or just the front.  A lot of times the checks were

25  deposited electronically, so there's nothing on the back.

1  Q   What do you mean by being deposited electronically?

2  A   It just means that they were electronically scanned in and

3  then transmitted to the bank for deposit.

4  Q   Now, I have shown you the C&R Pharmacy records and I'm

5  going to show you the Physician Pain Specialists of Alabama

6  records.  Did you have someone prepare a spreadsheet for the

7  PPSA Wells Fargo Bank account ending 6971?

8  A   Yes, I did.

9  Q   From that did you do an analysis based on the spreadsheet

10 and various bank documents?

11 A   Yes, I did a summary table.

12         MS. GRIFFIN:  Your Honor, pursuant to a stipulation,

13 we would move to admit Government's Exhibit 36-3.

14         THE COURT:  All right.  Mark it in.

15     (Government's Exhibit 36-3 was entered into evidence.)

16         MS. GRIFFIN:  And may we publish it to the jury?

17         THE COURT:  Yes.

18 BY MS. GRIFFIN:

19 Q   Agent White, is this the summary binder you prepared for

20 Physicians Pain Specialists of Alabama, Wells Fargo Bank

21 account 6971?

22 A   Yes, it is.

23 Q   Does it too contain various tabs with supporting

24 documentation for your summary chart?

25 A   It does.

FBI SA AMY WHITE - DIRECT BY MS. GRIFFIN

1  Q   I'll show you the first page of Wells Fargo account 6971,

2  account reconciliation, and ask if you can tell us from

3  November the 1st of 2011 through June the 30th of 2015 what was

4  deposited in this PPSA account?

5  A   $35,363,479.18.

6  Q   Did you break down or did you compile payments made to

7  various individuals from the PPSA account?

8  A   Yes.

9  Q   Have you compiled that summary in a 24-page summary of

10 debits?

11 A   I don't remember how many pages there were, but I did put

12 it together in a summary.

13 Q   What date range is this?  (Indicating.)

14 A   October 1st of 2011 to June 30th of 2015.

15 Q   And this came from the Wells Fargo documents produced by

16 Wells Fargo for the PPSA account ending in 6971?

17 A   Yes.

18 Q   Further, you have supporting documents for the statement;

19 is that right?

20 A   That's correct.

21 Q   Did you show payment to C&R Pharmacy, LLC?

22 A   Yes.

23 Q   In what amount?

24 A   $1,130,205.29.

25 Q   Did you show payments to E*Trade from PPSA?

FBI SA AMY WHITE - DIRECT BY MS. GRIFFIN

```
 1   A   Yes.
 2   Q   Do you know what E*Trade is?
 3   A   It's an investment account.
 4   Q   And what amount was paid as to the investment account from
 5   PPSA to E*Trade?
 6   A   $250,000.54.
 7   Q   Did you show what was paid to John Patrick Couch?
 8   A   Yes.
 9   Q   By check number, date, and amount?
10   A   Yes.
11   Q   Did you total what was paid to John Patrick Couch during
12   that period of time?
13   A   Yes.
14   Q   Could you tell us that number, please?
15   A   $3,238,067.83.
16   Q   From the Wells Fargo PPSA account did you show what was
17   paid to JPC Properties, LLC?
18   A   Yes.
19   Q   Is that Dr. Couch's LLC?
20   A   Yes.
21   Q   What amount did you show as the total?
22   A   $3,900.
23   Q   Did you also show amounts paid to Physicians Compounding
24   Solutions from PPSA, Wells Fargo account 6971?
25   A   Yes.
```

FBI SA AMY WHITE - DIRECT BY MS. GRIFFIN

1   Q   Whose company is Physician's Compounding Solutions?

2   A   Defendant Couch.

3   Q   And the total paid to him from PPSA?

4   A   $484,218.

5   Q   Did you total the monies paid to Ruan Companies?

6   A   Yes.

7   Q   Whose companies were these?

8   A   Defendant Ruan.

9   Q   Did you list the item, the date, and the amount of the

10  check?

11  A   I did.

12  Q   Did you compile a total paid to Ruan Companies?

13  A   I did.

14  Q   Based on the records; is that right?

15  A   That's right.

16  Q   How much?

17  A   $500,787.77.

18  Q   500,787.77?

19  A   Sorry.  Yeah.

20  Q   I show you two pages that shows payments to RXL, LLC.  Do

21  you know whose company this is?

22  A   Defendant Ruan's.

23  Q   Does it show a check number, a date, and an amount paid to

24  the Defendant Ruan?

25  A   It does.

FBI SA AMY WHITE - DIRECT BY MS. GRIFFIN

```
 1   Q   On the second page of this summary, does it show the total

 2   paid to XLR, Dr. Ruan's company, during the time that you had

 3   available records?

 4   A   $178,700.

 5   Q   Beginning on page 20 at the bottom, do you show payments to

 6   Xiulu Ruan?

 7   A   Yes.

 8   Q   By date, check number, and amount?

 9   A   Yes.

10   Q   Does that continue on page 21 --

11   A   Yes.

12   Q   -- of your report, your summary?

13   A   It does.

14   Q   And does it contain a total on page 22 of your summary?

15   A   Yes.

16   Q   Total for Xiulu Ruan?

17   A   $3,211,764.03.

18   Q   Does it also contain a total for XLR Properties -- excuse

19   me -- XLR Properties, LLC?

20   A   Yes.

21   Q   And is that -- in what amount?

22   A   $9,079.

23           MS. GRIFFIN:  One moment, Your Honor.

24           THE COURT:  All right.

25   BY MS. GRIFFIN:
```

FBI SA AMY WHITE - DIRECT BY MS. GRIFFIN

1  Q   Did you further compile a summary of credits to C&R

2  Pharmacy -- excuse me -- to the PPSA Wells Fargo Bank account

3  ending in 6971?

4  A   Yes.

5  Q   Did it show who the check was from?

6  A   Yes.

7  Q   And the credit amount?

8  A   It did.

9  Q   You have selected some of these to highlight; is that

10  correct?

11  A   You asked me to highlight some specific ones, yes.

12  Q   On page five of that summary do you show incoming money

13  from C&R Pharmacy, LLC?

14  A   Yes.

15  Q   And the date range is October of '11 to June 30th of '15?

16  A   Yes.

17  Q   In what amount?

18  A   $512,314.79.

19  Q   So you found that C&R Pharmacy had paid the doctors

20  individually and had paid money to PPSA?

21  A   Yes.

22         MS. GRIFFIN:  One moment, Your Honor.

23  Q   In addition to some of the sums, did you show payments from

24  Industrial Pharmacy Management to PPSA?

25  A   Yes.

1   Q   And what was the total for that amount?

2   A   18,000.

3   Q   And that was a deposit into the account; is that right?

4   A   That's right.

5         MS. GRIFFIN:  One moment, Your Honor.

6     (A discussion was held off the record between government

7   counsel.)

8         MS. GRIFFIN:  Your Honor, that's all I have of this

9   witness at this time.

10        THE COURT:  Mr. Essig?

11        MR. ESSIG:  Yes, Your Honor.  It's going to take a

12  couple of minutes.

13        THE COURT:  All right.

14                    CROSS EXAMINATION

15  BY MR. ESSIG:

16  Q   Good morning, Ms. White.

17  A   Good morning.

18  Q   I think as you know, I'm Brandon Essig.  I'm one of

19  Dr. Couch's attorneys.

20  A   Yes.

21  Q   Good to see you this morning.  I want to follow up on some

22  of the questions that Ms. Griffin asked you.  So the first

23  thing I wanted to do was I just wanted to clarify.  This

24  investigation was a dual investigation by the FBI and the DEA;

25  is that correct?

4191

```
 1   A   Correct.  It was a joint investigation.

 2   Q   And in this case the lead DEA agent in the case was Agent

 3   Burt; is that correct?

 4   A   That's correct.

 5   Q   And you were the lead FBI Agent?

 6   A   Correct.

 7   Q   So as the lead FBI agent on this case, you supervised the

 8   FBI's investigation all the way up from the beginning of the

 9   investigation through being in the courtroom and trying the

10   case since last month?

11   A   It was actually started by another FBI agent --

12   Q   Okay.

13   A   -- who is no longer in the division.

14   Q   And as part of your responsibilities, you stated, I think,

15   on direct examination that when the search warrants were

16   conducted --

17   A   Yes?

18   Q   -- you were the agent who filled out the affidavit to get

19   that search warrant started; is that correct?

20   A   Yes; correct.

21   Q   And in this case there were three search warrants that were

22   done; is that right?

23   A   There were either three or four.

24   Q   Okay.  All right.

25   A   Yeah.
```

FBI SA AMY WHITE - CROSS BY MR. ESSIG

1  Q   And, well, I guess for in terms of what the jury has heard

2  about during the course of the trial, there was a search

3  warrant done at each clinic location; is that correct?

4  A   Right; yes.

5  Q   And for the C&R Pharmacy which was colocated with the

6  Airport location, was there a separate search warrant for C&R?

7  A   Yes.

8  Q   Okay.  So we had three search warrants for all three

9  places?

10  A   Correct.

11  Q   And in the course of drafting the affidavit and getting the

12  search warrant done, I guess you were aware of all the

13  investigative steps that had been taken at that point in time;

14  is that right?

15       MS. GRIFFIN:  Your Honor, we object.  This is beyond

16  the scope of direct.

17       THE COURT:  Yes.

18       MR. ESSIG:  Your Honor, these are foundational

19  questions that I'm trying to ask at this point in time of Agent

20  White.

21       THE COURT:  Well, let's stick to whatever she

22  testified about on direct.  All right?

23       MR. ESSIG:  Yes, ma'am.

24  Q   Now, Agent White, the point I'm trying to make is that

25  leading up to this investigation is that this was a case where

1      the FBI spent a lot of time developing information about the

2      practices of Dr. Ruan and Dr. Couch prior to conducting the

3      search warrant; is that correct?

4                MS. GRIFFIN:  Your Honor, object to the relevance.

5                THE COURT:  Sustained.

6      BY MR. ESSIG:

7      Q    Agent White, during the course of your investigation did

8      you or your agents have an opportunity to observe the day-to-

9      day practice and activity of PPSA?

10               MS. GRIFFIN:  Object to the relevance, Your Honor.

11               THE COURT:  Sustained.  It's beyond the scope of

12     direct.

13               MR. ESSIG:  Yes, ma'am.

14     Q    Agent White, during the course of this case on direct

15     examination you just admitted essentially all of the financial

16     records for PPSA for the entire time period charged in the

17     indictment; is that correct?

18     A    That were charged in the indictment, yes.

19     Q    Yes, ma'am.  And that's from 2011 through 2015; is that

20     correct?

21     A    That's correct.

22     Q    And the amounts of money that the jury saw for both PPSA

23     and the C&R Pharmacy, the amounts of money that those two

24     entities were bringing in were significant amounts of money; is

25     that right?

4194

 1   A    In my opinion, yes.

 2   Q    I mean, I think for both of them the approximate figure was

 3   somewhere around 35 to 36 million dollars?

 4   A    Yes.

 5   Q    But I think, as the jury saw and as your charts showed,

 6   that that 35 to 36 million dollars did not represent the profit

 7   of the two businesses; is that correct?

 8   A    No.  It was based On the bank records.

 9   Q    And you know from your investigation in this case, from

10   writing the search warrant affidavit, from reviewing

11   surveillance logs done by the agents, that these were both

12   sophisticated, very involved operations; is that correct?

13            MS. GRIFFIN:  Your Honor, it's beyond the scope of

14   direct and we would object.

15            THE COURT:  Sustained.

16            MR. ESSIG:  Your Honor, I'm trying to put the numbers

17   that are before the jury in context.

18            THE COURT:  I know.  But your basis for that question

19   included stuff that she had no testimony about on direct.

20   BY MR. ESSIG:

21   Q    Now, Ms. White, you're aware that PPSA, that the two

22   clinics that they operated, that both of those were essentially

23   full-service clinics?  Are you aware of that fact?

24            MS. GRIFFIN:  Objection again, Your Honor, as to

25   foundation through this witness and outside the scope of

1  direct.

2        THE COURT:  Sustained.

3  BY MR. ESSIG:

4  Q   Ms. White, you are aware that PPSA, through your

5  investigation in this case -- doing the search warrant,

6  reviewing surveillance logs -- that they had lots of employees?

7        MS. GRIFFIN:  Objection, Your Honor.

8        THE COURT:  There has been no testimony about

9  surveillance logs by this witness.  So base your questions on

10  what she's testified about.

11  BY MR. ESSIG:

12  Q   Agent White, are you aware through your investigation that

13  PPSA employed a lot of people?

14        MS. GRIFFIN:  Objection, Your Honor.  It's the same

15  question.

16        THE COURT:  Where are you going with this?  Come to

17  side bar, if you will.

18     (At the side bar, jury not present.)

19        MR. ESSIG:  Judge, when we ask her questions, we get a

20  lot of objections to foundation.  And what I am trying to do is

21  I just want to ask her about the money that PPSA is spending

22  versus the amount of earning, put some context to the

23  numbers.  So I just want to establish they have a lot of -- we

24  have a lot of employees, we have a lot of --

25        THE COURT:  Isn't all of that in the records that

```
 1    she -- the payments out?

 2              MR. ESSIG:  I mean, yeah, the payments out.  But I

 3    mean there's -- I mean, again, what I'm trying to do is set

 4    some foundation in order to be able to ask her those questions.

 5              THE COURT:  Well, you can ask them from the records, I

 6    mean.  But asking about her knowledge of PPSA, she didn't

 7    testify anything about her knowledge other than what is

 8    directly in those records.

 9              MR. ESSIG:  I mean, she testified that she did the

10    search warrant, she was the lead agent in the case.

11              THE COURT:  That's all.  But nothing substantive.  So

12    let's just stick to the records that she introduced.

13              MR. ESSIG:  Okay.

14         (In open court, defendants and jury present.)

15    BY MR. ESSIG:

16    Q   Ms. White, one of the things you did do, that you

17    personally did in preparation for your testimony here today, is

18    you reviewed all of the financial records for the businesses;

19    is that right?  Is that correct?

20    A   I reviewed the spreadsheets that were prepared from all of

21    the bank statements.

22    Q   Okay.  And so based on that review, that you have knowledge

23    of -- a general knowledge at least -- of the expenditures and

24    the earnings of PPSA and C&R Pharmacy; is that correct?

25    A   Yes.
```

4197

```
1    Q   And for those businesses, I mean, you saw that they had a
2    substantial payroll; is that correct?
3    A   They had a payroll.  I don't know what you mean by
4    substantial.
5    Q   Well, they had a lot of employees that they paid; is that
6    correct?
7    A   I believe that's correct.  Yes.
8    Q   And those employees included nurses, nurse practitioners,
9    MAs, or medical assistants; is that correct?
10           MS. GRIFFIN:  Your Honor, objection.  That's not
11   referenced in the records that she reviewed.  There's no
12   foundation.
13           THE COURT:  Well, if she doesn't know, she can say she
14   doesn't know.
15   A   That was not reflected in the bank records.  They used a
16   payroll service and I saw dollar amounts that went to the
17   payroll service rather than to individual people.
18   BY MR. ESSIG:
19   Q   Okay.  I understand.
20           MS. GRIFFIN:  Your Honor, I object to him responding.
21           THE COURT:  That's all right.  Let's just get on with
22   this.  Okay?
23           MR. ESSIG:  Yes, ma'am.
24   Q   Now, the point I want to make, Agent White, is when we look
25   at these numbers and the numbers that we look at and we look at
```

4198

```
 1   the costs that both PPSA and C&R Pharmacy had, they were
 2   expensive places to operate; isn't that true?
 3   A   I suppose that's true.
 4   Q   I mean, they each had debits, which is the money that comes
 5   out of them; isn't that right?
 6   A   They did have debits, yes.
 7   Q   And they each had debits for the time period that you
 8   looked at in excess of 35 million dollars; isn't that correct?
 9   Isn't that what the records show?
10   A   The records do show that, yes.
11   Q   Now, I want to ask you also, on the billing records that
12   you looked at -- and I think you testified on direct that you
13   looked at billing records for every single year except 2013?
14   Or you charted billing records?
15   A   You're talking about the out-of-office billing?
16   Q   Yes, ma'am.
17   A   That's correct.
18   Q   And why did you not do 2013?
19   A   Because as we got closer to time for the trial to begin,
20   the year 2013 was rather large, there were numerous dates that
21   needed to be scheduled out.  So in talking with the U.S.
22   Attorney's Office, we agreed that we had already established a
23   pattern by looking at 2011, 2012, and then the back end, 2014
24   and 2015, and that that pattern having been established was
25   sufficient.
```

4199

1  Q  Okay.  Understood.  Now, in the records here -- and

2  Ms. Griffin went through this with you on direct -- that these,

3  these dates, what you did is you went through, you identified

4  from the attendance records at the clinic, based on those

5  attendance records, the time that they reflect that Dr. Couch

6  was out of the office; is that right?

7  A  Yes.  You're talking about the blocked minutes?

8  Q  Yes, ma'am.

9  A  Yes, sir; that's correct.

10  Q  And is that blocked minutes, when you look at that in the

11  records, that just shows Dr. Couch -- the record reflects that

12  day he was out for 540 minutes?

13  A  It looked like whoever was doing the scheduling had typed

14  that in so no one would schedule patients during that time.

15  Q  Okay.  And for those dates you don't know how those minutes

16  are arrived at, do you?

17  A  I do not, no.

18  Q  Did you gather an understanding of how they do their

19  attendance schedule or anything like that in the course of the

20  process?

21  A  No, did not.

22  Q  And I think you testified on direct, too, that these are

23  what the records show.  You wouldn't know and you wouldn't have

24  any knowledge of whether Dr. Couch was actually in the office

25  for a portion of some of these dates?

1   A   No, I would have no way of knowing that.

2   Q   And then when we look over here and we go to the right, for

3   the amounts that were billed during the time that Dr. Couch was

4   out, explain to me how you determined that.

5   A   I ran a billing report for each day that's listed on this

6   summary.

7   Q   Uh-huh?

8   A   And then I used the totals on the billing report to

9   calculate the totals you see here.

10  Q   And the billing report, where did that come from?  Did that

11  come from the Greenway system?

12  A   The Greenway system, yes (nodding head affirmatively).

13  Q   And what do these numbers represent?  Do these represent

14  the numbers that were billed under Dr. Couch's NPI number?  Is

15  that correct?

16  A   Yes.  Greenway allows you to run a billing report for each

17  provider.  So these would have been -- these would have come

18  from billing reports for the provider listed as Defendant

19  Couch.

20  Q   And from your review of the Greenway system and your review

21  of these billing records, you were able to see and able to

22  determine that it wasn't Dr. Couch personally who was

23  submitting these bills; is that correct?

24  A   Correct.

25  Q   And you're aware that Greenway -- that's sort of a

4201

1  third-party program that the practice purchased for their

2  billing?  Are you aware of that fact?

3  A    That's right; yes.

4  Q    And did you determine during the course of your

5  investigation and your review of these billing records and

6  these numbers that this system was set up and operated by

7  employees there at the practice?  Is that right?

8  A    That's my understanding, yes.

9  Q    And Dr. Couch didn't participate in that day-to-day -- day-

10 to-day process, did he?

11 A    That's correct; yes.

12 Q    And, Agent White, when we look at these numbers here over

13 on the right-hand side, these total numbers that coincide with

14 the minutes Dr. Couch was out of the office, there's a lot of

15 information that's included within that total figure?

16 A    Yes, that's why I included the actual billing reports and

17 the schedules in my binders, so if there was a question about

18 what makes up these numbers, you could turn to those and look

19 at them.

20 Q    And I guess the point is this number here is not the profit

21 to the clinic on the day that these services are rendered; is

22 that right?

23 A    That's the total amount billed.

24 Q    Okay.  And going back to the question that I asked about

25 your knowledge of the employees there, these billing services

1   would include things that the employees were doing --

2   urinalyses, if those were done; is that right?

3   A   Yes.  And those billing reports will show, it's broken down

4   by who provided the service.  So if it was Justin Palmer, it

5   would list his name.  If it was Stacy Madison, it would list

6   her name.

7   Q   Okay.  And there's a lot of services being performed at the

8   clinic by a lot of employees that are encompassed within that

9   number?

10  A   That's correct.

11  Q   What I don't want to do, Agent White, is I don't want to go

12  back through all these numbers.  But as I recall on direct,

13  these charts and these summaries that Ms. Griffin showed you,

14  they are essentially the same for every year; is that right?

15  A   Correct; yes.

16  Q   And so the analysis, or the questions that I just asked you

17  about what they represent, the fact they don't represent profit

18  and they represent cost of the services, that's going to be

19  true for all charts and all years; is that right?

20  A   Yes.  Everything would be consistent, yes.

21          MR. ESSIG:  Okay.  Judge, now would be a good time to

22  take a break.

23          THE COURT:  Are you hungry?

24          MR. ESSIG:  Well, I know I'm getting close and I don't

25  want to start a new line.

FBI SA AMY WHITE - CROSS BY MR. ESSIG

4203

```
 1              THE COURT:  That's okay.  Ladies and gentlemen, we
 2    will go ahead and break for lunch now.  Leave your pads on your
 3    chairs.  Do not discuss the case over the lunch break.  Be
 4    downstairs in the jury assembly room at 1:15, ready to be
 5    called back up.  We're in recess.
 6         (A recess was taken at 11:59 a.m.)
 7         (Afternoon session, 1:15 p.m., in open court, defendants
 8    and jury present.)
 9              THE COURT:  All right, Mr. Essig.
10              MR. ESSIG:  I'm full now, Your Honor.
11              THE COURT:  I'm glad to hear it.
12    BY MR. ESSIG:
13    Q   Agent White, starting back where we left off, I wanted to
14    start a new line of questioning with you.  And what I want to
15    show you is -- this is Government's Exhibit 34-1 and these are
16    the pump refills; is that right?
17    A   Yes, sir.
18    Q   That you found?
19    A   Yes.
20    Q   And just so we're clear, these pump refills are going to
21    match out-of-office time from PPSA's internal attendance
22    record; is that right?
23    A   Correct; yes.
24    Q   Now, are you aware -- well, first let me ask you this:  In
25    the report you created in 34-1, attached to that in this binder
```

4204

1   are various medical records from PPSA?

2   A   Correct.

3   Q   Matching those dates; is that right?

4   A   That's right.

5   Q   And those are -- these are all going to be Dr. Couch's

6   patients or Dr. Couch's records; is that correct?

7   A   Yes, they should be.

8   Q   And so this report was created in reliance on those

9   records; is that right?

10  A   Yes.  And again, I attached the actual records in case

11  there was a question about my summary.

12  Q   Yes, ma'am.  And it would include from that day all the

13  progress notes, any prescriptions, everything that was in the

14  system for that patient?

15  A   No, I believe it's just the pump refill notes.

16  Q   The only reason I'm asking is because there are some

17  prescriptions in here (indicating).

18  A   I think the reason I did that is because new prescriptions

19  were written on the days that he was out.  I think that's why I

20  would have included a prescription or a copy of something like

21  that.

22  Q   And you know for Dilaudid, that's one of the medicines that

23  was put into a pain pump; is that right?

24  A   That's correct.

25  Q   And you don't know; this could have been done for like

FBI SA AMY WHITE - CROSS BY MR. ESSIG

1  recordkeeping purposes to indicate what the patient received

2  that day?

3  A   I assume it was done because there was a pump refill.

4  Q   Okay.  But you know that with a pump refill they don't take

5  that prescription outside and go get that filled in the

6  pharmacy?

7  A   I would assume they wouldn't, no.

8  Q   And are you aware, have you come to learn, or do you know

9  one way or the other during the course of your investigation

10  whether the doctors at PPSA -- Dr. Ruan, Dr. Couch and Dr. Chen

11  also -- if they had an on-call rotation schedule?

12  A   That I don't know.

13  Q   And you don't know if they were subject to being called in

14  even on days they were off to do things like pump refills?

15  A   I don't know.

16  Q   I think that goes back to, again, your out-of-office charts

17  and records that are created based off PPSA's internal system

18  and what they show?

19  A   Correct.

20  Q   Also I wanted to ask you, Agent White, for Government's

21  Exhibit 34-7, these medical records that you looked at?

22  A   Oh, where we looked at the electronic signature times?

23  Q   Yes.

24  A   Yes.

25  Q   And there's a total of -- is it seven?  Is that right?  Do

1   you remember?

2   A   I would have to count.

3   Q   There's a total of nine.  If I represent nine, does that

4   sound about right?

5   A   I believe you, yes.

6   Q   And did you count the page numbers for any of these medical

7   records?

8   A   No, I didn't.

9   Q   Would you disagree if I represented to you that none of

10  them is longer than four pages?  Would you disagree with that?

11  A   I would not disagree with that, no.

12  Q   And when you looked at these and you looked at the times

13  that are entered on the back -- and what you were looking at

14  and what you were testifying to on the direct is when the

15  records were electronically cosigned by Dr. Couch; is that

16  right?

17  A   That's correct; yes.

18  Q   And the point that wasn't made, I think, on direct

19  examination was that not all of them but some of the records

20  would be electronically cosigned by Dr. Couch within seconds of

21  each other; is that right?

22  A   That's right.

23  Q   Now, I want to just ask you a little bit about some of the

24  information in these records.  Now, if we look at the top on

25  these progress notes -- and again, you've been in the Greenway

 1   system quite a bit; is that correct?

 2   A   I've been in there quite a bit, yeah.

 3   Q   And this progress note, sort of the biographical

 4   information at the top, that's pretty much the same for

 5   everybody?

 6   A   Yes.

 7   Q   Is that right?

 8   A   Yes.

 9   Q   And you would agree that as you go through these medical

10   records, there's a lot of abbreviations; is that right?

11        MS. GRIFFIN:  Your Honor, it's beyond the scope of

12   direct as to these records.

13        THE COURT:  Overruled.

14   A   Can you point out --

15   BY MR. ESSIG:

16   Q   Yes, ma'am.

17   A   -- what you're looking at?

18   Q   For example, here -- let me point on the screen -- like

19   here, the last drug screen, do you see that GC-MS test?

20   A   I do.

21   Q   Do you understand that to be an abbreviation?

22   A   Yes, I do.

23   Q   And down here for this patient it says they tried -- excuse

24   me -- NSAIDs?

25   A   Yes.

4208

1  Q   And you understand that to stand for nonsteroidal anti-

2  inflammatory drugs?

3  A   Yes.

4  Q   And that's like Advil, over-the-counter medications; is

5  that right?

6  A   That's my understanding, yes.

7  Q   And you see there Tylenol is mentioned here in this record;

8  is that correct?

9  A   Correct.

10 Q   And then it goes through and it talks about here the

11 medications that this person is currently prescribed from PPSA;

12 is that right?

13 A   Yes, it appears so.

14 Q   And then for the current treatment there's a summary there

15 that's about three and a half sentences long; is that correct?

16 A   Yes.

17 Q   And then if we go down to here for past medical history,

18 for most of these there's just a one-line description, would

19 that be fair to say?

20 A   Yeah, one or two words.

21 Q   All right.  Like for this one it talks about that there's a

22 degeneration of the cervical intervertebral disk?  Do you see

23 that?  (Indicating.)

24 A   I do see that, yes.

25 Q   And the date of onset is March 10, 2015?

1   A   Yes.

2   Q   But that doesn't give like a detailed MRI analysis or

3   anything like that, does it?

4   A   I don't see anything like that, no.

5   Q   Same thing here at the bottom for past surgical history,

6   there's nothing entered; is that correct?

7   A   Correct.

8   Q   And then we have a medication list?

9   A   Yes.

10   Q   And it lists the three medications there on the front page;

11   is that correct?

12   A   Right.

13   Q   And do you know too -- again, we talked about

14   abbreviations -- for F/U, or F/U neck pain, chief complaint,

15   do you understand that F/U stands for followup?

16   A   I assume that.  But I don't know if that's medical

17   terminology or -- I mean --

18   Q   Sure.  It doesn't say new patient, though, does it?

19   A   I don't see anywhere on there that says new patient, no.

20   Q   Then if we go over to the next page, here on the allergy

21   list there's nothing entered for this patient; is that right?

22   A   No.

23   Q   Same thing for social history, for married, it doesn't have

24   anything there; is that right?

25   A   Correct.

FBI SA AMY WHITE - CROSS BY MR. ESSIG

1    Q    Then there's one tobacco entry?

2    A    Yes.

3    Q    It says it's currently used every day; is that right?

4    A    That's right.

5    Q    And then this review of systems -- we've seen this, I

6    think, in every medical record we've seen -- is that whether

7    the symptoms or relevant or not to their condition, there's

8    always this denies or admits category; is that right?

9    A    I'm not sure about that.  I'm not sure if it's on every one

10   or not.

11   Q    Every one you've seen in this case, they all have that,

12   don't they?

13   A    I couldn't say for sure.

14   Q    And you don't know if that's something that's just

15   automatically there when the record is pulled up?

16   A    I'm told it is by some of our witnesses, but I don't know

17   for sure.

18   Q    And in this case this person is following up and the only

19   thing they admit in this review of systems is muscle pain, neck

20   pain, and shoulder pain; is that right?

21   A    That's what it looks like, yes.

22   Q    And then there's vital signs?

23   A    Yes.

24   Q    Do you see that?

25   A    I do.

4211

1    Q    And do you understand BP to stand for blood pressure?

2    A    I would assume that, yes.

3    Q    And then we've got temperature, body temperature, and

4    weight on there; is that correct as well?

5    A    Looks like it, yes.

6    Q    And again, if we go down here towards the bottom of the

7    second page of that record, there are some -- do you see where

8    there's some red print in there?

9    A    I do.

10   Q    Musculoskeletal conditions; is that right?

11   A    Yes.

12   Q    And the same thing for these other -- we've heard, again,

13   that most of the records we've seen have something about the

14   eyes and whether or not they are reactive to light bilaterally.

15   Again, is that one of the things you understand to be

16   prepopulated into the record, regardless of the patient?

17   A    I can't say that I've ever known what exactly is

18   prepopulated.  I know we had multiple witnesses tell us that

19   the forms that they use, such as progress notes, were

20   prepopulated to include certain examinations that would support

21   a 99214 CPT code.

22   Q    Yes, ma'am?

23   A    That specifically is what we were told.  We weren't told

24   anything about what part of the progress note was prepopulated

25   or what exactly it would say.

1  Q   I understand.  But you would agree with me, would you not,

2  for a patient here following up that a lot of these things

3  aren't relevant to this patient's treatment; is that right?

4          MS. GRIFFIN:  Objection, Your Honor, as to lack of

5  foundation.

6          THE COURT:  Sustained.

7  BY MR. ESSIG:

8  Q   Now, if we go down again, we talked about the red

9  writing.  And then we flip to the next page, which is the third

10  page of this document.  That's -- that's the last page; right?

11  There's nothing beyond that?

12  A   It looks like it, yes.

13  Q   And we can see here there's some diagnosis codes.  We've

14  heard about diagnosis codes; is that right?

15  A   Uh-huh, yes.

16  Q   And did you understand under assessment that's what those

17  are?

18  A   Do I understand those are diagnosis codes?

19  Q   Yes, ma'am.

20  A   I believe that's correct; yes.

21  Q   And then under that we have the plan and the instructions

22  given to the patient; is that correct?

23  A   That's what it says, yes.

24  Q   Now, Agent White, neither you or I are doctors or nurse

25  practitioners, are we?

1    A    I'm not.

2    Q    And it took us about three minutes to go through that

3    medical record; is that right?

4    A    I'll take your word for it.

5    Q    All right.  Now, you'll note too on this one that this

6    record shows that it was signed by Dr. Couch about an hour and

7    12 minutes after it was signed by Ben Clark, the nurse

8    practitioner; is that right?

9    A    I think that would be fair to say.

10   Q    And you recall on these nine exhibits that the government

11   showed you that in almost every circumstance, I think, with the

12   exception of one, that they were signed by Dr. Couch at least

13   an hour and sometimes several hours after they had been signed

14   by the nurse practitioner?

15   A    I'd have to say I didn't look at that.

16   Q    Would you have any reason to disagree with that?

17   A    I would have no reason to not believe you.

18   Q    Yeah.  And I'll represent to you at least one of them was

19   done just five minutes after Mr. Clark.

20   A    I have no reason to not believe you.

21   Q    Certainly the records speak for themselves; right?

22   A    Yes.

23   Q    We're both stuck with what they say; correct?

24   A    That's right.

25   Q    But all of the other ones, there was at least an hour in

FBI SA AMY WHITE - CROSS BY MR. ESSIG

1   between the nurse practitioner signing and Dr. Couch signing?

2   A   Okay.

3   Q   You don't have any reason to disagree with that?

4   A   I don't.

5   Q   Now, again, you've spent some time with the Greenway

6   system, haven't you?

7   A   Yes.

8   Q   And you are aware that you can actually pull up -- kind of

9   like when you're surfing the internet -- you can pull up

10  several Greenway files on your screen at one time; are you

11  aware of that fact?

12  A   I'm not aware of that.

13  Q   Okay.  Do you disagree that that's actually true?

14  A   It would be logical that you could.  With what I was doing,

15  I would run a single patient's report at a time.  So I never

16  had an occasion to pull up multiple ones at the same time.

17  Q   So for these entries, it could be that in those hours

18  between the nurse practitioner signing the record and Dr. Couch

19  signing the record, that in those hours he could actually

20  review multiple records and then go back and sign them all at

21  the same time?

22  A   I suppose that's possible.  I have no way of knowing.

23  Q   And you would not -- you're not aware of anything, based on

24  your knowledge of the Greenway system, that would keep him from

25  reviewing multiple records then going back later and signing

 1  them at the same time?

 2  A    No way of knowing, no.

 3          MR. ESSIG:  Just a moment.

 4          No further questions.

 5          THE COURT:  Mr. Knizley?

 6                      CROSS EXAMINATION

 7  BY MR. KNIZLEY:

 8  Q    Good afternoon, Agent White.

 9  A    Good afternoon.

10  Q    How are you?

11  A    I'm good.  How are you?

12  Q    Just fine.  Thank you.

13          Agent, you showed us Government's Exhibit 34-6 on

14  direct examination, which was entitled Xiulu Ruan's Billing on

15  Days Out of the Office.  Do you recall that?

16  A    Yes, sir.

17  Q    And this was a compilation that you had made; is that

18  correct?

19  A    That's correct.

20  Q    And as you have described to the jury, you were attempting

21  to determine what days the records may have indicated Dr. Ruan

22  was not in his office over a time frame?

23  A    Correct.

24  Q    Okay.  And could you tell the ladies and gentlemen of the

25  jury what the time frame you were looking at was, if you

1  recall?

2  A    I would have focused on our indictment period.

3  Q    Which would have been --

4  A    January --

5  Q    -- January 2011?

6  A    Correct.

7  Q    Until May 2015?

8  A    Correct.

9  Q    Approximately four years and five months?

10  A    Yes.

11  Q    And --

12  A    However, Greenway started in 2013.  So I was pulling from

13  the Greenway system, which would have started in 2013.

14  Q    Yes.  But you -- and that's for billing purposes; right?

15  A    Correct.

16  Q    But then again, and I'm really just -- maybe you can advise

17  me here -- if you see within 34-6 -- and this may have been

18  incorporated in Greenway later.  I don't know.  But the billing

19  date from 2011 --

20  A    That would have come Green -- every billing report that I

21  pulled came out of the Greenway system.

22  Q    Well, then, so for you and I both, our clarity, somehow the

23  old billing got into the Greenway after it got there?

24  A    Yes.

25  Q    So for the jury's information, it appears -- at least from

1    what I showed you right there --

2    A    Yes.

3    Q    -- that the billing for the entire indictment period

4    somehow is on the Greenway records that you had an opportunity

5    to look at?

6    A    I can't say that the whole thing is there, but I did find

7    what's in that binder in Greenway.

8    Q    And which was, again, so we'll know, what you and I were

9    talking about was the March 2011 --

10    A    Correct.

11    Q    -- entry and we know Greenway didn't come around till 2013?

12    A    Right.

13    Q    So someway at least these particular records got

14    incorporated in there?

15    A    Yes, sir.

16    Q    Okay.  Now, and to determine what times the records may

17    have reflected Dr. Ruan was not in his office during that four-

18    and-a-half-year period, there was daily logs you looked at,

19    daily schedule logs or daily --

20    A    Schedule, yes, sir.

21    Q    I'm not using the right word.  Daily reports?

22    A    I've only heard it called the schedule.  And I was told to

23    look at the schedule by numerous witnesses that we interviewed

24    during the investigation and they always just called it the

25    schedule.

FBI SA AMY WHITE - CROSS BY MR. KNIZLEY

1   Q   And I think at least what gets printed out, at the top it's

2   called daily schedule report?

3   A   Yes; that's correct.

4   Q   And these are the things you looked at?

5   A   Yes, sir.

6   Q   So many, many, many of them in what you were looking for,

7   if I'm correct, is things such as what you find here on the

8   daily schedule report for 3/23/11 -- and that's your

9   highlighting; right?

10  A   That's right.

11  Q   It says Dr. Ruan, blocked time, and this is one indicator,

12  things like this, that you used to determine whether Dr. Ruan

13  may have been out of the office?

14  A   That was the only way I could tell.  I mean, that was the

15  only indicator I really had, because I wasn't there.

16  Q   Well, from the log.  But you also had the airline tickets?

17  A   Airline tickets, emails.

18  Q   An email regarding a vacation to or a trip to Panama City?

19  A   And I think there may have been one to China.

20  Q   I think that was the same as the airline, was it not?

21  A   It could have been, it could have been.

22  Q   Okay.

23  A   And the bank records.

24  Q   Let's go through and we'll look at it in a minute.  And you

25  correct me if I say something wrong; okay?

4219

1    A    Okay.

2    Q    So, as determining whether Dr. Ruan, as I understood it,

3    was out of the office, you used this PPSA's Springhill office

4    daily schedule report, and I think there was one for Airport

5    after that?

6    A    (Nodding head affirmatively.)

7    Q    When it says that, that says -- what it says to you, like

8    it says Dr. Ruan's out.  So you figured he must not have been

9    there on that day; right?

10   A    That's what witnesses told me.

11   Q    And that's what the records also say; right?

12   A    And they told me I could go to the records and it would

13   support what they were telling me.

14   Q    And there it is right there; right?

15   A    Yes.

16   Q    And then we talked about the airline tickets, which is in

17   here?

18   A    Right.

19   Q    And we talked about the email to China associated probably

20   with the airline ticket?

21   A    Yes.

22   Q    And the email associated with at least reserving his unit

23   in Panama City, condominium unit, for a certain time frame?

24   A    Right.

25   Q    And from those you were able to make a compilation, the

 1    best that you could understand it, the times Dr. Ruan was out

 2    of the office?

 3    A    Correct.

 4    Q    And I'm going to take this loose so we can see it a little

 5    better.   From Government's Exhibit 34-6, I'm taking out the

 6    page that says at the top Ruan Billing While Out of Office;

 7    right?

 8    A    Correct.

 9    Q    And it looks like you've got five tabs here, over here;

10    right?   (Indicating.)

11    A    Correct.

12    Q    Is that the time frame blocks, if you will, that you

13    associated with him being out of the office?

14    A    Yes.

15    Q    And so this one is, of course, these two days -- three

16    days?   That's block tab one; right?

17    A    Right.

18    Q    The next one, one, two, is for one day, or at least one day that

19    he had something going on; right?

20    A    Right.

21    Q    Three, same day, was one day?

22    A    Right.

23    Q    Four, associated with two days?

24    A    Correct.

25    Q    Is that correct?

1    A    Uh-huh (positive response).

2    Q    And five is associated with two more -- well, two more days

3    over what looks like maybe a week-long time frame?

4    A    Yes.

5    Q    All right.  And for all the research you did -- and so we

6    remember what this means here, it says "schedule says."  That's

7    that daily schedule that we just looked at?

8    A    That's right.

9    Q    And it said "blocked off 555 minutes."  Now, you don't know

10   what that means, but that it just says -- that's what it says?

11   A    Right.

12   Q    And it also says, as we looked at a moment ago, "Ruan off"

13   on each one of these; right?

14   A    Correct.

15   Q    And two of them says he is actually out of the country?

16   A    That's right.

17   Q    And two of them says he's out of town.  Okay.  For these

18   time frames you were able to find some records of billing; is

19   that correct?

20   A    Correct.

21   Q    And that record came from where?

22   A    Greenway.

23   Q    And we looked back at Greenway and we saw that at least it

24   in part reached back into 2011?

25   A    Right.

FBI SA AMY WHITE - CROSS BY MR. KNIZLEY

1   Q   Okay.  Now, and I think when we were looking over

2   Dr. Ruan's -- excuse me -- Dr. Couch's similar records, you

3   didn't have the year 2013?

4   A   Correct.

5   Q   Now, as far as Dr. Ruan is concerned, you were able to

6   recover every -- well, you did analyze every year you were able

7   to look at, including 2013?

8   A   I looked at all the years for Dr. Couch as well.

9   Q   And I'm sorry.  I misspoke that.  You did look at it, but

10  you only brought to court because it was exemplary, the other

11  years were exemplary?

12  A   And it was a large volume year in 2013.

13  Q   Time frame -- excuse me.  Go ahead.  Say it again?

14  A   It was a large volume of travel for Dr. Couch in 2013.  So

15  instead of spending a lot of time on 2013, we decided that we

16  had enough to establish a pattern.

17  Q   But you did spend time on 2013 with Dr. Ruan?

18  A   Yes.

19  Q   Okay.  And as to Dr. Ruan, you brought us all the times

20  that you saw he was had out of the office and billed?

21  A   Correct.

22  Q   Okay.  And you told us, again, it was over a

23  four-and-a-half-year period; right?

24  A   That's right.

25  Q   Now, the billing for Dr. Ruan that you found in your

FBI SA AMY WHITE - CROSS BY MR. KNIZLEY

4223

```
 1   search -- first I'm going to ask you about the office visits.
 2   Okay?
 3   A   Okay.
 4   Q   Okay?  And we have an office visit here in March of 2011
 5   and it was a hundred bucks; right?
 6   A   Yes, sir.
 7   Q   A day later, $75; right?
 8   A   Yes, sir.
 9   Q   And one a day later for another $75?
10   A   That's right.
11   Q   That was in that first little group; right?
12   A   Right.
13   Q   And then we had three months later one for 75 and one for
14   170; is that right?
15   A   Right; uh-huh (positive response).
16   Q   And then that looks like it for office visits; right?
17   A   I believe that's right.  Yes.
18   Q   And if my math is correct, 175, 75, 75, 225, 325, looks
19   like about $495; right?
20   A   That sounds about right.
21   Q   Over a four-and-a-half-year period?
22   A   Yes.
23   Q   Might that have been attributed to a mistake in billing?
24   A   I would have no way of knowing.
25   Q   All right.  Now, if we looked at it close, we may get a
```

1    little better understanding.  But we know at least for office

2    visits over this time frame there are 475 -- $495 unaccounted

3    for?

4    A   What do you mean, unaccounted for?

5    Q   Well, when we say unaccounted for, we have -- over this

6    four-and-a-half-year time frame there are $495 billed under

7    Dr. Ruan's name where it appears he wasn't there.

8    A   Correct.

9    Q   And we want to figure out why that may have

10   happened.  Because we know generally every day he has 70-80

11   patients lined up?  Is that right?

12   A   That's what we're told by multiple witnesses.

13   Q   All right.  And did you go look at the records, these daily

14   logs, to sort of try to confirm that?

15   A   If they had 70 or 80 patients each time?

16   Q   If Dr. Ruan himself would have that many?  Dr. Ruan and his

17   NPs would have that many?

18   A   No, I didn't.

19   Q   Didn't take a look at that at all?

20   A   No.

21   Q   Okay.  But you did look at those dates he was out where it

22   said blocked time and there was nothing scheduled for Dr. Ruan,

23   was there?

24   A   Doesn't look like it, no.

25   Q   Okay.  Now, aside from the 475 -- $495, every other --

4225

 1 | let's look.  The rest of the charges on this date says pump;
 2 | right?
 3 | A   Right.
 4 | Q   And this date says pump?
 5 | A   Right.
 6 | Q   And just going down, all of them say pump, they are not
 7 | office visits; right?
 8 | A   Correct.
 9 | Q   And we know about spinal pain pumps; right?  In this
10 | practice that these physicians --
11 | A   That they did them?
12 | Q   -- implanted spinal pain pumps; right?
13 | A   Yes.
14 | Q   And those pumps have to be filled?
15 | A   Yes.
16 | Q   And a pump, it's actually something that goes into the
17 | spinal cord rather than something you ingest and gets into your
18 | bloodstream and deadens the pain?  It actually goes into the
19 | cord itself and that's the reason it has a lesser amount of
20 | medication that has to go in there right?
21 | A   I -- I don't know about that.  But my understanding is it
22 | goes into the spinal cord, yes.
23 | Q   And this is something that is in the patient's body?
24 | A   Yes.
25 | Q   And it would have to be refilled --

4226

1    A    Yes.

2    Q    -- if it's going -- and it's -- it's -- they don't control

3    the release of the medication; right?

4    A    Yes, that's my understanding.

5    Q    So as far as the pump patients are concerned, they can't

6    wait on the doctor, can they?

7    A    I wouldn't have any way of knowing that.

8    Q    Okay.  But if they are scheduled from the last time they

9    are to come back in in 60 days, if that's the time frame, to

10   get the pump refilled, they have to get the pump refilled or it

11   will run out, because they don't control it?

12   A    I have no way of knowing how they schedule their patients.

13   Q    Okay.  And so we're clear, other than the office visits we

14   talked about and the pump patients, there are no other charges

15   you saw for Dr. Ruan while the records indicate he was not

16   there?

17   A    Correct.

18   Q    You went over a number of records that were from various

19   accounts, including the PPSA account, the C&R, LLC, account and

20   Dr. Ruan's individual accounts that were accumulated; is that

21   right?

22   A    It is, except everyone gets confused; the C&R, LLC, and the

23   C&R Pharmacy, LLC, there were two different accounts.  So we

24   talked about the C&R Pharmacy, LLC, this morning.

25   Q    Okay.  Before I move on from those pump records, you

4227

1  certainly don't have any idea whether any other physicians were

2  in the office at the time of those visits that were indicated

3  that were billed for pumps for Dr. Ruan, do you?

4  A   I don't know.

5  Q   You don't know if Dr. Couch or Dr. Chen happened to be in

6  there or a supervisor or anyone else?

7  A   I don't, no.

8  Q   The PPSA records, Exhibit 36-3, have been introduced into

9  evidence and you have provided a copy of those to us.  And it

10  may be easier to deal with that than the big three-ring

11  binder.  But do you remember PPSA 36-3, which was the Wells

12  Fargo account reconciliation?  Do you recall that?

13  A   Yes.

14  Q   And so that the jury will understand what we're about to

15  talk about, that again is what, now?

16  A   That's the main PPSA clinic bank account.

17  Q   And that was the one that had the total deposits of 35

18  million dollars; right?

19  A   Correct.

20  Q   Now, we talked about the money in C&R Pharmacy.  I see here

21  one of your totals down here is for C&R Pharmacy, LLC, and this

22  is debits; right?

23  A   Correct.

24  Q   From our time frame of October 2011 to June 30th, 2015?

25  A   Right.

FBI SA AMY WHITE - CROSS BY MR. KNIZLEY

1  Q   We've got PPSA paying to or paying out, if you will,

2  $1,130,000 to the pharmacy?  Is that correct or not?

3  A   Yes, that looks like --

4  Q   C&R Pharmacy, and this is the total, I think; right?

5  A   Right.

6  Q   And if we look back over time, beginning in October 17,

7  2013 [sic], there's a small deposit of --

8          THE COURT:  It looks like 2011 is what --

9          MR. KNIZLEY:  I'm sorry.  And I apologize.

10  Q   2011; is that right.

11  A   That's right.

12  Q   $1,400.  A little bit later, a week, eight days later,

13  $25,000?

14  A   That's what it says, yes.

15  Q   And this is going out of PPSA into C&R Pharmacy, LLC?

16  A   Yes.

17  Q   And like a week later, another $30,000.  And do you see as

18  time goes on, as to August 2012, $50,000; August 24, 2012,

19  26,000; September 2014, 236,000; and as you see, these numbers,

20  197,000 in July 2014, on down for a total that you totaled up;

21  right?

22  A   Right.

23  Q   Did you make any determination as to why PPSA is paying

24  money into C&R?

25  A   I did not.

FBI SA AMY WHITE - CROSS BY MR. KNIZLEY

```
1   Q   Well, we also saw C&R paid money out to PPSA; right?
2   A   Correct.
3   Q   And I think we found out there -- do you recall the amount
4   of money they paid out to C&R?  About?
5   A   If you show me my spreadsheet, I could tell you.
6   Q   I was going to.  But I was trying to see if I could find
7   that number quickly.  If I find it, I'll get back to it.  Okay?
8   A   Okay.
9   Q   Apparently for some reason PPSA is paying C&R?
10  A   Looks like it.
11  Q   Do you know if they were keeping them afloat for a while,
12  if you recall?
13  A   I don't know.
14  Q   And then some other expenditures of -- again, it's out of
15  the PPSA account; right?
16  A   Right.
17  Q   And this is debits of PPSA; is that right?
18  A   That's right.
19  Q   Money they paid out.  And you summarized these, I believe,
20  did you not?
21  A   I did.
22  Q   And then we have a Blue Cross/Blue Shield summary of
23  $806,000 they paid out to Blue Cross/Blue Shield?
24  A   Correct.
25  Q   Do you have any idea why they were paying Blue Cross/Blue
```

FBI SA AMY WHITE - CROSS BY MR. KNIZLEY

```
 1   Shield?

 2   A   I don't.

 3   Q   Did you look into it in any way?

 4   A   No.

 5   Q   Still talking about debits -- and down here I didn't

 6   highlight it -- do you know why PPSA was paying -- remember our

 7   Greenway system we had talked about?

 8   A   Yes, sir.

 9   Q   And do you see where we paid $170,000 over that time frame

10   to Greenway; is that right?

11   A   Yeah, that looks like that's the same line.  Yes.

12   Q   Do we know why they paid that?

13   A   I'm assuming they were paying for the use of the system,

14   but I don't know.

15   Q   All right.

16   A   I'm not sure.

17   Q   And how about this $455,000 expenditure to Hagn Scientific.

18   Do you know what that expenditure was?

19   A   I do not know.

20   Q   And I'll show you on the next page -- what is this one

21   right here?  (Indicating.)

22   A   IRS tax payment.

23   Q   Yes, ma'am.  And how much is it?

24   A   $4,945,129.13.

25   Q   Now, that's PPSA paying it; right?
```

FBI SA AMY WHITE - CROSS BY MR. KNIZLEY

1   A   That's out of the main PPSA account, yes.

2   Q   So that's not going to be individual income tax paid by the

3   people that got income out of it, is it?

4   A   Unless --

5   Q   It's payroll taxes, isn't it?

6   A   Unless the company was paying their tax bill.  I don't

7   know.

8   Q   And you investigated this case thoroughly, didn't you?

9   A   I investigated what was charged, yes, sir.

10  Q   Okay.  And --

11  A   I don't believe there were any tax charges.

12  Q   Okay.  Did you get the income tax returns and that sort of

13  thing?

14  A   We got some of them (nodding head affirmatively).

15  Q   And did you see where the income tax was paid?

16          MS. GRIFFIN:  Your Honor, objection.  It's beyond the

17  scope of direct.

18          THE COURT:  Sustained.

19          MR. KNIZLEY:  I'll get off that subject, Judge.

20  Q   All right.  PPSA paid to the United States Government

21  $4,945,000 and $129 over that time frame, didn't it?

22  A   Say that again?

23  Q   (Indicating.)  Physicians Pain Specialists of Alabama --

24  A   Yes.

25  Q   -- paid to the United States Government in a tax payment,

1    according to your summary --

2    A    Yes?

3    Q    -- right?  $4,945,129.13?

4            MS. GRIFFIN:  It's been asked and answered, Your

5    Honor.

6            MR. KNIZLEY:  She asked me to repeat it and that's the

7    only reason I did.

8            THE COURT:  Well, you asked it before and you've

9    already talked about it, so let's move on.

10   BY MR. KNIZLEY:

11   Q    Above that, do you see this Intuit entry?

12   A    Yes.

13   Q    And PPSA paid, over your time period, $5,933,466 to this

14   entity?

15   A    Yes.

16   Q    Did you determine what that entity was?

17   A    I believe that was their payroll, but I'm not sure.

18   Q    It's QuickBooks, I think is what it's called.  And payroll,

19   apparently that's how much their payroll was over that time

20   period; right?

21           MS. GRIFFIN:  Your Honor, I object because it's beyond

22   the scope of direct.  She testified about the very specific

23   line items in connection with this.

24           MR. KNIZLEY:  Judge, we introduced the document.

25           THE COURT:  Yes, I overrule the objection.

1   BY MR. KNIZLEY:

2   Q   I'm sorry.  Could you explain to the jury what it was?

3   A   I believe that that was their payroll.

4   Q   Thank you.

5           THE COURT:  No thanking, Mr. Knizley.

6           MR. KNIZLEY:  I am so sorry.

7   Q   There's another entry to the United States Treasury; is

8   that correct?

9   A   That's correct.

10  Q   And that's where we paid our taxes; right?

11  A   Yes.

12  Q   Do you know what the $351,555 was over our time period?

13  A   I assume taxes.

14  Q   We talked about money going back and forth -- I think

15  Ms. Griffin asked you about that -- between accounts sometimes

16  and I saw on here that Physicians Pain Specialists of Alabama

17  P.C. paid to at least this account of Physicians Pain

18  Specialists, it looks like -- and that's a credit.  And I

19  didn't really figure out how that -- is that some other entity

20  that they paid too?  (Indicating.)

21  A   There were multiple accounts during our indictment

22  period.  So this likely would have been one of the other clinic

23  accounts that money was moved from one account into this 6971.

24  Q   All right.  Now, you had mentioned on the Government's

25  Exhibit 36-5, which was the C&R account -- do you recall?

FBI SA AMY WHITE - CROSS BY MR. KNIZLEY

1    A    Yes.

2    Q    And am I showing you the C&R account, the Wells Fargo

3    account ending in 7003?

4    A    Yes, sir, that's it.

5    Q    And you had indicated that there was money paid to Insys

6    Therapeutics, 5.5 million?

7    A    Yes.

8    Q    Do you know if that were the cost of the chemicals or the

9    medications themselves?  Do you know?

10   A    I can give you my opinion.

11   Q    If you -- I appreciate your opinion, but do you know?

12   A    I don't know for sure.

13   Q    Okay.  Now, I show you on that same sheet where Smartfill

14   was paid $9,155,000.  Do you know what Smartfill was?

15   A    There were multiple invoices from Smartfill.  It looks like

16   they were purchasing their drugs from there.

17   Q    Maybe a clearing house or something, a wholesaler of some

18   sort?

19   A    It looked like it.  But I don't know for sure.

20   Q    Could you tell from your investigation who the

21   pharmaceutical companies were that were going to the

22   wholesaler?

23   A    No.

24   Q    But over that time frame you see that's 9 million and Insys

25   was 5 million.  Did you see the other pharmaceutical payments

1   out during that time frame?

2   A   We can look at the rest of the spreadsheet and see.

3   Q   If it's in there, it's in there; right?

4   A   Yes, sir.

5   Q   And you also showed us what's marked as Government's

6   Exhibit 36-2A, and I believe that's volume two of Dr. Ruan's

7   account reconciliation; is that correct?

8   A   That's correct.

9   Q   And so do you recall what each of these accounts were

10  particularly, or were they just all accounts that happened to

11  be either Dr. Ruan's name or an entity which he controlled?

12  A   I'd have to look at the records to see how they were

13  titled, but he controlled all of them.

14  Q   Okay.  Now, and you showed us this figure where the total

15  credits to all six of those accounts totaled that much money;

16  is that right?  (Indicating.)

17  A   That's what was scheduled, yes.

18  Q   And you say scheduled --

19  A   That means it was taken from the bank records and put into

20  an electronic spreadsheet.

21  Q   And what does that represent, then, this 10.5 million?

22  A   It shows the time -- the date ranges listed here for all of

23  these accounts, we scheduled out these dollar amounts

24  (indicating).

25  Q   Okay.

1  A   Each one of these.

2  Q   From the earliest time, it looks to be 11/17/11; right?

3  A   For that account, yes.

4  Q   Earliest out of all of them; right?

5  A   Yes, sir.

6  Q   And the latest time of all of them appears to be 8/7/15;

7  right?

8  A   Looks like it, yes.

9  Q   So over that time frame you say total credits.  And

10  that's -- that's crediting total deposits; is that right?

11  A   That's correct; yes.

12  Q   Okay.  And I think the prosecutor asked you were there some

13  deposits and withdrawals back and forth; right?

14  A   Yes, inter-account transfers is the way I have them listed

15  on my spreadsheet.

16  Q   So what that would mean would be that maybe one of these

17  accounts would put money over in the other account?

18  A   Correct.

19  Q   And maybe that same other account may have put money back

20  in the other account?

21  A   Correct.

22  Q   And so this 10.5 million dollars, sometimes it's just the

23  same money from one account to another; right?

24  A   Yes, you could see that in -- you could see the total for

25  that in my spreadsheet.

FBI SA AMY WHITE - CROSS BY MR. KNIZLEY

4237

1  Q   And I think the total is more than just some money back and
2  forth, it's actually 4.4 million dollars back and forth; right?
3  A   Correct.
4  Q   So these total deposits -- and this is what you call in
5  your summary inter-account transfers, payments to self total;
6  right?
7  A   Yes, and that includes some of the business accounts as
8  well, not just his.
9  Q   But he paid to an account that was -- paid from an account
10 belonging to Dr. Ruan to an account belonging to Dr. Ruan, 4.4
11 million dollars?
12 A   If you look back at the spreadsheet above -- the pages
13 before this, you will see the account numbers that those
14 transfers came from.
15 Q   Such as the Ruan Companies account; right?
16 A   Correct.  See the column where it says account number?
17 That shows the account that it came from.
18 Q   Okay.  And that number applies to the Ruan Companies
19 account?  Do you know?
20 A   Correct.  Now, that was a transfer from Ruan Companies,
21 LLC --
22 Q   Okay.
23 A   -- to 9013.
24 Q   Okay.  And we don't know what Ruan Companies, LLC's, number
25 was?  From this document?

1  A   I'd have to go back and look at the -- at the bank records.

2  Q   If we take a look at these that you were pointing out, on

3  page six of that exhibit, here we've got transfers to Ruan

4  Companies and that's a debit, that's out of this 9013 account,

5  which is Community Bank; right?

6  A   Correct, correct.

7  Q   To the Ruan Companies account.  There's one for 20,000, one

8  for 14,000, and then one from another company, XLR, for 5,000,

9  and then Ruan Companies puts right back over in its own account

10 30,000?

11 A   Correct.  And you can see some of these accounts that I

12 have listed in the transaction description are not included in

13 this spreadsheet because they were not charged.

14 Q   And then we see the transfer to Ruan Companies, the 30,000

15 from Ruan Companies to the Community Bank account; right?

16 A   Correct.  And I should probably say I believe he had about

17 23 accounts that were active during this time frame.

18 Q   Okay.

19 A   So it could have gone to any one of those 23 accounts, not

20 necessarily another one that's indicted -- that's been

21 indicted.

22 Q   Well, for the moment we'll look at 9013, Community Bank

23 account, and Ruan Companies account.  Okay?  And we'll just go

24 over a few of them here.

25 A   Okay.

4239

1    Q   On 11/23 Ruan Companies -- was paid to Ruan Companies

2    20,000; right?

3    A   We don't know which Ruan Companies account it went to, but

4    it went to one of them, yes.

5    Q   Okay.

6    A   Correct.

7    Q   And I guess we could have put it on here, but we just don't

8    know; right?

9    A   Yeah, I don't know.  If it wasn't put into the -- if it

10   wasn't on the bank records and put into the spreadsheet, then

11   it wouldn't show up on my summary.

12   Q   The jury doesn't know what Ruan account, Ruan Companies

13   account, but one Ruan Companies account?

14   A   Correct.  Yes.

15   Q   So on one Ruan Companies -- from this Community Bank

16   account 20 goes out, 14 goes out, to a Ruan Companies account,

17   then -- Ruan Companies, LLC, account -- and 30 comes back in?

18   A   Correct.

19   Q   14 goes back out, 40 comes back in; right?

20   A   Correct.

21   Q   And we'll see these types of --  Ruan Companies, 50 goes --

22   from Ruan Companies comes in; right?

23   A   (Nodding head affirmatively.)

24   Q   Right?

25   A   Correct; yes.

4240

1  Q   Okay.  And 10 goes back out, 20 comes back in, and you can

2  see by looking at these records that money's coming in and out

3  of these accounts; right?

4  A   All kinds of money coming in and out, yes.

5  Q   And so the 4.4 million -- this 10.5 million, you know,

6  you're certain that 4.4 million is just his own money going

7  back and forth; right?

8  A   I don't agree with that.  You can see on my spreadsheet

9  there were numerous accounts that were being transferred either

10  to or from that are not included in that, that account

11  reconciliation.

12  Q   How did you describe it right here (indicating)?

13  A   If you -- if you go back to where you were just pointing

14  out, the highlighted lines --

15  Q   Yes, ma'am?

16  A   -- you'll see transaction descriptions that are not

17  included in the reconciliation.

18  Q   Let me ask you now how did you describe --

19  A   Inter-account transfers.

20  Q   And what's that right there?  (Indicating.)

21  A   "Payments to self."

22  Q   Total?

23  A   Total, total for the category, yes.

24  Q   And it's 4.4 million dollars?

25  A   Yes.

4241

1        MR. KNIZLEY:  That's all I have, Your Honor.

2        THE COURT:  Any redirect?

3        MS. GRIFFIN:  Briefly, Your Honor.

                        REDIRECT EXAMINATION

5    BY MS. GRIFFIN:

6    Q    Agent White, counsel for Dr. Couch asked you if all the

7    date ranges shown on your charts included the entire time of

8    the conspiracy charged?

9    A    Yes.

10   Q    Do they include just the time periods that are noted in

11   your summary charts?

12   A    Yes.

13   Q    For example, some of the records may not have started until

14   later in 2011 than January of '11?

15   A    Correct.  And as I said, there were -- each defendant had

16   about 23 accounts and there were five or six business accounts.

17   All of them were not open the entire indictment period.

18   Q    And one of the attorneys asked you about whether some money

19   had to be put in to support C&R Pharmacy; is that correct?

20   A    He did, yes.

21   Q    Do you know the approximate date that monies began to go

22   into C&R Pharmacy --

23   A    I don't.

24   Q    -- from sales of Abstral and Subsys?

25   A    I do not.

1  Q   Do you know whether that would have to be after they

2  started prescribing Abstral and Subsys?

3  A   I would assume.

4  Q   In connection with the moving of monies back and forth, you

5  identified various numbers over $10,000 that were being moved

6  back and forth --

7  A   Yes.

8  Q   -- in Dr. Ruan's account?

9  A   Yes.

10  Q   And you said there were approximately 20-some accounts?

11  A   Approximately 23 accounts.

12  Q   For Dr. Ruan?

13  A   Yes.

14  Q   Were some of those monies moved back and forth into the

15  State Bank & Trust account that he used to send the wire

16  transfers for the purchase of the Audi Spyder and the

17  Lamborghini?

18  A   Yes.

19  Q   Now, based on your training and experience, is the moving

20  of monies something you would look at as a forensic accountant?

21  A   Yes.

22  Q   Could you explain that to us?

23       MR. KNIZLEY:  Your Honor, I object to the lack of

24  foundation and relevance.

25       MS. GRIFFIN:  Your Honor, he went into all the movings

1   of monies back and forth and I think she's entitled to state

2   what she believes that pertains to.

3          MR. KNIZLEY:  Judge, I went over her own records.

4          THE COURT:  Well, I overrule the objection.  You may

5   testify.

6   A   It's something that we typically look for in

7   money-laundering investigations.  The purpose of money

8   laundering is to take illegal proceeds and conduct financial

9   transactions to make it look like it's legitimate income.  And

10  so typically in a money-laundering case you would see a person

11  open multiple accounts, usually in different business names

12  that appear to be unrelated businesses, and then in fact they

13  are taking proceeds from one activity or one business and

14  moving it around throughout those other accounts, appearing to

15  be unrelated when they in fact are coming from the same illegal

16  activity.

17  BY MS. GRIFFIN:

18  Q   In connection with the questions to you about payments over

19  5 million dollars to Insys --

20  A   Yes.

21  Q   -- you're aware Insys manufactured Subsys?

22  A   Yes.

23  Q   Are you aware that Insys was a manufacturer and not a

24  distributor?

25  A   Yes.

1    Q    Did you say Smartfill was a distributor?

2    A    I believe.  I'm not sure.

3    Q    And do you know whether Subsys was distributed through

4    Smartfill?

5    A    I do not know.  I assume, but I do not know.

6    Q    Now, the payments that Mr. Knizley identified from PPSA to

7    the United States Government and then to the IRS, do you have

8    any way of knowing from the records you reviewed whether those

9    were withholding payments, whether they were unemployment,

10   whether they were workers' comp, what type payments those were?

11   A    It was probably all of the above.

12   Q    You don't even know if they could have been for back taxes

13   or future taxes, do you?

14   A    I do not.

15   Q    In connection with the questions from Dr. Couch's counsel,

16   did you find any records in the records you reviewed from PPSA

17   about an on-call rotation schedule?

18   A    No.

19        (A discussion was held off the record between government

20   counsel.)

21          MS. GRIFFIN:  That's all I have of this witness, Your

22   Honor.  May she be excused?

23          THE COURT:  Yes, you may step down.

24          MR. BODNAR:  United States calls Sharon Byrd.

25                       SHARON BYRD

4245

```
1                      was sworn and testified as follows:
2              THE WITNESS:  Yes, ma'am.
3              THE CLERK:  Thank you, ma'am.  Please be seated.
4                          DIRECT EXAMINATION
5    BY MR. BODNAR:
6    Q   Good afternoon, Ms. Byrd.
7    A   Hello.
8    Q   Could you please introduce yourself to the jury?
9    A   I'm Sharon Taylor Byrd.
10   Q   And Ms. Byrd, how do you spell your last name?
11   A   B-Y-R-D.
12   Q   And Ms. Byrd, at some point did you become a patient at
13   PPSA?
14   A   Yes, sir.
15   Q   Can you -- tell the jury which doctor Were you going to
16   see, Dr. Ruan or Dr. Couch?
17   A   Dr. Ruan.
18   Q   And do you see Dr. Ruan here in the courtroom today?
19   A   Yes, sir.
20   Q   Could you please identify him for the record?
21   A   The man sitting right here on the end (indicating).
22   Q   And just because it's a typed record, can you describe one
23   thing he's wearing?
24   A   Glasses.
25              MR. BODNAR:  Let the record reflect she has identified
```

1  Dr. Ruan.

2  Q   Ms. Byrd, why did you start going to Dr. Ruan at PPSA?

3  A   I started having lower back pain and went to see Dr. Revels

4  and he did surgery and it really didn't help.  And he told me

5  that he could send me to someone; that he couldn't give me the

6  medication that would help me but he could send me to someone

7  that could.

8  Q   And approximately when was this that you got referred over

9  to PPSA?

10  A   I had my surgery in 2008 so I would say the end of that or

11  the beginning of 2009.

12  Q   And when you first started going to PPSA, did you see

13  Dr. Ruan during the office visits?

14  A   Yes, sir.

15  Q   Did that at some point change?

16  A   Yes, sir.

17  Q   Would you explain that to the jury, please?

18  A   Well, it got to being less frequent and then I only saw him

19  during procedures.

20  Q   What kind of procedures did you have done with Dr. Ruan?

21  A   They would call them -- let's see; epidural and facet.

22  Just different nerve pain shots.

23  Q   In general, were those injections of drugs into your back?

24  A   Yes, sir.

25  Q   And on those instances would you see Dr. Ruan?

1   A   Yes, sir.

2   Q   How about during the office visits later on after the

3   initial few?

4   A   No, sir.

5   Q   And what kind of insurance do you have?

6   A   Blue Cross/Blue Shield.

7   Q   Who was it that you were seeing during those office visits

8   after the fact?

9   A   Could I correct that?

10   Q   Yes.

11   A   I have Blue Cross/Blue Shield but my disability Medicare

12   kicked in too.  So I have both.

13   Q   Did you have both at that time?

14   A   Not when I first started, no, sir.

15   Q   What did you have when you first started?

16   A   Blue Cross/Blue Shield.

17   Q   Can you explain to the jury who was it that you would see

18   rather than Dr. Ruan during those later office visits?

19   A   Nurse practitioners.

20   Q   Do you remember which nurse practitioner?

21   A   I knew there was one named Matt and one named Sharon

22   Noland.  There were a few others, but I don't remember those.

23   Q   At any point did you raise the idea of possibly having

24   surgery on your back again?

25   A   Yes, sir.

1   Q   What, if anything, was advised of you at PPSA?

2   A   I asked would it be --

3           MR. ARMSTRONG:  Excuse me.  I would object unless she

4   can identify who it is she's getting this information from.

5   BY MR. BODNAR:

6   Q   Did somebody -- were you ever able to ask Dr. Ruan about

7   getting a surgery?

8   A   No, sir.

9   Q   And can you explain to the jury why was it that you weren't

10  able to ask Dr. Ruan that question?

11  A   I never saw him.  They say that if you see a nurse

12  practitioner, then you can get in and out faster.  If not, you

13  had a three- or four-hour wait.

14  Q   And how long were you already waiting at PPSA?

15  A   At least an hour to two.

16  Q   Since you couldn't see or ask that to Dr. Ruan, who did you

17  ask if whether you should get surgery for your back?

18  A   I'm not sure.

19  Q   Was it Dr. Ruan or was it one of the nurse practitioners?

20  A   It was one of the nurse practitioners.

21  Q   And what, if anything, was the response?

22          MR. ARMSTRONG:  Judge, I object.  It's hearsay.

23          THE COURT:  Overruled.

24  BY MR. BODNAR:

25  Q   What, if anything, was the responses to you?

```
 1   A    She -- I said:  Wouldn't it be better to take the
 2   medication than all of -- I mean, have surgery than all the
 3   medication?  And she said:  Oh, no, ma'am.
 4   Q    No, ma'am for what?
 5   A    To taking the medication.
 6   Q    As --
 7   A    I mean, the surgery.
 8   Q    In that it would be better for you to continue taking the
 9   medication instead of having surgery?
10   A    Yes, sir.
11   Q    Could you please explain to the jury what kind of
12   medication you were taking for your back?
13   A    At the end or in the beginning?
14   Q    In the beginning what were you taking?
15   A    In the beginning I started out with Lortabs and --
16   Q    Did you eventually move up to Opana?
17   A    Opana.
18   Q    What level of Opana were you taking?
19   A    I started at 10 and ended at 40.
20   Q    Do you know if 40 is the highest level of Opana?
21   A    I think it was.
22   Q    Do you have any breathing condition unrelated -- did you
23   have a breathing condition naturally before you started coming
24   in at PPSA?
25   A    Yes, sir.  I have asthma.
```

1   Q   What, if any, warnings were given to you about taking Opana

2   while you have asthma?

3   A   None.

4   Q   Did Dr. Ruan ever give you any warnings?

5   A   No, sir.

6   Q   Did any of the nurse practitioners ever give you warnings?

7   A   No, sir.

8   Q   Did you have any issues with your asthma when you were on

9   Opana?

10  A   Yes, sir.

11  Q   Could you explain that to the jury, please?

12  A   It kind of like slows all your breathing down when you take

13  a lot of the Opana.  And it's -- you know, you need to really

14  be able to breathe to get the air into your lungs, and it's

15  like it slows you down.

16  Q   What, if anything, did you do when you were having those

17  breathing issues?

18  A   Pardon me?

19  Q   What, if anything, did you do when you were having those

20  breathing issues?

21  A   I am under a pulmonary specialist.  I take Proventil and

22  Proair, stuff like that.

23  Q   Was there a point when Dr. -- when you were prescribed

24  Subsys, the spray?

25  A   Yes, sir.

4251

1   Q   Could you explain to the jury -- at what point were you

2   started to be prescribed Subsys?

3   A   After I was up to the 40 milligrams of Opana and the

4   Percocet 10s.

5   Q   What, if anything, did Dr. Ruan specifically tell you about

6   using Subsys?

7   A   I never saw him.

8   Q   Did anybody give you any warnings about Subsys?

9   A   Matt.

10   Q   And who is Matt?

11   A   He was one of the nurse practitioners.

12        MR. BODNAR:  And Your Honor, may I approach and show

13   the witness what's already been marked as Government's Exhibit

14   9-10?

15        THE COURT:  It's already in evidence?

16        MR. BODNAR:  This is already in evidence, Your Honor.

17        THE COURT:  Yes.

18   BY MR. BODNAR:

19   Q   Ms. Byrd, I'm showing you what's already been admitted as

20   Government's Exhibit 9-10.  Is this specifically -- is this one

21   of your prescriptions for Subsys?

22   A   Yes, sir.

23   Q   And how do you know it's yours?

24   A   It has my name on it.

25   Q   I'll show it so the jury can see on the box.

1          Ms. Byrd, is this what you identified as a box that

2   was your Subsys prescription?

3   A   Yes, sir.

4   Q   Is that your name right up there?  (Indicating.)

5   A   Yes, sir.

6   Q   Where were you filling your Subsys prescriptions?

7   A   At the pharmacy at the clinic where I went, Dr. Ruan's

8   clinic.

9   Q   What do you mean at a pharmacy of Dr. Ruan's clinic?

10  A   They had one at the back of it.

11  Q   At which location are you talking about?

12  A   At the one on Springhill.  No, I'm sorry; not Springhill,

13  the one on Airport.

14  Q   And is that C&R Pharmacy that's written up here?

15  (Indicating.)

16  A   Yes, sir.

17  Q   Do you know who or did you know who owned C&R Pharmacy?

18  A   Not when I first started using them, but then I did.

19  Q   And who did you come to learn or how did you come to learn

20  about the owners?

21  A   I figured out what the C&R was.

22  Q   What did you figure out it means?

23  A   I said Couch and Ruan.

24  Q   Do you recall how long you were being prescribed Subsys

25  for?  Was it a long period of time or a short period of time?

4253

```
 1   A   Short period of time.

 2   Q   Why was it that you only received it for a short period of

 3   time?

 4   A   They told me that I could only get it --

 5   Q   And who is "they"?

 6   A   It was Matt.

 7   Q   Okay.  What did Matt tell you?

 8   A   That I could only get it through that pharmacy and the

 9   insurance would pay it one time and they could waive the $500

10   deductible.

11   Q   And Ms. Byrd, did you have cancer?

12   A   No.

13   Q   Were you being treated for cancer pain?

14   A   No, sir.

15   Q   At PPSA?

16   A   (Shaking head negatively.)

17   Q   Were you using your Subsys when you were getting it?

18   A   No, sir.

19   Q   And explain that to the jury.  Why weren't you using your

20   Subsys?

21   A   Well, after I was being given so many medications, I

22   started reading all the packages that come with it.  And when I

23   read that, I said:  Well, I'm not sure of this.  So when I

24   first tried it, I tried it at home and called my cousin and

25   told her I was taking it and to check on me because I didn't
```

1    like the sound of it.  And I took it and I -- I really didn't

2    like the way it made me feel.

3    Q   Can you explain to the jury how did it make you feel taking

4    Subsys?

5    A   A lot worse than the Opana 40.  It was -- it kind of just

6    dulled your senses and your -- you know, it was just like you

7    were there.  And it was a very low breathing threshold.

8    Q   And with your already breathing issues did this cause you

9    concern?

10   A   Yes, sir.

11   Q   Did you stop taking your Subsys and not take everything

12   that was in this box?

13   A   Yes, sir.

14   Q   How did this box get to the DEA?

15   A   I brought it to them.

16   Q   Was that during an interview?

17   A   Yes, sir.

18   Q   Did you bring any other drugs with you to an interview with

19   the DEA?

20   A   Yes, sir.

21   Q   What drug was that?

22   A   Subsys.

23   Q   Well, this is the Subsys.  Did you bring any other drug?

24   A   I'm sorry.  The -- what is it?  Adderall or -- A-L-S --

25   Q   Was it a tablet that you put under your tongue?

SHARON BYRD - DIRECT BY MR. BODNAR

1   A   Yes, sir, and it dissolved.  Abstral.

2   Q   Was it Abstral?

3   A   Abstral yeah.

4   Q   Why were you put on Abstral?

5   A   Because I could only get the one prescription of the other

6   one.

7   Q   For the other one, do you mean the Subsys?

8   A   Yeah, the Subsys.

9   Q   Is that because your insurance wouldn't pay for it?

10  A   Yes, sir.

11  Q   When you were put on Abstral, what if any warnings did

12  Dr. Ruan specifically give you?

13  A   None.

14  Q   Did anybody in his practice give you any warnings about

15  Abstral?

16  A   No, sir.

17  Q   Who was the person that you were seeing at the time during

18  your office visits when you were on Abstral?

19  A   Matt.

20  Q   And is that the individual you referred to as Matt Bean or

21  was this the nurse practitioner?

22  A   Nurse practitioner, yes.

23  Q   Did you -- where did you fill your Abstral prescription?

24  A   At the C&R Pharmacy.

25  Q   And did you take all of your Abstral?

4256

1    A    No, sir.

2    Q    And why was that?

3    A    It was virtually the same medicine.

4    Q    So what was happening to you when you took Abstral?

5    A    The same.

6    Q    The same being what, Ms. Byrd?

7    A    As far as being out of it and really having problems with

8    the breathing and -- really not able to function.  And that was

9    the purpose of my taking it, was to get me out of a tight

10   situation.

11   Q    What do you mean by a tight situation?

12   A    If I was to go shopping and my leg was to go out on me

13   where I couldn't move it, then I would take it to get me back

14   to my automobile.

15   Q    And did you end up using all the Abstral that you were

16   prescribed?

17   A    No, sir.

18   Q    What did you do with the remainder of the Abstral?

19   A    I brought it to you -- to the D.A.

20   Q    After the raid at PPSA, what did you do at that point to

21   alleviate your back issues?

22   A    They were giving me 120 Percocet, so --

23   Q    Who was "they"?

24   A    The office at Dr. Ruan's.

25   Q    This is before the raid or after the raid?

1   A   Before the raid.

2   Q   Before the raid.  Okay.

3   A   Yes, sir.  So I was told when I first started going to

4   Dr. Ruan's that I had to take the medication that they were

5   giving me.

6   Q   Who told you that?

7   A   Dr. Ruan.

8   Q   Okay.

9   A   So I didn't take it, but I didn't want to be out of the

10  program so I had some left of the Percocet.

11  Q   Did you eventually go to have back surgery?

12  A   Yes, sir.

13  Q   Is that the surgery that you had -- type of surgery you had

14  requested or discussed about having when you were at PPSA?

15  A   I asked about having the surgery and they told me it was

16  better to take the medication.

17  Q   Who is "they" that said --

18  A   The nurse practitioners at Dr. Ruan's.

19  Q   But afterwards -- sorry.  Go ahead.

20  A   I'm sorry.  It was Sharon Noland right before they got shut

21  down, asked me had I asked for a second opinion.  And I told

22  her no.

23  Q   Second opinion about what?  What were you --

24  A   About having the surgery.

25  Q   Sorry.  Could you clear that up then with Sharon -- your

1  discussion with Sharon?

2  A   She asked me that --

3        MR. ARMSTRONG:  Judge, I'm going to object to what

4  Sharon Noland said as hearsay.

5        MR. BODNAR:  Your Honor, she's an employee.

6        THE COURT:  Yes, overruled.

7  A   She said -- we were talking and she asked me had I asked

8  for a second opinion as far as having surgery.  I said no,

9  ma'am.  I said:  I was told here -- I said:  You told me it was

10  better to take the medication.  She said:  Oh, no, I didn't.  I

11  said:  Well, it was one lady at this office.  Speaking as a

12  nurse practitioner, I had forgotten her name.

13  Q   And have you since had back surgery?

14  A   Yes, ma'am -- sir.

15  Q   And since your back surgery has that alleviated most of

16  your problems that you had, that you were going to PPSA for?

17  A   Oh, yes, sir.  It alleviated all the problems I went

18  for.  And -- but I still have a bad back.

19  Q   But are you taking Subsys for your back?

20  A   Oh, no, sir.

21  Q   Are you taking Abstral for your back?

22  A   No, sir.

23  Q   Are you taking Opana 40 for your back?

24  A   No, sir.

25  Q   What are you taking for your back now?

```
 1   A   I take Opana 10 in the morning and one late in the

 2   afternoon and a half a Percocet to a whole one.

 3   Q   How is the quality of your life now since you've had the

 4   back surgery versus the time period that you were taking these

 5   drugs at PPSA?

 6   A   A lot better.

 7   Q   Which is a lot better?

 8   A   Pardon me?

 9   Q   Which -- which time is a lot better?

10   A   When I had surgery, it's a lot better.

11   Q   So now it's a lot better?

12   A   Yes, sir, now it's a lot better.

13          MR. BODNAR:  One moment, Your Honor.

14       (A discussion was held off the record between government

15   counsel.)

16          MR. BODNAR:  Pass the witness, Your Honor.

17          THE COURT:  Mr. Armstrong?

18                        CROSS EXAMINATION

19   BY MR. ARMSTRONG:

20   Q   Hi, Ms. Byrd.  My name's Gordon Armstrong and I represent

21   Dr. Ruan.

22   A   Yes.

23   Q   I have a few questions for you.

24   A   Okay.

25   Q   You were just talking about the fact that you had -- I
```

SHARON BYRD - CROSS BY MR. ARMSTRONG

```
 1  guess at some time since May of 2015 you had had back surgery?
 2  A   Yes, sir, April of 2016.
 3  Q   So April of this past year, 2016?
 4  A   Yes, sir (nodding head affirmatively).
 5  Q   About a year after PPSA closed down?
 6  A   Yes, sir.
 7  Q   And who did that surgery?  Was that Dr. Revels who did
 8  that?
 9  A   Dr. Faircloth.
10  Q   So a different one than did your surgery the first time?
11  A   Yes, sir.
12  Q   Dr. Revels did your first surgery, your back surgery?
13  A   Yes, sir.
14  Q   And then Dr. Revels sent you to Dr. Ruan?
15  A   Yes, sir.
16  Q   Okay.  And then sometime thereafter you had your back
17  surgery with Dr. Faircloth?
18  A   Yes, sir.
19  Q   Now, you said you were currently -- you're currently taking
20  Opana and Percocet for your pain?
21  A   Yes, sir.
22  Q   And the Opana is kind of long-acting, throughout the day?
23  A   Yes, sir.
24  Q   Percocet is if you have some onset pain or what they call
25  breakthrough pain?
```

SHARON BYRD - CROSS BY MR. ARMSTRONG

1   A   Yes, sir.

2   Q   You can take that to kind of get you through that; right?

3   A   (Nodding head affirmatively.)

4   Q   Okay.  So you're still kind of having those moments where

5   the pain just kind of gets you?

6   A   Yes, sir.  What I had surgery for was a herniated disk.  I

7   have deteriorating disks.

8   Q   Right.

9   A   And arthritis.

10  Q   So you have problems with your back?

11  A   Yes, sir.

12  Q   And ever since -- and this goes back -- going on more than

13  10 years now you've had problems with your back; right?

14  A   Yes, sir.

15  Q   And bad enough to where 10 years ago in 2008 you had back

16  surgery the first time?

17  A   Yes, sir.

18  Q   Okay.  Now, Dr. Revels is an orthopedic surgeon at AOC,

19  Alabama Orthopedic Clinic; right?

20  A   Yes, sir.

21  Q   And when he referred you over to Dr. Ruan, he told Dr. Ruan

22  that you were suffering lumbar stenosis; correct?

23  A   Yes, sir.

24  Q   And that's when you have a narrowing of the space in your

25  lumbar spine, that's part of the problem?

4262

1    A   Yes, sir.

2    Q   That's causing the pain?  And you also had lumbar

3    spondylosis, do you remember that, when he -- that was what

4    Dr. Revels was treating you for?

5    A   Dr. Revels, when he did the surgery, he removed the

6    arthritis on the lower back.

7    Q   That's kind of -- you had like fractures in your low back,

8    in the bones in your low back?

9    A   Yes, sir.

10   Q   And he also diagnosed you with lumbar radiculitis which is

11   when you have pain that radiates down your spine into your low

12   back and down through your leg, you had that problem too;

13   right?

14   A   Yes, sir.

15   Q   And Dr. Revels had already tried some of these -- in

16   addition to the surgery had tried some of these facet blocks?

17   Do you remember the blocks that he did?

18   A   Yes, sir.

19   Q   And he did that at his office, there at his office?

20   A   Yes.

21   Q   Because they have those interventional machines as well;

22   right?

23   A   When Dr. Revels did the shots I think it was at another

24   facility over there by the Roadhouse on Airport.

25   Q   Wasn't it Dr. Hall -- that's at their other location.  They

4263

1    had two locations; right?

2    A   Yes, sir.

3    Q   And he sent you over to Dr. Hall?

4    A   Yes, sir.

5    Q   Which is his partner; right?

6    A   Yes, sir.

7    Q   To do the blocks?

8    A   (Nodding head affirmatively.)

9    Q   And he also took MRIs of your back and sent those MRIs with

10   what he had found from the MRIs, he sent those over to Dr. Ruan

11   too, right, as far as you know?

12   A   As far as I know.  I know I had MRIs at Dr. Ruan's office.

13   Q   But you also had them over at Dr. Revels' office too?

14   A   Yes, sir.

15   Q   And he's got an MRI facility right there on location;

16   right?

17   A   Yes, sir.

18   Q   And despite everything that Dr. Revels did, he just

19   couldn't stop the pain and the surgery didn't help; right?

20   A   Dr. Revels told me if he did surgery again, when he went

21   back in he would do everything; that meant screws and pins and

22   whatever had to be done.

23   Q   It would be a major surgery; right?

24   A   Yes, sir.

25   Q   Okay.  And you didn't want to have to have that if you

SHARON BYRD - CROSS BY MR. ARMSTRONG

1    could avoid it; right?

2    A    He said at my age it was -- you know, it was my choice but

3    it was a very intensive surgery.

4    Q    Very difficult?

5    A    Yes, sir.

6    Q    Couldn't promise you an outcome; right?

7    A    Dr. Faircloth didn't promise me anything either.

8    Q    Well, I'm talking about Dr. Revels.

9    A    Yes, sir.  I mean, no, sir, he didn't promise me anything.

10   Q    And Dr. Revels, I think you said on direct, couldn't give

11   you the medicine that you needed but that he'd send you to

12   someone that could?

13   A    He said he would not give me medicine -- he could not give

14   me medicine that wouldn't hurt me but he could send me to

15   someone that could.

16   Q    Right.  So he was going to send you to a specialist in pain

17   management?

18   A    Yes, sir.

19   Q    Because you were suffering in pain?

20   A    Yes, sir.

21   Q    All right.  And I think you said that when you went to

22   Dr. Ruan you saw him the first time and then nearly every time

23   for the first period of time that you were there; that early

24   part of when you were there?

25   A    That's a short period of time, yes, sir.

1  Q   Okay.  And that's -- you said at first you had Blue Cross

2  and Blue Shield?

3  A   Yes, sir.

4  Q   And then I think at some point you qualified and you were

5  deemed disabled; right?

6  A   Yes, sir.

7  Q   And at that point you started getting Medicare?

8  A   Yes, sir.

9  Q   Is that correct?

10  A   Yes, sir.

11  Q   And it was after you started getting the Medicare benefits

12  that you started seeing the nurse practitioners more than you

13  saw Dr. Ruan; right?  It was sometime in that time period;

14  right?  As best as you recall.

15  A   I don't think so.

16  Q   When did you get disability, do you remember the year?

17  A   2010.

18  Q   2010, okay.  And your recollection was that the nurse

19  practitioners you saw were either Matt Bean or Sharon Noland;

20  right?

21  A   That's the two I saw the most.

22  Q   The most.  Okay.  Now, currently you said that you're

23  getting Opana and Percocet.  Now, that's from Dr. Chen.  You're

24  currently seeing Dr. Chen?

25  A   Yes, sir.

1   Q   And you're also seeing Sharon Noland still; right?

2   A   Yes, sir.

3   Q   And you're very comfortable with Sharon, aren't you?

4   A   Yes, sir.

5   Q   And do you trust Sharon?

6   A   Yes, sir.

7   Q   Okay.  And do you find that Sharon's a good professional to

8   work with?

9   A   Yes, sir.

10   Q   Okay.  And she talks to you and you talk to her?

11   A   Yes, sir.

12   Q   Good communication; right?

13   A   (Nodding head affirmatively.)  Yes, sir.

14   Q   Was it that way when she was working with Dr. Ruan?  Did

15   you have that same rapport with Sharon?

16   A   Yes, sir.

17   Q   Okay.  Well, let's talk about the -- when you first got

18   Subsys.  That was on October 31st of 2013, wasn't it?  Do you

19   remember the days?

20   A   No, sir.

21   Q   Well, okay.  Maybe that's not fair.  It's a long time ago?

22   A   Yes.

23   Q   It's hard to remember exact details; right?

24   A   (Nodding head affirmatively.)

25   Q   If Dr. Ruan's records indicate that the first time you got

SHARON BYRD - CROSS BY MR. ARMSTRONG

1   Subsys was in October of 2013 -- well, I tell you what.  This

2   is an easy way to do it (indicating).

3           See the date of the prescription?

4   A   Yes, sir.

5   Q   October 31st; 2013?

6   A   Not the exact -- that's the day of the prescription but

7   that's not when I received the medication.

8   Q   Well, that's the date that you had the office visit where

9   it was prescribed; right?

10  A   Yes, sir.

11  Q   Okay.  Is that fair enough?  That's kind of about right?

12  A   Yes, sir.

13  Q   And when you went into the office that day, you had been

14  seeing either Dr. Ruan or Sharon for nearly five years by that

15  point; right?

16  A   Yes, sir.

17  Q   Been since 2008.  So you had been a patient there a long

18  time.

19  A   Yes, sir.

20  Q   And during that period of time they had tried different

21  medicines; right?

22  A   Yes, sir.

23  Q   I think you said it started with the Lortab, eventually

24  moved over to Opana, and then we take you off the Lortab and

25  give you something new, and it was trying to see what worked

1  best; right?

2  A   I think he originally put me on Percocet and I didn't like

3  it.  And I went to the -- what is it -- Lortab.  And as my pain

4  changed, I went back on the Percocet.

5  Q   Okay.  So it didn't help, so you switched back?

6  A   No.  It helped but it -- I was still having a lot of pain.

7  Q   Okay.  So they were trying different medications trying to

8  see what would work best with your pain?

9  A   Yes, sir.

10  Q   Different combinations, different dosages, different

11  strengths.  They would change it to try to see what worked best

12  for you; right?

13  A   Yes, sir.

14  Q   And by the time you were first given this Subsys, nothing

15  was working for your pain at that point; right?

16  A   No.

17  Q   And you were still having these episodes where you would

18  get severe moments where it would just -- it would really just

19  strike you and then you couldn't do anything at that point;

20  right?

21  A   Exactly.  Yes, sir.

22  Q   And that's when the discussion over the Subsys came in;

23  right?

24  A   Yes, sir.

25  Q   Okay.  And do you recall that -- on direct you said that it

4269

1   was Matt Bean that saw you that day.  If the records reflect

2   that it was Sharon Noland who saw you that day, would that

3   maybe refresh your memory a little bit?

4   A   No, sir.  It was Matt that first --

5   Q   It was Matt?

6   A   Yes, sir.

7   Q   Are you sure of that?

8   A   Yes, sir.

9   Q   I'm going to show you from your patient file --

10          MR. ARMSTRONG:  Judge, I would move to admit

11  Ms. Byrd's patient file which is Exhibit 4-3 or is it 43?  It's

12  43.  It's 43, but I would put my --

13          MR. BODNAR:  No objection, Your Honor.

14          THE COURT:  All right.  So you're renumbering it?

15          MR. ARMSTRONG:  Yes, Your Honor, I am renumbering it

16  as Ruan Exhibit 183 and I'm just going to stick it right on top

17  of the government's.

18          THE COURT:  All right.

19          MR. ARMSTRONG:  That will now be Ruan Exhibit 183.

20          THE COURT:  Mark it in.

21      (Defendant Ruan's Exhibit 183 was entered into evidence.)

22  BY MR. ARMSTRONG:

23  Q   And looking at -- from that file Bates stamped 222671 --

24  and Ms. Byrd, this is the progress note from your chart.  And

25  can you see --

SHARON BYRD - CROSS BY MR. ARMSTRONG

1   A   Yeah.

2   Q   -- October 31st, 2013?

3   A   Yes, sir.

4   Q   And this is you (indicating) and this is from your chart.

5   A   Okay.

6   Q   And --

7       Start -- well, read for me starting right here under

8   "current treatment," if you will.  You can read that out loud.

9   A   Sir?

10      THE COURT:  Sir?

11  BY MR. ARMSTRONG:

12  Q   You can read that out loud.

13  A   Okay.  Flexeril.  Do you want the dosage amount?

14  Q   I tell you what.  Let me just do it.  You're currently

15  being treated for pain and it gives some different medications;

16  right?

17  A   Right.

18  Q   And it says:  With some improvement; that you're please

19  with the current medications, there's no new significant side-

20  effects or excessive drowsiness from the medications.  And then

21  it says:  Patient is using a topical compound.  The compound is

22  somewhat effective, but that you report increased pain in the

23  upper mid back and the BIL, which I suggest to you is bilateral

24  hands.  You were having pain in your back and your hands by

25  that point; right?

4271

1    A    No, sir.  I was having numbness in my hand.

2    Q    Numbness, okay.  Reports increase in muscle spasms; reports

3    the OxyContin did not help; did see Dr. Revels in July -- and

4    again this is October -- and reports that he told her she would

5    need surgery at some point in time but she would like to delay

6    this as long as possible; states trying to use the Lortab as

7    sparingly as possible.

8              Did you tell the person at PPSA that?

9    A    No, sir.

10   Q    You didn't say that?  Does that not refresh your memory a

11   little bit?

12   A    It says -- I did go see Dr. Revels, and he said it was a

13   quality of life.  Okay.  And again, about it was up to me and

14   what it would entail if I had surgery.  And I said:  Let me

15   think about that.  That was in July.

16   Q    Right.

17   A    So in October I said I would try to wait, yeah, till -- if

18   there was something else they could do.

19   Q    Well, so it's true that you were trying to put it off as

20   long as you could, if you could -- if you could?

21   A    Well, up until the point I asked wouldn't it be better to

22   have the surgery.

23   Q    Okay.  Well, I'll get to that.

24              And it says:  Trying to use your Lortab as sparingly

25   as possible.  Now, that's what you just said.  You didn't like

SHARON BYRD - CROSS BY MR. ARMSTRONG

1    to have to use it, you didn't always use it.

2    A   No, not taking Lortabs sparingly.  I was taking it

3    then.  But only like three.  If it come to the point of four,

4    then it was to get home.

5    Q   Well, let me take you back here --

6    A   Now, I only took three Lortab -- I mean, Percocet a day

7    because I thought that was only -- how do I say it?  That it --

8    the amount that wouldn't hurt me.

9    Q   You took as minimum amount as you could to get through the

10   day?

11   A   Yes, sir.

12   Q   Okay.  And let's look at the last page of that visit

13   note.  And do you see what's down here?  Whose name is down

14   there?

15   A   This says Sharon Noland.

16   Q   So Sharon Noland prepared this report and Sharon Noland

17   indicated that she's the one that saw you; right?

18   A   Not when I was prescribed the first medication for the

19   cancer.

20   Q   Okay.

21   A   She was not.

22   Q   Well, this is October 31st; right?

23   A   Yes, sir.

24   Q   2013.  And Sharon Noland signed it; right?

25   A   Well, it says it's printed.  I don't see a signature, sir.

4273

1  Q   You're not -- you're not -- you don't know how the

2  electronic records work, do you?

3  A   No, I don't.

4  Q   Okay.  So if somebody's already told the jury that they go

5  in and they sign these --

6        MR. BODNAR:  Your Honor, objection to asking her to

7  testify about what someone else already testified to when she

8  was not present in the courtroom.

9        THE COURT:  Sustained.

10 BY MR. ARMSTRONG:

11 Q   All right.  So you were saying that Sharon Noland did not

12 do this?

13 A   She was the one -- Sharon Noland was treating me and she

14 asked -- she was the one who asked me about getting the second

15 opinion as far as the surgery, and that is when I went.

16 Q   Were you aware that Matt Bean was not even hired until

17 2014?

18 A   No, sir.

19 Q   So Matt Bean was not even working at this office on October

20 of 2013, were you aware of that?

21 A   No, sir.

22 Q   Okay.  And again, we talked about this a little bit.  I

23 know you're here today looking back a couple of years and

24 sometimes it's hard to remember exact things that occurred on

25 exact dates; right?

1  A   Yes, sir.

2  Q   So what does it say in the chart note that the record shows

3  is authored by Sharon Noland?  What does it say starting up

4  here?

5  A   Patient seen in collaboration with Dr. Xiulu Ruan.

6  Q   And then what's the next line say?

7  A   Medication adjusted as above.

8  Q   Okay.  Keep going.

9  A   Will see if she can get a free trial of the Subsys to use

10 for the severe pain episodes.

11 Q   Okay.  Keep going.

12 A   Postdated --

13 Q   Rxs?

14 A   Right.  Given since lives one hour away.

15 Q   Or greater than an hour away?

16 A   Or greater.

17 Q   Keep going.

18 A   Discussed possible --

19 Q   Then it's got some letters.

20 A   Yeah.  If decides she wants to do, can call me.

21 Q   All right.  Then what does it say?

22 A   Paper Rx given due to computer issues?

23 Q   All right.  So you were written a -- you were written a

24 prescription by hand and it was handed to you while you were

25 there; right?

1    A    Yes, sir.

2    Q    And sometimes those were printed out by the computer and

3    they came out on a printed form, but these were written out by

4    hand; right?

5    A    I don't recall.

6    Q    Okay.  Well, I'll go back to the question I asked you about

7    Sharon Noland.  You don't think Sharon Noland would put any

8    false information in the report about you, would you?

9    A    I wouldn't think so, no.

10   Q    Now, you didn't take all that Subsys, did you?

11   A    No, sir.

12   Q    In fact, I think you said you took some, you called

13   somebody because you didn't know exactly what was going to

14   happen, because you read the insert.  There's some paperwork

15   that came with it; right?

16   A    Yes, sir.

17   Q    And that kind of bothered you or concerned you enough to

18   where you called somebody; right?

19   A    Yes, sir.

20   Q    And then after that you just -- you didn't take that

21   much.  How many -- do you recall how many you took?

22   A    One more, I think.

23   Q    Okay.  And this box comes -- it had a lot of them in it?

24   A    Yes, sir.

25   Q    And they were like little sprayers and you would use them

SHARON BYRD - CROSS BY MR. ARMSTRONG                                  4276

```
 1   one time and then throw them away?
 2   A   Yes, sir.
 3   Q   Okay.  And whatever you didn't use, you brought back and
 4   you turned it in when you --
 5   A   No, sir.  What I would do is, I told you, I used it in
 6   emergency situations.
 7   Q   Right.
 8   A   So I would put it in my purse.  If the package got defrayed
 9   or whatever, I would dispose of it and get another one out.
10   Q   Right.  And the instructions on it says what?  It says --
11   A   One spray under tongue once to twice daily as needed for
12   severe pain.
13   Q   As needed for severe pain; right?
14   A   Yes, sir.
15   Q   So it really was up to you to use it as you needed it for
16   severe pain?
17   A   Yes, sir.
18   Q   And so you just took it for emergencies; right?
19   A   Yes, sir.
20   Q   So you used it as you were instructed; right?
21   A   No, sir.
22   Q   Okay.  And the Abstral that you were given the next time
23   you came back; right?
24   A   Okay -- yes, sir.
25   Q   The Abstral, the different -- I think you told the jury on
```

4277

```
 1   direct that the Subsys was charged to your insurance?

 2   A   Yes, sir.

 3   Q   Okay.  Isn't it true, Ms. Byrd, that that actually was a

 4   free trial and you had a coupon or a voucher and you took it

 5   over there and there was no charge to your insurance?

 6   A   I don't know.

 7   Q   What makes you think it was charged to your insurance?

 8   A   Well, I give them the insurance card.

 9   Q   So you just assumed that?

10   A   Yes, sir.

11   Q   Okay.  But you understood that it was a free trial; right?

12   A   I understood that I wouldn't have to pay a copay.  They

13   said that if I didn't get it there -- I  wouldn't have to pay a

14   $500 copay.

15   Q   And not to belabor the point, but going back to that

16   record, it talks about:  We will see if she can get a free

17   trial of the Subsys to use.  Right?

18   A   Yes, sir.

19   Q   So that would make you believe that it was the free trial

20   voucher you got; right?

21   A   I was told I could only get it once.

22   Q   Right.  It was only available one time?

23   A   Yes, sir.

24   Q   Now, you went back in March of 2014.  Do you remember going

25   back then, the next time you went back?
```

4278

1   A   Uh, I went back before then.

2   Q   And the next time you went back, you saw Sharon Noland

3   again too, didn't you?  Do you remember that?

4   A   No, sir.  I -- I saw her a couple of times and Matt.  As to

5   which -- how it was being swapped around, I don't remember.

6   Q   Well, I'll show you, just from your chart, since maybe this

7   might refresh your memory.  In March of 2014 when you went

8   back, and do you remember having the discussion -- and just so

9   you'll know, I'm looking on the back page.  And again, it shows

10  Sharon Noland authored the report, and Dr. Ruan signed it?

11  A   Okay.

12  Q   All right.  Just so you know who you were talking to

13  here.  And you went back -- and start reading right here.

14  A   Still has about number 10 Subsys left; trying to use very

15  sparingly; only was able to fill one time, then insurance

16  denied.

17  Q   Okay.  Was that true, you only had one time?

18  A   Yeah, I only had one time but I never tried again.

19  Q   Okay.  And was it true you were only trying to use

20  sparingly; right?

21  A   Right.

22  Q   So that's true.  You had -- you told Sharon you had some

23  Subsys left over; right?  That's true; right?

24  A   Yeah.

25  Q   That's what you told the jury?

1    A    I told someone.

2    Q    Pardon?

3    A    I told someone.

4    Q    Okay.  But you don't remember --

5    A    I'm not sure that I talked to Sharon about the Subsys.  I

6    know I did Matt.

7    Q    Okay.  And let's get back to this right here.  Start

8    reading again.  Keep going.  Read it out loud.

9    A    Show me again.

10   Q    Well, where you left off right here.  Do you want me to

11   read it to you?

12        Dr. Revels did her previous surgery in 2009.  Reports

13   trying to be more active with exercise, but now has noticed

14   increased N/T in her right leg.

15        Is that numbness and tingling in your right leg from

16   hip to foot and numbness and tingling in your left foot, even

17   some in the hands?  Is that -- do you remember telling Sharon

18   that?

19   A    When I had my surgery, my pain was in my right

20   side.  Shortly after that, my pain went to radiating down my

21   left side.  So you're saying here that it was in my right?

22   Q    No.  I'm just reading to you what Sharon put in the report,

23   in the chart.  Is that --

24   A    It was in the right side when it started.  I'm not really

25   sure if this is saying I had it after 2009.  Leg from hip to

SHARON BYRD - CROSS BY MR. ARMSTRONG

1   foot, and numbness/tingling in the left foot, even some in

2   hands.

3   Q   Okay.  And you reported using the Norco because by then you

4   had changed over to Norco, two to four times a day depending on

5   your activity level?

6   A   That's right.

7   Q   In other words, the more it hurt the more you would take

8   it; right?

9   A   Well, the more I did the more it hurt and the more I took.

10  Yes, sir.

11  Q   Right, right.  So that's all true; right?

12  A   Yes.

13  Q   You were trying to walk and then use a stationary bike.

14  That's true; right?

15  A   Right.

16  Q   Do you remember that?  And your knees were getting

17  stiffness, bilateral knee -- you had had a bilateral knee

18  replacement.  You had had a knee replacement; right?

19  A   Yes, sir.

20  Q   And that caused you a lot of pain; right?  In addition to

21  your back?

22  A   Before the surgery.  After the surgery, it was good.  It

23  started getting stiff on me.

24  Q   Okay.  And you were using Mobic for arthritis and you last

25  saw Dr. Revels about a year ago.  He told her that if the pain

1   and the numbness worsened, may need surgery.  She said not

2   really wanting to see him right now since the MRI was

3   relatively unchanged.

4           Did you tell Sharon that in March of 2014?  Do you

5   remember telling Sharon that?

6   A   '14 -- I'm not sure.

7   Q   Okay.  And again, it's been a long time and it may not be

8   fair to ask you if you don't -- just don't remember.  So it's

9   okay to say you don't remember.

10  A   Okay.  Because I mean, you -- most of my dealings -- for a

11  while I saw Sharon pretty regular but then when we moved --

12  when he moved to the Airport office it was like I saw Matt more

13  often.

14  Q   Well, you understand Matt didn't even come to work there

15  till later to 2014?

16          MR. BODNAR:  Objection, Your Honor, to him telling the

17  witness when someone came to work when there's no evidence of

18  when he did come to work.

19          THE COURT:  All right.  Sustained.

20  BY MR. ARMSTRONG:

21  Q   But you understand that the records reveal that you saw

22  Sharon Noland on this date; right?

23  A   Yes, sir.

24  Q   All right.  So let's look up here.

25          MR. BODNAR:  At this point, Your Honor, we didn't even

 1  go through on direct any of the medical records; little leeway

 2  but we're way off what the direct was at this point.

 3          MR. ARMSTRONG:  Judge, the direct testimony --

 4          THE COURT:  All right.  That's enough.  Let's take our

 5  break right now.  We're going to take our afternoon break.

 6          Ladies and gentlemen, leave your pads on your chairs.

 7  No discussion about the case.  Take your break downstairs.  We

 8  will call you back up in about 15 minutes.

 9      (In open court, defendants present, jury not present.)

10          THE COURT:  All right.  Mr. Armstrong, I'll let you

11  continue but let's not get too far afield beyond --

12          MR. ARMSTRONG:  This is the last medical record I'm

13  going through.  She had testified that Matt is the one.  The

14  record is showing Sharon.

15          THE COURT:  Well, that's what her memory is.  Let's

16  take our break and we'll be back in 15 minutes.

17          MR. ARMSTRONG:  Yes, Your Honor.

18          THE COURT:  We're in recess.

19      (A recess was taken at approximately 3:01 p.m.)

20      (In open court, defendants and jury present.)

21          THE COURT:  All right.  Go ahead, Mr. Armstrong.

22  BY MR. ARMSTRONG:

23  Q   Ms. Byrd, just to remind you where we were, and I promise

24  you this is the last patient chart I'm going to ask you about.

25  We were talking about your March 24th, 2014 visit.  Do you

SHARON BYRD - CROSS BY MR. ARMSTRONG

1    remember that?

2    A   Okay.

3    Q   And I was showing you back here where Sharon Noland had put

4    these notes on the file, on the chart anyway.  Do you remember

5    that?

6    A   Yes, sir.

7    Q   And back here, Sharon put in your chart that the plan was

8    or the instructions was to continue your present medications.

9    We discussed Abstral and since she has not used, she may try.

10   She still has some Subsys left.  And I think we've already, you

11   know, gotten that in that you had it left over.  You hadn't

12   used it all.  And you -- advised her not to use both; discussed

13   the risks versus the benefits, the proper usage, safety, et

14   cetera.  She can pick up postdated Rx for the Opana when she

15   comes in to her physical therapy.  And there was a referral

16   made for physical therapy.

17            And then she puts in collaboration with Dr. Ruan and

18   then something else about the medication.  Do you remember

19   talking with Sharon about the Abstral, since the Subsys -- the

20   coupon had run out.  Do you remember talking to Sharon about

21   it?

22   A   No, sir.  But it said:  PT.  She comes in for PT.  Are you

23   saying that's physical therapy?

24   Q   Well, I can't tell you what it is.  I can tell you what the

25   chart says.  It says PT.  I assume that's physical therapy.

SHARON BYRD - CROSS BY MR. ARMSTRONG

4284

1    A    I didn't have any physical therapy there.

2    Q    Well, did you have it somewhere else?  It says:  Referral,

3    which means that you went somewhere else.

4    A    Yes, I did go to Citronelle to Providence.

5    Q    They referred you over there --

6    A    Right.

7    Q    -- for physical therapy; right?

8    A    Right.  Okay.

9    Q    And so that Sharon at least put in the chart that she

10   discussed everything with you about the Abstral; right?  Isn't

11   that what that says?

12   A    It says that but I still -- my memory may be wrong but I

13   did not remember discussing that with Sharon.

14   Q    Okay.  You have a current ongoing relationship with Sharon,

15   don't you?

16   A    Yes, sir.

17   Q    And like I asked you before, you find her to be very

18   trustworthy; right?

19   A    Yes, sir.

20   Q    And you don't think she'd put something in your chart

21   unless it was true; right?

22   A    I'm telling you what I remember.

23   Q    All right.  And so is it possible you just don't remember

24   everything that was said in all these different appointments?

25   A    I may not remember the dates or anything, but I feel like I

4285

1  remember pretty much what was said.

2  Q   Okay.  Now -- and then on that visit, that's when you got

3  the Abstral; right?  And I think this is already in evidence,

4  Ruan Exhibit 165, which is a photograph of the Abstral you got

5  that day; right?  Doesn't that look like that's what that is,

6  the prescription label that was on the Abstral as you got it?

7  A   Yes, sir.

8  Q   I'm sorry?

9  A   Yes, sir.

10  Q   Okay.  And again, it says to take it up to two times a day

11  as needed.

12  A   Right.

13  Q   And "as needed" means if you need it, take it.  If you

14  don't need it, don't take it; right?

15  A   Right.

16  Q   And after that, that you got the Subsys the one time;

17  right?

18  A   Yes, sir.

19  Q   That one voucher?

20  A   Yes, sir.

21  Q   And then you got this -- again, this was a free trial of

22  Abstral; right?  You got coupons for this?

23  A   I don't remember any coupons.

24  Q   Okay.  And after that you didn't get anymore Abstral

25  either; right?

1    A    No, sir.

2    Q    Now, do you remember when you got the Subsys -- and I'll

3    show you what has previously been marked as Government's

4    Exhibit 1-1.

5           MR. BODNAR:  Objection, Your Honor, to this

6    exhibit.  As already has been discussed, this is the prescriber

7    enrollment form.  The patient enrollment form is a different

8    exhibit that's already in evidence.

9           MR. ARMSTRONG:  I apologize.  They both look alike.

10   Q    Exhibit 37-1, have you seen a document that looks like this

11   before?  Do you remember Sharon showing you a document that

12   looked like this?

13   A    No, sir.

14   Q    Okay.

15   A    Not Sharon.  And I don't -- I'm not -- don't remember.  I

16   know I had to fill out something, sign my name, and I knew I

17   was given a prescription.

18   Q    You remember signing something, you just don't -- you don't

19   remember this exact form?

20   A    No.

21   Q    Could it have been this form?

22   A    I have no idea.

23          MR. ARMSTRONG:  This will be for the witness only.

24   This is not in evidence, Judge.

25          THE COURT:  All right.

1    BY MR. ARMSTRONG:

2    Q   I'll show you what I've had marked as Ruan Exhibit 182,

3    Ms. Byrd.  And first I'll ask you if you've ever seen this

4    before.  Do you want me to kind of come in closer?

5    A   I don't remember seeing this.

6    Q   Okay.  Well, let me ask you, to yourself, not out loud,

7    read this paragraph right here.  It's right here (indicating).

8           Read that to yourself.

9    A   (Reading.)

10          Okay.

11   Q   All right.  And then read this right here (indicating).

12   A   (Reading.)

13          Okay.

14   Q   Now, the question I was asking you before was whether you

15   filled out one of these, which is the TIRF REMS access

16   agreement form, and you said you didn't remember.  But after

17   reading this, does that refresh your recollection that perhaps

18   you did fill one out?

19   A   No, it doesn't.

20   Q   Right?  This part right here doesn't refresh your

21   recollection at all?  (Indicating.)

22   A   No.  It just says --

23   Q   At some point thereafter you started seeing Mr. Bean, after

24   he was hired; isn't that correct?

25   A   Shortly after when?

1   Q   Well, after that March of 2014.

2   A   Not after the Subsys, no.  If it was after that, then

3   no.  Because all I remember -- like I said, I remember Matt

4   being the first one introducing me to the Subsys.  If I'm

5   wrong, I'm wrong.

6   Q   So you think that -- is it your testimony that after --

7   after you had had the Subsys which was in October and then the

8   Abstral which was in March, you never saw Matt anymore after

9   that?  That Matt was before then?

10  A   Ask that question again.

11  Q   Are you saying that Matt was involved in the Subsys and the

12  Abstral visits but he wasn't involved after that, is that what

13  you said?

14  A   No.  I'm saying that he was the one that introduced me to

15  the Abstral and the -- well, both of them pain medications.

16  Q   And you say that despite what the chart records show?

17  A   Yes, sir.

18  Q   Now, last question, and this is from your chart.  And this

19  is in the chart, so this is in evidence.

20          THE CLERK:  It'll take a few minutes.

21  BY MR. ARMSTRONG:

22  Q   Do you recall Dr. Ruan helping you with this?

23  (Indicating.)

24  A   Yes.

25  Q   So Dr. Ruan got you out of jury duty because of your back?

1    A   Well, I didn't see Dr. Ruan.  But the office gave me the

2    sheet.

3          MR. ARMSTRONG:  Judge, I think that's all.

4          THE COURT:  Any redirect?

5          MR. BODNAR:  Yes, Your Honor.

6                        REDIRECT EXAMINATION

7    BY MR. BODNAR:

8    Q   Hi, Ms. Byrd.

9    A   Hi.

10   Q   Do you recall Mr. Armstrong asking you about that October

11   31st visit?  And you mentioned that the notes didn't match up

12   with how you remembered it?

13   A   Yes, sir.

14   Q   And what was the date on that visit?

15   A   It was October the 31st, 2013.

16   Q   And when he showed you the electronic signature, what's the

17   date?

18   A   It says November the 5th, 2013.

19   Q   So is that the same date as your visit if your visit was on

20   October 31st?

21   A   No, sir.

22   Q   And in that October 31st visit it lists the physical

23   examinations you had that day.  Do you remember when they

24   palpated, that means pressed on your spine?

25   A   No, sir.

1  Q   Did that happen?

2  A   Not on that date.  It did at the beginning of my -- when I

3  started going.

4  Q   But not several years in?

5  A   No.

6  Q   So was this a lie in your medical record?

7  A   Yes.

8  Q   How about down here where it talks palpating your lower

9  back; is that also a lie?

10  A   Yes.

11         MR. ESSIG:  I'm going to object to the prosecutor

12  classifying the document as a lie.  It's the province of the

13  jury to decide that.

14         THE COURT:  Just ask whether it's true or not.

15  BY MR. BODNAR:

16  Q   Is it true?

17  A   No.

18  Q   And on that second visit that Mr. Armstrong showed you, do

19  you recall looking at that March 24th visit and it not lining

20  up with how you remembered things?

21  A   Yes.

22  Q   And again, the listing of physical examinations you

23  supposedly had that day, again is it true that they were

24  palpating -- someone was palpating, pressing on your lower

25  back?

4291

1    A    No, sir.

2    Q    How about pressing on your middle of the back?

3    A    No, sir.

4    Q    How about shining a light into your eyes?

5    A    No, sir.

6    Q    Did those things happen?

7    A    No, sir.

8    Q    So are there things in your medical records that are not

9    true?

10   A    Yes, sir.

11   Q    Ms. Byrd, at the time that you were discouraged from having

12   surgery, who was prescribing your drugs?

13   A    The nurse practitioners.

14   Q    Was the nurse practitioner doing it or who was actually

15   signing the prescription?

16   A    Dr. Ruan.

17   Q    And at the time you were being discouraged from having

18   surgery, who was doing your procedures?

19   A    Dr. Ruan.

20   Q    And who would have done your surgery had you had surgery?

21   A    At that time, Dr. Revels.

22   Q    And did you ultimately have surgery with somebody that

23   wasn't Dr. Ruan?

24   A    Yes, sir.

25   Q    And did that relieve the issues that you had been going to

1   Dr. Ruan for?

2   A   Yes, sir.

3        MR. BODNAR:  No further questions for this witness,

4   Your Honor.

5        THE COURT:  May she be excused?

6        MR. BODNAR:  Yes, Your Honor.

7        THE COURT:  All right.  Ms. Byrd, you may step down.

8   Thank you.

9        THE WITNESS:  Thank you.

10       MR. BODNAR:  The United States calls Erick Gist.

11       THE CLERK:  Mr. Gist, if you'll step forward toward

12  the witness stand, I'll swear you in.

13       Let me get you to raise your right hand.

14                        ERICK LEE GIST

15            was sworn and testified as follows:

16       THE WITNESS:  I do.

17       THE CLERK:  Thank you, sir.  Please be seated.

18                      DIRECT EXAMINATION

19  BY MR. BODNAR:

20  Q   Good afternoon, Mr. Gist.  Could you please introduce

21  yourself to the jury?

22  A   Erick Lee Gist.

23  Q   And Mr. Gist, how do you spell your first name?  Because

24  it's a bit unusual.

25  A   E-R-I-C-K.

ERICK LEE GIST - DIRECT BY MR. BODNAR

1  Q   And Mr. Gist, are you a U.S. veteran?

2  A   Yes, sir.

3  Q   In what service?

4  A   U.S. Army.

5  Q   After getting out of the army, what did you do for work?

6  A   I got around to several different jobs.  I worked for the

7  government for about five years and worked auto parts stores,

8  manager.

9  Q   And I'm sorry.  Could you pull the microphone just a little

10  bit closer to you?

11        THE COURT:  You may have to move your chair closer.

12  The microphone itself doesn't move.

13  BY MR. BODNAR:

14  Q   I couldn't hear.  Mr. Gist, after getting out of the army,

15  what did you do?

16  A   I worked for the government for about five years as a

17  purchasing agent.  I worked as a manager at an auto parts store

18  and several other smaller jobs, you know, part-time jobs.

19  Q   And at some point were you working as a truck driver?

20  A   Yes, sir.

21  Q   Were you in an accident at one point that injured your

22  back?

23  A   Yes, sir.

24  Q   Is that what led you ultimately to start going to PPSA?

25  A   No.  The first injury I was in a car accident back in '92.

4294

```
 1   I was rear ended.
 2   Q   And was it issues with your back?
 3   A   Yes, sir.
 4   Q   Why did you start going to PPSA?
 5   A   At the time my wife was going and she said that she was
 6   getting pretty good service there, so I didn't know where else
 7   to go personally.  And so when she mentioned Dr. Ruan, I
 8   thought I'd, you know, ask them if they can help me.
 9   Q   When did you start going to see Dr. Ruan?
10   A   I don't remember the exact time.
11   Q   Do you remember roughly?  Was it around 2009?
12   A   I thought 2009, 2010, something like that.
13   Q   What issues were you going to PPSA to have treated?
14   A   Just a lot of pain in my lower back, left side and right
15   side.
16   Q   Were any procedures done for you by Dr. Ruan on your lower
17   back?
18   A   Yes, sir.
19   Q   Could you please explain that to the jury?
20   A   I had several epidurals.  I had what's called a facet
21   block.  I had a couple other different types of blocks he
22   mentioned.  I don't really know the names of them, but they did
23   several different procedures.
24   Q   And were those procedures helpful?
25   A   The first one I got relief for about three days and after
```

1    that I didn't get any relief from them at all.

2    Q    Even though you were not getting relief were you continuing

3    to get procedures done?

4    A    I did.  He told me that --

5    Q    I'm going to ask you, who is "he"?

6    A    I'm sorry.  Dr. Ruan told me that a lot of times the first

7    one doesn't help and you have to get one or two more before

8    they actually take effect.

9    Q    And overall did you have multiple procedures done?

10   A    Yes, sir.

11   Q    Were you getting relief from it?

12   A    No, sir.

13   Q    Did there come a time that you began taking a drug called

14   Fentora?

15   A    Yes, sir.

16   Q    I'm going to show you what has previously been marked but

17   not -- for demonstration purposes as Government's Exhibit 1-9,

18   and ask:  Is this the drug you're talking about right here,

19   Fentora?  (Indicating.)

20   A    Yes, sir.

21   Q    Can you please explain to the jury, how do you use Fentora?

22   A    It's a lozenge you put between your cheek and your gums and

23   it dissolves.

24   Q    Can you explain to the jury what Dr. Ruan specifically told

25   you before you started taking Fentora?

ERICK LEE GIST- DIRECT BY MR. BODNAR

```
 1  A   He told me that it was a breakthrough medication that was
 2  supposed to alleviate a lot of the pain I was experiencing.
 3  Q   Dr. Ruan himself told you that?
 4  A   Dr. Ruan told me that.
 5  Q   Did he mention if it was a drug indicated only for
 6  breakthrough cancer pain?
 7  A   He just said it was a breakthrough pain medication.  He
 8  didn't tell me it was cancer.
 9  Q   If you had been told it was for breakthrough cancer pain,
10  would that have made a difference in your decision of whether
11  or not you wanted to take that drug?
12  A   It would have, mainly because it would have scared me to
13  the fact being a cancer drug, do I have cancer.  And I know
14  I've never been told I've had cancer before.  So -- I don't
15  know that I would actually need something that strong.
16  Q   Where were you filling that drug?
17  A   At C&R Pharmacy.
18  Q   And did you know who owned C&R Pharmacy?
19  A   I did not know exactly, but I had a feeling with the
20  initials on it C&R, Couch and Ruan.
21  Q   Approximately how long were you on the Fentora?
22  A   It had to be a couple of years because each time I had to
23  get a referral from my insurance company.
24  Q   And prior to going on Fentora, did you have any
25  conversations with Dr. Ruan about what kind of insurance you
```

ERICK LEE GIST- DIRECT BY MR. BODNAR

1  had?

2  A   Yes, sir.  He asked me if I had insurance and what type.

3  Q   Now, was that in your new intake form where they're asking

4  if you had insurance or was that in the exam room?

5  A   That was in the exam room.

6  Q   And what kind of insurance did you have?

7  A   I have Blue Cross and Blue Shield and Medicare.

8  Q   Now, in the beginning did you see Dr. Ruan in the office

9  visits?

10  A   Yes, sir.

11  Q   How about as years went on, did you continue to see

12  Dr. Ruan during the office visits?

13  A   No, sir.

14  Q   Who were you seeing?

15  A   I was seeing I think -- I think they were nursing

16  assistants or practitioners.  I'm not quite sure what their

17  professional --

18  Q   Do you remember any of their names?

19  A   Shannon and Matt.

20  Q   Did you say Sharon or Shannon?

21  A   Shannon.

22  Q   At some point were you then moved from Fentora on to

23  Subsys?

24  A   Yes, sir.

25  Q   And can you explain to the jury, is this Subsys here the

 1    spray?

 2    A    Yes, sir.

 3    Q    When you first started taking Subsys, did Dr. Ruan himself

 4    ever give you any warning about it?

 5    A    I don't recall any warnings at all, no, other than making

 6    sure no one else got it.

 7    Q    What do you mean "making sure no one else got it"?

 8    A    Well, he just warned me that it could kill somebody else if

 9    they weren't -- if it wasn't prescribed for them.

10    Q    Who gave you that warning?  Was that Dr. Ruan or somebody

11    else?

12    A    Dr. Ruan gave me that warning.

13    Q    Was there any warning given to you about it being indicated

14    only for cancer pain?

15    A    No, sir.

16    Q    Like with Fentora would that have made a difference to you

17    had you known that?

18    A    I think so.  Yes, sir.

19    Q    Mr. Gist, when you began taking Subsys, did Dr. Ruan let

20    you know that he had a financial incentive in that drug?

21    A    Not at all.

22    Q    Was there any explanation given to you about speaking fees

23    paid to him by that company for that drug?

24    A    No, sir.

25    Q    If you had known that up front, would that have made a

ERICK LEE GIST - DIRECT BY MR. BODNAR

```
 1   difference in whether or not you wanted to take that drug?

 2   A   Yes, sir.

 3   Q   Can you explain that to the jury?

 4   A   I just -- I don't feel that it's right for a person to be

 5   seeing a doctor to get help for pain and then profiting off of

 6   giving that particular medicine.  Because to me it's like they

 7   are not giving it because they think it's right for that person

 8   but because they're going to make money off of it.

 9   Q   And was the Subsys even helpful for you?

10   A   It didn't help at all.  I told Dr. Ruan that, though.

11   Q   Were you eventually switched to this drug, Abstral?

12   (Indicating.)

13   A   Yes, sir.  It goes under the tongue.  I remember it.

14   Q   Again, was any warning given to you about Abstral being a

15   cancer or a drug for breakthrough cancer pain?

16   A   No, sir.

17   Q   Did Dr. Ruan or anybody else tell you that they owned large

18   amounts of stock in the company that made Abstral?

19   A   No, sir.

20   Q   Would that have made -- would that have made any difference

21   to you in whether or not you took that drug?

22   A   Again, yes, sir.

23   Q   And why is that?

24   A   Again, peddling medicine.  I don't understand it.  I'm

25   trying to get help, not to just make somebody rich.
```

4300

1    Q    And was the Abstral even helpful for you?

2    A    Not at all.

3    Q    Were you then switched onto Lazanda?

4    A    I don't recognize the name, but in the picture I do

5    recognize the medicine because you put it up and push it like a

6    pump spray.  I remember a pump.

7    Q    What if any warnings were given to you about Lazanda from

8    Dr. Ruan?

9    A    I don't remember any about that one.

10   Q    Please explain to the jury what your office visits were

11   like in terms of the in-depth physical examination you were

12   getting?

13   A    The first time, the exam was pretty thorough.  He asked a

14   lot of questions, he checked me out and found out where I was

15   hurting at, and how severe it was, and checked my legs and

16   everything like that.  And that was the only time I really got

17   an exam like that.  After that I'd go in, sit down and wait to

18   be seen.  I would be seen by one of the other associates there.

19   And go in and they asked me how things were going, if the

20   medicine was working or not and then they'd prescribe something

21   else and send me out.

22   Q    And by "they" do you mean Dr. Ruan or a nurse practitioner?

23   A    The nurse practitioner.

24   Q    As an example from your file, which is Government's Exhibit

25   13-4, I'm taking out your progress note for April 22nd, 2014.

1  Do you see that, Mr. Gist?

2  A   Yes, sir.

3  Q   And by this point in April of '14 had you been going there

4  for a while?

5  A   Yes, sir.

6  Q   And if it says within your physical examination for that

7  visit that your pupils were equally round and reactive to light

8  bilaterally, do you recall anyone shining a light in your eyes

9  to see if they reacted bilaterally?

10  A   No, not at all.

11  Q   How about no nodules or masses present on palpation of the

12  thyroid.  Do you recall anyone pulling on your neck or rubbing

13  on your neck?

14  A   No, not at all.

15  Q   How about palpation of your lumbar, your lower back?  Do

16  you recall that?

17  A   I don't even know what it is, honestly.  No, I don't.

18  Q   Would those things be true if they are listed as having

19  occurred on your April 22nd, 2014 visit?

20  A   If they did, they did it while I was asleep because it

21  didn't happen to me.

22  Q   And if there are other examples in your file talking about

23  in-depth physical examinations throughout 2013, '14, and '15,

24  would that be true?

25  A   Again, I wasn't there -- there's no way they did it to

1   me.  I don't know who they did it to.  But I did not get exams

2   like that every time I went.

3   Q   Mr. Gist, you mentioned that the Fentora, the Subsys, and

4   Abstral and the Lazanda were not relieving your pain.  But were

5   they causing you any other issues?

6   A   Yes, it made me -- a lot of times it made me feel like a

7   zombie, like I wasn't really there.  But it was --

8   Q   What do you mean?  Can you explain what you felt like a

9   zombie?

10   A   It's like the expression:  I stepped out of myself.  I was

11   there but I wasn't really there mentally.  My body was

12   physically there, but mentally I didn't know what I was doing a

13   lot of times.  My son would come back and tell me:  Well,

14   daddy, you said this.  And like wait a minute, when did I say

15   this, you know.  And he can pinpoint exactly when and where I

16   said it.

17        MR. ARMSTRONG:  Hearsay what his son said or what he

18   could say.

19        THE COURT:  Overruled.

20   BY MR. BODNAR:

21   Q   Mr. Gist, have you had any -- since PPSA closed down, how

22   were you treating your pain for your back?

23   A   I was taking Zohydro and Nucynta.  And I recently just

24   stopped taking it altogether.  I can't do it anymore.  It's not

25   helping me like the point I wanted to, like I'd hoped.

4303

```
 1   Q   Was the Fentora, the Subsys, the Abstral and the Lazanda
 2   increasing your quality of life?
 3   A   No.
 4   Q   Was it decreasing your quality of life?
 5   A   Definitely decreasing it.
 6   Q   Where were you filling those prescriptions for your Subsys,
 7   Abstral, Fentora and Lazanda?
 8   A   C&R Pharmacy.
 9            MR. BODNAR:  One moment, Your Honor.
10            THE COURT:  All right.
11            MR. BODNAR:  Nothing further from this witness at this
12   time.
13            THE COURT:  All right.  Mr. Armstrong?
14                         CROSS EXAMINATION
15   BY MR. ARMSTRONG:
16   Q   Good afternoon, Mr. Gist.  My name is Gordon Armstrong, I
17   represent Dr. Ruan.  I've got a few questions for you.
18   A   Yes, sir.
19   Q   You were referred over to Dr. Ruan?
20   A   Yes, sir.
21   Q   Isn't that right?  And I think you told the jury that in
22   addition -- actually I don't know that you said you were
23   referred.  But you were referred by Dr. Rubinstein; right?
24   A   Yes, sir.
25   Q   And he recommended you go see Dr. Ruan for your back
```

1  problems?

2  A   No, sir.  I asked Dr. -- I went to Dr. Ruan's office with

3  my wife and asked if Dr. Ruan could see me and they said only

4  by referral.  So then I went back to my doctor and asked if he

5  would give me a referral to see Dr. Ruan.

6  Q   And Dr. Rubinstein gave you a referral?

7  A   Yes, sir.

8  Q   Okay.  And I think you told the jury that your wife was

9  also a patient there and she was happy and pleased and so you

10 thought that you would try to see if Dr. Ruan could help you?

11 A   She said she was pretty satisfied with the service, yes,

12 sir.

13 Q   And did she have a back problem or some kind of --

14 something causing her pain?

15 A   She still does.  She still has a back problem.

16 Q   Okay.  And was she receiving some prescriptions and

17 procedures and physical therapy and different things like that

18 to try to help her?

19 A   She started to, but because of her position, she's a bus

20 driver, she couldn't be taking the medications and being a bus

21 driver.  So she couldn't -- she couldn't continue.

22 Q   Okay.  Well, you understand from your experience with your

23 wife that when you went to Dr. Ruan that it was a pain

24 management clinic; right?

25 A   Yes, sir.

4305

1   Q   It wasn't a surgeon or anything like that, and it was to

2   help manage pain; right?

3   A   Yes, sir.

4   Q   To help you through the day or through your daily

5   activities; right?

6   A   Yes, sir.

7   Q   So you kind of had an idea going into it what Dr. Ruan

8   could offer you?

9   A   Not really, no, sir.  I didn't.

10  Q   Now, prior to going to Dr. Ruan, you had had several back

11  surgeries?

12  A   Yes, sir.

13  Q   And then while a patient of Dr. Ruan you had another back

14  surgery, while being a patient; isn't that right?

15  A   (Pause.)  I had a preventive back surgery, yes.

16  Q   Okay.  And then you also had surgery on your hand by

17  Dr. Freeman, do you remember that?

18  A   No, sir.  Never had surgery on my hand.

19  Q   Or -- okay.  Let me take it back.  Dr. Ruan referred you

20  over to Dr. Freeman because you were having problems with your

21  hand.  And he's a hand surgeon but he didn't do surgery; right?

22  A   I haven't had problems with my hands.  My wife had problems

23  with her hands but I didn't.

24  Q   Do you remember Dr. Ruan also sending you to see

25  Dr. Bassam, a neurologist?

4306

```
 1    A   Yes, sir.

 2    Q   He referred you over there?

 3    A   Uh-huh (positive response).

 4    Q   Do you remember going to see Dr. Bennett?  He referred you

 5    to Dr. Bennett, a psychologist?  I'm sorry --

 6    A   Yes, sir.

 7    Q   -- a psychiatrist?

 8    A   Uh-huh (positive response).

 9    Q   And do you remember Dr. Bennett did a report based on a

10    pretty extensive examination of you?

11    A   I don't remember -- have knowledge of a report but I'm

12    pretty sure he did.

13    Q   Do you remember at that time that the discussion was trying

14    to see if you qualified for some type of a pain pump for your

15    pain; right?  And that's why you had to go see Dr. Bennett, the

16    psychiatrist?

17    A   It doesn't sound familiar but it's possible.

18    Q   Okay.  You don't recall that?

19    A   No, sir, I don't.

20    Q   Have you seen Dr. Bennett's report?

21    A   No, sir, I haven't.

22    Q   Now, you were also seeing Dr. Danzig at the VA?

23    A   Yes, sir.

24    Q   And he's a psychiatrist; right?

25    A   Yes, sir.
```

ERICK LEE GIST - CROSS BY MR. ARMSTRONG

1  Q   And he was prescribing medications for you to help you?

2  Were you having problems sleeping because of the pain?

3  A   I had -- not for the pain, no.  I was having problems

4  sleeping, yes.

5  Q   Okay.  Now, in your chart there's reference to a drug test

6  that showed a real high level of alcohol.  Did you ever go to

7  Dr. Ruan's office intoxicated?

8  A   No.  Never.

9  Q   In fact, do you remember when they did that test that not

10  only were you not intoxicated, but that Dr. Ruan didn't think

11  you were intoxicated either and they thought there might have

12  been something wrong with the test; right?  Do you remember

13  that?

14  A   I don't remember that.  But I know I've never gone there

15  intoxicated.  Not once.

16  Q   Well, if there's a record in your chart that shows an

17  elevated level of alcohol on one of those urine tests, that

18  would have -- that would have been a -- that test would have

19  been inaccurate; right?

20  A   Absolutely.

21  Q   Because you don't have a problem with alcohol, do you?

22  A   No, I don't.

23  Q   And if anybody suggested that you had a problem with

24  alcohol, they would just be wrong; right?

25  A   I'd like to have them try and prove it.

1   Q   Now, Mr. Bodnar asked you about when you started taking the

2   Fentora and I think you -- he showed it to you on that little

3   chart.  And that's the -- that's the little tablet you put

4   in-between your cheek?

5   A   Lozenge.

6   Q   It's a lozenge?

7   A   Uh-huh (positive response).

8   Q   And you actually took that for a pretty long period of

9   time, didn't you?

10   A   Couple of years.

11   Q   Couple of years?  And do you remember you had to fill out

12   some forms in order to get it?  You know, they have some

13   required paperwork.  They call these -- these TIRF REMS

14   documents, do you remember that?

15   A   I remember filling out a document saying that I'm not going

16   to take medication from any other doctor, no other pain

17   medicine, and that I agree that I'm not going to give it out to

18   anyone or sell it or anything like that.  That, I do remember.

19   Q   Well, yeah, that's the -- that's the opioid agreement.  You

20   remember that too?

21   A   Okay.

22   Q   And you abided by that; right?

23   A   Yes, sir.

24   Q   And you weren't there to try to get medicine from Dr. Ruan

25   and then go give it away or sell it to anyone, were you?

1   A   I was trying to get help.  I didn't know if there was going

2   to be medication or therapy or what.  I went to get help.

3   Q   So you had no intention of doing that; right?

4   A   Not at all.

5   Q   And do you remember telling Dr. Ruan's office that the

6   Fentora was helpful, and it gave you your life back?

7   A   Gave me my life back?  No, I don't remember telling him

8   that.

9   Q   Mr. Gist, this whole thing is your chart.  I'm trying to

10  find that report that's in here.  I promise you.

11          Mr. Gist, I'm having a hard time finding that date in

12  your file because all the dates are mixed up.  But if the chart

13  indicates that upon interview regarding the Fentora, that you

14  quoted, and it's written in the chart:  Actually feel like

15  human.  You can take care of your yard, play with your dog,

16  perform your daily activities, cook, walk outside, refill your

17  medicines.  Without meds he would stay in bed unable to

18  function.

19          Do you remember telling them that?

20  A   There are several problems with that.  One, I don't play

21  with my dog.  Two, I don't need to cook.  My wife cooks.  So I

22  don't know where you got that from.  But it wasn't from me.

23  Q   Now, let's talk about -- I think you said that Dr. Ruan

24  told you or gave you warnings about the Subsys.  Do you

25  remember telling the jury that?

 1   A    About the Subsys?

 2   Q    Right.  That Dr. Ruan was the one that gave you warnings

 3   about the Subsys.  You said that Dr. Ruan told you don't let

 4   anyone else take it because it might kill them?

 5   A    Right.

 6   Q    All right.  And that explanation was talking about the fact

 7   that in order to take Subsys you had to already be taking

 8   around-the-clock opioids because that's what the requirements

 9   are in order to even get Subsys.

10   A    Right.

11   Q    Do you remember him explaining that to you?

12   A    Yes, sir.

13   Q    And if somebody else who wasn't taking opioid therapy, if

14   they tried it, it might cause them great harm; right?

15   A    Might stop their breathing is what he told me.

16   Q    Right.  And that was -- you actually filled out some

17   paperwork.  Do you remember that?  Do you remember the -- this,

18   the TIRF REMS agreement?  Do you remember that?  And Dr. Ruan

19   filled this out, this front page?  And this was 2012 and this

20   is page 103.  And this has all the explanations.  And then the

21   back page, that's where -- that's your signature, isn't it?

22   A    Looks like it.  Uh-huh (positive response).

23   Q    And so you signed that; right?

24   A    I think so.

25   Q    Did you read this before you signed it?

ERICK LEE GIST - CROSS BY MR. ARMSTRONG

4311

```
 1   A   Not all of it, no.
 2   Q   No?  Is this the form that you signed that Dr. Ruan was
 3   talking to you about in order to get the Subsys?
 4   A   It looks like I signed it.  Again, it doesn't look familiar
 5   right now but it looks like I signed it.
 6   Q   Okay.  And again, this is going back nearly five years.  I
 7   understand that's a long time ago.  But that did look like your
 8   signature; right?
 9   A   It looked like it.
10   Q   So at the time it was presented to you; right?
11   A   Yes.
12   Q   And you do recall Dr. Ruan talking to you about it and
13   giving you warnings about it; right?
14   A   Yes, sir.
15   Q   And if the document reflects that it's -- or the -- at some
16   point you switched over to Abstral; right?
17   A   Yes, sir.
18   Q   And you did the same thing for the Abstral, do you remember
19   that?  Do you remember seeing this form?  (Indicating.)  Is
20   that your signature down here (indicating)?  Does that look
21   like your signature?
22   A   It looks a little bit different but, yeah, that looks like
23   it might be.
24   Q   Well, I'll represent to you this is -- there's a number on
25   here that's what we call a Bates number, which is 219895.
```

1          MR. BODNAR:  Object.  Your Honor, object to him

2    representing that that is his.  He said it looks like his.  I

3    don't think Mr. Armstrong can tell him that it is his.

4          THE COURT:  I don't think that's what he's attempting

5    to do.

6          But do you recognize your signature on there,

7    Mr. Gist?

8          THE WITNESS:  Like I'm saying, it looks like it but

9    according to the last one he showed me it looks a little bit

10   different.  So I mean, I may have signed this and been hurting

11   already or something.  I don't know.  See, it looks -- this on

12   the right is my usual signature.  This doesn't look like mine

13   on the left.  I'm not sure.

14   BY MR. ARMSTRONG:

15   Q   But do you remember going over the forms each time that --

16   A   No.

17   Q   -- you went from the Subsys to the Abstral?

18   A   No.  He just told me it was something I had to sign in

19   order to receive the medicine.  I remember that.

20   Q   Okay.  So you -- but you signed it.  You do remember

21   signing a document?

22   A   I do remember signing a document, yes.

23   Q   Okay.  And I think you told us about different procedures

24   that Dr. Ruan did?

25   A   Yes, sir.

ERICK LEE GIST - CROSS BY MR. ARMSTRONG

1   Q   And I think you said that the first one helped you with

2   pain but the rest of them didn't really help?

3   A   Yes, sir.

4   Q   Would they help you temporarily but then not much after

5   that?

6   A   No, sir, only the first one.  The first one, like I said,

7   it seemed to help me for about three days.  I seemed to feel

8   some relief about three days, but I stayed in the bed the first

9   and the second day.

10  Q   Well, the records reveal that you did not get any type of

11  procedure after January of 2013.  So Dr. Ruan stopped doing the

12  procedures, didn't he?

13  A   I stopped taking them.  He asked me if I wanted to do

14  another one and I said no, I didn't want anymore.  I haven't

15  had any since then either from anyone else.

16  Q   We talked a little bit about urine testing.  Do you

17  remember in 2015 that you had done a urine test when you went

18  in for an appointment in April of 2015?

19  A   I did several urine tests.  I don't remember exactly what

20  day you're talking about, though.

21  Q   Do you remember that at that time your urine was negative

22  for showing that you didn't have any hydrocodone in your

23  system --

24  A   Yes, sir.

25  Q   -- even though it was prescribed?

4314

```
 1   A   Yes, sir.

 2   Q   Do you remember that?

 3   A   Yes, sir.

 4   Q   And do you remember that that had happened before?  And

 5   since that happened before Dr. Ruan asked you to come in for a

 6   pill count, do you remember that?

 7   A   Yes, sir.

 8   Q   And when they asked you to come in for a pill count --

 9   well, actually they asked you to come in early.  It's kind of

10   like a random --

11   A   Uh-huh (positive response).

12   Q   You don't know it's happening and they tell you to come in

13   and we want to count your pills, do you remember that?

14   A   I don't remember going in for a pill count but I know they

15   did do that randomly.

16   Q   And do you remember -- calling you and asking you to come

17   in early for a pill count and you didn't show up?

18   A   And I didn't show up?  I remember him calling me and

19   telling me that the medicine didn't show up in my system

20   because I took my wife back with me so that she could let him

21   know.  She watched me take my medication.  And he tested me

22   again and it didn't show up in my system and then he wanted to

23   do a brain scan to find out if the medicine was actually taking

24   effect.  I remember that quite well, because I kept telling

25   him:  I'm not giving it away.  I can't afford to give it away.
```

 1   Q   I'll show you your chart from April of 2015.  And do you
 2   see this up here, April 21st, 2015?
 3   A   Uh-huh (positive response).
 4   Q   Erick Gist, that's you.  And do you see where they put in
 5   here that you didn't have the hydrocodone in your system?
 6   A   Right.
 7   Q   And I think you told us that they talked to you about that?
 8   A   Uh-huh (positive response).  (Nodding head affirmatively).
 9   Q   And it's noted in here that this is your first opioid
10   violation that's been recorded.  And do you see the note back
11   here that Dr. Ruan requested to do a pill count in two weeks?
12   A   Uh-huh (positive response).
13   Q   And so you remember that?
14   A   I don't remember him doing it but I remember -- I see it.
15   Q   And two weeks later in May you were called and told to come
16   in within 24 hours so they could do that pill count.  So that
17   was -- they surprise you with it.  They don't tell you it's
18   coming.  They call you the day before and say:  Come on in
19   tomorrow, we're going to count your pills.  Do you remember
20   that, getting that phone call?
21   A   No, I don't.
22   Q   You don't remember that phone call?
23   A   No, I don't.
24   Q   And Ms. Arnold, Brenda Arnold, put in your chart that you
25   weren't very happy with her because you wanted to talk to

ERICK LEE GIST - REDIRECT BY MR. BODNAR

```
 1   Dr. Ruan right away and that you'd have to come in to talk to
 2   Dr. Ruan; is that what she said?
 3   A   I see it on your chart here but I don't remember saying
 4   that to her, no.
 5   Q   And the day that you were supposed to come in for the pill
 6   count was May 7th and you didn't come in -- or I'm sorry, you
 7   were supposed to come in on May 5th and you did not come in.
 8   Do you remember that?
 9   A   No, I don't.
10   Q   And they called you to tell you that you were going to be
11   terminated from the practice.  Do you remember that?
12   A   No, I don't.
13   Q   You don't remember that?  (Indicating).
14           MR. ARMSTRONG:  One moment.
15           Judge, that's all.
16           THE COURT:  Any redirect?
17                         REDIRECT EXAMINATION
18   BY MR. BODNAR:
19   Q   Just very briefly.  Mr. Gist, do you remember that quote
20   that Mr. Armstrong was reading to you about Fentora giving you
21   back your life so you could cook and play with your dog?
22   A   I remember him saying it.
23   Q   And do you remember if you said if that was true or false?
24   A   I know it's false.
25   Q   And that was for the drug Fentora he was referencing; is
```

1   that correct?

2   A   That's correct.

3   Q   Who was prescribing you your Fentora?

4   A   Dr. Ruan.

5   Q   Where were you filling your Fentora?

6   A   C&R Pharmacy.

7           MR. BODNAR:  Nothing further from this witness, Your

8   Honor.

9           THE COURT:  May he be excused?

10          MR. BODNAR:  Yes, Your Honor.

11          THE COURT:  All right.  Mr. Gist, thank you.  You may

12  step down.

13          MR. BODNAR:  Your Honor, may we approach very briefly?

14          THE COURT:  All right.

15      (At the side bar, defendants not present.)

16          MR. BODNAR:  Your Honor, we thought that would take us

17  till 5 o'clock.  It's obviously a little before 5 o'clock.  We

18  have Dr. Aultman, and then the only other possible, potential

19  witness --

20          THE COURT:  Is she here now?

21          MR. BODNAR:  No.

22          THE COURT:  Monday?

23          MR. BODNAR:  For Monday.  And the only other potential

24  witness is possibly the insurance person from Louisville, if we

25  cannot get stipulation on it beforehand.  But if this --

4318

```
 1            MR. KNIZLEY:  We offered to stipulate to it.

 2            MR. BODNAR:  But you want a little bit more --

 3            MR. KNIZLEY:  No.  You --

 4            MR. BODNAR:  We will probably bring her in.  Other

 5    than that, we have nobody else, Your Honor.

 6            THE COURT:  All right.  Well, I'll let the jury go

 7    today.  And we need to talk about rule 29 motions.

 8            MR. BODNAR:  Yes, Your Honor.

 9        (In open court, defendants and jury present.)

10            THE COURT:  All right.  Ladies and gentlemen, we are

11    concluding our business for today.  You will not be called back

12    in to continue until Monday morning at 9 o'clock.  Now, once

13    again we have a three-day gap between today and Monday

14    morning.  So I need to especially remind you, no discussion

15    about this case with anyone.  Try and put it out of your mind,

16    if you can, and enjoy your weekend.  We will see you back

17    Monday morning at 9 o'clock in the jury assembly room, ready to

18    be called back up.

19            Thank you, and you're excused for the day.

20        (In open court, defendants present, jury not present.)

21            THE COURT:  All right.  Counsel, I think we had

22    discussed previously about filing -- since, you know

23    essentially what the remainder of the witnesses' -- subject

24    matter of the testimony is -- y'all have a seat -- I'd asked if

25    you could file the rule 29 motions tomorrow.  What is your
```

4319

```
 1    position on that now?
 2          MR. SHARMAN:  Your Honor, Dr. Couch will file the rule
 3    29 motion at the close of the government's case.  We realize
 4    that means that we won't have any hearing or oral argument on
 5    it.  We certainly understand.
 6          THE COURT:  All right.
 7          MR. KNIZLEY:  And we feel likewise, Your Honor.
 8    Dr. Ruan feels likewise.  We'll file it at the close of the
 9    government's case and forego any arguments the Court seeks.
10          MS. GRIFFIN:  Your Honor, that puts us in an awkward
11    posture.  We don't know what they are going to allege until
12    obviously they file it Monday when we finish.  And we would
13    like to be heard on it orally after they file it.  But if we
14    need to --
15          THE COURT:  What we will do is, then, just address it
16    orally once you rest and we're not going to have any argument.
17    But they will have to state what the grounds are and then you
18    can respond.
19          MS. GRIFFIN:  Thank you.
20          THE COURT:  Of course.  All right.
21          MR. SHARMAN:  Your Honor, just to be clear and for the
22    government's benefit, our submission will be a written
23    submission as well as an oral submission.
24          THE COURT:  All right.  Well, you do realize that if
25    you don't give it to me in advance, I'm going to rule on what
```

1    you tell me orally basically on Monday or whenever they rest.

2           MR. SHARMAN:  Yes, ma'am.

3           THE COURT:  All right.  Is there anything else we need

4    to take up?

5           MR. BODNAR:  Not from the United States, Your Honor.

6           THE COURT:  All right.  Y'all have a good weekend.

7           MS. GRIFFIN:  Thank you, Your Honor.

8           THE COURT:  We'll see you Monday.

9        (Court adjourned at approximately 4:18 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25