1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF ALABAMA
2

3   UNITED STATES OF AMERICA
                                         CASE NO. CR15-00088
4   v.
                                         COURTROOM 2B
5   JOHN PATRICK COUCH, M.D.,
    and XIULU RUAN, M.D.,
6                                        MOBILE, ALABAMA
            Defendants.
7   * * * * * * * * * * * * * *          MONDAY, FEBRUARY 6, 2017

8   REDACTED

9
                              DAY 19 OF TRIAL
10        BEFORE THE HONORABLE CALLIE V. S. GRANADE,
            UNITED STATES DISTRICT JUDGE, AND JURY
11

12  APPEARANCES:

13  FOR THE GOVERNMENT:
        DEBORAH A. GRIFFIN
14      CHRISTOPHER BODNAR
        ADAM W. OVERSTREET
15      CHRISTOPHER B. BRINSON
        United States Attorney's Office
16      63 S. Royal Street, Suite 600
        Mobile, AL  36602
17      (251) 441-5845

18
    FOR THE DEFENDANT COUCH:
19      ARTHUR T. POWELL, III
        P.O. Box 40456
20      Mobile, AL 36640-0456
        (251) 433-8310
21
        JACKSON R. SHARMAN, III
22      ROBERT JACKSON SEWELL
        JEFFREY PAUL DOSS
23      BENJAMIN SANDERS WILLSON
        Lightfoot, Franklin & White
24      400 North 20th Street
        Birmingham, AL  35203
25      (205) 581-0700

```
 1   (Continued)

 2       BRANDON KEITH ESSIG
         800 Shades Creek Parkway, Suite 600D
 3       Birmingham, AL  35209
         (251) 879-1981
 4
     FOR THE DEFENDANT RUAN:
 5       DENNIS J. KNIZLEY
         7 N. Lawrence
 6       Mobile, AL 36602
         (251) 432-3799
 7
         JASON BRADLEY DARLEY
 8       Darley & McGough, LLC
         1751 Dauphin Street
 9       Mobile, AL 36604
         (251) 441-7772
10
         GORDON G. ARMSTRONG, III
11       P.O. Box 1464
         Mobile, AL  36633
12       (251) 434-6428

13       STEVEN D. MARTINIE
         4955 North Lake Drive
14       Whitefish Bay, WI  53217
         (414) 332-9683
15
     THE CLERK:  MARY ANN BOYLES
16   THE LAW CLERK:  LYNN DEKLE
     U.S. ATTORNEY IT:  BRIAN COCHRAN
17   DEFENSE IT:  SAM McALLISTER
     COURT SECURITY OFFICER:  CONNIE KING
18   COURT REPORTER:  ROY ISBELL, CCR, RDR, CRR

19          Proceedings recorded by OFFICIAL COURT REPORTER
            Qualified pursuant to 28 U.S.C. 753(a) & Guide to
20     Judiciary Policies and Procedures Vol. VI, Chapter III, D.2.
             Transcript produced by computerized stenotype.
21

22

23          I do not certify that any audio/video recordings

24   played in open court and transcribed herein are verbatim

25   transcriptions, but were transcribed to the best of my ability.
```

1                          EXAMINATION INDEX

2

TRICIA AULTMAN, MD

3          DIRECT BY MR. BODNAR  . . . . . . . . . . . . . . . 4328
           CROSS BY MR. SHARMAN  . . . . . . . . . . . . . . . 4439

4          CROSS BY MR. ARMSTRONG . . . . . . . . . . . . . .4480
           REDIRECT BY MR. BODNAR . . . . . . . . . . . . . .4511

5

6                            EXHIBIT INDEX

7
                                                       MAR  ADM

8    GOVERNMENT'S

     21-2   Patient file:  J. Driver (Couch)           4333
9
     21-3   Patient file:  SW......... (Ruan)          4334
10
     21-5   Patient file:  BW... (Couch)               4334
11
     50     Alabama Secretary of State business entity 4327
12          records for PPSA

13   51     Alabama Secretary of State business entity 4327
            records for C&R Pharmacy, LLC
14
     52     Alabama Secretary of State business entity 4327
15          records for Physicians Compounding
            Solutions, Inc.
16
     53     Alabama Secretary of State business entity 4327
17          records for JPC Properties, LLC

18   54     Alabama Secretary of State business entity 4327
            records for Physicians' Weight Loss &
19          Wellness, LLC

20   55     Alabama Secretary of State business entity 4327
            records for XLR Exotic Autos, LLC
21

22   56     Alabama Secretary of State business entity 4327
            Records for Ruan Companies, LLC
23

24   57     Alabama Secretary of State business entity 4327
            Records for XLR Properties, LLC
25

1    (9 a.m., in chambers, jury not present.)

2         MR. SHARMAN:  Good morning, Judge.

3         MR. POWELL:  Good morning.

4         MR. KNIZLEY:  Good morning, Judge.

5         MR. ARMSTRONG:  Good morning.

6         MS. GRIFFIN:  Good morning.

7         THE COURT:  Good morning.

8         MR. BODNAR:  Good morning.

9         ...(Redacted.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1          ...(Redacted.)

22          ...

23          MR. POWELL:  Yes, ma'am.

24          THE COURT:  All right.

25          MS. GRIFFIN:  Thank you.

1          MR. ARMSTRONG:  The first parade is Friday too.

2    There's going to be a lot of traffic down here.

3          MR. POWELL:  That's right.  Thank you, Judge.

4      (A recess was taken at 9:04 a.m.)

5      (In open court, defendants and jury present.)

6          THE COURT:  Good morning, ladies and gentlemen.  All

7    right, counsel.

8          MS. GRIFFIN:  Your Honor, prior to calling the first

9    witness, I'd like to introduce some Secretary of State records

10   from the State of Alabama pursuant to agreement.

11         THE COURT:  All right.

12         MS. GRIFFIN:  Government's Exhibit 50 is the Secretary

13   of State documents for Physicians Pain Specialists of Alabama

14   showing, who are the principals from that organization.

15         Government's Exhibit 51 is Alabama Secretary of State

16   records for C&R Pharmacy, LLC.

17         Government's Exhibit 52 is the Secretary of State

18   records for Physicians Compounding Solutions, Inc.

19         Government's Exhibit 53 is the Alabama Secretary of

20   State records for JPC Properties, LLC.

21         Government's Exhibit 54 is the Alabama Secretary of

22   State records for Physicians Weightloss and Wellness, LLC.

23         Government's Exhibit 55 is the Alabama Secretary of

24   State records for XLR Exotic Autos, LLC.

25         Government's Exhibit 56 is the Alabama Secretary of

```
 1    State records for Ruan Companies, LLC.
 2            Government's Exhibit 57 is the Alabama Secretary of
 3    State records for XLR Properties LLC.
 4            And, Your Honor, if I could just briefly publish the
 5    first page of each so the jury can know what we're talking
 6    about?
 7            THE COURT:  All right.
 8        (Government's Exhibits 50 through 57 were entered into
 9    evidence.)
10            MS. GRIFFIN:  Is it ready?
11            THE COURT:  No, it's not on quite yet.
12            THE CLERK:  Not yet.
13            THE COURT:  The only bad thing about having a weekend
14    is you don't know what's not going to work when we come back on
15    Monday.  It's still not up.
16            THE CLERK:  Nobody's is up.
17            MS. GRIFFIN:  Your Honor, we could publish them later
18    during the trial.
19            THE COURT:  Okay.  Maybe we should do that, because I
20    think we're going to need some help to get it back up.
21            You'll need it for your next witness?
22            MR. BODNAR:  We will need it for the next witness
23    quite a bit, Your Honor.
24        (The clerk made a telephone call.)
25            THE COURT:  We're calling.
```

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

4328

```
 1              THE CLERK:  P.J.'s going to try and reboot something.
 2              THE COURT:  Okay.  The IT people are going to try and
 3    reboot something somewhere.  Maybe it will work.
 4              MR. BODNAR:  Your Honor, we can begin the beginning
 5    part of the next witness.
 6              THE COURT:  All right.  Go ahead and call your
 7    witness.
 8              MR. BODNAR:  United States calls Dr. Tricia Aultman.
 9              THE CLERK:  If I can get you to come up to the witness
10    stand and raise your right hand.
11                          TRICIA AULTMAN, MD,
12                 was sworn and testified as follows:
13              THE WITNESS:  I do.
14              THE CLERK:  Thank you, ma'am.  Please be seated.
15                          DIRECT EXAMINATION
16    BY MR. BODNAR:
17    Q    Good morning, Dr. Aultman.
18    A    Good morning.
19    Q    Would you please introduce yourself to the jury.
20    A    My name is Dr. Tricia Aultman.
21    Q    And, Dr. Aultman, could you please explain your educational
22    background to the jury.
23    A    Sure.  I went to Miami University in Ohio for my
24    undergraduate, and I got a degree in zoology.  And I went to
25    medical school at Emory University, which is in Atlanta,
```

4329

 1   Georgia, and then --

 2   Q   And when did you graduate from medical school at Emory?

 3   A   1992.

 4   Q   Following your graduating medical school, did you do any

 5   sort of fellowship or additional training as a doctor?

 6   A   Yes, sir.  I did a residency in internal medicine at the

 7   University of Cincinnati.  It was three years.

 8   Q   And what is a residency?  Could you explain that?

 9   A   A residency occurs after medical school in whatever field

10   of medicine the doctor chooses to enter.

11   Q   And in this case yours was internal medicine?

12   A   Yes, sir.

13   Q   Can you explain what is internal medicine?

14   A   So internal medicine is like family practice except that we

15   don't see children.  So it's the treatment of virtually all

16   diseases and problems.

17   Q   And since then have you worked as an internalist for the

18   last roughly 21 years?

19   A   Yes, sir.

20   Q   Where do you currently work?

21   A   I work at Memorial Hospital in Gulfport.

22   Q   Can you explain what does a doctor do if you're employed by

23   a hospital?

24   A   I am what's called a hospitalist.  It's a movement that

25   started about 10 or 15 years ago where your primary care doctor

1    doesn't come to the hospital anymore.  If you get admitted to

2    the hospital for a problem, the hospitalists, the doctors are

3    right there at the hospital and they see you.  And we also see

4    most of the heart patients, the cancer patients, and we see

5    patients for other doctors as well so that they can be busy in

6    their clinics.

7    Q    Now, do you see patients in the hospital that deal with

8    chronic pain?

9    A    Yes, sir.

10   Q    And is it your job -- is it part of your job in the

11   hospital to treat both acute pain from like a surgery and

12   people that are in chronic pain in the hospital?

13   A    Yes, sir.

14   Q    How long have you worked as a hospitalist?

15   A    I've been a hospitalist for about three and a half years.

16   Q    Prior to that what did you do as a doctor?

17   A    I had an outpatient practice.  I owned a practice for a

18   while and I was also owned by a hospital doing outpatient work.

19   For some time I admitted my own patients, and I moonlighted as

20   a hospitalist a lot on the weekends.

21   Q    Now, when you owned your own private practice, what kind of

22   medicine were you practicing then?

23   A    Internal medicine, so primary care.

24   Q    And is that all sorts of systems of the body, just not

25   children?

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

1   A   Sure (nodding head affirmatively).

2   Q   Had you also had an opportunity to work as a doctor in

3   hospice care?

4   A   Yes, sir.

5   Q   Can you explain to the jury what does hospice care mean?

6   A   So hospice by definition means that you think that the life

7   expectancy of someone is less than six months.  And while

8   people typically think of that as being cancer, it can be

9   really any disease.  So it can be Parkinson's disease, it can

10  be just not eating from dementia or other diseases.  And so you

11  care for people at the end of life knowing that you want to

12  keep them painfree and comfortable.

13  Q   So in that setting were you also practicing -- prescribing

14  for chronic-pain patients?

15  A   Yes, sir.

16  Q   And how long have you had a DEA license?

17  A   I guess since 1999.

18  Q   And since that --

19  A   Since I finished my residency.

20  Q   I'm sorry.  Say that again.

21  A   Since I finished my residency.

22  Q   And during that time period have you prescribed opiates?

23  A   Yes.

24  Q   And is that to a range of people including chronic-pain

25  patients?

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

1   A   Yes, sir.

2   Q   How about benzodiazepines?

3   A   Yes, sir.

4   Q   How about muscle relaxers such as Soma?

5   A   Yes, sir.

6   Q   Are these drugs that you typically use in the usual course

7   of your day-to-day operation as a hospitalist or prior to as an

8   internalist?

9   A   Yes, sir.

10  Q   And prior to coming here today to testify, were you asked

11  to examine certain patient files?

12  A   Yes, sir.

13  Q   I'm going to show you now --

14      (A discussion was held off the record between counsel.)

15          MR. SHARMAN:  Your Honor, do I understand that the

16  doctor is being offered as an expert?

17          MR. BODNAR:  We will offer her as an expert in a

18  moment.  I'm just having her identify the files that she's

19  reviewed at this point.

20          THE COURT:  All right.

21  BY MR. BODNAR:

22  Q   Dr. Aultman, I'm showing you what has already been admitted

23  as Government's Exhibit 8-3, the medical file for CC.........

24  ....  Is this one of the patient files you reviewed in

25  preparing for today?

4333

```
 1   A   Yes, sir.

 2   Q   I'm going to show you what's already been admitted as

 3   20-22, a patient file for an individual named Shawn Brennan.

 4   Is that one of the patient files you reviewed prior to today?

 5   A   Yes, sir.

 6   Q   Now I'm showing you what has not been admitted yet but is

 7   being offered as Government's Exhibit 21-2.  Can you please

 8   identify what patient this is for, this file?

 9   A   Jeanette Driver.

10   Q   And is Jeanette Driver one of the patients you reviewed in

11   preparation for your testimony today?

12   A   Yes, sir.

13         MR. BODNAR:  United States moves to admit Government's

14   Exhibit 21-22 [sic].

15         THE COURT:  Any objection?

16         MR. SHARMAN:  No objection.

17         THE COURT:  All right.  Mark it in.

18      (Government's Exhibit 21-2 was entered into evidence.)

19   BY MR. BODNAR:

20   Q   I'm now showing you what has been marked as --

21         THE COURT:  Is that 21-22 or 21-2?

22         MR. BODNAR:  21-2.

23         THE COURT:  All right.  Go ahead.

24   BY MS. GRIFFIN:

25   Q   I'm now showing you what has been marked as 21-3.   Can you
```

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

 1  please identify which patient file this is?

 2  A   SW.............

 3  Q   And is the SW........... file one of the files you

 4  reviewed in preparation for your testimony today?

 5  A   Yes, sir.

 6          MR. BODNAR:  United States moves to admit 21-3.

 7          THE COURT:  Any objection?

 8          MR. ARMSTRONG:  No objection.

 9          THE COURT:  All right.  Mark it in.

10      (Government's Exhibit 21-3 was entered into evidence.)

11  BY MR. BODNAR:

12  Q   And finally United States is showing you now what has been

13  offered -- or marked as Government's Exhibit 21-5.  Can you

14  identify which patient file this is?

15  A   BW..........

16  Q   And is BW......... one of the patients that you reviewed in

17  preparation for your testimony today?

18  A   Yes, sir.

19          MR. BODNAR:  United States moves to admit 21-5.

20          MR. SHARMAN:  No objection.

21          THE COURT:  Mark it in.

22      (Government's Exhibit 21-5 was entered into evidence.)

23  BY MR. BODNAR:

24  Q   Dr. Aultman, in preparing for trial -- or your testimony,

25  did it take you a significant number of hours to review these

1  files?

2  A   Yes.

3  Q   Approximately how long did it take you to go through these

4  five different patient files?

5  A   I know it was less than 20, but it was a lot more than

6  usual -- than it takes me for each patient.

7  Q   And is this time that's taken away from either your family

8  life or from time that you would be doing work otherwise?

9  A   Maybe taking away from my fun time.

10  Q   But this was a job to you; correct?

11  A   Absolutely.  It is a job that I do on my weeks off, yes.

12  Q   And it was work that you put into it.  And were you paid

13  for your work that you did in terms of reviewing these files?

14  A   Yes, sir.

15  Q   And was that amount $7,600?

16  A   Yes, sir.

17  Q   Prior to being here in court today, can you explain to the

18  jury have you ever testified in federal court before?

19  A   Yes, sir.

20  Q   Can you explain that to the jury?  What type of cases have

21  you testified in?

22  A   Both of them were physicians involved in writing

23  prescriptions inappropriately.  The second case actually the

24  physician pled guilty, but the pharmacist still went to trial,

25  and I testified.

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

1    Q    And where were these cases that you testified in?

2    A    Both of them were in Gulfport, Mississippi.

3    Q    And in federal court?

4    A    Yes, sir.

5    Q    In addition, have you done work for the DEA in the past in

6    terms of reviewing files?

7    A    Yes, sir.

8    Q    In the cases that you testified in in Mississippi, were you

9    qualified as an expert in those cases?

10   A    Yes, sir.

11   Q    And were you permitted to give expert testimony about the

12   files that you reviewed in those cases?

13   A    Yes, sir.

14   Q    And do you know were you qualified as an internalist in

15   those cases?

16   A    Yes, sir.

17   Q    But in your capacity as an internalist, did you testify

18   about prescribing opiates and other drugs whether it was within

19   or outside the usual course of professional practice?

20   A    Yes.

21         MR. BODNAR:  The United States moves to admit

22   Dr. Aultman as an expert witness.

23         MR. SHARMAN:  Your Honor, Dr. Couch objects and would

24   like to be heard.

25         THE COURT:  Well, come to side bar, please.

1    (At the side bar, jury not present.)

2         MR. SHARMAN:  Your Honor, Dr. Couch objects to

3  Dr. Aultman being allowed to testify as an expert on the basis

4  of her qualifications.  She is an internalist and family care

5  practitioner only.  She has no training, experience in pain,

6  pain management.  She has no certifications in pain management,

7  she has not published in pain management, she's never had a job

8  in pain management, she's never had any education about pain

9  management.  She can certainly testify about principles of

10  general medicine, she can testify about issues of internal

11  medicine if there are any in this case.  But she is absolutely

12  unqualified to say anything about pain management, and we

13  object to her testimony and ask that she be excluded on that

14  topic.

15         MR. BODNAR:  Your Honor, this is something that the

16  defense has been aware of since June of 2016.  They had plenty

17  of opportunity to file a Daubert motion should this have been

18  an issue for them.  Nothing is new here.  She has worked since

19  1999 with a DEA license.  She testified that she has regularly

20  used -- prescribes these opiates on a daily basis in a hospital

21  setting and in private practice for patients that have chronic

22  pain.  She's been qualified as an expert before in federal

23  court, and we are offering her as an expert internalist, and as

24  an internalist she deals with these exact drugs.

25         THE COURT:  Are you saying internist?

4338

1          MR. BODNAR:  Internalist.

2          THE COURT:  I thought it's internist.

3          MR. SHARMAN:  Internist.

4          MR. BODNAR:  I'll clarify that with her, but she wrote

5   internalist, as internal systems, I think.

6          MR. SHARMAN:  And, Your Honor, a couple of points.

7   First, this is a simple qualifications challenge; this is not a

8   methodology kind of publication Daubert challenge.  She is

9   literally unqualified to do this.

10         Secondly, as best I can tell, at least for that kind

11  of challenge, there is no proscription against raising

12  qualifications whenever the witness takes the stand.

13         THE COURT:  Okay.  I overrule the objection and I will

14  allow her to testify as an expert.

15     (In open court, defendants and jury present.)

16  BY MR. BODNAR:

17  Q   Dr. Aultman, one clarifying point.  When you said the type

18  of job that you worked, is it called an internalist or an

19  internist?

20  A   Internist.

21  Q   An internist?

22  A   A doctor of internal medicine.

23  Q   I'm sorry.  I talked over you.

24  A   A doctor of internal medicine.

25  Q   And that is an internist?

4339

1  A   Yes, sir.

2  Q   Can you explain to the jury a little bit about what a

3  doctor-patient -- what makes up a doctor-patient relationship?

4  A   A doctor-patient relationship in legal terms is really any

5  communication that occurs between someone who is asking for

6  help and someone who provides it.

7  Q   And in your experience when you work in private practice

8  and in the hospital, do you actually sit down and meet with the

9  patients that you deal with?

10  A   Yes, sir.

11  Q   Why is it important for a doctor or the person who's going

12  to be prescribing for that patient to be the one that actually

13  meets with the patient?

14  A   To take your own history or confirm a history taken by

15  members of your staff and to perform your own physical

16  exam.  We can also tell a lot about a person just by the way

17  they sit, the way they walk, the way they talk, in terms of

18  their general well being.

19  Q   In terms of patient history, can you explain why is it

20  important for a doctor to take a patient history even if

21  they've been seen by another doctor or referring doctor in the

22  past?

23  A   I think you can never really trust what is written or what

24  you've been told by someone until you ask, yourself, in the

25  same way that you would ask a friend a story or not ask a

4340

 1   friend about a situation that you had already heard.  You'd

 2   want to hear the information for yourself.  And everyone

 3   throughout your medical career develops your own style of

 4   questioning and certain questions that you like to ask and want

 5   answered.

 6   Q   Is there a general, standard kind of protocol for progress

 7   notes known as SOAP?

 8   A   Yes, sir.

 9   Q   Could you please explain first what does the SOAP stand for

10   and then kind of walk through what each of them means in terms

11   of a progress note?

12   A   Right.  So a SOAP note is the standard way that any

13   doctor's visit is written in the medical chart, both in the

14   hospital and out, in a private clinic.  Subjective is the

15   subjective part.  And that is what the patient tells you.  So,

16   in other words, a patient comes in with a complaint like:  I

17   have a runny nose and a cough.

18              And then to get more under the S., the subjective, you

19   engage in a dialogue with the patient.  You say:  Well, how

20   long have you had it?  How bad does it hurt?  Does anything

21   else bother you, and so forth.  And --

22   Q   So that's the S. section?

23   A   Yes, sir.

24   Q   I'm sorry.  You said and also?

25   A   There's also a part called the review of systems, which the

1    physician goes through first all the body systems, it says,

2    even starting from head to toe:  Have you ever had, you know,

3    hair loss, problems with your vision, runny nose, watery eyes,

4    sore throat, cough, et cetera, and all the way through.

5    Q    And what's the next part, what is O.?

6    A    So O. stands for objective, and objective is the physical

7    exam.  So it starts with usually vital signs -- height, weight,

8    blood pressure, temperature, et cetera -- and then it goes

9    through the physical exam.  Also included in the objective is

10   any other information like labs or radiology reports, those

11   kinds of things.

12   Q    With pain being fairly subjective, why would you have an

13   O., an objective part, when you're looking at a chronic pain

14   patient to begin with?

15   A    As I said a few minutes ago, you can tell a lot about a

16   person just by their general well being.  So if you walk into a

17   room and the patient's lying on the exam table, for example,

18   with a fever, you know they have the flu.  They don't have to

19   say too much perhaps, but you know that's a bad sign they are

20   really sick.  And then the same way with a pain patient, how

21   they walk, are they using any assist devices, like are they in

22   a wheelchair that day and last week you saw them and they

23   walked in?  Do they have a cane?  What's their range of motion

24   like?  In other words, can they move their arms around all the

25   way?  Are they stuck here?  And also things like can they stand

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

1   from a sitting position by themselves or do they have to have
2   help?
3   Q    Now, does the objective, in looking at pain patients, help
4   you evaluate the subjective part as well?
5   A    Yes, I think so.
6   Q    So if a patient comes in and says their pain is a 10 out of
7   10, but objectively they are walking in smiling, shaking your
8   hands, is that something that you would consider in evaluating
9   whether the person actually was in 10 out of 10 pain?
10  A    Yes, I would say clearly their scale seems to be off,
11  because 10 out of 10 pain would be equivalent to having third-
12  degree burns or second-degree burns or being on fire, something
13  like that.
14  Q    So we've done S. and O.  What's the A.?
15  A    So under A., A. stands for assessment.  So that's when you
16  take everything, the information from the subjective and the
17  objective, and you kind of formulate it into something.  It can
18  be a diagnosis.  Sometimes you don't know the diagnosis, so you
19  just might put sore throat.
20  Q    And which section does the physical exam go in?  Is that in
21  the O. or the A. section?
22  A    That's in the O.
23  Q    So let's go back to the O. for a minute.  What's the
24  importance of doing a physical examination, particularly with
25  pain patients?

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

1    A    As I said, you want to find out and perhaps validate some

2    of their complaints that you heard in the S.  So if they say,

3    you know:  I have a rotator cuff tear and I can't raise my arm,

4    and you know you can sort of try to lift their arm up and it

5    will go, or if it's a frozen shoulder, for example, and you ask

6    them to raise it and they can't, and then you try to push it up

7    even and you can't push it up, they will sort of lean, so it

8    can help you validate all sorts of complaints.

9    Q    So again, physical exam helps understand whether or not the

10   S., the subjective part, is legitimate?

11   A    Yes, it can (nodding head affirmatively).

12   Q    And when you do -- as a doctor, if you're doing the

13   physical exam or if there's a physical examination in the

14   notes, are you just copying the physical exam that the

15   referring doctor did or are you doing your own physical exam?

16   A    No, I would perform my own.

17   Q    Why wouldn't you just copy over the physical exam done by a

18   referring doctor?

19   A    Because that's not honest.  And I'm signing the chart, and

20   so it's going to be my exam in the notes.

21   Q    And if the physical exam was done by a previous doctor, who

22   was the doctor that day that might be prescribing them, the

23   pain -- the pain medicine?

24   A    I'm sorry.  Ask that again.

25   Q    If a prior doctor had done the physical, that prior doctor

1  isn't there that day to do the prescriptions?

2  A   Correct.  So, of course, the physical exam can change.  I

3  mean, it can even change day to day.

4  Q   So now we've done the S., the O., and the A.  What's the P.

5  portion of SOAP?

6  A   So P. stands for plan.  So once you have your diagnosis,

7  then in the plan you're going to write everything you might

8  do.  For a pain patient it might be medication, it might be

9  physical therapy, it might be occupational therapy.  It could

10  be a release from work orders for tests and labs, all of those

11  things.

12  Q   And how often is the SOAP analysis done?  Is this done

13  every time you meet with a pain patient or is this done just in

14  the beginning and it carries over throughout?

15  A   No, it should be done every time.

16  Q   Why is that?

17  A   Things change.  And under the subjective part, especially

18  in a pain patient, you're going to ask them how are they doing,

19  are they able to do their daily activities or not?  Have they

20  gotten better?  Have they gotten worse?  And what if anything

21  has happened in the meantime?  Have they fallen down, for

22  example, had a surgery, had some other procedure?

23  Q   How long does a typical office visit take when you're going

24  through the SOAP process with a patient?

25  A   I think for a new patient visit, I think it averages

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

1  probably 30 to 40 minutes.  I think for a followup probably 15

2  to 20.

3  Q   And can portions of this SOAP be done by a nurse

4  practitioner or a lower-level delegate of the doctor?

5  A   Yes.

6  Q   Ultimately, though, whose decision is it to make if a drug

7  is going to be prescribed?

8  A   It's the responsibility of the prescribing physician or the

9  person with the DEA number, if it happens to be a nurse

10 practitioner.

11 Q   So if a nurse practitioner has a DEA number, then that's

12 fine, if they are making the prescription decisions?

13 A   Yes.

14 Q   If the prescriber is ultimately going to be the doctor,

15 though, what role does the doctor have to play in any of this

16 SOAP analysis?

17 A   The doctor, despite what the nurse practitioner writes, is

18 signing the note and is ultimately responsible for everything

19 that happens in the note.

20 Q   So explain signing the note.  How does that work for

21 electronic medical records?

22 A   Usually how it works is you'll have an inbox and it will be

23 things to sign and just pull them up one at a time and click --

24 sorry -- click to sign.

25 Q   And before you click to sign, in your cases do you review

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

1    the file to make sure that it is accurate?

2    A   Yes.  And I work with nurse practitioners and I read

3    through everything I sign.

4    Q   If it's not accurate, what do you do before you sign it?

5    A   You can either -- depending on the medical record -- you

6    can either add an addendum at the end or you can insert your

7    own stuff within their note or correct it, change it.

8    Q   Why is accuracy important in medical records?

9    A   Because a medical record is not just something that other

10   doctors use to help them take care of patients.  It's also a

11   legal document.

12           MR. SHARMAN:  Objection to any legal conclusions, Your

13   Honor.

14           THE COURT:  Overruled.

15   BY MR. BODNAR:

16   Q   You can continue, please.

17   A   So it's a legal document.  And so -- and actually bringing

18   electronic medical records into play has helped and hurt in

19   some ways the way that we document things.  It's certainly

20   easier to read now, but at times just a little bit more

21   cumbersome.

22   Q   And you mentioned that sometimes other doctors may use

23   medical records.  Why in this, with other doctors looking at a

24   medical record, is it important that a patient's file be

25   accurate?

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

1    A    When I was in my training, I was taught that it was
2    basically -- they called it the hit-by-the-bus rule.  So if you
3    leave the clinic and you walk out in Atlanta and you get hit by
4    the bus, whoever takes over your clinic the next week needs to
5    be able to understand what you were doing and what the plan
6    was.
7    Q    You talked about prescription writing before and DEA
8    licenses.  You mentioned nurse practitioners can get DEA
9    licenses; is that correct?
10   A    Yes, sir.
11   Q    If someone doesn't have a DEA license, do you allow them to
12   sign your name if they're working under you?
13   A    They would absolutely not be allowed to sign my name.
14   Q    Why is that?
15   A    Because that would be forgery, I believe.  And I would work
16   with them and if they thought that a certain medicine needed to
17   be prescribed, I would discuss that with them and maybe put it
18   in the note, but I would write the prescription myself.
19   Q    And sign the signature yourself?
20   A    Yes, sir.
21   Q    Have you ever delegated your signing authority on
22   prescriptions to someone else in your practice?
23   A    No.
24   Q    How about when you're out of town?  If you're out of town
25   and you've got nurse practitioners working under you, can't you

4348

1    just let them sign your name to prescriptions?

2    A    No, sir.

3    Q    Why is that?

4    A    It's not appropriate, it's illegal, and it's -- you know,

5    you run the risk of losing your DEA license.  And it's

6    dangerous.

7    Q    Is that outside the usual course of professional practice

8    to allow someone else to sign your name --

9    A    Yes, sir.

10   Q    -- if you're the doctor?

11   A    Yes, sir.

12   Q    How about -- we talked about the accuracy of medical

13   records.  Is it within the usual course of professional

14   practice to ensure that medical records are accurate?

15   A    Yes, sir.  That's your responsibility.

16   Q    Now, with the advent of electronic medical records, are you

17   familiar with the term of certain things prepopulating or

18   cloning from one visit to the other?

19   A    Yes, sir.

20   Q    Could you explain that to the jury?

21   A    So the manufacturers that have put together these

22   electronic medical records have tried to make it easy for

23   doctors to be able to make a nice note electronically without

24   taking up too much time, as you can imagine.  And if you've

25   been to a physician lately, you know that they are sort of

1    typing, looking, typing, looking, something like that.  So what

2    they've done is they've created these normal exams.  So you can

3    just make it so that the normal exam, a normal human -- either

4    male or female -- exam will go right into your note.  The other

5    option is to make it so that the normal goes in and change it

6    or make it so that no exam goes in and you write your own.

7    Q   If it prepopulates from one visit to the other and you're

8    really busy, isn't it just fine to sign the note as if that's

9    what happened that time?

10   A   No.

11   Q   Why is that?

12   A   Because it's not accurate.

13   Q   And do you have a duty, by signing it, to ensure that the

14   medical record is in fact accurate that you're signing?

15   A   Yes, sir.

16   Q   Turning now to certain medications, you discussed that you

17   prescribe opiates during the usual course of your business; is

18   that correct?

19   A   Yes, sir.

20   Q   Can you explain what are the type of opiates that you

21   prescribe in the hospital setting?

22   A   So opiates is a really big name for a lot of different

23   medications.  There's a couple of natural opiates, which are

24   codeine and morphine, and then there's all sorts of synthetic

25   or man-made opioids.

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

1  Q   Does that include hydromorphone, oxymorphone, fentanyl,

2  oxycodone, and hydrocodone?

3  A   Yes, sir.

4  Q   And are those drugs that you use on a regular basis?

5  A   Yes, sir.

6  Q   Can you explain to the jury about the type of chronic-pain

7  patients that you see in the hospital now?

8  A   In the hospital we cover a lot of the orthopedic surgery

9  patients.  And many of these patients have chronic pain from a

10 back disorder, a neck disorder, and they are there to try to

11 get help for their back or neck with the surgery.  And so we

12 have to manage sort of their chronic-pain issues along with the

13 acute surgical pain.

14 Q   So just to clarify, the pain from the surgery itself would

15 be the acute pain, the short pain with a known reason?

16 A   Yes, sir (nodding head affirmatively).

17 Q   Versus the chronic pain was maybe the reason they came in

18 and had the surgery in the first place?

19 A   Right.  That would be one example.  Another example would

20 be we manage cancer patients in the hospital and also hospice

21 patients.

22 Q   Now, are you familiar with the term "breakthrough pain"?

23 A   Yes, sir.

24 Q   How about the term "breakthrough cancer pain"?

25 A   Yes, sir.

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

1   Q   Can you explain to the jury what if any difference there is

2   between breakthrough pain versus breakthrough cancer pain?

3   A   Aside from the fact that one's from cancer, there's

4   probably not a huge difference.

5   Q   Is there any difference in the severity between the two or

6   is it just based on the cancer aspect?

7   A   Most patients that have chronic pain from cancer, it's

8   usually significantly more severe than people that have chronic

9   pain from muscular or joint problems.

10  Q   And did you deal with people that had breakthrough cancer

11  pain in the hospital and then also while you worked in hospice

12  care?

13  A   Yes, sir.

14  Q   And did you have people that just had normal breakthrough

15  pain through a musculoskeletal issue --

16  A   Yes, sir.

17  Q   -- in both settings?

18  A   (Nodding head affirmatively.)

19  Q   You mentioned the different types of drugs that you

20  use.  Is fentanyl one of the types of drugs that you use in the

21  hospital?

22  A   Yes, sir.

23  Q   What type of fentanyl are you using for patients in the

24  hospital setting?

25  A   In the hospital, probably the type that I would use would

4352

1    be the patch.  They've been around for quite a while and

2    they're reasonably affordable and they work well in people with

3    chronic pain, especially cancer pain.  They last for 72 hours.

4    So it's a nice, good delivery of pain medicine in a patch form.

5    You can easily see where it is and know how much they're on.

6    The dose is written on it, et cetera.

7    Q    And are those what are called the Duragesic patches?

8    A    Yes, sir.

9    Q    And prior to working in the hospital, had you used

10   Duragesic patches for chronic-pain patients in your private

11   practice and in hospice care?

12   A    In hospice care, yes.  In private practice, there may have

13   been a few patients and I probably wasn't the prescriber.  This

14   is not something that -- it's a very strong drug and not

15   something that I would typically need to use.

16   Q    What were you typically using then for breakthrough pain --

17   or for chronic pain?  I'm sorry.

18   A    Chronic pain, in my practice, I manage through a variety of

19   ways.  Hydrocodone would probably be one thing that I would

20   prescribe in low doses along with other modalities.  So

21   physical therapy, occupational therapy, massage therapy, heat,

22   and surgery, if it's something that -- if it's a young patient

23   and they are healthy and they can undergo surgery, it's a great

24   way to fix the problem.

25   Q    And for these chronic-pain patients were you able to

1   alleviate or at least lessen their chronic pain without going

2   up to fentanyl?

3   A   Yes.  And I think one thing that I missed in that list was

4   some of the antidepressants we know now are also very good for

5   chronic pain, as well as Neurontin and Lyrica, which are drugs

6   that work on the nerves and they help.  But yes.  And if I

7   couldn't, I would refer to pain management.

8   Q   And in your career did you ever use -- have you every used

9   the drug Subsys?

10  A   No, sir.

11  Q   How about Abstral?

12  A   No, sir.

13  Q   How about Fentora?

14  A   No, sir.

15  Q   And do you know what type of drugs those are?

16  A   Those are all forms of fentanyl that I believe are reserved

17  for cancer patients.

18  Q   But you've dealt with cancer patients at the end of their

19  life; isn't that correct?

20  A   Yes, sir.

21  Q   You didn't use Subsys or Abstral for those end-of-life

22  cancer patients?

23  A   No, sir.

24  Q   Were you able to alleviate their end-of-life cancer pain

25  with something less than Subsys or Abstral?

4354

1   A   Yes, sir.

2   Q   Typically what were you using for those end-of-life cancer

3   patients?

4   A   Probably a good dose of a fentanyl patch and maybe with or

5   without other medication.

6   Q   Now, is there a difference between the patch, the

7   long-acting patch, versus instant release Subsys and Abstral?

8   A   Yes, sir.

9   Q   Can you explain what that difference is?

10  A   Well, a long-acting opioid, the idea is that you don't get

11  a spike and a fall of the pain, that you just -- once a patch

12  is in place, you get a smooth release of the pain (indicating).

13          And the other ones that you mentioned, a spray or

14  something, you would get a very large amount.  And so we know

15  from years of experience that drugs that give you an immediate

16  release are more likely to be abused.

17  Q   And in your practice do you prescribe any drugs that you

18  have a personal financial self-interest in prescribing?

19  A   No, sir.

20  Q   Are you on the speaking program for any pharmaceutical

21  companies?

22  A   No, sir.

23  Q   Do you own large amounts of stock in any of the companies

24  for the drugs that you prescribe?

25  A   No, sir.

1   Q   Now, from opiates we'll go now to benzodiazepines.  Is that

2   a class of drugs that you have used before as well?

3   A   Yes, sir.

4   Q   Would you explain to the jury what are some of the examples

5   of benzodiazepines?

6   A   So benzodiazepines are sedatives, including names you would

7   have heard, would be Xanax, Klonopin, Valium, and some

8   longer-acting ones we use for alcohol withdrawal, Tranxene and

9   Librium.

10  Q   Now, how are drugs like Xanax and Valium used in the

11  treatment of chronic pain?

12  A   When you're treating chronic pain, you have to look at all

13  of the parts of pain in the patient.  And a lot of pain is the

14  anxiety over pain.  It's also true that benzodiazepines can be

15  good for muscle spasm, so they do have a place.

16  Q   And when you are prescribing benzodiazepines in combination

17  with opiates, is there any special care that needs to be taken?

18  A   Yes, sir.

19  Q   And can you explain that?

20  A   Benzodiazepines, when you give them with opiates, have a

21  much -- there's a much greater risk of respiratory depression

22  or to stop breathing.

23  Q   So what if anything do you counsel a patient on beforehand,

24  before prescribing those type of drugs in combination?

25  A   Certainly if they have sleep apnea or COPD, you need to

4356

1   have a long discussion about the benefits and the risks.

2   Q   And is that so that the patient can make informed consent

3   of whether or not they want to take this combination of

4   medicine?

5   A   Yes, sir.

6   Q   Who is the one that has the conversation with the patient

7   in order for their informed consent to be given?

8   A   The physician.

9   Q   Why is it the physician versus just a nurse practitioner or

10  an MA?

11  A   Well, because the physician is the one responsible for the

12  prescription.  They are signing it and so they are going to

13  need to have the conversation.

14  Q   Well, can you explain to the jury how does a typical

15  informed consent work with you, with your patients, if you are

16  going to put them on a potentially dangerous combination of

17  drugs?

18  A   So you try to first give the patient choices.  You say:

19  You have this choice and this choice.

20          And then you tell them all the risks of both of the

21  choices and then you discuss the benefits.  And you try to keep

22  it in pretty basic language, because reading the inserts with

23  the products is usually pretty difficult.

24  Q   So do you try to put it in kind of simple terms for a

25  patient to understand here are the risks versus the benefits of

4357

1   being on a particular drug or combinations of drugs?

2   A   Yes, sir.

3   Q   Is doing that, providing that type of informed consent by

4   the doctor, is that within the usual course of professional

5   practice of medicine?

6   A   Absolutely.

7   Q   Is not doing that outside the usual course of professional

8   practice?

9   A   When you're dealing with dangerous drugs, it would be

10   outside the course of professional practice.

11   Q   And when we're talking about opiates, are those what you're

12   considering to be dangerous, potentially dangerous drugs?

13   A   Yes, sir.

14   Q   Now, we talked about opiates and benzodiazepines.  Are you

15   familiar with a term called the "Holy Trinity"?

16   A   Yes, sir.

17   Q   Can you explain to the jury, what is the Holy Trinity?

18   A   So the Holy Trinity is when a patient takes an opioid such

19   as morphine, hydrocodone, Lortab, with a benzodiazepine like

20   Xanax, Klonopin, Valium, with a muscle relaxant.  And sort of

21   the one on the street that's most coveted would be Soma, or

22   carisoprodol.  There is some evidence that Soma, when you take

23   it with Lortab or hydrocodone, has a very euphoric effect, more

24   so than the other muscle relaxants.

25   Q   By euphoric, you mean it gets you high?

4358

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

1  A    Yes, sir.

2  Q    And if you're going to be prescribing those -- now, it's

3  not inherently illegal to prescribe those three drugs in

4  combination, is it?

5  A    No, sir.

6  Q    So what steps should be taken if you were going to be

7  prescribing those three particular types of drugs in

8  combination, the Holy Trinity combination?

9  A    I mean it starts pretty basic.  You perform your own

10  history, you document an adequate physical exam, and especially

11  when prescribing drugs of abuse, and you want to discuss with

12  the patient a previous history of substance abuse, alcohol

13  abuse, and perhaps abuse in their family, and you also want to

14  go through some sort of psychiatric questions.

15  Q    Why would you ask those type of questions?

16  A    We know that people that -- people that abuse other drugs

17  and alcohol are more likely to run into problems abusing these

18  types of medications.  And you also want to make sure you're

19  not prescribing medicines that are just going to end up on the

20  street.

21  Q    Now, if you have that informed consent conversation with a

22  patient, is that something that you document in your file?

23  A    Yes, sir.

24  Q    And do you also put in the medical record your reasoning or

25  rationale for why you would prescribe certain combinations of

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

```
 1   drugs?
 2   A   Yes, sir.
 3   Q   What part of the SOAP would that typically go into?
 4   A   It would go into your plan.
 5   Q   So the P.?
 6   A   Yes, sir.
 7   Q   And if you did decide:  Okay, we're going to prescribe
 8   Soma, an opiate, and a benzo, what type of language would you
 9   put in your P., your plan, to explain why you were giving a
10   patient those drugs?
11   A   If you were going to be just real brief, you might say:
12   Risks and benefits of these medications discussed and patient
13   willing to proceed.  Will follow up in this time period or call
14   with problems.
15   Q   Now, what kind of -- what kind of steps do you take to
16   monitor patients to make sure that they are complying with what
17   they should be doing?
18   A   Right.  So there's a couple of ways to monitor.  You can
19   have patients bring their pills in and you can even make that
20   random.
21   Q   What's that called?
22   A   It's called a pill count.  So you can call them and say you
23   need to bring all your medicines in and just count the number
24   of pills that are left and compare that to the calendar, see if
25   they are taking them as prescribed.  And you can also perform a
```

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

```
 1  urine drug screen.
 2  Q   And why is a urine drug screen done?
 3  A   It's done for two reasons.  It's done to make sure they are
 4  taking the things you prescribed and it's also done to make
 5  sure they are not taking anything illegal.
 6  Q   Now, in your practice --
 7  A   Or not prescribed.  Sorry.
 8  Q   So to confirm that they should have the right drugs in
 9  their system --
10  A   Right.
11  Q   -- and to try to confirm that they don't have other --
12  whether prescription drugs or illegal -- drugs?
13  A   Yes.
14  Q   And are you familiar with what's called GC-MS testing, the
15  gas spectrometer mass chromatography testing?
16  A   Yes, sir.
17  Q   Do you know, how is that different from just the standard
18  cup test?
19  A   It's more expensive and usually not the type of testing
20  that's done in the office.  It's something you would send out
21  for.
22  Q   To an outside lab?
23  A   Right.
24  Q   But it is important to get accurate readings of what is in
25  the urine?
```

TRICIA AULTMAN-MD - DIRECT BY MR. BODNAR

1   A   Yes.  That would be -- it would be much more specific.

2   They can even tell you, you know, which opioid the person's

3   taking, not just positive for opioids.

4   Q   So doing something like that would be in the usual course

5   of professional practice; is that correct?

6   A   Yes, sir.

7   Q   Now, what about when the results come in?  Let's say the

8   results come in and you have inconsistent GC-MS tests.  What is

9   the usual course of professional practice for a doctor to do at

10  that point?

11  A   I think you would repeat it and you would have a frank

12  discussion with the patient.  And if you found they were

13  noncompliant, I think very likely the appropriate thing would

14  be to dismiss them from your practice.

15  Q   But what about the fact that there could be people that are

16  abusing drugs who are in legitimate pain?  Isn't that not

17  compassionate, to dismiss a patient like that?

18  A   No, sir.

19  Q   Why is that?

20  A   If you're putting medicine into the hands of someone who's

21  not using it appropriately, you're responsible if something bad

22  happens to them or if they sold the drugs to somebody else.

23  You could potentially be responsible for what happened to that

24  person.

25  Q   Does Mississippi have a program that monitors prescription

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

4362

1  drugs, a PDMP or a PMP?

2  A   Yes, sir.

3  Q   How are those used in connection with treating pain

4  patients?

5  A   So before a visit, you might print up the prescription

6  monitoring program just to make sure, number one, they filled

7  the prescription that you gave hem, and that they hadn't gotten

8  any other medicines from other doctors or emergency rooms.

9  Q   Why, why is it a concern if they are getting prescriptions

10  from another doctor?

11  A   Usually when you enter into a pain-management program

12  there's some sort of contractual agreement that you agree that

13  you'll only receive medicines from that physician, controlled

14  substances from that physician.  So if they're receiving from

15  other people, there's a risk that they're either abusing the

16  medicine, selling it, or there's a risk that they're having an

17  addiction problem and could potentially get themselves into

18  trouble.

19  Q   If you have a patient that you believe is addicted or is

20  abusing their drugs, typically what would you do with that type

21  of patient?

22  A   In that case I usually dismiss the patient from the

23  practice.  You try to -- at least in Mississippi, in my

24  practice, I always was to give 30 days' notice and you provide

25  medication for the 30 days.

4363

1  Q   Is that so they don't go through withdrawal --

2  A   Sure.

3  Q   -- while they seek treatment?

4  A   Sure.  You also might give them a weaning schedule and then

5  you would refer them to another provider.

6  Q   What's a weaning schedule?

7  A   For example, if you are willing to give them 30 days of

8  medicine but you thought they should significantly cut back on

9  the dose, you could cut back, say, 10 percent per week, for

10  example, on the amount of medicine they were taking.

11  Q   Is that something that you would mark in your medical file

12  as well?

13  A   Absolutely.

14  Q   Now, turning to the patient files that you reviewed --

15  A   Okay.

16  Q   -- I believe you mentioned that BW......... was one of the

17  patients that you reviewed prior to testifying today?

18  A   Yes, sir.

19  Q   I'm going to show you now excerpts of what has been

20  admitted as Government's Exhibit 21-5, the patient file for

21  BW..........  Based on your review of this file, do you know if

22  BW......... was a workers' comp patient?

23  A   I believe she was.

24  Q   And can you explain to the jury, do you know what workers'

25  comp is or how workers' comp reimburses compared to how a

1    normal commercial insurance reimburses?

2    A   Workers' comp is normally very good reimbursement.

3    Unfortunately, medicine has become a business and so when

4    you're looking at patients you often look at all of them and

5    you try to have at least some that have good insurance.  The

6    workers' comp would be one of those.

7    Q   And I'm now going to take out from Government's Exhibit

8    21-5 a copy of the first visit.  And BW......... is a patient

9    of which doctor?

10   A   I would have to look at the end who signed it.  I'm sorry.

11   There you go.  Dr. Couch.

12   Q   And here, the history of present illness, is this what

13   you're talking about as kind of the S. portion of the exam?

14   A   Yes, sir.

15   Q   And what is her issue?  What are her complaints here?

16   A   So she's referred by another doctor for chronic back pain,

17   which appears to be really neck to lower back.

18   Q   And is it explained here that she's a workers' comp patient

19   who had been injured up in Ohio?

20   A   Yes, sir.

21   Q   What is she currently taking as she came to the practice?

22   A   It looks like she was taking Lortab, which was hydrocodone,

23   an opioid, and a Soma, which is a muscle relaxer.

24   Q   And working down the social history, is that also part of

25   the S. portion?

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

4365

1    A    Yes, it is.

2    Q    Why is it important to take a social history?

3    A    It tells you so much about the patient.  I mean, if they

4    come in complaining of pain and they are digging ditches every

5    day, then clearly they are not doing too poorly.  Social

6    history also includes information about drug or alcohol abuse

7    and it also tells you about their family history.  Some kinds

8    of arthritis can run in families.  And so if you see, for

9    example, that their mom had rheumatoid arthritis, you might

10   think that you needed to test that.

11   Q    And then we see the review of symptoms.  Is that part of

12   O., the objective portion?

13   A    No.  Review of systems is still part of the subjective,

14   because it's a dialogue.  You are talking back and forth with

15   the patient.

16   Q    So presumably the patient actually was asked these

17   questions and actually gave these responses?

18   A    Right.

19   Q    And based on just looking at the physical record, do you

20   have any way of telling whether or not these are in fact

21   accurate records?

22   A    No.

23   Q    Now, physical examination.

24   A    Yes, sir?

25   Q    Is that now part of the O.?

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

1  A   Yes, sir.

2  Q   And does this appear to detail a fairly detailed physical

3  examination that occurred?

4  A   This is actually a pretty detailed physical examination.

5  Q   And I'll just show you.  It goes on to the next page as

6  well.  And review -- having reviewed this already,

7  approximately how long would you expect a physical examination

8  as described in here to take a doctor?

9  A   Especially with all of the musculoskeletal things you see

10 here that they are documenting, I would say at least 15

11 minutes, and that's in somebody that's fast.

12 Q   And just looking at some of the things that claim they were

13 done, pupils equal and round, pupils reactive to light

14 bilaterally, does that mean you shine a light in their eyes?

15 A   Yes, sir.

16 Q   How about looking at the thyroid:  Gland size normal,

17 nontender, no nodules or masses present on palpation?

18 A   A thyroid exam can take a while to find it.  And then to

19 really know if it has masses, you want to have a patient

20 swallow.  Sometimes you need to get a cup of water.  That can

21 delay it.

22 Q   And that would be you physically putting your hands on the

23 patient?

24 A   Yes, sir.

25 Q   So according to this record, all that happened in this

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

1    visit?

2    A    Yes, sir.  And they listened to their heart as well.

3    Q    They listened to their heart?

4    A    Uh-huh (positive response).

5    Q    Abdominal examination, what does it -- according to this

6    record, what does it say occurred?

7    A    So they performed a full abdominal exam, which is performed

8    with the patient lying down, and they felt on all areas of the

9    belly and in the lower belly.

10   Q    And that's something that you physically -- someone, either

11   the nurse practitioner or the doctor, physically is touching

12   the patient; is that correct?

13   A    Yes, sir.  Especially with the liver and spleen, to say

14   that there's no hepatomegaly, you have to press hard actually

15   sometimes.

16   Q    So it's not something that could just happen by a brush of

17   a hand against a person?

18   A    No, sir.

19   Q    And just looking at some of these range in motion tests,

20   where they talk about inspection/palpation of the lumbar spine,

21   what, according to this record, actually happened during this

22   visit?

23   A    They did a very thorough spinal exam.  You would have to

24   probably be in a hospital gown or at least in a very thin shirt

25   to be able to do all these things adequately.

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

1  Q   But according to this record, that is what occurred at this
2  visit?
3  A   Yes, sir.  He also walked in here.  It says gait
4  inspection.
5  Q   What does that mean?
6  A   The way they stand and viewing the walk and watching them
7  stand from a sitting position.
8  Q   What is it about no abnormalities on palpation of the skin,
9  what would be required to have done that test?
10 A   If you're really documenting the full skin exam, you really
11 need to be undressed and unclothed.
12 Q   And does that appear to be what they are saying occurred
13 here?
14 A   Yes, sir.
15 Q   Now, you mentioned before that electronic medical records
16 -- it may have just all populated it in here as part of a
17 normal plan.  Is that what you were talking about before?
18 A   As part of a normal exam, yes, sir.
19 Q   Would it be the usual course of professional practice,
20 though, if this didn't happen, to just leave that in as it had
21 been prepopulated?
22 A   No.  You could delete them.  There would probably be boxes
23 and you could just uncheck the things you didn't do and then
24 maybe elaborate on the things you did, if there was something
25 abnormal.

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

1  Q   So just because something prepopulates in an electronic

2  medical record, you still can change that?

3  A   Yes.

4  Q   And would it be in the usual course of professional

5  practice to make sure it was done accurately?

6  A   Yes.

7  Q   And I see the assessment and plan.  Is that the A. and the

8  P. part of SOAP?

9  A   Yes, sir.

10  Q   And what drugs are prescribed now?  It said she had come in

11  on Lortab and Soma.  What is she now being prescribed?

12  A   Looks like she was given Mobic, which is an anti-

13  inflammatory; Ultram, which is an opioidish drug, kind of a low

14  strength; and then Zanaflex is a muscle relaxer.

15  Q   And at the end do you see electronic signatures?

16  A   Yes, sir.

17  Q   What was the date that it was signed by Justin Palmer?

18  A   February 6th.

19  Q   And just looking back at that front page, is that the date

20  of the exam?

21  A   Yes.

22  Q   What's the date signed by Dr. Couch?

23  A   February 20th.

24  Q   By signing that, is he confirming that it is true and

25  accurate?

4370

1   A   Yes, sir.

2   Q   Also on that first visit was a drug test taken?  And I'll

3   show you now another excerpt from her file.  Is this a drug

4   test for BW......... for February 6th?

5   A   Yes, sir.

6   Q   What does it mention that she is positive for here?

7   A   Marijuana.

8   Q   And what if any concern would you have if this was your

9   patient with their first test and them testing positive for

10   marijuana?

11   A   That they are taking an illegal substance.

12   Q   What if anything would you do in this case where a patient

13   comes to you for the first time and has marijuana in their

14   system?

15   A   I think I would counsel her or him and ask them to come

16   back and recheck.  And if they were negative, I would let them

17   into my practice and just follow them with a little bit more

18   care, a little closer than I would somebody else.

19   Q   What if they continue to test positive for marijuana?

20   A   Then I would dismiss them from my practice.

21   Q   Isn't it true, though, that marijuana can help people, such

22   as medical marijuana?

23   A   I think that's debatable.

24   Q   If someone has an actual medical marijuana prescription,

25   though, would that be noted in the file?

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

4371

1   A   Yes, sir.  As far as I know, it's not legal in Alabama.

2   Q   And did you see anywhere in there that noted she had a

3   medical marijuana prescription from anywhere else?

4   A   No, sir.

5   Q   And, as you reviewed this entire file, was there any

6   indication that she had a medical prescription for marijuana?

7   A   No, sir.

8   Q   You mentioned the importance of doing GC-MS testing?

9   A   Yes, sir.

10  Q   I'm going to show you now the GC-MS test for BW.........

11  for that visit.  (Indicating.)

12  A   Okay.

13  Q   Does it say it was collected on February 6 of 2014?

14  A   Yes, sir.

15  Q   And what does it say was in her system here?

16  A   Marijuana.

17  Q   So has it now been confirmed that she did have marijuana in

18  her system?

19  A   Yes, sir.

20  Q   And did they continue to go forward prescribing to this

21  patient?

22  A   Yes, sir.

23  Q   Following her testing positive for marijuana, I'm going to

24  show you now from her file what is the second visit.

25  A   Okay.

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

4372

1   Q   On March 6, 2014.  And does it mention in her history of

2   present illness if it was discussed with her about her

3   marijuana usage?

4   A   It looks like they mentioned it, yes, sir.

5   Q   Now what drugs are being prescribed for her at this visit?

6   A   She's given a Duragesic patch, which is fentanyl, Norco,

7   which is hydrocodone, with the 325, which means it has

8   acetaminophen or Tylenol with it.

9   Q   So in one month she jumped from Ultram and Mobic to

10  Duragesic patches and Norco?

11  A   Yes, sir.

12  Q   Is that a big leap or a small leap?

13  A   That's a very big leap.

14  Q   Looking back at the first page of that progress note, then,

15  looking at her current treatment, is there anything in there

16  that suggests why they would have given -- had such a large

17  leap?

18  A   No.  The only thing it says is she had a mild response but

19  continues to have significant pain.

20  Q   Could there have been steps to be taken between jumping

21  straight from what she was at up to Duragesic patches and

22  Norco?

23  A   Yes, sir.

24  Q   What could some of those have been?

25  A   I'm sorry.  I forget how often she was taking the Ultram.

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

```
 1   But she could increase the Ultram dose.  You could probably
 2   increase the frequency of Xanax or Zanaflex.
 3   Q   Is that a muscle relaxant?
 4   A   Yes, sir.  And then instead of using the fentanyl and the
 5   Norco, you might just start with just Norco.
 6   Q   And is that, Norco, hydrocodone, a less strong drug than
 7   the Duragesic patches?
 8   A   Yes, sir.
 9   Q   Is it significantly less strong?
10   A   Yes.
11   Q   And without going through the physical examination, does
12   this show that a physical examination was done on the second
13   visit?
14   A   It does look like an exam was done.
15   Q   And again, it talks about thyroid check?
16   A   (Nodding head affirmatively.)
17   Q   And various range of motion?
18   A   Right.
19   Q   What if this had just been populated over from the last
20   visit?  Is it appropriate just to leave it in as if this
21   happened during this visit?
22   A   No, sir.
23   Q   Now, on this second visit, was she again drug tested?  I'm
24   going to show you the results of her drug tests from her second
25   visit.
```

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

1   A   Okay.

2   Q   And I think you had mentioned that that would be something

3   you would do, is to continue to monitor her --

4   A   Right.

5   Q   -- because of the marijuana?

6   A   Yes, sir.

7   Q   What does it say she tested positive for on this second

8   visit?

9   A   Marijuana, fentanyl, and hydrocodone.  And then the

10  phenobarbital is not prescribed, but she's -- she has seizures.

11  So I imagine that's what that is.  But then the marijuana is

12  positive as well.

13  Q   And this fentanyl and hydrocodone, would that make sense

14  that it would be inconsistent, because she just was prescribed

15  it that day?  Isn't that correct?

16  A   Right, right.

17  Q   I'm now showing you her dispensing form from that second

18  visit --

19  A   Okay.

20  Q   -- on March 6th, 2014.  Can you tell me up at the top what

21  company is listed on the top of this form?

22  A   Comprehensive Rx.

23  Q   And is this a standard prescription?

24  A   No, sir.  It looks like a preprinted order form where you

25  can circle the choices that you'd like.

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

1   Q   And do you know if Dr. Ruan and Dr. Couch had this workers'

2   comp dispensary in their office?

3   A   I believe they did.

4   Q   And does this list the drugs that she is receiving at this

5   time?

6   A   Yes, sir.

7   Q   I'll jump forward to her patient visit on June 23rd, 2014,

8   where she took another GC-MS test.  And on this occasion, June

9   23rd, 2014, does she again test positive for marijuana?

10  A   Yes.

11  Q   This is at least the third positive test for marijuana; is

12  that correct?

13  A   Right.  And four months later.  So the initial -- even if

14  she used it the day she was first seen, it should be out of her

15  system?

16  Q   How long does marijuana typically last in your system?

17  A   30 days.

18  Q   So we are now six months later.  You wouldn't expect it to

19  be in her system?

20  A   No, sir.

21  Q   And what drugs is she currently taking at this time?

22  A   Looks like she's taking MS Contin and oxycodone.

23  Q   And is Ambien a sleeping drug?

24  A   Yes, sir.

25  Q   Now, looking at the actual patient note, the visit for that

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR                                       4376

1    day, the June 23rd, which she tested positive for marijuana

2    again, do you see that progress note from that date?

3    A    Yes, sir.

4    Q    Flipping to the last page, do you see a signature for

5    Dr. Couch at all?

6    A    No, sir.

7    Q    Who signed this?

8    A    A medical assistant, Fletcher.

9    Q    And what is a medical assistant?

10   A    A medical assistant is a person whose job should be to call

11   the patient from the waiting room, put them into the room, take

12   vital signs, maybe take a little bit of the history, write a

13   few things in there.

14   Q    But in this case is it the medical assistant that is the

15   only one that's verifying the accuracy of this record?

16   A    It appears that.

17   Q    And again, just looking back one page, is this a supposedly

18   extensive physical exam done for that visit?

19   A    It's pretty thorough, yes, sir (nodding head

20   affirmatively).

21   Q    And once again, for this visit, does Ms. W... get a --

22   actually this is for the next visit -- does she again receive

23   drugs dispensed by a company called Comprehensive Rx?

24   A    Yes, sir.

25   Q    Now, you had mentioned before about the Holy Trinity.  I'm

1    going to show you what is from BW.........'s file the September

2    15th visit.  Do you see the progress note from the 15th?

3    A   Yes, sir.

4    Q   Flipping back to her plan, what drugs is she being

5    prescribed on this visit?

6    A   She's actually receiving three opiates, OxyContin, Abstral,

7    and Roxicodone, as well as a benzodiazepine and a muscle

8    relaxer, which would be the Holy Trinity.

9    Q   Just walking through these, OxyContin, is that a

10   long-lasting form of oxycodone?

11   A   Yes, sir.  That's the 12-hour release.

12   Q   And how many pills is she getting of OxyContin?

13   A   60 -- I'm sorry -- yes, 60.

14   Q   And is a short-acting form Roxicodone?

15   A   Yes.

16   Q   What kind of roxy -- how many Roxicodone pills is she

17   getting?

18   A   90.

19   Q   And both of those are opiates; is that correct?

20   A   Yes, sir.

21   Q   Is she also getting Xanax, a benzodiazepine?

22   A   Yes, sir.

23   Q   How many is she getting of that?

24   A   She's getting 75, and it says for severe anxiety, which

25   benzodiazepines are the drug of choice for anxiety.

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

4378

1   Q   And have you seen any markup in the file explaining from a

2   doctor that she's got severe anxiety?

3   A   No, sir.

4   Q   Soma, right here, is that the third part of the Holy

5   Trinity?  (Indicating.)

6   A   Yes, sir.

7   Q   And how many Soma pills is she getting?

8   A   90.

9   Q   And is this a patient that has tested positive multiple

10  times already for marijuana?

11  A   Yes, sir.

12  Q   What if anything concerns you about prescribing the Holy

13  Trinity to a patient that has repeatedly tested positive for

14  marijuana?

15  A   Patients that abuse other drugs, either legal or illegal,

16  or alcohol are at much increased risk for abusing opioids or

17  benzodiazepines.

18  Q   Would it be in the usual course of professional practice to

19  prescribe this set of drugs to an individual who's testing

20  positive repeatedly for marijuana?

21  A   No, sir.

22  Q   Let's look here at Abstral.

23  A   Yes, sir.

24  Q   Is she also, along with the Holy Trinity, getting Abstral?

25  A   Yes, she is.

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

1  Q   And how many tablets is she getting for that?

2  A   32.

3  Q   And at this point in the file has there been any indication

4  that this patient ever had cancer?

5  A   There was some question of whether she had cervical cancer.

6  But there was never any confirmation from any other doctor,

7  number one.  Number two, cervical cancer is normally very

8  easily treated with a hysterectomy and wouldn't be a type of

9  cancer to cause chronic pain unless she had very severe and

10 widely spread cervical cancer.  In that case, number three, I

11 would -- I would suspect that you would have had a conversation

12 with the patient's oncologist or the cancer doctor about who

13 was going to treat the patient's pain.

14 Q   And I apologize.  I think I jumped around on you.  There

15 was, prior to this visit in September, the July visit where

16 cancer was noted; is that correct?  I'll show you now --

17 A   Yes, yes.

18 Q   -- it's July 21.

19 A   Uh-huh (positive response).

20 Q   What does it report that the patient is saying?

21 A   It says that she has cervical cancer with pelvic and

22 low-back pain.

23 Q   Anywhere else in this file did you see anything that

24 confirmed that this patient did in fact have cancer?

25 A   No, sir.

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

4380

1  Q   And if you were treating this patient and they come and

2  tell you that they've got cervical cancer, what steps would you

3  take to confirm that?

4  A   I would, you know, ask them who diagnosed it, was it your

5  OB-GYN or your family practitioner, and then I would request

6  records from them.  And if you thought it was widespread and

7  very painful kind of cancer, then they would have an oncologist

8  by that time and you would either call them -- if you were

9  intending to represcribe all of these medicines, I would

10 probably just stop and call them and say:  What's going on with

11 her and what's the plan?  Where are we going?  And are you

12 prescribing anything?

13 Q   Is this something that you would report, if you had this

14 conversation, that you would put in your medical notes?

15 A   Yes, sir.

16 Q   And having reviewed all of BW.........'s notes, did you

17 ever see where Dr. Couch reached out to determine whether or

18 not she did in fact have cancer?

19 A   No, sir.

20 Q   And, in fact, I'm going to show you the last page of the

21 progress note for July 21, where she mentions the cervical

22 cancer.  And flipping to the electronic signature, when was it

23 signed by Justin Palmer and Dr. Couch?

24 A   August 19th, and then August 20th.

25 Q   And is that approximately a month after the visit actually

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

1  occurred?

2  A   Yes, sir.

3  Q   Is that typical, to be signing medical notes a month after

4  the visit occurred?

5  A   It is definitely frowned upon.

6  Q   Why is that?

7  A   Because you can't possibly remember what you did a month

8  prior if you're seeing that many patients.  And so it would

9  call into question your accuracy of the note.

10 Q   I'm going to show you now a copy of the prescription from

11 BW.........'s file from October 13, 2014.  Is this for a drug

12 called Fentora?

13 A   Yes, sir.

14 Q   What is Fentora?

15 A   Fentora is another form of fentanyl.

16 Q   And is it also an instant release fentanyl, like Abstral

17 and Subsys?

18 A   Yes, sir.

19 Q   And what is listed up here at the top of her prescription?

20 A   Diagnosis of cervical cancer.

21 Q   And again, other than the patient reporting it, any

22 indication of cervical cancer?

23 A   No, sir.

24 Q   From that date, from the date of that Fentora prescription

25 of October 13, 2014, I'm going to now show you her workers'

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

4382

```
1   comp dispensary form on that date.  And again, is this from a
2   company called Comprehensive Rx?
3   A   Yes, sir.
4   Q   And does it show -- and I'm going to have to go down
5   this -- that she received on that same date, she also received
6   carisoprodol?
7   A   Which is Soma, yes, sir.
8   Q   Two things of carisoprodol; is that correct?
9   A   Looks like it, yes, sir.
10  Q   Morphine sulfate, is that an opiate?
11  A   Yes, sir, and a pretty high dose.
12  Q   Pretty high dose of the morphine sulfate?
13  A   Yes, sir.
14  Q   And how about alprazolam?
15  A   Yes, sir.
16  Q   As well as oxycodone?
17  A   Yes, sir.
18  Q   So did she receive the Holy Trinity on this date?
19  A   Yes, sir.
20  Q   Along with Fentora?
21  A   Yes, sir.
22  Q   And how many Roxicodone 30 pills is she prescribed here or
23  is she dispensed here?
24  A   120.
25  Q   And is 30 milligrams the highest strength of Roxicodone?
```

4383

1    A    I would have to look it up.  Here it's a high dose.

2    Because I don't prescribe those high doses.

3    Q    Why don't you prescribe high doses of Roxicodone?

4    A    It's a very high dose and there's very few instances

5    perhaps where I would feel that it would be necessary -- in my

6    previous outpatient practice there would be very -- there's

7    just not an instance where I would think it would be necessary,

8    especially in combination with other medications.

9    Q    And in this case, combination of lots of medications; is

10   that correct?

11   A    Yes, sir.

12   Q    And the 120 pills, is that what's known as a triple digit

13   dispensing?

14   A    Yes, sir.

15   Q    Now, at this point the patient has been seen nearly a year

16   when this note is in the file on November 25th, 2014.  And it

17   says drug query at the top.  Can you please read what it says?

18   A    It says printed drug query (due to insurance alert).  It

19   shows that patient has been receiving pain meds from other

20   doctors for some time.  Will give query to the nurse.

21   Q    What if anything is concerning about the fact that

22   insurance alerted you that she is receiving -- or alerted the

23   practice that BW......... is receiving drugs from other

24   doctors?

25   A    She is receiving quite a bit of medication from this

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

```
 1   practice, and so the concern is that she's developed an abuse

 2   or addiction problem or that she's selling the medication

 3   perhaps.

 4   Q   And even -- well, what would you do -- what is the usual

 5   course of professional practice now when you've had a patient

 6   that's multiple times tested positive for marijuana and now

 7   you're getting alerts of maybe also doctor shopping?

 8   A   You'd probably have to dismiss her from the practice.

 9   Q   Is that what happened after this?

10   A   I don't believe so, no.

11   Q   And I'll show you her dispensation or her dispensing form

12   from the following visit in December of 2014, again from

13   Comprehensive Rx.  Rather than dismiss her, does she again

14   receive Soma, carisoprodol, opiates, benzos, and Roxicodone?

15   A   Yes, sir.

16   Q   So even after being told that she might be doctor shopping,

17   she still received the Holy Trinity?

18   A   Right.

19   Q   Is that when the usual course of professional practice?

20   A   No, sir.

21   Q   And does that continue?  I show you from February of 2015,

22   a Comprehensive Rx dispensing form.  Does she again continue

23   month after month to get the Holy Trinity?

24   A   Yes, sir, it looks like it.

25   Q   Now we're in March of 2015 for another drug test.  March
```

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

1    27, 2015, what does BW......... test positive for again?

2    A   Marijuana.

3    Q   In her visit from that March 27th does she also mention

4    that she's running out of her medicine early?  This is the

5    progress note from that same date for the drug test we just

6    looked at, March 27th, 2015.  In reported objectives, does it

7    say:  Reports changing to MS Contin, is not sedating, but

8    states out of medication of MS Contin and Roxicodone since

9    Monday?

10   A   Yes, sir.

11   Q   What if anything is that a concern, with the patient

12   running out of medicine early?

13   A   That they are either diverting it, which means selling it

14   or giving it to someone else, or that they've developed an

15   abuse problem or an addiction problem that needs to be

16   addressed.

17   Q   So that was March of 2015.  In April of 2015 does the drug

18   test again show positive for marijuana?

19   A   Yes, sir.

20   Q   So as we discussed, drug tests are a good and useful thing

21   to be done in a doctor's practice; is that correct?

22   A   Right.

23   Q   Does it appear that they are utilizing the results in any

24   way, though?

25   A   No, it doesn't appear that they are using them for their

1    intended purpose, which is to see if the patient's compliant.

2    Q   Now, during that April visit is it actually noted -- this

3    is her April 23rd visit, the visit she tested positive on --

4    does it say:  Urine drug screen positive for maintenance

5    medications but still for -- what's probably meant to be THC?

6    A   Yes, sir.

7    Q   Patient reports needing something for appetite.  If the

8    patient needs something for appetite, though, isn't it okay for

9    that patient to be using marijuana?

10   A   No, not in the state of Mississippi or Alabama.  It's an

11   illegal substance.

12   Q   And is there any indication that she has a medical

13   marijuana prescription from anywhere?

14   A   No, sir.

15   Q   And finally on that visit is she finally warned that she

16   will be dismissed if she keeps testing positive?

17   A   (Nodding head affirmatively.)

18   Q   I'll show you that.  Now, finally in April of 2015, at that

19   progress note she's finally warned about testing positive for

20   marijuana?

21   A   Yes, sir.

22   Q   It says:  Patient was seen today with Dr. Couch.  And then

23   it goes about the confirmation that she tested positive on

24   multiple occasions.  Is that what it says?

25   A   Yes, sir, it does.

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

1  Q  And yet despite that warning on that date in April of 2015,

2  does she still get dispensed from C&R -- from Comprehensive

3  Rx -- does she still receive the Holy Trinity of carisoprodol,

4  Soma --

5  A  Morphine.

6  Q  -- morphine, an opiate, and Xanax?

7  A  Yes, sir.

8  Q  Based on your review and your training and experience, with

9  BW......... was the prescriptions written to her outside the

10  usual course of professional practice?

11  A  Yes, they were.

12  Q  Did you also review a patient file for an individual named

13  SW.............?

14  A  Yes, sir.

15  Q  And I'm going to show you now what has been admitted as

16  Government's Exhibit 21-3, the patient file for SW......

17  ......... And Ms. W......., I believe you had mentioned from

18  reviewing her thing, she did have legitimate pain issues; is

19  that correct?

20  A  She did.  She had a lot of spinal and bony issues.

21  Q  Can you explain to the jury what were some of her issues

22  that she was being treated for?

23  A  I believe that she had more than one surgery on her spine.

24  And I'd have to see the record to remember if it was cervical

25  or lumbar.

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

4388

1  Q   I'll show you one of her patient visits from March 23rd,

2  2013.  First, whose name is circled at the top in terms of

3  which doctor is treating Ms. W.......?

4  A   Dr. Ruan.

5  Q   What drugs does it say that she is getting during this

6  visit?

7  A   She is getting Soma, Klonopin, Fentora, Opana long acting,

8  and Opana.

9  Q   And Opana short acting?

10 A   Yes, sir.

11 Q   So Soma, we've talked about that's carisoprodol; correct?

12 A   Yeah, yeah.

13 Q   Opana, is that an opiate?

14 A   Yes, sir.

15 Q   Is Klonopin a different type of benzodiazepine?

16 A   Yes, sir.

17 Q   So is this patient receiving the Holy Trinity?

18 A   Yes, sir.

19 Q   In addition to the Holy Trinity, what is she receiving?

20 A   Fentora.

21 Q   And what is Fentora?

22 A   It's a form of fentanyl used in cancer pain.

23 Q   Having reviewed all of SW.............'s file, did you see

24 anywhere in it that she had claimed to have cancer or anyone

25 had said she had cancer?

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

1   A   No, sir.

2   Q   I want to direct your attention to what it says right here.

3   (Indicating.)  Could you please read that?

4   A   It says:  Nurse visit and prescription only.

5   Q   And zooming out on this, do you see where it says:

6   Prescription only, as well?  (Indicating.)

7   A   Yes, sir.

8   Q   Is there any notes about whatever treatment was done or any

9   examination for her that day?

10  A   It looks as if the examination is blank, all those check

11  boxes in the middle, and there's no plan except prescription.

12  Q   And it does appear to have a signature above physician's

13  signature?

14  A   Yes, sir.

15  Q   Can you explain what is a nurse's visit?

16  A   Normally a nurse's visit is something that's very

17  straightforward.  For example, if someone's blood pressure has

18  been up and down and inconsistent, you might have them come in

19  for some nurse visits just to get a blood pressure check, check

20  a blood sugar.  Another common reason to call someone in is you

21  don't know what medicines they are taking and so you have them

22  bring all their pills and sit down with the nurse and go

23  through it and make sure they are taking things appropriately.

24  Q   Can you prescribe -- can you give prescriptions out during

25  a nurse visit if they're just seeing a nurse or a medical

 1   assistant?

 2   A   No, sir.

 3   Q   Would that be outside the usual course of professional

 4   practice?

 5   A   Yes, sir.  That would be poor form.

 6   Q   What if the practice is just very, very busy?  Is it

 7   appropriate for a nurse to just to move the line along, to walk

 8   out and hand a patient a bunch of prescriptions?

 9   A   No, sir, that's not okay.

10   Q   Is that outside the usual course of professional practice?

11   A   Yes, sir.

12           THE COURT:  Mr. Bodnar, is now a good time for us to

13   take our morning break?

14           MR. BODNAR:  Yes, Your Honor.

15           THE COURT:  Ladies and gentlemen, leave your pads on

16   your chairs.  Take your break downstairs in the jury assembly

17   room.  No discussion about the case.  And we will call you up

18   in about 15 minutes.  We're in recess.

19       (A recess was taken at approximately 10:31 a.m.)

20       (In open court, 10:52 a.m., defendants and jury present.)

21           THE COURT:  All right, Mr. Bodnar.

22           MR. BODNAR:  Thank you, Your Honor.

23   Q   Dr. Aultman, I want to jump back and clarify one thing from

24   the BW......... file that we just spoke about.

25   A   Okay.

4391

1  Q  Do you recall when we saw the note that said the insurance

2  company had informed the practice that she may be doctor

3  shopping?

4  A  Yes, sir.

5  Q  Is that information that Dr. Couch could have learned had

6  he been looking at the PDMPs for that patient?

7  A  Yes, sir.

8  Q  So that's not something just solely that an insurance

9  company could find out?

10  A  No.

11  Q  And it --

12  A  If you just look at the PMP, you would see that the patient

13  was getting medicines from someone else.

14  Q  And is it the usual course of professional practice to

15  actually utilize the PMP reports?

16  A  Yes, sir.

17  Q  Now, going back to SW............, the Dr. Ruan patient,

18  do you recall we just looked at a date in which she had

19  received the Holy Trinity?

20  A  Yes, sir.

21  Q  I'm going to now show you her drug tests for the date of

22  May 20th, 2013.  And do you see this GC-MS test for SW......

23  ........?

24  A  Yes, sir.

25  Q  If utilized, drug tests, and GC-MS in particular, are very

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

1  useful tool for doctors?

2  A   Yes, sir.

3  Q   And here does it show with the Klonopin, the Soma, and the

4  Opana that she is still receiving the Holy Trinity?

5  A   Yes, sir.

6  Q   Plus Fentora?

7  A   Yes, sir.

8  Q   Looking now to August 15th of 2013, when another year-end

9  drug screen was done, does this one again list that she is

10  receiving the Holy Trinity plus fentanyl?

11  A   Yes, sir.

12  Q   But what about -- what does the drug test show about her

13  fentanyl usage?

14  A   It shows that there's no reportable -- or there's no

15  evidence that she's taking the fentanyl.

16  Q   And is there any norfentanyl or any metabolites of fentanyl

17  present there?

18  A   No.

19  Q   What does that suggest to you, if the GC-MS test shows no

20  fentanyl and no metabolites for fentanyl?

21  A   It means that she's not taking it.

22  Q   What if any concern would this be for you?

23  A   Again, two things:  that she's either selling the

24  medication, giving it to someone else, or that she's taking too

25  much and run out early.

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

1  Q   That's August 15, 2013.  I'm going to show you the progress

2  note from the following visit in September of 2013.  Do you see

3  the progress note for September of 2013?

4  A   Yes, sir.

5  Q   She continued to receive Fentora despite not testing

6  positive for it last month?

7  A   Yes, sir.

8  Q   And what does it say, the explanation point right there in

9  the middle?

10  A   Prescription only.

11  Q   Is there any sort of assessment or anything that was done

12  otherwise?

13  A   No, sir.

14  Q   Does this look similar to the nurse's visit note that was

15  received last time?

16  A   Yes, sir.

17  Q   Just zooming out, it mentions the urine drug screen that we

18  just looked at; is that correct?

19  A   Yes, sir.

20  Q   Does it mention at all anywhere on here the fact that she

21  was inconsistent for the fentanyl?

22  A   It does not address the issue, no, sir.

23  Q   If someone had actually addressed the issue with her, about

24  her inconsistent drug tests, is that something that should be

25  in her progress note?

1    A    Yes, sir.

2    Q    The following month, October 14th, 2013, appears to be the

3    first of the electronic medical records for SW......

4    ........   And what does she list as her chief complaint?

5    A    Patient says she has followup for evaluation and management

6    of chronic pain in the whole body pain [sic].

7    Q    Does a subjective complaint of whole body pain raise any

8    sort of red flags or concerns to you?

9    A    It usually is a sign of a patient who may have something

10   else, for example, fibromyalgia or some other disease that's

11   not usually treated with opioids or that --

12   Q    Did you say it usually is or usually is not treated with --

13   A    It is -- it's usually not.  So fibromyalgia would not be

14   treated with opioids, would not be the course that you would

15   take.  Also patients that complain of whole body pain, it

16   really makes you wonder if they're not just an addict taking

17   the medicine because they are unable to actually delineate

18   where they hurt.  If people really hurt, you know, usually they

19   can give you a pretty good description of what it is that

20   hurts.

21   Q    And looking down at the medication list, does it list that

22   she is still getting the Holy Trinity of Soma; an opiate,

23   Opana; and Klonopin?

24   A    Yes, sir.

25   Q    As well as Fentora?

TRICIA AULTMAN MD - DIRECT BY MR. BODNAR
4395

1   A   Yes, sir.

2   Q   What's Pristiq?

3   A   Pristiq is sort of an anti-depressant that has also been
4   found to be good in patients that have pain.  It could also be
5   used for anxiety sometimes.

6   Q   Now, is it in the class of opiates or benzos, or is it
7   something different?

8   A   It's something different.

9   Q   Looking at the physical examination from this visit, again,
10   does this talk about the eyes being checked and various
11   palpations of the thyroid being done?

12   A   Right.  And her mouth, all that.

13   Q   And since you were not there at the visit, do you have any
14   way to know if those are in fact accurate?

15   A   No, sir.

16   Q   In fact it mentions a Spurling's test being negative there.

17   A   Yes.

18   Q   Can you explain to the jury what is a Spurling's test?

19   A   I'm going to be honest.  I'm not exactly sure.

20   Q   Would it be something involving the cervical spine, though?

21   A   I believe it has to do with the range of motion in the
22   spine.

23   Q   Now, if the test is negative, does that suggest that such a
24   test was actually performed?

25   A   Yes, sir.

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

1   Q   And at least according to these records, it was performed?

2   A   Yes, sir.

3   Q   And does it go on and show the rest of the examination that

4   supposedly took place?

5   A   Yes, sir.

6   Q   Including the skin palpations?

7   A   Right.

8   Q   Skipping ahead to the March 7th, 2014, visit, is this the

9   progress note for SW............ for that date?

10  A   Yes, sir.

11  Q   And what does it say, what drug has been approved for her

12  now?

13  A   Gralise.

14  Q   I'm sorry.  Right here.  (Indicating.)

15  A   Subsys.

16  Q   And do you know, what is Subsys indicated for?

17  A   Intractable cancer pain.

18  Q   And have you seen anything in here that suggests that she

19  has cancer pain?

20  A   No, sir.

21  Q   Does it note that she's currently taking the Gralise,

22  Klonopin, Opana, and Soma?

23  A   Yes, sir.

24  Q   So she's getting the Holy Trinity plus Gralise.  What's

25  Gralise?

4397

1    A    I believe it's also a fentanyl.

2    Q    And as with other examinations, did you note in here and

3    the other, as well as the other progress notes, that they

4    listed an extensive examination which, according to the record,

5    occurred?

6    A    Yes, sir.

7    Q    Now skipping to the September 30th, 2014, visit for

8    SW...... ........, under provider comments do you see where

9    under it it says:  Meds helpful?

10   A    Yes, sir.

11   Q    Then:  Does not like MS Contin, wants to change back to

12   Opana ER at a lower dosage?

13   A    Yes, sir.

14   Q    Is that common for patients to be requesting changes from

15   one drug to another?

16   A    No, sir, not necessarily in that fashion.  They may say

17   that it's giving them some sort of side-effect, like some sort

18   of intolerable side-effect, maybe constipation or nausea, but

19   not that they just like one more than another.

20   Q    Having examined all of the Ms. W.......'s file, did you

21   know if she was continually asking to switch back and forth

22   between MS Contin and Opana?

23   A    It did appear that she went back and forth quite a bit.

24   Q    And is MS Contin morphine?

25   A    Yes, sir.

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

4398

1   Q   And is Opana the stronger drug oxymorphone?

2   A   Yes, sir.

3   Q   Looking now at her very next visit, October 31st, 2014, do

4   you see her history of present illness?

5   A   Yes, sir.

6   Q   Can you begin reading, starting:  She was behaving?

7   A   She was behaving very inappropriately in the waiting room

8   before her office visit today.  At one point she was laying on

9   the floor in front of the bathroom.  She was moving from chair

10  to chair in the waiting room, talking to various other patients

11  waiting to be seen, and attempting to hug them.  She was

12  intermittently moaning and crying out, along with excessive

13  talking.  During the visit with her she mostly complained of

14  very severe lower back pain that is worsening and intractable

15  headache that is worsening.

16  Q   And then does she continue to say -- or does it continue to

17  list what she supposedly said is her symptoms?

18  A   Yes, sir.

19  Q   With this noted unusual behavior, what if any steps should

20  be taken by a doctor in the usual course of professional

21  practice?

22  A   Well, there's several things that come to mind when someone

23  has a change in mental status like this.  The first one would

24  obviously be misuse of her medications.  Since she is on

25  several controlled substances, all of those could cause changes

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

1  in her mental status.  Other medical things come to mind as

2  well.  Sometimes infections will make people goofy.  That's

3  most likely to be seen in an older person.  Mini-strokes.

4  Q  Is that something you would take into account before

5  deciding what to prescribe during that visit?

6  A  Absolutely.

7  Q  And yet during that visit, going down the list, what are

8  all the different things she's prescribed?

9  A  She's given some lidocaine patches; promethazine, which is

10  Phenergan, a nausea medicine; Soma; Klonopin; Neurontin.

11  Q  And then on to the last page?

12  A  And Opana.

13  Q  So with the Opana and Neurontin -- in fact, there's Opana

14  on the bottom here as well -- Soma, the Klonopin, and the

15  Opana, is she still getting the Holy Trinity on this date where

16  she came in and was acting extremely bizarre?

17  A  Yes, sir.

18  Q  Is that in the usual course of professional practice, to

19  prescribe in that way?

20  A  No, sir, especially with someone who was not acting

21  appropriately to prescribe these medications.  Virtually all of

22  them can cause some changes in mental status.

23  Q  And under the notes at the very bottom, does it say that

24  Dr. Ruan personally examined Ms. W....... --

25  A  Yes, it does.

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

```
 1   Q   -- on this date?
 2            So assuming that's accurate, does that mean he
 3   actually was aware or should have been aware what was going on
 4   that day?
 5   A   Yes, sir.
 6   Q   Now, looking at the very next -- or the drug tests that
 7   followed up after that -- so this is now November of 2014 --
 8   you had mentioned that she was receiving Klonopin.  Does she
 9   test positive for the drug in Klonopin?
10   A   No.  She tests negative.
11   Q   And is that the benzodiazepine?
12   A   Yes, sir.
13   Q   And does she also test positive for fentanyl?
14   A   She does.
15   Q   Had she been prescribed fentanyl in that a list that you
16   just read off to us?
17   A   No, sir.
18   Q   Again, is this concerning?
19   A   It is concerning that she's not taking what is prescribed
20   and she's taking things that are not prescribed.
21   Q   I believe you mentioned before that Ms. W.......'s file is
22   quite extensive?
23   A   Yes, sir.
24   Q   And she did appear to have legitimate issues that would
25   cause pain?
```

1    A   Yes, sir.

2    Q   But based on reviewing the entirety of her file, have you

3    come to an opinion on whether or not prescribing of controlled

4    substances to Ms. W....... was within or outside the usual

5    course of professional practice?

6    A   I feel it's outside the usual course of professional

7    practice.

8    Q   Was Jeanette Driver one of the patients that you reviewed

9    in terms of to prepare for your testimony today?

10   A   Yes, sir.

11   Q   I'm showing you what is her first progress note.

12          THE COURT:  Which exhibit number is this file?

13          MR. BODNAR:  I'm sorry, Your Honor.  This is 21-2, the

14   medical file for Jeannette Driver.

15   Q   And when was she first seen at PPSA?

16   A   May 6, 2014.

17   Q   And who was her doctor?

18   A   It looks like it's Dr. Couch.

19   Q   And what was it that she was being referred to Dr. Couch

20   for?

21   A   Low-back pain.

22   Q   What had been her prior medicine that she had been on?  Is

23   it listed there?

24   A   Yes, in the second paragraph, it says that she's tried

25   Ultram, physical therapy, chiropractor.  Oh, I'm sorry.  Up in

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

1    the first paragraph it also says that she's taking Cymbalta,

2    Soma, MS Contin, morphine sulfate, immediate release oxycodone,

3    and Lidoderm.

4    Q    And flipping to -- well, does this show also pretty

5    extensive physical examination of what supposedly occurred?

6    A    Yes.

7    Q    And that includes, again, like we've seen, palpations of

8    the abdomen, palpations of the spine?

9    A    Listening to heart and lungs with the stethoscope, yes.

10   Q    No masses in the neck?

11   A    (Nodding head affirmatively.)

12   Q    During this first visit what is prescribed --

13   A    During this visit --

14   Q    -- to Ms. Driver?

15   A    -- she gets Duragesic, or fentanyl patches; Mobic, which is

16   anti-inflammatory; and Lyrica, which is medicine for neuropathy

17   or nerve pain.

18   Q    And what is the date of these prescriptions and the date of

19   this visit?

20   A    Looks like May 6, 2014.

21   Q    What date did Bridgette Parker sign this?

22   A    June 10th.

23   Q    And what date did Dr. Couch sign this?

24   A    June 11th.

25   Q    Is that more than a month after this visit occurred?

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

```
 1   A    It appears so, yes, sir.
 2   Q    Focusing in on the Duragesic patches --
 3   A    Yes, sir?
 4   Q    -- what strength is she being prescribed on May 6th?
 5   A    She's prescribed for the second step up.  There's a 12 and
 6   a half microgram patch as well.  So she's given 25.
 7   Q    That's 25 micrograms per hour?
 8   A    Right.
 9   Q    And she received 10 patches.  How long are 10 patches
10   supposed to last you?
11   A    You only change it every three days.  So --
12   Q    So is 10 patches a month's supply?
13   A    Yes, sir.
14   Q    So on May 6th she got 25 micrograms, a month supply of 25
15   microgram patches?
16   A    Yes, sir.
17   Q    I'm going to show you now her progress note from May 16th.
18   Do you see that May 16th progress note?
19   A    Yes, sir.
20   Q    Is that 10 days after the one that we just looked at?
21   A    Yes, sir.
22   Q    Again, does it indicate a substantial physical examination
23   was done?
24   A    Yes, sir.
25   Q    Now, 10 days later, what does it say happened to her
```

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

1   Duragesic patches?

2   A   So he's increased it from 25 micrograms to 50 micrograms.

3   Q   Is that a doubling?

4   A   Yes.

5   Q   And she just received a month supply and 10 days later gets

6   a double dose of Duragesic?

7   A   Right.  So she's clearly either used up her supply early or

8   sold them or there's something that's happened with them,

9   because she should have plenty of medication.  There's no

10  indication in the note that she surrendered them, which, I

11  guess, you know, could be done if you decided this isn't

12  working, you could take them to the doctor and they could

13  dispose of them appropriately.

14  Q   In fact if we look back on that first page, the history of

15  present illness, does it list any reason of why they moved up

16  from the 25 patch that they mentioned here?

17  A   No.  It actually says the patient is pleased with her

18  current PPSA medications.

19  Q   Does it also say with little improvement?

20  A   Yes.  So --

21  Q   Do those appear to contradict each other?

22  A   It's a contradictory statement that is seen throughout the

23  medical record, where it must be something with the electronic

24  medical record that it will populate that field and they don't

25  bother to uncheck it.  So then it's going to say both things.

1   Q   So this is on May 16, 10 days later.  What was the date

2   that it was signed by Bridgette Parker and Dr. Couch?

3   A   May 27th.

4   Q   And on May 27th did Ms. Driver come back to the practice --

5   A   Yes, she did.

6   Q   -- for her third visit?

7   A   Yes, she did.

8   Q   Does it note that she's currently on the 50 microgram

9   patches?

10   A   Yes, sir.

11   Q   And we were looking at May 16th before.  So is this 11 days

12   later?

13   A   Right.

14   Q   She had just received a 15-day supply --

15   A   Yes, sir.

16   Q   -- of 50s?  What does it mention that she claims right

17   here?  (Indicating.)

18   A   She claims the Duragesic patches are falling off.

19   Q   Can you explain to the jury, what do these patches look

20   like?  Is it easy for them to fall off?

21   A   It's actually not that easy if you give the patient the

22   appropriate instructions -- which is, if you want to clean the

23   area, it needs to be clean and dry and no hair, and apply it

24   and then sometimes you just might put some medical tape over

25   it.  There's lots of different tricks to make them more -- you

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

1   know, not fall off.

2   Q   So we are 21 days after she received the 25 microgram an

3   hour patch?

4   A   Right.  So theoretically she still should have the 25

5   microgram patches and some of the 50s.

6   Q   Now what do they give her?

7   A   They increase from 50 to 75 micrograms.

8   Q   So are we now three times the strength of what she received

9   21 days ago?

10  A   Yes, sir.

11  Q   Did she receive a full month's supply?

12  A   Yes, sir.

13  Q   In addition to that and the Lyrica and the Mobic, did she

14  also receive Roxicodone?

15  A   Yes, sir.

16  Q   And was this actually signed by Dr. Couch and Bridgette

17  Parker on the date of the visit?

18  A   Yes, sir.

19  Q   Having reviewed Jeannette Driver's file, was there anything

20  in the file that indicated a reason for a tripling in the

21  dosage over a 21-day period?

22  A   No, sir.  There was no documentation of why she was in such

23  tremendous pain and why someone who's naive to those kind of

24  medicines would be able to tolerate even going up that high

25  that fast.

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

1   Q   And is that -- it's three times the strength, but is that a
2   significant increase?
3   A   It is, because fentanyl itself is more than twice as strong
4   as morphine.
5   Q   Having reviewed Jeannette Driver's medical file, have you
6   come to an opinion on whether or not the prescriptions she
7   received for controlled substances were within or outside the
8   usual course of professional practice?
9   A   I consider they were outside the usual course of
10  professional practice.
11  Q   Did you also review a file for an individual named
12  CCC...................?
13  A   Yes, sir.
14  Q   And was he seen by both Dr. Ruan and Dr. Couch?
15  A   I do believe so (nodding head affirmatively).
16  Q   Without going through all of his file, have you previously
17  gone through his file, though, and reviewed it?
18  A   Yes, sir.
19  Q   Based on your review of his file, was he being prescribed
20  within or outside the usual course of professional practice by
21  Dr. Ruan and Dr. Couch?
22  A   For several reasons I think it was outside the course of
23  professional practice.
24  Q   And why was it that it was outside?
25  A   He -- he had some lower back pain, it was really not

4408

1   significant, on his imaging studies.  He admitted at one point

2   that he was taking more medication than was prescribed at a

3   time.  He was taking four pills at a time.  And he also, as we

4   saw in the previous case, he was coming earlier than 30 days or

5   earlier than his visits, saying he was out of medication or

6   what have you.

7   Q   And is that a red flag, if someone's coming in and saying

8   they're running out of medication early?

9   A   Right.

10  Q   And what could that potentially signal?  What different

11  types of problems could that be if they're running out of pills

12  or claiming that?

13  A   If somebody's either, you know, abusing the medicine, he's

14  got an addiction problem that needs to be addressed, or he

15  could be diverting it, selling it or giving it to someone else.

16  Q   Finally, for the patients that you reviewed, Dr. Aultman,

17  did you review a patient who went by the name of Shawn Brennan?

18  A   Yes, sir.

19  Q   And have you through the course of your working on this

20  case come to know that that was in fact an undercover DEA

21  employee?

22  A   Yes, sir.

23  Q   And in connection with reviewing Shawn Brennan's medical

24  file, did you also review the video of his first visit?

25  A   Yes, sir, I did.

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

4409

1   Q   And I'm going to show you the August 5th, 2014, visit in

2   the notes from Shawn Brennan.

3   A   Okay.

4   Q   And what does it say that he's coming in there for?

5   A   It says that he's being referred for chronic low-back pain.

6   Q   And according to the medical record, what does he

7   supposedly claim his pain levels are?

8   A   A 10 out of 10.

9   Q   And averages a --

10  A   A seven out of 10.

11  Q   Is that something that would typically come from the

12  patient, as in the doctor or someone in the doctor's practice

13  asks the pain level and then it's recorded in the medical

14  record?

15  A   Yes, that's very common to either ask it or to have some

16  sort of a form that the person just checks off or writes on the

17  scale what it is.

18  Q   So presumably Shawn Brennan would have told somebody at the

19  practice it was seven out of 10 and reached a maximum of 10 out

20  of 10?

21  A   Right.

22  Q   Does his exam also -- or does his report also list the

23  examination that he received?

24  A   Yes, sir.

25  Q   Does that include checking the thyroid in the neck?

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

1   A   It does.  An eye exam, looking in his throat, listening to

2   his heart and lungs with a stethoscope, feeling on his arms and

3   legs to feel the pulses.  And examination of the abdomen.  As

4   we discussed, normally that's laying down.  And then a pretty

5   decent musculoskelatal exam, looking at all the skin, watching

6   him walk, stand, et cetera.

7   Q   How long would an exam such as this, if it took place,

8   actually occur?

9   A   To be really thorough like this, I would say 10 to 15

10  minutes.

11  Q   What if the referring doctor had done these tests?  Is it

12  in the usual course of professional practice just to take the

13  referring doctor's physical examination and put it down as your

14  own?

15  A   No, sir.

16  Q   And during this visit is there anything listed in the

17  medical record of what Shawn Brennan received in terms of

18  prescriptions on that day?

19  A   I don't see it written on this progress note, no.

20  Q   Should the progress note also include the drugs that were

21  prescribed to him that day?

22  A   Yes, especially in the plan section, it should list the

23  medications prescribed.

24  Q   But in this case it shows none?

25  A   None.

4411

```
 1          MR. BODNAR:  All right.  Brian, can we please show the
 2   video of that August 5th visit?
 3       (The Video was played.)
 4          VOICE OF STACY:  Hey.
 5          VOICE OF MR. BRENNAN:  Hi.
 6          VOICE OF STACY:  I'm Stacy.  I work for Dr. Couch.
 7          VOICE OF MR. BRENNAN:  I'm Shawn.
 8   I'm...(unintelligible) trying to sign these things.
 9          VOICE OF STACY:  I need to ask you some questions real
10   quick.
11          VOICE OF MR. BRENNAN:  Okay.
12          VOICE OF UNKNOWN MALE:  Can you have a seat right
13   here?  (Unintelligible.)
14          VOICE OF STACY:  All right.  Uh, what happened to your
15   low back?
16          VOICE OF MR. BRENNAN:  I operate equipment for a
17   living.  And over the years, I guess it's just -- gets to where
18   it gives me real pain...(unintelligible).
19          VOICE OF STACY:  How long has it been hurting so bad
20   that you've had to see pain management?
21          VOICE OF MR. BRENNAN:  I've never been.  That's why I
22   got referred.  I've been going to --
23          VOICE OF STACY:  Okay.
24          VOICE OF MR. BRENNAN:  -- for the last several
25   amongst.
```

1        VOICE OF STACY:  For how long -- I mean how long has

2   your pain been that unbearable that you've had to take pain

3   medicine?

4        VOICE OF MR. BRENNAN:  I don't take pain medicines

5   generally -- generally, generally.

6        VOICE OF STACY:  So this is really --

7        VOICE OF MR. BRENNAN:  I have taken some before, but

8   not from a doctor.

9        VOICE OF STACY:  Okay.  So it's just in the past few

10  months...(unintelligible).

11        VOICE OF MR. BRENNAN:  About a year, about a year.

12        VOICE OF STACY:  About a year?

13        VOICE OF MR. BRENNAN:  Yeah.

14        VOICE OF UNKNOWN MALE:  Blood pressure is 159 over 86,

15  and your heart rate is 112.

16        VOICE OF STACY:  And, uh, they say you just got a job?

17        VOICE OF MR. BRENNAN:  Oh, no.  I've had a job for 15

18  years, honey.  I own my own company.

19        VOICE OF STACY:  Okay.

20        VOICE OF MR. BRENNAN:  I own Brennan Earth Movers out

21  of Montgomery.

22        VOICE OF STACY:  Okay.

23        VOICE OF MR. BRENNAN:  So, yeah, I don't know where

24  they got that from.

25        VOICE OF STACY:  Okay.  All right.  Uh, are you from

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

 1  Montgomery?

 2          VOICE OF MR. BRENNAN:  I'm from all over Alabama.  I

 3  was born in Tennessee, but I'm from all over.  I work all over

 4  the state.  And so --

 5          VOICE OF STACY:  My sister lives in Montgomery.

 6          VOICE OF MR. BRENNAN:  What part of Montgomery?

 7          VOICE OF STACY:  Uh, well, they live off of Taylor

 8  Road.

 9          VOICE OF MR. BRENNAN:  Yeah.

10          VOICE OF STACY:  But, uh, my -- well, her

11  stepfather -- we have the same biological -- her stepfather's a

12  neurosurgeon there.

13          VOICE OF MR. BRENNAN:  Cool.  I've got a townhouse

14  apartment right now in Montgomery.  I went through a divorce

15  and my wife wiped me out.  So I'm starting over.  So --

16          VOICE OF STACY:  That sucks.

17          VOICE OF MR. BRENNAN:  Oh, it happens.  I mean, it

18  happens.

19          VOICE OF STACY:  Okay.  Now your low-back pain, does

20  it radiate anywhere or does it stay right there in your low

21  back?

22          VOICE OF MR. BRENNAN:  Pretty much just up right here.

23  I'll show you.  Come here.  Right -- it's right here in my --

24  this area.

25          VOICE OF STACY:  Okay.  So it's mainly over here on

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

 1    this left side?

 2           VOICE OF MR. BRENNAN:  No.  I mean the whole back

 3    area, over there.

 4           VOICE OF STACY:  Okay.  So it's --

 5           VOICE OF MR. BRENNAN:  Yeah.

 6           VOICE OF STACY:  -- right here?

 7           VOICE OF MR. BRENNAN:  Yeah.

 8           VOICE OF STACY:  Okay.  So no -- no one side is worse

 9    than the other?

10           VOICE OF MR. BRENNAN:  Not really, no.

11           VOICE OF STACY:  Okay.  Does it stay right there in

12    your lower back or does it radiate down your legs or --

13           VOICE OF MR. BRENNAN:  Well, sometimes.  Sometimes it

14    goes down my left leg.

15           VOICE OF STACY:  Your left leg?

16           VOICE OF MR. BRENNAN:  But not far, not far, I mean.

17           VOICE OF STACY:  Okay.

18           VOICE OF MR. BRENNAN:  It's not like my toes are

19    tingling or nothing like that.

20           VOICE OF STACY:  Okay.  So you don't have any

21    numbness, tingling, or burning?

22           VOICE OF MR. BRENNAN:  No, no.

23           VOICE OF UNKNOWN MALE:  Do you...(unintelligible)

24    service?

25           VOICE OF UNKNOWN MALE:  No, I've already paid.  So --

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

 1          VOICE OF STACY:  Okay.  Uh --

 2          VOICE OF UNKNOWN MALE:  Can I get you to do something

 3   for me?  Can you stand up for me?

 4          VOICE OF MR. BRENNAN:  Yeah.

 5          VOICE OF STACY:  Excuse me.  Do you need me?

 6          VOICE OF UNKNOWN FEMALE:  Is everything all good?

 7          VOICE OF STACY:  Yes, ma'am, Everything's fine.

 8          Now, without hurting yourself, I want you to bend over

 9   like this as far as you can.  But I want you to stop when you

10   feel the least bit of pain.

11          VOICE OF MR. BRENNAN:  The least bit?

12          VOICE OF STACY:  The least bit.

13          VOICE OF MR. BRENNAN:  Okay.

14          VOICE OF STACY:  Okay.  All right.  Now come back

15   up.  Now I want you to bend back the same way.  Okay.  That's

16   fine.  Now get you side to side.

17          VOICE OF MR. BRENNAN:  Side to side?

18          VOICE OF STACY:  Uh-huh (positive response).  Do you

19   feel pain anywhere when you do all this?

20          VOICE OF MR. BRENNAN:  Tight.  But, I mean, it's

21   not -- it's not like I'm going to fall down crying, you know.

22          VOICE OF STACY:  All right.  Here you go.

23          VOICE OF MR. BRENNAN:  Thank you.  I feel like I'm

24   signing a house mortgage.  (Laughing.)

25          VOICE OF STACY:  All right.  Now, what have you taken

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

 1   for pain in the past that helped?

 2           VOICE OF MR. BRENNAN:  Ah, well, I'm going to have to

 3   admit to some criminal activity.

 4           VOICE OF STACY:  Go ahead.  Come on.

 5           VOICE OF MR. BRENNAN:  Taken some OxyContin before.

 6           VOICE OF STACY:  Okay.

 7           VOICE OF MR. BRENNAN:  I've taken hydrocodone, which

 8   is uh, uh --

 9           VOICE OF STACY:  I know.

10           VOICE OF MR. BRENNAN:  I know.  I'm trying to think of

11   what --

12           VOICE OF STACY:  Norcos?

13           VOICE OF MR. BRENNAN:  Yeah, that's what it was,

14   Norco.  He told me it was hydrocodone.  I was like:  Well, what

15   is that?

16           And he said:  It's Norco 10.

17           So I took some of those.

18           VOICE OF STACY:  And so does that help you with your

19   pain?

20           VOICE OF MR. BRENNAN:  Oh, yeah, definitely.

21           VOICE OF STACY:  So how much OxyContin were you

22   taking?

23           VOICE OF MR. BRENNAN:  Uh, I mean, I don't know what

24   milligram it was.  They were blue.

25           VOICE OF STACY:  Okay.  Are you talking about

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

1   oxycodone or OxyContin?

2           VOICE OF MR. BRENNAN:  He called it roxy.

3           VOICE OF STACY:  That's Roxicodone.  That's oxycodone,

4   not OxyContin.

5           VOICE OF MR. BRENNAN:   Okay.

6           VOICE OF STACY:  Okay.  Now, the way we work here, the

7   DEA will let us give one long-acting pain medication and one

8   short-acting pain medication.

9           VOICE OF MR. BRENNAN:  Okay.

10          VOICE OF STACY:  So your oxycodone, which was the

11  Roxicodone, and the Norco are both short acting.

12          VOICE OF MR. BRENNAN:  Okay.

13          VOICE OF STACY:  So you can have one or the other.  So

14  I suspect that the oxycodone probably helped you better?

15          VOICE OF MR. BRENNAN:  Oh, yeah, it definitely did.

16          VOICE OF STACY:  Okay.  Do you remember if it was 15

17  or 30?

18          VOICE OF MR. BRENNAN:  I have no idea.

19          VOICE OF STACY:  Okay.  Let's start you out at 15.

20          VOICE OF MR. BRENNAN:  Okay.

21          VOICE OF STACY:  Okay.  Because we've got to start

22  somewhere.  I want to see you every four weeks for a little

23  while.  And, uh, this is just a starting place.  If we need to

24  go up or change medications or do whatever whenever you come

25  back, we can do that.

4418

```
 1              VOICE OF MR. BRENNAN:  Okay.

 2              VOICE OF STACY:  Okay.

 3              VOICE OF MR. BRENNAN:  Sounds good.

 4              VOICE OF STACY:  And I also want to set up a lumbar

 5    MRI for you.

 6              VOICE OF MR. BRENNAN:  Okay.

 7              VOICE OF STACY:  And --

 8              VOICE OF MR. BRENNAN:  You know, I had an MRI.

 9              VOICE OF STACY:  Oh, that's right.  Never mind.  That

10    was new too, wasn't it?

11              VOICE OF MR. BRENNAN:  Yeah, less than a year old, I

12    think.

13              VOICE OF STACY:  Yeah.  Okay.  Never mind.  Don't

14    worry about that.

15              VOICE OF MR. BRENNAN:  Okay.

16              VOICE OF STACY:  But I want to set you up for a lumbar

17    facet joint block.

18              VOICE OF MR. BRENNAN:  What is that?

19              VOICE OF STACY:  Well, let me get my

20    skeleton...(unintelligible).

21              VOICE OF MR. BRENNAN:  Is it a shot?

22              VOICE OF STACY:  Yes.

23              VOICE OF MR. BRENNAN:  I don't want it.

24              VOICE OF STACY:  Then you've come to the wrong place.

25              VOICE OF MR. BRENNAN:  When have I got to do it?
```

 1          VOICE OF STACY:  When?

 2          VOICE OF MR. BRENNAN:  Yeah.

 3          VOICE OF STACY:  After -- well, you're self-pay?

 4          VOICE OF MR. BRENNAN:  Yeah.

 5          VOICE OF STACY:  So that's the thing.  That's why we

 6  don't take cash-paying patients.  Because we have -- we do

 7  procedures and we do physical therapy.

 8          VOICE OF MR. BRENNAN:  Right.  I understand.

 9          VOICE OF STACY:  And all that stuff.

10          VOICE OF MR. BRENNAN:  Well, I'm down with the

11  physical person.  I don't like -- I know I've got tattoos.  I

12  don't like needles.  All right?  I have like a phobia with

13  needles.

14          VOICE OF STACY:  We're an interventional pain clinic.

15  We don't just give out pain medicine.

16          VOICE OF MR. BRENNAN:  Okay.  Well, maybe we can work

17  around it or something or maybe might help he work through it

18  or something.  I don't know.  We'll work something out.

19          VOICE OF STACY:  I'll -- I'll sedate you and I'll baby

20  you the whole way.

21          VOICE OF MR. BRENNAN:  When are we gonna do this?

22          VOICE OF STACY:  Whenever you want to.

23          VOICE OF MR. BRENNAN:  All right.  Let's do --

24  let's talk about it the next -- next time.

25          VOICE OF STACY:  Sure.

 1          VOICE OF MR. BRENNAN:  Is that okay?

 2          VOICE OF STACY:  That sounds good.

 3          VOICE OF MR. BRENNAN:  All right.  All right.  I mean,

 4   I'm literally sweating right now, thinking about it.  It's that

 5   bad.

 6          VOICE OF STACY:  Okay.

 7          VOICE OF MR. BRENNAN:  That really freaks me out.

 8          VOICE OF STACY:  That's what we are.

 9          VOICE OF MR. BRENNAN:  Okay.  Well, I ain't -- I'm not

10   saying that I won't do it.  But you're awful sweet.  So we'll

11   see.

12          VOICE OF STACY:  And I'll be sweet and I'll sedate

13   you.

14          VOICE OF MR. BRENNAN:  Okay.

15          VOICE OF STACY:  Let you watch TV and walk you through

16   the whole thing.  Just make you sure you have a driver.

17          VOICE OF MR. BRENNAN:  Okay.

18          VOICE OF STACY:  Okay.  And uh --

19          VOICE OF MR. BRENNAN:  All right.

20          VOICE OF STACY:  And if it helps with your pain, if

21   you have that much pain, you'll do anything for your pain.

22          VOICE OF MR. BRENNAN:  Right.  I agree.

23          VOICE OF STACY:  Okay.  I get epidurals in my neck for

24   my pain because it hurts.

25          VOICE OF MR. BRENNAN:  All right.

```
 1              VOICE OF STACY:  And epidurals hurt.  But I'd rather
 2   live with two seconds of the epidural pain than the pain that I
 3   live with without it.
 4              VOICE OF MR. BRENNAN:  Okay.
 5              VOICE OF STACY:  That's how I see it.
 6              VOICE OF MR. BRENNAN:  Okay.  All right.  I'm not
 7   going to discard it.  (Unintelligible.)
 8              VOICE OF STACY:  So I'm going to go ahead and order
 9   it.  Okay?
10              VOICE OF MR. BRENNAN:  Okay.
11              VOICE OF STACY:  And then that's why I asked you if
12   one side hurts worse than the other.  Because we can do both
13   sides at once or we can do one side or the other.  But let me
14   explain to you what it is.
15              VOICE OF MR. BRENNAN:  Okay.  We'll do that.
16              I think this is her stuff.
17              I think this is her stuff.  I will -- I'm trying to
18   get my paperwork back together here.  I don't know what
19   happened to it.  It was right here.
20              VOICE OF STACY:  I just put it with all the rest of
21   it.  Just throw it in there.
22              VOICE OF MR. BRENNAN:  Okay.  I didn't want to mess
23   you up.
24              VOICE OF STACY:  That's fine.  Don't worry about it.
25   Now, a facet joint block is -- have you ever had an epidural
```

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

 1    for your pain, your back pain?

 2            VOICE OF MR. BRENNAN:  Never.

 3            VOICE OF STACY:  Okay.  Well, if it was traveling down

 4    your legs, you know, like it's going down the back of your

 5    legs, we do an epidural.  If your pain was maybe right here and

 6    then here it's shooting down, that's called -- that's your

 7    sciatic nerve.  So we would do a sciatic nerve block.  It just

 8    depends.  But if your back pain, you're saying, is just right

 9    here in your low back --

10            VOICE OF MR. BRENNAN:  Right.

11            VOICE OF STACY:  -- usually it's due to arthritis.

12    Just like you have arthritis in your finger joints, your knees,

13    and all that, you have arthritis in your back.  And the joints

14    that bring your vertebrae together are called facet joints.  So

15    I go in there and those joints.

16            VOICE OF MR. BRENNAN:  Okay.

17            VOICE OF STACY:  These nerve --

18            VOICE OF MR. BRENNAN:  What do you use?

19            VOICE OF STACY:  I use Decadron, I use Marcaine.

20            VOICE OF MR. BRENNAN:  Decadron, that is a steroid.

21            VOICE OF STACY:  Steroid.

22            VOICE OF MR. BRENNAN:  Yeah.  I've used that.  I got

23    that shot one time for like a cold --

24            VOICE OF STACY:  Yes.

25            VOICE OF MR. BRENNAN:  -- sinus infection or something

 1   like that.  Yeah.

 2          VOICE OF STACY:  Yeah.  It's a local anesthetic.

 3          VOICE OF MR. BRENNAN:  Okay.  All right.

 4          VOICE OF STACY:  Yeah.  So, uh, I go in there and I

 5   just numb those up.

 6          VOICE OF MR. BRENNAN:  Like how big of a needle are we

 7   talking about?

 8          VOICE OF STACY:  It's a little needle.

 9          VOICE OF MR. BRENNAN:  Like how big is little?

10          VOICE OF STACY:  Well, it's just several different

11   needles.  Because I numb you up first with a little needle.

12          VOICE OF MR. BRENNAN:  Okay.

13          VOICE OF STACY:  Let me find one and I'll show you.

14          Yes, ma'am.

15      (Muffled conversation between Stacy Madison and another

16   employee)

17          VOICE OF UNKNOWN FEMALE:  Okay.

18          VOICE OF STACY:  Okay.  So I numb you up with this

19   little needle right here.

20          VOICE OF MR. BRENNAN:  That's not that big.

21          VOICE OF STACY:  No.  That's what I numb you up with.

22          VOICE OF MR. BRENNAN:  Okay.

23          VOICE OF STACY:  Now, the needle that I actually put

24   into you for this -- for the shot is about that long.

25   Okay.  But you're numbed up.  And the only thing you'll feel

 1   maybe is when you'll feel pressure when I put the anesthetic

 2   and the steroid in.

 3          VOICE OF MR. BRENNAN:  Okay.

 4          VOICE OF STACY:  Okay?

 5          VOICE OF MR. BRENNAN:  All right.  We'll see.  I'll

 6   get prepared for it.

 7          VOICE OF STACY:  You will get prepared for it, because

 8   that is how we practice here.

 9          VOICE OF MR. BRENNAN:  Okay.

10          VOICE OF STACY:  Okay?

11          VOICE OF MR. BRENNAN:  All right.

12          VOICE OF STACY:  All right.  Now, I'm going to go get

13   your oxycodone prescription together.  And do you need any

14   muscle relaxers or anything like that?

15          VOICE OF MR. BRENNAN:  Never had one before.  Never

16   had one.  So I, uh --

17          VOICE OF STACY:  I'm going to start you off on a very

18   low dose of Zanaflex.  Because it may make you sleepy.

19          VOICE OF MR. BRENNAN:  Yeah?

20          VOICE OF STACY:  Like four milligrams would be the

21   normal dose up to three times a day.  But some people say that

22   it really knocks them out, makes them sleepy.  Let me give

23   you -- I'll give you four milligrams.

24          VOICE OF STACY:  Okay.

25          VOICE OF MR. BRENNAN:  But make sure you take it at

1    night, see how it does you.

2          VOICE OF MR. BRENNAN:  Yeah.  Well, I'm afraid about

3    that because I operate heavy equipment.

4          VOICE OF STACY:  I know, I know.  That's why I want

5    you to -- let's just do two milligrams.

6          VOICE OF MR. BRENNAN:  Okay.

7          VOICE OF STACY:  And take it at night and see how it

8    works for you.

9          VOICE OF MR. BRENNAN:  That works.

10         VOICE OF STACY:  Okay.

11         VOICE OF MR. BRENNAN:  that will.

12         VOICE OF STACY:  All right.

13         VOICE OF MR. BRENNAN:  Thank you.

14         VOICE OF STACY:  I'll be right back.  And I'll bring

15   Dr. Couch in.

16         VOICE OF DR. COUCH:  How are you doing?

17         VOICE OF STACY:  This is Dr. Couch.

18         VOICE OF DR. COUCH:  How are you?

19         VOICE OF MR. BRENNAN:  Good.  How are you?

20         VOICE OF STACY:  Mr. Brennan has low-back pain that's

21   been pretty severe for about a year.  He's a heavy equipment

22   operator.  Here's his MRI.

23         VOICE OF DR. COUCH:  Okay.

24         VOICE OF STACY:  And we're going to do a facet joint

25   block.

1            VOICE OF DR. COUCH:  Okay.  Does it go down your legs

2    or just in your back?

3            VOICE OF MR. BRENNAN:  It goes down the left leg just

4    a little bit.

5            VOICE OF DR. COUCH:  Where?

6            VOICE OF MR. BRENNAN:  Right around here.  Not far.

7            VOICE OF DR. COUCH:  Right in here?

8            VOICE OF MR. BRENNAN:  Yeah, mostly right there.

9            VOICE OF DR. COUCH:  Okay.  We'll try that first and

10   see if that helps.  Okay?

11           VOICE OF MR. BRENNAN:  All right.

12           VOICE OF DR. COUCH:  Get you some medicine going.

13           VOICE OF MR. BRENNAN:  Okay.

14           VOICE OF DR. COUCH:  Any questions?

15           VOICE OF MR. BRENNAN:  No, sir.  She's pretty much

16   thorough.

17           VOICE OF DR. COUCH:  She's thorough.

18           VOICE OF MR. BRENNAN:  (Inaudible.)

19           VOICE OF DR. COUCH:  Thank you.

20           VOICE OF MR. BRENNAN:  All right.

21           MR. BODNAR:  Stop.

22       (The video recording stopped playing.)

23           MR. BODNAR:  Can we return to the Elmo, please?

24   Q   Dr. Aultman, looking back now at what is recorded from that

25   day, when you watched that video again here in court today, did

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

1   you see Mr. Brennan anywhere say that his back pain averages a

2   seven out of 10?

3   A   No, sir.

4   Q   Did you he ever mention it was a 10 out of 10?

5   A   No, sir.

6   Q   Did you hear him say anything in terms of the pain scale of

7   what he had?

8   A   No, sir.

9   Q   When he did his objective part -- so the S. was what he's

10  reporting.  The objective part, where he's bending and moving,

11  did that correspond with somebody that is 10 out of 10 pain?

12  A   No, sir.  His range of motion looked pretty normal.

13  Q   Did he specifically say he's not falling down, crying in

14  pain?

15  A   He did say that.

16  Q   If you're a 10 out of 10, is that pretty much falling down,

17  crying in pain?

18  A   Yes, sir, writhing in pain.

19  Q   Now, I know she's off screen certain parts of it.  But did

20  you notice at any point where his thyroid's being checked?

21  A   No, sir.

22  Q   Were they checking his pulse bilaterally?

23  A   No, sir.

24  Q   Did you notice if he ever removed his clothes to do abdomen

25  and liver checks?

1   A   No, sir.

2   Q   How about the skin checks?

3   A   Other than just viewing what could be seen, you know, from

4   his T-shirt, no.

5   Q   You didn't see any sort of palpitations [sic]?

6   A   Palpation, no.

7   Q   Palpation?  Did you see a straight-leg raise test

8   performed?

9   A   I did not see it.  He was off the screen.  But I didn't see

10   him.  You would sit and then raise your leg.  It did not seem

11   like that happened.

12   Q   And did you hear during that video whether he was actually

13   prescribed controled substances?

14   A   He was.

15   Q   And was that the Roxicodone?

16   A   Yes, sir.

17   Q   Is that listed anywhere on here?

18   A   No, sir.

19   Q   Having reviewed the video now again, were the prescriptions

20   on that date within or outside the usual course of professional

21   practice?

22   A   I feel they are outside the usual course of professional

23   practice.

24   Q   Can you explain to the jury why you think that way?

25   A   So this is a pretty common scenario that you would see in

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR

1   primary care.  It's a relatively healthy man who doesn't even

2   appear to have a primary care doctor, who has basically

3   musculoskeletal low-back pain, which is very common.  He is a

4   hard worker, he's out there working, and he's taken some things

5   he probably shouldn't have, because he took them illegally.

6   But it would be very common in him to start on just an anti-

7   inflammatory medicine like an NSAID, like Motrin or Aleve, or

8   even a prescription NSAID like Celebrex or Mobic.  So that's in

9   terms of the medication.

10          And then, you know, there should be some sort of exam.

11  If you're going to justify using an opioid especially, I would

12  think you would find something on exam, you would be able to

13  move him or twist him a certain way or he would be able to tell

14  you:  Oh, it's only when I do this.

15          And finally I think, other than just using nonopioid

16  medicine, you could refer him for physical therapy.  He would

17  probably do really well.  He doesn't appear to be overweight.

18  He's young and otherwise healthy.

19          They could also probably help him, since he owns his

20  own company, through occupational therapy, helping him with

21  different kinds of seats or, you know, showing him ways he

22  could operate his equipment that might be less stressful for

23  him.

24  Q   And did you see any of that done in this?

25  A   No, sir.

1  Q   Was a 43-second visit like this for a new patient within or

2  outside the usual course of professional practice?

3  A   That would be outside the course of professional practice.

4  Q   Did you see if either Stacy Madison, the nurse

5  practitioner, or Dr. Couch ever gave any sort of warnings about

6  the use of oxycodone -- Roxicodone?

7  A   No, sir.

8  Q   I'm sorry?

9  A   No, sir.

10 Q   You touched on it briefly that he noted some drug-seeking

11 behavior.  He mentioned that he had purchased -- or received

12 drugs other than from a doctor before?

13 A   Right.

14 Q   What if any concern do you have about that, that there's a

15 new patient who doesn't appear to have anything and can bend

16 all the ways you're asking him to bending and is telling you

17 that they have received controlled substances not from a doctor

18 before?

19         MR. SHARMAN:  Objection.  Leading.

20         THE COURT:  Don't lead the witness.

21 BY MR. BODNAR:

22 Q   What if any concerns do you have about a situation like

23 that where someone mentions they had -- they were receiving

24 drugs from someone else not a doctor?

25 A   Well, if they state already that they are doing something

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR                                                    4431

1   illegally, I think you have to be concerned that they either

2   have an issue with abuse or that they could be actually dealing

3   the drugs and seeing multiple providers and selling them.

4   Q   Now, you only -- did you review any more than just the

5   first video?

6   A   No, sir.  I only saw the first one.

7   Q   But you did review the entirety of the file; is that

8   correct?

9   A   I'm sorry?

10  Q   But you did review the entirety of the medical file?

11  A   Yes, sir.

12  Q   Looking at the next visit of November 6th, 2014, does it

13  again show a pretty extensive physical examination that

14  supposedly occurred?

15  A   It does.

16  Q   Do you see an instruction and what it says for the

17  instruction?

18  A   Continue present medications.

19  Q   Hypothetically if this patient was increased from 90

20  Roxicodone pills to 110 Roxicodone pills, would that be

21  continuing the present medication?

22  A   No, not unless he qualified it with increased quantity.

23  Q   Is there anything indicated in this progress note that this

24  patient was increased to 110 Roxicodone pills?

25  A   No, sir.

4432

1  Q   Hypothetically, if this patient never saw Dr. Couch on this

2  visit, when he was increased to 110 Roxicodone pills, what if

3  any problems would there be with that?

4  A   That whoever -- that he was giving the patient a controlled

5  substance without a visit or allowing someone else to sign a

6  prescription with his DEA number.

7  Q   Is that within the usual course of professional practice to

8  allow that to occur?

9  A   No, sir.

10  Q   Turning now to the March 19th, 2015, visit.  Do you see

11  this drug test from that date?

12  A   Yes, sir.

13  Q   What does it say that Shawn Brennan tested positive for

14  that day?

15  A   It says positive for amphetamines.

16  Q   What if any concern would it be for you if a patient is

17  testing positive for amphetamines and negative for anything

18  else?

19  A   Positive for amphetamines, I would be concerned that he's

20  either taking illegal amphetamines, like methamphetamines, or

21  that he's taking Adderall or some other ADD-type medicine.  But

22  he didn't reveal that to me, so that would be concerning.  And,

23  then, he's negative for the prescribed medicines.

24  Q   And looking on that same date, the progress note from March

25  19th, 2015, under provider comments, could you please read

TRICIA AULTMAN, MD - DIRECT BY MR. BODNAR                                4433

1   that?

2   A   Patient reports unable to make it to Mobile about two weeks

3   ago, secondary to the ice storm that was in north Alabama,

4   working.  Thus late for appointment.  States out of Roxicodone

5   10 days.

6   Q   Is there any concern if a patient has been out of

7   Roxicodone who claims that he needs the Roxicodone to help his

8   pain?

9   A   You'd be concerned that he would have had some withdrawal

10  syndrome or that he got the Roxicodone somewhere else, from the

11  street or another provider.

12  Q   Would that be something that you would have questioned him

13  about:  How was it that you were able to maintain your pain

14  over the last 10 days?

15  A   Right.  I would certainly inquire about what he did, if he

16  was able to work, if he was laid up in bed -- all those kinds

17  of things.

18  Q   And during this visit does it have an extremely extensive

19  physical examination of all the extremities --

20  A   Right.

21  Q   -- listed in there?

22  A   Right.  He -- this is probably one of the most extensive

23  physicals I've seen in the charts.

24  Q   And if a physical like this were to actually have occurred,

25  with all these tests that are being listed here, approximately

4434

1  how long would you expect the office visit to take?

2  A   I would think say at least 15 minutes.  The range of motion

3  and all the extremities sort of testing takes time, especially

4  if the patient's hurting.

5  Q   And if the video were to show that none of this occurred,

6  would this be an accurate record or inaccurate?

7  A   It would not be accurate.

8  Q   And if the video were to show also that Dr. Couch didn't

9  even see the patient on this visit, would it be in the usual

10  course of professional practice to continue prescribing him

11  Roxicodone?

12  A   No, sir, it would not.

13  Q   Finally, on the last page of that visit dated March 19th,

14  2015, under instructions, what is now being stated?

15  A   It says:  Continue present medicines, advised to use (b-t)

16  meds sparingly.

17         And then it looks as if they've put in sort of a

18  standard kind of phrase that they discussed all the effects of

19  the medications prescribed and the risks.

20  Q   This is on March 19th, 2015.  Prior to this date had he

21  already been receiving opiates?

22  A   Yes, sir.

23  Q   Had you ever seen -- in the first video did you see any

24  warnings given such as these about the side-effects of opiates?

25  A   I think she just kind of briefly touched on the fact that

4435

 1  she knew he was a heavy equipment operator.  But other than

 2  that, no, sir.

 3  Q   And does it say:  Patient seen in collaboration with

 4  Dr. Couch?

 5  A   Yes, sir.

 6  Q   If the video were to show that he did not see Dr. Couch

 7  that visit, would that be accurate?

 8  A   No, it would not.

 9  Q   And is it noted in there that he tested positive for

10  amphetamines?

11  A   It is noted but not explained in any way.

12  Q   Does this appear to be signed by Dr. Couch approximately

13  six days after the visit?

14  A   Yes, sir.

15  Q   Having reviewed the entirety of the Shawn Brennan file,

16  have you come to a conclusion of whether or not the prescribing

17  of controlled substances to Shawn Brennan was within or outside

18  the usual course of professional practice?

19  A   It was out -- it was outside the usual course of

20  professional practice.

21  Q   Briefly jumping back to CCC.................., do you

22  recall if in his progress notes he noted that the medicine or

23  his medication had been stolen by a friend?

24  A   Yes.

25  Q   Why would that be concerning if someone is reporting their

1  medication has been stolen?

2  A   It's pretty standard in a pain-management practice to

3  discuss with the patient that it's their responsibility for

4  securing the medication.

5  Q   Is that an excuse that you've ever personally heard before

6  from individuals?

7  A   Absolutely.

8  Q   Does that tend to be an excuse from people that may be

9  diverting their drugs?

10  A   Either that or abusing them, yes, sir.

11  Q   And if a person's medication was actually stolen, would you

12  at least question how it was they were able to get by with the

13  pain up till the next visit?

14  A   Right.  Or you might ask if they have a police report, for

15  example, if it was taken out of the car and other things were

16  taken.

17  Q   And for CC........, was he initially seen by Dr. Couch?

18  A   I would have to look.  But I do believe he was.

19  Q   And then later by Dr. Ruan?

20  A   Yes.

21  Q   As we've seen in the other charts, did CCC.............

22  .... also have what appeared to be cloned diversions and

23  physical examinations?

24  A   Yes.

25  Q   Having reviewed all these charts, now, have you come to an

1  opinion or assessment on whether or not the treatment by

2  Dr. Ruan and Dr. Couch of these patients was within or outside

3  the usual course of professional practice?

4  A   I feel that it was outside the usual course of professional

5  practice.

6  Q   And why was that?

7  A   Just to summarize starting from the beginning, there was

8  never an accurate history.  So they never really talked to

9  these people, it did not seem, to find out really what was the

10 problem.  Along with that they didn't collaborate with any of

11 the patients' other doctors to find out what was going on or at

12 least look at old medical records to see perhaps what was going

13 on.  And physical exams, I think, appear to be just generically

14 populated with either a normal exam and just a few exceptions,

15 but there's no real substance to them that you could really get

16 an idea of what the patient looks like.  And then just in terms

17 of their assessment and plan, they always or almost always

18 jumped to an opioid medication first without trying other

19 things.  They did try to do some injections and things, but

20 there's no referral to physical therapy, and they didn't make

21 use of a lot of other things that you can do for patients with

22 chronic pain.

23 Q   And then, the point you bring up, are there other options

24 other than just prescribing opiates for chronic pain patients?

25 A   Right.  Physical therapy can be really important in helping

4438

1   somebody maintain their current level of functioning or perhaps

2   even get better, in the same way occupational therapy can help

3   somebody who's working or help somebody just continue to be

4   able to do the things they normally do around the

5   house.  There's massage therapy, some people believe in

6   chiropractors, acupuncture has also been shown to be beneficial

7   in patients with chronic pain, and, of course, referral to a

8   surgeon if you felt that something could actually be fixed.

9   (Indicating.)

10  Q   You mentioned that you noticed that there were some

11  injections being done?

12  A   Yes, sir.

13  Q   Were those injections being done by either Dr. Ruan or

14  Dr. Couch?

15  A   Dr. Ruan.

16  Q   So who would get to bill insurance for those injections?

17  A   Dr. Ruan.

18  Q   When a patient's medication is being increased or switched

19  to a different opiate, whose decision is it?  Who has to make

20  that call of whether or not to go up or to switch to another

21  medication?

22  A   It should be the person with the DEA license, the person

23  that's writing the prescription.

24  Q   And does that same hold true if a nurse practitioner

25  without a DEA license works underneath a doctor?

TRICIA AULTMAN, MD - CROSS BY MR. SHARMAN

1   A   Ask it again?  I'm sorry.

2   Q   Does the doctor still need to be -- does the buck

3   ultimately stop with the doctor even if they've got nurse

4   practitioners working under them?

5   A   Absolutely.  Even if the nurse practitioner suggests

6   something, the physician is ultimately the one that's

7   responsible.

8   Q   In all the files that you reviewed, did you notice anywhere

9   where either Dr. Ruan or Dr. Couch or their staff informed the

10  patients about any sort of financial conflict of interest the

11  doctor might have?

12  A   Not that I can recall, no, sir.

13          MR. BODNAR:  One moment, Your Honor.

14      (A discussion was held off the record between government

15  counsel.)

16          MR. BODNAR:  Pass the witness, Your Honor.

17          THE COURT:  Mr. Sharman?

18          MR. SHARMAN:  Take me just a moment to get set up,

19  Your Honor.

20                      CROSS EXAMINATION

21  BY MR. SHARMAN:

22  Q   Dr. Aultman, my name is Jack Sharman.  I represent

23  Dr. Couch.

24  A   Okay.

25  Q   You're an internist; right?

4440

```
 1   A   Yes, sir.
 2   Q   An internist, as the name implies, practices internal
 3   medicine; right?
 4   A   Yes, sir.
 5   Q   And as you alluded to on direct, there are great
 6   similarities between what you do as an internist and what a
 7   family physician does; right?
 8   A   Yes, there are.
 9   Q   The main distinction being that you, unlike a family
10   physician, do not regularly see patients 12 or so and under;
11   right?
12   A   And an internist focuses more on probably more complex
13   medical problems than a family practice doctor.
14   Q   But a family practice doctor, and even an internist to some
15   extent, will in the course of his or her practice mostly see
16   things like high blood pressure, for example; right?
17   A   That would be very common, yes, sir.
18   Q   And coughs, cold, and flu; right?
19   A   Probably more often in family practice than internal
20   medical.
21   Q   Diabetes, heart problems, that sort of thing; right?
22   A   Yes, sir.
23   Q   Those are all conditions that an internist regularly is
24   presented with; right?
25   A   Yes.
```

```
 1   Q   Now, you haven't had formal academic training in pain
 2   management or pain medicine; right?
 3   A   No, sir.
 4   Q   You've never taken one of those tests to get board
 5   certified in pain management; right?
 6   A   Only internal medicine.
 7   Q   And you haven't had a residency or a fellowship in pain
 8   management; right?
 9   A   No, sir.
10   Q   You've never been published in a peer-reviewed pain
11   journal, have you?
12   A   No, sir.
13   Q   Okay.  You know what peer review means; right?
14   A   I certainly do.
15   Q   Peer review, that's a process where you write an article
16   and then you send it in to a journal or a textbook; right?
17   A   Yes, sir.
18   Q   And then people who are knowledgeable in that field --
19            MR. BODNAR:  Your Honor?  Objection to him explaining
20   this.  She said she knows what it is.
21   A   I do, sir.  I do know what it means.
22            MR. SHARMAN:  And, Your Honor, the jury may not.  And
23   I would like for them to know.
24            THE COURT:  Well, get her to explain rather than
25   saying what it is.
```

4442

 1  BY MR. SHARMAN:

 2  Q   Dr. Aultman, do you know what a peer-Reviewed article is?

 3  A   Yes, I do.

 4  Q   All right.  Would you please explain to the jury the peer

 5  review process?

 6  A   So in a respectable medical journal you have a group of

 7  people that review the articles.  So you'll send an article in

 8  and a group of doctors in that field will look at it and make

 9  sure that the studies look like they're legitimate and then

10  they'll decide whether it's worthy to be published in the

11  journal or not.

12  Q   So, for example, in a pain journal or a pain-management

13  journal, if somebody was to submit an article, they would have

14  experts in that subject reviewing the article; right?

15          MR. BODNAR:  Objection to relevance on this.

16          THE COURT:  Sustained.

17  BY MR. SHARMAN:

18  Q   You've never had an article reviewed by an expert in pain

19  management; right?

20  A   No, sir.

21  Q   You've never written such an article and submitted it to a

22  journal; right?

23  A   No, sir.

24  Q   You're not an anesthesiologist; right?

25  A   No.

1              MR. BODNAR:  Objection, Your Honor.  I think she has

2     already explained her qualifications and been qualified as an

3     expert in the area that she's testified in.

4              MR. SHARMAN:  Your Honor, the question does not go to

5     whether she's been qualified as an expert, but the credibility

6     of the expert.

7              THE COURT:  I understand.  You can go ahead.

8     BY MR. SHARMAN:

9     Q   All right.  And on direct you discussed some procedures, do

10    you remember that?  Blocks and so forth; right?

11    A   I'm not sure that I discussed them, but I'm familiar with

12    what you're speaking about.

13    Q   All right.  And those are not procedures that you do

14    regularly as an internist; right?

15    A   No, sir.

16    Q   You don't practice other modalities of pain management, for

17    example, like implantation of a pain pump?

18    A   No, sir.

19    Q   You also testified on direct that you're a hospitalist;

20    right?

21    A   Yes, sir.

22    Q   That means -- again, as the name implies, you work in a

23    hospital; right?

24    A   Yes, sir.

25    Q   And that you work for the hospital; right?

 1    A    Yes, sir.

 2    Q    You're their employee basically?

 3    A    Yes, sir.

 4    Q    All right.  And you don't have your own clinical practice,

 5    at least any more; right?

 6    A    Not any more, no, sir.

 7    Q    When you did have your own clinical practice, it was

 8    generally the nature of an outpatient clinic; is that right?

 9    A    Yes, sir.  I still followed patients in the hospital for

10    some time as well, but it was mostly outpatient.

11    Q    And when you have a patient in your general internist

12    outpatient practice who presented with a significant amount of

13    pain that was beyond your specialization, you referred that

14    patient out; right?

15    A    Either to the orthopedist, general surgery, sometimes pain

16    management, physical therapy, yes, sir, I definitely used

17    referrals to help take care of the patient.

18    Q    Among those referrals were referrals to pain management

19    specialists right?

20    A    Yes, sir.  There's a very good one in town.

21            MR. SHARMAN:  Court's indulgence.

22            THE COURT:  All right.

23    BY MR. SHARMAN:

24    Q    All right.  Dr. Aultman, you're familiar with the

25    Mississippi Board of Medical Licensure, are you not?

1   A   Yes, sir.

2   Q   That's basically the state medical board?

3   A   Right.

4   Q   And that's the organization that, among other things,

5   issues licenses to doctors in Mississippi?

6   A   Yes, sir.

7   Q   And they publish rules and regulations and guidance

8   documents; right?

9   A   Right.

10  Q   And if you practice medicine at least in Mississippi,

11  you've got to follow those rules and regulations; right?

12  A   Yes, sir.

13  Q   All right.  As a good Mississippi practitioner, you try to

14  keep up to date on all those rules and regulations; right?

15  A   I do my best.

16  Q   And you're aware that the Mississippi board has set out

17  rules for a pain-management practice in Mississippi; right?

18  A   Right.

19  Q   Those are pretty new, are they not?

20  A   Within a couple of years ago, if you're speaking of --

21          MR. BODNAR:  I have an objection to relevance, Your

22  Honor.  They didn't practice in Mississippi.  So the relevance

23  of the Mississippi rules for pain management are not relevant

24  in the case.

25          MR. SHARMAN:  Again, Your Honor, it goes to her

1  credibility.  And I will link this up and demonstrate that it

2  has an effect on her.

3          THE COURT:  Come to side bar.

4      (At the side bar, jury not present.)

5          MR. SHARMAN:  Your Honor, the Mississippi medical

6  board recently promulgated regulations addressing a variety of

7  areas for pain-Management practice in Mississippi.  One of

8  those areas involved the level of training or education

9  necessary before one can even practice pain management at

10  all.  In other words, not be an expert, but simply practice in

11  the field.  She is being offered as an expert.  And what I

12  would intend to do is to get her to review the regulations,

13  which she has already acknowledged keeping up with, and

14  demonstrate that she's satisfied none of the requirements set

15  out by the Mississippi medical board to be able to practice

16  pain management in Mississippi.

17          THE COURT:  I sustain the objection.

18      (In open court, defendants and jury present.)

19          THE COURT:  Mr. Sharman, is now a good time for us to

20  break for lunch?

21          MR. SHARMAN:  Yes, ma'am.

22          THE COURT:  All right.  Ladies and gentlemen, we will

23  take our lunch break now.  We will break for an hour and 15

24  minutes.  Leave your pads on your chairs.  No discussion about

25  the case.  Be back downstairs in the jury assembly room at

 1    1:15, ready to be called back up.  Thank you.  We're in recess.

 2        (In open court, defendants present, jury not present.)

 3            THE COURT:  Counsel, I failed to ascertain exactly

 4    what time we need to break this afternoon.

 5            MR. POWELL:  Judge, I believe the appointment is at 4

 6    in west Mobile.

 7            THE COURT:  So what time are you asking that we break?

 8            MR. POWELL:  3:30.

 9            THE COURT:  That'll be fine.  We'll break at 3:30.

10            MR. POWELL:  Thank you.

11        (A recess was taken at approximately 12:01 p.m.)

12        (Afternoon session, 1:15 p.m., in open court, defendants

13    and jury present.)

14            THE COURT:  All right, Mr. Sharman.

15            MR. SHARMAN:  Thank you, Your Honor.

16    Q   Dr. Aultman, when we left off, we were talking about your

17    work as a hospitalist.

18    A   Yes, sir.

19    Q   Now, as a hospitalist, you see whatever patients are

20    admitted to the hospital and assigned to you; right?

21    A   Correct.

22    Q   And that when they leave, you don't see them again to treat

23    them unless they happen to get readmitted to the hospital and

24    assigned to you again; right?

25    A   That's correct.

1  Q   As a hospitalist, other physicians do not refer patients to
2  you; right?
3  A   Sometimes indirectly, yes.  A physician might be admitting
4  someone and they ask specifically for me.
5  Q   That's because they know you or admire your skills; right?
6  A   Correct.
7  Q   But it's not like somebody sends their patient and says:
8  I'm going to give you a referral to Dr. Aultman today?
9  A   No, sir, no, sir.
10  Q   And today as a hospitalist, how many patients are you
11  treating who have chronic pain?
12  A   I would say on an average day when I work I see between 20
13  and 25 patients, and there's probably at least one or two that
14  have some sort of chronic pain issue, just depending on the
15  week, of course.
16  Q   And you see them only for the hours, days, or weeks that
17  they happen to be in the hospital; right?
18  A   Yes, sir.
19  Q   All right.  We've talked about chronic pain.  Just for a
20  definition, is chronic pain pain that typically lasts greater
21  than three months or past the time of normal tissue healing?
22  A   Yes, sir, that would be a good explanation.
23  Q   And when we use the word "chronic" in "chronic pain," we
24  mean a condition that is extended rather than short-term;
25  right?

TRICIA AULTMAN, MD - CROSS BY MR. SHARMAN

```
 1   A    Correct.
 2   Q    And it's a condition for which a cure or resolution is not
 3   likely?  In other words, it's going to continue?
 4   A    I would agree with that.
 5   Q    So in general when we talk about chronic pain, the pain is
 6   more or less here to stay and the question presented to the
 7   physician is how best can we help this person manage the pain;
 8   is that fair?
 9   A    Yes, sir.
10   Q    And in the treatment of pain, the concepts of dependence
11   and addiction often come up, do they not?
12   A    Yes, sir.
13   Q    Those are different things, though, are they not?
14   A    Yes, sir.
15   Q    And dependence means that a patient having had a course of
16   medication, should he or she abruptly stop taking that
17   medication, they are going to experience some withdrawal
18   symptoms; right?
19   A    Yes, sir.
20   Q    That's physical dependence?
21   A    Yes, sir.
22   Q    That's different than addiction?
23   A    Yes.
24   Q    Because addiction is associated with dysfunctional --
25   A    Right.
```

1    Q    -- or aberrant behavior associated --

2    A    Sort of maladaptive behavior, even though the person knows

3    it might be harmful to them, yes, sir.

4    Q    We were discussing a state medical board a moment

5    ago.  Have you had any occasion in preparing your opinions in

6    this case to consult with any regulations or standards set out

7    by the Alabama medical board?

8    A    Yes, sir.

9    Q    All right.  I'm going to show you Exhibit 118, that is

10   already in evidence.  And it is a portion of the regulations --

11   I'll have it up in a minute here.

12          I'm going to show you a portion of the regulations

13   promulgated by the Alabama medical board that relate to

14   controlled substances certification.  Do you recall whether you

15   reviewed these particular provisions or not?

16   A    It looks to be the same, sir.  I would not know if it was

17   the same year, but it looks about the same, yes.

18   Q    All right.  Now, I'm going to direct your attention,

19   Dr. Aultman, to page 4-26 of Exhibit 118.  And there the

20   Alabama medical board says:  Inadequate pain control may result

21   from physician's lack of knowledge about pain management or an

22   inadequate understanding of tolerance, dependence or addiction.

23   Fears of investigation or sanction by federal, state, and local

24   regulatory agencies may also result in inappropriate or

25   inadequate treatment of chronic-pain patients.  Do you agree

4451

 1   with the Alabama medical board on that?

 2   A   Yes, sir.  It does go on to say, however, that there's

 3   quite a few things the physician needs to do in order to

 4   prescribe the medicines for pain management.

 5   Q   And then let's look at subparagraph C.

 6        MR. SHARMAN:  Sam, if we could, in that regard?

 7   Q   And the Alabama medical board goes on to say:  The board

 8   recognizes that controlled substances, including opioid

 9   analgesics -- and analgesic is just a fancy word for something

10   that helps with pain; right?

11   A   Yes, sir.

12   Q   The board recognizes that controlled substances, including

13   opioid analgesics, may be essential in the treatment of acute

14   pain due to trauma or surgery and chronic pain, whether due to

15   cancer or noncancer origins.  Would you agree with the Alabama

16   medical board on that?

17   A   Yes, sir.

18   Q   The medical management of pain should be based on current

19   knowledge and research and should include the use of both

20   pharmacologic and nonpharmacologic modalities.

21        And pharmacologic just means having to do with

22   medicine; right?

23   A   Yes, sir.

24   Q   And modalities is just a different way of doing it?

25   A   Right.

TRICIA AULTMAN, MD - CROSS BY MR. SHARMAN
4452

1  Q   And then the Alabama medical board concludes in that

2  paragraph by saying:  Physicians should recognize that

3  tolerance and physical dependence are normal consequences of

4  sustained use of opioid analgesics and are not synonymous with

5  addiction.  Do you agree with that?

6  A   I would agree.

7  Q   All right.  And there are consequences, are there not, to

8  the patient who suffers from chronic pain; right?

9  A   Sure.

10 Q   It limits what you can do in your daily activities; right?

11 A   It should.

12 Q   If you've got a job, it can reduce your productivity;

13 right?

14 A   Yes, sir.

15 Q   It can reduce your quality of life; right?

16 A   Certainly.

17 Q   And it can even cause some stigma or some ostracism for

18 people to suffer; right?

19 A   I'm not sure about that last one.  I guess you would have

20 to elaborate a little bit.  I'm not sure that anyone who has

21 chronic pain is ostracized from society or anything.  I'm not

22 sure you would even know.

23 Q   Now, in your review of the files from PPSA and from

24 Dr. Couch, you saw that Dr. Couch in his practice did not just

25 prescribe pain medication; right?

4453

```
 1   A   I would have to say I did not see very many examples of

 2   that, to my recollection, other than referrals to Dr. Ruan.

 3   Q   So you didn't see in myobloc injections?

 4   A   Sure, I did see those.

 5   Q   You saw epidural steroid injections; right?

 6   A   Right.

 7   Q   And nerve block procedures of different sorts?

 8   A   Yes, those.

 9   Q   And facet blocks?

10   A   Uh-huh (nodding head affirmatively).

11   Q   I'm sorry.  You need to say yes or no.

12   A   Yes, sir.

13   Q   And pain pump procedures, you saw references to those?

14   A   Yes, sir.

15   Q   And then on direct you were asked some questions about

16   various fentanyl products and their uses.  Do you remember some

17   of those questions?

18   A   Yes, sir.

19   Q   All right.  Now, in your review of the files, you saw, did

20   you not, that Dr. Couch from time to time would prescribe

21   medications what's called off label; right?

22   A   Yes, sir.

23   Q   So, for example, on direct you talked briefly about Xanax;

24   right?

25   A   Yes, sir.
```

TRICIA AULTMAN, MD - CROSS BY MR. SHARMAN
4454

1    Q    And Xanax is originally an anti-anxiety medication; right?

2    A    Right.

3    Q    But it's also useful in particular instances in pain

4    management; right?

5    A    Sure.

6    Q    So there's nothing unusual or inappropriate about a

7    physician prescribing medication off label; right?

8    A    No, except that if you're prescribing something for chronic

9    pain, you shouldn't say it's for anxiety, as in some of the

10   prescriptions we saw -- take three times a day for anxiety --

11   there would be no history documented for anxiety.

12   Q    And my question was there's nothing particularly unusual or

13   inappropriate about a doctor prescribing off label; right?

14   A    It's really not, because the way the off label and sort of

15   the FDA works is that these days you have to apply for a

16   specific use for a specific medication, whereas years ago those

17   kind of parameters didn't exist.  So there's many, many, many

18   older medicines that we use today that are indicated for other

19   things other than what we use them for.

20   Q    And when the FDA -- that's the Food and Drug

21   Administration; right?

22   A    Right.

23   Q    When they approve a medication for a particular use, that's

24   what's often called indicated; right?

25   A    Sure.

4455

1   Q   And that indication allows that pharmaceutical company that

2   has gone through the effort of the clinical trials and so forth

3   to get the approval, it also allows the company to then market

4   that medication for that purpose?

5   A   Exactly.

6   Q   Right?

7   A   Yes, sir.

8   Q   And then conversely that company may not market it for

9   other purposes; right?

10   A   Right.

11   Q   But a doctor is in a different situation than the

12   pharmaceutical company; right?

13   A   Right.

14   Q   The doctor, in the exercise of his or her professional

15   judgment, may prescribe that medication for purposes responding

16   to a condition in a particular patient other than the indicated

17   use; right?

18   A   You can, definitely with caution and with counseling of the

19   patient of the risks and benefits, compared to using what would

20   be a standard medication, so to speak.

21   Q   All right.  And in your review of the files, you noted that

22   there was something called an opioid agreement, sometimes

23   called an opioid contract; right?

24   A   Yes, sir (nodding head affirmatively).

25   Q   And that's an appropriate thing to do; right?

1    A    Yes.

2    Q    And, now, in your work as a hospitalist, they don't have

3    opioid agreements in a hospital; right?

4    A    No, sir.

5    Q    And in your outpatient internist practice before you were a

6    hospitalist, you didn't have occasion regularly to use opioid

7    agreements; right?

8    A    No.  But -- and let me also answer to the previous question

9    that, although I don't have my own agreements with patients, I

10   take care of plenty of patients who are under these agreements

11   and so you need to be careful about what you're prescribing

12   that you haven't invalidated their agreement with their pain

13   provider.  Even once one is discharged from the hospital, I

14   have to make sure what I'm doing isn't going to get them in

15   trouble with their pain management provider.

16   Q    In your earlier practice in your outpatient clinical

17   practice, you didn't have occasion to regularly cause patients

18   to enter into opioid agreements; right?

19   A    No, sir.

20   Q    Because that was in part, if one of your patients was at

21   that level of pain such that they were going to get medications

22   that would require an opioid agreement, you would normally be

23   referring them to a pain specialist or somebody else outside of

24   your practice; right?

25   A    Right.  And if I felt as if the patient were doing

TRICIA AULTMAN, MD - CROSS BY MR. SHARMAN

4457

1   something inappropriate with the medication, then they would be

2   discharged from my practice.

3   Q   Sure.  You could always exercise your professional

4   judgment, whether you had the agreement or not; right?

5   A   Right.

6   Q   In fact that's what prescribing medication with a patient

7   comes down to, is it not, a physician's professional judgment

8   on the one hand and then the patient's decision to do something

9   or not about it; right?

10  A   Correct.

11  Q   I'm sorry?

12  A   I would say correct.

13  Q   In pain medicine there is no hard-and-fast consensus about

14  the use of opioids in the treatment of pain; right?

15  A   Can you clarify that a little bit?

16  Q   In pain medicine there is no hard-and-fast consensus, there

17  are no strict rules and regulations about the use of opioids in

18  treating chronic pain; right?

19  A   The only regulations are the ones that came out within the

20  last year recommending that a certain number of commonsense

21  things and then also that you try to stay less than 90 morphine

22  equivalents a day.  But other than that, no, sir, there's no

23  specific rule or law to give exact treatment, as there isn't in

24  any medicine.

25  Q   And even what you refer to is a set of guidelines; right?

TRICIA AULTMAN, MD - CROSS BY MR. SHARMAN                                    4458

```
 1   A    Yes, sir.
 2   Q    And doctors can in good faith disagree with each other
 3   about the application of guidelines; right?
 4   A    Absolutely.
 5   Q    You're smiling.  That happens from time to time, doesn't
 6   it?
 7   A    Yeah, doctors disagree, yes, sir.
 8   Q    And doctors even can disagree about the appropriate
 9   treatment for a particular patient in a particular situation;
10   right?
11   A    Certainly.
12   Q    That's why patients sometimes go get the famous second
13   opinion; right?
14   A    Yes, sir.
15   Q    And in fact medicine is both an art and a science, is it
16   not?
17   A    Absolutely.
18   Q    The treatment of chronic pain is dependent in part on the
19   subjective recitation of the patients; right?
20   A    Sure.  You would definitely rely on what the patient is
21   telling you and you need to listen and then answer into that
22   feedback of questions in the subjective part of the exam.
23   Q    And that's because pain itself is a subjective experience;
24   right?
25   A    Certainly.
```

1  Q   There's no painometer you can plug somebody into and get a

2  precise reading; right?

3  A   No.  But there's definitely some things which are known to

4  be more painful than others.  For example, things people bring

5  up are childbirth and kidney stones; right.

6  Q   The subjectivity of pain is one reason that physicians use

7  things like the scale of zero to 10; right?

8  A   Correct.

9  Q   And you know what I'm talking about:  Tell me how bad the

10  pain is on this scale; right?

11  A   Right.

12  Q   Or it can have the frowny face and the smiley face?

13  A   Right.

14  Q   Would you agree that the benefits of opioid therapy usually

15  apply to patients who have tried nonopioid avenues or

16  modalities; right?

17  A   That's a pretty broad general statement.  But I would

18  agree, I suppose.

19  Q   In other words, as you addressed briefly on direct,

20  oftentimes the most desirous course is that a patient try other

21  pathways first; right?

22  A   Sure.

23  Q   Whether that's nonopioid medication is one; right?

24  A   Uh-huh (nodding head affirmatively).

25  Q   Going to see a chiropractor is another one; right?

 1   A   Right.

 2   Q   Exercise, massage, those are all things that could be

 3   tried; right?

 4   A   Weightloss, acupuncture, yes, sir.

 5   Q   And in general the most viable and appropriate candidate

 6   for opioid prescriptions in pain management is going to be a

 7   patient who has likely traveled those other roads already and

 8   they've not been successful; is that a fair statement?

 9   A   Correct.  And I think it's really important to document in

10   the chart that they've done all of those things and failed.

11   Q   You have from time to time -- and I think you alluded to

12   this in direct -- spoken or given talks to the DEA; right?

13   A   Yes, sir.

14   Q   To the Drug Enforcement Administration; right?

15   A   Yes, I have (nodding head affirmatively).

16   Q   And in doing so, you have described pain physicians who, in

17   your view, lack good faith?

18   A   Right.

19   Q   And you've sort of created maybe some checklists to

20   determine whether a physician's acting in good faith; right?

21   A   Correct.

22   Q   So, now, this is Pat Couch.  (Indicating.)  You've never

23   met him before, have you?

24   A   No, sir.

25   Q   So you don't know anything about his good faith or lack

4461

1    thereof other than in the records you've been provided; right?

2    A    Correct.

3    Q    So one of the indications of a pain physician acting, I

4    guess, in bad faith is that the physician --

5            MR. BODNAR:  Your Honor?

6    BY MR. SHARMAN:

7    Q    -- allows the patient to name the drug the patient desires;

8    right?

9            MR. BODNAR:  We're going to object at this time.

10   First of all, good faith is not the standard we have here in

11   criminal court.  And this is outside of what she was doing

12   anywhere on direct examination.

13           MR. SHARMAN:  It goes --

14           THE COURT:  (Indicating.)

15       (At the side bar, jury not present.)

16           MR. SHARMAN:  Finished?

17           MR. BODNAR:  Your Honor, good faith is not the

18   standard here.  It's whether it's outside the usual course of

19   professional practice.  Furthermore, she just said she has

20   never met him.  And unless he's going to show her something

21   exactly within or without the usual course of professional

22   practice and ask whether that matches up with good faith, I

23   don't see how this is relevant or within the bounds of what

24   went on during the direct examination.

25           THE COURT:  What is --

1          MR. SHARMAN:  Your Honor, the legal inquiry, of

2     course, requires intentional conduct.  What she is talking

3     about and the presentations as badges of good faith really are

4     badges of intent; that is to say, does the physician have a

5     wrongful intent or not.  She's testified about good pain

6     management versus bad, what's within the usual course and

7     not.  And intent and the intent of the physician, the

8     pain-management physician, is critical to that analysis.  And

9     I'm only going to ask her about her own opinions about what

10    that constitutes.

11         MR. BODNAR:  But she can't testify as to intent

12    either.  Experts can never give what someone intended to do.

13    That's in rule 702.

14         MR. SHARMAN:  She can testify to standards and what

15    she thinks they are.

16         THE COURT:  There are no standards of intent.  So I'm

17    not sure that this --

18         MR. SHARMAN:  But the government keeps talking about

19    red flags and all these things that aren't really within the

20    usual course analysis either.  So if they get to talk about red

21    flags, that sort of thing, then we ought to be able to talk

22    with their expert about lack of good faith by a pain

23    practitioner.

24         MR. BODNAR:  I think that's different than asking her

25    to opine on whether or not he did or didn't have intent.

1          THE COURT:  Are you going to ask specific questions
2     about Dr. Couch?
3          MR. SHARMAN:  No, ma'am.  I'm just going to ask -- I'm
4     just going to ask is this a badge of, you know, I guess, bad
5     faith, in your view, in your presentations to the DEA.  I'm not
6     going to ask about Dr. Couch.
7          THE COURT:  I think this is outside the scope of
8     direct examination with her.  She didn't testify to anything
9     about what she's told the DEA or what her opinions are in that
10    regard.  So I think -- I sustain the objection.
11        (A discussion was held off the record between defense
12    counsel.)
13        (In open court, defendant and jury present.)
14    BY MR. SHARMAN:
15    Q   In the records you reviewed upon which you base the opinion
16    that you are giving, Dr. Aultman, did you see any situation
17    where Dr. Couch or anybody in his practice allowed the
18    physician to name or identify the drug he or she was demanding?
19    Did you see anything like that?
20    A   It seemed on several times.  I'm trying to give you a good
21    example.  For example, in the undercover patient, Mr. Brennan,
22    and she said -- she kind of asked him what he got illegally and
23    he told her and then she sighed:  I bet the oxycodone worked
24    better.
25            That's not probably the best example.

TRICIA AULTMAN, MD - CROSS BY MR. SHARMAN

4464

1  Q   I'm sorry.  I was probably unclear.  I was asking for any

2  situation in the records that you determined where the patient,

3  not the staff member, but the patient said:  I want X, by name,

4  and he or she was given it.  You didn't see that, did you?

5  A   Yes.  I know there was an example in Mr. C's... chart, I

6  believe, where he asked for Valium and he was given Valium.  To

7  give you any other examples, I would have to go through notes

8  and such.

9        I believe Ms. W....... made a lot of suggestions that

10  she wanted to switch back and forth as well.

11  Q   All right.  In preparing your opinions, I think we just

12  confirmed you just relied on the paper records plus that clip

13  of that UC video that you were given; right?

14  A   And the report of the clip, yes, sir.

15  Q   All right.  So you didn't interview any of Dr. Couch's

16  patients; right?

17  A   No, sir.

18  Q   You didn't interview any family members of any patients;

19  right?

20  A   No, sir.

21  Q   And you didn't interview any of the doctors who referred

22  their patients to Dr. Couch, did you?

23  A   No, sir.

24  Q   Okay.  So you don't have any idea whether any of those

25  people are happy, unhappy, or neutral about the care they

TRICIA AULTMAN, MD - CROSS BY MR. SHARMAN

1  received by Dr. Couch, are you?

2  A   I have -- I have no idea, no.

3  Q   You reviewed, if I'm correct, Dr. Aultman, five files plus

4  the video.  That would be Ms. Driver, Ms. W..., Mr. Brennan,

5  Ms. W......., Mr. C..., and then the video.  Does that sound

6  right?

7  A   Yes, sir.

8  Q   All right.  Do you know how many patients Dr. Couch had in

9  total?

10  A   I would guess in the thousands, just knowing what an

11  average internist does.

12  Q   You didn't select those files for your review out of those

13  thousands of patients; right?

14  A   No, sir.  They were given to me by the Department of

15  Justice and the DEA.

16  Q   So the government selected some files for you that they

17  wanted you to look at; right?

18  A   Yes, sir.

19  Q   And you didn't ask to see a different or larger sample;

20  right?

21  A   Not at the time, no, sir.

22  Q   I beg your pardon?

23  A   No, sir.

24  Q   So you don't have any knowledge of or opinion about how the

25  files you reviewed reflect or do not reflect the practice;

TRICIA AULTMAN, MD - CROSS BY MR. SHARMAN

1    right?

2    A    No, I do not.

3    Q    You answered some questions on direct about Dr. Couch's

4    patient Ms. Driver.  Do you remember some of those questions?

5    A    Yes, sir.

6    Q    Now, Ms. Driver was referred to Dr. Couch, she just didn't

7    walk in the door; right?

8    A    I believe she was referred.

9    Q    And in fact she had at least eight physicians treat her

10   before she showed up at PPSA; right?

11   A    I wouldn't know exactly without looking at the chart, sir.

12   Q    And those physicians diagnosed Ms. Driver with a number of

13   conditions; right?

14   A    Yes, sir.

15   Q    She had a large ruptured disk at the L5-S1.  Does that

16   sound right?

17   A    Again, sir, the patients are so similar, without looking at

18   a specific page in the record, I wouldn't be able to answer

19   with a hundred percent accuracy.  But if you had the record,

20   I'd be happy to answer.

21   Q    Well, you don't -- I'm trying to shorten things.  You don't

22   dispute that Ms. Driver had significant medical issues when she

23   was referred to PPSA; right?

24   A    Sure.

25   Q    On the subject of the video clip, that was the only video

TRICIA AULEYMAN, MD - CROSS BY MR. SHARMAN

 1   clip with regard to the undercover that you saw; right?

 2   A   Yes, sir.

 3   Q   You didn't see any other clips of that visit; right?

 4   A   No, sir (shaking head negatively).

 5   Q   Are you aware that other clips exist?

 6   A   I am aware that there were clips of subsequent visits, yes.

 7   Q   And you didn't ask to see any other video clips; right?

 8   A   No, sir.

 9   Q   You just stuck with what they gave you; right?

10   A   I had quite a bit to review.

11   Q   I'm not questioning that.  But as far as that clip goes,

12   you just took what they gave you; right?

13   A   Yes, sir.

14   Q   You didn't say -- you didn't say:  Show me the rest of

15   them; right?

16   A   No, sir.

17   Q   All right.  Did you review the referral package for the

18   undercover agent, in other words, the referral documents from

19   the chiropractor that were sent to PPSA for the undercover

20   agent?

21   A   Not that I recall, although they may have well been in the

22   chart.  I was much more concerned with what happened inside the

23   clinic.

24   Q   Okay.  So you don't know whether or not a chiropractor

25   named JW......... referred that undercover agent; right?

1          MR. BODNAR:  Your Honor, objection to relevance.  She

2     said she has not reviewed that material.  And it's outside the

3     scope of what she testified to about this patient.

4          MR. SHARMAN:  Your Honor, it's -- she --

5          THE COURT:  Well, if you want to show it to her, go

6     ahead and show it to her.  But just to ask her, you know, cold

7     questions about what she reviewed --

8          MR. SHARMAN:  Fair enough.

9          THE COURT:  -- overrule the objection

10       (A discussion was held off the record between defense

11    counsel.)

12         MR. SHARMAN:  May I have the ELMO, please?

13    Q   Let me show you this document, Dr. Aultman, which at the

14    top says that it's an examination report of Shawn Brennan by

15    Dr. JW..........  Have you seen these materials before?

16    A   Not that I recall.  But, again, there's a lot of material

17    that I reviewed.

18    Q   I'll turn to the second page, where Dr. W's..... form

19    recites a history for Shawn Brennan.  Do you see that name at

20    the top?

21    A   Yes, sir.

22    Q   And that's the name of the undercover agent; right?

23    A   Correct.

24    Q   And the history, as you testified on direct, seeks a

25    variety of different kinds of information, but in particular it

1   seeks information about the kind of pain that the patient is

2   suffering; right?

3   A    Yes, sir.

4   Q    All right.  So there you can see that the records are

5   filled out about the aggravation, the onset, the relief,

6   quality, timing, severity, and progress of the pain; right?

7   A    Yes, sir.

8   Q    And you see there that it's reported that the pain is

9   aggravated when he sits and bends; right?

10  A    Uh-huh (positive response).  Yes.

11  Q    And that there is -- there's basically been no relief

12  obtained thus far?

13  A    Yes, sir.

14  Q    And that the pain is characterized as both sharp and

15  aching; right?

16  A    Yes, sir.

17  Q    And constant?

18  A    Yes, sir.

19  Q    And severe?

20  A    Yes, sir.

21  Q    And that its progress basically is worse?

22  A    Yes, sir.

23  Q    You don't remember seeing any of that in your evaluation of

24  the treatment of the undercover by Dr. Couch and his staff?

25  A    Not that I can recall, no, sir.  But I can say that the

1    examination and the history that's documented by the

2    chiropractor is not consistent with how the patient was acting

3    in the room when he could bend and flex without pain.

4    Q   And when you receive -- or I guess when you used to

5    receive -- I shouldn't even say that.  I'll start over.

6            In your prior clinical practice, did you get

7    referrals?

8    A   Yes, sir.

9    Q   And did you get medical records sent to you from the

10   referring physician?

11   A   Often, yes, sir (nodding head affirmatively).

12   Q   Did you look to those records for useful information?

13   A   Sure (nodding head affirmatively).

14   Q   And did those records help guide you in the way you treated

15   that particular patient unless you had some reason to question

16   the records?

17   A   I would like to think that they gave me a starting

18   point.  But I always perform my own independent history and

19   exam and then make my own opinion, because you can miss things

20   in medicine and it can be tragic if you do.  And so I don't

21   think it's ever safe to assume what someone else has given you

22   is a hundred percent true.

23   Q   And on that point, have you ever had anybody send you a

24   referral package that was wholly fake?

25   A   Not that I'm aware of.

1   Q   And that would be troubling to you, would it not?

2   A   If I knew, yes, it would.  And I guess that's all the more

3   reason to perform your own history and physical exam, to make

4   your own assessment.

5   Q   And with Mr. Bodnar on direct you went over some

6   observations and criticisms of Dr. Couch's or his staff's

7   practice with regard to several visits.  Do you remember those

8   questions and answers?

9   A   Yes, sir.

10  Q   One of the criticisms you had was that Ms. Driver had

11  returned early; that is, she had returned and she was out of

12  medication already?

13  A   Correct.

14  Q   You're familiar with the term "pseudoaddiction," are you

15  not?

16  A   I'm not entirely sure what you mean by pseudoaddiction.

17  Q   Have you ever heard that term?

18  A   I'm not sure that I have.

19  Q   Are there occasions when a patient is suffering chronic

20  pain, they have been prescribed a medication, and they are

21  trying to get to a level of analgesia, a level of little or no

22  pain by taking more of the medication?

23  A   I'm sure that's possible.

24  Q   Have you not seen that in your practice?

25  A   If a patient was taking more than I prescribed, I would

4472

1  dismiss them from my practice.

2  Q   You'd fired them first off, you're not a second-chance

3  person, you wouldn't give them a second chance?

4  A   I know if I set out rules in an agreement, I would follow

5  the rules that I set out.

6  Q   Without exception?

7  A   I can't think of a good exception.  I've heard them all:

8  My dog ate it, I lost it -- in terms of what happens to

9  people's medicine.

10 Q   So in your practice you don't believe that it's actually a

11 possibility that a patient could be suffering pain that is not

12 met by the prescription and they are trying to address it,

13 including by taking more than prescribed?  That just doesn't

14 happen?

15 A   I think it's very possible.  But I would be very careful to

16 document all that in my history and I would expect to see some

17 sort of maybe phone communication or maybe the patient walked

18 in early and said:  I really need to see the doctor.

19        And it's just not clear to me that I saw any of that

20 in Ms. Driver's chart.  In other words, if they are using more

21 than prescribed, they better have a really good explanation,

22 and including have shown up or called to say that something was

23 not going well.

24 Q   On direct you also talked a little bit about electronic

25 medical records.  Do you remember some of those questions and

4473

 1   answers?

 2   A    Yes, sir.

 3   Q    And electronic medical records came about in general

 4   because in part the government, especially Medicare, was sort

 5   of pushing that that happen?

 6   A    Right, right.  Medicare was going to stop paying physicians

 7   unless they had electronic records.

 8   Q    And as you alluded to on direct, there are advantages and

 9   disadvantages about electronic medical records; right?

10   A    Yes, sir.

11   Q    There are good things and bad things?

12   A    Yes, sir.

13   Q    And one of the good things is they are clear and printed

14   and you don't have doctors' squiggly writing everywhere; right?

15   A    Yes, sir.  That's probably the best thing about them.

16   Q    But one of the downsides is the repetition or

17   autopopulation function that you talked about on direct; right?

18   A    It's only a problem if you don't turn it off.

19   Q    But the function is designed to help the practitioner fill

20   out the form with greater ease; right?

21   A    It's supposed to make it easier, yes, sir.

22   Q    And it is possible, though, especially in a busy practice,

23   that all those autopopulated fields do not get changed in the

24   way that maybe they should get changed; right?

25   A    No, I don't think that's okay.

4474

1  Q   That's not -- I didn't say it's okay.  I said that's

2  possible that happens; right?

3  A   I think it's possible it happens once in a while.  And if

4  you saw that it happened, you should go back and add -- you can

5  always type in something in a medical record.  There's always a

6  space.  And you can add an addendum and say:  These fields were

7  put in this note by mistake, when actually the exam showed --

8  and then you could just plug it in, what you actually did.

9  Q   But it's certainly possible to have a good description in a

10 bad note; right?

11 A   Sure.

12 Q   You also got asked a few questions about a combination of

13 medications called the Holy Trinity.  Remember those?

14 A   Yes, sir.

15 Q   Okay.  Now, Holy Trinity, that's not a term you learned in

16 medical school; right?

17 A   No, sir.

18 Q   That's not even a medical term; right?

19 A   In the urban dictionary or some sort of something like

20 that, I'm sure it is.

21 Q   But in recognized medical vocabulary among serious

22 professionals, that is not a medical term, that's a slang term;

23 right?

24 A   Sure, it's slang.

25 Q   On the subject of electronic records, you were shown some

TRICIA AULBMAN, MD - CROSS BY MR. SHARMAN

1    documents and asked some questions on direct about the timing

2    of the signature by the nurse practitioner, by Dr. Couch, or by

3    both of them.  Do you remember some of that?

4    A    Yes, sir.

5    Q    And there are no hard and fast rules and regulations or

6    even guidelines and principles about signing electronic

7    records; right?

8    A    It would be governed -- for example, at my hospital there

9    is, where everything needs to be signed, and usually 30 days

10   late will get you in trouble.  But if you had your own

11   practice, of course not, the rules would just be up to your

12   judgment.

13   Q    Sure.  If you're in a hospital, you might have to follow

14   the hospital's rules; right?

15   A    Exactly.

16   Q    And if you're dealing with an insurance company, you might

17   have to follow the insurance company's rules; right?

18   A    Right.

19   Q    If you deal in your own practice, you deal with your own

20   rules; right?

21   A    Right.

22   Q    And there's nothing especially good or bad, suspicious or

23   not suspicious, about the particular timing of the signing

24   electronically of a record; right?

25   A    I think if something is done by a nurse practitioner and

1    you're the covering physician, I think it's probably better to

2    look at that sooner than later.  Otherwise I'm not sure how you

3    could accurately remember -- especially physical examination,

4    like who had a heart murmur or who had, you know, a frozen

5    shoulder.  I would think that would be just about impossible to

6    remember a month later.

7    Q    In your view --

8    A    It's a general view.

9    Q    -- in your view, it would be better practice to review a

10   record sooner rather than later; right?

11   A    Absolutely.

12   Q    In your view, that doesn't necessarily make the record

13   invalid, though; right?

14   A    No.

15   Q    All right.  With regard to BW........., when you were

16   walking through with Mr. Bodnar her treatment, one of your

17   complaints was, as I understood it, that her opioid medication

18   was increased more sharply than you thought appropriate; is

19   that fair?

20   A    Yes, sir.

21   Q    You suggested on direct that, for example, her Ultram could

22   have been increased before going to opioids; right?

23   A    Depending on the number she was taking a day, it's a

24   possibility, yes, sir.

25   Q    And Ms. W... was subject to seizures, was she not?

1   A   Yes, sir.

2   Q   Okay.  And --

3   A   Which makes Ultram even worse, because it can actually

4   potentiate seizures.

5   Q   Right.  So increasing Ultram in a patient prone to seizures

6   might not be a good idea?

7   A   Well, I wouldn't use it in the first place in a patient

8   with seizures.

9   Q   I'm sorry.  I misunderstood you.  I thought you said that

10  Ultram increased might be better than an opioid.  Is that not

11  right?

12  A   Just in general.  But in a patient with seizures I wouldn't

13  have used it in the first place, because of the risk of

14  seizures with Ultram.

15  Q   And certainly you wouldn't have increased Ms. W...'s

16  Ultram; right?

17  A   No, sir.  No, sir.

18  Q   And Dr. Couch did not increase her Ultram either; right?

19  A   No, sir.

20  Q   Also with regard to Ms. W..., on direct you criticized

21  Dr. Couch's willingness to maintain her as a patient, given

22  that there were several repeated urine drug screen failures;

23  right?

24  A   Yes, sir.

25  Q   And based on what you said on direct -- but correct me if

1    I'm wrong -- you would have kicked her out the first time;

2    right?

3    A    If I signed an agreement that said that you would be kicked

4    out if you failed a drug screen, and she failed a drug screen,

5    then yes, I would kick her out.

6    Q    So you would have kicked her out the first time if she were

7    your patient; right?

8    A    If she signed the agreement and I signed the agreement that

9    said as such, yes.  I would follow the agreement.

10   Q    And then Dr. Couch told her he was going to kick her out,

11   but not on the first time, but after several offenses so to

12   speak; right?

13   A    Yes, sir.

14   Q    So on that point, with regard to Ms. W..., the difference

15   between you and Dr. Couch is the number of offenses?  You would

16   have kicked her out at the first one, he was going to kick her

17   out after several; right?

18   A    I suppose.

19   Q    And in fact it's accurate, isn't it, Dr. Aultman, that with

20   regard to your opinions about all the files that you've

21   reviewed from Dr. Couch that you are describing what you would

22   have done in that particular situation; right?

23   A    I'm sorry.  Ask that question again.

24   Q    Isn't it true that with regard to all of the patient charts

25   that you reviewed you were testifying on direct about what you

4479

TRICIA AULTMAN, MD - CROSS BY MR. SHARMAN

```
1   would have done, by your likes, in that same situation; right?

2   A   Of course.

3   Q   I'm sorry?

4   A   Of course, I can only speak for myself, not others.

5   Q   And what any physician does, as we touched on earlier, by

6   his or her own likes professionally with regard to a particular

7   patient is something that doctors can and do disagree about

8   with each other; right?

9   A   Sure.

10  Q   With regard to the undercover video, you watched -- and by

11  now probably watched several times -- the interaction between

12  the fake patient and Stacy Madison, the nurse practitioner;

13  right?

14  A   Yes, sir.

15  Q   And you heard what he said and you heard what she said;

16  right?

17  A   Sure.

18  Q   And nothing she said was untrue, as far as you can tell;

19  right?

20  A   (Indicating.)  I -- I don't know.  She could have been

21  lying the whole time.  There's no way for me to know, sir.

22  Q   Well, as far as you know, sitting here today, nothing she

23  said was untrue; right?

24  A   Sure.

25  Q   And nothing she told him about treatment for pain was
```

 1   inappropriate; right?

 2   A   I guess, not that I can think of.  I do think it was a

 3   little fishy that she said that when she tried to describe the

 4   pain medicines they were going to use, she said:  The DEA

 5   allows us to do this or that.

 6           I thought that was a little odd instead of framing it

 7   towards the patient like:  This is what we're going to try to

 8   do for you.

 9   Q   In general, though, you'd agree that it's a good thing, not

10   a bad thing, for people in pain-management practice to be

11   sensitive to what our friends at the DEA say and want to do;

12   right?  That's a good thing and not a bad thing?

13   A   Sure.

14           MR. SHARMAN:  With the Court's indulgence.

15       (A discussion was held off the record between defense

16   counsel.)

17           MR. SHARMAN:  No further questions, Your Honor.

18           THE COURT:  All right.  Mr. Armstrong?

19           MR. ARMSTRONG:  I've got to get the file, Judge.

20           THE COURT:  All right.

21                        CROSS EXAMINATION

22   BY MR. ARMSTRONG:

23   Q   Good afternoon.  I'm Gordon Armstrong, and I represent

24   Dr. Ruan.  I want to ask you a few questions --

25   A   Okay.

1  Q   -- about your testimony with regard to the files you

2  reviewed for him.

3       To start with, I want to start with where you finished

4  off with Mr. Bodnar.  And he kind of got you to -- after you

5  reviewed the files -- he got you to kind of summarize your

6  general thoughts.  And just to be clear, you looked at one file

7  that was his, or one chart, which was Ms. W.......; correct?

8  A   Yes, sir.

9  Q   And then there was a Mr. C... that, I think, Dr. Ruan saw a

10 handful of times, like three times; correct?

11 A   That sounds right.

12 Q   Okay.  And with regard to those two charts, or those two

13 patients, you kind of summarized what you felt were problems

14 within these charts, and I think you said that there was never

15 an accurate history taken, you saw this kind of a general

16 pattern?

17 A   (Nodding head affirmatively.)

18 Q   No collaboration with other doctors, no physical exams,

19 almost always jumped to opioids first, no referral for physical

20 therapy, no referrals for surgeons or chiropractors, and then I

21 think that you touched on the fact that Dr. Ruan did injections

22 himself and could bill for that.  And these were kind of some

23 general problems you had with these charts.  Do you recall

24 testifying to that?

25 A   Yes, sir, I did.

TRICIA AULTMAN MD - CROSS BY MR. ARMSTRONG

```
 1   Q   Okay.  Well, let me jump straight into Ms. W.......'s
 2   chart.  You first said there was never an accurate
 3   history.  That was one of the problems you had.  Do you recall
 4   seeing the very first time Ms. W....... came to see Dr. Ruan?
 5   A   Hers was a very sensitive chart dating back, I think, to
 6   like 2008, for example.
 7   Q   Right.  She was a -- she was a seven-year patient, she was
 8   a long-time patient; right?
 9   A   Yes, sir.
10   Q   And she had extensive problems, didn't she?
11   A   She did (nodding head affirmatively).
12   Q   Do you remember seeing the very first visit note that
13   Dr. Ruan has in his file for this patient?  Do you remember?
14   A   With all due respect, there's way too many notes.  If you
15   wouldn't mind showing me, that would be great.
16   Q   Sure.  This is the first visit note.  Do you remember
17   seeing this note?  (Indicating.)
18   A   Yes, sir.
19   Q   And this is the very first time -- and this is in the
20   chart --
21   A   Right.
22   Q   -- that this is the very first time that Dr. Ruan saw
23   her.  That is quite an extensive history he took, isn't it?
24   A   The first time, yes, sir.
25   Q   Okay.  Well, isn't that what you said, that there was never
```

TRICIA AULTMAN, MD - CROSS BY MR. ARMSTRONG

1   an accurate history taken of the patients?

2   A   Not just the history on the original history, but a history

3   occurs at each visit, sir.  And so my problem is subsequently

4   the lack of data and knowing what's happened to the patient in

5   between visits.

6   Q   A lack of information between visits?

7   A   A lack of a followup history.  So there's a history on each

8   note, yes, sir.

9   Q   Oh, so you think Dr. Ruan has to do this each time he sees

10  this patient?

11  A   Absolutely, I would think not this extensive, no, sir.  But

12  I would think you would need to ask some key questions,

13  especially if you're changing doses or changing your regimen.

14  Q   He goes through who referred her, which this is the spine

15  surgeon, Dr. Revels.  Do you know Dr. Revels?

16  A   No, sir.

17  Q   And she had had several spine surgeries; isn't that

18  correct?

19  A   Yes, sir.

20  Q   And Dr. Ruan documents not just who the referring physician

21  is, but exactly what her situation was upon the time of her

22  arrival to his office; correct?

23  A   Yes.

24  Q   Including the review of Dr. Revels' file and all the MRIs,

25  the postoperative notes; correct?

4484

TRICIA AULTMAN, MD - CROSS BY MR. ARMSTRONG

1   A   Yes, sir.

2   Q   And those findings?  And he documents exactly where her

3   problems are; correct?

4   A   It looks like he delineates everything out.

5   Q   In quite detail; correct?

6   A   It is in good detail, in this instance (nodding head

7   affirmatively).

8   Q   And right in here it's clear that he's had communication

9   with her because she tells him that she's had numerous

10   injections before that's caused her to gain weight and she

11   didn't want any more steroid injections, and that she'd

12   previously had therapy, physical therapy, that had made her

13   pain worse; correct?

14   A   That's what it says.

15   Q   That would have come from her; correct?

16   A   Yes.

17   Q   All right.  So that's the dialogue he had with the patient;

18   correct?

19   A   Correct.

20   Q   And then it goes into what her past history is, her

21   surgical history, some family history -- and I'm not real sure

22   what that means?

23   A   Diabetes mellitis.

24   Q   Social history?

25   A   It does say she's a former drinker, which would make you

1  concerned that you have to be a little extra careful in

2  prescriptions and followup.

3  Q   If someone is a former drinker you have to be careful?

4  A   Yeah, I think if you're a former drinker, in terms of an

5  alcoholic, you are at increased risk for abusing prescription

6  drugs.

7  Q   Does this say that she's an alcoholic?

8  A   Former alcohol user, in medical lingo, I would say yes,

9  implies that she had an alcohol problem.

10 Q   So if somebody socially or occasionally drinks alcohol,

11 that is a problem?

12 A   No.  It would say social drinker instead of former alcohol

13 user.  It's just the language.

14 Q   That ETOH user, quit four years ago, quit smoking two years

15 ago -- that's not just information he got from her?

16 A   It's open to interpretation, I suppose.

17 Q   Oh, and so the interpretation to the caregiver that's

18 actually taking the information and treating the patient would

19 be in the best position to interpret it; right?

20 A   Sure.

21 Q   Now we go to the back page.  Did a full physical exam?

22 A   No, that's the review of the systems.

23 Q   Oh, review of the systems.  Is this information coming from

24 her and from the view of the information taken at the scene;

25 correct?

 1    A    Yes, sir.

 2    Q    And then the physical exam.  And this is just -- this kind

 3    of goes straight down what you've referred to as the SOAP?

 4    A    Yes, sir.

 5    Q    Okay.  Physical exam, do you see where we've got blood

 6    pressure, pulse, respiration, temperature, you know, pretty

 7    much everything.  He goes into great detail, does he not?

 8    A    He does.

 9    Q    And then he goes into the discussions and the plan, what

10    he's going to do, what he recommends; correct?

11    A    Yes, sir.

12    Q    Talks about how she wants to postpone -- she was going to

13    have another neck surgery; isn't that right?

14    A    Yes, sir.

15    Q    She wanted to postpone it as long as possible; right?

16    A    Yes, sir.

17    Q    And she was taking medications that were causing liver

18    problems; right?

19    A    Yes, sir.

20    Q    And she also had some GI issues, bleeding from other

21    medicines that she was taking; correct?

22    A    Yes, sir.

23    Q    All right.  So she's a very challenging patient, because

24    you have to be careful what you prescribe, because she has

25    liver issues and stomach issues; correct?

4487

1   A   Yes, sir.

2   Q   Based on medicines that she takes.  And then Dr. Ruan

3   obviously discussed with her different medications, discussed

4   with her surgery, discussed with her that he would start her on

5   Avinza, because that Avinza is an opioid.  She was taking

6   Lortabs before; right?

7   A   Yes.

8   Q   And that has the Tylenol in it that was causing her

9   problems; right?  Her liver problems?

10  A   I think her liver problems were from hepatitis C, and the

11  small amount of Tylenol she was receiving was probably not too

12  much.  But you could argue, to be safe, to not use any medicine

13  with Tylenol.

14  Q   And then, of course, he discussed with her opioid

15  medication and to follow as directed, don't take from anybody

16  else, give to anybody else, all those kind of things; correct?

17  A   Yes, sir.

18  Q   And then he thanks Dr. Revels for the referral, sends him a

19  copy of the report; right?  That's what you'd expect to see;

20  right?

21  A   Yes.

22  Q   That's a good report?

23  A   Yes, sir.

24  Q   Now, you also indicated, in addition to the exams and the

25  history, that a lack of either consultation with referring

4488

1    physicians or referral out to other physicians -- do you

2    remember saying that?

3    A    Yes, sir.

4    Q    Do you remember seeing in the file where Dr. Ruan referred

5    Ms. W....... to Dr. Bodet?

6    A    Yes.

7    Q    Infection and disease?

8    A    Yes, she was one patient that there were referrals that

9    went back and forth for her spine and for other issues.

10   Q    She was having problems with lesions and infections;

11   correct?

12   A    She had all kind of problems, yes, sir.

13   Q    All right.  And then another doctor, Dr. Sforzini at USA

14   Hospital, do you know him?

15   A    No, sir.

16   Q    Got information about what the prior problems were?  This

17   was in the chart as well; right?

18   A    Yes, sir.

19   Q    The referring physician, in addition to his charts, also

20   sent this update about her, saying that her disability is

21   chronic and will be forever?  That's what Dr. Revels says;

22   right?

23   A    Yes, sir.

24   Q    Did you see the collaboration with Dr. Martino in 2011?

25   A    Yes, sir.

1  Q   And that was about his referral to Dr. Martino about her

2  spine problems?

3  A   Correct.

4  Q   To see if surgery -- if she would be a candidate for

5  surgery and if she was a candidate, what the likelihood of a

6  positive result would be?

7  A   Correct.

8  Q   And Dr. Martino sent this very long, detailed report back

9  to Dr. Ruan, did he not?

10  A   He did send it.

11  Q   And he notes exactly what all the problems are; correct?

12  A   I'm sorry.  Who notes?  Dr. Martino or Dr. Ruan?

13  Q   He sent all that to Dr. Ruan; right?

14  A   Yes, he did.

15  Q   And that was in his chart.  Subsequently -- and then, of

16  course, she had a total of four cervical spinal surgeries, did

17  she not, during this period of time?

18  A   I couldn't give you an exact number, but she was operated

19  on quite a bit.  She was a sick lady, yes, sir.

20  Q   Well, during the period of time that Dr. Ruan cared for

21  her, she had all these major surgeries; correct?

22  A   She did.

23  Q   And she went to different surgeons.  This is one from

24  Dr. Volkman.  Again sends it back to Dr. Ruan.  Ms. W.......

25  was referred over by Dr. Ruan.  So he's referring this lady out

TRICIA AULTMAN, MD - CROSS BY MR. ARMSTRONG

1  to other physicians for care?

2  A   Yes, she was one patient that was referred repeatedly to

3  surgeons.

4  Q   And then we've got another one from Dr. Martino.  Anyway,

5  the file is filled with these, is it not?  With all the -- this

6  chart documents all the referrals and the collaboration with

7  all the other physicians; correct?

8  A   I think it documents it pretty well, yes, sir.  It does

9  not, however, always on her next followup visit kind of take

10  what happened and then put in her words how what happened is

11  affecting her currently.  I don't remember a lot of details in

12  that effect.

13  Q   You don't remember seeing that within the file?

14  A   In general, I think, especially as the years went on, I

15  think the documentation of the followup histories was pretty

16  sparse.

17  Q   Okay.  Let me show you just the progress note.  And this is

18  just one.  This progress note refers to Dr. Bodet, does it not?

19  A   It does.  But again, when you look for history, you don't

20  really see a whole lot except that she's hurting in her lower

21  back.

22  Q   It refers her to have surgery.  Again, all these other very

23  lengthy documents from these physicians are in the chart that's

24  in the medical records at the practice; correct?

25  A   Sure.

1  Q   So it would be nearly impossible to reference each and

2  every one of those in this little area right here, would it

3  not?  (Indicating.)

4  A   No, I think you could put a simple statement like:  I've

5  reviewed the notes from Dr. Martino.  He advised this, but

6  patient thinks -- you know, whatever.  I think there's always a

7  back side to a page, if you couldn't fit it into the little

8  box.

9  Q   And it's your testimony to the jury that that has to be

10 done with each one of these visits in a seven-year patient,

11 that much data and information on the patient?

12 A   I would say if you're going to prescribe controlled

13 substances and change the dose or change the regimen, that you

14 should probably have some kind of documentation of your reasons

15 why.  It also is in part of the Alabama medical board that you

16 document the patient's progress towards the goals in each pain

17 management note.

18 Q   Okay.  Well, let's look at June 7th, 2012, just kind of

19 move forward.  She's had three separate surgeries, Revels,

20 Dr. Martino, Middleton, saw in December, not satisfied, she's

21 got a history of GI bleeding, she's not happy, she wanted to

22 see only Dr. Ruan.  She insists that she sees Dr. Ruan; right?

23 A   That's what it says.

24 Q   Who signs this down here?

25 A   I think that's Dr. Ruan's signature.

1  Q   There's a lot of information going on here; right?

2  (Indicating.)

3  A   Again, I think there's not a lot of information regarding

4  what her current problem is.  They -- the nurse practitioner

5  documented a lot of old stuff on there and said she's got this

6  and this and this.  But she doesn't say:  What is going on

7  since your last visit?

8  Q   Let's go through some of these.

9          The first -- the first visit that Mr. Bodnar asked you

10  about was March 23rd of 2013.  Do you remember that?

11  A   I'm sorry.  For which patient?

12  Q   For Ms. W........

13  A   Again, if you want me to give you an exact date, you would

14  have to show me the page that it's written on.  I'm sorry.

15  There's too many to remember.

16  Q   Now, let me show you this.  Do you remember that that's the

17  first one he ever showed you?

18  A   Okay.

19  Q   Do you remember that?

20  A   Sure.

21  Q   And he brought it to your attention that it said:  Nurse

22  visit and Rx only.  Do you know that by this time she'd already

23  been a patient for about five years?

24  A   Sure.

25  Q   If that long?

1   A   By the dates you can see that.

2   Q   By 2008; correct?  I mean since 2008?

3   A   Uh-huh (positive response).

4   Q   And they took all the vitals on this visit; right?

5   A   Yes, sir.

6   Q   And they referred that this is a followup from January 28th

7   of 2013.  Did you look at that visit to see what it said then?

8   A   I'm sure I did in my initial review of everything.

9   Q   Well, isn't it permissible for a physician, when he's

10  maintaining a pain patient, to let that patient have

11  prescriptions going out 90 days at least?  They don't have to

12  see them every month, do they?

13  A   I suppose if you really thought it was in the best interest

14  of a patient to have the exact same medicine for three months,

15  that you could do that, yes, sir.

16  Q   And that's all that's going on here, is it's being renewed,

17  and this is a 30-day supply; right?

18  A   Yes, sir.

19  Q   And it says come back in four weeks?  That all would have

20  been within the 90-day period; right; from January?

21  A   I suppose.  I think the concern would be if the dosage of

22  the prescriptions were changed.

23  Q   Well, but he had been treating -- this lady had been

24  treated by him for five years?

25  A   I'm not arguing that.  I'm just saying that it's not a

1   nurse's job to change a dose of a medication --

2   Q   Oh, okay.

3   A   -- or the frequency, if that was done.

4   Q   Who authorized the medicine?

5   A   He did.  But he did not see the patient.

6   Q   Who signed the prescription?

7   A   He did.

8   Q   The nurse didn't do that, did she?

9   A   Not that I'm aware of.

10  Q   Now, Mr. Bodnar jumped ahead to August 15 of 2013.  Do you

11  remember looking at that visit?

12  A   Yes, sir.  It looks familiar.

13  Q   And do you remember you discussed the Pristiq and she told

14  them the Pristiq caused nausea and dry mouth and so she wanted

15  it discontinued and she went back to her primary care

16  physician -- and that would be somebody similar to your former

17  practice; correct?

18  A   Sure.

19  Q   And was placed on Wellbutrin; right?

20  A   Yes, sir.

21  Q   Now, all these physicians obviously that he's collaborating

22  with are aware that she's being treated by him; correct?

23          MR. BODNAR:  Objection to foundation, Your Honor,

24  about what other physicians may or may not have known.

25          THE COURT:  Sustained.

4495

BY MR. ARMSTRONG:

Q   Based on the reports and the collaborative documentation in the file that you've seen, doctors were working in collaboration with Dr. Ruan, they knew Dr. Ruan was treating her; correct?

A   You hate to assume, but it does appear there's communication back and forth between the physicians, yes.

Q   All right.  So I think it's safe to assume that they know that she's being treated by Dr. Ruan; right?

A   (Nodding head affirmatively.)

Q   And so he takes her off the Pristiq.  And again, that's kind of an anxiety-type medication?

A   It's used as an antidepressant and anti-anxiety, also in chronic pain.

Q   And the fact that it helps with chronic pain is not the FDA-indicated purpose of that medication, is it?

A   I would have to look and see if Pristiq is indicated.  I know Cymbalta is indicated for chronic pain.  It has that indication now as well.

Q   What about Neurontin?  I think you said that you had prescribed Neurontin in your practice for pain?

A   Sure.  Neurontin is a nonscheduled medicine.  It's actually an old seizure medicine that we use mostly for nerve pain at this time.

Q   So it's kind of off label; right?

TRICIA AULTMAN, MD - CROSS BY MR. ARMSTRONG

1   A   Right.  Because no one's going to take a drug that's that

2   old back through the FDA process, because it's too expensive.

3   Q   Right.  Because it's not necessary to waste the money to go

4   back through the process again, when physicians who are

5   competent to understand the effects of the drugs can prescribe

6   it off label?  They don't have to do that; right?

7   A   Well, Neurontin's been around for many, many years.  So --

8   Q   One note on here also is by this time, because of her spine

9   surgery, she could no longer talk; correct?  Her vocal cords

10  were paralyzed?

11  A   It just depends on if it's one vocal cord or both or if she

12  has an apparatus to help her speak.

13  Q   Well, again, this --

14  A   She had a lot of medical problems.  There's no denial.

15  Yes, she had a lot of medical problems, yes, she had.

16  Q   She had a lot of problems.  And I think you even said that

17  her pain was legitimate, she had real pain?

18  A   She probably did have some legitimate pain; right.

19  Q   Some?  Or severe?

20  A   I've never met her.  I couldn't say.

21  Q   All right.  So that might not be a fair question, because

22  you've never met her?

23  A   Right.

24  Q   The chart indicates she had severe pain; correct?

25  A   Right.

1   Q   And based on the MRI findings and the surgeries, you can

2   see that that would be consistent with that subjective

3   complaint she had?

4   A   She had a lot of problems, yes, sir.

5   Q   That would be objective findings of the subjective

6   complaints; right?

7   A   Correct.

8   Q   Now, moving forward to March 7th of 2014 -- Mr. Bodnar

9   asked you about that -- and that was the one where, by now, we

10  are now into the electronic records?

11  A   Yes, sir.

12  Q   And I may need to back up to the last visit.  But by this

13  point she was on, I think you said, Gralise?  You saw that?

14  A   Uh-huh (positive response).

15  Q   And Klonopin, Opana?  I think you said -- you testified on

16  direct that Gralise, you thought, was a fentanyl product?

17  A   Yes, sir.

18  Q   Did you know that that's actually not a fentanyl product?

19  A   No, sir.  I wasn't exactly sure.

20  Q   That's a gabapentin, Neurontin-type product?

21  A   So it's just another name for Neurontin.

22  Q   Right.  You weren't aware of that?

23  A   No, I never heard that trade name used before.

24  Q   And it was for the fact that she had -- she had shingles;

25  correct?  I may need to back up to the one before.

4498

1    A   I don't see shingles anywhere, no, sir.

2    Q   Do you remember seeing where she had shingles?  I'm sorry.

3    I jumped ahead.  It was February 7th.

4    A   Okay.

5    Q   Do you see down here she's having her problems with

6    shingles, that it had gotten so bad.  Tell the jury what

7    purulent drainage coming out of her ears is, tell them --

8    A   That's a separate problem.  Shingles is a rash that's

9    normally seen on the chest, abdomen, back, or going down the

10   leg.  But now she's having some sort of ear infection.  So

11   purulent just means that it looks like pus.

12   Q   She had green pus coming out of her ears?

13   A   That's what it says.

14   Q   And she had had MRI -- I think we saw MRSA, which is like a

15   staph infection?

16   A   Correct.  She had had a staph infection in the past.

17   Q   And it was on -- actually it was ongoing, was it not?  In

18   fact, we see that in the next visit.  Now she's got a PICC line

19   for the MRSA?

20   A   Correct.

21   Q   And that's what's causing the drainage in her ears.  And

22   again, without belaboring the fact, this poor woman had a lot

23   of problems, did she not?

24   A   She did have a significant amount of medical problems.

25   Q   And remember, you testified about how Dr. Ruan had her on

1   Opana, but she said she wanted to switch to MS Contin and that

2   you found some criticism in the fact that he would just listen

3   to the patient and do what the patient wanted?

4   A   Correct.

5   Q   Well --

6   A   Without any further elaboration.  So I think it's fair to

7   ask a patient, you know:  Why don't you feel good on this?  You

8   know, what is it about this medicine that doesn't work as well?

9   Tell me about the side-effects.  Tell me how much you can do

10  compared to what you could do on the other medicines.

11          So I think you have to put it into a framework in

12  questions with the patient.

13  Q   On February 7th of 2014, the note says insurance is no

14  longer covering Opana, and she wanted to switch back to MS

15  Contin because she couldn't get it with her insurance.  Do you

16  remember earlier you said --

17  A   That's a legitimate reason.

18  Q   -- that would --

19  A   I'm not going to argue that that's a legitimate reason to

20  change medicines.  These medicines are very expensive.

21  Q   Well, your testimony on direct was that it appeared to you

22  that the switching from the Opana to the MS Contin and then

23  back from MS Contin to Opana was something you said was

24  continually happening?

25  A   It seemed to me there was a lot of switching in her

TRICIA AULTMAN, MD - CROSS BY MR. ARMSTRONG

1   medications from one medication to another.

2   Q   Dr. Ruan treated this Ms. W....... for seven years, did he

3   not?

4   A   Yes, he did.

5   Q   Would you agree that the records show -- that these chart

6   records show -- that he switched her from Opana to MS Contin

7   and then back three times in seven years?

8   A   There is no way that I could remember in seven years of

9   charting that that's exactly what happened, sir, without going

10  through all of it.

11  Q   Okay.  Well, I mean, you went through the chart; right?

12  A   I did, sir.

13  Q   I don't want to sit here and belabor.  I can go through

14  them note by note, if you want.

15  A   No, I don't want you to do that, sir.  If you say it

16  switched back three or four times, I would believe you.

17  Q   And this was all -- you know, a doctor has to work in

18  collaboration with his patient; too; right?  Or her patient?

19  A   Sure.  That's kind of the first rule of medicine, is listen

20  to the patient, they'll tell you what's wrong.

21  Q   And if the patient says:  Look, the Opana makes me feel

22  sick or it's too strong, I liked the MS Contin that I was on

23  before -- there's nothing wrong with that, is there?

24  A   Again, if you document the reasons why, I think that's

25  okay.

1   Q   Now let's go to the October of 2014 visit.  That was the

2   one where, if you recall, Mr. Bodnar asked you about where she

3   had been -- or the notes about her behaving oddly in the

4   waiting room prior to her visit.  Do you remember that?

5   A   I remember it, yes, sir.

6   Q   Let me find the chart note.  And I think you testified that

7   that kind of behavior would make you worry about somebody's

8   mental status; correct?

9   A   Absolutely.

10  Q   And there would be different things that possibly could be

11  going on?

12  A   Sure.

13  Q   Especially depending on the age of the patient and the

14  medical history of the patient, there could be possible mini-

15  strokes or different --

16  A   In her you would worry about infection, you know, the staph

17  infection, that she now has meningitis.  She had a lot of

18  hardware in her body.  So those things could have been

19  affecting her as well, certainly.

20  Q   I'm sorry.  And she has that history of the staph

21  infection?

22  A   She does (nodding head affirmatively).

23  Q   And the shingles?

24  A   Yes.

25  Q   And on this particular visit --

1  A   Although shingles in general wouldn't cause a change in

2  mental status.

3  Q   And on this particular visit Dr. Ruan made it a point,

4  after hearing about what had happened in the waiting room, he

5  saw her personally and personally examined her, did he not?

6  A   Correct.

7  Q   And what he did, he ordered a brain MRI, did he not?

8  A   He did.

9  Q   And that would help rule out any abnormalities in the

10 brain; right?

11 A   Right.

12 Q   Like possible aneurysm or other possibilities?

13 A   Yes, sir, that would be one thing that would help in the

14 workup of mental status changes.

15 Q   And again, you've already gone over all this with

16 Mr. Bodnar?

17         THE COURT:  Mr. Armstrong, can I see counsel at side

18 bar for a minute?

19     (At the side bar, jury not present.)

20         THE COURT:  If we are breaking at 3:30 today, I want

21 to get finished with this witness.

22         MR. ARMSTRONG:  I think we have about 10 minutes to

23 go.

24         THE COURT:  My question is:  I don't know if I need to

25 give this jury a break.

1        MR. SHARMAN:  I wouldn't, I wouldn't.

2        MR. KNIZLEY:  Now?

3        MR. ARMSTRONG:  I've got about 10 or 15 minutes.  I'm

4   at the end.

5        MR. BODNAR:  I don't expect redirect to be more than

6   10 or 15 minutes.

7        THE COURT:  All right.  Let's go.

8      (In open court, defendants and jury present.)

9        MR. ARMSTRONG:  Are we taking a break?

10        THE COURT:  No.

11        MR. ARMSTRONG:  Oh.

12        THE COURT:  You need to continue.

13   BY MR. ARMSTRONG:

14   Q   And I believe the next visit after this, her drug screens

15   were normal; isn't that correct?

16   A   (No response.)

17   Q   Let me ask you something about the -- and this is -- this

18   is the last note on there.  Dr. Ruan personally examined her,

19   did another MRI of the spine and MRI of the brain to rule out

20   brain mass, which is aneurysm, because of the headaches.

21   A   Right.  But he really doesn't address the change in mental

22   status that she had.  He just says he's doing it for the

23   headache.  But he doesn't say what the plan is for why she's

24   being so goofy.

25   Q   And on all these, I was asking you about the drug screens.

TRICIA AULTMAN MD - CROSS BY MR. ARMSTRONG

1   Over this seven-year period she had a lot of drug screens;
2   correct?
3   A   Yes, sir.
4   Q   And none of the drug screens had marijuana or cocaine or
5   any kind of illicit-type substance in it; correct?
6   A   No.  I think our issue or my issue with them was they were
7   at times inconsistent with what she was prescribed.
8   Q   Right.  They would be inconsistent because, I think, on one
9   occasion she had run out of her medicine and it wasn't in
10  there?  Correct?
11  A   Without seeing it, it's difficult to say.  But I would take
12  your word for it.  But then the question is if she had run out
13  of the medicine, then they shouldn't have -- or the bigger
14  question, of course, is then why did she run out of her
15  medicine?
16  Q   Well, she would go from a consistent drug screen, she would
17  have several of those, then there would be an inconsistent one
18  and then she would be complaining again on the next one.  So
19  she was kind of like this; right?  (Indicating.)
20  A   Yes, sir.
21  Q   Over a period of time.  And there was never any illegal
22  substances; correct?
23  A   Not to my knowledge.
24  Q   Now, real quick on Mr. C....  We talked a little bit about
25  Mr. C....  Mr. C... had been treated for a period of time

4505

1  before going, switching over to Dr. Ruan; right?

2  A   Yes, sir.

3  Q   And in fact I think Dr. Ruan only saw him three times,

4  twice in October of 2014 and once in December of 2014; is that

5  correct?

6  A   Sure.

7  Q   And the very first time he saw him, that was the time where

8  you noted that someone had taken his medicine; correct?

9  A   Yes, sir.

10  Q   And were you aware that, before Dr. Ruan would even see

11  him, he had his staff verify that story?

12  A   No, sir, I didn't see that charted anywhere.

13  Q   And on that visit, October 9th, the very first one,

14  Dr. Ruan went in and noted his prior history, didn't he?

15  A   Again, without the note, I'm taking your word for it, but

16  sure.

17  Q   The chart's up there.  That's what it indicates.  He noted

18  his prior MRI findings; correct?

19  A   Which showed a very small disk bulge, yes, sir.

20  Q   And he did a spinal exam and neurological exam on him at

21  that time as well?

22  A   Is that a question?  Or are you just stating that he did.

23  Q   Well, that's in the chart; correct?

24  A   Sure.

25  Q   And then what he did was he reduced the prior medication

1    that he had received, he actually reduced the methadone that he

2    had from four a day to just two to three a day?  That's a

3    reduction; correct?

4    A   It is a reduction.

5    Q   And the Roxicodone that he had been prescribed, he reduced

6    him from a 30 milligram down to 15 milligrams; correct?

7    A   I'll take your word for it.  I'd rather see the note to

8    give you an answer.  But --

9    Q   And he only gave him a two-week supply and said:  Come back

10   in two weeks and we'll reevaluate you?

11   A   Sure.

12   Q   He was being careful, wasn't he, with a new patient?

13   A   He was being --

14        MR. BODNAR:  Your Honor, we object that he keeps

15   asking her things and she keeps asking to be shown the chart.

16   We don't know if it's true or not true unless it's being put up

17   there.

18        MR. ARMSTRONG:  I'm just trying to speed it up.

19   Q   See where he was taking the methadone 10 milligram q.i.d.?

20   That means four times a day?

21   A   Yes, sir.

22   Q   Roxicodone 30 milligram q.i.d., that's four times a day?

23   A   Yes, sir.

24   Q   Plus some of the other things.  And then Dr. Ruan did a

25   UDS.  And by the way, the drug screen was consistent; correct;

1   on that day?  Do you remember seeing that?

2   A   Yes, sir.

3   Q   And so the methadone, he reduces it from -- down to b.i.d.

4   or t.i.d.; right?  Or down to b.i.d.?  That's a reduction from

5   the --

6   A   Four times a day, yes, sir.

7   Q   -- four times a day.  So he reduces the methadone and then

8   he reduces the Roxicodone; right?

9   A   Correct.

10  Q   Okay.  When I said that before, this is -- this is the

11  chart note I'm referring to.  (Indicating.)

12  A   Sure.  I think my confusion was I had forgotten he had seen

13  Dr. Couch prior.  So his initial -- when you spoke of his

14  initial visit, you were speaking of Dr. Ruan.

15  Q   And then when he came back on the 22nd, Mr. C..., since he

16  had been reduced, was complaining about symptoms of

17  withdrawals; correct?

18  A   I don't remember him complaining about withdrawal.  I don't

19  remember seeing that documented.  On October 22nd?

20  Q   October 22nd:  Patient complains of mild withdrawal

21  symptoms since coming down on meds, as previously explained?

22  A   Okay.  The rest of the history was copied from the previous

23  note word for word.

24  Q   I'm talking about what he complained about when he came

25  back on the 22nd.

1   A   Yes.

2   Q   Correct?

3   A   Yes.

4   Q   And isn't one of the purposes of pain management to try to

5   make the patient functional?

6   A   Yes, sir.

7   Q   And to be able to go about their everyday lives?

8   A   Yes, sir.

9   Q   And on the December 17th visit -- and that's when Mr. C...

10  advised that he had found employment, was able to work -- do

11  you remember seeing that?

12  A   No, sir.

13  Q   Working at full-time job as a service advisor.  Workplace

14  okay with his meds.

15          Isn't that what one of the goals of pain management

16  is, to make people functional?

17  A   Sure, sure.

18  Q   So they can work again?  And so that was the only three

19  times Dr. Ruan saw Mr. C...; right?

20  A   Yes, sir.

21  Q   Now, with regard to -- Mr. Bodnar asked you if you'd been

22  paid to be here in this case, and you said you had been paid

23  $7,600 roughly?

24  A   Yes, sir.

25  Q   To testify?

TRICIA AULTMAN, MD - CROSS BY MR. ARMSTRONG

```
 1   A   To review everything.
 2   Q   And to review everything?
 3   A   Yes.
 4   Q   That takes a lot of time?
 5   A   Not just for today.
 6   Q   Your time is valuable?
 7   A   Yes, sir.
 8   Q   Okay.  You don't like to do anything for free, do you?
 9   Most people don't.
10   A   I do some volunteer work, but this is not part of that.
11   Q   And your time is worth something; correct?
12   A   Yes, sir.
13   Q   That's not the only amount of money you've been paid by the
14   government, though, is it?
15   A   No, sir.  I have worked for the DEA on probably, if I had
16   to guess, five or six cases last year.  Or the Department of
17   Justice, one of the two.
18   Q   And in fact when you get paid, you get paid pursuant to a
19   contract, you have a contract with either the DEA or the
20   Department of Justice, whatever it may be, and the contract
21   says:  We will pay you up to X dollars, and then you charge an
22   hourly rate and you start working toward it and then if you hit
23   that maximum level, then you have to get a new contract; right?
24   A   Yes.
25   Q   Isn't it true that between the year of 2000 and 2014 you
```

1    had signed government contracts totaling more than $325,000?

2        MR. BODNAR:  Your Honor, we object to the relevance of

3    any contracts unrelated to what she's paid for her work in this

4    case.

5        THE COURT:  Sustained.

6    BY MR. ARMSTRONG:

7    Q   You've been handling work for either the DEA or the

8    Department of Justice at least since the year 2000; correct?

9    A   I was in 2002.  2000 I still lived in San Antonio.

10   Q   Now, you mentioned referrals to pain management while you

11   were in private practice.  And then obviously, since you're

12   working in the hospital setting, you don't make referrals;

13   right?

14   A   No, we do.  If there's someone we think needs it, we can

15   give them a sort of informal referral.  We can call and get

16   them an appointment or give them a name and number of somebody.

17   Q   Now, with regard to a problem patient like Ms. W.......,

18   knowing what we know about her now, have you ever had a

19   physician or other specialist refer a patient that's had four

20   cervical spine surgeries, lumbar disk herniation, problems with

21   the liver, problem with the GI bleeding, hepatitis C, shingles,

22   MRSA -- have you ever had a physician refer somebody like her

23   to you for pain management?

24   A   I'm going to be honest, we see these kind of patients all

25   the time.  It's not uncommon any more to see these people that

1    are very, very ill with multiple medical problems.

2    Q   Have you had a physician refer a patient like that to you

3    for pain management?

4    A   No.

5    Q   In fact, that's the kind of patient that, when you were in

6    private practice, you would refer out to a pain management

7    specialist, wouldn't you?

8    A   Probably.  There are some very good ones in town.

9    Q   Right.  And the best ones are board certified, they have

10   clinics that are dedicated to the treatment of chronic pain;

11   correct?

12   A   Yes, sir.

13           MR. ARMSTRONG:  I think that's all.  Thank you, ma'am.

14           THE COURT:  All right.  Ladies and gentlemen, normally

15   we would break at this time.  But the parties need to recess at

16   3:30 this afternoon, and I'm just asking you do you need to

17   take a break or can you last until 3:30 before you have a

18   break?

19           Is that all right with y'all?

20           A JUROR:  (Nodding head affirmatively.)

21           THE COURT:  Okay.  Go ahead, Mr. Bodnar.

22           MR. BODNAR:  Yes, Your Honor.

23                        REDIRECT EXAMINATION

24   BY MR. BODNAR:

25   Q   Dr. Aultman?

4512

1   A   Yes, sir?

2   Q   Do you recall with counsel for Dr. Ruan on cross-

3 examination discussing what Dr. Ruan said in the file, when he

4 kept saying:  Dr. Ruan said this?  Do you remember questions

5 like that?

6   A   Yes, sir.

7   Q   And it was in referring to things that were in the progress

8 note?

9   A   Yes, sir.

10   Q   Just looking at the note, though, do you have any way to

11 know if Dr. Ruan in fact is saying what's in that record?

12   A   There's really no way to tell in this electronic medical

13 record who the author of what is.  It doesn't notate one person

14 or the other.  Some of them will.

15   Q   And just looking at the record, is there any way to tell

16 whether or not what is written in that progress note is

17 actually accurate?

18   A   No.

19   Q   And have we today on direct examination seen examples where

20 things, based on the Brennan file and the video, were in fact

21 not accurate in the medical record?

22   A   Yes, we have seen those examples.

23   Q   Assuming, though, those early records that you saw in the

24 SW............. file were accurate, does that suggest to you

25 that Dr. Ruan does in fact know how to do a proper write-up or

1   progress note?

2   A   Yes, sir, it was a very thorough and comprehensive note and

3   exam.

4   Q   And did you see such thorough and comprehensive exams later

5   on in his file?

6   A   No, sir.

7   Q   Do you recall Mr. Armstrong pointing out to you places in

8   the file where Ms. W....... supposedly said she wants to see a

9   nurse or -- sorry -- wants to see Dr. Ruan only, not a nurse?

10  A   I remember seeing that.

11  Q   And do you recall him pointing out to you that Dr. Ruan

12  personally saw Ms. W....... the day she had her kind of

13  breakdown?

14  A   Yes, I remember that (nodding head affirmatively).

15  Q   Do you know on the other visits whether or not she actually

16  saw Dr. Ruan or saw a nurse practitioner?

17  A   There would be no way to know.

18  Q   And in fact do you recall when Mr. Armstrong showed you

19  some prescriptions and showed you Dr. Ruan's signature at the

20  bottom?

21  A   Yes, sir.

22  Q   Would you have any way to know if those prescriptions had

23  been presigned?

24  A   No, sir.

25  Q   And what is a blank presigned prescription?

4514

```
 1   A   It's a lot of trouble.  So basically you could
 2   theoretically take a prescription pad and sign your name on all
 3   the prescriptions and then leave it up to somebody else to
 4   decide what to write, to write the prescription for you, and it
 5   would be signed and it would be there for a legitimate -- not a
 6   legitimate prescription, but it would be able to be filled.
 7        (A discussion was held off the record between government
 8   counsel.)
 9   BY MR. BODNAR:
10   Q   And there were a lot of questions about medicine being an
11   art and a science.  But are there certain things that are just
12   not allowed, such as presigning scripts?
13   A   Yes, sir, that would be one thing that would be not
14   allowed.
15   Q   Is that outside the usual course of professional practice?
16   A   It would be outside the usual course of professional
17   practice, yes, sir.
18   Q   Now, and just showing you what has previously been admitted
19   as Government's Exhibit 20-5, is this what you were referring
20   to as a blank script?
21   A   Right.
22   Q   Which name is circled here at the top?
23   A   Dr. Ruan.
24   Q   You mentioned you only reviewed five files; is that
25   correct?
```

1    A    Yes, sir.

2    Q    And in those files did you see the same repetitious

3    physical examination in many of the electronic records?

4            MR. SHARMAN:  Objection to leading.

5    A    Yes.

6            THE COURT:  Don't lead.

7    BY MR. BODNAR:

8    Q    Did you see those -- I'm sorry.  Did you see repeated

9    things in different patients' files?

10   A    Yes, I think you saw the same physical exam not just within

11   the same patient, but sometimes in between different patients

12   you would see the same thing documented.

13   Q    But you have no way of knowing if there were other patients

14   outside those five who had similarly cloned physical exams?

15   A    No, I don't have any way of knowing, sir.

16   Q    Do you recall speaking with counsel for Dr. Couch about the

17   Brennan report from the -- or from the UC report that came in

18   from the chiropractor?

19   A    Yes.

20   Q    Was there anywhere that Dr. Couch's counsel showed you that

21   indicated that Dr. Couch had actually ever seen that document?

22   A    Sometimes when you review a document from another doctor,

23   you'll like put your signature in the bottom.  That's pretty

24   standard.  That kind of lets everyone know that you saw it.

25   Q    And did you see that anywhere his counsel showed you?

4516

1   A   No, sir.

2   Q   Is it typical to then include the referring paperwork as

3   part of your new medical file for, in this case, Patient

4   Brennan?

5   A   Yes.

6   Q   And in this case was that anywhere in Shawn Brennan's file?

7   A   Not the one that I received, sir.

8   Q   And even if that report from the undercover agent stated

9   that he had intractable pain, why is it important for you to do

10  your own physical?

11  A   I think that you can never rely on the exam of

12  others.  You're responsible for what you prescribe and what you

13  order.  And if I am responsible, I'm going to do it myself.

14  Q   And the small, little bending and flexing that was done in

15  that, did that comport with what supposedly was in the

16  undercover file for intractable pain?

17  A   He did not appear to be in any pain doing those maneuvers,

18  and I think he even said something like:  Oh, it only happens

19  once in a while, or something like that.

20  Q   Do you recall Dr. Couch's counsel discussing with you too

21  about a physician's judgment is important and a physician's

22  judgment can vary, doctors can disagree with one another?

23  A   Yes, sir.

24  Q   However, what about the judgment of a nurse practitioner

25  that doesn't have a DEA license?  Does that nurse

1  practitioner's judgment at all matter in terms of what to

2  prescribe?

3  A   I would think not.  I would think if you had a really good

4  relationship with a nurse practitioner and you knew her style

5  and you learned to trust her, that perhaps you might take input

6  from her.  But the ultimate decision would still be on the

7  physician.

8  Q   With Patient W......., you mentioned that she did have

9  significant amounts of pain -- or significant amounts of issues

10  that could lead to significant pain?

11  A   Yes, sir, she did.

12  Q   If a patient does have significant pain and is in

13  legitimate need of pain medication, does a doctor still need to

14  prescribe in the usual course of professional practice?

15  A   Yes, sir.

16  Q   Did you see any sort of documentation or informed consent

17  about why she was receiving the Holy Trinity combination from

18  Dr. Ruan?

19  A   No, sir.

20  Q   Do you recall going over with counsel for Dr. Couch about

21  opioid agreements and using opioid agreements?

22  A   Yes, sir.

23  Q   If there was an opioid agreement in the BW......... file,

24  was it followed?

25  A   It would depend on what it says in it.  But no, it did not

TRICIA AULTMAN, MD - REDIRECT BY MR. BODNAR

```
 1   appear to be followed.  They did not seem to take action on the
 2   drug screens, even if they were inconsistent with what there
 3   should be on there.
 4   Q   You were asked a lot of questions too about off-label
 5   prescribing and whether it was -- it was -- able to do it.  It
 6   is something doctors can do; is that correct?
 7   A   Yes, sir.
 8   Q   If you were prescribing something like Subsys or Abstral
 9   off label, should you be notating why, what is your intent for
10   doing so?
11   A   I think so.  I think you should document pretty carefully
12   what intent is and why you're doing it for the safety of the
13   patient and so that you can learn from that.  If you're trying
14   to develop a practice that you'd use something, then you'd want
15   to take really good notes to figure out, well, you know, did
16   this work?  I'm trying this risky thing.
17   Q   Is financial self-interest a reason for prescribing off
18   label, a justification for prescribing off label?
19   A   No.  There's plenty of -- plenty of opioids available that
20   are low cost and more easily obtained.
21   Q   Do you recall going through with Mr. Sharman -- talked
22   about the fact that chronic pain is really -- really is a bad
23   problem?
24   A   It is a bad problem.
25   Q   And there are drugs, including opiates, that can treat
```

TRICIA AULTMAN, MD - REDIRECT BY MR. BODNAR

1    chronic pain; is that fair?

2    A   Yes, sir.

3    Q   But still, even if someone has legitimate chronic pain,

4    does the doctor have a responsibility to prescribe those

5    opiates within the usual course of professional practice?

6    A   Yes, sir, they have to be within the course of professional

7    practice.

8    Q   With Dr. Cain -- sorry.  With CCC.................., do

9    you recall when they talked about reducing his meds when he

10   came to Dr. Ruan?

11   A   Yes.

12   Q   Who was the doctor prescribing the higher level of

13   medication before that?

14   A   It was Dr. Couch.  That's why I was confused.

15   Q   So Dr. Ruan was reducing Dr. Couch's medicine?

16   A   Yes, sir.

17   Q   Based on everything you reviewed in this case and then the

18   questions that were asked on cross-examination, has anything

19   changed your mind regarding your opinions of these five

20   patients?

21   A   No, sir.

22   Q   Is it still -- what is your final opinion of these five

23   patients in terms of the way they were prescribed, either

24   within or outside the usual course of professional practice?

25   A   I do not feel that they were prescribed these medications

 1    within the usual course of medical practice.

 2            MR. BODNAR:  One moment, Your Honor.

 3        (A discussion was held off the record between government

 4    counsel.)

 5            MR. BODNAR:  Nothing further from this witness.

 6            THE COURT:  Ms. Griffin, do you want to go ahead and

 7    show the jury the stipulated records from the Alabama Secretary

 8    of State at this point in time?

 9            MS. GRIFFIN:  Yes, ma'am.  May we approach one moment,

10    Your Honor?

11            THE COURT:  Yes.

12        (At the side bar, jury not present.)

13            MS. GRIFFIN:  Dennis, come -- Your Honor, there was a

14    question about the workers' comp patients being billed to

15    insurance companies, federal agencies.  I just have received an

16    entire stack that came from Greenway -- which means the defense

17    already had these -- that show all the billings for the

18    Department of Labor for all of the workers' comp.  They consist

19    of this many pages.  (Indicating.)  I'm prepared to go forward

20    with those with Agent White, but we'd also request a

21    stipulation.  I believe if the defense has time to review

22    these, that they will stipulate that there was a workers' comp

23    nexus where federal money was being billed, and I think that

24    would save us time in the morning, if they were willing to look

25    at that and if we can decide not to put her on by having a

```
 1  stipulation.  But they've not seen these, although they have
 2  had access to them through the files that they maintained.
 3          THE COURT:  Can y'all look at these tonight?
 4          MR. KNIZLEY:  Tonight, yes, ma'am.
 5          MR. SHARMAN:  We'll look at them, yes, ma'am.
 6          MS. GRIFFIN:  And I'll go publish those.
 7          THE COURT:  After you publish those, that's when we
 8  intend to break; is that right?
 9          MS. GRIFFIN:  Yes, ma'am.  And then as soon as they
10  tell me, we'll stipulate to this.  We will rest first thing in
11  the morning.
12          THE COURT:  Okay.  But if you're going to do that, I
13  don't want to bring the jury up and have them sit around, if
14  we're going to file a motion first thing in the morning.  If
15  you've got testimony, that's one thing.  But --
16          MR. SHARMAN:  Well, we will -- what I would suggest we
17  do is the government rests, have a motion ready, file it, then
18  the Court can do as it pleases and we will be ready to go.
19          THE COURT:  All right.  But there's a question of
20  whether I tell the jury to be ready to come here at 9 o'clock
21  or 9:30 or 9:45 or 10.  So --
22          MR. SHARMAN:  I would defer to the Court.  But
23  practically, it might --
24          MR. KNIZLEY:  Go ahead.
25          MR. SHARMAN:  I would say practically it might be wise
```

 1   to defer them a little bit.

 2          MR. KNIZLEY:  Judge, possibly we could look at this

 3   and contact the government and the Court tonight or later on

 4   today possibly and say we will need a witness or we don't need

 5   a witness, and then the Court would -- well, you've got to tell

 6   them right now.  That doesn't help any.  I'm sorry.

 7          MR. BODNAR:  The jurisdictional issue --

 8          MS. GRIFFIN:  The nexus with federal healthcare

 9   providers is what we were talking about with the Department of

10   Labor.

11          THE COURT:  All right.

12      (In open court, defendants and jury present.)

13          MS. GRIFFIN:  Your Honor, may we talk with you?

14      (At the side bar, jury not present.)

15          MS. GRIFFIN:  We have no idea what their motion, of

16   course, is going to say.  So we will need some time to review

17   it, depending on its length, in the morning.  And they are not

18   going to file it until we rest, which I understand.

19          THE COURT:  Well --

20          MS. GRIFFIN:  However, we do need time to digest it.

21          THE COURT:  I understand.  But I intend to rule on it

22   orally and I intend for them to summarize it orally for me.

23          MR. KNIZLEY:  We will.

24          THE COURT:  The written thing will be for the record.

25          MS. GRIFFIN:  Just clarifying.  Thank you.

1          THE COURT:  All right.

2       (In open court, defendants and jury present.)

3          THE COURT:  All right.  Ms. Griffin is going to

4    publish those records she referenced earlier this morning when

5    we couldn't get the presenter to work.  Go ahead, Ms. Griffin.

6          MS. GRIFFIN:  Your Honor, this morning we introduced

7    business entity records from the Alabama Secretary of State.

8    Government's Exhibit 50 was admitted.  Those are the records

9    for Physicians Pain Specialists of Alabama, Exhibit 50.  That

10   shows what type of business it is and who the registered agent

11   is for the particular business.

12          Government's Exhibit 51 is the business entity records

13   from the Alabama Secretary of State for C&R Pharmacy, LLC.

14   Registered agent, J. Patrick Couch.  Members Xiulu Ruan and

15   Couch.

16          Government's Exhibit 52 are the records for Physicians

17   Compounding Solutions, Incorporated.  Incorporator, Patrick M.

18   Couch.  The registered agent on 52 is John P. Couch.

19          Government's Exhibit 53, Alabama Secretary of State

20   records for JPC Properties, Limited Liability Corporation.  The

21   registered agent is Patrick Couch.  The member's name, Patrick

22   Couch.

23          Government's Exhibit 54, Secretary of State records

24   for Physicians' Weightloss and Wellness, Limited Liability

25   Corporation.  Registered Agent Xiulu Ruan.

1           Government's Exhibit 55, Secretary of State records

2    for XLR Exotic Autos, LLC.  Registered agent Xiulu Ruan.

3    Organizer name, Xiulu Ruan.

4           Government's Exhibit 56, LLC records for Ruan

5    Companies.  It shows the registered Agent, Xiulu Ruan.  The

6    member name, Xiulu Ruan.

7           And finally, Government's Exhibit 57, Secretary of

8    State records for XLR Properties, LLC.  It shows registered

9    Agent, Xiulu Ruan, and member name, Xiulu Ruan.

10          THE COURT:  All right.  And with that, ladies and

11   gentlemen, we are going to recess for today.  Remember any

12   instructions to you not to discuss the case or to allow anyone

13   to discuss it with you.  Be back downstairs in the jury

14   assembly room tomorrow morning at 9 o'clock ready to be called

15   back up.

16          Have a good evening, and we are in recess.

17       (In open court, defendants present, jury not present.)

18          MR. BODNAR:  Your Honor, may we approach on one other

19   matter on the record, please?

20          THE COURT:  Does it need to be at side bar?

21          MR. BODNAR:  Yes.

22          THE COURT:  All right.

23       (At the side bar, jury not present.)

24          MR. BODNAR:  Your Honor, to speed up the process

25   today, and as we already told the defense counsel, the United

1    States is not going to proceed on count 18, which is the

2    rebate -- which had been the anti-kickback violation of the

3    rebate agreement.  We are no longer going forward and we intend

4    to dismiss that count.

5            THE COURT:  Count 18?

6            MR. BODNAR:  It is 18?

7            MS. GRIFFIN:  (Nodding head affirmatively.)

8            MR. BODNAR:  18, yes.

9            THE COURT:  Any objections?

10           MR. SHARMAN:  No, ma'am.

11           MR. ARMSTRONG:  That's our best argument.

12           THE COURT:  Well, let me say this:  Tomorrow morning

13   before we call the jury up, let me find out from them what the

14   status is of any stipulation.  Okay?

15           MS. GRIFFIN:  And, Your Honor, we should be able to

16   know pretty quickly and I'll email Mary Ann tonight.

17           THE COURT:  All right.

18       (Court adjourned at approximately 3:22 p.m.)

19

20

21

22

23

24

25