

1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF ALABAMA
2

3   UNITED STATES OF AMERICA
                                    CASE NO. CR15-00088
4   v.
                                    COURTROOM 2B
5   JOHN PATRICK COUCH, M.D.,
    and XIULU RUAN, M.D.,
6                                   MOBILE, ALABAMA
            Defendants.
7                                   TUESDAY, FEBRUARY 7, 2017
    * * * * * * * * * * * * * *
8   REDACTED

9                         DAY 20 OF TRIAL
            BEFORE THE HONORABLE CALLIE V. S. GRANADE,
10            UNITED STATES DISTRICT JUDGE, AND JURY

11

12  APPEARANCES:

13  FOR THE GOVERNMENT:
        DEBORAH A. GRIFFIN
14      CHRISTOPHER BONDAR
        ADAM W. OVERSTREET
15      CHRISTOPHER B. BRINSON
        United States Attorney's Office
16      63 S. Royal Street, Suite 600
        Mobile, AL  36602
17      (251) 441-5845

18
    FOR THE DEFENDANT COUCH:
19      ARTHUR T. POWELL, III
        P.O. Box 40456
20      Mobile, AL 36640-0456
        (251) 433-8310
21
        JACKSON R. SHARMAN, III
22      ROBERT JACKSON SEWELL
        JEFFREY PAUL DOSS
23      BENJAMIN SANDERS WILLSON
        Lightfoot, Franklin & White
24      400 North 20th Street
        Birmingham, AL  35203
25      (205) 581-0700

1    (Continued)

2        BRANDON KEITH ESSIG
         800 Shades Creek Parkway, Suite 600D
3        Birmingham, AL  35209
         (251) 879-1981
4
     FOR THE DEFENDANT RUAN:
5        DENNIS J. KNIZLEY
         7 N. Lawrence
6        Mobile, AL 36602
         (251) 432-3799
7
         JASON BRADLEY DARLEY
8        Darley & McGough, LLC
         1751 Dauphin Street
9        Mobile, AL 36604
         (251) 441-7772
10
         GORDON G. ARMSTRONG, III
11       P.O. Box 1464
         Mobile, AL  36633
12       (251) 434-6428

13       STEVEN D. MARTINIE
         4955 North Lake Drive
14       Whitefish Bay, WI  53217
         (414) 332-9683
15
     THE CLERK:  MARY ANN BOYLES
16   THE LAW CLERK:  LYNN DEKLE
     U.S. ATTORNEY IT:  BRIAN COCHRAN
17   DEFENSE IT:  SAM McALLISTER
     COURT REPORTER:  ROY ISBELL, CCR, RDR, CRR
18
             Proceedings recorded by OFFICIAL COURT REPORTER
19       Qualified pursuant to 28 U.S.C. 753(a) & Guide to
     Judiciary Policies and Procedures Vol. VI, Chapter III, D.2.
20           Transcript produced by computerized stenotype.

21

22

23

24

25

1                    EXAMINATION INDEX

2

FBI SA AMY WHITE
3        FURTHER DIRECT BY MS. GRIFFIN . . . . . . . . . . . 4531

4  BENJAMIN BROWN
         DIRECT BY MR. WILLSON . . . . . . . . . . . . . 4580
5        CROSS BY MR. BODNAR . . . . . . . . . . . . . . 4612
         REDIRECT BY MR. WILLSON . . . . . . . . . . . . 4619
6
   DAVID WAYNE RILEY
7        DIRECT BY MR. ESSIG . . . . . . . . . . . . . . 4623
         CROSS BY MR. BODNAR . . . . . . . . . . . . . . 4656
8        REDIRECT BY MR. ESSIG . . . . . . . . . . . . . 4665

9  BOBBI COBURN
         DIRECT BY MR. DOSS . . . . . . . . . . . . . . .4670
10       CROSS BY MS. GRIFFIN . . . . . . . . . . . . . .4688
         REDIRECT BY MR. DOSS . . . . . . . . . . . . . 4701
11
   ELAINE R. MCDONALD
12       DIRECT BY MR. POWELL . . . . . . . . . . . . . .4706
         CROSS BY MR. BODNAR . . . . . . . . . . . . . . 4737
13       REDIRECT BY MR. POWELL . . . . . . . . . . . . .4750

14

15

16

17

18

19

20

21

22

23

24

25

FBI SA AMY WHITE - FURTHER DIRECT BY MS. GRIFFIN

1                          EXHIBIT INDEX

2                                                      MAR   ADM
      GOVERNMENT'S
3     46    Health insurance claim forms - workmen's         4542
            comp
4
      47    Five emails re: FARA; (1) Ruan to Manfuso        4535
5           6/20/12 - Help w/FARA; (2) Ruan to Manfuso
            9/10/12 - FARA Very Important - Stop
6           Dispensing; (3) Ruan to Manfuso 9/5/12 -
            FARA; (4) Ruan to Manfuso 3/19/13 - F......
7           ESIS - Longshoreman patient; (5) Terranova
            to Ruan 8/14/13 - F...... ESIS doc
8
      49    Viva Medicare - Medicare Determination Form      4532
9           for Abstral (Couch)

10    66    Insurance Analysis - Greenway Electronic         4545
            File PPSA - 2001 - Physician Services
11          Workman's Comp

12    67    Insurance Analysis - Greenway Electronic         4547
            File PPSA - 2012 - Physician Services
13          Workman's Comp

14    68    Insurance Analysis - Greenway Electronic         4547
            File PPSA - 2013 - Physician Services
15          Workman's Comp

16    69    Insurance Analysis - Greenway Electronic         4547
            File PPSA - 2014 - Physician Services
17          Workman's Comp

18    70    Insurance Analysis - Greenway Electronic         4547
            File PPSA - through May 2015 - Physician
19          Services Workman's Comp

20

21

22

23

24

25

1

DEFENDANT COUCH'S

11B   B. Brown medical file                           4587

2

27C   Account Information Report - Goellner       4731
      (billing info)

3

4

46B   B. Brown medical file from January 2011 to  4639
      August 2012

5

252   Health Insurance Claim Form - sample        4725

6

253   PPSA New Patient Package mailed in advance   4673
      of first visit

7

255   Drug Query (PDMP) log-in names and          4679
      passwords for AL, MS, FL

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        (Morning session, 9:03 a.m., in open court, defendants and

 2   jury present.)

 3            THE COURT:  Good morning, ladies and gentlemen.

 4            THE COURT:  All right, Ms. Griffin.

 5            MS. GRIFFIN:  Your Honor, we would recall Special

 6   Agent Amy White.

 7            THE COURT:  All right.

 8            THE CLERK:  Ms. White, you're still under oath.

 9            THE COURT:  Just remember you are still under oath.

10                        FBI SA AMY WHITE,

11        previously sworn, testified further, as follows:

12                    FURTHER DIRECT EXAMINATION

13   BY MS. GRIFFIN:

14   Q    Agent White, remind us that you're an FBI agent.  Is that

15   right.

16   A    That's right.

17   Q    How many years of law enforcement experience?

18   A    20.

19   Q    I want to direct your attention --

20            THE COURT:  Ms. Griffin, check your microphone,

21   please.  Is it on?

22            MS. GRIFFIN:  Thank you.

23            THE COURT:  Okay.

24            MS. GRIFFIN:  I think it is.

25   Q    I want to direct your attention to item 1B120 collected
```

4532

 1   from PPSA Springhill Avenue location and numbered for the

 2   purposes of this examination as Government's Exhibit 49.

 3           MS. GRIFFIN:  Your Honor, I believe we can introduce

 4   this pursuant to a stipulation as coming from one of the

 5   searches.  This pertains to Dr. Couch.

 6           MR. ESSIG:  Yes, Your Honor.

 7           THE COURT:  Okay.  Mark it in.

 8       (Government's Exhibit 49 was entered into evidence.)

 9           MS. GRIFFIN:  So may we publish it to the jury?

10           THE COURT:  Yes.

11   BY MS. GRIFFIN:

12   Q   Government's Exhibit 49.  (Indicating.)  And it was

13   collected from PPSA at Springhill Avenue; is that correct,

14   Ms. White?

15   A   That's correct.

16   Q   I'll show you a fax to Viva Medicare Plus.  Does that

17   appear to have the patient name on the form?

18   A   Yes, BW..........

19   Q   Does it give her address in Prichard, Alabama?

20   A   It does.

21   Q   Does it list the physician as Patrick Couch?

22   A   Yes, it does.

23   Q   Is this a Medicare coverage determination form for Abstral?

24   A   Yes.

25   Q   Does it indicate at the bottom, the additional comments,

FBI SA AMY WHITE - FURTHER DIRECT BY MS. GRIFFIN

1  what they are requesting?

2  A   Yes.  It says:  We are asking for approval on the Abstral

3  to relieve patient's breakthrough cancer pain.

4  Q   And it also says, in addition to Viva Medicare Plus, at the

5  top of the form does it indicate anything about Medicare Part D

6  coverage determination form?

7  A   Yes, it does.

8  Q   Have you had the opportunity to compare the name and the

9  address on this government's exhibit, Medicare Plus, Exhibit

10  49, with the address for BW......... in Government's Exhibit

11  21-5 that was discussed yesterday by Dr. Aultman?

12  A   Yes.  The address on this form is the same as the address

13  listed for the patient in the Greenway patient file.

14  Q   I show you what's marked and been introduced as

15  Government's Exhibit 21-5, the BW......... patient file, and

16  ask at page seven of 42 if you have determined MW's......

17  address?

18  A   Yes.

19  Q   It's the same?

20  A   It's the same.

21  Q   That's ................, Prichard, Alabama?

22  A   Correct.

23  Q   And E...... is spelled how?

24  A   E..............

25  Q   Is it likewise spelled the same on Government's Exhibit 49?

FBI SA AMY WHITE - FURTHER DIRECT BY MS. GRIFFIN

1   A   Yes, it is.

2   Q   Agent White, I'll show you what has been marked as

3   Government's Exhibit 47 but has not been admitted -- these are

4   emails from Dr. Ruan's email account; ask if you have

5   previously seen the emails that came from the search of

6   Dr. Ruan's Yahoo email account?

7   A   Yes, I have.

8   Q   Have you had the opportunity to go through each of these

9   emails?

10  A   Yes, I have.

11        MS. GRIFFIN:  Your Honor, we would move to admit

12  Government's Exhibit 47, consisting of five emails to or from

13  Dr. Ruan.

14        MR. KNIZLEY:  Your Honor, we would object to

15  Government's Exhibit 47 as a whole, and individually as each

16  individual email, and assign as grounds as to the remarks from

17  others such as Mr. Manfuso and Laura Terranova.  They are

18  hearsay.  And further, some of the other remarks within there

19  are hearsay within hearsay and no foundation for the

20  information that Mr. Manfuso, Ms. Terranova, or even Dr. Ruan

21  maybe, for the information within, such as who the insurance

22  carrier may be or what program it may have come from.

23        THE COURT:  Ms. Griffin, are you introducing this to

24  show the knowledge of Dr. Ruan concerning these issues?

25        MS. GRIFFIN:  No, Your Honor.

 1          THE COURT:  What are you --

 2          MS. GRIFFIN:  May we approach?

 3          THE COURT:  Yes.

 4      (At the side bar, jury not present.)

 5          MS. GRIFFIN:  Your Honor, this relates to emails

 6  between Christopher Manfuso and Laura Terranova, who had worked

 7  for Christopher Manfuso, and Dr. Ruan about FARA, being a

 8  federal longshore insurance program.  It's not to show

 9  Dr. Ruan's knowledge because he does not have to have knowledge

10  that the monies sent were actually -- the monies billed were

11  federal monies.  But it shows that Christopher Manfuso was

12  representing this longshoreman insurance billing and that

13  Dr. Ruan is asking them not to bill federal companies because

14  federal companies do not allow him to dispense from his

15  dispensary.  They want him to go to pharmacies that they have

16  selected that pay lower payments.

17          THE COURT:  So the purpose of your introducing

18  Mr. Manfuso's -- whatever he's communicating in this email is

19  to show the response from Dr. Ruan?

20          MS. GRIFFIN:  That's correct.

21          THE COURT:  I overrule the objection.

22      (In open court, defendants and jury present.)

23      (Government's Exhibit 47 was entered into evidence.)

24          MS. GRIFFIN:  Your Honor, again, we'd move to admit

25  Government's Exhibit 47.

4536

1        THE COURT:  All right.  Mark it in.

2        MS. GRIFFIN:  And may we publish it to the jury?

3        THE COURT:  Yes.

4  BY MS. GRIFFIN:

5  Q   Agent White, is the first email in this series of emails of

6  Government's Exhibit 47 dated?

7  A   Yes, it is, June 20th of 2012.

8  Q   Can you tell who it is from and who it is to?

9  A   It is from Defendant Ruan and it's to Christopher Manfuso.

10 Q   And I'll start at the bottom.  Is this email at the bottom

11 from Manfuso to Xiulu Ruan?

12 A   Yes, it is.

13 Q   Could you tell us, could you read the second paragraph?

14 A   Yes, it says:  FARA is a federal longshoreman insurance

15 program that has requested that you no longer dispense to their

16 patients.  Since they are a federal program, and not an Alabama

17 workers' comp state program, the laws and regulations that

18 apply to their patients are different.

19 Q   Could you read the second paragraph?

20 A   Alabama workers' comp law supports that the patient has the

21 right to choose where to get their medications.  Alabama work

22 comp insurance companies cannot legally tell you not to

23 dispense to their patients.  Federal law unfortunately does not

24 state that the patient has the right to choose where to get

25 their medication.  The insurance company that covers an injured

4537

```
 1   federal worker -- in this case that's FARA -- has the ability
 2   to direct the patient to a certain pharmacy service to get
 3   their medication.  In other words, FARA is allowed to tell you
 4   that they don't want you to dispense to their patients and they
 5   would like you to send their patients to an outside pharmacy.
 6   Q   And Dr. Ruan's response to Manfuso?
 7   A   He says:  Chris, the chance will be low as they do not like
 8   our drug dispensing for years.  If legally they don't have to,
 9   I see little chance.  But will try.
10   Q   As for the second email, was it dated thereafter the first
11   one?
12   A   It's dated September the 10th of 2012.
13   Q   And it is from --
14   A   It is from Defendant Ruan and it's to Christopher Manfuso.
15   Q   We'll start again at the bottom of the page and ask what
16   Chris Manfuso is sending to Dr. Ruan and copying to Laura
17   Terranova?
18   A   Manfuso says:  Hello, Dr. Ruan.  I have worked very hard
19   with FARA to try to get them to provide us with reasonable
20   reimbursement for medications dispensed in the office.
21   Unfortunately the amounts that they wish to pay in the proposed
22   contract are way too low to make money.  Unfortunately, FARA is
23   a federal program, so the state rules and reimbursements do not
24   apply and there isn't anything more that we can do.  If it was
25   an Alabama work comp situation, the law would be on our
```

FBI SA AMY WHITE - FURTHER DIRECT BY MS. GRIFFIN

1   side.  At this time we need to immediately stop dispensing to

2   FARA patients.  They will no longer pay for physician-dispensed

3   medication.  I will have Laura Terranova work with your staff

4   to note which patients to no longer dispense to.  This will

5   take place immediately.  I wish that FARA would pay more and

6   make this a better situation, but they will not.  The good news

7   is that FARA sent us a big check in August so they paid for the

8   meds that were dispensed previously.

9   Q   Thank you.  And does Manfuso indicate who he works for at

10  the bottom of the page?

11  A   Yes, Industrial Pharmacy Management, IPM.

12  Q   What does Dr. Ruan respond?

13  A   He says:  Okay, make sure we know when they get here so

14  that we pay attention to them.  Will stop.  Dr. Ruan.

15  Q   The third email is also September of 2012?

16  A   Yes, it is.  The 5th.

17  Q   Is it from Dr. Ruan?

18  A   Yes.

19  Q   To whom?

20  A   Christopher Manfuso.

21  Q   And what does it ask?

22  A   Hi, Chris, we are still dispensing FARA patients.  Do they

23  pay you?  Have you talked to them on our behalf?  Dr. Ruan.

24  Q   From your investigation, was the billing for the workers'

25  comp medications through the company that Christopher Manfuso

```
 1    managed?
 2            MR. KNIZLEY:  Judge, I'll object to hearsay, Your
 3    Honor.
 4            THE COURT:  Overruled.
 5    A    Yes.  The health claims for the medications for the
 6    workmen's comp patients were submitted through IPM, the
 7    services provided at PPSA.  The health claims for those
 8    services were done at PPSA.
 9    BY MS. GRIFFIN:
10    Q    I show you the fourth email and ask you the date and who
11    it's to and who it's from.
12    A    It's dated March the 19th of 2013, it's from Defendant Ruan
13    and it is to Christopher Manfuso.
14    Q    The subject line?
15    A    The subject line is F...... ESIS.
16    Q    ESIS is all in capital letters; is that right?
17    A    Yes, it is.
18    Q    Let's start with the bottom email to Dr. Ruan and ask if
19    it's from Chris Manfuso?
20    A    Yes, it is.
21    Q    Give what it states, please.
22    A    He says:  Hello, Dr. Ruan.  WF............. is a federal
23    longshore patient that you have been dispensing to for a
24    while.  The carrier, ESIS, is aware that federal workers do not
25    fall under the Alabama State and are thus refusing to allow you
```

1    to dispense any more meds.  They have told us that the only way

2    they will pay on the outstanding balance of $72,500 is if you

3    agree to stop dispensing.  Since the federal law is on their

4    side, we have no leverage and need to stop dispensing and get

5    all the money that we can out of this outstanding bill.

6         I have drafted a letter for you to sign that says that

7    in exchange for agreeing to stop dispensing, you expect them to

8    pay the outstanding bill.  Can you please review the attached

9    letter, sign it, and scan back to me?

10   Q   And is it your understanding from this letter that this is

11   just to quit dispensing to federal longshore patients?

12        MR. KNIZLEY:  Your Honor, I object to what her

13   understanding is.

14        THE COURT:  Sustained.

15   BY MS. GRIFFIN:

16   Q   Could you tell us if Dr. Ruan responds to Christopher

17   Manfuso?

18   A   He did.  He says:  Will do.  Thanks.  Ask Laura to remind

19   me tomorrow.  Dr. Ruan.

20   Q   Again, is there an August 14th of 2013 -- about a federal

21   claim?

22   A   Yes.

23   Q   From?

24   A   Laura Terranova.

25   Q   To?

1   A    Defendant Ruan.

2   Q    And what does it request?

3   A    She says:  Good morning, Dr. Ruan.  Please read below and

4   remember that -- while we did dispense to WF............ in

5   the past -- in order to collect on payments due to PPSA, we

6   agreed not to dispense to this federal claim patient going

7   forward.

8   Q    That's all I need you to read.  Do you gather -- excuse

9   me.  It says not to dispense to this federal patient?

10  A    Yes.

11  Q    And does it give a name of the patient, to your knowledge,

12  in the line just above that?  (Indicating.)

13  A    The patient's name is WF.............

14  Q    Agent White, I also show you what is marked as Government's

15  Exhibit 46, three documents that were -- excuse me -- four

16  documents that were seized in a search of PPSA.

17         MS. GRIFFIN:  And, Your Honor, we'd ask if we could

18  admit these by stipulation.

19       (A discussion was held off the record between counsel.)

20         MS. GRIFFIN:  Without publishing it to the jury, Your

21  Honor, may we show this to Agent White?

22         THE COURT:  Hold on just a minute.

23         Okay.

24  BY MS. GRIFFIN:

25  Q    Agent White, have you previously seen Government's Exhibit

1  46?

2  A   Yes, I have.

3  Q   What are these four pages?

4  A   They are health insurance claim forms that were found

5  during the search of PPSA in May of 2015.

6           MS. GRIFFIN:  Your Honor, we would move to admit

7  Government's Exhibit 46 and publish it to the jury.

8           MR. KNIZLEY:  Your Honor, we object.  One, on the

9  basis of hearsay; there's no showing that this is a business

10 record.  And the basis of relevance.  It's offered for the

11 purpose of the workmen's compensation situation.  Because I

12 don't think there's a foundation here as to whether this

13 document's associated with the medical practice or the

14 workmen's compensation.  Hearsay, second foundation.

15          THE COURT:  Overruled.  Mark it in.

16      (Government's Exhibit 46 was entered into evidence.)

17 BY MS. GRIFFIN:

18 Q   These documents were seized along with other similar

19 documents --

20 A   Yes.

21 Q   -- in the search of PPSA?

22 A   They were.

23          MS. GRIFFIN:  I'll ask may we publish it to the jury,

24 Your Honor?

25          THE COURT:  Yes.

```
 1   BY MS. GRIFFIN:
 2   Q   As to the first page, Agent White, does it list a patient
 3   name?
 4   A   The patient's name is listed as RC...............
 5   Q   At the top of the insurance claim form does it have a
 6   listing?
 7   A   It says workmen's -- WC, workmen's comp -- in London,
 8   Kentucky.
 9   Q   Does it list the insurance plan or program name?
10   A   U.S. Department of Labor.
11   Q   At the bottom does it list a signature and a date --
12   A   Yes.
13   Q   -- of the physician?
14   A   The physician is listed as Xiulu Ruan and it's dated May
15   19th of 2015.
16   Q   You've previously seen this exhibit.  Do the other three
17   attachments to the exhibit show billings for WC to the United
18   States Department of Labor?
19   A   Yes.
20   Q   And on the second one, Dr. Ruan?
21   A   Yes.
22   Q   In fact, does this indicate at the top that it's page three
23   of four of the same claim?
24   A   It does.
25   Q   Still U.S. Department of Labor on page three?
```

1  A   Yes.

2  Q   Still workers' comp?

3  A   Yes, it is.

4  Q   And as to the final page, page four, does it indicate that

5  the patient you previously identified had insurance with the

6  U.S. Department of Labor?

7  A   That's correct; yes.

8  Q   And again, who is it being sent to?

9  A   WC, which is workers' comp, in London, Kentucky.

10 Q   And who is it from?

11 A   Xiulu Ruan, MD.

12 Q   Agent White, did you have occasion to print an insurance

13 analysis for the workers' comp patients from the Greenway file

14 electronic system that was seized from PPSA on May the 20th of

15 2015?

16 A   I did, yes.

17 Q   Could you explain to us how you were able to do that?

18 A   The Greenway system has a report function just like many

19 other accounting programs do.  And that report function pulls

20 data from what's been entered into the Greenway file.  So I ran

21 a report using specific search criteria that are related to the

22 workmen's comp program.

23 Q   And that printed a report from the Greenway system that was

24 seized at the search warrant; is that correct?

25 A   That's correct.

1   Q   Did you request just workers' comp patients?

2   A   Yes.

3   Q   Did you request them by year?

4   A   I did.

5   Q   And did you request them by their primary insurance

6   provider?

7   A   Yes.

8   Q   I'll show you what's marked as Government's Exhibit 19 --

9   66.  Excuse me.  Exhibit 66.

10          THE COURT:  Is this in evidence?

11          MS. GRIFFIN:  It's not in evidence, Your Honor.

12          THE COURT:  All right.  Go ahead.

13  BY MS. GRIFFIN:

14  Q   I show you Government's Exhibit 66 and ask if this is the

15  data you described from the year 2011?

16  A   That's the report, yes.

17          MS. GRIFFIN:  I move to admit Government's Exhibit 66,

18  Your Honor.

19          MR. KNIZLEY:  Your Honor, we object as to hearsay and

20  the predicate.  I understand this is a page from a document --

21  a summary based on documents that are not in evidence.

22          THE COURT:  Overruled.

23      (Government's Exhibit 66 was entered into evidence.)

24          MS. GRIFFIN:  May we publish 66 to the jury, Your

25  Honor?

4546

```
1              THE COURT:  Yes.
2    BY MS. GRIFFIN:
3    Q   Agent White, I'll show you on the front of Exhibit 66, does
4    this state the topic?
5    A   Yes.
6    Q   What is that?
7    A   Insurance Analysis.  That's the name of the report that I
8    ran.
9    Q   The date range, does it give you that?
10   A   January 1st of 2011 through December 31st of 2011.
11   Q   Did you request the primary insurance company?
12   A   I did.
13   Q   And for what type patients from PPSA?
14   A   Workers' comp.
15   Q   I'll show you page 38 of this report and ask if it shows
16   billings for the United States Department of Labor?
17   A   Yes.
18   Q   At the top of the page 38, and then additional billings for
19   the U.S. Department of Labor at the bottom of that page?
20   A   Yes.
21   Q   Does it show the amount billed?
22   A   It does.
23   Q   And does it show whether there are any adjustments?
24   A   Yes, it does.
25   Q   Again, this U.S. Department of Labor for billing for
```

1  workers' comp is for office visits or for prescriptions, if you

2  know?

3  A   It's for services rendered at PPSA, not for prescriptions.

4  Q   Did you likewise do the same for 2012, Government's Exhibit

5  67; for 2013, Government's Exhibit 68; for 2014, Government's

6  Exhibit 69; and for 2015 through the end of May in '15,

7  Government's Exhibit 70?

8  A   I did, yes.

9        MS. GRIFFIN:  Your Honor, I'd move to admit 67, 68,

10 69, and 70.

11       MR. KNIZLEY:  Your Honor, if the proffer also states

12 these are not for workmen's compensation medications, then

13 we -- is that correct, as far as these as well?  I would have

14 no --

15       THE COURT:  They are for physician services, not for

16 prescriptions; is that right?

17       MS. GRIFFIN:  That's correct.

18       MR. KNIZLEY:  We have no objection.

19       THE COURT:  All right.  Mark them in.

20    (Government's Exhibits 67, 68, 69, and 70 were entered into

21 evidence.)

22 BY MS. GRIFFIN:

23 Q   And Government's Exhibit 67 shows, again -- or does it show

24 billings to the Department of Labor for 2012?

25 A   Yes.

1  Q   For services rendered at PPSA?

2  A   Yes.

3  Q   For Government's Exhibit 68, does it too show billings for

4  the United States Department of Labor for PPSA on workers' comp

5  patients?

6  A   Yes, it does.

7  Q   Government's Exhibit 69, does this show billings for the

8  U.S. Department of Labor for 2014?

9  A   Yes, it does.

10  Q   Now, I notice at the top right hand of this exhibit showing

11  billings to the Department of Labor it has yesterday's date at

12  the top.  Is this the date that they were run?

13  A   That's the date I ran the report, yes.

14  Q   From the Greenway records of PPSA?

15  A   Correct.

16  Q   And finally, Government's Exhibit 70, is this for January

17  through May of 2015?

18  A   Yes, it is.

19  Q   I show you again -- were there billings for the United

20  States Department of Labor-Longshore?

21  A   Yes.

22  Q   Were these likewise billings from PPSA for workers' comp

23  patients?

24  A   Yes.

25       MS. GRIFFIN:  One moment, Your Honor.

FBI SA AMY WHITE - FURTHER DIRECT BY MS. GRIFFIN

 1      (A discussion was held off the record between government

 2   counsel.)

 3          MS. GRIFFIN:  That's all I have of this witness, Your

 4   Honor.

 5          THE COURT:  All right.

 6          MR. ESSIG:  No questions from Dr. Couch, Your Honor.

 7          THE COURT:  Mr. Knizley?

 8          MR. KNIZLEY:  Judge, we have no questions for this

 9   witness.

10          THE COURT:  All right.  You may step down.  Thank you.

11          MR. BODNAR:  Your Honor, subject to checking the

12   exhibit list, the United States rests its case in chief.

13          THE COURT:  All right.  Ladies and gentlemen, the

14   government has rested.  That means it's not going to put on any

15   more evidence.  So I have some legal matters that I need to

16   take up with the lawyers at this time before we proceed in the

17   case.  It may take a little while.  So I want you to go

18   downstairs and just rest easy until we call you back up.  If I

19   see it's going to take longer than I thought, I will let you

20   know so that you can go to lunch.  But surely we'll be done

21   before lunch.

22          Don't talk anything about the case, no discussion

23   about the case.  Leave your pads here and we will call you back

24   up when we are ready to proceed.

25      (In open court, defendants present, jury not present.)

```
 1              THE COURT:  All right, Counsel.  Does anybody have a
 2     motion to make?
 3              MR. DOSS:  Yes, Your Honor.  On behalf of Dr. Couch,
 4     we have a written submission that, if permitted, we can file in
 5     open court, electronically file as well.
 6              THE COURT:  All right.
 7              MR. DOSS:  Here's a copy.
 8              THE COURT:  All right.  What I'm going to do is -- I
 9     take it you've given a copy to the government?
10              MR. DOSS:  Yes, ma'am.
11              THE COURT:  Okay.  I'm going to take a 10-minute
12     recess to allow the government to read the motion and then I
13     will hear from you on your motion and I'll hear what the
14     government has to say.  Do you have a motion as well?
15              MR. KNIZLEY:  Yes, ma'am.  I have provided them with a
16     copy.
17              THE COURT:  All right.
18              MR. KNIZLEY:  We had filed it electronically just a
19     moment ago and I handed a paper copy here.
20              THE COURT:  Okay.  Thank you.
21              All right.  We'll be in recess for 10 minutes.
22         (A recess was taken at approximately 9:33 a.m.)
23         (In open court, 9:47 p.m., defendants present, jury not
24     present.)
25              THE COURT:  All right, Mr. Doss.
```

4551

```
 1              MR. DOSS:  Yes, Your Honor.  And we rely on the
 2    grounds more fully stated in our written submission, but just
 3    wanted to highlight a few issues for the Court's
 4    attention.  Before getting into the motion for judgment of
 5    acquittal, we also make a motion to strike any hearsay
 6    statements by the alleged coconspirators that have been offered
 7    throughout the government's case in chief.  That would be from
 8    CMR................., Stacy Madison, Justin Palmer, and
 9    Bridgette Parker.  We don't think the government has met its
10    burden to establish the existence of a conspiracy and that any
11    statements made by those four were in furtherance of such
12    conspiracy, and so we move to strike any of the hearsay
13    statements introduced throughout the government's case in
14    chief, having failed to make that showing.
15              As to the judgment of acquittal for count one, that
16    would be the conspiracy to violate the RICO, I'll set aside as
17    that pins on the predicate acts more fully charged throughout
18    the indictment.
19              On counts two through four -- those are the
20    conspiracies to distribute controlled substances outside the
21    usual course of professional practice and for no legitimate
22    medical purpose -- primarily there is no evidence of a
23    conspiracy that the government has presented.  The evidence
24    that's been presented has been the prescribing practices of the
25    two doctors.  There was never any evidence of a meeting of the
```

1   minds between the two to accomplish a shared and unlawful plan

2   or goal as charged in the indictment.  Nor was there any

3   evidence as to Justin Palmer and Bridgette Parker, the alleged

4   indicted coconspirators, as part of those two -- those three

5   conspiracies, that they joined in such a conspiracy and acted

6   in furtherance of it.

7            If anything, Justin Palmer and Bridgette Parker, when

8   they testified in the government's case, they both agreed that

9   they never intended to hurt any patients and that they were

10  using their clinical judgment in doing so.  That's critical for

11  these counts, because for there to be an actionable violation

12  of a Controlled Substances Act, it must be outside the usual

13  course of professional practice and for no legitimate medical

14  purpose.

15           That doesn't mean that it's bad medicine.  That means

16  that it is not medicine at all.  From those two witnesses,

17  however, they both testified that they were exercising clinical

18  judgment, that they were acting in the course of medical

19  practice, and there was no evidence that any of the

20  prescriptions were for no legitimate medical purpose.

21           On that account, the government has failed to meet its

22  burden as to counts two through four, that there were

23  prescribing conspiracies associated with controlled substances.

24           As to the expert testimony presented by the government

25  to support these conspiracy counts, we heard from no expert

4553

1    that there was any national standard that Dr. Couch failed to
2    follow in this case.
3         The case law, as we've cited in our proposed jury
4    instructions, acknowledges that it's not enough to show
5    negligence, it's not enough to show malpractice, and it's not
6    enough to show the failure to act as a reasonable doctor would
7    act under these circumstances.  The courts have been unanimous
8    that it must be outside the usual course of medical practice,
9    the implication being it is not medical practice.  It is a
10   doctor acting as a drug pusher.  That is simply not the
11   evidence in this case.
12        The government's experts' failure to identify a
13   standard accepted in the United States applicable to the
14   practice of pain management precludes a conviction under counts
15   two through four, or counts five, six, seven, 13, and 14, which
16   are the substantive violations of the Controlled Substances Act
17   charged against Dr. Couch.
18        In the absence of such a national standard, there can
19   be no actionable violation as there cannot be established that
20   it was outside the usual course of professional practice.
21        If Your Honor recalls, when Dr. Vohra testified he
22   defined expressly that the usual course of professional
23   practice means the standard of care, or how a reasonable doctor
24   would act under similar circumstances.  It was never
25   established that that was a national recognized standard, which

4554

1    is required by law, number one.

2          And number two, the courts have been unanimous that

3    mere negligence is not enough to establish an actionable

4    violation of the Controlled Substances Act when applied to a

5    physician under circumstances such as these.

6          Additionally, to the extent the government relies on

7    any sort of recordkeeping violation, any sort of failure to

8    follow things like physical examinations, they have identified

9    nothing requiring a physician under law to do such a thing

10   before the dispensation or distribution of a controlled

11   substance occurs.  The expert testimony presented by the

12   government is merely a disagreement between doctors.  It does

13   not establish beyond a reasonable doubt that Dr. Couch did any

14   decision charged in this case outside the usual course of

15   professional practice and for no legitimate medical purpose.

16         Simple disagreement between doctors is not

17   enough.  And that flaw in the government's case underlies

18   counts two through four, five, six, seven, 13 and 14.

19         More specifically as to those, counts five, six, and

20   seven concern the undercover visit with Dr. Couch.  There was

21   no evidence that anything was done outside the usual course of

22   professional practice and for no legitimate medical

23   purpose.  That was relied upon by the records received from the

24   referring chiropractor.  There was nothing to indicate that the

25   prescribing of the controlled substances under those

4555

 1    circumstances was outside the usual course of professional

 2    practice and for no legitimate medical purpose.

 3              The same applies to counts 13 and 14.  Those would be

 4    patients with initials K.D. and P.C.

 5              And for those reasons we move for a judgment of

 6    acquittal as to counts two through four, five, six, seven, 13,

 7    and 14.

 8              Moving more -- moving further into the indictment, we

 9    then reach count 15, which is the conspiracy to commit

10    healthcare fraud.  We don't think that there has been

11    sufficient evidence presented that there was any kind of

12    conspiracy in this case.  There was no intent to defraud

13    anyone.  There was no effort to make material misrepresentation

14    to any healthcare provider, as required as to count 16 and 17,

15    the conspiracy to violate the anti-kickback statute, and 18 for

16    that matter.

17              I understand the government plans to dismiss count 18.

18    So focusing on counts 16 and 17, count 16 concerns the alleged

19    conspiracy to violate the anti-kickback statute pertaining to

20    IPM and CRM.  Critical to that conspiracy is that some federal

21    funding had to be involved, there has to be a nexus for there

22    to be an actionable violation of the anti-kickback statute and

23    therefore a conspiracy to violate such.

24              The evidence we heard this morning, there was no

25    evidence that Dr. Couch was aware of any kind of federal funds

4556

1    touching the workers' comp dispensary.

2            And as to CRM, the company that Manfuso started after

3    he left IPM, there is no evidence that there were any federal

4    funds passing through the workers' comp dispensary during the

5    time when CRM was handling the workers' comp dispensary.  We

6    think that is a jurisdictional law in count 16.

7            In the absence of any kind of federal nexus, any sort

8    of management services agreement such as the one between

9    Dr. Couch and CRM, it is not a violation of the law and

10   therefore there cannot be a conspiracy to violate the anti-

11   kickback statute if the action itself is not criminal.

12           Additionally, we think that the evidence was that

13   Mr. Manfuso was paid for his services.  It was not a kickback,

14   it was not a remuneration intended to induce a referral.  In

15   fact there was no evidence that any money paid to Mr. Manfuso

16   or that Mr. Manfuso was returning to Dr. Couch of his own money

17   was ever an effort to induce the referral of services or the

18   provision of goods as required by the anti-kickback statute.

19           The same is true for count 17, the conspiracy to

20   violate the anti-kickback statute pertaining to the Insys

21   speaker agreement, an arrangement.  The evidence from

22   Ms. Perhacs is that she never did anything that would influence

23   the doctors' decision, she never affected their medical

24   judgments.  If that's the case, there can be no agreement to

25   violate the anti-kickback statute, as there was never any

1    effort by anyone to in fact induce the referral of goods or

2    services or for covered goods and services associated with

3    federal funding.

4            In the absence of an effort by Ms. Perhacs to in fact

5    influence Dr. Couch's decision-making, as to his prescribing,

6    there is no actionable violation of the anti-kickback statute

7    and therefore there can be no conspiracy to violate it as such.

8            As to count 19, the conspiracy to commit mail fraud

9    and wire fraud, there's been no evidence presented by the

10   government that there was a conspiracy to accomplish this

11   unlawful plan.  There was no evidence presented by the

12   government that anyone devised or participated in a scheme to

13   defraud someone or to obtain money or property using false or

14   fraudulent pretenses, representations, or promises.

15           Moreover, there was no evidence presented that any

16   such false or fraudulent pretenses, representations, or

17   promises were about a valid material fact.

18           In fact, most of the allegations underlying count 19

19   of the indictment concerned IPM's and CRM's relationship.  That

20   in and of itself is not a false or material misrepresentation

21   made to anyone.  So for these reasons we think that judgment of

22   acquittal should be entered as to count 19 as well.

23           Returning back to count one, the conspiracy to violate

24   RICO, for the reasons that we've already stated in our paper

25   and in our oral argument, we think that that count also -- a

1    judgment of acquittal should be entered.  It depends on the

2    actionability of the underlying offenses, the violation of the

3    Controlled Substances Act, the alleged mail fraud, the alleged

4    wire fraud.  In the absence of those substantive offenses, then

5    the count one conspiracy to violate RICO also should -- a

6    judgment of acquittal should also be entered.

7           For these reasons and those reasons stated in our

8    written submission, we would move for a judgment of acquittal

9    as to all counts against Dr. Couch in the second superseding

10   indictment.

11          THE COURT:  All right.  Thank you.  Mr. Knizley?

12          MR. KNIZLEY:  Thank you, Your Honor.

13          Your Honor, before moving to the motion for judgment

14   of motion, as in counts to Dr. Couch, we would join in their

15   motion to strike the hearsay testimony of CR.......... and

16   others on the same basis they have asserted.

17          THE COURT:  Mr. Knizley, don't forget that you have

18   already moved to join in all objections and motions unless

19   specifically exempting yourself from them.

20          MR. KNIZLEY:  Yes, ma'am.  And I wasn't sure if that

21   applied to this.  And if it does apply, I will not be redundant

22   and just say that, as previously indicated, I would move to

23   join --

24          THE COURT:  That's fine.

25          MR. KNIZLEY:  -- and adopt the grounds that have been

1  asserted by them, by Couch in the motion for judgment of

2  acquittal.

3       And as to the motion for judgment of acquittal, as to

4  counts two through four, we would simply assert that the

5  government's failed to prove a prima facie case as to each and

6  every material allegation in the second superseding indictment

7  in counts two, three, and four, again adopting the grounds of

8  Dr. Couch.

9       Likewise for eight, nine, 10, 11, and 12, which were

10 the substantive counts, we would assert that the government's

11 failed to prove a prima facie case as to each and every

12 material allegation set forth in the indictment and adopt the

13 grounds that have been asserted by Dr. Couch as to his counts,

14 his substantive counts, and apply those to our substantive

15 counts as well.

16      As to count 15, Your Honor, which is the count of

17 healthcare fraud, specifically it has four different parts that

18 make the basis of the healthcare fraud.  And first we would

19 assert that they've failed to prove a prima facie case as to

20 each and every material allegation in count 15, and

21 particularly looking at the second paragraph of count 15, on

22 the healthcare fraud aspect -- and that would be paragraph

23 114.B. of the indictment -- and it states that there was

24 fraudulent and materially misleading medical information --

25 that there was a conspiracy to submit fraudulent and materially

1   misleading medical information from the patients to the

2   insurance providers.

3          And we suggest, we'd state, that the government has

4   failed to prove, one, that there was false and material or

5   misleading information as described in paragraph B. and,

6   further, that Dr. Ruan had any knowledge of that or any showing

7   of any intent to agree to submit to insurance carriers such

8   false information as described in paragraph B.

9          As to paragraph C., 114.C., it speaks to the lab

10  testing, urinalysis, for no legitimate purpose and outside the

11  normal course of medical practice.  As to that aspect of it, my

12  recollection of the testimony was that almost universally the

13  lab reports, the GC-MS and the others that were reimbursed by

14  the insurance carriers, were not outside the course of normal

15  practice but were necessary to be inside the course and they

16  were for a legitimate purpose and there was not testimony that

17  would say the reimbursements or any particular reimbursements

18  or any agreement to have reimbursements, conspiratorial

19  agreement, was proven by the government as to the lab testing.

20         And as to in count 15 at 114.D. was the national

21  provider number alleged false healthcare fraud, that being that

22  Dr. Ruan conspired with others to submit billing to an

23  insurance carrier, false billing, using his NPI number to get

24  reimbursed for work or services that he was not entitled to be

25  reimbursed for.

```
 1              Well, my understanding of the testimony was, first,
 2    there was a contractual agreement between Blue Cross/Blue
 3    Shield that says that the doctor agrees contractually to
 4    actually see the patient if you're going to bill under his
 5    number.  And if  the doctors fail to do that without some
 6    fraudulent intent, it would simply be a civil contractual
 7    breach.  But the evidence in this case, Your Honor, I think,
 8    is, one, there was no specific showing that Dr. Ruan made a
 9    claim under his NPI number for a Blue Cross/Blue Shield patient
10    where there was evidence he did not see the patient.  And even
11    if so, there was no evidence that he intentionally did so for
12    the purposes of defrauding the insurance carrier.
13              And we suggest on B., C., and D. of paragraph 114 that
14    those three aspects not be allowed to go to the jury, that only
15    A., if the Court sees fit not to grant the judgment of
16    acquittal in general as to that count -- that those three
17    particular aspects are ones that should not be submitted to the
18    jury.
19              On count 16, again, Dr. Ruan moves for judgment of
20    acquittal on that count, saying the government's failed to
21    prove a prima facie case as to each and every material element,
22    adopts the arguments of Dr. Couch, and particularly would draw
23    to the Court's attention the fact that Mr. Manfuso testified
24    that he was clearly managing the workmen's comp.  And he
25    testified that it was Dr. Ruan or Dr. Couch's or both, they
```

4562

1    paid for the medications, they provided the place, it was their

2    money which was being billed to be reimbursed, and that none of

3    this was his money and that he was a manager.  And I think that

4    was unequivocal.  So there was no -- one, no person to refer to

5    because they were referring to themselves, because they were

6    the workmen's compensation -- they owned the dispensary.  They

7    were referring to themselves, not to Mr. Manfuso, because he

8    didn't have anything to own.  He was simply managing what they

9    had.

10              And, secondly, the arguments that Mr. Doss said about

11   the federal nexus, though there are some emails that have been

12   introduced for a particular purpose that has language with

13   Dr. Ruan discussing what might or might not be a federally

14   funded healthcare program, the last bit of information that was

15   brought in, the government conceded that that was not for

16   workmen's compensation dispensary purposes but for office

17   visits and other type purposes in PPSA, which the kickback

18   that's involved in 16 applies to only the dispensary, not to

19   what workmen's compensation reimbursements may have taken place

20   at PPSA.  So those documents did not apply, the last group that

21   they put in, to indicate that it was a federally insured

22   healthcare program.

23              The emails were offered for a different purpose, and

24   not for the purpose of establishing that.  And even if they

25   were offered for that purpose, there was not sufficient

4563

```
 1   information in those to establish the fact that whatever
 2   Mr. Manfuso may have claimed or Ms. Terranova may have claimed
 3   or even whatever Dr. Ruan may have said about what a particular
 4   program is, U.S. Department of Justice, whether that's a
 5   federally insured healthcare program as defined by the statute,
 6   there's insufficient evidence to show that.
 7           As to count 17, again, we move for judgment of
 8   acquittal, as grounds therefore that the government failed to
 9   prove a prima facie case as to each and every material
10   allegation.  And the argument -- Ms. Perhacs, as I understood
11   her testimony, she said these were bona fide speaking
12   arrangements, that there was not a quid pro quo.  And if
13   there's not a quid pro quo, then I think the evidence in the
14   case fails to show a kickback in 17.
15           18 has been dismissed.
16           19, we assert that the government's failed to prove a
17   prima facie case as to each and every material allegation of
18   19, as well as 20, 21, and 22, same failure to prove a prima
19   facie case.
20           As to 20, 21, and 22, the money-laundering statute
21   requires a specific unlawful activity.  The allegation in the
22   indictment was simply that it was -- it was a sweeping
23   allegation saying whether they engaged in healthcare fraud and
24   other frauds and did not indicate whether a specific unlawful
25   activity was -- nor did the proof in the case indicate the
```

```
 1   specific unlawful activity that is required by the statute.
 2   And we think those three counts fail for that reason.
 3        THE COURT:  All right.  Who's going to respond for the
 4   government?  Both of you or one of you?
 5        MS. GRIFFIN:  Both of us will be responding, Your
 6   Honor.
 7        THE COURT:  All right.
 8        MS. GRIFFIN:  First I'd like to address the
 9   coconspirator statements.  We contend that they --
10        MR. KNIZLEY:  Your Honor, I'm sorry.  I overlooked
11   one.  Going back to one, if I could, with the Court's
12   permission, I'd like to say we move for judgment of acquittal
13   for count one as the government's failed to prove a prima facie
14   case to each and every material allegation in count one and all
15   the other counts in the indictment.
16        THE COURT:  All right.
17        MS. GRIFFIN:  Your Honor?  We'll both be addressing.
18   As to, first, the coconspirator statements, we would ask for a
19   finding from the Court they have all been convicted and that
20   the Court has properly admitted all the coconspirator
21   statements that have come in during the course of the trial.
22        THE COURT:  Well, I think there is sufficient evidence
23   of a conspiracy to justify that.  And because nobody has said
24   specifically what coconspirator statements, it's hard for me to
25   evaluate them individually on the motion.  But I think that
```

1    there is sufficient evidence of a conspiracy to justify the

2    admission of the coconspirator statements.  So go ahead.

3           MS. GRIFFIN:  Second, I note that in Dr. Couch's

4    motion, page four, paragraph six, he indicated the government

5    has failed to negate the good faith.  Good faith is an

6    affirmative defense and we are not required to negate good

7    faith.  And we would ask for a ruling as to that as well.

8           Finally, Your Honor, of course, the Court is aware

9    that a motion for judgment of acquittal is a challenge to the

10   sufficiency of the government's evidence and that the evidence

11   must be viewed in the light most favorable to the government,

12   drawing all reasonable inferences and credibility choices in

13   the government's favor.

14          Second, as to the drug counts, there is no requirement

15   for expert testimony to establish the drug counts to sustain a

16   conviction under the Controlled Substances Act.  That is

17   Eleventh Circuit case law.  And the government is not required

18   to prove both prongs of the outside the usual course of

19   professional practice.  We may prove one or the other, pursuant

20   to the Eleventh Circuit.

21          THE COURT:  You mean outside the course of

22   professional practice or for no legitimate medical purpose?

23          MR. BODNAR:  Yes, Your Honor.

24          MS. GRIFFIN:  That's correct, Your Honor.

25          THE COURT:  All right.

4566

1          MS. GRIFFIN:  We are not required to prove them.  And,

2    of course, they are charged in conjunctive, but we are allowed

3    to prove them in disjunctive, according to Eleventh Circuit

4    case law.

5          Further, I will discuss count one, the RICO

6    conspiracy, last.

7          As to the drug charges, they are conspiracy counts,

8    counts two, three, and four.  We contend that we have met the

9    burden for those in connection with the conspiracy.

10         For all the drugs but the hydrocodone, which is count

11   three, and then the fentanyl for count four, we contend we have

12   met those as well to show a conspiracy to distribute outside

13   the usual course of professional practice or for no legitimate

14   medical purpose.

15         As to the individual undercover counts which were

16   challenged, they stand basically unrefuted that those are

17   outside the course of professional practice.  There was expert

18   testimony which, again, is not required for those counts, but

19   there was expert testimony about the undercover counts.  And

20   then the jury has the opportunity and can make a decision if

21   the continuing filling of the prescriptions were outside the

22   usual course of professional practice.  The video showed that

23   the doctor never saw the patients on any visit after the first

24   one, and only saw the patient, the undercover patient, for 43

25   seconds in connection with the first undercover count.

1          As to the counts where there are initials used for the
2    various patients, we contend that, as to each of those, there
3    has been expert testimony.  And as to each of those, there's
4    been a showing that they are outside the usual course of
5    professional practice, not only in the treating of those
6    patients, but in the prescribing of those patients, as alleged
7    specifically in the second superseding indictment.
8          MR. BODNAR:  And, Your Honor, on the idea of there not
9    being a national standard that any witness could point to,
10   that's because there is no written national standard.  This was
11   something that has previously been argued in the briefs on the
12   defense argument of dismissing the Controlled Substances Act as
13   being unconstitutionally vague.  That issue has already been
14   taken up.
15         If that were the standard, if there had to be a
16   written standard, that 1.2, there could be no conviction of any
17   doctor anywhere and we know that that is not the case.  And
18   that through experience and through what various state board
19   rules are and general practices of medicine, doctors do have an
20   idea of what is within the usual course of professional
21   practice and what is outside the usual course of professional
22   practice.
23         MS. GRIFFIN:  As to the void for vagueness challenge
24   that's previously been raised by Dr. Couch and has been ruled
25   on  in this case --

1    THE COURT:  I don't intend to revisit that now.

2    MS. GRIFFIN:  As specifically to the three money

3  laundering counts, 20, 21, and 22, we contend that the money

4  laundering counts are supported by the checks being sent from

5  Mr. Manfuso to Dr. Ruan's residence for the kickbacks, for the

6  payments that he extorted from Manfuso to continue to use

7  Manfuso's services for both companies.

8         As to the specific substantive counts, counts 21 and

9  22, those are the payments that were shown for the purchase of

10  two vehicles that came from PPSA funding that went into Ruan's

11  State Bank & Trust account and then being sent out.  Of course,

12  as to those counts, the amounts have to be over $10,000, which

13  they were.  And it's criminally derived property, derived from

14  specific unlawful activity, which has been shown during the

15  course of this case.

16         It does not have to be an intent to hide the

17  money.  It just has to be that there is use of those monies in

18  a financial transaction, which a wire transfer is, in amounts

19  over $10,000.

20         Finally, Mr. Bodnar's going to discuss the specific

21  substantive and remaining healthcare, and then I will finish

22  with the RICO count.

23    THE COURT:  All right.

24    MR. BODNAR:  Your Honor, with regard to count 15,

25  Mr. Knizley took issue with paragraphs 14.B., C., and D., and

4569

```
1    asked just that part A. go forward, A. being the billing of
2    controlled substances that were prescribed outside the usual
3    course of professional practice.
4            With subsection B., the submitting false and
5    fraudulent misleading medical information about the TIRF
6    patients, with Dr. Ruan we have Kathleen Burns, where he
7    certified that she did have active cancer to Cigna-HealthSpring
8    after receiving information in the medical file that she did
9    not in fact have cancer.  Of course, there was nothing in her
10   medical record that suggested she did.
11           Just as the one example for Ruan, for Dr. Couch one
12   example would be the RI........ PA that came in from Natalie
13   Perhacs.  That was the one that said he had bladder cancer and
14   there is nothing in the record that indicates that he had
15   bladder cancer.
16           For paragraph C., running and billing patients'
17   insurance for lab tests outside the usual course of
18   professional practice, there has not been a dispute that urine
19   drug testing are an important part of within the usual course
20   of professional practice.  However, it's been our contention
21   throughout that it is only within the usual course of
22   professional practice if you're actually utilizing the
23   results.  And all these records are replete with instances
24   where the urine drug tests are run time and time again and come
25   up for inconsistent behavior, either drugs that should be in
```

4570

the system and are not, or drugs that shouldn't be in the
system and are.  And despite the fact that there's opioid
agreements, these patients are still maintained and still kept
on.

So in that respect, the fact that these tests are run
but not actually utilized, that's what we contend makes them
fraudulent billings for those tests -- particularly in light of
the Dr. Ruan emails discussing how much money they're making on
those and that they're doing the GC-MS test because that's
where the profit is.

And finally, for paragraph D., with the NPI number,
the representative from Blue Cross/Blue Shield came in and
testified that never on any time was any billing done for any
nurse practitioner NPI here at PPSA.  It is part of their
contractual rules.  This is no different than the Diantha
Miller trial that we had in which the defendants sign up to be
part of Blue Cross/Blue Shield, they agree to abide by their
rules.  Even though there was emails to Dr. Ruan about seeing
his patients and testimony from Sharon Noland about seeing Blue
Cross and Blue Shield patients, we know that not on every
occasion for Dr. Ruan and certainly not for Dr. Couch were they
seeing their patient each time and that it was never billed
under the nurse practitioner.

For count 16, which is the IPM/CRM kickback, as was
discussed at length with Mr. Manfuso, it was the guaranteed

1    amount that made it a kickback, and that's where the money was

2    turned in that was not Dr. Ruan or Dr. Couch's money.  Without

3    the guaranteed amount, Dr. Ruan and Dr. Couch would get a

4    certain percentage of whatever their billing was at the

5    dispensary each month.  However, as you heard from the emails

6    and through testimony, Dr. Ruan demanded that there be no risk

7    to him and Dr. Couch.  And therefore, there had to be the

8    guaranteed amount that we saw in those contracts.

9            That guaranteed amount meant that, even if the

10    percentage that would have been collected as a 70 percent by

11    Dr. Ruan and Dr. Couch, on a month that fell below -- let's

12    say, the 54,000, when Dr. Ruan was getting that, he still

13    received $54,000.  It's that excess amount at the top between

14    what he should have received and what he was guaranteed, was

15    the inducement to continue sending everybody to the dispensary,

16    which made money for both IPM and CRM, as well as Ruan and

17    Couch.

18            For count 17, the kickbacks regarding the speaking

19    payments, I disagree wholeheartedly that it was Perhacs'

20    testimony that those were bona fide speaking agreements, or

21    speaking engagements.  There were times she indicated where

22    patients -- I'm sorry -- where other doctors did show up.  But

23    by and large, these were held once a week, once for Dr. Ruan

24    and once for Dr. Couch, in which nobody other than the people

25    in their own practice showed up, they clicked through a slide

1   show, they got a free meal, and then Dr. Ruan and Dr. Couch got

2   paid certain thousands of dollars.

3          We also saw the emails that showed that that money was

4   tied to the speaker program -- the speaker programs were tied

5   to the amount they were prescribing and, when they were

6   prescribing a lot of Abstral and less Subsys, the speaker

7   programs went down.

8          So we contend that while, yes, they physically had

9   speaker programs and they did click through slide shows, it was

10  just a farce and that there's enough evidence for the jury to

11  see that this was just a way to pass money to the doctors.

12         With 19, the mail and wire fraud, it's mentioned in

13  paragraph 171 among the manner and means was the billing to

14  Blue Cross and Blue Shield.  It's been established that those

15  were electronically done.  With regard to the upcoding, that

16  would have been electronically sent for IPM/CRM.  There was

17  testimony that checks were going back and forth between

18  California and the Southern District of Alabama as well as

19  electronic billing.

20         And in fact through the billing agents as well,

21  there's been discussion of how the interstate nexus of checks

22  were coming from various locations and from Medicare and United

23  Healthcare as well, that there were checks and/or wire

24  transfers coming back and forth to the PPSA office from outside

25  of the Southern District of Alabama.

4573

1          MS. GRIFFIN:  Your Honor, first, I'd like to address

2     that the defense talked about no one was hurt by the

3     prescribing.  That's not a requirement for the drug statute.

4     It's outside the usual course of professional practice or not

5     for legitimate medical purpose.  So no one has to be hurt at

6     all.

7          In connection with the drug counts that use initials

8     instead of the patients' names, we'll be glad to provide those

9     full names for the Court at side bar.  Each of those names are

10    contained in files that were discussed during the course of

11    this trial that support the drug counts.

12          As to the conspiracy, as to the RICO count, of course,

13    it may be proved by circumstantial evidence.  And if the

14    government can prove an agreement on an overall objective, it

15    need not prove a defendant personally agreed to commit two

16    predicate acts.  That's Eleventh Circuit case law, United

17    States versus A-B-B-E-L-L, 2001, 271 Fed. 3d, 1286, at 1299.

18          There are hundreds of drug acts, predicate acts, there

19    are hundreds of wire and mail fraud acts proven during the

20    course of this case.  We contend that we have clearly met that

21    this was an enterprise, that there was a meeting of the

22    minds.  Of course, that can be proved circumstantially.  It's

23    likewise been proved through the various emails back and forth

24    for the doctors and to other members.  The doctors are charged

25    with conspiring with others both known and unknown.  So they

1    may be found to have conspired with one another in this

2    conspiracy count for the RICO.

3            But because it is a conspiracy, RICO, to violate

4    subsection (c) of the RICO statute, we do not have to prove

5    that they committed any overt acts.  And we would contend to

6    the Court that we have met the standard as to each and every

7    case and every count, respectfully ask the Court to find that

8    this indictment is sufficient to go to a jury.

9            THE COURT:  All right.  Does any defendant want to

10   respond to any of the government's arguments?  Or do you stand

11   on your arguments?

12           MR. KNIZLEY:  No, ma'am.

13           MR. DOSS:  No, Your Honor.

14           THE COURT:  All right.  Well, based upon the evidence

15   that I can remember to this date, I feel that there is

16   sufficient evidence to go forward on all of the counts that are

17   outstanding.  And therefore I deny the motions for judgment of

18   acquittal at this point.

19           Now, is the defense ready to proceed?

20           MR. DOSS:  Yes, Your Honor.  If we could have one

21   moment to see if we've got our first witness available?

22           THE COURT:  All right.  Well, we're going to take a

23   15-minute break and then we will call the jury up.  But if you

24   have some problem, let us know.  Okay?

25           MR. DOSS:  Thank you, Judge.

4575

```
 1        (A recess was taken at 10:22 a.m.)

 2        (In chambers, 10:39 a.m., jury not present.)

 3              THE COURT:  Y'all have a seat, if you can find one.

 4              MR. ESSIG:  I don't want to sit down.  Thank you,

 5    Judge, I appreciate it.

 6              MS. GRIFFIN:  Waiting just a second on Mr. Bodnar.

 7              THE COURT:  Is he coming?

 8              MS. GRIFFIN:  I can go ahead and start, but I may need

 9    him to add to it.  The first two defense witnesses for

10    Dr. Couch are patients, or were patients, of Dr. Couch's.  They

11    were named in the fentanyl summary that we provided showing

12    that these fentanyl patients did not have cancer.  We would

13    object to the testimony of good patient care from Dr. Couch by

14    these patients based on the Court's prior ruling.  I understand

15    that some of their testimony would be admissible as to the fact

16    that they did or did not receive the fentanyl that was

17    prescribed to them.  But to go into the good patient care with

18    these two particular patients, we contend, would be outside of

19    the Court's prior ruling about putting up witnesses for good

20    patient care.

21        (Mr. Bodnar entered chambers.)

22              THE COURT:  So what is the purpose of this testimony,

23    Mr. Essig?

24              MR. ESSIG:  Your Honor, I've got one.  Mr. Willson has

25    actually the first one.  The two individuals are Benjamin Brown
```

1  and David Riley, are the two patients.  Mr. Brown and Mr. Riley

2  both are listed, as Ms. Griffin identified, in the -- they are

3  in that, if you remember, that top 28, 14 patients from each

4  doctor, that received TIRF products.  They looked in their

5  records, Agent Young testified that they did not have

6  cancer.  As a matter of fact, both of their medical charts are

7  actually in evidence, they've been admitted by the

8  government.  What we're going to do is have these patients come

9  in and basically describe their care by Dr. Couch.  Mr. Riley

10  was treated a little bit by Dr. Ruan, but he was primarily a

11  Dr. Couch patient.  So both of them are just going to

12  essentially say:  Here's what my medical condition is, here's

13  how I presented to Dr. Couch, here's how I got to Dr. Couch,

14  here's what my pain was, here's what he prescribed to me,

15  here's the course of treatment through which I came to be

16  prescribed the TIRF products off label.

17         MS. GRIFFIN:  As to one of those patients, the file

18  goes back about 15 years.  We've only introduced the portion

19  that pertains to the time frame charged and we would object to

20  the portions coming in for the past 15 years.

21         MR. ESSIG:  That's not -- that's not exactly accurate.

22  And I know you're not meaning to misrepresent.  Mr. Riley's --

23  the Greenway file's in evidence, which starts in 2012 or 2013.

24  His treatment began in like 2001.  What we would like to do --

25  I understand their objection.  What we would like -- certainly

4577

1   he's got to describe, you know, 15 years back, here's how I --

2   he's missing four limbs, he's a quadri -- amputee, I don't know

3   what the term is, but certainly he's got to explain how he got

4   those injuries and how the pain came and which led him to

5   Dr. Couch.  We don't necessarily need to get into the records

6   from 15 years ago.  So what I propose, Your Honor, the way we

7   have ours marked is we have two sets marked.  It's Couch

8   Exhibit 46.  46A would be the paper documents of his medical

9   treatment that would have existed at the practice prior to the

10  initiation of Greenway which, again, was 2012-2013.  So what I

11  would propose, Your Honor -- and 46B is the Greenway file.  So

12  what that means is there are some paper files that are within

13  the time frame of the indictment.  So January 1st of 2011

14  through May of 2015.  So what I can do, Your Honor, what I'm

15  prepared to do, is just to offer his patient file for the

16  relevant time period of the indictment, but what we'll have to

17  do, we'll have to go back and remark our exhibit.

18          THE COURT:  I think that's appropriate.  Well, you

19  know, there's not going to be any opinion as to how he felt his

20  care was.

21          MR. ESSIG:  Your Honor, he will give an opinion -- I

22  mean, not that it was in the usual course.

23          THE COURT:  But I think he can simply relevantly

24  testify as to what the TIRF drug did for him.

25          MR. ESSIG:  Yes, ma'am, yes, ma'am.

```
 1            THE COURT:  But not anything about his care generally
 2   or anything like that.
 3            MR. ESSIG:  Well, I think that's -- I guess that's
 4   right, Judge.  I mean, I guess he's got to talk about other
 5   things because it places -- I mean, unless he can talk about
 6   other things, he can't explain how it is he came to be on the
 7   TIRF medications, if that makes sense, Your Honor.  I mean,
 8   it's --
 9            MS. GRIFFIN:  As I understand it, he's not going to be
10   allowed to talk about that that was good care.  He's not going
11   to be able to give an opinion that he received good care.  He
12   can just testify --
13            THE COURT:  What happened.
14            MS. GRIFFIN:  -- what happened.
15            THE COURT:  Yes, I think so.
16            MR. ESSIG:  Judge, what we would say, it's no
17   different than other witnesses that have come in and said:
18   When I took this medication, here's what happened to me.
19   Here's the bad side-effects or bad effects of the medicine on
20   me.
21            We do intend to have Mr. Riley say the effect of
22   taking the fentanyl was good for him.  I mean, it helped
23   him.  I mean, that's sort of the point of the medication.
24            THE COURT:  Yeah, he can say the effect the medicine
25   had on him.  But I don't want him giving an opinion about his
```

4579

1   overall medical care by the practice there.  So what about the

2   other one?

3           MR. WILLSON:  Similar situation, Your

4   Honor.  Mr. Brown, his treatment by Dr. Couch was entirely

5   within the indictment period.  So there's no issue there.  Of

6   course, you know, what is alleged is that the prescription, the

7   prescribing of TIRF drugs, was inappropriate and so, you know,

8   we would hope to ask him, you know, about the injuries and

9   about the care that led up to the prescribing of Subsys in his

10  case.  And then he was a patient up until the May of 2015.  So

11  a similar situation.

12          THE COURT:  Well, I'll just have to rule on the

13  objections to the questions when asked.

14          MR. ESSIG:  And, Judge, as a little bit of a preview

15  from Mr. Riley -- because he is a little bit different --

16  again, he got some sort of TIRF medication the whole time he

17  was there.  And so we're going to -- so some of the issues with

18  some of that TIRF medication kind of gets us to why he ended up

19  on some of the medications he had.  So I just want to make the

20  Court and the government aware we can't explain how he got to

21  the time period in the indictment without talking a little bit

22  about some of the rotation of the TIRF drugs prior to getting

23  there.  I don't plan to spend a whole lot of time talking about

24  it, but just --

25          THE COURT:  As I say, I'll just have to rule on

4580

 1   objections as they are made.  Anything else?

 2          MS. GRIFFIN:  No, your Honor.

 3          MR. BODNAR:  Not from the United States.

 4          THE COURT:  Let's get the jury up.

 5          THE CLERK:  Yes, ma'am.

 6      (A recess was taken at approximately 10:46 a.m.)

 7      (In open court, 10:53 a.m., defendants and jury present.)

 8          THE COURT:  All right.  Counsel for Mr. Couch may call

 9   their first witness.

10          MR. WILLSON:  Your Honor, Dr. Couch calls Benjamin

11   Brown.

12          THE COURT:  All right.

13                      BENJAMIN BROWN

14          was sworn and testified as follows:

15          THE WITNESS:  Yes, ma'am.

16                    DIRECT EXAMINATION

17   BY MR. WILLSON:

18   Q   Good morning, sir.

19   A   Good morning.

20   Q   Would you introduce yourself to the jury?

21   A   I'm Benjamin Brown.

22   Q   Where are you from, sir?

23   A   Lucedale, Mississippi.

24   Q   Is that where you came from this morning?

25   A   Well, I'm residing at the Leakesville nursing home right

```
 1   now.

 2   Q   Is that a medical facility?  You said it's a nursing home?

 3   A   It's -- it's more or less I've got the help I need right

 4   there.  It's nothing about the medical issues.  It's just when

 5   I've got to have a shower, when I've got to use the bathroom,

 6   stuff like that.

 7   Q   How long have you been there?

 8   A   Roughly Thanksgivingish, somewhere around there.

 9   Q   Mr. Brown, were you at one time a patient of Dr. Patrick

10   Couch?

11   A   Yes, sir.

12        THE COURT:  Excuse me.  Mr. Willson, is your

13   microphone on?

14        MR. WILLSON:  Your Honor, I believe it is now.

15        THE COURT:  Okay.  Great.  Thank you.  Go ahead.

16   BY MR. WILLSON:

17   Q   Mr. Brown, you were a patient of Dr. Couch's; is that

18   right?

19   A   Yes, sir.

20   Q   Do you see him in the room?  Is this Dr. Couch over here?

21   (Indicating.)

22   A   Yes, sir.

23   Q   Were you referred initially to Dr. Couch by another

24   physician?

25   A   Yes, sir.
```

BENJAMIN BROWN - DIRECT BY MR. WILLSON

1  Q   And was that for the treatment of pain?

2  A   Yes, sir.

3  Q   Mr. Brown, I'd like you to tell the jury about your

4  injuries and your medical conditions.  And we can start from

5  the beginning.  Was there a time in your life when you were not

6  in a wheelchair?

7  A   Yes, sir.

8  Q   And when was that?

9  A   That was before June the 21st of 1998, on Fathers Day, I

10 had a diving accident and broke my neck and I'm a C-6 quad.

11 Q   What kind of a -- you say a diving accident?

12 A   Yes, sir.  I broke my neck at C-6 and I'm paralyzed from

13 the chest down.  And that was in '98.

14 Q   And how did you -- tell us about the diving accident.  What

15 do you mean by that?

16 A   I was on the Pascagoula River and I swung out of a tree off

17 a rope.  And me and my son had been swimming in the water and I

18 knew it was plenty deep, and around 12-15 foot deep.  And I

19 swung out of it and dove past the area that me and my son was

20 swimming in and I hit an area that was no bigger than the size

21 of a car, it was not but about four foot deep, that the current

22 had made the river bottom real short.  And I swung out and dove

23 in that water and broke my neck and I was paralyzed.  I've been

24 paralyzed since.

25 Q   Did that injury require surgery?

4583

1  A   Yes, sir.  C-6 quad, they removed the bone fragments around

2  my spinal cord and put a donor vertebrae in my neck at C-6.

3  Q   When you say you're a C-6 quadriplegic, does that mean that

4  you can't feel your limbs?

5  A   No, sir.  The C-6 quad, quad means my four limbs, my two

6  legs and my arms has some paralysis, that I can't -- like I

7  can't move my hands and some parts of my arms and my legs are

8  totally paralyzed.  But as far as feeling, I've got a lot of

9  burning feeling.  But since I've been -- as I told you, since

10  I've been in a wreck.  I've had a car accident.  I was driving

11  my van and I broke -- do you want me to tell you what?

12  Q   Well, let's get to that in just a second, Mr. Brown.

13  A   Okay.

14  Q   Let me ask you, as a C-6 quadriplegic, you began to

15  describe some pain.  Tell the jury, if you would, what other

16  kinds of conditions are a result of your being a quadriplegic?

17  A   Say that one more time?

18  Q   Do you have any other medical problems or just health

19  problems or physical problems that cause you pain as a result

20  of your injury from diving into the creek?

21  A   Yes, sir.  I have a lot of pain in my neck and I also have

22  a lot of pain, you know, in my lower limbs, as far as the

23  burning.  I've had to learn to live with it.  But it still, you

24  know, it hurts.  It definitely hurts bad.

25  Q   Mr. Brown, when you had your surgery to fix the vertebrae

4584

1    and the bone embedded in it, what if anything -- did you ask

2    your doctor about your chances of walking again?

3    A   Yes, sir.

4    Q   And without saying exactly what he told you, tell us what

5    you came to understand from that conversation about your

6    chances of walking again?

7    A   He told me that there was no -- no chance of me walking, of

8    getting any of my function back.  He said if I was going to get

9    anything back, like in my hands, it would be within the first

10   three months.  But if -- I asked him, I said:  Well, if you've

11   got to say if I'm going to get anything back, am I?

12          He said:  No, you will not.

13   Q   Were you able to be active at all after your spinal injury?

14   A   Yes, sir.

15   Q   And tell the jury about what you were able to do during

16   that period of time after your first injury?

17   A   After my first injury, I started driving, I had three kids

18   at the -- my diving accident.  My oldest daughter was five,

19   then I had a son that was three and a half years old, and then

20   I had my third child, he was two and a half months old.  And

21   I -- like I said, after about a year of me, you know, not

22   accepting the hand I'd been dealt, that was the way a guy put

23   it to me, that I was going to have to accept the hand that I've

24   been dealt.  And I started being a dad again, being a husband

25   the best I could, driving, and coaching ball, coaching both of

4585

1    my boys.  My first child was by my first marriage.  But my

2    boys, you know, we'd fish, we hunted.

3    Q   Mr. Brown, were you in pain during that period of time?

4    A   Yes, sir, some.

5    Q   Now, you mentioned earlier that there was a second injury?

6    A   Yes, sir.

7    Q   Would you tell the jury about that injury, when it happened

8    and what it was?

9    A   On December the 13th, 2011, I wrecked my van, went across

10   98 and hit the embankment and I broke three ribs.  My left hip

11   was broke in two places.  They had to put some pins and plates

12   in it.  I broke both of my femurs.  I've got rods from my knees

13   to my hip.  I broke my tibia and fibula on my left leg, I broke

14   my left ankle, I crushed my right heel, and I tore everything

15   in my right knee.

16   Q   Did you have surgery after that accident?

17   A   Yes, sir.

18   Q   Were you referred by your primary care doctor to an

19   orthopedist?

20   A   I can't remember the orthopedist.

21   Q   And that's all right, if you can't remember his name.

22   A   No.

23   Q   Were you referred to a neurologist as well?

24   A   (Pause.)  I can't remember their name.

25   Q   Mr. Brown, I'd like to show you what we've marked for

 1    identification purposes as Couch Exhibit 11B.

 2            MR. WILLSON:  This is a copy of Mr. Brown's medical

 3    chart as disclosed by the government.  And it is not in

 4    evidence at this time.  Could we switch to the laptop mode,

 5    please?

 6            THE CLERK:  Yes.  It will take a minute.

 7    BY MR. WILLSON:

 8    Q   Mr. Brown, can you see -- do you have on your screen a

 9    copy?

10    A   Yes, sir.

11    Q   Mr. Brown, is that your name at the top?

12    A   Yes, sir.

13    Q   And your address?

14    A   Yes, sir.

15    Q   And do you recognize the name Dawn Watkins, MD?

16    A   Yes, sir.

17    Q   And you'll see on the left there's a date.  Does that

18    appear to you to be about the date that you would have visited

19    Dr. Watkins?

20    A   Yes, sir.

21    Q   Mr. Brown, did Dr. Watkins refer you for your pain to

22    Dr. Couch after this visit?

23    A   Yes, sir, I do believe that's Dr. Watkins' -- she was the

24    one who referred me.

25            MR. WILLSON:  Your Honor, Dr. Couch moves to admit

1    Couch Exhibit 11B, which is the medical chart of Mr. Brown,

2    into evidence.

3          MR. BODNAR:  No objection, Your Honor.

4          THE COURT:  All right.  Mark it in.

5          MR. WILLSON:  And we wish to publish it to the jury as

6    well.

7          THE COURT:  All right.

8       (Defendant Couch's Exhibit 11B was entered into evidence.)

9    BY MR. WILLSON:

10   Q   Mr. Brown, if you'll look on the left there where it says

11   current medications, and if you would look through that list

12   and let me know if that is in fact a good list of the

13   medications that you were being prescribed at that time prior

14   to your first visit with Dr. Couch?

15   A   Yes, sir.  Neurontin 400 milligrams, I think that's what I

16   was taking at the time that I -- that's a little bit up, what

17   I'm taking now.  But the Valium, yes.  Zanaflex, yes.  And the

18   Lortabs, yes, that's it.

19   Q   Now, Lortab, was that an opioid medicine for your pain?

20   A   Yes, sir.

21   Q   The Zanaflex, Mr. Brown, was that a muscle relaxant for

22   your spasms?

23   A   Yes, sir.

24   Q   The Valium, was that also -- do you happen to know what

25   kind of drug Valium is?

1  A   Yes, sir.  I know what Valium is.  It -- what helps the

2  Valium for me, the nerve endings that burn, makes it burn so

3  bad, that's what I take it for.

4  Q   Have you ever heard the term "benzodiazepines"?

5  A   Yes, sir.

6  Q   Do you happen to know is Valium a benzodiazepine?

7  A   Yes, sir, I think so.

8  Q   Mr. Brown, when I say the words "Holy Trinity," what does

9  that mean to you?

10  A   I have no idea.  What did you say?

11  Q   Holy Trinity.  What comes to mind?

12          MR. BODNAR:  Your Honor, we would object to the

13  relevance.  He's not being prescribed the Holy Trinity here.

14          THE COURT:  Sustain the objection.

15  BY MR. WILLSON:

16  Q   And again, Mr. Brown -- Mr. Brown, prior to your first

17  visit to Dr. Couch, when you were taking these medications,

18  which include Lortab, Zanaflex, and Valium, was your pain being

19  effectively managed by those medications?

20  A   Not -- not after my accident, it was not.

21  Q   And we talked a little bit about your pain and your

22  conditions after that first injury.  Tell the jury a little bit

23  about pain related to your condition after the car wreck.  Can

24  you feel both of those metal rods in your leg?

25  A   Yes, sir.

BENJAMIN BROWN - DIRECT BY MR. WILLSON

1  Q   Does that cause you pain?

2  A   Very much so (nodding head affirmatively).

3  Q   Do you still have spasms?

4  A   Yes, sir (nodding head affirmatively).

5  Q   And where do you experience spasms in your body?

6  A   In my lower extremities.  It gets worse when I lay down in

7  the bed.  Which I say gets worse -- there are constantly spasms

8  all the time and this baclofen and Zanaflex, it hardly even

9  touches it.

10 Q   Were those spasms worse or did they cause you more pain

11 after your car wreck than before?

12 A   Yes, sir.

13 Q   Why is that?

14 A   I really don't know exactly the medical reason for

15 that.  But when I -- I come home from the hospital from all my

16 fractures and in casts, I've been -- I was in the bed pretty

17 much until Dr. Couch -- I started seeing Dr. Couch and he got

18 my pain managed.

19 Q   Are there certain times when your -- when the pain related

20 to the metal in your body is worse than others?

21 A   Yes, sir.

22 Q   When is it worse?

23 A   Well, when the spasms get real bad, the pain gets worse.

24 But, now, in the wintertime it also -- it gets worse.

25 Q   When the weather's cold?

1   A   Yes, sir.

2   Q   You mentioned burning earlier.  Tell the jury a little bit

3   about that sort of pain.  What does it mean when you said you

4   feel burning?

5   A   Well, do you want me to start from the first time I got

6   hurt?  When I started feeling this pain?  This burning pain?

7   Q   That would be fine, if you would describe your burning pain

8   to the jury.

9   A   It was -- it was miserable.  I didn't want to accept -- I

10  did not accept the hand that I had been dealt, the burning.  My

11  kids, I was not a -- not a daddy to them until a guy come and

12  explained a little bit to me about the burning.  It never goes

13  away.  But with the medicine that puts a little bit of dent in

14  the pain, I'm able to be a daddy again.  Right now I'm -- my

15  kids is wanting to know where their daddy is.

16  Q   Mr. Brown, let's talk about your treatment by

17  Dr. Couch.  In about the middle of 2012 were you referred to

18  Dr. Couch for the treatment of your pain?

19  A   Yes.

20  Q   And had you been seeing a pain management doctor prior to

21  that?

22  A   Before Dr. Couch?

23  Q   Yes.

24  A   I can't remember their names.

25  Q   That's okay, if you can't remember their names.  Were you

1    seeing any pain management doctor prior to Dr. Couch?

2    A    Yes.

3    Q    And were you satisfied with that doctor's treatment of the

4    pain?

5    A    No, sir.

6    Q    And was that doctor in Mississippi?

7    A    Yes, sir.

8    Q    Where you live?  In other words, you're from Mississippi;

9    right?

10   A    Sir?

11   Q    You're from Mississippi?

12   A    Yes, sir.

13   Q    And Dr. Couch was here in Mobile.  Did you travel from

14   Mississippi to Mobile to come to Dr. Couch's treatment?

15   A    Yes, sir.  That's not but about, you know, 40 minutes.

16   Q    And who would transport you?

17   A    Either my roommate that I had, I was living with, or my

18   dad, or some -- a couple of friends.

19   Q    Mr. Brown, tell the jury about your first visit to

20   PPSA.  When I say PPSA, do you understand that I'm referring to

21   Dr. Couch's practice; right?

22   A    Yes, sir.

23   Q    Tell the jury about your first visit to PPSA.

24   A    Okay.  My first visit when I went to see Dr. Couch, my son

25   that was two and a half months old -- traveled with us and he

4592

```
 1    asked to go back there with me, which I told him okay -- which
 2    that had nothing to do with me wanting to see Dr. Couch.  I
 3    told him that I was going to be talking to doctors and, you
 4    know, for him to be respectful.  When I talked to Dr. Manchikes
 5    -- am I pronouncing his name correctly?
 6    Q   I don't know.
 7    A   Anyhow, Dr. Couch come in the office and introduced hisself
 8    and asked me a little bit about my family, my kids, how many
 9    kids.  He asked my son Gary a couple of questions.  And then we
10    got on the subject of my medication and what we was going to
11    try to start with and we was just going to go from there and
12    try to work up, you know, to where I was comfortable.
13            And I would like to add, my son turned to me and he
14    asked:  Daddy, can I ask him a question?
15            And I had no idea what he was talking about.
16            MR. BODNAR:  Your Honor, we object to this going way
17    outside of the question now and also hearsay at this point.
18            THE COURT:  I sustain the question.
19            MR. WILLSON:  I'll ask more specific questions, Your
20    Honor.
21            THE COURT:  All right.
22    BY MR. WILLSON:
23    Q   Mr. Brown, did you meet with Dr. Couch on that first visit?
24    A   Yes, sir.
25    Q   And you said that your son was with you?
```

1    A    Yes, sir.

2    Q    How old was your son?  Gary was his name?

3    A    He was maybe 13 or 14, something.  I can't remember now.

4    Q    Did you discuss with Dr. Couch your goals for treatment?

5    A    Yes, sir.

6    Q    Tell the jury specifically about that conversation that was

7    had in the room about your goals for your treatment.

8    A    My goal was to be able to get back out of the bed and back

9    out with my kids.  I was a ball coach, a football coach.  I

10   hunted and fished.  My kids didn't know I wanted to get back

11   out to be social like I was before my accident.  And that was

12   our goal to meet.  And like I was saying, that's -- that's

13   something that my son asked, if he could get my daddy back

14   outside with us again.

15   Q    And did Dr. Couch respond to that question?

16   A    Yes, sir, he sure did.  And he said that he was going to do

17   everything possible to get him -- it was to get me back out to

18   where they could have their daddy again.  And, you know, after

19   that first visit, if I didn't see him in the hall -- or he'd

20   stop, he always was asking me have we met that goal and, once

21   we had met that goal, I was back with my kids.

22   Q    So during your treatment with Dr. Couch, did you meet that

23   goal that was established in the first meeting?

24   A    Yes, sir.

25   Q    And did you see Dr. Couch on multiple occasions during the

4594

1    course of your treatment with Dr. Couch?

2    A   Yes, sir.

3    Q   Would you tell the jury what the period of time was that

4    you were in Dr. Couch's care?  I believe you said it was middle

5    of 2012 that you went first; is that right?

6    A   Yes, sir (nodding head affirmatively).

7    Q   Until --

8    A   Until it was, I guess, the middle of -- around -- I guess

9    it was around May of -- what was it, 2015, I guess?

10   Q   Did you discuss in that first meeting the medications or

11   the treatments, the plan of treatment that you would have with

12   Dr. Couch?

13   A   Say that again?

14   Q   Did you talk about what Dr. Couch was going to do for you

15   for your pain in your first meeting?

16   A   Yes.

17   Q   And if you can recall, tell the jury what that plan was.

18   A   The plan was to get the pain level where I was comfortable

19   and to get me back out of the bed and to where I could be with

20   my kids and be out, be outside, where I could function again.

21   Q   Did Dr. Couch perform any procedures on you?

22   A   He done some MRIs on my legs.

23   Q   Did he do any steroid injections or epidural injections on

24   you, if you can recall?

25   A   I can't recall.

4595

1   Q   Were you prescribed medications as well?

2   A   Yes, sir.

3   Q   If you can recall, Mr. Brown, what were the medications

4   that Dr. Couch prescribed to you at first?

5   A   At first, it was 15 milligram oxycodone, my Valium, as I've

6   been taking it, an OxyContin time release, baclofen, Zanaflex,

7   and Neurontin.  I think that's -- that's what we started with,

8   yes, sir.

9   Q   Was there a point in time, Mr. Brown -- you mentioned

10  earlier Dr. Manchikes.  Was that someone who was working for

11  Dr. Couch at the time?

12  A   Yes, sir.

13  Q   Did Dr. Manchikes -- do you know, was he a doctor?

14  A   Yes, sir, that's what I knew him as, I guess.

15  Q   Did he at some point in time prescribe to you a medication

16  known as Subsys?

17  A   Yes, sir.

18  Q   And do you recall about when that was?

19  A   It was -- if I remember right, it was a couple of months

20  after my first visit, I think.  I can't remember.

21  Q   And was that basically a free trial of Subsys?

22  A   Yes, sir.

23  Q   And do you recall what dosage you were prescribed?

24  A   I know it was a low dosage.  I can't remember.  I can't

25  recall.

BENJAMIN BROWN - DIRECT BY MR. WILLSON

1   Q   Do you recall whether it was the lowest dosage?

2   A   I think so.

3   Q   Did Dr. Manchikes discuss with you the medication Subsys

4   being off label?  Does that -- do you have any recollection of

5   that?

6   A   No, sir.

7   Q   Did he tell you, if you can recall, whether or not the

8   medicine was approved by the government only for use in

9   breakthrough pain for cancer patients?

10  A   No, sir.

11  Q   Did you discontinue your use of Subsys after that free

12  trial period was complete?

13  A   Yes, sir.

14  Q   Mr. Brown, on your screen is a copy of a medical note.  It

15  is from Couch's Exhibit 11B.  And this is -- it's dated October

16  5th, 2012.  Mr. Brown, it says here that you have significant

17  pain in your hips and legs, muscle spasms will not calm

18  down.  Patient states current medical regimen working

19  well.  And then you'll note:  Burning in legs as well.

20        MR. WILLSON:  If you could zoom out, Sam, please?

21  Q   Did you also discuss a pain pump with the doctor at that

22  visit?

23  A   Yes, sir.

24  Q   And do you recall that discussion?

25  A   Yes, sir, a little bit.  I know that we was talking about

1  the pain pump and he wanted me to go see a -- I believe a

2  psychiatrist, if I remember right.  I don't really remember his

3  name.  But I never got over to see him.

4  Q  It says -- did you have a discussion about your pain pump

5  with Dr. Couch?

6  A  I know I did.  But I don't remember when.

7  Q  This note also says that DC medications -- I'm sorry.  It

8  says that you discontinued your Subsys on this date.  And it

9  also says that your roxi was increased to 30 milligrams.  Do

10  you recall having that discussion with either Dr. Couch or

11  Justin Palmer, about discontinuing that free sample of Subsys

12  and increasing the Roxicodone?

13  A  Yes, sir.

14  Q  Tell the jury a little bit about what that discussion was?

15         MR. BODNAR:  Your Honor, we just object to who it is

16  he's discussing it with.  He mentioned Justin Palmer or

17  Dr. Couch.  So just to clarify for the jury who this discussion

18  was with.

19  BY MR. WILLSON:

20  Q  Do you recall who the discussion was with, Mr. Brown?

21  A  With Dr. Justin.

22  Q  With Justin?

23  A  (Nodding head affirmatively.)

24  Q  Did Justin tell you about the plan for dealing with your

25  discontinuing of the Subsys and increasing the Roxicodone?

1   A   Yes, sir.  He told me that I was going to have to pick from

2   one or the other.  And I told him, you know, my pain was worse

3   during the summertime so that -- I mean the pain's worse in the

4   wintertime than it is in the summertime.  So I -- I

5   discontinued the Subsys and kept the Roxicodone for it would

6   help better with my legs.  I didn't need the Subsys at that

7   time.

8   Q   One last question about this document, Mr. Brown.  There's

9   a note that says:  Neurontin 800.  Looks like it was prescribed

10  to you in this visit.  Do you know what Neurontin is?  Do you

11  remember?

12  A   Yes, sir.

13  Q   What did you take Neurontin for?

14  A   The burn.

15  Q   Do you know if Neurontin is a controlled substance by the

16  DEA or not?

17  A   No, sir, I don't think it is.

18          MR. WILLSON:  If you would go to the next page, Sam?

19  Q   Mr. Brown, I'm showing you a prescription for

20  Neurontin.  Does this -- and this is your name; is that right?

21  At the top?

22  A   Yes, sir.

23  Q   Do you know who signed this prescription on the bottom?

24  A   No, sir.

25  Q   Did Justin Palmer sometimes write prescriptions for

4599

1   nonscheduled drugs for you and sign them?

2   A   Yes, sir.

3   Q   This is a visit from October 10th, 2012, Mr. Brown.  And

4   had you been taken off of Lortab before this visit, if you

5   remember?

6   A   Yes, sir.

7   Q   And did that cause you problems?

8   A   Taking Lortab off?

9   Q   Yes.

10   A   No, sir.  Because he took the Lortab off and we had the

11   Roxicodone upped to 30.

12   Q   And it says that you were having problems with

13   constipation; is that right?

14   A   Yes, sir.

15   Q   And MiraLAX was prescribed; is that right?

16   A   Yes.

17        MR. WILLSON:  Go to the next page, please, Sam.

18   Q   And this appears to be a prescription for MiraLAX.

19   A   Yes, sir.

20   Q   And do you recognize the signature at the bottom left?  Is

21   it similar to the signature we just saw?

22   A   Yes, sir, similar.

23   Q   Mr. Brown, on your screen now, again from Couch's Exhibit

24   11B, is a note from January 18th of 2013.  And it says here

25   that you were recently discharged from the hospital for sepsis

BENJAMIN BROWN - DIRECT BY MR. WILLSON

 1  secondary to infection in your back.  Do you recall that?

 2  A   Say that one more time?  I'm trying to read this.

 3  Q   Sure.  Did you have -- did you go to the hospital in

 4  December of 2012 for an infection in your back?

 5  A   I guess I did.  I can't remember all the way back.

 6  Q   This word up here, is that osteomyelitis?  Have you ever

 7  heard of that word?

 8  A   I can't remember it.

 9          MR. WILLSON:  And, Your Honor, if we might --

10  A   It sounds familiar.

11          MR. WILLSON:  May I approach the witness and see if we

12  might close the distance between himself and the screen?

13          THE COURT:  Yes.  I'm not sure we can move the

14  computer much closer with the wire, but maybe we can move him a

15  little closer.  But you need to have him at the microphone.

16          THE COURT:  Mary Ann, can you move the microphone

17  further forward on the table?

18          THE WITNESS:  I'll try to speak right here.  How's

19  that?

20          THE COURT:  That's much better.  Thank you.

21          THE WITNESS:  Okay.

22  BY MR. WILLSON:

23  Q   Mr. Brown, it looks like in this visit you again discussed

24  pain pump procedure.  Did you have multiple discussions about

25  pain pumps?

4601

1   A   Yes, sir.

2   Q   Do you recall why you were not put on a pain pump?

3   A   I was supposed to go and make an appointment with a --

4   what's it called?  A psychiatrist.  A psychiatrist, I guess.  I

5   never, never -- never made the appointment.

6   Q   So did Dr. Couch refer you to a psychiatrist for the

7   implantation of a pump?

8   A   Yes, sir.  He -- he referred me to one.

9   Q   Mr. Brown, this is now from Couch's Exhibit 11A.  And this

10  is a note from June of 2013.

11          THE CLERK:  Your Honor, 11A is not in evidence.

12  BY MR. WILLSON:

13  Q   It says -- does it say that --

14          THE COURT:  Mr. Willson, 11A is not in evidence.

15          MR. WILLSON:  I'm sorry, Your Honor.  It is not.  This

16  is from Dr. -- this is from Mr. Brown's medical charts that are

17  in evidence.  And I --

18          THE COURT:  Well, we need to get the right exhibit

19  number so the record will reflect what it is.

20          MR. WILLSON:  Yes, ma'am.  With the Court's

21  indulgence, just a moment.

22          THE COURT:  All right.

23      (A discussion was held off the record between defense

24  counsel.)

25          MR. WILLSON:  And, Your Honor, for purposes of

 1    efficiency and economy, we would offer Couch's Exhibit 11B,

 2    which is the Greenway chart of Mr. Brown that is otherwise in

 3    evidence.

 4         MR. BODNAR:  Your Honor, we don't have any problem

 5    with it being shown to the jury.  This is part of the exhibits

 6    that came in through Special Agent Jeff Young in the creation

 7    of the top 28.  We do object to admitting the same thing under

 8    a different number into the record.  But we have no problem

 9    with them using this portion to show him as opposed to fishing

10    through.

11         THE COURT:  What we need to do is find out what the

12    exhibit number was so that we can properly show it in the

13    transcript.

14         THE CLERK:  Witness Young was Exhibit 12, fentanyl

15    patients.

16         MS. GRIFFIN:  Those were Exhibit 12, Your Honor, if

17    they want to go pull it.

18         THE COURT:  Well, you can use the copies of it that

19    you are currently using.  But we need to make sure it's the

20    same thing.  But the record should reflect what you're talking

21    about is Mr. Brown's patient file that's contained in Exhibit

22    12.

23         MR. WILLSON:  Your Honor --

24         MR. BODNAR:  And, Your Honor, those did come from

25    Greenway.  We're presuming they did come from Greenway.  It

1   should be the exact same copy that we admitted as part of the

2   Jeff Young exhibits.

3           THE COURT:  But you've referenced 11A and 11B.

4           MR. WILLSON:  Yes, Your Honor.  If we'll agree that

5   11A is identical to Government's 12, it might be better --

6   since we have 11A, which is Greenway, and 11B, which is the

7   additional charts that we have admitted -- if the Court would

8   allow us to admit 11A and 11B together so that they are

9   together in one place.  Or we can refer to Exhibit 12.

10       (A discussion was held off the record between counsel.)

11          MR. WILLSON:  And, Your Honor, this is Government's

12   Exhibit 12-1(a), what has been admitted as Mr. Brown's Greenway

13   chart.  And I will refer to that exhibit as we move forward.

14          THE COURT:  That's fine.

15          MR. BODNAR:  No objection, Your Honor.

16   BY MR. WILLSON:

17   Q   Mr. Brown, back to June 17th of 2013, did you discuss

18   Subsys on that day?

19          MR. BODNAR:  And objection, Your Honor, to who he

20   discussed it with, so we have clarification of who he spoke to.

21          THE COURT:  Sustained.

22   BY MR. WILLSON:

23   Q   Do you recall this visit, Mr. Brown?

24   A   Yes, sir.

25   Q   And did there come a time when you discussed with

BENJAMIN BROWN - DIRECT BY MR. WILLSON

1  Mr. Palmer the going back to taking Subsys?

2  A   Yes, sir.

3  Q   And was it about this time?

4  A   Yes, sir.

5  Q   Tell the jury about that discussion and why you suggested

6  taking Subsys.

7  A   Well, I was -- it -- my pain had been worse and I had been

8  off of it for quite a while and I mentioned about going back to

9  the Subsys.  And he had no problem with that, and that's when I

10 went back to it.

11 Q   And did he tell you at that time anything about Subsys?

12 Did he discuss the medicine with you?

13 A   What I was told was about breakthrough pain.

14 Q   Say again?

15 A   About breakthrough pain.

16 Q   Did he discuss breakthrough pain with you?

17 A   Not -- not in detail, no, sir.

18 Q   Did he discuss with you how to take your medicine?

19 A   Yes, sir.

20 Q   Did he tell you about how to -- in terms of how often to

21 take it?

22 A   Yes, sir.

23 Q   How to follow the prescription?

24 A   Yes, sir.

25 Q   Did he tell you that it was for --

1       MR. BODNAR:  Objection to leading, Your Honor.

2       THE COURT:  Sustained.

3  BY MR. WILLSON:

4  Q   Mr. Brown, you said a moment ago that you don't recall that

5  he discussed with you specifically that this was a breakthrough

6  medicine for patients with cancer; is that right?

7  A   Yes, sir.

8  Q   Okay.  And, Mr. Brown, as you sit here today, had you been

9  told that Subsys was indicated by the government for only

10 cancer pain, would that make any difference to you about

11 whether or not you used that medication as prescribed?

12      MR. BODNAR:  Objection to foundation.  He needs to ask

13 him first if he even knew it was only indicated for cancer

14 pain.

15      THE COURT:  Overruled.  You can answer.

16 BY MR. WILLSON:

17 Q   Would you like me to ask the question again?

18 A   No, sir, it wouldn't make no difference to me.

19 Q   Why not?

20 A   Because it helped with my breakthrough pain.  I was in a

21 lot of pain.

22 Q   And --

23 A   I am in a lot of pain.

24 Q   So from this date, June of '13, were you prescribed Subsys

25 for a period of time after that?

4606

1   A   Yes, sir.

2   Q   It was part of your medical medication regime; is that

3   right?

4   A   Yes, sir.

5   Q   Mr. Brown, tell the jury, were you able to be more active

6   after you were prescribed Subsys?

7   A   Yes, sir.

8   Q   Were you able to do more after you were prescribed Subsys

9   than you were before?

10  A   Yes, sir.

11  Q   Were there any side-effects of Subsys that you experienced

12  that were not good?

13  A   No, sir.  I mean, I was -- I was back active, with being

14  able to go outside again, being active with my kids again.  My

15  pain level was extremely low.

16  Q   And again, this is from Government Exhibit 12-1(a).  This

17  is a note from July of 2013, the next month.  And, Mr. Brown,

18  it says here that you discussed Subsys with the provider.  Is

19  that -- if you remember, was that Mr. Palmer or was it

20  Dr. Couch?

21  A   Palmer.

22  Q   And do you recall this discussion about Subsys?

23  A   No, sir.

24  Q   And this is a note from the next month, Mr. Brown.  It says

25  down here towards the bottom:  Just received Subsys, discussed

BENJAMIN BROWN - DIRECT BY MR. WILLSON

```
 1   discontinuation of oxycodone.
 2           Was that Mr. Palmer who you had that discussion with?
 3   A   Yes, sir.
 4   Q   And do you recall that discussion?
 5   A   Yes, sir.
 6   Q   What did Mr. Palmer tell you about discontinuing oxycodone
 7   while you were on Subsys?
 8   A   He told me that I was either going to have one or the
 9   other.
10   Q   Here's a note from the next month, again from Government
11   Exhibit 12-1(a), Mr. Brown.  And it says:  Patient states low
12   back and legs are killing me, feels like hips are wanting to go
13   out of socket.  Again the burning.
14           Do you recall that pain during this time in September
15   of 2013?
16   A   Yes, sir.
17   Q   Zooming back out, Mr. Brown, it seems to be indicated that
18   your prescription for Subsys was decreased from three times a
19   day to two times a day and maybe even the number of units was
20   decreased.  Do you recall that?
21   A   Yes, sir.
22   Q   Do you remember why that was?
23   A   (No response.)
24   Q   And if you don't, that's okay.
25   A   I can't remember.
```

1  Q   Did you take Subsys throughout 2014, the next year?

2  A   Yes, sir.

3  Q   And the same as what you told us before, did it help with

4  your pain?

5  A   Yes, sir.

6  Q   Did it help you be more active?

7  A   Yes, sir.

8  Q   Did you have any problems using the medication?

9  A   No.

10 Q   Now, Mr. Brown, did there come a time when you were denied

11 by your insurer for Subsys?

12 A   Say that again.

13 Q   Did you change your insurance provider at some point in

14 time during this?

15 A   Yes, sir.

16 Q   And did your insurance provider, after that change, deny

17 coverage for Subsys?

18 A   Yes, sir.

19 Q   And this is from, again, Government's Exhibit 12-1(a).

20 And, Mr. Brown, is that your name towards the top?

21 A   Yes, sir.

22 Q   All right.  And it says that:  We've denied coverage under

23 your Medicare Part D; right?

24 A   Yes, sir.

25 Q   And that's for Subsys?

4609

```
 1   A   Yes, sir.
 2         MR. WILLSON:  And, Sam, if you will zoom in on this
 3   box:  Why did we deny your request?
 4   Q   Mr. Brown, does it appear to you that this paragraph
 5   describes the information provided by your prescriber for the
 6   approval of Subsys?
 7         MR. BODNAR:  Your Honor, foundation to what he knew
 8   that Justin Palmer or anybody else sent to his insurance
 9   provider.
10         MR. WILLSON:  I'm just asking about what's on the face
11   of this document, Your Honor, and whether it accurately
12   describes his conditions at that time.
13         MR. BODNAR:  I don't think he can say -- well, he can
14   say that accurately describes it, but not who sent it, if he
15   knows.
16         THE COURT:  All right.
17         MR. WILLSON:  I'm sorry, Your Honor?
18         THE COURT:  You can ask the question.  Go ahead.
19   BY MR. WILLSON:
20   Q   Mr. Brown, on this, in this sentence, does it say that the
21   diagnoses were injury to nerves?  Did you have injury to your
22   nerves?
23   A   Yes, sir.
24   Q   Did you have disease of the spinal cord?
25   A   Yes, sir.
```

BENJAMIN BROWN - DIRECT BY MR. WILLSON

4610

1    Q   Did you have spinal muscular atrophy?

2    A   I had -- my spinal cord was bruised.  It was -- yes, sir,

3    I -- I recall somebody saying that.

4    Q   Did you have a backache?

5    A   Yes, sir.

6    Q   Pain in your limbs?

7    A   Yes, sir.

8    Q   And does this document say that that did not meet the

9    requirement of a medically accepted reason for Subsys?

10   A   Yes, sir.

11   Q   And this is a different insurance than the insurer who had

12   approved it before; is that right?

13   A   Yes, sir.

14       (The witness hit the microphone.)

15           THE WITNESS:  Oh, I'm sorry.

16   BY MR. WILLSON:

17   Q   Mr. Brown, are you still taking Subsys?

18   A   No, sir.

19   Q   When did you stop taking Subsys?

20   A   It was the first -- I think the first couple of months of -

21   - I -- I can't remember.

22   Q   Was it after you learned that Dr. Couch's practice had been

23   shut down?

24   A   Yes, sir.

25   Q   And was that why you stopped taking Subsys?

BENJAMIN BROWN - DIRECT BY MR. WILLSON

4611

```
 1   A   Yes, sir.  I had -- I'd seen another doctor.  I can't

 2   remember his name.  But there was another doctor there.

 3   Q   And since discontinuing your Subsys, has your condition

 4   changed?  Have you been in more or less pain?

 5   A   I've been in a lot of pain.

 6   Q   Have you been more or less active?

 7   A   Less active.  I've been in the bed in a nursing home.

 8   Q   Did you have --

 9       (A discussion was held off the record between counsel.)

10   BY MR. WILLSON:

11   Q   Almost finished, Mr. Brown.  You said earlier that you and

12   I had talked.  Have you and I met before today?

13   A   Yes, sir.

14   Q   And did we discuss this case?

15   A   Yes, sir.

16   Q   And did we discuss the things that we've discussed today?

17   A   Yes, sir.

18   Q   And what if any advice or instruction did I offer to you

19   about your testimony today?

20   A   No, sir.

21   Q   Did I tell you to be honest?

22   A   Yes, sir.

23       (A discussion was held off the record between defense

24   counsel.)

25           MR. WILLSON:  No further questions at this time of
```

1    this witness, Your Honor.

2          THE COURT:  All right.  Mr. Bodnar?

3                    CROSS EXAMINATION

4    BY MR. BODNAR:

5    Q   Good morning, Mr. Brown.

6    A   Good morning.

7    Q   My name is Chris Bodnar, and I represent the United

8    States.  I want to clarify with you about who was actually

9    doing your medical treatment at PPSA.  Because for several of

10   these visits there were pronouns that "he," or it was talked

11   about things that were done at PPSA.  When you first started

12   coming to PPSA, your prescriptions were being written by a

13   doctor named Dr. Manchikes; is that correct?  Or Manchikes?

14   A   That was the first doctor that come in the room, yes, sir.

15   Q   So, and from approximately June through August of 2012, you

16   were receiving your prescriptions from Dr. Manchikes, not from

17   Dr. Couch; is that correct?

18   A   I do not know.  I'm not for sure.

19   Q   You don't recall?

20   A   No, sir.

21   Q   You mentioned seeing Dr. Couch during your very first

22   visit.  What kind of physical examination of you did Dr. Couch

23   do during that first visit when you were there with your son?

24   A   He -- he was asking me about my legs.  He -- he kind of

25   straightened my legs out, you know, to see about the muscle

1  spasms.

2  Q   And Dr. Couch did this himself?

3        MR. WILLSON:  Your Honor, I would ask that the witness

4  be permitted to finish the answer.

5        THE COURT:  Well, I don't think that he was going to

6  say anything else.  But if he was, he's welcome to.

7  BY MR. BODNAR:

8  Q   Was there anything else that Dr. Couch -- we're just

9  talking about what he actually did?

10  A   No, sir.

11  Q   In your followup visits though, you mentioned seeing

12  someone you called Dr. Justin.  Do you remember saying

13  Dr. Justin during your direct examination?

14  A   Yes, sir.

15  Q   Who is Dr. Justin?

16  A   I think it's Dr. Justin Palmer.

17  Q   And did he tell you that he was a doctor?

18  A   I can't -- I can't recall.  I can't remember.  I assumed he

19  was.

20  Q   And during most of your subsequent visits it was Dr. Justin

21  that actually treated you; isn't that correct?  It was

22  Dr. Justin that came in the room and talked with you?

23  A   Yes, sir.

24  Q   You mentioned seeing Dr. Couch in the hallway and just at

25  various places in PPSA.  But in the exam room after that first

4614

1  visit, it was predominantly Dr. Justin; is that correct?

2  A   Yes, sir.

3  Q   I'm going to show you now what has been taken out of your

4  12-1(a), and this is a progress note.  Mr. Brown, this is that

5  progress note that you looked at before from June 17th, 2013,

6  where it says:  Patient states the meds are working well.

7         Do you recall if you would have said that to

8  Dr. Justin?

9  A   Yes, sir.

10 Q   And the meds that are working well at this time, would that

11 have been the baclofen, Roxicodone, Valium, and OxyContin?

12 A   Yes, sir, plus the -- I don't know why, I may not have

13 needed the Neurontin and Zanaflex at that time.

14 Q   At this time, though, you were not on Subsys when you said

15 your medications were working well?

16 A   No, sir, I was not, I don't think.

17 Q   You mentioned that Dr. Manchikes had put you on Subsys 100,

18 the lowest dose, several months earlier; is that correct?

19 A   Yes, sir, I think so.

20 Q   And now Dr. Justin, what level of Subsys did he put you on

21 here?

22 A   1200.

23 Q   Is that 12 times the strength of the 100?

24 A   Yes, sir.

25 Q   What did Dr. Couch -- not Dr. Justin -- what did Dr. Couch

BENJAMIN BROWN - CROSS BY MR. BODNAR

1   tell you about Subsys before you started taking this?

2   A   I don't recall.

3   Q   Were you aware that Dr. Couch wasn't even in the state on

4   June 17th, 2013?

5   A   No, sir.

6   Q   So you didn't see him during this visit, did you?

7   A   No, sir.

8   Q   Do you know if Dr. Justin had the ability to prescribe

9   Subsys or any other controlled substance?

10  A   I did not.  I don't know.

11  Q   Did you ever see him signing prescriptions for you?

12  A   Dr. Justin?

13  Q   Yes.

14  A   Yes, sir.

15  Q   Would he sign his name or Dr. Couch's name, or do you not

16  know?

17  A   I don't recall.  I thought it was his name.

18  Q   Did you ever see him sign a prescription for Subsys for

19  you?

20  A   I don't want to say yes or no, but I think so.

21  Q   Mr. Brown, from your file I'm showing you a prescription

22  for Subsys dated June 21st, 2013.  Do you recall if this was

23  approximately the time period of your first Subsys

24  prescription?

25  A   My first?

4616

```
1  Q   Your first -- sorry -- your first prescription after that
2  100 trial.
3  A   I'm -- I think so.  I'm not for sure, but I think so.
4  Q   But you don't know who signed this down at the bottom, do
5  you?
6  A   No, sir.
7  Q   And as you came back month after month, was it Dr. Justin
8  who you saw at PPSA?
9  A   Yes, sir.
10 Q   Did Dr. Couch come into the exam room and inspect you or
11 discuss your plan with you in the exam room?
12 A   No, sir.
13 Q   If you had questions about your prescription, then, would
14 you ask Dr. Justin?
15 A   Yes, sir.
16 Q   And would you come in roughly once a month for your
17 physicals and any prescriptions?
18 A   Yes, sir, sometimes.  And sometimes they would give me
19 refills.
20 Q   During those times can you please explain to the jury how
21 did your interactions go with Dr. Justin?
22 A   He was just asking me if my medicine was working well.
23 Q   Approximately how long were you in the room with
24 Dr. Justin?
25 A   Sometimes maybe five or 10 minutes, maybe.
```

4617

1   Q   I'm going to show you your exam note from January 13th,

2   2014.  Do you see your name at the top there, Mr. Brown?

3   A   Yes, sir.

4   Q   Do you see where it says history of present illness,

5   current treatment, and then it goes down to talk about your

6   physical examination?

7   A   Yes, sir.

8   Q   Do you recall in any of your examinations by Dr. Justin

9   having a light shined in your eyes to see if they were the

10  same, your pupils were the same?

11  A   No, sir.

12  Q   You don't remember or that didn't happen?

13  A   It didn't happen.

14  Q   How about feeling around on your neck and thyroid for any

15  masses?  Did Dr. Justin ever do that?

16  A   No, sir.

17  Q   Did Dr. Couch ever do that?

18  A   No, sir.

19  Q   January 30th of 2014, was this true that you had normal

20  gait and were able to stand without difficulty?

21  A   Say that again?

22  Q   On January 30th, 2014, is this true, that you had a normal

23  gait and were able to stand without difficulty?  (Indicating.)

24  A   That's false, no.

25  Q   Flipping to the second page on this, do you see who it was

4618

1    that signed on the 30th for your exam?  (Indicating.)

2    A   Yes, sir.

3    Q   And who is that?

4    A   Dr. Palmer.

5    Q   Do you see Dr. Couch's name listed anywhere on there?

6    A   No, sir.

7    Q   Mr. Brown, you came to PPSA with very serious injuries and

8    legitimate pain; isn't that correct?

9    A   Yes, sir.

10   Q   And did you come there because you understood it to be a

11   specialty, a pain specialist that could help you with your

12   pain?

13   A   Yes, sir.

14   Q   And did you expect to be treated by a specialist for your

15   pain?

16   A   Yes, sir.

17   Q   Who was it that treated you the majority of your time at

18   PPSA?

19   A   Majority of my time?

20   Q   Yes.

21   A   Dr. Palmer, Dr. Justin.

22          MR. BODNAR:  No further questions of this witness,

23   Your Honor.

24          THE COURT:  Any redirect?

25          MR. WILLSON:  I'll be very brief, Your Honor.

4619

```
 1              THE COURT:  All right.
 2                      REDIRECT EXAMINATION
 3   BY MR. WILLSON:
 4   Q   Mr. Brown, how often did you see Dr. Couch during your time
 5   in his care?  How frequently?  Was it every visit?
 6   A   No, sir.
 7   Q   Was it every other visit?
 8   A   Maybe, but sometimes longer than that.
 9   Q   Was it periodically?
10   A   Yes, sir.
11   Q   Do you know whether Justin Palmer is a medical doctor or
12   whether he is a certified registered nurse practitioner?  Do
13   you know?
14   A   I do not know.
15   Q   Did you call him Dr. Justin because he was in scrubs and
16   you were being polite?
17   A   Yes, sir.
18   Q   Do you have a nurse practitioner who sees you now?
19   A   That sees me now?
20   Q   Right.  Do you have a relationship with any nurse
21   practitioners that you know of right now?
22              MR. BODNAR:  Objection to relevance on this, Your
23   Honor.
24              THE COURT:  Sustained.
25   BY MR. WILLSON:
```

BENJAMIN BROWN - REDIRECT BY MR. WILLSON

1  Q   The prosecutor asked you, Mr. Brown, about your first

2  prescription of Subsys after that first one, when it was 1200

3  micrograms.  Do you remember that?  Did you have a discussion

4  with Justin Palmer or with Dr. Couch on that visit about why

5  that particular dosage was going to be prescribed?

6          MR. BODNAR:  And again, Your Honor, objection to being

7  one or the other.  We need to clarify who he had the discussion

8  with, if he did.

9          THE COURT:  Correct.

10          MR. WILLSON:  I'll try to break that out of the

11  question, Your Honor.

12  Q   Was it discussed with you about that dosage on that day?

13  A   Yes, sir.

14  Q   And by whom?  Who did you have that conversation with?

15  A   Dr. Justin.

16  Q   Okay.  And what did he tell you?

17  A   He said that I needed to be on a much higher dose of Subsys

18  because I was already on -- I was -- the pain medicine that I

19  was on was so high, that the lowest dose of Subsys would not --

20  would not -- would not help me.

21  Q   The prosecutor asked you about physical examinations.

22  Mr. Brown, is your pain pretty obvious, in your opinion?

23  A   Yes, sir.

24  Q   Okay.  And you said you didn't know one way or the other

25  whether Justin or Dr. Couch signed your prescriptions for

1   controlled medicines, including Subsys; right?  You didn't

2   know; is that right?

3   A   I didn't know.

4   Q   But you said Dr. -- you said Justin did prescribe you --

5   did sign on some prescriptions; is that right?

6   A   Yes, sir.

7   Q   And did I show you here on direct examination some of those

8   prescriptions --

9   A   Yes, sir.

10  Q   -- that were signed by Justin Palmer?

11  A   Yes, sir.

12  Q   And you don't know whether the times when you saw him sign

13  a prescription it was one of those or whether it was anything

14  else; is that right?

15  A   Right.

16  Q   Okay.  Mr. Brown, when you were prescribed that 1200

17  micrograms of Subsys, did that help your pain?

18  A   Yes, sir.

19  Q   Did it improve your activities?

20  A   Yes, sir.

21  Q   And are you in more pain now than you were then?

22  A   Yes, sir.

23  Q   Are you less active now than you were then?

24  A   Yes, sir.

25          MR. WILLSON:  That's all I have from this witness,

1  Your Honor.

2          THE COURT:  May this witness be excused?

3          MR. BODNAR:  Yes, Your Honor.

4          MR. WILLSON:  Yes, Your Honor.

5          THE COURT:  All right.  Thank you, Mr. Brown.

6          THE WITNESS:  Thank you.

7          THE COURT:  All right.  Ladies and gentlemen, we are

8  going to have our lunch recess now.  I'm going to put you in

9  recess until 1:30 because I have another matter to take up at 1

10  o'clock.  But be downstairs in the jury assembly room, ready to

11  be called back up, at 1:30.  No discussion about the

12  case.  Leave your pads on your chairs.  Thank you.  We're in

13  recess.

14      (A recess was taken at 12:01 p.m.)

15      (Afternoon session, 1:34 p.m., in open court, defendants

16  and jury present.)

17          THE COURT:  All right.  Ladies and gentlemen, I hope

18  you did not get soaked over the lunch hour.  It may well have

19  happened.

20          THE COURT:  All right, Mr. Essig.

21          MR. ESSIG:  Thank you, Your Honor.  Dr. Couch calls

22  Mr. David Riley.

23                      DAVID WAYNE RILEY

24            was sworn and testified as follows:

25          THE WITNESS:  I do.

1    THE CLERK:  Thank you, sir.  Please be seated.

2                      DIRECT EXAMINATION

3    BY MR. ESSIG:

4    Q    Good morning, sir.  If you would, please start by stating

5    your full name for the record and spell your last name, please.

6    A    David Wayne Riley, R-I-L-E-Y.

7    Q    And, Mr. Riley, what city and state do you currently reside

8    in?

9    A    Semmes, Alabama.

10   Q    Is that here in the Mobile area?

11   A    Yes.

12   Q    And, Mr. Riley, what do you do for a living?

13   A    I'm national commander of Disabled American Veterans.

14   Q    And what is the Disabled American Veterans?

15   A    It was the organization started by Congress over a hundred

16   years ago, close to a hundred years ago.  We advocate for

17   veterans.

18   Q    All right.  And you state you're currently the national

19   commander of that organization; is that correct?

20   A    Yes, sir.

21   Q    And what are your roles and responsibilities in that job?

22   A    I am the head of the organization.  So all decisions of

23   substance come to me.  And then, you know, we have a large

24   organization underneath us, chapters, departments, and national

25   service officers.

4624

1  Q   And, Mr. Riley, are you in fact a disabled veteran?

2  A   Yes.

3  Q   And what is the disability that you have?

4  A   I'm a quad amputee.

5  Q   Quad amputee?  Could you describe for us specifically what

6  that means?

7  A   My right leg is before -- or right below my knee amputated,

8  my left leg is amputated right below my knee, my left arm is

9  amputated below my elbow, and my right arm is amputated below

10  my elbow.

11  Q   And, Mr. Riley, you walked into the courtroom here today.

12  How is it that you are able to ambulate and get around?

13  A   Prosthetics.

14  Q   And if you could, describe for the jury or tell us exactly

15  when did your injuries occur?

16  A   Summer of '97.

17  Q   And were you on active duty at that point in time?

18  A   Yes.

19  Q   And, Mr. Riley, what branches of service have you served

20  in?

21  A   Army and Coast Guard.

22  Q   At the time that you suffered your injuries, which branch

23  of service were you in?

24  A   Coast Guard.

25  Q   And what was your job with the Coast Guard?

4625

1    A    I was a rescue swimmer, and helicopters.

2    Q    And again, if you can describe for the jury how your

3    injuries came about that led to your amputations?

4    A    I incurred a bacterial infection through my sinuses.  The

5    term is "septic."  Got gangrene.  It went into DIC,

6    disseminated intravascular coagulation, where all your blood

7    goes to your vital organs and cuts off your extremities.  So I

8    got gangrene and lost my extremities.

9    Q    And, Mr. Riley, I'm sorry.  Can you lean a little bit

10   closer to your microphone?  I'm having a little bit of a tough

11   time hearing you.

12   A    (Complying.)

13   Q    And again, you stated that you got some sort of bacterial

14   infection; is that right?

15   A    Yes.

16   Q    And how is it that you got the bacterial infection again?

17   A    It came in through my sinuses, got into my blood system,

18   got through my spleen and turned me septic.  I went into septic

19   shock.

20   Q    Were you in a body of water when you got the virus?

21   A    Many bodies of water around the area (nodding head

22   affirmatively).

23   Q    Okay.  All right.  So it was not a single event; is that

24   right?

25   A    Probably not.

4626

 1  Q   Describe for us what happened after the infection set in.

 2  A   I went into a coma.  And I was in Providence for 30 days.

 3  They medivacked me out of here to Brooke Army Medical, I was in

 4  Brooke for 30 days.  Then I came back to Bedsole Rehab for 30

 5  days.

 6  Q   And you said you started off at Providence Hospital.  Is

 7  that in Mobile here?

 8  A   Yes.

 9  Q   And when you were in the Coast Guard, at that time were you

10  stationed in the Mobile area?

11  A   Yes.

12  Q   Do you know how long you were at Providence Hospital?

13  A   About 30 days.

14  Q   And then you went, you said, to Brooke Army Medical Center;

15  is that correct?

16  A   Yes.

17  Q   And, Mr. Riley, what was the total period of time that you

18  were hospitalized after your infection?

19  A   About 90 days.

20  Q   And during the course of that hospitalization, is that when

21  the amputation surgeries occurred?

22  A   Amputee -- amputations occurred probably eight days after I

23  went into the coma.

24  Q   What was the treatment that you received then when you went

25  to Brooke Army Medical Hospital?

DAVID WAYNE RILEY - DIRECT BY MR. ESSIG

1   A   Well, you know, the bacteria had -- it was scabs all over

2   my body.  I had -- I was at the burn center of Brooke and went

3   through burn center treatments, Silvadene and washes and stuff.

4   Q   Why did you get treated by the burn unit?

5   A   Because the bacteria kind of bubbled up out of my body and

6   it -- I have a scars all over my body from the bacteria.

7   Q   And did it actually cause burns on your skin?

8   A   It looked like burns, bubbles (nodding head affirmatively).

9   Q   And does it present with the same symptoms as a burn?

10  A   Yes.

11  Q   Is that correct?  And was the treatment that you received

12  at the burn unit, was it consistent with other burn patients,

13  the type treatment they were getting?

14  A   Yes.  Silvadene is what cured it.  I was infected.

15  Q   And so when you were discharged from Brooke Army Medical,

16  how were you treated after that time?

17  A   Well, they medivacked me back here to ATC Mobile, Coast

18  Guard base.  They brought me in a ambulance over to Bedsole

19  Rehab in Mobile Infirmary to check me in, and then I was there

20  for 30 days.  And they brought me from off my back to a

21  wheelchair, by the time I got out.

22  Q   What was the rehab treatment that you went through?

23  A   Occupational therapy, PTs, OTs.

24  Q   When you say PT, is that physical therapy?

25  A   Physical therapy, yes.

4628

1   Q   When you say OT, is that occupational therapy?

2   A   Occupational, yes.

3   Q   And how long of a period of time did you go through that

4   type of treatment?

5   A   30 days.

6   Q   And at some point in time did you begin to see Dr. Patrick

7   Couch here in Mobile?

8   A   Yes.

9   Q   And do you recall about when that treatment would have

10  begun?

11  A   It was after the hospital.  I don't -- don't know the exact

12  date.  Sorry.

13  Q   And do you know which provider it was that actually

14  referred you to Dr. Couch?

15  A   The VA.

16  Q   It was the VA hospital?

17  A   Yes.

18  Q   Was it your doctor there at the VA?

19  A   Yes.

20  Q   And what was the purpose that you were referred to

21  Dr. Couch for?

22  A   Pain management.

23  Q   At that point in time, Mr. Riley, had you been undergoing

24  any pain management or treatment for your pain from the doctors

25  you had been seeing?

DAVID WAYNE RILEY - DIRECT BY MR. ESSIG

4629

1    A    Yes.

2    Q    And what type of pain management treatment had you

3    received?

4    A    Well, they were prescribing fentanyl patches and I think --

5    well, first it was OxyContin, I think.

6    Q    Oral medication?

7    A    Yes.

8    Q    OxyContin?

9    A    Oral.

10   Q    And then you stated fentanyl patches; is that right?

11   A    Yes.

12   Q    And did the patches work by -- you just placed those on

13   your body?  Is that correct?

14   A    Yes.

15   Q    And do you know if the fentanyl patches were something that

16   slowly released the medicine throughout the period of time?

17   A    Over a period of a couple of days, yes.

18   Q    What type of pain did you have associated with your initial

19   injuries?

20   A    Well, I had what they call phantom pain.  So the burn.  The

21   scars all over my body felt like burns still.

22   Q    Okay.

23   A    And my -- all my limbs burned and I have stabbing pains

24   like somebody's stabbing me (indicating).

25   Q    And when you say phantom limb pain, can you tell us what

1   that means?

2   A   It's pain where you cannot get to the limb to rub it or

3   help it.  It's in the limb that was there.  I can still wiggle

4   my toes and wiggle my fingers, but --

5   Q   Psychologically you feel like they're still there?

6   A   Yeah, and physically I feel like it's still there too.

7   Q   And so your initial treatment would have been for the

8   burn-type injuries from the bacteria and then also the phantom

9   pain; is that fair to say?

10  A   Yes.

11  Q   And, Mr. Riley, do you continue to be a pain management

12  patient to this day?

13  A   Yes.

14  Q   Your phantom limb pain, has that ever gone away?

15  A   No.

16  Q   And can you describe for the jury what that pain is like?

17  Is there a way to describe that so they can understand?

18  A   Well, I guess if you would put your hand in a pot of

19  boiling water, you would kind of understand what it feels like.

20  And then the stabbing pain is like somebody taking a knife and

21  going all the way to the bone (indicating).

22  Q   Mr. Riley, if you had been treated for pain management by

23  the VA in your initial treatment, why was it that you ended up

24  going to Dr. Couch at PPSA?

25  A   The VA figured it was chronic, I was going to need pain

4631

1  management.  So they farmed me out to a pain management doctor.

2  Q   And do you remember what year it was that you began to see

3  Dr. Couch?

4  A   Early in -- got to be around 2000, maybe '99, I'm

5  thinking.  I don't really know the date, sir.

6  Q   And did you continue to see Dr. Couch from that time until

7  May of 2015, when his practice was shut down?

8  A   Yes.

9  Q   When you first went to see Dr. Couch, how did he address

10  your pain situation?

11  A   Well, I had already been through a bunch of other doctors.

12  And by the time that I made it to Dr. Couch, he took me and he

13  managed my pain by first -- we went through some different

14  medications, I don't remember what they were, until we found

15  that the fentanyl worked.

16  Q   And when you say the fentanyl, prior to Dr. Couch, if I

17  understand correctly, you were on fentanyl Duragesic patches;

18  is that right?

19  A   Yes, in the hospital.  And, then, I think they had gotten

20  me off, to OxyContin after the hospital, and then -- yeah.

21  Q   Okay.  And so did Dr. Couch prescribe you Duragesic

22  patches?

23  A   Yes.

24  Q   And was that able to resolve the pain conditions that you

25  were having at that point in time?

4632

1    A    To where I could sleep (nodding head affirmatively).

2    Q    At some point in time did he prescribe you some additional

3    fentanyl products?

4    A    Yes.

5    Q    And what were those products?

6    A    For breakthrough pain.  They were like -- I went through a

7    range of different ones starting with, I think, suckers.

8    Q    And do you know if the suckers -- were those called Actiq?

9    A    Yes.

10   Q    And describe for the jury how the suckers -- how those

11   worked?

12   A    It's in a foil or plastic container and you rip it open and

13   then it's a plastic lollipop, and you just put it in your

14   mouth.

15   Q    Mr. Riley, when you first came to see Dr. Couch, were you

16   having issues other than just your pain management problems?

17   A    Yes.

18   Q    And were those issues that were related to your pain?

19   A    Yes.

20   Q    What other issues were you having?

21   A    I was going to mental health in the VA.

22   Q    And did you continue to do that when you saw Dr. Couch?

23   A    No.  I went to Dr. Couch only.

24   Q    And why is it that you quit going to mental health after

25   you began seeing Dr. Couch?

4633

1  A   Probably the most -- largest reason is that they were

2  prescribing Klonopin for me.

3  Q   That's right.  I apologize.  But you have to stay close to

4  your mic.

5  A   Probably -- probably the largest reason was that they were

6  prescribing Klonopin to me.  And they were prescribing a lot of

7  different stuff and I didn't want any of that.  So Dr. Couch

8  took over prescribing my Klonopin, and Justin Palmer.

9  Q   When you initially got the Actiq, the fentanyl lollipops,

10  how was that -- was the process of how to use those, was that

11  explained to you?

12  A   Yes.

13  Q   And who gave you that explanation?

14  A   Both Dr. Couch and Justin.

15  Q   And what was the description that they gave you on the use

16  of that medication?

17  A   Use it like it's prescribed.

18  Q   Which was how?

19  A   Well, a patch every 48 hours -- I think they go out to 72,

20  but it only worked for 48 for me -- and the suckers, and then

21  Klonopin when I needed it.

22  Q   And how often were you told to take the suckers that you

23  were taking?

24  A   I was prescribed four a day.

25  Q   And was that something you took as needed or was it

1   designated as four times a day?

2   A   It was designated as four times a day.  As needed,

3   yeah.  As needed.  I get four a day, as needed.

4   Q   And did at some point in time either Dr. Couch or

5   Mr. Palmer give you a prescription of off-label use of

6   medications?  Was that discussed with you?

7           MR. BODNAR:  Objection, Your Honor --

8   A   Yes.

9           MR. BODNAR:  -- to asking -- again, it was one or the

10  other.  We need to clarify if it was Dr. Couch or Justin

11  Palmer.

12          THE COURT:  Yes.

13          MR. ESSIG:  Your Honor, I asked either.  The witness

14  can clarify which one it was.

15          THE WITNESS:  Of what?

16  BY MR. ESSIG:

17  Q   At some point in time was there a discussion about

18  off-label use of medicines for you?

19  A   Yes.

20  Q   And who had those discussions with you?

21  A   Both Dr. Couch and Justin.

22  Q   Was that something they did together or was that something

23  that they did --

24  A   Separately.

25  Q   -- separately?  Now, Mr. Riley, in the time that you were

4635

```
1    seeing Dr. Couch, was Mr. Palmer primarily your nurse
2    practitioner?
3    A    Yes.
4    Q    And were there any other nurse practitioners that you saw?
5    A    Sometimes Justin wasn't there and I would see somebody
6    else.  But I don't remember any of those people.
7    Q    And was your care typically handled collaboratively between
8    Mr. Palmer and Dr. Couch?
9    A    Yes.
10   Q    Would you see Dr. Couch every time you visited PPSA?
11   A    Just about (nodding head affirmatively).  Yeah.
12   Q    Were there ever occasions that you only saw Justin?
13   A    There were a few, yes.
14   Q    Describe for the jury an occasion, an office visit, where
15   you would only see Justin Palmer?
16   A    Well, you know, we would go in, I'd have an appointment
17   time and I'd have to go in and sit and wait until they called
18   me in.  And he would call me in, do whatever tests he needed,
19   talk to me, write my prescriptions.  Well, he had to bring
20   them, I think, to Dr. Couch.  Or I think he might have been
21   signing them for a while.
22   Q    Okay.
23   A    And then that was it.
24   Q    And with your visits with Dr. Couch, when you first started
25   seeing him, how often or what was the period at which you had
```

1   followup visits?

2   A   When I first saw him, it was every 30 days.

3   Q   And did that change at some point in time?

4   A   Yes.

5   Q   And what did it change to?

6   A   Every 60 days.  And then for -- and then when I got off

7   everything, every 90 days, I think, something like that.

8   Q   When you initially went to Dr. Couch and when you were

9   initially prescribed Actiq as a breakthrough fentanyl product,

10  at some point in time did it become necessary to change the way

11  that particular medicine was being prescribed to you?

12  A   Yes.

13  Q   And what was it that led to that change?

14  A   Well, I was having problems with a different -- with the

15  patches and stuff, getting them open.  And then I had some

16  problems with my -- my insurance wouldn't pay for one of them,

17  I think, and we had to switch or something.

18  Q   Okay.  And was there at some point in time were you having

19  a problem with your teeth because of the sugar --

20  A   Yes.

21  Q   -- in the lollipops?

22  A   Yes.  They made my teeth all go away because there was

23  sugar in them and I was using them to sleep and the sugar,

24  while you're sleeping, destroys all your teeth.

25  Q   Once you had that problem with the sugar, did PPSA make an

 1  adjustment to --

 2  A   Yes.

 3  Q   -- your Actiq prescription?  What kind of adjustment did

 4  they make?

 5  A   We went to a compounding pharmacy and made sugarfree

 6  lollipops.

 7  Q   And who sent you to that pharmacy?

 8  A   I found the pharmacy.

 9  Q   Okay.  And did you let Dr. Couch know that you were -- that

10  you needed to get those compounded sugarfree prescriptions?

11  A   Yes.

12  Q   And where was the pharmacy that you were going to at that

13  point in time?

14  A   Over to the other side of the bay.

15  Q   And how far of a drive was that for you from your residence

16  in Semmes to --

17  A   About an hour, hour and a half.

18  Q   At some point in time, Mr. Riley, did you express to

19  Dr. Couch and to Justin some concerns with the level of

20  medication you were taking?

21  A   Yes.

22  Q   And what was the concern that you expressed to them?

23  A   I was losing parts of the day, having problems remembering

24  things.

25  Q   And when you say losing parts of the day, can you describe

4638

1   for us what you meant by that?

2   A   I had become -- I had risen to such a high dosage that meds

3   were messing with my consciousness.  You know, I wasn't

4   conscious for periods of the day.

5   Q   And you said that the medicines had risen to such a

6   level.  Do you know why your prescription dosages got so high?

7   A   Because it's the natural course of meds.  You know, you

8   have to -- they'd only work for so long, then you have to raise

9   the dosage.  Over the course of many years the dosage got high.

10  Q   And at that point in time that you brought this to PPSA's

11  attention, were you taking --

12           MR. BODNAR:  Objection, Your Honor, to PPSA's

13  attention.  We need to know who it was he was talking to here,

14  not the practice itself.

15           MR. ESSIG:  And, Your Honor, I will -- for each of

16  these lines of questions, I will get to that question of who he

17  talked to.  I'm trying to just lay some foundation.

18           THE COURT:  All right.

19  BY MR. ESSIG:

20  Q   When you initially raised the issue that you believed you

21  were having problems with your medications because you were

22  losing portions of the day --

23  A   (Nodding head affirmatively.)

24  Q   -- were you taking or using both Duragesic and the Actiq

25  product at that point in time?

1    A   Yes.

2    Q   Who did you have the discussion with about your

3    medications, your dosages being too high?

4    A   First Justin, then Dr. Couch.

5            THE COURT:  Is this in evidence?

6            MR. ESSIG:  Your Honor, I'm actually going to move

7    this into evidence.  We've got what is Mr. Riley's medical

8    file.  A portion of it is in evidence.  It's only the Greenway

9    file.  That begins in August of 2012.  Your Honor, Dr. Couch

10   would move to admit the remainder of his file that begins

11   January of 2011 until August of 2012 and, Your Honor, we will

12   mark that as Couch Exhibit 46B and offer that at this time.

13           THE COURT:  Any objection?

14           MR. BODNAR:  No objection for the 2011 portion of it,

15   Your Honor.

16           THE COURT:  All right.  Mark it in.

17        (Defendant Couch's Exhibit 46B was entered into evidence.)

18           MR. ESSIG:  All right, Mr. Riley.  And, Your Honor,

19   could we publish it to the jury?

20           THE COURT:  Pardon me?

21           THE CLERK:  They should be seeing it now.

22   BY MR. ESSIG:

23   Q   Mr. Riley, I'm showing you an office visit note or a chart

24   progress note.  And that's your name there at the top; is that

25   right?  David Riley; is that correct?

4640

1   A   Yes.

2   Q   And do you see the date there, October 3rd of 2011?

3   A   Yes.

4   Q   Now, what I want to show you, Mr. Riley, if you look down

5   this middle part where we're zoomed in, do you see that first

6   yellow line I just made there?

7   A   Yes.

8   Q   And I don't know if you can read that or not.  But do you

9   see where it says:  Has not taken any meds times three days; is

10  that correct?

11  A   Yes.

12  Q   And it says here:  Patient states losing parts of day and

13  not remembering things.

14          Is that accurate?  Is that what you would have told --

15  A   Yes, sir.

16  Q   -- Mr. Palmer and Dr. Couch?  Is that correct?

17  A   Yes.

18  Q   And it says here that you -- can you make out what that

19  line says?  (Indicating.)

20  A   Something lame --

21  Q   Does it look like:  Long discussion about Suboxone?

22  A   Yes.

23  Q   And, Mr. Riley, do you remember having that discussion with

24  Dr. Couch and Mr. Palmer?

25  A   Yes.

DAVID WAYNE RILEY - DIRECT BY MR. ESSIG

1   Q   And what is Suboxone?

2   A   It aids in getting off narcotics.

3   Q   And do you recall the discussion you had with Mr. Palmer

4   and Dr. Couch about Suboxone?

5   A   Yes.

6   Q   And what was the discussion you had?

7   A   That I would use that to get off of everything.

8   Q   And was there a specific discussion about needing to wean

9   you off of your medications?

10  A   Yes.

11  Q   And at the end of this particular visit, or the first time

12  you discussed Suboxone, did you get a Suboxone prescription?

13  A   Yes.

14  Q   Now, Mr. Riley, this is, for the record, 46B-464.  And,

15  Mr. Riley, is that your name there at the top of this document?

16  A   Yes.

17  Q   And do you see where it states:  Suboxone and Subutex

18  appropriate use checklist?

19  A   Yes.

20  Q   And, Mr. Riley, do you remember specifically them going

21  over this form with you?

22  A   Yes.

23  Q   And there's a signature there at the bottom of that page,

24  Mr. Riley, and --

25  A   There's a patient name up at top.  That's not my signature

DAVID WAYNE RILEY - DIRECT BY MR. ESSIG

 1   at the bottom, but --

 2   Q   Do you know if that's Justin Palmer's signature?  Or do you

 3   know one way or the other?

 4   A   It looks like it, I guess.  J.P., yeah.

 5   Q   Now, Mr. Riley, do you recall how long it was that you took

 6   Suboxone to wean off of the high doses of medication you were

 7   on?

 8   A   Around 30 days, around a month.

 9   Q   And do you recall if there was a time that you went back on

10   Roxicodone?

11   A   Yes.

12   Q   And again, do you remember how long that was after you were

13   weaned off of the medications?

14   A   A couple of years.

15   Q   And so you said there was a period of a couple of years

16   where you weren't taking any, any controlled substances?

17   A   Maybe over a year.  I don't know the exact time, but yes.

18   Q   All right.  And whether the time frame was exactly right

19   are not, you're just saying there was a period of time that you

20   had taken the Suboxone and you weren't taking any opioids; is

21   that right?

22   A   Right.

23   Q   What kind of medicines were you taking during that, that

24   interval?

25   A   A lot of Motrin and I really don't recall.

4643

1  Q   Was Dr. Couch prescribing you some medications for some

2  other health issues you were having?

3  A   Yes.

4  Q   What kind of things, what kind of issues were you having

5  and what kind of prescriptions was he giving you?

6          MR. BODNAR:  Your Honor, could we ask for a time

7  period here?  He had mentioned it was a few years in between,

8  and we don't know at what point he's discussing prescribing

9  these at this time.

10         THE COURT:  Well, that's subject to cross.  So --

11         MR. ESSIG:  Yes, ma'am.  And I will clarify.

12 Q   Mr. Riley, if your medical records reflect that you got the

13 first Suboxone in October of 2011 and that you didn't take any

14 opioids, but that you got prescribed new opioids in April of

15 2012, you got a new Roxicodone prescription --

16 A   Okay.

17 Q   -- would you have any reason to disagree with that?

18 A   No.  It was probably for when I needed it.

19 Q   And you would agree with me that's about -- that's about a

20 six-month period from October to April 2012?

21 A   Okay.

22 Q   So a little bit shorter than you thought?

23 A   Okay.

24 Q   But in the time period that you were not taking any

25 opiates, were you continuing to get prescriptions from

 1   Dr. Couch?

 2   A   Yes, until the accident.

 3   Q   What were some of the conditions that he was treating you

 4   for that point of time?

 5   A   I was getting sleep medications to help me sleep, and

 6   testosterone.  I can't remember any of the other ones.

 7   Q   Were you getting some nerve medication from him?

 8   A   Yes, yes.

 9   Q   And --

10   A   Oh, yeah, Lyrica.

11   Q   And at some point in time were you prescribed some

12   antidepressants?

13   A   Yes.

14   Q   And, Mr. Riley, all of those conditions and those

15   medications you received, were those all treating conditions

16   related in some way to your pain?

17   A   Yes.

18   Q   Now, Mr. Riley, was there a point in time that you began to

19   get prescriptions, breakthrough fentanyl medications, from

20   Dr. Couch again?

21   A   Yes.

22   Q   And do you recall about when that happened?

23   A   Right after my accident.

24   Q   And you say your accident.  Can you tell the jury what

25   you're referring to there?

4645

1  A  I had a head-on accident on Moffett Road.

2  Q  How did your accident occur?

3  A  I came out of my driving ring to turn my lights on and was

4  headed on the way back.  And it had zero effort steering --

5  just right into oncoming terrific.  Didn't even have a second.

6  We both hit at 50.

7  Q  You hit another car?

8  A  (Nodding head affirmatively.)

9  Q  You said at 50 miles an hour; is that right?

10  A  Yes (nodding head affirmatively).

11  Q  And did you suffer some additional injuries as a result of

12  that accident?

13  A  Yes.  I -- I sheared off my -- all my prosthetics, it broke

14  my -- fractured -- exploded my femur.  And I had some other

15  things, facial stuff and --

16  Q  And you said it exploded your femur.  Do you remember if

17  that was the right or the left?

18  A  Right femur.

19  Q  Obviously, I would assume you got some medical treatment

20  for that?

21  A  Yes.

22  Q  Who was the primary treating doctor as a result of that

23  accident?

24  A  Orthopedic Group.

25  Q  And did they refer you to Dr. Couch or did you just

1   continue to see Dr. Couch?

2   A   I continued to see Dr. Couch.

3   Q   And did you see Dr. Couch and Justin Palmer after you had

4   that accident?

5   A   Yes.

6   Q   And can you describe for us how that visit went?

7   A   Well, you know, I was right out of the hospital.  I still

8   had a wheelchair.  They had put metal in my leg to rebuild it

9   and I needed to go back on some kind of pain management.

10  Q   And did your pain increase --

11  A   Yes.

12  Q   -- as a result of that?

13  A   My whole body changed.

14  Q   Did they put a rod in your leg?

15  A   Yes.

16  Q   Is that one of the treatments that you received?

17  A   Yes.  And then the rod went bad and they had to take it

18  back out.

19  Q   What kind of pain complications did you have as a result of

20  that accident?

21  A   In addition to the phantom, I had a fractured femur and a

22  lot of pain with that.  I mean, there was just -- it was a

23  different kind of pain.  But --

24  Q   Mr. Riley, I'm going to show you another portion of your

25  medical record.

1          MR. ESSIG:  And, Your Honor, for the record, this
2    would be part of the Government's exhibit.  And I don't know
3    the exhibit number.
4          THE CLERK:  12-1(h).
5          MR. SHARMAN:  This would be a portion, Your Honor, of
6    12-1(h).
7          THE COURT:  All right.
8    BY MR. ESSIG:
9    Q   Mr. Riley, do you see that on this chart the date of the
10   visit is April 16th of 2013; is that correct?
11   A   Yes.
12   Q   And that would have been -- would that have been shortly
13   after your -- after your accident?
14   A   Yes, I guess.
15   Q   And do you see here in the notes?  And it talks about a --
16   do you see here it says:  A fracture of the right knee and
17   hardware?  Do you see that in the note?
18   A   Yes.
19   Q   Now, that's a fairly short note for this visit.  Do you
20   recall if your conversations with Mr. Palmer and Dr. Couch --
21   how extensive they were during this visit?
22   A   Yeah.  You know, we had gotten off everything and now we
23   had to go back on it.  And it was a tough conversation, yeah.
24   Q   And you say a tough conversation.  In what way was it a
25   tough conversation?

4648

1    A   We came to the conclusion that there was no choice in the

2    matter on --

3    Q   Was there a discussion with you about the risk of going

4    back on opioid medications?

5    A   Yes.

6    Q   Did y'all specifically discuss you being prescribed some

7    breakthrough pain fentanyl products?

8    A   Yes.

9    Q   And did y'all talk about the risks of those?

10   A   Yes.

11   Q   And did you, after this visit, get a new prescription for

12   some breakthrough fentanyl?

13   A   Yes.

14   Q   Now, Mr. Riley, I think you had stated before that at some

15   point in time with the Actiq or the suckers or the compound

16   suckers that there was a problem with your insurance covering

17   those?

18   A   Yes.

19   Q   Is that right?

20   A   Yes, I think so.

21   Q   And do you recall, as a result of this visit, being

22   prescribed a TIRF drug or a breakthrough fentanyl product

23   called Subsys?

24   A   Subsys?

25   Q   Yes.

1    A    Yes.

2    Q    Now, Mr. Riley, again, do you see this is an office visit

3    of May 20th of 2013?  Is that right?

4    A    Yes.

5    Q    And so is this visit just a month after that April of 2013

6    visit?

7    A    Yes.

8    Q    And at this point in time for you, that was sooner than

9    your normal followup period; is that right?

10   A    Yeah, well, yes.

11   Q    Why, why was that?

12   A    Well, it was still acute, pretty --

13   Q    You say acute.  What are you referring to?

14   A    I was still healing and having a lot of problems with my

15   surgeries and stuff.

16   Q    And do you see here in the note reference to your right

17   femur fracture and then it says hardware, and then a down arrow

18   and ROM?  Do you know what that means?

19   A    No.

20   Q    Were you having a decreased range of motion?

21   A    Oh, yeah.  I can't bend the knee more than 30 degrees.

22   Q    And, Mr. Riley, if you'll look down at the bottom here?  Do

23   you see where it says add medications, do you see that says

24   Subsys 800?

25   A    Yes.

4650

1    Q    And you understand that dosage to be 800 micrograms?

2    A    Yes.

3    Q    And do you see also there that there's a down arrow next to

4    the word R-O-X-I?

5    A    Yes, that's when they stopped the roxies.

6    Q    Did they stop them or did they just decrease them?

7    A    Well, yeah, maybe decreased them.  I'm sorry.

8    Q    Mr. Riley, why during this visit did you request to go back

9    to a breakthrough fentanyl product?

10   A    Because I knew it would work.

11   Q    And when you say you knew it worked, how was your pain at

12   this point in time?  Could you manage it?

13   A    I was having -- I couldn't sleep at all and I was having

14   bad days, really bad days and really bad nights.  And so I

15   needed something to knock it out.

16   Q    Mr. Riley, I also want to show you on this document there's

17   a list of your current medications that you were taking.  Do

18   you see that?

19   A    Yes.

20   Q    And does this accurately reflect all the medications you

21   were taking when you came in on that day?

22   A    It looks familiar, yes.

23   Q    And we saw that your Roxicodone was decreased.  Is that

24   right?

25   A    Yes.

4651

DAVID WAYNE RILEY - DIRECT BY MR. ESSIG

1  Q   And we saw where they added the Subsys for you; is that

2  correct?

3  A   Yep.

4  Q   Did you continue to take all of these medications after you

5  were prescribed the Subsys?

6  A   I think we stopped the testosterone after a while.

7  Q   But the remaining medications would have been ones you

8  would have taken?

9  A   Yeah.  We might have stopped the Lunesta after a while

10  too.  I don't remember.

11  Q   And, Mr. Riley, is Lunesta a sleep medication?

12  A   Yes.

13  Q   And are you saying that your pain was to the extent at this

14  point that even with the sleep medication you couldn't sleep?

15  A   Right.

16  Q   Did that change after you began adding Subsys to your

17  medicine routine?

18  A   Yes.

19  Q   Mr. Riley, we talked about when you mentioned to Justin

20  Palmer and Dr. Couch that there was a period where you were

21  losing portions of your day.

22  A   Yes.

23  Q   Did you get to the point to where you could function while

24  taking these breakthrough fentanyl products?

25  A   Yes.

DAVID WAYNE RILEY - DIRECT BY MR. ESSIG

1  Q   Could you function taking the breakthrough fentanyl

2  products along with the other medications you were taking?

3  A   Yes.

4  Q   How did you get to the point you could do that?

5  A   After many years of taking pain meds, you learn how to

6  manage them, take pain, pain holidays -- I mean med holidays,

7  things like that to manage the dosages.

8  Q   Did you do that on your own or did you do that in

9  consultation with Justin Palmer and Dr. Couch?

10 A   After speaking with them, yes, I did it pretty much -- I

11 didn't have a prescription to do it or anything, no.

12 Q   What kind of things did they tell you to do in order to

13 learn to manage and be active while taking this level of

14 medication?

15 A   What kind of things did they do?

16 Q   What kind of things did they tell you to do?  What kind of

17 things did they talk about with you?

18 A   Just, you know, that dosages tend to climb over the years

19 and to be watchful and mindful of the fact that that happens

20 and not to increase or take more if you think that you're in

21 more pain.  Or take it according to how it's prescribed.  And

22 then I'm not sure if he told me about the pain holidays or the

23 med holidays, but I think I kind of learned on my own maybe

24 that you just have to reduce your dosages for a while and go

25 through a bad week to make sure that your dosage -- your meds

1    don't climb all the time.

2    Q   Mr. Riley, did your treatment by Dr. Couch and your

3    prescriptions for breakthrough fentanyl products, did they help

4    you?

5    A   Yes, certainly.

6    Q   Describe to the jury how they helped you.

7    A   You know, there was a time period in my life that I would

8    have not hung around if I didn't have some way out of the

9    pain.  Dr. Couch helped me with that.

10   Q   And specifically did the breakthrough fentanyl products

11   help you with that?

12   A   Yes.

13   Q   What kind of things were you able to do in your life after

14   you began taking the breakthrough fentanyl products?

15   A   I got my bachelor's and master's degree in computer

16   science, started Gulf Coast Technical Services.

17   Q   You say Gulf Coast Technical Services.  Was that your

18   business?

19   A   Yes.

20   Q   And how are you able to operate a business on this level of

21   medication?

22   A   I -- I'm not sure I can answer that question.  I just did

23   it.

24   Q   Could you have operated your business without the

25   medication you were being prescribed by Dr. Couch?

4654

1  A   No.

2  Q   Mr. Riley, you mentioned that there came a point in time

3  where you were not seeing Dr. Couch every 30 days; is that

4  right?

5  A   Yes.

6  Q   And you went to intervals of -- did you say a couple of

7  months or three months?  I can't remember.

8  A   A couple of months.

9  Q   And how would you get your prescriptions for a two-month

10  period when you went to see Dr. Couch?

11  A   Typically I would go in and have to go through a face to

12  face and then they write the prescriptions.  First I would go

13  across the bay to get my meds until C&R opened, and then I

14  could just get everything right there.

15  Q   And was that more convenient for you, being able to go to

16  C&R Pharmacy?

17  A   Much more.

18  Q   Did anybody ever tell you that you had to go to C&R

19  Pharmacy?

20  A   No.

21  Q   And, Mr. Riley, is it true that you were prescribed both

22  Subsys and Abstral?  Is that correct?

23  A   Abstral?

24  Q   It's a product, a pill you place under your tongue?

25  A   Oh, yes, yes.

4655

1    Q    And, Mr. Riley, were there multiple changes to the

2    medication, that would be the way you would take it?  Were

3    there multiple changes to that?

4    A    Yes.

5    Q    And why were those changes made?

6    A    I was having a lot of problems with delivery.  And, you

7    know, we went from the suckers to the -- I think the suckers, I

8    couldn't get any more with insurance.  And then we went to

9    other forms, sprays and pills.  They all were hard to

10   open.  Pills would crush before I could get them to my mouth

11   and just all those different problems.

12   Q    Do you remember Subsys being a spray delivery system?

13   A    Yes.

14   Q    And did you have problems with that too?

15   A    Yes.

16   Q    What were the problems that you had with the spray?

17   A    My wife had to open them and spray them.  I couldn't do it

18   myself.

19   Q    Did the sprayers always work?

20   A    Not really.  Sometimes they dribbled a little.

21   Q    And, Mr. Riley, when did you stop being prescribed

22   breakthrough fentanyl products?

23   A    When I went to go get my meds and they said I couldn't

24   because he was shut down.

25   Q    And that was after the place got shut down after the raid,

DAVID WAYNE RILEY - DIRECT BY MR. ESSIG

```
 1   is that your understanding?
 2   A   Yes (nodding head affirmatively).
 3   Q   And, Mr. Riley, so today are you being prescribed any type
 4   of fentanyl at all?
 5   A   Yes.
 6   Q   And is that Duragesic patches?
 7   A   Yes.
 8   Q   And was your pain better with or without the breakthrough
 9   fentanyl products?
10   A   My pain is better with them.  But I don't get breakthrough
11   any more.
12   Q   And how is it that you stopped having breakthrough pain?
13   A   I'm sorry.  I didn't hear you.
14   Q   You said you don't get breakthrough any more.  How is it
15   that your breakthrough pain stopped?
16   A   Well, I don't get fentanyl breakthrough stuff.  They
17   prescribe me Roxicodone for breakthrough.
18   Q   Does the Roxicodone work as well?
19   A   No.
20   Q   As the breakthrough products?
21   A   No.
22           MR. ESSIG:  Just a moment.
23           Pass the witness, Your Honor.
24           THE COURT:  All right.  Mr. Bodnar?
25                         CROSS EXAMINATION
```

DAVID WAYNE RILEY - CROSS BY MR. BODNAR

```
 1    BY MR. BODNAR:
 2    Q   Good afternoon, Mr. Riley.  My name's Chris Bodnar, and I
 3    represent the United States.  Now, I know you've been treated
 4    by Dr. Couch at PPSA for a very long period of time; is that
 5    correct?
 6    A   Yes.
 7    Q   Starting back in about 2001?
 8    A   I guess, yeah (nodding head affirmatively).
 9    Q   We want to focus your attention, though, to the time period
10    from 2013 forward.  In fact I'm going to show you the same
11    progress note from May 20th, 2013, that you just looked at with
12    defense counsel.  And do you recall just looking at this --
13    A   Yes.
14    Q   -- with defense counsel from May 20th 2013?
15    A   Yes, sir.
16    Q   And do you recall, was this shortly after the accident that
17    you described?
18    A   Yes.
19    Q   And in reading the objective stuff, this first line was not
20    read.  Does that say:  Patient states pain is stable with meds?
21    Or on meds?
22    A   Patient states -- I don't know what that word is, the
23    R.  And then it says stable, and then some symbol, and meds.
24    Q   Were you stable on the meds at this point, the Intermezzo,
25    the Lunesta, Roxicodone, testosterone, and the Duragesic?
```

1  A  Yes.

2  Q  Despite being stable, there was an addition of Subsys 800;

3  is that correct; at this visit?

4  A  Yeah.  He decreased my roxies and then put me on Subsys --

5  oh, you were asking if my pain was better?  I'm not sure what

6  you were asking there.  Stable, I mean, I was alive.

7  Q  I'm sorry.  I couldn't hear you.  You were pulling away

8  from the mic a little bit.

9  A  I'm not understanding the last question, stable.  But, you

10  know, I was having -- this was after the accident and I was

11  still having a lot of pain, yeah.

12  Q  And you mentioned they and them a lot.  And I want to

13  deconstruct that to find out exactly who it was you talked to

14  about what.  Now, when you said on direct that you were seeing

15  Dr. Ruan -- I'm sorry -- Dr. Couch and Justin Palmer in

16  collaboration, what do you mean that you were seeing them in

17  collaboration?  Were they both in the room with you, discussing

18  at the same time?

19  A  Not typically.

20  Q  Typically what was happening?

21  A  Typically I would go in on a visit, talk to Justin.  Justin

22  talked to all the patients, as far as I'm concerned.  And if

23  there was a need for me to talk to Dr. Couch, I would -- I

24  would -- he would come in and speak to me.  That's typically

25  how it went.

DAVID WAYNE RILEY - CROSS BY MR. BODNAR

1  Q   So Justin Palmer was the one that you saw at least all the
2  time, and then sometimes Dr. Couch?
3  A   Yes.
4  Q   Do you recall on this instance when you were put on Subsys
5  and you had your Roxicodone increased, was this done by Justin
6  Palmer or was this done by Dr. Couch?
7  A   I don't remember.
8  Q   During your office visits, please explain what kind of
9  physical examination of your body was being done.
10  A   Well, I would go in and if I had additional pain in a
11  specific area or still open sores -- most of the time I was
12  seeing Dr. Couch I had open sores -- they would examine them,
13  treat them if I needed to be treated, tell me what to do about
14  it, prescribe whatever medication I had, and then I was done.
15  Q   And I want to -- again we're saying they.  Who was the one
16  that would do the physical examination for you when you came in
17  for your treatment?
18  A   Probably Justin first and then, if there was a need for it,
19  it would go to Dr. Couch.
20  Q   And who was the one that actually wrote your prescriptions
21  for you?
22  A   He would sit down with a notepad, write them.  I'm not sure
23  if he would take them to Dr. Couch or if he would just write
24  them and sign them.  I don't remember.
25  Q   And by he, do you mean Justin Palmer?

1   A    Justin, yes.

2   Q    Now, I'm going to show you now as an example your office

3   visit from October 2nd, 2013.  Do you see your name up here and

4   the date for the office visit?

5   A    Yes.

6   Q    And working down, do you see the history of illness, the

7   medication, and then do you see a section that talks about

8   physical examination?

9   A    Yeah.

10  Q    I just want to point out a couple of things.  Here for

11  pupils and irises, do you recall instances where Justin Palmer

12  or Dr. Couch was shining the light in your eyes to test them

13  bilaterally?

14  A    Yes, yes.

15  Q    That did happen?

16  A    Yes.

17  Q    How about range of motion for your upper and lower

18  extremities, were those being tested?

19  A    Not all the time.  I mean, if I had a problem, he would

20  look at it.  But, you know, he wouldn't operate everything on

21  me, no.

22  Q    So this shouldn't be in every one of your patient visits,

23  because it didn't happen every time?  Is that what you're

24  saying?

25  A    Yeah, I guess.  I mean, they would do it when I needed it,

DAVID WAYNE RILEY - CROSS BY MR. BODNAR

1   when I had something wrong.

2   Q   How about checking your thyroid, do you recall Justin

3   Palmer or Dr. Couch feeling around on your thyroid?

4   A   I did have a thyroid problem and they did prescribe some

5   stuff for that.  But I think it came from the VA.

6   Q   Was Dr. Ruan or Dr. Couch ever examining your thyroid,

7   though, feeling around on your throat?

8   A   They had, yeah.  I don't remember if -- not every time, but

9   they have done it, yeah.

10  Q   So it shouldn't be in your report every time, though; is

11  that correct?

12  A   Probably not.  Was that in all of them or just that one?

13  Q   I'll show you another one marked October 30th of '13.  And

14  again turning to the physical, do you see again, checking your

15  eyes, checking your thyroid (indicating)?

16  A   Yeah.

17  Q   And then again checking your extremities.  Are you saying

18  that this did not happen every time that you came in there?

19  A   Yeah, I guess so.

20  Q   You guess so, that it didn't happen every time?

21  A   It didn't happen every time, no.

22  Q   Mr. Riley, who were you insured by?

23  A   Tricare and the VA and Medicare.

24  Q   For Tricare, does that mean that the military is paying for

25  your office visits, for your insurance for your office visits?

4662

```
 1   A   No.
 2   Q   Who would be paying for your office visits?
 3   A   Well, they are paid for by a corporation that -- is
 4   Tricare -- what is Tricare, is what you're asking me?
 5   Q   Well, you have Tricare.  Do you understand that Tricare is
 6   a military benefit, so it's a federal insurance for the
 7   military?
 8   A   Okay.  It's an insurance policy taken out when you retire.
 9   Q   And yes, and that's who was paying for your office visits
10   and your prescriptions; is that correct?
11   A   Yes, I guess.
12   Q   When you were placed on Subsys, do you recall Dr. Couch
13   specifically giving you warnings that this was a drug indicated
14   only for cancer pain?
15   A   Only for cancer pain?  I don't recall.
16   Q   Do you recall being switched over at some point to Abstral?
17   A   Abstral?  Is that the --
18   Q   That's under the tongue.
19   A   Yeah.  (Nodding head affirmatively).
20   Q   And if your PDMP report, which is your prescription
21   monitoring report, indicates that you were placed on Abstral on
22   December 19th, 2013, does that sound about right?
23   A   Sure.
24   Q   Do you recall if Dr. Couch at that point, when he placed
25   you on it on December 19th, 2013, mentioned anything about
```

1    buying hundreds of thousands of dollars in the stock that owned
2    that company?
3    A    No.
4    Q    Did he ever tell you that?
5    A    No.
6    Q    Did Justin Palmer also tell you that they purchased stock
7    even that exact day?
8    A    No.
9    Q    Did Dr. Couch or Justin Palmer ever tell you that the
10   company that made Subsys, Insys, was paying Dr. Couch money
11   every week?
12   A    No.
13   Q    Did there come a time at the very end, right before the
14   raid on PPSA, where Justin Palmer was no longer there?
15   A    Yes.
16   Q    In those instances, who were you being seen by for your
17   appointments?
18   A    A new -- a new doc, you know, a new medical guy.
19   Q    Do you remember if his name was Ben Clark?
20   A    Sounds familiar.
21   Q    I'm going to show you your visit from May 7th, 2015, and
22   I'll quickly show you the physical exam that supposedly
23   occurred again.  Do you see where it talks about checking the
24   thyroid and checking the eyes with the light?
25   A    (Nodding head affirmatively.)  I remember when they -- when

 1    we switched from Justin there was a whole thing I had to go all

 2    through again.

 3    Q    A whole new physical?

 4    A    Yeah.

 5    Q    And who did that physical for you?  Was it Dr. Couch or was

 6    it somebody else?

 7    A    It was probably that Ben guy you were talking about.

 8    Q    And if you look at the bottom, looking back on the front

 9    page, what does it say was the date of your visit, up at the

10    top?

11    A    May 7th, 2015.

12    Q    And what date was it signed by Ben Clark?

13    A    May 7th of 2015.

14    Q    Do you know if Dr. Couch was even in the office that day,

15    on May 7th, 2015?

16    A    No.

17    Q    Or even in the state?

18    A    No, I don't know.

19    Q    When did he sign it?  (Indicating.)

20    A    May 14th, 2015.

21    Q    Mr. Riley, where did you fill your Subsys prescriptions

22    when it was prescribed for you?

23    A    Most of the time at C&R.

24    Q    And how about your Abstral prescriptions?

25    A    I think they were at C&R.  Whenever they started C&R, I

4665

1    just started going there.

2    Q   You say they started.  Who do you mean by they started C&R?

3    A   Well, when Physicians Pain -- you could go to get your

4    doctor or to get your prescription and everything in one place.

5    I started just going to that one place.

6    Q   And is that where you were being seen, at the Airport

7    Boulevard location?

8    A   Yes.  Most of the time I had to go over there.  The other

9    one, whenever -- there was not appointments at the other one.

10   Q   And do you know -- do you know who owned C&R Pharmacy?

11   A   Probably Casa Ruan.

12   Q   And do you have an opportunity to see your bills about how

13   much Tricare was paying for your Abstral and Subsys?

14   A   That's pretty expensive.

15   Q   Do you recall roughly about how much it was?

16   A   In the thousands, multiple thousands, like 10 or 12 maybe.

17   Q   Per month?

18   A   Per month.

19          MR. BODNAR:  Nothing further for this witness, Your

20   Honor.

21          THE COURT:  All right.  Mr. Essig?

22          MR. ESSIG:  Very briefly.

23                       REDIRECT EXAMINATION

24   BY MR. ESSIG:

25   Q   Mr. Riley, did you need Dr. Couch or Justin Palmer to shine

```
 1    a light in your eyes every time you went to visit them?

 2    A    No.

 3    Q    Did you need Dr. Couch or Justin Palmer to feel your neck

 4    every time you went to visit them?

 5    A    No.

 6    Q    Did you need the medications that they prescribed you every

 7    time --

 8    A    Yes.

 9    Q    -- you went to visit them?

10    A    Yes.

11    Q    Does it matter to you that Dr. Couch owned stock in the

12    company, his medications he prescribed for you?

13    A    More power to him.

14    Q    Does it matter to you that he was receiving payments for

15    speaking engagements from a company whose medication he was

16    prescribing to you?

17    A    No.

18              MR. ESSIG:  No further questions.

19              THE COURT:  May this witness be excused?

20              MR. BODNAR:  Yes, Your Honor.

21              MR. ESSIG:  Yes, Your Honor.

22              THE COURT:  All right.  Thank you.

23              THE WITNESS:  Thank you, Judge.

24              MR. ESSIG:  May we approach?

25         (At the side bar, jury not present.)
```

4667

```
 1            MR. ESSIG:  We've got one very small witness issue.
 2   It may not be an issue anyway.  But we've got -- we had planned
 3   to put on two office people today and then also Debi Phillips,
 4   who was kind of the CEO of the place by the time it closed
 5   down.  Ms. Phillips was not going to testify until, I think,
 6   starting around 4 o'clock, which was going to be -- probably
 7   she was going to continue until tomorrow morning.  Our expert
 8   starting tomorrow morning, she has to testify tomorrow morning
 9   because she's got a husband -- her husband actually fell and
10   broke his neck in the last week or so.  And so she's got to get
11   back to him tomorrow.  She's got to catch a flight out, our
12   expert does.  And so I was just letting the Court know we're
13   not going to call Ms. Phillips because we don't want to delay
14   the start of the expert's testimony tomorrow morning.  So with
15   our next two witnesses, I think we'll probably easily get to
16   about 4 o'clock, but we may be -- may be a little short of 5
17   o'clock.
18            THE COURT:  How long do you anticipate the defense
19   being overall?
20            MR. ESSIG:  I think we can say we've got a pretty firm
21   rest of next --
22            MR. DOSS:  I think the issue is with some of our
23   experts.  They have some travel restrictions.  And so we're
24   working around them.
25            THE COURT:  Are they from Yemen?  I said, are they
```

4668

1   from Yemen?

2          MR. DOSS:  I think one of ours, he's out of the

3   country right now, but he's available early next week.  So

4   we're kind of working around those dates.  But --

5          MR. ESSIG:  Right.  I would -- I think -- I'll let

6   you.

7          MR. KNIZLEY:  I might be able to help the Court.  I

8   think I understand where you're going.  Tomorrow will be their

9   witness Rauck, expert.  Friday, our witness Gudin, expert.

10  Monday we're back to traditional witnesses.  Tuesday, their

11  witness Rauck.  Wednesday, our witness Gharibo, expert.  That's

12  the expert schedule there.  And we should have ample witnesses

13  in the days those experts are not there to fill up those

14  days.  And then after Gharibo on Wednesday, depending upon

15  whether any of the defendants testify, that would probably be

16  the end of the testimony, absent whether a defendant testifies.

17         THE COURT:  All right.

18         MR. KNIZLEY:  If that helps the Court.

19         MR. ESSIG:  We've got a pretty firm outside date with

20  that last expert, unless the defendants testify.  That last

21  expert will be the last witness, barring some unforeseen

22  change.

23         THE COURT:  Okay.  All right.

24         MR. BODNAR:  That's Gharibo?

25         MR. ESSIG:  Gharibo will be the last one.

1          MR. DARLEY:  On the 15th.

2          MS. GRIFFIN:  I don't mind, I don't know if the

3    Court's willing to do this, if you start with Debi Phillips

4    today and not pick back up with her till Thursday.  But that's

5    up to y'all.

6          MR. ESSIG:  Yeah, I think that's -- I mean, I don't

7    think that works very well.

8          MR. KNIZLEY:  Judge, in trying to fill up and not have

9    what we've got here, we have commingled, with the government's

10   permission, the lay witnesses of both Ruan and Couch, with the

11   Court's permission -- and we haven't discussed it with the

12   Court, but discussed it with them to keep these kind of holes

13   from showing up.  And so we will have some, with the Court's

14   permission, Ruan witnesses on Thursday, even in the course of

15   their case.

16         MR. DARLEY:  (Shaking head negatively.)

17         THE COURT:  He's saying no.

18         MR. KNIZLEY:  Don't pay any attention to him.  That --

19   if they don't have enough, if they don't have enough.  Okay.

20   So we won't have this hole.  And then Monday again.  And we

21   would identify, of course, a Ruan witness.  And the order --

22         THE COURT:  You can present them in whatever order you

23   want, as long as it's designed to close any gaps.

24         MR. KNIZLEY:  That's why we're doing it.  We would

25   prefer to do it the other way, but we don't want the gaps.

```
 1          THE COURT:  All right.  Let's go ahead.

 2       (In open court, defendants and jury present.)

 3          MR. DOSS:  Your Honor, Dr. Couch calls Bobbi Coburn.

 4          THE COURT:  All right.

 5                       BOBBI COBURN

 6            was sworn and testified as follows:

 7          THE WITNESS:  Yes, ma'am.

 8          THE CLERK:  Thank you, ma'am.  Please be seated.

 9                    DIRECT EXAMINATION

10   BY MR. DOSS:

11   Q   Good afternoon.

12   A   Good afternoon.

13   Q   Would you mind stating your name for the record, please?

14   A   Bobbi Coburn.

15   Q   And could you spell that for us?

16   A   My first name is B-O-B-B-I, my last name is C-O-B-U-R-N.

17   Q   Ms. Coburn, where do you live?

18   A   Like my address?

19   Q   What city?

20   A   Oh, Mobile.

21   Q   Okay.

22   A   Theodore.

23   Q   And was there a time when you worked at Physicians Pain

24   Specialists of Alabama?

25   A   Yes, sir.
```

BOBBI COBURN - DIRECT BY MR. DOSS

1   Q   When did you start working at PPSA?

2   A   It was late March, early April of 2013.

3   Q   Is that your first job?

4   A   Correct.

5   Q   Had you just graduated from college?

6   A   Yes, sir.

7   Q   When you started at PPSA, what was your job there?

8   A   I was a receptionist.

9           THE COURT:  Mr. Doss, is your microphone on?

10          MR. DOSS:  It is now.  Thank you.

11  Q   What location were you working as a receptionist at PPSA?

12  A   Airport.

13  Q   As a receptionist for PPSA's Airport location, what were

14  your general job duties?

15  A   I would check patients in, check them out, take their

16  copay, and let the MAs know that they were there.

17  Q   How long did you serve as a receptionist at PPSA?

18  A   A couple of months.  I'm not really for sure.

19  Q   And during the time that you were a receptionist at PPSA,

20  did you have an opportunity to observe the clinic's patients?

21  A   Yes.

22  Q   Now, you said that you were a receptionist for a couple of

23  months.  Did you take on a new job at PPSA essentially?

24  A   I did.

25  Q   What job was that?

BOBBI COBURN - DIRECT BY MR. DOSS

1   A   I was moved to insurance verification and workmen's comp.

2   Q   About how long were you working there?

3   A   For workmen's comp only about three months.  But I did

4   insurance all the way up until we -- the day we were last able

5   to work.

6   Q   Until May of 2015?

7   A   Yes.

8   Q   And generally speaking, what were your job responsibilities

9   for insurance verification and workmen's comp?

10  A   For the insurance we would go online for like Blue Cross,

11  HealthSprings, and verify the patient was active, what their

12  copay would be, if they had a deductible or coinsurance.  And

13  with HealthSprings and Tricare and with the VA department, we

14  had to make sure there was a valid referral on file for them to

15  see the doctors.  Then with workmen's comp we would call or

16  email the workmen's comp coordinators and make sure it was okay

17  for them to be seen on that day with a drug screen.

18  Q   And did you have a -- did you eventually have another job

19  at PPSA?

20  A   Yes.  I was then promoted to new patient coordinator.

21  Q   About when did that happen?

22  A   Maybe end of April of 2014.

23  Q   And who held that position before you?

24  A   Shannon Hackworth.

25  Q   And if you would, tell us what your general job

BOBBI COBURN - DIRECT BY MR. DOSS

1  responsibilities were as the new patient coordinator?

2  A   I would receive the packets, the insurance verification, to

3  make sure they were active to be able to see the doctors.  We

4  would pull a drug query from PDMP.  I would check the patients

5  in, I would let the front desk know when to take their copay,

6  and then I would give the packets to the MAs.

7           MR. DOSS:  Okay.  If I may approach the witness, Your

8  Honor?

9           THE COURT:  All right.

10  BY MR. DOSS:

11  Q   Ms. Coburn, I'm going to show you what we've marked for

12  identification purposes as Couch Exhibit 253.  Let me know if

13  you recognize that document.

14  A   I do.

15  Q   What is that document?

16  A   The new patient packet we would mail to the patients to

17  fill out.

18           MR. DOSS:  Your Honor, at this time we offer Couch

19  Exhibit 253.

20           MS. GRIFFIN:  If you will give me just a moment to

21  finish reviewing it, Your Honor.

22           THE COURT:  All right.

23           MS. GRIFFIN:  I do not object.

24           THE COURT:  All right.  Mark it in.

25      (Defendant Couch's Exhibit 253 was entered into evidence.)

 1  BY MR. DOSS:

 2  Q    And, Ms. Coburn, is this the document you were saying was

 3  mailed out to the patients?

 4  A    Yes.

 5  Q    How many pages approximately is this document?

 6  A    14, 15, 14 or 15 maybe.

 7  Q    As far as you know, from the time you were at PPSA, was

 8  this new patient packet always mailed out in advance of the

 9  patients coming into the clinic?

10  A    Yes.

11  Q    About how much in advance of the patient's appointment at

12  PPSA was it mailed out?

13  A    As soon as we scheduled the appointment.  Usually it was

14  about two or three weeks before their appointment.

15  Q    And there are a few pages I want to go through of

16  this.  Tell us what this form is for generally, please.

17  A    It's for the demographics, to have their name, date of

18  birth, address, insurance information, if anything were to

19  happen while they were in clinic, who to contact.

20  Q    Okay.  And on the next page is this a health history and

21  pain questionnaire?

22  A    Yes.

23  Q    Is the next page a continuing of that same questionnaire?

24  A    Yes.

25  Q    Same, same continuation?

BOBBI COBURN - DIRECT BY MR. DOSS

```
1    A    Yes.
2    Q    Again the same?  (Indicating.)
3    A    Yes.
4    Q    Is this a notice of privacy practices contained in the
5    packet?
6    A    Yes.
7    Q    Was this also mailed out as part of this new patient
8    packet?
9    A    Yes.
10   Q    Okay.  And is this the patient consent and agreement for
11   off-label pain treatment?
12   A    Yes.
13   Q    Was this included in the new patient packet (indicating)?
14   A    Yes.
15   Q    And what generally is this document?
16   A    The opioid agreement.
17   Q    And was this document generally included in the new patient
18   packet?  (Indicating.)
19   A    Yes.
20   Q    What is this document?
21   A    It stated we have our own pharmacy as well as a weightloss
22   and wellness clinic.  You didn't have to use the pharmacy, but
23   it was there if you needed it.
24   Q    And as far as you know, while you're a new patient
25   coordinator, all new patients received this disclosure?
```

BOBBI COBURN - DIRECT BY MR. DOSS

1    A   Correct.

2    Q   All right.  So if you would, can you walk us through the

3    process of getting a new patient at PPSA?  What would have been

4    step one?

5    A   We would receive the records from the referring physician

6    and then we would go through the packets and find out if it was

7    medically necessary for them to be seen.

8    Q   And what do you mean by medically necessary?  Was that a

9    term y'all used in the new patient context?

10   A   When we were speaking to referring physicians, yes.

11   Q   And what do you mean by medical necessity?

12   A   To make sure they had a need to be seen and they weren't

13   just coming to say:  I hurt.

14   Q   And then in determining whether there was medical

15   necessity, would you communicate with the patient's referring

16   physician?

17   A   Yes.

18           MS. GRIFFIN:  Your Honor, objection as to foundation,

19   if she would actually communicate with the referring physician.

20           THE COURT:  Sustained.

21   BY MR. DOSS:

22   Q   Would you, in your capacity as a new patient coordinator,

23   communicate with the referring physician?

24   A   I don't understand.

25   Q   When you would get -- if you were trying to determine

BOBBI COBURN - DIRECT BY MR. DOSS

```
 1   medical necessity, would you ever contact the referring
 2   physician with questions you might have?
 3   A   To -- if we didn't have what we needed, we would.
 4   Q   And would you do that yourself sometimes?
 5   A   Yes.
 6   Q   And you said that if we didn't have what we needed, we
 7   sometimes would.  What sort of things might you request from
 8   the referring physician that you didn't have?
 9   A   We needed a good demographic sheet.
10   Q   What do you mean by a good demographic sheet?
11   A   A correct working phone number, the correct address, name,
12   date of birth.
13   Q   Okay.
14   A   Insurance information.
15   Q   What are some other things that you might have needed from
16   a referring physician in determining medical necessity?
17   A   At least three to four office notes and any MRIs or CT
18   scans the patient may have had.
19   Q   When you say at least three to four office notes, whose
20   office notes would those have been?
21   A   The referring physician.
22   Q   Okay.  So when you're getting a new patient and you're
23   checking for medical necessity and talking to a referring
24   physician, what would be your next step?
25   A   Verify the insurance to make sure they had active
```

1   insurance.

2   Q   Did PPSA take cash-only patients?

3   A   No.

4   Q   And after you verified the insurance during your process of

5   receiving new patients, what would have been the next step?

6   A   We would pull the drug query.

7   Q   What do you mean by a drug query?

8   A   It had a list of drugs ever filled within a time frame from

9   any pharmacy.  We had Alabama, Mississippi, and Florida.

10  Q   Is that sometimes called the PDMP?

11  A   Yes.

12  Q   Let me show you -- this is not yet in evidence -- what

13  we've marked for identification purposes as Couch Exhibit

14  255.  Ms. Coburn, do you recognize this sheet?

15  A   Yes.

16  Q   What is this?

17  A   That is the websites as well as the log-in and passwords

18  that we would go to pull the PDMP, the drug query.

19  Q   Are these the log-in names and passwords you would use in

20  checking new patients' PDMP?

21  A   Yes.

22          MR. DOSS:  Your Honor, we offer Couch Exhibit 255.

23          MS. GRIFFIN:  Your Honor, may I inquire of one matter

24  with counsel?

25          (A discussion was held off the record between counsel.)

4679

BOBBI COBURN - DIRECT BY MR. DOSS

```
 1              MS. GRIFFIN:  No objection.
 2              THE COURT:  Mark them in.
 3         (Defendant Couch's Exhibit 255 was entered into evidence.)
 4              MR. DOSS:  May we publish the exhibit?
 5              THE COURT:  Yes.
 6  BY MR. DOSS:
 7  Q    So is it correct that you would check the PDMP from Alabama
 8  for a new patient?
 9  A    Yes.
10  Q    What about for Florida, did you do that as well?
11  A    Yes.
12  Q    And Mississippi?
13  A    Correct.
14  Q    Why were you running -- if you know -- the drug queries for
15  new patients?
16              MS. GRIFFIN:  Objection as to foundation, Your Honor.
17              THE COURT:  Sustained.
18  BY MR. DOSS:
19  Q    Do you know why the drug queries for new patients were
20  being run?
21  A    Yes.
22  Q    Why is that?
23  A    So that -- because it will tell us if the patient has been,
24  as we call it, doctor shopping, hopping from different pain
25  management doctors, getting the same prescription.
```

4680

BOBBI COBURN - DIRECT BY MR. DOSS

1    Q    And were there occasions when you did detect new patients

2    doctor shopping?

3    A    Yes.

4    Q    What would happen while you were the new patient

5    coordinator if you determined or found a patient who was doctor

6    shopping?

7    A    I would verify with our clinical manager.  And after she

8    had -- we looked at it, I would give the referring physician a

9    call and let them know what we had found and if they were aware

10   of it and that at that time we would not be able to take the

11   patient on.

12   Q    Who was the clinical manager at that time?

13   A    Monica Carroll.

14   Q    So the new patient wouldn't have been seen at PPSA?

15   A    Correct.

16   Q    About how many times while you were a new patient

17   coordinator did PPSA decline to see a new patient because there

18   was a concern about doctor shopping?

19   A    I'm not really sure of the percentage.

20   Q    Did it ever happen?

21   A    It did.

22   Q    Did it happen on a monthly basis?

23   A    Maybe once or twice a month, I'd say.

24   Q    If you saw in the drug query potential signs of doctor

25   shopping, were there ever times when you would talk to a

BOBBI COBURN - DIRECT BY MR. DOSS

1  referring physician and the referring physician would clarify
2  that it wasn't doctor shopping?
3  A   Yes.
4  Q   If that happened, would you take -- would PPSA see the new
5  patient?
6         MS. GRIFFIN:  Objection, Your Honor, as to foundation
7  for would PPSA see the patient.  She doesn't have knowledge of
8  what the whole business did.  I don't object to being asked
9  what would she do.
10         THE COURT:  Well, you need to establish some
11  foundation first.
12         MR. DOSS:  Yes, Your Honor.
13  Q   Do you know -- let me back up.
14         Were there occasions when you talked to a referring
15  physician and the referring physician provided you with
16  information that led you to believe that the patient was not in
17  fact doctor shopping?
18  A   Yes.
19  Q   If that was determined, would the new patient then be seen
20  at PPSA?
21  A   It would have been taken to my clinical manager, and she
22  would then verify as well.  And then if she deemed it, yes,
23  then I would go ahead and schedule an appointment.
24  Q   So if there were concerns about doctor shopping, it would
25  be reviewed by both you and Ms. Carroll; is that right?

4682

BOBBI COBURN - DIRECT BY MR. DOSS

1   A   Yes.

2   Q   When you would run the drug queries in Alabama, Florida,

3   and Mississippi, would you always print out the results?

4   A   Yes.

5   Q   What would happen to those printed results?

6   A   They would go with the office note that would then, at the

7   time of the appointment, be given to the MA.

8   Q   Were they always scanned into the electronic medical file?

9   A   Yes.

10  Q   Do you know what would happen to the printed PDMP results

11  after they were passed along to the MA?

12  A   No.

13  Q   Now I want to turn back to medical necessity.  Were there

14  any common diagnoses for new patients at PPSA?

15  A   Cancer, phantom limb pain, is the only two I can recall at

16  this time.

17  Q   And were there any diagnoses or complaints that would not

18  pass muster?

19  A   Not that I can recall.

20  Q   If a patient said that my body hurts, would that have been

21  enough to establish medical necessity?

22  A   No.

23          MS. GRIFFIN:  Objection, Your Honor, as to foundation

24  through this witness.

25          THE COURT:  Sustained.

4683

1  BY MR. DOSS:

2  Q   Was part of your responsibility at PPSA assessing whether

3  there was medical necessity for the new patient to be seen

4  there?

5  A   Yes.

6  Q   If a patient complained of my body hurting, would that have

7  been enough, while you were the new patient coordinator, to

8  establish medical necessity?

9  A   No.

10  Q   Would that patient have been turned away from PPSA?

11  A   Yes, if the referring physician cannot give me the proper

12  diagnosis.

13  Q   And would you always receive the referring physician's

14  files before the patient would be seen at PPSA?

15  A   Yes.

16  Q   What would happen to those referring physicians' files once

17  received at PPSA?

18  A   After I would go over them, if they were scheduled, I would

19  put them in a folder per the date they were scheduled for so we

20  would have them as soon as they checked in, so I could provide

21  them to the medical assistant.

22  Q   And would that be included along with the PDMP results?

23  A   Yes.

24  Q   Now, what did PPSA require for a doctor's referral, if you

25  know?

1  A    It was a letter stating they were referring to us,

2  referring the patient to us.

3  Q    And would that be addressed to someone in particular at

4  PPSA?

5  A    The new patient coordinator.

6  Q    And would that usually include a diagnostic code --

7  A    Yes.

8  Q    -- for the patient's condition?

9  A    Yes.

10  Q    What do you mean by a diagnostic code?

11  A    I'm not sure I understand.

12  Q    What is a diagnostic code?

13  A    The reason why they hurt?

14  Q    Would that be a series of letters and numbers?

15  A    Yes (nodding head affirmatively).

16  Q    And if any information was missing, would the patient be

17  seen at PPSA by a medical provider?

18  A    I had to have all the documentation before scheduling an

19  appointment.

20  Q    Now, did patients always complete their new patient

21  information packet by the time they arrived at PPSA?

22  A    No.

23  Q    And what would happen if they had not completed all of

24  their information in that packet?

25  A    We always asked them to arrive at least 30 to 45 minutes

4685

1  before their appointment in case they had any questions about

2  it.  We would be able to go over it with them.

3  Q   Were you screening patients, as the new patient

4  coordinator, who were going to be seeing Dr. Couch?

5  A   Yes.

6  Q   Were people available to answer a new patient's questions

7  about the new patient packet, if they had any questions?

8  A   Yes.

9  Q   From time to time did patients have questions about their

10  new patient packet?

11  A   About 90 percent of them (nodding head affirmatively).

12  Q   And people were there to answer those questions; is that

13  correct?

14  A   Yes.

15  Q   During your time at PPSA, did you have an opportunity to

16  observe the new patients who were coming in?

17  A   I have spoken to them.  I was the one who had to check them

18  in and take their insurance cards.

19  Q   Did people come to PPSA with -- did they ever come into

20  PPSA in wheelchairs?

21  A   Yes.

22  Q   Needing wheelchairs?

23        MS. GRIFFIN:  Objection, Your Honor, as to the

24  relevance.

25        THE COURT:  Sustained.

BOBBI COBURN - DIRECT BY MR. DOSS

```
 1  BY MR. DOSS:
 2  Q   Were you involved with scheduling the new patient
 3  appointments?
 4  A   Yes.
 5  Q   Would you try to avoid scheduling new patient appointments
 6  if Dr. Couch was out of the office?
 7  A   I wouldn't schedule until he was there.  They -- we had a
 8  certain time we would schedule our patients and that was after
 9  he arrived.
10  Q   And what time usually was that?
11  A   That our new patients' appointments were?
12  Q   Yes, ma'am.
13  A   11:30 and then 1:30.
14          MR. DOSS:  And one moment, Your Honor.
15          THE COURT:  All right.
16      (A discussion was held off the record between defense
17  counsel.)
18  BY MR. DOSS:
19  Q   During your time while working at PPSA, were you able to
20  observe the patients who were coming there and to form an
21  opinion about their medical condition?
22          MS. GRIFFIN:  Objection, Your Honor.  There is no
23  foundation for her ability to have an opinion about their
24  medical condition.
25          THE COURT:  Sustained.
```

1          MR. DOSS:  May we approach briefly?

2          THE COURT:  All right.

3       (At the side bar, jury not present.)

4          MR. DOSS:  The issue that we're running into, Judge,

5    is that during the government's case in chief we had a witness

6    describe the patients as zombies and we had witnesses describe

7    them as being overmedicated, things of that sort.  All I'm

8    asking for is her observations about the patients coming into

9    PPSA that would refute the zombie characterization.

10         MS. GRIFFIN:  Your Honor, I don't object to her saying

11   what they looked like.  But for her to draw a conclusion -- you

12   know, she can describe were they disheveled or --

13         MR. ESSIG:  Were they in wheelchairs?

14         MS. GRIFFIN:  No, it's not relevant.

15         MR. DOSS:  We think it's relevant to refuting the

16   zombie characterization.

17         THE COURT:  You can ask:  Did you see anybody that

18   looked like zombies?  But, I mean, for her to give a general

19   description of everybody that came in there, I think --

20         MR. DOSS:  I can ask that.  I can.

21         THE COURT:  Okay.

22       (In open court, defendants and jury present.)

23   BY MR. DOSS:

24   Q   Ms. Coburn, did you have an opportunity to interact with

25   the new patients who would come into PPSA?

1    A    Yes.

2    Q    From your perspective, Ms. Coburn, did the new patients

3    coming into PPSA appear to be in pain?

4            MS. GRIFFIN:  Objection, Your Honor.

5            THE COURT:  Sustained.

6        (A discussion was held off the record between defense

7    counsel.)

8            MR. DOSS:  And I think that's it, Your Honor.  Thank

9    you.

10            THE COURT:  All right.  Let's go ahead and take our

11    afternoon break at this time.  Leave your pads on your

12    chairs.  Take your break downstairs in the jury assembly

13    room.  No discussion about the case.  And we will call you back

14    up in about 15 minutes.  We're in recess.

15        (A recess was taken at 2:59 p.m.)

16        (In open court, 3:20 p.m., defendants and jury present.)

17            MR. DARLEY:  Judge, we don't have any questions.

18            THE COURT:  All right.

19            MR. DOSS:  She's walking up.

20            MS. GRIFFIN:  Ready to proceed, Your Honor?

21            THE COURT:  Yes.

22                        CROSS EXAMINATION

23    BY MS. GRIFFIN:

24    Q    So, Ms. Coburn, you worked at PPSA just a little over two

25    years; that is, from April of '13 through May the 20th of '15?

1   Is that right?

2   A   Yes, ma'am.

3   Q   When did you go from being a receptionist to the new

4   patient coordinator?

5   A   I become new patient coordinator end of April of 2014.

6   Q   The end of April of '14?

7   A   Yes, ma'am.

8   Q   So you were the new patient coordinator in August of '14;

9   is that correct?

10  A   Yes, ma'am.

11  Q   But I want to back up and talk about while you were

12  receptionist.  Did you tell us that you took the payments, the

13  copayments, as the receptionist; is that right?

14  A   Yes, ma'am.

15  Q   And you took cash sometimes as copayments; is that correct?

16  A   Yes, ma'am.

17  Q   Now, you switched to the new patient coordinator and you

18  told us, didn't you, that y'all did not take patients without

19  insurance; is that right?

20  A   Yes, ma'am.

21  Q   But are you aware that in August of 2014, while you were

22  new patient coordinator, y'all accepted a patient for five

23  visits that did not have insurance, that was a cash-paying

24  patient?  Were you aware of that?

25  A   I would not know of him.  I know I was training beginning

4690

 1  of April -- or end of April for a while, I don't know exactly

 2  how long.

 3  Q   Were you training through August of '14, that many months?

 4  A   I might have.  I don't know for sure.

 5  Q   So what you're saying is you may not have known anything

 6  about the time that Shawn Brennan was seen for five occasions

 7  and paid cash each time?  Is that what you're telling us?

 8  A   Yes, ma'am, I would have no idea about him.

 9  Q   So let's think about that, since you were in training for

10  some period of time.  When were you actually full hands on as

11  the new patient coordinator?  What date?

12  A   I don't recall exactly what day.

13  Q   Do you remember when Stacy Madison was let go at PPSA in

14  late October of 2014?

15  A   Yes, ma'am.

16  Q   Were you the new patient coordinator then?

17  A   Yes, ma'am.

18  Q   Do you remember when Justin Palmer and Bridgette Parker

19  left in late December of '14, early January '15, were you new

20  patient coordinator at that time?

21  A   Yes.

22  Q   I want to back up and talk about the drug query that you

23  have indicated you ran on the new patients.  Now, since you

24  were still in training maybe as late as August of '14, you

25  don't know what was done before you became the new patient

BOBBI COBURN - CROSS BY MS. GRIFFIN

 1  coordinator about the PDMP, do you?

 2  A   I do know that they were ran the day of the appointment

 3  before I was new patient coordinator.

 4  Q   Before you were the new patient coordinator, you knew that

 5  of your own personal knowledge?

 6  A   Yes.

 7  Q   Or from what somebody told you?

 8  A   I knew they had to have been pulled, from speaking to

 9  people at PPSA.

10  Q   Okay.  So hearsay, somebody told you that had to be done;

11  is that right?

12  A   Yes.

13  Q   And you don't know what happened before you started working

14  there, do you, in April of '13?

15  A   No, ma'am.

16  Q   Now, you see where this query was updated March of '15; is

17  that right?

18  A   Yes.

19  Q   You're telling us you would check Mississippi, Alabama, and

20  Florida for each new patient sometime after August of '14, when

21  you were fully trained as new patient coordinator; is that

22  right?

23  A   Yes.

24  Q   And when you pulled up Alabama, you'd always do Dr. Ruan's

25  password; is that right?  (Indicating.)

BOBBI COBURN - CROSS BY MS. GRIFFIN

1   A   Yes.

2   Q   When you pulled up Florida, you'd always do Dr. Couch's

3   password; isn't that right?  (Indicating.)

4   A   Yes.

5   Q   When you pulled up Mississippi, you'd always do Dr. Chen's

6   password; isn't that right?  (Indicating.)

7   A   Yes.

8   Q   So there's no way to tell whose patients these people

9   actually were, because you used the same password for every

10  patient in Alabama; is that right?  (Indicating.)  All

11  Dr. Ruan's numbers?

12  A   That was the only password and log-ins that I knew of.

13  Q   That was the only password you were provided, isn't it?

14  A   Yes, ma'am.

15  Q   So every one you ran would have shown it was being run by

16  Dr. Ruan; is that correct?  For Alabama?

17  A   I'm not understanding.

18  Q   Well, the number that you used to sign in with, if PDMP

19  were checking who had signed in, the only way you had access to

20  it was through Dr. Ruan's number; is that right?

21  A   With that password, yes.

22  Q   With that password.

23  A   (Nodding head affirmatively.)

24  Q   So if PDMP were to see how many times somebody checked in

25  using Dr. Ruan or Dr. Couch's number, all the Alabama ones

4693

1   would be under Dr. Ruan's name as being checked; is that right?

2   A   Yes, ma'am.

3   Q   Now, you said that when you became the full coordinator and

4   you were trained by August of '14, that you would take these

5   PDMP reports and you would put them in a package that was a new

6   package -- new patient package; is that correct?

7   A   After the patient checked in, yes.

8   Q   And you don't know what was actually done with them

9   thereafter, do you?

10   A   No, ma'am.

11   Q   You don't know if a doctor ever saw them, do you?

12   A   No, ma'am.

13   Q   You don't know if the nurse practitioner ever saw them, do

14   you?

15   A   No, ma'am.

16   Q   You don't know if they were put in the trash, do you?

17   A   No, ma'am.

18   Q   Now, Ms. Coburn, you said that you had a new patient

19   package that you would mail to the new patients; is that

20   correct?

21   A   Yes, ma'am.

22   Q   That's Couch Exhibit 253.  You don't know when that came

23   into being, do you?

24   A   No, ma'am.  I know it was established when I become new

25   patient coordinator.

BOBBI COLURA - CROSS BY MS. GRIFFIN

1  Q   So you know that this was there as of the time you were
2  fully trained in August of '14; is that correct?
3  A   Yes, ma'am.
4  Q   You don't know what was used before then?
5  A   Correct.
6  Q   I want to show you in this new patient packet, Couch
7  Exhibit 253, page 110, and ask you -- you don't know whether
8  every patient that came to PPSA received an off-label drug, do
9  you?
10 A   After I become new patient coordinator, all my new patients
11 had to receive and sign that paper.
12 Q   But you don't know whether they were even going to receive
13 an off-label pain, do you -- medicine?
14 A   No, not for -- not after they signed that, I do not know
15 what the doctors would have prescribed.
16 Q   You don't know really what off-label pain treatment means,
17 do you?
18 A   A little.
19 Q   But you're not trained in that, are you?
20 A   No, ma'am.
21 Q   You don't have a DEA license, do you?
22 A   No, ma'am.
23 Q   And you certainly don't have a medical license, do you?
24 A   No, ma'am.
25 Q   So this was given, even before the patient got there and

4695

1    before anyone knew if they were going to get off-label pain

2    treatment; is that what you're telling us?

3    A    Can you ask that question again?

4    Q    Are you telling us that every patient received this after

5    August of '14 when you became the coordinator, every new

6    patient, before they even saw a doctor and a decision was made

7    as to whether it was in the usual course of professional

8    practice to give them an off-label drug?

9    A    Yes, ma'am.

10   Q    Also in this new patient packet was there an opioid

11   agreement for pain management sent to each patient, at least as

12   of August of '14, when you said you were fully trained?

13   A    Yes, ma'am.

14   Q    And again, do you know whether every patient that came in

15   as a new patient was going to receive opioids?  You don't, do

16   you?

17   A    No, ma'am.

18   Q    Do you know whether a doctor went over this opioid

19   agreement for pain management with every patient?

20   A    I do not know.

21   Q    And do you know whether a doctor went over this consent

22   form for off-label pain treatment with every patient?  You

23   don't, do you?

24   A    No, ma'am, I do not.

25   Q    I'll show you the direct financial interest disclosure

BOBBI COBURN - CROSS BY MS. GRIFFIN

1  statement, which is Couch's Exhibit 253, at page 16.  Direct

2  financial interest disclosure statement.  Are you aware of any

3  other financial interest Dr. Couch and Dr. Ruan had other than

4  what was listed on this form as of August of 2014?  You aren't,

5  are you?

6  A   No, ma'am.

7  Q   Do you see anything in this packet or on this particular

8  sheet that says they were being paid by the manufacturers of

9  Subsys?

10  A   I do not.

11  Q   Do you see anything on this sheet that says they owned

12  stock in the manufacture of Abstral?

13  A   No.

14  Q   Now, you indicated to Mr. Doss, who represents Dr. Couch,

15  that you would talk to the doctors about why they were

16  referring a patient to PPSA; is that correct?

17  A   Yes, ma'am.

18  Q   Are you telling us that you personally would talk to a

19  doctor or were you talking to someone at the doctors' offices?

20  A   The staff.

21  Q   You weren't talking to the doctors, were you?

22  A   Not directly.

23  Q   Did you talk to the doctors indirectly on the phone?

24  A   I don't understand.

25  Q   Did you talk to anyone that said:  This is Dr. Smith,

 1  Dr. Jones, Dr. So and So?  You didn't, did you?

 2  A   I can't remember a name, but I did speak to one doctor.  He

 3  was one of our most referring.  I would speak with him.

 4  Q   But you didn't regularly speak to doctors about why they

 5  were referring patients, did you?

 6  A   No.

 7  Q   You in fact spoke to some staff members, didn't you?

 8  A   Yes, ma'am.

 9  Q   Now, Ms. Coburn, you weren't the only one that made a

10  decision at PPSA after August of '14 what patients were seen,

11  were you?

12  A   I'm not understanding.

13  Q   You weren't the only person at PPSA who made a decision

14  after August of 2014 what patients would be seen, were you?

15  A   I was going over the packet and seeing who we would turn

16  away?

17  Q   Were you the only person that made the decision:  We will

18  see this patient or we will not see this patient, after August

19  of 2014?

20  A   I would schedule them, if we seen -- if it seemed like the

21  patient needed to be seen.

22  Q   But you weren't the one that made that final decision, were

23  you?

24  A   It was me and Monica.

25  Q   You and Monica made that decision?

4698

1    A   Yes, ma'am.

2    Q   And that's based on what somebody had told you on the

3    phone; is that right?  Or had faxed to you or mailed to you?

4    A   The office notes.

5    Q   So you and Monica made that decision as to who got into

6    PPSA?

7    A   Yes, ma'am.

8    Q   But you're telling us you didn't have anything to do with

9    Shawn Brennan being allowed in as a five-time patient at PPSA;

10   is that correct?

11   A   Correct.

12   Q   You don't remember Mr. Brennan?

13   A   No, ma'am, I do not.

14   Q   Now, I want to direct your attention to sometime when

15   Bridgette had been let go, when Justin had gone into treatment,

16   and when Stacy Madison had gone.  There were some new employees

17   thereafter in early 2015 at PPSA; is that correct?

18   A   Yes, ma'am.

19   Q   And in fact some things began to tighten up a little after

20   all three of them had left; is that correct?

21   A   I'm not sure what you mean.

22   Q   Are you not sure if things changed some and began to

23   tighten up after all three of them left?

24   A   Our practice changed because their practices -- the nurse

25   practitioners are different.

1   Q   So you had new nurse practitioners; is that right?

2   A   Yes, ma'am.

3   Q   And you told us that you scheduled Dr. Couch's new patients

4   around 11:30 or 1:30 because he came in late; is that correct?

5   A   Yes, ma'am.

6   Q   You knew, however, that Dr. Couch's patients were being

7   seen by nurse practitioners prior to 11:30 each day, didn't

8   you, ma'am?

9   A   Yes, ma'am.

10  Q   You knew in fact some were seen as early as 7 or 7:30 in

11  the morning, didn't you?

12  A   Yes, ma'am.

13  Q   And one last thing to show you on your form, the new

14  patient package.  On the next-to-the-last page, the payment

15  policy that you sent to the new patients that is Couch Exhibit

16  253, at page 17 -- and this is my copy, but it is a copy of

17  what was introduced.  Let me show you the actual exhibit so I

18  haven't written on it.

19          On the payment policy, that tells payments due at the

20  time of service; is that right?

21  A   Yes, ma'am.

22  Q   That went out to each new patient?

23  A   Yes, ma'am.

24  Q   And does it say what form of payment PPSA accepts?

25  A   Yes, ma'am.

1    Q    Read that for us, please.

2    A    The first paragraph?

3    Q    The last sentence:  We accept --

4    A    We accept cash, check, money orders, Visa, MasterCard,

5    American Express, and Discover.

6    Q    So cash payments were accepted, weren't they?

7    A    As a copayment to established patients.

8    Q    That doesn't say that here, does it?

9    A    Not in that sentence, no, ma'am.

10   Q    Does it say it anywhere on the form?  It doesn't, does it?

11   A    Not that I see.

12   Q    So if you were a new patient, you would assume just what

13   the form says:  We accept cash; right?

14   A    Yes, ma'am.

15   Q    Also on the new patient form, where it says agreement for

16   off-label pain treatment, Couch Exhibit 253, page 10, it

17   doesn't list the drug Subsys or Abstral, does it?

18   A    No, ma'am.

19   Q    Now, if a patient came in and had not signed every page of

20   this, you wouldn't turn them away, would you?

21   A    If they didn't understand and would like to speak to the

22   doctors about it, we would let them speak to the doctors, once

23   they went back, about this form if they had not signed it until

24   they spoke to the doctor.

25   Q    So what you're saying is they would be allowed to come in

1  without having signed every single page; is that correct?

2  A   Yes, ma'am.

3        MS. GRIFFIN:  That's all I have, Your Honor.

4        THE COURT:  Any redirect?

5        MR. DOSS:  Briefly, Your Honor.

6                    REDIRECT EXAMINATION

7  BY MR. DOSS:

8  Q   Ms. Coburn, you mentioned a few times somebody by the name

9  of Monica Carroll.  What was her title at PPSA?

10 A   She was the clinical manager.

11 Q   Was she a registered nurse?

12 A   Yes, sir.

13 Q   And so if you had any questions about a patient's intake

14 form about medical necessity, about any of the medical

15 information you were receiving as the new patient coordinator,

16 could you from time to time ask Monica Carroll questions?

17       MS. GRIFFIN:  Your Honor, it's beyond the scope of his

18 direct examination and was not covered in cross.

19       MR. DOSS:  There was the chain of command established

20 in direct.  Monica Carroll's name was specifically referenced,

21 Your Honor.

22       THE COURT:  It was beyond the scope of cross, so I

23 sustain the objection.

24 BY MR. DOSS:

25 Q   Ms. Coburn, you testified that cash would be accepted for

4702

1  purposes of making copayments; is that right?

2  A   Yes, sir.

3  Q   Do you ever recall or was it PPSA's practice, though, to

4  accept new patients who had no insurance?

5        MS. GRIFFIN:  Your Honor, it's beyond the scope,

6  again.

7        MR. DOSS:  This was -- this was questions just raised

8  at the end of cross-examination about the receipt of cash,

9  questions about the new patient form.

10        MS. GRIFFIN:  Your Honor, there was no question about

11  them being a new patient.  The question was whether they

12  accepted cash.

13        THE COURT:  Sustain the objection.

14  BY MR. DOSS:

15  Q   Now, you were asked several questions about the PDMP drug

16  query and specifically questions about the log-in information.

17  Do you remember those questions, Ms. Coburn?

18  A   Yes, sir.

19  Q   Whether you used Dr. Ruan's password, Dr. Couch's password,

20  or Dr. Chen's password, you were still pulling a drug query for

21  each new patient who came into PPSA, weren't you?

22  A   Yes, sir.

23  Q   And you were asked the question about whether somebody

24  would have taken those results and thrown them in the trash.

25  Do you remember that?

BOBBI COBURN - REDIRECT BY MR. DOSS

1    A    Yes.

2    Q    Did you ever see anybody ever throw PDMP results in the

3    trash?

4    A    No.

5    Q    From time to time did you see people consult the PDMP

6    results?

7    A    I'm not understanding.

8    Q    From time to time did you see any of the folks at PPSA --

9    medical providers, whether they be the physicians, the nurse

10   practitioners, or the MAs, or the RNs -- did you ever see them

11   review PDMP results that you had printed?

12   A    I gave them to the medical assistant and they would make

13   sure that it was on the packet.  They wouldn't -- the medical

14   assistant wouldn't take the packet without the form, without

15   the drug query.

16   Q    You were asked some questions about the financial

17   disclosure or the payment information in the new patient

18   packet.  I want to show you that.  That's Couch Exhibit 253,

19   page 17.  If you would, please, read the next paragraph after

20   the sentence that you were asked to read on cross-examination,

21   please.

22   A    Our practice is committed to providing the best treatment

23   for our patients.  We must emphasize that, as medical care

24   providers, our relationship is with you, our patient, and not

25   with your insurance company.  We cannot accept the

1    responsibility of negotiating the claims with the insurance

2    companies or any other persons.  While the filing of insurance

3    claims is a courtesy that we extend to our patients, all

4    charges are your responsibility from the date of services

5    rendered.

6    Q   And the next paragraph, please?

7    A   Not all services are a covered benefit in all

8    contracts.  Some insurance companies arbitrarily --

9           THE COURT:  That's not -- do you want the next

10   paragraph?  Or the --

11          THE WITNESS:  Oh, I'm sorry.  I skipped it.  I'm so

12   sorry.

13   BY MR. DOSS:

14   Q   That's all right.

15   A   Your insurance is a contract between you, your employer,

16   and the insurance company.  We are not a party to that

17   contract.  It is very important that you understand the

18   provisions of your policy.  We cannot guarantee payment of all

19   claims.  If your insurance company pays only a portion of the

20   bill or rejects your claims, any contact or explanation should

21   be made to you, their policyholder.

22          I can't see the first word right there.

23          Reduction or rejection of your claim by your insurance

24   company does not relieve you of your financial obligation.

25   Q   Is there anywhere on this form where it says that insurance

BOBBI COBURN - REDIRECT BY MR. DOSS

1  is not a prerequisite to being seen at PPSA?

2  A   I'm not sure what you mean.

3  Q   Do you remember the new patient form, the very first page,

4  the demographic sheet?  Do you recall that?

5  A   Yes, sir.

6  Q   Does that ask for the patient's insurance information?

7  A   It does.

8  Q   That was not filled in with the patient being seen at PPSA?

9  A   No.

10  Q   Do you remember all the patients that you coordinated while

11  you worked at PPSA?

12  A   No.

13  Q   So if you can't remember one particular patient, there's

14  nothing unusual about that, is there?

15  A   No, sir.

16          MR. DOSS:  One moment, Your Honor.

17      (A discussion was held off the record between defense

18  counsel.)

19          MR. DOSS:  No further questions, Your Honor.

20          THE COURT:  May this witness be excused?

21          MR. DOSS:  Yes, ma'am.

22          THE COURT:  You may step down.

23          MR. POWELL:  Dr. Couch calls Elaine McDonald, Your

24  Honor.

25                ELAINE R. McDONALD

1          was sworn and testified as follows:

2          THE WITNESS:  Yes.

3          THE CLERK:  Thank you, ma'am.  Please be seated.

4          THE WITNESS:  All right.

5                    DIRECT EXAMINATION

6    BY MR. POWELL:

7    Q    Good afternoon, Ms. McDonald.

8    A    How are you?

9    Q    I'm good.

10   A    Good.

11   Q    If you would, tell the jury your name, please.

12   A    It's Elaine R. McDonald.

13   Q    All right.  I want you to pull that -- or slide a little

14   closer to that microphone there, if you can.

15   A    Okay.

16   Q    All right.  What do you do for a living, Ms. McDonald?

17   A    I do insurance billing.

18   Q    For medical practices?

19   A    Yes.

20   Q    And what is medical billing?

21   A    Medical billing is basically taking charges from a patient

22   who is seen by a doctor and we go in and you bill them to the

23   insurance companies.

24   Q    Okay.  And where do you currently work?

25   A    I work for -- it's called -- it's another insurance billing

1    practice.  It's MedPoint.

2    Q    MedPoint?

3    A    Yes.

4    Q    And what does MedPoint do?

5    A    I bill for 10 urgent care clinics for Missouri.

6    Q    And you work here in Mobile?

7    A    Yes.

8    Q    And you work for a company that essentially processes for

9    these urgent care clinics in Missouri, processes their billing?

10   A    Their medical billing, yes.

11   Q    So you work for, I guess, what would be an outside medical

12   billing contractor?

13   A    Yes.  Outsource, yes.

14   Q    Outsource.  Where else have you worked in medical billing?

15   A    Well, I started in San Diego, because I'm originally from

16   San Diego.  And I used to work for a major insurance

17   company.  And when I moved to Mobile, I started doing medical

18   billing for different doctors' offices.

19   Q    Did you ever work for Mobile Family Physicians?

20   A    I did.

21   Q    Baker Medical?

22   A    Yes.

23   Q    When did you go to work at PPSA?

24   A    I started with Physicians Pain, let's see, June of 2010.

25   Q    What training or education do you have in medical billing,

1   Ms. McDonald?

2   A   I have experience in medical billing.  Let's see.  I've

3   been doing it since 1996, because I started off in an insurance

4   company.  So I know the insurance side, as well as now like the

5   billing part of it.

6   Q   Did you receive some undergraduate training in medical

7   billing when you were in San Diego?

8   A   Oh, yes.  I used to -- I went to Meritt College and did

9   medical administration.

10  Q   And over the course of your career, including in your

11  previous occupations and also your time at PPSA, did you ever

12  attend seminars and conferences regarding billing practices in

13  medical clinics and specialties?

14  A   Yes.  We -- it was a team of five of us.  We would actually

15  go to different Blue Cross/Blue Shield -- any kind of updates

16  they would have for us, we went to those different

17  meetings.  We actually went to seminars out of state, just to

18  be ready for any up and coming different procedure codes or

19  whatever was going to transpire.  We did go to the seminars.

20  Q   Now, we jumped ahead just a little bit and I just want to

21  clarify something and we'll come back to it.  Okay?

22  A   Okay.

23  Q   You said five of us --

24  A   Yes.

25  Q   -- went to seminars and conferences?

ELAINE R. McDONALD - DIRECT BY MR. POWELL

1    A   Yes, I was one of five billers.

2    Q   At --

3    A   At Physicians Pain Specialists, PPSA.

4    Q   All right.  All right.  And that would be between -- in

5    fact you worked at PPSA, you said -- I think you said --

6    beginning in June of 2010 and you continued working at PPSA for

7    how long?

8    A   Just until August.

9    Q   Of 2000 --

10   A   Of 2016.

11   Q   Okay.  Now, you know and we know that the clinic closed in

12   May of 2015; is that right?

13   A   Yes.

14   Q   You continued in your current position at PPSA doing

15   billing after the clinic closed?

16   A   Yes.

17   Q   So is it fair to say, then, that there was still insurance

18   billing to be done after May 20th of 2015, when you filled that

19   role?

20   A   Yes.  There was still a lot of claims that were

21   outstanding, claims that were not paid, and I would do the

22   followup, you know, and find out whatever the problems were and

23   try to fix it and resubmit the claims.

24   Q   And get those bills paid?

25   A   Yes.

1  Q   You just mentioned the training that you -- continuing

2  training seminars and things and you specifically mentioned

3  going to different seminars, meetings put on by major insurance

4  carriers like Blue Cross and Medicare and those type things, is

5  that what you're referring to?

6  A   Yes.

7  Q   And did you in fact have someone available to you and the

8  other staff at PPSA at Blue Cross that you could contact or

9  that could contact you if there was any question regarding Blue

10 Cross/Blue Shield billing?

11 A   Yes.  We had a rep.  If you had any questions or concerns

12 about anything that was on your Blue Cross remits or if there

13 were any changes, she would normally contact us.  But if we had

14 questions or we saw like different procedure codes not paying

15 and there could have been a change that we wasn't aware of or

16 we didn't get the actual paper that would tell us, then we

17 could call our rep, our local rep, and she should get back with

18 us and tell us if there was something we were doing wrong.

19 Q   All right.  We're getting a little bit ahead.  I just want

20 to back up a little bit with some more general questions about

21 billing.  How much does medical billing vary from practice to

22 practice?

23 A   Medical billing, it's pretty much the same.

24 Q   Can you explain to the jury what you mean by that?

25 A   When I say that, we all use the same codes.  You have E/M

1   codes that you use.

2   Q   What is an E/M code?

3   A   An E/M code is called evaluation management codes.  So you

4   have new patient codes, you have followup codes, and those

5   codes are billed universal.  So --

6   Q   By universal, do you mean whether that bill comes from PPSA

7   or comes from Joe Blow's medical practice?

8   A   Any insurance company uses the same E/M codes.  Whenever

9   you go to the doctor yourself, if you look at your EOB, the

10  same codes are used.

11  Q   EOB is an explanation of benefits?

12  A   Oh, I'm sorry.  Yes.  Explanation of benefits.

13  Q   Those are the things that we sometimes get in the mail from

14  our insurance companies --

15  A   You would get them all the time, yes.

16  Q   -- telling us what they paid?

17  A   Exactly.

18  Q   Now, how did the billing process work at PPSA?

19  A   Well, I mean, from beginning like after the patient is

20  actually seen that day?

21  Q   Well, let me back up a little bit.  Was there someone at

22  PPSA who initially -- okay.  Let's say a new patient.  All

23  right?  A new referral.  And before that first office visit

24  would someone at PPSA verify the existence of major medical

25  insurance for that new patient and the amount of the copay and

1   that sort of thing?

2   A   Well, yes.  You have a new patient coordinator that --

3   actually would verify the information that actually would come

4   from their doctor, their PCP, or whoever is referring them to

5   us.

6   Q   Primary care doctor or another medical specialist?

7   A   Right.

8   Q   Okay.

9   A   Then she would verify all of their benefits, and I guess at

10  that point they make the appointment.

11  Q   Okay.  And you know that because of your role, and

12  ultimately you would get whatever information they got so that

13  you could process the bill?

14  A   Yes.  After the patient is seen, we get it that next --

15  that night.

16  Q   So in the p.m. that's done and then the patient comes in --

17  A   Uh-huh (positive response).

18  Q   -- and pays the copay and has the visit, the services are

19  rendered?  Okay?

20  A   Right.

21  Q   Then what happens after that?

22  A   The next morning I would come in and I will actually run my

23  report for the provider that I billed for.  I would take the

24  list of patients that he actually saw that day and I would go

25  in and pull up the charge for that day and verify his charge

4713

1    against the medical records and be sure that everything is a

2    go.

3    Q   By everything is a go, what do you mean?

4    A   When I say that, I mean that he is billing the actual

5    office visit and it actually matches the note, the level.

6    Q   The level of service?

7    A   The level of service (nodding head affirmatively).

8    Q   All right.  And in that -- we'll get to this again in a

9    minute, but I just want to make sure I clear something.  That

10   document that you get is an electronic record; correct?

11   A   Yes.

12   Q   You pull it up?  You don't literally go get a chart, get a

13   piece of paper --

14   A   No.

15   Q   -- and start filling out anything; right?

16   A   It's in the system for me.

17   Q   All right.  Okay.  And then that document, when you pull it

18   up, is going to have the level of service codes?

19   A   Yes, it has the level of service, diagnosis codes --

20   Q   That's what I was about to ask you.  In addition to the

21   level of service -- which is a code; right?

22   A   Yes.

23   Q   It also has specific diagnosis codes --

24   A   Yes.

25   Q   -- on that bill or that document that ultimately becomes --

4714

1   A   It has everything on there.

2   Q   All right.  And you then, I think you said, you make sure

3   that the codes match the notes?

4   A   Right.  So --

5   Q   Now, explain to the jury what you mean by the codes

6   matching the notes.

7   A   If I saw, for example, where they are billing a 99214 and I

8   saw notes that could be probably missing, things that are

9   missing, and it just wasn't to that level, at that time I would

10   stop and I would go ask them to review their notes to be sure

11   that they've clicked everything that was supposed to be there.

12   Because, I mean, we're all humans and sometimes you can click

13   off of different things.  If it didn't match for that level,

14   then I would go back to the provider and ask them to look at

15   this, because he could have selected the wrong thing.

16   Q   And the provider would be whoever was rendering --

17   A   Whoever's rendering the services.

18   Q   -- the medical --

19   A   Yes.

20   Q   And that could be a nurse practitioner; correct?

21   A   Yes.

22   Q   It could be a certified nurse anesthetist?

23   A   Yes.

24   Q   Correct?

25   A   Yes.

ELAINE R. McDONALD - DIRECT BY MR. POWELL

1    Q    Or it could be the physician?

2    A    It could be the physician himself.

3    Q    And you had five different people that performed that same

4    function --

5    A    Yes.

6    Q    -- as you; correct?

7    A    Yes.

8    Q    And were they individually assigned or worked for a

9    specific provider --

10   A    Yes.

11   Q    -- in the practice?

12   A    Everything was split up in that office.

13   Q    So, for example, you would have one medical billing person

14   who handled, let's say, Dr. Ruan's --

15   A    Yes.

16   Q    -- patients that he saw?

17   A    Right.

18   Q    And Dr. Couch and the patients that he saw?

19   A    Exactly.

20   Q    And then someone that would handle the nurse practitioner

21   and the patients that the nurse practitioner saw?

22   A    Yes.

23   Q    Okay.  Now, who did you process billing for?

24   A    I started out with Justin Palmer.

25   Q    Okay.

ELAINE R. McDONALD - DIRECT BY MR. POWELL

1    A    When Justin left, then I had Ben.

2    Q    Ben Clark?

3    A    Ben Clark.

4    Q    Did you ever -- let me back up a little bit.

5         You and I have talked before about this process and

6    your position at PPSA, haven't we?

7    A    Yes.

8    Q    And you described the physical layout --

9    A    Uh-huh (positive response).

10   Q    -- of the clinic?  And you worked at Springhill Avenue;

11   right?

12   A    Yes.

13   Q    And the medical billing portion of the clinic was separated

14   from, let's say, the medical practice part of the clinic; is

15   that fair?

16   A    Yes.

17   Q    You were in an office?

18   A    Yes.

19   Q    And you were in that office with the other four?

20   A    Yes.  Four billers, yes.

21   Q    Billers?  And you had a lead biller in that office?

22   A    Yes, we had a lead person.

23   Q    A lead person?

24   A    (Nodding head affirmatively).

25   Q    And the lead person would sort of be first in the chain of

4717

1    command maybe?

2    A   Yes, she's the first.  If I was having any issues, I would

3    actually see if she knew any different guidelines of what was

4    going on.  We try to, you know, look over things.  I would go

5    to her first.  And if we couldn't figure it out, then she would

6    take it to the manager.

7    Q   If you had an issue with a bill -- and you've already

8    talked to us about how the codes had to match up and sometimes

9    clerical mistakes may be made by the provider?

10   A   Uh-huh (positive response).

11   Q   Okay?  The nurse practitioner or physician.  And you would

12   have to reconcile those errors, or the bill wasn't in a

13   position to be electronically filed; is that fair?

14   A   That's the -- yes, the charge, yeah, bill charge.

15   Q   You're not -- you're not telling us that the bills were

16   wrong on their face, are you?

17   A   No.

18           MR. BODNAR:  Objection, Your Honor, to leading.

19           THE COURT:  Yes.  Don't lead the witness.

20   BY MR. POWELL:

21   Q   And who was -- who was in the chain of command for you

22   above the lead biller?  Who was next in your --

23   A   That would be Debi.

24   Q   Debi Phillips?

25   A   Yes.

1    Q    Debi Phillips was the --

2    A    She's the actual manager, yeah.

3    Q    She's the manager?

4    A    Manager, yeah.  I -- well, Debi's role kind of changed. At

5    first she was our billing manager, and then she got

6    promoted.  But she still, you know, knew billing very well.  So

7    we still went to Debi when we had issues with bills.

8    Q    Despite her promotion to an overall --

9    A    Yes.

10   Q    -- office manager role?

11   A    Yes.

12   Q    So you didn't go see -- or did you -- did you ever go see

13   Dr. Couch about billing practices or did you follow the chain

14   of command as you've described?

15   A    For billing issues I would actually go to Debi.  I went to

16   Dr. Couch if I had an issue where a patient might have had --

17   he's indigent care and he had a balance, and I would talk to

18   Dr. Couch about something like that.

19   Q    When you say indigent care, what do you mean by that?

20   A    Where a patient would just come to me and say:  Look, I

21   don't have any money.  You know, I've exhausted this.  I don't

22   have the money and I have such a high bill.

23          We would try payment arrangements and at that point I

24   would talk to Dr. Couch if the patient, you know, really wanted

25   me to talk to Dr. Couch and just say that he could no longer

ELAINE R. McDONALD - DIRECT BY MR. POWELL

1   afford, you know, the high bill.

2   Q   Was Dr. Couch understanding of those situations?

3   A   Yeah, he was.

4   Q   Did he work with those patients?

5   A   Yes.  And at the end result he would either tell me to --

6   you know, if we would try the payment arrangements for a while

7   and they would make some payments but not all of them, he would

8   then just tell me, he'd say:  Elaine, I know they don't have

9   the money.  Just go ahead and write it off.

10  Q   Write it off?

11  A   Yes.

12  Q   And is that what you did?

13  A   Yes.

14  Q   Now, we've covered a little bit about the billing, the

15  medical billing part of it.  Were the copays paid or supposed

16  to be paid prior to the service being rendered?

17  A   Copays are supposed to be paid when services are

18  rendered.  But, of course, you know, sometimes we have patients

19  who either didn't have the copay or they forgot their wallet,

20  whatever their issue may be.  They would have to talk to me.

21  Q   And you tried to make arrangements?

22  A   I would.  Unless it was, you know, a recurring event, it

23  happens all the time.  Some patients had bad checks and I would

24  have to talk to them about that.

25  Q   You'd try to clear those things up?

1   A   Yes.

2   Q   Tell us what you would do if you found some error in a

3   bill.  What would you -- is that something that you could fix

4   yourself?

5   A   When you say bill, you're talking about in the EOB?  I

6   mean, on the actual EOB?

7   Q   What you're -- right.  What you get from the --

8   A   From the insurance company?

9   Q   Right.  Or the information that you get from a provider,

10  when you're getting ready at the beginning of the process,

11  beginning of the billing process --

12  A   Well, I'm sorry.

13  Q   That's okay.  And you see when you pull it up Patient John

14  Doe, who was seen the day before and everything's been done,

15  and you pull it up and you see -- you notice a problem that you

16  know, because of your experience, is going to cause or

17  potentially cause a problem with that bill being paid, you have

18  the authority to correct those errors yourself?

19  A   Well, no.  What happens, well, it just depends on what it

20  was.  If it was something like the notes wasn't signed, if the

21  notes wasn't signed, before I can bill anything, they have to

22  be signed.

23  Q   Okay.  That's a good -- that's a good point.  I want to ask

24  you about that now.

25  A   Okay.

ELAINE R. McDONALD - DIRECT BY MR. POWELL

1    Q   When you get the chart or whatever you want to call it,

2    you're ready to prepare the bill to go to the insurance

3    provider --

4    A   Uh-huh (positive response).

5    Q   -- it has to have an electronic signature --

6    A   On the notes.

7    Q   -- of the -- of the provider; correct?  The one who

8    rendered the --

9    A   The person who rendered the services.

10   Q   The rendering provider, is that the right term?

11   A   Yes, yes.

12   Q   Okay.  You have -- the rendering provider has to

13   electronically sign it; right?

14   A   Yes.

15   Q   And if that rendering provider is a nurse practitioner or

16   certified nurse anesthetist, then the physician has to also

17   review that and electronically sign it?

18   A   Yes.

19   Q   Is that right?

20   A   Yes.

21   Q   And in order for you to send that bill electronically to

22   whoever -- Blue Cross, whatever -- those two things have to

23   occur?

24   A   Yes.

25   Q   Were there times when the nurse practitioners that you

ELAINE R. McDONALD - DIRECT BY MR. POWELL

1   handled the billing for would make mistakes in the information

2   that they populate the chart with in order for you to prepare a

3   bill, did they make -- did they make clerical mistakes that you

4   would have to go to them to correct?

5   A   Well, if they made a mistake like, I mean, if they made a

6   mistake and I thought that I wanted them to look it over, to be

7   sure, I gave it back to them and let them review it.

8   Q   So that it was accurate?

9   A   Yeah, so when they gave it back to me it was normally --

10  they had checked it and everything was ready to be -- to go.

11  Q   Now, what -- where was all of this information located when

12  you got it?  Where does it come from?  Does it come from

13  Greenway?  Does it come from Greenway?

14  A   Yes, it comes from the software system.

15  Q   Okay.  So the billing, in addition to Greenway essentially

16  electronically hosting the entire medical record of the

17  patient, Greenway also populated that patient's electronic file

18  with the billing documents?

19  A   Right.  Everything is in the system for me to see.

20  Q   Okay.

21  A   And I would just click on the notes and look at it and

22  review it and do whatever I needed to do to it.

23  Q   Okay.  And what would happen with it when you hit the send

24  button?

25  A   Well, after we hit the send button, basically late that

 1   night the systems interface with each other.

 2   Q    What systems?

 3   A    Greenway talks to our clearinghouse.

 4   Q    What is a clearinghouse?

 5   A    A clearinghouse is where all of your claims go and then

 6   they are supposed to scrub the claims for you.

 7   Q    Tell me what scrubbing means.

 8   A    Scrubbing is like find any errors on your claims.  The

 9   errors could be like this patient -- I can't identify this

10   patient.  Well, at that time the next morning we get all the

11   rejections back.  And I would go in and I would look at the

12   patient's insurance information.  Sometimes it's just typos, a

13   lot of typos, and I would correct that.  Or they put -- forgot

14   the letter behind the Medicare number or whatever that case may

15   be.  They scrub the claims for us and then we would get

16   rejections back.

17        Well, sometimes the clearinghouse -- the edits would

18   pass and then it goes to the insurance company.  At that time

19   the insurance company, they scrub the claim again and they'll

20   say:  Patient not -- patient's insurance termed on such and

21   such a date.  They'll give us dates.

22   Q    Termed, you mean their policy lapsed?

23   A    Yeah, their insurance canceled, termed.  And at that time,

24   then we'd get that back and we would have to contact the

25   patient.

4724

```
 1  Q   Okay.  Let me back up just a little bit.  The report, let's
 2  say, the bill that you populate --
 3          MR. POWELL:  Sam, would you pull up 252-001?
 4          THE COURT:  Is this in evidence?
 5          MR. POWELL:  No, ma'am.
 6  Q   I want to show you what's been marked for identification
 7  purposes as Couch 252-001 and ask if you recognize it.  This is
 8  obviously a sample form.  Do you recognize it?
 9  A   Yes, this is our HCFA form.
10  Q   A what?  What did you call it?
11  A   It's called a HCFA.  But that's just short for the health
12  insurance claim form.
13  Q   And is this a somewhat universal form used in the
14  healthcare industry for billing purposes to various insurance
15  companies, and government and nongovernment?
16  A   Yes.
17  Q   It indicates in the top of it Medicare, Medicaid, Tricare,
18  CHAMPVA, Group Health Plan, FECA, Black Lung, Other.  Do you
19  see those boxes?
20  A   Uh-huh (positive response).
21  Q   So if this was, let's say, a Blue Cross/Blue Shield
22  patient, then this form -- you could use this form or, let's
23  say, the information in this form would be universal?
24  A   Yeah, you use this form for everyone.
25  Q   Okay.  And so that would be a group health plan; right?
```

ELAINE R. McDONALD - DIRECT BY MR. POWELL

```
 1   A   Yes.

 2   Q   And this document indicates -- has different identifiers

 3   for different people; is that right?

 4   A   Yes.

 5   Q   For instance --

 6           THE COURT:  Are you offering this document?

 7           MR. POWELL:  I'm about to.  I would offer Couch

 8   Exhibit 252-001.

 9           MR. BODNAR:  No objection, Your Honor.

10           THE COURT:  All right.  Mark it in.

11       (Defendant Couch's Exhibit 252 was entered into evidence.)

12           MR. POWELL:  Thank you.  May we publish?

13           THE COURT:  It's being published.

14   BY MR. POWELL:

15   Q   Now, what is -- what is the billable provider?

16   A   Repeat that.

17   Q   What is the billable -- who is the billable provider?

18   A   Well, the billable provider would be the actual doctor.

19   Q   Okay.  And what is the rendering provider?

20   A   The rendering provider would be the person who's giving the

21   care.

22   Q   Whoever's rendering --

23   A   Or the patient saw.

24   Q   -- whoever is rendering the medical service to the patient?

25   A   Yes.
```

ELAINE R. McDONALD - DIRECT BY MR. POWELL

```
 1   Q   And in this form those don't necessarily have to be the
 2   same person, do they?
 3   A   No.
 4   Q   It also contains the diagnosis -- it also contains the
 5   diagnosis codes for that particular service; right?
 6   A   Yes.
 7   Q   And that means whatever this patient's problem, medical
 8   problem was, has a number?
 9   A   Right.
10   Q   Correct?
11   A   Right.
12   Q   And those numbers go on this form; right?
13   A   Yes, in 21.
14   Q   If you look down at the bottom of this document --
15   A   Okay.
16   Q   -- that has a place there for the rendering provider;
17   right?
18   A   Yes.
19        MR. POWELL:  And then if you will go back up, Sam?
20   Q   It also has information requesting referral information,
21   who was the referring physician or provider; correct?
22   A   Yes.
23   Q   Now, so whether or not you actually used this particular
24   form in Greenway, the information that you are inputting, if
25   you will, into Greenway is so that you can send what you hope
```

 1    to be a correct bill to whatever insurance carrier -- actually

 2    the clearinghouse; right?

 3    A   Yes.

 4    Q   This same information is going to be plugged into your

 5    Greenway document that you have on the screen?

 6    A   Yes.  I mean, I don't foresee -- see this form.  But it's

 7    populated -- I guess when it gets wherever it goes, it

 8    actually -- that information is put on that form.

 9    Q   Okay.  It's not necessarily done by you at PPSA, it's done

10    at some point in time before the claim is paid?

11    A   Right.

12    Q   So let me -- I think I've got this.

13          You send, electronically send, the bill if it meets

14    all of the criteria that you've already talked about, you send

15    it to a clearinghouse?

16    A   (Nodding head affirmatively.)

17    Q   Do you know the name of the clearinghouse?

18    A   That clearinghouse is Navicure -- or NaviNet.  I think they

19    changed the name.  But that's where it goes first.

20    Q   Is that a nationwide clearinghouse?

21    A   Well, yeah.  You have so many different clearinghouses.

22    But yes, that's one of the big ones.

23    Q   All right.  And so the clearinghouse would then review --

24    scrub the claim, as you called it?

25    A   Yes.

1   Q   And they would be looking for inconsistent notes, codes?

2   A   No, they don't look --

3   Q   What do they do?

4   A   They don't look for notes or anything like that.  They look

5   for like -- it's definitely not a note.  They may look for

6   modifiers.  They look for -- they'll say like if a modifier or

7   something was used on the claim and that particular diagnosis

8   or that CPT code doesn't require that modifier, then it could

9   reject for that.  I mean, there are so many various rejections.

10  Q   Hold on one second.  What is a modifier?

11  A   A modifier is a like a two-digit code that is used on a

12  claim to identify if a patient -- an example -- had a procedure

13  done and it was left and right.  He had it on the left arm, he

14  had it on the right arm.  It tells the payor that it was more

15  than one procedure.  Or if a patient had another service that

16  was done once they came in to their followup visit and

17  something transpired where they needed an injection, then we

18  would use a modifier to let them know something else happened

19  at that office visit.  So at that time we would code it with

20  this modifier and then list the injection, epidural, or

21  whatever was needed.  It would actually be listed on that claim

22  as well.

23  Q   So after the clearinghouse has scrubbed the bill, it then

24  goes to the insurance carrier?

25  A   Yes.

ELAINE R. McDONALD - DIRECT BY MR. POWELL

1   Q   It goes direct to the insurance carrier?

2   A   Yes.

3   Q   It doesn't come back to you and then go to the insurance

4   carrier?

5   A   No.  It goes straight to the insurance and the insurance

6   looks as it and, like I said, they scrub the claiming again.

7   And that's where we'll find like this diagnosis is not

8   consistent, or you need a modifier with this procedure, or this

9   is not covered, or whatever they -- I mean, it's such a big

10  list.

11  Q   Now, what do you mean when you say there's something

12  inconsistent?  What do you mean by that?

13  A   Well, I mean -- I wish I had an example.  It's just like

14  when doing the billing part of it, I mean, the insurance

15  company, they may say something is -- this is inconsistent with

16  this -- this modifier.  Probably we used a modifier 50 with an

17  LT.  Or you can't use two different modifiers.  You need to let

18  them know that's LT and an RT.  Or some insurance companies

19  don't use left and right, they use a modifier 50 only.

20  Q   All right.  Let me ask -- let me ask --

21  A   I mean, it's --

22  Q   If I understand what you're telling me, they are looking at

23  it as if the information that's being supplied is incorrect in

24  order to pay the claim; is that fair?

25  A   Yeah, we need to make a correction.  Because you get

4730

1   different versions.  I mean, different things might have

2   happened where now they are not using left and right, they are

3   using -- you know, you get updates and now they're not using

4   like the left and right.  They're using a 50.  And you'll have

5   to fix your claim and put the 50 on it versus the left and

6   right.  Even though it's the same information, it's just new

7   how they want it done.

8   Q   So that then there are actually, then, three separate

9   processes that have to be completed accurately in order for a

10  claim to get paid; is that fair?

11  A   It can.  Sometimes it's wonderful when we open up your

12  Navicure the next morning and you don't have any, you know,

13  rejection.  That lets you know that everybody did their job

14  from the front desk all the way, you know, all the way to when

15  it gets to me.  If it gets to me, that means it's a problem,

16  something happened.  I'm happy when I don't see any type of

17  rejections.  I'm like:  Yeah, that's great.  So we can just

18  move on to the next thing.

19  Q   Now, and then when the payments get made, what do you do

20  then?

21  A   Well, when the payment comes in, then we would all five --

22  we had batches.  We would start posting payments to that

23  particular charge.

24  Q   Back up one second.  I want to show you something.

25  A   Okay.

4731

1    Q   Now, I want to show you what I'll identify as Couch Exhibit
2    027C-010, which appears to be an account information report on
3    a PPSA patient.  Do you see that?
4    A   Uh-huh (positive response).
5    Q   I want you to look up at the top, on the posting date of
6    February the 11th, 2015.  Do you see that?
7    A   Yes.
8    Q   The first thing you see there, it says a posting date, a
9    service date, and a user.  Who is the user?
10   A   That would be me.
11           MR. POWELL:  Judge, may I publish this to the jury?
12           THE COURT:  Is it in evidence?
13           THE CLERK:  No, ma'am.
14           MR. POWELL:  It is not.  I will offer it as Couch
15   Exhibit 27C-010.
16           THE COURT:  Is it more than one page?
17           MR. POWELL:  It's just one page.
18           MR. BODNAR:  No objection, Your Honor.
19           THE COURT:  All right.  Mark it in.
20       (Defendant Couch's Exhibit 27C was entered into evidence.)
21           MR. POWELL:  May I publish it?
22           THE COURT:  It's published.
23   BY MR. POWELL:
24   Q   E.M. is you?
25   A   Yes.

4732

1  Q   And then it says 99214.  What is 99214?

2  A   99214 is a -- that's the E/M code I was talking about.

3  That patient came in that day and was charged a 99214.

4  Q   That is a service, that is a level of service code?

5  A   Yes, that is.  I always say that's like a higher service

6  date.

7  Q   Okay.  And then it has next to that, after it has $135

8  times one -- which means $135; right?

9  A   Yes, that's the amount of that particular charge.

10 Q   Okay.  And then it has billable.  Do you see that?

11 A   The billable?

12 Q   And it has colon:  John P. Couch, MD?

13 A   Yes.

14 Q   Is that right?

15 A   Yes.

16 Q   Is that what you were referring to earlier as the billing

17 provider?

18 A   Yes.  The charges were rendered -- the patient was seen by

19 Ben.

20 Q   All right.  I'm getting there.

21 A   Okay.

22 Q   After Dr. Couch's name appears, it then has rendering, with

23 a colon, and it says:  Ben Clark, CRNP.

24        What does that notation mean in medical billing where

25 it says Rendering:  Ben Clark, CRNP?

4733

```
 1   A    That means that Ben actually provided medical services to
 2   the patient.
 3   Q    Okay.  And then the next has the practice location
 4   underneath that; correct?
 5   A    Yes.
 6   Q    And then it has on the third line -- those are the
 7   diagnosis codes; right?
 8   A    Yes.
 9   Q    So if I'm a health insurance company and I'm looking at
10   this document, those three numbers in the 700 range, I can look
11   those up and that's going to tell me what those -- those
12   diagnosis codes mean?
13            MR. BODNAR:  Objection, Your Honor, to foundation.  I
14   believe she testified that this is the information that they
15   have internally, not the information that is seen by the
16   insurance company.
17            MR. POWELL:  I'll rephrase the question.
18            THE COURT:  All right.
19   BY MR. POWELL:
20   Q    Those three numbers are diagnosis codes?
21   A    Yes, they are.
22   Q    Is this information transmitted to the respective insurance
23   companies?
24   A    Yes, it is.
25   Q    And those three numbers refer to a specific medical
```

4734

 1   diagnosis in your training and experience; is that right?

 2   A   Yes.

 3   Q   Now, the next thing is the copayment type, the visit ID,

 4   and the recipient name, Tena Goellner; right?

 5   A   Yes.

 6         MR. POWELL:  Ask you to go down just a little.

 7   Q   Do you see the next entry, February the 25th, 2015?

 8   A   Yes.

 9   Q   And it says:  Applied to charge:  Contractual adjustment,

10   $40?

11   A   Yes.

12   Q   Are you familiar with what that means?

13   A   Well, what this is is because we are providers for Blue

14   Cross, we're a contractor with Blue Cross.  So we have to

15   take -- necessary adjustments through Blue Cross.

16   Q   You have to -- you have to adjust your bill?

17   A   Yes.

18   Q   Downward?

19   A   Down.

20   Q   And you did so or under this particular service for that

21   particular visit on February the 11th, that bill was reduced by

22   $40 for Blue Cross pursuant to a contract --

23   A   Yes, yes.

24   Q   -- that PPSA had with Blue Cross; is that accurate?

25   A   Yes.

4735

1  Q   So is this information, based on your training and

2  experience, transmitted to Blue Cross and does this information

3  in this document summarize the information that is populated in

4  the claim that goes to Blue Cross?

5  A   Right.  It's sent to Blue Cross and this is what Blue Cross

6  told us to do.

7  Q   And eventually it was paid?  If you go down further, Blue

8  Cross paid the bill, didn't it?

9  A   Yes, they did.  Patient had a $40 copay.

10  Q   And they paid it based on the representation that the

11  services were rendered by Ben Clark, certified nurse

12  practitioner, billable to Dr. John P. Couch; is that right?

13  A   Yes.

14  Q   What is an NPI?

15  A   That is a national provider number.

16  Q   And did the PPSA practice have a group NPI number?

17  A   Yes, we do.  Or yes, we did.

18  Q   And were bills sent to insurance companies under that group

19  NPI number, regardless of who actually rendered the service?

20  A   Yes, that is the number we would bill under, yes.

21  Q   And would that have been the procedure and process that was

22  in place, for instance, in February of 2015, as we just talked

23  about in Couch Exhibit 027C-010?

24  A   Yes.

25  Q   Nurse practitioners didn't have NPIs at PPSA, did they?

4736

1   A   No.

2   Q   You mentioned to us earlier that you and the other

3   individuals in medical billing had tried to stay current by

4   going to seminars and conferences put on by Blue Cross/Blue

5   Shield and other healthcare providers.  Do you remember that

6   testimony?

7   A   Yes.

8   Q   And you also said you had a personal Blue Cross/Blue Shield

9   representative you could go to, a go-to person; right?

10  A   Yes (nodding head affirmatively).

11  Q   Back when you were doing this -- and, for instance, that

12  bill that we just talked about with that information -- were

13  you ever made aware that Blue Cross/Blue Shield had any

14  complaints or any problems with the billing procedures, for

15  instance, like we just talked about occurring in February of

16  2015?

17  A   No.

18          MR. BODNAR:  Objection to hearsay, Your Honor.

19          MR. POWELL:  I asked if she was aware, Judge.

20          THE COURT:  Sustained.  Well, of her own personal

21  knowledge?

22  BY MR. POWELL:

23  Q   Of your own personal knowledge?

24  A   No.

25  Q   Ms. McDonald, in terms of your experience in the billing at

1  PPSA -- and we've already established you worked in other

2  medical practices; right?

3  A   Yes.

4  Q   Did it operate any differently at PPSA than your experience

5  at other medical practices?

6  A   No.

7          MR. POWELL:  I believe that's all.  Thank you.

8          THE COURT:  Mr. Knizley?  Do any of you have any

9  questions?

10         MR. DARLEY:  No, ma'am.

11         THE COURT:  All right.

12         MR. BODNAR:  Your Honor, we just need a moment to

13 gather some material.

14         THE COURT:  All right.

15                     CROSS EXAMINATION

16 BY MR. BODNAR:

17 Q   Good afternoon, Ms. McDonald.

18 A   How are you?

19 Q   My name is Chris Bodnar, and I represent the United States.

20 A   Okay.

21 Q   Ms. McDonald, you began working there at PPSA, I think you

22 said, in 2010; is that correct?

23 A   Yes.

24 Q   So you were there over the time period when there was a big

25 switch in the billing from the billing code 99213 to 99214;

ELAINE R. McDONALD - CROSS BY MR. BODNAR

1    isn't that correct?

2    A   Well, I can't say a billing switch.  I mean, when I got

3    there, I don't recall a big switch.  Because when I first got

4    there, I was not doing any type of charges.  I was hired to

5    pretty much just do posting of payments.

6    Q   So you weren't dealing with any of the office visit codes

7    in 2002?

8    A   Not in --

9    Q   I mean 2010 forward.  When did you first start dealing with

10   the office visit codes?

11   A   I started when Debi took over and we split everything up.

12   She hired more billing people and she wanted everyone to do

13   everything.  And I believe that was like 2013.

14   Q   I'm going to show you what has already been admitted as

15   Government's Exhibit 33-1 -- actually 33-2 for Dr. Couch.

16   Office visit billed to Blue Cross and Blue Shield by Dr. Couch,

17   do you see the blue line for office code 99213?

18   A   Okay.  Yes.

19   Q   Do you see that?

20   A   Yes, I see that.

21   Q   And the red line for 99214?

22   A   Yes.

23   Q   According to this graph, in approximately 2013 did it

24   switch where many more codes were going out under 99214 as

25   opposed to 99213?

4739

```
 1   A   Okay.

 2   Q   Do you see that?

 3   A   I see, yeah, I see it.

 4   Q   But you started around this time period, so you say you

 5   don't know why it was that there was a big switch over from

 6   99213 to 99214?

 7   A   Yes, I wasn't aware of that.  I mean, like I said, I

 8   started actually doing the charges later.  So, I mean, to me

 9   when you look at the notes and, if everything is okay, you can

10   bill that.

11   Q   You can bill a 99214?

12   A   Yes, sir.

13   Q   And 99214 pays more in reimbursement than a 99213?

14   A   Well, you would have to look at the notes and everything

15   and make sure that everything -- in order to bill that code --

16   that everything is justified.

17   Q   Now, we're going to look at a note, for example, from a

18   patient named Benjamin Brown.  And this is from Government's

19   Exhibit 12-1(a).  So this is a Dr. Couch patient, and it's an

20   office visit from October 8, 2014.  Do you see that?

21   A   Yes.

22   Q   So were these the type of notes that you would review to

23   determine whether or not it matched up a 99214 code?

24   A   Yeah, that would be a note.  But this looks like there's a

25   problem with that note.
```

ELAINE R. McDONALD - CROSS BY MR. BODNAR

4740

1   Q   Some of the typing in there; correct (indicating)?

2   A   Yeah.  It looks like something's missing.

3   Q   Well, we're going to go down --

4   A   I mean, it's just something's wrong with that note.  I see

5   all those A's and all that on there.

6   Q   Now, you weren't the one that chose whether it was going to

7   be a 99213 or a 99214 visit?  That was already prepopulated

8   when it came here?

9   A   Right.

10   Q   So your role, then, was to look at the note like this to

11   determine does it match up with the 99214 code?

12   A   Right.

13   Q   And one of the things you would look at would be the

14   examination that was done; correct?

15   A   Right.

16   Q   To determine if it justified a 99214 code?

17   A   The exam I would look at.  If, you know, he talked about

18   like social problems or if he touched the patient -- you know,

19   whatever he did in the visit.

20   Q   Exactly.  So in this one, the note shows that he checked

21   the eyes; correct?

22   A   Yes.

23   Q   He checked the thyroid in the neck, he checked all the

24   different parts of the spine.  So this was a pretty extensive

25   examination --

1    A    Yes.

2    Q    -- per the note; correct?

3    A    Yes.

4    Q    So this would justify a 99214 code because it was a pretty

5    extensive examination that was done?

6    A    Right.

7    Q    Is there any -- now, you weren't actually in the patient

8    room with Benjamin Brown on this day or with any patient on any

9    day; correct?

10   A    Wait.  Say that again.

11   Q    You never were back in the patient room to see -- to

12   actually see these tests being done, were you?

13   A    Oh, no.  I -- no, I never went in the room.

14   Q    But according to the note, that is what happened?

15   A    Yes.

16   Q    And according to what's on there, this does justify a 99214

17   code, this was a pretty extensive examination?

18   A    Yes.

19   Q    In fact, at the end of it, of this October 8th visit, it's

20   signed on November 7th and November 14th by Justin Palmer and

21   Dr. Couch; is that correct?

22   A    Right.

23   Q    Does it anywhere in this note indicate that Dr. Couch was

24   out of town that day, on October 8th?

25   A    No.

ELAINE R. McDONALD - CROSS BY MR. BODNAR

1  Q   You wouldn't be able to tell that from just looking at the
2  note, would you?
3  A   I wouldn't, no.
4  Q   So you have to go off what the note tells you on who to
5  bill it for; correct?
6  A   Yes.  I mean, other factors could -- because you could
7  have -- I can't tell from -- just from the notes, I can't tell
8  that.
9  Q   So after looking at a note like this, there's no way to
10 tell, if it's signed by Dr. Couch, no way to tell that he
11 didn't actually render the service because he wasn't there that
12 day?
13 A   Right.  I couldn't tell.
14 Q   And it certainly appears that an extensive physical
15 examination was done which justifies that 99214 code?
16 A   Yes.
17 Q   So when you bill it, it would be billed under Dr. Couch's
18 NPI and for a 99214 visit?
19 A   Yes.
20 Q   Now, you talked a lot with defense counsel about scrubs or
21 edits.  Would any of the edits at the clearinghouse or at the
22 insurance company be able to tell that Dr. Couch was not in
23 town that day?
24 A   No.
25 Q   And would any of the edits be able to tell if any of these

1    things actually occurred for Benjamin Brown?  (Indicating.)

2    A    No.

3    Q    Just so we're clear, when it comes in the next day to you,

4    when the information comes in for Benjamin Brown on this date,

5    it would have this progress note and it would have already

6    populated in the 99214 code, because that appears to be what

7    the right code would be for that?

8    A    Right.

9    Q    So your job, you don't have to determine, look at it and

10   decide what code it is?  You're just saying:  Okay, is it

11   justified for 99214, based on what I'm seeing?

12   A    Okay.  If everything was done that he said he did, then

13   yes, that 99214 would be the code to use.

14   Q    And you just -- do you know that that was done because it

15   says it in the note that it was done?

16   A    Right.

17   Q    I'm going to show you an example from a patient named David

18   Riley.  And this comes from Government's Exhibit 12-1.  You had

19   mentioned that after Justin left you worked with or you coded

20   for Ben McDonald -- Ben Clark; correct?

21   A    Ben Clark.

22   Q    So is this a similar progress note that we just looked at,

23   this one for David Riley on May 7th?

24   A    Yes.

25   Q    Again, does it go down and talk about the history and the

4744

ELAINE R. McDONALD - CROSS BY MR. BODNAR

1    treatment and then go on to explain the type of physical
2    examination he had that day?
3    A    Yes.
4    Q    And again, does this appear to be a pretty thorough
5    examination of the eyes, the thyroid, all sorts of extremities?
6    A    Yes.  But when you're looking at it on the screen, in
7    Greenway it actually kind of highlights in a different color.
8    Q    Okay.
9    A    And it tells you -- you can see where all those things were
10   done.
11   Q    So again, you would highlight this and say that these
12   things were done?
13   A    Yes.  It's like in a different color.  So, I mean, it
14   looks -- yes, it would be done.
15   Q    So, for instance, this patient, David Riley, for joint
16   stability they were looking at his elbows and his wrist, that
17   was done that day, according to the note?
18   A    Well, when I would look at it on the screen, I would
19   actually see it being highlighted.
20   Q    Okay.  So it wouldn't be just a piece of paper, it would
21   be --
22   A    (Shaking Head negatively.)
23   Q    -- but you would see the exam?
24   A    You would actually see -- yeah, because it's highlighted in
25   different -- in color (indicating).

1   Q   And it talks about the other parts.  He's got a normal

2   gait, stands without difficulty, and talks about all the other

3   tests that were done that day.  But you have no way of knowing,

4   do you, of whether or not any of these exams actually occurred,

5   because you weren't back in the patient room?

6   A   Right.  I wasn't there.

7   Q   Exactly.  You rely on what is in the chart as being

8   accurate?

9   A   Wait.  Say that again?

10   Q   You have to rely on what is in this note as being accurate

11   so that you can bill accurately?

12   A   Right.

13   Q   And for this visit on May 7th, does it show at the end that

14   it was signed by Ben Clark on May 7th and then Dr. Couch on May

15   14?

16   A   Yes.

17   Q   But is there any way that you would know from this record

18   that Dr. Couch wasn't in town on May 7th?

19   A   No.

20   Q   So you would have no way of knowing, you'd have to rely on

21   the accuracy of these records?

22   A   Right.

23   Q   So your billing, then, is only as accurate as the

24   information that you were provided by the doctors?

25   A   Well, I mean, there's other things.  I didn't do

1  Dr. Couch's billing.  So, I mean, for my doctor I would know

2  when he was there.

3  Q   I thought you said that you did it for Justin Palmer --

4  A   I mean for Justin or Ben.  And if Ben was --

5  Q   Or Dr. Couch?

6  A   I mean, I would know that he was there or if he was on

7  vacation -- or that information, I would have that

8  information.  I would know.

9  Q   So you would know, then, on May 7th to not bill it out as

10  being done by Dr. Couch, because he wasn't there?

11          MR. SHARMAN:  Objection.

12  A   Yes.  If I was doing Dr. Couch's billings.

13          MR. POWELL:  Excuse me.  Object to the form of the

14  question.  Assumes facts not in evidence.

15          THE COURT:  Overruled.

16  BY MR. BODNAR:

17  Q   Help me understand.  How is it that you weren't doing

18  Dr. Couch, if you were doing Ben and Justin?  Maybe I missed

19  that.

20  A   I billed for Justin.

21  Q   Okay.

22  A   So Justin is the rendering provider.  If he was -- if he's

23  there, then I will bill -- he would -- I would get his charges

24  the next day.  Now, when it comes to the signing, I never

25  signed -- I mean, I never billed anything out until I saw the

ELAINE R. McDONALD - CROSS BY MR. BODNAR

```
 1   signature there.
 2   Q   The signature of whom?  Of Justin or of Dr. Couch?
 3   A   No.  Of Dr. Couch.
 4   Q   Okay.
 5   A   Because I had to have both signatures.  I'd have to have
 6   that signature in order to bill it.
 7   Q   And that's because it's billed out under the doctor's NPI
 8   number?
 9   A   Yes.
10   Q   And that includes for Blue Cross/Blue Shield patients?
11   A   That's everyone, yes.
12   Q   You mentioned that you had gone to training for Blue Cross
13   and Blue Shield.  But at no point during that training had you
14   heard that they don't do incident-to billing?
15   A   No.
16   Q   Are you familiar with what Blue Cross and Blue Shield's
17   billing policy is under who you can bill under?
18   A   If we had any issues with billing for Blue Cross, that
19   means our supervisor would have known as well.  I didn't.  I
20   mean, when we had a problem, we always went to our manager.  At
21   that time she would call our rep.  And if you could get a hold
22   to Ms. Malone, she would then tell us what, you know, what we
23   needed to do, or if there was any issues.  But no, I didn't --
24   I mean, I don't know if there were any different -- if we could
25   have missed something.  I mean, I don't know.
```

ELAINE R. McDONALD - CROSS BY MR. BODNAR

1    Q   I'm going to show you what has previously been admitted as

2    Government's Exhibit 27-24, which has previously been

3    identified -- there's two pages here, the Physician Extender

4    Guidelines for Blue Cross and Blue Shield -- and just ask in

5    this third paragraph does it say:  Blue Cross requires claims

6    to be billed under the name and NPI of the provider who

7    actually rendered the service and does not recognize

8    incident-to billing.  Under no circumstances should services

9    performed solely by a CRNP, CNM, PA, or PSA be billed under a

10   physicians name and NPI.  Were you not aware of that?

11   A   I've never seen that.

12   Q   But you did go to training for Blue Cross and Blue Shield?

13   A   Yeah, I went to several seminars and things with Blue

14   Cross.  But I've never seen that.

15   Q   And I'll show you one that came out in 2015.  It's the same

16   exhibit, it's the second page of that.  Where it says Blue

17   Cross requires claims to be billed under the name and national

18   provider identifier, NPI, of the provider who physically

19   evaluates the patient to collect or confirm the patient's

20   history of present illness.  The provider who physically

21   conducts or affirms the HPI and performs an in-person

22   examination can bill for the evaluation and management

23   services.  This work is not relegated to ancillary staff.

24         Again, you weren't aware to have this policy?

25   A   No.

ELAINE R. McDONALD - CROSS BY MR. BODNAR

1    Q   You did have a contract with Blue Cross and Blue Shield?

2    A   Yes, we're a contractor with Blue Cross/Blue Shield.

3    Q   Had anyone at PPSA ever trained you on what the

4    requirements were for billing for Blue Cross/Blue Shield?

5    A   Wait.  Say that again.

6    Q   Was there any training given to you by someone at PPSA

7    about what the responsibilities were for billing to Blue Cross

8    and Blue Shield?

9    A   No.

10   Q   The patient you looked at, Tena Goellner, do you recall

11   Couch 27C-10?

12   A   Yes.

13         MR. BODNAR:  Do you have a hard copy?

14   Q   Now, this sheet that you looked at, the account information

15   report, is this the sheet that was sent to Blue Cross and Blue

16   Shield or is this an internal document?

17   A   Yeah, this is an internal document.  This is just a report

18   that was pulled under her charges.

19   Q   And it does say it was billable under John Patrick Couch?

20   A   Yes, it does.

21   Q   But do you have any way of knowing whether Tena Goellner

22   could even recognize Dr. Couch?

23   A   No.

24   Q   Is that because you were never in the -- you weren't in the

25   clinical rooms with them?

4750

```
 1   A   Wait.  Say that again.

 2   Q   Because you weren't in the clinical rooms with them?

 3   A   Right.

 4   Q   So, Ms. McDonald, is it fair to say, then, for all of the

 5   information that you ended up passing on to the clearinghouse

 6   and the insurance companies, you relied on the accuracy of the

 7   information provided to you?

 8   A   Yes.

 9           MR. BODNAR:  Nothing further from this witness, Your

10   Honor.

11           THE COURT:  All right.  Mr. Powell?

12           MR. POWELL:  Yes, ma'am.

13                       REDIRECT EXAMINATION

14   BY MR. POWELL:

15   Q   Referring again, Ms. McDonald, to Couch Exhibit 027C-010,

16   we discussed this a little earlier, Mr. Bodnar asked you some

17   questions about it.  This information is transmitted to Blue

18   Cross?

19   A   Yes.

20   Q   And during your time at PPSA, when you prepared a bill and

21   populated the electronic document --

22   A   Yes?

23   Q   -- this information was sent to Blue Cross; right?

24   A   Yes.

25   Q   And is that information, regardless, sent to Blue Cross for
```

ELAINE R. McDONALD - REDIRECT BY MR. POWELL                    4751

```
 1   every single claim?

 2   A    For every claim (nodding head affirmatively).

 3   Q    So every claim that you completed and checked for accuracy

 4   would have a rendering provider; correct?

 5   A    Yes.

 6   Q    And a billable provider?

 7   A    Yes.

 8   Q    So if Blue Cross paid these claims over the course of your

 9   time at PPSA -- and I don't mean just for Tena Goellner's

10   claim, I mean every Blue Cross claim?

11   A    Yes.

12   Q    -- that information categorically would have been sent to

13   Blue Cross if the claims -- and claim paid if it was paid?

14   A    Yes.

15   Q    Regardless of any physician extender guideline of which you

16   were or were not aware?

17   A    Yes.

18   Q    Now, you mentioned -- Mr. Bodnar asked you some questions

19   about the physical exam being one of the things that you look

20   to to see if a level of service matched the 99214 billing code.

21   Do you remember that?

22   A    Yes.

23   Q    And he asked you about a physical exam and he showed you a

24   patient record that talked about thyroid and talked about some

25   other things.  Do you remember that?
```

1    A    Yes.

2    Q    Do you know what the term "populated medical record" means

3    or a "cloning" of the medical record?

4    A    I believe I do.  It's just the information that is like a

5    template, I'm going to say like a template in the Greenway

6    system, and a lot of the information is like there and you

7    choose what you did.

8    Q    And if you didn't do that, did it carry over, did the same

9    information carry over to the next office visit that was

10   completed on a prior occasion?

11         MR. BODNAR:  Objection to foundation, Your Honor.

12         THE COURT:  Sustained.

13   BY MR. POWELL:

14   Q    Now, whether or not there was a physical exam conducted or

15   a complete physical exam, as Mr. Bodnar asked you about, is

16   only one of the factors in determining whether or not the

17   billing codes are correct, isn't it?

18   A    Wait.  Say that one more time.

19   Q    Let me back up.  What is an HPI?  Do you know?

20   A    HPI?

21   Q    History of -- history of present illness?

22   A    I'm not sure of the HPI.

23   Q    Let me show you.

24         (A discussion was held off the record between counsel.)

25   BY MR. POWELL:

1  Q   Government's Exhibit 12-1(h) which was the progress note

2  from David Riley, do you see that?

3  A   Okay.

4  Q   Now, if you look, history of present illness, isn't that

5  one of the most important things that you look at to determine

6  whether or not the level of service is appropriate for the

7  charges that are going to be sent to the insurance company?

8  A   Yes.

9  Q   What's also important -- or is it important also what

10  actual service was rendered?  What the patient's problem was

11  and what the prescription or plan was to address that problem?

12  A   (Nodding head affirmatively.)

13  Q   You have to answer out loud.

14  A   Yes.

15  Q   Now, the physical exam that he asked you about, Mr. Bodnar,

16  was just one of the things that you look at, isn't it?

17  A   Yeah.

18  Q   You're also going to look at what the plan of treatment is?

19  A   Yes.

20  Q   You're going to look at what medications are prescribed,

21  that sort of thing?

22  A   Yes.

23  Q   Are all of those things important in determining the level

24  of service that you're billing for is appropriate?

25  A   It is.

 1   Q   It's not one single factor?

 2   A   No.

 3   Q   Mr. Bodnar showed you a document from Blue Cross which you

 4   indicated you weren't familiar with.  And this is page two of

 5   Government's Exhibit 27-24.  I show you this.  Do you see the

 6   highlighted portion here where it says the provider who

 7   physically -- who is physically conducting or affirming the

 8   history of present illness and performing an in-person

 9   examination can bill for the E/M service?  Do you see that?

10   A   Yes.

11   Q   So is it fair to say the confirmation of the history of

12   present illness -- which is what the patient comes in and talks

13   about during that office visit; right?

14   A   Yes.

15   Q   That that is probably the most important factor in

16   determining the level of service?

17           MR. BODNAR:  Objection, Your Honor, to foundation of

18   what is the most important factor.

19           THE COURT:  Sustained.

20   BY MR. POWELL:

21   Q   You mentioned Greenway.  When you're looking at the chart

22   and the notes, as you referred to them, it doesn't look like

23   this, does it?  (Indicating.)

24   A   No.

25   Q   This is a document that's generated after or it goes

4755

1   somewhere else and it's not part of what you do to determine

2   the accuracy of the bill, is it?

3   A   Right.

4   Q   And you mentioned something about in Greenway that what was

5   actually done would have been highlighted?

6   A   Yes.

7   Q   What do you mean by that?

8   A   When we get the ticket the next morning and we scroll down

9   and we look at everything that's done -- if I'm remembering

10  this correctly, because it's been a while -- whatever he -- I

11  say touch and feel, the doctor touched and felt -- it's

12  highlighted.  I remember it being highlighted in a color.  And

13  I want to say red.  And so it's -- everything may not be

14  checked.  I mean, you know, it shows what -- it has a color

15  that I can remember.  It's color coded.

16  Q   And is that -- is that to make it easier for you to review

17  to determine what was actually done?

18  A   I'm going to say yes.

19      (A discussion was held off the record between defense

20  counsel.)

21  BY MR. POWELL:

22  Q   Are things that the doctor or nurse practitioner does or

23  does not do, are they highlighted in a different color?

24  A   I want to say they are left just black.

25      (A discussion was held off the record between defense

4756

1  counsel.)

2  BY MR. POWELL:

3  Q   I want to show you what's already been admitted as Couch

4  Exhibit 11A, at page 170, and then I want to put this --

5       MR. POWELL:  Can you pull that up?

6  Q   Okay.  And I'll show this to you, if we can publish it,

7  Your Honor.

8       THE COURT:  Do you want it on the presenter?  Or are

9  you using the computer?

10      MR. POWELL:  Yes, ma'am, I'm trying to do it.

11      THE CLERK:  He's using the camera.

12 BY MR. POWELL:

13 Q   Is this something similar to what you're talking about?

14 A   Yes.

15 Q   And the information that is in red, is that what you were

16 talking about?

17 A   Yes.  And I think that's -- if I can remember right, this

18 is when they -- when it's highlighted is when they did a lot of

19 the -- they checked everything, they checked it.

20 Q   The one I just showed you is not like that, is it?

21 (Indicating.)

22 A   Okay.  Repeat that for me?  What you --

23 Q   It doesn't appear like that on your screen when you're

24 doing the billing, though?

25 A   No.  I want to say it's in a red.  It's in a color, that I

1   can remember.

2   Q   And it's those notations, the ones from which you make your

3   determination if it's an accurate bill or not, the ones

4   highlighted in red?

5   A   I believe when it's in the red, they check -- they've

6   checked that.  I just can't really remember.  I remember the

7   color being there where I think they -- that's where they

8   checked the patient.

9   Q   So would it be fair to say that the red print that you look

10  at on the screen is what you use to determine the accuracy of

11  the codes?

12          MR. BODNAR:  Objection to leading, Your Honor.

13          THE COURT:  Sustained.

14  BY MR. POWELL:

15  Q   Do you use the information in red for population of the

16  Greenway form in order to determine the appropriate code for

17  the bill?

18  A   Not the appropriate code.  I mean --

19  Q   Completed form.  Is that -- the information in red that I

20  just showed you in an example --

21  A   That is where the doctor, I'm saying, checked the patient,

22  checked certain parts of the body.  I can't say that that's not

23  the code.

24  Q   I guess that was a bad question.  That's the information

25  that you look at?  The information that is in red --

4758

 1    A   Yes.

 2    Q   -- that's the information that you look at to determine

 3    whether or not whatever particular billing code is being

 4    presented is justified?

 5    A   Right.  That is one of the things I look at, that he

 6    actually touched the patient, yeah.

 7    Q   During the time when you were --

 8            THE COURT:  Mr. Powell, how much longer?

 9            MR. POWELL:  I have two more questions, Judge.

10            THE COURT:  Okay.

11    BY MR. POWELL:

12    Q   During the time you were at PPSA -- and I want to show you,

13    again, Couch Exhibit 27C-010, and particularly the information

14    at the very top, where it says billable John P. Couch,

15    rendering Ben Clark -- is that information consistently or was

16    it consistently provided to Blue Cross for every Blue Cross

17    claim that you personally handled, based on your training and

18    experience, during your time at PPSA?

19    A   Yes.

20            MR. POWELL:  That's all.

21            THE COURT:  All right.  May this witness be excused?

22            MR. BODNAR:  Yes, Your Honor.

23            MR. POWELL:  Yes, ma'am.

24            THE COURT:  All right.  You may step down.  Thank you,

25    ma'am.

1          THE WITNESS:  Thank you.

2          THE COURT:  Ladies and gentlemen, we're going to break

3    for the day.  Leave your pads on your chairs.  Remember my

4    instructions to you not to discuss the case or to allow anyone

5    to discuss it with you.

6          We will start again at 9 o'clock tomorrow morning.  So

7    be back downstairs in the jury assembly room again.  Hope you

8    have a good evening.

9       (Court adjourned at approximately 5:01 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25