

```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF ALABAMA
 2

 3   UNITED STATES OF AMERICA
                                       CASE NO. CR15-00088
 4   v.
                                       COURTROOM 2B
 5   JOHN PATRICK COUCH, M.D.,
     and XIULU RUAN, M.D.,
 6                                     MOBILE, ALABAMA

 7              Defendants.
                                       WEDNESDAY, FEBRUARY 8, 2017
     * * * * * * * * * * * * * *
 8

 9                              DAY 21 OF TRIAL
10           BEFORE THE HONORABLE CALLIE V. S. GRANADE,
                UNITED STATES DISTRICT JUDGE, AND JURY
11

12

13   APPEARANCES:

14   FOR THE GOVERNMENT:
          DEBORAH A. GRIFFIN
15        CHRISTOPHER BODNAR
          United States Attorney's Office
16        63 S. Royal Street, Suite 600
          Mobile, AL  36602
17        (251) 441-5845

18
     FOR THE DEFENDANT COUCH:
19        ARTHUR T. POWELL, III
          P.O. Box 40456
20        Mobile, AL 36640-0456
          (251) 433-8310
21
          JACKSON R. SHARMAN, III
22        ROBERT JACKSON SEWELL
          JEFFREY PAUL DOSS
23        BENJAMIN SANDERS WILLSON
          Lightfoot, Franklin & White
24        400 North 20th Street
          Birmingham, AL  35203
25        (205) 581-0700
```

1    (Continued)

2        BRANDON KEITH ESSIG
         800 Shades Creek Parkway, Suite 600D
3        Birmingham, AL  35209
         (251) 879-1981

4

     FOR THE DEFENDANT RUAN:
5        DENNIS J. KNIZLEY
         7 N. Lawrence
6        Mobile, AL 36602
         (251) 432-3799

7

         JASON BRADLEY DARLEY
8        Darley & McGough, LLC
         1751 Dauphin Street
9        Mobile, AL 36604
         (251) 441-7772

10

         GORDON G. ARMSTRONG, III
11       P.O. Box 1464
         Mobile, AL  36633
12       (251) 434-6428

13       STEVEN D. MARTINIE
         4955 North Lake Drive
14       Whitefish Bay, WI  53217
         (414) 332-9683

15

     THE CLERK:  MARY ANN BOYLES
16   THE LAW CLERK:  LYNN DEKLE
     U.S. ATTORNEY IT:  BRIAN COCHRAN
17   DEFENSE IT:  SAM MCALLISTER
     COURT REPORTER:  ROY ISBELL, CCR, RDR, CRR

18
            Proceedings recorded by OFFICIAL COURT REPORTER
19        Qualified pursuant to 28 U.S.C. 753(a) & Guide to
      Judiciary Policies and Procedures Vol. VI, Chapter III, D.2.
20         Transcript produced by computerized stenotype.

21

22

23        I do not certify that any audio/video recordings

24   played in open court and transcribed herein are verbatim

25   transcriptions, but were transcribed to the best of my ability.

1                          EXAMINATION INDEX

2

CAROL ANN WARFIELD, MD
3        DIRECT BY MR. SHARMAN . . . . . . . . . . . . . . 4763
         CROSS BY MS. GRIFFIN  . . . . . . . . . . . . . . 4827
4        REDIRECT BY MR. SHARMAN . . . . . . . . . . . . . 4901

5    TAMARA DABNEY
         DIRECT BY MR. WILLSON . . . . . . . . . . . . . . 4915
6        CROSS BY MR. BODNAR . . . . . . . . . . . . . . . 4948
         REDIRECT BY MR. WILLSON . . . . . . . . . . . . . 4960
7
     AMANDA COMBS
8        DIRECT BY MR. DARLEY  . . . . . . . . . . . . . . 4963
         CROSS BY MS. GRIFFIN  . . . . . . . . . . . . . . 4976
9        REDIRECT BY MR. DARLEY . . . . . . . . . . . . . .4990

10   MONICA CARROLL
         DIRECT BY MR. SHARMAN . . . . . . . . . . . . . . 4993

11

12

13

14

15

16

17

18

19

20                          EXHIBIT INDEX

21
                                               MAR   ADM
22   DEFENDANT COUCH'S
     264    Narcotic Count - sign-out log for medicine          4997
             for treatment on patients

23

24

25

4763

```
 1        (Morning session, 9 a.m., in open court, defendants and

 2   jury present.)

 3             THE COURT:  Good morning, ladies and gentlemen.

 4             All right, Counsel.  You may continue.

 5             MR. SHARMAN:  Thank you, Your Honor.  Dr. Couch calls

 6   Dr. Carol Warfield.

 7             THE CLERK:  Dr. Warfield, if you'll step forward

 8   toward the witness stand, I'll swear you in.  Let me get you to

 9   raise your right hand.

10                      CAROL ANN WARFIELD, MD,

11              was sworn and testified as follows:

12             THE WITNESS:  I do.

13             THE CLERK:  Thank you, ma'am.  Please be seated.

14                        DIRECT EXAMINATION

15   BY MR. SHARMAN:

16   Q   Would you introduce yourself, please, ma'am?

17   A   Yes.  My name is Dr. Carol Warfield.

18   Q   Dr. Warfield, are you here to offer certain opinions about

19   Dr. Pat Couch?

20   A   That's correct.  I am.

21   Q   Could you summarize for us your educational background,

22   please?

23   A   I went to college just outside of Boston at Tufts

24   University, majoring in math and mechanical engineering.  And

25   then I went on to Tufts Medical School in Boston.  Did an
```

4764

1   internship in medicine and surgery and then a residency in

2   anesthesia at Massachusetts General Hospital in Boston and Beth

3   Israel Hospital in Boston.  And then did a fellowship and

4   started on faculty at Harvard Medical School in 1980.  And I've

5   been there ever since.

6   Q   Do you have any certifications or licenses?

7   A   Yes.  I'm licensed in the state of Massachusetts and I'm

8   board certified in anesthesiology and I'm also board certified

9   in pain management through the Board of Anesthesiology.

10  Q   And with regard to pain management in particular, what's

11  your background and history in pain management?

12  A   Well, I started the pain management center at Beth Israel

13  Hospital at Harvard Medical School in 1980, and so I was in on

14  the ground floor and was very actively involved in the

15  beginnings of the whole specialty.  I was on the committee that

16  wrote the pain management boards when it became a board

17  certifiable specialty, and I've been on the board of directors

18  of many of the national and international pain organizations

19  like the American Pain Society, the International Association

20  for the Study of Pain.  I've been on the editorial boards of

21  many journals.  I review pain management papers for the New

22  England Journal of Medicine and many other journals and such.

23  I've been on the FDA committee on anesthetic drugs and pain

24  management drugs.  So I've sat on that committee and I've had,

25  you know, many -- many positions.  I've been very fortunate to

1   have many positions over the years in national and

2   international pain medicine.

3   Q   And what is your position today?

4   A   Oh, what do I do?  What is my title and position today?

5   Today I am the Lowenstein distinguished professor of anesthesia

6   at Harvard Medical School.  You probably wonder what the heck

7   is that.  At most colleges and universities there's kind of a

8   hierarchy; you start as a lecturer, you go to instructor,

9   assistant professor, associate professor, and then ultimately

10  professor.  And there are a few professors who ultimately get

11  what's called an endowed professorship, which is what I have.

12  That's why they call it the Lowenstein professorship.  And I

13  was fortunate to be the first woman at Beth Israel and Harvard

14  Medical School to have an endowed professorship at Harvard.

15  Q   With regard to the work that you undertook and then

16  continued at the pain management center at Beth Israel and at

17  Harvard, did you and your colleages treat patients who suffer

18  from, among other things, chronic pain?

19  A   Absolutely.  I mean, I've treated thousands and thousands

20  of patients over the years who have suffered from chronic pain,

21  yes.  And I -- go ahead.

22  Q   And have you been published in journals and in textbooks

23  and so forth on the subject of pain medicine or pain

24  management?

25  A   Yes.  I've published hundreds of articles on pain

1  management and I've written three major textbooks on pain
2  medicine, one of which is the most widely used textbook in pain
3  training and pain fellowships.  Today I just finished the third
4  edition of that textbook, which has been translated into many
5  different languages and it's used very widely.
6  Q   Dr. Warfield, we won't go over it, but this red-bound book,
7  is that the one you're talking about?
8  A   That's one of the editions of one of the textbooks, yes.
9  Q   And then we spoke about your education.  Have you been
10  involved in teaching others especially with regard to pain
11  medicine and pain management?
12  A   Yes, absolutely.  I've run the fellowship at Beth Israel
13  and Harvard Medical School, so I teach pain fellows.  What that
14  means is after a doctor does a residency in anesthesia, or one
15  of the other specialties, and they want to do further training
16  in pain, they do a year fellowship.  And I've run that
17  fellowship and taught those doctors extensively.
18       I annually run the Harvard Medical School week-long
19  course on pain medicine, which is a course that attracts
20  hundreds of doctors from all over the country and world to kind
21  of keep up on new things in the field of pain medicine.
22       And I've, you know, again, served on many, many boards
23  for credentialing of various hospitals and their pain
24  management program and taught and lectured extensively,
25  nationally, and internationally.

CAROL ANN WARFIELD, MD - DIRECT BY MR. SHARMAN

1   Q   And today does the pain management center at Harvard and

2   Beth Israel have a name or a title?

3   A   Yes.  It was named after me.

4           MR. SHARMAN:  Your Honor, Dr. Couch offers

5   Dr. Warfield as an expert in pain medicine and pain management.

6           THE COURT:  All right.  So designated.

7   BY MR. SHARMAN:

8   Q   All right.  Dr. Warfield, have you reviewed certain medical

9   records in this case?

10  A   Yes.

11  Q   Okay.  Do you recall the names of the patients whose

12  records you reviewed?

13  A   Yes.  I think I've reviewed the medical records of patients

14  named Beasley, Brennan, Blouin, Chausse, Daves and Driver.

15  Q   And have you reviewed --

16          MS. GRIFFIN:  May we approach, Your Honor?

17          THE COURT:  Yes.

18      (At the side bar, jury not present.)

19          MS. GRIFFIN:  Your Honor, this is what we were

20  provided that she had reviewed, the medical records of four

21  patients:  Chausse, Daves, Driver, and Blouin, and she

22  announced two additional patients that we were not provided

23  notice, Beasley and someone else.

24          MR. DOSS:  Brennan.  We did provide notice.

25          MS. GRIFFIN:  But not Beasley.  So we would object to

4768

```
 1   any testimony being elicited about Beasley.

 2          MR. SHARMAN:  If that's the case, I don't have a

 3   problem with it.  I thought we had.  But if we didn't --

 4          MS. GRIFFIN:  Do you know what it is, if it's in this?

 5   This is all I have that was provided for her.  (Indicating.)

 6          MR. SHARMAN:  That's fine.  So --

 7          THE COURT:  Start with the others and check and see if

 8   you --

 9          MR. SHARMAN:  So we don't go into which ones?

10          MS. GRIFFIN:  Beasley.

11          MR. SHARMAN:  Beasley only.

12          THE COURT:  Okay.

13      (In open court, defendants and jury present.)

14   BY MR. SHARMAN:

15   Q   Dr. Warfield, have you also reviewed summaries provided by

16   Dr. Aultman, Dr. Vohra, and Dr. Greenberg, experts offered in

17   this case by the government?

18   A   Yes, I have.

19          MS. GRIFFIN:  We would object to any comments on any

20   reviews by other experts in this case.

21          MR. SHARMAN:  Your Honor, I don't think that question

22   sought a comment.

23          THE COURT:  I think that that's premature.  So --

24   BY MR. SHARMAN:

25   Q   Have you reviewed videos of an undercover agent posing as a
```

1  patient to Dr. Couch's practice as well as an FBI report

2  reflecting that visit?

3  A   Yes, I have.

4  Q   All right.  Dr. Warfield, let me try to go first to a

5  summary of your opinions and then perhaps some detail later, if

6  that's okay.  First, with regard to the records that you

7  reviewed, is it your conclusion that those patients were

8  referred to Dr. Couch by other healthcare providers?

9          MS. GRIFFIN:  Your Honor, we would ask for a

10 foundation just as to Chausse, Daves, Driver, and Blouin, and

11 Brennan.  Those are the ones we were notified that she had

12 reviewed.

13         THE COURT:  Yeah, she had indicated an additional

14 patient that was objected to.

15         MR. SHARMAN:  Yes, ma'am.  Well, I think that the

16 response would cover those that are not objected to and I'm

17 not inquiring specifically --

18         THE COURT:  You need to specify which patients you

19 want her to give an opinion on.

20         MR. SHARMAN:  Okay.

21    (A discussion was held off the record between defense

22 counsel.)

23 BY MR. SHARMAN:

24 Q   All right.  Dr. Warfield, for purposes of these questions

25 and all my other questions, I want you to set aside patient

CAROL ANN WARFIELD, MD - DIRECT BY MR. SHARMAN

1    Beasley.

2    A    Okay.

3    Q    So just respond about the others.  Okay?

4    A    Yes.

5    Q    All right.  With regard to that set of patients whose

6    records you reviewed, were they all referred to Dr. Couch by

7    other healthcare providers?

8    A    Yes, they were.

9    Q    And were all those patients prescribed some form of opioid

10   pain medication before they were referred to Dr. Couch?

11   A    Yes, they all were prescribed opiates before they saw

12   Dr. Couch.

13   Q    And then did you find that all of them had a history taken?

14   A    Correct.  Yes, they did.

15   Q    Did you find that all of them had an examination done?

16   A    Yes.

17   Q    In your review did you conclude that they all had a pain

18   diagnosis of some sort?

19   A    That's correct.  They all had a diagnosis of some sort of

20   pain.

21   Q    In your opinion were the medications prescribed for their

22   respective pain diagnoses in the usual course of medical

23   practice and for a legitimate purpose?

24   A    Yes, absolutely, they were in the usual course of medical

25   practice and for a legitimate medical purpose.

CAROL ANN WARFIELD, MD - DIRECT BY MR. SHARMAN

1   Q   And based on your review, did you find that Dr. Couch used

2   other medicines or treatments besides or in addition to opioid

3   treatment?

4   A   Yes, he used a number of nonopioid medications,

5   antidepressants, anti-inflammatories, lots of different

6   medications lots of different nerve blocks, Botox injections,

7   various -- various other treatments in addition to opioids.

8   Q   Did you find that Dr. Couch or his staff provided urine

9   drug screens?

10  A   Yes, they did.

11  Q   And in the files that you reviewed did the patients receive

12  various types of diagnostic testing?

13  A   Yes, they did, including MRIs, nerve conduction studies,

14  and various things.

15  Q   In your opinion was Dr. Couch's treatment of these

16  patients, including their prescriptions, within the usual

17  course of medical practice and for a legitimate medical

18  purpose?

19  A   Yes, yes, absolutely.

20  Q   All right.  Let's turn, if we could, to your opinion

21  regarding the varieties of treatment that the patients received

22  in the files that you reviewed.  What particular treatments did

23  they receive in addition to opioid treatment?

24  A   Well, first of all, they received a number of different

25  medications.  Not just opioids.  They received anti-

CAROL ANN WARFIELD, MD - DIRECT BY MR. SHARMAN

1    inflammatory medications, the purpose of which is to decrease

2    any swelling or irritation around nerves or joints or muscles

3    that are causing the pain.  They received drugs that are drugs

4    that treat nerve pain.  They're specific drugs that used to be

5    used exclusively for people with epilepsy or drugs that were

6    used exclusively for people with depression which now are used

7    to treat nerve pain.  And appropriately, they received those

8    types of medications also.  They received muscle relaxants to

9    treat spasm or a muscle spasm that occurs in many, many

10   patients with pain.  So these were all very reasonable,

11   appropriate treatments that a typical pain management doctor

12   would prescribe in a typical pain clinic.

13   Q   And did you find that there was in fact an investigation of

14   the causes or manifestations of pain?

15   A   Yes, the patients had a number of studies; they had nerve

16   conduction studies which are studies that try and pinpoint

17   where along the course of a nerve the damage is that's causing

18   pain.  They had MRIs, some of which in these few patients that

19   I saw had very significant findings, extrusion of -- protrusion

20   of disks, which is a very significant pain problem, and other

21   issues, problems with the knees, problems with other parts of

22   the body.  So there were -- there were investigations in the

23   records of the cause of the pain, yes, certainly.

24   Q   And also did you reach any conclusions about the kind of

25   evaluation of the pain in these patients whose files you

4773

1    reviewed?

2    A    Yes, the patients all had a history taken of their -- of

3    their pain, a physical examination was done, and in some cases

4    old medical records were there.  So there was an evaluation

5    done of the pain, a diagnosis was made, and then a decision was

6    made about what treatments were appropriate.  There were some

7    opiates, but there were also a number of other treatments,

8    which is very, very typical of a pain management center because

9    it's unusual for one drug or one thing to help people with

10   chronic pain.  Usually we need to use a combination of things.

11   And that's exactly what was done here, a combination of nerve

12   blocks, epidural steroid injections, other types of medications

13   along with opioids.

14   Q    And with regard to opioids and their prescription, did you

15   reach any conclusions as to whether or not patients received

16   information about opioids and entered into any sort of

17   agreements about opioids?

18   A    Yes, there were opioid agreements in the charts that the

19   patients signed.  There was one case I think I mentioned where

20   I did see a video.  In the one case I did see a video, clearly

21   there was some information given to the patient about potential

22   side-effects, about the issue of combining opiates with other

23   treatments, not just using the opiates, but using the blocks

24   and that sort of thing.  So again, this is a very typical pain

25   management practice.

1  Q   And with regard to dosage of medication and titration of

2  medication and increases or decreases, did you reach any

3  conclusion about those areas with regard to the files you

4  reviewed?

5  A   Yes, the doses were titrated.  And by that I mean

6  typically, as in this situation, the patient came in, they had

7  already been given opiates by another doctor.  Their pain was

8  complicated, so that doctor referred the patient to a pain

9  management center.  All very appropriate, very typical.  Then

10  the doctor -- Dr. Couch in this case -- determined what pain

11  medications were likely to work and started a pain medication.

12       Titration is the process by which the doctor decides

13  what the dose should be or whether, after one visit, if that

14  dose isn't helping, whether he should increase the dose or

15  decrease the dose or whether he needs to change to a different

16  medication or add different medications.  That's the process of

17  titration, changing medications.  And there are many good

18  scientific reasons why this is done.  So this is the absolutely

19  appropriate thing to do, to increase the dose, change

20  medications, maybe change back to medications for a variety of

21  reasons.  For example, if a patient has a lot of nausea with a

22  medication, one might go to a patch or a sublingual or under-

23  the-tongue medication that doesn't have to go through the

24  stomach.  If a patient gets a lot of side-effects from one

25  medication or it's just not working, the doctor may decide to

 1   change to a different class of medications.  A different,

 2   totally different, chemical formula of medications that might

 3   work better for that patient.  So it's a whole process.  And

 4   we, as pain doctors, are trained in these medications and how

 5   to do that.  And that's exactly what was done here, which is

 6   very appropriate.

 7           MR. SHARMAN:  Your Honor, may Dr. Warfield be allowed

 8   to step down from the stand to make use of a demonstrative for

 9   the jury?

10           THE COURT:  Yes.

11           MR. SHARMAN:  In fact, I want you to come here and I

12   believe the court reporter would like you on that side, to hear

13   you better.  (Indicating.)

14           THE COURT:  Face the court reporter, if you will.

15   BY MR. SHARMAN:

16   Q   Dr. Warfield, you have before you a --

17           THE COURT:  Mr. Sharman, you're going to have to

18   switch positions with her.  If you will come around to this

19   side and if she will get on the other side of the exhibit, she

20   can kind of face the jury as well, but the court reporter needs

21   to see her face.

22   MR. SHARMAN:

23   Q   Dr. Warfield, you have before you a skeleton.  Using this,

24   we have heard -- and you referred to in part about conditions

25   of chronic pain like lumbago and radiculitis and so

1   forth.  Using this model, can you help explain to the jury some

2   of the parts of the body involved and the causes of those

3   pains?

4   A   Sure.  I'm just going to get a -- can I have a pen?

5         MR. DOSS:  (Complying.)

6   A   Thank you, that will be easier than my finger.  Anyway,

7   just to talk about low-back pain -- so when we talk about

8   low-back pain, we're talking about this area of the body.  And

9   there are lots of different structures in there that cause

10  pain.  One can get pain from the bones, one can get pain from

11  these -- you can see there are these vertebrae and between the

12  vertebrae are disks which can generate pain.  These yellow

13  things here, those are nerves.  And the big yellow thing that's

14  going up and down here, that's the spinal cord.  The nerves

15  come off of the spinal cord.  These are called radicular

16  nerves.  So radiculitis implies that these nerves are

17  irritated.  And what often irritates those nerves is that the

18  disk you can see here -- this red thing represents a piece of

19  the disk bulging out and pushing up against the nerves.  These

20  disks, they're kind of like jelly doughnuts and inside is the

21  jelly.  And over the years or with an injury what happens is

22  these vertebrae compress down on those disks and sometimes the

23  jelly gets pushed out.  And when it gets pushed out, it can

24  push up against these nerves and get very irritated.

25         This is really a big disk protrusion.  It's sticking

CAROL ANN WARFIELD, MD - DIRECT BY MR. SHARMAN

 1  out like this.  One might have a disk bulge, which doesn't
 2  stick out quite this much but just kind of bulges out.  One
 3  might have something called an extrusion, which means a piece
 4  of this actually kind of breaks off and there's a piece of disk
 5  just sitting there against the nerve.  So there are many, many
 6  reasons why one might get irritation of these nerves.  And
 7  these nerves travel all the way down the body, into the leg.
 8  So when somebody gets sciatica, what it means is that one of
 9  these nerves, one that travels down your leg, is irritated by
10  something that happened here.  And sometimes what happens is,
11  you know, this jelly that's inside the doughnut is a very, very
12  irritating substance, and sometimes it just leaks out.  And
13  that irritating substance leaks out and irritates the nerve, so
14  you get that pain going down the leg.  But if we did an MRI,
15  you wouldn't see a bulge here because all it is is this watery
16  substance that's coming out.  So there are many, many reasons
17  why one might have something called radiculitis or
18  radiculopathy, which is pain going down the leg.  It usually
19  has something to do with these nerves and disks.  But, you
20  know, there are lots of other reasons why someone might have
21  back pain.  Over all of this you have muscles and you have
22  ligaments.  And the purpose of those is to protect the nerves
23  and the bones from getting damaged.  So if you have an injury,
24  the first thing that happens is those muscles tighten up, and
25  their job is to tighten up so that the nerves don't get

CAROL ANN WARFIELD, MD - DIRECT BY MR. SHARMAN

 1  injured.

 2          But sometimes that tightening or spasm never

 3  stops.  And sometimes that can be just as painful as these

 4  nerve injuries.

 5          So there are many, many different structures back

 6  here.  Sometimes we can see the problem on MRI, sometimes we

 7  can't see the problem on MRI.  And interestingly, the kinds of

 8  patients who get sent to pain clinics are often the ones you

 9  don't see a lot of stuff on MRI, because if it was very clear

10  and easy to fix, the primary care doctor would just take care

11  of it and wouldn't send the patient to the pain clinic.

12          It's usually people who have very unclear diagnoses or

13  people for whom we don't know what to do, those are the ones

14  who get sent to us.

15          The other, I think, term you might have heard is

16  "facet syndrome."  The facets are the joints that join each of

17  these vertebrae.  And they are joints just like your knees and

18  shoulders are joints.  So just as if you had a knee problem,

19  the doctor might give you a cortisone injection in your knee,

20  sometimes the doctors give a facet block or a cortisone

21  injection in the nerves or they inject local anesthetic to the

22  nerves that supply those joints.  So this is what the facet

23  joints are.  That's arthritis in your spine, your joints that

24  connect the spine.

25          The other term I think I saw was "lumbago," and that's

CAROL ANN WARFIELD, MD - DIRECT BY MR. SHARMAN

1   kind of an old very generic term.  It just means pain in the

2   back.  So did I answer?

3   BY MR. SHARMAN:

4   Q   Yes, ma'am.  We've also heard about myobloc injections and

5   epidurals.

6   A   Okay.

7   Q   What are those and how do they play into chronic pain?

8   A   Myobloc is Botox.  And you hear about Botox all the time

9   being used for wrinkles.  And the reason for use with wrinkles

10  is because what Botox does is it relaxes the muscles.  And when

11  you relax the muscles in your face, you don't see the wrinkles

12  any more because it smoothes out the wrinkles.

13          That's not what we use it for in this situation.  We

14  use it to relax the muscles because, as I mentioned, sometimes

15  people have muscle spasm that just doesn't stop and it can be

16  just as painful as any kind of nerve injury.  So myobloc is

17  Botox and it's sometimes injected into the muscles, especially

18  in the neck, when those muscles are in spasm.

19          An epidural injection is an injection that's done

20  right around those spinal nerves.  It's an injection of

21  cortisone because, again, when you have a slipped disk or

22  something like that, the disk pushes against the nerve, the

23  nerve becomes very irritated and swollen and then the nerve,

24  when the nerve gets swollen, it's a bigger target now for the

25  disk.  So it pushes and it's a vicious cycle.  The more swollen

1  the nerve is, the more the disk pushes against it.  So we do an

2  epidural injection -- which is an injection of cortisone or a

3  cortisone-like substance -- around those nerves to make those

4  nerves shrink and settle down so that they are no longer being

5  irritated.

6         And there are different approaches to those epidural

7  injections.  So you hear about selective nerve root blocks,

8  transfer nerve root blocks.  Those are just different ways of

9  getting to the epidural space.

10  Q   Dr. Warfield, those are procedures with regard to

11  medications, especially including opioid medications.  Do they

12  affect directly the systems that you described?  Do they

13  operate differently?

14  A   Well, again, as I mentioned, there are different

15  medications that we use.  Opioid medications are pain killers

16  that work mainly on receptors in the brain and they also work

17  on receptors specifically in the spinal cord.  The  muscle-

18  relaxant medications work, again, to relax the spasm in these

19  muscles.  The medicines that are like antidepressants or anti-

20  epilepsy, we call anti-convulsive medication used for seizures

21  and epilepsy, those work to soothe down irritation in the

22  nerves.  So typically a combination of these things is used

23  because in most people it's not just one thing causing your

24  pain.

25         You know, if you bend over and you slip a disk, you

1    have nerve pain because it's irritating the nerve, you have

2    muscle pain because the muscles have gone into spasm, and you

3    may have pain from the bone or the disk or different sources.

4    So typically people don't have just one place causing pain.

5    That's why we use a combination of treatments.

6    Q    Thank you.

7    A    Sure.  I stole somebody's pen (indicating).

8    Q    When you were discussing the model, Dr. Warfield, you were

9    talking about pain medicine and earlier you had talked about

10   your training in anesthesia and being chief of anesthesia at

11   Harvard and Beth Israel.  What if anything is the relationship

12   between, on the one hand, the study and practice of anesthesia

13   and, on the other hand, the use of pain killers including, you

14   know, opioid analgesics?

15   A    Well, as you know, what anesthesiologists typically do --

16   when you think of an anesthesiologist, you think of someone

17   putting people to sleep in the operating room for surgery.  And

18   the things we use to keep people pain-free during surgery

19   include drugs like the opiates -- we're used to using very high

20   doses of those drugs -- and we use a number of these other

21   medications.  So we're very, very familiar with those.  We're

22   also the people who have been trained to do things like spinal

23   anesthesia for surgery or epidural anesthesia, which we use for

24   labor, during childbirth.

25              So it was a normal extrapolation from those kinds of

CAROL ANN WARFIELD, MD - DIRECT BY MR. SHARMAN

4782

1   treatments that we used to keep people pain-free in the OR to

2   use the same treatments to keep people who have chronic pain

3   pain-free.  And that's why the most common specialty associated

4   with pain management is anesthesiology.  So we know how to do

5   these epidural injections I just mentioned to you, because

6   we're used to doing them in the labor and delivery suites.  We

7   know all about opioids and common medications like fentanyl,

8   things that other doctors don't typically use but

9   anesthesiologists do.  So we're very familiar and our training

10  includes everything about opioids and about other pain-

11  relieving medications.

12  Q   With regard to what you just mentioned, the practice of

13  pain management and bringing to bear different studies and

14  disciplines to it, is there a continuum or band of practice

15  within the usual course of pain management practice?

16  A   You mean with respect to opioids?  Is that what you're

17  talking about?

18  Q   Yes, ma'am.

19  A   Well, you know, within the practice of pain medicine

20  there's a big continuum of the different ways doctors approach

21  the use of opioids for pain.  On one end of the spectrum there

22  are some doctors who use these drugs very readily for most of

23  their patients with pain.  Because they understand that, you

24  know, these drugs have been around for 4,000 years, we know

25  what they do and how they act, and we know that they are by far

 1    the best pain killers that have ever been discovered.  We've

 2    had -- you know, in my experience in the last 40 years we've

 3    had lots of other drugs that have come on the market.  Nothing

 4    is as good as these drugs in relieving pain.  So there are many

 5    doctors on one end of the spectrum who say:  You know, these

 6    are the best drugs we have.  Why would we leave patients in

 7    horrible pain and not give them these drugs?

 8            So they very readily give those drugs to patients with

 9    pain.

10            On the other end of the spectrum, there are some

11    doctors who never prescribe these drugs.  And there are more

12    and more of them every day now, because a lot of these doctors

13    have stopped prescribing drugs for fear of sanctions and legal

14    issues and such.

15            MS. GRIFFIN:  Objection, Your Honor.

16    A   So --

17            MS. GRIFFIN:  May we approach?

18            THE COURT:  Yes.

19        (At the side bar, jury not present.)

20            MS. GRIFFIN:  We would contend that it is outside of

21    the notice about sanctions and that that gets into an issue for

22    the jury and that it's an effort to persuade the jury as jury

23    nullification that these people are scared of being prosecuted

24    or investigated.  And perhaps she didn't say that doctors

25    shouldn't be investigated or that these doctors weren't

 1    criminals, but I want to make sure that she's not going into

 2    that because that has nothing to do with the standard of care

 3    and outside the usual course of professional practice.

 4          MR. SHARMAN:  She's not going to say anything about

 5    criminality.  But she needs to be able to describe fully what

 6    the usual course of practice is, including the background and

 7    including the continuum of practice and then where Dr. Couch

 8    falls on that.  That's all.  She's not making a legal

 9    conclusion, but it's a factual observation based on 40 years of

10    professional work.

11          MS. GRIFFIN:  But, Your Honor, she says:  these

12    doctors, and she's practiced nowhere except the northeast.  So

13    she knows nothing about the entire United States.  And if they

14    want to qualify something -- but to say these doctors

15    collectively -- and it is nothing to do with the purpose of her

16    testimony, which is to testify whether the patients were

17    treated outside the usual course of professional practice.

18          MR. SHARMAN:  Your Honor, that's all appropriate for

19    cross-examination, including the geographical reach of her

20    practice.

21          THE COURT:  Well, guide her just a little bit on that

22    so you can stay away from the possible sanctions.

23          MR. SHARMAN:  Yes, ma'am.

24          THE COURT:  Okay.  All right.

25       (In open court, defendants and jury present.)

 1  BY MR. SHARMAN:

 2  Q   Dr. Warfield, when we left off, I believe you said that for

 3  the other end of the spectrum there are doctors who rarely or

 4  never prescribe opioids; is that right?

 5  A   That's correct.

 6  Q   Okay.  Let me -- let me --

 7  A   Oh, go ahead.

 8  Q   So, and then are there also physicians, based upon your

 9  professional experience, observation, teaching and so forth,

10  who fall somewhere between those two ends of the spectrum?

11  A   Yes.  Again, as I said, there's a whole continuum from

12  those who prescribe very commonly for their pain patients to

13  those who never prescribe at all for a variety of reasons and

14  then, of course, all the other doctors in between.  You know,

15  all of these things are within the standard of care, all of

16  them are reasonable ways of doing it.  Lots of doctors do

17  things differently.  Not all doctors do them the way I do.  Not

18  all doctors do things the way Dr. Couch does or Dr. Smith or

19  Dr. Jones or whatever.  There's a variety of ways of doing this

20  and, unfortunately, there's no specific consensus about whether

21  one way is better than the other.  There's just a lot of

22  different ways of doing it.

23  Q   And based on that sort of continuum from, you know, the one

24  end to the other, based upon your review and your education and

25  professional judgment, where does Dr. Couch fall along that

4786

1    continuum?

2    A    I'd say he falls, you know, in the middle and towards the

3    end where he prescribes more readily for patients who are in

4    pain, believes that these are very good drugs and the best

5    drugs and are appropriate drugs.

6    Q    Is that still within the usual course of medical practice

7    and for a legitimate purpose?

8    A    Absolutely.  This is a very typical way of treating these

9    patients.

10   Q    All right.  With regard to the files that you reviewed, did

11   you see records relating to examinations, both on the first

12   visit and then on recurring or later visits?

13   A    Yes.

14   Q    With regard to pain management especially, how do

15   examinations work both at initial visit and then thereafter at

16   recurring visits?

17   A    Well, there are guidelines out there published by a number

18   of sources that tell us something about examinations.  And

19   basically what they require is that an examination has been

20   done.  And I've actually been involved in the setting up of

21   these guidelines and reviewing of these guidelines and such.

22   So I know about, you know, why they were set up like that.  And

23   the guidelines are specifically loose about what the

24   examination needs to include because it really is up to the

25   individual doctor sitting there with that particular patient in

Case 1:15-cr-00088-CG-B   Document 775-21   Filed 05/31/18   Page 28 of 251   PageID #:
30973
CAROL ANN WARFIELD, MD - DIRECT BY MR. SHARMAN

4787

 1    terms of what the examination needs to include, how long it

 2    needs to be, what you need to do or don't do.

 3           So the guidelines basically say that you need to do an

 4    examination.  And as I said, it varies depending on the doctor.

 5    Typically, though, the examination is what we call problem

 6    focused.  It means if someone says:  I have pain in my toe, we

 7    examine the toe.  We're not going to initially examine your

 8    head because you have pain in your toe.  If they say they have

 9    back pain, we examine the back.

10           So, again, there's a whole continuum and it varies

11    from, you know, from one doctor to the other in terms of what

12    that doctor feels they need to do.  Sometimes they decide to do

13    other physical exam maneuvers depending on what the first

14    maneuver showed.

15           And the other thing those guidelines require is that

16    we do an exam on the initial visit.  There is no requirement

17    anywhere that an examination is done on subsequent visits.

18  Q    In preparing your opinions did you have a chance to look at

19    the relevant Alabama regulations by the Alabama medical board

20    that would govern an Alabama physician?

21  A    Yes, I did.

22  Q    And did you look at the examination requirements and those

23    regulations?

24  A    Yes, the state of Alabama says an examination.  And as I

25    said, those were specifically left that way because it's up to

1  the discretion of the doctor in terms of what he or she does,

2  how long it is, what's included, what's not included.

3  Q   You mentioned a moment ago that different doctors may do

4  different things.  Does that opinion and observation also hold

5  true for examinations even within the community of pain

6  management physicians?

7  A   Oh, absolutely.  I mean, you could spend three days doing

8  an examination, there are so many different maneuvers you could

9  do.  Or you could spend, you know, 10 seconds doing an

10  examination -- it very much depends on the patient -- or two

11  seconds.

12  Q   In pain management practice and in seeing patients who are

13  referred for chronic pain, in your experience does it happen

14  from time to time that there are patients who either have a

15  history of some sort of substance abuse or, for example, by

16  virtue of failing a urine drug screen, have or seem to have a

17  present use of inappropriate substances?  Does that happen in

18  pain management?

19  A   Yes.

20  Q   What is the significance or insignificance of those events?

21  A   Well, you know, again, first let me say that these patients

22  are often very complicated.  You know, they have drug histories

23  or urine drug screens that are positive.  If they were easy,

24  they would never be sent to a pain management center.  The

25  primary care doctor would take care of them themselves.  So

1    oftentimes we do urine drug screens on these patients.

2             Now, I should mention that, again, there is not a

3    requirement that a urine drug screen is done this time or that

4    time or whatever.  In fact, the data shows that probably less

5    than 10 percent of doctors even do urine drug screens on

6    patients who have taken opiates.  It's a very small percentage

7    who even use them.  But for the doctors that use them, they

8    feel perhaps it's more diligent to use them.

9             You know, sometimes there are issues with these urine

10   drug screens.  Sometimes the urine drug screens don't show the

11   medication that the patient was prescribed.  And there are lots

12   of reasons for that.  Sometimes it means the patient ran out of

13   the medications or, you know, you gave medication for 30 days

14   and now it's day 32 you're seeing the patient and they ran out

15   of medication.

16            Sometimes it means they just had to take more medicine

17   than you prescribed because they were in a lot of pain and you

18   weren't giving them enough during your titration, you need to

19   increase the dose.  Sometimes that's it.

20            A common reason is that the drug test you use didn't

21   detect the medication that you prescribed.  That's more common

22   than one would think.

23            It might be that the drug test you used detected that

24   medication, but there's a threshold for the amount of

25   medication that's in the urine.  So if the person just drank a

CAROL ANN WARFIELD, MD - DIRECT BY MR. SHARMAN

 1  lot of water or whatever, the urine's diluted, they may have

 2  that medication in their body but it doesn't test positive.

 3        So there are many, many very confusing reasons why

 4  those tests might be negative.  And that's one of the reasons

 5  some doctors don't even use the urine drug tests, because they

 6  can be extremely confusing and misleading.

 7        And then there are times when the urine drug screen

 8  tests positive for some other substance like marijuana.  And,

 9  you know, there are a variety of responses to that.  You know,

10  sometimes some doctors might say:  Oh, you have marijuana.

11        You know, you might have a patient you're treating for

12  years and years and they have marijuana in their system and

13  they say, you know, even though it wasn't legal in the state,

14  they say:  You know, Doc, I smoked a joint because it really

15  helped me.  I was with a friend, blah, blah, blah.

16        The doctor has a choice.  They can say:  Okay.  You're

17  never getting these drugs from me again.

18        That's one choice.  Or they can counsel and say, you

19  know:  You shouldn't do this.  I'm going to repeat the urine

20  drug screen.

21        Or, you know, many doctors do the don't ask, don't

22  tell with marijuana.  They think maybe it's a good thing that

23  these patients take it.

24        So my point is there are a variety of responses to

25  having what's called an abnormal urine drug screen.  And again,

1    the guidelines specifically don't tell the doctor what they

2    need to do if they have an abnormal drug screen just for that

3    reason, because it's up to the discretion of the doctor whether

4    they want to stop that drug and never give it to the patient

5    again, which might be kind of cruel, depending on the

6    situation, or whether they want to counsel the patient or, you

7    know, there are times when, for example, the patient is seeing

8    another doctor, a psychiatrist or someone, who's giving the

9    patient a drug, giving the patient Valium or a drug that the

10   doctor isn't prescribing.  The doctor knows about that and

11   that's a reason why a drug that wasn't prescribed comes up.

12          So there are many, many reasons why this might happen.

13   And the guidelines are very specifically vague.  They don't

14   even say you need to do urine drug screens, let alone do they

15   say if you find this in the urine drug screen, you must stop

16   the drug.  They don't, they don't do that.  And in fact, it's a

17   reason why many doctors just don't even use urine drug screens.

18   It's very confusing, very misleading.

19   Q   Dr. Warfield, in the scenarios that you just outlined --

20   that is to say the pain medicine practitioner who upon one bad

21   drug screen says:  I'm basically going to fire you from the

22   practice; and then the practitioner who upon a bad drug screen

23   says:  That's not a good thing to do and I'm going to keep

24   doing drug screens; or the practitioner who has a policy of

25   basically don't ask, don't tell -- are all three of those

1   approaches within the usual course of medical practice in pain

2   management?

3   A   Absolutely.  This is all the practice of medicine.  It's

4   all within the practice of medicine.  And there are different

5   ways of doing it.  Not everybody does it the same way.  And as

6   I said, if you look in the literature, there's not even

7   consensus there about what you have to do or in these

8   guidelines there's not even consensus.  So there are lot of

9   different ways of doing it.  Medicine's an art.  There are lots

10  of different ways of doing things.

11  Q   Are there any rules or guidelines in pain medicine and pain

12  management that say that patients who have a present or past

13  history of inappropriate drug use should not or should never be

14  prescribed opioids?

15  A   Absolutely not.  Again, people who have a history of drug

16  abuse have pain just like everybody else.  They get slipped

17  disks just like everybody else.  And you don't say to these

18  patients:  Oh, you know, we know you're in horrible pain, but

19  we can't give you any medications.

20          Again, you have to take that into consideration.  They

21  might be at higher risk to get or to have problems with the

22  drugs.  But again, there are no guidelines, nothing that says

23  you don't ever give drugs to these sorts of patients.  It's a

24  judgment call that the individual physician with that

25  individual patient needs to make.

1    Q   Dr. Warfield, a moment ago when I was asking you questions

2    about examinations, I focused my questions on examinations by

3    the physician.  In your opinion in pain management practice, is

4    it appropriate that an examination be conducted by a nurse

5    practitioner?

6    A   Oh, certainly.  Nurse practitioners have extra training and

7    they see patients, you know, usually in place of the doctor.

8    I'm sure many of you have seen nurse practitioners in your own

9    doctors' offices.  They basically practice, they see the

10   patient, do the exam, make the decisions, and will only get the

11   doctor if they have questions, for example.  So it's not

12   uncommon for a visit to be conducted by a nurse practitioner

13   and the patient doesn't even see the doctor.  I mean, that's

14   not uncommon.  We have a nurse practitioner who ran the opiate

15   clinic at our pain management center at Harvard and she saw all

16   those patients we did not.

17          MS. GRIFFIN:  Your Honor, objection as to

18   relevance.  It's nonresponsive to the question.  It's not

19   relevant.

20          MR. SHARMAN:  It's her factual experience, Judge.

21          THE COURT:  Overruled.

22   BY MR. SHARMAN:

23   Q   All right.  Dr. Warfield, in the records that you reviewed

24   did you see references to the phrase "dependence" or "opioid

25   dependence"?

1    A    Yes.

2    Q    And can you explain for us what opioid dependence is and

3    how that may or may not differ from addiction to opioids?

4    A    Again, this is a very confusing area too.  If you have

5    someone who puts someone on opiate medication for a long enough

6    period of time, eventually they are going to need more and more

7    of that opiate medication to give them pain relief.  We call

8    that tolerance, they become tolerant to the effect of the drug,

9    so they need more and more of it.

10        If you give someone enough opiate for a long enough

11   period of time and you suddenly stop it, they will go through a

12   withdrawal phenomenon.  They will have a very unpleasant -- you

13   know, they call that cold turkey, they have sweating and

14   vomiting.  It's a horrible situation to go through, withdrawal.

15   So if you give somebody enough opiate for a long enough period

16   of time, they will go through withdrawal.  That is physical

17   dependence on the opiate.  Their body is dependent on it.  If

18   you don't give it to them, they will withdraw.

19        Addiction is a totally different thing.  Addiction is

20   a psychiatric diagnosis.  It's the insatiable craving that a

21   drug addict has for which they will procure the drug, hoard the

22   drug, take the drug, even if it means harm to themselves.

23   That's addiction.  These are three distinct entities.  You can

24   be addicted without being physically dependent.  You can be

25   physically dependant without being addicted.  You can be

CAROL ANN WARFIELD, MD - DIRECT BY MR. SHARMAN

 1    tolerant without being addicted.  Yada, yada.

 2          For example, you can be addicted after one dose of

 3    heroin.  You shoot up heroin, you may crave heroin.  That

 4    person is not physically dependent.  If you cold turkey them,

 5    if they never have another injection of heroin, they won't

 6    withdraw.  They are not physically dependent.  They are not

 7    tolerant.  They haven't been on the drug long enough to need a

 8    higher dosage.  But they are addicted.

 9          On the other hand, in a pain clinic we sometimes have

10    patients who have been on opiates for years because of horrible

11    chronic pain.  They get sent to the pain clinic and we do some

12    sort of nerve block and it takes their pain away.  We say:  You

13    know, Mrs. Jones, when you go home, you have to take a tapering

14    dose of opiate for the next three weeks because, if you don't,

15    you're going to go through withdrawal.

16          Well, what does Mrs. Jones do?  She goes home.  She's

17    so happy not to have the sedation and the nausea and vomiting

18    from the opiates, she stops it and goes through withdrawal.

19    She is physically dependent.  She is not addicted.  She doesn't

20    want the drug, she doesn't crave the drug.  She's probably

21    tolerant, she's physically dependent.  She is not addicted.

22          This is a very, very confusing area even for doctors

23    to understand the difference, because sometimes people say drug

24    dependence and they think that means someone's addicted.  That

25    just means you've been on the drug for long enough that your

1  body would need to taper off it.  You can't just suddenly stop

2  it.  An addiction is a totally different thing and it's very,

3  very confusing even to physicians.

4  Q   And is there a related concept to dependence and addiction

5  called pseudoaddiction?

6  A   Well, pseudoaddiction is another interesting thing.

7  Sometimes patients look like they're seeking drugs for

8  recreational uses when in fact they are really just seeking

9  drugs to relieve their pain.  And again I'll give you an

10  example.  We might do a hernia operation on a patient in the

11  hospital and we give them one Percocet after, after the

12  surgery.  And the patient says to the nurse:  You know, that

13  one Percocet doesn't work for me.  I think I need more.  I

14  think I need two Percocets.  And, you know, the last time I was

15  in the hospital for an operation, instead of Percocet they gave

16  me Dilaudid and that worked a lot better.

17       Well, the nurses may get all upset, thinking:  Oh,

18  this must be a drug addict.  He's asking for twice as much

19  medication.  He's asking for a specific drug.  He says:  You

20  know, I need two milligrams of Dilaudid.  He must be a drug

21  addict.

22       No, he's not a drug addict.  He is just trying to

23  treat his pain.

24       So pseudoaddiction is someone who's is in severe pain

25  and today it's getting more and more difficult to get opiates

1    for a variety of reasons, because of what's going on in the

2    country and such, it's harder to get it.  So many, many, many

3    people will go out of their way to try and get these drugs, ask

4    for more drugs, et cetera, simply to relieve their pain.  And

5    again, we call that pseudoaddiction.

6           Someone who goes to a pain doctor and comes back a

7    month later and says:  You know, Doctor, I used up my drugs

8    early.

9           They didn't do that because they are addicted.  It's

10   because they were in pain and they needed more drugs and the

11   titration period hadn't -- hadn't increased.

12          Or, you know, let's say you suddenly lifted your piano

13   and your back hurts and, you know, your wife has some Percocet

14   in the medicine cabinet because she had it from when her wisdom

15   teeth came out.  They take the Percocet from their wife and

16   they come in and they say:  You know, Doctor, my back hurts.

17          And the doctor says:  What's helped you?

18          Well, you know, I took a Percocet from my wife.

19          Or:  I took a Percocet -- a friend of mine came over

20   and said:  Here, try these.  I used that when I hurt my back.

21          That's not addiction.  That's trying to get rid of the

22   pain.  So we call that pseudoaddiction.

23   Q   Dr. Warfield, are there occasions when in your experience

24   and opinion when a patient runs out of medication early or

25   specifically names a medication, that that could be a sign of

1  pill-seeking behavior?  Is that possible?

2  A   Certainly it could be.  You know, in all of these things we

3  take into account -- we file them away in our mind and we take

4  into account if someone keeps coming in early.  Certainly we

5  want to take that into account.

6         You know, those things all are things we have to take

7  into account.  There are many, many factors when one decides

8  whether or not to prescribe opiates to patients.  So certainly

9  we take that into account.

10  Q   And despite the -- as you described it -- confused state of

11  these particular terms even among physicians, ultimately is the

12  decision about whether a patient is, for example, pill seeking

13  on the one hand versus suffering from pseudoaddiction on the

14  other, is that ultimately left by the relevant regulations and

15  guidance documents to the pain physician's professional

16  judgment?

17  A   Absolutely.  It's a judgment call in good faith that the

18  doctor has to make.  And one of the reasons for that is that

19  there is no test, there's no questionnaire, there's no history,

20  there's no anything that has been foolproof in determining

21  which patients are faking and which patients are real

22  patients.  All of us who have prescribed these opiates and done

23  pain management for years, including me, have been fooled by

24  patients.  It's impossible to determine who's faking and who's

25  not faking, no matter what kind of screening you use.  It's

1    well recognized that there's no way to tell.

2    Q   With regard to the medical documentation in pain patients'

3    files generally, has there been a change in recent years from

4    manual handwritten recordkeeping to electronic medical

5    recordkeeping?

6    A   Yes.

7    Q   And are there advantages and disadvantages to electronic

8    medical recordkeeping whether in terms of efficiency, accuracy,

9    or anything else?

10   A   Well, there are advantages and disadvantages to both.  I

11   mean, the medical recordkeeping, the online or electronic

12   keeping, is still pretty much in its infancy depending on where

13   you are in the country and people are just still kind of

14   getting used to it.  But obviously there's the old joke that

15   you can't read doctors' handwriting and it's a big advantage to

16   be able to have something printed out and not have to read some

17   scribbling and handwriting.  But there are disadvantages of,

18   you know, the kinds of, you know, dropdown menus and the

19   cutting and pasting that's done with these electronic records

20   and how they, you know, how they have fields that are already

21   always populated.  And, I mean, there's a lot of lingo that

22   goes along with this.  But they still can be confusing.  So I

23   think there are advantages and disadvantages of both.  But, you

24   know, the reason people are going to this is because it's more

25   legible and because you can access it from many, many different

4800

```
 1   areas.  So your doctor in California could access it
 2   potentially, if they needed to, you know, if you're here.
 3   But, as I said, it's brought along its own series of problems
 4   and all of these glitches have not been worked out yet.
 5   Q   And whether it is the fault of that system or not, if there
 6   is an error or even more than one inaccuracy in a particular
 7   patient record, does that invalidate the prescription, for
 8   example, that may be associated with that record?
 9   A   No, absolutely not.  I mean, there are -- you know, as I
10   said, I go around reviewing other hospitals and medical records
11   as a peer reviewer many, many times and there are often
12   inaccuracies in medical records.  People make mistakes, people
13   leave things out, sometimes things are, you know, things are
14   lost, forms don't make it into the chart, or somebody puts the
15   wrong patient's note in or they confuse a patient with somebody
16   else, they confuse what's wrong with the patient.  I mean,
17   those things all happen and everybody understands that those
18   happen.
19           That doesn't make it not a legitimate practice.  It
20   doesn't make it outside of the usual course of medical
21   practice.  It doesn't invalidate the reason that the patient
22   was treated and the treatment they were given.
23   Q   All right.  I should have asked you this earlier.  Were you
24   hired by Dr. Couch and Dr. Couch's counsel in this case?
25   A   Yes, Dr. Couch's counsel called me.
```

4801

```
 1   Q    All right.  And have you been compensated?  Have you been
 2   paid for your time working on the case, reviewing files,
 3   preparing to testify and so forth?
 4   A    Yes.
 5   Q    Okay.  About how much have you been paid?
 6   A    I think almost under $20,000.
 7   Q    And do you have an hourly rate that you use to get those
 8   amounts?
 9   A    Yes.  I charge $500 an hour to review records and 750 to
10   take time away from my practice to come down here to be in
11   court and such.
12   Q    Is that your standard set of rates?
13   A    Yes.
14   Q    Okay.  Is it anything in particular for this case?
15   A    No, it's my standard.
16   Q    Dr. Warfield, did you have a chance, in addition to
17   reviewing the patient records that we identified earlier, also
18   to review video clips associated with an undercover agent's
19   visit to Dr. Couch's practice posing as a patient?
20   A    Yes, I did.
21   Q    And did you see anything in your review of the video clips
22   of the undercover agent's visit or visits that you concluded
23   were outside the usual course of medical practice or not for a
24   legitimate medical purpose?
25   A    No.  I think that was a pretty standard type of visit.  It
```

1   was all within the usual course of medical practice.

2   Q   All right.  And in particular do you recall that there was

3   interaction between the undercover agent and a nurse

4   practitioner?

5   A   Yes.

6   Q   Was there anything in your opinion inappropriate or

7   professionally lacking or outside the usual course about that

8   interaction between the two of them?

9   A   No, I think that was a pretty standard type of visit.

10  Q   In that visit, of course, it was an undercover agent --

11  that is to say, not a real patient -- making a complaint of

12  pain.  In pain medicine and pain management to what extent is

13  it appropriate and within the usual course of medical practice

14  for the physician to look to and rely upon what the patient is

15  telling him or her?

16  A   It's essential.  As I mentioned, there's no lab, there's no

17  blood test, there's no laboratory test, there's no MRI or

18  anything that can tell a doctor how much pain a patient is

19  in.  You have to rely on the patient.  And we train all of our

20  residents and fellows and student doctors that if the patient

21  says they are in pain, they're in pain.  So you treat their

22  pain.  Even if their MRI is negative or you don't have the

23  X-ray or whatever, if someone says:  I'm in pain, you treat the

24  pain.

25          In addition to that, there needs to be a certain

1    doctor-patient relationship and trust between the patient and

2    the doctor.  So we believe what the patient tells us.  We're

3    not investigators.  You know, we're not agents who try and

4    figure -- see if the patient is doing something wrong.  We're

5    there to treat the patient's pain and help the patient.  So we

6    rely on the patient's explanation.  If the patient comes into

7    my office and said:  You know, I had gallbladder surgery five

8    years ago and I have pain, I believe them.

9            I don't go investigating and checking to see if they

10   really had gallbladder surgery five years ago.  You know, you

11   go to a doctor, you tell them:  I'm having pain in my chest, or

12   my leg hurts or whatever -- we believe the patient.

13   Q   In the records that you reviewed on the subject of the

14   amount of pain, did you see some reports of and scales relating

15   to pain on a zero-to-10 kind of scale?

16   A   Yes.

17   Q   And if a patient, for example, reports that his or her pain

18   is 10 out of 10 on that scale, is that report something that

19   automatically would be discounted or not believed; that is, the

20   report of:  My pain is 10 out of 10?

21   A   Oh, absolutely not.  This is a very, very important

22   point.  In fact, so important are these pain scales thought to

23   be that in 2001 the Joint Commission on the Accreditation of

24   Healthcare Facilities -- that's basically the national

25   accrediting body that accredits hospitals -- mandated that this

4804

```
 1   pain scale be used as the fifth vital sign.  So when you went
 2   into the hospital prior to that, you would get your
 3   temperature, pulse, respiration, blood pressure taken.  Now you
 4   go into a hospital, they have to do those four things and a
 5   pain scale.  And they have mandated that if that pain scale is
 6   high, something has to be done about it.  So it's considered
 7   very, very important, just as important as having a high blood
 8   pressure reading, for example, when you see a doctor or go into
 9   a hospital.
10   Q   We spoke a moment ago about physicians and nurse
11   practitioners.  With regard to physicians and nurses, is it
12   appropriate and within the usual course for a physician to
13   provide an order to a nurse that medication -- for example, a
14   pain pump -- may be changed by some percentage up or down?
15   A   oh, absolutely.  We do that every day.  For example,
16   patients very commonly get these epidural kind of pumps after
17   surgery.  So if you went in and had a knee replacement, for
18   example, you're going to get an epidural and you'll have one of
19   these pumps.  And after the surgery, when you go back to the
20   ward, you'll have the epidural all night probably for a couple
21   of days and we usually write an order for the nurse throughout
22   the night and we say, you know:  For the epidural pain pump,
23   you can increase the rate from, you know, five to 10 depending
24   on the patient's pain.
25            So, I mean, this is very typically done with the
```

4805

1  nurse -- and these aren't nurse practitioners, these are just

2  regular nurses on the floor -- are allowed to titrate that dose

3  within parameters.  The doctor gives parameters, depending on

4  the patient's pain, so they can go up a little or down a

5  little, just as they can with pills.  We'll write an order that

6  says, you know, Percocet one or two tablets, depending on the

7  patient's pain.  So the nurses are trained.  They use their

8  discretion to increase or decrease the dose as the pain

9  permits.

10 Q   You mentioned epidural pumps or pain pumps.  Can you

11 just describe briefly what that is?

12 A   Sure.

13 Q   And the kind of patient it is that gets that?

14 A   Sure.  I mentioned the epidural space.  The epidural space

15 is the space outside of the spinal fluid.  And when you're in

16 labor or after you've had surgery in the hospital, typically a

17 catheter is put in that area and then a pump, an external pump,

18 is attached to it to continuously give medication into that

19 epidural area for however long you need it -- for days.

20      For chronic-pain patients we use a very similar thing

21 except we implant the pump, so they don't have to walk around

22 with an I.V. pole attached to them all the time (indicating).

23 So we put a catheter into the epidural space, sometimes we put

24 it actually right into the spinal fluid space, and it

25 continuously pumps this medication in except they don't have

4806

1    the I.V. pole and pump here.  They have a little pump that's

2    about the size of a pacemaker that gets implanted under their

3    skin and gets filled periodically.  (Indicating.)  And they use

4    that as a pain pump.

5             But it's basically the same kind of thing that we do

6    postoperatively all the time after, you know, after surgery.

7    Q   In pain management practice do those patients tend to be

8    short-term or longer-term patients?

9    A   In the pain management practice those tend to be long-term

10   patients, which is why the pumps are implanted.  They can be in

11   for years and years and years.

12   Q   Earlier this morning when you were talking about opioids,

13   and in particular when you were discussing the effect of

14   medications by using the model as an example, you mentioned

15   that usually more than one medication is prescribed.  Did I

16   recall that --

17   A   Yes.

18   Q   -- right?

19   A   Yes.

20   Q   But at least before this case had you ever heard the term

21   "Holy Trinity" or "Holy Trinity cocktail?"

22   A   No.

23   Q   Did you have some understanding of what that reference

24   means?

25   A   No.

4807

1  Q   Is it common in pain management to have a cocktail, a group

2  or suite of several kinds of medications?  And if it is common,

3  why is that so?

4  A   Yes, it's very common.  As I said, in pain management,

5  usually it's not just one magic bullet, you know, one drug or

6  one injection or whatever takes away the pain.  Usually we give

7  different things and maybe one thing can take away 20 percent

8  of the pain and another thing can take away 20 percent of the

9  pain and another thing can take away 30 percent of the pain and

10  we get to a reasonably comfortable dose.  So, as I mentioned

11  this morning, there are different things that cause pain.  So

12  we might give an opiate, for example, to deaden the pain itself

13  within the brain and spinal cord.  We might in addition to that

14  give a muscle relaxant.  Because the opiates don't relax

15  muscles, we give the muscle relaxant and that will calm down

16  the spasm and muscles.  And then we might give the patient

17  something for anxiety or for sleep, to help them sleep at

18  night.  Because typically patients who have pain have insomnia

19  and have problems sleeping.

20        We might in addition give them an antidepressant or

21  one of these epilepsy, anti-convulsant drugs to soothe down the

22  nerves that are irritated.  So we might give them a nerve drug.

23        We might in addition give them an anti-inflammatory,

24  which cuts down inflammation and swelling.

25        So, I mean, you could call that a cocktail.  I mean,

CAROL ANN WARFIELD, MD - DIRECT BY MR. SHARMAN

```
 1   I've heard those things called cocktails.  You can give them --
 2   so you give them a group of different medications to treat the
 3   pain.  Not at all uncommon.
 4   Q   Okay.  Now, and I think I heard there -- does that also
 5   include benzos, benzodiazepines?
 6   A   Those would be the typical drugs you give for anxiety or
 7   sleep.
 8   Q   So depending upon the particular patient and the particular
 9   physician's judgment, a prescription of the opioid, a
10   benzodiazepine and a muscle relaxant by itself -- in other
11   words, just simply that prescription -- is that within or
12   outside the usual course of medical practice and for pain
13   management?
14   A   That's absolutely within the usual course of medical
15   practice.  That's what we do.  And it's, you know, it's not
16   just in pain.  You know, if you have high blood pressure, the
17   doctor may give you three different -- they may give you a
18   diuretic and they may give you two blood pressure pills.  I
19   mean, you can call that a cocktail.  You can call it whatever
20   you want.  But it's a combination of drugs.  And, of course,
21   when we do that, that increases the side-effects if you give
22   more than one drug, sure.  But we're aware of that and it's
23   done very commonly to treat anything.  We often use a group of
24   different drugs because they do different things to treat,
25   again, as I said, something like blood pressure.
```

4809

1   Q   All right.  And in your experience in pain medicine and

2   pain management, have you come to understand, to know, that

3   sometimes medications can be diverted; that is, end up in the

4   hands of people that they weren't prescribed to?

5   A   Absolutely.  We're all very concerned about that.  And it

6   happens.  It happens.  No question.

7   Q   And with that in mind, though, does a physician in pain

8   management take into consideration, for example, the street

9   desirability of a medication or does he or she generally ignore

10  that and focus on that patient?

11  A   Well, you know, it's something we always keep in the back

12  of our mind.  There are all these considerations.  But, you

13  know, as a physician, I choose my drugs and I think in general

14  physicians choose their drugs based on what's the best drug for

15  this patient, not what the drug desirability of this drug is on

16  the street.  We want to give you the best drug available for

17  you.  Sometimes there are costs considerations; a patient can't

18  afford a particular drug, so we'll go to a different drug.

19          But by and large the physicians are trained:  You

20  choose the drug that's best for what the patient has.  You

21  know, not a drug that's less likely to be diverted.  I mean,

22  you know, again, those are things you keep in mind.  But it's

23  certainly not the first thing I consider when I decide what

24  drug to give.

25  Q   And obviously drugs, they require a prescription?

CAROL ANN WARFIELD, MD - DIRECT BY MR. SHARMAN

1    A    Yes.

2    Q    Is there anything as far as rules, guidelines, or practices

3    in pain medicine and pain management that prohibits a

4    prescription being prepared in advance for a patient?

5    A    No.  It can be done and it is done.  And you can give

6    patients up to three months of prescriptions in advance.

7    Q    Okay.  What do you mean by that, you can give patients some

8    for three months?

9    A    So, for example, if you see a patient on January 1st, you

10   can give them a prescription for the month of January that he

11   goes and fills that day.  And, then, you can give him another

12   prescription for February 1st and another prescription for

13   March 1st that they wouldn't fill until those dates, but the

14   patient doesn't have to come back and see you and get

15   prescriptions.  So that's -- that's perfectly legitimate and

16   legal and done.

17   Q    And that's within the usual course of medical practice to

18   do that?

19   A    Yes, definitely.

20   Q    Are there occasions when a pain management physician may

21   prepare a prescription and sign a prescription in advance of

22   the patient's visit?

23   A    Yes.  And especially with this electronic medical record

24   stuff that's done, sometimes these things are spit out by the

25   computer the night before or whatever and in the chart and then

1    you see the patient and if you agree with those you hand them
2    to the patient.  If not, you can rip them up and write whatever
3    prescription you want.  But again, it's -- you know, it's a
4    time-saving mechanism that some -- that some practices use.
5    They have the prescriptions ready to go so that you don't spend
6    a lot of time writing them out.  But if you see the patient and
7    you decide no, no, I think I'm going to change my mind, you can
8    just rip it up and give him a different one.  It's not really a
9    prescription, it's not really -- you're not really prescribing
10   unless until you hand it to the patient.
11   Q    And we mentioned a minute ago the collaboration between the
12   nurse practitioner and the pain management physician.  In the
13   last scenario that you just described, is it appropriate --
14   that is, is it within the usual course of medical practice for
15   the physician to instruct the nurse practitioner to provide the
16   prescription to the patient, assuming there's no changes?  Is
17   that within the usual course of medical practice?
18   A    Yes, yes, absolutely.
19   Q    From time to time in your either clinical practice or in
20   your teaching work or in review of other practices, have you
21   seen pain management physicians and clinics with cancer
22   patients; that is, patients who are currently suffering from
23   cancer?
24   A    Yes, certainly.
25   Q    Have you also seen and had occasion to deal with patients

4812

1   who had a history of cancer; that is, they had it sometime in

2   the past but are either in remission or otherwise aren't

3   presenting symptoms of cancer today?

4   A   Yes, we often see those (nodding head affirmatively).

5   Q   All right.  With regard to the latter group -- that is to

6   say, those who had a history of cancer but are not so

7   presenting today -- are there any implications for the pain

8   management physician with regard to, for example, residual

9   effects of radiation, chemotherapy, or other cancer treatment?

10          MS. GRIFFIN:  Your Honor, we would object.  That's

11   outside of the disclosure.

12          MR. SHARMAN:  I think it's within, Your Honor,

13   although I can't --

14          THE COURT:  Come to side bar, please.

15      (At the side bar, jury not present.)

16          THE COURT:  Can you read me back the question?

17          MR. SHARMAN:  Your Honor --

18          THE COURT:  Hold on.

19          THE REPORTER:  Wait, wait, wait.  It's here.

20      (Requested portion of record read.)

21          THE REPORTER:  I'm sorry.  If you had said anything

22   more, it was about to scroll off the display.

23          MR. SHARMAN:  I was trying to help Roy, to be very

24   deliberate about it.

25          But, Your Honor, this is related to and I was moving

 1    towards the off-label issue.  That was the only point of it,

 2    which is heavily disclosed throughout.

 3         MS. GRIFFIN:  Your Honor, there is nothing in the

 4    disclosure we received where she discusses cancer patients or

 5    prescribing.  If you can show me where it is, I will retract

 6    the objection.

 7         MR. SHARMAN:  The words "breakthrough pain" are not in

 8    the disclosure.  But this goes to the off-label use of Subsys

 9    and Abstral, which the government continuously reminds us is

10    indicated for breakthrough pain in cancer patients, which is

11    amply -- and the off-label topic is amply and repeatedly

12    disclosed.

13         MS. GRIFFIN:  Nor does she say anything about Subsys

14    or Abstral in her disclosure.  So we would object to any

15    inquiry about off-label use of those drugs.

16         MR. SHARMAN:  It is --

17         MS. GRIFFIN:  And the purpose -- excuse me -- the

18    purpose of this notification is it's so our experts have the

19    opportunity to review what the opposing experts will say and so

20    that we are prepared about what the witness is going to

21    say.  She does not mention cancer, she does not mention Subsys

22    and Abstral, and we object to those being discussed with this

23    witness.

24         MR. SHARMAN:  Subsys and Abstral are discussed in the

25    question and answer that we provided to the government's

 1    followups at page three at paragraph 11 and page one at

 2    paragraph four.  Those are -- those two are specifically

 3    referenced.  I can go get it, if you don't believe me.

 4         MS. GRIFFIN:  We had to send a multi-page request to

 5    ask them to explain some of the things in this.  And most of

 6    the answers were very curt.  But it could be included in that,

 7    but cancer is not anywhere.  And we'd object to her being asked

 8    about it.

 9         MR. SHARMAN:  Your Honor, you can't talk about -- the

10    way the government has posed Subsys and Abstral, we can't talk

11    about it now without talking about cancer.

12         THE COURT:  Well, you know, you are limited to

13    whatever your disclosure said.  And I have no way of judging

14    unless you submit all this to me.

15         MR. SHARMAN:  Well, I can certainly show you -- I can

16    bring up the Subsys and Abstral disclosures on the question and

17    answers on page three, paragraph 11, page one at paragraph

18    four.  I can bring that up right now.

19         THE COURT:  All right.

20         MR. SHARMAN:  I freely admit that the words

21    "breakthrough pain" are nowhere near -- are nowhere in any

22    disclosure.  The only purpose there is to lead up to the

23    off-label use of Subsys and Abstral, which is disclosed and

24    obviously is in the case.

25         MS. GRIFFIN:  Your Honor, breakthrough pain is not

1    mentioned in the disclosure either and we object.  That's the

2    purpose of the rule.  And we can't be prepared, we can't have

3    our experts prepared, if those aren't mentioned.  The four

4    patients she examined did not receive Abstral or Subsys, the

5    four patients she examined.

6              THE COURT:  You are limited to whatever you put in

7    your disclosures.

8              MR. SHARMAN:  I have disclosed Subsys and Abstral,

9    Your Honor.  I ought to be able to ask it.

10             MS. GRIFFIN:  You haven't discussed cancer or

11   breakthrough pain and that's the question you asked her about,

12   cancer, and I object.  And I object to breakthrough pain being

13   asked as well.

14             THE COURT:  You can ask her whatever you want about

15   Abstral and Subsys, except you're going to have to limit your

16   questions not to cancer or breakthrough pain.

17             MR. SHARMAN:  Okay.  I will -- I will not say anything

18   about breakthrough pain.  But, Your Honor, the Subsys and

19   Abstral has to talk -- will come back up, but we have to talk

20   about cancer because that's their whole position, it's a cancer

21   medication.

22             MS. GRIFFIN:  It's the FDA's position as well.  It's

23   not just the United States' position.  I'll go look.  I take

24   your word that it's in your ones where we asked you to clarify

25   some things.  But you still didn't mention breakthrough or

 1    cancer and we object to those.

 2             THE COURT:  Well, let's go ahead and put this jury in

 3    recess for their morning break.  And, then, my ruling is what I

 4    just said, unless you can come up with something else.

 5        (In open court, defendants and jury present.)

 6             THE COURT:  All right.  Ladies and gentlemen, we're

 7    going to go ahead and take our morning break at this

 8    time.  Leave your pads on your chairs.  No discussion about the

 9    case.  Take your break downstairs in the jury assembly room and

10    we will call you back up in about 15 minutes.

11             We're in recess.

12             MS. GRIFFIN:  Your Honor?  After the jury leaves, may

13    we mention one thing to the Court?

14             THE COURT:  Sure.  Go ahead and take your break.

15        (At the side bar, jury not present.)

16             THE COURT:  Do you want it at side bar?

17             MS. GRIFFIN:  Please.

18             THE COURT:  Come on, lawyers.

19             MS. GRIFFIN:  Your Honor, one of the lawyers from our

20    office who is in the courtroom in the back has just advised one

21    of our support people that they can hear what we are saying

22    when we are up here at side bar.  So I just want to point that

23    out for the Court and everybody else's information.  And I

24    suggest maybe, if we can, that the person that's speaking could

25    turn this way, away from the audience.  But I wanted to advise

1    the Court if they can hear it in the courtroom, back in the

2    back, the jury can hear and the witnesses as well.

3         THE COURT:  Well, I know the witness can hear.

4         THE CLERK:  I can turn the sound up a little bit more,

5    but it's going to start drowning you out.

6         THE COURT:  What?

7         THE CLERK:  I can turn the white noise up a little

8    bit, if you would like me to, Your Honor.

9         THE COURT:  Maybe you should just a little bit.  Okay.

10       (A recess was taken at 10:28 a.m.)

11       (In open court, defendants and jury present.)

12            THE COURT:  All right, Mr. Sharman.

13            MR. SHARMAN:  Thank you, Your Honor.

14   Q    Dr. Warfield, earlier you had talked a little bit about the

15   concepts of dose calculation and titration.  Do you remember

16   some of those questions?

17   A    Yes.

18   Q    And if you mentioned this, forgive me.  But is there also a

19   concept related to those called rotation of medications?

20   A    Yes, it's very related to it.  Rotation means switching

21   from one medication to another because you think the other

22   one's going to work better.  And there is scientific reasons

23   for that.  There are three different classes of opiates and

24   they are all distinct, different chemical formulas.  One group

25   is the group that methadone is in, and it's in its own group.

1    There's a second group that has fentanyl and Demerol in it, and

2    then everything else is in the third group.

3            So because they are different chemical formulas in

4    these three different groups, if one is tolerant to one group,

5    they may not be tolerant to the other group.  If one has side-

6    effects from one group -- say you're vomiting because of one --

7    you may not to the other one.  So opioid rotation refers to

8    while you're doing this titration, to get the best drug and

9    dose for your patient or combination for your patient, it's

10   common to switch from one group to another.  So from the

11   oxycodone group you would need to go to either fentanyl or

12   methadone.  Demerol is not a drug we use much any more.

13           So, again, if you were using oxycodone, Percocet, or

14   morphine, or Dilaudid, or any of those drugs, the reasonable

15   drug to switch to would be either fentanyl or methadone.  And

16   there are reasons that one might use one versus the other.  So

17   that's called opioid rotation.  And it's part of titration.

18   Q    And is that -- that is to say, rotation -- within the usual

19   course of medical practice in pain management?

20   A    Absolutely.  It's very good practice and reflects that the

21   doctor knows what they are doing.

22   Q    With regard to that term, or standard, "usual course of

23   medical practice," based on your experience and study, what

24   does that mean especially with regard to the continuum of

25   practice that we discussed earlier?  What does the usual course

1  of medical practice mean?

2  A   Well, usual course of medical practice means that it's a

3  medical practice, it's run and the doctor treats patients and

4  writes prescriptions like a real medical practice.  We talked

5  about that continuum and we talked about standard of care.  You

6  know, within the standard of care there are different ways of

7  doing things.  There's the best possible way of doing things

8  that the people in the ivory towers might aspire to, there's

9  kind of what your average doctor would do, which is, you know,

10 the average medical care, then there's even medical care that's

11 maybe not so great, not the best, but still within the standard

12 of care.  Those are all things within the standard of care and

13 within that umbrella.

14        Outside of the standard of care is often something

15 that happens when the doctor makes a mistake, like malpractice,

16 negligence, the doctor makes a mistake.  But they are still

17 practicing medicine.  I mean, if a surgeon leaves a sponge in

18 somebody's abdomen, they're still practicing medicine when they

19 do that.  It's still within the usual course of a medical

20 practice, but they made a mistake or did something wrong.  Or

21 even if the doctor didn't have the right knowledge and gave the

22 wrong treatment or something, they're still practicing medicine

23 and acting like a doctor when they make that mistake.  That's

24 malpractice.

25        Way outside of that is outside of is the usual course

 1   of medical practice, meaning the doctor isn't even acting as a

 2   doctor any more.  So, for example, you know, if somebody came

 3   up to me at a cocktail party and said:  Oh, I hear you're a

 4   pain doctor, can you give me a prescription for morphine, and I

 5   do it --

 6           MS. GRIFFIN:  Your Honor, I object.  That is outside

 7   the scope of the question.  It's not responsive to his

 8   question.

 9           MR. SHARMAN:  She was just giving an example, Your

10   Honor.

11           THE COURT:  Overruled.

12   A    I would consider that outside of the usual course of

13   medical practice if someone just came to me at a cocktail party

14   and asked for a prescription, said:  Oh, yeah, I hear you're a

15   pain doctor.  I have this neck pain.  Could you give me a

16   prescription?

17           I don't have a doctor-patient relationship with that

18   patient, I've never examined the patient.  That's outside of

19   the usual course of medical practice.

20           Or if someone comes to me even in my office and says:

21   Here, I'll give you a thousand dollars if you give me a

22   prescription for OxyContin, and I give it to them -- that's

23   outside the usual course of medical practice because, again, I

24   don't have a relationship with the patient, I haven't examined

25   the patient, this patient really isn't my patient.  I'm not

1    giving them the drug for a legitimate medical reason.  I'm

2    giving it to them so they can get high.  That's outside of the

3    usual course of medical practice.

4            If someone comes to me, a patient comes to me, and

5    says:  You know, my wife has pain too, could you give me a

6    prescription for her?

7            Or if I know, if my patient comes to me and says:  You

8    know, Doctor, I don't have any pain but I just like this stuff

9    because it makes me high.  If I slip you a little extra money,

10   will you give me that drug -- that's outside of the usual

11   course of medical practice.

12           But, as I said, I think the distinction is there are

13   things that people do outside of the standard of care which

14   probably isn't the best practice -- and most malpractice, in my

15   appearance, is still the practice of medicine, it's just not a

16   great practice of medicine.  But it's still within the usual

17   course of a doctor's practice of medicine.  But it is

18   confusing.

19   BY MR. SHARMAN:

20   Q    And we touched earlier on the status of a nurse

21   practitioner.  Are you familiar with the status of a title of a

22   CRNA?

23   A    Yes.

24   Q    What is a CRNA?  What do they do, especially with regard to

25   pain medicine and pain management?

4822

1   A   It's a certified registered nurse anesthetist.  And that

2   type of nurse has even more powers than a nurse

3   practitioner.  They are nurses who act to give anesthesia in

4   the operating room.  So they every day dispense opiates to

5   patients and narcotics.

6           And, you know, in some places where there aren't

7   anesthesiologists, they do this on their own without even the

8   doctor's supervision.  So they are kind of a step above.

9   They've had extra training in anesthesia and they really act

10  like an anesthesiologist and they can dispense opiates and

11  narcotics.  And they do, they do work on their own in

12  many places.  It depends on the place, but in some places.

13  Q   You mentioned it depends on the place.  It depends on that

14  particular CRNA's licensure; is that --

15  A   Correct.

16  Q   And in your review of the records, did you notice whether

17  or not Dr. Couch employed and used CRNAs?

18  A   Yes, he did.

19  Q   Are you familiar with the concept of off-label medication

20  or off-label prescriptions in the context of pain medicine or

21  pain management?

22  A   Yes, absolutely.

23  Q   What does, first of all, off label mean?

24  A   Off label essentially means that the doctor is using a

25  medicine for other than the reason it was approved by the FDA.

CAROL ANN WARFIELD, MD - DIRECT BY MR. SHARMAN

1    And again, this is something that's confused.  So, for example,

2    when aspirin was first approved by the FDA, it was approved to

3    treat headaches and the FDA give it -- they call that the

4    indication.  So the indication to prescribe aspirin to your

5    patients is mild pain or headaches.

6         It was later found that aspirin helps you prevent

7    heart attacks.  So doctors started telling their patients to

8    take an aspirin a day to prevent heart attacks.  That was an

9    off-label use, because the FDA had never approved it for

10   preventing heart attacks.  But it was perfectly legitimate

11   because there was data there in the literature, in the medical

12   literature, medical journals and lectures and such, to show

13   that it was effective in preventing heart attacks.

14        So you might say:  Well, then, why the heck doesn't

15   the FDA just approve it for that?

16        Well, because getting FDA approval for a drug is a

17   time consuming -- it can take 20 years.  It's very time

18   consuming, a very, very expensive process.  So most drug

19   companies use one indication for a drug.  They'll say:  I'm

20   asking for approval to use this drug to treat cancer pain.

21        And they get the approval to use that and it becomes

22   marketed and doctors, however, can use it for whatever they

23   feel is appropriate.  If there's stuff in the literature that

24   says it's good for other things, just like aspirin is good for

25   preventing heart attacks, it's perfectly reasonable to use it

4824

 1    for those so-called off-label uses.

 2            And I've been telling you today about the fact that we

 3    do anti-depressants and anti-convulsants to treat these types

 4    of pain.  Those are off-label uses.  Much of what we do in pain

 5    is off-label uses.  Because those anti-depressants were

 6    marketed and they got approval to treat depression, not to

 7    treat pain.  And the same thing with anti-convulsants; those

 8    were approved by and large to treat convulsions, epilepsy.

 9    They weren't approved to treat pain.  But we know because of

10    the literature that they are good to treat these other things.

11            So many, many of the drugs we use in medicine today

12    and certainly in pain management are so-called off-label

13    use.  It sounds kind of scary, but it's very, very commonly

14    done.

15    Q   Is off-label use in pain management within the customary

16    medical practice and for a legitimate medical purpose?

17    A   Absolutely.  It's very commonly done.  I do it all the time

18    myself and I think most pain doctors do.  It's very commonly

19    done.

20    Q   Based on your experience, observation, study, and teaching,

21    is overall volume of prescriptions by a pain management

22    physician an indicator of practice that is outside the usual

23    course?

24    A   No, absolutely not.  And again, you know, the answer is it

25    depends.  I mean, if you're the only pain management center or

 1   maybe you're one of the only doctors who will prescribe these

 2   drugs, as I said, because of many reasons, including fear of

 3   sanctions and, you know, court cases and all that, many doctors

 4   have just said:  I don't care who the patient is, whether they

 5   have cancer.  I'm not prescribing these drugs anymore.

 6        So sometimes doctors are the only show in town that

 7   prescribe these drugs.  And, of course, I wouldn't be surprised

 8   if in a city someone was the major pain clinic, that they would

 9   prescribe most of these drugs in that city.  So the numbers

10   mean nothing.

11        The other thing is, you know, you can have a hundred

12   one milligram tablets or 100 milligram tablets.  It's the same

13   thing.

14        MS. GRIFFIN:  Your Honor, I object to the answer being

15   nonresponsive to the question.

16        THE COURT:  Yes.

17        MR. SHARMAN:  Your Honor, she's elaborating on her

18   answer.

19        THE COURT:  I know.  But, Doctor, try and answer

20   specifically what he's asked without more explanation than is

21   necessary to answer.  All right?

22        THE WITNESS:  Okay.

23   BY MR. SHARMAN:

24   Q   Dr. Warfield, so, for example, would the number of doctors

25   per capita in a given area have some influence on the volume or

1   great or small number of opioid prescriptions written?

2   A   Of course.  The more doctors you have, the more the

3   prescriptions are divided among the population.  If you've got

4   one doctor in the state, obviously they are going to write a

5   hundred percent of the prescriptions.  If you have, you know, a

6   million doctors and it's divided up, they are going to

7   prescribe a lot less.  So I think that certainly makes sense.

8   Q   You may have said this.  Again, I apologize to you.  Is it

9   within the usual course for a pain management physician to rely

10  upon and use the information in the referral package -- that

11  is, the referral information from the referring primary care

12  physician or other healthcare provider -- to the pain clinic?

13  Is that reasonable and appropriate for him or her to rely upon

14  that?

15  A   Yes, we rely on that and oftentimes memorialize it, that

16  sort of thing.  But then we also do an exam and history on the

17  patient ourselves.  But there's often a lot of background

18  information that comes -- sometimes there's none, sometimes we

19  get nothing from a referring doctor.  But sometimes we get a

20  lot of information about the history and such.  So certainly we

21  rely on that when we receive it.

22  Q   And this is about nurse practitioners:  Is it within the

23  usual course of medical practice for pain management physicians

24  to consider the interaction between the nurse practitioner and

25  the patient to be part of the doctor-patient relationship?

1   A   Certainly.  It's part of the relationship with the

2   practice.

3   Q   For all of these topics, Dr. Warfield, that we have covered

4   with regard to whether or not a particular practice is within

5   the usual course of medical practice, is it still your opinion

6   that Dr. Couch's treatment of the patient files that you

7   reviewed, and particularly their prescriptions, were within the

8   usual course of medical practice and for a legitimate medical

9   purpose?

10  A   Yes.  I've reviewed these records and I absolutely feel

11  that this was a legitimate medical practice, these

12  prescriptions were done within the course of -- the usual

13  course of medical practice, and that the prescriptions were

14  written for legitimate medical purposes; i.e., pain.

15          MR. SHARMAN:  No more questions, Your Honor.

16          THE COURT:  Ms. Griffin?

17                      CROSS EXAMINATION

18  BY MS. GRIFFIN:

19  Q   I guess it's still good morning.  Good morning,

20  Dr. Warfield.

21  A   Morning.

22  Q   How are you today?

23  A   Good.

24  Q   I'm Deborah Griffin.  I represent the United States in

25  connection with this case, one of the two attorneys trying the

4828

1    case for the United States.

2          Obviously you were not present during any of the

3    examinations of the five patients you examined, were you?

4    A    That's correct.

5    Q    And you have a DEA license still, don't you?

6    A    Yes.

7    Q    But you've stopped seeing patients in 2013, didn't you?

8    A    That's correct.

9    Q    You've not written a controlled-substance prescription in

10   the past three years, have you?

11   A    That's correct.

12   Q    Now, were you aware that none of the nurse practitioners or

13   the nurse anesthetists that worked for Dr. Couch had a DEA

14   license to write schedule II controlled substances?

15   A    I believe I was aware of that, yes.

16   Q    So you knew they could not write controlled substances and

17   schedule II -- or schedule IIs?

18   A    They couldn't, they couldn't sign their name to them.  A

19   doctor needed to do that.

20   Q    And you would agree that it's outside the usual course of

21   professional practice for a nurse practitioner to sign a

22   doctor's name on a controlled-substance prescription, wouldn't

23   you?

24   A    Outside of the usual course of practice for whom?  For the

25   nurse?

1   Q   For the nurse practitioner to sign a doctor's name on a

2   schedule II controlled substance.

3   A   I think for the nurse it would be, not for the doctor,

4   unless the doctor knew that that was happening.  I mean --

5   Q   So if the doctor knew that the nurse practitioner who had

6   no DEA license was routinely signing the doctor's name on

7   controlled substance scripts, you would agree that that would

8   be outside the usual course of professional practice for both

9   the doctor and the nurse practitioner, wouldn't you?

10  A   If the doctor was condoning that a nurse was forging

11  someone's name, I think that's -- that's not legitimate.  I

12  agree.  Forgery, forging someone's name, is not okay.

13  Q   It's forgery; right?

14  A   Correct.

15  Q   And you would agree that it's outside the usual course of

16  professional practice for a doctor to sell a prescription,

17  wouldn't you?

18  A   To sell a prescription?  To say:  Give me $20 and I'll give

19  you a prescription?

20          Sure, that's outside the usual course, yes.

21  Q   And you would agree that it's outside the usual course of

22  professional practice for controlled-substance prescriptions to

23  be sold out the back door of a pain clinic; right?

24  A   Prescriptions sold to somebody for money is never

25  appropriate.

1    Q    You would also agree that it's outside the usual course of

2    professional practice to lie on a patient file for the purpose

3    of billing a higher-level visit, wouldn't you?

4    A    I wouldn't say that was outside the usual course of medical

5    practice.  I would say there are lots of these billing mistakes

6    and it's very confusing.  So that one I would have to say, you

7    know, there may be some concerns about the standard of care.

8    But within the usual course of medical practice, I have seen

9    many, many billing mistakes, especially when it comes to level

10   of care.  So I'd have to say regular medical practices do this,

11   they get audited and they find irregularities in billing all

12   the time.  But that's within the usual course of medical

13   practice.  It's not -- you know, it's not okay, but it's still

14   medical practice when that happens.

15   Q    You would agree that there may be some errors, but it

16   wouldn't be every time you saw a patient that there was a lie

17   in the file for the purpose of billing at a higher billing

18   code?  That would be outside the usual course of professional

19   practice, wouldn't it?

20   A    I guess what I'm saying is that I've reviewed a number of

21   these cases.  And the coding for these cases, you know, every

22   time you see a patient you need to put a different code in,

23   depending on how long you took, whether you examined just the

24   back, whether you examined the toes.  Or if you did the left

25   toe and the right toe, it's different than if you examined just

4831

```
 1   one.  And it's very, very confusing.  And I must say that I
 2   have seen many, many times errors like this and usually the
 3   insurers catch up with them; they have to pay the money back.
 4   But, again, that's still the usual course of medical practice.
 5   It's not -- it's still a legit medical practice.  So I would
 6   have to differ about the billing.  I don't think -- I don't
 7   think that means that because your billing was irregular, the
 8   prescriptions you wrote weren't legitimate.
 9   Q   No.  The question wasn't about the prescriptions.  Is it
10   outside the usual course of professional practice to lie on the
11   medical record about what occurred in the visit for the purpose
12   of billing at a higher rate?
13           MR. SHARMAN:  Objection to the lie on the medical
14   record.  It misstates the testimony.
15           THE COURT:  Overruled.
16   A   I think I've already answered that.
17   BY MS. GRIFFIN:
18   Q   You believe that it's okay, then?
19   A   Oh, I didn't say it was okay.  What I said was that it's
20   common, there are mistakes that are commonly done in billing
21   within practices.  That doesn't mean that the medical practice
22   is not a legitimate practice or that patients aren't seen
23   within the usual course of medical practice.  It means that
24   there is a -- there are mistakes and things going on with the
25   billing that aren't correct and aren't right.  I'm not agreeing
```

1    with that kind of billing.  But I'm saying that the fact that

2    you see a billing error, which is not that uncommon in the

3    medical practices that I've reviewed, does not have anything to

4    do with whether the practice is legitimate and whether the

5    doctor was performing in the usual course of practice with

6    respect to treating patients.

7    Q   So the question is not about the practice.  The question is

8    very specific.  Is it outside the usual course of professional

9    practice to lie -- not to make a mistake -- but to lie in a

10   patient's file for the sole purpose of billing a high-level,

11   long visit when that is not true?

12   A   I think -- I mean, maybe I misunderstood, but I think I've

13   already answered that.

14   Q   That you think those were mistakes rather than intentional,

15   was that what you're saying?

16   A   I think that it's very, very common to have those kinds of

17   mistakes in practices, it happens all the time, and that it

18   doesn't make the practice outside the usual course of medical

19   practice.

20   Q   Now, you said you've had the opportunity to review files.

21   In fact, you've testified 10 times as a defense witness in

22   these types of cases, haven't you?

23   A   That sounds about correct, yes.

24   Q   And you've been paid for each of those; right?

25   A   I've been paid for my time away from my practice, yes.

CAROL ANN WARFIELD, MD - CROSS BY MS. GRIFFIN

1  Q   And so you were being paid for yesterday when you were

2  going over your testimony with Mr. Sharman, too; right?

3  A   That's correct.

4  Q   And your time here today?

5  A   Yes.

6  Q   And your time away from Boston?

7  A   That's correct.

8  Q   And your time when you were preparing your reports?

9  A   Yes.  I'm paid for all of the time I take away from my

10  practice to do this sort of thing, yes.

11  Q   And that's 750 an hour all the time you're away from your

12  practice except when you're sleeping, isn't it?

13  A   Yes.

14  Q   Now, Dr. Warfield, you said a comment that you do something

15  all the time yourself.  But, in fact, you've not been seeing

16  patients since '13, so you've not done a lot of the things with

17  a patient since 2013 that you've testified about here today; is

18  that correct?

19  A   Right.  When I say I do this with my patients, I meant for

20  the 35 or 40 years before that.  I've stopped seeing patients,

21  but I'm still full time, I'm still full time at Harvard Medical

22  School, doing mainly teaching and that sort of thing.

23  Q   But no, the question is you've not done many of these

24  things with a patient since 2013, have you?

25  A   That's true.  Sure.  Yes.

4834

```
 1   Q   That's true, isn't it?

 2   A   Yes; that's true.  Absolutely.

 3   Q   Now, in connection with your responsibilities and the

 4   things you do, you are salaried; is that correct?

 5   A   Yes.

 6   Q   You're a salaried professor?

 7   A   Yes.

 8   Q   So you don't have to depend on how many patients come in,

 9   or seeing more patients, to determine your salary, do you?

10   A   Correct.

11   Q   You have given some speaking engagements before, as you

12   described, the International Conference on Opioids?

13   A   Yes.

14   Q   Frequently spoke there; is that right?

15   A   Yes.

16   Q   And you spoke there in 2015; is that right?

17   A   I've been codirector of the International Conference on

18   Opioids and I've spoken there every year since it was

19   initiated.

20          MS. GRIFFIN:  And if I could publish this to the

21   witness and the jury?  It's a demonstrative aid, Your Honor.

22          THE COURT:  All right.

23   BY MS. GRIFFIN:

24   Q   Can you see this, Dr. Warfield?

25   A   It's an old picture.
```

4835

1      (Laughter.)

2    BY MS. GRIFFIN:

3    Q   We all like to use those, don't we?

4    A   Don't we?

5    Q   Can you see this?

6    A   Yes.

7    Q   And does it say in the top right-hand corner that this was

8    a speaking program in 2015?

9    A   Correct.

10   Q   And you were speaking on legal issues from a physician's

11   viewpoint; is that right?

12   A   That's correct.

13   Q   Now, in this program you used a PowerPoint, didn't you?

14   A   Correct.

15   Q   Did you tell them at the very end that you were not an

16   advocate of using opioids for chronic pain?

17   A   Well, I believe what I said was I personally am not a big

18   advocate of using these medications in my practice.  I do

19   mainly blocks for a variety of reasons.  But I am an advocate

20   of a physician's right to do so, which means I believe that

21   there's that whole continuum.  So there are physicians who

22   prescribe these all the time and physicians who don't.  Our

23   pain clinic was one of the pain clinics that, because of legal

24   sanctions and such, decided that we would have our primary care

25   doctors do the prescription rather than the pain doctors for a

CAROL ANN WARFIELD, MD - CROSS BY MS. GRIFFIN

 1  while.  So yes.

 2  Q    So this was a program in 2015?

 3  A    Yes.

 4  Q    And you weren't seeing patients in 2015, were you?

 5  A    That's correct.  I was doing teaching mainly.

 6  Q    And so it is correct that at the end of your PowerPoint you

 7  stated --

 8  A    Yes, exactly.

 9  Q    -- that you were not a big advocate of using opioids for

10  chronic pain; is that correct?

11  A    Correct.

12  Q    You are obviously aware of the Alabama rules that cover the

13  doctors that are charged here in this indictment?

14  A    Correct.

15  Q    And you, of course, are not an Alabama-licensed physician,

16  are you?

17  A    Correct.

18  Q    Have you reviewed the Alabama Board of Medical Examiners

19  Administrative Code in preparation for your testimony here

20  today?

21  A    Yes.

22  Q    I'll show you what's marked as Couch Exhibit 118, at page

23  09, and submit to you that this is the 2013 Alabama Board of

24  Medical Examiners Administrative Code for controlled

25  substances, under Controlled Substances Prescription Guidelines

1   For Physicians.  Does it state that:  "The prescription shall

2   be dated as of, and signed on, the day when issued"?

3   A   Yes.

4   Q   And you understand that doctors in this case, the

5   defendants, are bound by these Alabama rules; is that right?

6   A   Yes.

7   Q   It does not say that those prescriptions can be signed the

8   day before and predated or post-dated, does it?

9   A   I'm not sure that's what predated or post-dated

10  means.  But --

11  Q   Well, let's talk about that.

12  A   But I think it's -- I'm sorry.  Shall I go ahead?

13  Q   Today's the 8th of February; right?

14  A   That's right.

15  Q   So if you were still presigning prescriptions, if you were

16  still practicing, seeing patients, and you saw a patient today,

17  you prescribed something, you would date it today's date, if

18  you were an Alabama doctor; is that correct?

19  A   I probably would, although, as I mentioned earlier, I know

20  there are many practices who do this computer-generated thing

21  where they spit them out the night before.

22  Q   And when you mean computer generated, you don't mean a

23  computer-generated signature, do you?

24  A   No.  They are signed sometimes.  And again, there are many,

25  many different ways of doing things.  And again, I don't think

1   that a prescription that's written the night before or the day

2   of or whatever makes a prescription illegitimate or outside of

3   the usual course of medical practice, if that's what you're

4   asking.

5   Q   You would agree, though, that in Alabama the prescription

6   says "shall be dated as of, and signed on, the day when

7   issued"?  It's not a multiple choice, is it?

8   A   I would agree that it says that.

9   Q   And so you would agree that an Alabama physician would have

10   to abide by that requirement; is that correct?

11   A   I agree.

12   Q   I show you on page 10 of the same guidebook paragraph five,

13   and it says:  "When a physician prescribes a controlled

14   substance, he or she shall not delegate the responsibility of

15   determining the type, dosage form, frequency of application and

16   number of refills of the drug prescribed."

17          You understand that that is binding on Alabama

18   physicians, as well?

19   A   Correct.

20   Q   And as to paragraph seven, still this same pain guide for

21   Alabama physicians, you would agree:  "It is improper for any

22   prescription for a controlled substance to be signed by any

23   person in the place of or on behalf of the prescribing

24   physician"?

25   A   Correct.

CAROL ANN WARFIELD, MD - CROSS BY MS. GRIFFIN

1  Q   So if an Alabama physician were knowingly letting another

2  person sign in the place of or on behalf of the prescribing

3  physician, that would be outside the usual course of

4  professional practice, wouldn't it?

5  A   Correct.

6  Q   As to paragraph number eight, it states:  "It is improper,

7  under any circumstances, for a physician to presign blank

8  prescription pads or forms and make them available to employees

9  or support personnel"?

10  A   Correct.

11  Q   Do you understand that a presigned blank prescription means

12  a prescription with a doctor's signature on the prescription

13  and the information about the drug or the patient being omitted

14  from the prescription?

15  A   I understand that.

16  Q   So if this were done by an Alabama doctor, it would be

17  outside the usual course of professional practice, wouldn't it?

18  A   It would be in violation of this code, which isn't

19  necessarily outside of the usual course of medical practice,

20  depending on what the practice is.  But I agree that it would

21  be in violation of this number eight.

22  Q   But you're not telling us that it is within the usual

23  course of professional practice for doctors to leave presigned

24  blank prescription pads for employees or support personnel, are

25  you?

1  A   No.  I don't think that's the standard, but I don't think

2  it makes the entire practice not in the legitimate course of

3  practice.

4  Q   Well, we're not --

5  A   I don't agree with this particular -- I mean, what I'm

6  saying is I don't think that's appropriate.  It would not be

7  the standard thing to do, to leave your name on a prescription

8  blank like that.  It would not be.  But it does not make the

9  practice not a legitimate medical practice.  It doesn't make

10  the prescriptions that were written and signed by the doctor

11  illegitimate prescriptions.

12  Q   So you are saying that someone other than the physician

13  could then decide what controlled substance --

14  A   No.  I'm saying that this isn't appropriate.  But my

15  understanding is that what I'm being asked is were the

16  prescriptions that I saw that were written within the usual

17  course of medical practice, and they were, and this doesn't

18  make them not within the usual course of legitimate medical

19  practice.

20  Q   We're going to get to those prescriptions later while we're

21  talking.  But for paragraph eight, you would agree for an

22  Alabama physician to violate number eight would be not the

23  whole practice but outside the usual course of professional

24  practice for prescriptions; right?

25  A   I think -- I guess maybe I'm confused, because I think I've

1    answered that.  I don't think this is the standard, I don't

2    think this would be the standard of care.  But I don't think

3    this is outside of the usual course of medical practice.  It

4    doesn't make the practice outside the usual course.  Maybe I'm

5    confused, but I think I've already answered that.

6    Q   The act of presigning a blank prescription pad, leaving it

7    for availability of others, is that act outside the usual

8    course of professional practice for an Alabama doctor?

9            MR. SHARMAN:  Objection, Your Honor.  Asked and

10   answered.  We've been over this as well now.

11           THE COURT:  I think they are misunderstanding each

12   other.  So I'm not sure it is asked and answered at this time.

13   I know it's been asked, but I'm not sure it's been answered.

14   So I overrule the objection.

15   BY MS. GRIFFIN:

16   Q   Would you like me to repeat the question again?

17   A   No.  I think I know what you're asking.  And what I'm

18   saying is that the prescriptions that were written were within

19   the usual course of medical practice.  I've been asked my

20   opinion about the prescriptions that have been written.  They

21   are within the usual course of medical practice.  Whether or

22   not there was a prescription pad with a name signed on it has

23   nothing to do with those prescriptions.  I'm not condoning

24   that, but I'm saying it has nothing to do with my -- it

25   wouldn't change my opinion that the prescriptions that were

1  written were within the usual course of medical practice.

2  Q  Dr. Warfield, we're not asking you about the prescriptions

3  that you reviewed.  We're asking about this statement, if a

4  doctor left blank presigned prescription pads.  Not about the

5  whole practice.  Not about the prescriptions you

6  reviewed.  Would that be, in and of itself, outside the usual

7  course of professional practice?  It would, wouldn't it?

8  A  No.  I guess what I'm saying is no, it wouldn't make the

9  practice outside the usual course of medical practice.  So I

10 guess I disagree with that.

11 Q  So you disagree with the Alabama rule as to that?

12 A  No, I didn't say that.  I didn't say that.  I said this

13 would not be the standard.  But there's nothing in this Alabama

14 rule that says that if any of these are violated, the doctor is

15 outside the usual course of medical practice.  And I think

16 that's the leap you're taking that I don't agree with.

17 Q  Okay.  You agree, then, that it would be within the usual

18 course of professional practice to leave presigned blank

19 prescription pads, is that what you're telling us?

20 A  No.  I'm telling you that this act of doing this -- and

21 again, I'm not sure what the relevance is -- but I'm saying

22 that that does not make the practice outside the usual course

23 of medical practice.  What it does is it makes a violation of

24 number eight of these rules.  And if somebody violates one of

25 these rules, it does not mean that they are practicing outside

1  the usual course of medical practice.

2  Q   And I show you page 28 of the medical examiners pain rules,

3  and you previously reviewed these; right?

4  A   Correct.

5  Q   And you note that on page 28 of Couch Exhibit 118 it

6  discusses informed consent; is that correct?

7  A   Yes.

8  Q   Informed consent.  Does it say:  "The physician shall

9  discuss the risks and benefits of the use of controlled

10  substances with the patient"?  The first part of the sentence.

11  A   Yes.  Yeah.

12  Q   Okay.  "Persons designated by the patient or with the

13  patient's surrogate or guardian if the patient is incompetent"?

14  Do you agree that the physician should be the one to discuss

15  the benefits and the risks of the use of controlled substances

16  with a patient?

17  A   I think the physician or the physician's designee as a

18  licensed nurse practitioner or a nurse anesthetist or someone

19  along those lines.  Sometimes it's as simple as a form that is

20  given to the patient to read.  So yes, informed consent is

21  important.  But the physician does it by a number of different

22  means.

23  Q   But you would agree that in Alabama this says:  "The

24  physician shall discuss the risks and benefits"?

25  A   I interpret that that the physician does that by various

CAROL ANN WARFIELD, MD - CROSS BY MS. GRIFFIN

1   means:  the Physician, the nurse practitioner, a handout that

2   might be given, an agreement that the patient might sign.  And

3   remember, these are based on the Federation of State Medical

4   Boards guidelines and rules, which I'm familiar with also.  So

5   I understand what you're talking about.

6   Q   But it doesn't say that the doctor can have his nurse

7   practitioner or anyone in his practice discuss the risks and

8   benefits, does it?

9   A   It doesn't say that he can't, and that is the common

10  practice.

11  Q   Okay.  So "shall" is not a multiple choice, is it?

12  A   No.  But to -- and I said even in our practice at Harvard,

13  we have a nurse practitioner who does this and sees our opiate

14  patients and gives them informed consent and such.  So it is

15  the common practice across the country for someone else to be

16  able to give the patient informed consent.  You know, sometimes

17  a patient says:  I have a question.  I'd like to speak with the

18  doctor.

19         And that's generally honored.  But it's not at all

20  uncommon for the patient to be given informed consent, even --

21  either an agreement they have to sign that has the informed

22  consent and risks in it, or a nurse gives the informed consent,

23  or they're given an information sheet.  There are many ways

24  that the doctor shall discuss the risks and benefits.

25  Q   But you would agree that this Alabama rule says "the

 1   physician shall discuss"?

 2   A   That's what it says.

 3   Q   Or the --

 4   A   I'm telling you what my interpretation of what that means

 5   in real life and real practice is.

 6   Q   But you don't control what doctors do and don't do in

 7   Alabama, do you?

 8   A   I don't.  But I'm very familiar with the national standards

 9   under which this was -- I think even at the bottom of this it

10   says that it was based on the Federation of State Medical

11   Boards guidelines.

12   Q   And so if there was informed consent when a patient was

13   mailed a package before they ever came in to being a patient,

14   would you consider that within the standard of practice for

15   giving informed concept?

16   A   I would.  And it's done not uncommonly, because typically

17   that says:  If you have any questions, ask the doctor.

18        I mean, it's done typically preoperatively.  If

19   someone's coming in for surgery, they get a packet sent that

20   gives them informed consent and then when they come in that

21   day, if they have questions, they ask the physician.  So in my

22   experience that's how this is done.

23   Q   Now, you've observed in the five records that you reviewed,

24   didn't you, that some of those who had procedures had a signed

25   informed consent for the procedures; is that correct?

1   A    For procedure, typically a signed informed consent is done

2   for the procedure.  But for medications, no.

3   Q    In the files that you examined -- you examined five?

4   A    Yes.

5   Q    Did you see for some of those patients that had a procedure

6   done by Dr. Couch or Dr. Ruan that there was a signed informed

7   consent just for the procedure?

8   A    Yes, and that's very typical.

9   Q    So what you are telling us is that you know there are nurse

10  practitioners at Harvard who sometimes give the informed

11  consent and discuss the risks and benefits of the drugs with

12  patients in the clinical/hospital setting; is that correct?

13  A    Most of the time the nurse practitioner does it, yes.

14  Q    And the nurse practitioners that you are describing were

15  doing that because they had DEA licenses; right?

16  A    I'm not aware of what the DEA license status is.  Sorry.

17  Q    And you're telling us perhaps that the state you're

18  licensed to practice in does not require that the physician

19  shall discuss the risks and benefits; is that correct?

20  A    I -- I think they require that -- I couldn't quote you the

21  wording, but I think they require that the patient be given

22  informed consent and that questions be answered.  And, as I

23  said, I know that the Federation of State Medical Boards

24  guidelines from which this was taken do mean the same

25  thing.  So I have no problem with a nurse practitioner giving

1    informed consent for medications.

2    Q   But you would agree that that would be in violation of the

3    Alabama rules; right?

4    A   I guess I don't, because I guess what I'm saying is I take

5    that to mean the physician or the physician's designee, a nurse

6    practitioner.  I think those of us who do this every day would

7    interpret it that way.

8    Q   But, Dr. Warfield, you haven't been seeing patients since

9    2013, have you?

10   A   No.  But I've been very intimately involved with these

11   guidelines and their regulations in teaching fellows and

12   residents and teaching at the medical school and teaching

13   nationally.  So I'm very -- I'm very aware of what the

14   guidelines are.  I've been involved with writing the

15   guidelines.

16   Q   You would agree that seeing a patient in a university

17   setting is very different from seeing a patient in a pain

18   clinic setting, wouldn't you?

19   A   There are many aspects that are different and many aspects

20   that are the same.

21   Q   One of the things that would be the same is that there

22   should be a doctor-patient relationship; isn't that correct?

23   A   Yes.

24   Q   That's very important, isn't it?

25   A   Yes.

4848

1   Q   And you think that that is within the usual course of

2   professional practice, for there to be a doctor-patient

3   relationship, don't you?

4   A   Yes, and that means doctor-nurse practitioner, doctor-

5   physician extenders we call them.  So definitely, yes, there's

6   a relationship.  In other words, that patient is a patient of

7   your practice.

8   Q   And you believe it's important for the doctor to sit down

9   with the patient and find out what's going on with the patient,

10   don't you?

11   A   Oftentimes a nurse practitioner does that.  So it may be --

12   it may be someone else who does that, but someone gets a

13   history from the patient, yes.

14   Q   And in addition to getting a history, don't you believe

15   it's important for the physician to actually see the patient

16   and make the physician's own assessment so the physician can

17   decide on a plan?

18   A   Not necessarily.  Again, in our practice the nurse

19   practitioner would do that, would relay that information to the

20   physician, if the nurse practitioner felt it was

21   appropriate.  I mean, this is something that's done every

22   day.  I know in pediatrician offices your child may not see the

23   doctor for a year.  There's a nurse practitioner who sees the

24   doctor.  This is very, very commonly done in all kinds of

25   practices without the doctor seeing the patient.

CAROL ANN WARFIELD, MD - CROSS BY MS. GRIFFIN

1  Q   You do realize we're not talking about pediatricians here,

2  don't you?

3  A   Correct.

4  Q   So the pediatrician examples wouldn't apply to these pain

5  doctors, would they?

6  A   Certainly.  I mean, it applies that a physician extender --

7  i.e., a nurse practitioner -- often sees the patient without

8  the physician.  They are licensed to do that.  They see the

9  patient without the physician.  If they have questions, they

10  can call the doctor and the doctor answers their

11  questions.  But pretty much the nurse practitioner sees the

12  patient and makes those decisions or may go back to the doctor

13  and say:  Here's what I think is the appropriate thing to do,

14  and the doctor agrees and signs a prescription and treats the

15  patient.  This is how things are done.

16  Q   You're telling us that you think it's appropriate for a

17  doctor, a pain physician, to never lay eyes on a patient and

18  write them a controlled-substance prescription?

19  A   To never lay eyes on the patient, so the patient has never

20  seen the doctor in the first place?

21  Q   Right.

22  A   Again, I think if a nurse practitioner sees the patient,

23  talks to the doctor, the doctor signs the prescription, I think

24  that's a physician extender and, yes, it's appropriate.  I

25  think this is done not uncommonly.

4850

CAROL ANN WARFIELD, MD - CROSS BY MS. GRIFFIN

1   Q   You think that a pain physician can have a patient

2   relationship, make an assessment, and write a controlled

3   substance without ever seeing the patient herself?

4   A   And I think if the designee, the delegate, of the doctor

5   sees the patient, that's appropriate.

6   Q   So your answer is that it is okay for the doctor not to see

7   the patient, then, that's really what you're telling us?

8   A   As long as the nurse can see him.

9   Q   Excuse me, ma'am.  Let me finish.

10  A   It's not okay for no one to see the patient, I guess, is

11  what I'm saying.

12  Q   Okay.  So anybody could see the patient?

13  A   Oh, I didn't say that.

14  Q   That's what you said; right?

15  A   I said a licensed nurse practitioner can see the patient or

16  a nurse anesthetist can see the patient.

17  Q   And if there is no one qualified to write a controlled

18  substance in Dr. Couch's office, are you telling us that it's

19  within the usual course of professional practice, in your

20  opinion, for him to never see a patient and sign a controlled

21  substance script?

22  A   Yes, I'm saying if the nurse practitioner sees the patient,

23  it is.

24  Q   So how does a doctor develop a patient relationship with

25  someone they have never seen?

CAROL ANN WARFIELD, MD - CROSS BY MS. GRIFFIN

1   A   Through the nurse practitioner.

2   Q   But you're --

3   A   It's commonly done.

4   Q   The word is a doctor-patient relationship.  So are you

5   saying they may have a nurse practitioner-patient relationship

6   but not a doctor-patient relationship?  Is that what you're

7   telling us?

8   A   I think you're confused by the semantics.  I think that it

9   is appropriate for the physician extender, for the nurse

10  practitioner, to have the relationship and thus relay that to

11  the doctor.  Yes, it's done all the time.  It's very common.

12  It's very acceptable.

13  Q   Then let's take that a step further.  What if the doctor is

14  aware that the nurse practitioner is abusing Dilaudid daily

15  while seeing patients.  Is that still within the usual course

16  of professional practice, for that addicted or that tolerant or

17  that user of Dilaudid to see a patient?

18  A   Well, I think -- I think we're getting into a whole

19  different issue.  You're saying -- this has nothing whatsoever

20  to do with whether they are prescribing drugs or what the nurse

21  practitioner's doing.  I think it has to do with patients who

22  are workers who have issues with addiction or have medical

23  issues.  And I think you're asking me a whole different issue.

24  If someone has the flu, should they see a patient?  If someone

25  has dementia, should they see a patient?  If someone has an

1    addiction problem, should they see a patient?  If someone drank

2    a glass of wine the night before, should they see a patient?

3            This is a whole different bag of worms that really I

4    don't think has relevance to this issue of who's prescribing

5    the opiates.  If the nurse practitioner is healthy enough to

6    see patients in any capacity, whether it be a pediatrician or

7    whatever, then that person can act as an extender of the

8    physician.  But there's a whole debate about whether someone

9    who is on medications legitimately should be seeing patients,

10   whether someone who has an addiction problem should be seeing

11   patients, whether someone who is getting prescription

12   medication, whether they're on antidepressants, should they be

13   seeing patients.  It's a whole different -- it's a whole

14   different area.

15   Q   You were told, weren't you, that one of Dr. Couch's nurse

16   practitioners took 600 milligrams of Dilaudid daily through his

17   veins which was not prescribed for him?  Didn't they tell you

18   that?

19   A   I was told that someone had some issues.  But I don't think

20   I got all the details.

21   Q   You would agree, wouldn't you, that 600 milligrams of

22   Dilaudid a day which was not prescribed for someone was a

23   problem, wouldn't you?

24   A   Yes.

25   Q   You would also agree that if another nurse practitioner was

CAROL ANN WARFIELD, MD - CROSS BY MS. GRIFFIN

1  so sleepy and so passed out from using prescribed drugs and for

2  drugs that that particular person stole, that would be an

3  issue, having them see patients, wouldn't it?

4  A   Yes.  Again, I think just like any illness, again, it's a

5  whole different argument, whether someone with an illness

6  should be working and seeing patients.

7  Q   And it would be your opinion, wouldn't it, that a pain

8  specialist should be able to determine if one of their

9  employees was impaired with Dilaudid or with other drugs,

10  wouldn't it?

11  A   I think it totally depends on what their function is.  You

12  know, some people can be on huge doses of drugs and function

13  perfectly well, just like somebody can drink a fifth of gin

14  every day and function perfectly well and you might not even

15  realize they are doing it.  So, I mean, there are so many "it

16  depends" answers there that it would be hard for me to say,

17  hard for me to answer that, because it's -- you know, it

18  depends.

19  Q   Well, one of the things that depends is pain specialists

20  don't just treat pain, do they?  Don't they address

21  functionality as well?

22  A   As it pertains to pain (nodding head affirmatively).

23  Q   So the goal isn't just to knock the patient out so they are

24  not hurting, as you might do in an operating room, the goal is

25  for the patient to not hurt and to have some functionality in

1    their life, isn't it?

2    A    Yes; correct.

3    Q    So that would be something important to inquire about with

4    a patient, wouldn't it?  Functionality?

5    A    Yes.  Not necessarily in so many words, but functionality

6    is something that's important.

7    Q    So it would be important to say if you take your medicines

8    and it makes you sleep 24 hours a day, you don't have a life,

9    wouldn't it be appropriate to know that with a patient?

10   A    It would be a good thing to know.

11   Q    And wouldn't it be appropriate to know once you are

12   prescribing a drug that you've determined is appropriate as to

13   whether, when that patient comes back to see the doctor, their

14   functionality or their life has improved, wouldn't it?

15   A    It's one of the parameters we look for.  It's not the only

16   parameter.  But we look for pain relief, we look for

17   functionality improvement, we look for other things in

18   patients.

19   Q    You also observe patients when the physician actually sees

20   the patient, too, don't you?

21   A    Yes.

22   Q    How they look, how their eyes look?

23   A    Yes.

24   Q    If they look glassed over?  Those type things; is that

25   correct?

4855

1    A    Correct.

2    Q    And you might determine, if you see them walking, whether

3    they may be limping or relying on some type of aid to help them

4    walk, don't you?

5    A    Yes.

6    Q    And that goes into your decision making as to what type of

7    drugs you give the patient, doesn't it?

8    A    It might, certainly.

9    Q    Well, it's one of the things; right?

10   A    Exactly.

11   Q    You wouldn't exclude considering it, would you?

12   A    I wouldn't exclude considering any information that I was

13   given, if that's what you mean.

14   Q    So all the information might be important to help make your

15   decision; right?

16   A    It might be.

17   Q    And in connection with your reviewing the files and

18   determining whether the prescriptions that were given in those

19   particular files -- are you telling us that if Dr. Couch never

20   saw those patients, all those prescriptions were inside the

21   usual course of professional practice?

22   A    Yes.

23   Q    Are you telling us that, if Dr. Couch only saw one patient

24   for 43 seconds, that the prescriptions for that patient were

25   inside the usual course of professional practice?

1    A    Absolutely.  It doesn't matter how much time one

2    spends.  It's within the usual course of medical practice.

3    Q    And it doesn't really matter where it is, either, does it?

4    A    It depends.  There are -- you know, everything is it

5    depends.  There are extenuating circumstances where people see

6    patients in very odd places and there are -- there are -- it

7    depends, it depends on the situation.  You have to look at each

8    situation individually.

9    Q    In fact, you've testified that it was inside the usual

10   course of professional practice in a case where a doctor wrote

11   prescriptions at Starbucks, haven't you?

12   A    I testified that in a case where a doctor's office was

13   closed down and the doctor had been seeing a patient for a long

14   time and providing that patient with prescriptions and the

15   patient called and said:  Your office is closed.

16           The doctor still had his license and the patient

17   needed a prescription before he could get to another doctor;

18   that in that very extenuating circumstance, that it was

19   appropriate, and the doctor was acquitted.

20   Q    Now, Dr. Warfield, you're not representing the doctor was

21   acquitted just based on your testimony, are you?

22   A    No.  I have no idea.  I guess I wouldn't have any

23   idea.  But that doctor was found not guilty.

24   Q    You don't have any idea if that was based on your

25   testimony, though, do you?

1   A   I would have no idea.  I imagine it was a lot of things.

2   Q   Now, you talk about that you could even see a patient for

3   two seconds and that would be enough time to see the patient;

4   is that correct; for a doctor?  That was the example you gave

5   on direct, wasn't it?

6   A   I think that was physical exam for two seconds, was my

7   response on direct.  I was talking about a physical exam.  But

8   I guess the point I was trying to make is that sometimes the

9   nurse practitioner's seeing the patient, you pop your head in

10  the room and you say hello to the patient, is everything okay,

11  and that's it.  Sometimes, sometimes you don't see the patient

12  at all.  It very much depends.  Sometimes you spend two hours

13  in the room with the patient.  It tremendously depends on the

14  situation.  And many of these patients who are coming back

15  month after month for their prescriptions, many of them are

16  very straightforward and the nurse -- or a questionnaire

17  sometimes is given.  You know, are you having any problems with

18  your medication?  Is your pain better?  Et cetera, et

19  cetera.  And it only takes a few seconds.  That's, you know,

20  that's an extreme.  But the other extreme would be a couple of

21  hours.  All of them are within the usual course of practice,

22  was my point.

23  Q   So just seeing the patient and speaking, hello, how are

24  you -- which takes more than two seconds -- would be within the

25  usual course of professional practice for a doctor visit?

1   A   Within the usual course of practice, yes, to see a patient

2   for a couple of minutes.

3   Q   No, two seconds.

4   A   Oh, I'm sorry.  To see a patient for a couple of seconds?

5   Again, in a situation where the nurse practitioner's seeing the

6   patient, you pop your head in and say:  How are you doing?  It

7   happens all the time.

8   Q   So you are qualifying it that two seconds wouldn't be

9   sufficient -- would not be sufficient -- to see a patient

10   unless a nurse practitioner or someone else had seen them; is

11   that correct?

12   A   Well, you know, again, I'm trying to make a point here and

13   I think what I said was the two seconds was the -- was the

14   physical exam.  You can do a physical exam in two seconds, you

15   know, poke at someone's back after you've seen them for months

16   and months:  Does this still hurt?

17           That could be the physical examination.

18           Again, it very much depends on the situation, it

19   depends on whether the patient has filled out a questionnaire

20   when they come in, whether you've reviewed that questionnaire

21   before you go in the room, and you've seen what their blood

22   pressure is, and you've seen what the drugs are that they are

23   on, and you've seen what the patient's response is to what

24   their pain score is, and:  Is the medication helping?  Are you

25   having any side-effects?

4859

1                And you walk in the room and you say:  So everything's

2       okay?

3                You know.  Do you have any questions?

4                No.

5                That may be an okay visit, yes.

6       Q   And so in actuality, based on what you say, a doctor could

7       do a two-second physical exam at a cocktail party, couldn't

8       they?

9       A   Could a doctor do -- I mean, you know, anything is

10      possible.  And, I mean, I don't know -- I guess I don't know

11      what you're getting at.  Could a doctor do a physical exam for

12      two seconds at a cocktail party?  Anything is possible.  It's

13      certainly not the standard.

14      Q   So the answer to that would be yes, that a doctor could?

15      A   Anything is possible.  But you're asking me if that would

16      be the usual course of medical practice?  No, that would not

17      be.  But seeing a patient for a few seconds whom you have been

18      seeing for a long time in your office is within the usual

19      course of medical practice.

20      Q   Let's go back to the Brennan file you reviewed.  And you

21      knew that was an undercover patient; is that correct?  You were

22      told that, weren't you?

23      A   At some point I was told, yes.

24      Q   Yes.  And in connection with that, you knew that at some

25      point some records from a chiropractor were sent to Dr. Couch's

1  office for the undercover patient; is that right?

2  A   Yes.

3  Q   And that in and of itself, the chiropractor's records,

4  wouldn't suffice for a physical exam for Mr. Brennan, would it?

5  A   No.  The physician's practice needs to do a physical exam

6  in addition to the records they receive from the referring

7  doctor, yes.

8  Q   So just a review of the referring doctor's records would

9  not count as a physical exam for one of these pain specialists;

10  is that correct?

11  A   Simply that, you might rely on that for some things, but it

12  doesn't take the place of the doctor or nurse practitioner's

13  physical exam.

14  Q   And you would agree that just because a referring doctor

15  had a patient on a certain controlled substance that you, as a

16  specialist, wouldn't have to put that person on those same

17  controlled substances, wouldn't you?

18  A   You don't have to.  But it makes it much more likely that

19  you're going to put them on an opiate of some sort.  You don't

20  have to, though.

21  Q   Would --

22  A   But you probably -- I'm sorry.  But you probably would have

23  to taper them, if you weren't going to give them an opiate.

24  You'd have to do something.

25  Q   Now, you answered Mr. Sharman that, of the files you

4861

1  reviewed, that everyone there came to the practice with opioids

2  already prescribed, didn't you?

3  A   Yes.

4  Q   You are aware that Brennan, the undercover patient, did not

5  have a prescription for any opioids when he presented to the

6  pain clinic, aren't you?

7  A   Well, I guess he was on opioids.  He said he had been

8  taking 30 milligram oxycodone tablets.

9  Q   He didn't in fact give a milligram number, did he?

10  A   He said the blue ones, and that meant to me 30 milligrams.

11  Q   Now, he wasn't on a prescription for opioids when he came

12  to PPSA, though, was he?

13  A   No, I think he said he got them from someone else.

14  Q   Got them off the streets?

15  A   Correct, correct.  So he was on, he was on opioids, he was

16  taking opioids.

17  Q   But not from a physician?

18  A   Correct.

19  Q   Not where a medical decision had been made that that was

20  warranted; is that correct?

21  A   Correct.

22  Q   That's typically what you call self-medicating, isn't it,

23  when you take something just off the street that you think you

24  need?

25  A   Yes.

CAROL ANN WARFIELD, MD - CROSS BY MS. GRIFFIN

4862

1  Q   Now, is it your opinion that the 43 seconds Dr. Couch saw

2  Mr. Brennan and said:  Here's a script, see what it does for

3  you -- was sufficient to tell him the risk and the benefits of

4  that prescription?

5  A   I believe the nurse practitioner talked to him about that,

6  which I said before was perfectly appropriate.  The nurse

7  practitioner was in the room with him for quite some time.  I

8  recall her talking to him about the opiates and about doing the

9  nerve blocks and other things, that not just the opiates would

10  be appropriate.  I recall he was prescribed a very small dose

11  of opiate and that she left the room, presumably to talk to

12  Dr. Couch about the case.  She had done a physical examination

13  herself, went out, out of the room, brought Dr. Couch back in.

14  You know, he performed a very brief repetition of that and

15  signed the prescription.  And that was -- that's my

16  recollection, although there was more than one --

17  Q   In fact, as Dr. Couch is walking in the room, the first

18  thing he does is sign the prescription, isn't it?

19  A   He did it early on.  I don't remember exactly, but there's

20  no problem with that.

21  Q   And you are assuming that Dr. Couch had had a discussion

22  with the nurse anesthetist, or the lady who was in the room

23  with Mr. Brennan, is that what you're telling us?

24  A   I'm telling you that would be the standard practice or he

25  could have looked at a questionnaire or whatever.

1    Q   But you don't have anything that indicates that Stacy, who

2    was the particular person there, discussed the patient with

3    Dr. Couch, do you?

4    A   I don't know the details.  But I'm just saying what the

5    usual practice would be, to go out of the room -- she was out

6    of the room for a little while --

7    Q   But you don't know --

8    A   -- to get him.

9    Q   -- if she did talk to him, do you?

10   A   No.  No, I don't have any direct knowledge.

11   Q   You don't have any direct knowledge, do you?

12   A   No.

13   Q   And in connection with that prescription, you're

14   contending, then, that that prescription is within the usual

15   course of professional care?

16   A   Absolutely, yes.

17   Q   Would there not be a reason to start on a lower dosage or

18   to start with less than 90 pills a month in connection with a

19   new patient?

20   A   He started with half of what he was taking.  That's the

21   lower dose.  That's half of what he said he was taking.

22   Q   So you use what somebody says they were taking off the

23   street?  Isn't that really letting them pick the drug?

24   A   Well, you know, the best way to know what dose of a

25   patient -- what drug in a patient works is asking the

CAROL ANN WARFIELD, MD - CROSS BY MS. GRIFFIN

 1   patient.  That's the best way to do it.  Asking the patient
 2   what worked for them before is by far the best way to determine
 3   what the appropriate dose is.  And I think Dr. Couch was being
 4   very conservative.  The patient said the blue pill, the 30
 5   milligrams, helped.  So he gave him a prescription for 15
 6   milligrams, which is -- which is a small dose.  So I think that
 7   was very appropriate.
 8   Q   So you might consider what the patient says is the best
 9   drug that helped him, but that is not the only thing you take
10   into consideration in dosing, is it?
11   A   No.  You take a lot of things into consideration.  But it's
12   one thing you take into consideration and it's a judgment call
13   in good faith on the part of the doctor to decide what drug and
14   what dose is appropriate.
15   Q   And you would agree that it might cause a doctor to pause
16   if a patient asked for a particular brand name of drug,
17   wouldn't you?
18   A   Again, that's pseudoaddiction.  It's not at all uncommon
19   for the patient to say:  Such and such helped me before,
20   Percocet helped me before, Dilaudid helped me before, oxycodone
21   helped me before.
22          And that's the best indication as to what drug helped
23   and what dose helped.  And appropriately enough, Dr. Couch
24   prescribed that drug in half the dosage.  And the plan usually
25   is to do that and then bring the patient back and titrate; if

1   that wasn't enough, to go up on the dose.  And sometimes that

2   needs to be done or changed to a different medication.

3   Q   And were you aware, from the next two videos -- did you see

4   the next two videos of the patient, undercover patient Brennan?

5   You didn't, did you?

6   A   Yes, I did.

7   Q   You did?

8   A   Yes.

9   Q   So you are aware that on the third visit patient Brennan

10  asked for an increased dosage through the nurse, Bridgette;

11  correct?

12  A   Yes.

13  Q   And you are aware that the patient, undercover Brennan,

14  said that he would be happy with 10, aren't you?

15  A   He would be happy with --

16  Q   10 increased tablets, 10 more?

17  A   I don't remember the details.  I could refer to my notes.

18  But I don't remember the details.  But that's -- that's not

19  uncommon for the patient to say.

20  Q   Well, that's not the question.  The question is did you

21  remember that he said he would be happy with 10?  You're not

22  saying that's not correct, are you?

23  A   No.

24  Q   Okay.

25  A   Should I refer to -- may I refer to my notes?

1 Q   And the --

2         THE COURT:  Yes.  She's asking to refer to her notes.

3         MS. GRIFFIN:  Certainly.

4 A   I'm sorry.  You said this was the third visit?

5 BY MS. GRIFFIN:

6 Q   November '14 visit, November 2014.

7 A   Bear with me for a second here.  November 5th, November

8 5th, '14?

9 Q   Yes.

10 A   Is that what you're saying?  The notes I have, he said he

11 had -- he had -- he had run out, he was out of town, which is

12 why he was late for an appointment, or he's late coming in for

13 an appointment, and that's about all I had from that.  Those

14 are the only notes I made.  So there mustn't have been anything

15 that -- I took notes from the things that I thought were

16 important.  So there mustn't have been anything else I thought

17 was important.  This was November of 2014.

18 Q   So if the patient came in and said they would like 10 more,

19 if Mr. Brennan said he would like 10 more, would it be within

20 the usual course of professional practice for the nurse

21 practitioner and Dr. Couch to just give him 20 more?

22 A   Absolutely.  It's a judgment call.

23         MR. SHARMAN:  Objection.

24         THE WITNESS:  I'm sorry.

25         MR. SHARMAN:  Objection.  That way mischaracterizes

```
 1    the testimony.
 2              THE COURT:  Overruled.
 3    A   It's a judgment call.  The physician or the nurse
 4    practitioner is making the decision.  I mean, if the patient
 5    says, you know:  Even if I just got 10 more, I think that would
 6    help -- and the physician decides:  Well, you know, let's give
 7    you 20 to last for the month -- it's perfectly appropriate and
 8    perfectly within the usual course of medical practice.
 9    BY MS. GRIFFIN:
10    Q   And it would also be within the usual course, then, to
11    document that the number of pills prescribed on that date was
12    increased; is that correct?
13    A   Typically that's done by way of a copy of the prescription
14    in the chart.  There are different ways of doing it.  Sometimes
15    there's a list in the chart of what drugs were given.
16    Sometimes there are just copies of those prescriptions in the
17    charts that would tell you what they were given.
18    Q   But either way it was done, there would be something in the
19    chart to reflect that the dosage had been increased within the
20    usual course of professional practice; is that correct?
21    A   Again, I think you're confusing the usual course of
22    professional practice with the standard of care.  It's within
23    the standard of care to document things you do in the
24    chart.  If you forget to document something, it doesn't mean
25    you're not practicing medicine, it doesn't mean you're a
```

 1    criminal, it doesn't mean you're doing something illegal.  It

 2    means you forgot to document something.  And that might -- if

 3    it comes to a malpractice case -- that might be outside of the

 4    standard of care, to forget to document.  But it's within the

 5    usual course of medical practice.  This doctor is still

 6    practicing medicine, even if he forgets to write something down

 7    or forgets to Xerox something and put it in the chart.  It's

 8    still medical practice.

 9    Q   But what you're telling us is that a doctor should

10    certainly document somewhere that the dosage has been increased

11    or that the number of pills has been increased; is that right?

12    A   Usually a copy of the prescription is in the chart (nodding

13    head affirmatively).  There's usually something in the chart

14    that says how many pills of what drug were prescribed on that

15    day.  That would be the standard.

16    Q   And are you telling us that it should also be documented

17    why the pills were increased, what was the reason for an

18    increase?  That should be in the chart somewhere, shouldn't it?

19    A   Well, again, it's not always there in black and white.

20    There's not always a sentence that says:  The pills were

21    increased because -- oftentimes what it is is it's simply a

22    pain number.  Oftentimes a patient comes in and the pain is

23    eight out of 10, and so the dose is increased.  You know, the

24    implication being that it's increased because the pain is still

25    eight out of 10.  I mean, in a perfect world you would write

 1   down everything the patient said and everything you said.  But

 2   it's impossible and nobody does that.

 3          THE COURT:  Ms. Griffin, is now a good time for us to

 4   break for lunch?

 5          MS. GRIFFIN:  Yes, Your Honor.

 6          THE COURT:  All right.  Ladies and gentlemen, leave

 7   your pads on your chairs.  We will break for an hour and 15

 8   minutes.  Be back downstairs in the jury assembly room to be

 9   called back up at 1:15.  We're in recess.

10      (A recess was taken at approximately 12:02 p.m.)

11      (Afternoon session, 1:15 p.m., in open court, defendants

12   and jury present.)

13          THE COURT:  All right, Ms. Griffin.

14   BY MS. GRIFFIN:

15   Q   Dr. Warfield, would you agree that it was inside the usual

16   course of professional practice to only bill for work that was

17   actually done by a physician's office?

18   A   Again, I think that many mistakes are done in billing.  And

19   I guess I'm not sure what that means.  I mean, if there was a

20   mistake in billing, it was a billing error, and people have the

21   usual course of medical practice where they make errors in

22   billing.  It doesn't mean it's criminal or outside of the usual

23   course of practice.  It might be outside of the standard of

24   care.  But I guess what I'm saying is it depends.

25   Q   Well, you understand that the jury is the one here today

1  that's going to decide what's criminal and what isn't, don't

2  you?

3  A   Correct.  But I'm making the distinction between what's

4  outside of the standard of care and what's outside of the usual

5  course of medical practice because, to me, those are very, very

6  different things.

7           THE COURT:  Ms. Griffin, will you check to see that

8  your microphone is on?

9           MS. GRIFFIN:  Thank you.  It is now, Your Honor.

10           THE COURT:  Thank you.

11  BY MS. GRIFFIN:

12  Q   You would generally agree it's outside the standard of care

13  and the usual course of professional practice to knowingly bill

14  for something in a doctor's office that was not done, wouldn't

15  you?

16  A   I think to knowingly bill for something that was never done

17  is certainly outside of the standard of care.  Again, I think

18  I'd need the specifics, because billing mistakes are made all

19  of the time and there's a lot of confusion among doctors and

20  the staff, as I pointed out earlier.  There are different

21  codes, there are different things.  Knowingly using the wrong

22  code, is that, you know, something that's outside of the usual

23  course of medical practice?  I don't think necessarily.  I

24  think it could be a mistake.  It could be that the doctor just

25  didn't know.  So I guess -- I guess my answer has to be it

4871

 1    would depend.

 2    Q   And it would depend on the type of people you hired to do

 3    the work, to make sure that they were doing the work accurately

 4    as best they could, wouldn't it?

 5    A   You know, I think a doctor does rely on a lot of the office

 6    staff and they try and do the best they can.

 7    Q   And you would agree that billing something repeatedly as a

 8    45-minute visit when you knew the visits were under 10 minutes

 9    would be inappropriate, don't you?

10            MR. SHARMAN:  Your Honor, I object to this line of

11    questioning.  It's way beyond the scope of direct.

12    Dr. Warfield has not been offered as an expert on billing, she

13    didn't testify about billing.  And outside or within the usual

14    course of medical practice is not a standard of billing

15    anyway.  So it's beyond the scope of direct and it's not

16    relevant to the issues.

17            THE COURT:  Sustained.

18    BY MS. GRIFFIN:

19    Q   Now, Dr. Warfield, you, yourself, when you did see

20    patients, would not bill for a patient visit if you were in

21    another state, would you?

22            MR. SHARMAN:  Same objection, Your Honor, still

23    billing.  She's not being offered as an expert on that.  She

24    didn't testify about it on direct.

25            THE COURT:  Sustained.

1  BY MS. GRIFFIN:

2  Q   You did testify that a physician assistant or a nurse

3  practitioner or an extender, if you will, could see a patient;

4  is that correct?

5  A   Yes.

6  Q   And you would agree that the extender who is not a

7  physician should not hold themselves out to the patient as a

8  physician, wouldn't you?

9  A   You mean tell the patient that I am a physician when I am

10  not a physician?

11  Q   Would you agree that it's outside the usual course of

12  professional practice to misrepresent to a patient that you are

13  a doctor when you are not?

14  A   Again, for whom?  For the person who's doing it?  You're

15  saying if the secretary goes into the room and says:  I'm a

16  doctor?  That's inappropriate for the secretary to do that,

17  yes.

18  Q   How about for a nurse practitioner?

19  A   To go in and say:  I'm a doctor?

20  Q   I'm a doctor (nodding head affirmatively).

21  A   Again, unless she's got a doctorate -- and there are some

22  who have PhDs and go in and I see where say they are doctor so

23  and so --

24  Q   Let's talk about a nurse who has typically, depending on

25  where you are, a two- or four-year degree.

1   A   Yes.

2   Q   Is it appropriate, within the usual course of professional

3   practice, for a nurse to go in to see a patient and say:  I am

4   Dr. So and so?  It's not appropriate, is it?

5   A   It's not appropriate.

6   Q   It's not appropriate for a nurse practitioner who's a

7   master's degree level, at the four-year nursing, one-year

8   master's or one-and-a-half-year master's, to go in and hold

9   themselves out as a medical doctor either, is it?

10  A   It's not appropriate for them to say that they are a

11  doctor, I agree (nodding head affirmatively).

12  Q   Now, you also commented about the 10-percent increase or

13  decrease for a pump medication.

14  A   Yes.

15  Q   Are you talking about in a hospital setting or are you

16  referring to a clinic setting, such as the pain clinic these

17  doctors had?

18  A   I think in any setting.  The doctor often gives a nurse

19  parameters to change things.

20  Q   And you are talking about an implanted pain pump?

21  A   Either one.

22  Q   Either one.  I just wanted to make sure.  And what you

23  mentioned is if there were a written order, so that there

24  should be a written order by the doctor to that effect so that

25  the doctor's intent is clear, shouldn't it?

1   A   It can be a verbal order.

2   Q   It can be a verbal order?

3   A   Yes.

4   Q   To go up or down 10 percent on controlled substances when

5   the doctor is not there?

6   A   It can be a verbal order, yes.

7   Q   And where do you get that authority?

8   A   Where do I get that authority or where does one get the

9   authority, I guess?

10  Q   Where is that written down that it can be an oral order

11  from a doctor to a nurse to go up or down 10 percent on a

12  controlled substance?

13  A   I don't think there is a specific rule that says you can go

14  up or down 10 percent on a controlled substance.  What I'm

15  saying is that's the practice, that's the usual thing that's in

16  practice, that a doctor can give a verbal order to tell the

17  nurse that she can go up or down a certain amount.  I mean,

18  it's done, it's done very frequently.  I've done it myself.

19  It's done not uncommonly.

20  Q   When's the last time you've done that?

21  A   Well, I haven't done it since 2013.  But for 35 years

22  before that I did it very frequently.

23  Q   In a hospital setting; right?

24  A   In our clinic also.  We had clinics, the clinics where I

25  saw patients and gave orders.

4875

1   Q   And you didn't reduce it to a written order, did you?

2   A   You know, it depended.  I mean, oftentimes the nurse would

3   write down that verbal order and then at some point down the

4   line we cosign that.  You know, it depends on the practice.

5   Q   So at some point what you're saying what you did was

6   confirm the order by signing it at a later date?

7   A   Sometimes way later than the drug was given or it could

8   have been months later.  Usually what happens is, you know, the

9   nurse calls up on the telephone or you give the nurse a

10  standing verbal order to go up or down on a particular drug and

11  the nurse writes that down in the chart and then they have

12  people in the medical records who go through those charts and,

13  if they think that something's missing or they think that a

14  doctor should sign something, they'll send it to you.  It might

15  be months later they send it to you and you look at it and you

16  sign it and send it back to medical records.  So, I mean, there

17  are many, many ways in which this is typically done in a

18  medical practice.

19  Q   And you would agree that it would be best for that to be a

20  written order, wouldn't you?

21  A   Well, again, the best possible practice is always to have

22  something in writing.  But it doesn't always work out that way.

23  And in practice oftentimes the doctor gives the nurse a verbal

24  order.

25  Q   Well, it's also true if that's a standing oral order that

1   every time a pain pump patient comes in you can go up or down

2   10 percent, the patient keeps coming in and saying:  I want

3   more and I want more and I want more -- that eventually those

4   10 percent, 10 percent, 10 percent, 10 percent, could result in

5   almost doubling the amount of medication, couldn't it?

6   (Indicating.)

7   A   That could happen with any standing order, sure.

8   Q   Now, Dr. Warfield, you don't own a pharmacy, do you?

9   A   No, I don't.

10   Q   You were aware that Drs. Ruan and Couch owned the pharmacy

11   that was colocated with one of their pain clinics?

12   A   Yes, I was aware of that.

13   Q   And you have not received any Sunshine Act money from Big

14   Pharma since the Sunshine Act has been in effect, have you?

15   A   I personally haven't, no.

16   Q   Now, were you aware that these doctors were receiving

17   payments to speak on behalf of certain pharmaceutical

18   companies?  Did you know that?

19          MR. SHARMAN:  Your Honor, I object.  It's beyond the

20   scope of direct.  Dr. Warfield did not testify on that.  She's

21   not being held out as or offered as an expert on the

22   pharmaceutical industry or its relationships with doctors.

23          MS. GRIFFIN:  Your Honor, I think the financial self-

24   interest dictating how someone prescribes is something that

25   would be important to whether it was inside or outside the

CAROL ANN WARFIELD, MD - CROSS BY MS. GRIFFIN

 1   usual course of professional practice.
 2          MR. SHARMAN:  It's still not part of her opinion, Your
 3   Honor.  That's for another witness.
 4          THE COURT:  Overrule the objection.
 5   BY MS. GRIFFIN:
 6   Q   Were you aware that Drs. Ruan and Dr. Couch received monies
 7   for speaking from certain pharmaceutical companies?
 8   A   I was aware, as I have done.  I've spoken for
 9   pharmaceutical companies and most of my colleagues have.  It's
10   very common.
11   Q   But you've not done that since the Sunshine Act has been in
12   effect, because you don't have any sunshine reporting, do you?
13   A   I've -- I've not done it for the last several years.  I
14   honestly couldn't tell you exactly when was the last time I
15   did.  Probably for not the last two or three years.
16   Q   And you would agree that having a financial interest in a
17   pharmaceutical product and using that to dictate what you
18   prescribed would be outside the usual course of professional
19   practice, wouldn't you?
20          MR. SHARMAN:  Objection, Your Honor.  That distorts
21   the record.  None of that's actually in evidence.
22          MS. GRIFFIN:  Your Honor, we contend that it is
23   relevant cross-examination.
24          THE COURT:  Well, it is relevant.  But I think the
25   basis of your question is not exactly accurate.  So if you can

1    reask it, it's allowed.

2    BY MS. GRIFFIN:

3    Q   Dr. Warfield, if a physician has a financial self-interest

4    in a pharmaceutical company and writes prescriptions based on

5    that financial interest -- in other words, writes lots of

6    prescriptions based on that financial interest -- would that be

7    outside the usual course of professional care?

8              MR. SHARMAN:  Same objection, Your Honor.  Based upon,

9    there's no evidence of that.

10             THE COURT:  Overruled.

11   A   I guess I'd have to know what you meant by based

12   upon.  Because there are many physicians who give talks for

13   drug companies or who have a financial interest in the drug

14   company and they may be giving talks because they believe this

15   is a good drug and so for that reason they prescribe this drug

16   to their patients.  It's nothing -- there's nothing wrong with

17   that.  In other words, they have a financial interest and they

18   also happen to prescribe that drug for their patients.  I

19   don't, I don't see that there's a problem with that.  They

20   may -- I'm sorry.  I'll end there.

21   BY MS. GRIFFIN:

22   Q   And would you agree that prescribing because you have

23   purchased stock in a company was outside the usual course of

24   professional practice?

25             MR. SHARMAN:  Same objection, Your Honor.  That hasn't

1    been established either.
2           THE COURT:  Overruled.
3    A   Again, I think it's the other way around.  I think
4    typically physicians will see a drug that they think that --
5    maybe it's a new drug and they think it's a really, really good
6    drug, and so maybe they go out and they buy stock in it and
7    maybe they disclose that.  Maybe there are some rules around
8    disclosing that.  But it's usually the other way around.  It's
9    usually they prescribe a drug, they think a drug is great, and
10   then maybe they buy some stock in the drug.  You know, I think
11   it would be, I think -- I think it's very hard to say someone
12   buys stock in a drug they never used and then all of a sudden
13   start prescribing it because they bought stock in it.  It
14   doesn't make sense.
15   BY MS. GRIFFIN:
16   Q   I show you what's been introduced as Government's Exhibit
17   10-19, a chart for Dr. Ruan and Dr. Couch, Abstral Prescribed
18   by Month in Micrograms.  Can you see the dates at the bottom or
19   do I need to --
20   A   Yes.
21   Q   -- move it up some where you can see the micrograms over on
22   the left-hand side?  Can you see the micrograms?
23   A   Yes.
24   Q   So I want to direct your attention to what you've just told
25   us.  At the bottom you see the blue is Dr. Couch?  The blue

1  line, do you see that?

2  A   Yes.

3  Q   And the red would be Dr. Ruan?

4  A   Yes.

5  Q   So these are the prescribing charts.  You see a spike in

6  September of '13 that goes up to a high spike sometime in early

7  '14; is that correct?

8  A   Yes, yes.

9  Q   Do you know of anything that would have happened in this

10  area during that period of time, any tragedy or anything that

11  would have occasioned the prescribing of a huge spike in

12  Abstral during that time?

13         MR. SHARMAN:  Your Honor, again, I mean, Dr. Warfield

14  is not being called to testify about this.  The government has

15  even objected to her testifying about Abstral.  So it's way

16  beyond the scope of direct and it's way beyond what she's even

17  being offered for.

18         THE COURT:  All right.  Sustained.

19  BY MS. GRIFFIN:

20  Q   Dr. Warfield, you previously were telling us about the

21  presigned prescriptions; is that correct?

22  A   Yes.

23  Q   We talked about that before lunch?

24  A   Yes.

25  Q   I want to show you Government's Exhibit 2-12.  And I'm

1    removing one of the prescriptions from this exhibit to show you

2    on the presenter and ask if you see a prescription effective

3    date May the 26th of 2015?

4    A    Yes.

5    Q    Purporting to be Dr. Couch's signature?

6    A    Yes.

7    Q    And that's for a schedule II controlled substance?

8    A    Yes.

9    Q    Is that correct?

10   A    Yes.

11   Q    And were you aware that the clinic was raided on May the

12   20th of 2015 by the FBI and DEA?

13   A    I don't think I was aware of the date.

14   Q    But you knew at some point; right?

15   A    Yes.

16   Q    You wouldn't question if I told you it was May the 20th of

17   2015, would you, ma'am?

18   A    No.

19   Q    So this would be not a presigned blank script, would it, it

20   would be a presigned completed script; is that correct?

21   A    Well, I guess I -- I guess I don't know when it was signed.

22   I don't know -- I know what the date is on there.  I don't know

23   when it was signed.

24   Q    Well, if it were seized on May the 20th, it would be fair

25   to say it had to be signed before May the 20th; is that

1  correct?

2  A   Correct.

3  Q   So if it's seized on May the 20th, it's not signed on the

4  date that is stated on the prescription, is it?

5  A   That's correct.  I see what you're saying.

6  Q   And if we were to tell you that the medical records were

7  not true that you reviewed, you would not be able to give the

8  same opinion if you were told they were not true; is that

9  correct?

10  A   It depends on what wasn't true.  I mean, if it was some

11  trivial something that wasn't true, then it probably would not

12  change my opinion.  But it would depend.

13  Q   Well, let's talk about if everything in the record except

14  the patient's name and the date of the visits and the drugs

15  prescribed was false, that would be difficult to base your

16  opinion on, wouldn't it?

17  A   Right.

18      MR. SHARMAN:  Objection, Your Honor.  It doesn't

19  reflect the record as it stands.

20      MS. GRIFFIN:  Your Honor, there is -- she's talked

21  about there's a line --

22      THE COURT:  Yeah, I think based upon her testimony on

23  the continuum, that it's a valid question.

24  BY MS. GRIFFIN:

25  Q   And, Dr. Warfield, you have also talked about or previously

CAROL ANN WARFIELD, MD - CROSS BY MS. GRIFFIN

 1    testified that the best way to find out what's going on is to

 2    actually sit and talk to a patient, isn't it?

 3    A    That was kind of general.  I think I'd like the context on

 4    that one.  I'm not sure what you're talking about.

 5    Q    Well, you talked about the best way to determine what's

 6    going on with a patient by a doctor is to talk to the patient.

 7    Isn't that what you told us?

 8    A    I guess I need the context.  I don't know where --

 9    Q    In the office for a medical doctor such as yourself, to get

10    an idea of what's going on with a patient, wouldn't one of the

11    best things to do be to sit down and talk to that patient?

12    A    Well, one of the best things to do might be.  But, again,

13    it very much depends on the situation and the patient.  I don't

14    know the context of when I said that.  It certainly could

15    be.  But I'm not sure what you're talking about.

16    Q    Well, you can tell a lot by talking to someone, can't you,

17    as a doctor?

18    A    Sometimes.

19    Q    Observing them?

20    A    Sometimes.

21    Q    You can tell about their eyes, sometimes about their

22    emotions, sometimes about whether they have slurred speech; is

23    that correct?

24    A    Correct.  Sometimes.

25    Q    So you can tell a fair amount about somebody, as a doctor,

4884

1   by sitting down and talking to them, can't you?

2   A   Sometimes.  Again, it totally -- it totally depends

3   (nodding head affirmatively).

4   Q   You also believe in patient counseling as part of dealing

5   with a patient, don't you?

6   A   Sometimes.  I say a very small percentage of our patients

7   get counseling.  I'm not sure what you mean by counseling.  I

8   mean --

9   Q   Well, you do agree about telling the patient what issues

10  are with certain medications, don't you?

11  A   We give them -- we tell them about the side-effects of

12  medications.

13  Q   And that can sometimes be called the risk and the benefits;

14  is that correct?

15  A   Correct.

16  Q   And that's the patient's call, isn't it, as to the risk and

17  the benefits, whether they want to take what you're telling

18  them to take?

19  A   It's the doctor and the patient making the decision.

20  Q   But if the patient says:  No, I don't want to take

21  something that's dangerous like that, then that's the patient's

22  decision; is that correct?

23  A   The patient can certainly refuse to do what the doctor is

24  suggesting, yes, certainly.

25  Q   But the patient is entitled to know the risk and the

1    benefits of a particular controlled substance; isn't that

2    correct?

3    A    You know, in general we tell the patients the risks and

4    benefits.  You can't possibly go through every little risk and

5    benefit.  But in general the patients are told in one way or

6    another, sometimes verbally, sometimes they get an information

7    sheet.  There are different ways.  The pharmacy sheets that go

8    with the drugs.  There are many ways where they can find out

9    what the risks and benefits are.

10   Q    Now, you also talked about when Mr. Sharman was asking you

11   questions about -- are we -- are you looking at something?  Are

12   you referring to something up there?  Are you looking at

13   something when you're looking down?

14   A    No.

15   Q    Oh, I didn't know if you had a report in front of you

16   perhaps.  Do you?

17   A    (Indicating.)

18   Q    Okay.  My mistake it looked like you were reading

19   something.

20   A    Nothing.  (Indicating.)

21   Q    You talked about you could go up, up, up when you were

22   prescribing, in the dosages; is that correct?

23   A    Well, you could go up, you could go down, you could change

24   the dose.  I mean, there are many different -- it's titration.

25   You might change the drug, you might not change it, add a

1  different drug.  Lots of different things.  (Nodding head

2  affirmatively.)

3  Q   But you could continue to go up as long as the patients

4  weren't having problems with the drugs that you were

5  increasing; is that correct?

6  A   You could.  That's one option.

7  Q   And one of the problems with increasing the dosages for

8  many of these opioids is that it interferes with patients'

9  breathing; isn't that correct?

10  A   Generally when you get to a very high dose.  But most of

11  these patients are very, very tolerant to these drugs.  So it

12  is in fact very unusual for that to happen.

13  Q   But that is something that you have to watch for, you have

14  to advise the patient that if you go up, up, up on them like

15  you described on direct, that you need to watch out for

16  respiratory depression; isn't that correct?

17  A   That's not something I usually talk about with a patient

18  when I prescribe.  I usually tell them about nausea and

19  sedation and constipation when I prescribe these kinds of

20  drugs.  Again, there are lots of different things that any drug

21  can cause and we just talk about the more common side-effects

22  when we give informed consent.

23  Q   But certainly respiratory depression would be something

24  significant, wouldn't it?

25  A   It would be significant, but very, very rare.  So we don't

1    go into the rare terrible things that could happen.  You know,

2    just like when we give consent for anesthesia, we don't go into

3    all of the thousands of horrible things that could happen which

4    are exceedingly rare.  We talk about the more common things;

5    you could get nauseous, you could get sedated, you could get

6    constipated -- the common things.  And I think that's the case

7    with any kind of informed consent.  We don't, we don't talk

8    about everything.  But it depends on the patient.

9    Q    Now, your clinic, when you were seeing patients, y'all did

10   not provide long-term opioid management, did you?

11   A    Well, just in recent years -- again, many, many pain

12   clinics now just will not prescribe these drugs for, you know,

13   fear of sanctions and fear of, you know, getting convictions

14   and that sort of thing.  So our clinic was one of them.  It

15   wasn't my decision, but our clinic was one that did not provide

16   prescriptions for long-term opiates.  We would see the

17   patients, so we would determine what the appropriate opiates

18   were for the patient, and then we would ask the primary care

19   doctors -- send them to their primary care doctors to actually

20   do the prescribing.  And there was an insurance reason for

21   doing that, too.  The patient's insurance typically would not

22   pay for a specialist to just write a prescription every month.

23   They wanted the primary care doctor to do that.  So our clinic

24   stopped writing for long term.  We would recommend those drugs,

25   but we stopped writing long term.  But we would write in the

1    short term and then send the patient back to the primary care

2    doctor with recommendations.

3    Q    And you certainly agree that's in the usual course of

4    professional practice, if that's what your clinic was doing,

5    don't you?

6    A    It's something that a lot of clinics do.

7    Q    But was it in the usual course of professional practice for

8    your clinic to do that?

9    A    Sure.

10   Q    Now, it's also within the usual course of professional

11   practice for a pain doctor to try other things besides opioids;

12   is that correct, for a patient?

13   A    Yes.

14   Q    And there are many other things besides opioids, aren't

15   there?

16   A    Yes.

17   Q    I'm going to show you what's been introduced as

18   Government's Exhibit 9-1(2), which is an email.  There is an

19   exhibit number.  And this is an email from Dr. Ruan to

20   Dr. Couch.  It is in July of 2014.  Have you previously seen

21   this email that you know of, Dr. Warfield?

22   A    I don't believe so.

23        MR. KNIZLEY:  Your Honor, I will object to any

24   reference to Dr. Ruan's statements as being there was no

25   examination by Dr. Ruan of this witness.  It would be outside

CAROL ANN WARFIELD, MD - CROSS BY MS. GRIFFIN

```
 1    the scope of the examination.
 2             THE COURT:  Overruled.
 3    BY MS. GRIFFIN:
 4    Q   Do you believe you've seen this before?  You haven't, have
 5    you?
 6    A   I don't believe I've seen this.
 7    Q   Okay.  Do you see where it says, from Dr. Ruan:  Pat, have
 8    you been watching the news?  Alabama is the leading state with
 9    the most opioid Rx written.  I notice you have quite a few
10    patients on Roxicodone 30 and OxyContin 80.  Based on the
11    diversion study done in Florida pill mills, these two are the
12    most thought of in south Florida, therefore considered biggest
13    reg -- I think that could be red -- flag.  I think you should
14    talk to Justin on cutting down Roxicodone 30 mg usage,
15    especially -- we are trying to convince Alabama Board of
16    Medical Examiners that we have a great system to keep patients
17    satisfied, and addicts out.
18             You do see that; right?
19    A   Yes.
20    Q   And it says further:  We don't want Roxicodone 30 mgs --
21    mess things up or at least contradict to what we promote.
22             And Dr. Ruan goes on to say that he has two patients
23    on 30, one of them is a workers' comp, and that they try to use
24    OxyContin 60 instead of 80 because that might help.
25             He further says:  Everyone in the nation knows that
```

1   Alabama state prescribes the most pain killers in the nation.

2   We will need to adjust our routine regimen a bit.  One of the

3   things I've done is to wean off benzo or ask their PCP to write

4   their benzo, as benzo prescription is also one of the things

5   they look at.  We would rather be careful than sorry.  Please

6   remind Justin about this stuff.

7            You see that?

8   A   Yes.

9   Q   You know -- or do you know -- that Justin Palmer was a

10  nurse practitioner for Dr. Couch?

11  A   I believe so.

12  Q   Do you recognize that name?

13  A   Yes.

14  Q   And you see where Dr. Couch responds:  I reviewed this with

15  him tonight.  We do not write triple digit dispensations of the

16  short-acting opioids.  We keep it at 90 tablets per month

17  unless they have a cancer diagnosis.

18            Do you see that from Dr. Couch to Dr. Ruan?

19  A   Yes.

20  Q   Can you assume that "reviewed this with him tonight"

21  references Justin?

22  A   If you say so.

23  Q   No, I'm asking you.  When Dr. Couch is responding --

24  A   Oh, I guess I don't know.  I mean --

25  Q   You don't know.  He reviewed it with someone; right?

4891

1    A    Yeah.

2    Q    Or according to the email he says he did; is that correct?

3    A    Yes.

4    Q    And it says they don't write triple digit dispensations; is

5    that correct?

6    A    That's what it says.

7    Q    Now, you've only reviewed the files for five patients; is

8    that correct?

9    A    Correct.

10   Q    So you don't know, sitting here today, whether they write

11   triple digit prescriptions or not, do you?

12   A    By triple digit prescriptions, you mean prescriptions for

13   over a hundred tablets?

14   Q    Yes, yes.

15   A    I don't recall exactly.  And I can look in my notes to

16   see.  You're talking about for OxyContin 80, was that what they

17   were talking about?

18   Q    I'm talking for any drug.  You don't know whether they do

19   or don't write prescriptions, triple digit prescriptions, do

20   you?

21   A    I -- I could look at my notes.

22   Q    You would only know for the five files you reviewed; right?

23   A    Right, right.

24   Q    And then I show --

25   A    I'm sorry.  But, I mean, it wouldn't be uncommon to give

4892

```
 1   120 tablets of a drug.  So I wouldn't -- that wouldn't surprise
 2   me, if there were triple digits.  But I guess I'd have to look
 3   at the notes to see whether there were.  I mean, that would be
 4   taking a drug four times a day, which isn't uncommon.
 5   Q   Well, that must have meant something in this email where it
 6   says:  We do not write triple digit dispensations?
 7           MR. SHARMAN:  Objection, Your Honor.  This is calling
 8   for speculation, must have meant.
 9           THE COURT:  Sustained.
10   BY MS. GRIFFIN:
11   Q   Dr. Warfield, finally, I show you an email from Dr. Ruan
12   copied to -- it's not copied to Dr. Ruan, so we won't talk
13   about that one.
14           You said you had reviewed the video that was played --
15   excuse me -- you had reviewed the video of Mr. Brennan's August
16   of '14 --
17   A   Let me --
18   Q   Do you want to pull your notes and see if you reviewed
19   August of '14?
20   A   Let me see what the dates were.  I did review several
21   videos of Mr. Brennan.
22   Q   This would be the first one, the first visit, August of
23   2014.
24   A   Yes.  I have August 5th, 2014; September 8th --
25   Q   Let's talk about the August 5th one.
```

1    A    Okay.

2    Q    Do you have that in front of you?

3    A    Yes.

4    Q    Have you located it?

5    A    Yes.

6         MS. GRIFIFN:  Your Honor, if we could play the short

7    video of that, of that patient visit?

8         THE COURT:  All right.

9      (The video recording was played.)

10   BY MS. GRIFFIN:

11   Q    Dr. Warfield, if I told you that the undercover was able to

12   touch the floor when he bent over forward, that wouldn't be

13   indicative of back pain to you, would it?

14        MR. SHARMAN:  Objection, Your Honor.  We all just

15   watched the video.  Counsel doesn't need to instruct the

16   witness what her opinion of his mobility is.

17        THE COURT:  Overruled.

18   A    Just because someone has negative physical examination

19   findings does not mean they don't have pain.  Someone can have

20   a perfectly normal physical examination and still have very

21   severe pain.

22   BY MS. GRIFFIN:

23   Q    So if they're saying it is back pain, though, they are able

24   to bend all the way to the floor, bend all the way back and

25   bend to either side, that might be something that would give

4894

1  you pause as to where the pain was, wasn't it?

2  A   No, I think you're misinformed.  Just because someone has a

3  negative examination of range of motion doesn't mean they don't

4  have back pain.  Range of motion is just one thing that is

5  negative.  It doesn't mean anything at all.  As I say, just

6  because someone has a negative MRI doesn't mean they are not

7  feeling pain.  And these are just the kind of typical patients

8  we see.

9  Q   So in this video, if we're not going to take that much into

10  consideration about the physical exam, can you tell us what in

11  this exam showed that this person needed Roxicodone?

12  A   Because he came in, he said he had severe pain, that's why

13  he's coming to a pain clinic, this is what he took in the past

14  that seemed to help him.  When Dr. Couch comes in, Stacy says

15  he's had this severe pain for over a year, and this tells me

16  that he's had this kind of pain and they talked about how long

17  he had it and such.  And then they talked about, again, as we

18  discussed before, doing a number of things.  They give him a

19  small dose of pain reliever, they give him a muscle relaxant,

20  and they schedule him for a nerve block with some cortisone --

21  perfectly appropriate thing to do in this situation.

22  Q   And you're telling us that the length of time Dr. Couch saw

23  this patient is within the usual course of professional

24  practice for -- wait a minute -- for a new patient visit?

25  A   Absolutely.

1    Q   Okay.

2    A   And the nurse --

3    Q   (Unintelligible.)

4    A   -- practitioner saw the patient.

5         MR. SHARMAN:  Your Honor, can she be allowed to finish

6    her answer, please?

7         THE COURT:  Well, no.  You can reexamine that on

8    redirect.  But she ought to just answer the questions directly.

9    BY MS. GRIFFIN:

10   Q   You did see Bridgette -- excuse me -- Stacy tell the

11   undercover how to use the Zanaflex, how to be careful with the

12   Zanaflex, didn't you?

13   A   Yes.

14   Q   You did not hear anybody tell the patient how to be careful

15   with the controlled substance Roxicodone, did you?

16   A   I didn't hear anything about the side-effects of that.

17   But, again, there could be a sheet that's handed out, it could

18   be given when he fills the prescription, there could be a

19   list of -- you know, there are many, many ways that this is

20   done.  Sometimes it's done on the opiate consent or opiate

21   agreement that the patient signs.

22   Q   So the question was you didn't hear that done on this

23   video, though --

24   A   No.

25   Q   -- did you?

4896

1    A    No.

2    Q    And you saw the examination on the video?

3    A    Yeah.

4    Q    Like we all did; right?

5    A    Yes.

6    Q    I'll show you the history and physical of this visit,

7    August the 5th.  You've previously seen this; right?

8    A    Yes.

9         MS. GRIFFIN:  May we switch to the Elmo, please?

10         THE CLERK:  Yes, ma'am.  It will take a few seconds.

11         THE COURT:  Ms. Griffin, make sure your microphone is

12    on.

13         MS. GRIFFIN:  It is, Your Honor.  I'll stand right in

14    front of it.  Thank you.

15    Q    You've previously seen -- when you reviewed the file;

16    right?

17    A    Yes.

18    Q    And, of course, other than there being some simple

19    mistakes, that it calls him a female and it doesn't say who

20    referred him --

21    A    Yes.

22    Q    -- did you hear him say -- him being Brennan -- that his

23    pain had reached a maximum of 10 over 10?

24    A    No.  But again, that's often written down in an intake

25    sheet when the patients come.

1   Q   But you didn't hear him say that on the video we saw, did

2   you?

3   A   I didn't hear it on the video.

4   Q   And did you hear him say that no activities increased the

5   severity of the pain?

6   A   Again, that's something that's usually logged in on an

7   intake sheet.  But no, I didn't hear that.

8   Q   You didn't hear that, did you?

9   A   I didn't hear that, no; correct.

10  Q   And did you hear Mr. Brennan deny anything under the review

11  of symptoms?  Did you hear him deny fatigue?  Did you hear him

12  deny chest pain?  Did you hear him deny nausea?  You didn't

13  hear him even be asked about any of those, did you?

14  A   I didn't.  But again, this is something that could be on

15  intake.  And I'm not familiar with the way these computer-

16  generated forms are done.

17  Q   But the question is you did not hear him being asked any of

18  this during the visit, did you?

19  A   No.

20  Q   Now, the physical examination, we saw the physical

21  examination on the video; right?

22  A   Correct.

23  Q   You did not see his pupils reacting to light bilaterally,

24  did you?

25  A   No.  And again, I don't know what this means, whether this

 1    is computer generated and they are supposed to check off these

 2    little dots here as they do these things.  I don't know what

 3    this means.  I mean, what I based my opinion on was the exam

 4    that was done and was that exam appropriate enough to warrant

 5    prescription of the medications.  So I guess I'm not familiar

 6    with this practice.  I don't know whether this is computer

 7    generated for every patient and they're supposed to check them

 8    off or what this means.

 9    Q   Well, now, you've not talked to Dr. Couch himself, have

10    you?

11    A   Right.

12    Q   So what I'm asking you is did you hear these questions we

13    just talked about in the examination --

14    A   No.

15    Q   -- we just saw?

16    A   Correct.

17    Q   And at the bottom, under Physical Examination, you did not

18    see any test of Brennan's pupils, did you?

19    A   No.

20    Q   You didn't see any test of his throat, did you?

21    A   Correct.

22    Q   Didn't see any test of his thyroid, did you?

23    A   No.

24    Q   Didn't see any indication as to whether there were lesions

25    or deformities, did you?

1  A   Correct.

2  Q   Didn't appear that he took any of his clothing off, did it?

3  A   No.

4  Q   Didn't see any muscle strength or tone examination, did

5  you?

6  A   No.

7  Q   And you didn't see any straight leg test positive

8  bilaterally, did you?

9  A   Right.

10  Q   On the next page, and the last page of this report, we

11  don't know from the examination if there were any lesions or

12  areas of discoloration present at all, do we?

13  A   No.

14  Q   And you didn't see any indication as to whether he was

15  grossly oriented to person or any indication about his gait,

16  did you?

17  A   Well, that's examined normally.  You know, his gait is how

18  he walked in the room and how he walked over.  And his mental

19  status is whether he was alert and could talk to you.  So

20  those sorts of things.

21  Q   Did you see anything in this examination, the video we just

22  saw, that would show this patient was continuously opioid

23  dependent?

24  A   On the examination, no.

25  Q   And you see this listed as an assessment, don't you?

4900

1    A    Yes.

2    Q    Do you see that this is signed by Stacy, the young lady who

3    was in the room with him?

4    A    Yes.

5    Q    And then do you see that it was electronically signed by

6    Dr. Couch?

7    A    Right.

8    Q    Now, you talked about there being a continuum, or a line,

9    as to best practices, as to not so good practices, as to middle

10   of the road practices; is that correct?

11   A    Well --

12   Q    In connection with pain management?

13   A    -- there are all different things that are all within the

14   standard of care, yes.

15   Q    But there are some that are better than others, aren't

16   there?

17   A    Yes.

18   Q    And you would agree, wouldn't you, that a 43-second first

19   patient visit by a doctor is outside that standard of care,

20   wouldn't you?

21   A    Not when the nurse practitioner sees the patient.  I would

22   disagree with that.

23          MS. GRIFFIN:  That's all I have of this witness.

24   A    It's not the best, it's not the best.  But I would not say

25   that's outside the standard of care.

```
 1   BY MS. GRIFFIN:

 2   Q   So you do agree it's not the best; right?

 3   A   I agree it's not the best.  But it's --

 4   Q   That's as far as you will go with it, it's not the best; is

 5   that right?

 6           MR. SHARMAN:  Objection.  Argumentative.

 7           THE COURT:  Sustained.

 8           MS. GRIFFIN:  That's all I have of this witness, Your

 9   Honor.

10           THE COURT:  All right.  Mr. Sharman?

11                       REDIRECT EXAMINATION

12   BY MR. SHARMAN:

13   Q   On cross-examination, Dr. Warfield, Ms. Griffin asked you a

14   few questions about your current job duties as opposed to prior

15   years when you saw patients.  Do you recall some of those

16   questions?

17   A   Yes.

18   Q   And remind us what your current position is, please.

19   A   I'm the Lowenstein distinguished professor of anesthesia of

20   Harvard Medical School and on the faculty of Beth Israel

21   Medical Center and the pain management center there full time.

22   Q   All right.  And is it correct that as a part of holding

23   those positions you're not required to and you do not currently

24   see patients?

25   A   That's correct.  I do teaching mainly and administrative,
```

1    that sort of thing.

2    Q   And I believe you agreed with Ms. Griffin that the last

3    time you had a regular active patient practice was about 2013;

4    is that right?

5    A   Correct.

6    Q   Before that, Dr. Warfield, about how many years had you

7    actively practiced pain management medicine?

8    A   Well, from 1980 until 2013.  Do the math.  That's 33 years.

9    Q   And roughly in that period about how many pain patients did

10   you see?

11   A   Oh, many, many thousands.  I would see about 30 patients a

12   day in the clinic, sometimes more, sometimes less.  So a lot of

13   them.

14   Q   Is seeing 30 patients a day in a pain management practice

15   within the usual course of medical practice?

16           MS. GRIFFIN:  Your Honor, it is beyond the scope.

17           THE COURT:  That wasn't addressed on cross-

18   examination.  So sustain the objection.

19   BY MR. SHARMAN:

20   Q   You were also asked a few questions on cross-examination

21   about the administrative code that was relevant to the Alabama

22   medical board, do you recall some of those questions?

23   A   Yes.

24   Q   And is it the case in any state, including yours where

25   you're licensed, Massachusetts, that there are regulations that

1    are promulgated by the relevant medical boards?

2           MS. GRIFFIN:  Your Honor, foundation and relevance

3    objections.

4           MR. SHARMAN:  Your Honor, this was inquired --

5           MS. GRIFFIN:  As to other states.

6           MR. SHARMAN:  This was inquired into at length on

7    cross-examination.

8           THE COURT:  About Alabama.

9    BY MR. SHARMAN:

10   Q   Is it your opinion, Dr. Warfield, based on your multiple

11   decades of practicing medicine, especially with regard to pain

12   management, that medical boards, including the Alabama medical

13   board, published regulations to govern the activities of the

14   doctors that are subject to that board?

15   A   Yes, they all do.

16   Q   So is it your experience that if a physician -- in this

17   instance, an Alabama physician -- who might violate a provision

18   of that code could get into various kinds of trouble with the

19   board?

20   A   Could.  It depends on what the violation is, yes.

21   Q   And is it your opinion that if a physician got in trouble

22   with the Alabama medical board, hypothetically, because he or

23   she violated a provision, that that potential violation would

24   not mean that --

25          MS. GRIFFIN:  Your Honor?

 1   BY MR. SHARMAN:

 2   Q   -- their practice was outside the ordinary and usual course

 3   of medical practice?

 4           MS. GRIFFIN:  Again, we would object that that is

 5   beyond the cross-examination.

 6           MR. SHARMAN:  That very question was inquired into,

 7   Your Honor.

 8           THE COURT:  Overruled.

 9   BY MR. SHARMAN:

10   Q   Shall we say --

11   A   Absolutely.  The board controls whether or not you have a

12   license.  And they can put your license on probation, they can

13   require education, that sort of thing.  It doesn't mean you're

14   practicing outside the usual course of medical practice or that

15   you're a criminal or should go to jail or anything like that.

16   It means that the board has certain regulations that regulate

17   your having a license and that sort of thing.

18           MS. GRIFFIN:  Your Honor, move to strike the answer as

19   being unresponsive, the references to going to jail.

20           MR. SHARMAN:  I'll move on, Your Honor.

21           THE COURT:  All right.  I will strike that.  Ladies

22   and gentlemen, please do not take into consideration that

23   statement.

24           All right.  Go ahead Mr. Sharman.

25           MR. SHARMAN:  Thank you, Your Honor.

CAROL ANN WARFIELD, MD - REDIRECT BY MR. SHARMAN

1    Q    Also on cross-examination, Dr. Warfield, I believe you

2    agreed that if drug abuse were occurring by an employee, that's

3    not a good thing?

4    A    Correct.

5    Q    But is it correct in your opinion that a particular

6    employee's potential misconduct does not determine whether, for

7    example, a particular prescription is within or without the

8    usual course of medical practice?

9    A    That's correct.  It depends on what the patient's condition

10   is, what the patient's diagnosis is, whether they have pain,

11   and whether the physical or history was done and such and if

12   they are appropriate patients for the treatment.  It has

13   nothing to do with an illness or whatever that someone in the

14   office might have.

15   Q    You also had a few questions about giving talks and, in

16   particular, giving talks about medications, talks that were

17   paid for or where the physician's given an honorarium by the

18   pharmaceutical company.  Do you remember those?

19   A    Yes.

20   Q    Is there anything wrong, in your opinion, based upon your

21   work and study and teaching, with giving talks about medication

22   where those talks are also accompanied by an honorarium or

23   payment by a pharmaceutical company?

24           MS. GRIFFIN:  Your Honor, I object to the form of the

25   question, asking her if there's anything wrong.

1    THE COURT:  Sustained.

2  BY MR. SHARMAN:

3  Q   Based upon your experience, knowledge, and teaching, is

4  there anything at all outside the usual course of medical

5  practice for a physician to give talks about a medication where

6  those talks are also accompanied by an honorarium or some

7  payment by the pharmaceutical company?

8  A   No.  It's commonly done.  I've done it myself.  Many, many

9  doctors do that.  It's pretty common.

10  Q   You also got some questions about prescriptions and stock

11  ownership.  Do you remember those?

12  A   Yes.

13  Q   Is there anything at all outside the usual course of

14  medical practice for a physician to prescribe a medication and

15  also simultaneously to own stock in the company that makes the

16  medication?

17  A   No, there is absolutely no regulation that I know of that

18  says that one cannot do that.

19  Q   You also responded to some questions about information and

20  consent and informed consent.  Do you remember some of those

21  questions?

22  A   Yes.

23  Q   Is it within the course of usual medical practice for a

24  physician, including a pain management physician, to rely on

25  the medication inserts and the prescription label that

 1    accompanies a prescription as part of the information process?

 2           MS. GRIFFIN:  Your Honor, objection.  There was no

 3    questioning about the inserts connected with medication.  It's

 4    beyond the scope.

 5           THE COURT:  Overruled.

 6    BY MR. SHARMAN:

 7    Q    Do I need to repeat?

 8    A    It's perfectly reasonable.  In fact, this is pretty much

 9    all the time now and pharmacies will give you information

10    about the medication.  Sometimes the office hands you

11    information about the medication.  But the pharmacy certainly

12    will give you information and ask you if you want further

13    information and such, though.  There are many, many layers of

14    informed consent.

15    Q    And Ms. Griffin also showed you an email from Dr. Ruan and

16    then a response by Dr. Couch to that email on the subject of

17    some regulatory enforcement actions and then some potential

18    actions that the clinic might take.  Do you remember those

19    questions and answers?

20    A    Yes, yes.

21    Q    Is it within the usual course of medical practice for a

22    pain management physician to keep abreast of regulatory and

23    enforcement action?

24    A    Absolutely.

25    Q    And is it within the usual course of medical practice for a

 1   pain management physician to consider that regulatory and

 2   enforcement framework in making his or her prescription

 3   determinations?

 4   A   Yes, absolutely.

 5   Q   You also watched again and were asked some questions about

 6   the undercover patient visit.  Do you remember some of those

 7   questions?

 8   A   Yes.

 9   Q   All right.  Do you understand that or do you know that the

10   undercover agent was referred to Dr. Couch by a chiropractor?

11   A   Yes.

12           MR. SHARMAN:  May I have the ELMO, please?

13           THE CLERK:  Yes, sir.

14   BY MR. SHARMAN:

15   Q   I'll show you what's been admitted in evidence as

16   Government Exhibit 20-23, which, as you can see at the top, is

17   the examination report of Dr. John Wetzel.  If I tell you that

18   Dr. John Wetzel is the referring chiropractor, do you have any

19   reason to disbelieve me?

20   A   No.

21   Q   All right.

22           MS. GRIFFIN:  Your Honor?  We object to this being

23   beyond the scope of cross.  She was merely asked about the

24   visit that's documented in PPSA.  She was not asked about the

25   referring documents from the chiropractor.

1          MR. SHARMAN:  And it leaves an incomplete impression,

2     Your Honor, because what the questions were on cross stated

3     that there was no pain basis available to Dr. Couch, and I seek

4     to show that there is.

5          MS. GRIFFIN:  Your Honor, it's not in the record.

6          THE COURT:  I sustain the objection.

7     BY MR. SHARMAN:

8     Q    Did you review the referring report from the chiropractor

9     as part of forming your opinion with regard to the undercover

10    agent?

11    A    Yes.

12    Q    And did you note in there that the history taken addressed

13    or supposedly addressed the undercover agent's condition,

14    including whether it was aggravated, by what it was relieved or

15    not, quality, timing, severity -- do you remember reviewing

16    that?

17         MS. GRIFFIN:  Your Honor, there's no foundation in the

18    record that Dr. Couch ever reviewed them and it is beyond the

19    scope of the cross-examination.

20         MR. SHARMAN:  Your Honor, the question --

21         THE COURT:  I sustain for the second reason.

22    BY MR. SHARMAN:

23    Q    If you had gotten a referral like this, would you have

24    relied upon it in good faith?

25         MS. GRIFFIN:  Your Honor, objection.  It's merely

4910

 1   rehashing the same thing that the Court has twice sustained.

 2   He did not ask her that when he had her on direct examination,

 3   I did not ask her about it on cross.

 4          THE COURT:  I sustain the objection.

 5   BY MR. SHARMAN:

 6   Q   All right.  With regard to the undercover visit, did

 7   you observe in the video that the CRNA, Stacy, asked the

 8   agent about employment and whether or not he had his own

 9   company?

10   A   Yes.

11   Q   Are those kind of employment and employment ownership and

12   leadership characteristics important or useful to know for a

13   prescription?

14          MS. GRIFFIN:  Your Honor, again, it is beyond the

15   scope of cross-examination.

16          MR. SHARMAN:  Your Honor, they played the video.  It's

17   directly within the cross-examination.

18          THE COURT:  I overrule the objection.

19   BY MR. SHARMAN:

20   Q   Are those kind of questions about employment, about

21   leadership, or ownership positions in employment, are those

22   relevant to questions about pain management in general, and in

23   particular about assessing the propriety of giving opioids to

24   somebody?

25   A   Yes.

1   Q    And how so?  How does that apply?

2   A    It tells you how much pain the patient is in, if they need

3   the pain medicine to work, if they've been able to work, if

4   they're -- you know, if they are upstanding citizens who own a

5   business and have a job, you may take that into account.  So

6   all of those things are useful in knowing that someone needs to

7   be able to function to work.  It's all helpful, knowing

8   background about the patient.

9   Q    You also were asked questions with regard to the video and

10  the undercover visit about a so-called triple digit

11  prescription, do you remember some of those questions?

12  A    Yes, yes.

13  Q    By itself, is there anything outside the usual course of

14  medical practice about prescribing medication in more than a

15  hundred units?

16  A    Absolutely not.  As I said, it's pretty common, if you need

17  to take a medicine four times a day.  And that totally has to

18  do with the duration of the medicine.  It has nothing to do

19  with how powerful the medicine is or whatever.  But there are

20  some medicines that only last six hours, so you have to take

21  them four times a day.  If you take Tylenol, you have to take

22  it sometimes every four hours.  So sometimes you have to take

23  drugs six times a day.  So it's not uncommon to see a

24  prescription written for 120 tablets a month or 150 tablets a

25  month, not uncommon.  It depends on the medicine.

1  Q   In the interaction between the CRNA and the undercover

2  agent, did you hear him say something to the effect of:  I've

3  got to confess to some criminal activity?  Do you remember

4  that?

5  A   Yes.

6  Q   And then did you hear the CRNA ask him to tell her what

7  he's talking about?

8  A   Yes.

9  Q   Did you ever hear him say that he got it off the streets or

10  anything like that?

11  A   No.

12  Q   Based upon what you have seen from that video of that

13  initial visit, was the undercover agent presenting with a

14  relatively simple case or a relatively complex case?

15  A   Well, this was a relatively simple, common case of pain

16  problems.  And it was a -- you know, it was a very typical

17  doctor's office visit for such a thing.

18  Q   And do you recall the interplay that you witnessed on

19  cross-examination between the CRNA and the undercover agent

20  with regard to the subject of getting a lumbar facet joint

21  block?

22  A   Yes.

23  Q   All right.  And is a block like that an interventional pain

24  procedure?

25  A   Yes, it's an interventional pain procedure that one would

1  use in a plan for various things to treat the patient.  It's

2  not something you'd do or suggest if it was a drug deal.  This

3  is a doctor's office suggesting various treatments,

4  recommending various treatments, to treat the patient's pain.

5  They weren't selling him drugs.  They were giving him various

6  options for his pain.

7  Q   And did you hear and understand the CRNA expressly to tell

8  the undercover agent:  We are an interventional pain clinic?

9  A   That's right.  She said something like:  You're in the

10  wrong place, if you think you're just going to get

11  medications.  We're an interventional pain clinic.  So we're

12  going to want to do facet blocks.

13         And, by the way, that was the appropriate block to do

14  for what he presented with.  She was absolutely right.  You

15  know:  And we're going to give you a muscle relaxant and then

16  we're going to give you some pain medicine.

17         So she was absolutely, absolutely right in telling him

18  that.

19  Q   And did you, in the video clip you heard on cross-

20  examination, understand her to tell him that that is how we

21  practice here?

22  A   Correct.

23  Q   Did you understand at the conclusion of the visit the

24  undercover agent to refer, when speaking of the CRNA, as:

25  She's thorough?

1    A    I'm sorry.  Ask me that again.

2    Q    Did you hear the undercover agent say at the very end of

3    the visit, say to Dr. Couch:  She's thorough?

4    A    Yes.

5    Q    All right.  Do you agree with that assessment?

6    A    Yes.

7    Q    On cross-examination you got several questions about the

8    initial patient records for the undercover agent including some

9    specific items like shining a light in his eyes and squeezing

10   his throat a little bit.  Do you remember some of those

11   questions?

12   A    Uh-huh, yes.

13   Q    In your opinion, for a patient referred from a chiropractor

14   for the pain that he was pretending to present with, would

15   shining a light in his eyes be an important part of that

16   history and exam?

17   A    No, no, I wouldn't -- no.

18   Q    Would squeezing his throat be an important part of his

19   exam?

20   A    No, I definitely wouldn't have done that, if it was my

21   patient.

22           MR. SHARMAN:  No further questions.

23           THE COURT:  May this witness be excused?

24           MR. SHARMAN:  Yes, ma'am.

25           THE COURT:  All right.  Thank you.  You may step down.

 1              THE WITNESS:  Thank you.

 2              MR. WILLSON:  Your Honor, Dr. Couch calls Tamara

 3  Dabney.

 4              THE CLERK:  Ms. Dabney, if you will step forward

 5  toward the witness stand, I'll swear you in.  Let me get you to

 6  raise your right hand.

 7                       TAMARA DABNEY

 8              was sworn and testified as follows:

 9              THE WITNESS:  I do.

10              THE CLERK:  Thank you, ma'am.  Please be seated.

11                      DIRECT EXAMINATION

12  BY MR. WILLSON:

13  Q   Good afternoon, Ms. Dabney.

14  A   Hello.

15  Q   If you would, just be sure that microphone is close to your

16  face and, if you would, introduce yourself to the jury.

17  A   Okay.  My name is Tamara Dabney.

18  Q   And, Ms. Dabney, are you a registered nurse?

19  A   Yes.

20  Q   How long have you been an RN?

21  A   Since 1984.

22  Q   Are you still an RN?

23  A   Yes.

24  Q   And you're still practicing as a registered nurse?

25  A   Yes.

TAMARA DABNEY - DIRECT BY MR. WILLSON

1  Q   Tell us, tell the jury, a little bit about your training.

2  Did you go to school to become an RN?

3  A   Yes.

4  Q   Did you at some point in time work as a registered nurse at

5  Physicians Pain Specialists of Alabama?

6  A   Yes.

7  Q   When did you begin your time working as a registered nurse

8  at PPSA?

9  A   It was in December 2013.

10  Q   And when was your last day at work at PPSA?

11  A   May the 20th.

12  Q   Okay.  And what did you do at PPSA as a nurse?

13  A   I was the intrathecal pump nurse.

14  Q   The pump nurse.  And the pump, is that an implantable

15  device --

16  A   Correct.

17  Q   -- that's surgically implanted into certain patients; is

18  that right?

19  A   Correct.

20  Q   Ms. Dabney, not every patient at PPSA was a pump patient;

21  right?

22  A   Correct.

23  Q   It was just -- just it was a portion of them?

24  A   Yes.

25  Q   Were pump patients in severe pain?

TAMARA DABNEY - DIRECT BY MR. WILLSON

1    A    Yes.

2    Q    Relative to other patients?

3    A    Yes.

4    Q    And tell the jury a little bit about how your pump practice

5    was laid out in the building.  Did you have an office?

6    A    Yes, I did.

7    Q    And was that -- where was that office located in the

8    building?  Was it close to the front desk?

9    A    Close to the front desk on the left side (nodding head

10   affirmatively).

11   Q    Were there --

12   A    If you're looking at the office, yes.

13   Q    Close to the front desk, on the left side of the building

14   as you face the desk?

15   A    Right.

16   Q    Were there specific procedure rooms that were set aside

17   just for pain pump procedures?

18   A    Correct.

19   Q    How many?

20   A    Two.

21   Q    Was there additionally a room where the medicines for the

22   pump were compounded?

23   A    Yes.

24   Q    And in those procedure rooms were there -- were there

25   procedures where those pumps were actually implanted into the

```
 1   patient's bodies?

 2   A    No.

 3   Q    Was that done somewhere else?

 4   A    In a hospital.

 5   Q    Who did those procedures in the hospitals?

 6   A    Dr. Couch.

 7   Q    So Dr. Couch would leave the practice and go to the

 8   hospital and he would do the surgical procedure to implant that

 9   device into the body?

10   A    Correct.

11   Q    In the procedure rooms at PPSA, what kind of procedures

12   were done there?

13   A    Refills of the pumps.

14   Q    At times were there problems with patients' pumps?  Were

15   there sometimes infections that would result?

16   A    No infections.

17   Q    Did Dr. Couch ever have to go back to the hospital and do

18   other kinds of surgical intervention procedures on patients who

19   already had pumps?

20   A    Yes.

21   Q    But in the building PPSA, in those procedures rooms, was it

22   primarily refills?

23   A    Correct.

24   Q    And would you do those refills?

25   A    Yes.
```

1   Q   Tell the jury a little bit about those pumps.  How many

2   kinds of pumps were there that were -- that Dr. Couch implanted

3   in his patients?

4   A   There was two kinds.  One was a programmable kind and one

5   was operated off of body heat.

6   Q   And help the jury understand a little bit about where on

7   the body those pumps would be actually implanted.

8   A   They would be in the lower part of the abdomen, in the soft

9   tissue area, either on the right or left side.

10  Q   Would they be all the way on the left or right or somewhat

11  to the front or somewhat to the back?

12  A   Somewhat to the front and the back.

13  Q   Ms. Dabney, is what Dr. Couch did with pumps, intrathecal

14  pumps -- that is, implanting them and managing the care of

15  patients who are on them -- is that a specialized skill?

16  A   Yes.

17  Q   And that was over and above his role as a pain management

18  practitioner, or doctor?

19  A   Yes.

20  Q   The patients who would get this kind of care, Ms. Dabney,

21  would they have had longstanding problems with pain?

22  A   Yes.

23  Q   What kinds of conditions would be typical of a pain pump

24  patient?

25  A   Patients with multiple back injuries, multiple back

TAMARA DABNEY - DIRECT BY MR. WILLSON

 1  surgeries for physical defect, chronic spasticity.
 2  Q   Did you have --
 3  A   Motor vehicle accidents, cancer, tumors on the spine.
 4  Q   Would a patient with those kinds of problems, would the
 5  pain pump be the first thing that they would try --
 6  A   No.
 7  Q   -- in terms of interventional pain management?  Would they
 8  have had to have failed other modalities of pain management
 9  prior to being considered for a pain pump?
10  A   Correct.
11  Q   Were some of these patients who had pain pumps implanted in
12  their bodies, were some of them patients at PPSA before their
13  pump?
14  A   Repeat that again, please.
15  Q   I'm sorry.  That was a bad question.  Were some of the
16  patients who got pumps, were some of those patients folks who
17  had been patients before they got their pumps?
18  A   Yes.
19  Q   And was there a process by which Dr. Couch would determine
20  that a certain patient needed to have a pump implanted into
21  their body?
22  A   Yes.
23  Q   Were you a part of that process in any way?
24  A   No.
25  Q   Did you at times meet with patients who were being

1   considered for the pain pump implantation?

2   A   Yes.

3   Q   And tell the jury a little bit about that kind of a

4   meeting.  What would be the exchange between you and that

5   patient?

6   A   I would give them information about the pump, allow them to

7   hold it and see it and show them where it would be implanted

8   and the basics of how the surgical procedure would go and what

9   -- the following months after the implant would happen, how the

10  medicines would be titrated.

11  Q   And titrated, actually let's get back to that word in a

12  bit, because I have some questions about it.  But in terms of

13  your education of these patients up front, were they then

14  selected or not to receive the pain pump?

15  A   Correct.

16  Q   And prior to that would Dr. Couch refer those individuals

17  to any other provider outside of the clinic?

18  A   Yes, they would have to go see a psychiatrist.

19  Q   And what would the purpose of that referral be to a

20  psychiatrist outside the clinic?

21  A   It's dealing with a foreign body being implanted within

22  their body and also the commitment that they would have to

23  make, compliance to a care plan that required a continuous,

24  every 40 -- 30 to 45 days having to refill the pump and make

25  that commitment to comply with the treatment plan.

TAMARA DABNEY - DIRECT BY MR. WILLSON

1  Q   So the first reason was, as I understood it, because they

2  were going to have a foreign body implanted in their body, and

3  would that sometimes cause psychological difficulties?

4  A   Correct.

5  Q   Does it also cause sometimes the potential for injuries if

6  a certain kind of person has a pump and is not prepared to

7  manage it well?

8  A   Correct.

9  Q   In other words, if a person has certain bad habits, then

10  they may not be appropriate for a pump because they could hurt

11  themselves with this thing in their body; is that fair?

12  A   Right.

13  Q   The second reason you mentioned I want to ask you about,

14  and you said because Dr. Couch wanted to be sure that the

15  psychiatrist was able to determine if they were capable of

16  complying with their treatment plan.  Did I say that correctly?

17  A   Correct.

18  Q   Why is it so important, Ms. Dabney, that the patient be

19  compliant with the treatment plan?

20  A   Because they had a risk of going into withdrawal if they

21  allowed their pump to not be refilled at the scheduled time,

22  which could be life threatening.

23  Q   How soon -- if you can answer this, Ms. Dabney -- after,

24  say, running out of medication would a pump patient go into

25  withdrawal symptoms?

4923

1   A   Within hours.

2   Q   And tell the jury a little bit about what withdrawal would

3   look like in such a patient.

4   A   Very anxious, nausea, vomiting, diarrhea, sweating.

5   Q   Pardon me.  Is that an emergency situation?

6   A   Yes, it is.

7   Q   Is that a medical emergency?

8   A   Yes, it is.

9   Q   And so is it fair to say that Dr. Couch made sure -- and

10  you helped him -- that these patients were seen regularly?

11  A   Correct.

12  Q   And that they were capable of complying with such a

13  regimen?

14  A   Correct.

15  Q   Did you have any role during your time at PPSA in

16  developing certain procedures of different kinds for the

17  clinical side of the practice?

18  A   No.

19  Q   Was there any sort of a procedure in place at PPSA that

20  related to the handling of these pain pump patients in

21  emergency situations?

22  A   Yes.

23  Q   What sorts of policies were in place with respect to that?

24  A   There was always an active list of all the pump patients

25  and where they stood within their refill cycle so, if there was

1    an emergency, you know which patients were a priority to

2    contact and get them in for a refill or to make -- you know,

3    even if it was an early scheduled refill, they would be

4    contacted to come in and you'd review their medicines and make

5    sure that they would be able to get through a period of time

6    that you were expecting that emergency, like a hurricane or

7    something.

8    Q    So, for example, you mentioned a hurricane.  So the

9    hurricane would have come through Mobile, as they have from

10   time to time.  Is there a policy in place at PPSA to be sure

11   that you were in a position to manage those very carefully

12   managed pain patients?

13   A    Correct.

14   Q    Ms. Dabney, the pain patients, were they also prescribed

15   certain oral medications in addition to their pain?

16   A    Yes.

17   Q    So they were prescribed other controlled substances, like

18   oxycodone or, you know, OxyContin or other types of medication?

19        MR. BODNAR:  Objection to Leading at this point, Your

20   Honor.

21        MR. WILLSON:  I was giving examples, Your Honor.  I'll

22   move on.

23   Q    Why were patients prescribed oral medications in addition

24   to their intrathecal pain pump?

25   A    Because it was provided for breakthrough pain at times when

1   pain was escalated.

2   Q   Which were provided for breakthrough pain?  The pump

3   medicines --

4   A   Oral medicines.

5   Q   The oral medicines were for breakthrough pain?

6   A   Yes.

7   Q   And is that because pain is not a straight line over time?

8   Does pain change over the course of days and months?

9   A   Yes.

10  Q   And so would you prescribe those oral medications as

11  needed?

12  A   Correct.

13  Q   And was that, as far as you know, based upon your --  I

14  hate to date you -- but your 30-plus some years of practice as

15  a nurse?  Was that fairly normal?

16  A   (Nodding head affirmatively.)

17          THE COURT:  You have to answer out loud.

18  A   Yes.

19  BY MR. WILLSON:

20  Q   Thank you.

21          Ms. Dabney, when you first arrived at PPSA in -- I

22  believe it was December 2013?

23  A   Correct.

24  Q   When you first arrived, did Dr. Couch meet with you and

25  give you some training about the practice of pain pumps?

1   A    Yes.

2   Q    Did he discuss with you various procedures and

3   considerations at some length?

4   A    Yes.

5   Q    Did he often discuss with you the practice of pain

6   management, specifically with respect to these pain pumps?

7   A    Yes.

8   Q    Would you talk often about various literature having to do

9   with the care and management of the care of pain pump patients?

10  A    Yes.

11  Q    Would Dr. Couch ask you about or would Dr. Couch discuss

12  with you at times different cases, whether real or

13  hypothetical, and how to address the pain management issues

14  that were raised by those cases?

15  A    Yes.

16  Q    Ms. Dabney, are you familiar with Insys?  Do you know what

17  Insys is?

18  A    Yes.

19  Q    Is that a pharmaceutical company?

20  A    Correct.

21  Q    And would Dr. Couch, if you can recall, would he sometimes

22  give lunch discussions at restaurants in the area about Insys

23  medications?

24  A    Yes.

25  Q    Did you ever attend any of those meetings?

TAMARA DABNEY - DIRECT BY MR. WILLSON

```
1   A   Yes.
2   Q   When you attended those lunch seminars with Dr. Couch, did
3   Dr. Couch discuss individual cases and hypothetical cases and
4   did he go into some detail at those meetings --
5   A   Yes.
6   Q   -- as far as your recollection?
7            Did you think that those lunch meetings were
8   substantial in terms of the amount of discussion, substantive
9   discussion that was had?
10  A   Yes.
11  Q   Ms. Dabney, on the topic of Dr. Couch's instructions to you
12  and education of you in this practice, did he at some point in
13  time issue you a standing order with respect to the
14  administration or prescription of pain medicines for pain
15  patients?
16  A   Yes.
17  Q   And let's back up just a little bit and run up to
18  that.  How much medicine is in a pain pump typically?
19  A   Varied amounts of different drugs, but it totaled a volume
20  of 30 milliliters.
21  Q   And so was it basically inside this pump was a reservoir
22  that contained a certain volume of fluid?
23  A   Correct.
24  Q   Now, what kinds of medicines -- were there multiple
25  medicines that were part of that fluid?
```

4928

1    A    Yes.

2    Q    And was it different for every patient?

3    A    Yes.

4    Q    Was that sort of combination of medicines, was that

5    tailored, individually tailored to each pain pump patient?

6    A    Yes.

7    Q    What were the medicines that kind of could go into a pain

8    pump?

9    A    It could be morphine, Dilaudid, fentanyl, Marcaine, and

10   saline, and Prialt.

11   Q    Ms. Dabney, are some of those medications pain medications?

12   A    Yes.

13   Q    Which ones?

14   A    The morphine, Dilaudid, and the fentanyl.

15   Q    Now, were there -- so the other ones, are they pain

16   medicines as well?

17   A    They are not.  They are anesthetic medicines and

18   antispasmodic medicines.

19   Q    Now, tell us about that standing order we talked

20   about.  When Dr. Couch -- what were you permitted to do,

21   according to his standing order?

22   A    If the patient was having elevated pain levels, you could

23   take the primary pain medication and alter it 10 percent,

24   increase it by 10 percent.

25   Q    Could you decrease it by 10 percent?

TAMARA DABNEY - DIRECT BY MR. WILLSON

1    A   You could decrease it if it needed to be.

2    Q   Now, let's talk a little bit about that -- let's break that

3    down a little bit.  When a pain patient would first get their

4    first dose of medicine in their new pump, which of the two --

5    which of the pain medicines that you mentioned earlier would

6    they be started with?

7    A   A new pain pump patient was started initially with just

8    baclofen and saline.

9    Q   And, then, is baclofen a pain --

10   A   It's an anti-spasm medicine.

11   Q   As between morphine and Dilaudid, which were prescribed

12   first, which were put into the pump first?

13   A   Morphine.

14   Q   So a new patient would get morphine into their pump and was

15   it a high dose or a low dose?

16   A   A very low dose.

17   Q   So would you sort of start low with a new patient and then

18   would you increase that amount gradually?

19   A   Correct.

20   Q   Now, earlier you mentioned the word "titrate."  Tell the

21   jury what titrate means in this setting that we're discussing.

22   A   When medicines were titrated, they were just increased in

23   small dosages over a period of time.

24   Q   And what is the purpose of titrating a medicine?

25   A   The goal was to achieve effective level of pain control and

4930

1  maintain the patient's functions.

2  Q   So you would start low?

3  A   Uh-huh (positive response).

4  Q   And then how often would a pain pump patient have to return

5  to PPSA to be seen there?

6  A   The average was every 45 days.

7  Q   Was that, again, tailored to every patient?

8  A   Yes.

9  Q   And so when a patient would return 45 days, say, later --

10 and this is early in their treatment, let's say their second

11 visit back -- would their level of morphine be increased in

12 sort of conformance with this titration?

13 A   Correct.

14 Q   And would that continue for a number of return visits?

15 A   Correct.

16 Q   When would that stop, when would you stop sort of adding

17 medicine or morphine to a new pain pump patient's dosage?

18 A   When they achieved a level they felt that their pain was

19 reduced.

20 Q   And if they don't achieve that level, do you sometimes get

21 to sort of the maximum amount of morphine?

22 A   Yes.

23 Q   And then what do you do after that?  Say, the next visit

24 you're at the maximum amount of morphine and their pain is

25 still not being managed.  What's the next step?

1    A    Another pain medication would be added.

2    Q    And would one of those be Dilaudid?

3    A    Yes.

4    Q    As you continued the titration after that and Dilaudid was

5    added, would the morphine level stay the same?

6    A    No, it would be reduced.

7    Q    So, Ms. Dabney, if I understand the titration process, it

8    starts with a very low dose of morphine, it goes up to a

9    maximum level of morphine, and then you start with Dilaudid

10   and, as you move forward with Dilaudid, the morphine decreases;

11   is that right?

12   A    Right.

13   Q    So in essence you're replacing some of that Dilaudid -- or

14   rather some of that morphine with the Dilaudid?

15   A    Correct.

16   Q    As the titration process continues?

17   A    Correct.

18   Q    Now, when does that whole process stop?  And I believe

19   you've already answered this.

20   A    Usually in three to four months you obtain a level that

21   they have reduced pain levels and obtained control.

22   Q    So when they have reduced pain levels -- and earlier you

23   talked about maximum functionality?

24   A    Correct.

25   Q    At that point is that patient stable on that medication?

1    A    Yes.

2    Q    And is that a term that you would use, "stable"?

3    A    Yes.

4    Q    Now, during that titration process -- and particularly,

5    let's say, in the early stages -- about what percentage was

6    average in terms of the amount of morphine, say, that would be

7    increased from one visit to the next as the titration process

8    continued?

9    A    Repeat that question.

10   Q    I will.  What percentage of the morphine that had been

11   prescribed was added to it in a subsequent visit when you're

12   going through this titration process?

13   A    For a new pump patient that titration process, most -- 90

14   percent of them -- would require an increase titration level.

15   Q    And about how much morphine would be added per visit?

16   A    Within 10 percent, small increases.

17   Q    Now, when a patient is stabilized or when their medication

18   is stable, as you described, and they had a set sort of ratio

19   of these various medications in their pump, would their

20   medications ever change again?

21   A    Yes.

22   Q    In what circumstances would a patient's medications change

23   after they are stabilized?

24   A    If they had steady variations and increased episodes of

25   acute pain or just progressive worsening of pain.

1  Q   What if a patient, for example, lost functionality as well,

2  would that be a reason to consider changing the medication?

3  A   Yes.

4  Q   Now, let me back up just once.  During that titration

5  process did Dr. Couch direct that titration plan?

6  A   Yes.

7  Q   Was that a written plan from Dr. Couch that essentially

8  established how this patient was going to be titrated?

9  A   Correct.

10 Q   Now, Ms. Dabney, you said earlier there was a standing

11 order and that that standing order from Dr. Couch was that you

12 could increase or decrease a medicine by 10 percent.  Now let

13 me give you a hypothetical.  Let's say that you have a pain

14 pump patient --

15       MR. BODNAR:  Your Honor, objection to hypotheticals

16 with this witness, who is not an expert.

17       MR. WILLSON:  Your Honor, this witness has multiple

18 patients that she manages, and so a hypothetical is just sort

19 of giving her an example of one of those kinds of patients.

20       THE COURT:  I'll overrule the objection.

21 BY MR. WILLSON:

22 Q   So, Ms. Dabney, if you have a patient who has, you know, a

23 certain amount of morphine in their pump and then a certain

24 amount of Dilaudid and a certain amount of these other kinds of

25 medicines, are you permitted to change up or down only one of

1    those medicines?

2    A    Correct.

3    Q    Could you, according to Dr. Couch's standing order, could

4    you change the morphine a little bit and the Dilaudid a little

5    bit?

6    A    No.

7    Q    Could you change any of the other drugs by 10 percent that

8    aren't morphine or Dilaudid?

9    A    No.

10   Q    Could you change the morphine -- you answered that.  So you

11   could only change the morphine or the Dilaudid, and only one at

12   a time; is that right?

13   A    Correct.

14   Q    Now, let's say that you added within 10 percent to just the

15   morphine.  Would you have to adjust any of the other components

16   of that fluid as well?

17   A    Yes.

18   Q    Which components of the fluid would be adjusted if it was

19   required in terms of the full sum of the volume?

20   A    It would either be the normal saline or the Marcaine.

21   Q    Now Marcaine, is that basically an anesthetic?

22   A    Yes.

23   Q    If you know, is it a controlled substance?

24   A    No.

25   Q    Is it used for local anesthesia in general practice?

TAMARA DABNEY - DIRECT BY MR. WILLSON

1    A    Yes.

2    Q    And saline, what is saline?

3    A    Normal saline is a -- 0.9 percent saline is a fluid that's

4    comparable to our normal body fluids.

5    Q    So it's a neutral?

6    A    Correct.

7    Q    And you weren't permitted to touch any other medicines in

8    that pump fluid but one at a time, either morphine or Dilaudid,

9    and only within 10 percent?

10   A    Correct.

11   Q    And that was the standing order, that you were limited?

12   A    Correct.

13   Q    Now, Ms. Dabney, what if, in your judgment, more than 10

14   percent -- because you said earlier 10 percent is a relatively

15   small amount; right?

16   A    Correct.

17   Q    In fact, that's about what you do during the normal

18   titration period; right?

19   A    Correct.

20   Q    And that normal titration period is directed by Dr. Couch;

21   is that right?

22   A    Correct.

23   Q    What would you do if, in your opinion or in your judgment,

24   more than 10 percent was required to be increased for a patient

25   in a given visit?

1   A   That would be under Dr. Couch's direction.

2   Q   So what would you do in that circumstance?  Would you go

3 find Dr. Couch?

4   A   Dr. Couch would evaluate the patient, yes.

5   Q   And what if Dr. Couch was not present in the office?

6   A   They would not receive an increase in their medications.

7   Q   Was there any other option available to you in that

8 building?

9   A   Dr. Chen was available.

10   Q   And so would you attempt to find Dr. Chen and have him

11 handle that prescription?

12   A   Yes.

13   Q   And if Dr. Chen wasn't available, what would you do?

14   A   They would get a -- if they required a refill of their pump

15 medicines, they would get what the standing prescription was.

16   Q   So it wouldn't be changed?

17   A   No.  They would have to make an appointment and come back.

18   Q   And we didn't discuss this, but I should have.  Did

19 Dr. Couch see these patients every time they visited?

20   A   Not every time.

21   Q   When would Dr. Couch physically see these pain pump

22 patients?

23   A   They would see them -- he would evaluate them if there was

24 an alteration -- altering of their function, level of function,

25 if they had escalating pain, abnormal vital signs.  I would

4937

1   have him evaluate them.

2           THE COURT:  Mr. Willson, is now a good time for our

3   break?

4           MR. WILLSON:  Yes, Your Honor.

5           THE COURT:  All right.  Ladies and gentlemen, leave

6   your pads on your chairs.  Take your break downstairs in the

7   jury assembly room.  No discussion about the case.  We will

8   call you back up in about 15 minutes.

9           We're in recess.

10      (A recess was taken at approximately 3:04 p.m.)

11      (In open court, 3:30 p.m., defendants and jury present.)

12          THE COURT:  All right, Mr. Willson.

13  BY MR. WILLSON:

14  Q   Now, Ms. Dabney, we were talking about the frequency of

15  Dr. Couch's visits with the patients; right?  And did Dr. Couch

16  see the patients personally when they needed a change in their

17  medication?  Is that what you testified to?

18  A   Yes.

19  Q   And about how frequently would that be, if you know?

20  A   It would vary patient to patient.

21  Q   Every patient was different?

22  A   Every patient was different.

23  Q   And it depended on that particular patient when Dr. Couch

24  would need to see them; is that right?

25  A   Correct.

1  Q   I didn't ask you this, Ms. Dabney:  About how many pain

2  pump patients were there at PPSA when you were there?

3  A   I recall my record to be a little over 400, about 440-45.

4  Q   That's just based on your best -- your best recollection?

5  A   My best recollection, yes.

6  Q   Now, Ms. Dabney, the medicines would require a

7  prescription; is that right?

8  A   Correct.

9  Q   How would those prescriptions be filled out?  Would you do

10  that?

11  A   They would be filled out through the electronic health

12  record.  Yes, I would do that.

13  Q   And would you do it ahead of time?  In other words, before

14  the patient's visit?

15  A   Yes.

16  Q   And what would you base that filled-out prescription on?

17  A   Their previous prescription from the previous month.

18  Q   And did Dr. Couch sometimes sign those prescriptions before

19  the visit as well?

20  A   Correct.

21  Q   And when did Dr. Couch get to work in the morning about?

22  A   Anywhere between 9 and 10.  Some days earlier, but 9 and

23  10.

24  Q   When would his first pain pump patients that he needed to

25  see be scheduled?

TAMARA DABNEY - DIRECT BY MR. WILLSON

1   A   Around 10 o'clock.

2   Q   And would Dr. Couch sign prescriptions in the morning when

3   he arrived?

4   A   Yes.

5   Q   And throughout the day, if there weren't prescriptions

6   already signed, would you find Dr. Couch and get them signed?

7   A   Yes.

8   Q   Now, tell us a little bit, tell the jury a little bit about

9   how the work went when the situation you described earlier

10  occurred where the patient needed a prescription of some kind,

11  what would happen with that prescription that you had filled

12  out before the visit?

13  A   It would be destroyed.

14  Q   And tell the jury what you mean by destroyed.

15  A   It would be shredded.

16  Q   And what would you do then?

17  A   The new prescription would be entered into the electronic

18  health record and printed.

19  Q   And printed out?  And what would you do with it then?

20  A   It would be taken to Dr. Couch to be signed.

21  Q   And would you have a discussion with Dr. Couch at that

22  point in time about that prescription and why it was changed?

23  A   That discussion would occur when he changed the medication

24  and initiated that prescription.

25  Q   Okay.  Did you handle the scheduling for Dr. Couch of pain

1    pump patients as well?

2    A    Correct.

3    Q    Tell the jury a little about how you would do that.  Would

4    you coordinate with other personnel in the building, coordinate

5    it with Dr. Couch?  How would you set the schedule for

6    Dr. Couch's pain pump day?

7    A    His -- yes, it was all scheduled around Dr. Couch's

8    schedule for his patients and based upon the patient's duration

9    of their pump fill.

10   Q    And would you discuss that with Dr. Couch from time to

11   time?  In other words, how his schedule was being handled?

12   A    Yes.

13   Q    You said earlier that you did the refills.  Tell the jury a

14   little bit about how a refill happens.  What do you do when you

15   have that patient and you refill their pump?

16   A    The patient comes into the procedure room and they are

17   questioned about how they felt during that time since their

18   last refill, what their pain episodes were like, what their

19   duration was, did their level of function change at any

20   time.  You're looking at how they are dressed, and how they

21   walk, how they are communicating with you.  Are they

22   understanding what you're saying?  They get blood pressure,

23   temperature, pulse, respirations.  Have they been ill?  Have

24   they seen any other physicians?  Are they on any new

25   medications?  All that information was taken in prior to the

1    refill.  And then, if they were continued with no changes in

2    those areas, then their pump was refilled.  And that's done

3    through a sterile procedure.

4    Q   Did anyone ever suggest to you or lead you to believe that

5    there was anything inappropriate about your doing those refills

6    without Dr. Couch in the room with you?

7            MR. BODNAR:  Objection, Your Honor --

8    A   No.

9            MR. BODNAR:  -- as to whether or not it was

10   appropriate.

11           THE COURT:  Overruled.  You can answer.

12   BY MR. WILLSON:

13   Q   Would you like me to restate it?

14   A   Repeat it again, please.

15   Q   Were you ever told or is it your opinion or belief now that

16   there was anything inappropriate about you, as a registered

17   nurse, doing those pain pump refills in the procedure room

18   without Dr. Couch present?

19   A   No.

20   Q   Is that, in your experience, common?

21   A   Yes.

22   Q   In your experience, are there times when a pain pump

23   patient gets a refill in their own home?

24   A   Yes.

25   Q   Tell the jury a little bit about that.  When does that

1  happen?

2  A   If the patient has a mobility issue or they are homebound,

3  we would use a -- we contracted with a company that would

4  provide those home refills.

5  Q   And what sort of a provider would travel to a home to do

6  those refills?

7  A   A registered nurse.

8       MR. BODNAR:  Your Honor, objection to relevance at

9  this point, if it's not being done by someone at PPSA.

10       THE COURT:  I sustain.

11  BY MR. WILLSON:

12  Q   Ms. Dabney, I want to ask you about urine drug screens.

13  Are you familiar with the term?

14  A   Yes.

15  Q   With your pain pump patients, was it your understanding

16  that you had to do a urine drug screen every time they came in?

17  A   No.

18  Q   Were there reasons why it didn't make -- did it make sense

19  to do a urine drug screen with pain pump patients every time

20  they came in?

21  A   Not every single visit, because over a period of time with

22  them they were very -- they proved compliant with their

23  treatment plan.

24  Q   Was it your testimony earlier that in fact they had to see

25  a psychiatrist in order to show they were compliant with this

1    medication regime?

2    A    Correct.

3    Q    Is there a relatively low risk of diversion of medications

4    that are inside the body?

5             MR. BODNAR:  Objection to foundation, Your Honor.

6             THE COURT:  Overruled.

7    BY MR. WILLSON:

8    Q    What are the reasons, as far as you understand, for

9    administering urine drug screens on patients?

10   A    To look for other substances that were not prescribed to

11   them.

12   Q    Is it also a concern -- are you familiar with the word

13   "diversion"?

14   A    Correct.

15   Q    Do you know that word?

16   A    Yes.

17   Q    Is diversion of controlled medicines a -- is there any

18   particular reason why it's less of a problem or more of a

19   problem with pain pump patients?

20   A    It was less common.

21   Q    Do you know these patients better than your typical

22   patients in the clinic?

23   A    I formed a very close relationship with these patients.

24   Q    Had they been under managed -- carefully managed -- opioid

25   care for an extended period of time?

1   A   Yes.

2   Q   Relative to, say, the larger population of pain patients?

3   A   Correct.

4   Q   Ms. Dabney, you've mentioned some medicines that were put

5   into these pumps.  Where were those medicines stored inside

6   PPSA?

7   A   The pump medications were stored in my office.

8   Q   And again, was your office sort of in the front left side

9   of the building?  Is that how you described it?

10   A   Yes.

11   Q   And were the procedure rooms further back in the building?

12   Were they relatively far away from where your office was?

13   A   No, they were directly right with my office, right in the

14   front.

15   Q   What about the compounding room where the medicines were

16   put together?

17   A   That was located in the back of the office.

18   Q   And was there a safe in your office where the medicines

19   were kept?

20   A   Yes.

21   Q   And was there a locked safe?

22   A   Yes.

23   Q   How was it controlled?  How was that -- was there a code?

24   A   There was, yes, a code.

25   Q   And was there any procedure for how to track those

TAMARA DABNEY - DIRECT BY MR. WILLSON

1    medicines?

2    A    Yes.

3    Q    Back to the urine drug screens, I meant to ask you a

4    question that I didn't ask you.  In your opinion as a pump

5    nurse at PPSA, was there any other purpose than the ones we

6    discussed that urine drug screens might serve?

7    A    Yes, it would look at metabolism of the medicines.

8    Q    Would you describe for the jury, explain, educate the jury

9    what that means.

10   A    Well, when the body is utilizing the medication, it's

11   broken down chemically in metabolites, is what that breakdown

12   process is.  And there would be a range, a number range, of

13   those metabolites within the system.

14   Q    And would that drug screen actually return information that

15   was helpful in the diagnostic sense for that patient?

16   A    Yes.

17   Q    And was that an additional benefit of urine drug screens,

18   in your opinion?

19   A    Yes.

20   Q    Or experience rather.  Ms. Dabney, I want to move forward

21   to May of 2015.  We talked about that a bit ago.  Were you

22   present at the Springhill clinic on that day?

23   A    No.

24   Q    Did you at some point soon after -- and that was the day of

25   the raid; is that right?

 1   A    Correct.

 2          MR. BODNAR:  Objection to questions about stuff that

 3   occurred after the raid.  It's after the time period of this

 4   indictment, Your Honor.

 5          THE COURT:  Sustained.

 6   BY MR. WILLSON:

 7   Q    Ms. Dabney, you mentioned earlier the emergency policies --

 8          MR. BODNAR:  Again, objection.  Can we approach, Your

 9   Honor?

10          THE COURT:  Can you come to side bar?  Can you come to

11   side bar?

12       (At the side bar, jury not present.)

13          THE COURT:  Mr. Willson, we are not going to have any

14   testimony about what effect the raid may have had or its

15   aftermath on his patients.  That's not relevant to this case,

16   this trial.

17          MR. WILLSON:  Yes, Your Honor.

18          THE COURT:  So was there some other purpose?

19          MR. WILLSON:  Would you like to hear us on relevance

20   or not, Your Honor?

21          THE COURT:  Well, yeah, if you think it's relevant.

22   But anything that happened after May the 20th I don't think is

23   relevant.

24          MR. WILLSON:  And, Your Honor, we would -- we would

25   say --

 1          THE COURT:  Come closer, if you need to.

 2          MR. WILLSON:  This witness has testified about these

 3   patients in a very carefully managed care.  There have been

 4   pain pump patients who have been opined upon by the various

 5   government experts and this would be relevant to show that this

 6   particular kind of patient was very carefully monitored, as a

 7   matter of course and necessity.

 8          THE COURT:  Well, you've got that.  That is in

 9   evidence.  But what happened to them after the raid is of no

10   consequence to this case.

11          MR. WILLSON:  Yes, Your Honor.

12          THE COURT:  That's my ruling.

13          MR. WILLSON:  Yes, Your Honor.

14      (In open court, defendants and jury present.)

15      (A discussion was held off the record between defense

16   counsel.)

17   BY MR. WILLSON:

18   Q   Ms. Dabney, were some of your pump patients cancer

19   patients?

20   A   Yes.

21   Q   More than one?

22   A   More than one.

23   Q   Were there many?

24   A   Yes.

25   Q   Did you have patients with active cancer diagnoses?

1   A   Yes.

2   Q   Did you have patients with, for lack of a better term,

3   inactive cancer diagnosis?

4           MR. BODNAR:  Your Honor, objection to relevance on

5   this.  Active and inactive cancer was about Subsys, which is

6   not a pain pump drug.

7           THE COURT:  Sustained.

8           MR. WILLSON:  Just a moment, Your Honor.

9           THE COURT:  All right.

10      (A discussion was held off the record between counsel.)

11          MR. WILLSON:  Nothing further at this time.

12          THE COURT:  Any cross?

13          MR. BODNAR:  Yes, Your Honor.

14                      CROSS EXAMINATION

15   BY MR. BODNAR:

16   Q   Good afternoon, Ms. Dabney.

17   A   Good afternoon.

18   Q   This is not the first time you and I have met; is that

19   correct?

20   A   Correct.

21   Q   And in fact, prior to testifying today you have twice been

22   interviewed by the FBI --

23   A   Correct.

24   Q   -- in connection with this case?  And one of the first

25   things I want to go over with you is you had mentioned on

4949

1   direct examination that Dr. Couch saw the patients when the

2   patients needed to be moved up or down on their medication.  Do

3   you remember saying that?

4   A   Correct.

5   Q   But that was not the case all the time, was it?  He did not

6   see the patients when they needed to go up or down all the

7   time?

8   A   Yes, he did.

9   Q   If that was the case, what would the need be to give a

10  standing order for you to make the decision, then, if Dr. Couch

11  was there?

12  A   It was available if it was needed.  But he was there.  He

13  was --

14  Q   He was there every time?  Is that your testimony?

15  A   He was there every -- if a pump adjustment needed to occur,

16  he was there.

17  Q   He was there, so you are telling the jury that there was

18  never a time when he's out of the country or days he's out of

19  the office or just simply sitting in his office that you made

20  the decision about moving the pump up or down 10 percent?

21  A   Correct.

22  Q   That standing order is really irrelevant as to you, because

23  you never did that?  Dr. Couch did it every single time?

24  A   Correct.

25  Q   And what was the date range that you were there?

4950

1   A    Pardon?

2   Q    What was the date range that you were the pump nurse in

3   that office?

4   A    I was there from December 2013 through that May of 2015.

5   Q    So in the time period Dr. Couch was out of the country in

6   2014, nobody had an adjustment on their pumps on those days?

7   A    No pump adjustments were made when he was out of town

8   unless it was made by another physician.

9   Q    So what was the point in the standing order in the first

10  place, if it was never used by you?

11  A    It was a protocol that professionally was in place.  But I

12  always felt more comfortable discussing it with him and double-

13  checking the math.

14  Q    And he came into the room and made the decision each time?

15  A    Yes.

16  Q    And the times, though, that it didn't need to be changed,

17  you made the decision without Dr. Couch being there that it

18  didn't need to be changed; isn't that correct?

19  A    It was based upon the patient's presentation and the

20  patient not wanting any changes.

21  Q    So again, then, it is you making the medical decision that

22  the medication does not need to be changed, that their

23  prescription was the same as it was the past month, that's your

24  decision then?

25  A    The decision is based -- the patient is there for a refill.

1   They had stable vital signs, control of their pain.  There was

2   no requirement to make changes.  If they wanted to see -- if

3   they needed to see Dr. Couch or if they wanted to speak with

4   him, I always asked them:  Do you need to see Dr. Couch today?

5   If the answer was no, we proceeded with the refill.

6   Q   So you decided that the refill was appropriate and no

7   further thing was needed?

8   A   Correct.

9   Q   You mentioned that pain pills were also given, oral pills,

10  along with pain pump.  Do you remember saying that?

11  A   Yes.

12  Q   And on direct you were asked about you taking the scripts

13  to Dr. Couch to get signed?

14  A   Correct.

15  Q   You also saw Justin Palmer sign those prescriptions, didn't

16  you?

17  A   There were prescriptions and some prescriptions,

18  nonnarcotic, that he would sign.

19  Q   So you never told the FBI that you saw Justin Palmer

20  signing prescriptions?

21          MR. WILLSON:  Your Honor, I object to the scope.  It's

22  outside the scope of direct examination.

23          THE COURT:  Overruled.

24  BY MR. BODNAR:

25  Q   You've never told the FBI before that you saw Justin Palmer

 1   signing those prescriptions?

 2   A   I saw Justin Palmer sign prescriptions.

 3   Q   And you saw him sign with Dr. Couch's name?

 4   A   Yes.

 5   Q   So that's different than what you just told us a minute

 6   ago?

 7   A   No.

 8   Q   So you're saying you saw him do noncontrolled substances,

 9   but still sign Dr. Couch's name?

10   A   No.  You asked me did I see Justin Palmer sign

11   prescriptions.

12   Q   And you saw him sign prescriptions?

13   A   Yes.

14   Q   And you said you saw him forge Dr. Couch's name?

15   A   Yes.

16   Q   That wasn't the only concern that you had about Justin

17   Palmer, was it?

18   A   No.

19   Q   In fact, there was medicine that went missing from that

20   safe at a certain point, the safe that was in your office;

21   isn't that correct?

22   A   Correct.

23   Q   And the individuals that had access to that safe were you,

24   Dr. Couch, Dr. Ruan, and Justin Palmer; is that correct?

25   A   That's not correct.

TAMARA DABNEY - CROSS BY MR. BODNAR

1  Q   Justin Palmer, though, did have access to it?

2  A   Justin Palmer did have access.

3  Q   Who else had access?

4  A   Dr. Couch and myself.

5  Q   Okay.  So Dr. Ruan did not have access?

6  A   Dr. Chen also had access.

7  Q   And you knew that Justin Palmer was using drugs while in

8  the office, didn't you?

9  A   I was approached by another employee that they had -- they

10 were suspecting he was using.

11 Q   And in fact do you recall telling the FBI that you saw him

12 with a needle in his arm and brought that to the attention of

13 Dr. Couch?

14 A   I did not visually see him.  Another employee saw him and

15 brought it to my attention, and we went directly to Dr. Couch.

16 Q   So Dr. Couch knew that Justin Palmer was using drugs in the

17 office?

18 A   At that -- when we brought it to his attention.

19 Q   And that wasn't the only employee that you brought to his

20 attention about using drugs in the office.  You also mentioned

21 that you saw Bridgette Parker falling down multiple times?

22 A   Yes.

23      MR. WILLSON:  Your Honor, we object again.  We're

24 proceeding further and further outside the scope of the direct

25 examination at this point.

```
 1              THE COURT:  Well, I overrule it as to what's been
 2    asked.  But let's go back to whatever he was directing the
 3    direct testimony to.
 4    BY MR. BODNAR:
 5    Q   I think I heard you say on direct that you don't recall any
 6    patients getting infections from their pumps or at the site of
 7    the injection?
 8    A   Surgical infection or at the site of injection, no.
 9    Q   You don't recall it or it didn't happen?
10    A   Pardon?
11    Q   You don't recall or it did not happen?
12    A   I do not recall an infection occurring from being injected
13    at the site or at surgical --
14    Q   Was the Dolores Odom one of your patients?
15    A   Pardon?
16    Q   Was Dolores Odom one of your patients?
17    A   Yes.
18    Q   You don't recall any sort of infection at her surgical
19    site?
20    A   She had an infection near the injection site.
21    Q   So you're saying that that's different than --
22              MR. WILLSON:  Your Honor?  And I would restate our
23    objection previously ruled upon by the Court about going beyond
24    the scope of the cross-examination at this point.
25              THE COURT:  Well, this is directly what was asked
```

1    about on direct, so I overrule your objection.

2    BY MR. BODNAR:

3    Q   So you're telling the jury there was a distinction when you

4    said there were no infections?  You didn't mean infections --

5    you meant infections just from implanting the pump; is that

6    what you meant?

7    A   Or from needle puncture into the pump.

8    Q   And that's not what Dolores Odom's infection was from?

9    A   No, sir.

10   Q   Do you remember having to physically move Dolores Odom's

11   infection -- infected area so you could put a needle into her

12   reservoir?

13   A   I did not move the infection site.  But there's a

14   Z-tracking method that you can use to move healthy skin over

15   the top of the pump for injection.

16   Q   And did you get Dr. Couch to come examine Dolores Odom's

17   infected area?

18   A   Yes.

19   Q   And he came in and checked it?

20   A   Yes.

21   Q   Now, you don't have a DEA license, do you?

22   A   No.

23   Q   You've not had one ever?

24   A   Pardon?

25   Q   And you've not had one ever?

1    A    No.

2    Q    So in your previous work prior to coming to PPSA and your

3    work after, have you ever been given the authority to move

4    drugs up or down or decide if a patient stays on the same

5    regime?

6    A    Yes.

7    Q    And where is that?

8    A    In the critical care.

9    Q    And that's in the hospital setting; correct?

10   A    Yes.

11   Q    And you had a written standing order for each patient;

12   isn't that correct?

13   A    Correct.

14   Q    But here you just had an oral order; if you want, you can

15   go up or down 10 percent if the patient wants it?

16   A    There was a written protocol.

17   Q    Where was that?

18   A    It was in a notebook within my office.

19   Q    There was a notebook in your office that had that?

20   A    Yes, yes.

21   Q    Just handwritten?

22   A    No, it was typed out.

23   Q    Do you recall telling the FBI about your concerns about

24   Dr. Couch's compounding?

25            MR. WILLSON:  Objection, Your Honor, to outside the

1   scope of the direct examination.

2          MR. BODNAR:  Your Honor, she was asked about the

3   compounding.

4          THE COURT:  I overrule.

5   BY MR. BODNAR:

6   Q   Do you recall in your meeting with the FBI discussing your

7   concern about Dr. Couch's compounding?

8   A   I had concerns about the room of the compounding.

9   Q   And because you were concerned that it might not be a

10  sanitary place to do compounding; isn't that correct?

11  A   I was concerned about the guide -- regulation guidelines

12  being followed.

13  Q   And that is something that you then raised with Dr. Couch?

14  A   Yes.

15  Q   So he knew he was at least put on notice that you were

16  concerned about that?

17  A   Yes.

18  Q   You talked about giving informed consent to patients and

19  explaining to them what will happen with the pump and how it

20  will work.  Now, that's instructions that you gave the

21  patients; correct?

22  A   That -- yes (nodding head affirmatively).

23  Q   So it wasn't Dr. Couch giving instructions, it was you?

24  A   Dr. Couch gave instructions as well about the function of

25  the pump and how it was -- what medications were used and how

1   it operated.

2   Q   And that's when he saw the patients each time?

3   A   This was before they had the pump implanted.

4   Q   You mentioned attending the Subsys lunches.  Do you recall

5   questions about that on direct examination?

6   A   Yes.

7   Q   And you know that at those Subsys lunches it was you and

8   Natalie Perhacs together; is that correct?

9   A   Pardon?

10  Q   Natalie Perhacs, do you remember who she is?

11  A   Yes.

12  Q   She was there and a lot of other employees of PPSA were

13  there?

14  A   Correct.

15  Q   How often did you go to these?

16  A   Maybe once or twice every couple of months.

17  Q   And in the times you went how often were there outside

18  physicians outside of people that worked at PPSA attending

19  those?

20  A   Probably half the time.

21  Q   Half the time?

22  A   Uh-huh (positive response).

23  Q   And were you aware that he was also receiving not only a

24  free lunch, but thousands of dollars from Insys for those

25  speeches?

TAMARA DABNEY - CROSS BY MR. BODNAR

1   A   I wasn't aware of the dollar amount.

2   Q   But it's your testimony that it was a substantial

3   discussion about Subsys?

4   A   We had discussion -- yes, we had good discussion about

5   Subsys.

6   Q   And by good, you mean more than just five-six minutes?

7   A   Correct.

8   Q   And you were there how often?

9   A   Every couple of months.

10   Q   What kind of stuff would you talk about about Subsys in

11   those substantial conversations?

12   A   We'd talk about patients' function and use of that

13   medicine.

14   Q   And this was a drug you were already using at PPSA?

15   A   Yes.

16   Q   Ms. Dabney, if the records reflected that there were times

17   when Dr. Couch was out of the country during 2013, '14, and '15

18   and the records show that the pumps were moved up and down, in

19   terms of the amount in there, those would be false records,

20   based on your testimony; is that correct?

21   A   I would have to review the records, but yes.

22   Q   So there can only be one of two things; right?  Either they

23   were moved up and down and they were accurate records, or those

24   records in the person's medical file are false; is that

25   correct?

1   A   Correct.

2          MR. BODNAR:  One moment, Your Honor.

3      (A discussion was held off the record between government

4   counsel.)

5          MR. BODNAR:  Nothing further from this witness, Your

6   Honor.

7          THE COURT:  All right.  Mr. Willson?

8          MR. WILLSON:  Yes, Your Honor.

9                    REDIRECT EXAMINATION

10  BY MR. WILLSON:

11  Q   Ms. Dabney, didn't you tell me a short time ago that there

12  were multiple, multiple options available to you, to go up or

13  down on your patients' medicines when Dr. Couch was not

14  present?  Did you tell me that?

15  A   Yes.

16  Q   And was one of those options -- in fact close to the top of

17  the list -- was one of those options having another physician

18  in the building to sign the prescriptions and approve that

19  change?

20  A   Correct.

21  Q   So would you agree with me that it is absolutely not the

22  case that those are false records?

23  A   Correct.

24  Q   Ms. Dabney, the prosecutor asked you a bit about Justin

25  Palmer and about you observing him or coming to know that he

1  was abusing drugs.  Would you tell the jury a little bit more

2  about that situation?  What -- how did you find that out?

3  A   Another employee had come to me and told me what she had

4  seen with Justin, and I said:  Well, let's take this to

5  Dr. Couch immediately.  And we did.

6  Q   Did the two of you go to Dr. Couch?

7  A   The two of us went to Dr. Couch.

8  Q   Did you find him?

9  A   Yes.

10 Q   And did you tell him what your coworker had seen?

11 A   Yes.

12 Q   And would you tell the jury what Dr. Couch's reaction to

13 that news was?

14 A   He was highly upset.

15 Q   When you say he was upset, how did you know?

16 A   He was pacing.  He was upset.  He was, you know, asking

17 questions about what was seen and very concerned --

18 Q   Did he take some --

19 A   -- for Justin.

20 Q   I'm sorry.

21 A   Go ahead.

22 Q   Did he take some action?

23 A   Yes.

24 Q   What did he do?

25 A   He suspended Justin.

1   Q   About when, if you recall, did that episode occur?

2   A   That was in December.

3   Q   About what year?

4   A   '14.

5   Q   And do you recall Justin Palmer at some point of time no

6   longer being employed at PPSA?

7   A   Yes.

8   Q   Do you recall about when that was?

9   A   In January of 2015.

10  Q   The next month?

11  A   Yes.

12  Q   Ms. Dabney, did you know Justin Palmer outside of the

13  office?

14  A   Yes.

15          MR. BODNAR:  Objection to relevance, Your Honor.

16  That's not involved in the workplace.

17          THE COURT:  Sustained.

18  BY MR. WILLSON:

19  Q   Did you suspect, before that incident, did you have any

20  reason to suspect that Justin Palmer was abusing drugs?

21  A   I didn't.

22          MR. WILLSON:  No further questions.

23          THE COURT:  All right.  May this witness been excused?

24          MR. WILLSON:  Yes, Your Honor.

25          THE COURT:  Thank you.  You may step down.

1          THE WITNESS:  Thank you.

2          MR. KNIZLEY:  Judge, as we discussed yesterday,

3   Dr. Ruan would call a witness out of turn.  We discussed it

4   with the prosecution and we wanted to make sure we had no dead

5   time in the case.

6          THE COURT:  All right.

7          MR. KNIZLEY:  Mr. Darley will conduct the examination.

8          THE COURT:  And what is the witness' name?

9          MR. DARLEY:  Amanda Combs, Your Honor.

10                      AMANDA COMBS

11           was sworn and testified as follows:

12          THE WITNESS:  Yes.

13          THE CLERK:  Thank you, ma'am.  Please be seated.

14                    DIRECT EXAMINATION

15   BY MR. DARLEY:

16   Q   Good afternoon, ma'am.

17   A   Hey.

18   Q   Can you introduce yourself to the jury, please?

19   A   I'm Amanda Combs.

20   Q   Ms. Combs, how are you employed currently?

21   A   I work for pain management, Dr. Hall, at Alabama Orthopedic

22   Group.

23   Q   Okay.  And how are you employed there?

24   A   As a medical assistant.

25   Q   Okay.  And at some point in the past you were employed by

AMANDA COMBS - DIRECT BY MR. DARLEY

```
 1   PPSA?

 2   A    Correct.

 3   Q    Right?  What was your position at PPSA?

 4   A    I was a medical assistant.

 5   Q    Were you a medical assistant for any specific physician?

 6   A    Yes.  Dr. Ruan.

 7   Q    Okay.  Do you recall the dates or approximate dates you

 8   were employed?

 9   A    Yes, it was around 2012 to 2015, I believe.

10   Q    Okay.  Do you recall when you left in 2015?

11   A    I believe it was May.

12   Q    May?  Did you lose your job as a result of the raid?

13   A    Yes.

14   Q    Okay.  Did you find employment thereafter?

15   A    Yes.

16   Q    Approximately how long were you out of a job?

17   A    About two months.

18   Q    And is that the job you are currently in?

19   A    Yes, sir.

20   Q    Could you take the jury through a medical assistant's

21   duties at PPSA, specifically for Dr. Ruan?

22   A    Yes.  We would work up a patient.

23            MS. GRIFFIN:  Your Honor, objection as to taking

24   through for a medical assistant.  I don't object if he wants to

25   ask for her.  But I don't think she has the foundation to
```

 1    testify about the other medical assistants.

 2            MR. DARLEY:  I'm sorry.  Let me rephrase the question.

 3    Q   What were your duties as a medical assistant at PPSA for

 4    Dr. Ruan?

 5    A   Okay.  I would call back a patient, work them up, get their

 6    vital signs, ask them how their medication was working.

 7    Q   When you say work them up, could you expand on that or

 8    expound on that a little bit for the jury?

 9    A   I mean, we discussed if they had any medication changes or

10    if they were having any problems with the medication they were

11    currently taking.

12    Q   Are you familiar with what a drug query or a PDMP search

13    is?

14    A   Yes, sir.

15    Q   Would those be -- would that be part of your duties?

16    A   Uh-huh, yes (nodding head affirmatively).

17    Q   Could you tell the jury what you would do when searching

18    someone through this database?

19    A   Yes.  You would put their information in and it would come

20    back with all the narcotics that they had been taking or

21    prescribed.

22    Q   What would you do then with that data?

23    A   We would take it to the nurse practitioner/doctor so they

24    could review it.

25    Q   Okay.  Would you take a computer to them or would you print

AMANDA COMBS - DIRECT BY MR. DARLEY

1   it out?

2   A   We would print it out and bring them the paperwork.

3   Q   To your knowledge, did the nurse practitioners also do drug

4   searches through the PDMP?

5   A   Yes, they had access to it.

6   Q   Okay.  When you worked up -- and you personally -- when you

7   worked up a patient, a patient came to you, what would be the

8   first thing you would do?

9   A   Take their vital signs, get their temperature, pulse,

10  respiration rate.

11  Q   And are you familiar with what a progress note is?

12  A   Yes.

13  Q   All right.  Please tell the jury what a progress note is.

14  A   Usually right now we use an EMR system.  So once we would

15  go in a room with a patient, we would start a template and

16  bring that template over, and basically it just would state

17  what was going on with the patient, the last time they were

18  seen, what medicines they were on.

19  Q   So you would begin -- you would begin a progress note, you

20  would start a template?

21  A   Yes.

22  Q   And were you the first stage in this process?

23  A   Yes.

24  Q   Would other practitioners, to your knowledge, would other

25  practitioners fill in this progress note, contribute to this

1   progress note?

2   A   Correct.  It would start with myself and then go to a nurse

3   practitioner and/or doctor.

4   Q   Okay.  So these progress notes were often filled out in

5   stages, were they not?

6   A   Correct.

7   Q   So if, for instance, I walked into a clinic and you had

8   completed a patient workup and there was a nurse practitioner

9   there meeting with a patient, would the progress note already

10  have some data inputted?

11  A   Yes.

12  Q   The patients that saw Dr. Ruan or you or the nurse

13  practitioner specifically under Dr. Ruan's care, how often

14  would they be seen, how often would they have an appointment,

15  Ms. Combs?

16  A   It just depended.  Most of the time monthly, some two

17  months, some three months.

18  Q   So when a patient was put on a schedule like this, they

19  would come in, they would see different practitioners within

20  the clinic, would they not?

21  A   Yes.

22  Q   Are you familiar with what types of insurance or

23  Medicare/Medicaid or medical health insurance plans the

24  patients you saw or you worked up had?

25  A   Uh-huh (nodding head affirmatively).

1   Q   Do you know -- if you know -- do you know if any of the

2   patients had insurances that didn't require a doctor visit, a

3   doctor seeing them?

4   A   There were some insurances that required them to be seen by

5   the physician only.

6   Q   Okay.  And to those patients that you know that had that

7   type of insurance, did Dr. Ruan see those patients?

8   A   Yes, to my knowledge.

9   Q   Okay.  Now, as you were treating -- well, to your

10  knowledge, if Dr. Ruan did not see a patient, was he consulted

11  on it by you or, if you have knowledge, by a nurse

12  practitioner?

13          MS. GRIFFIN:  I'm going to object to her being asked

14  what somebody else did.

15          THE COURT:  Sustained.  You need to limit your

16  question to what she did.

17          MR. DARLEY:  Yes, ma'am.

18  Q   Did you see nurse practitioners on a daily basis consult

19  with Dr. Ruan?

20  A   Absolutely.

21  Q   Was Dr. Ruan involved in these patients' levels of care?

22  A   Yes.

23  Q   When a patient was examined by you, when you started this

24  examination, Ms. Combs, did your role as a medical assistant --

25  did you have certain procedures that you had to follow?

1   A   Routinely?

2   Q   Yes, ma'am.

3   A   Yes.

4   Q   As part of those routine procedures, were patients drug

5   tested?

6   A   Uh-huh (positive response).

7   Q   Would you, yourself, drug test them, for instance, with a

8   cup test?

9   A   Well, I worked there at -- at first, when I first started

10  with the company, we did -- we were able to do the cups and

11  read the cups.  But they were always sent out for confirmation.

12  Q   Why were they sent out for confirmation?

13  A   Because usually instant cups aren't usually that reliable.

14  Q   Okay.  You've worked in many medical offices, haven't you?

15  Several?

16  A   Several.

17  Q   Is that policy and procedure for those same medical

18  offices?

19          MS. GRIFFIN:  Objection to relevance, Your Honor.

20  A   Yes.

21          THE COURT:  Sustained.

22  BY MR. DARLEY:

23  Q   Did Dr. Ruan utilize pill counts?

24  A   Yes.

25  Q   Could you tell the jury what a pill count is?

1   A   Okay.  Yes.  We would call patients in and tell them to

2   bring the medications that they were taking.  They would come

3   in and we would count the medication that was left over with

4   the patient and make sure they were taking them properly.

5   Q   What would be an indication that the patient was not taking

6   them properly?

7   A   They could be overtaking them, they could be selling them.

8   Q   If you, Ms. Combs, were supervising a pill count and it

9   didn't add up, what would you do then?

10  A   I would notify the nurse practitioner or the doctor and

11  normally they would be terminated.

12  Q   Would every patient be terminated that had a bad pill count

13  or an off pill count?

14  A   Most of them would.  There was an instance I remember where

15  the patient was out of town.  They normally have 24 hours to

16  come in the office or they are terminated.  But the patient had

17  already stated that they were out of town, so we gave them

18  another chance.  They didn't show up, so they were terminated.

19  Q   Yes, ma'am.  Now, was this the only reason why patients

20  were terminated or were there other reasons?

21          MS. GRIFFIN:  Objection.

22  BY MR. DARLEY:

23  Q   If you knew.

24          MS. GRIFFIN:  Object to foundation, Your Honor, her

25  personal knowledge.

AMANDA COMBS - DIRECT BY MR. DARLEY

```
 1              THE COURT:  Yes.  Sustained.
 2    BY MR. DARLEY:
 3    Q   Ms. Combs, you saw these people, you saw these patients'
 4    charts, did you not?
 5    A   Yes.
 6    Q   And you treated these patients routinely, did you not?
 7    A   Yes.
 8    Q   And, to your knowledge, would some of these patients be
 9    terminated?
10              MS. GRIFFIN:  Your Honor, that would be hearsay,
11    rather than her first-hand knowledge.
12              THE COURT:  Sustained.
13    BY MR. DARLEY:
14    Q   Ms. Combs, what are some of the other violations that you
15    yourself saw patients commit, you, yourself?
16              MS. GRIFFIN:  Objection as to relevance, Your Honor.
17              MR. DARLEY:  Judge, if she --
18              THE COURT:  Talking about violations of what?
19              MR. DARLEY:  Violations of the clinic's procedures as
20    patients, whether they violated opioid agreements or any other
21    sort of --
22              THE COURT:  Are you talking about terminations?
23              MR. DARLEY:  Yes, ma'am.
24              THE COURT:  Go ahead.
25    A   Yes, we'd have patients that would violate opioid
```

1    agreements; rather, they would seek out another doctor and

2    would be getting narcotics from another doctor, if they weren't

3    coming up positive for their medication that they should be, or

4    if they were coming up positive for a medication that they

5    should not have been taking.

6    Q    And to your knowledge, was this a routine occurrence?

7    A    Yes.

8    Q    And they would be fired?

9    A    Correct.

10   Q    Now, back to the PDMP, the drug queries, you personally did

11   those, did you not?

12   A    Yes, sir.

13   Q    Did you do them for new patients?

14   A    Yes.

15   Q    Did you do them for followup patients?

16   A    Yes.

17   Q    Were there ever patients that were coming in that you just

18   wouldn't do a PDMP for?

19   A    I mean, you don't necessarily do them at every single

20   visit.

21   Q    But you would do them routinely?

22   A    Yes.

23   Q    And would you do them for patients that you were more

24   concerned with as problem patients?

25   A    Yes.

AMANDA COMBS - DIRECT BY MR. DARLEY

1  Q   Ms. Combs, when patients would appear to the clinic, they

2  were sent to the clinic and you would begin working them up,

3  did you ever give the patients prescriptions?

4  A   You mean after they were signed by the doctor?

5  Q   Yes, ma'am.

6  A   Yes.

7  Q   Did you ever sign the doctor's name?

8  A   No.

9  Q   Dr. Ruan's name?

10  A   I never signed my name, period -- or his name.

11  Q   Did you ever witness a nurse practitioner sign Dr. Ruan's

12  name?

13  A   Never.

14  Q   Who signed Dr. Ruan's prescriptions?

15  A   Dr. Ruan.

16         MS. GRIFFIN:  Objection, Your Honor.  Excuse

17  me.  Objection as to her personal knowledge, of her seeing him

18  sign them rather than a blanket --

19         THE COURT:  Yes.

20  A   To my knowledge.

21         MR. DARLEY:  Ma'am?

22         THE COURT:  You have to ask her about what she had

23  personally seen.

24         MR. DARLEY:  Yes, ma'am.

25  Q   Ms. Combs, did you personally see nurse practitioners and

AMANDA COMBS - DIRECT BY MR. DARLEY

1    Dr. Ruan interact?

2    A   Yes.

3    Q   Okay.  At any of those points did you ever see anyone other

4    than Dr. Ruan sign those prescriptions?

5    A   Never.

6    Q   Ms. Combs, are you aware that onsite, I guess at the

7    Airport location, there was a pharmacy?

8    A   Yes.

9    Q   Was it your responsibility to advise patients where they

10   could fill their medications?

11   A   We would just give them the option.  If it was more

12   convenient for them to go there, they could fill there.  Or if

13   it was more convenient to go to their regular pharmacy, they

14   could choose wherever they wanted to go.

15   Q   Did you ever tell a patient they had to go fill their

16   prescriptions at C&R?

17   A   No, no.

18   Q   As far as prescriptions, Ms. Combs, are you familiar if any

19   type of drug makers provided vouchers or coupons or rebates to

20   aid patients in the cost of these medications?

21   A   Yes, several.

22   Q   Did PPSA, to your knowledge, try to employ those

23   medications for patient use to save them money?

24          MS. GRIFFIN:  Objection as to what PPSA would do.  She

25   doesn't have first-hand knowledge.  There's no foundation for

1    her testimony.

2            THE COURT:  Sustained.

3            MR. DARLEY:  I'll withdraw that question.  May I have

4    one moment, Your Honor?

5            THE COURT:  Yes.

6        (A discussion was held off the record between defense

7    counsel.)

8    BY MR. DARLEY:

9    Q   Ms. Combs, I want to show you what has been previously

10   marked and admitted as Government's Exhibit 13-4.  Ms. Combs,

11   this is your name right here, is it not?  (Indicating.)

12   A   Yes.

13   Q   Can you take a look at that?  Do you recall a patient named

14   Erick Gist?  Or Gist?

15   A   Yes.

16   Q   Can you take a look at that note right there?

17   A   (Reading.)

18   Q   Do you recall that incident?

19   A   Uh-huh (nodding head affirmatively).

20   Q   Do you recall Mr. Gist ever showing for his pill count?

21   A   I don't remember.

22           MR. DARLEY:  One moment, Your Honor, please.

23       (A discussion was held off the record between defense

24   counsel.)

25   BY MR. DARLEY:

4976

```
1  Q   Ms. Combs, when a person would present for a pill count,
2  would you personally do that?
3  A   Uh-huh (positive response).
4  Q   Okay.  And you don't ever recall Mr. Gist coming back for a
5  pill count, do you?
6  A   I really -- I don't remember.
7          MR. DARLEY:  Okay.  Thank you.  Pass the witness.
8          THE COURT:  All right.  Ms. Griffin?  Ms. Griffin or
9  Mr. Bodnar?
10         MR. BODNAR:  I'm just grabbing some stuff, Your Honor.
11         MS. GRIFFIN:  One moment, Your Honor, please.
12         THE COURT:  All right.
13                      CROSS EXAMINATION
14 BY MS. GRIFFIN:
15 Q   Ms. Combs, you were previously interviewed by the FBI; is
16 that correct?
17 A   Yes, ma'am.
18 Q   And that was in July of 2015; is that right?
19 A   I believe.
20 Q   Now, when you said that you worked for Dr. Ruan at the
21 Airport location, you also worked for Dr. Couch some, didn't
22 you?
23 A   Yes, ma'am.
24 Q   And you would not know what was going on with Dr. Ruan when
25 you were at the different location working for Dr. Couch, would
```

1    you?

2    A    Right.

3    Q    In connection with your work, when you said -- you were

4    asked if you did exams, you didn't do any medical exams, did

5    you?

6    A    No, ma'am.

7    Q    You did basic temperature maybe?

8    A    Right; yes, ma'am.

9    Q    But nothing that you would consider a medical exam; is that

10   right?

11   A    Yes, ma'am.

12   Q    In other words, Dr. Ruan wouldn't rely on you to tell him

13   what the examination was of the patient, would he?

14   A    Right.

15   Q    And you said that you did the UDT monitoring, the drug

16   screens?

17   A    Well, UDS cups?

18   Q    Yes.

19   A    When I first started, yes, we did our urine cups.

20   Q    Those were not monitored cups, were they?  In other words,

21   no one monitored the patient giving the urine sample, did they?

22   A    I mean, they went in the restroom and would put the cup in

23   the window and then exit.

24   Q    But there wasn't a monitor that watched to see if the

25   patient that put a cup in the window with urine in it, if that

AMANDA COMBS - CROSS BY MS. GRIFFIN

1   was that patient's urine, was there?

2   A   No.

3   Q   Are you aware that some patients used other people's urine

4   instead of their own?

5   A   I'm sure that happens.  But I don't know of a specific

6   incident.

7   Q   But you wouldn't -- you might have known that had that been

8   monitored; is that right?

9   A   Yes.

10  Q   Now, I think you said you were asked if PPSA took certain

11  types of insurance and Mr. Darley asked you Medicare, Medicaid,

12  several different kinds.  In fact, PPSA would not take Medicaid

13  patients, would they?

14  A   They did take Medicaid as a secondary, if the patient had

15  lost their -- I'm sorry.  They -- they could have Medicaid

16  secondary, and then the only way we would see them primary is

17  if they lost their regular insurance while they were already a

18  patient.

19  Q   And you understand the difference between Medicare and

20  Medicaid, don't you?

21  A   Correct.

22  Q   So if they had their own insurance, they probably wouldn't

23  have Medicaid, would they -- I mean Medicare, would they?

24  A   If they had Blue Cross --

25  Q   Medicaid?

4979

1  A   I'm sorry.

2  Q   If they had their own insurance, they probably would not

3  have Medicaid, would they?

4  A   Uh --

5  Q   Do you know?

6  A   Well, yeah, sometimes they would.  Sometimes they would

7  have two insurances.

8  Q   So you're saying that PPSA would take patients on both

9  Medicare and/or Medicaid?

10  A   The only way we've seen Medicaid only is if they were

11  already a prior patient and they lost their primary insurance

12  and their then primary would be -- if they had Medicaid,

13  primary then.

14  Q   Now, you said you were employed there in 2012.  You

15  actually began in July of 2012; is that right?

16  A   I believe so.

17  Q   And you were there through the raid in May of 2015; is that

18  correct?

19  A   Yes, ma'am.

20  Q   You also claimed that you would print the PDMP for a new

21  patient?

22  A   Yes, ma'am.

23  Q   Did you receive a new patient file from the new patient

24  coordinator before a new patient came back to have their blood

25  pressure checked or their vitals checked?

AMANDA COMBS - CROSS BY MS. GRIFFIN

 1   A   Yeah.  I mean, yes, we would have their paperwork.

 2   Q   And that wouldn't contain a PDMP already in it?

 3   A   I'm not sure.  I've always done my own PDMP for a new

 4   patient, because you want to make sure they are current.

 5   Q   Are you saying that there might be a PDMP already in the

 6   new patient file and you would print another one?

 7   A   I mean, it could possibly.  I don't know.  I didn't thumb

 8   through to see if they already had one in there.

 9   Q   In fact, you don't know everything they did have in that

10   new patient file, do you?

11   A   Not exactly.

12   Q   And you weren't responsible for reviewing the PDMPs, were

13   you?

14   A   I would be responsible for printing them out, but -- and

15   get them to the doctor or nurse practitioner.

16   Q   You weren't responsible for reviewing them, though, were

17   you?

18   A   I mean, I don't know if I would call it a primary role, but

19   I would look over and see what they were taking so I could

20   notify the provider.

21   Q   By provider, do you mean the nurse practitioner?

22   A   If -- if the nurse practitioner was the one seeing the

23   patient, then yes, I would notify them.

24   Q   And the nurse practitioners did see the patients, didn't

25   they?

1   A   Yes.

2   Q   On many occasions, didn't they?

3   A   Yes.

4   Q   And the nurse practitioners would sometimes go to

5   Dr. Ruan's office after or during the patient visit, chat with

6   him, and then go back to see the patient; correct?

7   A   Yes.

8   Q   So those visits Dr. Ruan did not see the patients; isn't

9   that correct?

10  A   I -- I have seen him go with the nurse practitioner back

11  into the room.  He would try to see most of the patients while

12  they were there.  Do I know if he'd seen every single one?  I

13  don't know, because I was at my desk.

14  Q   And you certainly don't know while you were at the other

15  location with Dr. Couch, do you?

16  A   Well, I worked with Dr. Couch when I first started there

17  and then I worked with Dr. Ruan towards the end.

18  Q   When toward the end did you go to work with Dr. Ruan?  Was

19  that when Matt Bean first got hired?

20  A   Yes.

21  Q   So you didn't start working with Dr. Ruan until sometime in

22  late 2014, early 2015?

23  A   Well, no.  In between that time I worked at the front desk

24  as well.

25  Q   Okay.  But when you were an MA for Dr. Ruan, it was when

4982

 1    Matt Bean was there; is that right?

 2  A   Yes, ma'am.

 3  Q   And that was toward the end; right?

 4  A   Okay.

 5  Q   Toward the end of 2014 and '15, until the raid; right?

 6  A   I guess, yes, ma'am.

 7  Q   Okay.  So you don't know what Dr. Ruan was doing about

 8  seeing patients before you were directly assigned to him as an

 9  MA, do you?

10  A   Correct.  No.

11  Q   And you don't know if his procedures changed after Stacy

12  Madison, Bridgette, and Justin left, do you?

13  A   I'm not sure.  I don't know why they would change.  But --

14  Q   You don't know whether they did or not --

15  A   Right.

16  Q   -- because you weren't there with him; is that right?

17  A   Right.

18  Q   Now, you talked to us about that you thought Dr. Ruan

19  signed every prescription.  Do you know what a blank

20  prescription is?

21  A   Uh-huh (positive response).

22  Q   Tell us what that is.

23  A   A prescription with nothing on it.

24  Q   Okay.  I'll show you what's marked as Government's Exhibit

25  3-3 -- these were seized on May the 20th, 2015, from PPSA at

4983

```
 1    Airport -- and ask you -- are you able to see that?  Is it
 2    clear enough for you?
 3    A   I can't see the signature.
 4    Q   Can you see the top, to see that it is a --
 5    A   Yes, ma'am, yes, ma'am.
 6    Q   -- it's a prescription pad, or a prescription; right?
 7    A   Uh-huh (positive response)?
 8    Q   Does it have anything filled in except Dr. Ruan's
 9    signature?
10    A   No.
11    Q   It doesn't have a patient name, does it?
12    A   No, ma'am.
13    Q   Doesn't have the name of the prescription or the
14    directions, does it?
15    A   No, ma'am.
16    Q   And do you know why there were approximately 30 of these in
17    a drawer at that location presigned by Dr. Ruan?
18    A   I do not.  But that doesn't look like Dr. Ruan's signature.
19    Q   You don't think that's Dr. Ruan's signature?
20    A   I think it's similar.
21    Q   You're not suggesting that someone was forging Dr. Ruan's
22    signature, are you?
23    A   I don't -- I just don't recall it looking exactly like
24    that.
25    Q   I'll show you what's marked as Government's Exhibit
```

1  2-3.  These are prescriptions seized from PPSA on Springhill

2  Avenue, and these appear to be presigned prescriptions as well;

3  right?

4  A    Uh-huh (positive response).

5  Q    Again, they don't have the patient's name, do they?

6  A    Right.

7  Q    They don't have an actual drug listed, do they?

8  A    Right.

9  Q    And they are presigned by someone; is that correct?

10  A    By someone, yes.

11  Q    Do you not recognize that as Dr. Ruan's signature?

12  A    It looks like it's similar, but it looks completely

13  different than the last one that you showed me.

14  Q    Do you know if some of these were found in Dr. Ruan's desk

15  drawer, whether or not that would be his signature or not?

16  A    I don't know.

17  Q    You aren't an expert, of course, in handwriting; is that

18  right?

19  A    Right.  No, ma'am.

20  Q    Did you see the various nurse practitioners use these blank

21  scripts to fill in the drugs and the patient name to give

22  prescriptions for Dr. Ruan's patients?

23  A    I've never seen a nurse practitioner sign for Dr. Ruan.

24  Q    So if they were doing that, it wouldn't have been in front

25  of you, is that what you're telling us?

AMANDA COMBS - CROSS BY MS. GRIFFIN

1   A   I've never seen anybody do it.  I don't know.

2   Q   Is that what you're telling us, that it wouldn't be in

3   front of you if that had happened?

4   A   I'm saying I don't know if that happened at all.

5   Q   But if it did happen, you wouldn't have observed it, is

6   that what you're telling us?

7   A   I'm saying they would not do it in front of me, no.

8   Q   Now, tell us.  You said that patients would bring back

9   pills; is that correct?

10  A   Yes, ma'am.

11  Q   Did you know that that was forbidden by DEA, for patients

12  to return pills to the clinic?

13  A   I did not.

14        MR. DARLEY:  Judge, I object.  This is outside the

15  scope of direct.

16        THE COURT:  Overruled.

17  BY MS. GRIFFIN:

18  Q   And you claim that the pills were put in a safe place where

19  nobody could get to them; is that correct?

20  A   As far as I know, yes, ma'am.

21  Q   Were returned?

22  A   Yes, ma'am.

23  Q   Did you know that certain people in the clinic were

24  actually taking and using some of those pills?

25  A   I did not.

1          MR. DARLEY:  Object, Judge.  Your Honor, this is

2    outside of her scope of direct and there's no foundation as far

3    as her personal knowledge.

4          THE COURT:  The question was about her personal

5    knowledge.  So overruled.

6    BY MS. GRIFFIN:

7    Q   Do you have any personal knowledge of people using -- some

8    people within the clinic using some of the returned

9    medications?

10   A   I do not.

11   Q   You don't know whether they did or not, do you?

12   A   I don't know (shaking head negatively).

13   Q   And you knew that the nurse practitioners working for

14   Dr. Ruan were prescribing some of the medications; is that

15   right?

16   A   I knew that they would suggest certain medications and

17   discuss it with Dr. Ruan.

18   Q   Now, you told us that patients were discharged; is that

19   correct; for testing positive?

20   A   Yes, ma'am.

21   Q   Did you, yourself, ever discharge a patient?

22   A   I don't have that authority.

23   Q   So you weren't present when patients were actually told

24   they were being discharged by Dr. Ruan, were you?

25   A   I wasn't in the room, but I've seen them being escorted out

 1    of the building.

 2    Q   But you weren't there to know what was said by the nurse

 3    practitioner when they were terminated, were you?

 4    A   No.

 5    Q   Now, have you previously seen what's contained in

 6    Government's Exhibit 9-5(8), an email from Dr. Ruan about

 7    terminating patients that test positive?  (Indicating.)

 8    A   Are you asking if I've ever seen this before?

 9    Q   Yes, ma'am.

10    A   No.

11    Q   Okay.  Does it say it's from Dr. Ruan?  Is that right?  Is

12    this email from Dr. Ruan?

13            MR. DARLEY:  Your Honor, I object.  She said she's not

14    seen this exhibit.

15            THE COURT:  Overruled.

16    BY MS. GRIFFIN:

17    Q   This email purports to be from Dr. Ruan?

18    A   It has his name on it.  But I don't know if it came from

19    him.

20    Q   You don't know?

21    A   (Shaking head negatively.)

22    Q   And does the email say in part:  In reality we fire

23    patients rather infrequently.  Is that what it says?

24    A   That's what that says, yes.

25    Q   And does it say:  In private practice the more you fire,

```
 1   the more revenue you lose.  Is that what it says?
 2   A   The more revenue you lose, yes.
 3   Q   And you know that revenue means money; right?
 4   A   Right.
 5   Q   And does it say:  Private practice is different.  Another
 6   interesting thing is when one patient tests positive for street
 7   drugs, that gives you more reason to do more frequent urine
 8   drug screens, which pays three times more than an office visit?
 9            Do you see that?
10   A   Yes, ma'am.
11   Q   So that was an email talking about keeping these people
12   that were testing positive, wasn't it?
13   A   Uh-huh (positive response).
14   Q   And does it say there's an incentive for taking care of
15   risk individuals?
16   A   I'm sorry.  Where are you at?
17   Q   Does it say there is an incentive for taking care of risk
18   individuals?
19   A   Yes.
20   Q   So you don't know, until you started working for Dr. Ruan
21   sometime at the end of '14 and into '15, whether patients were
22   being fired by him for testing positive for drugs from the
23   street or not, do you?
24   A   Not before working with him, I don't know.
25   Q   Were you also an MA for Dr. Couch at some point?
```

1  A   Yes.

2  Q   And then you switched over to Dr. Ruan; is that right?

3  A   Yes.

4  Q   And you claim you worked under Matt Bean as the medical

5  assistant?

6  A   For Couch?

7  Q   No.  Who did you work for as a medical assistant?

8  A   I've worked for Matt and Dr. Ruan and I've worked for

9  Couch.

10 Q   You worked for Shanna Harville?

11 A   Huh-huh (negative response).

12 Q   No?  You didn't work with nurse practitioner Shanna

13 Harville?

14 A   No, ma'am.

15 Q   Just with Matt Bean?

16 A   Yes, ma'am.

17 Q   With Dr. Ruan and Matt Bean?

18 A   Yes.

19 Q   So you didn't work with Dr. Ruan at all while Shanna

20 Harville was one of his NPs?

21 A   Yeah, I worked under Dr. Ruan and Matt, but I didn't work

22 for her, no.

23 Q   So Matt Bean was one -- was the nurse practitioner you

24 reported to?

25 A   Yes.

1  Q   And then Matt Bean was a nurse practitioner -- nurse

2  practitioner for Dr. Ruan; is that right?

3  A   Yes.

4  Q   But there were other MAs for Dr. Ruan?

5  A   Yes, Shanna's a medical assistant.

6  Q   And there were other nurse practitioners besides Matt Bean

7  for Dr. Ruan; is that correct?

8  A   Yes.

9  Q   So all three nurse practitioners were seeing patients for

10  Dr. Ruan at the same time; is that right?

11  A   Yes.

12  Q   Three patient rooms busy at one time just for Dr. Ruan?

13  A   Yes.

14       MS. GRIFFIN:  One moment, Your Honor.

15   (A discussion was held off the record between government

16  counsel.)

17       MS. GRIFFIN:  That's all I have of this witness at

18  this time, Your Honor.

19       THE COURT:  All right.  Mr. Darley?

20       MR. DARLEY:  Yes, ma'am, Your Honor.  Just a few.

21                    REDIRECT EXAMINATION

22  BY MR. DARLEY:

23  Q   Ms. Combs, did you switch to being a medical assistant for

24  Dr. Ruan when Matt Bean was hired?

25  A   Yes.

1  Q   Okay.  Ms. Griffin suggested to you that that was late

2  2014.  Do you know when Matt was hired?

3  A   I don't remember.

4  Q   Would it have been early 2014?

5  A   It could have been.  I don't know.

6  Q   But when Matt Bean was hired, that's when you went to work

7  for Dr. Ruan?

8  A   Well, he had a medical assistant before myself for a very

9  short period of time.

10  Q   I want to show you what has already been admitted as

11  Government's Exhibit 2-3.  Ms. Combs, you worked at -- can you

12  tell the jury one more time your time period of working at PPSA

13  generally, just as a whole?

14  A   About three years.

15  Q   Okay.  When did that start?

16  A   I think I started in July of 2012.

17  Q   Okay.  Does the name Peggy Holder mean anything to you?

18  A   Was that a nurse practitioner?

19  Q   Yeah.  Did she work with you at any time there?

20  A   That was before I worked back there.

21  Q   Before.  And Ms. Griffin represented that there were some

22  prescriptions that were found during the raid that shut down

23  the clinic with potentially Dr. Ruan's signature on them there;

24  correct?

25  A   Right.

1   Q   And do you see that name right there?  (Indicating.)

2   A   Yes.

3   Q   It's Peggy Holder's name, isn't it?

4   A   Yes.

5   Q   So if these were found during the raid, we don't know how

6   old they were, do we?

7   A   No.

8   Q   But she was not there when you worked there?  Ms. Holder

9   was not there in 2012, she was already gone?

10  A   Right.

11          MR. DARLEY:  That's all I have.

12          THE COURT:  May this witness be excused?

13          MR. DARLEY:  Yes, ma'am, Your Honor.

14          THE COURT:  All right.  Thank you.  You may step down.

15          THE WITNESS:  Thank you.

16          MR. SHARMAN:  Your Honor, may we approach briefly?

17          THE COURT:  Yes.

18      (At the side bar, jury not present.)

19          MR. SHARMAN:  Your Honor, I will, of course, follow

20  the Court's pleasure.  We have a witness, she is not

21  extraordinarily lengthy, but it will be more than 15 minutes.

22          THE COURT:  We can start with her.

23          MR. SHARMAN:  Do you want to start?

24          THE COURT:  Yes.

25          MR. SHARMAN:  Okay.

4993

```
 1        (In open court, defendants and jury present.)
 2            MR. SHARMAN:  Dr. Couch calls Monica Carroll.
 3                        MONICA CARROLL
 4            was sworn and testified as follows:
 5            THE WITNESS:  I do.
 6            THE CLERK:  Thank you, ma'am.  Please be seated.
 7                      DIRECT EXAMINATION
 8  BY MR. SHARMAN:
 9  Q   Ms. Carroll, my name's Jack Sharman.  Can you tell the jury
10  your name, please?
11  A   Monica Carroll.
12  Q   Ms. Carroll, are you a registered nurse?
13  A   Yes, sir.
14  Q   Where did you go to nursing school?
15  A   Bishop State Community College.
16  Q   And about when did you become a registered nurse?
17  A   1991.
18  Q   Have you been a registered nurse continuously since 1991?
19  A   Yes.
20  Q   Was there a time that you worked at PPSA?
21  A   Yes, sir.
22  Q   And about when did you start at PPSA?
23  A   2015.
24  Q   Does May of 2014 sound about right?
25  A   Yes, yes.
```

1  Q   And when did your employment with PPSA end?

2  A   In June of '15.

3  Q   In June of 2015?

4  A   Uh-huh (positive response).

5  Q   And while you were at PPSA, what was your title there?

6  A   Clinical nurse manager.

7  Q   And did employees report to you?

8  A   Yes.

9  Q   Who or what kind of status of employees reported to you?

10 A   The medical assistants.

11 Q   And to whom did you report?  Who was your boss?

12 A   Debi Phillips, and the physicians at times.

13 Q   All right.  You mentioned the medical assistants.  As part

14 of your duties as clinical nurse manager, did you have any

15 responsibility for continuing medical education for the medical

16 assistants?

17 A   Yes, sir.

18 Q   And generally explain how that continuing education for

19 medical assistants would work.

20 A   Dr. Ruan would send us information.

21 Q   I'm sorry, please, ma'am.  Could you speak up just a little

22 bit?

23 A   Dr. Ruan at times sent in fliers through the email and I

24 would print them out and read them and review them with the

25 employees, and they would read through them and sign off that

1    they read them for updated education.

2    Q   And when you say fliers, do you mean some sort of written

3    or published material?

4    A   Yes, sir.

5    Q   And just an example, do you have an example of either a

6    title or a subject matter of this kind of continuing education

7    material?

8    A   Effects of Pain Management.

9    Q   All right.  As part of your duties as clinical nurse

10   manager, did you come to know that there were safes for the

11   secure storage of medications at PPSA?

12   A   Yes, sir.

13   Q   Was there a safe at the nurses station?

14   A   Yes.

15   Q   Was there one in Dr. Ruan's office?

16   A   Yes, sir.

17   Q   Was there one in Dr. Couch's procedure room?

18   A   Yes, sir.

19   Q   Was there one in the pump room?  That is, where pump

20   procedures were performed?

21   A   Yes, sir.

22   Q   And was there a safe for medications in your office as

23   well?

24   A   Yes, sir.

25   Q   Was access to these safes widely available or only to a few

MONICA CARROLL - DIRECT BY MR. SHARMAN

```
 1   people?
 2           MS. GRIFFIN:  Your Honor, object as to foundation as
 3   to her direct knowledge.
 4           MR. SHARMAN:  I'm just asking her personal knowledge
 5   if she knows.
 6           THE COURT:  All right.
 7   BY MR. SHARMAN:
 8   Q   Was access to these safes widely available or limited to a
 9   few people?
10   A   Limited to a few people.
11           MR. SHARMAN:  May I approach, Your Honor?
12           THE COURT:  Yes.
13   BY MR. SHARMAN:
14   Q   I want to show you, Ms. Carroll, what's been marked for
15   identification as Couch Exhibit 264, which has on the front a
16   cover sheet called narcotic count, and ask you to take a look
17   at 264 for me, please.  (Indicating.)  Do you recognize this
18   document that's been identified as Couch 264?
19   A   That?  (Indicating.)
20   Q   Yes, ma'am, the one I just handed you.  Do you recognize
21   that?
22   A   Yes, sir.
23   Q   And what is that document, what is that collection there?
24   A   Okay.
25   Q   In general.
```

4997

1    A    These are from sign-out logbooks for medications used

2    during treatment on patients.

3    Q    And are these logbooks documents that you became familiar

4    with, reviewed, and from time to time signed during your time

5    at PPSA?

6    A    Yes, sir.

7    Q    And are you generally familiar with their contents,

8    generally?

9    A    Yes, sir.

10          MR. SHARMAN:  Your Honor, Dr. Couch moves in evidence

11    Couch 264.

12          MS. GRIFFIN:  No objection.

13          THE COURT:  All right.  Mark them in.  Mark it in.

14          (Defendant Couch's Exhibit 264 was entered into evidence.)

15    BY MR. SHARMAN:

16    Q    And for time, Ms. Carroll, we won't go through all.  But if

17    you would turn with me to page three?

18          MR. SHARMAN:  And if we could have page three, Sam,

19    published to the jury?

20    Q    All right.  Now, at the top of the page Ms. Carroll, it

21    says Physicians Pain Specialists of Alabama Medication Sign-In

22    and Out Log.  In general what was the purpose of a medication

23    sign-in and out log at PPSA?

24    A    The vials were numbered and there were five -- there were

25    five -- I can't remember exactly how many mls were in a vial,

MONICA CARROLL - DIRECT BY MR. SHARMAN

```
 1   but it was a multi-dose vial.  And they would sign out a vial,
 2   use what they were prescribed, and then if they didn't use the
 3   whole vial that day, they resigned it back in.
 4   Q   So if I understand you, was the purpose of the log to
 5   create a record that would reflect usage and control of a
 6   medication?
 7   A   Yes.
 8   Q   And if you'll look with me at the top of page three here,
 9   it says at the top:  Versed 5 milligram/cc.  Do you see where
10   I --
11   A   Uh-huh (nodding head affirmatively).
12   Q   And you can see it on the screen as well.  Do you see where
13   I read that?
14   A   Yes.
15   Q   So does that mean that this log, for example, is a log
16   reflecting usage of Versed?
17   A   Yes.
18   Q   And then just as an example, if we can go to the first
19   entry, which is 3-16, so would you interpret that to be March
20   16?
21   A   Yes, sir.
22   Q   And then is there a name beside it?
23   A   Yes, sir.
24   Q   And on this example whose name is that?
25   A   Casey Weltlich.
```

4999

```
 1   Q   And then the next column says vial number.  What does that
 2   information provide?
 3   A   All the vials were numbered.  So that was to keep up with
 4   it.
 5   Q   And then there's a column for start count.  What does that
 6   tell us?  What does that information tell us?
 7   A   There were 14 in the safe.
 8   Q   And then there's a column for out count.  What is that
 9   telling us?
10   A   One vial.
11   Q   One vial of what?
12   A   Going out.  They are signing out one vial.
13   Q   And then there's a column for in count.  What is the in
14   count column meant to tell us?
15   A   It's when you add medicine back to the safe.
16   Q   And then remaining count, is that just going to be the
17   difference, if any, between start count and -- I'm sorry -- out
18   count and in count?
19   A   Yes.
20   Q   And then the last column is for initials?
21   A   Yes, sir.
22   Q   And who was to initial the initials column?
23   A   Whoever signed it out and signed it back in.
24   Q   So still sticking with our example here, the vial of Versed
25   was numbered 396; is that right?
```

MONICA CARROLL - DIRECT BY MR. SHARMAN

1    A    Yes.

2    Q    And then there were -- were there 14 units within the vial?

3    Is that how to read this?

4    A    No.  It was, I think, a 10 ml vial -- or 10 cc vial and

5    five ccs -- five milligrams per cc.

6    Q    And then for a procedure or other use, Casey Weltlich

7    removed one of those units from vial 396?  Is that how to read

8    that?

9    A    No.  She removed one bottle, one complete vial.

10   Q    I'm sorry.  Ms. Weltlich removed one bottle from that vial?

11   A    Yes.

12   Q    And then there's an X in the in count column.  What does

13   that tell us?

14   A    She was signing -- she was taking it out, she was not

15   putting it back in.

16   Q    And so what is the purpose of going through that written

17   process?  What does that accomplish?

18   A    To help keep up with the medications.

19          MR. SHARMAN:  All right.  And then, Sam, if you could

20   turn to page 38?

21   Q    Now, Ms. Carroll, page 38 of Exhibit 264 is a similar

22   document.  Do you see where I am there, that says medication

23   sign-in and out log?

24   A    Yes, sir.

25   Q    And, now this one has a heading of Morphine Four

5001

1   Milligram/One Milliliter; is that right?

2   A   Yes, sir.

3   Q   So the earlier page we saw was a log sheet for Versed; is

4   that right?

5   A   Yes, sir.

6   Q   Is this a log sheet for morphine?

7   A   Yes, sir.

8       MR. SHARMAN:  And then, Sam, if we could look at the

9   first line, please?

10   Q   And again, we see the same columns for this morphine log

11   sheet as we saw for the Versed sheet; is that correct?

12   A   Yes, sir.

13   Q   And if you were reading this sheet, would we read the

14   columns in the same way as we did for the Versed sheet?

15   A   Yes.

16   Q   And would the purpose for this log be similar to the

17   purpose for the Versed log; that is to say, knowing where and

18   how much of the medication was moving; is that correct?

19   A   Yes, yes, sir.

20       MR. SHARMAN:  And then, Sam, if we could turn to page

21   41, please?

22   Q   Now, page 41 has a legend at the top that says Physicians

23   Pain Specialists of Alabama PC Narcotics Count Sheet, and then

24   Safe Location:  Springhill.  Do you see where I read that?

25   A   Uh-huh, yes.

5002

1  Q   And so is this log sheet showing us activity in a safe

2  located at the Springhill clinic location?

3  A   Yes, sir.

4  Q   All right.  And then is that your signature down there at

5  the bottom?

6  A   Yes, sir.

7  Q   So here we have four columns:  Drug Name and Strength,

8  Count on Hand, Discrepancy, and Comment.  Do you see where I

9  read those?

10  A   Yes, sir.

11  Q   And since you signed this, what is it that this sheet is

12  telling us?

13  A   At the end of the day to count and see what's onhand.

14  Q   And what is the Discrepancy column telling us?

15  A   If it matches the sign-out sheet or not.

16       THE COURT:  All right.  Mr. Sharman, is now a good

17  time for us to break?

18       MR. SHARMAN:  Your Honor, actually, we might be able

19  to finish, if it's convenient.

20       THE COURT:  Well, we still have to have cross-

21  examination.

22       MR. SHARMAN:  Yes, ma'am.

23       THE COURT:  And redirect after that.  So we're going

24  to go ahead and break.  Ladies and gentlemen, leave your pads

25  on your chairs.  Remember my instructions not to discuss the

5003

1   case or allow anyone to discuss it with you.  Be back

2   downstairs in the jury assembly room tomorrow morning at

3   9 a.m., ready to start back again.  Have a good evening.

4       (A recess was taken from 4:57 to 4:59 p.m.)

5       (In chambers, 4:59 p.m., jury not present.)

6           MR. SHARMAN:  This will be brief, Your Honor.  Your

7   Honor, we just want to bring this to the Court's attention in

8   part because the C.S.O. suggested we do.  Our first witness

9   tomorrow is a man who needs assistance.  And he actually has to

10  be moved and actually speak from essentially a gurney.  He's

11  not lying down.  But as I understand it, he's propped up.  So

12  it will take some extra effort to get him in and presumably he

13  will need some accommodation with the microphone -- sorry --

14  some accommodation with the microphone about that.  But I

15  think, as I understand it, the C.S.O. just wanted to make sure

16  you were aware of that because it will be a little bit more

17  effort than just a normal witness.

18          MS. GRIFFIN:  Your Honor, if this is not one of the

19  named Abstral or Subsys patients that was testified to by Jeff

20  Young, we would object to it being in connection with a good

21  patient or good doctor visit.  And we've not been advised the

22  name of this person, so we don't know that.

23          MR. ESSIG:  Judge, he is an off-label recipient of

24  TIRF medications.

25          THE COURT:  Is he on the list?

```
1              MR. ESSIG:  He's not on the top 28 list, Judge.  But
2   their evidence, of course, in this case and their contention in
3   front of the jury with all of their witnesses throughout the
4   case has been that every off-label prescription of TIRF
5   medications is outside the usual course and not for a
6   legitimate medical purpose.
7              THE COURT:  I hadn't understood that to be the
8   evidence.  So --
9              MR. ESSIG:  Judge, they asked repeated witnesses what
10  the percentage of cancer patients were.
11             THE COURT:  I understand.
12             MR. ESSIG:  They've repeatedly made that argument --
13             THE COURT:  I think that witness would fall into the
14  motion in limine that I've already ruled on.  If they
15  introduced evidence about the witness, then I think surely you
16  could bring the witness in.  But if it's just a witness to show
17  that he was prescribed off label and it worked for him or was
18  great for him, no.
19             MR. ESSIG:  Well, Judge, certainly all of our -- all
20  of our prescriptions of TIRF medications off label, whether the
21  patient is named or not, just based on the volume of
22  prescriptions, there's literally not a prescription, a TIRF
23  off-label prescription, done by our practice that's not in some
24  way covered by the government's evidence in their case in
25  chief.
```

1          MS. GRIFFIN:  Your Honor, the 28 was given for the

2    purpose of the fentanyl -- the statutory limit for them to

3    decide if there was a sufficient weight of fentanyl prescribed.

4    And so I think there is some argument that they could call the

5    people listed on that, the 28 patients.  But I think that's

6    good patient testimony and that that is directly what the Court

7    has previously ruled on.

8          THE COURT:  I think that's correct.

9          MR. ESSIG:  Judge?

10         THE COURT:  I mean, I don't think that -- there's

11   certainly been evidence of cancer versus noncancer.  But I have

12   not understood the government's case to be that all the

13   fentanyl off-label uses are criminal offenses.  So --

14         MR. ESSIG:  Judge, we'll note too that the government

15   in their case in chief called two patients who received TIRF

16   prescriptions off label that were not listed on that.  That was

17   Ms. Barber and Ms. Blanks.  Both of those were well down the

18   list in terms of the volume of fentanyl products, and those

19   patients were brought in specifically for the purpose of trying

20   to prove to the jury and convince the jury that off-label

21   prescribing of fentanyl products is illegal.  And that's been

22   the position they've taken throughout the case with the various

23   insurance representatives they've brought in.  Again, they've

24   made every single prescription an issue in this case.

25         MS. GRIFFIN:  Your Honor, the two that were called, we

```
 1   contend, were outside the usual course and that's why they were
 2   called.  But we have no contention that it is illegal to
 3   prescribe off label for a TIRF drug.  It's illegal to not do it
 4   the way it's supposed to be done, but just the off-label
 5   prescribing of it per se is not.
 6           THE COURT:  Yeah.  So --
 7           MR. SHARMAN:  Your Honor, and I understand the Court's
 8   ruling.  I would ask and take this opportunity to ask the Court
 9   to reconsider its ruling in part on the grounds that we laid
10   out in our trial brief in relying on United States versus
11   Hearn, United States v. Lankford, and United States v.
12   Sheffield in order to be able to put on evidence in our
13   affirmative case that responds to the government's case not
14   only directly to the matters alleged in the indictment, but to
15   make an otherwise misleading impression correct and whole.  So
16   on those grounds I would ask the Court reconsider its earlier
17   ruling and allow us to put on this evidence.
18           THE COURT:  Not this specific one.  Because I don't
19   think that there is a contention made by the government that
20   all off-label use of fentanyl products is prohibited.  So
21   that's my ruling on that.
22           MR. SHARMAN:  Yes, ma'am.
23           THE COURT:  All right.
24           MR. KNIZLEY:  Your Honor, one question procedurally.
25   When we've gotten into Dr. Couch's case, they've called a
```

1    witness and it hasn't been an issue yet because I don't think

2    anyone's touched anything to have anything to do with Dr. Ruan.

3    But does the Court intend to allow Dr. Ruan to have cross-

4    examination?  I understand sometimes it's not totally adverse.

5    But examination of a witness even though it may be called by

6    Dr. Couch, if it in some way touches upon Dr. --

7              THE COURT:  You will need to ask to approach, not just

8    if it touches on Dr. Ruan, but if there's something adverse to

9    Dr. Ruan in the direct examination of that witness.

10             MR. KNIZLEY:  And, Judge, with that ruling, if it is a

11   witness that I would also want to gain information, I should

12   call that witness back in Dr. Ruan's case?  Would that be the

13   appropriate --

14             THE COURT:  No.  You can put on a direct examination

15   after they are through.

16             MR. KNIZLEY:  Okay.

17             THE COURT:  If you intend to call that witness.  But

18   you need to --

19             MR. KNIZLEY:  To advise the Court that that was my

20   intention, I would like to examine the witness as a direct

21   examination witness at this time?  Is that what you're --

22             THE COURT:  Yeah.  But I think you need to provide a

23   list -- you've already provided a list of witnesses, haven't

24   you?

25             MR. KNIZLEY:  Yes, ma'am.

1          THE COURT:  All right.  Yeah, so you need to advise.

2          MR. KNIZLEY:  Like they are duplicative.  Like one of

3     the witnesses they called today was on our list as well.  But

4     it's fine, we didn't need to examine the witness.  But if that

5     comes up such as, tomorrow, Debi Phillips, who was the office

6     manager for the entire practice, I will have some examination

7     of her separate from what they may have.

8          THE COURT:  Just as long as you don't duplicate, you

9     know.  In other words, don't ask --

10         MR. KNIZLEY:  Do you think I would do that, Judge?

11         THE COURT:  Don't ask the same information.

12         MR. KNIZLEY:  That would be a type witness and Boe

13    Strange would be another one and there may be a couple or three

14    more, but depending on who they call.  Should I approach the

15    Court?

16         THE COURT:  Yes, you need to let us know if you intend

17    to do a direct of any witness that they call at the time they

18    call him.

19         MR. KNIZLEY:  And if it happens to be something I

20    would consider cross, advise the Court I consider that and you

21    would limit whatever my examination is, if there was some

22    cross-examination?  If he brings Debi Phillips and she says

23    something bad about Dr. Ruan, okay, and I want to cross-examine

24    her about that?

25         THE COURT:  Well, let's just --

1          MR. KNIZLEY:  Cross that bridge when we come to it?

2          THE COURT:  When we come to it, yeah.

3          MR. KNIZLEY:  As to the direct, just tell the Court

4    I'd liked to directly examine this witness as well?

5          THE COURT:  Right.  Before the government cross-

6    examines.

7          MS. GRIFFIN:  And, Your Honor, Mr. Knizley just

8    mentioned a particular potential witness that we would have to

9    ask the Court to advise of their rights, because he is a

10   target, and we would ask that that part be sealed and that not

11   be discussed outside of this room.  But if Mr. Strange is

12   called, I think the Court -- we are going to have to ask the

13   Court.

14         THE COURT:  Is he going to have a lawyer with him?

15         MR. KNIZLEY:  Yes, probably.

16         THE COURT:  All right.

17         MS. GRIFFIN:  And we'll be glad to talk to that

18   lawyer, if you would like to share that information with us.

19         MR. KNIZLEY:  Jerry Speegle.  Y'all have talked to him

20   before, I believe, haven't you?

21         MS. GRIFFIN:  Not about Strange.  And Mr. Speegle --

22         MR. KNIZLEY:  About the Bayou La Batre case y'all

23   talked to him?

24         MS. GRIFFIN:  I don't know what you're talking

25   about.  Mr. Speegle represented PPSA and there's a conflict

```
 1    with him representing Mr. Strange.

 2           MR. KNIZLEY:  That's his conflict.

 3           MR. SHARMAN:  That's --

 4           MS. GRIFFIN:  I understand that.  I'm just putting it

 5    all on the record.

 6           THE COURT:  All right.  Let me know what you're going

 7    to do when you do it.

 8           MR. KNIZLEY:  Yes, ma'am.

 9        (Court adjourned at approximately 5:07 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```