

1       UNITED STATES DISTRICT COURT
        SOUTHERN DISTRICT OF ALABAMA
2

3  UNITED STATES OF AMERICA
                                     CASE NO. CR15-00088
4  v.
                                     COURTROOM 2B
5  JOHN PATRICK COUCH, M.D.,
   and XIULU RUAN, M.D.,
6                                    MOBILE, ALABAMA

7           Defendants.             THURSDAY, FEBRUARY 9, 2017
   * * * * * * * * * * * * * *
8  REDACTED

9
                        DAY 22 OF TRIAL
10      BEFORE THE HONORABLE CALLIE V. S. GRANADE,
          UNITED STATES DISTRICT JUDGE, AND JURY
11

12

13  APPEARANCES:

14  FOR THE GOVERNMENT:
        DEBORAH A. GRIFFIN
15      CHRISTOPHER BODNAR
        United States Attorney's Office
16      63 S. Royal Street, Suite 600
        Mobile, AL  36602
17      (251) 441-5845

18
    FOR THE DEFENDANT COUCH:
19      ARTHUR T. POWELL, III
        P.O. Box 40456
20      Mobile, AL 36640-0456
        (251) 433-8310
21
        JACKSON R. SHARMAN, III
22      ROBERT JACKSON SEWELL
        JEFFREY PAUL DOSS
23      BENJAMIN SANDERS WILLSON
        Lightfoot, Franklin & White
24      400 North 20th Street
        Birmingham, AL  35203
25      (205) 581-0700

1    (Continued)

2        BRANDON KEITH ESSIG
         800 Shades Creek Parkway, Suite 600D
3        Birmingham, AL  35209
         (251) 879-1981

4
     FOR THE DEFENDANT RUAN:
5        DENNIS J. KNIZLEY
         7 N. Lawrence
6        Mobile, AL 36602
         (251) 432-3799

7
         JASON BRADLEY DARLEY
8        Darley & McGough, LLC
         1751 Dauphin Street
9        Mobile, AL 36604
         (251) 441-7772

10
         STEVEN D. MARTINIE
11       4955 North Lake Drive
         Whitefish Bay, WI  53217
12       (414) 332-9683

13   THE CLERK:  MARY ANN BOYLES
     THE LAW CLERK:  LYNN DEKLE
14   U.S. ATTORNEY IT:  BRIAN COCHRAN
     DEFENSE IT:  SAM McALLISTER
15   COURT REPORTER:  ROY ISBELL, CCR, RDR, CRR

16           Proceedings recorded by OFFICIAL COURT REPORTER
             Qualified pursuant to 28 U.S.C. 753(a) & Guide to
17    Judiciary Policies and Procedures Vol. VI, Chapter III, D.2.
             Transcript produced by computerized stenotype.

18

19

20

21

22

23

24

25

1                        EXAMINATION INDEX

2

NANCY BISHOP
3        DIRECT BY MR. SEWELL . . . . . . . . . . . . . 5019
         DIRECT BY MR. KNIZLEY . . . . . . . . . . . . . 5027
4        CROSS BY MR. BODNAR . . . . . . . . . . . . . . 5034
         REDIRECT BY MR. SEWELL . . . . . . . . . . . . .5037
5        REDIRECT BY MR. KNIZLEY . . . . . . . . . . . . 5039

6   DEBORAH SUE "DEBI" PHILLIPS
         DIRECT BY MR. ESSIG . . . . . . . . . . . . . . 5040
7        DIRECT BY MR. KNIZLEY . . . . . . . . . . . . . 5106
         CROSS BY MS. GRIFFIN . . . . . . . . . . . . . . 5113
8        REDIRECT BY MR. ESSIG . . . . . . . . . . . . . 5140
         REDIRECT BY MR. KNIZLEY . . . . . . . . . . . . 5147

9

10  ANGELA CHRISTY
         DIRECT BY MR. DOSS . . . . . . . . . . . . . . .5152
         DIRECT BY MR. DARLEY . . . . . . . . . . . . . 5171
11       CROSS BY MS. GRIFFIN . . . . . . . . . . . . . 5172
         REDIRECT BY MR. DOSS . . . . . . . . . . . . . 5190
12       REDIRECT BY MR. DARLEY . . . . . . . . . . . . .5194

13

14

15

16

17

18

19

20

21

22

23

24

25

5014

```
 1                        EXHIBIT INDEX

 2                                                        MAR  ADM
      GOVERNMENT'S
 3      43    Email chain Ethridge/Phillips to Ruan        5121
              12/14/12 - self-pay visits
 4

 5

 6    DEFENDANT COUCH'S
        187   Patient files from PPSA for Douthitt, Byrd,  5155
 7            & Diminiguez - file from old Medscan files
              and electronic Greenway files (subject to
 8            relevance objections)

 9      266   Summary of PDMP database queries 1/1/2011 -  5023
              12/5/2016, searches by Dr. Couch
10
        267   PDMP database queries 1/11/2011 -            5023
11            12/5/2016, searches by Dr. Couch

12

13
      DEFENDANT RUAN'S
14      184   PDMP database queries 1/11/2011 -            5028
              12/5/2016, searches by Dr. Ruan
15
        185   Summary PDMP database queries 1/1/2011 -     5032
16            12/5/2016, searches by Dr. Ruan

17

18

19

20

21

22

23

24

25
```

```
 1          (Morning session, 9 a.m., in chambers, jury not present.)

 2          MR. BODNAR:  Good morning, Your Honor.

 3          THE COURT:  Good morning, good morning.

 4          MR. SHARMAN:  Good morning.

 5          THE COURT:  I hope all of you are staying healthy.  I

 6   understand we've lost a juror.

 7          MR. DARLEY:  What?

 8          THE CLERK:  One of the jurors got sick.

 9          THE COURT:  Juror number three, who was coughing and

10   hacking yesterday, he came in this morning but he had chills

11   and fever, so we sent him home, because we didn't want him

12   infecting the rest of the jury.  So there's the lady on the

13   first row, then the second juror who's first in the box, then

14   the next juror to him, light-skinned black male.

15          MR. DARLEY:  Yes, ma'am, that's him.

16          MR. SHARMAN:  Your Honor, we wanted to apprise the

17   Court of a little bit of a scheduling issue.  The good news is

18   it doesn't impact the overall schedule.  Two things:  One,

19   Dr. Couch had a full day set for yesterday.  In light of the

20   Court's ruling with regard to that patient, that also impacted

21   two others.  So last night we were hustling around to readjust.

22   but in all candor, I predict that we will be doing well -- that

23   is, Dr. Couch -- to go to 3 o'clock realistically.  Things can

24   happen, but realistically I would expect that.  Plus the

25   witness who is on the stand, Ms. Carroll, was in a car wreck on
```

5016

```
 1   the way to the courthouse.  She's in the ER somewhere.  I'm not
 2   sure where, nor am I sure of her condition.  So we will start
 3   in -- we have no choice -- but with the next witness.  So I
 4   would have to ask the Court's indulgence probably this
 5   afternoon, at least from Dr. Couch's perspective, that we
 6   probably won't make it.  I know that the Court was kind enough
 7   to give the government some leeway.  We're not asking for
 8   anything like that.  You know, we're talking probably hours,
 9   not days.  But we are in that position.
10          THE COURT:  Okay.  And so what is scheduled for
11   tomorrow?  Do you have that set up yet?
12          MR. KNIZLEY:  Dr. Gudin, he's here's.  Gordon is with
13   him all day today.  He will be the first witness tomorrow.  We
14   don't know how long he will last -- probably afternoon, I would
15   think.  I know the Court had to leave a bit early.  But we will
16   have a witness to fill in the time frame after, up until the
17   time --
18          THE COURT:  I think I need to leave by 4 to be at
19   Foley at 5:30.
20          MR. KNIZLEY:  If Dr. Gudin does not last that long,
21   then I will have a witness to take up the rest of the time.
22          THE COURT:  You don't want to hold Dr. Gudin over the
23   weekend.
24          MR. KNIZLEY:  No, ma'am.  We want to get him over
25   with, if at all possible, Friday.
```

5017

```
1              THE COURT:  Okay.

2              THE COURT:  Anything else?

3              MR. SHARMAN:  No, ma'am.  I think that it's --

4              MS. GRIFFIN:  Do y'all want to talk about next week?

5              MR. SHARMAN:  I believe -- and Mr. Knizley or anybody

6    could correct me -- but I believe, as I mentioned, this doesn't

7    affect the overall projection of the schedule I think

8    Mr. Knizley may have shared the day before yesterday, that in

9    all likelihood, after Dr. Rauck, who is our second and last

10   expert testifies on Tuesday, and then after Dr. Gharibo, who is

11   Dr. Ruan's second and last expert testifies on Wednesday, that

12   should be essentially the end of the case, unless either

13   Dr. Couch or Dr. Ruan elect to testify.  If they do, and

14   assuming both of them do, my expectation would be at the latest

15   the case would be over is by the end of the day on Friday, at

16   the outset.

17             THE COURT:  Okay.  Assuming they don't testify and

18   we're through with testimony on Wednesday, what is your

19   proposed schedule for -- I mean, you know obviously we have to

20   have a charge conference and get a draft of the jury charge

21   together before we do that.  But how long are you expecting

22   right now to take with the final closings?  I'm just -- we've

23   got this --

24             MR. SHARMAN:  Holiday on Monday.

25             THE COURT:  Yes, we've got this holiday weekend coming
```

5018

```
 1    up and I don't want to split up closings if we don't have to.
 2            MR. SHARMAN:  I don't believe anybody wants to do
 3    that.
 4            MS. GRIFFIN:  No, ma'am.
 5            THE COURT:  So have you thought about how long you're
 6    going to need?
 7            MS. GRIFFIN:  Your Honor, we would request two hours
 8    because of the length of the trial and the detailed information
 9    that's in the various exhibits.
10            MR. BODNAR:  And split that between the first and
11    second one; correct.
12            MS. GRIFFIN:  Yes, two hours total.
13            MR. KNIZLEY:  We would want to request an hour and a
14    half for Dr. Ruan.
15            MR. DOSS:  An hour to hour and a half for Dr. Couch.
16            THE COURT:  Okay.  That gives me an idea.  So thank
17    you.
18            MR. SHARMAN:  Yes, ma'am.
19            MS. GRIFFIN:  Thank you.
20            THE COURT:  Anything else we need to talk about?
21            MR. SHARMAN:  (Shaking head negatively.)
22            THE COURT:  Do you want me to tell the jury that the
23    witness that was on the stand when they left had an accident
24    and we don't know her status yet?
25            MR. SHARMAN:  I think something short and neutral like
```

1    that would be appropriate.

2              THE COURT:  Okay.  All right.

3              MR. BODNAR:  Thank Your Honor.

4              THE COURT:  Thank you.

5         (A recess was taken at approximately 9:11 a.m.)

6         (In open court, defendants and jury present.)

7              THE COURT:  Good morning, ladies and gentlemen.

8              As you can see, we are one less juror today.  And I'm

9    frankly kind of amazed that all of you have lasted this long,

10   as this has been a long, long trial.  But we have sufficient

11   jurors to continue on.

12             I apologize for bringing you up late this morning, but

13   we had another problem in that the witness who was on the stand

14   yesterday afternoon had an accident coming in to the courthouse

15   this morning and we don't know her status at this time or

16   whether she will be able to continue with her testimony.  So

17   we're going to proceed with another witness at this time.

18             All right, Counsel.

19             MR. SEWELL:  Dr. Couch calls Nancy Bishop, Your Honor.

20                        NANCY BISHOP

21        was resworn and testified further, as follows:

22        THE WITNESS:  I do.

23        THE CLERK:  Thank you, ma'am.  Please be seated.

24                      DIRECT EXAMINATION

25   BY MR. SEWELL:

5020

 1   Q    Good morning, Ms. Bishop, and welcome back.

 2   A    Thank you.

 3   Q    Can you remind everybody or tell everybody your name again,

 4   please?  Just --

 5   A    Nancy Bishop.

 6   Q    And can you remind everybody of where you work and what you

 7   do, please?

 8   A    Yes.  I work for the Department of Public Health.  I'm the

 9   state pharmacy directory and manage the Prescription Drug

10   Monitoring Program.

11   Q    And can you remind us again what exactly the Prescription

12   Drug Monitoring Program or PDMP is?

13   A    It's a database of controlled substances dispensed in

14   Alabama.

15   Q    And you testified earlier in this case; correct?

16   A    I did.

17   Q    And you testified about the data that's collected in the

18   PDMP; correct?

19   A    I did.

20   Q    Okay.  What other information does the PDMP keep records

21   of?

22   A    Well, it's a database of controlled substances dispensed.

23   So it keeps the information about the prescription, all the

24   information is about the prescription, and it lists the

25   dispenser and the prescriber of those medicines.

NANCY BISHOP - DIRECT BY MR. SEWELL

1  Q   And this is a database that can be searched for results;
2  correct?
3  A   That's correct.
4  Q   Does the PDMP keep track of whenever someone searches the
5  PDMP?
6  A   It does.
7  Q   When a doctor searches the PDMP or when somebody searches
8  the PDMP, can you kind of explain how that search works?
9  A   The dispenser or prescriber would sign into the database
10 using their unique user ID and password.  They would enter the
11 patient's -- we call them recipients -- demographic information
12 such as first name, last name, date of birth.  Those are the
13 required fields.  But they can also add address, Social
14 Security number, driver's license number, and they can enter up
15 to three alias names and addresses to capture any nicknames or
16 something that the patient would go by.
17 Q   And when they enter all that information and click search,
18 what will that person that's doing the search see?
19 A   They will see any controlled substance medications that was
20 dispensed to that patient within the time frame of their search
21 that they put in.
22 Q   Will that show them the medication that was prescribed
23 them?
24 A   It would.
25 Q   Will it show them how much medication was prescribed?

5022

1    A   It would.

2    Q   Will it show the doctor or person that prescribed them that

3    particular medication?

4    A   It would.

5    Q   Will it show them where they got that prescription filled?

6    A   It would, the dispenser.

7           MR. SEWELL:  Your Honor, may I approach the witness?

8           THE COURT:  Yes.

9    BY MR. SEWELL:

10   Q   Ms. Bishop, I'm going to show you a couple of

11   documents.  First I'm going to show you a document labeled

12   Couch Exhibit 267 and ask if you recognize that.

13   A   I do.

14   Q   Can you tell us what that is, please?

15   A   This is a list of the searches done by Dr. Couch.

16   Q   And I'm going to show you what's been marked as Couch

17   Exhibit 266 and ask if you recognize that.

18   A   I do.

19   Q   Can you tell me what that is?

20   A   That is a summary of the searches, giving the report name

21   and the number of requests.

22   Q   And these are records of the Alabama Department of Public

23   Health and the PDMP?

24   A   It is.

25          MR. SEWELL:  Your Honor, Dr. Couch offers Exhibits 266

1    and 267.

2            MR. BODNAR:  No objection, Your Honor.

3            THE COURT:  All right.  Mark them in.

4        (Defendant Couch's Exhibits 266 and 267 were marked for

5    identification.)

6            MR. SEWELL:  I'll let you hold on to those for right

7    now.  And, Mary Ann, can you swap over to Sam, please?

8    Okay.  And actually, can we look at Couch Exhibit 267 first?

9    Q    Okay.  Ms. Bishop, can you just kind of explain what all we

10   are seeing, just highlighting these first few lines, and tell

11   us where it lists kind of what each of these columns can tell

12   us.

13   A    The sequence number is the number generated by the

14   database.  And it just -- it's just a record number really of

15   that search.

16           The date the search was done.  And the By column is

17   the person who did the search.  It is our user IDs of the

18   regulatory board followed by the license number.  And so this

19   particular person's regulatory board is the Board of Medical

20   Examiners.  So it's BME and then the license number.

21           And Detail is really the description of the report.

22   It just is an ad hoc query, which means it was done by the user

23   at a certain time.

24   Q    Looking at the top, this report runs from January 1st,

25   2011, to December 5th, 2016.  Is that the time frame that you

1   searched for these results?

2   A   Can you repeat that, please?

3   Q   When you created this spreadsheet or looked at these

4   results, is that the time frame that you searched for the

5   number of searches run under Dr. Couch's user name?

6   A   It is.

7   Q   And we see -- what is the date of the first entry right

8   there?

9   A   January 3rd, 2011.

10  Q   So that's the first entry in this time frame that you

11  searched?

12  A   That is correct.

13        MR. SEWELL:  Sam, can we go to the last page of that?

14  100?

15  Q   And we look down to the bottom, and what is the date of the

16  last entry?

17  A   October 3rd, 2013.

18  Q   So based on your review of the records, that's the last

19  time that Dr. Couch's user name was used for a search in that

20  time frame?

21  A   That is correct.

22  Q   You don't know why it stopped on that date?

23  A   I do not.

24        MR. SEWELL:  Can we look now at Couch 266, please?

25  Q   Ms. Bishop, can you explain to us and the jury what this

1    chart is showing us?

2    A   This is the ID that was used and the report name and the

3    number of requests.  It's basically a summary of the hundred

4    pages that we just discussed.

5    Q   Okay.  And can you tell us what each of these rows tells

6    us?

7    A   Yes.  The user ID bme20444 had 53 ad hoc reports and 4,482

8    doctor queries, which is really the same thing.  Our system

9    used a different nomenclature at one point, and so really those

10   are the same type search.

11          The interstate, the third -- the fourth line,

12   interstate report is when they use the multi-state query, which

13   we share data with Kentucky and Maine.  So they searched --

14   they went to the multi-state query and could have searched

15   Alabama, Kentucky, and Maine through that.

16   Q   And based on this chart, how many total searches were done

17   with Dr. Couch's user ID?

18   A   4,550.

19   Q   And we've already established in Couch 267 that that time

20   frame, even though you search for a broader time frame, it's

21   really from January 3rd, 2011, to October 3rd, 2013; correct?

22   A   Correct.

23   Q   Do you know how many business days there are in that time

24   frame?

25   A   I do not.

1    Q    If I told you this number was 695, do you have any reason
2    to dispute that?
3    A    No.  There's 52 weeks in a year.  So five business days, I
4    would --
5    Q    And does a business day to you mean Monday through Friday,
6    excluding public holidays?
7    A    It does.
8    Q    Okay.  Do you mind helping me out with doing a little math
9    today, please?
10            MR. SEWELL:  And, Mary Ann, could we have the ELMO,
11    please?
12    Q    Okay.  I'm going to try and do a little bit of math.  So
13    we've already talked about that there were 400 -- and pardon my
14    third-grade handwriting -- 4,550 searches under Dr. Couch's
15    name and there were 695 business days in that time frame;
16    correct?
17    A    Correct.
18    Q    Okay.  So would I be correct, do you think, if we divided
19    that 4,550 by the 695, we should get about the average number
20    of searches per business day?
21    A    That is correct.
22    Q    Okay.  So let's do that.  4,550 divided by 695.  Does it
23    look like I did that correctly to you?
24    A    It does.
25    Q    Okay.  Does that number come out to about six and a half

 1   searches per business day?

 2   A   It does.

 3   Q   So if I've done my math correctly, Dr. Couch's user ID for

 4   the PDMP was used to search patients six and a half times on

 5   average per day in that time frame?

 6   A   Yes.

 7          MR. SEWELL:  No further questions at this time, Your

 8   Honor.

 9          THE COURT:  Mr. Knizley, are you going to question?

10          MR. KNIZLEY:  Yes, ma'am.

11          THE COURT:  All right.

12                        DIRECT EXAMINATION

13   BY MR. KNIZLEY:

14   Q   Good morning, Ms. Bishop.

15   A   Good morning.

16   Q   Ms. Bishop, as the counsel for Dr. Couch, I asked you -- I

17   subpoenaed some documents from you?  Is that correct?

18   A   That is.

19   Q   And do you recall what I subpoenaed from you, what I was

20   asking for?

21   A   Not specifically.

22   Q   Okay.  If I told you I was asking for Dr. Ruan's hits under

23   a particular --

24   A   Searches.

25   Q   -- pass code that seemed to be assigned to him for a

 1   certain time frame, is that what I asked you to get for me?

 2   A   Yes, it is.

 3   Q   I'm going to show you what's marked as Ruan's Exhibit 184.

 4        MR. KNIZLEY:  If I may approach the witness, Your

 5   Honor?

 6        THE COURT:  Yes.

 7   BY MR. KNIZLEY:

 8   Q   Ms. Bishop, if you would look at Ruan Exhibit 184, take a

 9   few moments and see if that is what you produced in response to

10   the subpoena.

11   A   It is.

12        MR. KNIZLEY:  Judge, we'd offer Ruan's Exhibit 184.

13        MR. BODNAR:  No objection, Your Honor.

14        THE COURT:  All right.  Mark it in.  Is that for the

15   same time frame as Couch's?

16        MR. KNIZLEY:  It's a different time frame, Judge.  I

17   think I can explain that through her.

18     (Defendant Ruan's Exhibit 184 was entered into evidence.)

19   BY MR. KNIZLEY:

20   Q   Ms. Bishop, now I'm showing you what has been marked into

21   evidence as Ruan's Exhibit 184.  And do you see at the top it

22   says PDMP searches from January 1, 2011, through May 31, 2015,

23   for Dr. Ruan's license number, 25262.  Do you see that?

24   A   Yes, sir.

25   Q   And could you tell the ladies and gentlemen of the jury

1    again what this information means to you as when you run the

2    PDMP check?

3    A    When I run the PDMP, we call it an audit trail to capture

4    the searches done.  I search it by license number.

5    Q    And is that Dr. Ruan's license number?

6    A    It is.

7    Q    And then once you search by license number, there's a

8    password, I think they have to have, to get into the system; is

9    that right?

10   A    Each user has a unique user name and password.

11   Q    Okay.  This, by doing this search under this number, it's

12   going to tell you however many searches under Dr. Ruan's

13   license number was made for that time frame; is that right?

14   A    It is.

15   Q    And I note that although the top says January 1, 2011, the

16   first date is October 7, 2013, do you see that?

17   A    Yes, sir.

18   Q    Could you explain to the jury why that is, if you know?

19   A    I don't know.  We couldn't find -- I could not find any

20   searches prior to that under his user ID.

21   Q    And did you see Dr. Ruan's counsel saying that -- excuse

22   me -- Dr. Couch's counsel saying that he had a great deal

23   before that time?  Did you see that?

24   A    Yes, sir.

25   Q    Did it seem to swap over about that time frame?

NANCY BISHOP- DIRECT BY MR. KNIZLEY                                                     5030

1    A    It did.

2    Q    So it seemed like what we just saw from Dr. Couch would

3    have been previous to this day; is that right?  (Indicating.)

4    A    That's right.

5    Q    And we start with October 7, 2013, and does the dates just

6    follow sequentially all the way to the end of your search

7    period?

8    A    It does.

9    Q    Okay.  So this would be -- the first date you found this

10   within the time frame until the last date you found within that

11   time frame?  (Indicating.)

12   A    That's correct.

13   Q    Now, you had some questions from Mr. Sewell about various

14   totals.  And the number is what the number is.  But if I told

15   you that was approximately slightly more than 7,000 entries,

16   would that sound about right?

17   A    That is.

18   Q    Have you counted them, by any chance?

19   A    I do -- when I ran it, I remember seeing the lines on the

20   Excel spreadsheet.

21   Q    And what do you recall it adding up to?

22   A    It was in the 7,000 range, but I can't remember

23   specifically.

24   Q    What that tells the jury is from October 7, 2013, until

25   August 31, 2015, the PDMP searches under this license number

5031

```
 1   were just over 7,000?

 2   A   That's correct.

 3   Q   Is that correct?

 4   A   That's correct.

 5   Q   And just by way of example, if you're looking at the very

 6   first day here, 10/7/2013 -- and I went down it and that looks

 7   to be about 20.  Excuse me.  Yeah, does 20 sound fair on that

 8   day?

 9   A   (Pause.)  It is 20.

10   Q   Okay.  And the next day, the 8th, my count was 17.  Does

11   that sound about fair?

12   A   (Pause.)  There are 17.

13   Q   The 4th of August, 2014, if you will look here?

14   A   What date was that?

15   Q   August 4th, 2014?

16   A   Uh-huh (positive response).

17   Q   All right.  We go to this column.  And then on the next

18   date it appears to go all the way out to the end of the page?

19   A   Yes, sir.

20   Q   My count was 55 on that day?

21   A   I didn't count them, but it's quite a few.

22   Q   It's about that amount?  And the last one I'd like to show

23   you is January 19th, 2015, starting here.  It takes that page,

24   it takes the entirety of the next page, and ends up here on the

25   third page?  (Indicating.)
```

1    A    (Nodding head affirmatively.)

2    Q    And I know you haven't counted those.  My count says 82.

3    Does that sound a fair enough amount of entries there?

4    A    It would.

5         MR. KNIZLEY:  No further questions.

6         Judge, again, maybe by way of clarification, if I

7    could show her one more thing?

8         THE COURT:  All right.

9    BY MR. KNIZLEY:

10   Q    I'm going to show what's marked as Ruan's Exhibit

11   185.  That --

12        THE COURT:  Are you offering this?

13        MR. KNIZLEY:  I would, Your Honor.  I'd offer Ruan's

14   Exhibit 185, which purports to be a summary of the search and

15   the numbers that she used.

16        THE COURT:  All right.  Any objection?

17        MR. BODNAR:  No objection, Your Honor.

18        THE COURT:  All right.  Mark it in.

19      (Defendant Ruan's Exhibit 185 was entered into evidence.)

20   BY MR. KNIZLEY:

21   Q    And, Ms. Bishop, does this appear to be the summation, if

22   you will, of the searches you did under this license number?

23   A    Yes.

24   Q    Does that sound correct?

25   A    Uh-huh (positive response).

1   Q   And these numbers -- these letters over here, is that some

2   of the various passwords that can be used for that license

3   number?

4   A   Those are the report names.

5   Q   Report names?

6   A   Right.

7   Q   Could you tell the ladies and gentlemen of the jury again

8   what the first name was up here?

9   A   The doctor query, is that what you're referring to?

10  Q   Yes, ma'am.  Under queries --

11  A   Right.  That's a search, that's a doctor -- a query is a

12  search -- so a doctor search for his recipient or his patient.

13  And the ad hoc report is just a different name for that.

14  Again, our system just changed the nomenclature.

15  Q   Okay.  And what's the last one here?

16  A   Interstate, that's when they used the multi-state query to

17  search adjoining states or various states.

18  Q   Two document queries of 5,787 and 1,314, as you said, that

19  seems to be a little more than 7,000 for that part?

20  A   That's correct.

21  Q   And the out of state is another one; is that correct?

22  A   That is correct.

23          MR. KNIZLEY:  That's all we have for this witness,

24  Your Honor.

25          THE COURT:  Mr. Bodnar?

5034

1                          CROSS EXAMINATION

2    BY MR. BODNAR:

3    Q   Welcome back, Ms. Bishop.

4    A   Thank you.

5    Q   I'm Chris Bodnar for the United States.  I just have one

6    clarifying question first.  On the exhibit Ruan's Exhibit 184

7    that was just shown to you --

8    A   Yes?

9    Q   -- at the top what is the date range that this says it was

10   run through?

11   A   January 1, 2011, through May 31, 2015.

12   Q   Now, when counsel for Dr. Ruan referred to the last page,

13   why does it show entries for August?

14   A   Because I put the wrong date in.

15   Q   So this should say through August?

16   A   Yes.

17   Q   Do you know that the office was raided on May 20th, 2015?

18   A   I was not aware of that.

19   Q   Do you know that Dr. Ruan had stopped practicing there on

20   May 20th 2015?

21          MR. KNIZLEY:  Your Honor, I object to the form of the

22   question.  That's not something that's in evidence.

23          THE COURT:  Overruled.

24   BY MR. BODNAR:

25   Q   Do you know that Dr. Ruan stopped practicing on May 20th,

1    2015?

2           MR. KNIZLEY:  Judge, I'd also object to it being

3    outside the scope of direct examination.

4           THE COURT:  You introduced this document that's got

5    these dates on it.

6           MR. KNIZLEY:  The question was about his practice,

7    Judge.

8           THE COURT:  Well, I overrule the objection.

9    BY MR. BODNAR:

10   Q   Ms. Bishop, those numbers that you had included -- I'll

11   turn to page 149 here of 158 in the defense exhibit.  Do you

12   see where it ends on -- you have a string of numbers from May

13   19th and then it goes May 29th, June 8th, down to August, and

14   then a bunch of dates in August?

15   A   Yes.

16   Q   Does your total number that Mr. Knizley showed you, would

17   that include all those dates after May 19th, 2000 --

18   A   It does.

19   Q   So the numbers before that would be slightly less than that

20   7,000, whatever number that Mr. Knizley showed you?

21   A   That's correct.

22   Q   And do you recall seeing that approximately a switchover on

23   October 3rd through October 7th from where it appeared all --

24   all of the numbers were being accessed by Dr. Couch's and then

25   being accessed by Dr. Ruan's address?

1  A   That's correct.

2  Q   But nothing in here indicates whose patient is actually

3  being seen on, say, 10/7 or 10/8?

4  A   No.

5  Q   So it could be both Dr. Ruan and Dr. Couch's patients?

6  A   All I can tell you is that -- that ID was used to search on

7  that date.

8  Q   And just by the ID being used to search on that date, that

9  doesn't give you any indication if the doctor actually did the

10 search himself, does it?

11 A   No, it was just his ID was used.

12 Q   And there's nothing on here that says whether it was

13 actually printed out or utilized in any way, is there?

14 A   I wouldn't know that.

15 Q   This simply tells you when somebody logged into the system;

16 is that correct?

17 A   That's true.

18 Q   And do you recall counsel for Dr. Couch doing the math with

19 you, it was roughly six and a half times per day during that

20 first time period?

21 A   I'm sorry?

22 Q   Do you recall doing the math with Mr. Willson [sic]?

23 A   Yes.

24 Q   It was about six and a half access times per day?

25 A   That's right.

1   Q   Do you have any idea of how many patients were seen at PPSA

2   for Dr. Ruan and Dr. Couch per day?

3   A   I have no idea.

4   Q   So it could be around six, it could be much more, you don't

5   know?

6   A   I have no idea.

7   Q   That January 19, 2015, date, I believe you said that

8   approximately 87 entries were run on that date?

9   A   That's correct.

10  Q   But you don't have any way of knowing what was going on at

11  PPSA at that date or at that time why 87 entries would be run,

12  do you?

13  A   I have no idea.

14  Q   You wouldn't know if somebody went over to help Dr. Couch

15  and ran all the PDMPs for his patients that day?

16  A   I have no idea what goes on in the practice.

17  Q   And again, you wouldn't know if Dr. Couch saw approximately

18  90 people a day?

19  A   I wouldn't know.

20          MR. BODNAR:  Nothing further from this witness, Your

21  Honor.

22          THE COURT:  Mr. Sewell?

23          MR. SEWELL:  Yes, Your Honor.

24                      REDIRECT EXAMINATION

25  BY MR. SEWELL:

5038

1   Q   Ms. Bishop, I just have a few followup questions, and I

2   won't try and take up too much of your time.  Are you aware

3   that October 3rd, 2013, was a Thursday?

4   A   I was not aware of that.

5   Q   If I tell you that, you don't have any reason to dispute

6   that?

7   A   No, I don't.

8   Q   And the 7th of that month was a Monday?

9   A   Again, I haven't looked back on the calendar.

10   Q   But again, you wouldn't dispute that?

11   A   No.

12   Q   So between those two days there would also be two weekend

13   days, Saturday and Sunday, between that Thursday and that

14   Monday?

15   A   That's correct.

16   Q   Okay.  Mr. Bodnar just a second ago pointed out the date

17   range on Dr. Ruan's report, and it ran through August whenever

18   it said at the top it was supposed to be May?

19   A   Right.

20   Q   About how many months' difference is there between May and

21   August?

22   A   It would be three months.

23   Q   About three months.  Okay.  And that total range from

24   October of '13 through August of '15 is about 23 total months?

25   A   That's right.

1  Q   Does at that sound about right?

2  A   That's correct.

3  Q   And so there were three months missing out of that

4  apparently.  Or there's three months' difference from that 23

5  --

6  A   Yes.

7  Q   -- being 20 months.  So there are three additional months'

8  worth of numbers in your summary?

9  A   Right.

10 Q   But there were still thousands of hits or -- excuse me --

11 thousands of searches done on Dr. Ruan's ID?

12 A   That's right.

13 Q   And your report not only shows or doesn't just show log-ins

14 on -- but it also shows searches?

15 A   It shows -- what I ran shows searches.

16 Q   Searches, not just somebody logging in.  They actually

17 performed a search?

18 A   That is correct.

19 Q   So for -- just rough estimates -- between January 3rd,

20 2011, and May of 2015, there were close to 10,000 searches done

21 using the log-in information of Dr. Ruan or Dr. Couch?

22 A   That's -- that would be approximate.

23         MR. SEWELL:  No further questions, Your Honor.

24                  REDIRECT EXAMINATION

25 BY MR. KNIZLEY:

DEBORAH SUE "DEBI" PHILLIPS - DIRECT BY MR. ESSIG

1  Q   Ms. Bishop, you were asked when Dr. Ruan stopped practicing

2  medicine.  You have no idea, do you?

3  A   I do not.

4  Q   I'm going to show you back again Dr. Ruan's Exhibit

5  184.  And if you will look, how many pages did you produce, if

6  you recall, total?

7  A   It's 158.

8  Q   And on page 149 you have a May 19th entry, May 19th at the

9  bottom of the page?

10  A   Yes, it's page 149.

11  Q   So 149 of 158 pages were before May 19; is that right?

12  A   That's correct.

13          MR. KNIZLEY:  Thank you.

14          THE COURT:  May this witness be finally excused?

15          MR. BODNAR:  Yes, Your Honor.

16          MR. SEWELL:  Yes, Your Honor.

17          THE COURT:  All right.  You may step down,

18  Ms. Bishop.  Thank you.

19          MR. ESSIG:  Your Honor, Dr. Couch calls Debi Phillips.

20              DEBORAH SUE "DEBI" PHILLIPS

21          was sworn and testified as follows:

22          THE WITNESS:  I do.

23          THE CLERK:  Thank you.  Please be seated.

24                  DIRECT EXAMINATION

25  BY MR. ESSIG:

5041

1    Q    Good morning, Ms. Phillips.  Could you please start by

2    stating your full name for the record and spell your first and

3    last name for us, please?

4    A    Deborah Sue Phillips.  Deborah, D-E-B-O-R-A-H.  Last name

5    Phillips, P-H-I-L-L-I-P-S.

6    Q    And, Ms. Phillips, do you go by Debi?

7    A    I do.

8    Q    And, Ms. Phillips, what city and state do you reside in?

9    A    Spanish Fort, Alabama.

10   Q    And how are you currently employed?

11   A    I'm employed at Gulf Coast Interventional Spine and Joint.

12   Q    And who is the doctor that you work for there at that

13   facility?

14   A    I work for Tao Chen.

15   Q    And how many years' experience do you have in the

16   healthcare field?

17   A    Over 30.

18   Q    And what kind of job duties have you performed in the

19   course of your healthcare experience?

20   A    I started clinically as a medical assistant, went on to

21   billing, and then to management.

22   Q    So how many years specifically do you have in medical

23   billing?

24   A    A lot.  Over -- over 20 maybe.

25   Q    And at some point in time did you work at PPSA or

 1  Physicians Pain Specialists of Alabama?

 2  A   Yes.

 3  Q   And who are the doctors that were at PPSA when you worked

 4  there?

 5  A   Dr. Couch and Dr. Ruan and Dr. Chen.

 6  Q   And were all three of those doctors there the entire time

 7  you were there?

 8  A   Yes.

 9  Q   Ms. Phillips, when did you begin working at PPSA?

10  A   September 27th, 2012.

11  Q   And what was the position that you had when you were first

12  hired there?

13  A   Biller.

14  Q   Who actually hired you at PPSA?

15  A   Tammy Etheridge.

16  Q   And what was Ms. Etheridge's position when she hired you?

17  A   I believe she was the practice manager.

18  Q   And were you at PPSA until it closed in May of 2015?

19  A   Yes.

20  Q   And what different positions did you hold while you were at

21  PPSA?

22  A   I was hired as a biller, then I became the billing manager,

23  and then I became the operations officer.

24  Q   When you first started at PPSA, you said you were a biller.

25  How long were you in that position at PPSA?

DEBORAH SUE DEBBIE PHILLIPS - DIRECT BY MR. ESSIG

1   A   I want to say six months.

2   Q   And what led to you being promoted to the billing manager?

3   A   I presented Dr. Ruan with some data, financial data, losses

4   to the practice, and asked him who I needed to speak to about

5   that, about the financial data that I had found.

6   Q   And how did you discover these financial losses?

7   A   By doing my job.

8   Q   Okay.  You say doing your job.  Your job as a biller; is

9   that correct?

10   A   Correct.

11   Q   Can you describe for us what your job duties were that led

12   to this discovery?

13   A   I was the person in charge of posting the money that came

14   from insurance companies.

15   Q   And what was it that you saw during the course of those

16   duties?

17   A   I saw that a lot of the claims that were a sent out on

18   behalf of the doctors were not paid.

19   Q   And was there an amount of money that had not been

20   collected by PPSA at that time?

21   A   Yes.

22   Q   What was the total amount of money, if you recall?

23   A   I want to say in the millions.

24   Q   And who did you say you addressed that issue with?

25   A   Dr. Ruan.

1   Q   And what was his advice to you?

2   A   He called the accountant.

3   Q   And who was the accountant?

4   A   Boe Strange.

5   Q   And what happened after you talked to Mr. Strange about

6   this issue?

7   A   He asked me how -- how would I fix it, fix it.  He wanted

8   me to detail a plan on how I would go about fixing what I had

9   found.

10  Q   And did you detail that plan for him?

11  A   I did.

12  Q   And how did you go about detailing that plan?

13  A   I made a PowerPoint presentation.

14  Q   And did you present that to him?

15  A   I did.

16  Q   And after you presented that to Mr. Strange, did he give

17  you the authority to try to address the billing issues that

18  were going on at PPSA?

19  A   He did.

20  Q   And if you would, describe for the jury of this pot of

21  money that had not been collected or that the practice was

22  losing, were there categories that it fell into?

23  A   Yes.

24  Q   And can you give the jury sort of an overview of what some

25  of the key categories of unbilled claims were?

DEBORAH SUE-DEBE PHILLIPS - DIRECT BY MR. ESSIG

1   A   Billing errors, operating --

2   Q   When you say -- I'm sorry.  When you say a billing error,

3   what sort are you talking about?

4   A   On some claims you need modifiers.  So if you were working

5   on a need, for example, you might have to put a modifier

6   signifying if it was right or left.  If you did lab work, you

7   had to put a CLIA number on the claim.  Just different type --

8   if a physician ordered an MRI, you had to put ordering and

9   referring physician on the claim or you wouldn't get paid,

10  things like that.

11  Q   Okay.  So if I understand correctly, what you are

12  describing is the claim itself, the document that went to the

13  insurance company, there's information on there that was

14  missing; is that correct?

15  A   Correct.

16  Q   And at that point in time when you arrived at PPSA, what

17  was the billing system that you were using?

18  A   Greenway.

19  Q   And what is Greenway?

20  A   It's an electronic health record and practice management

21  software.

22  Q   And was Greenway a third-party software system?

23  A   I don't understand what you mean by third party.

24  Q   Was it purchased from a company that came in and set up

25  Greenway for the practice?

5046

DEBORAH SUE PHILLIPS - DIRECT BY MR. ESSIG

1   A   I'm not aware of how.

2   Q   In your experience at PPSA, did Greenway have

3   representatives who would occasionally come to the practice?

4   A   Yes.

5   Q   And what kind of things would the Greenway representatives

6   do?

7           MS. GRIFFIN:  Your Honor, I'm going to object to

8   relevance.

9           THE COURT:  Sustained.

10          MR. ESSIG:  Your Honor, billing is a central issue in

11  this case and how the Greenway system was set up and how the

12  bills were submitted to the insurance companies.  And

13  Ms. Phillips is just explaining that to give context.

14          THE COURT:  But your question was originally about

15  unbilled claims.  Maybe you misspoke when you asked her.  What

16  she described were not unbilled claims, but that was your

17  question.  Is that what you're pursuing?

18          MR. ESSIG:  Yes, Your Honor.  I started talking about

19  the unbilled claims and honestly I forgot that I had had her

20  explain the system they were using.  I'm trying to go back and

21  lay a foundation.

22          THE COURT:  All right.  Go ahead.

23  BY MR. ESSIG:

24  Q   Go ahead.

25  A   I'm sorry.  Could you please repeat the question?

DEBORAH SUE DEBBIE PHILLIPS - DIRECT BY MR. ESSIG

```
 1   Q   Yeah.  The question was -- we mentioned that there were
 2   Greenway reps; is that correct?
 3   A   Consultants.
 4   Q   Okay.  And they worked for the people that came up with the
 5   Greenway system?  Would that be fair to say?
 6   A   Yes.
 7   Q   And what kind of things would they do when they visited the
 8   practice?
 9           MS. GRIFFIN:  Your Honor, again I object to the
10   relevance.  The Greenway employees are not -- are not charged
11   in this matter.
12           THE COURT:  Well, I'll let him go a little ways on
13   this, but I don't know where we're going.  So go ahead.
14   BY MR. ESSIG:
15   Q   Ms. Phillips, what kind of things would the Greenway reps
16   do when they came to the practice?
17   A   We actually -- do you want me to explain?
18   Q   Yes, ma'am, please.
19   A   We actually hired Greenway consultants to come and train us
20   how to use the system.
21   Q   And why was that?
22   A   Because nobody had training fully on the Greenway system.
23   Q   And did that decision -- was that a decision you made after
24   you took over as the billing manager?
25   A   It was a decision that I suggested to my practice
```

5048

1  administrator.

2  Q   Now, who was your practice administrator at that time?

3  A   Ken Cross.

4  Q   And did Ken Cross agree to allow you to bring in the

5  Greenway people?

6  A   He presented it to the physicians.

7  Q   Now, Ms. Phillips, you said that one of the categories of

8  uncollected bills when you first got there was the claims that

9  had some sort of problem; is that correct?

10  A   Yes.

11  Q   And what were some of the other major categories of

12  unclaimed or uncollected bills at the practice at that time?

13  A   Lack of obtaining referrals for HMOs, lack of

14  preauthorization for procedures or diagnostic radiology.

15  Q   When you say lack of referrals for HMOs, would you tell us

16  what that is?

17  A   HMOs are a gatekeeper plan.  So in order -- those -- the

18  people that have HMOs are assigned a primary care physician and

19  in order to go to a specialist the primary care physician has

20  to authorize it.  And so they actually need a specific piece of

21  paper or electronic authorization that states how many visits

22  they can have and a start date and expiration date.

23  Q   So for those uncollected bills or unpaid bills, was the

24  issue with the fact there was no referring doctor at all or

25  just the file didn't have something to reflect that?

DEBORAH SUE TERRE PHILLIPS - DIRECT BY MR. ESSIG

1  A   The file didn't have the referral from the insurance

2  company.

3  Q   And was that issue specific to only certain insurance

4  companies?

5  A   Yes.

6  Q   Was there an issue also with something called an

7  explanation of benefits?

8  A   Yes.

9  Q   And what is that, please?

10  A   There were missing explanation of benefits.

11  Q   And what is an explanation of benefits?

12  A   An explanation of benefits is what the insurance carrier

13  sends back to us with payment or without payment to explain how

14  they are going to pay us or how they paid us or why they

15  wouldn't pay us.

16  Q   And so would the explanation of benefits come after the

17  practice had submitted a bill to the insurance company?

18  A   Yes.

19  Q   Tell us how that process works from the submission of the

20  bill to the return of the explanation of benefits.

21  A   The biller would key in the data off the superbill, fee

22  ticket that the doctors or nurse practitioners would

23  circle.  The biller would take that data, enter it into the

24  Greenway system.  At midnight those claims automatically went

25  electronically to the insurance carriers.  Sometimes as little

1    as 14 days to maybe a month or two, we would get data back

2    whether we would be receiving payment or no payment.

3    Q    So by --

4    A    In the form of an EOB or a check.

5    Q    So by submitting a claim to the insurance company, did the

6    practice automatically get paid?

7    A    No.

8    Q    When the explanation of benefits would come back, what kind

9    of information would it have in it?

10    A    It would have the patient's name, the patient's ID number,

11    it would have the date of service, the charge, the CPT code, it

12    would have the allowed amount by the insurance company, the

13    adjustment amount that we would need to make the patient's

14    coinsurance or copay portion, and then the final column would

15    be what was paid actually to the physician.

16    Q    So in a typical scenario would an insurance company pay the

17    practice less than they were billed for?

18    A    Yes.

19    Q    And why would that be?

20    A    It's --

21         MS. GRIFFIN:  Objection as to foundation, Your Honor.

22         THE COURT:  Sustained.

23    BY MR. ESSIG:

24    Q    Do you know why they would pay less?

25         MS. GRIFFIN:  Objection as to foundation.

5051

1         THE COURT:  Well, it's either yes or no.  Do you know?

2    BY MR. ESSIG:

3    Q    Do you know why they would pay the practice less than the

4    amount submitted?

5    A    Yes.

6    Q    Why is that?

7    A    It was a discounted rate for being a PMD provider.

8    Q    What does PMD stand for?

9    A    Preferred medical provider.

10   Q    And those adjustments that were made, were those part of

11   the practice's contract with the various insurance companies?

12   A    Yes.

13   Q    Now, when you get an explanation of benefits back, why

14   would that be an area where there were uncollected bills?  I

15   guess my question is you mentioned that was one of the

16   categories where there were amounts that had not been

17   collected?

18   A    Do you want me to explain?

19   Q    Yes, ma'am.

20   A    Okay.  In the course of my job posting the money to the

21   dates of service in Greenway, if I was posting a particular

22   date of service, I had noticed that dates of service before

23   were not paid.  They still had balances.  And so my inquiry was

24   to look for the explanation of benefits to see why the claim

25   had not been paid.  And in the course of it, I could not find

DEBORAH SUE DEBBIE PHILLIPS - DIRECT BY MR. ESSIG

```
 1    those explanation of benefits, and so I called the insurance
 2    carrier to find out if a claim had been sent and if there was
 3    any denial on such claims, because I couldn't find the
 4    explanation of benefits.  On a majority of those items I was
 5    told that --
 6              MS. GRIFFIN:  Objection, Your Honor, to what she was
 7    told as hearsay.
 8              THE COURT:  Sustained.
 9              MR. ESSIG:  Your Honor, it wouldn't be offered for the
10    truth.  It would be offered to explain what she did after she
11    got that.
12              THE COURT:  Just ask her what she did.
13              MR. ESSIG:  Okay.  Yes, ma'am.  I'll move on.
14    Q   And, Ms. Phillips, if you would, just explain for us how
15    you went about resolving the explanation of benefits issue.
16    What was it you actually did?
17    A   I called the insurance carrier to see if there was a denial
18    or a payment, because I could not find record of such.
19    Q   Was the issue of the explanation of benefits that somebody
20    at PPSA had simply not entered those in the system?
21    A   Yes.
22              MS. GRIFFIN:  Objection to leading, Your Honor.
23              THE COURT:  Yeah, don't lead the witness.
24              MR. ESSIG:  Judge, I'm trying to get past some of the
25    hearsay.
```

 1          THE COURT:  Well, I understand that.

 2          MR. ESSIG:  Yes, ma'am.  I'll refrain.

 3          THE COURT:  Go ahead.

 4   BY MR. ESSIG:

 5   Q   Is that what the issue was?

 6   A   Yes.

 7   Q   And did you go back and actually enter in the explanation

 8   of benefits to get those payments for the practice?

 9   A   I requested duplicate explanation of benefits and check

10   numbers for said payments.

11   Q   Were there any explanation of benefits or any outstanding

12   insurance claims that you were not able to get payment for?

13   A   Yes.

14   Q   And what would be a circumstance that would lead to you not

15   being able to get payment?

16   A   It would be a denial for no authorization, like I said, no

17   referral, not a provider in this, not a provider of this

18   healthcare.

19   Q   Were some of the claims just too old?

20   A   Yes, timely filing as well.

21   Q   What would you do in the circumstance when you had a claim

22   that was too old?

23          MS. GRIFFIN:  Your Honor, objection to the

24   relevance.  That's not an issue in the matter.

25          THE COURT:  Yes, sustained.

 1          MR. ESSIG:  Your Honor, we contend this is --

 2          THE COURT:  Would you come to side bar?

 3          MR. ESSIG:  Yes, ma'am.

 4          THE COURT:  All right.

 5      (At the side bar, jury not present.)

 6          THE COURT:  You wanted to explain?

 7          MR. ESSIG:  Yes, Your Honor.  When Ms. Phillips came

 8  in, obviously, as we're demonstrating, there were significant

 9  issues with the billing.  This evidence that we're going to get

10  into with her addresses or goes specifically to negate the

11  motive the government has put forward in this case.  As

12  Mr. Bodnar stated in his opening statement --

13          THE COURT:  Which motive is --

14          MR. ESSIG:  The motive is, Your Honor, they weren't

15  running a pill mill, they were running a money mill, and that

16  they used every aspect of the practice to maximize the money

17  that they were making and that that was the doctors' motive for

18  the prescribing and for the way they ran the clinic.

19  Ms. Phillips demonstrated that there were unpaid claims, that

20  they were out millions of dollars of claims outstanding from

21  the practice when she arrived, that she advised the doctors of

22  that, that they knew that, but they allowed her to go forward

23  and resolve those claims as she saw fit and to do so

24  legally.  This line of questioning here, she's specifically

25  going to say that they submitted claims to the insurance

```
 1   company and that they were denied, that she would go back and
 2   inform the doctors that the claim was either too old or
 3   whatever the issue was, and that the doctors simply said:
 4   Okay, fine, we'll write off that claim and it will be
 5   uncollected by the practice.
 6           So, Your Honor, what this does is, again, it --
 7           THE COURT:  Well, yeah, I agree that this is probably
 8   admissible.  But the details of why they were denied and this,
 9   that, and the other -- just get to the point.
10           MR. ESSIG:  Well, I understand that, Your Honor.  And
11   I would like to.  But the only way I can do that is by setting
12   this foundation so that she will understand what I'm asking and
13   why I'm going where I'm going.  And it also gives context,
14   makes her answers make sense.  And I'm two or three questions
15   away from asking sort of the money question.  But I'm trying to
16   get the foundation to it in order to be able to get there.
17           MS. GRIFFIN:  Your Honor, it does not show that
18   they -- that money wasn't their object.  It shows that they
19   didn't bill on time and they couldn't bill any more because it
20   was out of time.  So it doesn't prove that money was the
21   object.
22           MR. ESSIG:  Your Honor, it's up to the jury to
23   determine what it means.
24           THE COURT:  I think it cuts both ways because,
25   frankly, if they can miss millions of dollars and not know
```

DEBORAH SUE "DEBBIE" PHILLIPS - DIRECT BY MR. ESSIG

5056

 1    it -- that shows something.

 2            MR. ESSIG:  I don't disagree.

 3            MS. GRIFFIN:  That's true.

 4            MR. ESSIG:  I don't disagree.

 5            THE COURT:  Let's go ahead.  But get through it

 6    quickly.

 7            MR. ESSIG:  Yes, ma'am.  I'm doing it as fast as I

 8    can.

 9        (In open court, defendants and jury present.)

10    BY MR. ESSIG:

11    Q    All right.  Ms. Phillips, we were discussing some claims,

12    where you had this outstanding sort of amount of money, that a

13    portion of those were unpaid insurance claims.  And I think

14    what we were talking about is the fact that at some point you

15    determined that some of the claims were too old and could not

16    be paid because they were too old?

17    A    Yes.

18    Q    And can you describe for the jury how you handled an old

19    claim for the practice?

20    A    If the claim did not go or something happened to it, the

21    claim was refiled to the insurance company or filed originally

22    to the insurance company.

23    Q    If it was -- if you knew it was too old, why would you file

24    it?

25    A    So that I had a trail that the insurance company said that

1   it was timely filing and that at that point I could adjust off

2   that money into the system.

3   Q   So you would file it so you could get a denial on the

4   books; is that correct?

5   A   Correct.

6   Q   What would do you -- if you filed a claim that was too old

7   and it got denied, what would you do with that information at

8   that point in time?

9   A   I would then adjust the claim.

10  Q   Would you go and talk to the management at PPSA or either

11  of the doctors about that issue?

12  A   Only if it was over a certain amount.

13  Q   And what was the threshold amount that you would go to them

14  about?

15  A   A thousand dollars.

16  Q   And what was the reaction of the doctors or the management

17  at PPSA when you took that information to them?

18          MS. GRIFFIN:  Your Honor, objection as to the managers

19  collectively or the doctors collectively.  We would request a

20  very specific question.

21          THE COURT:  See if you can do it specifically.

22          MR. ESSIG:  Yes, ma'am, I will.

23  Q   Ms. Phillips, can you tell us which of the doctors you

24  would have ever taken one of those claims above a thousand

25  dollars to?

DEBORAH SUE "DEBBIE" PHILLIPS - DIRECT BY MR. ESSIG

1    A    Both.

2    Q    And when you took one of those claims for a writeoff to

3    Dr. Couch, what was his reaction?

4    A    Upset.

5    Q    But did he accept the fact that the claim had to be written

6    off?

7    A    Yes.

8    Q    And did he allow you to write the claim off?

9    A    Yes.

10   Q    Same question for Dr. Ruan.

11   A    Same answers.

12   Q    And did you ever take those concerns to Ken Cross or Boe

13   Strange also?

14   A    Boe Strange.

15   Q    And why would you take it to Mr. Strange?

16   A    He was the accountant.

17   Q    At any point in time when you had to write off some losses

18   for the practice, did anyone ever ask you to falsify any of the

19   documents?

20   A    No.

21   Q    Did anyone ever ask you for an old claim to go back and

22   backdate the document so that it could be paid?

23   A    No.

24   Q    Did anyone ever ask you to lie at all in that process?

25   A    No.

1   Q   In the process of sort of resolving these old claims, were

2   there issues with all of the insurance providers that PPSA had?

3   A   No.

4   Q   Which providers did you have these issues with, these

5   claims?

6           MS. GRIFFIN:  Objection as to relevance, Your Honor.

7           THE COURT:  For the old claims, is that what you're

8   talking about?

9           MR. ESSIG:  Yes, ma'am.

10          THE COURT:  All right.  I sustain the objection.

11  BY MR. ESSIG:

12  Q   As part of this process did you deal with Blue Cross/Blue

13  Shield?

14  A   Yes.

15  Q   And did you deal with Medicare or Tricare?

16  A   Yes.

17  Q   Ms. Phillips, was another category of these unpaid claims

18  outstanding patient balances?

19  A   Yes.

20  Q   And in what form did outstanding patient balances come?

21  A   It would be the patient's portion of the claim, it would be

22  a copay, coinsurance, deductible.

23  Q   And how did it go about that there were copays that had not

24  been paid?

25  A   Do you want me to explain?

DEBORAH SUE DEBBIE PHILLIPS - DIRECT BY MR. ESSIG

1    Q   Yes, please.

2    A   If a patient came in the office, they may not have had --

3    for their regular scheduled visit they may not have had enough

4    money to pay their copay, so the copay may or may not have been

5    waived.

6    Q   And at that point in time would that be something that

7    would go on the patient's account?

8    A   Yes, and it would be waived for that visit, not -- let me

9    explain.  I don't mean waived.  I take that back.  But I mean

10   they were given opportunities at another time to pay that

11   balance.

12   Q   Did the practice continue to try to collect those copays?

13   A   Yes.

14   Q   And is that why you had that as one of the categories of

15   unpaid bills --

16   A   Yes.

17   Q   -- in the patient accounts?

18        What were some of the other issues in the patient

19   accounts that resulted in some of the unpaid bills.

20   A   Pain pump fills.

21   Q   Okay.  You said pain pump fills?

22   A   Yes, pain pump patients.

23   Q   And what type of unpaid claims would there be for those

24   patients?

25   A   It would be the coinsurance on the pain pump itself or the

DEBORAH SUE DEBBIE PHILLIPS - DIRECT BY MR. ESSIG

 1  fill of the pain pump.

 2  Q   And what was the dollar amount typically associated with a

 3  pain pump refill?

 4  A   Couple of thousand dollars a fill.

 5  Q   And that would be per fill; is that correct?

 6  A   Yes.

 7  Q   And did some of those result in very high balances?

 8  A   Yes.

 9  Q   What was the highest unpaid patient balance that you saw

10  for a pain pump?

11  A   44,000.

12  Q   And when you took that concern to the doctors -- we'll ask

13  you individually -- was that a patient of Dr. Ruan or

14  Dr. Couch?

15  A   I don't remember.

16  Q   Do you remember discussing some of these high balances for

17  unpaid pain pump refills with Dr. Couch?

18  A   Yes.

19          MS. GRIFFIN:  Your Honor?  Again, he's leading the

20  witness.  And we would object.

21          THE COURT:  Yes.  Sustained.

22  BY MR. ESSIG:

23  Q   Who did you talk to?

24  A   Both.  It depended on whose patient it was.

25  Q   Did you discuss this issue specifically with Dr. Couch?

DEBORAH SUE DEBBIE PHILLIPS - DIRECT BY MR. ESSIG

1   A   Yes.

2   Q   And did you discuss this issue specifically with Dr. Ruan?

3   A   Yes.

4   Q   And did you -- what was the position of the doctors for

5   pain pump patients?

6   A   Because a pain pump is a surgical device implanted within

7   the patient and the medication that's put in it was compounded

8   specifically for the patient, each patient had a different

9   formula that was inserted into their pain pump.  The pain pumps

10  had alarm dates on them and they had to be refilled by a

11  certain date or a patient would go into withdrawal.  And so

12  those patients had to have their visits under all

13  circumstances.

14  Q   So would a patient, a pain pump patient, be turned away for

15  a refill if they had a high outstanding balance?

16  A   No.

17  Q   Did PPSA make efforts to collect on pain pump patients with

18  high outstanding balances?

19  A   Yes.

20  Q   And what were those efforts?

21  A   We would bring the patient, we would bring them in to

22  billing, we tried to make payment arrangements with them,

23  monthly payment arrangements.

24  Q   But if they couldn't pay, were those amounts written off?

25  A   No.

DEBORAH SUE "DEBBIE" PHILLIPS - DIRECT BY MR. ESSIG

1  Q   How were they carried on your books?

2  A   They showed as patient balances.

3  Q   Did some of those high balances go unpaid?

4  A   Yes.

5  Q   Was that common?

6  A   Yes.

7  Q   Now, Ms. Phillips, I want to back up just a little bit and

8  I want to show you a portion of what's been marked -- well, let

9  me ask you this question first:  At some point in time did you

10 become the -- would the right term be CEO of PPSA?

11 A   It was -- I'm sorry.  I didn't --

12 Q   At some point in time did you become effectively the CEO of

13 PPSA?

14 A   Not CEO.

15 Q   What was it?

16 A   Chief operations officer.

17 Q   And who had that position before you did?

18 A   I don't think anybody.

19 Q   And did you take that position after someone left the

20 practice?

21 A   No.

22 Q   What year did you actually become the chief operating

23 officer?

24 A   I want to say it was 2014.

25 Q   And how long --

DEBORAH SUE DEBBIE PHILLIPS - DIRECT BY MR. ESSIG

1   A   Beginning of 2014.

2   Q   Say that again?

3   A   I think it was March of 2014.

4   Q   So you served in that capacity for a little over a year?

5   A   Yes.

6   Q   And, Ms. Phillips, the entire time you were at PPSA, were

7   you always at the Springhill location?

8   A   Majority of the time.

9   Q   And what would cause you to go to the Airport location?

10  A   To go over there and check on things or discuss things with

11  Dr. Ruan.

12  Q   Were most of the administrative personnel located at the

13  Springhill location?

14  A   Yes.

15  Q   All right.  Ms. Phillips, I'm going to show you a portion

16  of what's been marked as Government's Exhibit 2-2.  Do you

17  recognize that, Ms. Phillips?

18  A   Yes.

19  Q   And what is this photograph that I'm showing you here?

20  A   It's showing me the front of the Springhill office.

21  Q   Then I'm going to show you another picture from 2-2.  And

22  what is this picture you see here?

23  A   The waiting room of the Springhill office.

24  Q   And is this photograph -- does this capture the entire

25  waiting area there at Springhill?

5065

```
 1   A   There's a small portion before that picture that you can't
 2   see.
 3             MR. ESSIG:  Your Honor, may I approach?
 4             THE COURT:  Yes.
 5   BY MR. ESSIG:
 6   Q   Ms. Phillips, I'm handing you what's been entered as
 7   Government's Exhibit 2-4.  This is a drawing of the layout of
 8   the Springhill location of PPSA.
 9   A   Yes.
10   Q   And I know it's not to scale, but does that look to you
11   like a fairly accurate depiction of the layout right there?
12   A   Yes.
13   Q   You can keep that.
14             Now, Ms. Phillips, when you were at PPSA, the entire
15   time you were there, you said you started as a biller, or the
16   billing manager, and eventually became the chief operating
17   officer; is that correct?
18   A   Yes.
19   Q   And for point of clarification also, were you the chief
20   operating officer of all of PPSA?  In other words, it was not
21   just the Springhill organization?
22   A   Yes.
23   Q   And the entire time you were at PPSA, did you have some
24   supervision over the billing personnel?
25   A   Yes.
```

1   Q   Now, Ms. Phillips, I'm going to show you there this is

2   another -- a smaller version of -- this comes from Government's

3   Exhibit 2-1.  This is a smaller version of the diagram of PPSA

4   that you're holding.

5           Does this appear to be -- if you orient yourself to

6   the north lobby entrance, does this appear to match what you

7   have in your hand there?

8   A   Yes.

9   Q   Now, if you will touch on the screen, you can make an

10  arrow.  Can you describe for the jury where your office would

11  have been at PPSA?

12  A   During which period?

13  Q   When you were the -- we'll start with when you were the

14  billing manager.

15  A   This was -- there was a room here on the outside.

16  Q   Okay.

17  A   It was in the waiting room.

18  Q   And I'm going to take that off the screen here.

19          It's this area here near the yellow arrow?

20  A   Yes.  And it didn't look like that.  There was

21  construction.

22  Q   Construction between the time you were there and when this

23  diagram was drawn?

24  A   Yes.

25  Q   Is that correct?  Okay.  And did you enter through the

1   inside of the building or through the outside of the building?

2   A   Through -- we entered -- we -- we entered inside the

3   building, but we had to come out into the lobby to get into

4   that office.

5   Q   Okay.  And then where were the billers that you managed?

6   where were they located, if you could point out that?

7   A   We all sat in that same area (indicating).

8   Q   So what is this area here in the middle that's identified

9   as billing?  What is that area?

10  A   That's the clinical area.

11  Q   And do you know why it was marked as billing on this

12  diagram?

13  A   I don't.

14  Q   So is that actually not the billing area?

15  A   No.

16          MR. ESSIG:  Mary Ann, switch to the laptop, please.

17          Your Honor, I have a couple of photographs I want to

18  show to the jury that are not admitted into evidence.  All I

19  want to do is show them as a demonstrative aid.

20          THE COURT:  All right.

21  BY MR. ESSIG:

22  Q   Now Ms. Phillips, do you recognize --

23          THE COURT:  Wait.  Hold on.  The jury's not seeing

24  them yet.

25          MR. ESSIG:  Oh, I'm sorry.

DEBORAH SUE "DEBBIE" PHILLIPS - DIRECT BY MR. ESSIG

5068

```
 1              THE COURT:  Okay.
 2    BY MR. ESSIG:
 3    Q    Ms. Phillips, do you recognize the photograph there
 4    depicted on the screen?
 5    A    I do.
 6    Q    And what does this photograph depict?
 7    A    That is the -- that is one of the offices that -- it's a
 8    part of billing that was precert. and surgery scheduling and
 9    new patient coordinator.
10    Q    And did you supervise the individuals that sat in this
11    room?
12    A    I did.
13    Q    And who was the new patient coordinator when you took over
14    as the chief operating officer?
15    A    Bobbi -- oh, Lord -- Coburn.
16    Q    And who had been the new patient coordinator prior to that
17    time?
18    A    Shannon Hackworth.
19    Q    And did you ever supervise Ms. Hackworth?
20    A    I did.
21    Q    And for how long did you supervise her?
22    A    I'm not sure if it was less than a year or at a year.
23    Q    And did she sit in this area as well?
24    A    No.
25    Q    Where was her office?  And I'll go back to the ELMO.  Is
```

5069

1  her office depicted on the graph?  (Indicating.)

2  A   Originally it was -- originally it was here.  There was a

3  desk there.

4  Q   Okay.

5  A   And then it moved to the back.

6  Q   And so, for the record, what you indicated there when you

7  said initially it was here, you indicated in the reception

8  area; is that right?

9  A   That's where the receptionist sat.  It was a big open space

10  where the new patient coordinator desk was.

11  Q   Now, you say eventually it moved to the back.  When did

12  that happen?

13  A   I want to say during the remodel.

14  Q   When did the remodel occur?

15  A   It happened in 2014.  I'm thinking April sometime, May,

16  summer.

17  Q   Got you.  I understand.  Now, Ms. Phillips, when you took

18  over as the billing manager, did you provide some training to

19  the billers and the other staff that were there?

20  A   Me personally?

21  Q   Yes.

22  A   No.

23  Q   Did you conduct meetings for the staff that were there?

24  A   Yes.

25  Q   And what kind of meetings would you conduct for the staff?

5070

```
 1   A   At the time I oversaw the clerical departments, and so we

 2   did customer service -- I'm trying to think -- instruction on

 3   how to handle patients in the billing department, collect

 4   copays, precert.

 5   Q   Just various office functions?

 6   A   Office duties.

 7   Q   Typical office meetings; is that correct?

 8   A   Correct.

 9   Q   And how often did you actually conduct those meetings?

10   A   I tried to do it either quarterly and sometimes as things

11   came up.

12   Q   And who were the staff that would attend those meetings?

13           MS. GRIFFIN:  Objection.

14   A   The clerical staff.

15           MS. GRIFFIN:  Objection as to the relevance.

16           THE COURT:  Sustained.

17   BY MR. ESSIG:

18   Q   Ms. Phillips, you mentioned that you didn't personally do

19   training for the billers.  But did they get some training after

20   you took over those responsibilities?

21   A   Yes.

22   Q   And who provided them with their training?

23   A   We had training with Greenway on how to use the system, we

24   had training by going to conferences.

25   Q   And how often did you attend conferences?
```

1           MS. GRIFFIN:  Objection as to relevance, Your Honor.

2           MR. ESSIG:  Your Honor, it's relevant to some of the

3    issues we discussed at side bar.  These are foundational

4    questions.

5           MS. GRIFFIN:  We don't believe it is.

6           THE COURT:  Yes.  I sustain the objection.

7    BY MR. ESSIG:

8    Q   Now, Ms. Phillips, when you were there and you were

9    supervising the staff -- let me ask you this question:  The

10   billing system that was in place at PPSA, was it in place when

11   you got there?

12   A   Yes.

13   Q   And did you make any changes to that system?

14   A   I personally did not make any changes to the system.

15   Q   And do you know if any changes were made during the time

16   that you were there?

17   A   The Greenway trainers had upgraded our system and made some

18   changes and made some entries for us and then we enhanced our

19   clearinghouse.

20   Q   Now, Ms. Phillips, was part of your responsibility at PPSA

21   to sort of oversee and manage the process of submitting claims

22   to the insurance companies?

23   A   Could you ask that question again?

24   Q   Were you ultimately the person who was ultimately

25   responsible for making sure the billing actually occurred and

1   got done?

2   A   Yes.

3   Q   And did PPSA have different contracts with each insurance

4   company that they were working with?

5   A   Yes.

6   Q   And what was the way that PPSA actually billed its services

7   to the insurance companies?

8   A   Do you want from the time they got a superbill or do you

9   want when --

10  Q   Just generally what was the mechanism that caused that to

11  take place?

12  A   A superbill would be generated.

13  Q   And what's a superbill?

14  A   A superbill is either -- it's a paper item that has all the

15  CPT codes that the doctors might use with charges and then

16  diagnosis codes, and then there's electronic superbills as well

17  for an electronic system.

18  Q   And what was the process of those being submitted?

19  A   In the beginning we used paper superbills.  So every day

20  the biller in charge of charge entry would pick up those

21  superbills from the various physicians and nurse practitioners

22  and she would key in the charges for the day.

23  Q   And what -- what would actually be on the superbill for the

24  biller to enter into the system?  What information?

25  A   The level of service would be circled and diagnosis codes

1   would be circled.

2   Q   And did they also have access to the progress notes for the

3   provider that had been doing an examination that day?

4   A   If it was in the -- at the time if it was -- when we were

5   full EMR, they would.  If not, it was on paper and they had to

6   find paper.

7   Q   And at what point in time did y'all become full EMR?

8   A   I -- I want to say sometime in 2013, after the Greenway

9   training.  But I'm not sure of the exact date.

10  Q   And the biller's responsibility, did they have

11  responsibility for determining or calculating the CPT code

12  based on the progress notes they were reviewing?

13  A   No.

14  Q   How was the CPT code determined or calculated?

15  A   It was circled by the practitioner that saw the patient.

16  Or if it was in our EMR, it was put in by the practitioner that

17  saw the patient.

18  Q   Once you went to EMR, was that through Greenway?

19  A   Yes.

20  Q   And did Greenway have a formula that automatically

21  calculated a CPT code?

22  A   It calculated a rubric, a guide.

23  Q   When you say a rubric, tell us what you mean by that.

24  A   A guide.  It would tell you you have met this level of

25  service, do you want to keep this code?

1    Q   And would that be in the system when that progress note or

2    superbill reached the biller to put that information in the

3    system?

4    A   If they hit yes and the charges went to billing, those were

5    the charges and diagnosis codes that went to billing.

6    Q   Did the billers have any authority to modify or change the

7    CPT codes?

8    A   Not without notifying somebody.

9    Q   Was there a way for them to do that?

10   A   Yes.

11   Q   How would they go about doing that?

12   A   Each biller -- when we were fully EMR, each biller was

13   assigned a practitioner or an item, like we had lab and MRI and

14   CV mgs, so each biller was assigned either a practitioner or

15   some type of diagnostic test that they were responsible for.

16   And so if they had an issue with something that they felt like

17   a note wasn't complete or a note wasn't signed, or they didn't

18   agree with something on there, they would go to that

19   practitioner and have discussion.

20           THE COURT:  Mr. Essig, can we take our morning break

21   now?

22           MR. ESSIG:  Yes, ma'am.

23           THE COURT:  All right.  Ladies and gentlemen, leave

24   your pads on your chairs.  Take your break downstairs in the

25   jury assembly room.  No discussion about the case.  We will

5075

```
 1    call you back up in about 15 minutes.  We are in recess.
 2         (A recess was taken at approximately 10:31 a.m.)
 3         (In open court, 10:53 p.m., defendants and jury present.)
 4              THE COURT:  All right, Mr. Essig.
 5              MR. ESSIG:  Thank you, Your Honor.
 6    Q   Now, Ms. Phillips, before the break we were talking about
 7    the process of a biller at PPSA entering a CPT code into the
 8    system.  We were talking about that, and I think specifically
 9    what we were talking about was how they used a practitioner's
10    progress note to determine a CPT code.  Do you recall that
11    discussion?
12    A   No.
13    Q   Let me ask you this:  Would they use the practitioner's
14    progress note to determine the CPT code?
15    A   No.
16    Q   Okay.  Explain to me that process.
17    A   The process of entering a CPT code?
18    Q   Yes, ma'am.
19    A   It would come straight off a superbill or it would come
20    straight through the EMR to billing.
21    Q   Okay.  And I think you mentioned, though, that as part of
22    that process the biller would review the progress note and the
23    CPT code to determine if it was correct; right?
24              MS. GRIFFIN:  Your Honor, object as to foundation as
25    to whether she has direct knowledge of that.
```

1        MR. ESSIG:  Judge, I think she already testified to
2    that.
3        THE COURT:  Well, you need to find out if she has
4    direct knowledge or if she was acting on the information from
5    people she may have supervised.
6        MR. ESSIG:  Yes, ma'am.
7    Q   You were a biller at PPSA; is that correct?
8    A   Yes.
9    Q   And as a biller and as a person that supervised the billing
10   process, were you aware and had the opportunity to observe how
11   this process was done?
12   A   Yes.
13   Q   And are you aware of how the CPT code coming from the
14   practitioner got into the PPSA billing system?
15   A   Yes.
16   Q   And can you explain to us what the interaction may have
17   been between a biller and a practitioner regarding the CPT
18   code?
19   A   They would enter the code if they -- sometimes, depending
20   on what it was, if it was a procedure, if it was a diagnostic
21   study, they would look at a note to make sure all the
22   components were there.  They couldn't bill out if a note wasn't
23   signed.  So they needed to get -- if a note wasn't signed, they
24   had to talk to a practitioner.  If they felt that a note was
25   less than evaluation management code, they might have that

DEBORAH SUE TERRI PHILLIPS - DIRECT BY MR. ESSIG

1    discussion, stating:  This is the level we suggest.

2    Q   How did your billers get their training to learn about

3    diagnostic coding and CPT codes?

4          MS. GRIFFIN:  Your Honor, again I question the

5    relevance.

6          THE COURT:  Overruled.

7    BY MR. ESSIG:

8    Q   How did they get training?  How did they know this stuff?

9    A   Either from experience -- the majority were hired before I

10   got there.  So --

11   Q   Did some of them learn this at the conferences you

12   mentioned earlier?

13   A   They learned about different specific things regarding

14   billing at the conference.

15   Q   Now, if we've got the CPT code or the bill or the superbill

16   or the EMR comes to the biller and, based on the training they

17   have, you said they look at that to see if the note, progress

18   note, or the information from the practitioner justifies a

19   certain billing level; is that correct?

20   A   Yes.

21   Q   And is it correct that, if they think there might be an

22   issue, that they can go discuss that with a practitioner?

23   A   Yes.

24   Q   And as a part of that process would the biller utilize the

25   practitioner's progress note?

5078

DEBORAH SUE TERRI PHILLIPS - DIRECT BY MR. ESSIG

```
 1   A   Yes.
 2   Q   Now, Ms. Phillips, are you familiar with the progress notes
 3   that were used by PPSA after y'all went to electronic medical
 4   records?
 5   A   Yes.
 6   Q   Ms. Phillips, I'm going to show you --
 7           MR. ESSIG:  And, Your Honor, this is a portion of
 8   Benjamin Brown's medical chart which is in evidence.  It's a
 9   government exhibit.  I do not know the exhibit number.  I'm
10   using our copy of it.
11           MS. GRIFFIN:  I believe it's 12-1(a).  And, Counsel,
12   could you pull it down so we can see the top?
13           MR. ESSIG:  Yes.
14   Q   Now, Ms. Phillips, what are we looking at here?
15   A   You're looking at a progress note printed out of the EMR.
16   Q   And what patient is this progress note for?
17   A   It says Benjamin Brown.
18   Q   If a biller received a progress note like this, can you
19   explain to the jury how they would utilize this progress note
20   in conjunction with determining the CPT code?
21           MS. GRIFFIN:  Your Honor, we would object to the
22   foundation.  She was not a biller toward the end and there is
23   no foundation as to what she was at this specific date and that
24   she has first-hand knowledge of what the billers were actually
25   doing daily.
```

1           THE COURT:  I think --

2           MR. ESSIG:  Your Honor?

3           THE COURT:  Come to side bar, if you will.

4      (At the side bar, jury not present.)

5           MS. GRIFFIN:  Turn toward this way, if you can, so

6    they don't hear you.

7           THE COURT:  I think that you would have to establish

8    that she was the biller on this particular patient, the bill,

9    in order to say what was actually done on this one.  I don't

10   think a general idea of what may have been done is appropriate

11   for an individual bill.

12          MR. ESSIG:  What I want to do is use this one as an --

13   I don't think we have one that's going to show where she was

14   the biller on that specific bill.  I think this one, though,

15   she can say this is generally how they appear, this is

16   generally how the information from this progress note was used

17   in conjunction with the CPT code.  I'm not going to have her

18   testify as to what the CPT code would have been with this

19   particular progress note.  I'm just going to have her say

20   here's the information, using this one as an example, from a

21   progress note that would be used to generate the CPT code.

22   That's it.

23          MS. GRIFFIN:  She's not an expert and I don't believe

24   she was a biller at this period of time.  And I think to have

25   her comment on something that she didn't work on, what somebody

1    else did, is hearsay.

2            THE COURT:  So what are you using the note for?  Are

3    you going to ask her what code should have been billed using

4    this?

5            MR. ESSIG:  No, ma'am.

6            THE COURT:  Are you going to ask her whether this note

7    was used to bill?

8            MR. ESSIG:  Yes, ma'am.  I'm just going --

9            THE COURT:  Can she say that this note was going to be

10   used to bill?

11           MR. ESSIG:  I don't know that.  But I think, Judge,

12   what I want her to do is just explain using this note:  Here's

13   how the progress would have worked, here's my knowledge of the

14   way that the biller at PPSA, based on my observation, how they

15   used progress notes and based on my use of progress notes, this

16   is how the process worked.

17           This is a go-by, as a sample, this is how this worked.

18   And I think I should be able to do that with an exhibit that's

19   in evidence that this witness has personal knowledge about, how

20   the process works.  I mean, the government repeatedly was

21   showing the defense witnesses documents they've never seen

22   before in their life, emails they have no knowledge of

23   whatsoever, been given wide latitude to cross-examine on

24   this.  This is a record she was in charge of, she was the

25   supervisor for.

1              MS. GRIFFIN:  The rules don't go as to what one party

2    got to do and what the other party got to do.  The rules go as

3    to the specific question that this witness is being asked to

4    do, is something that she has knowledge of.  I mean, if she

5    wasn't doing daily billing and she wasn't watching them daily,

6    she's not qualified to testify about this.  And just to say in

7    general, she doesn't know.  You've established no foundation

8    that she knows.

9              MR. ESSIG:  Judge, the foundation questions occurred

10   earlier with this line of questions just a moment ago when we

11   came back from the break.  I asked her specifically:  Do you

12   have knowledge -- were you a biller?  Yes.  Did you supervise

13   the billers as billing manager?  Yes.  As a part of that

14   process, did you obtain personal knowledge as to how the

15   progress notes from the practitioner were used by the biller?

16             THE COURT:  I think if you want to use her just to

17   show as an example, you ought to use a progress note from a

18   patient who has not testified in this case.  I mean, there are

19   plenty of progress notes in evidence that are not from patients

20   who have actually testified.  He did testify, didn't he?

21             MR. ESSIG:  He did.  I don't -- I mean, I don't

22   know -- again, she's not going to comment on -- I mean, she's

23   not going to comment on like his testimony.  I mean, there's

24   not going to be any of that.  It's just going to be for this

25   patient here's the things and here's the categories that a

5082

1    biller would look at, here's how we would have -- here's how we

2    would have utilized the CPT code.

3           THE COURT:  I think you can have her testify to that,

4    but not any specific progress note.  Just have her testify in

5    general about what was generally looked at.

6       (A discussion was held off the record between defense

7    counsel.)

8           MR. KNIZLEY:  Block the top of it off so you're not

9    looking at anybody's name.

10          THE COURT:  That's what I'm saying.  I don't think we

11   ought to have her look at any specific progress note and say

12   what may or may not have been used from that.

13          MR. ESSIG:  Judge, I think --

14          THE COURT:  I'm allowing her to testify what was in a

15   progress note in order to --

16          MR. ESSIG:  Yes, ma'am, I understand.  Here's the

17   issue:  The government has repeatedly said this is not about

18   what one party is allowed to do.  That's not involved.  What

19   was in evidence from the government, the government has used

20   these charts, even with witnesses who have not looked at the

21   charts.  They've used them to get into the issue of shining the

22   light bilaterally in their eyes, feeling their throat.  That

23   hasn't only been done with witnesses who have specific

24   knowledge of the chart they are looking at; it's been done by

25   witnesses who have no knowledge of the charts whatsoever.

1          THE COURT:  I know.  But they were the patients
2    generally speaking.
3          MR. ESSIG:  Not always.  It wasn't limited to
4    patients.
5          THE COURT:  I'm telling you what I'm going to allow
6    you to do.  Not using the actual progress note, but just I'm
7    telling you to get her to testify in general what off of the
8    progress note was used to make any determinations about the --
9          MR. SHARMAN:  May I make one suggestion?  And then
10   I'll be quiet then.  If it gives the Court comfort, Sam can
11   electronically redact out the name and everything so it's just
12   a record, so it doesn't even reflect the identity of the
13   witness, if that would address any concern and render the
14   document an example of the process.  That can be done, if that
15   makes a difference.
16         THE COURT:  You can use a progress note, but not the
17   one that's up on the thing now.  Just get him to pull up any
18   progress note without the name on it.
19         MR. KNIZLEY:  Just take a moment to find one.
20         MR. ESSIG:  Yes, ma'am.  It's going to take a couple
21   of minutes, but we can do that.
22      (In open court, defendants and jury present.)
23         MR. ESSIG:  Mary Ann, we'll use the laptop, please.
24         THE CLERK:  Yes, sir.
25   BY MR. ESSIG:

DEBORAH SUE DEBI PHILLIPS - DIRECT BY MR. ESSIG

1  Q   Ms. Phillips, can you see that document there on the
2  screen?
3  A   I can.
4  Q   And are you able to identify that as a -- the name and
5  information of the patient has been taken off, but can you
6  identify that as a progress note of PPSA?
7  A   Part of it.
8  Q   And what part is missing from this one?
9  A   The first half, history of present illness, review of
10  systems, medication reconciliation, and then the bottom is the
11  plan, or any orders.
12  Q   Just one moment.  We're going to pull up an example of the
13  first page.
14        Is this the first page of the progress note,
15  Ms. Phillips?
16  A   Yes.
17  Q   And how would a progress note such as this be used by the
18  biller to determine the CPT code?
19  A   They didn't determine the CPT code.
20        MS. GRIFFIN:  Your Honor, the only objection is this
21  date is outside the date of the conspiracy.  Just as long as
22  that's noted in the record, this is not a progress note used
23  during the time charged.
24        THE COURT:  All right.  The record now reflects
25  that.  Go ahead.

1          MR. ESSIG:  Thank you.

2    Q    And I say determine the CPT code.  You said they would

3    review the CPT code based on the progress notes; is that

4    correct?

5    A    Can I explain?

6    Q    Yes, ma'am.

7    A    I think there's a misunderstanding that progress notes do

8    not accompany claims.

9    Q    Okay.

10   A    A biller might use that as a tool to make sure that the

11   doctors coded correctly.

12   Q    They might use the progress note?

13   A    Correct.

14   Q    So if you can explain to us how a biller would use a

15   progress note to make that determination?

16   A    They would look at all the key components on the progress

17   note.

18   Q    And what are those key components?

19   A    The chief complaint, history of present illness, review of

20   systems.

21   Q    Now, if we go to review of systems --

22          MR. ESSIG:  And for this patient, Sam, if you could

23   zoom in on the chief complaint?

24   Q    And do you see for this patient the chief complaint is low-

25   back pain, generalized body pain, depression, and severe

5086

1    fatigue?

2    A    Yes.

3    Q    And would there be diagnostic codes on the chart that would

4    match the chief complaint?

5    A    It should be at the end, where the assessment is of the

6    note.

7    Q    And for this type of chief complaint what kind of

8    information or how would that information be used by a biller?

9    A    Depending on what they were looking for, they would look to

10   see if there was -- let's say it was -- I'm going to throw an

11   example out there, a code that's rarely used, 99215.  If a

12   doctor might or a practitioner might have put that code at that

13   point, they may have looked at a note to see if it met that

14   criteria.  They would look to make sure all the key components

15   were there in order to meet that criteria.

16          MR. ESSIG:  Sam, if you could highlight the history of

17   present illness, please?

18   Q    And, Ms. Phillips, how would the chief complaint and the

19   history of present illness be used to determine how the

20   remainder of the progress note is reviewed?

21   A    Can you repeat that?  I'm not understanding.

22   Q    Let me ask you this question:  What kind of information

23   would a biller be getting -- if they are using the progress

24   note -- what kind of information is being looked for in the

25   history of present illness?

5087

1   A   Let's say -- I'll give you an example.  I see the word
2   "fatigue" in here a bunch of times.  So if a diagnosis of
3   fatigue was put on the assessment, then they may look in the
4   note and see did the patient complain of fatigue.
5   Q   What about the diagnosis of low-back pain and generalized
6   body pain, how would that be used?
7   A   Same.  They would look for those types of diagnoses.
8           MR. ESSIG:  Sam, if you would go to the review of
9   systems?
10  Q   And, Ms. Phillips, how is this information used?
11  A   It depends on what they were looking for.  If the diagnosis
12  was about neck, they would generally look at the neck region
13  and make sure that the diagnosis was consistent with the exam
14  on the neck, the review of systems.
15  Q   And we showed with this patient that they had low-back pain
16  and overall body pain?
17  A   And actually I take that back.  I made a mistake.  Review
18  of systems is about what the patient -- I'm speaking more of
19  the physical exam.  Review of systems is stuff patients
20  complain of or have a history of.
21  Q   And --
22  A   That may not really -- the key component for a biller is
23  did they do a review of systems, not necessarily what was --
24  Q   There for each item?
25  A   Right.

DEBORAH SUE DEBRA PHILLIPS - DIRECT BY MR. ESSIG

1  Q   And so for this information here, do you know if this
2  information comes prepopulated in PPSA's EMR system?
3  (Indicating.)
4  A   It depended on the template.
5  Q   And what do you mean by that?
6  A   Each practitioner had the opportunity to build their own
7  templates, and then there were general templates in the
8  system.  So review of systems is something that's in every EMR.
9  So there might have been a general set that they decided to
10 keep and use.  And so yes, there might have been a general set
11 with prepopulated items.
12 Q   So can the record prepopulate here relevant information to
13 the patient?
14 A   Yes.
15 Q   And in this case the person complained of low-back pain and
16 body pain.  Was there any issue that you saw in the history of
17 present illness for this person's cardiovascular system?
18 A   I didn't really read it.
19 Q   But if they presented with just low-back pain, would the
20 cardiovascular be relevant?
21         MS. GRIFFIN:  Objection, Your Honor.  No foundation.
22         THE COURT:  Sustained.
23         MR. ESSIG:  Can we go back to the history of present
24 illness, please?
25 Q   And, Ms. Phillips, if you will take a moment to review

1   that, do you see anywhere in the history of present illness

2   where this patient presented with any cardiovascular issues?

3          MS. GRIFFIN:  Your Honor, object.  This is just an

4   example, and how is it relevant what anything this patient

5   presented with --

6          THE COURT:  Yes, I think you just need to go by

7   categories, because I sustain the objection as to this.  She

8   needs to be talking about what is pertaining to the code and

9   which code it pertains to and that sort of thing.

10          MR. ESSIG:  Yes, Your Honor.

11   Q   Ms. Phillips, were you aware occasionally at PPSA that some

12   of the prepopulated records would populate with information not

13   relevant to a particular patient?

14   A   Possibly.

15   Q   Have you seen that happen before?

16   A   Yes.

17   Q   And if a record prepopulates with information that's

18   irrelevant to the patient, how does that influence the bill

19   that gets submitted?

20          MS. GRIFFIN:  Your Honor, I don't know that she -- we

21   object, because there's no way that she has a foundation for

22   that.

23          THE COURT:  I sustain.

24   BY MR. ESSIG:

25   Q   Do you know how irrelevant or prepopulated information in

 1  the record affects the bill that gets submitted by PPSA?

 2  A   The record doesn't go with the bill unless it's asked for

 3  by the insurance company.  So it may or may not.

 4  Q   And do you know how it affects the CPT code or the billing

 5  code that goes to the insurance company?

 6  A   If an insurance company would have requested the records

 7  for a certain EM -- evaluation management service, they would

 8  be looking at the key components to see if it justified that

 9  code.

10  Q   And what are some of the key components?

11       MS. GRIFFIN:  Your Honor, we would move to strike.

12  She has no idea what the insurance companies look for.  It's

13  not relevant.

14       THE COURT:  I sustain the objection and ask the jury

15  to ignore what she just stated.  You need to keep your

16  questions about the actual billing process and not what the

17  insurance company would do.

18  BY MR. ESSIG:

19  Q   And, Ms. Phillips, do you see the physical examination

20  portion on the progress note for this patient?

21  A   I do.

22  Q   And do you see there that some of the record, the progress

23  note, is actually in red?

24  A   I do.

25  Q   And is the remainder of the physical examination of the

1  progress note in black and white?

2  A   Yes.

3  Q   What's the distinction of the red typing in the physical

4  examination portion?

5  A   That is the portion that was changed from the template.

6  Q   And the remaining information on here in black and white,

7  how would that be utilized by the biller, if you know?

8  A   Mostly they would look to see if a physical exam happened.

9  And if it was about cervical spine, like you see there, they

10  would make sure that there was cervical spine issues.  But this

11  wasn't looked at all the time.

12  Q   Why would this not be looked at all the time?

13  A   Because in some cases it may not be necessary to look at

14  that.  It depends on if something triggered them to look.

15  Q   So if the patient presents with low-back pain, what portion

16  of the physical exam is reviewed by the biller?

17          MS. GRIFFIN:  Your Honor, as to foundation, she has no

18  idea what they individually reviewed each time and we would

19  object.

20          THE COURT:  Yeah.  I sustain the objection.

21  BY MR. ESSIG:

22  Q   How are they trained to use that information?

23          MS. GRIFFIN:  Your Honor, objection again.  Even if

24  they are trained, that does not mean that that's what they did

25  and we object to this line of questioning because she has no

 1    first-hand knowledge.
 2              MR. ESSIG:  Your Honor, that's for the weight
 3    consideration by the jury.
 4              THE COURT:  Yes.  I overrule that objection.
 5              THE WITNESS:  Can you reask the question?
 6    BY MR. ESSIG:
 7    Q   Yes, ma'am.  How were the billers trained to use the
 8    information in the physical examination in their reviews of the
 9    progress notes?  What is the relevance to them of that portion?
10    A   I'm a surgical biller, so I'm going to go by that
11    standpoint.  I did surgical billing for Dr. Couch.
12    Q   Okay.
13    A   And so if he did a surgery, I'm looking for specifics of
14    that surgery.  So if Dr. Couch did back surgery on a patient,
15    I'm looking for everything relevant in the back to support the
16    medical necessity of his surgery.
17    Q   Would the parts of the physical examination listed on the
18    report that are irrelevant to the patient's condition -- would
19    those be used by the biller to determine CPT code?
20    A   The billers didn't determine the CPT code.
21              MS. GRIFFIN:  Your Honor, object.
22              THE COURT:  Hold up just a moment, please.
23              MS. GRIFFIN:  Object.
24              THE COURT:  I think you have to determine what CPT
25    code you're talking about to make that question correct.  So I

1    sustain the objection.

2    BY MR. ESSIG:

3    Q   If a biller is reviewing a CPT code that's been submitted

4    by a practitioner -- and you stated -- I think you stated the

5    purpose of using a progress note in that was to make sure that

6    it justified the billing level; is that correct?

7              THE COURT:  Which CPT code?

8              MR. ESSIG:  I think any CPT code.

9              MS. GRIFFIN:  Your Honor, we --

10             THE COURT:  Well, I sustain the objection to

11   that.  They need to be specific.

12   BY MR. ESSIG:

13   Q   Let's take a 99214.

14   A   Okay.

15   Q   If the biller has a question about what was done in the

16   exam to justify the 99214, how was the physical examination

17   record relevant to that?

18   A   They would look to see if there was a physical exam because

19   one would be needed in that code set.  And then based on what

20   specialty we were, what they actually checked -- and there are

21   several key components that drive that claim -- you must have a

22   physical exam, but you can have face-to-face time with a

23   patient too.  So there's several things made up -- several key

24   components that are needed to justify a code.  That is just one

25   of them.

1  Q   And if a biller is presented with a progress note for a

2  patient with lumbar or low back --

3  A   You would be looking for a lumbar exam.  So the diagnosis

4  code used, me personally, I'd be looking there if I needed to

5  look there.

6  Q   So --

7  A   It would be driven more by a diagnosis code.

8  Q   Than the history of present illness?  Than the history of

9  present illness?  Is it driven more by the diagnostic code than

10  the history of present illness?

11  A   This, the physical exam could be used to make sure that a

12  physical exam happened for a CPT code, but it also could be

13  used to justify a diagnosis code.  So if this person here had a

14  back diagnosis, then they might look to make sure that it

15  stated that there was something wrong with the patient's back.

16  It's used in multiple ways.  It's just not for one component of

17  billing.  It could be used for CPT purposes or they could be

18  checking it for ICD-10 purposes.

19  Q   And if they are checking it for CPT purposes and the

20  patient has low-back pain, do they look to see if a light's

21  been shined in their eyes?

22          MS. GRIFFIN:  Your Honor, objection again to what they

23  look for specifically on this list.

24          THE COURT:  Sustained, sustained.  I think you've gone

25  as far as you can go with this.

DEBORAH SUE DEBBI PHILLIPS - DIRECT BY MR. ESSIG

```
 1          MR. ESSIG:  Yes, ma'am.
 2          THE COURT:  So let's move on.
 3      (A discussion was held off the record between defense
 4  counsel.)
 5  BY MR. ESSIG:
 6  Q   Ms. Phillips, one more question on this, I think it was
 7  noted earlier that this note here, this progress note, is from
 8  2009; is that correct?
 9  A   That's what I saw in the corner, yes.
10  Q   And the red lettering here on this note, was the red
11  lettering if there was a change?  Was that something that
12  remained consistent in y'all's records throughout the time you
13  worked there?
14  A   Yeah, it might have been red and it might have been
15  blue.  Blue is where they could change, physically change,
16  something in a template, how it -- when we printed notes, I
17  don't remember seeing them this way.  (Indicating.)  I remember
18  seeing them in black and white.
19  Q   Okay.
20  A   But I do know that anything color was where changes were
21  made by the practitioner, typed in.
22  Q   When you say you never saw the red, so you printed them
23  out?  Did y'all print in black and white?
24  A   Yes.
25  Q   Now, Ms. Phillips, when again was it that you stated you
```

5096

```
 1  became the chief operating officer at PPSA?
 2  A   It was in March of 2014.
 3  Q   And in that role did you have some responsibility and
 4  oversight in whether patients were allowed into the clinic or
 5  not?
 6  A   Some.
 7  Q   And do you recall an occasion in August of 2014 when you
 8  allowed in a patient by DJW............?
 9  A   Very well.
10  Q   And how is it you remember that particular patient?
11          MS. GRIFFIN:  Your Honor, object as to whether this
12  would call for a hearsay response or not and would ask counsel
13  to rephrase the question.
14          MR. ESSIG:  Your Honor, any statements from DW........
15  made to Mrs. Phillips would go directly to the effect on the
16  listener.  Ms. Phillips, as a result of the conversation with
17  DW........, made the decision to allow Mr. Brennan into the
18  clinic after he had been turned away.
19          THE COURT:  Well --
20          MS. GRIFFIN:  But that does not mean the statements
21  are not hearsay.
22          THE COURT:  That's correct.  I sustain the objection
23  to any statements DW........ may have made.  But the result of
24  any statements is certainly admissible, if she acted on them.
25          MR. ESSIG:  Your Honor, and also these statements of
```

5097

 1   DW........ are not offered for the truth of the matter

 2   asserted.  This was a patient named Shawn Brennan.

 3            THE COURT:  I still sustain the objection to whatever

 4   he may have presented to her as hearsay.

 5   BY MR. ESSIG:

 6   Q   Now, Ms. Phillips, how did you come to have a conversation

 7   with DJW............?

 8   A   I -- the new patient coordinator sat at the very back of

 9   the clinic, which was near the kitchen.

10   Q   And who was the new patient coordinator at that time?

11   A   Shannon Hackworth.

12   Q   All right.  And I want to see if you have the larger

13   diagram up there with you?

14   A   I do.

15   Q   And do you see -- can you make out the kitchen on there?

16   A   Yeah.

17   Q   Is it towards the front or towards the rear?

18   A   It's towards the rear.

19   Q   And can you on the screen here, can you see where the

20   kitchen is?

21   A   Yes.

22   Q   Can you point it out to us, please?

23   A   That line that I just made.  (Indicating.)

24   Q   On this diagram it's designated as the west break room; is

25   that right?

DEBORAH SUE DEBI PHILLIPS - DIRECT BY MR. ESSIG

1    A    Yes.

2    Q    And where did Ms. Hackworth sit?

3    A    She sat here in that room.  (Indicating.)

4    Q    Explain to me how your interaction with DW........ came

5    about?

6    A    I was on my way to the kitchen and I overheard a

7    conversation on speaker.  I actually heard the conversation and

8    I looked in and everybody was listening to the speaker phone at

9    Shannon's desk.

10   Q    Can you describe for us what Ms. Hackworth's demeanor was

11   at that time?

12   A    She was upset.

13   Q    You say upset.  How could you tell she was upset?

14   A    She was crying.

15   Q    And can you describe, without saying what was said, the

16   tone of Dr. -- of this person she was talking to on the phone,

17   the tone of their voice?

18   A    Angry.

19          MS. GRIFFIN:  Objection as to relevance, Your Honor.

20          THE COURT:  Sustained.

21          MR. ESSIG:  Your Honor, the tone of his voice goes to

22   explain why he was allowed in the clinic.

23          THE COURT:  I sustain the objection.

24   BY MR. ESSIG:

25   Q    At some point in time did you pick up that phone and speak

1    directly to the individual who Ms. Hackworth was speaking with?

2    A    Yes.

3    Q    Who was the individual who was on the other end of the

4    phone?

5    A    DW.........

6    Q    And how did you determine that it was DW........?

7    A    He told me.

8            MS. GRIFFIN:  Objection, Your Honor.

9            THE COURT:  Sustained.

10   BY MR. ESSIG:

11   Q    When Ms. Hackworth was sitting there and you heard this

12   conversation on the speaker phone, was she holding anything or

13   was there anything on the table?

14   A    She had the new patient paperwork in front of her.

15   Q    Okay.  How could you tell it was the new patient paperwork?

16   A    The front sheet is the sheet where they write down all the

17   information from the referring physician, verified benefits,

18   things like that, put the appointment, put that they mailed the

19   packet.  It's a checklist for a new patient.

20   Q    And prior to that conversation do you know what had

21   happened at the clinic with Mr. Brennan?

22   A    No.

23   Q    And did PPSA accept patients without insurance?

24   A    Only if they lost their insurance in the course of

25   treatment.  If they were already a patient and they lost their

5100

```
 1   insurance, then they could continue to be a patient until such
 2   time they got new insurance.
 3   Q   Did PPSA allow new patients that were cash only to come to
 4   the clinic?
 5   A   No, not -- not without insurance.
 6   Q   And how long was your conversation with DW........?
 7   A   Maybe five, 10 minutes.
 8   Q   And what did you conclude about Mr. Brennan as a result of
 9   that conversation?
10   A   That DW........ --
11           MS. GRIFFIN:  Objection, Your Honor, to anything that
12   DW........ said to her as hearsay.
13           THE COURT:  Sustained.
14   BY MR. ESSIG:
15   Q   Do you know where DW........ practiced?
16           MS. GRIFFIN:  Objection as to relevance, Your Honor.
17           THE COURT:  Do you want to come to side bar?
18      (At the side bar, jury not present.)
19           MS. GRIFFIN:  Your Honor, the fact is whether they
20   accepted cash people or not, they did accept this cash-paying
21   patient.  And to go through this minutia of how it came about
22   has no relevance to the charge.  The charge is that the visit
23   was outside the usual course of professional practice and
24   prescribing.
25           THE COURT:  As far as I can tell, the evidence is
```

5101

1    already in that they accepted him, it was because of

2    DW........'s insistence about it or something that he said, and

3    there's nothing else that's relevant to his visit.

4            MR. ESSIG:  Judge, I think -- I mean certainly where

5    he practiced is relevant.  It helps explain to the jury, puts

6    this in context.  What the government wants the jury to believe

7    is that Shawn Brennan walked in, got turned away because he

8    didn't have insurance, had the chiropractor phone and came back

9    and he got in.  That's not accurate.

10           THE COURT:  It doesn't matter.  That is irrelevant,

11   how he got in.

12           MR. ESSIG:  Judge?

13           THE COURT:  The fact is he got in and was treated and

14   that's where the relevance is with his treatment.  So I sustain

15   the objection to that.

16           MR. ESSIG:  Not even asking where he practiced?  I

17   can't even ask where he practiced?

18           THE COURT:  No.

19           MR. SHARMAN:  Your Honor, I do request that a time,

20   before this witness is excused, and outside the presence of the

21   jury, we be allowed to make a proffer through her testimony of

22   what she would have testified to with regard to communications

23   with DW.........

24           THE COURT:  Not through her testimony.  You can put it

25   on the record right now as to what she would testify.

DEBORAH SUE DEBBIE PHILLIPS - DIRECT BY MR. ESSIG

 1          MR. ESSIG:  Judge, what she would have testified to,

 2    had she been allowed to talk about the initial conversation

 3    with DW........, what she would say is she walked back in the

 4    back.  She testified Ms. Hackworth was crying.  The reason she

 5    was --

 6          THE COURT:  That's already in evidence.  Let's tell me

 7    what DW........ said.

 8          MR. ESSIG:  I think the jury's entitled to understand

 9    she was crying because DW........ was angry, DW........ was

10    raising his voice with them when she picked up the phone and

11    talked to DW.........  DW........ vouched for Mr. Brennan,

12    vouched for the fact this was a patient of his, vouched for the

13    fact that Mr. Brennan was a business owner and Mr. Brennan was

14    an individual that was not just somebody off the street, that

15    Mr. Brennan could come in, he had the money, he had sufficient

16    funds to pay for his visit.  All of that explains why we ever

17    allowed a cash patient in.  Also, Your Honor, MW........

18    made -- DW........ made threats to Ms. Phillips, made comments

19    to her that she perceived as threats, made things like:  What

20    kind of practice are y'all -- I'm going to go, I'm going to

21    tell people about this.

22          That sort of thing.  And it's not just that she had a

23    conversation with DW........ and decided to let this patient

24    in.  It's that she had a conversation with DW........ because

25    he was angry, because he was making threats, and she had an

1    employee that was crying that she relented.

2            THE COURT:  What else did he tell her that's relevant?

3    Because all of that is a rabbit trail, whether they accept cash

4    payments or not is a rabbit trail.  The issues in this case are

5    about the actual treatments and prescriptions for patients.  So

6    if there's anything else you want to put on the record about

7    it, you can do it.  But I think it's irrelevant.  So let's move

8    on.

9            MR. ESSIG:  Judge, we will.  One more proffer just on

10   this, why we think this is relevant and why we think we're

11   entitled to do it.  The trial brief that we filed references

12   her, references four factors the defendant specifically be

13   allowed to introduce into evidence, one of the fifth and sixth

14   amendment rights.  We contend this goes to the third and fourth

15   elements of her.  Those say that the defense is allowed to get

16   into collateral matters either through a chain of inferences

17   that go to rebut a specific element of the crime or collateral

18   matters that, if admitted into evidence, paint the government's

19   evidence in their case in a different light.  The light that is

20   painted for the jury at this point in time is that a simple

21   phone call was made by a chiropractor, this guy walked in off

22   the street and was able to pay cash and visit.

23           The true story is because he called the practice,

24   because he made the threats, Ms. Phillips relented and allowed

25   him into this practice and it was a one-time exception.  There

5104

```
1    was also a followup phone call from DW........ -- I don't know
2    if the government knows about it or not -- where he asked to be
3    allowed to send other patients in there.  She took the phone
4    call, put his number up, but didn't agree to do that.  So --
5          MS. GRIFFIN:  Your Honor, we're going to bring the
6    tape tomorrow of DW........'s conversation and admit it as a
7    court exhibit in case they decide to take this up, if that
8    opportunity arises.  And further, the only thing charged is
9    what happened inside on the visits.
10         THE COURT:  Yes.  I still think it's irrelevant, and
11   so I've ruled.
12         MR. ESSIG:  Yes, ma'am.  Just for the record, the
13   recording they have --
14         THE COURT:  Everything is for the record.
15         MR. ESSIG:  Yes, ma'am.  I'm sorry.  The recording
16   they have is not this recording.  The recording they have is
17   the initial phone call the week prior to the visit of
18   DW........ making the appointment for August 5th for him to get
19   in.  That's not this phone call.  We tried to admit that phone
20   call.
21         THE COURT:  That's irrelevant.  So let's move on.
22         MR. ESSIG:  That's fine.  But I just want to make the
23   point that's not the phone call.
24         THE COURT:  All right.  But we're not going into any
25   of that.
```

 1        (In open court, defendants and jury present.)

 2   BY MR. ESSIG:

 3   Q   Ms. Phillips, how long did your conversation with

 4   DW........ last?

 5   A   Approximately five to 10 minutes.

 6   Q   And as a result of this conversation, did you decide to let

 7   the patient DW........ had referred into the clinic?

 8   A   Yes, and I told him only for that visit.

 9   Q   Was that an exception to your general policy of not

10   accepting cash payments?

11   A   It was.  And I didn't do so without permission from a

12   practitioner.

13   Q   Who was the practitioner that you got permission from on

14   that particular day?

15   A   It was Stacy Madison.

16   Q   And can you tell us how that interaction came about?

17            MS. GRIFFIN:  Objection as to relevance, Your Honor.

18            THE COURT:  Sustained.

19   BY MR. ESSIG:

20   Q   Ms. Phillips, but for this phone call with DW........,

21   would you have allowed this patient to come into the clinic?

22            MS. GRIFFIN:  Objection, Your Honor.

23            THE COURT:  Sustained.  Let's move on.

24            MR. ESSIG:  Just a moment.

25        (A discussion was held off the record between defense

1    counsel.)

2           MR. ESSIG:  No further questions.

3           THE COURT:  All right.

4        (A discussion was held off the record between defense

5    counsel.)

6           THE COURT:  Mr. Knizley, are you taking her on direct?

7           MR. KNIZLEY:  Yes, ma'am.

8           THE COURT:  As one of your witnesses?

9           MR. KNIZLEY:  Yes, ma'am, it will be.

10          THE COURT:  All right.  That's fine.

11                        DIRECT EXAMINATION

12   BY MR. KNIZLEY:

13   Q   Good morning, Ms. Phillips.

14   A   Good morning.

15   Q   Ms. Phillips, first I want to bring your attention back to

16   the diagram of the floor plan of the Springhill Avenue

17   building.

18   A   Yes.

19   Q   Do you recall that?

20   A   Yes.

21   Q   All right.  Do you know a person who was employed by the

22   name of Peggy Tims?

23   A   I do.

24   Q   And drawing your attention to the diagram, what did she do

25   when she worked there, if you recall?

1   A   I hired her as the clinic manager.

2   Q   Okay.  And did she have a particular area where she sat or

3   spent most of her time in the building?

4   A   She did.

5   Q   Could you point out on the screen up there by touching it

6   as to where her location was?

7   A   She also moved.  So she started out in a little room that

8   was on the side of the building over here.  (Indicating.)

9   Q   Okay.

10  A   And then her and I both moved into here.  (Indicating.)

11  Q   Okay.  And could you tell us -- and I may have to slide it

12  down -- where Dr. Ruan's office was, please?

13  A   Here.  (Indicating.)

14  Q   And right here is that a wall, if you recall?

15  A   Yes.

16  Q   And what was your opportunity to view from where Ms. Tims

17  sat to Dr. Ruan's office?

18  A   Peggy sat here on this wall (indicating) and I sat on this

19  wall (indicating).

20  Q   From where Ms. Tims sat, did she have opportunity to

21  observe Dr. Ruan's office?

22  A   No.

23  Q   And where did Dr. Ruan see patients?

24  A   In the exam rooms on this side of the hall.  (Indicating.)

25  Q   And where are they?  I'm sorry.  I talked over you.

1  A    The exam rooms on this side of the hall.  (Indicating.)

2  Q    And do we need to slide down for you to --

3  A    And sometimes on this side of the hall.  (Indicating.)  He

4  would come on Wednesdays, and I'm really not -- on Wednesdays

5  the doctors would switch.  So probably both sides of the hall.

6  Q    And, Ms. Phillips, I talked over you.  Which side, if you

7  could with your finger point on the side of the hall where you

8  were talking about, when Dr. Ruan came he saw patients?

9  A    There were two exam rooms here (indicating) and then the

10  exam rooms on this side (indicating).  And if he had pump

11  patients, he would be in these pump rooms.

12  Q    And again, Ms. Tims' opportunity to observe from her place

13  where she generally stayed, would she be able to observe any of

14  those rooms?

15       MS. GRIFFIN:  Your Honor, objection.  There's no

16  foundation as to what Ms. Tims or what someone else could

17  observe.

18  BY MR. KNIZLEY:

19  Q    Could any person sitting where Ms. Tims sat -- could you

20  point where she sat again, please?

21  A    Yeah, she sat on this wall (indicating) and I sat on this

22  wall (indicating).

23  Q    And so when you sat on that wall, you know what you could

24  see and not see; is that right?

25  A    Yes.

1    Q    All right.  Could you see the exam rooms Dr. Ruan used?

2    A    No, I could not.

3    Q    Could you see the pump rooms from that area?

4    A    No.

5    Q    And could you see his office?

6    A    No.

7    Q    Now, I believe there was some conversation about when you

8    at some time became -- you were a billing person to begin with;

9    is that right?

10   A    Yes.

11   Q    And then you took on some additional responsibilities in

12   connection with billing?

13   A    Yes.

14   Q    Were there ever any training sessions that the physicians

15   sent the billers to to learn more about training?

16   A    Yes.

17   Q    Where did those training sessions take place?

18   A    We went to the American Academy of Professional Coder

19   Conference.  It's a yearly conference.  The first one we were

20   able to attend was in April of 2014.

21   Q    And, Ms. Phillips, you say we.  Who were you speaking of?

22   A    The billing team.

23   Q    And could you tell us who the billing team was, how many

24   people it were that went to the conference, please?

25   A    There were six of us in total.

1  Q   Okay.  And what was -- how long did the conference last?

2  A   It was three -- the first time we did a preconference,

3  which was two days, and then three days after that.  So it was

4  five days.

5  Q   And what were you attempting to learn or gain from going to

6  the conference?

7  A   ICD-10 was coming out and we knew nothing about it.  It was

8  brand new.  So we first attended an ICD-10 boot camp.

9  Q   And when in your tenure at PPSA did this first billing

10  conference take place?

11  A   April of 2014.

12  Q   And did you again go to yet another billing conference at a

13  later time?

14  A   We did.  We attended the same conference the following

15  year, April of 2015.

16  Q   And who is we again, please?

17  A   The same six people.

18  Q   And was this done with the knowledge and approval of the

19  physicians in the clinic?

20  A   Yes, we had to get approval.

21  Q   And what was the nature of the second billing conference

22  you went to?

23  A   General billing and management topics and it took place in

24  Las Vegas.

25  Q   How long did it last?

1          MS. GRIFFIN:  Your Honor, object to the relevance.

2          THE COURT:  Yes.  Sustained.

3    BY MR. KNIZLEY:

4    Q   Ms. Phillips, you spoke of when the Greenway system was in

5    effect that there were the mechanisms by which a biller would

6    put the information or bill the insurance company; is that

7    right?

8    A   Correct.

9    Q   And if I understood you correctly, the biller would the day

10   after of whatever services may have been rendered would then

11   come to get the information from the Greenway system as what

12   was billed or done the day before in order to bill it for that

13   day?

14   A   Yes.

15   Q   And you were a biller at one time?

16   A   Yes.

17   Q   And then you were the billing manager?

18   A   Yes.

19   Q   During the time that you were a biller and a billing

20   manager, was the Greenway system in place?

21   A   Yes.

22   Q   And you mentioned that there was a "rubric," I believe you

23   used the term?

24   A   Yes.

25   Q   Could you tell the ladies and gentlemen of the jury as to

5112

1  CPT codes what a rubric was?

2  A   Rubric?  It was a guide.  And so based on what the -- what

3  was put in the progress notes by the practitioner, the system

4  Greenway would calculate if they met all the requirements for

5  certain CPT codes and it would populate that CPT code as a

6  guide.

7  Q   And populate, so when the biller saw it the next day, what

8  would the biller see?

9  A   If the practitioner signed off on it, the biller would see

10  the actual code.

11  Q   And you say the rubric made a suggestion and the

12  practitioner, nurse practitioner or doctor or whoever was

13  giving the service, would either say yeah, I want this, or no,

14  I don't want this one?

15  A   Correct.

16  Q   And the biller the next day then would see what that

17  selection may have been?

18  A   Correct.

19  Q   And did you tell us that from the progress notes or

20  whatever other information the biller may have they made a

21  review of whether that was an appropriate selection or not?

22  A   Yes, they would do that.

23  Q   And what were the factors that were taken into

24  consideration?

25         THE COURT:  Mr. Knizley, we've been over this.  This

DEBORAH SUE DEBI PHILLIPS - CROSS BY MS. GRIFFIN

```
 1  is repetitive.
 2  BY MR. KNIZLEY:
 3  Q   Whatever the factors were that were taken into
 4  consideration, did anyone ever instruct the billers to not
 5  question that?
 6          MS. GRIFFIN:  Foundation objection, Your Honor.
 7          THE COURT:  Sustained.
 8  BY MR. KNIZLEY:
 9  Q   Did you receive instructions -- did the billers -- you as
10  the billing supervisor, did you ever instruct any of the
11  billers not to question the CPT code?
12  A   No.
13  Q   And was that something done from time to time?
14  A   It was done from time to time.
15  Q   And were there changes to CPT codes made from time to time?
16  A   Yes.
17  Q   And were there reductions of CPT codes done from time to
18  time?
19  A   Yes.
20          MR. KNIZLEY:  Thank you.
21          THE COURT:  All right.
22          MR. KNIZLEY:  That's all we have.
23          THE COURT:  Any cross?
24                      CROSS EXAMINATION
25  BY MS. GRIFFIN:
```

DEBORAH SUE "DEBI" PHILLIPS - CROSS BY MS. GRIFFIN

1   Q   Good morning, Ms. Phillips.  How are you?

2   A   Good.

3   Q   Ms. Phillips, it's true that a billing code ending in 14

4   pays more than a billing code ending in 13, isn't it?

5   A   Yes.

6   Q   And in connection with billing, didn't PPSA have contracts

7   with various insurance companies that they could see their

8   patients and then bill the visits and the services to those

9   insurance companies?

10  A   Yes.

11  Q   Specifically, they had a Blue Cross/Blue Shield contract

12  with each of your doctors; is that correct?

13  A   Yes.

14  Q   And that meant that PPSA was bound by what Blue Cross/Blue

15  Shield would cover; is that correct?

16  A   Yes.

17  Q   Also as to other insurance companies, PPSA was bound by

18  what they specifically cover; is that right?

19  A   Yes.

20  Q   So you knew what Blue Cross/Blue Shield would cover, didn't

21  you?

22  A   Sometimes.

23  Q   And those were made available to the practice online from

24  Blue Cross/Blue Shield, weren't they?

25  A   Sometimes.

1   Q   And you were available to call them and inquire what it

2   would cover, weren't you?

3   A   Yes.

4   Q   And you had a local representative you could contact from

5   Blue Cross/Blue Shield as well, didn't you?

6   A   Yes.

7   Q   Now, you knew that Blue Cross/Blue Shield required an NPI

8   number, national provider identifier number, to be able to bill

9   for a doctor or an extender, didn't you?

10          MR. KNIZLEY:  Your Honor, I will object as being

11   outside the scope of either direct examination as to NPI

12   numbers and Blue Cross/Blue Shield.

13          THE COURT:  Sustained.

14   BY MS. GRIFFIN:

15   Q   Now, Ms. Phillips, the numbers -- CPT codes ending in 14

16   and ending in 13, did there come a time while you were there

17   when the office visits billed by PPSA went up dramatically for

18   billings under the 14, 99214?  That happened, didn't it?

19   A   I didn't run any report for that, so I don't have any

20   knowledge of that.

21   Q   I show you Government's Exhibit 33-8 that's previously been

22   introduced into evidence, office visits billed to Medicare,

23   Dr. Ruan, and ask at the bottom that you see the CPT code in

24   red is the 14, do you see that?

25   A   I do.

DEBORAH SUE "DEBBI" PHILLIPS - CROSS BY MS. GRIFFIN

1   Q   And you see that 13 is the blue; is that correct?

2   A   Yes.

3   Q   Then you see years across the bottom?

4          MR. KNIZLEY:  Your Honor, I object to questioning

5   regarding this document.  She said she had no knowledge of the

6   billing code practices reflected in the document.

7          THE COURT:  Overruled.

8   BY MS. GRIFFIN:

9   Q   Are you aware that sometime early 2013 the CPT code billing

10  for Medicare for Dr. Ruan went up?  Do you see that on the

11  chart?

12  A   I see it on your chart.

13  Q   Are you aware that the billing for the lower-paying 213

14  code went down?

15  A   Because I see it on your chart.

16  Q   Now, it's true, isn't it, that the billers ultimately would

17  bill what the physicians told them to bill for, isn't it?

18  A   Yes.

19  Q   Even if they disagreed with that; is that correct?  Even if

20  the biller disagreed?

21  A   I can't -- I can't answer that.  I don't know if they

22  disagreed.

23  Q   Well, you just told us that the biller would bill whatever

24  the doctor ultimately said, didn't you?

25  A   Yes.

DEBORAH SUE "DEBI" PHILLIPS - CROSS BY MS. GRIFFIN

1   Q   So it didn't matter what the biller thought, did it?

2   A   I guess.

3   Q   The biller didn't make the ultimate decision, though, did

4   they?

5   A   No.

6   Q   I show you the office visits billed to Blue Cross and Blue

7   Shield by Dr. Ruan, Government's Exhibit 32-1, and again ask if

8   you see these codes, the 213 and the 214, the 214 being in red?

9           MR. KNIZLEY:  Your Honor, I'll object to examining the

10  witness about this topic.  She said she has no independent

11  knowledge except the document exists.

12          MS. GRIFFIN:  Your Honor, she's testified extensively

13  about how these were determined.

14          THE COURT:  Yeah, I overrule the objection.

15  BY MS. GRIFFIN:

16  Q   Do you see that the red is the 214 and the blue is the 213

17  billing?

18  A   I do.

19  Q   Do you see that sometime in early 2012 the 14 billing goes

20  way up?

21  A   Yes.  And might I explain that?

22  Q   Not if you're not asked it.

23  A   Okay.

24  Q   As the blue, you see that the 2013 billing goes right down;

25  is that correct?

1    A   I see that.

2    Q   And in connection with that, you learned that billing on

3    Blue Cross/Blue Shield had some different requirements from

4    billing from other companies, didn't you?

5    A   I'm sorry.  Can you repeat that question?

6    Q   Did you learn at some point that Blue Cross/Blue Shield

7    billing was different than some other company's billing?

8            MR. KNIZLEY:  Your Honor, I object.

9            MR. ESSIG:  Object.  Beyond the scope.

10           THE COURT:  Overruled.

11   BY MS. GRIFFIN:

12   Q   Did you learn at some point that Blue Cross/Blue Shield had

13   different billing than some other insurance companies?

14   A   Yes.

15   Q   And Blue Cross/Blue Shield was one of the larger contracts

16   that PPSA had for patients' billing, wasn't it?

17   A   It was about even.

18   Q   About even?

19   A   Yes, Medicare and Blue Cross were about even.

20   Q   Were two of the bigger ones; right?

21   A   Yes.

22   Q   Now, did you have some questioning with Dr. Ruan about

23   billing in connection with 2013 and 2014?

24   A   I'm sorry?

25   Q   Do you remember some conversations with Dr. Ruan about

5119

```
 1   billing and the various codes, 213 or 214?

 2   A   I don't recall.

 3           MS. GRIFFIN:  Madam Clerk, what is an available

 4   number?

 5           THE CLERK:  43.

 6           MS. GRIFFIN:  43?

 7           THE CLERK:  Yes, ma'am.

 8       (A discussion was held off the record between counsel.)

 9           THE COURT:  Ladies and gentlemen, while they are doing

10   that, let's go ahead and take our lunch break.  Leave your pads

11   on your chairs.  We will be in recess until 1:15.  No

12   discussion about the case.  And be back downstairs in the jury

13   assembly room at 1:15, ready to be called back up.  We're in

14   recess.

15       (A recess was taken at approximately 11:54 a.m.)

16       (Afternoon session, 1:19 p.m., in open court, defendants

17   and jury present.)

18           THE COURT:  All right, Ms. Griffin.

19   BY MS. GRIFFIN:

20   Q   Ms. Phillips, I believe I had just asked you about if you

21   had any conversations with Dr. Ruan about the billing codes,

22   the 13 or 14 codes, and I was going to show you an email marked

23   as Government's Exhibit 43.  First, did you have your own email

24   address at PPSA with your name in it?

25   A   I did.
```

1    Q   Did you also use -- didn't you also use the email of Tammy

2    Etheridge on occasion?

3    A   Tammy Ethridge's emails went to my computer automatically.

4    Q   So you saw what she sent and she received?

5    A   If I was looking for it.

6    Q   I show you what's marked as Government's Exhibit 43 --

7             MS. GRIFFIN:  Which has not been admitted yet, Your

8    Honor?

9             THE COURT:  All right.

10   BY MS. GRIFFIN:

11   Q   -- and ask you to look at the bottom, the email that says:

12   From Tammy Etheridge to Xiulu Ruan.

13   A   (Reading.)  Yeah, I see it.

14   Q   Because of the way this is printed, did you see that this

15   email purports to be from you?

16   A   Yes.

17   Q   Do you recall writing that email to Dr. Ruan?

18   A   I don't recall, but I see it.

19   Q   But you think this is one because of your name at the end

20   of the email?

21   A   Yes.

22            MS. GRIFFIN:  Move to admit Government's Exhibit 43,

23   which was received pursuant to a search warrant from Dr. Xiulu

24   Ruan's Yahoo account, Your Honor.

25            MR. KNIZLEY:  No objection.

1           THE COURT:  All right.  Mark it in.

2        (Government's Exhibit 43 was entered into evidence.)

3   BY MS. GRIFFIN:

4   Q   Ms. Phillips, is this what you were asking -- we move to

5   publish it to the jury as well, Your Honor.

6           THE COURT:  It will come on.  There you go.

7   BY MS. GRIFFIN:

8   Q   At the bottom what were you asking Dr. Ruan about?

9   A   I'm going to read it again, if you don't mind.

10  Q   Just tell me when you're finished, and I'll ask you the

11  question, please.

12  A   It looks like I'm asking that -- the codes are defaulted to

13  a charge.  So it looks like I'm asking that a certain -- it

14  says Bridgette is hitting a charge that's higher than the

15  amount charged for a self-pay patient.

16  Q   And a self-pay patient is a patient that doesn't have

17  insurance, isn't it?

18  A   That lost their insurance in the course of care.

19  Q   Which means they don't have insurance, doesn't it?

20  A   Correct.

21  Q   Then Dr. Ruan responded to you that that was fine, that

22  those visits were usually short, those self-paid visits; is

23  that right?

24  A   Yes.

25  Q   And you respond:  Can you tell Bridgette to mark the 13 on

DEBORAH SUE "DEBE" PHILLIPS - CROSS BY MS. GRIFFIN

1   the self-pay patients, the noninsurance patients; right?

2   A   Yes.

3   Q   And Dr. Ruan responds to you that he did most of the

4   billing actually, doesn't he?  Do you see that where he

5   responds?

6   A   Yes, I do.

7   Q   I did most of the billing actually.  Isn't that correct,

8   what it says?

9   A   That is what it says.

10  Q   And, Ms. Phillips, when we're talking about billing for

11  PPSA that you discussed with the lawyers for the defendants,

12  you are not talking about billing for C&R Pharmacy, are you?

13  A   No.

14  Q   And you are not talking about the billing for the workers'

15  comp patients either, are you?

16  A   We did have workmen's comp patients we billed for in

17  billing.

18  Q   That's correct.  But they weren't under the same type of

19  rules as your billings that were for insurance companies, were

20  they?  Worker's comp is very different from insurance

21  companies; is that correct?

22  A   To me it's an insurance company that I would bill the same

23  way.  It just has authorization requirements and a different

24  fee schedule.

25  Q   And it pays more than regular insurance or workers' comp,

```
 1    doesn't it?
 2            MR. KNIZLEY:  Your Honor, we object as to workmen's
 3    comp being outside the scope of the direct examination.
 4            MS. GRIFFIN:  Your Honor, she's been talking about the
 5    billing for the whole business.
 6            THE COURT:  Overruled.
 7    BY MS. GRIFFIN:
 8    Q   Worker's comp pays more than typical insurance, doesn't it?
 9    A   Yes, it has a higher fee schedule.
10    Q   And PPSA didn't bill for the dispensary items for the
11    workers' comp patients, their prescriptions, either, did it?
12    A   No.
13    Q   Further, the checks that came in from Insys to Dr. Ruan and
14    Dr. Couch weren't part of something that was billed for by
15    PPSA, were they?
16    A   No.
17    Q   Those didn't even come to PPSA, did they?
18    A   Not to my knowledge.
19    Q   Do you know that they went to the doctors' homes or not?
20    A   I do not know.
21    Q   And do you know where the monies from the IPM that were
22    guaranteed monthly to Dr. Ruan and Dr. Couch came?  Those
23    weren't part of your billing either, were they?
24    A   No, they were not.
25    Q   And they weren't received by PPSA either, were they?
```

5124

DEBORAH SUE "DEBI" PHILLIPS - CROSS BY MS. GRIFFIN

1   A   Not to the billing department.

2        MR. KNIZLEY:  Your Honor, we also object.  We would

3   object to that being outside the scope of the direct

4   examination.

5        THE COURT:  Overruled.

6   BY MS. GRIFFIN:

7   Q   So you weren't privy to how much was coming in to Dr. Ruan

8   and Dr. Couch from IPM?

9   A   That is correct.

10  Q   You weren't privy to how much was coming to each of them

11  from Insys, were you?

12  A   No.

13  Q   Or from the manufacturer of Exalgo to Dr. Ruan?

14  A   No.

15  Q   You knew that there were payments, but those weren't things

16  you had billed for for PPSA; is that correct?

17  A   That is correct.

18  Q   So those weren't for services rendered, those payments,

19  were they?

20  A   Not in the billing department.

21  Q   Now, in connection with the billing, you said that there

22  was money that hadn't been collected or money that hadn't been

23  billed for that you discovered; is that correct?

24  A   Yes.

25  Q   And it was a substantial sum; is that right?

1    A    Yes.

2    Q    I want to talk about prior to your discovering that had

3    either doctor told you:  We are missing money and we need you

4    to find it?  They had not, had they?

5    A    No.

6    Q    You did that on your own?

7    A    Yes.

8    Q    They did not tell you that somehow we're not being paid; is

9    that right?

10   A    No.

11   Q    So they didn't even notice that that money was outstanding,

12   did they?

13   A    I -- I don't know.

14   Q    If they did, they hadn't mentioned it to you and you were

15   in charge; is that right?  Of the billing?

16   A    After I became in charge of billing, Dr. Couch hired a

17   billing company.

18   Q    Then I want to talk about your interaction with the

19   doctors.  You've talked about some things you would interact

20   with them on.  Did Dr. Ruan interact with you about billing and

21   about the various codes and about how much was coming in in

22   connection?

23   A    We had discussions.

24   Q    I mean, he was interested in that very much so, wasn't he?

25   A    Yes.

DEBORAH SUE "DEBBI" PHILLIPS - CROSS BY MS. GRIFFIN

1  Q   And you also talked about some bills, some billing that was

2  out of date, that if PPSA had waited too long to bill for it;

3  is that correct?

4  A   Yes.

5  Q   That was per the agreement with the insurance companies

6  that the insurance companies only gave you a certain time range

7  to bill within; is that correct?

8  A   Correct.

9  Q   And you understood that if you wrote those off, those were

10 deductions for PPSA, didn't you?

11 A   No, I did not.

12 Q   You did not know that they could deduct those that they

13 wrote off?

14 A   No, I did not.

15         MR. ESSIG:  Objection, Your Honor.  She doesn't know.

16         THE COURT:  Okay.

17 BY MS. GRIFFIN:

18 Q   Now, Ms. Phillips, you said that the different billers were

19 assigned to a different provider; is that correct?

20 A   Yes.

21 Q   And there was one full-time biller assigned to Justin

22 Palmer, wasn't it?

23 A   Not originally.  But later, yes.

24 Q   Ms. McDonald?

25 A   Yes.

DEBORAH SUE "DEBI" PHILLIPS - CROSS BY MS. GRIFFIN

1    Q    Was that her name?

2    A    Yes.

3    Q    And Ms. McDonald billed just for Justin Palmer?

4    A    She did Justin and she did workmen's comp, I believe.

5    Q    And was Justin Palmer billing for visits he had done for

6    Dr. Couch?

7    A    Patients he saw, he entered the data into the computer.

8    Q    That's not the question, ma'am.  Why would Justin Palmer,

9    who was a nurse practitioner, require almost a full-time

10   biller, if it wasn't being billed under Justin Palmer's name?

11   A    He was in collaboration with Dr. Couch.

12   Q    So it was being billed under Dr. Couch, is that what you're

13   saying?

14   A    Yes.

15   Q    Not under Justin Palmer?

16   A    Correct.

17   Q    Even though Justin Palmer may have been the one who

18   provided the service; is that right?

19   A    Yes, the subsequent service.

20   Q    The subsequent service?

21   A    Yes.

22   Q    Or the visit?

23   A    Not --

24   Q    Justin Palmer saw the patient?

25   A    He did.  They were in conjunction.  So it was my

5128

1   understanding that the physician --

2   Q   I'm not asking you your understanding.  I'm asking what you

3   know.

4   A   I know that he billed for his followups.

5   Q   Wait a minute.  Dr. Couch billed for visits that Justin

6   Palmer performed; is that correct?

7   A   Correct.

8   Q   And that's why you needed a full-time biller who allegedly

9   was assigned to Justin Palmer but was billing using Dr. Couch's

10  number; is that right?

11  A   Could you repeat the question?

12  Q   Yes.  You had a lady that handled billing for Justin

13  Palmer; is that right?

14  A   Correct; yes.

15  Q   But PPSA did not bill insurance companies for visits done

16  by Justin Palmer, did they?

17  A   We did, but under Dr. Couch.

18  Q   So they were billed under Dr. Couch even though Justin

19  Palmer had conducted the visit; is that right?

20  A   Yes.

21  Q   You also talked about a template and that each doctor could

22  build their own template; is that correct?

23  A   Each practitioner or physician, yes.

24  Q   And by building their template, do you mean that they could

25  select certain things that they wanted to include and certain

1   things they did not want to include?

2   A   Yes.

3   Q   So when the prepopulated template came up, if Dr. Couch

4   didn't want thyroid listed on there, it wouldn't be on his

5   template, would it?

6   A   I'm not sure.  I know you could get rid of buckets, but I'm

7   not sure what things in the buckets you could get rid of.

8   Q   Well, you are talking about particular examinations; right?

9   A   Physical exam.

10  Q   Physical exam?

11  A   Is that what you're talking about?

12          MR. ESSIG:  Objection, Your Honor.  Object to this

13  line of questioning regarding templates.  She's already

14  testified that she doesn't know what the specific practitioner

15  would have set up in their template or exactly how they would

16  have done that or that it was done.

17          MS. GRIFFIN:  Your Honor, she's indicated that they

18  could build their own templates.

19          THE COURT:  I overrule the objection.

20  BY MS. GRIFFIN:

21  Q   So you don't know what Dr. Ruan or Dr. Couch may have asked

22  to be omitted from their templates, do you?

23  A   No.

24  Q   And you only know from what you see on the billing and on

25  the visits what they asked to be included in their templates;

1    is that correct?

2    A   Yes.

3    Q   You didn't have any part in choosing what was included in

4    those doctors' templates, did you?

5    A   No.

6    Q   You knew that the billing relied in part on the length of

7    the physical exam; is that correct?

8    A   Yes.

9    Q   That was an important part in deciding whether you could

10   bill for a higher amount or a lower amount; is that correct?

11   A   Yes.

12   Q   So, for example, a 20-minute visit might be billed higher

13   than a two-second visit; isn't that correct?

14   A   It depends on the other key components.

15   Q   Of a two-second visit?

16   A   You have face-to-face time, is one of the key components.

17   Q   All right, let's talk about face-to-face time.  You're

18   talking about face to face with a doctor, aren't you?

19   A   With a practitioner.

20   Q   Are you talking about face-to-face time with a doctor?

21   A   It could be, yes.

22   Q   So higher face-to-face time was billed if a doctor saw a

23   patient; is that right?

24   A   Could you rephrase the question?

25   Q   Yes.  You talked about a practitioner.  I want to make sure

1    we're talking about the same thing.  Are you talking about a
2    doctor as a practitioner?
3    A    It could be a nurse practitioner or it could be a physician
4    that does an exam.
5    Q    Let's talk about face-to-face time with a doctor so we
6    won't mix the terms up.  Okay?
7    A    Okay.
8    Q    Face-to-face time with a doctor is going to bill higher
9    than face-to-face time with an NP; is that correct?
10   A    To me face-to-face time is the same.  It's done in minute
11   categories.  So if you have a nurse practitioner and she spends
12   10 minutes face-to-face time or you have a physician spending
13   10 minutes face-to-face time, it's still face-to-face time.  It
14   doesn't change.
15   Q    So you're telling us that the entire time that a nurse
16   practitioner is in with one of these patients at PPSA it was
17   billed the same as though a doctor had been there?
18   A    No, that's not what I'm saying.
19   Q    You're saying it does not matter who's there, as long as
20   face-to-face time is counted?
21   A    It's one of the key components of a visit.  So if -- and I
22   don't know if you want me to explain or not.
23   Q    I'm asking you does face-to-face time include when a doctor
24   is in with a patient?
25   A    It does.  And it also does when a nurse practitioner is.

DEBORAH SUE "DEBBI" PHILLIPS - CROSS BY MS. GRIFFIN

1   Q   But you understand that face-to-face time definitions vary
2   by insurance companies, don't you?
3   A   No, it's in the CPT book.  It's not an insurance company
4   thing.  It's the code definition.
5   Q   And you are aware that certain insurance companies require
6   a doctor to actually see a patient before the visit can be
7   billed as though a doctor saw them, aren't you?
8   A   An initial visit.
9   Q   A visit regardless; right?
10  A   Correct.
11  Q   Now, if the codes were based on what was contained in the
12  progress notes, that depended on the progress notes being
13  accurate, didn't it?
14  A   Correct.
15  Q   And if the doctor had certified at the end of the
16  electronic progress note, PPSA was then able to bill; is that
17  correct?
18  A   Correct.
19  Q   And if that were signed by a doctor and you reviewed it,
20  you determined, based on your review, that everything that was
21  listed on there had actually been done, didn't it?
22  A   Correct.
23  Q   And so whether it had been done or not, because the doctor
24  had signed it, you could bill it as what was on that form; is
25  that correct?

1  A   Correct.

2  Q   And you have no first-hand knowledge whether anything that

3  was listed as being done had actually been done, did you?

4  A   I did not go in the rooms.

5  Q   Now, you talked about Ms. Tims working nearby you, had a

6  desk in the same area as yours.  Do you recall that testimony?

7  A   Yes.

8  Q   You didn't stay at your desk all day, did you?

9  A   No.

10  Q   And she didn't either, did she?

11  A   No.

12  Q   She'd get up and walk around and check on things and be

13  called to assist and she had a number of responsibilities just

14  like you did, didn't she?

15  A   Yes.

16  Q   So you don't know what she could and couldn't see when she

17  was walking around within PPSA, do you?

18  A   No.  They asked about in the office.

19  Q   You don't know what she could see or couldn't see in the

20  office when she was walking around, performing her duties, do

21  you?

22  A   If she was walking around, no.

23  Q   Just like she wouldn't know what you saw or didn't see when

24  you walked around; isn't that correct?

25  A   That's correct.

1  Q  And in terms of the physical exams, you don't know how long

2  the physical exams were, do you?

3  A  No, I do not.

4  Q  They could have been two seconds, 43 seconds, or 10 minutes

5  and you wouldn't know the difference; right?

6  A  No.

7  Q  You had previously worked in billing before you came to

8  PPSA, hadn't you?

9  A  Yes.

10  Q  Had you ever worked in a doctor's office that billed the

11  way PPSA billed?

12      MR. KNIZLEY:  Your Honor, again I object.  That's

13  outside the scope.

14      THE COURT:  Sustained.

15  BY MS. GRIFFIN:

16  Q  Did you discuss any of these billing issues you talked

17  about with Boe Strange?

18  A  Yes.

19  Q  Who was Boe Strange?

20  A  He was the accountant and he kind of managed our practice.

21  Q  He was frequently in the PPSA office, wasn't he?

22  A  Yes.

23  Q  And when you reported to Dr. Couch that you had discovered

24  some monies that hadn't been billed, did you observe -- excuse

25  me -- to Dr. Ruan that you had found some monies that hadn't

5135

DEBORAH SUE "DEBI" PHILLIPS - CROSS BY MS. GRIFFIN

```
 1   been billed and you said it was in the millions; is that
 2   correct?
 3   A   Yes.
 4   Q   What did Dr. Ruan do?  Who did he immediately contact?
 5   A   Boe.
 6   Q   How do you know that?
 7   A   I was in front of him when he called him.
 8   Q   You were in front of Dr. Ruan when Dr. Ruan called Boe
 9   Strange?
10   A   Yes.
11   Q   And I'm not going to ask you what was said.  But was there
12   a conversation between the two of them right after you had told
13   Dr. Ruan you had determined there was money outstanding that
14   was owed to the practice?
15   A   Yes.
16   Q   Is that right?
17   A   Yes.
18   Q   And frequently you consulted with Mr. Strange on billing
19   matters for PPSA; didn't you?
20   A   Yes.
21   Q   Now, I believe you said your duties when you became the COO
22   included personnel as well?  Did you have any personnel
23   responsibilities over the personnel?
24   A   Yes.
25   Q   What type?
```

DEBORAH SUE-DEBBY PHILLIPS - CROSS BY MS. GRIFFIN

1   A   Making sure they did their jobs, making sure they followed

2   proper protocol, time off, operation, flow of patients in the

3   office, customer service.

4   Q   And by customer service, you mean patients; right?

5   A   Yes.

6   Q   Those were your customers, weren't they?

7   A   Correct.

8   Q   That's how you made your money; is that correct; for PPSA?

9   A   Correct.

10  Q   Did you also have responsibility for hiring and firing

11  employees?

12  A   Sometimes.

13  Q   And that depended on what level person was being hired or

14  fired; is that correct?

15  A   Yes.

16          MS. GRIFFIN:  One moment, Your Honor.

17          THE COURT:  All right.

18      (A discussion was held off the record between government

19  counsel.)

20  BY MS. GRIFFIN:

21  Q   Now, did Boe Strange also have some hiring and firing

22  responsibilities along with you?

23  A   I don't know if along with me, but he had say-so.

24  Q   And sometimes that was his say-so alone; is that correct?

25  A   Yes.

DEBORAH SUE "DEBBY" PHILLIPS - CROSS BY MS. GRIFFIN

1   Q   Would he frequently meet with Dr. Ruan?

2   A   I don't know.

3   Q   You saw Boe Strange when he was in the office, didn't you?

4   A   Yes.

5   Q   But you weren't always aware who he was there to meet with,

6   were you?

7   A   No.  Only when it pertained to me.

8   Q   And did you have anything to do in connection with the

9   hiring or firing of Stacy Madison?

10  A   That was with Dr. Couch.

11  Q   Did you have anything to do with the termination of

12  Bridgette Parker?

13  A   No.

14  Q   Did you have anything to do with the termination of Justin

15  Palmer?

16  A   No.

17  Q   Did you have anything to do with any of the other employees

18  who went out for purposes of drug treatment?

19  A   I don't know of any others.

20  Q   You weren't aware of any others that went for drug

21  treatment?

22  A   I was not aware of any others.

23  Q   You were not aware of one of the individuals working for

24  Dr. Ruan who went out for drug treatment?

25  A   More than the ones you just mentioned?

1    Q    Yes.

2    A    Okay.  Remention them.  Did you leave someone out?

3             MR. KNIZLEY:  Your Honor, I object to it being outside

4    the scope of direct examination.

5             MS. GRIFFIN:  Your Honor, I asked her just was she

6    aware of that.  And she said she's not.

7             MR. KNIZLEY:  Outside the scope.

8             THE COURT:  All right.  Sustained.

9    BY MS. GRIFFIN:

10   Q    Were you aware of the reassigning of some patients between

11   one doctor to another?

12            MR. KNIZLEY:  Same objection, Your Honor.

13            THE COURT:  Overruled.

14   A    What do you mean by reassigning?

15   BY MS. GRIFFIN:

16   Q    Specifically, were you aware of CCC..................

17   being switched as a patient of Dr. Couch's to be a patient of

18   Dr. Ruan's?

19            MR. ESSIG:  Your Honor, clearly beyond the scope of

20   direct examination.  We haven't discussed any specific patients

21   with this witness.

22            THE COURT:  Does this have to do with billing at all?

23            MS. GRIFFIN:  Your Honor, I'm going to ask her who

24   would bill depending on who the person saw.

25            THE COURT:  Overruled.

5139

```
 1   BY MS. GRIFFIN:
 2   Q   Do you remember that CCC................. was switched
 3   from Dr. Couch --
 4   A   Yes.
 5   Q   -- to Dr. Ruan?
 6   A   Yes.
 7   Q   And once a patient was a Dr. Couch patient and switched to
 8   Dr. Ruan, who received the billing benefits from a switched
 9   patient?
10   A   The provider.
11   Q   The person that the patient was switched to?
12   A   Correct.
13   Q   And when you're saying the provider, because you include
14   that as the nurse practitioner, if a patient switched from
15   Dr. Couch, CC............. specifically, then to Dr. Ruan,
16   would MC's..... billing be credited to Dr. Ruan?
17   A   From that point forward, yes.
18   Q   So the exact one they were seeing, even if they had
19   switched, would go to the doctor that they were assigned to; is
20   that correct?
21   A   That's correct.
22   Q   And you don't have any independent knowledge of whether
23   patients were switched back and forth from Dr. Ruan to
24   Dr. Couch, do you?
25   A   No.
```

1          MS. GRIFFIN:  That's all I have of this witness, Your

2    Honor.

3          THE COURT:  All right.  Mr. Essig?

4          MR. ESSIG:  Thank you, Your Honor.

5                    REDIRECT EXAMINATION

6    BY MR. ESSIG:

7    Q   Ms. Phillips, those questions you were asked there at the

8    end, would that be true of any patient who was switched from

9    one doctor to the other?

10   A   Yes.

11   Q   Now, Ms. Phillips, you were asked a lot of questions about

12   CPT codes.  Can you tell the jury how many CPT codes there are

13   in total?

14   A   (Laughing.)  The book is that thick.  (Indicating.)

15         MS. GRIFFIN:  Your Honor, that is beyond the scope of

16   cross.

17         THE COURT:  Yes.  Sustained.

18   BY MR. ESSIG:

19   Q   Ms. Phillips, I'm going to ask you this question:  Is 99214

20   the highest billing CPT code?

21         MS. GRIFFIN:  That is beyond the scope of cross too,

22   Your Honor.

23         THE COURT:  Overruled.

24   BY MR. ESSIG:

25   Q   Is it?

5141

DEBORAH SUE PHILLIPS - REDIRECT BY MR. ESSIG

```
 1   A   Can I answer?

 2   Q   Yes, ma'am, you can.

 3   A   Okay.  No.

 4   Q   What is the highest CPT code?

 5   A   Consult codes.

 6   Q   Okay.  And what is that number?

 7   A   Those are 99244s, 45s.

 8   Q   Is there a 99 --

 9   A   They are not billed a lot.

10   Q   Is there a 99215 CPT code?

11   A   Yes.

12   Q   Is that higher than a 99214?

13   A   Yes.

14           MS. GRIFFIN:  Your Honor, we object.

15           THE COURT:  I sustain, I sustain the objection.  We're

16   talking about consult codes.  They're not --

17   A   Those are visits.

18           THE COURT:  Sustained.

19   BY MR. ESSIG:

20   Q   Is a 99215 a visit code?

21   A   It is.

22   Q   Is that a higher-billed code than a 99214?

23   A   Yes.

24   Q   How often did PPSA bill a 99215?

25   A   Very minimally.
```

 1  Q   You mentioned the term that Justin Palmer was billing or
 2  working with Dr. Couch in collaboration; is that correct?
 3  A   Yes.
 4  Q   Is there guidance out there on billing for a practice when
 5  a nurse practitioner and a doctor bill in collaboration?
 6          MS. GRIFFIN:  Your Honor, I object, I object to the
 7  foundation.  They had many, many, many insurance companies.
 8  And that's asked as a general question rather than a specific,
 9  and we would ask to approach.
10          THE COURT:  All right.  (Indicating.)
11      (At the side bar, jury not present.)
12          MS. GRIFFIN:  Your Honor, if she's allowed to answer
13  this, we would like to recross her on the Blue Cross/Blue
14  Shield requirements that it only be a doctor visit in
15  connection with the billing, and we object to it being asked
16  generally.  We would be here for the rest of today and tomorrow
17  to talk about every single insurance company.  And they all had
18  different requirements because it pertained to the
19  contracts.  And I don't know that she has the foundation or the
20  knowledge to answer that as well.
21          MR. ESSIG:  Your Honor, first of all, the Blue
22  Cross/Blue Shield rule on its face doesn't say it has to be a
23  doctor visit only.  That's not what it says.  Second of all,
24  this is not directed to a Blue Cross/Blue Shield issue.  They
25  raised the issue of Justin Palmer, Dr. Couch billing for

1   services done by Justin Palmer.  They raised that issue.  All I

2   want to do is ask it generally how they handled that within the

3   practice, the guidance they used for that.  They've raised it,

4   Judge.

5          MS. GRIFFIN:  But, Judge, she can't -- he's asked a

6   blanket question.  He's not asked a specific question.  And I

7   don't know that she has the foundation to answer it.  Further,

8   I don't know that it is past.  She's talked specifically about

9   Blue Cross/Blue Shield and she said they billed all of

10  Justin's.  And I don't think we take the legal of when they can

11  and when they can't bill from somebody who was not at the end

12  connected with billing.  She doesn't know what's legal about it

13  and what's not.

14         MR. ESSIG:  Judge, she either knows the answers to my

15  questions or she doesn't.  That's the --

16         THE COURT:  I sustain the objection.

17     (In open court, defendants and jury present.)

18  BY MR. ESSIG:

19  Q   Now, Ms. Phillips, you were asked questions about a 99214

20  visit and the distinction between a patient being seen by

21  either a nurse practitioner or a doctor.  Can a patient being

22  seen solely by a nurse practitioner generate a CPT code of

23  99214?

24  A   Yes.

25  Q   You were asked about the time duration of a physical

1    examination.  Do you remember getting that question?

2    A   Yes.

3    Q   Is the time duration of the physical examination the only

4    factor that determines how it's billed?

5    A   No.

6    Q   What are the other factors that are considered?

7         MS. GRIFFIN:  Your Honor, it was not gone over in

8    cross.  It's a rehash of his direct.

9         THE COURT:  That's true.  You went over all of that on

10   direct.  Sustained.

11   BY MR. ESSIG:

12   Q   And, Ms. Phillips, I think you testified during cross-

13   examination at some point in time there was a question you were

14   asked and you wanted to give an explanation.  Do you recall the

15   explanation that you wanted to give?

16        MS. GRIFFIN:  Your Honor, I object.  There's no

17   question before her.

18        THE COURT:  Yes.  You need to ask her a direct

19   question, not for her to comment generally on something.

20   BY MR. ESSIG:

21   Q   Did you have an explanation for one of the answers you gave

22   before?

23   A   I did.

24        MS. GRIFFIN:  Your Honor, there's no question before

25   her.

1          THE COURT:  Yes.  You need to ask her about the
2    subject matter that you want her to explain.
3    BY MR. ESSIG:
4    Q   Did it relate to the interaction between the practitioners
5    and the billers regarding CPT codes?
6    A   I don't think so.
7    Q   Let me ask you this, Ms. Phillips.  You were asked
8    questions about if the billers billed what the doctors told
9    them to bill.  Do you remember being asked that question?
10   A   Yes.
11   Q   Was it always the doctors that the billers were talking to
12   when they were resolving issues with the correct codes?
13   A   No.
14   Q   And did they also have discussions with the nurse
15   practitioners about how to resolve those issues?
16   A   Yes.
17   Q   And when reviewing a progress note, as Ms. Phillips [sic]
18   asked you about and she asked you about certification of the
19   accuracy of the progress note, when the biller enters the bill,
20   are they considering all of the information in the progress
21   note or only that information relevant to the condition of the
22   patient?
23          MS. GRIFFIN:  Objection, Your Honor, to
24   foundation.  And again, it's beyond the cross.
25          THE COURT:  Sustained.

5146

```
 1   BY MR. ESSIG:

 2   Q   And when you were shown -- I think you were shown a chart

 3   during cross-examination.  Do you recall that chart?

 4   A   Yes.

 5   Q   And for each doctor you were shown that there was a point

 6   in time where the 99213 codes went down, the 99214 codes went

 7   up?

 8   A   Yes.

 9   Q   Do you have an explanation for that?

10   A   I do.

11          MS. GRIFFIN:  Your Honor, objection.  She was not

12   shown, except for Dr. Ruan.

13          THE COURT:  Overruled.

14   BY MR. ESSIG:

15   Q   The chart you were shown that showed a change in the

16   billing, do you have an explanation for that?

17   A   Yes.

18   Q   Can you give us that explanation, please?

19   A   She showed 2012 on the graph and the billing dramatically

20   increases from what I see, not from any reports, but from what

21   she showed me.  But that's the time that they hired all their

22   nurse practitioners.

23   Q   And what was the significance of the hiring of the nurse

24   practitioners in terms of generating the CPT codes?

25   A   More patients were seen, therefore more of that same code
```

1  would have -- it would have increased the usage of that code

2  because more practitioners were using it.

3  Q   And is there anything that says that a nurse practitioner

4  has to bill a 99213?

5  A   No.

6  Q   In your time when you were at PPSA did any of the doctors

7  ever dictate -- did you ever hear any of the doctors dictating

8  to the nurse practitioners the CPT code that they had to bill?

9  A   Not to my knowledge.

10 Q   And are you aware at any point in time any of the doctors

11 dictating to the billers the CPT codes that they would enter

12 into the system?

13 A   What do you mean by dictating?  Say --

14 Q   Did any of the doctors ever say we're always going to bill

15 a 9921 --

16 A   No.

17           MR. ESSIG:  No further questions.

18           THE COURT:  Mr. Knizley?

19                     REDIRECT EXAMINATION

20 BY MR. KNIZLEY:

21 Q   Ms. Phillips, you were asked about Government's Exhibit 43

22 that is in evidence.

23 A   Yes.

24 Q   Do you recall being asked about this email?

25 A   I do.

1   Q   And the date here on this email is what?

2   A   December 14th, 2012.

3   Q   Was the paper superbilling in place or the electronic

4   superbilling in place at that time?

5   A   Paper.

6   Q   And so that we'll remember what that is, tell us what the

7   paper superbilling is versus the electronic.

8   A   It's a sheet of paper with CPT codes and diagnosis codes

9   charging and charges.

10  Q   And the prosecutor showed you the email starting at the

11  bottom where from Ms. Etheridge's email address you were

12  writing to Dr. Ruan; is that correct?

13  A   That's correct.

14  Q   And you asked Dr. Ruan about some charging for some higher

15  office visits; is that right?

16  A   Yes.

17  Q   What are the office visits you were asking about, what code

18  numbers?

19  A   I was asking about 99214 and 99213.

20  Q   And are you saying that it has come to your attention that

21  several of our self-pay patients have been charged the higher

22  office visit; is that right?

23  A   Yes.

24  Q   And then you normally quote these patients 90 for the

25  charge of that?

```
 1   A   Correct.

 2   Q   And 75 for the urinalysis; is that right?

 3   A   Correct.

 4   Q   And when you do that, this 90 is the lower fee; right?

 5   A   That's correct.

 6   Q   And then it says when the higher fee, 14, is charged, the

 7   patients have a balance due?

 8   A   Correct.

 9   Q   Is that correct?

10   A   Yes.

11   Q   Because you only collect for the 90 plus the 75, which is

12   165; right?

13   A   That's correct.

14   Q   So what do you ask Dr. Ruan about whether -- about what to

15   charge, what do you say?

16   A   I'm asking basically did the practitioner make a mistake

17   because self-pay is $90.  Did they -- did this warrant a higher

18   thing or, if not, if it was a mistake, do you want it written

19   off or do you want a balance billed to the patient because it

20   entailed more work?

21   Q   So you're asking the doctor does he want to bill 13 or 14?

22   A   Correct.

23   Q   Is that what you're doing here?  (Indicating.)

24   A   Yes.

25   Q   Are you saying:  Do you want to bill 13 -- which one do you
```

1    want to bill, is what you're saying; right?

2    A    Yes.

3    Q    What does Dr. Ruan tell you?

4    A    If you can bring it down.

5    Q    I'm sorry.

6    A    That's okay.

7    Q    First he says -- what does he say right here?

8     (Indicating.)

9    A    He says that's fine.  These visits are usually short, which

10   warrant -- and even though other people charge more for

11   self-pay patients, is what he's telling me.

12   Q    Is he telling you that it's fine to charge -- what is he

13   telling you it's fine to do?

14   A    To keep the lower code even though she circled the higher

15   code.

16   Q    The 13?

17   A    Correct.

18   Q    Okay.  And then at the top he continues to discuss that

19   with you, he says:  She is overwhelmed.  Do you know who he's

20   talking about?

21   A    Bridgette.

22   Q    And again, this was back in the day of the paper?

23   A    Right.

24   Q    The paper superbill.  And he says:  I did most of the

25   billing actually.  Do you know whether he's talking about going

5151

```
 1    back into the billing office and entering data or what's he
 2    talking about?
 3            MS. GRIFFIN:  Object, Your Honor, to foundation as to
 4    what he's talking about.
 5            THE COURT:  Overruled.  Overruled.
 6    BY MR. KNIZLEY:
 7    Q   Go ahead.
 8    A   Possibly doing her superbills.
 9    Q   Doing them?  Tell the jury what doing the superbills means.
10    What are you talking about, writing them?
11    A   Circling, circling, overwhelmed maybe.
12    Q   And even -- and he said he would do what here?  If so, what
13    does he say?
14    A   He says he's going to change them all to 99213.
15    Q   And again, that's the lower amount?
16    A   Correct.
17            MR. KNIZLEY:  Thank you.  That's all we have for this
18    witness.
19            THE COURT:  May this witness be excused?
20            MR. ESSIG:  Yes, Your Honor.
21            THE COURT:  All right.  You may step down.  Thank you.
22            Call your next witness.
23            MR. DOSS:  Dr. Couch calls Angela Christy.
24                        ANGELA CHRISTY
25               was sworn and testified as follows:
```

1          THE WITNESS:  Yes, I do.

2                    DIRECT EXAMINATION

3    BY MR. DOSS:

4    Q   Good afternoon.  Would you please state your name and spell

5    it for the record, please, ma'am?

6    A   Angela, A-N-G-E-L-A, Christy, C-H-R-I-S-T-Y.

7    Q   And, Ms. Christy, what do you do for a living?

8    A   Medical assistant.

9          THE COURT:  Ma'am, if you will lean a little bit into

10   the microphone so we can hear you better?  Thank you.

11   BY MR. DOSS:

12   Q   And what do you do for a living?

13   A   Medical assistant.

14   Q   How long have you been a medical assistant?

15   A   About 11 years.

16   Q   Did you go to school for that?

17   A   Yes.

18   Q   At some point in time did you begin working at Physicians

19   Pain Specialists of Alabama, or PPSA?

20   A   Yes.

21   Q   About when did you start working there?

22   A   July 2010.

23   Q   By January and February of 2011, what was your job at PPSA?

24   A   Prescription nurse.

25   Q   And was that sometimes called the script nurse?

ANGELA CHRISTY - DIRECT BY MR. DOSS

1   A   Yes.

2   Q   So either prescription nurse or script nurse.  In that role

3   generally speaking, and then we'll go into some specifics, but

4   generally speaking what were your job duties?

5   A   Basically refill medications for the most part.

6   Q   Would you assist in other ways as needed from time to time?

7   A   Yes.

8   Q   Could you give us some examples of those things?

9   A   I'd work in clinic, get vitals, putting patients in the

10  room, assisting with procedures as needed, prior authorizations

11  on medications, knee braces, back braces.

12  Q   And which location of PPSA did you work at?

13  A   Majority Springhill office.

14  Q   Now, I want to talk first about one of the last things you

15  said, the PAs, the prior authorization process.  Did you do PAs

16  for Abstral and Subsys?

17  A   Yes.

18  Q   Tell us a little bit about that process.  Generally

19  speaking, what was involved, please?

20          MS. GRIFFIN:  Your Honor, can we have a foundation as

21  to time?

22  BY MR. DOSS:

23  Q   About when did you start doing the PAs for Abstral and

24  Subsys, Ms. Christy?

25  A   Maybe roughly a year, year and a half.  So about 2014, end

1  of 2013.

2  Q   Okay.  And that was through, as far as you can remember,

3  the end of PPSA, May of 2015?

4  A   Yes.

5  Q   So going back to the original question, Ms. Christy, if you

6  could just give us a general overview what the PA process for

7  Abstral and Subsys involved, please?

8  A   If the insurance required prior authorization, I would fill

9  out a form, fax it to the company, wait for approval or denial.

10 If it was denied, I would sometimes submit an appeal.

11 Q   When you say prior authorization, what do you mean by that?

12 A   It was a form just giving additional information for the

13 insurance company to approve or deny the medication.

14 Q   I'm going to show you what we've marked as Couch Exhibit

15 187.

16         THE COURT:  Is this for -- it's not been admitted yet;

17 right?

18         MR. DOSS:  No, ma'am.

19 Q   Ms. Christy, do you recognize this form?

20 A   Yes.

21 Q   And what kind of form is this?

22 A   That is for Subsys.

23 Q   And is this in fact a form that you completed as script

24 nurse at PPSA?

25 A   Yes.

 1          MR. DOSS:  Your Honor, at this time we offer Couch

 2   Exhibit 187.

 3          THE COURT:  Is this a preauthorization form or

 4   something --

 5          MR. DOSS:  Yes.

 6          MS. GRIFFIN:  If we could just have a date on the

 7   exhibit?  Or if we could just see the exhibit for a moment?

 8          MR. DOSS:  Sure.  I have a spare copy for you.

 9          MS. GRIFFIN:  No objection, Your Honor.

10          THE COURT:  All right.  Mark it in.

11       (Defendant Couch's Exhibit 187 was entered into evidence.)

12          MR. DOSS:  May we publish that to the jury, Your

13   Honor?

14          THE COURT:  Yes.  It just takes a minute.

15   BY MR. DOSS:

16   Q   And briefly what is this document, Ms. Christy?

17   A   It is a prior authorization form for the medication Subsys.

18   Q   And how do you know it's for Subsys?

19   A   Because Insys was the maker of Subsys and Insys is on the

20   top of the form.

21   Q   And does it have some demographic information about the

22   patient on this form?

23   A   Yes.

24   Q   Does it have some practitioner information?  (Indicating.)

25   A   Yes.

1  Q   And does it have insurance information?

2  A   Yes.

3  Q   And then we get to medical information.  Did you complete

4  that portion of the PA?

5  A   Yes.

6  Q   And for the PAs that you prepared for Abstral and Subsys,

7  were you the one, generally speaking, completing the medical

8  information for those forms?

9  A   Yes.

10 Q   Tell us how you prepared that portion of the form that

11 includes the medical information for the patient.

12 A   I got that information out of the patient's chart.

13 Q   Is that sometimes called Greenway?

14 A   Yes.

15 Q   And we see here with this particular patient 789.07, 724,

16 and 577.1.  Do you see those?

17 A   Yes.

18 Q   What are those?

19 A   Those are ICD-9 codes.

20 Q   Are those sometimes referred to as diagnostic codes?

21 A   Yes.

22 Q   And is there a -- well, let's back up.  ICD-9 code, what is

23 that?

24 A   It's a diagnosis code that I'm assuming was insurance

25 purposes.

ANGELA CHRISTY - DIRECT BY MR. DOSS

```
 1   Q   Is it usually -- is it generally used in the medical
 2   community?
 3   A   Yes.
 4   Q   And would there be diagnoses for patients in the patient's
 5   Greenway file?
 6   A   Yes.
 7   Q   And for -- was that where you were getting this information
 8   from for these forms?
 9   A   Yes.
10   Q   And if you look down at the bottom, does that appear to be
11   a fax stamp?
12   A   Yes.
13   Q   Once you would complete one of these forms, would you fax
14   it?
15   A   Yes.
16   Q   Where would you fax it to?
17   A   To the fax number, I believe it's at the top of the form,
18   to Insys.
19   Q   Is that here at the top, that fax number?  (Indicating.)
20   A   Yes.
21   Q   And did you prepare similar forms for Abstral?
22   A   Yes.
23   Q   And would you go through the same process in preparing
24   those forms as you did in preparing the forms for Subsys?
25   A   Yes.
```

1  Q   And would that include checking the patient's Greenway file

2  for the patient's diagnosis code?

3  A   Yes.

4  Q   Is it safe to say you did hundreds of these PAs while

5  working at PPSA?

6  A   Maybe hundreds.  I'm not sure.

7  Q   Were you ever told by Dr. Couch to falsify any of these

8  PAs?

9  A   Absolutely not.

10  Q   Were you ever told by Dr. Couch to check a cancer diagnosis

11  when the patient didn't have cancer?

12  A   Absolutely not.

13  Q   Now, after you faxed it -- well, let me back up.  For the

14  Abstral PA would you fax that to the company that made Abstral

15  or would you fax that to an insurance company, if you recall?

16  A   I don't recall.  I think it may have been the company.

17  Q   After you faxed the PAs, whether to Insys or Abstral, what

18  would be the next thing you would come to understand about this

19  process?

20  A   I would wait for an approval or denial.

21  Q   And would that be received from the insurance company?

22  A   I believe so.

23  Q   If the PA was denied, would something happen after that?

24  A   If it was a medication that the patient needed or the

25  physician or practitioner requested that I would do an appeal

ANGELA CHRISTY - DIRECT BY MR. DOSS

1  on, I would type an appeal letter.

2  Q   And would Dr. Couch sign that appeal letter?

3  A   Yes.

4  Q   After the appeal letter was prepared, then what would

5  happen?

6  A   Sometimes additional information will be requested, such as

7  office notes.  It would -- in the end it would either be a

8  final denial or approval.

9  Q   Who would request those office notes?

10  A   Insurance company.

11  Q   And would you be -- would you be involved in the process of

12  providing those office notes to the insurance company?

13  A   Yes.

14  Q   And would they be -- when insurance companies were

15  requesting office notes, were they requesting information from

16  PPSA about the patient's diagnoses?

17  A   Yes.

18  Q   And during this process of seeking the PA, getting letters

19  back from the insurance company, sending letters back to the

20  insurance company, getting letters back, were you in contact

21  with the patients during this process; for example,

22  Ms. Goellner on this sheet?

23  A   Yes.

24  Q   Were you keeping the patients updated about the status of

25  the PA?

1    A    Yes.

2    Q    Would from time to time patients have questions for you

3    about this process?

4    A    Not exactly.

5    Q    Based on your experience of preparing these PAs and

6    corresponding back and forth with insurance companies, did

7    insurance companies from time to time approve Subsys when the

8    patient didn't have cancer?

9                MS. GRIFFIN:  Your Honor?

10   A    Yes.

11               MS. GRIFFIN:  Ask for a foundation.  He's blanketly

12   asking insurance companies.

13   BY MR. DOSS:

14   Q    Well, let's start with Blue Cross.  From time to time did

15   Blue Cross approve Subsys when the patient didn't have cancer?

16   A    Yes.

17   Q    From time to time did Blue Cross approve Abstral when the

18   patient didn't have cancer?

19   A    Yes.

20   Q    Do you recall some of the other insurance companies that

21   you corresponded back and forth with during this PA process for

22   Abstral and Subsys?

23   A    I don't recall off the top of my head, but maybe United

24   Healthcare, Medicare.  I mean, there are dozens of insurance

25   companies.

1   Q   With United Healthcare, did it from time to time approve

2   Subsys when the patient didn't have cancer?

3   A   If that was their insurance company, yes.

4   Q   If the patient had United Healthcare, did United Healthcare

5   from time to time approve Abstral when the patient didn't have

6   cancer?

7   A   Yes.

8   Q   Did you say Medicaid or Medicare?

9   A   Medicare.

10  Q   Medicare.  Did Medicare from time to time approve Subsys

11  when the patient didn't have cancer?

12  A   Yes.

13  Q   Did Medicare from time to time approve Abstral when the

14  patient didn't have cancer?

15  A   Yes.

16  Q   Now, with Insys in particular, do you recall there being a

17  sales representative that worked with PPSA from Insys named

18  Natalie Perhacs?

19  A   Yes.

20  Q   And about how long, if you recall, or when did you first

21  interact with Ms. Perhacs in your role as overseeing this PA

22  process?

23  A   Maybe within the last year.

24  Q   So maybe in 2014, is that what you're saying?

25  A   Yeah.

ANGELA CHRISTY - DIRECT BY MR. DOSS

```
 1   Q   Now, while Ms. Perhacs was the sales representative working
 2   at PPSA, did you ever catch her altering a PA?
 3   A   I did.
 4   Q   Can you tell us a little bit about that?
 5   A   I only witnessed it once.  I don't know if it happened
 6   multiple times.  I witnessed it.  I went directly to my office
 7   manager.
 8   Q   Before we get there, where was Ms. Perhacs when you saw
 9   this?
10   A   At my desk.
11   Q   At your desk?
12   A   Uh-huh (positive response).
13   Q   In PPSA?
14   A   Uh-huh (positive response).
15   Q   And did you walk in and see her doing this?
16   A   Yes.
17   Q   And as best you recall, what exactly was she doing to alter
18   the PA?
19   A   She just wrote a specific diagnosis code.
20   Q   And did she have access to Greenway?
21   A   No.
22   Q   Do you know if that diagnosis code was the correct
23   diagnosis code for that patient?
24   A   It was not.
25   Q   And did you check Greenway to confirm that?
```

1    A    I did.

2    Q    Then did you report that incident to someone at PPSA?

3    A    I did.

4    Q    To whom did you report that incident?

5    A    To my office manager.

6    Q    And who was that at the time?

7    A    It was Debi.

8    Q    Is that Debi Phillips?

9    A    Yes.

10   Q    After you reported that to Ms. Phillips, shortly thereafter

11   did Insys have a new sales rep assigned to PPSA?

12   A    They did.

13   Q    And was Ms. Perhacs ever working with PPSA again after

14   that, as far as you knew?

15   A    I'm not sure.

16   Q    Did you ever see her again at PPSA?

17   A    No.

18   Q    Did you from time to time toward the end of your career at

19   PPSA assist with new patients?

20   A    Yes.

21   Q    While assisting with new patients, did you run PDMP reports

22   for them?

23   A    Yes.

24   Q    Would you look for anything suspicious in the PDMP report

25   while you were assisting with the new patient process?

1    A    Yes.

2    Q    What were you looking for that would have been suspicious?

3    A    Multiple doctors prescribing multiple narcotics.

4    Q    What would that have been a sign of, if you know?

5    A    Judging by which doctors and specific dates; if it was

6    multiple doctors close to the same time frame, that would

7    trigger a red flag.

8    Q    What would you do if one of those red flags was raised?

9    A    I would highlight all the information and take it to the

10   doctor.

11   Q    Now, after a patient had been admitted at PPSA and seen,

12   was that patient sometimes referred to as an established

13   patient?

14   A    Yes.

15   Q    And did you have an occasion while you were at PPSA to run

16   PDMP reports on established patients?

17   A    Yes.

18   Q    And did you do that from January 2011 until May 2015,

19   running PDMP reports on established patients?

20   A    Roughly.

21   Q    So basically the whole time you were there; is that right?

22   A    Yes.

23   Q    Now, your title was script nurse, and we've talked about

24   the PA process.  Let's focus now on the script part, the

25   prescription part.  Is it fair -- is it fair that eventually

1    patients at PPSA would transition from seeing or coming into

2    the clinic every 30 days to coming into the clinic every 90

3    days?

4    A   Yes.

5    Q   And when a patient was on that 90-day cycle, would patients

6    receive new prescriptions between their office visits?

7              MS. GRIFFIN:  Your Honor, we would ask for some

8    foundation as to which doctor he's referring to.

9    BY MR. DOSS:

10   Q   Which doctor did you serve as script nurse for,

11   Ms. Christy?

12   A   Dr. Couch, Dr. Ruan, and Dr. Chen.

13   Q   Okay.  So when a patient was on the 90-day cycle, would

14   patients receive new prescriptions between their office visits?

15   A   New prescriptions of the same medication, yes.

16   Q   Okay.  Tell us generally how that process worked.

17   A   If a patient was not due for an appointment, they would

18   call the prescription line.  I would check their chart.  If

19   they were not due for an appointment, they were due for their

20   refills, I would refill their medications with the correct

21   date, have it signed by the physician, call the patient, tell

22   them they could pick it up.

23   Q   And when you say refill, it's not actually a refill, is it?

24   A   It's a new prescription of the same medication.

25   Q   Okay.  Now, from time to time would patients call in saying

1    that they needed new medicine or new prescriptions and they

2    weren't actually due for a new prescription?

3    A    Right; yes.

4    Q    And how would you handle that?

5    A    If they were not due for a new prescription?

6    Q    Yes, ma'am.

7    A    I would date it for the date that it is due and then they

8    could come pick it up.

9    Q    When patients would call in that they were due for a new

10   prescription, were there ever times that things that they would

11   say would trigger or cause you to run a PDMP report?

12   A    Yes.

13   Q    Can you tell us a little bit about that?

14   A    For example, if someone called in and said their house was

15   broken into, someone stole their medications, they needed an

16   early refill, I would pull the PDMP report, make sure they

17   weren't receiving it from another doctor.  Typically a police

18   report would be requested for the patient.

19   Q    Would you request that police report?

20   A    Yes.

21   Q    And would that be a police report requested if they were

22   saying that their medications had been stolen?

23   A    Correct.

24   Q    When they were due -- well, let me back up.

25         How did you know when patients were due for a

1  prescription?

2  A   I would look at their last office visit and see whether

3  they were due for an appointment or their medication.

4  Q   So what were you looking for in -- let me back up.

5      Were you checking Greenway for that?

6  A   Yes.

7  Q   What were you looking for in the patient's Greenway file to

8  let you know that the patient was due for a new prescription?

9  A   When their followup appointment was due.

10 Q   And so if a patient had a 90-day follow up and it was 30

11 days after that first office visit, was that your signal that a

12 new prescription was due?

13 A   Yes.

14 Q   And 60 days after that office visit, was that your signal

15 that a new prescription was due?

16 A   Yes.

17 Q   And in 90 days would the patient be due for another

18 appointment?

19 A   Yes.

20 Q   Now, when you were going through and preparing the

21 prescriptions, were you relying on the Greenway charts of the

22 patients to determine what those prescriptions were?

23 A   Yes.

24 Q   Would you write them by hand or were they printed or was it

25 both?

```
 1   A   Before we got Greenway, they were written by hand.  Once we
 2   got Greenway, they were printed, unless there was ever an issue
 3   where the computer system was down and they would be
 4   handwritten.
 5   Q   And then when you would prepare the prescriptions, would
 6   you include the patient's name?
 7   A   (Nodding head affirmatively.)  Yes.
 8   Q   Would you include the medication?
 9   A   Yes.
10   Q   Would you include the dosage?
11   A   Yes.
12   Q   And was that information you were getting out of Greenway?
13   A   Yes.
14   Q   And was it your understanding you were being directed by
15   Dr. Couch to prepare those prescriptions based on what was in
16   Greenway?
17           MS. GRIFFIN:  It's leading, Your Honor.
18   A   Correct.
19           MS. GRIFFIN:  I object.
20           THE COURT:  Don't lead the witness.
21   BY MR. DOSS:
22   Q   After you prepared the prescriptions, what would happen
23   next?
24   A   I would take them to whichever physician, have them signed,
25   call the patient, tell the patient they could pick their
```

1    prescription up.

2    Q    Now, during this 90-day period between office visits, if a

3    patient called in for a new prescription and requested new

4    medication, what would happen?

5    A    If it was a new medication they had never been on?

6    Q    Yes, ma'am.

7    A    They would be required to come into the office or an

8    appointment.

9    Q    What if the patient had been complaining of side-effects,

10   some new side-effect from the medication?

11   A    They would be directed to discontinue the medication and

12   come to the doctor or practitioner.

13   Q    And what if the patient asked to see a doctor when calling

14   in for the new medication, what would happen?

15   A    Are you referring to the doctor, not a practitioner?

16   Q    Either the practitioner or the doctor.

17   A    They would be scheduled an appointment to come in.

18   Q    Now, this 90-day cycle, this is different than when a

19   patient first comes to PPSA; is that right?

20   A    Correct.

21   Q    When a patient first starts at PPSA, how frequently were

22   they coming into the clinic, generally speaking?

23   A    To my knowledge, once a month.

24   Q    And was there a cycle in between every 30 days and every 90

25   days that patients were sometimes placed on?

5170

 1   A   Maybe two months instead of three months.

 2   Q   Would the patient be graduated to that 90-day interval?

 3   A   From my understanding, yes.

 4   Q   And best guess, how many prescriptions did you prepare over

 5   your five years at PPSA?

 6   A   Probably hundreds, thousands over the whole four and a

 7   half, five years I done that.

 8   Q   And when we talked before about the five-year period you

 9   were there, were you doing your script nurse duties that entire

10   time?

11   A   The first year -- well, I would say the first year no,

12   because I went on maternity leave.

13   Q   Okay.

14   A   I came back.  That's when I took over that position.  That

15   was in 2011.

16   Q   So 2011 is when you started that?

17   A   Yes.

18   Q   And that was all the way through May of 2015?

19   A   Yes.

20           MR. DOSS:  Okay.  One moment, Your Honor.

21           THE COURT:  All right.

22           MR. DOSS:  No further questions at this time, Your

23   Honor.

24           THE COURT:  Mr. Darley?

25           MR. DARLEY:  I just have a couple.

```
 1            THE COURT:  All right.  And you're taking her on
 2   direct; is that correct?
 3            MR. DARLEY:  Yes, ma'am, Your Honor.
 4            THE COURT:  All right.
 5                          DIRECT EXAMINATION
 6   BY MR. DARLEY:
 7   Q    Good afternoon, Ms. Christy.
 8   A    Hello.
 9   Q    I'm Jason Darley, and I represent Dr. Ruan.  Mr. Doss on
10   direct showed you this, what has been marked as Couch Exhibit
11   187 into evidence.  And this is -- can you tell the jury again
12   what this is?
13   A    That is a prior authorization form for the medication
14   Subsys.
15   Q    Okay.  And you testified on direct that you did these for
16   Dr. Couch, Dr. Ruan, and Dr. Chen; correct?
17   A    Yes.
18   Q    And you, did you fill these things out accurately and
19   truthfully?
20   A    Yes.
21   Q    According to the information that you had?
22   A    Yes.
23   Q    Okay.  And you testified Dr. Couch never instructed you to
24   falsify these?
25   A    No.
```

1   Q   Did any other doctor tell you to falsify these, period?

2   A   Never.

3   Q   And the one time that you saw someone falsify it, you

4   reported that, did you not?

5   A   Yes.

6           MR. DARLEY:  That's all I have.  Pass the witness.

7           THE COURT:  Is it Ms. Griffin or Mr. Bodnar?

8           MR. BODNAR:  Ms. Griffin.  We've just got to gather

9   some documents, Your Honor.

10          THE COURT:  All right.

11                          CROSS EXAMINATION

12  BY MS. GRIFFIN:

13  Q   Ms. Christy, you said you served mainly as the refill

14  nurse; is that correct?

15  A   Correct.

16  Q   You were not a nurse, though, were you?

17  A   No, ma'am.

18  Q   And in addition to receiving calls from patients wanting a

19  refill, you would receive calls from patients who had a problem

20  with their prescriptions as well, wouldn't you?

21  A   That would typically go to the medical assistant that

22  worked in clinic with the doctor or a nurse practitioner.

23  Q   So you didn't receive any calls from patients saying that

24  the pharmacies wouldn't fill their prescriptions?

25  A   Issues such as that, yes, I would receive those calls.

1   Q   You would receive those calls?

2   A   Yes.

3   Q   And those would be from patients that were upset because

4   the pharmacies weren't filling their scripts from PPSA; is that

5   correct?

6   A   Correct.

7   Q   And did you occasionally receive calls as well from

8   pharmacists who would not -- would not fill scripts from PPSA?

9   A   Correct.

10  Q   But you didn't receive any of those calls from C&R

11  Pharmacy, did you?

12  A   Unless there was an issue with a fill date on there, no, I

13  did not.

14  Q   What would you do with a pharmacist that said:  We're not

15  going to fill a PPSA script?  Would you pass that on to

16  somebody above you?

17  A   Well, first of all I would find out why they wouldn't fill

18  it.  If it was due to the fact that it wasn't quite due for it

19  to be filled, they would have to hold it on file until it was

20  due.

21  Q   And were there times that they told you that those doctors

22  couldn't write those certain drugs, that they weren't going to

23  fill it?

24  A   No.

25  Q   You did not receive those calls from pharmacists?

ANGELA CHRISTY - CROSS BY MS. GRIFFIN                                  5174

1  A    Saying that they wouldn't fill it just because it was a
2  certain medication?  No.
3  Q    Because it was a certain medication written by a pain
4  doctor, you did not receive those calls?
5  A    No.
6  Q    Now, Ms. Christy, when you were filling the scripts or
7  writing out the scripts, what did you do when the doctors were
8  out of the country?  Those patients didn't get their scripts
9  then or you had somebody else sign them?  Which was it?
10 A    Justin Palmer signed scripts for my -- for me personally
11 maybe a handful of times.
12 Q    But he didn't sign Justin Palmer on them, did he?
13 A    He did not.
14 Q    He signed Dr. Couch, didn't he?
15 A    He did.
16 Q    And you knew that there were some presigned scripts already
17 there for Dr. Ruan when Dr. Ruan was out of the country, didn't
18 you?
19 A    There were.
20 Q    So you could rely on those to refill the Dr. Ruan scripts;
21 is that correct?
22 A    In cases of emergency, yes.
23 Q    But regardless, the doctors weren't in the building and
24 those were presigned scripts for both -- for Dr. Ruan; right?
25 A    Correct.

1  Q   And they were signed by Justin Palmer for Dr. Couch; is

2  that right?

3  A   Correct.

4  Q   You knew that Justin Palmer was not a doctor, didn't you?

5  A   Yes, I did.

6  Q   You knew that he could not sign Dr. Couch's name, didn't

7  you?

8  A   Yes, I did.

9  Q   And you, yourself, did not have a DEA number, did you?

10 A   No.

11 Q   And you certainly didn't sign any scripts, did you?

12 A   No, ma'am.

13 Q   Now, Ms. Christy, in connection with your duties with

14 Abstral and Subsys, when were you telling us that you saw

15 Natalie Perhacs and she was terminated from coming as a rep to

16 PPSA?

17 A   I don't know the exact date.  It was toward the end of the

18 office closing.

19 Q   Was it in 2014, before Christmas?

20 A   2015.

21 Q   It was in 2015?

22 A   Yes.

23 Q   You don't know the exact date?

24 A   I do not know the exact date.

25 Q   Because you were still dealing with her in January of '15,

1  weren't you?

2  A   I was.

3  Q   In fact, you were still creating calls that put in

4  parentheses that the PA for Subsys was going to be approved per

5  Natalie, weren't you?

6  A   Yes.

7  Q   And that was as late as January of 2015?

8  A   Maybe.

9  Q   I show you what's an exhibit from the Benjamin Brown file,

10 Dr. Couch exhibit, a phone call.

11         THE COURT:  Does it have an exhibit number?

12         MS. GRIFFIN:  The defense Exhibit is --

13         MR. BODNAR:  It's Government's Exhibit 12-1(a).

14         MS. GRIFFIN:  I'm sorry.  12-1(a), Your Honor.

15         THE COURT:  All right.

16         MS. GRIFFIN:  And I'm pulling a phone call from

17 January 8th of '15.

18 Q   Now, Ms. Christy, this is your electronic signature in

19 January the 8th of '15, isn't it?

20 A   Yes.

21 Q   And in that it states per Natalie; is that right?

22 A   Yes.

23 Q   That's Natalie Perhacs that you were relying on; is that

24 right?

25 A   Yes.

1    Q   And then I show you also from that same file another
2    patient call from Mr. Brown, January 21st of '15, and ask if
3    you electronically signed this patient call note?
4    A   Yes.
5    Q   And does it say that you informed the patient that the PA -
6    - his prior approval -- is in the process and that he could
7    call and check on the appeal per Natalie?
8    A   Yes.
9    Q   And that's Natalie Perhacs, isn't it?
10   A   Yes.
11   Q   So she was still connected with PPSA on January 21st of
12   '15?
13   A   Yes.
14   Q   And you are not aware that she continued in that capacity
15   through the day of the raid, May the 20th, 2015?
16   A   I didn't have contact with her through that date, no.
17   Q   But you don't know, do you, that she was terminated from
18   coming to PPSA, do you?
19   A   I don't know that.
20   Q   Well, you didn't see her; is that right?
21   A   I did not see her.
22   Q   And in fact when you were sending the prior authorizations
23   for Subsys and for Abstral, you sent the prior authorizations
24   to the manufacturers; isn't that correct?
25   A   Correct.

1  Q   You didn't send them to the insurance companies to

2  determine if they were approved, did you?

3  A   No.

4  Q   Once you filled out the paperwork -- and I show you

5  Ms. Goellner's that you just were testifying about that the

6  defense showed you, Couch's 187, page one.  Is this your

7  handwriting?

8  A   Yes.

9  Q   All the way down is your handwriting?

10  A   Yes.

11  Q   From the top of the form down to the physician's signature,

12  would that be your handwriting?

13  A   Yes.

14  Q   In connection with that information, this was going to be

15  faxed to Insys; is that right?

16  A   Yes.

17  Q   In fact, this was an Insys form?

18  A   Yes.

19  Q   When you got this information put on the form and were

20  ready to get it preapproved, did you go and take this

21  particular one to Dr. Couch to sign?

22  A   I had a blank form for both medications with Dr. Couch's

23  information, Dr. Ruan's information, with their signature on

24  there so that I could fill it out and have it signed -- or have

25  it faxed.

1  Q   You had presigned forms by Dr. Ruan and Dr. Couch for

2  Abstral and Subsys, didn't you?

3  A   Correct.

4  Q   That didn't have a patient name on them; is that right?

5  A   That is correct.

6  Q   I show you what's been introduced as Government's Exhibit

7  4-13 and ask if these are -- can you see the top?

8  A   Yes.

9  Q   Does it say Abstral Enrollment Form?

10  A   Yes.

11  Q   And these were seized from C&R Pharmacy, Government's

12  Exhibit 4-13.  Does it have any patient information?

13  A   No.

14  Q   It doesn't have insurance information either, does it,

15  ma'am?

16  A   No.

17  Q   Doesn't have a diagnosis?

18  A   No.

19  Q   Doesn't have anything except how many boxes they are

20  supposed to receive?

21  A   Correct.

22  Q   It already has the directions for the script for Abstral?

23  A   Correct.

24  Q   And it already has the information about Dr. Couch?

25  A   Correct.

1  Q   Who he is, and it has the signature at the bottom for

2  Dr. Couch; is that correct?

3  A   Correct.

4  Q   So you had these presigned that you or anyone else who

5  picked them up could put any name they wanted to and any dosage

6  they wanted to in, didn't you?

7  A   The handwriting where the pharmacy is at is not my

8  handwriting.

9  Q   Which handwriting?  You can mark on it.

10  A   Through this, through this area (indicating).

11  Q   All right.

12  A   This, this is not my handwriting (indicating).

13  Q   Okay.

14  A   And my forms stayed locked up in my drawer.

15  Q   But you do recognize these as Abstral forms?

16  A   Yes.

17  Q   Same type you used; right?

18  A   Yes.

19  Q   Abstral enrollment forms; right?

20  A   Yes.

21  Q   And these were seized from C&R?  You do recognize the

22  presigning by Dr. Couch just like the ones you had; right?

23  A   Yes.

24  Q   And the ones you had didn't have the doctor having checked

25  the strength or the drug, did it?

5181

1    A    No.

2    Q    Are you also aware that there were presigned Abstral forms

3    for Dr. Ruan?

4    A    Yes.

5    Q    And they were the same as those for Dr. Couch; is that

6    correct?

7    A    Yes.

8    Q    I'll show you what's still part of the exhibit 4-13 and ask

9    if these were Abstral enrollment forms.

10   A    Yes.

11   Q    And they are presigned by Dr. Ruan; is that correct?

12   A    Yes.

13   Q    These also are missing the patient name and the strength;

14   is that correct?

15   A    That is correct.

16   Q    But both forms presigned by both doctors have the four box

17   of 32 circled; right?

18   A    Yes.

19   Q    Handwritten.  Excuse me.  Is that right?

20   A    Yes.

21   Q    Now, you said you maintained your presigned forms that were

22   locked up at the Airport office; is that right?

23   A    Springhill office.

24   Q    Springhill office?  I show you Government's Exhibit 3-6,

25   seized from the Airport office, and ask if there were

1  presigned -- if this is a presigned Abstral enrollment form.

2  This is an Abstral enrollment form; right?

3  A   It is.

4  Q   And if you see at the bottom, is it presigned by Dr. Ruan?

5  A   It is.

6  Q   Doesn't have a patient's name, does it?

7  A   No, it does not.

8  Q   Doesn't have the strength of the drug?

9  A   No.

10  Q   And you're saying that these weren't the ones you had;

11  right?

12  A   No.

13  Q   So there were some at C&R, there were some at Springhill,

14  and there were some at Airport that were presigned; is that

15  correct?  For Abstral?

16  A   I don't know.

17  Q   Well, you've just been told that these came from C&R and

18  came from --

19        MR. DARLEY:  Judge, I object.  She said she didn't

20  know.  Ms. Griffin is trying to supply her answer.

21  BY MS. GRIFFIN:

22  Q   You're not contesting that they came from those locations,

23  are you, ma'am?

24  A   I'm not saying they did not.  I worked at the Springhill

25  office.  I don't know what was at the Airport office.

1   Q   But you had similar presigned forms where you worked as
2   well?
3   A   Yes.
4   Q   Now, you did not send in authorizations to any other
5   manufacturers, except to the Concierge Program, for any other
6   drugs, did you?  To the manufacturers?
7   A   No.
8   Q   I show you what's marked as Government's Exhibit 3.6, still
9   from the PPSA Airport location, and ask if you sometimes sent
10  forms to Horizon Pharma Concierge Program for patient files.
11  A   That does not look familiar to me.
12  Q   Does it look like Dr. Ruan's signature?
13  A   It does.
14  Q   Yes?
15  A   It does to me, yes.
16  Q   And that's for Duexis?
17  A   Looks like it.
18  Q   Is that right?
19  A   Yes.
20  Q   Does it say a three-month supply, 270 tablets?
21  A   Yes.
22  Q   Does it contain any patient information?
23  A   No.
24  Q   Now, Ms. Christy, I show you what's introduced as
25  Government's Exhibit 32-2(2).  You can see that; right?

5184

```
 1   A   I can.
 2   Q   And this is an Insys reimbursement assistance prior
 3   authorization request; is that right?
 4   A   I'm assuming so.
 5   Q   Would you like me to bring it up so you can see it?
 6   A   I see it.
 7   Q   It is an Insys reimbursement assistance prior authorization
 8   request, isn't it?
 9   A   Yes, it appears to be.
10   Q   And is any of this your handwriting?
11   A   No.
12   Q   It is not your handwriting?
13   A   No.
14   Q   You were not responsible for the prior authorization for
15   Subsys?
16   A   I was, but not the entire time, no.
17   Q   So sometimes other people participated in that process; is
18   that right?
19   A   Prior to myself doing those two medications, yes.
20   Q   All right.  Let's talk about -- well, you were doing it in
21   2013, weren't you?
22   A   I was.
23   Q   Do you see that this is dated, Government's Exhibit
24   32-2(2), in 2013?
25   A   Yes.
```

1    Q    So you weren't the only one sending these forms to Insys?

2    A    I was not doing prior authorizations during that time.

3    Q    Someone else was doing it; is that correct?

4    A    Correct (nodding head affirmatively).

5    Q    And you talked about that you would print the PDMPs; is

6    that correct?

7    A    Correct.

8    Q    You had one code for Dr. Ruan to print them; right?

9    A    Yes.

10   Q    You had one code for Dr. Couch to print them; right?

11   A    I don't recall, but I thought it was all the same code on

12   the Alabama one.

13   Q    Okay.  On Alabama you thought you just had one code; is

14   that right?

15   A    I think so.

16   Q    But you could look at patients for all three doctors?

17   A    Yes.

18   Q    Chen, Couch, Ruan?

19   A    Yes.

20   Q    Is that right?  Before we get to that, I forgot to ask you,

21   you didn't do many Abstral or Subsys preapprovals for Dr. Chen,

22   did you?

23   A    Not many, no.

24   Q    Not hardly any compared to Dr. Ruan and Dr. Couch; isn't

25   that correct?

 1    A    Correct.

 2    Q    And let's go back to the PDMPs.  You thought you had one

 3    code that you used.  It wasn't your code, was it?

 4    A    No.

 5    Q    You knew it was one of the doctors' codes?

 6    A    Correct.

 7    Q    And once you would print those PDMPs, where would you put

 8    them?

 9    A    I would take them to either the nurse practitioner or the

10    physician.

11    Q    And did you know that they were only being accessed about

12    six times a day?

13    A    No.

14    Q    You had more than six patients a day, didn't you?

15    A    We did.

16    Q    And in connection with PDMPs, you would give them to a

17    nurse practitioner or a doctor and you don't know what if

18    anything was done with them past your duty to hand them to

19    somebody; is that right?

20    A    Correct.

21    Q    I show you a Government's Exhibit 21-5, which is the Brenda

22    ward patient file.  Now, you probably don't remember all the

23    patients names, do you?

24    A    I do not.

25    Q    But in Ms. Ward's file -- I'm pulling out one of the

1    pages -- and there is a drug query note and I'll ask if this
2    note is signed by you electronically?
3    A    Yes.
4    Q    And you have stated on November the 25th of '14 that Brenda
5    Ward -- her printed drug query due to an insurance alert.  Now,
6    the insurance company had alerted PPSA that this patient was
7    receiving pain meds from other doctors for some time; is that
8    correct?
9    A    Correct.
10   Q    So obviously you or somebody else had not printed her PDMP
11   or you would have seen that or whoever you handed it to would
12   already know that; is that right?
13   A    Correct.
14   Q    And it was not uncommon for insurance companies to notify
15   PPSA that certain patients were getting medication from several
16   different doctors, was it?
17   A    No, it was not.
18   Q    Which meant that perhaps a PDMP had not been run as to
19   those patients; is that right?
20   A    Right.
21   Q    You were also asked about the insurance companies approving
22   payments.  Were you aware that the insurance companies also
23   refused to pay for Subsys and Abstral?
24   A    Insurance companies would deny those medications, as well
25   as any other medications.  Whatever the reasons are, I don't

1    know.

2    Q   You didn't look at the form as to the reason, did you?

3    A   No.

4    Q   But you're not telling us, are you, that every insurance

5    company approved all the Abstral and Subsys prescription

6    requests, are you?

7    A   No.

8    Q   You were previously interviewed by the FBI; is that

9    correct?

10   A   I think that's who came to my house.  I think.  I'm not

11   sure.

12   Q   Do you recall it being actually on the day of the search,

13   May the 20th, 2015?

14   A   Oh, yes, I did talk to someone then, yes.

15   Q   Do you recall it being some type agent, whether you knew it

16   was FBI --

17   A   Yes.

18   Q   -- or DEA?

19   A   Yes.

20   Q   Some type of federal agent?

21   A   Yes.

22   Q   And you talked to them on that occasion; right?

23   A   Yes.

24   Q   And on that date you didn't tell them anything about

25   Natalie having changed a prior approval, did you?

1   A    No.

2   Q    You said something about patients calling and it wasn't

3   time for their prescription refill and that you would date the

4   prescription the date it was due?

5   A    Correct.

6   Q    So give us an example if a patient called on the 6th, this

7   past Monday, and their prescription wasn't due until today, the

8   9th.  You would give the patient the prescription dated the

9   9th, but they could come pick it up before the 9th; is that

10  right?

11  A    It was dated on the day that it was either written or

12  printed.  But it would have a do not fill until the date it is

13  due.

14  Q    So those are for the ones that people would come in and

15  pick up from you?

16  A    Correct.

17  Q    And the prescriptions that people came and picked up from

18  you, were those billed as nurse visits?

19  A    No.

20  Q    So the patient would call, you would get the prescription

21  signed, sometimes by Justin for Dr. Couch, sometimes the blank

22  ones for Dr. Ruan would be used, and the patients could come

23  pick those up even when the doctors were out of the country or

24  out of state; is that right?

25  A    On occasion, yes.

1  Q   And that happened more than once, though, didn't it, ma'am?

2  A   Yes.

3          MS. GRIFFIN:  That's all I have of this witness, Your

4  Honor.

5          THE COURT:  Mr. Doss?

6                    REDIRECT EXAMINATION

7  BY MR. DOSS:

8  Q   Ms. Christy, remind us, how many prescriptions over your

9  five years did you handle preparing for Dr. Couch?

10  A   Hundreds.

11  Q   If not thousands; is that fair?

12  A   If not thousands, yes.

13  Q   Over that five-year period of time how many times did

14  Justin Palmer sign for Dr. Couch?

15  A   For me, that I personally witnessed?

16  Q   Yes, ma'am.

17  A   Maybe a handful of times.

18  Q   Less than 10 times?

19  A   Yes, probably so.

20  Q   Would that be two times a year for five years at most?

21  A   If you averaged it, sure.

22  Q   And as far as you know, Dr. Couch didn't know about that,

23  did he?

24          MS. GRIFFIN:  Object as to foundation, Your Honor.

25  A   Not to my knowledge.

```
 1              THE COURT:  Sustained.
 2   BY MR. DOSS:
 3   Q   As to the PAs that had Dr. Couch's signature on them, where
 4   did you keep those in your office?
 5   A   I kept -- if you're referring to the presigned ones, the
 6   blank ones that I would fill out --
 7   Q   Yes, ma'am.
 8   A   -- I kept them locked in the file cabinet.
 9   Q   Did you ever let anybody have access to those?
10   A   No.  Unless my office manager would need my key for any
11   reason, no.
12   Q   Did Dr. Couch give you authorization to possess those?
13   A   Sure.
14   Q   And when you would have those blank forms with Dr. Couch's
15   signature on them, did you ever make up diagnosis codes for the
16   patients that you were filling out information about?
17              MS. GRIFFIN:  Objection, Your Honor.
18   A   Absolutely not.
19              MS. GRIFFIN:  Beyond the scope of cross.  There was no
20   questioning about whether she made up the patients or diagnosis
21   codes.
22              THE COURT:  Sustained.
23   BY MR. DOSS:
24   Q   Were the blank forms that had Dr. Couch's signature on
25   them, did you fill those out the same way you filled out every
```

 1   other PA that you submitted for a patient?

 2   A   Yes.

 3   Q   And would that start with checking the Greenway patient

 4   file for the patient's diagnosis?

 5   A   Yes.

 6   Q   Now, you testified that from time to time you might have

 7   been alerted about a patient filling at another pharmacy -- or

 8   filling at a pharmacy by a doctor other than PPSA.  Do you

 9   remember those questions?

10   A   Yes.

11   Q   What happened if you got a phone call like that?

12   A   A phone call saying that they got medications from another

13   doctor?

14   Q   Yes, ma'am.

15   A   I would run the PDMP.  Sometimes it would be something that

16   was no issue, such as a dentist, an ER visit.  But if it were

17   something that looked like it was multiple doctors or multiple

18   different dates and multiple times, I would make aware or alert

19   the doctor or the medical assistant that worked with the doctor

20   or practitioner.

21   Q   So that was taken seriously at PPSA; is that fair?

22   A   To my knowledge, yes.

23   Q   Now, if one of the physicians -- let's say Dr. Couch -- was

24   out of the office when a patient was coming in to fill a

25   prescription or receive or pick up a prescription and that

```
 1    patient had questions or wanted to talk to someone, were there
 2    other people in the office available to talk to that patient?
 3    A    Typically a nurse practitioner or a medical assistant.
 4    Q    Any physicians other than Dr. Couch?
 5    A    Maybe Dr. Ruan or Dr. Chen, depending on which location and
 6    which doctor was there the day.
 7    Q    As best you know, the patient was taken care of, wasn't he
 8    or she?
 9    A    Yes.
10    Q    Now, you said that you were interviewed by some federal
11    agents the day that PPSA was raided.  Do you remember that
12    question?
13    A    Yes.
14    Q    And you said you didn't mention anything about Ms. Perhacs
15    changing the diagnosis code on a PA that day; right?
16    A    Right.
17    Q    As far as you knew that day, Ms. Christy, was your
18    employment over with PPSA?
19    A    I mean, I assumed it was.
20    Q    Was that a pretty shocking day?
21    A    Yeah.
22    Q    Do you remember every detail over the past five years of
23    that day in great clarity?
24    A    No, I didn't remember every detail.
25            MR. DOSS:  One moment, Your Honor.
```

1      (A discussion was held off the record between defense

2  counsel.)

3  BY MR. DOSS:

4  Q   On that same day, Ms. Christy, did the FBI agent ask you

5  anything about Natalie Perhacs and the PA process?

6  A   I don't recall that, no.

7  Q   And you answered the questions that they had, didn't you?

8  A   Yes.

9           MR. DOSS:  Nothing further, Your Honor.

10           MR. DARLEY:  Just a couple, Your Honor.

11           THE COURT:  All right.

12                      REDIRECT EXAMINATION

13  BY MR. DARLEY:

14  Q   Ms. Christy, you were asked on cross by the government

15  about some of the forms that were found in various

16  locations.  Do you know what Duexis is?

17  A   It is an ibuprofen -- I mean, yeah, ibuprofen, kind of an

18  anti-inflammatory medication.

19  Q   Is an ibuprofen basically something that helps not irritate

20  your stomach?

21  A   Yes.

22  Q   It's a noncontrolled substance, isn't it?

23  A   I'm pretty sure it is.

24  Q   And I asked you on direct earlier did you fill out the

25  prior authorizations accurately and truthfully?

1  A   Yes.

2  Q   And has your answer changed?

3  A   No.

4  Q   The forms that the government presented to you, you still

5  filled those things out accurately and truthfully, did you not?

6  A   Correct.  The ones with my signature that I did, yes.

7  Q   And on those forms, or all of those forms that they showed

8  you, none of them had the strength checked, did they?

9  A   The forms that -- the blank forms?

10  Q   Yes, ma'am.

11  A   No.

12  Q   Even the ones that were prefilled out in some form, as far

13  as the information from the doctors?

14  A   No.

15  Q   No strength on them?

16  A   No.

17  Q   And as far as when you were asked on direct and cross and

18  redirect about the FBI interviewing you, you lost your job

19  shortly thereafter, did you not?

20  A   I did.

21  Q   And they said you didn't tell the FBI about Ms. Perhacs

22  that day?

23  A   No.

24         THE COURT:  That's already been gone over.

25         MR. DARLEY:  Yes, ma'am.  I'm sorry.

1  Q   But when you did observe Ms. Perhacs doing that, you

2  reported it, did you not?

3  A   I did.

4  Q   Is that because you knew it was wrong?

5  A   Correct.

6       MS. GRIFFIN:  Your Honor, objection.  It is beyond the

7  scope of direct -- I mean of cross.  Excuse me.

8       THE COURT:  It's already been covered.  So sustained.

9  BY MR. DARLEY:

10 Q   You never saw Ms. Perhacs again, did you?

11 A   I did not.

12     (A discussion was held off the record between defense

13 counsel.)

14 BY MR. DARLEY:

15 Q   And when filling out -- my last question, Ms. Christy --

16 when filling out the information that you used to submit the

17 prior authorizations, you took information from the medical

18 charts, did you not?

19 A   I did.

20 Q   And that's what you used to populate the prior

21 authorizations?

22 A   Yes.

23 Q   And it was not until those were complete that you submitted

24 them; correct?

25 A   Correct.

1          MR. DARLEY:  That's all I have.  Thank you, Your

2    Honor.

3          THE COURT:  May this witness be excused?

4          MR. DOSS:  Yes, Your Honor.

5          THE COURT:  All right.  Thank you.  You may step down.

6          THE WITNESS:  Thank you.

7          THE COURT:  Call your next witness.

8          MR. SHARMAN:  May we approach, Your Honor?

9          THE COURT:  Yes.

10      (At the side bar, jury not present.)

11         MR. SHARMAN:  Your Honor, following up on our

12    conversation this morning, the witness that was on the stand at

13    the end of the day yesterday, Monica Carroll, was admitted to

14    the emergency department at Springhill, let go, she returned to

15    Springhill and was actually admitted to the hospital, where our

16    understanding is she still remains.  For that reason and the

17    other reasons we mentioned this morning, Dr. Couch has no

18    additional witnesses to present today.

19         THE COURT:  Do you expect to be able to resume her

20    testimony at any time before the trial is over?

21         MR. SHARMAN:  We told her family that we would check

22    in with them regularly as to her status.  We made it clear she

23    was not released and that we would catch up with her and notify

24    the Court.

25         THE COURT:  All right.  And so you're saying you're

5198

1     out of witnesses for today?

2               MR. SHARMAN:  Correct.  Yes, ma'am.

3               THE COURT:  And what about tomorrow?

4               MR. KNIZLEY:  Your Honor, we have Dr. Gudin, who is an

5     expert for Dr. Couch, will be here.

6               THE COURT:  Dr. Couch?

7               MR. KNIZLEY:  Excuse me, excuse me.

8               MR. SHARMAN:  I'll take him.

9               MR. KNIZLEY:  For Dr. Ruan will be here.  The

10    anticipated testimony would probably be some time, into the

11    afternoon.  After that we, Dr. Ruan, will present witnesses to

12    take up the remainder of the day until the Court, I believe,

13    indicated that we may be leaving early.

14              THE COURT:  All right.  I will let the jury go for the

15    rest of the day.

16              MR. KNIZLEY:  Yes, ma'am.

17              MR. SHARMAN:  Yes, ma'am.  Thank you.

18         (In open court, defendants and jury present.)

19              THE COURT:  All right.  Ladies and gentlemen, it

20    appears that the witness whose testimony was interrupted that

21    had the accident this morning is not available to return today,

22    and so we are going to have to recess for the rest of

23    today.  And for your planning purposes, we will go until 4

24    o'clock tomorrow afternoon.  So you will be let go at 4 o'clock

25    tomorrow afternoon.

1          So, but with that, I'm going to recess you for the

2    rest of today.  I want you back in the jury assembly room at 9

3    o'clock tomorrow morning, ready to start back.  Remember my

4    instructions not to discuss the case, not to allow anyone to

5    discuss the case with you.

6          Sorry I missed you.

7      (Juror #16, the last alternate juror, returned to the

8    courtroom.)

9          THE COURT:  What I'm doing is recessing you for today

10   because we don't -- the witness who was on the stand at the

11   beginning or at the end of yesterday is unable to return today.

12         JUROR #16:  Yes, ma'am.

13         THE COURT:  No discussion about the case.  Back here

14   at 9 o'clock tomorrow morning, ready to start again.  And have

15   a good evening.  We will see you tomorrow.

16     (In open court, defendants present, jury not present.)

17         THE COURT:  Let me see one person from the government

18   and one person from the defense up here just on another matter

19   really.

20     (A discussion was held at side bar off the record between

21   the Court, Ms. Griffin, Mr. Sharman, and Mr. Knizley.)

22     (Court adjourned at approximately 3:04 p.m.)

23

24

25