5200

1       UNITED STATES DISTRICT COURT
        SOUTHERN DISTRICT OF ALABAMA

2

3   UNITED STATES OF AMERICA
                                        CASE NO. CR15-00088
4   v.
                                        COURTROOM 2B
5   JOHN PATRICK COUCH, M.D.,
    and XIULU RUAN, M.D.,
6                                       MOBILE, ALABAMA
            Defendants.
7                                       FRIDAY, FEBRUARY 10, 2017
    * * * * * * * * * * * * * *
8   REDACTED

9
                            DAY 23 OF TRIAL
10      BEFORE THE HONORABLE CALLIE V. S. GRANADE,
            UNITED STATES DISTRICT JUDGE, AND JURY
11

12

13  APPEARANCES:

14  FOR THE GOVERNMENT:
        DEBORAH A. GRIFFIN
15      CHRISTOPHER BODNAR
        United States Attorney's Office
16      63 S. Royal Street, Suite 600
        Mobile, AL  36602
17      (251) 441-5845

18
    FOR THE DEFENDANT COUCH:
19      ARTHUR T. POWELL, III
        P.O. Box 40456
20      Mobile, AL 36640-0456
        (251) 433-8310
21
        JACKSON R. SHARMAN, III
22      ROBERT JACKSON SEWELL
        JEFFREY PAUL DOSS
23      BENJAMIN SANDERS WILLSON
        Lightfoot, Franklin & White
24      400 North 20th Street
        Birmingham, AL  35203
25      (205) 581-0700

1  (Continued)

2     BRANDON KEITH ESSIG
      800 Shades Creek Parkway, Suite 600D
3     Birmingham, AL  35209
      (251) 879-1981

4

   FOR THE DEFENDANT RUAN:
5     DENNIS J. KNIZLEY
      7 N. Lawrence
6     Mobile, AL 36602
      (251) 432-3799

7

      JASON BRADLEY DARLEY
8     Darley & McGough, LLC
      1751 Dauphin Street
9     Mobile, AL 36604
      (251) 441-7772

10

      GORDON G. ARMSTRONG, III
11    P.O. Box 1464
      Mobile, AL  36633
12    (251) 434-6428

13    STEVEN D. MARTINIE
      4955 North Lake Drive
14    Whitefish Bay, WI  53217
      (414) 332-9683

15

   THE CLERK:  MARY ANN BOYLES
16 THE LAW CLERK:  LYNN DEKLE
   COURT REPORTER:  ROY ISBELL, CCR, RDR, CRR

17

         Proceedings recorded by OFFICIAL COURT REPORTER
18        Qualified pursuant to 28 U.S.C. 753(a) & Guide to
      Judiciary Policies and Procedures Vol. VI, Chapter III, D.2.
19           Transcript produced by computerized stenotype.

20

21

22

23

24

25

1                          EXAMINATION INDEX

2    JEFFREY A. GUDIN, MD
          DIRECT BY MR. ARMSTRONG . . . . . . . . . . . . . .5205
3         CROSS BY MR. BODNAR . . . . . . . . . . . . . . . .5282
          REDIRECT BY MR. ARMSTRONG  . . . . . . . . . . . . 5325
4
     CHARLENE SPEED
5         DIRECT BY MR. DARLEY  . . . . . . . . . . . . . . .5342
          CROSS BY MS. GRIFFIN . . . . . . . . . . . . . . . 5360
6
     DONNA NEWBURN
7         DIRECT BY MR. DARLEY  . . . . . . . . . . . . . . .5371
          CROSS BY MS. GRIFFIN . . . . . . . . . . . . . . .5378
8         REDIRECT BY MR. DARLEY . . . . . . . . . . . . . . 5385

9    CAROLYN FERENCZI
          DIRECT BY MR. DARLEY  . . . . . . . . . . . . . . .5387
10        CROSS BY MS. GRIFFIN . . . . . . . . . . . . . . .5395

11

12

13                          EXHIBIT INDEX

14                                                            ADM
     GOVERNMENT'S
15
       43-5    Jeffrey A. Gudin - Open Payments Data       5308
16             (redacted)

17     43-7    Email chain between Ruan and Gudin - MRI    5318
               facility - 12/7/11
18
       43-11   Email 5/30/12 between Ruan and Gudin -      5320
19             Daughter Internship

20     43-16   Email from Gudin to Ruan - your connection  5323
               Jeff Gudin, MD, has endorsed you
21

22

23

24

25

1          (Morning session, 9 a.m., in chambers, jury not present.)

2               MS. GRIFFIN:  Good morning.

3               THE COURT:  Good morning.

4               MR. BODNAR:  Your Honor, I think we're all set on

5     this.  Gordon and I have already spoken about it.  I just want

6     to make sure on the record that Dr. Gudin has reviewed numerous

7     files that were outside of the patients that we spoke of in

8     trial and our case in chief.  But he said that he's already

9     spoken to Dr. Gudin.  They're just going to limit it to, per

10    the Court's ruling, just the ones that we've alleged were

11    outside the usual course.

12              Also in his rule 16 disclosures he had mentioned twice

13    that something was not a violation of the Controlled Substances

14    Act or was not against the law.  As Gordon and I have talked,

15    we have no problem with, obviously, saying something was within

16    or outside the usual course of professional practice but not

17    saying whether it did or didn't violate the law.

18              MR. ARMSTRONG:  I've talked to him about that.  We are

19    going to limit --

20              THE COURT:  I have a hard time finding you amidst all

21    of these defense lawyers.

22              MR. ARMSTRONG:  (Laughing.)  Where should I stand?

23     Should I step forward?

24              THE COURT:  You need a Mardi Gras tie.

25              MR. ARMSTRONG:  We are going to be limited to the

5204

```
 1    patients that have been brought into issue in the case.  We've
 2    already talked about that.  I've talked about that with him
 3    already.  And he is not going to -- I've told him not to
 4    mention something -- whether something is criminal or not
 5    criminal, that that's for the legal conclusions for the jury,
 6    not for him.  We will talk about the various standards that he
 7    is considering in reviewing the charts, however, and the
 8    standard for this case being outside the usual course of
 9    professional practice, not whether it's a crime or whether it's
10    legal or illegal.
11            THE COURT:  Okay.  All right.  That's good.  Anything
12    else we need to --
13            MR. BODNAR:  No.  And just to clarify, of the 15
14    patients that were talked about that he reviewed, we only
15    received details about -- in terms of like going down the chart
16    -- John Bosarge, DG.............., Deborah Walker, KL......,
17    and Erick Gist.  So to the degree that he was going to go into
18    any other specific charts, we'd object that we didn't have his
19    opinions ahead of time for other than those.  But clearly just
20    talking about them in general --
21            MR. ARMSTRONG:  We are at this point just going to
22    generally talk about the ones that are not referenced -- I mean
23    with detail.
24            MR. BODNAR:  Yes.
25            MR. ARMSTRONG:  We're not going to go into those
```

 1  charts in detail.  I think the jury probably doesn't want to go

 2  into detail in the charts any more.  That would be my sense.

 3          THE COURT:  I concur with the jury.

 4          MR. ARMSTRONG:  Maybe the judge too.

 5          MS. GRIFFIN:  I do too.

 6          MR. KNIZLEY:  I don't know about the jury.

 7          THE COURT:  Okay.  Anything else?

 8          MR. BODNAR:  No, ma'am.

 9          THE COURT:  Go ahead and call for the jury.

10      (A recess was taken at approximately 9:03 a.m.)

11      (In open court, 9:08 a.m., defendants and jury present.)

12          THE COURT:  Good morning, ladies and gentlemen of the

13  jury.

14          THE JURY:  Good morning, Your Honor.

15          THE COURT:  All right, Mr. Armstrong.

16          MR. ARMSTRONG:  Judge, Dr. Ruan calls Dr. Jeffrey

17  Gudin.

18          THE CLERK:  Dr. Gudin, if you'll step over to the

19  witness stand, I'll swear you in.  Can I get you to raise your

20  right hand?

21                  JEFFREY A. GUDIN, MD

22              was sworn and testified as follows:

23      THE WITNESS:  I do.

24      THE CLERK:  Thank you, sir.  Please be seated.

25                  DIRECT EXAMINATION

JEFFREY A. GUDIN, MD - DIRECT BY MR. ARMSTRONG

1   BY MR. ARMSTRONG:

2   Q   Good morning, Dr. Gudin.

3   A   Good morning.

4          MR. ARMSTRONG:  Is his mic on?

5          THE CLERK:  (Indicating.)  It should be on.

6          THE WITNESS:  Are we on now?

7          THE CLERK:  Yes, sir.

8          THE WITNESS:  Good morning.

9   BY MR. ARMSTRONG:

10  Q   Good morning.  Could you introduce yourself to the jury,

11  please?

12  A   Good morning.  My name is Dr. Jeff Gudin.

13  Q   And, Dr. Gudin, where do you work?

14  A   I'm the director of pain management and palliative care at

15  a hospital in northern New Jersey called Englewood Hospital and

16  Medical Center.

17  Q   And you are here to offer your opinions about the

18  treatment and prescriptions written by Dr. Ruan for certain

19  patients?

20  A   That's correct.

21          A JUROR:  Could you spell your name?

22          THE COURT:  Spell his name.

23  BY MR. ARMSTRONG:

24  Q   Oh, could you spell your name?  I probably should have

25  asked that.

1   A   Of course.  It's Jeffrey, J-E-F-F-R-E-Y, last name is
2   Gudin, G-U-D-I-N.
3   Q   Thank you, sir.  Could you tell us a little bit about your
4   educational background with regard to medical school and
5   thereafter?
6   A   Of course.  Following college, like most, I had an idea of
7   the direction I wanted to go and was thinking somewhere along
8   the sciences, applied to and was accepted to medical school.
9           During my training in medical school I kind of early
10  on embraced the whole concept of treating patients mostly with
11  cancer and end-of-life conditions who were suffering, and
12  around about that time was almost the birth of a specialty
13  called pain management.  This was in the 1980s.  There were
14  very few places in the country that had pain management
15  training programs.  Mostly done through anesthesiology, believe
16  it or not, was the basic specialty that bred out pain
17  management doctors.
18          I went on to finish medical school in Albany, where
19  there was a nationally renowned pain doctor who recommended
20  that if I was really interested in pain management, to seek out
21  the program at Yale University, which was in
22  Connecticut.  Which I did.  I applied and was accepted to their
23  anesthesia program.  I stayed on at Yale for what they call a
24  fellowship program, post doctoral, after my residency training,
25  and that was at the Yale Center for Pain Management.  That was

```
 1    20 years ago.
 2            And since that time at Yale, I've kind of kept my
 3    hands in the academic world with research, publishing,
 4    lecturing, presentations around the country and around the
 5    world.
 6    Q    Okay.  So you did your residency at Yale in anesthesia?
 7    A    That's correct.
 8            THE COURT:  Mr. Armstrong, is your microphone on?
 9            MR. ARMSTRONG:  The light is on.  Is that better?
10    Maybe I'll get closer.
11            THE COURT:  All right.  Go ahead.
12    BY MR. ARMSTRONG:
13    Q    And then you also did a fellowship at Yale in pain
14    management.  Tell the jury what the significance of or why a
15    physician would want to do a fellowship in any type of
16    specialty?
17    A    Of course.  So the specialty of pain medicine was so young
18    at that point where many doctors who just had a knack for it or
19    an interest in doing it would, you know, hang up a shingle and
20    call themselves a pain management physician.  But at the time
21    they developed specialty training programs at the academic
22    centers across the country.  And the reason to do a fellowship
23    was to have a more formal education base in all of the tools
24    and techniques we use to treat patients.  So a fellowship
25    program -- or I'll tell you specifically my fellowship
```

JEFFREY A. GLENN, MD - DIRECT BY MR. ARMSTRONG

1   program I did almost two years and I kind of -- you know, being
2   early on in this, I kind of had the choice to set up my own
3   fellowship.
4           I spent three months with an oncologist learning about
5   cancer patients and treating cancer pain and how to deal with
6   end-of-life issues.
7           I spent three months with a neurologist learning about
8   headaches and how to do a good neurological exam and how to
9   treat certain neurological disorders.
10          I spent three to six months with an interventionalist,
11  somebody who did spinal injections, epidural injections, nerve
12  blocks, using certain types of temporary and permanent local
13  anesthetics to try to numb or deaden the pain with an
14  interventional approach.
15          I spent three to six months with one of my mentors
16  from a medical approach, learning about all of the classes of
17  medications that we use to treat pain.
18          So you can see how having a fellowship training would
19  really give you the backbone or the background that you need to
20  adequately treat this very difficult class of patients.
21  Q   And after your fellowship did you -- obviously you had
22  gotten a medical license?
23  A   That's correct.
24  Q   And where do you hold licenses or where have you held
25  licenses?

5210

```
 1   A   So not to digress too much, but during my training at Yale,
 2   I actually came across an ad in the newspaper for a
 3   moonlighting job.  And in the anesthesiology world you did --
 4   you worked 24-hour shifts and then you got the next day off.
 5   They didn't want you caring for patients after a night of no
 6   sleep.  I wasn't the sit-down and relax kind of guy, so I took
 7   a moonlighting job on my off days from anesthesia, and it
 8   happened to be at a substance abuse treatment center.
 9           So it just so happened that back in the 1990s I was a
10   guy interested in pain, heading towards a pain fellowship, who
11   just through a moonlighting job got kind of drawn into the
12   world of addiction medicine.  And then as we all know, within
13   the next 10 years or so there was an interface between those
14   two specialties, pain management and addiction medicine,
15   because of the types of medications that we use.
16           So I was granted my license in Connecticut.  It was
17   the first state where I had a license.  I also stayed on at
18   that substance abuse treatment center as an acting medical
19   director as I started up my own pain management practice.  So I
20   was probably one of the few guys in the country that early on
21   had the experience of on some days seeing patients with
22   addiction disorders and on other days seeing patients with pain
23   disorders and cancer and neurological problems.
24           I left Connecticut probably four or five years into
25   practice.  I had the opportunity to move closer to home where
```

1    my friends and family and significant other was, which is in

2    the upstate New York, New Jersey area.  So I got licensed in

3    New York.

4            In the interim I had applied for a Florida license,

5    thinking like most northerners I needed to get out of the cold

6    at some point and I would have a place to go.  I've since let

7    my Connecticut and my Florida license lapse, just because I

8    didn't need them, and I currently only have a license to

9    practice in New Jersey.

10   Q    Okay.  And do you have any relationships with hospitals?

11   A    I do.  Right now I'm the director of a program or I should

12   say two programs at my current hospital.  When I joined

13   Englewood Hospital, they were an affiliate of Mount Sinai

14   University, a teaching hospital in New York City.  So we get

15   residents and medical students and fellows.

16           And then about 10 years ago I said to our hospital, I

17   said:  You know, there's a new specialty coming up that we

18   don't have any representation for.  I'd like to start a

19   palliative care division.  And it turns out that palliative

20   care right now is the most rapidly growing specialty in

21   medicine.  Palliative care is providing comfort and support to

22   patients and their families who have life-threatening

23   illnesses, not just cancer.  End-stage heart disease, kidney

24   disease, lung disease.  So that was 10 years ago, and I'm

25   thrilled to say that we've grown to a staff of four people in

1  our hospital who do nothing but provide support to our

2  palliative care population.

3  Q   Is that Englewood Medical Center and Hospital?

4  A   Correct.

5  Q   And do you have any academic appointments currently?

6  A   I do.  They're in transition right now.  So I mentioned our

7  relationship with the Mount Sinai University School of

8  Medicine.  This year we terminated our relationship with Mount

9  Sinai because there's a brand new medical school being built in

10  New Jersey of which our hospital was asked to be a teaching

11  site for, and you can't have two academic relationships at the

12  same time.  So our hospital gave up the Mount Sinai affiliation

13  where my title was clinical instructor in anesthesiology for

14  the last 15 years or so, and my title at the new Seton Hall

15  University School of Medicine is pending.

16  Q   In your capacity as the clinical director at Mount Sinai,

17  explain to the jury exactly what you did in that capacity.

18  A   So just to be clear, Mount Sinai, even though it's only

19  about eight miles away, it's probably a 30-minute to an hour

20  drive in traffic in the New York City area.  So my day-to-day

21  responsibilities were at Englewood Hospital even though I had

22  the teaching title to be at Mount Sinai.  And at Englewood

23  Hospital I direct the division of pain management, which

24  includes an acute pain service.  Acute pain is exactly what you

25  might think it is, trauma, postoperative pain.  Anybody who

JEFFREY A. GUDIN, MD - DIRECT BY MR. ARMSTRONG

 1   comes to the hospital and acutely has -- or has some immediate
 2   pain problem.
 3          It's a chronic-pain service.  Whereas if you're
 4   admitted to the hospital because of pain or you're admitted to
 5   the hospital with any other diagnosis and you have a
 6   chronic-pain problem, they may consult our service.
 7          So my -- the hats I wear on a daily basis include
 8   directing the acute pain service, the chronic-pain service, and
 9   the palliative care service that I mentioned.
10   Q   And did that include other physicians under your
11   supervision?
12   A   Absolutely, physicians and nurse practitioners, yes.
13   Q   And do you hold any board certifications?
14   A   I do.
15   Q   Could you tell us about those, please?
16   A   Following my anesthesia residency, I obtained board
17   certification in anesthesia.  Following my pain fellowship, I
18   obtained board certification in pain management.  That board
19   certification is through the American Board of Anesthesiology.
20   The official title is call Added Qualifications in Pain
21   Management; most people refer to it as board certification.
22          Following my five-year or so stint at the substance
23   abuse treatment center, I had an interest in addiction
24   medicine, which I still practice in my own -- in my own
25   practice.  So I took the addiction medicine boards.

1              And then a few years back, after starting our hospital

2      palliative care service, I was eligible to take the palliative

3      medicine board.  So I'm probably one of the few physicians in

4      the country that has four board certifications:

5      anesthesiology, pain management, addiction medicine, and

6      hospice and palliative care medicine.

7      Q    In relation to your board certification in pain management,

8      can you get that from any residency program?  Or do you have to

9      go into certain specialties to then go into that specific

10     subspecialty?

11     A    Historically, as I mentioned it started through

12     anesthesiology.  But if you think about pain, it's so

13     multifactorial that other specialties were given the right to

14     apply for board certification, and the two that I know of are

15     physical medicine and rehabilitation.  If you think about it,

16     many pain syndromes are musculoskeletal based, and they're a

17     specialty that deals with musculoskeletal medicine.  And then

18     neurology as well.  So if you did training in neurology, you're

19     eligible to go for a pain management fellowship because many of

20     the pain syndromes have a neurological basis as well.

21     Q    What about psychiatry?  Is that another one that you could

22     go into pain management?

23     A    You know, it's not an uncommon route.  There are some

24     psychiatrists around the country who go into the field of pain

25     management.  I don't think that they can sit for the

JEFFREY A. GLENN, MD - DIRECT BY MR. ARMSTRONG

1  anesthesiology boards, although there are one or two other

2  governing bodies in the country.  The American Academy of Pain

3  Medicine or Pain Management, let's say, might offer a board

4  certification.  So there are some other boards that clinicians

5  can take, but the anesthesiology boards are limited to, I

6  believe, neurology, anesthesiology, and physical medicine and

7  rehabilitation.

8  Q   Tell the jury a little bit about what your position is and

9  your work is today, what you do today.

10  A   Well, I've kind of already given an outline of my

11  day-to-day clinical responsibilities.  I'm directing the pain

12  center on an outpatient basis.  I'm directing the in-patient

13  chronic and acute pain program.  I'm directing the palliative

14  care program.  But I'd say I spend a fair amount of my time

15  writing and reviewing.  I sit on some editorial review boards

16  for journals.  And as I mentioned before, I really have this

17  interest in educating clinicians about safe use of pain

18  medicine and pain management techniques.  So I've spent a fair

19  bit of my time writing and researching.

20  Q   Do you also see patients?

21  A   I do, yes.

22  Q   Okay.  And do you see patients on an in-patient basis at a

23  hospital setting but also on an outpatient for long-term,

24  chronic-pain care?

25  A   That's correct.

1   Q   And do others work under your supervision within that

2   practice?

3   A   Yes, we have a -- we have a full-time anesthesiology,

4   academically trained pain specialist who does very similar

5   things to what I do.  He's one of my associates.  We have a

6   palliative care-trained physician who trained at Sloan

7   Kettering in New York City who is our newest edition to the

8   palliative care team, so he really has been a welcome addition

9   offloading -- the palliative care specialty is a very

10  time-consuming -- very gratifying, very time-consuming process,

11  a lot of night and weekend time at the bedside with family

12  members.  And we just had to add staff to be able to service

13  that population.

14          We also have some nurse practitioners, one on the pain

15  management side and one on the palliative care side, and some

16  nurses under my guidance as well.

17  Q   Do you also employ medical assistants, nurses, RNs and

18  others?

19  A   Sure.  Especially in the outpatient setting.  We'd be lost

20  without our physician extenders when it comes to pain

21  patients.  Their visits are extremely lengthy.  You know, the

22  insurance companies expect you to see patients in, you know,

23  five to seven minutes, but a typical pain patient visit is

24  probably 25 or 30 minutes.  And that's on the short side.

25          Pain patients tend to have a lot of problems, need a

5217

1    lot of prescriptions, need a lot of referrals, need a little

2    bit of hand-holding and counseling.  It's not like a simple

3    visit to your family doc for a blood pressure check or a

4    diabetes check.  So we do make use of physician extenders in

5    our outpatient center, including medical assistants, nurses,

6    nurse practitioners.

7    Q    Are you a member of any professional organizations or have

8    any professional appointments?

9    A    So on a year-to-year basis it could fluctuate, the

10   associations that I have.  I'm usually a member of the American

11   Pain Society, the American Academy of Pain Medicine, and every

12   couple of years the American Academy of Pain Management.

13   Q    And with regard to those, have you ever held any positions

14   within those organizations?

15   A    So the American Academy of Pain Medicine has state

16   societies, and I was the New Jersey representative for the

17   American Academy of Pain Medicine.  That meeting is coming up

18   next month in Orlando, Florida.  The state society section has

19   kind of been dragging along a little bit without being very

20   active, but I'm still the representative there and still have

21   responsibilities.

22   Q    You mentioned some of these organizations have

23   publications.  Have you sat on their editorial boards?

24   A    I have as well.  The American Academy of Pain Medicine has

25   asked me to lecture a few years running at their course they

1   put on every year called the Safe Opioid Prescribing Course.  I

2   have been a guest editor for the American Academy of Pain

3   Medicine's journal called Pain Medicine as well as for other

4   various pain journals.

5   Q   And as a guest editor, what exactly would your duties be

6   with regard to the papers that are submitted for publication?

7   A   So my role for pain medicine was any time an article came

8   in that had something to do with opioid abuse, misuse, the

9   development of a new abuse-deterrent opioid formulation, they

10  would send it to me for what they called quick review and then

11  decide if it went out to unbiased reviewers, and I would kind

12  of then supervise the process for getting an article to be

13  published.

14  Q   These would be research papers from physicians or

15  specialists or researchers that are submitted to this

16  organization for publication, and you would be responsible for

17  helping to research to see if you -- if it met the proper

18  standards?

19  A   That's correct.  So to be more specific, when a doctor or

20  anyone wants to write an article for a medical journal, there

21  are two types of journals, just to keep it simple.  One is

22  called peer reviewed and the other is called non-peer reviewed.

23          Non-peer reviewed you might think about like a local

24  news flier or a newsletter.  And there are lots of those, and I

25  read them as well.  They have useful information there.  But

1   they're not scrutinized so much.  In other words, I could

2   almost write an article about anything I want and get it into

3   one of these non-peer-reviewed journals.  Obviously there's

4   some oversight.

5            But on the peer-reviewed side -- and that's where more

6   academic authors want to have their work published -- it has to

7   be reviewed by peers.  So they would send it to someone like me

8   as the guest editor for that section, I would review it and see

9   if the article even warranted publication in that journal, and

10  then we would send it out to other peers to independently

11  review.

12  Q   And with regard to sitting as an editor on that, did you

13  also publish your own work, your own research?

14  A   I did.  And one of the things that I'm proud of is that as

15  difficult and time-consuming as it is, almost each and every

16  year since finishing my training I've made the time to write at

17  least one article or do one poster presentation at one of our

18  national meetings that has -- that at least, I think,

19  contributes something to our literature about how to improve

20  our specialty.

21  Q   And without going through all of them, do you have an idea

22  of how many published papers you have?

23  A   I've never actually stopped to count.  It's probably on the

24  order of dozens.  And between publications and posters and book

25  chapters and presentations, it might approach the

5220

```
 1   hundreds.  What I can tell you in general is the majority of

 2   them have dealt with some issues relating to prescribing of

 3   pain medicines, whether it's safety of opioids, adverse effects

 4   of opioids.  In some fashion related to the safe practice of

 5   pain management.

 6   Q   I'm not going to go through all of them, but I do want to

 7   read a few titles, and you tell me if these are ones that are

 8   a sampling of articles you've written.

 9           Opioid Abuse-Deterrent Strategies, Deterring Opioid

10   Abuse in Acute Pain Management; is that one of yours?

11   A   Correct.

12   Q   Pain Scan, Abuse-Deterrent Technologies of Literature

13   Review.  Opioid-Related Endocrinopathy.  Common Adverse Effects

14   and Complications of Long-Term Opioid Therapy?

15   A   Those sound like mine, yes.

16   Q   Endocrine Effects of Chronic Opioid Therapy?

17   A   Yes.

18   Q   Acute Pain Effective Management Requires Comprehensive

19   Assessment?

20   A   Yes.

21   Q   Practical Considerations in Urine Drug Screening?

22   A   Absolutely.

23   Q   The Clinician's Perspective on Opioid Risk Evaluation and

24   Mitigation Strategy?

25   A   Yes.
```

1   Q   That's REMS?

2   A   Correct.

3   Q   Risks, Management and Monitoring of Combination Opioid

4   Benzodiazepines and Alcohol Use?

5   A   That's correct.

6   Q   The Changing Landscape of Opioid-Prescribing:  Long-Acting

7   and Extended-Release Opioid Class-Wide Risk Evaluation and

8   Mitigation Strategies?

9   A   Yes, sir.

10   Q   Again another REMS-related paper?

11   A   Correct.

12   Q   Clinical Strategies for Primary Care to Minimize Opioid

13   Abuse?

14   A   Yes.

15   Q   Assessment of Extended-Release Opioid Analgesics for the

16   Treatment of Chronic Pain?

17   A   That's right.

18   Q   Long-Acting Opioids in the Treatment of Chronic

19   Noncancer-Related Pain Conditions?

20   A   Yes.

21   Q   These are all peer-reviewed publications that you have

22   written?

23   A   Most of those are peer reviewed, yes.

24   Q   Now, you've also written in some books, I think you said,

25   some abstracts, and online publications as well?

JEFFREY A. GUDIN, MD - DIRECT BY MR. ARMSTRONG

1   A   That's correct.

2   Q   Are these all -- and again, there's a number of them, and I

3   will not go through them all.  Are they all related to pain

4   issues, opioid abuse, and chronic pain?

5   A   For the most part, yes.

6   Q   Risk factors in cancer and noncancer patients?

7   A   That's correct.

8   Q   Is one of them Advances in the Pharmacologic Treatment of

9   Chronic and Breakthrough Pain?  Is that one of yours?

10  A   Yes, it was yeah.

11  Q   Dose Finding for Breakthrough Pain?

12  A   Yes.

13  Q   Persistent Breakthrough and Acute Pain?

14  A   That's right.

15  Q   Have you also participated in a TV series related to pain

16  management?

17  A   So I'm not sure I would call it a TV series.

18  Q   Or a video series.

19  A   Yeah.  So I have done quite a number of video education

20  pieces that clinicians can access either on the web or through

21  any number of doctor websites.  So there are things like

22  QuantiaMD and Medscape.  There are these subscription services

23  that doctors subscribe to.  And I've done quite a number of

24  video educational series, all surrounding chronic pain and risk

25  management.

1  Q   Now, have you also served as a consultant to the

2  pharmaceutical industry?

3  A   I have, yes.

4  Q   Does that include presentations, speeches, lectures, and

5  national conferences?

6  A   It does.

7  Q   And would those be attended by physicians?

8  A   Yes.

9  Q   At the average national conference how many physicians

10  attend?

11  A   I'd say anywhere from hundreds to thousands based on the

12  topic.

13  Q   And have you provided educational lectures and talks at

14  smaller settings like dinners, lunches, these kind of --

15  A   Absolutely.

16  Q   If you have had a percentage of one versus the other, how

17  was your time split between those type of talks?

18  A   So I've never looked at it that way, I would probably say

19  somewhere in the range of 50/50.  There are only so many

20  national meetings and congresses that we attend.  But I'd say

21  about half of what I do from a presentation standpoint outside

22  the office is to larger audiences as part of either CME venues

23  or grand rounds at hospitals or doctors organizations and then

24  the other half would be things like promotional dinner programs

25  for pharmaceutical companies.

5224

1   Q   Now, when you say CME, that's continuing medical education?

2   A   That's correct.

3   Q   For other physicians; correct?

4   A   Correct.

5   Q   Now, why do pharmaceutical companies ask doctors like you

6   to participate in these type of conferences?

7   A   Well, I'll tell you, for better or for worse, without the

8   pharmaceutical companies, doctors probably wouldn't have a

9   whole lot of choices for medical education.  Whether they are

10   directly or indirectly sponsoring it, they are the ones who

11   have the resources to help put on the congresses.  There's not

12   a society, whether it's the cardiology society or oncology

13   society, that could host these large meetings based just on

14   membership dues alone.  They are almost always supported by the

15   pharmaceutical companies.  That's just the nature of the

16   business.

17          The pharmaceutical companies logically go after the

18   key opinion leaders, the authors, the clinicians who can

19   publicly speak to lecture at these venues, whether they're

20   promotional or nonpromotional, you know.  It's only logical

21   that they're going to ask the doctors who write the articles or

22   who have the most knowledge base to talk about a particular

23   subject.

24   Q   And obviously when you are presenting, you are taking time

25   away to do that.  Are you paid to do that?

5225

1    A    Yeah.  So most of the meetings are not local to northern

2    New Jersey.  They all include travel time away from home and

3    family, a flight, hotel stay, those kind of things.  And when

4    you lecture on behalf of the pharmaceutical company, they

5    usually cover those travel costs with an honorarium.

6    Q    And obviously you are being paid in this case to render an

7    opinion; correct?

8    A    That's correct.

9    Q    And your time is compensated on an hourly basis?

10   A    That's correct.

11   Q    Do you know how much you've been paid to date?

12   A    I'm not exactly sure.  I think there may have been a

13   retainer sent in the case somewhere on the order of $5,000 and

14   then maybe another $5,000 since the initial retainer for

15   probably near a hundred hours of work.

16   Q    Okay.  And obviously you will be paid for your in court

17   time now and for your travel to Mobile?

18   A    Correct.

19   Q    And how much do you get paid in court?

20   A    I apologize, I don't have my fee schedule.  It's probably

21   on the order of 6 or $7,000 for the day away for testimony in a

22   case like this.

23        MR. ARMSTRONG:  Judge, we would offer Dr. Gudin as an

24   expert in the field of pain management?

25        MR. BODNAR:  No objection, Your Honor.  But can we

5226

```
 1   approach on one quick matter?
 2           THE COURT:  Yes.  Well, so designated.  Let's have a
 3   side bar on whatever the other issue is.
 4           (A discussion was held off the record at side bar
 5   between the Court and counsel.)
 6   BY MR. ARMSTRONG:
 7   Q   Dr. Gudin, have you reviewed certain medical records in
 8   this case of patients that were treated by Dr. Ruan?
 9   A   I have, yes.
10   Q   And do you have a list of those files that you reviewed in
11   front of you?
12   A   I believe I do, yes.
13   Q   With regard to the charts, could you tell the jury the
14   names of the patients that you reviewed their charts?
15   A   It's a rather long list.  Would you like me to read them
16   all?
17   Q   The charts that we discussed, yes.
18   A   So I have a list of about 25 or 30 patients.
19   Q   Wait, wait a minute.
20           MR. ARMSTRONG:  Judge may I approach?
21           THE COURT:  Sure.
22           (A discussion was held off the record between
23   Mr. Armstrong and the witness.)
24   BY MR. ARMSTRONG:
25   Q   Okay.  Could you tell the jury the names of the patient
```

 1  charts that you reviewed?

 2  A   I can, yes.  I have the charts of Deborah Walker, John

 3  Bosarge, KL..........., DG................., Erick Gist, Karen

 4  Daw, David Lott, Mark Weaver, RB.........., Gary McDowell,

 5  Janet Hilburn, Scarlett Jenkins, Stephen McDonald, Christopher

 6  Cain, and Sandra Wimberly.

 7  Q   And in addition to having those names, did you go through

 8  the medical records and charts for each of those patients?

 9  A   I did indeed, yes.

10  Q   Were most of those charts and records voluminous?

11  A   Yes, they were.

12  Q   And have you also reviewed the summary reports of the

13  experts that were retained by the government?

14        MR. BODNAR:  Objection, Your Honor, to anything that

15  the experts put in their reports.  That's not what they

16  testified to.

17        THE COURT:  Well, overruled.  If he reviewed them, he

18  reviewed them.  So --

19  BY MR. ARMSTRONG:

20  Q   And that would be Drs. Greenberg, Dr. Vohra, and

21  Dr. Aultman.  Did you review their written reports?

22  A   I did indeed, yes.

23  Q   And based on your experience and based on your training and

24  your education and your personal practice, have you been able

25  to formulate opinions regarding the treatment and the

5228

1    prescribing of Dr. Ruan for each of those patients that we

2    discussed?

3    A    I did, yes.

4    Q    And with regard to those charts and records you reviewed,

5    were each of those -- did you find from the charts that each of

6    those patients had been referred to Dr. Ruan by another

7    physician?

8    A    It appeared that way, yes.

9    Q    And what did you see in the charts as far as the conditions

10   of those patients or their medical conditions at the time they

11   were referred?

12   A    So reviewing those charts kind of struck a chord for me,

13   because each day I'm the clinician in my practice who decides

14   whether patients -- we're a practice by referral only as well.

15   That means you can't just pick up the phone and call the pain

16   center and get an appointment.  As silly as it sounds, you need

17   to be referred by a clinician and come with some kind of

18   medical notes and a medical history.  And in reviewing

19   Dr. Ruan's charts, they sounded very similar to the challenging

20   patients that I personally get referred who have failed many

21   treatments by their family doctors and have even failed

22   treatments by other pain doctors that get referred to a pain

23   management center.

24   Q    So many or most of these were very challenging patients

25   that were already in difficult positions?

JEFFREY A. GUDIN, MD - DIRECT BY MR. ARMSTRONG

1    A    Without question.

2    Q    And did that include patients that had or may have had

3    psychiatric issues as well?

4    A    Absolutely.  And I don't know if we'll have opportunity to

5    talk about this again, I will -- I will say that the patients

6    with combined pain and psychiatric illness are by far the most

7    challenging patients to treat.

8    Q    Now, did you see in the charts that these patients had all

9    been prescribed opioids prior to being referred to Dr. Ruan?

10   A    On most of them, yes.

11   Q    And did you see in the charts that upon their first visit

12   to Dr. Ruan's office, that Dr. Ruan performed a history?

13   A    Yes, he did.

14   Q    Did it appear from the charts that Dr. Ruan did that

15   himself?

16   A    It looked that way, yes.

17   Q    And an examination?

18   A    In every case.

19   Q    Okay.  Did you see that the examinations performed by

20   Dr. Ruan were rather exhaustive and extensive?

21        MR. BODNAR:  Objection, Your Honor, to "examinations

22   performed."  He can say what he saw in the record but not

23   whether or not the exams were in fact exhaustive.

24        THE COURT:  Well, he can say what the record shows.  I

25   don't think he can say what was actually done since he wasn't

5230

 1   in the exam room.

 2   BY MR. ARMSTRONG:

 3   Q   You weren't in the rooms, were you?

 4   A   That's correct.

 5   Q   Did you see the reports that Dr. Ruan personally prepared

 6   with regard to the initial exams?

 7   A   I did, yes.

 8   Q   Okay.  And did it appear from the charts that Dr. Ruan

 9   performed rather extensive first exams of the patients?

10   A   Absolutely, he did, yes.

11   Q   And did you also see that at the conclusion he rendered

12   some type of diagnosis after that first exam?

13   A   In each and every chart, yes.

14   Q   And did you see where there had been referral --

15   information from the referring physicians as well?

16   A   Yes, I did.

17   Q   And did the diagnosis that you saw that Dr. Ruan had

18   rendered include diagnoses of pain?

19   A   Absolutely.

20   Q   Now, did you see that Dr. Ruan -- obviously there are

21   prescriptions for opioids in the charts; correct?

22   A   That's correct.

23   Q   Did you see where Dr. Ruan employed other modalities other

24   than prescribing opioids?

25   A   In each and every case, yes.

1  Q   Okay.  Did you see that there were occasionally urine drug
2  screens, UDs?
3  A   That's correct.
4  Q   Did you also see confirmation of those urine drug tests
5  which would be the GC-MS?
6  A   On occasion, yes.
7  Q   Now, do you use those in your practice as well?
8  A   I do, yes.
9  Q   Now, based on your review of each of these charts and the
10  medical records contained therein, based on your knowledge
11  training and experience, is it your opinion that Dr. Ruan's
12  treatment with regard to each of these patients that you listed
13  before and his prescriptions written to each of those patients
14  were within the usual course of a professional medical practice
15  and for legitimate medical purpose?
16  A   There wasn't a single incidence in the records that I
17  reviewed to suggest otherwise.
18  Q   Now, you have -- and I don't know if you mentioned
19  this.  You have testified -- you have never testified in a
20  criminal case before, have you?
21  A   That's correct.
22  Q   Have you been asked to?
23  A   I've been asked to review some records of criminal cases of
24  which I didn't think there was any defense, and I elected not
25  to participate in the case.

1   Q   And have you also testified -- or participated in medical

2   malpractice cases like civil cases?

3   A   Absolutely.

4   Q   Have you participated in both the plaintiff side of a

5   medical malpractice case and the defense side, defending the

6   doctor in a medical malpractice case?

7   A   Absolutely, yes.

8   Q   And you understand those are civil cases; correct?

9   A   Understood.

10  Q   Now, have you also served at the request of state medical

11  boards in licensing issues?

12  A   I have, yes.

13  Q   And is that -- you would be hired by a board to review the

14  work or the treatment of other physicians?

15  A   Yeah.  It started originally in New Jersey where I was

16  asked to review a number of board cases from both an

17  anesthesiology and a pain management standpoint.  And then

18  after a few years I was asked by the medical board in

19  Maryland -- I'm not sure how they found me -- if I would help

20  them with the review of some cases.  So I've done work for two

21  different state medical boards.

22  Q   And so these are -- there are different standards of care

23  with regard to each of those different types of cases; correct?

24  A   Well, my understanding is those cases are based on standard

25  of care.

1   Q   Right.

2   A   Different than the case at hand.

3   Q   Now, this is a criminal case.  In a civil case, a

4   malpractice case, you may be looking for if a doctor deviated

5   from a standard of care, but that is a civil standard; correct?

6          MR. BODNAR:  Your Honor, objection to relevance of

7   what is or is not a civil case.  This is not a civil case.

8   We're talking about criminal standards here.

9          MR. ARMSTRONG:  Right.  Judge, what I'm doing is --

10   since he has been involved in other types of cases, how he

11   evaluated these files.  I'm just laying a foundation to get to

12   the next question.

13          THE COURT:  All right.  Overruled.

14   BY MR. ARMSTRONG:

15   Q   Correct?

16   A   That is correct, yeah.

17   Q   And in the context of this case you were reviewing for the

18   standard of looking for legitimate medical purpose and within

19   -- or outside the usual course of a professional medical

20   practice?

21   A   That's correct.  And I think that was an important

22   differentiator which even took me a little while to get my arms

23   around.  So in the cases that I'm used to seeing all year long,

24   I was asked -- I'm usually asked to offer an opinion as to how

25   the doctor performed compared to his peers, if he lived up to a

1    certain standard.  And like I say, it took me a while to

2    understand that that's not the issue in this case.  The issue

3    is whether what Dr. Ruan did was outside the course of a

4    legitimate medical practice.  It's quite different than what

5    I'm used to.

6    Q    In fact, does he deviate from being a doctor and become

7    something other than a doctor?

8          MR. BODNAR:  Your Honor, objection to leading and also

9    of stating what the standard is for the witness.

10         THE COURT:  Sustained.

11   BY MR. ARMSTRONG:

12   Q    Now, with regard to the charts you referred to, in addition

13   to opioid prescriptions, did you find any other types of

14   treatments that were received?

15   A    Absolutely.  So there wasn't a single chart of Dr. Ruan's

16   that I reviewed that did not include what we call in the pain

17   field multimodal techniques.  That means Dr. Ruan tried

18   everything at hand, not just prescription management, to get

19   patients comfortable.  That included physical and behavioral

20   therapies, it included things like injections, whether those

21   injections were Botox into the muscles to relieve spasm or

22   local anesthesia around nerves or epidural or spinal-like

23   procedures, as well as other pharmacological medication

24   management therapy of medicines that had nothing to do with

25   opioids.  Anti-inflammatory medicines, antiseizure medicines to

1  help control nerve pain, antidepressants to help control nerve

2  pain, muscle relaxants.  So every chart contained numerous

3  attempts at finding treatment other than opioids to manage the

4  pain.

5  Q   Did you see an effort to find the source of the pain or

6  what was perhaps causing the pain?

7  A   I recognized that Dr. Ruan made liberal use of diagnostic

8  testing, things like X-ray, MRI, EMG or nerve conduction

9  studies, even sometimes outside of what I would consider to be

10 our area of expertise, MRI of the brain, so to speak.  So he

11 did make use of multiple, you know, diagnostic tools to try to

12 figure out what was the source of the pain.  Which, you know,

13 in chronic pain we don't always find.  Oftentimes chronic pain

14 becomes the disease itself.

15 Q   And that was my next question.  In the field of pain

16 management, what is the importance or significance of doing all

17 this testing?

18 A   So we still do it even though knowing oftentimes we won't

19 find anything because on rare occasion we do find treatable

20 sources of pain.  I'll give you an example.  I had a patient

21 recently in the office that had wide-spread pain, had been to

22 10 doctors, told she was crazy, had seen the psychiatrist, got

23 labeled with fibromyalgia, saw two different rheumatologies.

24 Turns out that she had MS and nobody had done -- they did a

25 brain MRI, but nobody had done an imaging of her neck.  And

5236

1    when we sent an MRI of the cervical spine, we saw an MS plaque

2    lesion in her neck, not in her brain, which could almost

3    account for her total body pain symptoms.  So there are

4    occasions where we find treatable sources of pain.

5              Now, if you've had six or seven back surgeries or neck

6    surgeries, oftentimes there's no further diagnostic test that

7    we can do.  The pain has kind of settled in the nerves or in

8    the nervous system itself.  But we'll still on occasion do

9    nerve tests or more MRIs to see just on the hopes that there's

10   something findable and fixable.

11   Q    And is that standard within the pain management practice?

12   A    Absolutely.

13   Q    Those type of tests?

14             Now, did you find that in regard to Dr. Ruan's

15   patients that Dr. Ruan reached conclusions about the evaluation

16   of the pain that his patients had?

17   A    In every chart, yes.

18   Q    And is that something that is within the usual course of

19   professional practice, is to do that, make those evaluations?

20   A    Absolutely.

21   Q    Now, with regard to the opioids that were prescribed, did

22   you see in the charts that the patients had received

23   information about those opioids?

24   A    Yes, they did.

25   Q    And in the pain management context, in the pain management

JEFFREY A. GLENN, MD - DIRECT BY MR. ARMSTRONG

1    practice, what is available to a physician to educate the

2    patient on opioids and the use of opioids?

3    A    So if I may, I'll have to -- let's talk about two time

4    periods.  Let's talk about now when the dangers of opioids are

5    just front page each and every day.

6             MR. BODNAR:  Your Honor, we object to the

7    nonresponsive part of this answer, and it also runs afoul of

8    previous rulings.

9             THE COURT:  Sustained.

10   BY MR. ARMSTRONG:

11   Q    Okay.  Let's talk about with regard to the time period of

12   the patients that were treated.  So that would have to end in

13   2015, May of 2015.  So let's talk about during that time

14   period.

15   A    Sure.  So in 2012 the government and our own FDA put out a

16   program around long-acting opioids.  So hopefully we'll have a

17   chance to talk about the different kinds of opioids that are

18   used to treat pain.  But one of the kinds of opioids is a

19   long-acting opioid.  That means it lasts all day long.  The

20   government said, hey, you know because these come in higher

21   dosage strengths, these agents that last all day long, we want

22   to educate doctors and pharmacists and patients and families

23   about the use of these medicines.

24             So after 2012 every prescription written for one of

25   those medicines, when it was dispensed at the pharmacy, a

5238

1    patient was given a medication guide.  That medication guide

2    was a small pamphlet written in very simple terms about the

3    dangers and appropriate, safe, precautionary use of those kinds

4    of medicines.

5              So in the pain practice -- let's take Dr. Ruan's

6    practice for example -- each of his consultations, especially

7    the new consultations, said that I discussed specifically the

8    benefits and the risks of using a controlled substance in this

9    patient.  He gave the patients what we call an opioid treatment

10   agreement or a medication agreement.  We used to call it a

11   contract, a medication contract.  And that agreement says,

12   okay, if you want to be on this very powerful class of

13   medicines, there are some rules you need to follow.  And I'll

14   be here to help you.

15             But it says, number one, my office is only open 9 to

16   5; don't call me after 5 p.m. or on weekends to refill your

17   medicines because they won't be refilled after hours.

18             Number two, you can use any pharmacy you like to get

19   your medicines filled, but you may only use one pharmacy to get

20   your medicines.  And we'll write down the name and telephone

21   number of that pharmacy.

22             Number three, these medicines can be lethal,

23   especially if left unexposed in the house to kids and

24   pets.  You're to keep your medicines safe and secure, locked up

25   in the house.

JEFFREY A. GLINN, MD - DIRECT BY MR. ARMSTRONG

1          Number four, if ever there's any question about how

2     you take your pain medicine, you give us the right to take a

3     urine, a saliva, a blood, a hair sample at our request to send

4     it to the lab to make sure that you're taking your medicines

5     the way you're supposed to and that you're not using any

6     illicit drugs or substances.

7          And it says a whole list of things like that to ensure

8     that patients know the rules of the road, the safe guidelines

9     for using their pain medicines.  Dr. Ruan used that form on

10    each and every one of his patients in his practice.

11         So they were given ample education both in an informed

12    consent where he spoke to them and both in a written treatment

13    agreement.

14    Q    And that is what we refer to as the opioid agreement, the

15    written opioid agreement?

16    A    That's correct.

17    Q    So you found that within the charts, Dr. Ruan was talking

18    to his patients at the very first visit about opioid use?

19    A    That's correct.

20    Q    And the risks and benefits of that?

21    A    Correct.

22    Q    And then the opioid agreements?

23    A    Correct.

24    Q    And then I think you said that when someone fills that

25    prescription, the pharmacy would then also provide information?

JEFFREY A. GUDIN, MD - DIRECT BY MR. ARMSTRONG

1   A   That's correct.

2   Q   Is that method of communicating information to the patient

3   within the usual course of professional medical practice?

4   A   Absolutely.

5   Q   Do you rely on that within your own practice?

6   A   I do.

7   Q   Now, there's been discussion about the dosages of opioids

8   written as it relates to titration of the medication.  Can you

9   talk to the jury a little bit about what you found from

10  Dr. Ruan's charts that you reviewed about dosing and titration?

11  A   Sure.  Well, I could speak to that from a couple of

12  different fronts.  First off, it seemed that Dr. Ruan's dosing

13  and titration approach was logical in nature.  Titration means

14  we start at a lower dose and we progressively raise the doses

15  higher to meet the needs of the patient.  Titration is

16  something we do with blood pressure medicines, cholesterol

17  medicines, insulin for diabetes.  We don't always get the dose

18  right on the first attempt.  And sometimes the disease itself

19  gets worse, so your blood pressure gets worse over time or your

20  diabetes gets worse and you need more doses of your medicine.

21  That's what we refer to as titration.

22          And when I review records, I look to see that

23  clinicians do just that, that they start at reasonably low

24  doses and that they titrate in a logical fashion.  Which is

25  what Dr. Ruan did in the charts that I reviewed.

Case 1:15-cr-00088-CG-B   Document 775-23   Filed 05/31/18   Page 42 of 200   PageID #:
31427
JEFFREY A. GUDIN, MD - DIRECT BY MR. ARMSTRONG

5241

1  Q   And did you form an opinion about the dosing and titration

2  strategies that Dr. Ruan used?

3  A   It seemed that Dr. Ruan was titrating in a logical fashion.

4  It seemed that what he was doing was a legitimate course of

5  medical practice, especially for a pain management practice.

6        And, you know, you asked about dosages.  Being in the

7  metro New York area and having -- being in close proximity to

8  four or five large academic centers in New York City, I could

9  tell you that there's still a couple of generations of

10 physicians who basically grew up and trained in the --

11       MR. BODNAR:  Your Honor, objection to relevance of

12 training of people in New York who are not on trial here.

13       MR. ARMSTRONG:  Judge, I think he was explaining his

14 opinion with regard to Dr. Ruan and the information he used to

15 form that opinion.

16       THE COURT:  But he hasn't given the opinion yet, so I

17 don't know if it relates to it or not.  I sustain the

18 objection.

19       THE WITNESS:  I can clarify, Your Honor, if I may.

20       THE COURT:  Well, you need to answer the questions.

21 BY MR. ARMSTRONG:

22  Q    Do you want me to repeat the question?  Did you form

23 an opinion with regard to the prescription doses that Dr. Ruan

24 prescribed to his patients?  Did you form an opinion about

25 that?

1   A   Sure.  Yes, I did.  I could tell you that in many pain

2   management practices patients are referred on thousands of

3   milligram equivalents of morphine doses.  And for most of the

4   charts that I reviewed, the doses were not that high.  So his

5   dosages were reasonable and the titration of the medications

6   was reasonable.

7   Q   Now, the jury has heard a little bit about this morphine

8   equivalent standard.  Explain to them when you say the morphine

9   equivalent, what you're referring to.

10  A   Sure.

11       MR. BODNAR:  Your Honor, we object.  There was no

12  disclosure about the opinions -- his opinions on morphine

13  equivalent in what was turned over in the rule 16 disclosure.

14       THE COURT:  Sustained.

15  BY MR. ARMSTRONG:

16  Q   Now, does the quality of care provided to patients have

17  anything to do with the dosing of the prescriptions they

18  receive?

19  A   Not at all, with an explanation.

20  Q   Please explain.

21  A   Quality of care can't in any way be related to dosages of

22  medications for pain just like they can't be related to dosages

23  of medicines for any other specialty.  It would be ludicrous

24  for me to tell you because you're on 100 units of insulin

25  rather than 10 units that you're overusing your insulin if 100

 1  units is what you need to control your blood sugar.  Same thing

 2  for a cholesterol or a lipid medication, same thing for a blood

 3  pressure medicine.  So trying to say that just looking at a

 4  number of pills or a number of milligrams of medication that

 5  was prescribed and relating that to quality of care makes no

 6  sense.  Each one of us is individual.

 7         There's an emerging specialty called pharmacogenetics.

 8  As a matter of fact, there are labs popping up all over the

 9  country that want to test your genetics -- you probably see

10  some of them on television -- and tell a little bit about your

11  background.  Well, from a doctor standpoint --

12         MR. BODNAR:  Your Honor, we object to relevance at

13  this point.  There's no indication that Dr. Ruan was ever doing

14  any of these things.

15         THE COURT:  Sustained.

16  BY MR. ARMSTRONG:

17  Q   Dr. Gudin, a few minutes ago you mentioned that your review

18  of the chart indicated a lot of interventional procedures that

19  you saw:  the blocks, the epidurals, the injections.  In the

20  context of a pain management practice, why does a doctor do

21  those type of procedures and also prescribe opioids?  Why do

22  you do both?

23  A   You know, it goes back to an answer I gave earlier.  That

24  the state-of-the-art treatment, the best we can do for

25  patients, is offer them multimodal therapies, offer them

1    different approaches to treat the pain.  One approach is

2    interventional with injections.  Another approach is

3    medicines.  Another approach might be massage or acupuncture or

4    chiropractics.

5           The challenge in the pain management world is that

6    none of those approaches -- and I don't want to make this

7    universal because, you know, every once in a while we have a

8    patient where something works 100 percent, they come in and

9    they kiss and hug me and they love me for curing them.  But

10   "cure" is not a word we use in the chronic-pain world.  So each

11   of those approaches is meant to take the pain scores down just

12   a little bit to let patients function and have a better quality

13   of life.  So a doctor might do injections in addition to

14   medication management, in addition to other therapies just to

15   try to attack the pain from different viewpoints.

16   Q    So doing interventional procedures along with opioid or

17   other medication prescribing is within the usual course of a

18   professional medical practice?

19   A    Absolutely.

20   Q    In the context of a pain management practice?

21   A    Of course.  It's -- it's mandatory.

22   Q    Now, with regard to the files you reviewed -- and I think

23   you talked about the exams that you saw that Dr. Ruan

24   performed -- is it necessary to do a full physical exam like

25   that on followup visits?

1   A   I'll say no, with again a disclaimer.  Sorry for explaining

2   every answer.  If the patient has any new symptomatology, so

3   something new has come up since your initial examination, we

4   probably wouldn't repeat each and every portion of the physical

5   examination.  We would repeat the important portions, examining

6   the back, testing the reflexes, testing the strength, looking

7   for areas of redness or inflammation, looking for deformities

8   or muscle spasm.  But we usually don't perform the in-depth

9   clinical examination on every single visit.

10  Q   Are you more -- would that be more what they refer to as

11  problem focused on the area of the complaint?

12  A   That's what we call it in medicine, a problem-focused

13  evaluation.

14  Q   And that was what you would expect on followup visits?

15  A   Correct.

16  Q   Now, in this case -- and I probably should have asked you

17  this before -- did you review the Alabama Medical Board or

18  Alabama Medical Examiners -- Alabama Board of Medical Examiners

19  administrative code?

20  A   I did, yes.

21  Q   Okay.  Does every state have their own administrative code?

22  A   Yes, they do.

23  Q   And in forming your opinions, you took into account what

24  the Alabama Medical Examiners say with regard to patient care?

25  A   That's correct.

JEFFREY A. GLENN, MD - DIRECT BY MR. ARMSTRONG

1   Q   And prescriptions, opioid prescriptions --

2   A   That's correct.

3   Q   -- particularly.  You touched on this a minute ago.  You've

4   seen patient files that the patient who presented also had some

5   type of psychiatric issue.  And when we talk about psychiatric

6   issue, are we talking about an issue that requires some type of

7   institutional psychiatric care or are you talking about

8   something that needs to be assessed and controlled as part of

9   the plan?

10  A   So if you can imagine how pain affects patients, there are

11  a number of ways in which it basically ruins their

12  lives.  First of all, it affects sleep.  And for those of us

13  who have lost a night's sleep, you know how bad you feel the

14  next day.  Imagine losing weeks or months or years of

15  restorative sleep.

16          It ruins finances because you can't work any more, and

17  then you can't support your family.  So it creates marital and

18  family discord, some dysfunction in the house.

19          So by nature pain patients have this baseline of

20  anxiety and depression.

21          When they have overt psychiatric disease -- bipolar

22  disorder, manic depression, major depression -- those obviously

23  need treatment by a psychiatry professional, a psychiatrist or

24  a psychologist.

25          But for the most part we treat every patient alongside

 1   with the primary care doctor for the signs and symptoms of

 2   depression that go along with pain.

 3   Q    Did you find within the charts patients that at the time of

 4   the referral they had some type of prescription for either

 5   their inability to sleep or their anxiety perhaps?

 6   A    You know, that was a common theme and one of the first ones

 7   I picked out on the review of Dr. Ruan's charts.  I'm not sure

 8   how these particular patients were chosen, but they seemed to

 9   be the most challenging.  The patients -- and I said this

10   earlier -- who have combined psychiatric disease and pain are

11   the most challenging patients to treat.  They're the ones that

12   I'm sent from other pain doctors, academically trained pain

13   doctors.  And to say they're impossible to treat might be going

14   a little bit far, but it's close.  Almost nothing we do works

15   for them.  It's very frustrating to the patients.  It's

16   frustrating to us as clinicians.  And we're just now learning

17   how much more at risk these patients are from substance misuse

18   issues, things that we didn't recognize in the past.

19          So it's no surprise to see that the charts picked for

20   review are the most challenging patients who failed to respond

21   to conventional treatments, who needed higher doses of opioids,

22   who ran out of their medicines more commonly than the average

23   pain patient would, who needed injections and all different

24   kinds of therapies.  And even still some of the patients five,

25   10 years later in Dr. Ruan's practice still had severe pain

1  despite dozens of trials of medicines, injections, multiple

2  surgeries, again, just to show you how complex and difficult it

3  is to treat these patients.

4  Q   Now, you have told the jury about your board specialty in

5  addiction medicine and also your work with the addiction

6  centers and, of course, your many publications about abuse of

7  opioids.  Did you see a history in some of the files of

8  patients that may have had substance abuse issues?

9  A   Yes, they were there.  Yes.

10  Q   How does the pain management physician approach and then

11  treat a patient like that?

12  A   So not to make a joke of it, but, you know, early on there

13  were some colleagues that said, look, we don't treat patients

14  with substance abuse with pain medicines.  You don't do

15  that.  All right?  And, you know, then we learned to realize

16  that those patients need more pain medicines than others, not

17  less pain medicines.  Let's face it, if you have a history of

18  substance abuse -- which accounts for about 10 percent of the

19  population, sometimes 15 if you think about smoking and

20  alcohol.  If you think about that many people in our society

21  that have problematic use of alcohol, pain medications,

22  whatever the -- marijuana -- whatever the substance is, those

23  patients eventually get cancer or have car accidents or trauma

24  or botched surgeries and need pain medicines.  So we don't just

25  say, hey, look because you have a history of substance abuse,

5249

1   you don't get pain medicines.  No.  We embrace that patient.

2   We know that there's a greater risk of perhaps misusing their

3   pain medicines, so we'll see them more frequently.  We might

4   take their urine more frequently to make sure that they're

5   behaving.  We might check the prescription drug monitoring

6   database from the state more frequently.

7           So it's not that we don't prescribe for those

8   patients.  As I mentioned, oftentimes those patients need more

9   medicine because of their history than the average patient, but

10  we're more careful when prescribing for those patients.

11  Q   So even if somebody presents that may have a history of

12  substance abuse, that does not mean that it is outside the

13  usual course of professional practice to then treat that

14  patient and prescribe opioids?

15  A   Not at all.

16  Q   Now, I think you testified earlier that in your practice

17  you have nurse practitioners, you have RNs, you have medical

18  assistants, you have different staff members that are all

19  involved in the care of your chronic-pain patients; correct?

20  A   That's correct, yes.

21  Q   In the pain management practice is it appropriate for

22  doctors to employ such people?

23  A   It's not only appropriate in today's practice environment,

24  it's basically mandatory.  If doctors had to see every patient

25  by themselves and manage every referral and every insurance

5250

 1    company prior authorization and every letter and phone call,

 2    they'd go bankrupt, as up to a quarter of physicians in this

 3    country are facing those challenging issues.

 4    Q    So that is within the usual course of professional practice

 5    to employ extenders and office staff and medical assistants to

 6    assist in the treatment of the patient?

 7    A    Absolutely.  I couldn't think of a specialty practice --

 8    maybe with the exception of psychiatry where you go in and only

 9    see the psychiatrist -- where you wouldn't encounter a nurse

10    practitioner, medical assistant, nurse, someone who helps the

11    physician with the visit.

12    Q    Is it also within the usual course of professional practice

13    within a pain management context for a nurse practitioner to be

14    deeply involved with the treatment and care of the patient

15    following the first visit?

16    A    It's very common, yes.

17    Q    And did you find that in the charts you reviewed for

18    Dr. Ruan?

19    A    I did, yes.  Dr. Ruan did make use of nurse practitioner

20    extenders for his particular practice.

21    Q    And was his use -- did you find his use of nurse

22    practitioners for these charts within the usual course of

23    professional practice?

24    A    For the charts that I reviewed, many of them either state

25    specifically Dr. Ruan was in the office or saw the patient.

1    And when you look, Dr. Ruan has signed all the charts on the

2    same day of the visit.  So I believe that Dr. Ruan made

3    appropriate use of his extender nurse practitioners, yes.

4    Q   Now, that brings up a good point.  Did you see in the

5    charts at some point in time there was a transition from

6    handwritten chart notes to electronic medical records?

7    A   I did notice that, yes.

8    Q   And is that something that is a more recent phenomenon for

9    pain management practices to make that transition -- or

10   conversion, I think, is the actual word that they use?

11   A   Yes.  The answer is yes, with a little background.  Our

12   government has said that they think electronic medical records

13   should improve care and as a matter of fact have incentivized

14   physicians to use electronic medical records through a program

15   called Meaningful Use where they actually pay doctors to use an

16   electronic medical record system but to a meaningful extent.

17   That means you need to track vitals signs, smoking status,

18   allergy status, and then you apply to the government for this

19   rebate check or reward check.

20          MR. BODNAR:  Your Honor, we object to the relevance of

21   this unless he can tie up foundation that Dr. Ruan was one of

22   these individuals that was receiving money for this type of

23   program.

24          THE COURT:  Yes.  Sustained.

25          MR. ARMSTRONG:  I'll move on.

5252

1    Q    But you saw within these charts the transition.  Some of

2    the charts have a lot of handwritten notes from dates older

3    than, I think, around 2013 or so, and then they became

4    electronic?

5    A    Sure.  So the move is towards electronic medical records

6    for all specialties, not just pain management.  And I noticed

7    in Dr. Ruan's records, like most practices, that there was a

8    transition from handwritten notes to electronically prescribed

9    notes.

10   Q    And you mentioned the signing of the chart or the signing

11   of the progress note.  They're done differently with electronic

12   medical records as opposed to the handwritten chart notes;

13   correct?

14   A    That's correct.

15   Q    And did you see within the charts where the handwritten

16   notes were usually done all the same day; correct?

17   A    Correct.

18   Q    And in the electronic medical records maybe the charts are

19   signed the same day, maybe the next day or following day?

20   A    That's correct.

21   Q    Is that within the usual course of a professional medical

22   practice for that to be done that way by a pain management

23   physician?

24   A    Absolutely.

25   Q    Now, there's been some discussion in this case about opioid

 1    dependence.  Did you see within the charts diagnoses by

 2    Dr. Ruan that patients may have been opioid dependent?

 3    A    I did see that, yes.

 4    Q    Explain to the jury what opioid dependence means,

 5    particularly in regard to your expertise with addiction

 6    medicine?

 7    A    Sure.

 8    Q    And the difference.

 9          THE WITNESS:  Your Honor, if I may, this might be an

10    extended answer, but I think it would help put some context for

11    the jury.

12    A    There are a number of terms that we use in the pain

13    management world and there are a number of terms that are used

14    in the addiction or psychiatry world.  And the one word I want

15    to tell you to keep in mind is called "dependence" because we

16    use that term differently.  To a psychiatrist who's looking in

17    a psychiatric textbook or reference book --

18          MR. BODNAR:  Your Honor, we object to this being

19    pretty far outside where we're going here.  What it is to a

20    psychiatrist --

21          THE COURT:  Yes.

22          MR. BODNAR:  I think the question is does he know.

23          THE COURT:  All right.

24    BY MR. ARMSTRONG:

25    Q    Talk about in the context of the pain management

JEFFREY A. GUDIN, MD - DIRECT BY MR. ARMSTRONG

```
 1  practitioner what opioid dependence means and why opioid
 2  dependence would be in the chart.
 3  A   Of course.  So if you are writing for pain medications, as
 4  Dr. Ruan was, you need to understand the difference between a
 5  few basic concepts.  We've all heard the term "dependence,"
 6  we've all heard the term "tolerance."  Those are very commonly
 7  confused by clinicians and by patients.
 8          Tolerance just means that the more you take a product,
 9  the more it's going to take to have its effect.  We all get
10  tolerant to medicines like we do to other -- to other
11  substances.
12          Dependence means that your body has become dependent
13  on the medicine and if you were to stop it -- the one word I
14  teach my students to remember with dependence,
15  "withdrawal."  So it doesn't mean you're addicted to the
16  medicine.  It's a very common mistake that clinicians make.  I
17  get referrals all the time that say patient addicted to
18  Percocet, please detox.  But they're not addicted, they're
19  dependent on the medicine.  They need the medicine for their
20  pain.  If you were to stop it, they would go into withdrawal.
21          So patients develop both tolerance where it takes
22  higher doses over time and dependence where if we were to stop
23  the medicine, they would withdraw.
24          In the pain community that's how we use the word
25  "dependence."  And it's in many of Dr. Ruan's charts, the
```

1  diagnosis of opioid dependence, which in the pain setting means

2  if you stop the medicine, they go into withdrawal.  A little

3  bit different than what the psychiatrists use to describe the

4  word, as I explained before.

5  Q   Now, do you expect if Dr. Ruan is writing opioid

6  prescriptions -- has an opioid therapy plan for these patients,

7  do you expect to see an opioid-dependent diagnosis?

8  A   Whether it's written or not, in every case, yes.

9  Q   And is that within the usual course of professional

10  practice to have that diagnosis and then continue to write

11  opioids to that patient?

12  A   Absolutely.

13  Q   You mentioned in the context of difficult patients that

14  sometimes they run out of their medication early.  Is that

15  related to a concept known as pseudoaddiction sometimes?

16  A   Yes, it is.  Pseudoaddiction is a term that I think

17  basically came about in my early days of training to describe

18  the phenomenon of pain patients who come in and say to the

19  doctor very simply:  I need more.  I need more.  Doc, it's not

20  working.  I need more medicine, I need more.

21         And then it's our job to figure out is that addiction,

22  is this an addiction problem, or does this just sound like

23  pseudo, does it sound like it's a pseudoaddiction?

24         And what they figured out was that if you really have

25  pain -- take, for example, you have a migraine headache and I

1  give you one aspirin or one baby aspirin; you say look, I need

2  more, I need more, I have to have more.  Because you know that

3  it's going to take you three aspirin to control your migraine

4  headache.  You're not addicted to aspirin.  You need more for

5  the medical benefit.

6          And the same thing we recognize happens with pain

7  medicines.  If you give a patient only one pill and it takes

8  them two pills to get relief, they're going to run out of their

9  medicines.  They're going to come back and say I need more, I

10  need more.  And it's the clinician's job to decide is that a

11  pattern of misbehaving?  Is this somebody who may be having

12  problems with the medicine?  Is this addiction?  Or is this

13  pseudoaddiction?  Sounds like addiction but it's not really

14  addiction.  It's just uncontrolled pain.

15  Q   And who is in the best position to make that determination

16  as to what is in the best interest of the patient?

17  A   Without question, it's the physician sitting there in front

18  of the patient.

19  Q   And that in this context would be Dr. Ruan?

20  A   That's correct.

21  Q   Now, we talked a little bit about the transition from the

22  handwritten records to the medical records -- I mean the

23  electronic medical records.  Are there any advantages or

24  disadvantages to that new way of doing things with the medical

25  records and electronic printed forms?

JEFFREY A. GLUDIN, MD - DIRECT BY MR. ARMSTRONG

1    A    I chuckle a little bit because I think it depends upon your
2    typing abilities.  As a somewhat older clinician without great
3    typing skills, I found the change to electronic medical records
4    to be a bit more cumbersome and time consuming.  I'm not a very
5    fast typist.  And when making a living and running a practice
6    depends upon you being able to get out of the room to get to
7    the next patient, to see the next patient, and depends on how
8    fast you can type up into the record, it was a bit of a
9    challenge.  I think it's a universal phenomenon that when you
10   change over from a handwritten system where you can just put a
11   couple of checks on the page, write a few lines and sign it,
12   that takes seconds to a system that takes minutes, there's
13   going to be a learning curve and some issues that go along with
14   that.
15          One of the other challenges is the electronic medical
16   record made it very easy for us to have longer notes where,
17   with the click of a button, I can move entire sentences or
18   entire paragraphs from previous notes to the next note.  And I
19   think one of the biggest deficiencies with electronic records,
20   being a doctor that reviews other doctors' cases, is I see that
21   it's too easy for doctors to just click the box and move the
22   entire last note to the next note, almost cloning or copying
23   the medical records from previous visits.
24          Just as an aside, it's what the payors insist that we
25   have in order to be paid for our services, a certain level of

1    documentation.

2    Q   So you mentioned the phrase "cloning."  Could you expand on

3    that just a little bit with regard to the electronic medical

4    records?

5    A   Yeah.  Cloning is just making an exact duplicate, an exact

6    copy, of the note that you produced last time.  So, for

7    example, it's February now.  In January I saw a patient who

8    came in, I typed that I listened to their heart and lungs, I

9    typed that I examined their abdomen, I typed that I tested

10   their reflexes, I typed that I tested their sensation, I typed

11   that I tested their range of motion, I typed that their right

12   hip was tender when I palpated it.  That went in my January

13   note.  That took me a few minutes to type.  In February when

14   that patient comes back, if the complaints and my examination

15   are the same, with one click I can move everything I typed in

16   January to what I typed in February.  That's what I call

17   cloning of the medical record.

18   Q   And is that common in the industry, in the medical

19   community, to do that?

20        MR. BODNAR:  Your Honor, objection to foundation to

21   what is common across the medical community.

22        THE COURT:  Sustained.

23   BY MR. ARMSTRONG:

24   Q   With regard to other physician charts you've reviewed in

25   your experience, is that common?

5259

```
 1              MR. BODNAR:  And again, Your Honor, he reviewed the
 2    charts of other physicians, not when they were filling out
 3    their charts.  So still foundation.
 4              THE COURT:  Well, I sustain the objection.
 5              Mr. Armstrong, is now a good time for us to have a
 6    morning break?
 7              MR. ARMSTRONG:  Sure.
 8              THE COURT:  All right.  Ladies and gentlemen, leave
 9    your pads on your chairs.  Remember my instructions not to
10    discuss the case or to allow anyone to discuss it with
11    you.  Take your break downstairs in the jury assembly
12    room.  We'll call you back in about 15 minutes.  We're in
13    recess.
14         (A recess was taken at approximately 10:26 a.m.)
15         (In open court, 10:48 a.m., defendants and jury present.)
16              THE COURT:  All right, Mr. Armstrong.
17    BY MR. ARMSTRONG:
18    Q    Dr. Gudin, I want to clear something up real quick.  The
19    amount of money that you've been paid to date does not include
20    the time for coming down to Mobile to testify.  That's going to
21    have to be paid at some point once you've concluded; correct?
22    A    That's correct, yes.
23    Q    So the other -- I think you mentioned $10,000.  There's
24    additional money that will be paid to you for the time of
25    coming down here; correct?
```

1   A    All of my travel expenses and hotel have been paid for by

2   me so far, so I will be submitting that for the case, yes.

3   Q    And then, of course, your hourly rate -- your daily rate

4   for participating as a witness in a trial?

5   A    That's correct.

6   Q    Now, we left off talking about the medical records and the

7   transition into electronic medical records.  In the context of

8   a pain management practice, do you see inaccuracies, mistakes

9   or errors in the electronic records from time to time?

10  A    I think inaccuracies in medical records happen whether

11  they're handwritten or computer generated, yes.

12  Q    The fact that there may be inaccuracies or mistakes or

13  errors in an electronic medical record, does that invalidate

14  the treatment that was rendered or the prescription that may

15  have been written at that visit?

16  A    Well, I hate to generalize.  I'm not sure I could say that

17  in all cases.  But depending upon what the error is -- let's

18  say there's an error in height or weight or side to side, you

19  know, getting a right and a left mixed up.  If there's an error

20  in filling out a prescription for, let's say, the wrong patient

21  -- which happens.  Errors happen in medical practices.  They're

22  called medical errors.  It doesn't necessarily discredit,

23  disqualify, or make the treatment offered to the patient any

24  less valid.

25  Q    So if those were to occur, then that would not render that

5261

1   the care was -- or the prescription was outside of the usual

2   course of professional practice?

3   A   That's correct.

4   Q   Now, we've talked about the importance of getting the

5   patient's history and doing the exam.  What is the importance

6   of the actual information that the patient tells you directly

7   as a pain management physician?

8   A   So the way medical students, physicians, nurse

9   practitioners, nurses are taught to document an outpatient --

10  when you go to visit your doctor and then go home -- visit is

11  in a very specific format, and I believe it's universal amongst

12  doctors and practices and different specialties.  It's called

13  the SOAP note.  It sounds like a funny term, S-O-A-P, but it's

14  an acronym that has some meaning.  The S stands for subjective.

15  Subjective is whatever the patient tells you.  That portion of

16  the patient's history is usually done by either the medical

17  assistant, a nurse, a nurse practitioner.  And, for example, if

18  a patient comes back, you might ask an open-ended question

19  like:  How have you been since your last visit?

20          If the patient says:  Oh, Doc, I've been terrible

21  since my last visit, I've been to the ER twice -- somebody

22  documents that in the S, the subjective portion.

23          Have you taken any new medicines?

24          Yeah.  My orthopedist gave me such and such

25  medicine -- that gets documented.  Everything the patient tells

 1   you goes in the subjective portion.

 2          When I come in the room for my patient, my medical

 3   assistant has already garnered some of that information.  I sit

 4   down and read it, and then I ask the patient more questions:

 5   Oh, I see you've been to the emergency room.  Did you have an

 6   MRI?  Did you need any procedures done?  And I further

 7   supplement the record.  That's the subjective portion of the

 8   note.

 9   Q   And so how much -- is there a relationship between the

10   physician's office and the patient as far as the information

11   the patient actually tells you?

12   A   I'm not sure I understand the question of relationship.

13   Q   Well, let me -- yeah, that probably is poorly worded.  Is

14   there a relationship -- there's a doctor-patient relationship,

15   obviously; right?

16   A   Oh, absolutely.

17   Q   And what is -- and the significance of the trust between a

18   doctor and the patient, if you can tell us about that, please.

19   A   Well, we're taught as medical students, again, historically

20   that trust is the basic foundation of any relationship,

21   including the doctor-patient relationship.  You have to trust

22   your patients.  If we looked at every single patient as if they

23   were feigning their symptoms, faking their symptoms, or lying

24   to us, what kind of medical practice could we have?  So it's

25   human nature to listen and believe what the patient is telling

5263

 1   us.

 2   Q   And is it the doctor's first responsibility to treat the

 3   patient and treat the condition?

 4   A   Absolutely.

 5   Q   And in the context of pain management, is that to treat the

 6   pain and the suffering of the patient?

 7   A   That's our goal.

 8   Q   Now, in these charts that you reviewed, did you see

 9   requests of the patients to fill out a pain scale?

10   A   Usually.

11   Q   And there were also areas where the patients were asked

12   different questions, and then they could say what activity

13   caused certain pain or what it interfered with; correct?

14   A   That's correct.

15   Q   And if a patient presents to a pain management clinic and

16   writes down 10 of 10 on every visit, how does the pain

17   management expert evaluate that?

18   A   Yeah.  So it's a good question.  One of the challenges with

19   using a number scale to describe your pain when you have severe

20   pain, your pain might always be that number.  So it's important

21   for us to say, okay, I understand your pain is still a 10 or a

22   nine.  And actually there are some newer scales that have been

23   developed to actually describe to patients what a 10 would feel

24   like, having your arm cut off by a chainsaw and then salt

25   rubbed in the wound, just to put it in perspective.  Because

5264

```
 1    patients find it too easy to say the number 10 as the maximum
 2    pain score.
 3            But getting back to your question -- could you repeat
 4    your question?  Sorry.
 5    Q   How does the pain management clinician evaluate that pain
 6    scale and what is the value of that to you?
 7    A   Yeah, sure.  So in addition to the numeric scoring, we ask
 8    patients about their ability to function.  So here's a very
 9    common answer.  You know what, Doc, my pain is a nine.  But I
10    actually did some gardening the other day, I got out to my
11    kid's soccer game, and I've been more functional lately.  So
12    even though my number hasn't changed, if you and I were to just
13    look at the progress note and see the number was the same from
14    visit to visit, you might not interpret that as improvement.
15    But when you actually talk to the patient and use some of the
16    functional scales, you notice that their lives have gotten a
17    bit better.
18            And it's kind of strange, but patients will do as much
19    as they can, or I should say overdo, to keep themselves at a
20    number.  So that number isn't so reliable.  It almost never
21    changes.  They do more to keep themselves at a nine.
22    Q   And obviously pain is subjective; correct?
23    A   Of course.
24    Q   And different patients may have a different tolerance to
25    their pain and evaluate that differently; correct?
```

1    A    That's scientifically proven.

2    Q    And if one patient could have a certain amount of pain and

3    describe it as a 10, the next patient could have the exact same

4    amount of pain and describe it as a seven; is that correct?

5    A    That's correct.

6    Q    Does that mean that either one of them is overevaluating or

7    underevaluating their pain?

8    A    We know there are genetic differences in pain perception,

9    cultural differences in pain perception.  Having trained in an

10   inner-city hospital, I can tell you there are some patients by

11   culture and background that are very stoic.  For example, the

12   German population, the Korean population, those patients will

13   deliver babies without saying -- without making a peep of

14   pain.  They're very stoic and they keep it in.  And then there

15   are other populations who are known to be very expressive and

16   very loud about their pain that will scream and you'll hear it

17   two hallways -- two wards over the screaming.  It doesn't mean

18   that any one person's pain is worse than the other; it has to

19   do with your upbringing and your background and how you manage

20   that pain.

21   Q    Now, in talking about the prescribing of opioids and the

22   use of other medications that you've described, did you find in

23   the charts you reviewed different medications prescribed at the

24   same visit?

25   A    Absolutely.

JEFFREY A. GLENN, MD - DIRECT BY MR. ARMSTRONG

1   Q   And were some of these long-acting opioids and short-acting

2   opioids in addition to other medications like muscle relaxers

3   or anxiety medications?

4   A   Absolutely, there may have even been some records where

5   there were three different kinds of opioids that were used.

6   Q   If you could talk to the jury a little bit about your

7   review of these charts as it relates to the proper prescribing

8   of multiple medications to a single patient.

9   A   Sure.

10          THE COURT:  Well, let me stop you right there.  That's

11  not really a question.  That's a general asking him to talk to

12  the jury.  And I think it's more appropriate to ask

13  questions.  Okay.

14  BY MR. ARMSTRONG:

15  Q   Is it within the usual course of a professional practice to

16  prescribe more than one medication to the same patient at a

17  single visit?

18  A   It's not only within the course of usual legitimate medical

19  practice; it's -- as I mentioned before, it's basically the way

20  we care for pain patients.  Because we don't have any one

21  miracle drug, we don't have any one class of drug that treats

22  pain from multiple avenues, we have to use multiple drugs that

23  treat pain from different avenues.  For example, any one

24  particular patient can be on an anti-inflammatory drug.  We all

25  know the over-the-counter ones like Motrin or naproxen, Advil

1    and Aleve.  But there's probably 20 other prescription agents
2    that are just like it.
3          Doctors make lots of use of anti-inflammatory drugs.
4    They are not without their dangers.  An equal number of deaths
5    was reported due to these anti-inflammatory medicines -- from
6    things like GI bleed and heart attack and stroke -- to opioids,
7    believe it or not.
8          We use things like Tylenol, acetaminophen, which you
9    can get over the counter or in combination with prescription
10   medicines.  We'll use muscle relaxants for patients who have
11   muscle spasm like after car accidents and trauma at the heart
12   of their pain.  We'll use different kinds of opioids.  And when
13   I say different kinds of opioids, I mean different molecules.
14   You've all heard about morphine.  Most have heard about
15   oxycodone.  But if you were to review Dr. Ruan's records, he
16   makes use of hydromorphone, a drug like methadone, oxymorphone,
17   fentanyl.  He makes use of all different types of opioids
18   because in some patients some will respond to morphine-like
19   medicines, some will respond to oxycodone-like medicines, some
20   will respond to fentanyl-like medicines. So a basic tenet of
21   pain management is actually rotate through the different
22   opioids until we find the one that works.
23         But also when we say different kinds of opioids, you
24   need to understand -- you've heard us use the word here "long
25   acting" or "extended-release opioids."  Extended-release or

 1    long-acting opioids are just those that the pharmaceutical
 2    manufacturers have been able to put into a formulation that
 3    releases slowly over time.  So rather than having to take four
 4    or six pills in a day, a patient could take one or two pills in
 5    a day and have the same blood levels all day long.  Those we
 6    call the long-acting medicines.
 7            Then we have the short-acting medicines.  Those are
 8    the pills where you take it and you get two or three hours of
 9    relief and then it goes away.  Those most people think about
10    like your oxycodone immediate release preparations; we know
11    those as Percocet.  Or your hydrocodone preparations; we know
12    those as Vicodin or Lortab.  Or your hydromorphone; we know
13    those as Dilaudid tablets.
14            But then there's a third class of drugs, which I
15    presume you're going to hear a lot about in this case, and
16    those are called rapid-onset opioids.  So let me tell you again
17    long acting lasts all day, short acting lasts a couple of
18    hours, and then rapid-onset opioids.  The problem with the
19    short-acting medicines is they take 30 to 60 minutes to reach
20    their peak effect.  If you're sitting here and you have a spike
21    or a flair of pain that's so severe like you think you want to
22    go to the ER, historically we only had the short-acting
23    medicines available.  You had to wait 30 to 60 minutes for
24    those drugs to meet their effect.
25            Since the advent of the rapid-onset opioids -- and

JEFFREY A. GUDIN, MD - DIRECT BY MR. ARMSTRONG

1    most of them are of a specific molecule called fentanyl --

2    those take effect in as little as five minutes.  So many

3    clinicians have started using this third class of opioid to

4    treat patients who have rapidly escalating bouts of pain to

5    match the pain pattern better than our old-fashioned

6    short-acting which, again, took 30 to 60 minutes to work.

7    Q    Now this rapid-onset pain, is that also what they refer to

8    as breakthrough pain?

9    A    Absolutely.  There's a formal definition of breakthrough

10   pain, but one of the criteria of breakthrough pain is that it's

11   usually rapid in onset.

12   Q    And so this is pain that occurs while taking a long-acting

13   opioid, but yet it is so severe in nature that you don't want

14   to wait for the short-acting opioid to take effect?

15   A    And that's why they call it breakthrough pain, because it's

16   pain that actually breaks through your around-the-clock,

17   all-day-long, extended-release medicine or your all-day-long

18   medicines so you get pain -- although you're taking an opioid,

19   you get a flair of pain that's so bad, it breaks through your

20   current medicine and it requires treatment.

21   Q    Now, breakthrough pain, does that phenomenon -- is that

22   experienced in cancer patients?

23   A    Of course, absolutely.

24   Q    Is it experienced in noncancer patients?

25   A    Equally, yes.

JEFFREY A. GUDIN, MD - DIRECT BY MR. ARMSTRONG

```
 1  Q   You say equally.  Is there a difference between
 2  breakthrough pain in a cancer patient versus breakthrough pain
 3  in a noncancer patient?
 4  A   Well, let's set the disease aside for a second.  Cancer is
 5  a devastating condition.  It often leads to limitations of
 6  life, shortens your life, unless there's a cure for it or a
 7  remission.  But if you think about someone who gets a painful
 8  neuropathy from either their cancer or their cancer treatment
 9  like chemotherapy or they get a painful neuropathy from their
10  diabetes or their shingles, I don't think there's any
11  difference in the severity of the pain that the cancer patient
12  has from the noncancer patient.
13          Here's another, maybe even better example.  If you
14  have trauma or osteoporosis like many of our geriatric patients
15  do and you fracture one of the spines, call it a vertebral
16  fracture, a compression fracture, that's very painful.  If you
17  have cancer and a metastasis spreads to your spine and you get
18  a compression fracture, to me there's no difference in the pain
19  from a compression fracture that a grandma might experience
20  from osteoporosis than a cancer patient would experience.
21  They're both equally painful.
22          The fact that the FDA approved the fentanyl class of
23  drugs to treat only breakthrough pain in cancer patients has no
24  regard to whether doctors prescribe it for cancer pain or not
25  cancer pain.  We see those pain syndromes as equally bad.
```

1 Q Now, that brings up an important topic. Obviously if

2 someone does not have cancer and they are prescribed a fentanyl

3 product, that is not on label; correct? Or as indicated;

4 correct?

5 A Correct. But we probably should talk about what the label

6 is or means.

7 Q Okay. Well, tell the jury a little bit about why the FDA

8 puts it in a label, what the indication is for that medication,

9 for the fentanyl product.

10 A Sure. So when a company makes a new drug, they have to get

11 it approved by the FDA, something we hear on the news all the

12 time: The FDA approved a new medication for blank.

13    In order to get approved for a medical purpose, you

14 need to show the FDA and convince them that you've done the

15 appropriate studies that your drug is both safe and

16 effective. If you've been following the news, they want to

17 pass a bill that allows drugs to be --

18    MR. BODNAR: Objection, Your Honor, to outside of what

19 this case is about. Relevance.

20    THE COURT: Sustained.

21    THE WITNESS: Okay.

22 BY MR. ARMSTRONG:

23 Q Well, let's talk about off-label prescribing. Obviously

24 you are familiar with off-label prescribing; correct?

25 A Very much so, yes.

1   Q   And that's when a product that is not indicated -- or that

2   a product that is indicated by the FDA for one purpose is

3   prescribed for a separate purpose; correct?

4   A   That's correct.

5   Q   And that's perfectly appropriate, is it not?

6   A   Absolutely.  And I could cite an example if you'd like.

7   Q   Well, for fear of an objection, let's stick with the

8   fentanyl product.  Okay?  Does fentanyl have a place in the

9   treatment of breakthrough pain in noncancer patients?

10  A   Absolutely.

11  Q   Can you explain that, please?

12  A   Sure.  So as I've explained to the jury before, if you have

13  pain that comes on really fast and you have the choice of a

14  medicine that works in five minutes or 50 minutes, which would

15  the logical choice be?  And I hate to put it so simple, but

16  doctors recognize that.  And that's why there's been so much

17  use of a product that was approved and studied in cancer pain

18  but it's used so much for noncancer pain.

19  Q   Is it within the usual course of a legitimate medical

20  practice to use fentanyl off label for chronic pain -- let me

21  clear that up -- for chronic-pain patients suffering

22  breakthrough pain?

23  A   Well, the answer is yes.  And I think it's important for

24  the jury to know that most of the medicines we use in pain

25  management are used off label.  This is not a situation that's

 1    unique to fentanyl products.
 2            MR. BODNAR:  Your Honor, we object to any off-label
 3    discussion other than with regard to the fentanyl products
 4    because that's what the point of this trial is, not off label
 5    for other products.
 6            THE COURT:  I sustain the objection.
 7    BY MR. ARMSTRONG:
 8    Q   Did you find within the charts you reviewed for Dr. Ruan
 9    other products that were described off label other than
10    fentanyl?
11            MR. BODNAR:  Again, Your Honor, objection to the
12    relevance of other products being used off label.
13            THE COURT:  Sustained.
14    BY MR. ARMSTRONG:
15    Q   So it is your medical opinion based on your experience,
16    knowledge, and training that the off-label prescribing of
17    fentanyl is within the usual course of a professional practice
18    for noncancer patients?
19    A   It is, yes.
20    Q   You talked a little bit about opioid rotation.  I want to
21    ask you did you find from your review of Dr. Ruan's charts
22    evidence of opioid rotation?
23    A   Yes.  And if I may, "opioid rotation" is a very specific
24    term in the pain literature, which means what it sounds like;
25    that we'll go from one medicine, like morphine, to another

5274

1  medicine, like an oxycodone or a fentanyl or a methadone.  And

2  the reason we do opioid rotation is because, as I mentioned

3  before, we're all different.  Pharmacogenetically one patient

4  may be a better responder to a morphine-type product, another

5  patient might be a better responder to an oxycodone-type

6  product.  There's a study in the literature that shows it takes

7  an average of four or five rotations until you get the right

8  opioid for the right patient.

9         And I have to say, more than any other clinician that

10  I've interacted with in the past, Dr. Ruan exemplified the

11  practice of opioid rotation more than any other.

12         The purpose of opioid rotation is to try to find the

13  right drug in order to keep the doses down.  Because if it's

14  the wrong drug, if it's a drug that you don't respond to, our

15  natural inclination is to keep raising the doses.

16         And I found that Dr. Ruan in almost every patient went

17  from a low dose of one product to a low dose of another

18  product.

19  Q   And is there also the factor of tolerance that has to be

20  taken into account with regard to rotation?

21  A   Absolutely.  So there are a number of factors that get

22  taken into account when we make the decision to prescribe

23  and/or switch.  And it's not always an exact science.  There's

24  a little bit of art to this like any other medical

25  specialty.  We have to decide if the patient has been given a

1   fair enough trial of one particular medicine before we rotate

2   it to another medicine.

3   Q   And the practice of rotation of opioids and medicines, is

4   that within the usual course of a professional medical

5   practice?

6   A   Absolutely.

7   Q   And your findings of that occurring in each of the charts

8   you reviewed, in your opinion, were each of those changes from

9   one medicine to another within the usual course of a

10  professional practice?

11  A   They were, yes.

12  Q   Now, did you see some -- you are familiar with

13  abuse-deterrent opioids; correct?

14  A   Very much so.

15  Q   Did you find where Dr. Ruan prescribed some abuse-deterrent

16  opioids as well?

17  A   I'd have to say Dr. Ruan's records go back quite a few

18  years.  And more than other clinicians that I've interacted

19  with, Dr. Ruan was an early adopter of the abuse-deterrent

20  opioid medications, and he discusses them in his medical

21  records.

22  Q   Tell the jury what an abuse-deterrent opioid is and what

23  makes it an abuse deterrent.

24  A   Sure.  So we're at an interesting time in history with a

25  prescription drug epidemic.

1          MR. BODNAR:  Your Honor, we object.  None of this was

2    discussed in his rule 16 disclosure, going into what abuse

3    deterrences were or were not.  And it's also not relevant to

4    the issues here at this trial.

5          MR. ARMSTRONG:  Judge it was discussed when he talked

6    about --

7          THE COURT:  Come to side bar, please.

8       (At the side bar, jury not present.)

9          THE COURT:  Was it disclosed that he was going to give

10   an opinion on the use of abuse deterrents?

11         MR. ARMSTRONG:  It was disclosed that he was going to

12   discuss the rotation of opioids.  Abuse-deterrent opioids are

13   just one type of an opioid.  It was discussed that he would

14   give his opinion regarding opioids and the prescribing of

15   opioids.  This is just a different type of an opioid.  It's not

16   like it's outside --

17         THE COURT:  It hasn't been an issue in this trial.

18         MR. ARMSTRONG:  It's been discussed.  It has been

19   discussed in this case.

20         MR. BODNAR:  It's not something that's been alleged as

21   outside the usual course of the rotation.  They did talk about

22   that they would be discussing about rotation from one drug to

23   another.  But then getting into the abuse-deterrent aspect is

24   far afield from what we're doing here, Your Honor.

25         MR. ARMSTRONG:  But it has to do with the brand names.

1  One of the -- I'm trying to remember which one.  It may have

2  been Vohra or Aultman talked about the prescribing of certain

3  medications that were name brand medications, and the name

4  brand medications are the abuse-deterrent opioids.  That's --

5  and when I --

6          THE COURT:  What name brands?

7          MR. ARMSTRONG:  I think it's Exalgo.  And that's one

8  of their bones of contention.

9          MR. BODNAR:  If he wants to talk about the Exalgo, we

10  have no problem.

11          THE COURT:  That's what --

12          MR. BODNAR:  If that's the one you want to talk about.

13          THE CLERK:  Excuse me, Your Honor.

14          THE COURT:  Hold on.

15          THE CLERK:  One of the jurors has asked to be excused

16  if she could go cough and get the phlegm out, take a break.

17          THE COURT:  Yeah.  Let's take a standing break while

18  she does that.

19      (In open court, defendants and jury present.)

20          THE COURT:  If you need to take a break, go right

21  ahead.  We'll let the others take a standing break while you

22  take care of yourself.  Okay.  Do you want to just go to the

23  bathroom or do you need --

24          A JUROR:  I'm actually okay now.  I just didn't want

25  be hacking and interrupting court.

1          THE COURT:  Well, you don't worry about that.  We want
2   you to take care of yourself.  If you need to take a break --
3          A JUROR:  I'm okay.
4          THE COURT:  Does anybody else need to take a break
5   before the lunch break?
6          A JUROR:  I think she just had an allergic tickle.
7   She coughs when she tickles.
8          THE COURT:  Just get it on out.  Okay?  Don't worry
9   about interrupting.
10          A JUROR:  I am so sorry.
11          THE COURT:  We need to take care of you.  Okay.
12      (At the side bar, jury not present.)
13          MR. ARMSTRONG:  Judge, I'll move on.
14          THE COURT:  Okay.
15          MR. ARMSTRONG:  I'll go on to the next thing.
16          MS. GRIFFIN:  Just, may I put one other thing on the
17   record --
18          THE COURT:  Dennis?
19          MS. GRIFFIN:  -- that really pertains to Dr. Couch?
20   There were two conversations between the chiropractor and the
21   PPSA that were referenced, I believe --
22          THE COURT:  All right.  This is a totally different
23   subject?
24          MS. GRIFFIN:  Yes, it's a totally different subject.
25   My mistake.

1            On Debi Phillips there were two conversations that
2    were referenced.  I understood that Mr. -- that Brandon Essig
3    was talking about the call to get the patient, the undercover,
4    in the business.  The first call to get him in the PPSA was a
5    taped call, which was turned over to the defense.  The second
6    conversation while the patient -- while the undercover was in
7    the facility and they had some trouble at the front desk
8    getting him in was not a taped call.  And I told Brandon that
9    this morning.  So I wanted to correct that for the record.
10   There were two calls.  The first was taped and they have it.
11   But the one, I believe, Brandon was attempting to ask her about
12   was not a taped call, so I will not be turning over the taped
13   call because it's a different conversation that he was
14   referencing.  And I just wanted to clarify that.
15            THE COURT:  Okay.  Thank you.
16        (In open court, defendants and jury present.)
17            THE COURT:  All right, Mr. Armstrong.
18   BY MR. ARMSTRONG:
19   Q   We just talked about off-label prescribing and the rotation
20   of opioids.  Within the context of a pain management practice
21   and based on your years of experience and knowledge and
22   training, how does the overall volume of prescriptions -- in
23   other words, the number of prescriptions written for a
24   patient -- how does that come into play in the evaluation of
25   the needs of that patient?

JEFFREY A. GUDIN, MD - DIRECT BY MR. ARMSTRONG

1  A   Well, to generalize, the more refractory or the more

2  difficult the pain syndrome is to treat, usually the more

3  number of prescriptions that we prescribe.  I mean that's

4  logical.  If you are a responder, you might respond to one or

5  two medicines, where if you're a nonresponder and your pain is

6  really bad, you might need those six, seven, eight or nine

7  different prescriptions of all those classes of medicines that

8  we talked about.

9        So I have to say there's probably no direct

10  correlation between the number of prescriptions and the

11  particular pain syndrome.  But from a quality of care

12  standpoint, I don't think you can relate a number of

13  prescriptions to -- you can't make any inferences about the

14  type of practice it is.

15  Q   What is -- aside from the volume of prescriptions you've

16  written, what is a better indicator of whether that volume of

17  prescriptions that may have been written was appropriate for

18  that particular patient?

19  A   Well, it would be patient outcome.

20  Q   So you would look to the needs of that particular patient?

21  A   Absolutely.  And you know, again, I think -- hopefully you

22  recognize from some of my testimony just how challenging the

23  population of chronic-pain patients is to treat.  It's why pain

24  centers are just overloaded with patients.  Because if this was

25  a curable condition, we wouldn't be so busy.  But there is no

JEFFREY A. GUDIN, MD - DIRECT BY MR. ARMSTRONG

```
 1    cure, and unfortunately many patients continue to suffer.
 2            Now, the government report by the Institute of
 3    Medicine suggests --
 4            MR. BODNAR:  Objection, Your Honor, to hearsay from
 5    government reports.
 6            THE COURT:  Sustained.
 7    BY MR. ARMSTRONG:
 8    Q   Now, is it within the usual course of professional medical
 9    practice in the context of a pain management practice for a
10    nurse practitioner to meet with a patient in followup visits
11    and then make recommendations to the treating physician?
12    A   Absolutely.  They are licensed professionals.
13    Q   Does that happen in your practice?
14    A   It does indeed, yes.  As a matter of fact, in the state of
15    New Jersey nurse practitioners are given prescriptive ability.
16            MR. BODNAR:  Objection to what nurse practitioners can
17    do in New Jersey.  That's not relevant to what they can do down
18    here in Alabama.
19            THE COURT:  Sustained.
20    BY MR. ARMSTRONG:
21    Q   Is it within the usual course of professional medical
22    practice in the context of a pain management practice for a
23    nurse practitioner to be a part of the doctor-patient
24    relationship?
25    A   Of course it is.
```

JEFFREY A. GUDIN, MD - CROSS BY MR. BODNAR

```
 1          MR. ARMSTRONG:  One moment, Your Honor.
 2          THE COURT:  All right.
 3      (A discussion was held off the record between defense
 4  counsel.)
 5  BY MR. ARMSTRONG:
 6  Q   One last question, Dr. Gudin.  With regard to everything
 7  you've just testified about, taking all that into
 8  consideration, in considering your review of each and every
 9  patient chart that you've told the jury that you reviewed --
10  and again, you reviewed those patient charts -- did you skim
11  them?  Did you just do a summary?  Or did you go through the
12  charts?
13  A   I read each and every page of every medical record that I
14  was provided.
15  Q   And is it your opinion that -- is it your opinion that
16  Dr. Ruan's treatment of each of his patients was within the
17  course of professional medical practice and for a legitimate
18  medical purpose?
19  A   As I outlined in my expert report, each and every chart
20  that I reviewed of Dr. Ruan's, the prescribing seemed
21  appropriate and certainly within the course of legitimate
22  medical practice.
23          MR. ARMSTRONG:  I think that's all.  Thank you, sir.
24                      CROSS EXAMINATION
25  BY MR. BODNAR:
```

5283

1   Q   Welcome to Mobile, Dr. Gudin.

2   A   Thank you so much.

3   Q   My name is Chris Bodnar.  I represent the United States in

4   this matter.  And I just want to clarify something from the

5   beginning, because I was a little confused about the payments

6   on the $5,000 retainers.  You had mentioned two $5,000

7   retainers.  Other than -- I know that you said that there's

8   amounts to be paid for your testimony today.  But other than

9   the $5,000 -- well, $10,000, were you paid anything else for

10  reviewing what you said is hundreds of hours of medical

11  records.

12  A   With all due respect, I'm not -- this may sound funny.  "I

13  don't know" is the best answer to that question.  I'm not

14  directly responsible for my billing or collecting, so I could

15  have received one retainer, I may have received two.  I

16  think -- I think we received a retainer and then sent one

17  invoice, but, again, I'm not responsible for that.  So I don't

18  want to give you false information.  I can certainly check with

19  my admin, but I don't have that information as I sit here, no.

20  Q   So today you don't know how much you've been paid to review

21  all these files?

22  A   I could -- I could say it's within the range of the numbers

23  that we've talked about.

24  Q   Again, just $10,000 for hundreds of hours, what you

25  mentioned as hundreds of hours of work?

5284

1    A    I believe so.

2    Q    You mentioned in the very beginning that when you were an

3    anesthesiologist, that you did 24 hours on and 24 hours off.

4    And there was good reason for that; right?  You didn't want

5    doctors to be too tired when they were seeing their patients;

6    do you recall saying that?

7    A    There are some rules surrounding graduate medical education

8    and hours which -- which have changed over the years.

9    Q    But do you recall on your direct examination discussing

10   that it was a good idea, at least at that time, to rotate 24

11   hours off so that you wouldn't be tired when you were seeing

12   patients?

13   A    Well, I think it was specific to anesthesiology.  Unlike

14   other medical specialties where you could probably have a

15   conversation in an office setting with a patient after losing a

16   night's sleep, it probably wouldn't be the best idea to provide

17   anesthesia services to a patient after losing a night's sleep.

18   Q    Clearly so.  And you wouldn't want anyone to be impaired in

19   prescribing anesthetic medicine or doing any sort of nerve

20   block, would you?

21   A    Well, I think there's a difference between prescribing

22   anesthetic medicine -- I'm not sure what that means -- or doing

23   a nerve block and being the anesthesiologist for a case of,

24   let's say, heart surgery or lung surgery.  So I think you're

25   talking about two different things.

1  Q   Okay.  Well, would it be in the usual course of

2  professional practice to employ nurse practitioners who were

3  abusing drugs at work and then treating patients?

4          MR. ARMSTRONG:  Judge, I would object.  That's

5  certainly outside the course of the scope of my direct

6  regarding Dr. Ruan's patients.

7          THE COURT:  Overruled.

8  BY MR. BODNAR:

9  Q   Would it be outside the usual course of professional

10  practice to knowingly allow drug abusers in the workplace to

11  treat patients?

12  A   So I've never actually given thought to the question.  I'd

13  have to say it sounds illogical.  I'd assume that there might

14  be some rules or regulations that I would first want to

15  reference before I answer that question.

16  Q   And you certainly wouldn't allow that to happen in your

17  practice, would you?

18  A   Not in my practice, I wouldn't.

19  Q   And in your practice how often -- you talked about your

20  academic work.  How often are you actually sitting down and

21  doing clinical work with the patients?

22  A   Almost every day.  Every day that I'm not either traveling

23  for a lecture or working in a case like this, I'm in the office

24  seeing patients.

25  Q   So you are still actively prescribing then and maintain a

1   DEA license?

2   A   Absolutely.

3   Q   You had mentioned that a typical new pain patient, these

4   are very complicated patients.  And I think you had mentioned

5   Dr. Ruan's patients were particularly complicated because of a

6   lot of their psychological issues; is that correct?

7   A   That's correct.

8   Q   And you had mentioned that it may take a 20- to 30-minute

9   workup on a new patient visit to have that done, done properly?

10  A   Every patient is different, but I think that's a reasonable

11  time estimate.

12  Q   Clearly a 43-second visit would be outside the usual course

13  of professional practice, though, wouldn't it, for a new

14  patient visit?

15          MR. ARMSTRONG:  Judge, again I object.  That has

16  nothing to do with Dr. Ruan or any of these charts or my direct

17  examination.  It's way outside the scope.

18          THE COURT:  All right.  Sustained.

19  BY MR. BODNAR:

20  Q   And when you looked at the charts for Dr. Ruan, you weren't

21  actually in the exam room to see what exams were done at these

22  new-patient visits, were you?

23  A   Well, that makes sense.  None of us were there, obviously.

24  Q   Exactly.  So you have to rely on the accuracy of the

25  records to show what was or what wasn't -- at least from the

1    records, what was done; isn't that correct?

2    A    That's correct.

3    Q    So your review of the examination, the length and the type

4    of exam that occurred, is only as good as the accuracy that it

5    is in the record?

6    A    I'd agree.

7    Q    And it's important to have accurate records, isn't that

8    true?

9    A    It is.

10   Q    And of course, mistakes can happen.  You mentioned that.

11   Especially with electronic medical records.  Mistakes certainly

12   can happen in the records.  But a doctor needs to have accurate

13   records, don't they?  To the best they can.

14   A    To the best they can, yes.

15   Q    You had mentioned that you knew that Dr. Ruan -- or that

16   Dr. Ruan was treating the patients or seeing patients.  Again,

17   though, when you're saying that, that really just is what is

18   reflected to you in the record?  You weren't there to know if

19   Dr. Ruan actually did or didn't give any informed consent to

20   his patients?

21   A    That's correct.

22   Q    The record, though, does say he did give informed consent?

23   A    It does, yes.

24   Q    You mentioned an opioid agreement before as well.  And

25   those are a good thing in pain management practices, aren't

1    they?

2    A    Agreed.

3    Q    And that's something that you use in your practice as well,

4    don't you?

5    A    Yes, we do.

6    Q    And one of the things that you had noted in Dr. Ruan's

7    opioid agreement was that they were -- they didn't have to use

8    C&R Pharmacy, but they needed to stick with one pharmacy; isn't

9    that one of the things that you mentioned was in his opioid

10   agreement?

11   A    When I listed the basic tenets of an opioid agreement, I

12   was talking in general.

13   Q    So you weren't referring to this one specifically then?

14   A    That's correct.

15   Q    Did you know that Dr. Ruan and Dr. Couch co-owned a

16   pharmacy together?

17   A    Not particularly.

18   Q    You didn't know that they had a pharmacy located concurrent

19   with their practice?

20   A    I think I inferred that from review of the records.  But I

21   had no direct knowledge of whether there was an outpatient

22   pharmacy onsite or a private pharmacy.  I didn't know any of

23   the details.

24   Q    Now, you mentioned that in followup examinations you may

25   not need to go through full-length exams of the entire body if

 1   you know, for instance, the patient just has neck pain or back

 2   pain; correct?

 3   A   Correct.

 4   Q   And it really should be -- it's fine to just concentrate on

 5   the area that has pain unless there's a new area that has pain?

 6   A   In general, yes.

 7   Q   But you don't include in your records additional

 8   examinations that were not done for the purpose of billing at a

 9   higher code, do you, in your practice?

10   A   Well, I think we need to separate out those two things,

11   what's included in the medical record and then if things are

12   billed at a higher rate or not.

13   Q   All right.  Do you put into your medical records exams that

14   just were not done?

15   A   Not usually.

16   Q   And it could be a mistake, of course:  Right?

17   A   Of course.

18   Q   But you don't do it repeatedly across patient lines?

19   A   That's correct.

20   Q   In your opioid agreements that you have or the ones you

21   discussed in general, there are rules for the patients in terms

22   of if you don't follow X, whatever is in that agreement, you

23   may be fired as a patient; is that correct?

24   A   That's correct.

25   Q   And firing patients is something that does happen in pain

5290

1  management; isn't that correct?

2  A   It has to happen, yes.

3  Q   It has to happen why?  Why is it important that patients

4  actually be fired?

5  A   Well, I think rather than fired, in my opioid treatment

6  agreement, use of the word "dismissed" or some other word -- we

7  don't talk about fired like an employment position.  It's

8  important that patients need to understand that compliance is

9  important surrounding the way they take their pain medications

10  and there are repercussions for not following the rules.

11  Q   Of course.  Because you've set out rules ahead of time that

12  they've signed; right?  And then they're supposed to adhere to

13  those rules?

14  A   And that's the purpose of that opioid treatment agreement,

15  is to encourage compliance with those particular rules.  But

16  there's no -- but there's no standard or guideline that says

17  how and specifically when a patient should be dismissed from

18  care if they've not complied with the basic tenets of the

19  opioid treatment agreement.

20  Q   Of course, there's no standard of what needs to be in an

21  opioid agreement.  Whatever Dr. Ruan put in his, that's what he

22  wanted his patients to abide by?

23  A   More than likely, yes.

24  Q   When you decide whether or not you're going to give another

25  patient a second chance or fire the patient for violating the

5291

1    opioid agreement, do you take the fact that you're going to

2    lose revenue if you fire that patient into account?

3    A    Never.

4    Q    I'm going to show what you has been previously admitted as

5    Government's Exhibit 9-5(8).  And at the bottom this is an

6    email to Dr. Ruan as well as other doctors asking about when do

7    you actually fire patients.  And it's a researcher that's doing

8    a med school project on it.

9            I'm going to now show you Dr. Ruan's response and tell

10   me if this is what the email says.

11   A    I'm sorry, Mr. Bodnar.  Can I read the original email that

12   you put up?

13   Q    Yes.  In fact, we'll read it for the record.

14           Dear Drs. Kaye, Ruan, and Shah:  I am a medicine and

15   psychiatry combined resident of Southern Illinois University in

16   Springfield, Illinois.  I'm interested in knowing the

17   epidemiology and characteristics of patients who are, quote,

18   unquote, "fired" or terminated by pain physicians from their

19   practice.

20           He then goes on to say that he wants to write a paper

21   about that issue.

22           Do you see that there, Doctor?

23   A    If I can have a moment, please.

24   Q    Yes.

25   A    (Reading.)  Okay.  Thank you.

1   Q   And I'm going to now show you Dr. Ruan's response.  And I'm

2   going to read it and ask you if this is what the email says.

3         Yes, I think that's a great idea.  In literature

4   physicians usually say zero tolerance, but in reality we fire

5   patients rather infrequently.  We always give folks one more

6   chance.  In private practice, the more you fire, the more

7   revenue you lose.  So basically it's really how comfortable you

8   feel by keeping folks for a little longer.  In academic

9   institutions it's no big deal taking care of extra trouble

10  patients.  It does not bring in any additional income to the

11  physician.  So it's a clear-cut decision.  In private practice

12  it is different.  Another interesting thing is when one patient

13  tests positive for street drugs, that gives you more reason to

14  do more frequent urine drug screens, which pays three times

15  more than an office visit.  So there's an incentive to take

16  care of risk individuals.  So a lot of factors are involved

17  even if you do not see it on the chart.

18        Then it goes on to say he'll have his assistant send

19  some material.

20        Now, you don't take into account revenue loss when you

21  decide whether or not to fire a patient, do you?

22  A   Well, I think Dr. Ruan does say it really is based on how

23  comfortable you feel by keeping folks in the practice a little

24  longer.

25  Q   He does say that.  But you also agree he talks about the

JEFFREY A. GUDIN, MD - CROSS BY MR. BODNAR

1  loss of revenue and the additional revenue that can be brought

2  in by doing more urine drug screens for frequent -- for problem

3  patients?

4  A   I can see how for a practice that generates revenue by

5  doing ancillary testing, that that might be an important factor

6  for keeping patients in the practice.

7  Q   Dr. Gudin, I believe you mentioned on direct examination

8  that you had reviewed the Alabama Board of Medical Examiners

9  administrative code in preparation for this, this case today.

10  A   I did.  It was rather lengthy, so I hope you're not going

11  to quiz me on specifics.

12  Q   I'm going to show you certain sections.  I'm going to show

13  you what has previously been admitted as Couch Exhibit

14  118.  And I'm going to turn to -- and just for the record, this

15  is the Alabama Board of Medical Examiners administrative code.

16         Now on page 4-9 here, is there a section of the code

17  that details Controlled Substance Prescription Guidelines for

18  Physicians?

19  A   There is, yes.

20  Q   And does it say that:

21         All prescriptions for controlled substances shall meet

22  the following requirements:  Prescription shall be dated and

23  signed on the day when issued?

24  A   It does, yes.

25  Q   Is that fairly standard from across the country?

1  A    It is, yes.

2  Q    And is that to get rid of the problem or issues of leaving

3  blank signed prescriptions?

4  A    No.  I think that's probably pointing towards what I

5  believe is a federal law; that for a prescription to be valid,

6  it has to be dated on the date that it was written.

7  Q    So you mean the date it was actually signed?

8  A    Not signed.  Written.

9  Q    What is the difference -- explain the difference, what you

10  mean there.

11  A    My understanding of the federal regulations behind the

12  specifics of writing a prescription is that there's one line on

13  the prescription that says the word "date," and the only date

14  that the physician can write in there is the day that he writes

15  the prescription for the medication.  I'm not sure if the

16  phraseology says "signed."  I think it says "writes" the

17  prescription.

18  Q    So if you are going to give prescriptions for further dates

19  out, and today is February 10th, and you were to give one for

20  two months out, you would still date it February 10th but then

21  write or notate somehow don't refill before March 10th;

22  correct?

23  A    That's correct.

24  Q    You wouldn't sign -- or you wouldn't date one today as

25  February 10th and a second one today as March 10th?

1  A  No.  The regulations do -- the regulations do propose

2  against that.  But in reading that section of the Alabama Code

3  that you had just showed, if a clinician does not abide by

4  that, it doesn't talk about anything other than a fine as a

5  remedial punishment.

6  Q  This code is something that doctors in Alabama rely on as

7  part of the usual course of professional practice, though,

8  isn't it?

9  A  Agreed.

10  Q  I'm going to show you now on page 4-10 subsections (7) and

11  (8).

12         (7):  It is improper for any prescription for a

13  controlled substance to be signed by any person in the place of

14  or on behalf of the prescribing physician.

15         You agree with that; correct?  That it's the

16  prescriber with the DEA number that's got to sign the

17  prescription?

18  A  I do agree with that, yes.

19         And number (8):  It's improper under any circumstances for

20  a physician to presign blank prescription pads or forms and

21  make them available to employees or support personnel.

22         Do you agree with that?

23  A  I'll have to agree with that because I believe that that is

24  the code and that is the law, yes.

25  Q  Now, in your preparation for this case did Dr. Ruan or his

JEFFREY A. GUDIN, MD - CROSS BY MR. BODNAR

1    attorneys show you any blank signed scripts by Dr. Ruan?

2    A   I don't believe so.

3    Q   I'm going to show you what's already been admitted as

4    seized during the search.  This is Government's Exhibit

5    2-3.  And just turning to what's multiple pages, do you see at

6    least on this page four blank prescriptions with someone's

7    signature at the bottom?

8    A   I do, yes.

9    Q   Does this go on for several pages of similar blank

10   prescriptions with somebody's signature at the bottom?

11   A   It appears that way, yes.

12   Q   Dr. Gudin, you talked about the term "pseudoaddiction" on

13   direct.  Do you remember discussing that?

14   A   I do, yes.

15   Q   Did you see in any of the patient files that you looked at,

16   though, where Dr. Ruan had diagnosed or assessed in the record

17   that any of those patients actually were suffering from

18   pseudoaddiction?

19   A   Pseudoaddiction is not actually a term that's in our

20   medical coding textbook.  So it's not one that you might

21   necessarily see as documented in the records as

22   pseudoaddiction.  For example, I don't think I've written the

23   word "pseudoaddiction" in a patient chart either ever or within

24   20 years.

25   Q   But you'd agree that the examples that you said of

1  pseudoaddiction could certainly also appear to be either

2  diversion tactics, running out of drugs early because possibly

3  they're selling it or running out of drugs early because they

4  are actually abusing it, all of those would look similar unless

5  you differentiated what the doctor thought it was, isn't that

6  true?

7  A    And in the usual course of practice, clinicians learn to do

8  urine drug screening and pill counts and query the state's

9  prescription drug monitoring program.  So there are strategies

10 to help advise the doctor as to is this -- does this look more

11 like pseudoaddiction or does this look like addiction?

12 Q    And for your urine drug screens, that is an important thing

13 to be doing in pain management; isn't that correct?

14 A    It's important and way underutilized, yes.

15 Q    And the reason that you do urine drug tests is to make sure

16 that a patient is being compliant either for taking the drugs

17 that they're supposed to be taking and not taking ones that

18 they're not; isn't that correct?

19 A    That's correct.

20 Q    So urine drug tests are a good tool if you are using the

21 results as part of the treatment of a patient; isn't that

22 correct?

23 A    That's correct.

24 Q    Now, in your practice you don't use urine drug screens for

25 the purpose of generating revenue, do you?

5298

1    A    Not in my practice, no.

2    Q    Dr. Gudin I think you mentioned that you saw plenty of

3    examples of opiate rotation in Dr. Ruan's files of moving from

4    one drug to another.

5    A    I did, yes.

6    Q    And again, opiate rotation, if it's being done with the

7    individual in mind, is a very good thing or can be a very good

8    thing for a patient; isn't that correct?

9    A    It can, yes.

10    Q    But from the records you reviewed, are you able to tell if

11    at certain time periods Dr. Ruan was moving large swaths of his

12    patients en masse onto one drug versus another?

13    A    I didn't see any evidence of that.

14    Q    And there wouldn't be anything in the record that you saw

15    either that would show whether or not moving from one brand

16    name drug to another was in any way tied to speaker programs or

17    fees that Dr. Ruan was getting from the pharmaceutical

18    companies?

19    A    I didn't see any evidence of that in the record review.

20    Q    And you wouldn't, would you?  I mean from its face, it

21    appears -- all you can tell is that they are moving from one

22    drug to another?

23    A    If that's a trend that you've noted.  I didn't note that in

24    the records.

25    Q    But what I'm saying is all you can see from looking in the

JEFFREY A. GUDIN, MD - CROSS BY MR. BODNAR

1   records is that the drug did switch one from another?  You're

2   unable at this point to say what was the reason other than you

3   can note that this did happen?

4   A   Not to belabor the point Mr. Bodnar, but I think when I

5   referred to opioid rotation, I was talking more about the

6   extended-release, long-acting -- the main molecule that was

7   being used to treat the pain.  And I think you may be referring

8   to certain brands of the rapid-onset medication, if I'm --

9   Q   Well, we're going to talk about rapid onset too.  But

10  switching patients from, say, Opana over to Exalgo, that's an

11  example of rotation because it's oxymorphone to hydromorphone.

12  A   Correct.

13  Q   But we don't necessarily know just from the records why

14  that was done?

15  A   That's fair.

16  Q   And with regard, Dr. Gudin, to the rapid onset, you saw at

17  least in several of these charts examples of the patients

18  receiving the rapid-onset opioids; isn't that correct?

19  A   I did, yes.

20  Q   And in particular, you saw at least several of the patients

21  involved -- or taking Subsys and/or Abstral?

22  A   That's correct.

23  Q   And Dr. Gudin, you know quite a bit about Subsys, don't

24  you?

25  A   I think I'm rather fluent in all of the different

5300

1   medications.

2   Q   Well, specifically with Subsys, you know that it's made by

3   Insys Therapeutics; is that correct?

4   A   I do know that, yes.

5   Q   And when you give CMEs -- and that's continuing medical

6   education; right?

7   A   That's correct.

8   Q   When you give CMEs, you're often asked to disclose any sort

9   of conflict of interest that you might have in a particular

10  speech that you're giving; is that correct?

11  A   Of course.

12  Q   I'm going to show you what -- this has not been admitted,

13  Your Honor -- what has been marked as Government's Exhibit

14  43-1.  And is this an internet printout from a CME that you

15  were involved in for the management of breakthrough cancer

16  pain?

17  A   It appears to be, yes.

18  Q   And are you listed as one of the faculty members on here?

19  A   I am indeed.

20  Q   And do you recall this CME?

21  A   I believe so.

22  Q   And under disclosure statements, did you disclose that you

23  were a consultant and advisor for Insys Therapeutics?

24  A   I did.

25  Q   And you were a consultant and advisor for Insys; is that

1  correct?

2  A   I had done some work for Insys in the past, yes.

3  Q   So prior to giving a speech on the use of drugs, you

4  advised the people that were listening to you that you were a

5  speaker for Insys?  It's disclosed right there, isn't it?

6  A   Yes.

7  Q   But when we talked today and Mr. Armstrong was talking with

8  you about payments you received from pharmaceutical companies,

9  you didn't mention Insys, did you?

10  A   Someone who's a key --

11       MR. ARMSTRONG:  Judge, I would object to the relevance

12  of that question.

13       THE COURT:  Overruled.

14  BY MR. BODNAR:

15  Q   You didn't mention being paid by Insys, did you?  Or having

16  been paid in the past by Insys?

17  A   With all due respect, being an avid publisher and key

18  opinion leader in my field, I've probably consulted to every

19  major manufacturer of a pain medication, whether it's an NSAID

20  or a muscle relaxant.  So for me to disclose all of the

21  companies that I've worked for would be possible, but I'm not

22  sure of the relevance.

23  Q   But you have seen the indictment in this case, haven't you?

24  You know what Dr. Ruan is charged with, don't you?

25  A   I'm not sure that the complaint that I have mentions

5302

1   anything about a specific pharmaceutical company.

2   Q   So you weren't aware that Insys had any sort of stake in

3   this case or that Insys and particularly Subsys was involved in

4   this trial in any way?

5   A   As a matter of fact, only from -- probably from the lay

6   press news that I'd seen on my own.  But I'm not sure that I

7   was sent any correspondence or information about Insys playing

8   a role in this particular trial.

9   Q   And in fact, both you and Dr. Ruan have been involved with

10  Insys before Subsys even came on the market; isn't that

11  correct?

12  A   I'm not sure about Dr. Ruan's involvement or timing.

13  Q   Well, I'm going to show you then what has been marked as

14  Government's Exhibit 43-2.  Do you recall going to the

15  breakthrough pain expert advisory board for Insys in Arizona in

16  December of 2011?

17  A   Not specifically.

18  Q   Well, see if this refreshes your memory.  This is

19  Government's Exhibit marked as 43-2.  And flipping back to the

20  confirmed attendees, do you see your name there?

21  A   I do, yes.

22  Q   And do you see Dr. Ruan's name there?

23  A   I do, yes.

24  Q   And shortly after that December 2011 meeting is when Insys

25  got approval for Subsys; is that correct?  In January of 2012?

1   A   Well it's not out of the ordinary for pharmaceutical

2   companies to look towards prescribing physicians out in the

3   community to give them insight and advice on how to market

4   their drug.  That's part of being in the pharmaceutical

5   business.  So I'm not sure what the relevance of the

6   questioning is.

7   Q   Well, when on January 5th, 2012, Insys put out its own

8   press release, do you recall being one of the doctors that gave

9   a quote at that very first press release?

10  A   I think I was, yes.

11  Q   And I'm going to ask you if this is that quote.  This is

12  Government's Exhibit 43-3.

13              THE COURT:  Is this in evidence?

14              MR. BODNAR:  It is not, Your Honor.

15              THE COURT:  All right.

16  BY MR. BODNAR:

17  Q   Do you see the source up here being Insys Therapeutics?

18  (Indicating.)

19  A   I do.

20  Q   And do you see within the body of this article a quote by

21  Dr. Jeffrey Gudin?

22  A   I do.  And I can tell you I've probably given similar

23  quotes to other companies that make fentanyl products as well.

24  Q   Now, you're not part of the speaker program for Insys, are

25  you?  You don't go and give dinner speeches about Subsys in

5304

1  particular, do you?

2  A   If I recall correctly, I was asked to be a trainer of the

3  speakers; in other words, someone that went to the speaker

4  training meetings.  And I assume that made me eligible to be a

5  speaker.  But I don't think I ever did any speaking programs

6  for Insys Therapeutics.

7  Q   Now, you didn't do any speaking programs with other

8  doctors, but you were involved with Insys Therapeutics'

9  analyst/investor day in December of 2015, weren't you?

10  A   I've done a number of consulting projects for Insys up

11  until that point, including being asked to speak at their

12  investor day meeting in New York City, yes.

13  Q   And I'm going to show you what's been marked as

14  Government's Exhibit 43-4 and ask you does this say Insys

15  Therapeutics analyst/investor day?

16  A   It does.

17  Q   And do you recall being there giving a speech?

18  A   I do, yeah.

19  Q   You said it was in New York City; right?

20  A   It was.  As a matter of fact, what you're showing the jury

21  you can find online.  It's the transcribed speech that I gave

22  that day for the analyst meeting, yes.

23  Q   And in fact, much of the speech that you gave that day is

24  very similar to what you described today to the jury about

25  off-label prescribing of Subsys, isn't it?  Or of rapid-onset

5305

 1  opioids?

 2  A   I believe so.  I haven't looked at this, but I would

 3  imagine it was.  My opinions have not changed.

 4  Q   Well, right here you actually use the same joke that you

 5  used this morning about the direct and palliative care unit at

 6  Englewood Hospital is just across the bridge but it could take

 7  an hour and 45 minutes.  That's pretty similar to what you said

 8  today; right?

 9  A   That was downtown.  Mount Sinai is uptown.  So a little bit

10  further away, yes.

11  Q   And you also used similar examples about what's the

12  difference between a compression fracture from cancer or

13  osteoporosis in this speech to Insys investors as you did here

14  today?

15  A   I also used the trigeminal neuralgia example there, which I

16  did not use here.

17  Q   When you gave this speech for Insys, you were paid $8,000

18  for it, weren't you?

19  A   Honestly, I don't know.

20  Q   I'm going to show you what has been marked as Government's

21  Exhibit 43-5.  You're familiar with the Sunshine Act, aren't

22  you, Dr. Gudin?

23  A   Of course.

24  Q   And is that an online database that shows prescriptions --

25  or shows payments from pharmaceutical companies to doctors or

1   physicians -- or clinicians?

2   A   Yes, it is.

3   Q   And the date of this Insys investor program was December

4   3rd, 2015; is that correct?

5   A   It appears such, yes.

6   Q   And if we look at what's been marked as Government's

7   Exhibit 43-5, is this your printout of your open payments

8   database for Jeffrey A. Gudin?

9   A   It appears to be, yes.

10  Q   Is it for the year 2015?

11  A   Yes, it is.

12          MR. BODNAR:  Your Honor, we move to admit Government's

13  Exhibit 43-5 at this time and publish it to the jury.

14          THE COURT:  Any objection?

15          MR. ARMSTRONG:  Judge, we would object.  May we

16  approach at side bar?

17          THE COURT:  Yes.  Would you bring the exhibit with

18  you?  Mr. Bodnar?

19      (At the side bar, jury not present.)

20          MR. BODNAR:  Your Honor, he didn't recall receiving

21  $8,000 from Insys for that -- for the speech he gave on

22  December 3rd.  In the open payments records it shows for

23  December 3rd, 2015, the $8,000 consulting payment, the $818

24  travel, and $304 food and lodge.

25          MR. ARMSTRONG:  What was that?

JEFFREY A. GUDIN, MD - CROSS BY MR. BODNAR

1          MR. BODNAR:  Sorry.  $304 food and lodge.

2          MR. ARMSTRONG:  Judge, if he wants to refresh his

3   recollection with that, that might be one thing.  I don't know

4   that it's relevant.  I tried to introduce with Dr. Aultman

5   monies that she had been paid in other matters regarding --

6   from the Department of Justice or the DEA.  They objected

7   because it was not related to this case and that she wasn't

8   paid before for her testimony in this case.  And now they want

9   to do the exact same thing to Dr. Gudin by showing that he's

10  gotten payments from other sources in other matters.

11         THE COURT:  Well, you're only talking about Insys.

12         MR. BODNAR:  The only one we care about is Insys, Your

13  Honor.

14         MR. ARMSTRONG:  But there's other information that's

15  contained on this, Judge.  That's not --

16         THE COURT:  What else is in there?

17         MR. BODNAR:  It is his printout from 2015, so we'll

18  include everything else.

19         THE COURT:  How about just blanking out just that one

20  page and blanking out everything else around it that's not

21  about Insys.

22         MR. BODNAR:  We can do that, Your Honor.

23         MR. ARMSTRONG:  As long as the grand totals and the

24  gross and all that is kept out, if they want to just limit it

25  to just the Insys --

5308

```
 1              THE COURT:  Yeah, that's fine.
 2              MR. ARMSTRONG:  -- $8,000, that's fine.
 3              THE COURT:  Why don't you just show him the hard copy
 4    to refresh his recollection and the amount he was paid by Insys
 5    for that and then --
 6              MR. BODNAR:  Okay.
 7              THE COURT:  -- and then in order to introduce the
 8    whole thing, you just have to produce that page with everything
 9    else blacked out.
10              MR. BODNAR:  Yes, Your Honor.
11          (In open court, defendants and jury present.)
12          (Government's Exhibit 43-5 was entered into evidence.)
13    BY MR. BODNAR:
14    Q   Dr. Gudin, I'm going to hand you what's been marked as
15    Government's Exhibit 43-5 and ask if you can look here and see
16    if it reflects your recollection of whether or not you were
17    paid $8,000 to consult for Insys for that program.
18    A   It looks like -- I'm sorry.  Was the program on December
19    3rd, 2015?
20    Q   Yes, sir.  Do you want me to show you again?
21    A   If you could, that would be great.
22    Q   I'm showing you now what's been marked as Government's
23    Exhibit 43-4, the Insys Therapeutics' investor day.  Do you see
24    the date here, Dr. Gudin?
25    A   Thank you so much.  I do, yeah.  I see it, yes.
```

1  Q   So that $8,000, though, that didn't include your travel and

2  lodging as well for that day, did it?

3  A   I would imagine it did not.

4  Q   Well, rather than imagine, do you see right below the

5  amount you were paid how much you were paid for travel and

6  lodging?

7  A   I see that, yes.

8  Q   And how much was that?

9  A   So just a correction.  I was not paid for travel and

10  lodging.  I assume that's what the company spent on travel and

11  lodging in getting me to New York City.  So I wasn't paid for

12  travel and lodging the way you put it.

13  Q   You weren't reimbursed for that amount?

14  A   I --

15  Q   Well how did you get there?  I mean you mentioned it was

16  only about 15 miles away.

17  A   I would imagine that I took an Uber or car service from my

18  office to New York City.  I remember there being a full day of

19  prep time and then the following day was the analyst

20  meeting.  I remember we stayed in a hotel that night.  In

21  Midtown Manhattan in December, I'd have to imagine that hotel

22  prices are 5 or $600 alone.  So $800 for travel expenses to a

23  New York City meeting in December doesn't seem out of the

24  ordinary.

25  Q   But that is in addition to the 8,000 you were paid?

JEFFREY A. GUDIN, MD - CROSS BY MR. BODNAR

1    A   I wasn't paid for travel expenses.  You're making it sound
2    like I received money for travel expenses.  I was not paid for
3    that.
4    Q   At minimum, you were reimbursed then?  Somebody paid $818
5    for your travel and your getting there that day?
6    A   That's correct.  Whether or not they arranged for a car
7    service and the hotel or I paid for it and submitted for
8    reimbursement, I couldn't say as we sit here.
9    Q   Insys also paid -- maybe not to you but to somebody -- $308
10   for your food during that trip too, and that's reflected on
11   there as well, isn't it?
12   A   So I'm glad you bring that up because that's -- that's an
13   important point.  They report these numbers to the government.
14   And to the best of my understanding, how they did that is they
15   probably took the number of people in the room, the total cost
16   of the food, divided it per person, and apportioned me $304.38.
17   Q   So that may not have come to you, but it's still outside
18   the $8,000?
19   A   Correct.  But obviously I didn't spend $304.38 on food.
20          THE COURT:  Mr. Bodnar, is now a good time for us to
21   break for lunch?
22          MR. BODNAR:  Yes, Your Honor.
23          THE COURT:  All right.  Ladies and gentlemen, leave
24   your pads on your chairs.  We will break until 1:15.  No
25   discussion about the case.  Be back downstairs in the jury

5311

```
 1   assembly room at 1:15 ready to be called back up.  We're in
 2   recess.
 3        (A recess was taken at approximately 12:01 p.m.)
 4        (Afternoon session, 1:15 p.m., in open court, defendants
 5   and jury present.)
 6             THE COURT:  All right, Mr. Bodnar.
 7             MR. BODNAR:  Yes, Your Honor.
 8   Q   Dr. Gudin, when we broke, we were discussing Government's
 9   Exhibit 43-4, the investor day speech that you gave for Insys;
10   is that correct?
11   A   That is correct, yes.
12   Q   And we talked about at least as of December 13th --
13   sorry -- December 3rd of 2015 you were receiving money for
14   services that you were providing to Insys?
15   A   That's correct.
16   Q   How about beyond that?  Have you in 2016 been receiving
17   money for any type of services on behalf of Insys?
18   A   I think in 2016 Insys sponsored --
19             MR. ARMSTRONG:  Judge, I would object.  That's outside
20   the scope of this indictment, the time period of the
21   indictment.
22             THE COURT:  Well, overruled.
23   BY MR. BODNAR:
24   Q   Are you still receiving any sort of fees for any work
25   you're doing with Insys?
```

5312

1  A   To the best of my knowledge, the only compensation from

2  Insys at all in 2016 was that they had sponsored a meeting at

3  the most recent American Academy of Hospice and Palliative Care

4  Physicians where I gave a talk to a few hundred palliative care

5  doctors on the treatment of breakthrough pain in the palliative

6  care population, and it was a nonpromotional talk.  I didn't

7  speak about Subsys or their product, but they sponsored me to

8  give a talk on pain management to the palliative care society.

9  Q   I know you mentioned that you don't quite know how much

10  you've been paid for your review of the files or testimony, but

11  are you aware at all -- or do you know if Insys offered

12  anything for you to testify here in this trial?

13  A   Absolutely not.  I wouldn't have accepted it.

14  Q   You wouldn't have accepted anything from -- so you don't

15  know -- or you know that Insys did not pay for any of your

16  testimony?

17  A   Well, I have no idea.  I mentioned the only work that I've

18  done for Insys since 2015 was a program that was set up in

19  advance for the palliative care community.  I mentioned earlier

20  I don't know of any of the details about Insys relating to this

21  particular case or to Dr. Ruan's treatment of patients at all.

22  Q   Now, one of the things that you had mentioned on direct

23  examination was about sometimes pharmacies give out pamphlets

24  and that's part of the informed consent process, pamphlets or

25  some sort of directions on how to take certain controlled

JEFFREY A. GUDIN, MD - CROSS BY MR. BODNAR

5313

1   substances.  Do you recall talking about that?

2   A   I do, yes.

3   Q   But do you know from the records if C&R Pharmacy, the

4   pharmacy owned by Dr. Ruan and Couch, if they were providing

5   any of those pamphlets?

6   A   I mentioned I didn't have any details of the pharmacy owned

7   by Dr. Ruan or Dr. Couch, so I couldn't say.

8   Q   They may have, they may not.  We don't know one way or the

9   other, at least from what you reviewed; correct?

10  A   That's correct.

11  Q   If the pharmacy was giving out a pamphlet, would that alone

12  be enough for informed consent about a particular drug?

13  A   Probably not.

14  Q   And I want to show you what has been admitted as Couch

15  Exhibit 118.  This again is that American Board of Medical

16  Examiners code that we had looked at before.

17          MR. BODNAR:  And Your Honor, this is already in

18  evidence.  It's up there.

19  Q   And on page 4-28, do you see subsection C there about

20  informed consent and agreement for treatment?

21  A   I do.

22  Q   And while different states may vary, does it say here that

23  in Alabama the physician shall discuss the risks and benefits

24  of the use of controlled substances with the patients?

25  A   That's what the document says, yes.

5314

```
 1   Q   And you've written before on some of the risks and benefits
 2   of controlled substances, particularly of long-term opiate
 3   care; is that correct?
 4   A   That's correct.
 5   Q   And while opiates can certainly be useful for certain
 6   patients and they are useful for patients, there are in fact
 7   adverse effects that can happen from the use of opiates?
 8   A   Agreed.
 9   Q   And is that particularly true on the long term use of
10   opiates, people who are on opiates for many years?
11   A   Not necessarily, no.
12   Q   Is there a term called hyperanalgesia [sic] that you're
13   familiar with?
14   A   Very familiar.  The term is hyperalgesia.
15   Q   Thank you.  Hyperalgesia.  Could you please explain to the
16   jury what is hyperalgesia?
17   A   So hyperalgesia is what's known as a paradoxical or an
18   unexpected response to a medication.  An example of unexpected
19   response is some patients who take the medicine Benadryl, which
20   is known to be sedating, get hyperexcitable from it.  In fact,
21   if you talk to some people who take it, they say it kept me
22   awake all night.
23            Similarly with pain medications, there is often a
24   paradoxical or an unexpected response where the medicine
25   doesn't relieve pain; it might actually cause pain.
```

1          There's a big controversy in the literature as to just

2   how often this happens or if it even happens at all with the

3   oral administration of medications.  But we do know that it

4   happens in some really advanced cases where patients require

5   the spinal administration, an implanted device of pain

6   medicines, where if they get a drug like morphine, it turns out

7   they get more pain.  It almost sensitizes their nervous system.

8   But again, this is not something that's very common in the

9   outpatient world or common with pills of pain medicines.

10  Q   But as a clinician that works in the outpatient world, is

11  that something that you do keep in mind if a patient comes in

12  and says, you know, I'm in even more pain now that you've put

13  me on these higher doses?  Is that something that is at least

14  part of your decision on what to prescribe a particular

15  patient?

16  A   I don't think so.  I mean, clinicians who understand the

17  concept of hyperalgesia know that it's not making the patient's

18  pain worse.  Usually the most common complaint is a new source

19  of pain -- and forgive my use of the word -- but it's kind of a

20  weird pain.  It's an undescribable pain that doesn't go along

21  with their typical pain, a new source of pain.

22          So it's hard for patients to complain about it.  And

23  like I said, it's such a rare phenomenon in the outpatient

24  world, I don't think clinicians are thinking about that as they

25  prescribe pain medicines.

1  Q   And Dr. Gudin, prior to coming down here on this trip to

2  Mobile to testify, had you ever been down to Mobile to observe

3  Physicians Pain Specialists of Alabama before, PPSA, their

4  clinic?

5  A   I don't believe so.

6  Q   And never been to C&R Pharmacy before either?

7  A   Correct.

8  Q   But you did know Dr. Ruan before you were hired as an

9  expert; isn't that correct?

10  A   Well, Dr. Ruan is fairly well published and, as you've

11  mentioned, we've attended some of the same key opinion leader

12  or consultant meetings in the past before.  So I knew of

13  Dr. Ruan.  I didn't know him personally.

14  Q   But you knew him well enough to send emails back and forth

15  all the way back as early as 2011; isn't that true?

16  A   I'm not sure if the -- if the specific incident you're

17  referring to has to do with a publication that we may have

18  shared together.  I was involved, as we've talked about before,

19  with consulting on new product development, abuse-deterrent

20  opioids.  And Dr. Ruan contacted me when he had an interesting

21  case report about one of these new abuse deterrent analgesics.

22  Q   Well, let's talk about other communications you've had.  Do

23  you recall back in 2011 -- I'm going to show you now --

24       MR. BODNAR:  This has not been admitted, Your Honor,

25  yet.

1   Q   -- 43-6.  Is this an email from you -- sorry --

2   from Dr. Ruan to Jeff Gudin?

3   A   It appears to be.

4   Q   And is the subject IIPR?

5   A   It is, yes.

6   Q   And is this your email address healthmd@aol.com?

7   A   It hasn't been an active email address in probably five or

8   ten years.

9   Q   But appears, though, that on September 20th, 2011, Dr. Ruan

10  sent you an email at this address; is that correct?

11  A   I can't say I ever recall seeing this email.  I don't know

12  if it was part of an email list and Dr. Ruan may have

13  published that email address.  The reason I changed it was it

14  was published all over the web, and I was receiving emails from

15  multiple sources.  So it appears that Dr. Ruan sent an email to

16  that address.  I'm not sure he specifically targeted me for

17  that email.

18  Q   So this one you don't recall if you've seen it before.

19          I'm going to show you now what's been marked as

20  Government's Exhibit 43-7 and ask if this is a chain of emails

21  from Dr. Ruan, starting at the bottom, to you at

22  healthmd@aol.com and then you responding using that email

23  address and then him responding to you using that same email

24  address in December of 2011?

25  A   So it appears it's six years ago, somewhere between the

5318

```
 1    five and 10 years that I estimated I was still using that email
 2    address.  Yes, it looks like a response from me.
 3            MR. BODNAR:  And Your Honor, we move to admit
 4    Government's Exhibit 43-7.
 5            MR. ARMSTRONG:  Objection.  If we can see it to
 6    determine if it's relevant or not.
 7            THE COURT:  Can you look at it?
 8            MR. ARMSTRONG:  We haven't seen it.
 9            THE COURT:  Okay.
10       (A discussion was held off the record between counsel.)
11            MR. BODNAR:  Your Honor, the United States moves to
12    admit Government's Exhibit 43-7.
13            THE COURT:  Any objection?
14            MR. ARMSTRONG:  Well, if it can be properly
15    authenticated, we have no objection.
16            THE COURT:  All right.  Mark it in.
17       (Government's Exhibit 43-7 was entered into evidence.)
18    BY MR. BODNAR:
19    Q   Dr. Gudin I'm now showing you what's been admitted as
20    Government's Exhibit 43-7.  And at the bottom of this email
21    chain, is this an email from Dr. Ruan to you on December 7,
22    2011?  Or does that at least purport to be what it is?
23    A   Just to show you I have no recollection of this email
24    correspondence between Dr. Ruan and myself -- it's certainly
25    not something that was common.  And it's not out of the usual
```

1   course of my practice to get asked for referrals for family

2   members of this sort, as you see on the screen.

3   Q   So you don't recall where he said:  Hi, Jeff, how are you?

4   It's been a while since our last speaking meeting?

5   A   I can certainly read the email as well as you can,

6   counselor.  I said I don't recall correspondence, at least on

7   a regular basis, with Dr. Ruan.  I had no other relationship

8   with him than professional.  As a matter of fact, Dr. Ruan says

9   in this first line there:  It's been a while since last

10  speaking meeting.  I assume he meant seeing me at a speaking

11  meeting.

12  Q   So this chain of emails where you're helping his

13  father-in-law find an MRI clinic in New Jersey, you don't

14  recall that communication with Dr. Ruan?

15  A   If it looks like my two-sentence answer to him was

16  correspondence, I don't recall that, no.  It's probably -- it

17  looks to be the end of a busy day, a weekday, during the week,

18  and I answered as I would any other email in passing and went

19  on with my day.

20  Q   Do you recall Dr. Ruan sending you emails to wish you and

21  your family happy new year in 2012 and 2013?

22  A   If it came, it was probably alongside hundreds or thousands

23  of others, and I don't recall it.

24  Q   Do you recall there was a time that Dr. Ruan reached out to

25  you for a favor to help his daughter get an internship?

1   A   If you produce the email and show it to me, obviously I'll

2   corroborate it.  But I don't have any recollection of that, no,

3   I don't.

4   Q   I'm going to show you what has been marked as Government's

5   Exhibit 43-11.

6           MR. BODNAR:  And this is just to refresh his memory,

7   Your Honor.

8   Q   Do you see this email at the bottom from May 30th, 2012,

9   from Xiulu Ruan starting:  Hi, Jeff?

10  A   Again, with all due respect, I can imagine that Dr. Ruan

11  sent this email, very similar email to hundreds of his

12  associates or colleagues trying to help his daughter.

13  Q   But it appears at least in this one that he was aware that

14  you were in New Jersey because that's where he's asking --

15  where she wants the internship, in New Jersey or New York; is

16  that correct?

17  A   Yes.

18  Q   So that's in 2012.  And do you see your responses to

19  Dr. Ruan about helping his daughter get the internship?

20  A   I do, yes.

21          MR. BODNAR:  Your Honor, the United States moves to

22  admit Government's Exhibit 43-11.

23          THE COURT:  All right.  Mark it in.

24      (Government's Exhibit 43-11 was marked for identification.)

25  BY MR. BODNAR:

5321

1    Q   Do you recall over the years Dr. Ruan sending you, amongst

2    other people, various political emails and emails about the

3    presidency?

4    A   I do -- I do recall that, yes.

5    Q   So at least Dr. Ruan seemed to know you well enough to send

6    you political messages; correct?

7    A   I wouldn't say that at all, counselor.  I'd say that I was

8    probably on Dr. Ruan's carbon copy of all email lists for a

9    number of things, including holiday cards and his political

10   viewpoints.

11   Q   Do you remember a time in 2014 where Dr. Ruan reached out

12   to you to help out with an issue about Zohydro in the state of

13   Alabama?

14   A   Vaguely.

15   Q   I'm going to show you -- at this point just to refresh his

16   memory, Your Honor -- what's been marked as Government's

17   Exhibit 43-14.  Does this appear to be an email from Dr. Ruan

18   to yourself and an individual named Christopher Gharibo on June

19   1st, 2014?

20   A   It does so, yes.

21   Q   And do you recall this email about Dr. Ruan reaching out to

22   ask for help about writing a letter about Zohydro?

23   A   I don't actually recall it, no.

24   Q   This is now -- the first one is from 2011.  This is from

25   2014 now; right?

1   A   Correct.

2   Q   Are you still using that healthmd@aol.com address?

3   A   If you show me a reply to this email from healthmd, I'll

4   admit to using it.  And I will tell you that with previous

5   smart phones, I was able to receive that email and send

6   messages back on that -- on that address, which I haven't been

7   able to do for a couple of years.

8   Q   Do you remember in the summer of -- in August of 2014 where

9   Dr. Ruan sent you the final versions of the commercials that

10  had been made for PPSA, the television commercials?

11  A   I have no recollection of that at all.

12  Q   I'm going to show you what's been marked as Government's

13  Exhibit 43-15.  And at the top from Dr. Ruan, you don't recall

14  this email?

15  A   Not at all.  And it clearly looks like Dr. Ruan or one of

16  his marketing folks got a hold of a list of pain doctors to

17  email this out to.  I don't recall this.  And for the jury's

18  information, if I received this, I would delete it immediately.

19  I have no interest in other practices' promotional efforts or

20  marketing efforts and have no interest in looking at an email

21  from Dr. Ruan about his practice materials.

22  Q   Now, Dr. Gudin, for your professional networking aspects of

23  your business, do you utilize LinkedIn?

24  A   I'm not sure I understand the question.  I am -- I have --

25  Q   Are you on LinkedIn?

1  A   I am on LinkedIn, yes.

2  Q   And do you know if Dr. Ruan is on LinkedIn?

3  A   I don't know.

4  Q   Do you recall endorsing Dr. Ruan in 2013 on LinkedIn?

5  A   I may indeed have.  Anybody who's familiar with LinkedIn

6  knows that every time you're sitting on a bus or a plane, it

7  invites you to endorse people at the push of a button.  So I

8  very well may have.  Dr. Ruan is an accomplished,

9  well-published leader in the pain management world.

10 Q   And I'm going to show you just for identification purposes

11 first 43-16.  Does this appear to be an email to Dr. Ruan on

12 November 19th, 2013, with the subject:  Your connection, Jeff

13 Gudin, MD, has endorsed you?

14 A   Again, it's of no surprise.  I have no recollection of it.

15 But I would endorse Dr. Ruan tomorrow on LinkedIn as well.

16         MR. BODNAR:  The United States moves to admit

17 Government's Exhibit 43-16.

18         MR. ARMSTRONG:  Judge, I'll object to relevance for a

19 couple of reasons.  One, the witness has not identified

20 it.  And secondly, it appears to be a bounce-back and no reply

21 message at the top.

22         THE COURT:  Overruled.  Mark it in.

23    (Government's Exhibit 43-16 was entered into evidence.)

24 BY MR. BODNAR:

25 Q   Dr. Gudin, while you don't recall all of these emails or

5324

1  communications with Dr. Ruan, it is fair to say, though, that

2  you have had for at least going back to 2011 communications

3  back and forth to some degree with Dr. Ruan?

4  A  Counselor, it doesn't surprise me as out of the ordinary.

5  We're both key opinion leaders in a relatively small

6  subspecialty space, both well published in the literature, both

7  attend similar types of national congresses and pharmaceutical

8  consultant meetings.  It doesn't surprise me at all that

9  there's been correspondence between Dr. Ruan and I.  I

10  mentioned earlier there's been no social correspondence.  I

11  don't know Dr. Ruan's family or family status.  I don't know

12  any of them personally, so --

13  Q  And you mean no social correspondence other than the email

14  about helping the daughter get the internship and helping the

15  father-in-law find an MRI?

16  A  I think the jury is astute enough to recognize that those

17  were cordial, polite responses to requests that more than

18  likely wouldn't be acted upon.

19          MR. BODNAR:  One moment, Your Honor.

20      (A discussion was held off the record between government

21  counsel.)

22          MR. BODNAR:  Nothing further for this witness, Your

23  Honor.

24          THE COURT:  Mr. Armstrong?

25          MR. ARMSTRONG:  Just a couple.

1      (A discussion was held off the record between counsel.)

2           MR. ARMSTRONG:  I didn't bring my glasses.

3                    REDIRECT EXAMINATION

4  BY MR. ARMSTRONG:

5  Q   Dr. Gudin, I noticed there wasn't a single question about

6  the medical charts.  Has your opinion changed from --

7           THE COURT:  Mr. Armstrong, Mr. Armstrong, that is not

8  a proper comment.  That was not a question.

9  BY MR. ARMSTRONG:

10  Q   Has your opinion changed regarding any of those patient

11  charts you reviewed?

12  A   Not in the least.

13  Q   Now, Mr. Bodnar asked you about fentanyl and he asked you

14  about active prescribers or actively prescribing.  Have you

15  prescribed fentanyl off label?

16  A   I have indeed, yes.

17  Q   And is that within the usual course of professional

18  practice to do so?

19           MR. BODNAR:  Your Honor, this is beyond the scope of

20  cross-examination of how he's prescribing it or whether it's

21  off label or not.

22           THE COURT:  Sustained.

23  BY MR. ARMSTRONG:

24  Q   Mr. Bodnar asked you about whether you knew they had an

25  onsite pharmacy, C&R Pharmacy.  Is it common in the medical

1  community for hospitals or some clinics to have onsite

2  pharmacies?

3        MR. BODNAR:  Objection to relevance for hospitals,

4  Your Honor.  This is not a hospital.

5        THE COURT:  Sustained as to the form of the question.

6        MR. ARMSTRONG:  Okay.

7  Q   Forget what I said about hospitals.  Is it common within

8  the medical community for hospitals -- I mean for doctors

9  offices or clinics to have onsite pharmacies?

10 A   It is, yes.

11 Q   So the fact that they had a pharmacy is not outside the

12 course, the usual course of a professional practice?

13 A   Not at all.

14 Q   Now, Mr. Bodnar also asked you about -- he used the term

15 "firing patients."  You preferred the term "dismissed."

16 Correct?

17 A   Correct.

18 Q   Now, in the use of urine drug screens, you are board

19 certified in addiction medicine; correct?

20 A   Correct.

21 Q   And you also know that Dr. Ruan is board certified in

22 addiction medicine as well; correct?

23 A   I believe so, yes.

24 Q   Is it true that in the specialty of addiction medicine, if

25 you suspect somebody of being an addict, that the literature

JEFFREY A. GUDIN, MD - REDIRECT BY MR. ARMSTRONG

1    suggests that you test them more frequently?

2    A    Yes.

3    Q    And is the purpose of that to try to bring them into

4    compliance?

5    A    Yes.  It's one of the most important reasons for doing drug

6    testing, not so that you can fire patients from your practice.

7    As a matter of fact, pain and addiction specialists have agreed

8    that the most responsible thing to do with your patients when

9    you think they are misusing drugs is not fire them or dismiss

10   them, so to speak.  Because when you just dismiss a patient for

11   abusing medications or misbehaving, let's say, they're going to

12   go out and go to someone less skilled like a primary care

13   doctor, urgent care center, and much more easily obtain those

14   medications.

15          So the current rationale is that if you have a patient

16   who is exhibiting signs of aberrant behavior, misbehaving with

17   their medicines, despite failing -- what we call failing or

18   having inconsistent drug tests, we use those tests to keep the

19   patient in the practice and kind of force them into compliance,

20   to improve their behaviors, but maintain them in the practice

21   so that we're not just -- we call it turfing in the medical

22   specialty -- turfing them to be somebody else's problem.

23   Q    And specifically with regard to the charts you reviewed,

24   did you see where some patients may have had inconsistent drug

25   screens but then subsequently had consistent drug screens?

1   A   Absolutely, absolutely, yes.

2   Q   So these would be examples of patients who then came into

3   compliance?

4   A   That's correct.

5   Q   And the literature, at least with regard to addiction

6   medicine --

7           MR. BODNAR:  Your Honor, leading.

8   BY MR. ARMSTRONG:

9   Q   -- is to test more frequently?

10          THE COURT:  Don't be leading the witness.

11  BY MR. ARMSTRONG:

12  Q   Is that what the literature says, is to test more

13  frequently?

14  A   Correct.

15  Q   Now, is compliance just a cut and dry decision to make?  In

16  other words, they have an inconsistent drug screen and so you

17  just terminate?

18  A   No.  Obviously the answer to that question is no.  You

19  know, these tests -- I should at least give a little background

20  -- are just tests.  And we talked a lot about errors.

21          MR. BODNAR:  Objection, Your Honor, to additional

22  background.  He answered the question already.

23          THE COURT:  Sustained.

24  BY MR. ARMSTRONG:

25  Q   Now, one of the probably signs of medicine that doctors

1   don't like to talk about is the business side of medicine; is

2   that true?

3   A   Correct.

4   Q   You mentioned it a little bit on direct, and Mr. Bodnar

5   asked you some cross-examination about the loss of revenue.

6   A   Correct.

7   Q   Are physicians always conscious of revenue?

8          MR. BODNAR:  Objection to foundation on this, Your

9   Honor.  If he's talking about Dr. Ruan, that's one thing.  But

10  just physicians in general is completely different.

11         THE COURT:  Sustained.

12  BY MR. ARMSTRONG:

13  Q   Is the business side of the pain medicine clinic always

14  something that you have to think about?

15  A   There's no question about it.  I mentioned earlier that

16  seeing a pain patient is quite time-consuming.  Most pain

17  specialists have four or five ancillary staff members, other

18  staff members, to support each clinician in the office.

19  There's so much work that needs to be done to maintain a pain

20  practice.

21         And just speaking about my own practice, we've had two

22  clinicians over the years that didn't generate their salaries

23  because they couldn't see enough patients in a day because the

24  patients were so time-consuming.  It means it costs the

25  practice money to house them as clinicians.

1          MR. BODNAR:  Your Honor, I object to the relevance of

2     his practice versus Dr. Ruan's office.

3          THE COURT:  Sustained.

4          MR. ARMSTRONG:  And if we can have the ELMO.

5     Q   And referring you to this email which was Exhibit 9-5(8),

6     do you remember this one that Mr. Bodnar showed you?

7     A   Yes, I do.

8     Q   And it was an email that was sent to a couple of different

9     doctors by a resident from Illinois?

10    A   Correct.

11    Q   And he was talking about he was doing some research into

12    this area.  (Indicating.)  In Dr. Ruan's response, he refers to

13    in the literature; right?

14    A   Correct.

15    Q   And so he says:  In the literature physicians -- so he's

16    referring to physicians as a whole, not just him; right?

17    A   It appears that way, yes.

18    Q   And that is the tenor of how he proceeds through this:  But

19    in reality, we -- meaning physicians -- fire patients rather

20    infrequently.  So he's not referring specifically to just

21    himself, he's talking about physicians as a whole; correct?

22         MR. BODNAR:  Objection to leading, Your Honor.

23         THE COURT:  Sustained.

24    BY MR. ARMSTRONG:

25    Q   And of course, he goes on to say:  It's really how

5331

```
 1    comfortable you feel by keeping folks for a little longer.
 2           So when he states really how comfortable you feel,
 3    he's talking about the clinical decision that doctors have to
 4    make; correct?
 5    A    That's what it appears to be.
 6    Q    And of course, that email referred to other papers and
 7    literature that were attached to that email; correct?
 8           MR. BODNAR:  Objection to foundation, Your Honor.
 9    He's seen the email.  He doesn't know what else is attached or
10    if there is anything attached.
11           MR. ARMSTRONG:  I'm talking about what the email
12    referred to.  I'll show you.
13           THE COURT:  Yeah, overruled.
14    BY MR. ARMSTRONG:
15    Q    Down here:  Please find attached protocol with data
16    collection form and a few articles; right?  (Indicating.)  So
17    he's sending some stuff to Dr. Ruan; right?
18    A    It looks that way, yes.
19    Q    And then Dr. Ruan says:  I can have my assistant get
20    started tomorrow, about getting some information back to this
21    resident who's doing a research paper?
22    A    Right.  And I think the important point that I would call
23    out there is there's no incentive for Dr. Ruan to take his own
24    time out or his nursing staff's time to collect data for a
25    research paper other than the fact that he's a clinician who
```

 1  supports research and supports publications.

 2  Q   Now, Mr. Bodnar referred you to the administrative code in

 3  talking about some prescriptions and how they should be

 4  written.  Do you recall that?

 5  A   I do, yes.

 6  Q   And he referred you to a specific page.  I believe it was

 7  4-10.  It might have been the page before.  Yeah.  This page

 8  here.  (Indicating.)  This is Couch 118 on page 4-9.  Remember

 9  who shall sign it and when it should be dated, these kind of

10  things?

11  A   I recall, yes.

12  Q   Now, you started to answer about what the penalties are

13  that the Board of Medical Examiners have imposed and --

14          MR. BODNAR:  Your Honor, objection to relevance on the

15  penalties of this.  It was offered as it has been for the

16  defense, for what is part of the standard of care in Alabama.

17          THE COURT:  Sustained.

18  BY MR. ARMSTRONG:

19  Q   Is it within the standard -- not standard of care.  Is it

20  inside the normal course of professional practice to -- within

21  the terms of the provisions under 540-X-4-.06 -- that if this

22  is not complied with, is it still within the standard of care?

23  A   It very well may be, yes.

24  Q   And the medical examiners, if you do not do so, they set

25  up --

1          MR. BODNAR:  Again, Your Honor, as to it being in the

2    standard of care, that's fine.  But any actions taken by the

3    medical board, neither us nor the defense has used this for

4    that purpose.

5          THE COURT:  Sustained.

6    BY MR. ARMSTRONG:

7    Q   If the board assesses a fine if you do not comply --

8          MR. BODNAR:  Your Honor, that's the exact same thing

9    he just said.

10          THE COURT:  Yes.  I sustain the objection.

11    BY MR. ARMSTRONG:

12    Q   Is it within the usual course of a professional practice to

13    be fined --

14          MR. BODNAR:  Objection, Your Honor.  Can we approach

15    on this?

16          THE COURT:  Yes.

17       (At the side bar, jury not present.)

18          MR. BODNAR:  Your Honor, we have no issue with whether

19    it's part of the standard of care.  But going over whether the

20    board did or didn't fine Dr. Ruan or Dr. Couch for any of this

21    or if there's a fine that's part of this is irrelevant.

22    Neither us nor the defense who admitted this has been using it

23    at any point, nor was it part of cross-examination, about

24    whether or not there were fines imposed.

25          THE COURT:  We just need to stay away from what the

1  penalties are by the Board of Medical Examiners for violating

2  one of these conditions.

3       MR. ARMSTRONG:  Well, Judge, if it is part of his

4  opinion that it is within the standard of care that he consider

5  each of these provisions, how can I not ask him about it?

6  Because Mr. Bodnar asked him --

7       THE COURT:  You already did ask him about it.  He just

8  said --

9       MR. ARMSTRONG:  Well, he hasn't been allowed to

10  answer.

11       THE COURT:  He just said it was in the standard of

12  care, it could be.  So let's move on.  Okay?

13     (In open court, defendants and jury present.)

14  BY MR. ARMSTRONG:

15  Q   Mr. Bodnar also asked you -- did you review the entire

16  administrative code with regard to the physicians, the Alabama

17  Medical Board?

18  A   It was quite lengthy.  I reviewed the particular sections

19  that had to do with prescribing controlled substances and pain

20  specialists.

21  Q   Correct.  Is there a provision in there about emergency

22  prescription refills?

23  A   Absolutely, as I think there are with all states.

24  Q   Is that section 540-X4-.07?

25  A   It is, yes.

 1   Q   Okay.  And this addresses specifically if a pharmacist gets

 2   a request?

 3          MR. BODNAR:  Your Honor, this is not relevant.  This

 4   is a pharmacist request.  The emergency scripts that have been

 5   discussed are the blank scripts that Dr. Ruan signed, and this

 6   is beyond the cross-examination.

 7          THE COURT:  All right.  Sustained.

 8   BY MR. ARMSTRONG:

 9   Q   Mr. Bodnar showed you some prescriptions found in 2-3.

10   Which specific one Mr. Bodnar failed to tell you.  Did you know

11   these were found in a desk?

12          MR. BODNAR:  Objection to leading, Your Honor.

13   BY MR. ARMSTRONG:

14   Q   Do you know where these were found?

15          MR. BODNAR:  Objection to foundation.

16          THE COURT:  Well, the answer is yes or no.

17   BY MR. ARMSTRONG:

18   Q   Do you know where they were found?

19   A   I do know, yes.

20   Q   Where were they found?

21   A   I believe they were inside the personal desk of Dr. Ruan.

22   Q   Now, what are prescription pads used for?

23   A   They are used to document a written prescription that a

24   patient will take to a pharmacy.

25   Q   Are they sometimes used for other purposes by physicians?

1  A   Well, I can tell you very commonly a physician will use his

2  prescription pad as a notepad for lack of having other notes

3  around.  I happen to write my physical therapy orders on a

4  prescription pad.  I'll often write special instructions for a

5  patient or for a patient family member on the prescription

6  pad.  Again, maybe some things that belong on note paper, but

7  that's the notepad that we carry around.

8  Q   I'll show you what's already been introduced in evidence as

9  Government's Exhibit 2-2.  Obviously you've never seen this

10 before, have you?

11 A   I have not.

12 Q   This is --

13        MR. BODNAR:  Objection to relevance then, Your Honor.

14 This is outside the scope of anything that was done on

15 cross-examination.

16        THE COURT:  Sustained.

17        MR. ARMSTRONG:  It had to do with the use of

18 prescriptions found in the desk drawer.

19        MR. BODNAR:  It had to do with blank prescriptions,

20 Your Honor.

21        THE COURT:  Yes.  There was no question about

22 filled-out prescriptions.

23 BY MR. ARMSTRONG:

24 Q   If there is evidence in this case hypothetically -- never

25 mind.

1          Now, Mr. Bodnar asked you about sudden spikes in

2    prescriptions.  Obviously the charts don't reflect that.  But

3    he asked you the question about it.  Are you aware of different

4    pharmaceutical companies having promotions where they offer

5    free trials or free vouchers or discounts?

6    A    Of course.  Most of them do.

7          MR. BODNAR:  Your Honor, we object to -- there wasn't

8    a discussion about spikes with this witness.

9          MR. ARMSTRONG:  He asked him about opioid rotation.

10   His specific question was about large swaths.

11         THE COURT:  Swaths?

12         MR. ARMSTRONG:  I think that was the word.  That's

13   what I wrote down.  I'm not sure exactly what he said.  I

14   thought he said swaths.

15         THE COURT:  I thought you were asking about spikes.

16         MR. ARMSTRONG:  I think that's what he was talking

17   about.  He was talking about -- I think he meant spike.  He

18   said swath.

19         MR. BODNAR:  No.  It was moving over large swaths of

20   patients from one drug to another, not spikes in prescriptions

21   for any particular drug.

22         MR. ARMSTRONG:  Okay.

23         THE COURT:  All right.  Then I the sustain the

24   objection.

25   BY MR. ARMSTRONG:

1  Q   A swath of patients moved from one prescription to another.

2  Are you aware of vouchers and discount programs offered by

3  pharmaceuticals for their products?

4  A   Yes.  Most of them do that and certainly at different time

5  points.

6  Q   And what is the benefit to a patient of voucher programs?

7           MR. BODNAR:  Object to relevance, Your Honor, and

8  outside the scope of cross.

9           MR. ARMSTRONG:  You talked about the movement of

10  patients to a new product.  That's what he's referring to.  I

11  assume he's referring to moving to Abstral or to Subsys.

12           THE COURT:  I don't know.  So what is the objection?

13           MR. BODNAR:  Your Honor, again, it was moving swaths

14  from one brand name to another brand name.  But the question

15  now is why is the voucher program beneficial to patients.  He

16  asked if there were voucher programs, and he said there are.

17  He hasn't laid any foundation that there were any voucher

18  programs that led to the switch-over.  And the question about

19  whether the voucher programs are beneficial to patients is

20  clearly outside.

21           THE COURT:  All right.  Sustained.

22  BY MR. ARMSTRONG:

23  Q   Mr. Bodnar asked you about consulting work you had done for

24  Insys.  Have you actually done consulting work for many other

25  pharmaceutical companies as well?

1    A    I have indeed, yes.

2    Q    About how many would you -- if you can recall?

3    A    I'll throw a number out if you don't hold me to it.  I'd

4    say around 20 different pharmaceutical companies.  It's a very

5    busy time in the pain management space with the advent of

6    abuse-deterrent opioids and novel non-opioid products.  So I've

7    been fairly busy helping with new product development and

8    consulting to the pharmaceutical industry.

9    Q    And do you give talks or consultations to products you do

10   not believe in?

11   A    Of course not.

12   Q    Would you do any work or consultation to a product that

13   didn't benefit a patient?

14   A    Absolutely not.

15   Q    Specifically with Insys, did you believe in their product

16   Subsys?

17   A    I did, yeah.  I thought it fit well into the class.  It

18   offered an alternate to the four or five other products that

19   were out there that were similar to it, yes.

20   Q    So Insys had other products as well?

21   A    No.  I'm sorry.  I meant other products, competitor

22   products offered a novel delivery system, an easy delivery

23   system for patients.

24   Q    Are you in any way beholding to Insys?

25   A    Not in the least bit.

1   Q   Now, Mr. Bodnar asked you or suggested that perhaps Insys

2   is paying for your appearance here.  Are you being paid by

3   Insys?

4   A   Absolutely not.

5   Q   You're being paid by Dr. Ruan; correct?

6   A   That's correct.

7   Q   Now, the written speeches you've given, Mr. Bodnar pointed

8   them out to you and talked about some examples that you used

9   during that speech.  Are the products the same regardless of

10  whether speaking to doctors or whether you're talking to this

11  jury about them?

12  A   I'm sorry, counselor.  The products?

13  Q   Well, you were speaking to some group of doctors about a

14  product; correct?

15  A   Actually the speech that they found online, I didn't know

16  it was going to be published online.  And it actually was not

17  to doctors, it was to the analyst community.  So I think the

18  language that I used or the tone that I spoke in was probably

19  more geared towards the general population than it was towards

20  a group of physicians.  So I wouldn't take what we found on the

21  web as a one-time speaking engagement where I spoke to a Wall

22  Street audience and generalize that as the way that I would

23  speak to physicians.

24  Q   Okay.  But did you go back and review that speech and then

25  come down here and say I'm just going to tell this jury the

5341

1  same thing?

2  A   I did not, no.

3  Q   Now, he asked you in reference to 4-6 of the Alabama Board

4  of Medical Examiners -- Mr. Bodnar asked you specifically the

5  provision about the physician shall discuss the risks and

6  benefits about opioids -- or about prescriptions?

7  A   I recall.

8  Q   In your review of those files, did you find in every single

9  one of them Dr. Ruan had discussed personally with the patients

10  the use of opioids?

11  A   It appeared that way, yes.

12        Attorney Armstrong, while you're on the question about

13  the --

14  Q   I'm sorry.  You have to wait for a question.  I'm sorry.

15  A   Sorry.

16    (A discussion was held off the record between defense

17  counsel.)

18        MR. ARMSTRONG:  Judge, I think that's all.

19        THE COURT:  All right.  May this witness be excused?

20        MR. BODNAR:  Yes, Your Honor.

21        THE COURT:  All right.  Dr. Gudin, you may step down.

22        THE WITNESS:  Thank you.

23        THE COURT:  Call your next witness.

24        MR. DARLEY:  Yes, ma'am, Your Honor.  Dr. Ruan calls

25  Charlene Speed.

```
 1           THE COURT:  Charlene who?

 2           MR. DARLEY:  Charlene Speed (indicating).

 3                      CHARLENE SPEED

 4           was sworn and testified as follows:

 5           THE WITNESS:  Yes.

 6           THE CLERK:  Thank you, ma'am.  Please be seated.

 7                     DIRECT EXAMINATION

 8  BY MR. DARLEY:

 9  Q   Good afternoon, Ms. Speed.

10  A   Hi.

11  Q   Can you introduce yourself to the ladies and gentlemen of

12  the jury, please, ma'am?

13  A   My name is Charlene Speed.

14  Q   Can you --

15  A   Charlene Speed.

16  Q   Ms. Speed, I understand your voice is really soft.  If you

17  can, please stay close to the microphone so we can hear you.

18  A   Okay.

19  Q   Can you tell the jury what your background is as far as

20  your employment?

21  A   I am not employed at this time, but I was pharmacy tech.

22  Q   Okay.  How long were you a pharmacy tech, Ms. Speed?

23  A   18 years.

24  Q   All right.  In what area do you currently reside?

25  A   Mobile.
```

CHARLENE SPEED - DIRECT BY MR. DARLEY

```
 1   Q   Were you a patient at some point of Dr. Xiulu Ruan sitting
 2   over here?  Can you identify him?
 3   A   Yes.
 4   Q   Were you a patient of his?
 5   A   Yes, I was.
 6   Q   Do you recall the approximate dates that you were treated
 7   by Dr. Ruan?
 8   A   Approximately 2009, 2010 until 2015.
 9   Q   Okay.  Do you remember when in 2015 you ceased being
10   treated by Dr. Ruan?
11   A   When his office was closed.
12   Q   All right.  I want to direct your attention to your life
13   before encountering Dr. Ruan.  Were you always in pain?
14   A   No.
15   Q   Ma'am?
16   A   Before Dr. Ruan?
17   Q   Yes, ma'am.
18   A   I went to Dr. Ruan for pain, but I wasn't always in
19   pain.  I'm sorry.  Maybe I misunderstood your question.
20   Q   I'm sorry.  Being -- you were born and when you went
21   through your life, were you always in pain?
22           MS. GRIFFIN:  Your Honor, I object, unless it's
23   relevant to the time period charged in the indictment.
24           THE COURT:  Yeah.  Let's just try and limit it to the
25   time period in question.
```

5344

1          MR. DARLEY:  Yes, ma'am, Your Honor.  I'll narrow it.

2     Q   How did you come in contact with Dr. Ruan?

3     A   I was referred to Dr. Ruan for pain from a primary care

4     manager.

5     Q   Okay.  Who referred you to -- what is that person's name?

6     A   Dr. Michael Sforzini.

7     Q   Okay.  What was Dr. Sforzini treating you -- he was just

8     your general practitioner?

9     A   Yes.

10    Q   And at some point he referred you to Dr. Ruan?

11    A   Yes.

12    Q   What specifically did he refer you to Dr. Ruan for?

13    A   For back pain.

14    Q   Okay.  Ms. Speed, were you covered by an insurance plan?

15    A   Yes.

16    Q   Who covered -- who was your insurance plan?

17    A   At the time I had TRICARE Prime.

18    Q   Okay.  And for the entire period that you were treated by

19    Dr. Ruan, was that your only insurance?

20    A   No, it was not.

21    Q   Who else?  Which other coverage did you have?

22    A   Medicare, TRICARE for Life.

23    Q   But it was one of those three healthcare coverage plans

24    that you had the entire time?

25    A   Yes.

5345

1    Q   Okay.  So your testimony earlier was that you had pain and

2    that is why Dr. Sforzini referred you to Dr. Ruan?

3    A   Yes.

4    Q   Had Dr. Sforzini tried to manage your pain before the

5    referral?

6    A   Yes.

7    Q   When you first -- what methods did Dr. Sforzini try to

8    refer -- or try to help your pain?

9    A   He had given me some opiate pain medication.

10   Q   What pain medication specifically?

11   A   Lortab.  Lortab and I believe Soma.

12   Q   Okay.

13   A   Muscle relaxant.

14   Q   Had you had any procedures or surgeries or treatments prior

15   to the referral to Dr. Ruan?

16   A   I had some triggerpoint injections at USA Hospital by

17   Dr. Brad Steffler.

18   Q   And did any of this help to ease your pain?

19   A   It didn't help, no.

20   Q   Okay.  So now let's direct your attention to your treatment

21   by Dr. Ruan at PPSA.

22   A   Yes.

23   Q   You were a patient approximately five, five and a half

24   years, six years?

25   A   Yes.

1   Q   Okay.  And what -- can you tell the ladies and gentlemen of
2   the jury what the frequency of your visits to PPSA was?
3   A   The time?
4   Q   How often?
5   A   Monthly.  I saw Dr. Ruan monthly.
6   Q   Monthly.  You state that you saw Dr. Ruan monthly?
7   A   Yes.
8   Q   You would go to PPSA every month?
9   A   Yes.
10  Q   And on these visits at PPSA would you see Dr. Ruan
11  (indicating)?
12  A   Yes.
13  Q   You would -- you would see Dr. Ruan?
14  A   Yes.
15  Q   Would you also see other practitioners?
16  A   They -- yes.
17  Q   Could you tell the ladies and gentlemen of the jury what
18  other nurse practitioners you might encounter on a visit or the
19  ones you did actually encounter?
20  A   Yes.  I believe their names were Shanna and Bridgette.
21  Q   Okay.  Take us through a visit, take the ladies and
22  gentlemen of the jury through a visit at PPSA.
23          MS. GRIFFIN:  Your Honor, we would request some
24  foundation as to time.
25          THE COURT:  Yes.  And Ms. Speed, you need your chair

1   scootched up.  The clerk can help you do that.

2           THE WITNESS:  Okay.  (Complying.)  Okay.

3   A   I'm sorry.  What was the question?

4   Q   Let me narrow the time.  You saw Dr. Ruan for five to six

5   years; correct?

6   A   Yes.

7   Q   Let's focus on maybe the middle of that to the end, say

8   2011 till 2015 when the clinic was closed by the government.

9   A   Okay.

10  Q   When you would go into the clinic, who would -- and you

11  were checked into the back, who would you encounter, Ms. Speed,

12  initially?

13  A   I would see the nurse practitioner first, and Dr. Ruan

14  would come in.

15  Q   Okay.  What type of information or what type of exam would

16  the nurse practitioner conduct on you, Ms. Speed?

17  A   She would just check to see what I was complaining about,

18  if anything got better.  It would be the back and the hips.

19  Q   Would she conduct a physical exam if needed?

20  A   Yes.

21  Q   Would Dr. Ruan ever conduct a physical exam if needed?

22  A   Yes.

23  Q   Through your visits to PPSA from 2011 to 2015, it was your

24  testimony earlier that you saw Dr. Ruan every time?

25  A   Yes.

5348

1  Q   If you recall, approximately how much time would Dr. Ruan

2  spend with you on your visits?

3  A   10 minutes, 15 minutes, 10 or 15 minutes maybe.

4  Q   And during those 10 to 15 minutes that Dr. Ruan personally

5  spent with you during this time, what type of information would

6  he gather from you?

7  A   He would ask me if the medication was working, what pain

8  was giving -- you know, what pain I was having and if the

9  medication was working.

10  Q   Did you ever inform Dr. Ruan that the medication was not

11  working?

12  A   Yes.

13  Q   And what would Dr. Ruan do when you informed him that this

14  medication was not working?

15  A   He would change it to something else or increase it.

16  Q   Ms. Speed, were you ever subjected when you came to PPSA to

17  drug tests?

18  A   Yes.

19  Q   Who would subject you to those?  Who would request that you

20  take a drug test?

21  A   The nurse practitioners or the girls in the office.

22  Q   Okay.  Were you also -- were you ever called by anyone at

23  PPSA for a pill count?

24  A   Yes.

25  Q   Can you tell the ladies and gentlemen of the jury what a

1   pill count means to you?

2   A    Count my medication.

3         MS. GRIFFIN:  Your Honor, we object to what it means

4   to her.  We don't object to what happened, but --

5         THE COURT:  Are you asking for her impressions or are

6   you asking her just what happened?

7         MR. DARLEY:  I'll rephrase the question.

8         THE COURT:  All right.

9   BY MR. DARLEY:

10  Q   Ms. Speed, what would occur during a pill count for you

11  specifically?

12  A   Count my medication.

13  Q   Who counted your medication?

14  A   Nurse practitioners.

15  Q   What, to your knowledge, was the purpose of a pill count?

16  What were they checking for?

17  A   I think they were just checking to make sure I wasn't

18  overtaking or taking it properly.

19  Q   Ms. Speed, during the -- have you ever had a diagnosis of

20  cancer?

21  A   No.

22  Q   And as you sit there today, you are not aware -- you don't

23  have cancer, you've never had a diagnosis of cancer?

24  A   No.

25  Q   Can you tell us what drugs, if you recall, Dr. Ruan

CHARLENE SPEED - DIRECT BY MR. DARLEY

5350

1  prescribed to you to help you with your pain?

2  A   In the first beginning or the whole time?

3  Q   Let's try to move to 2011.

4  A   I was prescribed Subsys, Roxicet, Soma, Ativan, Abstral,

5  Lyrica.

6  Q   Were some of these medications used to treat pain?

7  A   Yes.

8  Q   And were some of these medications used to treat other

9  conditions?

10  A   Right.  Fibromyalgia.

11  Q   What diagnosis -- and I -- what diagnosis did you have that

12  Dr. Ruan was treating, specific diagnosis?

13  A   Spinal stenosis, back pain, and hip pain.

14  Q   How was the spinal stenosis found, Ms. Speed?

15  A   Dr. Ruan had taken tests of the neck and back.

16  Q   What kind of tests did he take?

17  A   I believe it was a CT scan, MRI.

18  Q   Okay.  Did Dr. Ruan refer you back to other doctors?

19  A   Yes.

20  Q   Do you recall why he referred you back to other doctors?

21  A   I guess just to check and see what they wanted to do.

22  Q   Do you recall if you were ever referred back to Dr. Anthony

23  Martino?

24  A   Yes.

25  Q   Do you recall what the specifics of that referral was for?

5351

1    A    That was for the spinal stenosis.

2    Q    Could you tell -- could you tell us -- I know we've covered

3    the spinal stenosis.  Could you tell us some of the other

4    specific diagnoses that you had, Ms. Speed?

5    A    Yes.  I went to Dr. Ruan for lower back pain, limping, and

6    did an MRI; came back two weeks later, still limping.  And he

7    noticed that I was limping, so he said I needed to get an MRI.

8    Q    You were limping?

9    A    Yes.

10   Q    And who noticed that?

11   A    Dr. Ruan.

12   Q    How did Dr. Ruan notice that you were limping?

13   A    I was in the hallway coming to get my results for the MRI

14   on my back.

15   Q    So you were in the hallway?

16   A    Yes.

17   Q    Where was Dr. Ruan?

18   A    He was in the hallway as I was coming to get my results and

19   noticed that I was limping still.

20   Q    And then what occurred then?

21   A    He requested an MRI and found out that I had a broken hip.

22   I have a rare disease called avascular necrosis.

23   Q    Avascular necrosis?  Do you know what that is?  Do you have

24   an understanding of what that is?

25   A    I believe it's a rare bone disease.

1  Q   Did Dr. Ruan try -- or did Dr. Ruan treat that condition?

2  A   Dr. Ruan treated that condition and also referred me to an

3  orthopedic.

4  Q   During the course of your treatment by Dr. Ruan from 2011

5  to 2015 how many different physicians were treating you,

6  Ms. Speed?

7  A   Dr. Ruan was treating me, but I was still seeing my other

8  doctors for just a checkup.  They all knew that I was seeing

9  Dr. Ruan.

10  Q   How -- you said "they."  How many other doctors?

11  A   I saw two rheumatologists, a neurologist, a primary care

12  manager, and two orthopedists.

13  Q   And some of these doctors Dr. Ruan was referring you to;

14  correct?

15  A   Yes.

16  Q   And were those doctors aware you were being treated by

17  Dr. Ruan?

18  A   Yes.  And also Dr. Martino.

19  Q   And they were aware that you were being prescribed

20  medicines by Dr. Ruan?

21  A   Yes.

22  Q   Did they ever raise any issues with you about those

23  medicines?

24  A   Never.

25  Q   Ms. Speed, do you recall if Dr. Ruan ever had you

5353

CHARLENE SPEED - DIRECT BY MR. DARLEY

```
 1    genetically tested to see how medicines -- how your body would
 2    metabolize medicines?
 3              MS. GRIFFIN:  Your Honor, objection as to relevance in
 4    connection with this case.
 5              MR. DARLEY:  Judge, it's a course of treatment.
 6    Dr. Ruan was trying to determine what she -- how her body
 7    processed medicines to determine dosage amounts.
 8              THE COURT:  I sustain the objection.
 9    BY MR. DARLEY:
10    Q    At some point, Ms. Speed, you were prescribed drugs that
11    contained fentanyl in them, were you not?
12    A    Yes.
13    Q    You were prescribed Subsys?
14    A    Yes.
15    Q    Were you also prescribed Abstral at some point?
16    A    Yes.
17    Q    Can you tell the ladies and gentlemen of the jury do you
18    recall the approximate dates you were prescribed these drugs?
19    A    I guess approximately 2014.
20    Q    Is that the best of your recollection?
21    A    Yes.  I've had two hip replacements, so --
22    Q    Were you aware that these drugs were prescribed to you but
23    they were indicated for breakthrough cancer pain?
24    A    Yes.
25    Q    How were you made aware of that?
```

5354

1  A   Dr. Ruan had told me that, plus I have literature to read

2  on.

3  Q   What do you mean you have literature?  Will you explain to

4  the jury what literature?

5  A   When you get the prescription filled, also on the

6  prescription itself there's literature inside of the box to let

7  you know warnings and other things and information about the

8  medication.

9  Q   So you were aware that the drug Dr. Ruan was prescribing

10  you -- well, first of all, do you know what breakthrough

11  cancer -- do you know what breakthrough pain is?

12  A   Yes.

13  Q   Can you tell the jury what breakthrough pain --

14  breakthrough pain is?  I'm sorry.

15  A   It's --

16        MS. GRIFFIN:  Objection, Your Honor, for her to tell a

17  jury what breakthrough pain is.  We don't object to her

18  describing what did she have.  But she does not have the

19  foundation to describe what breakthrough pain is.

20        MR. DARLEY:  I'll withdraw it.

21  Q   Ms. Speed what kind of pain did you have on a day-to-day

22  basis?

23  A   I had severe pain.

24  Q   Okay.  Without getting into breakthrough pain, your severe

25  pain, what scale, with 1 being minimal to 10 being unbearable

1    almost, what level would you be in?

2    A    8 to 10 range, bad pain.

3    Q    Now, what would be breakthrough pain to you?

4    A    Breakthrough pain would be from my normal pain medication

5    that is not helping, that I would need relief.

6    Q    So you were aware that the medications that Dr. Ruan was

7    prescribing to you, specifically the Subsys and Abstral, were

8    not indicated for noncancer pain?

9    A    I'm sorry.  What's the question?

10   Q    Dr. Ruan -- you testified earlier Dr. Ruan informed you

11   that Subsys and Abstral were indicated by the FDA for

12   breakthrough cancer pain.

13   A    Yes.

14   Q    And you testified you didn't have cancer?

15   A    Yes.

16   Q    But you still took these drugs, did you not?

17   A    Yes.

18   Q    Can you tell the ladies and gentlemen of the jury what your

19   life was like on a daily basis without those drugs, Subsys and

20   Abstral?

21   A    I'd be in bed.  I'm lucky if I can make it, you know, to

22   the toilet and back.  But that medication helped.

23   Q    So when you started taking the medication, did Dr. Ruan

24   start -- do you know what dosage ranges the Subsys came in?

25   A    I believe it was 100 milligrams to begin.

5356

CHARLENE SPEED - DIRECT BY MR. DARLEY

1   Q   Do you know what the larger doses were?

2   A   I believe it's 800.

3   Q   Okay.  Where did Dr. Ruan start you out on that range?

4   A   100 milligrams.

5   Q   Did he increase your dosages?

6   A   Yes.

7   Q   Why did he increase your dosages?

8   A   Because I -- I needed it to help me.  I needed more.

9   Q   Did you ask him to do it?

10   A   Yes.

11   Q   And at some point did he lower the dosages?

12   A   Yes.

13   Q   Ms. Speed, did the Subsys help you?

14   A   Yes.

15   Q   Can you describe your life while you were on those -- while

16   you were using those medications?

17   A   I was able to get up, get around, go to the doctor, go from

18   the kitchen -- go to the kitchen, get in the car, get out of

19   the car, I was able to move around definitely.

20   Q   Ms. Speed, when Dr. Ruan -- were you aware that there was a

21   pharmacy onsite at one of the PPSA locations?

22   A   Yes.

23   Q   Do you know who owned that pharmacy?

24   A   Yes.

25   Q   Who owned the pharmacy?

```
 1   A   Dr. Ruan and Dr. Couch.
 2   Q   Did anyone ever tell -- did you fill your prescriptions at
 3   that pharmacy?
 4   A   Yes.
 5   Q   Did Dr. Ruan ever tell you you had to fill your
 6   prescriptions at that pharmacy?
 7   A   No.
 8   Q   Did anyone in that office ever tell you you had to fill
 9   your prescriptions at C&R?
10   A   No.
11   Q   When Dr. Ruan referred you to Dr. Martino for neck pain,
12   did you have to have surgery?
13   A   No.
14   Q   When you were referred out to doctors about the hip
15   replacements, did you have to have hip surgery?
16   A   Yes.
17   Q   Did that help you?  Did the surgery help ease your pain?
18   A   Yes, a little bit.  I'm still in pain.
19   Q   And to this day are you not -- are you on Subsys at all or
20   Abstral?
21   A   No.
22   Q   What is your life like now without those drugs?
23   A   I'm limited to what I can do in pain.
24           MR. DARLEY:  May I approach, Your Honor?
25           THE COURT:  Yes.
```

5358

1      MR. DARLEY:  May I approach the witness, Your Honor?

2      THE COURT:  Yes.

3    BY MR. DARLEY:

4    Q   Ms. Speed, I want to show you what has been marked into

5    evidence as Government's Exhibit 9-2.  I want to show you this.

6    Will you take a look at that?

7    A   Yes.

8    Q   Do you recognize what that is?

9    A   Yes.

10   Q   Can you tell the ladies and gentlemen of the jury what that

11   is?

12   A   This is Subsys sublingual spray.

13   Q   Can you open that box?

14   A   Yes.

15   Q   Is there any documentation for the medicine in there?

16   A   Absolutely.

17   Q   Can you hold that up?

18   A   Yes.

19   Q   Open it, please.

20   A   (Indicating.)

21   Q   When you said there was literature, is that one of the

22   things you were referring to?

23   A   Yes.  This (indicating)?  Yes.

24   Q   Did you read it?

25   A   Yes.

CHARLENE SPEED - DIRECT BY MR. DARLEY

1  Q   What kind of information is contained on that?

2  A   It says it was supposed to be for cancer pain, it tells you

3  how to use it, and it also gives you precautions in case

4  anything --

5  Q   And you read those?

6  A   Yes.

7  Q   And you took those into consideration -- did you take that

8  into consideration?

9  A   Yes.

10  Q   And you still took it?

11  A   Yes.

12  Q   Why did you still take it?

13  A   Because it helped.

14         MR. DARLEY:  May I approach the witness, Your Honor?

15  May I approach?

16         THE COURT:  Yes.

17  BY MR. DARLEY:

18  Q   Do you recognize anybody at this front table right here

19  (indicating)?

20  A   No, sir.

21  Q   Did anybody from the United States, DEA FBI, anybody

22  interview you?

23         MS. GRIFFIN:  Relevance, Your Honor.

24         THE COURT:  Sustained.

25         MR. DARLEY:  One moment, Your Honor, please.

5360

1  Q   Ms. Speed, you testified earlier you're currently not on

2  Subsys, are you?

3  A   I am not.

4  Q   If given the opportunity today, would you take it again?

5          MS. GRIFFIN:  Objection, Your Honor, as to relevance.

6          THE COURT:  Sustained.

7  MR. DARLEY:

8  Q   If given the opportunity, would you see Dr. Ruan today?

9  A   Absolutely.

10          MR. DARLEY:  Your Honor, that's all I have.  Pass the

11  witness.

12          THE COURT:  All right.  Ms. Griffin?

13          MS. GRIFFIN:  One moment, Your Honor

14                        CROSS EXAMINATION

15  BY MS. GRIFFIN:

16  Q   Good afternoon, Ms. Speed.

17  A   Hi.

18  Q   When was the last time you worked as a med tech and where

19  was that?

20  A   I believe it was 2010, when my hips broke, Skyland Drugs.

21  Q   Now, in connection with that employment, you were familiar

22  with the fact that there was information about drugs inside

23  some of the packages, is that correct, in connection with being

24  a pharmacy tech?

25  A   Yes.

1   Q   And the pharmacy you worked for, was there a doctor's

2   office attached to that pharmacy?

3   A   (No audible response.)

4   Q   Was it part of a pain clinic or part of a doctor's office,

5   the pharmacy you worked in?

6   A   No, ma'am.

7   Q   It was not, was it?

8   A   No.

9   Q   Now, Ms. Speed, how did you get to your appointments when

10  you would go see Dr. Ruan?

11  A   I would drive or my husband would bring me.

12  Q   And your husband was a patient of Dr. Ruan's as well; is

13  that correct?

14  A   Yes.

15  Q   And your husband was also on Subsys; is that correct?

16  A   Yes.

17  Q   Prescribed by Dr. Ruan; is that right?

18  A   Yes.

19  Q   And y'all would go and have appointments on the same days?

20          MR. DARLEY:  Judge, I object.  It's outside the scope

21  of direct.

22          MS. GRIFFIN:  May we approach?

23          THE COURT:  Yes.

24     (At the side bar, jury not present.)

25          MS. GRIFFIN:  Your Honor, she and her husband are

1  going the same exact day, they're both given Subsys, and

2  they're getting it filled -- one will get it filled at C&R and

3  then one will get it filled somewhere else, the same time, same

4  day.  When she stops seeing Dr. Ruan, she never gets Subsys,

5  but she gets numerous other drugs.  When the husband stops

6  seeing Dr. Ruan, he gets three prescriptions in almost two

7  years.

8          And I think we're entitled to show that there's

9  something going on with them getting them identically.  And he

10 obviously doesn't need pain medicine thereafter because he's

11 not getting any according to the PDMP.  And I think it's part

12 of going into her history with what she was doing with these

13 drugs.

14         MR. DARLEY:  Judge, he's not even a subject of direct.

15 He's not named in any of this information as far as the

16 complaint.  He's not on any of the documentation as far as the

17 charts and exhibits.  It's irrelevant, it's irrelevant and it's

18 also speculation.

19         MS. GRIFFIN:  Your Honor, it goes to her bias in

20 connection with Dr. Ruan.

21         MR. KNIZLEY:  Judge, I don't know how it could

22 possibly go to bias.  We have the PD -- one, it's far outside

23 the scope of direct.  There was no testimony about it.

24         THE COURT:  Keep it down.

25         MR. KNIZLEY:  There was no testimony -- there was no

5363

```
 1   testimony about the husband.  Secondly, we have the husband
 2   went to and got medications, and subsequently the PDMP says he
 3   didn't get medications.  It would be totally speculative.  He
 4   may have had surgery, he may have had -- we don't know what his
 5   medical condition is.  We don't know anything about that.
 6          THE COURT:  You don't intend to go into it with her
 7   about what the PDMP shows?
 8          MS. GRIFFIN:  I do not.
 9          THE COURT:  Okay.
10          MS. GRIFFIN:  I do not.
11          THE COURT:  So what do you intend to ask her?
12          MS. GRIFFIN:  Only that they went and they got Subsys
13   prescriptions the same days when they went repeatedly to see
14   Dr. Ruan on the same days, back-to-back appointments.
15          MR. KNIZLEY:  This is --
16          THE COURT:  I think that's relevant.
17          MR. KNIZLEY:  -- Judge --
18          THE COURT:  But we're not -- I mean, I'm not allowing
19   her to go into what the PDMP showed after this.
20          MS. GRIFFIN:  I'm not.
21          THE COURT:  But, I mean, it's peculiar --
22          MR. DARLEY:  But you're asking for --
23          THE REPORTER:  Wait.  I can't --
24          MS. GRIFFIN:  He can't hear you.
25          MR. DARLEY:  She's -- they're trying to bring in a
```

1   completely separate patient that's not on any of these charts,

2   and that's what we're being limited to when we've had to select

3   our own patients.

4          MR. KNIZLEY:  Lastly, Judge, I mean, we have no idea

5   what the husband may have been suffering from, whether there

6   would be any propriety or impropriety of the medication.  And

7   to suggest they both got it leaves some implication that there

8   was something wrong with it.  If she had some information in

9   which she said that the husband was not ill or that it was not

10  justified, it may be more appropriate to explore it further.

11  But right now this has no relevance and it's -- the jury would

12  have to speculate there's some relevance to it.

13         MS. GRIFFIN:  Your Honor, the testimony has been that

14  if you get a prescription or a controlled substance script in

15  Alabama, that it -- most of them show up.  And it is

16  significant that she has another 30 more prescriptions for

17  controlled substances after they quit and then he has three,

18  which tells you --

19         THE COURT:  I know.  But that's not admissible.

20         MS. GRIFFIN:  No, I'm not going to.  But I think that

21  makes it relevant to inquire about them coming together and

22  getting the same drugs the same days together.

23         MR. KNIZLEY:  Again, Judge --

24         MS. GRIFFIN:  What are the chances that a husband and

25  wife are going to have the identical need for an off-label

1  prescription or drug prescriptions?

2          MR. KNIZLEY:  I would have to speculate to that,

3  because I don't know.

4          THE COURT:  I think she's entitled to inquire about it

5  because it's a peculiar circumstance.  And you put this woman

6  on.  So I think it's a legitimate area of questioning for the

7  witness on cross-examination.  I'm not saying she can put on

8  anything about what happened after the office was closed.

9          MR. KNIZLEY:  You're overruling our objection, Your

10  Honor?  You're overruling our objection?

11          THE COURT:  That's correct.

12          MR. BODNAR:  Your Honor, when we take our break, I

13  just have one matter to put on the record at side bar.

14          THE COURT:  Well, okay.

15          MR. BODNAR:  Unless you want to do it right now real

16  quick.

17          THE COURT:  I was not going to take a long break

18  because we're closing down at 4, so --

19          MR. BODNAR:  Can I just quickly put it on the record?

20          It was concerning to me with the last witness he had

21  not seen the prescriptions when I showed them to him on cross,

22  the blank prescriptions; yet on redirect somehow he knew

23  exactly where those had come from.  My concern is -- and I

24  don't know if it was inadvertent or what happened, and I'm not

25  saying that anyone spoke to the witness before that.  But I

1    don't know how he would have found out where that came from in

2    the search of items he had never seen if someone hadn't talked

3    to him during the break.  And I just want to make sure there's

4    nobody talking to the witnesses off the stand.

5         THE COURT:  Everybody knows the rules.  So let's go

6    on.

7         (In open court, defendants and jury present.)

8         MS. GRIFFIN:  Excuse me.  Mr. Court Reporter, could

9    you tell me how to turn this on so I can see (indicating

10   realtime)?  Or could you read me my last question?  I

11   apologize.

12        (Requested portion of record read.)

13        MS. GRIFFIN:  Thank you.

14   Q   Ms. Speed, you and your husband would many times have

15   appointments with Dr. Ruan on the same day; is that correct?

16   A   Sometimes.

17   Q   And you both would get prescriptions for Subsys; is that

18   correct?

19   A   Yes.

20   Q   Now, since -- you've not taken Subsys since Dr. Ruan was no

21   longer able to write controlled substances; is that correct?

22   A   Yes.

23   Q   And you saw Shanna Harville a good bit of the time when you

24   were at PPSA, didn't you, the nurse practitioner?

25   A   Yes.

1   Q   Frequently Shanna was the one that did most everything for
2   you, and Dr. Ruan might stick his head in a few minutes or two;
3   isn't that correct?
4   A   She would come in and interview me or whatever.  And when
5   he came in, we discussed it after.
6   Q   And you discussed it with him?
7   A   Yes.
8   Q   And in connection with the Subsys that you were taking, did
9   you advise him at any point that you had had a problem with the
10  Subsys, that it was making you feel groggy or sleepy?
11  A   No, ma'am.
12  Q   Had you discussed with him -- you had, hadn't you -- that
13  other drugs had made you feel groggy or sleepy?
14  A   I'm not really sure of that.
15  Q   You don't recall that?
16  A   I don't recall that.
17  Q   And in connection with the repeat visits, not your initial
18  visit sometime in 2009 or '10, but let's talk about your visits
19  in '13, '14, '15.  You were going every single month; is that
20  correct?
21  A   Yes.
22  Q   And you're telling us on every single one of those visits
23  that Dr. Ruan came in and talked to you approximately 10 to 15
24  minutes; is that what you're telling us?
25  A   Yes.

1  Q   In connection with that, what kind of exams were done of
2  you by Dr. Ruan in 2015, physical exams?
3  A   Check the hips, the back, and the neck.
4  Q   And how would he check your back?
5  A   He would physically put his hands on my back in different
6  parts.
7  Q   Would you take your top off and put on a gown like an
8  examining gown?  You wouldn't, would you?
9  A   No.
10 Q   You did not.  And for your hip you didn't take off your
11 skirt or your slacks and put on an examining gown either, did
12 you?
13 A   No.
14 Q   So anything that he touched was where you were fully
15 clothed with whatever you had on at the time of the visit; is
16 that right?
17 A   Yes.
18 Q   And frequently in connection with those visits, those
19 examinations were a matter of seconds, weren't they?
20 A   I wouldn't say seconds.  Maybe a little longer than that.
21 Q   A little longer than that?  Maybe a --
22 A   Couple of minutes.
23 Q   -- a minute total touching your back?
24 A   Yes.  We were just discussing that while he was examining
25 me.

CHARLENE SPEED - CROSS BY MS. GRIFFIN

1   Q   And then maybe a minute touching your neck?

2   A   Or a little longer.  We discussed things (indicating).

3   Q   Well, he wasn't actually doing the touching for that whole

4   time, was he?

5   A   Checking, talking, discussing areas that hurt (indicating).

6   Q   And then would your husband see him just before you saw him

7   or just after you saw him?

8   A   Uh, I'm -- just before or after, whatever times they have,

9   15-20 minutes.  I don't know if our -- if they were, you know,

10  together at the same minute or if they were 15-30 minutes

11  apart.

12  Q   Fairly close together on the same day; is that right?

13  A   Yes, sometimes.

14  Q   And then you would get your Subsys prescriptions filled at

15  C&R Pharmacy; is that correct?

16  A   Yes.

17  Q   Did your -- your husband wouldn't always get his filled at

18  C&R, though, would he, his Subsys prescriptions?

19  A   I believe he got them at C&R.

20  Q   At C&R?  That was the pharmacy connected to the office; is

21  that right?

22  A   Yes.

23  Q   And in connection with that, are there times when you would

24  just go and pick up a prescription or your husband would go

25  pick up a prescription for you at C&R Pharmacy?

1   A   There were times that he might have picked up my

2   prescription when I was unable.  I'm not really sure.  But

3   that's -- the majority of the time I picked it up myself.

4   Q   Were there times when you also picked up a prescription

5   from the clinic and then took it to C&R Pharmacy when you

6   didn't actually have a visit?

7   A   No.

8   Q   You always had a visit --

9   A   Yes.

10  Q   -- every single time you got a prescription?

11  A   Yes.

12  Q   And in connection with the Subsys, you were also taking

13  oxycodone and Zohydro from Dr. Ruan?

14  A   Yes.  I tried the Zohydro, but it wasn't something I was on

15  all the time.

16  Q   You were not on it for a long time?

17  A   I don't believe so.

18  Q   Pardon?

19  A   I don't believe so.

20  Q   You don't believe so?  Is your husband here with you today?

21  A   No, ma'am.

22       MS. GRIFFIN:  One moment, Your Honor.

23       THE COURT:  All right.

24       (A discussion was held off the record between government

25  counsel.)

5371

DONNA NEWBURN - DIRECT BY MR. DARLEY

1        MS. GRIFFIN:  Nothing furthering from this witness.

2        THE COURT:  Mr. Darley?

3        MR. DARLEY:  No questions, Your Honor.

4        THE COURT:  May this witness be excused?

5        MR. DARLEY:  Yes, ma'am.

6        THE COURT:  All right.  Thank you, ma'am.  You may

7   step down.

8        THE WITNESS:  Thank you.

9        THE COURT:  Call your next witness.

10        MR. DARLEY:  Your Honor, Dr. Ruan calls Donna Newburn.

11                    DONNA NEWBURN

12           was sworn and testified as follows:

13        THE WITNESS:  Yes.

14                  DIRECT EXAMINATION

15   BY MR. DARLEY:

16   Q   Good afternoon, ma'am.

17   A   Good afternoon.

18   Q   Can you introduce yourself to the jury?

19   A   My name is Donna Newburn.

20   Q   Ms. Newburn, are you currently employed?

21   A   Not at this time.  I was let go due to a car accident and

22   my FMLA was up.

23   Q   At some point in the past you were employed -- were you

24   employed by PPSA?

25   A   Yes.

5372

DONNA NEWBURN - DIRECT BY MR. DARLEY

1   Q   In what capacity was your employment at that facility?

2   A   A medical assistant.

3   Q   What were the dates that you were employed?

4   A   July 3rd of 2013 until the raid.

5   Q   So was it approximately May of 2015?

6   A   Yes.  I'm sorry.

7   Q   Ms. Newburn, what were your duties?  Or how were you

8   employed again?  Your title?

9   A   Medical assistant.

10  Q   What were your duties as a medical assistant at PPSA?

11  A   I prepped my charts, I administered drug screens,

12  injections if the patient needed them, I assisted the patients,

13  I started progress notes for the nurse practitioner to come

14  behind me and finish, I prepared prescriptions for Dr. Ruan to

15  sign and discharged patients.

16  Q   Did you -- did you work around Dr. Ruan?

17  A   Yes.

18  Q   Did you work closely with him?

19  A   Yes.

20  Q   Did you see him on a daily basis?

21  A   Every day.

22  Q   Ms. Newburn, how often would patients be seen?  Or how

23  often would you see your individual patients at PPSA?

24  A   They were either on a four-week or an eight-week schedule.

25  Q   As to a patient visit, can you walk the ladies and

DONNA NEWBURN - DIRECT BY MR. DARLEY

1  gentlemen of the jury through a patient visit?

2  A   Okay.  Well, when the patient was checked in, I would bring

3  them to the back and get their vitals.  If they needed a drug

4  screen, I administered that.  I put them in a room, assessed

5  them, and started my note.  And then when the nurse

6  practitioner went in or Dr. Ruan went in -- when they came out,

7  I had the prescriptions ready.  If there were no changes, they

8  were signed and I discharged them.

9  Q   What -- so at some point would you leave the patient in the

10  room?

11  A   Yes.

12  Q   And at that point would a nurse practitioner or Dr. Ruan

13  take over?

14  A   Yes.

15  Q   And you were no longer in the room at that point?

16  A   No.

17  Q   What would you do during the procedures of a -- what were

18  the procedures of a drug test?  How would you conduct one of

19  those?

20  A   I would give them a urine cup, show them where -- how much

21  I needed.  They would go in the restroom, and there was a door

22  that was linked to the lab.  They would stick it in that door.

23  And then they would come out and I would get them in a room.

24  The ladies in the lab would read the drug screen and put their

25  results in the computer.

DONNA NEWBURN - DIRECT BY MR. DARLEY

1  Q   And would you ever see those results?

2  A   Yes.

3  Q   What would you do with the results?

4  A   If it was -- if there was a problem with a drug screen, if

5  it showed positive for something or negative for whatever they

6  were supposed to be taking, I would let the nurse practitioner

7  know and Dr. Ruan know.

8  Q   Okay.  And from time to time did that occur where there

9  were problems with drug tests?

10 A   Yes.

11 Q   What would you -- to your knowledge, were patients

12 discharged?

13 A   Yes, there have been patients discharged, yes.

14 Q   And I'm not talking about discharging at the end of the

15 day.  What do you mean if there were patients that had repeated

16 problems or problems with their drug screens?

17 A   If their drug screen was abnormal, they were sent off for a

18 GC-MS, and the patient was counseled on their next followup

19 visit.  And depending on the patient, whether they had any

20 discrepancies before, that would determine whether they were

21 being let go or not.

22 Q   And so what -- can you tell the ladies and gentlemen of the

23 jury what a GC-MS you referenced was?

24 A   A GC-MS measured the amount of medications that were in

25 their system or the amount of illegal medications or illegal

5375

1    drugs.  And because the cups were not very reliable at all, you

2    know, we would send them out to make sure to confirm whatever

3    our findings were or were not.

4    Q   Was it your belief that GC-MS was more accurate?

5    A   Yes.

6    Q   Ms. Newburn, do you know what a pill count is?

7    A   Yes.

8    Q   Did you ever participate in pill counts?

9    A   Yes.

10   Q   Can you tell the jury what a pill count is?

11   A   I would call the patient in.  They would bring in their

12   medications that I told them to bring in.  I would sit in front

13   of the patient and count their medications, and I would put

14   my -- they were -- I put down what medication they had, the

15   strength, how many was prescribed, when it was filled, how many

16   they had, how many they were supposed to have, and I would put

17   my findings in the computer, and they were counseled at their

18   follow up visit.

19   Q   Do you know if patients were fired based on pill counts?

20   A   Yes.

21   Q   Were pill counts routinely used by PPSA?

22   A   Yes.

23        MS. GRIFFIN:  Objection, Your Honor, as to "by PPSA."

24   She testified that she worked just for Dr. Ruan.

25        THE COURT:  All right.  Sustained.

1   BY MR. DARLEY:

2   Q   Were pill counts routinely used by Dr. Ruan?

3   A   Yes.

4   Q   Ms. Newburn, when drugs were being prescribed to patients,

5   who informed the patients of risks of certain drugs?

6   A   I would, the nurse practitioner would, and Dr. Ruan also

7   would.

8   Q   So three people sometimes would?

9   A   Yes.

10  Q   Ms. Newburn, did Dr. Ruan have a policy or procedure to

11  check and see if patients were getting prescriptions filled

12  elsewhere or pill shopping?

13  A   Yes.  We would routinely run PDMPs.

14  Q   What is your understanding of the PDMP?

15  A   The PDMP is what pharmacists use to -- they have to report

16  any narcotics that they fill, what doctor they fill, how many

17  was prescribed, what's listed on there, what doctor wrote it.

18  Q   Did you ever use PDMP?

19  A   Yes.

20  Q   Did you ever see the nurse practitioners using PDMP?

21  A   Yes.

22          MS. GRIFFIN:  Objection, Your Honor, as to foundation.

23          THE COURT:  Sustained.

24  BY MR. DARLEY:

25  Q   Were you assigned to a specific nurse practitioner?

1    A    Yes.

2    Q    Who were you assigned to?

3    A    Shanna Harville.

4    Q    Did you ever see Shanna Harville run PDMP?

5    A    Yes.

6    Q    How often did you use it?

7    A    Every day.

8    Q    How often did you see Shanna use it?

9    A    Every day.

10   Q    Did you ever see Dr. Ruan use PDMP?

11   A    He would have us to run the PDMP, and he would come and

12   look at it.

13   Q    What level of involvement would you say Dr. Ruan had in a

14   patient's care?

15          MS. GRIFFIN:  Objection, Your Honor --

16   A    All of it.

17          MS. GRIFFIN:  -- unless it's as to something she was

18   present for.

19          THE COURT:  Sustained.

20   BY MR. DARLEY:

21   Q    Ms. Newburn, when you had an issue or a question with a

22   patient, could you ask Dr. Ruan?

23   A    Yes.

24   Q    Did you ask Dr. Ruan?

25   A    Yes.

1  Q   Did you ever see Shanna consult with Dr. Ruan?

2  A   Yes.

3          MR. DARLEY:  One moment, Your Honor.

4          THE COURT:  All right.

5      (A discussion was held off the record between defense

6  counsel.)

7          MR. DARLEY:  Pass the witness, Your Honor.

8          THE COURT:  Ms. Griffin?

9          MS. GRIFFIN:  If I might get two exhibits, Your Honor.

10                      CROSS EXAMINATION

11 BY MS. GRIFFIN:

12 Q   Ms. Newburn, you worked under Shanna Harville; she was the

13 nurse practitioner you were assigned to?

14 A   Yes, ma'am.

15 Q   You were interviewed by the FBI the end of July of 2015?

16 A   Yes, ma'am.

17 Q   Is that right?

18 A   Yes.

19 Q   Do you remember that?

20 A   Yes.

21 Q   And you told them that you loved your coworkers and you

22 loved Dr. Ruan, didn't you?

23 A   Yes.

24 Q   And that still holds true, doesn't it?

25 A   Yes.

DONNA NEWBURN - CROSS BY MS. GRIFFIN

1   Q   Now, Ms. Newburn, you said that you would prepare

2   prescriptions, and sometimes you would print them out the day

3   before in anticipation of a patient coming in the next day;

4   isn't that correct?

5   A   No, we did not preprint prescriptions.

6   Q   Well, you didn't.  But you don't know what other people may

7   have done, do you?

8   A   No.

9   Q   You can only speak for yourself; is that right?

10  A   I did not, no.

11  Q   You did not?

12  A   No.

13  Q   And you didn't ever sign Dr. Ruan's name on a prescription,

14  did you?

15  A   No.

16  Q   Now, did you ever have access to the presigned blank

17  scripts that Dr. Ruan had?

18  A   No.

19  Q   You weren't aware that other people there had those in the

20  Airport office?

21  A   No.

22  Q   You were at the Airport office; right?

23  A   Yes.

24  Q   I show you what's marked as Government's Exhibit 3-3.  It's

25  already been admitted.

5380

```
 1            MR. DARLEY:  Judge, I would object.  This is outside
 2   the scope of direct.  Nothing at all was asked about
 3   prescriptions.
 4            MS. GRIFFIN:  Your Honor, she testified that was one
 5   of her responsibilities.
 6            THE COURT:  Yeah.  Overruled.
 7            MR. DARLEY:  Judge, she also stated she had no
 8   knowledge.
 9            THE COURT:  Overruled.
10   BY MS. GRIFFIN:
11   Q   These were seized on May the 15th, 2015, from the Airport
12   location.  Do you see this being a Shanna Harville listed at
13   the top?  Do you see that?
14   A   Yes.
15   Q   Do you see Dr. Ruan's name listed at the top?
16   (Indicating.)
17   A   Yes, uh-huh.
18   Q   And you see that this is a prescription, a blank
19   prescription; right?
20   A   Yes.
21   Q   Except you do recognize Dr. Ruan's signature at the bottom,
22   don't you?
23   A   Yes.
24   Q   And there are four of those on one page.  Do you see the
25   that?
```

1    A    Uh-huh (positive response).

2    Q    Were you able to tell from the view that there were four on

3    one page?

4    A    Yeah.

5    Q    And I'll show you the second page that is the same.  Four?

6    A    Uh-huh (positive response).

7    Q    And then the third page, that is the same.

8    A    Yes.

9    Q    Did you know these were in his desk drawer?

10   A    No.

11   Q    And did you know that others had access to use those when

12   he was not in the office?

13   A    No.

14   Q    Now, Ms. Newburn, you said you ran the PDMPs every single

15   day; is that right?

16   A    Yes.

17   Q    You didn't have a DEA license, did you?

18   A    No.

19   Q    You didn't have a number to run those PDMPs under your

20   name, did you?

21   A    No.

22   Q    You had a number that you used to run them under?

23   A    Yes.

24   Q    Are you aware that only about six per day were run for

25   Dr. Ruan?

```
 1              MR. DARLEY:  Judge, that's outside the scope of
 2     direct.  I object.
 3              THE COURT:  Overruled.
 4     BY MS. GRIFFIN:
 5     Q   Were you aware that only about six to seven per day were
 6     run on an average by Dr. Ruan?
 7     A   It would depend on the day.  Some days we didn't run any
 8     and some days we ran several.
 9     Q   But you told us that you ran them all the time.
10     A   Yes.
11     Q   So which is it?
12     A   I mean, yeah, we ran them all the time.  But I mean that's
13     not necessarily saying that we ran it every single day.
14     Q   So the testimony that's correct is that you did not run
15     them every single day; is that right?
16     A   We did not run them every single day, but we ran them at
17     least four days a week.
18     Q   Four days a week?
19     A   Yes.
20     Q   And you -- so that would be about six or seven times a day;
21     is that what you're telling us?
22     A   Depending on the day and the patients.
23     Q   And in connection with those, did you have new patients
24     that came to you with a new patient package --
25     A   Yes.
```

1 Q    -- when there was a new patient?

2 A    Yes.

3 Q    And are you telling us those did not have any PDMPs in them

4 when the new patient came to you?

5 A    The new patient coordinator ran the PDMPs for the new

6 patients.  And if there was not one attached, then I ran one.

7 Q    But still not every day; is that right?

8 A    Depending on whether it was attached to the new patient

9 packet.

10 Q    And even if there was a return patient, you didn't run them

11 every day, did you?

12 A    No.

13 Q    And you didn't run them every visit either, did you?

14 A    No.  It all depended on the patient.

15 Q    Now, you've talked about the visits and you talked about

16 them having a physical exam.  You didn't give the physical

17 exams, did you?

18 A    No.

19 Q    And you weren't present when the physical exams were given,

20 either, were you?

21 A    No.

22 Q    You weren't in the room?

23 A    No.

24 Q    So you don't know exactly what happened during the physical

25 exams, do you?

5384

1   A   No.

2   Q   And you don't know who was actually conducting the physical

3   exam either, do you?

4   A   The nurse practitioner or Dr. Ruan.

5   Q   Well, you weren't in the room, were you?

6   A   I wasn't in the room, no.

7   Q   So you didn't see it, did you?

8   A   No.

9   Q   Now, Ms. Newburn, there were two other physician

10  assistants -- excuse me -- nurse prac -- you're not a nurse

11  practitioner.  You are an assistant; is that right?  MA?

12  A   Yes.

13  Q   There were two other MAs working along with you with

14  Dr. Ruan; is that right?

15  A   Yes.

16         MR. DARLEY:  Judge, I'll object.  This is outside the

17  scope of direct.  She testified she was assigned to one nurse

18  practitioner, Shanna Harville.  The government objected to this

19  issue.

20         THE COURT:  Overruled.

21  BY MS. GRIFFIN:

22  Q   Dr. Ruan had three nurse practitioners and three physician

23  assistants; right?

24  A   Three nurse practitioners and three medical assistants.

25  Q   Three medical assistants.  Excuse me.  And y'all worked all

DONNA NEWBURN - REDIRECT BY MR. DARLEY

1    at the same time; right?

2    A    Yes.

3    Q    Three rooms going at the same time?

4    A    Six rooms actually.

5    Q    Six rooms.  Simultaneous?

6    A    Yes.

7            MS. GRIFFIN:  That's all I have of this witness.

8            THE COURT:  All right.  Any redirect?

9            MR. DARLEY:  Yes, ma'am, Your Honor.

10                      REDIRECT EXAMINATION

11   BY MR. DARLEY:

12   Q    Ms. Newburn, you testified earlier that you personally ran

13   PDMP?

14   A    Yes.

15   Q    And you personally saw Shanna run PDMP?

16   A    Yes.

17   Q    And Ms. Griffin asked you about the other nurse

18   practitioners and the other medical assistants.  Did you ever

19   see those nurse practitioners or medical assistants run PDMP?

20   A    Yes.

21   Q    You did?

22           MS. GRIFFIN:  Your Honor, excuse me.  That was not

23   covered as to whether she saw other nurse practitioners in the

24   cross-examination.

25           THE COURT:  Sustained.

DONNA NEWBURN - REDIRECT BY MR. DARLEY

 1 | BY MR. DARLEY:

 2 | Q   Ms. Griffin asked you did you see the prescriptions.  Did

 3 | you ever see anyone forge Dr. Ruan's name?

 4 | A   No.

 5 | Q   Did you ever forge Dr. Ruan's name?

 6 | A   No.

 7 |         MR. DARLEY:  Thank you.  Pass the witness.

 8 |         THE COURT:  Well, may this witness be excused?

 9 |         MR. DARLEY:  Yes, ma'am.

10 |         THE COURT:  All right.  Thank you.  Ma'am.  You may

11 | step down.

12 |         Now let me ask this jury -- we normally take a break

13 | at this time, but we're going to quit at 4.  Does anybody need

14 | a break?  We will go ahead and take one if you need one.

15 |         A JUROR:  Yes.

16 |         THE COURT:  All right.  I'll give you your 15-minute

17 | break then.  Ladies and gentlemen, leave your pads on your

18 | chairs.  No discussion about the case.  Take your break

19 | downstairs, and we will call you back up in about 15 minutes.

20 |     (A recess was taken at 3:06 p.m.)

21 |     (In open court at 3:26 p.m., defendants and jury present.)

22 |         MR. DARLEY:  Your Honor, Dr. Ruan calls Carolyn -- I

23 | think it's Ferenczi.

24 |                      CAROLYN FERENCZI

25 |             was sworn and testified as follows:

CAROLYN FERENCZI - DIRECT BY MR. DARLEY

1                        DIRECT EXAMINATION

2    BY MR. DARLEY:

3    Q   Good afternoon, ma'am.

4    A   Good afternoon.

5    Q   Can you introduce yourself to the jury?  And I'm not sure

6    -- it's Ferenczi; correct?

7    A   Ferenczi.

8    Q   Ferenczi.  Can you introduce yourself to the jury and spell

9    your last name please?

10   A   Sure.  Carolyn Ferenczi, F-E-R-E-N-C-Z-I.

11   Q   Ms. Ferenczi, at some time in the past were you employed at

12   Physicians Pain Specialists of Alabama?

13   A   I was.

14   Q   What was your role at PPSA?

15   A   I set appointments for the patients that were leaving their

16   appointments.  So it was the next appointment after their --

17   the appointment that they already had.

18   Q   Yes, ma'am.  Did you work specifically for Dr. Ruan?

19   A   I did.

20   Q   What dates were you employed?

21   A   November 2014 until all of this happened, which I think was

22   in May or June.

23   Q   May of 2015.  What was -- what were your duties while

24   employed at PPSA?

25   A   Set appointments for the patients, answer the phones.

CAROLYN FERENCZI - DIRECT BY MR. DARLEY

```
 1  Patients would call and ask how to become a patient.
 2  Q   And regarding Dr. Ruan, what would a patient typically need
 3  to become -- or what would a person typically need to become a
 4  patient at PPSA of Dr. Ruan's?
 5  A   They would have to have a referral from their physician,
 6  which would include at least three to six possibly office
 7  visits, history on the patient.
 8  Q   Office visits from where?
 9  A   From that referring doctor.
10  Q   Okay.  And if the patient had that history and then
11  insurance, what was the next step to be seen by Dr. Ruan?
12  A   The information would be sent over to us, to the doctor,
13  Dr. Ruan's new patient coordinator, and then that information
14  would go to Dr. Ruan, and he would make the decision if it was
15  -- that he was a good fit for that patient.
16  Q   When you say "that information," do you know what
17  information you're speaking of other than the insurance and the
18  prior history of visits?
19  A   That was all that I'm aware of.  It's just the insurance
20  and the -- the referral and the history on the patient.
21  Q   Medical history?
22  A   Medical history; that's correct.
23  Q   And so then you said it would go to Dr. Ruan?
24  A   Correct.
25  Q   What was the purpose of the information going to Dr. Ruan?
```

1    A   To see if he would be the right doctor for that patient.

2    Q   And would Dr. Ruan review all of the information that you

3    just discussed?

4            MS. GRIFFIN:  Objection, Your Honor, as to foundation.

5            THE COURT:  Sustained.

6    BY MR. DARLEY:

7    Q   Do you know if Dr. Ruan would review that information?

8    A   I do.

9    Q   Ms. Ferenczi, when a patient would be checked in, they'd go

10   through the visit, and it was when they came back that you

11   would see them; correct?

12   A   Correct.  Actually before they saw the patient, they would

13   sit in my area until they were seen.

14   Q   All right.  And then when they were called back, what would

15   occur, to your knowledge?

16   A   They would see --

17           MS. GRIFFIN:  Your Honor, request a foundation.  If

18   it's not firsthand, we would object to it.

19   BY MR. DARLEY:

20   Q   Did you have firsthand knowledge of what would occur when a

21   patient would go to the back?

22   A   Yes.

23   Q   And you witnessed this yourself?

24   A   Yes.

25   Q   Could you see areas of the back from where you were?

 1   A    No.

 2   Q    How would you witness it then, Ms. Ferenczi?

 3   A    By walking to the back.

 4   Q    And what would you typically see?

 5   A    Waiting areas.  There was a procedure room.  The doors

 6   would be open where patients were there.

 7   Q    Okay.  And would you see -- would you yourself see patients

 8   interacting with medical assistants?

 9   A    (Nodding head affirmatively.)

10   Q    Would you see them interacting with nurse practitioners?

11   A    Yes.

12   Q    Would you see them interacting with Dr. Ruan?

13   A    Yes.

14   Q    What would you see going on between Dr. Ruan and the

15   patients or Dr. Ruan and the nurse practitioners?

16            MS. GRIFFIN:  Your Honor, we'd ask for some foundation

17   in time.

18            THE COURT:  Sustained.

19   BY MR. DARLEY:

20   Q    Can you state again the time frame you were employed for

21   Dr. Ruan?

22   A    November of 2014 -- November 2014 to when the business

23   closed.

24   Q    And during this time, this is the time that you're

25   referencing you would be moving back through the clinic;

CAROLYN FERENCZI - DIRECT BY MR. DARLEY

1    correct?

2    A    Correct.

3    Q    And you would -- at this point you would see Dr. Ruan

4    interacting with the patients?

5    A    I would see Dr. Ruan going in a room with the patients,

6    with the nurse practitioners also.

7    Q    And based on your knowledge, your view of this, was

8    Dr. Ruan involved in the patient care of these patients?

9    A    Yes.

10   Q    Would you see the nurse practitioners interacting with

11   Dr. Ruan about the patient care?

12   A    We --

13         MS. GRIFFIN:  Your Honor, it's been asked and

14   answered.

15         THE COURT:  Sustained.

16   BY MR. DARLEY:

17   Q    Ms. Ferenczi, you said you would, I guess, check the

18   patients out and reset their next appointments or set their

19   next appointments?

20   A    (Nodding head affirmatively.)

21   Q    How often were patients typically scheduled, rescheduled

22   for visits?

23   A    It would be sometimes 60 days to 90 days, every two to

24   three months.

25   Q    Do you have knowledge if patients were terminated or

1    discharged for improper pill counts or failing, so to speak --

2    having improper drug tests?

3    A    Yes.

4    Q    How do you have that knowledge, Ms. Ferenczi?

5    A    By them showing up and failing a urine test.

6    Q    And at that point obviously they would not be reset for a

7    visit, would they?

8    A    No; that's right.

9         MR. DARLEY:  One moment, Your Honor.

10        THE COURT:  All right.

11        (A discussion was held off the record between defense

12   counsel.)

13   BY MR. DARLEY:

14   Q    Ms. Ferenczi, as to the failed drug screens, do you know --

15   do you have knowledge if patients were just automatically

16   terminated based on failed drug screens?

17        MS. GRIFFIN:  Objection, Your Honor.  This is so far

18   beyond the direct examination.

19        THE COURT:  Yeah.  Let's come to side bar, please.

20        (At the side bar, jury not present.)

21        THE COURT:  Mr. Darley, I get the distinct impression

22   that you are just trying to bide time.  All of this is

23   duplicative of what the previous two witnesses have testified

24   about, and we don't need to go over these kind of details again

25   and again and again.  Do you have anything substantive to put

5393

```
 1    on through this witness?

 2            MR. DARLEY:  Nothing -- nothing further, Your Honor.

 3            THE COURT:  Do you have another witness?

 4            MR. DARLEY:  No, ma'am.

 5            THE COURT:  Do you have any cross-examination?

 6            MS. GRIFFIN:  Two questions.  And one of them I think

 7    I need to bring to the Court's attention.

 8            THE COURT:  All right.

 9            MS. GRIFFIN:  She's also in recovery for substance

10    abuse, and I would like to be able to ask her that.  I think it

11    goes to her credibility.

12            MR. DARLEY:  It's not relevant.

13            THE COURT:  Well, it is relevant.

14            MS. GRIFFIN:  Everybody they're hiring is a former

15    substance abuser.

16            MR. KNIZLEY:  The substance abuse during the time

17    frame she was employed?

18            MS. GRIFFIN:  She advised the FBI that she was

19    currently in recovery for substance abuse.

20            MR. KNIZLEY:  Subsequent to her employment --

21            MS. GRIFFIN:  Just you see what I have.

22            MR. KNIZLEY:  Judge, I mean --

23            THE COURT:  What date was she interviewed?

24            MS. GRIFFIN:  She was interviewed August of '15.

25            MR. DARLEY:  That's three months after the raid,
```

 1   Judge.

 2        THE COURT:  I think it's a legitimate area of

 3   inquiry.  If you want -- I mean, you know, you chose to put her

 4   on.

 5        MR. KNIZLEY:  Judge, is the inquiry going to be during

 6   the time frame she was employed with Dr. Ruan, whether or not

 7   she was --

 8        THE COURT:  A drug user.

 9        MR. KNIZLEY:  -- abusing drugs?  Or is the inquiry

10   going to be at some time subsequent to her employment?

11        THE COURT:  No.  It should be during the time she was

12   employed.

13        MR. KNIZLEY:  Well, that's the part --

14        THE COURT:  She's got a basis for asking that.  I'm

15   going to allow her to ask it.

16        MR. KNIZLEY:  Based on there being a report to the

17   FBI three months --

18        THE COURT:  Three months later she was in substance

19   abuse recovery.  So I mean, she can ask it.

20        MR. KNIZLEY:  Well, of course, she could have been in

21   recovery for 10 years, Judge.  I mean, people obviously --

22        THE COURT:  She can ask the question.  If she wasn't

23   using at the time, she can just simply say no and that will be

24   the end of it.

25        (In open court, defendants and jury present.)

1    MS. GRIFFIN:  You're going to have to help me, please,
2  ma'am, with pronouncing -- is it Ferenczi?
3         THE WITNESS:  Correct.
4         MR. DARLEY:  Judge, I've got --
5         MS. GRIFFIN:  Sorry.  I thought --
6         MR. DARLEY:  I think I formally need to pass the
7  witness.
8         THE COURT:  All right.  Go ahead.
9                    CROSS EXAMINATION
10 BY MS. GRIFFIN:
11 Q   I'll start again.  Is it Ms. Ferenczi?
12 A   That's correct.
13 Q   So you were only there from November of 2014 through May
14 20th of 2015; is that right?
15 A   Yes, ma'am.
16 Q   And you were the front desk receptionist; right?
17 A   Correct.
18 Q   Dr. Ruan had six rooms of patients going all the time?
19 A   (Nodding head affirmatively.)
20 Q   Three nurse practitioners?
21 A   (Nodding head affirmatively.)
22 Q   Three medical assistants?
23 A   (Nodding head affirmatively.)
24 Q   And you're checking in or checking out or rescheduling
25 approximately 80 patients a day?

1          MR. DARLEY:  Judge, I'll object to the form of the

2    question,  She's stating facts not in evidence.

3          MS. GRIFFIN:  Your Honor it's cross-examination.

4          THE COURT:  It's cross-examination.  She's allowed to

5    lead.

6    BY MS. GRIFFIN:

7    Q   And so you must have been everywhere all over the office to

8    see all the things you've described; is that correct?

9    A   No.  I was in one area (indicating).  But you could see it.

10   Q   Just one area?

11   A   You could see it.

12   Q   Right there at the front desk reception; is that right?

13   A   I was not in the front.  I was beside the front

14   (indicating).  There was a check-in, which was front, and I was

15   check-out.

16   Q   Now, Ms. Ferenczi, you are yourself currently in recovery

17   for substance abuse; is that correct?

18   A   Been sober for three years.

19   Q   So you were sober by the time you started working for

20   Physicians Pain Specialists; is that correct?

21   A   Oh, yes.

22   Q   And you only worked as front desk receptionist at the

23   Springhill office for a short period of time; is that correct?

24   A   Yes.

25          MS. GRIFFIN:  That's all I have, Your Honor.

CAROLYN FERENCZI - CROSS BY MS. GRIFFIN

1          THE COURT:  All right.  Any redirect?

2          MR. DARLEY:  No, ma'am, Your Honor.

3          THE COURT:  All right.  May this witness be excused?

4          MR. DARLEY:  Yes, ma'am, Your Honor.

5          THE COURT:  All right.  Thank you, ma'am.  You may

6   step down.

7          Do you have anything further?

8          MR. DARLEY:  Your Honor, may we approach?

9          THE COURT:  Yeah.

10     (At the side bar, jury not present.)

11          MR. KNIZLEY:  Judge, I apologize for not having a

12   witness to take us to 4 o'clock today.  It is my

13   responsibility, and I am sorry.  And that's all I can say.

14          THE COURT:  Well --

15          MR. KNIZLEY:  And I intended it to be different.

16          THE COURT:  I understand, I understand.

17          MR. KNIZLEY:  I deeply apologize.

18          THE COURT:  We're going in fits and starts.

19          MR. KNIZLEY:  I know.  We were supposed to -- we were

20   supposed to have the witnesses here, and there's no excuse for

21   it.

22          THE COURT:  Well, so Monday -- you've got an expert

23   Monday or not?

24          MR. KNIZLEY:  Tuesday and Wednesday are the experts.

25          THE COURT:  What are we putting on Monday?

```
 1              MR. DARLEY:  We have witnesses.

 2              MR. KNIZLEY:  We have witnesses, Judge.

 3              THE COURT:  Substantive witnesses?

 4              MR. DARLEY:  Yes, ma'am.

 5              MR. KNIZLEY:  Yes, ma'am.  When you say substantive, I

 6  mean --

 7              MR. SHARMAN:  They may not be exciting, but they're

 8  substantive.

 9              MR. KNIZLEY:  They're substantive.

10              THE COURT:  We are not going to have five witnesses

11  who worked in the office who are all going to testify about the

12  same thing.

13              MR. KNIZLEY:  No.  We have patients and we have

14  Shannon Harville who is a nurse practitioner that you've heard

15  a good bit about.  We have, I think, two more patients that are

16  on the fentanyl list.

17              THE COURT:  Top 28 or whatever?

18              MR. KNIZLEY:  Yes, ma'am.  And Jason, you're going to

19  have to tell me who the other one is.

20              THE COURT:  I'm just saying we're going to have

21  witnesses that really have something to say.

22              MR. KNIZLEY:  And -- yes.

23              THE COURT:  Okay.

24              MR. KNIZLEY:  And, of course, the experts' scheduling

25  drove --
```

```
 1              THE COURT:  A lot of this.

 2              MR. KNIZLEY:  -- this.  And, Judge, I would not dare

 3    want to just put on people to be putting them on.  And we would

 4    have called witnesses until we exhausted substantive witnesses

 5    and intend to do that.  And then if the expert was here, we

 6    would call him right away.  But, you know, it's just because of

 7    that scheduling caused us to -- and, you know, of course, the

 8    length of the testimony of the witnesses.  And I'm not going to

 9    blame Mr. Sharman for anything, but his cut a little short too.

10    And I would blame him.  He's from Birmingham.

11              MR. SHARMAN:  Please, please.

12              THE COURT:  All right.  That's it.

13              MR. KNIZLEY:  I'm sorry, Judge.

14              THE COURT:  That's okay.  I'm going to recess for the

15    day.

16          (In open court, defendants and jury present.)

17              THE COURT:  All right, ladies and gentlemen.  We are

18    going to go ahead and recess for today.  Leave your pads on

19    your chairs.  We've got the weekend ahead of us.  Remember my

20    instructions to you not to discuss the case.  And be back

21    Monday morning at 9 a.m. down in the jury assembly room ready

22    to be called back up.  Try and put this out of your mind for

23    the weekend.  Go home and enjoy yourselves.  We'll see you

24    Monday.

25          (Court adjourned at approximately 3:43 p.m.)
```