5400



```
 1                    UNITED STATES DISTRICT COURT
                       SOUTHERN DISTRICT OF ALABAMA
 2

 3   UNITED STATES OF AMERICA
                                       CASE NO. CR15-00088
 4   v.
                                       COURTROOM 2B
 5   JOHN PATRICK COUCH, M.D.,
     and XIULU RUAN, M.D.,
 6                                     MOBILE, ALABAMA
                  Defendants.
 7   * * * * * * * * * * * * * *       MONDAY, FEBRUARY 13, 2017

 8   REDACTED

 9

10                        DAY 24 OF TRIAL
          BEFORE THE HONORABLE CALLIE V. S. GRANADE,
11            UNITED STATES DISTRICT JUDGE, AND JURY

12

13   APPEARANCES:

14   FOR THE GOVERNMENT:
          DEBORAH A. GRIFFIN
15        CHRISTOPHER BODNAR
          United States Attorney's Office
16        63 S. Royal Street, Suite 600
          Mobile, AL  36602
17        (251) 441-5845

18
     FOR THE DEFENDANT COUCH:
19        ARTHUR T. POWELL, III
          P.O. Box 40456
20        Mobile, AL 36640-0456
          (251) 433-8310
21
          JACKSON R. SHARMAN, III
22        ROBERT JACKSON SEWELL
          JEFFREY PAUL DOSS
23        BENJAMIN SANDERS WILLSON
          Lightfoot, Franklin & White
24        400 North 20th Street
          Birmingham, AL  35203
25        (205) 581-0700
```

1    (Continued)

2         BRANDON KEITH ESSIG
          800 Shades Creek Parkway, Suite 600D
3         Birmingham, AL  35209
          (251) 879-1981

4

      FOR THE DEFENDANT RUAN:
5         DENNIS J. KNIZLEY
          7 N. Lawrence
6         Mobile, AL 36602
          (251) 432-3799

7

          JASON BRADLEY DARLEY
8         Darley & McGough, LLC
          1751 Dauphin Street
9         Mobile, AL 36604
          (251) 441-7772

10

          GORDON G. ARMSTRONG, III
11        P.O. Box 1464
          Mobile, AL  36633
12        (251) 434-6428

13        STEVEN D. MARTINIE
          4955 North Lake Drive
14        Whitefish Bay, WI  53217
          (414) 332-9683

15

      THE CLERK:  MARY ANN BOYLES
16    THE LAW CLERK:  LYNN DEKLE
      COURT REPORTER:  ROY ISBELL, CCR, RDR, CRR

17

              Proceedings recorded by OFFICIAL COURT REPORTER
18          Qualified pursuant to 28 U.S.C. 753(a) & Guide to
        Judiciary Policies and Procedures Vol. VI, Chapter III, D.2.
19           Transcript produced by computerized stenotype.

20

21

22

23

24

25

1                       EXAMINATION INDEX

2

    BOE STRANGE
3        DIRECT BY MR. KNIZLEY . . . . . . . . . . . . . . 5418
         DIRECT BY MR. DOSS . . . . . . . . . . . . . . .5436
4        CROSS BY MS. GRIFFIN . . . . . . . . . . . . . . 5450
         REDIRECT BY MR. KNIZLEY . . . . . . . . . . . . . 5474
5        REDIRECT BY MR. DOSS . . . . . . . . . . . . . . 5487

6    DIANNE M. ROGERS
         DIRECT BY MR. DARLEY . . . . . . . . . . . . . . 5493
7        CROSS BY MR. BODNAR . . . . . . . . . . . . . . . 5502
         REDIRECT BY MR. DARLEY . . . . . . . . . . . . .5503
8
     SHANNA HARVILLE
9        DIRECT BY MR. DARLEY . . . . . . . . . . . . . . 5505
         CROSS BY MS. GRIFFIN . . . . . . . . . . . . . . 5516
10       REDIRECT BY MR. DARLEY . . . . . . . . . . . . .5526

11   KIM LOWE
         DIRECT BY MR. KNIZLEY . . . . . . . . . . . . . . 5528
12       CROSS BY MR. BODNAR . . . . . . . . . . . . . . . 5536
         REDIRECT BY MR. KNIZLEY . . . . . . . . . . . . . 5548
13
     JOHN PATRICK COUCH, MD
14       DIRECT BY MR. SHARMAN . . . . . . . . . . . . . . 5551

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT INDEX

|  |  |  | MAR | ADM |
|---|---|---|---|---|

GOVERNMENT'S

43-1   Internet page printout - CME breakthrough   5417
       cancer pain

43-3   Insys press release re:  Subsys   5417

44-1   Email from Strange to Ruan 2/2/14 re:  date   5452

44-2   Email from Strange to Ruan 2/26/14 re:  C&R   5455
       Pharmacy

45     12/22/13 email from Boe Strange to PPSA   5471
       Group, Ken Cross, Debi Phillips, Melissa
       Baggett, Tammy Etheridge, Xiulu Ruan, and
       John Couch, re:  2014 Planning for PPSA

48     Alabama Query Report, Patient Rx History   5544
       Report:  K. Lowe 5/13/15

DEFENDANT COUCH'S

274    Photo of Dr. Couch with pain pump at Mobile   5562
       Infirmary

287    2013 Form 1065 U.S. Return of Partnership   5438
       for C&R Pharmacy

288    2014 Form 1065 U.S. Return of Partnership   5444
       for C&R Pharmacy

290    Memorandum of Appointment USA College of   5570
       Medicine - 8/1/2011

291    Memorandum of Appointment USA College of   5570
       Medicine - 7/2014

5404

```
 1        (Morning session, 8:50 a.m., in chambers, jury not
 2   present.)
 3            MR. BODNAR:  Morning, Your Honor.
 4            MS. GRIFFIN:  Good morning, Your Honor.
 5            THE COURT:  Good morning, good morning.  You're not
 6   sick too, are you?
 7            MS. GRIFFIN:  No, no.  Just getting ready.
 8            MR. BODNAR:  I'm on the upswing.
 9            MR. SHARMAN:  Good morning, Judge.
10            THE COURT:  Good morning.
11            MR. DOSS:  They are coming.
12            THE COURT:  Is everybody here this morning?
13            MR. KNIZLEY:  Good morning, Judge.
14            THE COURT:  Good morning.
15            MR. BODNAR:  Good morning.
16            MR. KNIZLEY:  Good morning, good morning.
17            MS. GRIFFIN:  Good morning.
18            MR. ARMSTRONG:  Morning, all.
19            THE COURT:  I understand we have another sick
20   juror.  The first man in the box, who was --
21            THE CLERK:  Number two.
22            THE COURT:  -- sitting next to the guy that got sick
23   last week.
24            MR. ARMSTRONG:  Oh, no.
25            THE COURT:  I mean, he came in, says he has an
```

```
 1   earache, bad cold.  I was going to let him go, but I thought
 2   this time I would consult you, since we are now down two out of
 3   four.  Any objection?
 4              MR. KNIZLEY:  If he's sick, he's sick, Judge.  That's
 5   all I can tell you.
 6              THE COURT:  And they are getting each other sick at
 7   this point.
 8              MR. SHARMAN:  Yes, ma'am.
 9              THE COURT:  So I intend to let him go.  So we're going
10   to move them all into the box so we don't have any outside the
11   box now.  Anything else we need to talk about?
12              MR. BODNAR:  Yes, Your Honor.  We understand that
13   Dianne Rogers is going to be called by Dr. Ruan today and we
14   object on relevance grounds and on the grounds previously
15   disclosed.  She was someone named on the top 25 list for
16   Dr. Ruan.
17         (Mr. Darley entered chambers.)
18              MR. KNIZLEY:  That's the man we're looking for.  Go
19   ahead.
20              MR. BODNAR:  When Paul Short came in and created his
21   foundational documents, because he is the one that did, just
22   based on the PDMP reports who received the most for Dr. Ruan
23   and Dr. Couch grams of Subsys and Abstral, she was on the top
24   25 list of that.  The second important -- those two charts form
25   the foundation of 12-2, which came in through Jeff Young.  She
```

5406

1    is not on that chart because she had active cancer and received

2    Subsys and Abstral appropriately.  It's never been alleged that

3    she didn't.  And therefore we object for her coming in as just

4    good medicine.

5              THE COURT:  What is the purpose of putting her on?

6              MR. DARLEY:  Well, Judge, first of all, and with all

7    due respect, they were mistaken.  She didn't have active

8    cancer.  She had a left breast mastectomy in 2005.  She was

9    referred to Dr. Ruan May-June 2011.  She had no cancer.  The

10   cancer came back in the right breast and she had a subsequent

11   mastectomy in January of, I think, 2015.  She didn't have

12   active cancer.  I've got her records.  She was admitted or

13   referred to Dr. Ruan for spinal pain and for back pain and rib

14   cage pain.  She was, I think -- I'm not sure if they missed it,

15   but she would be on their selective chart of 12-2, she would

16   fall in around -- she would fall in 22 on 12-2.

17        (The law clerk entered chambers.)

18             MR. DARLEY:  She didn't have active cancer.

19             MR. BODNAR:  Your Honor, her file was replete with

20   discussions of cancer and cancer pain and pain dealing with her

21   breast.  And that was, as Special Agent Jeff Young explained,

22   he excluded -- I apologize.  I thought she did have active

23   cancer when I looked through it.  And he excluded active cancer

24   and those who had cancer as well.  They were being treated for

25   pain.  So while she could have been on that chart, it sounds

1  like, she's not on that chart and we're not relying on her or
2  her numbers to come up with the amount of fentanyl for count
3  three.
4         MR. KNIZLEY:  Judge, as I understand the government's
5  position, they take the position any patient that had Subsys or
6  Abstral for an off-label use is outside the normal course of
7  medical practice.
8         THE COURT:  That's not my understanding.
9         MR. KNIZLEY:  That's what he wrote to me yesterday.
10        MR. BODNAR:  Our position, as I explained it, is the
11 financial motivation for prescribing it off label which is what
12 brings it outside the usual course of professional practice for
13 the Subsys and for the Abstral.  And she is not on this list.
14 It is not somebody that we are alleging for the total of over
15 the 40 grams of fentanyl between the two doctors.
16        MR. KNIZLEY:  Judge, if I could just have an
17 understanding whether -- I inquired about this yesterday and we
18 had a discussion about the propriety of calling this witness or
19 not.  And the government, I understood their position -- I may
20 be wrong about this, and they can clear me up -- that they take
21 the position that every Abstral and Subsys prescription in this
22 case for any patient that does not have a cancer diagnosis they
23 contend is outside the normal course of medical practice.  If
24 I'm wrong about that, please correct me.
25        MR. BODNAR:  First, Dianne Rogers does have a cancer

```
 1    diagnosis.  It's discussed throughout her chart, aspects
 2    related to cancer.  But it has always been the reason why they
 3    prescribed it off label.  And if there is a chart that says,
 4    you know, we've gone through and we've discussed with the
 5    patient and the patient has off-label pain that cannot -- or
 6    pain that can't be treated in any other way and this is why
 7    we're prescribing it off label, and the patient's given
 8    informed consent, that's possible.  But what we've got here is
 9    tons of patients getting it off label.  And we contend and I
10    intend to argue it was for the financial motivation for the
11    Subsys and Abstral.
12         MR. DARLEY:  But, Your Honor, she does appear on 20-
13    23, she's number 13 on that chart.  And furthermore, she is
14    referred to Dr. Ruan with no mention of the cancer in her first
15    visits.  At some point they started prescribing the Subsys and
16    Abstral in August, but she doesn't have cancer.  Her cancer has
17    been removed in 2005.  She will testify Mother's Day weekend it
18    was gone and she was referred to Dr. Ruan at some time as being
19    treated and then cancer, they believe, returns in the right
20    side in 2015, January.
21         THE COURT:  Well, to me it's like spinning wheels.  If
22    they are not on the top 28 list, I don't see the point of you
23    putting them on, especially if she has a cancer diagnosis.  But
24    I'm not going to prevent you from putting it on.  But it's much
25    ado about -- what we're doing is we're telling the jury the
```

5409

```
 1    same thing over and over again from both sides.  So --
 2            MR. KNIZLEY:  Judge, they've told them twice and we've
 3    told them once, and we want to tell them one more to say we've
 4    got two.  But that's it.  We'll cut it off with that.
 5            THE COURT:  Well, let's not belabor the point.  You
 6    can put her on.
 7            MR. KNIZLEY:  Yes, ma'am.
 8            THE COURT:  But let's go as quickly as we can.  Okay.
 9            MR. KNIZLEY:  In that respect I do -- well, the other
10    one, Kim Lowe, I don't think you're going to object to her;
11    right?
12            MR. BODNAR:  No.
13            MR. KNIZLEY:  She was discussed by Dr. Greenberg.
14    That's the only other patient, I'm just trying to tell the
15    Court.
16            THE COURT:  All right.  Have you got a full day?
17            MR. KNIZLEY:  Well, we had a full morning until 5:13
18    yesterday.  I had talked to MB....... and his lawyer a month
19    and a half ago, I had talked to him a week and a half ago, I
20    talked to his lawyer yesterday about 4 o'clock.  There had been
21    no mention whatsoever of exerting a ........................,
22    MB....... being the nurse practitioner for Dr. Ruan, the
23    primary nurse practitioner, which involved a number of these
24    patients and I anticipated his testimony about two hours of
25    testimony at 5:13.  I don't know what interaction the
```

```
 1   government may have had with Mr. B... or Mr. B's... counsel,
 2   but I just know for the first time ever it had ever been
 3   suggested to me, after 5 o'clock yesterday, Matt Green sent me
 4   a text, said he's going to .............. He's here this
 5   morning.  If he .............., that's going to take a big
 6   chunk of my day out.
 7            Boe Strange is my first witness.  I think the
 8   government had mentioned him to the Court earlier.  I had
 9   talked to Mr. Strange in my office a month ago, talked to him a
10   few days ago, talked to his lawyer, Jerry Speegle, Friday night
11   and I've talked to Mr. Strange here this morning.  I don't know
12   if the government intends to take any action they suggested to
13   the Court earlier, but I'm ready to go with Mr. Strange.  I'm
14   ready to go with the person he has, that's Ms. Kim Lowe, and
15   with Shannon Harville, who is another nurse practitioner
16   similarly situated as MB.......  However, I do not have any
17   reason to believe she's going to exert a ....................
18   But if she does, that would be news to me.
19            MS. GRIFFIN:  Your Honor, to clarify as to MB.......,
20   I had a conversation with Mr. Knizley on Friday in which I told
21   him we had some additional information about Mr. B... that we
22   felt we needed to share with his attorney, Matt Green.  But I
23   was not able to reach Matt Green.
24            THE COURT:  Not Jerry Speegle?
25            MR. KNIZLEY:  This is B....  Speegle is Strange.
```

```
 1            THE COURT:  Oh, okay.
 2            MS. GRIFFIN:  Matt Green represents Mr. B....
 3            MR. KNIZLEY:  Matt Green represents MB.......
 4            MS. GRIFFIN:  The first time we spoke to MB......., he
 5    brought his attorney, Mr. Green, with him.  The second time we
 6    met with Mr. B..., he came by himself.  I told Dennis that I
 7    had some information I wanted to share with Dennis, but I felt
 8    like I needed to talk to Mr. Matt Green, the attorney,
 9    first.  I was not able to reach him this weekend.  I did not
10    even try to reach him, because I had left his telephone number
11    at a different place from where I was, his cell number.  I did
12    not try his office number over the weekend.  I have not spoken
13    to him.  We have not spoken to him over the weekend.
14    (Indicating.)
15            MR. BODNAR:  Not over the weekend.  I saw him in the
16    courthouse Thursday or Friday of last week just in passing, and
17    he noted that our case was done and that we didn't call
18    MB....., and he mentioned possibly coming for the defense.  And
19    I said:  Just make sure to talk -- this is to Matt Green, the
20    attorney -- to talk to Deborah and I first about any potential
21    .............. issue that came up, and that was the issue that
22    they are talking about now.
23            THE COURT:  But you still haven't talked to him?
24            MS. GRIFFIN:  I have not, Your Honor.
25            THE COURT:  Okay.
```

5412

```
1          MS. GRIFFIN:  I'll be glad to if he's here.
2          MR. KNIZLEY:  He's here.  Matt Green, the lawyer,
3   texted me that I can't put this man on.  The lawyer has told me
4   that that's his intention.  Said he had state court at 8:30,
5   but intended to come straight over here.  So --
6          THE COURT:  All right.  Well, y'all can iron this out
7   at the break, I guess, since Boe Strange is your first witness.
8          MR. KNIZLEY:  Yes.
9          THE COURT:  All right.  We'll just have to see what
10  transpires.
11         MS. GRIFFIN:  Your Honor, is Mr. Speegle going to be
12  in, advising Mr. Strange?  Because, as I understand it,
13  Mr. Speegle represented and still represents PPSA.
14         MR. KNIZLEY:  Jerry Speegle was in Vermont on Friday
15  night, was to return to Mobile on Saturday, and that's the last
16  communication I've had with him.  So, but whether he's coming
17  here, I do not know.
18         Now, back to the Court's first question, do I have a
19  full day?  I have Mr. Strange an hour or so, I would think, the
20  witness Mr. Darley talked about, the witness I talked about,
21  Ms. Lowe, the patient, Ms. Harville, and hopefully she doesn't
22  take the ........................  Mr. B's... the other.  But
23  since he took the ......................., so that is not a
24  whole day.  And I couldn't do anything about B... at 5 o'clock
25  bailing on me yesterday.
```

```
 1            THE COURT:  All right.  Well, if we don't get to -- if
 2   the witnesses you've got don't take the whole day, you're going
 3   to have to make a decision before the end of the day about
 4   whether or not Dr. Ruan's going to take the stand.
 5            MR. KNIZLEY:  And in that regard, Judge -- and it
 6   won't take all day.  I don't think so.  And I understand that.
 7   And I don't know if procedure-wise whether you're going to turn
 8   to Dr. Couch before Dr. Ruan or how you're going to do it.  But
 9   whatever the Court's preference is, I'm not going to stop.  If
10   you're going to turn to Dr. Couch and make his determination
11   first or let the parties decide or turn to Dr. Ruan, we will be
12   ready to proceed one way or the other.
13            THE COURT:  Have you made that decision with
14   Dr. Couch?
15            MR. SHARMAN:  Your Honor, as I think everybody knows,
16   Dr. Couch basically has two potential witnesses left:  an
17   expert and Dr. Couch.  And so if the Court is telling me to
18   call your next witness, we can do that and we can call
19   Dr. Couch.  But I'll --
20            THE COURT:  But he has determined that he's going to
21   testify?
22            MR. SHARMAN:  That's our intention, yes, ma'am.
23            THE COURT:  Okay.
24            MR. SHARMAN:  And so, but I'll follow the Court's
25   instructions, however the schedule plays out.
```

5414

```
1              THE COURT:  All right.  Well, let me say this:  If
2    both doctors intend to testify, when do you expect this trial
3    to be over with, evidence presentation?
4              MR. SHARMAN:  I still think, Your Honor -- and this is
5    just my assessment -- I still think we are on the same track
6    that we discussed last week, if not quicker.
7              THE COURT:  Which was?  Because I hadn't understood
8    you were going to be through on Wednesday.
9              MR. ARMSTRONG:  Judge, we still have one expert,
10   Dr. Gharibo, who is scheduled to start Wednesday morning,
11   depending on how the flow goes.  He comes in Tuesday
12   night.  But I would expect him to be shorter than Dr. Gudin,
13   because I'm not going to go through everything like I went
14   through in some detail with Dr. Gudin.  I will probably try to
15   shorten that up.  So we likely could be finished with him, if
16   he starts in the morning, Wednesday morning, by noon.
17             MR. SHARMAN:  And, Your Honor, I think the framework
18   at least we had was if there were no defendants testifying, in
19   all likelihood we'd be wrapped up on Wednesday.  If both
20   defendants testify, I believe our discussion was, at the latest
21   it would wrap up on Friday.  And I think that general framework
22   is still accurate.
23             THE COURT:  All right.
24             MR. KNIZLEY:  And for planning purposes, I mean, I do
25   not think these witnesses will run till noon or much later, if
```

1  the Court would be inclined to want a witness to be called this

2  afternoon.

3          THE COURT:  That's correct.

4          MR. KNIZLEY:  And at the succession of that witness,

5  whatever the status of the experts may be at that time, we will

6  call the next witness, being, if it's the defendant, the other

7  defendant, whichever other defendant it may be.

8          THE COURT:  I'm not following this part.

9          MR. KNIZLEY:  Well, okay.  We've got today.  Unless we

10 call a defendant, one or the other, today and this afternoon he

11 begins his testimony, if at the conclusion of that defendant's

12 testimony we either have an expert testifying or the other

13 defendant begins testifying -- is that the Court's intention?

14         THE COURT:  Yes.  I mean, we're just going to go

15 straight through with the testimony until we're done, because

16 we're going to be running into some real scheduling problems

17 with Mardi Gras.  And I'll tell you, when I was set to try this

18 case in October, my schedule was completely clear through

19 December.  Okay?  But I have a prepaid trip to take over Mardi

20 Gras and I won't be back until the Thursday after Mardi Gras --

21 I mean, I won't be back in town.

22         MR. KNIZLEY:  But with jury deliberation, who knows?

23         THE COURT:  Well, that's just it.  This jury could be

24 out for a week or more.

25         MR. KNIZLEY:  Yes.

```
 1            THE COURT:  So --
 2            MR. KNIZLEY:  The schedule of being concluded this
 3    week is still certainly -- and also with these witnesses
 4    falling out, we're moving shorter rather than longer.
 5            THE COURT:  All right.  Well, let's go.  Let's get to
 6    it.
 7            MR. SHARMAN:  Your Honor, very briefly, just an
 8    administrative matter while we're all gathered together.  The
 9    Court may remember that the government offered as an expert
10    Dr. Tricia Aultman, who is an internist.  On cross-examination
11    Dr. Couch was intending to impeach her by offering evidence
12    from the Mississippi Medical Board that would tend to show that
13    she was not licensed in her licensing jurisdiction to practice
14    pain management, the topic for which the government offered her
15    at trial.
16            The Court sustained the government's objection.
17    Dr. Couch made an oral proffer on the record of why that
18    evidence would be offered, what it would be worth.  Just to
19    perfect the record, I've got a written proffer that I would
20    like to make as a Court exhibit.  I've already provided a copy
21    of it to the government.
22            THE COURT:  All right.
23            MR. BODNAR:  And one small housekeeping thing too, and
24    I spoke with Mr. Armstrong about it already this morning,
25    United States Exhibit 43-1 and 43-3, which were two items that
```

5417

1    were identified by Dr. Gudin on cross-examination, I simply

2    forgot to introduce them.  I intend to offer them.  And he may

3    or may not have objections.  But they were the document that

4    showed from the CME where Dr. Gudin was disclosing any sort of

5    conflicts and he listed Insys, and 43-3 was the Insys press

6    release in which he was quoted.

7            MR. ARMSTRONG:  And I would just object on relevance

8    grounds, Judge.

9            THE COURT:  Right.  Overrule the objection.  You can

10   mark them in.

11       (Government's Exhibits 43-1 and 43-3 were entered into

12   evidence.)

13           THE CLERK:  Yes, ma'am.

14           MR. BODNAR:  We want to publish them.

15           THE COURT:  We're going to compress the jury so they

16   will all fit in the box now.  So when she does that, we'll get

17   started.

18           MR. SHARMAN:  Thank you, Your Honor.

19           MR. BODNAR:  Thank you, Your Honor.

20       (A recess was taken at 9:13 a.m.)

21       (In open court, defendants and jury present.)

22           THE COURT:  Good morning, ladies and gentlemen.

23           All right.  Y'all are getting smaller in number.  I

24   know it's been difficult, with this cold season and flu season,

25   but I hope you all can try and stay healthy.  All right,

1  Mr. Knizley.

2        MR. KNIZLEY:  Dr. Ruan calls Boe Strange.

3        THE CLERK:  Mr. Strange, if you will step forward

4  toward the witness stand, I'll swear you in.  Let me get you to

5  raise your right hand.

6                         BOE STRANGE

7            was sworn and testified as follows:

8        THE WITNESS:  I do.

9        THE CLERK:  Thank you, sir.  Please be seated.

10                    DIRECT EXAMINATION

11  BY MR. KNIZLEY:

12  Q   State your name, please, sir.

13  A   Boe Strange.

14  Q   Mr. Strange, what is your occupation?

15  A   Today I'm a CEO for a private business.

16  Q   And when did you start that line of work?

17  A   About a year and a half ago.

18  Q   And before that time what had been your work history?

19  A   I was in public accounting for 25 years up until that

20  point.

21  Q   And do you have any qualifications to be an accountant?

22  A   Yes, sir.  I have an accounting degree from South Alabama.

23  I'm a certified public accountant, I'm also a certified

24  valuation analyst and a master analyst in financial forensics.

25  Q   What is a certified evaluation analyst?

1   A   If someone wants to sell a business, they will get my

2   opinion as to what it's worth, to make a determination if the

3   price is a fair price.

4   Q   And did you maintain your own accounting practice for the

5   25 years you had previously referenced before taking the

6   position you're in now?

7   A   Yes, sir.

8   Q   And was it a public business by which you took a number of

9   varied clients over the years?

10   A   Yes, sir.  I was up to about 130 corporate clients and 300

11   individuals.

12   Q   And what were the varying ranges of the sizes of the

13   companies that you may have done accounting services for?

14        MS. GRIFFIN:  Your Honor, objection as to relevance.

15        THE COURT:  Sustained.

16   BY MR. KNIZLEY:

17   Q   Over the 25 years that you were in the accounting practice

18   doing corporate accounting work, did there come a time when you

19   were involved with a business called PPSA, or Physicians Pain

20   Specialists of Alabama?

21   A   Yes, sir.

22   Q   And do you recall about when that was?

23   A   12 to 15 years ago.

24   Q   And I may have misspoke.  On PPSA, Dr. Ruan and Dr. Couch,

25   when did you first become acquainted with them?  It's been that

1   long since you first were doing accounting work for them; is

2   that correct?

3   A   That's correct.

4   Q   And I misspoke.  I'm sorry.  And you were doing accounting

5   work for PPSA; is that correct?  The accounting first we're

6   talking about.

7   A   Well, providing annual tax services for Dr. Couch, before

8   Dr. Ruan became a partner of PPSA.

9   Q   Okay.  Before Dr. Ruan, you were doing the business

10  accounting for Dr. Couch; is that right?

11  A   Correct.

12  Q   And when I say the accounting, are you speaking of both his

13  business and personal accounting?

14  A   Yes, sir.

15  Q   And did there come a time when Dr. Ruan became associated

16  with that business?

17  A   Yes, sir.

18  Q   And at that time what if anything did you do in connection

19  with, one, the accounting of the business and, two, the

20  accounting of Dr. Ruan?

21  A   Well, the services from the time Dr. Ruan came on changed

22  over the course of four or five years.  So --

23  Q   Okay.  Now, did there come a time when you were asked to do

24  more than the accounting work for that business?

25  A   Yes, sir.

5421

```
 1   Q   And about when was that?
 2   A   From today probably three and a half -- three years ago.
 3   From the time that the raid took place, probably a year and a
 4   half, two years before that time.
 5   Q   And you mentioned the raid.  We're talking about May 2015?
 6   A   Yes, sir.
 7   Q   And so about a year to a year and a half previous to that
 8   time you became -- you were asked to become more involved with
 9   PPSA?
10   A   Correct.
11   Q   And tell me what you were asked to do in connection with
12   your business involvement with PPSA?
13   A   To create a management team and create some accountability
14   within the office and evaluate the systems that were in place
15   at that time.
16   Q   Was this part of the services that you offered to other
17   clients as well?
18   A   Yes, sir.
19   Q   And who asked you to become involved in the management
20   aspects of PPSA?
21   A   Dr. Ruan and Dr. Couch.
22   Q   And after receiving that request or invitation, what if
23   anything did you do to, one, be involved in the management and,
24   two, evaluate the business itself?
25   A   Well, I already had a relationship with Ken Cross, who was
```

BOE STRANGE - DIRECT BY MR. KNIZLEY

1  the manager of the office.  So I basically interviewed him,

2  asked him some specific questions about some functions that

3  were or were not in place, and started the process of

4  evaluating -- you know, creating some accountability within the

5  office.

6  Q   What was Mr. Cross' title, if you recall, when you became

7  involved in the management?

8  A   Comptroller.

9  Q   And what did you understand his duties and responsibilities

10  were at that time?

11  A   He pretty much handled all the day-to-day accounting

12  activities.  He also handled the IT functions for the office as

13  well.

14  Q   And when you became involved, was part of what you did was

15  to evaluate the performance of Mr. Cross?

16  A   Well, yes, sir.  I mean, that wasn't the sole purpose.  But

17  it was to evaluate what he was doing to put some checks and

18  balances in place and basic accounting practices that weren't

19  there.

20  Q   And you said that wasn't your sole purpose.  What was your

21  purposes when you became involved as the -- we'll call it the

22  business manager or consultant of PPSA?

23  A   To evaluate the accounting practices in place at the time,

24  you know.

25  Q   And I believe you said a part of that was to evaluate the

BOE STRANGE - DIRECT BY MR. KNIZLEY

1    performance of Mr. Cross; is that correct?

2    A    Correct.

3    Q    And did you do so?

4    A    Yes, sir.

5    Q    Can you tell the ladies and gentlemen of the jury what that

6    evaluation revealed?

7           MS. GRIFFIN:  Your Honor, objection as to relevance.

8           MR. KNIZLEY:  Judge, if I may?

9           MS. GRIFFIN:  May we approach?

10          THE COURT:  All right.

11      (At the side bar, jury not present.)

12          MS. GRIFFIN:  Your Honor, I don't see how his

13   evaluating of Ken Cross or any other employee has anything to

14   do with the charges that are before the jury.

15          THE COURT:  Where are you going?

16          MR. KNIZLEY:  Mr. Cross is a witness in the case for

17   the government.  We would expect the evidence to show that

18   Mr. Strange evaluated his performance, that he fired him with

19   the concurrence of the defendants in the case, and that would

20   provide a bias for Mr. Cross' testimony adverse to the

21   defendants in the case.

22          MS. GRIFFIN:  He's already -- Mr. Cross has already

23   admitted he was fired.

24          THE COURT:  Yeah.

25          MR. KNIZLEY:  The facts and circumstances surrounding

 1    it, I don't think we're restricted to Mr. Cross' admission.  We

 2    want to say why and how and under what circumstances.

 3            THE COURT:  Well, since you didn't cross-examine

 4    Mr. Cross on those issues --

 5            MR. KNIZLEY:  It's not impeachment, Judge.  This is

 6    new testimony.  We're not trying to impeach Mr. Cross.  We're

 7    trying to show the bias of Mr. Cross through a separate witness

 8    that says Mr. Cross was employed by the defendants, Mr. Cross

 9    was discharged by the defendants.

10            THE COURT:  What do you expect him to say?

11            MR. KNIZLEY:  Ma'am?

12            THE COURT:  I said, what do you expect him to say?

13            MR. KNIZLEY:  Just that he didn't do a very good job

14    and that he was disorganized, that he had many times asked him

15    to perform certain tasks and he didn't fulfill them and as a

16    result he had -- and there's nothing terrible.  He ultimately

17    discharged him, got a new management under Swanzey and Debi

18    Phillips and that's what happened.

19            MS. GRIFFIN:  Your Honor, also I think there's a risk

20    for hearsay.  Because of necessity you would assume he had

21    discussed with Couch and Ruan, and anything that they told him

22    is hearsay.

23            MR. KNIZLEY:  I'm not going to ask what you told Couch

24    and Ruan.

25            THE COURT:  I do not see how the reason that this man

1    may have had for recommending his firing shows bias.  The very

2    fact that he was fired shows the bias and that is already in

3    evidence.

4            MR. KNIZLEY:  Judge, we would respectfully ask the

5    Court the opportunity to expand upon his discharge and the

6    facts and circumstances surrounding it and the defendants in

7    this case's knowledge and approval of the discharge that showed

8    the bias the witness may have had against the defendants in

9    this case.

10           THE COURT:  I don't see how that adds any to the bias

11   that Mr. Cross may have.

12           MR. KNIZLEY:  I just don't think there is -- I don't

13   think Mr. Cross on examination offered the totality of the

14   circumstances surrounding the discharge that could clearly

15   indicate to the jury whether there was reasons that he may have

16   had a bias against the defendants.

17           THE COURT:  I don't think you asked him about that,

18   did you?

19           MR. KNIZLEY:  Judge, I don't think I'm obligated to

20   ask that.  I can get it by another witness.

21           THE COURT:  You want to put independent evidence on?

22           MR. KNIZLEY:  Yes, ma'am.  Absolutely.  That's what I

23   want to do.

24           THE COURT:  I sustain the objection.

25         (In open court, defendants and jury present.)

1  BY MR. KNIZLEY:

2  Q   Mr. Strange, after you became involved in the management of

3  PPSA, was Mr. Cross relieved of his services?

4  A   Yes, sir.

5  Q   And after Mr. Cross was relieved of his services, what if

6  anything did you do regarding designing or assembling a

7  management team for this business?

8  A   It had started before he was terminated.

9  Q   If you could tell us how it was started before he was

10 terminated and how that development of the management team

11 progressed at PPSA under your direction?

12 A   Well, it started with Ken Cross, me asking him to perform

13 or actually create some reports to account for patient

14 activity.

15        MS. GRIFFIN:  Objection, Your Honor.  It's not

16 responsive to the question.

17        THE COURT:  I sustain the objection.

18 BY MR. KNIZLEY:

19 Q   If you might, Mr. Strange, focus upon the assembling --

20 what you did prior to the discharge of Mr. Cross to assemble

21 the management team and then subsequent to his discharge how

22 that management team operated when formed?

23 A   I hired a bookkeeper to take some of the duties off of Ken

24 so he could focus on some of the areas I'd recommended.

25 Q   And who was that?

5427

1   A   Melissa Baggett.

2   Q   Go ahead.  What else did you do before Mr. Cross'

3   termination?

4   A   After Melissa Baggett was hired and started handling the

5   accounts payable and the posting of receipts, we hired Debi

6   Phillips to give some more support to the office.  She was an

7   expert in the billing process.

8   Q   And you used the term "hired."  Who had the responsibility

9   for hiring and firing patients at that time?

10   A   I did.

11   Q   And you said --

12   A   You mean not patients.  You mean --

13   Q   Excuse me.  I am so sorry.

14   A   -- employees?

15   Q   Employees.  You had Ms. Phillips and Ms. Baggett.  And what

16   else did you do?

17   A   Then we hired a nurse, an RN, to kind of manage and oversee

18   the nurse practitioners.

19   Q   You say the nurse practitioners.  What was your

20   understanding of the number of nurse practitioners at the time

21   you first became involved in the business?

22   A   There were none.

23   Q   Did that change after you got involved in the business?

24   A   When you say you got involved, you mean initially?  When I

25   first met Couch, when I first started working for PPSA, I

5428

1    didn't have any nurse practitioners.  Over the years the

2    practice evolved into hirings nurse practitioners.  When

3    Dr. Ruan came on, more nurse practitioners were hired.

4    Q    And did the fact more nurse practitioners were involved in

5    the business have any effect on how the business may operate?

6    A    Yes, sir.  That was kind of the reason I was brought in, to

7    help build a management team and an infrastructure to manage

8    the increased volume of the patients.

9    Q    And those patients, the volume of patients, increased at

10   least in part in connection with the nurse practitioners?

11   A    Yes, sir.

12   Q    Or the utilization of nurse practitioners?

13   A    Yes, sir.

14   Q    Now, back to you assembling the team with Ms. Baggett and

15   Ms. Phillips, do you recall adding any other employees before

16   the discharge of Mr. Cross?

17   A    No, sir.

18   Q    And after Mr. Cross' discharge, was there yet another part

19   of the management team added?

20   A    Yes, sir, Hunter Swanzey.

21   Q    And what was Mr. Swanzey's duties and responsibilities?

22   A    He was now the comptroller, and his responsibility was to

23   manage the processes that we were putting in place.

24   Q    And what were those processes?

25   A    Well, for example, this didn't exist before, but an

BOE STRANGE - DIRECT BY MR. KNIZLEY

1    accountability of exactly how many patients came in that day,

2    how many checked out that day, and were they all billed for in

3    a timely manner within a couple of days.

4    Q   And you mentioned Ms. Phillips being involved in billing.

5    What was her duties and responsibilities in connection with

6    this review, if you will, or assessment of the billing

7    practice?

8    A   Well, I felt like it was important, as that practice was

9    growing, to get someone who was properly trained and had been

10   attending seminars on a regular basis and understood everything

11   there was to know about billing for services properly.  So she

12   went in there and evaluated the billing team and made changes,

13   found errors, and created some efficiencies and basically

14   followed through on the processes I was trying to put in place.

15   Q   Who was the management team when Ms. Phillips began to work

16   on or improve the billing procedures that you're speaking of?

17   A   It was Ken Cross, Ms. Phillips, and Ms. Baggett.

18   Q   And after Mr. Cross' discharge, who was in the management

19   team?

20   A   Hunter Swanzey replaced Ken Cross.

21   Q   Now, were you part of the management team?

22   A   Essentially I was kind of like the leader, trying to get

23   them going in the right direction.  And basically I would give

24   them a task and say:  It's up to you to get it in place.

25            For example, I needed an accountability of how many

BOE STRANGE - DIRECT BY MR. KNIZLEY

1   patients were seen on a weekly basis, how many were billed for

2   within three days of that week ending, were all the cash

3   receipts posted into the accounting system for Greenway, which

4   is what tracked the patients' activity, and did it balance back

5   to what was deposited into the bank, what the differences, if

6   any, and why.  I would give them those kind of processes and

7   say:  It's up to y'all to implement them.

8   Q   And how often would you meet with the management team in

9   order to assess the progress, if any, that the management team

10  had made in regards to the instructions you were giving?

11  A   We would meet weekly, once a week at 8 a.m., for about two

12  hours.

13  Q   And where would you meet?

14  A   At the office on Springhill Avenue.

15  Q   And who attended those weekly meetings?

16  A   It was Ken Cross, before the termination, with Debi

17  Phillips and Melissa Baggett and whichever nurse, RN, was kind

18  of running the floor operations.  We had a couple over that

19  year and a half period.  And then post Ken, it was Hunter

20  Swanzey, Debi Phillips, Melissa Baggett, and the nurse.

21  Q   Did Dr. Ruan or Dr. Couch participate in the weekly

22  meetings?

23  A   No, sir.

24  Q   So the responsibility for the business aspect of the

25  practice had been delegated to your management team?

5431

1    A    Yes, sir.

2    Q    And did that practice of a management team without the

3    weekly involvement of the physicians continue on until what you

4    characterized as a raid?

5    A    Yes, sir.

6    Q    And what things, if any, did this management team continue

7    to do after Mr. Swanzey came on to improve the practice of

8    PPSA?

9            MS. GRIFFIN:  Your Honor, it's been gone over and

10   over.  And we would contend that it's repetitive at this point.

11           THE COURT:  Overruled.

12   BY MR. KNIZLEY:

13   Q    Go ahead.

14   A    For example, patients were complaining about wait times.

15           MS. GRIFFIN:  Objection, Your Honor, to foundation

16   about the patients.

17           THE COURT:  Overruled.

18   A    So we created and we had to physically change up the front

19   when people walked in, when they checked in.  They changed up

20   the orientation of the front to where there was an entry and an

21   exit and it was real clear for the patients to understand you

22   came in here, you couldn't go -- you had to exit this direction

23   and check out before you did.  Hunter made all that happen.  He

24   contracted with an IT -- a local IT company to give us a backup

25   to the internet access that was constantly going down with no

1  secondary recovery.  And, of course, when your internet's down,
2  you're out of business.  So that was a very key function that
3  he provided in his interim time there.
4  Q   You mentioned Greenway.  Could you tell the ladies and
5  gentlemen of the jury what Greenway is?
6  A   It's the billing software from a third party that all the
7  charges were entered into on a daily basis.
8  Q   Was the Greenway system in effect when you became involved
9  in the management aspect of PPSA?
10 A   Yes, sir.
11 Q   And how did you understand the billing aspect, the Greenway
12 billing, third-party billing, operated?
13 A   Well, my understanding was a chart was turned in to the
14 billing department with services provided, and they billed
15 based on the service provided.
16 Q   Were you familiar with C&R Pharmacy?
17 A   Yes, sir.
18 Q   And could you tell the ladies and gentlemen of the jury
19 when you came on what you understood C&R Pharmacy was in
20 relationship to PPSA?
21 A   Well, it was a pharmacy-owned site that was there to
22 essentially provide the patients with easy access to their
23 prescriptions.
24 Q   And did you provide any accounting services for C&R
25 Pharmacy?

1   A   Yes, sir.  I filed and prepared a tax return annually.

2   Q   And how long had you been doing that?

3   A   From inception.

4   Q   And do you have a rough idea when inception of PPSA --

5   excuse me -- when inception of C&R Pharmacy may have been?

6   A   2011 or 2012.  That, I think, was the time that it started.

7   Q   Initially was the pharmacy one that was a profitable one?

8   A   You know, I can't recall off the top of my head exactly

9   whether it made or lost money in years one or two.  I'd have to

10  see tax returns.

11  Q   Do you recall there ever being a discussion at PPSA about

12  the closure of the pharmacy?

13  A   Closing the pharmacy, PPSA?

14  Q   Or whether that was ever pursued?

15  A   I mean, there was concerns early on about the profitability

16  of the company, whether it was going to be a success or not,

17  and we determined it was management related, because they were

18  trying to manage it internally on their own with PPSA employees

19  and it wasn't working.

20  Q   So C&R Pharmacy, at least at some juncture, was being

21  operated by PPSA employees; is that your understanding?

22  A   Correct.

23  Q   And did that change at any time?

24  A   Yes, sir.

25  Q   And could you tell the ladies and gentlemen of the jury how

BOE STRANGE - DIRECT BY MR. KNIZLEY

1  that changed?

2  A   McConaghy Pharmacy was hired to manage the pharmacy for

3  PPSA.  They provided the employees, they managed the inventory,

4  they purchased, they handled every aspect of it.

5  Q   And was this an independent entity that came in and shared

6  in the proceeds of the pharmacy as a compensation for their

7  services they rendered?

8  A   There was actually a contract between C&R Pharmacy and

9  McConaghy Pharmacy to perform these services.  And I don't

10  remember what the details of the contract were, but it stated

11  what their service was to be and they were paid based on 25

12  percent of the profit of the company on a quarterly basis.

13  Q   And who was the principal of the McConaghy Pharmacy, if you

14  know?

15  A   I don't recall his name.

16  Q   Dan McConaghy?

17  A   That sounds correct.

18  Q   And do you know if there was a pharmacist also involved?

19  A   It was.  I don't recall her name either.

20  Q   To your knowledge did Dr. Ruan or Dr. Couch have any direct

21  management responsibilities when the McConaghys were there over

22  C&R Pharmacy?

23  A   No, sir.

24  Q   Who ran the pharmacy?

25  A   McConaghy, the representatives from McConaghy Pharmacy.

1    Q   Was there ever a time where you implemented any policies or

2    procedures regarding urinalysis for employees?

3    A   Yes, sir.  That was one of the tasks I put towards the

4    management team, was to create -- put a drugfree workplace

5    policy that tested employees periodically and also created a

6    nonsmoking facility at the same time.

7    Q   And can you recall when in the juncture -- you told us that

8    you were there approximately a year or year and a half before

9    the raid -- when you became actively involved in the management

10   did you implement the urinalysis policy for the employees?

11   A   I don't recall at what point in that time frame.

12   Q   And what was the policy, if you recall?

13   A   I don't recall the policy.  I just recall the basics that

14   there was going to be random drug testing that was supposed to

15   take place for every employee that worked for PPSA.

16   Q   And, of course, there would have been discipline associated

17   with failures of the urinalysis?

18           MS. GRIFFIN:  Objection as to foundation, Your Honor.

19           THE COURT:  Sustained.

20   BY MR. KNIZLEY:

21   Q   Do you know whether or not there would have been discipline

22   associated -- what was the purpose of having employees taking

23   urinalysis tests?

24   A   Well, working in that environment, I thought it was in the

25   best interest of the company to make sure that everybody knew

1   that they were going to be drug tested; obviously anybody that

2   did have issues, get them cleaned up and, you know, don't be

3   taking drugs while you're working, period.

4   Q   That's common sense.  And was it your goal and the

5   management team's goal to follow the rules and regulations and

6   laws applicable to the operation of this clinic?

7           MS. GRIFFIN:  Your Honor, objection to the laws.

8           THE COURT:  Sustained.

9   BY MR. KNIZLEY:

10  Q   Was it your goal and the management company's goal to

11  follow all rules/regulations that may have been applicable to

12  this business?

13  A   Yes, sir.

14          MR. KNIZLEY:  That's all the questions I have, Your

15  Honor.

16                      DIRECT EXAMINATION

17  BY MR. DOSS:

18  Q   Good morning, Mr. Strange.

19  A   Good morning.

20  Q   Just a few followup questions from Mr. Knizley.

21          THE COURT:  And, Mr. Doss, are you taking him on

22  direct?

23          MR. DOSS:  Yes, ma'am.

24          THE COURT:  All right.

25  BY MR. DOSS:

1  Q   You mentioned, if I recall, you prepared tax returns for

2  PPSA; is that right?

3  A   Correct.

4  Q   And did you also prepare the tax returns for C&R Pharmacy?

5  A   Yes, sir.

6  Q   Was C&R Pharmacy a separate business from PPSA?

7  A   Yes, sir.

8          MR. DOSS:  Your Honor, may I approach?

9          THE COURT:  Yes.

10 BY MR. DOSS:

11 Q   Mr. Strange, I've shown you what we've marked for

12 identification purposes as Couch Exhibit 287.

13         MR. DOSS:  And is it okay if I show it on the ELMO?

14         THE COURT:  Any objection?

15         MS. GRIFFIN:  Your Honor, it appears to be something

16 that Mr. Strange prepared.  But it is not a signed copy --

17 anywhere -- and we would object to it.

18         MR. DOSS:  Your Honor, this is --

19         MS. GRIFFIN:  May we approach?

20         MR. DOSS:  We can.

21    (At the side bar, jury not present.)

22         THE COURT:  Tell me what it is.

23         MR. DOSS:  It is the 2013 tax return for C&R Pharmacy.

24 That's Couch 287, my understanding, Judge.  Is that correct the

25 signed version gets sent off to the IRS.  This is the copy

1    maintained in the file CPA and client.

2            THE COURT:  He can identify it?

3            MR. DOSS:  Yes, ma'am.

4            MS. GRIFFIN:  Your Honor, there's nothing to show that

5    it was created at the time it purports to be created.

6            MR. DOSS:  I think we can ask him that question, Your

7    Honor.

8            MS. GRIFFIN:  And I don't believe it was produced to

9    us as reciprocal discovery.

10           MR. DOSS:  This is a clean copy.  But there were

11   documents seized during the search, which is this document.

12           MS. GRIFFIN:  Do you have the C&R Pharmacy --

13           MR. DOSS:  It's not from C&R Pharmacy.  But it was

14   pursuant to search.

15           MS. GRIFFIN:  Excuse me.  Do you have the Bates stamps

16   numbers?

17           MR. DOSS:  I don't have it with me.  But we confirmed

18   it was a document that was seized.

19           MS. GRIFFIN:  That was seized?

20           THE COURT:  We can mark it in.  You can show it to the

21   jury.

22           MR. DOSS:  Thank you, Judge.

23       (Defendant Couch's Exhibit 287 was entered into evidence.)

24       (In open court, defendants and jury present.)

25           MR. DOSS:  May we use the ELMO, please?

BOE STRANGE - DIRECT BY MR. DOSS                              5439

```
 1            THE CLERK:  Yes, sir.
 2            THE COURT:  It's not showing up.
 3            THE CLERK:  I don't know why.
 4            MR. DOSS:  Your Honor, I believe we have an electronic
 5   copy, if we could switch over to the laptop.
 6   Q    All right.  Mr. Strange, do you recognize this document?
 7   A    Yes, sir.
 8            THE COURT:  Hold on just a minute.
 9            A JUROR:  Our screens are not working.
10            THE COURT:  Some of the jurors' screens are not
11   working.  The gremlins got in here over the weekend apparently.
12            THE CLERK:  When we unplugged the others, maybe they
13   went off.
14            THE COURT:  When we unplugged the other two, maybe
15   they were all hooked together.  Is it coming on?
16            It came up?
17            THE CLERK:  It came up.
18            THE COURT:  Jack-of-all-trades.
19            THE CLERK:  You just keep pushing buttons.
20            THE COURT:  Okay.  I think we're good.
21   BY MR. DOSS:
22   Q    Mr. Strange, do you recognize this document?
23   A    Yes, sir.
24   Q    What is this document?
25   A    It's a partnership income tax return.
```

BOE STRANGE - DIRECT BY MR. DOSS

5440

1  Q   And is this the tax turn that you prepared for C&R

2  Pharmacy, LLC?

3  A   Yes, sir.

4  Q   And for what tax year is this tax return for?

5  A   2013.

6  Q   If we could look at page four?  All right.  If we look, if

7  we look at the income section of this tax return, do you see

8  where it says gross receipts or sales?

9  A   Yes, sir.

10 Q   And in the context of this tax return for C&R Pharmacy,

11 LLC, what's included in the gross receipts or sales?

12 A   The invoicing for all prescriptions or any medications sold

13 out of the pharmacy for that given year.

14 Q   Would it have included the reimbursements from insurance

15 companies?

16 A   It should have been from all receipts.

17 Q   And if you will look at line two -- we'll zoom in -- do you

18 see where that's cost of goods sold?

19 A   Yes, sir.

20 Q   And what is cost of goods sold?

21 A   That's the cost of any of the medication that was sold,

22 that's included in the gross receipts.

23 Q   Would that have been how much C&R Pharmacy, LLC, paid for

24 the medications that were sold during 2013?

25 A   It was an accrual basis tax return.  So to say they paid

5441

1    for it all in that year or collected all 10 million is really

2    not a true statement.  It's what was invoiced in that year and

3    what was entered into accounts payable.  Either they paid it or

4    they still owed it at the end of the year, it's included in the

5    cost of goods.

6    Q   You said it was an accrual basis.  Is that checked at the

7    top on this tax return, accrual versus --

8    A   Yes, sir, yes, sir.  It's right underneath the name.

9    There's a box that says accrual.  That has an X in it.

10   Q   And if you subtract the cost of goods sold from the gross

11   receipts or sales, does that give us line eight on this tax

12   return?

13   A   Yes, sir.

14   Q   And when it says total income, for tax purposes what does

15   that mean?

16   A   That's just a combination of lines three through seven.

17   That's gross profit.

18   Q   Okay.

19   A   Plus four, five, and six, and seven.

20   Q   And then the next set we've got deductions.  Do you see

21   that?

22   A   Yes, sir.

23   Q   And we have repairs and maintenance; right?

24   A   Correct.

25   Q   Do you see where there's rent?

5442

BOE STRANGE - DIRECT BY MR. DOSS

1    A    Yes, sir.

2    Q    Taxes and licenses, do you see that line item?

3    A    Yes, sir.

4    Q    Do you see depreciation?

5    A    Yes, sir.

6    Q    And do you see other deductions?

7    A    Yes, sir.

8    Q    And the total deductions, line 21 on the tax return, is

9    that adding lines nine through 20?

10   A    Correct.

11   Q    If we could look at page 20, are these the other deductions

12   included on line 20 of the front page of the tax return?

13   A    Yes, sir.

14   Q    And do you see where it says payroll leasing?  What's

15   included in that line item?

16   A    That's a reimbursement to McConaghy Pharmacy for the

17   payroll.

18   Q    Let's look back at page four, please.  So once the total

19   deductions are calculated, what do you do with that number

20   after that?

21   A    The ordinary business income, line 22?

22   Q    Yes, sir.

23   A    That gets reported on form K1.

24   Q    What's a K1?

25   A    The 1061 is a pass-through entity, so there's no tax at the

1   partnership level.  So whatever the income or loss from the

2   business is, it's passed straight through to the individual

3   partners, based on their ownership percentage.

4   Q   And what were the ownership percentages for C&R Pharmacy,

5   LLC?

6   A   50 percent John P. Couch and 50 percent Xiulu Ruan.

7   Q   And once the ordinary business or loss is calculated for

8   C&R Pharmacy and 50 percent is assigned to Dr. Couch and 50

9   percent assigned to Dr. Ruan, what happens to that number?

10  Where does it go?

11  A   It passes through into their personal tax return on

12  schedule E.

13  Q   So then Dr. Couch and Dr. Ruan would pay personal income

14  tax on that amount; is that correct?

15  A   Correct.

16  Q   So $784,133, that's not necessarily money going into either

17  one of their pockets; fair?

18  A   Correct.

19  Q   Now, I notice, Mr. Strange, on this page the signature line

20  is blank.  As far as you know, was this tax return submitted to

21  the Internal Revenue Service?

22  A   Yes, sir, it was electronically filed.

23  Q   And if it's electronically filed, would it have a signature

24  on it?

25  A   No, sir.

5444

```
 1   Q   If you look back on the first page of this exhibit,

 2   Mr. Strange, do you see a date at the top?

 3   A   Yes, sir.

 4   Q   Was this tax return prepared at or near February 26, 2014?

 5   A   Yes, sir.

 6           MR. DOSS:  May I approach, Your Honor?

 7           THE COURT:  Yes.

 8   BY MR. DOSS:

 9   Q   I show you, Mr. Strange, what we've marked as Couch Exhibit

10   Number 288.  Do you recognize that document, Mr. Strange?

11   A   Yes, sir.

12   Q   And what is that document?

13   A   It's a U.S. Return of Partnership Income for C&R Pharmacy,

14   LLC.

15   Q   And for what tax year?

16   A   2014.

17           MR. DOSS:  Your Honor, we offer Couch Exhibit 288.

18           MS. GRIFFIN:  No objection, Your Honor.

19           THE COURT:  All right.  Mark it in.

20       (Defendant Couch's Exhibit 288 was entered into evidence.)

21   BY MR. DOSS:

22   Q   Now, if we'll look at page four, we'll go briefly through

23   these.  Do you see income of 20,269,310?

24   A   Yes, sir.

25   Q   And is that number calculated the same way as the 2013
```

BOE STRANGE - DIRECT BY MR. DOSS

1    gross receipts for sales was calculated?

2    A    Yes, sir.

3    Q    And what's the cost of goods sold for 2014?

4    A    18,177,584.

5    Q    Leaving a total income of how much?

6    A    2,091,726.

7    Q    Now, if we look at the bottom half of the tax return, the

8    deductions section, what are the total deductions for 2014?

9    A    442,000.

10   Q    Giving us an ordinary business income of how much?

11   A    1,649,726.

12   Q    Now, we also have a line 20, other deductions, $384,810;

13   correct?

14   A    Correct.

15   Q    Let's look at page 17, please.

16         Is this a breakdown of that line item on the first

17   page of the 2014 tax return?

18   A    Yes, sir.

19   Q    And do you see again payroll leasing?

20   A    Yes, sir.

21   Q    What does that number reflect?

22   A    That was the payroll for the pharmacy employees paid to

23   McConaghy Pharmacy.

24   Q    And let's look back again at page four, please.  When we

25   have the ordinary business income of $1,649,726, does that

1  amount work the same way as the amount we discussed in 2013,

2  where it's passed through to the individual partners of C&R

3  Pharmacy, LLC?

4  A   Yes, sir.

5  Q   And when you say passed through, could you explain what

6  that means, please?

7  A   Since there's no tax at the partnership level, the partners

8  of this entity pick up the taxable portion associated with this

9  profit in their personal return and pay tax on it individually.

10  Q   Is that sometimes referred to as an S-corporation?

11  A   Well, S-corporations are also pass-through entities.  But

12  this is actually a 1065.  So it's a partnership.  But they're

13  both treated the same for pass-through purposes.

14          MR. DOSS:  May I approach, Your Honor?

15          THE COURT:  Yes.

16  BY MR. DOSS:

17  Q   Mr. Strange, I show you what we've marked as Exhibit 289

18  for identification purposes, and tell me if you recognize that

19  document, please.

20  A   Yes, sir.

21  Q   What is this document?

22  A   It's a U.S. Return of Partnership Income for C&R Pharmacy,

23  LLC, for tax year 2015.

24          MR. DOSS:  Your Honor, we offer Couch 289.

25          MS. GRIFFIN:  We do object to this one, Your

5447

```
 1    Honor.  May we approach?

 2              THE COURT:  Yes, ma'am.

 3        (At the side bar, jury not present.)

 4              MS. GRIFFIN:  This appears to be what he prepared for

 5    2015.  That was only, of course, a part of the year, and we

 6    would object to it.  It was not seized during the search.  It

 7    was not provided as reciprocal discovery.

 8              MR. DOSS:  Your Honor, it does only go through May of

 9    2015 because the business closed during that point in time.

10    But they still have to prepare a tax return for the year

11    end.  We subpoenaed this document from Mr. Strange, didn't

12    realize it wasn't in the seizure of the government exhibits.

13    But we think it is relevant to show the amount of money that

14    C&R Pharmacy, LLC, had the remaining five years of the

15    conspiracy charged in the indictment.

16              MS. GRIFFIN:  It couldn't have been seized in the

17    raid.  The raid was May 20th of '15.  This was prepared March

18    of '16.  So it --

19              THE COURT:  I sustain the objection.

20        (In open court, defendants and jury present.)

21    BY MR. DOSS:

22    Q   Mr. Strange, did you prepare a tax return for 2015?

23    A   Yes, sir.

24    Q   And did it follow the same format as the tax returns for

25    2013 and 2014?
```

1    A   Yes, sir.

2    Q   And was that tax return for C&R Pharmacy, LLC, then

3    provided to the Internal Revenue Service?

4    A   For all three of these, I'm under the impression they were

5    all electronically filed and accepted.

6    Q   Now, when you were preparing these tax returns,

7    Mr. Strange, for C&R Pharmacy, LLC, did Melissa Baggett assist

8    with gathering data to prepare them?

9           MS. GRIFFIN:  Your Honor, object to the relevance.

10          MR. DOSS:  It's foundational for a followup question,

11   Your Honor.

12          MS. GRIFFIN:  It doesn't make it relevant.

13          THE COURT:  Yes, sustained.

14   BY MR. DOSS:

15   Q   To prepare these tax returns for C&R Pharmacy, Mr. Strange,

16   were you relying on the receipt of financial information from

17   McConaghy Drugs to prepare them?

18   A   No, sir.

19   Q   Who were you relying on to prepare these tax returns?

20   A   The accounting data provided by Melissa Baggett in the form

21   of QuickBooks.

22   Q   Do you know if Melissa Baggett was receiving financial data

23   from McConaghy Drugs that was then being passed on to you?

24          MS. GRIFFIN:  Object as to foundation.

25          THE COURT:  Sustained.

BOE STRANGE - DIRECT BY MR. DOSS

```
 1   BY MR. DOSS:
 2   Q   When you say you relied on the QuickBooks data, did PPSA or
 3   C&R Pharmacy, LLC, maintain QuickBooks data for the financial
 4   information of the operations?
 5   A   They did.
 6   Q   And did Melissa Baggett prepare or maintain the QuickBooks
 7   data for them?
 8           MS. GRIFFIN:  Objection as to foundation, Your Honor.
 9           THE COURT:  Sustained.
10   BY MR. DOSS:
11   Q   Do you know if Melissa Baggett maintained the QuickBooks
12   data for the financial information associated with C&R
13   Pharmacy, LLC?
14   A   She did.
15   Q   And do you know if she was receiving that information to
16   add to QuickBooks from McConaghy Drugs?
17           MS. GRIFFIN:  Your Honor, again, this is further
18   attenuated and we would object as to foundation and to
19   relevance.
20           THE COURT:  Sustained.
21           MR. DOSS:  One moment, Your Honor.
22           THE COURT:  All right.
23       (A discussion was held off the record between defense
24   counsel.)
25           MR. DOSS:  No further questions, Your Honor.
```

5450

```
 1              THE COURT:  All right.  Any cross?

 2              MS. GRIFFIN:  Yes, Your Honor.

 3                        CROSS EXAMINATION

 4   BY MS. GRIFFIN:

 5   Q   Good morning, Mr. Strange.

 6   A   Good morning.

 7   Q   How are you today?

 8   A   Pretty good.

 9   Q   I first want to ask you, you answered that you don't know

10   if these returns were filed; is that correct?  You said you

11   assumed they were; is that right?

12   A   Well, I can't tell you right off the top of my head did I

13   go look yesterday and verify that these returns were

14   electronically filed and accepted.  To the best of my

15   knowledge, they were.  There's no reason that they wouldn't

16   have been.  But I can't validate it at this moment.

17   Q   So you really don't know, you're just assuming they were;

18   is that right?

19   A   No, I electronically filed it.  I'm quite sure they were

20   accepted.  But to tell you that I know that at this exact

21   moment, I didn't go back and verify it.  I mean, just --

22   (indicating).

23   Q   Now, you're talking about C&R Pharmacy, that McConaghy

24   Pharmacy received 25 percent of the profits each quarter; is

25   that correct?
```

5451

1    A    Correct.

2    Q    So that meant Drs. Couch and Ruan split the remaining 75

3    percent of the profits each quarter; is that correct?

4    A    Correct.

5    Q    And in connection with preparing the returns, you were

6    shown Couch Exhibit 287, which was the return you prepared for

7    2013.  You, of course, recall that, don't you?

8    A    Yes, ma'am.

9    Q    And on that return the gross sales or receipts was a little

10   over $10 million; is that right?

11   A    Correct.

12   Q    Then for 2014 the gross receipts were a little over 20

13   million; is that correct?

14   A    Yes, ma'am.

15   Q    So between 2013 and 2014 the gross receipts virtually

16   doubled, didn't they?

17   A    Yes, ma'am.

18   Q    And were you aware at the time in late 2013 and early 2014

19   C&R Pharmacy was filling a substantial number of Subsys and

20   Abstral prescriptions for the doctors?

21   A    I don't recall the details of what they were selling.

22   Q    Well, whatever it was, it doubled the gross receipts;

23   right?

24   A    I'm just -- you're asking me to speculate on that.  I don't

25   know what caused them to double their receipts.

5452

1  Q   Now, in fact, you knew a little bit about Subsys, didn't
2  you sir?
3  A   I mean, I can say I've heard it being brought up.  I mean,
4  doing inventory, that drug was brought up.
5  Q   I want to direct your attention to Government's Exhibit
6  44-1.
7          MS. GRIFFIN:  And, Your Honor, it has not been
8  admitted, so I'll need to show it just to him first.
9          THE COURT:  All right.
10  BY MS. GRIFFIN:
11  Q   I show you Government's Exhibit 44-1 and first ask if this
12  was your email address in February of 2014?
13  A   Yes, ma'am.
14  Q   And if this is an email that you received on February
15  2nd -- excuse me -- an email you sent February 2nd, 2014, to
16  Xiulu Ruan?
17  A   Yes, ma'am.
18          MS. GRIFFIN:  Move to admit Government's Exhibit 44-1,
19  Your Honor.
20          MR. KNIZLEY:  No objection.
21          THE COURT:  All right.  Mark it in.
22      (Government's Exhibit 44-1 was entered into evidence.)
23  BY MS. GRIFFIN:
24  Q   We'll start at the bottom of this email, 44-1, and ask if
25  Dr. Ruan is writing to Dan that the Insys owner will fly here

5453

```
 1   during the week of February 10 to 14, and setting the
 2   days.  Will you and Bryan be available?  Please let me know.
 3   Have to get it arranged.
 4           You see that, don't you?
 5   A   Yes, ma'am.
 6   Q   Then you see your response to Dr. Ruan, Boe Strange wrote:
 7   Would you like me to attend?
 8   A   Yes, ma'am.
 9   Q   And Dr. Ruan replies:  Yes.
10           And then you indicate:  Okay, that you will attend; is
11   that right?
12   A   Yes, ma'am.
13   Q   And you did attend that meeting, didn't you, with the
14   executives from Insys?
15   A   I don't recall attending that meeting.
16   Q   You do not recall meeting the Insys owner when he met with
17   Dr. Ruan and Dr. Couch in Mobile, Alabama?
18   A   I don't recall meeting them at Ruth's Chris.
19   Q   You're not denying it, you're just saying you don't recall
20   it; is that right?
21   A   Right; I don't recall it.
22   Q   Do you recall discussions with Dr. Ruan about wanting to be
23   a distributor for Insys Pharmaceuticals, the manufacturer of
24   Subsys?
25   A   No, ma'am, not off the top of my head.
```

5454

```
 1   Q   Do you recall there being an agreement with Subsys about
 2   distributing?
 3           MR. KNIZLEY:  Your Honor, we object to being outside
 4   the scope of direct examination.
 5           MS. GRIFFIN:  Your Honor, he's testified about the tax
 6   returns for the income for the pharmacy and this directly
 7   relates to the income for the pharmacy.
 8           THE COURT:  Overrule the objection.
 9   BY MS. GRIFFIN:
10   Q   I'll show you --
11           MS. GRIFFIN:  Your Honor, I don't believe I published
12   44-1.
13           THE CLERK:  (Indicating.)
14           MS. GRIFFIN:  I did?
15           THE COURT:  You did.
16           MS. GRIFFIN:  I show him 44-2, and it has not been
17   admitted.
18           THE COURT:  All right.
19   BY MS. GRIFFIN:
20   Q   Mr. Strange, do you see an email from you to Xiulu Ruan?
21   A   Yes, ma'am.
22   Q   And is that dated February the 26th of '14?
23   A   Yes, ma'am.
24           MS. GRIFFIN:  I move to admit Government's Exhibit
25   44-2 and publish it to the jury, Your Honor.
```

```
 1              THE COURT:  All right.  Mark it in.
 2         (Government's Exhibit 44-2 was entered into evidence.)
 3    BY MS. GRIFFIN:
 4    Q   Let's start at the bottom.  Dr. Ruan is sending you an
 5    email; is that correct?
 6    A   Can you scroll back up?
 7    Q   Yes, sir.
 8    A   I see I replied.  Was he sending it straight to me?  I
 9    can't really tell if that's the case.  Or was I cc'ed in?
10    Q   Do you see where you say:  I will read ASAP?
11    A   Yes, ma'am.
12    Q   That's you, isn't it?
13    A   Correct.  That's where I replied.
14    Q   You're replying to what he wrote you?
15    A   It just doesn't look normal.  It looks like -- usually it
16    will say to Boe right above Xiulu Ruan.  But go ahead.
17    Q   These were seized --
18    A   Okay.
19    Q   -- in connection with Dr. Ruan's search warrant of his
20    email address.
21              MR. KNIZLEY:  Your Honor, we object --
22              MS. GRIFFIN:  Go ahead.
23              MR. KNIZLEY:  -- to the statement.  She can ask the
24    question, does he know about it.
25              MS. GRIFFIN:  Does he know?  Your Honor, he said he
```

1    did not recognize it.

2           THE COURT:  Well, it's in evidence.  So go ahead and

3    read it.

4    BY MS. GRIFFIN:

5    Q    Does it say:  Hi, Pat, I had a brief discussion with Dan

6    and Bryant.  I went through the agreement from Insys very

7    carefully and felt everything is okay except some small

8    area.  Both of them agree with the terms.  I believe we need to

9    move on with signing them.  But I told them we need to make

10   sure Insys understands they will need to treat us like a

11   distribution center so that other area Rxs can be filled

12   here.  We don't want to be in a position that we can only fill

13   the Rxs we write.  We want the whole territory.

14          You do see that, don't you?

15   A    Yes, ma'am.

16   Q    And that's what it says, doesn't it?

17   A    Correct.

18   Q    And then the next paragraph, does it say:  I asked Dan to

19   email the modified contract to Boe to take a look?

20          I'm assuming that Boe is you; is that correct?

21   A    Yes, ma'am.

22   Q    You don't know any other Boe that worked with them, do you?

23   A    I don't.

24   Q    Does it further state:  We need to realize that we need to

25   make our decision quick, as we have had this thing in our hand

1    for over a week.  Another thing Dan mentioned is that we

2    probably are able to use current C&R Pharmacy plus some

3    modifications.   However, for us to refill Rxs from out of

4    state, there has to be some number or permit C&R needs to

5    apply.  Bryant mentioned when our pharmacy space is limiting

6    Subsys shipment, we can store them at McConaghy's Pharmacy

7    temporarily, then shipping them to C&R if we have space

8    limitation as of being -- do you see that?  And that's what it

9    states, doesn't it?

10   A   Yes, ma'am.

11   Q   Does it also state that they -- Dr. Ruan states:  They feel

12   with our current space and staff, we will be able to handle out

13   of state.  So once we have the confirmation from Insys about

14   out of state Rxs, we can move on signing the contract with

15   them.  Dan will forward the copy of the contract to you.

16           That's what it states, doesn't it?

17   A   Yes, ma'am.

18   Q   And you're assuming he's talking about Dan McConaghy?

19   A   Yes, ma'am.

20   Q   And do you know who he's talking about with Bryant?  Is

21   that correct Bryan Crawford or do you know?

22   A   I don't recognize a Bryant.  I don't know who that is.

23   Q   And you responded --

24   A   There's a Bryan, I think.  You said Bryant?

25   Q   Doesn't this say Bryant in the email?

1    A    Okay.  I don't know a Bryant.  No, ma'am.

2    Q    And you responded:  I will read ASAP and as soon as

3    possible, is that what that stands for?

4    A    Yes, ma'am.

5    Q    So you were aware of the pharmacy attempting to be a

6    distributor for Subsys through the pharmaceutical company

7    Insys; is that correct?

8    A    That's what it looks like.

9    Q    Now, you also stated, Mr. Strange, that you prepared tax

10   returns for Ruan and Couch individually as well as for PPSA and

11   as well as for C&R Pharmacy; is that correct?

12   A    No, ma'am.

13   Q    Which did you provide tax returns for?

14   A    I prepared tax returns for C&R Pharmacy, PPSA, and Pat

15   Couch individually.

16   Q    Did not for Dr. Ruan, is that what you're telling us?

17   A    No, ma'am.

18   Q    Did you prepare tax returns for Physicians Compounding

19   Solutions, Dr. Couch's business?

20   A    Yes, ma'am.

21   Q    Did you prepare tax returns for JPC Properties, Dr. Couch's

22   business?

23   A    Yes, ma'am.

24   Q    Did you prepare tax returns for the two C&R Pharmacy, LLCs,

25   and then just C&R, LLC?

BOE STRANGE - CROSS BY MS. GRIFFIN

1   A   Yes, ma'am.

2   Q   Did you prepare any tax returns for XLR Exotic Autos for

3   Dr. Ruan?

4   A   I had some involvement in it.  I can't tell you off the top

5   of my head if I prepared those returns or not.

6   Q   And by involvement in it, you had something to do with the

7   financials of XLR Exotic Autos; is that correct?

8   A   I don't know whether it was an application for a Business

9   Privilege Tax Return or what the detail of it was off the top

10  of my head.

11  Q   You don't recall if you did the returns for that company,

12  though, or not, do you?

13  A   No, ma'am.

14  Q   You know that XLR Exotic Autos was Dr. Ruan's company;

15  right?

16  A   Yes, ma'am.

17  Q   Did you prepare returns or have any responsibility as to

18  Ruan Companies -- excuse me -- Ruan Companies, LLC?

19  A   No, ma'am.

20  Q   Did you know that was Dr. Ruan's company?

21  A   Yes, ma'am.

22  Q   Did you have any responsibility, sir, with XLR Properties,

23  LLC?

24  A   No, ma'am.

25  Q   Did you have any responsibilities with RXL, LLC?

5460

 1  A   I may have done a return for that entity.  I can't recall

 2  off the top of my head.

 3  Q   You knew that was connected to Dr. Ruan; is that correct?

 4  A   Yes, ma'am.

 5  Q   Did you have any responsibility with Physicians Weight Loss

 6  and Wellness with Dr. Ruan?

 7  A   I recall that entity being a viable entity at one time, and

 8  I don't recall if I prepared that return.

 9  Q   But you were aware that it was Dr. Ruan's business; is that

10  correct?

11  A   Yes, ma'am.

12  Q   Did you have any participation in preparing returns or any

13  financial matters for Ruan Construction account?

14  A   No, ma'am.

15  Q   You knew that was Dr. Ruan, however; right?

16  A   I've never heard of that entity account.

17  Q   Did you have any responsibilities for preparing returns for

18  Southern Exotic Car Club, LLC, connected with Dr. Ruan?

19  A   No, ma'am.

20  Q   Did you have any responsibilities for preparing

21  International Institute of Pain and Rehab for Dr. Ruan?

22  A   No, ma'am.

23  Q   Did you have any responsibilities for preparing any returns

24  for J-A-X Leasing?  I'm assuming that's JAX Leasing.

25  A   I don't recall.

1  Q   Did you know that was connected with Dr. Ruan?

2  A   I don't know that's the case.  I don't know if it's Ruan or

3  Couch or someone else totally.  I can't recall.  I've heard the

4  name, but I don't know who owns it.

5  Q   Now, Mr. Strange, you also told us a little bit about a

6  change in the way or looking into the way the urine drug

7  screens were handled.  You were part of that as well; right?

8          MR. KNIZLEY:  Your Honor, I object with regard to that

9  urine drug screens were not the subject of the direct

10 examination.  It was the urine screening for employees.  So I

11 object to it being outside the scope.

12         MS. GRIFFIN:  We would ask then as to urinalysis,

13 since he testified about urinalysis.

14         THE COURT:  He said it was just pertaining solely to

15 the employees.

16         MS. GRIFFIN:  Oh, as to the employees?

17         THE COURT:  Yes; right.

18 BY MS. GRIFFIN:

19 Q   Now, Mr. Strange, you knew there were some problems, didn't

20 you, with some employees that were using drugs?

21 A   Yes, ma'am.

22 Q   You'd had some conversation with both Dr. Ruan and

23 Dr. Couch about that, hadn't you?

24 A   I don't recall any specific conversations with them.

25 Q   I'm not asking you what was said.  You did discuss it with

BOE STRANGE - CROSS BY MS. GRIFFIN

1  them, though, didn't you?

2  A    You know, I don't recall.  I remember the conversations we

3  had.  I -- I think it's fair to say I did discuss some post

4  awareness of some employees that had problems with Couch, I do.

5  Q    Had problems with Couch?

6  A    No.  Some employees that were terminated or went into

7  rehab.  I talked to Pat Couch about that employee after he had

8  gone, because they prepared a severance package for him.

9  Q    Now, you also had some emails with Dr. Couch about

10  monitoring Stacy Madison, didn't you?

11  A    I don't recall.  You'd have to pull them up.

12  Q    You knew that Stacy Madison had a problem with drugs; is

13  that correct?

14  A    No, ma'am.  I can't tell you I knew that beforehand.

15  Q    You knew that there was some problem with Bridgette Parker

16  with drugs; is that correct?

17  A    Yes, ma'am.

18  Q    You knew there were some problems with Jason Palmer with

19  drugs; is that correct?

20  A    Yes, ma'am.

21  Q    Now, you told us on direct that you didn't want them to

22  take drugs while they were at the clinic.  The truth of the

23  matter is you didn't want them to take drugs anytime, did you?

24  A    Correct.

25  Q    In connection with the drug screen, that occurred after

BOE STRANGE - CROSS BY MS. GRIFFIN

```
 1   Stacy Madison was gone, didn't it?
 2   A   I don't -- I don't recall the date that it took place.
 3   Q   It occurred after Justin Palmer had been found with a
 4   needle, injecting himself with Dilaudid, didn't it?
 5   A   I can't tell you the timing of the transaction.
 6   Q   And you weren't aware, were you, that Justin Palmer was
 7   able to use someone else's urine rather than his own for the
 8   test, so he tested negative, were you?
 9   A   No, ma'am.
10   Q   Were you aware that most of the employees knew exactly when
11   the test was going to be so that they could prepare if their
12   intention was to give someone else's urine?  Did you know that?
13   A   No, ma'am.
14   Q   Now, this is fair for any CPA, isn't it, Mr. Strange, that
15   you only do what you are provided; is that correct?  In other
16   words, you only use the information -- financial -- that you
17   are provided; is that correct?
18   A   Correct.
19   Q   And you don't represent to the IRS or to anyone else that
20   you know that is all the income, do you?
21   A   No, ma'am.
22   Q   You can only do what a client gives you to prepare returns;
23   is that correct?
24   A   Correct.
25   Q   So it's fair to say that you weren't given the information
```

```
1   about the monies that were being sent to Dr. Ruan and Dr. Couch
2   at home from IPM, were you?
3           MR. KNIZLEY:  Your Honor, it's outside the scope.
4   It's outside the scope of direct examination and he has
5   testified he had -- well, there was no testimony regarding his
6   involvement with the workmen's compensation dispensary at all.
7           MS. GRIFFIN:  Your Honor, he's testified he prepared
8   the tax returns for the company and for Dr. Couch individually
9   and perhaps for some of Dr. Ruan's businesses.
10          THE COURT:  Yes.  Overrule the objection.
11  A   What gets reported is whatever 1099s are turned in by the
12  client to me.  And if the 1099 represented income from those
13  sources, then they got put on the tax return.
14  BY MS. GRIFFIN:
15  Q   So you put what you received; is that right?
16  A   That's correct.
17  Q   And you didn't receive information that Dr. Ruan was
18  getting up to 50, sometimes $80,000 a month at his home from
19  one of the dispensary companies, did you?
20  A   I wouldn't have.  I don't prepare his individual returns,
21  so I'm not --
22  Q   You didn't get information that Dr. Couch was receiving
23  monies each month for IPM at his personal residence, either,
24  did you?
25  A   To my knowledge, he reported all that income in his tax
```

BOE STRANGE - CROSS BY MS. GRIFFIN

```
 1   return.
 2   Q   And you received information also --
 3   A   1099.
 4   Q   -- that you -- that both Couch and Ruan were being paid by
 5   Insys Pharmaceuticals and that those checks were being sent to
 6   their residences as well; is that correct?
 7   A   No, ma'am.
 8   Q   You did not?
 9   A   I didn't know.
10   Q   That wasn't included then in their taxes, was it, because
11   you didn't have it, was it?
12   A   It --
13            MR. KNIZLEY:  Your Honor, I'd object to the form of
14   the question, as the collective "their taxes."  His testimony
15   was he did not prepare Dr. Ruan's taxes.
16            THE COURT:  All right.  Sustained.
17   BY MS. GRIFFIN:
18   Q   Now, Mr. Strange, you did give some tax advice, though, to
19   Dr. Ruan, didn't you?
20   A   I'm sure we've talked about taxes in some capacity over the
21   course of the time I worked there.
22   Q   I'll show you what's been introduced as Government's
23   Exhibit 9-8(3) and ask if this is an email from Xiulu Ruan to
24   you.
25   A   Yes, ma'am.
```

1  Q   Do you recognize this as being addressed to your email

2  address?  Can you see it?

3  A   Yes, ma'am, it is.  It's to me.

4  Q   It is?  And it's June 9th of '14; is that right?

5  A   Correct.

6  Q   I'll start down at the bottom.  And where it's asking:  Hi,

7  Boe and Mike, do you know who Mike is?

8  A   No, ma'am.

9  Q   It says from Dr. Ruan:  I plan to donate some of my

10  speaking fee to the Department of PMR, Medical College of

11  Wisconsin, some of them, not all.  I wrote to the department

12  chairman, who emailed me back.  As far as I know, some of the

13  physicians do that.  Will I actually get a tax credit in the

14  end?  Say if I will do 50,000 for the rest of the year 2014, if

15  it all goes to the Medical College of Wisconsin directly from

16  the pharmaceutical company, will I get a credit?

17          That was addressed to you from Dr. Ruan; is that

18  correct?

19  A   Yes, ma'am.

20  Q   And you advised him that he would receive a donation

21  deduction for only the cash contribution, which would yield a

22  40-percent tax savings to him, that he would not get a tax

23  deduction for speaking, that he would have to be paid for

24  speaking and then write a check to the charity to take it as a

25  deduction; is that correct?

1   A   Yes, ma'am.

2   Q   And then he asked you:  Is there a difference for me to do

3   the traditional way or do this way?  Which is better for me?

4        Is that right?

5   A   Yes, ma'am.

6   Q   So it appears he was asking your advice on that; correct?

7   A   Correct.

8   Q   Now, in connection with the deduction, you have to claim

9   something is income before you can deduct it as a deduction;

10  right?  Generally speaking?

11  A   No, ma'am.  That's not a fair correlation.

12  Q   So he could just deduct everything that Insys and these

13  other companies were paying to the University of South Alabama,

14  to the University of Wisconsin -- excuse me -- the Medical

15  College of Wisconsin, and to LSU Foundation as though they were

16  made by him?

17  A   If you make -- if you write a check to a charitable

18  organization that's qualified to receive, you know, funds, then

19  you can deduct it.  That doesn't have anything to do with

20  income.

21  Q   You have to write the check before he could deduct it;

22  correct?

23  A   Correct.

24  Q   Are you familiar with the implementation of the Sunshine

25  Act, showing public records of what doctors are paid by

1   pharmaceutical companies?
2           MR. KNIZLEY:  Your Honor, I object.  It's beyond the
3   scope of direct.
4           MS. GRIFFIN:  Your Honor --
5           THE COURT:  Sustained.
6   BY MS. GRIFFIN:
7   Q   Now, did there come a time when Dr. Ruan sent you an email
8   about how much money PPSA was losing because they weren't
9   sending urine drug tests out?
10  A   I don't recall that conversation.
11          MR. KNIZLEY:  Your Honor, it's also beyond the scope
12  of any direct examination questions.  There's been no inquiry
13  in that area.
14          MS. GRIFFIN:  Your Honor, he --
15          THE COURT:  Overruled, overruled.
16  BY MS. GRIFFIN:
17  Q   I'll show you what's been introduced as Government's
18  Exhibit 9-5(7) and ask if this appears to be an email from
19  Xiulu Ruan which is to Dr. Couch but copied to you?
20  A   Yes, ma'am.
21  Q   And it's sent to two separate emails of yours; is that
22  correct?
23  A   Yes, ma'am.
24  Q   Does it discuss the urine drug testing, the email to you?
25  A   I've got to read it.

BOE STRANGE - CROSS BY MS. GRIFFIN

```
 1   Q   Take your time.
 2   A   Okay.  (Reading.)
 3          Okay.  I've read it.
 4   Q   Is it about the urine drug testing?
 5   A   Are you asking me to comment on these acronyms and what a
 6   false positive -- I don't have any expertise in this area
 7   whatsoever.
 8   Q   But the question is does this have something to do with
 9   urine --
10   A   It says urine test in it.  I agree with that.
11   Q   And do you realize that down at the bottom that the average
12   profit was $755 per specimen?
13          MR. KNIZLEY:  Your Honor, I will object.  He is not on
14   that aspect of the email chain.  That's something to someone
15   else, totally different.
16          MS. GRIFFIN:  Your Honor, it is a forwarded message
17   that continues to go to him and this is printed out from
18   Dr. Ruan's emails from Yahoo.
19          THE COURT:  Overrule the objection.
20   BY MS. GRIFFIN:
21   Q   Does it indicate that the average profit per specimen of
22   urine is $755?
23   A   That's what it says.
24   Q   Did there come a time when Dr. Ruan discussed with you his
25   fear that PPSA was going to be raided by the FBI?
```

BOE STRANGE - CROSS BY MS. GRIFFIN

```
 1   A   I don't recall that conversation off the top of my head.
 2   Q   I want to show you what's marked as Government's Exhibit
 3   9-9(2) and it's previously been admitted.  First of all, is
 4   this an email from Pat Couch to Dr. Ruan?
 5   A   Yes, ma'am.
 6   Q   And does Dr. Ruan state:  Pat, regarding the idea of --
 7   restructure PPSA, I have mixed feelings.  You must have that
 8   too.  I discussed with Boe if there are ways of restructuring
 9   PPSA so that neither Dr. Chen nor I can be involved, in case
10   your team gets investigated, or something bad happened down the
11   road.
12           That's what it says, isn't it?
13   A   Yes, ma'am.
14   Q   Says:  Just two weeks ago you mentioned to me we were
15   supposed to be raided by FBI, which got you concerned, but
16   thank God it did not happen.  I talked to Boe about this issue
17   afterwards.
18           Do you recall talking to Dr. Ruan --
19   A   I do.
20   Q   -- or Dr. Couch about that?
21   A   I do, yes, ma'am.
22   Q   In connection with that, did you provide some suggestions
23   to Dr. Ruan about what should change there at PPSA?
24   A   Yes, ma'am.
25           MS. GRIFFIN:  One moment, Your Honor.
```

```
 1              THE COURT:  All right.

 2              MS. GRIFFIN:  Madam Clerk, may I please have the next

 3   exhibit number?

 4              THE CLERK:  45.

 5              MS. GRIFFIN:  I'm sorry?

 6              THE CLERK:  45.

 7              THE WITNESS:  May I get a cup of water?

 8              THE CLERK:  Oh, sure.

 9         (A discussion was held off the record between government

10   counsel.)

11   BY MS. GRIFFIN:

12   Q   Tell us when you're ready.  Take your time.

13   A   Yes, ma'am.  I'm good.

14   Q   I show you what's marked as Government's Exhibit 45 and ask

15   if this is an email from you to PPSA, Ken Cross, Debi Phillips,

16   Melissa Baggett, Tammy Etheridge, Xiulu Ruan, and John Couch?

17   A   Yes, ma'am.

18   Q   Is it dated December the 22nd of 2013?

19   A   Yes, ma'am.

20              MS. GRIFFIN:  Move to admit this exhibit, Your Honor,

21   and publish it to the jury.

22              THE COURT:  Any objection?

23              MR. KNIZLEY:  No, ma'am.

24              THE COURT:  All right.  Mark it in.

25         (Government's Exhibit 45 was entered into evidence.)
```

1    BY MS. GRIFFIN:

2    Q    Mr. Strange, this is an email you sent to everyone listed

3    in the to line; is that correct?

4    A    Yes, ma'am.

5    Q    And I'll show you on paragraph two -- well, first of all,

6    does it say that this is about issues discussed in the meeting,

7    summarize the game plan going into 2014?

8    A    Yes, ma'am.

9    Q    And does it talk about copays and a discussion that you

10   were having about what to do with copays?

11   A    Yes, ma'am.

12   Q    Then in paragraph number two does it confirm that Dr. Couch

13   will start a new schedule Monday through Tuesday 10 to 3 and

14   Friday 10 to 2?

15   A    Yes, ma'am.

16   Q    Does it also state that you spoke with Couch and Stacy,

17   that he has addressed the issue, and the solution is he will be

18   able to monitor her on a daily basis?  Does it state that?

19   A    Yes, ma'am.

20   Q    And you knew that was pertaining to her drug issue, didn't

21   you?

22   A    No, ma'am.

23   Q    Well, what did you think that pertained to, that he's

24   addressed the issue with Stacy and it's going to be monitored

25   on a daily basis?

1   A   Attendance.

2   Q   That he was going to monitor whether she was there?

3   A   Correct.

4   Q   Mr. Phillips -- excuse me -- Mr. Strange, you also

5   conducted all employees meetings each year; is that correct?

6   A   I was at several employee meetings, yes, ma'am.

7   Q   And you actually had a speaking part at those, didn't you?

8   A   Yes, ma'am.

9   Q   And in connection with that, you were at PPSA frequently;

10   right?

11   A   No, ma'am.

12   Q   You were not?

13   A   No, ma'am.

14   Q   Now, Mr. Strange, you were aware that C&R Pharmacy's DEA

15   registration number was issued to Dr. Ruan, were you not?

16   A   No, ma'am.

17   Q   Did you not know that only Ruan could authorize what could

18   be purchased by C&R Pharmacy because of his DEA number?

19   A   No, ma'am.

20        MS. GRIFFIN:  That's all I have of this witness, Your

21   Honor, at this time.

22        THE COURT:  Any redirect?

23        MR. KNIZLEY:  Yes, ma'am.

24     (A discussion was held off the record between defense

25   counsel.)

BOE STRANGE - REDIRECT BY MR. KNIZLEY

1          (A discussion was held off the record between all counsel.)

2                THE COURT:  Mr. Knizley, before you start, let's go

3   ahead and take our morning break.

4                MR. KNIZLEY:  Yes, ma'am.

5                THE COURT:  Ladies and gentlemen, leave your pads on

6   your chairs.  Take your break downstairs in the jury assembly

7   room.  No discussion about the case.  We will call you back in

8   about 15 minutes.  We're in recess.

9          (A recess was taken at approximately 10:40 a.m.)

10         (In open court, 11:05 a.m., defendants and jury present.)

11               THE COURT:  All right, Mr. Knizley.

12                         REDIRECT EXAMINATION

13  BY MR. KNIZLEY:

14  Q   Mr. Strange, in your responsibilities as the accountant for

15  C&R Pharmacy and for PPSA, did you have the opportunity to

16  review the books on a monthly basis or how did that work?

17  A   Yes, sir.  Once a month I would come out and review the

18  books.

19  Q   And --

20               MS. GRIFFIN:  Your Honor?  Excuse me.  That is beyond

21  the scope of cross.

22               THE COURT:  It appears to be.

23               MR. KNIZLEY:  Judge, I'll be happy to say it here or

24  at side bar as to where I'm going with the next question.

25               THE COURT:  All right.  Come to side bar.

1      (At the side bar, jury not present.)

2          MR. KNIZLEY:  Your Honor, the government has suggested

3  in its questioning that there was no income tax return filed or

4  income tax paid.  If he is the accountant that sees it on a

5  monthly basis and he sent the return for the filing, he would

6  see the next month where the check was sent for the large

7  amount of income tax and he would know whether the return was

8  filed.  They were left with the suggestion that maybe the

9  return wasn't filed.  I want to dispel that.

10         MS. GRIFFIN:  Your Honor, there was no question about

11  income tax being paid.  The question was whether he knew if

12  they were filed.

13         MR. KNIZLEY:  Yeah, and I'm trying to get to whether

14  he knew, because he's the accountant that sees it every month

15  and sees the next month where the large check for income taxes

16  were paid.

17         MS. GRIFFIN:  I'm assuming they were quarterly

18  payments, which would not be a monthly payment.  And, you know,

19  he said he did not know that, he assumed they were filed.

20         THE COURT:  Yeah.  I don't think that was really a

21  question.  So let's move on.  Okay.  I sustain the objection.

22      (In open court, defendants and jury present.)

23  BY MR. KNIZLEY:

24  Q   Mr. Strange, I'm going to show you what's marked as Couch

25  Exhibit 287, and it has been admitted into evidence.  And

1    you've reviewed that on your direct examination.  And tell the

2    ladies and gentlemen of the jury again, first, what is this

3    first page on here?

4    A    That's just a cover page to the U.S. Return of Partnership

5    Income.

6    Q    And is that something that you, as an accountant, is going

7    to do for each of your clients at tax time?

8            MS. GRIFFIN:  Your Honor, objection as to relevance.

9    These were not gone over except for the dollar amount in the

10   cross.

11           THE COURT:  Yes.  Sustained.

12   BY MR. KNIZLEY:

13   Q    You were asked on direct whether you knew whether the

14   income tax returns were in fact filed.  Do you recall that?

15           THE COURT:  I think that was asked on cross.

16           MR. KNIZLEY:  Excuse me.

17   Q    On cross do you remember being asked that?

18   A    Yes, sir.

19   Q    About these particular returns that I just showed you?

20   A    Correct.

21   Q    What does the accountant do with this letter when he's

22   sending the return to the income tax payor?  What is the

23   purpose of all that?

24           MS. GRIFFIN:  Your Honor, object as to what the

25   accountants do.  He has no foundation what other accountants

1   do.

2   BY MR. KNIZLEY:

3   Q   What do you do?

4           MS. GRIFFIN:  And also as to the relevance.

5           THE COURT:  I'll let you go a short ways, but let's

6   stick to the cross.

7   BY MR. KNIZLEY:

8   Q   When you send this letter to your income tax payor as the

9   accountant, what are the circumstances surrounding you sending

10  this letter?

11  A   It's a copy for their records.  The return has been filed.

12  Q   And if in fact you -- who files the return?

13  A   The letter's going to say that, whether I actually efiled

14  the return or not.

15  Q   And typically do you recall whether this is an efiled

16  return for this particular taxpayer?

17  A   Yes, sir.

18  Q   And if you failed to file the efile -- if you failed to

19  efile the tax returns, what happens then?

20  A   You'll receive a notice of not filing the tax return from

21  the IRS.

22  Q   And that's a relatively important thing?

23  A   Yes, sir.

24  Q   And do you recall in February or after February 26, 2014,

25  or after February 15th, 2015, receiving any notices from the

1    Internal Revenue Service in connection with a failure to file

2    an income tax return for C&R Pharmacy, LLC?

3            MS. GRIFFIN:  Your Honor, I object to the

4    relevance.  He was asked on cross if he had personal knowledge.

5    It has nothing to do with the IRS notifying them of something

6    at a later date.

7            THE COURT:  Overruled, overruled.

8    A    No notices.

9    BY MR. KNIZLEY:

10   Q    And what would that indicate to you, as the accountant for

11   C&R Pharmacy, LLC, in connection with the income tax returns

12   for the years 2013 and '14?

13   A    They were filed timely.

14   Q    And in connection with any income tax return for a business

15   related to Xiulu Ruan or a business related to Pat Couch, do

16   you recall receiving any notice of any failure of any income

17   tax return being filed?

18   A    No, sir.

19   Q    As clarification, you were asked about cash versus accrual.

20   Do you remember that?

21   A    Yes, sir.

22   Q    For the ladies and gentlemen of the jury that may not be

23   routinely dealing in cash versus accrual accounting, could you

24   explain to them what cash versus accrual accounting is?

25           MS. GRIFFIN:  Your Honor, I don't believe there were

5479

BOE STRANGE - REDIRECT BY MR. KNIZLEY

1   any questions about that on cross and I object.

2          THE COURT:  I don't recall any questions on cross

3   about the accounting method, so I sustain the objection.

4          MR. KNIZLEY:  Judge, I do believe there were questions

5   for him.  I didn't ask about it.  And it was -- I think it

6   was -- I'll move on.  It's not that critical.

7          THE COURT:  All right.

8   BY MR. KNIZLEY:

9   Q   And you were asked on cross about Dr. Ruan receiving checks

10  from a workman's compensation dispensary at his home.  Do you

11  recall that?

12  A   Yes, sir.

13  Q   Do you have anything to do with Xiulu Ruan's personal

14  income tax return?

15  A   No, sir.

16  Q   Would you be the person that would have any knowledge about

17  whether he received those checks at home?

18  A   No, sir.

19  Q   So that's something you know nothing about?

20  A   Correct.

21  Q   And in your duties and responsibilities to Xiulu Ruan

22  wouldn't have any reason to know about, would you?

23  A   No, sir.

24  Q   You were just asked about something you don't know anything

25  about?

5480

```
 1    A    Correct.
 2              MR. KNIZLEY:  Your Honor, if I can pick up one more
 3    exhibit?
 4         (A discussion was held off the record between counsel.)
 5    BY MR. KNIZLEY:
 6    Q    Mr. Strange, I'm going to show you what's marked as
 7    Government's Exhibit 9-8(3), which is an email from Dr. Ruan,
 8    at least at the top, to you.  Do you recall this email that
 9    you -- do you recall this email by seeing it a few moments ago?
10    A    Yes, sir.
11    Q    And absent seeing it a few moments ago, do you have a
12    recollection of it?
13    A    Yes, sir.
14    Q    Now, this is Dr. Ruan writing to you and a gentleman named
15    Mike, that you told us you didn't recall who he was; right?
16    A    Correct.
17    Q    And what is this email asking?  What is Dr. Ruan asking you
18    from a tax perspective in this email?
19    A    He's asking me can he get a tax credit based on the
20    donation of some speaking fee.
21    Q    Now, your clients from time to time, do they ask about
22    credits and deductions and get the terminology confused?
23    A    Yes, sir.
24    Q    Could you tell the ladies and gentlemen of the jury what
25    you mean by that terminology about getting confused from time
```

5481

1    to time by taxpayers?

2            MS. GRIFFIN:  Your Honor, objection as to the

3    relevance about taxpayers.  If he has any independent knowledge

4    of this and Dr. Ruan being confused -- but objection to

5    taxpayers in general.

6            THE COURT:  Sustained.

7    BY MR. KNIZLEY:

8    Q   On this particular taxpayer, on this particular taxpayer,

9    did he seem, from your exchange with him, he may have some

10   concern or confusion about the difference in a tax deduction

11   and a tax credit?

12           MS. GRIFFIN:  No foundation as to know that Dr. Ruan

13   has confusion.

14           THE COURT:  Sustained.

15   BY MR. KNIZLEY:

16   Q   From reviewing this Government's Exhibit 9-8, does he in

17   9-8 use the term "tax credit"?  (Indicating.)

18   A   Yes, sir.

19   Q   All right.  Is tax credit applicable to the fact situation

20   which he is describing with regard to these deductions?

21   A   No, sir.

22   Q   Could you tell the ladies and gentlemen of the jury why?

23           MS. GRIFFIN:  Objection as to relevance, Your Honor.

24           THE COURT:  Overruled.

25   A   There's no tax credit for a contribution.  There's a tax

5482

1   deduction for a contribution.

2   BY MR. KNIZLEY:

3   Q   And contribution, you're talking about charitable

4   contributions; right?

5   A   Correct.

6   Q   Is that what 9-8 is referring to?  (Indicating.)

7        MS. GRIFFIN:  Objection, Your Honor.  He has no idea

8   what Dr. Ruan's referring to.

9        THE COURT:  Well, are you pointing to his portion of

10  the email, Mr. Strange's portion of the email?  You've got your

11  finger pointing to something.

12       MR. KNIZLEY:  I was about to.  I was waiting on the

13  Court's ruling before I said anything else.

14       THE COURT:  Well, I overrule the objection now.

15       THE WITNESS:  So what was your question again?

16       MR. KNIZLEY:  I don't know.

17       THE WITNESS:  I'm sorry.

18    (Laughter.)

19       MR. KNIZLEY:  Help me out, Roy.

20    (Requested portion of record read.)

21       THE REPORTER:  "And contribution, you're talking about

22  charitable contributions; right?  Is that what 9-8 is referring

23  to?"

24  A   Yes.

25       THE COURT:  And you were pointing at something on 9-8

BOE STRANGE - REDIRECT BY MR. KNIZLEY

1   when you asked that question.  So that's why I asked you.

2   BY MR. KNIZLEY:

3   Q   I was pointing at the donation deduction he testified

4   about.

5   A   My -- my interpretation is Dr. Ruan was asking about the

6   tax deductibility of a contribution to a charitable

7   organization.

8   Q   Okay.  And the nature of the conversation surrounds this

9   donated speaking fees to -- as I'm pointing now -- donating

10  speaking fees to the Department of PMR, Medical College of

11  Wisconsin; right?

12  A   Yes.

13  Q   Tell the ladies and gentlemen of the jury, do you get the

14  credit -- how does that work, getting the credit and deduction?

15  Have you got to count the money before you can get the

16  deduction?  You have to count the income before you get the

17  deduction?

18  A   Well, the deduction just is on schedule A of the

19  individual's tax return.  So it just reduces whatever the

20  ordinary income is by the amount of the deduction.

21  Q   And this exchange between you and Dr. Ruan in Government's

22  Exhibit 9-8(3), is that simply your explanation to him of the

23  distinction between credit and deduction or how it's going to

24  work?

25  A   No, sir.  I really -- I really just knew that he meant --

1   he really didn't know what he was talking about when he said

2   tax credit.  So I just tried to make it in layman's terms for

3   him.  As a tax deduction, it's only deductible when you

4   contribute, you know, something of a monetary value or -- it

5   doesn't have to be cash, but typically in respect to what he

6   was asking about, it has to be a cash transaction.

7   Q   And you in your role as the accountant of the businesses,

8   that's what you -- that's the type information you share with

9   taxpayers when they get confused, if you will?

10  A   Yes, sir.

11  Q   I show you what's marked as Government's Exhibit 44-1,

12  which was an email exchange again between you and Dr. Ruan

13  regarding -- and a Dan.  Would that be -- do you know who that

14  Dan may be?

15  A   Dan McConaghy.

16  Q   Okay.  And it is from Dr. Ruan talking about the Insys

17  owner will fly here during a particular week and be available,

18  and I think we can go to dinner at Ruth's Chris.  Do you have

19  any recollection of that dinner?

20  A   No, sir.

21  Q   Do you have any recollection of this exchange or

22  communication at all?  (Indicating.)

23  A   No, sir.

24  Q   It doesn't impact you at all today?

25  A   No, sir.

5485

1  Q   I show you what's marked as Government's Exhibit

2  44-2.  Again, it's another email in February of 2014.  And this

3  is Dr. Ruan writing to Pat, and this is to him, just copied to

4  you; is that right?

5  A   Pull the page down some.

6  Q   Down?  Up here?

7  A   I think it looks like it's forwarded to me.  I'm not sure.

8  Q   Do you remember this email?  Do you remember it?  I'm not

9  talking about from this morning.  I'm talking about from way

10  back when.

11  A   No, sir.  I don't remember the email from February 25th of

12  2014.

13  Q   Okay.  And it was talking about -- they went through an

14  agreement from Insys and, let's see, it's to you.  It says:  I

15  asked Dan to email the modified contract to Boe to take a look

16  at.

17         Do you recall seeing the contract, independently here

18  today?

19  A   No, sir, I don't.

20  Q   And do you recall this situation or this development of

21  this business endeavor ever coming to fruition?

22  A   No, sir, I don't recall a contract at all with regards to

23  this email.

24  Q   And if you don't recall the contract, do you recall whether

25  or not any distribution or any involvement with Insys

1   distributing the medications out of C&R Pharmacy -- do you

2   remember anything about that?

3   A   No, sir.

4   Q   Let me show you what's marked as Government's Exhibit 45.

5   And do you recall being shown this email a few minutes ago?

6   A   Yes, sir.

7   Q   And that was from you to PPSA and Mr. Cross, who was,

8   I think you said, the comptroller at that time?

9   A   Yes, sir.

10  Q   Ms. Phillips, Ms. Baggett who you mentioned, and who is

11  Tammy Etheridge?  Do you recall Tammy?

12  A   I don't recall exactly what Tammy did for us at that time.

13  Q   And when you wrote this back in 2013, tell me what this

14  email says and I'll -- I mean, what are you trying to convey in

15  the email?

16  A   I'll need to read it first.

17  Q   Take your time.  And tell me how you want me to move it.

18  A   (Reading.)  Just basically updating the team on some of the

19  activity and transactions that need to take place going

20  forward.  Do you want me to go down one, two, three, and four?

21  Q   Anything unusual or out of the ordinary about this

22  document?

23  A   No, sir.

24  Q   I did want to know if you recall who this new hire was.  Do

25  you remember who that person was?

 1   A   I don't remember his first nurse practitioner.

 2            MR. KNIZLEY:  Okay.  That's all the questions we have,

 3   Your Honor.

 4            THE COURT:  Mr. Doss?

 5            MR. DOSS:  Yes, Your Honor.

 6                         REDIRECT EXAMINATION

 7   BY MR. DOSS:

 8   Q   Mr. Strange, I want to show you again Government Exhibit

 9   45, the email that Mr. Knizley was just going over with

10   you.  And the date is December 22nd, 2013; correct?

11   A   Yes, sir.

12   Q   And under the third point -- excuse me -- the second

13   paragraph there were references to Stacy; right?

14   A   Yes, sir.

15   Q   And would that have been Stacy Madison?

16   A   I can't really tell you if that was her last name or not

17   today.

18   Q   Was she a CRNA at PPSA?

19   A   I don't know.

20            MR. DOSS:  Your Honor, this exhibit has not yet been

21   admitted.

22            THE COURT:  Okay.

23        (A discussion was held off the record between counsel.)

24   BY MR. DOSS:

25   Q   I'm going to show you, Mr. Strange, what we've marked for

BOE STRANGE - REDIRECT BY MR. DOSS

1   identification purposes as Couch Exhibit 294.  And does that

2   appear to be an email from Ms. Phillips to you?

3   A   Yes, sir.

4   Q   And what's the date on that email?

5   A   1/3 of '14.

6          MR. DOSS:  Your Honor, we offer Couch Exhibit 294.

7          MS. GRIFFIN:  It's hearsay, Your Honor, and we would

8   object to it.

9          THE COURT:  Sustained.

10         MR. DOSS:  Your Honor, if we may approach on that?  We

11  don't think it is hearsay.

12         THE COURT:  All right.

13      (At the side bar, jury not present.)

14         MS. GRIFFIN:  May I see it?

15         MR. DOSS:  Sure.

16         THE COURT:  (Reading.)  All right.  What is your

17  argument?

18         MR. DOSS:  The issue with this email, the relevant

19  question during cross-examination about the prior email, the

20  government's exhibit, there was the insinuation that the

21  mention of Stacy Madison had something to do with substance

22  abuse.  And we think this email, which was sent two weeks after

23  that email, is a follow-on continuing of those discussions

24  regarding Stacy Madison, it's not being offered for the truth

25  of the matter asserted, but instead to corroborate what his

1    explanation was from the December 2013 email.  Again, it is a

2    statement that shows that that is -- it in fact corroborates

3    what his explanation was for it in light of the insinuation

4    regarding the substance abuse issue of Stacy Madison.

5             MS. GRIFFIN:  Your Honor, it was not received pursuant

6    to a subpoena -- by a search warrant from Ruan or Couch's

7    emails.  It was not seized during the search.

8             MR. DOSS:  That was seized during the search, Your

9    Honor.

10            MS. GRIFFIN:  Where's the Bates number?

11            MR. DOSS:  That was printed out.  We have the raw

12   emails where y'all copied the original files from the computers

13   at PPSA and that's what we received.

14            MS. GRIFFIN:  It's still hearsay.  It's from a witness

15   who's already testified, that they could have asked about it,

16   and it's to Boe Strange.  Neither of them are parties.

17            MR. DOSS:  It wasn't an issue when Ms. Phillips was

18   testifying about whether the reference in the December email

19   that the government introduced on cross was in fact a reference

20   to Ms. Madison's substance abuse/addiction.  This directly

21   shows that that was not what was going on in that December

22   email and it corrects a misimpression.

23            THE COURT:  The problem is it also contains hearsay

24   that the government can't cross-examine the witness about.  So

25   I sustain the objection.

1      (In open court, defendants and jury present.)

2  BY MR. DOSS:

3  Q   Mr. Strange, I'll show you again Government Exhibit 45.

4  And this is the December 22nd, 2014, email.  And there's a

5  reference to Stacy.  That had nothing to do with any kind of

6  substance abuse/addiction problem, did it, when you wrote this?

7  A   I don't recall that that was the point of the email.

8  Q   You testified in response to some questions about talking

9  to Dr. Couch regarding employees with substance abuse issues.

10  do you recall that testimony on cross-examination?

11  A   Yes, sir.

12  Q   You had those discussions -- or did you have those

13  discussions with Dr. Couch after those employees were

14  terminated from PPSA?

15  A   I don't recall the exact timing of the conversations.

16  Q   Was it at or around the time that those employees were

17  terminated from PPSA?

18  A   I still don't -- I can't tell you if that was the case or

19  not.

20  Q   Was the purpose of those discussions for you to provide

21  business advice to Dr. Couch regarding their terminations?

22          MS. GRIFFIN:  Your Honor, I object.  He stated he has

23  no recall of the conversations.

24          MR. DOSS:  He said that he didn't recall the dates of

25  the conversations.

5491

```
 1              THE COURT:  Overruled.
 2    A    That's correct.
 3    BY MR. DOSS:
 4    Q    And as part of that advice that you were giving to
 5    Dr. Couch, were you advising Dr. Couch regarding things, for
 6    example, like severance agreements?
 7              MS. GRIFFIN:  Objection to hearsay, Your Honor.
 8              THE COURT:  Sustained.
 9    BY MR. DOSS:
10    Q    Without telling us what was said or not said, when you were
11    providing business advice to Dr. Couch regarding the
12    terminations of these employees, were you advising regarding
13    things like severance agreements?
14              MS. GRIFFIN:  Your Honor, object.  It is just a
15    reformation of the same question.
16              THE COURT:  Sustained.
17    BY MR. DOSS:
18    Q    When you testified, Mr. Strange, that you were providing
19    business advice to Dr. Couch regarding the terminations of
20    these employees, what sort of advice were you providing to
21    Dr. Couch?
22              MS. GRIFFIN:  Objection, Your Honor.  It is hearsay.
23              THE COURT:  Sustained.
24              MR. DOSS:  One moment, Your Honor.
25              THE COURT:  All right.
```

1    (A discussion was held off the record between defense

2  counsel.)

3  BY MR. DOSS:

4  Q   Without telling us the specifics, Mr. Strange, if an

5  employee was terminated from PPSA while you were associated

6  with PPSA, did you from time to time provide advice on

7  severance agreements?

8           MS. GRIFFIN:  And it's leading, Your Honor.

9           THE COURT:  Sustained.

10          MR. DOSS:  I'm trying to avoid the hearsay question,

11 Your Honor.

12          THE COURT:  I understand, but it is leading.

13 BY MR. DOSS:

14 Q   When you were associated with PPSA, Mr. Strange, and an

15 employee was terminated, did you ever provide advice to

16 Dr. Couch about severance agreements?

17          MS. GRIFFIN:  Objection, Your Honor.

18          THE COURT:  What grounds?

19          MS. GRIFFIN:  He's leading.  Did he provide advice?

20 When?  About whom?  I mean, we object.

21          MR. DOSS:  Let me rephrase, Your Honor.

22 Q   Mr. Strange, when you were associated with PPSA and an

23 employee was terminated, what kinds of advice, if any, did you

24 provide to Dr. Couch?

25 A   We would discuss did they get paid out for the remainder of

1    the week, was there any other pay potentially available to

2    these employees, what benefits they had.  That was basically

3    it.

4    Q  Was that the substance of your discussions with Dr. Couch

5    regarding employees who had substance abuse issues at PPSA?

6    A  Yes, sir.

7           MR. DOSS:  No further questions, Your Honor.

8           THE COURT:  May this witness be excused?

9           MR. DOSS:  Yes, Your Honor.

10           THE COURT:  Mr. Strange, you may step down.

11           Call your next witness.

12           MR. KNIZLEY:  She's in a wheelchair.  She's in a

13    wheelchair.  They are bringing her up.

14           THE COURT:  All right.

15           MR. BODNAR:  Your Honor, the United States renews its

16    objection to this relevance, as this witness did have cancer.

17           THE COURT:  All right.  Same ruling, overruled.

18                      DIANNE M. ROGERS

19              was sworn and testified as follows:

20           THE WITNESS:  I do.

21           THE CLERK:  Thank you, ma'am.

22                      DIRECT EXAMINATION

23    BY MR. DARLEY:

24    Q  Good morning, ma'am.  Can you hear me?

25    A  Yes.

5494

1   Q   Can you state your name for the jury, please?

2   A   It's Dianne, spelled with two Ns, Michelle Rogers.

3   Q   And, Ms. Rogers, at some point in the past were you a

4   patient at PPSA?

5   A   Yes, I was.

6   Q   And which doctor at PPSA treated you, Ms. Rogers?

7   A   Dr. Ruan.

8   Q   Okay.  And do you recall the dates that you were a patient

9   of Dr. Ruan's at PPSA?

10  A   I believe I started in May or June 2011, until it closed.

11  Q   And, Ms. Rogers, I'm sorry.  Can you speak up a little bit,

12  please?  Did you say until they closed?

13  A   Yes.

14  Q   Do you know that approximate date, ma'am?

15  A   I think it was June 15th or 14th of June.  I can't

16  remember, sir.

17  Q   Ms. Rogers, how did you end up at PPSA?

18  A   I was referred by Dr. Weatherly, Daniela Weatherly.

19  Q   And, Ms. Rogers, what type of -- did you have health

20  insurance?

21  A   Yes, I had Tricare.

22  Q   Did you have Tricare before the PPSA referral?

23  A   Yes.

24  Q   And was that the same insurance that you carried through

25  your treatment at PPSA?

DIANNE M. ROGERS - DIRECT BY MR. DARLEY

1   A   Yes.

2   Q   Ms. Rogers, was there an incident in 2001 that resulted in

3   some pain to you?

4   A   Yes.  I was in a car wreck.

5   Q   And in that, was that car accident one of the resulting --

6   tell the ladies and gentlemen of the jury why you were referred

7   to Dr. Ruan, why Dr. Weatherly referred you to Dr. Ruan.

8   A   Well, I went to the emergency room, of course, and they

9   said I was okay.  And I was in school.  So they told me to take

10  a few days, you know, and then I could go back.  But I was

11  hurting in my chest area and nobody seemed to know why.  So I

12  think Dr. Ruan did MRIs, things like that, and I was told I had

13  a compressed fracture.

14  Q   Okay.  And, now, Ms. Rogers, at some point prior to being

15  referred to PPSA, did you have breast -- did you have cancer?

16  A   Yes, I had.

17  Q   What type?

18  A   Breast cancer.

19  Q   And specifically what breast, Ms. Rogers?

20  A   I found out later I had it in both breasts.  But the right

21  one was treated.  I was treated with chemo and radiation.

22  Q   Ms. Rogers, which breast was cancer first found in?

23  A   The right breast.

24  Q   And when was that -- and at some point was that breast

25  removed, Ms. Rogers?

5496

1    A   Yes, I just had it removed --

2    Q   Do you recall when?

3    A   May, May or August.  No.  My son died in August.  I'm

4    getting confused.  I think it was May or June of '14.

5    Q   2014.  And, now, prior to that, while you were being

6    treated at PPSA, and actually prior to your referral to PPSA,

7    were efforts made to treat your pain, Ms. Rogers?

8    A   Yes.  The doctors would give me Lortabs.  And then I

9    realized after a while that I was just taking too many and I'm

10   still hurting.  And I finally was honest with the doctor and I

11   told her, said:  If this is not working, I need something else.

12             And she said:  Well, you need pain management.

13   Q   So at that point you were referred to Dr. Ruan?

14   A   That's correct.

15   Q   Now, when you were referred to Dr. Ruan, how often were

16   your appointments at PPSA?

17   A   Once a month.

18   Q   And, Ms. Rogers, of your monthly visits at PPSA, how often

19   did you see Dr. Ruan himself?

20   A   I seen him most every visit.  If I had some questions or

21   something, you know, after the nurse practitioner took down the

22   information and things, had some questions, she would go tell

23   him and he'll come in the room and sit down and talk to

24   me.  So --

25   Q   So Dr. Ruan would come in the room and sit down and talk

DIANNE M. ROGERS - DIRECT BY MR. DARLEY

1   with you?

2   A   Yes, he did.

3   Q   When Dr. Ruan would sit down and talk with you, over the

4   course of your visits, approximately how long would Dr. Ruan

5   spend with you in these rooms?

6   A   Five to 10 minutes, sometimes even longer than that.

7   Q   Now, Ms. Rogers, did Dr. Ruan try different procedures or

8   other treatments, other modalities of treatment, to help

9   control your pain?

10  A   Yes.  He would give me -- I guess they would call it an

11  epidural -- epidural in my back and that helped a lot.  I tried

12  to get it done at least every three months, because I told him

13  I wanted my life back.  I just couldn't do anything.

14  Q   Did he help you get your life back?

15  A   Yes.  I was on my way.  I started back gardening -- we had

16  17 acres of land -- gardening, and I loved flowers, and I

17  started back to crocheting, and everything was going good.

18  Q   Now, Ms. Rogers, I want to ask you a few questions about

19  your visits.  When you would go to PPSA were you required to

20  take your pill bottles or your remaining medications?

21  A   Yes.

22  Q   Did you ever have an incident with Dr. Ruan where you

23  didn't have your medicine with you or your medicine didn't show

24  in the drug screens?

25  A   Yes.

5498

1    Q    What happened?  How did Dr. Ruan react during those visits?

2    A    Well, he would come in and he acted a little angry because

3    I wasn't doing what I was told to do.  And he told me if that

4    continued, that I wouldn't -- he would drop me as a patient.

5    And I didn't want that to happen.

6    Q    And that was over one of your drug tests; correct?

7    A    Yes.

8    Q    Was there another incident where you had obtained

9    medication from another source?

10   A    Yes.  I think I went to the hospital for pancreatitis or

11   something and the doctor wrote me a prescription.  I think they

12   were Lortabs.  And my husband got it filled.  And when I went

13   to Dr. Ruan, of course that showed up.  And I told him I had

14   gotten it from another doctor, and he scolded me on that and

15   told me if I got prescriptions from another doctor, to let him

16   know.  And I'd be okay, but don't get it filled and start

17   taking them.

18   Q    And these issues that you just spoke of, the two incidents

19   you just spoke of, did you correct that behavior in the future,

20   Ms. Rogers?

21   A    Yes, I did.

22   Q    Did you maintain -- and you continued to be a patient of

23   Dr. Ruan's; correct?

24   A    That's correct.

25   Q    Now, at some point, Ms. Rogers, were you treated with

 1   fentanyl drugs?  Do you know what that term means?

 2   A   It was for breakthrough pain.

 3   Q   Okay.  Can you tell the jury what breakthrough pain means

 4   to you?

 5   A   When the pain medication -- the oxycodone wasn't working,

 6   or the pain would ease up and then an hour later it's back

 7   again and I'm laying down.  So I had that to take to ease the

 8   pain.

 9   Q   And do you know specifically what fentanyl drugs you were

10   given?

11   A   I think it's called Abstral or something like that.

12   Q   Abstral?

13   A   Yes.

14   Q   Were you ever given Subsys?

15   A   Subsys?  I'm not sure what that was.  It probably was

16   that.  I just can't pronounce the words.

17   Q   Yes, ma'am.  And, Ms. Rogers, did this drug help you, this

18   Abstral drug help you?

19   A   Yes, they did.

20   Q   Can you tell the jury how the drug benefited you in your

21   treatment and your life?

22   A   Well, I was able to get up and not lay down all the time

23   and call the twins to get me some water or fix dinner, you

24   know, or something like that.  I was able to collect the eggs.

25   We had chickens and things like that, and I was able to collect

5500

```
 1    the eggs and bake their favorite cakes and just slowly, you
 2    know, going back to the way I used to be.
 3  Q   Yes, ma'am.  And did Dr. Ruan order MRIs, Ms. Rogers?
 4  A   Yes, he did.
 5  Q   Did any of the MRIs ever discover anything?
 6  A   The one in particular was the one in my head.
 7  Q   Can you tell the jury what that MRI found?
 8  A   Yes.  Dr. Ruan was afraid that I had had a stroke or was
 9    about to have a stroke or something.
10  Q   Do you know why?  Do you know why he was afraid of that?
11  A   Well, the results showed that, I guess, the two veins in my
12    head was kind of like deteriorating or something.  And he
13    wanted me to see a neurologist immediately, which I did.  I had
14    been seeing one before.  So I took the report Dr. Ruan gave me
15    and gave it to him.  And he read the results and he told me
16    that sometime back I'd had two strokes, two mild strokes.  He
17    could tell by that.  So -- and I was glad to find that out.  I
18    eventually had another small stroke.
19  Q   Yes, ma'am.  Now, Ms. Rogers, you testified earlier that
20    you had monthly visits approximately for almost four years.
21  A   Uh-huh (positive response).
22  Q   So you spent time in the waiting areas, the lobbies of
23    PPSA?
24  A   Yes.
25          MR. BODNAR:  Your Honor, may we approach briefly?
```

DIANNE M. ROGERS - DIRECT BY MR. DARLEY

1          THE COURT:  All right.

2      (At the side bar, jury not present.)

3          MR. BODNAR:  Your Honor, as we stated this morning,

4   this was never a patient that we've alleged was outside the

5   usual course of professional practice.  It was our

6   understanding that the reason the Court allowed her testimony

7   to be in was the Court concluded it was relevant as to the

8   Subsys and the Abstral.  However, discussing things outside of

9   her Subsys and Abstral, we're really far away from relevance,

10   since which we've never alleged this patient was treated

11   outside the course of professional practice.

12          THE COURT:  What are you attempting, what are you

13   going for now?

14          MR. DARLEY:  Judge, basically she was a

15   frequent patient.  It was just basically dealing with the

16   loiter issue.   I'll withdraw the issue.

17          THE COURT:  The loitering?

18          MR. DARLEY:  The loitering.  Ms. Buckley said she saw

19   drugs transactions going on in the parking lot and stuff like

20   that.  This patient was, I think, actually a more frequent and

21   routine and regular patient than Ms. Buckley was.

22          THE COURT:  All right.  I'll allow you to put that on,

23   but don't lead her.

24          MR. DARLEY:  Yes, ma'am, yes, ma'am.

25          THE COURT:  Okay.

5502

1       (In open court, defendants and jury present.)

2   BY MR. DARLEY:

3   Q   Ms. Rogers, I think you had testified earlier that you were

4   a patient of PPSA monthly for about four years?

5   A   That's correct.

6   Q   Did you have an opportunity to spend time at PPSA in the

7   parking lots and lobby areas, waiting rooms?

8   A   Yes, in the waiting room.  Wasn't too many people in the

9   parking lot, but just coming and going.

10  Q   Did you ever see anything out of the ordinary?

11  A   No.  Everybody, you know, sat in the waiting room and you'd

12  see them monthly and you'd start, you know, talking and make

13  new friends.

14          MR. DARLEY:  Yes, ma'am.  Pass the witness.

15                      CROSS EXAMINATION

16  BY MR. BODNAR:

17  Q   Good morning, Ms. Rogers.

18  A   Good morning, sir.

19  Q   My name is Chris Bodnar, and I represent the United States.

20  A   Okay.

21  Q   Ms. Rogers, before you started seeing Dr. Ruan, you were

22  diagnosed with breast cancer; is that correct?

23  A   Yes.  It had been, I think, '99 when I was diagnosed and

24  then I had a left mastectomy, in which they said it was cancer

25  in that too, which I didn't know.

5503

1  Q   So that's before you came to see Dr. Ruan; correct?

2  A   Right.

3  Q   And one of the things Dr. Ruan was treating you for was for

4  pain in your chest?

5  A   Yes.

6  Q   And then you had breast cancer in the other side while you

7  were with Dr. Ruan?

8  A   That's correct.

9  Q   And you received Subsys and Abstral during that time

10  period?

11  A   Yes.

12         MR. BODNAR:  No further questions, Your Honor.

13         MR. DARLEY:  Judge, if I could just clarify real

14  quick?

15                    REDIRECT EXAMINATION

16  BY MR. DARLEY:

17  Q   Ms. Rogers, you had breast cancer, you said, in your left

18  breast in 1999; correct?

19  A   No.  In my right.

20  Q   In your right.  When was that mastectomy?

21  A   The mastectomy was in the left breast in '05.

22  Q   '05.  And you were not referred to Dr. Ruan until 2011;

23  correct?

24  A   That's correct.

25  Q   And was that for spine issues?

5504

1   A   Yes.  I had arthritis and bulging disks.  I was wondering

2   why it hurt so, and I tried to get the MRIs.  That's when I had

3   to lay on my back.

4   Q   And did you also testify earlier that -- testify earlier

5   that you had a rib injury from what you believe was a car

6   accident?

7   A   That's correct.

8           MR. BODNAR:  Your Honor, this is all stuff that could

9   have been in direct.  It's not related to cross-examine at all.

10          THE COURT:  Sustained.

11          MR. DARLEY:  Pass the witness.

12          THE COURT:  May this witness be excused?

13          MR. BODNAR:  Yes, ma'am.

14          THE COURT:  Thank you, ma'am.  You may be excused.

15          All right.  Mr. Knizley?

16          MR. KNIZLEY:  Ngoc Vo.  I think she went to get her,

17  Your Honor.

18          THE COURT:  We're going to go until about 12:15 before

19  we have lunch, unless somebody needs a break.  Does somebody

20  need a break now?  Can you go another 15 minutes?

21     (No audible response.)

22          MR. KNIZLEY:  Your Honor, I think that witness may

23  have stepped to the restroom or somewhere.  We'll call another

24  witness right now.

25          THE COURT:  All right.

1           MR. DARLEY:  Your Honor, Dr. Ruan calls Shanna

2   Harville.

3           THE COURT:  All right.

4                       SHANNA HARVILLE

5           was sworn and testified as follows:

6           THE WITNESS:  I do.

7           THE CLERK:  Thank you, ma'am.  Please be seated.

8                   DIRECT EXAMINATION

9   BY MR. DARLEY:

10  Q   Good morning, ma'am.

11  A   Good morning.

12  Q   Can you introduce yourself to the jury and spell your name,

13  please?

14  A   My name is Shanna Harville, S-H-A-N-N-A, H-A-R-V-I-L-L-E.

15  Q   And, Ms. Harville, what is your occupation?

16  A   I'm a certified nurse practitioner.

17  Q   And I think the jury has heard a lot about what that is.

18  But let me ask you this:  Where did you go to school?

19  A   I went to the University of South Alabama and Troy

20  University.

21  Q   Okay.  And what kind of degrees and training did you have

22  to obtain to become a nurse practitioner?

23  A   I have a bachelor's of science in nursing and a master's of

24  science in nursing.

25  Q   And how are you currently employed?

SHANNA HARVILLE - DIRECT BY MR. DARLEY

1    A    I am employed as a family nurse practitioner with Dr. Lee
2    in Foley, Alabama.
3    Q    Okay.  And at some point in the past were you employed at
4    PPSA?
5    A    I was.
6    Q    And in what capacity, Ms. Harville?
7    A    As Dr. Ruan's nurse practitioner.
8    Q    Okay.  Do you see Dr. Ruan in the courtroom?
9    A    I do.
10   Q    Ms. Harville, what were the dates of your employment?
11   A    I started working with Dr. Ruan in October of 2012 until
12   the raid in May 2015, I believe.
13   Q    When you were hired by Dr. Ruan, did he train you?
14   A    He did.
15   Q    How did he train you?
16   A    I shadowed him initially and he showed me, you know, how to
17   evaluate patients for pain, different types of pain, different
18   physical ailments.  Our main issues were neck pain and back
19   pain, so we focused a lot on those.  He trained me how to
20   evaluate medication efficacy and things like that.  And what we
21   call -- I believe it's the five A's, which were --
22   Q    Five what?
23   A    -- the five A's is what they called it.  And I can't
24   remember specifically, but it's like the different -- how the
25   patient's doing, how the medicine's doing, you know their

SHANNA HARVILLE - DIRECT BY MR. DARLEY

1  activity level, their quality of life, that type of thing.

2  Q   Okay.  Did you have a medical assistant?

3  A   I did.

4  Q   What was that person's name or what were those persons'

5  names?

6  A   I had, I believe, two main medical assistants during my

7  time there:  Jamila Jones initially and then Donna Newburn was

8  my MA.

9  Q   Did Dr. Ruan have other nurse practitioners that worked

10 with him as well?

11 A   He did.  Yes, sir.

12 Q   Who were they?

13 A   When I first started, Sharon Noland and Bridgette Parker

14 were working with him.  Sharon Noland also trained me, and I

15 replaced a nurse practitioner that had retired.

16 Q   What was that person's name?

17 A   Peggy.  I do not recall her last name.

18 Q   And was there anyone else hired after you, nurse

19 practitioner hired after you?

20 A   Yes, sir, Matt Bean.

21 Q   Do you know the approximate date Mr. Bean was hired?

22 A   I do not.

23 Q   During one of your days, a typical day at PPSA, can you

24 describe to the jury what your duties were?

25 A   I can.  Typically each nurse practitioner, each provider

SHANNA LARAILLE - DIRECT BY MR. DARLEY

1    would have their own schedule for the day of patients.  And we

2    typically saw two new patients a day and anywhere -- I would

3    say on average maybe 25 followup patients, patients that were

4    just returning for refills, or followup patients.

5            So the patient would check in at their time and we

6    would have a screen where it would turn green upon their

7    check-in.  The MA would pull them back, do their vital signs.

8    We would have specific questions to ask, you know, pain level

9    with medications, without medications.  They would then room

10   the patient.  And I typically had three rooms on one hall and

11   they were, you know, put in order to be seen, so room one, room

12   two, and room three.  And so we went in order of their office

13   visit.  So I would start in room one, see the patient, we would

14   do a physical exam, see how the patient was doing, how the

15   medications were doing, if they're having any side-effects with

16   any of the medicines.  If there were any problems --

17   Q   Do you do --

18   A   No, I'm sorry.

19   Q   You would do a physical exam?

20   A   Right.

21   Q   And could you tell the jury what a physical exam would

22   consist of?

23   A   Typically, in a basic physical exam would be to listen to

24   heart and lungs.  If their complaint was back pain, we would

25   typically just check the back, see if there's any tenderness,

SHANNA HARVILLE - DIRECT BY MR. DARLEY

1    any range of motion problems, things like that.  If it was knee
2    pain, then you may just, you know, check the knee for any
3    swelling.  It would range.  It varied on the patient complaint,
4    you know.  It would vary too if it was a new patient or a
5    followup.  So a new patient is going to be a lot, a lot more of
6    a physical exam, you would check reflexes, things -- things of
7    that nature.  So it's a longer exam, like 45 minutes versus,
8    you know, 10 to 15 minutes.
9    Q   Who would conduct those 45-minute exams?
10   A   The nurse practitioner would.
11   Q   And at some point would you consult with Dr. Ruan?
12   A   Yes.
13   Q   Can you explain to the jury what that consultation would
14   include?
15   A   If it was a new patient, I would go to Dr. Ruan.  And we
16   had -- we had preprinted forms, like exam sheets, and I would
17   give him a synopsis of the patient, the history of present
18   illness, the chief complaint, the patient's history, medical
19   history, surgical history, any medications they were currently
20   on, what they were taking, who referred them, things like
21   that.  And then he would come with me to the room to meet the
22   patient, you know, and talk to the patient.
23          If it was a followup, patient, I would take -- we had
24   these -- just a clipboard that had one sheet on it.  And it
25   had, you know, like just some basic questions, pain level, if

5510

 1    they needed any procedures done or things like that.  And

 2    then --

 3    Q   Hold on one second.

 4           THE COURT:  Go ahead.

 5    BY MR. DARLEY:

 6    Q   And I'm sorry.  Go ahead.

 7    A   Okay.  If it was a followup, I would take that clipboard to

 8    Dr. Ruan, let them know if there was any changes, any problems,

 9    if the patient, you know, was having any issues with the

10    medications or needed to see him or needed changes in medicine.

11    Q   So you would have your own patients; correct?

12    A   Right.

13    Q   Or would you have your own patients?  And Dr. Ruan, to your

14    knowledge, he had his own patients?

15    A   He had procedures typically that he did during the day, and

16    then the nurse practitioners divided up the followup patients,

17    and then he would just see our patients with us throughout the

18    day.

19    Q   Why would he see your patients, or "our patients," as you

20    said?

21    A   Well, because they were all his patients.  So he had to, he

22    had to consult on them.  I'm not sure I understand the

23    question.

24    Q   You said he had to consult?

25    A   Right.

SHANNA HARVILLE - DIRECT BY MR. DARLEY

1   Q   Ms. Harville, are you familiar with the term "incident to"?

2   A   Yeah.

3   Q   All right.  Can you tell the jury what incident to is?

4           MS. GRIFFIN:  Your Honor, object.  She can tell what

5   her understanding is, not giving a definition of it.

6           THE COURT:  Sustained.

7   BY MR. DARLEY:

8   Q   Ms. Harville, to your understanding with Dr. -- one moment,

9   Your Honor.

10      (A discussion was held off the record between defense

11   counsel.)

12   BY MR. DARLEY:

13   Q   Let me switch gears.  Ms. Harville, did you do PDMP

14   searches?  Do you know what those are?

15   A   I do, yes, sir.

16   Q   Can you tell the jury what the PDMP searches are?

17   A   I can.  In the state of Alabama we have a prescription drug

18   monitoring program in which you can search a patient by their

19   name, date of birth, and it will pull up their prescription

20   drug history for controlled substances within the state.  For

21   Dr. Ruan we had the state of Alabama, state of Florida, and the

22   state of Mississippi that we were able to view and pull up.  So

23   for every new patient we had, we were able to pull the PDMP

24   prior to seeing them to see their history and their -- to

25   determine if they were a high-risk patient or not.  And then if

1    we had patients that we may have thought were high risk or if

2    we had anonymous calls or if we thought they were abusing or

3    diverting medicine, then we would also do a PDMP search.

4    Q    Would other practitioners in the clinic use PDMP as well?

5    A    Yes, sir.

6    Q    Ms. Harville, how many times a day do you estimate you

7    personally would use PDMP?

8    A    I know it was done daily.  I would assume multiple times a

9    day.  I can't give a -- I'd be guessing.

10   Q    Yes, ma'am.  Were patients drug tested?

11   A    Yes, sir.

12   Q    And were patients subjected to pill counts?

13   A    Yes, sir.

14   Q    If patients were found in violation of procedures at PPSA,

15   what would occur?

16   A    Depending on the violation, they were given a written

17   notice initially.  And then if they violated again, they were

18   fired from our practice.

19   Q    Do you know what Dr. Ruan would do -- do you specifically

20   know what Dr. Ruan would do to monitor opioid risk?

21   A    I do.

22   Q    What would he do?

23   A    He developed an opioid risk tool that we utilized to

24   determine on a scale whether a patient was low to high risk for

25   opioid abuse, diversion, or overuse.  And there were different

SHANNA LARADJE - DIRECT BY MR. DARLEY

1   factors with that.  So -- and it ranged from their level of
2   medication to any family history/personal history of abuse, to
3   how many doctors there -- I mean, there was different things
4   that factored into it.
5   Q   And Dr. Ruan developed this, did he not?
6   A   He did.  I think he used kind of an abbreviated tool that
7   was used in some of our pain management guidelines.
8   Q   Yes, ma'am.  Did Dr. Ruan -- did you ever see Dr. Ruan
9   prescribe or -- first of all, what is a TIRF drug?  Do you
10  know?
11  A   A TIRF drug is an instant release transmucosal fentanyl
12  product that goes usually under the tongue or there's some
13  intranasal versions of it.  It's an instant release fentanyl
14  product.
15  Q   And Dr. Ruan prescribed those drugs, did he not?
16  A   Yes, sir.
17  Q   Did you and Dr. Ruan counsel the patients on the risks of
18  those drugs?
19  A   We did.  They have TIRF REMS forms that we would give to
20  the patients when those -- when those type medications were
21  prescribed that the patient would sign, review and sign their
22  name to.
23  Q   Yes, ma'am.  Was there a pharmacy onsite at either PPSA
24  location?
25  A   There was.

5514

SHANNA HARVILLE - DIRECT BY MR. DARLEY

1  Q   Were patients informed that they could fill their

2  prescriptions there at that pharmacy?

3  A   Yes.

4  Q   Were they ever directed that they had to?

5  A   No, sir.

6  Q   Did you ever direct anybody that they had to?

7  A   No, sir.

8  Q   Ms. Harville, did you ever forge Dr. Ruan's name on a

9  prescription?

10 A   Never.

11 Q   Did you ever see anyone forge Dr. Ruan's name on a

12 prescription?

13 A   No, sir.

14 Q   Do you recall the day of the raid?

15 A   I was off that day.

16 Q   You were off that day?  Why were you off that day?

17 A   Dr. Ruan was -- his daughter was graduating from Johns

18 Hopkins University.

19          MS. GRIFFIN:  Relevance, Your Honor.

20          THE COURT:  Sustained.

21 BY MR. DARLEY:

22 Q   So Dr. Ruan was off that day?

23          MS. GRIFFIN:  Move to strike as well.

24          THE COURT:  Overruled.

25 BY MR. DARLEY:

1   Q   Dr. Ruan was off that day, was he not?

2   A   Yes, sir.

3   Q   Did you frequently take the days off Dr. Ruan was off?

4   A   I did.

5   Q   Why is that?

6   A   I did not have prescriptive authority to sign schedule II

7   medications, so there was no reason to work when he was not

8   working.

9   Q   So would you often coincide your vacations with Dr. Ruan's?

10  A   I did.

11  Q   So when Dr. Ruan was out of that office, you were --

12  A   I was off.

13  Q   -- you didn't see patients, did you?

14  A   I did not.

15  Q   And to this day you said you're still a nurse practitioner?

16  A   I am.

17  Q   Are your duties similar as they were at PPSA under

18  Dr. Ruan?

19  A   Yes.  I still work in pain management.

20          MR. DARLEY:  Thank you very much.  Sorry.  Pass the

21  witness.

22          THE COURT:  All right.  We're going to go ahead and

23  take our lunch break at this time.  Ladies and gentlemen, leave

24  your pads on your chairs.  Take your lunch -- well, be back

25  downstairs in the jury assembly room at 1:30, ready to be

5516

```
 1   called back up.  No discussion about the case.  We are in
 2   recess.
 3        (A recess was taken at approximately 12:12 p.m.)
 4        (Afternoon session, 1:30 p.m., in open court, defendants
 5   and jury present.)
 6            THE COURT:  All right, Ms. Griffin.
 7                       CROSS EXAMINATION
 8   BY MS. GRIFFIN:
 9   Q   Good afternoon, Ms. Harville.  How are you today?
10   A   I'm fine, good.  How are you?
11   Q   I want to ask you first, you did not have a DEA license
12   while you were working at PPSA, did you?
13   A   We were working on getting it.  But for most of the time,
14   no, ma'am, I did not.
15   Q   And even at the very end, you could never write controlled
16   IIs, could you?
17   A   Not schedule II, no, ma'am.
18   Q   And in fact many of the opioids that PPSA used were
19   schedule IIs, weren't they?
20   A   Yes, ma'am.
21   Q   In fact you estimated that about 90 percent of their
22   patients were on opioids; isn't that correct?
23   A   Yes, ma'am; that is correct.
24   Q   Now, Ms. Harville, you indicated that you and Dr. Ruan
25   assisted the patients on the TIRF, or the TIRF forms; is that
```

5517

1    correct?

2    A    TIRF REMS, yes, ma'am.

3    Q    And isn't it true that you told the FBI that Brenda Arnold

4    did that explaining to the patients?

5    A    No, ma'am.  The forms themselves were typically given to

6    the patients by myself or -- it would depend.  Now, the

7    entering of the actual information into the computer system was

8    done by Brenda Arnold.

9    Q    And she --

10   A    But that was separate from the forms, the actual

11   information given to the patient.

12   Q    And you, yourself, explained the information on those forms

13   to the patients; is that correct?

14   A    It's written out, yes, ma'am.  It's a black and white form,

15   it's typically two pages that would be given to the patient

16   when we prescribed it.  If I knew the patient was getting that

17   prescription, yes, ma'am.

18   Q    And you went over it with them; is that correct?

19   A    Yes, ma'am.

20   Q    Yourself?

21   A    I -- yes, ma'am (nodding head affirmatively).

22   Q    Did you tell them that it was approved only for

23   breakthrough cancer pain?

24   A    Yes, ma'am.

25   Q    And were you aware that the Alabama rules from the medical

1    board required that the doctor go over the informed consent

2    with the patients?

3    A    I was not.

4    Q    So you were doing in essence a job that the medical board

5    required a physician to do, weren't you?

6    A    I can't answer that.

7    Q    I show you what's marked as Couch's Exhibit 118, section C.

8    This has previously been admitted from the Alabama Board of

9    Medical Examiners, Administrative Code.  And you see where it

10   says, do you not:  Informed consent and agreement for

11   treatment, physician shall discuss the risks and benefits of

12   the use of controlled substances with the patient.  It doesn't

13   say that the nurse practitioner may do that, does it?

14   A    No, ma'am.

15   Q    So you weren't the one authorized to do that, were you?

16   A    Not according to that paper, no, ma'am.

17   Q    You don't question it being the Alabama Board of Medical

18   Examiners code, do you?

19   A    No, ma'am.

20   Q    Now, Ms. Harville, you said that there were many times you

21   had patients in three rooms; is that correct?

22   A    That's correct.

23   Q    And there were two other nurse practitioners who also had

24   patients in rooms; is that correct?

25   A    That's correct.

SHANNA HARVILLE - CROSS BY MS. GRIFFIN

1  Q   And Dr. Ruan was also performing procedures; is that
2  correct?
3  A   Yes, ma'am.
4  Q   So you also told us that he saw every patient.  But he
5  really didn't see every patient, did he?
6  A   No, ma'am.  He saw every new patient, he saw every patient
7  that was either having changes or problems, or Blue Cross/Blue
8  Shield patients.
9  Q   But he hadn't always seen all of the Blue Cross/Blue Shield
10 patients, had he?
11 A   Not to --
12 Q   Was that something that was brought to your attention, that
13 to continue to be paid as a physician, a physician had to see
14 the patient; is that right?
15 A   Yes, yes, ma'am.
16 Q   So after that he made sure, so he could stay paid as a
17 physician, that he stuck his head in on the Blue Cross/Blue
18 Shield patients; isn't that correct?
19 A   Prior to my being hired, I'm not sure how that worked.  But
20 initially when I first started, he went in all rooms with
21 me.  Then after a time he did not.  Then he started going in
22 with all Blue Cross/Blue Shield patients.  I'm not sure what
23 time frame that occurred.
24 Q   So you're not aware of the change that, after billing Blue
25 Cross/Blue Shield for visits that he didn't stick his head in,

5520

SHANNA HARVILLE - CROSS BY MS. GRIFFIN

1  he began to stick his head in when he was reminded --

2  A   I'm not sure what --

3  Q   Let me finish my question and then we'll let you have an

4  opportunity to answer.  You weren't there when that was done,

5  where he was told to stick his head in on Blue Cross/Blue

6  Shield so he could continue billing as a doctor visit, were

7  you, ma'am?

8  A   I'm not sure when that occurred, no, ma'am.

9  Q   Also, Ms. Harville, you saw all kinds of patients; right?

10  A   Yes, ma'am.

11  Q   Every type patient; right?

12  A   Medicare, Blue Cross/Blue Shield, those were our main, yes,

13  ma'am.

14  Q   You also saw workers comp patients, didn't you?

15  A   I did not see many work comp.  Maybe a handful.

16  Q   And you weren't happy about seeing worker's comp patients,

17  were you --

18  A   No, ma'am.

19  Q   -- because you were limited by what you could prescribe?

20  A   That is --

21  Q   Isn't that correct?

22  A   Yes, ma'am.

23  Q   You had a sheet of paper that had a list of medicines on it

24  and you could only pick from the medicines that were on that

25  list; is that correct?

SHANNA HARVILLE - CROSS BY MS. GRIFFIN

1    A    That's correct.

2    Q    And you felt that limited what you could do in helping a

3    patient, didn't you?

4    A    Yes, ma'am.

5    Q    But the worker's comp patients had their prescriptions

6    filled there at PPSA dispensary; right?

7    A    Yes, ma'am.

8    Q    And so that formulary or list was all you could pick?

9    A    Right.

10   Q    Is that right?

11   A    That's right.

12   Q    And that might not always be the best thing for the

13   patient; that's what upset you, wasn't it?

14   A    Yes, ma'am.

15   Q    Ms. Harville, you told us that you repeatedly, when you

16   were seeing a patient, would print the PDMP; is that correct?

17   A    We did, yes, ma'am.

18   Q    Who is we?

19   A    My MA or myself.

20   Q    Now, how many people at PPSA were printing the PDMPs on a

21   daily basis --

22   A    I don't know.

23   Q    -- that you have direct knowledge of?

24   A    I don't know.

25   Q    You didn't have a PDMP for every single patient that was

1   seen every time, did you?

2   A   No, ma'am.

3   Q   So you didn't know between one visit to the other from

4   certain patients whether they were seeing other doctors or not,

5   did you?

6   A   I did not.  But it's not a required thing.

7   Q   Well, the question was you didn't do it; is that right?

8   A   That's right.

9   Q   So you did not know the answer to that question, did you?

10  A   No, ma'am.

11  Q   Also, Ms. Harville, you've told the FBI when you were

12  interviewed in July of 2015 that you were close to Dr. Ruan; is

13  that correct?

14  A   That's correct.

15  Q   And you were until Matt Bean showed up; is that right?

16  A   I was close to Dr. Ruan until the last year of my

17  employment, yes.

18  Q   And that's sometime when Matt Bean was there; isn't that

19  correct?

20  A   Sometimes around there, yes.

21  Q   And you began to be replaced in your closeness to Dr. Ruan

22  with Matt Bean, didn't you?

23  A   Yes, ma'am.

24  Q   And you even suspected that he was being paid more than

25  you, didn't you?

SHANNA HARVILLE - CROSS BY MS. GRIFFIN

```
 1   A   Yes, ma'am.

 2   Q   That didn't make you happy, did it?

 3   A   No, ma'am.

 4   Q   Now, Ms. Harville, you told us that you were not aware of

 5   any signed blank scripts; is that correct?

 6   A   That is correct.

 7   Q   I show you what's been introduced as Government's Exhibit

 8   3-3, seized from the PPSA Airport location --

 9   A   Yes, ma'am.

10   Q   -- and ask you if this is Dr. Ruan's signature on these

11   blank scripts.

12   A   That does look like --

13          MR. DARLEY:  Judge, I'll object.  This is beyond the

14   scope of direct.

15          THE COURT:  Overruled.

16   BY MS. GRIFFIN:

17   Q   Go ahead.

18   A   That does, that does look like his signature.

19   Q   And in fact this is what you call a presigned blank script;

20   is that correct?

21   A   Yes, ma'am.

22   Q   Doesn't have a patient name, does it?  (Indicating.)

23   A   It does not.

24   Q   Doesn't have a drug listed, does it?

25   A   No, no, ma'am.
```

5524

1    Q   And anybody that had access to this could add a drug and
2    add a patient name, since it was already signed; isn't that
3    correct?
4    A   Yes, ma'am.
5    Q   And you're telling us you were not aware of these that
6    Dr. Ruan maintained at the Springhill location?
7    A   I was not, no, ma'am.
8    Q   Now, these show at the top, do they not, Bridgette Parker,
9    Sharon Noland, Justin Palmer, and Shanna Harville.  That's you;
10   right?
11   A   Yes, ma'am.
12   Q   So that was during the time you were there, wasn't it?
13   A   Yes, ma'am.
14   Q   And you were not aware of the people that had access to the
15   presigned blank scripts by Dr. Ruan?
16   A   I was not.
17   Q   Ms. Harville, while you were there, you testified some
18   about the drug testing?
19   A   Yes, ma'am.
20   Q   Isn't it true that while you were there PPSA began to use
21   Castle Medical for the drug testing?
22   A   That's correct.
23   Q   Were you aware that they were reimbursing PPSA $755 per
24   test?
25   A   I was not.

1  Q   And then finally, Ms. Harville, when the raid happened, May

2  the 20th, 2015, you were let go from PPSA; is that correct?

3  A   Yes, ma'am.

4  Q   And you actually went to work for Abstral as a sales rep

5  for Subsys -- excuse me -- for Insys as a sales rep for Subsys,

6  didn't you?

7  A   That's correct.

8  Q   So you went to work to sell Subsys to doctors; is that

9  correct?

10 A   I was contacted by a friend, a colleague, that had a

11 position available, because I was unemployed for a month or so

12 prior to this due to the raid.  I have a family that I also

13 have to support, you know, provide for.

14 Q   In fact, you were contacted by Natalie Perhacs?

15 A   I was.

16 Q   Who was your close friend; isn't that correct?

17 A   Yes, ma'am.

18 Q   You had known her because she had been in PPSA frequently

19 while you were at PPSA; is that right?

20 A   Yes, ma'am.

21 Q   Now, she had not been terminated from coming to PPSA prior

22 to the raid, had she?

23 A   No, ma'am.

24 Q   She was still there, in fact, the day before the raid,

25 wasn't she?

SHANNA HARVILLE - REDIRECT BY MR. DARLEY

```
 1  A   I'm not sure how close to the raid.  But as far as I know,
 2  yes, ma'am.
 3  Q   You were never aware of your close friend Natalie Perhacs
 4  being told that she couldn't come back to PPSA, were you?
 5  A   No, ma'am.
 6  Q   And in fact, she got you a job --
 7  A   As a sales rep.
 8  Q   -- as a sales rep to sell Subsys; is that right?
 9  A   Yes, ma'am.
10          MS. GRIFFIN:  That's all I have of this witness.
11          THE COURT:  Any redirect?
12                      REDIRECT EXAMINATION
13  BY MR. DARLEY:
14  Q   Ms. Harville, you were asked on cross about going over the
15  TIRF forms.
16  A   Uh-huh (positive response).
17  Q   You weren't in the rooms at all times Dr. Ruan was in there
18  with the patient, were you?
19  A   I was not, no, sir.
20  Q   You don't know if he went over those forms too, do you not?
21  A   No, sir.  It's a preprinted physician-patient prescriber
22  form that TIRF provides and you hand that to the patient, have
23  the patient review it and the patient signs it.
24  Q   And the prescriptions that Ms. Griffin placed on the screen
25  moments ago, you said you weren't aware of those?
```

SHANNA HARVILLE - REDIRECT BY MR. DARLEY

1   A   I was not.

2   Q   Did you know they were even found at your location?

3   A   No, I didn't.

4   Q   So if you weren't aware of them, you didn't have access to

5   them, did you?

6   A   No, sir.

7   Q   The Castle Medical urine screens that Ms. Griffin

8   referenced, do you know what the GC-MS screens were?

9   A   I do.

10  Q   Were they more specific than the cup test?

11          MS. GRIFFIN:  Your Honor, it's beyond the scope of

12  cross-examination.

13          MR. DARLEY:  Your Honor, it goes to the purpose of why

14  they were being ordered.

15          MS. GRIFFIN:  It's still beyond the scope.

16          THE COURT:  I sustain.

17          MR. DARLEY:  One moment, Your Honor.

18          THE COURT:  All right.

19      (A discussion was held off the record between defense

20  counsel.)

21          MR. DARLEY:  That's all.

22          THE COURT:  All right.  May this witness be excused?

23          MR. DARLEY:  Yes, ma'am, Your Honor.

24          THE COURT:  All right.  Thank you.  You may step down.

25          THE WITNESS:  Thank you.

5528

```
1        MR. KNIZLEY:  We call Kim Lowe.

2        THE COURT:  All right.

3                    KIM LOWE

4           was sworn and testified as follows:

5        THE WITNESS:  Yes, ma'am.

6        THE CLERK:  Thank you.  Please be seated.

7                 DIRECT EXAMINATION

8   BY MR. KNIZLEY:

9   Q   State your name, please, ma'am.

10  A   Kim Lowe.

11  Q   Ms. Lowe, were you ever a patient of Dr. Xiulu Ruan?

12  A   Yes.

13          A JUROR:  I'm sorry.  What's her last name?

14          MR. KNIZLEY:  Lowe, L-O-W-E.

15  Q   Is that the correct spelling, Ms. Lowe?

16  A   That's correct.

17  Q   Again, were you ever a patient of Dr. Xiulu Ruan?

18  A   Yes, I was.

19  Q   And when did you become a patient, if you recall?

20  A   Two to three years ago.

21  Q   And what was the nature of your medical condition that

22  caused you to become a patient?

23  A   I had back problems, fibro, migraines, bulging disks, RA,

24  OA.

25  Q   That's your knee?  Ms. Lowe, do you have a knee problem?
```

1    A    Knee problems.  I was in a car wreck.

2         (A discussion was held off the record between defense

3    counsel.)

4    BY MR. KNIZLEY:

5    Q    I'm sorry, Ms. Lowe.  Did you have a knee problem as well?

6    A    Yes, I did.

7    Q    And RA and OA, for us that don't know what that stands for,

8    could you tell the jury, please?

9    A    Yes.  RA is rheumatoid arthritis.  OA is osteoarthritis.

10   Fibro is fibromyalgia.

11   Q    And who sent you, if anyone, to see Dr. Ruan?

12   A    My orthopedic doctor, Dr. Zarzour.

13   Q    And was Dr. Zarzour, at the time he sent you to Dr. Ruan,

14   also treating you for some conditions of pain?

15   A    Yes.

16   Q    And were you getting successful results from that treatment

17   of Dr. Zarzour as it related to your pain problems?

18   A    Not -- he wasn't as helpful as Dr. Ruan.  He did not

19   diagnose me.

20   Q    And do you recall some of the medications that Dr. Zarzour

21   was treating you with before you went to see Dr. Ruan?

22   A    The same medications as Dr. Ruan was giving me:  the

23   OxyContin, oxycodone, and a muscle relaxer.

24   Q    And when you became a patient of Dr. Ruan's, did he do an

25   examination of you when you first came to see him?

5530

1  A   Yes, he did.

2  Q   And while you were seeing him, did you or did you not

3  routinely see him when he came -- when you came to PPSA for

4  treatment?

5  A   I'm sorry.  Repeat the question.

6  Q   When you came to Dr. Ruan's office for medical care, did

7  you have an opportunity to see Dr. Ruan when you came there?

8  A   Yes.

9  Q   And was it on each occasion or could you tell the ladies

10  and gentlemen of the jury when you saw Dr. Ruan when you came

11  there?

12  A   I saw Dr. Ruan each time I was in the office for an office

13  visit.  And I continuously had problems with my knee and he

14  pretty much became my primary physician.  He diagnosed --

15  excuse me -- he referred me to go to ER because he said that he

16  thought I could possibly have a blood clot which, though, was

17  not detected by anyone else.

18  Q   Now, Ms. Lowe, let me ask you, was there a time that you

19  called and you had a problem that you felt and you were seeking

20  advice from Dr. Ruan and he sent you to the hospital; is that

21  correct?

22  A   Yes; that's right.

23  Q   And is that the time you're telling us about, the blood

24  clot?

25  A   Yes, he's the one that actually wanted me -- or diagnosed

1    me with possibly having a blood clot.  No other doctor did.

2    Q    And did you in fact have a blood clot?

3    A    I did.

4    Q    And did you feel like Dr. Ruan was giving you satisfactory

5    medical care when he advised you to do that?

6    A    Yes, I did.

7    Q    And after that blood clot situation -- did you have any

8    surgery in association with that?

9    A    I had surgery prior to that.

10   Q    And what was the surgery you had prior to that?

11   A    I was given an injection of Synvisc in my knee and

12   Dr. Zarzour, the orthopedic doctor, gave that to me.  A couple

13   of months went by.  He continued to treat my knee and he gave

14   me another shot of the Synvisc, which I had a reaction to the

15   first shot, but he did not document that I had an allergy

16   reaction to that.  So when I went back to my appointment to see

17   Dr. Ruan, he knew right away, remembered that I had the

18   reaction to the Synvisc and couldn't believe that he gave me

19   another injection.

20   Q    And other than medications, did you receive any other

21   treatments or modalities or therapies from Dr. Ruan when you

22   went to see him?

23   A    Yes, I did.

24   Q    Could you tell the jury about that, please?

25   A    With my back problems, he put me in a back brace, he did

KIM LOWE - DIRECT BY MR. KNIZLEY

5532

1    procedures on me, he gave me epidurals in my back, he gave me

2    the injections in my neck and shoulders.  I have a history of

3    migraines.  He treated me with injections for the migraines, we

4    tried ointments, we tried therapy.

5    Q   And I think you mentioned the procedures, epidurals and

6    that sort of thing?

7    A   The facet blocks and the nerve blocks as well.

8    Q   Now, as far as medications during the course of treatment

9    that Dr. Ruan was treating you, did you ever receive -- first

10   off, what type medications were you originally on with

11   Dr. Ruan, if you recall?  What was the medicines Dr. Ruan gave

12   you when you first went there, if you remember?

13   A   My orthopedic doctor referred me to him and he prescribed

14   the same thing the orthopedic doctor gave me.

15   Q   And after some time did you ever get prescribed Subsys, if

16   you remember?

17   A   Once.

18   Q   By Dr. Ruan?

19   A   By Dr. Ruan (nodding head affirmatively).

20   Q   Do you recall whether there was a coupon program or a

21   sample program associated with that?

22   A   I don't remember.

23   Q   And after that one prescription of Subsys, did Dr. Ruan

24   continue to prescribe that or did he prescribe something else?

25   A   Something else.

1    Q    And why was that?

2    A    The substance didn't seem to help.

3    Q    Okay.  And as time went on did you ever get a prescription

4    for Fentora?

5    A    I did.

6    Q    And when was that, if you recall?

7    A    That would have been toward my last four visits with him.

8    Q    Now, you had this Subsys -- you had some other medications,

9    then the Subsys for one time, and then some other medications

10   before the Fentora ever came about; is that right?

11   A    Correct.

12   Q    Now, do you recall -- first off, was your general care,

13   your general care by Dr. Ruan, was it good general care?

14          MR. BODNAR:  Objection, Your Honor, to relevance to

15   what's being charged in this case.

16          THE COURT:  Sustained.

17   BY MR. KNIZLEY:

18   Q    You talked about toward the end.  Did you see Dr. Ruan as

19   your doctor until the, quote, "raid" or the end of the

20   practice?

21   A    I did.  I used Dr. Ruan as my primary physician.

22   Q    And do you recall going to the clinic for an appointment

23   right before the raid, if you will?  A few weeks before, a

24   couple of weeks before?

25   A    Yes.

KIM LOWE - DIRECT BY MR. KNIZLEY

```
1   Q   And would that be around April 27th?  Does that sound
2   right?
3   A   Yes.
4   Q   And do you recall receiving Fentora, OxyContin, and
5   oxycodone on that visit?
6   A   On the last visit I did not pick any prescriptions up
7   because of the raid.
8   Q   You were given some prescriptions, were you not?
9   A   Well, they were never -- yes, I was given, yes.
10  Q   Tell the jury what happened on the prescriptions.
11  A   Okay.  There was some that they were not readily available
12  in their pharmacy.  So I told the pharmacist I would just come
13  back the next day and pick them all up.  And I heard on the
14  news that morning that they had gotten raided.
15  Q   Do you recall what the medications were that you were
16  prescribed?  The ones you're talking about that you weren't
17  able to pick up?
18  A   It was the general medications, the OxyContin and
19  oxycodone.
20  Q   And how about the Fentora?
21  A   I think so.  Like I said, I didn't pick it up.
22  Q   And I'm going to show you for a visual aid --
23          MR. KNIZLEY:  Your Honor, just a visual aid I'd like
24  to show her?
25          THE COURT:  All right.
```

1    BY MR. KNIZLEY:

2    Q   I'm going to show you what I've written on this yellow

3    piece of paper 4/27/15, and I've written those three

4    medications that you say that you recall getting prescriptions

5    for shortly before the close of the practice.  Are those the

6    three medications?

7    A   Yes.

8    Q   Now, did those medications that you got in that last

9    prescription -- or the right at the end, if you will, of the

10   clinic -- were they helpful for you?

11   A   Yes.

12   Q   Did you use them?

13   A   Yes.  I did not use the Fentora as prescribed.

14   Q   Now, how was your understanding of the prescription of the

15   Fentora?

16   A   To use it very sparingly.

17   Q   And did you follow this prescription, did you follow that

18   instruction?

19   A   I used it very sparingly.

20   Q   Okay.  And after the clinic was closed or raided, did you

21   have some more?

22   A   Yes.

23   Q   And did you continue or not --

24   A   Yes.

25   Q   -- to utilize that, that medication?

1    A    Yes.

2    Q    And tell the jury for what purposes you continued to

3    utilize it.

4    A    Okay.  Once I was prescribed the medication, I used it

5    mainly if none of the other medications worked and I used it

6    for breakthrough pain.  If I had real bad pain, I would use it.

7    As a matter of fact, I just ran out of it like the end of last

8    year and it was prescribed to me by another physician.  But I

9    know my mother went in the hospital, she had a major surgery,

10   and I'm the primary caretaker.  So in order for me to go to the

11   hospital and spend time with her during those three months she

12   was very ill, I used it in order to get out of bed.

13   Q    I'm sorry, Ms. Lowe.  You said that the Fentora was

14   prescribed to you again by a physician after the clinic was --

15   some other physician, I suppose?

16   A    That's correct.

17              MR. KNIZLEY:  Pass the witness.

18                         CROSS EXAMINATION

19   BY MR. BODNAR:

20   Q    Good afternoon, Ms. Lowe.

21   A    Hi.

22   Q    My name is Chris Bodnar, and I represent the United States.

23   A    Hi.

24   Q    So I just want to clarify one thing from your direct.  It

25   was your testimony that you began seeing Dr. Ruan about two or

 1 | three years ago; is that what you recall?

 2 | A   It's what I recall.

 3 | Q   I'm going to show you from a pull-out from your file which

 4 | is marked as Government's Exhibit 12-1 --

 5 | A   Okay.

 6 | Q   -- and ask you if this is a PA request for Kim Lowe.  And

 7 | is that you?  Is that your birth date right there?

 8 |  (Indicating.)

 9 |         MR. KNIZLEY:  Your Honor, I object to the form of the

10 | question.

11 | A   Yes.

12 |         MR. KNIZLEY:  He can ask -- he can ask the witness

13 | does she recognize it and go from there.  But telling the

14 | witness what it is --

15 |         THE COURT:  Is this in evidence?

16 |         MR. BODNAR:  Yes, Your Honor, this is in evidence as

17 | 12-1.

18 |         THE COURT:  All right.  Overrule the objection.

19 | BY MR. BODNAR:

20 | Q   Does this note appear to say January 29th, 2009?

21 | A   Yes.

22 | Q   Is this for you?  Are you Kim Lowe, born on September 9,

23 | 1960?

24 | A   Yes.

25 | Q   So does this help refresh your memory if you were a patient

5538

1   back as far as eight years ago at least?

2   A   Well, I saw Dr. Couch one time, but I never went back for

3   over a year after that.  It doesn't seem like it's been that

4   long, but I'm assuming it has.

5   Q   Let me show you the next several pages --

6   A   Okay.

7   Q   -- from your file.  Does this show a call about you on

8   February 9th of 2009?  Do you see that, Ms. Lowe?

9   A   I do.

10  Q   And do you see this one for March of 2009?

11  A   Okay.

12  Q   And that's one for April of 2009?

13  A   Okay.

14  Q   And this one says per Dr. Ruan down here; correct?

15  (Indicating.)

16  A   Yes.

17  Q   So does this appear that you were a patient all the way

18  back in 2009 for Dr. Ruan?

19  A   I guess so.  I didn't -- yes.  (Nodding head

20  affirmatively.)

21  Q   And, Ms. Lowe, starting in about 2012 you kept getting the

22  same sort of combination of an opiate, such as you got Percocet

23  or OxyContin; correct; along with Soma --

24  A   Uh-huh (nodding head affirmatively).

25  Q   -- along with Xanax?  At first it was prescribed by a

1  different doctor.  Then Dr. Ruan started taking over your Xanax

2  writing too; is that correct?

3  A  Right.  But he stopped it.

4  Q  And that was pretty common for you, that pretty much every

5  month from January 2012 till very close to the raid you got

6  some combination of OxyContin, Soma, and Xanax; isn't that

7  true?

8  A  Yes.

9  Q  You also got Fentora frequently mixed in there towards the

10  end?

11  A  Toward the end.

12  Q  I'm going to show you now what is marked as Government's

13  Exhibit -- Madam Clerk, is 46 our next number?

14       THE CLERK:  Yes, sir.  Wait a minute.

15       MR. BODNAR:  This has not been admitted yet.  It's

16  marked as Government's Exhibit 46.

17     (A discussion was held off the record between counsel.)

18       THE CLERK:  Actually, Mr. Bodnar, you do have a 46.

19       MR. BODNAR:  This will be 47, Your Honor.

20       THE CLERK:  You have a 47 as well.  What about 48?

21       MR. BODNAR:  This will be 48.

22  Q  Ms. Lowe, do you recall the questions Mr. Knizley was

23  asking you at the end about the prescriptions that were written

24  for you on April 27th, 2015?

25  A  Yes.

1    Q   And was it your recollection that you didn't fill those

2    prescriptions?

3    A   I did not get that last prescription filled because, like I

4    said, there was a couple that were not available.  And I was

5    going to come back the next day and just pick them all up at

6    one time, and the raid happened that morning.

7    Q   Well, Ms. Lowe, I'm going to show you now what has been

8    marked as Government's Exhibit 48 and ask you at the top where

9    it says Alabama query report, is that your name, Kimberly Lowe,

10   and your birth date right there?  (Indicating.)

11   A   Yes.

12        MR. KNIZLEY:  Your Honor, I object to him referring to

13   a document that's not in evidence without it being

14   authenticated first and offered for admission.

15        MR. BODNAR:  I'm asking if she sees that first to

16   identify it, Your Honor.

17        THE COURT:  He's not offering it yet.

18        MR. KNIZLEY:  Yes, ma'am.  Yes, ma'am.

19        THE COURT:  Go ahead.

20   BY MR. BODNAR:

21   Q   Do you recognize that as your first -- last name, first

22   name, and your date of birth?

23        MR. KNIZLEY:  Your Honor, again I would object to him

24   referring to a document, asking the witness to identify

25   information in a document that has not been admitted into

5541

```
 1    evidence.  It's hearsay and it's not been authenticated.
 2              THE COURT:  Overruled.  You can answer.
 3    A   Yes.
 4    BY MR. BODNAR:
 5    Q   And does it say patient Rx history report at the top?
 6              MR. KNIZLEY:  Same objection.  Hearsay.
 7              THE COURT:  Overruled.
 8    BY MR. BODNAR:
 9    Q   Is that what it says at the top, Ms. Lowe?
10              THE WITNESS:  Answer?
11              THE COURT:  Yes, you may answer.
12    A   Yes.
13              MR. BODNAR:  United States moves to admit Government's
14    Exhibit 48, Your Honor.
15              MR. KNIZLEY:  Your Honor, we object.  The witness
16    can't authenticate it.  She has no personal knowledge, it's a
17    hearsay document, and without authentication it's not relevant.
18              MR. BODNAR:  Your Honor --
19              THE COURT:  Can you come to side bar?
20              MR. BODNAR:  Yes.
21         (At the side bar, jury not present.)
22              MR. BODNAR:  Your Honor, throughout this trial the
23    PDMP reports have come in as nonhearsay.  And in most
24    particular, here on the date of April 27, 2015, the PDMP report
25    shows that she did fill all of her drugs and she did fill it at
```

KIM LOWE - CROSS BY MR. BODNAR

```
 1   C&R Pharmacy.  So to the degree that it is a communication at
 2   all -- which we don't think -- we've long said it wasn't, it
 3   came from coconspirators that are only employees --
 4            THE COURT:  Well, I don't think that this shows
 5   anything of an impeachment nature with her, because she said
 6   that she was just going to pick them all up on the next day.
 7   So I'm assuming the pharmacy filled them all and she just never
 8   showed to pick them up because they were raided.
 9            MR. BODNAR:  I don't think that that's what that --
10   that that is supposed to go in when it's filled and given to
11   the person.
12            THE COURT:  Well, I can't --
13            MR. BODNAR:  That's not close to the time of the date
14   either.  Those were specific ones that were within the
15   indictment.
16            THE COURT:  What was the date of the raid?
17            MR. BODNAR:  May 20th.
18            MS. GRIFFIN:  May 20th.
19            THE COURT:  Okay.  Well, so your objection is simply
20   because it's hearsay?
21            MR. KNIZLEY:  Hearsay, and he showed the witness
22   Government's Exhibit --
23            THE COURT:  Well, he just asked her if that was her
24   name at the top.
25            MR. KNIZLEY:  The basis of the document, hearsay and
```

1   lack of authentication of this document.  Government Exhibit 48
2   is just a combination piece of paper presented to the witness
3   who has shown no familiarity with it -- she knows no idea what
4   it is, it's not admitted into evidence, and now he wants to ask
5   her questions about the content of it as if the content of it
6   has been demonstrated to have its reliability without ever
7   being any authentication of what it is.
8          MR. BODNAR:  The jury's heard plenty of evidence about
9   PDMP reports in evidence.
10          THE COURT:  I don't think there's any question about
11   its authenticity in question --
12          MR. KNIZLEY:  This witness is the one to authenticate
13   it, is the question.
14          THE COURT:  I think he's entitled to ask her if the
15   report shows it was actually filled; is that correct or not?
16   So --
17          MR. KNIZLEY:  Judge, I think he can ask her:  Did you
18   or did you not fill the prescription?  But to impeach her with
19   an unadmitted --
20          THE COURT:  I don't think he's impeaching her.  I
21   think it just contradicts her understanding of what happened.
22   I'll let you ask it.
23          MR. KNIZLEY:  Without exhibition to the jury, though,
24   Judge.
25          THE COURT:  Yes.

1          MR. KNIZLEY:  Without exhibition.

2          THE COURT:  But it's going to be admitted.

3          MR. BODNAR:  We do ask to publish it to the jury so

4    the jury can see it.  It does list, at least in the PDMP from

5    C&R Pharmacy, that it was filled on that date.

6          MR. KNIZLEY:  Judge, we would object and also object

7    to highlighting of it.

8          MR. BODNAR:  And I have a clean copy.  I wasn't

9    expecting to get into admitting it until she claimed she never

10   filled these prescriptions.  We can get one.

11         THE COURT:  You can use it.  You cannot use the

12   highlighted one to the jury.  I'm marking it in, 48.

13         MR. BODNAR:  Okay.

14       (Government's Exhibit 48 was entered into evidence.)

15       (In open court, defendants and jury present.)

16   BY MR. BODNAR:

17   Q   Ms. Lowe, I'm now going to show you what has been admitted

18   as Government's Exhibit Number 48.  And at the top you do see

19   where it says Alabama Query Report, Patient Rx History Report?

20   A   Yes.

21   Q   And you've identified this as your name; correct?  Kim

22   Lowe, and that's the correct birthday for you.  (Indicating.)

23   A   Yes.

24   Q   Flipping to the second page --

25         THE COURT:  Mr. Bodnar, I said you were not supposed

1    to show that to the jury.

2            MR. BODNAR:  I thought it was not up on the screen,

3    Your Honor.

4            THE COURT:  Well, it's been admitted.  So if you've

5    got a clean copy -- come up here and show it to her.

6            MR. BODNAR:  Yes.

7        (A discussion was held off the record between government

8    counsel.)

9    BY MR. BODNAR:

10   Q    Ms. Lowe, I'm handing you now what has been admitted as

11   Government's Exhibit 48 and ask in this column do you see that

12   column that says Written, with the string of dates?

13   A    Yes.

14   Q    And do you see the date for April 27th, 2015?

15   A    Yes.

16   Q    And are those -- are those the drugs, oxycodone 15

17   milligrams, OxyContin 80 milligrams, Fentora 600 micrograms,

18   Exelon three milligrams, carisoprodol 350 milligrams, and

19   alprazolam half a milligram?

20   A    Uh-huh (nodding head affirmatively).

21   Q    Do you see all those as having been written on April 27,

22   2015?

23   A    I do.

24   Q    And do you see here also on a fill date where all of those

25   are listed as being filled on April 27, 2015?

1   A   This is the date of the raid?

2   Q   I'm just asking does it show as being filled on April 27,

3   2015?

4   A   Was this the day of the raid?

5   Q   If the date of the raid were May 20th, 2015, does this

6   show, though, that all those drugs were filled on April 27th,

7   2015?

8   A   Yes.

9   Q   And do you see this code that starts FC for pharmacy of

10   where each of these drugs were filled?

11   A   Uh-huh (positive response).

12   Q   And do you see how each of these in the same column are the

13   same?

14   A   Uh-huh (nodding head affirmatively).

15   Q   I'm going to flip to the last page now, which will tell you

16   which pharmacy is FC.

17        MR. KNIZLEY:  Your Honor, I would object to the form

18   of the question, as the prosecutor has been telling the jury

19   what a document says and asking.  He can ask the witness about

20   the document, but --

21        THE COURT:  Well, it's In evidence.  So he can ask the

22   question --

23        MR. KNIZLEY:  The document's in evidence, Judge, not

24   the explanation attendant to.

25        MR. BODNAR:  Your Honor, flipping to the last page,

 1   which will show her --

 2           THE COURT:  Overruled.

 3   BY MR. BODNAR:

 4   Q   And for that FC code, which pharmacy is with that FC code?

 5   A   It's different --

 6   Q   FC 247604.

 7   A   Okay.  This one ends in 047.

 8           THE COURT:  Ma'am, you're going to have to speak into

 9   the microphone.  So back up just a little bit.  The

10   microphone's right there.  Okay.

11   A   This one is 047 and this was 04.  (Indicating.)

12   BY MR. BODNAR:

13   Q   So do you recall if you did or didn't fill those

14   prescriptions at C&R Pharmacy?

15   A   (Reading.)

16   Q   Ms. Lowe, did you typically fill your prescriptions at C&R

17   Pharmacy?

18   A   Yes, I did.

19   Q   If those show that they were filled, according to this

20   document, filled on April 27th, 2015, slightly more than -- or

21   less than a month before the raid, does that help you refresh

22   your memory whether or not you actually filled those

23   prescriptions that date?

24   A   Yes.

25           MR. BODNAR:  No further questions, Your Honor.

```
 1            THE COURT:  Mr. Knizley?
 2        (A discussion was held off the record between counsel.)
 3                    REDIRECT EXAMINATION
 4   BY MR. KNIZLEY:
 5   Q   Ms. Lowe?
 6   A   Yes?
 7   Q   Whenever you got those prescriptions filled, did you feel
 8   it was to your medical benefit?
 9   A   Definitely.
10   Q   And I'm going to show you what's marked from the
11   Government's file, from your medical file marked Government's
12   Exhibit 12-1, and show you what purports to be a notation.  Is
13   that your name right there?  (Indicating.)
14   A   Yes.
15   Q   And what date is that right there?
16   A   May the --
17            MR. BODNAR:  Your Honor, we object to this.  We were
18   talking about the April 27, 2015, prescriptions that are in the
19   indictment, not the May 5th.
20            THE COURT:  Overruled.
21            MR. KNIZLEY:  It will be for the jury to determine
22   whether that's what the content is referring to.
23            THE COURT:  Overruled.  Go ahead.
24   BY MR. KNIZLEY:
25   Q   What does it say right there?
```

1  A   May the 8th, 2015.

2  Q   And could you read for the jury what this says, beginning

3  with the word "patient"?

4  A   Patient was only able to fill number 60 of her oxycodone at

5  C&R due to that's all that's left that they had in stock.  I

6  gave C&R the patient's Rx for the remaining number 60, printed

7  Rx for oxycodone 15 milligram number 60, one PO q.i.d. p.r.n.

8  pain.

9  Q   And I believe that's what we were talking, is the oxycodone

10 15 milligrams?

11 A   Milligrams; correct.

12 Q   Now, does this help you remember what happened?  Did you go

13 to get it filled -- and tell the jury what happened.

14         MR. BODNAR:  Objection, Your Honor, to it being a

15 different date from what we were talking about.

16         THE COURT:  I sustain the objection.  All the previous

17 testimony was about April 20-something.

18 BY MR. KNIZLEY:

19 Q   All right.  This is a note, is it not, ma'am, from May

20 8th -- had you called about a previous prescription?  Do you

21 remember calling them about your prescription that did not have

22 enough medications?

23 A   I -- they told me when I dropped the prescriptions off and

24 I left them.  I did not pick those up.

25 Q   Okay.

5550

1    A    And the raid was the next morning.  So I never got any

2    prescriptions that month.

3    Q    And I'm going to show you the next entry on the same day,

4    was a message that came that you left -- or message that was

5    left about you.  And does that say about the same thing the

6    other one said?

7    A    Yes.

8    Q    Read the last sentence right here.  (Indicating.)

9    A    The oxycodone Rx printed for number 60 was voided and put

10   in the scan box.

11   Q    And that is an entry about -- backing up, read the first

12   part that says:  I've got a message stating.

13   A    I got a message stating that C&R Pharmacy had only filled

14   number 60 of the patient's oxycodone and needed an Rx for the

15   other 60.  But I spoke with C&R and they stated they filled her

16   number 60 and had the other 60 waiting for her to pick up.  The

17   oxycodone Rx printed for number 60 was voided and put in the

18   scan box.

19   Q    So as far as this document says on May 8th, there was

20   another number 60 prescription waiting for you to pick up; is

21   that right?

22   A    Correct.  But because -- correct.

23   Q    Go ahead.

24   A    Again, I did not pick those up because the pharmacy had

25   been raided.  I did not get them for that month.

JOHN PATRICK COUCH, MD - DIRECT BY MR. SHARMAN

1          MR. KNIZLEY:  Thank you.

2          THE COURT:  May this witness be excused?

3          MR. BODNAR:  Yes, Your Honor.

4          THE COURT:  All right.  Thank you.  You may step down.

5          MR. BODNAR:  Here's a clean copy of 48.

6          MR. KNIZLEY:  That's all the witnesses Dr. Ruan will

7    have for today, Your Honor.  This is consistent with our

8    in-chambers discussion.

9          THE COURT:  All right.  Dr. Couch?

10          MR. SHARMAN:  Your Honor, Dr. Couch calls Pat Couch,

11   MD.

12          THE COURT:  All right.

13          THE CLERK:  Dr. Couch, raise your right hand.

14                    JOHN PATRICK COUCH, MD,

15              was sworn and testified as follows:

16          THE WITNESS:  I do.

17          THE CLERK:  Thank you, sir.  Please be seated.

18          MR. SHARMAN:  May it please the Court.

19          THE COURT:  Yes.  Go ahead.

20                        DIRECT EXAMINATION

21   BY MR. SHARMAN:

22   Q   Sir, can you introduce yourself to the jury, please?

23   A   I'm John Patrick Couch.

24   Q   And, Dr. Couch, where did you grow up?

25   A   I was born in Miami, but I grew up starting at the age of

5552

```
 1  three in Atlanta.
 2  Q   And where did you go to school?
 3  A   Undergrad, University of Georgia at Athens, and medical
 4  school at the Medical College of Georgia.
 5  Q   And when you were in college, what was your undergraduate
 6  study; what was your undergraduate major?
 7  A   Microbiology.
 8  Q   Had you already decided that you wanted to study to be a
 9  doctor by the time you were in college?
10  A   Yes.
11  Q   And you may have said this, where did you go to medical
12  school?
13  A   The Medical College of Georgia, in Augusta, Georgia.
14  Q   Did you get a MD from there?
15  A   I did.  I did.
16  Q   And what did you do after that?
17  A   I went to Atlanta, back to Atlanta, and did a rotational
18  internship at Georgia Baptist Medical Center.
19  Q   Two things there:  First, what is an internship?
20  A   It's just a word that means a first year after medical
21  school that most -- that every MD has to do some type and there
22  are different types that you can do, of 12 months, before you
23  can get licensed to actually see patients and practice
24  medicine.
25  Q   And what is a rotational internship?
```

5553

```
 1   A   Usually they're blocks of one month where you rotate
 2   between specialties or at different hospitals around the state
 3   of Georgia, or actually most of them were at the hospital,
 4   Georgia Baptist Medical Center, but there were others I did
 5   around the state.  I believe I did two months of general
 6   surgery, one month of plastic surgery, two months of internal
 7   medicine, two months of ER medicine, two months of OB-GYN and
 8   one month of pediatrics.
 9   Q   And then after you --
10   A   No, I'm sorry, then one month elective in anesthesia.
11   Q   Is that the time that you began to be interested in
12   anesthesiology?
13   A   I began to be interested in anesthesiology when I was still
14   in Augusta, my senior year.
15   Q   After you finished that rotational internship, what did you
16   do next?
17   A   I went to Tampa, Florida and did a three-year residency in
18   anesthesiology.
19   Q   All right.  And --
20   A   University of South Florida.  Sorry.
21   Q   And remind us what a residency is and what one does in an
22   anesthesiology residency.
23   A   Well, as it says, residency; you pretty much reside at the
24   hospital.  You spend a lot of time there.  It's where you focus
25   on your principal area of training.  If you're going to be a
```

JOHN PATRICK COUCH, MD - DIRECT BY MR. SHARMAN

1  pediatrician, you do a pediatric residency, or OB-GYN, you

2  would do a OB-GYN residency, and so forth.

3  Q   And --

4  A   And I did anesthesiology and critical care medicine.

5  Q   And generally speaking, what is anesthesiology?

6  A   Anesthesiology is the practice of medicine of which you

7  mainly focus on rendering the patients -- portions of their

8  body insensible to pain, their entire body insensible to pain,

9  put them to sleep for surgery, get them safely through surgery.

10  And it also includes sometimes spending time in the ICU.  Some

11  of the anesthesia departments run the ICU.

12  Q   Now, did you say that was a -- that was a three-year

13  residency?

14  A   Yes.

15  Q   Then what did you do after that?

16  A   Well, I had met a distinguished physician, a specialist in

17  pain medicine when I was at Georgia Baptist back in '91, '92,

18  Dr. Raj, and I read some of his textbooks and so forth, and I

19  spent some time with him during that month that I did that

20  elective in anesthesia and pain.  And so I kind of kept it in

21  the back of my mind.

22       In the interim he had moved to Los Angeles to be

23  director of pain medicine for UCLA Medical Center in Westwood.

24  And so I met him -- I saw him at the American Pain Society

25  meeting in Miami and asked him if I could come out and

JOHN PATRICK COUCH, MD - DIRECT BY MR. SHARMAN

1  interview for one of the three slots to be a fellow in pain
2  medicine.
3  Q   And what does -- well, did you end up doing that?
4  A   I did.
5  Q   So did you go to Los Angeles to the UCLA Medical Center?
6  A   Yes, sir.  He handed me his card and said call my secretary
7  and tell her I said to tell you to call and make you an
8  appointment to come out for an interview.
9  Q   And what is a fellowship, at least in this discussion?
10  A   It's a subspecialty.  It's actually -- the best way I heard
11  it described by one of my attendings is knowing more and more
12  about less and less.
13  Q   And what was the focus, the knowing more and more part
14  about during your fellowship at UCLA?
15  A   Treating patients with pain, both acute and chronic.  That
16  was the focus, including surgical training on implantation of
17  devices used in the control of pain and blocks and other things
18  where these procedures that are done in the OR during the '50s
19  and '60s, they began to be taken out of the OR and used in
20  outpatient settings as part of what they called a multi-
21  disciplinary approach to treating patients with chronic pain
22  because they have many different problems.
23      And so they figured out that it would take more than
24  just one type of specialist with most of these complicated
25  patients to address all their problems.  So that's why it's

JOHN PATRICK COUCH, MD - DIRECT BY MR. SHARMAN

1    called multi-disciplinary.

2    Q    And did you say that was a 12-month program?

3    A    It was.

4    Q    And then what did you do after that?

5    A    Well, I started looking around for a job and I interviewed

6    around the country and I did some moonlighting.  I did some

7    anesthesia actually at the UCLA Medical Center in the OR.  So I

8    think I stayed along in Los Angeles for about three months

9    until I found a job.

10   Q    And was that a job whereby you ended up in Mobile?

11   A    Yes.

12   Q    Did you not want to stay in California or was there a

13   reason to come back this way?

14   A    I was offered a job, a couple of jobs there.  I think one

15   in the Valley and one in Beverly Hills.  But I wanted to try to

16   get back to the South and I knew it would kill my mom if I

17   stayed out there.

18   Q    All right.  Did you join another physician or a practice

19   when you first moved to Mobile?

20   A    I did.

21   Q    And who was that?

22   A    It was Dr. Irvin at Springhill.

23   Q    Was Dr. Irvin also a pain management physician?

24   A    He was, and anesthesiologist.

25   Q    And did you work with Dr. Irvin for a while?

JOHN PATRICK COUCH, MD - DIRECT BY MR. SHARMAN

1   A   I did.

2   Q   And then what happened after that?

3   A   After about nine or 10 months I decided to go out and open

4   my own practice, which I started working on that.  And I did

5   some moonlighting again doing anesthesia around the state and

6   saved up money and I borrowed some money from AmSouth Bank and

7   opened a practice that I rented some space from Dr. DeBakey

8   across from Mobile Infirmary.

9   Q   Is that the practice -- when you went on your own, is that

10  the practice that ultimately became PPSA?

11  A   Yes.

12  Q   We touched on your educational background.  Do you hold any

13  professional certifications?

14  A   Yes.

15  Q   And what are those?

16  A   Well, as far as board certifications?

17  Q   Yes, sir.

18  A   Well, everyone has to get the National Board of Medical

19  Examiners so that's kind of everybody.  And then I got board

20  certified by the American Board of Anesthesiology, which is

21  recognized by the American Board of Medical Specialties and

22  then they have a subspecialty board separate called the Added

23  Qualifications in Pain Management.  I took the exam for

24  that.  Anesthesia -- regular anesthesia board consists of a

25  written exam and an oral exam.

JOHN PATRICK COUCH, MD - DIRECT BY MR. SHARMAN

1  Q   And when we say board certified, are there particular

2  preliminary requirements you have to satisfy in addition to the

3  tests or do you just take a test?

4  A   Well, you have to -- well, for example, for anesthesia you

5  have to complete a residency, and there are other boards that

6  I'm boarded in as well.  I'm boarded by, let's see -- like I

7  said, the American Board of Anesthesiology and the American

8  Board of Pain Medicine.  I think I got that in about '97.

9  Dr. Raj was, as far as I know, was a founding member of that

10  board in the 1980s.  And then I'm also boarded by the American

11  Board of Addiction Medicine and a fellow of that board.  But I

12  took that exam last October a year ago.

13  Q   And are you practicing medicine today?

14  A   No.

15  Q   When you were practicing, where were you licensed?

16  A   In Alabama, Florida, Georgia, and California.

17  Q   You mentioned that you ended up in Mobile, practiced with

18  Dr. Irvin, and then went out on your own; right?

19  A   Yes, sir.

20  Q   All right.  Were you initially the only physician in your

21  own practice?

22  A   Yes.

23  Q   And about how long did that last?

24  A   Seven years.

25  Q   And then ultimately did you -- did the practice grow?

JOHN PATRICK COUCH, MD - DIRECT BY MR. SHARMAN

1    A    It did.

2    Q    Did you, over time, add more staff?

3    A    I did.

4    Q    And were there more patients?

5    A    Yes.

6    Q    And were there additional physicians besides yourself?

7    A    I hired a physician named Dr. Woodward that was with me for

8    a while.  He lived in Navarre.  He had planned to buy a house

9    nearby and that never came to fruition, so he wound up leaving

10   and moving to Indiana.  And then after that is when I hired

11   Dr. Ruan, sometime between Hurricane Ivan and Katrina.

12   Q    And then eventually did y'all also hire Dr. Chen?

13   A    Yes, sir, we brought him in initially as a fellow trainee I

14   think through the Louisiana State University.  So at first he

15   was a fellow with us, sponsored through LSU, and then became a

16   employee/partner.

17   Q    Eventually did PPSA grow to be a regional leader in pain

18   management?

19   A    I would say so.

20   Q    Were you proud of it?

21   A    Very much.  That's what I came here to town to do was try

22   to duplicate as best I could what we were doing at UCLA.

23   Q    And in May of 2015 about how many patients did you have,

24   roughly?

25   A    Active?

5560

1    Q    Yes, sir.

2    A    8,000.

3    Q    In your day at PPSA, as a physician -- there may have been

4    no day that was exactly like another, but can you give us a

5    sense of a typical day for you at PPSA?  And let's say in 2014

6    or 2015, that is in fairly recent time, what would be a typical

7    day for you in your practice?

8    A    Okay.  Of course, they always change.  And I tried it

9    different ways over the years in talking to colleagues around

10   the country, the best way to do it.  These patients are

11   complicated so a lot of them can show up with acute problems or

12   in pain crisis or something like that, so it can mess up the

13   schedule and so forth, so it's hard to keep it structured,

14   structured, structured.  But generally I would get to the

15   office about 9 o'clock.

16           If I had a patient to see in the hospital that I'd

17   done a procedure on or implantation device or something like

18   that, I would round and go see them, then come to the office

19   and I would be presented -- when I would get there, I would get

20   a copy of the schedule for the day.  And there were some

21   patients that I saw myself that all -- that I'd had for years

22   that wanted to see me and there were patients I would see with

23   a nurse practitioner.  I think, like Ms. Harville said, it was

24   about two new patients in the morning, I think two in the

25   afternoon usually on average, and then the others were

5561

1   followups that were generally just standard visits for refills

2   of their medication and check on them.

3        And the policy was I was to see them at least every 90

4   days.  And if it was a new patient, maybe every 30 days until

5   we kind of got to know them, depending -- like if they drove a

6   long way, if they drove a long from Monroeville or somewhere

7   like that, you know, we tried to help them as far as, you know,

8   a compassionate basis.  But 90 days on those kind of people and

9   that type of stuff, if everything was going okay.  And

10  in-between I would do procedures, typically about 8 to 10 maybe

11  12 a day in the procedure room.  And I would see patients that

12  were getting their pumps refilled as well.  So I would just

13  kind of rotate around (indicating).

14  Q   And in that context when you say "a pump," you're referring

15  to an implanted pain pump; is that right?

16  A   Right.  It's a device that delivers drug directly into the

17  spinal fluid.  The typical -- the pump that I used was --

18  generally the one I used was made by Johnson & Johnson.  It

19  will last 125 years.  That's what the engineer stated; that the

20  septum, how many times I have to stick it to refill it every 55

21  days or so, will wear out.  It works on body heat.

22       MR. SHARMAN:  Your Honor, may I approach?

23       THE COURT:  Yes.

24  BY MR. SHARMAN:

25  Q   I'm going to show you, Dr. Couch, what's been marked as

1    Couch Exhibit 274 and ask you to take a look at it please, sir.

2    A    Yes.

3    Q    All right.  Is Couch 274 a photograph of you?

4    A    It is.

5    Q    Is it a photograph of you with a pain pump in an

6    operational environment?

7    A    Yes, sir, at the Mobile Infirmary.

8              MR. SHARMAN:  Dr. Couch moves Exhibit 274.

9              MR. BODNAR:  No objection, Your Honor.

10             THE COURT:  Mark it in.

11        (Defendant Couch's Exhibit 274 was entered into evidence.)

12   A    I'd like to make one other comment about this.

13             MR. SHARMAN:  Can you -- publish it?  Can you switch

14   the computer?

15             THE CLERK:  Yes.  Go ahead.

16   BY MR. SHARMAN:

17   Q    All right.  So Dr. Couch, first, just to help the jury

18   understand what we mean by pain pump.  Well, first, is that you

19   behind the mask?

20   A    That's me.

21   Q    And what is -- what is the -- what is the device in your

22   hand?

23   A    That's a Congdon 3000, 30-milliliter reservoir infusion

24   pump.

25   Q    And is that the device that is implanted in a patient's

JOHN PATRICK COUCH, MD - DIRECT BY MR. SHARMAN

1   body?

2   A    It is.

3   Q    And just briefly, explain how that -- how that works.  What

4   is implanted and how is the medication delivered in this pump?

5   A    Well, we do them for several reasons.  They're basically

6   used when the patient gets to a higher level where they require

7   oral narcotics.  And the general rule is -- I was trained, was

8   about 300 milligrams per day of morphine equivalence even

9   though it's been around -- I think as Dr. Warfield alluded to,

10  for thousands of years 3500 B.C.  It's still the drug the FDA

11  uses to compare all other pain medicines to -- not narcotics --

12  including Aspirin, all the pain medicines.

13         But this -- you can also put baclofen in there with

14  some spasticity for the quadriplegic/paraplegic patients.  But

15  many of those even have pain as well.  And so we usually wind

16  up mixing two or three medicines together in there.  Synergism

17  is what it's called.  It makes them more effective when taken

18  that way than separately.  It's generally about 100 -- one

19  one-hundredth of the oral dose is required to get the same

20  effect as if you were taking a tablet by mouth.

21  Q    And we heard references in testimony earlier to refills of

22  pain pumps.  Is this the device that is being refilled?

23  A    Yes.

24         MR. SHARMAN:  Your Honor, may Dr. Couch be invited to

25  step down from the stand and make use of a demonstrative?

1          THE COURT:  Yes.

2          MR. SHARMAN:  Dr. Couch, will you come down and help?

3    Right here, so I can talk.  (Indicating.)

4          MR. BODNAR:  Your Honor, may we approach briefly while

5    they get that set up?

6          THE COURT:  Yes.

7       (At the side bar, jury not present.)

8          MS. GRIFFIN:  Will you ask him to wait until the

9    objection is heard?

10         MR. BODNAR:  Your Honor, I don't know where this is

11   going, but my concern is relevance.  This case is about the

12   prescribing, the prescribing of drugs outside the usual

13   course, not a lesson on implanting pain pumps or where it

14   goes.  I mean, none of that is alleged to have been done

15   improperly, the surgery, in any way.  It's the prescribing of

16   medicines that is the issue in this trial.

17         MR. SHARMAN:  Your Honor, the government has put on

18   five weeks, both by lay testimony and documents and by experts,

19   trying to show that Dr. Couch essentially was a drug pusher;

20   that the practice was beyond the usual course and not for

21   legitimate purpose.  That is a misleading impression they have

22   tried to create.  We're entitled to demonstrate that in fact

23   that was not the practice, that it was an interventional pain

24   practice, and that the opioid, for example, prescriptions that

25   are the subject of the case are within the usual course and for

 1  legitimate medical purpose because they are part and parcel of

 2  the broader practice.

 3       The government has brought in every aspect of this

 4  practice, everything from opioids to waiting room waits.  Their

 5  experts and ours have talked about other modalities of

 6  treatment.  Well, we believe that under United States versus

 7  Hearn this fits squarely within the first and fourth

 8  categories, and we are not able to move our theory of defense

 9  forward unless we're able to offer this kind of evidence.

10       THE COURT:  What are you getting ready to go into, is

11  my question.

12       MR. SHARMAN:  I'm getting ready to hopefully

13  efficiently and relatively briefly ask Dr. Couch to demonstrate

14  to the jury one or maybe two of these procedures in the

15  simplest way so as to illustrate the testimony that they've

16  already heard from both government and defense experts and lay

17  witnesses.

18       THE COURT:  What procedures?

19       MR. SHARMAN:  An epidural and, at least as best we

20  can, how the pain pump is placed.

21       MR. BODNAR:  Your Honor, that is --

22       THE COURT:  Yeah.  This trial is not about either

23  epidurals or the placement or filling of pain pumps except for

24  perhaps the Dilaudid that was used by Justin Palmer.  And I

25  think the jury has gotten a complete picture of what the entire

1    practice was about, of what these two doctors did in terms of

2    other procedures other than simply prescribing narcotics.  And

3    so I don't think this is a necessary part of your defense.  I

4    understand why you want to do it.  But to me it's not an

5    efficient use of the jury's time because they already

6    understand -- or at least I thoroughly understand what types of

7    procedures and practice went on other than the prescribing of

8    narcotics.

9            So I don't think it's necessary to do this and I

10   sustain the objection.

11       (In open court, defendants and jury present.)

12           MR. SHARMAN:  May I continue, Your Honor?

13           THE COURT:  Yes.

14   BY MR. SHARMAN:

15   Q    Dr. Couch, was PPSA what is known, and your practice, what

16   is known as interventional pain clinic or interventional pain

17   practice?

18   A    Yes, sir.  It's actually -- more correctly it's a multi-

19   disciplinary interventional pain medicine practice.

20   Q    What do you mean by whatever you just said?

21   A    Well, we try to have everything available we can to the

22   patients in one place where they don't have to go all over town

23   because many -- 50 or 55 percent of our patients were disabled

24   or had transportation problems or couldn't drive and that type

25   stuff, and they would have to depend on their son, daughter,

 1   neighbor, somebody to bring them to the office for their
 2   appointments.  And so, you know, I found and saw what some of
 3   my colleagues were doing around the country and what we did at
 4   UCLA.  There was a lot of the things they could have done at
 5   the same place.  So it was of great value to them to have that
 6   done because it was hard for them to get transportation.  And
 7   sometimes they had to be seen quickly, and that type of stuff.
 8   Q   And just by way of example, can you identify some of the
 9   modalities or pathways by which you and PPSA tried to
10   accomplish that?
11   A   Well, we -- one way is we began to expand.  We added the
12   MRI about nine years ago.  That turned out to be very valuable.
13   Some of my colleagues around the country have done that.  We
14   were able to pick up things not just that were missed before by
15   the surgeon or sometimes they would come in if their MRI was a
16   little older, they might have had progression of a disease
17   since the last MRI.  And typically we would have them scheduled
18   but we could do it on the same day if we were worried about
19   something, you know, catastrophic could be going on.
20   Q   And so were there invasive procedures in addition to, for
21   example, implantation of pain pumps that you provided patients
22   in the course of medical treatment?
23   A   Right.  Well, that's where you get stuck with needles and
24   none of us like that.  But we do it for really two purposes.  I
25   don't think that's what's come out.  We do it for diagnostic as

5568

JOHN PATRICK COUCH, MD - DIRECT BY MR. SHARMAN

 1    well as therapeutic purposes.  Everybody knows about an
 2    epidural.  Epidurals, there are two types.  Of course, there's
 3    labor epidurals in the OB suite and then there's epidurals for
 4    spinal pain or nerve damage pain, or other types of
 5    pain.  There's other more-invasive procedures that we do for
 6    people with like chronic angina or have cardiac disease and
 7    they can't take any more pain medicine than they're on and --
 8    or there's someone with a chronic pancreatitis, which is very
 9    bad.  It's hard to even tell if it's -- the difference between
10    that and pancreatic cancer.
11         It can go in -- it's under X-rays.  It's all done
12    under X-rays, usually with contrast dye.  Dye is not really a
13    fair word because it's clear, but it shows up black on the
14    X-ray because it blocks the X-ray signals coming through.  But
15    we go in with a needle, with the patient on their stomach under
16    light sedation, usually some medication in the fanny.  And I
17    had some TVs like these size put in there where they could
18    watch TV while they're waiting for us to help them relax and
19    stuff before we'd get in there.
20         But the one I was thinking of in particular is like a
21    celiac plexus block.  There's a group of nerves that live on
22    the front of the aorta at L1 that go to the pancreas.  So if
23    they have chronic pancreatitis and have terrible chronic
24    pancreatitis pain, or if they're a patient that are having like
25    kidney stones and they're throwing a stone every day, which is

JOHN PATRICK COUCH, MD - DIRECT BY MR. SHARMAN

5569

```
 1   a 10 over 10, we can go in under X-ray and block those nerves.
 2   Usually you do it twice and see if you get a response to rule
 3   out the placebo effect.  That's where it's just -- where they
 4   get relief.  It's a psychiatric phenomenon just from having
 5   something done.  You want to demonstrate at least two times
 6   that it worked.  And then we can go in there and do
 7   radiofrequency.
 8           MR. BODNAR:  Your Honor, at this point we have got to
 9   object to relevance.  We're so far off the prescribing of
10   drugs.  There's not been allegations that any of these
11   procedures are outside the usual course.
12           THE COURT:  All right.
13           MR. SHARMAN:  We can move on, Your Honor.
14           THE COURT:  Well, you know, I am not sustaining the
15   objection but let's do move on as quickly as we can.
16           MR. SHARMAN:  Yes, ma'am.
17           May I approach again?
18           THE COURT:  Yes.
19   BY MR. SHARMAN:
20   Q   Dr. Couch, I should have covered this earlier, your
21   educational and professional background.
22           I want to show you what's been marked as two separate
23   exhibits for identification, Couch 290 and Couch 291.  If you
24   would take a look at those please, sir.
25   A   Okay.
```

5570

1  Q   Dr. Couch, do you recognize Couch 290 and 291?

2  A   Yes.

3  Q   All right.  And do they -- are they letters to you from the

4  College of Medicine at the University of South Alabama?

5  A   Yes, sir.

6  Q   And are they letters that you signed your acceptance and

7  dated your signature?

8  A   Yes, sir.

9  Q   And so are you familiar with these?

10 A   Yes, sir.

11         MR. SHARMAN:  Dr. Couch moves in Couch 290 and 291.

12         MR. BODNAR:  No objection, Your Honor.

13         THE COURT:  All right.  Mark them in.

14     (Defendant Couch's Exhibits 290 and 291 were entered into

15 evidence.)

16 BY MR. SHARMAN:

17 Q   All right.  Dr. Couch, from time to time, have you been

18 what's called an adjunct professor at the University of South

19 Alabama College of Medicine?

20 A   Yes, sir.

21 Q   All right.  I direct your attention to Couch 290, which is

22 called Memorandum of Reappointment, dated August 1st, 2011.  Do

23 you see where I read that?

24 A   Yes, sir.

25 Q   And it is addressed to you in the Department of Neurology;

JOHN PATRICK COUCH, MD - DIRECT BY MR. SHARMAN

1    is that right?

2    A    That's correct.

3    Q    Have you from time to time had an appointment as an adjunct

4    associate professor of neurology at the University of South

5    Alabama?

6    A    Yes, I was for several years up until the day of the raid.

7    Q    And generally what is neurology?

8    A    Neurology is the study of the neurological systems of the

9    body and particularly they're important for diagnosis of

10   neurological disorders that take care of patients with

11   epilepsy seizures, neuropathy pain, that type of thing.  But a

12   lot of what they do is diagnostics for neurosurgeons too.

13   There are some interventional neurologists that do procedures

14   like we do, as I mentioned.  Some other specialties are -- do

15   pain medicine as well.

16   Q    And if we could look at 291.  That was in 2011.  Couch 291

17   is a similar memorandum from July of 2014.  Were you also

18   appointed a professor -- an adjunct professor of neurology at

19   USA in 2014 as well?

20   A    I was.  And there is no neurology.  There used to be an

21   anesthesiology department at South and I actually interviewed

22   there in '91, but it disbanded sometime -- I think while I was

23   in Tampa.

24             And we had the -- some of the neurology residents at

25   South and even some of the medical students wanted to spend a

1    month of pain rotation elective.  And so they would spend a

2    month with us in the clinic and observe us and round with us

3    and that type stuff.

4    Q    All right.  I'm going to change topics on you,

5    Dr. Couch.  You saw and heard testimony about an undercover

6    visit by a DEA agent posing as a patient to your office.  Do

7    you remember some of that testimony and the video clip?

8    A    Yes.

9    Q    All right.  Do you have an independent memory of that day,

10   setting aside film and what people said?

11   A    I do.

12   Q    In a -- briefly just tell us, walking forward from whatever

13   point makes sense, what happened that day from your

14   perspective.

15   A    I think it was Debi that came up to me in the hallway and

16   said:  This next patient you're about to see, that Stacy's

17   seeing now, came to the clinic and wanted to be seen and didn't

18   have a referral.

19          MR. BODNAR:  Your Honor, we object to hearsay, what

20   Debi Phillips told him.

21          THE COURT:  Sustained.

22          MR. SHARMAN:  Your Honor, it's just the effect on the

23   listener.  I'm just trying to get -- I'm not offering it for

24   the truth.

25          THE COURT:  All right.  Go ahead.

5573

 1  BY MR. SHARMAN:
 2  Q   All right.  I'm sorry.  You said that -- when you said
 3  Debi, is that Debi Phillips?
 4  A   Yes.
 5  Q   And what did you understand from Ms. Phillips?
 6  A   She said that he wouldn't take no for an answer at the
 7  front desk, that we don't take cash.  And then he had a doctor
 8  call and -- at the same time or something like that, and sent
 9  over records or something like that, or he had a problem with
10  us not taking cash.  And I specifically remember her saying
11  that -- I don't know if it was Ms. Sue or one of them, whoever
12  saw her, was in tears.
13  Q   I'm sorry.  I didn't hear you, sir.
14  A   Somebody at the front desk that saw this agent was in
15  tears.
16          MR. BODNAR:  Objection, Your Honor, to hearsay here.
17          THE COURT:  Sustained.
18          MR. SHARMAN:  Same -- same rationale, Your Honor.
19  It's not offered for the truth.  It's the effect on him
20  (indicating).
21          THE COURT:  All right.  Go ahead.
22  BY MR. SHARMAN:
23  Q   I'm sorry, Dr. Couch.  So you understood that there had
24  been an interaction with somebody at the -- at the desk?
25  A   Yes, sir.

1  Q   All right.  And what happened?  What did you understand

2  happened?

3  A   That he wanted -- that he got this doctor to call after we

4  told him up front that we didn't take cash.  I guess maybe we

5  didn't realize when -- I don't know, that he didn't have

6  insurance or something.  So I think Debi met with him on the

7  third time and finally relented and put him on Stacy's

8  schedule.

9  Q   All right.  And were you pleased or unhappy about the way

10  that the patient had gotten in the clinic?  And if so, why?

11  A   Yeah, I was unhappy.  And I -- because I'd never had that

12  happen before where I had somebody at the front desk, you know,

13  that upset, with somebody who showed up for an appointment, or

14  came in without an appointment.  I'm not sure.  He might have

15  had an appointment, I can't remember.  But anyway, you know,

16  for her to point that out to me.  But --

17  Q   And then what happened as far as the visit itself, that you

18  recall?

19  A   Stacy came to my office and told me about him.  And I said:

20  I hear that, you know, he kind of came in under unusual

21  circumstances.  And she said:  Yeah.  And she came to my

22  office, as they usually do.  She's a nurse anesthetist.  I'd

23  known her for years before.  She did anesthesia for me at

24  Knollwood when I'd done pumps and stuff.  So anyway, she

25  presented the patient to me with the notes that she had taken

1  and we decided it and she gave me what she thought was going

2  on, that she thought he had facet pain.  And I do remember --

3  Q   I'm sorry, sir.

4  A   Facet joint pain that Dr. Warfield had talked about, and

5  her instruction.  And she went over what medicines or whatever

6  he had been on, that he owned a bulldozer or earth moving

7  company, pain for 12 months, and he was working in Mississippi.

8  And he was able to do the bulldozer and he had gotten some

9  OxyContin or some oxycodone or something from a friend, that

10  worked.  And he --

11  Q   And I don't mean to interrupt you.  But was this discussion

12  going on between you and Stacy in your office?  Was that what

13  you said?

14  A   From what I remember, yeah.

15  Q   And what happened?  What happened next?

16  A   Well, she said:  I want -- I suggested a facet joint block

17  but he's afraid of needles, or something like that.  And she

18  said:  I want to put him on lower dose, you know, I'd recommend

19  a lower dose.  That's what I let them do, to recommend.  And I

20  either agree or disagree, and do a muscle relaxant.  I think

21  Zanaflex two milligrams, and see if -- get to know him and see

22  if he decides if he still hurts, and we don't need to go up on

23  the medicine too much, do the block.  hopefully, he'll

24  decide -- sometimes patients think about it.  They look it up

25  on the internet.  We give them an information sheet about the

5576

1   procedure, and they'll change their mind the next time we see

2   them.

3   Q   And from your perspective, what happened next?

4   A   Well, then I said:  Let's go see him.  And I think that's

5   when you see the video, when I come in.

6   Q   And is there anything you did that was not fully

7   represented on the video clip that we saw earlier?

8   A   Did I do it in the room?

9   Q   Yes, sir.

10  A   With the patient?

11  Q   Yes, sir.

12  A   I can't recall.  I can't recall.  It seems like I thought

13  that I talked it over, the procedure with him with the needle,

14  and showed him the size of it.  It was all that, but no.

15  Q   Did you touch him?

16  A   I did.

17  Q   Did you touch his spine?

18  A   I did.  You can hear us talking, but you can't see it on

19  the video because it's out of the range.

20  Q   The case that the undercover agent presented, was that a

21  simple case or a complicated case?

22  A   It's simple.

23  Q   And did you provide him with a large dose or a small dose

24  of medication?

25  A   A small dose.  In fact, I think the two milligrams of

JOHN PATRICK COUCH, MD - DIRECT BY MR. SHARMAN

1  Zanaflex is the lowest they make.

2  Q   And was it your expectation that Stacy, your nurse

3  practitioner, would have reviewed whatever records the

4  referring physician sent?

5         MR. BODNAR:  Objection, Your Honor, to leading as well

6  as speculation.

7         THE COURT:  Sustained.

8         MR. SHARMAN:  I'm just asking for a fact.

9         Let me restate it.

10 Q   Did you have any expectations with regard to what Stacy

11 your nurse practitioner would have or would not have done with

12 regard to records review?

13 A   No.  But I wanted to point out that she actually was a

14 certified registered nurse anesthetist and had done a three-

15 year doctorate level training on top of that.  So

16 she technically -- you could call her doctor like you call a

17 doctor of pharmacy and so forth.  So she had extra training on

18 top of being a CRNA.  That's why she had her own patients.

19 Q   In the normal course would Stacy review medical records

20 from referring physicians?

21 A   Yes, sir.

22 Q   All right.  On the subject of nurse practitioners -- and

23 you started to allude to this a moment ago -- what makes a

24 nurse practitioner different than a regular nurse; for example,

25 an RN?

5578

1    A    Nurse practitioners have to do extra training, about three

2    years, I think they do; have to spend at least two years in ICU

3    setting, and a critical care setting, and another year of

4    instruction above and beyond the RN level of education.

5    Q    And then you just mentioned a CRNA.  What does CRNA stand

6    for?

7    A    That's certified registered nurse anesthetist.

8    Q    Does that require something different or additional with

9    regard to what a nurse practitioner has to learn?

10   A    Yes, but it's a different track.  It's for supporting the

11   OR of anesthesiologists.

12   Q    And then you mentioned that Stacy had obtained a doctorate.

13   In this setting, in this circumstance, what does a doctorate

14   mean for a CRNA?

15   A    Well, she was able to qualify for this doctorate program

16   they had at Baylor, Texas that -- and it's kind of a new thing

17   now.  They have -- it's called doctorate of nurse practitioner,

18   the practice of nurse practitioning, or whatever.  And so it's

19   three years beyond -- for her it would have been three years

20   beyond her CRNA training.

21   Q    Now, Justin Palmer was one of your nurse practitioners, was

22   he not?

23   A    Correct.

24   Q    And did he have any experience or training that you found

25   to be particularly helpful or likely to be helpful when he was

JOHN PATRICK COUCH, MD - DIRECT BY MR. SHARMAN

1   hired?

2   A    Yes.

3   Q    What was that?

4   A    He had worked the emergency room, I think he told me, about

5   seven-eight years, something like that; plus he had done some

6   medic work in the Navy.

7   Q    And then was Bridgette Parker also one of your nurse

8   practitioners?

9   A    Yes.

10  Q    Did Ms. Parker have any particular prior experience that

11  you anticipated would be helpful or useful when she was hired?

12  A    Well, she was hired by Dr. Ruan but I knew that she had

13  worked for Cardiology Associates down the street from us.  And

14  I know Dr. Franchez and some of those doctors and that's --

15  they run a tight practice, tight ship.  And she had worked for

16  them for 15 years so I thought that she would be good in our

17  setting and would know a lot about cardiac issues and critical

18  care, and things like that.  And so --

19  Q    All right.  And was it within the normal course of medical

20  practice for a physician to use nurse practitioners?

21  A    It's done every day.  Yes.

22  Q    Did you collaborate with them; that is, work together?

23  A    Yes.  That's why I would say "we."  It's a team approach.

24  Q    All right.  Let me switch subjects again,

25  Dr. Couch.  You've been sitting here and you've heard some

5580

1   discussion about signed blank prescriptions.  Do you remember

2   generally that topic that's been discussed here?

3   A   Yes, sir.

4   Q   And this was in the context of signed blank prescription

5   pads at PPSA; is that right, that you heard discussion about?

6   A   Yes, sir.

7   Q   Did you ever sign a blank prescription?

8   A   No.

9   Q   Did you ever provide a blank signed prescription to a staff

10  member?

11  A   No.

12  Q   Did you ever provide a blank signed prescription to a

13  patient?

14  A   No.

15  Q   And you were here when Justin Palmer testified; is that

16  right?

17  A   Yes, sir.

18  Q   And you heard -- did you hear -- you heard what he said,

19  what he testified about?

20  A   Right, yes.

21  Q   Did you ever authorize Justin Palmer to sign your name on a

22  prescription?

23  A   No.

24  Q   Did you ever authorize anyone to sign your name on a

25  prescription?

5581

JOHN PATRICK GOUGH, MD - DIRECT BY MR. SHARMAN

1  A   No.

2  Q   Now, did there come a time when you found out that

3  Mr. Palmer had in fact signed your name on a prescription?

4  A   I found out that he was intending to leave a prescription

5  for a friend at the front desk, for Adderall.

6  Q   Was this -- was this the person that he referred to as

7  Person A, I believe?

8  A   That's correct.

9  Q   And when you found out that that was his intention, what

10 did you do?

11 A   Well, one of the medical assistants came up to me and said:

12 So-and-so called and wanted to know if this prescription was

13 going to be here to pick up and if it's ready.  And I went and

14 I found him in the hallway and I said:  What's this about

15 Person A getting this prescription for this at the front desk?

16 He said:  Well, I was going to give him that.  And I said:

17 Well, how are you going to do that?  And he said:  Well, I was

18 going to sign your name.  I said:  You're fired.

19 Q   Did you actually make that --

20 A   I went "you're fired," just like in Fast Times in Ridgemont

21 High, yeah.

22 Q   Did -- well, what happened -- what happened next?

23 A   He said:  Well, do you want me to get my stuff?  And I

24 said:  Well, if you want to.  Yeah, clean out your desk and get

25 your stuff later, we'll be in contact with you.

5582

1    Q    What happened after that?

2    A    I went to my office and I called -- well, I went and met

3    with Hunter -- I think it was Hunter Swanzey at the time, the

4    administrator, and I called Boe and I talked to Debi and talked

5    to a couple of people about it and kind of ran it past them.

6    Q    And then what happened with regard to your thinking about

7    that, and your decision?

8    A    Well, due to the fact that I didn't actually see any

9    prescriptions that he had signed, that I thought it was just a

10   one-time thing.  And because he was going through a divorce, I

11   believe at the time, things like that, I thought about it in my

12   office, I prayed about it, and then I decided to give him

13   another chance.  And I think I called Boe back and said:  I

14   think I'm going to give him another chance.

15   Q    Did you tell Mr. Palmer not to do that again?

16   A    I did.

17   Q    And did you expect that your instructions would be

18   followed?

19   A    Yes, sir.

20   Q    If he failed to follow your instructions and was signing

21   your name on prescriptions or anything else for that matter,

22   did you know about it?

23   A    No, sir.

24   Q    All right.  Let me switch topics on you again.  What was

25   your involvement, if any, in billing for services rendered by

JOHN PATRICK COUCH, MD - DIRECT BY MR. SHARMAN
5583

1   you or others at PPSA?

2   A   Only what I would see at the time of the patient visit or

3   if I was dictating or completing a chart in my office, ordering

4   tests or ordering procedures and things like that.

5   Q   Did you have a billing staff to handle billing duties?

6   A   I did.

7   Q   Did you look to them in general to get that done; that is,

8   to handle the billings and to do so in an appropriate way?

9   A   Yes.  Debi had about 24 years of experience in billing, I

10  think at the time, and the other people had a lot of experience

11  and they were sent at least once a year to update courses

12  because every insurance company changes their rules; not every

13  but they often change their rules from year to year on things

14  like that.  And so these are professional billing people that

15  are certified and that's their area of expertise.  So I depend

16  on them to do that.

17  Q   Even though you said you didn't do much with billing, did

18  you ever make any entry in any bill that you understood or

19  believed to be false?

20  A   No, sir.

21  Q   Did you ever endorse or approve anybody else doing that?

22  A   No, sir.

23  Q   All right.  Now, there was some discussion over the last

24  few weeks about bills and billing for services, including

25  billing for services when the government says you were out of

5584

1   the office or otherwise away from the practice.  Do you

2   remember some of that topic generally?

3   A   Yes, sir.  Yes, sir.

4   Q   All right.  With regard to services and statements for

5   those that occurred if you were out of the office, what was

6   your understanding of what was okay or not okay?

7   A   Well, like I mentioned with Debi with her experience and

8   going at least once or even twice a year to these conferences I

9   would ask her:  What are the rules now on who I'm supposed to

10  see and when do I have to be in the room, who do I have to see,

11  that type of thing.  And she said with --

12        MR. BODNAR:  Objection.  Hearsay, Your Honor, to what

13  she told him.

14  A   I can tell you what I know.

15        MR. SHARMAN:  Same thing, Your Honor.  Effect on the

16  listener.  I'm not offering Ms. Phillips' statement for the

17  truth; just what he understood to be the --

18        THE COURT:  Overruled.

19  BY MR. SHARMAN:

20  Q   I'm sorry.  What was -- you said that you had looked to

21  Ms. Phillips.

22  A   Yes.  She was my main resource to find out, you know, make

23  sure they were doing everything right.  And she said that with

24  Medicare, as long as you're available by phone, you know, you

25  can be out of the office and the nurse practitioner can see the

5585

1   patients in follow-up or even new patients.  I typically saw
2   every new patient.  And then with Blue Cross you have to see
3   them.
4   Q   Did you ever have any reason to doubt Ms. Phillips' advice
5   about anything in the area of billing?
6   A   No, sir.
7   Q   There was also some discussion about you being out of the
8   office or away from the office in general, understanding it may
9   change from year to year.  How much vacation did you take
10  annually?
11  A   Like a full week generally, with the week between --
12  generally between Christmas and New Year's and then most of
13  Mardi Gras week.  Because a lot of the employees were in Mardi
14  Gras associations and things like that.  So those were two
15  times that I would do -- I know those were only a couple of
16  months apart, and then maybe sometime between Mardi Gras and
17  the next Christmas.  But usually I had long weekends.  I
18  noticed that on the chart, looked like a Friday through Monday.
19  Q   Did you frequently take Fridays off?
20  A   I did.  I worked usually -- sometimes I did not work any
21  Fridays.  Justin never worked Friday after the first year of
22  employment, I think.  He only worked four days a week.  So I
23  would take either every other Friday off or work half a day on
24  Friday -- usually a half a day at the West Mobile office.  And
25  if there were no patients at all to be seen on that Friday, I

1    would schedule my surgeries that I would do in Florida, at West

2    Florida Hospital and do those on Fridays.

3    Q    I want to change topics on you again.  Did you from time to

4    time give talks about Subsys?

5    A    Yes.

6    Q    Did you give talks at, for example, lunches and dinners?

7    A    Yes.

8    Q    Did you have an agreement with the manufacturer of

9    Subsys -- Insys to deliver those talks?

10   A    I did.

11   Q    For those talks, did you receive a payment or an honorarium

12   from Insys, the manufacturer?

13   A    Yes.  They offered that, yes.

14   Q    Okay.  And did you accept it?

15   A    I did.

16   Q    And did those payments, Dr. Couch, have any effect on your

17   prescription of Subsys to any particular patient?

18   A    No, none whatsoever.

19   Q    What was the driving force or primary consideration in your

20   mind with regard to the prescription of Subsys to any patient?

21   A    Their pathoanatomy and the failure of other drugs to

22   deliver satisfactory relief to improve their function.

23   Q    Now, we have seen some charts that the government prepared

24   about prescription of Subsys based on volume over time.  Do you

25   remember generally --

JOHN PATRICK COUCH, MD - DIRECT BY MR. SHARMAN

1    A    Yes, sir.

2    Q    -- seeing some of those charts?

3    A    Yes, sir.

4    Q    Assuming for the moment those charts are accurate.

5    A    Okay.

6    Q    Why did it show an increase of Subsys prescriptions from

7    you?  Why did it increase?

8    A    Like I said, mainly because of the coupon system they had.

9    They would come out with these coupon voucher programs and the

10   patient could get free drugs for a certain amount of time.  As

11   I understood it, the insurance company or the government would

12   not be charged for the medication.  And that then sometimes we

13   could get them on the free assistance program where they could

14   get it for, you know, for life, really, some cases.

15   Q    Was your prescription of Subsys to your patients who

16   received it for a legitimate medical purpose every time?

17   A    Always.

18   Q    With regard to those talks we just mentioned, was it your

19   responsibility to show up and deliver the talk?

20   A    That's right.  That was the contract that I signed.

21   Q    And was it your responsibility to recruit people to attend

22   or just to deliver the talk to whoever showed up?

23   A    It was my responsibility to suit up and show up on time

24   with a slide deck that was preapproved by the FDA and we could

25   not deviate from that slide deck.

5588

JOHN PATRICK COUCH, MD - DIRECT BY MR. SHARMAN

1  Q   And regardless of how many or how few showed up, and

2  without regard to the particular composition of an audience on

3  a particular day, did you consider, from your viewpoint, those

4  talks to be genuine, educational and appropriate professional

5  talks?

6  A   Yes, sir.

7  Q   Similarly, the government talked a lot and the jury heard

8  about your ownership of some stock in a company called Galena.

9  Do you remember generally --

10 A   Yes, sir.

11 Q   -- some of that discussion?

12 A   Yes, sir.

13         THE COURT:  Mr. Sharman, before you get into that,

14 let's go ahead and take our afternoon break.

15         MR. SHARMAN:  Yes, ma'am.

16         THE COURT:  Ladies and gentlemen, leave your pads on

17 your chairs.  No discussion about the case.  Take your break

18 downstairs in the jury assembly room and we will call you back

19 in about 15 minutes.  We are in recess.

20     (A recess was taken at approximately 3:14 p.m.)

21     (In open court, defendants and jury present.)

22         THE COURT:  All right, Mr. Sharman.

23         MR. SHARMAN:  Thank you, Your Honor.

24 Q   All right.  Dr. Couch, over the last few weeks have you

25 seen, along with the jury, quite a few excerpts from patient

5589

1    charts, from patient files?

2    A    Yes, sir.

3    Q    I'm not going to march us through all those again but I am

4    going to ask you about some of the diagnoses that show up in

5    some of the charts that we've seen.  Okay?

6    A    All right.

7    Q    What is failed back surgery when we see that in a patient

8    chart?  And in general, what's the treatment response to that?

9    A    It means that the patient's had surgery prior on their

10   spine and it failed to relieve the pain or the problem that

11   they originally sought out care for.  It's really kind of

12   unfair to the surgeons to use the word failed, but that's

13   basically what it is.

14   Q    And can that be treated both pharmacologically, that is

15   with medication, and with some sort of procedure?

16   A    It can, along with physical therapy and bracing and

17   interventional procedure techniques that we do in the office

18   under X-ray, that type of stuff.

19   Q    Another diagnosis we've seen was degenerative disk disease.

20   What is degenerative disk disease and how is that handled in

21   pain management?

22   A    It's a general term for the cushiony disks between the

23   bones in our back, the vertebrae.  It was discovered that there

24   are very small nerves that go to those disks, called sinusoidal

25   nerves and the disks themselves can be painful.  And it might

JOHN PATRICK COUCH, MD - DIRECT BY MR. SHARMAN

```
 1  not even show up on X-ray.  And there is one way to find that.
 2  Sometimes we'll get a referral from the surgeon to do what's
 3  called a diskogram where we go in there and X-ray it and inject
 4  up to two ccs of that dye I was talking about and look to see
 5  if there's any leakage, because there can be tears in the disk
 6  itself.  It's like -- I think Dr. Greenberg said, it's like a
 7  jelly doughnut.  He's right.
 8          Sometimes you can have tears in the outer part of the
 9  doughnut that don't show up on CT or MRI.  And we do these
10  diskograms the surgeons will ask us to do.  It's actually
11  called a provocative diskogram.  And if the patient reports
12  actual reproduction of their usual pain when you put the
13  medicine in for a few seconds, it helps us to isolate what's
14  called the pain generator.
15  Q   We also saw radiculitis.  What is radiculitis?
16  A   Radicula means the root of the nerve coming off the spinal
17  cord or coming out of the spinal column, the vertebral column.
18  And the itis always means inflammation.
19  Q   We also saw pancreatitis.  Is pancreatitis a common
20  diagnosis that you saw in your patients?
21  A   I did.
22  Q   And what is that?
23  A   Again, that's the itis.  That's inflammation.  It's not
24  cancer or anything like that.  It can be caused by many
25  different reasons:  alcohol intake, stones that can back up
```

JOHN PATRICK COUCH, MD - DIRECT BY MR. SHARMAN

```
 1   into the pancreas.  Sometimes even the stones that are released
 2   by the liver can get up into the little hole that comes from
 3   the pancreas that dumps its enzymes into the small intestine
 4   that's used to digest food.
 5          But what happens, the problem is those enzymes, if
 6   it's a backup in the plumbing there, they can be released into
 7   the pancreas itself and start to autodigest the entire organ,
 8   and parts of the innards too.  And they develop what's called
 9   pseudocysts and they can show up on MRI or CT.  And these
10   people are in a lot of pain, and frequently we have to implant
11   the pump in those people.  And that happens to be one of the
12   type of pains that responds well to these intrathecal devices.
13   Q   And did you have patients who had a present diagnosis, a
14   present experience of some type of cancer?
15   A   Yes.
16   Q   And did you also have patients who did not have a present
17   diagnosis of cancer but had had one and suffered from cancer in
18   the past?
19   A   Yes.
20   Q   In your pain management practice did you encounter people
21   in the latter group who suffered from residual effects of
22   treatment, whether chemo or some other treatment?
23   A   I did.
24   Q   How does that -- how does that work and how is that
25   addressed?
```

JOHN PATRICK COUCH, MD - DIRECT BY MR. SHARMAN

1  A   Well, as the technology's gotten better, even since I

2  graduated from medical school for treating cancers, a lot of

3  the treatment to get those patients in remission can cause a

4  lot of problems.  They'll save their life but the radiation

5  therapy that many of them receive burns nerves and that can

6  become chronic and it can last a lifetime.  It's very painful.

7  That's one example.

8        Some of the chemotherapeutic agents that they receive

9  like particularly vincristine or cisplatin can also cause nerve

10 damage.  The surgery for, for example, a mastectomy, they have

11 to do dissection of the lymph nodes of the entire area up under

12 the armpit.  So the surgeon has to cut through nerves to get

13 through those lymph nodes.  So nerves don't like to be cut.

14 They learned that in the 50's.  They thought, well, you have

15 pain, just cut the nerve.  And one thing, you can't move that

16 part of the body anymore because there might be motor function

17 of that nerve.

18       And you'd be surprised, even though it's numb, it

19 becomes irritating to the person.  And when they're cut, they

20 try to find each other and they sprout little roots and they

21 start firing all the time.  So you get this -- what's called

22 dysesthetic pain, deafferentation pain.  We see that a lot in

23 the patients that get amputations.

24 Q   We also saw diagnoses of Crohn's disease.  What is Crohn's

25 disease and how does that relate to pain management practice?

5593

1  A   Crohn's disease is not cancer, but it's one of those

2  diseases that's just as bad, if not worse, than cancer

3  itself.  It's where the patients develop these ulcerations in

4  the small bowel.  Typically they can get it all the way from

5  the mouth, in their cheek, all the way to the end.  It's poorly

6  understood.  It's thought to be an autoimmune disease where the

7  body makes antibodies to the lining of the bowel and attacks

8  parts of that.  So they don't absorb food as well.  Therefore,

9  they don't absorb medicine very well.  And again, they can have

10  attacks, bouts of pain crises.

11  Q   All right.  With several of those diagnoses you mentioned

12  some of the interventional procedures that we had talked

13  about.  I want to direct your attention to medications,

14  including opioids and in your practice, how they worked.  Do

15  medications, including opioids, work differently to relieve

16  pain than, for example, some interventional procedure like an

17  epidural?

18  A   Yes, sir.

19  Q   Okay.  How does that work?  And explain the difference.

20  A   Well, for one thing, the patient has some control over the

21  medications.  When -- pain is not linear.  It's sinusoidal.

22  It's up and down (indicating).

23  Q   Doctor, you used the word -- actually, if you want to, you

24  can touch the screen and draw.

25  A   Yeah.  Well, linear means in a line, like it never changes.

JOHN PATRICK COUCH, MD - DIRECT BY MR. SHARMAN

```
1   Q    I got that.

2   A    Yeah.

3   Q    The other one.

4   A    The -- we might -- some of us remember it from

5   trigonometry.  Sinusoidal is up and down like a radio wave.

6   Q    You can actually draw that on the screen.

7   A    Good days and bad days (indicating).

8   Q    I'm sorry, I interrupted you.  Is that the nature of pain?

9   A    Yes, sir.   Generally.

10  Q    And how do opioids and other medications address pain?

11  A    They are receptors in the central nervous system.  They're

12  actually throughout the body, the small bowel and the brain,

13  spinal cord, that these molecules or these opioids bind to and

14  they activate a cascade of events to block the pain signals

15  from entering into the area of the brain that brings on

16  discomfort, and so forth, basically is the easiest way I can

17  put it.

18  Q    Now, do you -- based on your training and experience and

19  practice do you find opioid medications to be appropriate in a

20  particular situation?  And if you do, why?

21  A    I do.  They're not for everyone.  Typically when the

22  patients get to us, a lot of them are already on them or

23  they've been tried on them by their surgeon or their other

24  physician, family physician.  And sometimes they're the only

25  things that work.  And there's a professor from Cornell at
```

1    Sloan Kettering named Steven Passik, and I've seen -- several

2    medical conferences speaking, and he said we use them --

3            MR. BODNAR:  Objection to hearsay, Your Honor.

4            MR. SHARMAN:  Your Honor, I'm not offering it for the

5    truth of what Dr. Passik said.  I'm offering it for its effect

6    on Dr. Couch's understanding.

7            THE COURT:  Overruled.  Overruled.

8    A    And he said we use opioids for one simple reason:  Because

9    they work.  But really, the real answer is they work in some

10   people.  They don't work in everybody.

11   BY MR. SHARMAN:

12   Q    With regard to the use and prescription of opioids, in your

13   experience is that something that is ultimately dependent upon

14   the judgment of the physician?

15   A    Yes.

16   Q    Now, we talked about pain and you drew this example of its

17   pattern.  We've also heard a lot about breakthrough pain.  What

18   is breakthrough pain and how is it different from just pain?

19   A    Breakthrough pain is -- I think someone else had testified

20   before -- is great pain, that short-term, quick onset, very

21   intense.  Sometimes there's no warning it's going to come on,

22   and it's breaking through their medication that they're already

23   on.  Either -- their blood levels for that medicine have

24   dropped too low.  There's two types of breakthrough pain.

25   There's incidental, where they -- like if they go to the

1    mailbox and aggravate it or go to Wal-Mart and walk too much,

2    it will happen.  And then there's paroxysmal which is a fancy

3    word for we don't know why it happens, it just happens.

4    Q    Like can you graphically represent on the screen --

5    A    How do I erase it?

6    Q    -- breakthrough pain?

7    A    How do I erase it?

8            THE CLERK:  The screen itself, on the left hand only.

9            THE WITNESS:  Over here?

10            THE COURT:  Lower left at the bottom, right above the

11    word.

12            THE WITNESS:  I see (indicating).

13            THE COURT:  There you go.

14    A    Okay.  Well, as was learned throughout the '70s and '80s in

15    anesthesiology in the opera -- in the hospital when these

16    pumps -- you might have heard of these PCA pumps.  Patient

17    controlled analgesia is what it stands for, where you have the

18    pump and the button.  And studies were done that showed that

19    when they got that, instead of calling the nurse every

20    whatever, or having a p.r.n. or as-needed call the nurse, they

21    wound up using less medication and reporting lower pain

22    scores.  And so that principle, on outpatient basis, you put --

23    as we were trained, you put the patient on a long-acting opioid

24    to kind of try to keep their levels -- now, this is the level

25    in the blood.  Up here you get side-effects, down here you get

1    pain, and it's not an adequate dosing.  They might regurgitate

2    their medicine or feel better or not have -- or have absorption

3    problems in the gut and so they have -- that's one explanation

4    that you can have breakthrough pain.

5              So you take a short-acting on top of it to push

6    this -- serum levels we call them -- in the bloodstream back up

7    within this threshold, this area where they get adequate relief

8    and function without side-effects.

9    BY MR. SHARMAN:

10   Q   Is that kind of analysis or process part of the process

11   that you went through with each of the patients and their

12   experience that we've seen here in determining what their plan

13   of treatment would be, whether it included opioids or other

14   modalities?  Was this part of your thinking?

15   A   Yes, sir.  If they were on opioids or if we planned to have

16   them continue the opioids they were on, certainly that would be

17   a consideration that would go through my mind on dosing.

18   Q   On the subject of dosing, we heard -- the jury heard some

19   discussion about triple digit doses.  Do you remember some of

20   that discussion?

21   A   Yes, sir.

22   Q   And just your understanding of the term, what's your

23   understanding of the term triple digit dose?

24   A   I first heard that term as -- around 2006.  On the DEA

25   website, they put out some guidelines and I remembered a couple

5598

1   of them.  They weren't up past 2006, I don't think.  And they

2   said try your best to keep it below triple digits, something

3   like that.  You know, not more than 99.  As a general rule I

4   try to do that, but it's not written anywhere that you can't do

5   that.  But I try to do that.

6   Q   That was going to be my next question.  Is there any rule,

7   regulation, guidance document that says a prescribing physician

8   may prescribe no more than 99 units per prescription?

9   A   No, sir.  In fact, I've seen the opposite published.

10  Q   Is that something that at the end of the day is reserved

11  for the judgment of the physician?

12  A   Yes, sir.

13  Q   All right.  Dr. Couch, I'm going to turn your attention to

14  a different topic and a potentially difficult topic so I want

15  you to listen to my questions.  Okay?

16  A   All right.

17  Q   Was there a time when you realized that you had an alcohol

18  and medication substance abuse disorder or problem?

19  A   Yes.

20  Q   When did that realization occur and then what happened

21  after it?

22  A   It happened around February of 1992.

23  Q   Okay.  Where were you in February of '92 and what were you

24  doing?

25  A   I'm sorry '93.  '93.  '93.

JOHN PATRICK GOUGH, MD - DIRECT BY MR. SHARMAN

1   Q   Where were you in February of '93 and what were you doing?

2   A   I was in my first year of anesthesia residency at Tampa

3   General Hospital.

4   Q   And what happened?

5   A   Well, I noticed that my drinking began to progress and I

6   had heard about this chief, or he was a head resident when I

7   was in Augusta.  Apparently he was a heavy drinker and would

8   start an I.V. on himself and rehydrate himself.  And so I

9   thought about that.  I was getting hangovers.  And so I would

10  use that at home to get over a hangover fast, along with Advil

11  and that kind of stuff.

12  Q   I'm sorry.  You would use what at home?

13  A   I.V. fluid.

14  Q   Did there come a time when you sought any assistance or

15  were provided any assistance with regard to drinking or any

16  other sort of abuse?

17  A   Yes.

18  Q   Okay.  What happened then?

19  A   Well, I went to outpatient treatment there in Tampa.  I was

20  evaluated by, I believe, an addictionologist.  Dr. Sheehan was

21  his name, Michael Sheehan, and did outpatient counseling.  And

22  they allowed me to come back to work.

23  Q   And you were allowed to come back to work and did you

24  finish your residency, as you talked about earlier?

25  A   I did.

JOHN PATRICK COUCH, MD - DIRECT BY MR. SHARMAN
5600

1    Q    So if that was in early '93, was there a period after that

2    treatment where you were clean and sober?

3    A    There was.  And --

4    Q    When did that start?

5    A    Well, I was clean and sober for about three or four months

6    doing the outpatient.  And I was having trouble sleeping and so

7    I had been -- I started with Benadryl, putting it in my I.V. to

8    help me sleep.  And then that made me feel weird the next

9    day.  And then propofol, as we've heard about before, is a drug

10   that at the time was available and not controlled, or if it was

11   controlled it was available to the anesthesia residents.  And I

12   took that home to help me sleep.

13   Q    And then was there a period after that and that -- and

14   treatment for that that you were sober after that?

15   A    Yes.

16   Q    And was that from June of 1993 or so, summer of '93?

17   A    It was June of '90 -- June 26, 1993 until sometime for

18   about 12 years.

19   Q    And then what happened after about a dozen years?

20   A    Well, I had started out here in Mobile going to AA for a

21   couple or three years.  I remember I picked up my five-year

22   chip in Fairhope at the Friends Meeting, and I started to drift

23   away from it, as can happen.  And then --

24   Q    Did you have a relapse?

25   A    I picked up a gin and tonic at a party in Destin, Florida.

1    Q   And then did you seek and were provided rehab assistance in

2    that relapse?

3    A   Yes.

4    Q   And since the conclusion of that relapse and that

5    treatment, have you been clean and sober since then?

6    A   Yes.

7    Q   So from when until today?

8    A   Since June 27th of 2008.

9    Q   During that entire period, going back to when this was

10   first taken note of back in Tampa in 1993, were the medical

11   authorities always aware of your situation?

12   A   Yes.

13   Q   Did you ever hide that from any licensing or academic

14   authority?

15   A   No.  In fact, I underwent drug testing regularly.  Random.

16   Q   Do you today regularly attend AA meetings?

17   A   Yes.

18   Q   Are those meetings regularly in the early morning or are

19   they regularly in the evening?

20   A   Regularly in the morning.  My home group is a 7:30 meeting

21   on the Eastern Shore but I do go to other meetings in the

22   evening.

23   Q   So on a general day of practice if you weren't in the

24   office early, where were you?

25   A   Generally I was at my meeting unless, like I said,

5602

1   extenuating circumstances.  If I had a patient to see in the
2   hospital rounds or if my kids had a problem or something like
3   that, I would be at the 7:30 Serenity Group meeting.  And I
4   chaired the meeting -- I have chaired the meeting since I came
5   back in '08, twice a month.
6   Q   Were those experiences difficult ones?
7   A   Of course.
8   Q   Did they make you a better or a worse pain management
9   physician?
10   A   They made me a better physician.
11   Q   Why?
12   A   Because I was able to realize what it felt like to be in
13   that situation.  And when all else failed, if I had a patient
14   and I saw in their intake record that they had been through
15   treatment before, and they were asking for something like
16   Xanax, and I saw where it said:  Used to attend AA, or
17   something like that, I would ask them are they still attending
18   meetings, does your sponsor know you're asking for this, and --
19   or if I felt like there might be some -- on a long-term patient
20   the literature shows that five, six, seven percent of even
21   chronic-pain patients can develop what's called substance use
22   disorders now.  And if I felt that might be happening, and it
23   wasn't pseudo addiction, I would tell the patient about myself
24   in a general way.
25   Q   Because of your experience, Dr. Couch, would you ever do

1   anything in your practice that you believed would get somebody
2   addicted?
3   A    No.
4   Q    Now, as we've heard and as the jury has heard, there came a
5   time when the abuse and dependence issues of Justin Palmer and
6   Bridgette Parker came to light.  Do you remember some of that
7   discussion in testimony we've heard?
8   A    I do.
9   Q    When those addiction problems came to light, how, if at
10  all, did your experience factor into how you handled those
11  situations?
12  A    Yes.
13  Q    How did it -- how did it factor into it?  How did it affect
14  it?
15  A    Well, as soon as I found out that there was a problem, I
16  took action.
17  Q    Did you do anything to assist Mr. Palmer or Ms. Parker or
18  did you just show them the door?
19  A    We'll start with Ms. Parker.  As you know, she worked for
20  Dr. Ruan first and so when I found out, it came to my
21  attention.  Somebody said that she was oversedated and they saw
22  her bumping into walls and all that type stuff.  So I discussed
23  it with Debi who -- Debi Phillips, and I think Hunter, or
24  whoever the administrator was or the comptroller at the time,
25  the management team, and made the decision to refer her to

JOHN PATRICK COUCH, MD - DIRECT BY MR. SHARMAN

1    Recovery Resources for evaluation.

2    Q    And then what about Mr. Palmer, did you just show him the

3    door or did you take other steps with regard to him?

4    A    I didn't show him the door.  That's when I contacted Boe.

5    I told him -- he walked in my office and --

6    Q    I'm sorry.  You said Boe, is that Boe Strange?

7    A    Boe Strange, yes, sir.  As I recall, he came to my office

8    and said, you know, I'm using and I'm just tired.  And I need

9    help.

10            And I said -- and here's where I, you know, as an

11   employer and under the Americans with Disabilities Act and that

12   type of stuff, I tried to keep it limited and not go into

13   details with him.  And so I just told him to go home or go to

14   his sister's house, as he was going through a divorce still,

15   and we would be in contact with him.  And I called Boe and

16   discussed it with him and told him, you know, that we needed to

17   give him some type of -- get him into rehab.

18   Q    Eventually did both of those people separate from PPSA?

19   A    Yes, sir.

20   Q    With regard to Mr. Palmer, from the start of his employment

21   until the moment we just talked about, did you trust him?

22   A    I did.

23   Q    Did you rely upon him?

24   A    I did.

25   Q    Did you believe that he was good at what he did?

JOHN PATRICK COUCH, MD - DIRECT BY MR. SHARMAN

```
 1   A   I did.

 2   Q   Was he good at what he did?

 3   A   Yes, he was.

 4   Q   Did you trust him and rely upon him to take care of

 5   patients?

 6   A   Yes.

 7   Q   And the same with Ms. Parker, did you have faith in her

 8   abilities?

 9   A   I did.

10   Q   And did you believe that she did a good job with patients?

11   A   I did.

12   Q   And did you rely on her to provide the best care possible

13   to the patients that were presented?

14   A   Yes, sir.

15   Q   If you had known, for example with Mr. Palmer, either the

16   extent of his medication problems or the claim to the extent of

17   his forgeries, would you have taken action sooner?

18   A   Yes, sir.

19   Q   Let me move the subject matter again, Dr. Couch, to the

20   subject of prior authorizations.

21   A   All right.

22   Q   And do you remember some of the discussions in the

23   testimony that we had earlier about prior authorizations?

24   A   (Nodding head affirmatively.)

25   Q   First, what was your involvement, if any, in the
```

JOHN PATRICK COUCH, MD - DIRECT BY MR. SHARMAN

1  preparation of prior authorizations?

2  A   Prior authorizations for procedures you mean?

3  Q   Well, actually let's start with prior authorizations for

4  any medications, and in particular as we saw for Subsys.  What

5  was your involvement, if any, in those prior authorizations?

6  A   Well, we had two employees that that was their job, really,

7  was to get the authorization from the third-party payor to

8  cover any procedure, any particular thing we were going to do

9  separate than an office visit, including medications, to call

10  and try to see if they were covered or if they needed a prior

11  authorization.

12  Q   In general, did you rely on those folks to monitor and

13  follow through on that process?

14  A   Yes, sir.

15  Q   Did you ever sign a prior authorization or any document

16  associated with one?  Did you ever sign a prior authorization

17  in blank?

18  A   No, sir.

19  Q   Did you ever sign a prior authorization that was presented

20  to you and contained information that you believed to be false?

21  A   No, sir.

22  Q   For that matter, did you ever sign one that contained

23  information that you thought was just inaccurate, whether it

24  was false or not?

25  A   No, sir.

5607

JOHN PATRICK COUCH, MD - DIRECT BY MR. SHARMAN

1   Q   We also heard a lot about urine drug screens, both in

2   patient charts and then from testimony.  Do you remember

3   that --

4   A   Yes, sir.

5   Q   -- subject area?

6   A   Yes, sir.

7   Q   In your experience -- well, let me back up.

8           Your practice and PPSA's practice, used in-office

9   so-called cup urine screens; is that right?

10  A   Yes, sir.

11  Q   From time to time are cup urine screens inaccurate?

12  A   The reported data that I've seen is 60 percent of the time

13  they're accurate; 40 percent they're inaccurate.

14  Q   Can they be inaccurate in terms of giving a false positive?

15  A   Yes, sir.

16  Q   Can they be inaccurate in terms of giving a false negative?

17  A   Yes, sir.

18  Q   And when you use the term false positive, what do you know

19  that to mean or what do you understand that to mean?

20  A   It's saying it's positive for a drug that is not there.

21  Q   And what's your understanding of false negative?  What does

22  that mean?

23  A   It's indicating that there's no drug there when there

24  actually is.

25  Q   Is there -- when medication is in the body, does it

1  metabolize?

2  A   Yes, sir.

3  Q   What is metabolization?  What is that?

4  A   Metabolism?  It is -- it starts -- it depends on the

5  administration route of the drug.  Take, for example, a tablet.

6  It really can start as early as in the mouth with the saliva.

7  We have enzymes that the parotid glands make.  It starts there,

8  if you want the real answer, then it goes down to the stomach.

9  The first place it goes after that, some of it's absorbed into

10  the stomach -- aspirin, for example.  But generally, most of it

11  is absorbed in the first stage of the small bowel, in the

12  duodenum and the ileum.  And the first place it goes is what's

13  called the first-pass effect, the portal vein.  It goes

14  straight to the liver.  In general, the liver metabolizes 70-80

15  percent of the drug before it's released into the general

16  circulation to reach the part of the body where it's going to

17  work.

18  Q   And is that what's called sometimes the half-life of a

19  metabolite, how long it --

20  A   No.  The half-life -- the half-life means the time it takes

21  for one half of that dose to be eliminated from the body.

22  Q   Does the metabolization of a particular medication and its

23  half-life have an effect on the accuracy or inaccuracy of a

24  urine drug screen?

25  A   Yes, sir.  It can.

JOHN PATRICK COUCH, MD - DIRECT BY MR. SHARMAN

1  Q   How so?

2  A   Well, there are -- we're genetically programmed

3  differently.  Everybody's a little different.  And there are

4  fast metabolizers and slow metabolizers of different classes of

5  drugs.  And they made some headway in the recent years and we

6  did this for a while, to do swab genetic testing.  And there's

7  laboratories where they will actually send you a report and

8  tell you what drug would be best in each class for this patient

9  based on their genetic makeup and how their liver operates.  So

10  the thought is that it will decrease expenditure, improve care

11  for the patient, decrease the probability of side-effects if

12  they can tell you which -- like within the anti-inflammatory

13  drugs, which one would be best, Voltaren or Celebrex,

14  celecoxib, Celebrex, that type of thing.

15  Q   Now, we heard testimony about so-called inconsistent urine

16  drug screens or failed drug screens.  Do you remember some of

17  that testimony?

18  A   Yes, sir.

19  Q   And what is -- in your understanding, what's an

20  inconsistent or a failed urine drug screen?

21  A   Well, on those reports inconsistent means it's inconsistent

22  with the medication the patient had been prescribed, either

23  it's not there and had been thought to be prescribed or there's

24  a drug there or an illegal illicit drug positive on the screen

25  that is not supposed to be there.

JOHN PATRICK COUCH, MD - DIRECT BY MR. SHARMAN

1    Q   And in your practice and based on your experience, in pain

2    management practice generally, can a physician take steps when

3    he or she is confronted with a patient who has inconsistent

4    drug screens?  In other words, what can you or a physician in

5    your position do?

6    A   Well, you consult with the patient about it and discuss why

7    it might be that way.

8    Q   Can you also discharge the patient or fire them, as some

9    people say?

10   A   You can.

11   Q   Now, you were here when Dr. Aultman, the internist from

12   Gulfport testified for the government.  Do you remember

13   Dr. Aultman?

14   A   Yes, sir.

15   Q   And did -- is it your recollection that Dr. Aultman

16   testified that it was her practice that should she have a

17   patient who failed a drug screen or had an inconsistent drug

18   screen on the first go-round, that Dr. Aultman would fire that

19   patient; is that your recollection?

20            MR. BODNAR:  Your Honor, we object to him testifying

21   about other people's testimony here.

22            MR. SHARMAN:  I asked -- I'm asking for his

23   recollection of the government's testimony, Your Honor.

24            THE COURT:  Well --

25            MR. SHARMAN:  Does he remember what she said.

1          THE COURT:  Can you come to side bar?

2      (At the side bar, jury not present.)

3          THE COURT:  Wait for the other lawyers.

4          All right.  And what is the purpose of getting him to

5   recollect what she said?

6          MR. SHARMAN:  All I'm going to do, Your Honor, is ask

7   him if he remembers her policy, which was to fire on the first

8   go-round.  Then I'm going to ask him what is his policy, which

9   is to not do that.  So that I'll be able to demonstrate for the

10  jury in closing that in fact the usual course of medical

11  practice encompasses that range of options and that they were

12  equally within the legitimate -- usual course of medical

13  practice and for a legitimate purpose.  I'm not questioning or

14  attacking Dr. Aultman's practice.  I'm just drawing two data

15  points, one with her, one with him.

16         MR. BODNAR:  The concern was -- if that's it, then

17  that's not a problem.  The problem was going to be if he was

18  going to invite comments on the witness' testimony, which it

19  sounds like he's not doing.

20         THE COURT:  All right.

21         MR. BODNAR:  The government has no issue.

22      (In open court, defendants and jury present.)

23  BY MR. SHARMAN:

24  Q   All right.  Dr. Couch, do you remember Dr. Aultman, the

25  government's expert who testified?

5612

1    A    Yes, sir.

2    Q    And do you remember that -- is it your recollection that

3    Dr. Aultman had a policy that for her with regard to a patient

4    who failed or had an inconsistent drug screen?

5    A    Yes, sir.

6    Q    And do you recall what her policy was?

7    A    She said she fired them.

8    Q    On the -- did she say she fired them on basically the first

9    time?

10    A    Yes, sir, without a second chance.

11    Q    Was that your policy?

12    A    It depends on the patient and the level of egregion, I

13    guess you would say.

14    Q    In general, was it your policy to fire on the first time

15    should the patient have an inconsistent drug screen?

16    A    The one that I remember, if it was cocaine, that usually

17    was a nonnegotiable.  And we would refer them, that they go to

18    treatment because that's a felony-level drug.

19    Q    Setting aside a felony-level drug, what was your general

20    policy?  Was it to fire the first time or to discharge if at

21    all, after -- at a later date or after additional tests?

22    A    Well, I'd give them a second chance.  But we had a letter I

23    would use -- I always sent a patient, if we were going to

24    release them from the practice, it was taught to me to do, and

25    it basically said:  Mr. and Ms. So-and-so, you know, as of

JOHN PATRICK COUCH, MD - DIRECT BY MR. SHARMAN

5613

1   such-and-such a date, in 30 days usually, you'll be released

2   from the care.  Our doctor-patient relationship has been

3   altered, and something like that; it can't be improved.  And we

4   give them the number for the Mobile Medical Society to call to

5   find another physician, and that we would -- their medical

6   records would be available to them.  And we would generally

7   give them enough medication, not the one maybe that was in

8   question, but something as an alternative to help with any

9   withdrawals or their pain.

10  Q   If you did not as a general practice fire a patient on the

11  first infraction, was your policy within the usual course of

12  medical practice?

13  A   Yes, sir.

14  Q   Now, the discussion or counsel -- I can't remember the word

15  you used -- that you had with patients from time to time, who

16  had an inconsistent drug screen, was that always written down;

17  in other words that interaction, that event?

18  A   Not always.

19  Q   Why is that?

20  A   Sometimes I would write it down, sometimes I didn't.  And I

21  would try to remember it myself or -- I don't know.  It just

22  depended on the situation.

23  Q   Now, was PPSA a clinic?  I mean it was an outpatient

24  facility; right?

25  A   It was really a tertiary care referral center, yes.

JOHN PATRICK COUCH, MD - DIRECT BY MR. SHARMAN
5614

1   Q   Now, are there some places or some environments where a

2   urine drug screen is administered and it is the policy of those

3   places or those environments that somebody go in the bathroom

4   with the individual and actually watch them go to the bathroom;

5   is that so?

6          MR. BODNAR:  Objection, Your Honor, to foundation for

7   other places.

8          MR. SHARMAN:  I'm just asking for his knowledge.

9          MR. BODNAR:  I'm not sure what he's talking about.

10         MR. SHARMAN:  I'll try to do it.

11  Q   Dr. Couch, do you know if there are other places or

12  environments that when administering a urine drug screen

13  require a second person to go into the bathroom with the person

14  giving the test to watch them?

15  A   Yes, sir.

16  Q   And what are examples that you know of, the kinds of places

17  or environments that might require that, or do require that?

18  A   Law enforcement, or on judge's order, or someone on

19  probation.

20  Q   What about in alcohol or drug rehab, does that happen there

21  sometimes?

22  A   Yes, sir, that's right.

23  Q   Now, you heard some testimony here about people cheating or

24  trying to cheat on urine drug screens.  Do you remember hearing

25  some of that?

5615

JOHN PATRICK COUCH, MD - DIRECT BY MR. SHARMAN

1   A   Yes, sir.

2   Q   And do you remember hearing about a patient who took his

3   five-year-old son's urine; do you remember all that?

4   A   Yes, sir.

5   Q   Now, what we just described, that is having another person

6   go in with the individual and watch them go to the bathroom, is

7   that a good way to minimize cheating?

8   A   I would imagine it can help.  It would be an extra level.

9   Q   And do you, in your practice, or did you in your practice

10  require that?

11  A   No, we didn't --

12  Q   Why not?

13  A   -- as a general rule.

14  Q   Why not?

15  A   This is where it gets kind of tricky.  There are no hard

16  and fast rules out there.  We're only standing on the shoulders

17  of the men and women for hundreds, if not thousands of years at

18  this stage of medicine.  There's a lot we still don't know.

19  But there's no rules that say you have to do this, this or

20  this.  When I was at UCLA, we didn't do the drug testing.  The

21  patient called back and pill counted.  That's where you call

22  them if there's any suspicion, you know, an anonymous phone

23  call that I think so-and-so, you know, is selling their

24  medicine.  Well, what if that's their neighbor that's mad at

25  them because their dog barks all night or, you know, an

1    estranged ex-wife, or something.  You've got to prove it, you

2    know.  And so --

3           MR. BODNAR:  Your Honor, we object to nonresponsive at

4    this point.  The question was why does the policy, why did they

5    not monitor that at PPSA?

6           MR. SHARMAN:  I'll move on, Your Honor.

7    Q   Well, Dr. Couch, are there -- if that is a good way to

8    minimize cheating and if you did not practice that way, why is

9    that?  In other words, is there something particular about a

10   patient versus a probationer that makes it different for you?

11   A   It has to do with a doctor-patient relationship.

12   Q   How so?

13   A   Well, if I felt -- and many of my colleagues feel that if

14   you do that routinely the patient begins to see you as an

15   adversarial person rather than their physician.  And the

16   doctor-patient relationship can be negatively affected.  This

17   goes all the way back to the Hippocrates in 235 BC.

18   Q   Let me redirect your attention to the subject area I

19   skipped over a while back.

20          The jury has heard about your ownership of stock in a

21   company called Galena.  Do you remember some of that discussion

22   while you've been sitting here the last few weeks?

23   A   Yes, sir.

24   Q   Is Galena the manufacturer -- well, is Galena a

25   pharmaceutical company?

JOHN PATRICK COUCH, MD - DIRECT BY MR. SHARMAN

1    A    Actually, it's not.

2    Q    Well, did it manufacture Abstral?

3    A    It licensed Abstral.  I think it was made by someone else

4    to sell it in the United States.

5    Q    And you from time to time -- well, did you from time to

6    time prescribe Abstral to your patients?

7    A    I did.

8    Q    Did the -- did the fact, at any time, that you owned stock

9    in Galena have any effect on your prescription of Abstral for a

10   particular patient in a particular situation?

11   A    No, sir.

12   Q    What was it that you liked about -- if not -- what was it

13   you liked about Galena?  What attracted you to the stock?

14   A    The reason I bought the stock is -- was because they had in

15   their pipelines -- we've heard that word before -- a breast

16   cancer vaccine under development.  And when I went to the

17   speaker training program in Atlanta, as I recall, I talked to

18   some doctors there about this.  They had given a presentation

19   on this vaccine that was called NeuVax.  And it was originally

20   invented by the Department of Defense or the United States Army

21   and they had received a large grant, I believe, from the DOD to

22   develop this vaccine.  I think it was found out that it was --

23   had the early studies in small samples of patients that they

24   showed the FDA, that it was effective for certain type of

25   breast cancer recurrence.  It wasn't to prevent breast cancer.

JOHN PATRICK COUCH, MD - DIRECT BY MR. SHARMAN

5618

```
 1   It was a -- this type of ductile breast cancer 40 percent of
 2   females have after they had had radiation mastectomy surgery or
 3   chemotherapy.  And they were in remission and the vaccine was
 4   meant to be given to those people to prevent a recurrence.
 5   Q   So if I understood you, did you buy Galena because you
 6   liked or thought NeuVax was going to be a big deal?
 7   A   Yes.
 8   Q   Did it turn out to be a big deal?
 9   A   It's still -- still in the storage.  It hasn't been
10   approved by the FDA.
11   Q   Were all of your prescriptions of Abstral to your patients
12   in the usual course of medical practice and were they all for a
13   legitimate medical purpose?
14   A   They were for legitimate -- yes, sir.
15   Q   We spoke a little earlier about pain pumps and you showed
16   us in the photo what one looked like and so forth.  Do you
17   remember all that?
18   A   Yes, sir.
19   Q   And there's been some discussion here at trial about refill
20   of pain pumps for your patients and the ability of pain pump
21   nurses to appropriately refill those pumps.  Do you remember
22   that discussion generally?
23   A   Yes, sir.
24   Q   First, did you train your pain pump nurses?
25   A   Yes.
```

5619

1    Q   Did you train them how to do refills, for example?

2    A   I did.  But it was the policy of the company, as I

3    understood it, for them to also go to a course out at --

4    usually in New Jersey or wherever, Boston, to be trained by the

5    company on how to do it as well.  Because, you know, they're

6    liable as well.  So they want to make sure that anyone

7    refilling their devices is trained properly.  But on top of

8    that, I did it also, yes.

9    Q   Did you and the jury hear during trial from at least a

10   couple of your pain pump nurses?

11   A   Yes, sir.

12   Q   Did you have confidence in their training?

13   A   Yes, sir.

14   Q   Did you have confidence in their ability?

15   A   Yes, sir.

16   Q   Did they do their job well?

17   A   Yes, sir.

18   Q   Now, did you have a, for lack of a better term, standing

19   oral order for your pain pump nurses with regard to the

20   permissible amount of a dosage they could change on a patient's

21   refill?

22   A   Yes.

23   Q   What was that oral standing order?  Let's do that

24   first.  What was that oral standing order?

25   A   That they could -- if the doctor was unavailable by phone,

5620

 1    for whatever reason, under unusual circumstances, and the

 2    patient was there and they would run out within a few days or

 3    they needed -- they had to have their pump refilled, that they

 4    could change the predominant drug in the pump, usually the

 5    opioid narcotic up to 10 percent.  That means it could be one

 6    percent, two percent, 3 percent, up or down 10 percent.

 7    Q    So 10 percent up or 10 percent down, was that the outer

 8    bound?

 9    A    Yes, sir.

10    Q    But it could be within that boundary, also; right?

11    A    Yes, sir.

12    Q    You said something there "predominant medication," does

13    that mean only one or two medications?

14    A    Well, based on, like I said, if they have baclofen in

15    there, if they had opioid in there, if they had a local

16    anesthetic, bupivacaine we use many times in there with it, or

17    clonidine for nerve damage pain.  It was generally based on the

18    opioid.

19    Q    Could a pump nurse following your instructions change any

20    medication in the mix as he or she wished?

21    A    No.

22    Q    The standing order that you gave, based on your knowledge

23    and experience, was that appropriate?  Was that okay?

24    A    Yes, because I've consulted with many of my colleagues

25    around the country and that's what I was taught at UCLA Medical

1  Center.

2  Q   In general could the pump nurse if she had any question or

3  concern, even within the boundaries of the 10 percent rule, so

4  to speak --

5  A   Yes.

6  Q   -- could she still consult with you?

7  A   Yes.

8  Q   And from time to time, even though you had that standing

9  order, did they in fact consult with you even if their actions

10 would be well within your standing instruction?

11 A   Yes, sir; usually by text or a phone call.  But there was

12 also Dr. Chen in the office as well, as an extra level of

13 protection in their care, to see them.

14 Q   In this trial, Dr. Couch, we have heard testimony about and

15 reviewed documents from a number of patients or patient files;

16 is that right?

17 A   Yes, sir.

18 Q   I want to focus you on those patients that are -- that are

19 your patients.

20 A   Okay.

21 Q   Having treated those patients and having seen what you have

22 seen in their excerpted charts or having heard their testimony,

23 or both, was your care and treatment of them, including their

24 prescriptions, within the usual course of medical practice and

25 for a legitimate medical purpose?

JOHN PATRICK COUCH, MD - DIRECT BY MR. SHARMAN

 1   A   Mine was, yes.

 2   Q   Do you have any doubt about that?

 3   A   No, sir.

 4        MR. SHARMAN:  Court's indulgence.

 5      (A discussion was held off the record between defense

 6   counsel.)

 7   BY MR. SHARMAN:

 8   Q   Dr. Couch, did you hear, as you've been sitting here, some

 9   discussion and testimony on the question of the appropriateness

10   of a physician or pain management physician writing a

11   prescription for a patient not only for that day --

12   A   Yes, sir.

13   Q   -- but also for a day in the future?  In other words, a

14   prescription to be filled.  Do you remember --

15   A   Yes, sir.

16   Q   -- some of that?

17   A   Yes, sir.

18   Q   Is it the case that you wrote prescriptions for patients

19   who received from you both a prescription for that day; that is

20   to say immediate fill, and also a prescription or more than one

21   prescription to be filled at a later date?  Did that happen?

22   A   Yes, sir.

23   Q   Is it your understanding that that is appropriate?

24   A   Yes, sir, it's my understanding.

25   Q   And why do you believe that that was an appropriate thing

1  to do?

2  A    Because there's been some rulings by the federal government

3  about that and I discussed it -- that was one of the advantages

4  of having a PharmD in your practice.  She's Auburn trained.

5  She's very good.

6          MR. BODNAR:  Objection, Your Honor, again to hearsay.

7          THE COURT:  Sustained.

8          MR. SHARMAN:  I'll rephrase it.

9  Q    Do you have a basis for your belief?

10 A    Yes.

11 Q    What's your basis?

12 A    Because if the patient's stable -- and again, as I

13 mentioned before, they were on the same -- they tend to

14 plateau.  They stay on the same dosage for many years and the

15 VA says that they can stay on that same dose for the rest of

16 their lives with some of the veterans of the opioids and so

17 they can live a long way away.  As I mentioned, they have

18 transportation problems so for compassionate reasons -- and

19 this started a few years ago, insurance companies would --

20         MR. BODNAR:  Your Honor, we object to nonresponsive

21 and again hearsay.

22 A    -- only cover --

23         MR. BODNAR:  Move to strike what he testified about

24 what the VA said.  That's clearly hearsay.

25         MR. SHARMAN:  Your Honor, if it's his basis.

5624

```
 1            THE COURT:  I overrule the objection.
 2   BY MR. SHARMAN:
 3   Q   Sorry.  Dr. Couch, what is your basis for believing that
 4   the practice was --
 5   A   Well, the --
 6   Q   -- the practice of providing a patient with a prescription
 7   to be filled immediately and then a prescription to be filled
 8   at a later date, at least within the 90 days, what's your basis
 9   for believing that's appropriate?
10   A   Because it's usually -- we do it -- when I do it, it was on
11   a patient that I'd gotten to know that I didn't see any
12   evidence of diversion or aberration or inconsistent behavior
13   and because of -- they lived a long way away or had
14   transportation problems as I mentioned before, I mean there's a
15   lot of them that have that.
16            And so they could get three months.  Instead of having
17   to come every month, they can come every 60 days or every 90
18   days.  My -- I'm a patient too.  My doctor sees me once a year.
19   Q   Now, in the past have you had an opportunity to at least
20   take a look at, on this subject, the different rules and
21   guidance documents from the DEA and from the Alabama Medical
22   Board and other authorities?
23   A   Yes, sir.
24   Q   Having looked at that set of rules and guidance as a whole,
25   do you find that set of rules and guidance consistent and clear
```

5625

1    or do you find it inconsistent and confusing?

2           MR. BODNAR:  Your Honor, we object to relevance of

3    this.  The law is what the law is and his understanding of it

4    is not relevant.

5           MR. SHARMAN:  His understanding of the regulatory

6    regime is critical, Your Honor, to his intent.

7           THE COURT:  Come to side bar a minute.

8       (At the side bar, jury not present.)

9           MR. SHARMAN:  Your Honor?

10          MR. BODNAR:  Your Honor, the knowledge element -- this

11   is not the one -- the specific law and regulation he violated.

12   It's the one that is set out by the Eleventh Circuit, 9.1A,

13   which is the general knowledge that you knew what you were

14   doing is wrong, not that you know specific statutes and

15   specific regulations.

16          MR. SHARMAN:  Your Honor, this is a highly regulated

17   area.  And as the Court knows, in parts of the economy that are

18   highly regulated, a person's familiarity or lack of familiarity

19   with the relevant regulations provides an important backdrop to

20   what they understand to be right and wrong.  It is not a

21   defense, but it does go to their intent.  And my only question

22   is does he, not as a matter of law that the Court would find,

23   but does he find this set of regulations to be clearly

24   consistent or unclear and confusing.

25          THE COURT:  The problem is, as I see it, he's talking

JOHN PATRICK COUCH, MD - DIRECT BY MR. SHARMAN

1    in a very general sense about the regulations as opposed to --

2    I mean, since you don't have any references to what regulations

3    we're talking about, I think the jury could confuse it with the

4    legal standard in this case.  So I sustain the objection to

5    that.

6            You certainly can ask him whether he thought he was

7    doing the right thing or the wrong thing.  But --

8            MR. SHARMAN:  Yes, ma'am.

9            THE COURT:  -- but I just don't want the jury to get

10   confused about --

11           MR. SHARMAN:  I understand.  I wasn't trying to do

12   that.  I understand.

13           MR. BODNAR:  Jack, just one more second.

14           Your Honor, I don't know how soon he is or close to

15   being through with direct, but we're going to need about five-

16   six minutes to gather up all the material.  It may take a few

17   more minutes.  It might be worth taking a stretch break if we

18   get through before the end of the day.

19           MR. SHARMAN:  I'm fairly close actually.

20           THE COURT:  Okay.

21      (In open court, defendant and jury present.)

22   BY MR. SHARMAN:

23   Q    Dr. Couch, with regard to prescriptions and timing, whether

24   you put a patient on a 30-day cycle, a 60-day cycle or a 90-day

25   cycle, was that an exercise of your medical professional

JOHN PATRICK COUCH, MD - DIRECT BY MR. SHARMAN

1    judgment that in that particular patient's circumstance, that

2    was the medically best thing for them?

3    A   Yes, sir.

4    Q   And when you were prescribing, whether it was a 30-, 60-,

5    90-day cycle, did you believe you were doing the right thing?

6    A   Yes, sir.

7    Q   Dr. Couch, why did you want to become a doctor?

8    A   I wanted to help people.  And I really had an interest in

9    science at an early age, probably when I saw Neil Armstrong

10   jump off that ladder.

11   Q   And were there any experiences with a physician that sort

12   of encouraged or solidified that desire?

13            MR. BODNAR:  Objection.  Objection to relevance, Your

14   Honor.

15            THE COURT:  Sustained.

16   BY MR. SHARMAN:

17   Q   Throughout your time at PPSA, Dr. Couch, did you ever make

18   any decisions about a patient's care?

19   A   Yes.

20   Q   Including their prescriptions?

21   A   Yes, sir.

22   Q   That you did not think were in that patient's best

23   interest?

24   A   Never.

25   Q   Did the fact that you were getting payments or an

5628

```
 1   honorarium for talks, does that change that?

 2   A    No, sir.

 3   Q    Did the fact you owned stock in Galena change that?

 4   A    No, sir.

 5   Q    Did the fact that you had a -- or the company had a

 6   contract with IPM and that gentleman, Mr. Manfuso, did any of

 7   that change the reason why you cared for people or the

 8   prescriptions you gave them?

 9   A    No, sir.

10   Q    Did the fact that you owned a pharmacy with Dr. Ruan, did

11   that change any of that?

12   A    No, sir.

13   Q    Dr. Couch, is everything you did at PPSA in the usual

14   course of medical practice?

15   A    Yes, sir.

16   Q    Was everything you did to the best of your ability?

17   A    Yes, sir.

18   Q    Was everything you did for legitimate medical purpose?

19   A    Yes, sir.

20   Q    Are you still proud of it?

21   A    I'm very proud of it, or was.

22            MR. SHARMAN:  No further questions, Your Honor.

23            MR. BODNAR:  Your Honor, may we approach on one

24   matter?

25            THE COURT:  All right.
```

JOHN PATRICK COUCH, MD - DIRECT BY MR. SHARMAN

5629

1        (At the side bar, jury not present.)

2            MR. BODNAR:  During Dr. Couch's direct examination, he

3    touched on the fact that he had issues with alcohol and

4    propofol.  He also mentioned he came from out in California

5    here to Alabama because he wanted to get back south.  What he

6    didn't mention and what we would like to go into is that he had

7    a hearing before the California Medical Board and was suspended

8    and had an adverse ruling against him.  And we contend that

9    this was the timing when he came down to Alabama.  It was to

10   get away from what was happening in California, which is why he

11   came to Alabama.  This is from 1996, but we do feel it's

12   appropriate to go into it.

13           MR. SHARMAN:  Your Honor --

14           MS. GRIFFIN:  He was placed on some probation and

15   given some conditions having to do with his alcoholism and his

16   drug usage.  And it's our understanding that more recently,

17   since he has been here, he was in treatment for some length of

18   time, not just for alcohol but for alcohol and drugs too.  If

19   that can be confirmed --

20           MR. SHARMAN:  Well, a couple of things.  You know, the

21   last point I think we covered, alcohol, medication.

22           ... (Redacted.)

23

24

25

 1          MR. SHARMAN:  He didn't say that.

 2          MS. GRIFFIN:  No, he didn't.  But we're saying that I

 3   think we're entitled to go into it.

 4          MR. SHARMAN:  A couple of things, one on the

 5   California issue, my understanding is that he maintained his

 6   license.  There was a probationary condition.  He still

 7   practiced and so forth, but there were conditions to be

 8   satisfied.  I think that -- you know, I don't, I don't object

 9   to inquiry about it.  I think that, much like with

10   Dr. Greenberg, I don't know if the actual document itself is

11   appropriate to be introduced.  But I think that's what

12   happened, is that he had a hearing and kept his license, there

13   were probationary conditions, he could practice.

14          On the other hand, Your Honor, I think that I'm not

15   completely sure what they are talking about, about his recent

16   things.  But I think that, at least without knowing more, I

17   would consider that to be so prejudicial to outweigh the

18   probative value about where we already are, that I would object

19   to that, at least without knowing more about it.

20          THE COURT:  Well, my immediate take on that is if he's

21   going to admit to one sort of substance abuse but not admit to

22   another, I think that's probably relevant.

23          MR. SHARMAN:  I understand that.  I do understand

24   that.

25          THE COURT:  So, but anyway, tell me what the schedule

 1  is on this expert tomorrow.  How long do you expect this person

 2  to take?

 3          MR. SHARMAN:  Well, Your Honor, I think, as we've

 4  been going through this today, I think in reality what's going

 5  to happen is that -- well, I'd already decided once he was on

 6  the stand, we'll just go through and any expert will just have

 7  to --

 8          THE COURT:  Come late.

 9          MR. SHARMAN:  -- would have to wait.  And, you know,

10  we may even let him go.  But for practical purposes, I'd

11  already told Ms. Griffin that if we started, we would just go.

12          THE COURT:  All right.

13          MR. SHARMAN:  And anybody else would have to wait.

14          THE COURT:  I know they are going to have to pull a

15  bunch of exhibits, and if they pull them now she's going to

16  have to put them up again right after they are pulled, if we

17  stop at 5 o'clock.  So I'm just going to go ahead and let the

18  jury go.  It's 15 minutes to 5.  So you can start your cross-

19  examination in the morning.

20          MR. BODNAR:  Yes, Your Honor.

21          MS. GRIFFIN:  Your Honor, might we inquire:  Do you

22  think your expert will take the rest of the day or would we go

23  into Dr. Ruan's expert?  Or Dr. Ruan's expert won't be here

24  till Wednesday morning?

25          MR. ARMSTRONG:  Our expert does not fly in until about

1    5:20 tomorrow evening.  So he lands in Mobile.  He wouldn't be

2    available until first thing Wednesday morning.

3            MR. SHARMAN:  I'll let y'all know tonight --

4            MS. GRIFFIN:  Thank you.

5            MR. SHARMAN:  -- where that stands.

6            MR. BODNAR:  Realistically, I think that -- I don't

7    know how long redirect will take -- but I think I expect to be

8    done before lunchtime with this cross-examination, probably by

9    around the morning break, 10:30.  So we may be done with

10   Dr. Couch altogether right around -- before -- right at or

11   right around lunchtime.

12           MR. ARMSTRONG:  So we can find one to --

13           MS. GRIFFIN:  There is one other matter.  Dr. Couch is

14   currently on a controlled substance, as we speak.  I mean, he's

15   being prescribed and regularly filling a controlled substance.

16           THE COURT:  He made some allusion to that.

17           MS. GRIFFIN:  And I think we're entitled to go into

18   it.

19           MR. SHARMAN:  That, Your Honor, I object to it.  I

20   think it's Adderall.

21           MS. GRIFFIN:  I don't think -- it's more than

22   Adderall.

23           MR. SHARMAN:  I don't -- I don't see what relevance.

24           THE COURT:  Anything that may affect his ability to

25   testify, or his mental state, I think is relevant to his

5633

 1    testimony.  So --

 2              MR. SHARMAN:  Well, I would not object to, as you

 3    would say in deposition:  Are you taking any medication that

 4    could affect your memory or your ability to talk?  But I would

 5    object to going into details of his personal medical profile

 6    about that, unless there's some significant reason for it.

 7              MS. GRIFFIN:  There is.  He's testified that he's been

 8    clean and sober for all these years and that's not so.  And

 9    he's on a controlled substance, albeit prescribed.  They are

10    still controlled substances.

11              MR. SHARMAN:  Deborah, clean and sober means you're

12    not -- well, we all know what it means.  I strongly object to

13    that.  That is not appropriate.

14              THE COURT:  What is he on?

15              MS. GRIFFIN:  He's on benzo.

16              MR. BODNAR:  Adderall, two different benzodiazepines,

17    and testosterone.  But I think the most important thing would

18    be, as you said, obviously not getting into the drugs

19    themselves, but just:  Are you on something other that might

20    affect your ability to testify truthfully?

21              THE COURT:  That's a legitimate question.

22              MR. BODNAR:  I don't plan to get into the PDMP report.

23              MR. SHARMAN:  I still object.

24              THE COURT:  All right.

25         (In open court, defendants and jury present.)

 1          THE COURT:  All right.  Ladies and gentlemen, we're
 2     going to go ahead and break for today.  Leave your pads on your
 3     chairs.  Be back downstairs in the jury assembly room tomorrow
 4     morning at 9 o'clock, ready to be called back up.  No
 5     discussion about the case tonight.  Have a good evening.
 6          MR. SHARMAN:  Your Honor, may we have a brief side bar
 7     after they leave?
 8          THE COURT:  Sure.  Do you need to do this at side bar?
 9          MR. SHARMAN:  We can -- excuse me -- we probably --
10     yes, ma'am.
11       (At the side bar, jury not present.)
12          MR. SHARMAN:  Your Honor, we want to bring something
13     to the Court's attention.  And I often do not have a client who
14     testifies, so I had to actually look up the rule.  But it seems
15     to be the rule in the Eleventh Circuit that certainly during
16     the day, lunch breaks, recesses, one cannot speak with one's
17     client on the stand at all.  It does seem to be the rule that
18     on extended breaks, overnight breaks, that you can talk to your
19     client about the case.
20          THE COURT:  Yeah, I think that's correct.
21          MR. SHARMAN:  So I just wanted to say we'll probably
22     talk to him about the case at some point tonight.
23          THE COURT:  That's fine.
24          MS. GRIFFIN:  Does that mean you can talk about his
25     testimony or on other parts?

1          THE COURT:  I think you can talk to him about defense
2    matters, but not specifically about his testimony.
3          MR. SHARMAN:  Yes, ma'am.  That seems to be the rule
4    of United States versus Cavallo, C-A-V-A-L-L-O, 790 Fed. 3d
5    1202.
6          THE COURT:  All right.
7       (Court adjourned at approximately 4:48 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25