5636



```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF ALABAMA
 2

 3   UNITED STATES OF AMERICA
                                    CASE NO. CR15-00088
 4   v.
                                    COURTROOM 2B
 5   JOHN PATRICK COUCH, M.D.,
     and XIULU RUAN, M.D.,
 6                                  MOBILE, ALABAMA

 7         Defendants.             TUESDAY, FEBRUARY 14, 2017
     * * * * * * * * * * * * * * *
 8   REDACTED

 9
                          DAY 25 OF TRIAL
10          BEFORE THE HONORABLE CALLIE V. S. GRANADE,
              UNITED STATES DISTRICT JUDGE, AND JURY
11

12

13   APPEARANCES:

14   FOR THE GOVERNMENT:
          DEBORAH A. GRIFFIN
15        CHRISTOPHER BODNAR
          United States Attorney's Office
16        63 S. Royal Street, Suite 600
          Mobile, AL  36602
17        (251) 441-5845

18
     FOR THE DEFENDANT COUCH:
19        ARTHUR T. POWELL, III
          P.O. Box 40456
20        Mobile, AL 36640-0456
          (251) 433-8310
21
          JACKSON R. SHARMAN, III
22        ROBERT JACKSON SEWELL
          JEFFREY PAUL DOSS
23        BENJAMIN SANDERS WILLSON
          Lightfoot, Franklin & White
24        400 North 20th Street
          Birmingham, AL  35203
25        (205) 581-0700
```

1    (Continued)

2        BRANDON KEITH ESSIG
         800 Shades Creek Parkway, Suite 600D
3        Birmingham, AL  35209
         (251) 879-1981
4
     FOR THE DEFENDANT RUAN:
5        DENNIS J. KNIZLEY
         7 N. Lawrence
6        Mobile, AL 36602
         (251) 432-3799
7
         JASON BRADLEY DARLEY
8        Darley & McGough, LLC
         1751 Dauphin Street
9        Mobile, AL 36604
         (251) 441-7772
10
         GORDON G. ARMSTRONG, III
11       P.O. Box 1464
         Mobile, AL  36633
12       (251) 434-6428

13       STEVEN D. MARTINIE
         4955 North Lake Drive
14       Whitefish Bay, WI  53217
         (414) 332-9683
15
     THE CLERK:  MARY ANN BOYLES
16   THE LAW CLERK:  LYNN DEKLE
     COURT REPORTER:  ROY ISBELL, CCR, RDR, CRR
17
             Proceedings recorded by OFFICIAL COURT REPORTER
18        Qualified pursuant to 28 U.S.C. 753(a) & Guide to
     Judiciary Policies and Procedures Vol. VI, Chapter III, D.2.
19          Transcript produced by computerized stenotype.

20

21

22

23

24

25

5638

1                        EXAMINATION INDEX

2

   JOHN PATRICK COUCH, MD
3        CROSS BY MR. BODNAR . . . . . . . . . . . . . . . 5646
         REDIRECT BY MR. SHARMAN . . . . . . . . . . . . 5717
4
   XIULU RUAN, MD
5        DIRECT BY MR. KNIZLEY . . . . . . . . . . . . . . 5739

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                         EXHIBIT INDEX

 2                                               MAR  ADM
       GOVERNMENT'S
 3     58-1    12/6/13 email from Crawford to Ruan, Couch   5669
               & McConaghy
 4
       58-2    United Healthcare Retrospective Drug        5707
 5             Utilization form - I..

 6     58-3    United Healthcare Retrospective Drug        5707
               Utilization Form - M......
 7
       58-4    5/5/15 letter from Cigna Pharmacy Services  5707
 8             to Dr. Couch re:  Kamper

 9
       DEFENDANT COUCH'S
10     264     WITHDRAWN FROM EVIDENCE                     5884

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

5640

```
 1        (Morning session, 8:54 a.m., in chambers, one juror
 2   present.)
 3            MR. SHARMAN:  Morning, Judge.
 4            MR. ARMSTRONG:  Good morning.
 5            THE COURT:  Good morning, good morning, good morning.
 6            MS. GRIFFIN:  Good morning.
 7            THE COURT:  Good morning.  Is this everybody that's
 8   coming?
 9            MR. ARMSTRONG:  Is Dennis coming?
10            THE CLERK:  Mr. Knizley?
11        (Mr. Knizley entered chambers.)
12            THE COURT:  All right.  We have one of our jurors here
13   this morning and she overheard another juror saying something,
14   and I want her to repeat exactly what she told me.
15            JUROR...:  Okay.  I was just telling Judge Granade
16   that it wasn't in conversation, she wasn't engaging anyone,
17   just speaking kind of out loud to herself on the way to the
18   restroom.  You know:  Gosh, you know, Doctors do this
19   everywhere, people are doing this all the time, every day.
20   They've already done it.  Just get over it already.
21            And to me it just -- I mean, whether they are guilty
22   or innocent, I still feel like we have a lot to hear to be able
23   to determine that.  And I know all of the man hours and the
24   time and the money that has gone into even the preparation
25   before you even get to this stage to present to everyone, and I
```

5641

1    just didn't feel like it was right.  I've kind of been on the

2    fence.  I heard this about a week ago.

3            THE COURT:  About a week ago?

4            JUROR...:  And I've kind of been on the fence:  Do I

5    say something?  Do I not say something?

6            And I just didn't feel like, moving forward, whether

7    I'm an alternate on the jury, you know, I couldn't sit back and

8    not say anything and kind of carry that with me.  So I just

9    wanted to share it.  It could be something, it could not.  But

10   I just felt like it was my responsibility to bring it forward.

11           THE COURT:  We very much appreciate you letting us

12   know.  And do any of y'all have any questions before we excuse

13   her and allow you to discuss it?

14           MS. GRIFFIN:  I do, Your Honor.  If she would advise

15   the Court which juror and then, after she leaves, if the Court

16   would advise us which juror?

17           THE COURT:  She's already told me that.

18           MS. GRIFFIN:  Okay.

19           THE COURT:  So I will let you know.  And thank you

20   very much.

21           JUROR...:  You're welcome.

22           THE COURT:  So you can go back down to the jury

23   assembly room.

24           JUROR...:  And again, please, anonymous.

25           THE COURT:  We will not -- we will not rat you out.

5642

```
 1              JUROR...:  Okay.  I'll be making -- okay.

 2              THE COURT:  Thank you.

 3              JUROR...:  Thank you very much.

 4              THE COURT:  Okay.

 5         (Juror... left chambers.)

 6              THE COURT:  Thoughts?  Did she go?

 7              THE LAW CLERK:  Yes, she walked out the back door.

 8              THE COURT:  She's gone out the back door.  Okay.

 9    Well, Sharron is looking at the front door.  So -- is that

10    Sharron?  Yeah.

11              Okay.

12              MR. KNIZLEY:  Judge, my thoughts -- since I'm on the

13    end, I'll start here.  It's a juror saying something not to

14    someone and I don't think it means anything.

15              THE COURT:  Anyone else?

16              MR. ARMSTRONG:  It could be construed either way.  I

17    don't know that it's any indication of a violation of any

18    juror's oath.

19              THE COURT:  Mr. Sharman?

20              MR. SHARMAN:  I don't either, Your Honor.  It sounds

21    like it's a juror talking to himself or herself.

22              THE COURT:  ...(Redacted.)

23

24

25
```

1           ...(Redacted.)

2           MR. SHARMAN:  Sounds to me like it's a juror

3   essentially talking to herself and articulating thoughts in her

4   head.

5           THE COURT:  Out loud.

6           MR. SHARMAN:  Out loud.  And by itself I don't think

7   that's an issue one way or the other.

8           THE COURT:  Ms. Griffin?

9           MS. GRIFFIN:  Your Honor, the problem is, I believe

10  they were instructed not to make up their mind, not to discuss

11  anything, not to have anything pertaining to a resolution of

12  the matter.  And for that matter, I think we would request that

13  the Court consider calling her in without us and talking to her

14  to determine if she has already made up her mind and, if she

15  has, then I don't think she can serve.  I mean, I think it

16  would be somewhat intimidating if we were all here, but she

17  would feel more comfortable talking to the Court in private.

18          MR. SHARMAN:  Your Honor, I think obviously the Court

19  has great discretion in something like this.  I think that

20  jurors are presumed to follow instructions, including about

21  considering all the evidence and as to keeping an open mind.

22  And at least in my view, I don't think what we have heard --

23  which, again, is just the outward manifestation of an inward

24  thought process -- is sufficient to establish a ground to

25  really do anything.

5644

```
 1              THE COURT:  You know, frankly, in listening to her,
 2    you know, she obviously was on the fence about whether she
 3    should even say anything about the juror when she was in here.
 4    And the fact that it happened a week ago, I can't even remember
 5    what was going on in the trial at that point, so it may have
 6    been her reaction to a particular witness or what.  But she
 7    clearly was not violating the oath not to say things to other
 8    people.  She obviously was talking to herself.  And I just
 9    don't think there's enough for me to question her.  I think
10    questioning her may make her really uncomfortable and I don't
11    think it rises to that level at this time.  So I intend to do
12    nothing unless there's a vociferous objection to it or unless
13    something else comes to light.  Okay?  Any objection?
14              MS. GRIFFIN:  No, Your Honor.
15              MR. BODNAR:  Not from the United States.
16              MR. DOSS:  No, ma'am.
17              MR. SHARMAN:  No, ma'am.
18              MR. KNIZLEY:  No, ma'am.
19              THE COURT:  For your information, my husband is
20    retiring from the practice of law.  His law firm's giving him a
21    luncheon today.  So I intend to have a little bit longer recess
22    at lunch than normal, so just for your information.
23              MR. SHARMAN:  Yes, ma'am.
24              MS. GRIFFIN:  Congratulations to him.  Can we all join
25    him?
```

```
 1              THE COURT:  Congratulations to me too.
 2              MR. ARMSTRONG:  By the way, I got a letter from him
 3    today, I guess one of his last official duties.
 4              THE COURT:  Gee.
 5              MR. ARMSTRONG:  Unrelated to this case.
 6              THE COURT:  Thanks.
 7              MR. ARMSTRONG:  It had to do with some Baldwin County
 8    property.
 9              THE COURT:  Okay.  Thank you.
10              MR. ARMSTRONG:  That probably should have been off the
11    record.
12         (A recess was taken at approximately 9:01 a.m.)
13         (In open court, 9:12 a.m., defendants and jury present.)
14              THE COURT:  All right.  Good morning, ladies and
15    gentlemen.
16              A JUROR:  Good morning, Your Honor.
17              A JUROR:  Your Honor, if I may, thank you for the
18    cookies.  We enjoyed them with our coffee this morning.
19              THE COURT:  Well, I'm so glad you did.  And I've got
20    some candy back there.  So thank you, too.
21              All right.  Ms. Griffin?
22              MR. KNIZLEY:  Your Honor, I have no questions for this
23    witness.
24              THE COURT:  All right.  Ms. Griffin?  Oh, excuse
25    me.  Mr. Bodnar?
```

```
 1                    JOHN PATRICK COUCH, MD,
 2            previously sworn, testified further, as follows:
 3                        CROSS EXAMINATION
 4   BY MR. BODNAR:
 5   Q   Good morning, Dr. Couch.
 6   A   Good morning, Mr. Bodnar.
 7   Q   To clarify certain things that were discussed yesterday, I
 8   want to start with, you talked about your coming from
 9   California to Alabama in approximately 1996; is that correct?
10   A   Correct.
11   Q   And you mentioned before that you had, while you were in
12   medical school, issues with alcohol and propofol; correct?
13   A   That was the first year of anesthesia residency in Tampa.
14   Q   So when you were in Tampa you had those issues?
15   A   Yes, sir.
16   Q   You mentioned that you came from California to Alabama.  I
17   believe you testified yesterday that was because you wanted to
18   get back down to the South and you wanted to be closer to your
19   mother?
20   A   Well, I said -- I think I said that it would probably kill
21   my mother if I didn't come back.  She wouldn't say that, but
22   she hinted around that she would like to have me back home.
23   Q   There was another reason you left California though, and
24   that was the fact that you had had issues with the medical
25   board disciplinary action; isn't that correct?
```

JOHN PATRICK COUCH, MD - CROSS BY MR. BODNAR

1    A   Not necessarily.

2    Q   Dr. Ruan [sic], were you disciplined by the California

3    Medical Board due to your use of alcohol and propofol?

4    A   They didn't say it was a disciplinary action.  They said

5    that it was what they did with anyone who's ever been to

6    treatment when I met with them in Sacramento.

7    Q   I'm going to show you --

8    A   That -- yeah.

9    Q   -- what's not been admitted --

10           THE COURT:  Y'all just don't talk over each other.

11   A   Sorry.

12   BY MR. BODNAR:

13   Q   I'm going to show you a copy for identification

14   purposes.  Is this the medical board with your name on it?

15   A   Yes, sir.

16   Q   And is that your signature on the back for January 22nd,

17   1996?

18   A   It appears so; yes, sir.

19   Q   And Dr. Couch, you were placed on probation by the

20   California Medical Board before you came to Alabama; isn't that

21   correct?

22   A   When I applied -- when I flew up there, they told me --

23   when I met with them, they said:  Dr. Couch, we're not picking

24   on you but we put anybody who's ever been through treatment,

25   even if it was 30 years ago, on probation until they practice

JOHN PATRICK COUCH, MD - CROSS BY MR. BODNAR

5648

```
1   for two years in the State of California without any problems.
2   Q   And again, I'll ask -- I'm not asking why, but were you
3   placed on probation by the California Medical Association?
4   A   I was, yes.
5   Q   And that was before you came to Alabama?
6   A   Correct.  No, I -- no, that's while I was out there.  I had
7   gone out there in '95.
8   Q   Gone out to California in '95?
9   A   Yes, sir.
10  Q   And placed on probation by the California Medical Board?
11  A   When I applied -- my attending, Dr. Prager said:  You might
12  want to get your California license while you're out here
13  and --
14  Q   That's when you got on probation?
15  A   Yes, sir.  That's when I went to Sacramento and met with
16  them.
17  Q   Dr. Couch, you mentioned yesterday that you also, while you
18  were here in Alabama, had a relapse and had to have another
19  stint in rehab; isn't that correct?
20  A   Correct; yes.
21  Q   And you brought that up in the context of it helped you be
22  a better doctor because you understood what it was like to have
23  addiction problems.  Do you remember that testimony?
24  A   I do.
25  Q   And you were able to recognize addictive behaviors in your
```

1    patients because you saw that in yourself at one point.  It

2    helped you be more attentive to your patients; isn't that

3    correct?

4    A   Yes.

5    Q   And is it true you could also see the signs of addiction

6    and abuse in your employees that worked for you?

7    A   You would think so, yes.

8    Q   You would think so or you did?  Did you know that Justin

9    Palmer, Stacy Madison, Bridgette Parker, and others were

10   abusing drugs while at PPSA?

11   A   No, not until it was brought to my attention.

12   Q   So --

13   A   No, sir, I didn't.

14   Q   So you did not notice that Justin Palmer was excessively

15   sweaty and nodding off; you never saw that?

16   A   I never saw him nod off.  I don't remember much about the

17   sweating.  I remember him taking naps at lunch in the La-Z-Boy.

18   And he said it was because of his divorce he was sleeping on

19   the sofa, and things like that.  So he --

20   Q   Sorry.  And with Bridgette Parker, you never saw her

21   nodding off?

22   A   I did not.

23   Q   And that was not brought to your attention?

24   A   It was not.

25   Q   So you had three nurse practitioners all abusing drugs but

JOHN PATRICK COUGH, MD - CROSS BY MR. BODNAR

1  it was news to you until it was finally brought to your

2  attention that they were on drugs themselves, when they brought

3  that to you?

4  A   She was on prescription medication, yes.

5  Q   For Parker?

6  A   Sir?

7  Q   For Bridgette Parker?

8  A   Yes, sir.

9  Q   She was on prescription?

10  A   Ultram, I believe, and a muscle relaxant.

11  Q   So let's talk about when you did know for Justin Palmer.

12  A   Uh-huh (positive response).

13  Q   You suspended him when he had the needle in his arm, passed

14  out; isn't that correct?

15  A   I didn't see that.  Nurses told me that.  And I -- I think

16  that's when we had -- we had him drug tested that day.  It was

17  negative.

18  Q   So you were unable to see the signs of addiction and abuse

19  in your own employees; is that correct, Dr. Couch?

20  A   I'm not so sure that's a sign of addiction and abuse.  He

21  had a negative drug screen and he said it was -- he was using

22  toradol, Ketorolac, which is an injectable anti-inflammatory.

23  Q   So you felt comfortable allowing Bridgette Parker, Justin

24  Palmer and Stacy Madison to continue to see your patients?

25  A   Well, I left it up to my administrative staff.  Because of

5651

1  the Americans with Disabilities Act and all that type stuff, I

2  wanted to try to leave it to them to make the decision and

3  referral or anything for evaluation.

4  Q   And you weren't concerned about the well-being of your

5  patients?

6  A   I was.

7  Q   You weren't concerned about the well-being of your

8  patients?

9  A   I didn't see any signs of impairment in them.

10  Q   Dr. Couch, I'm going to show you a picture now from a trash

11  pull at your house in April of 2015.

12          MR. BODNAR:  And this has not been admitted, Your

13  Honor.

14  Q   And ask if you can identify what this was that was pulled

15  out of your trash at your home?

16  A   It looks like some -- what appears to be empty containers

17  of Subsys.

18  Q   And just flipping to the second page, what does that appear

19  to be, Dr. Couch?

20  A   Those are the vehicles to deliver the medicine that had

21  been used.

22  Q   So you mean the spray bottles for Subsys?

23  A   Yes, sir.

24  Q   Dr. Couch, did you have any prescription for Subsys?

25  A   No, sir.

JOHN PATRICK COUCH, MD - CROSS BY MR. BODNAR

5652

1  Q   Was there anyone living at your house in April of 2015 that

2  had a prescription for Subsys?

3  A   Not that I know of.  I know that my father, when he was on

4  hospice, I believe, got fentanyl during hospice care.

5  Q   But he was not living at your house in April 2015, is what

6  you're telling us?

7  A   He would stay there some but he was not living there, no,

8  sir.

9  Q   And you know that Subsys was not carried by many of the

10  pharmacies in this entire area.  You knew that, didn't you?

11  A   Yes, sir.

12  Q   How did Subsys -- basically only carried at C&R -- get in

13  your trash in April of 2015 at your home, Dr. Couch?

14  A   I don't know.

15  Q   Dr. Couch, were you using Subsys at that time?

16  A   No, sir.

17  Q   Was anyone at your house using Subsys at that time?

18  A   Not that I know of.

19  Q   Dr. Couch, you mentioned not firing patients just because

20  they have an inconsistent urine drug test.  Do you remember

21  talking about that on direct yesterday?

22  A   Yes, sir.

23  Q   And one of the reasons you gave is as someone that's been

24  an addict, you helped counsel them and you understood that

25  maybe they can move on and start using their medicine

5653

1   appropriately?

2   A   Correct.

3   Q   You did have opioid agreements though, with your patients,

4   didn't you?

5   A   Yes, sir.

6   Q   What was the point of an opioid agreement if you're not

7   going to follow through with it?

8   A   Well, you have to have some leeway.  It depends on the

9   patients because for this -- for example, we didn't do drug

10  testing in my training, and I recognize that, and -- that there

11  were some deficiencies in my knowledge about it, so that's why

12  I signed up to take the American Board of Addiction examination

13  in February of 2015.

14  Q   So Dr. Couch, you had an opioid agreement; correct?

15  A   Yes, sir.

16  Q   You made your patients sign it?

17  A   Right.

18  Q   But then it was -- whether or not you enforced it was up in

19  the air?

20  A   Well, I principally looked for illegal drugs in there.

21  Like I said, those cups are 60 percent positive and they can

22  have 40 percent false positives.

23  Q   Dr. Couch, do you remember walking through the BW.........

24  file that we've seen here throughout trial?

25  A   A little bit.

JOHN PATRICK COUGH, MD - CROSS BY MR. BODNAR

1  Q   And in that BW......... file do you recall if there were

2  multiple failed drug tests for the presence of THC, for

3  marijuana?

4  A   Which had positive THC?

5  Q   Positive for marijuana, yes.

6  A   Right.

7  Q   She wasn't fired, was she?

8  A   I can't remember.

9  Q   And marijuana is an illegal drug, isn't it?

10  A   I told them in the state of Alabama it was.

11  Q   And to your knowledge, did she happen to have any sort of

12  medical marijuana prescription?

13  A   Some of them had Marinol tablets that would have made it

14  positive.  I can't remember on her.

15  Q   And if she did have that, though, that is something that

16  would be documented in your chart, wouldn't it?

17  A   Yes, sir.

18  Q   So if it's not in her chart, she didn't have that?

19  A   I would assume so, that's right.

20  Q   I'll turn your attention now to a discussion you had about

21  undercover agent, Mr. Brennan.  Do you recall the conversations

22  about that yesterday with your counsel on direct examination?

23  A   Yes, sir.

24  Q   And you mentioned that when Stacy left the room after

25  talking to Mr. Brennan, that she came and consulted you and

1    that's how you knew what to do when you came in the room; isn't

2    that correct?

3    A   Yes, sir.

4    Q   That's your memory, that she came out and told you all

5    about it?

6    A   Yeah.  We sat in my office and went over the record she has

7    and what she had found on physical exam and what she thought he

8    might have been suffering from and had discussed with him the

9    facet joint block and those medications.

10          MR. BODNAR:  Your Honor, may we play the 43-second

11   clip where Dr. Couch is in there?  And we'll need it on the

12   computer.

13       (Video recording began playing.)

14       (Video recording stopped playing.)

15   BY MR. BODNAR:

16   Q   Dr. Couch, did you see where you came in the room that

17   Stacy Madison went over his history of present illness, what he

18   was there for and that she was going to do a facet block?

19   A   Uh-huh (positive response).

20   Q   If she just told you that in your office, why is she coming

21   in and telling you the same thing on the video, in your 43

22   seconds that you were with the patient?

23   A   It's routinely done to show the patient that I know what

24   we -- to show them that I have some knowledge and to show them

25   that we've discussed it.  It appears like it's the first time

JOHN PATRICK COUCH, MD - CROSS BY MR. BODNAR

 1   but we had talked about it in the office.  And then she says

 2   it -- asked me to let him know that I know, that I know what

 3   the plan is.

 4   Q   So that was all a show for the patient then?

 5   A   Yeah, pretty much.

 6   Q   You mentioned on direct examination that there was a big

 7   issue with his chiropractor calling in and demanding that

 8   Mr. Brennan be able to be seen at PPSA.  Do you recall that?

 9   A   I do.

10   Q   Nowhere in this video do you confront the patient, though,

11   about being a cash payer or saying anything about the fact that

12   he got into the clinic in a unusual way, do you?

13   A   No, sir.

14   Q   How, if at all, did whoever referred him and however they

15   did it affect you prescribing Roxicodone then?  It didn't, did

16   it?

17   A   No.

18   Q   You made the decision to prescribe Roxicodone?

19   A   I did.

20   Q   And you knew if he -- if Stacy told you everything, like

21   you said in the office, you knew that he had previously been

22   getting Roxicodone illegally?

23   A   I did know that, yes, sir.

24        MR. BODNAR:  May we switch back to the ELMO, please?

25   Q   Dr. Couch, I'm now showing you the Shawn Brennan file

5657

1  20-22.  And from that file I'm showing you the progress note of

2  that visit we just watched, that August 5th, 2014 visit.  Do

3  you see there at the top?

4  A   Yes.  Yes.

5  Q   And flipping to the second page, on direct you mentioned

6  doing an examination and you touched his back.

7  A   Right.

8  Q   But you did not do the examination that's listed in his

9  progress note as having occurred, did you, Dr. Couch?

10  A   Some of that, no, I did not.

11  Q   In fact, the only thing you did was touch his back through

12  his clothes; is that correct?

13  A   I was palpating with my thumb his facet joint on the

14  affected side where he was complaining of the pain and asking

15  the questions about it stays in his back and goes down his leg.

16  Q   In his progress note it lists this physical examination as

17  having occurred as well as what's on the next page; isn't that

18  correct?

19  A   Yes, sir.  Can I see the bottom?  Okay.

20  Q   It's signed by you.

21  A   Right.  Well, it says author:  Stacy.  So she did the note.

22  Q   Who was the doctor that reviewed it?

23  A   Me.

24  Q   How long after the visit did you sign that, that September

25  10th?

5658

```
 1   A   Yes, two days later.

 2   Q   Because it's August 5th?

 3   A   Right.

 4   Q   So how long after the visit did you sign that?  That's more

 5   than a month, Dr. Couch.

 6   A   I'm sorry.  Let's see.  That's August 5th, 2014.  And what

 7   was the signature date?  8th?

 8   Q   August 5th.

 9   A   Yeah.  It's a month.  It's a month later.  Almost.  A

10   little more.

11   Q   And that wasn't atypical for you to sign progress notes

12   weeks, a month later; isn't that correct, Dr. Couch?

13   A   Correct.

14   Q   Dr. Couch, after that first visit with Stacy Madison and

15   Shawn Brennan, you never visited with him again; is that

16   correct?

17   A   As far as I recall, no.

18   Q   And you've seen the videos, so you didn't see yourself in

19   any of those subsequent videos either, did you?

20   A   No, sir.

21   Q   Yet Mr. Brennan went up to -- from 90 Roxicodone pills to

22   110 Roxicodone pills at his request?

23   A   That's correct.

24   Q   At any time was it addressed, the fact that he never had

25   Roxicodone in his system?  He was never testing positive for
```

5659

1    Roxicodone.  That was never addressed, was it?

2    A   I don't remember if it was addressed.  But I remember the

3    part about the test being negative for the drug he was

4    prescribed.

5    Q   And yet he continued to get Roxicodone, didn't he?

6    A   Right.

7    Q   He also actually did test positive for Adderall, didn't he?

8    A   He did.

9    Q   And that was -- even with that he continued to get

10   Roxicodone despite the fact that his undercover persona

11   supposedly didn't take Adderall?

12   A   Right.  But there's a lot of false positives for that one

13   on the cup.

14   Q   So you could have done a GC-MS test to confirm that;

15   correct?

16   A   He was paying cash.

17   Q   And again, did Dr. Weltlich, each time Mr. Brennan went in

18   there, demand that he get in there so he could pay cash or did

19   you continue to take him on as a cash patient after that first

20   time?

21   A   I was continuing to take him on as a cash patient.  He

22   seemed to be functioning well from what he got, except for

23   wanting to go on up to the extra 10 tablets.  I was hoping --

24   at that time I didn't think we necessarily needed a block since

25   he was having improved function from what I gathered on the

JOHN PATRICK COUGH, MD - CROSS BY MR. BODNAR

1  followup visits with Ms. Stacy Madison.

2  Q   And correct, he did have pretty good function because he

3  had nothing wrong with him.  He bent over and touched the floor

4  and yet he got 90 Roxicodone and then went up to 110

5  Roxicodone; isn't that correct?

6  A   That's correct.

7  Q   You mentioned in connection with the undercover and the

8  employee, as well as part of the billing aspect, you talked

9  about Stacy being a CRNA, which is different than a nurse

10  practitioner; isn't that correct?

11  A   Yes, sir.

12  Q   You mentioned that is a doctorate level position so she had

13  her own patients; is that what you said?

14  A   Yes, sir.

15  Q   However, the billing was still done under you; isn't that

16  correct?

17  A   It was.

18  Q   And there was blame on billing staff and Debi Phillips if

19  there was any billing wrong; is that correct, that was not

20  your --

21          MR. SHARMAN:  Object to characterization of blame.  If

22  it can be rephrased.

23          THE COURT:  Overruled.

24          THE WITNESS:  What's the question?  I'm sorry.

25  BY MR. BODNAR:

1    Q   The blame falls on Debi Phillips and the billing staff if
2    there was anything wrong with the billing.  It doesn't fall on
3    you, isn't that what your direct examination testimony was
4    yesterday?
5    A   Well, there can be a breakdown anywhere in the system.
6    Typically when we see the patient, or whoever does the
7    authoring clicks the CPT code that the Greenway suggests.
8    Q   And by authoring you mean who writes the progress note;
9    correct?
10   A   Yes, sir.
11   Q   And you knew that the billing staff goes off of what was
12   provided, what the CPT code 99213, 99214 a different code is
13   input by the practitioner, whether it be you or Stacy or Justin
14   or Bridgette?
15   A   Correct.
16   Q   You didn't do that, did you?
17   A   Yes, sir.
18   Q   So billing staff is only doing what you're telling them to
19   bill for; isn't that correct?
20   A   Right.
21   Q   The billing staff, they were paid hourly; correct?
22   A   They were given a choice, and I think they all wanted to do
23   the hour -- no.  Oh, the billing staff were, yes.  I thought
24   you were talking about the nurse practitioners.  Yes.
25   Q   Billing staff were paid hourly, so any mistakes that they

1    may have made in billing accrued to your benefit.  They didn't

2    get anymore money hourly but you got money drained from PPSA

3    once a quarter; isn't that correct?

4    A    I'll have to say I'm not so sure how they were paid.  I

5    never knew exactly who, because at different times depended on

6    how much experience they had.  I can't tell you that I know

7    that all were paid hourly.  I don't know.

8    Q    Dr. Couch, you and your partner, Dr. Ruan, though, every

9    quarter received all the profit that was left in PPSA.  Those

10   accounts were drained and those were your quarterly bonuses;

11   correct?

12   A    Correct.

13   Q    So higher billing equates to more money each quarter; isn't

14   that correct?

15   A    Correct.

16   Q    Dr. Couch, yesterday your own attorneys put up the C&R tax

17   returns.  Do you recall seeing those?

18   A    Yes, sir.

19   Q    And that it virtually doubled the amount of money that came

20   in from C&R between 2013 and 2014; isn't that correct, from

21   approximately 10 million in gross sales, gross receipts, to 20

22   million in gross receipts?

23   A    Correct.

24   Q    Of course, C&R Pharmacy is owned by you and your partner,

25   Dr. Ruan; isn't that correct?

JOHN PATRICK COUCH, MD - CROSS BY MR. BODNAR

1  A    Yes.

2  Q    Now, not everybody filled their prescriptions at C&R

3  Pharmacy; correct?

4  A    I think I saw the percentage that you guys put up with 27

5  percent I think got filled at C&R.

6  Q    And I'm going to show you exactly what you're talking about

7  there.  Government's Exhibit 10-26, it's already been admitted

8  into evidence.  And looking at all drugs filled in Alabama,

9  Mississippi, and Florida, Dr. Couch, it was 24.10 percent of

10 all prescriptions were filled at C&R; isn't that correct?

11 A    All prescriptions for all drugs, that's including

12 antibiotics and everything?

13 Q    That's including everything, everything that would have

14 been on a PDMP, so all scheduled drugs.

15 A    Assuming this is correct; yes.

16 Q    Now showing you what has been admitted as Government's

17 Exhibit 10-28.  Dr. Ruan, this is the percentage of Subsys and

18 Abstral scripts that were filled at C&R Pharmacy.

19 A    Dr. Couch?

20 Q    Sorry.  Dr. Couch.

21 A    Yes.

22 Q    And what percentage of the Subsys and Abstral were filled

23 at C&R Pharmacy?

24 A    91.19 percent.

25 Q    So while less than a quarter of all the drugs were filled

5664

```
 1   there, nearly nine out of 10 Subsys and Abstral prescriptions
 2   were filled at C&R Pharmacy; isn't that correct?
 3   A   Correct.
 4   Q   And you know that there was a massive uptick in prescribing
 5   of both Subsys and Abstral between 2013 and 2014; isn't that
 6   correct?
 7   A   Yes.
 8   Q   Dr. Couch, turning to Subsys.  On direct I believe it was
 9   your testimony that you believed it was not your job to get any
10   other practitioners there at the Subsys speaking engagements?
11   A   That is not in my contract to do that.  It wasn't my
12   responsibility, as I understood it.
13   Q   And in fact, it was rare that other doctors were actually
14   there; isn't that correct?
15   A   At what point in time?
16   Q   When you were doing your speaking fees, your own counsel
17   admitted all those sign-in logs, it was very rare for other
18   physicians or other prescribers to attend those dinners and
19   talks; isn't that correct?
20   A   It was rare, yes.
21   Q   So by and large, it was just you and your staff at PPSA
22   with Natalie?
23   A   With Natalie; yes, sir.
24   Q   And do you recall that -- I'm going to show you now what
25   has been admitted as Government's Exhibit 10-18, the Subsys
```

5665

```
 1   chart by micrograms.  And Dr. Couch, moving up, you are the
 2   blue line, Dr. Ruan is the red line?
 3   A   Right.
 4   Q   Dr. Couch, you know that the speaking program for Subsys
 5   began here in April of 2012; correct?
 6   A   I would -- if you say so.  Yes.
 7   Q   And do you see that that's where Dr. Ruan starts to go up,
 8   don't you?
 9   A   Yes, sir.
10   Q   Can you see a big increase here for you after April of
11   2013; isn't that correct?
12   A   Yes, sir.
13   Q   In April of 2013 that's when Natalie Perhacs began; isn't
14   that correct?
15   A   Yes, sir.
16   Q   Now, you've seen -- Dr. Couch, I'm showing you what has
17   previously been admitted as Government's Exhibit 9-8(1).  Does
18   that email from Chris Lento at Galena Biopharma to your
19   partner, Dr. Ruan -- you're not cc'ed on this email, are you?
20   A   It does not appear so, no.
21   Q   And is this the email, Dr. Couch -- this is the email,
22   Dr. Couch, isn't it, where Chris Lento notified Dr. Ruan about
23   the Gavin Awerbuch criminal complaint; isn't that correct?
24           MR. SHARMAN:  Your Honor, I don't object to him
25   reading the email, but if he hasn't seen it or has no personal
```

1   knowledge, there's a lack of a basis for him to talk about it.

2           THE COURT:  Well, I'm assuming he saw it during the

3   course of the trial.  So he can either say what he thinks it is

4   now or that he doesn't know.

5   BY MR. BODNAR:

6   Q   Dr. Couch, did your partner, Dr. Ruan, ever notify you

7   about this Dr. Awerbuch criminal complaint?

8   A   I remember hearing about that, yes.

9   Q   He did tell you about it?

10  A   I don't know if it was him, but I remember hearing about

11  that issue in Michigan.

12  Q   And by "issue in Michigan" do you mean for Dr. Awerbuch?

13  A   Yes, sir.

14  Q   Did you recognize this as being you and this being Dr. Ruan

15  when you saw it (indicating)?

16  A   I don't remember seeing this back during when we were in

17  practice.  I saw it here.

18  Q   You've heard that Dr. Ruan changed the way that he received

19  his Insys payments following this email the very next day.  Did

20  you ever change the way you received your Insys payments?

21  A   No, sir.  I don't -- I don't recall any of that.

22  Q   Do you recall if your partner, Dr. Ruan, ever warned you:

23  Hey, don't get your Insys payments to yourself anymore?

24  A   No.  I ran those payments through my compounding company to

25  make it easier to report my income on the IRS -- to the IRS.

JOHN PATRICK COUCH, MD - CROSS BY MR. BODNAR

1  Q   So Dr. Ruan never said:  Hey, you need to distance yourself

2  from Insys because of what happened to Dr. Awerbuch?  He never

3  told you that, did he?

4  A   No, because Dr. Awerbuch apparently, as I understood it,

5  had hired the rep to work in his office and recruit patients,

6  that type of stuff.

7  Q   In addition to -- I'm showing you again what has been

8  admitted as Government's Exhibit 10-18 -- Dr. Awerbuch email we

9  just showed you was in June of 2014?

10 A   Right.

11 Q   Following June of '14, what happens to Dr. Ruan's

12 prescribing trend?

13 A   It's the red; it appears it's decreasing.

14 Q   Yours does not, though; isn't that correct?  Yours goes up

15 and down for a little while?

16 A   That's correct.

17 Q   Were you aware of any investigation going on with Insys at

18 this time?

19 A   I was not.

20 Q   Did Dr. Ruan ever -- did your partner, Dr. Ruan, ever let

21 you know about what was going on at Insys at that time?

22 A   No, sir.

23 Q   So you continued prescribing fairly regularly until the end

24 whereas he declined pretty quickly; isn't that correct?

25 A   It would appear so.

1  Q   I believe you said on direct examination that you never

2  made a decision about prescribing Subsys based on the money

3  that was paid to you by Insys.  Was that your direct

4  examination testimony?

5  A   That is my testimony, yes.

6  Q   Now, Dr. Chen, he was not paid by Subsys -- by Insys, was

7  he?

8  A   I have no idea.

9  Q   And Dr. Chen prescribed Subsys at a much, much lower rate

10 than did you or Dr. Couch; isn't that correct?  Sorry.  You or

11 Dr. Ruan; isn't that correct?

12 A   I have no idea what his prescribing was.  I really don't.

13 Q   Dr. Couch, you were prescribing -- you and Dr. Ruan was

14 prescribing massive amounts of Subsys and filling it at C&R

15 Pharmacy; isn't that correct?

16 A   We were prescribing Subsys and the patients were getting it

17 at C&R Pharmacy, some of them.

18 Q   And there were times that it was difficult to get enough

19 Subsys at C&R Pharmacy; isn't that correct?

20 A   I've heard that testimony, yes.

21 Q   I'm going to show you now what's been marked as

22 Government's Exhibit 49.

23          MR. BODNAR:  This has not yet been admitted, Your

24 Honor.

25 Q   And ask if this is an email from Bryan Crawford to

1  Dr. Ruan, yourself, and Dan McConaghy.  Can you see that?

2  A   Yes, sir.

3  Q   And is this dated February 6th, 2013?

4  A   Yes, sir.

5       THE COURT:  Mr. Bodnar, Mr. Bodnar, we already have an

6  Exhibit 49, other than this one.

7       MR. BODNAR:  What's the next best number?

8       THE CLERK:  58.

9       MR. BODNAR:  So now that will be Exhibit 58.  United

10  States moves to admit Government's Exhibit 58 and publish it to

11  the jury.

12       MR. SHARMAN:  No objection.

13       THE COURT:  All right.  Mark it in.

14     (Government's Exhibit 58-1 was entered into evidence.)

15  BY MR. BODNAR:

16  Q   Dr. Couch, I'm now showing you what's been admitted as

17  Government's Exhibit 58.

18  A   Okay.

19  Q   And is this the email from Bryan Crawford to Dr. Ruan and

20  yourself and Dan McConaghy?

21  A   Yes, sir.

22  Q   And Bryan Crawford is one of the ones that managed, along

23  with Dan McConaghy, C&R Pharmacy; is that correct?

24  A   He was -- as I understood, he was a business person; yes, a

25  manager from McConaghy.

1  Q   And as we heard yesterday, McConaghy received 25 percent of
2  the profit from C&R Pharmacy; do you recall that?
3  A   Yes, sir.
4  Q   And your partner, Dr. Ruan, and yourself, you received the
5  remaining 75 percent of the profit?
6  A   Of any profit, I think so, yes.
7  Q   And turning to this email from Bryan Crawford, does it
8  state:  We need to be able to purchase Subsys direct from the
9  manufacturer in order to avoid Amerisource restricting our
10 supply.
11         The manufacturer there is Insys; isn't that correct?
12 A   Yes, sir.
13 Q   And Amerisource, is this AmerisourceBergen, one of the
14 national distributors?
15 A   Yes.  I would assume so, yes.
16 Q   Continuing:  We have prescriptions for more Subsys than
17 Amerisource will sell us and they are becoming increasingly
18 restrictive and difficult.  The Subsys representatives should
19 help us establish adequate supply as they suffer when we cannot
20 fill the patient's needs with their product and must use
21 alternatives.  I spoke to the director of marketing yesterday
22 but I'm not sure he understands that the patients' needs must
23 be met even if it means alternative products.  We would
24 certainly like for the physician's first choice of meds to be
25 available.

JOHN PATRICK COUCH, MD - CROSS BY MR. BODNAR

5671

1           And in this case the first choice would be Subsys;
2   correct, based on the context of this email?
3   A   Yes, I would agree with this.
4   Q   And this -- do you recall this issue coming up where the
5   national distributors were not selling you as much Subsys as
6   you wanted to prescribe?
7   A   I do remember there was some talk.  I think I might have
8   talked to the pharmacist and she said she was having trouble
9   because of limits set on what they could distribute to us, yes.
10  Q   So there were limits on how much could be sold to C&R
11  Pharmacy so a workaround was needed to get more Subsys to be
12  prescribed; isn't that correct?
13  A   Well, if the patients were using it still in the -- yes,
14  sir, that's correct, the coupon.  You know, we wanted to have
15  it available.
16  Q   And at some point in connection with issues of the Subsys
17  supply chain, do you recall Dr. John Kapoor and Michael Babich
18  coming down to Mobile?
19  A   Yes, sir.
20  Q   I'm now showing you what has been admitted as Government's
21  Exhibit 32-7(1) and (2).  Does this appear to be the hotel
22  receipt for Dr. Kapoor?
23  A   Yes, sir.
24  Q   And Dr. Kapoor is the founder of Insys; is that correct?
25  A   That's correct.

1   Q   And he resides out in Arizona; correct?

2   A   I think so.

3   Q   And Mike Babich is the CEO of Insys; correct?

4   A   I think at that time he was, yes.

5   Q   And do you remember him coming here in February of 2014?

6   A   Yes, sir.

7   Q   And part of that discussion with Dr. Kapoor and Mike Babich

8   was about getting Subsys direct from Insys to C&R Pharmacy;

9   correct?

10  A   Yes, sir.

11  Q   Dr. Couch, I'm now going to turn towards Galena.  And I

12  believe it was your testimony yesterday, if I took the notes

13  correctly, that you never made a decision on prescribing Galena

14  based on the stock ownership?

15  A   That's correct.

16  Q   Further, I believe you said yesterday that it wasn't even

17  Abstral but rather the drug NeuVax that was your reason for

18  wanting to buy the stock?

19  A   That's my reason for buying the stock, yes; to buy the main

20  portion of the stock.

21  Q   I'm going to show you now what has previously been admitted

22  as Government's Exhibit 11-5(9.)  And is this an email at the

23  bottom first, from your partner, Dr. Ruan, to you?

24  A   Yes.

25  Q   And does it say here:  Pat, these are links to the comments

JOHN PATRICK COUGH, MD - CROSS BY MR. BODNAR

1   to the article of red flags.  When I read the history of Insys,

2   considering their initial IPO on May 7, 2013, at $8 and within

3   seven months it hit $60, despite the subpoena from the

4   inspector general.

5         So stopping there for a moment.  Dr. Ruan is talking

6   about Insys here that manufactures Subsys; correct?

7   A   Yes, sir.

8   Q   And he's comparing it to Galena which manufactures Abstral;

9   correct?

10  A   Yes.

11  Q   To your knowledge, were Insys and Galena competitors in any

12  sort of breakthrough cancer -- sorry -- in a breast cancer

13  drug?

14  A   Yes.

15  Q   Insys had a breast cancer drug in the pipeline like Galena?

16  A   Drug or vaccine?

17  Q   Vaccine.

18  A   No, sir.

19  Q   He also mentions the subpoena by the inspector general.  So

20  at this point it appears at least Dr. Ruan is aware of an

21  investigation at Insys; is that correct?

22  A   Yes, sir.

23  Q   It goes on:  I believe Galena -- G-A-L-E is Galena;

24  correct?

25  A   Yes, sir.

1  Q   Has much better chance of hitting much -- of hitting much

2  higher.  So I will hold mine for at least a year, giving it

3  three-quarters to grow.  It certainly has a chance to be close

4  to Insys in terms of market share.

5       Dr. Ruan is not talking about NeuVax there, he's

6  talking about Abstral; correct.

7  A   Correct.

8  Q   In fact, he goes on down saying:  Also, considering I've

9  lost millions in the real estate, I could afford to lose all

10 mine in this but there's a good chance it will bring the

11 most.  I like the chances.  And I will wait at least three-

12 quarters.

13      Now, NeuVax has not been approved yet, has it?

14 A   No, sir.

15 Q   There was no indication that it was going to be approved

16 sometime in 2014, was there?

17 A   There was some indication, because on the initial studies,

18 I think 43 patients, it showed -- it wasn't a clinically

19 significant strong enough value, P value, because it was only

20 43 patients.  But it showed that 90 percent of those that

21 received it had a positive response but the volume of patients

22 in the study was not large enough so the FDA told them they

23 were going to have to do a larger study around the world, and

24 they had to have at least 700 patients.  And so they initiated

25 that study.

JOHN PATRICK COUCH, MD - CROSS BY MR. BODNAR

1  Q   So for holding for three-quarters, this though, appears

2  he's talking about sales of Abstral; isn't that correct?

3  A   I don't know.

4  Q   Well, let's go to the next sentence.  This product, we can

5  play a big role in.  And again, what's the only product that

6  Galena had at that time?  It was Abstral; correct?

7  A   I think in sales yes, that was the only one they had on the

8  market.

9  Q   Now, I'm sure we can with Zogenix but not in this dominant

10  fashion as many other providers can do the same, but with

11  Abstral.  So again, he's talking about Abstral, not NeuVax;

12  correct?

13  A   I don't see NeuVax there; correct.

14  Q   And this is on February 2nd, 2014, after both you and your

15  partner, Dr. Ruan, had purchased stock in Galena; correct?

16  A   Yes.

17  Q   Showing you now what has already been admitted as

18  Government's Exhibit 10-19, the Abstral prescribed by month by

19  yourself and your partner, Dr. Ruan.  Do you see that?

20  A   Yes, sir.

21  Q   We've talked a lot before about the rise in this period.

22  That was the period that you were purchasing stock, both you

23  and your partner, Dr. Ruan, in Galena Biopharma; is that

24  correct?

25  A   I can't remember when I first purchased the stock, exactly.

JOHN PATRICK COUCH, MD - CROSS BY MR. BODNAR

1  Q   Dr. Couch, we'll bring that chart in a moment where you
2  purchased the stock.  You also recall, though, testimony about
3  the voucher program being in this period for Galena Biopharma;
4  correct?
5  A   As I remember, yes, sir.
6  Q   I'm going to show you now what has been admitted as
7  Government's Exhibit 11-4.  And Dr. Couch, does it show the
8  purchases of stock for Galena Biopharma for yourself, your
9  partner, Dr. Ruan, in November of '13, December of '13, January
10  of '14, February of '14, March, April, June and July?  Do you
11  see that?
12  A   Yes, sir.
13  Q   And again, this rise both for you and Dr. Ruan is in late
14  2013, early 2014; correct?
15  A   Correct.
16  Q   That's when a majority of the stock for both you and your
17  partner, Dr. Ruan, were purchased; correct?
18  A   Correct.
19  Q   There was also a discussion about the voucher program at
20  that time.  Do you recall that voucher program existing?
21  A   Yes, sir.
22  Q   Now, for the voucher program, the patient or the insurance
23  company for the patient doesn't pay for the medication;
24  correct?
25  A   That's the way I understood and was told.  Yes, sir.

1  Q   However, C&R isn't giving it out for free, are they?

2  A   No.  We can't.

3  Q   C&R is getting paid by Galena Biopharma; correct?

4  A   Correct.

5  Q   In fact, do you recall that under the voucher program C&R

6  got an 8.25 percent increase for filling those voucher drugs.

7  So you made more money at C&R filling the vouchers, do you

8  recall that?

9  A   I don't -- I might have heard that testimony but I don't

10 recall that from back then.  I didn't know.

11 Q   At its peak in February and January, you were aware,

12 though, that that was the peak of the Galena stock price right

13 at this point, weren't you?

14 A   Yes.

15 Q   And you knew about that insider traders scandal that

16 happened at Galena that dropped the stock price precipitously

17 down there; correct?

18 A   Yeah, I knew all about that.

19 Q   You did or did not know?

20 A   I did.

21 Q   And along with the stock price fell your prescribing for

22 both you and Dr. Couch -- sorry -- you and Dr. Ruan; correct?

23 A   There's decreased prescriptions according to this during

24 that time, yes, sir.

25 Q   Then following that you recall the C&R rebate agreement

1    that started in October of 2014; correct?

2    A   I wasn't involved in any of those discussions with that.  I

3    think that was between McConaghy and I just wasn't involved in

4    it.

5    Q   So you weren't aware that C&R was going to make more money

6    starting October 1st from the rebates to Galena Biopharma?

7    A   I did not know that, Mr. Bodnar.

8    Q   I'll show you what October 2014 is, Dr. Couch.  And you did

9    not know that for both you and Dr. Ruan it appeared to increase

10   at almost the exact same rate to almost the same point.  Do you

11   see that with the two lines?

12   A   Yes.

13   Q   And once that was paid, you both dropped off again;

14   correct?

15   A   If that's correct what you're saying, yes, it appears that

16   way.

17   Q   Now, Dr. Couch, you and Dr. Ruan had different patients;

18   correct?

19   A   No, sir.  We had some cross coverage at times, but mostly

20   yes.

21   Q   For the most part you have different patients?

22   A   Correct.

23   Q   And your patients had unique situations.  While they may

24   all have had similar-type ailments, you didn't have a mirror

25   image of what Dr. Ruan had in his patient pool, did you?

JOHN PATRICK COUCH, MD - CROSS BY MR. BODNAR

1   A   Not an exact mirror image.

2   Q   Other than the purchasing of the stock and the rebate

3   agreement, why are you and Dr. Ruan in virtual lockstep in how

4   you prescribe to your separate set of patients?

5        MR. SHARMAN:  Your Honor, objection to the extent it

6   requires Dr. Couch to guess about what Dr. Ruan was doing

7   either with any particular patient or with any stock

8   transaction.

9        THE COURT:  Overrule the objection.

10  BY MR. BODNAR:

11  Q   Do you know why it is for Abstral, you and Dr. Ruan were in

12  virtual lockstep with your different sets of patients in terms

13  of prescribing?

14  A   I would have to guess, but we were -- some of it again had

15  to do with the voucher program.  I was watching it mainly

16  because of the NeuVax because I went to the speaker training

17  program a couple of years, I think, after Dr. Ruan did.  So I

18  saw the presentation on NeuVax in Atlanta.

19  Q   So tell me this then.  How does the NeuVax possibility

20  affect your prescribing of Abstral, a completely different

21  drug?  Why would that have any effect on how you prescribed

22  Abstral here?  It didn't, did it?

23  A   I'm sorry.  Could you repeat the question?

24  Q   You mentioned -- you just said that you were following it

25  because of NeuVax.  We're talking about your prescribing of

JOHN PATRICK COUCH, MD - CROSS BY MR. BODNAR

5680

1    Abstral.  How would NeuVax, a potential breast cancer vaccine

2    down the line be affecting the way you and your partner were

3    prescribing Abstral together?

4    A    My due diligence on the NeuVax, I was watching that, but it

5    had no bearing on my prescribing of Abstral.

6    Q    So the NeuVax had nothing to do with why you guys are in

7    lockstep here?

8    A    No.

9    Q    And Dr. Chen also worked at your office during this time

10   period; correct?

11   A    Yes, sir.

12   Q    Dr. Chen was not prescribing Abstral anywhere near where

13   you and Dr. Ruan were, was he?

14   A    No, sir.

15   Q    In fact, virtually no one else in the country was

16   prescribing Abstral like you and Dr. Ruan were; isn't that

17   correct?

18   A    I don't know about that.  I'm not sure.

19   Q    I'm going to show you now what has already been admitted as

20   United States Exhibit 38-7, the chart identified by David Corin

21   of the prescribers of Abstral for Galena Biopharma.  And on

22   this exhibit whose name is at the very top of this list,

23   Dr. Couch?

24   A    It says Ruan.

25   Q    Does it say 1302?

1   A   Is that prescriptions?

2   Q   That's what --

3   A   That does say 1302, yes.

4   Q   And do you see your name being second?

5   A   Yes.

6   Q   649 prescriptions for Abstral?

7   A   Correct.

8   Q   And do you see Dr. Rho, third with 611 prescriptions?

9   A   Yes.

10  Q   You know who Dr. Rho was, don't you?

11  A   I really don't.

12  Q   Did you know that he was a friend of Dr. Ruan's?

13  A   No, sir, I didn't.

14  Q   Did you know that he also purchased stock in Galena

15  Biopharma, along with you and Dr. Ruan?

16  A   I did not know that.  I don't recall that.

17  Q   Dr. Couch, I want to show you what has previously been

18  admitted as Government's Exhibit 11-5(14).  Do you see this

19  email from Dr. Ruan to Remy Bernarda with you cc'ed with an

20  individual named JJRho4666@Gmail?  Do you see both of you on

21  there?

22  A   Yes, sir.

23  Q   And that second paragraph, do you see where it says

24  Dr. James Rho -- and again this is Dr. Ruan writing --

25  Dr. James Rho is a good friend of mine who is an interventional

1  pain specialist in California and also a strong believer in

2  Abstral and an expert in TIRF, is interested in joining the

3  conference on Thursday with you and your board of directors.  I

4  believe he should be no stranger to your Abstral sales team

5  even if you may not know him.  As a matter of fact, he has

6  shared with me many positive feedback from using Abstral since

7  last fall.  Just like Dr. Couch and I, Dr. Rho also believes

8  Galena's product and its pipeline and, therefore, is a

9  shareholder as well.

10        Based on this email, does it appear that the number

11  one, two, and three prescribers of Abstral are all

12  stockholders?

13  A   It says that, yes.

14  Q   Dr. Ruan, turning -- Dr. Couch, turning back to 38-7, we

15  saw Dr. Ruan, yourself, and Dr. Rho as number 1, 2, and 3.

16  After Dr. Rho at 611 prescriptions, how many was number 4?

17  A   153.

18  Q   153?

19  A   Yes.

20  Q   Assuming this chart is accurate, yourself, partner,

21  Dr. Ruan, this friend Dr. Rho, account for an enormous

22  percentage of the Abstral prescriptions; isn't that correct?

23  A   We account for a large percentage, yes.

24  Q   And Dr. Couch, it wasn't only Galena's internal documents

25  that showed that you were massive prescribers of Abstral, but

1  the insurance documents as well.  Do you recall seeing those

2  charts?

3  A   Yes.

4  Q   I'm showing you now what has been admitted as Government's

5  Exhibit 27-2.  And is this the Blue Cross/Blue Shield of

6  Alabama prescriber comparison for Abstral?

7  A   Yes.

8  Q   And are you and Dr. Ruan ranked number one and two in the

9  state of Alabama?

10  A   Yes.

11  Q   Was Dr. Ruan reimbursed -- prescriptions by Dr. Ruan

12  reimbursed almost 900,000 and you about 724,000?

13  A   That's what's paid to the pharmacy, and I had no knowledge

14  of any accounts receivable, accounting or whatever's paid to

15  that pharmacy.  I'm seeing this with y'all for the first time.

16  Q   So it was paid to the pharmacy based on the prescriptions

17  written by you and Dr. Ruan; correct?

18  A   Yes, sir.

19  Q   And the pharmacy is owned by you; correct?

20  A   Right.

21  Q   And your partner, Dr. Ruan, and you split 75 percent of the

22  profit in there?

23  A   If you say so, yes, sir.

24  Q   And with you at 724,000 as number two, number three here

25  appears to be $6,000; correct?

5684

1    A    Yes, sir.

2    Q    That's just in the state of Alabama.  Looking now at 27-7,

3    for United Healthcare, who was the number one prescriber of

4    Abstral to United Healthcare patients, Dr. Couch?

5    A    John Patrick Couch.

6    Q    And your partner, Dr. Ruan, was number nine; correct?

7    A    Yes.

8    Q    And that's in the entire nation.  This is a national

9    ranking; correct?

10   A    If you say so, yes.

11   Q    Well, the chart says so, doesn't it?

12   A    Yes, sir.

13   Q    And for Tricare, for the military, national prescriber

14   comparison, are you again the number one prescriber for the

15   entire United States amongst Tricare recipients?

16   A    Yes.

17   Q    Is your partner, Dr. Ruan, number two?

18   A    Yes.

19   Q    Again, are both of you just over $800,000 and number three

20   being at 230,000?

21   A    Yes.

22   Q    Based on these charts that we looked at, you and Dr. -- you

23   and your partner, Dr. Ruan, were prescribing way more Abstral

24   than virtually anyone else in this country; isn't that correct?

25   A    Yes.  I did not know at the time but, yes.

1   Q   Dr. Couch, turning now to Exalgo.  You know that Exalgo is

2   a brand name, hydromorphone drug, made by Mallinckrodt;

3   correct?

4   A   Yes, sir.

5   Q   And you were never paid anything by Mallinckrodt to be a

6   speaker during the time period when Exalgo was being marketed;

7   correct?

8   A   I don't recall, sir.  No, sir.

9   Q   And do you recall that Dr. Ruan was being paid?

10  A   I didn't know that.  I don't recall that.

11  Q   You have heard that testimony, though, haven't you?

12  A   Yes, sir.

13  Q   I'm going to show you now what's been admitted as

14  Government's Exhibit 10-17.  Again, you are the blue line,

15  Dr. Ruan is the red line.  Does Dr. Ruan's prescribing line go

16  up and then drop off precipitously?

17  A   It would appear so, yes.

18  Q   However, you're prescribing Exalgo at pretty much a steady

19  very low level; isn't that correct?

20  A   Yes.

21  Q   And you were not being paid, whereas Dr. Ruan was being

22  paid; correct?

23  A   Correct.  From what you see in this, yes, sir.

24  Q   Do you recall Exalgo had a voucher program that they were

25  giving out for their drug like Subsys and Abstral did?

5686

1    A   I think they were, but I'm not exactly sure.

2    Q   If they were, though, it doesn't look like that changed

3    your prescribing habit at all because you stayed steady at the

4    same level; correct?

5    A   Yeah.  Well, the state of Alabama had put a temporary

6    restraining order on prescribing that drug from what I recall,

7    or something, and we had some correspondence with the members

8    of the board up there about that.

9    Q   But yours and Dr. Ruan's prescribing were very different

10   for Exalgo, weren't they?

11   A   It appears so, yes.

12   Q   Dr. Couch, now turning to the prior authorizations.  I

13   believe you said yesterday that you never signed blank prior

14   authorization forms.  Was that --

15   A   I don't recall doing that.  Yes, sir.

16   Q   Now, I'm showing you what's taken out of United States

17   Exhibit 413, collected from C&R Pharmacy.  Dr. Couch, are these

18   Abstral enrollment forms?

19   A   Yes, sir.

20   Q   Do you see any patient name at the top?

21   A   No.

22   Q   It does say, though -- it's checked that the REMS patient

23   -- patient has been registered; correct?

24   A   Yes, sir.

25   Q   It doesn't say insurance or diagnoses?

JOHN PATRICK COUCH, MD - CROSS BY MR. BODNAR

```
 1   A   Correct.
 2   Q   But it's filled in for four boxes; correct?
 3   A   Yes, sir.
 4   Q   Is that your name, John Patrick Couch?
 5   A   Yes, sir.
 6   Q   Is that your pharmacy, C&R Pharmacy, yours and your
 7   partner, Dr. Ruan's?
 8   A   On the second section, yes.
 9   Q   And it does have a signature, doesn't it, at the bottom?
10   A   Yeah, but that doesn't appear to be my signature.
11   Q   So for this and the many pages behind it of blank scripts,
12   it's your contention that this is not your signature?
13   A   It doesn't appear so.
14   Q   Do you know who is signing your name?
15   A   I don't.
16   Q   Did you authorize anyone to sign your name?
17   A   No, sir.
18   Q   So this is not you.  That's your testimony; correct?
19   A   Yes, sir.
20   Q   And you know the problem with blank presigned PAs is that
21   they can be filled in for anything on top if the doctor's
22   already signed it.  You might not have oversight over it;
23   correct?
24   A   Correct, but it's not a prescription.
25   Q   But you wouldn't have any oversight on what is put on the
```

5688

 1    top, that is sent in, if you already signed it; correct?

 2    A    That would be correct; yes.

 3    Q    And that's a problem with prior authorization -- or with

 4    presigning something?

 5    A    Yes, sir.

 6    Q    I'm going to show you now what has been admitted as

 7    Government's Exhibit 32-2(2).  And is this a prior

 8    authorization for Insys for the drug Subsys?

 9    A    Let's see.  I see Insys reimbursement.  I don't see

10    Subsys.  You'll have to show it to me.

11              Okay.  Yes.

12    Q    Is this for the patient -- one of your patients,

13    RI........?

14    A    Right.  Yes, sir.

15    Q    And do you see there where it says he allegedly had bladder

16    cancer; correct?

17    A    I do.

18    Q    And at the bottom, does that appear to be your signature?

19    A    That does look more like my signature except at the end

20    there's not a back pull where the MD is, where the X is on fax.

21    Q    So again, you're not sure if you signed or someone signed

22    your name for you on this PA?

23    A    I can't, Mr. Bodnar, because of that reason.  I always put

24    that pull back to the left, or I generally do that, as the MD

25    part of my signature.

JOHN PATRICK COUCH, MD - CROSS BY MR. BODNAR

1  Q   So if this was sent to Insys Therapeutics for this patient,

2  then that was a fraudulent diagnosis and you don't know whether

3  or not you were the one that signed that?

4  A   I really don't.

5        MR. SHARMAN:  Objection, Your Honor, to fraudulent

6  diagnosis.

7        THE COURT:  Overruled.

8  BY MR. BODNAR:

9  Q   You don't know if you would have signed this?

10  A   I wouldn't have signed it if it had a false diagnosis on

11  it.

12  Q   Well, this was in fact a false diagnosis; correct?

13  A   From what I heard from testimony, yes.

14  Q   Dr. Couch, turning to the urine drug screens.  You knew the

15  GC-MS test was a better test than the -- was a more accurate

16  test than the cup test; correct?

17  A   Yes, sir; that's correct.

18  Q   You also knew that PPSA received reimbursement of $755

19  profit for each of those GC-MS tests; correct?

20  A   It depends on the carrier.  But, yeah, it sounds about

21  right.

22  Q   That's what you knew you were getting from Castle Medical;

23  correct?

24  A   I'm not sure what we were getting from Castle Medical.

25  Q   And urine drug tests were important because you needed to

1    know whether your patients were being compliant; correct?

2    A    Yes, sir.

3    Q    And that would go into account of whether or not you fired

4    or terminated a patient or whether you continued to prescribe

5    them opiates; correct?

6    A    It's part of it, yes, sir.

7    Q    Now, when you made the decision for your patients of

8    whether or not you were going to fire a patient, did you take

9    into account the revenues that would be lost if you fired that

10   patient?

11   A    No, sir, I did not.

12   Q    So you did not share that same belief that Dr. Ruan did as

13   expressed in that email?

14   A    I don't -- no, I don't.

15   Q    So you disagree with your partner, Dr. Ruan, in terms of --

16   or you did not consider profit when you were deciding whether

17   or not to cancel a patient; correct?

18   A    Right.  I didn't.

19   Q    Now, you mentioned that you did not monitor your patients

20   when they gave urine drug tests; correct?

21   A    You mean go in the bathroom with them?

22   Q    Yes.  There was no one monitoring PPSA patients when they

23   gave their drug test?

24   A    No, sir.

25   Q    And you had mentioned on direct, I believe, that one of the

1    reasons that you didn't do that was because you thought it hurt

2    the doctor-patient relationship?

3    A    I thought so.

4    Q    And you trusted your patients?

5    A    Most of -- yeah, I did (nodding head affirmatively).

6    Q    I'm going to show you now what's previously been admitted

7    as Government's Exhibit 9-9(1).  At the bottom is the email

8    from Dr. Ruan to you?

9    A    Yes, sir.

10   Q    This was the one where someone had accused -- another

11   practitioner had accused your clinic of being a pill pusher

12   clinic?

13   A    Right.

14   Q    And with your response at the top.  And do you recall

15   saying -- and does it say here:  Patients are notorious for

16   completely lying, not telling the truth at all.

17   A    Yes.

18   Q    Is that what you said to Dr. Ruan?

19   A    I did.  That's a little strong wording.  But, yeah, I said

20   it.

21   Q    Now, at some point PPSA employees were actually drug tested

22   at the job -- or they were drug tested to make sure they

23   weren't using drugs on the job; correct?

24   A    Correct.

25   Q    And you knew that when your own employees were being drug

1  tested, they were monitored during their urine drug testing.

2  You knew that, didn't you?

3  A   Actually, I didn't.  We sent them out to that American

4  Family Care on Schillinger Road.

5  Q   And you didn't know American Family Care did monitor the

6  urine drug testing for your own employees?

7  A   I was under the impression they did, yes.

8  Q   But that's not something you chose to do with your

9  patients?

10  A   Correct, because they're our patients.  We're not a drug

11  treatment center.  They're pain medicine patients.

12  Q   Dr. Couch, looking now at pump refills.  I believe you said

13  yesterday that it was an oral standing order that you had about

14  moving the pumps up or down 10 percent?

15  A   Right.

16  Q   So was it an oral order or was it something typed up in a

17  notebook on Tammy Dabney's desk?

18  A   I think -- I can't say for sure.  I thought it was in our

19  policy manual but I cannot tell you for sure.  But I did

20  discuss that with each of the nurses when I trained them.

21  Q   And by that, you mean -- by the nurses you mean the pump

22  nurses; correct?

23  A   Yes, sir.

24  Q   And that would be Sarah Carpenter and Tammy Dabney?

25  A   Right, plus they would have gone to the training with J&J.

1    Q    And for that 10 percent up or down, why did you think you

2    had the authority to delegate that to your nurses who didn't

3    have DEA licenses?  Specifically, why did you -- what were you

4    relying on?

5    A    On my training at UCLA Medical Center and talked to the

6    colleagues around the country.  Again, there's no hard set rule

7    or anything that says anything about this; under extreme

8    circumstances where they can't get in touch with an MD and the

9    patient needs their pump refilled.

10   Q    So you relied on that to give the delegated authority to

11   Angela Causby -- sorry -- to Tammy Dabney and Sarah Carpenter?

12   A    Yes.

13   Q    And both Sarah Carpenter and Tammy Dabney did, in fact,

14   adjust patients' medicines up or down 10 percent when they

15   couldn't get a hold of you?

16   A    Yes.

17   Q    Dr. Couch, I believe you said during your direct

18   examination that you never presigned blank prescriptions; is

19   that correct?

20   A    Correct.

21   Q    That is your testimony.  In fact, you said that that never

22   happened?

23   A    Correct.

24   Q    And it never happened because you knew that was against the

25   law; correct?

1    A   Yes, sir.

2    Q   And you knew it was against the Alabama Board of Medical

3    Examiners' rules?

4    A   That's right.

5    Q   And to presign blank scripts would be outside the usual

6    course of professional practice, wouldn't it?

7    A   Yes.

8    Q   I'm going to show you now what has been admitted as

9    Government's Exhibit 2-3.  And we've seen this before.

10   Dr. Couch, are these presigned scripts that appear to have the

11   signature of your partner, Dr. Ruan, on them?

12   A   They are presigned blank scripts but, you know, I don't

13   know if that's his signature or not.

14   Q   You heard they were found within his desk; correct?

15   A   Yes, sir.

16   Q   So if someone forged these for him, they would have put

17   them in Dr. Ruan's desk; correct?

18   A   Right.

19   Q   And you just told the jury that doing this is outside the

20   usual course of professional practice; correct?

21   A   It's to make them available.  I thought I heard in

22   testimony -- I could be incorrect, but I thought I heard them

23   say it was in a locked drawer.

24   Q   What I asked you is -- you just told the jury that it's

25   outside the usual course of professional practice and you knew

1    that, to presign scripts.  Do you see presigned scripts here?

2    A   Yes, sir.

3    Q   So your partner was acting outside the usual course of

4    professional practice by doing this, wasn't he?

5    A   I don't know that he did that.  But it's outside the course

6    of medical practice.

7    Q   If that is his signature, found in his desk, that would be

8    your partner acting outside the usual course of professional

9    practice?

10   A   If it's made available to the staff, yes.

11   Q   And Dr. Couch, the problem with presigned blank scripts is

12   that once a doctor signs it, they may not have any oversight of

13   what goes on the script thereafter; correct?

14   A   That's right.

15   Q   I'm going to show you now what has previously been admitted

16   as United States Exhibit 5-1(b).  And Dr. Couch, are these up

17   top the two prescriptions and at the bottom a third

18   prescription, all for JB..........?

19   A   Yes.

20   Q   And are these the prescriptions that we saw before for

21   Subsys that say uterine cancer at the top?

22   A   Right.

23   Q   And again, uterine cancer there?

24   A   Right.

25   Q   And you knew JB.......... didn't have uterine cancer,

JOHN PATRICK COUCH, MD - CROSS BY MR. BODNAR

```
 1   didn't you?

 2   A   I thought I saw that on her intake exam, that she had a

 3   history of it.

 4   Q   It's got your signature at the bottom; correct?

 5   A   It appears like it, yes.

 6   Q   So you would have authorized, then, uterine cancer to be on

 7   her script?

 8   A   Yeah.  We generally do that to let the pharmacist know, if

 9   it's filled out, said pharmacy.  I put product selection

10   permitted at the bottom, so it didn't necessarily have to be

11   Subsys that they received.

12   Q   But according to this, if that's your signature, you were

13   under the impression that she had uterine cancer?

14   A   Correct.

15   Q   And you met with Ms. B.....; correct?

16   A   Yes.

17   Q   Or did your nurse practitioner meet with her?

18   A   I believe -- I know that she did too, yeah.

19   Q   Could it have been that you didn't know she didn't have

20   uterine cancer because you didn't see Ms. B.....?

21   A   No.  I remember, from what I recall, that there was

22   something on her intake that she had had a history of uterine

23   cancer in the past.

24   Q   But she didn't have uterine cancer now?

25   A   But that doesn't mean she can't have recurrence of it
```

 1  later, years later, decades later.

 2  Q   Even if she's had a hysterectomy?

 3  A   Correct.  If they have a partial hysterectomy, if they

 4  leave any remnant of the uterus attached to the cervix, they

 5  can have uterine cancer years later.

 6  Q   Dr. Couch, looking at on 5-1(a), the Subsys 400 script on

 7  July 30th, 2013, do you see that one right there?

 8  A   Yes, sir.

 9  Q   And I'll show you from 5-1(a), the Lortab prescription for

10  JB.......... for that same day?

11  A   Right.

12  Q   That one doesn't say uterine cancer on it, though, does it?

13  A   No, because it's not a REMS drug or fentanyl or anything

14  like that.  It's --

15  Q   So Subsys was a REMS drug for cancer pain?

16  A   Right.

17  Q   And this, this indicates uterine cancer, doesn't it?

18  A   Uh-huh (positive response).

19  Q   Dr. Couch, on direct you discussed your belief that it was

20  okay to prescribe three prescriptions to a patient during a

21  single visit as long as they were dated, for instance, one

22  script today's date, February 14th, one for don't fill before

23  March 14th, and one don't fill before April 14th?

24  A   Correct.

25  Q   And that is -- that's okay, that's legitimate; correct?

5698

1  A   As I understood it; yes, sir.

2  Q   That's different, though, than having scripts already done

3  up for a patient to come in and receive; correct?

4  A   Done up?

5  Q   There's a difference between a patient coming in one time

6  and getting three scripts and a patient coming in at a later

7  date just to pick up the script that's already signed by you;

8  correct?

9  A   Yes.

10  Q   I'm going to show you what has been admitted as

11  Government's Exhibit 2-12.  And is this a series of scripts

12  that are signed by you, that are dated May 26, 2015?

13  A   Yes.

14  Q   And these were seized during the search warrant on May

15  20th, 2015; correct?

16  A   Correct.

17  Q   So these are scripts for a future date that have already

18  been signed by you?

19  A   Right.

20  Q   And I see gabapentin right there but it also included

21  Schedule II drugs; correct?

22  A   I don't know.

23  Q   Is this one for OxyContin 80?

24  A   Yes.

25  Q   And that's a Schedule II drug; correct?

5699

JOHN PATRICK COUCH, MD - CROSS BY MR. BODNAR

```
 1  A   Yes, sir.

 2  Q   It's also the strongest strength of OxyContin; correct?

 3  A   In tablet form, yes.

 4  Q   In fact, OxyContin 80 and Roxicodone 30 were two of the red

 5  flag drugs that your partner, Dr. Ruan, warned you about in the

 6  summer of 2014; correct?

 7  A   In that email, yes.

 8  Q   Dr. Ruan was concerned about the practice drawing too much

 9  attention; correct?

10  A   I --

11  Q   From those drugs?

12  A   Yeah, it appears so from the email.  Yes.

13  Q   Showing you what has been admitted as Government's Exhibit

14  10-3.  Dr. Ruan, during -- sorry -- Dr. Couch, during the time

15  period of this indictment how many Roxicodone 30 milligram

16  pills were prescribed by you?

17  A   Total pills, it looks like 1,145,867.

18  Q   And for OxyContin 80, how many pills were prescribed by

19  you?

20  A   93,274 in four years.  Yeah.

21          THE COURT:  Mr. Bodnar, is now a good time for us to

22  take our morning break?

23          MR. BODNAR:  Yes, Your Honor.

24          THE COURT:  All right.  Ladies and gentlemen, leave

25  your pads on your chairs.  Take your break downstairs in the
```

5700

```
1    jury assembly room.  No discussion about the case, and we will

2    call you back up in about 15 minutes.  We're in recess.

3         (A recess was taken at approximately 10:30 a.m.)

4         (In open court, defendant and jury present.)

5              THE COURT:  All right, Mr. Bodnar.

6              MR. BODNAR:  Your Honor, there's one housekeeping

7    matter.  We had previously admitted Government's Exhibit 58.

8    And for numbering purposes, we ask for it to be changed to 58-1

9    so it can correlate with other exhibits that are going to come

10   in through this witness.

11             THE COURT:  All right.  We'll change that.

12   BY MR. BODNAR:

13   Q   Dr. Couch, on direct, I believe you discussed that you came

14   in to work usually around 9 o'clock, between 9 and 10 o'clock

15   in the morning; is that correct?

16   A   Yes.  Sometimes later, sometimes earlier, but 9 o'clock was

17   the goal.

18   Q   9 o'clock was the goal?

19   A   Yes, sir.

20   Q   You knew patients of yours were being seen prior to 9

21   o'clock, though; correct?

22   A   If they were Medicare followups.

23   Q   So you knew Medicare followup patients were being seen

24   without you being there; correct?

25   A   That's right.  I was told that was legal.
```

5701

1   Q   You also knew that those individuals received prescriptions

2   before you got there; correct?

3   A   That I had left the day before or a couple of days before

4   because they were coming in.

5   Q   So you would have signed the prescriptions for the patients

6   ahead of time before they came in before knowing if anything

7   had changed with them?

8   A   Yeah.  If they needed a change they could consult -- they

9   could go get Dr. Chen to make the change.

10  Q   And how often did that actually happen?

11  A   I don't know, but it happened.

12  Q   There were also times -- you said you took vacations a

13  couple of times a year.  We've seen the dates that you were out

14  of town.  There were dates that you were out of town, out of

15  the country while your patients were still being seen; correct?

16  A   Correct.

17  Q   And was your testimony that you never left presigned

18  prescriptions like you saw for your partner, Dr. Ruan.  You

19  never did that.  That was your testimony; correct?

20  A   Wait.  You're talking about blank?

21  Q   Blank presigned scripts.

22  A   That's correct.

23  Q   So you never filled out pads ahead of time and left them

24  for Justin Palmer or anybody else?

25  A   No.

5702

1  Q   You knew your patients were being seen while you were out

2  of the country or out of town; correct?

3  A   Right.

4  Q   And you knew they were receiving prescriptions?

5  A   If they were the ones that I had signed, yes, and there

6  were no changes.

7  Q   You also knew, though, that Justin Palmer was forging your

8  name, didn't you?

9  A   I did not know that.

10 Q   You did not know that until you claim that when Patient A

11 was supposed to get a prescription for Adderall from Justin

12 Palmer; correct?

13 A   Yes, sir.

14 Q   You kept him on after that point, though, didn't you?

15 A   As I explained yesterday, yes.

16 Q   But you knew that he was also writing prescriptions under

17 your name for Roxicodone 30 and OxyContin 80; is that correct?

18 A   No, I did not.

19 Q   Dr. Couch, I want to show you what has been admitted as

20 Government's Exhibit 9-1(2).  Do you remember having seen this

21 email during this trial from Dr. Ruan to yourself?

22 A   Yes, sir.

23 Q   In which Dr. Ruan says:  The biggest red flag drugs -- he's

24 talking about Roxicodone 30 and OxyContin 80; correct?

25 A   Yes, sir.

5703

JOHN PATRICK COUCH, MD - CROSS BY MR. BODNAR

1    Q    And does he say here:  I think we should talk to Justin on

2    cutting down Roxicodone 30 milligram usage, especially where

3    trying to convince the Alabama Board of Medical Examiners.  We

4    have a great system to keep patients satisfied.  You see that,

5    don't you?

6    A    Yes, sir.

7    Q    Both you and your partner, Dr. Ruan, knew that Justin

8    Palmer was writing prescriptions, didn't you?

9    A    That's not how I took this email, and I did not know that

10   he was writing prescriptions.

11   Q    You knew that -- your staff members -- you heard numerous

12   staff members say that they were aware that Justin Palmer was

13   signing prescriptions under your name.  You've heard that;

14   correct?

15   A    I heard that in this trial, yes.

16   Q    You've heard from patients like Jessi Kamper, that they saw

17   Justin Palmer forging your name.  You heard that; right?

18   A    I remember them saying they saw him sign prescriptions, but

19   they didn't know if it was my name.  I could be wrong, but

20   that's what I recall.

21   Q    You said you reviewed it with him, with Justin Palmer.  And

22   by "reviewed it," you're saying that -- you didn't review his

23   not prescribing Roxicodone 30 and OxyContin 80?

24   A    The way I took that email to mean is the way it was.  If he

25   had a followup patient and I was in my office or I was doing a

JOHN PATRICK COUGH, MD - CROSS BY MR. BODNAR

1   pump refill that had this dosage of medicine, to come get me so

2   I could write a new prescription for the smaller dose.

3   Q   So what would have been the point of telling Justin that?

4   You're the doctor.  If you're the only one prescribing, there's

5   no need to tell Justin that, is there?

6   A   What do you mean?

7   Q   If you were the one writing the prescription and signing

8   your own name, there's no need for Dr. Ruan to tell Justin

9   about that?

10  A   Well, I might have signed it, you know, beforehand, the day

11  beforehand, like was routinely done.  That's common practice

12  around the country.  And so if he had the prescriptions waiting

13  for the patient and had 30 on there, and I asked him to come

14  get me whenever we came across a 30 so I could review it and

15  see if it would be appropriate to try to reduce that.  That's

16  what that means.

17  Q   So you stand by that.  You did not know, other than that

18  one incident, that Justin Palmer was signing your name to

19  prescriptions?

20  A   I did not know.

21  Q   Employees who claim to have overheard a conversation of you

22  telling Justin not to sign your name anymore, you don't recall

23  that happening?

24  A   That's when I fired him.

25  Q   And that was the only time that you were ever aware of

5705

1    Justin Palmer forging your name?

2    A    And he led me to believe that he was intending to do that,

3    and leave it at the front desk.

4    Q    Now, you were aware that there was another employee that

5    forged your name at one point too, wasn't there?

6    A    I can't remember.

7    Q    Was it an individual named Jane Breland working for you at

8    PPSA at one point?

9    A    Yes.

10   Q    And you know that she was also accused of forging your name

11   on prescriptions while you were out of town?

12   A    I didn't know it was prescriptions.

13   Q    You didn't know that the medication --

14   A    They didn't talk to me.

15   Q    Who is they?

16   A    The investigators.

17   Q    You knew there was an investigation?

18   A    I heard about it.

19   Q    But you were not told it was about your prescriptions while

20   you were out of town?

21   A    No, sir.

22   Q    Now, Dr. Couch, you also received letters, at times, from

23   healthcare providers such as United Healthcare, Cigna and

24   others that informed you about possible misbehavior by your

25   patients; isn't that correct?

1   A   Yes, sir, from time to time.

2   Q   And I'm going to show you now -- this has not been admitted

3   yet -- for identification purposes what has been marked as

4   Government's Exhibit 58-2, 58-3, and 58-4.

5           And, Your Honor, may I approach and show the witness?

6           THE COURT:  Yes.

7   BY MR. BODNAR:

8   Q   Dr. Couch, are you able to identify what type of documents

9   these are 58-2, 3, and 4?

10  A   Utilization profile, United Healthcare, Retrospective Drug

11  Utilization Review Program, RI.........

12  Q   That's 58-2; correct?

13  A   Yes, sir.  Okay.

14  Q   And do you recognize that document?

15  A   Well, I don't particularly recognize it from seeing it,

16  but --

17  Q   Do you recognize you received documents like that from

18  United Healthcare?

19  A   Correct.

20  Q   And is 58-3 a similar one from United Healthcare?

21  A   Yes, sir.

22  Q   Is that for a patient, CM........., one of your patients?

23  A   Yes, sir.

24  Q   And is that third one, 58-4, from Cigna HealthCare for a

25  patient, Jessi Kamper?

1    A    This?  I've got two.

2    Q    The fourth one right here, 58-4.

3    A    Oh, okay.  Yes.

4         MR. BODNAR:  United States moves to admit and publish

5    to the jury 58-2, 58-3, and 58-4.

6         MR. SHARMAN:  Your Honor, no objection to the inquiry.

7    But these are hearsay documents not subject to the exception if

8    Dr. Couch does not recall anything about them or even receiving

9    them.

10        MR. BODNAR:  Your Honor, they are sent to Dr. Couch

11   and they can be presumed that they were received by him, as

12   they were seized from his office.

13        MR. SHARMAN:  Your Honor, I don't believe that

14   presumption is available to the government.  It's hearsay.

15        THE COURT:  All right.  Overrule the objection.  Mark

16   them in.

17        (Government's Exhibits 58-2, 58-3, and 58-4 were entered

18   into evidence.)

19   BY MR. BODNAR:

20   Q    Dr. Couch, showing you first what has been admitted now as

21   Government's Exhibit 58-2.  Is this a Retrospective Drug

22   Utilization Review Program for United Healthcare?

23   A    It appears so, yes.

24   Q    And is this for the patient, RI........?

25   A    Yes.

5708

JOHN PATRICK COUCH, MD - CROSS BY MR. BODNAR

1  Q   And are you the prescriber listed here?

2  A   Yes.

3  Q   And does it then go on to tell you -- or to at least notify

4  you of potential high doses of opioids exceeding 200 milligrams

5  of morphine equivalent per day?

6  A   Yes.

7  Q   Does it mention that there's an increased risk of adverse

8  offense and may require intense monitoring for opioid rotation?

9  A   Yes.  That's 200 milligram morphine equivalent.  But I was

10 trained, and for 20 years, went by the 300 milligram.  So

11 that's my decision on how I took care of my patients, not some

12 -- an insurance company telling me what to do.

13 Q   And that is something that you received frequently from the

14 insurance company; correct?

15 A   No, I wouldn't say frequently.  I did get them, though.  I

16 still got them.  I got them after the raid.  They kept coming.

17 Q   And is this one then similar, 58-3, for CM...........?

18 A   Yes.

19 Q   And again notifying you about potentially high dose of

20 opioids exceeding 200 morphine equivalent a day?

21 A   Right.  But I'm not so -- I don't know if I got that, read

22 it, or anything, if it was delivered to me.

23 Q   Because you were making your own judgment on your own

24 patients; correct?

25 A   That's what I do, yes.

JOHN PATRICK COUCH, MD - CROSS BY MR. BODNAR

1    Q   Even though you were not seeing a vast majority of your

2    patients after the first time?

3    A   I disagree with that.

4    Q   You were seeing a vast majority of your patients after the

5    first time?

6    A   There were many patients that only wanted to see me and

7    never saw a nurse practitioner.

8    Q   The patients that have been in here today -- do you

9    recall Ms. -- or not today -- but in this trial, do you recall

10   Ms. Goellner?

11   A   Yeah.

12   Q   Do you recall she was not even able to identify you,

13   despite being a patient for years?

14   A   I think I remember that, yes.

15   Q   But it's your contention that there were many patients that

16   you saw each time?

17   A   Yeah, at least 30, 40 percent, I think.

18   Q   34?

19   A   Justin didn't work on Fridays.

20   Q   And you're saying 30 to 40 percent of your patients you saw

21   virtually every time?

22   A   Yes.

23   Q   And turning to 58-4, is this a letter or a correspondence

24   from Cigna Pharmacy Services?

25   A   It appears so, yes.

5710

```
 1   Q   To you at the Airport location?
 2   A   It is.
 3   Q   And inside is it regarding a patient named Jessi Kamper?
 4   A   Yes.
 5   Q   And is this notifying you that in addition to the drugs
 6   that you were prescribing, Ms. Kamper was getting drugs from
 7   five other doctors?
 8   A   Yes.
 9   Q   And during this time period of January 1st through March
10   31st of 2015?
11   A   Correct.
12   Q   Did you fire Ms. Kamper?
13   A   I don't know.  What's the date of the receipt of this
14   letter?  Is it on there?
15   Q   (Indicating).
16   A   May.  That could have been held up in the billing office
17   where they got the mail.  I think the mail came to Springhill
18   mainly, sometimes the Airport.
19   Q   When you received notifications from the insurance company
20   about possible dangerous behavior or possible doctor shopping,
21   did you document it in your files?
22   A   You can't put the PDMP on the patient's chart.  You have to
23   keep it separate.  But, yes, I did the best I could.  I took
24   action if there was some type of evidence of diversion or
25   hanky-panky.
```

JOHN PATRICK COUCH, MD - CROSS BY MR. BODNAR

```
1    Q   What action did you take?
2    A   Well, pill counts, the main thing.  That's how I was
3    trained.  It turns out that pill counts are the number one way
4    to detect diversion in any practice, not urine drug screenings.
5    And we did those regularly.  Patient called, back pill counts.
6    Q   Pill counts, though, don't -- and they don't create any
7    profit for the business, do they?
8    A   No.  Other than a short visit, like a 99211 or something.
9    Q   Dr. Couch, you mentioned several times during your direct
10   that you tried to duplicate what it was that you saw at UCLA
11   when you were in your fellowship training.  Do you recall that?
12   A   That was a guide, yes, sir.
13   Q   While you were at UCLA, did you ever see a doctor allowing
14   a nurse practitioner to forge their signature?
15   A   No, sir.
16   Q   Did you see drug use --
17   A   We didn't have nurse practitioners.
18   Q   Did you see anybody being allowed to forge a doctor's
19   signature while you were at UCLA?
20   A   No, sir.
21   Q   Did you see employees seeing patients while under the
22   influence of drugs at UCLA?
23   A   I don't know if they were on drugs or not.  But I don't
24   remember anything in particular, no.
25   Q   Do you recall at UCLA seeing blank presigned prescriptions
```

5712

1   for others to use?

2   A   No, sir.

3   Q   At UCLA was there any discussion about prescribing whatever

4   is in the financial best interest of the doctor?

5   A   No.

6   Q   Dr. Couch, I'll show you now what has been admitted as

7   Government's Exhibit 9-9(2).  Do you recall we talked about

8   this email from Dr. -- your partner, Dr. Ruan, to you on

9   October 13, 2014?

10  A   Yes, sir.

11  Q   And does it say in here:  Pat, regarding the idea of

12  restructuring PPSA, I have very mixed feelings.  You must have

13  them too, considering that you started it from ground zero.  I

14  discussed with Boe if there are any ways of restructuring PPSA,

15  so that neither Dr. Chen nor I can be involved, in case your

16  team gets investigated, or something bad happens down the

17  road.  Just two weeks ago you mentioned to me that we were

18  supposed to be raided by the FBI, which got you concerned, but

19  thank God it didn't happen.

20          And does Dr. Ruan go on to say:  Both of us will need

21  to set perfect examples for others, including our mid levels.

22  We know they are loyal.  Every practice gets into trouble when

23  there are opportunities for whistle blowers to gain.

24  A   Right.

25  Q   You received that email, didn't you?

JOHN PATRICK COUCH, MD - CROSS BY MR. BODNAR

1    A    I did.

2    Q    And you responded back:  I agree with all your points.

3    A    I remember this.  I was doing a pump refill on a patient

4    and all this came in.  And I think I had it on vibrate and I

5    saw it so I just texted out in the hallway and I went back into

6    the room with the patient.

7    Q    Dr. Couch, why did you and your partner, Dr. Ruan, think

8    the FBI was going to raid PPSA in October of 2014?

9    A    Because I was involved in a relationship with a female that

10   I had a lifetime do not contact order against from -- that was

11   issued by Judge Norton in Fairhope.  And on top of that,

12   Prosecutor Scroggins from Baldwin County also put a one-year

13   with her to have her sign that she wouldn't have any contact

14   with me.

15   Q    And that was about a personal dispute, a domestic relations

16   issue?

17   A    Right.  But she kept calling me and saying that I was going

18   to get raided by the FBI, that she was getting phone calls from

19   these people (indicating).

20   Q    Dr. Couch, if it was a personal relationship issue,

21   unassociated with the business, why were you concerned that the

22   FBI was going to raid your business?

23   A    Because he was my business partner and I thought it was my

24   duty to let him know.  I remember a particular morning when I

25   was going to see my fiancee.  She had called a drug rep who

JOHN PATRICK COUCH, MD - CROSS BY MR. BODNAR

1   called me, that she knew from her husband, who was -- his

2   baseball coach, I think, at Mary G. Montgomery or something, to

3   mess up my trip that weekend.  She always did that type of

4   thing even though she wasn't supposed to be contacting me.

5           So I called him to let him know that.  I didn't think

6   it was going to happen, but just to let him know.

7   Q   Dr. Couch, why did you think or what did you think the FBI

8   was going to raid PPSA for?

9   A   I don't know.

10  Q   You had no idea?

11  A   Actually, I told her, I said:  Tell them to come on in.

12  You know, I've been calling the authorities to come look us

13  over and give us some guidance and things like that.

14  Q   Who did you call?

15  A   I called the DEA office.

16  Q   The DEA office?

17  A   Yeah.

18  Q   The one here in Mobile?

19  A   No.  I called New Orleans.

20  Q   Do you remember who you spoke to?

21  A   I don't.  Unfortunately, my desk got cleaned out when I was

22  at Boy Scout camp with my son so all those cards and contacts

23  and things were gone.  They surprised me by cleaning out my

24  office and cleaning out my desk, and I couldn't find that stuff

25  later.

1   Q   Dr. Couch, it appears that your partner, Dr. Ruan, took the

2   threat of an FBI raid serious enough to discuss restructuring

3   your entire business.  Do you see that?

4   A   I do.

5   Q   Does it appear then that he believed, your partner believed

6   that the FBI may, in fact, raid PPSA?

7         MR. KNIZLEY:  Your Honor, I object to what he may

8   conclude by this, what the belief may be.  That would be an

9   undisclosed mental operation of someone else.

10        THE COURT:  Well, I think the question is about what

11   Dr. Couch took Dr. Ruan to mean.  So overrule the objection.

12   BY MR. BODNAR:

13   Q   Did it appear to you that Dr. Ruan took this seriously that

14   the FBI might raid PPSA?

15   A   Yes.  And there are other reasons for this proposed, you

16   know, change.

17   Q   This is in October of 2014; correct?

18   A   Right.

19   Q   Shortly thereafter Stacy Madison was fired from the

20   practice; correct; in the fall of '14?

21   A   That sounds right.

22   Q   And Justin Palmer goes to rehab in early '15?

23   A   Right.

24   Q   Bridgette Parker goes to rehab in early '15?

25   A   Right.

JOHN PATRICK COUCH, MD - CROSS BY MR. BODNAR

1  Q   During that late 2014 and into 2015 things got a lot

2  tighter at PPSA, didn't they?

3  A   Tighter?

4  Q   Practice started to change?

5  A   Yeah.

6  Q   Did anything change in the way you handled patients?

7  A   Yes.  We hired new nurse practitioners, yes.

8  Q   And did you attempt to do things more by the book and more

9  by the law following these emails than leaving it all to your

10 nurse practitioners?

11          MR. SHARMAN:  Object to the form of the question.

12 A   I don't --

13          THE COURT:  Overruled.

14 A   -- I can't say I did anything in particular, no.  I always

15 did it by the law and by the book, as I understood it.

16 BY MR. BODNAR:

17 Q   Dr. Couch, at the end of your direct testimony the other

18 day you were asked by your attorney whether you thought that

19 every prescription that you had written was for a legitimate

20 medical need.  Do you remember that testimony?

21 A   Yes, sir.

22 Q   And do you still maintain that all the prescriptions that

23 you wrote were for a legitimate medical purpose?

24 A   That I wrote, that I saw the patient, signed, and all that;

25 yes, sir, I do.

1   Q   Do you also stand by that all your prescriptions were

2   written in the usual course of professional practice?

3   A   The ones that were done by me, where I saw the patient.

4   Q   The ones that were forged by Justin Palmer under your name,

5   you're saying those were not in the usual course of

6   professional practice?

7   A   It turns out they were, but I didn't sign them.  So signing

8   my -- forging my name is not within the usual course of medical

9   practice.

10  Q   So if you knew that, then it would be outside the usual

11  course of professional practice for you too, wouldn't it?

12  A   I didn't know it.  I wasn't aware.

13  Q   If you knew that, it would be outside the usual course of

14  professional practice for you; correct?

15  A   Yeah, it would be.

16          MR. BODNAR:  One moment, Your Honor.

17      (A discussion was held off the record between government

18  counsel.)

19          MR. BODNAR:  Pass the witness, Your Honor.

20      (A discussion was held off the record between counsel.)

21                      REDIRECT EXAMINATION

22  BY MR. SHARMAN:

23  Q   Dr. Couch, on cross-examination you were shown a series of

24  charts about insurance company payments based upon your

25  prescription.  Do you remember some of those charts, generally,

5718

```
 1    that you just saw?
 2    A   Yes, sir.
 3    Q   Was Blue Cross/Blue Shield one of those payors?
 4    A   Yes, sir.  Well, that I saw today?  I don't remember
 5    that.  I think it was United.
 6    Q   Well, was Blue Cross/Blue Shield a payor?
 7    A   Yes, sir.
 8    Q   And for your patients?
 9    A   Yes, sir.
10    Q   Did Blue Cross/Blue Shield at any time ever tell you to
11    stop writing TIRF prescriptions?
12    A   No, sir, not that I'm aware of.
13    Q   Is Tricare another payor?
14    A   Yes, sir.
15    Q   Did Tricare ever tell you to stop writing TIRF
16    prescriptions?
17    A   Not that I recall, no, sir.
18    Q   Is United Healthcare another payor?
19    A   Yes, sir.
20    Q   And did United Healthcare ever tell you to not write TIRF
21    prescriptions?
22    A   Not that I recall, no, sir.
23    Q   On cross-examination you were asked a few questions about
24    prior authorizations for Subsys and for Abstral.  Do you
25    remember some of those questions?
```

```
 1    A    Yes, sir.

 2    Q    Are prior authorizations the same thing as a prescription?

 3    A    No, sir.

 4    Q    Is a prior authorization a document that goes to the

 5    insurance company or the payor?

 6    A    Yes, sir.

 7    Q    Did you ever sign a prior authorization that you believed

 8    or understood to contain a false diagnosis?

 9    A    No, sir.

10    Q    On cross-examination you were shown an email from Dr. Ruan

11    discussing Galena and its potential market prospects.  Do you

12    remember that email?

13    A    Yes, sir.

14    Q    Did Dr. Ruan's views on investments or investment strategy

15    have any effect on your prescription of Abstral to your

16    patients?

17    A    No, sir.

18    Q    Did you prescribe Abstral for any reason other than a

19    legitimate medical purpose in your professional judgment for

20    that particular patient?

21    A    No, sir.

22    Q    On the subject of Galena and Abstral you were shown, on

23    cross-examination, some charts that at least purport to reflect

24    your stock ownership and also your prescription history of

25    Abstral.  Do you remember those charts, generally?
```

1  A   Yes, sir.

2  Q   And I believe you testified on cross-examination that

3  Galena encountered some significant problems resulting in part

4  from an insider trading scandal; was that right?

5  A   Yes, sir.  There was a little more to it.  It wasn't just

6  insider trading.  They had hired this company called the Dream

7  Team Group in south Florida to promote the NeuVax.  And I began

8  to see these, you know, doing my due diligence on the drug.  I

9  have a degree in microbiology so it caught my attention.  And I

10 saw it when I went to the training program in Atlanta, the

11 presentation, so I started to find out everything I could about

12 it, about that breast cancer -- turns out that it was also

13 shown to have some -- suggestive to be effective against

14 gastric cancer.  That's why India got in on the study, and

15 endometrial cancer and testicular cancer.

16 Q   All right.  And was it your -- did you understand that at

17 the time that it is about this Dream Team and the issues about

18 marketing that arose for Galena?

19 A   Right.  They flooded the -- you know, the websites that

20 talk about prediction of stocks, and all that, with these

21 stories.  They weren't untrue, they just put a lot out there to

22 try to promote the stock.

23 Q   Did those two issues -- that is to say, the insider trading

24 issues and the investigation into the propriety of the

25 marketing company, did that cause you concern about the

1  viability of Galena in general, and in particular whether it

2  could continue to make available Abstral?

3  A   Not really.  I still believed in the potential drug.  I

4  mean the vaccine.  I assumed that they would fire those people,

5  which they did, and replace them with other leadership.  And

6  the drug is still the drug.  And they were still being

7  supported by the DOJ, and like I said India, and several other

8  countries were making, you know, either -- MD Anderson was one

9  of the hospitals here that were part of that study of 700

10  patients and Sloan Kettering.

11  Q   With regard to Subsys, on cross-examination you had a few

12  questions about Insys and Subsys.  Do you recall generally

13  those questions?

14  A   Yes, sir.

15  Q   Did you make your decision to prescribe any patient Subsys

16  on the basis of your giving educational talks and being paid

17  for it?

18  A   No.

19  Q   Did you prescribe Subsys because Natalie Perhacs told you

20  to?

21  A   No, sir.

22  Q   Did you prescribe it because anybody told you to?

23  A   No, sir.

24  Q   Did you prescribe it because you thought it appropriate

25  medically, in your professional judgment, for a particular

1   patient?

2   A   That's correct.

3   Q   On cross-examination you got a few questions about Greenway

4   and about billing.

5   A   Right.

6   Q   Do you remember some of those questions?

7   A   Yes, sir.

8   Q   When you looked at a note on Greenway -- first, did the

9   prior healthcare provider, for example, the nurse practitioner,

10  have to finish his or her input before you could even review

11  it?

12  A   That's right.  Yes, sir.

13  Q   Then if I understood you correctly, it was delivered in

14  something of an inbox fashion on your computer; is that right?

15  A   Yes, to be -- to be reviewed and signed, or something like

16  that.

17  Q   When you reviewed that note, after it was released to you

18  for your review, did you look at everything or did you only

19  look at those portions of the note or the exam that were

20  pertinent to your diagnosis?

21          MR. BODNAR:  Your Honor, object to outside the scope

22  of cross-examination questions on the billing here.

23          MR. SHARMAN:  He was asked about the billing on cross-

24  examination and what he did with the biller.

25          THE COURT:  Yeah.  Overruled.

5723

```
 1   BY MR. SHARMAN:
 2   Q    When the --
 3   A    I mainly looked at any changes since the interim, the last
 4   time they were there and the chief complaint or history of
 5   diagnosis.  I would scan the physical exam, see if there's any
 6   red typing that was --
 7   Q    That was going to be -- I hate to interrupt you.  That was
 8   going to be another question.  How did you know if you needed
 9   -- if there were any changes?
10   A    Well, the red ink, the red typing part would be something
11   new.  And then I looked at the diagnosis and I looked at the
12   plan.
13   Q    After having conducted that review, would you then
14   electronically sign the note?
15   A    If I agreed with the plan, yes.  If not, I would change it.
16   Because you log in under your own password and so it knows that
17   whoever did it first is the author, and then the professional
18   provider, myself, would sign and it would put that at the
19   bottom.
20   Q    Did you ever tell the billing staff what to bill or how to
21   bill it?
22   A    No, sir.  I don't know how to do it.
23   Q    You also received a few questions about the undercover
24   visit of the patient, or the fake patient, and also the video.
25   Do you remember seeing the video?
```

JOHN PATRICK GOUCH, MD - REDIRECT BY MR. SHARMAN

1  A   Yeah.

2  Q   And getting some of those questions; do you remember that?

3  A   Yes, sir.  Yes, sir.

4  Q   And do you recall if the urine drug screen that the

5  government referred to on cross-examination as showing

6  Adderall, do you recall whether or not it actually showed cold

7  medicine?

8  A   I would be surprised, but I can't say for sure I recall

9  that.  That would certainly cause a false positive for

10 amphetamines.

11 Q   You also got questions about -- with regard to the

12 undercover visit, your repetition of the plan for the patient

13 even though you had already discussed it with Stacy.  Do you

14 remember those questions and answers?

15 A   Yes.

16 Q   And just clarify, if you would, why it was your practice to

17 at least summarize for the patient, in that case the undercover

18 patient, in the examination room what the situation was and the

19 plan, even though you had already discussed it with Stacy in

20 your office?

21 A   Well, I just learned that during my training, it's to show

22 the patient that there's a triangular information going on that

23 she and I had discussed it, that the patient would know, that I

24 knew about it before I came in the room so I don't just come in

25 there and ask them to start bending over and prodding their

1  back and all that type of stuff.  And also to show the patient

2  that she had indeed talked to that patient -- to me beforehand

3  so they would know that I knew something about them before I

4  came in there, so I wouldn't have to repeat it or do more

5  physical exam than necessary and stir up their pain for the

6  ride home back to wherever.

7  Q   On cross-examination you also got some questions about a

8  patient named BW......... and her urine drug screens.  Do you

9  remember some of those questions, generally?

10 A   Yes, sir.

11 Q   All right.  Was it the case that -- eventually, that after

12 several events, Ms. W... was told that she would be discharged

13 if that continued?

14 A   Yes, sir.

15 Q   You also got questions about blank signed prescriptions.

16 Do you remember some of those questions?

17 A   Yes, sir.

18 Q   Just to be clear, did you ever sign a blank prescription?

19 A   No, sir.

20 Q   And what was your understanding to which you alluded on

21 cross-examination as to when that practice becomes an issue

22 with regard to the availability of such a presigned

23 prescription?

24 A   Yeah.  It comes to the word availability, as I understand

25 it, from what I've heard from testimony here and -- if it's

 1  unavailable to the staff, locked in your desk or something like

 2  that, then that doesn't meet or it's not congruent with

 3  available.

 4  Q   So it's your -- is it your understanding that if a

 5  presigned blank script is not made available to a staff member

 6  or to a patient --

 7  A   Yes, sir.

 8  Q   -- that that is okay.  Is that your understanding?

 9  A   That's what it appears like.

10  Q   And is it -- did you ever make such a prescription

11  available to a staff member?

12  A   No, sir.

13  Q   Did you ever make such a prescription available to a

14  patient?

15  A   No, sir.

16  Q   On cross-examination, Dr. Couch, you were shown several

17  prescriptions to a patient named JB..........?

18  A   Right.

19  Q   Do you remember some of those questions?

20  A   Yes, sir.

21  Q   Was it your understanding, based on those prescriptions,

22  that Ms. B..... was having those prescriptions filled at a

23  pharmacy other than C&R Pharmacy?

24  A   Yes.

25  Q   And the government showed you that there were notations on

5727

 1    some of those prescriptions for uterine cancer.  Do you

 2    remember those questions?

 3    A   Yes, sir.

 4    Q   Did you, in reviewing her chart, see a reference to or

 5    diagnosis of uterine cancer?

 6    A   From what I recall in her intake exam, she wrote that down

 7    years ago.

 8    Q   Was there a reason why if a patient were not getting a

 9    prescription filled at C&R Pharmacy and if it were a

10    prescription for Subsys, that a particular diagnosis would be

11    written even on the prescription itself?  Was there a reason

12    for that if they were going somewhere else?

13    A   Yeah.  Sometimes I would do that out of courtesy to the

14    pharmacist.  My oldest brother's a pharmacist and I've talked

15    to him.  And again, you know, if I had the actual diagnosis of

16    cancer, I would write that on there so they would know, and I

17    would circle that pain/inflammation box on the right.

18    Q   I'm going to show you an exhibit that you saw on cross-

19    examination, which is -- is this --

20            MR. SHARMAN:  Actually, could we have it taken off for

21    a moment?  I just want to make sure that I've got the right one

22    that's in evidence.

23            MR. BODNAR:  Your Honor, yes, the one in evidence is

24    redacted with the other practitioner's name.

25            THE CLERK:  It's not in evidence, Your Honor.  That

JOHN PATRICK GOUCH, MD - REDIRECT BY MR. SHARMAN

 1  wasn't offered.

 2        THE COURT:  It wasn't offered, apparently.

 3        MR. SHARMAN:  I believe it's in evidence.

 4        MR. BODNAR:  It's in evidence, Your Honor.  It's

 5  9-9(1), I believe.

 6        MR. SHARMAN:  Your Honor, I believe we've found it.

 7        THE COURT:  All right.  They found it.

 8        MR. SHARMAN:  Madame Clerk, can I have the ELMO,

 9  please?

10  BY MR. SHARMAN:

11  Q   I'm showing you, Dr. Couch, Government's Exhibit 9-9(1)

12  that you were shown on cross-examination.  Do you remember

13  being asked questions on cross-examination about this exhibit?

14  Do you remember that?

15  A   Today?

16  Q   Yes, sir.  This is the one where another physician is

17  making claims about PPSA's practice.

18  A   I don't remember that one today.

19  Q   All right.  If you will -- this is in evidence, and if you

20  could just take a moment to read it to yourself.

21  A   Yes, sir.  (Reading.)

22        Oh, actually I do now.  That was the part about -- I

23  say:  They always lie, and that kind of stuff, a little too

24  strong language.  It's a little strong.  But, yeah, I remember

25  that part now.

JOHN PATRICK GOUGH, MD - REDIRECT BY MR. SHARMAN

1   Q   And then if you will look, please, sir, to the top which is

2   the response from you, part of which you were examined about on

3   cross-examination.  Do you see that response?

4   A   Yes, sir.

5   Q   You wrote?

6   A   Yes, sir.

7   Q   And did you say there that you believe in the concept of

8   innocent until proven guilty?

9   A   Yes, sir.

10  Q   Is that, in fact, your belief?

11  A   Yes, sir.

12  Q   Do you also say there in the middle:  I would do -- I would

13  just do what you're saying.  Be careful.  But always remember

14  that it is probably not the whole story.  Is that what you

15  wrote?

16  A   Yes, sir.

17  Q   Does this response in general and those statements in

18  particular express your general understanding and viewpoint

19  with regard to such claims?

20          MR. BODNAR:  Objection to relevance, Your Honor.

21          MR. SHARMAN:  They put it in on cross, Your Honor.

22          MR. BODNAR:  Which claims is he talking about?  That's

23  not the portion of the email we crossed him on.

24          THE COURT:  Yes.  I sustain.

25      (A discussion was held off the record between defense

 1  counsel.)

 2  BY MR. SHARMAN:

 3  Q   At the end of your response in Government Exhibit 9-9(c)(1)

 4  there is, in the last sentence, the following language:  It's

 5  the concept of contempt prior to investigation which I hate.

 6  Do you see where I read that?

 7  A   Yes, sir.

 8  Q   What did you mean by that?

 9         MR. BODNAR:  Objection, Your Honor, to -- again, this

10  is -- with him reading that, that's fine.  But this is beyond

11  now the scope of cross-examination.

12         MR. SHARMAN:  Your Honor, they asked about certain

13  portions of it.  We should be able to ask about other portions

14  of it.

15         MR. BODNAR:  We read a certain portion of it.

16         THE COURT:  Yeah.  I sustain the objection.

17  BY MR. SHARMAN:

18  Q   On cross-examination, Dr. Couch, you got a series of

19  questions about giving patients prescriptions to be filled

20  later on at a date certain.  Do you remember some of those

21  questions the government asked you?

22  A   Yes, sir.

23  Q   Is there any DEA guidance or rule that you consulted or are

24  aware of that says that you cannot do that?

25  A   No, sir.

JOHN PATRICK GOUCH, MD - REDIRECT BY MR. SHARMAN

5731

1   Q   In your practice and understanding, is it perfectly

2   appropriate to do that?

3   A   Yes, sir.

4   Q   You were also shown an email where Dr. Ruan raised some

5   issues that appeared to follow on to your identification of the

6   possibility of an FBI raid.  Do you remember -- do you remember

7   those questions?

8   A   Yes, sir.

9   Q   And just to remind you -- if I may have the ELMO again --

10  I'll show you what's been marked and admitted in evidence as

11  Government Exhibit 9-9(2).  Do you remember being asked the

12  questions about this email this morning and also about your

13  follow-up response?

14  A   Yes, sir.  Yes.

15  Q   And the date of this email exchange, is it October 13 and

16  14 of 2014?

17  A   Yes, sir.

18  Q   And in the middle of the first paragraph of Dr. Ruan's

19  email to you it says:  Just two weeks ago you mentioned to me

20  that we were supposed to be raided by FBI.  This got you

21  concerned but thank God it did not happen.  Do you see where I

22  read that?

23  A   Yes, sir.

24  Q   And do you remember that the government asked you some

25  questions about that --

1  A   Yes, sir.

2  Q   -- on cross-examination?

3  A   Yes, sir.

4  Q   Now, at the time of this email exchange, Dr. Couch, did you

5  have a former girlfriend from whom you were estranged?

6  A   Yes, sir.

7  Q   And I'm going to refer to her as Person B.  Okay?

8  A   Yes, sir.

9  Q   You mentioned some sort of restraining order with regard to

10  Person B.  Did I hear you correctly?

11  A   Yes, sir.

12  Q   Was that a restraining order that she got against you or

13  was it one that you got against her?

14  A   I got against her.

15        MR. BODNAR:  Objection to relevance on this line of

16  questioning about a separate domestic violence issue.

17        THE COURT:  Overruled.

18  BY MR. SHARMAN:

19  Q   Was that a restraining order that she got against you or

20  that you had to get against her?

21  A   I got against her to stay away from me for the rest of my

22  life.

23  Q   And when I say "restraining order," was that an

24  order granted by a court?

25  A   It's a do not contact.  It was ordered by Judge Norton

5733

1    after testimony from witnesses, including my ex-wife and my

2    brothers and a few other people.

3    Q   So despite that order, did Person B make threats against

4    you and your business?

5    A   For at least a year, if not a year and a half.

6    Q   And was one of those threats to try to cause trouble for

7    you and your business with various authorities?

8    A   Yes.

9    Q   Was one of those authorities, for example, the Alabama

10   Medical Board?

11   A   It is.

12   Q   Was one of those authorities the DEA?

13   A   Yes.

14   Q   Okay.  And were you aware of her efforts, as a result of

15   the estrangement, to accomplish that harm?  Were you aware of

16   that?

17   A   She made it very clear that's what she would do if I broke

18   up with her.

19   Q   Was your understanding of those threats and violation of

20   that court order the basis of your comment to Dr. Ruan?

21   A   Yes, sir.

22   Q   Did your comment to Dr. Ruan have anything to do with any

23   concern or worry you had about your practices particularly or

24   PPSA's generally?

25   A   PPSA in general.

1    Q   No, sir.  I missed -- I wasn't clear.  Did your comment to

2    Dr. Ruan have anything to do with you thinking you were doing

3    something wrong?

4    A   I didn't think I was doing anything wrong.  I just wanted

5    to let him know, you know, that she's been doing this for a

6    while.  And I just, you know, thought it was my duty to let my

7    business partner know about it.  You have to remember I

8    didn't -- you know, we didn't see each other a lot, except for

9    every other Friday, or once or twice a month.

10   Q   Dr. Couch, on cross-examination the government showed you

11   three letters from payors concerning the prescription-fill

12   practices of three patients.  Do you remember some of those

13   questions?

14   A   Yes, sir.

15   Q   Did you use this kind of information as a factor or one of

16   a number of factors in the treatment of any patient?

17   A   Yes, I took it into consideration.  I didn't -- I didn't

18   ignore them.  If they made it to my desk, I saw them.

19   Q   Was it your understanding that when you got a letter from

20   an insurance company about your patients, they were conveying

21   facts to you but were not trying to dictate your care?

22           MR. BODNAR:  Objection to leading, Your Honor.

23           THE COURT:  All right.

24           MR. SHARMAN:  I'll withdraw it, Your Honor.

25   Q   I show you Exhibit 58-3 which is a letter from United

JOHN PATRICK GOUCH, MD - REDIRECT BY MR. SHARMAN

1  Healthcare concerning a patient named M.......  Do you see --

2  A   Yes, sir.

3  Q   -- where I am there?

4  A   Right.

5  Q   And in the first paragraph does United Healthcare say:

6  Please assess the clinical significance of the identified issue

7  and modify -- and modify the patient's medication regimen, if

8  appropriate.  Do you see where I read that?

9  A   Yes, sir.  Yes.

10  Q   And the part that says, if appropriate, did you understand

11  that to mean if you considered it appropriate to modify?

12  A   That's correct.

13  Q   United Healthcare goes on to say:  These issues are based

14  on pharmacy claims that are available to us and may not be

15  applicable to your patient's particular medical condition.

16         Do you see where I read that?

17  A   Yes, sir.

18  Q   When you got this and other such letters from United

19  Healthcare or other payors, did you understand that the

20  determination of what was and was not applicable to your

21  patients' particular medical condition was left up to you, the

22  doctor?

23  A   Yes, sir.

24      (A discussion was held off the record between defense

25  counsel.)

1          MR. SHARMAN:  No further questions.

2          THE COURT:  May this witness be excused?

3          MR. BODNAR:  Yes, Your Honor.

4          MR. SHARMAN:  Yes, ma'am.

5          THE COURT:  All right.  Ladies and gentlemen, we're

6   going to go ahead and take our lunch break at this time.  I

7   know it's early and we are going to be in recess until

8   1:30.  Leave your pads on your chairs.  No discussion about the

9   case.  Be back downstairs in the jury assembly room, ready to

10  be called back up at 1:30.  We're in recess.

11      (A recess was taken at approximately 11:47 a.m.)

12      (Afternoon session, 1:34 p.m., in open court, defendants

13  and jury present.)

14          THE COURT:  Let me see counsel at side bar for just a

15  minute.

16      (At the side bar, jury not present.)

17          THE COURT:  Is Couch resting or are you still mixing

18  things up?  Or what are you doing here?

19          MR. SHARMAN:  Your Honor, we are finished as to

20  witnesses.  I would like a chance to make a written proffer.

21  But it's all administrative.  We can do that at another side

22  bar.  But we're done with witnesses, yes, ma'am.

23          THE COURT:  Okay.  Well, are you going to announce

24  that you rest?

25          MR. SHARMAN:  I can, if Your Honor will allow me to

5737

1   make the written, submit the written proffers as Court exhibits

2   after that.

3           THE COURT:  Okay.  And it's a proffer of --

4           MR. SHARMAN:  Much like we did with the testimony of

5   Dr. Aultman, it's essentially just the written version of oral

6   proffers previously made on the record or otherwise objected

7   to.  I just want to have something in this record to be clear

8   about it.  So that's my only hangup.

9           THE COURT:  Okay.  But I want to make sure that it's

10  something that was brought to my attention.

11          MR. SHARMAN:  Yes, ma'am.  They all were.

12          THE COURT:  Okay.  And all the grounds that you intend

13  to put in your proffer as well?

14          MR. SHARMAN:  Yes, ma'am.

15          THE COURT:  Okay.  All right.

16          MS. GRIFFIN:  Your Honor, there's an issue of Monica

17  Carroll, if they are going to rest.  I understand she's still

18  not able to come back to testify and she was almost finished

19  with direct.  We did not get to cross her.

20          THE COURT:  What is her situation?

21          MR. SHARMAN:  The last we heard, Your Honor, which

22  was, I believe, this morning, she said that she was on her way

23  to an orthopedic physician.  In her words she had whiplash and

24  pinched nerves in her spine.  I don't know any more than

25  that.  I don't intend to use her or call her back.  But

1    obviously the government can do what it will.

2              THE COURT:  If she's not going to be able to testify,

3    we need to strike her testimony, her direct testimony.

4              MS. GRIFFIN:  And we'd move to strike it.  We were

5    waiting to do that until we knew she wasn't coming.  We would

6    also at some point request that Dr. Couch rest, you know, on

7    the record in front of the jury.

8              MR. SHARMAN:  If that's the Court's inclination, then

9    I would ask that before I rest that I be able to review notes

10   about her testimony and decide finally if I do want to recall

11   her.  So if I could have till the end of the day to do that, I

12   would appreciate that.

13             THE COURT:  All right.  Okay.  So you're going to

14   proceed with --

15             MR. KNIZLEY:  Dr. Couch -- Dr. Ruan.

16             MR. SHARMAN:  No way.

17             MR. KNIZLEY:  And I will probably be the rest of

18   today, Deborah may get started with him maybe before we get

19   through, but I doubt it.  And then we have Gharibo, who is here

20   tonight, this afternoon, who's probably the length of Gudin or

21   less.  And so that should certainly conclude before the end of

22   the day tomorrow.

23             THE COURT:  Okay.

24             MR. KNIZLEY:  Even if you went as far as -- we went as

25   far as the morning break, it would still conclude with the

5739

```
 1   evidence tomorrow.

 2           THE COURT:  Okay.

 3           MR. BODNAR:  And, Your Honor, we believe we'll have

 4   one rebuttal witness, and it won't take more than about 15

 5   minutes to clarify one point that came up during Dr. Couch's

 6   cross-examination -- sorry -- during Dr. Couch's case in chief.

 7           MR. KNIZLEY:  And it even could be shorter, if Ruan's

 8   ends up shorter than I think.  It could be even shorter.

 9           THE COURT:  Okay.

10       (In open court, defendants and jury present.)

11           THE COURT:  All right, Mr. Knizley.

12           MR. KNIZLEY:  Your Honor, we call Xiulu Ruan.

13           THE CLERK:  Dr. Ruan, if you'll step forward toward

14   the witness stand, I'll swear you in.  Let me get you to raise

15   your right hand.

16                       XIULU RUAN, MD,

17              was sworn and testified as follows:

18           THE WITNESS:  I do.

19           THE CLERK:  Thank you, sir.  Please be seated.

20                     DIRECT EXAMINATION

21   BY MR. KNIZLEY:

22   Q   State your name, please, sir.

23   A   Xiulu Ruan.

24   Q   And what is your occupation?

25   A   Medical doctor.
```

XIULU RUAN, MD - DIRECT BY MR. KNIZLEY

1   Q    And how long have you been a medical doctor?

2   A    About 15 years.

3   Q    And where were you born?

4   A    Jinan Shandong, China.

5   Q    And where is Jinan, China in relation to, let's say, a

6   large metropolitan area in China?

7   A    It's a city between Beijing and Shanghai.

8   Q    And did you grow up in China?

9   A    Yes, I did.

10  Q    Did you go to school there?

11  A    Yes, I did.

12  Q    And is their educational system somewhat different than we

13  might find in the United States?

14  A    Yes.  After you graduate from high school, in China you can

15  go to medical school directly.  You don't have to do a pre-med.

16  Q    And after you completed what would be the equivalent of the

17  high school studies in the United States, did you in fact

18  attend a higher education to get a medical degree in China?

19  A    Yes, sir.

20  Q    And how long is that process to get a medical degree in

21  China?

22  A    I was in a six-year program.

23  Q    And did you complete that program?

24  A    Yes, I did, sir.

25  Q    And after completion of that program, could you then make

5741

```
 1   application for a medical license in China?

 2   A   Yes.

 3   Q   Did you do so?

 4   A   I did not.  I did one year research.

 5   Q   And what -- the one-year research was in preparation for

 6   doing what?

 7   A   Coming to the United States.

 8   Q   And did you in fact, after your six years of medical study

 9   and your one year of research, come to the United States?

10   A   Yes, I did.

11   Q   And what purpose did you come to the United States for?

12   A   For better education.  U.S. has better science, technology,

13   and most importantly, freedom.

14   Q   And when you came to the United States, did you continue

15   your educational studies?

16   A   Yes, sir.  I was accepted by LSU in Baton Rouge in their

17   graduate program.

18   Q   What type of graduate program -- what type of graduate

19   degree were you seeking?

20   A   I majored in biochemistry and got my masters in natural

21   sciences, then I went on -- prepared for -- into medical field.

22   Q   And after you getting the degree from LSU and your studies

23   you had in China, could you then make application for a medical

24   degree in the United States?

25   A   No, I could not.
```

XIULU RUAN, MD - DIRECT BY MR. KNIZLEY

1    Q   Why?  Did you have to go do some other studies before that?

2    A   You have to pass a two-step test called the USMLE, United

3    States Medical License Exam.  After you pass those two steps

4    you are sort of the equivalent to the U.S. medical graduate.

5    Q   And did you do that?

6    A   I did.

7    Q   And did you take the exam?

8    A   I did.  I did.

9    Q   And did you obtain a license to practice medicine in the

10   United States?

11   A   After those -- passing those exams, then you have to apply

12   for -- to internship or residency.  You had to apply for a

13   program.  Only after you are accepted, you are able to start

14   your training.

15   Q   And did you apply for an internship somewhere?

16   A   I did.

17   Q   Where was that?

18   A   I did my internship in Worcester Medical Center in

19   Massachusetts.

20   Q   And how long was the internship?

21   A   One year.

22   Q   And after the internship did you go and do some further

23   medical studies in regards to residency?

24   A   I went to Milwaukee, Wisconsin; did a three-year residency

25   in physical medicine and rehabilitation.

1  Q   Now, you mentioned physical medicine and pain medication.

2  Were you determining what specialty you may want to practice

3  medicine in?

4  A   Physical medicine, we have rotation itself is in a

5  specialty.  It's not like an internship.  Internship you do

6  rotation, you're not fixed on anything.  Once you've come into

7  a residency, either you're going to be in internal medicine,

8  orthopedic or surgery.  So you already have a specialty you are

9  narrowed in.

10  Q   You obtained a medical license to practice medicine at some

11  point; is that correct?

12  A   I received my license second year when I was doing my

13  physical medicine and rehabilitation.  In the U.S. you can get

14  your medical license --

15       MS. GRIFFIN:  Your Honor, objection.  It's not

16  responsive to the questions.

17  BY MR. KNIZLEY:

18  Q   Dr. Ruan, if you'll just take it easy and let me ask you

19  questions.  Okay?

20  A   Okay.  Sorry.

21  Q   Now, you got your medical license in the United States; is

22  that right?

23  A   That's correct.

24  Q   And at what juncture in your education did you get that

25  medical license?

XIULU RUAN, MD - DIRECT BY MR. KNIZLEY

5744

1  A   During my physical medicine and rehabilitation residency in

2  Milwaukee, Wisconsin.

3  Q   Doctor, I'm going to ask you to speak up just a little bit,

4  okay, or maybe pull that microphone a little closer to you.

5  But speak up just a little bit if you would.

6         Okay.  After Massachusetts you went to the -- you went

7  to Wisconsin; is that right.

8  A   Yes; three-year physical medicine rehabilitation residency.

9  Q   And you completed that residency?

10 A   I did.

11 Q   And what, if anything, did you do to further your medical

12 education after that?

13 A   After that point I could choose a specialty to narrow

14 further -- in physical medicine, there are spinal cord

15 injury --

16         MS. GRIFFIN:  Your Honor, object.  Again, it's not

17 responsive.  He's not answering the question.

18         THE COURT:  Overruled.  You can answer.

19 A   So there are a few subspecialties.

20 BY MR. KNIZLEY:

21 Q   Dr. Ruan, just take it easy.  Go slow.  After -- what were

22 you studying in the University of Michigan?

23 A   I did a pain management fellowship at University of

24 Michigan Medical Center.

25 Q   And how long was that?

1    A    One year.

2    Q    Okay.  And so you went from your studies at University of

3    Wisconsin for three years in the residency; is that right?

4    A    Three-year residency was in Medical College of Wisconsin.

5    Q    Right.  And that subject matter was, again?

6    A    Physical medicine and rehabilitation.

7    Q    And then you went to the University of Michigan for the

8    pain management study?

9    A    Correct.

10   Q    All right.  Now, tell me -- tell me about the specialty

11   itself.  What were you trying to accomplish?  What field were

12   you getting into?

13   A    I wanted to become a board certified pain management

14   physician.

15   Q    And in completing the studies at Wisconsin did that prepare

16   you for taking the board in that particular field?

17   A    Upon completing my residency, I have to take the board

18   certification test in physical medicine and rehabilitation and

19   which I did.  And after that I went further with the fellowship

20   training.

21   Q    And the fellowship training was at the University of

22   Michigan?

23   A    That's correct.

24   Q    And you were attempting to get a subspecialty at that point

25   in a particular field; is that right?

XIULU RUAN, MD - DIRECT BY MR. KNIZLEY

1  A   That's right.

2  Q   And again, we've heard a lot about fellowships and it's a

3  one-year program; is that right?

4  A   That's correct.

5  Q   All right.  And what was the subject matter of that

6  one-year program at Michigan?

7  A   The program -- basically you are seeing all pain patients,

8  chronic pain, acute pain, post-surgical pain.  It's all about

9  pain rotations.  You rotate through to -- at different pain

10  service.  You learn all the things and interventional

11  procedures from pain specialists, specialists of the

12  department.

13  Q   And did you complete that study?

14  A   Yes, I did.

15  Q   And did you become a fellow?

16  A   Yes.

17  Q   And did you get a board certification -- a subspecialty

18  board certification in pain medicine?

19  A   That's correct.

20  Q   Was that your second board certification?

21  A   That's correct.

22  Q   And after that, did you obtain some other board

23  certifications?

24  A   In 2005 I took the test called -- by the American Board of

25  Electrodiagnostic Medicine.  I passed that in 2005.

XIULU REAN, MD - DIRECT BY MR. KNIZLEY

1  Q   And what was that board certification?

2  A   Electrodiagnosis -- diagnostic medicine is the field -- you

3  have nerve testing.  Electromyography is what we use to study

4  nerve, to study the nerve, how healthy, how diseased, and you

5  know that information.  It's very widely used in pain medicine

6  to diagnose disease condition of the nerve.

7  Q   Were you certified with that board?

8  A   Yes, I did.

9  Q   Did you take any other board certifications?

10  A   I took another specialty, subspecialty board within the

11  physical medicine and rehabilitation called neuromuscular

12  medicine, subspecialty board.  I was number 55 in the nation to

13  pass that board.

14  Q   When you say number 55, what do you mean by that?

15  A   Because the number goes to -- the board was a new

16  subspecialty when it was founded, and I took the test very

17  timely and I passed it.  The number is when -- how many people

18  were certified in the field.

19  Q   And were you certified in that board as well?

20  A   Yes.

21  Q   And did you have any other board certifications in your

22  medical history?

23  A   I passed another board named American Board of

24  Interventional Pain Physicians.  I was number 81 in the nation.

25  I was the second person in the state of Alabama who was boarded

1    in that specialty.

2    Q    Is this because these were new fields of medicine that were

3    becoming certified; is that correct?

4    A    That's correct.

5    Q    And were either of the ones you just spoke of which you

6    were relatively new or one of the beginning board certification

7    members was in the field of pain; is that correct?

8    A    Not just pain; electrodiagnostic testing, pain and physical

9    medicine.  I also have one -- one other, is American Board of

10   Pain Medicine.

11   Q    And could you tell us about that board certification, when

12   you got that and what that encompasses?

13   A    2005, I think.

14   Q    And what is the subject matter of that certification?

15   A    It's pain management and for those physicians who

16   specialize in pain.  It's not under the rehab board itself;

17   it's a separate boarding organization.

18   Q    How many board certifications do you have at the present

19   time, Doctor?

20   A    I had eight active board certifications in May last year.

21   Q    And have you let one or more expire at this time?

22   A    One of the boards because of what happened, they wouldn't

23   allow me to sit for the recertification, which expired by the

24   end of 2015.

25   Q    After your education and -- both in China and the United

1   States at LSU, Massachusetts, Milwaukee, and Michigan and the

2   studies for your boards, did you then begin to try to find a

3   place where you were going to practice medicine?

4   A   Yes.

5   Q   And we all heard here that you made it to Mobile, Alabama.

6   Could you tell us how you came about to coming here?

7   A   Yes.  When I was doing my fellowship, in the middle of

8   the -- trying to find a job, I knew what I wanted to do with

9   interventional pain management because it was a new field.  It

10  was a lot of advanced treatment and fellow needed to be

11  learning -- we were learning.  One of the areas that I really

12  wanted to be interested was interventional pain in the area of

13  spinal pump and spinal cord stimulation.  One of my fellow

14  attendees was in charge of the lecture, one of the nation's top

15  implanters, gave a lecture.  And he told me about it, so I

16  Googled online finding his practice.  Found his practice was a

17  one-person physician, one-person sort of practice.  I decided

18  to contact him.

19  Q   And contacted Pat Couch; is that correct?

20  A   That's correct.

21  Q   Now, you had come from China and you were a Chinese

22  citizen; is that correct?  You were --

23  A   I'm a U.S. citizen.

24  Q   You were a Chinese citizen?

25  A   Since 2000.

1   Q   And you arrived in the United States on what we call a

2   student visa; is that correct?

3   A   That's correct.

4   Q   And what, if anything, did you do regarding seeking

5   American citizenship?

6   A   Once I got the green card, I believe it's 1994, and you had

7   to stay like 10 years, something like that, and then we prepare

8   for become a citizen.  There are some courses to take.  And it

9   seemed to be pretty smooth.  I didn't have any problem and

10  finally got in 2000, during the time I was doing my residency

11  in Milwaukee.

12  Q   You got it; you got what?

13  A   Citizenship.

14  Q   Did you come to a courthouse like this and get sworn in and

15  naturalized as a citizen?

16  A   In Milwaukee it's much bigger than this, much bigger.

17  Q   Okay.  You found Dr. Couch.  Did you come to Mobile,

18  interview and speak to him in regards to working here?

19  A   I came here to interview and -- that's true.  And called --

20  Dr. Couch and his ex-wife sort of showed me around, introduced

21  me to the practice.

22  Q   And did you and he reach an agreement where you would

23  practice medicine with him?  Did you and he reach an agreement

24  where you would practice medicine with him?

25  A   Yes.

5751

1    Q    And at first were you a partner or what was the business

2    relationship or professional relationship with Dr. Couch

3    initially?

4    A    According to the contract, I was an associate the first

5    year.

6    Q    And after that, what was the relationship between you and

7    Dr. Couch?

8    A    After the first year I became a partner, junior partner.

9    Q    And when you came to Mobile, there was no Airport Boulevard

10   office; is that correct?

11   A    No, there was not.

12   Q    You were practicing medicine at the Springhill Avenue

13   location?

14   A    That's correct.

15   Q    And was the business known as PPSA at that time as well?

16   A    It was.

17   Q    And it was two physicians; is that correct?

18   A    Including me, two physicians, yes.

19   Q    And tell me what kind of staff you had on that first year

20   that you were an associate and then made partner.  What kind of

21   staff did y'all have available?

22   A    When I came to interview with Dr. Couch there were

23   basically seven employees.  Three of them were full-time, the

24   rest are part-time.  I was employee number 30 since the company

25   was founded.  And so we gradually grew the practice.

1    Q    And at the time -- at the end of the practice how many

2    employees did y'all --

3    A    PPSA hired a total of like 204 people.  And by the time we

4    like were raided, there were like 57 people, including C&R

5    Pharmacy employees.

6    Q    At the time the practice was raided, 57 people were

7    employed at PPSA including the C&R Pharmacy employees?

8    A    That's what I believe.

9    Q    When you had first gotten together with Dr. Couch and the

10   couple of years thereafter, initially did y'all utilize nurse

11   practitioners or physician extenders?

12   A    Initially, no.

13   Q    And did there come a time where the practice began to grow

14   a bit?

15   A    Yes.

16   Q    And could you describe when the practice began to add nurse

17   practitioners and physician extenders?

18   A    Okay.  When I came to practice in Mobile, Dr. Couch -- the

19   practice sent out a lot of fliers to different physicians.  And

20   Dr. Couch also introduced me to the community through actually

21   some of the speaker meeting -- attending some of the speakers,

22   introducing to other physicians.

23   Q    I don't mean to interrupt you, but please, you know, speak

24   as loudly as you can and as clearly as you can.  Okay?

25   A    Okay.  So after that we started to get a lot of referrals

XIULU RYAN, MD - DIRECT BY MR. KNIZLEY

1   from different physicians.  For example, Dr. Revels; spine

2   surgeon from Alabama Orthopedic sent me a lot of people.  We

3   started to get so busy and patient wait long, we decided to add

4   an extender.  That was probably 2006, I believe.

5   Q   All right.  In 2006 was there a specialty of this practice

6   from you and Dr. Couch?  Was there a specialty?

7   A   I beg your pardon?

8   Q   In 2006 was there a specialty of your medical practice, you

9   and Dr. Couch's medical practice?  Did y'all specialize in any

10  particular field of medicine?

11  A   We practiced what they call multi-disciplinary pain

12  management using intervention in conjunction with other

13  physical therapy, psychological therapy and medication therapy.

14  Q   And had that been the case since you became associated with

15  Dr. Couch's practice?

16  A   That's right.

17  Q   You say that you began to get referrals, you and Dr. Couch

18  began to get referrals from physicians in the Mobile community

19  and you began to get more and more patients, I assume; is that

20  right?

21  A   That's right.

22  Q   And what, if anything, did you and Dr. Couch do when y'all

23  began to get a greater patient base?

24  A   Well, as a gradual process -- I think by the time 2006-2007

25  we decided to add nurse practitioners.  So I'm not sure what

1  else you want me to --

2  Q   Okay.  The ladies and gentlemen of the jury have heard

3  about nurse practitioners, but just very briefly tell us again

4  what's their role, duty and responsibility in a medical

5  practice?

6  A   Nurse practitioners are certified nurses but they have more

7  advanced training.  They usually have a master's degree and

8  they are better.  Instead of providing nursing care, they

9  actually see patients, providing the needed service to

10  evaluate, diagnose and treat under -- basically in conjunction

11  with the physician.

12  Q   And let's take the time frame of about 2007-8, did there

13  come a time where you needed to have some management personnel

14  to assist you and Dr. Couch in operating the business aspect of

15  the business?

16  A   Well, that's a long story; cannot be short.  When we

17  started PPSA initially, it was Dr. Couch's ex-wife -- Ken Cross

18  who Dr. Couch's ex-wife hired, running the show.  So basically

19  it's a team decision always.  But gradually, as the practice

20  grew, we added MRI, we added nerve testing machine, we added

21  fluoroscopy and more staff, nurse practitioners.  So it really

22  outgrew that pace, so we just have to add a new management.

23  Q   Now, you mentioned, I think, three devices there.  I think

24  you said the MRI machine, a fluoroscopy?

25  A   Fluoroscopy, yes.

1   Q   And the third thing was?

2   A   The EMG machine, radiofrequency machine.  A lot of

3   equipment -- expensive equipment was added.

4   Q   Tell the ladies and gentlemen of the jury what each of

5   those pieces of machinery are.

6   A   MRI machine is what we use.  At that time we felt for the

7   clinic to be top notch you had to have MRI because it diagnosed

8   the central problem.  People have spinal cord problem, disc

9   herniations, spinal cord narrowing, you have to have MRI.  Also

10  we are interventionists.  If we are trying to defend specific

11  injections without MRI imaging, it's got so -- we can't do

12  it.  That machine costs 700 -- $975,000.

13          MS. GRIFFIN:  Object.  It's not responsive.  He was

14  asked what is an MRI machine.  It's not responsive.  We move to

15  strike it.

16          MR. KNIZLEY:  Tell us what the -- I'm sorry.

17          THE COURT:  Well, I sustain the objection but we don't

18  need to strike.  Just move on, please.

19  BY MR. KNIZLEY:

20  Q   Tell me what the next, the other -- you described four

21  machines, I believe; did you not?

22  A   Yeah.  Radio frequency machine is the one -- we added a

23  brand new radio frequency machine that we used to burn nerves

24  for people.  For example, you have injection, that injection

25  doesn't last long but, however, you knew that injection

1    targeted the nerve that's producing pain.  So instead of doing

2    injection we burn the nerve with the machine.  That was the new

3    machine.  When I joined Dr. Couch, he had an old one, using old

4    needle.  When the new machine was bought, we actually used the

5    machine.

6          MS. GRIFFIN:  Your Honor, I object.  It's not

7    responsive.  He was asked what is the machine.  And he goes on

8    into a paragraph.

9          THE COURT:  Well, yeah.  Dr. Ruan, just try and answer

10   specifically the questions asked.

11         THE WITNESS:  Of course.

12         THE COURT:  Thank you.

13   BY MR. KNIZLEY:

14   Q    You mentioned there's two machines.  What were the other

15   two machines?  First name them if you would, please; the other

16   two machines you were prescribing for the jury.

17   A    Fluoroscopy is a machine we used as a guidance.  It's a

18   X-ray machine but it's a continuous.  When you do procedures,

19   you -- every picture is alive.  You take the continuous monitor

20   to make sure the needle is placed in the right place

21   without trauma -- traumatize adjacent tissue we don't want to

22   reach.  So that's your vision when you do procedure.

23   Q    Doctor, we know about X-ray machines that give us static or

24   a still X-ray picture.  We see the doctor put them up on the

25   screen, get a light behind it, that's a still picture; right?

1   A   Right; you take one shot.

2   Q   Now, when you're doing this procedure you have to have one

3   that takes a constant picture; is that correct?

4   A   Yes; that's correct.

5   Q   What does this thing look like?  What does this fluoroscopy

6   --

7   A   It's a like C-Arm.  There is a screen on each side and then

8   there's a C-Arm.  You can rotate the arm at different angle.

9   Q   And at the time of the raid how many of those did you have?

10  A   Four.

11  Q   And two in each practice -- each area?

12  A   That's correct.

13  Q   And it's something in the room for each one; is that

14  correct?  Or is it two in one room or what?

15  A   Yeah; the -- that's correct.  There are two procedure

16  rooms, each side, and there are also two recovery rooms, each

17  side.

18  Q   And that's something that can move, as you said, when an

19  injection or I guess epidural or some procedure is being done;

20  is that right?

21  A   That's correct.

22  Q   And what was the fourth machine that you added back in the

23  2000s?

24  A   We added a nerve conduction study, EMG machine.  We used

25  that to diagnose nerve conditions.

5758

```
1    Q    And all the while is the practice in the way of patients
2    expanding?
3    A    Yes.
4    Q    And did there come -- and I think -- when did you get your
5    first nurse practitioner that you recall?
6    A    I really cannot recall the exact date.  I think probably
7    2006.
8    Q    When was it?
9    A    Probably 2006.
10   Q    And did there come a time -- did there come a time while
11   you were at Airport Boulevard -- and let's go ahead and get it
12   clear.  When did you move to -- when did you move to Airport
13   Boulevard?
14   A    In 2012.
15   Q    Okay.  Before 2012 when you were both at Springhill Avenue,
16   both doctors are at Springhill Avenue, did there come a time
17   where you felt that you would want to have an on-site pharmacy?
18   A    Yes.
19   Q    And did you and Dr. Couch develop an on-site pharmacy at
20   Springhill Avenue to begin with?
21   A    Initially, no, we didn't have one.
22   Q    Okay.  Over time when did you -- did C&R Pharmacy come into
23   existence while you were at Springhill Avenue?
24   A    That's correct.
25   Q    All right.  And when did C&R Pharmacy come into existence?
```

5759

```
 1   A    I think 2011.
 2   Q    And it was located at the Springhill Avenue site; is that
 3   correct?
 4   A    Right.
 5   Q    And when it first came into existence, how was it managed,
 6   by what type of employees or people?
 7   A    Before the pharmacy was founded, we had two consultations
 8   from different company give us some idea.  One of the
 9   pharmacists, Dr. Li, from Mobile -- actually from Diagnostic
10   Medical gave us evaluation.
11          MS. GRIFFIN:  Objection to the relevance of other
12   doctors telling him how to set up the pharmacy.
13          THE COURT:  Sustained.
14   BY MR. KNIZLEY:
15   Q    You got some advice and determined how you were supposed to
16   set up the pharmacy; is that right?
17   A    Many regulations; that's correct.
18          THE COURT REPORTER:  I'm sorry, I'm sorry.  I couldn't
19   understand it.
20   Q    Were you still in the Springhill --
21          THE COURT REPORTER:  Wait just a minute.
22          THE COURT:  He's trying to hear what he said.
23          THE COURT REPORTER:  I didn't hear that answer because
24   you were too close to the microphone.
25   A    There were a lot of regulations that we had to have some
```

5760

 1   consultations before we start the pharmacy.

 2   BY MR. KNIZLEY:

 3   Q   Okay.  Springhill Avenue and C&R Pharmacy is developed

 4   while you were there; is that right?

 5   A   That's right.

 6   Q   Was there also what we've heard over the course of this

 7   case a workmen's compensation dispensary?

 8   A   There was -- there had been one there.

 9   Q   And that was before C&R Pharmacy; is that right?

10   A   That was much before C&R Pharmacy.

11   Q   Was it before you arrived there?

12   A   Yeah.  We had a small scale one before I joined.

13   Q   And when you joined, there was already a workmen's

14   compensation dispensary at Springhill Avenue; is that correct?

15   A   We have some medication that we dispense to workers'

16   compensation patients that was -- existed before I joined.

17   Q   Tell us about that a little bit.  What is this workmen's --

18   when you got there, what was this workmen's compensation

19   dispensary?  What did it consist of?

20   A   Well, basically we have some basic medications used to --

21   for workers' comp patient use.  And Dr. Couch had that

22   initially set up.  And during the years there are so many

23   companies approach us saying:  We have different programs for

24   you.  One of the company called Kellman's Pharmaceutical --

25           MS. GRIFFIN:  Your Honor, object to the relevance.

1          THE COURT:  Can you lead him just a little bit through
2    this?
3          MR. KNIZLEY:  If I might, Judge.
4    Q    Was the workmen's compensation pharmacy a small one when
5    you first got there and then y'all developed it or did
6    workmen's compensation dispensary develop over the years to a
7    larger part of your practice; is that right?
8    A    We changed to a company called Kellman Pharmaceutical.
9    They started to help us more organize the pharmacy, make sure
10   all the stocking are filled, so we started using Kellman
11   Pharmaceutical.
12   Q    Okay.  At some point in time -- and we heard earlier on in
13   this case about Linear Medical; is that right?  Linear Medical
14   Solutions.
15   A    That's correct.
16   Q    And did Linear Medical Solutions at some point in time take
17   over the management of your workmen's compensation dispensary?
18   A    Yes.
19   Q    And about what year was that?
20   A    2007.
21   Q    And that was Mr. Jeff Bogan, I believe, we talked about
22   several weeks ago; is that right?
23   A    That's right.
24   Q    And did there come a time when there was a competitor for
25   Mr. Bogan's business for PPSA's workmen's compensation

XIULU RUAN, MD - DIRECT BY MR. KNIZLEY

1   dispensary?  Was there a competitor to Mr. Bogan in Linear

2   Medical?

3   A   Yes.  There were a few actually, yes.

4   Q   And was one of those competitors Mr. Manfuso's company,

5   IPM?

6   A   That's right.

7   Q   And about when did Mr. Manfuso become a competitor to the

8   extent he was going to take over the management of the

9   workmen's compensation dispensary?

10  A   I think we changed to IPM in April 2011.

11  Q   All right.  Now, you have a pharmacy and you were growing

12  the patients and you were putting on nurse practitioners.  Did

13  there come a time when you had to change the management of your

14  business in order to accommodate its growth?

15  A   I beg your pardon?

16  Q   Did there come a time where you expanded the management

17  part of your business to accommodate the growth of the

18  practice?

19  A   Yes.

20  Q   And could you tell us, let's say in January 2011; all

21  right?  In January 2011 what was your management team or

22  management organization in PPSA?

23  A   In 2011, at that time, the management was mostly Ken Cross.

24  And Dr. Couch's ex-wife, Jody, was involved in major decision

25  making, me, Dr. Couch, and there was also an office manager by

1    the name of Tammy Etheridge.  Five of us discussing -- Ken was

2    hired by Jody, Dr. Couch's ex-wife.

3    Q    And as time went on did you determine that you wanted an

4    outside management person to come assist you, assist you and

5    Dr. Couch or assist your management team?

6    A    Right, there was.

7    Q    Who was that?

8    A    There was a Jason we hired as a manager, who couldn't do it

9    and then we let him go.  Then later on Boe Strange, we

10   recommended.

11   Q    The gentleman that came in here yesterday?

12   A    That's correct.

13   Q    And when Mr. Strange came along, did he make some changes

14   in the management team?

15   A    He took over the management team; that's right.

16   Q    And you had mentioned Mr. Cross.  At some point in time, as

17   Mr. Strange told us, Mr. Cross was relieved; is that correct?

18   A    I believe so.

19   Q    And did you -- we've heard from Ms. Phillips.  Was she part

20   of this management team as well?

21   A    Debi Phillips took over basically as the company's manager.

22   Q    Okay.  And we also heard from Mr. Strange about a gentleman

23   named Hunter Swanzy.

24   A    Yes.

25   Q    Okay.  And so who was your management team in, let's say,

5764

1    2013 when Mr. Strange came along?

2    A   He was on the very top.  Debi and Ken Cross all report to

3    him, then we have a local -- we have other clinical managers

4    below Debi and Ken Cross.

5    Q   And did you have -- was there -- did this management team

6    meet on a routine basis from time to time?

7    A   I think they meet every other week or every -- I don't

8    know, but I never attended.

9    Q   You never attended?

10   A   No.

11   Q   Did Dr. Couch ever attend?

12   A   I don't know.  I don't think so.

13   Q   And did the management team also have control or

14   supervisory duties and responsibilities over the billing aspect

15   of the practice?

16   A   Yes.  Debi's major duty, it was billing, because that's the

17   reason we decided to put her there because she found a lot of

18   loopholes in the practice.

19   Q   As far as hiring and firing of personnel, who had that

20   responsibility?

21   A   It's the management team.

22   Q   And who ultimately had the hiring and firing responsibility

23   in the management team?

24   A   At the -- I think at the nurse practitioner level probably

25   checked with us.  All other levels of employees are hired by

XIULU RUAN, MD - DIRECT BY MR. KNIZLEY

 1   the management team.  Because with the nurse practitioner, they
 2   have to ask our opinion.
 3   Q   And did there come a time when the practice was such that
 4   y'all needed additional space, an additional building?  Did
 5   there come a time where you felt like you needed to buy an
 6   additional office building?
 7   A   Yes.
 8   Q   And did you do so?
 9   A   I did.  I did the purchase of the building.
10   Q   And you purchased the building where?
11   A   The Airport location.
12   Q   And about when was the Airport Boulevard building
13   purchased?
14   A   I think it's the end of 2011.
15   Q   And did -- then did the two of you begin to have primary
16   areas of operation of your medical practice?
17   A   That's correct.
18   Q   And who had the primary operation at what locations?  Where
19   were you and where was Dr. Couch?
20   A   I work in Airport office because it was closer to my
21   home.  I worked there Monday through -- Monday, Tuesday,
22   Thursday, Friday.  So basically four days.  The only day I go
23   to Springhill is on Wednesday.  And Dr. Couch switched with me
24   on Wednesday.  His whole team moved to Airport building and
25   therefore the only time we met weekly is Friday morning because

1   the Friday is half day.

2   Q   And where did the business operation continue to work?

3   A   Springhill office.

4   Q   Was it about that time when you became interested in the

5   medication known as Subsys?

6   A   Subsys was launched in like mid 2012.

7   Q   Was there any Subsys medication -- to your knowledge, known

8   as Subsys before 2012?

9   A   No.

10   Q   And how about the substance Abstral?  Was it in existence

11   prior to 2012?

12   A   Abstral was on the market in 2010 till 2011, I think.  I

13   was actually prior Abstral speaker years ago, but it wasn't

14   marketed.

15   Q   Before we get to that, Abstral was a product but was it

16   marketed by a company owned in the United States initially?

17   A   I think it was a European company.

18   Q   And did at some point in time that change?

19   A   Yeah, 2013, I believe.

20   Q   And what happened in 2013?

21   A   I think Galena bought it, bought the marketing rights for

22   Abstral.

23   Q   So these two fentanyl substances we've been talking about

24   so much in this case, Abstral was purchased by Galena and I

25   think we've heard some of this, in 2013 -- the licensing aspect

1    of it was purchased by Galena in 2013.  Was it then launched --

2    they relaunched a marketing program for that drug?

3    A    That's correct.

4    Q    And when was that?

5    A    That was last quarter of 2013.

6    Q    And again, did Subsys even exist as a medication until

7    when?  When did Subsys become even in existence?

8    A    Early 2012.

9    Q    I'm going to show you what's been marked in evidence as

10   Government's Exhibit 18.  10-18.  Excuse me.

11          All right.  This is a chart that purportedly reflects

12   the prescriptions of you in red and Dr. Couch in blue of

13   Subsys.  And it shows a increase starting in April 2012 and

14   increase -- then some drop as the practice closed.  Was

15   there -- when did you tell us that Subsys even came into

16   existence?

17   A    Mid 2012.

18   Q    So it couldn't have been prescribed at any time before

19   this, is that right, because it didn't exist?

20   A    It wasn't marketed.  I think it was approved.  It takes

21   some time before it gets marketed.

22   Q    And then likewise for Abstral, you said there was a

23   relaunch of Abstral.  There was a product that was produced by

24   a European company or some other company.  Abstral, when did it

25   get marketed in the United States?

XIULU RUAN, MD - DIRECT BY MR. KNIZLEY                              5768

1    A   Yeah.  Last quarter of 2013.

2    Q   And that would be like September and October of 2013?

3    A   That's correct.

4    Q   So these two products only became widely marketable in the

5    time frame we're seeing on these two graphs where it takes off?

6    A   That's what it looks like.

7    Q   Now, what are -- first off, on Subsys; what is Subsys?

8    A   Subsys is a sublingual spray formulation of fentanyl.

9    Q   And what is the significance of it being a sublingual spray

10   of fentanyl?  What is the medical significance of it?

11           Let me back up a little bit more.  What is the medical

12   significance of it as it applies to pain management?

13   A   Well, it's a fentanyl; therefore, it's a very unique

14   molecule.  So fentanyl -- this molecule itself allows it to be

15   absorbed by the skin, the mucosa.  You can't do the same thing

16   with morphine oxycodone.  There's no such thing as transmucosa.

17   Q   You have to speak slowly.  You can or cannot do the same

18   thing?

19   A   You cannot do the same thing, because the molecule does not

20   absorb through mucosa; only fentanyl can do this.

21   Q   Mucosa -- and I don't mean to interrupt you, but tell the

22   ladies and gentlemen of the jury what you mean by:  It can only

23   absorb through the mucosa.

24           What do you mean by that?

25   A   Mucosa is the lining in your mouth; sublingual or buccal

XIULU RUAN, MD - DIRECT BY MR. KNIZLEY

1    area.  It's the very skinny layer of epithelium; has a lot of

2    blood vessels, therefore the medication can absorb quickly,

3    bypass the tract in the stomach and intestines.  And then

4    another unique thing is the drug can get to the brain much

5    quicker.  It passes what they call the blood-brain barrier.

6    Because of this unique feature the drug is very quick in

7    reaching the pain reliever effect; five minutes.

8    Q    These two drugs, what two drugs?

9    A    These TIRF products in general, especially Subsys and

10   Abstral.  They're sublingual.

11   Q    We've heard the term breakthrough pain during the course of

12   this case.  How is that important to the concerns a patient may

13   have if they're experiencing breakthrough pain?

14   A    The unique feature of breakthrough pain is it reached peak

15   intensity in less than three minutes.  Routine medications take

16   45 minutes to start working.  With this TIRF product it gets to

17   the effect very quickly, five minutes, 10 minutes.  Therefore,

18   it can capture the breakthrough pain episode.  Therefore, it's

19   much more helpful for people who experience very severe

20   breakthrough pain, they're able to capture their episode.

21   Q    And these two transmucosal products were only available --

22   first, the Subsys didn't exist until 2012; is that right?

23   A    That's correct.

24   Q    And the Abstral wasn't marketed in a wide-spread basis in

25   the United States until 2013.

5770

1    A    That's right.

2    Q    And you talk about breakthrough pain in this five minutes

3    and transmucosal and quick working.  Were there other

4    breakthrough pain products, though?

5    A    There are.  There are some other forms.  It's not

6    sublingual.  It's the mucosa.  There's some nasal.  They all

7    have different characters.  So basically the sublingual are the

8    only two formulations.

9    Q    And you said there's two others.  I think you may have said

10   fentanyl based.  Are there other breakthrough pain products?

11   And you may have just mentioned something.  Are there other

12   breakthrough pain products that are not fentanyl based?

13   A    There are many.

14   Q    And could you give the ladies and gentlemen of the jury a

15   couple of examples of what they may be?

16   A    All the other -- morphine agents, opioid, oxycodone,

17   hydrocodone, Dilaudid, these are all opioid and they're

18   generally short acting.  Long acting is when you put it in the

19   formulary delivery system to make it long lasting.  All other

20   regular opioid is considered short acting.

21   Q    Why isn't the other short-acting opioids as good as, in

22   your opinion, fentanyl and Abstral to control breakthrough

23   pain?

24   A    Two things.  One is the molecule itself.  Like I said, two

25   is the -- all medication you take you have to go through the

5771

1  stomach, intestine, liver, blood.  Then the drug have to get

2  across the brain in order to be effective.

3  Q   What is the time frame?

4  A   That's why the regular short acting medication takes about

5  45 minutes to start kicking in.

6  Q   So a person who experiences the immediate onset of

7  breakthrough pain, this Abstral and Subsys can give them relief

8  in five minutes.  And if you don't use this type, it's going to

9  take 45 minutes?

10  A   That's correct.

11  Q   All right.  Now, the manufacturer of Subsys is Insys; is

12  that correct?

13  A   That's correct.

14  Q   First off, today do you have any monetary relationship with

15  Insys whatsoever?

16  A   No.

17  Q   Has Insys contributed any money whatsoever to any expert of

18  yours?

19  A   No, not at all.

20  Q   Has Insys contributed in any way directly or any way to --

21  anything associated with your defenses in this case?

22  A   No.

23  Q   Have they done anything to help you get along or get by or

24  live or anything else while you've not been practicing

25  medicine?

```
1   A   No.
2   Q   When is the last time you've ever received any money
3   whatsoever from Insys?
4   A   I think in mid 2014.
5   Q   Now, did you have any relationship with Insys as far as
6   speaking before you ever met Natalie Perhacs?  Did you serve as
7   a speaker, for instance, before Ms. Perhacs came along?
8   A   I really don't -- don't recall.  I think I was on the
9   speaker bureau long before Natalie became their salesperson.
10  Q   Before who became a salesperson?  I'm sorry.
11  A   Before Natalie.
12  Q   Okay.  And you said there was a salesperson.  Are people
13  like Natalie called pharmaceutical reps?
14  A   That's right.
15  Q   Is that something you routinely see in a medical practice?
16  A   Yes.
17  Q   And how many pharmaceutical reps might you see in a medical
18  practice in a 30-day time period?
19  A   On the average you're talking about four or five, from
20  different companies, a day.
21  Q   A day?
22  A   Yeah.
23  Q   And what are they doing when they come to your medical
24  practice?  What is a pharmaceutical representative there for,
25  if you know?
```

1    A    They introduce their products, they tell you what

2    promotions are there with their product.

3    Q    And is this common in the industry and practice of

4    medicine?

5              MS. GRIFFIN:  Your Honor, objection for foundation.

6              THE COURT:  Sustained.

7    BY MR. KNIZLEY:

8    Q    Are you aware of whether other physicians may have had

9    interaction with pharmaceutical representatives?

10             MS. GRIFFIN:  Your Honor, he has no foundation for

11   what other physicians do.

12             THE COURT:  Sustained.

13   BY MR. KNIZLEY:

14   Q    Do you know other physicians?

15   A    Yes.

16   Q    In the Mobile community?

17   A    Many.

18   Q    And do you know whether pharmaceutical representatives may

19   visit their practice from time to time?

20   A    I know that, yes.

21   Q    And do pharmaceutical representatives routinely visit the

22   practices of physicians in the Mobile community from time to

23   time?

24   A    I think so.

25   Q    Now, when Ms. Perhacs -- you knew her before she was a

1  Subsys or Insys pharmaceutical representative, did you not?

2  A   Right, I knew her before that.

3  Q   And how did you meet her?

4  A   She worked for a company that sell oxygen equipment.

5  Q   And did she ever visit your business as a representative of

6  an oxygen equipment sales company?

7  A   Yes.  Actually she was introduced by Dr. Couch to me.

8  Q   Tell me again what you said.

9  A   Okay.  She was introduced to me by Dr. Couch.

10 Q   And you saw some emails in regards to her.  Did you have a

11 friendship relationship with her?

12 A   Yes.

13 Q   And did you want her to help you in any other way in the

14 sense of your speaking abilities?

15 A   That's correct.

16 Q   Could you tell the ladies and gentlemen of the jury what

17 you wanted Ms. Perhacs to assist you in, in that regard?

18 A   Naturally I considered her as a close friend so I shared

19 with her my stories and she did the same thing.  So she told me

20 she has a master's degree in speech -- in public speech, which

21 was main reason I participated all the speaking events because

22 you can tell, I have some accent, lot of mistake with my speech

23 so I wanted to learn from Natalie.  And then -- because she

24 treat -- I thought she treated me like friend, shared with me a

25 lot of her family story; parents divorce, mother getting cancer

```
 1   treatment, so far she's paying for her mother's treatment.
 2           So I thought very -- I respect her for doing that, at
 3   a very young age taking care of her mother.  So I treated her
 4   as a very good friend.  I have a lot of respect for that.
 5   Q   And when there came a time that she wanted to change her
 6   occupation, did you assist her?
 7   A   I tried very hard to, to get better job so that --
 8   Q   What did you do?
 9   A   I contacted a different pharmaceutical company to try to
10   get her a better job.
11   Q   Different.  You mean different from what?
12   A   Different from Insys, such as PriCara, Endo
13   Pharmaceuticals, and then it was not successful, so finally
14   Insys took her.
15   Q   We saw some emails earlier in this case, I think, where you
16   had had some communications from some of these other
17   pharmaceutical companies in an effort to get Ms. Perhacs a job
18   with them; is that right?
19   A   That's correct.
20   Q   So it wasn't a focus upon Insys when you first began to
21   want to assist her; is that right?
22   A   No, it wasn't.
23   Q   And did she, in fact, get employed by Insys?
24   A   Yes.
25   Q   And did she come to your office from time to time?
```

XIULU RUAN, MD - DIRECT BY MR. KNIZLEY

```
 1    A    Yes.
 2    Q    And how often might you actually see her in the office on a
 3    weekly basis?
 4    A    I would think -- let me recall that.  Probably twice a
 5    week.
 6    Q    And for what time period?
 7    A    It varies.
 8    Q    Typically?
 9    A    Typically Monday, Wednesday, or maybe Tuesday and Thursday.
10    Q    And I'm sorry.  How long while she was in the office might
11    you personally interact with her as opposed to her interacting
12    with other members of the staff?
13    A    Well, early on, I give her some education on the drug
14    itself.  She became a drug rep.  She knew background.  I sent
15    her some emails explaining what the drug is, gave her some
16    online link for her to learn about the product.  She never
17    learned anything about opioid.  Every time she -- it varies;
18    maybe 10 minutes, maybe 20 minutes.  But she spent some of the
19    time with maybe nurse practitioners, other people as well.
20    Q    And did you have any -- did you give her any direction on
21    what to say or do or her involvement with the nurse
22    practitioners or anything?
23    A    Not at all.
24    Q    And did there come a time when there was a speakers program
25    in which you, for Insys, that you participated in?
```

1  A   I didn't catch you.

2  Q   Did there come a time where there was a speakers program, a

3  luncheon program, where you were asked to participate in

4  sponsored by the pharmaceutical manufacturer Insys?

5  A   I was their speaker long before Natalie joined.  I just

6  don't -- don't recall.

7  Q   Doctor, I'm probably not making myself clear.  But I asked

8  you that a little earlier.  Did you have some relationship,

9  some speaker relationship with Insys prior to Ms. Perhacs

10  becoming their representative?

11  A   Yes.

12  Q   All right.  Could you tell the ladies and gentlemen of the

13  jury how long you had been speaking for Insys before

14  Ms. Perhacs became their representative?

15  A   Once Insys launched their speaker program I really -- I

16  really am not sure how many I did or if I did any.  I really do

17  not understand.

18        I take that back.  So I did a few in late 2012, I

19  think.  In 2012 I did a few.  And Natalie became a speaker

20  probably in March 2013, I believe, if I'm correct.

21  Q   All right.  You said I became a -- you said speaker.  I

22  think you meant a pharmaceutical representative; is that right?

23  She became a pharmaceutical representative?

24  A   Right.

25  Q   All right.  I want to go back to Government's Exhibit 10-18

1    and this is your and Dr. Couch's Subsys prescription by

2    month.  When this company Insys came up with Subsys, did they

3    ask you to speak on its behalf?

4    A   They did.

5    Q   And did you become familiar with the product?

6    A   Yes.

7    Q   And you've already told us about the product.  What was

8    your opinion of the product once you became aware of what it

9    was?

10   A   When this product was launched, it was the shortest onset,

11   five minutes.  None of the other product had this kind of

12   data.  So everybody was very excited to see the five minutes

13   onset with the medication.  And so we knew about this type of

14   product.  We all knew about it and so we start -- and they have

15   offer -- initially offered very good voucher program, free

16   product.

17   Q   Was this product something new in the pain management

18   field?

19   A   For this sublingual spray, yes.  Brand new.  Revolutionary

20   at that time.

21   Q   And was Abstral, shifting a little bit, a different

22   delivery system for also a transmucosal substance that was

23   revolutionary as well?

24   A   It's sublingual tablets, that's right.

25   Q   Sublingual tablets and this other one is a spray,

1    sublingual spray?

2    A    That's correct.

3    Q    And so they were both revolutionary, you're saying, to some

4    degree?

5    A    They were both of this type delivery.  This is the only two

6    available for sublingual formulations.

7    Q    Do you remember the month you told me in 2013 -- in '13, I

8    believe it was, that Natalie Perhacs began to be a

9    representative.  Do you remember what month that was?

10   A    I do not really recall when she became a drug rep.

11   Q    I think you mentioned earlier maybe March, does that

12   sound -- in March or April, does that sound correct?

13   A    That's from my recollection.  I really --

14   Q    That's what, sir?

15   A    Probably that's what --

16   Q    So in March or April you had already began the Subsys

17   prescribing; is that correct, before she came along?

18   A    Right.

19   Q    And tell the ladies and gentlemen of the jury why you again

20   spoke for and prescribed this medication?

21   A    Because this -- the medication is very unique.  It really

22   help people that -- with the severe breakthrough pain.  The --

23   to differentiate this medication, when I prescribed, I put it

24   for very severe breakthrough pain.  I do not just write p.r.n.

25   for pain.  I use it for very severe breakthrough pain,

XIULU RUAN, M.D. - DIRECT BY MR. KNIZLEY

5780

1    therefore patients don't have to use them if they do not have

2    those severe pain episodes.  Early on it was mostly voucher

3    program and --

4            MS. GRIFFIN:  Your Honor, I object to this form of

5    testimony.  It is not question and answer.  And it's not

6    responsive.

7            THE COURT:  Overruled.

8    BY MR. KNIZLEY:

9    Q    Let me pose another question to you, Doctor.  And were you

10   finished with your answer about your opinion of Subsys?

11   A    So in patient, when I see good indication, when I see that

12   people can benefit from using it, I start prescribing it.  And

13   these medications -- and I told them not to use it for regular

14   breakthrough pain.  That's one of the reasons you see one of

15   the witnesses, she used it for five months, 30 doses.

16   Q    What's the difference to not use it for regular

17   breakthrough pain?  Are there more than one type of

18   breakthrough pain?

19   A    Well, depends on the severity.  Some people, they may call

20   it breakthrough pain, probably five.

21   Q    Back away a little bit so Mr. Isbell can hear you.

22   A    Some people have breakthrough pain episodes, eight or nine,

23   have to go to ER, go to hospital.  For people that experience

24   that type of pain, this is lifesaver.  They don't have to go to

25   hospital.  They can use it for that occasion.  So we very well

5781

XIULU RUAN, MD - DIRECT BY MR. KNIZLEY

1    instructed the patient.

2    Q   Now, and you became, as you told us, a speaker for this.

3    How does speakers -- medical doctors come about being speakers

4    for pharmaceutical sales, pharmaceutical companies to promote a

5    particular medication?

6             MS. GRIFFIN:  Your Honor, I object as to

7    foundation.  That question is not specific as to him.

8             THE COURT:  Sustained.

9    BY MR. KNIZLEY:

10   Q   Are you familiar with speakers who speak on behalf of

11   pharmaceutical companies?

12   A   Very familiar.

13   Q   Are you familiar with pharmaceutical companies who solicit

14   speakers to speak on behalf of some product they may be

15   selling?

16            MS. GRIFFIN:  And Your Honor, we question the

17   relevance.

18            THE COURT:  Sustained.  If you want to ask about his

19   experience, that's one thing.

20   BY MR. KNIZLEY:

21   Q   Have you had an experience in regards to pharmaceutical

22   companies seeking you to speak on their behalf to promote a

23   product they may have manufactured or have licensed?

24   A   I have spoken for probably 20 different product.

25   Q   Could you tell us how -- name us a few of the companies

1    other than Subsys you have spoken on behalf in connection with

2    promoting a product?

3    A    When -- I have never asked a pharmaceutical company to be

4    their speaker, never once.  When they feel you are ready, you

5    are prepared, you have knowledge, they come look for you.  So

6    different product -- I speak for three different anti-

7    inflammatory voluntary --

8    Q    Three what?  I'm sorry?

9    A    Three different anti-inflammatory drugs.  Maybe three or

10   four.  So it's whenever the company felt like you can educate

11   other physicians and you have experience using these products,

12   they'll ask you.  So I have very -- a lot of experience in

13   using different products, trying them on my patients.  That's

14   one of the reasons they asked me.

15   Q    Does the fact that you made -- published in journals or

16   anything of that nature have any effect on whether or not a

17   pharmaceutical company may have an interest in seeking your

18   services to speak on their behalf?

19   A    I believe they consider me as the front leader in the

20   field.  I became editor for the journal Pain Physician.

21            MS. GRIFFIN:  Your Honor, objection.

22   Q    Let me just ask you --

23            MS. GRIFFIN:  Not responsive to the questions.

24   Q    Let me ask another question.  Okay?

25            THE COURT:  Sustained.

 1   BY MR. KNIZLEY:

 2   Q   You say that from time to time a pharmaceutical company may

 3   have an interest in a physician to speak on their behalf

 4   because of publications they may have been in from time to

 5   time?

 6   A   Yes.

 7   Q   And you mentioned Pain Physicians.  And for diagnostic

 8   purposes, is this one of the magazines you're talking about?

 9   A   That's correct.

10   Q   Are you published in that magazine?

11   A   I have 14 papers in that journal.

12   Q   And another journal by the name of Opioid Management, are

13   you published in that magazine?

14   A   I have nine papers, first author in that article.

15   Q   And another pain management journal, Pain Medicine; are you

16   published in that magazine?

17   A   Yeah, four; four papers.

18   Q   Are these peer-reviewed magazines, journals?  Are they peer

19   reviewed?

20   A   They are, yes.

21   Q   Can you tell the ladies and gentlemen of the jury what peer

22   review means again?

23   A   Peer review is a process, whenever a journal take the

24   article, they have to have scientific merit because you

25   evaluate people who does the same kind of work and decide on

5784

```
 1    whether there's merit or not to accept the paper.  It's not
 2    something -- you do a blog online, you can publish,
 3    everything's published nowadays.  But it has to go through a
 4    scientific committee to decide on it.
 5    Q    And is that scientific committee the editorial board?
 6    A    Yes.
 7    Q    And are you on the editorial board of Pain Physician?
 8    A    Since 2007.
 9    Q    You're one of these reviewers or the peer reviewers of both
10    your own articles and what some other person may -- not your
11    own but what other physicians may submit?
12    A    That's correct.
13    Q    And because you have that experience, is that why some
14    pharmaceutical companies may come and seeked out you to speak
15    on their behalf?
16              MS. GRIFFIN:  Objection, Your Honor.  He has no
17    foundation as to why they come seek him out.
18              THE COURT:  Sustained.
19    BY MR. KNIZLEY:
20    Q    Has a pharmaceutical company came to you and sought you out
21    to speak on their behalf?
22    A    I believe so.
23    Q    And do you -- have they indicated to you what their purpose
24    was coming to you to speak on their behalf was?
25              MS. GRIFFIN:  It's hearsay, Your Honor.  We object.
```

5785

```
 1              THE COURT:  Sustained.
 2   BY MR. KNIZLEY:
 3   Q   When pharmaceutical companies, did they -- did they seek
 4   out other people?
 5              MS. GRIFFIN:  Objection as to foundation.
 6              THE COURT:  Sustained.
 7   BY MR. KNIZLEY:
 8   Q   Do you know other people the pharmaceutical companies --
 9   other physicians that pharmaceutical companies have sought out
10   to speak on their behalf?
11   A   I believe so.
12   Q   And of those other -- were they physicians?
13   A   Yes.
14   Q   And were those other physicians like you published in
15   journals such as Pain and Physician?
16   A   I have attended many of the lectures where I'm in the
17   audience.  I've attended many in the local community.
18   Q   And other doctors who have spoke on behalf of
19   pharmaceutical companies on pain medications, were they also
20   published in Pain Medicine?
21   A   I'm not aware of their publications but I've attended
22   different product, different product speaker events in the
23   community.
24   Q   And do the pharmaceutical companies compensate you for your
25   services to speak on their behalf?
```

1  A   Yes.

2  Q   And typically -- we're getting back to Insys here when you

3  were speaking for them here in the Mobile area -- what was a

4  typical compensation you would get from them?

5  A   Between 1,500 to 3,000 per speak.

6  Q   And how much time -- of your time does it take for you to

7  do that?

8  A   Away from the practice, the facility, go through the

9  presentation, finishing the discussion and coming back, it's

10  about one -- one and a half hours.

11  Q   And in your pain management practice could you have made

12  that equivalent amount of money or more if you had stayed in

13  the office?

14  A   If I see people, do procedures, yes.

15  Q   Did any of that money that you got from Insys or any other

16  company, for that matter -- we'll talk about Insys in

17  particular -- have any influence whatsoever on your prescribing

18  practices of the product Subsys?

19  A   Absolutely not.

20  Q   And why not?

21  A   What you prescribe, that's a decision, a clinical judgment

22  decision.  Patients had to be the only reason; number one

23  reason, the only reason.  I think Natalie almost fired because

24  I wrote many low dosage.  The company wasn't happy.  Even that,

25  it was always patients.  No other reason.

1  Q   And Natalie almost got fired.  I thought Natalie was a

2  friend of yours; is that right?

3  A   Right.  That's correct.

4  Q   And you were -- you had a personal and business

5  relationship with her; is that correct?

6  A   That's correct.

7  Q   And you wanted to help her?

8  A   Yes.

9  Q   Well, then why didn't you prescribe the medication her

10  company was paying you money for to speak about?

11  A   Patient -- sorry.  Patient need, that's all there is.

12  Q   Now, at these lunches, whose obligation was it to get the

13  attendees at the lunches?

14  A   Natalie.

15  Q   And did you have any responsibility in that regard?

16  A   I don't believe so.

17  Q   Did you take on any responsibility and try to help from

18  time to time, to get people to attend these lunches?

19  A   Many times.

20  Q   And could you tell the ladies and gentlemen of the jury

21  what you did, and who you might have tried to get there?

22  A   Might be dozens of emails every time before the talk.  I

23  emailed Natalie, I said:  Natalie, who are coming?  I said:  Do

24  you want me to get other physicians?  Do we have enough

25  audience?  Many emails in my email with Natalie was on these

1    kind of topic; make sure that enough attendees because I want

2    to use these opportunities to associate with the physicians

3    and to -- it was educational experience.  So I tried to get

4    Natalie people, actually.

5    Q   Were you successful from time to time?

6    A   Yes.  Yes.

7    Q   Now, were there any other reasons that you wanted to

8    participate in the speaker program?

9    A   Well, this is the process of learning.  When you present a

10   talk, if the people you're talking to ask you questions, if you

11   have no answers, you have no clue, that's bad.  So I'm a person

12   who really want to improve.  This is my opportunity to improve

13   myself.  Also the language portion.  English is my second

14   language so I have to really use this opportunity, plus

15   associate with physicians, pharmacists, nurses in the

16   community.

17   Q   Now, did there come a time when, as I think we saw this

18   morning and we saw previous in this case where you received

19   some information from the Abstral people about a physician

20   named Awerbuch that may have had some concerns, I think in

21   Michigan or Minnesota or somewhere else.  Do you remember

22   seeing that?

23   A   I remember that, yeah.

24   Q   And after seeing that, I think this morning you may have

25   heard Mr. Bodnar speaking of you changing the recipients of the

1   monies that you received from Subsys lunches.  Did you do that?

2   A   I did.

3   Q   And could you -- was one of those recipients the Louisiana

4   State University?

5   A   That's one of the three.

6   Q   Had you ever had any charitable contributions that you had

7   made to Louisiana State University in the past?

8   A   I started donating to LSU since 2007.

9           MS. GRIFFIN:  Your Honor, objection as to relevance.

10          THE COURT:  Sustained.

11  BY MR. KNIZLEY:

12  Q   Wasn't this the first time you had ever donated to LSU?

13          MS. GRIFFIN:  Objection as to relevance.

14  A   No.

15          THE COURT:  Sustained.

16          MR. KNIZLEY:  Did you sustain the objection?

17          THE COURT:  Yes.  I'm sorry.

18  BY MR. KNIZLEY:

19  Q   Did you, after receiving the information that was discussed

20  this morning, begin to make contributions -- begin to change

21  the manner in which the contributions -- excuse me -- begin to

22  change the manner in which the monies paid that you received

23  from Subsys was dispersed?

24  A   Directly from the company to different universities.

25  Q   And what universities was that?

5790

1   A   LSU of Baton Rouge, Medical College of Wisconsin, and USA.

2   Q   And why did you do that?

3   A   I saw that the link, and I saw some Alabama physicians'

4   name in there.  And I thought either me or Couch have probably

5   -- we use a lot of Subsys.  And I really do not want people to

6   question my motives for doing this kind of talk.  So I thought

7   once I donate them to universities, there's nothing wrong with

8   speaking to many of them in the country.  I've done many of the

9   speaker events.  And if I believed that was wrong, I would have

10  stopped doing that.

11  Q   And as a consequence you just gave the money away?

12  A   Well, if I can do this to practice my English, help my

13  patients, help the university, I thought:  Why not?

14  Q   Did the fact you received that money have any influence

15  whatsoever on your practice of prescriptions?

16  A   No, not at all.

17  Q   Change subjects to Galena, and the manufacture of the

18  Abstral, the licensee of the Abstral product.  Again, the same

19  thing with Galena.  Do you receive any monies from them today?

20  A   No.

21  Q   Have you ever received any money, do you recall, from

22  Galena?

23  A   No.

24  Q   At all, period?

25  A   Period, no.

5791

XIULU RUAN, MD - DIRECT BY MR. KNIZLEY

1  Q   And they don't assist you in any way today, financially?

2  A   Never have any speaking engagements, never received any

3  advisory board meeting.  But sometimes the pharmaceutical

4  company do launch -- normally they list launch under

5  physicians.  I'm not sure -- if I say no, I'm not sure whether

6  they have the launch listed somewhere.  Nothing moneywise.

7  Q   Now, before Abstral was licensed by Galena, was Abstral

8  licensed by someone else?

9  A   I think a European company.

10  Q   Did you ever speak on their behalf back then?

11  A   Yes, I did.

12  Q   Could you tell the ladies and gentlemen of the jury about

13  that?

14        MS. GRIFFIN:  Objection as to time frame, Your Honor,

15  and relevance.

16        THE COURT:  Sustained.

17  BY MR. KNIZLEY:

18  Q   When was it?  Can you tell me when it was?

19  A   2012.

20  Q   Can you tell the ladies and gentlemen of the jury about

21  that?

22        MS. GRIFFIN:  Your Honor, the relevance is not an

23  allegation in the indictment, about speaking for them prior to

24  it becoming a Galena product.

25        THE COURT:  Sustained.

5792

```
 1   BY MR. KNIZLEY:
 2   Q   Did Galena also have pharmaceutical representatives?
 3   A   Yes.
 4   Q   And did they also come to your place of business?
 5   A   Yes.
 6   Q   Do you remember who they were?
 7   A   One guy, name is Jeff.
 8   Q   And did Jeff or the pharmaceutical representative make you
 9   aware of the relaunch of Abstral or did you become aware of it
10   by some other way?
11   A   Yes, relaunch their voucher program and their trial --
12   relief trial, registry trial.
13   Q   And I couldn't understand that last thing.  Tell me that.
14   The what trial?
15   A   Relief trial.  Pain relief trial.
16   Q   What does that mean?
17   A   That means if you register a patient of yours into the
18   trial program, then the whole team get compensated.  Some
19   promotion program, I think.
20   Q   Doctor, the whole team; which team?  What team are you
21   talking about?
22   A   The team -- if I register my patient, the patient will have
23   some clinical trial data collected in my clinic, then there is
24   a compensation for those.
25   Q   All right.  And are you talking about -- is this in
```

1    connection with the relaunching and the promotional program of

2    Abstral?

3    A   That's correct.

4    Q   And when you talk about this team and money being

5    potentially paid to you, and the voucher program, is that all

6    part of this promotional relaunch you're talking about?

7    A   That's a separate thing.  One is a voucher, is a free

8    product the company offered to patient.  But once patients are

9    using Abstral, if I tell the company, say:  I'm trying to try

10   this patient on this relief trial, then I can get compensated

11   for it.

12   Q   Okay.  And was that something that was promoted in late

13   2013?

14   A   I think so.

15   Q   And early 2014, if you remember?

16   A   2000 -- yeah, probably.

17   Q   I'm going to show you again what's marked as Government's

18   Exhibit 10-18.  And if you recall from a previous government

19   exhibit we had talked about, do you recall when you made your

20   first purchase of Abstral stock?

21   A   I think it was in January 2014.

22   Q   This is January.  Do you recall what day in January?

23   A   Probably, yeah.

24   Q   Sir?

25   A   I can't see the date in the bottom.

1    Q    I'm showing you the wrong one.

2             Government's 10-19, and we'll just put it right on top

3    of January.  Okay?

4    A    Right.

5    Q    Since we don't know exactly what time in January.  Now,

6    that's when you first bought the stock; right?

7    A    January 9th, I think.

8    Q    Okay.  January 9th.  All right.  January, and we're putting

9    a line there.  You're the red line.  I see it looks like, at

10   least from the government's chart here, that your prescribing

11   practices of Abstral accelerated well before you purchased the

12   stock; is that correct?

13   A    That's correct.

14   Q    And that looks like a month of about -- if you're in red,

15   September, October; is that right?

16   A    That's right.

17   Q    Could you explain to the ladies and gentlemen of the jury

18   what caused that, if anything?

19   A    The first five months of the prescribing of Abstral from

20   October, November, December, January, February, 90 percent of

21   those purchases are vouchers, free product.  Those were the

22   reasons they objected at the way we used the voucher.  That's

23   the reason they complained about it, 90 percent of every one of

24   them.

25   Q    Explain to the ladies and gentlemen of the jury what you

1    understood about the voucher program and the use of Abstral.

2    How did it work?

3    A    Abstral voucher, you can use it total of 96 doses; 96

4    doses.  But you cannot write on these doses in one

5    prescription.  If you write it for one prescription for 96

6    doses, you cannot fill it.  Because that wasn't the intention

7    for the company.  The company wanted you to use 32 doses

8    starting the lowest doses, gradually titrating up.  Eight days

9    you come back, get another box; eight days you come back for

10   another box.  Therefore, when you run through those three boxes

11   32 each, the next month you will have to pay, otherwise you

12   can't get the drug, because the drug's free voucher only

13   applied to new patients only.

14           So we used this strategy so you can go through them

15   very quickly, then they have to pay, otherwise you can't get

16   it.  The way we use in PPSA, the way -- we give them three

17   boxes at the same time based on the dosage we think will help

18   the patient.  In addition, we say:  Use it only for very severe

19   breakthrough pain.

20   Q    And is that -- the manner in which you prescribe, is that

21   financially beneficial to the patient?

22   A    Absolutely.

23   Q    And we heard Mr. Corin's testimony.  Is that financially

24   beneficial to Galena?

25   A    The titration, yes.

5796

```
 1  Q   Is it financially beneficial to Galena, the manner in which
 2  you used the coupons?
 3          MS. GRIFFIN:  Object as to foundation, Your Honor.
 4          THE COURT:  Sustained.
 5  BY MR. KNIZLEY:
 6  Q   Were you here when Mr. Corin testified in connection with
 7  whether or not it was financially beneficial to Abstral?
 8  A   He said it would destroy them.
 9          MS. GRIFFIN:  Objection, Your Honor, as to him
10  repeating another witness' answer.
11          THE COURT:  Sustained.
12          MR. KNIZLEY:  Judge, she's asking for a foundation and
13  that would be foundation.
14          THE COURT:  It has to be something within his own
15  knowledge outside of this trial.  So --
16  BY MR. KNIZLEY:
17  Q   Well, do you have knowledge as to what would -- if the
18  coupon -- the patient didn't have to pay for the prescription,
19  did they?
20  A   That's correct.
21  Q   And the insurance company, to your knowledge, didn't have
22  to pay for the prescription, did they?
23  A   That's correct.
24          MS. GRIFFIN:  Objection, Your Honor, as to foundation.
25  BY MR. KNIZLEY:
```

```
 1   Q   Do you know how the coupon system worked?
 2           MS. GRIFFIN:  Objection.
 3           THE COURT:  Overruled as to that.
 4           Can you answer that question?  Do you know how it
 5   worked?
 6   A   You write the prescription based on the specification of
 7   the company.
 8   BY MR. KNIZLEY:
 9   Q   Do you know how the reimbursement or how the purchase of
10   the product came -- how that worked with the coupon system?
11   A   All I know is patient don't get charged, insurance does not
12   get charged.
13   Q   Okay.  And if the patient don't get charged and the
14   insurance don't get charged, who bears the cost of the product?
15   A   The company.
16   Q   And so is it financially beneficial to the company if they
17   don't get paid for the sale of their product?
18   A   No.
19   Q   I thought you -- if you had stock in the company, why did
20   you do that if it's not beneficial to the -- you as the
21   $600,000 stockholder?
22   A   Because, like I said, it's the patient.  Patient's
23   needs, that's the foundation.
24   Q   It is financially detrimental to you, is it not, if you're
25   the stockholder?
```

5798

XIULU RYAN, MD - DIRECT BY MR. KNIZLEY

1   A   I really don't care.

2   Q   Back to the chart.  And we were talking about the time

3   frame in January where you owned no stock and it was -- your

4   prescribing practices appeared to increase.  Can you explain

5   why that took place, in your opinion?

6   A   The voucher?

7   Q   Why the stock -- why your prescription practices for

8   Abstral in red, from October to January, when you did not own

9   any stock, why was the prescription practice taking off at such

10   a rapid pace?

11   A   Because they started to offer the voucher program.  That's

12   when we got to know that's a good voucher program.

13   Q   Why did you buy stock in Abstral -- excuse me -- in Galena?

14   Why did you buy stock in Galena?

15   A   Well, I believe in the drug and I believe its pipeline.

16   Q   What pipeline?

17   A   NeuVax, which is a breast cancer vaccine -- I have a lot of

18   relatives in my family actually victims of the breast cancer

19   and know how common it is, and this drug is very much needed.

20   So I was very hopeful it could make a difference.

21   Q   The breast cancer vaccine NeuVax?

22   A   Yes.

23   Q   Did you do any research or anything to determine how people

24   in the market may have evaluated the benefit of or the value of

25   NeuVax as it was in association with Galena stock?

```
 1              MS. GRIFFIN:  Objection, Your Honor, as to relevance.
 2              THE COURT:  Overruled.
 3    A   Yes, I did.  There were a lot of online papers.  There was
 4    one mentioning about the stock pre-priced at $11, $8 they give
 5    to NeuVax, $2 they to give to a different product; plasma
 6    product, I don't remember the name, and they gave Abstral $1
 7    off that paper.  I remember it was one paper.
 8    BY MR. KNIZLEY:
 9    Q   Doctor, when you say gave them, what do you mean by gave
10    them?
11    A   An expert basically judging how much the stock of a company
12    should be worth based on the potential of their -- each product
13    analysis.
14    Q   And the NeuVax was far away the most prominent value
15    associated with this expert's report of the stock; is that
16    right?
17    A   Very much so.
18    Q   And did you expect -- had you seen the progress of Subsys
19    in the past?
20    A   Yes.
21    Q   And had -- tell me what you recall about the progress or
22    the benefit or the rise in value of Subsys stock in the past.
23    A   Subsys has a very successful launch.  Over a year period
24    their stock went like multiple times from the initial price,
25    and I knew the Subsys and Abstral are similar product and --
```

XIULU RUAN, M.D. - DIRECT BY MR. KNIZLEY

1  because these products, they're selling because of the way it's

2  really helped people with the breakthrough pain.

3  Q   Is that in addition to the breast cancer vaccine?

4  A   That's right.

5  Q   In addition to that breast cancer vaccine for Galena?

6  A   Subsys doesn't have a breast vaccine.

7  Q   I say:  Is your decision to buy the Abstral stock along

8  with the -- excuse me -- the Galena stock because the Abstral

9  was a good product, the fact that the breast cancer vaccine was

10  indicated by the stockbrokers or people in the stock industry

11  that it would cause the stock to be quite valuable?

12  A   That's right.

13  Q   Did the fact that -- what effect, if any, did your

14  ownership of the stock have in your prescribing practices of

15  Abstral?

16  A   Not at all.  That was the reason they change the voucher

17  program, because the way we use it to provide patient with

18  help.  They use it for months rather than doing the titration

19  they recommended.  They shut down the program, I believe, in

20  March.

21  Q   Why did they shut down the program?

22  A   Because we were not doing the titration they wanted.  And

23  then every time patient got the three boxes, they don't have to

24  buy the drug for months.  Their initial to titrate them, then

25  switch them to a box of medication they can pay for it, now

5801

 1    they can't do this.  That's why the voucher program did not

 2    work.

 3            We used this because we know what's the effective dose

 4    when we prescribe.  Rather than titrating them as they

 5    recommend, we use a different --

 6    Q   Now, during the time frame that you were prescribing

 7    Abstral and stocking it -- and if you'll look at Government's

 8    Exhibit 10-19, that one is right, it's Abstral again -- you had

 9    stock in that product, I think, starting January '14; right?

10    A   Yes.

11    Q   On there for a long time, even up until the time you were

12    done; right?

13    A   That's right.

14    Q   Okay.  And this is your prescription of Abstral during that

15    time frame, and is this micrograms?  (Indicating.)

16    A   Total dose, I believe.

17    Q   Mr. Armstrong says you need to see the date.  So that's

18    January '14.  Okay?  That's when you bought it; right?  And you

19    see how much you had, 250 -- 2 million 500 micrograms and a

20    little bit more than that at the top; right?

21    A   That's right.

22    Q   Well, were you prescribing a similar product at that time?

23    Were you prescribing Subsys at that time as well?

24    A   Yes, I believe so.

25    Q   Well, if you wanted to prescribe more medication to drive

1    the stock up, could you have substituted your Subsys for your

2    Abstral?

3    A    I could.

4    Q    Did you do that?

5    A    No, I did not.

6    Q    I'm going to show you what's marked as Government's Exhibit

7    10-18 again, and we'll look at the same time frame, January

8    2014 over here -- I'll get one that's not wrote on.  All

9    right.  And you're in red; right?  Is that correct?

10   A    Yes.

11   Q    And starting here, that is 3 million milligrams; is that

12   right?

13   A    Micrograms, yes.

14   Q    Micrograms, excuse me.  Right?

15   A    Yes.

16   Q    During the time frame you owned the stock; right?

17   A    That's correct.

18   Q    Well, that's more than you were doing in Abstral, is it

19   not?

20   A    Yes, I think so.

21   Q    Abstral at the max was 2,500,000; right?

22   A    That's right.

23   Q    So you're prescribing more Subsys, which is a similar

24   product, at the same time that you owned $800,000 worth of

25   stock in the product?

1  A   That's correct.

2  Q   Tell the ladies and gentlemen of the jury why you did that.

3  A   What medication to use, not just these type of product, any

4  medication you use is the decision -- the individualized

5  decision based on the patient's best interest, not just any

6  physician -- any product.

7  Q   Did your Subsys prescriptions stay higher than your Abstral

8  prescriptions almost entirely during the time frame that you

9  owned the Abstral stock?

10  A   I think so.

11  Q   Were there other fentanyl-based TIRF drugs that you also

12  prescribed during the time frame you owned the Abstral stock?

13  A   Yes.

14  Q   What were their names?

15  A   Fentora and Lazanda.

16  Q   Could you have substituted Abstral for those products as

17  well?

18  A   Yes, I could.

19  Q   And would it have had at least a similar if not the same

20  medical benefit to the patient?

21  A   Yes.

22  Q   Why didn't you do that if you owned all that stock?

23  A   We said that before.  It's really a decision based on the

24  patient; nothing to do with stock, speaker, absolutely nothing

25  to do with that.

5804

1  Q   And is that the reasoning for the prescription of Subsys,

2  Abstral, Fentora and Lazanda when it comes to TIRF drugs?

3  A   That's correct.

4  Q   Let's change the subject and talk about the workmen's

5  compensation dispensary and IPM and Mr. Manfuso.

6  A   Okay.

7  Q   You gave us a little background earlier in your testimony

8  in regards to the workmen's compensation dispensary, the fact

9  it was there when you first came to PPSA, and that Linear

10  Solutions and Mr. Bogan had serviced the workmen's compensation

11  dispensary up until the time Mr. Manfuso and IPM became

12  interested in servicing the workmen's compensation dispensary;

13  is that correct?

14  A   Yes.

15  Q   Did I say that right?

16  A   Yes.

17  Q   Okay.  Now, what type relationship did you have with Linear

18  Medical and Mr. Bogan as far as what they were doing in regards

19  to managing the workmen's compensation dispensary?

20  A   Linear Solutions took over from Kellman Pharmaceutical

21  Company because Linear Solution took care of all the

22  billing.  With the Kellman we have to bill ourselves.  They

23  just make sure we have enough medication on the shelf.  We have

24  to put the bottle label on each billing sheet.  When we bill

25  workers' comp, that billing sheet has all the services,

5805

1    procedures, visits and medications.  So it's very tedious for

2    the billing staff.  So when Linear came to PPSA and say:  Hey,

3    we can help you do all the billing.  You don't have to bill any

4    medication at all.  We thought that was a good relief for the

5    billing people.  That's why we went with Linear in 2007.

6    Q    All right.  And that relation -- and what type of

7    contractual relationship did you have with them in regards to

8    what you paid them for the management?

9         MS. GRIFFIN:  Your Honor, object.  That occurred in

10   2007, which is outside the date range of the indictment.

11        THE COURT:  Sustained.

12   BY MR. KNIZLEY:

13   Q    In 2011 what relationship did you have with Linear in

14   connection with what you paid them to manage the workmen's

15   compensation clinic?  How were they paid?

16   A    It's based on the medication.

17   Q    2011 now.  Okay?

18   A    2011, based on the medications, they have sort of a --

19   based on the medication dispensed.  The -- that's how it's

20   calculated, based on -- for example, I have a lot of workers'

21   compensation patients and the medications you dispense, they

22   have roughly -- based on what you dispense, it's a list, based

23   on the collection from those.

24   Q    And was there a percentage of the collections that Linear

25   got?

5806

1    A    I really don't recall what exactly the contract -- do not

2    recall what exactly were the terms.

3    Q    Do you recall whether it was on a contractual or percentage

4    basis of it, they got a percentage of whatever they prescribed

5    out?

6    A    I don't recall the exact content of the contract.

7    Q    Do you remember Mr. Manfuso coming to you, though, with the

8    concept that he would do it on a percentage?

9    A    That's correct.

10   Q    Manfuso?

11   A    I remember that, yeah.

12   Q    And what was Mr. Manfuso supposed to do for the money he

13   was to be paid?

14   A    He was managing the workers' compensation dispensing system

15   in PPSA but he was able to introduce Schedule II drugs.  That

16   was the main reason we switched to him.  With Linear we could

17   not dispense any Schedule II drugs.  For people who were on

18   Scheduled drugs, they had to wait in a home, waiting for the

19   UPS truck to ship.  If we can --

20   Q    You go quick with that, Doctor.  You said one of the

21   reasons or the primary reason, I think you were saying, is you

22   moved to IPM was they could dispense Schedule II drugs?

23   A    That's correct.

24   Q    And the previous manager could not dispense them; is that

25   correct?

1  A  They could only mail out, that's correct, from other

2  places; not from our pharmacy but from other places, mailed the

3  drug to patient. The patient, once they missed the UPS truck,

4  they can't get their medication.

5  Q  The patient at home, if they're not home when the UPS truck

6  comes, they don't get their medication?

7  A  That's correct.

8  Q  And Manfuso said that his business could, in managing the

9  clinic, stock the Schedule II drugs in the dispensary; is that

10  right?

11  A  That's correct.

12  Q  And did you then, based on that and other things, decide to

13  reach an agreement with Mr. Manfuso's company, IPM, to manage

14  your clinic?

15  A  That's correct.

16  Q  And did y'all reach some financial arrangement as to what

17  IPM would be paid?

18  A  Yes.

19  Q  And do you recall initially what that was?

20  A  There was initially, of all the medication they bill out,

21  they get 10 percent of that and then minus the expense -- we

22  purchase the medication minus all the expenses, then whatever

23  the money they collected, we get 70 percent.

24  Q  Okay. Now, who bought the drugs?

25  A  We bought the drugs. PPSA.

1   Q   Whose DEA number?

2   A   My DEA number.

3   Q   And if you bought all the drugs, all the medications for

4   that clinic, all of them got assigned to your DEA number?

5   A   That's correct.

6   Q   And so would that hold true for C&R Pharmacy as well?

7   A   I'm not sure about C&R Pharmacy.  The -- there was

8   conflicting evidence in the trial so far.  Initially I heard

9   that the C&R Pharmacy is different one.

10          MS. GRIFFIN:  Your Honor, I object.  I object to him

11  commenting on the evidence in the trial.

12          THE COURT:  Sustained.

13          Mr. Knizley, why don't we go ahead and take our

14  afternoon break at this time?

15          Ladies and gentlemen, leave your pads on your chairs,

16  take your break downstairs in the jury assembly room.  No

17  discussion about the case.  And we will call you back up in

18  about 15 minutes.

19          We're in recess.

20      (A recess was taken at approximately 3:05 p.m.)

21      (In open court, defendants and jury present.)

22          THE COURT:  All right, Mr. Knizley.

23  BY MR. KNIZLEY:

24  Q   Dr. Ruan, as to the workmen's compensation dispensary, when

25  Mr. Manfuso and PSM [sic] was managing that entity, whose

1    responsibility was it to purchase the medications?

2    A    My responsibility.

3    Q    And who owned the medications once they were purchased?

4    A    My practice.

5    Q    And who provided the space for the dispensary to operate

6    out of?

7    A    PPSA.

8    Q    And who had the tables and chairs and other items?  Who did

9    they belong to?

10   A    PPSA.

11   Q    And what was Manfuso and IPM's role in connection with the

12   dispensary?

13   A    Managing.

14   Q    And we were beginning to talk about the compensation

15   relationship between IPM.  Was that relationship in writing?

16   A    Yes.

17   Q    And you mentioned a 10 percent and then a 70 percent, and

18   you said collections.  Their duty was to collect what?  What

19   were they collecting?

20   A    My understanding is the -- based on the medication

21   dispensed, they bill for those medications.

22   Q    Who do they bill for those medications?

23   A    They billed to their workers' comp carrier.

24   Q    Okay.  And so we can understand.  There would be a patient,

25   a workmen's compensation one you would see and prescribe

5810

```
 1   medication for; is that right?
 2   A   That's right.
 3   Q   Or Dr. Couch; right?
 4   A   That's correct.
 5   Q   And then that patient, if they so choose, could go to the
 6   workmen's compensation dispensary?
 7   A   That's correct.
 8   Q   And if they did so and bought or filled a prescription
 9   there, who got -- who billed and who did the billing and who
10   got billed for those medications?
11   A   IPM billed, I think, on our behalf.
12   Q   And billed who?
13   A   Billed the workers' compensation.
14   Q   And do you know whether or not that was a set fee that was
15   charged for the workmen's compensation or did it vary from time
16   to time?
17   A   I think the state had it's fee schedules.
18   Q   And what type of workmen's compensation patients, if you
19   know, did the contract require Mr. Manfuso's company to --
20   Manfuso's company to manage?  Was it the -- did it say any type
21   of particular workmen's compensation patients, if you know?
22   A   Alabama state workers' compensation.
23   Q   Is there anything in that -- did it say it expressly in the
24   contract, did it say Alabama?
25   A   I think so.
```

5811

1   Q   And did you have any involvement yourself over who he

2   billed or when he billed, Mr. Manfuso?

3   A   No.

4   Q   Now, you heard him talk and in that relationship the

5   contractual relationship, at least the 10 percent collection,

6   and then later on 70 percent, did that change after a while, if

7   you know?  If you know.

8   A   It was supposed to be changed so Manfuso, my feeling is, is

9   not being honest with us.  We got our information from --

10  comparing from different companies later on, approach us.

11  Q   Speak into the microphone please.  Maybe move it that way a

12  little bit so you can speak into it.  Okay?

13          And I'm sorry.  So did those contracts have sometimes

14  a minimum requirement that they would have to pay you?

15          MS. GRIFFIN:  Your Honor, we request a foundation as

16  to which contract he's referring to.

17          THE COURT:  Well, you can cover that on cross.  But it

18  might be helpful.

19          MR. KNIZLEY:  This may be a little more specific.

20  Q   When Mr. Manfuso's company -- he had two companies; right?

21  First started with IPM?

22  A   That's right.

23  Q   And I think those contracts were signed by a man named

24  Mr. Drobot, am I pronouncing his name right?

25  A   That was the contract, the first contract I think we

5812

XIULU RUAN, MD - DIRECT BY MR. KNIZLEY

1  signed.

2  Q   And did you ever have any communication with Mr. Drobot

3  other than the email we saw before, if you recall?

4  A   I think he sent me one email, or two.

5  Q   Do you know the guy?

6  A   I didn't know him.

7  Q   Did he ever come meet you here or anything?

8  A   No.

9  Q   Your main contact was Mr. Manfuso?

10  A   Yes.  Yes.

11  Q   All right.  The contract first you described, I think, the

12  first one with IPM and Manfuso had that 10 percent, then 70

13  percent; right?

14  A   10 percent.

15  Q   If you know, if you remember.

16  A   Well, I vaguely remember of all the billing, first 10

17  percent belonged to his company.  There are some legal fees,

18  there are some billing fees, some expenses, everything deducted

19  from the collection, medication cost and then left over 70

20  percent.

21  Q   And do you know when he removed the contract, whether that

22  was changed or not changed, the 10 percent part?

23  A   I don't recall.

24  Q   Now, did you have -- sometimes did you negotiate with him

25  about how much you were going to pay with some guaranteed fees

5813

1   from time to time?

2   A    It was only at the beginning because there's 90-day delay.

3   When you start dispensing medication, bill for those workers'

4   comp, there's a delay when the payment finally come in.  So we

5   don't know -- not know when it's going to be.  When we were

6   with Linear Solutions, we already had a system.  So in order

7   for us to get started -- because we're getting reimbursement

8   from Linear Solution, Manfuso said to start with based on the

9   Linear Solutions W9 form, a certain number.  He knows he's

10  going to bring C2 drugs into the formulary, therefore he know

11  how much he would be getting comparing with Linear's number.

12  That's how we started.  Because there's a delay of -- had to

13  start somewhere.

14  Q    And when you renewed the contract from time to time, did it

15  still have, at least to some degree, some guaranteed payments

16  for some time frame?

17  A    My -- initially the agreement was that there's a

18  percentage, 70 percent versus 30 percent, realizing when we

19  have C2 medication inhouse, you know, we were anticipating more

20  but never came -- came through, so we just don't know what

21  happened.  He always have excuses.

22  Q    Who always had excuses?

23  A    He always had excuses.  We don't know what happened,

24  really.

25  Q    Did you go over, check up his books and make sure he was

5814

1   not, you know, keeping more than he should or that sort of

2   thing?

3   A   He sent me something but you can never read it.  You cannot

4   understand what it says, collection or whatever.  It's hard to

5   really know what it was doing.

6   Q   These checks, did they come to your house?

7   A   The -- yes, I asked him to send to my home.

8   Q   Why?

9   A   Well, I don't want other people to see the check, you

10   know.  Any check, salary, whatever.  I just don't want people

11   to see the check.

12   Q   Did somebody ever see that check?

13   A   I think it was open once in the clinic, so I do not really

14   like that to be seen by other people, whatever check it is.

15   Q   Open once in the clinic.  Do you say it did at first come

16   to the clinic then?

17   A   It came to the -- initially it came to the clinic and they

18   brought it to me.  It was opened.  I really do not like any

19   check to be seen by other people.  So --

20   Q   Did the financial arrangement with Mr. Manfuso or any other

21   financial arrangement have an impact on the manner in which you

22   prescribed the medications for the workmen's compensation

23   patients?

24   A   Absolutely not.

25   Q   And did you ever take into consideration the amount of

1   remuneration or money you may receive when making the clinical

2   decision to prescribe the medication in association with the

3   workmen's compensation payment?

4   A   Never.

5   Q   Did there come a time when there was a competitor with

6   Mr. Manfuso?

7   A   I beg your pardon?

8   Q   Did there come a time when Mr. Manfuso's company -- and we

9   know that IPM finally sold off to a new company, Mr. Manfuso

10  CRM, Mr. Manfuso then owned; right?

11  A   That's correct.

12  Q   And you continued on the relationship with Mr. Manfuso's

13  company; is that right?

14  A   That's correct.

15  Q   And did there come a time when Mr. Manfuso's company had a

16  competitor trying to get his business?

17  A   Many times, actually.  Yes.

18  Q   And who was that or was it more than one?

19  A   One of them is Trident.

20          MS. GRIFFIN:  Object to the relevance.

21          THE COURT:  Sustained.

22  BY MR. KNIZLEY:

23  Q   Did Mr. Manfuso have conversations with you regarding the

24  manner of compensation -- the manner of compensation he would

25  give you in connection with what a competitor may do?

5816

```
 1    A    The competitor give me a analysis based on the medication I
 2    dispensed.  And it came back as a different number, of course.
 3    And so --
 4    Q    A different number; higher number or lower number?
 5    A    It was a higher number.
 6    Q    And what, if anything, did you and Mr. Manfuso discuss
 7    after that competitor gave you a higher number of compensation
 8    than Mr. Manfuso was giving you?
 9         MS. GRIFFIN:  Your Honor, it's hearsay in connection
10    with -- the contract is in evidence.
11         THE COURT:  Sustained.
12    BY MR. KNIZLEY:
13    Q    Did you receive information from a competitor of
14    Mr. Manfuso?
15    A    Yes.
16    Q    Regarding billing?
17    A    Yes.
18    Q    And after receiving that information, did you have a
19    conversation with Mr. Manfuso in connection with the
20    compensation you might receive from his company?
21    A    I wanted to terminate with Manfuso, and he flew here to
22    Mobile to meet with me.
23    Q    And did you and he have a conversation about what his
24    competitor was offering you?
25    A    I really did not tell him the exact number.  And he
```

 1    knows -- he knows roughly.  He's in the same business as the

 2    other.

 3    Q    And did he change his compensation level after the

 4    conversation you had with him about his competitor?

 5    A    He begged me at the dinner and basically he say:  Let me

 6    continue support him.  He just formed as a company.  He bought

 7    the company from IPM and he had seven months, so he really

 8    wished -- I hope I can continue with him.  I basically said for

 9    two reasons:  One, I thought he was not honest with me.  Two,

10    there are some IPM doing -- this Trident give me a lot of

11    information about IPM in California being really -- I was

12    concerned of that too.  So however, I thought maybe -- he

13    basically begged me to stay with him, which I did.

14    Q    Which you agreed to do so?

15    A    I agreed, yes.

16    Q    And was that part of the negotiations between you and

17    Mr. Manfuso in connection with what he would be paid for his

18    management of your business?

19    A    There was the same duty on their end.  The purpose for us

20    to have a meeting, because I told Trident I would have switched

21    with them but I cannot just send Manfuso an email or letter, so

22    I said:  We need -- I need to talk.  That's why he was asking

23    me to change, but I couldn't pull the trigger.

24    Q    You told us that this had no effect on your medical

25    judgment when you were prescribing medications; is that right?

XIULU RUAN, MD - DIRECT BY MR. KNIZLEY

1    A    Absolutely not.

2    Q    Why didn't you just go with the person that -- with the

3    company -- the company that would have compensated you more

4    money?

5    A    Well, it's -- I'd been with IPM for a few years and when he

6    came here I really could not make that addition.  So Trident

7    people came the next day asking me --

8              MS. GRIFFIN:  Objection, Your Honor.  It's hearsay.

9              THE COURT:  Sustained.

10   BY MR. KNIZLEY:

11   Q    Did the business relationship with Manfuso ever have any

12   impact whatsoever on your medical judgment in prescribing

13   workmen's compensation medications for workmen's compensation

14   patients?

15   A    No.

16   Q    In fact, could you have gotten more money from a different

17   entity?

18             MS. GRIFFIN:  Objection as to relevance, Your Honor.

19             THE COURT:  Sustained.

20   BY MR. KNIZLEY:

21   Q    Did you ever prescribe the medication known as Exalgo?

22   A    Yes.

23   Q    Could you tell the ladies and gentlemen of the jury what

24   that is?

25   A    Exalgo is a long-acting sustained-release hydromorphone.

1   The medication was launched in 2010.  At that time there was no

2   other pain medication at that time.

3          MS. GRIFFIN:  Objection, Your Honor, as to an

4   explanation about other drugs.  He was asked one question:

5   What is Exalgo.

6          THE COURT:  Sustained.

7   BY MR. KNIZLEY:

8   Q   What is Exalgo in relationship to other similar drugs?

9          MS. GRIFFIN:  Object, Your Honor, to the relevance.

10          THE COURT:  Overruled.

11  A   A unique feature of Exalgo was tamper resistant; you cannot

12  crush it.  One of the ways people misuse their drug is by

13  crushing it, destroying the long-acting delivery system.  You

14  take it one shot, therefore you become --

15          MS. GRIFFIN:  Your Honor, I object to the continued

16  speaking answers instead of the answers to the questions.

17          THE COURT:  Overruled.

18  BY MR. KNIZLEY:

19  Q   Dr. Ruan, I'm going to ask you to speak a little slower and

20  a little clearer.  Okay?

21          Now, would you please, if you could, describe what

22  difference, if any, Exalgo had to other similar medications?

23  A   When it was brought to the market, Exalgo has a unique

24  feature.  You cannot crush it, therefore it is resistant to

25  crushing.  Of other long-acting pain medication, one of the

5820

1    possible misuses of the drug is by crushing it into a short-

2    acting form, you take it all together to get the high.  When

3    you have a drug brought to the market with this unique feature,

4    it's very helpful to the pain clinic patient.

5    Q   And does Exalgo have a pharmaceutical representative as

6    well?

7    A   Yes.

8    Q   And did he come by your office?

9    A   Yes.

10   Q   Do you recall his name?

11   A   Buddy.

12   Q   And did he explain the benefits as he saw it of Exalgo to

13   you?

14   A   Yes, he did.

15   Q   And did he encourage you to use his product because of

16   those benefits?

17   A   He's a salesperson, that's all they do.  I went to the

18   training course, saw a video on Exalgo, the features of it.  To

19   pain clinic, that's a very useful feature, plus they have

20   promotions.  They have a good voucher program too.

21   Q   Did at this time, as a result of your exposure to Exalgo,

22   were you asked to be a speaker for that entity?

23   A   Yes, I was.

24   Q   And could you tell the ladies and gentlemen of the jury how

25   that happened?

5821

1   A   I've been a speaker for many years for different product,

2   and have a lot of knowledge in opioid and that's what the

3   opioid company seek for.  They want you to have practical

4   experience of different product that you are able to discuss

5   with your other physicians and people, nurse -- healthcare

6   providers.  So that was the purpose they sought my service.

7   Q   You saw this chart they've been showing about how your

8   Exalgo prescriptions rose up and then came down and Dr. Couch's

9   remained level.  Do you remember seeing that chart?

10  A   Yes.

11  Q   Tell me what explanation there might be for that increase

12  in your Exalgo prescriptions.

13  A   If you follow other drugs of my prescribing, you may see

14  the same thing.  Because when the drug was brought to the

15  market, we wrote it most of the people -- not most people --

16  some of the people to that product.  They finished the

17  promotion.  Those you're tracking are the prescription number,

18  nothing more.  Prescription number.  If I switch patient for

19  one-week supply, you're going to see a number.  It's a voucher.

20          Suppose a patient come in the clinic, run out of

21  medication a few days early, insurance will not cover their

22  routine medication you give them one week.  That's one

23  prescription.  Now, at the end of it, by 2013, many other

24  company brought abuse-deterrent formulation drug on the

25  market.  OxyContin became the same thing.

XIULU RUAN, MD - DIRECT BY MR. KNIZLEY

1  Q   Doctor, abuse-deterrent what?

2  A   Abuse-deterrent opioid formulation.

3  Q   Okay.  Are you telling the jury that, I believe as I

4  understood you, that Exalgo had this abuse-deterrent feature?

5  A   That's correct.

6  Q   And basically you can't crush it up?

7  A   That's right.

8  Q   Okay.  And Exalgo had a promotional program?

9  A   That's correct.

10 Q   And you're telling the jury that you used promotional

11 programs of new drugs, medicines, medicines?

12 A   That's correct.

13 Q   Why do you do that?

14 A   Well, when I see the indication in patient, I use it for

15 patient benefit.  Many times even if you cannot talk to this,

16 to the nurse practitioner -- if I tell the nurse practitioner,

17 she'll say:  This is the medication, we're going to prescribe

18 it to you because abuse deterrent.

19 Q   Okay.  I'm really asking you about -- I'm going to get to

20 the abuse deterrent in a little bit.  But the voucher program,

21 does it have an impact on you prescribing any medication,

22 including Exalgo?

23 A   It's available, it's affordable, yes.  I prescribe for that

24 patient for the indication.

25 Q   Now, after some time did other manufacturers begin to also

1  have an abuse-deterrent feature in similar medications?

2  A   Other opioid, yes.

3  Q   Other opioids?

4  A   Right.

5  Q   Could you tell me or the ladies and gentlemen of the jury

6  what this abuse -- what other companies may have also developed

7  an abuse-deterrent feature in a medication after Exalgo did?

8  A   OxyContin, for example.  The new formulated Opana ER had

9  that feature too, then the hydrocodone product.  But Purdue had

10 the same feature.  You cannot crush the abuse-deterrent --

11 different feature so --

12 Q   And those features came to your attention after Exalgo's

13 abuse-deterrent feature?

14 A   I'm pretty up-to-date with all the different company

15 producing different drugs and I tried to use it whenever my

16 patient get benefit.  That's one way I try to impress my

17 patient, when they --

18 Q   What effect did any speaking engagements that you had with

19 Exalgo have on your prescriptions of the medications?

20 A   No, no effect.  No specific effect.

21 Q   You told us earlier in your testimony that there was a

22 pharmacy attendant to the Airport Boulevard practice known as

23 C&R Pharmacy; is that right?

24 A   Beg your pardon?

25 Q   All right.  You told us earlier that C&R Pharmacy was a

1    pharmacy that was owned by you and Dr. Couch that was

2    associated with or connected to or in the same structure as the

3    Airport Boulevard PPSA Clinic; is that correct?

4    A    That's correct.

5    Q    And you've told us a little bit of the history of that.

6    And when C&R was initially formed, you told us that it had --

7    you ran it yourself in the sense that you hired employees to

8    run it; is that right?

9    A    We initially have a pharmacist.  She ran it herself.  It

10   just didn't work.  It could not sustain.  So --

11   Q    When did that change?

12   A    That's when we had invited McConaghy to take over.

13   Q    Before McConaghy, how was the pharmacy doing?

14   A    Before McConaghy, the major problem with the C&R Pharmacy

15   is once the pharmacist is off, nobody can get to the pharmacy,

16   the regulation.  So patients have prescriptions --

17   Q    I'm sorry.  Nobody can get to pharmacy what?

18   A    Nobody could get into the pharmacy once the pharmacist off.

19   There was no back up.  We could not afford back up.

20   Q    Why?  Why could no one go to the pharmacy when the

21   pharmacist was off?

22   A    It's a regulation.  If the pharmacist is not there, pharm

23   tech cannot get in.

24   Q    Go ahead.

25   A    So when that happened -- one day the pharmacist was off for

1    three days, patient waiting in the office could not get their

2    drug.  We do not even know what their medications were.  It

3    caused a major mistake, which is so much trouble.  We just

4    decided we can't run the practice that way.  You remember, a

5    lot of money from PPSA transferred into pharmacy to keep it

6    floating.

7    Q   You say I remember it.  Are you speaking of the records

8    that you saw admitted into evidence earlier which had payments

9    from PPSA to C&R Pharmacy?

10   A   Right.

11   Q   What was the purpose of those payments that you saw earlier

12   in the records that were introduced here?

13   A   Because C&R Pharmacy could not sustain, so we had to use

14   PPSA to feed -- just keep it floating.  So that was the reason.

15   You keep transferring money from PPSA to C&R Pharmacy.

16   Q   Was the pharmacy not profitable at that time?

17   A   Either management or just didn't work.

18   Q   And did you change the management and the way that C&R

19   Pharmacy operated when you contracted with Mr. McConaghy?

20   A   Yes.  One of the reasons -- one of the reasons with

21   McConaghy is we typically ran out of medication two weeks

22   before the monthly allowance.  By the time you run out of

23   medication you are forced to switch because the pharmacy had no

24   other -- there's a limitation.  Most people chose to fill there

25   at C&R Pharmacy.  However, we do not have enough supply.  And

1    that's how we ended up with only having 20 percent of people

2    actually using our pharmacy.

3    Q   What do you mean 20 percent of the people using the

4    pharmacy?  What are you talking about?

5    A   Of all this -- you saw the date that provided 24.1 percent

6    people using the pharmacy.

7    Q   Of your patients at PPSA you're speaking of?

8    A   Yeah; that's right.

9    Q   Now, 75 percent of the patients used some other pharmacy?

10   A   Yes.

11   Q   What was your -- did -- from time to time did you ever

12   check what inventory was available at -- for Subsys and Abstral

13   at C&R Pharmacy?

14   A   Yes, I did.

15   Q   Tell the ladies and gentlemen of the jury why you would do

16   that.

17   A   Every time -- these medications are very specialized

18   medications.  Local pharmacies do not carry them.  If I want to

19   write a dosage, if the pharmacy do not have it, patients could

20   not get it.  You have to come back, switch medication.  Other

21   pharmacy, they couldn't get this drug.  So, therefore, if there

22   is already one in the company, we know -- for example, if

23   patient was on 200 micrograms.

24   Q   Of what medication?

25   A   Let's say Abstral.  So we have no other supplier for 200.

5827

1    We can write a 100, give it two at a time; therefore, the

2    patient can fill the drug, use the same way.  Instead of

3    writing 200, later on found out they can't fill it, we had to

4    change it again.

5    Q    If you wrote a 200 micrograms of Abstral and it wasn't

6    available at Walgreens or Rite-Aid and even if they came to C&R

7    Pharmacy and you wrote it for 200, if the 200 is not available

8    there, could they fill it?

9    A    No, they could not.

10   Q    If you had two 100s, could they just substitute that or

11   would you have to write a new prescription?

12   A    You have to write a new prescription.

13   Q    So before you write the prescription you would need to know

14   the availability, in some cases, what would be in the pharmacy.

15   A    That's correct.

16   Q    Any other reason you would check?

17   A    Sometimes like switching; patient already on one or want to

18   switch, rotate to a different one.  And with the switching it's

19   actually also free to the patient, to the insurance, so we do

20   those.  For example, if I have a patient for -- on two Subsys a

21   day, 64 months, I may say:  This not coming back.  I'll give

22   you one box of Subsys, 30 pill; give you one box of Abstral.

23   You compare which one's better when you have a very severe

24   breakthrough pain.  Patient come back in a month, will say

25   actually work better.  Well, Subsys work better, we switch

5828

1  back.  So by doing that we cut down their -- that month of

2  dosage for one.  It's a free voucher.

3  Q   Did the availability of whatever medications may be in C&R

4  Pharmacy ever have an effect on your clinical judgment as to

5  what you should prescribe?

6  A   No.

7  Q   And why not?

8  A   Well, the -- based on the availability, the decision is

9  still based on the need of the patient.  We know what drug the

10  patient needs.  But, however, in order to fill that drug, it

11  had to be available.  The drug had to be there for you to fill

12  it.

13  Q   And after the McConaghys took over the operation of C&R

14  Pharmacy, what daily involvement, if any, did you have with the

15  operation of the C&R Pharmacy?

16  A   The agreement with McConaghy, they handle everything.

17  That's in their agreement; although we pay for the employees.

18  It's their decision to hire, to fire whoever, because we have

19  no way of intervening, therefore everybody is theirs.  And

20  then -- there they hire, they make decision.  And whenever the

21  pharmacist is sick, they have coverage.  So we don't have to

22  take care of any of those.

23  Q   Did you have any daily management or other involvement in

24  C&R Pharmacy after McConaghy became involved?

25  A   No.  No.

XIULU RUAN, MD - DIRECT BY MR. KNIZLEY

1   Q   Did from time to time you do urine tests at PPSA?

2   A   Yes.

3   Q   And we've heard it, but what is the distinction between the

4   cup test and the GC-MS?

5   A   Cup test give you immediate information.  But, however,

6   it's not specific.

7   Q   And Doctor, let me back up.  A cup test -- when a patient

8   comes into the pharmacy -- excuse me -- comes into the clinic

9   and they're going to do a urinalysis, they give a urine sample

10  into a cup; is that right?

11  A   That's correct.

12  Q   And that cup is -- they're in a bathroom, they hand the cup

13  through a door, there's a person on the other side of the door

14  and gets the cup; right?

15  A   That's correct.

16  Q   And then in that cup they make a test; right?

17  A   Right.

18  Q   And first describe that test.  What is that test?

19  A   That test is what they call immunoassay.  Basically you're

20  trying to find out which class of drug the urine has; testing

21  for class.  It doesn't tell you what it is.  Opioid can be a

22  morphine, can be a hydrocodone, can be a codeine.  You can't

23  tell which is which.  That test most important when it shows

24  cocaine-marijuana.  Because that -- when we see those right

25  there, we can make a change to the regimen.  Even if that

5830

```
1   opioid or marijuana may not be real, may be false positive,

2   false negatives so -- false positive, so -- but, however, if a

3   patient's on a high-dose opioid, we see that cup testing

4   suggests of cocaine/marijuana, we make changes.  For example,

5   cut down the medication; only give one week of supply, come

6   back, we'll send GC-MS to confirm that cocaine/marijuana is

7   real.

8   Q   One-week supply of, for instance, what?

9   A   Their routine medication.

10  Q   What kind of routine medication would be a one-week supply?

11  A   It really varies.  If some patient, for example, on

12  OxyContin, 16 milligrams twice a day, okay, I may change it to

13  40 milligram twice a day, giving them one week.  I say:  Come

14  back in a week and then I will have a GC-MS report.

15  Q   Right.  Now, you've got the GC-MS, you've got the cup test,

16  you got some concerns arising out of the cup test.  So you

17  don't just tell them to come back in a month or two months or

18  three months.  You say come back in one week; right?

19  A   If it shows illicit drug, cocaine-marijuana.

20  Q   You send it off to another place to get a GC-MS test;

21  right?

22  A   That's correct.

23  Q   And it comes back and then what do you do?

24  A   Based on the result, you decide what you do.  Okay.  For

25  example, there are variations; also based on what the patient
```

5831

1    was on, their opioid regimen.  You treat differently.  For

2    example, if cocaine-marijuana was confirmed, then I would most

3    likely discharge patient.  95 percent chance I would discharge

4    the patient based on cocaine-marijuana.

5    Q    Do you get money?  Do you get money?  Do you make money off

6    this urine test, this GC-MS test?  Do you get money for it?

7    A    The GC-MS test, we bill for those runs of the tests.

8    The -- if the tests were done because of medical, we bill for

9    the test.

10   Q    Do you get money for it?

11   A    They're compensated for that test.

12   Q    But is that why you do it?

13   A    No.  It's absolutely needed to monitor the usage.  It's

14   absolutely.

15   Q    Can you run the pain clinic without doing GC-MS tests?

16   A    I beg your pardon?

17   Q    Can you run this pain clinic effectively without doing

18   these GC-MS tests?

19   A    This whole thing of urine testing is involving -- when I

20   did my fellowship at the University of Michigan, we had never

21   done a single test.  It's gradually, gradually get to --

22   integrated into the clinical pain practice.  When I joined

23   PPSA, by that time we did not do it.  It was not required.  If

24   we needed a UDS, we had to send to Mobile Infirmary, takes four

25   hours for that test to come back.

1                On a daily operation, without doing the cup testing,

2       you cannot do it.  It's very difficult to -- it was new

3       regulation on that, what to do.  Cup testing gradually

4       incorporated into daily practice, then we know we had to follow

5       up the result, make adjustment.

6       Q   Right.  But if you don't have this GC-MS test, how are you

7       going to know whether the cocaine or marijuana is positive?

8       How are you going to know whether they're, you know, diverting

9       the drugs?  How are you going to know if you don't have this

10      GC-MS test?  Is that something you've got to have?

11      A   You have to, yes.  You have to have it.

12      Q   Even though you make money off of it?

13      A   Yes.

14      Q   What about blood tests and saliva tests, do y'all ever do

15      any of those?

16      A   We do.  We do the blood test on situation when people are

17      on very high dosage of opioids because urine testing can be

18      sort of manipulated.  Some people can give the urine and put

19      the medication into the urine.  So with -- the differences with

20      the GC-MS, with the blood, is when you get blood, people can't

21      fake it.  You have to draw the blood from the person.  The

22      difficulty is it's painful procedure.  Sometimes you can't get

23      the blood.  We do this often -- we have a very high dosage of

24      -- people on high dosage and then we do this in a random way in

25      order to make sure to verify the usage.  Saliva test in people,

5833

```
 1    for example, can cheat.
 2           I have a patient for a few years like almost 500
 3    pounds, wheelchair bound, so very difficult to get the urine
 4    sample.  With a saliva test you can get a quick sample but the
 5    sensitivity of saliva test and blood test is much less than
 6    urine because urine, the kidney concentrating the drug,
 7    therefore, you are able to catch the drug much easily.  Saliva
 8    test and blood is less sensitive.
 9    Q   And you've heard a lot of discussion about the monitoring
10    of the urinalysis.  Is that something that is routinely done at
11    your practice?
12    A   I beg your pardon?  I didn't catch it.
13    Q   Monitoring of urinalysis; watching people when they go to
14    the restroom?
15    A   Well, I got my addiction medicine board in 2010.  I was
16    number 12 in the whole state who's boarded in addiction
17    medicine, taking care of people for many years.  Never heard of
18    getting a urine monitor.
19           MS. GRIFFIN:  Objection, Your Honor.  He's not
20    responsive to the question.
21           THE COURT:  Sustained.
22    BY MR. KNIZLEY:
23    Q   You heard some evidence earlier in the case about you being
24    out of town and there being some billing in association with
25    medical services you may have rendered.  Do you recall that?
```

1    A    I do.

2    Q    What is the practice -- what is your practice when you

3    leave Mobile or not present at your office as it relates to

4    having appointments?

5    A    In my 12 years of practice, when I took off, everybody

6    associated with me, nurse practitioner took off.  They all are

7    aware of this, including visit, pump refill, everyone.  Those

8    pump refills somehow billed over the four and a half years,

9    maybe nine or 10 of them.

10   Q    You're getting ahead a little bit.  Those $495 over four

11   years of billing for an office visit, do you remember seeing

12   that?

13   A    I -- yeah, I saw them.  I saw them.

14   Q    Did you have any office visits?

15   A    No, I did not.

16   Q    And do you know what that $495 represented in any way?

17   A    My guess is my patient --

18        MS. GRIFFIN:  Objection, Your Honor, to him guessing

19   on an answer.

20        THE COURT:  Sustained.

21   BY MR. KNIZLEY:

22   Q    Do you have any idea?

23   A    No.

24   Q    Did you have some pump patients?

25   A    I do, yes.

5835

XIULU RUAN, MD - DIRECT BY MR. KNIZLEY

```
 1   Q   And is it a spinal pain pump; is that correct?

 2   A   That's correct.

 3   Q   And we've heard a lot about it during the course of this

 4   case; is that right?

 5   A   That's right.

 6   Q   Can a patient -- what happens if a patient runs out of the

 7   medications in the spinal pain pump?

 8           MS. GRIFFIN:  Objection, Your Honor, there's no

 9   allegation the patients ran out of medications in the pain

10   pumps.  It has nothing to do with the indictment.

11           THE COURT:  Sustained.

12   BY MR. KNIZLEY:

13   Q   Is there a need to have routine filling of the spinal pain

14   pumps?

15   A   Absolutely.

16   Q   And what is the need?

17   A   Because you're infusing an opioid, a mixture of different

18   things into the spinal canal directly, central-acting

19   medications around the brain and spinal cord, if you stop,

20   you're going to withdraw.  It's major --

21   Q   Please slow down, Doctor.  Okay?  Please slow down.  Okay?

22   A   I'm sorry.

23   Q   Go ahead and finish your explanation, but speak slower and

24   clearer.

25   A   When these medications are interrupted, stopped all of a
```

1    sudden, patient can go into serious withdrawal.  That's

2    dangerous.

3    Q    And did you see some billing that the government introduced

4    in connection with some spinal pain pump patient that you had

5    over the last four and a half years?

6    A    I saw that, yes.

7    Q    How long ago was that?

8    A    I don't remember the date.

9    Q    How long ago was the billing, if you recall?

10   A    2011, 2012.

11   Q    Okay.  And do you recall -- one, whether you're there or

12   not, can the patients go without having their pain pump filled?

13   A    Yes.

14   Q    Do you make changes from time to time in that regard?  Can

15   the patients go without refilling their pain pump?

16   A    No, they cannot.

17   Q    And do you know whether -- how those billings may or may

18   not have taken place in your pain pump patients?

19   A    I don't recall exactly how they end up on the schedule,

20   unless they were not on schedule with -- called to be on

21   schedule because of refill.  Because the pump nurses usually

22   fill pumps whenever they're in the clinic.  I saw every one of

23   them.  Just happened to be -- I'm not sure what happened

24   exactly, either by mistake or actually I can't recall what

25   happened.

1   Q   In the event one of your patients were there, by mistake or
2   whatever, that -- to have a pain pump refilled, were there
3   other physicians at the clinic that could have oversaw the pain
4   pump refill?
5   A   That's correct.
6   Q   And is that done from time to time?
7   A   Yes.
8   Q   Do you recall an email that you had received, and I think
9   Dr. Alan Kaye had received, from a student from the University
10  of Illinois in connection with discharging patients?  Do you
11  remember that email?
12  A   I do.
13  Q   And do you remember your response to the email in
14  connection with real world philosophies in discharging
15  patients?
16  A   Yes.
17  Q   Could you explain to the ladies and gentlemen of the jury
18  what you meant when you gave that response?
19  A   Dr. Alan Kaye is the chairman and professor at LSU.
20       MS. GRIFFIN:  Your Honor, objection.  That is not
21  responsive to the question.  He starts talking about a
22  professor at LSU instead of what he intended by the email that
23  he answered.
24       MR. KNIZLEY:  Judge, Dr. Kaye was on the email.  And
25  if the explanation requires some predicate of that --

XIULU RUAN, MD - DIRECT BY MR. KNIZLEY

1    Q    Do you have to explain --

2    A    Yeah.

3    Q    Excuse me?

4    A    I'll make it simple.  Dr. Kaye is anesthesiologist.  I am

5    at that time board certified in addiction medicine, so I was

6    trying to basically tell the medical student and Dr. Kaye and

7    Dr. Shah, there is a difference between the way people handle

8    addiction medicine versus pain practice.  Addiction medicine

9    based on the guideline, you should check patient's urine at

10   every medication refill; monthly, biweekly or even weekly.

11   That was based on the guideline.  The current -- most current

12   one published in 2013 say the same thing.

13          Now, in reality, I'm checking urine actually every

14   three months.  You saw many document.  So I was telling them

15   that was basically academic, the practice versus -- private

16   practice is different because of the guideline difference.  And

17   I can't tell Dr. Kaye I have a board in addiction medicine so I

18   basically say that was in general, in practice how people do in

19   contrast with academic.

20   Q    Have you ever failed to discharge a patient that you

21   thought it was medically necessary to do for -- in order to

22   maintain the patient for compensation?

23   A    Never.  If I don't think I can help that patient, I would

24   terminate the physician-patient relationship.  Many patient, I

25   discharge them this way.  Once I decide I can no longer help a

```
 1  patient, then I terminate the relationship.
 2  Q   Have you discharged patients in PPSA?
 3  A   Hundreds of them.
 4  Q   Do you know how many?
 5  A   A few years back, maybe two to 300.
 6  Q   You have seen during the course of this case some
 7  prescriptions that were blank in nature that bore a signature
 8  that looked like yours.  Did you see those?
 9  A   I saw some prescriptions, yes.
10  Q   Was that your signatures?
11  A   I recognized some of them, yes.
12  Q   And did you have any prescriptions in any area of your --
13  in a drawer in your office?
14  A   Yes.
15  Q   If you recall.
16  A   Yeah.  Those prescriptions showed -- there are different
17  ways of signing it, so one of them was signed maybe 10 years
18  ago.  I changed the way I sign my prescription.
19  Q   Just so you're not -- we're not being confused, you're just
20  saying 10 years ago you had a different type of way of signing
21  your name?
22  A   That's correct.
23  Q   And looking at those prescriptions, that way of signing
24  existed 10 years ago?
25  A   Well, maybe eight years.  I don't remember when did I
```

XIULU RUAN, MD - DIRECT BY MR. KNIZLEY

5840

1   switch but it was a different way of signing this, yes.

2   Q   So are you telling the jury that those -- those may have

3   been that old since you signed them?

4   A   Yes.

5   Q   Did they have Peggy Holder's name on there, some of them?

6   A   One set have Janice Bishop and Beverly Parker.  Beverly

7   Parker was working with us in 2008, I think.

8   Q   And hadn't been since that time?

9   A   Right.

10  Q   Did you sign those and put them in a drawer?

11  A   I signed those for emergency situations, not for billing,

12  not -- only made for changing -- for example, a patient was

13  prescribed Exalgo, for example, they couldn't find it, that

14  medication, either insurance does not cover it, it need to be

15  changed.  However, if I'm out of town, that medication cannot

16  be changed.  Only Sharon Noland said she used it twice in three

17  years.

18  Q   Did you ever know -- have you ever seen any particular

19  medication ever been signed by those -- have you ever seen it?

20  Do you have any recollection of any medication ever been

21  prescribed by one of those prescriptions?

22  A   I don't.

23  Q   So you don't know whether one of those prescriptions ever

24  has been used?

25  A   I don't.  I don't know.

5841

1  Q   And if they had been used by Ms. Noland, you don't know

2  what she may have -- the prescription may have been; Schedule

3  II, III, IV, V; you don't know?

4  A   That's correct.  I don't know what's really used for.

5  Q   You've seen prior authorization forms in this case, have

6  you not?

7  A   Yes, I have.

8  Q   And have you seen some prior authorization forms that bore

9  your signature that were not completely filled?

10  A   I saw them.

11  Q   Can you tell the ladies and gentlemen of the jury the

12  circumstances surrounding those forms?

13  A   Those preauthorization forms, we have -- I really don't

14  know what's the significance of it because I don't know when

15  the signatures were on them, and I thought was for facilitating

16  people getting their medication.  I saw one of the Duexis three

17  months preauthorization.  That's a patient assistance

18  program.  It wasn't even no choice.  And that was also in one

19  of the envelope, so I'm not sure which person put them in there

20  and how they work.  And it's not a prescription, it's just a

21  form for paperwork.

22  Q   As far as seeing patients -- on new patients when they came

23  to your office, did you see new patients when they came to your

24  office?

25  A   Always.

1   Q   Excuse me.  Always.  You mean always like every single

2   time?

3   A   Every single one of them in the 12 years.

4   Q   For how long?

5   A   12 -- my last 12 years in PPSA, every single one.

6   Q   And did you see patients that came on a repeat basis -- or

7   a later basis?

8   A   Whenever there's a need, I see them regardless of

9   insurance.

10  Q   Insurance plays no part in it?

11  A   No, not at all.

12  Q   And you've heard some talk about Blue Cross/Blue Shield

13  patients.  Did there -- did you have a practice where you would

14  see those patients routinely?

15  A   Every patient who comes to the clinic, if there's an issue,

16  I need to see them.  If their nerve testing need to be

17  interpreted, I saw them, explained to them.  And my finding is

18  explained.  I saw them, explained to them.  I'm -- I was

19  involved in every decision making, medications, procedures,

20  because they are my patient so I'm involved in every decision

21  making.  Nurse report to them, I get updated, I agree or

22  disagree.  Not a single one I did not involve with their care.

23  Q   We've heard the term PDMP.  Can you tell the jury one more

24  time what that means?

25  A   Prescription monitoring program.  It's a program.  Every

5843

```
 1   state has it to monitor its usage.  And so it's a program
 2   that's very useful and we use it very frequently.
 3   Q   How much do you use it?
 4   A   I think averaging -- in my part of the practice, I think
 5   probably -- you use it based on the need, with the
 6   presentations.  Shanna, my nurse practitioner on my part, used
 7   frequently if there's a need.  Not on every one, but when we
 8   feel the need.  When patient presents running out of medication
 9   a few days early, some abnormal history that suggests we should
10   check on them, we use them.
11   Q   Was it a routine part of your practice to use the PDMP?
12   A   Yes.
13   Q   Now, in your healthcare clinic you prescribed opioids, did
14   you not?
15   A   Yes, I did.
16   Q   And was that something you typically prescribe for people
17   who are in pain?
18   A   At the time -- yes.  By the time patient is referred to my
19   clinic, 90 percent -- 94 percent are on opioid, 35 percent on
20   benzo, 10 percent on Soma.  This is in the literature.  You can
21   verify it.  That's when people come to the interventional pain
22   practice, they are already on those.  Many people are on those
23   and some of the people actually referred to us have their own
24   therapy because the primary care physician do not want to write
25   them.
```

5844

1   Q   What percentage of your patients were on opioids?

2   A   I think probably 90 percent.

3   Q   And what percentage of the prescriptions that you wrote out

4   of your clinic were opioid prescriptions, do you know?

5   A   I would think probably 20 percent.

6   Q   And the other 80 percent were other type medications?

7   A   Because we use a combination, combination for nerve pain,

8   for muscle spasm, for insomnia.  So it's a combination therapy

9   we use.

10  Q   In your utilization of nurse practitioners, did there come

11  a time -- did you ever use Justin Palmer?  Was he -- did he

12  work for you for very long?

13  A   I recall I used him for a few weeks when he joined the

14  practice.  I used him for a few weeks and I found out nurse

15  practitioners, when they saw the patient, they can report to

16  you what they wanted to do, then have to approve.  I found out

17  he was a little aggressive in terms of his opioid -- in terms

18  of initiation of long-acting without even short-acting opioid

19  to prime it.  So I basically said:  I don't want to -- him to

20  work with me.

21  Q   And you suggested he go to work for Dr. Couch or somewhere

22  else?

23  A   So I no longer use him.  I think a few weeks, two months

24  maybe, I don't recall.  But very short, short after he started

25  with us.

XIULU REAN, MD - DIRECT BY MR. KNIZLEY

5845

1    Q    And did you make a similar decision with Ms. Parker?

2    A    Ms. Parker's different.  Ms. Parker's different because she

3    had back surgery three weeks before she started working with us

4    and when she did the rotation under Peggy Holder, Peggy Holder

5    said Ms. Parker --

6              MS. GRIFFIN:  Objection, Your Honor.  Hearsay.

7              THE COURT:  Sustained.

8    BY MR. KNIZLEY:

9    Q    Why did you not -- why did you decide not to use Ms. Parker

10   any longer?

11   A    Ms. Parker could not handle the volume that -- as a full

12   nurse practitioner she's less efficient than I anticipated.

13   And she has some reported missing work and so forth.  I thought

14   by transferring her to Dr. Couch, put her under part-time

15   schedule, she probably be able to handle it.  And then when she

16   had some major problem I basically decided to let her go.

17   Q    Did you -- while they were under your supervision, did you

18   ever note anything that would indicate to you they had any

19   substance abuse problems?

20   A    Well, she was -- she was taking medication prescribed by

21   Dr. Chen, so I knew she had the pain condition.  She had back

22   surgery at a young age.  So I knew she had pain condition; she

23   needed to take her medication.  But when she started to not

24   performing at work, I started to let -- I decided she can't fit

25   full-time nurse practitioner, therefore I let her go.

5846

1   Q   I'm going to turn your attention to some of the patients.

2   There has been testimony about during the course of this trial

3   that you had rendered medical services to.  And I'm going to

4   show you what's marked as Ruan's Exhibit 187 which has three

5   particular patients' names on there.  Do you recognize this

6   binder?

7   A   Yes.

8   Q   And is this a binder with some portions of the charts of

9   Mr. Douthitt, Ms. Byrd, and Ms. Dominguez.  These have been

10  admitted into evidence, are part of the MedScan or other parts

11  of your medical records?

12  A   Yes.

13          MR. KNIZLEY:  Judge, we provided this to the

14  government yesterday.  And we would offer Government's Exhibit

15  187.

16          MS. GRIFFIN:  Your Honor, I object to some of the

17  dates going as far back as 2007.  And I don't know which are

18  from the Greenway and which are from the MedScan.  I think

19  there needs to be some explanation about MedScan.  The majority

20  of these did not come from the Greenway files.  But I do not

21  object to the ones that were produced from the United States as

22  to the items seized during the search.

23          MR. KNIZLEY:  Judge, we would represent that every

24  piece of paper in here came from the United States.  And I

25  don't think the government contests that.

1          MS. GRIFFIN:  But not from Greenway, Your Honor, and

2    not from the patient files.

3          MR. KNIZLEY:  That is correct.

4          THE COURT:  Come to side bar, please.

5      (At the side bar, jury not present.)

6          MS. GRIFFIN:  Your Honor, I think there needs to be

7    some explanation that these weren't in the Greenway patient

8    files, as to where they were before they come in through

9    him.  If they were produced by the government as being seized

10   from the clinic, we don't object to them.  But I think they

11   need to be differentiated as to which are which.

12         MR. KNIZLEY:  Well, I'm missing something.  First, I

13   gave this to Ms. Griffin last night.  Two, I thought today she

14   said except for maybe relevance she didn't have an objection to

15   it.  And three, every piece of paper in here, every one, came

16   from the seizure.

17         THE COURT:  Well, yeah.  But are they all patient

18   files?

19         MR. KNIZLEY:  Every one of them.  The problem, Judge,

20   there was a Greenway electronic system that around 2013 became

21   the primary and eventually the sole recordkeeping database for

22   this clinic.  There was before that a --

23         THE COURT:  Will you hold your voice down a little

24   bit?

25         MR. KNIZLEY:  Ma'am?

5848

XIULU RUAN, MD - DIRECT BY MR. KNIZLEY

1           THE COURT:  Hold your voice down a little.

2           MR. KNIZLEY:  I'm sorry, I'm sorry.  Before that there

3   was a system called MedScan which were the very same documents

4   that were seized by the government from the MedScan system.

5   Not all the MedScan or vast majority -- very few of the MedScan

6   documents ever made it into the Greenway file.  But the medical

7   records that they seized are just this way.  And just because

8   we characterize them as the electronic records really is of no

9   importance.  These are the seized records from these patients'

10  files.

11          MS. GRIFFIN:  Your Honor, I would propose that we do a

12  stipulation that some of these records came from the old manner

13  in which they stored patient files and some of them came from

14  the Greenway files.  And other than the relevance, we don't

15  have an objection.  They didn't come from the seizures.  But I

16  don't want it coming in through him.  I don't want that

17  explanation coming in through your client.

18          THE COURT:  So what do you propose, just a

19  stipulation --

20          MS. GRIFFIN:  A stipulation that these are some parts

21  of this file that came from other places within PPSA other than

22  the Greenway files, the electronic files.

23          MR. KNIZLEY:  That were seized by the government.

24          THE COURT:  Can you announce that?

25          MR. KNIZLEY:  That were seized by the government.

```
 1            MS. GRIFFIN:  They were seized.
 2            MR. KNIZLEY:  I mean, I don't want the jury to have
 3    some impression that these were something they didn't have
 4    access to.
 5            THE COURT:  All right.
 6            MS. GRIFFIN:  And we don't suggest it is.  But I think
 7    they need to know they were not contained in the patient files.
 8    They were contained somewhere else.
 9            MR. KNIZLEY:  They are.  The MedScans are the patient
10    files.  They are the patient files.  This is not something --
11            THE COURT:  They weren't in the Greenway files?
12            MS. GRIFFIN:  They weren't in the Greenway files.
13            MR. KNIZLEY:  Greenway didn't start until 2012-2013.
14            MS. GRIFFIN:  But there are plenty of things in the
15    Greenway files that go back even to 2007, so that's not
16    exclusive.
17            MR. KNIZLEY:  Because -- no, that's not exclusive.
18    But, Judge, I'm not trying to blame anyone, but they just
19    didn't get all the files into the files -- they didn't get all
20    the records.
21            THE COURT:  They being whom?
22            MR. KNIZLEY:  Whoever proposed -- gathered this up for
23    the government.  Okay?  Whoever assembled those files over
24    there for the government did not get all the medical records
25    they had accessible to them.  They got everything that was in
```

5850

```
 1    Greenway.  They printed it all off, they put it in a binder.
 2    Some of the stuff in Greenway, the patient files, they said:
 3    Okay.  Let's get the old records and put it in this new
 4    electronic system.
 5              And they got it in there.  And -- but I'm not -- these
 6    people didn't do it.  But whoever did that for them left out
 7    many of the MedScan records that were there, that were seized,
 8    and they just didn't assemble them into the files.  And for the
 9    witness to testify about what he did to his patients or did for
10    his patients, he goes back to his other files, his MedScan
11    files, and gets those documents out and looks at them.
12              THE COURT:  Then why don't you just explain to the
13    jury this exhibit contains a combination of the old style files
14    and the new files that were all -- all of them seized by the
15    government?
16              MR. KNIZLEY:  Yes, ma'am.
17              MR. ARMSTRONG:  Part of the old system and the new
18    system.
19              THE COURT:  All right.
20         (In open court, defendants and jury present.)
21              MR. KNIZLEY:  Your Honor, by way of explanation,
22    Ruan's Exhibit 187, this exhibit contains records that are
23    maintained at PPSA for three different patients that contain
24    both of what has been described here as Greenway or the
25    electronic system records, as well as records from a older
```

5851

1   system described as MedScan, that did not -- not all those

2   records got incorporated into the Greenway but they're all both

3   two sets of medical records that were seized by the government

4   at the time of the raid of the clinic.

5              THE COURT:  All right.

6              MS. GRIFFIN:  Your Honor, no objection other than

7   there may be some relevance objections.

8              THE COURT:  All right.  Let's -- and what exhibit

9   number is that?  Sorry.

10             MR. KNIZLEY:  187.

11             THE COURT:  Mark it in subject to objections to

12  certain pages for relevance.

13        (Ruan Exhibit 187 was entered into evidence.)

14  BY MR. KNIZLEY:

15  Q   Doctor, I draw your attention to Ruan's Exhibit 187, a

16  portion of it addressing the patient named Gary Douthitt,

17  D-O-U-T-H-I-T-T, that appeared in court earlier.  Do you recall

18  that patient?

19  A   Yes.

20  Q   And I want to show you what's marked from his portion of

21  187 at CR216585.  And tell me if you recognize that.

22  A   Yes, I do.

23  Q   And what is that?

24  A   It's a referral from his primary care physician.

25  Q   And when did he become your patient?

5852

1  A   March 28, 2012, the date of referral.

2  Q   And after he came in to see you, did he do an intake pain

3  assessment?

4  A   Yes.

5  Q   I'm going to show you what's marked as CR -- from the same

6  file, CR216590.  And is that that assessment?

7  A   That's right.

8  Q   And what, if anything, is significant about that assessment

9  to you?

10  A   He had like four accidents.

11  Q   And did he in fact say -- is that what you were told?

12  A   Right.  There was four of his age that's a major accident.

13  Q   How old was this gentleman, if you recall?

14  A   29, I think.

15  Q   And what were his accidents that he told you he had?

16  A   That was --

17  Q   Told you or told whoever did the intake.

18  A   He filled himself.

19  Q   And what did he say?

20  A   Broken neck and collar bone, four-wheeler accident, fall

21  accident at work, and then fall with a wrist fracture.  So

22  significant accident history.

23  Q   Did you also get a pain score in that intake from this

24  gentleman?

25  A   He was on the hydrocodone, Xanax.  He was on that before he

5853

 1  came.

 2  Q   Did he give you information as to what medications he was

 3  on when he came in?

 4  A   On the same intake form, yes.

 5  Q   I'm sorry, Doctor; say that again, please.

 6  A   He was on hydrocodone.

 7  Q   Tell me where you said you saw that.

 8  A   Just the same page you were pointing, the accident.

 9  Q   All right.  Excuse me.  This says what medications he was

10  on; is that right?

11  A   Yeah; right here (indicating).

12  Q   And --

13  A   Xanax, Lortab, Soma, that's the so-called holy trinity.

14  That's actually by definition the hydrocodone -- holy trinity

15  is supposed to be hydrocodone, not all other opioids.  That was

16  it by definition.

17  Q   Did you know anything about the holy trinity before these

18  allegations came about?

19  A   No.  I've never heard it until this case.

20  Q   Okay.  But we've heard it during the course of this case

21  that that's supposed to be -- someone else was prescribing him

22  these medications; is that right?

23  A   That's right.

24  Q   Dr. McKnight?

25  A   Yes.

XIULU RUAN, MD - DIRECT BY MR. KNIZLEY

5854

1    Q    Is that correct?

2    A    That's correct.

3    Q    And did that form also contain his pain indications?

4    A    Yes, pain score.  This is the pain score (indicating).  And

5    it's more severe range, seven to 10, average of eight, less

6    severe pain.

7    Q    And did you undertake to treat him when he came in?

8    A    Yes.

9    Q    And was there anything significant in his intake at

10   CR216592 in connection with his employment?

11   A    Significant is job history.  He is working at a job.

12   Q    Right there?

13   A    Yeah, still there.  So this is very significant.  That's

14   the purpose of pain management, to keep people functional.

15   Q    And after you saw him on the first occasion, did you

16   develop a plan to treat this gentleman?

17   A    Yes, I did.

18   Q    I'm going to show you what's at CR -- last three digits

19   561.  Is this the assessment?

20   A    Yes.  This is the plan portion.

21   Q    Excuse me.  Plan portion?

22   A    This is the plan -- assessment and plan portion.

23   Q    And this is the first time he came in?

24   A    That's correct.

25   Q    And he was on what people have talked about as being the

1   holy trinity; is that right?

2   A    Before, yes.

3   Q    And what is your plan here?

4   A    So get a UDS and order MRI of the neck and the lumbar spine

5   because we really need to see what's it look like.  A lot of

6   pain complaint of the neck and the low back.  At his age we

7   need something objective and the MRI testing, it's going to

8   give us image information in those area.  See, the Percocet

9   only give him two weeks, 45 tablets twice a day, b.i.d.,

10  t.i.d., as needed, twice a day and three times as needed; 45,

11  two weeks.

12  Q    Is that any different than what he was on?

13  A    He was -- well, initially he was heavy on it previously.

14  He wasn't on anything.  The initial urine was negative.  And

15  also tried the ointment which is noncontrolled.  He was on

16  Valium, 10 milligram, three a day.  We change it to twice a day

17  as needed; only give him 30 tablets.  He was getting 90 a

18  month.

19  Q    Is that an increase or a decrease?

20  A    That's a significant decrease.  And we ordered an MRI

21  study.

22  Q    Is he on the so-called holy trinity anymore?

23  A    No.

24  Q    And that's at your prescription?

25  A    That's correct.

1  Q   Now, you said he had the -- you had to give him some MRIs

2  because of what he had indicated in his initial assessment

3  regarding his injuries; is that right?

4  A   Injury, pain.

5  Q   And did you order MRIs?

6  A   We did.

7  Q   And I'm going to show you at CR600.  On 7/11 did you

8  conduct an MRI?

9  A   Yes.

10 Q   And was that done in your office?

11 A   That's correct.

12 Q   And was it sent out?

13 A   Dr. Mark Goddard is the board certified -- the radiologist

14 who read our MRI study.

15 Q   Did he come back with his assessment of it?

16 A   Yes.

17 Q   Is that your initials right there?

18 A   That's correct.

19 Q   Do you recall Mr. Douthitt's testimony that he didn't have

20 these injuries?  He didn't have the back injuries.

21 A   He didn't have the injury and I never saw him the first

22 time.

23 Q   Okay.  And on the first time did you, in fact, see him the

24 first time?

25 A   Yes.

XIULU RUAN, MD - DIRECT BY MR. KNIZLEY

1   Q   And does your records here reflect that, that you were
2   actually in there attending to him?
3   A   Yes, always.
4   Q   What does the MRI say?
5   A   Okay.  Briefly, he has three level of significant
6   narrowing.  Any time a radiologist put a number in there,
7   that's your narrowed.  Otherwise they would not specify any
8   number.  Normal diameter.
9   Q   Slow down.
10  A   Normal diameter of the cervical canal is between 15 to
11  23.  He is at 8 millimeter, without definite cord compression,
12  almost compression of the spinal cord, 8.8; next level 9.5.
13  Three level of narrowing in his neck, and these cannot be
14  faked.  It's objective study and that may explain why he's
15  hurting.
16  Q   Compression, you said this is 8.8 and he had 8 millimeters
17  here.  And what is normal?
18  A   15 to 23.
19  Q   Here?
20  A   He had 8.8.
21  Q   Is this -- and what is that?  What is normal?
22  A   15 to 23.
23  Q   So what does this tell you about his cervical spine?
24  A   He has significant cervical spinal stenosis at age 29.  So
25  this is a significant finding.

5858

1   Q   And this is not something he told you.  This is something

2   some radiologist sent back and said this is my findings?

3   A   That's correct.

4   Q   It's not your findings?

5   A   That's right.

6   Q   And did you also have lumbar spine MRI?

7   A   Yes.

8   Q   For this gentleman, on the same date?

9   A   That's correct.

10  Q   And did you send it all to the same radiologist?

11  A   That's correct.

12  Q   And you signed it when it came back?

13  A   True.

14  Q   And what did the radiologist interpretation say about his

15  lumbar area?

16  A   Here it says the word protrusion.  He used the word

17  protrusion.  Any time radiology use the word protrusion, it's

18  herniation.  It's not just degeneration, it's not just a

19  bulging.  It's disc herniated, so this is significant

20  finding.  That may explain why he has low-back pain.

21  Q   And how did you choose to treat it?

22  A   Tried him with a back brace, set him up for a cervical

23  epidural injection.

24  Q   And do you have progress notes reflecting that?

25  A   Yes.

5859

1    Q   Now, I'm going to show you the progress note -- that was in

2    July.  And did he come in at CR607 at 8/8/12?  Did he come in

3    there then, come into your office?

4    A   That's correct.

5    Q   And do you remember his testimony about him seeing you?

6    A   That's right.  Never saw me, he said.

7    Q   Or something to that effect?

8    A   That nature, yes.

9    Q   And do you remember me showing him this and showing him the

10   handwriting here and him telling us he didn't recognize the

11   handwriting?

12   A   Right.

13   Q   Do you recognize it?

14   A   That's mine.

15   Q   What does this mean when your handwriting is on this

16   progress note of 8/8/12 after the MRI?

17   A   That means I was the only clinician who saw him that day,

18   and wrote the note, signed the note, and I made the changes.

19   Look at that up here (indicating).

20   Q   First off, there's your signature.

21   A   That's right.

22   Q   And what changes did you make?

23   A   Here low-back pain, hepatitis C, on treatment with

24   interferon.  Interferon, you treat for hepatitis C.  So he's

25   concerned about his Tylenol usage because he was on

XIULU RUAN, MD - DIRECT BY MR. KNIZLEY

```
 1   Percocet.  Because of this I change him to Roxicodone, which is
 2   oxycodone without any Tylenol.
 3   Q   Why is Tylenol not a good thing for a person that has
 4   hepatitis C?
 5   A   Any medication -- the Tylenol anti-inflammatory.  In
 6   patient with a liver disease, you avoid those by all means.
 7   You know, liver can handle limited amount of these drugs.  When
 8   reserve of the liver is impaired due to disease, these
 9   medications can cause serious liver damage.
10         Also, in addition, put him in a back brace, set him
11   for two cervical epidural injections.
12   Q   I'm going to show you the next time you saw him, procedure
13   note at CR612, September 5, 2012.  Did you see him on that day?
14   A   Yes.
15   Q   And what did he have done that day?
16   A   I performed a cervical epidural injection under
17   fluoroscopy.
18   Q   And that's not medication.  That's a modality you did?
19   A   That's a interventional procedure for his cervical spinal
20   stenosis.
21   Q   And after that time did you see him yet again on 10/3/12 at
22   CR618?  Did you see him that day?
23   A   Yes.
24   Q   And do you recall he said he never saw you; right?
25   A   That's right.
```

1    Q    Whose handwriting is this?

2    A    Mine.

3    Q    Whose signature is this?

4    A    Mine.

5    Q    What does that indicate to you if your handwriting,

6    signature -- in fact, is there any nurse practitioner's writing

7    on here at all?

8    A    No.

9    Q    This up top, who did this come from?

10   A    This is the nurse -- medical assistant who wrote the

11   initial information, put the date on there, UDS, and the --

12   this portion filled by medical assistant.  I take over from

13   here (indicating).  This is what I wrote.

14   Q    So what does that mean?  Does that mean you're the only

15   person who saw him?

16   A    Only clinician who saw him.

17   Q    So is he being candid with the jury when he came in here?

18          MS. GRIFFIN:  Objection, Your Honor, to him commenting

19   on another witness' testimony.

20          THE COURT:  Sustained.

21   BY MR. KNIZLEY:

22   Q    Does this entry reflect a difference of the testimony from

23   his and yours?

24          MS. GRIFFIN:  Objection, Your Honor, for him to

25   comment on another witness' testimony.

5862

```
 1              THE COURT:  Sustained.
 2    BY MR. KNIZLEY:
 3    Q    Did you see him that day and you were the only one who saw
 4    him?
 5    A    Yes, I was.
 6    Q    Now, did he give a urinalysis that day too, a cup
 7    urinalysis?
 8    A    That's right.  That's right.
 9    Q    And here's the same date, is it not, 10/3, same day?  What
10    happened with his cup urinalysis?
11    A    This test showed it was negative for oxycodone, which he
12    was on.
13    Q    What does that mean to you?
14    A    Well, it could still be a false negative because urine
15    testing to oxycodone has limited sensitivity.  Urine testing to
16    morphine is much more sensitive to oxycodone because of the
17    immunoassay.  This gentleman had no insurance issue.  We could
18    not -- ideally we should have sent a GC-MS to verify it but
19    however, since he has a network issue with his insurance we
20    could not do a GC-MS.  It would cost him $2,000 for that test.
21    Q    Who wrote this right here?
22    A    My handwriting.
23    Q    And tell us what that means.
24    A    Hold.
25    Q    What do you mean hold?
```

1   A   Hold GC-MS.  Don't order any GC-MS.

2   Q   And who is this direction to?

3   A   For now, I wrote myself to plan, hold GC-MS for now,

4   network issue.

5   Q   And what does network issue mean?

6   A   Means either insurance does not cover GC-MS or he has to

7   pay for it himself.  It's going to be very costly for him so we

8   decided not to do it.

9   Q   Did he give you any indication when he expected to get

10  insurance again?  Do you recall anything about that?

11  A   He had insurance when he was referred to us.  Some of the

12  insurance do not allow GC-MS to be ordered like Blue Cross/Blue

13  Shield from somewhere, they are very strict.  Blue Cross/Blue

14  Shield of California, also very strict on those.  So in this

15  case we could not order it because of the cost.

16  Q   And did he come back in again?

17  A   Yes.

18  Q   In about two months?  In January at CR630, January of 2012?

19  A   That's correct.

20  Q   And what, if anything -- did you give him another test?

21  A   We --

22  Q   Did you give him a urinalysis test?

23  A   I think -- move up; we're going to see that.  Yeah, that's

24  right.

25  Q   Is this his second urinalysis test?

XIULU RUAN, MD - DIRECT BY MR. KNIZLEY

1  A   Yes.  This was different because this one, at this time, he
2  was on morphine.  Last office visit, we change from oxycodone
3  to morphine.  This time it's also negative, cup UDS is
4  sensitive enough to morphine.  That's why we decided it's time
5  to terminate the relationship, so I discharge him.
6  Q   Is the cup urinalysis more sensitive to morphine or the
7  prescription he was on before?
8  A   He was on oxycodone before initially; can't get GC-MS
9  because of the cost.  This time it was negative again.
10  However, this time he was on morphine already.  Morphine should
11  have enough sensitivity at that dosage, that's why we decided
12  to terminate him from the practice.
13  Q   Could have been a false negative on the other one but this
14  is pretty certain it's not a false negative?
15  A   That's right.  And we wean him off on opioid.  You see, the
16  last prescription he got -- instead of giving him four a day,
17  120, we gave him 42.  Taper him off.
18  Q   Is this -- that's the same day?
19  A   Right.
20  Q   Okay.  And before we get to the weaning off; okay?  Before
21  we get to the prescription you've just spoke about, what did
22  you do on the progress note that day?
23  A   So patient was discharged.  Bridgette Parker saw him first.
24  I co-signed the note, saw him later on.  Because when we have
25  to discharge a patient, I have to do that.  And it was a very

5865

```
 1    lengthy note but the decision was very clear.
 2          UDS negative for two visits, decrease MSR, taper off
 3    and decrease Soma to 45.  Patient violated opioid agreement,
 4    instructed to see Dr. Crumb another pain physician in town.
 5    Here we refer to Dr. Crumb.
 6    Q   And did you, in fact, prescribe him a medication in order
 7    to wean him off?
 8    A   Yes, taper off, two a day for a week, three a day for a
 9    week, two a day for a week, once a day for week, then
10    discontinue.
11    Q   Why didn't you just cut him off altogether?
12    A   Well, the thing is, remember, that test itself, even if --
13    could still be -- they may still have medication, because it's
14    not a GC-MS.  It's not a final -- it's enough, sufficient
15    evidence for me to discontinue, but I'm still not 100 percent
16    sure.  It's not a GC-MS.  This is the reason we bought two
17    GC-MS machines in 2013; paid $455,000, bought those two
18    machines, installed them.  Therefore, we can offer these kind
19    of tests to patients before we make decision like this.  It's
20    not a decision -- ideal decision, but we have no other choice.
21    Q   Do you remember Ashley Dominguez coming in to see you?
22    A   I remember.
23    Q   Do you remember Ashley Dominguez?
24    A   Yes.
25    Q   Ashley Buckley?
```

1   A   I remember her, yes.

2   Q   And do you remember her testimony previously in this

3   courtroom?

4   A   Yes, I do remember that.

5   Q   And do you remember how long she said she treated you --

6   you treated her?

7   A   About three years.

8   Q   And I'm going to show you what's marked as -- from her file

9   in the same Ruan's 187 as CR055 and show you this document of

10  history and physical.  Do you know whether or not that was the

11  first time she had ever seen you?

12  A   Let me see.  I think that's the first time we saw her,

13  right.

14  Q   Why do you think that?

15  A   May 17, 2014, last visit.  This is one year prior to the

16  raid.  So she was with us for a year.

17  Q   So that is the only time you ever treated her was for this

18  one year?

19  A   That's correct.

20  Q   And how did she present herself, if you recall?

21  A   Very painful 13 years.  Had five back surgeries.  Where are

22  the five back surgeries?  Was it -- yeah, here.  Hardware, five

23  back surgeries.  This is very significant.  When people have

24  this much back surgery, they have a lot of issue; pain in the

25  back and the leg.

5867

1  Q   And what -- what did you decide that you would treat her?

2  What was going to be your plan of treatment for her?

3  A   She was on opioid medication, different ones.  We

4  actually -- remember, she said I didn't see her the first time,

5  give her 12 drugs on the first visit.  I think that was what

6  her --

7  Q   I'm going to show you what was marked as CR059 as your plan

8  of treatment.  And does it say what type of medications you

9  prescribed for her on that date?

10  A   Yeah.  That was -- that was the first time we put her on

11  six medications.  These two medications she was on that -- she

12  was on that for anxiety and insomnia.  And Zanaflex, I use it

13  for muscle spasm.  It's not a controlled drug.  This medication

14  help their spasm, help sleep and help their blood pressure,

15  actually.  The side-effect of the drug can lower the blood

16  pressure and it can help sleep because of the sedating effect.

17  Now, these two indications were all off-label.  This is

18  medicine.  This is -- when you use the side-effect of drug for

19  therapeutic purposes.

20        Gralise is gradual release Neurontin, and we use it

21  for nerve pain.  It's not a fentanyl product like Dr. Aultman

22  so stated in her testimony.  It's a noncontrolled gabapentin.

23  Q   A noncontrolled what?

24  A   Noncontrolled drug.  The name is gabapentin.  It's a

25  generic name.

5868

```
 1          Percocet -- she was on Narco, switched to Percocet,
 2   added the lowest dosage of OxyContin, 10 milligram twice a day.
 3   That's what we added in addition, to give her a little more
 4   pain regimen.
 5   Q   And after her first visit, then when was she to return; do
 6   you recall?
 7   A   I remember ordering some tests on her.
 8   Q   Did she undergo some testing?
 9   A   I think so.
10   Q   And was an MRI one of the tests she underwent?
11   A   I think we did an MRI.  We did a nerve conduction study.
12   Q   I'm going to show you what's CR076, and is this from her
13   file regarding her MRI?
14   A   That's correct.
15   Q   And do you see this diagram down here at the bottom?
16   A   Yeah, this one she wrote.  You see the diagram.
17   Q   Doctor, slow down a little bit.  Okay?
18   A   Okay.  You see the pain pattern --
19   Q   Doctor, slow down some.  Okay?  This diagram at the bottom,
20   okay?
21   A   That's what she drew.
22   Q   All right.  Who wrote that?
23   A   The patient.
24   Q   Okay.  Tell me what the patient wrote on this diagram at
25   the bottom.
```

XIULU REAN, MD - DIRECT BY MR. KNIZLEY

1   A   She basically drawed the pain pattern that she experienced.

2   You see the symmetrical involvement on both sides, and you see

3   an asymmetrical component, the pain coming down from the back

4   all the way wrapping around to the right side.

5   Q   Who wrote that?

6   A   What is that?

7   Q   Who drew this picture?

8   A   The patient.

9   Q   Okay.  And this picture -- she didn't know anything about

10  asymmetrical pain; she just drew that and --

11          MS. GRIFFIN:  Objection, Your Honor.  There's no

12  showing she didn't know anything about asymmetrical pain.

13          THE COURT:  Sustained.

14  BY MR. KNIZLEY:

15  Q   Did she draw it?

16  A   She drew it.  What I want to say is basically you can see

17  the pattern from this is a symmetrical involvement coming from

18  the periphery, from the foot and leg, then you have a lumbar

19  component coming from her lumbar spine.  This gave us a reason

20  to actually get the MRI, get the nerve testing to figure out

21  what's going on with her.

22  Q   And is that what it says up here at the top -- down here on

23  the side, is that what she -- who wrote this right here

24  (indicating)?

25  A   That's her handwriting.

5870

1  Q   And on the MRI, is this the MRI, 075 -- is this the

2  radiologist's returned impressions?

3  A   That's right.

4  Q   And the significance of this is -- tell the ladies and

5  gentlemen of the jury, please.

6  A   I just want to comment on this here.  She has evidence of

7  scar tissue wrapping around the S1 nerve root which explains

8  the typical radicular pain that she experienced from back all

9  the way down to the foot, because the irritation -- nerve root

10  irritation here.  History of five back surgeries, we expect to

11  see some epidural tissue but this one was wrapping around the

12  nerve causing irritation.

13  Q   Let the screen come back up just a second.  All right.  Go

14  ahead.

15  A   So that's what we're talking about here.

16  Q   Did she return -- you said you had only been seeing her for

17  only one year, from May '14 to May '15; is that right?

18  A   That's right.

19  Q   And here you are seeing her again in a progress note on

20  July 2014?

21  A   I had to see her for this type again, yes.

22  Q   Hold on just one moment.  It's not moving at all.

23          THE CLERK:  Maybe it froze.  I don't know why it's

24  doing that.

25          MR. KNIZLEY:  Judge, can I move on to another area

1    that may not require this?  But I sort of do need it, but if
2    I -- we move on to another area; it's taking a little bit more
3    time.
4             THE COURT:  Maybe if we turn it off and reboot it.
5             THE CLERK:  It'll take turning off the whole system.
6             THE COURT:  Go on to something else if you will.
7    We've only got another 10 minutes or so before we recess for
8    the day.
9    BY MR. KNIZLEY:
10   Q    Doctor, I'm going to draw your attention to some of the
11   patients that you have seen without utilizing their particular
12   charts, and some of the patients that you have heard testimony
13   about in this trial, and let you discuss your course of
14   treatment of them.  First I'll turn your attention to Stephen
15   McDonald.  Do you recall that patient?
16   A    Yes.
17   Q    And when did you begin to treat that patient?
18   A    Stephen McDonald, between 2010 to 2013.  That was the time,
19   two and a half years.
20   Q    And how old a man was he?
21   A    I beg your pardon?
22   Q    How old a gentleman was Mr. McDonald?
23   A    21 years of age when I first saw him.
24   Q    Okay.  And back to this.  Let's finish Mr. McDonald to
25   begin with.  How did you first come about to see Mr. McDonald?

1    A   His grandma was a patient of mine for many years.  And

2    later on his mother became patient of mine too.  So three

3    generations had been seeing me, and Stephen McDonald was one of

4    the ones that had major trauma:  Hip fracture, shoulder

5    dislocation, lot of issues.  So the grandma has a lot of hope

6    in me to try to take care of her grandson.

7    Q   And did you begin to undertake treatment of him?

8    A   I beg your pardon?

9    Q   Did you begin to undertake the treatment of him?

10   A   Yes.

11   Q   And what did you find him to be suffering from?

12   A   Well, he has -- did the MRI on low back, had some disc

13   problem at his age, 21 years of age; had some spondylosis, we

14   call it.  Arthritis of the back at that age.  And we also --

15       MS. GRIFFIN:  Your Honor, I object to the witness

16   reading something.

17       MR. KNIZLEY:  He is?  You're more than welcome to see

18   it.

19   A   The cards?

20       MS. GRIFFIN:  Yes, I'd liked to see it.

21       MR. KNIZLEY:  Sure.  Do you want to see it before he

22   reads or -- I mean, he's using it, his notes, but you're

23   certainly welcome so see it.

24       MS. GRIFFIN:  We're entitled to see it.

25       THE COURT:  Yeah.  If he's reading off of something,

```
 1    she needs to see it.

 2          Go ahead.  Do you want to show it to her?

 3          THE WITNESS:  You can see.

 4          THE COURT:  If he's reading off of something, you need

 5    to show it to Ms. Griffin.

 6          MR. KNIZLEY:  He has it up there, Judge.

 7          MS. GRIFFIN:  Would you get it from your client?

 8          MR. KNIZLEY:  Oh, I'm sorry.

 9       (A discussion was held off the record between counsel.)

10          MS. GRIFFIN:  Your Honor, we would ask that the

11    reading cards be taken away from him and that we be shown every

12    one he's going to read from before he does.

13          MR. KNIZLEY:  Judge, we don't mind that.  But he's

14    read from one and --

15          MS. GRIFFIN:  Your Honor, he's --

16          MR. KNIZLEY:  He's got a right to see it to refresh

17    his recollection from.

18          THE COURT:  Well, he doesn't need to read from them.

19    If he needs his recollection refreshed, you can then show him

20    something.  But he doesn't need to have notes up there with

21    him.  Okay?

22          MR. KNIZLEY:  Yes, ma'am.

23          THE COURT:  All right.

24          MS. GRIFFIN:  I'm going to read it.  (Reading.)

25          MR. KNIZLEY:  Judge, we have to take them off of
```

```
 1    there, I suppose.
 2            THE COURT:  All right.
 3            MS. GRIFFIN:  Well, if you're going to take them and
 4    he's not going to read them, then I won't read them unless --
 5            MR. KNIZLEY:  He needs the notes to refresh his
 6    recollection.
 7            MS. GRIFFIN:  Your Honor, he can refresh his
 8    recollection from the file, not from his personal notes.
 9            MR. KNIZLEY:  He can, Judge.  But he can also from his
10    personal notes if he so chooses.  He doesn't have to --
11            THE COURT:  Well, the problem is he needs to attempt
12    to recall things without anything first.  If he cannot, then
13    you can ask him if his notes would refresh his recollection.
14    But you know the drill, Mr. Knizley.
15            MR. KNIZLEY:  Yes, ma'am.  Yes, ma'am.
16            THE WITNESS:  We're saving time.
17    Q   I'm sorry?
18    A   I thought for saving time, it's quicker rather than go
19    through my notes.
20            MS. GRIFFIN:  Your Honor, we would move to strike that
21    unsolicited comment.
22            THE COURT:  Let's move on.
23    BY MR. KNIZLEY:
24    Q   Did you see Mr. McDonald?  And from your recollection,
25    without referring to your notes.
```

1    A    Yes, I saw him.

2    Q    Dr. Ruan, just tell us what you recall about your treatment

3    of him, please.

4    A    Basically we managed his pain.  He had a job in Alaska so

5    basically put him on a very low dosage opioid regimen.  He was

6    very honest with us.  At his initial intake form, in filling

7    the information, he used to use amphetamine and marijuana

8    occasional only.  At the time he came to us he wasn't using it.

9    And we did a urine check on him and everything was

10    okay.  Positive for benzo.  He had been getting benzo from

11    Dr. Campbell and he was getting Adderall from Dr. Michelle

12    Jackson.  So we knew that part of the history.

13          So basically we just managed his pain.  And realizing

14    he had a job, he had to work out of state.  And knowing his

15    grandma, know his mom -- okay.  Knew his mom later on.  So

16    basically tried to manage his pain; let him function.

17    Q    And I'm going to take your attention back to the --

18    Ms. Dominguez before we get through before 5 o'clock.  Okay?

19    Back to her chart.

20    A    Okay.

21    Q    Ms. Dominguez -- after you -- the last time you mentioned

22    you saw her, did you see her and give her a nerve sensory

23    testing?

24    A    Yes, sir.

25    Q    And at CR088, is this the result of that?

XIULU RUAN, MD - DIRECT BY MR. KNIZLEY

1    A    That's correct.

2    Q    And can you tell us what that is, please, sir?

3    A    Yeah; basically that confirmed the condition that she was

4    having.

5    Q    And what was that condition?

6    A    It fell off.

7    Q    What was that condition, please, sir?

8    A    What this panel -- basically there's no sensory potential.

9    Everything is zero.  This whole line three did not record any

10   sensory potential.  No interpretations are preserved.  Normal

11   conduction velocity here and potential symmetrical.  So

12   basically what he has -- what she has -- sorry -- what she has

13   was a polysensory neuropathy, a mild form affecting sensory

14   nerve only, sparing motor nerve.

15           So that would give her a lot of symmetrical pain from

16   toe to the knee.  We call stocking distribution, very typical

17   for that sensory neuropathy, painful neuropathy.

18   Q    And at this time, did you prescribe her any fentanyl

19   medications?  At the time?

20   A    No.  No.  That was -- that was first or second follow-up

21   visit.  So these are the information we need because that way

22   we know we follow up in a year or so if the disease progression

23   involving the motor nerve, she's going to lose her strength in

24   the leg.  So this is where we know what the nerve conditions

25   are monitoring, also realizing patient with diagnosed

1    neuropathic pain condition, they typically require much higher

2    opioid dosage.  We know that.  Literatures in the past say

3    neuropathic pain do not respond to opioid; currently say they

4    do respond to opioid but higher dosage.

5    Q   And what was your course of treatment, if you recall, for

6    her at this time?

7    A   We -- remember the MRI testing we did.  We recommended a

8    selected nerve root block on the right side, injection around

9    the S1 nerve root which was irritated by the scar tissue.

10   However, she was afraid of needles which reported multiple

11   times in the notes.  She did not remember the other day.  She

12   said she never reported afraid of needles.  It was documented

13   here.  So we basically adjust her medications.  On this day we

14   added TIRF, added the low dosage TIRF medication.

15   Q   And is this the first time she was prescribed TIRF

16   medication?

17   A   Yes.  This say pain's eight out of 10.  And as you go --

18   scroll up a little bit, you'll see the documentation -- up --

19   no, no -- yeah, right here (indicating).  Episodes of very

20   severe breakthrough pain in the feet, mostly in the a.m. and

21   evening.  So this is the time that we decided to add a low-dose

22   voucher to give her some relief.

23   Q   How is she expressing -- how did she look when she was in

24   there (indicating?)

25   A   Tearful, in pain.

5878

1   Q   And what was the medication you prescribed for her at that

2   time?

3   A   Let me see the notes.

4   Q   Again, is this the first time she received the TIRF drug?

5   A   At this time she's already on a fentanyl patch to help her.

6   She's on -- a long-acting agent on board.  It said she's on

7   Percocet as needed.  Therefore, we added the Abstral as needed

8   for severe breakthrough pain, to distinguish between the

9   regular Percocet and the Abstral.  If you look into the bottom,

10  at the bottom -- yeah, right here (indicating).  This is where

11  we take advantage of the voucher program.  We give her three

12  boxes altogether.  That's how the voucher is used.  Therefore,

13  she can get the three boxes free of charge.

14  Q   And what's the time frame that this was done?

15  A   September 4th.

16  Q   Was this --

17  A   September 4th.

18  Q   And was the voucher program still going on at that time for

19  Abstral?

20  A   The -- I think we give her three boxes.  She filled at

21  intervals.  Then there were changes in the voucher program.

22  Before, you can fill the same day; now they change the program

23  to restrict those conditions.  But however, I think she filled

24  it.  The PDMP showed that she filled them all.

25  Q   And after this Abstral -- and this is the first time she

XIULU RUAN, MD - DIRECT BY MR. KNIZLEY

1   ever got prescribed Abstral; right?

2   A   That's correct.

3   Q   Did she come in the next time on October 3rd and did you

4   prescribe her -- what did you prescribe her at that time?

5   A   One month later -- we knew the Abstral program is only

6   one-time deal, three boxes.  This time still having the same

7   complaints.  She had breakthrough pain in her feet and Abstral

8   helped but we can't give her anymore.  There was no voucher, so

9   we switch her to Subsys.

10  Q   Is that reflected --

11          THE COURT:  Mr. Knizley, how much longer are you going

12  to be with this exhibit?

13          MR. KNIZLEY:  With this patient and the exhibit, about

14  two or three more minutes, Your Honor.

15          THE COURT:  All right.  Go ahead.

16  BY MR. KNIZLEY:

17  Q   What were the medications you gave this patient at --

18  again, you've given her Abstral one time on a coupon, now

19  you're giving her Subsys the next time; is that right?

20  A   Only 30 dose.  That was the voucher also.

21  Q   Where is that now?

22  A   Right here (indicating).

23  Q   Okay.  And how do you know it's a voucher?

24  A   Because 30.  Voucher is 10 or 30.  That's a voucher.  And

25  insurance didn't pay.  We knew that.  That's why we give her to

1   help her pain without charging her insurance.

2   Q   So Ms. Dominguez had two TIRF drugs two times, two samples;

3   right?  Two different occasions?

4   A   Right.

5   Q   One Abstral and one Subsys?

6   A   And the lowest -- come close to the lowest dosage.

7   Q   And do you recall any testimony about her saying she was

8   debilitated and couldn't get out of bed and that sort of thing?

9   A   Three-month withdrawal, that's what she said; could not get

10  up.

11  Q   And did you see her -- how often -- and was that supposedly

12  after she took her TIRF drug?

13  A   Right.  She came back the following two months, two visits

14  in the following month.

15  Q   Okay.  October 3rd you gave her the Subsys; is that

16  correct?

17  A   That's correct.

18  Q   Okay.  And did she return to your clinic the next month, on

19  October 6th?

20  A   That's correct.

21  Q   And was there a progress note on October 6th -- November

22  6th as well?

23  A   That's correct.

24  Q   And she was back in your clinic in 30 days after being

25  prescribed --

XIULU RUAN, MD - DIRECT BY MR. KNIZLEY

```
 1    A   Right.

 2    Q   -- medication; right?

 3    A   Right.  Right.

 4    Q   And did she return the next month as well?

 5    A   That's correct.

 6    Q   And on December 22nd was there a progress note when she

 7    came in?

 8    A   That's true.

 9    Q   So --

10    A   No mention of withdrawal in these notes.

11    Q   And no mention of being bedridden or anything of that

12    nature?

13    A   No.  No.

14    Q   And she's in your clinic for the next 30 days and then

15    about 45 days after that?

16    A   Right.  The reason is with that dosage of fentanyl she

17    would not go into withdrawal because she still had a patch on

18    her body.  She still had the oxycodone on board.  The majority

19    of the opioid in the body come from the fentanyl patch.  She

20    was on 50 every hour, plus the oxycodone.  And these small

21    dosages of Subsys used one time, it would not go into

22    withdrawal.  Withdrawal happens when you stop --

23            MS. GRIFFIN:  Your Honor, I object.  It's not

24    responsive to the question.

25            THE COURT:  Sustained.
```

```
 1            MR. KNIZLEY:  Judge, that will wrap up this particular
 2   patient.
 3            THE COURT:  I'm sorry?
 4            MR. KNIZLEY:  That's all we have from this file on
 5   this patient.
 6            THE COURT:  All right.  Then let's go ahead and break
 7   for the day.  Ladies and gentlemen, leave your pads on your
 8   chairs.  Remember my instructions to you not to discuss the
 9   case or allow anyone to discuss it with you.  Be back
10   downstairs in the jury assembly room tomorrow morning at 9 a.m.
11   ready to be called back up.
12            Have a good evening.
13            MR. SHARMAN:  Your Honor, may we consult after?
14            THE COURT:  Yes.
15      (In open court, defendants present, jury not present.)
16            MR. SHARMAN:  May we approach?
17            THE COURT:  Yes.  Do you want a side bar?
18      (At the side bar, jury not present.)
19            THE COURT:  Do you want your co-counsel?
20            MR. ARMSTRONG:  I would think he would want to be
21   here.
22      (Mr. Knizley present.)
23            MR. SHARMAN:  Your Honor, I see where the Court
24   addressed Monica Carroll by order.  So the only remaining issue
25   would be if I could ask to have the evening just to make sure
```

```
 1    that we have every document in that we want to in anticipation
 2    of Dr. Couch resting in the morning.
 3              THE COURT:  What did you say at first?
 4              MR. SHARMAN:  I said I believe the Court addressed
 5    Monica Carroll and granted the motion to strike, I believe.
 6              THE COURT:  Well, I said I would if you weren't going
 7    to put her on, back on again.
 8              MR. SHARMAN:  I'm sorry.  I read the --
 9              THE COURT:  You asked for time to make that
10    determination.
11              MR. SHARMAN:  Yes, ma'am.  I read the electronic order
12    as the Court actually granting the motion to strike.
13              THE COURT:  Oh, well, I hadn't.  But I said I would if
14    you determined not to put her back on.
15              MR. SHARMAN:  Yes, ma'am.  We had determined not to
16    put her back on.  So the Court's order --
17              THE COURT:  Now I'll grant the motion.
18              MR. SHARMAN:  The order can stay as it is.
19              THE COURT:  Okay.
20              MR. SHARMAN:  And then if I could have the evening to
21    make sure we have any documents that we would want to issue in
22    anticipation of resting in the morning.
23              MS. GRIFFIN:  I believe there was at least one exhibit
24    that was admitted through Monica Carroll that we would, you
25    know, ask to be withdrawn.
```

1          THE COURT:  Well, that would be withdrawn, if there
2    was one.  So do you know what it was?
3          MR. SHARMAN:  I had one more thing.  I want to get
4    these proffers done too.
5          THE CLERK:  (Reading.)  I don't know when that would
6    be.
7          MR. SHARMAN:  I want to do these proffers, if I can.
8          THE COURT:  Couch Exhibit 264?  It was Couch Exhibit
9    264.
10         THE CLERK:  Oh.
11         THE COURT:  Was that one admitted through her?
12         THE CLERK:  Yes, ma'am.
13         THE COURT:  What was it?
14         THE CLERK:  Narcotics count sign-out log for medicine
15    for treatment on patients.
16         THE COURT:  Did you hear that?
17         MR. SHARMAN:  Yes, 264.
18         THE COURT:  Yeah.
19      (Defendant Couch's Exhibit 264 was withdrawn from
20    evidence.)
21         MR. SHARMAN:  And then the only other thing, Your
22    Honor, I would like to take this opportunity to offer three
23    proffers of evidence and have them marked as a Court Exhibit
24    regarding Tamara Dabney, Debi Phillips, and Michael Tiller.
25    These are the written versions of the oral proffers that were

5885

```
 1   made on the record.
 2          THE COURT:  All right.  Mark those as Court Exhibits.
 3          THE CLERK:  Yes, ma'am.
 4          THE COURT:  Anything else?  Is that it?
 5          MR. SHARMAN:  Do you want to talk about --
 6          MR. BODNAR:  Your Honor, when they get back, we were
 7   just going to try to coordinate, make sure everyone's on the
 8   same page when we're starting closings.  I think all of us are
 9   in agreement we are going to be done with all testimony
10   tomorrow.
11          THE COURT:  It depends on what time.  Because we still
12   have to do the charge conference.
13          MR. BODNAR:  Let me grab Deborah and Dennis real
14   quick.
15      (Mr. Bodnar left and returned to side bar with Ms. Griffin
16   and Mr. Knizley.)
17          MR. BODNAR:  We just wanted to find out what is the
18   plan likely to be, assuming that we are going to finish up in
19   all likelihood with all evidence tomorrow.  We've got one very
20   short rebuttal witness.  And my understanding is they've got
21   one witness after we finish up with Dr. Ruan tomorrow.
22          THE COURT:  That's the expert witness?
23          MR. BODNAR:  Correct.
24          THE COURT:  It entirely depends on how long all this
25   is going to go.
```

1              MR. ARMSTRONG:  Well, he's going to be my witness,

2    Judge.  And my goal with him is to cut out a lot of the stuff

3    that I've already gone through with Dr. Gudin I don't think I

4    have to repeat, and I can get to the meat of the issues with

5    him.

6              THE COURT:  How long?  How much longer do you intend

7    to be with Dr. Ruan?

8              MR. KNIZLEY:  She's given me permission to send

9    somebody else to go talk to him and tell him I'm cutting all

10   this.  It's just too boring.

11             THE COURT:  I wasn't going to say that.

12             MR. KNIZLEY:  I did.  On the record.

13             THE COURT:  Okay.  So how long do you -- who's --

14             MR. BODNAR:  Deborah's going to be --

15             THE COURT:  How long do you think you're going to be

16   on cross with him?

17             MS. GRIFFIN:  I would say less than an hour.

18             THE COURT:  Okay.  All right.  Well, we will probably

19   get through tomorrow then.  So let's plan on having our -- what

20   is today, Tuesday?  We'll plan on having our charge conference

21   tomorrow -- maybe tomorrow afternoon.  I'll give you a draft of

22   the jury charge tomorrow afternoon and then we'll have our

23   charge conference first thing Thursday morning.

24             MR. SHARMAN:  That's --

25             THE COURT:  And maybe plan on starting argument like

```
 1    at 10 o'clock Thursday morning?

 2             MR. BODNAR:  Okay.

 3             THE COURT:  Now, are you still saying two hours?  It

 4    seems like an awful -- not very long.

 5             MR. BODNAR:  That's split.  You think it should be

 6    longer?

 7             THE COURT:  Well, I'm just saying there's -- I don't

 8    ever ask for longer.  This is a long trial and two hours is not

 9    a whole lot of time.  But --

10             MR. BODNAR:  Could Deborah and I discuss it this

11    afternoon and we'll get back with the Court in the morning?

12             THE COURT:  Yeah.  Because, I mean, I don't want to

13    cut you short, but I don't want you to get in a situation where

14    you have to ask for more time during the argument.  So

15    okay.  All right.  We'll talk about that.

16             MR. KNIZLEY:  Judge, you're speaking of charge

17    conference on Thursday morning?  Is there some chance we might

18    get to it tomorrow afternoon?  And if he's going to get longer

19    or we all possibly get longer, I don't know.  As I said before,

20    we said about five hours of closing.

21             THE COURT:  I know.

22             MR. KNIZLEY:  So the sooner we get started with him on

23    Thursday morning, what I was thinking, if we had a charge

24    conference on Wednesday afternoon, if we had time?  Or would

25    the Court rather have Wednesday night to work on it?
```

1        THE COURT:  Well, I'm trying to give you a draft

2   tomorrow.

3        MR. KNIZLEY:  Okay.

4        THE COURT:  By the close of evidence tomorrow so that

5   y'all have time to go over it tomorrow night before our charge

6   conference on Thursday morning.  And hopefully we won't have to

7   be that long.  And then, you know, we may get all the argument

8   in on Thursday, but we may not.

9        MR. KNIZLEY:  Okay.  Yes, ma'am.  All right.  That's

10  fine.

11        THE COURT:  And, of course, we're off Monday because

12  that's a federal holiday.  So you know that.

13        MR. KNIZLEY:  Yes, ma'am.

14        THE COURT:  Okay.

15        MR. BODNAR:  Thank you, Your Honor.

16        MS. GRIFFIN:  Thank you, Your Honor.

17        MR. SHARMAN:  Thank you, Your Honor.

18     (Court adjourned at approximately 5:10 p.m.)

19

20

21

22

23

24

25