1        UNITED STATES DISTRICT COURT
2        SOUTHERN DISTRICT OF ALABAMA

3   UNITED STATES OF AMERICA
                                    CASE NO. CR15-00088
4   v.
                                    COURTROOM 2B
5   JOHN PATRICK COUCH, M.D.,
    and XIULU RUAN, M.D.,
6                                   MOBILE, ALABAMA
              Defendants.
7   * * * * * * * * * * * * * *     WEDNESDAY, FEBRUARY 15, 2017

8   REDACTED

9                        DAY 26 OF TRIAL
10      BEFORE THE HONORABLE CALLIE V. S. GRANADE,
            UNITED STATES DISTRICT JUDGE, AND JURY
11

12

13  APPEARANCES:

14  FOR THE GOVERNMENT:
        DEBORAH A. GRIFFIN
15      CHRISTOPHER BODNAR
        United States Attorney's Office
16      63 S. Royal Street, Suite 600
        Mobile, AL  36602
17      (251) 441-5845

18

    FOR THE DEFENDANT COUCH:
19      ARTHUR T. POWELL, III
        P.O. Box 40456
20      Mobile, AL 36640-0456
        (251) 433-8310

21
        JACKSON R. SHARMAN, III
22      ROBERT JACKSON SEWELL
        JEFFREY PAUL DOSS
23      BENJAMIN SANDERS WILLSON
        Lightfoot, Franklin & White
24      400 North 20th Street
        Birmingham, AL  35203
25      (205) 581-0700

 1    (Continued)

 2        BRANDON KEITH ESSIG
         800 Shades Creek Parkway, Suite 600D
 3        Birmingham, AL  35209
         (251) 879-1981

 4

     FOR THE DEFENDANT RUAN:
 5        DENNIS J. KNIZLEY
         7 N. Lawrence
 6        Mobile, AL 36602
         (251) 432-3799

 7

         JASON BRADLEY DARLEY
 8        Darley & McGough, LLC
         1751 Dauphin Street
 9        Mobile, AL 36604
         (251) 441-7772

10

         GORDON G. ARMSTRONG, III
11        P.O. Box 1464
         Mobile, AL  36633
12        (251) 434-6428

13        STEVEN D. MARTINIE
         4955 North Lake Drive
14        Whitefish Bay, WI  53217
         (414) 332-9683

15

     THE CLERK:  MARY ANN BOYLES
16    THE LAW CLERK:  LYNN DEKLE
     COURT REPORTER:  ROY ISBELL, CCR, RDR, CRR

17

            Proceedings recorded by OFFICIAL COURT REPORTER
18        Qualified pursuant to 28 U.S.C. 753(a) & Guide to
     Judiciary Policies and Procedures Vol. VI, Chapter III, D.2.
19        Transcript produced by computerized stenotype.

20

21

22

23

24

25

1                     EXAMINATION INDEX

2

XIULU RUAN, MD
3      DIRECT BY MR. KNIZLEY . . . . . . . . . . . . . 5896
       CROSS BY MS. GRIFFIN  . . . . . . . . . . . . 5921
4      REDIRECT BY MR. KNIZLEY . . . . . . . . . . . 6014

5   CHRISTOPHER GEORGE GHARIBO, MD
       DIRECT BY MR. ARMSTRONG . . . . . . . . . . . 6034
6      CROSS BY MR. BODNAR . . . . . . . . . . . . . 6056
       REDIRECT BY MR. ARMSTRONG  . . . . . . . . . .6073
7
    CINDY MCKENZIE
8      REBUTTAL BY MR. BODNAR . . . . . . . . . . . .6078
       SURREBUTTAL BY MR. ESSIG . . . . . . . . . . .6081

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT INDEX

MAR   ADM

GOVERNMENT'S

59   Letters from insurance companies to Dr.          5991
     Ruan re:  information regarding patient
     drug utilization

60   Email 6/29/14 Bean to Ruan re:  "Incident        6007
     to" CMS rules, BCBS, Cigna and Aetna
     Compliance

62   Email 12/9/13 from Ruan to Couch re:             5998
     transfer Bridgette to be under Dr. Couch

65   Matthew Bean patient file (Ruan)                 6004

66-3 Email 6/1/14 Ruan to Gudin & Gharibo -           6068
     advice on letter to AL Board of Medical
     Examiners

66-5 Email Gharibo to Ruan 8/16/14 re:  TV            6070
     commercial of our pain clinic

71   Office visit bill from PPSA to BCBS via          6080
     Navicure for T. Goellner


DEFENDANT COUCH'S

295  Data compilation of C&R Pharmacy Daily           5895
     Audit Logs as of 2/12/14 & Transaction
     Signature Logs for 2/4/14 - 2/12/2014
     (stipulation - 2/15/17)

296  Data Compilation of C&R Pharmacy Daily           5895
     Audit Logs as of 4/10/14 & Transaction
     Signature Logs 4/3/14 - 4/10/14
     (stipulation - 2/15/17)

297  Data Compilation of C&R Pharmacy Daily           5895
     Audit Logs as of 8/6/14 & Transaction
     Signature Logs 7/31/14 - 8/6/14
     (stipulation - 2/15/17)

298  Data Compilation of C&R Pharmacy Daily           5895
     Audit Logs as of 8/15/14 & Transaction
     Signature Logs 7/31/14 - 8/15/14
     (stipulation - 2/15/17)

| | 299 | Data Compilation of C&R Pharmacy Daily Audit Logs as of 8/25/14 & Transaction Signature Logs 8/11/14 – 8/25/14 (stipulation – 2/15/17) | 5895 |
|---|---|---|---|
| | 300 | Prior Authorization Request Form 5/6/13 & Insys – Reimbursement Assistance/Prior Authorization Request 5/2/13 for Joyce Barber (stipulation 2/15/17) | 5895 |

COURT'S

| 4 | Defendant John Patrick Couch's proffer of evidence concerning government witness Tamara Dabney | 6076 |
|---|---|---|
| 5 | Defendant John Patrick Couch's proffer of evidence concerning government witness Debi Phillips | 6076 |
| 6 | Defendant John Patrick Couch's proffer of evidence concerning government witness Michael Tiller | 6076 |
| 7 | CD – UC visit on 2/25/15 to Dr. Ruan at Springhill office files 5, 6, 7 & 8, Ruan Exhibit 201 | 6076 |
| 8 | CD – UC visit on 2/25/15 to Dr. Ruan at Springhill office files 1, 2, 3, & 4, Ruan Exhibit 204 | 6076 |
| 9 | CD – UC in PPSA on 3/12/15 w/ Dr. Ruan files 1-3, Ruan Exhibit 205 | 6076 |
| 10 | CD – UC in PPSA on 3/12/15 w/ Dr. Ruan files 5-9, Ruan Exhibit 206 | 6076 |

1        (Morning session, 9 a.m., in chambers, jury not present.)

2            MR. BODNAR:  Good morning, Your Honor.

3            THE COURT:  Good morning.

4            MR. SHARMAN:  Good morning, Your Honor.

5            THE COURT:  Good morning.

6            MS. GRIFFIN:  Good morning.

7            MR. KNIZLEY:  Good morning, Judge.

8            THE COURT:  Good morning.

9            MR. SHARMAN:  Good morning, Your Honor.  Dr. Couch is

10   prepared to rest.  By stipulation, we offer Couch Exhibit 295,

11   296, 297, 298, 299, and 300.  If those are due to be admitted,

12   then Dr. Couch rests.  I think technically there's a witness on

13   the stand.  So I don't know if technically one has to rest

14   after the witness is off.  But either we rest or we'll be

15   deemed to have rested when the witness --

16            THE COURT:  I'll have you announce it in open court at

17   an appropriate time.  Can you identify for the record what

18   those exhibits are?

19            MR. SHARMAN:  Yes, ma'am.  Exhibits 295 through 299

20   are data compilations seized in the raid reflecting C&R

21   Pharmacy daily audit logs for February, April, and August,

22   twice -- three times -- in 2014.

23            THE COURT:  What do you mean three times?

24            MR. SHARMAN:  Three separate dates.  I'm sorry.

25            THE COURT:  Okay.

5895

1          MR. SHARMAN:  And then --

2          MR. BODNAR:  Sorry.  I just want to put one point

3    about those on.  We discussed those.  We have no issue with

4    those coming in.  The entirety of the C&R audit logs are

5    already in evidence, but it's about 4,500 pages.  So we have no

6    issue with it just being broken out in smaller parts so it can

7    be identified for certain things he may need to do during

8    closing.

9          THE COURT:  Yeah.  Okay.  I was going to say, you

10   know, at some point you need to draw attention to the jury what

11   these exhibits are --

12         MR. SHARMAN:  Yes, ma'am.

13         THE COURT:  -- instead of just throwing them out

14   there.

15         MR. SHARMAN:  Yes, ma'am, I understand.

16      (Defendant Couch Exhibits 295, 296, 297, 298, and 299 were

17   entered into evidence.)

18         MR. SHARMAN:  And then Couch Exhibit 300 is a three-

19   page document that is a PA, prior authorization, regarding

20   patient Joyce Barber, who Your Honor may remember testified.

21         MR. BODNAR:  No objection to that, Your Honor.

22      (Defendant Couch Exhibit 300 was entered into evidence.)

23         THE COURT:  All right.  Y'all ready to go?

24         MR. KNIZLEY:  Yes, ma'am.

25         MR. SHARMAN:  Yes, ma'am.

```
 1              THE COURT:  How much longer are you going to be with
 2    Dr. Ruan?
 3              MR. KNIZLEY:  20, maybe 30, but probably 20 minutes.
 4              THE COURT:  Okay.  Call the jury.
 5              MR. SHARMAN:  Thank you, Your Honor.
 6         (A recess was taken at approximately 9:02 a.m.)
 7         (In open court, defendants and jury present.)
 8              THE COURT:  Good morning, ladies and gentlemen.
 9              All right, Mr. Knizley, you may continue.
10                        XIULU RUAN, MD,
11          previously sworn, testified further, as follows:
12                    DIRECT EXAMINATION CONTINUED
13    BY MR. KNIZLEY:
14    Q   Dr. Ruan, yesterday you had saw what's marked as Ruan's
15    Exhibit 187, which purported to be excerpts from three patient
16    files.  Do you recall that?
17    A   Yes, sir.
18    Q   I want to show you the excerpts from Sharon Byrd's file.
19    And do you recall Ms. Sharon Byrd testifying in the courtroom?
20    A   Yes, sir.
21    Q   Do you recall her testimony regarding not seeing you
22    frequently?
23    A   Yes, sir.
24    Q   I want to show you from Ruan's 187, at page five, the
25    progress note dated 3/16/11.  Do you see that?
```

XIULU RUAN, MD - DIRECT BY MR. KNIZLEY

1   A   Yes, sir.

2   Q   Whose handwriting is this?

3   A   Mine.

4   Q   Whose signature is this?

5   A   Mine.

6   Q   What, if anything, does that indicate to you about your

7   files?

8   A   That means I was the only provider who saw her that day.

9   Q   Your handwriting reflects the fact you were there and saw

10  her?

11  A   I was only provider, yes.

12  Q   I'm going to show you what's -- from Ruan's 187, what is

13  marked page six from the same file, which purports to be a

14  progress note from 10/24/11.

15  A   That's correct.

16  Q   Do you see the handwriting here?

17  A   Left knee, total knee replacement by Dr. Setzler this week.

18  I wrote it.

19  Q   Whose handwriting is this?

20  A   My handwriting.

21  Q   And what does that indicate to you?

22  A   I was the only provider who saw her.  And she was actually

23  a Medicare patient.  She got her Medicare in 2000.

24  Q   And whose signature is this?

25  A   Mine.

XIULU RUAN, MD - DIRECT BY MR. KNIZLEY

1   Q   I'm going to show you the progress note from the same file

2   of 12/30/11.  Do you recognize the handwriting?

3   A   Yes, I do, sir.

4   Q   Do you recognize the signature?

5   A   Yes.

6   Q   What, if anything, does that indicate to you about who saw

7   the patient?

8   A   I was the one who saw her.  She was on my schedule.

9   Q   Does this indicate whether or not a nurse practitioner saw

10  the patient or not?

11  A   No.  I was the one who saw her that day.  She was on my

12  schedule.

13  Q   From the same Ruan 187 I show you the progress note

14  dated -- for Ms. Byrd again, dated June 28, 2012.  Can you tell

15  me whose handwriting that is?

16  A   That's my handwriting.

17  Q   And whose signature this is?

18  A   Mine.

19  Q   What, if anything, does that indicate to you about the

20  service rendered to Ms. Byrd on that day?

21  A   I was the one who saw her; no nurse practitioners involved.

22  Q   I show you the progress note dated 8/23/12.  Whose

23  handwriting is that?

24  A   Mine.

25  Q   Whose signature is it?

1    A    Mine.

2    Q    What does that indicate to you?

3    A    Same thing.  I was the one who saw her that day; no nurse

4    practitioners involved.

5    Q    Do you recall Ms. Byrd's testimony in connection with the

6    nurse practitioner that she said she saw?

7    A    Yes, sir.

8    Q    And do you recall what nurse practitioners she said she did

9    see and did not see?

10   A    I saw either Matt or Sharon Noland.

11   Q    Did she say she did not see Sharon Noland or do you recall?

12        MS. GRIFFIN:  Your Honor, I object to his commenting

13   on another witness' testimony.

14        THE COURT:  Sustained.

15   BY MR. KNIZLEY:

16   Q    Is it -- we're not designed to comment on the truth or

17   veracity of it, just the fact the statement was made and put it

18   in context for the next question.

19        MS. GRIFFIN:  Your Honor, we still object.  It is

20   commenting on what she did or didn't say.

21        THE COURT:  Well, the jury will remember what she did

22   or did not say, so just ask your questions, if you will.

23   BY MR. KNIZLEY:

24   Q    In connection with whether or not Ms. Byrd saw whatever

25   nurse practitioner she may have seen, I'm going to show you the

5900

```
 1   progress note dated October 31, 2013.  Do you see that?

 2   A   Yes, sir.

 3   Q   Do you see who the patient is?

 4   A   Yes, sir.

 5   Q   And, as I said, is this a progress note?

 6   A   That's right.

 7   Q   And again, a progress note would indicate what?

 8   A   She was in the clinic.  She was seen by Noland, Sharon

 9   Noland and me.

10   Q   I show you the back of this progress note at CR222674.  And

11   is that the electronic signing of that progress note?

12   A   That's correct.

13   Q   And who signed it?

14   A   Sharon Noland and me.

15   Q   It's signed on November 5th?

16   A   Right.

17   Q   And the date of service was 3/31 [sic]?

18   A   That's correct.

19   Q   October 31?

20   A   That's correct, sir.

21   Q   I'm going to show you the progress note for Ms. Byrd,

22   222705.  Is it Ms. Byrd's progress note (indicating)?  Is that

23   Ms. Byrd?

24   A   That's correct.

25   Q   And what date is it?
```

1   A    March 24, 2014.

2   Q    Who is the note signed by?

3   A    Sharon Noland and me.

4   Q    And on what day was it signed?

5   A    March 24, 2014.

6   Q    Is that the same day as the service?

7   A    That's correct.

8   Q    Now, as to what information may have been given to Ms. Byrd

9   regarding the use of fentanyl, I want to show you on the back

10  of this note where it says:  Instructions.  Could you read that

11  for the jury, please?

12  A    Continue present medications.  We discussed Abstral and

13  since she has not used, she may try it.  She still has some

14  Subsys left.  Advised her not to use both.  Discussed risks

15  versus benefits, proper usage, safety, et cetera.  She can pick

16  up postdated prescription for Opana ER when she comes to

17  physical therapy.  Referral made.

18  Q    What is the next thing it says?

19  A    Patient seen in collaboration with Dr. Ruan.

20  Q    Turning your attention to Erick Gist's file.  Do you recall

21  Mr. Gist, a patient?

22  A    Yes, sir.

23  Q    And in connection with his testimony, I want to direct your

24  attention to the office visit for Mr. Gist of January 7, 2011.

25  Do you see that?

1  A   Yes, sir.

2  Q   And in connection with whether or not who saw Mr. Gist as a

3  physician or as a practitioner, whose handwriting is this right

4  here?  (Indicating.)

5  A   Mine.

6  Q   And whose handwriting is this right here?  (Indicating.)

7  A   My handwriting.

8  Q   Whose signature?

9  A   Mine.

10  Q   What is that indicative of to you?

11  A   I was the only one who saw him that day.  This was many

12  years after he was with me already.

13  Q   This was on January 7, 2011?

14  A   That's correct.

15  Q   Had he been a patient for quite some time?

16  A   Quite a few years.  Three or four years.

17  Q   Let me show you what is CR843.  It's another -- the next

18  progress note.  That's going to be three days later; is that

19  correct?

20  A   That's correct.

21       MS. GRIFFIN:  Your Honor, I object.  It appears to be

22  2010, outside the date.

23       THE COURT:  Overruled.  Overruled.

24  BY MR. KNIZLEY:

25  Q   This is January; is that correct?

 1   A   That's correct.

 2   Q   And that does look like a 10 right there; is that right?

 3   A   They made a mistake, that's right.  Because this one, it

 4   says --

 5   Q   What does that say right down there?

 6   A   January 14, 2011.

 7   Q   By your signature?

 8   A   My signature.

 9   Q   You saw him on January 7, 2011, according to the previous

10   progress note?  (Indicating.)

11   A   That's correct.

12   Q   This is the previous one?  (Indicating.)  Seven days

13   later --

14   A   That's --

15   Q   -- which is 2011.  Whose handwriting is that?

16   A   Mine.

17   Q   Whose handwriting is that?

18   A   My handwriting.

19   Q   And whose signature is that?

20   A   Mine.

21   Q   What is that indicative of to you?

22   A   I was the clinician who saw him the other day -- that day.

23   Q   I show you the progress note three months later.  What's

24   the date?

25   A   April 4, 2011.

1    Q    Who's the patient?

2    A    Erick Gist.

3    Q    Whose handwriting?

4    A    Mine.

5    Q    Whose handwriting?

6    A    Mine.

7    Q    Whose signature?

8    A    My signature.

9    Q    What is that indicative of?

10   A    I was the only one who saw him that date.

11   Q    This is another progress note from whom?

12   A    Erick Gist.

13   Q    What date?

14   A    August 19, 2011.

15   Q    Whose handwriting appears here?

16   A    Mine.

17   Q    Whose handwriting appears here?

18   A    Mine.

19   Q    Whose signature appears here?

20   A    My signature.

21   Q    Again, what is that indicative of?

22   A    I was the only clinician who saw him that day.

23   Q    The next month; is that correct?

24   A    September 27, 2011; that's correct.

25   Q    Same patient?

5905

XIULU RUAN, MD - DIRECT BY MR. KNIZLEY

1   A   That's correct.

2   Q   Same handwriting?

3   A   That's correct.

4   Q   Same signature?

5   A   That's correct.

6   Q   The next month -- excuse me.  Is this the next month?

7   A   November 29.

8   Q   Two months later?

9   A   That's correct.

10  Q   Patient?

11  A   Erick Gist.

12  Q   Handwriting?

13  A   Mine.

14  Q   Handwriting?

15  A   Mine.

16  Q   Signature?

17  A   Mine.

18  Q   January of the next year, whose handwriting?

19  A   Mine.

20  Q   Signature?

21  A   Mine too.

22  Q   February of 2012; handwriting?

23  A   Mine.

24  Q   Handwriting?

25  A   Mine.

1   Q   (Indicating.)

2   A   Mine too.

3   Q   May of the next year.  Doctor, that's your handwriting, is

4   it not, and signature?

5   A   Yes; correct.

6   Q   July of the next year?

7   A   Yeah; that's correct.

8   Q   Handwriting and signature?

9   A   Yeah.

10  Q   And again, your handwriting appearing in that is indicative

11  of who sees that patient?

12  A   I was the only one who saw him at those visits.  No nurse

13  practitioners were involved.

14  Q   You heard -- do you recall Mr. Gist's testimony in

15  connection with what medications may or may not have helped

16  him?

17  A   Right.

18  Q   I'm going to show you the note from May 30, 2013, on

19  Mr. Gist.  What does the note say in connection with his

20  medications?

21  A   Medication helpful.  Patient states taking medication as

22  directed.

23  Q   What's that say?

24  A   No side-effects; no problem.

25  Q   What type medication was he taking?

1   A   Fentora.

2   Q   And what was he continued upon?

3   A   This visit, we lowered his Fentora to twice a day from

4   initially three to four times a day.  This actually -- we

5   lowered next visit; he came back with a lot of complaint, could

6   not get out of bed.  I remember that.  This is the one --

7   basically we did a drug query.  He filled a few Lortab.  Drug

8   query is basically a PDMP; filled Lortab 20 tablets three days

9   ago.  So we confront him with this finding.  We lower his

10   Fentora because of this, and he came back with a lot of

11   complaint the next visit.

12   Q   When you ran the drug query and he filled the Lortab, did

13   you do anything in connection with cautioning him about such

14   conduct?

15   A   We did.  That's when we warned him about the opioid

16   agreement that he signed before.  And he came back -- actually

17   came back next visit, explained that too.

18   Q   Who signed this?

19   A   My signature.

20   Q   That was May 30.  And did he come back in two weeks later

21   on June 12th?

22   A   That's correct.

23   Q   And that's Gist again?

24   A   Right.  He -- right here --

25   Q   Still on Fentora?

1    A    That's correct.  Here he said he had tough time reading the

2    opioid agreement, he remembered that.  So he was very -- he

3    misunderstood the agreement.  This was signed many years ago,

4    initial opioid agreement.  And this one -- like I said, this is

5    what he said:  Severe pain, cannot get out of bed.  Cannot

6    function.  That's when we lower his Fentora to twice a day from

7    the initial frequency.  That's when we went back to three a

8    day; give 84 instead of the 56.

9    Q    You'll have to explain that again.  And you say you lowered

10   it and you said something about 56.

11   A    In the previous visits he -- the PDMP showed that he filled

12   20 Lortabs so we -- because of those, we warn him, we lowered

13   the Fentora frequency to twice a day.  He came back this time

14   saying that that lowering of his Fentora caused him to have a

15   lot of pain.  That's what he says:  Severe pain, cannot get out

16   of bed, in response to the lowering of his Fentora.  And on his

17   testimony he said he never -- Fentora never helped him.

18   Q    Doctor, I -- I apologize for interrupting you.  Sometimes I

19   don't hear well, but I did not understand the last sentence you

20   said.

21   A    Okay.  In his testimony he said Fentora never helped him.

22         MS. GRIFFIN:  Objection, Your Honor, to him commenting

23   on the patient's testimony.

24         THE COURT:  Sustained.

25         MR. KNIZLEY:  Ms. Griffin, I don't mean -- you said

 1    the patient's testimony; commenting on the --

 2            THE COURT:  Yes.

 3            MS. GRIFFIN:  I understood he was commenting on Erick

 4    Gist's trial testimony, and that's the objection.

 5    BY MR. KNIZLEY:

 6    Q    Please don't talk about what somebody said in court.

 7    A    Okay.  I'm sorry.

 8    Q    Now, as to this file on this date, you've already told us

 9    he said he had severe pain, he can't function, he can't get out

10    of bed.  What did you do in connection with what needed to be

11    done here?

12    A    We went back to the Fentora; took three a day as

13    needed.  That was the frequency he was on, three times a day as

14    needed.  So give him 84 instead of the 56.

15    Q    Now, on the last one -- before that, just before that, you

16    had to do what about the opioid agreement?  What did you do to

17    it?

18    A    We counseled him.  We said:  You remember the opioid

19    agreement.  This is a break.  You cannot fill any other

20    controlled drug from other provider.

21    Q    And just a month later what did you do?

22    A    Reinforced opioid agreement again, basically; remind him,

23    counsel him, we expect to see improvement in that regard.

24    Q    What are you telling this gentleman about his opioid

25    agreement over these visits?

5910

1   A   Opioid agreement is what they sign at the initial visit.

2         MS. GRIFFIN:  Your Honor, I object.  The question is

3   what did he tell Mr. Gist, not for him to explain the opioid

4   agreement.  We would object to his answer as being

5   nonresponsive.

6         THE COURT:  Just answer directly the question.

7   A   We remind him of the opioid agreement he signed previously

8   and warn him to make sure that he needs to be compliant with

9   the practice, with the regulations that we set for him.

10  Q   After the June visit did you see him in September?

11  A   Yes, sir.

12  Q   And in September what was he on?

13  A   Fentora.

14  Q   And what did he say about how the Fentora was helping him?

15  A   Fentora works well.

16  Q   And that he had had some Exalgo, and what did he say about

17  that?

18  A   He said Exalgo causing him to have a rash so we discontinue

19  it.

20  Q   Who signed this?

21  A   My signature and Shanna.

22  Q   What does this mean right here?

23  A   Brought all bottles.

24  Q   Yes, sir.  Was he requested to do that?

25  A   All patient are required, yes.

XIULU RUAN, MD - DIRECT BY MR. KNIZLEY

1   Q   Sir?

2   A   Yes.  He was required to do it.

3   Q   Now, Mr. Gist, do you recall the progress note where he

4   came in on July 15, 2014?

5   A   Yes.

6   Q   And what did he have to say about his medications and what

7   did he have to say about the Fentora he was on?

8   A   Can you move up a little bit?

9   Q   Sure.  I'll get to this last part first.  First, what did

10  he have to say here?

11  A   Patient is pleased with the current PPSA medications.

12  There are no new significant side-effects or excessive

13  drowsiness from medication.

14  Q   And what did he -- what does the progress note say he said

15  regarding how he was doing?  If you could read that for the

16  jury.  Start with:  With medications, please.

17  A   With medications perform activities of daily living, cook,

18  walk outside, take care of his yard, play with his dog,

19  actually feel human.  This was recorded by Matt Bean.  He was

20  the one who finished this note.

21  Q   What does it say without medication?

22  A   He was not able to -- could not get out of bed.

23  Q   Was not able to do what?  (Indicating.)  He was not able to

24  do --

25  A   Patient states would not be able to function; would stay in

1    bed.

2    Q    And this progress note was signed by whom?

3    A    Matt Bean, my nurse practitioner, and me.

4    Q    Now, later on was on May 4th, 2015.  Was there a phone call

5    located in the record that would indicate CR408, to Mr. Gist

6    regarding his pill count?

7    A    That's correct.

8    Q    And could you read that, please?

9    A    Called patient and advised him to come in within -- to come

10   in within 24 hours with his medications.  And I stated if he

11   does not come in, he will be terminated from the

12   practice.  Patient claims he does not have transportation to

13   come in.  Patient was being rude with me because he has no one

14   going -- and wanted to speak with Dr. Ruan, because he has no

15   way to get.  I advised that he would be able to talk with

16   Dr. Ruan on the phone.

17   Q    And this was signed by whom?

18   A    Brenda Arnold.  Arnold is my medical assistant.

19   Q    What were the circumstances surrounding this patient's call

20   regarding the pill count; do you recall?

21   A    This was because the last visit -- previous visit, his

22   urine was negative for hydrocodone.  And this is a situation --

23   we have to wait for a few days before the urine to come

24   back.  Then we give him one month medication, we call him in

25   the middle of it.  That's more than just revolving count pill.

1    In the middle of it when he come in in two weeks, if you do not

2    have medication in their urine and if they're missing

3    medication, we know they're not using medication properly.

4    This is a much more strict than just bring the bottle, we count

5    pill.

6           When I call them, I told my nurse:  Don't leave any

7    messages.  You speak to the person directly so, therefore, once

8    he talk to you, you say you have 24 hours to come in.  If he

9    come in with no medication or without medication in their

10   urine, that means they're using the drug inappropriate.  That

11   give us ground to terminate and we give them no negotiation.

12   We do this in the middle of the two-week pill count.  That's

13   what we do.

14          MS. GRIFFIN:  Your Honor, we object to being

15   nonresponsive.  He's talking about patients in general.  This

16   question was about a specific patient, Mr. Gist.  And we would

17   object to that testimony.

18          THE COURT:  All right.  Overruled.

19   BY MR. KNIZLEY:

20   Q    Go ahead, Doctor.

21   A    So in people -- in patient only like Mr. Gist, we really

22   doubt; not using medication properly.  That's what we do; call

23   the pill count in the middle of it so that -- give him a

24   surprise pill count.  Then based on that information, make

25   final decision.  If they do not show up, it's automatic

5914

 1   discharge.  They'll be discharged from the clinic.

 2   Q   Doctor, I want to direct your attention to Kathleen

 3   Burns.  I show you what's marked as Government's Exhibit

 4   9-11.  Do you recall Ms. Burns?

 5   A   Yes, sir.

 6   Q   Do you recall there being a letter from her insurance

 7   carrier sent to you?

 8   A   I recall that.

 9   Q   Do you recall that?

10   A   Yes.

11   Q   First, let me show you from her file, page 217, a letter

12   dated from your firm -- from your clinic, dated 7/9/14, to

13   Ms. Burns.  And what is it telling Ms. Burns?

14   A   Violation of opioid agreement.

15   Q   And what is the purpose of this letter?

16   A   She was terminated from the practice.

17   Q   On that day?

18   A   On July 9, 2014.

19   Q   Now, after that day, you were no longer treating her?

20   A   She was discharged; that's correct.

21   Q   And then after that termination from her file, did you

22   receive this letter at page 224, a letter dated what date?

23   A   July 18, 2014.

24   Q   The previous letter was 2009?

25   A   That's correct.

XIULU RUAN, MD - DIRECT BY MR. KNIZLEY

1    Q   And reading this letter, what does it purport to be?

2    A   Supposed to be insurance.  One is to confirm.  We

3    previously submitted a request for the TIRF product, is that

4    insurance information.  They want us to confirm that.

5    Q   Is that what it says, this portion right here?

6    (Indicating.)  Is that what -- are you saying it's wanting to

7    confirm that you had prescribed this lady a TIRF product?

8    A   That's correct.

9    Q   All right.  Now, it mentions cancer in here.  Did you

10   indicate -- was it your purpose to indicate to them that she

11   had cancer?

12   A   No.  We requested -- no.  We requested the form.  It was

13   filled before.  We used lumbar diagnosis only on that

14   requisition form.

15   Q   I'm going to show you -- did she, in fact, receive some

16   Subsys back on the date -- do you remember the date of the

17   prescription here that we're speaking of in that letter?

18   (Indicating.)  They were talking about a prescription of this

19   date, 3/4/2013.  Do you remember that?

20   A   Yes, sir.

21   Q   Does it say -- could you read that first sentence, please?

22   A   On March the 4th, 2013, our records indicate that you wrote

23   a prescription for Subsys for Cigna-HealthSpring member

24   Kathleen Burns, date of birth -- and then, yes.

25   Q   I'm going to show you what's been admitted into evidence as

 1   Ruan Exhibit 133.  What is this?

 2   A   This is the notice of denial of Medicare prescription drug

 3   coverage.

 4   Q   And what is the date of it?

 5   A   February 8th, 2013.

 6   Q   So a prescription was written on the 4th and it was denied

 7   ultimately?

 8   A   I guess so.

 9   Q   And on Ruan's Exhibit 134 that's been admitted into

10   evidence, what is this document about, if you know?

11   A   Information -- important information about your appeal

12   rights.

13   Q   Appealing of a denial of the prescription?

14   A   Yes.

15   Q   And did you -- I'm going to show you what's marked as

16   Ruan's Exhibit 130, dated February 6, 2013.  Was this a

17   correspondence from HealthSpring, her insurance carrier, the

18   same one that wrote you the letter a year later, regarding

19   Subsys, regarding Ms. Burns?  Do you see that?

20   A   Yes, sir.

21   Q   And if you could read that to the jury starting right

22   there.  (Indicating.)

23   A   This letter is in response to your request for a

24   nonformulary exception that Dr. Xiulu Ruan filed with us on

25   February 6, 2013.  A formulary exception request is when you

1    ask for a drug that is not on HealthSpring's list of covered

2    drugs (called a formulary), or ask us not to apply a prior

3    authorization or other requirement to a drug on our formulary.

4    Q    Keep going.

5    A    In order to process your request, you need additional

6    information from your physician or other prescriber.

7    Q    Let me stop you there.  When this comes to Ms. Burns, is

8    this part filled out when she gets it from her insurance

9    carrier or is that something done later?

10    A    The -- our PA people in the office receive this form.

11    Q    Okay.

12    A    Fill this information.

13    Q    But your PA people get this and what do your PA people do

14    with that?  Do they make this entry?

15    A    That's correct; based on the chart.  Based on the medical

16    chart.

17    Q    So when this comes addressed to you, but also addressed to

18    Ms. Burns, is that part filled out or not?

19    A    By PA.  I believe it's by PA.

20    Q    When it gets there, is it filled out to you originally,

21    when you get it from the insurance company?

22    A    No.  It was blank.  We have to fill it.

23    Q    Okay.  And this was filled out by your personnel; is that

24    right?

25    A    That's correct.

5918

XIULU RUAN, MD - DIRECT BY MR. KNIZLEY

1  Q   All right.  What is the diagnosis here?  (Indicating.)

2  A   These three codes are lumbar diagnosis.  I don't -- I have

3  to look at the chart to tell you what they are.

4  Q   How do you know it's lumbar diagnosis?

5  A   722 -- no.  I have to look at a chart.  I do not remember

6  the code.

7  Q   I know you don't know the specific code, but is the 700 the

8  lumbar range of codes?

9  A   That's correct.  As far as -- I have to look at the chart.

10  Q   Any of this got anything to do with cancer?

11  A   No; nothing.

12  Q   Are you certain?

13  A   I'm certain.

14  Q   And this is what you send to HealthSpring in order to

15  appeal their denial; is that right?

16  A   That's correct.

17  Q   And what is the other information you give here?

18  A   We give the medication patient have tried previously,

19  Roxicodone, fentanyl patch, Fentora, Subsys, MSR is the MS

20  immediate release, and Namenda.

21  Q   And the purpose of this document is -- was this document,

22  at least the entry of up here -- what's the entry say up here?

23  A   Faxed on February 8, 2013.

24  Q   This is the date of the document, some information was

25  filled, and then it was faxed; is that right?

1    A    That's correct.

2    Q    What is the purpose of doing that?

3    A    Try to get her coverage, coverage for Subsys.

4    Q    This company?  (Indicating.)

5    A    Right.

6    Q    I'm going to show you what's marked as Ruan's 129, which is

7    in evidence.  Is that from the same company?

8    A    That's correct.

9    Q    What is the date?

10   A    March 4th, 2013.

11   Q    Who is it to?

12   A    Kathleen Burns.

13   Q    And what does it say?

14   A    We are pleased to inform you that we are approving your --

15   approving your redetermination request for Subsys 400 microgram

16   spray, sublingual spray, with the quantity of 60 per 30

17   days.  We have approved this medication from February 6, 2013,

18   through February 6, 2014.  This approval is based on clinical

19   information that we received from your prescribing physician.

20   Q    Let me hold you up right there.  Is this the clinical

21   information they received from the prescribing physician?

22   (Indicating.)

23   A    That's correct.

24   Q    And the diagnosis again did not include cancer?

25   A    No.

1  Q   There was no request for this prescription to be given

2  because this lady had cancer; is that right?

3  A   That's correct.

4  Q   And the prescription they were inquiring about was on what

5  date?

6  A   March 4th, 2013.

7  Q   And Ruan's 129, the date is?

8  A   March 4th, 2013.

9  Q   Doctor, why did you come to this country?

10        MS. GRIFFIN:  Objection, Your Honor.  It was asked and

11  answered on the very first part of the testimony.

12        THE COURT:  Sustained.

13  BY MR. KNIZLEY:

14  Q   How long have you been practicing medicine in this country?

15  A   Together about 16 years; 16-17 years.

16  Q   During the time frame that we've talked about regarding the

17  allegations that have been made against you, have you ever

18  prescribed any medication outside the normal course of medical

19  practice?

20  A   Never.

21  Q   Have you ever wrote a prescription that wasn't for the

22  legitimate medical purpose of your patient?

23  A   Never.

24  Q   Have you ever done anything that was motivated -- in your

25  medical practice that was motivated by anything other than

1   caring for your patients?

2   A   Never.

3       MR. KNIZLEY:  That's all.

4       THE COURT:  All right, Ms. Griffin.

5   (A discussion was held off the record between counsel.)

6       THE COURT:  Whenever you're ready, Ms. Griffin.

7                   CROSS EXAMINATION

8   BY MS. GRIFFIN:

9   Q   Now, you have gone over your testimony from yesterday and

10  this morning with Mr. Knizley before you came in here yesterday

11  and today; correct?

12  A   I beg your pardon?

13  Q   You've gone over your testimony, haven't you, with

14  Mr. Knizley before beginning testifying yesterday?

15  A   We discussed about it.

16  Q   And you went over the questions; is that right?

17  A   Some of them.

18  Q   And you also went over what to expect on cross-examination,

19  didn't you, with Mr. Knizley?

20  A   Some of them.

21  Q   And then you wrote things down on some index cards, didn't

22  you?

23  A   I wrote some patient age, years of the same.  Basic

24  information, yes.

25  Q   So the answer to that question is yes, that you did write

 1  things down about the patient's diagnosis, age, what you

 2  treated them for; is that correct?

 3  A   That's correct.

 4  Q   And you took those to the stand with you to testify from,

 5  didn't you?

 6  A   Only used one in.

 7  Q   And you took them to the stand to testify from?  The answer

 8  to that is yes; right?

 9  A   I was trying to use them but they were taken away.

10  Q   You did use one, though, didn't you?  Isn't that how you

11  were caught?

12  A   Only one.  That's correct.

13          MR. KNIZLEY:  Object to the form of the question

14  Judge.

15          THE COURT:  Beg your pardon?

16          MR. KNIZLEY:  I object to the form of the question as

17  saying he was caught.

18          THE COURT:  All right.

19  A   I was told it's allowed.

20          THE COURT:  Overruled.

21  BY MS. GRIFFIN:

22  Q   Dr. Ruan, the answer to the question is that you used an

23  index card that you had pre-prepared when you answered some of

24  Mr. Knizley's questions yesterday, didn't you?

25  A   Only one question about one patient.

1   Q   The answer is yes, you did use a card?

2   A   On that patient.

3   Q   So the answer is yes, you used a card?

4   A   Yes, on that patient.

5   Q   Now, in connection with your work at PPSA, it's very

6   important to you to be accurate, isn't it?

7   A   To be accurate?

8   Q   Accurate in what you do.

9   A   Yes.

10  Q   And it's very important for you to pay attention to detail,

11  isn't it?

12  A   Yes, ma'am.

13  Q   And in connection with this 2014 letter you signed for

14  Cigna insurance, Mr. Knizley had showed you pertaining to

15  Ms. Byrd, the last part of the letter says:  Please confirm by

16  signing below that the member -- talking about Ms. Byrd; right?

17  A   Right.

18  Q   Listed above, received the TIRF medication indicated for

19  the approved diagnosis of management of breakthrough cancer

20  pain; is that correct?

21  A   That's correct.

22  Q   And you signed confirming by signing below, didn't you,

23  sir?

24  A   I did.

25  Q   And you knew she didn't have cancer, isn't that correct?

1    A    That's correct.

2    Q    So this form that you signed is not correct, is it?

3    A    It's not correct.

4    Q    Now, you also paid attention to what drugs came in and out

5    of your business, didn't you?  Both clinics; right?

6    A    Pay attention?  What do you mean by that?

7    Q    You kept detailed records about the drugs you ordered and

8    the drugs that were used, didn't you, the controlled

9    substances?

10   A    I do not keep the record.  I do not.  The pharmacy was

11   managed by McConaghy, dealing with.

12   Q    I'm not talking about the ones coming to the pharmacy.  I'm

13   talking about the ones that came -- the drugs that came in to

14   both of the clinics, you paid attention and followed the rules

15   that those were meticulously accounted for, didn't you, sir?

16   A    The company ordered -- purchased mostly on Dr. Couch's

17   portion of it.  The workers' compensation was managing by IPM,

18   so I signed the purchase order.  I don't check on the stock.  I

19   don't look through them.  And that's not part of my job.  My

20   job is to see patients.

21   Q    But it was important to you that a record was maintained of

22   what drugs came in or ordered under your DEA number and what

23   happened to them, where they went, wasn't it?

24   A    I was -- I signed those purchase orders for IPM.  I rely on

25   them to monitor the usage, to make sure the log, everything's

1   properly documented.  I didn't have to do that myself.

2   Q   Let's back up.  You had a DEA number; is that correct?

3   A   That's correct.

4   Q   Your NPs did not have DEA numbers, did they?

5   A   That's right.

6   Q   You could sign prescriptions for controlled substances only

7   because you had a DEA number; is that correct?

8   A   That's correct.

9   Q   You could order controlled substances only because you had

10  a different DEA number to order controlled substances; is that

11  correct?

12  A   I don't think -- I don't believe so.

13  Q   You ordered controlled substances using your DEA number,

14  didn't you, sir?

15  A   That's true.  But it's the same number, I believe.  It's

16  the same DEA number.

17  Q   Either way, you used your DEA number to order controlled

18  substances for PPSA; is that correct?

19  A   For the workers' compensation dispensing system; that's

20  correct.

21  Q   And also, you ordered some drugs for C&R Pharmacy under

22  your DEA number, didn't you?

23  A   I'm not sure.  I thought C&R Pharmacy had its own DEA

24  number.

25  Q   Did you order drugs that were used in your practice to give

5926

```
 1   injections to patients from, while they were in the clinic,
 2   didn't you?
 3   A   I'm not sure about that.  I'm not sure using Couch's number
 4   or Dr. Chen's number or my number.  I have no way of knowing.
 5   Q    In connection with however controlled substances got to the
 6   Springhill or the Airport location, you knew there were
 7   regulations that required accounting for those controlled
 8   substances; is that correct?
 9   A   There were regulations, I know that.
10   Q   And you knew it was important then to keep up with what
11   happened to Dilaudid and morphine and fentanyl and any other
12   controlled substance that came in either of the clinics; is
13   that right?
14   A   Dr. Couch had been ordering medication five years, six
15   years before I even arrived at PPSA.  There's a system they
16   use.  How to track it, I have no idea.  We followed whatever he
17   established.
18   Q   Okay.  The question is:  You knew it was important to keep
19   up with controlled substances that were ordered and received by
20   PPSA while you were a doctor there; is that correct?
21   A   I use it but I never knew.  That's not part of my
22   job.  That's never part of my job.  Because it was -- already
23   had a system there.  They have a tracking, they have a safe,
24   the lock, so it wasn't my job to watch on those.
25          Dr. Couch also have company pharmacy that order a lot
```

1    of -- some controlled drug in there.  So they're different

2    systems.  My job is to see patient.  I never pay much attention

3    to looking through the log to find out which one need to be

4    ordered.

5    Q    You and Dr. Couch were partners; right?

6    A    That's correct.

7    Q    You both were equally responsible for that clinic; is that

8    correct?

9    A    We have a management team, that's correct.  Partners, we

10   never --

11   Q    Bottom line is the buck stopped with you and Dr. Couch,

12   didn't it?

13   A    I beg your pardon?

14   Q    The buck stopped with you and Dr. Couch as the owners; is

15   that correct?

16   A    We are the owners, that's correct.

17   Q    And the responsibility for the entire clinic was with you

18   and Dr. Couch; is that correct?

19   A    That's correct.

20   Q    And you're telling the jury that you didn't know and your

21   clinic didn't know that every single day 600 to a thousand

22   micrograms or milligrams of Dilaudid was disappearing through

23   your clinic and going in Justin Palmer's veins?

24   A    I had no idea that's happening.

25   Q    Didn't account for 600 to a thousand milligrams of Dilaudid

 1  a day, did you, being missing?

 2  A   I never saw Justin for the past four years.

 3  Q   No.  The question is:  You didn't account for it being

 4  missing, did you?  Your clinic did not?

 5  A   I never watched -- saw the log myself.  It was on their

 6  portion of it, the practice.  It was on Springhill location.

 7  And Dr. Couch has a company pharmacy providing some Dilaudid,

 8  so I have no idea of knowing because I never saw that.

 9  Q   But Dr. Ruan, it's your responsibility to know as a

10  partner, isn't it?

11  A   Partners will practice medicine.  That's what we say, daily

12  management.  But not the log.  That's not part of my job.

13  Q   But you just told us that the buck stopped with you and

14  Dr. Couch; that the two of you were responsible for everything

15  that went on in those two clinics, didn't you?

16  A   With -- whoever Dr. Couch hired is his decision.  So the

17  point is those aspects of practice, I wasn't involved.  I had

18  no idea of knowing it.

19  Q   From what you're telling us, though, is that PPSA wasn't

20  accounting for massive quantities of Dilaudid that were being

21  diverted, isn't it?

22  A   I had no idea that's happening.  I do not even know the

23  combination of the lock because I never use it.  I never have

24  access to that.  I don't even know the lock combination code.

25  Q   There's no suggestion that you're taking it.  The question

1  is PPSA did not account for huge quantities of missing

2  Dilaudid, did they?

3  A   I guess so, yes.

4  Q   Now, Dr. Ruan, you and Dr. Couch also owned C&R Pharmacy;

5  is that correct?

6  A   That's correct.

7  Q   And you and Dr. Couch also had contracts for the workers'

8  comp dispensary; is that correct?

9  A   Yes, ma'am.

10  Q   You negotiated those contracts with IPM and later with

11  Mr. Manfuso for his company, didn't you?

12  A   I was the one negotiate with him, yeah.

13  Q   And you negotiated for yourself to receive more money per

14  month than Dr. Couch was going to receive; is that correct?

15  A   That's not true.

16  Q   You were receiving $75,000 a month and Dr. Couch was

17  receiving around $20,000 a month?  Isn't it correct, sir, that

18  you negotiated those amounts and you did not want Dr. Couch to

19  know you were receiving more?

20  A   The compensation with IPM based on the W9 form of Linear

21  Solutions in 2010, that's based on those.  By introducing C2

22  drugs into the formulary, those 10 percent increase, Manfuso

23  already included those.  That's based on the medication being

24  dispensed, that number not from -- nowhere.  Based on the W9

25  form which was faxed to Manfuso before this whole thing

 1    started.

 2    Q    Dr. Ruan --

 3    A    Yeah.

 4    Q    -- in 2014 and '15 you were receiving more money per month

 5    from Manfuso's company than Dr. Couch was receiving, weren't

 6    you?

 7    A    That's true.

 8    Q    You had negotiated yourself a guaranteed amount in return

 9    for staying with Manfuso, didn't you?

10    A    No, that's not true.

11    Q    Have you seen the contract and the emails about the

12    contract?  Have you, sir?

13    A    I saw the contract.

14    Q    And have you seen the information where you described not

15    to let Dr. Couch know that you were receiving more money than

16    he received?

17    A    I remember the email.

18    Q    You also had your checks from IPM and CRM with Manfuso sent

19    to your residence rather than to PPSA; is that correct?

20    A    That's correct.

21    Q    And you had those checks made payable to XLR Properties,

22    didn't you, sir?

23    A    I use it for tax purposes; yes, I did, one time.

24    Q    The question is:  Did you have them made payable to XLR

25    Properties rather than PPSA?

 1   A   It's never paid to PPSA.  It was never paid to PPSA.  We

 2   were told any account is --

 3   Q   Sir, that's not the question.  Were they sent to your home

 4   and were they made payable to XLR Properties; is that correct?

 5   A   That's correct.

 6   Q   And XLR Properties was one of your other LLCs; is that

 7   correct?

 8   A   That's correct.

 9   Q   And you didn't put that money that was earned because of

10   PPSA into the PPSA account, did you, sir?

11   A   It's -- the company, we specified.  We were told that's any

12   choice, any company.

13   Q   No, that's not the question, not what you were told.  You

14   did not deposit the monthly payments, 30, 40, 50, 70, 80,000 a

15   month, from the dispensary in PPSA in PPSA's account, did you?

16   A   I did not.

17   Q   Now, I'll show you what's introduced as Government's

18   Exhibit 28-21.  In fact, you had asked for some information

19   about what Dr. Couch was making; is that correct, from

20   Mr. Manfuso?

21   A   That's correct.

22   Q   And you shared that amount of money with Dr. Couch as to

23   what he was doing number-wise, didn't you, sir?

24   A   That's -- that's what it is.

25   Q   Okay.  So this shows from Christopher Manfuso to Xiulu

5932

1    Ruan, July of '11, and you're saying:  Dr. Couch is very

2    pleased with the numbers.  Aren't you, sir?

3    A    That's what he emailed me.

4    Q    Is this --

5    A    This is not from me.  This is from Manfuso.

6    Q    Is Mr. Manfuso saying Dr. Couch is very pleased?

7    A    That's correct.

8    Q    With his numbers; is that right?

9    A    Where does it say?

10   Q    (Indicating) down at the bottom, does it say:  Dr. Couch,

11   please see attached your financial statement.  From Manfuso.

12   A    Yes, I see that.

13   Q    Does it say:  Please see attached your financial statement?

14   A    I never opened it.  I didn't even know.

15   Q    You didn't open it?

16   A    I don't -- I didn't open it.  I really don't care.

17   Q    Well, you responded to it, though, didn't you?  So you did

18   open it, didn't you?

19   A    No, I did not open the attachment.

20   Q    You did open the email, sir, didn't you?

21   A    I did open the email, not the attachment.  You see the

22   attachment?  I don't even care about that.

23   Q    You weren't asked about the attachment, were you?

24   A    Well, you were saying the number.  There's no number in the

25   email.

XIULU BIAN, MD - CROSS BY MS. GRIFFIN

1   Q   It says:  Please see attached your financial statement.

2   And it's addressed to Dr. Couch; is that correct?

3   A   That's correct.

4   Q   And then you see from Dr. Couch to Manfuso, whether you

5   read it or not, it says:  Good.  That he's pleased; right?

6   Dr. Couch is?

7   A   That's -- looks like what it is.

8   Q   And then Manfuso sends you, because you were the one he had

9   been dealing with, saying that Dr. Couch is pleased, doesn't

10  he?

11  A   That's right.

12  Q   And you respond, don't you?

13  A   I did.

14  Q   Thanks.  Don't share mine with him.

15          Is that correct?

16  A   That's correct.

17  Q   You did not want Dr. Couch knowing that you had negotiated

18  for more guaranteed money per month than you had negotiated for

19  him?

20  A   That's not right.

21  Q   You did not negotiate for y'all to receive the same amount,

22  did you?

23  A   It was based on the previous W9 from Linear Solution.  And

24  there's a delay of 90 days to get the contract started.  For us

25  to stop receiving the money from Linear Solutions for the

 1   dispensed drug, we have to start somewhere.  And we have to

 2   start -- there's a 90-day delay.  That was all there is.  They

 3   knew how much they should be expecting.  They knew the fee

 4   schedule; the workers' comp, the same thing all across the

 5   board.

 6          As a matter of fact, once I switched with them, Linear

 7   came back wanted us back too.  We switched based on the fact

 8   they could stock C2 drug in the clinic so it would benefit

 9   patients.  That's the main reason we switched.  Nothing more

10   than that.  Because they were able to schedule C2, we could

11   dispense C2 drug rather than people waiting in the house for

12   medication for -- to arrive.

13   Q   And Dr. Ruan, you negotiated the contract about the

14   guaranteed payment for yourself and Dr. Couch, didn't you?

15   A   That's not true.

16   Q   I show you Government's Exhibit 28-15, and ask first if

17   this is from Christopher Manfuso in November of 2013 to Xiulu

18   Ruan.

19   A   I see that.

20   Q   Is that what that says?

21   A   That's -- that's true.

22   Q   And down at the bottom it says:  Dr. Couch had 18,000

23   guarantee initially and then 15,000 guarantee.  Is that what it

24   says?

25   A   That's what it says.

5935

1    Q    And then does it say that Manfuso's going to be in contact

2    with you when he starts his company, CRX; is that correct?

3    That's to you from Mr. Manfuso.  Is that what it says; that

4    he'll be getting in touch with you about his company?

5    A    That's right.

6    Q    And it says:  If Dr. Couch is willing to work with me for

7    at least six months, I can guarantee him 17,000 for three

8    months; is that correct?

9    A    That's what it says.

10   Q    And then you say in response from Xiulu Ruan to Chris

11   Manfuso; is that correct?

12   A    That's right.

13   Q    Can you give him monthly guarantee of 20,000 a month; is

14   that correct?

15   A    That's correct.

16   Q    And you're talking about giving him -- it's talking about

17   Dr. Couch, isn't it?

18   A    That's correct.

19   Q    So you're negotiating, aren't you, for Dr. Couch to receive

20   a monthly guarantee; is that correct?

21   A    That's correct.

22   Q    And you also negotiated for yourself to receive a monthly

23   guarantee, didn't you, sir?

24   A    That's what to start with.  We have a formula to calculate.

25   That's what we're looking for.

5936

 1  Q   But the answer to the question is yes, you did negotiate

 2  for yourself to receive a monthly amount, didn't you?

 3  A   The letter, how I understand, guarantee.  It's a starting

 4  point for getting initiated.

 5  Q   But the question is:  You did negotiate for yourself to

 6  receive a monthly amount, whether it was for one month or 30

 7  months, didn't you, sir?

 8  A   I negotiated with him on this part, transitioning with the

 9  whole thing from the previous IPM to this company.

10  Q   For you to receive a guaranteed monthly payment; correct?

11  A   That's for start.  We had to start somewhere.  It's a way

12  of saying it.

13  Q   Well, you've told us that three times, but you haven't

14  answered the question.  The question is:  Did you negotiate for

15  yourself to receive a guaranteed monthly payment?  You did,

16  didn't you?

17  A   That's what this contract says.  I think we did.

18  Q   And you signed the contract, didn't you?

19  A   The second one, I'm not sure we signed the contract.

20  Q   Okay.  You entered into the contract; is that correct?

21  A   That was -- that was the thought, yes.

22  Q   And it guarantees you no matter how many workers' comp

23  scripts you wrote, that you were going to receive a monthly

24  guaranteed payment; is that correct?

25  A   That's to start with for the first three months, is that we

1  have a number to set and then the rest can go on the formula.

2  It was because of the delay, that's how it was done.

3  Q    And you were very concerned, weren't you, Government's

4  Exhibit 28-22, that the check be sent to your home address, not

5  your company.  Is that your email to Mr. Manfuso, July of 2011?

6  A    That was my email.

7  Q    Is that correct?  Make sure the check be sent to my home

8  address, not the company.

9  A    That's correct.

10  Q    And you were concerned that you put 16 to 18 exclamation

11  points, that somebody opened it at PPSA and saw it?

12  A    That's correct.

13  Q    And you were also concerned that somebody would see that

14  you were getting more out of the contract per month than

15  Dr. Ruan was getting; is that correct?

16  A    I'm Dr. Ruan.

17  Q    Than Dr. Couch was getting?

18  A    That's correct.

19  Q    You were concerned --

20  A    No.  That was -- I was concerned.  We lost a lot of mail in

21  the clinic, a bunch of emails back and forth.  Because when

22  there's so many email arrive at PPSA -- so many mails arriving

23  at PPSA, it was very -- there was no set daily person to open

24  the mail.  So because of that concern I wanted them to send it

25  to my home.

1  Q  Well, you didn't have Blue Cross/Blue Shield or Aetna or

2  any of the other insurance companies send money to your home,

3  did you?

4  A  No, we don't.

5  Q  Only these that were your guaranteed monthly amounts did

6  not go into the PPSA account; is that correct?

7  A  Because the contract was signed with a different company,

8  yeah.  It's not PPSA.  Dr. Couch signed his with a different

9  company too.

10  Q  And did XLR Properties do any work for that money?  They

11  didn't, did they?

12  A  They did not.

13  Q  And --

14  A  I was the one -- I'm sorry.

15  Q  And the other companies didn't do any work for that money

16  either, did they?

17  A  But I was the provider.  I was the one -- it was my

18  company.

19  Q  You did that work as a partner with PPSA, didn't you, sir?

20  A  Yes.

21  Q  I show you Government's Exhibit 28-25, and ask if this is

22  an email from you to Chris Manfuso in October of '13; is that

23  correct?

24  A  That's correct.

25  Q  And it says:  Can you change the upcoming check to XLR

1   Properties, LLC instead of Ruan Companies XLC; is that correct?

2   A   That's correct.

3   Q   You are XL Properties and you are Ruan Companies; is that

4   correct?

5   A   That's correct.

6   Q   And this check that's coming guaranteed every month is not

7   going to PPSA, is it?

8   A   It was never contracted to go to PPSA.  It was contracted

9   to my own company.

10  Q   But it wasn't going to PPSA, was it?

11  A   No, it was not.

12  Q   And the office visits for the patients that were receiving

13  these workers' comp medications were billed to PPSA from PPSA;

14  is that correct?

15  A   Office visit and procedures were billed to the workers'

16  compensation company by PPSA directly.

17  Q   So that was -- these checks are as a result of the

18  prescription drugs issued for the treatments, or for the

19  visits, aren't they?

20  A   It was -- it was medications dispensed.

21  Q   And it wasn't money XLR Properties was earning or Ruan

22  Companies was earning, was it, sir?

23  A   They were my company.  I designated the money sent to my

24  company.  But those money -- we all pay taxes, so all the money

25  received from anywhere that pays for tax.

1  Q   These moneys did not go into PPSA, did they, sir?

2  A   No.

3  Q   And they were for prescriptions for drugs, for workers'

4  comp patients, those patients who were treated at PPSA; is that

5  correct?

6  A   For the medications.

7  Q   That's correct, though.  They were for things that were

8  prescribed at PPSA; is that right?

9  A   For their medications.

10 Q   You didn't prescribe drugs under XLR Properties, did you?

11 A   No, I did not.

12 Q   You didn't prescribe drugs under Ruan Companies, did you?

13 A   No, I did not.

14 Q   Now, Dr. Ruan, in connection with some of your patients,

15 you've told us that you signed every single script that the

16 patients under your care received; is that correct?

17 A   That's correct.

18 Q   So that means that you signed all of KL's......

19 prescriptions; is that correct?

20 A   There were ones -- there were times when other physicians

21 maybe seen -- if I was the physician, it was -- she came to see

22 me or my nurse practitioner, I signed prescription.  There is

23 times, for example, where patient is waiting, other physician

24 on board -- for example, if she was there, I was in a

25 procedure, lengthy procedure, scrubbed in and cannot get out,

1  then it's easy for other nurse or another physician to write a

2  prescription.  Patient can't wait for too long.

3  Q   So you're telling us that you didn't sign every

4  prescription for each of your patients, is that what you're

5  saying?

6  A   Well, I'm not -- I'm not sure.  Those are situations in

7  order to facilitate the clinic, so not for billing purpose but

8  we just -- to facilitate care.  So that's what I'm getting

9  at.  So you mean general.  In -- in general, mostly I

10  signed every prescription.  I make all decisions of the need.

11  I'm either agreeing with the plan, change the plan, for every

12  patient who come and see me.

13  Q   Well, you couldn't be seeing a patient who was there for an

14  office visit if you were in the middle of a procedure, could

15  you?  That's not possible, is it?

16  A   It's possible.  When I finish a procedure, I came

17  out.  Based on -- it really depends on how long the procedure

18  was.

19  Q   But you're not telling us while you were conducting a

20  procedure, that you could also be seeing a patient in a patient

21  room, are you, sir?

22  A   My schedule with the procedure spersed -- interspersed with

23  the office visits all the time, daily basis.  Procedures --

24  none procedure doesn't take a whole day.  Take five minutes of

25  procedure.  Some lengthy ones take a little longer.  It really

1    depends.

2    Q   Dr. Ruan, when you're in the middle of a procedure, you've

3    got a patient on the table, you're all suited up, you don't

4    leave the middle of the procedure, do you, sir?

5    A   To come out and see a patient; that's correct.

6    Q   To go see a patient in a waiting room, do you?

7    A   That's correct.

8    Q   And you've told us earlier that you signed all your own

9    prescriptions; is that correct?

10   A   That's correct.

11   Q   And you've just told us that you can't be sure of that,

12   because when you're in a procedure or something else is going

13   on, that somebody else may have signed them; is that correct?

14   A   That's correct.

15   Q   So as to the KL...... prescriptions, if it purports to have

16   your name on each of them, did you sign those?

17   A   I have to see them.  I have to see the -- we're talking

18   about K....... being a patient of mine eight, nine years.  I've

19   been practicing 12 years so you can never remember

20   exactly.  But the principle, the way I practice medicine,

21   that's what it is.

22   Q   Sir, that's not what you're asked.  If they purport to have

23   your name, you would be the one who had signed them, wouldn't

24   you?

25   A   I would, yes.  You have to look at the -- I would have to

1  look at the context.  I can't remember anything you say.  You
2  have to show that on the screen, I'll take a look at it, to
3  find out the context of it.
4  Q  As to John Bosarge, he was a patient of yours; is that
5  correct?
6  A  Referred to me by surgeon general of the United States;
7  that's correct.
8  Q  And in connection with Mr. Bosarge, as to every script he
9  received for a controlled substance, that purports to have your
10  signature on it, those would be a prescription you signed; is
11  that correct?
12  A  I have to see the prescription.  I can't recall.
13  Q  Are you suggesting that someone was signing your names on
14  prescriptions?
15  A  It's likely.
16  Q  It's likely that someone was signing your name to
17  prescriptions?
18  A  I don't know.  I have to see that.  There was somebody
19  stole a prescription pad from PPSA, that's the reason I changed
20  the way I sign the prescription.  They changed the whole pad.
21  Pharmacy called us.  That's before mine is more of an X.  Now I
22  changed it to Ruan, Chinese name Ruan because of this.  That
23  happened without our control.  One of patients stole my
24  prescription, this happened.
25  Q  I show you what's marked as Government's Exhibit 13-2A,

1  prescriptions for John Bosarge.  Can you see at the top where

2  Xiulu Ruan is circled?

3  A   Yes.

4  Q   Do you see it's for Percocet, November the 10th of 2012?

5  A   Yeah.

6  Q   For 105 tablets?

7  A   I see that.

8  Q   And that's your signature, isn't it, sir?

9  A   That's correct.

10  Q   I show you down at the bottom, the same date for

11  Mr. Bosarge for MS Contin and for Klonopin, two separate

12  scripts.  That's your signature, isn't it, sir?

13  A   That's correct.  That's the way I signed later on.  It

14  wasn't before.

15  Q   You signed these prescriptions for Mr. Bosarge; is that

16  right?

17  A   That's correct.

18  Q   I show you Government's Exhibit 13-3A.  You also signed

19  these prescriptions for Deborah Walker, didn't you, sir?

20  A   That's correct.

21  Q   That is your signature?

22  A   Yes.

23  Q   This is your signature where you signed product selection

24  and dispense as written; is that correct?

25  A   That's correct.

XIULU BIAN, MD - CROSS BY MS. GRIFFIN

1  Q   And those are for Opana for Deborah Walker, and the Soma is

2  in October of '14 and the Opana is in November of '14; is that

3  correct?

4  A   That's correct.  This is a computer prescription.  You can

5  see it was computerized.

6  Q   That's not what you were asked, is it?  You were asked were

7  these your signatures?

8  A   This is my signature.

9  Q   All three of these are your signatures, aren't they?

10  A   That's correct.

11  Q   And at the bottom of the page, for Deborah Walker, also

12  October of '14, you've signed again for Opana, product

13  selection permitted.  That's your signature?

14  A   That's correct.

15  Q   Dispense as written.  That's your signature, isn't it?

16  A   That's correct.

17  Q   And these other two for the Opana are your signature as

18  well; is that correct?

19  A   That's correct.

20  Q   And you see that both of these are issued on October the

21  2nd of '14; is that correct?

22  A   That's correct.

23  Q   Is that what --

24  A   That's what it says on the computer.

25  Q   Is that what it says?

```
 1   A   That's what it says on the computer but it's not the truth.
 2   It's not the -- this is misleading information.  Do you want me
 3   to explain?  I can explain to you.
 4   Q   Is this the date that these filled prescriptions say?
 5   A   These -- no.
 6   Q   Is that the date that's on the documents?
 7   A   The date has a meaning.  So this is computer printed, has
 8   to do how you fill the prescription on the computer.  When you
 9   have electronic-generated prescription, it's not the same way
10   like other prescription, other written one.  But this is how --
11   when you're using electronic record to generate prescription,
12   that's what you have.  You have a date that you don't know what
13   it means.
14           Supposedly you sign the date on the prescription.  If
15   you don't want that medication to be filled, you put a fill
16   date.  You have two dates.  You have a signed date, you have a
17   fill date.  But this is only one date with the computer.  Once
18   we switched this system, that's the problem we have.  We have
19   one thing in there.  We don't know what's going on with the
20   date.  That, we have addressed with our nurses, to find out the
21   reason -- how to solve this problem, because the format of the
22   electronic prescription.
23   Q   And in connection with prescriptions, the prescription must
24   be signed on the date that it is written; is that correct?
25   A   According to regulation.  But this is typo error from the
```

 1  computer electronic-generated prescription.  That's what

 2  happened.

 3  Q   But you still signed it.  You've just told us you signed

 4  it.  You signed it two times on each one, didn't you, sir?

 5  A   I signed it; that's correct.

 6  Q   And so you either signed it on this day or you signed it

 7  outside the regulations on a different day; is that correct?

 8  A   I'm not sure what day was it signed but effective date --

 9  the effective date could be because of the error; could be the

10  date.  If the patient was there that day, it was on that day,

11  or could be a later day.  But with this electronic

12  prescription, we were implementing in late 2013.  There's no

13  way of knowing.  Everybody doing it differently.  So we have no

14  clue why this mistake.  It was unfortunate mistake of typo but

15  was not what we mean.  It's basically a computer error.

16  Q   Well, you've told us that twice.  But a pharmacist doesn't

17  know this is a computer error, do they?  (Indicating.)  They

18  wouldn't know you had a computer error, would they?

19  A   I'm not sure how pharmacists would interpret.  I think our

20  pharmacist would know because it's a few date --

21  Q   No, sir.  My question is:  The pharmacist would only have

22  this information; is that correct?

23  A   That's correct.  That's correct.

24  Q   And you signed it.  Regardless of whether it was there

25  before or not, you had the opportunity to correct it before you

1    signed it, didn't you?

2    A    We -- we trust all --

3    Q    Did you?

4    A    I signed it, yes.

5    Q    And you also signed the prescriptions for Mr. Gist that

6    you've described, didn't you?

7    A    I did.  He was my patient.

8    Q    And you also signed prescriptions for DG.............; is

9    that correct?

10   A    That's correct.

11   Q    Now, Dr. Ruan, you had a national provider identifier

12   number, didn't you, sir?

13   A    I believe so.

14   Q    That's an NPI; is that correct?

15   A    That's correct.

16   Q    And that's a unique billing number assigned only to you; is

17   that right?

18   A    That's right.

19   Q    That was used for billing at PPSA, for billing under your

20   name, wasn't it?

21   A    It was.

22   Q    And in connection with the billing, you knew that a doctor

23   received more for a visit than a nurse practitioner could

24   receive for a visit, didn't you, sir?

25   A    I didn't -- we didn't have nurse practitioner when I joined

 1   the practice.  And I saw every patient of mine.  Every one of

 2   them.

 3   Q    So before we go on with the NPI, that's why early on in

 4   2011 you were the one seeing Ms. Byrd, Ms. L..., Mr. Gist,

 5   because you didn't have an NP early on in '11 and early '12,

 6   did you, sir?

 7   A    I don't know what you're talking about.

 8   Q    You didn't have an NP assigned to you early on in the

 9   practice, did you, sir?

10   A    The first NP we started with was Janice Bishop; probably

11   2006, 2007.

12   Q    Do you recall telling us that as the business grew you had

13   to get nurse practitioners but that you -- you didn't have

14   three nurse practitioners assigned to you in 2011, did you?

15   A    2011, by the end of it, I have two.  Sharon Noland is a

16   part time.

17   Q    But what you were telling us, there was a time when you saw

18   patients yourself because there wasn't an NP; is that correct?

19   A    No, that was not the case.

20   Q    Well, wait a minute.  Wait a minute.  If you didn't have an

21   NP, how was it that an NP was seeing the patients?  So which is

22   it?

23   A    That was confusion on your part.  The nurse practitioner in

24   my practice started -- once it started it continued from Janet

25   Bishop, Beverly Parker, Peggy Holder, Matt Bean, Sharon Noland

1   is always there.  But when people came to my clinic for follow-
2   up, I have my own follow-up schedule.  That is what I mean.  I
3   do procedure in conjunction with patient follow-up.  That's why
4   Mr. Gist, KL...... -- KL...... saw me 11 times in the year
5   2011.  Later on, once we switched to electronic record, you
6   cannot tell whether I saw them.  Everybody sign.  You cannot
7   even verify.  The reason I show those records because I want to
8   show you I was the only one who saw them.  Mine and the others
9   I saw in conjunction but these ones I saw them myself on my
10  schedule.
11  Q   So that's what you're telling us; is that correct?
12  A   That's correct.
13  Q   And you can't tell us from an electronic record where you
14  signed a few days later, whether you were actually the one that
15  saw the patient or not, can you?
16  A   Well, you cannot -- that's the reason I show you the
17  records on those, actually, without an NP.  I saw patients.
18  Everybody knows.  Everybody knows that's the way I practice
19  medicine.  Every time there's a nerve testing --
20  Q   Wait just a minute.  You identified the notes as being
21  written by somebody else on occasion, didn't you, sir?  You
22  said those weren't your handwriting, didn't you?
23  A   The notes --
24  Q   Isn't that correct, that you identified --
25  A   Let me explain the situation to you.

 1  Q   Sir, if you'll just answer the questions.

 2  A   I need to see the note.

 3       MR. KNIZLEY:  Your Honor, he's trying to answer the

 4  question.

 5  A   I was going to answer the question.

 6       THE COURT:  Dr. Ruan, wait a minute.  She's entitled

 7  to have a direct answer to her question that she asks you.  If

 8  your lawyer wants to clear anything else, he can do that.  So

 9  just answer her questions directly and then your lawyer can

10  come back and ask others.

11       THE WITNESS:  Yes, ma'am, Your Honor.

12       THE COURT:  All right.

13  BY MS. GRIFFIN:

14  Q   On the electronic patient visits, you cannot tell who saw

15  the patient and who didn't, can you?

16  A   You cannot say for sure.  You cannot say.

17  Q   Now, let's go back to the NPI numbers.  You knew that Blue

18  Cross/Blue Shield was never billed for anything but a doctor

19  visit on Blue Cross/Blue Shield patients, didn't you?

20  A   I -- I don't understand what you say.  Can you repeat that,

21  please?

22  Q   You knew that Blue Cross/Blue Shield was billed by PPSA for

23  a doctor visit every time a nurse practitioner saw a PPSA

24  patient, didn't you?

25  A   No, that's not the case.  That's not the case.

1   Q   You were not aware of that, is that what you're telling us?

2   A   I was not aware of that.

3   Q   In connection with your prescribing you saw the patient,

4   Mr. Douthitt; is that right?

5   A   That's correct.

6   Q   And he was referred to you by someone; is that correct?

7   A   That's correct.

8   Q   And there came a time while he was your patient that he

9   lost his insurance, didn't he?

10  A   That's correct.

11  Q   And in connection with your seeing him -- and you said you

12  saw him every time; is that right?

13  A   I saw every patient when there's a need.  My nurse

14  practitioner saw them, I saw them in conjunction.  So those

15  visits you've shown, it was where I was the only one.  Other

16  visits, I saw with the nurses.  And if he lost the insurance, I

17  didn't have to see him but I saw him anyway.

18  Q   And in connection with that you fired him shortly after he

19  lost his insurance, didn't you, sir?

20  A   That wasn't the case.  Because he failed the urine test

21  second time.

22  Q   But you kept Kathleen Burns after she failed drug tests

23  repeatedly, because she still had insurance; isn't that

24  correct?

25  A   That wasn't true.  That wasn't true at all.

 1   Q   She did still have insurance till the very end when they

 2   wouldn't pay for the Subsys; isn't that correct?

 3   A   That's not true.  I fired a lot of people on higher Subsys

 4   dosage.  JL........ is my second patient on highest dosage

 5   ever.  I terminated her because she failed the urine test.  She

 6   had the insurance, never have issue -- the coverage issue.  I

 7   terminated her after 10 years I took care of her, 10-plus

 8   years.

 9   Q   Let's talk about Mr. Douthitt.

10   A   Okay.

11   Q   He was terminated after two failed urinalyses; is that

12   correct?

13   A   That's correct.

14   Q   That showed he wasn't taking anything he was prescribed; is

15   that correct?

16   A   That's correct.

17   Q   And you're telling us you treated him and nobody at your

18   facility noticed that he had track marks from I.V. needles up

19   his arm?

20   A   I wasn't sure that's the true case.  He wasn't having

21   those.  That's the story that's made up.  We never noticed

22   that.

23   Q   So you're contending that he made up track marks on his

24   arm?

25   A   I suppose so.  We didn't notice any of those.  He was -- he

 1   has legitimate pain.

 2   Q   Well, now, you're trained in pain management; right?

 3   A   That's correct.

 4   Q   And you're trained to notice signs of addiction or signs of

 5   abuse, aren't you?

 6   A   That's correct.

 7   Q   And you know that people can have track marks on their

 8   neck, don't you?

 9   A   I never noticed any track mark on the neck.  I never

10   noticed.

11   Q   You know that people who abuse drugs in their veins can

12   have track marks on their neck?

13   A   I never heard of it until today.

14   Q   And you do know that they can have track marks on their

15   arms, don't you?

16   A   That's correct.

17   Q   And the track mark is from where they're injecting the

18   drugs; is that correct?

19   A   That's right.

20   Q   Where the needle goes into the body; right?

21   A   That's correct.

22   Q   And you're telling us you didn't check patients to

23   determine if they had track marks; is that what you're saying?

24   A   I didn't notice.  I didn't notice he has them.  I

25   wouldn't --

1  Q   You didn't look either, did you?

2  A   I trust my nurse practitioner. When we do the evaluation,

3  Sharon Noland was the first one who did the examination.

4  Sharon Noland is very thorough. And this man has true pain

5  diagnosis. You saw the MRI report. He was getting therapy,

6  getting treatment from me. He has legitimate pain. For a 29

7  year old with that kind of finding, he is a true legit patient.

8  Whatever he say afterwards is a different story. He was a pain

9  patient. I treated him for his pain.

10  Q   So the answer to the question is no, you didn't look for

11  the track marks on his arm?

12  A   I didn't observe anything.

13          THE COURT:  All right. Ms. Griffin, let's break --

14  take our morning break at this time.

15          Ladies and gentlemen, leave your pads on your chairs.

16  Take your break downstairs in the jury assembly room. No

17  discussion about the case. We'll call you back in about 15

18  minutes.

19          We're in recess.

20      (A recess was taken at approximately 10:30 a.m.)

21      (In open court, defendants and jury present.)

22          THE COURT:  All right, Ms. Griffin.

23  BY MS. GRIFFIN:

24  Q   Dr. Ruan, you had some testimony about giving speeches for

25  Insys; is that correct?

 1  A    Correct.

 2  Q    And there were prepared slides for you to use by a company

 3  who prepared them for Insys; is that correct?

 4  A    Yes, ma'am.

 5  Q    So you didn't have to prepare those slides, did you?

 6  A    They have to be FDA approved.  That presentation has to be

 7  approved, yes.

 8  Q    And one of the reasons for that is a manufacturer is

 9  prohibited from encouraging anyone to use their drugs

10  off-label; isn't that correct?

11  A    The presentation was FDA approved with the FDA-approved

12  indication.

13  Q    And the manufacturer that you're speaking for is prohibited

14  for recommending drugs off-label; is that correct?

15  A    Yes.

16  Q    In other words, they can't push the off-label use of their

17  drugs; is that correct?

18  A    That's correct.

19  Q    They can only push the use of their drugs that have been

20  approved by the FDA; is that right?

21  A    That's right.

22  Q    But you sometimes at a speaker dinner, after your little

23  speech, you would tell people that you did use them off-label;

24  isn't that correct?

25  A    Only when people have the questions regarding a off-label

1  question.  We can answer --

2  Q   So on the speech where you were paid, the little slides,

3  you would not promote it but in one-on-one conversations you

4  would admit that you did prescribe off-label; is that right?

5  A   Only when questioned.  When they questioned -- if the

6  question is dealing with off-label.  Only when the question

7  that I can answer.  I'll say:  This is off-label.  I have to

8  make statement to tell them what I'm talking about is off-label

9  now.  I make a distinction.

10  Q   So what you're telling us is that you were paid to say what

11  was on the little script and not promote off-label, but if

12  later at the dinner you were asked, you would tell them you use

13  it off-label; is that correct?

14  A   Right.  I'll make a distinction.  I will say it, that's

15  correct.

16  Q   Now, you also told us yesterday that you only prescribed

17  but about -- only about 20 percent of your patients were on

18  opioids; is that correct?

19  A   On the medication, I think roughly 20 percent.  That's

20  correct.

21  Q   I'll show you what's admitted as Government's Exhibit 10-8.

22  There's the exhibit number.  This is opioids in red, this is

23  Dr. Ruan from January 1st of '11 through May 19th of '15.  And

24  in fact, this chart shows that 71 percent of your prescriptions

25  were opioid prescriptions, doesn't it, sir?

1   A   This is from PDMP.  It's all -- you're comparing all from

2   controlled drug.  If a physician only write one prescription,

3   which is morphine, his ratio would be 100 percent.  It's

4   misleading.  You were talking about compared the controlled

5   drug.  We're talking about of all pain medication:  Anti-

6   inflammatory, Neurontin, Lidocaine.  Those medications, I will

7   use combination, so this is misleading.  It doesn't tell you

8   anything.

9   Q   It does tell you what was reported to the PDMP in Alabama,

10  Mississippi, and Florida under you writing a prescription,

11  doesn't it?

12  A   Only -- they only report controlled medication.  They don't

13  record -- report any noncontrolled.  If you ask me percentage

14  of my medications, that would have included everything.  This

15  is -- doesn't tell you anything.

16  Q   There's no reporting required for noncontrolled, is there,

17  sir?

18  A   Yeah.  But you're asking me the percentage of medication.

19  Q   There's no reporting for noncontrolled, is there, sir?

20  A   No.

21  Q   The states are concerned about who's writing controlled

22  substances; isn't that correct?

23  A   That's correct.  These are noncontrolled drugs, the

24  percentage.

25  Q   Of those controlled drugs, 71 percent of yours during the

1   time of the indictment were for opioids, weren't they?

2   A   According to this, yes.

3   Q   And Dr. Ruan, there came a time when you learned that

4   Dr. Awerbuch, who was also a Subsys whale, had been charged

5   with a criminal offense; is that correct?

6           MR. KNIZLEY:   Judge, we would object to the form of

7   the question as also being a whale.

8           THE COURT:   Overruled.

9   A   I learned that, that's correct, before the email was sent

10  to me.

11  BY MS. GRIFFIN:

12  Q   And you knew that you and Dr. Awerbuch were referred to by

13  the people at Insys, as a whale, didn't you, because you were

14  big producers; isn't that right?

15  A   I used the product, I know that, but I'm not sure what the

16  whale is, in this setting.

17  Q   And you knew the word "whale" was not a reference to your

18  size but a reference to -- that you were a big prescriber,

19  didn't you?

20  A   That's what they used.  I never heard of that before,

21  before this trial.

22  Q   Now, in connection with that, you saw that the charges

23  listed two doctors in Alabama; is that right?

24  A   That's correct.

25  Q   And you recognize one of those as being a doctor with your

1  number; is that correct?

2  A   I suspected that, but I do not recognize the number.

3  Q   You suspected that it was talking about you and Dr. Couch,

4  didn't you?

5  A   I suspected that, yes.

6  Q   And in connection with that, once you learned that you

7  began to have your checks from Subsys for speaking go to LSU,

8  to South Alabama, and to somewhere in Wisconsin, didn't you?

9  A   That's correct.

10 Q   And in connection with that, you hoped to use that as a tax

11 deduction, didn't you?

12 A   I had this thought of donating long before this whole thing

13 happened.  I had a lot of email communication, you already

14 showed, with my credit.  I wanted to do donation to the

15 universities before this happened.

16 Q   But you just happened to actually do it?

17 A   When I saw --

18 Q   Excuse me.  Let me finish and then you can have an

19 opportunity to answer.

20 A   I apologize.

21 Q   You happened to do that two or three days after you were

22 aware Awerbuch had been arrested for kickbacks from Subsys; is

23 that correct?

24 A   I saw that email and I look at that because it was a

25 question of the motive of speaking, so I thought:  Why do I

1    need to do this?  So what I'll do is I'll donate everything
2    from Insys to different institutions directly, without even me.
3    However, I realized they will have my name because I did a talk
4    for them, for university, and not to have my name.  There's
5    nothing wrong with it.  And I would have stopped doing this --
6    Q    So the question is:  You did do it a few days later,
7    though; right?  It just happened to be a few days after you
8    learned Dr. Awerbuch was arrested; is that right?
9    A    That's correct.
10   Q    And you got some benefit because you hoped to deduct it or
11   you even asked your accountant about deducting it, didn't you?
12   A    I thought before this.  Before this.
13   Q    And in connection with that you even wanted whatever they
14   did with it to be placed in your name, not in Insys' name; is
15   that correct, at the universities?
16   A    They put it under my name because I did the talk.  That's
17   the reason I was -- nothing to hide.  It was under my name.  I
18   liked that to be under my name so that it's my work, to attend
19   all for my work.
20   Q    You didn't actually, yourself, pay to the universities,
21   though, did you?
22   A    I paid --
23   Q    That was from Insys, wasn't it?
24   A    I paid using other money to LSU, New Orleans, three year in
25   a row, from 2012 to --

1    Q   I'm not talking about what you did earlier.  We're talking
2    about the checks from Insys were not made payable to you after
3    Dr. Awerbuch was arrested; is that correct?
4    A   I sent them directly to universities (nodding head
5    affirmatively).
6    Q   They weren't made payable to you, were they?
7    A   No.  They were not.
8    Q   Now, also I show you Government's Exhibit 33 -- excuse
9    me -- yes, 33-1, office visits billed to Blue Cross/Blue Shield
10   by Dr. Ruan.  Do you see that the red line is the CPT code that
11   ends in a 14?
12   A   Yes, I see that.
13   Q   At the bottom?  Do you see that the blue line is the code
14   that ends in 13?
15   A   That's correct.
16   Q   Did there come a time when your billings went dramatically
17   up for the larger code, 14?
18   A   That's what it shows on this chart.
19   Q   And that's what happened, isn't it, for Blue Cross/Blue
20   Shield?
21   A   I'm not sure how accurate the chart is, to be honest.
22   Q   You're challenging the chart from Blue Cross/Blue Shield,
23   is that what you're telling us?
24   A   I'm not sure how accurate the chart is.
25   Q   But you don't contest that the chart from their numbers

 1   shows it going dramatically up, do you, sir?

 2   A   We see more people.  We used electronic billing.  That

 3   billing code, once you switch to Greenway billing is up.

 4   Basically you calculate the billing -- instead of one note, you

 5   have four patient notes.  So that --

 6   Q   But the question is:  Does the line go dramatically up on

 7   this chart?

 8   A   That's what it shows.

 9   Q   So the answer to that is yes?

10   A   Yes, based on what it is.

11   Q   Then I show you Government's Exhibit 33-5 from the office

12   visits billed to Medicare.  Actually it's 33-7.  My

13   mistake.  And ask if these 33-8 are office visits billed to

14   Medicare by Dr. Ruan; is that what it says?

15   A   That's what it says.

16   Q   And you heard the Medicare representative testify about

17   these, didn't you?

18   A   I beg your pardon?

19   Q   Did you hear the Medicare representative testify about

20   these charts in the trial?

21   A   Yes.

22   Q   You did, didn't you?

23   A   I did.

24   Q   And it shows the 14 code being the red line; is that

25   correct?

5964

1   A   That's right.

2   Q   And it shows a dramatic increase in billing for the longer

3   visits and a dramatic decrease in billing for the shorter

4   visits by you during that time frame; is that correct?

5   A   I am sure it's not real.

6   Q   You're sure that Medicare has --

7   A   Misleading, yes, because Medicare, I -- the billing.

8   Q   Wait.  Wait.  You're sure Medicare's documents that they

9   introduced as their records is not real?  Is that what you're

10  telling us?

11  A   That's what I think.  I do not think that's my billing;

12  doesn't reflect the truth.

13  Q   Now, also, you told us that you had a rebate contract with

14  Galena folks.  You recall that, don't you?

15  A   I was not involved.  I heard about it and I knew about it

16  from the trial.  I wasn't aware of this.  I wasn't in

17  negotiation with them.

18  Q   You were not aware that Galena was entering into a contract

19  to pay C&R Pharmacy a discount based on the quantity of Abstral

20  that was sold from C&R Pharmacy, is that what you're telling

21  us?

22  A   I wasn't -- I wasn't --

23  Q   Is that what you're telling us?

24  A   I wasn't aware.

25  Q   You were not aware?

1   A   That's right.

2   Q   But you certainly took your share of the $97,000 that they

3   paid to C&R Pharmacy, didn't you?

4           MR. KNIZLEY:  Your Honor, I don't believe that's any

5   longer relevant to the issues in this case.

6           MS. GRIFFIN:  Your Honor, it's specifically from

7   account.  In February of '15 C&R received a payment of $97,924

8   from Galena.

9           MR. KNIZLEY:  I believe it's no longer relevant to the

10  case.

11          THE COURT:  Well, come to side bar, if you will.

12          MS. GRIFFIN:  May we approach?

13          THE COURT:  Yes.

14      (At the side bar, jury not present.)

15          MS. GRIFFIN:  Your Honor, it goes to the RICO

16  conspiracy for mail fraud and wire fraud, and it goes to the

17  drug conspiracy, count two, for the controlled substances.  And

18  it is relevant.

19          MR. ARMSTRONG:  Which count were you talking about?

20          MS. GRIFFIN:  One and two.

21          MR. ARMSTRONG:  No.  Which count?  You said that --

22          MS. GRIFFIN:  One, two and three.

23          MR. ARMSTRONG:  I thought this was the dismissed

24  count.

25          MS. GRIFFIN:  That was 18.

1          THE COURT:  18 was dismissed.

2          MR. KNIZLEY:  That's what we're talking about.

3          MR. ARMSTRONG:  That's what she's talking about.

4          MS. GRIFFIN:  I didn't ask a count number.

5          MR. KNIZLEY: I know that.  But the facts you're

6    talking about is 18.

7          MS. GRIFFIN:  It goes to the conspiracy, one, two, and

8    three.

9          MR. ARMSTRONG:  Judge, if you look at count 18, the

10   line of questions she's asking right now track the count 18.

11         MS. GRIFFIN:  Your Honor, I made no reference to a

12   count specifically, and I made the reference to the money that

13   he received, a portion of it, and it goes to the predicate acts

14   and the RICO, and it goes to the drug conspiracy.

15         THE COURT:  Yeah, that portion of the RICO count was

16   not dismissed, nor has the drug conspiracy been dismissed.

17         MR. KNIZLEY:  Judge, as to the RICO count, I don't

18   think that's a predicate act on -- that count, dismissed or not

19   dismissed, was not part of the predicate count as to the RICO.

20         MS. GRIFFIN:  Your Honor, everything in this case is

21   part of the mail and wire and drug count acts alleged in the

22   RICO --

23         THE COURT:  I overrule the objection.

24      (In open court, defendants and jury present.)

25   BY MS. GRIFFIN:

1   Q   You knew that the more Abstral you wrote, the bigger

2   discount C&R Pharmacy made; is that correct?

3   A   I -- it never -- that never come to me as that's what the

4   purpose is.  I used medication only for patient, that's all.

5   Q   Now, in connection with your other interest in Galena, you

6   tried to talk some other people into investing in Galena as

7   well, didn't you?

8   A   Because I believed in the company; that's correct.

9   Q   But you did try to help them invest and you sent an email

10  to a friend of yours, Exhibit 11-5(13) -- 11-5(13).  You sent

11  an email to a friend who was Dr. R..; is that correct?

12  A   That's correct.

13  Q   And you forwarded some emails about Galena; is that right?

14  A   That's correct.

15  Q   And this was about their problems you perceived at Galena;

16  is that correct?

17  A   That's correct.

18  Q   And at the end you told your friend:  We need to give them

19  the impression that if they do not do it, we will switch to

20  other companies and its products.

21          Is that correct?

22  A   That's correct; that's what it says.

23  Q   And you said:  I will express it in an indirect but enough

24  to understand what we will do if they don't do it.

25          Is that correct?

1    A    That's what I wrote.

2    Q    So you were in an indirect way threatening to switch

3    patients from Abstral to something else if the company itself

4    did not do what you wanted; is that correct?

5    A    That's what I said.  Basically -- well, that's what I have

6    in there.  I'm not saying it's threatening but that's what I

7    expressed.

8    Q    Also Dr. Ruan, you previously identified these so we won't

9    go through them long.  But you do have an email, Government's

10   Exhibit 9-1(2) for -- that you're sending to Dr. Couch; is that

11   correct?

12   A    That's correct.

13   Q    And that's July the 8th of '14?

14   A    That's right.

15   Q    Can you see the date?

16   A    Yes.

17   Q    And it talks about:  Alabama is the state with the most

18   opioid Rx written; is that correct?

19   A    That's correct.

20   Q    And you were aware that he had quite a few patients on Roxy

21   30 and OxyContin 80 by your email, weren't you?

22   A    I was aware.

23   Q    And in it you said:  We don't want Roxicodone to mess

24   things up or at least contradict to what we promote.

25             Is that correct?

XIULU BUAN, MD - CROSS BY MS. GRIFFIN

1   A   That's what it says.

2   Q   Is that what you said?

3   A   That's what I said in response to a letter I wrote to

4   Alabama Board of Medicine to the examiner.

5   Q   That's what you said?

6   A   That's what I said.  Yes, ma'am.

7   Q   Okay.  Now, is one of the things you told him is:  Please

8   remind Justin about this stuff.

9   A   That's what it said.

10  Q   Because you knew that Justin was writing Roxy's; correct?

11  A   He was initiating, I thought, not that he was -- he saw the

12  follow-up and he initiated it.  Dr. Couch had to approve.  So

13  if he initiated it, Dr. Couch do not want to turn it down.

14  Q   But you had knowledge that Justin was -- you wanted Justin

15  to cut down the Roxy's; is that correct?

16  A   Initially, yes.  That's my intention; that's right.

17  Q   And Dr. Couch told you back that he reviewed it with Justin

18  and it says:  We do not write triple digits; is that correct?

19  A   Yes, that's what it says.

20  Q   It says "we?"

21  A   Right.

22  Q   Now, you had had Justin for a short time as an NP you had

23  hired; is that right?

24  A   That's correct.

25  Q   And in connection with that, you told us yesterday that he

1   was too aggressive a writer for you, to stay with you.  You

2   meant too aggressive for proposing drugs, didn't you?

3   A   That was the point.  He initiated, I approve it.  If I

4   don't approve, I have to send it back.  That was my feeling.

5   That's why I decided not to use him.  Initially he was hired

6   under both of us.  I decided not to use him.

7   Q   But you didn't bother to tell Dr. Couch, did you, that you

8   thought Justin was too aggressive in writing prescriptions, did

9   you?

10  A   I apologize.  I told Dr. Couch.

11  Q   And in connection with that, you and Dr. Couch were

12  partners; right?

13  A   Yes.

14  Q   And the same with Bridgette.  In connection with Bridgette,

15  you had written a very nice letter to the nursing board on her

16  behalf, hadn't you?

17  A   I did.

18  Q   Government's Exhibit 8-1 was praising Bridgette; is that

19  correct?

20  A   That's correct.  That's early on when she was under me.

21  Q   And in connection with this, this was April of '13, wasn't

22  it?

23  A   That was right.  That's right.

24  Q   So she had been with you at least a year by that time,

25  hadn't she?

1  A   No; a few months.

2  Q   And you were praising everything she had done?

3  A   I was -- tried to help her so as she can save her license.

4  And she had back surgery, found a job working under me, support

5  her family and I thought we should encourage, try to help her.

6  Q   So are you telling us that what you wrote was not true?

7  A   It was true at that time.

8  Q   It was true at that time?

9  A   That's correct.

10  Q   And then there came a time when she wasn't finishing her

11  reports fast enough for you; is that correct?

12  A   Yeah.  She had some delay in her notes and consultation;

13  that's right.

14  Q   And you couldn't bill for those until they were completed,

15  could you?

16  A   I'm not sure how -- I wasn't sure was it because of the

17  billing or because of the inaccuracy in the record.  It showed

18  that she did not do a good job.  She actually had gotten in

19  trouble, the flow of the clinic, because the note is

20  inaccurate.  When you look at the note, it wasn't updated.

21  That was the reason.

22  Q   But you could not bill until the file was completed, could

23  you?  Isn't that correct?

24  A   That's correct.

25  Q   And in connection you also wrote an email, Government's

 1   Exhibit 9-9(3), to Dr. Couch about -- mentioning that you were

 2   to be raided by the FBI; is that correct?

 3   A   That's correct.

 4   Q   And in connection with that you had had a conversation with

 5   Dr. Couch about a fear that y'all were going to be raided; is

 6   that correct?

 7   A   That was what Dr. Couch told me his girlfriend --

 8   Q   No.  Had you had a conversation with Dr. Couch that made

 9   you say:  You mentioned we were supposed to be raided by the

10   FBI.

11   A   That's --

12   Q   Did you have that conversation with Dr. Couch?

13   A   I did.  I did at the dinner.

14   Q   And he told you that; is that correct?

15   A   Yeah, about his girlfriend reporting us.

16   Q   And you wanted to make some kind of agreement with him

17   about if one of you got investigated, what would happen with

18   your joint business; isn't that correct?

19   A   Took care of the rest of the patients.

20   Q   And also, you recall that there was a patient called

21   CC.............. who was coming to PPSA as a patient of

22   Dr. Couch's; is that correct?

23   A   That's correct.

24   Q   And there became a problem with Mr. C..., didn't there?

25   A   True.

1  Q   In fact, he made some allegations about Stacy; is that
2  correct?
3  A   That's correct.
4  Q   And you heard him make those allegations.  You were in the
5  meeting where he made the allegations?
6  A   That's correct.
7  Q   And he told you that he had been receiving some of the
8  prescriptions that Stacy had been writing for him; he had been
9  receiving those and giving some of those pills back to Stacy;
10 is that correct?
11 A   No, that's not true.
12 Q   You're telling us he didn't advise you?
13 A   No, he did not.
14 Q   And you heard him make some other allegations; is that
15 correct?
16 A   That's correct.
17 Q   And he was very upset that day he was talking to you,
18 wasn't he?
19 A   He said Stacy stole his medication.
20 Q   He was upset that day, wasn't he?
21 A   He was.
22 Q   And in connection with that, he wanted to switch to you and
23 be seen by you; is that correct?
24 A   Because he was running out of his medications, he was going
25 into withdrawal.  That's the reason he called me.  I talked to

  1  my lawyer, talked to my management team, talked everyone
  2  together, decided I took over. Couch was -- Dr. Couch was out
  3  of town.
  4  Q   You agreed to treat him, didn't you?
  5  A   I had to. He was a patient of ours, he's going through
  6  withdrawal.
  7  Q   And, in fact, you treated him that same day, didn't you?
  8  A   I treated him three visits. I'm not sure what date you're
  9  referring to.
 10  Q   I show you what's marked as Government's Exhibit 5-3 and
 11  ask if these are your signatures on prescriptions to
 12  CC..............?
 13  A   That's my signature. This is later on. Sorry.
 14          MS. GRIFFIN: Madame clerk, can you clear the screen?
 15  I can't do it from here any longer.
 16          THE COURT: We can't do it. Either you have to do it
 17  or the witness has to do it.
 18          MR. BODNAR: It's locked.
 19          MS. GRIFFIN: It's locked. I apologize for the circle
 20  but I can't get it to come off.
 21          THE COURT: Well, it's another one of our glitches
 22  apparently. It's not coming off.
 23          So we'll just have to look through it.
 24  BY MS. GRIFFIN:
 25  Q   So Dr. Ruan, this is your signature on the CC..............

1  prescription both in October of '14 and in December of '14; is

2  that correct?

3  A   That's correct.

4  Q   And you are prescribing methadone and Soma on these two

5  prescriptions; is that right?

6  A   Yes.

7  Q   You also have a prescription again at the bottom of the

8  page that is your signature as well for CC..............; is

9  that right?

10 A   That's correct.

11 Q   And you were giving him 105 methadone, December the 17th of

12 '14?

13 A   That's correct.

14 Q   And that same date you give him one that says:  Do not fill

15 until January of 2015; is that correct?

16 A   That's correct.

17 Q   And you're aware that Mr. C... did not return to your PPSA

18 thereafter; is that correct?

19 A   He was supposed to be followed up in two months.  He just

20 found a job.  He's working as adjuster in the company.  So we

21 saw him two -- he has no insurance yet, so we saw him -- we

22 said:  Come back in two months.  Never saw him again.

23 Q   He didn't come back in two months, did he?

24 A   He did not.

25 Q   He was not able to, was he?

```
 1            MR. KNIZLEY:  Objection, Your Honor, to relevance.
 2            THE COURT:  Overruled.
 3  BY MS. GRIFFIN:
 4  Q   He was not able to, was he?
 5  A   He -- he never showed up.
 6  Q   He wasn't able to come back, was he?
 7  A   I guess so.
 8  Q   Now, we've talked about Mr. McDonald when your attorney was
 9  asking you questions.  Is that right?
10  A   Right.
11  Q   And Mr. McDonald got quite a few vacation packages, didn't
12  he, sir?
13  A   That's right.
14  Q   And that's where he tells you he's going somewhere out of
15  town and you give him drugs in advance; is that correct?
16  A   He works in Alaska.  And then the medication I wrote, I'm
17  not sure he's going to be able to fill it once he was in
18  Alaska.  So a few times, because of you can't ask him to come
19  back for medication, we give him a few prescriptions so that he
20  can work in Alaska.  That was --
21  Q   And you put vacation package on the top of the scripts,
22  didn't you?
23  A   We could use work package or use whatever package, which
24  just happened to be a expression, say, allow the pharmacy to
25  fill the medication in town before he took it to Alaska,
```

 1  whether -- if he could not fill it there.

 2  Q   You knew he had been a street drug user, didn't you, before

 3  you treated him?

 4  A   He was honest with me.  In the initial intake form he was

 5  using -- he said he previously occasionally used marijuana and

 6  amphetamine.  However, two and a half years I saw him, never

 7  tested for marijuana-cocaine.

 8  Q   But you knew he had been a methamphetamine user.  Meth is a

 9  street drug, isn't it?

10  A   Previously.  Previously.

11  Q   Isn't it a street drug?

12  A   Previously.

13  Q   Isn't it a street drug?

14  A   He was also getting Adderall from Michelle Jackson.  So he

15  was on stimulant for ADHD.  That's in his history.

16  Q   Didn't he tell you he had been using methamphetamine and

17  isn't that a street drug?

18  A   That's a street drug.

19  Q   You don't write prescriptions for methamphetamine, do you?

20  A   No, I don't.

21  Q   You're prohibited from doing that; right?

22  A   Right.  I don't do it.

23  Q   And in connection with writing prescriptions -- I'll show

24  you what's been introduced and referred to during trial as

25  Government's Exhibit 3-3, seized from the Airport location.

5978

 1   These are presigned scripts; is that correct?  Presigned

 2   scripts?

 3   A   That's correct.

 4   Q   And that is -- those are your initials or your signature;

 5   correct?

 6   A   That's correct.

 7   Q   And these are at the time Sharon Noland and Shanna Harville

 8   were there at PPSA; is that correct?

 9   A   That's correct.

10   Q   And Shanna Harville and Sharon Noland were with you till

11   the very end, weren't they?

12   A   No.  Sharon Noland went to Dr. Chen probably a year.

13   Q   She was with PPSA?

14   A   That's correct.

15   Q   That's correct?

16   A   Right.

17   Q   And you previously had the opportunity to look through

18   these blank signed scripts?

19   A   I saw them, yes.

20   Q   And they are all your signature in this exhibit, aren't

21   they?

22   A   That's correct.

23   Q   Actually on the one -- on the second page at the bottom it

24   says:  Product selection permitted and dispense as written,

25   doesn't it?

 1   A   That's right.

 2   Q   And those are all your signature?

 3   A   Can you flip a few pages?  I really did not see the whole

 4   thing.  If you can flip through.

 5   Q   One more time.  One more time.

 6   A   If you can turn over a few pages, I can see.  I can see

 7   them, because you have a bunch.

 8   Q   So on the first page you see four prescriptions with your

 9   signature; is that right?

10   A   Right.

11   Q   On the second page you see four prescriptions -- blank

12   prescriptions with your signature; is that correct?

13   A   That's right.

14   Q   On the third page you see four prescriptions with your

15   signature; is that correct?

16   A   That's correct.

17   Q   And on the fifth page you see a prescription with your

18   signature; is that correct?

19   A   That's correct.

20   Q   So that makes 17 prescriptions that were blank and

21   presigned by you; is that correct?

22   A   That's correct.

23   Q   And you knew that was prohibited, to presign blank scripts,

24   didn't you, sir?

25   A   I know for presigning prescriptions, this is used for

 1   emergency only.  That's --

 2   Q   And you know there's no exception for that in the Alabama

 3   rules; is that correct?

 4   A   The presigned prescription, it was not for opioid.  You're

 5   not sure what it's for.  We don't know whether it's for opioid,

 6   do we?

 7   Q   Well, it doesn't say on these, does it, that this can't be

 8   used for opioids?

 9   A   It can be used for anything, yeah.

10   Q   Okay.  So it could be used for Schedule II controlled

11   substances; right?

12   A   Only given to the nurse practitioner for emergency use

13   only, only for switching for our own patient -- established

14   patient; not for new patient, not for billing, only for old,

15   established patient when there's urgency, needs to be replaced.

16   That's the purpose -- whole purpose of it.

17   Q   Well, you had two other doctors at the clinic, right, if

18   you weren't there, that can do that?  You told us earlier

19   sometimes the other doctors signed things, didn't they?

20   A   Sometimes?

21   Q   Didn't they?

22   A   This is for my nurse practitioner, use only -- emergency

23   only situation.  That's all.

24   Q   No, sir.  Didn't you tell us earlier today that sometimes

25   the other doctors would sign when you weren't available, like

5981

1  when you were in a procedure?  Isn't that what you told us

2  earlier this morning?

3  A   I said on -- I have to see them.  I think those can happen

4  in the clinic.  I'm not sure it happened.  I don't know when,

5  but that may happen if somebody's in a procedure for an hour.

6  A patient --

7  Q   But there's nothing on this that says it can't be used for

8  a controlled substance, does it?

9  A   No, ma'am.  No.

10 Q   It can be used for Subsys, couldn't it?

11 A   It could be used --

12 Q   It could be used for morphine, couldn't it.

13 A   Yes.

14 Q   It could be used for hydrocodone, couldn't it?

15 A   It could.

16 Q   It could be used for any controlled substance and there's

17 no -- nothing that prohibits these 17 scripts from having hit

18 the street once they were filled out, does it?

19 A   There is a way to prohibit it from doing that, because it

20 come from my nurse practitioner that I trusted.

21 Q   Well, obviously Dr. Ruan, they were seized so somebody else

22 did get these; right?

23 A   The government seized it, not the nurse practitioner -- no

24 other people.

25 Q   They were seized; right?

 1   A   It was hidden in my drawer.  It was because the office was

 2   taken away.

 3   Q   And you admitted that Sharon Noland had used two before and

 4   she wasn't authorized to write controlled substances, was she?

 5   A   She was allowed to use it with my signature for emergency

 6   situation two and three years.

 7   Q   That's not the question.  You had admitted on direct,

 8   didn't you, that she had used two of these for controlled

 9   substances; is that correct?

10   A   That was based on her testimony.  I didn't see her.

11   Q   You're not questioning her, did you?  You believed her that

12   she had used them, didn't you?

13   A   I never saw that, but that's what she said.

14   Q   And you know, in fact, that Matt Bean also used some of

15   these to write controlled substances, don't you?

16   A   I don't know.  I don't know.

17   Q   And there's no -- nothing in the Alabama rules that says

18   you can use and save an emergency supply of presigned blank

19   scripts, is there?

20   A   I don't understand there's a rule in there.  I don't know.

21   I don't recall any rules specifically say that.

22   Q   So it's not allowed, is it?  Is that the bottom line?  It's

23   not allowed?

24   A   It's a violation of the rule.

25   Q   It's a violation; is that correct?

1  A    Of Alabama.  I guess so.

2  Q    And it's a violation of federal rules as well, isn't it?

3  A    I'm not sure about that.

4  Q    Doesn't a prescription have to be signed on the date it is

5  written by the doctor?  Isn't that correct?

6  A    Signed on the date, those are -- there are -- there's not a

7  date on those.  Those are emergency situation only.

8  Q    No, sir, that's not what I asked you.  There is no date on

9  any of these, is there?

10  A    There's no date.

11  Q    So there's no proof from you as to what date you signed

12  them, is there?

13  A    There's no proof.

14  Q    And there is nothing that allows you to do this, is there?

15  A    There's nothing to allow you to do this?

16  Q    That's the question.

17  A    I don't think there's any law, anything to say you can do

18  this.

19  Q    Okay.  So there's nothing that allows you to do it, is

20  there?

21  A    I don't think there is.

22  Q    And in connection with your testimony you sent a letter on

23  your letterhead under your name or you prepared a letter that

24  you had many patients not on any opioid; is that correct?

25  A    That's correct.

1   Q   And that's not true, is it?  That was not true?

2   A   I do have many people who are not on opioid.  Even

3   McDonald's mother -- grandmother, actually, was one of them.

4   She wouldn't get procedure.  Many patients just get procedure

5   from me.

6   Q   And in connection with your representation that you start

7   low and go slow, that wasn't true either, was it?

8   A   That's always true.  Every opioid, start low, go slow.

9   Q   You're telling us that every prescription you wrote was the

10  lowest amount that you could write for those particular

11  patients?

12  A   No, that never mean that way.  Based on the need.  We are

13  physicians.  We're fellowship-trained physicians.  We know what

14  to write.  We know what to prescribe, how to titrate.  We base

15  on the patient need.  That's a clinical decision.  We knew

16  never to justify.  It has to be coming from us, based on our

17  experience.

18  Q   But you're not telling us that every patient received the

19  lowest dosage they could receive of a controlled substance when

20  they came in to see you, are you?  Is the answer to that no?

21  A   Repeat that question.  I don't --

22  Q   You're not telling us that every patient that came into

23  your practice received the lowest amount they could receive?

24  A   No, that's not the case.  Based on the patient need.

25          MS. GRIFFIN:  Your Honor, I think we may need to

1    approach on this next exhibit.

2            THE COURT:  All right.

3        (At the side bar, jury not present.)

4            ...(Redacted.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          ...(Redacted.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            MR. ARMSTRONG:  The whispering had nothing to do with
 2    Valentine's either, Judge.
 3            MR. KNIZLEY:  (Indicating.)
 4            THE COURT:  All right.  Yeah, I think that it's --
 5    tell me, it's 404(b) as to what?
 6            MS. GRIFFIN:  Well, we filed it as inextricably or
 7    404(b).
 8            THE COURT:  Inextricably intertwined with what?
 9            MS. GRIFFIN:  With the whole conspiracy that he's
10    trying to hide the ball from everybody involved in this whole
11    case, with everything they did; hide who was treating the
12    patients, hide what they were actually doing there, in
13    connection with the evidence that's come out in the case.  They
14    are hiding the fact that the doctors weren't the ones treating
15    some of the patients.  They were billing every patient as a
16    doctor visit when there's testimony from them and from others
17    that it is not.  So it's in keeping with him trying to hide
18    from other people information that has to do with his
19    finances.  And that's what we contend is the motive for him, is
20    his financial well-being.  And so we intend to use it, though,
21    in this setting as to his credibility that --
22            THE COURT:  He hasn't said anything about this.  I
23    sustain the objection to it.
24        (In open court, defendants and jury present.)
25        (A discussion was held off the record between counsel.)
```

1    BY MS. GRIFFIN:

2    Q    Now, Dr. Ruan, it was not uncommon for insurance companies

3    to write to PPSA and complain about the drugs that had been

4    prescribed or to make suggestions about other drugs that should

5    have been prescribed; is that correct?

6    A    It's common, yes.

7    Q    And that's common?

8    A    Uh-huh (positive response).

9    Q    And those come frequently; is that right?

10   A    That's correct.

11   Q    I show you what's marked as Government's Exhibit 59.

12        THE COURT:  Is this in evidence?

13        MS. GRIFFIN:  It is not in evidence, Your Honor.

14   Q    And ask if this is from Medicare Generation Rx on April the

15   21st, 2015, addressed to you?

16   A    Yes.

17   Q    And does it talk about a patient under your care who is 65

18   years of age or older?

19   A    Yes.

20   Q    Further in the exhibit are there documents from Health

21   Direct?

22   A    Yes.

23   Q    Are there documents from Active Health addressed to you?

24   A    Yes.

25   Q    And are there documents from United Healthcare addressed to

1  you?

2  A   Yes.

3  Q   Did you notice that all of these were in the spring of 2015

4  prior to the raid?

5  A   Yeah, that was -- that's correct.

6  Q   From what you saw on the dates; is that correct?

7  A   That's correct.

8       MS. GRIFFIN:  Your Honor, I move to admit Government's

9  Exhibit 59.

10       MR. KNIZLEY:  Your Honor, objection on two grounds.

11  One, he has not authenticated this as something he recognized.

12  Second, the relevance to any of the allegations set forth in

13  the indictment, particularly the patients that were in the

14  indictment.

15       MS. GRIFFIN:  Your Honor, these -- these were seized

16  during the search of PPSA.

17       THE COURT:  And the relevance to the counts in the

18  indictment?

19       MS. GRIFFIN:  The relevance to the indictment is that

20  the insurance companies are advising that the prescribing is

21  outside the usual course of professional practice.

22       MR. KNIZLEY:  Judge, I don't think that's what the

23  language or the characterization of it, of what the letters

24  say.

25       MS. GRIFFIN:  We'll be glad to bring them up, Your

```
 1   Honor.
 2           THE COURT:  All right.  Let me see them.
 3      (At the side bar, jury not present.)
 4           THE COURT:  Are all of these controlled substances?
 5           MS. GRIFFIN:  I did not include any one in there that
 6   did not have controlled substances.  They may discuss two, with
 7   one of them being a controlled.  And Your Honor, these are the
 8   same type letters that were admitted yesterday on Dr. Couch's
 9   cross-examination.  They are insurance companies telling them
10   they are exceeding the morphine equivalent or that they are
11   using multiple doctors or something that would indicate
12   concerns about the patients.
13           MR. ARMSTRONG:  Judge, I think the ones introduced for
14   Dr. Couch were patients related to the treatment and the
15   patients listed in the indictment.  I don't know that these
16   are.
17           MS. GRIFFIN:  And, Your Honor --
18           THE COURT:  Tell me what those are (indicating).
19           MR. BODNAR:  That's --
20           THE COURT:  Zolpidem tartrate?
21           MS. GRIFFIN:  Lunesta.
22           THE COURT:  Which is a controlled substance?
23           MR. BODNAR:  Yes.  Schedule IV.
24           MS. GRIFFIN:  And then this is hydro, which, of
25   course --
```

1          THE COURT:  I saw the rest of them.  All right.  I
2    overrule the objection
3        (Government's Exhibit 59 was entered into evidence.)
4        (In open court, defendants and jury present.)
5          MS. GRIFFIN:  May we publish this to the jury, Your
6    Honor?
7          THE COURT:  Yes.  And what's the exhibit number?  59?
8          MS. GRIFFIN:  59.
9    Q   In fact, Dr. Ruan, the April 21st, '15 letter talks about a
10   patient under your care who is 65 years or older; is that
11   right?
12   A   That's what the letter says.
13   Q   And it says:  She's recently filled -- well, it doesn't say
14   she.  It says that patient has recently filled a prescription
15   for medication deemed by the American Geriatric Society as
16   likely to cause more harm than good when used in older
17   individuals; is that correct?
18   A   That's what it says.
19   Q   Does it go on to say:  Due to the high likelihood of
20   adverse drug reactions; is that correct?
21   A   That's what it says.
22   Q   And they include for you a list of alternative medications;
23   is that right?
24   A   I didn't see it.
25   Q   Does it say:  We've attached a list of alternative

1    medications?  In this paragraph, the third -- fourth full

2    paragraph?

3    A    Did I receive this letter at all?  Because it was May;

4    right?  In the beginning of May.

5    Q    Does it say that:  For your convenience we've attached a

6    list of alternative medications that may be appropriate and

7    safer alternatives for your patient?  Is that what the letter

8    says?

9    A    That's what the letter says.

10   Q    This was from Medicare Generation; is that right?

11   A    That's correct.

12   Q    And then there is a letter addressed to you.  Has your

13   name; right?

14   A    That's my name; that's right.

15   Q    And this is from Health Direct referring that you wean

16   certain patients or stop certain patients on certain drugs; is

17   that correct?

18   A    Is there a patient name?

19   Q    Do you see the patient name?

20   A    Yes, yes.  C...... -- yeah, I remember him.  Yes.

21   Q    And that's suggesting that you stop certain drugs for this

22   particular patient; is that right?

23   A    They had their recommendation; that's correct.

24   Q    Then there is another to you from Active Health; is that

25   correct?

XIULU RUAN, MD - CROSS BY MS. GRIFFIN

1    A    That's correct.

2    Q    And that notifies you that your prescription is

3    contraindicated with another medication; is that correct?

4    A    That's correct.  None of them are opioid, by the way.

5    Q    Then is there one from Active Health?  Hydrocodone is an

6    opioid, isn't it?

7    A    The one -- the other two -- this one is, yes.

8    Q    Hydrocodone is an opioid?

9    A    It is.  I was referring to the other one.

10   Q    And it is a Schedule II controlled substance; right?

11   A    It is.  7.5 gram.

12   Q    Then this next one is from Active Health?

13   A    These two -- I'm sorry.

14   Q    And is it talking to you about avoiding benzodiazepines in

15   older adults with certain conditions; is that correct?

16   A    That's correct.

17   Q    And it talks about this patient being 65 or older; is that

18   correct?

19   A    That's correct.

20   Q    And it says benzodiazepines may have a prolonged half-life

21   in older adults and increase the risk of cognitive impairment,

22   falls and fractures; is that correct?

23   A    That's correct.  Can I see the patient name?

24   Q    (Indicating.)  It's a patient number that's provided for

25   this.

 1   A   I'm not even sure that's my name -- my patient.

 2   Q   Here it is.  Patient listed in the black box.  Do you see

 3   that?

 4   A   Black box?

 5   Q   Can you see the black box at the top of the letter?

 6   A   Yeah.  Yeah, I saw that.  Yes.

 7   Q   And it lists a patient name; is that correct?

 8   A   Yes; he's my patient.

 9   Q   And then it cites some criteria of the American Geriatric

10   Society; correct?

11   A   That's correct.

12   Q   And the diazepam is a controlled substance; correct?

13   A   It is.

14   Q   Is there also a letter, May the 4th of '15 from United

15   Healthcare to you?

16   A   That's correct.

17   Q   And does it tell you that this particular patient, last

18   name beginning with an S has a high daily dose of opioids that

19   exceeds the 200 milligram morphine equivalent by the American

20   Pain Society and American Academy of Pain Medicine.  Is that

21   what it says?

22   A   That's what it says.

23   Q   Okay.  And these are oxycodone, morphine.  Those are

24   opioids; correct?

25   A   That's correct.

1   Q   As to the next page, last name beginning with a T, does it
2   too, tell you daily dose of opioids exceeding 200 milligrams
3   morphine equivalent increase the risk of adverse effects?
4   A   Yes, it says that.
5   Q   And those are opioids, morphine, oxycodone, aren't they?
6   A   That's correct.
7   Q   And controlled -- says Schedule II controlled substances?
8   A   That's correct.
9   Q   The next one is to a patient whose last name begins with a
10  C; is that correct?
11  A   That's correct.
12  Q   And there is a Narcotic Drug Utilization Review Program; is
13  that right?
14  A   That's correct.
15  Q   Does it tell you again that this prescribing exceeds the
16  200 milligram morphine equivalent?
17  A   That's what it says.
18  Q   Does it also tell you that the cumulative days' supply of
19  opioids exceeds 360 days in the review period may indicate an
20  excessive amount of opioids?
21  A   That's what it says.
22  Q   Does it likewise involve OxyContin, oxycodone, and Subsys?
23  A   That's correct.
24  Q   Those are opioids; right?
25  A   That's correct.

1  Q   And it shows where OxyContin, Subsys, and oxycodone were

2  all filled on the same day at C&R Pharmacy; is that correct?

3  A   That's correct.

4  Q   And the oxycodone was for a quantity of 120; is that right?

5  A   That's the Percocet.

6  Q   Pardon?

7  A   That's Percocet, yeah.  It's -- yeah, it's the oxycodone

8  with APAP.

9  Q   Does it say 120 tablets that you prescribed?

10  A   That's correct.

11  Q   On the next page someone whose last name begins with an F.

12  Does it again tell you about the morphine equivalent being

13  high?

14  A   That's correct.

15  Q   And these two -- some of these are Schedule II opioids --

16  opiates; is that correct?

17  A   That's correct.

18  Q   The same for the patient last name beginning in an R.

19  You're being notified about the morphine equivalent dosage for

20  opioids; is that correct?

21  A   That's correct.

22  Q   Same for the patient last name beginning in a T.  You're

23  warned by United Healthcare that use of four more pharmacies

24  may indicate abuse potential or inappropriate use of opioids;

25  is that correct?

 1    A    Can I see the name again, please?

 2    Q    (Complying.)

 3    A    Okay.

 4    Q    And does that show that this particular patient has been

 5    prescribed opioids?

 6    A    It is the opioid, yes.

 7    Q    Pardon?

 8    A    It is -- the medication are the opioids.

 9    Q    They are opioids; is that correct?

10    A    That's correct.

11    Q    And a PDMP would have shown if this patient was using more

12    than one pharmacy, wouldn't it have?

13    A    It would show it, yes.

14    Q    Now, prior to your termination of Bridgette and her

15    transferring within the business to Dr. Ruan [sic], you had

16    sort of analyzed what you were going to do about her; is that

17    correct?

18    A    I did.

19    Q    Had you even written Dr. Couch an email about it?

20    A    I did.

21         MS. GRIFFIN:  Your Honor, this has not been admitted.

22         THE COURT:  All right.

23         MS. GRIFFIN:  Ready?

24    Q    I show you what's marked as Government's Exhibit 62 and ask

25    if this is an email that you sent December the 9th of 2013?

1    A    Yes, ma'am.

2    Q    To Dr. Ruan -- excuse me -- to Dr. Couch; is that right?

3    A    That's true.

4    Q    You also copied Boe Strange and Ken Cross; is that right?

5    A    That's correct.

6    Q    This email pertains to the transfer of Bridgette, doesn't

7    it?

8    A    That's right.

9         MS. GRIFFIN:  Your Honor, I'd move to admit

10   Government's Exhibit 62.

11        MR. SHARMAN:  No objection.

12        MR. KNIZLEY:  No objection.

13        THE COURT:  All right.  Mark it in.

14        (Government's Exhibit 62 was marked for identification.)

15   BY MS. GRIFFIN:

16   Q    Does it talk about that Bridgette needs a full-time job?

17   A    That's correct, because of her insurance.

18   Q    And does it say that she's on production salary?

19   A    That's correct.

20   Q    That's unlike Sharon Noland?

21   A    Noland.

22   Q    Because she was on salary, wasn't she?

23   A    She's a part-time.

24   Q    She was on a salary, wasn't she?

25   A    She wanted to be on salary.  That's what she wanted.

1    Q   But she was on one; correct?

2    A   She was; correct.

3    Q   And in connection with this, does it have you talking about

4    transferring her, what she can do and what she can't do?

5    A   I talk about this because her husband had cardiac surgery.

6    She needs health insurance, so there's no way she could -- she

7    could lose her insurance.  Her family needs support.  That's

8    the reason I was asking Dr. Couch to take over.

9    Q   But it says on number three, doesn't it, Bridgette has been

10   the most consistent player for order ointment.  I believe she

11   ordered more than Shanna and Sharon combined.

12          And you're telling Dr. Couch this is a plus for you

13   and for C&R.  That itself is a very good reason to keep her.

14          Isn't that what you told Dr. Couch?

15   A   That's what I said.

16   Q   So the ointment could be filled at C&R; correct?

17   A   That's correct.

18   Q   And she orders a lot of ointment for patients, doesn't she?

19   A   All patients, we want them to try ointment first, because

20   noncontrolled.

21   Q   But the question to you is that Bridgette ordered a lot of

22   ointment; right?

23   A   She did.

24   Q   And you thought that was a plus for Dr. Couch and for C&R;

25   is that right?

1   A   That's what it says.

2   Q   And you said that in and of itself was a good reason to

3   keep her, didn't you?

4   A   We want people to be started with nonopioid regardless, and

5   that's -- that's the message we had been telling our MA or

6   nurse practitioners, because it's noncontrolled.  We try those

7   first.

8   Q   But this doesn't have to do with a patient, does it?  It

9   has to do that this is a plus for Dr. Couch and for C&R, and

10  that that's a good reason to keep her, because she prescribes a

11  lot of ointment; is that correct?

12  A   That's what I've been trying to convey to Dr. Couch, we

13  should.

14  Q   That you should keep her because she prescribes a lot of

15  that; right?

16  A   Because that's one of the things we want our other

17  employees to do.

18  Q   It doesn't say that, does it?  It just says:  This is a

19  plus for you and C&R:  Is that right?

20  A   That's right.

21  Q   And it says:  That's a good reason to keep her; right?

22  A   Right, I say that.

23  Q   And then on number seven you're telling him that adding

24  Bridgette to Dr. Couch will help him generate more.  Is that

25  correct?  Is that what it says?

1  A   That's what it says.

2  Q   And you're talking about generating more income; right?

3  A   Extra helper for Dr. Couch.

4  Q   But it doesn't say that.  It says:  Help you generate more;

5  is that correct?

6  A   That's right.

7  Q   Then in paragraph eight it says:  We have our TV and

8  billboard running, doesn't it?

9  A   That's right.

10  Q   And, in fact, you and PPSA were advertising on television

11  and on billboard for patients; is that right?

12  A   We -- we did do that.

13  Q   Even though you say patients had to be referred by a

14  doctor; is that correct?

15  A   That's right.

16  Q   And you said:  Adding another NPR under Dr. Couch would

17  help his volume; is that correct?

18  A   That's what it said, yes.

19        MS. GRIFFIN:  One moment, Your Honor.

20        THE COURT:  All right.

21     (A discussion was held off the record between government

22  counsel.)

23  BY MS. GRIFFIN:

24  Q   Now, Dr. Ruan, you hired Matt Bean, didn't you?

25  A   That's correct.

1  Q   And he was an NP for you; is that correct?

2  A   That's correct.

3      ...(Redacted.)

4

5

6

7  A   I did not know that at all.

8          MS. GRIFFIN:  Madame Clerk, can you tell me the next

9  exhibit number, please?

10         THE CLERK:  Yes, ma'am.  60.

11         MS. GRIFFIN:  Is 65 taken?

12         THE CLERK:  Not yet.  No, ma'am.

13 BY MS. GRIFFIN:

14 Q   I show you what's marked as Government's Exhibit 65 --

15 A   Okay.

16 Q   -- and identify this as MB's........ patient file from

17 PPSA, Greenway file.

18 A   Okay.

19         MS. GRIFFIN:  Your Honor, we'd move to admit this file

20 in as Government's Exhibit 65 and publish it to the jury.

21         MR. KNIZLEY:  Judge, we would object on relevance at

22 this point.  I don't see a date for this.  What is the date of

23 the services?  Do you know?

24         MS. GRIFFIN:  This is a cover page.

25         MR. KNIZLEY:  We object on relevance at this point.

1          THE COURT:  Let me see the exhibit, if you will.

2      (At the side bar, jury not present.)

3          MS. GRIFFIN:  This is Dr. Ruan treating MB....... and

4  it says:  Reports previous narcotic abuse.

5          And he said that he was unaware, that he had not seen

6  that.

7          THE COURT:  What's the date of that?  20 --

8          MS. GRIFFIN:  '9.  And then it reappears.  He sees him

9  through December of '13.  And the social history, as I

10 understand, continues to say -- let me find it.  That's in the

11 2009 visit.

12         That's the '13 visit.

13         MR. KNIZLEY:  '13 doesn't say anything about

14 controlled substance.

15         MR. BODNAR:  (Indicating.)  You missed it right there.

16         MS. GRIFFIN:  Social history.

17         MR. BODNAR:  Narcotic.

18         MS. GRIFFIN:  Reports previous narcotics abuse.

19         THE COURT:  All right.  Overrule the objection.

20         MR. KNIZLEY:  Judge, if I might say, I object on the

21 ground of remoteness as well and, I believe, impeachment on a

22 collateral matter.

23         THE COURT:  Overruled.

24     (In open court, defendants and jury present.)

25         THE COURT:  Okay.  Mark it in.

1          (Government's Exhibit 65 was entered into evidence.)

2     BY MS. GRIFFIN:

3     Q   Now, you hired Mr. Bean as a nurse practitioner; is that

4     right?

5     A   That's correct.

6              ...(Redacted.)

1          ...(Redacted.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          ...(Redacted.)

2

3

4

5

6

7

8

9

10   Q   Now, in connection with Mr. Bean, there was a time when

11   y'all had an issue about what incident to meant in connection

12   with billing; is that correct?

13   A   I don't recall any incidents.

14   Q   You recall incident-to billing?

15   A   I know that topic.  I don't recall what he said.

16   Q   I show you what's marked as Government's Exhibit 60.

17          MS. GRIFFIN:  Your Honor, this has not been admitted.

18          THE COURT:  All right.

19   BY MS. GRIFFIN:

20   Q   And ask if this is an email dated June the 29th of '14 from

21   Matt Bean to you?

22   A   Now that I see it, but I don't recall.  I don't recall this

23   email.

24   Q   But you're not denying that it came from your Yahoo

25   account, are you, sir?

6007

1    A    No.  I saw that right now, yeah.  But I don't recall this.

2            MS. GRIFFIN:  Your Honor, I'd move to admit

3    Government's Exhibit 60.  It was seized pursuant to a search

4    warrant from Dr. Ruan's Yahoo account.

5            MR. KNIZLEY:  Your Honor, we object on the basis of,

6    first, he hasn't identified it; secondly, on the basis of

7    complete hearsay within the document.

8            THE COURT:  Overruled.  Mark it in.

9        (Government's Exhibit 60 was entered into evidence.)

10           THE COURT:  Ms. Griffin, why don't we take this up

11   after lunch?

12           MS. GRIFFIN:  This is my last question.  Whatever is

13   the Court's preference.

14           THE COURT:  Well, I think it's time for lunch.

15           MS. GRIFFIN:  All right.

16           THE COURT:  So let's go eat lunch.

17           Ladies and gentlemen, leave your pads on your chairs.

18   No discussion about the case.  Be back downstairs in the jury

19   assembly room at 1:15 ready to be called back up.

20           We're in recess.

21       (A recess was taken at 11:59 a.m.)

22       (Afternoon session, 1:20 p.m., in open court, defendants

23   and jury present.)

24           THE COURT:  All right, Ms. Griffin.

25           MS. GRIFFIN:  Your Honor, I believe when we broke, the

1    Court had just admitted Government's Exhibit 60, and I would

2    ask to publish it to the jury.

3            THE COURT:  All right.

4    BY MS. GRIFFIN:

5    Q   Dr. Ruan, this is from Matt Bean to you; is that correct?

6    A   That's correct.

7    Q   And the date is June the 29th of 2014?

8    A   That's correct.

9    Q   Is that correct?  Does it talk about the physician must

10   perform the initial H&P on Medicare patients; is that what it

11   says?

12   A   It is.

13   Q   And that H&P is history and present illness; is that

14   correct?

15   A   That's correct.

16   Q   Does he propose a solution to you?

17   A   That's what it says here --

18   Q   And does it say:  Shanna and I do what we've always done

19   except rather than signing the chart and noting that we saw the

20   patient in collaboration with you, we provide you with the name

21   of the patient and you sign -- in double quotations -- the

22   chart rather than co-signing.

23            Is that what he's proposing to you?

24   A   That's what it says here.

25   Q   And that has to do with the billing, doesn't it?

6009

1    A    I beg your pardon?

2    Q    That has to do with billing, doesn't it, sir?

3    A    That's the way we complete the record.

4    Q    Does it -- it has to do with billing, though; right?

5    A    I'm not sure what it means, does just the billing.  That's

6    how the medical record is completed.

7    Q    Does it say:  Or I can simply log on as you and sign off so

8    it will be less cumbersome for you.

9              Is that what it says?

10   A    That's what he says.

11   Q    And so he's telling you that he can log on as you, Xiulu

12   Ruan, isn't he?

13   A    That's what it says here.  But I ignored him.

14   Q    Then number five, does he say:  Blue Cross/Blue Shield

15   plans don't recognize incident-to rules at all.  What they say

16   is that the NP sees the patient and documents the visit, it

17   should be billed under NP.

18             Is that correct?

19   A    That's what it says here.

20   Q    So you had knowledge of that, if not earlier, at least by

21   this date; is that correct?

22   A    That -- we knew about this before; that's right.

23   Q    Did you -- you knew about it before too, didn't you?

24   A    I did.

25   Q    Does it further say:  My -- his proposed solution, who had

 1   a billing specialist conduct billing training, is to add the

 2   line Dr. Ruan has examined the patient and has set the

 3   treatment plan.

 4   A    That he proposed.

 5   Q    That's what he proposed.  It doesn't say that Dr. Ruan

 6   actually saw the patient, though, does it?

 7   A    That's what he proposed.  That's all I can tell you.

 8   Q    And does it say:  For now it is probably a good idea for

 9   you to lay eyes on every patient?

10   A    I was doing that anyway.  I'm not sure what you mean by

11   that.

12   Q    But it does say:  For now it's probably a good idea for you

13   to lay eyes on every patient, doesn't it?

14   A    That's what he said.

15   Q    Does it further say down at the bottom:  In summary, in

16   quotations, "Dr. Ruan has personally examined this patient and

17   has set the treatment plan," dictated on follow-up patients

18   should allow us to be audit ready.

19        Is that correct?

20   A    That's what it says here.

21   Q    And does it say:  For now I recommend you continue to pop

22   in and say you agree with the plan on each patient so there

23   won't be any doubt regarding compliance.

24        Is that correct?

25   A    That's his choice of words.

1   Q   He chose the words "pop in"?

2   A   That's correct.

3   Q   And you understand that pop in means quickly, don't you?

4   A   I do.

5   Q   And then does it end advising you:  If we have NPIs, the

6   worst case scenario, should an audit happen, is we could argue

7   that though the patient visits should have been billed under

8   the NP, we were incorrectly billed under you.  And rather than

9   paying huge fines and having to pay back 100 percent, we would

10  have to pay back 15 percent.

11          Is that what you were told?

12  A   I don't recall this message at all.  But that's what it

13  says here.

14  Q   This is what Matt Bean is writing to you, isn't it?

15  A   Right.

16  Q   And he became one of the NPs you trusted; isn't that right?

17  A   That's correct.  But there's no evidence that I responded

18  to the email.

19  Q   Now, Dr. Ruan, you've previously been shown Government's

20  Exhibit 9-5(8); is that correct?

21  A   Yes.

22  Q   And in this you were saying:  In reality, we fire patients

23  rather infrequently.

24          Isn't that what you write?

25  A   I'm in practice, in general.  That's what I wrote, yes.

```
 1   Q   You wrote:  But in reality we fire patients rather
 2   infrequently.
 3           Is that correct?
 4   A   I'm using we --
 5   Q   That's what you said?
 6   A   That's what I said, yes.
 7   Q   That is what you said, isn't it?
 8   A   That's correct.  That's what it says here.
 9   Q   Okay.  In private practice the more you fire, the more
10   revenue you lose is what you wrote, isn't it?
11   A   That's what I wrote.
12   Q   That's the email you sent, isn't it; right?
13   A   Yes.
14   Q   Private practice, it's different; correct?
15   A   That's right.
16   Q   And you put:  Another interesting thing is one patient
17   tests positive for street drugs, that gives you more reason to
18   do more frequent urine drug screens which pay three times more
19   than an office visit; is that correct?
20   A   That's what I wrote here.
21   Q   And you knew that the urine drug screens pay about 7 to
22   $750 per screen for PPSA, didn't you, sir?
23   A   That's from the rep.  It wasn't the case.  It really wasn't
24   the case.  So whatever they say, that was a forwarded
25   email.  This I'm referring to the addiction medicine in
```

 1   general, in comparison to pain medicine.

 2   Q   But it says:  Gives you more reason to do more frequent

 3   drug screens which pay three times more than an office visit is

 4   what you were telling this young man that's trying to get

 5   information about practitioners, isn't it, sir?

 6   A   With the young man and the director -- department chairman

 7   in pain medicine in Louisiana State University, talking about

 8   the -- in general, addiction medicine in comparison to pain

 9   medicine in the community versus academic; that's what -- my

10   point.

11   Q   But what you say regardless of your point is that it gives

12   you more reason to do more frequent urine drug screens which

13   pays three times more than an office visit.  Isn't that what it

14   says?

15   A   That's what it says, yes.

16   Q   And that's what you wrote?

17   A   To -- based on addiction medicine guideline.

18   Q   Didn't you write this?

19   A   That's right, that's what I wrote.

20   Q   You wrote it?

21   A   That's correct.

22   Q   And you emailed it too, didn't you, sir?

23   A   That's correct.

24        MS. GRIFFIN:  That's all I have of this witness, Your

25   Honor.

1              THE COURT:  Redirect?

2              MR. KNIZLEY:  Yes, ma'am.

3                        REDIRECT EXAMINATION

4    BY MR. KNIZLEY:

5    Q   Dr. Ruan, I want to show you what's been marked for

6    identification only, Ruan's Exhibit 203.  Can you tell me what

7    that is, please, sir?

8    A   This is the card I wrote down on Stephen McDonald, which I

9    used yesterday, to remember me about this situation that I saw

10   him.

11   Q   Is that the only card you referred to?

12   A   That's right.

13             MR. KNIZLEY:  We would offer Ruan Exhibit 203.

14             MS. GRIFFIN:  I object to it, Your Honor.

15             THE COURT:  I sustain the objection.

16             MR. KNIZLEY:  Your Honor, she identified --

17             THE COURT:  It doesn't make it substantive

18   evidence.  So I sustain the objection.

19   BY MR. KNIZLEY:

20   Q   On Ruan's Exhibit 203, what was on that card?

21             MS. GRIFFIN:  Objection, Your Honor, as to relevance.

22             THE COURT:  Overruled.

23   BY MR. KNIZLEY:

24   Q   Tell me everything you recall that was on -- and if you

25   need to refresh your recollection, please let me know.

6015

1    A    Basic information about when I saw him, who was the

2    referring physician, what were the condition, what date was the

3    urine test done, what was the result.  Basic information.

4    That's all there.

5    Q    Anything else?  Tell me everything you can recall that was

6    on that card.

7    A    I think that's all I can remember.

8    Q    If you saw the card, would it refresh your recollection?

9    A    Yes.

10             MR. KNIZLEY:  May I approach the witness?

11             THE COURT:  Yes.

12             MS. GRIFFIN:  Your Honor, I object.  He used the card

13   to testify yesterday and this is just another way of him trying

14   to get that information in.

15             THE COURT:  Well, the card is not going to go into

16   evidence but he can look at it if he wants to.

17   BY MR. KNIZLEY:

18   Q    I show you what's marked as Ruan's Exhibit 203.  And just

19   glance over the card and tell me what other type information is

20   on there.  What's on that card, Doctor?

21   A    Basic treatment information, including the date and a urine

22   test done, so -- with the result.  Also had the statement on

23   the patient, what -- under my care for two and a half years.

24   He never tested positive for cocaine, marijuana.

25   Q    Doctor, did Justin Palmer -- do you know anything about

1    where Justin Palmer got the Dilaudid he claimed he used?

2    A    No.   Justin Palmer -- no.   Justin Palmer was in the

3    Springhill office.   I was in the Airport office.   Wednesday, we

4    switched, and Friday, he never came.

5    Q    Do you know if it was waste Dilaudid?

6    A    No.

7    Q    In your practice of medicine did you keep up with things

8    like that or what -- was that part of what you did when you

9    were practicing medicine, was to keep up with the medications

10   and the numbers and all that type of thing?

11   A    No.

12   Q    What did you do?

13   A    Patient care.

14   Q    Mr. Manfuso and his IPM contracts, do you remember that?

15   A    Yes.

16   Q    Who drafted those contracts?

17   A    Who drafted?

18   Q    Who typed them up?   Who had them done?

19   A    Manfuso.

20   Q    And did Manfuso pick the person to do it for him?

21   A    Lawyer -- his lawyer.

22   Q    And when it came to as to how much you may get and how much

23   Dr. Couch may get, where did that come from?

24   A    From the Linear Solution a year prior, the W9 form.

25   Q    What's a W9?

1   A   It's how much Linear Solution paid me and Dr. Couch, which

2   was faxed to Manfuso's company.

3   Q   Is it a tax form that shows what you got the year before?

4   A   It's a record showing how much Linear reimbursed us.

5   Q   Do you know for what purpose the W9 exists, why there is

6   such a thing as a W9?

7   A   For tax records.

8   Q   And you heard the prosecutor ask you about XR -- XLR

9   Properties, Ruan Properties, and about the check being made

10  payable to them.  Who owns XLR?  Who owns that?

11  A   I do.

12  Q   And it's yours totally?

13  A   That's right.  Yes.

14  Q   Same thing with Ruan Properties?

15  A   Yeah.  Yes, it's my company.

16  Q   And whether it came to PPSA or XLR or Ruan Properties, it

17  was coming to you; is that right?

18  A   That's correct.

19  Q   Did you pay your income tax on that money?

20  A   Yes.

21  Q   All of it?

22  A   Whatever the income -- my CPA did.

23  Q   Did you give all the records to your CPA?

24  A   Absolutely.

25  Q   And is that for all the income you received?

6018

1  A   Yes.

2         MS. GRIFFIN:  Your Honor, it's beyond the scope of

3  cross.

4         THE COURT:  Sustained.

5  BY MR. KNIZLEY:

6  Q   How long have you had nurse practitioners?

7  A   Either 2006, 2007; I don't recall exact date.

8  Q   And even when you had those nurse practitioners, you saw

9  your patients?

10 A   Yes.

11 Q   On these luncheon talks we've talked about, did those talks

12 or the compensation you received therefor ever have any effect

13 on your professional judgment as to the prescriptions you wrote

14 or the care you gave to your patients?

15 A   Absolutely not.

16 Q   You were asked about some presigned prescriptions.  Why did

17 you have those presigned prescriptions?

18 A   Those are for emergency situations when I'm out of town.

19 If I had a prescription the patient could not fill it, could

20 not find it, they need to be switched.  So only the nurse

21 practitioner who know the patient well in case that happened.

22 Q   Do you ever know of it ever happening?

23 A   I do not have direct evidence, but Sharon Noland said the

24 other day.

25 Q   That's where you first heard about it?

1   A   That's correct.

2   Q   Before then you never knew it ever happened?

3   A   No, I did not know.

4   Q   Did you ever give a presigned script to anyone?

5   A   No.

6   Q   And what do you understand would have been the penalty from

7   the Alabama Board of Medical Examiners if there was a presigned

8   script?

9           MS. GRIFFIN:  Objection, Your Honor.  It is beyond the

10  scope of cross and it's not relevant.

11          THE COURT:  Sustained.

12  BY MR. KNIZLEY:

13  Q   Who was the presigned script going to help in a crisis?

14          MS. GRIFFIN:  Objection, Your Honor.  That's beyond

15  the scope.

16          THE COURT:  Overruled.

17  BY MR. KNIZLEY:

18  Q   Who was the presigned script going to help if there was an

19  emergency?

20  A   My patients.

21  Q   Do you remember the email from the student at the

22  University of Illinois that you received, that the prosecutor

23  talked about?

24  A   Yes.

25  Q   What did you mean when you were explaining to that student

1    about firing patients?

2    A    I was referring to in practice and academic setting, the

3    field of addiction medicine and pain medicine is different.

4    Student couldn't find any literature saying that the clinic,

5    how frequently to fire people.  So I was referring to him in

6    addiction medicine physicians take care of people with

7    addiction.  I was boarded in addiction medicine since 2010.

8    Meanwhile I handled a chronic pain clinic.  In my clinic I

9    checked the urine, on the average, three months; not as

10   monthly, biweekly.

11        Every medication refill based on addiction medicine

12   guideline, so there's a difference between people who use those

13   guidelines and there's a difference between how people manage

14   their patients.

15   Q    Do you remember the Government's Exhibit 9-1(2) which was

16   an email where you and Dr. Couch were talking and you told

17   Dr. Couch:  Remind Justin about some prescriptions.

18        Do you remember that?

19   A    Right.

20   Q    What did you mean by that?

21   A    That was in July 2014, I wrote a letter to Alabama Board of

22   Medicine trying to express my interest to be a board -- I mean,

23   to be a member of the board.  So I introduced my practice, my

24   credentials, my clinic, and sent that to Alabama Board of

25   Medicine, trying to serve on the board.  That was when

 1    Dr. Couch -- when I realized --

 2             MS. GRIFFIN:  Your Honor, object, as that's beyond the

 3    scope of --

 4             MR. KNIZLEY:  She asked.

 5             MS. GRIFFIN:  I don't believe so.  It's not -- if it's

 6    not beyond the scope, it is not responsive to the question.

 7             THE COURT:  Well, I don't think he's answering the

 8    question that was asked so if you'll ask it again.

 9    BY MR. KNIZLEY:

10    Q   What was meant by -- when you said to remind Justin about

11    the prescription, what did you mean by that?

12    A   Remind Justin -- Justin, the one in the clinic, saw patient

13    first, initiated the prescription, Dr. Couch then signed

14    them.  So if Justin initiated a patient on the higher dosage,

15    Dr. Couch may likely to approve.  If he try not to initiate

16    that first step --

17    Q   I'm having a hard time understanding you.  If he does what

18    he --

19    A   Initiate the prescription.

20    Q   Initiate?

21    A   That's right.

22    Q   What's that mean?

23    A   He saw the patient first in the follow-up visit, decided

24    the patient dosage should be updated, and he basically come up

25    with that plan -- when he see Dr. Couch for approval.  If he

```
 1   initiate less --
 2   Q   He initiates a plan and then would take it to Dr. -- your
 3   understanding from that email -- would take it to Dr. Couch for
 4   approval?
 5   A   That's correct.
 6   Q   And did you complete your answer about what you meant to
 7   remind him?  If you -- did you complete your answer?
 8   A   Yes.  Because in the letter I expressed to Alabama Board of
 9   Medicine about my attitude about how the clinic does it.  So
10   try to avoid those prescriptions, high opioid dose
11   prescriptions like oxycodone 30, OxyContin 80 milligram.
12   Q   All right.  You were shown the email where there was a
13   discussion about a concern about FBI raid.  Do you remember
14   that?
15   A   Yes.
16   Q   What did you understand was the concern -- what did you
17   mean -- what did you mean when you said there was a concern
18   about possible FBI raid?
19   A   Two weeks prior to that email we had a dinner with
20   Dr. Couch and my girlfriend, Justin, and one of the other drug
21   reps in one of the restaurants.  Dr. Couch had mentioned his
22   girlfriend trashed his cars, threatened to report --
23           MS. GRIFFIN:  Your Honor, object as that being
24   unresponsive to the question, and it's hearsay.
25           THE COURT:  Sustained.
```

BY MR. KNIZLEY:

Q    What were the circumstances surrounding the disclosure regarding the FBI -- the concern about the FBI raid?

A    Dr. Couch told me his girlfriend reported us to DEA, FBI and Alabama Board of Medicine.

Q    Did she -- did Dr. Couch tell you she also made some other allegations that were unfounded?

A    That's right.

Q    And was this something that had been ongoing between Dr. Couch and the lady he was seeing?

            MS. GRIFFIN:  Objection as to relevance and foundation.

            THE COURT:  Sustained.

BY MR. KNIZLEY:

Q    As to the foundation, were you aware of previous false allegations --

            MS. GRIFFIN:  Your Honor, it has no relevance and we object to it being gone into.

            THE COURT:  Unless it pertains directly to what he said about the FBI, I sustain the objection.  Anything previous, I think is not relevant.

BY MR. KNIZLEY:

Q    You heard the term vacation package?

A    Yes.

Q    And you said work package?

1    A   It's something similar.

2    Q   Who does that help?

3    A   The patient.

4    Q   What is it?

5    A   It's a medication, allow the patient to refill a little

6    early, therefore when go out of state, you don't run into

7    problem of missing -- either the prescription were not filled

8    by their local pharmacy because we're not sure they recognize

9    our number where they can fill or not.

10   Q   Where did you understand Stephen McDonald was going?

11   A   Alaska.

12   Q   For what purpose?

13   A   He is working a very demanding job, I think --

14           MS. GRIFFIN:  Your Honor, objection as to relevance;

15   why, what he was doing.

16           THE COURT:  Overruled.

17   BY MR. KNIZLEY:

18   Q   You may answer.

19   A   He worked in Alaska in a scaffolding company -- some sort

20   of company.  And so we have to sort of make sure he do not run

21   out of the medication.

22   Q   I show you what's marked as Government's Exhibit 59 that

23   you were shown a little while ago.  And it's a one -- exhibit

24   with a number of letters in it.  Do you remember seeing that?

25   A   Yes.

XIULU RUAN, M.D. - REDIRECT BY MR. KNIZLEY
32211

1    Q   I want to direct your attention down to this line right
2    here.  (Indicating.)  And this is again from Medicare
3    Generation to you, and it's -- it's addressed to Xiulu Ruan or
4    who is it addressed to?
5    A   Provider.
6    Q   Will you read for the jury, please, where you started at
7    "we?"  (Indicating.)
8    A   We have attached a list of alternative medications.
9    Q   We -- that's this "we."  Okay?
10   A   We understand that any consideration about changing
11   medications for the elderly should be done carefully and that
12   this intervention may not apply to all patients.  Your clinical
13   judgment in the context of discussion with your patients is the
14   best way to balance the risks and benefits of any therapy.  We
15   recognize and value that judgment.
16   Q   And what judgment are they talking about?
17   A   The judgment of the treating physician.
18   Q   I show you another letter in that series of documents; this
19   one from Active Health, addressed to you, May 7, 2015.  And it
20   says it's a note -- and what does it say here?
21   A   Please see the attached care consideration.
22   Q   And it's about a particular patient; is that right?
23   A   That's correct.
24   Q   Could you read this, where that yellow thing is, please?
25   Starting with:  Does this affect.

1    A    Does this affect physician performance or compensation in

2    any way?  No.  This is not a utilization review,

3    precertification program, or a professional medical

4    consultation.  The only purpose is to share information that

5    might help you care for your patient.

6    Q    And who is the "you" here?

7    A    That's the physician it's sent to.  That's me.

8    Q    Another one in the same package dated 5/4/15 from United

9    Healthcare.  Could you read this sentence, please?

10   A    This report does not take into account patient-specific

11   variables that may factor into your prescribing decisions.  If

12   you have already identified the concern, please disregard this

13   notice and continue to monitor your patient for any potential

14   issues.

15   Q    And lastly, on another one from United Healthcare regarding

16   a particular patient, does it have other prescribers listed on

17   this notice that was sent to you?

18   A    That's correct.

19   Q    And what is that?

20   A    This is hydrocodone 10.

21   Q    And this prescriber?  (Indicating.)

22   A    This is eight tablets, two-day supply.

23   Q    How about over here?

24   A    Four tablets --

25   Q    What is this prescriber?

 1   A   DB.............

 2   Q   And this is yet another prescriber?

 3   A   That's correct.

 4   Q   I show you what's marked as Government Exhibit 62.  And

 5   this is the email about -- from you to Dr. Couch, copied to a

 6   number of others; to Mr. Strange, to Mr. Cross, regarding

 7   transferring Bridgette to Dr. Couch.  Do you see that?

 8   A   Yes, I do.

 9   Q   What do you say right here with the "but?"  What does that

10   say?

11   A   But she needs full-time job for her insurance.

12   Q   What did you mean by that?

13   A   ...(Redacted.)

14

15

16

17        MS. GRIFFIN:  Your Honor, object to the answer as not

18   being responsive to the questions.

19        THE COURT:  Overrule.

20   BY MR. KNIZLEY:

21   Q   Did you complete your answer about what that meant right

22   there?  (Indicating.)

23   A   ...(Redacted.)

24

25

1  Q  Do you recall the prosecutor talking about your billboard

2  and TV ad?  Do you remember that?

3  A  That's right.

4  Q  And you heard her say something about -- asking you about

5  did you get business from -- that she understood you got

6  business from referrals?  Did you hear that?

7  A  From referring physicians.

8  Q  Did you hear it?

9  A  I don't recall.

10  Q  Did you hear her ask you about referrals?

11  A  Yes.

12  Q  Read that first sentence right there, please.

13  A  Especially, we have had our TV and billboard running, and

14  we're getting more referrals than before.

15  Q  What type of referrals are you referring to?

16  A  Referring from physicians.

17  Q  Mr. B..., you saw his file, Government's Exhibit 65.  Do

18  you remember that?

19  A  Yes, sir.

20  Q  And you heard the prosecutor asking you questions about

21  when you first started seeing him back in 2009; is that

22  correct?

23  A  That's true.

24  Q  ...(Redacted.)

25

1       ...(Redacted.)

2   A   Well --

3   Q   Did you know anything about it?

4   A   That was what the record shows.  And we did not put him on

5   any opioids.

6   Q   First off, do you recall back then knowing whether he had

7   any of those problems?

8   A   I don't recall he had any problem.

9   Q   And now back to what you were saying.  Did you ever, during

10  the time frame that you treated him until you transferred him

11  to Dr. Chen, did you ever prescribe him an opioid?

12  A   No.

13  Q   Did you ever have any indication, while he worked for you,

14  that he had any substance abuse problem whatsoever?

15  A   None whatsoever.  No.

16  Q   I show you what's marked as Government's Exhibit 60, what

17  you looked at a few moments ago with the subject:  Incident-to,

18  Mr. Bean in June 2014, to you; is that right?

19  A   That's correct.

20  Q   Now, would you read the first thing he says in this?

21  A   What I've gathered so far in my study into the matter is as

22  follows.

23  Q   And what is the subject matter up here?

24  A   Incident to.

25  Q   Incident to what?

1   A    CMS rules, Blue Cross/Blue Shield, Cigna and Aetna
2   compliance.
3   Q    Did you understand that he was studying up on the matter
4   about how to be in compliance with these matters?
5   A    That's what it says.
6   Q    Was that important to your clinic to be in compliance with
7   matters?
8   A    Yes.
9   Q    And was he doing something on behalf of your clinic in
10  order to make sure you were within compliance?
11  A    That's right.
12  Q    And in paragraph two, would you read what he was able to
13  determine from his study in paragraph two?
14  A    For Medicare/Medicare-managed care insurance, it is not
15  required that the MD see the patient at follow-up, only the
16  initial visit.  And co-signing is valid if there are no new
17  problems.
18  Q    And that was for Medicare and Medicaid.  Did Cigna and
19  Aetna have a different rule?
20  A    It says here:  Cigna and Aetna follow the CMS incident-to
21  rules as listed above.
22  Q    Now, what is CMS; do you know?
23  A    Centers for medical care service.
24  Q    I'm sorry.  Say it again, sir.
25  A    Center for government medical care.  Medicare.

1  Q   And then Blue Cross/Blue Shield had yet another rule?

2  A   That's what it says here, yes.

3  Q   And he says:  Blue Cross/Blue Shield plans evidently don't

4  recognize the incident-to rules at all; is that right?

5  A   That's what it says here.

6  Q   That's what his study is just now bringing to your clinic's

7  attention; is that correct?

8  A   That's right.

9  Q   Now, the prosecutor asked you about this sentence right

10  here.  Could you read that, please?

11  A   My proposed solution, after talking with a colleague of

12  mine who had a billing specialist conduct billing training for

13  their clinic, is to add this line.

14  Q   All right.  Who is their clinic?  What's the name of their

15  clinic?

16  A   Southern Cancer Center.

17  Q   What is the Southern Cancer Center?

18        MS. GRIFFIN:  Objection as to relevance, Your Honor.

19        THE COURT:  Sustained.

20  BY MR. KNIZLEY:

21  Q   Do you know what the Southern Cancer Center is?

22        MS. GRIFFIN:  Objection, Your Honor, as to relevance.

23        THE COURT:  I sustain the objection.

24  BY MR. KNIZLEY:

25  Q   Does this email that's in evidence say that Mr. Bean had

XIULU RUAN, MD, REDIRECT BY MR. KNIZLEY
32218

1  consulted a colleague who had someone who was a billing

2  specialist conduct the training for this clinic?  (Indicating.)

3  A   That's correct.

4  Q   Now, you were asked about this sentence before now.  It's

5  probably a good idea to lay eyes on everyone.  Were you or were

6  you not already doing that?

7  A   I was doing that for years.

8  Q   The last sentence.  What did Mr. Bean say about these

9  billing coverage issues?

10 A   Hope this helps to begin to clarify this complex issue.

11 Q   At least he considered that to be fairly complex, how you

12 do this billing?

13 A   That's correct.

14 Q   And whatever way you billed when you saw patients, whether

15 you -- however you billed or were compensated, was it in the

16 best interest of your patients, whatever you did?

17 A   Yes.

18 Q   Was it your job -- did you oversee the billing aspect of

19 your practice?

20 A   No.

21 Q   Was this something you knew about or were concerned about

22 on a routine basis?

23 A   There -- news is about this kind of event happening in

24 Mobile.  That's how Matthew Bean wanted to do something.  We

25 had the practice -- all the patients that came to see me,

 1    whether on my nurse practitioner's schedule or on my schedule,

 2    I saw them all.

 3              MS. GRIFFIN:  Your Honor, I object.  It is not

 4    responsive to the question.

 5              THE COURT:  Sustained.

 6    BY MR. KNIZLEY:

 7    Q   Have you ever known anyone to forge a prescription of

 8    yours?

 9    A   No.

10    Q   Have you ever fraudulently submitted any insurance claim

11    for payment?

12    A   No.

13              MS. GRIFFIN:  Your Honor, it is beyond the scope of

14    cross.  And it was asked and answered on his direct.

15              THE COURT:  Sustained.

16    BY MR. KNIZLEY:

17    Q   Have you ever falsely entered anything in a medical record

18    for any reason?

19    A   No.

20    Q   Have you ever fraudulently completed a preapproval

21    application?

22    A   No.

23              MS. GRIFFIN:  Your Honor, it's beyond the scope --

24              THE COURT:  I sustain.

25              MS. GRIFFIN:  -- of cross.

```
 1            THE COURT:  Mr. Knizley, you've covered all of this
 2    before.
 3            MR. KNIZLEY:  No further questions, Your Honor.
 4            THE COURT:  All right.  May he step down?
 5            MR. KNIZLEY:  Yes, ma'am.
 6            THE COURT:  All right.  Dr. Ruan, you may step down.
 7            Do you have another witness?
 8            MR. ARMSTRONG:  Yes, ma'am, she's gone to get him.
 9              CHRISTOPHER GEORGE GHARIBO, MD,
10              was sworn and testified as follows:
11            THE WITNESS:  I do.
12                      DIRECT EXAMINATION
13    BY MR. ARMSTRONG:
14    Q   Could you state your name for the record and then also
15    spell it, please?
16    A   Christopher George Gharibo, C-H-R-I-S-T-O-P-H-E-R,
17    G-E-O-R-G-E, G-H-A-R-I-B-O.
18    Q   And you are Dr. Gharibo?
19    A   Yes.
20    Q   And how are you presently employed?
21    A   I'm at NYU School of Medicine.
22    Q   And you also actively practice within a pain medicine
23    practice?
24    A   Yes.
25    Q   Clinic?
```

1   A   Yes.

2   Q   And have you been hired by Dr. Ruan to come down and give

3   opinions about certain medical files in this case?

4   A   Yes.

5   Q   And have you charged a fee to do that?

6   A   Yes.

7   Q   And approximately how much have you been paid to review the

8   charts and come down here and testify?

9   A   All total, about 20 to $25,000.

10   Q   And the medical charts you reviewed, were they the charts

11   of Deborah Walker, John Bosarge, KL.........., D....

12   G........., Erick Gist, Karen Daw, David L..., Mark W.....,

13   RB.........., GM..........., JH..........., SJ..............,

14   Stephen McDonald, CC.............., and SW.............?

15   A   That's correct.

16   Q   That's a lot of files; that's why your fee is so large?

17   A   Yes.

18   Q   Let's talk a little bit about your background, Dr. Gudin --

19   I'm sorry -- Dr. Gharibo.  Can you tell the jury a little bit

20   about your medical training?

21   A   I went to New Jersey Medical School.  Right now it's called

22   Rutgers Medical School.  That was in Newark, New Jersey.  That

23   was followed by one year of internal medicine internship in New

24   Brunswick, New Jersey, as part of the Robert Wood Johnson

25   Medical School.  That was followed by three years of

CHRISTOPHER GEORGE GHARIBO, MD - DIRECT BY MR. ARMSTRONG

1    anesthesiology training at NYU Medical Center in New York City.

2    And that was followed by one year of pain medicine training at

3    Thomas Jefferson University Hospital in Philadelphia, New

4    Jersey -- Philadelphia, Pennsylvania.

5    Q   As a resident, did you have a specialized field that you

6    were looking into?

7    A   Yes.

8    Q   What was that?

9    A   I trained in anesthesiology, which also covers pain

10   medicine as well.

11   Q   And that was a three-year program, I believe?

12   A   Yes, it is.

13   Q   And then you followed that with a fellowship in

14   anesthesiology at -- I believe you said it was the Jefferson

15   Pain Center in Philadelphia?

16   A   No, I followed it with a pain medicine fellowship in

17   Philadelphia.

18   Q   Okay.  Sorry.  I had that backward.

19           And are you licensed to practice medicine?

20   A   Yes.

21   Q   And where are you licensed to practice?

22   A   New York state.

23   Q   And is that where your office is right now?

24   A   Yes.

25   Q   And do you have any certifications, board certifications?

CHRISTOPHER GEORGE GHARIBO, MD - DIRECT BY MR. ARMSTRONG

1    A    Yes.

2    Q    And what are those, please?

3    A    I'm board certified with the American Board of

4    Anesthesiology and a subspecialty certification with pain

5    medicine within American Board of Anesthesiology.

6    Q    And how long have you held those boards and certifications?

7    A    About 20 years.

8    Q    Do you have any certifications with the DEA?

9    A    I am -- yes.  I have DEA certification as well.

10   Q    And do you have any academic appointments?

11   A    Yes.

12   Q    What are those, please?

13   A    I'm an associate professor of anesthesiology in pain

14   medicine as well as associate professor of orthopedics at New

15   York University School of Medicine.

16   Q    And how long have you had that?

17   A    I've been an associate professor for about four to six

18   years.

19   Q    Did you start out initially as an instructor and work your

20   way up to the associate professorship?

21   A    That's correct.

22   Q    And so you began that around 1997?

23   A    Yes.

24   Q    So you've been doing that for quite a while?

25   A    Yes.

1   Q   And do you have any affiliations with any hospitals?

2   A   Yes.

3   Q   And what are those, please?

4   A   I'm affiliated with NYU Hospital for joint diseases, NYU

5   Medical Center, and Bellevue Hospital Center in New York City.

6   Q   And what do you do presently at Bellevue?

7   A   I don't go to Bellevue.  I do have credentialing at

8   Bellevue.  But I do have an appointment there.  I haven't been

9   there for about 10 years.

10  Q   And are you a member of any organizations?

11  A   Yes.

12  Q   Related to pain management?

13  A   Yes.

14  Q   And what organizations are you a member of?

15  A   A whole spectrum.  We can start with New York State Society

16  of Interventional Pain Physicians, New York State Society of

17  Anesthesiologists, American Society of Anesthesiologists,

18  American Society of Regional Anesthesia and Pain Medicine,

19  International Association for the Study of Pain, the Eastern

20  Pain Association, and probably a variety of others as well.

21  Q   Do most of these organizations have journals or

22  publications that they issue --

23  A   Yes.

24  Q   -- to members?  And have you ever authored any of these

25  publications?

 1   A   Yes, I have.

 2   Q   Approximately how many, without going through each of them,

 3   approximately how many publications have you --

 4   A   Probably about 20 to 30 publications or so overall.

 5   Q   Okay.  And have you ever served any of these organizations

 6   as an editor of their publications?

 7   A   Yes.

 8   Q   And for which organizations?

 9   A   A whole spectrum of them.  I am the section editor for the

10   journal of pain physicians, as I am also on the editorial board

11   of the same journal, the Pain Physician Journal.  I have also

12   been a guest editor for Pain Medicine for the journal of opioid

13   pharmacotherapy and palliative care, I believe, for Journal of

14   Pain, and for, I believe, for Journal of Regional Anesthesia

15   and Pain Medicine, as well as Pain Medicine News as well.

16   Q   And as an editor on one of these boards, or as a guest

17   editor, what exactly is your role?

18   A   They send me papers, research that has been done in an

19   institution, for review for appropriateness, for evaluation of

20   the methodology, whether if appropriate conclusions were

21   reached and whether if it deserves publication or not.  They

22   are also seeking my comments to improve the paper so that when

23   it is published it is enhanced.

24   Q   Have you ever taught or presented at any international

25   conferences related to pain management?

6040

1    A    Yes.

2    Q    And in that capacity have you given speeches?

3    A    Yes.

4    Q    In such places as -- have you gone to Turkey to give

5    presentations?

6    A    Yes.

7    Q    China?

8    A    Yes.

9    Q    Belgium?

10   A    Yes.

11   Q    Italy?

12   A    Yes.

13   Q    Singapore?

14   A    Yes.

15   Q    South Korea?

16   A    Yes.

17   Q    Mexico?

18   A    Yes.

19   Q    The Bahamas?

20   A    (Pause.)  It was on a cruise to the Bahamas.

21   Q    Or Nassau, was there some speech you gave?

22   A    Yes.

23   Q    Malaysia?

24   A    Yes.

25   Q    Colombia?

6041

1    A    Yes.

2    Q    And these are all related to the international meetings

3    where you were presenting related to pain management?

4    A    That's correct.

5    Q    Have you also either authored or assisted in the authorship

6    of books related to pain management?

7    A    Yes, I have.

8    Q    And interventional medicine as well?

9    A    Yes.

10   Q    Within the United States have you participated in

11   presentations on a national level regarding pain management?

12   A    Yes, I have.

13   Q    Can you remember how many times you've given presentations

14   approximately?

15   A    It's way more than a hundred.

16   Q    Have you also participated in public outreach and media

17   events related to pain management?

18   A    Yes, I have.

19   Q    Have you been accepted as an expert in a federal criminal

20   case before?

21   A    Yes, I have.

22   Q    Was that in New York state, federal court in New York?

23   A    Yes.

24   Q    And was that an expert on behalf of the United States, on

25   behalf of the government?

1   A   That's correct.

2   Q   You were accepted as an expert in that case?

3   A   Yes.

4          MR. ARMSTRONG:  Judge, we would offer Dr. Gharibo as

5   an expert in the field of pain management.

6          MR. BODNAR:  No objection, Your Honor.

7          THE COURT:  All right.  So designated.

8   BY MR. ARMSTRONG:

9   Q   Now, I read through the list of the charts, patient charts

10  that you reviewed.  You remember going through all those

11  charts; correct?

12  A   Yes, I do.

13  Q   And with regard to those charts, have you also reviewed the

14  summary of the reports of the government experts in this case,

15  Dr. Greenberg, Dr. Vohra, and Dr. Aultman?

16  A   Yes, I have.

17  Q   Did you also review, in forming your opinions, the Alabama

18  Board of Medical Examiners Administrative Code?

19  A   Yes, I have.

20  Q   And that is this document here?  (Indicating.)

21  A   Yes, it is.

22  Q   And in particular did you review the sections having to do

23  with controlled substances and requirements for the use of a

24  controlled substance for the treatment of pain?

25  A   Yes, I did.

CHRISTOPHER GEORGE GHARIBO, MD - DIRECT BY MR. ARMSTRONG

1  Q   And you reviewed all that in evaluating the content of the

2  files in forming your opinions?

3  A   That's correct.

4  Q   Now, with regard to the charts that you reviewed, did you

5  find that all of the patients had been referred by other

6  physicians?

7  A   Yes.

8  Q   What was your finding regarding the conditions of these

9  patients upon referral to Dr. Ruan for treatment?

10  A   They had rather an advanced pain state with major pain

11  problems, what we call in pain medicine pain generators.  They

12  ranged from patients having multiple knee surgeries, over 10

13  knee surgeries, with torn meniscus and torn ligaments; multiple

14  back surgeries with significant spinal disease such as, for

15  example, a mass within the spine that's putting pressure on the

16  nerve or on the tuft of nerves that are coming down, from the

17  spine down; history of cancer; history of rheumatological

18  conditions; history of significant hip, knee, and joint issues;

19  as well as having arrived at Dr. Ruan's office with significant

20  pharmacotherapy as well as a significant what we call end-organ

21  disease.  What I mean by that, for example, history of renal

22  failure, history of liver disease, obesity, obstructive sleep

23  apnea.  There were definitely what we say -- what we call

24  within medicine suitable for a tertiary care center, where they

25  are required advanced pain care and had been treated

1   unsuccessfully often out in the community.

2   Q   So would it be fair to say or describe the patients as very

3   challenging patients?

4   A   Yes, they are some of the most challenging I've seen, with

5   some of the most advanced disease states that I have seen.

6   Q   And how did you find the treatment that Dr. Ruan -- or the

7   treatment plans and the course of treatment that Dr. Ruan

8   employed in these cases?

9   A   I found Dr. Ruan's treatment in many ways exemplary.  The

10  principles of pain medicine is that you want to minimize the

11  opioids as much as possible by using other measures.  That can

12  include, at the beginning of the beginning, a good diagnostic

13  workup so that the doctor knows what they are dealing with.  So

14  that can include, for example, as Dr. Ruan ordered, it may

15  include Doppler to rule out blood clots, MRIs and other imaging

16  studies of the different parts of the back, the neck, the mid

17  back, the lower back, imaging of the different joints, nerve

18  tests, quite a comprehensive history, especially the initial

19  history and physical examination, a good diagnostic followup,

20  advanced imaging on advanced diagnostic studies in many cases

21  just to sort things out, and appropriate reach out to the

22  community physicians, from primary care to orthopedics and

23  neurosurgery, and then a treatment plan that was in many ways

24  all-encompassing that aimed to minimize the opioids that are

25  prescribed.  So that ranged from, for example, adjusting a

CHRISTOPHER GEORGE GHARIBO, MD - DIRECT BY MR. ARMSTRONG

1  loose-fitting brace to minimize the back pain to prescribing a

2  spectrum of nonopioid medications such as, for example, anti-

3  depressants and nerve pain medications, performing a range of

4  interventional procedures ranging from, for example, joint

5  injections or muscle injections and back injections and spinal

6  injections, all in an effort to treat the combination pain that

7  the patients are suffering from.

8          Close followups, close monitoring.  When he discovered

9  that the treatment is failing or the opioid plan is failing or

10  if the doses are getting to be high, often he rotated out of

11  whatever he was prescribing that was a controlled

12  substance.  So generally speaking, it was quite impressive and

13  exemplary treatment of a patient that is rather challenging.

14  Q   So you mentioned a lot of different topics.  I'm just going

15  to kind of grab onto a few of them.  You mentioned the rotation

16  of the opioids when it looked like the patients might not be

17  getting the optimum benefit anymore?  Did you mention that?  Is

18  that like when a patient becomes tolerant or it appears that

19  the opioid is not working?

20  A   Yes.  Or if you want to cut down on the overall dose.

21  Q   Okay.  I believe dosage within this context is what they

22  refer to as titration, when you're trying to work on the exact

23  dose that may benefit the patient?

24  A   That's correct.

25  Q   Could you explain how a pain management physician uses the

1  tolerance to the medication and rotation with titration and

2  dosages?

3  A    As we titrate up, let's say, a particular opiate molecule,

4  let's say hydrocodone, which is like Vicodin.  And if we find

5  that after reasonable titration where, let's say, we're getting

6  to a dosage of somewhere between 50 to 100 milligrams, where a

7  patient was initially getting pain relief but now the molecule

8  is beginning to fail, there are a couple of different

9  strategies there to manage that.  In addition to doing

10  everything else and optimizing the nonopioids, one of the

11  options you have is to go up on the dose of existing

12  medication, so go up on the hydrocodone or whatever else is

13  being prescribed as an example.  But what I found with Dr. Ruan

14  is that, instead of doing that, he rotated out to another

15  molecule, to another opioid, such as, for example, morphine or

16  oxycodone or Duragesic or whatever it may be, where because of

17  that rotation you're able to decrease the dose overall

18  significantly.  And that's something that I saw where at times

19  I even said to myself why not just go up on the existing dose

20  of what was working before?  But the opioid rotation is

21  definitely -- it told me that he really knows what he's doing

22  in terms of the practice of medicine and in many ways he's

23  providing advanced pain care and really keeping the doses in

24  check as much as possible.

25  Q    So is the opioid rotation and the dosages that you saw from

6047

CHRISTOPHER GEORGE CHARIBO, MD - DIRECT BY MR. ARMSTRONG

1    these patient files, were they for a legitimate medical

2    purpose?

3    A    They absolutely were.

4    Q    And were they within the usual course of professional

5    practice to do it the way he did these?

6    A    Yes, they were.

7    Q    Now, with regard to the use of opioids with other

8    medications, did you find evidence from the files that in

9    addition to the opioids he worked in nonopioids as part of the

10   treatment plan?

11   A    Yes, I did.

12   Q    And what is the benefit to the patient of doing so, or the

13   need of the patient of doing so, from the charts you reviewed?

14   A    The benefit to the patient is what we call -- it may sound

15   like a geeky term -- but it's called multi-mechanistic

16   analgesia because there are different types of pain, not just

17   different degrees of the same type.  And those different types

18   of pain require a particular type of an analgesic to really hit

19   it on the head and alleviate the pain.

20         So that ranges from medicines that attack different

21   parts of the central nervous system, at the brain and spinal

22   cord, or giving medicines that work on the joints and the

23   periphery.  So by attacking those different mechanisms of pain

24   both in the periphery, let's say at the muscle and joints, as

25   well as within the brain and other parts of the nervous system,

CHRISTOPHER GEORGE GHARIBO, MD - DIRECT BY MR. ARMSTRONG

6048

1   you can cut down on the opioid and improve the quality of the

2   pain relief.  So you have the strategy of sticking with one

3   mechanism where ultimately you run out from what that mechanism

4   provides, but you can improve the quality of pain relief by

5   being multi-mechanistic with the nonopioids, which he did quite

6   impressively.

7   Q    In addition to the use of the opioids with the nonopioids

8   that you just described, did you also see where he worked in

9   other efforts like interventional efforts to block pain or do

10  other procedures?

11  A    Yes, I did.

12  Q    And how does that benefit -- within the context of the pain

13  management clinic, how is that evidence of good treatment to

14  the patient?

15  A    That's evidence of somebody who is highly skilled, who is

16  addressing the patient's problems head on.  Medications work in

17  our blood and they get circulated to different targets and

18  provide pain relief.  The advantage of interventional

19  therapies -- and what I mean by that is injections to different

20  parts of the body -- is that it treats the pain exactly where

21  it needs to be treated.  So they range from, let's say,

22  cortisone shots in the hips or the knees to injections in the

23  spine.  But Dr. Ruan also engaged in more advanced

24  interventional therapies; for example, many of us, for example,

25  we may go up and up and up on the opioid molecule but what he

CHRISTOPHER GEORGE GHARIBO, MD - DIRECT BY MR. ARMSTRONG                6049

1   opted to do for some patients is to encourage them to have a

2   drug delivery system implanted, where you can cut down on the

3   overall dosing that the patient gets on a 24-hour basis by a

4   factor of 100 to one, 200 to one, or so.  So that told me that

5   he's getting advanced with patients and he's able to cut down

6   on the medication needs through different interventions that

7   get to the pain problem.

8   Q   And with regard to those procedures, his use of procedures

9   for these patients, was that for a legitimate medical purpose?

10  A   Yes, because these patients had significant spine disease

11  in particular as well as significant peripheral joint disease.

12  And the practice of medicine is to not be overly simple.  Maybe

13  some of us are simple, and that's still within the practice of

14  medicine.  But Dr. Ruan's care was clearly more multi-modal and

15  multi-disciplinary, where in many ways he was quite capable

16  himself in being diverse in the way he treats the patient, and

17  that was clearly in the higher end of the standard of care.

18  Q   When you use the word multi-modal, is that when we've heard

19  the word different modalities and he was multi-modal?

20  A   Yes.  For example, physical therapy injections and

21  medications.

22  Q   And those were for a legitimate medical purpose.  Were they

23  also within the ordinary course of a professional practice,

24  medical practice?

25  A   Yes, they definitely were.

1  Q   And the combination of the interventional procedures and

2  the medications, whether they were opioids or nonopioids, were

3  those all for legitimate medical purposes and within the

4  ordinary course of a legitimate medical practice?

5  A   Yes, that was the practice of medicine to an impressive

6  degree.

7  Q   Now I want to draw your attention to -- this is in

8  evidence.  This is Couch 118, the Alabama Board of Medical

9  Examiners -- I'll back this up a little bit.  And I drew your

10 attention earlier to section .06 about controlled substances

11 and prescription guidelines for physicians; correct?  You

12 reviewed these; correct?

13 A   Yes, I did.

14 Q   And I believe it starts right here, and I believe under 06

15 you've got paragraph one and there's A, B, C, D, and then

16 you've got two, three, four, so this section, .06, goes all the

17 way through, back to this page, and then ends with the next

18 section here, .07; correct?

19 A   Correct.

20 Q   Now, when you reviewed this entire administrative code, did

21 you just take certain sections of it and look at it or did you

22 review the whole thing, to review it all in context?

23 A   The whole thing.

24 Q   And the administrative code says in this section, does it

25 not, about controlled substances, prescription guidelines for

1   physicians, it has instructions about the signing and dating,

2   whose name is supposed to be on it; correct?

3   A   Yes.

4   Q   Who is to do it, who is to issue it, the role of an

5   extender, prepared by employees, et cetera?  Correct?

6   A   Yes.

7   Q   And then back here at paragraph 10 it talks about if --

8        MR. BODNAR:  Objection, Your Honor, to discussing

9   about penalties again for this.  This is what we've talked

10  about before in other objections.

11       MR. ARMSTRONG:  This is in evidence and he reviewed

12  it.

13       THE COURT:  Well, we don't need to have specific

14  questions about the penalties.  So --

15       MR. ARMSTRONG:  Okay.

16  Q   Did you take all of the provisions into mind in forming

17  your opinions about whether Dr. Ruan's prescribing was within

18  or without the ordinary course of a professional medical

19  practice?

20  A   Yes, I did.

21  Q   Now, within the context of a pain medicine practice, did

22  you find through the files that Dr. Ruan employed the use of a

23  nurse practitioner?

24  A   Yes, I did.

25  Q   As well as other medical staff?

1  A   Yes.

2  Q   The use of a nurse practitioner, is that within the normal

3  course of a professional practice, medical practice?

4  A   Most of us use nurse practitioners or physician extenders.

5  It's very common.

6  Q   So the use of those and the collaborative use is part of

7  the physician practice in pain management; correct?

8  A   Yes, in many practices across the country.

9  Q   And differentiating from a medical assistant, what is the

10 collaborative role between the physician and the nurse

11 practitioner?

12 A   They play a vital role in patient education, performing

13 history and physicals, in giving a different perspective to the

14 physician, in helping patient flow throughout the day, in

15 essentially evaluating the patient.  In many ways in many

16 practices they are -- in working with the physician -- are

17 responsible for a good part of the collaborative relationship

18 that makes the whole plan work.  It is really an integrated

19 team approach -- and to have some training that the physician

20 does not have, for example, from a counseling perspective and

21 from a psychosocial perspective.  So it's a team approach that

22 best takes care of the patient.

23 Q   And did you find from the charts you reviewed that

24 Dr. Ruan's reliance on nurse practitioners or other medical

25 staff were within the normal course of a professional practice?

6053

1    A    It was.

2    Q    Did you find evidence from the charts you reviewed of the

3    off label prescribing of medications?

4    A    Yes, I did.

5    Q    Was that limited to opioids or was that also nonopioids?

6    A    Opioids and nonopioids.

7    Q    I want to draw your attention specifically to the off-label

8    use of fentanyl products.  Did you see evidence of that from

9    the charts?

10   A    Yes, I did.

11   Q    You understand that fentanyl products are indicated by the

12   FDA for use in cancer patients; correct?

13   A    That's correct.

14   Q    Did you find from the charts that fentanyl products were

15   prescribed for noncancer patients?

16   A    Yes, I did.

17   Q    And that's what we refer to as off label?

18   A    That's correct.

19   Q    Did you find from your review, and is it your opinion based

20   on your knowledge and experience, that Dr. Ruan's prescribing

21   of fentanyl products -- and specifically whether it's Fentora

22   or Subsys or Abstral or whichever product it was -- was within

23   the normal course of a professional practice, despite those

24   patients not having cancer?

25   A    It was within the course of a practice of medicine and

 1  medical practice.

 2  Q   Is it also your opinion that those prescriptions were for a

 3  legitimate medical purpose?

 4  A   Yes, it was.

 5  Q   Now, I have asked you about each of the patient charts.

 6  And we read the names out.  And I'm not limiting you to these.

 7  But is your opinion that each of the prescriptions were proper

 8  for all patients reviewed, including DG.............,

 9  KL......., Erick Gist, Deborah Walker and John Bosarge?

10          MR. BODNAR:  Your Honor?  Can I speak with counsel for

11  one moment?

12          THE COURT:  All right.

13      (A discussion was held off the record between counsel.)

14          MR. BODNAR:  We're fine, Your Honor.

15  BY MR. ARMSTRONG:

16  Q   I'm not limiting you to those charts, but for all patient

17  charts you reviewed, the full list of names I read before,

18  including those; correct?

19  A   Yes.

20  Q   Last set of questions:  Specifically with regard to the

21  last set of questions I asked you, I want to ask you specific

22  questions about Subsys and Abstral.  You saw evidence from the

23  charts of some of the patients getting those prescriptions?

24  A   Yes, I did.

25  Q   And specific to those specific fentanyl products, is it

1  your opinion that each of those prescriptions that were written

2  were for a legitimate medical purpose?

3  A   Yes.  There were significant pain problems, patients were

4  already on short acting pain medications, and that is another

5  way to address the breakthrough pain that the patients

6  experienced.  And this wasn't just any pain.  Many of these

7  patients had formidable mixed pain states that required a broad

8  spectrum analgesic such as an opioid or such as the fentanyl

9  products.

10 Q   You mentioned breakthrough pain.  Is breakthrough pain only

11 experienced by cancer patients?

12 A   No.  It can be experienced by noncancer patients too.

13 Q   And can that breakthrough pain in noncancer patients feel

14 just as bad as those that have cancer?

15 A   It can even be worse, because we're dealing with

16 significant spine disease and failed back surgery syndrome and

17 marked tightness in the spine for many of those patients.  So

18 those patients are going to have a lot of mechanical pain,

19 mechanical bone pain, muscle pain, and nerve pain.  And that

20 will dull up in a snap.  Or sometimes you need quick-acting

21 medications just to get your day started, for

22 example.  Patients sort of gel up overnight.  It's tough to get

23 your day started and it's difficult to take a medicine and wait

24 for about an hour for it to work.  So the advantage of these

25 fentanyl products is that they will begin to work in about

1    15-20 minutes, so patients can get going quicker.

2    Q   So it is your opinion that each of these Subsys and Abstral

3    prescriptions you saw on these charts were within the ordinary

4    course of a professional practice within the context of a pain

5    management clinic?

6    A   They were rarely prescribed.  When they were prescribed,

7    they were prescribed for appropriate reasons.  The majority of

8    these patients were not on such products that I looked at.  The

9    small percentage there was was prescribed for appropriate

10   reasons.

11          MR. ARMSTRONG:  Pass the witness, Judge.

12          THE COURT:  Mr. Bodnar?

13          MR. BODNAR:  Yes, Your Honor.  Just one moment to

14   gather some material.

15          THE COURT:  All right.

16                    CROSS EXAMINATION

17   BY MR. BODNAR:

18   Q   Welcome to Mobile, Dr. Gharibo.

19   A   Thank you.

20   Q   My name is Chris Bodnar and I represent the United States.

21          Just one clarifying point to begin with.  I know you

22   reviewed a lot of different files.  But do you recall -- I

23   think you mentioned that you noted that one of the patients had

24   renal failure.  Do you recall, though, for sure seeing that

25   anyone had renal failure within the list of patients that

1   Mr. Armstrong read off to you?

2   A   There was definitely one patient within that list that was

3   read to me that had renal issues, yes.

4   Q   And renal issues, you mean some sort of kidney failure?

5   A   Yes.

6   Q   Actually one more thing.

7       (A discussion was held off the record between government

8   counsel.)

9   BY MR. BODNAR:

10  Q   And, Dr. Gharibo, in preparation for coming down here and

11  testifying today, you reviewed Dr. Ruan's medical files, the

12  paper files that were printed out for you; correct?

13  A   You're correct.

14  Q   And one of the disadvantages of having to review something

15  just from a file is that the review and the opinions of it can

16  only be as good as the accuracy of the files; isn't that

17  correct?

18  A   Correct.

19  Q   So you mentioned in there about the extensive workups and

20  extensive physicals that you saw within the patient files;

21  right?

22  A   I did.

23  Q   And you had mentioned before or -- sorry -- previously on

24  direct you talked about testifying on behalf of the United

25  States before?

6058

1   A   Yes.

2   Q   Is that correct?  And do you recall testifying in

3   Manhattan, back in -- I believe it was March of last year, in

4   the United States versus Moshe Mirilashvili?

5   A   I remember the case.

6   Q   And do you remember in that case where you were discussing

7   about the typical length of an initial visit for a pain

8   patient?

9   A   I don't remember.

10  Q   Well, if you said back then that a typical visit would be

11  somewhere between 20 minutes and an hour, is that about what it

12  would be for a typical initial pain treatment?

13  A   For many, yes.

14  Q   And particularly for the patients you looked of

15  Dr. Ruan's --

16  A   Not pain treatment, but pain evaluation.

17  Q   Pain evaluation.  So the first visit for pain evaluation?

18  A   Yes.

19  Q   And that would be particularly so for patients like

20  Dr. Ruan's that you noted, at least according to the file, had

21  had a significant number of problems?

22  A   Yes.

23  Q   Unfortunately, though, just from the file you can't tell

24  what aspects of that physical were done, if any; correct?

25  A   I -- I wasn't there, so --

1   Q   So you only know what it is that it says in there?

2   A   Correct.

3   Q   Dr. Gharibo, you mentioned seeing indications of opioid

4   rotation in the files as well; correct?

5   A   Correct.

6   Q   And opioid rotation can be a very good thing, so that

7   patients don't become tolerant or so you don't have to keep

8   going up and up on the same drug; isn't that correct?

9   A   You're correct.

10  Q   Unfortunately, again, from the record, there's no way to

11  tell what is the doctor's intent from rotating from one drug to

12  another?

13  A   I think there's some reasonable understanding of the intent

14  of the rotation, based on the record.

15  Q   Was there anything in the record that indicated whether or

16  not Dr. Ruan had financial interests in a drug that he was

17  rotating patients onto?

18  A   No.

19  Q   That's not something you would be able to tell from the

20  record, is it?

21  A   No, there was no indication -- usually with financial

22  interest you pick a product that you have an interest in and

23  you drive up the dose of that, not so much rotate out to a

24  generic medicine.

25  Q   You talked about picking a drug and driving up the

1  prescriptions for it.

2  A   Overall dosing per patient per day.

3  Q   Why would you do that?

4  A   Well, for the reason if somebody had a financial interest

5  in, let's say, Purdue or whatever else was out there, the way

6  to maximize the return and maybe benefit financially is to pick

7  that company's product and drive up the overall dose to

8  hundreds of milligrams or, let's say, approach 400 to 500

9  milligrams and so on.  That's not what I saw here.  I saw

10  rotation within less than a hundred milligrams, which is just

11  not that impressive and doesn't indicate any financial bias.

12  Q   Dr. Gharibo, I'm going to show you what has previously been

13  admitted as Government's Exhibit 10-19.  And does this say at

14  the top Dr. Xiulu Ruan and Dr. John Patrick Couch, Abstral

15  Prescribed by Month in Micrograms?

16  A   Yes, it does.

17  Q   Do you see how the blue line is for Dr. Couch and the red

18  line for Dr. Ruan?

19  A   Yes.

20  Q   And do you see in this time period starting in the fall of

21  2013 a sharp uptick into the millions of micrograms of Abstral

22  prescribed?

23  A   That's what it shows.

24  Q   But based on the records, you would have no idea if

25  Dr. Ruan and Dr. Couch have a financial self-interest in the

6061

1  company that manufactures Abstral?

2  A   I would not.

3  Q   Dr. Gharibo, there are a lot of ways -- there's a large

4  spectrum in which you can practice pain medicine, there's not

5  just one right or wrong way to do things; correct?

6  A   You're correct.

7  Q   And different doctors can agree or disagree on different

8  tracks of how they should treat pain management?

9  A   Correct.

10  Q   And in fact, in your practice you don't prescribe Subsys or

11  Abstral at all; isn't that correct?

12  A   That's correct.

13  Q   And you've never prescribed either of those drugs?

14  A   Not as an outpatient, maybe some in-patient.

15  Q   How about Fentora or Lazanda?

16  A   I don't prescribe them as an outpatient.

17  Q   And you also, in your own pain clinic in Manhattan, you

18  have people with very difficult back and neck and hip issues as

19  well; correct?

20  A   I do.

21  Q   And you're able to provide them pain relief with something

22  other than a TIRF fentanyl drug?

23  A   Oftentimes I do.

24  Q   I'm going to show you what has previously been admitted as

25  Government's Exhibit 9-2(5).  And this is an email from

 1    Dr. Ruan to Dr. Couch and Dr. Chen.  I draw your attention to

 2    this part right here, which says:  I want them to understand

 3    their criterion of using active cancer is flawed and, lastly,

 4    breakthrough pain in cancer and noncancer are very similar and

 5    only TIRF products are the drug of choice.

 6            Now, in your practice for breakthrough pain, TIRF

 7    drugs are not simply the only drug of choice, are they?

 8    A    It's a matter of perspective.  Certainly in my practice

 9    they are not the only drug of choice.  But they are a drug of

10    choice.  That's within the practice of medicine.

11    Q    Of course.  And if you're making the decision to put

12    somebody off label on a TIRF drug and you have the patient's

13    best interest in mind, that's clearly within the usual course

14    of professional practice, isn't it?

15    A    Yes, it is.

16    Q    But if you're doing it for your own financial self-

17    interest, that would not be in the usual course of professional

18    practice, would it be?

19    A    You're correct.

20    Q    Dr. Gharibo, approximately how many patients do you have at

21    your clinic?

22    A    Probably over a thousand.

23    Q    I'm sorry.  1,000?

24    A    Yes.  My personal patients, not the clinic.

25    Q    Personally you have about 1,000 patients.  How many do you

 1  think overall in your clinic?

 2  A   Couple of thousand.

 3  Q   Are there times when you have to discharge patients or fire

 4  them from your practice?

 5  A   Discharge, yes.

 6  Q   And when you discharge a patient, that is an appropriate --

 7  that is an appropriate thing to be done under certain

 8  circumstances in pain management; isn't that correct?

 9  A   It's complicated, but sometimes, yes.

10  Q   And while it may be complicated to decide whether or not

11  you should retain or discharge a patient, for your patients do

12  you take into account the fact that if you discharge a patient

13  you're going to lose that patient's revenue?

14  A   No.

15  Q   Dr. Gharibo, in your practice -- well, first off, do you

16  know what I mean by presigned blank prescription?

17  A   I believe I do.

18  Q   Is that a prescription that has a doctor's name on the

19  bottom but nothing else filled in?

20  A   That's my interpretation.

21  Q   Is that something that you -- well, first off, I'm going to

22  show you now what has been admitted as United States 3-3 and

23  ask you is this an example of what you are meaning by a

24  presigned blank script?

25  A   Yes.

6064

1   Q   In your practice do you leave presigned blank scripts for

2   your nurse practitioners to use?

3   A   It's not an issue in New York state because we eprescribe.

4   Q   So you wouldn't, you do not leave them presigned scripts

5   like this?

6   A   We don't use paper at all.

7   Q   Have you ever used paper during your career?

8   A   Yes.

9   Q   During that time period did you leave presigned scripts for

10  your nurse practitioners to use if needed?

11  A   I don't have a nurse practitioner.  I did not, therefore.

12  Q   Is it outside the usual course of professional practice to

13  leave presigned blank prescriptions for nurse practitioners

14  without a DEA license?

15  A   No, it's not.

16  Q   It is not outside the usual course of professional

17  practice?

18  A   It's something that shouldn't be done.  But I've seen other

19  colleagues practice in such a way to save time and facilitate

20  patient flow.

21  Q   Now, you do know, though, that it is against the Alabama

22  rules; correct?

23  A   Yes, I do.

24  Q   Now, Dr. Gharibo, you mentioned that you're on the

25  editorial boards of several different journals; isn't that

 1   correct?

 2   A    Two, yes.

 3   Q    Was one of them Pain Physician?

 4   A    Yes.

 5   Q    And in your work as an editor on Pain Physician, that's how

 6   you got to know Dr. Ruan; isn't that correct?  Who was also an

 7   editor on that, on Pain Physician?

 8   A    I don't know Dr. Ruan.  I've come across his papers and

 9   I've come -- I've seen him at various different meetings.  But

10   I'm not sure if that's -- if ASIP is how I got to know him.

11   Q    Do you recall as early back as March and April of 2011

12   sending emails back and forth with Dr. Ruan regarding journal

13   publications?

14   A    Sounds right.

15   Q    So you were in contact with him at least back in 2011?

16   A    There were group emails that were sent as part of the

17   opioid guidelines and interventional pain guidelines that I

18   believe Dr. Ruan was part of.  So we sort of just all replied

19   to all.

20   Q    How about for urine testing in drug -- in chronic pain?

21   A    I don't have a specific recollection.  But, you know, we

22   kind of broke up into groups.  I don't know if Dr. Ruan was

23   part of one of my groups.  But there may have been some emails

24   back and forth on a variety of topics.

25   Q    And in 2012 through 2014 you and Dr. Ruan also traded back

1   and forth political jokes by email; isn't that correct?

2   A   I don't remember such a thing at all.

3   Q   I'm going to show you now what has been marked.

4        MR. BODNAR:  And, Your Honor, this is just for

5   identification purposes --

6        THE COURT:  All right.

7        MR. BODNAR:  -- not for admission -- what is marked as

8   66-1 and 66-2.

9        (A discussion was held off the record between counsel.)

10        MR. BODNAR:  And, Your Honor, this is not for public

11   viewing by the jury.

12   Q   Mr. Gharibo, I'm showing -- Dr. Gharibo, I'm showing you

13   now what has been marked as Government's Exhibit 66-1.  And I'm

14   going to zoom out for you.  And without going into what

15   anything says here on this email other than your name and the

16   date, does this help refresh your memory of whether or not

17   first an email was sent to you on September 5th, 2012, from

18   Dr. Ruan and then you sending an email back to Dr. Ruan?

19   A   It was a dear all, which I responded to, yes.

20   Q   And you responded, though, directly to Dr. Ruan; is that

21   correct?

22   A   Right.  But no political comments.

23   Q   And showing you now again just for identification purposes

24   66-2, is this an email that Dr. Ruan again wrote to dear all

25   but then you responded on April 9, 2014, directly to Dr. Ruan?

CHRISTOPHER GEORGE CHARIBO, MD - CROSS BY MR. BODNAR

1    A    This is at the time of the healthcare reform, where --

2    Q    Without getting into what it says in the email though --

3    A    Yes, it's dear all.

4    Q    -- were you communicating with him in 2014?

5    A    And I responded to dear all.

6    Q    Well, you responded directly to Dr. Ruan; is that correct?

7    A    Well, yeah, because all the other emails are kind of just

8    obscured, or I don't want to contaminate people's mailboxes,

9    yes.  Nothing of a personal nature.

10   Q    Do you remember in the summer of 2014 when Dr. Ruan reached

11   out to you and an individual named Dr. Jeffrey Gudin to help

12   him draft a letter to the Alabama Board of Medical Examiners

13   about Zohydro?

14   A    I remember something like that.

15   Q    And who is Dr. Jeffrey Gudin?

16   A    He is a colleague in New Jersey.

17   Q    And he's somebody that you've done Youtube videos together

18   for for PainLive Television; is that correct?

19   A    Maybe out there.

20   Q    And do you know if Dr. Gudin was also involved in this

21   case?

22   A    Yes.

23   Q    You know that he was; correct?

24   A    Yes.

25   Q    I'm going to show you now what has been marked as

CHRISTOPHER GEORGE GHARIBO, MD - CROSS BY MR. BODNAR

```
 1    Government's Exhibit 66-3.  Is this an email from Dr. Ruan to
 2    Jeff Gudin and Christopher Gharibo?
 3    A   Yes, it is.
 4    Q   And do you remember this email?
 5    A   Yeah.
 6          MR. BODNAR:  The United States does move to admit
 7    Government's Exhibit 66-3.
 8          THE COURT:  Any objection?
 9          MR. ARMSTRONG:  Judge, I'm going to object on
10    relevance grounds.
11          THE COURT:  Overruled.
12       (Government's Exhibit 66-3 was entered into evidence.)
13          MR. BODNAR:  May we publish it to the jury?
14          THE COURT:  (Indicating.)
15    BY MR. BODNAR:
16    Q   Dr. Gudin [sic], do you remember this, then, in the summer
17    of 2014, Dr. Ruan reaching out to you and Dr. Jeffery Gudin to
18    help out with writing letters about Zohydro to the Alabama
19    Medical Board?
20    A   I remember it.
21    Q   And did you in fact write a letter or help Dr. Ruan draft a
22    letter to the Alabama Medical Board?
23    A   I'm pretty sure I responded to this.
24    Q   Pretty sure or you remember helping him draft a letter?
25    A   I don't remember my response, but I did respond in a
```

1    constructive way.

2    Q   And then did you follow up with him when you found out

3    afterwards that Alabama had ruled in favor of what Dr. Ruan

4    wanted regarding Zohydro?

5    A   I don't remember following up.

6    Q   I'm going to show you now what has been marked as United

7    States Exhibit 66-4 and ask if this email -- first, from

8    Dr. Ruan, again dear all, but then your response on June 12th

9    -- helps you remember whether or not you responded after the

10   Alabama Medical Board made their decision about Zohydro?

11   A   He followed up, to which I responded.  I didn't followup

12   otherwise.

13   Q   You did respond to him, though, about the ruling; correct?

14   A   I responded to his followup.

15   Q   Do you remember also in summer of 2014 where Dr. Ruan sent

16   you copies of the PPSA commercial?

17   A   I don't specifically remember it.  But I may have looked at

18   a video.

19   Q   Do you recall responding back to Dr. Ruan about that?

20   A   I probably did.

21   Q   I'm going to show you what's been marked as Government's

22   Exhibit 66-5, just for identification purposes.  Dr. Gharibo,

23   does this help you recall whether or not you knew of the

24   commercials and responded to Dr. Ruan?

25   A   I responded to him.

1          MR. BODNAR:  United States moves to admit Government's

2   Exhibit 66-5, Your Honor.

3          THE COURT:  All right.  Mark it in.

4      (Government's Exhibit 66-5 was entered into evidence.)

5          MR. BODNAR:  Is it displayed to the jury?

6          THE COURT:  It will be as soon as it comes up.  All

7   right.

8   BY MR. BODNAR:

9   Q   And, Dr. Gharibo, is this where Dr. Ruan is sending to all

10  copies of the commercial for PPSA for 2014 and '15?

11  A   That's what it looks like.

12  Q   And do you respond only to him, saying:  This is so

13  good.  I think it's very effective, I'm proud of this, Xiulu,

14  have a great time in China?

15  A   Yes.

16  Q   Dr. Gharibo, you mentioned before that you don't personally

17  prescribe Subsys at all?

18  A   Correct.

19  Q   You don't prescribe Abstral at all either?

20  A   You're correct.

21  Q   And you don't receive any money from Insys Therapeutics, do

22  you?

23  A   You're correct.

24  Q   Did you know that Dr. Ruan and Dr. Couch received money

25  from Insys therapeutics?

6071

1   A   No.

2   Q   No, you didn't know that, or no, they didn't?

3   A   I know they received something, but I don't know the

4   details of it.

5   Q   Do you recall back on December 22nd, 2016, being asked to

6   do an interview with CBS news regarding Insys Therapeutics?

7   A   Yes, I do.

8   Q   With regard to that interview, do you recall -- do you

9   remember giving comments about the excessive prescribing of

10  narcotics?

11  A   I was giving some information that may have included that.

12  Q   Do you recall what it was that you said to CBS news about

13  the excessive prescribing of opiates?

14          MR. ARMSTRONG:  Judge, I would object.  This is

15  hearsay, it's beyond the scope, and no foundation.  It's not

16  related to --

17          THE COURT:  Do you want to come to side bar?

18      (At the side bar, jury not present.)

19          MR. BODNAR:  This is not going to be admitted.  I just

20  wanted him to testify about it.  And I'm not going to ask him

21  anything about the indictment or the folks at Insys.  But he

22  was asked -- CBS news did an interview right after the

23  indictment came out against these individuals.  And of the two

24  quotes that he gave, the one I want to ask him about is the

25  second one, where he's asked about whether doctors prescribing

```
 1    outside the usual course of professional practice is a regular
 2    thing.  And it says, now, clearly this is the exception.  There
 3    is egregious criminal irking behavior --
 4              THE REPORTER:  I'm sorry?
 5              MR. BODNAR:  -- irking behavior out there.
 6              And it's the last part right here (indicating).
 7              THE COURT:  What is irking?
 8              MR. BODNAR:  I don't know.  I wasn't sure if that was
 9    a misspelling.  It's this part though, that most of the
10    misprescribing occurs, I believe, is actually well intended and
11    just not inappropriately due to lack of educational foundation.
12    Clearly Dr. Ruan is not someone lacking educational foundation.
13              THE COURT:  Okay.  I sustain the objection.
14         (In open court, defendants and jury present.)
15    BY MR. BODNAR:
16    Q   Dr. Gharibo, in the beginning you mentioned that you
17    received somewhere between 20 and $25,000 for reviewing the
18    files and coming to testify today; is that correct?
19    A   You're correct.
20    Q   What's your rate for testifying in court, do you know?
21    A   It's $5,000.
22    Q   $5,000 an hour or for today?
23    A   Per day.
24    Q   And just to be clear, your opinion that everything was done
25    in the usual course of professional practice with regard to the
```

 1  prescribing done by Dr. Ruan was based only on what you found

 2  inside of those files?

 3  A   That's correct.

 4  Q   And your opinions can only be as good as the accuracy of

 5  what you were given to review?

 6  A   Yes.

 7        MR. BODNAR:  Nothing further from this witness.

 8        THE COURT:  Any redirect?

 9        MR. ARMSTRONG:  Very briefly.

10     (A discussion was held off the record between counsel.)

11                    REDIRECT EXAMINATION

12  BY MR. ARMSTRONG:

13  Q   Dr. Gharibo, just a couple of followup questions.

14  Mr. Bodnar asked you about the use of TIRF medications within

15  your own practice; right?

16  A   Correct.

17  Q   And you said that it's up to the clinician as to how to use

18  those products and the appropriate circumstances; correct?

19  A   Yes.

20  Q   Is it still your opinion that Dr. Ruan's use of TIRF

21  medications off label for the patient charts you reviewed were

22  within the usual course of professional practice?

23  A   It was within the practice of medicine.

24  Q   Now, if in your practice -- Mr. Bodnar asked you about

25  sales of products or prescribing of products going up

 1  quickly.  Are you familiar with promotional programs offered or

 2  sponsored by pharmaceutical companies?

 3  A   Yes, I am.

 4  Q   What is the effect of vouchers, free vouchers, on a

 5  promotional basis on prescribing?

 6         MR. BODNAR:  Your Honor, we object to foundation on

 7  this broad of a question, if it's not tailored to Dr. Ruan or

 8  Dr. Couch.

 9         THE COURT:  Sustained.

10  BY MR. ARMSTRONG:

11  Q   You are familiar with pharmaceutical companies offering

12  voucher programs?

13  A   Yes, I am.

14  Q   And that's usually in conjunction with some type of

15  promotion being offered by that pharmaceutical company?

16  A   Yes, it is.

17  Q   Does that impact the prescribing of physicians in the pain

18  management field?

19         MR. BODNAR:  Again, object to foundation, Your Honor.

20         THE COURT:  Sustained.

21  BY MR. ARMSTRONG:

22  Q   Now, Mr. Bodnar mentioned some emails back and forth.  Are

23  you personal friends with Dr. Ruan?

24  A   No, I was not.

25  Q   Have you ever visited his home?

1   A   No.

2   Q   Have you ever gone to some kind of party with him or

3   Christmas party?

4   A   No.

5   Q   You were a colleague through membership of some

6   professional organizations; correct?

7   A   That's correct.

8   Q   You are professional colleagues?

9   A   Absolutely.

10  Q   Okay.  Anything more than that?

11  A   Absolutely not.

12  Q   Did the fact that you have served on some committees that

13  have brought you into contact with Dr. Ruan in any way affect

14  your opinion in this case?

15  A   It does not.

16          MR. ARMSTRONG:  All right.  That's all.

17          THE COURT:  May this witness be excused?

18          MR. BODNAR:  Yes, Your Honor.

19          THE COURT:  All right.  You may step down,

20  Dr. Gharibo.

21          THE WITNESS:  Thank you.

22          THE COURT:  Any further witnesses?

23          MR. KNIZLEY:  Your Honor, that's all the witnesses we

24  have.  I do have, pursuant to some pretrial motions, a proffer

25  of evidence.  But after that we would be in a position to rest.

1    Maybe the Court will want to hear about that at side bar.

2           THE COURT:  All right.  Come to side bar.

3       (At the side bar, jury not present.)

4           MR. KNIZLEY:  Your Honor, we have marked as Ruan's

5    Exhibit 201, 204, 205, and 206.  Your Honor may recall that

6    there were some undercover videos of Dr. Ruan that the good

7    evidence ruling excluded from evidence.  And we had way back,

8    about six or seven weeks ago, asked could we proffer those.

9    And we have prepared them.

10          THE COURT:  You can mark them as a Court's exhibit.

11          MR. KNIZLEY:  That's all I'm speaking of, Judge.  And

12   we would proffer them and put them in, ask them to be admitted

13   as Court's exhibits.

14          THE COURT:  All right.  We'll admit those.  Hand them

15   to Mary Ann.

16      (Court's Exhibits 4 through 10 were marked for

17   identification.)

18          THE CLERK:  Yes, sir.

19          THE COURT:  And anything else?

20          MR. KNIZLEY:  No, ma'am.  Do you want us to rest in

21   front of the jury?

22          THE COURT:  Yeah.  But let me ask you.  I'm going to

23   ask you if you rest and I'm going to ask you if you rest.

24   (Indicating.)

25          MR. SHARMAN:  Yes, ma'am.

```
 1            THE COURT:  I'm assuming you will say yes.
 2            MR. SHARMAN:  I will say yes.
 3            MR. BODNAR:  And we have one, maybe 10 minutes tops,
 4   rebuttal witness.
 5            THE COURT:  But I do want to advise the jury Monica
 6   Carroll is not going to return as a witness and order that they
 7   disregard her testimony and the exhibit that was admitted
 8   through her.
 9            MR. SHARMAN:  Yes, ma'am.
10            THE COURT:  Okay.  If they can remember what it was.
11            THE CLERK:  It's 264, Your Honor.  Do you want me to
12   get it?
13            THE COURT:  Yeah.  Yeah.
14            MR. SHARMAN:  And so we'll rest and have one rebuttal
15   witness.
16            THE COURT:  And they will put on whatever.  All right.
17       (In open court, defendants and jury present.)
18            THE COURT:  All right.  Mr. Knizley?
19            MR. KNIZLEY:  Your Honor, Xiulu Ruan rests.
20            THE COURT:  All right.  Mr. Sharman?
21            MR. SHARMAN:  Your Honor, Dr. Couch rests.
22            THE COURT:  All right.
23            Ladies and gentlemen, you may recall that you heard
24   testimony from a witness who started, her name was Monica
25   Carroll, then she had a traffic accident and did not
```

6078

1   return.  So she is not going to return.  And I am instructing

2   you to disregard her testimony.  You cannot use it in your

3   decision in this case.

4          There was also an exhibit admitted through her which

5   was Number 264, and I'm striking that from the record as

6   well.

7          All right.  Does the government have any rebuttal?

8          MR. BODNAR:  Yes, Your Honor, we have one rebuttal

9   witness.  We will recall Cindy McKenzie from Blue Cross/Blue

10  Shield.

11         THE COURT:  All right.

12         THE CLERK:  Ms. McKenzie, if you'll step forward and

13  have a seat, I just remind you you're still under oath.

14         THE WITNESS:  Okay.  Thank you.

15                    CINDY McKENZIE,

16     previously sworn, testified further, as follows:

17                  REBUTTAL EXAMINATION

18  BY MR. BODNAR:

19  Q   Good afternoon, Ms. McKenzie.

20  A   Good afternoon.

21  Q   Welcome back to Mobile.

22  A   Thank you.

23  Q   Could you please just briefly remind the jury who you are,

24  where you work, and what you do?

25  A   I am the network integrity operations manager at Blue

1  Cross/Blue Shield of Alabama and I oversee all fraud, waste,

2  and abuse activities.

3  Q   During the course of this trial were you asked to pull data

4  about an office visit bill for a patient named Tena Goellner

5  for the date February 10th, 2015?

6  A   I was.

7  Q   I'm going to show you what has been marked as Government's

8  Exhibit 69 and ask if that is that document.

9  A   It is.

10        MR. BODNAR:  United States moves to admit Government's

11  Exhibit 69.

12        MR. ESSIG:  No objection, Your Honor.  Just the first

13  page?

14        MR. BODNAR:  Just the first page.

15        MR. ESSIG:  No objection.

16        THE COURT:  All right.  Mark it in.

17  BY MR. BODNAR:

18  Q   Ms. McKenzie, prior to showing you Government's Exhibit 69,

19  I'm going to show you what has already been admitted as Couch

20  Exhibit 27C.  Do you see at the top where it says Account

21  Information Report for an individual named Tena Goellner?

22  A   Yes.

23  Q   Ms. McKenzie, do you see here the service date listed

24  February 10th, 2015?

25  A   Right.

1  Q   I'll zoom in for you, Ms. McKenzie.  According to Couch

2  Exhibit 27C, who is listed as rendering service for Tena

3  Goellner on February 10, 2015?

4  A   Ben Clark, nurse practitioner.

5  Q   Were you asked by the United States to then go back and

6  look at what was actually submitted to Blue Cross and Blue

7  Shield about who rendered service to Tena Goellner on that day?

8  A   I was.

9  Q   I'm now showing you what has been admitted as Government's

10  Exhibit 69.

11          THE COURT:  Well, Mr. Bodnar, there apparently is

12  already an Exhibit 69, so we need to renumber that one.

13          MR. BODNAR:  Is there a 70?

14          THE CLERK:  Wait.  71.

15          THE COURT:  71.

16      (Government's Exhibit 71 was entered into evidence.)

17  BY MR. BODNAR:

18  Q   I'm now going to show you what is being remarked as United

19  States Exhibit 71 and ask you is this the sheet I showed you

20  and you identified a moment ago?

21  A   Correct.

22  Q   And is this for Tena Goellner?

23  A   Correct.

24  Q   And where on here do we see the date of service?  And you

25  can touch the screen.

1   A   It's lower.  Right there, the date of service, it shows

2   2/10/2015.

3   Q   And is that the same date we just looked at on Couch

4   Exhibit 27C?

5   A   Correct.

6   Q   According to the information that was provided to Blue

7   Cross and Blue Shield, though, who was the rendering provider

8   to Tena Goellner on that date?

9   A   Dr. Couch.

10  Q   Did you check to see if Ben Clark was even registered in

11  the Blue Cross/Blue Shield network?

12  A   I did.

13  Q   Was he in your network?

14  A   He is not.

15  Q   If he had been listed as the rendering provider for Tena

16  Goellner on that date, could the claim even have been paid?

17  A   No.

18          MR. BODNAR:  No further questions of this witness.

19          THE COURT:  All right.  Mr. Essig?

20          MR. ESSIG:  Brief cross.

21                    SURREBUTTAL EXAMINATION

22  BY MR. ESSIG:

23  Q   Good afternoon, Ms. McKenzie.

24  A   How are you doing?

25  Q   Good.  Good to see you again.  Very brief questions for you

1  here.  You pulled this -- it looks like a printout of a

2  computer screen; is that right?

3  A   Correct.  It's a computer printout of the 837 transaction

4  for electronic claim filing.

5  Q   What's an 837 transaction?

6  A   It's just the name of the transaction for electronic data

7  exchange.  It's a national standard.

8  Q   So that's a code, some sort of number code that tells you

9  what to look at?

10  A   It's computer program talk.

11  Q   Got you.  What is Navicure?  What is that?

12  A   I think that's the name of the clearinghouse that Drs.

13  Couch and Ruan used at their office.

14  Q   Okay.  Got you.  So that would be -- is that something

15  internal to their office or are you familiar with Navicure, the

16  clearinghouse, in general in your work?

17  A   I have heard of Navicure.  I'm pretty sure they're a

18  clearinghouse.  There are lots of different clearinghouses in

19  lots of provider offices.  Doctor offices use a clearinghouse

20  to then transmit the data to us.

21  Q   I got you.  And my question here, Ms. McKenzie, is why is

22  Navicure listed with the designation of submitter ID?

23  A   That's just identifying the clearinghouse it came through.

24  Q   And so Navicure is who submitted this information on this

25  computer screen to Blue Cross/Blue Shield; is that correct?

1   A   Navicure is who the doctors' office has contracted with to

2   submit the data to us.

3   Q   Got you.

4   A   Blue Cross doesn't have a relationship with Navicure.  The

5   doctors' office does.

6   Q   I understand.  But if I understand correctly -- and you

7   tell me if you know or not -- the doctors' office submits it to

8   Navicure, who is the clearinghouse, who submits it to Blue

9   Cross?  Is that right?

10  A   Yes.  It's just a data interchange.

11  Q   And this creation time on here, 0748, is that 7:48 in the

12  morning?

13  A   I'm not sure.

14  Q   And do you know on the creation date, again, is that the

15  date of service that was indicated in the record that you

16  looked at?  Is that right?

17  A   No.  The date of service is listed down on the line I

18  pointed to a minute ago, if you will scroll down.  Date of

19  service is in this field, 2400.  The DTP, that's the date of

20  service.

21  Q   I see.  And what's the designation 2400 there, what's that

22  designation?

23  A   All the different numbers, the 2000, all these different

24  numbers are all different codes for different information you

25  key into the system.

1  Q   I understand.  And I'm sorry.  I didn't mean to erase your

2  red marks.

3  A   That's okay.

4  Q   So the creation date of 2015, if it's 20150212, is that

5  February 12, 2015?

6  A   It is, and that's -- that's the date that they sent the

7  claim to us.

8  Q   The date that Navicure submitted the claim; is that right?

9  A   Correct.

10 Q   And would it be reasonable to assume that 0748, that would

11 be the time in the morning 7:48 a.m.?

12 A   Possible.  I'm not sure.

13         MR. ESSIG:  Thank you.

14         No further questions, Your Honor.

15         MR. BODNAR:  No redirect, Your Honor.

16         THE COURT:  All right.  Thank you.  You may step down.

17         MR. BODNAR:  Your Honor, we do have one stipulation

18 that Ms. Griffin is going to read in before the United States

19 rests its case.

20         MS. GRIFFIN:  May the witness step down?

21         THE COURT:  Yes, you may step down.

22         MS. GRIFFIN:  Your Honor, as to fentanyl, the parties

23 agree that the chemical name set forth in count three of the

24 indictment is the chemical name for the product fentanyl.

25         THE COURT:  All right.  And that's a long name.  Can

6085

```
 1   you read it out?

 2           MS. GRIFFIN:  I will do my best.  What if I put it on

 3   the screen?

 4           THE COURT:  That's fine.

 5           MS. GRIFFIN:  Just the name.  (Indicating.)  That's

 6   N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl], close brackets.

 7   propanamide -- and I'm sure that's mispronounced -- is the

 8   chemical name for fentanyl.  That is the stipulation, Your

 9   Honor.

10           THE COURT:  All right.  I'm sure we'll all remember

11   that.

12           MS. GRIFFIN:  And with that, the United States would

13   rest, Your Honor.

14           THE COURT:  All right.  All right, ladies and

15   gentlemen.  You have heard all the evidence you're going to

16   hear.  But I have a number of things that I need to take up

17   with the lawyers before we can proceed to have them argue the

18   case to you and for me to charge you on the law.

19           So I'm going to put you in recess for today.  Still,

20   no discussion about the case until you actually begin your

21   deliberations.  And you can go home tonight and hopefully put

22   it out of your mind.  Be back downstairs in the jury assembly

23   room tomorrow morning at 9 a.m., ready to start back.

24           Thank you and have a good evening.

25         (In open court, defendants present, jury not present.)
```

6086

1          THE COURT:  Counsel, are there any motions to be

2    renewed?

3          MR. SHARMAN:  Your Honor, Dr. Couch moves, pursuant to

4    rule 29, for a judgment of acquittal at the close of all

5    evidence, relying on the grounds he submitted in his original

6    motion.

7          THE COURT:  All right.  And Dr. Ruan?

8          MR. KNIZLEY:  Your Honor, Dr. Ruan moves for judgment

9    of acquittal under rule 29 of the Federal Rules of Criminal

10   Procedure and asserts and relies upon each and every contention

11   that was made previously at the close of the government's case.

12         THE COURT:  All right.  Same ruling from the Court as

13   to both of those motions.

14         Now, I am still working on the draft.  I will get them

15   to you before 5 o'clock this afternoon.  So if you could just

16   at least have one person hang around where we can get hold of

17   you to distribute those, I would appreciate it.

18         All right.

19         MR. KNIZLEY:  Yes, ma'am.

20         THE COURT:  Okay.  We're in recess.

21         And, well, let me say this:  Can y'all come at 8:30 in

22   the morning for us to start talking --

23         MR. SHARMAN:  Yes, ma'am.

24         THE COURT:  -- so we won't let the jury hang for too

25   long?

 1          MR. BODNAR:  Yes, ma'am.

 2          THE COURT:  Okay.  All right.  See you then.

 3      (A recess was taken at approximately 3:11 p.m.)

 4          THE CLERK:  Counsel, I'll need the exhibits that are

 5  still out.

 6          MR. KNIZLEY:  Your Honor, you had asked about length

 7  of closings yesterday.

 8          THE COURT:  Have you changed your minds?

 9          MR. KNIZLEY:  I haven't.  I had asked for an hour and

10  a half, and I don't think that has changed.  I don't think

11  anyone else has.

12          THE COURT:  Government?

13          MS. GRIFFIN:  We would ask for two and a half all

14  total, with opening and the closing combined.

15          THE COURT:  How are you going to divide that?

16          MS. GRIFFIN:  Could we notify the clerk in the

17  morning?

18          THE COURT:  Sure.

19          MR. SHARMAN:  Your Honor, we would like an hour and a

20  half, although I don't think we'll need all of it.

21          THE COURT:  All right.  That sounds good.

22      (A recess was taken at approximately 3:12 p.m.)

23

24

25