

1        UNITED STATES DISTRICT COURT
        SOUTHERN DISTRICT OF ALABAMA
2

3  UNITED STATES OF AMERICA
                                CASE NO. CR15-00088
4  v.
                                COURTROOM 2B
5  JOHN PATRICK COUCH, M.D.,
   and XIULU RUAN, M.D.,
6                               MOBILE, ALABAMA
           Defendants.
7                               THURSDAY, FEBRUARY 16, 2017
   * * * * * * * * * * * * * *
8  REDACTED

9

10                  DAY 27 OF TRIAL
        BEFORE THE HONORABLE CALLIE V. S. GRANADE,
11         UNITED STATES DISTRICT JUDGE, AND JURY

12

13  APPEARANCES:

14  FOR THE GOVERNMENT:
       DEBORAH A. GRIFFIN
15     CHRISTOPHER BODNAR
       United States Attorney's Office
16     63 S. Royal Street, Suite 600
       Mobile, AL  36602
17     (251) 441-5845

18
   FOR THE DEFENDANT COUCH:
19     ARTHUR T. POWELL, III
       P.O. Box 40456
20     Mobile, AL 36640-0456
       (251) 433-8310
21
       JACKSON R. SHARMAN, III
22     ROBERT JACKSON SEWELL
       JEFFREY PAUL DOSS
23     BENJAMIN SANDERS WILLSON
       Lightfoot, Franklin & White
24     400 North 20th Street
       Birmingham, AL  35203
25     (205) 581-0700

6089

1   (Continued)

2       BRANDON KEITH ESSIG
        800 Shades Creek Parkway, Suite 600D
3       Birmingham, AL  35209
        (251) 879-1981

4
    FOR THE DEFENDANT RUAN:
5       DENNIS J. KNIZLEY
        7 N. Lawrence
6       Mobile, AL 36602
        (251) 432-3799

7
        JASON BRADLEY DARLEY
8       Darley & McGough, LLC
        1751 Dauphin Street
9       Mobile, AL 36604
        (251) 441-7772

10
        GORDON G. ARMSTRONG, III
11      P.O. Box 1464
        Mobile, AL  36633
12      (251) 434-6428

13      STEVEN D. MARTINIE
        4955 North Lake Drive
14      Whitefish Bay, WI  53217
        (414) 332-9683

15
    THE CLERK:  MARY ANN BOYLES
16  THE LAW CLERK:  LYNN DEKLE
    COURT REPORTER:  ROY ISBELL, CCR, RDR, CRR

17
            Proceedings recorded by OFFICIAL COURT REPORTER
18      Qualified pursuant to 28 U.S.C. 753(a) & Guide to
    Judiciary Policies and Procedures Vol. VI, Chapter III, D.2.
19          Transcript produced by computerized stenotype.

20

21

22

23

24

25

6090

1          I N D E X

2

3  CLOSING ARGUMENT OF MR. BODNAR –              6120

4  CLOSING ARGUMENT OF MR. DOSS –               6170

5  CLOSING ARGUMENT OF MR. KNIZLEY –            6214

6  REBUTTAL ARGUMENT OF MS. GRIFFIN –           6273

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1      (Morning session, 8:30 a.m., in chambers, jury not

 2   present.)

 3          MR. BODNAR:  Good morning, Your Honor.

 4          MS. GRIFFIN:  Good morning.

 5          MR. SHARMAN:  Good morning, Judge.

 6          THE COURT:  Good morning, good morning.  Have a seat,

 7   find a seat.  There's a seat for you.

 8          First I wanted to go through spots that I wanted to

 9   talk about and then I'll hear from you on your objections to

10   what we've got.

11          Turning to page three, where the paragraph is in

12   italics there, I've never seen a requested instruction like

13   this one.  And I don't think it's incorrect -- it's incorrect

14   in the sense that it talks about prejudice against the

15   attorneys, and that's just not the point.  It's prejudice

16   against the parties.  You know, so I'm intending to leave it

17   out.  I don't think it adds or takes away much.  But I'll hear

18   from you on that.

19          MR. ESSIG:  We proposed, Judge -- we don't feel very

20   strongly about it.  We think it's fine.

21          THE COURT:  Okay.  Then I'll just leave it out.  I

22   think it's really not necessary.  That's Defendants' number

23   five.

24          The next spot was on page six, at the bottom, the last

25   paragraph:  "Also in this case the government called as

1   witnesses" and it says "codefendants," although technically not

2   all of them were codefendants in this case.  So I was just

3   going to cross out just "called as witnesses" and then name

4   them.

5           MR. BODNAR:  There's no problem with that.

6           MR. ESSIG:  Judge, I had one very small suggested edit

7   in the paragraph above that I'd just change "he" to "he or

8   she," since we had both male and females that testified and had

9   used at times addictive drugs.

10           THE COURT:  Let's just put "the witness."

11           MR. ESSIG:  That's fine, that's fine.

12           THE COURT:  So leave out "codefendants" in the next

13   paragraph, put "the witness" instead of that.

14           My next spot was page eight.  First is Government's

15   10, that's in italics there.  And I think that's a correct

16   statement of the law, but the edits I would suggest are as

17   follows.  In the second sentence I would say:  "However, expert

18   medical testimony is not essential to your consideration of

19   this case, because a jury may find that a doctor violated the

20   Controlled Substances Act from evidence received from lay

21   witnesses surrounding the facts and circumstances of the

22   prescriptions at issue, as well as from the expert medical

23   testimony."  But I'll be happy to hear from y'all on this.

24           MR. BODNAR:  The United States would be fine with

25   those edits, Your Honor.

6093

```
 1              MR. ESSIG:  Judge, Dr. Couch's thought is that I don't
 2    know that there's any -- I understand this is a correct
 3    statement of the law and I'm aware of that case law.  But I
 4    don't know that there's anything necessary beyond the standard
 5    instruction that an expert's no different than anybody else,
 6    you weigh their credibility the same way you do any other
 7    witnesses.  I mean, it's kind of a more emphatic statement of
 8    that, but it --
 9              THE COURT:  I think the reason for that is because
10    we're talking about a standard that requires some showing of
11    what the usual course of professional practice is.
12              MR. ESSIG:  Yes, ma'am.
13              THE COURT:  That, you know, they may think that an
14    expert has more say on that than other evidence concerning that
15    matter.  So that's why I think it's probably a good thing to
16    leave that in.  But if you think it's a wrong statement of law,
17    I'll certainly reconsider.
18              MR. ESSIG:  I don't think it's a wrong statement of
19    the law.  I think the instruction as the Court has modified it
20    is a correct statement of the law.  We would simply object on
21    the basis that we don't think anything beyond the normal expert
22    instruction is necessary and we just have a concern that it
23    perhaps shifts consideration of certain witnesses, lay versus
24    expert, in a way that they may consider one more strongly than
25    the other based on the modified instruction.
```

6094

```
 1          THE COURT:  Okay.  Well, that's their right.
 2          MR. ESSIG:  Yes, ma'am.  I know.  I understand that.
 3          THE COURT:  So I intend to leave that in with those
 4    edits.
 5          The next one --
 6          MR. SHARMAN:  I'm sorry, Your Honor.  Would you read
 7    through again --
 8          THE COURT:  Yes, the second sentence:  "However,
 9    expert medical testimony is not" -- instead of "necessary" say
10    "essential to," instead of -- cross out "convicted defendant of
11    a Controlled Substance Act" and put in "your consideration of
12    this case" and then go on, "because a jury may find that a
13    doctor violated the Controlled Substances Act from evidence
14    received from lay witnesses surrounding the facts and
15    circumstances of the prescriptions at issue as well as medical
16    expert testimony."
17          MR. SHARMAN:  Thank you.
18          THE COURT:  And then the last sentence on that
19    paragraph, it says "your own opinion of."  I'm just going to
20    put "on" instead of "of," "on whether a prescription was
21    written."  That's just a personal preference.
22          MR. ESSIG:  I'm sorry.  What sentence are you
23    referring to?  Okay.  Yes, ma'am.
24          THE COURT:  Opinion on whether a prescription was
25    written within or outside the usual course of professional
```

6095

```
 1    practice.

 2              Ready for the next one?

 3              MS. GRIFFIN:  Yes.

 4              THE COURT:  Okay.  The defendants' number 12 about the

 5    transcripts, I don't recall any dispute over what was actually

 6    said.  And since there weren't separate transcripts but it was

 7    just a running subtitle-type thing, I thought that this might

 8    be confusing.  I don't know that -- is there any dispute about

 9    what was said during the videos that were played?

10              MR. BODNAR:  I didn't think so.

11              MR. ESSIG:  No, ma'am.  There's not.  I mean, I

12    think -- I've seen this.  In any case where there are

13    transcripts, I think typically this instruction is

14    included.  But, I mean, we --

15              THE COURT:  Well, it's usually only if there's some

16    dispute over what was actually said and the defense produces

17    transcripts and the government produces transcripts and the

18    jury makes up its mind as to which is the correct version, if

19    either.  But I just thought this might be a little confusing.

20              MR. ESSIG:  Judge, we don't have a strong position on

21    this one either.

22              THE COURT:  Okay.  Well, I intend to leave that out.

23              MR. ESSIG:  Yes, ma'am.

24              THE COURT:  Unless you have some contention something

25    other than what was in the subtitles was what was actually
```

```
 1    said.  So I'm going to leave that out.
 2          Last paragraph on page nine, third sentence starts:
 3    "I will not read it."  I'm going to put "them," because I was
 4    talking about the counts, as opposed to the indictment itself.
 5          Next page, page 10, at the bottom, you know, the
 6    elements from the pattern on racketeering activity talks about
 7    it had to have occurred after October 15, 1970.  I mean, that
 8    is the law, but I don't think it's necessary to tell the jury
 9    about that since there's no contention that anything happened
10    before that date.
11          MR. SHARMAN:  Yes, ma'am.
12          MR. BODNAR:  I agree, Your Honor.
13          THE COURT:  All right.  I'm going to leave that out.
14          MR. SHARMAN:  Your Honor, at the top of 10 there may
15    be a typographical error, the sentence beginning:  "That
16    statute makes if a federal offense."
17          THE COURT:  Yes, it should be "it."  Thank you.
18          The next thing I have is on page 18, in the chart of
19    the drugs, controlled substances.  When we originally made this
20    chart, it had that scientific name that you spelled out for the
21    jury yesterday that was in the stipulation.  I had taken it out
22    before you put in that evidence, and then I don't know how to
23    spell that stuff again.  So do you think we need to have it in
24    there for any reason?
25          MS. GRIFFIN:  I do not, Your Honor.
```

6097

```
 1              THE COURT:  Okay.
 2              MR. SHARMAN:  I don't think so.
 3              MR. ESSIG:  No, ma'am.
 4              THE COURT:  Then I'm just going to leave that out.
 5    I sure don't want to have to try and read it to the jury.
 6              MR. ESSIG:  How is the special -- what's the special
 7    verdict form going to --
 8              THE LAW CLERK:  There is no special verdict form.
 9              MR. ESSIG:  Is it still going to have that word?
10              THE COURT:  No, it's not.  We'll talk about that in a
11    minute when we get through with the instructions.
12              Okay.  Let me hear what you have to say and what you
13    object to me leaving out, what you want me to put back in, that
14    sort of thing.  Who wants to go first?
15              MR. BODNAR:  Do you want to start?  You have more
16    stuff.
17              MR. ESSIG:  Sure.  Judge, we had sort of -- we filed
18    our objections last night.  And what I'll just go through is --
19              THE COURT:  I haven't seen those.
20              MR. ESSIG:  Okay.  And so I guess it technically
21    violated the Court's order and we apologize.  We filed it as
22    soon as we got finished.  But we had raised -- we have other
23    objections -- but we wanted to address -- there are three areas
24    specifically that we filed a brief brief on those issues just
25    because we feel like there's case law that's needed to be set
```

6098

1    out to sort of explain our issue on those.

2        The first, Your Honor, is that there has been

3    references to other legal authority in this case.  One of those

4    is there have been references to breaches of the standard of

5    care, carelessness, negligence in this case.  And the law from

6    the Eleventh Circuit, which we had cited in our motion to

7    dismiss for vagueness challenge prior to trial, is that such

8    evidence can be used as circumstantial evidence to determine

9    whether or not the defendants acted outside of the usual course

10   or not for a legitimate medical purpose.

11       There's no Eleventh Circuit case law that goes really

12   sort of beyond that analysis.  However, Eleventh Circuit case

13   law cites cases from other circuits and there's a significant

14   body of case law from other circuits that strongly cautions

15   against not having some sort of jury instruction included where

16   evidence of a civil standard of care comes in, that would

17   caution the jury that they can't convict based solely on a

18   civil standard of care, which is the reason we included some of

19   that language in Couch's instruction 18.  So, I mean, our

20   request is that that portion of instruction 18 be given and, if

21   not, that there be some instruction to the jury that they can't

22   convict solely on that basis.

23       As a second part of that, Your Honor --

24       THE COURT:  Does the second part impact on what you

25   just said?

1           MR. ESSIG:  Not directly.  It's similar.  The second
2    part of that first part, the indictment has language in there
3    regarding the TIRF REMS program and references the fact that
4    the FDA requires a prescriber to enroll and comply with the
5    TIRF REMS program.  That's technically correct.  I mean, when
6    you look up the TIRF REMS program on the FDA website, it says
7    prescribers are required to enroll.  However, the indictment
8    reads as if that has the force of law.  And it does not.  I
9    mean, the FDA's explicit on their own website.  They do not
10   have jurisdiction over doctors.  Even through the TIRF REMS
11   program, their jurisdiction is over the manufacturers and the
12   wholesalers that distribute the TIRF products.  So the
13   consequences, so far as we can gather, for not complying with
14   that FDA rule is that the FDA can instruct the manufacturer or
15   the distributor to the doctor that they can't distribute to
16   them any more, they can't sell to them any more.  But they
17   don't have -- they have no ability to take away a doctor's
18   ability to prescribe, they have no ability to dictate to a
19   doctor, based on their violation of TIRF REMS, that they can't
20   prescribe fentanyl products any more.
21           So our concern is that it gets two sides of the same
22   coin; is that that TIRF REMS language and the requirement as it
23   applies to the doctors is misleading, it could lead the jury to
24   conclude that by not following that FDA rule that they violated
25   the law.  And that's not the case.

6100

1          MS. GRIFFIN:  Your Honor, there is going to be no

2     allegation by the United States that the failure to actually

3     use those forms is beyond the usual course of professional

4     practice.  The allegation is that those contain informed

5     consent and that that's required to be given by the Court.

6          THE COURT:  That was my understanding of the evidence

7     as it was presented, was that the only relevance to those forms

8     in connection with the charges in this case were the fact that

9     they contained informed consent information that doctors were

10    allegedly relying on to give the informed consent.  So --

11         MR. ESSIG:  And I would agree, Your Honor.  I think

12    that's exactly how the evidence is presented.  My concern is,

13    as I understand the Judge's or the Court's instructions, the

14    jury's going to get a copy of the indictment when they go back

15    and as they read through -- and that's fairly early in the

16    thing.  I mean, they're going to -- this is the language we

17    cited, Your Honor, direct from the indictment -- is the FDA

18    requires that all practitioners, pharmacists, and patients must

19    be enrolled in an FDA risk evaluation and management strategy

20    REMS program before they are allowed to prescribe, dispense, or

21    take Subsys, Abstral, Fentora, and Lazanda.  And so I

22    understand the government's position is not that failing to do

23    that in and of itself is outside the usual course.  But, I

24    mean, the jury's going to see that allegation in the indictment

25    that it's legally required by the FDA and there's been no

6101

1    context to that allegation provided to the jury that, simply

2    violating the TIRF REMS requirement, whatever it may be, is not

3    a violation of the law.  I mean, and the fact the government's

4    taken the position that that's not outside the usual course, I

5    think, is a stronger indicator that some sort of instruction to

6    the jury that that fact in and of itself is not a violation of

7    the Controlled Substances Act is important in this case.

8              MS. GRIFFIN:  Your Honor, we are not going to say that

9    the failure to comply with what the FDA says --

10             THE COURT:  I understand.  And listen, my whole point

11   of not putting in the supplemental jury request of the

12   government and anything about TIRF REMS or a lot of the other

13   stuff that's in the preamble is --

14             MR. ESSIG:  Yes, ma'am.

15             THE COURT:  -- I don't want to confuse the jury about

16   what regulations may say versus what the law is in this case

17   that they are supposed to follow.  And so I'm going to tell

18   them through the instructions that this is what has to be

19   proved in order to convict in this case.  And I don't want them

20   to get mixed up in what the Code of Federal Regulations say or

21   what any other standard might be.  So for me to instruct on

22   something like TIRF REMS and what it actually requires and that

23   sort of thing, I think, is just going to be confusing to them.

24             You know, I will, if you think it will be helpful,

25   tell the jury that, although they are going to be given a

1   copy -- where does it say that -- they will be given a copy of
2   the indictment, that it is only for what the substantive
3   charges are in the case.  "And the law as explained in my
4   instructions, and not in anything that it says in the
5   indictment, is what you must follow."
6           Do you think that would take care of your concern?  I
7   just don't want to get into any regulatory issues with the
8   jury.
9           MR. ESSIG:  Yes, ma'am.  And I understand the Court's
10  position perfectly.  And I think the Court's position is
11  appropriate.  Our position would be we think for something as
12  specific as the TIRF REMS issue in the indictment, as specific
13  as the civil standard of care, we believe it's appropriate on
14  those to have an additional instruction to the jury that those
15  issues alone -- their determination that those things were
16  violated or the civil standard of care was breached would not
17  be sufficient alone.
18          THE COURT:  I don't want to give them any civil
19  standard of care, whether saying:  "Here's the civil standard
20  of care.  Don't follow this, follow this other."  I think that
21  would just be confusing and I just don't want to do it.  I
22  understand your concern.
23          MR. ESSIG:  Yes, ma'am.
24          THE COURT:  But that's why I didn't include that.
25          MR. ESSIG:  Yes, ma'am.

6103

1          THE COURT:  So next?

2          MR. ESSIG:  Next, Your Honor, the second aspect of it

3    is that the Court's proposed instructions do not contain a

4    definition of "usual course of medical practice or legitimate

5    medical purpose."

6          We think there needs to be one in this case and it's

7    sort of a two-part issue, is that, one, those terms wholly

8    undefined are, I think, difficult for the jury to determine.

9          Second, Your Honor, is that there is sort of a -- the

10   Eleventh Circuit certainly doesn't have a pattern jury

11   instruction on this issue.  But through United States v. Moore,

12   which is sort of the beginning case, the Supreme Court case

13   from the '70s that kind of starts the juris prudence on the

14   Controlled Substances Act as applied to physicians, it's sort

15   of developed an accepted jury instruction that the Eleventh

16   Circuit has given.

17         Now, we have proposed in Couch instruction 18 various

18   aspects of the concept of usual course for the jury to be

19   instructed on and we think those are appropriate.  All of the

20   requested instructions that we provide, most of them are taken

21   from Eleventh Circuit case law, some of them are taken from the

22   Fourth Circuit -- a Fourth Circuit case as well.  But, Your

23   Honor, particularly we think the Court included a good faith

24   instruction as it was related to the fraud counts in this

25   case.  But we think some sort of good faith or honest faith,

```
 1  honest effort language or instruction should be included along
 2  with the -- with the usual course instruction, the Controlled
 3  Substances Act portion of the Court's instructions to the jury.
 4            MS. GRIFFIN:  Your Honor, excuse me.  Are you
 5  finished?
 6            MR. ESSIG:  Yes.
 7            MS. GRIFFIN:  Are you finished?  We would be opposed
 8  to that.  I don't think there is a definition by the Eleventh
 9  Circuit about "outside the usual course of professional care"
10  and I think to charge them anything would invite confusion.
11  Further, I don't think there's been any argument or any
12  suggestion about good faith or honest effort through the
13  testimony of the defense.
14            MR. BODNAR:  As it applies to the drugs.  For the
15  fraud --
16            MS. GRIFFIN:  As to the drugs.
17            MR. BODNAR:  -- of course, it is our burden to show
18  that it wasn't done in good faith, as instructed.
19            MR. ESSIG:  Judge, we would disagree with the notion
20  there's been no good faith.  Both Dr. Ruan and Dr. Couch in
21  their testimony stated that they did everything with their
22  patients that they believed was appropriate, based on their
23  medical training and experience as board certified pain
24  management doctors.  So that's certainly sufficient.
25            THE COURT:  Well, the problem with your requested
```

1   instruction, as I understand it -- and having looked at some,

2   although I looked at not all of the case law in this regard --

3   is what you are proposing is a subjective view of what is the

4   usual course of professional practice.  And the standard should

5   be an objective one, not a subjective one.  I understand that

6   good faith is a subjective aspect, although the Eleventh

7   Circuit has approved the language from the Williams case that

8   included good faith.

9          MR. ESSIG:  Yes, ma'am.  Yes, ma'am.  And that's --

10  the Williams case, I mean, that instruction has kind of emerged

11  from the case law as kind of the standard Eleventh Circuit

12  instruction that's been given repeatedly in these cases.  I

13  mean, it's Williams, it's Merrill, I think the most recent

14  Eleventh Circuit case that applies that is the case of Joseph,

15  which is at --

16         THE COURT:  Yeah, I read the Joseph case.

17         MR. ESSIG:  And that case sort of gives -- that case

18  gives an analysis of the jury instructions there.

19         THE COURT:  But that was not national versus -- not a

20  national standard of care.  I mean, it was more of a

21  jurisdictional-type argument.

22         MR. ESSIG:  Yes, ma'am.  I think it was.  And I think

23  that's right.  And one of the challenges, of course, with the

24  Eleventh Circuit case law on this is it's muddled, it is not

25  clear.  The Eleventh Circuit's gone both ways on this issue.  I

6106

1    mean, I think they rejected a more robust request for a good

2    faith instruction from the defense but defaulted to this

3    instruction which incorporates -- which incorporates good faith

4    while recognizing that their position that a more robust good

5    faith instruction was not required.

6           We think it is.  Again, our position is that we think

7    that defense instruction 18 should be given.  However, if the

8    Court --

9           THE COURT:  Portions of instruction 18 are not what

10   the law is in that regard, at least as I understand it, in that

11   regard.  And so that's why I rejected 18.  The government

12   didn't propose any definition on that.

13          MR. BODNAR:  For the reason being there's not a

14   defined --

15          THE COURT:  No.  But, I mean, there have been cases

16   where they say the giving of such instruction was not plain

17   error.  Although we're not -- you know, you're talking about

18   this now, and so it wouldn't be plain error.  It would be

19   whether or not it's error not to give the instruction.  So I am

20   willing to give the instruction that was in the Williams case.

21          MR. ESSIG:  Yes, ma'am.

22          THE COURT:  That would say:  "The defendants in this

23   case maintain at all times they acted in good faith and in

24   accordance with the standard of medical practice generally

25   recognized and accepted in treating patients.  Thus a medical

6107

1   doctor has violated the Controlled Substances Act when the

2   government has proved beyond a reasonable doubt that the

3   doctor's actions were not for legitimate medical purpose in the

4   usual course of professional practice or were beyond the bounds

5   of professional medical practice."  But that's as far as I'm

6   willing to go, given the state of the law on this issue.  But

7   it throws a bone to your good faith language while still being

8   fairly general.

9           MR. BODNAR:  We would have no problem with that

10  instruction.

11          MR. ESSIG:  Judge, without waiving our objection that

12  we would like to see instruction 18 --

13          THE COURT:  You would rather see that than nothing at

14  all?

15          MR. ESSIG:  -- we will accept the Court's -- no, we

16  will accept the Court's position.

17          THE COURT:  All right.  Okay.  Then I'll stick that in

18  there.  And that would be -- where I will stick that would be

19  -- there are two places where I describe that.  One is on page

20  15 and --

21          MR. ESSIG:  It becomes a little bit cumbersome because

22  it relates to multiple parts.

23          THE COURT:  Yeah.  And then the other place I discuss

24  it is on page 23.  15 is under the conspiracy charge, the

25  substantive portion of the conspiracy charge.  And page 23 is

6108

1    concerning the -- no.  Well, it's --

2            MR. ESSIG:  The substantive offenses.

3            THE COURT:  -- the substantive offenses.  It starts

4    over on page 22.  So I would be inclined to stick it in there

5    where the substantive offenses are.  And actually I'll just

6    append it to after "issued," the period and "issued," then

7    start with:  "The defendants maintain at all times they acted

8    in good faith," blah, blah, blah, blah, blah.

9            MR. SHARMAN:  That would be at the bottom of 15, Your

10   Honor?

11           THE COURT:  That would be -- yeah, and also on page 23

12   at the end of that very first paragraph.  So it's in those two

13   places.  Okay?

14           MR. ESSIG:  One more, Judge.

15           THE COURT:  Okay.

16           MR. ESSIG:  On the -- a couple of more, but this is

17   one more sort of substantive that we need to make some argument

18   on, is that in the Court's description on page 12, the

19   predicate for the RICO charge -- this is sort of small in

20   substance but we think a significant distinction.  In paragraph

21   three, where the Court states -- describes the racketeering

22   acts which in this case would be acts violating the Controlled

23   Substances Act and then mail fraud or wire fraud.  And our

24   concern is that this broad definition of the controlled

25   substance predicate of RICO is a broader description of the

6109

 1   type of activity that the jury has to find in order to convict

 2   than what's contained in the indictment.

 3          The indictment basically takes the language directly

 4   from the RICO predicate language that's contained in the

 5   statute, which makes it clear that the Controlled Substances

 6   Act relating to some sort of distribution/manufacturing, sort

 7   of the standard language, is what is required and what is

 8   charged in the indictment as the controlled substances

 9   predicate.

10          THE COURT:  So do you want me to say "the illegal

11   dispensing of controlled substances"?

12          MR. ESSIG:  Yes, ma'am.  That would be fine.  Or a

13   reference to the code sections charged.

14          MS. GRIFFIN:  Judge, we would object to just a legal

15   description because it could be manufacturing, receiving, any

16   of the others.  So we would request "which in this case would

17   be acts violating the Controlled Substances Act as alleged in

18   count one," which gives the code sections.

19          THE COURT:  What page of the indictment is that on?

20          MR. ESSIG:  It's on page 19 and 20, Your Honor.  And

21   specifically the government states multiple offenses involving

22   the felonious manufacturing, receiving, concealment, buying,

23   selling, or otherwise dealing in controlled substances in

24   violation of Title 21, United States Code, Sections 841(a)(1)

25   and 846.  And we would not object even if it said "violating

1  sections 841 and 846 of the Controlled Substances Act."  We

2  wouldn't have an objection to that.  Our concern is that as

3  currently crafted it could be construed as a constructive

4  amendment of the indictment because it broadens --

5      THE COURT:  Well, that could be construed that way.

6  But the only definition they've got of the Controlled

7  Substances Act is the one that's in the distribution counts and

8  the conspiracy to distribute.  So --

9      MR. ESSIG:  Judge, our specific concern is, again,

10 this kind of goes back to the preamble of the indictment that

11 as they describe the controlled substances provisions in the

12 preamble, there's lots of references to the Code of Federal

13 Regulations and the requirements there, there's references to

14 other sections of the Controlled Substances Act.

15     THE COURT:  I'm going to tell them not to rely on

16 anything concerning the law that's in the indictment.

17     MR. ESSIG:  Yes, ma'am.

18     THE COURT:  So --

19     MR. ESSIG:  Judge, again, we would be satisfied if it

20 specifically referred either to the language in the indictment

21 or just Title 21 or the code sections 841 and 846.  We would be

22 satisfied with that slight modification.

23     THE COURT:  I think what I would do is in this case

24 would add to the language that's in the parentheses here --

25     MR. ESSIG:  Yes, ma'am.

6111

1          THE COURT:  -- which in this case would be "acts

2  violating the Controlled Substances Act as described herein,"

3  which would refer to the rest of the instructions, especially

4  since I'm going to tell them not to rely on anything in the

5  indictment for what the law is in this case.

6          Now, I don't think that this is -- I think it's a

7  nonissue.  Because they don't know anything about the

8  Controlled Substances Act other than what I'm telling them

9  supposedly.

10          MR. ESSIG:  Yes, ma'am.

11          THE COURT:  Supposedly.  Unless they have independent

12  knowledge, which I seriously doubt.  So that's what I'm going

13  to do on that.

14          MR. ESSIG:  Judge, we would object to something not

15  more specific.  But I understand the Court's position.

16          THE COURT:  Okay.  All right.  What else?

17          MR. ESSIG:  And the last thing, Judge, is we had

18  requested a conspiracy intent requirement, which is number 24

19  of Dr. Couch's and Dr. Ruan's instructions.  And we would

20  object to that not being included.

21          THE COURT:  I think the instructions that are already

22  in my proposed charge adequately cover that.

23          MR. ESSIG:  Yes, ma'am.

24          THE COURT:  So I note your objection to not including

25  that.

1            MR. BODNAR:  Your Honor, we have two small things.

2    One is on page 19 of your proposed instructions.

3            THE COURT:  Okay.

4            MR. BODNAR:  At the end of that second large paragraph

5    that starts "with regard to count three only," where it says

6    "you must unanimously agree on whether the weight of fentanyl

7    the defendant is responsible for exceeds 40 grams," I was

8    wondering, since this is a conspiracy and a defendant is

9    responsible for what the coconspirator does as well, if that

10   needs to be spelled out a little bit clearer or if you just

11   look at that top 28 list, Dr. Ruan's number is not -- in fact,

12   I don't think any of their numbers independently, if I recall

13   correctly, are above 40.  Couch's might be, Ruan's is not.  But

14   we've argued it as a conspiracy where together it's above that

15   40-gram threshold.

16           THE COURT:  All right.  Then what I'll do is:  "You

17   must also unanimously agree whether the weight of the fentanyl

18   involved in the conspiracy exceeds 40 grams."

19           MR. BODNAR:  That would be fine, Your Honor.  And the

20   other --

21           THE COURT:  As to count -- what count is that?

22           MR. BODNAR:  Three.

23           THE COURT:  Count three, we are going to need --

24   where's Mary Ann?

25           THE CLERK:  Right here.  Yes, ma'am?

1          THE COURT:  We're going to need a specific finding on

2     count three as to "if and only if you find one or more of the

3     defendants in this case guilty of count three, you must

4     unanimously agree on whether the weight was above, exceeded 40

5     grams, or 40 grams or below."

6          MR. ESSIG:  Judge, looking at that, I mean, we would

7     have one small request.  And that would be that it read

8     "unanimously agree whether or not."  It almost reads as if --

9     you know, I understand it has to have the unanimously agree

10    language.  But --

11         THE COURT:  Well, I mean, the verdict form will have a

12    place for them to check --

13         MR. ESSIG:  Yes or no?

14         THE COURT:  -- above 40 grams, or 40 grams or below,

15    "indicate which you unanimously find."

16         MR. ESSIG:  Yes, ma'am.

17         THE COURT:  So it will be clear from the form.  It has

18    to exceed 40.

19         MR. BODNAR:  It has to exceed 40.  Okay.

20         THE COURT:  So it's 40 or below or exceeds 40.

21         MR. BODNAR:  Another thing, small housekeeping matter,

22    with count 18 being out, so I reference it correctly in my

23    closing, do we just go 17 to 19 or do the counts beyond --

24         THE COURT:  17 and 19, we just jump over 18.

25    Actually, the 13, 15 --

6114

```
1          THE CLERK:  Judge, here's a copy of the redacted
2    indictment, without 18.
3          THE COURT:  Okay.
4          MR. KNIZLEY:  Your Honor, as to 18, the language, the
5    discussion about that Abstral stock only appears in 18.  But
6    I'm assuming the government contends that is a motive for some
7    other conduct in the indictment.  And I just want to make sure
8    it's fair game to argue that we're going to -- that that is
9    something that's going to be argued in closing argument.  The
10   language as to the purchase of the stock only appears in 18.
11   Now 18's out.  But I'm assuming they are taking the position
12   that that motivates some other aspect of the indictment.
13         THE COURT:  I think it's fair to argue the evidence.
14         MR. KNIZLEY:  I wanted to make sure before I said
15   something about it.
16         THE COURT:  Yeah.  But I propose to put on page 31 of
17   the indictment, you know -- and actually I propose to go back
18   and put in bold the count numbers whenever it says, you know,
19   "as to count 16, as to count 17."  If they are looking through
20   what is the law on 17, they can find it more easily.  And then
21   I will stick a paragraph -- or a sentence in on page 31 right
22   before the paragraph that starts "in count 19," and I'll just
23   say:  "There is no count 18."
24         MR. KNIZLEY:  That's all you're going to say?  "There
25   is no count 18"?
```

6115

```
1              THE COURT:  Yes.  That's all I'm going to say, if they
2    come back and say:  "What happened to 18," looking in the
3    indictment.
4              Okay.  Anything else?
5              MS. GRIFFIN:  Just one quick question.  And it may be
6    better addressed to Mary Ann.  On the redacted indictment the
7    jury will receive, are the page numbers still the same or did
8    you condense them?
9              THE CLERK:  I didn't change the page numbers.
10   (Indicating.)
11             THE COURT:  So you took out the death allegation,
12   enhancements for the death allegations?
13             THE CLERK:  I took that out.  Whatever Deborah
14   indicated, I took that out.
15             MS. GRIFFIN:  Page numbers are the same and the
16   phrases about the --
17             THE COURT:  Enhancements.
18             MS. GRIFFIN:  -- enhancements are out?
19             THE COURT:  Y'all take a look at that.
20             MR. SHARMAN:  Mr. Knizley, is that what you were
21   looking at?
22             MR. KNIZLEY:  The indictment, yes.
23             THE COURT:  Here's the proposed verdict forms she's
24   got.  But we'll redo them to have the weight thing in there and
25   we'll give you a copy of them at lunchtime.  You're not going
```

6116

```
 1    to need them until later.
 2            Now, how do you want to split your time?
 3            MR. BODNAR:  Your Honor, we'd like to split ours an
 4    hour and a half for me to start and then an hour for Deborah
 5    for rebuttal.  I don't think I will use the full hour and a
 6    half.  But, Mary Ann, if I can get a warning at about 10
 7    minutes, please?
 8            THE CLERK:  Okay.
 9            MR. BODNAR:  Thank you.
10            THE COURT:  And y'all are having an hour and a half
11    each; is that right?
12            MR. SHARMAN:  That's what we asked for, Your Honor.
13            THE COURT:  Are you splitting it?  Or are you --
14            MR. ESSIG:  No.
15            MR. SHARMAN:  Within the defendant, no, ma'am.  It
16    will be one person at least for Dr. Couch.
17            THE COURT:  Okay.
18            MR. KNIZLEY:  Same, Judge.  It will just be me.
19            THE COURT:  Okay.  And what kind of a warning do you
20    want?
21            MR. KNIZLEY:  10 minutes will be fine.
22            MR. SHARMAN:  10 minutes will be fine.
23            THE COURT:  Okay.  So all right.  Assuming we'll start
24    argument at 9:30 -- 9:30 -- so you'll go an hour and a half
25    first.  Well, we'll start as soon as we can and I'll tell them
```

6117

```
 1    we're not going to break until you're finished with your --
 2            MR. BODNAR:  I'd be really shocked if I go the full
 3    hour and a half.
 4            THE COURT:  I'll tell them -- we'll get them up here
 5    and I'll tell them you're not going to break until you're
 6    through with your portion before the defense begins.
 7            THE CLERK:  Yes, sir.
 8            MR. KNIZLEY:  Judge, likewise, you'll let Dr. Couch go
 9    until the lunch break, I suppose, and whatever it comes to be,
10    and then me start after lunch?
11            THE COURT:  Hopefully it will work out that way,
12    unless, you know, somebody stands up and says:  "I have to go
13    to bathroom."
14            MR. ESSIG:  Judge, I think -- this is kind of a
15    housekeeping matter for all of us.  I think we probably would
16    prefer not to have to break in the middle of an argument.  So I
17    don't know if the Court would prefer, you know, if Chris is
18    done at like 11 and the jury -- I mean, if maybe we take an
19    early lunch break so that, you know, Mr. Doss --
20            THE COURT:  That's a long time for them to go in the
21    afternoon.  I don't want -- you know, I'll tell them we're
22    going to try not to break in the middle of somebody's argument
23    but to let us know if they need a break or something like that.
24            Also, I know you don't want to think about this now,
25    but in the event of a conviction we need to talk about what's
```

6118

 1   going to happen with the forfeiture allegation.  So we'll talk

 2   about that once the jury goes out.

 3            MR. ESSIG:  Yes, ma'am.

 4            MR. BODNAR:  Yes, ma'am.

 5            MR. KNIZLEY:  Lastly, Judge, if the arguments are over

 6   at 4:30, do you want to charge them this afternoon?

 7            THE COURT:  No, I'm going to charge them in the

 8   morning.  Yeah, yeah.

 9            THE CLERK:  Your Honor, another housekeeping matter.

10   We're missing Ruan's Exhibits 127, 128, 129, 130, 131, 132, and

11   135.

12            MR. KNIZLEY:  I don't have that many, but I do have --

13   let me see what I've got.

14            MR. ARMSTRONG:  They are all in that packet.

15            MR. KNIZLEY:  We'll check and see.

16            THE CLERK:  Then we need a replacement.

17            MR. BODNAR:  It's going to take me about 15 minutes,

18   Your Honor.

19            MR. ARMSTRONG:  Judge, real quick, we would join in

20   Dr. Couch's motion they filed last night, which I guess was

21   document 441.

22            THE COURT:  You don't have to join unless you want to

23   exclude yourself.

24            MR. ARMSTRONG:  No.  The only difference, we have to

25   modify it because the count -- they mentioned specific counts.

6119

```
 1    It would be the Ruan counts.
 2            THE COURT:  The corresponding counts.
 3            MR. ARMSTRONG:  Two through four and 8 through 12
 4    would be the difference.
 5            THE COURT:  Okay.  All right.
 6            MR. ESSIG:  Thank you, Judge.
 7            MR. SHARMAN:  Thank you.
 8            MR. BODNAR:  Thank you.
 9        (A recess was taken at approximately 9:10 a.m.)
10        (In open court, 9:32 a.m., defendants and jury present.)
11            THE COURT:  Good morning, ladies and gentlemen of the
12    jury.  I think they fixed the sound system, don't you?
13            Good morning.  I apologize for our late start.  As I'm
14    sure you've gathered, many things behind the scenes go on
15    toward the end of a trial.  We've taken care of those this
16    morning.  But our schedule today is going to be a little bit
17    different than we usually have.  The parties are going to make
18    their closing arguments to you.  And they each have an allotted
19    amount of time.  So we will break after the government makes
20    its opening closing argument, with our morning break which will
21    probably be a little later than usual, then the first defense
22    argument will be made.  Then we'll break for lunch, and that
23    will probably be around 12:30 or 1.  Then the second defendant
24    will make his closing argument, and then the government comes
25    back with a rebuttal closing argument.
```

```
 1            I will not instruct you on the law until tomorrow.  So
 2   you will not deliberate on the case starting this afternoon.
 3   It will be sometime tomorrow before you start deliberating on
 4   the case.
 5            All right.  Are you ready to make your closing
 6   argument?
 7            MR. BODNAR:  Ready to proceed, Your Honor.
 8            THE COURT:  All right.
 9            MR. BODNAR:  Ladies and gentlemen, like I said to you
10   in opening seven weeks and 81 witnesses ago, this trial was
11   about what did they do and why did they do it.  What did
12   Dr. Ruan and his partner, Dr. Couch, do and why did they do it?
13            Now, the defense made a big deal in opening that this
14   was about real doctors prescribing real medicine to real
15   patients.  And in a lot of ways they are actually right about
16   that.
17            Both Dr. Ruan and Dr. Couch are real doctors.  They do
18   have MDs.  By and large their patients were legitimate
19   patients.  And I told you that right from the very start and it
20   has always been our contention that a majority of the patients
21   that went there had legitimate pain needs and were in need of
22   legitimate pain management.  That doesn't necessarily mean what
23   they did was lawful.  But they did have real patients.  And
24   medicines.  All those drugs really are real drugs.
25            So was it real doctors with real patients and real
```

6121

CLOSING ARGUMENT OF MR. BODNAR

1   drugs?  Well, in a sense it was.  But that doesn't mean what

2   they were doing was lawful.  Because it's what did they do and,

3   most importantly, why did they do it?

4          For the last seven weeks you've heard why they did

5   it.  Why did Dr. Ruan and Dr. Couch prescribe drugs outside the

6   usual course of professional practice?

7          For money.  They were running a money mill.

8          Again, this is not your standard pill mill where

9   somebody comes in the back door, pays a $150 for

10  OxyContin.  This is big-time money.  This is owning your own

11  pharmacy.  This is requiring your patients to have insurance.

12         There's no fooling with $150 in cash when you can

13  prescribe $18,000 a month Subsys and Abstral and have their

14  insurance pay for it.

15         This was a money mill.  It was run as one.

16         There was some legitimate patient care.  But the basis

17  for why the doctors did what we've alleged and with the

18  patients that we've alleged was to enrich themselves, because

19  they had a DEA license and they had the ability to write

20  scripts and make money off the unlawful prescribing of drugs.

21         So you've heard all the evidence so far.  Nothing I'm

22  going to say today, nothing the defense attorney or Ms. Griffin

23  is going to tell you is evidence any more.  You will have every

24  bit of it to go through in deliberation.  And there's a lot.

25  And I hope you do go through it very carefully.  Because when

CLOSING ARGUMENT OF MR. BODNAR
32308

1    you go through it carefully and actually look at what's in the
2    evidence, it strongly, strongly supports the United States'
3    position as to each and every count.
4           And there's a reason that our counts are very specific
5    of what the doctors are alleged to have done. Because what
6    you've heard throughout the trial from the defense is their
7    wanting to talk about other things -- nerve conduction studies.
8    Well, no one's ever alleged that those were unlawful. No one's
9    ever alleged that they were done outside the usual course of
10   professional practice. Or myoblocs. Or other parts of -- what
11   was the legitimate aspects of patient care. We're not here
12   because of that. We're here because of illegal prescribing and
13   fraud.
14          Ladies and gentlemen, it would be somewhat analogous,
15   if this were a bank robbery trial, it's to distract. That's
16   what the defense has been trying to do, is distract from the
17   core issues. If this was a bank robbery trial, you would hear
18   things like: Well, didn't he drive the speed limit to the
19   bank? That's lawful.
20          He paid for the meter. That's lawful too.
21          The gun was lawfully registered to him. And that's a
22   good thing.
23          Well, none of that matters because none of that is
24   what's alleged to have happened. So we are focusing in on the
25   prescriptions, the prescriptions written, and why they were

6123

 1   written.

 2          Now, there are 22 counts here.  And you could start in

 3   any order you want.  You could start one through 22.  I suggest

 4   you start at count five, five through 14, which are the

 5   substantive counts.  Because those are the smallest, most

 6   discrete counts.  And it's a good place to start from.  So

 7   count five relates just to Dr. Couch, and that's the UCE

 8   patient.  So you've seen videos.  And today neither myself nor

 9   Ms. Griffin is going to walk through every bit of this

10   evidence.  We would be here a month if we did that.

11          I'm going to give you a general overview of what

12   you're looking for from the United States' perspective for each

13   count.

14          So count five through seven -- five, six, and seven --

15   those are the three discrete UCE, undercover, patient visits to

16   Dr. Couch.  You've seen the video.  You saw that he went in,

17   Dr. Couch did, for 43 seconds.

18          Now, he claims that Stacy Madison had gone out of the

19   room and explained everything to him beforehand about what the

20   UCE's issues were.  That was off camera.  We don't know if that

21   happened or didn't happen.  But what we do know is that

22   Dr. Couch comes in the room and Stacy Madison goes over all the

23   things again.  She tells him exactly what's wrong with the

24   patient.  And remember, he has nothing wrong with him.

25          He said he had some stiffness in his back.  He wasn't

1    complaining of terrible pain, and he's given Roxicodone

2    pills -- which he already admitted that he was getting

3    illegally from some other means outside of seeing a doctor.

4            Dr. Couch is not acting in the usual course of

5    professional practice in prescribing that undercover patient

6    those Roxicodone pills on that first visit.

7            The whole issue of, well, you know, the chiropractor

8    called and yelled at somebody in the practice and, well, that's

9    the reason the UCE patient got in is irrelevant.  We've never

10   claimed that there was a problem with the patient getting

11   in.  We've never said that's lawful or unlawful.  And it is

12   completely unrelated to what happened once the patient actually

13   was inside.  That's what the focus is on.  Not how the person

14   got in.  It's what happened, how he was treated once he was in.

15           So not only from that first visit do you know that

16   Dr. Couch saw the patient for 43 seconds, Sean Brennan, but

17   you've got his file.  You can look through it.  And we've

18   showed it to you before.  Look at all those exams that were

19   supposedly done to Sean Brennan that day.  You will recognize a

20   lot of them, because they are the same false exams that are

21   listed throughout the patient files:  checking the thyroid,

22   palpating the stomach, looking at the eyes -- all things that

23   were done and put in the medical file.

24           And you've heard why.  Of course, you don't need to

25   check someone's eyes or necessarily palpate their stomach or

 1    throat if somebody's showing up with back pain.  That's not
 2    necessary.  But they put it in, into the file, Dr. Couch
 3    certified it, and the reason why, as you heard, was because it
 4    bumps up the billing.  It bumps up that 99214 billing code the
 5    more you place in that examination file.
 6           And the thought of blaming the people that work in
 7    billing for this problem is just ridiculous.  You've heard from
 8    the billing staff.  They didn't make any decision on how to
 9    bill or what codes to pick.  They were assigned a code
10    already.  It was going to be a 99213, a 99214, or whatever
11    other procedure code it might be.  Then they simply checked the
12    record to see if it matched up with what a 99214 billing code
13    would look like.
14           And, of course, it does match up, because it appears
15    to the biller that all these exams were done.
16           We know they were not.  And we know why Dr. Couch and
17    Dr. Ruan did this, and it was to make more money.
18           Now, count six and count seven are the next two
19    undercover patient visits with Sean Brennan.  You've seen those
20    videos.  Dr. Couch never even shows up in either of those
21    videos.  He's not there, he's not treating the patient, and
22    you've heard from other patients and staff that that was his
23    modus operandi.  He doesn't see patients after for followup and
24    in some cases he doesn't even see patients the first time
25    around.

1          Use your common sense and think about your experience
2   with doctors.  This is not how doctors' offices operate.  This
3   money mill was operated to run the maximum number of people
4   through every day to increase profits.
5          You can't run a legitimate medical practice like that
6   with only two doctors.  There's no way Dr. Ruan and Dr. Couch
7   can see the 90-plus patients each of them had flowing through
8   that clinic every day.  Patient care was secondary.
9   Moneymaking was primary.  That's why they were running so many
10  people through here.  That's why things are being done by nurse
11  practitioners and doctors are signing off at the last second,
12  whether or not they actually see the patient, whether or not
13  they actually do the exam.
14         And you saw the example with Special Agent White of a
15  series -- I believe it was from May 5th, 2015, a progress note
16  signed by Dr. Couch, where he literally must have opened up his
17  computer and started click, click, click, click, click, click.
18         You've got that in evidence.  Look at those time
19  stamps.  Some of those time stamps are signed seconds -- two,
20  three, 10 seconds -- after the last one was signed.
21         This is running through the motions, making it look
22  legitimate for the purpose of billing.
23         So counts five, six, and seven are the undercover
24  visits.  And again, those don't include Dr. Ruan at all.  That
25  is just Dr. Couch.

```
 1            Then you come to counts eight, nine, and 10.  Those
 2  are only Dr. Ruan, and Dr. Couch is not involved in eight,
 3  nine, or 10.
 4            Count eight is DG.............., count nine is Kim
 5  Lowe, and count 10 is Erick Gist.  Now, you heard from Erick
 6  Gist and you heard from Kim Lowe.  You also heard from United
 7  States experts going through those files and explaining to you
 8  why it was that the treatment of Kim Lowe, of Erick Gist, and
 9  of DG............. was outside the usual course of
10  professional practice.  I believe all three of those were heard
11  from Dr. Greenberg.
12            You also heard various other patient files from,
13  obviously, Dr. Vohra and Dr. Aultman.
14            Now, in this case you have heard from experts on all
15  sides.  One of the things the Court is going to instruct you
16  about is that, while experts are certainly things you can
17  consider in cases involving controlled substance violations and
18  prescribing violations, it's not the end-all and be-all.  It is
19  not essential to have expert opinions.  You are able to use all
20  the evidence in this case to evaluate whether or not the
21  prescriptions listed in the indictment for DG..............,
22  Kim Lowe, and Erick Gist were within or outside the usual
23  course of professional practice.  And if you recall, for those
24  three patients, Dr. Greenberg went in depth and went through
25  the actual files and pointed out things -- and I know people
```

1    were taking notes -- and explaining why it was, what it was in

2    the file specifically that caught his attention and brought him

3    to have his opinion that those were outside the usual course of

4    professional practice.

5            Now, at times did Dr. Greenberg get confused about

6    small matters?

7            Yes.  He was on the stand for two days, two full days,

8    answering questions for the United States, meticulously going

9    through those files and then being grilled on the small details

10   from the files by defense counsel.  Of course, he had some

11   mistakes and he forgot some things.  That does not mean that

12   his opinions are not valid.

13           Not only that, his opinions were hardly refuted.

14   Think about the defense experts that came on and talked about

15   files.  You had Dr. Warfield, you had Dr. Gudin, and you had

16   Dr. Gharibo.

17           None of the defense experts went through any of the

18   files with you.  It was a very high level of:  Nothing that was

19   done was wrong, all the prescriptions were good, everything was

20   in the usual course of professional practice.

21           The reason they didn't get into these was because you

22   can't.  You're going to have those case files.  Please look

23   through them, get in the weeds.  Look at all those fraudulent

24   examinations.

25           Look at all the things, all the inconsistent drug

1    tests.  All the aspects, as Dr. Greenberg and Dr. Vohra and

2    Dr. Aultman pointed out, caused the prescribing of those three

3    patients by Dr. Ruan to be outside the usual course of

4    professional practice.

5           Dr. Ruan's experts didn't even attempt to touch on the

6    details of those cases.

7           Now, Dr. Warfield.  Dr. Warfield came here and, as you

8    heard, for $750 an hour she told you that virtually nothing a

9    doctor could do would ever be wrong.  Nothing's outside the

10   usual course of professional practice.  Forging scripts are not

11   outside the usual course of professional practice.  Blank

12   presigned scripts aren't outside the usual course of

13   professional practice.

14          Allowing nurse practitioners to see patients while

15   they're high, she said:  Well, that's kind of a bad thing.

16   But, you know, you never know about their tolerance.

17          And she made the reference that sometimes surgeons can

18   have a fifth of gin and still perform surgery.

19          But again, she never got into any of the details.

20          Now, Dr. Gudin and Dr. Gharibo, they did say certain

21   things that you know happened in this case were outside the

22   usual course of professional practice.

23          Dr. Gudin admitted that blank presigned scripts,

24   that's outside the usual course of professional practice.  And

25   you've seen those many a time from Dr. Ruan.  We've shown these

CLOSING ARGUMENT OF MR. BODNAR

6130

1   and I showed them to Dr. Gudin and he agreed this is outside

2   the usual course of professional practice (indicating).

3          The whole excuse that these are just for

4   emergencies -- well, do you know what?  If there's a true

5   emergency and there's no other doctor around and you're in the

6   middle of a rural area, well, maybe he would have a case

7   there.  It may not be lawful, but it may be something that has

8   to be done to help your patients.

9          Here, though, within the practice there's at least two

10  other doctors.  Not only to mention that, you're in Mobile,

11  where you could go to other doctors' offices, if need be.

12         This is an excuse, an excuse to cover up conduct that

13  as Dr. Ruan's own attorneys told you -- or I'm sorry -- our

14  experts told you is outside the usual course of professional

15  practice.

16         Dr. Gharibo, when he was on the stand yesterday,

17  explained to you as well, he reminded everybody that his

18  opinions, as the opinions of all the experts, are only as good

19  as the accuracy of the files.

20         So if you're going to lay the basis of your opinion

21  that everything was done right on the fact that there were

22  these great exams and everything was worked up and the doctors

23  were actually seeing the patients, the experts have no way of

24  knowing whether that was true or not.  You know that it wasn't

25  true.

CLOSING ARGUMENT OF MR. BODNAR
6131

1          The other thing Dr. Gharibo pointed out to you all
2    yesterday was that prescribing and making prescribing decisions
3    based on the financial self-interest of the doctor is outside
4    the usual course of professional practice.
5          We'll get a little more into that in a bit.  But you
6    know through the evidence that you've seen the seven weeks that
7    that was a driving motivation behind a lot of the prescribing
8    that occurred here.  It was for financial self-interest of
9    Dr. Couch and of Dr. Ruan.
10         There was another big problem that was pretty apparent
11   with Dr. Ruan's two experts.
12         There are a lot of doctors in this country.  A lot of
13   people that could have been brought in to give you opinions on
14   whether or not Dr. Ruan's medical practice and his prescribing
15   was within the usual course of professional practice or outside
16   the usual course.
17         He brings down to Mobile two of his buddies.  They
18   knew him, these were guys that had traded political jokes back
19   in 2011.  Dr. Gudin helped Dr. Ruan's daughter get an
20   internship.  They were passing commercials back and forth to
21   one another.
22         These were not neutral parties.  And while they may be
23   trying to set aside whatever bias that they may have in favor
24   of Dr. Ruan, they had the opportunity to bring neutral third
25   parties that had no prior history with the defendants, like the

 1   United States did, and they chose to bring people that were

 2   Dr. Ruan's buddies.

 3          Not to mention that, but it was not brought out on

 4   direct examination, they never told you when Dr. Ruan's

 5   attorneys were interviewing -- were having them questioned,

 6   they never mentioned that they knew Dr. Ruan.  It was only when

 7   I started asking them that did they admit:  Yeah, you know, I

 8   guess I do know him.

 9          And then it was:  Well, I don't know if we were

10   actually friends or colleagues, until they started seeing

11   things.

12          Dr. Gudin has a second problem of being heavily,

13   heavily involved with Insys, who, as he told you, he doesn't

14   see what the relevance of that is.  I know you on the jury know

15   exactly what the relevance of that is.  His direct examination,

16   as I pointed out last Friday, used the same jokes and examples

17   of the speech that he gave at Insys Investor Day on Wall Street

18   for a speech he was paid $8,000 for by Insys Therapeutics, the

19   very company that's at the heart of some of the major

20   allegations in this case.

21          So, as I've said, the United States' experts walked

22   you through the case file and explained why it was that for

23   each of those patients the prescribing was outside the usual

24   course of professional practice.

25          The defense experts glossed right over the top.  They

CLOSING ARGUMENT OF MR. BODNAR
6133

1    don't want you to look at the details.  We do.  Please look

2    back at your notes for what the United States experts said and

3    walk through the files yourselves carefully and you will see

4    that prescribing by Dr. Ruan to DG.............., Kim Lowe, and

5    Erick Gist were outside the usual course of professional

6    practice.

7         The same holds true for counts 11, 12, 13, and 14.  11

8    is Deborah Walker.  12 is John Bosarge.  13 is Kenneth

9    Daves.  And 14 is Patrick Chausse.

10        Again, the United States expert walked you through

11   their files and explained exactly why the prescribing that's

12   alleged in the indictment was outside the usual course of

13   professional practice.  That was not refuted by the defense

14   experts in any way, other than them coming in and telling you

15   everything that was done was fine, without opening a single

16   file and going through it with you.

17        So again, that's where I suggest to start, is with the

18   singular discrete counts.  With each of those counts it's going

19   to list a specific day.  For example, DG............. in count

20   five -- I'm sorry, count eight -- will say on or about February

21   26th, 2015, and list the drugs that she received that day,

22   those being Subsys, and Abstral, OxyContin, and Norco.

23        After the substantive counts, where at least I would

24   turn next would be to the conspiracy counts for the drugs,

25   those being count two, three, and four.  Now, count two is the

CLOSING ARGUMENT OF MR. BODNAR

1   schedule II drugs.  Count three is the fentanyl.  And count

2   four is schedule III.  Because, as you heard, during the time

3   period in this indictment hydrocodone products started as a

4   schedule III and then moved to a schedule II.

5           With regard to the nonfentanyl schedule II and

6   schedule III for hydrocodone prior to October 6th of 2014, how

7   do you know that the prescribing by the doctors was outside the

8   usual course of professional practice?

9           It's because of the way they were prescribing.  And

10  the reasons they were prescribing these drugs to these patients

11  was for the financial incentive to the doctors.  And I think

12  one of the better examples to show that was what we showed you

13  with Exalgo.  I'm going to bring back the chart.

14          And you recall this chart is really a compilation of

15  what three different witnesses told you.  First, you had

16  Special Agent Paul Short, who talked about how he went through

17  the PDMP records, how he created the spreadsheets and then was

18  able to make graphs from it.  So he was the one, if you recall,

19  that created this graph initially, with the blue line being

20  Dr. Couch, which pretty much stays steady along the bottom, and

21  the red line being Dr. Ruan.

22          Then you had Gail Tetzlaff, who came in from

23  Mallinckrodt.  She's the woman who came in early on a Monday

24  morning and she was the one who explained she was the record

25  keeper for the company that made Exalgo and she was asked to

 1    look and see if Dr. Ruan or Dr. Couch had ever been paid for

 2    promoting the drug Exalgo.  You heard that Dr. Ruan was paid

 3    and that Dr. Couch wasn't paid.

 4           And that is really, really clear on this graph, the

 5    difference between these two doctors.

 6           Dr. Couch was not paid at all for this drug.

 7    Consequently, he's not prescribing it.

 8           Dr. Ruan -- and as Mike Burt came and drew on each one

 9    of these for you, here are all the dates that he was paid.  You

10    see that Dr. Ruan starts prescribing when he starts to get

11    paid, all the way to here.  (Indicating.)  When Mallinckrodt

12    stops paying Dr. Ruan for promoting Exalgo, you can see what

13    happened after that (indicating).

14           Dr. Gharibo basically out of thin air made a great

15    comment yesterday afternoon and said, when I asked him about

16    the opioid rotation, he said:  Well, if the doctors were

17    rotating from one drug to the other simply because they had a

18    financial self-interest in it, well, then I would expect to see

19    a large spike in prescribing of that drug.

20           I couldn't find that Abstral graph fast enough.  But

21    that's exactly what you see with both Abstral and with Exalgo.

22           Now, you heard from Dr. Ruan that he had other uses

23    for why he's prescribing in this fashion and Dr. Couch is

24    not.  One of the ones you heard was the voucher program.  Well,

25    Exalgo may have had a voucher program.  There's not actually

CLOSING ARGUMENT OF MR. BODNAR

1    been any evidence of that.  But let's say, assuming that maybe

2    they did have a voucher program, which means it would be free

3    to the patient, that's a good point to bring up now.  Just

4    because something is free to the patient does not mean it's

5    something that the patient needs medically or that it's written

6    in the usual course of professional practice.

7            But if there's a voucher program here and that's why

8    Dr. Couch is prescribing it, why isn't Dr. Ruan taking

9    advantage of the same voucher program?

10           Similarly, Dr. Ruan alluded to the fact that Exalgo

11   had come out with a new tamper-resistant formula, so you

12   couldn't crush it up and inject it.  Well, again, that's a good

13   thing.  And if that's the reason that they're prescribing it,

14   why is there such a stark difference between Dr. Ruan and

15   Dr. Couch in the prescribing of Exalgo?

16           Again, the reason is it comes down to money.  Dr. Ruan

17   was not getting -- I'm sorry -- Dr. Ruan was getting paid,

18   right to here, and when he stops getting paid it drops off.

19   (Indicating.)

20           Dr. Couch is never paid for Exalgo.  Consequently, his

21   patients aren't going to get it.

22           From the numerous patients that have come in before

23   you and testified so far, you have heard and you've seen their

24   medical files that while they were at PPSA, they were receiving

25   numerous prescriptions often four and five at a time of various

CLOSING ARGUMENT OF MR. BODNAR

1   different opioids and other drugs sometimes benzodiazepines,

2   sometimes noncontrolled substances, and then you've heard what

3   they take now.  It's nowhere close to what Dr. Ruan or

4   Dr. Couch was prescribing.

5          Now, again, there's differences in how doctors want to

6   prescribe.  And that's lawful.  There's no problem and there's

7   a spectrum of what prescribing can be.  But when Dr. Ruan and

8   Dr. Couch are prescribing in their own financial self-interest,

9   that's what brings it outside the usual course of professional

10  practice.

11         Furthermore, you've got the Dr. Justin problem for

12  Dr. Ruan.  Dr. Justin is not a doctor at all, as you've

13  heard.  And, as Dr. Justin admitted, he forged, he estimated,

14  roughly 25,000 prescriptions with Dr. Couch's name on them.

15         You've heard that virtually every employee that worked

16  there knew that Dr. Justin was doing this.  You've heard even

17  from patients like Jessi Kamper that Dr. Justin was doing this.

18         You've seen the email in 9-1(2), which we've gone over

19  and over, where Dr. Ruan reminds Dr. Couch to talk to Justin

20  about prescribing the red flag drugs, OxyContin 80, Roxicodone

21  30.

22         Yet Dr. Ruan and Dr. Couch claim they had no idea that

23  Justin was doing this.

24         Now, you've got Dr. Ruan who, as you've seen,

25  micromanaged every aspect of PPSA.  If something went on at

1  PPSA and Dr. Ruan didn't know about it, I'd be shocked.

2          Now, granted, Dr. Ruan was not often at the same

3  clinic as Dr. Couch.  But everybody in there knew what

4  Dr. Justin was doing.  Everybody.

5          You've also heard from both Dr. Justin and from others

6  in there that Dr. Couch was definitely on notice and that

7  Dr. Justin had been yelled at by Dr. Couch about prescribing in

8  his name.

9          Now, Dr. Couch was out of the town.  You saw all those

10  dates that Special Agent White put up of when he was out of

11  town and when prescriptions were written on those days.  So

12  that's one of two things.  Either those were presigned

13  prescriptions or that's Dr. Justin prescribing.  It is beyond

14  any reason that Dr. Couch was not aware of what Dr. Justin was

15  doing, forging his name over and over again.

16          And Dr. Couch admitted on the stand in cross-

17  examination -- it was my last set of questions -- that if he

18  would have known, then yes, that would have been outside the

19  usual course of professional practice.

20          He absolutely knew what Dr. Justin was doing.

21          And just because, as they pointed out from time to

22  time, Dr. Couch really trusted Justin -- Justin did have a

23  decent amount of training -- but that does not mean that

24  prescribing somebody something when you don't have a DEA

25  license is okay.

CLOSING ARGUMENT OF MR. BODNAR

1          That's also true even if the drug works.  There is no
2   question that Subsys and Abstral, which are highly, highly
3   potent fentanyl drugs, work.  The fact that they were good for
4   David Riley or bad for someone like Tamison Blanks are
5   irrelevant.  Because when you're looking at whether or not the
6   prescription was written outside the usual course of
7   professional practice, you look at the time it was written and
8   issued.  So anything signed or forged with Dr. Couch's name by
9   Dr. Justin, assuming Dr. Couch was aware of it, is outside the
10  usual course of professional practice.
11          With regard to count three, that's the fentanyl count.
12  This is the conspiracy to prescribe fentanyl, including Subsys
13  and Abstral, outside the usual course of professional practice.
14          You've heard what the motivation was for Dr. Ruan and
15  Dr. Couch prescribing Subsys; that was, they are being paid
16  speaker fees.  They received large speaker fees from Insys
17  Therapeutics.  And when you go look at Government's Exhibit
18  9-4, you'll see just how much more Insys was paying Dr. Ruan
19  and Dr. Couch than any other pharmaceutical company.
20          Nobody's paying Dr. Ruan and Dr. Couch anywhere near
21  what Insys Therapeutics was paying them.  That's why they were
22  prescribing Subsys and that's why they were prescribing it off
23  label.
24          Again, prescribing something off label, as I've told
25  you from the beginning, is not inherently illegal.  It may be a

CLOSING ARGUMENT OF MR. BODNAR
6140

1  very good thing to prescribe something off label.  It may be

2  very helpful and beneficial to the patient.

3         If Dr. Ruan or Dr. Couch actually had a doctor-patient

4  relationship with a patient and sat down with them and told

5  them the dangers of being on an end-of-life cancer drug and the

6  patient said:  I get it, I understand those risks and I'm

7  willing to take them, then there is nothing at all wrong with

8  the off-label prescribing of Subsys or Abstral in those, in

9  those times.

10        But as you've heard, that's not what happened.

11  Dr. Ruan and Dr. Couch by and large were not giving informed

12  consent.  Patients filled out a form on their intake that said:

13  Oh, I agree everything is fine off label.

14        Well, just because a patient agrees to something at

15  the very beginning doesn't mean they have any sense of what the

16  drugs are and what the dangers are, particularly of Subsys and

17  Abstral.

18        And go look at those opioid -- or off-label consent

19  forms.  Subsys and Abstral aren't even listed on there.

20        To say:  Oh, well, they would have gotten the warning

21  from the pharmacy, or in the box they could have read it, yes,

22  they may have gotten some warnings at C&R Pharmacy.  We don't

23  know.  We have no evidence of that.  We do know that there's a

24  warning in the box.  But you've seen time and again Alabama

25  state medical rules say that the doctor shall give informed

1    consent.

2          That was not happening.  These patients were being

3    placed on highly dangerous, highly addictive drugs off label

4    for problems that you heard Dr. Gharibo and Dr. Gudin treat

5    patients just like that and they don't prescribe Subsys and

6    Abstral at all, and they are able to take care of their

7    patients' pain.

8          Same thing with Dr. Greenberg, Dr. Vohra, and

9    Dr. Aultman.  None of them have ever written a prescription for

10   Subsys and Abstral.  Yet they see patients much akin to the

11   ones Dr. Ruan and Dr. Couch did.

12         Now, you also heard from Dianne Rogers, who you may

13   recall the United States objected to her testimony as

14   irrelevant from the get-go because she did have cancer, and she

15   received Subsys.  And again, that's another distraction.

16   That's exactly the type of person that should get Subsys.  And

17   we have never at any point alleged that prescribing to

18   individuals like Dianne Rogers was outside the usual course of

19   professional practice.

20         You've seen Exhibit 12-2.  We've shown it many a time.

21   This was the top 28 list of individuals that received Subsys

22   and Abstral.  And you saw it listed their micro -- or their

23   grams that they received as well as the money that was billed

24   from C&R Pharmacy for that.  And totaled at the bottom shows

25   67.311 grams, just from these 28 patients.

1          And the reason that's important is count three has a

2    subpart.  If you were to find the defendants guilty on count

3    three, which is the fentanyl conspiracy, then you would ask the

4    second question to decide whether the amount of fentanyl in

5    that conspiracy and dispensed as part of that conspiracy was

6    above or below 40 grams.  So that's a special question that you

7    have just for count three.

8          As you can see, just from the top 28 patients alone

9    that don't have cancer -- these are just the off-label

10   patients -- you have well over 40 grams.

11          But as defense counsel for Dr. Couch pointed out at

12   one point during trial, there was actually a whole bunch more

13   Subsys and Abstral than just what was on that 28 chart.  And it

14   was alluded to at one point that, you know, we're not talking

15   about much.  Over four years all we're talking about is 102

16   grams, 102 paper clips.  And that was just referencing just

17   Dr. Couch just for Subsys.  (Indicating.)

18          You've got to remember how much 102 grams of Subsys

19   is.

20          Subsys is measured in micrograms.  That means each one

21   of these one-gram paper clips is divided up into a million

22   pieces, one million pieces.  That's one microgram.

23   (Indicating.)

24          This drug is measured out in micrograms.  And

25   Dr. Couch and Dr. Ruan prescribed so much of it, Dr. Couch had

1     102 grams of Subsys and 25 grams of Abstral.  (Indicating.)

2            Dr. Ruan had 69 grams of Subsys and 27 grams of

3     Abstral.  (Indicating.)

4            That is an unbelievable large amount of fentanyl for

5     just these two drugs.

6            And recall, too, in the percentages that Paul Short,

7     those charts that he created, that's the PDMP records from

8     January 1st, 2011, all the way to the date of the search

9     warrant, May 20, 2015.  But Subsys and Abstral were not being

10    prescribed that entire time.  Neither -- or Subsys wasn't even

11    on the market in 2011.  It started in 2012, as you saw.  And

12    the doctors didn't begin prescribing it until March of

13    '12.  For Abstral, they didn't start prescribing it big time

14    until the end of 2013.

15           So really in a much smaller time window all of this

16    fentanyl, or Subsys and Abstral, was prescribed by Dr. Ruan and

17    his partner, Dr. Couch.

18           And as you saw this, putting it in perspective,

19    Dr. Warfield brought up:  Well, you know, this is the largest

20    pain clinic in the area and there's not a lot of other pain

21    doctors in Mobile.  So reasonably you'd expect them to be

22    prescribing more than other doctors in the area.  But as you

23    saw from Blue Cross and Blue Shield -- this is 27-1, and you'll

24    have all these charts back there with you -- Dr. Ruan and

25    Dr. Couch, number one and two in the state of Alabama.  That

1    includes every doctor.  Oncologists, that includes pain

2    doctors.  Yet Dr. Ruan and Dr. Couch are one and two by a huge

3    margin.

4          Dr. Ruan here is 1.5 million, Dr. Couch $1.4 million

5    reimbursed for those drugs.  The next highest one is 400,000.

6          And as Dr. Ruan and Dr. Couch are quick to point out,

7    this money isn't reimbursed for the doctors.  It goes to the

8    pharmacy.

9          Yeah.  But what pharmacy is filling these drugs?  As

10   you saw from the charts from Paul Short, 91 percent of all the

11   Subsys and Abstral was filled and billed at C&R Pharmacy, the

12   pharmacy the doctors owned, the pharmacy that they got 75

13   percent of the profit.

14         Abstral is even more egregious.  We don't have a top

15   25 list for the state of Alabama for Blue Cross and Blue Shield

16   because there were only seven doctors in the entire state

17   during the entire period of this indictment that prescribed

18   this drug.

19         Dr. Ruan, number one, and Dr. Couch, number

20   two.  Dr. Ruan prescribed almost $900,000 worth of it,

21   Dr. Couch about 725,000.  Number three?  $6,000.  Nobody else

22   was prescribing Abstral in the state of Alabama anywhere near

23   where Dr. Ruan and Dr. Couch were.

24         And it's not just the state of Alabama.  In fact, when

25   Ms. McKenzie was on the stand, the defense counsel made a point

CLOSING ARGUMENT OF MR. BODNAR

1   of saying:  Well, we have no idea where they would rank in the

2   entire nation, would we?

3           Well, you saw from the followup witnesses.  We know

4   exactly where they rank in the nation for United Healthcare,

5   for Medicare, and for Tricare.

6           Do you recall Tricare is the military entitlement?

7   This is money that's supposed to be spent on veterans and their

8   families.  And Dr. Couch or Dr. Ruan leads the nation in Subsys

9   paid by Tricare at over $2.6 million.  Dr. Couch number two,

10  roughly the same amount.  They are both double what the next

11  highest person is.

12          Now, as we've seen before, Abstral is even more

13  egregious for Tricare, for United Healthcare, and for

14  Medicare.  This is the entire nation, all doctors, all types,

15  all practices.

16          And in particular with Abstral, as you heard from

17  witnesses with regard to Subsys, the motivation was the

18  speaking fees.  Dr. Ruan and Dr. Couch received anywhere from

19  1,200 to $3,000 to go click through the slide show that he was

20  presenting to, by and large, his own employees who, other than

21  Dr. Justin, weren't prescribing at all.  And as we know,

22  Dr. Justin was not supposed to prescribe at all, but we know he

23  was.

24          That was the motivation for Subsys.

25          And you saw from Natalie Perhacs and from her emails

 1    that when Dr. Ruan and Dr. Couch started prescribing more

 2    Abstral, they reduced the speaker programs for Subsys.

 3           As counsel for Dr. Ruan has pointed out, even when

 4    they were prescribing Abstral, their numbers really didn't drop

 5    that whole -- much from Subsys.  And that's true.  And if you

 6    look at the chart that Paul Short created about that -- and I

 7    know this was toward the beginning of trial, he laid that out

 8    for you.  The patients that were put on Abstral during that

 9    first big spike period, 74 percent of them were not on

10    Subsys.  This wasn't about switching Subsys patients to Abstral

11    patients.  This was about going out and farming through your

12    patients that you have and figuring out who it was that you

13    could put on this other drug, Abstral, that you've got a

14    financial self-interest in.

15           So it wasn't that Subsys was losing business or losing

16    many of their patients to Abstral.  It was that Dr. Ruan and

17    Dr. Couch were now putting a whole bunch of people on the same

18    type of medicine, but they weren't doing Subsys.  They were

19    doing Abstral.  And that's where you saw the frantic emails

20    from Insys Therapeutics to Natalie Perhacs that ultimately led

21    to reduction in the speaker program for Dr. Ruan and Dr. Couch.

22           And at least with Dr. Ruan you see that as well.  At

23    that time period you start to see a pretty strong reduction in

24    his prescribing of Subsys.  The drug doesn't change.  It's the

25    same drug as it was before.  But he's not making as much money.

 1              Plus, as you've seen, Dr. Ruan became aware that
 2    Dr. Awerbuch -- also a top subscriber of Subsys, also being
 3    paid by Insys -- was the subject of a criminal investigation.
 4    And what did Dr. Ruan do the very next day?  He started
 5    distancing himself from Insys.  He no longer wanted the checks
 6    to come to him.  He wanted them to go to the Wisconsin School
 7    of Medicine, he wanted them to go to LSU, he wanted them to go
 8    to the University of South Alabama.
 9              Now, sure, that's a good ting to do, is to donate
10    money.  But it goes back to what did they do and why did they
11    do it?
12              Why did Dr. Ruan suddenly wake up on June 6th, 2014,
13    and say:  Now is the time I need to start donating my money
14    from Insys?
15              Because he saw the other day, the day before, that
16    both him and Dr. Couch were referenced by NPI number in a
17    criminal case in another district.
18              Turning to Abstral, you heard from David Corin, who
19    came in here from Galena Biopharma, that there was absolutely
20    no difference in the drug or how it helped patients anywhere
21    along this time period, when you see that Dr. Ruan and
22    Dr. Couch were prescribing just a few prescriptions every month
23    for Abstral.
24              This wasn't newly on the market, but it was newly
25    promoted by Galena Biopharma.  And you see the big spike that

1    starts to occur here in November.  Remember, this is exactly

2    what Dr. Gharibo said he would expect to see if a doctor was

3    prescribing based on their own financial self-interest.  And

4    that's exactly what you see here.

5              Now, there was a voucher program.  And you've heard

6    about that.  And again, let's talk about what a voucher program

7    means.  It means the drug is free to the patient.  So the

8    doctor has no financial self-interest in the voucher program if

9    a patient is going and getting their Abstral filled at CVS or

10   Walgreens.  But as you heard, this is a very specialized drug.

11   It is not a drug that is carried in most pharmacies.

12             Where is it carried?  C&R Pharmacy.

13             The voucher program is financially beneficial to the

14   doctors because they are still filling their prescription at

15   C&R Pharmacy.

16             And, as you heard from David Corin, at the time of the

17   voucher program C&R Pharmacy actually received more money than

18   they would have if it was solely reimbursed by the insurance

19   company.  So, while it's free to the patient, there is still

20   the financial incentive for the doctor.

21             As you heard David Corin say as well, though, the way

22   that Dr. Ruan and Dr. Couch were using the voucher program was

23   completely unique.  Nobody else in the country was doing it the

24   way that Dr. Ruan and Dr. Couch were doing it.  And it was very

25   financially destabilizing to Galena Biopharma, the company that

1    you know Dr. Ruan and Dr. Couch purchased a significant amount

2    of stock in.

3            So the question was raised, then:  Well, why would

4    Dr. Ruan and Dr. Couch abuse the voucher program if it's bad

5    business for the company they own stock in?

6            Well, there's been no evidence that Dr. Ruan and

7    Dr. Couch were ever aware of how the voucher program ever

8    affected Galena Biopharma at the time they were prescribing.

9    They know that now because they heard David Corin say that.

10   But there's not been an email in evidence, there's been nothing

11   that suggested that the doctors knew that at that time.

12           Not to mention while they did, as you saw, want the

13   stock to go up, the more immediate payment was from using the

14   voucher and having the drug filled at C&R Pharmacy.

15           There's been a lot of questions about, well,

16   prescribing really started in November and December and the

17   first stocks were purchased not really predominantly until

18   later December and January, after the big spike in prescribing.

19           But go back and read through the emails in

20   11-5.  We've got all of them.  You will have a chance to go

21   through each of them carefully.  Dr. Ruan and Ngoc Vo were

22   discussing back in November, when the first surge started,

23   prescribing this drug and buying stock in it.  So the

24   discussions were already there.

25           And you know from the chart that Dr. Couch was already

1    buying drugs -- sorry -- already buying stock in Galena during
2    that first big spike.
3          Then when you go through the emails you'll see exactly
4    what accounted for this enormous dropoff.  It was Dr. Ruan and
5    Dr. Couch being extremely angry at Galena Biopharma for what
6    the board of executives did there in tanking the stock price.
7          Go through and look at the emails where Dr. Ruan
8    mentions that he's got a hundred percent confidence in the drug
9    and zero percent confidence in the management team at Galena
10   Biopharma.  If you have a hundred percent confidence in the
11   drug and this is a drug that is good and beneficial to your
12   patients, you're not seeing that massive drop.
13         You're also not seeing Dr. Ruan and Dr. Couch operate
14   in virtual lockstep here.  Remember, while they are partners
15   and they run their business together, they see different
16   patients with different issues at different clinics --
17   different clinic locations.  Yet their prescribing of Abstral
18   is virtually in lockstep.  They knew what they were doing and
19   they are acting coordinated together.  And the biggest example
20   of that is this second spike.
21         You heard from David Corin that a rebate agreement was
22   reached with C&R Pharmacy owned by Dr. Couch and Dr. Ruan
23   whereby C&R Pharmacy would get a rebate for filling Abstral
24   prescriptions.
25         Once that happened, what do you see occur?  Both

6151

1   Dr. Ruan and Dr. Couch immediately start prescribing this drug

2   again.

3          Now, this was something that when Dr. Ruan took the

4   stand yesterday he said he didn't know anything about the

5   rebate program.  That's C&R Pharmacy, that he didn't deal with

6   C&R Pharmacy.  He didn't know about this rebate program.

7          And I neglected to ask Dr. Couch whether he knew about

8   it.  How do you know that they knew about this rebate program?

9   Because of that spike.

10         All of a sudden both doctors together decided:  We're

11  going to start prescribing a whole lot more Abstral.

12         Now, with both Galena Biopharma and Insys Therapeutics

13  you heard that Dr. Ruan and Dr. Couch had a pretty close

14  relationship with upper management.  You've seen that

15  Dr. Kapoor, the founder of Insys, and Michael Babich, the CEO

16  at the time, flew to Mobile, Alabama, to meet with Dr. Ruan and

17  Couch personally over the fact that C&R Pharmacy couldn't keep

18  enough Subsys in stock.  You've seen the emails about that with

19  Boe Strange.

20         Dr. Ruan and Dr. Couch were prescribing so much Subsys

21  and filling so much of it at C&R Pharmacy, that the

22  distributors weren't able to give them enough Subsys.  Thence

23  their need for that IOU:  We'll do a partial fill.  You'll come

24  back and get the rest of it when we can get more in stock.

25         You heard that the work-around for that was that Insys

```
 1   was going to begin to ship directly to Dr. Ruan and Dr. Couch's
 2   pharmacy, C&R Pharmacy, bypass the whole system.  That woman
 3   from ARCOS who came in and told you it exists so that drugs can
 4   be tracked.  Instead of going to a distributor, it's going to
 5   go right to the pharmacy.
 6          Ladies and gentlemen, all of this evidence goes to
 7   count three as well as the RICO count.  There is no question
 8   that Dr. Ruan and Dr. Couch engaged in a conspiracy to
 9   prescribe fentanyl, which is what both of these drugs are, and
10   doing it for a financial motivation, which is what, as
11   Dr. Gharibo told you yesterday, makes it outside the usual
12   course of professional practice.
13          After you finish up with counts two, three, and four,
14   the schedule II conspiracy, the fentanyl conspiracy, and the
15   schedule III conspiracy -- because, again, the hydrocodone
16   switched during that time period -- the next best place I think
17   to turn your attention is to count 15, which is healthcare
18   fraud.  And the Judge is going to instruct you on what
19   healthcare fraud is.
20          And, of course, that is transmitting some sort of
21   materially misleading, false, or fraudulent information in
22   connection with the payment of a health service.
23          For one, Dr. Ruan and Dr. Couch are billing through
24   C&R Pharmacy drugs that were being prescribed outside the usual
25   course of professional practice and that's being paid by
```

CLOSING ARGUMENT OF MR. BODNAR

1   healthcare providers.

2           In addition, you saw from Cindy McKenzie of Blue

3   Cross/Blue Shield that they had specific rules that the

4   doctors, when you decide to be part of the Blue Cross system,

5   you agree to follow.  And that very specific rule, which was

6   very clear -- and you know that Dr. Ruan knows it because Matt

7   Bean told him in the email -- is that they don't have incident-

8   to billing for Blue Cross/Blue Shield.  The person that treats

9   the patient is the one whose number it gets billed under.

10          And you heard that Blue Cross and Blue Shield has that

11  rule because they pay out more for doctor visits than nurse

12  practitioner visits, which makes sense.  Again, these doctors

13  are specialists.  They are supposed to be offering their

14  patients specialized pain management.

15          So, of course, it makes sense that if a specialist is

16  actually treating the patient, the specialist will be

17  reimbursed higher than Dr. Justin or Stacy or Bridgette or

18  Sharon Noland.

19          But you heard from Blue Cross and Blue Shield that

20  none of the nurse practitioners' NPIs were ever billed at any

21  point during this time period.  Every billing that went out was

22  billed under Dr. Couch or Dr. Ruan.

23          And as you saw from Cindy McKenzie yesterday -- even

24  the defense's witnesses, when Elaine McDonald came on and said,

25  you remember, here is Couch 27C that we were showing on

1    rebuttal, where it said rendering provider to Tena Goellner was

2    Ben Clark.  And the defense made a big deal of:  Well, we told

3    them it was Ben Clark.  If they paid it under Dr. Couch's

4    number, that's their own problem.

5           That's why we brought Ms. McKenzie back on rebuttal to

6    show you no, what was actually transmitted to Blue Cross and

7    Blue Shield was that Dr. Couch was the one who rendered that

8    service.

9           Other aspects of healthcare fraud that you've heard

10   about include the GC-MS urine drug testing.  Now, we have to

11   distinguish what we mean by the fraudulent billing.  There was

12   no question that GC-MS testing is a good idea.  It is something

13   that should be done in pain management.  And it was done in

14   this practice.  The issue is when you're running tests and

15   you're not utilizing the results.

16          GC-MS tests are good because they give you good

17   clinical information from which the doctor is supposed to make

18   a decision:  Should I keep this patient?  Should I warn this

19   patient?  Are they taking the drugs the way they should be?

20   Are they taking illegal drugs?  Are they taking drugs

21   prescribed by somebody else?

22          All great information to help the doctors make

23   clinical decisions on what to do with a patient.

24          But you've seen that those tests are being run and

25   being billed for and, as Dr. Ruan explained, cup tests don't

1    pay anything.  GC-MS is where the profits are.  $755 profit per

2    test.  They are being run and only utilized sometimes.  So the

3    point of running these tests is not to get the best clinical

4    information.  It's to make them money.

5            You've seen the Dr. Ruan email about fired

6    patients.  I've asked Dr. Gharibo and I've asked Dr. Gudin

7    whether or not they ever take in the financial loss that may

8    occur to them if they fire a patient.  You heard them both say

9    no, that would never be part of their equation.

10           Even Dr. Couch, when I asked him on cross-examination,

11   disagreed with his own partner on this.  Dr. Couch told you

12   that he doesn't take into account whether or not it will

13   financially benefit the doctor to fire a patient.  Dr. Ruan

14   tells you right in the email that he does that.

15           And let's compare and contrast some of the

16   patients.  You heard from Gary Douthitt, a Dr. Ruan patient.

17   He's the one that came in here shackled.  He's the one that

18   lied and used his five-year-old son's urine to get the drugs

19   because he knew he wasn't going to test clean.

20           Well, of course, his five-year-old son's urine has

21   nothing in it.  But they don't run a GC-MS test the first time.

22   And go back and look through that file and look at that

23   notation.  Because Gary Douthitt no longer had insurance.

24           You don't have insurance.  You're of no value to a

25   money mill.  We can't bill you for the GC-MS test, we can't

CLOSING ARGUMENT OF MR. BODNAR

1   prescribe you the high-dollar drugs because you probably can't

2   afford it.  What value are you without insurance?

3        You're not.

4        So, of course, he was terminated, as he should have

5   been, because he was a drug addict and a drug dealer at PPSA

6   seeking pills to sell and to abuse himself.  He should have

7   been fired.  That's exactly the right thing that should have

8   been done.  And it was done when there was no more money to be

9   sucked out of Gary Douthitt for his insurance money.

10       Compare that to Kathleen Burns.  Remember, Mr. Burns

11  came in here and explained that his wife had been abusing drugs

12  in the past and was abusing her Subsys.  Please go through

13  Kathleen Burns' file, and it is number 9-11, and count how many

14  different times she's warned about violating the opioid

15  agreement.

16       She's got the one page in there that she signed that's

17  just got multiple notations in the progress notes:  Patient was

18  warned, patient was told don't use your Subsys other than the

19  way we told you to use it, patient was warned time and time and

20  time and time again.

21       And she is eventually fired.  And remember the reason

22  that was given, habitually running out of medicine.  That's

23  right.  That's exactly what she was doing.  And she was doing

24  that, though, for 16 months before they fired her.

25       And when did they fire her?  They fired her nine days

1    after receiving notice from her insurance company that they

2    were no longer going to pay for Subsys.

3           Prior to that point, as you will see on 12-2, Kathleen

4    Burns, prior to that point her insurance had paid $157,000 just

5    for Subsys, just to C&R Pharmacy.

6           Her insurance no longer was going to cover it.  Why?

7    Because she doesn't have cancer.

8           Now what do you do?  Now Dr. Ruan does the right

9    thing.  Now he fires her.  She should have been fired long ago.

10          Not to be uncompassionate and not because people

11   aren't deserving of other chances.  She had a serious drug

12   problem, which was evident from the fact that she was routinely

13   abusing her drugs.  It was not compassion to keep her around as

14   long as her insurance paid.  The compassionate thing to do,

15   particularly with someone that is board certified in

16   addictionology like Dr. Ruan is, to know that these are signs

17   of addiction and abuse, is get this woman into treatment.

18          That didn't happen at any point when they could still

19   make money off her.

20          And then we've seen the letter to Kathleen Burns'

21   insurance many a time where it asks Dr. Ruan:  Please certify

22   by signing below that this patient was being treated for the

23   indicated reason with Subsys for their breakthrough cancer

24   pain.

25          And Dr. Ruan wants to keep showing you stuff that

1    happened earlier, where he didn't say she had cancer.

2          Well, that's not really relevant to the fact that

3    after she was fired and after the insurance is looking at that

4    money that they've paid out for Subsys, $157,000, what does

5    Dr. Ruan do?  He certifies that yes, he was prescribing it for

6    breakthrough cancer pain.  And you know through her husband and

7    you know through going through her file that she did not have

8    cancer.

9          After going through the healthcare fraud count, I

10   would next turn to count 16.  Count 16 is IPM/CRS.  Remember,

11   that was Chris Manfuso and the dispensary.  That's the kickback

12   program.  Those contracts are in evidence.  Go through them and

13   look.  It does mention that the point is to dispense drugs to

14   people in the Alabama state worker's comp system.

15         And remember, you heard the State of Alabama sets a

16   fee schedule.  But the State of Alabama doesn't manage the

17   worker's comp program.  There are various worker's comp

18   programs like private insurance companies and there is also

19   federally insured worker's comp.  You've seen from the emails

20   that Dr. Ruan was aware that there were problems with the

21   federal insurance, the FARA, and you've seen through Amy White,

22   Special Agent Amy White's testimony, that there were federal

23   employees that were going through and getting their drugs

24   dispensed at the dispensary, the IPM/CRS dispensary.

25         Why is it important they are federal monies?  Because

CLOSING ARGUMENT OF MR. BODNAR

1   in order for there to be a federal anti-kickback violation,

2   some portion of the quid pro quo has to be for federal dollars.

3   And that's why we made that point and called back Special Agent

4   White, so you could see that, yes, in fact, there were federal

5   dollars going through the IPM dispensary.

6           So what was Chris Manfuso and Michael Drobot -- what

7   were they trying to do by paying these guarantees?

8           They were buying essentially the whole grouping of

9   Dr. Ruan and Dr. Couch's worker's compensation payments --

10  worker's compensation patients in order to have the right to

11  dispense out of that dispensary.

12          Now, you've seen that Dr. Ruan is the one that

13  purchased the drugs under his number.  But Dr. Ruan is not out

14  of pocket for one bit of that drug amount.  As Mr. Manfuso told

15  you, IPM and later his company CRX, they paid for the drugs up

16  front ordered under Dr. Ruan's DEA number.  Then when the money

17  was collected at the back end, they took out the amount that it

18  cost for the drug, IPM and later CRX, they got their cut.  And

19  if it was lawfully done, the way it was done as Mr. Manfuso

20  told you with all other doctors in the country it was lawfully

21  done, Dr. Ruan and Dr. Couch would have gotten whatever was

22  left, whatever's left after deducting the cost of the drugs and

23  the cut that goes to IPM or CRX for managing it.

24          But that's not what happened when the guarantees ran

25  out.  As Chris Manfuso told you, this was completely atypical

1   from how contracts were done with other doctors.  And, as you

2   heard Dr. Ruan tell you on the stand the other day:  Well, we

3   needed a 90-day guarantee in the beginning as we were

4   transitioning over from Linear, the company that ran the

5   dispensary before that.

6          Well, maybe that's a good excuse for the first 90

7   days.  But those guarantees were in each of the contracts over

8   years.  So again, guarantees are important, because Dr. Ruan

9   and Dr. Couch could not lose money, no matter how little was

10  prescribed there or dispensed out of that dispensary.  No

11  matter what, Dr. Ruan and Dr. Couch were getting their money

12  each month.

13         And these were patients that went to PPSA.  Their

14  office visit was billed and that money from the office visit

15  went into the PPSA accounts.

16         Yet Dr. Ruan and Dr. Couch, the money that they

17  received from the dispensary for the pharmaceuticals, went to

18  their own houses and to separate companies that Dr. Ruan and

19  Dr. Couch had set up.

20         Why was that?  Well, Dr. Ruan and Dr. Couch were not

21  getting the same amount of money, for one thing.  As you saw

22  from the emails, Dr. Ruan was the one that negotiated for

23  himself and for his partner, Dr. Couch.

24         You also saw that Dr. Couch did not get anywhere near

25  the money that Dr. Ruan had, because Dr. Ruan was negotiating

CLOSING ARGUMENT OF MR. BODNAR

1    on his own behalf and then for his partner tossing him a few
2    bones on the side.
3             If the money from the dispensary for the PPSA patients
4    had gone into the General account for PPSA, well, it would have
5    been split 50-50 to the two doctors.  Well, it would have been
6    better for Dr. Couch.  Certainly not for Dr. Ruan, who at the
7    end was getting $80,000 guaranteed a month, whereas Dr. Couch
8    was only getting $20,000 a month guaranteed.
9             Dr. Couch and Dr. Ruan both knew it was going on.
10   They both received and accepted those checks from Chris
11   Manfuso.  Those checks were kickbacks every time they were paid
12   that guaranteed amount because that money was IPM money up and
13   above what the doctors would have received had they just gotten
14   the normal percentage.  As Chris Manfuso told you, there were
15   many months where the amount that was collected that should
16   have come from the doctors in a legal contract had to be
17   subsidized by IPM and later CRX's own money because Dr. Ruan
18   and Dr. Couch had demanded those guarantees.
19            Following the IPM kickback scheme is count 17.  That's
20   where I will turn next.
21            Count 17 is the Subsys kickback scheme.  And you've
22   heard all about this.  You heard from Natalie Perhacs, you
23   heard from Lacey Fortenberry, and you've seen the
24   emails.  Dr. Ruan and Dr. Couch were made paid speakers by
25   Insys.  And, as Lacey Thorntonberry told you, the reason they

CLOSING ARGUMENT OF MR. BODNAR                                    6162

1    had the speaker program in the way that Insys ran it was so

2    that high-prescribing doctors would get money on the side to

3    continue prescribing.

4           You saw the emails from Karen Hill to Natalie Perhacs.

5    Karen Hill was the regional manager over Natalie Perhacs.

6    Karen Hill told her, reminded her that it's the speaking

7    programs that drive up prescriptions.

8           Both Dr. Ruan and Dr. Couch went roughly once a week,

9    clicked through a slide show for other than their own -- mostly

10   their own staff.  Occasionally another doctor would be there.

11          This was of no value to Insys other than to get their

12   high-prescribing doctors, their whales, extra money on the

13   side.  That's what this was all about.

14          And as you can see, if you go back through their

15   Sunshine Act forms, nobody else in the country, no other

16   pharmaceutical company, is paying Dr. Ruan or Dr. Couch

17   anywhere near what Insys Therapeutics was doing.

18          And as soon as Dr. Couch -- I'm sorry -- Dr. Ruan was

19   aware that Insys was in trouble and that another doctor who had

20   been receiving these payments was under criminal investigation,

21   Dr. Ruan ran away from that money as fast as he could.  The

22   very next day he starts donating those.

23          He even tells Dr. Busta, remember, he told him:  This

24   is the only company I'm doing this with.

25          So he's not donating money across the board.  He's

6163

1   donating Insys money.  He doesn't want that Insys check to come

2   to Dr. Ruan any more.  He wants it to go directly to the

3   college.  He sends that Insys money to all three of those

4   colleges.  When you pore through the emails again, you'll see

5   that.

6           But he still gets the benefit of it.  As you heard

7   from Boe Strange and you'll see an email that Dr. Ruan can get

8   a tax deduction for that.

9           He also gets the benefit of having his name on an

10  endowed scholarship, Dr. Ruan's endowed scholarship at the

11  University of South Alabama.

12          Unfortunately, Dr. Couch, it doesn't appear that he

13  was ever told about that.  Because he keeps his money coming

14  directly to him.  And as you saw in that email, Dr. Couch was

15  not included on that email and there's no indication that

16  Dr. Ruan ever told his partner about the need to distance

17  yourself from Insys.

18          With regard to the Subsys kickback claim too, we

19  talked about the federal nexus and the meaning that federal

20  dollars go through this.  Look no further than the Medicare and

21  Tricare.  Millions of dollars, federal money, was paid in

22  exchange for Dr. Ruan -- sorry -- millions of dollars of

23  federal money was paid as reimbursement for Subsys

24  prescriptions that Dr. Ruan and Dr. Couch were writing in

25  exchange for the speaking fees they got from Insys.

CLOSING ARGUMENT OF MR. BODNAR

1          Now, there is no count 18 in your indictment.  So once
2    you get done with 17, I would move right on to number 19, which
3    is the mail and wire fraud conspiracy.
4          Mail and wire fraud and internet healthcare fraud
5    usually does not happen in a healthcare practice.
6          Here, though, we know that Dr. Ruan and Dr. Couch were
7    operating as a medical practice.  So by and large the mail that
8    was going in or out, or the wires or financial invoices that
9    were coming in and out, were related to medicine.
10         One of the things that you know and you've seen
11   already that was fraudulently being sent to insurance companies
12   was the office codes.  I can't remember if it was Sharon Noland
13   or Shanna Harville, one of them was asked:  Well, why was it
14   being switch from the 99213 to 99214?
15         Actually I believe it was Debi Phillips.  And her
16   response was:  Well, as time went along we hired more nurse
17   practitioners so we could see more patients.
18         Well, that would make sense if the total volume
19   increased over here.  (Indicating.)  But it doesn't.  Virtually
20   they just swap.
21         You know why this happened.  When they went to
22   electronic medical records, Greenway gave the doctors the
23   ability to clone and to have essentially pattern language
24   placed in all those progress notes.  You know that didn't
25   happen because you heard time and again from the witnesses.

1    And as you go through these files, you're going to see the same
2    pattern language across the board.
3            This isn't just a mistake here and there.  This was
4    calculated and purposely done to justify getting a 99214 code.
5            Those were sent to Blue Cross and Blue Shield, those
6    were sent to Medicare, Tricare, to United Healthcare, either by
7    mail or electronically.  And, as you heard, when I asked those
8    witnesses where the money was coming back or where the
9    information was going to, it was outside the state of Alabama.
10   And that's important because for mail and wire fraud it has to
11   be something that goes into the mail or something that goes on
12   a wire and crosses the state line.  That's what happened in
13   this case.  You need to look no further than these office
14   visits.
15           Now, the doctors can say:  Oh, well, I wasn't in
16   charge of billing.  Billing wasn't my problem.
17           This is their clinic.  Not only is it their clinic,
18   but the billers are simply putting in the information given to
19   them by the doctors, information that is signed at the bottom
20   of the progress note and certified as being accurate by the
21   doctors.
22           So whether or not -- and Dr. Ruan has said he sees all
23   his patients.  Whether we believe that or not is one thing.  We
24   know that Dr. Couch did not see all his patients, so he may
25   have no way of knowing what Dr. Justin does.  But he signs the

1    form, the progress note.  That's what causes the billing.

2    Those are fraudulent billings.  That is mail and wire fraud.

3             With regard to Dr. Justin and Bridgette Parker and

4    Stacy Madison as well, you've heard a lot of evidence that the

5    three of them were all at various times abusing controlled

6    substances in the workplace.  Now, I know Dr. Warfield came in

7    here for $750 an hour and told you that's not a big deal, some

8    people are more tolerant than others.

9             We know that wasn't the case of Bridgette Parker.

10   Even though Bridgette had a prescription and it was coming from

11   somebody at PPSA, she was also stealing drugs from patients and

12   stealing drugs from the wasted drugs, the ones that were

13   brought back in to get wasted.

14            It was readily apparent to numerous patients and

15   employees in there that Bridgette Parker was impaired at work.

16   It was readily apparent to numerous patients, as you heard, and

17   employees that Justin Palmer was abusing drugs at work.

18            Yet for some reason Dr. Couch and Dr. Ruan claims they

19   have not realized it until it was brought to their attention.

20   These are specialists, these are medical doctors who are

21   supposed to be highly specialized in pain management, and

22   everybody around them can tell that their own employees are

23   abusing drugs and seeing patients while under the

24   influence.  But somehow these doctors don't know that?

25            That's not good.  Why keep nurse practitioners that

```
 1    are abusing drugs at a practice like this?
 2            One, they weren't asking questions about the legality
 3    of the things that were going on.
 4            Two, if you start firing nurse practitioners, you have
 5    the problem that Dr. Couch ran into in early 2015 when Stacy
 6    was fired and Justin went to rehab --
 7            THE CLERK:  Mr. Bodnar, 10 minutes.
 8            MR. BODNAR:  -- yes -- and when Bridgette went to
 9    rehab.  If you don't have nurse practitioners, that seriously
10    hurts the volume of patients you can see.  And if you're
11    running a money mill, you need the patients to keep churning on
12    through.
13            Counts 20, 21, and 22 all relate to money
14    laundering.  And Dr. Couch is not involved in these ones.  This
15    is just Dr. Ruan.
16            Count 20 is conspiracy to commit money laundering.
17    And the judge will instruct you what money laundering is.  In
18    general that's the concealing of money in some way, where the
19    money came from an illegal source.  So it's really two steps.
20    Did the money first come from what's called a specified
21    unlawful activity?  And in count 20 that is the IPM kickbacks.
22    And if that money is unlawful, did Dr. Ruan do something to try
23    to hide the money?
24            And you've heard what he did.  He had it sent to his
25    home, to a separate company, and he didn't want anyone,
```

 1    especially Dr. Couch, to see how much money Dr. Ruan was

 2    getting from IPM.

 3            Counts 21 and 22 are substantive money-laundering

 4    counts.  Again, Dr. Couch is not involved.  This is just

 5    Dr. Ruan.  Those are for those two vehicles that you saw

 6    Special Agent White talk with you about.

 7            Substantive money laundering, again, if the money from

 8    IPM is unlawful and that it was used to make a transaction of

 9    over $10,000, that's constitutes substantive money laundering.

10    And as you saw, those cars were well over $10,000.  There's no

11    question that $10,000 or more of money was used in those

12    financial transactions.  The issue is whether the money that

13    came from IPM was unlawful money.  That's the key for counts

14    21 -- sorry -- 20, 21, and 22.

15            And finally that leaves count one, which is the RICO

16    count.  And that's the all-encompassing count.  And the reason

17    I think it's best to do that one last is because the acts that

18    support the RICO count are acts that you've already discussed

19    and gone through as you do the other counts in the indictment.

20            As I told you in the beginning, RICO does not

21    necessarily equate to organized crime.  It certainly is used in

22    that context.  But nobody is accusing Dr. Ruan or Dr. Couch of

23    being gang members or racketeers.  That's not what this is.

24            As we've explained in the beginning, and the judge

25    will give you the law, the RICO statute makes it unlawful to

1    create an enterprise, create in this case a legal entity, C&R

2    Pharmacy and PPSA, and to utilize those legal entities to

3    conduct at least two different types of crimes.

4         Now, of course, there are a whole list of crimes that

5    they act for.  And that's why it is used in the gang member

6    case, because it encompasses things like murder, arson,

7    loansharking.  But it also encompasses violations of the

8    Controlled Substances Act as well as mail and wire fraud.

9         You've already had substantive counts that you all

10   looked at of whether or not Dr. Couch and Dr. Ruan were

11   prescribing drugs outside the usual course of professional

12   practice.  And by the time you get to the RICO count, you will

13   have also examined whether or not Dr. Couch and Dr. Ruan were

14   engaged in mail and wire fraud.

15        If you find that they used the PPSA and C&R Pharmacy

16   enterprise to at least on two occasions carry out violations of

17   the Controlled Substances Act or mail and wire fraud, then

18   that's enough to establish the RICO conviction.

19        So all told, when you go back, you will have all of

20   this evidence to look through.  Please take your time.  Go

21   through it, look through it as you review your notes.  This is

22   a serious case with serious charges.  The last seven weeks the

23   United States has put on significant amounts of witnesses and

24   evidence and we believe that beyond a reasonable doubt we've

25   established that Dr. Ruan and Dr. Couch are guilty of each and

CLOSING ARGUMENT OF MR. DOSS

1    every one of the counts in the indictment.  That's the RICO

2    count, that's the controlled substance conspiracies, that's the

3    substantive drug charges, the healthcare fraud, the anti-

4    kickback counts of mail and wire fraud, and the money

5    laundering.

6            As to each element of each of those counts, the United

7    States has to prove beyond a reasonable doubt.  When you go

8    back and you deliberate and you look through all this evidence,

9    Ms. Griffin and I are confident that you will find the

10   defendants both guilty.

11           Thank you, Your Honor.

12           THE COURT:  All right.  Ladies and gentlemen, we're

13   going to take our morning break at this time.  Leave your pads

14   on your chairs.  Take your break downstairs in the jury

15   assembly room.  Still no discussion about the case.  And we

16   will call you back up in about 15 minutes.

17           We're in recess.

18      (A recess was taken at approximately 11 a.m.)

19      (In open court, 11:26 a.m., defendants and jury present.)

20           THE COURT:  All right, Mr. Doss.

21           MR. DOSS:  Good morning, ladies and gentlemen.

22           We've been together for a long time now; seven weeks,

23   over 80 witnesses, thousands of pages of documents.  But this

24   case, this is not a case about charts, this is not a case about

25   numbers, this is not even a case about paper clips.  This is a

1    case about a man, Dr. John Patrick Couch, and decisions that he
2    made.
3         Dr. Couch was, is, and remains innocent of every
4    single count in the government's indictment.  When the federal
5    government puts its awesome resources to work and decides to
6    accuse an individual of a crime, we presume that that person is
7    innocent.  We hold the government to a standard of proof beyond
8    a reasonable doubt.
9         What does reasonable doubt mean?  What does the
10   presumption of innocence mean?  Tomorrow you will hear from the
11   judge various instructions on the law but for now know that to
12   be presumed innocent means that you're given the benefit of the
13   doubt.  The government has asked you in this case through every
14   witness, through every piece of paper, through every chart, not
15   to presume Dr. Couch's innocence but to presume his guilt.  It
16   is a cynical viewpoint that they're advancing.  But Dr. Couch
17   is innocent and the law requires you to find that.
18        We don't view everything in the most sinister way
19   possible.  We give people the benefit of the doubt before we
20   decide to convict them of a crime.
21        And how do we know in this case that the government is
22   less concerned about Dr. Couch and more concerned about the
23   charts, graphs, pieces of paper?
24        Dr. Couch did a courageous thing and decided to take
25   the stand.  He had the right to remain silent, to hold the

1   government to its burden of proof.  He instead said:  No, I
2   want to tell the jury my side of the story.
3        He was on the stand for hours and hours and
4   hours.  The government, however, cross-examined him for
5   slightly more than one hour.  Never once did the government
6   ever ask him a single question about the prescriptions that he
7   wrote.
8        During the government's closing argument Mr. Bodnar
9   suggested that the defense is trying to put forth distractions,
10  we're trying to distract you from getting to the real issue in
11  this case, the question of prescriptions and why things were
12  being prescribed.
13       It is not us who is trying to distract you, ladies and
14  gentlemen.
15       Dr. Couch was there on the stand.  Any question could
16  have been asked, but it wasn't.  You should ask yourselves why
17  weren't those questions asked?
18       The government retained Dr. Greenberg, as you may
19  recall from very early on in this case.  The government paid
20  Dr. Greenberg over $50,000.  Dr. Greenberg was on the stand for
21  hours and hours and hours.  The government was more interested
22  in asking Dr. Greenberg about why Dr. Couch did the things he
23  did and less concerned about asking Dr. Couch why he did the
24  things he did.
25       In our country there are two times we get to say no to

1   the government.  We get to say no in the voting booth and we

2   get to say no in the jury box.  You are at the pinnacle of

3   participation in our democracy right now.  And Dr. Couch is

4   asking you, his peers, to stand up to the government in this

5   case and say no, you've got it wrong; you haven't met your

6   burden, you haven't proven this case beyond a reasonable doubt

7   and overcome the critical presumption of innocence.

8          It should come as no surprise to you, ladies and

9   gentlemen, that everyone in this room except with one exception

10  has a stake in this case's outcome.  How this case turns out is

11  imminently important for Dr. Couch.  How this case turns out is

12  imminently important for the government and its witnesses and

13  its agents.  You, ladies and gentlemen, are the only ones

14  sitting in this courtroom right now who don't have an interest

15  in how this case turns out.

16         Throughout this case you got a bit of a lesson on the

17  criminal justice system.  We saw lots of plea agreements

18  between various witnesses and the United States.  In those plea

19  agreements the government demanded that the individuals tell

20  the truth and it was for the government to decide whether or

21  not those individuals had told the truth.  But despite the

22  awesome resources of the federal government, the one thing that

23  they do not have is an exclusive monopoly on the truth.  You,

24  ladies and gentlemen, disinterested to the outcome of this

25  case, you get to decide.

CLOSING ARGUMENT OF MR. DOSS
32360

1          As you may have noticed throughout this trial, the

2     attorneys and even those in the gallery stand two times.  We

3     stand when Judge Granade enters the room, and we stand when you

4     enter the room.

5          You are the judges of the facts in this case.  It is

6     for you to determine whether the government has met its burden

7     and whether the government has overcome the presumption of

8     innocence.

9          A reporter once said that sitting on a jury is like

10    watching a foreign movie without subtitles, and it may have

11    felt that way throughout this trial.  You've gotten bits and

12    pieces as we've gone along and this is the point in the case

13    when the attorneys get the opportunity to tell you all what our

14    take on the evidence is.

15         So after seven weeks and over 80 witnesses and

16    thousands of pages of documents, what do we in fact know?

17    Well, we know that Dr. Couch is a great doctor; board

18    certified, well trained, and he always had the patients' best

19    interest at heart.  How do we know that?  He testified, he told

20    you that.  And you give him the benefit of the doubt.  That's

21    what it means to presume someone innocent.  You don't assume

22    the worst about people, you assume the best.  That's what the

23    presumption of innocence means.

24         Dr. Couch built PPSA into one of the top pain

25    management clinics in the southeast.  PPSA offered multi-modal

CLOSING ARGUMENT OF MR. DOSS

1    interdisciplinary, interventional pain management treatment.

2    This wasn't a pill mill, and I think we all know that after

3    seven weeks.

4             This was a clinic that offered its patients not just

5    opioid therapy, epidurals, blocks, referrals out for physical

6    therapy.  We've seen that in the patient charts.  What a

7    cynical world view for the government, however, to claim that

8    this is a money mill.  It assumes the worst, and works from

9    that assumption to present its evidence.

10            The second thing that we know at the end of this case

11   is that PPSA was a great clinic until the government closed it

12   down with a raid in May of 2015.  As of May 20th, 2015, that

13   began Dr. Couch's prosecution.

14            PPSA had 57 employees at the time, and served 8,000

15   patients.  But on May 20th of 2015, 57 employees lost their

16   jobs and 8,000 patients lost their medical care.  And after

17   hearing all of the evidence in this case we're confident that

18   you will find that those patients should not have lost their

19   doctor and its employees should not have lost their job.

20            The third thing that we know at the end of this case

21   is that PPSA did not run perfectly all the time.  And who does?

22   We don't claim that PPSA was a perfect company.  No company

23   is.  No organization, small or large, ever operates without a

24   hiccup.

25            Were there charting mistakes?  Sure.

1          Were there problem employees?  Sure.

2          Maybe there were even billing mistakes.

3          But the law, and we should all be thankful for this,

4   does not demand perfection.  In fact, as the Judge will tell

5   you during the instructions in this case, negligence or even

6   carelessness is not enough.  There must be knowing and

7   intentional misconduct, because in our system we convict people

8   when they have a guilty mind and when they have guilty actions.

9          The fourth thing that we know at the end of this case,

10  PPSA, C&R Pharmacy, and yes even Dr. Couch earned a lot of

11  money.  Before this trial I doubt any of you thought or I doubt

12  this trial surprised many of you, that doctors make a good

13  living.

14         And so long as this is a free country that isn't a

15  crime.  In fact, you'll hear lots of instructions on the

16  law.  You'll hear about the various substantive offenses,

17  you'll hear about conspiracies, you'll hear about RICO, you'll

18  hear about the different types of controlled substances, but

19  never once will Judge Granade tell you that making good money

20  must be bad.  But again, we have a cynical take from the

21  government.  If someone is making a lot of money, it must be

22  their only motivation for the decisions that they're making.

23         But remember, we give the benefit of the doubt to

24  Dr. Couch.  We presume his innocence.  We hold that against the

25  evidence that the government presents.  We ask you to say no to

1    the government's cynicism.

2          The fifth thing that we know at the end of this trial,

3    we know that Justin Palmer and Bridgette Parker did some bad

4    things.  There is no doubt.  They both pleaded guilty to

5    conspiring to violate the Controlled Substances Act and guilty

6    people plead guilty.

7          But what were they doing and why did they plead

8    guilty?  Well, we heard from both of them.  They both agreed to

9    cooperate after entering their guilty pleas.  And they both

10   agreed to start helping the government in, of course, the hopes

11   of reducing their sentence.

12         We know that Justin Palmer forged Dr. Couch's

13   prescriptions.  We know that.  He admitted to it.  But what do

14   we know about what Dr. Couch knew?  We know that in early 2014,

15   we know that Dr. Couch discovered a forgery for Person A.  We

16   know that Dr. Couch immediately terminated Justin Palmer from

17   PPSA.  And what did Dr. Couch tell you about that incident when

18   he testified?  He said:  I thought about it.  I decided to give

19   him a second chance.  The government wants to make that into

20   something wicked.  It is not.  There is no crime in giving

21   someone a second chance, no matter how foolhardy it may seem in

22   hindsight.  Knowing now what we know should Dr. Couch have

23   immediately terminated Justin Palmer and never looked back?

24   Maybe so.  But that's with the benefit of hindsight.

25         Bridgette Parker confirmed that story, if you

1    remember.  And what she recalled was that Dr. Couch
2    specifically instructed Justin Palmer never to do that
3    again.  On further questioning, Ms. Parker also agreed if
4    Justin did that afterward, it would have been without
5    Dr. Couch's permission and authorization.  Of course, it is
6    outside the usual course of professional practice for a nurse
7    practitioner to unlawfully forge a doctor's prescription and
8    dispense controlled substances.  There's no doubt about
9    that.  And that's, in fact, why they pleaded guilty.
10           Justin Palmer, the chief wrongdoer, not even he could
11   say Dr. Couch knew that he had been forging his signature.
12           So despite what other people at PPSA may or may not
13   have known, that's not the issue.  Did Dr. Couch have a guilty
14   mind?  Did he know that Justin Palmer was forging those
15   prescriptions?  If there is a question mark in your head about
16   that, presumption of innocence demands that the government has
17   not proven that fact beyond a reasonable doubt.
18           And how do we know that Justin Palmer was signing
19   those prescriptions without Dr. Couch's authority?  Because he
20   never talked to him about it.  He had already been fired once
21   for it, and he couldn't say with any certainty whether
22   Dr. Couch actually knew that he was signing those
23   prescriptions.  Why does he hide it?  Because he knows what the
24   consequences would have been had Dr. Couch known.
25           Now, Justin Palmer has been cooperating with the

1    government for a long, long time.  In May of 2015 the
2    government seized every piece of paper it could get its hands
3    on from PPSA.  At no point, though, did Justin Palmer ever say:
4    Ah, here's an example.  Here's in fact -- here are these
5    examples of prescriptions I forged with Dr. Couch's name on it.
6            In fact, if you recall Angela Christy's testimony, she
7    was the prescription nurse.  She prepared thousands of
8    prescriptions for PPSA over the years, over the five-year
9    period charged in the indictment.  And at most she estimated
10   that Justin Palmer may have forged Dr. Couch's prescription two
11   times a year on average in extraordinary circumstances.  So did
12   he forge Dr. Couch's signature?  Yes.  Do we know, in fact, how
13   many forgeries occurred over the years?  No.  The government
14   hasn't proven that to you beyond a reasonable doubt.
15           The issue in this case is not should Dr. Couch have
16   known.
17           The issue is not could Dr. Couch have known.
18           The issue is did Dr. Couch know and approve?
19           Throughout this case we've heard criticisms of these
20   nurse practitioners, Justin Palmer, Bridgette Parker, and Stacy
21   Madison, that they may have been under the influence or
22   impaired.  But Dr. Couch trusted them.  To suggest that
23   Dr. Couch would allow knowingly impaired nurse practitioners to
24   treat his patients is an extraordinary accusation.  Dr. Couch,
25   as he shared with all of you, has had his history.  He knows

6180

1    what addiction can do.  To suggest that Dr. Couch would have

2    turned a blind eye knowing the danger that could have posed to

3    the patients, all in the name of money?  It's unbelievably

4    simple.  Dr. Couch testified for hours for you, and I submit

5    there was no hint whatsoever that Dr. Couch ever would have

6    allowed something like that to happen had he known it.

7            As to Stacy Madison, we watched the undercover video

8    now four, five, six times.  Did she seem impaired to anybody on

9    this jury?  She seemed competent, thorough, articulate, and

10   that was a random day in August of 2014, not three or four

11   months before Stacy Madison was terminated from the practice.

12           The bottom line, ladies and gentlemen, with respect to

13   Justin Palmer and Bridgette Parker is that they were eventually

14   terminated.  Bridgette Parker was terminated in December of

15   2014.  Justin Palmer -- do you remember Tammy Dabney testified

16   during the defense case.  She was one of the pump nurses at

17   PPSA.  She caught Justin Palmer with a needle in his arm in

18   December of 2014.  She immediately took that information to

19   Dr. Couch and Dr. Couch was upset and immediately put Justin

20   Palmer -- he suspended him.

21           The next thing Dr. Couch knows, Justin's saying he

22   needs treatment, he needs help, and Dr. Couch even offers and

23   pays for his rehabilitation.

24           The suggestion that this is a money mill is

25   unfounded.  All organizations have problems.  But Justin and

 1    Bridgette and Stacy likely were able to conceal their problems
 2    from Dr. Couch.  The government is asking you to hold Dr. Couch
 3    responsible based on how successful his nurse practitioners'
 4    deception was.  That's not what you're asked to decide.  You
 5    are asked to decide did Dr. Couch know?  Did he approve?
 6              I want to walk through some of the counts in the
 7    indictment.
 8              Count one charges Dr. Couch with conspiring to violate
 9    RICO.  That's the Racketeer Influenced and Corrupt
10    Organizations Act.  And though the government does its best to
11    suggest they're not calling Dr. Couch a racketeer or a mobster
12    or gang member or things like that, that's exactly what is
13    being accused here.
14              The government has alleged that PPSA and C&R were a
15    criminal enterprise used by Dr. Couch, Dr. Ruan, and others to
16    perpetuate criminal activity.
17              We have met a lot of former employees of PPSA
18    throughout this trial.  I submit to you I saw no mobsters on
19    the stand; I saw no racketeers.  But this count, as Mr. Bodnar
20    said, relies on drug dealing and mail and wire fraud.  So if
21    you find that there was no drug dealing, no mail and wire
22    fraud, vote to acquit on count one.
23              On count two, three, and four, the government alleges
24    conspiracies.  And a conspiracy under the law is an agreement
25    between two or more people to commit an unlawful act.  And for

```
 1    these three conspiracies the government has alleged that
 2    Dr. Couch conspired with Dr. Ruan to violate the Controlled
 3    Substances Act.  Let me speak plainly.  The government is
 4    accusing Dr. Couch of shedding his white coat and becoming a
 5    drug dealer.  As Agent Herbert with the DEA testified very
 6    early on in this case, this is the same statute that the
 7    government uses to prosecute people selling crack cocaine on
 8    the street corner.
 9             But doctors are allowed to prescribe controlled
10    substances, no doubt.  They must do so in the usual course of
11    professional practice and for a legitimate medical purpose.
12             For count two, the government targets Schedule II
13    controlled substances.  Those would be things like oxycodone,
14    oxymorphone, hydromorphone, and morphine.
15             There is no evidence of a conspiracy here.  What there
16    is evidence of is a legitimate pain practice prescribing
17    medications in the usual course for legitimate medical
18    purposes.
19             In fact, in closing, Mr. Bodnar showed you a
20    chart.  Look at these high volumes of prescriptions; there must
21    be something criminal afoot.
22             But numbers prove to you nothing.  For every number on
23    every chart the government has shown to you, that number
24    represents an individual patient with individual needs, and the
25    government's focus in this case, the patients whose patient
```

6183

1   files are on those two tables.  Volume tells you nothing other

2   than there is a lot of pain to treat.

3           Again, a cynical view of the world, a world view that

4   presumes guilt, but look at those numbers and find criminality.

5   A presumption of innocence, though, demands more.

6           On count three the government has targeted fentanyl.

7   A conspiracy to unlawfully deal in fentanyl is in essence what

8   is charged here.

9           We learned a lot about various fentanyl products.

10  We've heard about Actiq, we've heard about Lazanda, we've heard

11  about Subsys and we've heard about Abstral.

12          But Subsys and Abstral were revolutionary medications.

13  We've heard testimony that they could bring about pain relief

14  in five minutes.

15          The next best drug would bring about relief in 45

16  minutes to an hour.  If you're experiencing intense

17  breakthrough, debilitating pain, you need instantaneous relief.

18  Dr. Couch saw the value of these medications for his most

19  severe and complex patients.

20          Before delving into the patients in particular,

21  though, let's talk about some numbers in this case.  The

22  government wants to talk about huge prescription numbers, lots

23  and lots of prescriptions.

24          Well, based on the government's own data, the PDMP

25  data, for just schedule controlled substances, excluding every

1    other type of medication that was being prescribed at PPSA,

2    over the five years charged in the indictment Dr. Couch wrote

3    129,689 prescriptions.  The government is saying not all of

4    those are bad.  Instead let's focus on the Subsys and Abstral

5    prescriptions.  He wrote 1,752, a tiny fraction of the total

6    medication that was being prescribed.

7            In other words, one out of 100 prescriptions that

8    Dr. Couch was writing was for Subsys or Abstral.  But even then

9    the government doesn't seem to be suggesting that everyone who

10   got Subsys and Abstral got it for an illegitimate reason and it

11   was outside the usual course.  Instead we have another chart.

12           The top off-label recipients of Subsys and

13   Abstral.  And in total, 525 prescriptions.  A fraction of a

14   fraction.  The government contends that Dr. Couch would have

15   been willing to risk everything for this tiny, tiny, tiny

16   subset of all his patients.  The presumption of innocence

17   requires more.

18           And of these top 25, 14 are Dr. Couch's patients, so

19   14 off-label patients in this chart, 0.25 percent.  That

20   equates to roughly one prescription out of every 400

21   prescriptions that Dr. Couch wrote was for either Subsys or

22   Abstral.  The charts tell you one side of the story.  What's

23   more important in this case is not the numbers, but the

24   patients.

25           The government first called two witnesses from this

1    list:  Mr. Blackman, who suffered from chronic venous stasis

2    ulcers, which, if you recall, was debilitating.  It was the

3    equivalent of feeling like your legs were on fire.

4           Five minutes of instantaneous relief from pain was

5    worth it to Mr. Blackman.

6           Now, admittedly, Mr. Blackman, when he testified,

7    explained that he had side-effects from Subsys and

8    Abstral.  Every medication has them, there's no dispute.

9           But if you also recall, he acknowledged he never

10   shared those side-effects at PPSA.  He never relayed those

11   concerns to anyone.  The doctor-patient relationship is a

12   two-way street.

13          Patient must communicate information to the doctor and

14   the doctor's staff in order to get the necessary

15   treatment.  Mr. Blackman didn't provide that information.

16   There's only so much that can be done in those circumstances.

17          Now, Ms. Goellner, she suffered from failed surgery;

18   chronic pancreatitis, if you recall she testified, and she

19   explained that her surgeon had nicked her pancreas and it was

20   causing her severe, unbelievable pain.  Five minutes of instant

21   pain relief to someone like Ms. Goellner is critical.

22          With these two patients and with every patient that

23   we've heard from in this case, when the government called the

24   patient to the witness stand on direct examination, we got one

25   side of the story.  But what would always happen on cross-

CLOSING ARGUMENT OF MR. DOSS

1    examination?  We'd get the rest of the story.  We would learn

2    that the patient had significant medical problems.  We would

3    learn that the patient found relief with the medications that

4    he or she was receiving.  And we would learn that, though, the

5    patients may have had side-effects such as drowsiness, they

6    either never reported those to PPSA or the decision was this --

7    as was the case with Ms. Goellner -- when you're in that much

8    pain, you have two choices:  Experience debilitating, disabling

9    pain, or you can have the side-effects of the medication.  You

10   can experience drowsiness and the pain is reduced.  These are

11   not patients who can make the problem go away with a

12   Tylenol.  These are the most serious patients imaginable.

13           In fact, the records have been admitted, and we

14   encourage you to review them.  These were the diagnoses that

15   Dr. Couch was treating (indicating).

16           Crohn's disease, which as you may recall Dr. Couch

17   explained, can create pain worse than any cancer pain.

18           Benjamin Brown testified for the defense.  He was a

19   quadriplegic confined to a wheelchair, collapsed lung and

20   failed back syndrome, degenerative lumbar disc disease, post-

21   laminectomy syndrome, multiple hip fractures, quadruple

22   amputee -- that was Mr. Riley -- who testified that he was in

23   such dire straits before Dr. Couch introduced him to fentanyl

24   products.

25           And after Dr. Couch prescribed those medications to

 1  Mr. Riley, what did he tell us?  He got a master's degree; he

 2  started a company.  The government has tried to cast Subsys and

 3  Abstral as a loaded gun but it's approved by the FDA, no doubt;

 4  it's lawful and we've had, certainly, success stories that

 5  we've heard.

 6          Scheuermann's spine disease, failed surgeries, chronic

 7  pancreatitis, extreme migraines, herniated disc, post-

 8  laminectomy syndrome, lumbar pain, hernia, car wreck.  These

 9  are the patients that the government is claiming didn't need

10  the medication that Dr. Couch, in his clinical judgment,

11  determined to be appropriate under the circumstances.  This is

12  not evidence of becoming a drug dealer, ladies and

13  gentlemen.  This is evidence of being a doctor.

14          For all of the Controlled Substances Act counts in

15  this case, conspiracies, substantive violations, a doctor is

16  given wide latitude in determining what medications are

17  appropriate for his or her unique patient -- in his or her

18  unique patient's unique medical condition.

19          The boundary line is that the prescription must not be

20  outside the usual course of professional practice.  And it

21  cannot be for an illegitimate medical -- or nonlegitimate

22  medical purpose.  So what does that mean:  Outside the usual

23  course of professional practice?

24          Dr. Warfield testified, if you recall.  Dr. Warfield

25  is a preeminent expert in the field of pain management.  She's

1    written books, she's published, she's on staff at Harvard

2    Medical College, she's an endowed chair, she's an endowed

3    professor there.  Dr. Warfield had this to say:  The issue is

4    whether the doctor is actually practicing medicine, that's

5    whether it's inside or outside the usual course of professional

6    practice.  Is medicine being practiced?

7            The example she gave was, imagine you're a doctor and

8    you're at a cocktail party and someone comes up and says:  Hey,

9    I hear you're a doctor.  Would you mind writing me a

10   prescription for a Percocet?  Sure.  Not a problem.  Here's the

11   prescription.

12           That's not practicing medicine.  But there are a lot

13   of layers to what it means to practice medicine.

14           There's perfect care.  There's what every doctor

15   aspires to do.  There's great care; may not be perfect.  You

16   may have a mistake here or there but nothing too big.

17           There's poor care.  Okay.  There's neglect care,

18   even.  And then there's even malpractice.  That's what

19   Dr. Warfield told us.  All of that is within the usual course

20   of medicine.

21           It's only when you step outside the practice of

22   medicine or you're outside the usual course of professional

23   practice, that's where the government has to get you.  Was

24   Dr. Couch no longer practicing medicine?  Had he shed his white

25   coat and decided to become a drug pusher, a drug dealer?

CLOSING ARGUMENT OF MR. DOSS

1    That's the question in this case, not whether he committed

2    malpractice, not whether he was negligent, not whether his

3    records were perfect.

4            Was he practicing medicine?

5            Remember also the example that Dr. Warfield gave.

6    Imagine a surgeon is performing surgery and leaves a sponge

7    inside someone's chest.  There is no doubt that that is

8    malpractice but there's also no doubt that the surgeon is still

9    practicing medicine.  But the practice of medicine is a

10   collaborative one.  Doctors rely on nurses, doctors rely on

11   nurse practitioners, doctors rely on medical assistants.

12   Doctors rely on a host of professionals.  And that's

13   okay.  There is no rule written anywhere that says a doctor

14   must see his patient every single visit.  Nothing.  The

15   government brought you experts who suggested otherwise.  But

16   remember on cross-examination:  Were any of them ever able to

17   identify for you a single written national standard saying that

18   the doctor must examine a patient every single time that the

19   patient comes into a practice?

20           Mr. Bodnar during his closing said:  Watch the videos

21   and use your common sense; it doesn't look like any doctor's

22   visit I've been to.

23           I disagree.  Ask yourselves how many times you've been

24   to a doctor's office and seen a nurse practitioner, primarily

25   if not exclusively.

1          There's nothing criminal about that and it's certainly
2    not outside the usual course of professional practice to rely
3    on your physician extenders who form part of that doctor-
4    patient relationship.
5          Dr. Warfield also explained that there's a wide
6    spectrum of medical practice.  The government looks at that
7    cynically to suggest Dr. Warfield was saying a doctor could do
8    whatever he wants to do without recourse.  That's not at all
9    what Dr. Warfield was suggesting.  What she said was crystal
10   clear.  Doctors have to treat the patients in front of them and
11   they have a wide range of options on how to treat those
12   patients.
13         The DEA doesn't determine how Dr. Couch is supposed to
14   conduct his office visits with his patients, nor does the DEA
15   get to determine what medications are proper for a specific
16   diagnosis.  A doctor should be making that decision for that
17   patient.
18         Remember, Dr. Couch was on the stand and the
19   government could have asked him anything, anything, about any
20   of those documents that they put into evidence and they never
21   put the first prescription in front of him and said:  Explain
22   this.  Why did you do this?
23         No.  They instead relied on their experts.  They're
24   more interested in paying somebody to talk to him than actually
25   talking to the person who matters.

6191

1          It's not beyond a reasonable doubt.

2          Now, as to the undercover visit, Mr. Bodnar suggested

3     that some of the issues we have tried to bring to your

4     attention are distractions.  It's like saying that a bank

5     robber had a license to carry a gun.  That's ludicrous.  This

6     was a patient who was turned away from PPSA, turned away

7     because he was a cash-only patient.  And do you remember during

8     that first visit why Stacy Madison -- how Stacy Madison

9     explained that?  When he said, I don't want to do procedures.

10    She said:  You've come to the wrong place.

11         This wasn't a pill mill and it wasn't a money

12    mill.  If this was a money mill, don't you think this

13    undercover would have been the prime candidate for handing over

14    some Subsys or Abstral or Roxicodone 30 milligrams?  No.  They

15    gave him 15 milligrams.  He was a cash-only patient.  There was

16    no insurance watching over PPSA.  It could have done virtually

17    whatever it wanted to do with no oversight.  And what did PPSA

18    do?  What did Dr. Couch in collaboration with Stacy Madison do?

19    They gave him the lowest dosage of Roxicodone available.

20         We don't hide from the videos.  We think the videos

21    are great.  This is a practice that looks like any other

22    practice in the country.  There was no pill pushing.  There may

23    not have been an elaborate physical examination but this wasn't

24    an elaborate case.  It was a middle-aged gentleman who

25    presented with lower back pain.  And remember how also the

1    government got this patient into the clinic?  They got a

2    chiropractor to dummy up a record.

3            For all of the government's criticisms in this case

4    about inaccuracies in medical records, this is as far as I know

5    the first and only fake patient file that we've seen in

6    evidence.  And it wasn't a record created by PPSA.  It was a

7    record created at the direction of the DEA to get Shawn Brennan

8    into the clinic.

9            There are criticisms that he went up on his pills from

10   90 pills to 110.  That's less than one extra pill per day for

11   that prescription.  Tiny amount.  That's not outside the usual

12   course of professional practice.

13           There are criticisms that his medications weren't

14   showing up on his urine drug screen.  Well, if you look at the

15   patient file -- we encourage you to go through all of these

16   files -- he had missed appointments.  Of course he would turn

17   up negative on his urine drug screen.

18           And throughout this case there have been criticisms

19   about failing to check the PDMP.  Well, his medications weren't

20   showing up there.

21           Now, if you remember, during the government's case,

22   Dr. Greenberg on the stand said:  This is a clinic that appears

23   to have never checked the PDMP.  And that is quite troubling.

24           That was Dr. Greenberg's testimony.  Throughout the

25   entire case presented by the government, you never heard any

1    evidence about the clinic checking the PDMP.  We called Nancy

2    Bishop in our case and subpoenaed those records showing how

3    frequently PPSA checked the PDMP.  10,000 times the PDMP was

4    searched during this five-year period of time.

5            Well, when that evidence comes in, then it becomes:

6    Well, we weren't doing it enough.  You should have been doing

7    it more.  And according to the government's case Dr. Couch

8    couldn't do anything correctly.  He either did it too much or

9    he did it too little, and it's the same thing with the urine

10   drug screens which I'll get to in a bit.  But this was a clinic

11   that checked the PDMP when it was necessary, when there were

12   red flags that required the doctors or the nurses to check it.

13           Remember what Angela Christy told you?  She was the

14   prescription nurse.  From time to time she would get calls in.

15   Patients were reporting that the medications needed to be

16   renewed, and if they were early or if there was anything

17   suspicious -- for example, if a patient claimed that the

18   medications had been stolen, what did she say that she did?  I

19   asked for a police report.  I would run the PDMP.  This was a

20   legitimate medical clinic.  They were doing the right things

21   when they had a reason to do so.  It is unnecessary to check

22   the PDMP for every patient.

23           The cynical world view from the government is that all

24   patients being seen for pain management are there to steal and

25   get drugs and pass them off on the street.  They should be

 1  doing drug screens, monitored, their PDMP should be run all the
 2  time, if they're ever out early they should be cut off, if they
 3  ever lose their medications they should be cut off.  That's the
 4  message we're getting from the government's theory in this
 5  case.  And sometimes patients lose medicine.  Sometimes that's
 6  the truth.  Sometimes they may test positive for amphetamines
 7  because they might be taking another medication that gives a
 8  false positive for that.  Dr. Couch was not running a
 9  prison.  He was not running a probation office.  He was not
10  running a law enforcement department.  He was running a medical
11  practice.
12          Out of the 8,000 patients the government has found one
13  that used someone else's urine; one of 8,000.  And yet they
14  suggest PPSA should have monitored those urine drug screens.
15  And because they didn't, it was a money mill.  It's cynical and
16  it defies the presumption of innocence.
17          With the undercover, we heard from Debi Phillips, that
18  Dr. W....., the chiropractor working in tandem with the DEA,
19  called the clinic.  She doesn't know what was said, but she did
20  find the person who answered the phone in tears.  The
21  undercover was then permitted to come into the clinic.
22          Low dosages were prescribed.  It was well within the
23  usual course of professional practice.
24          As to the next two counts, concerning Patrick Chausse
25  and Kenneth Daves.  Patrick Chausse was discussed by

CLOSING ARGUMENT OF MR. DOSS                                                    6195

1    Dr. Greenberg a long time ago.  You may recall from

2    Mr. Chausse's file, he said -- or at least the file reported

3    that he had suffered previously from some sort of drug

4    addiction.

5           Now, history of drug addiction does not mean that

6    you're disqualified from receiving pain treatment.  There's

7    nothing that says that.  People who have a history, they're

8    entitled to pain medications like anyone else.  But when

9    Mr. Chausse's wife testified, if you remember, she said

10   actually he never -- he never did have that history in the

11   first place.  So we don't really know one way or the other

12   whether or not he had that history.  But if you recall

13   Dr. Greenberg's entire opinion about Mr. Chausse hinged on that

14   assumption that, in fact, he had this history of drug problems

15   and, therefore, these prescriptions were outside the usual

16   course.  There's reasonable doubt here.

17          Kenneth Daves was testified about by Dr. Vohra, the

18   government's second expert.  This man was disabled when he came

19   to PPSA.  His referring physician who sent him to PPSA helped

20   him fill out his handicapped placard.  PPSA went through great

21   lengths to help diagnose his problems.  There were nerve

22   conduction studies, for example.  And that was one of

23   Dr. Vohra's criticisms if you recall.  He said:  Well, he comes

24   in with total body pain but there's not a diagnosis to support

25   that.  That's exactly what PPSA was doing.  His medications

1    were reasonable.  They were within the usual course of

2    professional practice.

3           Dr. Warfield reviewed both of these charts and said as

4    much.  So you have experts who disagreed.  Doctors can

5    disagree.  But simply because one doctor says it's outside the

6    usual course of professional practice that doesn't mean it's

7    outside the usual course of professional practice.  That means

8    that doctor may have done it differently.  And that's okay.  We

9    want doctors to do things differently.  But we don't convict

10   someone of a crime because Dr. Vohra disagrees with a treatment

11   decision.

12           We don't convict someone of a crime because

13   Dr. Greenberg, after receiving double the amount Dr. Warfield

14   ever received, disagrees with a treatment decision.

15           I want to talk about count 15, healthcare fraud count.

16           The government has very specific allegations here

17   about what is and is not healthcare fraud.  Billing patients'

18   insurance providers for controlled substances that were not

19   prescribed for a legitimate medical purpose or were prescribed

20   outside the usual course of professional practice.

21           Again, we say:  Prove it.  Prove which prescription

22   was billed to which insurance company outside the usual course.

23   This was a real clinic doing real work for real patients.

24           Submitting false and fraudulent material, misleading

25   medical information to patients' insurance providers, and

1    specifically there what they're talking about are the TIRF PAs,

2    if you remember those documents; for example, that he submitted

3    to Galena or that he submitted to Insys for the purpose of

4    getting the patients' insurance providers to approve the

5    medication.

6           Again, the government seized thousands of pages of

7    paper and they've held up one, one PA with the supposedly false

8    diagnosis on it.  And that was for Mr. Ronald Ivy where it said

9    bladder cancer when, in fact, he did not have it.

10          Dr. Couch -- the government did ask Dr. Couch about

11   this.  Do you remember what he said about that signature?  It's

12   not mine.  It's the other side of the story.  The government is

13   trying to convict Dr. Couch on the basis of a piece of paper

14   when it's not even his signature in the first place.

15          Remember what Angela Christy also said.  She was the

16   one who filled out the PAs for PPSA.  Dr. Couch never told her

17   to include a false diagnosis.  He never told her to report

18   cancer when, in fact, it was some other diagnosis.

19          And let's think about the balance of the

20   evidence.  Why would Dr. Couch not have said that?  Because

21   other insurance companies -- all insurance companies were

22   approving Subsys and Abstral for off-label use.  Every one of

23   them.

24          Blue Cross, Medicare, Tricare.  So who would have

25   benefit from trying to increase the odds of a PA going through?

1          The sales rep listed here is Natalie Perhacs.  And

2   we've heard testimony that Ms. Perhacs was caught changing a

3   diagnosis code on a PA and it was reported to Angela -- excuse

4   me -- it was reported to Debi Phillips.  That's the kind of

5   balance that PPSA was.  If this was a money mill, do you think

6   the employees would even care if they saw a forged PA?  Of

7   course not.  But it was reported to Debi Phillips and the next

8   thing Angela Christy said, Natalie Perhacs was no longer

9   allowed in that office.

10          I submit to you, ladies and gentlemen, the evidence in

11  this case suggests that if anyone had a motive to falsify and

12  forge Dr. Couch's signature on this form, I think we all know

13  who that could be.  And, in fact, Ms. Perhacs, when she entered

14  into her plea agreement with the government, the government

15  agreed it will not bring any additional charges against her

16  related to the facts underlying the information.  She had every

17  incentive to plead as she did.

18          The government then contends that Dr. Couch was

19  running and then billing patients' insurance providers for

20  various lab tests, including UDSs for no legitimate medical

21  purpose and outside the usual course.  It's either too much or

22  too little.  And either one apparently is wrong.

23          You either do it too few times and you're running a

24  pill mill and you're outside the usual course of professional

25  practice, or you're doing it too many times and you're

 1    committing healthcare fraud.  It's like Goldilocks, looking for

 2    the just-right, apparently.  Presumption of innocence, though,

 3    suggests the UDSs were being utilized, they were being

 4    reviewed, they were being considered, and they were being

 5    ordered appropriately.

 6            Some of the government's own experts said not enough

 7    UDSs, not enough urine drug screens.  So which is it?

 8            Next, falsely and fraudulently billing patients'

 9    insurance providers for office visits using a physician's NPI

10    number.

11            This relates only to Blue Cross/Blue Shield, ladies

12    and gentlemen.  As we've heard in this case lots of insurance

13    providers do it lots of different ways.  Some insurance

14    providers allow for a nurse practitioner visit to be billed

15    under the doctor's NPI.  As an aside, what does that suggest to

16    us all?  It suggests that insurance providers are okay with

17    nurse practitioners seeing patients without a doctor.  Yet the

18    government claims that is outside the usual course, even though

19    insurance pays for it.

20            But to the fraud question, this is the policy:

21    Government Exhibit 27-24.  The government did not call Elaine

22    McDonald or Debi Phillips in its case.  Dr. Couch

23    did.  Dr. Couch brought to you the people who knew the most

24    about PPSA's billing practices because we have nothing to hide

25    on this point.

1           Elaine McDonald, as you may recall, had a significant

2    history of medical billing.  Her whole career practically had

3    been spent in medical billing.  She had formal training, she

4    attended conferences.  In fact, while she was working at PPSA

5    she had a Blue Cross/Blue Shield representative who she was

6    routinely in contact with when she would have questions.

7           And her reaction to Government's Exhibit 27-24 was

8    amazing.  Her response when shown this document was:  Wow.  I

9    had no idea.

10          This was a professional billing employee.  I had no

11   idea about this policy.

12          Now, Ms. McDonald also went over Couch Exhibit 27-C.

13   This is the billing chart from Tena Goellner.  And if you

14   recall for this one -- and the real issue here is who was

15   rendering service, who was rendering care.  That's how Blue

16   Cross is compensating.

17          For Ms. Goellner's bill, as Ms. McDonald explained the

18   rendering here, is Ben Clark, CRNP, and the billable is John P.

19   Couch, and she testified categorically:  When we submit it,

20   Blue Cross information, Blue Cross billing, we always included

21   it for rendering.  If it was a nurse practitioner, we reported

22   it as the rendering.

23          In rebuttal, the government called Ms. McKenzie back

24   and she testified that:  The information that we actually

25   received at Blue Cross didn't have that information for

1    rendering.

2         What evidence is there to show that Dr. Couch or

3    anyone else at PPSA, for that matter, ever knew that?  We

4    learned about a third party hired by Blue Cross that intercepts

5    bills and does something to the information and then provides

6    it to Blue Cross.  If that third party clearinghouse, Navicure,

7    strips out information that PPSA was otherwise providing --

8         MS. GRIFFIN:  Objection, Your Honor.  There's no

9    evidence whatsoever to support his claim.

10        THE COURT:  The jury will remember what the evidence

11   is.

12        MR. DOSS:  If there's any evidence of anyone at PPSA

13   knowing about that process, I'll leave it to your recollection.

14   There isn't.  There are two world views here, ladies and

15   gentlemen, on the healthcare fraud issue.  There's the

16   government's which suggests there's an intent to defraud, an

17   intent to cheat Blue Cross, that we're purposely submitting

18   false and fraudulent information for the purpose of making

19   money and only money.  But there's another explanation.  That's

20   -- we thought we were doing the right thing.

21        If a mistake was made, a mistake was made.  But a

22   crime, that is not.  There may be a contract between Blue Cross

23   and Dr. Couch.  Maybe the terms of the contract weren't

24   followed to a T, but that's not enough.  The government's

25   burden to you, ladies and gentlemen, is to prove beyond a

1   reasonable doubt that Dr. Couch had an intent to defraud Blue

2   Cross and caused false and materially misleading information to

3   be sent to Blue Cross.  This is what PPSA sent to Blue

4   Cross.  Who was performing the service?  It is not a crime.

5         The government also likes the CPT code issue.  And

6   we've seen these charts over and over on the CPT codes

7   (indicating).

8         A couple of problems with their theory, though.  The

9   government has yet to identify a single office visit that was

10  billed as a 99214 that should have been billed as a 99213.  All

11  they've shown you is that at some point in time the 99214

12  exceeded the 99213s.  What office visit -- what office visit

13  was upcoded?  Which one?  For which patient?  On which day?  To

14  which insurance company?  These are questions that are left

15  unanswered in this case.  And if there are questions that are

16  left unanswered, you resolve the doubts in favor of the

17  accused.  The government hasn't met its burden of proof and we

18  presume innocence.

19        Additionally, as Debi Phillips explained, a nurse

20  practitioner office visit can, under the right circumstances,

21  justify a 99214 billing code.  It goes unrefuted in this case.

22        So even if the patient is seeing only a nurse

23  practitioner, that doesn't mean it automatically has to be a

24  99213.  It can be a 99214.  Again, it is a cynical world view

25  that just because a chart says something or may suggest

1    something, a crime is afoot.
2          That's not the presumption of innocence.  That's the
3    presumption of guilt.
4          On the cloning allegation -- this is the undercover
5    fake patient, Mr. Brennan.  There were a number of tests that
6    they went through and they asked Mr. Brennan whether you had
7    your thyroid checked or the light was shined in your eye.  And
8    in fact, they did that with a number of patients in this
9    case.  What was the rest of the story?  Remember what Elaine
10   McDonald, Debi Phillips, and Dr. Couch said?  When changes were
11   made in Greenway, it caused there to be red italicized texts.
12   Even the government's exhibits had that.
13         As you see here we have red italicized texts, which
14   within PPSA everyone understood what it meant.  Something was
15   done, something was changed.  So every time the government
16   asked a witness during its case whether certain tests were done
17   and there was no red lettering or italicization, of course
18   there wasn't testing done.  And PPSA's records didn't show
19   testing had been done.  It's the red text that the billing
20   department was looking at to determine whether or not a CPT
21   code was warranted under the circumstances.
22         It's the first 20 minutes of a story.  The rest of the
23   story is there's nothing false about that.
24         You just have to know how to read the records.
25         And that's not what they gave you.

1          Count 16 is the alleged conspiracy to violate the
2    anti-kickback statute.  And this one involves Mr. Manfuso.
3          You recall first that Mr. Manfuso has a plea agreement
4    with the government and as part of that plea agreement not only
5    has this office of the Department of Justice agreed not to
6    pursue any other charges, but an office out in California.
7          Why would somebody enter into that kind of agreement?
8    Dr. Couch doesn't live in California.  What else is Mr. Manfuso
9    worried about that caused him to enter into that agreement?
10          But here they have a legitimate business arrangement,
11    memorialized in a contract.
12          The government has to prove not just that money was
13    exchanged.  The government must prove that there was a guilty
14    mind here.  Most people, when they are entering into a criminal
15    conspiracy, are probably not going to put it down in
16    writing.  They're probably not going to have a lawyer draft the
17    agreement as Mr. Manfuso testified.  They're probably not going
18    to issue checks, have them deposited and do all these other
19    sorts of things.
20          Now, the government wants to draw suspicion by saying
21    Dr. Couch wasn't having his checks mailed to PPSA, he was
22    having them mailed elsewhere.
23          And to that I say again, it's a free country.  And
24    there's no crime about specifying where you want your payments
25    sent.  You'll hear a lot of instructions from the Judge but

1    that's not one you're going to hear, that that's evidence of a

2    bad intent or an effort to break the law.

3             What were the mechanics of this arrangement?  IPM,

4    Mr. Manfuso's next company, they were hired to manage a

5    workers' comp dispensary.  And the workers' comp dispensary was

6    there to be able to fill prescriptions for workers' comp

7    patients.

8             Mr. Manfuso's companies were there to do a variety of

9    things, all laid out in the agreements; identify appropriate

10   pharmacy vendors, provide all the required labels, record

11   keeping, packaging, patient disclosure forms, maintain storage

12   and delivery facilities, maintain an inventory of formulary

13   products, bill and collect services in the name of physician

14   group required to obtain payment.  It goes on and on and on.

15            The government, however, suggests that there's

16   something wrong about a guaranteed payment.

17            Setting aside the fact that sounds like a good

18   business opportunity, the charge here is not about receiving

19   guaranteed payments.  The charge here is about conspiring to

20   violate the anti-kickback statute.

21            What does the anti-kickback statute prohibit?  It

22   prohibits payments in exchange for referrals.  And that's not

23   what we have going on here.

24            We have Mr. Manfuso's company managing the workers'

25   comp dispensary, billing out, receiving money to which

1    Dr. Couch and Dr. Ruan are entitled in the first place, taking
2    off his costs associated with managing the workers' comp
3    dispensary, and paying Dr. Couch and Dr. Ruan.  That's it.
4            There's no crime here.
5            It's paying Mr. Manfuso for his services.
6            And there was never any evidence that any patients
7    were required to fill at that workers' comp dispensary.  Again,
8    give the benefit of the doubt.
9            If the anti-kickback statute prohibits referrals and
10   essentially pushing patients somewhere, if there's not evidence
11   of it and the government hasn't proven it, give the benefit of
12   the doubt to Dr. Couch.  The law requires it.
13           Count 17, this concerns Ms. Perhacs and the Insys
14   speaking arrangements.
15           When Ms. Perhacs testified in this case, I asked her a
16   couple of questions.  And one that stuck out to me, at least,
17   was:  Did you ever intend to cause Dr. Couch to prescribe
18   Subsys to a patient who didn't need it?
19           And her answer was no.
20           The government has alleged a criminal conspiracy
21   between Ms. Perhacs, Dr. Couch, Dr. Ruan where Dr. Couch is
22   being paid for his time to give speeches and talks and,
23   therefore, Dr. Couch must have subverted the best interest of
24   his patients.  Dr. Couch must have prescribed these potentially
25   deadly medications to his patients only because he had a

1  financial interest.
2          Again, what a cynical way to look at the evidence.
3  And thankfully that's not how we look at the evidence in a
4  criminal case.  We do presume innocence.  Dr. Couch testified
5  about this very point and he said no.  I never let my financial
6  interest overwhelm my medical judgment.
7          We presume best, not the worst.  We don't presume
8  guilt.  And you'll recall, the government introduced into
9  evidence Dr. Couch's payments that he received from Insys from
10  a website called openpaymentsdata.cms.gov.  And that's
11  Government's Exhibit 9-4, and there are some subparts to it.
12          This is not evidence of a guilty mind.  This is
13  evidence of having payments reported to the federal government
14  so that anybody can look them up at any point in time and know
15  exactly who, which doctor is receiving payments from which
16  company.
17          There's no subversiveness here.  There's no effort to
18  hide anything.  The government, as I recall the testimony, has
19  some websites like this so that patients can research.  And we
20  heard from Lacy Fortenberry and we also heard from Natalie
21  Perhacs.  My impression of their testimony was Insys was a
22  rough place to work, to say the least; a lot of pressure, a lot
23  of boiler room emails being sent around demanding higher sales.
24          Another question I asked Ms. Perhacs was:  Did you
25  ever find it frustrating that your compensation was tied to a

```
 1    doctor's prescribing decisions over which you had no control?

 2    And she said:  Yes.  Think about it; a legitimate doctor like

 3    Dr. Couch.  Natalie Perhacs is relying on his prescribing for

 4    purposes of her salary but she has no control over how he's

 5    prescribing.  He's prescribing in the usual course of

 6    professional practice for the patients that need Subsys the

 7    most.  And that was frustrating to her because she had no

 8    control over those decisions.

 9              So her salary was all over the place.

10              Lacey Fortenberry testified that she never revealed

11    the intense inscrutable pressure that she was placed under by

12    Insys to Dr. Couch.  She was pressured over and over and over

13    again to increase the speaking engagements, for example, but

14    she never shared that with Dr. Couch.

15              In fact, in early 2014 Ms. Perhacs sent an internal

16    email at Insys to one of her supervisors and she said:

17    Dr. Couch was a nine out of 10.  He was doing great with his

18    speaking programs.  And when asked on the stand was that true

19    and does that remain true today?  Her answer was yes.

20              The lunches occurred from time to time and Dr. Couch

21    was compensated for his time away from the office.  And that's

22    not criminal.  Though a lot of his clinic staff were attending

23    those lunches, as Ms. Perhacs testified, there was a

24    justification for that.  If you remember, part of her goal was

25    to reach out to others in the medical community and by talking
```

1   to nurse practitioners, by talking to MAs, who also had

2   contacts in the medical community, it helped her indirectly to

3   spread the word about Subsys.

4          Tammy Dabney testified that she attended several of

5   these lunches and that there were substantive real discussions

6   about specific case -- excuse me -- specific clients, specific

7   patients.

8          This wasn't just clicking through a slide show.  But

9   ask yourselves if a large pharmaceutical company offered to pay

10  you $1,600 every time for lunch with your coworkers, who's

11  going to say no to that?  But here we have a legitimate doctor,

12  a legitimate doctor making legitimate medical decisions for his

13  patients.

14         We have yet to see the first patient who as a result

15  of a Subsys speaking engagement was written a prescription for

16  Subsys.  Let me clarify that.  This is not:  Did Dr. Couch --

17  the question here is not did Dr. Couch receive money for

18  speaking engagements?  The question here is:  Did Dr. Couch

19  conspire to violate the anti-kickback statute?  And you will

20  hear more instructions on this.  But generally speaking, the

21  anti-kickback statute means you're paid money to refer patients

22  for something.

23         Which patient did Natalie Perhacs cause Dr. Couch to

24  write a prescription for?  Mr. Bodnar used the expression quid

25  pro quo in his closing, and I think that's a great one, a this

1  for that.

2  Here's a speaking engagement, Dr. Couch, now go write

3  that prescription. If there was any evidence of Dr. Couch

4  doing that, you would have heard it. There wasn't.

5  Now, Dr. Couch saw the benefits early on of Subsys and

6  Abstral. Its FDA approval on-label, off-label, it's a red

7  herring. It doesn't matter. Dr. Couch understood that Subsys

8  could provide immediate relief for breakthrough pain for his

9  most serious patients.

10  And a cynical view of this case would be: We must

11  then prescribe it just because he was speaking for

12  Insys. Maybe it's the other way around. Maybe he was speaking

13  for Insys because he saw the value of the medication.

14  Insys would not want speakers who knew nothing about

15  the medication. They want speakers who know about it. So in

16  the early years, 2013, 2014, for example, though Dr. Couch may

17  have out-prescribed other doctors, there's nothing wrong with

18  that, seeing value in a medication. It's not being purchased

19  by the pharmaceutical company.

20  And if there's any doubt left, recall that

21  Dr. Greenberg has been paid over $50,000 by the government for

22  his testimony in this case.

23  The government doesn't claim that his medical judgment

24  is impaired simply because he received compensation for his

25  time.

1              The government is willing to give Dr. Greenberg the

2     benefit of the doubt.  We ask you to give Dr. Couch the same

3     benefit of the doubt.

4              As to Galena, how do we know Dr. Couch wasn't

5     motivated by his ownership interest in Galena to write

6     unnecessary prescriptions?  Well, first of all, he said so.  He

7     said so.  And that's significant evidence.  He denied that

8     accusation.  But second, he lost money in his stock

9     investments.  The only evidence in this case about his stock

10    purchases, and it was early, early on in the case, an FBI agent

11    presented an E*Trade account information, you may recall.

12             Dr. Couch was taking money, investing it in Galena,

13    selling off the same stock, taking that money, reinvesting it,

14    selling it off, reinvesting it.  So early on, in maybe the

15    November-December time frame Dr. Couch earned approximately

16    $6,000 off of his Galena stock.  But throughout the course of

17    his prescribing he ended up losing money on the stock, hundreds

18    of thousands of dollars on the stock.

19             And, in fact, as Mr. Corin testified, former Galena

20    employee, who you may recall, the vouchers that Dr. Couch was

21    using almost bankrupted Galena.  So that's proof that

22    Dr. Couch's decisionmaking was not intended to benefit himself.

23    It was there for the patient's best interest.

24             The government suggests that doesn't matter because

25    there's no evidence Dr. Couch knew about that financial impact

1    that the voucher program was having.  The problem there, ladies
2    and gentlemen, that is an inconsistent position for the
3    government to take.  Either Dr. Couch is in Galena's back
4    pocket intimately involved or he knows nothing.  That's the
5    government --
6              THE CLERK:  Mr. Doss, 10 minutes.
7              MR. DOSS:  Thank you.
8              Again, the benefit of the doubt is that he owned
9    stock.  And remember what he said.  He purchased -- he invested
10   in that stock because of the NeuVax vaccine.  That was
11   important to him.  He had read some articles about the
12   significance of it and how it could improve the financial
13   condition of Galena.
14             That has nothing to do with Abstral.
15             As to the last count in the indictment, count
16   nineteen, the government has alleged here mail and wire
17   fraud.  And again, in closing, the government is focused on
18   these charts (indicating).
19             And that's the CPT code chart.
20             There's no evidence that Dr. Couch ever intended to
21   defraud anyone.  In fact, quite to the contrary.
22             So this is the final chance I have to talk to
23   you.  And you'll hear from Dr. Ruan's counsel, you'll hear from
24   the government's counsel.  The government gets to go last.  The
25   government gets to go last because it carries the burden of

6213

 1    proof.  Though beyond a reasonable doubt is not an

 2    insurmountable burden, it is certainly a heavy one.

 3         And we submit, ladies and gentlemen, that Dr. Couch is

 4    innocent of all charges in this indictment.  There are too many

 5    questions, too many uncertainties, too much speculation.

 6    Speculation plus cynicism does not equal beyond a reasonable

 7    doubt.  So when you look through the evidence, you recall the

 8    testimony that you've heard in this case, remember Dr. Couch

 9    testified.  The government had every opportunity to ask him

10    questions, could have asked him about out-of-office moments,

11    could have asked him about his medical judgment, could have

12    asked him anything and it chose not to.

13         There is no evidence in this case that Dr. Couch ever

14    intended to do anything wrong.  There is no evidence that

15    Dr. Couch ever intended to do anything other than help his

16    patients.

17         Thank you.

18         THE COURT:  All right.  Ladies and gentlemen, we're

19    going to go ahead and take our lunch break at this time.  Leave

20    your pads on your chairs.  If you will be back in the jury

21    assembly room at five minutes after 2.  Yeah, it's almost 1

22    o'clock.  Five minutes after 2.  We will call you back up then.

23    And remember, no discussion about the case yet.

24         We're in recess.

25      (A recess was taken at 12:50 p.m.)

```
 1          (Afternoon session, 2:09 p.m., in open court, defendants
 2   and jury present.)
 3          THE COURT:  All right, Mr. Knizley.
 4          MR. KNIZLEY:  May it please the Court, counsel, ladies
 5   and gentlemen of the jury.
 6          May 20th, 2015, these two gentlemen were practicing
 7   medicine.  Agents of the United States came to their practice
 8   of medicine and from that point forward they were branded as
 9   running a pill mill.
10          If you'll look at the indictment in front of you, at
11   paragraph 28 of the second superseding indictment of April
12   2016, the government told the world Xiulu Ruan was running a
13   pill mill.
14          I told you ladies and gentlemen in opening statement
15   for the first time we ever heard that it wasn't any longer a
16   pill mill that this man was accused of running, but a money
17   mill.
18          The reason is, it never was a pill mill.
19          What they told the world was not true and they
20   couldn't prove it.  So now they want to manipulate things and
21   change things and maybe make it some way you can believe
22   somehow that Xiulu Ruan has done something illegal.  Because
23   they are not going to give up with all the time and resources
24   and money and stuff that they put into this.
25          Ladies and gentlemen, there never was a pill
```

6215

1   mill.  There's not a money mill.  It's never been a criminal

2   enterprise of any way whatsoever and it's time for that to be

3   addressed.

4         Tomorrow this case will be yours.  All the witnesses

5   will have testified, all the documents will have been

6   exhibited, the lawyers will have asked all the questions and

7   made all the objections and made all the arguments they are

8   going to make, and the judge will have given you the

9   instructions on the law and at that time you are in charge of

10  this case.

11        It is your case then.  You are in fact the true judges

12  of the facts.  Nobody should and could ever question what you

13  do with this case.

14        You should do what you think is right and not consider

15  anything else.

16        The government of the United States has brought two --

17  has brought extremely serious allegations against two of its

18  citizens.

19        In our country, in our criminal justice system, when

20  that is done, the accused citizen does have a right to a trial

21  by jury.  44 days ago you were asked to come to the courthouse

22  to be evaluated as to whether you was going to be the jury of

23  these two citizens accused and you've been selected.

24        A jury in a criminal case, in our system, is a

25  gatekeeper.  The jury stands between the might and the power of

1    the government of the United States and the citizens.

2          It is the jury and the jury only that can keep their

3    fellow citizens from being wrongly convicted.  It is a great

4    deal of power.  It's a great deal of responsibility as well.

5          The jury is now -- you're tasked to seek the truth, is

6    what you have to do.  From what you've seen here, what's going

7    on, you need to determine what the truth is.

8          Man has done some wonderful things.  We can send a

9    rocket ship to Mars.  And we can watch a car drive around on

10   there and we can control it.  We can put persons on the moon.

11         We can pick up this very small device and we can

12   communicate with anybody on earth instantaneously (indicating).

13         I understand that automobiles can drive without people

14   operating them.  Man has made some wonderful machines.  But man

15   has never made a machine where you put the information in the

16   top and the truth comes out the bottom.  There's no such

17   machine.  The only way that can work is 12 people just like you

18   hearing information and determining what the truth really is.

19         In a criminal case the responsibility of the jury is

20   so high that our Founding Fathers, when they established our

21   country and our criminal justice system, gave us certain

22   guidelines and principles to go by when making the decision

23   when we're passing judgment on a fellow citizen.  The first of

24   those principles is the presumption of innocence.

25         January 4th, 2017, Xiulu Ruan walked in here with the

1    presumption of innocence.  Each of us -- each of you -- when

2    you looked over here and you looked at him and you saw him, you

3    should have in your heart and in your mind presumed him

4    innocent of each and every allegation.  And from that time

5    throughout the course of this trial until right now, when you

6    go back into that jury room to deliberate, you should presume

7    him innocent.

8           And every time you talk about a witness' testimony and

9    every time you talk about a piece of evidence and every time

10   you look at one of the Government's charts and every time that

11   you have anything to do with considering guilt or innocence in

12   this case, you say:  Well, what about that presumption of

13   innocence?  Because it's something that should be considered

14   with everything you consider throughout the course of this

15   trial because that's our system.

16          Not only is Xiulu Ruan presumed innocent, the total

17   and complete burden of proof because of that in the case rests

18   upon the government.

19          Xiulu Ruan does not have to call any witnesses, he

20   doesn't have to cross-examine any witnesses, he does not have

21   to put on any witnesses.  He does not have to put on testimony,

22   he doesn't have to take the witness stand himself.  He does not

23   have to prove his innocence.

24          The total and complete burden of proof rests upon the

25   prosecution.

```
 1              And not only do they have the burden of proof, they
 2   have the burden of proof beyond a reasonable doubt.  And that's
 3   been defined a lot of different ways and talked about with
 4   juries a lot of different times.  And one thing is reasonable
 5   doubt -- I'm sure it's pretty common sense -- it's a doubt with
 6   a reason for which you have a doubt.  If you have a doubt and
 7   you have a reason for it, it's a reasonable doubt.
 8              The judge is going to give you a definition of it that
 9   I think is useful.  And I think the judge will say something
10   along these lines:  Proof beyond a reasonable doubt is proof of
11   such a convincing character that you, the juror, will rely upon
12   it without hesitation in the most important of your own
13   affairs.
14              Proof beyond a reasonable doubt is proof of such a
15   convincing character that you would rely upon it in the most
16   important of your own personal affairs:  Who you get married
17   to.
18              Are you going to buy a house?
19              Are you going to have children?
20              That's how convincing the proof should be before you
21   return a verdict of guilt as to your fellow man.
22              All right.  So what is it that the government must
23   prove beyond a reasonable doubt?  They've got to prove the
24   allegations of the indictment.  And the judge is going to tell
25   you it's the allegations starting in count one, two, not the
```

1    preamble or anything else, but you've got to prove what they

2    have alleged they have done wrong.  And if they've proved

3    something else was not proper or this wasn't good, that doesn't

4    matter.  They've got to prove what these people have been

5    called upon to defend.

6              How do they prove each of those allegations?

7              Well, you prove it with no speculation, no guess.  You

8    prove it from the witness stand.  The witnesses that come up

9    there and their testimony and the other evidence that's

10   admitted into evidence is how you determine proof beyond a

11   reasonable doubt.  And that's all you can rely upon.  You can't

12   speculate, you can't guess.

13             And the government is who has to bring that.  And we

14   start this case and say:  Okay, has the government brought that

15   type?  And have we heard everything we want to hear?  Has the

16   government been straightforward with this evidence?

17             And you've heard this talk about it from some of the

18   other lawyers already and say:  Well, I hear you saying, well,

19   testimony of the witnesses and proof.  But I see an awful lot

20   of these charts and stuff.  Should I consider those?

21             Sure, you should.  But you should not be misled by

22   that.

23             In cases now in modern courtrooms we like to put up

24   charts and PowerPoints and stuff because of the visual impact.

25   That is important.  But take these charts that you see and

1    these numbers you see and these statistics you see for just

2    what they are, because they might be misleading.

3          Just a couple of examples.  If you remember the chart

4    that the government put up, it was about C&R Pharmacy and said

5    they had received several million dollars.  Okay?  And I forget

6    the number.  It was like $8 million, $6 million, whatever it

7    was.  And if you left that chart alone right there and said:

8    Man, that pharmacy sure made a bunch of money -- but they

9    didn't put in there, in that chart, that wait a minute.

10   There's rent to be paid, there's medications to be purchased,

11   there's payroll to be made, there's taxes and everything,

12   insurance.  And then that number comes way down.

13         And I pointed that out when the witness did that and

14   the prosecutor got up and said:  Look, I don't want y'all to

15   think we're hiding the ball.

16         Well, ladies and gentlemen, he wouldn't have said that

17   if it hadn't been a little bit deceptive and if there hadn't

18   been a little thought that maybe the ball was being hidden.

19   And he said it twice.  And another thing, I'm telling you when

20   see these charts and see these numbers, be careful.  Be careful

21   to say:  Look, I see your chart, but is there something more to

22   it?

23         For instance, they had a chart.  If you look on this

24   chart, this is one of the charts they put up there and say --

25   Mr. Armstrong, slide it down just a little bit so they can see

```
 1    the top of it first.
 2              MR. ARMSTRONG:  (Complying.)
 3              MR. KNIZLEY:  This is the Top Off-Label Recipients of
 4    Subsys and Abstral.  And they want to put on there who they
 5    are, and it was billed, $473,000 billed by C&R, big numbers.
 6    Come down here to Ms. Speed at 14.  Wow, there was $204,000
 7    billed on behalf of Ms. Speed.
 8              Well, first, that's billed; two, C&R; and three, we
 9    don't know what the expenses were for the medication itself and
10    all the other things attributed to it.  So that number really
11    doesn't mean too much because one thing that's very important
12    about it, what about Ms. Speed?  What about the patients here?
13    How did they do?
14              Do you remember Ms. Speed, who came up here?  Remember
15    the lady that came up there?  Remember, she said this stuff was
16    the best thing she had ever had, it made her be able to get out
17    of the bed and she could function and she could work.
18              Do you remember her?
19              Do you remember on the top between -- do remember
20    Mr. Riley, I believe his name was?  That was one of Dr. Couch's
21    patients.  Or Mr. Brown.  Benjamin Brown, I believe he was the
22    man that was disabled.  He came up here.  What did that do for
23    him?  I think Mr. Riley was the other gentleman who was
24    disabled that came up here, that was the head of the Disabled
25    American Veterans.
```

1           And these are all on this chart that's got this big

2    number.  But, you know, the numbers are deceiving and the

3    amount of money.  And nobody's talked about the benefit to the

4    humans that are on the left-hand side of this.

5           So when you get these charts and you look at these

6    charts, say:  Man, I see what you're saying.  But there may be

7    an awful lot more to that chart than what you're telling.

8           So what is this?  What about the good evidence, the

9    testimony, and what do we have here?

10           Let's see what -- you said we want to talk about these

11    documents and the charges of the indictment and see if they've

12    proven it.  And what have they brought us?  What evidence have

13    they brought us and what witnesses have they brought us to see

14    if they can prove the allegations of the indictment?

15           Well, let's first look at what the allegations are.

16           Count two.  If you remember when we started this 44

17    days ago, these are the very same charts up here.  And I use

18    them because hopefully they can guide us a little bit because

19    that's the indictment you're going to have back there and

20    you're going to go through it, count one to count 23, and you

21    have to go through it.  So we'll go through it a little bit

22    here sort of to give you a guideline of what you're going to be

23    looking for when you go back in the witness room.

24           Rather than going over the words of the indictment,

25    I'm going to summarize it here so we can understand it maybe a

CLOSING ARGUMENT OF MR. KNIZLEY

 1   little better.  So I'm starting on count two though.  Do you

 2   remember -- I think we've all done that, after the RICO count.

 3   RICO is the racketeer influenced count, count one.  And we've

 4   all sort of -- the lawyers here have left that to come back to

 5   at the end, so that's what I'm going to do here as well.

 6            Counts two, three, and four, if you recall, is a

 7   conspiracy to unlawfully distribute controlled substances.

 8            Counts eight, nine, 10, 11, and 12 as to Dr. Ruan --

 9   they're different counts as to Dr. Couch -- was to unlawfully

10   distribute controlled substances to five specific people, all

11   for no legitimate medical purpose and outside the usual course

12   of professional practice.

13            Now, we've heard that now for six weeks, seven

14   weeks.  So what this charge is is the exact same charge you

15   would charge someone with for selling cocaine on the side of

16   the street, selling methamphetamine or distributing any of

17   that.  That's the same charge.  And the doctor has to be such

18   that he is no longer having the usual course of his

19   professional practice and he is no longer having a legitimate

20   purpose for the controlled substance, like -- like cocaine,

21   methamphetamine -- that he is nothing more than a drug dealer,

22   because he no longer has a purpose of being a doctor.

23            So to prove these -- and I suggest to you, ladies and

24   gentlemen, this is the meat of the case, these counts right

25   here.  (Indicating.)  This is what the case is about.  Are

1    these doctors practicing medicine or have they fallen so far

2    away from the practice of medicine that it is no longer a

3    medical enterprise, no longer a medical clinic, it is nothing

4    more than a drug dealer?

5           What were the witnesses?

6           Well, I think we start out with the experts.  Because

7    I certainly didn't know -- still don't know well -- but you

8    know, I don't know what outside the usual course of medical

9    professional practice is and I don't necessarily know what no

10   legitimate medical purpose is when you talk about medicines and

11   prescriptions and doctors doing prescriptions.  So where do I

12   turn to?

13          Well, we turn to people who do this every day.  We

14   need to find people who know what these standards are, that

15   know what legit medical purpose is.  Where do you find them?

16          Well, it's going to have to be these other doctors,

17   somebody that's trained.  They should know what they're talking

18   about; right?

19          And they say:  Okay.  Well, I want to make sure.  You

20   say that -- is that any doctor?

21          No, no, no.  It can't be just any doctor.  It's going

22   to have to be a doctor that has some expertise.

23          Why is that?

24          Well, this is a very specialized field we're talking

25   about.  It's not just general medicine.  It's not a primary

6225

 1   care practice.  This is a highly specialized field which

 2   everyone has told us is pain management.

 3         So what we need to do is find people that are

 4   qualified in pain management to tell us what these -- what it

 5   would have to be for a doctor to be so bad that he's outside

 6   the usual course of medical practice and he's no longer

 7   practicing medicine, he's just a drug dealer.

 8         So I will take the first expert, Dr. Greenberg, for

 9   the government and the last expert, Dr. Yarbrough [sic] for

10   Dr. Ruan.  Now let's look at those two people and let's see,

11   one, what their qualifications are first.  Because we need

12   somebody that's qualified and an expert in the field, that

13   knows what they are talking about, and then we need to see what

14   they have to say to see if they are able to tell us one way or

15   the other whether the doctor has done something so bad.

16         You have to look at the qualifications first.  And if

17   you look down here, this is a chart of qualifications of some

18   of our experts.

19         And we'll start with the yellow mark that

20   Mr. Armstrong has and we see Dr. Greenberg.  Did he have a

21   specialty?

22         No.  He didn't really have one.  Was he board

23   certified in any specialty?  It says no.  Pain specialty, no.

24   Excuse me.  Or subspecialty, no.

25         Now, he was an American Board of Addiction Medicine.

6226

CLOSING ARGUMENT OF MR. KNIZLEY

 1    Okay?  You will see that.  He had that.  That's addiction.

 2          And if you recall, we've been through all his

 3    residency and fellowships and academic positions.  Remember

 4    that?  The residency, the doctor goes, goes through and gets

 5    his medical degree and after that he does an internship, sort

 6    of gets started, and then he has a residency where he starts

 7    working on what his specialty is going to be.

 8          Well, Dr. Greenberg didn't have a residency at all.

 9          And then if you get through with your residency, then

10    you can have a fellowship, they say.  And that's when it's

11    getting real particular, where you go back to school for

12    another year.  This is not just training in a hospital or

13    something.  You actually go and have an educational process for

14    another year and you get to have a fellowship in that.  And

15    Dr. Greenberg didn't do that.

16          And then following that did he have academic

17    positions, maybe he taught something at a college, and teaches

18    other people how to practice medicine and how to practice

19    medicine in a specialty, and do you would think that's the type

20    of person that we would want to come tell us, well, what is it

21    when the doctor's so bad that he's outside the normal course?

22          Well, that was the qualifications of Mr. Greenberg.

23    But let's look at the qualifications of Dr. Gharibo.  Well, he

24    is has a pain-related specialty being the American Board of

25    Anesthesiology.  And I think we learned here, now, that pain

 1   medicine is a subspecialty of anesthesiology.

 2          Anesthesiology, of course, you go to have anesthesia,

 3   when they put you under, that reduces your pain when you have

 4   surgery or whatever it might be, childbirth it might be, or

 5   after effects of surgery.

 6          And then the next thing you do, if you've got that

 7   general understanding, now let's see if you've got a more

 8   specific qualification.  And Dr. Gharibo had a pain medicine

 9   specialty by the American Board of Anesthesiology.  And what

10   else did he have?

11          He had a residency.  He actually did a residency.  He

12   did that residency at New York University in anesthesiology.

13          Well, that sounds like he's fairly qualified.  But is

14   there anything more?

15          Yes.  He was one of those with one of those one-year

16   fellowships.  In what subject?  Pain management.

17          And then what did he do?  Or what does he do now in an

18   academic position?  And you will see he was associate professor

19   in the department of anesthesiology -- and you can read it for

20   yourself.  Extremely, extremely well qualified.

21          Now, we learned a little bit more about this that we

22   didn't know before we got here -- at least you may have.  I

23   have to admit I wasn't that knowledgeable about it.

24          But physicians that study medicine closely, they then

25   write for certain journals, like the Pain Journal.  You saw

6228

1   this journal that was held up there with Dr. Ruan.  You heard

2   Dr. Gharibo talk about it up there.  You're published.  And

3   you're published in a peer-reviewed article, a peer-reviewed

4   article being other people that are highly respected in the

5   pain management field or whatever field it may be and they have

6   these journals, the Journal of Pain Management or whatever it

7   might be.  You submit papers up there because you study and you

8   do research and stuff and you say:  I think the pain medicine

9   on this particular area, this should be done, that should be

10  done, this treatment should be, this is the effect this

11  molecule has on this -- far more than I could ever understand

12  -- and you're published.

13          Well, we knew the peer-reviewed publications for

14  Mr. Greenberg was zero.  The peer-reviewed publications for

15  Dr. Gharibo -- I said Mister, excuse me -- Dr. Greenberg.

16          Gharibo's was 27.  27 time he sent an article about

17  that, about pain medicine or something in that neighborhood,

18  and it appears.  And they said:  This guy knows what he's

19  talking about.  We're going to publish it for doctors all over

20  the United States to look at and rely upon when they treat

21  people in pain.

22          So those are the two comparative people.  And the

23  government can say whatever they want about whether or not

24  Dr. Gharibo went over the files.  He went over every single

25  file Dr. Greenberg did.  He told you he did.  In detail.  And

1    he said:  I looked at every one of them.  I spent hours upon

2    hours upon hours looking at them.  And on every single one of

3    them Xiulu Ruan was certainly within the normal course of

4    medical practice.

5          But that is not all he said.  He said he was

6    exemplary.  This extremely highly qualified doctor said he was

7    exemplary.

8          And the only thing these people said -- well, guess

9    what?  There's been some emails back and forth and they talked

10    about -- I forget what it was -- four or five emails they had

11    exchanged where Dr. Gharibo said:  Look, I've never been to his

12    house, da da da, and it was a group email and I responded.

13          It really doesn't matter.  If you think for once that

14    a man of this caliber is going to come here under oath, which

15    is going to be published all over the United States, what he

16    said in here, and he's going to lie and throw away everything

17    that he's done over these years for Xiulu Ruan?

18          No.  Not at all.  He's not going to come here if he

19    does not believe what he had read in that and what he saw.  And

20    he said it was exemplary.

21          Now who refuted him on almost all the cases involving

22    Xiulu Ruan?

23          Dr. Greenberg.

24          Just because you don't have the same qualifications

25    Dr. Gharibo does not mean you're not a good doctor.  Of course

1    not.  You can still listen to what he says and then evaluate

2    what he says and, even though this other doctor may be

3    extremely more qualified, still want to hear what Dr. Greenberg

4    says and see if I can rely upon what he tells me.

5            He came in here.  The government said he made a few

6    mistakes after two days on the witness stand.

7            This man is on trial for everything he's ever

8    had.  You can't bring somebody in here and make a few mistakes

9    and say:  Look, it's okay.

10           It wasn't a few mistakes.  It was horrible.  Horrible

11   is a strong word.  It was not something that you should be

12   asked to be relied upon to pass judgment on your fellow

13   citizen.  This man said this clinic never uses PDMP, rarely

14   uses PDMP.

15           10,000 times this clinic used PDMP.  How can he dare

16   come in here and say such a thing and when this man's

17   everything is at stake and say he's never used PDMP?

18           And if we don't do the work and we don't get Nancy

19   Bishop up here, if we don't get witnesses down here -- and we

20   don't have to prove our case -- to refute that type of thing, a

21   horrible thing can happen.  And that's one right there.

22           You can say:  Well, I'm not listening to any more.  If

23   you haven't done any more work and you look over here and

24   testify about that man's ability to practice medicine and you

25   haven't done any more work to ever find out how many times they

1   just checked the PDMP?  No, that's it.  I'm done with you.

2          Wait a minute.  That's not all.

3          He got up there and said that a person should not have

4   been treated with medications for pain because they had a

5   hernia and they should have been sent out for the hernia

6   surgery, if you recall.  You can go back and look over your

7   notes when you go back, and it turned out when he got cross-

8   examined the person had already had the hernia surgery.

9          What?

10         You're coming in here and telling this jury that this

11  person is outside the normal course of medical practice when he

12  -- because he should have sent them out for hernia surgery and

13  you haven't even looked enough at the notes to see that the

14  person has already had the hernia surgery and that he's going

15  to be treated for the pain from the hernia surgery?  How

16  ridiculous can that be?

17         The gentleman had a hard time following the file, just

18  turning the page and finding the page.  If you recall, I was up

19  there assisting him somewhat.  The man forgot the notes he had

20  seen.

21         Mr. Armstrong cross-examined him and had to say:

22  Doctor, come on, do you remember this?

23         No, not really.

24         He got totally confused.

25         Ladies and gentlemen, you cannot -- your government

1 cannot bring that type person up here and ask a jury of its

2 citizens to rely upon something like that to make such a

3 serious determination that you're going to have to make here.

4 And that in and of itself says, I'm sorry, I can't believe that

5 expert.  I'm going to have to believe the other expert.  He's

6 tremendously more qualified and this guy really is off.

7         Not only is he off, your government spend $58,000 of

8 your money to have the man come here and tell you that the

9 PDMPs were never used in the practice when it's done 10,000

10 times, and for this man to come tell you this person needs to

11 be sent out for surgery when they already had it.  And that's

12 $58,000 of your tax money -- $325,000 of your tax money over

13 the years.

14         You need your money back.

15         Two other experts in this case.  And we'll quickly

16 take a look at Dr. Aultman.  Do you remember, she was, I think,

17 the last witness for the government, last expert witness for

18 the government.  I think she was from Mississippi.  And she was

19 certainly a nice person.  And I'm not going to say that she was

20 anywhere in the category of Dr. Greenberg.  But she too had no

21 pain-related specialties.  She had no pain-related subspecialty

22 boards.

23         She was an internal medicine person.  And internal

24 medicine is, you know, good medicine certainly.  But an

25 internist is, you know, sort of like a general practitioner,

1  but maybe a little more, but sort of like a general

2  practitioner.  But what she did for a living, though, she

3  was -- she did have residency in internal medicine.  But if you

4  remember, her occupation was -- she was, I think, a

5  hospitalist.  And that's someone, I think, that doesn't have a

6  practice out on your own and doesn't have patients like we

7  would think, someone who works in the hospital and is employed

8  by the hospital.

9          And an internal medicine residency, you see, she had a

10 medicine residency.  We've got that internship, which when she

11 got out of medical, you go work at the hospital or whatever, do

12 an internship, and then you do a residency and you sort of

13 specialize and figure out what you're going to be good at and

14 what you're going to concentrate on and what you're going to do

15 once you're out.  And this Dr. Aultman decided she wanted to do

16 this internal medicine, which is somewhat like a general

17 practice.  And that's fine.  That's good.

18          But I don't know if that's who we need to call here,

19 who your government needs to call here, to make determinations

20 on people that are extremely qualified in pain medicine and

21 involved in extremely complex clinical medical decisions.

22          And if you look a little further at her

23 qualifications, you know, she didn't do a fellowship.  Again,

24 there's nothing wrong with that.

25          And she held no academic positions and she never wrote

1    or studied or submitted papers to be peer reviewed by her other

2    peers.

3            And we would also have to go to Dr. Vohra, take a

4    quick look at his qualifications as well.  And he did have a

5    specialty, and he did have some pain background, and he did

6    have one board of pain medicine subspecialty with a particular

7    board.  But if you recall, he wanted to disagree with the board

8    certifications that Dr. Ruan had -- and he has eight board

9    certifications -- and all the other physicians came up here and

10   said no, that's an appropriate board certification he's arguing

11   about.  In fact, I think Dr. Gharibo has the same subspecialty

12   board certification.

13           But see what he has.  And then did he have any other

14   boards?  None.

15           And what was his residency in?  Physical medicine and

16   rehabilitation from Baylor.  That's getting close to pain

17   medicine, but certainly not a pain medicine specialty.  And, of

18   course, he didn't have that extra year of training as a

19   fellowship and he didn't hold any academic positions and he

20   wasn't one that was inclined to want to write articles and be

21   peer reviewed by others and study medicine in the detail that

22   Xiulu Ruan has, that Dr. Gharibo has, and our other expert,

23   Dr. Gudin, has.

24           If you look at Dr. Gudin's history, as well -- again,

25   American Board of Anesthesiology.  All right.  Well, remember,

6235

```
 1   anesthesiology is like you go to the hospital and get put
 2   under.  That's for pain, controlling pain.
 3           And then he had a pain medicine subspecialty from the
 4   American Board of Anesthesiology.  And you see his other boards
 5   with the American Board of Anesthesiology.  Again, pain
 6   related.  And his residency, which was anesthesiology, pain
 7   control, from Yale.  Pretty impressive.
 8           He also had a fellowship, one of those extra one
 9   years, you go study more about the intricacies of pain.  Again,
10   from Yale.  Pretty impressive.
11           And how about academic positions?  He teaches medicine
12   at Mount Sinai and he is the one that teaches other people how
13   to become doctors, to learn about medicine.
14           These are the people that know what good pain medicine
15   is and not.
16           I'm not being critical of Dr. Aultman or Dr. Vohra.
17   I'm just saying they don't have the expertise that's going to
18   be required to look at what this man does for a living and say
19   whether he's doing it right.
20           Not only whether he's doing it right.  That's not the
21   question, as you've heard.  The question is:  Is he doing it so
22   wrong that he's not even practicing medicine any more?  He's
23   just nothing but a drug dealer?
24           No.  No.  There's just no way.  None of these people
25   with these kind of qualifications can come down here and say:
```

6236

1    I looked at every single file that's involved in this case,

2    every single file for Dr. Aultman, that Dr. Greenberg, and

3    Dr. Vohra looked at, and I looked at every single one of those.

4    And, as Dr. Gharibo said, he was exemplary.

5            As did Dr. Gudin, said everything he did was within

6    the normal course of medical practice and for a medical

7    necessity.

8            That's the experts.  That's the top people in our

9    country.

10           I think some of them had lectured overseas.  All over

11   the world.  These are top people in the world in medicine.

12           And it's not, again, to be critical.  But this is such

13   a complex field that you're going to have to have this

14   expertise in order to be able to give these type opinions.

15           And, ladies and gentlemen, because these men who are

16   fighting for their lives came here and brought these type

17   witnesses, you've got to say:  You haven't even got started

18   with telling me this is outside the normal course of medical

19   practice.  You haven't even got started.

20           And they've all told you there's a spectrum, that

21   nothing in medicine is for certain.  That some doctors see it

22   one way, some doctors see it another way.  Some doctors use

23   medication more, some doctors use other things more.  Some

24   doctors perform surgery, if it's a surgeon, before another

25   doctor certainly may.  If he had a back problem, some surgeon

```
 1    will say:  No, let's try this exercise and this stretching
 2    first.
 3              And the other one says:  No, that's never going to
 4    work.  We need to go ahead.
 5              Both of them are within the normal course of medical
 6    practice and both of them are trying to help the patient and
 7    both of them are doing right.  But they -- both of them are
 8    practicing medicine, but just both of them are right.
 9              And that can be the case here.  But I think not only
10    is he practicing medicine appropriately, but the highest
11    experts in the United States, and maybe the world, say he's
12    doing so and doing so exemplary.
13              I don't think they ever get started.  (Indicating.)
14     But let's see what else we've got.  That's the experts.
15              All right.  However, I can't leave Dr. Greenberg
16    because of the things he said about my client.
17              What we've got, I'm talking about his days in medical
18    school.  And it's not so bad that he had the days right after
19    medical school, days where he was doing -- when he worked for
20    the Army.  He did some things he shouldn't have done about
21    taking medication.  Actually what he said I think he did was it
22    was fentanyl, the same medication.  He just stole it.  It was
23    being disposed of and he started taking it and everything else.
24    And though that's not very good, and if he did like he
25    really -- first thing he did, he went and told whoever it was
```

6238

1  and he went and got treatment.  Okay.  That's fine, that would

2  have been fine, and we could forgive him for that and bring him

3  here and say:  Okay, well, good, you know, I'm not going to

4  hold that against you in your testimony.  But you lied to me

5  about it.  You came in here and I asked you some questions

6  about it and you told some big, long story, and these lawyers

7  here had their documents where you testified in other cases and

8  said:  No, no, no.  No.  You were shooting.  You were having

9  some other nurse shooting this up for you.  Okay?

10          And then, so he said:  No.

11          You were suspended by the board.

12          No, I was not.

13          Look here, Doctor.  Here it is in black and white.

14  You got suspended.  Look, we can forgive you for all this, but

15  quit lying to us about it.  And if you're going to fib about

16  that, I'm not going to believe a word you say about that man's

17  practice of medicine.  (Indicating.)

18          I suggest you have to disregard that man altogether.

19          All right.  Well, the expert testimony certainly

20  indicated there's no crime here.  So let's see what actually

21  happened, what goes on, what goes on on a day-to-day basis,

22  where he practices medicine.  So let's go bring the witnesses

23  that would see the patients every day.

24          These were the people that say they know what's going

25  on.

CLOSING ARGUMENT OF MR. KNIZLEY                                           6239

 1          He won't even talk about it being a pill mill any
 2   more, about somebody taking cash in the examination room and
 3   kidding about:  What kind of drugs do you need?  I'll give you
 4   anything you want -- going out the back door with it or
 5   anything else.
 6          Once you get there, so now let's look at what really
 7   goes on here.
 8          Well, I think we start with the people up front.  I
 9   think we had a new patient coordinator.  And I won't go through
10   every one of these, because y'all heard about them.  I'll try
11   to refresh your memory just a little bit about what we heard
12   about Karen Ferenczi, I think her name was.  She was later on
13   in the case called up here.  She was a taller lady, and she
14   said:  You know, I was also the receptionist and new patient
15   coordinator along with Ms. Coburn, if you remember.  I think
16   her name was Debi Coburn -- Bobby Coburn.
17          She goes:  Look, here's the way we do things here:
18   One, there's no cash basis, like pill mills.  We don't have
19   cash patients.
20          Two, you've got to have -- you've got to have
21   insurance.
22          Three, you're going to have to have a referral from a
23   doctor.
24          Why is that?  Well, that's -- that's the way we
25   practice medicine.

1              Now, why is that important?  Okay?  Because we don't
2       have just walk-ins to come in and say:  Look, I want to get
3       drugs for nothing okay.  Okay?  We have doctors that are going
4       to refer people to us or you can't come see us.
5              And if you recall, I think Ms. Ferenczi said:  When I
6       got the referral from the doctor, then I would call the doctor
7       himself, or the doctor's office, and I would make sure I got
8       the records from the other doctor before we ever get started,
9       before the patient ever comes in here.
10             Why is that important?  Well, it first says this is
11      not a pill mill, this is not some kind of -- it's a legitimate
12      medical practice, you know, we're getting referrals from these
13      doctors.  But more -- or as importantly, Dr. Revels,
14      Dr. Fontana, I believe it was, Dr. Lowenstein, and some of the
15      reputable physicians, orthopedic surgeons, people with other
16      disciplines in our community are saying:  Look, I'm a doctor,
17      I'm well respected, I've got patients, and where do I send my
18      patients when I can't handle their pain any more?
19             Xiulu Ruan.  Because he knows what he's doing.
20             Dr. Ruan sees him one time.  How did that go?
21             Well, good.
22             So they sent him again and again and again and
23      again.  And what happens?  Dr. Ruan sends a letter:  Thank you
24      for the referral.
25             He gets the medications from Dr. Revels or

6241

```
 1    Dr. Fontana, whoever it may be.  And -- Fontana was not one of
 2    them.  Whatever, there were several of them.  Lowenstein was
 3    one of them.  Anyway, the doctors say:  Okay.  Change the
 4    medication.  This is what I'm giving the patient.  It's not
 5    helping him.  Can you help him, Doctor?
 6              Yes.  I'm going to start him off on something else, or
 7    something different, or what you're doing is good.
 8              And then say:  Okay.  Well, he's still having back
 9    pain after I've given him an epidural and this sort of thing.
10    Maybe we need to send you back to the orthopedist to have
11    further surgery.
12              And they communicate, they collaborate, all along, all
13    of this time, for years and years and years, and other doctors.
14    And if this guy was somebody that was outside the normal course
15    of medical practice in prescribing medication without a
16    legitimate purpose, huh-uh, these doctors would not send these
17    people over and over and over again for years and years and
18    years.  It's a legitimate medical practice.  And to think
19    otherwise, it's just hard to fathom.
20              So we have our people, our new patient coordinators
21    and our receptionist up there getting the -- making sure
22    they've got insurance, making sure they've got a referral from
23    the doctor, making sure that we've got the doctors records.
24    And then what happens when they come in?  They even send out a
25    new patient package to them and they send it to them, saying to
```

6242

1    bring it back when they come in and give the information and go

2    through an actual physical, as you're supposed to do in a

3    medical practice, and check your weight, your temperature, your

4    blood pressure and that sort of thing.

5            And then they go to the next stage and they go to

6    nurse practitioners.  And then the nurse practitioners, as

7    every doctor here said, you know -- almost every doctor here

8    said they are appropriate, the medical extenders now.  A nurse

9    practitioner is not just a nurse.  These are people that have

10   got specialized training over and above what a nurse may have.

11   I think they said -- I forget how much time they have to have

12   in nursing.  But they are physician extenders, and that's what

13   they're called in Blue Cross/Blue Shield, physician extenders.

14           So we get to the nurse practitioner, and then the

15   nurse practitioner is a person like Sharon Noland, if y'all

16   remember her.  This was a government witness.  Sharon Noland

17   comes and tells you at the government's request that this

18   gentleman saw every single patient, at least on the first

19   occasion.  He collaborated with all the other people.  He was

20   there every day.  Whatever -- he made all the prescription

21   decisions.  He did it appropriately.  She never saw him do

22   anything wrong.  And he always tended to patients.  He was the

23   man that made the decision on the medications.  She never saw

24   any abuse of the medications.  And when he was not there, when

25   he was going to be on vacation, she told you that his calendar

 1    was clear.  And why?  Because he was there when his patients
 2    came in.  He wasn't going to have anything happen if he wasn't
 3    there.
 4          And we heard it from Sharon Noland, and then we heard
 5    it again from Ms. Harville, Shanna Harville, when we brought
 6    her up here, the lady.  She said the exact same thing.  She
 7    even went a little bit further and says:  You know, every
 8    single patient that he didn't even have to see -- because of
 9    the medication requirements, because of insurance
10    requirements -- he saw anyway and that he never let anyone --
11    any prescription be signed.  Nobody ever signed a script
12    without him knowing about it.
13          And then we get to the presigned scripts.  First off,
14    the presigned scripts that we saw so many of -- here it is, in
15    a drawer two places.  Some of them so old it had Peggy Holder's
16    name on there, who hadn't worked there in years.
17          But that really doesn't matter.  It's presigned
18    scripts.
19          First, the presigned script, Sharon Noland tells us, I
20    suggest to you ladies and gentlemen, as a reputable person
21    would do, that it was for emergency purposes.  That she didn't
22    even trust Dr. Couch, didn't trust Dr. Chen.  But if an
23    emergency came for his patients -- this is for patients who had
24    to have something -- that's what that was for.
25          Ms. Harville said the same thing.

6244

```
 1              And guess what?  Dr. Gharibo said that is not outside
 2    the normal course of medical practice.  With all his
 3    connections, he's not going to come down here and tell you
 4    that.  And here's the key, though:  The charges are not just
 5    maybe doing something that might be outside the normal course
 6    of medical practice, but the charges in this case are
 7    distributing controlled substances.
 8              There's not one iota of evidence this (indicating)
 9    ever distributed any controlled substance at all.  Period.
10              It may have been used.  For what?  But there's no
11    evidence that it was done outside the normal course of medical
12    practice, with his knowledge or otherwise.
13              And even so, Dr. Gharibo tells us that's not outside
14    the normal course of medical practices.  It's done for
15    convenience, done for emergency.  Sure, certainly.  It makes
16    total sense.
17              We're not going to convict somebody of being -- gone
18    crazy in his medical practice because he's trying to help a
19    patient when he had to be out of town and he gave it to a
20    trusted nurse practitioner.  That's just -- that is a red
21    herring.  That's something they want you to -- a rabbit trail
22    they want you to go down.
23              So we've got two reputable nurse practitioners that
24    tell you this is a fine doctor, who does what he's supposed to
25    do.
```

```
 1              And we have one more, a nurse practitioner, that we
 2     didn't hear from, but we did see a letter from Matt Bean.  We
 3     saw that email from Matt Bean.  And the email from Matt Bean is
 4     important for another reason we're going to talking about in
 5     just a moment.  But it's the next count.
 6              Do you remember the email from Matt Bean?  I want you
 7     to look at it for a moment right here.  We'll get back to it.
 8     Because we're talking about nurse practitioners.
 9              What is the subject matter of Matt Bean's email?
10              Compliance.  (Indicating.)  Incident-to compliance.
11              And we'll go back to the email in a bit.
12              Mr. Armstrong, if you will go to the second page in
13     just a second.
14              They are trying to have some compliance about what he
15     hopes is to get clarity for a complex issue.
16              What we're talking about -- and we'll go ahead and
17     talk about it since it's up there.
18              Mr. Armstrong, if you will flip back to the front.
19              MR. ARMSTRONG:  (Complying.)
20              MR. KNIZLEY:  You hear this issue about -- okay, Blue
21     Cross/Blue Shield, they want you to bill one way.  They want
22     the nurse practitioners -- they want you to bill one way.
23              Now, as Mr. Bean figured out, he said:  So far in my
24     study into this matter is as follows.
25              He's been studying and he's writing to Dr. Ruan,
```

1    saying that you have to collaborate, the physician has to do

2    first the history and physical on Medicare patients to

3    establish a diagnosis and then, flipping on down, for Medicare-

4    managed patients it is not required that the doctor see the

5    patient on the followup.

6            Okay.  Well, then if Xiulu Ruan is helping his

7    patients to begin with, he's not required to see them on

8    followup.

9            Well, good.

10           Well, no.  There's other insurance companies.  What do

11   they want?

12           Well Cigna and Aetna says the followup incident-to

13   rules are as follows: -- or is as listed above.  The incident

14   to, that term means if a doctor's around, he doesn't have to

15   see the patient, it can be incident to and a nurse practitioner

16   can bill for the doctor -- for the doctor.

17           But, now, Blue Cross/Blue Shield, his research has

18   told him, says:  evidently don't recognize incident to.

19           It's sort of like a revelation to him.  And I think

20   Debi Phillips told us that as well.  What they say -- what they

21   say is if he sees the patient, the doctor, it should be billed

22   under the NP, you're actively involved in the patient care, so

23   it's like we're not collaborating with you.

24           He says:  Look, that's what they say, you're involved.

25   And he doesn't know that we're going to be in this courtroom to

 1    read this.  But he's telling us that you are -- he's telling

 2    Dr. Ruan:  You are actively involved in patient care, so it

 3    isn't like we're not collaborating already.

 4            Then he says a proposed solution.

 5            And, Mr. Armstrong, move it up just a little bit.

 6            MR. ARMSTRONG:  (Complying.)

 7            MR. KNIZLEY:  Probably good for you to lay eyes  on

 8    every patient.  And that's what they did.  And that's what --

 9    Dr. Ruan said he was already doing that.  And he says he was

10    going to do it from that point forward.

11            If you look at the next page, the next page, it says:

12    The worst thing should be if there's some problem with this is

13    that's a contractual violation or something.  Blue Cross/Blue

14    Shield, we might owe them some money back.

15            We're not talking about crime.  Patient one comes in,

16    and it's on the second visit, and we don't see him, and that's

17    not a crime.  Patient two, it is.  It's identical conduct.

18    That makes no sense.  We know what we're talking about.  These

19    are regulations, contractual agreements with an insurance

20    company, that -- if you would flip back, Mr. Armstrong, to the

21    first page -- where was he getting some of his research from?

22            My proposed solution, after talking with a colleague

23    of mine who had a billing specialist conduct a billing training

24    for their clinic at Southern Cancer Center, is to add this

25    line.

CLOSING ARGUMENT OF MR. KNIZLEY

6248

1              Southern Cancer Center's apparently having the same

2    issue they are having.  It's not a crime.  It's foolishness.

3    Some billing issue.  If we owe them some money back, we'll pay

4    them some money back.  We're not talking about crimes.  We're

5    not talking about somebody abandoning legitimate medical

6    purposes.  And there's no suggestion whatsoever these people

7    hadn't got proper medical care anyway.

8              Well, Elaine McDonald.  You heard Mr. Doss tell about

9    Elaine McDonald, who had been billing for years.  She said:  I

10   never heard of all that, what they are talking about there.

11             So she's never heard about it.  And the doctor over

12   there is practicing medicine, and the billing office is over

13   there doing one thing.  And the billing office -- if

14   experienced billers don't know, certainly there's no crime.  If

15   there's some civil responsibility, fine.  But this is not

16   criminal conduct.  That's foolishness, to think that.  And

17   criminal conduct in that count, which we'll talk about in just

18   a moment, has to be knowing conduct.  It can't be a mistake,

19   you can't guess wrong, it can't be all that.  You've got to

20   know and try to steal the money from the insurance company or

21   it's not a crime.  The fraud has to be knowing.  And you can

22   look at that in the indictment and it will tell you that.

23             Okay.  So we've been through the experts about this

24   and we've been through the medical staff like this, and the

25   experts tell us it's the normal course of medical business, the

6249

```
 1   expert tells us this is real doctors practicing real medicine,
 2   treating real patients.  The people that work there tell us
 3   that.
 4           Now, what about other people?  What about management?
 5           Yes, these people had management staff as well.  It's
 6   not like these -- we had Debi Phillips.  They went and hired
 7   Boe Strange, who is a very reputable CPA and did this type
 8   thing and managed other businesses, and they had a management
 9   team.  And part of that team was Ken Cross, who didn't do as
10   well as he thought he should do and he got fired.
11           But what did even fired Ken Cross say, who came up
12   here and testified?  If you remember, his testimony was this
13   was one of the finest medical pain clinics in the region.  That
14   was his words from a government witness.
15           There's no way, no way that was a pill mill.  Or a
16   money mill.  There's no way this is outside normal medical
17   practice.
18           Mistakes.  Errors.  We all have them in everything we
19   do in our life.  But that's not a crime.
20           Now, that's not all.  So we have the doctors
21   testifying.  We had -- the doctors testified we don't -- you
22   know, it looks likes the doctors are on Xiulu Ruan's side, and
23   the doctors that wasn't on Xiulu Ruan side, we can't trust them
24   very much because they paid them, and the people that worked
25   there seemed to be good, hard workers and decent people and
```

 1    they're all saying he does stuff right.

 2            What about the patients themselves?  Let's get them in

 3    here and let's look and see what they have to say.

 4            And I suggest to you out of 8,000 patients, who did

 5    they bring in here to try to prove their case?  Because the

 6    doctors couldn't prove it for them, because the people that

 7    worked there didn't prove it for them, because the nurse

 8    practitioners didn't prove it for them, so they bring patients

 9    in here.

10            So in this you'll see five named patients.  And they

11    brought Mr. Gist and they brought Kim Lowe and the rest of them

12    was proved by otherwise, or tried to be proved otherwise.

13            But what did Kim Lowe say?  Do you remember Kim Lowe?

14    You've got Dr. Greenberg saying one thing.  And then Kim Lowe

15    comes in here, when I brought her in here, she says:  What are

16    y'all talking about?  This is great medicine.  This is fine.

17    Everything was fine.  There was nothing wrong with this at

18    all.  Nothing.

19            Then Mr. Gist comes in here.  And what did Mr. Gist

20    tell us?

21            Well, I don't know, I'm not going to say he was

22    confused.  I don't know.  But if you went and looked at his

23    file, he told us the part about his file that, he said, well,

24    you know, whoever said that -- first off, Mr. -- Dr. Greenberg

25    said Mr. Gist had an alcohol problem, if you remember.  He said

 1   this is why it's outside the course of normal medical practice.

 2   Dr. Greenberg said Gist was outside the course of normal

 3   medical practice because he tested positive, he was drunk when

 4   he came in the office one day.

 5          Mr. Gist said -- and he said that to somebody else.

 6   It wasn't me.  And then I don't know which one of them they

 7   want but, you know, they can't have both.  I suggest that

 8   Dr. Greenberg was probably wrong and Mr. Gist was probably

 9   right.

10          Then look at Mr. Gist.  He says, you know, he also

11   says:  I don't know what they are talking about, about me

12   having a dog and playing with a dog.  Well, I don't know.

13          But you got to look at what the record says.  And you

14   know, they already know some of the records are not clear.  But

15   I don't know how somebody's going to make up and put in the

16   records that without medications he's not able to function and

17   stays in bed, and with medications he cooks, walks outside,

18   takes care of his yard and plays with his dog and actually

19   feels human.

20          And if you remember, I went over with Dr. Ruan this

21   file, time and time and time again.  He saw Dr. Ruan's

22   handwriting where he had seen him in the office and you saw

23   where he had Fentora, not Subsys, not Abstral, Fentora time and

24   time and time again.  And you saw where Mr. Gist says:  Well, I

25   don't know what they are talking about, about a pill count.

1     And then, of course, we saw documents yesterday when

2  Dr. Ruan was on that he in fact did have a pill count that was

3  called and that sort of thing.

4     I suggest to you, ladies and gentlemen, those two

5  patients, the two patients they called of the five, neither one

6  of them proved their case.

7     We know the documents don't prove the case, we know

8  the medical records don't prove the case, the patients don't

9  prove the case.

10     What other things do we have?

11     G.......... We never heard Ms. G..........  No one

12  from her family appeared.  I don't think anyone from

13  Mr. Greenberg's [sic] family appeared.

14     Mr. Walker appeared on behalf of Mrs. Walker, who had

15  passed away, and I suggest to you her testimony -- his

16  testimony was nothing that would suggest it was outside the

17  course of normal medical practice either.

18     But I suggest, since that's the people in these

19  specific counts, that -- these counts are gone.  (Indicating.)

20     Let's hang on to these counts.  Maybe there's a couple

21  of other patients on these conspiracy counts that don't have

22  named people.  Maybe there's a couple of the other patients

23  y'all could bring in here, Government, because the doctors

24  don't help you much.  The clinic don't help you much.  Maybe

25  several patients you should bring in.  Let's bring in

6253

CLOSING ARGUMENT OF MR. KNIZLEY

1   Catherine -- Kathleen Owens' [sic] widower.  What did he say?

2          Kathleen Burns' widower, if you remember him.  They

3   claim that the reason that was important is that they fired her

4   because she didn't have the medicine any more -- or didn't have

5   insurance any more.

6          There's just nothing to support that at all.  That she

7   wasn't a cancer patient.  We went through all this yesterday.

8   We don't want to bore you going through it again.  But it's

9   clear as a bell.  What happened was Ms. Burns -- and Mr. Burns

10  was honest about it, he didn't try to argue about it, didn't

11  try to say it wasn't true.  Ms. Burns had a back problem.  She

12  had HealthSpring, I believe it was, the insurance.  And she had

13  a back problem.  722.52, 724.2, all of these files, go look

14  them up and read them.  It's all lumbar, nothing to do with

15  cancer.  They sent this on that date, on the second, to the

16  insurance company and said:  We are going to pay you for your

17  back problem.

18          And then they did pay them for the back problem.  And

19  he had already been seeing her for a year.

20          She didn't get fired because of this.  It was because

21  she missed a pill count, which was at the end of her -- and her

22  husband said she was bad, she was an addict and all of this

23  kind of stuff.  But that's why she got fired, was because of

24  the pill count.

25          And then they tried to make some allegation that

6254

 1   Dr. Ruan claimed she had cancer?  After she got fired?  On that

 2   letter of -- Mr. Armstrong, have you got that letter?  I think

 3   it's July 14, from the insurance company.

 4          I don't have to show it to you again.  You remember

 5   it.  You looked at it five times.  They tried to say:  Okay.

 6   Well, look here.  The insurance company sent them a letter and

 7   he -- initialed it and sent it back to them and the letter says

 8   back on this date, back on this date here, that we prescribed

 9   you -- you prescribed fentanyl and fentanyl is indicated for a

10   particular product that's for cancer only.  And please indicate

11   that you prescribed this medication.

12          And I don't say it's not clear at all.  Obviously --

13   look at this.  No, it's not for cancer.  I got this for a back

14   problem.

15          And she don't even -- she's not even here anymore.

16   He's not trying to get any money out of anybody.  He's not

17   trying to lie to anybody.  He's got 8,000 patients.  If he

18   needed more patients, maybe so.  But it had nothing to do with

19   money, nothing to do with fraud, nothing to do with what he

20   signed for this lady that had back problems.  Nobody can say

21   anything else.  And that's just another red herring.

22          But you've got to save the best -- the best patient

23   for last to try to save these three counts.  Gary Douthitt.  Of

24   8,000 people, they bring him.  Not only -- do you know why they

25   bring him?

1    They cut a deal with him.  He's looking at a heroin

2  case.  Two years after he left here, he's caught in some motel

3  with heroin and a gun.  And they say:  Look, fellow, we'll drop

4  the heroin case and let you plead to the gun case -- which I

5  suggest to you, I think he told us is a lot less time -- if

6  you'll come in here and please say something bad about

7  Dr. Ruan, because we're not getting very far with that.

8    And he comes in here and tells some ridiculous story

9  and then tells you people that he doesn't mind putting his

10  five-year-old son up to his lie.

11    I wouldn't believe a word he said if I had to.  And if

12  I was the government, I wouldn't be bringing that type people

13  here and asking a jury like you to hold your fellow citizen

14  responsible on that type testimony.

15    But they've got a chart, they've got that top 25

16  chart, maybe it will tell you something.  Maybe that will prove

17  something, to get a chart.

18    On that top 25 chart, man, we've talked a little bit

19  about Ms. Speed, who came in here, she told you she had -- and

20  do you remember Ms. Rogers came in here, number 13?  She was

21  happy with the treatment.  But what about number four, Judy

22  Loper?  That's real high.  There's got to be something wrong

23  with the fact that Judy Loper is so high.  And you know all he

24  ever does now is, if the patient doesn't have insurance, he

25  fires them, remember that?  Remember?  That's what he says.

Case 1:15-cr-00088-CG-B   Document 775-27   Filed 05/31/18   Page 169 of 226   PageID #: 6256

CLOSING ARGUMENT OF MR. KNIZLEY
32442

1        Mr. Armstrong, take a quick look at Ms. Loper's file
2   and see what happened to Ms. Loper.  It's in evidence.
3        Let's see.  Right here at the bottom, GC-MS
4   inconsistent.  What else does it say?  There is no good
5   explanation as to why the patient would be negative on her
6   fentanyl and oxycodone on the blood draws and GC-MS and the
7   only good explanation as to why she would be positive for
8   morphine is if she took her husband's medication, who is also a
9   patient I see.  She came today asking for an additional box of
10  Subsys, but then states she had been using the medication
11  properly.  She is on quite a large dose of opioids at
12  present.  She has insurance that's paid for the Subsys.  And
13  what happens to her?
14       Failed last GC-MS blood draw.  No more controlled
15  drugs will be dispensed after today.  Give her titrating dosage
16  of Subsys and one last oxycodone, titrating going down.  We
17  don't throw people out on the street.  We wean them off of it.
18  That -- oh, the one example of Ms. Kathleen they brought really
19  didn't make sense.  Here's an example -- it's on the top 25
20  list.  But they don't want to show you that.  Why?  Because
21  they don't want you to see the truth.
22       Be careful of the charts.
23       The case should be over.  Those drug counts, there is
24  no outside the normal course of medical practice.  But they
25  have a few rabbit trails.  And one of the rabbit trails, I

Roy Isbell, CCR, RDR, CRR, Official Court Reporter
113 St. Joseph Street, #231, Mobile, Alabama  36602

6257

CLOSING ARGUMENT OF MR. KNIZLEY

 1   suggest to you, was this thing here.  (Indicating.)  You know,
 2   this sort of reminds me a little bit, this prescription here,
 3   of you've got a blank prescription that's not signed, so that
 4   must mean that you're doing something illegal and you're
 5   selling drugs.  It's sort of like if you have your handgun or
 6   your gun in your home or at your business -- okay -- it's
 7   there, but you've got it there for your protection.  And in
 8   this case it's for the benefit of a patient.  And if somebody
 9   gets it that shouldn't get it and goes and commits a robbery,
10   oh, well, you're responsible for the robbery.
11          No.  I had it in a drawer at my office.  You know, I
12   never intended for it --
13          Oh, no, no.  You're going to have to be responsible
14   because you had a gun and somebody else got it and committed a
15   crime with it.  So you're responsible for the crime.
16          Well, there's no evidence that ever happened.  But
17   that's about as logical as this argument that I've got a
18   prescription to help the patient in this drawer that my nurse
19   practitioner knows about and because somebody might get it and
20   might commit a robbery with the gun or might with the
21   controlled substance, that somehow I'm responsible for that,
22   that bad thing.
23          I may have some problem I need to answer to the
24   medical board or something.  I may -- they may have some --
25   whatever discipline they may have.  But that's all that is.

```
 1   Like Dr. Gharibo said, it's not outside the normal course of
 2   medical practice.  And it is not something -- it is not
 3   something that you can find this man guilty of that stuff for
 4   (indicating).
 5          Now, what other rabbit trail did they have?  What
 6   about urines?  And Mr. Doss talked about that.  As he said, you
 7   know, either you don't like it if you've got too many urines
 8   because they were getting money inappropriately that we're not
 9   using, or if you don't use the urines, then you're not
10   practicing medicine properly, because somebody could be
11   diverting or somebody could be doing that other thing.
12          And without repeating Mr. Doss' points on it again,
13   it's sort of -- you get an analogy if someone's asked a
14   contractor to build a road and they say:  Okay.  I want you to
15   build a road coming into the town and I want you to put
16   lighting out there so that when we come into town, there's no
17   lights and then when you get close to town I want you to have
18   some lights for safety because children could run out there or
19   other things could happen.  So let's put some lights out there.
20          You say:  Where do I start with them?
21          Just, you know, that's your job.
22          So he starts putting lights.  I'm going to stop here.
23   I'm not going to put any lights out here.
24          And the next thing you know, there's a traffic
25   accident out here, a child gets hurt, and a lawyer goes and
```

 1    sues you.

 2           You didn't have enough lights out there.  You didn't

 3    take enough drug tests.

 4           Oh, okay.

 5           Well, then I should have put more lights out there.

 6           And then two years later there's an audit for the City

 7    and County and they say:  Y'all spent too much money on lights

 8    out there.

 9           How's a person to know about something like that?  He

10    just does the best he can, using his judgement.

11           Look, I'm trying to do what's best for the safety of

12    these people.  There are no guidelines on it.  And I'm using

13    the drug tests like -- and to even suggest that these

14    urinalysis cases, file after file after file we've seen about

15    the cup test being used, about it being sent off, about people

16    like Ms. Loper right there being fired from it and other people

17    being fired from it and people being counseled, Mr. Douthitt

18    being -- you know, all this kind of stuff -- of course, they

19    are using the drug tests appropriately.  Yes, they're making a

20    bunch of money off of it.  But that's what happens.  When you

21    put up a streetlight, you get paid to put up a streetlight.

22    You make money off of it.  But you're doing the right thing

23    anyway.

24           Healthcare fraud.  Billing an insurance company for

25    drugs not for legitimate medical purpose.  I suggest to you

 1  ladies and gentlemen that's not a question, if you look at

 2  this, no legitimate medical question.  There's no question this

 3  was a legitimate medical practice.

 4          Submitting false medical information to insurers?  I

 5  think they are talking about -- I'm not sure -- but I think

 6  they're talking about submitting the bill for the nurse

 7  practitioner when the doctor did not necessarily see the

 8  patient on the second event on Blue Cross/Blue Shield only.

 9  And I suggest to you ladies and gentlemen that's got to be a

10  knowing thing.  If it were done, if there's any proof of it,

11  which I think there's little or no proof of it, anyway it's got

12  to be knowing.

13          You look at Mr. Bean's email.  Nobody knew, even

14  Southern Cancer didn't know.  Ms. Phillips told you that it was

15  something they didn't know.  The billing lady came in,

16  Ms. McDonald.  She didn't know.  People just didn't know that

17  Blue Cross/Blue Shield had some particular way they wanted

18  things done different from other people.  That if you don't do

19  it exactly the way they do it, that you may owe them some money

20  back.  But that's all it is.  It's not because it would be

21  outside the normal course of medical practice or committing

22  some fraud.

23          16 and 17 and 18 are the kickback counts.

24          I'll take 18 out.  We'll just take this out.  Okay?

25  This is no longer for your consideration.  Okay?  (Indicating.)

1    So we're only talking about 16 and 17 here.

2           16, conspiracy to receive a kickback from Manfuso's

3    company involving the worker's compensation dispensary.

4    Mr. Doss did this quite well.  He said, well, first off it's

5    for referring a patient to another person for which that other

6    person kicks back or gives you compensation.

7           Where we have to start off is wait a minute, there is

8    no referral.  This is our own patient we're sending to our own

9    worker's compensation dispensary.  Mr. Manfuso doesn't own one.

10   There is no IPM.  Okay?

11          Secondly, we own the workmen's comp -- we own the

12   workman's comp dispensary.  Mr. Manfuso's IPM, we buy the

13   drugs, the medicines going in there.  We have the chairs and

14   the tables.  We have everything else.  We have everything.  He

15   doesn't have an entity to refer it to.  He is managing our own

16   referral.  He doesn't have something to refer it to.

17          So we send the money, so we can't kick back to

18   ourselves.  I mean, this is -- he then bills our claims, our

19   money, he bills for our money and then gives us our money, a

20   portion of it, back.  You can't kick money back from

21   yourself.  This is simply a business deal.  That's it.

22          Linear Medical has the same identical thing, been

23   doing that for years.  Trident was knocking at the door, trying

24   to get Mr. Manfuso's business.  Why is Mr. Manfuso in here

25   testifying?

6262

```
 1          California.  Mr. Drobot.  He knew what was going on
 2     over there.  And that wasn't -- that wasn't what this is.  That
 3     was some real stuff.  Sending certain patients over to a
 4     hospital that Mr. Drobot's daddy owned or whatever the
 5     situation was.
 6          And that guy said:  No, no.  In this agreement I'm
 7     going to have a provision in there that I'm not going to get
 8     charged in California, and whatever y'all want to hear, because
 9     they'll come marching in people like Mr. Douthitt, to come in
10     here and testify, get the rest of the world, and I'll come
11     testify if I get out of California and Mr. Drobot's problems.
12          And that's all that is.
13          We've had doctor after doctor after doctor tell us it
14     is appropriate for doctors who are well recognized in the
15     community to get reimbursed for speaking fees.  You see that in
16     the political world all the time.  It's done all the time.  And
17     it's $1,800 or $2,500 in the political world or any other
18     world.  Okay?  It's hundreds of thousands of dollars.  People
19     that have expertise in fields are asked to come speak all the
20     time and get honorariums for it.  There's nothing unusual about
21     that.
22          This man is one of the highest, most recognized people
23     in the pain management field.  The pharmaceutical companies
24     throughout the country said:  I want this guy to come speak for
25     us.
```

6263

1          And that's what he did.  And there is no evidence

2   whatsoever there was ever one bit of prescription that he wrote

3   that was influenced by the speaking fees.

4          And if you listen and remember, what Ms. Perhacs said

5   was she was about to get fired because she couldn't make him

6   write higher prescriptions.  She was going to get fired because

7   of that.

8          Because I don't care how much money you pay me.  You

9   know, you want me to come say your product is so good because I

10  am well recognized in the community.  I will if you pay me for

11  it.  But I'm not changing my prescription practices for that.

12         And she almost got fired because he wouldn't do it.

13  That's another red herring.

14         This is 18, and it's gone.  Okay.  We won't talk about

15  the rebate.

16         We can talk a little bit about Galena.  I want the

17  chart.

18         And this is where you've got to be careful about these

19  charts.  Okay?  Here it is.

20         Gordon, if you'd show it all the way down so they can

21  see the title of it, the title up at the top.

22         MR. ARMSTRONG:  (Complying.)

23         MR. KNIZLEY:  All right.  Dr. Couch and Dr. Ruan's

24  Abstral prescribing trends.  We've seen this a bunch, a bunch

25  of times.  Okay?  Look, they weren't prescribing much of

1    anything and all of a sudden it takes off right here

2    (indicating).  And there's some talk about them buying stock.

3         Sure, that proves it.  Don't look at that any further.

4    There's a takeoff of those prescribing trends.  If they bought

5    stock about that same time, they are guilty.

6         Wait a minute.  Wait a minute.  Can you tell us,

7    Government, a little bit more of the facts surrounding this

8    chart?

9         Well, like what would you want to know?

10         Well, what we would like to know, there was no such

11    thing as -- as the same thing with Subsys, you know.

12         MS. GRIFFIN:  Your Honor, we object.  I don't believe

13    this is the chart that's in evidence.

14         MR. KNIZLEY:  So?  I mean, it's stipulated that it's

15    on it.

16         MR. BODNAR:  He can't say it's our chart.

17         MS. GRIFFIN:  He can't say it's our chart.

18         THE COURT:  He's saying it's their chart.  So --

19         MS. GRIFFIN:  It's not the chart the United States

20    introduced, Your Honor.

21         MR. KNIZLEY:  Well, it looks a lot like it.  I don't

22    know.  But if it's not their very own chart, I'll -- if you see

23    it to be different from their chart, then I'm wrong.  I think

24    it is, though.

25         In any event, Abstral was not being promoted in the

6265

 1   United States, it was licensed in some other countries until
 2   September right here, if you follow the line right here.  Okay?
 3           And then we find out that Abstral, even Mr. --
 4   whatever his name was -- Mr. Corin comes and tells us that:
 5   Okay, yeah, we started, we started promoting that, and that's
 6   why it began to take back off in September.  And we promoted it
 7   with a coupon and that's why it started taking off.  Before
 8   that time it was not being promoted in the United States.
 9           And guess what?
10           If you can put on there January, Mr. Armstrong?
11           We purchased the stock -- wait a minute.  We don't own
12   any stock.  We don't own any stock.  What's all this about?
13           Well, I'll tell you what it's all about.  It's about
14   that coupon program.  That's all there is to it.  They
15   relaunched and they started doing that.  That's all there is to
16   that.
17           And they say:  Oh, well, they were talking about it.
18           Talking about it and buying is two different things.
19           Now, oh, but they -- Gordon, if you would move that
20   please?
21           MR. ARMSTRONG:  (Complying.)
22           MR. KNIZLEY:  Well, they did all this, though, because
23   they wanted to make more money off of prescribing that.
24           Well, really?  Then why don't you -- and Subsys is the
25   same thing.  Why don't you then forget about prescribing Subsys

6266

1    and Fentora and Lazanda, the same thing, and just do totally,

2    totally Abstral?  Because you can make a bunch of money, if you

3    really want to affect your stock.

4         And what does the chart say then about -- I suggest

5    this is information taken from the Government's other chart,

6    and I'll be happy if you will see the source of it, 10-18(a)

7    and 10-19(a), if you really want to go look at that and see if

8    the chart's right, if you do.  But I think it is.

9         Now, this is Dr. Ruan.  And Abstral is the low one and

10   the Subsys is the high one.  For this same time period, Abstral

11   starts -- Subsys starts at nothing because there was no such

12   thing as Subsys until 2012, period.  It didn't exist.  You

13   can't start any higher.  It didn't have anything to do with the

14   speaking speaker program because at the bottom there is no such

15   thing.  So at the same time we are above the Abstral the entire

16   time.

17        Well, that makes no sense.  If I want to prescribe

18   this medication in order to make money and make my $800,000

19   worth of stock go up, I should forget Subsys.

20        No, because that's not what --

21        THE CLERK:  Mr. Knizley, 10 minutes.

22        MR. KNIZLEY:  Yes, ma'am.

23        That's not what the patients were prescribed.  The

24   patient trend was Lazanda and the same thing with

25   Fentora.  They kept on prescribing those.  You see them

6267

 1    throughout the records during that time frame.

 2            One more thing about this:  Mr. Corin tells us that

 3    his use of the coupon -- which I suggest to you, ladies and

 4    gentlemen, was prior to that to begin with (indicating) -- was

 5    the bank was going to bankrupt Abstral that he owned $800,000

 6    worth of stock in.

 7            Wait a minute.  If I'm doing this for financial

 8    purposes, why would you prescribe it and use the coupon that

 9    Mr. Corin himself said would put the company I own stock in

10    into bankruptcy?  Do you know why?  Because he doesn't

11    prescribe stuff for money.  He prescribes stuff for what is the

12    best interest of his patients.  And he wouldn't have done that

13    and wouldn't have endangered his $800,000 worth of stock if he

14    wasn't doing it in the best interest of his patients.  He would

15    not have, in this chart right here, continued to prescribe

16    Subsys over and above Abstral if he's trying to make himself

17    some money.  That's just untrue.

18            Why don't we show that one and just satisfy everybody?

19            That's the one I was referring to.  (Indicating.)

20            I want to touch on Exalgo a minute.  Exalgo.

21    Remember, they had a chart up here and said that the chart

22    means we're guilty because Exalgo goes up and there's a speaker

23    program.  And Dr. Couch is quite -- Dr. Couch didn't write

24    that.  He's not going to like it.  His patient don't like it.

25    We don't know that, but they want you to guess about that.

6268

1              We know that Exalgo, like every single one of them,

2    had pharmacy reps.  He came in there, he said:  Look, we've got

3    a voucher program.  Why don't you try this?

4              Dr. Ruan tells you that Exalgo's got an anti-cancer

5    thing, you can't crush it up and snort it and stuff like that.

6    So he tried it and used the coupon and it went up.

7              So, by the way, we know you're very smart and very

8    intelligent.  We know you're well written.  People respect your

9    pain opinions.  We would liked you to speak for us too.

10             And he does.  But that doesn't mean anything except

11   just that.

12             And then they came out where the coupon program goes

13   off, runs out.  They use it about three months.  It goes down

14   and also some other people had picked up on this anti-abuse

15   thing, which was a good thing, and they started making the same

16   thing and we had more availability.

17             That's just another deception without any proof, some

18   chart that they want you to look at and say:  Look at the

19   chart.

20             There's nothing.

21             If there's no inappropriate prescription of

22   medications and there's no kickbacks, then there's no bad money

23   and fraudulent money to send.  If there's no mail -- if there's

24   no fraud in sending to Blue Cross/Blue Shield stuff, as I told

25   y'all, all this is -- all this is -- is if you use the United

6269

1   States mail and commit fraud, then we bring you -- then we
2   bring you a charge over here.  It's only just a way for the
3   federal government to get us over here and get us a fraud
4   count.  And the same thing as the wire.  That's all it is.
5   There's nothing special about the wire, nothing special about
6   the fraud, except that's the jurisdictional thing to get over
7   here.  It's just are you stealing or not stealing?  That's all
8   it is.  This doesn't mean anything.
9            And if you're not stealing, if you are submitting
10  bills as you should submit them, or if you don't know or it's
11  not fraudulent, then there's no wire fraud.
12           And they said it was emailing.  I don't really even
13  know what evidence you even had about that.  But if there is no
14  fraud with the medical work, there is no fraud with the
15  kickbacks, and there is no fraud with the billing, that doesn't
16  matter.
17           Lastly, and this is going to Dr. Ruan, they want to
18  say that he's sent some money into a bank and paid a lot of
19  money, over a hundred thousand dollars, for two cars.  Do you
20  remember that?
21           They could have picked anything over $10,000.
22  Anything.  They picked two cars.  This man worked all his life.
23  He's worked hard and he's made a bunch of money and he wants to
24  buy him some cars.  He's got every single right as an American
25  citizen to do that.  And they want to put these cars in here.

6270

1     Do you know why?  To make you mad.  Or to get you

2  upset and say:  Oh, I don't like that.  He's got these big

3  fancy cars.

4     And I want to -- I want you to feel bad about that.  I

5  want that to make you mad.

6     They could have picked anything over $10,000.  No.

7  They are using every little red herring, every little

8  deception, everything they can do to try to make you mad and to

9  try to make you convict someone who is not guilty.

10     Ladies and gentlemen, then he gets up there and

11  testifies himself.  And this poor man -- at least he was poor

12  one time -- he came here from Communist China to escape from a

13  government that is oppressive.

14     MS. GRIFFIN:  Objection, Your Honor.  That is improper

15  argument.

16     THE COURT:  Sustained.

17     MR. KNIZLEY:  He came to the United States, from his

18  testimony, seeking freedom.  That's what he told us.  And

19  that's what he's here for.  And he came here and he studied and

20  he worked and he did everything he ought to do to be a

21  successful American citizen.  He got in line and said:  I'm

22  going through the immigration process.

23     And came up and was just very proud the day he became

24  an American citizen.  And I hope he's still proud today.  And I

25  hope he's proud next week when you return a verdict of not

1  guilty, because that's going to be the right thing for you to
2  do for this man.
3       Ladies and gentlemen, in a few minutes the case is
4  going to be yours.  I don't get a chance to get back up here
5  again.  But what's going on here, I suggest to you ladies and
6  gentlemen, is not fair and it's not just.
7       And if our Founding Fathers -- when you go back there
8  to deliberate this case, you remember those things these
9  lawyers have talked about and I've talked about.  You remember
10  that presumption of innocence.  You remember that the burden of
11  proof -- and you remember it has to be proof beyond a
12  reasonable doubt and that is real proof.  Witnesses.  Not
13  charts, not something else.  Real proof.  You remember what
14  those doctors said.  You remember what those people that worked
15  there said.  You remember what those nurses said.
16       You remember all of this and you go apply that
17  presumption of innocence and hold them to that burden of proof.
18  And make them give you evidence beyond a reasonable doubt,
19  which they have not.
20       And if the Founding Fathers were sitting on the front
21  chair here, if Thomas Jefferson and Alexander Hamilton and John
22  Adams were sitting out here, a tear would come to their eye to
23  think that this government now is trying to convict people on
24  that type of evidence.
25       And I ask you ladies and gentlemen to go back in that

1    jury room and think about that presumption of innocence and

2    think about those Founding Fathers and think about those

3    principles and say:  No, I'm not participating in this.  I'm

4    not going to be a part of this.  I'm not going to be a part of

5    the government running the medical system.  I'm not going to be

6    a part of the government telling people how to practice

7    medicine.  I'm not going to be a part of the government trying

8    to convict people on evidence that is not there.

9          And please come back out here and stand up, and when

10   you do, proudly say Xiulu Ruan is not guilty of every single

11   count.  And if you will do that when you walk out of this

12   courtroom, Thomas Jefferson and Alexander Hamilton and John

13   Adams would shake your hand because you had done the right

14   thing.

15         THE COURT:  Are you done, Mr. Knizley?

16         MR. KNIZLEY:  Yes, ma'am.

17         THE COURT:  All right.  Ladies and gentlemen, we're

18   going to go ahead and take our afternoon break at this time.

19   Leave your pads on your chairs.  Take your break down in the

20   jury assembly room.  No discussion about the case.  We will

21   call you back up in about 15 minutes.

22         We're in recess.

23     (A recess was taken at approximately 3:40 p.m.)

24     (In open court, 4 p.m., defendant and jury present.)

25         THE COURT:  All right, Ms. Griffin.

1          MS. GRIFFIN:  If it please the Court, Counsel.

2          Good afternoon, ladies and gentlemen.  Do not

3    worry.  I will not be screaming at you.  I will be thanking

4    you, however, for your service.  Every one of you has paid

5    close attention and we certainly appreciate it.  I know it's

6    been a hardship for many of you to have to be here.  I can

7    assure you there's no place that needs you more.  Our system of

8    justice depends on the right to trial by jury.  It is a sacred

9    right.  And it is a right that we all take seriously.  In

10   connection with this case, actions speak louder than

11   words.  The defense wants you to believe what they say, not

12   what they did.  And not what has been proven to you in this

13   trial over these past seven weeks.

14          The buck stops with Dr. Couch and Dr. Ruan

15   (indicating).

16          They owned PPSA and C&R Pharmacy.

17          They, and only those two, were responsible for

18   everything that took place.  Their enterprise is comprised of

19   PPSA, C&R Pharmacy, those two doctors and the coconspirators

20   who pled guilty.

21          And others, both known and unknown.

22          You'll have the indictment with you for the first time

23   when you go out to deliberate and you will see that each count

24   that charges a conspiracy charges them with conspiring with

25   other people, both known and unknown.  They're not just alleged

6274

1  to have conspired with one another.  They are alleged to have

2  conspired with others as well.

3          Despite what you've heard, you have no duty when you

4  go back in that jury room except to follow the law as this

5  Court gives it to you.  Nothing the lawyers have said, meaning

6  any of the lawyers, is what you must abide by.  This Court has

7  the power and the obligation to charge you, and that is what

8  you follow.

9          You're not swayed by sympathy, you're not swayed by

10  hollering, you're not swayed by misinforming you.  You make the

11  decision.  The most important thing -- this is a very sobering

12  moment in a trial because the 12 of you become the law.

13          It is the 12 of you that decide based on what the

14  Court tells you.

15          A pill mill is a money mill.  A money mill is a pill

16  mill.  You don't have to put a label on what these people are

17  charged with.  You have to decide if it's outside the usual

18  course of professional practice or not for a legitimate medical

19  purpose as to the drug counts.  As to the fraud counts, you

20  will be given the direction as to what you must decide as to

21  those counts as well.

22          Reasonable doubt will be defined by the Court.  By

23  none of us.  The Court will tell you the law that you apply to

24  all the facts.

25          As to the first count, we contend to you that all the

6275

1  evidence, every bit of it from day one goes toward proving the

2  first count.

3         As to the second count, all of the drug evidence goes

4  toward proving the second count.

5         As to the third count, all of the evidence that

6  discusses fentanyl goes to the third count.

7         As to the remainder of the counts, some of them you

8  will hear the Court tell you those are substantive counts and

9  then you will hear the Court tell you that other counts are

10  conspiracy counts.

11        A conspiracy means an agreement to do what the law

12  forbids.  It does not mean that it has to actually be carried

13  out or that it has to be successful.

14        It means that there had to be a meeting of the minds.

15        Actions speak louder than words.

16        Criminals don't write what they're going to do

17  illegally.  They don't make a contract, let's you and I go

18  break the law.  That's why you have to look at their

19  actions.  What did they do?  Why did they do it?

20        We contend in this case the sheer motivation was

21  money.  Greed.  Not enough that they could have practiced

22  legitimately.  Not enough that they could have made money

23  legitimately.  But they wanted to make more.  They wanted to

24  push the line, go beyond the line, go further beyond the line

25  and do what was illegal to do.

6276

```
1              It's not about that these patients needed
2    medicine.  Of course, many of them did.  Anything that was done
3    to a patient had to be done for a legitimate medical purpose,
4    not for the greed of the doctors.
5              All the prescribing, if it was done for greed, was
6    outside the usual course of professional practice.
7              If it was done because they didn't want to go in and
8    see that patient and they sent a nurse practitioner in who was
9    impaired by their own abuse, it's outside the usual course of
10   professional practice.
11             If they prescribed because they were being paid to
12   promote a particular drug, that's outside the usual course of
13   professional practice.
14             You will have now with you all the evidence, but
15   you'll have a chart that talks about Subsys and you will see a
16   peak -- and Abstral -- you will see a peak suddenly when
17   Abstral starts spiking and being prescribed.  You will also
18   have, from Mr. Paul Short, his exhibit that shows you on this
19   date when all these folks suddenly get Abstral, that there were
20   328 patients who had never had a fentanyl drug before.  Outside
21   the usual course of professional practice.
22             Nothing happened on this date.  There wasn't a
23   catastrophe, there wasn't a mass explosion, there wasn't a
24   bombing that would require suddenly 328 people to suddenly need
25   Abstral.
```

REBUTTAL ARGUMENT OF MS. GRIFFIN

1            You were selected because of your common sense, what
2    you probably heard some of your relatives or older family
3    members call your good-old-walking-around sense.  You look at
4    that chart and you know that it's not so, that suddenly at that
5    moment there were that many people that rushed in to PPSA and
6    needed Abstral.  But what we know is that these doctors bought
7    stock in that company.  And you heard their expert, Dr. Gudin
8    or Dr. Gharibo, tell you that what would happen if you were
9    investing in something, you would suddenly have a spike in
10   prescribing it if you were doing it outside the usual course of
11   professional practice.  And the first thing Mr. Bodnar flipped
12   on that screen is that chart that showed that's exactly what
13   happened.
14            The other things that you have before you, these
15   doctors are not family practice.  They're pain
16   specialists.  They hold themselves out to be.  They can't tell
17   when they have nurse practitioners that are impaired at work?
18   Of course, they can.  They can't tell that 600 to 1,000
19   milligrams of Dilaudid is missing every single day?  Drugs that
20   have to be accounted for?  Drugs that they have purchased?
21   Drugs that they are responsible for knowing where it went is
22   going in the arm of a nurse practitioner who worked for both of
23   them, who worked for PPSA.  They can't tell that another nurse
24   practitioner who worked for both of them is so impaired and so
25   addicted that she's stealing drugs that are being returned?

1    They can't tell that she's falling asleep on the job because of
2    her addiction?  And they are letting -- both of them are
3    letting those nurse practitioners treat patients.  That's
4    outside the usual course of professional practice.
5            You don't go to a doctor for any reason and expect to
6    be treated by someone who is impaired.
7            Nor do you go to a doctor and expect to get a drug
8    because it enriches the doctors, not because it is what is best
9    for the condition you are there for.
10           These two doctors are drug dealers with a pen.  They
11   are drug dealers with a pen.  Yes, it's the same statute that
12   drug dealers are charged with because what they're charged with
13   is drug dealing.  Outside the usual course of professional
14   practice and for no legitimate medical purpose.
15           The witnesses that came here that worked in PPSA were
16   the people that these doctors hired.  They want to attack
17   Justin Palmer, they want to attack Bridgette Parker, they want
18   to attack some of the others.  Those were their
19   employees.  Those were the people they chose to treat patients.
20           Instead of it being a legitimate medical practice, it
21   was almost like animal house.  You're going to be seen by
22   somebody who's shooting up in the next room?  And what happens
23   to him?  He gets two weeks paid leave?  He doesn't get fired.
24   He gets two weeks paid leave; not till he goes some months
25   later and tells Dr. Couch:  I've had enough.  I've got to get

1    some help.  That's when he goes, not when an employee finds him

2    shooting up the Dilaudid.

3          Bridgette doesn't go.  When she's slurring her words,

4    she falling against the wall, she's falling asleep, and

5    everybody knows it.  And she has a wreck because of it and is

6    charged.  And Stacy doesn't go.  You heard that she used drugs

7    there off and on as well.  Stacy doesn't go until a patient

8    complains about her splitting drugs with him.

9          And then instead of that patient who's been breaking

10   the law as well, all that happens is:  Well, Dr. Ruan takes him

11   as a patient, Mr. C... and he gets the same exact medicine that

12   he's been splitting with Stacy.  Well, he obviously doesn't

13   need it because he's splitting it with somebody instead of

14   taking it.  That's outside the usual course of professional

15   practice as well.

16         You are not limited to the 14 patients and/or family

17   members that the United States put on this stand, to make your

18   decision.  You can decide what Justin Palmer told you, that at

19   least half of the patients there were over-medicated, were pill

20   seekers, and had no business being prescribed what they were

21   prescribed.

22         You can also make your decision based on what

23   Bridgette told you, that many, many, many of the patients did

24   not need the drugs they were receiving.  That's outside the

25   usual course of professional practice.

6280

1            In connection with the treating of these patients,

2    when they received more drugs than they needed, that is gold on

3    the streets.  You heard that those pills on the street go from

4    20 to 30 to $45 apiece.  And when you're giving those out, that

5    is like giving out gold to somebody who's going to sell them on

6    the street.  If you're not testing positive for what you're

7    being prescribed, you are diverting it.  If you're not testing

8    positive for what you're prescribed but you're testing positive

9    for street drugs, you're also selling or diverting or doing

10   something with it.

11           But we know that Dr. Ruan wanted to keep those

12   patients because he wrote that if you keep them, you get to

13   charge more urine drug screens and that a urine drug screen

14   pays three times as much as an office visit.  Well, $750 per

15   drug screen and so you're going to continue to break the law

16   and feed an addict and feed diversion because you can make

17   three times more money.  You don't have to rely on anybody that

18   testified for that.  You will have with you Exhibit Number

19   9-5(8) where he says:  It's a clear-cut decision.  Private

20   practice is different.  When one patient tests positive for

21   street drugs, that gives you more reason to do more frequent

22   urine drug screens which pays three times more than an office

23   visit.

24           He goes further.  So there is an incentive for taking

25   care of risk individuals.  It's a money incentive and it's drug

1  dealing.

2        You know that a verdict -- you're continuing to feed

3  it, you're outside the usual course of professional practice

4  and you are committing a crime.

5        The RICO charge, which is the first charge you'll have

6  out with you, as I mentioned to you, covers the entire

7  case.  It requires two acts.  It can be two drug acts outside

8  the usual course of professional practice, it can be two fraud

9  cases outside the usual course of professional practice.  It

10  could be one wire fraud, one mail fraud, one drug distribution,

11  or it could be two of each; any combination of the drug and/or

12  the wire and mail fraud counts, because you know the enterprise

13  is the business that these two men owned.

14        Now, both attorneys told you that all this is is

15  numbers, that the government just put up all these charts, pie

16  charts, picture charts.  The defendants had the same subpoena

17  power as the United States of America.  That means they can

18  subpoena anybody they want to come in this courtroom, just like

19  the United States can.  If those charts weren't accurate, if

20  those charts weren't what was happening, don't you think they

21  would have brought you somebody to tell you that this chart is

22  not right?

23        This isn't what the facts showed.  This isn't what the

24  numbers are.  And they want to tell you that numbers don't mean

25  anything.  But numbers control.  You can't wait to be 16, you

```
1   can't wait to be 21, you can't wait to make a 100 on a
2   test.  Most everything we do has to do with numbers.  And if
3   these numbers weren't correct, these charts weren't correct,
4   they'd be the first one to show you and tell you with evidence
5   and with witnesses.
6          In connection with that, they could also have called
7   doctors who would have said that they referred people to these
8   doctors.  That didn't happen.
9          They could call anybody they wanted to call in
10  connection with this case.  And in turn, in connection with
11  Dr. Couch not being asked many questions throughout the seven
12  weeks, probably more times than you'd care to remember, we have
13  objected, as has the defense objected, to asking questions that
14  are outside the scope of direct testimony.  And you will know
15  by the Court's rulings on those that that means that if it's
16  not gone into on direct, you're limited from being able to ask
17  about it on cross.  And you didn't hear Dr. Couch talk about a
18  single patient.  He talked in generalities.  He's got the most
19  motive of anyone to misrepresent to you.  It's him that's on
20  trial.  And as to Dr. Ruan, he tried to pull the wool over your
21  eyes that he would remember the files he's talking about and he
22  had some index cards up there until he got caught with
23  them.  He also has a motive to misrepresent to you.  Those are
24  the two people on trial.  And those are the people that have
25  the motives.
```

1          Yes, the United States has the burden of proof, to
2    prove guilt beyond a reasonable doubt.  We welcome that
3    burden.  We contend we have met it.  The Court will define that
4    for you.  The burden is not beyond all doubt, it is beyond a
5    reasonable doubt.  The defendants are presumed innocent.  That
6    can be replaced by a showing of proof beyond a reasonable
7    doubt.  And we contend we have done that.
8          The Court will tell you that direct and circumstantial
9    evidence are treated the same.  So if you see this chart and
10   you know that around that time is when the stock was purchased
11   or if you see payments from Insys Therapeutics and you start --
12   suddenly start seeing increased prescribing with Insys, that's
13   circumstantial evidence, that the motivation for that is the
14   money being paid or the stock being purchased or the chance to
15   make money from the selling of stock.
16         You can use your common sense to determine direct
17   evidence and circumstantial evidence.  This is not about
18   whether a patient needs a medicine or not.  That has nothing to
19   do with it.  Any prescription Justin Palmer, Bridgette Parker,
20   Sharon Noland, Matt Bean, any of those folks wrote for a
21   controlled substance is outside the usual course of
22   professional practice.  They are not authorized to write
23   controlled substances.
24         It is a privilege to be licensed to write a controlled
25   substance to someone.  You're talking about writing a

REBUTTAL ARGUMENT OF MS. GRIFFIN

6284

1    prescription that can do great harm to someone's body.  And

2    it's not something that you leave 17 blank scripts out where

3    anybody can get to them and it's not something that you just

4    casually let your practitioner -- nurse practitioner do who is

5    not licensed.

6            Three people in that building could write controlled

7    substance scripts:  Dr. Ruan, Dr. Couch, and Dr. Chen.  Nobody

8    else.  Nobody else had authority to use the blank scripts.

9            Why are they there?  Well, Dr. Chen -- Dr. Ruan wants

10   you to think that it has to do with an emergency.  There's no

11   emergency exception.  You saw the Alabama rules.  You saw

12   exactly what it said.

13           There is no reason for them to be there but greed.  He

14   didn't want to miss a chance that he could make money on

15   writing something else.  And by the way, since they also owned

16   the pharmacy that's connected, they're making money double

17   fisted.  They make it on the end of writing, they make it from

18   Subsys, they make it from Galena stock, they make it from the

19   Exalgo manufacturer -- Dr. Ruan does, at least -- and then they

20   make it from C&R Pharmacy because they're encouraging patients

21   who don't have to fill it there to go fill it at C&R

22   Pharmacy.  They own it.  They make 75 percent of the profit

23   split between them.

24           They also own the workers' comp distribution that's

25   inside one of the other -- the other clinic.  In connection

1    with it, they're making $20,000 a month, Dr. Couch; 40, 50, 70,

2    $80,000 a month, Dr. Ruan.

3           They're making that off of drugs that they prescribe

4    to workers' comp patients.  And you heard that workers' comp

5    patients pay more than regular patients.  But those monies are

6    a kickback for them having that dispensary there and letting

7    IPM and CRM run it.

8           Also, those kickbacks go to their residences and they

9    go to Dr. Ruan's XLR Properties company.

10          They're not going into PPSA.  They're money made from

11   PPSA, but they're not counting toward the astronomical numbers

12   that you saw of monies that were going to PPSA and to C&R

13   Pharmacy.

14          And what does Dr. Ruan -- he has a fit.  He puts 15

15   exclamation points at the end of a sentence that he doesn't

16   want anybody to see those checks.  Of course not.  Because

17   they'll know that those are kickbacks, and he wants them sent

18   to his home.  So not only can he conceal it from PPSA, the

19   enterprise, he can conceal it from Dr. Couch that he's making

20   four times as much because he negotiated it.

21          Yes, he asked could Dr. Couch get two or 3,000 more a

22   month but he's making up to three, four times more a month as

23   payment, as kickback for letting them have the workers' comp

24   distribution there.

25          You know, they want to point to everybody else in

1    connection with what was going on at PPSA.  They want to

2    pretend they had blinders on, that they had no clue about the

3    billing, that they had no clue about there's people that were

4    on drugs that were treating patients, that they had no clue

5    that Dilaudid was being diverted from within their own

6    businesses.

7         And it reminds me of something that happened a long

8    time ago.  Some of you may not remember this, but a long time

9    ago girls weren't allowed to play baseball and occasionally we

10   would get to play baseball with boys in the neighborhood only

11   when there weren't enough boys to make out two teams.  And we

12   would try to go to a lady's house in South Georgia and play in

13   her yard because she had a bigger yard than most of us.  And

14   she would fuss at us and say:  Y'all break a window in my

15   house, you're going to be responsible for it.

16        And child-like, we kept going there and playing until

17   the inevitable happened.  And one of the guys in the group of

18   us named Scotty hit the baseball and, of course, just smacked

19   it into her window and broke it.  Well, we scattered, like

20   young children do, and she knew all of us.  She called all of

21   our mothers and our mothers dragged us back over there by our

22   ears and we had to stand in front of her and be responsible for

23   what we had done.

24        And, of course, also child-like, we wanted to point at

25   Scotty:  He hit it, he hit it, he hit it.  He's the one that

1    swung the bat.

2         And the elderly lady whose window we had broken looked

3    at us and she said:  You're all going to pay for it because you

4    were all in the game.  And that's exactly what's going on here.

5         The difference is these two men ran the whole

6    game.  They were the ones in charge.  The buck stopped with

7    them.

8         Now, let's talk about their witness, Warfield.  She

9    wants you to believe in two seconds you can do a medical

10   exam.  Do you know how long that is?  It's one 100, two 100,

11   and there's your medical exam.  She's even testified you can do

12   a medical exam at Starbucks.  She says you can -- anything goes

13   as long as it's a doctor.  And we know that is not so.  She

14   hasn't practiced medicine in four years.  She's Dr. Couch's

15   expert.

16        And let's look at Gharibo and Gudin, who were

17   Dr. Ruan's experts.  They are literally in bed with

18   him.  They're friends of his.  One of them is bought and sold

19   by Subsys.  One of them makes money from Subsys.  But

20   interestingly, neither of them write Subsys prescriptions.

21        Now, when they talk about making their money when they

22   go and give a little 10-minute speech using the slides that

23   Subsys prepared and they make 1,200 to $3,000 and their lawyers

24   say:  Well, they're entitled to be paid for their time.  That

25   one hour makes them much more per hour from Subsys than their

REBUTTAL ARGUMENT OF MS. GRIFFIN

1    one hour of seeing a patient.  They make tons of money for

2    Subsys.  They make tons of money with them.  You heard

3    Dr. Greenberg, Dr. Aultman, and Dr. Vohra tell you they didn't

4    take money from pharmaceutical companies.

5         You heard them also say they didn't write Subsys and

6    Abstral because they were dangerous.

7         You heard them all three say that they actively saw

8    patients.

9         Further, Dr. Couch's attorney told you that on the

10   tape of the visit from Brennan, who was the undercover name for

11   a DEA task force officer, that he was told that they didn't

12   pass out drugs.  Well, you'll have that tape out with you to

13   listen to, the video.  And what it says -- Brennan says, when

14   she starts talking about some type of treatment, he says:  Is

15   that a shot?

16        And Bridgette says -- excuse me -- they say:  Yes.

17        And he says:  I don't want it.

18        And Stacy says:  Well, you've come to the wrong place.

19   It's not about saying if you want drugs you've come to the

20   wrong place.

21        He says:  I don't want a shot.  And she says --

22   Stacy -- well, you've come to the wrong place.  You'll have

23   that out and you can listen to it.

24        You also saw charts from Mr. Short that 75 percent of

25   the patients that got placed on fentanyl, once they came to

1    PPSA had never been on fentanyl before.

2          Ken Cross was fired, we contend, because he warned

3    them.  He told them exactly what has happened these past seven

4    weeks was going to happen, that you're wasting millions of

5    dollars to make yourself thousands of dollars.  And they got

6    rid of him.  And they kept doing exactly what they were doing.

7          The buck stops with these doctors.  One of the doctors

8    told you:  Well, Justin may have signed only two scripts.

9    Well, those two were outside the usual course of professional

10   practice and are in violation of the law.  It doesn't have to

11   be 50, it doesn't have to be 1000.  One is outside the usual

12   course of professional practice and is breaking the law.

13         Joyce Barber and Tena Goellner told you that they

14   didn't know what Dr. Couch looked like.  They had only seen him

15   once all the time they had been there.  And Tena Goellner told

16   you that she could not even hold her grandchild.  She was not

17   trusted to hold a baby that was her grandchild because of the

18   medications they prescribed to her.  And she told you -- in

19   fact, everybody who was on these strong drugs that testified as

20   a former patient, that once PPSA closed, they've not been

21   prescribed those strong drugs again.  And we contend it's

22   because those drugs are outside the usual course of

23   professional practice.  And they have their life

24   back.  Ms. Goellner was able to hold a baby.  She was trusted

25   enough at that point not to pass out, that she could keep a

1   grandchild.

2          And Joyce Barber had a hysterectomy in 1965; 50 years

3   later they write uterine cancer on her prescriptions to get

4   them paid for.

5          You heard from both Sharon Noland and Bridgette Parker

6   that the doctors changed medicines, particularly Dr. Ruan,

7   frequently.  And he wouldn't give a reason.  And that they, the

8   nurse practitioner would have to go into the room and say to

9   the patient:  Dr. Ruan wants you to get on this medicine.

10          And the patients would say:  I don't need it.

11          And Dr. Ruan would say:  That's what I want them to

12   take.

13          And that he would jump them back and forth.

14          You also heard Bridgette tell you that they wrote a

15   lot of Exalgo for Dr. Ruan.  And you will have the chart that

16   shows you they quit doing that when he quit getting paid by the

17   company that manufactured Exalgo.

18          You heard Bridgette tell you that she would go to

19   Ruan's office, you heard Sharon Noland tell you she would go to

20   Ruan's office, and they would present in a row one, two, three,

21   what was going on with the patient.  And he would decide.  But

22   he never saw those people.

23          And he never explained to them why if they were happy

24   with what they were on and it was working, he was changing it.

25   And they never explained to them that Subsys was a cancer drug

1    and they never explained to patients that it had severe chance

2    of harming you.  And they never explained to the patients that

3    they were making money off prescribing Subsys.

4          Jesi Kamper, the young lady who was just moving

5    furniture and hurt her back, suddenly ends up on Subsys.  You

6    saw she didn't have any problem walking to the stand.  Outside

7    the usual course of professional practice.

8          We called for you 14 patients in comparison to the few

9    patients the defense called, but Mr. Brown, the gentleman who

10   came up in the wheelchair and had the accident from jumping off

11   a rope of a tree, y'all remember him, he said his doctor was

12   Dr. Justin; Justin Palmer, because that's who he saw.

13   Everything about Mr. Brown is outside the usual course of

14   professional practice, because Justin had no authority

15   whatsoever to write scripts.

16         Palmer told you that the patients were over-

17   medicated.  He told you it was obvious and he himself was on

18   medication, that these doctors could not discern or turned

19   their heads to.  Outside the usual course of professional

20   practice to allow an impaired practitioner to see your

21   patients.

22         He also told you they very seldom did informed

23   consent.  Informed consent is required to be given by a doctor,

24   not by a nurse practitioner.

25         And yes, he was fired for, as he told you, writing a

1    script for someone Dr. Couch didn't like.  But that lasted 10

2    minutes.  He was fired for 10 minutes for writing a

3    script.  Everybody that testified told you they were aware of

4    Dr. -- of Palmer writing scripts for Dr. Couch.

5           Brennan, who comes in, gets seen for 43 seconds.

6    Nobody could contend, except Dr. Warfield, that that was within

7    the usual course of professional practice.  And she hasn't

8    practiced in four years.  43 seconds, you can see Dr. Couch

9    signing the script as he's walking in.  He hasn't had the

10   opportunity to make a decision based on an exam of a plan for

11   that patient.  And he gets Roxicodone just for walking in the

12   door and saying he's gotten some drugs, that he's going to have

13   to admit to criminal conduct, but that he didn't get them from

14   doctors.

15          Now what did they do?  They hand over 20 more when he

16   just says:  I could use some more and just give me 10; 10 will

17   work.

18          And they give him 20 more.  That's gold in somebody

19   that wants to divert it.  They can go out on the street.

20          Palmer also told you about Dr. Couch signing scripts

21   when he's going to be out of town and you saw the billings for

22   when he was out of town.

23          He told you Dr. Couch told him not to tell

24   anybody.  Well, of course, there weren't any signed scripts by

25   Dr. Couch by the time of the raid.  Justin had gone to rehab,

REBUTTAL ARGUMENT OF MS. GRIFFIN

 1      Bridgette had gone to rehab, Stacy had been fired, and
 2      Dr. Couch was having to see patients.
 3              And Dr. Couch pre-signed scripts for people, triple
 4      digit scripts, Subsys scripts, Schedule II scripts, for May the
 5      26th, 2015.
 6              They were seized.  The search was May 20th.  So those
 7      scripts were signed at least six days ahead of time.  And
 8      Dr. Couch, as you heard, wasn't arrested at the clinic.  He was
 9      arrested at his home.  And so those had to be signed on the
10      19th to be seized on the early morning of the 20th and they
11      were for patients on the 26th.
12              So you wouldn't know what those patients were going to
13      need five days ahead of time unless you were clairvoyant.
14              You wouldn't know that they were going to need the
15      drugs that you had signed ahead of time but they were already
16      done.  You also heard from Kevin McCash who was the addict and
17      he told you that they ran a monthly pill mill analysis.  That
18      there were factors they looked at to determine whether certain
19      practices that were billing Medicare fit that pill mill
20      grouping.
21              He told you that in the 17 months he ran it, Dr. Ruan
22      nine of those months scored 1,000, the highest you could score
23      on being a pill mill.  He told you Dr. Couch scored 1,000, the
24      highest you could score; 17 times every month he ran it.
25              You also heard from a friend of Natalie Perhacs,

1    Shanna Harville, who interestingly enough went to work for

2    Insys once the clinic was shut down, that Natalie Perhacs was

3    never fired, that she was there even on the 19th, the day

4    before the raid.  So she refuted what Christy did.  And

5    everybody who testified for the defense virtually, except the

6    experts, seemed to be running PDMPs.  But if there were 10,000

7    PDMPs in four and a half years, that averages to 180-something

8    a month.  They were seeing 90 patients a day.

9              There's nobody running PDMPs like everybody that took

10   the stand for the defense that worked there virtually told you:

11   Oh, I'd run the PDMP; no, I'd run the PDMPs.

12             10,000 in four and a half years is 186 a month.

13             In connection with the fraud charges, you can argue

14   that the money sent to Ruan and Couch's residence was fraud in

15   and of itself, to conceal the fact that they were getting

16   kickbacks.  IPM, then ultimately CRM, you can also argue that

17   the fraud involved wire fraud, mail fraud, constantly.

18             You heard Amy White testify that every billing that

19   came in and out of C&R Pharmacy was either electronic or by the

20   United States mail or by one of the commercial carriers such as

21   UPS and FedEx.  So there's no question that the mails were

22   used, the interstate commercial carriers were used, and the

23   wire service was used.

24             Those are elements you do not have to decide upon.

25             In connection with the billing, you also saw where the

1   billing changed from 13 to the 14.  A dramatic sweep when it

2   became Medicare and Blue Cross/Blue Shield.  Because not only

3   did it make more for 14 visits which allegedly took more time,

4   but they made more because Blue Cross/Blue Shield was never

5   billed for anything but a doctor visit.  And you heard both

6   doctors tell you that there were many times they never saw

7   patients although they both claimed that they saw them the

8   first time, which meant every other time a Blue Cross/Blue

9   Shield patient came in, even if we believe them, that they were

10  making 30 percent more because they were billing it under their

11  names instead of under their practitioners' names.

12          Fraud.  That's absolute fraud.  It's called upcoding.

13          Perhacs, she told you that Dr. Ruan was a whale.  That

14  there were three whales.  Now, it doesn't make reference to his

15  size; it makes reference to him being a huge prescriber, thus a

16  whale.  And told you that they weren't to lose the business to

17  Abstral and so she began to do everything she could do to

18  include reporting back to her company that Abstral was courting

19  Dr. Ruan and Dr. Couch pretty heavily.  And they were trying to

20  get their share of the market back.

21          She told you that Ruan and Couch wrote more Subsys and

22  Abstral than oncologists.  She told you that they weren't

23  having other people come to these so-called speaker programs,

24  but usually the people there in the office.  Well, nobody in

25  the office could write these drugs.  So there was no benefit to

REBUTTAL ARGUMENT OF MS. GRIFFIN

 1    talking to people that don't have DEA licenses and can't write

 2    prescriptions, but it justified that five minutes of saying

 3    that -- whatever Subsys wanted him to say.

 4            And you heard Dr. Ruan admit that in those little five

 5    minute spiels they couldn't say that you could write Subsys

 6    off-label, because that's forbidden.  Manufacturers cannot

 7    promote the off-label prescribing of a drug that is only

 8    approved for a certain use by the FDA.

 9            But you heard Dr. Ruan tell you that -- but if he got

10    asked one-on-one, he would say that he did it and he used it

11    all the time.

12            Now, what we're talking about here -- if I can get

13    this to work -- is they are drug dealers.  You can't serve two

14    masters.  You either serve your patients or you serve the

15    people who are paying you.  We're not going to look at just one

16    thing that happened in this case, on one day or one

17    patient.  We're looking at the totality of the circumstances.

18            These doctors were bought and paid for, Ruan by

19    Exalgo, both of them by Subsys, IPM, and CRM.

20            United States.  When you think about some of the best

21    medical treatment in the country, the premier doctors in the

22    country, do you think that they were all at PPSA, in Mobile,

23    Alabama?  Of course not.  They weren't cancer doctors.  They're

24    pain doctors.  Yet they wrote in the top five of cancer drugs

25    in the United States; every state, every single state.  They

REBUTTAL ARGUMENT OF MS. GRIFFIN

1    wrote more of controlled substances in the state of Alabama,

2    the majority of the drugs charged in counts two and three than

3    any other doctor.  And C&R was right up there on the top on

4    filling the drugs they wrote.  Remember?  Double-dipping.

5         The Court will tell you that there's no expert

6    required; that you may use your common sense to make a decision

7    on whether treatment was outside the usual course of

8    professional practice or not, that the United States does not

9    have to call an expert.

10        Warfield, you will remember, despite what she told you

11   also admitted that she, in another speaking engagement for

12   which she was paid, had said she was not an advocate -- she was

13   not a big advocate of using opioids for chronic pain.

14        That's not what she told you when she testified here

15   before you.

16        Dr. Vohra refused to be paid, reviewed the files he

17   testified about, took no money.  He's a pain doctor.  He told

18   you what you do to make sure that your patients comply.  And

19   that wasn't refuted.

20        Debi Phillips told you that Dr. Ruan was on top of

21   everything, that he knew everything that jumped at that

22   clinic.  And we contend to you that he did everything about

23   billing, everything that went on there.

24        She also told you that when it came to billing no

25   matter what the ladies in the billing department thought, that

1    they did what the doctor said.  And she told you that the

2    templates -- that the doctors were allowed to decide their own

3    templates.  So when you suddenly see that Mr. Brennan who

4    doesn't have a cervical collar suddenly starts showing up in

5    their files as wearing a cervical collar, you know that the

6    files are not correct.

7           And one of the things that's used to decide if you get

8    paid for a 14 or a 13 is how much an exam you did.  So if you

9    put in your template that you're doing 15, 18, 30 different

10   things, you're likely to get approved as billing for a 14 even

11   though you heard the witnesses say those weren't the types of

12   exams they were actually doing -- that were being done.

13          You also saw an email from Dr. Ruan where he says:  I

14   do most of the billing.  Not the ladies.  Because it's up to

15   him.

16          You heard all the experts that testified admit to you

17   that their review was only as good as the charts that they saw,

18   that if the chart was false, their review had to be false.  If

19   the chart wasn't true, that they could not give a valid

20   opinion.

21          You also heard them tell you that there was a

22   spectrum, that there were great doctors, there were okay

23   doctors and there were bad doctors.  These doctors were greedy

24   doctors and they made decisions based on money from their

25   clients, that you could run more people in, you could bill for

1    a doctor visit, you could prescribe for the people that were

2    paying you.  Remember, you can't have two masters.  If you're

3    waiting -- if you're serving your patient, you can't do it if

4    you're being paid by someone else.

5            Tamison Blanks told you that nobody cared that she got

6    addicted when they put her on Subsys, that she had to go -- she

7    passed out taking her meds then on a heating pad and burned

8    herself so badly.

9            You heard from Ms. Dominguez Buckley that Dr. Ruan

10   told her:  I can't make anymore money off of you.  Because she

11   was a Medicare patient.  I can't make anymore money off you.

12   That's like saying:  I can't help you anymore, you need to go

13   to a different specialist.  I can't make anymore money off of

14   you.  Outside the usual course of professional practice.

15           Counts one through four involve all the witnesses and

16   all the exhibits.  Count two is all witnesses and all exhibits.

17           Count three is all the witnesses and all the exhibits,

18   as pertains to fentanyl.

19           Count four is your hydrocodone count.  Counts five,

20   six and seven are your Brennan undercover counts.  The first

21   one is 43-second count, the second one is where he sees Stacy

22   again.  The third one is where he sees Bridgette, he asked for

23   10 more and he receives 20 more of Roxies, controlled

24   substance.

25           No effort to try anything first before.  He walks in

1   and admits criminal activity as to how he's gotten drugs and

2   he's suddenly given controlled substances.

3             Counts 13 and 14 involve Exhibits 21 and Exhibit 13.

4   Those are the medical files.  You heard from Ms. Chausse who

5   told you that she went to the treatment program with her

6   husband who had served in the United States military.  She told

7   you that before they went there they could go on a date night,

8   they could go out for pizza, that they could take a walk, that

9   they could do things that couples do.  And that once he went

10   there and got put on the drugs that he was put on, that he was

11   angry and that he would sit over in the corner and that he

12   wasn't her husband anymore, and that she begged them to take

13   him off the drugs right in front of him, and they kept putting

14   him on them and on them and on them.

15             Counts 15 through 17.  Count 15 is the billing count

16   to the insurance companies.

17             Count 16 involves Manfuso, IPM, CRM, and workmens'

18   compensation.

19             Count 17 is Subsys that we've talked about

20   extensively.

21             Count 19 is wire and mail fraud conspiracy.

22             Ruan, money laundering counts, counts 20, 21, and

23   22.  Count 20 is the money laundering conspiracy with Manfuso

24   where the money is being diverted from PPSA, going from

25   Manfuso's company to Dr. Ruan's residence, made out to his

1    private companies that aren't connected with PPSA.

2          Those exhibits are 36-2 and 36-2(a) in support of that

3    count.

4          Count 21 is a wire transfer for the purchase of an

5    Audi Spyder.

6          Count 22 is a wire transfer purchase of a Lamborghini.

7    Both of those vehicles cost more than $10,000.  The statute

8    requires a monetary transaction in excess of $10,000.  Both of

9    those were over $100,000.

10         There were wire transfers of monies that the exhibits

11   show you went into PPSA accounts, then went into State Bank &

12   Trust as being T-accounts belonging to Dr. Ruan.  They were

13   ultimately wired to purchase those particular vehicles.

14         I remind you that Manfuso is Exhibit 28 and that his

15   testimony supports counts one through four, count 16, count 17,

16   and counts 19 through 22.

17         You heard him tell you that he was going to make them

18   more money than a pharmacy.

19         That repackaged billed at a hundred percent and higher

20   and that in all the 12 years he had done this work, he never

21   had anything like he had with Dr. Ruan because Dr. Ruan kept

22   telling him he was going to break away and not use him if he

23   didn't pay more, and extorted it on up to $80,000 a month.

24         Ruan's average number of bottles prescribed was

25   extremely high.  The average was 704 a month, $704.

1          THE CLERK:  Ms. Griffin, 10 minutes.

2          MS. GRIFFIN:  Thank you.  Ruan continuously brought up

3   what competitors could do and threatened to quit; the revenue

4   followed the number of bottles prescribed, so the number of

5   bottles prescribed was high.

6          Ruan wanted to know the profit margins.

7          Manfuso, going to make really good money, $80,000 a

8   month sent to your home which has nothing to do with the money

9   you're making from PPSA or C&R Pharmacy.

10          The totals are astronomical for the two doctors.  It's

11   over two and a half million dollars.

12          Ruan's patient Gary Douthitt, he used the urine from

13   his child, and he had track marks.  Dr. Ruan didn't even look

14   to see where he's been shooting up, where he's been using

15   I.V.s.  Jesi Kamper, even Sharon Noland, looked in that file

16   and left a note that said:  Please review the drug query before

17   the next prescription.  Which tells you they weren't looking at

18   the PDMP for Jesi Kamper.  And it's not just not looking to the

19   PDMP.  It's not just one thing.  It's all the circumstances

20   connected with these drugs.

21          It's also like Ms. Buckley Dominguez or Ms. Dominguez

22   Buckley telling you she told Matt that she saw drug

23   transactions in the parking lot.  Nothing happened.  Nothing

24   changed.

25          Shawn Brennan, we had been through the 43-second

 1    count.  Never saw Couch.  Sharon Noland said that the drugs

 2    that were prescribed by Dr. Ruan were just like the flavor of

 3    the day.  Whatever he decided to give out that day is what the

 4    patients got changed to.  Outside the usual course of

 5    professional practice.

 6          We talked about Ruan's pre-signed scripts.  We talked

 7    about Ruan's donations to LSU, coming two days after he learns

 8    that Awerbuch, Dr. Awerbuch has been charged for kickbacks from

 9    Subsys.  He suddenly doesn't want a paper trail but, oh, he

10    wants the benefit of having something named at the university

11    after him.  And he has the money sent directly from Insys to

12    those institutions so it can't be traced directly back to him.

13          Justin Palmer, counts one through 17, and count 19.

14          And his testimony pertains to those counts.

15          Bridgette Parker, her testimony pertains to counts one

16    through 17 and count 19.

17          She told you that we "wrote lots of fentanyl and we

18    used often when it shouldn't be."  She also said that they

19    wrote lots of Exalgo.  And she told you and you could tell she

20    had been a user.  It was obvious.  Y'all knew that.  And the

21    doctor should have known that.  They are trained to notice

22    that.

23          She said it was wrong to sign them up ahead of time.

24    And she's talking about the prescriptions.  She knew it was

25    wrong even in her altered state.

6304

1        Couch tells her the FBI is looking at PPSA.  Well, if

2   you're not doing anything wrong and somebody tells you the FBI

3   is coming to look at you, you say:  Bring it on.  Go ahead.

4   There's nothing.  I'm not doing anything.

5        But instead, Dr. Ruan runs to his lawyer and wants to

6   know if we can break up the company, try to figure something

7   out.  Because they must think they're doing something.

8        Now, you heard from Mr. Burns who talked to you about

9   his wife Kathleen.  Remember?  He said no cancer.  But she

10  would be like a drug addict, that lethargic and pass out,

11  because the scripts she was being prescribed by Dr. Ruan were

12  too strong for her condition.  Outside the usual course of

13  professional practice.

14       Yet Ruan -- and you saw it -- he testified, claimed

15  she had cancer to get that prescription -- those prescriptions

16  approved.

17       Mr. Walker.  Y'all all remember Mr. Walker.  His wife

18  was Ruan's patient.  His exhibits are number 13.  And he talked

19  about having to call the ambulance for her because she would

20  pass out on that strong medicine.  And remember?  He talked

21  that he came home one day and that she had burned the food and

22  she was fixing her supper and that he was afraid the house

23  would burn down because she was passing out so from the strong

24  drugs that she was being prescribed from Dr. Ruan, and that she

25  had no function.  She had no life because of those medications.

1          You also heard from Amanda Chausse.  You remember her,
2    the tearful young lady, talking about he was a Couch patient.
3    She's Exhibit 13.  And that they kept saying it was too much
4    medicine.  What a handsome couple.  Military honors.  And
5    they're loading him up with dope, and suddenly he can't do
6    anything.
7          Natalie Perhacs, her exhibits are number 32.  And her
8    testimony pertains to counts one, three, 17, and 19.
9          ARCOS, Nancy Jackson, Exhibit 40; she tells you that
10   Ruan had 510 orders to the national average of 72.  Remember
11   the picture of the United States?  That's the national average.
12   He had over five times more than anybody else in the nation.
13         For the fentanyl patches, in 2013, the national
14   average was 66.  He had 1705.  Astronomical.
15         One nanogram of Subsys or Abstral equals one millionth
16   of a gram.  In 2013 C&R Pharmacy had 57 grams.  In 2014 they
17   had 105 grams.  Because they almost doubled the number that
18   they wrote of fentanyl in those years.
19         And yet Dr. Ruan wants you to believe that what he did
20   was based on medical need.
21         Dr. Greenberg went through the files he reviewed, the
22   various counts.  Most of those exhibits start with number 31 or
23   number 13 to support counts eight, nine, 10, 11, 12, and 14.
24         Dr. Vohra, his exhibits are number 22.  His testimony
25   supports counts one through 17 and count 19.

 1          You will recall that his rule was start low, go slow,
 2    and weigh the risk versus the benefits, and that he told you
 3    also that doctors had to give informed consent.  You can't have
 4    that by a flier in your medication.  You can't have that by a
 5    nurse practitioner.
 6          Dr. Vohra said you make your own diagnosis and your
 7    own exam, and that the records he saw from PPSA looked like
 8    cookie-cutter exams.  He talked about the morphine equivalents
 9    being dangerous from 90 to 10, 90 to 100 over there being
10    dangerous.  And if it was over 90 to 100, the chance for dying
11    went up five to six times.
12          He talked about various patients contained in Exhibit
13    22.  He told you that he sees pain patients every day and he's
14    never prescribed Subsys or Abstral.
15          Dr. Aultman, the holy trinity gets you high.  You
16    heard the paperwork and you heard the charts where they were
17    prescribing the holy trinity.  She told you forgery was
18    illegal, that NPs signing doctors' names was illegal, and that
19    you keep good medical records in case you get hit by a bus.
20    You get hit by a bus going home, somebody can look at a medical
21    record and tell what you've been doing.
22          Enterprise.  They were all in it together.  They wrote
23    the scripts.  They were told to fill it at C&R Pharmacy many
24    times and they owned the pharmacy.  They double dipped.
25          People don't die from pain.  But pain meds can cause

 1    the pain to be worse.  And you heard that.  When you reach a
 2    certain level going up, up, up, that pain can be worse.
 3              We talked about Warfield, that she said the
 4    two-second exam was sufficient.
 5              We talked about the Couch and Ruan emails; Couch
 6    telling you patients are notorious for completely lying.
 7              Blue Cross/Blue Shield.  We heard about the billing.
 8    Tricare was counts one, 15, and 19, the testimony about the
 9    monies that were paid.  United Healthcare, Galena.  You heard
10    that Galena offered $500 per patient for a study but Ruan
11    wanted more money than that.  And his testimony about Galena
12    pertains to counts one and three.  These two doctors wrote
13    every script in the entire United States, one out of every
14    three for Abstral.  When they were arrested, Abstral had to
15    sell -- the company, Galena, had to sell the product Abstral
16    because they were writing one-third in the entire United
17    States.  Ask yourself:  Is that outside the usual course of
18    professional practice?
19              With freedom comes responsibility.
20              We live in a country that gives us this right to trial
21    by jury.  And the responsibility is to be accountable for your
22    behavior and your actions.  And you have a responsibility with
23    freedom, to follow the law.
24              THE COURT:  Ms. Griffin, it's time to wind up, please.
25              MS. GRIFFIN:  Evil triumphs when good men and women

1   like yourself do nothing.  You know where justice lies in this

2   case.  And by your verdict you will speak.

3          Thank you.

4          THE COURT:  All right.  Ladies and gentlemen, you've

5   put in a good long hard day.  I want you to go home

6   tonight.  Don't talk about this case.  Try not to even think

7   about it.  Be back downstairs in the jury assembly room

8   tomorrow morning at 9 a.m. and I will call you up at that time

9   and then I will give you the instructions on the law.  And

10   after that you will go and deliberate on the case.

11          Have a good evening.  Leave your pad on your chairs,

12   if you will.

13      (In open court, defendants present, jury not present.)

14          THE COURT:  Let me see the lawyers at side bar for

15   just a minute.

16      (At the side bar, jury not present.)

17          THE COURT:  I just want to talk to you about the

18   alternates.  We had that one issue come up where the one juror

19   said she overheard the other juror just talking to herself,

20   with the possibility that she may have had some predecision in

21   the case before the trial was over.

22          My thought is perhaps we should make her, who is the

23   very first witness in the box now -- or juror, not witness --

24   and the last one, who is number 16, the two alternates in this

25   case.

6309

```
 1            MR. KNIZLEY:  Dr. Ruan objects.
 2            MR. SHARMAN:  We do too.  We have two alternates,
 3   don't we?
 4            THE COURT:  We have what?
 5            MR. SHARMAN:  We have alternates, don't we?
 6            THE COURT:  You have --
 7            MR. SHARMAN:  We have alternates right now, don't we?
 8            THE COURT:  There are two alternates.
 9            MR. SHARMAN:  Yes, ma'am.
10            THE COURT:  They are never told who they are.
11            MR. SHARMAN:  Yes, ma'am.
12            THE COURT:  So, I mean, they don't know if they are
13   alternates.  And we --
14            MR. SHARMAN:  Dr. Couch objects.  I don't --
15            THE COURT:  On what ground?
16            MR. SHARMAN:  There's no reason to change, make that
17   change.
18            MR. KNIZLEY:  No basis at all.  I mean, we --
19            THE COURT:  Come here.  I can't hear you.
20            MR. KNIZLEY:  -- we're satisfied with the jury that
21   was struck and impaneled and there is no basis to change that
22   makeup of the jury.
23            THE COURT:  Well, there was an allegation made by one
24   of the jurors against another juror.  And so I thought that
25   would resolve any possibility of question about it.
```

6310

1         MR. SHARMAN:  Well, Your Honor, I believe, as we

2   discussed in chambers, that what happened was a report of a

3   juror essentially thinking out loud.  And jurors are presumed

4   to follow instructions, including to listen to all the evidence

5   and to keep an open mind.  And based on the report that the

6   Court received, the Court properly decided that there was

7   nothing to even investigate, much less to do.

8         THE COURT:  How would that prejudice you at all?

9         MR. KNIZLEY:  We want the jury that we struck.

10         THE COURT:  Well --

11         MR. KNIZLEY:  No, ma'am.

12         THE COURT:  -- she's one of them.

13         MS. GRIFFIN:  There's alternates.

14         MR. KNIZLEY:  We struck the jury and the alternates

15   were outside, they were --

16         THE COURT:  But we've already lost two regular jurors.

17   So if we lost two more, they would have been on the jury, she

18   would have been part of the jury.  So --

19         MR. SHARMAN:  She would have been, but without --

20   without action --

21         MR. KNIZLEY:  By the Court.

22         MR. SHARMAN:  -- internally.  I mean, it would have

23   been like a car wreck or some external action.  That's

24   obviously why one has alternates.  But if there is not a reason

25   to move a juror from her current status to alternate status,

6311

1    then she shouldn't be moved.

2              THE COURT:  Well, I think there is a reason.  I mean,

3    I don't want anything in this record to cloud whatever their

4    verdict might be.

5              MR. KNIZLEY:  Well, the defendant has no objection

6    whatsoever, so we can't cloud it.  And the government can't

7    appeal, so I don't think there's anything to cloud the record.

8              MS. GRIFFIN:  Your Honor, the juror that reported it,

9    obviously there had been something that bothered her.  She said

10   She had continued to thinking about it and she reported it

11   because they were told not to be talking and not to have any

12   preconceived notions and she heard this juror talking either to

13   herself or talking out loud, clearly, about having some

14   preconceived notions.

15             MR. SHARMAN:  And, Your Honor, that would be the

16   external articulation of a juror's internal thoughts.  I mean,

17   the Court surely would not begin polling jurors to say:  Where

18   are you?

19             That was just -- that was just a literal incidence of

20   somebody talking to themselves.

21             THE COURT:  Well, I understand.

22             MR. SHARMAN:  They weren't taking to somebody else.

23             MR. KNIZLEY:  And the content of it does not

24   necessarily conclude one way or the other whether, one, she had

25   a previous decision and what it might be.  It just could have

6312

```
 1   been a comment, a week-old comment.  It was just on -- we don't
 2   even know what it was about.  I mean, it may have been talking
 3   about one witness, it may have been anything.  I mean, I just
 4   don't think it's a basis for removing this juror.
 5        THE COURT:  All I'm saying, one juror was concerned
 6   enough about it that she thought she ought to report it to the
 7   Court.  So to me it makes sense to do that.  Since all of them
 8   have been very attentive, all of them paid good attention --
 9        MR. KNIZLEY:  Judge, the defendant exercised their
10   strikes in such a fashion and in such an order and there is a
11   segment of the jurors that are alternates.  And --
12        THE COURT:  Two of whom are now jurors.
13        MR. KNIZLEY:  Certainly.  But we want our primary jury
14   that we struck to serve, if they at all can.
15        THE COURT:  Well, I'll think about it tonight.  But my
16   inclination is to make her one of the alternates.  I'm just
17   letting you know my thoughts.
18        MR. SHARMAN:  Your Honor, I would request -- again, I
19   join Mr. Knizley.  I don't believe there's a basis for it.  And
20   I would request that if the Court did that, that the Court call
21   the juror in and make a record so as to preserve --
22        THE COURT:  I'm not going to do that.  We know what
23   somebody overheard her saying, and that's all the record we
24   need of that.  So I'm just still thinking about it.  But I'm
25   telling you what my inclination is.  We'll see you in the
```

1    morning.

2        (Court adjourned at approximately 5:11 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25